# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>Stream TV Networks, Inc., *et al*.[1]<br><br>    The Debtors. | Chapter 11<br><br>Bankr. Case No. 23-10763 (AMC)<br>(Jointly Administered) |

## DESIGNATION OF RECORD ON APPEAL AND STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

Appellant, Visual Semiconductor ("VSI"), by and through his undersigned counsel, designates the following items to be included in the record on appeal, pursuant to the *Notice of Appeal and Statement of Election* dated November 27, 2024 [ECF No. 821], from the *Order Approving settlement between Trustee, Hawk Investment Holdings, Ltd., SeeCubic, Inc.* [ECF No. 805] and sets forth his statement of issues to be presented on appeal:

## I.    Record on Appeal[2]

|  | ECF DKT. NO. | DOCKET DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 49 | 03/28/23 | Emergency Motion For Entry Of An Order Enforcing The Automatic Stay And For Sanctions For Willful Stay Violation |
| 2. | 458 | 11/06/23 | Additional Supplement to Debtors' Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations. |
| 3. | 517 | 12/14/23 | Stipulated Order Restating and Enforcing the Worldwide Automatic Stay |

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] All items designated herein include all exhibits, filed with, attached to, or otherwise referenced in such pleadings.

| 4. | 630 | 05/06/24 | Motion of William A. Homony in his Capacity as Chapter 11 Trustee for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd., as Collateral Agent for The Secured Noteholders of Seecubic, Inc., Pursuant To Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a). |
| 5. | 642 | 05/20/24 | Objection of Visual Semiconductor, Inc. to the Motion of the Chapter 11 Trustee to Approve Settlement Agreement And Mutual Release with Hawk Investment Holdings, Ltd, as Collateral Agent for The Secured Noteholders of Seecubic, Inc., Pursuant to Fed. R. Bankr. P. 9109(a) and 11 U.S.C. § 105. |
| 6. | 643 | 05/20/24 | Rembrandt 3d Holding Ltd.'s Objection to Motion of William A. Homony in his Capacity as Chapter 11 Trustee for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd., as Collateral Agent for The Secured Noteholders of Seecubic, Inc., Pursuant To Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a). |
| 7. | 653 | 06/06/24 | Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a). |
| **8.** | **670** | **Transcript attached as Exh. A** | **Transcript of Hearing re: Hearing held on June 5, 2024** |
| 9. | 678 | 06/18/24 | Objection of Visual Semiconductor, Inc. to the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property. |
| 10. | 686 | 06/20/24 | Visual Semiconductor, Inc.'s Motion to Reconsider and/or Clarify Order Approving Settlement Agreement Between Chapter 11 Trustee and Hawk Investment Holdings, Ltd (ECF No. 653). |
| 11. | 700 | 07/05/24 | Opposition of William A. Homony In His Capacity as Chapter 11 Trustee to Motion of Visual Semiconductor, Inc. to Reconsider and/or Clarify Order Approving Settlement Agreement Between Chapter 11 Trustee and Hawk Investment Holdings, Ltd. |

79125023;2

| 12. | 724 | 08/29/24 | Motion of William A. Homony In His Capacity as Chapter 11 Trustee for entry of an Order: (i) Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena; (iii) Entering a Protective Order; and (iv) Granting Related Relief. |
|---|---|---|---|
| 13. | 728 | 09/04/24 | Visual Semiconductor, Inc.'s Motion to Compel and Objection to Trustee's (a) Motion for Entry of Orders: (i) Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena; (iii) Entering a Protective Order; and (iv) Granting Related Relief; and (b) Trustee's Motion for Entry of an Order; and (b) Motion for Entry of Orders: (i) Granting Expedited Consideration, Shortened Time and Limited Notice; and (ii) For Authority to Withdraw the Trustee's Motion for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property Without Prejudice. |
| 14. | **786** | **Transcript attached as Exh. B** | **Transcript of Hearing re: Hearing held on October 30, 2024** |
| 15. | **796** | **Transcript attached as Exh. C** | **Transcript of Hearing re: Hearing held on November 7, 2024** |
| 16. | 805 | 11/14/24 | Order Denying Motion for Reconsideration; Granting Motion to Quash with Respect to the Remaining VSI Discovery Requests; Denying Motion to Compel with Respect to Remaining Discovery Requests. |
| 17. | **807** | **Transcript attached as Exh. D** | **Transcript of Hearing re: Hearing held on November 13, 2024** |
| 18. | 824 | 11/27/24 | Rembrandt 3d Holding Ltd.'s Motion Seeking (i) Enforcement of the Temporary Restraining Order, (ii) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (Iii) Injunctive Relief. |
| 19. | 828 | 11/27/24 | Visual Semiconductor Inc.'s Joinder to Rembrandt 3d Holding Ltd.'s Motion Seeking Enforcement of the Temporary Restraining Order, Sanctions Against Parties Who Violated the Temporary Restraining Order, and Injunctive Relief. |

79125023;2

**ADVERSARY PROCEEDING (*In Re:  Stream Tv Networks, Inc. And Technovative Media, Inc. V. Shadron L. Stastney, et al*., ADV. NO. 23-00057-MDC)**

|  | ECF DKT. NO. | DOCKET DATE | DESCRIPTION |
|---|---|---|---|
| 20. | 75 | **Transcript attached as Exh. E** | Transcript regarding hearing held on October 16, 2023. |
| 21. | 109 | **Transcript attached as Exh. F** | Transcript regarding hearing held on November 27, 2023 |
| 22. | 119 | 01/04/24 | Order Granting Temporary Restraining Order |

## II.    Statement of Issues on Appeal

1.    Whether the Bankruptcy Court erred in approving the settlement as being in the best interest of the Debtors' estates, creditors and equity and maximizing the benefit to the Debtors' estates and which favors Hawk Investment Holdings, Ltd. and SeeCubic, Inc. by granting them the right to credit bid as the "stalking horse" bid for sale of the Debtors' assets, notwithstanding demonstrated their demonstrated misconduct in the case.

Dated:  New York, New York
      December 11, 2024

**AKERMAN LLP**

By:   */s/Donald N. David*
      Donald N. David (SBN # 304846)
      1251 Avenue of the Americas, 37th Floor
      New York, NY 10020
      Telephone: (212) 880-3856
      Facsimile: (212) 880-8965
      Email: donald.david@akerman.com

      -and-

      R. Adam Swick (admitted *pro hac vice*)
      500 W. 5th Street, Suite 1210
      Austin, TX 78701
      Telephone: (737) 999-7100
      Facsimile: (512) 623-6701
      Email: adam.swick@akerman.com

-and-

John H. Thompson (admitted *pro hac vice*)
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Telephone: (202) 393-6222
Facsimile: (202) 393-5959
Email: john.thompson@akerman.com
Attorneys for Visual Semiconductor Inc.

79125023;2

# EXHIBIT A

```
                    UNITED STATES BANKRUPTCY COURT

                 FOR THE DISTRICT OF PENNSYLVANIA

                                        :
IN RE:                                  : Case No.  23-10763-amc
                                        :
STREAM TV NETWORKS, INC.  CH: 11 :
AND NETWORKS, INC. AND                  : Philadelphia, Pennsylvania
TECHNOVATIVE MEDIA, INC.                : June 5, 2024
                                        : 11:17 a.m.
. . . . . . . . . . . . . . . . . .:


                 BEFORE THE HONORABLE ASHELY M. CHAN
                   UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

 For the  Debtor:              Rafael X. Zahralddin
                               Lewis Brisbois Bisgaard & Smith
                               500 Delaware Avenue, Suite 700
                               Wilmington, DE 19801
                               302-985-6004


 For SeeCubic, Inc.:           Eben P. Colby, Esq.
                               Skadden Arps Slate Meagher &
                               Flom, LLP
                               500 Boylston Street, 23rd Floor
                               Boston, MA 021116
                               617-573-4800


 For the Chapter 11 Trustee:   Michael D. Vagnoni, Esq.
                               Edmond M. George, Esq.
                               Obermayer Rebmann Maxwell &
                               Hippel LLP
                               Centre Square West
                               1500 Market Street, Suite 3400
                               Philadelphia, PA 19102
                               215-665-3066

                               Steven M. Coren, Esq.
                               Kaufman Coren & Ress, P.C.
                               Two Commerce Square
                               Suite 3900
                               2001 Market Street
                               Philadelphia, PA 19103-2713
                               215-735-8700
```

For Shadron Stasney:                    Terence M. Grugan, Esq.
                                        1735 Market Street
                                        51st Floor
                                        Ballard Spahr
                                        Philadelphia, PA 19103
                                        215-864-8320

For Rembrandt:                          Andrew Peter Demarco
                                        Devlin Law Firm, LLC
                                        1526 Gilpin Avenue
                                        Wilmington, DE 19806
                                        302-449-9010

For Hawk Investment Holdings            Steven Caponi, Esq.
Ltd.:                                   K&L Gates
                                        600 N King Street
                                        Suite 901
                                        Wilmington, DE 19801
                                        302-416-7080

For SLS Holdings:                       Davis Wright, Esq.
                                        Robinson Cole
                                        1201 North Market Street
                                        Suite 1406
                                        Wilmington, DE 19801
                                        302-516-1701

For the Trustee:                        Kevin M. Callahan
                                        DOJ-UST
                                        Robert N.C. Nix Federal
                                        Building
                                        900 Market Street
                                        Suite 320
                                        Philadelphia, PA 19107
                                        215-597-4411

For Visual Semiconductor,               Leslie Beth Baskin
Inc.:                                   Spector Gadon Rosen Vinci P.C.
                                        1635 Market Street
                                        Seven Penn Center - 7th Floor
                                        Philadelphia, PA 19103
                                        (215) 241-8888

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
                              INDEX

                       Direct   Cross   Redirect   Recross

WITNESSES:

William Homony
     (By Mr. George)          47
     (By Mr. Michaels)                  70
     (By Ms. Baskin)                    79
```

```
 1   JUNE 5, 2024                                    11:17 A.M.

 2            THE BAILIFF:  Back to the matters involving Stream

 3   TV.  Okay.  Numbers 27 through 31 on the list.  I know I have

 4   several parties on the line.  Do you want to start with the

 5   people in the courtroom?

 6            THE COURT:  All right.  We're going to start with

 7   people in the courtroom first.

 8            THE BAILIFF:  Okay.  Okay.  Everyone in the courtroom

 9   who is assembling could enter their appearances on the record,

10   please.  And please speak directly into the microphone so

11   everyone on the telephone can hear you.

12            MS. BASKIN:  Good morning, Your Honor.  Leslie Beth

13   Baskin, Spector Gadson Rosen Vinci on behalf of VSI.

14            THE COURT:  Good morning.

15            MR. GEORGE:  Good morning, Your Honor.  Edmond George

16   from the Obermayer firm.  With me, Mr. Vagnoni.  Mr. Vagnoni

17   may take a piece of this hearing.

18            THE COURT:  Good morning.  Steven Coren, special

19   counsel for the Trustee.

20            MR. CAPONI:  Morning, Your Honor.  Steven Caponi for

21   K&L Gates on behalf of Hawk Investments Limited in its capacity

22   as collateral agent. And that would be Margaret Westbrook and

23   Jonathan Edel.

24            THE COURT:  Welcome. Mr. Callaghan has entered the

25   courtroom.
```

1          MR. CALLAGHAN:  Morning, Your Honor.  Kevin Callaghan

2     on behalf of the United States Trustee.  Thank you, Your Honor.

3          THE COURT:  Good to see you.

4          MR. COLBY:  Morning, Your Honor.  Eben Colby of

5     Skadden Arps on behalf of SeeCubic, Inc.

6          THE COURT:  Okay.

7          MR. WRIGHT:  Morning, Your Honor.  Davis Wright with

8     Robinson & Cole on behalf of SLS Holdings VI, LLC.

9          THE COURT:  Welcome.

10         MR. GRUGAN:  Good morning, Your Honor.  Terence

11    Grugan from Ballard Spahr on behalf of Shadron Stasney. My

12    collogue --

13         THE COURT:  Okay.

14         MS. LASALLE:  Nekavia LaSalle (phonetic), Your Honor.

15    Nice to see you again.

16         THE COURT:  Welcome.

17         MR. DEMARCO:  Morning, Your Honor.  Andrew DeMarco

18    for Rembrandt.  With me as well is Rembrandt's co-counsel,

19    Christopher Michaels.

20         THE COURT:  Welcome.  Okay.  Do you want to take the

21    people on the phone, Pam?

22         THE BAILIFF:  Okay.  The parties on the line who are

23    here on Stream TV, if you could enter your appearances, please.

24    Try it one at a time, please.  Good luck.

25         MR. ZAHRALDDIN:  Good morning, Your Honor.  Rafael

1    Zahralddin from Lewis Brisbois.

2              THE COURT:  Okay.

3              MR. WALLACE:  morning, Judge.  Neil Wallace.  I'm

4    counsel for Rembrandt.

5              THE COURT:  Okay.  Is that everyone?

6              MR. RAJAN:  Good morning, Your Honor.  This is Mathu

7    Rajan.

8              THE COURT:  Okay.  Anyone else on the line?  Is there

9    anyone else on the line on the Stream TV case?

10             MR. BLUMENTHAL:  Morning, Your Honor.  Stephen

11   Blumenthal, CEO of Rembrandt 3D.

12             THE COURT:  Okay.  All right.  So I think we have

13   everyone here.  I know that we have a number of matters today.

14   But I'd like to first start with the application to retain

15   Capstone.  So I saw that there was -- unless you guys have like

16   a settlement or anything to report?

17             MR. GEORGE:  No, Judge.  No.  I don't think so.

18             THE COURT:  No settlement?  No?  Okay.

19             MR. GEORGE:  But I think we requested an adjournment

20   of the Capstone application.  I don't know whether we

21   communicate that to your courtroom deputy or not.

22             THE COURT:  I guess I saw so many different positions

23   on the Capstone application.  I just wanted to make sure that I

24   understood some basics.  Like there was conflicting things like

25   whether or not Capstone had signed a nondisclosure agreement.

1  Ms. Baskin said that they had.  And I understand that

2  Capstone's position was that it didn't.  So I thought the one

3  issue I'd like to hear from both of you on today is did they or

4  not sign a nondisclosure agreement?

5          MR. GEORGE:  Well, Your Honor, Capstone has

6  represented to us that they did not sign an NDA.  And I think

7  we asked for a copy of it --

8          THE COURT:  Yeah.

9          MR. GEORGE:  -- when it was reported, and I don't

10  believe we've been delivered one, so.

11         THE COURT:  Ms. Baskin?

12         MS. BASKIN:  Your Honor, I did make that

13  representation in the pleading.  I did advise at least Mr.

14  Callaghan that I was withdrawing that portion of the objection

15  and the portion of the objection as to conflict because I've

16  yet to be able to get a copy of the NDA from my client.

17         THE COURT:  Right.  So I guess, I guess I just have

18  concerns, right?  You're -- you have a stellar reputation.  And

19  I just want to make sure that as today's hearing unfolds that

20  we all know that, you know, we can't make statements that

21  aren't true.  There's a line between zealously advocating for

22  our client and the truth.

23         So when I saw that statement, that just gave my

24  pause.  Right because you're an attorney of the court, if you

25  tell me that they sign a nondisclosure agreement, I'm going to

```
 1   take you at your word.  So when I saw the affidavit from

 2   Capstone that they in fact hadn't done that, that just raised a

 3   red flag to me.

 4          So I see all of these statements in the affidavit by

 5   Capstone about how Capstone hadn't actually reached out to VSI.

 6   That instead, individuals from VSI were reaching out to them.

 7   So I thought in an effort to bypass the need for an evidentiary

 8   hearing, I would like to hear a proffer from you as to a

 9   response to the affidavit that was filed by Capstone so we

10   could at least make sure what actually happened.  Like if you

11   told me that you read the affidavit and it's patently untrue,

12   then I will hold an evidentiary hearing on this, and we will

13   get to the bottom of who is lying to me.

14          And obviously, you know, when people say things to me

15   that are untrue that is very concerning to me.  So I was

16   wondering if after you read the affidavit, if you had an

17   opportunity to talk to your client and see whether or not those

18   statements are statements you agree with, then perhaps you

19   should withdraw the entire objection to the Capstone

20   application.

21          MS. BASKIN:  A couple of points, Your Honor.

22          THE COURT:  Yeah?

23          MS. BASKIN:  Number one.  Yes, I did read the

24   affidavit.

25          THE COURT:  Yeah.
```

1            MS. BASKIN:  The original one, which I still have

2  problems with besides the NDA.  And also, the supplemental one.

3            THE COURT:  Yeah.

4            MS. BASKIN:  I sent the supplemental affidavit to my

5  client, and I asked them to mark up where they thought the

6  representations were accurate and where they were not accurate.

7            THE COURT:  Yeah.

8            MS. BASKIN:  I had a conversation via email or a

9  couple of them with Mr. Callaghan on this issue.  And I sent

10  him the marked-up version or my client's explanation --

11            THE COURT:  For the amended one?

12            MS. BASKIN:  Yes.

13            THE COURT:  Okay.

14            MS. BASKIN:  I asked them to keep it confidential.

15  At this point it doesn't really matter or not.  I'm looking for

16  the markups.  If you want me to mention them, they were like

17  three or four --

18            THE COURT:  I guess I just -- yeah, I just want to

19  see like, you know, are they totally wrong?  Do you totally

20  disagree?  Are they misrepresenting?  Do they either -- are

21  their statements patently false or did they omit things, right,

22  that you've got concerns about?  I just wanted to get that

23  proffer.

24            MS. BASKIN:  I think they misstated comments.  I know

25  that there were a series of conversations in May of 2022 about

1    Capstone working with VSI.

2           THE COURT:  Is it true that VSI was the one that

3    initiated that conversation?

4           MS. BASKIN:  There's conflict over that. You may need

5    testimony about that.

6           THE COURT:  Well, I guess I -- again, I am trying to

7    see if there's a way for me to bypass an evidentiary hearing by

8    asking basic questions like who initiated the conversation,

9    right?  That seems like something that shouldn't be

10   controversial.  So and I was kind of hoping that you would have

11   had like some kind of conversations with your client to say,

12   you know, did you -- because the way that it looks like in the

13   affidavit to me is that VSI is the one who approached Capstone.

14   And then in fact it says on May 8th, 2024, Rajan, is that how

15   we pronounce Rajan's name or?

16          MS. BASKIN:  Rajan.

17          THE COURT:  Rajan spoke to Bailey and provided a

18   general business update on VSI.  At that time, Bailey was

19   vaguely aware that Capstone may have had some involvement,

20   reached out to Justin O'Malley (phonetic), and then after that,

21   shut down all the communication.  So is it true that Rajan

22   reached out on May 8th after the application was filed to speak

23   to Mr. Bailey?

24          MS. BASKIN:  Yes, Your Honor.  But it was based on

25   prior conversations that they had.  Prior conversations

1   regarding the relationship between VSI and Capstone.  There was

2   an issue, I believe, with a gentlemen.  I have it.  If you

3   could just give me one second, I'll pull up the email that I

4   sent to Mr. Callaghan.

5            THE COURT:  Yeah.  And while you're doing that.  Mr.

6   Callaghan, so I know she asked you to keep it confidential.

7   But I guess I wanted to ask the US Trustee's office if they had

8   any similar concerns with the Capstone application.

9            MR. CALLAGHAN:  Well, Kevin Callaghan for the US

10  Trustee, Your Honor.  We have pending issue with the Capstone

11  engagement having nothing to do with this.

12           THE COURT:  What was your concern?

13           MR. CALLAGHAN:  It's an issue with respect to certain

14  provisions in the transaction agreement purporting to limit

15  Capstone's liability in the event.  And presently, we are

16  discussing that with Mr. Vagnoni, and I think Mr. George

17  suggested that they're going to request a short adjournment,

18  and we're hopeful we can work that out.

19           THE COURT:  All right.

20           MR. CALLAGHAN:  I too read the declaration.  The

21  amended declaration filed just a couple days ago.  And I too

22  was aware of the objection by VSI, which purported to -- well,

23  which stated as a fact that there was an NDA signed.  And I

24  appreciate that the Court reviewed that before today's hearing.

25           I reached out to Ms. Baskin yesterday requesting a

1    copy of the NDA and she did not produce it.  She -- and without

2    getting detail right now, she indicated that she doesn't have

3    it, but somebody purports to have something.

4            THE COURT:  Well, I thought she just said she

5    withdrew that statement and that suggests that there is no NDA.

6    Is that what you said, Ms. Baskin?

7            MR. CALLAGHAN:  Well, that's not the request.  That's

8    not the response I got.

9            THE COURT:  Okay.

10           MR. CALLAGHAN:  Well, that wasn't the response.  But

11   there was also a statement that -- well, I have the email.  The

12   person who purportedly has this document is in Paris and is

13   unreachable at the moment.  So I asked Ms. Baskin for a series

14   of questions.  Have you seen it?  What have you done to

15   determine whether there is one?  Who is this person?  Who made

16   this statement?  And Ms. Baskin responded last night, but

17   without that information.  This morning I asked her to provide

18   that information.

19           And Your Honor is asking whether there should be an

20   evidentiary hearing.  I'm not prepared to state if there should

21   or not should or there should be one until we get that

22   information.  But I assure the Court that the US Trustee is

23   extremely concerned about representations made by one of the

24   parties that are clearly not accurate.  We have one declaration

25   under oath and another statement by counsel in a pleading, not

```
 1   upon information or belief if there was an NDA.

 2          Ms. Baskin has assured me that she's going to

 3   cooperate and find out who the parties were who made these

 4   representations and who -- the other questions that the Court

 5   has just asked whether who had who actually and initially

 6   approached Capstone with respect to doing that.  So I see this

 7   as a still floating issue.  And until we receive that

 8   information, and everything is fine, we can move on, but yes.

 9          THE COURT:  Thank you for your thoughts, Mr.

10   Callaghan.

11          MS. BASKIN:  Well, I'd like to respond to a couple

12   comments that Mr. Callaghan made. Okay.  Number one, when he

13   said that I responded last night, he sent me an email

14   questioning this at 5:05.  I responded to him that I had a

15   cardiologist appointment at 5:30, but I was cancelling it so I

16   could get back to him.  So his blanket statement that I

17   responded last night should be taken in context.  I responded

18   to him immediately.

19          I had advised him that I was withdrawing that part of

20   the application and that he was correct.  I probably phrased it

21   incorrectly.  I should have listed, or I should have stated in

22   the objection that upon information and belief.  I admit I did

23   not do that.  That is my mistake.  I had -- he had asked me

24   what due diligence I did. I mean, it seems like this is more

25   about me than about the objection.  But that's okay.  I accept
```

 1   that.

 2          THE COURT:  Well, the reason why it's about you is

 3   because when you stated without any kind of conditions that

 4   there was NDA and then I have an affidavit saying that there

 5   wasn't an NDA, at that point I know that someone is not telling

 6   me the truth.  So at that point, I take it very seriously and I

 7   just want to make sure that I know exactly what's going on.

 8          So the fact that you stood here today, I think what I

 9   heard you say was that you don't have the NDA in your hands and

10   you're withdrawing that part of your application.  I assume

11   that means that you haven't seen the NDA; is that correct?

12          MS. BASKIN:  Correct, because my understanding in

13   speaking to the client five times over the past couple of weeks

14   and prior to my filing the objection was that they were

15   forwarding it to me.  The never forwarded it to me.

16          THE COURT:  I know.  They're making you look bad

17   here, Ms. Baskin.

18          MS. BASKIN:  They are making me look bad but --

19          THE COURT:  This is not good.

20          MS. BASKIN:  This is not the first client whose done

21   that, so I accept it.  That's part of my job.

22          But I must say that I had gotten more details and I'm

23   putting on the record as I told --

24          THE COURT:  So there's someone one the phone who just

25   spoke.  You may have accidentally taken yourself off of mute.

1  But I'd ask that you put yourself back on mute or we'll do it

2  too.  Go ahead.

3          MS. BASKIN:  My understanding in speaking with the

4  client and the client's right-hand person, Nicole Medine

5  (phonetic), that there's a gentlemen, Dan Rink (phonetic) who's

6  the inhouse counsel at VSI.  I was advised that he had the

7  document.  I was advised that way all along.  When I kept on

8  saying please provide it to me, they said he is in Paris.  He

9  is not taking work calls.  And when he returns, he will send it

10  to you.

11          THE COURT:  When's he getting back from vacation?

12          MS. BASKIN:  In about a week.

13          THE COURT:  Okay.  So we are going to continue the

14  hearing, but I am concerned.  You know, at this point, I'm

15  wondering whether or not your client made a representation to

16  you that's simply not true.  So obviously, you're on notice now

17  that we're all concerned about the statements that they're

18  making to you.  And, you know, you relied upon a statement,

19  right?  That's probably why you didn't put upon information.  I

20  mean, you probably should  have seen it.  But you didn't

21  realize it was an issue because the moment you saw the amended

22  affidavit, that's when I'm sure you realized there was a

23  disconnect.

24          So I would like you to make sure that before the next

25  hearing, you get to the bottom of it and you explain to them

1   that when they say things to you and you make that

2   representation, right, that they're -- that they need to be

3   true because --

4           MS. BASKIN:  I have had that conversation, Your

5   Honor.

6           THE COURT:  Right.  And so, if they're not true, then

7   that will affect my assessment of your client's credibility,

8   the gentleman or the people who are talking to you, okay.

9           MS. BASKIN:  And just to assure the Court --

10          THE COURT:  Yeah.

11          MS. BASKIN:  -- and other counsel here, I don't

12   knowingly do that.

13          THE COURT:  Yes.  I have -- I don't ever see you

14   making representations that aren't true.  But I am starting to

15   have concerns about the veracity of statements made to you by

16   your client.  So I'm positive that the next time we have a

17   hearing on Capstone's application, you will get to the bottom

18   of it.  And you will either tell me that they cannot produce

19   one, in which case I will make whatever inferences I need to

20   make.  But that going forward, you're not going to be making

21   statements that, you know, unless you've actually seen it, you

22   know, you're not going to tell me that a document exists.

23          MS. BASKIN:  I accept that, Your Honor.  And just one

24   other comment.

25          THE COURT:  Yeah?

1        MS. BASKIN:  Of course, other people could talk.

2    That was one of the objections.  I still believe that there are

3    other very valid objections that both I raised on behalf of VSI

4    and Rembrandt raised concerning what our major reason for being

5    here at the status conference is.

6        THE COURT:  Yeah.  I guess, I -- you know, it sounds

7    like -- okay.  I wanted to make sure I understood.  It didn't

8    appear to me that VSI is a creditor of this debtor.  Is that --

9        MS. BASKIN:  They are.

10       THE COURT:  I thought that they were just an equity

11   holder.  See, that's like another fact that we should all like

12   be on this --

13       MR. GEORGE:  Your Honor, they're not scheduled, and

14   they haven't filed a proof of claim.  They are listed as an

15   equity security holder as I understand from --

16       THE COURT:  It sounds like they're an equity security

17   holder, but that was another statement that you had made.  You

18   know, that -- sir, I just want to make sure that that guy --

19   we're here on case called Stream.  And just tell me, are you

20   here on a different matter?  What is the name of your case?

21       THE BAILIFF:  It's on at 12:30.

22       THE COURT:  It's on at 12:30.  So about an hour.

23   You're welcome to sit and listen to this, but you've got an

24   hour to kill.  No, no, no.  I just wanted to make sure you

25   weren't in the wrong courtroom.

1          So do you know with certainty that VSI is a creditor

2  of the Debtor?

3          MS. BASKIN:  Based upon representations that they

4  have made and notices that they have sent to me.

5          THE COURT:  And so, could you describe the basis of

6  their position as a creditor?  Did they loan money?  Did they

7  have a contract?

8          MS. BASKIN:  No.  Over the course of the bankruptcy

9  and prior to it they had made loans.

10          THE COURT:  Loans?

11          MS. BASKIN:  Loans to the company --

12          THE COURT:  Okay.

13          MS. BASKIN:  -- that were not equity infusions that

14  they are claiming were loans to the company.

15          THE COURT:  So why didn't they file a proof of claim?

16          MS. BASKIN:  I don't know that answer.  That was

17  before I was involved.

18          THE COURT:  Yeah.  So I guess another concern that I

19  guess I'd like you to raise with your client before we have the

20  continued hearing on the Capstone is, you know, when they tell

21  you that they're a creditor but they're not on the schedules

22  and they didn't file a proof of claim, then it starts to make

23  me think that they're not a creditor, right?  Again, maybe

24  they've got evidence of this, and at the next hearing we'll see

25  it.  But I guess I just want to, I just want to note to you and

 1    make sure that you pass along to them that it appears now that

 2    there's a couple of statements that they've made to you that

 3    I'm not sure are true, right?  And, you know, they're just

 4    telling you this.  And until you actually see the evidence, you

 5    won't know either.  But I trust that before the next hearing

 6    you will drill down and make sure that they provide evidence to

 7    you of the statements that they have made.  And hopefully

 8    you're starting to feel a little worried about, you know, some

 9    of the statements that they made to you too.

10              MS. BASKIN:  Yes, Your Honor.

11              THE COURT:  Okay.

12              MS. BASKIN:  I did think they have standing equity

13    holders also to raise certain issues.

14              THE COURT:  I mean, I wasn't questioning their right

15    as equity holders.  But I guess the concern I have is that if

16    it turns out at the end of the day that VSI is merely an equity

17    holder and Capstone forgot to run a conflict check on an equity

18    holder as opposed to forgetting to do a conflict check on a

19    creditor, those are two different things in my book, right?  If

20    Capstone is an unsecured creditor and they had a relationship

21    with Capstone beforehand, that's something that should have

22    been caught.  However, if they were merely an equity holder,

23    you know, I don't feel as concerned about that.

24              And I guess while we're on that topic, I'm also not

25    as concerned if the topic of discussion between VSI and

```
 1   Capstone was merely marketing VSI.  Like do you, have you seen

 2   any evidence that there was information given to Capstone about

 3   this debtor?

 4             MS. BASKIN:  Yes.

 5             THE COURT:  Okay.  Do you want to describe for that

 6   to me what you see?

 7             MS. BASKIN:  I can provide it to the Court.

 8             THE COURT:  Okay.  Do you want to just describe it

 9   just so I understand what information they gave just so I have

10   a ballpark understanding?

11             MS. BASKIN:  Information as to what VSI was doing on

12   behalf of Stream in order to market the proper or the assets of

13   Stream.  Not VSI, but of Stream.

14             THE COURT:  Okay.  Well, I think it looks like we are

15   going to have to have this continued hearing.  So I guess it --

16   yeah?

17             MS. BASKIN:  I'd like to make one other point.

18             THE COURT:  Yeah.

19             MS. BASKIN:  I apologize again.  I find it very

20   interesting that they did not put VSI on their conflict list,

21   but they did put --

22             THE COURT:  As an equity holder?  Their position is

23   that it's an equity holder.  So are you saying it's curious

24   that as an equity holder they didn't put that on the conflict

25   check?
```

```
1              MS. BASKIN:  No.  But if I finish my statement, maybe

2     you'll understand where I'm coming from.

3              THE COURT:  Yeah.

4              MS. BASKIN:  But they did put Nicole Medine who spoke

5     on behalf of VSI and others and also Mr. Rajan.  So they're not

6     creditors.  I think that's the same argument that I can make

7     that why would they list these two people on their list of

8     review for the conflict, but doesn't list VSI? That to me is --

9     raises some issues.

10             THE COURT:  Okay.  So for our next hearing then,

11    we'll get to the bottom of the veracity of some of the

12    statements that were made about whether they're a creditor.

13    And we'll get into exactly what information was given to

14    Capstone about the Debtor.

15             So I don't know if we -- maybe at the conclusion of

16    this hearing before we end someone just remind me that we need

17    to pick a continued hearing date on that application.  And

18    obviously, you know, we need to incorporate any comments by the

19    US Trustee's office if that does move forward.  So let's just

20    pick a date before we conclude today, okay?

21             MS. BASKIN:  And -- but I would  like to restate that

22    VSI is withdrawing the portion of their objection concerning a

23    conflict.  I know you've raised issues and --

24             THE COURT:  You mean with regard to the NDA?

25             MS. BASKIN:  Yeah.  Yes, I'm sorry.  About the NDA.
```

```
 1              THE COURT:  Right.

 2              MS. BASKIN:  And I totally understand that.  But I'm

 3    also withdrawing the portion of the objection concerning, you

 4    know, they are not raising or listing VSI as a potential

 5    conflict based upon their prior discussions.  So the NDA is

 6    tied into that.  But it's not solely an NDA issue from my

 7    perspective.  But we are withdrawing that part of the

 8    objection.  We are --

 9              THE COURT:  So you're withdrawing the part of the

10    objection that alleged that there was an NDA.  So what else are

11    you withdrawing?

12              MS. BASKIN:  But also that we being VSI supplied

13    information to them, notwithstanding the fact that there may

14    not have been an NDA.  That they knew based on conversations

15    were confidential.

16              THE COURT:  Okay.  But obviously, if it was truly

17    confidential and they were really concerned about it, they

18    would have had an NDA signed.

19              MS. BASKIN:  I agree with you, Your Honor.

20              THE COURT:  Yeah.

21              MS. BASKIN:  But we are withdrawing that part of the

22    objection.

23              THE COURT:  Okay.  Thank you for that clarification.

24              All right.  So, Mr. George, I didn't know if you

25    wanted to add anything?
```

1              MR. GEORGE:  I did want to add something, Judge.  And

2     again, I don't want to beat a dead horse here.  But the point

3     of the matter I would make is I've known Ms. Baskin a long

4     time.  I've never known her to make misrepresentations.  But I

5     think this is a common thread that you're going to see weave

6     through this entire proceeding.  And that is that Mr. Rajan is

7     a provocateur.  He will say whatever he needs to say.  It's

8     been judicially determined.

9              Judge Coleman in her findings and in appointment of

10    the Trustee said, "Unfortunately, in the context of so many

11    other instances where the Court has concerns regarding Mr.

12    Rajan's truthfulness, this is just another example."

13             Another place she says, "I have very serious

14    questions about whether Mr. Rajan is acting in his own instance

15    or his own interest.  The Court would have expressed the

16    Debtors to put on the testimony of Mr. Corso (phonetic) and Mr.

17    Savarese (phonetic), each who purport to have bound VSI.  The

18    Debtor instead relied on Mr. Rajan who's credibility with this

19    Court has been greatly diminished."

20             So he is a person who is, in the words of Judge

21    Laster, a chaos litigator.  He comes in for the purpose of

22    delay.  He came in at the last minute here.  He contacted our

23    potential broker after he knew that they were retained for the

24    purpose of trying to create it.  There's absolutely little

25    question in that.  I don't blame Ms. Baskin for that.

24

1          But what I want Your Honor to understand, this is a

2    common thread with Mr. Rajan's behavior.  And it's been going

3    on for months and months and months.  And the reason why we're

4    here today --

5          THE COURT:  Okay.  Thank you, George.  Okay.  Well,

6    moving on now to the other matters.  Let me just pull up --

7          MS. BASKIN:  Your Honor, I understood from your

8    order, I understand that you're the Judge and you're the one

9    who decides the order of things, that you were going to hear

10   the status, the request for the status conference and the

11   arguments that I made in there.  And then perhaps go on from

12   that and see whether you are going to hold other --

13         THE COURT:  Yeah.  You know, I've now had a chance to

14   look at everyone's pleadings.  And I guess I just wanted -- I

15   had some questions of my own and I thought it might be more

16   efficient if we just go through some of the questions that I

17   have.

18         MS. BASKIN:  Do you want me --

19         THE COURT:  No.  You can have a seat.  No.  You can

20   have a seat.  Okay.  So let me just pull out the right document

21   here.

22         So it's my understanding that some of the issues that

23   I'll need to be resolving is first the 99T motion filed by the

24   Trustee.  The Trustee was -- the Chapter 11 Trustee was

25   appointed upon motion.  And I presume that the Trustee has

1    reviewed all of the litigation involved in this case before

2    coming up with the 99T motion. The adversary proceeding, the

3    Delaware matters, all of the litigation.  And I'm also

4    presuming that the Trustee has seen the objections raised by

5    VSI and by Rembrandt.

6              So I first wanted to confirm that the Trustee has

7    taken all of these things into consideration.

8              MR. GEORGE:  Well, Your Honor, first I would say that

9    the Trustee hired very competent financial and legal advisors,

10   Mr. Coren from Coren & Ress as I think you know is a very

11   seasoned lender liability attorney.  He was hired not on a

12   contingency basis, but he was hired to review all of these

13   matters.  And he has spent -- he and his associate, Mr. Belli

14   have spent extensive time reviewing, strategizing, discussing

15   those cases in Delaware.

16             In addition, Your Honor, the Trustee spent

17   substantial time with the Debtor in possessions lawyer who was

18   conducting the hearings in Delaware.  Mr. Dupre, who I believe

19   is with McCarter & English.  We spent extensive time with him

20   trying to understand the positions, asking Mr. Dupre what he

21   thought about the potential outcome.  I won't breach

22   privileges.

23             THE COURT:  Yeah.

24             MR. GEORGE:  But all of those things were tested and

25   delved into and analyzed by the Trustee and it's advisors.  And

```
1    so, I believe there's been a fulsome review of everything

2    that's gone on in this case.

3            It's substantial, Judge, and the records are

4    voluminous.  And there was a lot of work put in over the last

5    four months by the Trustee himself, his financial advisors, and

6    his legal advisors to come to this settlement.

7            THE COURT:  Okay.  Thank them for that.  Because it

8    -- the first issue I want to address is the fact that there's

9    this outstanding objection, this claim objection filed by I

10   guess it was Rembrandt; is that correct?  And so, sometimes

11   I've made statements made by VSI.  But you guys are two

12   completely separate entities; is that correct?

13           MR. DEMARCO:  That is correct, Your Honor.  Rembrandt

14   represents Rembrandt's interests alone.

15           THE COURT:  Okay.

16           MS. BASKIN:  Yes, Your Honor.

17           THE COURT:  All right.  So with regard to Rembrandt's

18   claim objection, it seems to me that there's some overlap here,

19   right, because the essence -- at least one piece of the 99T

20   motion is to resolve the claim of Hawk, which you filed an

21   objection to, which you're allowed to do.  But I don't really

22   see any reason why I'm prohibited from ruling on the 99T motion

23   prior to resolving your claim objection.  I just want to make

24   sure that in one form or another that this issue has been

25   considered and that I make a determination.
```

1      So although I note that there is an outstanding claim

2  objection, I don't -- I'm planning on ruling on the 99t motion

3  today, which by rule and, you know, if I grant the 99t motion,

4  it will make your claim objection moot.  So I just wanted to

5  throw that out there so that you would understand that.

6      MR. DEMARCO:  Yes, Your Honor.

7      THE COURT:  And I guess next I just wanted to note

8  for the record that with the Trustee at the helm of this 99T

9  motion, unlike -- I sense the emotions of this case, I

10 understand that there are secured creditors in one corner who

11 are -- who have strong interests.  And I see that there's, you

12 know, there's VSI and Rembrandt on the other side.  And then I

13 see the Trustee who's been appointed to be kind of an objective

14 party who really has no skin in the game other than to maximize

15 value for creditors.

16     So when I see the 99t motion, I note that we just

17 need to make sure, I need to make sure that it's fair and

18 reasonable and it's in the best interest of the estate and that

19 the Trustee has some business judgment that I am going to give

20 some deference to.

21     So I just lay that out there because, you know, the

22 whole context in which I review the 99T motion is one where it

23 looks like I've heard that the Trustee has looked at all of

24 this extensive litigation.  And a lot of the objections that

25 I've seen to the 99T motion are issues that are being raised,

1    substantive issues that you have concerns about in connection

2    with the adversary proceeding and with the Delaware litigation

3    and all these other concerns.

4            But these are specifically issues that were

5    considered by the Trustee when he was considering whether or

6    not to enter into the 99T motion.

7            I guess I also wanted to understand a little bit

8    better, it sounds like VSI, you made a counter offer or an

9    offer to the Trustee to try and do what Hawk is trying to do.

10   And I thought I understood you to say that Hawk believes that

11   it's got a claim of somewhere in excess of 168-180.  And I

12   thought I saw that your offer to the Trustee, which you were

13   not happy that the Trustee did not accept that offer, you were

14   offering something like $11 million dollars.  And I was

15   confused as to how VSI could make the statement that under your

16   proposal that if the Trustee had gone with you, that you guys

17   were going to pay 50 percent of unsecured claims.

18           And it thought maybe -- well, I'll let you answer

19   that.  But what was -- how were you going to -- was it $11

20   million dollars that you proposed to pain to try to --

21           MS. BASKIN:  Brought it up.  That was a portion of

22   it.  There was $11 million dollars in total.  And it was broken

23   down in a certain way where it would categorically cover the

24   administrative claims in this case.

25           THE COURT:  So then let's just get to the heart of

29

1    the matter.  How did you or how were you going to pay the

2    secured creditors?

3         MS. BASKIN:  Well, as part of proposal, we said that

4    we were going to issue notes.  And if the Court found that they

5    had a secured claim, which we do not believe they have at all,

6    that they would be paid pursuant to certain notes over time.

7         If the Court found that they didn't have a secured

8    claim, which we believe that they don't based upon conversion

9    agreements, then their claim irrelevant and that the $11

10   million dollars would be acceptable under a Chapter 11 plan.

11   It pays administrative claims.  It would buy the litigation

12   from the Trustee. The Trustee raises the point that they're

13   concerned that there is a lot of time and expense associated

14   with the outstanding litigation.  That would be taken away.

15        It would actually make Stream TV a viable entity

16   because there are these two outstanding purchase orders, which

17   upon demand by the Trustee, we have produced proof of these in

18   two, from two entities.  From So Tel (phonetic) and Cistar

19   (phonetic)in excess of $165,000.  So that would generate not

20   just business, but substantial business for the company.

21        So we believe that the $11 million -- so the way VSI

22   looks at it --

23        THE COURT:  I didn't need to see the specific

24   breakdown. I guess my primary concern with your offer was how

25   you were going to be able to satisfy the secured claims.  And

```
 1   you're telling me now that you were going to give them notes to

 2   -- you know, over time.

 3          MS. BASKIN:  It's in the proposal that we --

 4          THE COURT:  Right.

 5          MS. BASKIN:  The Trustee had asked us, Your Honor --

 6   they refused really to talk to us.  There's be no -- very

 7   little -- you can laugh all you want.  There has been very

 8   little communication.  And that's one reason why we requested

 9   this status conference.  I would say 95 percent of my

10   communications with the Trustee have gone unanswered.

11          But the one thing that they did answer is they said,

12   well, if you want to make a proposal, attach it to your

13   objection.  I attached it to the objection, which was basically

14   what I sort of just outlined to you.  They never responded.  I

15   followed up.  Can we talk about the proposal?  No response

16   whatsoever.

17          Silly me, I followed up for a third time.  Still no

18   response.  So this is what is going on here.  Not just as is

19   their divisive behavior, which I accept between the clients.

20   But there is very little, if any, real communication between

21   the parties.  And that's what I think so critical for Your

22   Honor to understand.  And to understand that, there are really

23   certain issues, which they won't even discuss with us why they

24   believe, for example, the conversion agreements don't apply.

25   That is the linchpin of every single motion that is before,
```

```
 1   Your Honor.
 2          Now, I heard you say that, you know, you don't feel
 3   -- you're the Judge.  I respect and accept whatever your
 4   decision is obviously.  But I just find it confusing to me that
 5   if in fact there is a dispute as to the secured creditor's
 6   status and if in fact it's proven that this conversion
 7   agreement either was fulfilled or it has the potential to be
 8   fulfilled based upon order, based upon proposals that are out
 9   there or evidence that is out there, then there's certain
10   choices.  They either have no secured claim, they have a
11   greatly reduced secured claim, or they have a secured claim
12   which is vitiated based upon cases like Philadelphia Newspaper
13   and Fisker which says that even a secured creditor where it's
14   found to be a secured creditor can be found to have -- not have
15   one based upon their malfeasance.  You know, there still is an
16   issue which has never been answered by the Trustee of trustee's
17   counsel as to what is going on, what assets are intended to be
18   sold, and what is going on with the major assets, why no one
19   has honored the Supreme Court of Delaware's order whereby Hawk
20   is required to return the assets to the estate.
21          These are very important issues.  So I assume, Your
22   Honor, if you are going to approve the 9019 that I assume there
23   is going to be some offer of proof or some testimony as to what
24   the research they did, what investigation they did.  I find it
25   bizarre that they have refused to answer any of these questions
```

1   that we have posed to them.  But that's okay.  They just have

2   to really respond to you, I guess, and prove that they have

3   exercised their due diligence, et cetera, et cetera.  I just

4   think that, as I said before, the lynchpin of this whole matter

5   is whether they in fact have a secured claim.

6          THE COURT:  So I guess I take a different view of

7   this case than you do, Ms. Baskin.  I guess the view that I

8   take is that I don't know if, you know, Counsel has always been

9   responding to you in the manner and, you know, if he's been as

10  responsive to you as you would like him to be.  I don't know

11  about that.  But what I do know is that I trust that the

12  Trustee took a look at your offer, you know, and perhaps the

13  Trustee just wasn't jazzed up about $11 million and a note to

14  pay the secured creditor when clearly the Trustee believes that

15  Hawk is a secured creditor.

16          You know, if that's the position that the Trustee

17  takes I think that we can all agree the Trustee has no skin in

18  this game.  The Trustee is not on the side of the secured

19  creditors.  The Trustee is just trying to generate as much

20  money as the Trustee can to pay off creditors in this case.

21  And when I look at it, it looks like based upon, you know, the

22  Delaware Supreme Court opinion, you know, it sounded like, you

23  know, they believe that Hawk is a secured creditor.  They did

24  lots of findings of fact, far more than I did and certainly

25  more than Judge Coleman did, right?  Which is why she let them

1   go forward with that litigation.

2        So it does seem like another judge has taken a look

3   at this and has found that Hawk is a secured creditor.  So I

4   don't fault the Trustee necessarily then in, you know, taking

5   that fact and then trying to figure out some kind of

6   resolution.  So that was just the question I had for you with

7   regard to the amount that VSI had offered.  So I appreciate

8   your --

9        MS. BASKIN:  I just feel that if you don't really

10  analyze the validity of these secured claims.

11       THE COURT:  I know.  So let's talk about that.  Let's

12  talk about that.  You've got all these objections, right, that

13  they're doing all these things and some of them may have some

14  merit, right?  But the purpose of appointing a Chapter 11

15  trustee is not so that we can all sit here and make our own

16  independent determination and, you know, see out the

17  litigation.

18       The point of a Chapter 11 trustee is to see whether

19  or not that person who is tasked with talking to all of the

20  litigants and getting all of the pleadings in those underlying

21  proceedings, whether they have considered -- you know, what

22  they think about all of these objections that you have raised.

23  And I just want to make sure that the Trustee has seen every

24  single objection.  And it sounds like a lot of the objections

25  that you have raised were the objections that were raised in

1    these proceedings like in the adversary proceeding.

2            These were the exact same arguments and statements.

3    There's no like new thing and I need to make sure the Trustee

4    has taken into account a new arguments.  These were all the

5    arguments that are part of all of this litigation that the

6    Trustee has looked at and has deemed to be -- you know, has

7    caused the Trustee to tee up the 9019 motion, right?  I mean,

8    all of these objections are the issues that were raised in

9    those proceedings.  So for whatever reason, the Trustee does

10   not share your concerns about those issues, right, and has

11   taken that into consideration when coming up with the 9019

12   motion.

13           MS. BASKIN:  I would love to hear if you have an

14   offer of proof or testimony --

15           THE COURT:  Okay.

16           MS. BASKIN:  -- as to what they actually did in

17   investigating.

18           THE COURT:  I'm going to take Rembrandt and then I'll

19   take you, Mr. George.  Yes.

20           MR. DEMARCO:  Yes, Your Honor.  I didn't want to

21   derail Your Honor.

22           THE COURT:  Yeah.  Go ahead.

23           MR. DEMARCO:  Since you said you've got your own

24   questions.

25           THE COURT:  Yeah.

1          MR. DEMARCO:  Rembrandt has thoughts as well.

2    Rembrandt has some thoughts as well on this issue with VSI.  I

3    didn't know if Your Honor wanted to hear us now or if you were

4    going to come to us in your own time.

5          THE COURT:  Well, I guess, you know, I just -- I

6    think that my comments apply to both Rembrandt and VSI which is

7    that the objections that you've raised for me to consider are

8    all based upon the meritorious -- the merits of the litigation

9    that's already been -- you know, everyone knows what those --

10   like in the adversary proceeding, right?  He knows what the

11   complaint says.  He knows what the issues are in the adversary

12   proceeding.

13         So for you to raise them now as an objection, you

14   know, in support of me denying the 9019 motion, to me, it's

15   just not going to get very far because everything that you're

16   raising is something that he's considered.  And I'm sure that

17   there will be a proffer where they assure me that they've

18   considered all of the allegations and arguments that you guys

19   have raised in your objections.

20         MR. DEMARCO:  Well, Your Honor, I understand that

21   might be the case regarding the issue of the convertibility,

22   for example, of Hawk's.

23         THE COURT:  Uh-huh.

24         MR. DEMARCO:  So for that I might be able to

25   understand, but as to matters of sufficiency, you know, as Ms.

1  Baskin noted and we've tried to discuss with the Trustee as

2  well, a lot of issues and some of our concerns.  As far as

3  we're aware, there's been no even --

4           UNIDENTIFIED SPEAKER:  Close the door.

5           THE COURT:  John, could you mute whoever that may be?

6           MR. DEMARCO:  Thank you, Your Honor.

7           As far as we're aware, you know, we at Rembrandt have

8  requested any kind of representation that even these companies

9  have the money in the accounts to go forward with this and

10 we've heard nothing kind of in that response, for example.

11 We've been trying to get some very basic information.  In fact,

12 we sent out discovery requests, noticed depositions.

13          THE COURT:  Yeah.  Those discovery requests, let's

14 talk about that.

15          MR. DEMARCO:  We can, Your Honor.

16          THE COURT:  So who -- you wanted to make discovery

17 requests or VSI was going to make discovery requests?  Who

18 wanted to make these discovery requests?

19          MR. DEMARCO:  So Rembrandt issued discovery requests.

20          THE COURT:  When did you issue these discovery

21 requests?

22          MR. DEMARCO:  So we noticed the depositions a week

23 from this previous Tuesday.

24          THE COURT:  When did you send out the discovery?

25          MR. DEMARCO:  Send out the --

1          THE COURT:  Discovery requests.

2          MR. DEMARCO:  The deposition requests were a week

3   from this past Tuesday, so as far as a date, I believe that was

4   May 29th.  I don't have that --

5          THE COURT:  And is the discovery discovery that is

6   relevant to the adversary proceeding?

7          MR. DEMARCO:  In part, Your Honor.  The portions

8   regarding, for example, the kind of questions we asked which

9   were tangentially related to that part of the proceeding that

10  we could not get answers on from the Trustee or from the other

11  parts of whom we requested.  So part of it was related to that.

12  Yes, Your Honor.  But other parts regarded, for example,

13  representations that there was even money on behalf of these

14  parties that was offered.

15         THE COURT:  I was just curious about it.  I mean, it

16  sounds like this discovery was something that you needed really

17  urgently, but had only, you know, as far as I could tell,

18  hadn't even been issued until, you know, I guess a week ago now

19  it seems.

20         MR. DEMARCO:  Well, yeah.

21         THE COURT:  I just wondered about the delay if there

22  was such an urgent need for the discovery.

23         MR. DEMARCO:  Well, in part -- Your Honor, part of

24  that was we were trying to seek these answers directly from the

25  parties themselves.  A lot of the things that we requested

1    discovery on, we wouldn't have been satisfied with

2    representations from counsel.  So we sent out emails to

3    opposing counsel.  My colleague and co-counsel, Christopher

4    Michaels, for example.  We've tried to reach out through phone,

5    through email.

6              THE COURT:  But you're saying that you're trying to

7    get information to help the Trustee make a decision. Is that --

8              MR. DEMARCO:  We're trying to -- we wanted to get

9    information to understand that the Trustee's decision was on

10   firm footing and that we did not have to challenge it.  And

11   we're sitting from a position here where we don't know what the

12   basis of these decisions are.

13             THE COURT:  Okay.

14             MR. DEMARCO:  And we have serious concerns and

15   questions.

16             THE COURT:  Yep.  Okay.

17             Mr. George, I don't know if you were jumping up here.

18             MR. GEORGE:  Your Honor, I just wanted to respond to

19   a couple of things.  One, the absolute misstatement that we

20   never dealt with Mr. Rajan and his group.  Ms. Baskin got

21   involved very, very late in the case.  She was coming up to

22   speed.  And we did have communications with her, but I won't

23   characterize them.  But every communication was an accusation.

24             And so, you know, when you're -- someone just gets in

25   the case and they don't have the complexion of everything that

1   you've been dealing with for four months and every email is a

2   threat, you know, we don't respond to those kind of things.

3          I'll say this.  The proposal that's in that plan is

4   the same proposal that was made to the Trustee back when we met

5   with Mr. Rajan and his group long before Ms. Baskin was

6   involved.  It wasn't acceptable then.  It's not acceptable now.

7   When he made the proposal, the request was show us that you

8   have the financial ability to fund this.  Judge, there are

9   almost $3 million of administrative expenses in this case all

10  to the Lewis Brisbois firm.

11         Now, Mr. Zahralddin is here today.  There's no

12  debtor-in-possession.  I think that Mr. Zahralddin is here on

13  behalf of VSI because he appears every time Mr. Rajan does with

14  him.  So there is no debtor-in-possession.  So for him to say

15  he represents the Debtor, untrue.  He's not been retained by

16  the Debtor.  He was retained by the Debtors-in-possession and

17  they don't even exist anymore.

18         But any notion, Judge, that we didn't sit and fairly

19  have a discussion with Mr. Rajan in his group.  He brought the

20  TV into my conference room.  We sat it up.  We watched it for

21  three hours.

22         THE COURT:  Let me just make a -- let me just ask you

23  to pause.  I am going to ask for a proffer and at that point,

24  you know, if someone can tell me about --

25         MR. GEORGE:  Well, we have --

1           THE COURT:  Yeah.  Okay.  That's fine.

2           MR. GEORGE:  We have --

3           THE COURT:  We can go through --

4           MR. GEORGE:  -- the Trustee or judge.

5           THE COURT:  We can go through all of that.

6           MR. GEORGE:  And I'll put them on the stand.  But I

7     didn't want that to go without being said.

8           THE COURT:  Yeah.

9           MR. GEORGE:  The other thing wanted to mention,

10    Judge, was the thing that was mentioned in the beginning about

11    the objection to the proof of claim.  On page 73 of Judge

12    Coleman's order, she directs the Trustee to investigate,

13    evaluate, resolve, and/or litigate the claims of Hawk,

14    SeeCubic, and Rembrandt and others.  So this wasn't just --

15    this was a direct charge by the -- by Judge Coleman.

16          THE COURT:  Yep.

17          MR. GEORGE:  And the law is generally, Judge, that

18    when a trustee is appointed, he is the representative of the

19    estate and the one who brings those objections.  And if you

20    write to the Trustee and you ask him to do it and you have a

21    legitimate reason and he does it, then you can come to the

22    Court and ask.

23          But what happened here, Judge was these parties

24    learned about the settlement in advance because we were honest

25    with them.  We told them we had a resolution with Hawk.  We

1   were working through the document.  It took a few weeks to get

2   done.  They filed that objection in order to try to leapfrog

3   their position in front of our position settlement.  So now --

4           THE COURT:  I understand.  Everyone is zealously

5   advocating on behalf of their client.  That's absolutely --

6           MR. GEORGE:  I'm not --

7           THE COURT:  -- clear to me.

8           MR. GEORGE:  I'm not sure whether that's zealous or

9   gamesmanship, but the fact of the matter --

10          THE COURT:  I'm trying to put a nice spin on things.

11          MR. GEORGE:  I appreciate it, Your Honor.  But the

12   fact of the matter is that the Trustee has the exclusive

13   province under the order to make an effort to settle it and

14   resolve it and he has.  And to your point, this is -- these are

15   all litigation claims.  It's not like this is a million dollar

16   preference and, you know, Bristol Myer is on the other side.

17   And we were deciding to pay --

18          THE COURT:  Yeah,  Mr. George, no need -- I think --

19          MR. GEORGE:  -- $10,000.

20          THE COURT:  I think we're on the same -- we see

21   things in the same way.  I understand what you're saying.

22          MR. GEORGE:  Fair enough, Judge.

23          MS. BASKIN:  Your Honor, if I may just respond to one

24   or two things.

25          MR. ZAHRALDDIN:  Your Honor.

```
1              THE COURT:  Yes.

2              MR. ZAHRALDDIN:  Your Honor.

3              THE COURT:  Yes.

4              MR. ZAHRALDDIN:  I'm sorry, Your Honor.  This is Mr.

5    Zahralddin.  I apologize because I know I'm not there.  I'm a

6    little bit sick and I told Ms. Blalock I didn't want to get the

7    rest of the room sick, so --

8              THE COURT:  Thank you.

9              MR. ZAHRALDDIN:  -- I had to appear by phone.

10             THE COURT:  Okay.

11             MR. ZAHRALDDIN:  You're welcome.

12             Your Honor, I just -- I was sitting here quietly

13   listening because I'm really just an observer.  And in a way

14   Mr. George is correct.  There is not a client, though obviously

15   you and I both know that even with a Chapter 11 Trustee or when

16   a Chapter 7 Trustee if brought in, there is still a debtor's

17   counsel that's there.  I'm not billing the estate.  I'm here

18   monitoring this for my firm as we're an administrative

19   claimant.

20             I will say this.  I am very concerned after having a

21   very professional relationship with Mr. George that he wants to

22   drag me into whatever dispute he's having with the other

23   professionals here by alleging that I represent VSI.  That has

24   been an allegation Mr. Caponi and others have made at different

25   times and which have been completely refuted.
```

1          Right now, since Stream doesn't have funding in place

2  to pay my admin claim, it would be great if someone would pay

3  my claim and if it were VSI, but that's not the case.  If that

4  were the case, I would have reported that to Mr. Callahan as

5  I've told him before when he's questioned me about that issue.

6  And that is a trope that's been out there over and over again

7  in pleadings from the Hawk parties, et cetera, which has been

8  refuted.

9          I take serious umbrage being accused of what I

10 believe would be a major ethical issue without any support and

11 in an attempt to drag me into whatever this is, which has not

12 become a civil discourse in the last 30 minutes.  I apologize

13 for being a little bit strident, Your Honor, but there are

14 times when you have to basically put your foot down in this.  I

15 have acted professionally with the Trustee and their counsel.

16 I cooperated in getting things over to them.  I have spent

17 countless hours trying to figure out a way to help them in

18 their diligence, et cetera.  And I take it as a personal

19 attack, what Mr. George said, and I'm not happy about it.

20          THE COURT:  Okay.  All right.  Well, thank you for

21 sharing your thoughts with me.

22          MS. BASKIN:  And, Your Honor, on that point.

23          THE COURT:  Yeah.

24          MS. BASKIN:  And I know the Judge has not and the

25 Court does not usually like entertaining this stuff, but I will

1    say for the record that there is not one modicum of truth as to

2    what Mr. George said as to any threatening emails which I have

3    sent on behalf of VSI.  I will just state on the record that

4    Mr. Michaels and I tried to have a very fair and open

5    discussion, which we tried to do by Zoom with Mr. Vagnoni and

6    Mr. George.

7         Mr. George got to such a point in taking with me or

8    screaming at me on the phone that I told him -- and I will be

9    honest -- that since I turned 67, I do daily affirmations.  And

10   one of my affirmations is I cannot control the behavior of

11   other people.  I can only control my response.  And my response

12   to him talking to me like he was literally a rabid dog was that

13   I choose not to deal with you anymore whereby he immediately

14   hung up.  And then we had a civil conversation with Mr.

15   Vagnoni.  It didn't really move the ball along at all when it

16   came to the merits of the case.  But for him to say that I have

17   sent threatening emails to him is bizarre and totally untrue

18   and I will not let that stand on the record.

19        THE COURT:  Okay.  So I think that I would like at

20   this point to substance of the 9019 motion.  One thing I guess

21   I would like to hear about in whatever proffer is made about

22   that is this allegation that VSI made that Mr. Stastney and

23   SeeCubic are in possession of technology belonging to the

24   Debtors and they have been using that technology to do

25   demonstrations of the glasses 3 3D technology to potential

45

1    clients.  I just want to hear that whether or not the Trustee

2    has heard that allegation and what concerns, if any, that they

3    have about that.  So I would like to hear that.  And I guess I

4    just wanted to point out a couple of other things before I hear

5    that proffer.

6            MR. GEORGE:  So, Your Honor.

7            THE COURT:  Yeah.

8            MR. GEORGE:  We received an email from Ms. Baskin --

9            THE COURT:  Yeah.

10           MR. GEORGE:  -- making allegations.  We asked her for

11   proof of those allegations.

12           THE COURT:  That they were doing that, yeah.

13           MR. GEORGE:  And we never got anything from them.

14           THE COURT:  Okay.

15           MR. GEORGE:  And the fact of the matter, Judge, is

16   that SeeCubic BV is an affiliate of the Debtor.  And the

17   Phillips license allows the affiliates of the Debtor to use

18   those license for demonstrations.  VSI, on the other hand, is

19   not an affiliate of the Debtor, and they've been using that

20   technology and been out demonstrating on it.

21           THE COURT:  That's the subject of the motion to

22   enforce that we'll need to find a hearing date.  That's also

23   another date that we're going to come back to.  Hold on one

24   second.

25           So I didn't see the settlement agreement making a

1   statement about how the claim filed by Hawk is going to be

2   treated in the Technovative bankruptcy.  So if someone could

3   just talk to me about that.  And then other things I wanted to

4   note is that I just saw this discrepancy where it sounds like

5   the settlement agreement is trying to say that only Hawk will

6   remain standing at the end of the day with a secured claim, but

7   I noticed that the stalking horse bidder might be SeeCubic.

8   And I would just ask that whoever ends up holding a claim at

9   the end of the day probably ought to be the same name of the

10  stalking horse bidder.

11          MR. GEORGE:  Understood.

12          THE COURT:  So you want to maybe --

13          MR. GEORGE:  Your Honor, I think, in fact, that Hawk

14  is the collateral agent for a number of secured creditors.

15          THE COURT:  I know.  So whatever name you want to

16  call the ultimate holder of the allowed secured claim, just

17  make sure it's the name of the stalking horse bidder.

18          MR. GEORGE:  Fair enough, Judge.

19          THE COURT:  Right.  Okay.  So, I guess at this point,

20  I'd like to hear a proffer or if you wanted to put on testimony

21  --

22          MR. GEORGE:  I'm going to put Mr. Homony on the

23  stand, Your Honor.

24          THE COURT:  Alrighty.  So, sir, come right over here.

25  Mr. Barbado will swear you in.  Yeah.

1           MR. DEMARCO:  Your Honor, just as a quick procedural

2    matter.  I'd like to -- My co-counsel, Christopher Michaels,

3    would like to do a temporary pro hac for the purposes of this

4    proceeding that we're going to be having evidence to --

5           THE COURT:  All right.  Any objection to that?

6           MR. GEORGE:  No, Judge.

7           THE COURT:  Okay.  That's fine.  Welcome, sir.

8           MR. HOMONY:  Good morning, Your Honor, or good

9    afternoon.

10          THE CLERK:  State and spell your name for the record.

11          MR. HOMONY:  William Homony, H-O-M-O-N-Y.

12          THE CLERK:  Can --

13          MR. HOMONY:  Yes.  1730 Maple Avenue, Hatfield,

14   Pennsylvania 19440.

15          MR. GEORGE:  And, Your Honor, we have an exhibit book

16   that we want to hand Your Honor if we can approach.

17          THE COURT:  Alrighty.

18          MR. GEORGE:  Thank you.

19          THE COURT:  Alrighty.  Thank you.

20          MR. GEORGE:  You ready, Your Honor?

21          THE COURT:  Of course.  Proceed.

22                        DIRECT EXAMINATION

23   BY MR. GEORGE:

24   Q   Mr. Homony, good morning.  And can you tell the Court a

25   little bit about your background in restructuring and

1    insolvency proceedings?

2    A    Sure.  Since graduating with a bachelor's degree in

3    accounting from the University of Pittsburgh, in 2000, I joined

4    Miller Coffey Tate and have been with them since.  I'm now a

5    partner and primarily spent most of my career focused on

6    bankruptcy and restructuring matters assisting trustees, both

7    Chapter 11 and Chapter 7 trustees in fulfilling their duties as

8    well as assisting debtors committees and acting as both a plan

9    administrator and liquidating trustee in post-confirmation

10   matters in this Court and in the District of Delaware.  And I

11   am currently also a Subchapter 5 Trustee in the District of

12   Delaware since 2022.

13   Q    And do you have any certifications, any insolvency or

14   restructuring certifications?

15   A    Yes.  I'm a certified insolvency and restructuring

16   advisor.

17   Q    Okay.  And upon your appointment, did you review the

18   Trustee opinion and order?

19   A    Yes.

20   Q    And did you have an understanding of what the Court was

21   asking you to do by the appointment?

22   A    Yes.

23   Q    Would it be fair to say that the Court was asking you to

24   try to bring some sensibility to this matter that's been going

25   on for over ten years with acrimony on both sides?

1    A     I think that's one of the tasks, yes.

2    Q     And di the -- your appointment cause you any immediate

3    concerns with respect to the operations or condition of the

4    Debtor?

5    A     Well, it would certainly seem as if the parties on both

6    sides, clearly the relationship was irreconcilable early on.

7    The question of operations was certain raised in the Court's

8    opinion appointing myself with respect to the MORs, the lack of

9    transparency, the inaccuracies, et cetera.  And so early on,

10   again, trying to, as in any trustee appointment case, trying to

11   evaluate the Debtor's operations, its assets, the parties'

12   positions, you know, interview them, sit down, communicate, and

13   try to figure out a path forward for these cases that had been

14   pending since March of 2023.

15   Q     And did the Court's findings with respect to the character

16   for truthfulness and the findings that the Court made with

17   respect to Mr. Rajan, did that give you any concern?

18   A     Of course.  Having said that and being an independent

19   fiduciary tasked with trying to recover and maximize the value

20   of assets for creditors, I was certainly open-minded in meeting

21   with Mr. Rajan, listening to his side of the story, negotiating

22   a potential resolution with himself, et cetera.  So I certainly

23   came in with an open mind and tried to assess for myself his

24   credibility, his ability to manage and operate a business based

25   on his helm prior to my appointment as the CEO of Stream.  I

1    gave him, in my estimation, every chance to make a case for why

2    his position was the correct one and to propose a path that I

3    felt was viable and feasible to have these cases exit and have

4    a successful go forward business for Stream.

5    Q    And you heard my comments that I made to the Court about

6    the meetings with Mr. Rajan.  Did he meet with you and

7    demonstrate the technology?

8    A    Yes.  We met Mr. Rajan I believe more than once and

9    certainly had many communications via email, telephone, with

10   him and his representatives.  But we certainly met with Mr.

11   Rajan, gave him the opportunity to present his -- the

12   technology that was in his possession and an opportunity to

13   discuss the background of the case, their position, and how

14   they'd like to see the case proceed forward.

15   Q    And you made these efforts with Mr. Rajan before you made

16   the settlement agreement with Hawk?

17   A    Yes.  Several times.  I mean we -- I mean, we met with

18   both sides, or Rembrandt, VSI, Stream representatives multiple

19   times before any terms of any settlement were reached with

20   Hawk.

21   Q    Okay.  That book in front of you or the exhibits, can you

22   turn to T-1 and tell me if you recognize that as the memorandum

23   opinion that resulted in your appointment?

24   A    Yes.

25   Q    And can you now go to T-7, if you could?

```
1    A    Okay.

2    Q    And is this a document that was provided to you by the

3    Debtors?

4    A    It was provided by -- yes.

5    Q    And did -- have you see this document before?

6    A    I have.

7    Q    And can you tell the Court where the patents and licenses

8    are located, in which entities?

9    A    Yes.  So the intellectual property is held by a indirect

10   subsidiary of one of the Debtors, Technovative, in Ultra D

11   Cooperative.  And the -- I believe the Phillips license is held

12   in also a non-debtor foreign subsidiary of Technovative, Ultra

13   D Ventures.

14   Q    Okay.  And what's the purpose of the entity known as

15   SeeCubic BV?

16   A    That is an operating entity, also a non-debtor affiliate

17   in the Netherlands, primarily a research and development entity

18   that has supported the technology for a number of years for

19   prior and post-petition.

20   Q    And do --

21        THE COURT:  Mr. George, could you just hold on for

22   one second?

23        MR. GEORGE:  Yes, Judge.

24      (Court and Clerk confer)

25        THE COURT:  So, Mr. George, I have a 12:30 list and
```

1    I've reviewed all of this stuff.  I mean, basically for this

2    examination --

3              MR. GEORGE:  Get to the punch, I think you're saying,

4    Judge.

5              THE COURT:  Yeah.  That's right.  Okay.  Sorry.

6    That's good.  I hear you flipping pages.

7              MR. GEORGE:  Moving ahead.

8    BY MR. GEORGE:

9    Q    Do the Debtors have any factories?

10   A    They do not manufacture product.

11   Q    Are there any warehouses with any finished goods or

12   inventory in them?

13   A    Nothing of any consequence.  There may be some facilities

14   that have some de minimis units utilized to demonstrate for

15   third parties.

16   Q    Is there any manufacturing capabilities today --

17   A    No.

18   Q    -- for these debtors?

19   A    No.

20   Q    Are there any customers currently purchasing from these

21   debtors?

22   A    No.

23   Q    Is there any revenue coming in to these debtors?

24   A    No.

25   Q    Is there any money in the bank?

1   A    Less than $50,000 currently.

2   Q    Do you know when the last time was that the Debtors built

3   a tv?

4   A    I believe it's sometime prior to 2018.

5   Q    And what were the outstanding administrative fees when you

6   took over?

7   A    Approximately $3 million.

8   Q    And under your proposed settlement agreement, do those

9   fees get paid?

10  A    There will be funds sufficient to pay administrative

11  creditors, yes.

12  Q    Now, have you ever seen these purchase orders to which Ms.

13  Baskin has referred?

14  A    Several versions of them, yes.

15  Q    And have you ever been able to get any independent

16  verification of what's in those purchase orders?

17  A    In terms of their validity?

18  Q    Yes.

19  A    No.  No.

20  Q    And have you ever been provided any additional information

21  that satisfied you with respect to the bonafides of those POs?

22  A    No.

23  Q    Have you ever seen anything to indicate that the Debtors

24  would be able to immediately begin manufacturing televisions?

25  A    No.  They don't currently possess that capability.

1  Q    When you took over was payroll being paid in BV?

2  A    When I was appointed, I believe that SeeCubic had a

3  promissory note in place with BV to pay the ongoing costs, as

4  that is an R&D entity only and does not have any independent

5  revenue.

6  Q    Were there a number of employees at BV?

7  A    Yes.

8  Q    And those employees have access to the Debtor's IP and

9  software information?

10 A    Yes.

11 Q    And was there a concern about those employees not being

12 paid?

13 A    Absolutely.

14 Q    And so how was an arrangement made for them to be paid?

15 A    So at a certain point the funding in place with SeeCubic

16 had run out, was exhausted, Your Honor, so I was concerned that

17 they were panicking in the Netherlands in terms of having

18 funding available to pay not just salaries, but the other costs

19 to keep the lights on, house the technology, et cetera.  And so

20 we made several attempts to obtain debtor-in-possession

21 financing from both Rembrandt and VSI throughout the case, not

22 just at that point.  But at that point it had become an

23 emergency -- an urgent situation that needed to be addressed.

24 And so one of the factors considered in entering into an

25 agreement with Hawk was their agreement to fund immediately the

1  costs associated with the Netherlands group, SeeCubic BV.

2  Q     And if I were to tell you that there was about $980,000

3  spent by BV to make sure payroll and other obligations at BV

4  were paid, would that sound --

5  A     Yes.  That's been the amount advanced since we entered

6  into the agreement with Hawk.  Excuse me.  Yeah.  Into the

7  agreement with Hawk, but certainly they had funded millions of

8  dollars before that and have agreed to fund through a sale

9  closing.

10 Q     And as part of your settlement, is that a claim that

11 remains in the bankruptcy case or does that get released, that

12 SeeCubic BV claim?

13 A     With respect to the ongoing funding?

14 Q     Yes.

15 A     It's an increase to their allowed secured claim.

16 Q     Now, with respect to the bonding equipment, do you know

17 what the bonding equipment is for?

18 A     I believe it is to essentially glue the lenses to the

19 actual screens to allow the 3D technology to work.  It is not

20 currently being utilized.  I believe it's in -- it's sitting in

21 a China warehouse somewhere.  It's not anything that SeeCubic

22 BV needs in order to produce the demonstrating units that

23 they're using currently, but that's where it currently resides.

24 Q     Did the Debtor's estates have sufficient money for you to

25 either clear the warehouseman's liens, remove that equipment to

1  the United States?

2  A    No.  The Debtor had and has zero funds since my

3  appointment.

4  Q    But you did in fact make demand for return of the bonding

5  equipment, didn't you?

6  A    We asked that it be shipped to the place that Mr. Rajan

7  had requested.

8  Q    And the settlement agreement that you've reached with Hawk

9  resolves the issue with timing or non-turnover of that

10 particular asset, right?

11 A    It resolves essentially the entire case.

12 Q    Now, you heard the talk about the discussions with Mr.

13 Rajan.  One of the primary discussions I think you had with all

14 the parties was the need for a DIP, right?

15 A    Yes.

16 Q    And did you request that Mr. Rajan or his investor group

17 provide a DIP?

18 A    Yes.

19 Q    Was there any ever any communication to indicate that he

20 was in a position to do that or willing to do that?

21 A    None.

22 Q    And why was getting in a DIP important?

23 A    Well, a couple of reasons.  When I was appointed, the case

24 was administratively insolvent already in the amount of $3

25 million.  I needed to hire professionals in order to fulfill my

1    duties required by both the Code and the appointment order.

2    And so I knew the administrative insolvency was only going to

3    get worse.  And with no operations from Stream to generate

4    revenue, the only other source would have been to go find

5    external funding.

6    Q    And do you know who controls VTI or VSI?

7    A    Matthew Rajan.

8    Q    And do you know anything about those entities generally

9    other than they're controlled by Mr. Rajan and appear to be

10   using the same technology that the Debtor has?

11   A    Yeah.  I think they were formed all around the same time

12   as the omnibus agreement which really started the conflict

13   between the parties.  And my understanding is that they were

14   created to raise capital essentially for the Stream technology.

15   And to my knowledge, they continue to exist today.  They are --

16   well, as you know, I filed a motion to enforce the automatic

17   stay and turnover against VSI recently.

18   Q    And that's T-11 in the book, right?  If you'll just take a

19   look.  Sorry.  I know we're moving rapidly.

20           MS. BASKIN:  Your Honor, I would object to this line

21   of questioning --

22           THE WITNESS:  Yes, it is.

23           MS. BASKIN:  -- as to what the relevance is to a

24   motion that is before the Court that is -- an answer has not

25   yet been filed yet and there has been no hearing.

```
 1              MR. GEORGE:  I'm just --

 2              THE COURT:  If the purpose is to continue to impute

 3   Mr. Rajan, I think that's --

 4              MR. GEORGE:  That's not the purpose, Judge.  We're

 5   just mentioning that it's filed and then I'm moving on to the

 6   next subject, so --

 7              THE COURT:  Thank you.  Okay.  So let's --

 8              MR. GEORGE:  He'll evidence the motion --

 9              THE COURT:  -- do this.  So it's 12:27.  I've got a

10   12:30 list.  It's not going to take that long.  I'm going to

11   blow through it.  But what I think I'd like to do if you guys

12   are okay with it is if you could just take all of your papers

13   at the table; just move back a seat.  Let me blow through the

14   12:30 list and then as soon as I --

15              MR. GEORGE:  I'm sorry, Judge.  I tried.

16              THE COURT:  I know.  Well, and they've got to cross,

17   so I was just trying to see if we could get as far as we could.

18              So you're still under oath, sir.  I'm going to excuse

19   you from the witness seat here and hopefully in the next 15

20   minutes or so I'll get you back up here.

21              THE WITNESS:  Okay.  Thank you, Your Honor.

22              THE COURT:  Okay.  Thank you so much.

23          (Recess taken)

24              THE COURT:  Okay.  Let's pick up where we left off

25   then, everybody.  Thank you so much.
```

```
 1   BY MR. GEORGE:

 2   Q    So Mr. Homony, I want to try to focus you on the steps

 3   that it took to get to the settlement agreement.  You

 4   retrained, on behalf of the -- on behalf of yourself, Coren &

 5   Ress, did they advise you with respect to the litigation?

 6   A    Yes.

 7   Q    And Coren & Ress were retained on an hourly basis, right?

 8   A    That's correct.

 9   Q    And so did you have discussions with Coren & Ress about

10   the expense and delay would be occasioned by taking on the

11   fight with Stream over the extent of their collateral?

12   A    Yeah.  All -- all aspects of the existing litigation.

13   Q    And were you satisfied that the litigation approach to

14   this matter wouldn't result in a meaningful distribution to the

15   creditors and possibly put at risk the existing assets of the

16   Debtor?

17   A    Absolutely.  That was a major concern and one of the main

18   reasons that led to the settlement.

19   Q    And one of the actions that we're referring to is the 225

20   action, correct?

21   A    Yes.  And when Judge Coleman was on the bench and

22   immediately after you got appointed, you filed a motion to

23   reimpose the stay on that case, right?

24   A    Correct.

25   Q    And Judge Coleman was unwilling to give you a blanket
```

1   extension of the deadlines for trial on that matter, correct?

2   A    Correct.  We had requested an indefinite stay, and she was

3   only willing to give us a period of time.  And currently the

4   trial is set for July 31st, I believe.

5   Q    And in the judge's order reimposing or staying that matter

6   temporarily, did the court make clear that the pre litigation

7   matters that are related to the Delaware action have to go

8   forward?  In other words, if there's discovery or documentation

9   that has to be delivered?

10  A    I'm not sure -- I'm not sure I understand.

11  Q    Well, the court didn't just say go have the hearing on the

12  31st.  They said that if there are certain preliminary matters

13  that relate to that case, those are to proceed, right?

14  A    Yes, I apologize.  My understanding was the record, the

15  evidentiary record, is closed to that matter, and I don't have

16  the opportunity to introduce evidence, et cetera.  But yes,

17  preliminary matters in advance of the 7/31 trial start date,

18  yes.

19            THE COURT:  We decided to start without you, John.

20            UNIDENTIFIED SPEAKER:  I've heard it all before.

21  BY MR. GEORGE:

22  Q    So Mr. Homony, would it be fair to say that after your

23  consultation with your consultation with your financial and

24  legal advisors that you made a determination that a settlement

25  of the matters with the secured creditors favored any effort to

1  try to litigate with them?

2  A    Yes.

3  Q    And can you go to T-2, which is a copy of the 9019 motion?

4  A    Okay.

5  Q    Explain to the Court, if you will, walk through the terms

6  of the settlement.  It's on page 9 of the motion.

7  A    Sure.

8  Q    Let's start with how it treats the secured creditors.

9  A    Sure.  So the secured creditors as a whole will now have

10  an allowed claim of -- an allowed secured claim, non-

11  convertible -- of $180 million plus any amounts advanced by

12  them to fund -- to continue funding the Netherlands subsidiary

13  through the closing date -- a sale closing date.

14  Q    Okay.  And how about with respect to the proofs of claim

15  that are on page 10 for SLS Holdings VI, LLC, claim number 9,

16  and the claim with SeeCubic Inc., number 14.  What happens with

17  respect to those?

18  A    Yes.  Those claims are all deemed to be withdrawal.

19  Q    And there is a provision to allow for the marketing and

20  sale of the assets?

21  A    Yes.  So I have already filed an application to retain an

22  investment banker to -- to run a sales process to hopefully

23  generate or create a competitive bidding environment to drive

24  up the -- maximize the value of the assets for the benefit of

25  the unsecured creditors.  And so in connection with that, we're

1   negotiating a stalking horse asset purchase agreement with the

2   secured lenders that will provide a minimum starting point for

3   any -- any auction of $150 million.

4   Q    And there are no bid protections, stocking fees or break-

5   up fees to the secured creditors in the event that they get

6   outbid?

7   A    No.

8   Q    And the $150 million, is that -- I think we can all do the

9   math -- about a $30 million reduction from the face amount of

10  the secured claim as asserted by the secured creditors?

11  A    Correct.

12  Q    And what happens with respect to any efforts to sell the

13  assets?  Is there a reduction in the amount the secured

14  creditors will take if another party comes in and bids with a

15  portion of it payable over time?  I'm talking specifically

16  about paragraph 56 of the motion.

17  A    So any -- so yes.  We have, from certain parties I've

18  talked to, there's been some expressions that -- would they be

19  willing -- is there a willingness to entertain value in some

20  other form in addition to cash.  And so we've -- we negotiated

21  where any -- any bid would, at minimum, would have to include a

22  component of $100 million in cash, but could include some other

23  non-cash components, such as deferred notes, earnouts, you

24  know, other kinds of securities, in order to compete with the

25  stalking horse bid.

1    Q    And what are the provisions with respect to SCI's

2    participation in the auction -- 57?

3    A    So SCI has been identified as the -- as the buyer.  That

4    may change based upon Your Honor's comments earlier.  But

5    they're identified as the -- as the -- as the stalking horse

6    purchaser.

7    Q    Okay.  And I think you mentioned the cash component of the

8    bid in the event another qualifying bidder comes in is 120

9    million?

10   A    Yes.  That's the minimum cash component of any qualified

11   bid.

12   Q    And can you explain to the court what the carveouts are

13   that are provided to the estate?

14   A    Sure.  Generally, the carveouts will provide a minimum of

15   $8.5 million, with the potential upside.  In the event that

16   third parties come in and create value in excess of the

17   stalking horse bid, anything over $150 million, the estate

18   carveout will be increased 10 percent.  So if -- if it sold for

19   $150 million, the estate would get an additional million

20   dollars on top of the minimum $8.5 million, as well as the fact

21   that we are not -- we are excluding certain assets from the

22   collateral that's being sold or secured, such as any cause of

23   action, Chapter 5 cause of action, causes of action against

24   former directors and officers or other third parties, which may

25   hold value and that would benefit directly the unsecured

64

1   creditors as well.

2   Q    And does the Trustee and the estates retain the right to

3   seek the recovery of the million dollar bond that's in the

4   Chancery Court?

5   A    Yes.

6   Q    And with respect to any deficiency that would exist in the

7   event that either the secured creditors are outbid, what

8   happens to any deficiency claim of the secured creditors?

9   A    I believe it's it will be deemed an impaired claim for

10  purposes of any plan of liquidation that might be proposed by

11  post-sale closing.

12  Q    Are they subordinate to the other unsecured creditors?

13  A    Yes, yes.

14  Q    And there are four releases for both sides in this case?

15  A    Yes.  Outside of the obligations of the agreement, yes.

16  Q    And with respect to the litigation, had K&L Gates taken

17  any positions with respect to the conversion issue about

18  whether that issue had been collaterally estopped or decided by

19  Res judicata in State Court?

20  A    I think they believe it was collateral estopped, yes.

21  Additionally, I think -- I don't think this has been mentioned

22  yet, but the -- the components, there's an SLS component to the

23  debt as well as a Hawk component of the debt, Your Honor.  And

24  my understanding is that the SLS portion of the debt, which is

25  about $18 million, is not subject to conversion at this point.

1  It was triggered.  It hasn't been subject to conversion since

2  2019 is my understanding.  So there's a -- there's a portion

3  that really isn't subject to either past conversion or future

4  conversion at this point.

5  Q    And there are -- there are releases provided to the secure

6  creditors for the violation of the Debtor's rights that

7  occurred in the Delaware State Court proceedings?

8  A    There are, yeah, releases with respect to -- to

9  everything.

10  Q    So, Mr. Homony, can you tell us and the Court, what are

11  the benefits of the settlement in your mind?

12  A    Well, I think it provides a resolution to long-standing

13  litigation between the parties in multiple forms and multiple

14  courts over years and years.  It -- it will provide a recovery

15  for unsecured creditors, and it provides upside for additional

16  recoveries as well.  I think without a settlement, the cases

17  would prolong -- ultimately convert, and I think there might

18  not be value for anybody.  And so my -- my -- my goal here is

19  to achieve a recovery for unsecured creditors.  It's clear to

20  me that the Debtor cannot exist on any kind of go-forward

21  reorganization basis.  And so I think this is the best path

22  forward.  It also provides for a sale process which will

23  establish, in fact, what is the actual value of these assets,

24  which is the subject of interesting positions over time.

25  Anywhere from an excess of a billion dollars, Your Honor, to as

1   we sit here with an insolvent estate without the ability to pay

2   anybody.  So there's -- there's a great range, and we hope that

3   -- obviously the goal here is to again, create a competitive

4   bidding environment, drive the price up, and hopefully pay off

5   the secured creditors and provide a -- a larger recovery for

6   unsecured creditors at the end of the day.

7   Q    And just concluding one question about the litigation.

8   Did you consult with Mr. Coren and his firm about the damage

9   issues that could be related to the actions that were taken in

10  State Court?

11  A    Again, all matters.  I've -- I've -- I've had a

12  relationship with Mr. Coren for 20 years in many matters,

13  including in Chapter 11 trustee cases, and I trust his judgment

14  and experience and -- which is why I hired him in this case.

15  And he went -- he went through all the outstanding matters as

16  did I personally, and he advised me, and, I -- I took that

17  advice and tried to achieve the best outcome as we possibly

18  could.

19  Q    So then, in making a decision about moving forward with

20  the settlement agreement, did you compare the potential for

21  success in the litigation to the benefits that were being

22  provided under the proposed settlement?

23  A    Yes.

24  Q    And did you have any conclusions about proceeding with the

25  litigation based approach to this case?

```
 1   A     Well, I think, quite frankly, the -- the 225 action again

 2   is scheduled for trial on July 31st, Your Honor, and I think

 3   the chances of -- of winning that are remote.  And if we were

 4   to lose that case, the chances of any recovery for anybody in

 5   this case would likely be zero.  I think the creditors would be

 6   free to exercise their rights in terms of ultimately

 7   foreclosure, and there would be nothing left for unsecured

 8   creditors.

 9   Q     And again, in addition to consulting with Coren & Ress,

10   you actually consulted with the Debtor and possessions lawyer

11   that was handling that matter, Mr. Dupree (phonetic), correct?

12   A     Yes.  I spoke to Mr. Dupree personally, along with

13   counsel, and got his viewpoint in connection with all the

14   Chancery Court matters, including the 225 action and certainly

15   took that into consideration in reaching the settlement with

16   the secured creditors.

17   Q     And nothing he said changed your mind about your business

18   judgment and reaching a settlement as opposed to litigating?

19   A     No, just reaffirmed it.

20   Q     Did you consider the benefits that would be provided to

21   the creditors from the resolution of the ongoing disputes

22   between the parties and reaching into the settlement agreement?

23   A     Yeah.  Again, I think the chances, if we took the

24   litigation route, would be -- at the end of the day, there

25   would be nothing left for unsecured creditors.
```

1    Q    And I think you also mentioned to the Judge the benefits

2    and allowing the assets to be sold.   What what are the benefits

3    in allowing the assets to be exposed to the market?

4    A    Well, it will set -- it will set the finally the -- the

5    true value of these assets, which again has been the subject of

6    a great dispute and a range of values over the course of years,

7    and so it provides an opportunity again for to -- to pay off

8    the secured creditors in full and provide a greater benefit to

9    the unsecured creditors over and above what the minimum

10   carveout provides for in the settlement.

11   Q    And I think you mentioned that you did consider the

12   expense and delay that would be occasioned by proceeding in a

13   litigation posture with this case?

14   A    Yes.

15   Q    And administratively, did you have any fears that the

16   Debtor wouldn't be able to sustain any kind of administrative

17   -- additional administrative expenses with $2 million already

18   outstanding?

19   A    Sure.  The estate can't sustain what it has right now.

20   Q    And if the Court were to approve this settlement, what

21   would be the next steps for the Trustee to take in connection

22   with these bankruptcy estates?

23   A    So we will move to file bid procedures and get those

24   approved along with the stalking horse APA, go through that

25   diligence process, have the sale closed and have the sale

```
 1   hearing, and then proceed likely -- most likely -- with a plan

 2   of liquidation.

 3   Q    Okay.  Mr. Homony, do you feel that your advisors,

 4   financial and legal, provided you good advice and acted

 5   competently --

 6   A    Yes, of course.  Yes.

 7   Q    And did you reach this resolution in an arm's length

 8   discussion with the secured creditor?

 9   A    Absolutely.

10   Q    And it was pretty hard fought?

11   A    Yes.

12   Q    The K&L Gates folks are pretty aggressive?

13   A    Yes.  We had some interesting conversations directly and

14   indirectly through counsel, yes.

15   Q    And do you feel that the settlement is the best that you

16   can be attained under the circumstances?

17   A    Yes.

18   Q    And do you feel that it's fair to the creditors?

19   A    Yes.

20   Q    And are there tangible benefits to the estates if Hawk is

21   not the successful bidder?

22   A    Meaning?

23   Q    Well --

24   A    If somebody comes in and out bids Hawk?  Absolutely.  The

25   carveout, as I mentioned before, increases, you know, the
```

1  estate gets to retain 10 percent of every dollar in excess of

2  $150 million.

3  Q    Very good.

4           MR. GEORGE:  Just a moment, Judge.  Nothing further,

5  Your Honor.

6           THE COURT:  Thank you so much.

7           All right.  Who wants to go first?

8           MR. DEMARCO:  Yes, Your Honor.  Rembrandt will move

9  to cross.  Mr. Michaels will be handling that examination.

10          THE COURT:  Do you want to stay at the table or?

11                        CROSS-EXAMINATION

12 BY MR. MICHAELS:

13 Q    So I'm going to try to be brief.  The first question I

14 have for you is in -- you've testified that you have considered

15 the Hawk conversion position.  In your consideration, did you

16 evaluate the testimony and the trial transcript from June 26th

17 when Mr. Caponi represented that the Hawk debt was convertible,

18 to Judge Coleman?

19 A    Yes.

20 Q    And do you believe that that representation by Mr. Capone

21 provides a position where the Hawk debt is currently

22 convertible for 39 million?

23          MR. GEORGE:  Objection to the form, Your Honor.  He

24 added 39 million at the end there and that was not the question

25 he asked before.

1              MR. MICHAELS: I'll revise.

2    BY MR. MICHAELS:

3    Q    Is it your opinion that the Hawk debt is convertible?

4    A    I don't -- it may be convertible.  It's certainly subject

5    to dispute on both sides.  I think Hawk would tell you today

6    that there are arguments against conversion.  I personally

7    would tell you that the conversion agreements are vague and

8    ambiguous, and subject to interpretation.  And so whether or

9    not it's convertible would be subject to certainly litigation

10   going forward.

11   Q    Mr. Homony, do you have any experience in the design

12   manufacture of a flat-panel displays?

13   A    No.

14   Q    Do you have any experience in software related to 3D

15   content?

16   A    Not prior to this case, no.

17   Q    Did you retain any experts to advise you on the status of

18   the technology with respect to the Philips technology that had

19   been provided under license to Stream and its subsidiaries or

20   the Rembrandt technology they have provided under license?

21   A    No.

22   Q    So have you made any assessment whether the displays that

23   currently are in the possession of SCBV and/or SeeCubic are

24   utilizing 2d-plus-depth technology?

25   A    I have not.  I know there's a dispute with respect to --

1  to Rembrandt and its belief that their IP is being utilized by

2  SCBV.  I also know SCBV disputes that to the assertion by

3  Rembrandt.  And so --

4  Q    So there was prior litigation with Rembrandt that was

5  settled that resulted in a settlement agreement and a license

6  agreement also with Philips.  Do you have any information to

7  dispute that all of the technology related to Ultra-D is

8  reliant on a license from Philips and a license from Rembrandt?

9         MR. GEORGE:  Objection to form, Your Honor.  There's

10  no foundation that he would have any basis or ability to even

11  testify about this.  This is like a patent lawyer examining a

12  lay witness.  And so how can he really answer?

13        THE COURT:  I think that a fair question to ask him

14  is if he's seen that settlement agreement and taken that into

15  consideration in coming to this agreement.  You could ask him

16  that.

17        MR. MICHAELS:  I appreciate the guidance, Your Honor,

18  and I will certainly take it.  I think Mr. George is actually

19  making our point, and the questions that I'm trying to elicit

20  is not to enter this with the expectation that Mr. Homony has

21  this expertise, but that he did not retain any form of patent

22  attorney or expert to advise him --

23        THE COURT:  I understand that.  I take the point.

24        MR. GEORGE:  Your Honor, I would object because this

25  is really relevant because the motion's very clear.  The

1  Trustee's only selling what the Trustee owns.  And so this

2  seems like a little bit --

3          THE COURT:  He's trying to make the point that -- I'm

4  fine with that.  That doesn't --

5  BY MR. MICHAELS:

6  Q    Mr. Homony, are you familiar with the provisions in the

7  Philips license that specifically state that the software

8  provided to Ultra-D Cooperative Ventures -- excuse me, Ultra-D

9  Ventures retains ownership of that software by Philips?

10         MR. GEORGE:  Objection, Your Honor.  That's not what

11 the document says.  He knows that's not what it says.  I'm

12 happy to read to you what it says.

13         THE COURT:  I think that all I need to hear is that

14 he's looked at the document or his counsel has looked at the

15 document and taken that into consideration.

16 BY MR. MICHAELS:

17 Q    Have you looked at the portion of the Philips license that

18 states it is expressly acknowledged and agreed that the license

19 software is licensed to Ultra-D and not sold?

20 A    I understand it's not a sale; it's a license.  Yes.

21 Q    Okay.  What provision have you made to remove the Philips

22 technology and the Rembrandt technology prior to any sale of

23 assets?

24 A    So I'm not sure the Rembrandt technology is in

25 incorporated or not.  That was always a subject of dispute and

1    quite frankly, the timing of the settlement agreement you

2    referenced.  And the actions Rembrandt has taken subsequent to

3    that certainly call into question for me the validity of that

4    settlement.  With respect to the Philips license, I'm not sure

5    it's a valid license why any of the technology would have to be

6    removed from the current process.

7    Q    So are you familiar with the fact that the Philips license

8    includes a prohibition of transfer and that it upon change of

9    control, it can be terminated?

10   A    I don't think it says that.  I'm familiar with that

11   provision, and it actually provides that it's -- that there --

12   the request for a change is not to be unreasonably withheld by

13   Philips.  So I think if we notice Phillips that there's a sale,

14   that they will provide the appropriate authority and -- and

15   allow for that to be transferred.

16   Q    So are you aware that Philips has sold the underlying

17   patents and technology to Leah, Inc.? (phonetic)

18           MR. GEORGE:  Objection, Your Honor.  It assumes facts

19   not in evidence.

20           THE COURT:  I'm not sure how that's relevant either.

21           MR. MICHAELS:  But Philips can't grant the

22   authorization that he is --

23           THE COURT:  There's now some other party.  I mean,

24   listen, I get what you're saying -- your objection.  The

25   objections that have been raised is that you believe that the

```
1   licenses are not assignable; is that correct?

2            MR. GEORGE:  Yes.

3            THE COURT:  Okay.  So those are going to be issues

4   that we can take up at a sale hearing if we have that at some

5   point.  Thank you.

6   BY MR. MICHAELS:

7   Q    What, if any, information has been provided to you by

8   SeeCubic to show that they have the seven million-plus in cash

9   to honor their obligations under the proposed settlement

10  agreement?

11  A    I've been provided with SeeCubic investor information that

12  I'm satisfied that they'll be able to fund the carveout.

13  Q    How much cash does SeeCubic Inc. have to pay on the seven

14  million?

15  A    I don't know how much cash SeeCubic Inc. has.

16  Q    So who is the investor who is going to support the $7

17  million obligation?

18  A    Number one, I think that's confidential.  I don't know if

19  I can disclose that, to be honest with you.  I mean, I have --

20  I have information from an investor, a statement, that provides

21  that they have enough funds to -- to -- to pay the carveout.

22            MR. MICHAELS:  Did somebody object?

23            MR. GEORGE:  No, I didn't object.

24  BY MR. MICHAELS:

25  Q    To your knowledge, has anyone from Stream or its
```

1  subsidiaries been utilizing hardware or software that includes

2  Ultra-D technology and since you've been trustee?

3  A    I know that the research and development team certainly

4  has access to it and is utilizing it.  On the Stream side, I'm

5  not sure -- as I mentioned, Stream isn't really operating.  And

6  again, this goes back to the motion to compel turnover from

7  VSI.  I think VSI is in possession of a lot of the Stream

8  technology.  But again, this is all relevant to -- to a sale

9  hearing if -- I mean, these are -- these seem to be sale

10  objections and not settlement objections, but --

11  Q    What is -- let's take it specifically with respect to the

12  sale process that you're proposing.

13  A    Uh-huh.

14  Q    How would you propose to demonstrate the technology to

15  potential purchasers?

16  A    We're going to set up either in -- in Live or some kind of

17  a Zoom room in order to allow for live demonstrations of the

18  technology.

19  Q    So in that case, have you made any assessment as to

20  whether or not that technology that will be demonstrated is

21  utilizing Rembrandt technology?

22  A    I have not.  Again, I think the Rembrandt technology is

23  subject to an ongoing dispute.  And again, Rembrandt will have

24  whatever rights Rembrandt has after it's sold as well.  So the

25  sale will be as is, whereas, which is what the stalking horse

1    agreement will provide for.  Meaning, Hawk is taking on

2    whatever responsibilities and obligations that result from a

3    potential IP infringement, and they're well aware of that.

4    Q    So if a license is being utilized by the licensee inside

5    of a bankruptcy during dependency of that bankruptcy, the

6    license fees and royalties would typically be paid.  Are you

7    planning to pay Rembrandt for its license while you're

8    utilizing its technology on displays to demonstrate the

9    technology to potential investors, potential buyers?

10   A    Well, I understand that the license is -- it was

11   incorporated into a settlement, which is a prepetition

12   agreement.  I'm not aware that there are outstanding license

13   fees.  I don't think that's what the agreement provided for.

14   It provided for a lump settlement amounts and then an ongoing

15   delivery of goods.  And again, my view is that the Rembrandt

16   claim is potentially subject to challenge, and we're certainly

17   going to look at that once we get through this sale process.

18   Q    So to understand, you are planning to demonstrate the

19   Ultra-D technology that was the subject of years of litigation

20   and before Magistrate Parker, Shadron Stastney (phonetic), and

21   our team sat down and negotiated the term sheet that eventually

22   the Rajans themselves have signed.  So --

23          MR. GEORGE:  Your Honor, I object.  That's compound

24   and confusing.  I'm not even sure what he's asking whether he's

25   testifying.

1              THE COURT:  It all seems like you're trying to raise

2     potential arguments that are going to be raised at the sale

3     where you think that -- objections to the sale that it

4     shouldn't go forward, right?  Isn't that the basis of all this?

5              MR. MICHAELS:  In part, I think that's a fair

6     assessment of what I'm going.  I'm also looking at the 9019

7     specifically as a settlement agreement in the process

8     contemplated on that?

9              THE COURT:  We're not going to get into the weeds

10    here.  I don't want to hear every single argument, right?

11    You can ask the man if he's considered the litigation and all

12    the arguments raised therein.  And if he has, then I suggest

13    that you move on.

14             MR. MICHAELS:  So just give me a minute, Your Honor.

15    I may be done.

16    BY MR. MICHAELS:

17    Q    Have you, at any point, provided SeeCubic permission to

18    use Stream assets to demonstrate to potential investors in

19    SeeCubic?

20    A    Have I given them authority or permission?  No.

21             MR. MICHAELS:  That's my last question.

22             THE COURT:  Okay.  Thank you.

23             Ms. Baskin, did you --

24             MS. BASKIN:  A couple questions, Your Honor.

25             THE COURT:  Okay.

```
1                         CROSS-EXAMINATION

2    BY MS. BASKIN:

3    Q    When you testified about these purchase orders --

4              THE COURT:  Why don't you speak into the microphone?

5              MS. BASKIN:  I'm so sorry.

6              THE COURT:  That's okay.  You don't have to stand.

7    You can just sit there, but just draw it closer so we can all

8    hear your question.

9    BY MS. BASKIN:

10   Q    When you referred to the purchase orders,  I assume you

11   were talking about the purchase orders from Cistar (phonetic)

12   and from Cistar and from Zotel (phonetic), which were provided

13   to you from VSI?

14   A    Yes.

15   Q    And I assume that you are aware that in about a year ago,

16   March of 2023, there were purchase orders by these two

17   entities, Cistar and Zotel, and those were provided --

18             MR. GEORGE:  Objection, Your Honor.  Oh, I'm sorry.

19   BY MS. BASKIN:

20   Q    And those were provided to your counsel, correct?

21             THE COURT:  Objection, Your Honor.  I don't think

22   that she's identifying who the counterparty to the contract is.

23   He's the Trustee for Stream.  And I think those purchase orders

24   are not Stream purchase orders.

25             MS. BASKIN:  Well, if I could get to that --
```

```
 1              MR. GEORGE:  He can't really testify about --

 2              MS. BASKIN:  -- in my questioning, that would be

 3     helpful.

 4              MR. GEORGE:  He can't testify about what they are or

 5     the contents of them because they're not Stream.

 6              THE COURT:  Let's just try and identify so we all

 7     understand which purchase orders you're talking about.  So who

 8     are the parties to his purchase order?

 9              MS. BASKIN:  The purchase orders are -- there's one

10     -- that is Zotel, and that is for $140 million, and the parties

11     are Zotel and VSI.  VSI had agreed with the Debtor that those

12     purchase orders would be processed through Stream to give

13     Stream a future business going forward and make money.

14              MR. GEORGE:  That's testimony.  That's testimony.

15     That's not an examination of a witness.

16              THE COURT:  So I mean what I think we should do is,

17     you know, you're characterizing that purchase order as

18     something that the Debtor is obligated to pay.  I think that

19     you could ask him if he's seen this purchase order.

20              MS. BASKIN:  That's what I was getting to, Your

21     Honor.

22              THE COURT:  Have you seen this purchase order for the

23     140 million or something?

24              THE WITNESS:  I've seen both the purchase orders that

25     Ms. Baskin's referencing.
```

1          MS. BASKIN:  Okay.  He's seen them.

2          THE COURT:  And you're aware that your lawyer

3   requested VSI's lawyer for updated purchase orders from Zotel

4   and from Cistar, correct?

5          THE WITNESS:  Yes.  And I think they're included in

6   your objection.

7          THE COURT:  Then, I'm not really sure I understand

8   your comment when you just testified that you didn't see

9   evidence of the purchase orders.

10         MS. BASKIN:  Correct.

11         THE COURT:  So you testified earlier that you didn't

12  see sufficient -- you didn't see evidence of purchase orders

13  what would put Stream on the hook.  And so she's saying, well,

14  I'm giving you this purchase order here.  It doesn't have

15  Stream's name on it, but she clearly has some argument that

16  Stream is responsible.  So --

17         THE WITNESS:  So I can -- Your Honor.  So the VSI

18  purchase orders, they're the same purchase orders that were --

19  that Stream put forth as evidence and has spoken at great

20  length about in Judge Coleman's appointment opinion, Your

21  Honor.  They're the same.  They -- we just asked them to update

22  them to try to -- to get a sense of whether or not they were

23  valid.  But they're -- they're VSI purchase orders.  There is

24  no agreement between VSI and Stream to do anything, nothing.

25  And so I don't think they're even capable of being fulfilled,

1  if they are in fact valid in the sense that somebody's actually

2  going to pay $140 million for the TVs.

3  BY MS. BASKIN:

4  Q    Okay.  Well, then can you explain to the Court why your

5  attorney asked VSI's counsel to provide updated purchase orders

6  so that you could consider them and that they were actually

7  provided to you -- to your counsel on April 18th at 1:46 p.m.?

8  A    Listen, I want to consider everything.  Again, I came into

9  this with an open mind.  Mathu had it fair and equal

10  opportunity, Rembrandt had a fair and equal opportunity, and

11  Hawk had a fair and equal opportunity to present me with

12  whatever they thought was a proposal -- the best proposal that

13  they thought would resolve everything and provide some

14  recovery, because that was one of my demands from everybody.  I

15  have to get money to unsecured creditors.  And so up until the

16  point where I agreed with Hawk that these were going to be the

17  terms, I was negotiating with everybody.  So of course, VSI has

18  just never come forward with anything that's credible.

19  Q    That's not my question, sir.

20  A    So the proposed --

21       MR. GEORGE:  What is the question, Judge?

22       MS. BASKIN:  That is not my question.

23       THE COURT:  So I think that the testimony that I

24  understand today is that he has seen the purchase orders that

25  you asked him about.  He doesn't believe that those purchase

1  orders are credible and sounds like there's a legal argument

2  here which goes beyond testimony today.  VSI believes that the

3  Debtor may be on the hook for those purchase orders and the

4  Trustee, I'm assuming based upon, you know, advice he may be

5  getting from counsel, he disagrees.  So whether he asked for

6  updated purchase orders, he just testified that before coming

7  to an agreement to go with Hawk, he looked at all the evidence.

8          So you're asking me, I think, to infer that because

9  he asked for the updated purchase orders that he believes that

10 Stream was on the hook for it.  But he's just explained that he

11 asked for the updated orders because that was something that

12 you guys clearly thought gave you some -- right, right, that

13 the Debtor's going to pay for it, and he doesn't agree.

14          MS. BASKIN:  Thank you, Your Honor.

15          THE COURT:  You're welcome.

16 BY MS. BASKIN:

17 Q    I have another question.  Actually, what assets are part

18 of the sale?

19 A    Every potential asset that the Debtor has an interest in

20 except for those specifically excluded in the settlement

21 agreement?

22 Q    Well, what are they?  Can you list them?

23 A    All their -- the intellectual property.  It's -- honestly,

24 it's -- the large majority of it is in the non-debtor foreign

25 subsidiaries.

1  Q    I'm sorry, is in the what?

2  A    The non-debtor foreign subsidiaries are being sold.  The

3  equity -- Debtor's equity interest in those entities.

4  Q    Well, you filed a motion saying that you wanted the Court

5  to approve a settlement for the sale of assets and then there

6  was a footnote saying something to the effect, I believe, that

7  it didn't really involve litigation.  So you must somewhere

8  have a list of assets that you believe are subject to the sale

9  and that at some point should be made available to potential

10  bidders.

11  A    Yep --

12       MR. GEORGE:  Again, Judge, isn't that a sale

13  objection?

14       THE COURT:  Yeah, so --

15       MR. GEORGE:  I mean, he's selling everything -- he's

16  already testified he's selling everything that the Debtor owns.

17       THE COURT:  The 9019 motion refers to a sale of

18  substantially all of the Debtor's assets.  I feel no need to

19  get a list of substantially all of the Debtor's assets.  If at

20  the time that a sale is teed up and you want to make sure you

21  nail down everything and you see the exclusions, obviously,

22  you'll relay that to them and I'm sure that they will give that

23  to you.

24       MS. BASKIN:  Understood, Your Honor.  I have no

25  further questions.

```
 1              THE COURT:  Okay.  All right.  Well, thank you very

 2   much.

 3              You guys didn't have any redirect, did you?

 4              MR. GEORGE:  I don't have anything else, Judge.

 5              THE COURT:  Thank you.  You may take a seat.  Thank

 6   you.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  All right.  Well, thank you all for

 9   coming today.  I found this witness's testimony to be very

10   credible.  I do believe that -- oh, I just want to ask.

11              Mr. Callahan, did you have any objection to the 9019

12   motion?  I didn't see anything, but.

13              MR. CALLAHAN:  Your Honor, the US Trustee takes no

14   position on it.

15              THE COURT:  Okay.  Thank you very much.

16              I believe that this proposed settlement is fair and

17   reasonable and is in the best interest of the estate and I am

18   willing to differ and acknowledge the Trustee's business

19   judgment.  So I am prepared to enter an order approving the

20   9019 motion.

21              With regard to the TRO motion that's scheduled for

22   June 26th which Ms. Baskin cannot attend, I wanted to ask

23   counsel whether you thought that this was an urgent enough

24   matter that we should schedule a hearing before her vacation or

25   if this is something we can hear after her vacation.
```

1              MR. GEORGE:  Your Honor, we can push that.  I don't

2     know if you want to just put it out for 30 days for control

3     purposes until we see where we are in the -- in the sale

4     process.

5              THE COURT:  Yeah.  All right.  I mean, we have that

6     July -- don't we have the July --

7              THE CLERK:  24th and the 31st.

8              THE COURT:  All right.  We have July 24th and 31st

9     available so at some point can you guys confer amongst

10    yourselves and that's, what --

11             THE CLERK:  It's just the 31st.

12             THE COURT:  All right.  It's just July 31st.  Oh, you

13    know, obviously, we're not going to do that over her vacation.

14    So just if the 31st is okay with you, just confirm that with

15    Pam and then we'll have that hearing then.

16             MR. GEORGE:  Your Honor, I want to interrupt you for

17    a second.  I didn't move in those two exhibits.

18             THE COURT:  Yeah.  Sure.

19             MR. GEORGE:  Just before we do that.

20             THE COURT:  Any objection?

21             MS. BASKIN:  No, Your Honor.

22             THE COURT:  Okay.  Fine.  So admitted.

23             MS. BASKIN:  Your Honor, there's another hearing

24    that's scheduled for the 26th.

25             THE COURT:  Yeah.

1          MS. BASKIN:  I was wondering if that could be

2    continued also.

3          THE COURT:  Yeah, what's that -- so I know that there

4    was the Trustee's motion to enforce, which we'll now schedule

5    for July.  We should continue the TRO until some extra dates,

6    so you should give me some kind of order that I can sign about

7    that.  I do want to pick a date for Capstone.

8          What's the other matter scheduled for June 26th?

9          MS. BASKIN:  Well, I thought it was two.  It was

10   the --

11         THE COURT:  I thought there was only the motion to

12   enforce filed by the Trustee.  Was there some other motion that

13   hasn't been mooted today?

14         MS. BASKIN:  The objection to the claims, Your Honor.

15         THE COURT:  Yes.  The objection to the claim is now

16   moot because I'm -- I am going to approve the 9019 motion.

17         Okay.  So I think that leaves --

18         MR. VAGNONI:  Your Honor?

19         THE COURT:  Yeah.

20         MR. VAGNONI:  I'm sorry to interrupt.  The motion to

21   enforce the automatic stay isn't something that we agreed to

22   adjourn.  We agreed with Ms. Baskin that based on her vacation

23   we could have it sooner than the 24th or the 26th, but we

24   hadn't agreed to adjourn it beyond that.

25         THE COURT:  Well, that's what I was just asking you

1    guys.  I was asking you whether or not --

2              MR. GEORGE:  I was confused, Judge.  I thought we

3    were talking about the TRO.

4              THE COURT:  No.  So the TRO, you're just going to

5    give me an order --

6              MR. VAGNONI:  Yes.

7              THE COURT:  -- that continues that date for some

8    further future time.  But the Trustee motion to enforce against

9    VSI, that one we're obviously not going to have over her

10   vacation.

11             MR. GEORGE:  No, we're not.

12             MR. VAGNONI:  No, no.  No, Your Honor.

13             THE COURT:  So I wanted to know -- right.  So I

14   wanted to know if this was an urgent enough issue that you

15   needed me to have a hearing before she goes on vacation?

16             MR. VAGNONI:  And again, we've -- I apologize.  We

17   thought you were talking about the TRO.  Yes, we do believe

18   that it is an urgent enough, especially considering that the

19   assets are going to be marketed.

20             THE COURT:  Right.

21             MR. VAGNONI:  If there's any question about who's

22   utilizing them --

23             THE COURT:  Ms. Baskin, when are you going to -- when

24   are you leaving for vacation?

25             MS. BASKIN:  I am leaving June 24th.

1            THE COURT:  Okay.  So --

2            MS. BASKIN:  I do believe we just got served with the

3    motion.

4            THE COURT:  You what?

5            MS. BASKIN:  We just got served with the motion.  The

6    Trustee was nice enough to give us five extra days to file our

7    response.  We did not -- we did not consent, although obviously

8    the Judge can overrule this, that we would have the hearing

9    before my planned vacation because we believe that there's

10   discovery that needs to be taken.

11           THE COURT:  Well, I mean, it just seems to me that,

12   you know, if they think that you're using their technology and

13   it's, you know, it's somehow hurting them, then I think we

14   should probably have a hearing sooner rather than later on,

15   then.

16           So when did you file that motion to enforce?

17           MR. VAGNONI:  We filed that last week.  Was it the

18   beginning of last week or the end of --

19           THE COURT:  All right.  So when is her objection

20   deadline?

21           MR. VAGNONI:  The 30th, Your Honor.  We filed it on

22   May 30th.

23           THE COURT:  Okay.  So they filed it last Thursday, so

24   I assume you got a copy of that electronically.

25           MS. BASKIN:  Yes.

```
 1              THE COURT:  And originally it had a date of the 26th,

 2  which you're away from, right?

 3              MS. BASKIN:  Correct.

 4              THE COURT:  Okay.  So didn't you guys know at that

 5  time that she had that vacation scheduled on the 26th?

 6              MS. BASKIN:  Yes, they did.

 7              THE COURT:  I think she'd be saying that multiple

 8  times.  That's why we had the hearings all today.

 9              MR. GEORGE:  Again, Judge, I --

10              THE COURT:  Let's do this.  Let's not go crazy here.

11  Let's just schedule it for right after she gets back.

12              So you said you're leaving on the 24th and you're

13  coming -- the 24th and you're coming back when?

14              MS. BASKIN:  On Saturday, July 6th.

15              THE COURT:  Saturday, July 6th.  Okay.

16              Pam, do I have any hearing dates on the week of July

17  8th?

18              THE CLERK:  You do.  You have --

19              THE COURT:  You what?

20              MR. COREN:  Unfortunately, I am starting a trial in

21  the district court in Delaware that starts on the 8th, will

22  take the entire week.

23              THE COURT:  Okay.  What about the 15th?  What about

24  July 15th?  Monday?

25              MS. BASKIN:  That works, Your Honor.
```

```
1              MR. COREN:  I can do it.

2              THE COURT:  Okay.  And did you guys feel strongly

3     about having an in-person hearing or might I persuade you to

4     have a Zoom hearing where the electronic recorder can put up on

5     the screen which we all see all of the exhibits?  It's very

6     efficient.  But if someone feels very strongly about having an

7     in-person hearing, I will do so.

8              MS. BASKIN:  I feel the electronic hearing works for

9     us.

10             THE COURT:  No?  Are you guys -- Mr. Coren, have you

11    ever had a Zoom hearing?

12             MR. COREN:  Yeah, I don't know --

13             THE COURT:  It's lots of fun.

14             MR. COREN:  I don't know about when I'm cross-

15    examining witnesses.

16             MR. GEORGE:  And the jury's out.

17             THE COURT:  All right, fine.

18             MR. COREN:  But if Your Honor feels strongly about

19    it, I'll adapt.

20             THE COURT:  I think that we should try with a 10:00

21    o'clock Zoom hearing on the 15th.  And we'll -- I'll see if I

22    can get you to see my way, Mr. Coren.

23             MR. COREN:  All right.

24             THE COURT:  All right.  So Ms. Baskin, have a good

25    vacation.
```

1           MS. BASKIN:  Thank you very much.

2           THE COURT:  Now, when should we have that hearing --

3    should we also put Capstone on at some point?  How about this,

4    why don't you guys confer amongst yourselves because you need

5    to have time to incorporate Mr. Callahan's objection.  It

6    sounds like Ms. Baskin needs to have a coming to Jesus talk

7    with her clients about exactly how they feel about the

8    affidavit.  And then you want to come back to Pam once all of

9    you have conferred about a good date and we can have that

10   scheduled too?

11          I would suggest not having it, though, on that July

12   15th date.  Just pick another date like on a regular listed

13   hearing or something like that.  Okay?

14          MR. GEORGE:  Very good, Judge.

15          THE COURT:  All right.  I think we have all of the

16   dates and details.

17          MR. GEORGE:  Your Honor, you said you were going to

18   set the Capstone hearing.

19          THE COURT:  That's what I just said.  Wasn't that

20   just the Capstone?

21          MR. GEORGE:  Oh.

22          MR. COREN:  She said whenever we want.

23          MR. VAGNONI:  Your Honor, is there any way we could

24   have it next week, possibly?  We do need to confer --

25          THE COURT:  The Capstone?  Oh, you think you could

1  get that resolved by next week?

2          MR. VAGNONI:  I -- we have to.  We have to get them

3  onboard and moving towards the sale.

4          THE COURT:  Oh, okay, fine.  Do we have -- okay.

5          MS. BASKIN:  Your Honor, I'm not available next week.

6  I'm preparing for another trial.

7          THE COURT:  Yeah, okay.

8          MR. GEORGE:  But we should talk about it this week

9  then.

10         THE COURT:  Oh, okay.

11         MS. BASKIN:  Maybe we could work something out when

12  we --

13         THE COURT:  Okay.  Well, you know, my thoughts about

14  Capstone, clearly, Mr. Callahan, you'll get them your comments.

15         My concern about Capstone, the objections to

16  Capstone, are that I fear that maybe your clients have

17  overextended themselves with regard to the facts.  And I would

18  hate to see -- I don't want to have a hearing where they're

19  going to tell me things that aren't true because, you know,

20  that's going to be bad for everybody.

21         So I don't presently see any concerns with the

22  Capstone objection.  And I'd like to see all of your objections

23  worked out.  If I have to have an evidentiary hearing, your

24  clients will be here.

25         MS. BASKIN:  Yes.

1         THE COURT:  And if they're going to take a position

2   that is opposite to what was put into that amended verified

3   statement, I'm going to have to get to the bottom of the day.

4   And I guess I just want to make sure that your relay to your

5   clients right now that my concern is that if I have to have an

6   evidentiary hearing and they oppose statements made on there

7   and I ultimately find them to be not credible and that they

8   lied to me about that, that I will invite any party here to

9   sanction them for doing so.

10         And I have a lot of confidence in you, Ms. Baskin, to

11   know that you would not do anything untoward.  So I'm hopeful

12   that we're not going to have to have an evidentiary hearing.

13   But if we do, I'd like to make sure that that warning goes

14   straight to them.

15         So having said that if we --

16         MS. BASKIN:  Your Honor, and I will relate that.

17         THE COURT:  Thank you.  If we do need to have a

18   hearing, why don't you guys talk amongst yourselves, come up

19   with a proposed date.  Let Pam know.  If there's an issue and

20   we can't pick a hearing date, let her know that too and I will

21   resolve that.

22         MR. COREN:  Thank you, Your Honor.

23         MR. GEORGE:  Thank you, Your Honor.

24         THE COURT:  All right.  Thank you, everybody.  Have a

25   good day.



 1          MR. GEORGE:  Thank you, Judge.

 2          MR. CALLAHAN:  Thank you.

 3          MS. BASKIN:  Thank you.

 4      (Proceedings adjourned)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                    :
IN RE:                              : Case No.  23-10763-amc
                                    :
STREAM TV NETWORKS, INC.  CH: 11    :
AND NETWORKS, INC. AND              : Philadelphia, Pennsylvania
TECHNOVATIVE MEDIA, INC.            : October 30, 2024
                                    : 11:07 a.m.
. . . . . . . . . . . . . . . . . . :
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For SeeCubic, Inc.: | Marley Brumme, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For the Chapter 11 Trustee: | Michael D. Vagnoni, Esq.<br>Obermayer Rebmann Maxwell &<br>Hippel LLP<br>Centre Square West<br>1500 Market Street, Suite 3400<br>Philadelphia, PA 19102<br>215-665-3066 |
| | Steven M. Coren, Esq.<br>Kaufman Coren & Ress, P.C.<br>Two Commerce Square<br>Suite 3900<br>2001 Market Street<br>Philadelphia, PA 19103-2713<br>215-735-8700 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010 |

```
For Hawk Investment Holdings    Steven Caponi, Esq.
Ltd.:                           K&L Gates
                                600 N King Street
                                Suite 901
                                Wilmington, DE 19801
                                302-416-7080

                                Jonathan N. Edel, Esq.
                                300 South Tryon St., Suite 1000
                                Charlotte, NC 28202

For VSI:                        John H. Thompson. Esq.
                                Akerman
                                750 Ninth Street, N.W.
                                Washington, D.C. 20001
                                202-824-1760

                                R. Adam Swick, Esq.
                                Akerman
                                500 West 5th Street, Suite 1210
                                Austin, TX 8701
                                737-999-7103
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   OCTOBER 30, 2024                                    11:07 A.M.

 2          THE COURT:  Numbers 28 and 29 are motions involving

 3   Stream TV Networks, an expedited motion to withdraw motion, and

 4   a motion to quash and for a protective order.

 5          THE CLERK:  Okay.

 6          THE COURT:  Appearances, please.  Let's take -- we're

 7   going to take the parties in the courtroom first and then

 8   anyone who's on the line that wants to be.

 9          MR. COREN:  Good morning.  Steven Coren for the

10   Trustee.

11          THE COURT:  Okay.

12          MR. VAGNONI:  Good morning.  Michael Vagnoni on

13   behalf of the Chapter 11 Trustee.

14          THE COURT:  Okay.

15          MR. THOMPSON:  Good morning, Your Honor.  John

16   Thompson of Akerman on behalf of VSI and I'm here with my

17   colleague, Adam Swick.

18          THE COURT:  Okay.  Welcome.  I don't know if there's

19   anyone.  Is there anyone on the phone who would like to enter

20   their appearance?

21          MR. CAPONI:  Hi.  Good morning.  This is Steven

22   Caponi from K&L Gates on behalf of Hawk.

23          THE COURT:  Okay.

24          MS. BRUMME:  And Marley Brumme from Skadden on behalf

25   of SeeCubic, Inc.
```

```
1              THE COURT:  Okay.  All right.

2              MR. DEMARCO:  This is Andrew Demarco from Devlin Law

3   Firm on behalf of Rembrandt just listening in today.

4              MR. EDEL:  And this is Jonathan Edel from K&L Gates

5   on behalf of Hawk Investment Holdings.

6              THE COURT:  All right.  Well, I guess I just wanted

7   to say at the outset I saw the papers filed by the parties and

8   that with this second round of discovery it appears that there

9   are issues related to the upcoming bid procedures hearing that

10  we're going to have that have now been added to the discovery.

11  And I understand you both -- both parties consent to that.

12             I guess I choose to handle this by sort of

13  bifurcating it.  With regard to the discovery related to

14  anything not related to the bid procedures, I am going to quash

15  all of that discovery.  I just -- you'll see in my opinion that

16  I don't believe that there's any basis for that.  And I am

17  going to enter an order granting the motion to withdraw the

18  motion for entry of automatic stay.

19             So, at this point, the discovery with regard to the

20  non-bid procedures will -- all of those discoveries will not --

21  you know, I'm not -- I don't see any point.  I think that

22  they're just not relevant and I think our next step then is to

23  -- I guess we have a hearing, Pam, on the reconsideration

24  motion coming up.

25             THE CLERK:  Yes.  Yes.  On the 7th.
```

```
1              THE COURT:  Okay.  So I'll hear from you guys on the

2    7th.  But I appreciate all your briefing on this and you'll see

3    the orders that I enter shortly.

4              MR. THOMPSON:  Well, Your Honor.

5              THE COURT:  Yeah.

6              MR. THOMPSON:  May I make a record?

7              THE COURT:  Yeah.  Go ahead.

8              MR. THOMPSON:  Okay.  Your Honor, I think that the

9    difficult -- and I understand your ruling, but it also includes

10   -- our contention is and I think it's one that would be born

11   out through discovery -- is that everything that we've asked

12   for ultimately gets to the issues involved with the Trustee's

13   motion for sale and bidding procedures.

14             Now if Your Honor's order quashing that discovery is

15   not limiting our capability to go into those topics, then I

16   think I understand it, but --

17             THE COURT:  Well, I guess I want it -- yeah.  I want

18   it with regard to your discovery related to the bid procedures.

19   I hadn't yet seen your objection to -- which I'm sure is -- I

20   don't know if you've already filed it, but I'm sure it's

21   forthcoming.  But I wanted to look at that first and then I

22   will enter my ruling in connection with your discovery request

23   with regard to that matter.

24             MR. THOMPSON:  Yes, Your Honor.  But there are other

25   topics including TRO violations, alleged TRO violations,
```

```
 1   failure to remedy or cure those violations, actions of other
 2   parties in the case that we assert are related to the sale and
 3   the bid procedures.
 4           THE COURT:  Okay.  I think that a lot of the
 5   discovery that you have asked for also just relates to your
 6   reconsideration motion, which I'll be ruling on shortly.  So,
 7   you know, so I'm trying to just keep things on their own
 8   separate track because I think it's easier for me to handle all
 9   of your discovery requests if I view it in that light.
10           MR. THOMPSON:  Yes, Your Honor.  And you -- I'm sure
11   Your Honor took notice of the fact that we have a plan that we
12   are intending to file --
13           THE COURT:  Yeah.
14           MR. THOMPSON:  -- in very short order.  Some of these
15   same issues have come up --
16           THE COURT:  Is this a plan that is consensual with
17   the Trustee or it's just --
18           MR. THOMPSON:  It will not be.
19           THE COURT:  Okay.
20           MR. THOMPSON:  Notwithstanding our best efforts, Your
21   Honor.
22           THE COURT:  Okay.  Okay.
23           MR. THOMPSON:  And that's actually part and parcel of
24   what we're talking about here.
25           THE COURT:  Okay.
```

1          MR. THOMPSON:  So it also involves the motion for

2    reconsideration.  So I would think that our motion for

3    reconsideration also -- are you suggesting that we not have --

4    that we not get any discovery from this Trustee with respect to

5    that?

6          THE COURT:  At this point, I would tell you my

7    inclinations with regard to your motion for reconsideration,

8    I'm not inclined to grant your motion for reconsideration.  And

9    if I do end up concluding in that manner, then I'm not going to

10   be permitting discovery to go forth with regard to that issue

11   as well.

12         MR. THOMPSON:  Well, wouldn't it be important for the

13   Court to understand that what we deem to be new information for

14   the Court to make a determination?

15         THE COURT:  Well, I'm assuming you've included

16   everything in your papers that you would like me to consider.

17         MR. THOMPSON:  Well, I think we have allegations that

18   need to be --

19         THE COURT:  So I think that what you're saying is

20   that you think that this discovery will, you know, uncover a

21   smoking gun, something like that, right?  That whatever -- I'm

22   just interested in whatever evidence you have right now to

23   justify those discovery requests.  And right now, I'm not

24   feeling that convinced.

25         MR. THOMPSON:  Your Honor, I -- what we would suggest

1  is that the 9019 settlement agreement together.  And this is

2  not something that we had concluded prior to the Trustee's

3  rejection of what we think is a very reasonably plan, joint

4  plan proposal, to pay virtually 100 cents to all creditors and

5  certainly a much better outcome for unsecured creditors.  We

6  weren't of this opinion until after that rejection, but it

7  strikes us at this point that it is very possible that what the

8  9019 settlement agreement and the proposed sale and bid

9  procedures actually constitute is a sub rosa plan.

10         THE COURT:  Okay.

11         MR. THOMPSON:  So, okay.

12         THE COURT:  I understand --

13         MR. THOMPSON:  Okay.

14         THE COURT:  -- that that's your position and I'll

15  take that into consideration when I enter my ruling, okay?

16         MR. THOMPSON:  Okay, Your Honor.  Thank you.

17         THE COURT:  All right.  Thank you very much.

18         Okay.  Anything else, Mr. Coren?  Yes?

19         MR. COREN:  No, Your Honor.  It's unusual where I

20  come down here and say nothing, but I'm happy to say nothing.

21         THE COURT:  All right.  Well, I appreciate everyone's

22  thorough briefing.  Yes.

23         MR. SWICK:  Can I please say one thing just for the

24  record?

25         THE COURT:  Yeah.  Go ahead.

1              MR. SWICK:  Okay.  So on the motion to withdraw, like

2      the motion for turnover was also for sanctions and included in

3      that were documents that we're extremely convinced were

4      falsified.  And they were accusing our client of doing things

5      they did not do and asking for sanctions.  So I really think,

6      and I would implore this Court to let us -- and look, most of

7      this stuff could have been done by a phone call,

8      communications, emails.  Communications are not going great

9      with opposing counsel.

10             So like if somebody filed something and they said,

11     "Hey, man, this is a mistake.  Here's what happened."  Fine.

12     But we didn't have that conversation.  We just had we're going

13     to withdraw this on the day before discovery is due when we've

14     been conferring about doing discovery and you're not going to

15     get any information about what we've -- like I don't make these

16     accusations lightly -- were clearly either falsified documents

17     or they were insinuating that our client used them in violation

18     of this Court's order, which they were not.  And there is no

19     evidence that they were.

20             So I -- on this motion to withdraw the motion for

21     turnover and sanctions, Your Honor, I really believe we should

22     be able to get down to why those documents, that motion for

23     turnover was filed and have some explanation for that because

24     that goes into our bidding procedure.  Should we, you know, go

25     with this sale?  Should we do a plan?  Like are we behind the

```
1   eight ball here because they're not going to do anything with
2   us.  And I also want to make it clear.  We took this case to
3   not waste anybody's time.  Like I'm not going to come in and do
4   a plan objection when we can't do a substitution or anything
5   like that.  But to me, and I'm not from this Court, but I feel
6   like the really injustice that's going on, that someone is
7   trying to get my client for sanctions on falsified documents
8   and I can't get any explanation or discovery on those
9   documents.
10          THE COURT:  You know, I've read all of the
11  allegations that you guys have made, and unfortunately, I'm
12  just not convinced by those allegations.  And I appreciate that
13  you're zealously advocating on behalf of your client.  I'm just
14  not convinced on the evidence and the arguments that you've
15  presented to me today.  Okay.
16          Okay.  So I guess we'll see you again with regard to
17  the next hearing, which I guess is next week then, Pam?
18          THE CLERK:  Yes.
19          THE COURT:  Okay.  All right.  Thank you, both.
20          MR. THOMPSON:  Very good.  Thank you, Your Honor.
21          MR. COREN:  Thank you, Your Honor.
22          THE COURT:  Yes.  Thank you.
23          MR. THOMPSON:  Have a nice day.
24          THE COURT:  You too.
25          (Proceedings adjourned at 11:17 a.m.)
```

## C E R T I F I C A T E

       I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : |
|  | : Case No.  23-10763 |
|  | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : ADV. No.  23-00057 |
| AND TECHNOVATIVE MEDIA, | : |
| INC. | : Philadelphia, Pennsylvania |
|  | : November 7, 2024 |
| Motion to Reconsider (related | : 11:14 a.m. |
| Documents Order on Motion to | : |
| Approve Compromise under Rule | : |
| 9019) Filed by Visual | : |
| Semiconductor, Inc. Represented | : |
| by Donald N. David (Counsel) | : |
|  | : |
| . . . . . . . . . . . . . . . . . : | |

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Trustee:                    Michael D. Vagnoni, Esq.
                                    Obermayer Rebmann Maxwell &
                                    Hippel LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia, PA 19102
                                    215-665-3066

                                    Steven M. Coren, Esq.
                                    Kaufman Coren & Ress, P.C.
                                    Two Commerce Square
                                    Suite 3900
                                    2001 Market Street
                                    Philadelphia, PA 19103-2713

For Rembrandt:                      Andrew Peter Demarco
                                    Devlin Law Firm, LLC
                                    1526 Gilpin Avenue
                                    Wilmington, DE 19806
                                    302-449-9010

                                    Chris Michaels

<u>APPEARANCES</u> (Continued):

For VSI:                          John H. Thompson
                                  Akerman
                                  750 Ninth Street, N.W.
                                  Suite 750
                                  Washington, D.C. 20001
                                  202-393-6222

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 7, 2024                            10:00 A.M.

 2           THE COURT:  Perfect timing, gentlemen.  Morning,

 3   Steve.

 4           MR. COREN:  Good morning.  How are you, Judge?

 5           THE COURT:  I'm doing okay.  Hanging in.  Vagnoni?

 6           MR. VAGNONI:  Good morning, Your Honor.

 7           THE COURT:  Good morning.  All right.  Well Pam, it's

 8   10:00.

 9           THE CLERK:  Okay.  All right.  Today's Thursday,

10   November 7th, the 10:00 list.  The only matter on the list is

11   Stream TV Network's motion to reconsider the motion to approve

12   compromise filed by VSI.  Appearances please.

13           MR. VAGNONI:  Morning, Your Honor.  Michael Vagnoni

14   and Ed George on behalf of William Homony, the Chapter 11

15   Trustee.  Also with us today is Steve Coren, special counsel

16   for the Trustee.

17           MR. COREN:  Right.

18           THE COURT:  Okay.

19           MR. THOMPSON:  Good morning, Your Honor.  John

20   Thompson of Akerman LLP on behalf of VSI.  Morning.

21           THE COURT:  All right.  Well maybe no one else wants

22   to make their appearance known.

23           MR. DEMARCO:  Good morning, Your Honor.  This is

24   Andrew DeMarco with Devlin Law Firm here for Rembrandt.

25           THE COURT:  Okay.  All right.  Drive safely.
```

4

1        MR. DEMARCO:  Oh, I'm parked, Your Honor.

2        THE COURT:  Okay.  All right.  Okay.  All right.

3   Well, if no one else wants to enter their appearance.  I have

4   read all of the briefs, and I guess I just wanted to see if

5   there were any additional arguments that were different than

6   the arguments already set forth in the briefs.  So if you do,

7   I'd like to hear them.

8        MR. THOMPSON:  Your Honor, I would like to make a

9   presentation if I may, right?  We've asked for a consideration

10  for some important and very fundamental reasons.  In short, we

11  believe that the Court should reconsider the 9019 settlement

12  agreement because it is fatally flawed.  There are a number of

13  points of new information that the Court was not privy to in

14  making its decision to enter the order approving the 9019

15  settlement agreement.  And therefore, we think that it, again,

16  is flawed for a number of reasons.

17       The first is that the Trustee didn't complete his

18  assignment as issued to him through the Court's appointment

19  order.  And as a result, the Hawk party's claims and the

20  conversion of their notes were never truly investigated or

21  vetted by the Trustee despite protestations to the contrary.

22       Accordingly, the allowance of the secured claim in

23  the amount of $180 million, $150 million of that being

24  permitted to a credit bid is patently unreasonable in our view.

25       As set forth in greater detail in our objection, the

1    Trustee's settlement to the sale motion, the Trustee's

2    settlement agreement sets up a framework for sale process

3    that's both unworkable from a legal and practical perspective

4    and unfair to all stakeholders, including potential competing

5    bidders and unsecured creditors because it establishes an

6    unlevel playing field that advantages the Hawk parties, the

7    stalking horse, to the detriment of all others.

8            Finally, the 9019 settlement agreement failed to

9    negotiate and provide a fiduciary out to permit the

10   consideration of any debtor deal that might arise after the

11   entry of disagreement with the Hawk parties. Specifically,

12   better deals that would ensure administrative solvency for the

13   estates, achieve meaningfully better recoveries for all

14   creditors, including unsecured creditors.  And we've seen the

15   negative fallout from the failure to secure such a fiduciary

16   out time and time again in this case, even if the Court has

17   not. As Trustees similarly rejected reasonable and considerably

18   better offers after offers in favor of some blind lot loyalty

19   to Hawk's outcome and the 9019 settlement.

20           Those aren't just VSI offers to be clear, Your Honor.

21   Those are offers coming from multiple parties and interests in

22   the case.  The bottom line is the Trustee is unwilling or

23   unable to take yes for an answer and achieve a better result

24   for the Debtor's estates and a better recovery for creditors of

25   those estates based upon the unreasonable and unwavering

1   allegiance to this 9019 settlement agreement.

2          That's never made any -- and that settlement

3   agreement has never made any sense, but it's definitely one

4   that does not make sense now in wake of the multiple offers and

5   compromise that would improve outcomes for all parties and do

6   so in a fair way.

7          Accordingly, we believe that the Court should grant

8   our motion to reconsider, vacate its prior order approving the

9   9019 settlement.  Your Honor, I'll take your questions if you

10  have any.

11         THE CLERK:  Judge, you're on mute.

12         THE COURT:  I'm sorry about that.  I don't have any

13  questions, but thank you, Mr. Thompson.

14         MR. THOMPSON:  Thank you.

15         THE COURT:  Mr. Vagnoni, Mr. Coren, you're welcome to

16  respond but you don't have it.  It's totally up to you.

17         MR. VAGNONI:  Your Honor, Michael Vagnoni on behalf

18  of the Trustee.  I'll keep it simple.  This is a situation

19  where the Trustee was given a mandate by the bankruptcy court.

20  I know counsel with VSI just indicated without any evidence

21  that the Trustee didn't fulfill his function.  We disagree

22  wholeheartedly.  We -- since the beginning of this case, I

23  think Your Honor is well aware that not only did the Court

24  appoint a Trustee, but the Court also granted relief from the

25  automatic stay to Hawk to go forward with the 225 action, which

1    they attempted to do.

2          He gave the Court -- the Trustee, a very short

3    timeframe.  During which time the Trustee met with all of the

4    parties who were at play here, met with VSI, or the Debtor.  We

5    couldn't really tell which.  But with Mr. Rajan's group on

6    multiple occasions.  Met with Hawk.  Met with SeeCubic, Inc.

7    And met with Rembrandt.  And the result of those meetings and

8    the shortened timeframe that we had to operate in and extensive

9    -- and this speaks a little bit to the conversion issue that

10   Mr. Thompson alluded to.  Met with the Debtor's chancery court

11   attorney, Andy Dupre, at McCarty & English who now is at

12   Akerman.

13         And we're left with the very clear impression and

14   opinion that the 225 action was careless at best, and could

15   result in and would likely result in the estate having no

16   assets for unsecured creditors.

17         Because of that, Your Honor, the Trustee entered into

18   a settlement agreement with Hawk that would guarantee money

19   into the estate, and would get, our hope is, money to unsecured

20   creditors.  The multiple offers that Mr. Thompson alluded to --

21   again, I'm not sure what offers he's talking about, but we have

22   spent time with VSI to vet the proposals that they would like

23   to make and have found them to be lacking in evidentiary

24   support.  And the Trustee has chosen to move forward with the

25   Hawk settlement.

1           The Court evaluated that settlement at the 9019

2    hearing.  Found that the Trustee met all the Martin factors,

3    and approved the settlement.  We don't believe that VSI has

4    established grounds for this Court to reconsider to the extent

5    that 8008 would permit that.  And we believe that the motion

6    should be denied in its entirety.

7           THE COURT:  Okay.  Thank you, Mr. Vagnoni.

8           MR. VAGNONI:  Mr. George, I think that you're not on

9    mute, so when you're not on mute, we hear all of your email

10   rings, your phone calls.

11          THE COURT:  Okay, good.  All right.  Thanks, Mr.

12   George.  All right.  Mr. Coren, did you want to add anything to

13   that?

14          MR. COREN:  Yes.  I would just briefly, Your Honor.

15   Because the notion that we didn't do our due diligence or

16   investigation is preposterous.  I was hired to do just that.

17   And in fact, I participated in some of those meetings, reviewed

18   lots of the documents, interviewed the Debtor's counsel in the

19   225 action at length.  Looked at the materials from that case.

20   And I rendered a judgment and an opinion and gave advice, which

21   I will only talk of at the highest level to the Trustee.

22          And I wholeheartedly, given that analysis and my

23   experience and my review, concluded that this settlement was in

24   the best interest of the estate.  Wholeheartedly support that

25   there were serious risks as Mr. Vagnoni points out, which if

1    they didn't go well for the estate, would have resulted in the

2    estate having nothing.  I viewed those risks as real, and we

3    did an analysis of them, and I cancelled the trustee

4    accordingly.  And I did weigh in and participate in looking at

5    what are referred to as subsequent offers that -- in the

6    judgment of Mr. Thompson or his client he thinks are better to

7    the estate.  And I counseled along with bankruptcy counsel, the

8    Trustee.  And in my view to the extent that I looked at the

9    support for them, much of them was a illusory much like that,

10   which was present to Judge Coleman and she wholeheartedly

11   rejected it.

12         So I support the settlement.  I counseled the Trustee

13   accordingly as bankruptcy counsel.  And reject wholeheartedly

14   the notion that he did not perform his functions under the

15   bankruptcy code and the mandate.  He did precisely that as did

16   his professionals.  Thank you.

17         THE COURT:  Thanks, Mr. Coren.  Okay.  Well, I'm

18   going to take the matter under advisement.  I hope to have out

19   an opinion and order on this I hope in the next week or so.  So

20   you'll see that soon, all right.  Thank you all for your

21   presentation today and I'll talk to you guys soon.

22         MR. THOMPSON:  Your Honor, before -- I think you

23   indicated at the last hearing last week that you would rule

24   with respect to the motion to quash.

25         THE COURT:  Yeah.

1          MR. THOMPSON:  With a specific request, with a

2    specific regard to the sale and the procedures order.

3          THE COURT:  Yes.  And so, that will be part of the

4    opinion and order, my ruling on the discovery.

5          MR. THOMPSON:  Will be part of your consideration to

6    -- of the reconsideration motion?

7          THE COURT:  So I'm going to rule on the motion for

8    reconsideration.  And I'm also going to rule on the discovery

9    in connection with the reconsideration. But there is also

10   outstanding discovery regarding the bid procedures and things

11   like that.  So I'm going to just rule on the discovery with

12   regard to the motion for reconsideration topic.

13         MR. THOMPSON:  Okay.  But the sale topic is different

14   from the reconsideration topic, Your Honor, with respect to

15   discovery.

16         THE COURT:  Yes, absolutely.

17         MR. THOMPSON:  Right.

18         THE COURT:  So there's, you know, there were three

19   topics for discovery.  One I've already ruled on, right?

20         MR. THOMPSON:  Correct.

21         THE COURT:  And now there's the discovery in

22   connection with today's hearing.  And then there's also

23   discovery in connection with the bid procedure motion.

24         MR. THOMPSON:  Yes, Your Honor.  The bid procedure

25   motion, of course, is going forward on the 13th.  And the

1   question is whether we will get an opportunity to have the

2   discovery, in particular the deposition discovery, that we

3   asked for and need in advance of that hearing.  For the reasons

4   we set forth in our objection filed last night, it's pretty

5   critical.  And I would hope that the Court would see the need

6   to have that discovery done in advance of the hearing as it's

7   only really helpful I would think to Your Honor before the

8   hearing.

9        (Telephone ringing)

10            THE COURT:  Mr. Thompson, are you having technical

11   difficulties there?

12            MR. THOMPSON:  I'm trying to decline the call, Your

13   Honor.

14            THE COURT:  That's okay.

15            MR. VAGNONI:  Your Honor, it remains the Trustee's

16   position that that discovery on a procedures motion is not

17   appropriate under the circumstances and is once again designed

18   to delay these proceedings, which the Trustee hopes to wrap up

19   as soon as possible.

20            MR. THOMPSON:  Your Honor, I reject that contention

21   in the main, right?  We're not doing anything to delay this

22   process.  It's actually quite to the contrary.  We've asked

23   that the Trustee for some time now respect to discovery on

24   these topics, all of which we think go to the Trustee's

25   inability to sell these assets as set forth in our sale

1    objection.

2          And we frankly think that the issues raised are of

3    pretty monumental importance to the case at large.  And the

4    idea that nobody would be able to cross-examine this Trustee

5    about his judgment and his understanding of the assets that he

6    purports to want to sell through a 363 sale.  It's just so

7    quite exceptional.  I don't see that as merely a process issue,

8    and I would hope that the Court does not have.

9          MR. DEMARCO:  Your Honor, if I may very briefly?

10         THE COURT:  Yeah, Mr. DeMarco?

11         MR. DEMARCO:  Yes.  Hi.  I just wanted to note that

12   we agree, that Rembrandt agrees and joins with the request for

13   that discovery as we filed in our objection and as Mr. Thompson

14   noted.  And if Your Honor wishes to hear more about our

15   position, we are happy to discuss as well.  But I wanted to

16   note that we join for the same reasons.

17         THE COURT:  Okay.  Thank you, Mr. DeMarco.  I mean,

18   I'll be candid with both you and Mr. Thompson.  I'm not

19   persuaded by your motion for reconsideration.  And in all of my

20   years of practice, I have never once seen discovery requested

21   in connection with a motion for bid procedure.  I've just never

22   seen it.  Given the fact that this Trustee was appointed by

23   Judge Coleman and was clearly, in my opinion, the most

24   objective party here, they've got no skin in the game.  They

25   just want to make the right calls.  It's just a really high

1   burden for VSI and Rembrandt to overcome. While I appreciate

2   your zealous advocacy, you know, I am inclined to deny the

3   motion for reconsideration and deny the discovery in connection

4   with that and the bid procedure motion.

5        MR. THOMPSON:  The bid procedure and sale motion,

6   right, Your Honor? I mean, so the sale -- there's no discovery

7   in connect with the sale.

8        THE COURT:  At this point, I mean, you know, I'll put

9   together an order.  But at this point, I just -- I've never

10  seen -- I've never even seen a request.

11       MR. THOMPSON:  Your Honor, I would just direct your

12  attention to the cases that were cited in our objection, which

13  are manifold.  And all of them involve --

14       THE COURT:  I'm not saying it's never done.  But Mr.

15  Thompson, you have to understand that you've come into this

16  case relatively recently, and the parties have been around.

17  And I've seen some of the actions that they've taken.  Not on

18  your watch.  And that has affected my view of your client.

19       And like I said, you know, all of those cases that

20  you may have cited, I think that their facts are probably quite

21  different than the facts that I have before me, which is that

22  I've got a Trustee, right?  I mean, the appointment of a

23  Chapter 11 Trustee.  It's a very extraordinary event.  I've

24  only done it once in my career.  And when you do it, you do it

25  because you absolutely have to do it.  Because you're balancing

1   the interests of having a completely independent person, you

2   know, making these calls.

3          So given that extraordinary event, you know, I'm

4   going to give the Trustee a great deal of deference.  I just

5   am, okay?

6          MR. MICHAELS:  Your Honor, this is Chris Michaels for

7   Rembrandt.

8          THE COURT:  Yes.

9          MR. MICHAELS:  This -- I appreciate your comments

10  about this being an extraordinary case.

11         THE COURT:  Yeah.

12         MR. MICHAELS:  I have been involved from the very

13  beginning.  Rembrandt has been litigating its intellectual

14  property disputes.  Thought it had settled those.  All parties

15  in this matter, Chadron Stastney, Matthew Rajan, all signed off

16  on a settlement agreement saying, yes.  Our trade secrets have

17  been included in Ultra-D.  Our patents cover the products are

18  being sold.  And the Trustee is moving forward planning to sell

19  our technology, right?  I mean, we -- our question is very

20  simple, right?  Have you removed Rembrandt's technology from

21  the very assets that are trying to be sold?  If the answer is

22  yes, let's figure that out.  We've offered numerous times to do

23  that in an expedited and effectual way, to no avail.  And we

24  have asked if they're not in there, what are you doing with

25  respect to assumption or rejection of our license, to no

1    definitive answer.

2         And we are now saying, we now see from the Trustee's

3    papers that SSG is offering assets for sale.  That is patent

4    infringement under section 271.  If, and only if, they are not

5    covered by the license we issued Stream.  And this is -- this

6    should be basic question.  Are you assuming our license?  Are

7    they covered or are they committing patent infringement?

8    Absent any discovery, absent any assumption or rejection of our

9    license, we are left to go litigate a patent infringement case

10   against SSG because they're the ones that are actively

11   offering. All of the employees at SSG that are doing that are

12   likewise guilty of patent infringement.

13        And unless, of course, the Trustee has assumed

14   Rembrandt's license, then they're covered by the license.

15   These are basic questions that should be answers.  And I don't

16   under -- I've never been involved in a case where a trustee or

17   debtor in possession didn't answer them.  So I appreciate that

18   this is a very unique situation, but it's also simply resolved,

19   right?  From our perspective, the Trustee could provide basic

20   information that would move this case forward and tell us

21   whether or not we need to file additional litigation or not.

22        But, you know, we're not new to raising these

23   concerns, right?  I mean, there is a settlement agreement.

24   We've been -- we are part of the TRO mentioned directly.  And

25   so, I think that our request for these basic things are things

1  that can certainly be resolved in a week or two.  I mean, they

2  can decide.  I mean, are you assuming it or are you rejecting

3  the license?  That's a one sentence answer.  You know, is that

4  -- so we think the request for discovery is reasonable in this

5  context, especially how many issues that it can resolve.  I

6  can't image there's going to be any bidders, save the stalking

7  horse bidder, they're going to come in and walk themselves into

8  all these IP disputes.

9            And, you know, Rembrandts here.  But, I mean, forget

10  Rembrandt.  I mean, Phillips has 1,500 plus patents at issue,

11  most of which they've sold off to Leia that is actively trying

12  to license those out. I mean, companies don't walk into almost

13  certain patent infringement cases with companies like Phillips

14  to enforce, right?  This is, this is absolutely guaranteed to

15  this ambiguity in what the assets are and whether or not they

16  need licenses or have licenses from Phillips and Rembrandt is a

17  virtual certainty that anybody is going to either not bid or

18  just walk away from this.  This is designed for failure.

19            And quite frankly, we talked about the concern about

20  an action in chancery court to determine whether or not some

21  debt was owed.  And that's a trivial expense for litigation.

22  Patent infringement costs the average for a case of this size

23  is somewhere between 7 and $15 million dollars.  Where is the

24  estate going to get the money to defend, right?  I mean, it's

25  going to render this estate with almost absolute certainty

1  administratively insolvent as soon as Rembrandt acts.  And

2  we're all on -- all of Rembrandt's attorneys by the way are on

3  contingency fee, and originally signed on for a patent

4  infringement action.  So it's not like Rembrandt doesn't have

5  counsel that's going to enforce.  But I don't see that the

6  estate has prepared itself for litigation in multiple

7  jurisdictions, right?

8        So I -- with respect, I think this is a unique

9  situation that has potentially unique issues that would warrant

10  this basic discovery.

11        THE COURT:  Okay.

12        MR. VAGNONI:  Your Honor, I'm not sure what role Mr.

13  Michaels or Mr. DeMarco play in VSI's motion for

14  reconsideration.  They -- there were a number of misstates made

15  by Mr. Michaels just now that I can address.  The -- you know,

16  the issue of the settlement agreement, I don't -- I don't think

17  I know which one he's talking about because the one I know Chad

18  Stasney did not sign and was not a party to.

19        The issue of all the patent infringement claims he

20  allegedly has would only be an issue if the Debtor had sold

21  TVs, which it clearly hasn't.  There are no operations in the

22  Debtor.  What the Debtor is selling is its assets, including

23  interests in foreign subsidiaries that have technology.  And

24  there -- we don't know of any technology that Rembrandt has

25  sold or that Rembrandt has in that technology nor are we

```
1    selling that technology.  We're selling the subsidiary.

2            That being said, there is little or no evidence, I

3    would say no evidence for the vast majority of what Mr.

4    Michaels just said. We're here on a 9019 hearing, and I don't

5    know what his comments lend to that.

6            MR. THOMPSON:  Your Honor, I must respond to what Mr.

7    Vagnoni just said.  In that, first of all, we're actually

8    talking about what this Court asked to be placed at the end of

9    this hearing.  So I don't think it's about the 9019

10   reconsideration.  But rather with the respect to discovery

11   related to the sale and bid procedures motion filed by this

12   Trustee.

13           THE COURT:  I agree.  Mr. Vagnoni, they're talking

14   about, you know, he -- Mr. Thompson had invited me to comment

15   on the discovery related to the procedures motion --

16           MR. VAGNONI:  Understood.

17           THE COURT:  -- that's coming up.  So I think that

18   they're kind of highlighting issues and obstacles that they

19   believe that the Trustee faces in connection with that, and why

20   they think it's, you know, I should grant some discovery.  So I

21   think that's really what the focus was of Mr. Michaels.

22           MR. THOMPSON:  That's right, Your Honor.  And I think

23   it's important to note based upon what Mr. Vagnoni just said.

24   We have no contentions about what the Trustee is selling or is

25   not selling.  I wish the Trustee knew what he is selling.  I
```

```
 1   wish his advisors knew what they were selling.  I don't believe

 2   they do.  And as set forth in our objection pretty clearly, and

 3   as had been made clear on the record on June 5th, the Trustee

 4   does not understand these assets.  He does not understand the

 5   implications, let alone the encumbrances upon some of these

 6   assets, including the rights that Rembrandt has just raised.

 7          And so, if they -- if the Trustee did, we would be

 8   having a different discussion right now.  But he doesn't, and

 9   his advisors don't.  And that's important.

10          MR. VAGNONI:  Pretty clearly as to what the Trustee

11   is selling.

12          THE COURT:  All right.  Well, I mean, I think what

13   I'm hearing them say, Mr. Vagnoni, is that they don't think you

14   know what you're selling.  But do you know what you're selling

15   as part of this motion?

16          MR. VAGNONI:  As part of the --

17          THE COURT:  The motion for the bid procedures.

18          MR. VAGNONI:  Absolutely.  The Trustee is selling all

19   of the assets of the Debtors, including their equitable rights

20   in the foreign subsidiaries that they -- that they have.  That

21   is what they're selling.

22          MR. THOMPSON:  Are they selling the right to license?

23          MR. VAGNONI:  I'm not -- I don't think I'm on the

24   stand here.  And I don't think that -- no.  The Trustee is not

25   selling a license.
```

1            MR. THOMPSON:  Okay.  Well, that's what it says in

2    SSTs teaser.

3            MR. VAGNONI:  I don't believe so.  And again, we're

4    not here on that today.

5            MR. THOMPSON:  Well, that's why we need discovery is

6    what I would argue, Your Honor.  Because it says very clearly

7    in the SSG teaser that what the Trustee is purporting to sell

8    are the capabilities to license the so-called Ultra-D

9    technology, which incorporates other people's IP, including,

10   but not limited to Rembrandts.  And that's why we think it

11   destroys value. And that's why we think the Trustee doesn't

12   understand what its selling.  And that's why we think we need

13   discovery.

14           MR. MICHAELS:  Your Honor, with respect to the teaser

15   that it was put out, it references the very Phillips license

16   that specifically prohibits a transfer under a change of

17   control provision, right?  There's huge numbers of patents that

18   we have sent the Trustee as part of our discussions and we

19   filed it with our papers a list of assets that we needed to

20   understand the status of that had been licensed from Phillips.

21   A blue box software for example.  I mean, there's a huge

22   laundry list of assets that were provided by Phillips that were

23   used to create and are used to implement the Ultra-D

24   technology.  Are those included or not?  Are those -- those are

25   -- if they're not included by the way, you can't be using

 1  Rembrandt's technology because ours is reliant on that -- those

 2  software and that no how and that technology.

 3          So if we answered that question, right, that they

 4  have put front and center in their marketing piece, we would

 5  know whether or not Rembrandt's technology is included.

 6  Because if it's not, if they're not using the Phillips

 7  technology, they're not, we're not involved, right?  We back

 8  right off.  They get rid of us.  We are not making any motions.

 9  So these are basic, basic, factual pieces of information that

10  are -- they have made front and center.  I mean, we certainly

11  have been raising them for years.  But they've said right in

12  their paper, in their marketing materials, that this is subject

13  to a Phillips license.

14          THE COURT:  Mr. Michaels, thank you for that.  So Mr.

15  Vagnoni, I guess what I'm hearing Mr. Thompson and Mr. Michaels

16  saying is they want to drill down into the weeds, understand

17  exactly what is being sold so that they understand what's

18  happening and if there's going to be future litigation.  And

19  so, they seem confused about that.  I think it's certainly fair

20  for them to understand exactly what is being sold.  I myself

21  haven't got into the weeds about the schedules in terms of

22  exactly what's being sold.  But I think that that's certainly

23  something that they need to know.

24          And I'm not going to put you on the spot here today,

25  but certainly I'd like them to understand exactly what's being

1  sold so that they can take whatever litigation positions that

2  are necessary and then they can make arguments to me.  But it

3  sounds like they don't know that.  And it sounds like you might

4  not want to be in the position to answer that, but I think it's

5  a fair request to understand what's being sold as part of this

6  sale.

7          So I'm going to rule on the motion for

8  reconsideration and the discovery related to that.  I'm going

9  to urge Mr. Vagnoni to get back to Mr. Thompson and Mr.

10  Michaels about exactly what's, you know, what's being sold.

11  And then my hope is that when we meet again that Mr. Thompson

12  and Mr. Michaels will report to me that they know what's being

13  sold, and that they can raise whatever issues come up as a

14  results of that.  And then the Court will address it then,

15  okay?

16      (Proceedings adjourned at 10:30 p.m.)

17

18

19

20

21

22

23

24

25

23

C E R T I F I C A T E

       I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : Case No.  23-10763 |
| | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
| AND TECHNOVATIVE MEDIA, | : |
| INC. | : Philadelphia, Pennsylvania |
| | : November 13, 2024 |
| | : 11:00 a.m. |

. . . . . . . . . . . . . . . . . :

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For SeeCubic, Inc.: | Marley Brumme, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010<br><br>Christopher Michaels |
| For SSG Capital Advisors: | Samuel Charlton |
| For VSI: | John H. Thompson<br>Akerman<br>750 Ninth Street, N.W.<br>Suite 750<br>Washington, D.C. 20001<br>202-393-6222 |
| For Hawk Investment Holdings<br>Ltd.: | Steven Caponi, Esq.<br>Margaret Westbrook, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |

```
                                Jonathan N. Edel, Esq.
                                300 South Tryon St., Suite 1000
                                Charlotte, NC 28202

For the Trustee:                Michael D. Vagnoni, Esq.
                                Obermayer Rebmann Maxwell &
                                Hippel LLP
                                Centre Square West
                                1500 Market Street, Suite 3400
                                Philadelphia, PA 19102
                                215-665-3066

                                Steven M. Coren, Esq.
                                Kaufman Coren & Ress, P.C.
                                Two Commerce Square
                                Suite 3900
                                2001 Market Street
                                Philadelphia, PA 19103-2713
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 13, 2024                            11:00 A.M.

 2            THE COURT:  Okay.  Is there anyone else on the phone

 3   who is here for a case other than Stream TV?  Okay.  Thank you.

 4            Party who just joined the call, the last four digits

 5   6443.  Could you identify -- I'm sorry, 6643, could you

 6   identify yourself, please?

 7            MR. CHARLTON:  Yes.  Samuel Charlton with SSG Capital

 8   Advisers.

 9            THE CLERK:  Yes, with the last four digits 4063.  Can

10   I have your last name, please?

11            All rise.

12            THE COURT:  Morning.  Please be seated.  Court is now

13   in session.  All right.  This is the call on the 11:00 list.

14   The only matter remaining on the list is number 23, Stream TV

15   Networks and we have several parties on the phone and in the

16   courtroom.

17            Do you want to start with the people in the

18   courtroom, first?

19            UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah, let's start

20   with the people in the courtroom.

21            THE COURT:  Okay.  We're going to start with the

22   people in the courtroom and get everyone's appearances.

23            Appearances, please, on Stream TV.

24            UNIDENTIFIED SPEAKER:  Come sit at the table.

25   Welcome.
```

1          MR. THOMPSON:  Morning, Your Honor.  John Thompson of

2    Akerman on behalf of VSI and with me today is my colleague Adam

3    Swick and retired Judge Nick Clark from the Western District of

4    Texas.

5          THE COURT:  Welcome.

6          MR. CLARK:  Morning, Your Honor.

7          THE COURT:  It's good to see you.

8          MR. CLARK:  Thank you.

9          MR. DEMARCO:  Good morning, Your Honor.  This is

10   Andrew DeMarco from Devlin Law Firm here representing

11   Rembrandt.  Also here with me is Christopher Michaels from

12   Brown and Michaels who will be handling any argument today.

13         THE COURT:  Welcome.

14         MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

15   from K&L Gates on behalf of Hawk.

16         THE COURT:  Okay.

17         MS. BRUMME:  Good morning, Your Honor.  Marley Ann

18   Brumme of Skadden Arps on behalf of SeeCubic.

19         THE COURT:  Okay.  Great.  I thought you guys were

20   going on the phone.  You're going to be outnumbered.

21         MR. CAPONI:  Yeah.

22         THE COURT:  No, you're here.  Okay.  All right.

23   We're just entering appearance, so come on up and say hello.

24         MR. VAGNONI:  Good morning, Your Honor.  Michael

25   Vagnoni on behalf of Bill Homony, Chapter 11 Trustee.  I have

1    with me Ed George and Steve Coran from Coran and Ress.

2              THE COURT:  Okay.

3              MR. CORAN:  Morning.

4              THE COURT:  Good morning.  All right.  How about the

5    people on the phone?  Did you want to note your appearance if

6    there's anywhere there?

7              Do we have anyone?

8              UNIDENTIFIED SPEAKER:  Yeah.  Yeah.

9              THE COURT:  We do?  The parties on the line, if every

10   -- if you could each speak one at a time and tell us who you're

11   here for on Stream TV and enter your appearances, please.

12             MR. EDEL:  This is Jonathan Edel from K&L Gates on

13   behalf of Hawk Investment Holdings.

14             THE COURT:  Okay.  Anyone else or you think that's

15   it?

16             UNIDENTIFIED SPEAKER:  They might just be observing.

17             THE COURT:  Okay.  Fine.

18             All right.  Well, welcome back, everybody.  I know

19   we're here on the reconsideration, which I will -- I guess I

20   just wanted to address the discovery issue.  So the last time

21   we were talking on the phone, you guys had raised an issue

22   about the assets that were being sold and you had concerns

23   about whether there were licenses and I think Mr. Vagnoni, I

24   was giving you a week to try to clarify for them what assets

25   were going to be sold.

1          So have you had any productive conversations

2   hopefully with them?

3          MR. VAGNONI:  Your Honor, we took your direction from

4   the last hearing, and we provided both VSI, accounts for VSI

5   and accounts with Rembrandt.  A fairly exhausted list of what

6   the assets are.  Not just the assets that we are -- that the

7   Trustee is selling, but the assets that are embedded in the

8   downstream subsidiaries whose equity we are selling as well.

9          That, I think, would have satisfied the Court's

10  concern in that regard.  I have a copy of what we sent.  I

11  didn't bring multiple copies.  It's very thick.  But we did

12  provide that.  We did also receive a email on Friday of last

13  week asking for a meet and confer to discuss what discovery

14  would be taking place.

15         We did not engage in that meet and confer.  We didn't

16  take your comments last week as we thought everything was

17  quashed to that point based on your ruling.  So we did not meet

18  and confer.  We were preparing for the hearing.  But we -- and

19  we did not engage in any discovery again, because we thought

20  the discovery request had been quashed by Your Honor.

21         But again, we did provide them with a listing --

22         THE COURT:  Okay.  Well, let me --

23         MR. VAGNONI:  -- on the --

24         THE COURT:  -- see if they feel like they have a

25  better understanding.

1          So do you gentlemen have a better understanding of

2    exactly what's being sold?

3          MR. MICHAELS:  We have no better understanding.  Most

4    simply, are they accepting -- assuming, rejecting saying that

5    the Rembrandt contract is invalid, valid?  What is their

6    position?  Where is our IP?  Have they removed it?

7          They're disclosure, this voluminous thing they

8    described has a single sentence that says, "software," right?

9    There's no discussion of -- we have asked over and over again,

10   are you in control of the software professional development

11   system?  I.E., do you have the username and password?  No

12   response.

13         THE COURT:  Uh-huh.

14         MR. MICHAELS:  We have no idea what they have.  More

15   so, we're the ones that have provided a far more extensive list

16   of what assets we believe could be in that estate and we've

17   told them what documents we're relying upon and asked them,

18   what is the status of each of these individuals assets?  No

19   response.

20         THE COURT:  Okay.  So --

21         MR. MICHAELS:  We are no more clear than we have --

22         THE COURT:  -- I've been with you guys up until this

23   point.  But now, you know, they've got some serious concerns.

24   You know, their belief is that the sale of the asset is going

25   to violate all of these rights.  It's going to spawn all of

1    this litigation about the licenses, right?  That's their

2    concern.

3            And I'm willing to consider a sale of this, but at

4    the very basic level, we need to understand exactly what is

5    being sold, right?  And it sounds like today they don't know.

6            So he just said that you said it's software.  Do you

7    have something more specific than just the word software in

8    terms of this being sold?

9            MR. VAGNONI:  There was -- Your Honor, first of all,

10   let me just address a couple of things that Mr. Michaels said.

11   I think he indicated once again to the Court that he hasn't

12   been made aware of whether or not the sale will include an

13   assumption and assignment of the Rembrandt license.

14           Paragraph 27 of our motion clearly indicates that

15   that license is not part of the sale transaction.  It is not

16   going to be acquired by the stock and horse purchaser.

17   However, if there is a competitive bid, a bid that is a

18   superior bid to the stock and horse bid that wants the

19   Rembrandt license, absolutely we would entertain an assumption.

20   There would have to be discussion about what --

21           THE COURT:  Okay.  So let's -- what we're going to do

22   today, just so I have an idea, we're just going to take this

23   issue by issue.  So you're saying that the license is not part

24   of the sale --

25           MR. VAGNONI:  That's correct.

1              THE COURT:  -- but you would contemplate bids on it.

2    I'm not sure how you'd write that into the bid procedure, but

3    we can talk about that in a minute.

4              So what's your response to that?

5              MR. MICHAELS:  It's not an assignable license.  It's

6    not their option to decide to sell it or not.  That's -- and

7    neither is the Phillips license.  It is -- we have -- we did

8    not need Mr. Vagnoni to explain to us whether or not our

9    license was assignable.  It is absolutely note and all the case

10   law is --

11             THE COURT:  Okay.  Well --

12             MR. MICHAELS:  -- if I don't mind?

13             THE COURT:  Yeah.

14             MR. MICHAELS:  Our issue isn't that the contract is

15   -- that they're attempting to assign it.  They are clear

16   they're not attempting to assign the contract.  It's the

17   intellectual property that is the basis of that.  I mean,

18   saying I'm not handing you a piece of the car, the car title

19   is, you know, that -- but I'm going to hand them the keys to

20   the Lamborghini.  I mean, we're concerned about the keys and

21   the Lamborghini, not the piece of paper that says we own it.

22   We already have that.  I don't need them to tell me we have

23   that.

24             THE COURT:  Yeah.  Yeah, yeah.

25             MR. THOMPSON:  Your Honor, if I might add?

```
 1              THE COURT:  Yeah.

 2              MR. THOMPSON:  There's a real problem with the bid

 3  procedures in addition to those that Mr. Michaels rose --

 4  raised.  In this circumstance, Mr. Vagnoni has just told the

 5  Court as his email to us told us that they are, I guess,

 6  excluding the asset that is the Rembrandt license.  The reasons

 7  you just heard.  It doesn't matter whether they wanted to

 8  assume it and assign it, they could not.

 9              But in this circumstance, right, they're suggesting

10  that some other party out there might come in and bid for it.

11  Well, how do we have a bid process where --

12              THE COURT:  Yeah, yeah.  Okay.

13              MR. THOMPSON:  -- some other parties actually

14  consider --

15              THE COURT:  Well, tell me this.  If he -- if we have

16  -- let's say we have the bid, we had the auction, right, and

17  Hawk's the only one that shows up and under their purchase

18  agreement, they're not going to get it.  Then does that take

19  care of your issue entirely because --

20              MR. MICHAELS:  Not in any way, Your Honor.  I mean,

21  we have listed out a huge number of trade secrets.  We have a

22  bunch of patents.  The very assets that they have listed where

23  they've talked about TV's, prototypes, demos, those are all --

24  were all alleged back in 2017 to have been covered by

25  Rembrandt --
```

 1          THE COURT:  All right.  So let me just, like -- I'm

 2    sorry.  Let me just be more specific.  So I want to take it

 3    issue by issue.

 4          MR. MICHAELS:  Uh-huh.

 5          THE COURT:  So at least I understand.  So he had

 6    thrown out this comment that he's not attending to sell certain

 7    licenses unless someone else bids for it.  So with regard to

 8    those licenses, if there's no other bidder and the stocking

 9    horse gets it, Hawk gets it, then with regard to that license,

10    then I think we're all in agreement that the license isn't

11    being sold at all, right?

12          So I think you wouldn't have an issue if there's no

13    stocking horse -- if it's just a stocking horse bidder and

14    there's no other bidders with regard to the license.

15          MR. MICHAELS:  With respect, we would.  The issue

16    with the license -- it's not a question of will they assume or

17    reject it in the future.  It's SSG offering for sale

18    Rembrandt's patented technology.  That's a violation of Section

19    271.  That's present today patent infringement -- you -- they

20    do not have a license to the Rembrandt technology.

21          THE COURT:  Hold on a second.  Who is that person?

22          All right.  So I would ask everyone on the phone line

23    to try to mute your phone because we're -- someone's not muted,

24    so we're hearing everything in the courtroom that's going on

25    there.  So could everyone just take a moment?  How do they mute

1    their line?

2              UNIDENTIFIED SPEAKER:  Star six.

3              THE COURT:  So if you could just hit star six,

4    everyone on the line, I'd appreciate that.

5              MR. VAGNONI:  Your Honor, if I may -- raise that

6    issue for a very specific reason.  SSG is not offering that

7    license for sale.  That is not part of the AP --

8              THE COURT:  So when we say license, let's just drill

9    down a little bit.  License of what?

10             MR. VAGNONI:  Absolutely.  Very vague.

11             THE COURT:  License of what?

12             MR. VAGNONI:  There is a 2021 settlement agreement

13   that a single line in it that is a -- called a grant of rights.

14   In that grant of rights, Rembrandt reports to give the rights

15   -- the nonexclusive rights to use their intellectual property.

16             By the way, that settlement agreement was entered

17   into the day or the day before Rembrandt -- they became a

18   creditor by virtue of that and then were a petitioning creditor

19   in Stream's failed involuntary bankruptcy in Delaware.  We take

20   significant issue with that agreement as a whole.  But let's

21   just take it as it is.  That license agreement comes out of a

22   settlement agreement.  And like I said, the -- SSG is not

23   offering that for sale.  However, in the -- which you'll hear

24   about when we get to testimony.

25             In negotiations with VSI and with Rembrandt, it's

1   been made clear to us that if a transaction was to occur with

2   VSI, that the Rembrandt license would have no problem being

3   assumed.

4          And in fact, there are -- there is a post-petition

5   agreement that was entered into by Rembrandt Stream and VSI

6   that was not court approved that purported to do just that.

7   Give VSI rights in that license.  And exclude Streams

8   subsidiaries from the use of that technology pursuant to that

9   license.

10          So that is why I indicated to the Court that if there

11  was a transaction that was a higher and better bid, which VSI

12  and Rembrandt are free to bid in this process.  They've been

13  free all along.  They've had access to the data room if they

14  wanted it.

15          The VSI is the only person who's taken up that offer.

16  That is what I was referring to.  Not that it was generally

17  assignable.  We don't think anybody has interest in it and we

18  also don't think we are selling any assets that have that --

19  Rembrandt intellectual property in that -- in the asset.

20          MR. MICHAELS:  Your Honor, I'd like -- I apologize.

21  I'd really like a chance to finish answering your question that

22  you had asked previously.

23          THE COURT:  Yes, that's fine.

24          MR. MICHAELS:  So the -- you asked whether the issue

25  would be resolved if the Hawk party's just didn't take -- it

1   isn't a question of SSG selling our license.  It isn't an

2   active patent infringement.  The active patent infringement is

3   offering for sale in a patented invention on why Rembrandt,

4   right?

5          And the TVs, all of the assets that Mr. Vagnoni

6   clearly lists are being offered for sale.  That is the active

7   patient infringement.  SSG has committed patent infringement.

8   All five of those individuals have committed patent

9   infringement.  The Trustee has committed patent infringement

10  unless they can show that they have a license.

11         So when Rembrandt is asking about the status of its

12  license, it is, are we suing those individuals and those

13  entities tomorrow?  They -- it is -- if they have a license, we

14  can't.  That is a full and absolute complete defense.

15         The agreement that Mr. Vagnoni's referring to is

16  Streams former counsel, almost immediately after filing the

17  petition contacted Rembrandt and said, we know we need a

18  license to your technology as an administrative claim.  We need

19  to resolve this.  And we signed a settlement amendment that

20  extended the time that prevented the estate from becoming

21  administratively insolvent due to the fees that were going to

22  be due to Rembrandt.

23         They have said they're not honoring that settlement

24  amendment.  The arrears are $3 million.  Does the estate have

25  $3 million to have that license?

```
 1              THE COURT:  So I'm trying to -- I feel like there's

 2   litigation that's going to be spawned, right, by -- under the

 3   licenses and I'm just trying to have a very basic understanding

 4   of what is purportedly being sold by the Debtor.

 5              MR. THOMPSON:  They don't know, Your Honor.

 6              THE COURT:  I --

 7              MR. THOMPSON:  And that's --

 8              THE COURT:  -- and I get that.  And I -- so I'm -- I

 9   think that we have, like first thing -- what happened?  Okay.

10   Good.  Thank you for muting everybody.

11              So the first step to me seems that we should at least

12   come to an agreement, or at least I need to understand what is

13   being sold.  So can we just focus on that for instance.

14              All right.  So I think one of the comments -- and so,

15   you said before, like, they had described software or something

16   that was, like, their general description.  So did you, Mr.

17   Vagnoni, describe on some schedule that software is going to be

18   sold as part of this?

19              MR. VAGNONI:  Your Honor, I will -- if I may, to

20   preface what -- the answer to that question.  What the Trustee

21   is selling is all of the assets of Stream, which are clearly

22   listed in schedules, which are a public document they have

23   access to.

24              Mr. Rajan, who is the head of VSI, signed those

25   scheduled, I believe, and he certainly took part in preparing
```

1    them.  So he should know exactly what is in those schedules.

2    The other assets that are being sold in the APA are the equity

3    interest and all the subsidiaries of Technovative.

4           The software, the intellectual property, the license

5    to Phillips, all of that is contained in downstream

6    subsidiaries.  We are not selling those assets per say.  We're

7    selling the equity in those assets.

8           And this is typical of a case where a Chapter 11 or

9    Chapter 7 Trustee walks into a mess and sees that it's

10   spiraling out of control and tries to bring some control to the

11   situation and get the estate some money before there is no

12   money.

13          THE COURT:  Okay.  So again, my focus for right now

14   is, I'm just trying to understand what the assets are.  So he's

15   telling me that he's purporting to sell the equity and the

16   entities that presumably are in possession perhaps of your

17   property, is that your understanding there?

18          MR. MICHAELS:  Mr. Vagnoni just described the process

19   as typical, right?  An IP -- a technology case of this sort,

20   purporting to sell intellectual property rights is anything but

21   typical.  And I think --

22          THE COURT:  Okay.  So let's just focus on -- I just

23   want to drill down on what assets are being sold.  So he's told

24   me that he's selling equity in entities that presumably possess

25   your intellectual property.  Can we agree on that?

17

```
 1              MR. MICHAELS:  Yes.

 2              THE COURT:  Okay.  Good.  All right.  That's

 3    progress.

 4              MR. MICHAELS:  That's one -- I mean, that's one

 5    aspect of what he said.

 6              THE COURT:  Okay.  Fine.  That's one aspect.  Okay.

 7    So tell me -- so your concern, though, is that when he purports

 8    to sell the equity in these companies, then the buyer who takes

 9    possession of the -- like, they buy the equity, right?  Now,

10    they're going to own, you know, via that equity, everything,

11    you know, tangible and intangible that those entities own.  And

12    your -- and so your position is that some of the assets that

13    they own are your property?

14              MR. MICHAELS:  Yes.

15              THE COURT:  Okay.

16              MR. EDEL:  Your Honor, if I may --

17              THE COURT:  Yeah.

18              MR. EDEL:  -- since I'm representing Hawk.  The --

19    Mr. Vagnoni is correct.  We're -- the stalking horse is

20    acquiring the equity.  Stream is a holding company.  All the

21    operating entities, the main operating entities in the

22    Netherlands and requiring the stock that owns the stock that

23    owns the stock that owns that entity.  The fundamental dispute

24    here is that Rembrandt believes that its trade secrets, its

25    knowledge, its know-how is embedded in everything that Stream
```

1    does.

2         So every TV that it has, every computer that it

3    touches, somehow can -- you know, involves their intellectual

4    property.  Now, there's intellectual property such as patents.

5    Rembrandt brought patent litigation many years ago, but it was

6    dismissed, and they have not asserted a patent case.

7         They're really talking about the intellectual

8    property.  We disagree.  We believe that the technology that

9    Stream developed through its operating subsidiaries overseas is

10   -- belongs to Stream.  If my client acquires the stock, it's

11   acquiring that entity, the good, the bad, and the ugly.

12        And if that means that entity, if Rembrandt believes

13   that entity has put intellectual property into a TV or trade

14   secrets, we'll duke it out after the fact.  But what this is

15   all about, this is Rembrandt and attached to the hip of Mr.

16   Rajan trying to stop at every opportunity this case moving

17   forward.

18        THE COURT:  Okay.  I know.

19        MR. EDEL:  Rembrandt --

20        THE COURT:  You believe there's spoilers and I --

21        MR. EDEL:  Well, Your Honor, I think it's -- it's not

22   just, I think.  As Mr. Vagnoni indicated, they entered into a

23   settlement.  They're standing before Your Honor before today

24   trying to hold up this sale.  Rembrandt entered into an

25   agreement during the pendency of the bankruptcy and amended it

1   with Mr. Rajan where they identified all of their technology,

2   all of their knowhow, how they believed it was being used in

3   everything and said, if Mr. Rajan gets the company, all is good

4   in the world.  No one else is allowed to have it.

5           And then come before the Court today and say, we have

6   no idea how he's using our stuff.  Well, they had a pretty good

7   idea when they were executing documents, you know, in the

8   shadows during the pendency of a bankruptcy.  But now they want

9   to come, Mr. Rajan, who founded the company, ran the company

10  until he was -- you know, the Court determined he was

11  uncredible and removed him.  And throughout the entire pendency

12  of the second bankruptcy which dismisses fraudulent at the aide

13  of Rembrandt to today, they're attached at the hip.

14          This is, with all due respect to the Court, my client

15  has been through this process for many, many years.  It's a

16  very simple sale.  Nobody else, and I think this cannot be

17  lost, nobody else is interested in these assets.  No one has

18  come forward to the pendency of the bankruptcy.

19          THE COURT:  All right.  But we aren't going to get

20  into this.  But from what I understood, the data room is not

21  complete.  I mean, there's --

22          MR. MICHAELS:  That's right, Your Honor.

23          MR. EDEL:  The --

24          MR. MICHAELS:  That's by design.

25          MR. EDEL:  -- data room is not complete because the

```
 1  data room does not include the fraudulent documents Mr. Rajan

 2  created during the bankruptcy, for example --

 3            THE COURT:  Okay.  Well --

 4            MR. EDEL:  -- these purchase orders that don't exist.

 5            THE COURT:  I would like to just -- I would like to

 6  be able to have civil conversations here today.  And I

 7  understand you guys don't like each other.  I know that.  So to

 8  the extent that we could -- I understand.  Like, I call it

 9  spoilers.  You think that they're spoilers.  You guys think

10  that they're selling your assets, and everyone is really

11  annoyed with each other.  I get the sentiment.  I understand

12  that.

13            Okay.  But it doesn't help me get to the point.  So

14  let me tell you what I think is one possibility here, right?

15  So Mr. Vagnoni wants to sell the equity in these companies, if

16  there's -- if we get to the point of a sale and there's no

17  other bidders and Hawk picks up these assets, then under 363

18  when he gets all this stuff, to the extent that you think that

19  he's misusing it, then you're going to sue Hawk, right?  Aren't

20  you going to sue Hawk?

21            MR. MICHAELS:  We already have.  They're in --

22            THE COURT:  Yeah.  Yeah.

23            MR. MICHAELS:  -- we're in litigation in Delaware.

24  But I think what I'm trying to be clear here is that Mr.

25  Vagnoni has -- they're talking about a bunch of equity, and
```

21

1    he's also put on their asset list that they are selling devices

2    that are accused of being -- infringing over on Rembrandt's

3    patterns and Stream, under the guidance of DLA Piper, took a

4    license.

5            Stream again renewed that -- negotiated again are

6    Armstrong T -- they advised them to do that.  Lewis Brisbois,

7    same thing.  We have numerous law firms evaluating these claims

8    and saying this was a good idea.  We have Mr. Homony testify.

9    He's done no investigation as to whether this is a good idea or

10   not.  And they ignored the issue.

11           They have not -- if the Rembrandt is not valid, we're

12   hearing, you know, testimony that may or may not -- this

13   Rembrandt license may or may not be valid.  It was, you know,

14   executed in 2021 right before a bankruptcy.

15           So if it's not valid, that means all the activity

16   that the estate to date are infringing a patent.  I just want

17   to be clear that that's the argument, is that this estate goes

18   almost instantaneously administratively insolvent.  And we are

19   looking for and we will ask the Courts -- the District Courts

20   to enjoin any transfer of our intellectual property.

21           Now we have licensed Stream.  We have -- we are

22   arguing that the license is valid but cannot be transferred.

23   You may not transfer our intellectual property.  You take a

24   ring, and you put it in a box and say, well, I'm just selling

25   this box, whatever may be in it.

1              You know, we've evaluated what's inside the box.

2    What's inside of SeeCubic B.V. is Rembrandt technology.  We've

3    gone through that multiple law firms representing Stream.  And

4    we have determined that a license was necessary.  And SSG does

5    not get covered by ignorance.  There's no, I didn't know, Your

6    Honor.  It defends patent infringement.

7              They are actively offering for sale assets that

8    include that were directly laid out in the complaints back in

9    2017.  And while Mr. Caponi said it was dismissed, it was a

10   jurisdictional.  Every patent case under *TC Heartland*, the

11   Supreme Court case was dismissed and had to be brought in the

12   home state of the corporation.

13             And we immediately entered mediation, and they

14   insisted the DLA Piper's counsel and Streams officers, most

15   notably, Shadron Stastney, insisted that the patents be

16   included in the license agreement.

17             So this idea that they weren't important to Stream is

18   not supported by the facts in any way, shape, or form.  And we

19   are asking for clarity, is the Trustee operating and is SSG

20   operating under the license?  I.E. they therefore can't be sued

21   for trying to sell a TV covered by one of our patterns.

22             THE COURT:  Okay.  It sounds like they want to sell

23   equity and entities who have hard assets that contain your

24   intellectual property.  So the owner of the equity will

25   presumably then own these hard assets that have your

1    intellectual property embedded in them.  That's what I

2    understand?

3         MR. EDEL:  That's Your Honor, that's if it indeed a

4    -- a bidder is capable of determining what they're buying or

5    what the assets underneath that equity.

6         UNIDENTIFIED SPEAKER:  Your Honor?

7         MR. EDEL:  We have a whole list -- excuse me.  We

8    have a whole list of items that purport to the assets of the

9    Debtors.  I'm telling you today that that is an incomplete list

10   that was filed on this docket reported to this set of assets

11   that are being sold, that's substantially all of the assets of

12   the Debtors and we can show that.

13        More than that, the data room is breath of lots of

14   information.  And the process -- and I know Your Honor wants to

15   focus on the assets, I will focus on the assets, but as Mr.

16   Caponi tried to raise the broader issues.  The broader issue

17   here is that this trustee has agreed to transfer this set of

18   assets to one party and one party only and that is the Hawk

19   parties, right?

20        And they've done pursuant to 9019 settlement

21   agreement that purports just to be a settlement agreement, but

22   it's a sub rosa plan, because there's no other entity out

23   there, whether they be a strategic buyer or another competitor

24   of a Stream TV that would be interested in these assets under

25   these conditions based upon these encumbrances.  And it's not

1    just --

2            THE COURT:  Okay.  So gentlemen --

3            MR. EDEL:  -- not --

4            THE COURT:  -- let's just take a moment here.  So in

5    terms of the bid procedures, I have concerns I think that you

6    guys raised.  Some legitimate concerns, which we'll get to,

7    right?

8            So I see, like, several different areas that need to

9    be addressed over time.  The first is, you need to know what is

10   being sold.  They're selling the equities that contain the

11   equity of entities that own the tangible property that has your

12   intellectual property.  So now you know.  They're -- that's

13   what they're trying to sell.

14           So the first step is, I'd just like to get some

15   clarity and make sure that we're all on the same page as to

16   exactly what's being sold.  Then we'll go through the bid

17   procedures and all of the many objections, some of which I

18   thought were meritorious.  But some of the issues that you're

19   raising are really important issues.

20           But to me, they appear closer to sale issues, right?

21   It's going to be a huge issue when you object to the sale,

22   right?  I'm going to -- it looks like I'm going to need some

23   briefs on all of the very important issues that you have to

24   raise.  But those are issues that, you know, that I think are

25   more appropriately dealt with then, right?

1          So in terms of, you want discovery.  So the discovery

2    that you want, I think it's important for you to get discovery

3    if it's necessary on what assets are being sold.  But we have

4    that -- we now have that nailed down.

5          So let's focus first on what exactly is being sold.

6    So you're selling the equity that has hard assets, that has

7    their intellectual property embedded in it.  So let's --

8          MR. VAGNONI:  Allegedly, Your Honor.  There's been

9    no --

10         THE COURT:  Oh, okay.

11         MR. VAGNONI:  -- there's been --

12         THE COURT:  That's fine.  I understand you're not

13   conceding anything.  But I just want, for clarity sake, to

14   understand what it -- you know, what's being sold.

15         MR. MICHAELS:  Your Honor, their agent, SSG, as

16   investment banker, sent out a teaser that purported to sell the

17   capability of making licenses of the Ultra-D technology.

18   Rembrandt's technology or IP is in it and so is Phillips.

19         THE COURT:  Okay.  So what we're -- so that's not --

20   what I'm talking about, like, a hard asset.  Now you're talking

21   about some technology, is that --

22         MR. MICHAELS:  In some cases, it is a hard asset.

23   There are -- this lens technology they patented.

24         MR. SWICK:  Your Honor, Adam Swick, Akerman on behalf

25   of Visual Semi, VSI.  The issue is they have a stalking horse

1   bidder that has been at odds with the former debtor --

2          THE COURT:  Clearly.  Yeah.

3          MR. SWICK:  Yeah, yeah.  And so, they took control of

4   the Debtors' assets, they broke into the Debtors' offices,

5   stole TVs, they stole intellectual property.  They've been

6   using them.  They've been showing.  There's emails and letters

7   and we'd love to get discovery from the Trustees, because we

8   believe the Trustee knows all of this.

9          And so, they have TVs in different locations.  They

10  have different hard assets.  All this is purporting to be sold

11  by the Trustee who hasn't gotten it back, because that's the

12  stalking horse and they need the stalking horse to be able to

13  go out and raise money to fulfil their obligations.  And as of

14  the filings last night, the stalking horse doesn't have the

15  money to pay for the 363 as it is right now.

16         So yeah, what we need is discovery on where are all

17  these TVs?  They're all over the world.  They're in the

18  different offices of SeeCubic and the Hawk parties.  I mean,

19  Mr. Caponi up here, he represents the Hawk party's and Robert

20  Morten (phonetic), who's subject to a cold shoulder, which is

21  the worst crime of moral turpitude in the U.K.  It's supposed

22  to end your career and that's who these guys have hitched their

23  wagon to.  So we just need discovery to find the assets so we

24  -- if they want us to participate in a 363 sales process, how

25  are we going to do that if we don't know where the TVs are?

1    Who's --

2           THE COURT:  Okay.

3           MR. SWICK:  -- using them?

4           THE COURT:  So again, let's just focus back on what I

5    care about.  What I care about is, I want to know what they're

6    purportedly selling.

7           MR. SWICK:  They don't know.

8           THE COURT:  Okay.  And I know you say that.  But why

9    don't we just go through all of the concerns you have about the

10   identity of the assets?

11          Yes?

12          UNIDENTIFIED SPEAKER:  Your Honor, going -- sort of

13   taking a broad step back, how we ended up here.  My client has

14   a security interest.  Again, Stream's the holding company.  Has

15   no assets, other than stock and subsidiaries.

16          My client's security interest was primarily in the

17   stock and subsidiaries, not in the assets of the subsidiaries.

18   The 225 action, which we settled through the 9019, we were a

19   day away from taking control of that stock.

20          This settlement and this sale is effectively the same

21   thing.  It's selling the stock.  The companies that -- whatever

22   assets are in those companies that my client shows up and there

23   was TVs -- before my client and everybody else shows up,

24   there's TVs there, they own them.  If they're not, they don't.

25          It's the stock.  They want to drill down into -- and

1   if we get into this level, what TV is sitting in Copenhagen and

2   what software is on that TV, we're going to be here for six

3   years.  One, we're never going to know because it's in

4   Copenhagen.  But, we're going to be here for six years.  This

5   is a sale of stock, the security interest was in the stock.

6   And absent the settlement, my client would have already had

7   it's one day hearing in a court of chancery and owned the

8   stock, this would all be muted.  This is a path of least

9   resistance to an estate that never had any money and doesn't

10  have any money. This deal is --

11          THE COURT:  Okay. I understand that you're buying the

12  stock.  But in order for any potential bidder to understand

13  what they're buying, right, they know that they're getting the

14  stock.  But presumably, they'd like to get a better idea of

15  what the hard assets or the intangibles are of the entities

16  whose stock you're purchasing, right?

17          So I think it's reasonable that there should at least

18  be some general description of -- you know, it doesn't have to

19  be, like, I don't need, like, a audit, right, of every single

20  TV or every single hard asset.

21          But isn't there some kind of --

22          UNIDENTIFIED SPEAKER:  Your Honor --

23          THE COURT:  -- schedule that we could put together

24  that would say, you know, all the -- I mean, I don't know.  Are

25  you just purporting to say that all of the equipment and all of

1    the -- you know, every personal property owned by these

2    entities. But do we have, like, a vague description of, like --

3              UNIDENTIFIED SPEAKER:  Well, there's --

4              THE COURT:  -- you know, approximately this many TVs

5    or approximately this many --

6              MR. VAGNONI:  Yes, Your Honor.

7              THE COURT:  -- other things.

8              MR. VAGNONI:  The --

9              THE COURT:  Okay.

10             MR. VAGNONI:  -- answer is yes.  We have a list that

11   we're happy to share with you.

12             The -- one thing I want to point out to Your Honor is

13   the process that we -- that was started over a month ago that

14   was teasers were sent out to over 500 different entities, both

15   strategic and financial, by SSG.  Mr. Victor is going to

16   testify about that for you as part of the sale procedure.

17             We got exactly zero interest from those teasers.

18   Nobody asked the question of who -- what is in there.  The only

19   parties that expressed an interest were VSI and not Rembrandt

20   and a purported investor in VSI.

21             And we have worked with VSI, who by the way Your

22   Honor, I think you're getting the picture that they are in the

23   unique position to know exactly what those assets are that are

24   being sold.  Exactly what they are.

25             VSI has expressed no interest in bidding on these.

1    They wanted to go down a sale process, which we will describe

2    to you why that is not a possibility.  But not even speaking to

3    Mr. Michaels comments about the lawsuits and the estate being

4    administratively insolvent.

5            The purchaser is assuming all liability.  Not just

6    from Rembrandt under an IP claim, but they're assuming any

7    liability from any alleged IP infringement.  And they're fully

8    indemnifying the bankruptcy estates, the Trustee, and the

9    Trustees professionals.

10           MR. MICHAELS:  Exactly, Your Honor.

11           MR. VAGNONI:  We think that we are insulated -- and

12   that was based on what we think are hollow threats, but that

13   doesn't mean there won't be a lawsuit and that the Defense

14   won't impair the unsecured creditor's ability to get a

15   distribution.  That's what we're trying to protect here.

16   That's what we're trying to specify.

17           THE COURT:  Okay.  So Mr. Vagnoni, let me tell you

18   what I'm interested in.  You know, in a 363 sale, you know,

19   you're -- my concern is, I just want to make this a transparent

20   process so that any potential bidder could understand what is

21   being sold, right?

22           So it sounds like you -- you know, you have this

23   teaser.  I haven't seen what the teaser says, but this list of

24   all of the -- you were saying that there was a schedule that

25   the owner of VSI -- what was his name again?

```
 1                    MR. VAGNONI:  Mr. Rajan.

 2                    THE COURT:  Mr. Rajan?  Okay.  So Mr. Rajan, at some

 3      point, put together some kind of a schedule of what each of

 4      these entities owned.

 5                    MR. VAGNONI:  Schedule A.  Oh, I'm sorry.  Yes, the

 6      Schedules A and B to the -- the official schedules of the

 7      Debtors.

 8                    THE COURT:  Okay.

 9                    MR. MICHAELS:  Excuse me, Your Honor.  I have to --

10      correct.  Is that your -- is this the Trustees schedule or are

11      you suggesting --

12                    THE COURT:  I think --

13                    MR. MICHAELS:  -- that this is Mr. Rajans schedule.

14                    THE COURT:  No, I thought you were saying Stream's

15      schedule?

16                    MR. VAGNONI:  The Debtors.

17                    THE COURT:  Yeah.

18                    MR. MICHAELS:  Okay.  So it wasn't Mr. Rajan's

19      schedule, just -- correct?

20                    THE COURT:  Yeah.  No, no, no.

21                    MR. MICHAELS:  Correct.

22                    THE COURT:  I'm trying to understand.  So when Stream

23      filed for bankruptcy, they had a file scheduled in the

24      statement of financial affairs and as part of that you have to

25      schedule Schedule A, which is the real property and Schedule B,
```

1   which is the personal property.

2         So when he put those schedules together, did he --

3   and he was putting together the personal property owned by the

4   entities whose equity you're selling in the sale, Mr. Vagnoni?

5         MR. VAGNONI:  That's correct.  And Your Honor, there

6   is zero intellectual property in that Schedule B.

7         THE COURT:  Okay.  But -- so I think that one issue

8   that I'm identifying is that the personal property that was

9   scheduled in Schedule B of Stream contained hard pieces of

10  equipment or something that they are now claiming has their

11  intellectual property embedded in.

12        I'm just trying to understand everyone's position.

13  You're saying that in Schedule B is a list of a bunch of hard

14  assets, right?  And they're saying that in those pieces of hard

15  assets are some of their IP embedded in it?

16        MR. VAGNONI:  Stream -- Your Honor, Steam is a

17  holding company.

18        THE COURT:  Yes.

19        MR. VAGNONI:  They're --

20        THE COURT:  No, I understand.

21        MR. VAGNONI:  I --

22        THE COURT:  I understand they're a holding company,

23  but they put together Schedule B and Schedule B included hard

24  assets owned by their subsidiaries and affiliates, correct?

25        MR. VAGNONI:  No, Your Honor.

```
 1                 THE COURT:  Okay.

 2                 MR. VAGNONI:  It was a list of assets that, again, we

 3     -- the Trustee had no part in drafting.

 4                 THE COURT:  Right, because this is before your time.

 5                 MR. VAGNONI:  It was well before our time.  And we --

 6                 THE COURT:  So what -- let's describe.  What's on

 7     Schedule B?

 8                 MR. VAGNONI:  It is a various list of equipment.  On

 9     Schedule B there is some office furniture.  There's nothing

10     that we see that could contain Rembrandt's --

11                 THE COURT:  Well, I don't -- okay.  At this point --

12                 MR. VAGNONI:  -- intellectual property.

13                 THE COURT:  -- let's -- okay.  We're not going to be

14     able to resolve today whether -- you're not going to come to an

15     agreement with them as to whether or not their technology is

16     embedded in it.  I just need --

17                 MR. VAGNONI:  Right.

18                 THE COURT:  -- to understand the argument, just so I

19     can try and move the case forward, okay?

20                 MR. VAGNONI:  Absolutely.

21                 THE COURT:  So what is on Schedule B?  So it's the

22     furniture --

23                 MR. VAGNONI:  I don't have it with me and I can't

24     speak to what exactly is on it.

25                 THE COURT:  So does anyone have Schedule B of the --
```

1           MR. MICHAELS:  Your Honor, I would just note that

2    there is an extensive list, over 800 pages long, attached to

3    Mr. Rajan's declaration in support of the filing --

4           THE COURT:  Okay.

5           MR. MICHAELS:  -- right?  So --

6           MR. VAGNONI:  That's not what we're talking about.

7           MR. MICHAELS:  I'm sure it's not.  I would just to

8    Your Honor that that's --

9           THE COURT:  Okay.

10          MR. MICHAELS:  -- on the record.

11          THE COURT:  Okay.  So -- but you're saying Schedule

12   B.  So we're talking about the sale of equity of these

13   entities.  Let's just call these entities, you know, the

14   subsidiaries, or I guess we just call them the entities.

15          So the entity stock is purported -- that's what

16   you're trying to sell.  But these entities own certain hard

17   assets, correct?  Aside from office equipment --

18          MR. VAGNONI:  Correct.

19          THE COURT:  -- and furniture, right?

20          MR. VAGNONI:  Correct.

21          THE COURT:  There's some -- there's other things.

22   TVs, right?

23          MR. VAGNONI:  Potentially.  We -- and Your Honor,

24   again, we --

25          THE COURT:  When you say potentially, see that just -

```
 1    - I just want to understand, you know, what is being sold.

 2              MR. VAGNONI:  There -- when I say potentially, there

 3    are prototypes that are created by the Debtors downstream --

 4              THE COURT:  Entities.

 5              MR. VAGNONI:  -- subsidiaries.

 6              THE COURT:  Let's just focus on the entities.  What

 7    do the entities own?  That's what I really want to focus on.

 8              MR. VAGNONI:  And again, I can give you the list we

 9    sent them.  The entities own intellectual property, they own

10    equipment that allows them to make protypes of -- they're not

11    TVs.  They are screens --

12              THE COURT:  Uh-huh.

13              MR. VAGNONI:  -- that show the technology to

14    potential investors or purchasers.

15              THE COURT:  Yeah.

16              MR. VAGNONI:  They own licenses, the Phillips

17    license.  And really that's about it.  The downstream entities

18    are meant to house intellectual property, they're meant to

19    house licenses, and they're meant to do research and

20    development.

21              THE COURT:  Okay.  So hold on one second.

22              MR. VAGNONI:  And the Trustees can testify to that.

23              THE COURT:  So I presume, though, that your client,

24    Mr. Rajan, that he was the owner of Stream, right?  He knew

25    what all of these subsidiaries owned.  Didn't he know that?
```

```
 1              UNIDENTIFIED SPEAKER:  Yes, and he knows what was

 2   taken by the stalking horse bidder and never returned after --

 3              THE COURT:  Okay.

 4              UNIDENTIFIED SPEAKER:  -- contempt of court --

 5              THE COURT:  Yes.

 6              UNIDENTIFIED SPEAKER:  -- in various litigations.

 7              THE COURT:  Okay.  So --

 8              UNIDENTIFIED SPEAKER:  And there's bonding --

 9              THE COURT:  Again --

10              UNIDENTIFIED SPEAKER:  -- machines that are tens of

11   millions of dollars.

12              THE COURT:  -- this is what I care about.  I just

13   want to identify the assets that are being sold.  So doesn't it

14   seem that Mr. Rajan knows exactly what assets are owned by the

15   entities?

16              MR. MICHAELS:  I would say, Your Honor, he does have

17   an understanding in -- probably in fairly good detail, and

18   that's the point that he has been making to the Trustee at

19   nauseum.

20              THE COURT:  Okay.  So -- but --

21              MR. MICHAELS:  Right.

22              THE COURT:  -- so you --

23              MR. MICHAELS:  Your Honor, I just -- if I may, just

24   to complete the thought.  It's that they don't understand that

25   there are other encumbrances including Rembrandt's license,
```

1   including the Phillips license on that property.  And I would

2   say importantly that there is material amounts of assets that

3   have been in violation of the TRO, absconded with by Mr.

4   Stastney --

5             THE COURT:  So if you --

6             MR. MICHAELS:  -- and that has --

7             THE COURT:  -- you think that -- that's a complete

8   separate issue.

9             MR. MICHAELS:  Well, it's not, Your Honor --

10            THE COURT:  That you think that.

11            MR. MICHAELS:  -- because that intellectual property

12  that is in those prototypes, samples that are taken to market

13  to try to get investors and customers to buy or purchase the

14  ultimately asset that is Stream TVs product, those things have

15  the intellectual property not only of Stream TV, but also

16  Rembrandt and also Phillips embedded in it.

17            There's -- I mean, it was no accident that Mr.

18  Stastney on behalf of SeeCubic, Inc. and the Hawk party's

19  absconded with monitors that this trustee actually witnessed

20  with Mr. Stastney giving him a demonstration.

21            THE COURT:  Okay.  So who --

22            MR. MICHAELS:  That happened.

23            THE COURT:  So you're saying that Hawk has monitors

24  and Stream has monitors of the entities?

25            MR. MICHAELS:  I'm saying that the Hawk parties,

1    specifically Mr. Stastney, SeeCubic, Inc. definitely had took

2    both monitors that are samples.  They were displayed to be able

3    to sell the product.  It obviously has embedded technology in

4    it.  He took servers.  He took computers.  All of that would

5    have had his code in it, including Rembrandt's code.

6            THE COURT:  Okay.  So -- but are you saying that

7    that's not part of the sale or it is part of the sale?

8            MR. MICHAELS:  I'm just suggesting to you that those

9    particular assets are not on the list.  It was just filed by

10   the Trustee in support of the asset listing.

11           THE COURT:  All right.  All right.  So hold on one

12   second.

13           UNIDENTIFIED SPEAKER:  Your Honor?

14           THE COURT:  No, hold on.  Hold on one second.

15           You guys can all have a seat.  We're going to be here

16   for a little bit.

17           So he's saying that some of the assets are not in the

18   possession of Stream.  That they're in the possession of Hawk.

19   What's your response to that Mr. Vagnoni?

20           MR. VAGNONI:  Your Honor, there -- it's clear to the

21   Trustee that there are assets that are not in his possession.

22           THE COURT:  And are they in the possession of Hawk?

23           MR. VAGNONI:  We are not aware of that, Your Honor.

24   We -- what we are --

25           THE COURT:  So -- okay.  Let me just ask you one

1  question.  Do you think that there are assets owned by Stream

2  that are not in Streams possession?

3          MR. VAGNONI:  Yes, there is -- there's a bonding

4  machine in China --

5          THE COURT:  Okay.

6          MR. VAGNONI:  -- that the Trustee has neither the

7  money or nor the wherewithal to get.  We've gotten various

8  reports -- that was the subject of mediation which --

9          THE COURT:  So does Hawk own any -- does Hawk -- is

10  Hawk in possession of any assets by Stream?

11          MR. VAGNONI:  Not that I'm aware of, Your Honor.

12  SCBV, SeeCubic B.V. has prototypes.  There is -- Mr. Stastney

13  is the director of SCBV.  There is -- we have no indication

14  that Hawk is in possession of anything.  If they are, that --

15  we've heard of tail of it, but we've never been given any

16  evidence that they have -- that Hawk has anything that is --

17          THE COURT:  Why do you guys think that Hawk has the

18  Stream properties?

19          UNIDENTIFIED SPEAKER:  Well, Hawk and its

20  subsidiaries broke into Streams offices and took them.

21          THE COURT:  Okay.  So let's stop right there.

22          UNIDENTIFIED SPEAKER:  Yeah.

23          THE COURT:  Okay.  So let's go the Hawk person.

24          So they're accusing you guys of having broken into

25  Streams building and stolen things.  So what's your response to

1  that?

2          MR. CAPONI:  My response, Your Honor, it's part of

3  the same delusion arguments we've been dealing with for six

4  years.  The -- as a result of the original settlement

5  agreement, the -- give you a brief history.  Mr. Rajan borrowed

6  a bunch of money, never repaid it, the secured lenders reached

7  an accommodation with all the other directors and shareholders

8  to restructure, that led to an omnibus settlement agreement.

9          Following the omnibus settlement agreement, Mr.

10 Stastney took control and operated the entities for quite a

11 period of time before that was reversed.  And when that was

12 reversed by the Delaware Supreme Court, they went back to the

13 Court of Chancery, and they were orders entered that required

14 everything to be turned back over.

15         Vice Chancelor Laster supervised that turning back

16 over and Mr. Rajan took back control of the company.  Ever

17 since then, like a child afraid of the dark, they're constantly

18 saying there's this here, there's this under that bed, but

19 there's no evidence, no Judge, no ruling, no nothing.  I can't

20 disprove the negative.

21         My client lent money; my client is not here.  My

22 client here is a collateral agent for SeeCubic, Inc., which

23 owns the debt and we're just exercising our debt rights.  They

24 want to --

25         THE COURT:  Okay.

1          MR. CAPONI:  -- full stop --

2          THE COURT:  It's helpful --

3          MR. CAPONI:  -- we have nothing.

4          THE COURT:  -- for me if I just get answers to my

5  questions.  So I just want you on the record, do you believe

6  that Hawk is in possession of any property owned by Stream?

7          MR. CAPONI:  Hawk?  No.

8          THE COURT:  Okay.

9          MR. MICHAELS:  Excuse me, Your Honor.  I'm sorry.

10          THE COURT:  Yes.

11          MR. MICHAELS:  We each refer to the Hawk party's that

12  includes SeeCubic, Inc. Delaware and Mr. Stastney in his

13  individual capacity.

14          THE COURT:  Okay.  So with that --

15          MR. MICHAELS:  We have evidence of that.

16          THE COURT:  -- those --

17          MR. MICHAELS:  Now, Mister -- I'm sorry.

18          THE COURT:  Okay.  So do any of those entities, do

19  you know?  And if you don't know, that's fine.

20          MR. CAPONI:  Well, I am not -- what I -- no, I am not

21  aware of them in possession of anything.  I am --

22          THE COURT:  That's owned by Stream?

23          MR. CAPONI:  -- Jon may be able to address this, but

24  when Skadden was representing SeeCubic, Inc. in the Court of

25  Chancery, Schedules were put together, everything was turned

1   back over, it was done in detail.  My client was not involved

2   in that.  What I can say, Your Honor, and this gets to, again,

3   the whole -- of today.

4          There is this concept on the part of the other side

5   that once SeeCubic, Inc. took over through the omnibus

6   agreement, every piece of paper, every pen, every everything is

7   in -- somehow contains something that belongs to them.  So if

8   there's a laptop, there's a TV.  If there was a pitcher for

9   water that was in a conference room, they're claiming it's got

10  Rembrandt's technology.  We don't agree with any of that.

11         We think we own the pitcher.  We can -- we've gone

12  around and around in multiple courts with them about who owns

13  this, who owns that.  As we stand here today, they don't have

14  any shred of evidence.  They don't have a court order.  They

15  don't have a document.  They don't have a bill of sale.  They

16  don't have a photograph.  They don't have anything to

17  substantiate what they're saying.

18         My client has nothing that belongs to Rembrandt.  My

19  client has nothing that belongs to this debtor.  It is my

20  understanding as I stand here today and neither does Mr.

21  Stastney or does SeeCubic, Inc.  We're never going to reach

22  agreement of this.

23         You could have discovery until the cow comes home,

24  they're going to say, well, no, no, we think it's in there

25  somewhere.  Now, if it's not in the trunk, slash the tires and

```
1    see if he, like, you know, hid it in the tires.

2            THE COURT:  So I understand your position, okay?  But

3    I don't want to keep going around and around with the

4    arguments, okay?

5            MR. CAPONI:  The answer is no, we don't have it.

6            THE COURT:  That's great.  That's all I need to hear.

7            MR. CAPONI:  Absolutely.

8            MR. MICHAELS:  Your Honor, I think it's important

9    that Mr. Caponi just told you that his client does not have it,

10   but he also told you that the Delaware Court supervised the

11   return of assets that was under court order to return after the

12   Delaware Supreme Court's decision.

13           He's not telling you that his client doesn't have it

14   and he doesn't know about anybody else.  I will tell you that

15   we have evidence that Mr. Stastney and SeeCubic, Inc. of

16   Delaware did take assets, does possess assets now.  Has used

17   those assets.

18           THE COURT:  Well, okay.  So just describe for me what

19   the basis of that evidence is.

20           MR. MICHAELS:  The basis of that evidence is, I'll

21   start with just the Trustee.  The Trustee saw those assets

22   during a meeting that he had with Mr. Stastney, in which --

23           THE COURT:  When you say trustee, you're saying?

24           MR. MICHAELS:  I'm saying Mr. Homony.

25           THE COURT:  Okay.
```

```
 1              MR. MICHAELS:  Right?

 2              THE COURT:  Hello?

 3              MR. MICHAELS:  Who admitted to our client that it was

 4  -- that he had actually observed it.  That's one.

 5              THE COURT:  He had observed what?

 6              MR. MICHAELS:  He had observed a monitor built by

 7  Stream TV in --

 8              THE COURT:  Uh-huh.

 9              MR. MICHAELS:  - the possession of Shad Stastney

10  during the pendency of this bankruptcy.

11              THE COURT:  Okay.  So --

12              MR. CAPONI:  Your Honor, if I --

13              THE COURT:  Yeah.

14              MR. CAPONI:  -- this goes to when SeeCubic, Inc.

15  verses SeeCubic, B.V.  SeeCubic, Inc. after everything was

16  turned around, continued to develop its own technology in this

17  space.  That's -- they believe that everything in SeeCubic,

18  that's it's been developing, again, incorporates Streams

19  technology, which therefore incorporates Rembrandt's

20  technology.

21              So are there TVs?  Yes.  Are there laptops?  Yes.  Do

22  they belong to them?  No.  Have they -- and I would just put it

23  to the Court this way, if they believe this information or

24  these assets were retained, why did they not go to the Court of

25  Chancery, get an order to establish that?
```

1          Why during the year plus that I've been coming to

2    this court and the bankruptcy have they not, when Mr. Rajan

3    controls everything, get relief from the Court?

4          THE COURT:  Okay.  So let's everyone just return to

5    my focus, which is what is being sold?

6          Did you want to say something, ma'am?

7          MS. BRUMME:  Yes, briefly, Your Honor.

8          THE COURT:  Who do you represent?

9          MS. BRUMME:  Marley Ann Brumme from Skadden on behalf

10   of SeeCubic, Inc., the Delaware entity.  And contrary to what

11   our friends over here have to say, the supervision process of

12   the return of the assets from SeeCubic, Inc. back to Stream was

13   supervised by Vice Chancelor Laster and we've been hearing for

14   a year at least that SeeCubic, Inc. has not returned things.

15         That Mr. Stastney has things and until this bit of

16   evidence that he's presented here today about the Trustee

17   apparently seeing a demo unit, we've never seen any evidence to

18   substantiate that SeeCubic, Inc., the US entity and Mr.

19   Stastney, retained any assets.

20         What I think is getting lost here is that Stream TV,

21   as I think Your Honor understands, is a holding company.  The

22   demo units were developed and built by SeeCubic B.V. in the

23   Netherlands, which is five entities down in the corporate

24   structure.  Any demo unit that has been produced and especially

25   one that Mr. Homony has seen would be from SeeCubic B.V., which

1   is not a debtor here.

2          Further, Mr. Stastney, which they love to impugn

3   here.

4          THE COURT:  The entity that you just said, though,

5   are they trying to sell the equity in that entity?  The one

6   that's not the Debtor?

7          MS. BRUMME:  It's five levels down.  So Stream --

8          THE COURT:  But they are trying?  That is being sold

9   as part of the --

10          MS. BRUMME:  The equity would be sold in the first

11   level subsidiaries.

12          THE COURT:  And so they would own that equity?

13          MS. BRUMME:  And then it would waterfall down.

14          THE COURT:  Okay.

15          MS. BRUMME:  Mr. Stastney notably is the director of

16   SeeCubic B.V. the Netherlands entity that develops all the

17   tech, and Mr. Stastney was installed as director by a

18   Netherlands Court when moving Mr. Rajan.

19          So any sort of implication that Mr. Stastney and

20   SeeCubic, Inc. are unlawfully retaining anything, there's no

21   evidence of that, one.  And two, they can't conflate SeeCubic,

22   Inc. and what's going on at SeeCubic B.V.

23          THE COURT:  Okay.  Thank you.  Okay.  Let's stop one

24   second.

25          So I think what would be helpful for me is if we

1   could focus on all the potential bidders that are out there

2   that are not in this courtroom.  And my job is to make sure

3   that they understand exactly what is being sold.  So just

4   describing the equity, obviously, is not sufficient, because,

5   you know, the -- each of the entities whose equity is being

6   sold has some kind of personal property and that, I think, is

7   the schedule that I'd like to focus on.

8          So what is -- so is there, like, a schedule as part

9   of your, you know, proposed asset purchase agreement that

10  lists, you know, what is owned by the entities whose stock is

11  being sold?

12         MR. VAGNONI:  We -- Your Honor, we do not have the

13  schedule together yet.  But we do have the list of assets that

14  were turned over to --

15         THE COURT:  Okay.

16         MR. VAGNONI:  -- VSI.

17         THE COURT:  So let's be clear.  I don't want to set

18  up any procedures until we're clear on exactly what assets are

19  being sold, so that other potential bidders can have some idea.

20         So this is what I would envision if I was a potential

21  bidder.  I see that the stock is being sold.  I'd want to see

22  some general description of the assets that are owned by those

23  entities, so I know what it is that I'm buying.  Now, obviously

24  you can't give me, like, pictures, so that's what we engage in

25  the due diligence process, right?  A potential bidder --

1          MR. VAGNONI:  Correct.  And --

2          THE COURT:  -- would see, like, a schedule that says,

3    you know, ten TVs and -- or whatever TVs.

4          MR. VAGNONI:  Correct, Your Honor.

5          THE COURT:  And then if their interest has peaked,

6    they would do their due diligence.  And if they wanted to, they

7    could go out and go look at all this stuff or go look in the

8    room or do whatever.

9          MR. VAGNONI:  So Your Honor --

10         THE COURT:  Yeah.

11         MR. VAGNONI:  -- that -- I -- you're correct in what

12   you're saying.  And the process that was setup by SSG was that

13   a teaser would go out to drum up interest in potential bidders.

14         THE COURT:  So what does the teaser say, just so I

15   understand?  Do you have it?

16         MR. VAGNONI:  Yeah, I absolutely do.

17         THE COURT:  All right.  Show me a teaser.

18         MR. VAGNONI:  I have a book of art --

19         MR. MICHAELS:  Your Honor, if I may?  As you're

20   looking through the teaser, you will note that is specifically

21   mentions the Phillips license.  Attached to that Phillips

22   license is a laundry list of software assets --

23         THE COURT:  Uh-huh.

24         MR. MICHAELS:  -- by title, function, what they do.

25         THE COURT:  Uh-huh.

1          MR. MICHAELS:  And we have asked since March whether

2    or not those are being included in the assets with zero

3    response.

4          You had said -- you had made an offhand comment

5    earlier about, well, you're not asking for an audit for

6    anything.  However, the Phillips license requires an audit.

7    That that technology has been removed at termination of that

8    license, which would be caused by a change of control, I.E.,

9    sale of the entity.

10         THE COURT:  That's a sale issue to me.  You object to

11   the sale, because that's not permitted.  As for the bid

12   procedure stage, I just need to identify what assets are being

13   sold.

14         MR. MICHAELS:  My point to you, Your Honor, is there

15   is already a long list of software assets provided in the

16   Phillips license, along with a bunch of know-how and that -- a

17   simple question.  Is this being included in the sale or not?

18   Is what we have asked.  And I think is a touchstone for the

19   kind of list we are looking for here.

20         In addition, it seems that the retention of an expert

21   to walk through the Rembrandt list, we've provided a detailed

22   list of those trade secrets in the Delaware case and can --

23   that can ascertain whether or not those assets are or are not

24   included.

25         THE COURT:  Okay.

1          Mr. Vagnoni, did you have the teaser?

2          MR. VAGNONI:  I do, by a book.

3          THE COURT:  Okay.  How -- the teaser is the binder?

4          MR. VAGNONI:  No, it's in the binder.

5          THE COURT:  Oh, okay.  All right.  So go ahead.

6    Which -- what's the tab of this?

7          MR. VAGNONI:  Tab four.

8          THE COURT:  Okay.  And you guys -- I'm presuming

9    you've seen the teaser?

10          MR. CAPONI:  I have in front of me, Your Honor.

11          THE COURT:  Oh, good.

12          MR. MICHAELS:  We saw it.  It's filed in the papers.

13    But we --

14          MR. VAGNONI:  And Your Honor, if I may?

15          MR. MICHAELS:  -- did not get it.

16          MR. VAGNONI:  That teaser was -- as I'm sure you're

17    aware, the initial document that was sent out, again, to over

18    500 different entities, that then invited them to contact SSG

19    so they could go into --

20          THE COURT:  Okay.

21          MR. VAGNONI:  -- a more complete data room.

22          THE COURT:  I see that this is a one-piece teaser,

23    right?

24          MR. VAGNONI:  Correct.

25          THE COURT:  But as part of any potential sale, we

1    need to have schedules of -- you know, schedules of, you know,

2    what's being sold.  Like, what's owned by those entities,

3    something, a description.  Like, TVs or, you know,

4    approximately --

5              MR. VAGNONI:  So --

6              THE COURT:  -- 100 TVs or something.

7              MR. VAGNONI:  Correct.  And the irony of that

8    comment, Your Honor, is that yes, there would be a schedule

9    available to any potential bidder --

10             THE COURT:  Uh-huh.

11             MR. VAGNONI:  -- who wanted to come in and do due

12   diligence.  There has been zero bidders that have even

13   scratched the surface of learning about this technology.  The

14   only entity that desired to look in the data room was VSI,

15   who's made is abundantly clear to the Trustee that they have no

16   interest in bidding on the purchase of these assets.

17             THE COURT:  So is your position, Mr. Vagnoni, that

18   this teaser provides sufficient information to potential

19   bidders that would allow them to show interest in this?

20             MR. VAGNONI:  Yes.

21             THE COURT:  So this one page, if someone likes what

22   they see, then they'll proceed with you?  And if they don't,

23   like, this is sufficient information to kind of vet whether --

24             MR. VAGNONI:  So --

25             THE COURT:  -- there's interest out there?

1            MR. VAGNONI:  Correct.  And the Trustee hired SSG as

2    his investment banker and SSG as we've seen them do in numerous

3    occasions, initiates contact by first identifying potential

4    parties.  They identified 500 plus different entities that they

5    sent that out to.  Again, both financial and people in the

6    industry.  And they sent that teaser out to those entities.

7            THE COURT:  Okay.  Fine.  And they didn't get a

8    response.  Okay.

9            MR. VAGNONI:  They got it with -- let me be clear.

10   They got one response from someone other than Rembrandt and

11   Rembrandt -- VSI and VSIs purported investor.  That party

12   declined to sign an NDA once they spoke to SSG.  And we'll --

13   Mr. Victor will describe why.

14           THE COURT:  Okay.  All right.  Well, I'll --

15           MR. SWICK:  Your Honor, I would --

16           THE COURT:  -- this teaser.

17           MR. SWICK:  Excuse me.  I would just add that I think

18   Mr. Vagnoni -- I think Mr. Vagnoni has just given us an

19   admission against interest.

20           THE COURT:  A what?

21           MR. SWICK:  And a --

22           THE COURT:  A what?

23           MR. SWICK:  An admission against interest, right?

24   That this teaser yielded no bidders, other than the people who

25   already know about these assets.  And why would there be no

1    bidders?  Well, probably because they read things in a teaser

2    like this and they're sophisticated actors and they understand

3    the --

4            THE COURT:  Okay.  So --

5            MR. SWICK:  -- effort to license things --

6            THE COURT:  Okay.

7            MR. SWICK:  -- that they cannot --

8            THE COURT:  All right.

9            MR. SWICK:  -- license.

10           THE COURT:  I understand.

11           MR. SWICK:  Is not appropriate.

12           THE COURT:  Okay.

13           MR. SWICK:  Okay.

14           THE COURT:  Fine.

15           MR. VAGNONI:  That --

16           THE COURT:  All right.  So --

17           MR. VAGNONI:  -- is quite a leap, Your Honor.

18           THE COURT:  Okay.  So as part of the sale process,

19   though, will there be a more robust description then?  Like

20   schedules of the assets owned by these entities?  Something?

21   Some description?

22           MR. VAGNONI:  Your Honor, and again, Mr. Victor is

23   prepared to testify today.  But at this point after a month out

24   in the market and there having been no interest in --

25           THE COURT:  Are you suggesting that because there's

1   no interest in the market that there's no need to prepare

2   schedules?

3               MR. VAGNONI:  No, no, no.  There are -- schedules are

4   being prepared.

5               THE COURT:  Okay.

6               MR. VAGNONI:  That will be attached to the APA to

7   make it clear what is being -- but I think they're going to be

8   more simplistic than what you are considering.

9               THE COURT:  Okay.  So what --

10              MR. VAGNONI:  Any potential --

11              THE COURT:  -- so just generally describe what it is.

12  It's going to be, like, equipment or software or --

13              MR. VAGNONI:  Lists all of the assets of Stream and

14  the equity interest in Technovative subsidiaries.  Now, Your

15  Honor, that doesn't mean that if someone who had interest in

16  getting due diligence on these assets --

17              THE COURT:  Couldn't come in and --

18              MR. VAGNONI:  -- wanted to get more information.

19              THE COURT:  Yeah.

20              MR. VAGNONI:  That SSG wouldn't give them whatever

21  they wanted.  If they said, we want to know exactly what

22  SeeCubic, Inc. holds, they would have it.  And a lot of that is

23  already in the data room.  That's part of the process that SSG

24  runs.

25              THE COURT:  Okay.  I understand --

```
 1              MR. VAGNONI:  You don't send out a teaser that has --

 2              THE COURT:  Okay.  I understand.

 3              MR. VAGNONI:  -- hundreds of pages.

 4              THE COURT:  Yes?

 5              UNIDENTIFIED SPEAKER:  Well, the data room, which was

 6    prepared, then Your Honor asks for a list of assets, they

 7    provide a list of assets.

 8              THE COURT:  In the data room?

 9              UNIDENTIFIED SPEAKER:  A lot of these assets weren't

10    in the data room before.

11              THE COURT:  Okay.

12              UNIDENTIFIED SPEAKER:  The Phillips IP wasn't there.

13    And I also want to say, this investor, he provided 170-million-

14    dollar proof funds.  When they asked for it -- so liquid funds

15    in an account.  They said, we just want to do some due

16    diligence, all right?  They sat on that for three months.  That

17    took $1.8 million from our investor.

18              So this investment you're talking about, these are

19    the entities who want to buy these assets, bind this company to

20    a plan.  It's getting sorted at every turn, because they're

21    married to this 9019 with the Hawk parties.  But we have real

22    money.  We want to pay unsecured creditors.  We have to have

23    due diligence.  We've got to get forward on this. And I mean --

24              THE COURT:  Weren't you guys going to put together a

25    plan or something?
```

1          UNIDENTIFIED SPEAKER:  Yeah, but we have --

2          THE COURT:  So did you file the plan?

3          UNIDENTIFIED SPEAKER:  No, we're going -- we have to

4   get diligence to know where the assets are so we can have it --

5   they want an unconditional offer for almost $200 million for

6   these assets.  We want to give it to them.  But we also need to

7   know, where's the bonding machine?  Is it still functional?

8   They said we could access to it.  Then they said, oh, here's

9   some photos.  We're not going to give you access to it and the

10  photos are two and a half years old, because they don't know --

11  like, the bonding machine is tens of millions of dollars.

12         THE COURT:  Okay.  All right.  Okay.

13         All right.  So --

14         MR. CLARK:  Can I make a brief intervention?

15         THE COURT:  Yes.

16         MR. CLARK:  I apologize.  And I won't make very many

17  interventions in this matter because there are people here who

18  know a lot more about this case than I do.  I'm a recent entry.

19         But I appreciate the Court's concern about making

20  sure that you have an open and fair bid procedure so that you

21  can have a true 363 sale.  The problem that we have here is

22  this case reminds me a lot of *Fiskarata* (phonetic) we have a

23  secured claim from a secured creditor that I understand lent in

24  terms of hard money about $39 million.  Maybe 45, depending on

25  whether you count some additional advances by Mr. Stastney.

1    But now we have a 9019 that says their actual claim is $180

2    million.  And that they can credit the -- their 150 million of

3    it.

4            As in *Fiskarata* with a credit bid of $150 million,

5    that means that the stalking horse bidder doesn't actually have

6    to put up anymore in terms of cash than the seven and a half

7    million dollars that they said they were going to credit.

8            THE COURT:  They're going to credit it.  Right.

9            MR. CLARK:  So for seven and a half million dollars,

10   they get in the door.  Anybody else who wants to play this game

11   has to come up with cash, cash in the amount of $157.5 million.

12           MR. VAGNONI:  That's not accurate.

13           MR. CLARK:  Excuse me.  I'm sorry, maybe it's less.

14   But it's a lot more than $39 million, that's for sure.

15           And that's -- and to me, that's the real story here.

16   That we have a bid process where the amount of money that

17   anybody else who wants to play this game has to come up with,

18   certainly north of $100 million in order to be able to play

19   this game and be prepared to close in December.

20           If we were talking about a plan process so I could

21   understand how we could come up with a structure where $170

22   million or such might end up being -- be folded into a plan.

23   But on a expedited sale process, where the proposed bidders

24   don't know for sure what's going to be sold until --

25           THE COURT:  Why do you say it's a expedited sale

```
 1   process?

 2          MR. CLARK:  -- we get to today.

 3          THE COURT:  Why do you say it's an expedited sale

 4   process?

 5          MR. CLARK:  Well, it's expedited in the sense that

 6   the bid procedures motion contemplates that the bids will be

 7   received -- binding bids will be received by Friday of this

 8   week.  So that gives whoever's going to buy this, other than

 9   Hawk, two days to do the due diligence that we're talking

10   about.  Two days.  And that the Trustee will then make a

11   decision on Monday.  And then the sale will close in December.

12          Now, as a practical matter, that's not what I would

13   call an open and transparent process.  So if you want to know

14   why there aren't other bidders here, it seems to me it's

15   straight forward.  With a 180 -- 157.5-million-dollar credit

16   bid in place, nobody's going to come to the table.

17          THE COURT:  So I think, though, what I'm hearing is

18   that the credit bid is a hurdle to other potential bidders from

19   entering the situation?  Unfortunately, I've already approved

20   the settlement, the 9019 agreement that they have.  So that's

21   what Hawk is.  I mean, and they --

22          MR. CLARK:  I understand that, Your Honor.  And --

23          THE COURT:  -- and because I've approved that, they

24   have -- they're allowed a credit bid.  That's just part of the

25   system.
```

1              MR. CLARK:  And candidly, Your Honor, as I look

2   through this, looking at it from the standpoint, you know,

3   obviously I've sat in your position.  So I asked the same kinds

4   of questions I would like to think that you would ask.  And

5   what occurred to me in this particular case is there is a

6   motion to reconsider and I'm glad that it hasn't been ruled on

7   yet because it strikes me that this process is fundamentally

8   flawed because of the provisions that were put in that 9019,

9   that they were all but certain to assure that there would be no

10  other bidders.

11             THE COURT:  Okay.  Thank you, sir.

12             MR. CLARK:  Thank you, Your Honor.

13             THE COURT:  You're welcome.

14             MR. VAGNONI:  And Your Honor, just so we're clear on

15  the -- there are very limited issues that's why in the motion

16  to reconsider one of which isn't --

17             THE COURT:  Let's focus on the bid procedure, shall

18  we?  I think I'd like to just hone in on some of those things.

19  I don't want to hear re-argument on something I already heard

20  on.  Okay.  So I want to talk about some of the substantive

21  concerns that Rembrandt and VSI has raised in their objections,

22  if we could turn to that for a minute.  Let me just get this.

23  Okay.  So I wanted to take, for instance, the bonding

24  equipment.  So is the bonding equipment being sold as part of

25  the sale?

1          MR. VAGNONI:  Yes, Your Honor.  It is.  The problem

2   we have with the bonding equipment is there are disputes as to

3   who owns the bonding equipment.

4          THE COURT:  Okay.

5          MR. VAGNONI:  But what we believe is that either the

6   Debtor owns it and the Debtor did list the bonding equipment in

7   its Schedule B.

8          THE COURT:  Uh-huh.

9          MR. VAGNONI:  And the rest of the things in Schedule

10  B are office equipment and FF&E.  But the Debtor alleges that

11  it owns it.  There has been -- there has been allegations that

12  that bonding equipment was transferred to SeeCubic B.V.  The

13  Debtor downstream, the Stream downstream subsidiary.

14         THE COURT:  Transferred by whom?  Who transferred it?

15         MR. VAGNONI:  So and I can't speak to this directly

16  because I was not involved at the time, but it was my

17  understanding that at the time of the omnibus agreement that --

18  and correct me if I'm wrong, but that their allegation that

19  that -- that the bonding equipment was transferred by the

20  controlling entity -- by the Debtor to SeeCubic B.V.  Whether

21  or not it's the Debtor's property or SeeCubic B.V.'s property,

22  that bonding equipment is being transferred.

23         THE COURT:  Okay.  All right.  Just give me a minute

24  to go through all of this for one moment.  Okay.  So this is

25  how I would like to proceed.  Before I sign off on any bid

1    procedure order, I'd like to see what the schedules are to the

2    purchase agreement.  I just -- I think that we should put

3    together the schedule, but I don't think that you have the

4    schedule here today, right?

5         But what I envision is, since it does seem to be an

6    issue, what is being sold, I'd like someone to put together the

7    schedules and then I'd like you to -- and you could break it

8    out any way you want.  Perhaps you could say that this entity,

9    you know, has these assets and that's what could be part of the

10   sale when you buy the equity of that entity.

11        And then what I'd like to do is I'd like to invite

12   VSI and Rembrandt to look at those schedules and to point out

13   the very many issues that I think that they're going to have

14   with those schedules as to potentially flag the issues that you

15   have with regard to each of those entities.

16        And then what I think we should do for any potential

17   bidder is they should see a list of the scheduled assets that

18   actually do have some asterisks to them, which might note there

19   were objections or concerns that you guys have to those assets,

20   right?  So that whoever is, you know, potentially interested in

21   buying the assets will see your asterisk, right?  And then

22   either we'll get them in as bidders or not.  So I think the

23   first thing I'd like to do is I'd like to get that schedule

24   together --

25        MR. THOMPSON:  Your Honor, if I may be heard just on

```
 1  one of those asterisks because we just heard about the bonding

 2  machine.

 3            THE COURT:  Uh-huh.

 4            MR. THOMPSON:  If you look at what the Trustee just

 5  filed with respect to the bonding machine, it's got conditions

 6  all over the place, right?  And it is not guaranteeing --

 7            THE COURT:  Could you -- which one?  Could you --

 8            MR. THOMPSON:  -- not guaranteeing the transfer right

 9  to any buyer, right?

10            THE COURT:  Okay.

11            MR. THOMPSON:  So --

12            MR. GEORGE:  But the buyer will know that.

13            MR. THOMPSON:  Well, it would not have known that --

14            THE COURT:  Okay.  Could we just stop and just take a

15  moment that you're selling something that you may or may not

16  have.  That just does seem a little curious.

17            MR. THOMPSON:  Thank you, Your Honor.

18            THE COURT:  Doesn't it seem a little curious?

19            MR. THOMPSON:  That's precisely our --

20            MR. VAGNONI:  Your Honor.

21            MR. THOMPSON:  We may or may not be in possession of

22  it.

23            THE COURT:  Okay.  All right.  Argument for the

24  Trustee.  I just have to get an answer to the question why is

25  it not weird to say that you're going to sell something but
```

```
 1    then not be sure if you're actually going to get it.

 2              MR. THOMPSON:  Your Honor --

 3              THE COURT:  I'd like to hear from the Trustee.  I'm

 4    sorry, I didn't mean you, I met the guy standing behind the

 5    asterisk --

 6              MR. HOMONY:  Prior to my appointment, as you can tell

 7    -- was a complete and utter disaster.

 8              THE COURT:  It still kind of seems like a disaster

 9    which I'm trying to clean up.  Yes.

10              MR. HOMONY:  I want you to appreciate Stream used to

11    own the bond equipment --

12              THE COURT:  Uh-huh.

13              MR. HOMONY:  -- before the omnibus agreement which

14    set all this off.

15              THE COURT:  Okay.

16              MR. HOMONY:  At some point, we were informed that a

17    receiver -- again prior to my getting on the scene -- a

18    receiver was appointed to oversee Technovative in Delaware

19    District Court.  I believe that receiver retitled the bonding

20    equipment into the Netherlands subsidiary --

21              THE COURT:  Okay.

22              MR. HOMONY:  -- the equity of which I'm selling --

23              THE COURT:  Okay.  Yeah.

24              MR. HOMONY:  -- because it's in China, there's issues

25    with warehouse liens, past due rent.
```

64

```
1              THE COURT:  But presumably that's something that's

2    being sold --

3              MR. HOMONY:  It is being sold, Your Honor.

4              THE COURT:  -- if you can get through -- if you can

5    jump through all those hurdles.

6              MR. HOMONY:  It is being sold.  But as I'm sure you

7    can appreciate in other cases, somebody's holding that asset

8    that might demand --

9              THE COURT:  Okay.  But that's okay.

10             MR. HOMONY:  -- $500,000.

11             THE COURT:  That's okay.  I mean --

12             MR. HOMONY:  Before it gets --

13             THE COURT:  So perhaps with regard to the bonding

14   equipment, there'll be a very long asterisk which will describe

15   exactly where it is and all the claims subject to it.  And you

16   guys would be able to add something to that as well.

17             MR. THOMPSON:  Your Honor, there's an omnibus order

18   -- an omnibus agreement that was overturned by the Delaware

19   Supreme Court.  And thereafter there was a chancery court

20   opinion directing the return of all the equipment including

21   that.

22             THE COURT:  Let me just tell you where I'm focused

23   at.

24             MR. THOMPSON:  Okay.

25             THE COURT:  Where I'm focused at is, I just want to
```

65

1    know what's being sold even if it's subject to a million

2    caveats, right?  So we're going to work together and we're

3    going to come up with a schedule so at least a normal person

4    will at least know this is what's being sold.

5           Now, just based on my preliminary observation, I

6    don't believe anybody will be bidding for these asset because

7    you guys are hopping up and down.  You really think that -- you

8    know, that it's your stuff that's going to fall on this

9    litigation.  I just want to tell you what I think that the

10   logical conclusion of all of this is going to be.  That if we

11   ever get to a sale, there will be no other bidders because

12   you'd have to be crazy to enter this like firestorm of like,

13   you know, litigation, right?

14          So what it's going to be is we're going to have Hawk,

15   who wants to be the buyer.  They're the stalking horse bidder.

16   No one else is going to bid.  And you guys are going to raise a

17   slew of objections to the sale, right?  And if I have -- I have

18   Hawk, right, who's going to then say, you know, Your Honor, I'm

19   going to -- this is what I want to buy and I know that they're

20   hopping mad and they're going to sue me and that they're going

21   to -- they have all these, you know, issues or whatever.

22          And then at that point, if I approve the sale to them

23   that I'm delivering that to them, Hawk is going to pay them

24   whatever they're going to pay and then you guys, Hawk and you

25   guys are going to fight it out, right?  And then I don't have

1   to resolve, right, exactly who owns what or whatever, because

2   they're going to be doing all of that, right?  And then you can

3   engage in that fight.  But all of your jumping up and down, it

4   does have a chilling effect on the bidding as well, right.  It

5   will make it -- it will basically guarantee that Hawk will be

6   the buyer of these assets at the end of the day.

7           MR. THOMPSON:  That's already been guaranteed, Your

8   Honor.

9           THE COURT:  Okay.

10          MR. GEORGE:  Your Honor, if I may.  This is --

11          THE COURT:  Yes.

12          MR. HOMONY:  Your Honor, I can address --

13          MR. GEORGE:  I would just like to --

14          THE COURT:  Okay.

15          MR. HOMONY:  This case has been drawn out for a long

16  time.  And as I'm sure you can appreciate, Stream is a pre-

17  revenue company.  It has no revenues, it has no ability to

18  generate loans.  Part of the Hawk settlement provided that Hawk

19  through SeeCubic would continue to fund the Netherlands,

20  SeeCubic BV, which is an operating entity with real people

21  there who really care about this technology, have lived with it

22  for 20 years and want to see it commercialized.

23          The longer this goes, their livelihoods are put in

24  jeopardy.  The value of these assets is put in jeopardy because

25  if I have an outside -- a date where they have agreed to fund,

1    which is December 10th.  If the sale isn't closed by December

2    10th, there's no funding secured for those people in SeeCubic

3    BV, and not only their lives, but the value of these assets

4    will disappear.

5            Right now, through the carveout I think my and my

6    team have managed to secure between 9- and $10 million in cash

7    for the benefit of unsecured creditors, which would otherwise

8    vanish.  And so I just -- I want everybody in this room to

9    appreciate --

10           THE COURT:  Yes.  I get it.

11           MR. HOMONY:  Okay.

12           THE COURT:  I understand.

13           MR. HOMONY:  Thank you, Your Honor.

14           THE COURT:  Thank you.  Okay.  Hold on one second.  I

15   don't want to hear from anyone right now.  Okay.

16           So Mr. Vagnoni, when -- and you can talk to your

17   colleagues here, but when do you think you could put together a

18   schedule of what be -- I mean, if this is going to be going out

19   for bidders, we need to have like a schedule.  So when would

20   you be able to put together some schedules?

21           MR. VAGNONI:  We'd have to do it -- I do have to

22   speak with -- but we have to do it immediately.

23           THE COURT:  Why don't you talk to your people and

24   tell me how soon you could get those schedules together?  Go

25   talk to them.

1          MR. VAGNONI:  Thank you, Your Honor.

2          THE COURT:  You're welcome.  So while they're doing

3    that, I didn't realize the whole room was empty.  Perhaps what

4    we'll do is while they're doing that can I just run through the

5    rest of my list because I have a 12:30 list as well.  So I'm

6    just going to -- you can keep all your stuff here.  Keep all

7    your stuff here.  I'm just going to run through my 11:00 list.

8    Oh, with the other parties.  Yeah.  Yeah.  But so just sit

9    tight.

10         Pam, what else do we have going on at 11:00?

11         THE CLERK:  11 should be all --

12         THE COURT:  Oh, good.  Excellent.  Okay.  Good.  So

13   hold tight right there.  So I just want to take a short break

14   and I'll be right back.

15         THE CLERK:  Okay.

16     (Recess)

17         THE CLERK:  Court is back in session.

18         THE COURT:  All right.  Mr. Vagnoni, when do you

19   think you'll have those schedules for me?

20         MR. VAGNONI:  We can have them filed by tomorrow.

21         THE COURT:  Okay.  Great.  So what I would like is --

22   what I envision is that there will be schedules identifying

23   what the assets are.  And I think that for instance, with the

24   bonding equipment, you should drop an asterisk that says, you

25   know, we are actually not in possession of the bonding

1  equipment and whatever caveats you think there may be to

2  actually a buyer taking possession of them.  I think you should

3  add that to that.

4        MR. VAGNONI:  Absolutely.  And Your Honor, just to be

5  clear, you know, with the foreign subsidiaries, the Trustee

6  isn't in possession of those assets either, but they are in the

7  possession of subsidiaries of --

8        THE COURT:  Okay.  So you should just -- I just want

9  this to be clearly laid out where everything is.  So if someone

10  were to look at this, they understand these are the issues that

11  I face if I put in a bid.

12        MR. VAGNONI:  Understood.

13        THE COURT:  Okay.  Then I'd like you guys to take a

14  look at the schedules because before it goes out to other

15  potential bidders, I'd like to get your input.  And I think

16  that you have lots of different issues like, you know, you

17  could say that, you know, these assets are subject to our

18  claims and put whatever, you know, statements in there that you

19  think would be appropriate.

20        And I think just to be clear that, you know, if you

21  have an asterisk, you know, you might have an asterisk saying

22  these are the Debtors comments about, you know, like maybe just

23  say a footnote, why don't you have a footnote, right?  You put

24  a footnote and you say this is debtor's position that these

25  assets are not in our possession or whatever.  Put whatever

```
1    caveat.

2            And then we're also going to have footnotes with you

3    guys and you're going to -- so the potential bidder will know

4    that the statements that are being made with regard to your

5    footnotes are your comments and are not the Debtor's comments,

6    right?  And you -- I'm willing to include that just because I

7    think that you have some serious concerns and people should

8    know them.  So it would say something like Rembrandt believes

9    that with regard to these assets, that there are these issues

10   implicated on intellectual properties embedded in them and, you

11   know, this is going to spawn litigation or whatever.  Yes?

12           MR. MICHAELS:  I think the main issue here, I think

13   it's been handled by Whitehall and it was a jeweler who had

14   taken in property on -- jewels on consignment, embedded them in

15   rings and wanted to go to a bankruptcy sale where they just

16   sold it all off subject to the rights of the vendors who had

17   given them tools on consignment.  And I think it was somewhere

18   in the neighborhood of 193 adversary proceedings would have

19   been necessary.

20           And the court said tough.  You need to figure out

21   what the assets of the estate are and you need to have those

22   adversary proceedings by trying to go forward.  And it is -- I

23   understand the Court's desire to move through a process, but

24   saying with an asterisk Rembrandt may or may not sue you for IP

25   infringement is the courts have determined that's not an
```

1  acceptable process.  It is in and of itself subjecting the

2  estate to additional liability for making that transfer in the

3  first place which was not authorized --

4        THE COURT:  Okay.  Would you not want me to add your

5  comments to the schedule?

6        MR. MICHAELS:  We would like -- we would certainly

7  like the ability to enter the comments, but we -- what we

8  believe is necessary in this situation is to ascertain what are

9  actually the assets of the estate, and what else is on the

10  record.

11        THE COURT:  Okay.  So let me tell you my skepticism

12  with that comment.  With respect to the client, the guy that he

13  used to be.  This -- the guy who was replaced by the Trustee.

14  He had a pretty good idea of what's in all of these entities,

15  because up until, you know, earlier this year, wasn't he in

16  control of all those assets?  Okay.  Well, regardless, this is

17  we're going to do.

18        You've got litigation issues with regard to the

19  license, and I'm going to look at that because you're going to

20  file a sale objection and it's going to lay out every single

21  objection you have to the sale and they are going to respond to

22  that and I am going to address all of those arguments, okay?

23  So this is what we're going to do.  You guys, you can add

24  footnotes and all I care about your footnotes is that you put

25  in the preamble of whatever footnotes you want to add to the

1    schedule that these are comments made on your behalf, not on

2    the Debtor's behalf so that people who read it understand it.

3              MR. MICHAELS:  We do have one request --

4              THE COURT:  Yeah.

5              MR. MICHAELS:  -- that we've been making for a while

6    now.

7              THE COURT:  Yeah.

8              MR. MICHAELS:  And that is that the Trustee specify

9    with particularity, whether he is relying on the Rembrandt

10   license or not.

11             THE COURT:  What do you mean you're relying upon the

12   Rembrandt license?

13             MR. MICHAELS:  If they are offering for sale assets

14   Rembrandt has alleged have -- are covered by patent inventions,

15   we have the right to bring suit against anybody who is offering

16   those for sale.

17             THE COURT:  I don't think that Mr. Vagnoni thinks

18   that you have the right to sue them.  Do you -- Mr. Vagnoni, do

19   you think that they have the right to sue you arising out of

20   the sale of the assets that --

21             MR. VAGNONI:  Absolutely not.

22             THE COURT:  See so they just disagree.  That's just a

23   sale -- that's a sale argument that you can make in front of me

24   that I'll consider.

25             MR. MICHAELS:  With respect, we provided the case law

```
 1   that says we do not need leave of this Court.  We can file in

 2   any jurisdiction and SSG is not a part of this bankruptcy.  I

 3   mean, I appreciate they're professional, but they're actively

 4   offering our patented technology for sale.  That's an

 5   infringement under 35 USC.  And it's the only --

 6             THE COURT:  I disagree.

 7             MR. MICHAELS:  -- defense to that because --

 8             THE COURT:  So you're sitting here and you're making

 9   an argument and they just disagree with the argument.  And I'm

10   going to consider it.  Don't include it in your brief because

11   it's a sale objection, right?  You're going to say, Judge, you

12   don't have the authority to do this.  No one should be selling

13   this, right.  You're going to tell me that and I'm going to

14   look at your case law and your legal argument and I'm going to

15   look at theirs and then I will give you a decision on that.

16             MR. MICHAELS:  I respect what you're saying about

17   with regard to the sale process.

18             THE COURT:  Uh-huh.

19             MR. MICHAELS:  My question is different than that, is

20   we -- Rembrandt has the ability to go after SSG today in a

21   different court for patent infringement unless the Trustee is

22   claiming that they are covered by a valid, current, paid up

23   license with Rembrandt.  And I'm asking the Trustee to clarify.

24   Are they saying that they have -- that Stream has a valid paid

25   up license with Rembrandt?
```

```
 1              THE COURT:  Your response, Mr. Vagnoni?

 2              MR. VAGNONI:  It sounds like he's asking me to

 3   testify under threat of suit of the Trustee's professionals.

 4              THE COURT:  Okay.  Well, in any case, I would like to

 5   have any footnotes that you want to add to the schedules by,

 6   let's say Wednesday.  So on Friday, if you could just put

 7   together whatever footnotes that you want, just tell them,

 8   like, do a black line, right?  And then send them a black line

 9   of the schedules.

10              But let's talk about the scheduling here, right?  So

11   I know you're telling me, Hawk, that you have to have this, you

12   know, this all is done by the 10th.  But I need to have, you

13   know, the schedules nailed down so that a potential bidder

14   would know exactly what they're buying.  So we need to get that

15   done first.  I can't -- we can't send this out for bidding

16   until that's done.

17              So once the schedules are done on Friday because

18   they're going to give you their comments by just say Friday

19   morning at 9 a.m., right?  So you -- did you say tomorrow

20   you're going to get them?  So what time tomorrow do we have the

21   schedule?

22              MR. VAGNONI:  Yeah, by afternoon.

23              THE COURT:  In the afternoon?

24              MR. VAGNONI:  And look, if we can get them in today,

25   we're going to get them in today.
```

1           THE COURT:  Okay.

2           MR. VAGNONI:  But we would like to have a week until

3   tomorrow and we're going to do it as soon as we possibly can.

4           THE COURT:  Okay.  So then Friday by 5 p.m.  I'd like

5   you to hand your black line of what the schedule looks like

6   back to them, okay.  So that they can attach that to the

7   purchase agreement.  Yes?

8           MR. SWICK:  Well, we have 48 -- like Monday by 5:00?

9   Like I have to fly home tonight, so I don't know whether it

10  will be tomorrow, that's Thursday.  So --

11          MR. VAGNONI:  We're not going to be here until

12  tomorrow.

13          MR. SWICK:  It might be quite voluminous.  Like I'm

14  not sure what they're going to --

15          THE COURT:  Okay.  That's fine.  You can have until

16  Monday, just to send out -- to add the footnote.  So let's say

17  by Monday 9:00 a.m. you're going to get them your footnotes to

18  the schedules.  Now, so on Monday, you guys are going to have

19  the schedules, right?  And you already presumably have your

20  asset purchase agreement.

21          So let's just talk about the bidding procedure.  Oh,

22  also the data room.  They've got some serious concerns about

23  what's in the data room.  So by the time that this goes live

24  and we send this out for people to bid on or show interest,

25  what's going on with the data room?  And can you make sure you

1    populate it with actual, like, information?  Who's -- when do

2    you -- okay.  So when do you think -- come on up, Mr. Victor.

3    When will the data room actually be sold with things that are

4    clear about what's being sold?

5            MR. VICTOR:  Good afternoon, Your Honor.  Scott

6    Victor for SSG.  The data room is full.  The data room has been

7    accessed by one party; VSI, who is made up of all the insiders

8    of the Debtor.

9            THE COURT:  Okay.  Let's just focus on what's in the

10   data room.  So is there--

11           MR. VICTOR:  The data room is fully set up.  And has

12   been for over a month.

13           THE COURT:  Okay.  Because they said there was

14   missing information in the data room.  Is it possible that they

15   looked at the data room before it was 100 percent complete?

16           MR. VICTOR:  They looked at it after it was 100

17   percent.

18           THE COURT:  Okay.

19           MR. VICTOR:  And they will complain about anything at

20   any time to stall the process.  There's nothing wrong with the

21   data room.

22           THE COURT:  Okay.  So you think that there's -- so

23   everything in the data room is there that would be.  So --

24           MR. VICTOR:  Yes.

25           THE COURT:  -- yeah.

1          MR. VICTOR:  But, Your Honor.

2          THE COURT:  Yeah.

3          MR. VICTOR:  Not one single party has signed an NDA

4    other than an insider of the Debtors and has requested access

5    to the data room.

6          THE COURT:  I understand.  This is going to be a very

7    short period.  I understand.  Yeah.  I'm aware of that.  Okay.

8    It's your position is that the data room has everything --

9          MR. VICTOR:  The data room is fully complete --

10         THE COURT:  Okay.

11         MR. VICTOR:  -- and needs nothing further.  We

12   understand that it is appropriate to file schedules to the APA

13   like in every other case.  That will be done tomorrow.  We'll

14   have until Monday to black line it and add their asterisks.

15   But I have to put on the record that in my 41 years of

16   experience, I've never been threatened by counsel as many times

17   that we've been threatened by Rembrandt.

18         Who are they to sue SSG?  My employees who are

19   working on this, we're not selling their intellectual property.

20   We're not infringing on their patent rights.  We're selling the

21   equity of subsidiaries that may or may not have any

22   intellectual property that may or may not belong or rightfully

23   be licensed by Rembrandt. So I take complete offense to that.

24         THE COURT:  Understood.

25         MR. THOMPSON:  Your Honor, I just might say though

```
 1   that the Trustee of course, has a responsibility to make sure

 2   that everything that he is attempting to sell below the --

 3           MR. VICTOR:  Your Honor, the people --

 4           MR. THOMPSON:  Excuse me.

 5           MR. VICTOR:  -- and its subsidiaries --

 6           THE COURT:  Let him finish his statement, Mr. Victor.

 7   Go ahead.

 8           MR. THOMPSON:  All of the assets that the Trustee is

 9   purporting to sell, have full disclosure with regards to those

10   assets. And I think the point that Rembrandt has been making is

11   that disclosure has been incomplete to date.  I understand that

12   Mr. Victor suggests that everything is in the data room and

13   therefore any reasonable bidder could make a determination as

14   to what exposure they may or may not have.  We would argue that

15   is incorrect.

16           THE COURT:  Okay.  Thank you.

17           I understand, Mr. Victor.

18           MR. VICTOR:  Thank you, Your Honor.

19           THE COURT:  You're welcome.  Okay.

20           So Mr. Vagnoni, let's just talk about some deadlines,

21   okay?  So we have to pick a date for a sale hearing.  We have

22   to pick a date for a sale objection deadline.  And I'd also

23   like to get any replies by the Debtor to any objections.

24           MR. VAGNONI:  Well --

25           THE COURT:  All right.  So we should also start with
```

```
 1    like the bid deadline, okay.  So you're saying that -- so the
 2    big deadline right now you're suggesting is the 18th, but
 3    that's in like five days and we don't even have the schedules.
 4    We don't have them.  So I don't think we need a long time
 5    because I think that we could all agree that given everything
 6    I've heard today, I highly doubt anyone is going to be placing
 7    a bid, but you know, we should still put it out there for at
 8    least a couple weeks to see if you're going to generate any
 9    bids, okay.
10            So let's look at the calendar here.  All right.  So
11    presumably you'll have the final form of the schedule on the
12    18th.  So I think that we could get -- we can have a bid
13    deadline be December 2nd.  December 2nd.  And then that means
14    -- well, I'm sorry.  Yeah.  December 2nd and then we could have
15    an auction on the 3rd.  You guys are going to do that in your
16    offices, right?
17            MR. GEORGE:  If one is required.
18            THE COURT:  If one is required.  All right.  And so
19    then after that, we just need to -- we need to decide when
20    we're going to have the sale hearing.
21            MR. VAGNONI:  Your Honor.
22            THE COURT:  Yes?
23            MR. VAGNONI:  We have a sale closing deadline of
24    December 10th.  We're going to -- this is extremely tight with
25    those --
```

1          THE COURT:  I'm going to give you -- I mean, let me

2     just look at the schedule here.  Okay.  So the 10th is a

3     Tuesday.  All right.  Okay.  So I think what we should do is we

4     should have the sale hearing on -- I think we should have it on

5     the 10th of December.  Okay.  And I'll give you a ruling on the

6     10th because we're going to back into that all the objections

7     for when people are going to file objections to the sale.

8          MR. VAGNONI:  Okay.  Your Honor, that's going to put

9     us out of the agreement we have with Hawk.

10          THE COURT:  Okay.  So Hawk, I'm looking at my

11     schedule and I'm trying to give you a hearing as soon as I can,

12     and I'm -- you know, they're the ones who gave you the deadline

13     of December 10th, is that right?

14          MR. VAGNONI:  It was -- yeah, Hawk and SeeCubic.

15     Yeah.

16          THE COURT:  Yeah.  Okay.  So I'm trying to work with

17     you guys here, but I'm not going to be able to have a hearing

18     in the first week of December because I think we have a lot

19     going on then.  I mean, I guess we could try to have it on the

20     4th.

21          (Court and clerk confer)

22          THE COURT:  So I think what we should do then let's

23     have a sale hearing on the 4th of December at 1:00 p.m.  And

24     we'll make a sale objection deadline next Friday the 22nd, and

25     any responses to the objection should be filed by the 29th.

1  The deadline again is the 2nd, the auction is the 3rd.  We'll

2  have the hearing on the 4th.

3           MR. THOMPSON:  Well, Your Honor.

4           THE COURT:  Yeah.

5           MR. THOMPSON:  Your Honor, I would only make two

6  observations, right?  One, first that it's pretty clear that

7  Rome is not burning.  Notwithstanding protestations to the

8  contrary.  And we once again see the accommodation of the Hawk

9  parties even with regards to scheduling on something that was

10 completely within their control in terms of providing -- the

11 Trustee providing this list of assets well before now.

12          And frankly having other potential bidders have

13 access to this information in the data room.  It is

14 regrettable, although not too terribly unforeseeable that

15 nobody else was interested, given the information that they

16 would have and the concerns that any probable bidder would have

17 given what they know and what the risks probably are.

18          But beyond that, I just want the record to reflect

19 that there seems to be some suggestion that all VSI has done

20 throughout this process has been an obstructor.  We have tried

21 multiple times to provide alternative financing, in the way of

22 DIP financing to proposals.  And I am aware of Rembrandt having

23 made a proposal before that.

24          Mr. Vagnoni, during our hearing suggested that none

25 of those things were acceptable.  All of them -- I will

1    contend, Your Honor, all of them, each and every one was better

2    than the outcome that this trustee has decided is the only

3    track he can go down.

4              THE COURT:  I have one question.  Where is Phillips

5    in all this litigation?

6              MR. GEORGE:  Ready to cancel the --

7              THE COURT:  Excuse me?

8              MR. GEORGE:  Probably about ready to cancel the

9    license.

10             MR. VAGNONI:  Probably.  Your Honor --

11             THE COURT:  Where are they?  Like I haven't seen

12   them.  Like you're jumping up and down, but where's Phillips?

13             MR. GEORGE:  I spoken to Alex Damvelt if you'd like

14   to hear about that.  And I've spoken to Phillips as well.

15             MR. VAGNONI:  Your Honor, he's testified -- he's

16   testified enough.  Your Honor, the proposals that we received

17   -- and I don't want to prolong this anymore.  I know Your Honor

18   has made a ruling on dates.  The proposals that the Trustee has

19   received so far are from the same individual who found it has

20   grossly mismanaged the Debtor's --

21             THE COURT:  Mr. Vagnoni, I'm giving you everything

22   you want.

23             MR. VAGNONI:  I agree.

24             THE COURT:  I'm moving forward with the bid

25   procedure, and --

83

```
1              MR. VAGNONI:  And I acknowledge that.

2              THE COURT:  Okay.

3              MR. VAGNONI:  And I thank you.  But to sit here and

4   listen to --

5              THE COURT:  There's zealous advocates --

6              MR. THOMPSON:  I'm going to object to this line --

7              THE COURT:  -- being paid to be --

8              MR. THOMPSON:  -- to this line of -- I'm going to

9   object.

10             THE COURT:  Everybody.  So Mr. Vagnoni, I don't need

11  to hear anything more from anybody.

12             MR. VAGNONI:  Thank you, Your Honor.

13             THE COURT:  Okay.  So I'll hear from all of you.

14  Just make sure you put in those briefs.  My law clerk is

15  waiting with baited breath to see all of your sale objections

16  because he's got to do a lot of research.  So next Friday,

17  okay.  We'll be taking a close look at all of that.  So please

18  include all of your arguments then.  Okay, everybody. I will --

19             MR. THOMPSON:  Thank you, Your Honor.

20             MR. VAGNONI:  Thank you, Your Honor.

21             THE COURT:  All right.  Thank you.  I have a 12:30

22  hearing.  Don't need to stand for me.  Okay.

23       (Proceedings adjourned at 12:47 p.m.)

24

25
```

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: | : | Case No.  23-10763 |
|  | : |  |
| STREAM TV NETWORKS, INC.   CH: 11 | : | ADV. No.  23-00057 |
|  | : |  |
| Stream Tv Networks, Inc. Vs | : | Philadelphia, Pennsylvania |
| Shadron L Stastney | : | October 16, 2023 |
|  | : | 10:32 a.m. |
| Motion For Preliminary Injunction | : |  |
| Request For Temporary Restraining | : |  |
| Order Filed By Alastair Crawford, | : |  |
| Delaware And Other Law Firms | : |  |
| Representing And Acting In | : |  |
| Concert With John Doe(S) And/Or | : |  |
| Jane Doe(S), Jane Doe(S), John | : |  |
| Doe(S), Asaf Gola, Kevin Gollop, | : |  |
| Hawk Investment Holdings Limited, | : |  |
| Investment Banks Employed By John | : |  |
| Doe(S) And/Or Jane Doe(S), | : |  |
| Krzysztof Kabacinski, Arthur | : |  |
| Leonard Robert "Bob" Morton, | : |  |
| Seecubic B.V., Sls Holdings Vi, | : |  |
| Llc, Shadron L Stastney, | : |  |
| Seecubic, Inc., Patric Theune | : |  |
| Represented By Rafael X. | : |  |
| Zahralddin | : |  |

. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                    Keith Kodosky, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   600 Peachtree Street NE
                                   Suite 4700
                                   Atlanta, GA 30308
                                   404-991-2183

                                   Rafael X. Zahralddin
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

APPEARANCES:

For Hawk Investment Holdings         Steven Caponi, Esq.
Ltd:                                 K&L Gates
                                     600 N. King Street, Suite 901
                                     Wilmington, DE 19801
                                     302-416-7080


For SeeCubic, Inc.:                  Eben P. Colby, Esq.
                                     Skadden Arps Slate Meagher &
                                     Flom, LLP
                                     500 Boylston Street, 23rd Floor
                                     Boston, MA 021116
                                     617-573-4800


                                     Emilia McKee-Vassallo, Esq.
For Shadron Stastney:                1735 Market Street
                                     51st Floor
                                     Ballard Spahr
                                     Philadelphia, PA 19103
                                     215-864-8320



For SLS Holdings VI, LLC:            Davis Lee Wright, Esq.
                                     Robinson Cole, LLP
                                     1201 North Market Street
                                     Wilmington, DE 19801
                                     302-516-1703

For Rembrandt:
                                     Andrew Peter Demarco
                                     Devlin Law Firm, LLC
                                     1526 Gilpin Avenue
                                     Wilmington, DE 19806
                                     302-449-9010








Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
                              INDEX

                    Direct   Cross   Redirect   Recross

WITNESSES:

Charles M. Robertson
   (By Mr. Zahralddin)      77                83
   (By Mr. Colby)                  80                    90
Mathu Rajan
   (By Mr. Kodosky)        91
```

```
 1  OCTOBER 16, 2023                              10:32 A.M.

 2           THE COURT:  Good morning.

 3           MR. CAPONI:  Good morning.

 4           MR. COLBY:  Good morning, Your Honor.

 5           THE COURT:  Please be seated.

 6           All right, Counsel.  Before we begin, I think there's

 7  a little housekeeping matters I'd probably like to address.  So

 8  let's have the entry of appearance for all of the relevant

 9  parties, starting with first -- turn on the right page -- the

10  debtors.  Whos' here for the debtors?

11           MR. KODOSKY:  Good morning, Your Honor.  Keith

12  Kodosky joined by --

13           MR. ZAHRALDDIN:  Rafael Zahralddin, Your Honor, and

14  Beau Strickland (phonetic).  That's better than Mr. Kodosky

15  having to pronounce my last name.

16           THE COURT:  Zahralddin?

17           MR. ZAHRALDDIN:  See, you've known me a long time.

18           THE COURT:  Well, no, I've heard it enough.  I was

19  not good at the beginning either.  Okay.  Mr. Kodosky, I was

20  not pronouncing it correctly on the last hearing, so now I had

21  it.

22           MR. KODOSKY:  Thank you, Your Honor.

23           THE COURT:  Okay.  And who's here for the

24  Respondents?

25           MR. COLBY:  Good morning, Your Honor.  Evan Colby and
```

1  Marley Brumme from Skadden Arps on behalf of SeeCubic, also

2  joined by Melissa Lao, a legal assistant from our office.

3        THE COURT:  Okay.  And we have probably for -- I'm

4  sorry, again Mr. Colby.  You represent?

5        MR. COLBY:  SeeCubic, Inc. of Delaware.

6        THE COURT:  SeeCubic, Inc. of Delaware.  Okay.  Yes.

7        MS. VASSALO:  Good morning, Your Honor.  Camilia

8  McKee Vassalo on behalf of Mr. Stastney.

9        THE COURT:  Stastney.

10        MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

11  of Robinson and Holt on behalf of SLS Holdings VI, LLC.

12        THE COURT:  And, Counsel, could you say that again

13  because unfortunately I did not hear the first -- your name.  I

14  heard SLS Holdings VI, I think you said.

15        MR. WRIGHT:  Yes, Your Honor.  Davis, D-A-V-I-S,

16  Wright, W-R-I-G-H-T.

17        THE COURT:  Okay.

18        MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

19  from K&L Gates on behalf of Hawk Investments.

20        THE COURT:  Anyone else?

21        MR. DEMARCO:  Your Honor, Andrew Demarco with Devlin

22  Law Firm here for Rembrandt.

23        THE COURT: Anyone else?  Okay.  Before we begin, as

24  I said, there's a couple of housekeeping matters that I think I

25  need to deal with.

1              With respect to the debtors, on Saturday evening,

2    9:30, I think, you filed a 40 page brief.  I'm not quite sure

3    -- this is a TRO -- why you filed that.  And again, which now

4    necessitated the Court, opposing counsel, the Court to expend

5    time, because I wanted to start at 10:00, but that wasn't going

6    to happen reviewing a 40 page with voluminous attachments and

7    which seemed to set forth different -- because we were forced

8    to do a comparison between the initial TRO that was filed, the

9    brief that was filed.

10             And they seemed to make different arguments that the

11   Court now had to figure out how to address those.  So I'm not

12   quite sure.  You know, this isn't a situation where we have,

13   you know, a summary judgment or a motion where, you know, the

14   Court is expecting briefing.  This is a TRO that is supposed to

15   be an emergency.  And so this would not have happened except

16   that we continued the hearing that apparently the debtor took

17   the opportunity to file supplemental briefing.

18             My rules typically in an -- overall do not allow for

19   supplemental without prior Court approval.  But all that did

20   was make things unnecessarily complicated and then delayed the

21   start of this hearing.  And, Counsel, I would tell you if this

22   is an emergency, I'm not quite sure how filing a 40 page

23   supplemental brief is going to move the dime in one bit other

24   than causing additional work for opposing counsel and

25   additional issues that the Court was not originally -- as,

1   again, when we did a comparison, there seems to be there's

2   different arguments.  We'll have to figure that out during the

3   course of this hearing today.

4           The second matter that I'm concerned with, apparently

5   there is an outstanding renewed motion, I think it's called, to

6   force the parties to comply with the 26(f) requirements, which

7   of course I went and I reviewed the rules and I'm not quite

8   sure what the parties' positions are and how they get there.

9   The rules specifically set forth some deadlines that need to be

10  adhered to.  And 16(b), Rule 26(f) refers to 16(b), which says

11  that the Court shall issue an order within 60 days of either

12  the entry of appearance of a party and another deadline, but

13  for my purposes, it's within 60 days of an entry of appearance

14  of a party.  And unless the Court orders otherwise, the parties

15  have to comply.

16          I don't understand if the Defendants don't want to

17  comply with 26(f) how they get to say we're not going to

18  comply.  Absent court order, you have to come and ask me to

19  extend the deadline.  Nobody did that except I got a motion

20  from the debtors, Plaintiff debtors, saying force them to

21  comply.  I don't know what the issue is between the parties,

22  and frankly, you guys keep that outside of my courtroom.  But I

23  will tell you I expect everyone to comply with the rules.

24  26(f) says this is how you do it.  There is no motion before

25  this Court asking to extend the 26(f) deadlines.  That is all

1    I'm going to say.

2              There is an outstanding motion to force you to

3    comply.  I suggest at the end of this hearing that you guys get

4    together and figure it out because you don't want me addressing

5    it when there has been no request for an extension.  And unless

6    somebody can tell me how it works otherwise, unless I have a

7    missed understanding of what the rules require, I don't want to

8    see this stuff.  I think it is unnecessary.  It's not how I

9    expect attorneys appearing before m to behave.  Follow the

10   rules.  Do not burden the Court with unnecessary issues that I

11   should not have before me.  Again, I am not finding that cause

12   may not exist to extend the deadlines, but that hasn't been

13   requested.  And until it is, follow the rules.

14             Now, that's the only two things I needed to address

15   for today.  And I think -- I hope -- that I don't have to say

16   any of this again because I had thought that we'd reach a point

17   in these proceedings where everybody, for lack of a better

18   word, was playing nice.  Okay?

19             Now, where did we leave off at the last hearing?

20             MR. COLBY:  Sorry, Your Honor.  If I might, I did

21   wish to have an opportunity to address the middle of the night

22   Saturday filing.

23             THE COURT:  Uh-huh.

24             MR. COLBY:  A minute ago, the Court said we'll have

25   to work that out over the course of the day, which I

1    appreciate.  I don't fully understand how we're going to do

2    that or what that might mean, but we would submit that this, in

3    a TRO and an expedited context, where the debtor has already

4    sat on this issue for an extended period of time before

5    bringing it to the Court in a purported emergency context and

6    where during the intervening week we get this, you know, the

7    day before, the middle of the night before we're going to be

8    here to continue the hearing, we get a brief that raises new

9    legal arguments, new factual issues and factual arguments, and

10   submits 2,000 pages of new exhibits that completely changes the

11   thrust of the basis for the TRO.

12          That that's just simply too late and shouldn't be

13   considered as part of today's proceedings, which should be

14   designed around completing the process of addressing the TRO

15   motion as it was actually filed and as it was made.  For

16   example, there are arguments in the new brief that relate to

17   confidential -- supposed confidential information that Mr.

18   Stastney had access to in 2018.  Debtors had an opportunity to

19   question Mr. Stastney and didn't raise this issue whatsoever.

20   That's just one example.  There's also this new theory of

21   lender liability.

22          THE COURT:  Well, frankly, I'm not quite sure how

23   that has anything to do with a TRO.  You have a lender

24   liability claim, you go file it.  I don't get it.

25          MR. COLBY:  I'm comforted to hear the Court say that

1 | because we don't think it does either.

2 |     THE COURT:  Well, I'm not -- I'm just saying I don't

3 | understand.  They're going to get to tell me how, but just in

4 | reading it.  In addition, I also forgot to mention that during

5 | that time period the debtors took the opportunity to also seek

6 | discovery within 48 hours, necessitating the Court, again --

7 | and let me just say because there was another thing I wanted to

8 | say.  I don't know how any of you think that we're even going

9 | to get to the briefs that you submitted in connection with the

10 | other hearing because all of our time has now been devoted to

11 | issues, emergencies regarding discovery, a TRO.

12 |     So I just want you to understand if anybody was

13 | expecting and we were hoping to get that done quickly, this is

14 | not helping.  This is not helping at all.  And it is what it

15 | is.  I'm just telling you I will try my best to get to what I

16 | can get to, but, you know, a lot of the times that we should

17 | have been devoting to try to get to the briefs and all those

18 | other things, we are now devoting to discovery disputes, TROs.

19 | I don't know what to tell you.

20 |     MR. COLBY:  Your Honor, I think that's a fundamental

21 | concern for the secured creditors as well.  And, in fact, the

22 | overall conduct of the bankruptcy proceeding so far has

23 | suggested a primary strategy of attempting to avoid dealing

24 | with the substantive issues raised by the bankruptcy filing.

25 | It is a continuation of a pattern that we have seen of

11

```
1    attempting to get out from under impending judgments by courts.

2    It's part of the reason, we submit, why we're here because of

3    the near conclusion of the 225 action in the court of chancery.

4            It's what we've seen as we got close to the end of

5    the hearing on the various Hawk motions.  There this motion

6    to withdraw the reference and effectively move substantial

7    portions of this dispute to the district court here filed by

8    the debtor.

9            THE COURT:  Has that been ruled on?

10           MR. COLBY:  I'm sorry.

11           THE COURT:  Has that been ruled on?

12           MR. COLBY:  It has not been ruled on.  And now we're

13   seeing it in this Court with the serial raising of new issues

14   and new motions.  And I think to state what the secured

15   creditors submit is obvious, this all speaks in favor of a

16   compelling need to put a responsible party in charge of the

17   debtors in the form of a trustee that will bring some semblance

18   of order to these proceedings and permit the Court and the

19   parties to focus on actually getting to the important work of

20   the bankruptcy filing and of the restructuring, whatever form

21   that takes, because otherwise the pattern has been repeated

22   forum shopping, shifting of issues, moving targets for us to

23   try to advance the ball.  And it's making it very, very

24   difficult to make forward progress here.

25           THE COURT:  Uh-huh.
```

```
 1            MR. COLBY:  And the way this has played out suggests

 2   that that's not a byproduct of the strategy.  That is the

 3   strategy.

 4            THE COURT:  Well, Counsel, I'm not going to say

 5   whether it's a strategy or not, and I'm not sure what weight if

 6   any -- I'm not saying I wouldn't -- to the fact that this was

 7   filed when the 225 litigation was in place.  Parties often file

 8   bankruptcy when there is litigation when they are in financial

 9   strait.  You know, I get you guys have come to this court with

10   a history that is not a history here.  I get it.  So my goal is

11   to have you guys leave that at the door.

12            It doesn't mean that it's completely -- I'm not going

13   to completely ignore it, but for my purposes, again, I -- and

14   the debtor will need to tell me this.  And when I said we

15   figure out how we deal with that.  Again, we're trying to just

16   sift through and spend time, you know, a couple of hours that

17   we are trying to -- you know, did I read this on Saturday

18   night?  No.  I don't even get notices that this is filed.  You

19   know, only thing I get notices of is if an appeal is filed or a

20   new bankruptcy case is filed.

21            I do not get -- and as I have said, I don't go

22   perusing the dockets looking for information.  In this case, we

23   know come Monday morning, my law clerks and I know we better go

24   -- and my courtroom deputy, the first question I'll have, did

25   they file anything.  At least the last hearing, I was happy to
```

1  say that nothing was filed and instead, like, yes, there's a 40

2  with ha zip drive.

3           So again, you know, that's not how I want this to go.

4  And then when I said I have to figure out where this -- where

5  we go with this new filing.  Do I even consider it at all?  Is

6  it something that really relates to what was originally before

7  me or was this just an expansion because we had to continue the

8  hearing?

9           And the debtors are going to have to tell me that,

10 which means now instead of starting the hearing at 10:00 with

11 evidence we're going to spend God knows how much time trying to

12 sift through all these issues because, again, we have spent two

13 and a half hours this morning trying to figure out what the

14 heck this -- the new filings are, which means we didn't start

15 when I anticipated, and now we can't start because now I have

16 to issue that.  And, you know, the 26(f), you guys are going to

17 figure that out, so we're not talking about that anymore.

18 We're only going to talk about this.  And I get your point, Mr.

19 Colby, of what -- because they were mine.  Not saying that I

20 agree, but they were issues that were raised for the Court.

21           MR. COLBY:  Yeah.

22           THE COURT:  Okay.

23           MR. COLBY:  So, I mean, the initial motion barely

24 devoted any time or space whatsoever to an important element on

25 a TRO, which is likelihood of success on the merits.  It was so

1   bereft of any analysis that on our side it wasn't clear to us

2   what we were even responding to, what, of the 19 causes of

3   action in the -- supposed causes of action because some of them

4   aren't actual causes of action, but of the 19 supposed causes

5   of action in the adversary proceeding, which one was this TRO

6   about.  It can't really be about all of them, and so we had to

7   guess.  And we pointed out in our brief the absence of any

8   analysis on that very important element of a TRO.

9            And now, all of the sudden, after all of our

10  preparation, after a substantial portion of the hearing is

11  complete, in the middle of the night the weekend before we

12  resume supposedly to finish up, all of the sudden there's this

13  new focus on some supposed cause of action, one of which still

14  isn't actually a cause of action and it should fail on that

15  basis.  But it has created certainly some prejudice.  It

16  certainly speaks to the utter failure of the motion as it was

17  initially framed to carry the debtor's burden.  It is a tacit,

18  if not express admission, borderline express admission,

19  whatever, however we want to characterize it, that the basis

20  for the motion utterly failed after day one.

21           They didn't satisfy the elements of what one needs to

22  show in order to obtain injunctive relief, temporary injunctive

23  relief.  As a legal matter, it didn't make any arguments about

24  a particular likelihood of success on the merits on a

25  particular claim.  And secondly, we spent the whole day when we

1    were here a week ago talking about the Phillips license and

2    sublicenses and all those things.  Not at all a component, a

3    significant component, of this new brief.  The issues, the

4    basis for the TRO has completely changed all of the sudden in a

5    way that shows the fatal flaws in the initial motion and which

6    is highly prejudicial for us to proceed on those basis if

7    that's going to be part of what we're, you know, litigating

8    here today in the evidence.

9              THE COURT:  Well --

10             MR. COLBY:  So, I think I made my point.

11             THE COURT:  Right.  And I will say this, Counsel,

12   with respect to the issue of success on the merit.  I mean,

13   that's sort of a low threshold.  I mean, I've looked at the

14   case law.  It's not very high.  But the biggest thing in a TRO

15   is irreparable harm.

16             MR. COLBY:  Sure.

17             THE COURT:  And what I've tried to figure out and

18   I've tried to decipher is what is that standard.  Is it a

19   preponderance of the evidence?  Is it some high, you know, more

20   than likely than not?  You know, and so that's sort of what I

21   was focusing on for these hearings.  And now, again, I have

22   something new and I have to first, one, decide, do we even

23   address those things.

24             MR. COLBY:  Right.

25             THE COURT:  And again, it necessitating, and

1   somewhere in my notes I have a comparison of what was in the

2   original motion as to what is in the new motion.  And to be

3   perfectly honest, my view of TROs, yes, success on the merit.

4   But if you look at the case laws and the cases out of the Third

5   Circuit, it's sort of a low threshold.

6           MR. COLBY:  Well, Your Honor --

7           THE COURT:  It's really irreparable harm.

8           MR. COLBY:  We could spend a lot of time talking

9   about it.

10          THE COURT:  But we're not going to talk about that

11  because --

12          MR. COLBY:  Yeah.  I was going to say --

13          THE COURT:  We're not going to talk about that

14  because I need to know what I needed.  I needed to know what it

15  is from the Court's perspective, where we needed to go, what

16  the standard is, what the elements I have, and be in a position

17  to make a ruling.  So I'm just simply saying this is how I

18  looked at it.

19          MR. COLBY:  Understood.

20          THE COURT:  And that was it.  I get what you're

21  saying, which is you believe this is a new basis.  It wasn't in

22  the original.  You're prejudiced because you weren't prepared

23  to address that and that wasn't the issue brought to the Court.

24          MR. COLBY:  Yeah.  And the showing, we could probably

25  have an interesting discussion of exactly what the --

1          THE COURT:  The legal thresholds are?

2          MR. COLBY:  The required, the legal threshold is, but

3    what I think is abundantly clear is that the showing made by

4    the debtors was, you know, zero or barely above that, and so.

5          THE COURT:  But we're not there yet.  You're arguing,

6    you know, you're making closing arguments as to -- but I'm not

7    there.

8          MR. COLBY:  Understood.

9          THE COURT:  All I'm trying to address right now is

10   where as we with the evidentiary record that needs to be made

11   for this Court to get where I need to get.

12         MR. COLBY:  Understood.  I think I raised it only

13   because the failure to make any initial, you know, meaningful

14   initial argument on success on the merits or the failure to

15   make a meaningfully factual showing on irreparable harm or the

16   imminent component of irreparable harm, which I think we

17   addressed by showing these supposed concerns have been around

18   for months and months.  All of that also speaks to why now all

19   of a sudden we've got a new TRO effectively on midnight on

20   Saturday before resuming our hearings.

21         It was -- you know, I know we're not done.  I think

22   we should close out the record on that motion as it was

23   originally framed.  We'll see if the debtors can do any better.

24   But I think -- you know, I think the fact that we're now trying

25   to litigate some completely different TRO and have apparently

```
 1   abandoned the way it's initially framed speaks to the fact that
 2   it really, you know, should be denied.  So I understand we're
 3   going to finish the process.
 4              THE COURT:  Right.  I'm not sure, you know.
 5              MR. COLBY:  But --
 6              THE COURT:  I'm not going to make a decision because,
 7   first of all, I don't have a complete record.  I get your
 8   arguments.  I'm going to -- you know, I see counsel are all
 9   standing, so I'm not sure if they want to contribute or add to
10   what you wanted, what you said, and then I'll hear from the
11   debtor.  Let's see how this works.
12              Okay, Mr. Caponi.  I see you're walking up to the
13   podium.  What's your position?
14              MR. COLBY:  Never turn on --
15              THE COURT:  And please -- right.
16              MR. COLBY:  Yeah.  So, sorry, Your Honor.  Just to
17   conclude the thought so I can sleep better at night.  I think
18   it speaks to the need to not allow the debtors to suddenly turn
19   today into a proceeding on a motion, effectively what is a new
20   motion with entirely new basis that was filed in the middle of
21   the night on Saturday.  We haven't had a chance to respond to
22   it.  We've barely had a chance to analyze it.  We got 2,000 new
23   documents, 2,000 pages of new exhibits.  I don't think that's
24   what today should be about.  That's all.  Thank you, Your
25   Honor.
```

1          THE COURT:  All right, Mr. Caponi.  And I get that

2     you were going to add to what Mr. Caponi says?

3          MR. CAPONI:  Your Honor, I'm not going to add to Mr.

4     Colby's presentation.  I think he said it admirably.  I just

5     want to address one point, which is as Your Honor started out,

6     the -- and maybe Mr. Colby started out -- the notion, you know,

7     the debtors filed these cases and they repeatedly say in their

8     filings we filed the bankruptcy in order to provide the debtor

9     breathing room.

10         The Court is entitled to breathing room to address

11    the gating issue as to whether or not a trustee should be

12    appointed or these cases were properly filed because who runs

13    these estates if these estates continue to exist is fundamental

14    to whether these adversary proceedings should be followed,

15    whether there's a need for a TRO.  There's a tremendous amount

16    of money being spent and --

17         THE COURT:  Oh, we commented about how much money is

18    being racked up in attorney fees.  That was one of the first

19    thing I said.  How much is this stuff costing?  And from the

20    Court's perspective, I mean, no offense to the creditors, you

21    spend what you spend.  But from the debtor's perspective, every

22    dime spent on attorney fees is less money for creditors.  So,

23    from my perspective, I have a concern.

24         MR. CAPONI:  And it's shared, Your Honor.  And, you

25    know, once we put the -- the record was closed on the prior

20

1    motions, our goal was to give the Court breathing room.  We

2    were required to file a motion to extend the time and respond

3    to the adversary proceedings because the debtors wouldn't agree

4    to the TRO, the Rule 26(f).  I mean, the Court's on the

5    receiving end is a lot.  We're getting on the receiving end

6    even more.  It's like shotgun, you know, making us dance.

7            I'm not making an application, Your Honor, because

8    there is no such application as -- all I am is encouraging the

9    Court do the best it can to separate the wheat from the shaft

10   and focus on the prior motions and ignore the debtor's efforts,

11   to the extent the Court can within the rules, to distract

12   because those gating issues, I can't stress enough.  They are

13   gating issues because if a Chapter 11 trustee is appointed of a

14   7 trustee where these cases are kicked, this TRO, the adversary

15   proceedings, are all going to be handled, not handled or

16   handled in a completely different way.  So anything that we can

17   do --

18            THE COURT:  Well, we don't know in a different way.

19   You would hope --

20            MR. CAPONI:  Well, I don't know, but it could be.

21            THE COURT:  Right.  Right.

22            MR. CAPONI:  I'm not saying this from my client's

23   perspective as a secured creditor that advanced those motions,

24   whatever we can do to give the Court breathing room.  I heard

25   you about the 26(f).  Take it to heart.  And I would just --

1    again, I'm just pleading my case that we've got to not let the

2    distractions take us away from the primary motions.  That's all

3    I wanted to add, Your Honor.  Thank you.

4              THE COURT:  All right.  Thank you, Mr. Caponi.

5              Yes, Counsel.

6              MS. VASSALO:  Thank you, Your Honor.  And I will be

7    brief because I do understand that we have taken a lot of time

8    trying to address these preliminary issues when Your Honor is

9    expecting to hear evidence this morning.

10             THE COURT:  Right.

11             MS. VASSALO:  We spent a lot of time over a week ago

12   hearing evidence on one motion that was premised almost

13   entirely on whether or not SeeCubic could utilize sublicenses

14   and whether or not that was permissible or whether or not that

15   was going to result in imminent, irreparable injury to Stream.

16             Now, on Saturday night, I opened a document that all

17   of a sudden turns on whether or not a 2018 employment agreement

18   was somehow breached by my client, Mr. Stastney, in 2023, and

19   that is somehow irreparable, imminent, irreparable injury that,

20   you know, weighs in favor of a TRO now that was never raised

21   during that hearing.

22             THE COURT:  Well, at least a TRO with respect to your

23   client.

24             MS. VASSALO:  Right.

25             THE COURT:  Because this doesn't relate to -- well, I

1    didn't see it and the debtor is going to have to tell me how

2    that related to these other people, other defendants.

3            MS. VASSALO:  But my point is we spent a lot of time

4    that Friday and not once did that employment agreement come up.

5    In fact, the employment agreement wasn't even attached to the

6    adversary complaint.  The first time it was presented to this

7    Court was Friday or Saturday night.  And buried among those

8    additional 2,000 pages is a settlement agreement with my

9    client, which if you look at the settlement agreement, contains

10   a waiver of claims which if you examine it will actually

11   demonstrate to the Court that many of the claims contained in

12   the adversary complaint are actually barred.  So there are

13   serious legal issues here that I need to have the opportunity

14   to brief on behalf of my client and not just with 48 hours'

15   notice.

16           THE COURT:  Well, I will --

17           MS. VASSALO:  The prejudice here is --

18           THE COURT:  All right.

19           MS. VASSALO:  -- extraordinary.

20           THE COURT:  Well, I will tell you we did not look at

21   the exhibits.  I was not opening a zip drive that was how many

22   pages.  So, to the extent there is a settlement agreement or

23   whether one was attached or not attached, I wouldn't know.

24           MS. VASSALO:  And that's my concern, Your Honor, is

25   the prejudice to my client if we proceed today on some new form

1   of liability, new form of immediate emergency relief where

2   frankly, Your Honor, when we stood here at the end of the

3   hearing on Friday.  You said, "Is there anything else?"

4   Debtors could have said, "You know, we would like to submit

5   additional briefing."  And we likely would have said we don't

6   want to do that.

7           THE COURT:  You would have said no, but.

8           MS. VASSALO:  But if we're going to do that, let's at

9   least have some order because we've all practiced for a long

10  period of time and we just want to have a little bit more order

11  to these proceedings, as does Your Honor, right?

12          THE COURT:  Well, as I pointed out initially, my

13  rules, my chamber rules talk about what you can and can't file.

14  And one of the things that I don't allow is supplemental

15  briefing without prior notice or approval from the Court simply

16  because I don't want to have endless filings where this party

17  files and then there's a response and we never get to where

18  we're trying to get because there's too many new issues, new

19  things that come that were not part of the original motion, the

20  original whatever it is that the Court is addressing.

21          So that -- I would also encourage people to look at

22  my chamber rules before you file anything.  I thought I said

23  that -- and you weren't here.  I thought I said that months

24  ago, that that was important.  But I get your point that this

25  is highly -- you believe it's highly prejudicial to your

1    client, Mr. Stastney, and that if we're going to proceed today,

2    that we don't consider any of the things that are not -- other

3    than what has been previously mentioned in the motion to the

4    extent it's different, that you believe that that should not be

5    addressed today.  Any evidence regarding that should not come

6    in.

7             MS. VASSALO:  Yes, Your Honor.  And to the extent

8    that the Court is inclined to consider any evidence that's

9    outside of those motions -- the motion that was filed

10   originally and heard on, I believe, it's October 6th was when we

11   were first here, I would ask that we would adjourn today's

12   proceedings and allow me the time to actually respond before.

13   But I just say that so that you understand the prejudice that I

14   am feeling at this moment and the feeling of --

15            THE COURT:  Right.  How do you -- right.  And, you

16   know, this is a TRO.  And I'm not quite sure.  You know, it's

17   been a long time since I've done one, but in my prior life, I

18   did them routinely.  And I don't recall them being extended

19   like this.  We go in half a day, maybe a day, done.

20            I don't recall any discovery ever happening because

21   it's a TRO.  So, again, this was many moons, many years ago, so

22   maybe the practice has changed.  Maybe things are different.

23   But from my recollection, this is unusual from my own

24   experience.  Again, I don't know what, you know, everybody

25   else's experience.  I don't know what people do now.  You know,

 1  that was 14 years, almost 14 years ago, so things have clearly

 2  changed.  So, I get your point and I will consider that --

 3           MS. VASSALO:  Thank you, Your Honor.

 4           THE COURT:  -- in figuring out how we proceed.

 5           Counsel.

 6           MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

 7  again on behalf of SLS Holdings VI, Inc.  Your Honor, I don't

 8  want to belabor the point, but I have to echo that, the very

 9  last argument.  In connection with SLS, we have now been

10  identified with these lender liability claims in the

11  supplemental briefing.  That was not something in the original

12  motion.  It's not something my client briefed in response to

13  the original TRO motion.

14           THE COURT:  Well, I'm not quite sure how a TRO

15  relates to that.

16           MR. WRIGHT:  Your Honor --

17           THE COURT:  I don't know.  Debtors are going to tell

18  me.  I don't know.

19           MR. WRIGHT:  Your Honor, I understand what you're

20  saying that debtor is going to tell you.  I'm going to suggest,

21  Your Honor, that even if the debtor somehow makes a suggestion

22  as to how a legal claim for lender liability requires a TRO,

23  I'm going to ask Your Honor at the end of today to continue

24  that so that my client may actually brief that legal argument

25  and address whatever evidence comes up today that was not

26

```
 1   available ten days ago.

 2           THE COURT:  Okay.

 3           MR. WRIGHT:  Thank you, Your Honor.

 4           THE COURT:  Okay.  Anybody else from this side?

 5           All right.  Mr. Zahralddin, explain to me.

 6           MR. ZAHRALDDIN:  Thank you, Your Honor.

 7           THE COURT:  Okay.

 8           MR. ZAHRALDDIN:  I'm going to try not to denigrate

 9   counsel on the other side in any way because I just sat through

10   weak arguments, didn't do this.  I mean, they did closing

11   argument and that's, I think, a problem.  But let's just talk a

12   little bit about the case so we can put this into context.

13           We filed this case and then immediately were hit

14   without any sort of breathing spell because we were hit with a

15   motion to dismiss.  We were hit for motions to displace the

16   management of the debtor.  And this is after having had the

17   entire company taken away and then supposedly given back to us

18   about eight months ago.  And then the reason that this

19   bankruptcy filing was filed was not to just avoid a 225 action.

20   A 225 action is a secured creditor's action.  It has nothing to

21   do with determining whether there's a valid director.  It has

22   to do with whether you can exercise a pledge agreement in a

23   loan document.  So it's no different from any time somebody is

24   trying to file an action, a secured lender, and the debtor says

25   I can do better somewhere else.
```

1                  And key to why we can do better here is because we
2     are going to pay the unsecured creditors in the case and we
3     will pay the other creditors if they have allowed claims.  And
4     central to everything that's happened in this last few years is
5     key on the lender liability, which is not a cause of action, as
6     Mr. Colby said.  It is a series of causes of action that focus
7     on whether or not there's dominion and control over a debtor or
8     assets of the debtor, in this case.
9                  And everyone says, well, why is it that we come up
10    now?  Well, we come up now, Your Honor, because we said this
11    was happening in the very beginning.  We filed a motion to
12    enforce the stay and said we were going down the pathway of
13    there trying to be control over these subsidiaries where we
14    have stock that is an asset of the estate and we also have
15    obligations.
16                  THE COURT:  What are the assets?  That's something
17    I've been struggling to figure out.
18                  MR. ZAHRALDDIN:  Well, Your Honor, it's -- I have --
19    I ran through it last night just to give myself some
20    perspective on whether I was completely displaced in time and
21    space or whether it was actually just the circumstances of this
22    case.  You look through any cash management motion, any DIP
23    motion, you can pull up 50 to 100 different references to money
24    flowing through non-debtor subsidiaries, non-debtor foreign
25    subsidiaries.  This is not an uncommon structure.  And

1   particularly with a tech company, this is not an uncommon

2   structure to have a tax group over in Europe.

3          But what's important is that the licenses that are

4   involved here and the trade secrets, even though they're in

5   different subsidiaries, there are still obligations of the

6   debtor that have to be adhered to.  If you have trade secrets

7   and they're sitting in the subsidiary in the Netherlands, they

8   have to protect those trade secrets.  The only reason --

9          THE COURT:  They who?  Who has to protect the trade

10  secrets?

11         MR. ZAHRALDDIN:  The, well, number one, it would be

12  the folks in the subsidiary that are managing it.  A gentleman

13  like Mr. Patrick Thune, Mr. Bart Barenthol (phonetic), those

14  folks who are in the Netherlands.  And then now if Mr. Stastney

15  has been appointed as an interim director, there is a similar

16  obligation to protect those trade secrets and to adhere to the

17  licenses, the two things that are probably, I would say top

18  three that are probably most important to a tech company is the

19  protection of the trade secrets because they do not stay trade

20  secrets unless they are protected and kept secret, and number

21  two, adherence to the license as the licensor believes it is,

22  not some other interpretation --

23         THE COURT:  Well --

24         MR. ZAHRALDDIN:  -- which I believe we heard last

25  Friday during testimony.

```
 1              THE COURT:  All right.  Well, what I'm trying to

 2    figure out, and I will be perfectly honest.  I kept trying to

 3    figure out who owns these license?  Are they property?  Because

 4    the first time I ever saw the license was just -- I was

 5    surprised.  I didn't see them in the numerous days of

 6    litigation with the motions.  All I heard was license this,

 7    license that.  Well, I still haven't figured out who owns the -

 8    - at least, I'm confused as to who actually owns these

 9    licenses.  Debtor says they own them.  Somebody else says they

10    own them.

11              MR. ZAHRALDDIN:  Well, the debtor owns, as of today

12    during the bankruptcy, no 225 action or any other, the debtor

13    owns those.  The debtor is Technovative.  The debtor owns

14    everything.  And that's why we -- we haven't had our breathing

15    spell, Your Honor, because it's been extended --

16              THE COURT:  Wait a minute.  So when I look at -- and

17    I briefly looked at the licenses and the -- well, I looked at

18    the Phillips license.  I'm a little confused.  I mean, there's

19    patents.  I heard references to patents.  I still don't' know

20    who owns this stuff.

21              MR. ZAHRALDDIN:  The license is licensed out by

22    Phillips.  We also had new information that came in that

23    Phillips is making no more licenses.

24              THE COURT:  I get all that, but that still --

25              MR. ZAHRALDDIN:  Yeah.
```

1          THE COURT:  -- doesn't answer the question for me.

2          MR. ZAHRALDDIN:  Well, the license itself says that

3    it's owned by the subsidiary and it's -- and the use of it is

4    all of its affiliates, of which Stream TV and Technovative are

5    affiliates.  It was written that way so that this subsidiary

6    structure, this tax group, some of which had R&D, most of the

7    production capability is here in the United States with Stream,

8    but that way it all worked out and it was done for business

9    purposes.  There were tax reasons at one point which have no

10   become obsolete, but that's the way the business was set up.

11   And it does clearly say that affiliates are there.

12          But the trade secrets are on loan.  They are being

13   used by the R&D.  They are owned by Stream.  And that's why

14   Stream has to protect them.  They have to make sure they're not

15   exposed to other people, whether it's through another business

16   model or whether it's just through negligence or inadvertence,

17   but right now, what we have heard is that it's through a

18   business model, one which is unacceptable and contrary to the

19   license itself, the license, which is irreplaceable and also

20   will lead to irreparable harm if it's damaged.

21          THE COURT:  Okay.

22          MR. ZAHRALDDIN:  And, Your Honor, look, we know that

23   you were ill.  Mr. Rajan was ill.  It's not as if we didn't say

24   this is happening.  We had a quite protracted and long and

25   lengthy trial over the motions that were filed.  And I wish we

1    didn't have to do any of those because they did take away money

2    from the estate, but the debtor has to defend itself.  And if

3    there are gating issues that cost the estate something, then we

4    have to defend ourselves.

5            THE COURT:  Okay.

6            MR. ZAHRALDDIN:  And we have put up -- and I will let

7    Mr. Kodosky explain where he's going to go with the evidence,

8    but I had to rise and tell you that aside from finding out

9    there are not going to be any more licenses, aside from finding

10   out who the license, the only other license went to or the

11   portfolio went to, which were key pieces of information that

12   came in, Mr. Stastney was made an interim director.  And he

13   said he's going to be -- and if you read the protocol -- he's

14   going to be vetoing any R&D work that we need done.  He's going

15   to continue to hold on to assets that the subsidiary said that

16   they're refusing to give to us until you rule because of what

17   happened in the Amsterdam court.  And most troubling, Your

18   Honor --

19           THE COURT:  Wait a minute.  Wait a minute.

20           MR. ZAHRALDDIN:  Okay.  Sure.

21           THE COURT:  Wait a minute.  I'm a little -- I mean,

22   there's so many layers to what you're saying.  You know, you're

23   saying that Mr. -- and I don't -- and this is colloquy because

24   --

25           MR. ZAHRALDDIN:  I understand, Your Honor.

32

1          THE COURT:  -- that Mr. Stastney is going to veto any

2     research that's related to Stream, correct?

3          MR. ZAHRALDDIN:  Yes.  And that was what was

4     happening with the prior independent director.  And Mr.

5     Stastney has indicated that he's a competitor and let the best

6     company win.  That's his position.  And that's who is our

7     interim director now looking over our trade secrets and

8     managing our --

9          THE COURT:  So I'm a little confused.

10          MR. ZAHRALDDIN:  Okay.

11          THE COURT:  The Dutch court, the court in the

12     Netherlands, has appointed Mr. Stastney and presumably he has

13     some independent obligations.  He has all these other things

14     that he has to adhere to because he's supposed to be -- I'm

15     sure the Court is expecting him to be a neutral party.

16          MR. ZAHRALDDIN:  I don't --

17          THE COURT:  They appointed him.

18          MR. ZAHRALDDIN:  I'll tell you why.  I'll tell you

19     why in a second, please.

20          THE COURT:  Well, I don't -- I mean, I'm trying --

21     there's, again, these conflicts between, you know, I'm assuming

22     Mr. Stastney has rules and regulations that are guiding his

23     position as the independent director.

24          MR. ZAHRALDDIN:  He does.

25          THE COURT:  For whatever reason that court decided he

1   was independent has nothing to do with me.

2           MR. ZAHRALDDIN:  He's not independent, Your Honor.

3   He's the interim director until such time as a court -- also

4   including you -- gives an indication of where we should go on

5   this.

6           THE COURT:  So somehow I'm supposed to tell SeeCubic

7   B.V. over there in the Netherlands how they're supposed to

8   proceed?

9           MR. ZAHRALDDIN:  They are waiting to see if the

10  automatic stay will be enforced.  And the automatic stay,

11  according to Congress, is extraterritorial.  It is not -- Your

12  Honor, it does not say -- it says in any other court, so it is

13  clear to us that you do have that power.  And again, the stay

14  is extraterritorial and we've been asking for enforcement of

15  it, which was put into abeyance, and now it's come to a head.

16  This is a very crucial point.

17          THE COURT:  Wait a minute.  And there's been so many

18  filings in this Court.  You're telling me that you actually

19  filed -- and I'm not saying you didn't because the focus has

20  been on the motion to dismiss, the motion for a trustee, the

21  motion to convert.  All of those things have been to the

22  forefront of this matter and whether the parties get to go back

23  to the chancery court and all of those other issues.  I don't

24  recall -- and maybe you did, maybe you didn't -- addressing the

25  issue of imposing the stay on the subsidiary.

```
1              MR. ZAHRALDDIN:  Yes, ma'am.  It was a motion to ask
2   for a -- you usually get it as a comfort order so you can give
3   it to a foreign court.  And we did say that it was an emergency
4   motion to enforce the stay.  Mr. Maza (phonetic), you know,
5   directly told you that nothing was happening, that there's no
6   reason for this, that they were never going to move on the
7   assets in the subsidiaries.  And here we sit today and Mr.
8   Stastney is now the interim director.
9              THE COURT:  But again, I get that Mr. Stastney may be
10  the interim -- I'm going to call him independent because that's
11  what he's supposed to be.
12             MR. ZAHRALDDIN:  That's not what the order says, Your
13  Honor.  It says interim.
14             THE COURT:  Well, I haven't seen the order.  I mean,
15  I don't know.  I mean, that's the whole point.  There's no
16  transcript.  There's none of the -- what am I supposed to do?
17  Just sort of --
18             MR. ZAHRALDDIN:  Oh, I think we may have.  I'll have
19  to double check.
20             THE COURT:  Well, I understood from --
21             MR. ZAHRALDDIN:  We can introduce the order from
22  Amsterdam, Your Honor.
23             THE COURT:  Okay.
24             MR. ZAHRALDDIN:  And it's got the protocols attached
25  to it.  And they give wide latitude, which is what concerns us.
```

1           THE COURT:  Okay.  But why aren't you in Dutch court

2   telling them you need to reign Mister -- make sure that Mr.

3   Stastney complies?

4           MR. ZAHRALDDIN:  Because they're looking to the

5   United States to give them guidance, Your Honor.

6           THE COURT:  Oh, so they're looking to me for

7   guidance?  Oh, okay.

8           MR. ZAHRALDDIN:  Yes, ma'am.

9           THE COURT:  All right.  All right.  And again, I

10  understood there was no transcript of what occurred at that

11  hearing.

12          MR. ZAHRALDDIN:  There's no transcript of the

13  hearing, but there is the order afterwards and there are the

14  reference to the protocols and the protocols were also put into

15  evidence, if I'm not mistaken.

16          THE COURT:  Okay.  Hold on.  Do we know what exhibit

17  number that is?

18          UNIDENTIFIED SPEAKER:  24.

19          MR. ZAHRALDDIN:  24.

20          UNIDENTIFIED SPEAKER:  3 and 4.

21          THE COURT:  Okay.  But right.

22          UNIDENTIFIED SPEAKER:  I see 3 and 4.  They were

23  introduced last time.

24          THE COURT:  So we're going kind of afore right now.

25  You know, we're talking.  This is more almost like closing

1   arguments.  I don't want to go there.  I want to know for

2   today's purposes respond to the argument that this last minute

3   filing -- because that's what it was -- is somehow different

4   than what was originally before the Court and that this

5   basically is a new motion with new grounds because, again,

6   Counsel.  Maybe you can tell me because, again, I know what I

7   read, but as I always say, what I read and what people intend

8   or what -- may not be what is necessarily the --

9             MR. ZAHRALDDIN:  Your Honor, I apologize, but I

10  believe in looking through it, it is simply an amendment to the

11  original motion.  It is an amendment because we were able to

12  review the transcript from Mr. Stastney's testimony.  We also

13  were able to get more information from Phillips.  And most

14  alarmingly, we then were reviewing things and we found that

15  four -- was it four of our employees in the Netherlands?

16            UNIDENTIFIED SPEAKER:  Yeah.

17            MR. ZAHRALDDIN:  Four of our employees in the

18  Netherlands are now listed on the website for SeeCubic of

19  Delaware as part of their team -- four.  The head of

20  technology, head of finance.  Several people are now listed as

21  part of SeeCubic's team.  How is it that somehow our

22  subsidiaries employees and the head of technology is now

23  employed by and part of the team at SeeCubic of Delaware?  I

24  feel like Cassandra in a sense, Your Honor.  The sky is

25  falling.  It may have already fallen if these secrets get out.

1  And that's our concern and that's the reason this is an

2  emergency.

3          THE COURT:  Well, I get that, but what I'm trying to

4  figure out is that your -- a lot of what it's now Mr. Stastney

5  has trade secrets and you want to stop him from using them.

6  And we need a TRO.  I get the argument against Mr. Stastney.  I

7  get the argument against SeeCubic Delaware.  I don't get it

8  against these other people because I'm not quite sure how they

9  relate.  But my concern is is this just an amendment or is this

10  new grounds?

11          MR. ZAHRALDDIN:  We --

12          THE COURT:  Of course, their position is new grounds.

13  Again, I looked at the original, sort of said, okay.  You know,

14  what is -- how does that relate?  And I'm asking you to tell me

15  because now we have, you know, a lot of what may, in fact, be

16  closing arguments that you've now put into this supplemental.

17  I'm not quite sure how -- I mean, I guess part of it is I'm

18  trying to make sure that when we do this evidentiary record

19  that it remains within some framework.  And is that what you

20  filed on Saturday within that framework or is something

21  different?  You're saying it's not different.  We just

22  expanded.  They're saying, no, this is different because at no

23  time did you reference Mr. Stastney.  I don't know what you

24  said about Stastney without -- again, we were trying to do as

25  deep a dive as we could within the time period that we had.

```
 1              MR. ZAHRALDDIN:  Your Honor, it boils down to this.
 2    Mr. Stastney and Hawk and SLS and SeeCubic and Mr. Stastney are
 3    all related.  They have contracts which tie them together as
 4    secured creditors.  They have not denied that.  They have filed
 5    essentially duplicative proofs of claim with one exception and
 6    being SeeCubic is now saying that Stream TV owes them $37
 7    million because they've been paying for this subsidiary, which
 8    again argues for the fact that why are we going to be paying
 9    $37 million of estate money if this isn't our subsidiary?  I
10    mean, the whole thing has such a circular argument to it.  But
11    it can all be boiled down to this.  They took our company.
12    They then held it.
13              THE COURT:  They who?
14              MR. ZAHRALDDIN:  Well, it was Hawk who was part of
15    the omnibus agreement, Alister Crawford, SLS, and then Mr.
16    Stastney may have not been in his personal capacity, but he
17    certainly received -- he received remuneration out of that
18    contract as well as being the CEO of SeeCubic and a former CFO
19    and vice-chair of the board of Stream.
20              So they all put together this omnibus agreement.
21    They took over the company.  They took positions in this new
22    company, SeeCubic of Delaware, which by the way, we have the
23    trademark on SeeCubic because of the issues of SeeCubic of the
24    Netherlands having had it first and I think we're also
25    registered otherwise.  But let's get to that by --
```

```
 1              THE COURT:  Who's we?  We who?

 2              MR. ZAHRALDDIN:  Stream.

 3              THE COURT:  Stream has -- who has the trademark for

 4   the name?

 5              MR. ZAHRALDDIN:  Stream owns the name, SeeCubic, we

 6   believe, and we're in the middle of trying to run that down

 7   too.  But the fac tis they took the company and then they

 8   didn't give it back to us and certainly not in one piece.  And

 9   so all of this is a product of them not returning everything.

10   They've had novel arguments which have been pushed aside about

11   how they improved the technology.  In other words, they seem to

12   think that they have already won all these things.  We have

13   heard that from them before.

14              They're treating this -- and that's the problem and

15   that's the focus of the lender liability.  They're treating it

16   as if they already have the debtor.  And they're going every

17   which way they can.  They're utilizing self-help.  They're

18   going behind everyone's back here by going to the Netherlands

19   and getting the subsidiary.  This is what they've been doing

20   since the very beginning.  And only the Stellar (phonetic)

21   Supreme Court was able to say guys, you didn't do this the

22   right way.  And they vacated the prior orders.

23              THE COURT:  I get that, but how does that in any way

24   help me with -- I get everybody wants to argue their closing

25   arguments.
```

1           MR. ZAHRALDDIN:  I know, Your Honor.

2           THE COURT:  I get it.  That is not going to move the

3    dime one bit for me.  What I need to figure out is in

4    connection with today's hearing, what kind of evidence I will

5    allow or should be introduced into the record to allow this

6    court to decide whether a TRO is appropriate.  What I have

7    heard from the opposing parties is that what they were prepared

8    to defend is different than what was in the amendment.  And

9    therefore, I should do one of two things.  I should either

10   limit the evidence to support the specific claims that were in

11   the original not amended TRO or if I allow evidence on the

12   amended TRO that I keep the record open so that they are

13   allowed to defend against what they are asserting are new

14   claims.

15          So tell me how these in your calling supplemental,

16   but referring to it as amended.  This is supplemental brief,

17   but how does that relate to the original motion that would have

18   put the parties on notice?  Because they have to be placed on

19   notice as to what it is the claims are and what they are

20   expected to respond to.  How?  I have to do one of two things.

21   I either have to say, no, a supplement is a supplement.  It

22   wasn't what you originally moved on.  I'm not hearing it.  Or

23   it's an amendment that is inclusive or expansion of what you

24   originally pled, and therefore, the other parties get an

25   opportunity to defend.  Tell me which one.  You believe it's an

1    amendment.  Why is it an amendment as opposed to a new basis

2    for the relief being sought?

3          MR. ZAHRALDDIN:  Well, Your Honor, the adversary,

4    underlying adversary complaint is pretty all-encompassing

5    because lender liability is pretty all-encompassing.  It can be

6    tortious, it can be contractual, et cetera.  But at the end of

7    the day, the question, the reason that the lender liability

8    cases were put into place is because there is a question or

9    some confusions, Your Honor, as to Mr. Stastney, his duty,

10   whether he's independent, whether he is just an interim, what

11   controls him.  And those were brought up.

12         We introduced the protocol as well as the order on

13   Friday.  And it appeared that there is some confusion as to

14   what or how he's going to handle this.  We do not believe there

15   is any way, shape, or form that he is going to be unbiased.  He

16   has a company which is trying to use the same technology as us.

17   Whether he uses that technology or whether he stops us from

18   using the technology, it's the same thing.  He's the definition

19   of biased when it comes to that.

20         THE COURT:  Well --

21         MR. ZAHRALDDIN:  And I don't believe that anything

22   that we're going to be introducing, a lot of that will go to

23   that issue, to explain and clarify that issue.  Secondly, we do

24   have some cases in there, Your Honor, that are directly on

25   point from the Western District and I believe the Eastern

1   District.

2           THE COURT:  Well, let's back up.

3           MR. ZAHRALDDIN:  Yes.

4           THE COURT:  This lender, what exactly a TRO is going

5   to do with a lender liability?  I'm going to issue a TRO saying

6   what?

7           MR. ZAHRALDDIN:  No.  No.

8           THE COURT:  Because lender -- I'm not understanding

9   that.

10          MR. ZAHRALDDIN:  Your Honor, when there's dominion

11  and control over a lender or a lender's business, right, then

12  there is a heightened standard -- it's a fiduciary standard

13  that's put into place.

14          THE COURT:  Okay.

15          MR. ZAHRALDDIN:  It doesn't eliminate the regular

16  standard that you just -- you know, you can't commit torts and

17  breach contracts.  But if you're going to be a lender and start

18  exercising that kind of control, then there has to be a higher

19  fiduciary standard because you are there to make sure that you

20  don't get benefitted from the technology in this case, but that

21  the debtor and its creditors, all the other unsecureds, are not

22  impeded, so.

23          THE COURT:  So what would you envision a TRO saying

24  with respect to the lenders?

25          MR. ZAHRALDDIN:  I would envision, as we put in our

1    revised order, Your Honor, that we would ask for a separate

2    independent director be put into place perhaps --

3              THE COURT:  That I would appoint?

4              MR. ZAHRALDDIN:  Perhaps like Judge Carey or someone

5    else and let them -- someone who's a judge here who we know the

6    parties will respect and allow them --

7              THE COURT:  So you don't respect the court in the

8    Netherlands?

9              MR. ZAHRALDDIN:  Well, no, Your Honor.

10             THE COURT:  I don't see --

11             MR. ZAHRALDDIN:  The Court in the Netherlands has a

12   limited scope as to what they wish to do and they have

13   indicated they're waiting for the U.S. court.  So no disrespect

14   to the court in the Netherlands, but that's what they have

15   basically said.  They've done it the last two times and they

16   were hopeful that there would be some sort of resolution, but I

17   don't believe -- they've been looking for guidance from the

18   Court here.

19             THE COURT:  Okay.  And you believe that I need to --

20   because Mr. Stastney is now in charge, he's biased, for lack of

21   a better word, and that this court needs to do something to

22   protect the assets of the debtors because you believe Mr.

23   Stastney and SeeCubic Delaware because he is, from my

24   understanding, and my recollection of some of these facts are

25   -- you know, it's been some time, I mean, even from the hearing

1   on the 6th I have some dates a little confused -- that he does.

2   He has some role.  I can't recall what it is, but he has some

3   role in SeeCubic Delaware.

4           MR. ZAHRALDDIN:  He's the CEO, Your Honor.

5           THE COURT:  Okay.

6           MR. ZAHRALDDIN:  Unless I'm mistaken.

7           THE COURT:  That he does have some position and that

8   SeeCubic Delaware is adverse to the debtor, for lack of a

9   better word.  And if I recall, SeeCubic Delaware, is that a

10  combination of Hawk and SLS or it's some --

11          MR. ZAHRALDDIN:  Well, they have interests in there,

12  Your Honor, and that's one of the things we need some discovery

13  on, but SeeCubic of --

14          THE COURT:  Well, that has nothing to do with this

15  TRO.

16          MR. ZAHRALDDIN:  Right.  Right.  But SeeCubic --

17  well, we're just not sure from the proofs of claim and from

18  what we've seen.  But SeeCubic of Delaware only existed to take

19  the assets of Stream after the -- it didn't exist beforehand.

20          THE COURT:  I know.  It was formed --

21          MR. ZAHRALDDIN:  Yeah.

22          THE COURT:  -- after the omnibus and then, you know,

23  if I recall from Mr. Stastney's testimony on the 6th, that

24  they're not doing certain things.  They're only doing this.  I

25  can't recall off the top of my head, but they're not selling

1  anything.  They're kind of just I guess working with SeeCubic

2  in B.V., in the Netherlands.  But what I -- for my purposes, I

3  need to figure out exactly what it is.  I get you want a TRO.

4            MR. ZAHRALDDIN:  Uh-huh.

5            THE COURT:  But what the basis for that is, whether

6  those basis have been pled properly and the parties have been

7  given notice and an opportunity to defend, and whether you meet

8  -- you know, I've already said I've looked at the cases.  I

9  know what, you know, at least what I believe is the appropriate

10 stand, and then what really, really, really is the most

11 typically the driving force is, you know, harm.  I mean, that's

12 what a TRO is supposed to do.  It's supposed to sort of put a

13 standstill so that the status quo remains and that the party

14 who is allegedly doing certain action may cause irreparable

15 harm.  That's what this is all about.

16            MR. ZAHRALDDIN:  Yes, Your Honor.

17            THE COURT:  And instead, what I'm getting is, you

18 know, this person did this.  This person said that.  And, you

19 know, this person's a bad person.  This person has bad motives.

20 Let's keep that all outside.

21            MR. ZAHRALDDIN:  Your Honor, that's not what I'm

22 trying to do.  We --

23            THE COURT:  I'm not --

24            MR. ZAHRALDDIN:  Yeah.

25            THE COURT:  I'm simply saying because you started off

1    with that I'm not going to impugn, disparage, whatever the word

2    is that you used, and when somebody starts off with that,

3    they're about to do exactly what they said they're not going

4    to --

5                MR. ZAHRALDDIN:  But I actually -- but I actually

6    kept my word.

7                THE COURT:  You kept --

8                MR. ZAHRALDDIN:  I kept my word.

9                THE COURT:  Yes, you did with respect to the

10   attorneys anyway.

11               MR. ZAHRALDDIN:  Yeah.

12               THE COURT:  Not with respect to Mr. Stastney.

13               MR. ZAHRALDDIN:  Oh, no, no.  Mr. Stastney is running

14   his business trying to pursue his commercial interest.  The

15   issue is that's in conflict with paying off the creditors in

16   this case and the debtors.  And we're in a bankruptcy and

17   that's all I'm asking.

18               THE COURT:  And so what I am trying to -- and I'd

19   hoped the parties had focused on without all of this extraneous

20   he said, she said, they're bad, they're good, all of this.

21   There is clearly animosity between not the attorneys -- and,

22   you know, sometimes attorneys take things too personal and I

23   try to impose that they need to step back because, you know,

24   sometimes they get righteous indignation that, you know, the

25   other party is just terrible.  And everybody sort of comes to

```
 1  the table and I hope people become a little dispassionate and

 2  say, okay, what are the real issues here?

 3          I get the clients are going to be added.  That's just

 4  because otherwise we wouldn't be here.  They would have worked

 5  something out and we'd have a resolution.  That does not exist.

 6  So what I had said, and I said from the very beginning, keep

 7  this -- keep your personal feelings out, attorneys.  Bring to

 8  the Court the issues.  Let me see them in an orderly fashion.

 9  Do them appropriately and properly.  And I will do my best to

10  make what I think is the appropriate decision.

11          Now, people might not agree, but I'm going to do my

12  best to make sure my decision is well reasoned and based on the

13  law.  I try very much to be dispassionate, but I know you guys

14  have seen me when I was angry, that I was a bit not

15  dispassionate.  But, again, back to the germane issue here is

16  what exactly is it that you have put before the Court as the

17  basis for the relief that you're seeking and what you filed on

18  Saturday, did it go beyond that?  Is it something new?  And if

19  it's something new, I'm clearly not going to allow testimony or

20  evidence with respect to that, or is it an expansion because

21  people often file motions and they're bare bone, and you say

22  this is just the meat that were putting on the bones.  Is that

23  what this is or is this, you know, something different?  And

24  what I'm hearing from opposing parties is it's different.  It's

25  not meat on the bones.
```

1            MR. ZAHRALDDIN:  For example, Your Honor, counsel for

2    Mr. Stastney stood up and was asking why is this employment

3    agreement that they believe has a release in it, why is it

4    appropriate.  Well, it is appropriate because while it does

5    release certain things, and while there is a limitation on the

6    noncompete, and while there may be some arguments that that

7    should be extended because he was certainly competing during

8    the time he held the company, aside from that, there is a

9    requirement to keep confidential all the -- and that survives

10   out there infinitum.

11           THE COURT:  I get that point, but that's not the --

12   it's -- more focused point is was that the basis for your

13   request for relief, and are you now asserting a different basis

14   or are you just adding me to the original?

15           MR. ZAHRALDDIN:  We're adding meet to the original

16   concern about who's going to be, and I think -- I've read the

17   transcript -- who's going to be in the henhouse watching eggs

18   and the hens, right, and what motivations do they have.  Or

19   quite honestly, what restrictions do they have as it seems to

20   me Mr. Stastney's lawyer argued that he doesn't have any --

21   they're all gone, right?  So we just wanted to make sure that

22   it was before the Court that there are some things out there,

23   and we're trying to get to a solution.  That's one of the

24   reasons that we asked for perhaps there being appointed an

25   independent director here, which can be done because --

```
 1                 THE COURT:  Well, wait, is that in the TRO or is this
 2     something you're now bringing?
 3                 MR. ZAHRALDDIN:  It's in the revised order that we
 4     put in, Your Honor, yes.
 5                 THE COURT:  Okay, which I clearly did not look at
 6     because again, we're just trying to wade through the --
 7                 MR. ZAHRALDDIN:  I understand, Your Honor.
 8                 THE COURT:  -- thousands of pages.
 9                 MR. ZAHRALDDIN:  We also wanted to make sure that
10     since you -- that you had the benefit of some of the research
11     that we had found, particularly dealing with trade secrets and
12     the ones that were here.
13                 THE COURT:  I get that, Counsel, but I'm trying to
14     figure out where the original motion the issue was trade
15     secrets.  I may have missed it.  Again, I've read so many
16     different pleadings.
17                 MR. ZAHRALDDIN:  Well, Your Honor, it's in the
18     original motion.
19                 THE COURT:  Okay.  So if it's in the original motion
20     that you are alleging that they would were using trade secrets
21     -- and I think I may recall that, but I don't think --
22                 MR. ZAHRALDDIN:  They're taking the trade secrets,
23     Your Honor, and showing them to customers -- not our customers
24     -- allegedly SeeCubic of the Netherlands' customers.  But then
25     we find a website where SeeCubic of Netherlands and Delaware
```

1   seem to be the same entity or have the same team.  All of that

2   sells off a million alarm bells for us.

3          THE COURT:  Okay.  All right.  So you believe that

4   this evidence that you want to bring in with respect to the

5   trade secrets, it was something that you had alleged in the

6   motion and that you want to submit in support of that.

7          MR. ZAHRALDDIN:  Yes, ma'am.

8          THE COURT:  And what I'm hearing from opposing party

9   is -- well, you didn't mention specifically Mr. Stastney's I

10  guess, agreements, settlement agreements.  That's all new, and

11  therefore because you didn't put it in the original motion, it

12  shouldn't be allowed to come in now.

13         MR. ZAHRALDDIN:  That is their argument.  Our

14  argument would be that it does go towards how Mr. Stastney is

15  going to act here, what rules are going to be governed, and

16  whether he is going to follow them or whether he's going to

17  continue to pursue his own business interests.

18         And again, if he's pursuing his own business

19  interests in a vacuum, there's nothing illegal or in tort about

20  that.  But if he's being put in the position as an interim

21  director of the debtor's asset, we have serious concerns about

22  that, particularly since he said he's out there marketing.  If

23  you go to the marketing materials and what they do there --

24         THE COURT:  Which I would never do but go ahead.

25         MR. ZAHRALDDIN:  Oh, no, but they're in evidence.  We

1   have private placement memorandum that we put into evidence.

2              THE COURT:  Well, I saw the -- but that was pretty,

3   if I recall Mr. Stastney's testimony, that that was an old

4   private placement, and he wasn't using that anymore.

5              MR. ZAHRALDDIN:  Well, there was another one that was

6   dated starting October the 1st that we put into evidence, Your

7   Honor.  So --

8              THE COURT:  Okay.

9              MR. ZAHRALDDIN:  -- those, of course, it's been

10  consistent over the entire time and also right now.

11             THE COURT:  Okay.  So --

12             MR. ZAHRALDDIN:  It was beginning October 1.

13             THE COURT:  So this is where we are.  A hearing that

14  was supposed to start at 10 -- it's almost 12:00.  And I to

15  figure out before everybody rises where I'm at is I have to

16  figure out whether I'm going to allow evidence, which was the

17  Debtor saying it's just meat on the bones, and the opponents

18  are saying, no, this is something new -- this was not what you

19  pled in your original motion.  It wasn't what was contemplated,

20  and it wasn't what the parties were prepared to defend against,

21  which means I have to figure that out first.

22             MR. ZAHRALDDIN:  And Your Honor, I will say that had

23  the district court not put this up on the docket when we --

24             THE COURT:  Put what up on a docket?

25             MR. ZAHRALDDIN:  -- filed up there.  We filed it

1  there because we weren't sure if this was -- if it related to

2  normal proceedings going forward.  So the district court said,

3  no, send it back down.  You have to hear it in front of Judge

4  Coleman, so we refiled it in front of you.

5          THE COURT:  Well --

6          MR. ZAHRALDDIN:  But --

7          THE COURT:  -- I have a different view as to where it

8  should have been filed originally, but it is what it is.

9          MR. ZAHRALDDIN:  Your Honor, that's what we were told

10  to do.  So with a TRO, as Your Honor knows, they are ex parte

11  sometimes.  And in a --

12          THE COURT:  Oh, I know, but you didn't ask for ex

13  parte relief.

14          MR. ZAHRALDDIN:  Well, we didn't get a chance to

15  because we filed it in the district court and --

16          THE COURT:  Did you ask for ex parte relief there?

17          MR. ZAHRALDDIN:  We spoke to the clerk's office about

18  that, yes, Your Honor.  I think --

19          THE COURT:  Which clerk?  Not my clerk.

20          MR. ZAHRALDDIN:  Not your clerk -- not your clerk.

21          THE COURT:  No, no.

22          MR. ZAHRALDDIN:  No, not your clerk.

23          THE COURT:  Yeah, I know, I heard.  I knew -- I mean,

24  I didn't see --

25          MR. ZAHRALDDIN:  Yeah.

1          THE COURT:  -- the filing, but I heard all about it

2    because -- I heard about it.  And I was not surprised to see

3    that it was coming, you know, I'm, like, I'm not involved, but

4    I knew it was coming --

5          MR. ZAHRALDDIN:  Yeah.

6          THE COURT:  -- because it is what it is.  It's -- it

7    is what it is.  I don't know what the Court's going to do with

8    the reference to the extent the matters involved court

9    proceedings.  You know, typically in my experience, district

10   court is not withdrawing the reference.

11         MR. ZAHRALDDIN:  Right.

12         THE COURT:  They just don't.  And this court, with

13   respect to non-core matters, functions almost like a

14   magistrate.

15         MR. ZAHRALDDIN:  Exactly.  Exactly, Your Honor.

16         THE COURT:  We make report and recommendation and

17   then, here you go.

18         MR. ZAHRALDDIN:  Right and exactly.

19         THE COURT:  You do whatever you want with it.

20         MR. ZAHRALDDIN:  And if there's a jury trial, because

21   if I'm not mistaken, you guys haven't been trained in doing

22   jury trials, and so that goes up.

23         THE COURT:  That doesn't mean anything.  We've had

24   jury trials here.

25         MR. ZAHRALDDIN:  Okay, well, that's fine.

```
 1                 THE COURT:  Let me just say --
 2                 MR. ZAHRALDDIN:  Yeah.
 3                 THE COURT:  Not that I want a jury trial, not that
 4     I'm telling anybody to ask me to do a jury trial.  If I have
 5     to, I'll figure it out.
 6                 MR. ZAHRALDDIN:  Right.
 7                 THE COURT:  But typically, core matters remain here.
 8                 MR. ZAHRALDDIN:  Right.
 9                 THE COURT:  I decide them.  I, as the bankruptcy
10     court.  And then, so what I'm saying is that while all this is
11     in a motion to withdraw the reference, until the reference is
12     withdrawn, we're going forward.
13                 MR. ZAHRALDDIN:  Right.
14                 THE COURT:  So --
15                 MR. ZAHRALDDIN:  And Your Honor, I understand that.
16     I wasn't forum shopping when we suggested go up there.  We
17     needed to sort out the core and non-core issues, and that's the
18     way you do it.
19                 THE COURT:  Right.  And if it's core, non-core, and
20     it's a combo, typically the court will say, Judge, you rule on
21     what you can and give me a report and recommendation, and I'll
22     figure it out.  And I love when I give report and
23     recommendations because then I'm done.  I'm done, and it's
24     gone.
25                 But this is a little more complicated than my typical
```

1  I'm withdrawing the reference because somebody's brought a

2  matter that, for instance, it's a fraudulent transfer claim

3  under the state law is not necessarily a core matter, and you

4  may have a preference which is a core matter, and you have all

5  those different things, and I'll take it, or they'll tell me to

6  basically function as a magistrate, send it to me, and I'll

7  figure it out.

8           MR. ZAHRALDDIN:  Right.

9           THE COURT:  So but that -- we're going a little

10  astray.  What I need to figure out is what am I allowing today,

11  and I've seen counsel for Mr. Stastney stand up a couple of

12  times.

13           And you want to respond briefly when he's done?

14           MR. ZAHRALDDIN:  I concede.  I concede.

15           THE COURT:  All right.  Yes, Counsel?

16           UNIDENTIFIED SPEAKER:  No --

17           THE COURT:  No, that's okay.

18           MS. VASSALO:  Just briefly, Your Honor.  While I

19  appreciate opposing counsel's representation that this is

20  merely meat on the bones, I would contend that this amendment

21  is a new matter because if it weren't a new matter, right, if

22  it were just meat on the bones, why is the first time that the

23  Court's seeing the employment agreement in the middle of the

24  night over the weekend?

25           Opposing counsel also said that the confidentiality

```
 1   provision survives out there in infinitum, right?  This is the

 2   concrete example of how we would've litigated this differently

 3   had we known this is at issue.

 4              THE COURT:  Okay.

 5              MS. VASSALO:  I would have briefed this issue for

 6   Your Honor.  What is the scope of that confidentiality

 7   agreement?  When does it apply?  How far does it apply?  How

 8   long does it apply?  These are all issues that we weren't aware

 9   were even before the Court at this time until this weekend.

10   And now, we're on her heels trying to figure out we're going to

11   defend against these claims because the goalposts have shifted.

12              And so while I appreciate that they are making their

13   arguments, and I hear the Court's, you know, admonition to the

14   parties that none of this is personal -- none of it is

15   personal.  It's all about --

16              THE COURT:  Well, I'm not suggest -- Counsel --

17              MS. VASSALO:  Right.

18              THE COURT:  -- you only got here.

19              MS. VASSALO:  I did, and I would like to leave.  No,

20   I'm just kidding.  But --

21              THE COURT:  So I will say from my perspective, at

22   times, this was personal between the attorney -- personal not

23   for their clients, but personal for other reasons.  You know,

24   you play, you know, you're playing basketball, and guys play a

25   certain way on the court.  You know, their -- I don't want to
```

1   use the word, but I'm probably going to use it anyway.  Their

2   egos get involved and so they play the game a certain way.  But

3   when they're off the court, they're all fine.

4           But so that's what I'm saying.  Don't bring your egos

5   in here.  I'm the only one allowed to have an ego, and I try

6   not to even bring that in here because it doesn't do any good.

7   So --

8           MS. VASSALO:  And so all I am asking for, Your Honor,

9   is for an equal playing field in order to be able to advance

10  our clients' interests, right.  We all want to be able to brief

11  these issues to be able to argue our positions so that we're

12  able to fairly present the issues to the court so that you can

13  make a decision on the legal issues and on the merits.  I can't

14  make those arguments I don't have notice of them.

15          THE COURT:  Right.

16          MS. VASSALO:  And this is not meat on the bones.

17  It's an amendment that provides a new argument to the Court,

18  and I'll rest on that.  Thank you.

19          THE COURT:  Right.  And so that's again why I have to

20  figure out, one, if it's new, and if it is, I'm not hearing it.

21  Or if it's meat on the bones, which everybody gets to respond

22  to.

23          Mr. Zahralddin, I'll let you say one thing, and I

24  have to figure out what I'm going to do.

25          MR. ZAHRALDDIN:  Absolutely.

```
 1              THE COURT:  And that's it.  I think I've heard
 2    enough.  I've heard from everybody.
 3              MR. ZAHRALDDIN:  Absolutely.
 4              THE COURT:  And we'll --
 5              MR. ZAHRALDDIN:  So they're saying that there's Count
 6    IV of our -- sorry, Count V of our original motion is breach of
 7    contract.  So --
 8              THE COURT:  Breach of contract against you?
 9              MR. ZAHRALDDIN:  Well, Stastney.
10              UNIDENTIFIED SPEAKER:  That's the employment
11    agreement.
12              MR. ZAHRALDDIN:  Yes.
13              UNIDENTIFIED SPEAKER:  Of the complaint, Mister --
14              MR. ZAHRALDDIN:  Yes, of the complaint.
15              UNIDENTIFIED SPEAKER:  It --
16              MR. ZAHRALDDIN:  Sorry, my fault.
17              UNIDENTIFIED SPEAKER:  And lender liability's claim
18    19.
19              MR. ZAHRALDDIN:  And lender's liability claim 19.
20              THE COURT:  I get all that.  But in your motion, did
21    you say -- I think what their position is, when you filed your
22    motion for the TRO, what did you say you were going to assert
23    as the basis for the relief you were seeking?  Did you put them
24    on notice that you were going to say Mr. Stastney breached his
25    contract?  I get the trade secrets -- I've heard that.  But I
```

```
 1   think that's what their position is, is that you never
 2   identified that as the basis for the relief you were seeking.
 3   And now you've added it, and they never had notice that that's
 4   the basis on which you were proceeding.
 5            MR. ZAHRALDDIN:  Your Honor, in the cases that we
 6   originally cited and the cases afterwards, it is a fairly
 7   common fact pattern that when someone is breaching trade
 8   secrets, when they're misusing them, misappropriating them,
 9   they were a former employee and had an employment contract,
10   which restricted them or provided convenance and then there's
11   convenience that survive going forward, plus the --
12            THE COURT:  But I'm not --
13            MR. ZAHRALDDIN:  -- statutory and common law.
14            THE COURT:  -- getting to the merits of who did what
15   or what employ -- what I am strictly trying to focus on is that
16   a get you said all these things in the complaint.  What I am
17   trying to figure out is when you came and asked for a TRO, the
18   basis for that.  You didn't -- did you say it's based on every
19   count we have in the complaint --
20            MR. ZAHRALDDIN:  Yes.
21            THE COURT:  -- or did you specifically limit it to --
22            MR. ZAHRALDDIN:  Yes, Your Honnor.
23            THE COURT:  -- so I have to go back and do those
24   things.
25            MR. ZAHRALDDIN:  Okay.
```

1                THE COURT:  That's it.  So where I am right now is

2       I'm going to have to go back.  So I don't know how much time

3       you guys thought was going to be devoted to evidence today.

4       How many witnesses are we supposed to have -- two?

5                MR. ZAHRALDDIN:  We believe two, Your Honor, yes.

6                THE COURT:  And then maybe your rebuttal from the

7       Respondents, correct, Mr. Colby?

8                MR. COLBY:  Potentially, Your Honor.

9                THE COURT:  Right.  I know you said -- I said

10      perhaps --

11               MR. COLBY:  Part of that depends on the outcome of

12      your thinking..

13               THE COURT:  Well, you were going to have one -- even

14      if they had not filed supplement, amendment, whatever words you

15      want to use, I understood that you may call Mr. Stastney as a

16      rebuttal, putting in all this other stuff aside --

17               MR. COLBY:  Right.

18               THE COURT:  -- that he may have been a rebuttal

19      witness notwithstanding the issues for today.

20               MR. COLBY:  Right.  We might have, I think based upon

21      the record as it stood when we finished on Friday.  Frankly, I

22      didn't think it was going to be necessary because I felt that

23      the Debtors had, to that point, fallen well short of their

24      burden.  We have to see what happens after Mr. Rajan and Mr.

25      Robertson --

```
 1              THE COURT:  Right.

 2              MR. COLBY:  -- testify to fully --

 3              THE COURT:  So what I'm going to do right now -- it's

 4    12:00, and as usual, I haven't eaten today, so I don't want to

 5    be hangry.  Mr. Caponi is smiling because he's been the

 6    recipient of that hangry.  My, you know.  So what we'll do is

 7    we'll come back.  I need to continue the -- I need to do a deep

 8    dive, not a surface now, saying, you know, pretty much what I'm

 9    going to do is, this is a motion, this is the supplement, and

10    figure out how we proceed.

11              MR. COLBY:  Yeah.

12              THE COURT:  If I find that I believe it's new, and I

13    don't know yet, we're not hearing any of that.  If it is, then

14    I figure out how to give the parties an opportunity to respond.

15              MR. COLBY:  Your Honor --

16              THE COURT:  Uh-huh.

17              MR. COLBY:  -- if I might, I think that the relief

18    that Mr. Zahralddin is requesting is instructive.  And I

19    believe Your Honor touched on this in some of your questions.

20    And that is, is -- and this is what I think we understood to be

21    the core issue up until Saturday.  Is a -- so Debtors came in

22    and said, the Netherlands court has appointed Mr. Stastney as

23    director of SCB.V..  We need a TRO to remedy what we say is

24    going to prevent what we say is going to be irreparable harm

25    that comes from that.
```

1           So that's the question.  Have they been made a

2    record.  And they say the reason why is because they're going

3    to be issuing these sublicenses, which is going to cause

4    Phillips to cancel the license.  We spent all day on Friday on

5    sublicenses, okay?  Sublicenses are literally but a footnote in

6    the new filing.  It's only mentioned once in the new filing,

7    and it's in a footnote.  But the question is, does Mr.

8    Stastney's appointment require this Court to put injunctive

9    relief around what he or SeeCubic, Inc. can or can't do.

10          And the reason why we submit that that's completely

11   unnecessary, and it's already in the record, one, Mr. Stastney

12   testified, and there's been no evidence yet to the contrary --

13          THE COURT:  Yet.

14          MR. COLBY:  -- that there are no sublicenses that are

15   going to be eminently a given.  It's a potential in the future,

16   but right now --

17          THE COURT:  But he also testified about these

18   protocol --

19          MR. COLBY:  The proof of concept.

20          THE COURT:  Proof of concept --

21          MR. COLBY:  Correct.

22          THE COURT:  -- so okay.

23          MR. COLBY:  So very, very early development project.

24   Second, that's not harm to the Debtor because Mr. Stastney

25   testified that the contracts and the work are taking place

1    within SeeCubic B.V., and so any benefits of them will inure to

2    SeeCubic B.V. --

3              THE COURT:  Uh-huh.

4              MR.  COLBY:  -- and ultimately Stream or the Debtors,

5    depending upon the outcome of questions that aren't at issue on

6    the TRO --

7              THE COURT:  Right.

8              MR. COLBY:  -- right?

9              THE COURT:  Counsel, I would be -- I'm not sure how

10   the Netherlands court got to where they did, but I'm not quite

11   -- you know, these parties are all at loggerhead.

12             MR. COLBY:  Yes.

13             THE COURT:  And now one party, who is taking a

14   position that -- Mr. Stastney is in several roles.  And so I

15   don't know how that plays out.

16             MR. COLBY:  Well --

17             THE COURT:  I'm assuming he would do what he supposed

18   to do, but I don't know.

19             MR. COLBY:  Right.  And that brings me, I think, to

20   the third point and then probably a break is appropriate.  But

21   the third point is that the current relief sought is at -- so

22   there are multiple levels of constraints and controls around

23   what Mr. Stastney can do in that role.  First, subject to

24   fairly rigorous fiduciary duties under Dutch law; second,

25   subject to the protocol that was incorporated into the court's

64

1  order, which is in evidence, and we talked about it with Mr.

2  Stastney last Friday; third, subject to the Court's

3  supervision.  And the Court has heard all kinds of evidence and

4  applied to --

5          THE COURT:  To the Dutch court.

6          MR. COLBY:  Dutch court.  And the Court has heard all

7  kinds of evidence and arguments about what would be best for

8  SeeCubic B.V., the Dutch entity, and has concluded that at

9  least for now, subject to those various controls, Mr. Stastney

10 was the better option than the one put forth by Mr. Rajan,

11 which was Mr. Park.

12         THE COURT:  Uh-huh.

13         MR. COLBY:  And so what the request is here is to

14 issue a TRO that completely overrides that determination by the

15 Dutch court for Dutch entity under Dutch law.

16         THE COURT:  Is it --

17         MR. COLBY:  For example --

18         THE COURT:  -- is it overriding, or --

19         MR. COLBY:  Yes.

20         THE COURT:  -- is it saying, Mr. Stastney, we can't

21 trust you to exercise your fiduciary obligations and don't do

22 anything that is in violation of that.

23         MR. COLBY:  It --

24         THE COURT:  I don't know -- is unnecessary?

25         MR. COLBY:  It's an override.  It's not necessary

1    because the -- we'll call it the do the right thing mandate --

2    is both part of the Dutch order, part of the protocol, and

3    subject to the ongoing supervision of the court.  What they're

4    asking for here are things like, for example, enjoining the

5    Defendants, which includes SeeCubic B.V., from directing or

6    otherwise contacting employees of Stream or Stream's

7    Netherlands subsidiaries, which includes SeeCubic B.V..

8             THE COURT:  Okay.

9             MR. COLBY:  How does that even work?

10            THE COURT:  I don't know.  But I did hear Mr.

11   Zahralddin say that there's a website, and I'm presuming I'll

12   get some evidence, where the companies are combined.

13            MR. COLBY:  We can deal with that --

14            THE COURT:  Oh, yeah, were going to deal with that.

15            MR. COLBY:  The website -- look --

16            THE COURT:  No, no, no, no.  We are going to deal

17   with that because that's --

18            MR. COLBY:  That's a 2021 website.

19            THE COURT:  -- a concern for me.

20            MR. COLBY:  It's not combining companies, Your Honor.

21            THE COURT:  I don't know what it is, Counsel, but

22   you're going to give me some evidence.

23            MR. COLBY:  That's fine.

24            THE COURT:  And so, Counsel, I already said I have to

25   go back and figure out.  Now, unless you're going to tell me

1  how this amendment is not in the original, I think I've heard

2  enough, and I --

3           MR. ZAHRALDDIN:  I just have one thing, Your Honor.

4  I promise you it will be short.

5           THE COURT:  Wait, wait, I'm going to let Mr. Colby --

6  you get one more thing, Mr. Colby.  That's it.  What is it --

7  okay.

8           MR. COLBY:  With respect to that, I won't address the

9  whole theory of the employment agreement because it's already

10 been addressed by Mr. Stastney's counsel, this whole theory of

11 lender liability.  I mean, that's really what Plaintiff's

12 Debtor say is the ultimate issue in the case.

13          THE COURT:  Well, you guys will go there -- I don't

14 go deal with that in the case.

15          MR. COLBY:  It doesn't appear anywhere in the initial

16 motion.  The question is simply should the relief that they've

17 requested, which are severe restrictions on SeeCubic, Inc. and

18 SeeCubic of The Netherlands, SeeCubic B.V., and Mr. Stastney,

19 in his position, subject to the court's jurisdiction, should

20 you overwrite what the Dutch court has done.

21          THE COURT:  Well, what I'm hearing is not override

22 that, that court is asking me to do something.  And I don't

23 know what they said, and if they are, that's a whole different

24 issue.  I don't know if they are or they aren't, or whether I

25 should or I shouldn't.

```
 1              MR. COLBY:  All the court has said -- it doesn't

 2   relate at all to the issues on the TRO.  All the court has said

 3   is that this is an interim order, putting Mr. Stastney in that

 4   director seat until the issue -- the ultimate issue in the

 5   bankruptcy decided who owns the Technovative share.

 6              THE COURT:  Well, is that really going to be decided

 7   here?

 8              MR. COLBY:  Not on a TRO.

 9              THE COURT:  Well, not even on not a TRO.  I thought

10   that was going to go in the 225.  So is that the court they are

11   referring to?

12              MR. COLBY:  Yes.  It says -- no, it refers to the

13   bankruptcy court because it refers -- remember the issue in the

14   225 has to do with the ability to vote the shares.

15              THE COURT:  I know what it is and whether, right, but

16   what is this -- what is the Netherlands thinking I'm supposed

17   to do?

18              MR. COLBY:  It simply says that it is in -- Mr.

19   Stastney is appointed until the issue -- and I'll paraphrase,

20   but it's on page 14 of Exhibit --

21              THE COURT:  I have it, page 14.

22              MR. COLBY:  Okay, yeah, 5.21.

23              THE COURT:  Uh-huh, and B, Section B, that's Exhibit

24   G.  It says until the U.S. bankruptcy proceedings determine

25   that the shares in Technovative -- they spell a little
```

1    different -- remained the property of Stream, the security

2    entries in --

3              MR. COLBY:  Right.

4              THE COURT:  -- those shares expire or until a judge

5    decides otherwise.  What's that supposed to mean?

6              MR. COLBY:  Right.

7              MR. ZAHRALDDIN:  It seems like it's a blank check,

8    Your Honor.  But it's --

9              THE COURT:  Well, no, it says until a judge.  What

10   Judge?  I don't know.  In reference to me all the shares remain

11   the property of Stream, which, like, I don't -- okay.

12             MR. ZAHRALDDIN:  And that's ultimately, really the

13   issue there, it is, you know, essentially the outcome of the

14   bankruptcy.  Can the secured lenders effectively, through the

15   bankruptcy process, foreclose my debt or not.  That's really, I

16   think, all that -- we submit all that that's saying.

17             THE COURT:  Well then, it says in 5.20, that means

18   until then, until a court -- what court -- decides otherwise,

19   Stastney will be appointed director of those entities to the

20   exclusion of Park and Rajan.  So is this court thinking that I

21   can order otherwise he will be appointed director?  That's what

22   it seems like.

23             MR. ZAHRALDDIN:  Yes, ma'am.

24             THE COURT:  Oh my.  Okay.  I mean, listen, guys, I

25   looked at this.  Did I go through it try to figure it out

1   because I figured I get to that, you know, go through the

2   evidence to make a rational decision.  I think I need to figure

3   out where we're going.  I think I've heard enough.

4          Mr. Zahralddin, you get one thing.

5          MR. ZAHRALDDIN:  Yeah.  I just wanted to point out

6   that Mr. Colby even crystallized this.  All of that is put into

7   place to protect the subsidiary, not to protect the entire

8   group, the Debtors and the Creditors.  So that's why we're

9   asking for this relief.

10          THE COURT:  Well, he says that anything that they do

11   inures to the benefit of the Debtor and the Creditor.  So

12   then --

13          MR. ZAHRALDDIN:  But it doesn't, Your Honor, when --

14          THE COURT:  All right.

15          MR. ZAHRALDDIN:  -- you'll see.  You'll see.

16          THE COURT:  Let me figure this threshold matter is

17   what I'm going to do with the supplement, whether the hearing

18   that -- the evidence I hear today goes towards what is the

19   Debtor's position is just what we said and just building our

20   case for a TRO, or what the Respondents are saying is huh-uh,

21   this is something new, and we're not prepared to defend.  This

22   is basically trial by ambush, is lack of a better word, is what

23   I'm hearing.

24          So we're going to be in recess.  I'm going to say

25   let's come back in 45 minutes because I'm going to need a

1   little bit of time to get through -- I'm not looking at the

2   exhibits.  I typically don't look at exhibits until they're put

3   in the record, I can tell you that, because I try not you.

4            MR. COLBY:  But you'll see in the revised order

5   there's only --

6            THE COURT:  I'm not looking at --

7            MR. COLBY:  -- two things that were different.

8   That's it.

9            THE COURT:  Okay.

10           Mr. Caponi?

11           MR. CAPONI:  Your Honor, if we're going to take a

12  break, factor in a couple extra minutes so we can eat.  Then if

13  we go forward in the afternoon, we don't have to take a second

14  break, that probably would --

15           THE COURT:  That would make -- that works.  That's

16  why I said 12:45. That gives you guys -- you need more time.  I

17  don't know -- there's nowhere to eat around here.  So maybe you

18  might come back at 1:00.  Okay.

19           We're in recess until 1.

20           MR. COLBY:  Thank you, Your Honor.

21           THE COURT:  Thank you.

22      (Recess taken)

23           THE COURT:  Okay, please be seated.  Okay.  I had an

24  opportunity to review the original motion and the supplement

25  amendments.  And based on my reading of the original motion,

```
 1   the Debtors were seeking relief in the form of a temporary

 2   restraining order based upon SeeCubic B.V., and I guess

 3   SeeCubic Delaware's intention, alleged intention, to license

 4   the technology that's in dispute.

 5          The Debtors also alleged that they were doing this by

 6   using trade secrets that would lead to harm -- let's see

 7   exactly what I tabbed here -- that would result in -- here we

 8   go -- because that there would -- that there was more likely

 9   than not that they would suffer irreparable harm because that

10   Stream was intended to sell, and that the Defendants were

11   intending to license the technology.  And that activity was an

12   interference with the Phillips and the Rembrandt license.

13          And it was those -- that interference would result in

14   losing the benefits of the license and that they could possibly

15   lose their license from Phillips, lose their license from

16   Rembrandts, and that the industry quote is a competitive one.

17   And as a result, their trade secrets are being used, that the

18   license could be -- license to the technology, license to other

19   parties, which was prohibited, and that it would cheapen the

20   value of the technology.

21          And so the new allegations are that now the basis for

22   the temporary restraining order with at least with respect to

23   Mr. Stastney is that because he is somehow violating an

24   employment contract and with respect to the lenders, there's

25   some sort of lender liability claim.
```

```
 1              Now, while all of that may have been pled in the

 2    complaint, they are nowhere referenced in the motion.  And so

 3    the only thing that is before this Court is what is in the

 4    original motion, which is that you wanted me to issue a TRO

 5    prohibiting the parties from licensing the agreement and taking

 6    other actions that would include using trade secrets.

 7              This issue about employment contract -- new issue at

 8    least with respect to the TRO.  It might be in the complaint --

 9    that's all fine and well.  But that and the lender liability,

10    that was never asserted as a basis for the TRO.  You can't do

11    it now.  It's a new -- two new claims.  And more importantly, I

12    don't even know why it would even be, at least with respect to

13    the employment contract, there's an allegation that you're

14    using trade secrets.  I don't know why you would even need the

15    issue of the employment contract.  Either they are or they

16    aren't.

17              So I'm not going to have any testimony or evidence

18    with respect to the employment contract or any evidence with

19    respect to the lender liability.  The evidence regarding the

20    use of trade secrets, that was pled.  That evidence can be

21    placed on the record with respect to that.

22              Now, the problem we have is -- how many witnesses do

23    we have today?  Two?  The marshals have informed me that there

24    is going to be a protest starting at 4 p.m.  I don't know if

25    they're telling me that because they want me to end by 4 p.m.
```

1    or why the purpose of telling me -- telling us that.

2             Didn't they tell -- what time did they tell us?

3             Starting at 4 and heading down to Market to Sixth

4    Street.  So what does that mean for us?  Are we supposed to

5    stop -- I mean, they didn't tell us that just to tell me.

6             Did they say what they wanted us to do?

7             Okay.  So that may mean if we go past, you know, if

8    they're starting at City Hall, I don't think it's going to get

9    them an hour to get down here, and it's a very difficult -- I

10   got stuck in that on Friday night -- couldn't get out of here,

11   couldn't get in the court, including anything at 5:00 on

12   Friday.  See you don't want to be in that.  I don't think

13   anybody's driving -- hopefully you're not parked around here

14   because if you are, you need to get out of here well before

15   5:00.  If you're walking, I guess you can walk up Market Street

16   if you're just in a hotel or you're marking [sic].  But if you

17   are parked anywhere near here, be prepared to not be able to

18   get out until 8:00 -- at least that's what time I was able to

19   get out.  So I just want to tell you guys that.

20            With that being said, do people think, I mean it's

21   1:30.  Are we going to go past?  I mean, if that's not a

22   problem we can go to 5:00.  I just don't know what that means

23   for the marshals if they're worked that that means -- or the

24   CSOs -- that's heightened security for them, you know,

25        (Court and clerk confer)

```
 1                THE COURT:  All right.  So I'm just letting you now.

 2                MR. COLBY:  Depending on the nature of the protest,

 3    Your Honor, I --

 4                THE COURT:  What do you mean the nature of the

 5    protest?

 6                MR. COLBY:  Well, we're fine doing whatever the

 7    others want to do.

 8                THE COURT:  Well, I'm just trying to figure out, you

 9    know, they told us for a specific reason.  Whether it was just

10    an FYI or whether --

11                MR. COLBY:  Right.

12                THE COURT:  -- they didn't specifically say.  I

13    understand it's either pro-Israel or pro --

14                MR. COLBY:  Okay.

15                THE COURT:  -- pro -- pro or pro against.  Pro-

16    Israel, okay.  Pro-Israel march that's --

17                MR. COLBY:  Got it.

18                THE COURT:  -- going to start at City Hall.  I mean,

19    the other one on Friday was peaceful.  I didn't, you know,

20    there was a lot of please, a lot of, you know, more -- I think

21    there was more buses and police than people.  But you do have

22    some traffic issues.  You do have some issues been able to get

23    from the courthouse to where you're going.

24                MR. COLBY:  Yep, understood.

25                THE COURT:  I mean, if it's not a problem I'll keep,
```

```
 1    I mean, well, wait a minute, I would like to be able to get

 2    home.

 3        (Court addresses unrelated matters)

 4            MR. COLBY:  Personally, I think for us, we defer to

 5    the judgment of the Court and the court security officers, and

 6    we're fine.

 7            THE COURT:  Mr. Zahralddin?

 8            MR. ZAHRALDDIN:  We're fine, too.  The only issue

 9    that I have is Mr. Robertson I'd like to put on first because I

10    believe he flies away to Africa, and we can have him miss that

11    flight.  Not today, but I think tomorrow.

12            THE COURT:  Okay.

13            MR. ZAHRALDDIN:  So and he won't be that long, so

14    that's the only person on our side that's really --

15            THE COURT:  Right.  I was just -- because the

16    marshals told me they thought it was important, and I wasn't

17    quite sure given, I don't know people, if you parked in that

18    parking lot, forget it -- you're not getting out of here.  So

19    that's all I'm telling people why -- I mean, maybe you just

20    want to stay, go have dinner, and then move your car later.  I

21    don't know.  Okay, all right.

22            So with that being said, I think we understand what

23    the parameters are with respect to the evidence that's going to

24    be allowed.  All right.  So then we can proceed with the

25    evidence.
```

1          I think we've talked enough with colloquy for today.

2    I think we just need to get to the evidence, okay?

3          MR. ZAHRALDDIN:  Okay, Your Honor, then I'd like to

4    call up Mr. Robertson --

5          THE COURT:  Okay.

6          MR. ZAHRALDDIN:  -- to the stand.

7          THE COURT:  All right.  Stop right here.

8          THE CLERK:  Oh, Judge, actually I'm guessing in front

9    of the microphone.

10         THE COURT:  Oh, okay.

11         THE CLERK:  Sorry.

12         THE COURT:  All right, all right.  I didn't know you

13   change the rules on here.

14         THE CLERK:  Just for this transfer of people.

15         THE COURT:  Okay, all right.

16      CHARLES M. ROBERTSON, PLAINTIFF'S WITNESS, SWORN

17         THE CLERK:  Would you please state and spell your

18   name for the record?

19         THE WITNESS:  Charles M. Robertson.  That's C-H-A-R-

20   L-E-S M like Michael, Robertson, R-O-B-E-R-T-S-O-N.

21         THE CLERK:  Could you please state your address for

22   the record?

23         THE WITNESS:  10 Via Visione, Unit 201, Henderson,

24   Nevada, 89011.

25         THE COURT:  Hold on one second.

1              THE WITNESS:  Do you need a spelling on Via Visione?

2              THE COURT:  All right.  Well, we're not being

3    directed to leave at 4 -- they just want us to know.

4              Okay.  I'm sorry.  I heard unit 201 -- where?

5              THE WITNESS:  Henderson, Nevada 89011.

6              THE COURT:  Okay.  All right.

7              You may proceed.

8                        DIRECT EXAMINATION

9    BY MR. ZAHRALDDIN:

10   Q    Mr. Robertson, can you please tell us where you're

11   currently employed?

12   A    I am working for Stream TV Networks, Inc.

13   Q    And did you have any prior positions within Stream or any

14   of its subsidiaries?

15   A    Yes.  I have been employed with Stream TV Networks as an

16   employee from 2009 until the preliminary injunction order came

17   out in December of 2020.  And in parallel with that, from May

18   of 2018 until that same date in December 2020, I was also the

19   chief executive officer of SeeCubic B.V. in the Netherlands.

20   Q    Thank you.  And in your role as CEO of SeeCubic B.V., did

21   you have any compliance responsibility?

22   A    Well, yeah, general compliance.  That was the R&D

23   facility.  SeeCubic B.V. or SCB.V. was the R&D development

24   group for the overall technology.  So the employees all had

25   nondisclosures.  We practiced a variety of -- we implemented a

 1   variety of practices, I should say, to protect the technology.

 2   So there was encryption on the code, there was encryption on

 3   the content files that were sent out with that.

 4          In fact, part of our investor portfolio talked about

 5   how do we protect the IP because there was some concern --

 6   well, you're dealing with a lot of customers in China and there

 7   have historically been some issues about the protection there.

 8   So we did a number of things like, for example, in planning the

 9   chips, right, the -- our business model is to sell chips and to

10   sell the optical films.

11          So the chips we would use a major foundry like TSMC

12   in Taiwan.  We would get a major chip company like Morningstar

13   that already makes television chips that are accepted in the

14   industry.  TSMC would then build the chip for Morningstar, and

15   they would put a little partition in there to keep our

16   technology separate from the Morningstar technology.  That way,

17   customers can get the benefit of a Stream TV-enabled chip

18   without us risking our IP for the 3D rendering, putting it with

19   the -- with the Chinese chip company, for example.

20          On the optical design side, we had a similar

21   situation.  We designed the optics.  We would have a third

22   party manufacturer make those films for us.  We wouldn't share

23   those designs with anyone.  Then, those films would be

24   manufactured and delivered to us.  Those films will be glued on

25   to a regular 2D video panel, and those glued together modules

1   would be delivered to the customers.  So the customers who

2   might be making a television or making a phone or a tablet,

3   they would never see the optical design that went into it.  So

4   we compartmentalized the different parts of the technology so

5   that it didn't reside in any one place, so we had some security

6   through separation.

7   Q     And Mr. Robertson, with these -- with all of these

8   techniques in place, what was the -- what do you think the

9   consequences would be would any of that breakdown, as the

10  compliance officer and CEO?

11  A     Well, it's a pretty broad question, but it's pretty

12  significant in that it's a very competitive industry as it's

13  been acknowledged in the court here.  There's not a lot of

14  players and the glasses-free 3D space.  I've watched this

15  technology from its infancy when we first licensed the

16  foundation from Phillips, and I saw a very, very rough

17  technology that could maybe become something.  And over the

18  course of many years, we built it into something.  And we've

19  done head-to-head shootouts with our competitors where

20  prospective customers said, oh, we might like Demanco

21  (phonetic).  What -- we want to see how that compares with

22  Stream.  Every contest that we did our technology was perceived

23  as being better.  So although we have not been to market with a

24  mass production meaningful number, empirically and subjectively

25  in the presentations I've seen, we have, by far, the better

1   performing technology.  And if the secrets on how, you know,

2   what we built on top of Phillips, if those secrets get out,

3   then anybody can do what we did, and we lose that market

4   advantage.

5           MR. ZAHRALDDIN:  Your Honor, I have no further

6   questions for this witness.

7           THE COURT:  Okay.

8           Cross-examination, Mr. Colby?

9                          CROSS-EXAMINATION

10  BY MR. COLBY:

11  Q    Mr. Robertson, you stated that you are working for Stream

12  TV, Incorporated.  Are you an employee of Stream TV?

13  A    I am a -- excuse me -- I'm a contract employee.

14  Q    So that's a no, you're not an employee of Stream TV?

15  A    I am an independent contractor for Stream TV.

16  Q    Do you consider that to be an employee of Stream TV or

17  something different?

18          MR. ZAHRALDDIN:  Objection, Your Honor.  Asked and

19  answered.

20          THE COURT:  Response?  He's objecting.  Ask him --

21          MR. COLBY:  I don't believe he's answer the question.

22          THE COURT:  And the question that you were going to

23  ask him to --

24          MR. COLBY:  The question was whether he considers

25  independent contractor to be an employee of Stream TV or

```
 1   something different.

 2              MR. ZAHRALDDIN:  Your Honor, we've stated in court

 3   before that there is only one employee right now -- two

 4   actually --

 5              THE COURT:  All right.

 6              MR. ZAHRALDDIN:  -- Mr. Park and Mr. Rajan.

 7              THE COURT:  Overruled.

 8              Answer the question.

 9              THE WITNESS:  I am an independent contractor of

10   Stream TV.

11   BY MR. COLBY:

12   Q    Who is your employer?

13   A    I don't -- I'm -- I would be self-employed, I guess, if I

14   am an independent contractor.

15   Q    Are you familiar with an entity named VSI?

16   A    I am.

17   Q    Is VSI who pays your compensation?

18   A    Not currently, no.

19   Q    Who pays your compensation?

20   A    Currently?

21   Q    Yes.

22   A    Stream TV Networks.

23   Q    When did that begin to occur?

24   A    When Stream TV got its DIP bank account open,

25   approximately month ago, I think.
```

```
1   Q    You're also involved in VSI's business, correct?

2   A    Peripherally.

3   Q    That's a yes?

4   A    Yes.

5   Q    Mr. Robertson, you described various protections on chips,

6   optical and optical design a minute ago.  Do you recall the

7   testimony?

8   A    I do.

9   Q    Would a party be able to copy the chip or optical lens

10  designed just by seeing a demo of the Ultra-D Glasses-Free 3D

11  technology?

12  A    By seeing a demo, no -- by having a demo, potentially.  I

13  should correct that -- having it demo unit in -- in their

14  possession.

15  Q    You were here on Friday before last when Mr. Stastney

16  testified, correct?

17  A    Yes.

18  Q    And you heard him describe ongoing developmental projects

19  with respect to the technology at issue, correct?

20  A    Yes, I heard his testimony, yes.

21  Q    Okay.  You have no first-hand knowledge regarding what

22  protections are being put in place around the technology in the

23  course of those developmental projects, correct?

24  A    Presently, correct.

25            MR. COLBY:  No further questions at this time, Your
```

```
 1   Honor.

 2              THE COURT:  Any redirect?

 3              MR. ZAHRALDDIN:  Yes, Your Honor, briefly.

 4                         REDIRECT EXAMINATION

 5   BY MR. ZAHRALDDIN:

 6   Q    Mr. Robertson, Mr. Colby asked you if you have any present

 7   knowledge.  I'm going to ask you a question.  When the Dutch

 8   court appointed the independent director, did you have occasion

 9   to visit the Netherlands and SeeCubic B.V.?

10   A    I did, yes.

11   Q    When you were there with the SeeCubic B.V., did you make

12   inquiries into the protection of trade secrets and what was

13   going on, projects and that type of thing?

14   A    I did.

15   Q    And Mr. Robertson, can you tell me who you spoke with when

16   you were there?

17   A    I spoke with the independent director and spoke with Bart

18   Barenbrug.

19              THE COURT:  Who?

20              THE WITNESS:  Bart Barenbrug, B-A-R-E-N-B-R-U-G.

21   He's a senior software engineer.

22              THE COURT:  Spell that again.

23              THE WITNESS:  B-A-R-T --

24              THE COURT:  Uh-huh.

25              THE WITNESS:  -- last name, Barenbrug, B-A-R-E-N-B-R-
```

1   U-G.

2          THE COURT:  Okay.  Barenbrug.  Okay, all right.

3   BY MR. ZAHRALDDIN:

4   Q    Any others?

5   A    And I spoke with Bram Riemens, that's B-R-A-M R-I-E-M-E-N-

6   S and Patric Theune via Zoom, P-A-T-R-I-C T-H-E-U-N-E.

7   Q    And Mr. Robertson, can you tell us what they told -- what

8   they told you in regard to the protections?

9          MR. COLBY:  Objection, Your Honor.  Hearsay.

10         THE COURT:  Response?

11         MR. ZAHRALDDIN:  Your Honor, we're trying to

12  ascertain what projections were still being -- Mr. Colby opened

13  the door by asking whether or not Mr. Robertson had personal,

14  first-hand knowledge.  Mr. Robertson has testified he went to

15  the Netherlands, he went and spoke to the people who would be

16  in charge of these protections, and I simply want to know what

17  they told him.

18         THE COURT:  All right.  And it's a hearsay exception

19  because it is an out-of-court statement.  Don't give me any

20  exceptions otherwise I'm going to have to sustain the

21  objection.  What's the basis for which I would allow a hearsay

22  statement?  What are you saying that was the basis --

23         MR. ZAHRALDDIN:  Well, the B.V. is a defendant, so

24  these are party admissions.

25         MR. COLBY:  Your Honor, B.V. is a party that's not

1  present here because they haven't been served yet.  If it's

2  being offered against B.V., it's inappropriate.  If it's being

3  offered against SeeCubic, it's not a statement by a party.

4        THE COURT:  Okay.  They haven't been served with the

5  TRO motion?

6        MR. ZAHRALDDIN:  Excuse me, Your Honor?

7        MR. COLBY:  They've been served with the complaint.

8        THE COURT:  Well, have they been served with this

9  TRO?  They might have not been served with the complaint.  My

10  question is, have they been served with the TRO motion.

11        MR. ZAHRALDDIN:  No, Your Honor.  We did not serve

12  them yet with the TRO motion.

13        THE COURT:  So their position is it can't be a party

14  admission because they're not here.  They haven't been served.

15  BY MR. ZAHRALDDIN:

16  Q    Mr. Robertson, do that there are adequate protections at

17  this point in time regarding the trade secrets and the licenses

18  after your visit to the Netherlands?

19        MR. COLBY:  Objection, Your Honor.  The witness

20  testified he has no first-hand knowledge of what those

21  protections may or may not be.

22        MR. ZAHRALDDIN:  I don't believe he testified to

23  that.

24        MR. COLBY:  He was direct questioned to -- response

25  to my question.

1          THE COURT:  All right.  So you're asking him based on

2   his understanding, what does he believe it is?

3          MR. ZAHRALDDIN:  Yes.  Well, yes.  And this is

4   redirect, and so I'm coming to clarify because we've

5   established that he visited the Netherlands.  We established

6   that he is a contract employee assisting the Debtors who want

7   to the Netherlands for specific reasons like --

8          THE COURT:  And he said he visited the operations?

9          MR. ZAHRALDDIN:  Yes, he did.

10          THE COURT:  His understanding, based on his visit and

11   whatever information -- can you tell me what they told him.

12          MR. COLBY:  Right.  With no first-hand knowledge, the

13   understanding is based solely on the conversation with these

14   individuals.

15          THE COURT:  No, he said he visited the operations.

16          MR. COLBY:  Your Honor, he said he had no first-hand

17   knowledge --

18          THE COURT:  Counsel --

19          MR. COLBY:  -- of the confidentiality protections.

20          THE COURT:  -- he said he visited the operations, and

21   he spoke with the independent director, which assumably is Mr.

22   Stastney, Bart B., spoke with Bram R., and spoke with Patric

23   Theun.  And that the question -- I will allow his answer -- is

24   his understanding based on his visit and discussions.  It's

25   just his understanding.  I'll allow it for what it's worth.

1  Answer the question.

2  BY MR. ZAHRALDDIN:

3  Q    You can answer the question, Mr. Robertson.

4  A    So my understanding Is that the new 8K samples didn't have

5  the security in place and could not be sent out and left

6  unescorted because the standard protections that had been put

7  in place previously were not there with those units.

8  Q    And Mr. Robertson, where the folks in the Netherlands

9  forthcoming with any other information?

10 A    Very little.

11 Q    Mr. Robertson, can you tell me why they were not

12 forthcoming?

13 A    They --

14         MR. COLBY:  Objection, Your Honor.  That calls for

15 speculation about someone else's state of mind.

16         MR. ZAHRALDDIN:  I'd like our witness to answer

17 because I believe he was told why.

18         THE COURT:  No, no, no.

19         MR. ZAHRALDDIN:  He was told why.

20         THE COURT:  Okay.  He's objecting on the basis that

21 that calls for speculation as to somebody else's state of mind

22 as to why they would not, I guess, give him information.  I

23 don't know.

24         MR. ZAHRALDDIN:  And Your Honor, I'm not saying it's

25 not speculation.  I'm saying that they gave him a reason, so --

```
 1    well, if they did, I'd like him to tell the Court.

 2            THE COURT:  Wait a minute, he can't tell me what they

 3    told him.  He can say based on his understanding, he believes.

 4            MR. ZAHRALDDIN:  Okay, that's fine.

 5            THE COURT:  Based on your understanding and belief,

 6    why weren't they forthcoming?  Your understanding.  You can't

 7    tell me anything anybody said.  It's based on your observation.

 8    That's all he can tell me is what he observed.

 9            So based on your observation, why do you think they

10    weren't forthcoming?  Don't tell me anything they said.

11            THE WITNESS:  So that's really a, for me, it's a two-

12    part answer because my understanding evolved.  So my

13    understanding from March through June was that there was

14    confusion on their part about who was a legitimate director,

15    and they presented to me --

16            THE COURT:  You can't tell me what they told you.

17            THE WITNESS:  There was confusion about whether Mr.

18    Stastney or Mr. Rajan was director.  And until that was

19    clarified, they wouldn't provide any information.  And then

20    after June 29th, the situation --

21            THE COURT:  June 29th what year

22            THE WITNESS:  Sorry, June 29, 2023.  The situation

23    did not improve because the independent director, and Your

24    Honor, I was referring to Jasper Berkenbosch, not Mr. Stastney

25    as the --
```

1              THE COURT:  Oh, okay.  Jasper who?

2              THE WITNESS:  B-E-R-K-E-N-B-O-S-C-H.  Mr. Berkenbosch

3    was appointed by the Amsterdam court.

4              THE COURT:  Okay, so that independent director?

5              THE WITNESS:  Correct.  I met with him --

6              THE COURT:  Okay.

7              THE WITNESS:  -- the day after the -- the hearing in

8    the Netherlands to discuss -- I'm digressing there.  But as far

9    as my understanding about the lack of cooperation and sharing

10   of information, including the projects that were being worked

11   on, it was largely -- they were lacking direction who they were

12   entitled to discuss anything with and that change from the

13   dispute between Rajan and Stastney to Mr. Berkenbosch having

14   been appointed.  He would be the one who could disseminate any

15   information.

16   BY MR. ZAHRALDDIN:

17   Q    I'll ask one final question then.  Do you believe that

18   that is an ideal situation for protecting trade secrets?

19   A    Can you clarify the question?

20   Q    Do you believe that the current situation, as you

21   understand it, is an ideal situation for protecting the

22   Debtor's trade secrets?

23   A    From the debtor's perspective, no, not at all.

24   Q    And you have a similar -- do you have an opinion on how

25   the situation in the Netherlands is affecting the protection of

1    the licenses?

2              MR. COLBY:  Objection, Your Honor, to the extent it

3    calls for the witness' opinion as opposed to facts.

4              MR. ZAHRALDDIN:  The --

5              MR. COLBY:  Also, outside the scope of the cross,

6    which didn't address licenses because the director didn't

7    address licenses.

8              MR. ZAHRALDDIN:  The licenses and trade secrets are

9    rolled up into one, but I'll withdraw the question.

10             MR. COLBY:  They're very different things.

11             MR. ZAHRALDDIN:  I'll withdraw the question.  I'm

12   sure we'll have plenty to talk about later, Your Honor.

13             THE COURT:  Anything further?

14             MR. ZAHRALDDIN:  No, Your Honor.

15             THE COURT:  Redirect (sic).

16             MR. COLBY:  Yeah, just briefly.

17             THE COURT:  Okay.

18                          RECROSS EXAMINATION

19   BY MR. COLBY:

20   Q    The understanding that you just testified to, Mr.

21   Robertson, concerning what protections may or may not be in

22   place around the technology, that's based on your conversations

23   with the individuals you identified, correct?

24   A    Correct.

25   Q    You did not, yourself, see with your own eyes, what

91

1    protections may or not be in place, correct?

2    A    Those are not visible -- it's computer code.

3    Q    Okay, thank you.

4          MR. ZAHRALDDIN:  Your Honor, we can excuse the

5    witness if it's okay with you.

6          THE COURT:  Okay.

7          You may be excused, Mr. Robertson.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Okay.  All right.

10         Counsel, are you going to call the next witness?

11         MR. KODOSKY:  Your Honor, we call Mr. Mathu Rajan.

12          MATHU RAJAN, PLAINTIFF'S WITNESS, SWORN

13         THE CLERK:  Would you please state and spell your

14   name for the record?

15         THE WITNESS:  Mathu Rajan, M-A-T-H-U is the first

16   name.  Last name is Rajan, R-A-J-A-N.

17         THE CLERK:  Would you please state your address?

18         THE WITNESS:  1105 William Penn Drive, Bensalem,

19   Pennsylvania 19020.

20                     DIRECT EXAMINATION

21   BY MR. KODOSKY:

22   Q    Mr. Rajan, what relationship do you have with the Debtor,

23   stream TV?

24   A    I'm the founder and CEO, and board member.

25   Q    Who makes litigation decisions for Stream?

```
 1   A    I do.

 2   Q    Stream TV filed an adversary complaint against the

 3   Defendants with request for injunctive relief over 60 days ago.

 4           THE COURT:  Counsel, can you hold just one second?  I

 5   need to take a five-minute break.

 6           MR. KODOSKY:  I'm sorry, Your Honor.

 7           THE COURT:  All right.  We'll be in recess for five

 8   minutes.  Thank you.

 9      (Recess taken)

10           THE BAILIFF:  All rise.

11           THE COURT:  Sorry for that interruption.  Please be

12   seated.  Okay.  You can continue, counsel.

13   BY MR. KODOSKY:

14   Q    Mr. Rajan, Stream TV had filed an adversary complaint

15   against the Defendants with a request for injunctive relief

16   over 60 days ago, correct?

17   A    Correct.

18   Q    And then within the last two weeks, Stream TV has filed a

19   request for a temporary restraining order; is that correct?

20   A    Correct.

21   Q    What caused Stream TV to file a motion for a temporary

22   restraining order now?

23   A    That happened for about four different reasons, what

24   caused the emergency as to why we went from just an injunction

25   to a TRO.  The first one was I had travelled to the Netherlands
```

1    at least two times this year, and in my -- at that time I was

2    the CEO and the director of the Netherlands, and in that

3    process we found that they were, SeeCubic of Delaware and the

4    B.V. on instructions from SeeCubic of Delaware, were violating

5    trade secrets, unfortunately landed up in the hospital, and

6    then when I got out we filed a -- the adversary complaint.

7    There was widespread trade secret violation.

8          Then the other reason was we -- there was hearings in

9    Amsterdam where Mr. Stastney testified and I was on the Zoom

10   call, unfortunately then, I'd just gotten out of the hospital

11   again or else I would have been there in person, but we were on

12   a video camera on the Zoom call where he testified under oath

13   that Stream TV has one business model, we sell components or

14   chips or devices, and you know, that chipped in the film, and

15   SeeCubic of Delaware has a sublicense model.

16         He said very clearly that SeeCubic of Delaware is

17   competing against Stream TV.  He made the statement like that

18   let the two companies compete, whoever is the best company can

19   win.  He indicated in his testimony that there was widespread

20   discussions with companies around the industry on a sublicense

21   model which would have caused us to lose our Phillips license.

22   I had already known they were violating the Rembrandt license

23   with the trade secret violations and a number of other things.

24         Then, and we were at grave risk of losing our

25   Phillips license at any moment with the behavior of SeeCubic of

1    Delaware.  Then, then it went further.  He wanted to become --

2    when I went into the hospital I was a director, when I got out

3    of the hospital I was removed.  I was out.

4              So he wanted to become the director of the

5    Netherlands where he would have access to all of our

6    specifications, and he would have access to our designs, he

7    would be reviewing resource requirements, and he's basically

8    working for a competitor, and it was clear he was exercising a

9    huge amount of dominion and control over a company that is in

10   bankruptcy.

11   Q    Who's the competitor?

12   A    SeeCubic of Delaware, Hawk In, SLS, all of them.

13   Q    And what is his position with any of those entities?

14   A    He's the CEO and chairman of SeeCubic of Delaware, and

15   he's also, I believe, the managing director of SLS, and Hawk is

16   now reporting to him on this particular matter.

17   Q    You were present at the hearing that was held in this

18   matter on October 6th?

19   A    What did you say?

20   Q    Were you present for the hearing that was held in this

21   matter on October 6th?

22   A    Yeah, in this court, yes, correct.

23   Q    Were you present for Mr. Stastney's testimony?

24   A    Yes, I was.

25   Q    What did you hear Mr. Stastney say with regard to

1  SeeCubic's discussions with customers and potential customers

2  here in court?

3  A    What he said was here, he had three running projects, he

4  testified in -- here in Philadelphia, that he has three running

5  projects in the Netherlands for technology demonstrators which

6  are demo units, and in Amsterdam he said it was 11 to 12.  Then

7  he furthermore said that they have spoken to a hundred

8  companies regarding -- regarding the technology.  Then he had

9  four companies that he asked for $5 million from, and he said

10 he asked them for $5 million each for an investment into

11 SeeCubic.

12 Q    What are the implications for the debtors and the debtors

13 estate based upon Mr. Stastney's testimony?

14 A    Well, one for the trade secrets, you know, it's causing

15 horrible damage to Stream TV and to the debtor and to the --

16 and Technovative, and the debtor's assets on the fact that he

17 had told hundreds of investors also about a sublicensing model,

18 and is at least 300 people, possible more, know about it which

19 is in direct violation of our relationship with Phillips,

20 Stream TV could lose its license at any moment which is

21 absolutely irreparable damage.  There's also a huge problem now

22 with the Rembrandt license because now there's trade secret

23 leakage which involves one of the Rembrandt claims.

24      Then on top of it he's going to have access to our

25 engineering designs, engineering specifications, and he's going

1   to decide if the Netherlands people are going to work on Stream

2   TV and Technovative projects which is a direct interference in

3   the debtor and the debtors estate, and it's going to cause us

4   irreparable damage, one because our customers and their

5   specifications, their information is going to go to a

6   competitor, and all -- and now his sublicense model's basically

7   dead because Phillips has sold the patents and said no more

8   licensing, so now he's going to learn about our chips and our

9   films and how we're doing everything to sort of resuscitate his

10  company, and so he's going to learn all of that in his role as

11  a director.

12          And then the other big issue is basically telling

13  everybody about sublicenses, and Phillips is very clear,

14  there's no more licenses, sublicensing is dead, so they have

15  every right to cancel our license as we speak, and Rembrandt

16  has a massive claim because of all the trade secret violations.

17  Q    And what trade secret violations are you referring to?

18  A    When I went to the Netherlands in my role as director of

19  the Netherlands and CEO of the Netherlands, first question that

20  I asked, what is happening with the trade secrets so I had an

21  investigation.  The rumors flying all over the industry and

22  that the protocols between SeeCubic of Delaware and the

23  Netherlands changed between the protocols of Stream TV and the

24  Netherlands.  We encrypted all the code inside the chips and we

25  crypted all the content, meaning Stream TV and Technovative.

1            And we also put additional protections in to protect

2    the technology demonstration units.  There were three major

3    trade secret violations just on the surface level

4    investigation, didn't even get into the other aspects of it.  I

5    saw an automotive device that was not as good as the one that

6    Stream TV made, the quality wasn't good, and in my work with

7    the engineers there, the content was not locked.  So anybody

8    could go in, grab the content, and figure out how we make

9    content, which is one of our trade secrets, and one of the

10   claims of Rembrandt.

11           The they had an 8K TV.  The quality of the 8K TV was

12   not as good as the Stream TV 4K, 8K like that Stream TV had,

13   and apparently what was happening was they were working with

14   content companies, their India team, and they're basically

15   mapping to the device, and as it's sharing a whole bunch of

16   trade secrets to compensate for some of the quality issues.

17           Stream TV's doing content deals right now.  We have

18   major content deals we have worked on.  We share zero of the

19   content.  Everything's encrypted, everything's protected, we

20   don't let people go map into the device.  That's what they were

21   doing.  So the Hyundai sample put Stream TV and Technovative

22   and the debtors estate at risk.  So did the 8K TV's.

23           Then I was even more shocked to learn that they have

24   unlocked the gaming protocols for gaming companies.  So

25   basically now you're going to have gaming companies going in

1   and mapping into our device.  That is a major trade secret of

2   Stream TV and Technovative, and SeeCubic of Delaware just

3   opened the whole thing up.

4   Q    You mentioned protections that Stream TV has put in place

5   to protect its trade secrets.  Tell us what protections Stream

6   TV has put into place to protect trade secrets.

7   Q    Well, we had a huge list of all kinds of security and

8   trade secret protections, you know, everything from, you know,

9   camera security system in the Netherlands as well as we had one

10  in --

11  Q    I'm sorry, I missed that.

12  A    I mean, we had a -- a huge list of protections we had put

13  in for trade secret and intellectual properties that --

14  Q    Tell us what those are, please.

15  A    Huh?

16  Q    Tell us what those protections are.

17  A    Yeah, about -- yeah.  So I mean we had everything from

18  security cameras to -- we would have rotation on the codes and

19  things off of the servers, and the servers were encrypted and

20  protected where we had hosted the code.  Employees couldn't

21  leave the code on their laptops.  They were -- they were set up

22  as, like, client servers so people could not take things at

23  home.  Then the devices themselves, the demo units, all of the

24  content were encrypted, the codes were encrypted.  We also put

25  in a security chip that you could get from a military security

1   company.  We had put that into place, as well.

2          And what we did was we had at Stream TV brought in

3   people to handle the electronics, brought in people to handle

4   the security because in the Netherlands, that wasn't one of

5   their strong suits, was the security.  Then we brought in

6   people to also handle, like, manufacturing trade secrets and a

7   number of other things.

8          Those things all reside at Stream TV as well as the

9   knowledge for manufacturing and knowledge for electronics, all

10  those things reside at Stream TV, so all of that was put in

11  place, but I was adamant on day one that not one sample's going

12  to go out unless the content's encrypted, and all the code is

13  encrypted, not one sample.  And here, they were sending samples

14  off to Hyundai and sharing things with studios in Hollywood and

15  opened the whole kimono up to gaming companies.

16  Q    Mr. Rajan, you've mentioned --

17          MR. COLBY:  Sorry.  Sorry.

18          THE COURT:  Yes?

19          MR. COLBY:  I think Mr. Rajan has gone well beyond

20  the bounds of what the original basis for the TRO was.  I

21  understand broadly speaking they used the word "trade secrets"

22  but he put a declaration in this case that mentioned none of

23  the things that he just testified at length about.  If they

24  were as critical as he says they were and he was aware of them

25  after his trip to the Netherlands back in September you'd think

1   they would have been part of this.  All we got here was I was

2   in the hearing in the Netherlands and I heard Mr. Stastney say

3   A, B, and C.

4          So again, this is -- maybe it falls broadly within

5   the legal claim that they identified early on, but as a factual

6   matter this is entirely new.  I'll leave it obviously within

7   your discretion how to deal with it, but just putting something

8   on the record so that I could maybe later request we have a

9   fair opportunity to respond to those facts.  That's all.

10          THE COURT:  Counsel's response?

11          MR. KODOSKY:  Your Honor, our motion for a temporary

12   restraining order clearly referenced the misappropriation of

13   trade secrets.  The case law that I've reviewed that deals with

14   temporary restraining orders and preliminary injunctions being

15   granted or denied often depend upon what is a description of

16   the trade secrets that have been misappropriate, what were the

17   reasonable steps that the company took to protect the

18   confidentiality of the trade secrets, things of that nature.

19          And so to the extent that Mr. Rajan is here to

20   testify live and in person, you know, the declaration that was

21   filed in support of the motion was not all of the evidence that

22   we intended to submit to the Court in support of the motion.

23   Our plan all along was to bring Mr. Rajan here to testify.

24          And so I understand the Court had ruled, has ruled

25   about the employment agreement, and that we're not to bring in

1   the employment agreement that Mr. Stastney has testified to,

2   but my next question was -- to Mr. Rajan was going to be

3   whether or not in addition to the protections he's already

4   mentioned, what agreements, if any, that Stream such as

5   NDA's --

6           THE COURT:  Wait a minute, wait a minute, wait a

7   minute, wait a minute.

8           MR. COLBY:  Yeah.

9           THE COURT:  Okay.

10          MR. COLBY:  Your Honor, I think Mister --

11          THE COURT:  I get it.  I'm going to allow it because

12  they said they were misappropriating trade secrets, and to me,

13  just because you -- I mean, your declaration isn't limited, so

14  I think it's okay for him to testify on how he believed they

15  were misappropriating trade secrets.

16          MR. COLBY:  Well, Your Honor, actually, the -- what

17  Mr. Kodosky just stated was the definition of litigating by

18  ambush.  We intended to bring Mr. Rajan to testify about the

19  security protocols and particular units and this and that, but

20  it was nowhere identified --

21          THE COURT:  Well, the question is --

22          MR. COLBY:  -- in their papers.

23          THE COURT:  -- did you have that in your declaration?

24  Was it required to say if he had just said misappropriation of

25  debt, of trade secrets, what would then have been your response

 1   if you didn't go into detail?

 2         MR. COLBY:  Yeah, certainly.  If there was fair

 3   warning that the issue was going to be about particular

 4   encryption or security protocols or whatever in -- in the

 5   Netherlands, then we would have prepared differently.  What the

 6   -- and when we were here before, the basis for the TRO motion

 7   was the September 13th hearing, the outcome of the September 13th

 8   hearing, what Mr. Rajan just testified had nothing to do with

 9   the hearing, it had to do with some visit other than that.  I

10   would also point out that in his declaration --

11         THE COURT:  Uh-huh.

12         MR. COLBY:  -- every single -- all the paragraphs

13   either identify the issue about customers, talking to customers

14   about sublicensing, or every paragraph, sublicense, sublicense,

15   sublicensing, customer base, Phillips, sublicense.  That's the

16   entire substance of what the purported factual basis for the

17   claim was.  This is an entirely new factual basis for the

18   claim.

19         So look, I understand it fits broadly within the

20   category of trade secrets, but if this was so important, if

21   this was so important that it's the basis for issuing a TRO

22   today, one would think it would have been mentioned in the

23   factual assertions that formed the basis of the motion when

24   they tried to get it ex parte from the district court, or when

25   they tried to get it heard within 24 hours here.  It is another

1   moving target.

2           THE COURT:  Counsel?

3           MR. KODOSKY:  I think it's a nonsense objection, Your

4   Honor.  With all due respect, we've -- we've -- clearly have

5   asked for a temporary restraining order based on

6   misappropriation of trade secrets.  We're here to ask Mr. Rajan

7   today what are those trade secrets, what protections were in

8   place to protect the confidentiality of those trade secrets,

9   and he is here and has already gone over a long list of

10  protections that the company has in place to protect the

11  confidentiality of the trade secrets.

12          THE COURT:  I'll allow it for what it's worth.

13  Continue.

14          THE WITNESS:  So Stream and Technovative have

15  engineers who could -- who are security experts who can go in

16  and fix this but I was removed as director when I was in the

17  hospital, so right now we can't fix it until we get this

18  somehow resolved immediately.

19  BY MR. KODOSKY:

20  Q    What if any written agreements does Stream TV have with

21  customers or employees with respect to protecting the

22  confidentiality of the trade secrets?

23  A    They signed contracts that have -- and paperwork, they

24  keep all the trade secrets and other materials confidential and

25  they're supposed to protect all of it, but they were operating

1    under instructions from SeeCubic of Delaware.

2    Q    Mr. Rajan, we're going to switch subjects.  What did the

3    Delaware Supreme Court rule 15 months ago, in June 2022?

4            MR. COLBY:  Objection, Your Honor.  Relevance.

5            THE COURT:  Counsel, relevance?

6            MR. KODOSKY:  I'm sorry, Your Honor?

7            THE COURT:  He's objecting on relevance.

8            MR. KODOSKY:  To the extent that the Supreme Court

9    had ordered them to turn back over the assets and they have not

10   done that to this point, and we have asked as part of our

11   motion for a temporary restraining order for that to be done,

12   that's the relevance.

13           MR. COLBY:  I think we all know what the Supreme

14   Court order says.  If that's how we want to spend our time

15   today, fine, but I don't think it's relevant to the supposed

16   immediate irreparable time that -- that we're supposed to be

17   here for, so I'll withdraw my objection.

18           THE COURT:  All right.  Proceed.

19           MR. COLBY:  I'd like to stay focused.

20           THE COURT:  Counsel?

21   BY MR. KODOSKY:

22   Q    What did the Delaware Supreme Court rule in June of 2022?

23   A    The Delaware Supreme Court overturned the Chancery Court's

24   decision five-zero thus saying the omnibus transaction was

25   legal and vacated the Chancery Court's 82-page opinion so it's

1  not supposed to be used for any legal purpose whatsoever, and

2  then it remanded it to the court to execute this order for

3  Stream TV.

4  Q    And what did the Chancery Court order?

5  A    The Chancery Court ordered all assets to be turned over,

6  including, not just limited to the bonding machine, but the 8K

7  TV's, all -- all of SeeCubic's customer lists, all of

8  SeeCubic's investor lists, all of their projects Stream TV was

9  supposed to inherit, a new and improved company, they could sue

10 us for unjust enrichment, but everything was supposed to be

11 turned over to Stream TV.

12 Q    And was that followed?

13 A    Only about 5 percent, 95 percent of the assets, they just

14 kept on hanging on to it and -- or exercising dominion and

15 control the entire time.

16 Q    Are you able to give me any specifics of what they come on

17 to?

18 A    They -- they never gave the bonding machine, they never

19 gave the company laptops back, they haven't given most of the

20 emails back, they haven't given the servers back, they haven't

21 given phone and tablet samples back, they never gave the 8K

22 samples back, they were interfering with the operations of the

23 customers, I'm sorry, with the -- the subsidiaries.

24      They were talking to over a hundred customers, and

25 asking money from four of them, offering and now supplying

1  samples to customers, diverting revenue and money away from the

2  debtor and the debtors estate, and moving that all away from

3  the company.  They've told hundreds of people that they're

4  going to be sublicensing. Everybody, even though Phillips sold

5  the patents and is unequivocable, that there's no more Phillips

6  licenses, they've been saying that to all kinds of people.

7  Q    What impact does it have on the debtors estate, the fact

8  that the court order has not been followed?

9  A    Well, first let me say even though they didn't follow it

10 because there is tremendous value at Stream TV and

11 Technovative, we developed a backup bonding solution which

12 we're now implementing because we didn't get our bonding

13 machine back, our team is doing the electronics, getting us

14 into productions right now, so in spite of all the roadblocks

15 and dominion control that have been thrown up, we have found a

16 way to fulfill our orders and take care of our customers, we're

17 putting our own TV's together.  We had developed all those

18 things at Stream TV independent of the Netherlands.

19        I don't know if they're even aware of it, and so

20 we're going forward, but they have caused hundreds of millions

21 of dollars of damages to Stream TV and the debtor and

22 Technovative, and the debtors estate.  They diverted huge

23 amounts of revenue, huge amounts of investment away from the

24 company, and by not giving these things we've had investors and

25 customers get very upset with us, not only after we won in the

```
 1   Supreme Court, but very upset after we've been in the

 2   bankruptcy, like, where are the samples, why don't you guys

 3   even have, like, your emails back, all kinds of questions we're

 4   getting, pounded every single day, why they're not following

 5   the court orders.

 6   Q    Mr. Rajan, as the CEO of Stream TV, are you familiar with

 7   the proofs of claim that have been filed in this matter?

 8   A    Yes, ma'am.

 9   Q    Which of the Defendants have filed proofs of claim against

10   the debtors?

11   A    SLS is called --

12            MR. COLBY:  Objection, Your Honor.  What's the

13   relevance of that to the TRO issues?  It sounds to me like a

14   lender liability issue which I think we're not doing today

15   but --

16            THE COURT:  Counsel?

17            MR. KODOSKY:  To the extent that SeeCubic claims as

18   part of its proof of claim to have conferred a benefit.

19   They're essentially suing Stream 37 million dollars for money

20   that was given to SeeCubic B.V. in connection with their

21   competition against us, and they're seeking to have that

22   recovered from Stream TV.  My only question was going to be

23   what benefit have we received in connection with that?

24            MR. COLBY:  Again, nothing to do with the supposed

25   immediate irreparable harm to the intellectual property.
```

```
 1   That's -- that's an issue, financing issue.  We were in front

 2   of this court on -- in April, really has nothing to do with the

 3   issues presented by the current motion.

 4            THE COURT:  Counsel?

 5            MR. KODOSKY:  I don't know that I have anything else

 6   to add, Your Honor.

 7            THE COURT:  Okay.  No further questions?

 8            MR. KODOSKY:  On?

 9            THE COURT:  On direct?

10            MR. KODOSKY:  No, I do, on the proof of claim I had

11   no further questions.

12            THE COURT:  Oh, proof of claim.  I'm sorry.  No, no,

13   no.  Okay.  I thought we were done.

14            MR. KODOSKY:  Nothing further to add on it.

15            THE COURT:  Okay.  All right.  Go ahead.

16   BY MR. KODOSKY:

17   Q    Have you ever heard the term "CES"?

18   A    Yes, I have.

19   Q    What is CES?

20            THE COURT:  CES?  Okay.

21            THE WITNESS:  It's a consumer electronic show where

22   not only just electronics companies, but content companies,

23   wide-range of companies get together and show new and maybe old

24   products, and they discuss business.  It's held in Las Vegas

25   every year.
```

```
 1   BY MR. KODOSKY:

 2   Q    When is it held?  Is there a --

 3   A    It's usually in January.

 4   Q    Has Stream TV every exhibited at CES?

 5   A    We presented every year up until we lost in the Chancery

 6   Court and we won awards a number of years there.

 7   Q    What was Stream's involvement at CES after it won in the

 8   Delaware Supreme Court?

 9   A    We were going to go this year but we didn't because we

10   didn't get our samples back from SeeCubic of Delaware.  We sent

11   some personnel there but we didn't have a booth or anything

12   this year.

13              MR. COLBY:  Objection, Your Honor.  Relevance to the

14   present TRO motion.  That sounds to me like something that

15   happened last January, which was eight months ago and can't

16   possibly reflect any immediate irreparable harm.

17              MR. KODOSKY:  Your Honor, it does go to the immediate

18   irreparable harm to the extent that the next exhibit that I

19   would hope to show this witness is evidence that SeeCubic was

20   at CES, speaking with potential customers regarding the

21   technology that they had misappropriated from Stream TV.

22              THE COURT:  What's SeeCubic?  You guys keep saying

23   SeeCubic?

24              MR. KODOSKY:  SCI, the Mr. Stastney's -- the entity

25   that was --
```

```
 1              THE COURT:  Delaware?

 2              MR. KODOSKY:  -- that was formed to receive the

 3   assets.

 4              THE COURT:  SeeCubic of Delaware, right?

 5              MR. KODOSKY:  Correct.

 6              THE COURT:  Okay.

 7              MR. COLBY:  Objection, Your Honor.  It was in January

 8   so it can't be the basis of the motion which supposedly arose

 9   as a result of a -- developments in the Netherlands in this

10   September.  That was the basis for today's motion.

11              THE COURT:  Counsel?

12              MR. KODOSKY:  We believe that it's evidence that

13   they're out there competing, Your Honor, and to the extent that

14   we have recently learned, based on Mr. Stastney's continue --

15   and the continuing harm that it's causing to the debtors and

16   the debtors estate, that it is certainly relevant.

17              MR. COLBY:  Continuing harm would be something that

18   for the purpose of a TRO would be to prevent some harm that is

19   about to happen, not something that supposedly occurred, like I

20   said, ten months ago in January. They can't enjoin what

21   happened last January.

22              THE COURT:  Well --

23              MR. KODOSKY:  Your Honor, he's stated that he's

24   talked to a hundred people, they've got this PPM, the

25   subscription agreement that's dated October 1$^{st}$.  It's
```

 1  continuing harm, misappropriation of trade secrets, and the

 2  ongoing competition continues, continues to cause damage to us.

 3          MR. COLBY:  Your Honor, the PPM that references

 4  anything about licensing was years old, and during the period

 5  of time prior to the -- we've been through this, was during the

 6  period of time prior to the reversal of the -- by the Delaware

 7  Supreme Court.  The subscription agreement references nothing

 8  about a sublicensing business plan, and that was the other

 9  document we looked at that makes representations, you know, to

10  investors who are going to be investing, has nothing about the

11  business plan.

12          So I just, again, I'd like to keep moving, like to

13  stay focused on what the TRO is about, but something that

14  happened last January isn't the basis of an immediate

15  irreparable imminent harm.

16          THE COURT:  I'll allow it for what it's worth.  He

17  says that they're using trade secrets, they've been doing it

18  since January, and he said he was doing it again at the

19  hearing.  I'll allow it for that purpose only.

20          Continue, counsel.

21          MR. KODOSKY:  Thank you, Your Honor.

22          MR. COLBY:  What exhibit is this?

23          MR. KODOSKY:  It's 38.

24          MR. COLBY:  And is this one of the ones that was

25  served on Saturday night?

1            MS. VASSALO:  Yes.

2            MR. COLBY:  And I'll renew the objection, Your Honor.

3    This is an exhibit that was given to us in the middle of the

4    night on Saturday, along with several thousand other pages of

5    exhibits.  This wasn't part of the original filing.

6            THE COURT:  Well, all right, counsel, respond, saying

7    you didn't give it to him with the original filing.

8            MR. KODOSKY:  Rebuttal, Your Honor.  Our witness

9    exhibit list stated that we reserve the right to rebut, to add

10   to our exhibit list and to our witness list based upon what we

11   heard Mr. Stastney testify to.  He was the very first witness

12   that we called, and to the extent that we've added to our

13   witness exhibit list based upon what we learned and what he

14   admitted or denied.

15           MR. COLBY:  Your Honor, this is apparently an email

16   that relates to something that occurred last January.  There's

17   been no particular citation to something new that arose by

18   virtue of Mr. Stastney's testimony.  There's nothing new about

19   this.  This is something from January 10th, 2023.  There's no

20   reason why it couldn't have been part of the original motion,

21   or if it was responsive to something Mr. Stastney said last

22   Friday, why he needed to wait until the middle of the night

23   this past weekend to be served.

24           THE COURT:  Counsel, response?  His position is that

25   it's from January, I haven't seen it, and that if it was so

1    important, why you didn't confront Mr. Stastney with it in his

2    testimony, and why you waited until Saturday to identify it,

3    because clearly you reserved the right to produce documents in

4    response to Mr. Stastney's testimony.  And so response?

5          MR. KODOSKY:  Response is it's in rebuttal of Mr.

6    Stastney's testimony, Your Honor, from the October 6th hearing.

7    We had reserved the right to amend the exhibit list prior to

8    the hearing.

9          MR. COLBY:  Your Honor, they haven't identified

10   anything in particular in Mr. Stastney's testimony.

11         THE COURT:  Well, you haven't let him.  You already

12   objected.

13         MR. COLBY:  Your Honor, the question that's been

14   posed to debtors counsel multiple times, they've not identified

15   anything, and in fact, if the point is this shows competition,

16   they have up to now complained that Mr. Stastney disclosed in

17   the Netherlands proceedings that there was going to be

18   competition, and that -- I'm taking no position on whether or

19   not that's true because we disagree with that, but according to

20   what they say, if this evidence is competition, they say that

21   was disclosed in the Netherlands hearing, there's no reason why

22   this couldn't have been part of the initial package or why it

23   needed to come in, in the middle of the night on Saturday.

24         THE COURT:  Counsel?

25         MR. COLBY:  Right, and they called Shad, they called

```
 1   Mr. Stastney to the stand, so this really should have been part
 2   of the initial presentation.
 3           THE COURT:  Counsel?
 4           MR. KODOSKY:  I think that, Your Honor, I've stated
 5   all that I had to say.
 6           THE COURT:  All right.  I'll allow it for what it's
 7   worth.
 8           MR. KODOSKY:  Thank you, Your Honor.
 9           THE COURT:  Go ahead.
10           MR. KODOSKY:  Permission to approach?
11           THE COURT:  You're marking this as what?
12           MR. COLBY:  I'm sorry, if I could just -- I'm done
13   arguing the objection, Your Honor.  I just have a quick point
14   of clarification on mechanics.  We were just given a copy, it
15   says Exhibit 38 without error.  I don't know what that means or
16   if it's different --
17           THE COURT:  Well --
18           MR. COLBY:  -- than what we were served on Saturday,
19   and I try not to directly address opposing counsel, so I'm --
20           THE COURT:  Thank you.
21           MR. COLBY:  -- asking for the clarification from you.
22           THE COURT:  Well, I haven't seen it, so how I'm going
23   to get a clarification?
24           MR. COLBY:  Yeah, I don't know what to do.
25           THE COURT:  You need to show it to me and then ask me
```

1    something.  I mean, I'm talking in a vacuum here.  What's this?

2    Mark this Debtors what?

3            MR. COLBY:  Well, it's not been admitted yet but on

4    the list it's Exhibit 38.

5            THE COURT:  But for me to -- for me to do anything

6    with it, I have to see it.  It doesn't mean if I see --

7            MR. COLBY:  Okay.

8            THE COURT:  -- it, it's necessarily admitted.  Lots

9    of times parties will dispute a document and I either admit it

10   or don't but I have to see it first, so we're marking it as

11   what?

12       (Counsel confer)

13           THE COURT:  All right.  This is D38?  Wait a minute.

14   Before you give it to the witness, hold on, don't give it to

15   him yet because clearly there's some issues with it, so hold on

16   to it.  All right.  You said you were going to object to this

17   without -- before even shown --

18           MR. COLBY:  I'm just --

19           THE COURT:  -- to the witness?

20           MR. COLBY:  Yeah, I'm just requesting clarification.

21   I've got two copies.  One says without error, one says with

22   black box due to error.  I'm just seeking some clarify -- basic

23   document box here.

24           THE COURT:  All right.  I don't have -- I only have

25   one.

```
 1              MR. COLBY:  I'm just curious what the difference is
 2   here, if anything.  What's the --
 3              THE COURT:  Well, which one are we showing the
 4   witness?
 5              MR. KODOSKY:  I'm sorry, Your Honor?
 6              THE COURT:  Which one are we showing to the witness?
 7              MR. KODOSKY:  One with no black box on the two line
 8   of the email, the same one that Your Honor has.
 9              THE COURT:  All right.  He's going to ask him about
10   that one, counsel.
11              MR. COLBY:  Okay.
12              THE COURT:  D38.  I guess you can ask him about
13   whatever.  Okay.  All right.
14   BY MR. KODOSKY:
15   Q    Mr. Rajan, do you -- you've been handed what has been
16   marked for identification as D38; do you recognize this
17   document?
18   A    Yes, I do.
19   Q    What is it?
20   A    This is a letter from SeeCubic of Delaware describing the
21   things that SeeCubic of Delaware is doing in their company.
22   Q    What's the impact on Stream based upon this activity?
23              MR. COLBY:  Objection, Your Honor.  It's not clear to
24   me if we're seeking to -- counsel's seeking to admit this or
25   not, it hasn't been, if so, it hasn't been authenticated, and
```

1    Mr. Rajan doesn't appear on its face.

2           THE COURT:  Counsel?

3    BY MR. KODOSKY:

4    Q    Where did you receive this document from?

5    A    We received this document from Stream TV shareholders and

6    they gave it to Stream TV as part of our recordkeeping and our

7    books and records.  This is logged into the books and records

8    at Stream TV.

9    Q    And so to the extent that -- were you the custodian of the

10   books and records of Stream TV?

11   A    Yes, I am.

12   Q    Are the documents an accurate record of the information,

13   matters, and the events that are referenced?

14   A    Yes, it is.

15   Q    Were the documents made at or near the time of the

16   occurrence of the matters and events set forth in the document?

17   A    Yes, it did.

18   Q    Are the documents made by or from information transmitted

19   by a person with knowledge of those matters and events?

20   A    Yes, it was.

21   Q    Is the document kept and maintained in the course of the

22   regularly conducted activity of Stream?

23   A    Yes, it is.

24   Q    Is it customary practice of Stream to maintain such

25   records?

1    A    Yes, it is.

2          MR. KODOSKY:  We move to admit this document as --

3    into evidence, Your Honor.

4          MR. COLBY:  I maintain the objection, Your Honor.

5    I'm not sure that Mr. Rajan established how an email to

6    SeeCubic shareholders, of which he is not one, how he could

7    possibly authenticate this because somebody just handed it to

8    him to supposedly be logged as he said into the books and

9    records of Stream TV.  It all seems to strain credulity, but

10   I'll stand on that objection.

11         MR. KODOSKY:  Your Honor, he said that it was sent to

12   Stream TV shareholders if I heard his testimony correct.

13         MR. COLBY:  Yeah, it says dear SeeCubic Inc.

14   shareholders.

15         THE COURT:  Okay.  And his position is how did it get

16   to Stream TV shareholders?

17         MR. KODOSKY:  And I believe that there's --

18   BY MR. KODOSKY:

19   Q    Mr. Rajan?

20   A    The SeeCubic shareholders, most of them are Stream TV

21   shareholders who were improperly moved over to SeeCubic through

22   the Omnibus transaction.  They were ordered back.  That's

23   another thing that wasn't followed.  We were supposed to get

24   all the lists so people could transfer back, and there's

25   hundreds of shareholders trapped in SeeCubic because the orders

1    aren't being followed.  They're really Stream shareholders.

2    They call them SeeCubic shareholders, but they're really Stream

3    shareholders, and that those shareholders were ordered back to

4    Stream TV.  That's another order that hasn't been followed.

5              THE COURT:  So the answer is that they share

6    shareholders.

7              MR. COLBY:  Okay.  So in which case this was sent to

8    them in their capacity as SeeCubic shareholders.  If I'm a

9    shareholder of IBM and I get an email I'm also a shareholder of

10   Hewlett Packard, and I get an email from Hewlett Packard, that

11   doesn't make it a record of IBM because I happened to be

12   invested in both.  I think Mr. Rajan just laid out that they're

13   precisely different.

14             Mr. Rajan also testified that the shareholders were

15   ordered to be transferred back.  There's no basis for that.

16   It's also flatly untrue but --

17             THE COURT:  Well, he can testify anything you want.

18   You can ask him on cross-examination, counsel.

19             MR. COLBY:  I -- I understand.

20             THE COURT:  You don't get to give me a -- let's stick

21   to what we have which is he says is a business record because

22   some third party gave it to the debtor.  That is not a business

23   record.

24             MR. KODOSKY:  It's also a party admission, Your

25   Honor.  It's sent by SeeCubic.

1          THE COURT:  A party admission that is sent by

2    SeeCubic to its shareholders.  Counsel, now he's saying it's a

3    party admission.

4          MR. COLBY:  Okay, well, that's a different case.

5          THE COURT:  All right.  Let's talk about the -- was

6    definitely not a business record.  Just because somebody gives

7    you something that's their business records doesn't make it

8    your business record.  It wasn't created by the business.  It

9    has -- never mind.  Objection as to business record is

10   sustained.

11         MR. COLBY:  Thank you, Your Honor.

12         THE COURT:  Now we're talking about -- and you said

13   it's a party -- what did you say?  Admission, party admission?

14         MR. KODOSKY:  Yes, Your Honor.

15         THE COURT:  All right.  Let's see that one, party

16   admission, that's -- what's the basis for that?  Your response,

17   counsel?  He's saying party admission.

18         MR. COLBY:  It -- correct, it is a statement by

19   SeeCubic.  I don't believe then that it has been or could be by

20   Mr. Rajan properly authenticated, but I'll stand on that

21   objection.  That's all I have to say about it.

22         MR. KODOSKY:  Mr. Stastney's going to be called, it

23   sounds like, Your Honor, if you would rather us ask him and --

24         THE COURT:  You're going to recall him?  Well, he was

25   your witness.

1              MR. KODOSKY:  He's --

2              THE COURT:  And I don't know, can you recall him?

3     Mm.

4              MR. COLBY:  Either way, Your Honor, it's an email

5     dated January 10th, 2023, so it certainly could have been the

6     subject of questioning when they called him the first time.

7              THE COURT:  Counsel?  I'll allow it for what it's

8     worth.  You guys want to --

9         (Debtor's Exhibit 38 admitted into evidence)

10             MR. COLBY:  Thank you, Your Honor.

11             THE COURT:  For what it's worth.

12             MR. COLBY:  It's another example of a moving target

13    here but I will --

14             THE COURT:  Well, counsel, you know.  They reserved

15    the right to bring in information and call a witness to counter

16    Mr. Stastney's testimony, and if they said we were doing this

17    based on what he testified, I'm not quite sure, and they'll

18    have to, you know, I'll -- I'll allow it for what it's worth.

19    Okay?

20             MR. COLBY:  Thank you, Your Honor.

21             THE COURT:  Go ahead, counsel.

22    BY MR. KODOSKY:

23    Q    What impact, Mr. Rajan, does SeeCubic of Delaware

24    attending CES, the major trade show in the industry, speaking

25    with potential customers, have on the debtors and the debtors

1   estate?

2   A     They are taking revenue and investment away from -- from

3   Stream TV and Technovative, the debtors estate, they're causing

4   mass confusion in the market because Stream TV had won in the

5   Supreme Court, and these things were all ordered back, and were

6   not given.  Then also, the information regarding these

7   customers and vendors and other relationships regarding CES and

8   our success at CES, some of the things in there were trade

9   secrets and business secrets that we kept inside the company,

10  and SeeCubic was recruiting Stream TV employees over to

11  SeeCubic, and Mr. Stastney is a former Stream TV employee, so

12  he learned a lot of these things at Stream TV and was using it

13  against Stream TV.

14            MR. COLBY:  Objection, Your Honor.  That was

15  precluded.

16            THE COURT:  Counsel?

17            MR. KODOSKY:  I'm ready to move on, Your Honor.

18            THE COURT:  Move to strike.

19            MR. COLBY:  Yup.

20            MS. VASSALO:  I move to strike, Your Honor.

21            THE COURT:  Strike.

22            MR. COLBY:  Thank you.

23            THE COURT:  That's stricken from the record.

24  BY MR. KODOSKY:

25  Q     Mr. Rajan, what's your reaction to in Amsterdam, Mr.

1    Stastney saying that 12 companies wanted it but here, he said

2    that only three companies want it?

3    A    He said in Amsterdam that there was 11 to 12 running

4    projects in the Netherlands, then when he testified here he

5    said there was only three running projects in the -- in the

6    Netherlands.

7    Q    What's your reaction at such a low conversion rate of

8    companies wanting the demo units?

9    A    I don't know how that's possible that, you know, he's --

10   he testified that they did meetings with over a hundred

11   companies, but only anywhere from 10 percent, 3 percent only

12   want demo units, that's not even remotely our experience, so

13   clearly, those companies in their communications, which are

14   supposed to be Stream TV customers, the debtor, and the debtors

15   estate, they're being communicated something that isn't working

16   to have such a terrible conversion rate.

17   Q    Well, what's the problem with Stastney offering demo

18   units?

19   A    The demo units, in and of itself is a violation of the

20   trade secrets because in my investigation those demo units, the

21   contents were not secure for the automotive units, and it's

22   also one of the claims by Rembrandt, the content.  Then the

23   content was not secured for 8K TV's, and the mapping was being

24   available to a number of content companies.  Then the gaming

25   was going to be --

124

```
 1              THE COURT:  Just one second.  Are we saying AK, 8K?

 2              THE WITNESS:  8K.

 3              MR. KODOSKY:  8K.

 4              THE COURT:  Eight?

 5              THE WITNESS:  Eight.

 6              MR. KODOSKY:  The number eight.

 7              THE COURT:  Oh, okay.

 8              MR. KODOSKY:  That has to do with the resolution.

 9              THE COURT:  Right, I had AK, but I didn't know if he

10  was saying 8K.  Okay.  8K TV's.  Okay.  I'm sorry.  Continue.

11  BY MR. KODOSKY:

12  Q    Have you finished your answer?

13  A    No, I think I was in the middle -- what was the -- you

14  wanted to know all the things that -- they were open?

15  Q    What is the problem with Stastney offering demo units.

16  A    Yeah, the problem was with the gaming, it wasn't going to

17  be secured, the content.  The 8K TV's, the content was not

18  secured, and they were opening up the mapping to a number of

19  companies in violation of the Rembrandt license.  The

20  automotive, the content was open in direct violation of the

21  Rembrandt licenses, and that's the procedure they were

22  following.

23  Q    What was the problem with the Netherlands people and the

24  demo units?

25  A    The Netherlands people know how to -- they do just simple
```

1  sort of like technology demo units, and some people call it

2  proof of concept, they're just very simple units.  They're like

3  show and tell type units.  That's what they were able to do,

4  you know, that -- and they had issues with, you know, security.

5  That was not one of their strong suits.  It's something that,

6  you know, they had struggled with for years, and then there was

7  a business decision from SeeCubic of Delaware, let's just open

8  it open it up on the content side for certain applications, and

9  that made the situation even worse.

10 Q    What is the proper division of labor between the

11 Netherlands and the U.S.?

12 A    In the U.S., first of all, in 2018 we had put our foot

13 down and said technology demonstrators or proof of concepts

14 needed to stop, and in 2018 Stream TV started to take the lead

15 on -- even -- or before that, on the productization of the

16 technology.  So the Netherlands people did the original

17 formulas, so to speak, but turning it into a product with --

18 working with the customers, the lead was taken by Stream TV, so

19 all of the bonding, the mechanicals, the backlight, the 97

20 percent yield rate, which is certified for mass production,

21 that was all led and executed by Stream TV, lens designs for

22 some of the applications, the actual lenses themselves were

23 handled by Stream TV.

24       Then on the electronics, in taking all of the

25 original formulas and converting them for mass production which

```
 1   was done in 2018, 2019, was all led by Stream TV, and that work

 2   is done at Stream TV and Technovative, and that's what's

 3   ongoing now, and were going to production.

 4          When Stream went down because the projects were

 5   stopped, VSI financed the continuation of that work because we

 6   knew at some point we'd be reunited with the technology.  We

 7   knew we were going to win in the Supreme Court, so we knew we'd

 8   have to go to market --

 9          MR. COLBY:  Objection, Your Honor.

10          THE WITNESS:  -- and we've been working on it

11   nonstop.

12          THE COURT:  Objection.

13          MR. COLBY:  Objection.  Relevance.  Not responsive.

14   Not relevant to the TRO issues.

15          THE COURT:  Counsel?

16          MR. KODOSKY:  I'm ready to move on to the next

17   question, Your Honor.

18          THE COURT:  Well, I'll strike that. Going to move to

19   strike, counsel?

20          MR. COLBY:  Yes, please, Your Honor.

21          THE COURT:  As nonresponsive and irrelevant.  Strike.

22   Next?

23   BY MR. KODOSKY:

24   Q    Is Hawk involved in the TRO?

25          THE COURT:  Who?
```

```
 1   BY MR. KODOSKY:

 2   Q    Hawk?

 3   A    Yes, Hawk is involved in the TRO.

 4   Q    How?

 5   A    Hawk has some of our TV's, they're raising money for

 6   investors, telling people about sublicensing.  Bob Morton

 7   himself --

 8           MR. CAPONI:  Objection.

 9           THE WITNESS:  -- is doing it and --

10           THE COURT:  All right.  Objection.

11           MR. CAPONI:  I'm not -- I think it's hearsay.  I'm

12   not sure who Mr. Rajan's referring to as Hawk.  Hawk is -- if

13   there's an individual he would like to speak about, I mean,

14   that's one thing, but he's just generally attributing

15   statements to --

16           THE COURT:  Well, I guess you need to object to the

17   question because he said it's Hawk, and you should have

18   objected saying define Hawk.  Is that your objection?

19           MR. CAPONI:  That's my objection, Your Honor.

20           THE COURT:  Because he's responding to the question.

21   All right.  Objection, because there are various entities,

22   persons; who are you referring to when you say Hawk?  He said

23   it's broad.

24           Right, Mr. Caponi?

25           MR. CAPONI:  Yes, Your Honor.
```

```
 1              THE COURT:  All right.  Response?

 2    BY MR. KODOSKY:

 3    Q    Who are you referring to, Mr. Rajan?

 4    A    Hawk Holdings, and also Bob Morton, whose money is Hawk

 5    Holdings, and was in the Hawk officers with TV's, raising

 6    money, and taking money into --

 7              MR. CAPONI:  Objection, Your Honor.

 8              THE COURT:  Okay.  Objection.

 9              MR. CAPONI:  Your Honor, I'm sorry, I think Mr. --

10    one, I think the witness finished answering the question, but

11    to the extent he's going to go on, Mr. Morton is not present

12    here today, he has not been served, and he's not a party

13    against whom any statements made by him can be admitted.

14              THE COURT:  Okay.  Response?

15              MR. KODOSKY:  Who is Mister -- Mr. Caponi has asked

16    for an extension for Mr. Morton to answer the complaint in this

17    case and which would qualify as an appearance in our view, Your

18    Honor.

19              MR. ZAHRALDDIN:  And, Your Honor, you did grant that.

20    They did ask for Mr. Morton.  You did grant it so --

21              THE COURT:  I did because --

22              MR. CAPONI:  I did not ask for an extension for Mr.

23    Morton.  If you look at the footnote I was very clear that he

24    has not been served, he is not a party.

25              THE COURT:  So who did you ask for the -- I --
```

```
 1   hopefully, I didn't say all defendants --

 2           MR. CAPONI:  Well, you said --

 3           THE COURT:  -- when I issued my order.

 4           MR. CAPONI:  I don't recall what your order said,

 5   Your Honor, I know my request was we asked that because the

 6   debtor was cherry-picking defendants, that the extension, that

 7   all answers be set at the same date, so we did say all

 8   defendants, and made it very clear in a footnote, Mr. Morton

 9   has not been served, they admit he hasn't been served, and I've

10   never entered an appearance in his behalf.

11           THE COURT:  All right.  I guess I better go look at

12   my order because I was clear that I was granting an extension

13   based on my review of where the parties were, and I don't know

14   if I defined the word "defendants" in my order.

15           MR. CAPONI:  I said I don't have it memorized, Your

16   Honor.

17           THE COURT:  That's all right.  Can we -- give me a

18   copy?

19           MR. CAPONI:  But I do know that because I'm very --

20   one thing I've been very careful about is --

21           THE COURT:  Oh, I know you -- you sought, and I saw

22   footnotes.

23           MR. CAPONI:  -- I did not enter an appearance on

24   behalf of Mr. Morton.

25           THE COURT:  I think I was most focused on the basis
```

1  for the request and my authority to grant it.

2          MR. KODOSKY:  Sure, Your Honor.

3          THE COURT:  And that was what I focused on.  Can you

4  pull up -- I think it was pretty recent, last week, in the

5  midst of all the various motions, including the motions

6  apparently somebody filed and never gave -- in the clerks -- I

7  don't want to throw the clerk's office under the bus, but never

8  forwarded it to us.  I think we addressed it.  I can't even

9  remember at this point which motion it was, there have been so

10  many, but there was one that was filed, and that we never --

11  yeah, for whatever reason I can't get on again.

12          John, I don't know, it's probably because it should

13  say ADU and not -- I don't know.  I can't get on.

14          Okay.  My modem -- says Defendant Hawk Investments

15  Holding L, Limited, and together with all other defendants in

16  the above-captioned adversary proceeding, the defendants filed

17  a motion, the extension motion, whereby Hawk seeks on behalf of

18  all defendants an extension of the deadline to respond to the

19  complaint.

20          I have a little footnote.  Defendants SL (sic)

21  Holdings VI, LLC, Shadron Stastney, and SeeCubic Inc., filed,

22  joined to the extension motion collectively enjoinder.  All

23  right.  How do I -- oh, wait, I used to -- and upon

24  consideration of the extension motion, the response and the

25  joinders, that the response deadline for all defendants is

1    extended.  Okay.  I guess I used the word "all defendants",

2    notwithstanding that your original motion only referred to

3    certain defendants, correct?

4         MR. CAPONI:  That my motion was filed on behalf of

5    Hawk.

6         THE COURT:  Uh-huh.

7         MR. CAPONI:  And we specifically note it in our

8    motion that Mr. -- that we did not represent Mr. Morton, he has

9    not -- the debtors admit they haven't served him, and he's

10   under no obligation to show up.

11        THE COURT:  And that request was not for him?

12        MR. CAPONI:  Excuse me?

13        THE COURT:  And the request that you were making did

14   not relate to any unserved party that you may or may not --

15        MR. CAPONI:  Correct, Your Honor.  And, you know,

16   Your Honor, I'm sure the next argument we're going to hear, Mr.

17   Rajan tried to bring in, Mr. Morton has no role whatsoever with

18   Hawk Investments.  Hawk Investments is overseen by a company in

19   the Jersey Isles named Albanese (phonetic), and there's no role

20   by Mr. Morton.

21        MR. ZAHRALDDIN:  Your Honor, that's not before us

22   today.

23        THE COURT:  Hold on, hold on.  Let me read this.

24   Hold on.  All right.  I'm not -- this is -- is that the

25   response?  Motion to enlarge time.  Okay, Mr. Caponi, this is

1    what you said in the footnote.  Which one now was it?

2          It says moreover, the motion for default and proposed

3    orders specifically include Mr. Aurthur Leonard, Robert Bob

4    Morton as a named defendant against whom plaintiffs have sought

5    this spot fault, despite Mr. Morton having obtained an

6    extension to respond to the complaint.  This matter was raised

7    with plaintiff's counsel who indicated it would be corrected,

8    but to date, no such correction has been issued.

9          So in your footnote, you apparently say, Mr. Caponi,

10   that Mr. Morton has obtained an extension to respond to the

11   complaint.

12         MR. CAPONI:  There was an original extension granted

13   by the Court, yes, Your Honor, but I never, in that original

14   request which Your Honor memorized and subsequent never entered

15   an appearance on behalf of Mr. Morton.

16         THE COURT:  Well, you asked for a further extension,

17   so it is what it is, you said what you said, I'm not going to

18   debate right now.  Well, I guess I have to figure it out

19   because you said you didn't get -- he wasn't served, but in

20   your original response, was that the response to -- what was

21   that for?

22         UNIDENFIED SPEAKER:  That was the --

23         THE COURT:  Original motion?

24         UNIDENFIED SPEAKER:  No, that's -- was the second

25   entry into the account.

1            THE COURT:  Right.  So it was a second motion, so

2    you're saying that the second motion didn't seek an extension

3    of the response deadline that had already been afforded to Mr.

4    Morton?  Because it said that he'd already been granted an

5    extension, and there was some discussion with the plaintiffs

6    about something and why that had not been corrected.

7            So I guess I must have read that to say these are all

8    the people who are going to get an extension because I'm not

9    sure why that was in the footnote if he never entered his

10   appearance and he wasn't served, why would he even need an

11   extension in the first place?

12           MR. CAPONI:  Because the debtors moved for a default

13   judgment even though they acknowledged they hadn't served him,

14   and the debtors to this day still haven't withdrawn the default

15   judgment.

16           THE COURT:  I got that but it specifically says that

17   he had been granted an extension, and if he hadn't been served

18   I don't know why he would need an extension.  I don't know.

19   What do you -- what's your response?

20           MR. ZAHRALDDIN:  Your Honor, I'm the one who dealt

21   with trying to sort this out.  Yes, there was an error on the

22   motion for default judgment because certain of these

23   defendants, a motion for default judgment was filed because

24   they were served.  Mr. Morton was inadvertently included in

25   that.

1          THE COURT:  Okay.

2          MR. ZAHRALDDIN:  Okay.  So when the district court

3   said we're going to deny this without prejudice, please file it

4   in the bankruptcy court, which is what they did.

5          THE COURT:  You mean the TRO or the --

6          MR. ZAHRALDDIN:  No, no, no, the motion for default

7   judgment because we have three parties that are subject to that

8   and are defendants.

9          THE COURT:  Wait a minute.

10          MR. ZAHRALDDIN:  So a motion for default --

11          THE COURT:  Why did you take the default judgment in

12   connection with what?

13          MR. ZAHRALDDIN:  With this complaint, not with the

14   TRO, with the complaint.

15          THE COURT:  So the complaint was filed where?

16          MR. ZAHRALDDIN:  In the district court.

17          THE COURT:  Okay.  So you guys have a district court

18   action.

19          MR. KODOSKY:  That was filed here, Your Honor.

20          MR. ZAHRALDDIN:  No, well, we withdraw --

21          MR. CAPONI:  They moved -- they moved to withdraw the

22   reference on the file.

23          MR. ZAHRALDDIN:  We withdrew the reference on the

24   complaint and so --

25          THE COURT:  Well, that don't mean anything.  You keep

135

```
 1    coming -- I don't understand why you would --

 2             MR. ZAHRALDDIN:  I understand that Your Honor, be --

 3             THE COURT:  -- take a default in the district court

 4    for a matter that's pending here.

 5             MR. ZAHRALDDIN:  Well, that's because it's -- and the

 6    judge said denied without prejudice and refile in bankruptcy.

 7    I haven't filed it yet because we had other things to do.

 8             THE COURT:  Well, it should have never been.

 9    Counsel, I will tell you.

10             MR. ZAHRALDDIN:  Okay.

11             THE COURT:  Until the reference is withdrawn,

12    everything continues in bankruptcy.  I will not stop because

13    the first thing the district court is going to say, well, why

14    did you stop?

15             MR. ZAHRALDDIN:  Understood, Your Honor.

16             THE COURT:  Because we may or may not -- and more

17    importantly, if they don't withdraw the reference, I now have a

18    case that's sitting in limbo with nothing happening.

19             MR. ZAHRALDDIN:  I understand that.

20             THE COURT:  Okay.

21             MR. ZAHRALDDIN:  My point is this, very simple.

22             THE COURT:  What's your point?

23             MR. ZAHRALDDIN:  My point is this, we filed the

24    motion for a default judgment against three people that had

25    been served.
```

1          THE COURT:  Okay.

2          MR. ZAHRALDDIN:  Mr. Morton was inadvertently left on

3   that.

4          THE COURT:  Okay.

5          MR. ZAHRALDDIN:  I am not going to include him on the

6   motion, which I told counsel when we refiled the motion for

7   default.

8          THE COURT:  I -- that's all fine and well, but in

9   that footnote it said Mr. Morton had granted an extension --

10         MR. ZAHRALDDIN:  Extension.

11         THE COURT:  -- and time to respond.

12         MR. ZAHRALDDIN:  Yes, ma'am, that is absolutely

13   correct.

14         THE COURT:  And counsel is now saying well, he wasn't

15   served, so he doesn't have anything to do with this, but I'm

16   not quite sure why it was in the footnote when -- you know

17   what?  Can I see the entire motion because --

18         MR. ZAHRALDDIN:  Because the counsel asked for a --

19   he asked for a extension.

20         THE COURT:  Well, he said it himself that he got an

21   extension for Mr. Morton.

22         MR. ZAHRALDDIN:  I know.

23         THE COURT:  I don't know why Mr. Morton would need an

24   extension if he wasn't served.

25         MR. CAPONI:  Your Honor, whether -- I think the point

1    is whether the extension was granted or not, Mr. Morton, no one

2    has entered an appearance in this or any other -- in this court

3    or the district court for Mr. Morton.  He is not --

4            THE COURT:  Well, who gave him --

5            MR. CAPONI:  -- and is not present here today.

6            THE COURT:  Well, whether somebody gave him --

7    entered their appearance or not, they surely negotiated an

8    extension of time to respond for him.  I don't know what that

9    would be in, what authority he would be able to do that.

10           MR. CAPONI:  Your Honor?

11           THE COURT:  I don't know.

12           MR. CAPONI:  As we -- as Your Honor has pointed out,

13   the debtor has proceeded with a somewhat blunderbuss approach

14   of filing issues in different courts when they shouldn't,

15   moving for default even when they acknowledge they have no

16   basis to it --

17           THE COURT:  Well, I like that word "blunderbuss".

18           MR. CAPONI:  -- causing people to respond and -- but

19   in our response, because we had no -- we're reacting to chaos,

20   but we were always very clear to never enter an appearance on

21   behalf of Mr. Morton --

22           THE COURT:  Well, why -- well, who --

23           MR. CAPONI:  -- and no one can point to me on the

24   docket where anyone has entered an appearance.

25           THE COURT:  Well, it doesn't -- counsel?  You --

1   somebody negotiated something from him, and whether you put

2   your name on the docket or not, there had to have been some

3   basis for you to negotiate, because you said that as he's

4   obtained an extension to respond to the complaint.  What

5   authority would somebody have to do that?  Now maybe in the

6   second one you said I don't care what I did in the past, I'm

7   only asking for these people, so this matter was raised,

8   meaning having obtained an extension.

9           MR. CAPONI:  Your Honor, I have represented Mr.

10  Morton in the state court and the Court of Chancery, and I

11  represent lots of clients.  Every client I represent, unless I

12  enter an appearance in matter, they're not present, or they're

13  served and they fail to respond, they're not present in the

14  matter.  They want to introduce --

15          THE COURT:  Well, then -- but counsel, if you, the

16  fact that you may not have entered on the record, what

17  authority would you have had to obtain an extension from Mr.

18  Morton if you weren't representing him?  That's all I'm trying

19  to figure out.

20          MR. CAPONI:  What authority?  I was simply passing

21  along a request, acting as a intermediary facilitator.  I

22  didn't sign any document, an attorney of record, or as counsel

23  of record for Mr. Morton, and if the debtors wanted that they

24  could have asked for something and maybe we'd be in a different

25  position, but they did not.  The same, Your Honor, I would just

1   mention the same way if I had an issue with Mr. Rajan's

2   brother, Roger Rajan, I would speak to debtors counsel because

3   they facilitate that, but unless they enter an appearance on

4   his behalf.

5          THE COURT:  Well, they may also say, well, we don't

6   have the authority and what basis would we do anything because

7   we don't represent him, so why would we be -- if they ask you

8   for something, wouldn't you -- never mind.  I'm just reading

9   this.

10         MR. CAPONI:  Guess they were overly courteous.

11         THE COURT:  Okay.  Hold on.  Yes, and that's why we

12  did what we did.  Mr. Caponi, your second motion says,

13             "The undersigned counsel here filed this motion to

14             extend time to file and answer pursuant to Rule

15             9006(b)(1) requesting this Court to extend the

16             deadline to respond to the complaint for all

17             defendants for a second time pursuant to Federal Rule

18             of Bankruptcy Procedure 9000."

19         Okay.  You said all -- that's probably why my order

20  said what it said.

21         MR. CAPONI:  Your Honor, I absolutely said all

22  defendants.  And as we explained in the motion, because debtors

23  were cherry-picking and creating litigation chaos, we were

24  asking that the Court -- I did not -- I asked on behalf of all

25  defendants.  I did not have any authority for SLS.  I had no

1   authority --

2           THE COURT:  Well, then why did you file if you didn't

3   have the authority to ask all the defendants?

4           MR. CAPONI:  Because I -- well, I was -- as we argued

5   in the motion, from a judicial efficiency standpoint, in order

6   to stop the chaos, we wanted the Court to set a date whereby

7   all defendants were extended in order to prevent debtors from

8   stopping this games of asking for discovery from certain, Rule

9   26 from a different, motion to default from this one, motion to

10  default parties that they know that have no basis for default.

11          So in order to stop the chaos, as I explained in

12  detail, we wanted to level set the proceeding to where all

13  people.  That's why the other parties filed joinders, because I

14  was not representing them or speaking on their behalf.

15          THE COURT:  They're not -- Counsel, let me just tell

16  you.  Do not file anything asking for all defendants if you do

17  not represent all defendants.  Because when I read this, it

18  said all defendants.

19          MR. CAPONI:  I apologize, Your Honor, if --

20          THE COURT:  And nowhere did you drop a footnote

21  saying that -- you talked about, in your first paragraph,

22  they're filing a request of the extension of the response

23  deadline for all defendants to respond to the complaint in

24  order to end, as the Delaware Supreme Court, the plaintiffs'

25  litigation chaos.  Nowhere did you advise the Court when you

1   made that request that you said, I don't represent the other

2   defendant -- at least I don't see it in here.  Maybe you said

3   it somewhere else.

4         MR. CAPONI:  Your Honor, I think I would have relied

5   upon the -- you know, my fault if it wasn't clear, the title of

6   the motion as well as my signature block, but I take the

7   Court -- and the substance of the motion I thought conveyed

8   that message.  But if it wasn't clear, that's my fault.

9         THE COURT:  Well, Counsel, I don't go by titles.

10  Titles mean nothing to the Court.  You people mistitle motions

11  all the time.  I look at the content.  And that is likely why

12  my order was written the way that it was, was because I -- and

13  I couldn't understand why I would say that if you dropped a

14  footnote saying that it didn't apply to Mr. Morton, I would

15  wonder why I would do something like that, but apparently I

16  gave you exactly what you asked for, which an extension for all

17  defendants, and not once did you say, I don't have the

18  authority to ask that for everybody because I don't represent

19  them.  The other two parties joined in.

20        And again, I do not rely on titles.  I don't -- even

21  if the signature block says one thing, I look at what you asked

22  for.  And I believed what you said was correct, that we needed

23  to put some deadlines for everybody in here so that we could

24  have this litigation move smoothly.

25        Now, all of this goes back to whether Mr. Morton --

```
 1    he says Mr. Morton is not here.  Mr. Morton is not a party and

 2    he's not represented.  I guess Mr. Colby could have made that

 3    argument, I guess.  Counsel for Mr. Stastney, anybody, could

 4    have made it, but I'm not quite sure why they would if they're

 5    not representing him.  But that's neither here nor there.

 6            The question -- and we went off -- we all went

 7    off -- at least I went off on a tangent having to do with

 8    whether he can ask him questions about Mr. Morton given that

 9    Mr. Morton is not here, hasn't -- well, no appearance has been

10    entered on his behalf.  Maybe he'll represent his self.  I

11    don't know.

12            MR. ZAHRALDDIN:  Well, Your Honor, the -- my

13    understanding and what I've read in the Chancery Court docket

14    below is that Mr. Caponi tried this before in front of Judge

15    Laster and said that Mr. Morton isn't involved in this, he's no

16    longer there, and that there was a decision that said, no, Mr.

17    Morton was definitely involved.  He did all these things.  Now,

18    I don't --

19            THE COURT:  Well, that's all fine and well but what

20    does that have to do with me?

21            MR. ZAHRALDDIN:  Let me --

22            MR. CAPONI:  Categorically false, Your Honor.

23    Categorically false.

24            THE COURT:  All right.  I don't --

25            MR. ZAHRALDDIN:  Okay.
```

```
 1              THE COURT:  The whole -- I don't know the context.

 2   Doesn't have anything to do with me.  I don't know what the

 3   judge was basing his decision on.  Unless you're telling me

 4   he's saying, I didn't represent Mr. Morton, he's not in here,

 5   and the Court says, Well, you're doing something, I'm going to

 6   find you representing him.  That's the only issue.  Because Mr.

 7   Caponi is taking the position, I don't represent him, I was a

 8   facilitator.  Now, that's a new one.

 9              I also like the word "blunderbuss."  Is that what you

10   said?

11              MR. ZAHRALDDIN:  Yes, he did.

12              THE COURT:  I thought that was nice.

13              MR. ZAHRALDDIN:  He did.  It's Mister -- Hawk

14   Investments, Mister -- I mean Mr. Caponi can disagree, I think

15   it would be insane if he did, but Hawk Investments Holding

16   Limited, the holding company, is the family office for Mr.

17   Morton's family.  So you can separate this out.  You can say

18   maybe --

19              THE COURT:  Who -- who's the officer of -- is there

20   an office --

21              MR. CAPONI:  Yes, Your Honor.

22              THE COURT:  Is it a family trust?

23              MR. CAPONI:  Hawk Investments Holdings is equivalent,

24   in the Jersey Isles, what you would consider to be a trust

25   here.  It is not a family office.  It is --
```

```
 1              THE COURT:  It's a -- you said New Jersey?

 2              MR. CAPONI:  Jersey Isles.  The Isles of Jersey off

 3    of Britain.

 4              THE COURT:  Oh, in Britain?

 5              MR. CAPONI:  In Britain.  Yes.

 6              THE COURT:  Okay.  So in --

 7              MR. CAPONI:  Jersey, I think, technically.

 8              THE COURT:  I don't even know where that is --

 9              MR. CAPONI:  Yeah.

10              THE COURT:  -- but if you tell me it's in Britain,

11    off the Isles, it's fine.

12              MR. CAPONI:  And there is a professional trust

13    company -- this was all -- debtors explored this in detail in

14    the Court of Chancery.  And there's a company called Albanese,

15    which is a professional trust company.

16              THE COURT:  Can you spell that?

17              MR. CAPONI:  How do I spell Albanese?

18              THE COURT:  Like Albany with an I-E-S?

19              MR. CAPONI:  What?

20              UNIDENTIFIED SPEAKER:  Like Albany, New York.

21              MR. CAPONI:  Like Albany, New York, yes.

22              THE COURT:  With an I-E-S?  You said Albanese or

23    Albany' --

24              MR. CAPONI:  Albanese, S-E at the end.

25              THE COURT:  Okay.  I have A-L-B-A-N-I-E-S.  Is that
```

```
 1  close?

 2          MR. CAPONI:  Yes.  I think that's close.

 3          THE COURT:  Okay.

 4          MR. CAPONI:  And that is a professional trust

 5  company.  And they manage these assets.

 6          THE COURT:  They manage --

 7          MR. CAPONI:  All decisions.

 8          THE COURT:  For Hawks?

 9          MR. CAPONI:  For Hawk.  They make all decisions for

10  Hawk.  They're the only party -- and, again, debtors deposed

11  the individuals from Albanese in the Court of Chancery below

12  who testified at length, and Vice Chancellor Laster found that

13  was correct.  So Mr. Morton has -- he's a --

14          THE COURT:  Is he a beneficiary --

15          MR. CAPONI:  -- 80-some-year-old individual.

16          THE COURT:  -- of the trust?

17          MR. CAPONI:  No, he's not.

18          THE COURT:  What's his relationship, if any?

19          MR. CAPONI:  His money, many decades ago --

20          THE COURT:  He's the -- he's the --

21          MR. CAPONI:  -- founded the trust.

22          THE COURT:  -- settler -- he's the --

23          MR. CAPONI:  But he's not part of it.

24          THE COURT:  He's the one who --

25          MR. CAPONI:  Settler.
```

```
 1                    THE COURT:  Settler of the trust.  He's the one who

 2        established the trust?

 3                    MR. CAPONI:  Technically, he didn't settle the trust.

 4        I think he --

 5                    THE COURT:  Well, isn't the person who

 6        establishes -- I'm not sure if I'm using the right word,

 7        settler.

 8                    MR. CAPONI:  There was --

 9                    THE COURT:  The person who creates it.

10                    MR. CAPONI:  He was -- his -- it's very technical.

11        Ultimately, his money went into vehicles, went into vehicles

12        that got put into the trust, different voting structures

13        between his wife and other trusts and whatnot.

14                    THE COURT:  Okay.

15                    MR. CAPONI:  Very complex.

16                    THE COURT:  So who created the trust?  Somebody had

17        to create the trust and put in the trust the assets.

18                    MR. CAPONI:  I think it was a prior marital trust

19        between him and his wife that ultimately resulted in Hawk, but

20        it was -- you know, if you want to go -- the genesis was

21        Mr. Morton's money --

22                    THE COURT:  Okay.

23                    MR. CAPONI:  -- that he raised over years.

24                    THE COURT:  That's all fine and well, Mister -- it

25        might have created the entities, but somebody had to create the
```

1  trust, and into the trust put in the assets and named the

2  beneficiaries.  And you're saying at some point some entity,

3  that Mr. Morton may or may not have funded or created, created

4  the trust and all of these different assets were placed into

5  the trust and there's beneficiaries and the trust is managed by

6  Albanese.

7           MR. CAPONI:  The trust is managed by Albanese.

8  Mr. Morton is not a beneficiary.  And the Stream asset, I

9  believe, was not put into the trust but was an acquisition made

10 by Albanese as part of their trustee duties.

11          THE COURT:  Okay.  So Albanese was the vehicle by all

12 the -- not the vehicle.

13          MR. CAPONI:  The trustee, effectively.

14          THE COURT:  The trustee who decided to invest and put

15 this in the trust.

16          MR. CAPONI:  Yes.  And Albanese to this day is the

17 sole decisionmaker.  Mr. Morton has zero say in what happens

18 in -- with the Hawk Investment Limited because it's all done by

19 Albanese.

20          THE COURT:  Okay.

21          MR. ZAHRALDDIN:  Your Honor, Your Honor.

22          THE COURT:  Yes.

23          MR. ZAHRALDDIN:  I apologize.  Mr. Morton signed the

24 omnibus agreement himself.  Not Albanese, not the trust.  So

25 whatever he's put in the way of this or whatever the deal, I

1    mean, Mr. -- to say Mr. Morton is not involved here -- and

2    we're going way afield.  Because we were talking about --

3            THE COURT:  This all boils down to is this a

4    statement by a party in interest, which Mr. Caponi said it is

5    not because he hasn't been served, he hasn't been -- entered

6    his appearance.  I get a document that says he's got an

7    extension.

8            So by some way, I don't know who got it, who didn't,

9    he somehow has gotten some kind of extension which -- so

10   typically when you say people aren't involved, they haven't

11   served, they don't know anything, I'm not quite sure, if you

12   reach out and ask for an extension, to say, well, you can

13   argue, you can file a motion to dismiss for improper service or

14   all sorts of reasons other than an answer, but I'm not quite

15   sure what to do with -- this is a new one where someone gets an

16   extension and then say, I haven't subjected myself to the Court

17   because I haven't formally entered my appearance.

18           And maybe that's correct.  I don't know.  I have

19   never had to address that.  But the whole issue that we've gone

20   down this rabbit hole on is whether Mr. Morton's statements or

21   alleged statements or actions, you know, if it's something he

22   -- observed on his own, I don't care who Mr. Morton is.  If Mr.

23   Rajan said, I saw Mr. Morton doing these things, then, fine.

24   But the whole point is I don't know how this is a statement

25   against interest, unless it's something written by Mr. Morton,

1  he can't tell me what somebody -- I mean, the whole thing is

2  how does he even know this?

3          MR. CAPONI:  Well, Your Honor, point of

4  clarification.  Opposing counsel was wrong.  Mr. Morton did not

5  sign the omnibus agreement.  Again, overstating his role.

6          THE COURT:  All right.  Listen, Counsel --

7          MR. CAPONI:  I just want to be clear on the record

8  about that.

9          THE COURT:  Okay.

10          MR. CAPONI:  He did sign the omnibus agreement.  And,

11  two --

12          MR. ZAHRALDDIN:  Which one?

13          MR. CAPONI:  Again, I don't know why we're going down

14  this rabbit hole.  Mr. Morton is not here.  If he --

15          THE COURT:  Well, even if he wasn't here, Counsel, if

16  he testified, I observed --

17          MR. CAPONI:  I agree with that.

18          THE COURT:  But we don't know.  He just said he was

19  in his office.

20          So how about the objection be basis for that

21  statement, whether Mr. Morton is here or not.  If it's

22  something somebody else told him, pretty easy.  Hearsay.

23  Either he saw him -- because even if someone is not here and

24  you actually see and say, I saw him doing this --

25          MR. CAPONI:  Your Honor, respectfully, I think if I

1    see -- I don't see someone speak, I hear someone speak, and

2    that's the definition of hearsay.  An out-of-court statement

3    offered for the truth of the matter asserted when the declarant

4    is not available to defend or rebut when it's not a party

5    opponent.  So Mr. Rajan, if he sees something, he's only

6    speculating as to what he's seeing.  If he hears it and

7    regurgitates it in court, that's hearsay.

8            THE COURT:  Well, let's --

9            MR. CAPONI:  That's my position.  I understand the

10   Court has to make a ruling.

11           THE COURT:  Right.  So with respect to the party,

12   I'm -- I'm troubled by the fact that he got an extension and

13   now you say, Well, I did it as a courtesy.  Well, then I'm not

14   quite sure that people can always play the game, I didn't

15   formally enter.  I restate to counsel, he gave me an extension,

16   I didn't -- what if I had denied the extension knowing that

17   Mr. Morton had already gotten an extension but hadn't been

18   served?  Did he waive service by getting an extension?  I don't

19   know all that.  Now you're creating all sorts of problems for

20   me.

21           MR. CAPONI:  Honestly, Your Honor, I'll tell you

22   there's no problem because I was very meticulous about this

23   along the way and --

24           THE COURT:  Except you weren't in that motion you

25   filed.

1              MR. CAPONI:  And if Mr. Morton is ever served the

2     first motion I'll be filing is a motion for lack of personal

3     jurisdiction but we're not there yet, and I've made sure not to

4     waive anything.

5              THE COURT:  And I don't know whether you'll win that

6     or not.  I have -- I have a very lengthy, I think 80-page

7     opinion on personal jurisdiction over parties that were in

8     Canada and their actions here in the U.S., or inaction, because

9     some people I found were, some people I found were not.  Might

10    want to take a little look at that.

11             MR. CAPONI:  I will, Your Honor.  Absolutely.

12             THE COURT:  I don't remember the name of the case but

13    it was one that I took a lot of time having to --

14             MR. CAPONI:  Understood.

15             THE COURT:  You know, at the time it was great

16    because my daughter was studying for the bar and now we had to

17    talk about personal interest so she -- we both learned a lot on

18    personal jurisdiction.

19             MR. CAPONI:  You assuredly will.

20             THE COURT:  Refresher.  Anyway, so, Counsel, the

21    question to Mister -- back to the question at hand to Mr. Rajan

22    was something about Hawk and then you said Hawk has -- well,

23    actually that was -- was Hawk involved in the TRO, and then you

24    asked the question, Who's Hawk?  And then so you asked Mr.

25    Rajan who's Hawk, and he said Hawk was, I guess, the company

```
 1    and Mr. Bob Morton.  Okay.

 2             And you're objecting.  That's his -- that's his

 3    understanding.  You can, I guess, ask him questions.  You don't

 4    like his answer but that's his understanding of who it is.

 5             MR. CAPONI:  Understood.  But to the extent he wants

 6    to say Hawk did something --

 7             THE COURT:  Right.  Now the next --

 8             MR. CAPONI:  -- he has to identify who said it.

 9             THE COURT:  -- question -- no.  The next thing was

10    Bob Morton was in his office showing off the TVs, and that's

11    what your objection was, Mr. Morton is not here, he's not a

12    party, and -- said it was a party -- a statement of a party in

13    interest, and you're, like, no, it's not because he's not here.

14             MR. CAPONI:  Correct.

15             THE COURT:  Okay.  And I had to figure out, based on

16    they said, yes, he is here because he got an extension to

17    answer.  And then I looked at the motion and it didn't said he

18    got an extension, and the question for me is:  Well, what does

19    that mean?  Are you -- have you appeared by requesting or do

20    you have to formally enter your appearance?  What does all that

21    mean?

22             And your position, Mr. Caponi, is I can ask for all

23    the extensions I want.  If I don't answer, I haven't entered my

24    appearance and I'm not -- I haven't subjected myself to this

25    Court's jurisdiction because I haven't done anything yet.
```

1   Correct?

2            MR. CAPONI:  Correct.

3            THE COURT:  Counsel, your response to that?  All of

4   that to get to this.

5            MR. CAPONI:  Yes, Your Honor.

6            THE COURT:  Par for the course in this case.

7            Counsel, your response to Mr. Caponi's position that

8   just because Mr. Morton may have gotten an extension, he is

9   still not subject to this Court's jurisdiction and any

10  statement of a party in interest does not apply because he

11  hasn't formally submitted his self to this Court's

12  jurisdiction.

13           MR. KODOSKY:  I don't know that he needs to be

14  present for Mr. Rajan to be able to answer the question about

15  how is Hawk involved with the TRO motion.

16           THE COURT:  Well, he said Hawk and more -- I guess

17  about Hawk, yes, because Hawk is already in here.  The question

18  went to Mr. Morton.  Because he started talking about

19  Mr. Morton and some TVs and showing it to people.

20           MR. CAPONI:  Yes, Your Honor.  So to be -- put a

21  finer point on it, if someone were to say Albanese said on

22  behalf of Hawk, that would be conceivably an admission by a

23  party opponent.  But as I've explained, Mr. Morton is not

24  a -- not affiliated with Hawk so his statements are not

25  attributable to Hawk, which is here.  They're only attributable

1   to him.  And so --

2          THE COURT:  And he --

3          MR. CAPONI:  -- the debtors admitted -- I mean, it's

4   a fact.  The debtor admitted last Friday it has not even served

5   Hawk.  So it's not like I'm -- I was cute in responding.

6          THE COURT:  You mean Mr. Morton.

7          MR. CAPONI:  Mr. Morton.  Sorry.  The debtor's

8   admitted it has not even served Mr. Morton.  So, you know, I

9   don't know how the debtor can say, I've even served a party but

10  yet they're deemed present and I get to admit their

11  out-of-court statements.

12         THE COURT:  Because they got an extension.  That's

13  what they said.  Well, they got an extension to answer the

14  complaint; therefore, they're in here.

15         MR. CAPONI:  Yes, Your Honor.  And to that point, my

16  client should not be punished for my good -- for my being a

17  good lawyer and getting an extension without entering an

18  appearance.

19         THE COURT:  Well, the question is can you even --

20  that was the question, whether you're a good lawyer, bad

21  lawyer, lawyer any -- any kind of lawyer.  The fact that you

22  reached out to opposing counsel and asked for an extension,

23  does that then mean that you're subject to my jurisdiction?

24         MR. CAPONI:  I think not, Your Honor.

25         THE COURT:  You think not, and that's my question.

1          MR. KODOSKY:  I think so.

2          THE COURT:  On what basis?  Somebody tell me

3    something.

4          MR. KODOSKY:  I haven't --

5          THE COURT:  On what basis you believe asking for an

6    extension subjects you to my jurisdiction and means you're now

7    a party to the matter?

8          MR. ZAHRALDDIN:  Your Honor, if someone reaches out

9    to me, which they did, and we have folks that are overseas, and

10   several people did reach out to me, not through Mr. Caponi,

11   etcetera, and they asked for an extension, and I was glad to

12   give an extension.  I never said no to an extension, if they

13   put in the motion that I filed.  I've simply asked for an

14   accompanying motion in lieu of answer schedule and I asked for

15   a Rule 26(f).  That's it.  Instead of getting a response, they

16   fired off the motions.  But I did give --

17         THE COURT:  Who -- oh, the motion --

18         MR. ZAHRALDDIN:  The motion to extend.  But when

19   someone calls me up in the middle of -- when people are

20   overseas and they haven't lawyered up and different people have

21   gone to different folks, I did take it as that I was giving an

22   extension because I was being asked by someone who is an

23   official representative.  If that was my mistake, that's fine.

24         My only regret is the last 25, 30 minutes of

25   discussing this.  Because I'd rather us get to the evidence

1    here.  But, yes, I believe that when someone represents, hey,

2    can you give an extension to somebody, that they have then

3    decided they're going to enter the case, if I was mistaken,

4    then we'll figure out how to get Mr. Morton in later.

5              THE COURT:  Okay.  Okay.

6              MR. CAPONI:  I don't know if that was a withdrawal of

7    the question, I'll sit down, or if I -- if we're still going on

8    about this.

9              THE COURT:  What are we doing, Mr. Kodosky?  Are you

10   going with the -- the issue regarding Mr. Bob Morton or are you

11   only going to concentrate on Hawk?

12             MR. KODOSKY:  My next question was going to be about

13   Google.

14             THE COURT:  All right.  So you're withdrawing the

15   question, or what?

16             MR. KODOSKY:  He's answered my question, I believe.

17             THE COURT:  Well, they want to strike his answer with

18   respect to --

19             MR. CAPONI:  Yes, Your Honor.  I mean, if he's not

20   withdrawing -- if he's withdrawing --

21             THE COURT:  -- Mr. Morton showing the TV in his

22   office.

23             MR. CAPONI:  Correct.

24             MR. KODOSKY:  Just as to Mr. Morton but not Hawk,

25   Your Honor.

1              THE COURT:  All right.  Agree to strike the answer as

2    to Mr. Morton but not as to Hawk.

3              MR. CAPONI:  No.  Because if the only person showing

4    a TV or doing whatever was Mr. Morton, he is not Hawk.  They

5    have nobody -- they need to establish somebody from Hawk --

6              THE COURT:  Counsel --

7              MR. CAPONI:  -- did something, someone with

8    authority.

9              THE COURT:  -- he's agreeing that that testimony can

10   be stricken.

11             MR. CAPONI:  Yes, Your Honor.

12             THE COURT:  So why are we talking about it?

13             MR. CAPONI:  He said he wants it not stricken as to

14   Hawk.  It has to be stricken as to both.

15             THE COURT:  No.  He said -- I understood he said his

16   testimony regarding Hawk and Hawk being involved in the TRO

17   being -- is that what you were saying?  Or you're only

18   withdrawing it -- which one?

19             MR. KODOSKY:  The way you characterized it the first

20   time, Your Honor.

21             THE COURT:  Which is?

22             MR. KODOSKY:  As to Hawk, not as to Mister -- as

23   to -- as to Mr. Morton but not as to Hawk.

24             THE COURT:  And so the testimony relates to Hawk how?

25   I misunderstood what he was -- what he was --

```
 1              MR. CAPONI:  Yeah.  Sorry, Your Honor.  Yeah, I
 2    understood what he just said.
 3              THE COURT:  I -- obviously I'm out of the loop here.
 4    So you want that testimony to be stricken as to Mr. Morton but
 5    not stricken with respect to looking at the TVs.  Is that what
 6    we're talking about, that testimony?
 7              MR. KODOSKY:  Yes.  Yes, Your Honor.  About the TVs?
 8              THE COURT:  Yes.
 9              MR. KODOSKY:  The TVs that Mr. Morton had stolen --
10              THE COURT:  You guys with the stealing, the this -- I
11    had enough of that.  I had enough from somebody.  These the bad
12    guys, you're the bad guys, you're stealing, you're doing this.
13    Please leave that out.  That really doesn't help me, and
14    actually it sort of irritates me when people start attributing
15    bad facts and bad things to different parties.  And you're both
16    doing it.  Okay?  You're both doing it.  Please stop.  It
17    doesn't move the ball one iota for me, and it actually makes me
18    a little jaded when I have to look at this.  So let's leave the
19    descriptions out.  They don't help me.  Okay?
20              MR. KODOSKY:  Yes, Your Honor.
21              THE COURT:  So to the issue at hand, you want the
22    statement regarding Mr. Morton allegedly showing TVs in his
23    office, or somebody's office, you want that to remain of record
24    and attributed to Hawk?
25              MR. KODOSKY:  Yes.
```

1          THE COURT:  Mr. Caponi, you're objecting on the basis

2   that?

3          MR. CAPONI:  Mr. Morton has no affiliation with Hawk

4   and, therefore, Mr. Morton's statements are not a statement by

5   Hawk.

6          THE COURT:  Or they have failed to establish the

7   relationship?

8          MR. CAPONI:  Excuse me, Your Honor?

9          THE COURT:  He has failed to establish --

10          MR. CAPONI:  Yes, he's failed to establish a

11   connection between Mr. Morton and Hawk.

12          THE COURT:  All right.  Counsel, I sustain that you

13   have to -- to establish a relationship between Mr. Morton and

14   Hawk so that I can find that those statements or actions or

15   whatever could be attributable to Hawk.

16   BY MR. KODOSKY:

17   Q    Mr. Rajan, apart from what you described earlier, are

18   there any other complaints that we have not spoken to regarding

19   Hawk?

20          THE COURT:  Okay.  So we're withdrawing that question

21   with respect to the TVs and Hawk, which is what I thought we

22   were doing.  Yes?  No?

23          MR. KODOSKY:  Yes, Your Honor.

24          THE COURT:  You withdrawing that?

25          MR. KODOSKY:  Yes.

```
 1              THE COURT:  All right.  See, I had it right, Mr.

 2   Caponi.  Mr. Caponi, come on.

 3              All right.  Go ahead, next question.

 4   BY MR. KODOSKY:

 5   Q    Any other issues with Hawk, other than what you've

 6   described?

 7   A    Yeah.  Hawk has a history of interfering with the -- the

 8   technology and the trade secrets of Stream TV for a number of

 9   years now.  There's been -- even when the loans were in good

10   standing, Hawk went and blocked the company software from a

11   number of our engineers unbeknownst to the company, went and

12   blocked the software.  So they have a long history of doing

13   this.

14              THE COURT:  All right.  Is it being blocked now?

15              MR. CAPONI:  Yeah, objection, Your Honor.  Not

16   relevant to the present motion for a TRO.

17              THE COURT:  I mean, I did see in the motion that

18   there was some issue about somebody, I guess Hawk, not

19   returning some websites and -- where did I read that?

20              MR. CAPONI:  Yeah.  That was not Hawk.  I think the

21   allegation there is SeeCubic, but that certainly is nothing to

22   do with -- control over a domain has nothing to do with this

23   new supposed interference with blocking licenses from years ago

24   that Mr. Rajan just stated.  Whatever that was certainly has

25   nothing to do with the present, Your Honor.
```

```
 1              THE COURT:  Counsel, objection on the basis of

 2    relevance and what else, Counsel?

 3              MR. CAPONI:  Not relevant.

 4              THE COURT:  Okay.  Counsel.

 5              MR. KODOSKY:  I'm ready to move on, Your Honor.

 6              THE COURT:  All right.  Withdrawn?

 7              MR. KODOSKY:  Yes.

 8              THE COURT:  Withdrawn.  Move on.

 9    BY MR. KODOSKY:

10    Q    Mr. Rajan, did Stream have a project with Google?

11    A    Yes.  Stream was working with Google and Stream was an

12    approved vendor by Google.

13              MR. KODOSKY:  Permission to approach, Your Honor?

14              THE COURT:  Okay.  You have an exhibit that you want

15    to introduce?  Because it's surely not to refresh his

16    recollection.

17              MR. KODOSKY:  Yes, Your Honor.

18              THE COURT:  Okay.  Hand that to --

19              MR. KODOSKY:  D-28.

20              UNIDENTIFIED SPEAKER:  28?

21              MR. KODOSKY:  Yes.  Can I ask one quick question

22    while it's being done, Your Honor?

23              THE COURT:  Sure.  Go ahead.

24    BY MR. KODOSKY:

25    Q    Mr. Rajan, why do you think --
```

```
 1              THE COURT:  Don't hold -- you said one before that.

 2   Go ahead.

 3              MR. KODOSKY:  And the question that I have doesn't

 4   relate to this document, Your Honor, but --

 5              THE COURT:  So don't hand it to him yet, John.

 6   BY MR. KODOSKY:

 7   Q    Mr. Rajan, why do you believe Mr. Morton is Hawk?

 8   A    Bob Morton, all of his money went into -- Hawk money is

 9   Bob Morton's money.  He negotiated all the deals with Stream

10   TV, the conversion agreements.  He was involved in the omnibus.

11   And he was ordered to testify in the Chancery Court.

12              MR. CAPONI:  Objection.  Objection, Your Honor.

13   Mischaracterizes the order of the Court of Chancery.

14              THE COURT:  Okay.  But what with respect to that he

15   negotiated all the agreements with Stream?

16              MR. CAPONI:  Sorry, Your Honor, I didn't hear that.

17              THE COURT:  His testimony was that Mr. Morton

18   negotiated all the agreements with Stream and he also was

19   ordered to testify in --

20              MR. CAPONI:  Mr. Rajan testified that the Court of

21   Chancery ordered --

22              THE COURT:  I got that part.  I was asking about the

23   other part.

24              MR. CAPONI:  I'm not -- I'm not taking issue with the

25   prior.
```

```
1              THE COURT:  Okay.

2              MR. CAPONI:  Just the last piece.

3              THE COURT:  Okay.  And you object on the basis --

4              MR. CAPONI:  A, it's hearsay, and B, it's incorrect.

5              THE COURT:  Counsel, only with respect to the issue

6    of Mr. Morton being ordered to testify by the Chancery Court

7    and the Chancery Court -- presumably, the Chancery Court

8    litigation.

9              MR. CAPONI:  Yes, Your Honor?

10             THE COURT:  Presumably, in the Chancery Court

11   litigation?

12             MR. CAPONI:  Yes.

13             THE COURT:  Okay.

14             MR. CAPONI:  In the 225 proceeding.

15             THE COURT:  Okay.  Well, there's been a lot of

16   proceedings; right?

17             MR. CAPONI:  Yes, Your Honor.

18             THE COURT:  So I don't know which one of them it is.

19   Okay.  Response.

20             MR. KODOSKY:  To the objection, Your Honor?

21             THE COURT:  Yes.  Only with respect to Mr. Morton

22   being ordered by the Chancery Court to testify in the 225

23   litigation.

24             MR. KODOSKY:  To the extent that he was ordered, I

25   guess we could ask that he be -- that the Court take judicial
```

1   notice of that.

2           THE COURT:  Where?  Is there something on the docket

3   that says that?

4           MR. CAPONI:  It -- it was, in fact, not ordered.  So

5   I'm happy with the Court to take judicial notice of the fact

6   that the debtor requested -- or the prepetition debtor

7   requested and their request was denied, if they would like that

8   entered into the record, I'm okay with that.  That would be

9   accurate.

10          MR. KODOSKY:  I believe Mr. Rajan can elaborate.

11          THE WITNESS:  Yeah, he would --

12          THE COURT:  Whoa, whoa, whoa.  He's asking me to take

13  judicial notice of an order entered on the docket.  The only

14  thing my -- and, Counsel, I think based on my last order

15  regarding judicial notice, I can only take judicial notice of

16  what an order says, not a rationale or any of that sort

17  of -- the Court -- if there's an order that says

18  Mr. Morton -- the debtor's request to compel Mr. Morton to

19  testify is denied --

20          MR. CAPONI:  Your Honor, I'll make it easy on you.

21  They can admit that whole order and the whole transcript

22  related to it --

23          THE COURT:  I don't want -- but --

24          MR. CAPONI:  -- if they want to.  I won't object.

25          THE COURT:  They can object -- you can admit it all

you want. Third Circuit says I can't read that transcript.

MR. CAPONI: No. I just have our issue with Mr. Rajan trying to admit it.

THE COURT: Okay.

MR. CAPONI: If they're willing to bring the document for its -- on its own, bring it out and let's take a look at it.

THE COURT: All right. Counsel.

MR. CAPONI: Because it will be accurate. I'm okay with accuracy.

MR. KODOSKY: I'll withdraw that --

THE COURT: So, Counsel, he's objecting on the basis that it's, one, I guess he would have to ask him what's his understanding, what's his basis, all of those things. Because he's failed to establish how Mr. Rajan would know that he was ordered. I mean, maybe you think otherwise, but he could still try to --

MR. CAPONI: I agree. I'm not going to stand on an objection I know the answer to. Mr. Rajan participated in these proceedings. But Mr. Rajan trying to speak for the Court of Chancery is hearsay.

If they'd like to enter the order, I'm okay with that because it will then be accurate and my -- the reason why we don't let hearsay in, because Vice Chancellor isn't here to be called to say Mr. Rajan got it wrong. Enter the order, pull it

```
 1   out.  It's on the docket.  It's public record.  I'll have no

 2   issue with that at all.

 3               THE COURT:  Counsel.

 4               MR. KODOSKY:  The portion where he said that he was

 5   ordered, Your Honor, we'll withdraw that.  But the rest of

 6   the -- the rest of the answer stands.

 7               THE COURT:  Okay.  But he wasn't objecting to the

 8   other answer.

 9               MR. KODOSKY:  Correct.

10               THE COURT:  We'll strike -- move to strike.

11               MR. CAPONI:  Move to strike, Your Honor.

12               THE COURT:  We'll strike that portion.  All right.

13   Next.

14   BY MR. KODOSKY:

15   Q    Mr. Rajan, you've been handed what has been marked for

16   identification as D-28.  Do you recognize this document?

17   A    Correct.

18   Q    What is it?

19   A    We had one of our suppliers ship components to SeeCubic of

20   the Netherlands for the Google project.

21               MR. COLBY:  Your Honor, I object to the relevance of

22   this document on the grounds that it is from 2020 and 2019.

23   We're going even farther back in time, apparently, for this

24   line of inquiry.  It's got no bearing on whether or not there's

25   a basis for a TRO now because of immediate, imminent
```

1  irreparable harm.

2          MR. KODOSKY:  Let me get there, Your Honor.  I

3  believe that his testimony is going to be that Mr. Stastney is

4  hiding the assets necessary to fulfill the order.

5          THE COURT:  All right.  Counsel, I'll allow him to

6  try to make a foundation.  Go ahead.  He says he can prove the

7  relevance.  Okay.  Go ahead.

8          MR. KODOSKY:  Move for the admission of this --

9          THE COURT:  Wait a minute.  What did he say it was?

10 Did we even identify it?

11         MR. COLBY:  No, no.  I don't believe appropriate

12 foundation has been laid.

13         THE COURT:  All right.  We need a foundation.

14 BY MR. KODOSKY:

15 Q   Mr. Rajan, are you the custodian of this record at Stream

16 TV?

17 A   Yes.

18 Q   Is this a document that is an accurate record of the --

19         MR. KODOSKY:  Actually, Your Honor, this is a verbal

20 act.  This is --

21         THE COURT:  This is what?

22         MR. KODOSKY:  I'm starting to lay the foundation for

23 a business record, but to the extent that this is not hearsay

24 but, instead, would qualify as a verbal act --

25         THE COURT:  A verbal act?

1          MR. KODOSKY:  Purchase order.

2          THE COURT:  Oh, a purchase order is a --

3          MR. KODOSKY:  Like a contract.

4          THE COURT:  That's a new one.  So it's an exception

5    under what hearsay rule?

6          MR. KODOSKY:  801.  It's not -- it's not actually

7    hearsay.  It's not being offered to prove the truth of the

8    matter asserted.

9          THE COURT:  Okay.  Rule 801.  All right.

10         MR. KODOSKY:  Establishes the legal obligations and

11   rights of the parties.

12         THE COURT:  Okay.  Hold on.  801, what?  I got my

13   little handbooks.

14         MR. KODOSKY:  You know --

15         THE COURT:  Okay.  Definitions that -- okay.  So a

16   hearsay means a statement that the declarant does not make,

17   while testifying at the current trial, or hearing, and a party

18   offers in evidence to prove the truth of the matter asserted in

19   the statement.  A statement that is not hearsay is which one?

20   You're saying a declarant?  No, it's not a prior statement.  An

21   opposing party statement, okay.  So, which one?  What are we

22   going on, the 801 what?

23         MR. KODOSKY:  For verbal acts, Your Honor.

24         THE COURT:  Where is it?

25         MR. KODOSKY:  Verbal act is not defined in the rule,

1    this is not a --

2         THE COURT:  Oh.  A statement means a person's oral

3    assertion, written assertion, or nonverbal conduct, if the

4    person intended it as an assertion.  So you say this is a

5    verbal conduct so it doesn't meet the statement.

6         MR. KODOSKY:  It's legally operative language

7    accomplishing something through words rather than making an

8    assertion.

9         THE COURT:  Huh.  Counsel?

10        MR. COLBY:  Well, I guess I wasn't making precisely a

11   hearsay objection, it was a relevance objection.

12        THE COURT:  Okay.

13        MR. COLBY:  I would also note that this document is

14   SeeCubic B.V.  The question attempting to lay the foundation

15   had to do with Stream TV, a different entity multiple levels up

16   in the organization, and I'd also note that it's unsigned.  So

17   I don't think that there has been an appropriate foundation

18   laid for the admission or authenticity of this document.

19        THE COURT:  Okay.  Counsel?

20        MR. COLBY:  I'm still unclear for what purpose it's

21   going to be used.  So I'll reserve I guess potential further

22   objections based on what the questions are, but just on the

23   face of the document those are apparent issues with it.

24        THE COURT:  Okay.

25   BY MR. KODOSKY:

1   Q    Let me step back from that, Mr. Rajan, what was the Google

2   project, and what was the implication for Stream TV?

3   A    We were -- Stream TV was working with Google to make a 65

4   inch 3-D video conference unit.  We had shipped components over

5   to -- from our stream vendors to the Netherlands for assembly,

6   When unfortunately, we lost in the Chancery Court.  The

7   implication for Stream TV is, as you know, they were, when we

8   got to Phase 3, it was going to be $20 million in orders, and

9   also Google is looking at a possible investment in Stream TV,

10  which we entered into the Bankruptcy Court.  The letter from

11  Google, the immediacy is now that Stastney is the Director at

12  the Netherlands, which just happened.  We may -- we don't know

13  when and if we'll ever get our Google stuff back.

14  Q    Where is the lens for the Google project?

15  A    It's being kept in the -- the Netherlands.

16  Q    So has the lens been delivered to Google?

17  A    No.  The -- the Netherlands are holding everything, the

18  Google stuff in the Netherlands and Stream TV's understanding

19  is it's on order from SeeCubic to hold it.

20  Q    Where is the Ultra D phone and tablet?

21          MR. COLBY:  Sorry.  Objection.

22          THE WITNESS:  It's being held in --

23          MR. COLBY:  I'm sorry.

24          THE COURT:  Wait a minute, hold on.  There's an

25  objection. Whoa.

1          MR. COLBY:  Sorry.  Object, and move to strike the

2    witness' testimony regarding the Google project, not relevant

3    to the TRO, which has to do with potential present-day issues.

4    The witness himself previously testified when he was here

5    before that the Google project, which goes all the way back to

6    2018, has been canceled, and so it's therefore irrelevant to

7    whatever the purported imminent harm is now.

8          THE COURT:  Okay.

9          MR. KODOSKY:  It's ongoing harm to the Debtor, Your

10   Honor.

11         THE COURT:  Okay.

12         MR. COLBY:  Past harm, reparable --

13         THE COURT:  Wait a minute.

14         MR. COLBY:  -- he put a dollar down.

15         THE COURT:  Wait minute, wait a minute.

16         MR. COLBY:  It doesn't over relate to irreparable.  -

17         THE COURT:  Where's the product?

18         MR. COLBY:  I'm sorry.

19         THE COURT:  Where are the products that everybody

20   wants, this fighting over?

21         MR. KODOSKY:  That's what he said that it is being

22   hidden by Stastney, over in the Netherlands.

23         THE COURT:  Okay.  Well, I don't know about Stastney,

24   but he's saying that the SeeCubic B.V. has it, and hasn't

25   turned it over.  That's what my own question is.

```
 1              THE WITNESS:  Who had -- it is being held in the

 2   Netherlands, and I testified earlier in the bankruptcy, we had

 3   a meeting right before the bankruptcy with Google, we are to

 4   turn the unit over, which has not happened since the filing of

 5   the bankruptcy because --

 6              THE COURT:  Who's we?

 7              THE WITNESS:  Stream TV is to turn over the Google

 8   Unit.  There was a meeting right before the bankruptcy, and the

 9   Google Unit has been held since the bankruptcy in the

10   Netherlands, and in my role at the time of SeeCubic B.V., CEO,

11   my understanding was, is being held on instruction by SeeCubic

12   of Delaware.

13              THE COURT:  Okay.

14   BY MR. KODOSKY:

15   Q    Okay.  Where is the Ultra D phone and tablet?

16   A    They're being held in -- in the SeeCubic Netherlands.

17   Q    Where are the AK-TVs?

18   A    They're being held in SeeCubic of the Netherlands, as well

19   as in the Jersey Island and Hawk's Office.  It's being held in

20   New York and London, and some other locations of SeeCubic of

21   Delaware.

22   Q    Did Stream TV have customers who were supposed to see the

23   phone and the tablet?

24   A    Post-bankruptcy, yes.  We had customers who were supposed

25   to see the phone and the tablet.
```

1   Q    Do have customers who wanted to see the AKTV?

2   A    Stream TV and technically we have customers who requested

3   to see the AKTV.

4   Q    How many customers after the Delaware Supreme Court ruling

5   were you supposed to show the phone tablet and AKTVs to, and

6   never did because SeeCubic was holding it?

7   A    At least 50 possibly more --

8            MR. COLBY:  Objection, Your Honor.  That misstates

9   the testimony.  At least for many of those devices, Mr. Rajan

10  testified that they were at SeeCubic B.V, not SeeCubic, Inc.

11  The questions was --

12           THE COURT:  He said SeeCubic B.V.

13           MR. COLBY:  The most recent question said, SeeCubic

14  without identifying, which.

15           THE COURT:  Well, then objection, please clarify,

16  which SeeCubic?

17           MR. COLBY:  Vague.

18           THE COURT:  Okay.  Which SeeCubic?

19           THE WITNESS:  The phone and tablet are at the B.V.,

20  is my understanding, and I think one phone is at SeeCubic,

21  London.  Then the AKTVs are in the Netherlands, and also

22  they're also in the Jersey Island and Hawk's offices as well as

23  New York and London, and I believe India, some of other

24  SeeCubic Delaware's offices.

25  BY MR. KODOSKY:

1  Q    Was BOE one of the customers that -- you mentioned there

2  were over 50 customers that wanted to see --

3  A    Yes.  BOE is one of the customers who was, and also our

4  supply chain financer, who was supposed to see the AK -- AKTV,

5  but we were not able to present it because it's not being

6  turned over.

7  Q    Do you have investors who are supposed to see the phone

8  and the tablet?

9  A    Yes, we do.

10  Q    Do you have investors who wanted to see the AKTV?

11  A    Stream TV does have investors who want to see the AKTV.

12  Correct.

13  Q    Did any investors quit because you didn't show them the

14  phone, tablet and AKTV?

15  A    Yes.  Some investors quit because the AKTVs and the phone

16  and tablets were not turned over as expected.

17  Q    How much hard cash did Stream TV get from VSI, and

18  companies VSI was working with, since you lost in Chancery

19  Court?

20        MR. COLBY:  Objection, Your Honor.  That --

21        THE WITNESS:  Ten million hard cash.

22        THE COURT:  Wait a minute.  Objection.

23        MR. COLBY:  I don't know the relevance.  I mean, I

24  know this is an issue we've addressed in the context of the

25  Hawk motions, but what is the relevance to the TRO?

1          THE COURT:  Counsel, relevance to the TRO?

2          MR. KODOSKY:  To the extent that -- it goes to

3  damages, Your Honor, the amount of money coming in, our

4  loss.

5          THE COURT: Counsel, are you relying on the cases that

6  say that potential damages and loss can be a basis for a TRO?

7  Is that -- is that what we're talking about?

8          MR. KODOSKY:  Yes, Your Honor.

9          MR. COLBY:  Your Honor, I think if they can quantify

10  the supposed damages by the amount of money from VSI, then it's

11  not irreparable harm, it's reputable by payment of damages.

12          THE COURT:  No Counsel, the cases say that when there

13  are damages and you can save, well, the damages, perhaps, it's

14  not that you can recover those specific, they're cases that

15  talk about how you establish that.  And you're right, if

16  damages, if it's money, you can do by money, right?  That's not

17  a TRO, that's a money -- that's a money proposition.  They are

18  cases that talk about something different, that's what I was

19  referring to.

20          I'll allow it for what it's worth, because counsel,

21  what they're saying is that the way I read the cases, was that

22  I have suffered damages, and they'll continue in the -- if you

23  continue to violate, and they're usually in trademark patent

24  cases where we've suffered this and we're going to continue in

25  the future, we don't know how much, but we are going to, and

1    it's proof that we're going to be injured, not proof of

2    specific dollar numbers.  I think that's what he's trying to

3    do.  I'll allow it for that purpose.

4            MR. KODOSKY:  Thank you, Your Honor.

5    BY MR. KODOSKY:

6    Q    How much hard cash did Stream TV spend since the

7    bankruptcy?

8    A    So far we've spent over 2 million and we're going to have

9    to spend a million in short order for the production, an

10   additional million for the production right now.

11   Q    What's the current situation in the Netherlands for

12   resources?

13   A    Currently right now the Netherlands is in very bad

14   financial shape.  The money that they requested, the B.V.

15   requested, even though was not given to them, and they've got a

16   huge amount of unpaid payroll taxes, they've also defaulted on

17   almost $60 million of debt to Stream TV.

18           Stream TV has a loan into the B.V., which we need to

19   get repaid.  That loan is in default over $60 million, which

20   we're collecting because we're trying to maximize the Debtor's

21   estate, and that's another immediate concern.  Now that

22   Stastney is the Director, we don't know what's going to happen

23   with the collection of our $60 million.

24           MR. KODOSKY:  Permission to approach, Your Honor?

25       (Counsel confer)

```
 1              MR. KODOSKY:  Permission to approach, Your Honor?

 2              THE COURT:  He shared.  Hand it to the -- he'll mark

 3   them and we'll hand them out to the witness.

 4              MR. KODOSKY:  This is D-42.

 5              THE COURT:  Okay.

 6              MR. KODOSKY:  Thank you.

 7   BY MR. KODOSKY:

 8   Q    Mr. Rajan, you've been handed what's been marked for

 9   identification as Exhibit D-42.  Do you recognize this

10   document?

11   A    Yes, I do.

12   Q    What is it?  It is SeeCubic of Delaware, their website.

13              MR. COLBY:  Your Honor, I, we'll see where this goes.

14   I think based on the Court's, court's prior rulings regarding

15   website's authentication may be an issue, and don't think

16   that --

17              THE COURT:  Right.

18              MR. COLBY:  -- based upon --

19              THE COURT:  I remember going through an exhaustive --

20              MR. COLBY:  Yeah.

21              THE COURT:  -- review of what websites.  I think

22   there was a Third Circuit case that I relied on, or maybe it

23   was a District Court, Third Circuit case that talked about the

24   reliability of websites, and there was a four-part test, I

25   think.  I've looked at so many issues, I think there was a
```

1    four-part test that I needed to look at and figure out.

2            I think that that issue, I'd said we weren't going to

3    -- I think it might've been the Chinese website with respect to

4    their location --

5            MR. COLBY:  Right.

6            THE COURT:  -- with respect to their address.  I

7    think that based on the issues given where it was, that it

8    could not be -- reliability was an issue.  I'll listen to the

9    questions and I'll apply the same test.

10           MR. COLBY:  That that's all we're seeking.

11           THE COURT:  Right.  Which I don't -- as I said, I

12   don't recall the name of the case, but I know I looked at it

13   and read it --

14           MR. COLBY:  Yeah.

15           THE COURT:  And came to some conclusion.

16           MR. COLBY:  I don't think it hinged on whether it was

17   a domestic or a Chinese would say.

18           THE COURT:  No.  But one of the thing was

19   reliability.

20           MR. COLBY:  Right.

21           THE COURT:  And one of the things that factored into

22   my issue of reliability was in China.

23           MR. COLBY:  Right.  So, and I'm not saying that there

24   isn't a witness who exists who couldn't authenticate this.  I

25   think, based upon your prior rulings, I would object that

```
 1   Mr. Rajan could, but we'll --

 2              THE COURT:  Right.

 3              MR. COLBY:  -- see where it goes.

 4              THE COURT:  Well, we will see where it goes.  Okay.

 5   Let's go, Mr. Dombroski (sic), let's see what we have.

 6   BY MR. KODOSKY:

 7   Q    Mr. Rajan, I was going to ask you to direct your

 8   attention to the executive profiles --

 9   A    Yes.

10   Q    -- portion of this, and whether or not there are any

11   SeeCubic B.V. employees that are, that you are able to

12   identify.

13              MR. COLBY:  Objection, Your Honor, we've --

14   BY MR. KODOSKY:

15   Q    There are several.

16              MR. COLBY:  Objection, Your Honor, we've --

17   objection, Your Honor, we've now jumped right to apparently the

18   substance of what Mr. Kodosky wants to ask about without

19   clearing any of those initial hurdles that the Court laid out

20   when we previously addressed this issue.

21              THE COURT:  All right.  So he's saying that before

22   you can even ask him questions about this document, you have to

23   meet, I guess authenticity, or you have to do something with

24   the document to either authenticate it, get it in under some

25   exception, because this is hearsay.  This is something that you
```

1   want to admit for the truth of the matter, and it's an out of

2   court, but namely, it's a website; and so how do you get that

3   in?

4            And I don't recall -- what was the name of the case?

5   Can you look that name up?  I know I -- it was -- we took a

6   break and I know that I spent some time researching that issue,

7   because it was a rather important issue with respect to, I

8   think it was Hawks.  I think -- well, I don't know if it was

9   you, Mr. Colby or Mr. Caponi who was trying to introduce it; I

10  don't remember.

11           All right.  So Counsel, he says, you need to lay a

12  foundation to get this in and on what basis, because it's

13  hearsay.

14           MR. KODOSKY:  It's a statement by a party opponent,

15  Your Honor, this is their website.  This is the SeeCubic, Inc.

16  SeeCubic of Delaware website.

17           MR. COLBY:  A couple of things, Your Honor, appears

18  to have been modified with some text added to the bottom of the

19  page.  But more importantly --

20           THE COURT:  What text was added to what?  That

21  circled portion?

22           MR. COLBY:  No, this www.seecubic.com website, page

23  one.

24           MR. KODOSKY:  We just printed it, Your Honor.  We

25  didn't --

```
 1              MR. COLBY:  Okay.

 2              MR. KODOSKY:  We didn't add any text.

 3              MR. COLBY:  I just -- this is why authenticity is an

 4    issue, and -- and so this isn't a hill I'm going to die on, I

 5    think there is a witness who could talk about this.  I don't

 6    think it's Mr. Rajan, but also, I don't think that this -- the

 7    objection I'm making now isn't purely a hearsay objection, it's

 8    just -- it's an authentication question.  And that's what --

 9    those were the hoops that we were forced to jump through --

10              THE COURT:  Right.

11              MR. COLBY:  -- previously.

12              THE COURT:  And then how do you -- well, the question

13    is --

14              MR. COLBY:  It may have been --

15              THE COURT:  Wait a minute.

16              MR. COLBY:  Sorry, Your Honor.

17              THE COURT:  You may try to authenticate it, I don't

18    even know who printed it for you, Mr. Colby, you just said,

19    here it is.  I had no testimony as to how -- if somebody said,

20    I went on the website, I searched, this is what I got.  This

21    is, I didn't have any of that from you, all I had was here it

22    is.  So I think they can lay a foundation to tell me what they

23    did, how they got it.  I don't know if that meets through

24    hoops, but it was a little bit different than what you're --

25              MR. COLBY:  And that -- but that's why I'm objecting.
```

1    Mr. Kodosky just went to asking about all that.

2              THE COURT:  Oh, I get it.  I get it.  He has to lay a

3    foundation first, like any other document.

4    BY MR. KODOSKY:

5    Q    Mr. Rajan did you have any involvement with print out of

6    this document?

7    A    Yes.  Yes.  I was involved in the printout.

8    Q    Tell me where -- tell us where you've -- where you

9    obtained this document?

10   A    When the -- it happened in two parts.  One was when the

11   Delaware Court receiver resigned when we filed bankruptcy and

12   turned things over to me.  In that transition it was clear, you

13   know, my new role that the SeeCubic B.V. people were heavily

14   involved in SeeCubic of Delaware, and then in my role as the

15   CEO in the Netherlands, and as Director, they were integrated

16   into SeeCubic of Delaware, and several of the employees of the

17   Netherlands were being promoted to investors and customers as

18   employees of the Delaware, almost as one company.

19             MR. COLBY:  Your Honor.  Sorry to be a stickler for

20   detail, but --

21             THE COURT:  That didn't answer the foundation.

22             MR. COLBY:  It didn't answer the foundation question.

23   We also, we just pulled up the website and if you hit print and

24   you get the image of what the printed out page is going to look

25   like, it doesn't have this seecubic.com website, page one.

1    I've never seen anything like that.

2            The pagination doesn't match, the actual pages that

3    are also on the document, which say 1 of 2, 2 of 2, and then 1

4    of 2, 2 of 2, it appears to be a compilation of several sub-

5    pages from that domain.  There's just a lot of questions here

6    that Mr. Rajan didn't answer.

7            THE COURT:  Okay.  Counsel --

8            MR. COLBY:  Counsel said they didn't add that, but it

9    doesn't -- it doesn't make sense.

10           THE COURT:  Well, the whole point of the matter is he

11   didn't answer how he got it.

12           MR. COLBY:  Right.

13           THE COURT:  He just talked about what it, what -- the

14   employees and who they were.  He went straight to the testimony

15   that you were objecting to, that he was relying on the document

16   and testifying from his own memory.

17           MR. KODOSKY:  Right.

18           THE COURT:  All right.

19   BY MR. KODOSKY:

20   Q    How did you get the --

21           MR. KODOSKY:  Can I ask a follow up question, Your

22   Honor?

23           THE COURT:  Sure.

24   BY MR. KODOSKY:

25   Q    Where did you -- how did you get this particular document?

1    A    You type in www.seecubic.com and then you print it on the
2    computer.
3    Q    Thank you.
4          MR. KODOSKY:  Move for the admission of this
5    document, Your Honor?
6          THE COURT:  So that he went in, he put in SeeCubic
7    and then this is what he got, and he printed it out?  So it
8    says,
9              "Printout for a website do not bear the indicia of
10             reliability demanded from other self-authenticating
11             documents.  To be authenticated some statement, or
12             affidavits from someone with knowledge is required."
13         So what does that mean?  So it says -- so how do you
14   properly authenticate? I think that was what it says, and then
15   I think it told me how you did that.
16         MR. COLBY:  Facially, Your Honor, not only does the
17   pagination not match what to our eye appears to have been added
18   on the bottom, but if you notice at the top there are date and
19   timestamps that come from different times --
20         THE COURT:  Well, it would be --
21         MR. COLBY:  -- 10:00, 12:00, 5:25 --
22         THE COURT:  -- when you print it -- well, Counsel, if
23   I go and print from my office, it's going to tell me at the top
24   when I printed it.
25         MR. COLBY:  Yeah.

1           THE COURT:  It's not going to tell me -- because this

2    says, look, who's talking about us HuffPost, Yahoo Finance, and

3    then down at the bottom is H -- you know, the typical, I don't

4    know what the stuff at the W, the page, the website, page 1, 2,

5    3, 4, 5.  I don't know if somebody added that.

6           MR. COLBY:  Yeah.  And also at the --

7           THE COURT:  Or I don't know --

8           MR. COLBY:  -- the timestamps at the top are at 5:25,

9    2:13, so they're out of chronological order from when they were

10   well printed.

11          THE COURT:  Well, one says -- well, no it's --

12          MR. COLBY:  5:30.

13          THE COURT:  -- 5:25, 5:25, 5:27 of -- and then

14   another one, which is a different page is on 2:13, 2:13 and

15   5:30, and then 5:30.  So apparently some of this was printed on

16   different days at different times.

17          MR. COLBY:  The same day, I think, but different

18   times by a couple of hours.  And again, it doesn't explain

19   this --

20          THE COURT:  Well, this was 10/12, at 5:23, 10/12 --

21          MR. COLBY:  It's all 10/12.

22          THE COURT:  Yeah.  They're all on 10/12, and they

23   were printed at different times.  Okay.  And you're saying that

24   this isn't -- they're not self-authenticating, so somebody has

25   to authenticate them.  And I think what I went through is how

 1   did you authenticate them?

 2        MR. COLBY:  Yeah.  And this thing on the bottom

 3   doesn't appear to be original to the website.

 4        THE COURT:  I don't know if it is or isn't.  You're

 5   going to have to tell me why it isn't, because You're going to

 6   say, here it is.  Here's what it is.  How do I know?  And just

 7   because you say it doesn't -- none of what you guys say,

 8   because you -- my favorite line to my kids, just because you

 9   say it doesn't make it so; I love that line.  So --

10        MR. COLBY:  Well, I guess that's the fundamental

11   basis of our objection.  What we heard from Mr. Rajan is, yeah,

12   yeah, I printed it out, and there's unanswered questions that

13   that don't seem to be --

14        THE COURT:  Okay.  So let's see what it says.  How do

15   you -- because the issue there was not even, it had to do with

16   a non-compete.  The issue that, the case in question, which is

17   Victaulic Company v. Tieman, and actually it wasn't -- it was

18   out of the -- it's 499 F.3d 227, 2007, and it's an opinion from

19   Judge Ambro.  It's a classic case of jumping the gun, and it

20   was a covenant not to compete, but that's a whole different

21   issue.

22        But in any event a court talked about -- and

23   significant for me was the issue of the website and how you

24   authenticate it, because it's not a self-authenticating

25   document under the exceptions to, I guess, self-authenticating

1    documents aren't hearsay.

2             So it says in that case, the question was -- and in

3    that case, they were asking the Court to take judicial notice.

4    This is a little bit different, because they're not asking me

5    to take judicial notice for something to be admitted, and it

6    had to do with, and I think that's what you guys were -- we

7    were focusing on, is whether it can be self-authenticated, such

8    that I could take judicial notice.  It didn't tell me.

9             It says in order for me to take judicial notice,

10   there was some additional steps that needed to be taken,

11   because they weren't self-authenticating.  So my question is,

12   we are, we're in a different process now.  They're not trying

13   to ask me to take judicial notice, and they're not arguing

14   self-authentication.

15            So how do we -- this is a document.  So you have to

16   meet the regular rules for how do you get this document in

17   here?  And I don't know, they didn't create it, you need to

18   tell me how --

19            MR. COLBY:  How, I really --

20            THE COURT:  -- how it gets in you.

21            MR. COLBY:  I really -- I don't mean to make a

22   mountain out of a mole hill, I just want to make sure we're

23   respecting the same evidentiary rigors that we were subjected

24   to a few weeks ago.

25            THE COURT:  Well, what -- but what I'm saying is that

1  the rigors that you went through is because you asked me to

2  take judicial notice of it.  That's a whole different -- a

3  different standard that I have to look at.  And it was a --

4  whether it was judicial notice, it has to be self-

5  authenticating.

6          MR. COLBY:  Uh-huh.

7          THE COURT:  And they're saying websites are not, you

8  need to authenticate it in a different way.  My point today is

9  that no one's asking me to do judicial notice.  They're asking

10 me -- he wants to ask him to authenticate this.  So I think at

11 this point, it's the same regular rules as how do you

12 authenticate the document?

13          So that's why I'm glad I looked at this case because

14 that was judicial notice.  This is, how does he authenticate

15 it, and I don't know if he can.

16          MR. COLBY:  All we ask is that they make an effort.

17 Thank you.

18          THE COURT:  Right.  All right.  How do -- you need to

19 authenticate this document; how do you do that?  Because it's

20 not judicial notice, I can't take that.

21          MR. KODOSKY:  It's not judicial notice, but it's a

22 statement by a party opponent.  It's an admission, it's their

23 website.

24          THE COURT:  Well, that question is, how do you now

25 it's our website?

1          MR. KODOSKY:  And it's also not hearsay.  It's not

2   being offered to prove the truth of the matter asserted.

3          THE COURT:  Well, you just thought it did by asking

4   them something about the employees being the same.  That would

5   definitely be for the truth of the matter.  I mean, you can

6   probably get there without this dang-gon document, but I can't

7   tell you, and I'm, you know, sometimes when I get a little

8   frustrated, I tend to take over and that's not my role.

9          All right.  Go ahead.  With respect to how do you --

10  you're going to need to lay a foundation for this document?

11  BY MR. KODOSKY:

12  Q    Did you have any involvement in printing this document out

13  from the internet?

14  A    Yes.  I printed it out, and I printed it out, and I also

15  did due diligence earlier on the involvement of the B.V.

16  employees vis-a-vis the --

17         THE COURT:  Wait a minute --

18         THE WITNESS:  -- website.

19         THE COURT:  Wait a minute.  Let's just stick right

20  now to the document itself.  We're trying to authenticate the

21  document, and what do you need to do?  We don't need to hear

22  about all the other people.  He can testify about that without

23  this website.  But right now we need to focus on authenticating

24  the document that you want to introduce into evidence.

25         And it's the same as any other document when you need

1    to authenticate it.  You need to do something, lay a

2    foundation, something, to get it into the record.  You said

3    that he printed it out and the process that he went through to

4    get it to print out, what did he do?

5            THE WITNESS:  I typed in seecubic.com into the

6    computer, and the website is the same website that is on other

7    documents that we have received for SeeCubic, where they have

8    referred to the URL as their website, and printed it out.  And

9    they've mentioned the website in numerous documents that we've

10   received and had numerous dealings with SeeCubic for the last

11   few years.  So we are -- we've confirmed numerous times that

12   this is their website, and we're also the owner of this URL,

13   Seecubic.com.  Stream TV is.

14           THE COURT:  So --

15           MR. COLBY:  Your Honor, I don't believe Mr. Rajan has

16   established that SeeCubic, Inc. of Delaware controls this

17   domain as opposed to SeeCubic B.V.  And I think he also, I'm

18   not sure it could be used as a statement by a party opponent if

19   he just said they own the domain.

20           THE COURT:  Well, he said they owned it.  So I need

21   some -- this says SeeCubic Company, and I don't know what

22   SeeCubic Company this is.  Okay.  Do you want to ask him some

23   further questions, Counsel?

24       (Counsel confer)

25   BY MR. KODOSKY:

1  Q    Mr. Rajan, do you know if -- are you familiar with

2  SeeCubic's LinkedIn page?

3  A    Yes, I am.

4          THE COURT:  What SeeCubic are we talking about?  We

5  need to be precise.  Because, I mean, I'm about to ask the

6  questions myself and I hate doing that because then that's not

7  my job, but I'm getting a little frustrated here.

8  BY MR. KODOSKY:

9  Q    SeeCubic of Delaware?

10  A    Yes.  I'm familiar with SeeCubic Delaware's LinkedIn page

11  and their website.

12  Q    Are you familiar with a button on the LinkedIn page that

13  takes you to this website?

14  A    Yes, I am.

15  Q    And you've got personal knowledge of that?

16  A    Yes, I have.  Yes.  I have that because they're -- some of

17  their employees are on my LinkedIn page, and they still wish me

18  happy birthday and stuff like that.

19          MR. KODOSKY:  Your Honor, we move the admission of

20  Exhibit D.

21          MR. COLBY:  Objection, Your Honor.  They've laid no

22  foundation as to who or what controls a SeeCubic LinkedIn page.

23  It's the same issue with respect to this document, but one step

24  removed.

25          THE COURT:  Okay.

1            MR. COLBY:  And whether or not it links doesn't

2    establish the control issues that I raised a minute ago with

3    respect to this document, it can link to anything.

4            MR. KODOSKY:  Again, Your Honor, this isn't a

5    judicial notice question.  We're moving to have this admitted

6    as a statement, or an admission by a party opponent.

7            THE COURT:  Which party?  Because it says SeeCubic.

8    I don't know which SeeCubic we're talking about.

9            MR. KODOSKY:  SeeCubic, Inc., Your Honor.

10           THE COURT:  What is this seecubic.com.  Okay.  Does

11   it just says SeeCubic --

12           MR. KODOSKY:  Mr. Stastney, their leadership team is

13   described here.  Executive profile, CEO, Chairman of the Board,

14   Chad Stastney.  The first picture you see they're smiling at us

15   under executive profiles.

16           THE COURT:  Okay.

17           MR. KODOSKY:  Mr. Rajan's picture isn't on here.

18           THE COURT:  Wait a minute.  Wait a minute.  Wait a

19   minute.  And I get his picture's not on there.  Okay.  So what

20   he's saying to me, Mr. Colby, is, Mr. Rajan did research, went

21   on the internet, put in SeeCubic, Inc.  SeeCubic, I don't know

22   if he put in Inc. or what, and this is what came up for

23   SeeCubic and on -- and this was part and parcel of what's on

24   the website.

25           And so the question -- and he printed out what he saw

1   on the website, and based on that they believe that that is

2   sufficient information to have this document authenticated as

3   to what he printed out from the SeeCubic website. which

4   SeeCubic.  I don't know.

5         MR. COLBY:  Correct, Your Honor.  And Mr. Rajan just

6   testified that Stream TV owns this domain.  So --

7         THE COURT:  Well, then if they own the domain, he can

8   testify his domain, I went in there and I printed -- you don't

9   want to go down that road.

10         MR. COLBY:  Well, then --

11         THE COURT:  You don't want to go down there --

12         MR. COLBY:  -- it's not a statement by a party --

13         THE COURT:  No, then it's his records.

14         MR. COLBY:  Sure. I mean --

15         THE COURT:  Then now we're going down the road of

16   it's his records, we on the website, I went on there and I

17   printed it out.

18         MR. COLBY:  Well, then, if it's his records, Your

19   Honor, then it doesn't shed much light on --

20         THE COURT:  Maybe it does, maybe it doesn't, I don't

21   know.

22         MR. COLBY:  On, you know, the TRO issues.

23         THE COURT:  Oh, okay.  Here we go.

24         MR. COLBY:  So --

25         THE COURT:  Let me see how we authenticate a website.

 1   Boy, I don't have 50 associates at my hand, but I have some

 2   good law clerks.  Okay.  Oh, look at that.  It says,

 3         "Few courts have considered how a website printout or

 4         block posting may be authenticated.  Those that have

 5         considered the issues have found that website

 6         printouts are sufficiently authenticated, where the

 7         proponent declared that they were true and correct

 8         copies of the page on the internet, and that the

 9         printouts included their page URL address and the

10         dates printed."

11         And they said the exhibits in that case -- and this

12   is a case of <u>Randazza vs. Cox</u>, which is out of the District of

13   Nevada.  Now none of that is obviously binding on me.  This is

14   another one, In re Terrorist Attack on September 11, 2001, and

15   this one says, and this one is out of the Southern District of

16   New York.  And it says,

17         "A finding that a printout of a website was more

18         likely to be authenticated where it remains

19         accessible to the public website as of the writing of

20         the opinion as the Court has verified."

21         Okay.  And none of the cases undermine that.  So

22   apparently to authenticate a website the person has to be able

23   to say that, and you're telling me that it remains Mr. Colby,

24   because you just went on there, and said that there's a

25   website.  What's the URL website that you were on?  Is it

 1  different from this one?

 2          MR. COLBY:  No, it's the seecubic.com, but it doesn't

 3  have --

 4          THE COURT:  But, Counsel --

 5          MR. COLBY:  -- this note on there, so --

 6          THE COURT:  Okay.  But then all the person has to

 7  tell me is that that they -- let's see.  It says all they have

 8  to contain -- the printout has to have URL, and that it was you

 9  know, they printed, it's on the, it's on the internet.  It has

10  the URL on it, and that's sufficient.

11          So I'm not quite sure how it doesn't -- at least

12  according to these cases, meets the requirements for

13  authentication.  You are saying that the printout, if you go on

14  the website, doesn't have website page one?  I'm pretty sure it

15  probably doesn't, but do we know if you print it out --

16          MR. COLBY:  Yes, you --

17          THE COURT:  Does it have that?  At the bottom it says

18  HTPCS www.seecubicinc.com Company. So we have a URL, and if you

19  put that -- take aside from this other, like striking the

20  little page numbers, everything else has a URL on it, and it

21  was printed, seems to me the date printed was 10/12/25 -- 23 of

22  5/25.  So these different pages meet the requirement, at least

23  with respect to the date printed, and the URL number.  You

24  know, I don't know what this other -- if that was because of

25  what came out when it was printed.

1          But with respect to the -- everything in between

2     there, in between the date and the URL, seems to me the

3     definitions at least from, you know, I guess this is like no

4     circuit court, because they're saying few courts have addressed

5     it.  And so actually I have three cases.  I have, wait, one

6     from Delaware, one from Nevada, one from Southern District of

7     New York.  And let me see, hold on.  Oh, that's my other --

8     that's my judicial notice case.

9          So it seems to me, based on these two courts'

10    discussion on how you authenticate, they've met that by saying,

11    I went on the website, I printed it out, that's the URL and

12    this is the date.  Counsel I get -- I don't know how the

13    printout and you, I can't say that when it prints out it

14    doesn't tell you website page one.  I don't know.  But

15    Mr. Rajan's testimony is that that's how it came out when he

16    printed it?

17         MR. COLBY:  Yeah.  I don't -- I don't know that he

18    was specifically asked about that footer, but I think I've

19    stated my objection.  I understand the Court's --

20         THE COURT:  Overruled.

21         MR. COLBY:  -- likely to rule --

22         THE COURT:  Because, Counsel the guidance that I'm --

23    as again, I don't have a circuit court, I don't even have a

24    district court here, and this is more persuasive.  I, you know,

25    if there's another court who's addressed the issue, I am not

1  about to try to go and write an opinion on that.  I will take

2  what those courts have said.  So counsel, I believe you've

3  authenticated --

4          MR. KODOSKY:  Thank you.

5          THE COURT:  -- the website.

6          MR. KODOSKY:  Thank you, Your Honor.

7  BY MR. KODOSKY:

8  Q    Mr. Rajan there's a few things on this printout that I'm

9  going to ask you about, including, I want to direct your

10 attention to page 10, offices and contact information?

11 A    Correct.

12 Q    Whose offices and contact information are listed here?

13 A    These are the offices of SeeCubic of Delaware in New York

14 and London, and they're claiming the Eindhoven --

15         THE COURT:  Okay.  Where are we at?

16         THE WITNESS:  I'm sorry, Your Honor, page 10.

17         MR. KODOSKY:  Page 10.

18         THE COURT:  Wait a minute, I have --

19         MR. KODOSKY:  Website page 10 at the bottom.

20         THE COURT:  I only have 8 pages.

21         MR. KODOSKY:  Your Honor, this --

22         THE COURT:  I don't have -- I only have eight pages.

23 How many pages do you have, Mr. Colby?

24         MR. COLBY:  Well, according to what I believe to be

25 the added page numbers, we have 10.

```
 1              THE COURT:  Counsel, okay.  Page 7 --

 2              MR. COLBY:  Sorry, take that back we have 11.

 3              THE COURT:  Well, I have 8.

 4              MR. COLBY:  Right.

 5              THE COURT:  The last page I have says, Dr. Bart

 6    Barenbrug, Ph.D.

 7              MR. KODOSKY:  I can -- I can swap.

 8              THE COURT:  All right.  Make sure Mr. Colby has the

 9    same thing.  All right.

10              MR. KODOSKY:  It's 11 pages.

11              THE COURT:  All right.  Can somebody give me the

12    correct -- here, John, take this back.  All right.  Does the

13    one Mr. Rajan have 11 pages?

14              MR. KODOSKY:  I does, Your Honor.

15              THE WITNESS:  Yeah.  Yes, it does.

16              THE COURT:  Okay.  So we go on to page 10?

17              MR. KODOSKY:  Yes, Your Honor.

18              THE COURT:  All right.  Page 10.  Hold on.  Page 10,

19    Exhibit 42.  Okay.  All right.

20    BY MR. KODOSKY:

21    Q    Whose offices and contact information is shown on page 10?

22    A    These are the offices of SeeCubic of Delaware and New York

23    and London, and they're claiming the Eindhoven SeeCubic B.V. as

24    one of their offices.

25    Q    I'm sorry, I missed that last --
```

199

```
 1   A    The Eindhoven one is in the Netherlands.  They're claiming

 2   the SeeCubic B.V. as one of SeeCubic Delaware's offices.

 3   Q    They're mixing up the SeeCubic --

 4   A    They're -- they're, they're saying it's integrated.  Yeah.

 5   They're basically inferring that it's integrated.

 6   Q    And same questions with respect to the leaders, the

 7   executive profiles that began on page 4.

 8   A    Yes.

 9   Q    First question.  Do you recognize any former Stream TV

10   employees that are shown amongst the executive profiles for

11   SeeCubic, Inc.?

12   A    There are a number of former Stream TV employees and

13   number of current Stream TV employees on this website.  The

14   people in the Netherlands are listed on the website of

15   SeeCubic, a Delaware.  If you go here on page 4, down at the

16   bottom where it has Sheeba Rajesh, Dr. Bart Barenbru,

17   Andy James is a Netherlands employee, and so is Bram Riemens,

18   and then Patrick Theune --

19             THE COURT:  Wait a minute, one at a time.

20             THE WITNESS:  Sorry.

21             THE COURT:  The first one you said was Sheeba Rajesh.

22             THE WITNESS: Rajesh, right here.

23             THE COURT:  Okay.  What is she, what's --

24             THE WITNESS:  She is listed as a Senior Vice

25   President of Science --
```

```
 1                  THE COURT:  And she is --
 2                  THE WITNESS:  -- for SeeCubic of Delaware. She has
 3   a --
 4                  THE COURT:  And she has what, with respect to some
 5   other company?
 6                  THE WITNESS:  She works in the Netherlands for a
 7   stream subsidiary called SeeCubic B.V.
 8                  THE COURT:  Okay.  So she works for SeeCubic B.V.
 9   All right.
10                  THE WITNESS:  But she's being listed in SeeCubic --
11                  THE COURT:  I get it Mr. Rajan.  Next?
12                  THE WITNESS:  Then they're listing Patrick Theune as
13   the head of technology for all of SeeCubic of Delaware.  He
14   works in SeeCubic B.V. in the Netherlands, a Stream TV
15   subsidiary.  Then Dr. Bart Barenbrug is listed as a Senior Vice
16   President of Research and Development at SeeCubic of Delaware,
17   but he works in SeeCubic B.V., which is a Stream TV subsidiary.
18                  Then Andy James is listed as Vice President of
19   Industrialization Manufacturing, on page 5.  He is a SeeCubic
20   of the Netherland's employee, and he's listed on SeeCubic of
21   Delaware as their Vice President of industrialization.
22                  Then Bram Riemens is a Senior Executive Advisor,
23   system architecture listed.  He works in the Netherlands for
24   Stream, you know, Stream TV subsidiary, but he's being listed
25   as that title in SeeCubic of Delaware.
```

1    BY MR. KODOSKY:

2    Q    What effect is this having by co-mingling the Stream, the

3    SCVB employees with the SeeCubic employees on the SeeCubic

4    website; what impact is that having on the marketplace?

5    A    Well, it's having two major impacts.  When I did my due

6    diligence on this, they're shifting -- SeeCubic of Delaware is

7    shifting customers and investment to -- away from the Debtor to

8    another company, because the Debtor and the Debtor's assets are

9    in the process of reorganizing right now.  And money is being

10   spent on the B.V., which Stream TV has to pay back, putting a

11   burden on the Debtor's Estate, and this is continuing every

12   day, and they're pulling things away and it's causing confusion

13   in the marketplace.

14   Q    Confusion in the marketplace is the thing that I was going

15   to ask you about with respect to -- if you'll turn to page 6.

16   A    Yes.

17   Q    Would this, in your opinion, cause a reader of the website

18   to believe that Patrick Theune, am I pronouncing that name

19   correctly?

20   A    Yes.

21   Q    Has been -- well, it looks like it's got his bio there

22   stating that he's been working, experience from working in

23   research and development.  Would this cause a reader to believe

24   that this head of technology was an employee of SeeCubic, Inc.?

25            MR. COLBY:  Objection.  Objection, Your Honor, as for

```
 1   Mr. Rajan to speculate about what a generic unidentified reader

 2   may think.

 3              THE COURT:  Counsel.

 4   BY MR. KODOSKY:

 5   Q    What does it cause you to think?

 6   A    At, in my role, both at Stream TV, and I was the head of

 7   SeeCubic Netherlands, in my discussions with them, I asked

 8   them, where are you working, are you working in the

 9   Netherlands, or are you working for Delaware, and you're being

10   integrated as an employee of the Delaware --

11              MR. COLBY:  Move to strike.

12              THE WITNESS:  And that's the way --

13              MR. COLBY:  -- Your Honor.

14              THE COURT:  All right.

15              MR. COLBY:  I was trying not to interrupt.

16              THE COURT:  All right.  The question is, what did it

17   cause you to think?  We don't need to know about your

18   discussions with people outside of court?  What, looking at

19   this, what did it cause you to think?

20              THE WITNESS:  My first -- my first reaction was they

21   left our subsidiary and went to work for a competitor.

22              THE COURT:  Okay.

23   BY MR. KODOSKY:

24   Q    Page 7.  Do you see the bio for Dr. Sheeba, am I

25   pronouncing her name correctly, Rajesh?
```

```
 1   A     Rajesh.

 2   Q     Rajesh, Ph.D.?

 3   A     Correct.

 4   Q     Is she employed by SeeCubic, Inc.

 5   A     No.

 6   Q     SeeCubic of Delaware?

 7   A     No.

 8   Q     Who is she employed by?

 9   A     SeeCubic of the Netherlands.

10   Q     Which is a Stream subsidiary?

11   A     It is a Stream subsidiary.

12   Q     And this bio is saying, do you see where it says

13   responsible for all the optics division activities of the

14   company?

15   A     Correct.

16   Q     In the field of autostereoscopic display technology.  Am I

17   reading that correctly?

18   A     That is correct.

19   Q     Does SeeCubic, Inc., or SeeCubic of Delaware even have an

20   optics division?

21   A     No.

22   Q     Does SeeCubic, Inc., or SeeCubic of Delaware employ any

23   physicists with specialization in optics and photonics?

24   A     No.

25   Q     As a competitor to Stream TV, how is this impacting Stream
```

1   TV?

2   A    It's causing a huge problem for both customers and

3   investors, and also both new investors and people who have

4   given money here for the bankruptcy, as to why our employees

5   are being promoted to investors and companies, after we filed

6   the bankruptcy, and after we won in the Supreme Court.

7   Q    And this bio goes on to state that she's keen to interact

8   with customers, suppliers, and partners.  If Dr. Sheeba Rajesh,

9   Senior Vice President of Science for SCBV is being held out on

10  SeeCubic Inc.'s website as being part of the leadership, I'm

11  sorry, the executive leadership team for SeeCubic, Inc., how is

12  that impacting Stream TV?

13  A    It's having a massive impact for both customers and

14  investors, and you know, and we have you know, we have

15  contracts in place with all the various parties and, you know,

16  it's -- it's, it's a gigantic problem and it continues every

17  day, right now.

18  Q    If you turn to page 8, just briefly, the bio for Dr. Bart

19  Barenbrug, Ph.D.

20       THE COURT:  Wait a minute, counsel, I got to get

21  another page.

22       THE WITNESS:  Yeah.

23  BY MR. KODOSKY:

24  Q    Do you see where Doctor --

25       THE COURT:  Wait a minute, Counsel.

```
 1              MR. KODOSKY:  I'm sorry, Your Honor.

 2              THE COURT:  I'm not there yet.

 3              MR. KODOSKY:  Sorry.

 4              THE COURT:  Go ahead.

 5   BY MR. KODOSKY:

 6   Q    Do you see on page 8, the bio for Dr. Bart Barenbrug,

 7   Ph.D.?

 8   A    Yes, I do.

 9   Q    And he's described as Senior Vice President, Research and

10   Development?

11   A    Yes.

12   Q    Again, does SeeCubic, Inc. have any research and

13   development employees?

14   A    No.

15              THE COURT:  Which SeeCubic?

16              THE WITNESS:  SeeCubic at Delaware.

17              MR. KODOSKY:  Inc., of Delaware.

18              THE COURT:  Any what what, research and development

19   you asked?

20              MR. KODOSKY:  This describes him as being a Senior

21   Vice President Research and Development.

22              THE COURT:  Okay.

23   BY MR. KODOSKY:

24   Q    Halfway through that bio, do you see where it states that,

25              "Culminating in the founding of SeeCubic and
```

1              Eindhoven in 2011, where he has worked since, leading

2              a software team that works on a variety of topics

3              ranging from content tools, conversion and rendering

4              algorithms, implementing the latter for a variety of

5              platforms."

6              Do you see that discussion?

7    A    Yes.

8    Q    And that's actually, truth be told, the work that he's

9    done for Stream subsidiary SCVB, correct?

10   A    Yes.  This one is the most damaging because he's the

11   inventor of the original formula.  Stream TV has turned it into

12   electronics, they did in software, we did it in hardware.  But

13   he's the original inventor of the formula.  He was heavily

14   involved with me at Stream TV.  He's gone to investor meetings.

15   We've flown in to meet with customers.  Stream TV since we've

16   been reorganizing the customers and some of the investors who

17   are previously looking at the company, I've been asking him to

18   get on the phone, but we have a huge problem because he's been

19   co-opted by SeeCubic of Delaware.

20             THE COURT:  All right.  Leave the -- Mr. Rajan, just

21   say he now works for them.

22             THE WITNESS:  Okay.

23             THE COURT:  Again, I'm trying, everybody, to just

24   keep it generic.

25             THE WITNESS:  Okay.

1          THE COURT:  I get, I get it, but it doesn't advance

2     the cause.  Okay.

3     BY MR. KODOSKY:

4     Q    The fourth line from the bottom of his bio where it states

5     "In that work, he closely collaborates with mainly the optics

6     and firmware teams to optimize the technology across the

7     different parts of the solution."  Does SeeCubic, Inc., or

8     SeeCubic of Delaware, does it have an optics and firmware

9     teams?

10    A    No.  He works with Sheeba Rajesh and Bram Riemens on the

11    optics in the firmware, that work in the Netherlands.

12    Q    And the next line, it says he has several patents to his

13    name, both from the time at Philips and at SeeCubic.  Do you

14    see where I'm reading from?

15    A    Yeah.  His name I think is on all the patents that Stream

16    TV paid for.  I believe so.

17    Q    Is this essentially leading the reader to believe that

18    SeeCubic has patents, SeeCubic, Inc., or SeeCubic of Delaware

19    have patents that they do not?

20         MR. COLBY:  Objection, Your Honor --

21         THE WITNESS:  Yes, it is.

22         MR. COLBY:  -- to the extent of it is asking what

23    the, -- I think the way the question was phrased, is it leading

24    a reader to believe?

25         THE COURT:  A reader to believe.

```
 1              MR. COLBY:  It's either about a reader, not Mr.

 2   Rajan.  So it's inappropriate in that way, or it's asking

 3   some --

 4              THE COURT:  What is --

 5              MR. COLBY:  -- sort of intent question?

 6              THE COURT:  Or what does he -- what it leads him --

 7   once he reads this, what does he thinks it means?

 8              MR. COLBY:  Right.  Thank you.

 9   BY MR. KODOSKY:

10   Q    What's your -- what's your --

11   A    My impression that he's left our subsidiary and is working

12   for another company, and may have -- the patents may have gone

13   out of our company.

14   Q    What impact does that have on Debtors and Debtors' estate?

15   A    It has a dramatic impact on customers, and investors, and

16   shareholders, and vendors, and suppliers, and also all the

17   people that Bart has met with through Stream TV.

18   Q    Why did you not give the specs earlier to the Netherlands?

19   A    Because we were -- I was concerned that it was going to be

20   shared with Shad Stastney and SeeCubic of Delaware by one of

21   the employees.  And some of the employees would've kept it

22   confidential, but they were feeling extreme -- you know. in my

23   role as CEO of the Netherlands, there was tremendous

24   awkwardness because of you know, what was happening with

25   SeeCubic of Delaware.
```

1   Q    What is the cost of the Netherlands per month?

2   A    Currently they are spending 750,000 euros a month, and

3   they've been doing that for quite a while.

4   Q    Is that because they're working on SeeCubic, Inc., or

5   SeeCubic of Delaware projects?

6   A    They are working on SeeCubic of Delaware projects, no

7   Stream TV projects.

8   Q    What is the proper cost of the Netherlands per month?

9   A    Stream TV believes that the proper cost is only about a

10  hundred thousand euros a month.

11          THE COURT:  It's how much?

12          THE WITNESS:  A hundred thousand Euros a month.  And

13  our concern is that that differential could have gone to the

14  unsecured, it's now in the form of a loan that Stream TV has to

15  pay back, which is a burden on tech, innovative and Stream TV's

16  estate.

17          MR. KODOSKY:  Permission to approach, Your Honor.

18          THE COURT:  Sure.

19          MR. KODOSKY:  This has previously been marked for

20  identification as D-2.

21          THE COURT:  We won't do it now.  Hold on one second.

22  Okay.  All right.  Counsel, go ahead.

23          MR. KODOSKY:  And, Your Honor, I don't know if this

24  has been moved.  If we moved this into evidence.  We had asked

25  Mr. Stastney about this document, he recognized that.

1              THE COURT:  Can you see John, if D-2 was admitted --

2              THE CLERK:  Sure

3              MR. COLBY:  It's already been admitted, I believe,

4    correct?

5              MR. KODOSKY:  That's what I'm not clear about.

6              THE CLERK:  I have it on our list, but not circled.

7    So I don't remember --

8              MR. COLBY:  Oh.

9              THE CLERK:  -- if it what's totally admitted or not.

10             MR. COLBY:  Yeah.  I guess he introduced it and

11   discussed it, but it wasn't admitted.

12             MR. KODOSKY:  Any objection?

13             MR. COLBY:  I mean, if he'd authenticate it.

14             MR. KODOSKY:  Mr. Stastney has already stated that he

15   recognized it, whenever we ask some questions about it.

16             MR. COLBY:  I'll state it for the record, Your Honor,

17   I'll state a relevance objection, because it's from Q2, 2022.

18   We're back to that.  But I'll state that objection for the

19   record and sit down.

20             THE COURT:  Okay.  All right.  Go ahead Mr. Rajan --

21             MR. KODOSKY:  Thank you, Your Honor.

22   BY MR. KODOSKY:

23   Q    Mr. Rajan, have you ever seen this PPM before?  Yes, I

24   have.  When did -- where did you see the PPM and when?

25   A    I was -- this is the second time I was invited to a

1    meeting in New York to see if I wanted to personally invest in

2    SeeCubic of Delaware.  And this was handed to me by people

3    representing SeeCubic of Delaware.

4    Q    What did you do when you saw the PPM?

5    A    Well one, I was surprised what was in it.  It was in the

6    winter of 2022 well after the SeeCubic -- I'm sorry, the

7    supreme court ruling, and they were talking about sublicensing.

8    They were talking about our employees.  I immediately called

9    the CEO of Rembrandt to let him know that they were clearly

10   soliciting people saying that they're sublicensing, and they

11   were planning to sublicense the technology, which puts us in

12   risk with our IP licenses.

13   Q    What action did Rembrandt take?

14   A    Rembrandt filed a lawsuit against Technovative because

15   there was a Receiver in at that time and they also sued

16   SeeCubic and Shad Stastney.  I did prevent them from filing a

17   lawsuit against the Receiver for trade secret and IP and

18   license violations.

19   Q    I'm sorry you said SeeCubic.  Are you referring to

20   SeeCubic of Delaware?

21   A    SeeCubic of Delaware and they sued Technovative.  Sued

22   Technovative.  They sued Technovative because Technovative has

23   control of the subsidiaries and Stream TV does.

24   Q    What was the problem with Stream TV to cause this action?

25   A    The problem was is that SeeCubic was, through this

1  document, soliciting investors saying that they were using a

2  sublicense model, and this is the time when it was, you know,

3  it was known to people in the industry that Phillips was

4  beginning to sell their Patent's.  And Rembrandt was dead set

5  against sublicensing.  And also, the technology was being

6  misappropriated it appeared.  And Stream TV employees were

7  being passed off as SeeCubic employees and they were openly

8  talking about licensing a number of items in here that violate

9  the Rembrandt claims.

10        You know, if you go here to the sublicensing, when it

11 goes to the revenue, it talks about the SeeCubic pros, the

12 SeeCubic coder, the optical stack, and also, you know, the IP

13 course.  So we informed Rembrandt what was happening.

14 Q    Where was Rembrandt's technology used?

15 A    Rembrandt had four claims.  One claim had to do with

16 content that in all the devices, the automotive and the TV's

17 and the gaming had to do with content.  And that is what is at

18 risk with these demo units such as the AK and the automotive,

19 the trade secret.  That is one of the Rembrandt claims is being

20 leaked out because it's not secure.

21        Then in the TV's, there's three other claims that

22 have to do with real time conversion and how to protect being

23 able to see things like menus and others that's inside the TV

24 product, which is in these various offices and being shown to

25 various companies.  You know, as my role it has the

1    Netherlands, it's a security risk having -- leaving the TV's

2    behind.  But they're being left behind in a wide range of

3    locations.

4              MR. KODOSKY:  Permission to approach, Your Honor?

5              THE COURT:  You may.

6              MR. KODOSKY:  If we didn't move this into evidence --

7              MR. COLBY:  Can I see that again?  That looks

8    different.

9              MR. KODOSKY:  -- at the last hearing, Your Honor.  We

10   would do so now.

11             MR. COLBY:  Well, this is different then the one.  It

12   just doesn't have the address on the top.  It's just a

13   different document.  Is this another Saturday night?  This is

14   another Saturday night document?

15             MR. KODOSKY:  This is number six on our exhibit list.

16             THE COURT:  Let's refrain from the Saturday night.

17   This was D1 from the last hearing?

18             MR. COLBY:  No.  The document I have as D1 is

19   different.  The one I have as D1 it says on top valid October

20   1, 2023 and it starts with issuer and size.

21             THE COURT:  Well, that's what I have.

22             MR. COLBY:  Yeah.  This is -- what I was just shown

23   was a different document.

24             THE COURT:  Well, this is proposed terms for bridge

25   loan valid October 1, 2023.

```
 1              MR. COLBY:  Yeah.  That's not what I was just shown.

 2              THE COURT:  Oh.  Well, that's what I have.  He must

 3    have gave you the wrong copy.

 4              MR. COLBY:  Well, I don't know which one we're

 5    talking about.

 6              THE COURT:  Are we talking D1 or D4?

 7              MR. KODOSKY:  This is D4, Your Honor.

 8              THE COURT:  Well, I have D1.

 9              MR. KODOSKY:  You have --

10              THE COURT:  Dated October 1st, 2023.  SeeCubic up to

11    $5 million.

12              MR. KODOSKY:  Let me take this back.

13              THE COURT:  Take it back and I don't know what we're

14    doing.

15              MR. COLBY:  Okay.  I've got a bunch of pages.  Some

16    look the same.  Some don't.  The pagination doesn't make sense.

17              THE COURT:  Why don't we take a little bit of break

18    because I'm starting to get a little queasy here.  I need to

19    get some medicine.  All right.  We need a ten-minute break.

20    We'll come back at 5:00.

21              I mean, are we going to -- I want to try to finish

22    tonight.  And I'm sure by the time we finish the good old

23    demonstration will be over and we go until 7:00.  I don't want

24    to go past 7:00.  I don't know if I can.  I'm going to go see

25    if I can.  But can we wrap this up by 7:00?  I don't want to
```

1   have to come back here because then we're going to have to have

2   everybody's schedule.  And, I mean, it's up to you.  I would

3   like to get it done today, and I thought we would if we didn't

4   waste -- on issues.  But how much longer do you think you have

5   for Mister --

6           MR. KODOSKY:  I'd say 30 to 45 minutes, Your Honor.

7           THE COURT:  And Mister -- you probably need an hour,

8   hour-and-a --

9           MR. COLBY:  Yeah.  I've got some cross obviously.

10  And then there's a good chance we'll have to recall Mr.

11  Stastney.  You know my position that there's a whole bunch of

12  new facts that --

13          THE COURT:  So we're going to be past 7:00?  So

14  counsel, I think what we may have to do is wrap up Mr. Rajan's

15  direct and then get another date.  There's no way we're going

16  to finish this by 7:00 o'clock.  There's just no way.  And I

17  don't want to stay here past then.  I mean, I have been known

18  to go to 10:00-11:00.  But this, I'm not doing that.  Not

19  today.  So how about we take a recess, come back at 5:00

20  o'clock?  You can get your exhibits together and I can go get

21  something for my nausea.  So court is in recess until 5:00

22  o'clock.

23          MR. KODOSKY:  Thank you, Your Honor.

24      (Recess taken)

25          THE BAILIFF:  All rise.

```
 1              THE COURT:  Please be seated.  Counsel, you may

 2   proceed.

 3              MR. KODOSKY:  Mr. Rajan, you've been handed what has

 4   previously been marked as Exhibit D1, which we move into

 5   evidence, Your Honor.  Do you have any objection?

 6              MR. COLBY:  No objection, Your Honor.

 7              THE COURT:  All right.  Admitted.  Okay.

 8        (Plaintiff's Exhibit D1 admitted into evidence)

 9   BY MR. KODOSKY:

10   Q    Mr. Rajan, have you ever seen this document before?

11   A    Yes, I have.

12   Q    What is it?

13   A    This is a subscription agreement that SeeCubic used to

14   raise money just to -- like two weeks ago.

15   Q    Where and when did you see this subscription agreement?

16   A    It was given to me by Stream TV shareholders had given it

17   to me and we put it into the records at Stream TV.

18   Q    I'd like to direct your attention to page 7 of 17,

19   subparagraph F.

20   A    Page 17?

21   Q    Seven of 17.

22   A    Okay.  Yes.

23   Q    Part of the paragraph there in paragraph F where it states

24   that there is no lawsuits against the company.  Against --

25   involving any of their respective officers or directors that
```

1  would be expected to have a materially adverse effect.  Do you

2  see that language?

3  A    Yes.

4  Q    What's your response or what's your reaction to that

5  language?

6  A    Right now there is between Stream TV and Rembrandt $2

7  billion dollars' worth of active lawsuits against SeeCubic of

8  Delaware.  And they are in fact IP claims and trade secret and

9  offset claims, and you know, we're not supposed to mention

10  lender liability, but other types of claims against SeeCubic of

11  Delaware.  So it's a ludicrous statement.

12  Q    I'm sorry.  Did you say $2 million or $2 billion?

13  A    Two billion dollars in active lawsuits.  This is one of

14  the lawsuits against SeeCubic of Delaware.  This statement is

15  ludicrous.

16  Q    What's your understanding of who approved this

17  subscription agreement?

18  A    My understanding is --

19         MR. COLBY:  Objection, Your Honor.  Foundation.

20         THE COURT:  How does he know anything about this?

21         THE WITNESS:  By --

22         THE COURT:  You don't answer.  He's got to respond.

23         MR. KODOSKY:  I can ask a follow up question, Your

24  Honor.

25         THE COURT:  Yes.  Rephrase this question.

1   BY MR. KODOSKY:

2   Q    What understanding do you have of who approved this

3   subscription agreement?

4   A    I know because they've approached me twice for investment.

5   So the brokers didn't know who I was.

6        THE COURT:  Tell us how you understand.  You said

7   they've approached you.  Who is they?

8        THE WITNESS:  The brokers and brokers and other

9   people who have put money into SeeCubic told me.  That I was

10  invited to meetings and phone -- telephone calls to make an

11  investment at SeeCubic.  They didn't realize who I was.  So the

12  shareholder knew who I was.  And they told me what was

13  happening, so I know how it was approved.

14  BY MR. KODOSKY:

15  Q    And what is your understanding of who approved the

16  subscription agreement?

17       MR. COLBY:  Objection, Your Honor.  Hearsay.  Mr.

18  Rajan just said they told me what was happening.

19       THE COURT:  Okay.

20  BY MR. KODOSKY:

21  Q    Told by agents of party opponents?

22  A    Agents of SeeCubic.  I was told and my due diligence is --

23       MR. COLBY:  Objection, Your Honor.

24       THE COURT:  Well, he's saying it was an agent of a

25  party.

219

1          MR. COLBY:  Right.  He initially said shareholders.

2    Now he's identified these -- mainly identified brokers.  I

3    don't know who he's talking about.

4          THE COURT:  Well, he said brokers.  He said he was

5    approached by brokers and others to invest.  And his understand

6    was more than just a share.  He was talking about, at least

7    from my notes, brokers, and other representatives of --

8          MR. COLBY:  I think that's almost self-provingly

9    (sic) unreliable in the sense that --

10         THE COURT:  Well, I don't know what to tell you.

11         MR. COLBY:  He's proposing the somewhat unreasonable

12   scenario where these statements can be held against, for

13   example, SeeCubic because they're a statement of an agent.

14         THE COURT:  Well, why don't we ask him who the agents

15   are?

16         MR. COLBY:  And it's unreasonable to think that

17   SeeCubic -- that those agents were acting at SeeCubic's

18   direction to try to raise money for Mr. Rajan when he just

19   testified there's $2 billion dollars' worth of litigation

20   between the two companies.

21         THE COURT:  Well, he also testified they didn't know

22   who he was.  So let's ask him who these agent -- he said

23   brokers didn't know who he was.  Ask him who the agents were.

24   BY MR. KODOSKY:

25   Q    Who were the agents?

```
 1   A     There were several.  One -- the first time it happened it

 2   was Mark Danenberg (phonetic) and the second time it happened

 3   it was a friend of a Asaf Gola, who's on their board.

 4             THE COURT:  Who?

 5             THE WITNESS:  Asaf Gola who is a member of the board

 6   and one of the Defendants in the lawsuit.

 7             THE COURT:  What's his name?

 8             THE WITNESS:  The broker's name is Jonathan --

 9             MR. COLBY:  Objection.  I think Mr. Rajan -- are you

10   looking something up in your phone?

11             THE WITNESS:  Yeah.  I'm trying to find Jonathan's

12   last name.  Sorry.

13             MR. COLBY:  He can't be looking up stuff in his

14   phone.

15             THE COURT:  You can't look at any documents.  Just

16   tell us -- you said it was Mark Denenberg.  Who is he?

17             THE WITNESS:  He's one -- he was their broker at the

18   time.

19             THE COURT:  Broker for --

20             THE WITNESS:  SeeCubic of Delaware.

21             THE COURT:  Broker for SeeCubic.  And then you say

22   another guy.  What was his name?

23             THE WITNESS:  First name was Jonathan.  I can't

24   pronounce  his name.  It's a very long Jewish name.  He's

25   friends with Asaf Gola who's on the board of directors.
```

1              THE COURT:  He's friends with who?

2              THE WITNESS:  Asaf Gola who is on their board of

3    directors.

4              THE COURT:  Could you spell that for me, Asaf Gola?

5         (Phone ringing)

6              THE WITNESS:  A-S-F --

7              THE COURT:  Who's phone is that?

8              THE WITNESS:  That's mine.  I turned it off.  Sorry.

9              THE COURT:  No.  Hand that phone to John.

10             THE WITNESS:  All right.  No problem.

11             THE COURT:  Make sure to tell these people don't come

12   here with phones.

13             MR. KODOSKY:  I think Asaf Gola is on the Defendant

14   list, I think.

15             THE COURT:  Okay.  Okay.  I see A-S-A-F Gola.

16             THE WITNESS:  Yeah.

17             THE COURT:  Asaf Gola.  He's a friend of Asaf Gola

18   and he was a broker too?

19             THE WITNESS:  Yeah, in New York.

20             THE COURT:  Okay.  And they approached you about?

21             THE WITNESS:  Yeah.  The approached me for

22   investment.  And the other one came through SeeCubic

23   shareholders via Kevin Gallop, who's also a board member and a

24   Defendant in the lawsuit.

25             THE COURT:  Okay.

1          MR. COLBY:  So, Your Honor, I would maintain the

2    objection in the face of that answer.  A shareholder who knows

3    Mr. Gallop is not an agent.  A friend of Mr. Gola is not an

4    agent.  And Mr. Rajan identified Mr. Danenberg.  Mr. Danenberg

5    has appeared in this case in the sense that we've seen some

6    emails and documents from 2023 when he was raising money for

7    Stream, not SeeCubic.  He most certainly is not an agent of

8    SeeCubic during any period of time related to this October 1,

9    2023 document.  He is not an agent, and he has not established

10   any foundation that he was.

11         THE COURT:  Okay.  Well counsel, you can cross-

12   examine him on that.  But I -- just because you stand up and

13   say he wasn't.  You can say he believed he was an agent when he

14   dealt with it.  I can't --

15         MR. COLBY:  He hasn't established --

16         THE COURT:  Well, he said that --

17         MR. KODOSKY:  He said it -- sorry.

18         MR. COLBY:  The purported basis is --

19         THE COURT:  He testified that he dealt with a broker

20   who test or approached him.  And that broker was Mr. Danenberg.

21   Now, you can cross-examine him against that.  But you just

22   can't stand up and say it's not true.

23         MR. COLBY:  Well, Your Honor, but the purported basis

24   for at least two of the three was that they were a friend of so

25   and so or a shareholder who came through.

```
1            THE COURT:  Well, I get to them.  Those I get.

2            MR. COLBY:  That's insufficient.

3            THE COURT:  Okay.  But we were talking about Mr. --

4    and I said Broker.

5            MR. COLBY:  Danenberg.

6            THE COURT:  Mr. Danenberg, okay.  And he said

7    Jonathan was a broker who was a friend.  I thought he said

8    Jonathan from New York.  I don't know his last name.  Who was a

9    friend of Asaf Gola was a broker.  I don't know if he was just

10   a friend.  I thought he said two brokers.  One Mark Denenberg,

11   Jonathan from New York who was a friend of Asaf Gola.  And

12   Jonathan had a name he couldn't pronounce.  I'm not going to

13   comment the rest.  And that the third person is was Kevin

14   Gollop, who was a shareholder.

15           MR. COLBY:  I'm sorry, Your Honor.  He testified a

16   shareholder who knows Mr. Gollop who's a SeeCubic board member.

17   And the Gola friend is not a broker.  He said the Gola friend

18   is a Gola friend and Gola is on the board.  So he's trying to

19   create the implication that they're agents because they're

20   friends with or known to board members.  That's insufficient to

21   establish an agency relationship.

22           THE COURT:  I got that, but that wasn't my -- I guess

23   I had a different -- my notes reflect he said something

24   different.  So except with Danenberg that I'm clear he said was

25   a broker, I thought he said the other broker was Jonathan, I
```

1  can't remember his name.

2          MR. COLBY:  Yeah.  He said he's a friend of Mr. Gola,

3  not a broker.

4          THE COURT:  I don't know.  Okay.  So with respect to

5  the shareholder -- unless they had some authority, can't be an

6  agent for the company.  I don't know what his role was and know

7  his -- was it somebody who could buy the company and represent?

8  I don't know.  I don't know what Mr. Gollop's role was.

9  Because just because you're a shareholder doesn't mean that you

10  may not be able to act in a capacity as an agent, as a

11  representative of the Debtor.  I don't know.  That's why I'm

12  saying, I can't just conclude -- you just can't say approached

13  by a shareholder.  That's insufficient.

14          MR. COLBY:  Or we submit a friend of Mr. Gollop.

15          THE COURT:  Again, I have different interpretation

16  what he said about Mr. -- who Mr. Gollop's friend was.  I

17  thought he said he was a broker.  You said he just said he was

18  a friend of Mr. Gollop.  The record will reflect what he said.

19          MR. COLBY:  Okay.

20          THE COURT:  Okay.  But with respect to Mr. Denenberg,

21  his testimony is that he met Mr. Broker, I mean Mr. Denenberg

22  as a broker, and that he offered him some participation in his

23  offering.

24          MR. COLBY:  Happy to address Mr. Denenberg either on

25  cross or redirect.

1          THE COURT:  Yeah, on cross.  But you can't just say,

2    well, he's not and I take your word for it.  What evidence do I

3    have?  You get to put your evidence the same way they get to

4    put theirs in.  All right.  Counsel, you may continue with

5    respect to how Mr. Rajan knew about who authorized this offer.

6    BY MR. KODOSKY:

7    Q    What is your understanding of who approved the

8    subscription agreement?

9    A    My understanding is the subscription that warranty was

10   approved by the two Skadden lawyers in the courtroom.

11         THE COURT:  Okay.  That's his understanding.

12   Approved by who?

13         MR. COLBY:  I'm exercising all of my self-restraint,

14   Your Honor.

15         THE COURT:  Okay.  Well, maybe he means approved the

16   language.

17         THE WITNESS:  Language.

18         THE COURT:  All right.

19         MR. COLBY:  I --

20         THE COURT:  Counsel, that's his understanding, okay.

21         MR. COLBY:  I hope clients have better sense then to

22   ask me to approve language like that.

23   BY MR. KODOSKY:

24   Q    Mr. Rajan, have you ever had meetings --

25         THE COURT:  Well, I don't know.  Wait a minute.

```
 1   You're a litigator.  I'm not sure you'd be on the front end of

 2   this anyway.

 3          MR. COLBY:  That's what I mean.  Yeah, they shouldn't

 4   be ask --

 5          THE COURT:  Right.  The corporate section handling

 6   this and then you would be telling them don't put that in

 7   there, which is what my ruling was.  Was no, you can't do that.

 8   We were always the doom and gloom.  And the front-end people

 9   were always let's put anything we want in here.  Okay.

10   BY MR. KODOSKY:

11   Q    Mr. Rajan, have you ever had meetings with the electronics

12   companies?

13   A    Yes, we have.

14   Q    Did you ever have meetings with the electronic companies

15   where use of the technology through either sublicensing or the

16   self-components such as chip and film or devices was not

17   discussed?

18   A    We've had over -- we've had hundreds of meetings.  It was

19   always discussed; what was the method that they would get the

20   technologies if it was as a chip and film, or they were going

21   to get a sublicense?  It was always discussed in every single

22   meeting.

23   Q    Mr. Stastney said at the hearing last week that he had

24   meetings with over -- that they had meetings with over 100

25   companies and how the technology was going to be used by the
```

1  companies was never discussed.  Did you hear that testimony?

2  A    Yes, I did.

3          THE COURT:  Wait a minute.  What was the testimony?

4          MR. KODOSKY:  How the technology was going to be used

5  by the companies was never discussed.

6          THE WITNESS:  According to Mr. Stastney, not us.

7  BY MR. KODOSKY:

8  Q    And you also heard Mr. Stastney state how the technology

9  -- that the three companies getting the samples never discussed

10  how the technology was going to be used, correct?

11  A    Yeah.  He testified that they never discussed if it was

12  going to be a sublicense or if they were going to receive

13  components.

14  Q    And he also said that the four companies that are

15  supposedly imminently investing $5 million dollars each, never

16  discussed how the technology was going to be used; did you hear

17  him?

18  A    That was Mr. Stastney's testimony, correct.

19  Q    What's your reaction to that statement?

20  A    That's ludicrous.

21  Q    Why?

22  A    What's the point of having a meeting?  I mean, what's the

23  point?  Everybody is a -- wants to know how they're going to

24  get the technology.  Are they going to get chips and

25  components?  Are they going to get -- are they going to get a

1  sublicense?  They're not just coming to a meeting for

2  entertainment.

3  Q    All right.  Now you -- are you familiar with the Phillips

4  licensing agreement?

5  A    Yes, I am.

6  Q    And are you also familiar with the 2014 amendment to the

7  Phillips licensing agreement?

8  A    Sure.

9  Q    You heard Mr. Stastney's testimony regarding the

10 amendment, correct?

11 A    Yes.

12 Q    What did you understand him to be saying about the

13 amendment?

14 A    First of all, the main document says no sublicensing.  The

15 amendment is parallel licensing.  He was trying to say that

16 that's actually a light -- an understanding to go ahead and

17 sublicense.  Parallel licensing and sublicensing are completely

18 different.  You know, like when you have an apartment, if

19 you're allowed to, you can sublet it and you just take it and

20 you cut a deal with somebody.  Parallel licensing is just like

21 I go get a referral card to my landlord and you go get your own

22 apartment.  Phillips was controlling all discussions regarding

23 their technology between them and the companies.  And now it's

24 a moot point because the Paton's are sold and there's --

25 they've made it very clear there's no more licensing.  So

1   sublicensing is dead.

2   Q    And what is SeeCubic of Delaware doing based on the

3   information that's been gathered?

4           MR. COLBY:  Objection.  I don't understand the

5   question.

6           THE COURT:  Hold on.  Hold on.  I'm still back trying

7   to write what he said previously.  Okay.  So counsel, he's

8   objecting to the question.  And can you rephrase it because I

9   forgot what it was?

10  BY MR. KODOSKY:

11  Q    How does the Phillips license work?

12          MR. COLBY:  Sorry, Your Honor.  I would also move to

13  strike Mr. Rajan's previous answer as either lack of foundation

14  or hearsay.  There's no basis for what Phillips is or isn't

15  going to do in any evidence he's offered so far.

16          THE COURT:  Mr. Stastney testified regarding that?

17          MR. COLBY:  Well, I mean, we -- with Mr. Stastney we

18  looked at the licensing agreement.  But what Mr. Rajan just

19  said is there's no new Paton's.  Sublicensing is dead.

20          THE COURT:  Hold on.

21          MR. COLBY:  No new license -- sorry.  No new

22  licensing from Phillips.

23          THE COURT:  And did Stastney testify anything about

24  the issue about no new licensing being allowed by Phillips?

25          MR. COLBY:  Yes.

1          THE COURT:  I thought somebody asked him about that.

2          MR. COLBY:  Yes.  He testified about his

3  understanding of the 2014 amendment.

4          THE COURT:  Okay.  And I thought he also testified or

5  maybe I -- somebody talked about no more licensing being issued

6  by Phillips.

7          MR. COLBY:  Those were cross-examination questions

8  based upon the sale of the Phillips Patent portfolio.  I think

9  what concerned me about Mr. Rajan's previous answer is he

10  seemed to be saying that Phillips isn't going to do anymore

11  license, any sublicense, any parallel licenses, anything like

12  that.  He lack any foundation for that testimony.

13          THE COURT:  Well, I thought -- wait a minute.  I

14  thought Mr. Stastney testified to that.  And if that's what he

15  said, he would be basing it on what Stastney said.

16          MR. COLBY:  No.  Mr. --

17          THE COURT:  I mean, I don't know.  I can't -- I have

18  the -- it's not like I can scan -- I mean --

19          MR. COLBY:  My recollection is that Mr. Stastney

20  testified that the 2014 -- to his understanding of the 2014

21  amendment, which was that additional licenses by Phillips could

22  not be unreasonably withheld, which is the language of the

23  document.

24          Again, just going back to Mr. Rajan's answer.  He

25  seems to be making the statement that Phillips is not going to

1    do any new licenses or anything like that.  There's no

2    foundation for Mr. Rajan's knowledge about what Phillips is or

3    is not going to do.

4           THE COURT:  Unless it was testified to here in open

5    court.  I don't know.  I'm trying to figure out -- somebody

6    said it.  Maybe it was in colloquy with counsel.  I don't know.

7           MR. COLBY:  Yeah.  So previously the question that

8    Mr. Stastney was --

9           THE COURT:  Where we at?

10          MR. COLBY:  I'm looking at page 127 of the October

11   6th transcript.

12          THE COURT:  127, okay.  And we're talking about --

13   okay.

14          MR. COLBY:  So he says -- his name is Alexnder

15   Damveld.  The same Alexander -- the question is, "The same

16   Alexander Damveld that said there are no licenses available at

17   this point?  Answer:  "I don't know what you're referring to."

18          THE COURT:  Okay.

19          MR. COLBY:  Question: "Are you aware the gentlemen

20   has informed my client within the last month, dada, dada, da."

21   And then the question was rephrased because that was -- I

22   objected.  That was not a proffer of evidence and that would be

23   hearsay.  And then Mr. Kodosky moved on to ask if Mr. Stastney

24   had personal conversations with Mr. Damveld.

25          THE COURT:  Right.

```
1              MR. COLBY:  So what I'm saying is just a minute ago,

2   Mr. --

3              THE COURT:  And there was no foundation.  Sustained.

4              MR. COLBY:  Yeah.  No foundation.

5              THE COURT:  Lay a foundation.

6              MR. COLBY:  And to the extent there was to be

7   hearsay.

8              THE COURT:  Because again, I don't know if I heard

9   this with colloquy between counsel.

10             MR. COLBY:  That's right.  I think it was.

11             THE COURT:  I know I heard it.  But I thought it

12  might have been Mr. Stastney's testimony, and clearly it

13  wasn't.  It was from colloquy with counsel.  All right,

14  counsel.

15             MR. KODOSKY:  Permission to approach, Your Honor?

16             THE COURT:  Sure.

17  BY MR. KODOSKY:

18  Q    Mr. Rajan, you've been handed what's been marked for

19  identification as D40.  Do you recognize this document?

20  A    Yes, I do.

21  Q    What is it?

22  A    It's a letter from Phillips.

23  Q    Letter or an email?

24  A    Email.  Email, I'm sorry.  An email.

25  Q    Who is Alexander Damveld?
```

1  A    He's in charge of the licenses at Phillips.

2  Q    And who is this email sent to you?

3  A    Bud Robertson (phonetic), myself, and Dan Renk (phonetic).

4  Q    Is Bud Robertson Charles Robertson?

5  A    Yes.  That's who testified earlier.

6        MR. KODOSKY:  Move the admission of this document,

7  Your Honor.

8        MR. COLBY:  Objection, Your Honor.  The -- if I

9  understand correctly, there are going to be questions about

10  this top email from Mr. Damveld to Mr. Robertson.  That is

11  hearsay.  Even if the email itself is a business record, that

12  is hearsay within hearsay.  Hearsay within hearsay is only

13  admissible if each part of the combined statement conforms with

14  an exception to the rule.  And there is no exception to the

15  rule that applies to this email from Mr. Damveld.

16        MR. KODOSKY:  Counsel doesn't seem to have a grasp on

17  the hearsay rules, Your Honor.  This is not --

18        THE COURT:  All right, cut it out.

19        MR. KODOSKY:  I'm sorry.  That was -- I apologize for

20  that.  This is not being offered to prove the truth of the

21  matter asserted.  But instead is a verbal act that I am

22  referring to earlier.  Operative, legally operative language

23  affecting the rights of the -- and obligations of the parties.

24  It's not hearsay pursuant to Rule 801.

25        MR. COLBY:  It is in no way a document that embodies

1   the legal rights of the parties.  It is a statement by Mr.

2   Damveld about two other documents, which are in evidence.  The

3   license and the 2014 amendment.  But this is not a verbal act.

4   This is not a document that sets forth or establishes legal

5   rights of parties.

6          MR. KODOSKY:  Your Honor, I'd say it's right there.

7   "But if it will be finalized, please know that you're existing

8   license will not change and the license will remain with

9   Phillips."

10         MR. COLBY:  Correct.  So the existing license is the

11  document that establishes the legal rights of the parties.

12  This statement about it, about something that may or may not

13  change in the future is not an act that alters those rights.

14  This is -- we couldn't come into court somewhere and say this

15  document gives us a license or doesn't give us a license.  It's

16  simply an observation or prediction by Mr. Damveld.

17         Now, substantively is this -- does this even remotely

18  help the Debtors with their TRO?  No.  Their claim is that the

19  TRO -- that Phillips is going to take away the license.  What

20  this says is your license isn't going to change, but --

21         THE COURT:  Well, no.  It says your license will

22  remain with Phillips.  It didn't say it's not going to change.

23         MR. COLBY:  Yeah.  That's referring to the sale.  It

24  undermines their argument in another instance.  The Debtors

25  have argued that the sale of the Patent portfolio is somehow

```
 1   going to change the landscape here.  What they're saying is --

 2             THE COURT:  No, no, no.

 3             MR. COLBY:  -- Phillips still controls the licensing.

 4             THE COURT:  Their license.  I think his testimony is

 5   a little bit different.  His testimony is that based on some

 6   basis, Phillips is not going to be licensing to anyone else.

 7   That's what his testimony is about.  I'm not quite sure how

 8   this helps me to figure out how he came to that understanding,

 9   which is what you objected to.

10             MR. COLBY:  Correct, Your Honor.  But it's also

11   hearsay that is inadmissible.

12             THE COURT:  Okay.  The reason it's hearsay because

13   the email in question is from Mr. Alexander Damveld.  And it

14   was cc'd to Mister --

15             MR. KODOSKY:  Mr. Rajan.

16             THE COURT:  -- Rajan, Dan, and that was it.  It was

17   sent to the person who was before -- testified earlier.

18             MR. COLBY:  Yeah.

19             THE COURT:  Mr. Robinson.

20             MR. COLBY:  And a verbal act, Your Honor, is a

21   statement that has legal significance or brings about a legal

22   consequence simply by its existence.

23             MR. KODOSKY:  What are you referring from?

24             MR. COLBY:  This -- I'm referring to a case

25   Transportes Aereos Pegaso, S.A. the C.V. vs. Bell Helicopter
```

1    Textron, District of Delaware 2009, 623 F.Supp.2d 518.

2            THE COURT:  Okay.  And so, you believe that for the

3    verbal which because it's -- I mean, yeah.  Because it's

4    nonverbal, that it's subject to the hearsay.  At the beginning,

5    it talks about what the statement is in the hearsay rule on 80

6    -- what did I do with my rule book?  801 --

7            MR. COLBY:  Right.

8            THE COURT:  801 says, "A state means a person's oral

9    assertion, written assertion, or nonverbal conduct with the

10   person intended if the person intended it as an insertion."  So

11   it's implicit in there if it's a verbal -- I don't know how you

12   would call it.  I guess you could -- verbal conduct is not a

13   statement.  And you're saying that based on that Delaware

14   court?

15           MR. COLBY:  No.  I'm sorry, Your Honor.  I don't read

16   that the same way that you do.  And it's an out of --

17           THE COURT:  It's nonverbal.

18           MR. COLBY:  It's an out-of-court statement that is

19   either -- let me find the language so I'm not --

20           THE COURT:  A statement, right.  It's an out-of-court

21   statement --

22           MR. COLBY:  Means can oral assertion, a written

23   assertion, or nonverbal conduct that's intended to communicate

24   to an assertion.

25           THE COURT:  Right.

1          MR. COLBY:  Right.  So that's just saying if you nod

2   your head or shake your head or something like that.  So that

3   doesn't apply to this, okay.  This is a written communication.

4   And then --

5          THE COURT:  Okay.  I get that.

6          MR. COLBY:  Yeah.  And it's being offered for the

7   truth of the matter.  They're saying Phillips isn't going to do

8   any additional licenses.  And the reason why it's not a verbal

9   act in the sense like an act that has legal consequences is

10  because the licenses, the future -- the parties can disagree

11  about whether the 2014 amendment requires Phillips to grant

12  additional licenses or not unreasonably withhold or whatever.

13         But the simple fact is that the 2014 amendment, the

14  2010 original license, those are the terms that established the

15  contractual rights of the parties with respect to this issue of

16  licensing and sublicensing.  This email does not.  It is not a

17  verbal act.

18         THE COURT:  Counsel, I thought the whole line of

19  questioning went to the issue of the Debtors -- at least Mr.

20  Rajan is a Debtor's representative, of his understanding that

21  Phillips would not be issuing any more sublicense, anymore

22  licenses.  That was the issue.  I don't see anywhere in here

23  first of all where it says anything about us not issuing

24  anymore licensing.  I think that's what the whole issue was

25  when you objected and said there's no foundation upon which we

1  can -- Mister -- lay the foundation how Mr. Rajan acquired that

2  knowledge.  Isn't that what this was about?

3       All right.  I guess -- I mean, I'm not reading it

4  because I'm not supposed to really be --

5       MR. COLBY:  Right.  So for example, Mr. Rajan could

6  testify what his understanding is of the 2014 amendment, and he

7  did, right?  That's his understanding.  But to the extent he's

8  going to say my understanding is based on the fact that

9  Phillips told me they weren't doing any sublicenses, that's

10  hearsay.  And they can't -- whether it's him saying they told

11  me or whether it's him trying to introduce this email into

12  evidence, it's the same problem.  It's hearsay.  It's

13  inadmissible.

14       THE COURT:  Hold on, counsel.  All right.

15       MR. COLBY:  And to finish the thought, Your Honor, on

16  a verbal act.  Like a verbal act is something that, for

17  example, a verbal act that makes a contract.  So all of a

18  sudden, you know, it has a very direct legal consequence or to

19  make a threat.  Those are things that the third circuit has

20  identified as being verbal acts because the threat has a legal

21  consequence of a criminal act or something like that.

22       So it's a legally operative statement.  Read in an

23  email about what you may or may not do in the future is not a

24  legally operative statement.

25       MR. KODOSKY:  Your Honor, I don't know what Third

1    Circuit case he's referring to.

2            THE COURT:  All right.  Well, that case is -- don't

3    talk to him.  Talk to me.

4            MR. KODOSKY:  Sorry.  I'm holding in front of me the

5    notes of advisory committee on the rules.  It states that the

6    effect is to exclude from hearsay the entire category of quote-

7    on-quote verbal acts and verbal parts of an act in which the

8    statement itself affects the legal rights of the parties or is

9    a circumstance bearing on conduct affecting their rights.

10            MR. COLBY:  Yeah.  This expressly --

11            MR. KODOSKY:  That's straight out of the -- excuse

12   me.  Straight out of the advisor comments.  But I'll also point

13   out, Your Honor, the Rule 803-15, statements, and documents

14   that affect an interest in property would seem to apply.  We

15   don't -- I don't believe that this is hearsay.  But I think

16   that it's a verbal act.  But even if it was hearsay, it would

17   seem like 803-15 would seem to apply.

18            THE COURT:  Hold on.  Let me -- statement affecting a

19   -- this statement is admissible -- tells me  how you're

20   supposed to do this.

21            "The statement is containing a document purporting to

22            establish or affect an interest in property.  The

23            matter stated was relevant to the purpose of the

24            document and dealings with the property since the

25            document was made had not been inconsistent with the

1              truth of the statement or the purpose of the

2              document."

3         Okay.

4              MR. COLBY:  So, Your Honor, to the -- what this email

5    says is the existing license will not change.

6              THE COURT:  It also says some other stuff at the top.

7              MR. COLBY:  Yeah.  It's about again -- and that's

8    not, certainly not a verbal act.  It says, "I understand your

9    request.  The discussions regarding the patent sale of

10   advance."  That's just information.

11             THE COURT:  That is not.  It says, "when you're in a

12   phase that is not feasible to create new contracts or amend,

13   withstand, change, existing anymore."

14             MR. COLBY:  Again, so this is not a document that

15   creates, amends, or changes a legal right.  It expressly says

16   it's not doing that.  Now, so what are the legally --

17             THE COURT:  It also says it's not feasible to create

18   new contracts.

19             MR. COLBY:  Correct. And so what that leaves are the

20   existing contracts.  And the existing contracts -- so first of

21   all, that makes it by definition.  Not a verbal act.  Not a

22   statement in documents that affect the interest in property

23   because it's expressly saying it's not changing anything.  It's

24   not giving any new rights.  It is on its face --

25             THE COURT:  Well, does it have to change?

1              MR. COLBY:  It doesn't --

2              THE COURT:  Does 803-15 say it has to change rights

3    or what does it say?  Let me go back to 803.

4              MR. COLBY:  It says establish or affect an interest

5    in property.  It's like the equivalent --

6              THE COURT:  Establish or affect?  What does it mean?

7              MR. COLBY:  Like a deed.

8              THE COURT:  I'll write you and say that it doesn't

9    affect -- that that doesn't mean affect?

10             MR. COLBY:  It's  like a deed or a transfer in

11   property just like a verbal act is the formation of a contract.

12   This is by definition on its face none of those things.

13             THE COURT:  It's a written document you're saying?

14             MR. COLBY:  It's just -- it's words on a page.  It

15   does not --

16             THE COURT:  It's not a word, counsel. It's an email.

17   There was someone wrote and sent to someone else.

18             MR. COLBY:  Right.

19             THE COURT:  It's not just pages.  So it's an out-of-

20   court statement.

21             MR. COLBY:  Correct.

22             THE COURT:  That's being offered to establish that

23   Phillips is not granting anymore license.

24             MR. COLBY:  And that the -- this is the important

25   point, Your Honor.  That the current license will not change.

1    And the current license says that Phillips will not

2    unreasonably withhold --

3              THE COURT:  Counsel --

4              MR. COLBY:  -- additional licenses.

5              THE COURT:  -- I get that you're going to the next

6    step.  But all he -- you objected on the basis that Mr. Rajan

7    said Phillips is not granting anymore licenses, okay.  You

8    objected and said, well, what's the basis for that?  How does

9    he know that?  Where does he get it from?  And so -- and he

10   hands him this document that says he wants to have introduced

11   into evidence as the basis for saying why he came to that

12   conclusion.  How did he come to that conclusion and what was

13   the basis for that?

14             So are we saying that he's offering it to say this is

15   how he came to the basis for that information or are you

16   objecting because you're saying something -- and I think you're

17   going to object a step further to say that he can't use this

18   document as a basis as to how he came to his understanding that

19   they will not be issuing more licenses.

20             MR. COLBY:  So, Your Honor, what I'm actually

21   objecting to now -- so I made the previous objection.  And then

22   in response to it, Mr. Kodosky moved on to additional

23   questioning and attempted to introduce this into evidence.  In

24   order for it to be introduced into evidence, it can't be

25   hearsay, or it needs to fall into one of the exceptions, and it

1    doesn't.

2            So what we're talking about now is whether or not

3    this document should be admitted into evidence.  And it is

4    plainly hearsay and is plainly not a verbal act or a statement

5    in documents that affect an interest in property.  It's just --

6            THE COURT:  I'll sustain that.  I don't think it's a

7    verbal act nor do I think it's 801-15 or 803-15.

8            Okay.  Now, that leaves the issue of whether it

9    serves as a basis.  And maybe it doesn't have to be admitted.

10   But he shows that to him and maybe that's how he came to the --

11   because you're saying he doesn't know how he -- he just made a

12   conclusion.

13           MR. COLBY:  Well, if Mr. Kodosky wants to ask and Mr.

14   Rajan wants to testify how he -- what is, you know, his

15   understanding --

16           THE COURT:  I thought that's what this was for.

17           MR. COLBY:  I think the Court -- well, but not

18   putting it into evidence, Your Honor.

19           THE COURT:  At that, counsel.

20           MR. COLBY:  Okay.  Then maybe, but if the answer is

21   well I was told, whether it's in an email or directly, then

22   that's inadmissible.

23           THE COURT:  I get that.

24           MR. COLBY:  So I'm happy to go back to --

25           THE COURT:  Which is how did he come to his

 1    understanding?  And you're objecting because you're saying this

 2    document cannot be used as a foundation to say -- he could have

 3    just said, here's the document.  Did you refresh your

 4    recollect?  Give it back to me.  Does this refresh your

 5    recollection on how you came to that conclusion?

 6            MR. COLBY:  Well, I don't think that Mister --

 7            THE COURT:  Well, he said --

 8            MR. COLBY:  -- Mr. Rajan testified that he had --

 9            THE COURT:  Forgot.  I know.

10            MR. COLBY:  -- forgotten anything.

11            THE COURT:  Well, he just -- but he said do you

12    remember?  Do you recall?  You're absolutely right.  He could

13    have done it some other way.  So I'm going to sustain the

14    objection.  I don't think this is admissible because it doesn't

15    meet the hearsay exception.  So, okay.  Counsel, you can

16    continue with your questioning of Mr. Rajan.  We're fast

17    approaching 6:00.  Go ahead.

18            MR. KODOSKY:  Permission to approach, Your Honor?

19            THE COURT:  Okay.  Got to make sure not admitted,

20    okay.  I'm writing on here.  Give it to John.

21            THE BAILIFF:  Mister -- has not admitted 40.

22            THE COURT:  40, I just ruled on that.  I know I

23    shouldn't be but.

24    BY MR. KODOSKY:

25    Q    Mr. Rajan, do you recognize this document?

1   A     Yes, I do.

2   Q     What is it?

3   A     It's an email from Phillips.

4   Q     And what is Phillips conveying through this email to you

5   all?

6           MR. COLBY:  Objection, Your Honor.  Hearsay.  It's

7   effectively the same document that we just -- same substance,

8   same issue that we just addressed.

9           THE COURT:  Counsel?

10          MR. KODOSKY:  I think it's a verbal act, Your Honor.

11  I think that it affects property rights.  Relates to --

12          THE COURT:  Objection sustained.  Let's move on.

13  It's the same document.  I don't know how to rule differently.

14  BY MR. KODOSKY:

15  Q   Mr. Rajan, you were present for Mr. Stastney's testimony

16  when he stated that he will be revealing the specs of Stream TV

17  proposed projects?

18  A     Yeah.  He said that in his testimony in his role of

19  director, he will review the specifications and also will

20  decide if the Netherlands will work on Stream TV projects

21  because of the resource demand if it was warranted.  So we have

22  a situation where Stream TV subsidiary is being run by the CEO

23  of a competitor and the competitor is going to see all of our

24  specifications and decide whether or not our subsidiary is

25  going to work on Stream TV and Technovative projects, the

1    Debtor, and the Debtor's estate.

2         MR. COLBY:  Objection, Your Honor.  Move to strike

3    the portion of the answer where Mr. Rajan is merely relaying

4    testimony that took place already in this court.  There's no

5    reason for Mr. Rajan to sit here and say, back on October 6th,

6    Mr. Stastney said this.  Mr. Stastney says that.  That record

7    exists.  That was also incorrect.  Mr. Stastney testified that

8    he would put an independent party in place to review Stream's

9    projects.

10        So it's not consistent with the actual testimony.

11   And I think that shows why it's bad evidence.  It's just Mr.

12   Rajan sitting here saying Mr. Stastney testified about this or

13   that.  He's here to give his testimony.  Not to recast and

14   recharacterize what Mr. Stastney said.  That's written down in

15   black and white.  That's the evidence the Court should

16   consider.

17        THE COURT:  Counsel?

18        MR. KODOSKY:  At this rate, Your Honor, I think that

19   Mr. Rajan accurately described Mr. Stastney's testimony when he

20   said that the engineers would be reviewing the specs that would

21   ultimately be brought to him to approve.  And to the extent

22   that that is directly impacting the Debtor's, the estate, and

23   our ability to compete, to do business.

24        THE COURT:  I get that's argument at this point.  But

25   what you're saying is that counsel was objecting on the basis

1    is that the testimony is already in the record.  He doesn't

2    need to repeat it.  And that it's a mischaracterization of the

3    testimony.  Okay.  So let's deal first with he said, you know,

4    he said he would be reviewing the specs for projects.  And that

5    I get that he's a competitor of Stream.  And Stream's position

6    is that he will be determining what projects will go forward

7    with respect to Stream.

8              And counsel has objected to it has a

9    mischaracterization of the record.  And what Mr. Stastney

10   testified to, Mr. Kodosky.  That's what he's saying.

11             MR. KODOSKY:  Page 178, line 21.

12             THE COURT:  178, line 21.  Okay, line what?

13             MR. KODOSKY:  I believe it's line 21.

14             THE COURT:  "And if the Debtors have projects that

15   they want to propose, then they would have to propose those to

16   you, correct?  Or as directed by me and the process we plan to

17   put in place and will seek approval from the Court is that

18   they'll go to the employees to the extent that a name is needed

19   and will be given only to the staff.  And I won't receive the

20   name.  I'll receive the details of the analysis of the project

21   to determine its feasibility, but not the name."  And the

22   question is, where is that in the protocol?  And it states that

23   it doesn't.

24             Yeah, it says there -- and then you go further down,

25   and he says there are -- yes, he admitted that there were

1   provisions that have to be modified to affect the spirit and

2   we're in the process of doing that because of the protocols

3   were made when there was an independent director involved as

4   opposed to essentially the chairman and CEO of one of the two

5   parties.  Okay.  So it says he's going to change the process.

6        MR. COLBY:  Right.  So my only point is, Your Honor,

7   is Mr. Rajan can testify what his testimony is about that, but

8   he's not here to try to recast or reshape what Mr. Stastney

9   said.  The Court has that.  It's in black and white.  It's

10  written on the page.  I think the best use of our time would be

11  to focus on not having an argument about what Mr. Stastney said

12  a week ago.

13       THE COURT:  Or what is his understanding of what the

14  consequences of that.  He can tell me that.

15       MR. COLBY:  Yeah, but --

16       THE COURT:  You heard what Mr. Stastney said.  What

17  do you think that impact is, if any, on Stream and it's future

18  projects?

19       MR. COLBY:  And there were a handful of similar

20  questions about what Mr. Stastney said earlier.  I didn't

21  object, but I'm trying to -- at a certain point we've got to

22  move on and just focus on what Mr. Rajan is here to testify

23  about.

24       THE COURT:  All right.  Counsel, I'm going to sustain

25  the objection.  Just -- I already know what Mr. Stastney said.

1    You need to ask him -- you know, were you here?  Did you hear

2    what he testify?  What impact, if any, you believe this is

3    going to have?

4            MR. KODOSKY:  That was my next question, Your Honor.

5    BY MR. KODOSKY:

6    Q    What are the implications for the Debtor and the Debtor's

7    estate based upon Mr. Stastney's testimony?

8    A    It would be like the CEO of Pepsi is in charge of the

9    subsidiary of Coke and is going to see Coke's specifications

10   and decide the subsidiaries.  Is going to work on Coca-Cola's

11   projects.  That is -- they're already shifting business away

12   from the company.  They're shifting investment away from the

13   Debtor and the Debtor's estate.  And now they're in charge of

14   also the assets, which didn't come back.  And when we were in

15   Amsterdam, there was difficulty finding an independent director

16   because of all the IP litigation.  And so, that's why we

17   suggested an independent director here from Philadelphia that

18   can work with Rembrandt and bring the project forward without

19   hurting the Debtor and the Debtor's estate.

20   Q    Who is it that you would propose be the independent

21   director?

22   A    The Amsterdam court said twice that they needed guidance

23   from the U.S. court.  So we suggested a retired judge

24   preferably from Philadelphia so they're familiar with the

25   eastern district or a Philadelphia lawyer who would serve as

1    the independent director of the Netherland's company because

2    they're be familiar with, you know, who the procedures work in

3    front of the judge and everything.

4    Q    Is that Judge Carey, former Judge Carey?

5    A    Yes.

6    Q    What size purchase orders would you look to Judge Carey to

7    help get the assets back that you contend have never been

8    returned?

9    A    We have over 140 -- I'm sorry, $160 million dollars of

10   purchase orders.  There's a number of Stream TV assets that are

11   being housed in the Netherlands like a warehouse.  So we would

12   want to work with the -- Judge Carey to also get the assets as

13   well as get a couple of the key Netherlands people to work with

14   our team in Silicon Valley to help with not only our purchase

15   orders, but other customers who are issuing PO's.  And some of

16   them have even been involved in investment.

17   Q    You mentioned that you all have $160 million dollars in

18   purchase orders.  Who's financing the purchase orders?

19   A    We have BOE and also a company in Florida, Evol Capital

20   (phonetic).  They're giving supply chain finance.

21   Q    And who's doing the electronics?

22   A    Our Silicon Valley team that stayed with me after the

23   Chancery Court ruling that did stay with me.  About 60 percent

24   of the team stayed.  And they've been doing the electronics.

25   Q    Who's doing the bonding?

1  A    Fuji Pream (phonetic).  They have bonding machines, and

2  they can scale into the millions of units per year when we're

3  working with them on the production to get -- begin shipping

4  units.

5  Q    How much money have you spent since you lost in Chancery

6  Court?

7  A    Over $10 million Stream TV has spent.

8  Q    Who's financing the reorganization of Stream?

9  A    VSI.

10 Q    How are you paying off liabilities?

11 A    Well, we're doing it with a combination of both investor

12 money and some of it's the PO.  But we have investors that are

13 financing the bankruptcy and are anxious to take care of the

14 unsecured and any allowable claims.

15 Q    Who gave the PO's?

16 A    It was a company called Psystar who bought 3,000 TV's from

17 Stream TV as well as Southern Telecom.  They're a company that

18 owns like the Brookstone brand, Sharper Image, Polaroid,

19 Westinghouse, and they sell like to Walmart and Target and a

20 number of other stores.

21 Q    Last question, Mr. Rajan.  If you could in summary discuss

22 the -- what the TRO is for?

23 A    There's two parts to the TRO.  One is, which I stated in

24 my testimony, Stream TV's position is the Phillips patents are

25 sold.  You can't sublicense something that is sold.  And

1   hundreds of people have been told about the sublicensing and it

2   continues to happen even though the Phillips patents have been

3   sold.  And investors have been told we need a letter that's

4   approved by the Court that tells everybody the Phillips patents

5   are sold and there's no more Phillips licenses available right

6   now.  And if they want the technology they need to buy

7   components or they need to buy devices.  If we don't, we run

8   the risk of having our license cancelled immediately.  The

9   second thing is just recently, Mr. Stastney became the director

10  of Stream TV and Technovative's subsidiary where he is going to

11  see our specifications, our customer's specifications.  And

12  he's going to be vetoing our products and they've already been

13  shifting sales and investment to another company.  Telling

14  people that they're sublicensing.  So we need immediate action

15  because we're at great risk right now.  It's irrespirable

16  damage if we lose our licenses, also our trade secrets are --

17  have been exposed.  They're continuing to be exposed.  And they

18  need to be protected and we, you know, we're spending money

19  every day in the bankruptcy.  We're getting geared up for

20  production.  We can't now have a competitor seeing our trade

21  secrets and specifications and then, canceling our projects

22  when we're reorganizing and settling the debts.  So we need

23  immediate help from the Court.

24  Q    Thank you.

25       MR. KODOSKY:  No further questions.

1          MR. COLBY:  I would just move to strike the portions

2     of the answer about what investors told Mr. Rajan or Phillips

3     not issuing new licenses.  He's got no foundation, to the

4     extent he does, it's hearsay.

5          MR. KODOSKY:  No legal note says --

6          THE COURT:  Counsel.

7          MR. KODOSKY:  -- its own independent significance --

8          THE COURT:  Counsel.

9          MR. KODOSKY:  -- it --

10         THE COURT:  Counsel.

11         MR. KODOSKY:  I'm sorry.

12         THE COURT:  Mr. Colby has moved to strike with

13    respect to Mr. Rajan testimony regarding the cancellation or

14    the no -- Phillips no longer issuing licenses.  No basis for

15    that testimony.  And the testimony about what other --

16         MR. COLBY:  That investors told Mr. Rajan that they

17    want a letter or something about the Phillips license.

18         THE COURT:  No, I believe he can --

19         MR. COLBY:  He said investors told us.

20         THE COURT:  Well, Stastney hearings --

21         MR. KODOSKY:  I think what Mr. Rajan was saying was

22    that Mr. Stastney has communicated with over a hundred

23    companies and the hundred companies need to be sent a letter

24    saying that -- is that what you were --

25         THE COURT:  Yeah, I think he was saying that he

1  wanted a letter, I guess from the Court.  That's how I

2  understood it, though.

3            THE WITNESS:  No --

4            MR. KODOSKY:  Approved by the Court, Your Honor.

5            THE COURT:  Oh --

6            MR. KODOSKY:  It's part of the restraining order.

7            THE COURT:  -- something to having to do with me --

8            MR. COLBY:  Right.

9            THE COURT:  -- with respect to this letter.

10           MR. COLBY:  There was a portion of the answer,

11 though, in which he said investors told --

12           THE WITNESS:  No, I didn't say that.

13           MR. COLBY:  -- us.  And so, that's the portion.

14           THE COURT:  All right.  To the extent that he made

15 some references, some out of court statement is stricken.  I

16 don't recall specifically what he said.  But that they needed

17 to -- there was a letter that need -- because hundreds of

18 investors were being told about this sublicensing and that

19 there need to be something to protect the debtor's interest to

20 be sent to the 100 potentials or hundreds of potential

21 purchasers that they can't get a sublicense.  Or the issue of

22 whether they can get a sublicense is in dispute.  I don't know

23 if they can or can't.

24           Okay.  Anything further with respect to the Mr.

25 Rajan's direct testimony, counsel?

1          MR. ZAHRALDDIN:  Your Honor, I just want to address

2    the question of the independent legal significance of the

3    notice, the letters, or the discussion.  There's independent --

4    when you get notice pursuant to a contract, that has

5    independent legal significance.  There's a provision in the

6    Phillips license that says, "If the license -- if the patents

7    are going to be sold, you will be advised in writing."  The E-

8    sign, which is a federal law, makes all emails writing.

9          That's how they're held up as contracts, et cetera.

10   I don't think that's any different from legal notice coming

11   from someone at Phillips to Mr. Rajan, that way Mr. Rajan knows

12   might -- there are some things that are changing and there are

13   some things that are not changing.  But --

14         THE COURT:  So you're saying this was legal notice to

15   a -- who was -- but he was sending this to Mr. Robertson.

16         MR. ZAHRALDDIN:  Yeah, Mr. Robertson --

17         THE COURT:  Because I didn't admit them.  That wasn't

18   an argument.  It was sent to Mr. Robertson at Stream

19   Acquisition.  I don't know who the heck they are.

20         MR. ZAHRALDDIN:  Yes, Your Honor.  So Mr. Robertson

21   is here in court with us and he has testified before that he is

22   a contract employee, a 1099, not a W2.  And that he has had

23   responsibilities and continues with responsibilities that go

24   with the license.  He was there when they first did it and he

25   was also the CEO of the Netherlands.

```
 1              THE COURT:  So you're saying that this -- these

 2   emails constitute notice to the holder of the license of what's

 3   going on with the license?

 4              MR. ZAHRALDDIN:  Yes, that's exactly correct, Your

 5   Honor.

 6              THE COURT:  It's kind of late to argue that that's

 7   already said not admitted.

 8              MR. ZAHRALDDIN:  Well, I understand that, Your Honor.

 9   But we're talking now about -- and it's not that much later,

10   Your Honor.  I mean, I know we're held --

11              THE COURT:  Well --

12              MR. ZAHRALDDIN:  -- I know you want us to do things

13   promptly, but that was only about 15 minutes ago that we talked

14   about the --

15              THE COURT:  I thought he was objecting to Mr. Rajan's

16   testimony regarding no longer issue.

17              MR. COLBY:  Something completely different, yeah.

18              MR. ZAHRALDDIN:  No, the Phillips license.

19              THE COURT:  Well, he said no longer issuing licenses

20   and --

21              MR. ZAHRALDDIN:  Yes.

22              THE COURT:  -- you want me to strike that.  And he's

23   saying wait a minute, don't strike it because those previous

24   documents that you say we're not admitting were simply just

25   notice from the notice --
```

```
1              MR. ZAHRALDDIN:  Licensor.

2              THE COURT:  -- from the licensor --

3              MR. ZAHRALDDIN:  Yes.

4              THE COURT:  -- to the licensee about what's going on

5    with the license and that this serves as a notice because it

6    was sent to the representative because we already had Mr.

7    Robertson testify what his relationship with, you know, maybe

8    he might have been the better party to ask about these, but

9    they weren't.  You know, I can't tell people how to run their

10   cases, but I get what he's saying.  I don't know.  Can I --

11   because now they're offering another basis --

12             MR. COLBY:  Right.

13             THE COURT:  -- for a document I already said could

14   not be admitted.

15             MR. COLBY:  It -- but the document that they're

16   reportedly relying on says that the existing license will not

17   change.  So terms --

18             THE COURT:  But that's not what he's --

19             MR. COLBY:  -- whatever those terms --

20             THE COURT:  Right.

21             MR. COLBY:  -- may be.  I understand what Mr.

22   Zahralddin is saying.  But whatever those terms may be, as they

23   exist in the current license --

24             THE COURT:  But that's --

25             MR. COLBY:  -- they're not changing.
```

```
 1              THE COURT:  But that's not what we're talking about.

 2    You objected to Mr. Rajan's testimony, that no -- that Phillips

 3    will not be issuing other licenses, having nothing to do with

 4    the debt.  That's a separate issue.  The separate issue may go

 5    to your argument that I don't know what they're talking about,

 6    this is not going to have any -- because their position is,

 7    it's going to impact the license.  You believe that this

 8    doesn't do that.  But this went to whether -- what the basis

 9    for Mr. Rajan's testimony that Phillips would not be issuing

10    more licenses.

11              MR. COLBY:  Right.  I'm -- I think with the -- with

12    respect to the last piece of testimony, that Mr. Rajan offered

13    that he said, you know, Phillips is not going to do anymore

14    licenses.  I'm content to rest on the record as it is and where

15    we will go when we revisit it with respect to the 2014

16    amendment and all those other things.  I'll withdraw the motion

17    to strike that particular piece of --

18              THE COURT:  Right.  And that's simply --

19              MR. COLBY:  -- testimony.  I understand --

20              THE COURT:  Counsel.

21              MR. COLBY:  -- for what it's worth.

22              THE COURT:  That's just his understanding of what

23    they're going to do with future --

24              MR. COLBY:  Right.

25              THE COURT:  -- licenses.  I didn't take this -- and
```

1    that's why I kept trying to figure out, are we talking about --

2    I get your position, is that you're going to a different issue.

3    You're going to the issue that they're claiming that it's

4    somehow going to affect their license and it says in here it's

5    not.  But that isn't what his testimony and your original

6    objection, which is what I sustained, was because they said it

7    was a verbal exception and it was 803(50) and it didn't meet

8    any of that.

9              That's why I sustained, because it didn't meet that

10   exception.  But now they're saying this is just notice from the

11   lessor or the licensor rather as to what's going on with your

12   license and using it for the portion that says they're selling

13   -- and I understand based on that, that they're not going to

14   license to anybody else.

15             MR. COLBY:  Right.

16             THE COURT:  But --

17             MR. COLBY:  So the document is still hearsay.  It's

18   still inadmissible.  Mr. Rajan's testimony -- his

19   understanding, I think, I'll withdraw the motion to strike Mr.

20   Rajan's understanding.

21             THE COURT:  Okay.

22             Counsel?

23             MR. KODOSKY:  Your Honor, I think that's fine.  We do

24   reserve right for rebuttal and --

25             THE COURT:  Right.  Which is why I don't know why we

1  were making a big argument --

2           MR. KODOSKY:  I --

3           THE COURT:  -- because this was his understanding and

4  I thought that's what I kept trying to --

5           MR. KODOSKY:  I just didn't want my witness --

6           THE COURT:  All right.  I get it.  So not going to

7  strike the issue -- the -- his testimony as to his

8  understanding of what Phillips' intentions were to future

9  license.

10          With respect to what -- he said what other people

11 told him, clearly, that's hearsay.  He can't -- anything that

12 somebody else told him that he's serving as a basis for why he

13 believes he needs some relief, I'm going to strike that because

14 that's hearsay.  Unless it was a statement with some other

15 exception either -- or statement of a party in interest or some

16 other exception to the hearsay.

17          And counsel, what's your response?  That he wants to

18 strike anything that Mr. Rajan said based on what someone told

19 him why we needed the relief?  Or what he believed was based on

20 what someone else told him?

21          MR. KODOSKY:  Sorry, I missed that last part, Your

22 Honor.

23          THE COURT:  He's objecting because Mr. Rajan

24 testified that one of the -- they needed this letter, I think

25 it was, because people told him that they needed something with

```
 1   respect to the understanding of what was going on with the

 2   license or the sub -- they needed a letter based on his

 3   understanding or discussions with other people.

 4           MR. KODOSKY:  Yeah, it's -- I think there's some --

 5   maybe some confusion going on, Your Honor.  He didn't testify

 6   that it was based on anybody saying that to him.  Instead, it's

 7   -- we believe that based on Mr. Stastney's testimony that he

 8   had dealt with over a hundred companies, that the letter needs

 9   to be sent to those companies.

10           Mr. Rajan?

11           THE WITNESS:  Yeah.

12           THE COURT:  Okay.  No, no, no, no.

13           MR. COLBY:  There's no --

14           THE COURT:  All right.

15           MR. COLBY:  -- hand signals.

16           THE COURT:  So -- all right.  Counsel.

17           MR. COLBY:  No question pending.

18           THE COURT:  To the extent that he said that anything

19   is based on something somebody told him, I'm striking it.

20   Okay.  If he didn't, he didn't.  If he did, it's stricken.

21           Anything else with respect to this direct testimony?

22   Counsel?

23           MR. KODOSKY:  No, Your Honor.

24           THE COURT:  All right.  Mr. Kodosky that's your

25   direct.  You're not -- it's 6 -- almost 6:30.  You're
```

1  definitely not going to start with cross-examination of Mr.

2  Rajan right now, because I think we now have cross-examination.

3  Mr. Colby, I expect your cross is probably going to take just

4  as long or maybe with -- equal to his direct.  It typically is,

5  but I don't know.

6         MR. COLBY:  That's as good as guess as mine would be.

7         THE COURT:  All right.  And then, you guys may have a

8  rebuttal by calling Mr. Stastney --

9         MR. COLBY:  Stastney.

10         THE COURT:  -- as a rebuttal witness?  Okay.  So

11  we're talking about another four or five hours?  Another day?

12  I don't know.

13         MR. COLBY:  Well, we've gotten closer.

14         THE COURT:  I thought this would be it, but

15  apparently not.

16         MR. COLBY:  Yeah, yeah.  It's a--

17         THE COURT:  Have the parties discussed some dates?

18  We have some dates for you.

19         MR. COLBY:  We did discuss some dates.  We don't have

20  Mr. Caponi here any longer.  I can't speak for him.  But we

21  discussed with John also some dates but --

22         THE COURT:  Okay.  Good.  Because those dates that

23  were given to me by my courtroom deputy told me --

24         MR. COLBY:  But my understanding is he may not have

25  had complete information, so I don't want to speak for him.

1              THE COURT:  All right.  So I know tomorrow was one of

2    the dates that was on the table.  I know Friday we have a

3    trial, but she was trying to ascertain whether that was going

4    forward or not.  So that was one -- wait a minute.

5              Mr. Rajan can step down?  We're done, right, for now

6    with respect to his direct testimony.

7              You may step down, Mr. Rajan.  You cannot discuss

8    your testimony with your counsel, because you have to be cross-

9    examined.  And the first question I'm going to ask you when you

10   come back is have you discussed your testimony with your

11   counsel.  That's just how this works.  And you may step down.

12             All right.  Let me see if I can pull up my calendar.

13   I don't even know what's on.  I don't really know because --

14             UNIDENTIFIED SPEAKER:  Yeah, I think we're going to

15   have to contact Eileen, because everyone's not available

16   Tuesday, Wednesday, or Thursday afternoon this week.  I

17   already --

18             THE COURT:  For what?

19             UNIDENTIFIED SPEAKER:  -- asked about this week.

20             THE COURT:  To do what?

21             UNIDENTIFIED SPEAKER:  For this, if we were going

22   to --

23             THE COURT:  Oh --

24             UNIDENTIFIED SPEAKER:  -- because we had the

25   afternoons possibly open.

1          THE COURT:  Okay.  And who's not available?

2          UNIDENTIFIED SPEAKER:  Mr. Wright was --

3          THE COURT:  Oh, okay.  You mean the counsel?  Yes.

4          UNIDENTIFIED SPEAKER:  Yes, that's what I'm saying.

5          THE COURT:  Oh, yeah, yeah.  I thought you meant for

6  -- and I just --

7          UNIDENTIFIED SPEAKER:  No, I'm saying this week's

8  probably not going to work.

9          THE COURT:  How do you transfer -- change the ADU

10  because this is just not working here.  Because the domain has

11  to change with more choices.

12          UNIDENTIFIED SPEAKER:  Yeah.

13          THE COURT:  I want -- yes.

14          UNIDENTIFIED SPEAKER:  Yeah.

15          THE COURT:  No, it's just giving me -- well, wait a

16  minute.  Because this is -- no.  Anyways, never mind.  I don't

17  have my calendar.

18          What dates did you discuss with the parties?

19          UNIDENTIFIED SPEAKER:  Basically, every afternoon

20  this week.

21          THE COURT:  Okay.

22          UNIDENTIFIED SPEAKER:  Except Friday.  We didn't talk

23  about Friday.

24          THE COURT:  Friday --

25          UNIDENTIFIED SPEAKER:  But I don't know.

1            THE COURT:  -- maybe the -- maybe we won't know until

2    tomorrow whether the entire day of Friday is available.

3            MR. COLBY:  I believe Mr. Stastney is unavailable on

4    Friday.  I'm definitely unavailable on Friday, Your Honor.  I

5    apologize.

6            THE COURT:  Okay.  Well, Friday's off the table.

7            MR. COLBY:  If it's something I could move, I would.

8            THE COURT:  Okay.

9            UNIDENTIFIED SPEAKER:  Thursday is off the table.

10           MR. COLBY:  Yeah, Thursday I'm -- Thursday and Friday

11   I'm --

12           THE COURT:  Well, what's the date?

13           UNIDENTIFIED SPEAKER:  Today's Monday.

14           MR. KODOSKY:  Today's Monday.

15           THE COURT:  So we have Tuesday and Wednesday are we

16   talking about?

17           UNIDENTIFIED SPEAKER:  Somebody's not available for

18   most of Wednesday.

19           THE COURT:  So no day this week?

20           UNIDENTIFIED SPEAKER:  No, that's what I'm saying.

21   This week is no good.

22           THE COURT:  Okay.  What about next week?

23           UNIDENTIFIED SPEAKER:  You'd have to talk to Miss --

24   to Eileen probably, because Mr. Caponi is not here either.

25   Anyway --

```
1              THE COURT:  Okay.  And I don't have -- I made a

2    effort not to bring my phone because I don't need to talk to

3    Michael.  I can talk to him on Teams.

4              UNIDENTIFIED SPEAKER:  Uh-huh.

5              THE COURT:  So -- and I can't figure out how to get

6    into my -- because something's missing on here.  I can't get

7    into my calendar.  I have no idea.  I need to have somebody

8    come, because Eileen used to set this up for me every morning

9    and made --

10             UNIDENTIFIED SPEAKER:  Yeah.

11             THE COURT:  -- sure I was in the right domain.

12             UNIDENTIFIED SPEAKER:  I mean, is it normally there

13   if you're signed in properly?

14             THE COURT:  Yeah, if I sign in properly -- hold on.

15   Let me see if I can get out real quick and look.  Hold on for a

16   minute.  So the next week is the week of the 22nd.  Okay.  The

17   23rd I have nothing on my calendar.  No trials on the 24th.  The

18   25th -- I don't have any trials on my calendar and Eileen is out

19   that week.

20             UNIDENTIFIED SPEAKER:  That's probably why.

21             THE COURT:  That's why I don't have any trials.

22             UNIDENTIFIED SPEAKER:  So that's next week?

23             THE COURT:  We can function I think okay without

24   Eileen.  Barely, but we can make it.

25             Then that takes us to the week of the 29th where we
```

1    have a trial on the 3rd of November.  I don't see anything,

2    except the 1st is out.  I have a longstanding appointment.

3              All right.  So --

4              UNIDENTIFIED SPEAKER:  So what do we have on the 23rd

5    or the 27th?  Do you have anything?

6              THE COURT:  I see nothing on the 23rd and nothing on

7    the 27th.  Those two whole days are available.  Unless we

8    didn't put it in -- Eileen's been putting everything on my

9    calendar, you know, Carol --

10             UNIDENTIFIED SPEAKER:  Uh-huh.

11             THE COURT:  Yes, counsel?

12             MR. KODOSKY:  Your Honor, I hate to ask this, but I

13   figured I'd ask because we've got a little bit of a situation.

14   If we were going to try to get those two emails in as notice,

15   and since they're addressed to Mr. Robertson, he's not back

16   from Africa until November the 3rd.

17             So I don't know if you want me to recall him now for

18   that brief issue, or we can also speak to Phillips and get

19   notice since they -- we have a press release that went out that

20   said that we -- not we, but they had, Alaya (phonetic), I think

21   who they sold the patent portfolio to had a press release that

22   went out.  So obviously between that and the emails, we would

23   be inquiring on notice under this license anyway.  But I don't

24   know what you prefer us to do.

25             THE COURT:  Have Mr. Colby -- I mean, otherwise, he

1   says he's going to call him and --

2          MR. COLBY:  Yeah.  No, we would object to recalling

3   Mr. Robertson.  Debtors have had these documents since August,

4   at least one of them since August.  Mr. Robertson was here.  He

5   testified they didn't do it.  That was their choice.  So I

6   think that ship has sailed, Your Honor.

7          This notice theory is something that could have been

8   addressed.

9          THE COURT:  Well, they can address it, but they may

10  not be able to get Mr. Robertson to address it.  They may do it

11  by some other method, but not by Mr. Robertson because they've

12  already called him.  And typically, he's not a rebuttal

13  witness, what is he?  I mean, you can't call a witness.  You

14  don't get the evidence out and then say recall.  That's not how

15  that works.

16         And so, I'm going to have to agree, you cannot recall

17  him, unless you're calling him to rebut something.  He's not a

18  recall witness.  You get one bite at it in terms of your direct

19  and then, ask him.  I don't think we can do that.  You can

20  confer with Mr. Colby, but we're definitely not doing it right

21  now.

22         And you can figure out and you can figure out how to

23  get the announcements in.  There's nothing stopping you from

24  trying to do it that way.  I just don't think you can do it

25  because you already released Mister -- because I asked you, you

1   know, you're done.  He was released as a witness.  And the only

2   way he can come back is as a rebuttal, and I'm not quite sure

3   how that's going to work.  But you can ask Mr. Anthony about

4   it.  I don't know.

5            Okay.  So you guys figure that out.

6            We still need to come up with a date.  So November

7   3rd is not an issue.  But I can tell you guys, just because we

8   continue this hearing, presumably, you know, we're carrying

9   this out, I -- we're going to be moving forward on the Motions.

10  I'm not going to just stand still.  And whether this would have

11  an effect on it or not, I don't know.

12           MR. COLBY:  Your Honor, we would also -- in light of

13  what happened this past weekend, we would also request that at

14  least the record of written submissions on this TRO Motion be

15  closed and that we not be faced with another Saturday night

16  special with a bunch of new briefs and new exhibits and, you

17  know, new things like that.

18           I think in that case, we're up against, yet again,

19  another sort of moving target and I think if that were to

20  happen, we might be doing this, you know, in perpetuity.  And

21  we also -- I also have a question for the Court regarding

22  whether -- I know that that new filing was not part of what the

23  evidence was going to be today.

24           But if it's part of the written record on this

25  Motion, the Supplemental submission that was made on late

1  Saturday night, early Sunday, you know, we haven't had an

2  opportunity to respond to it.  If it's excluded, it's not being

3  considered, fine, we'll leave it alone.

4          THE COURT:  Well, counsel, what I said was that I was

5  not going to allow any evidence that was different from what

6  was in the original Motion.  To the extent that the

7  Supplemental Motion talked about trade secrets, that was in the

8  original Motion.  To the extent that it had something to do

9  with Mr. Stastney's employment contract, the liability.

10         MR. COLBY:  Okay.

11         THE COURT:  None of that.

12         MR. COLBY:  Well then, Your Honor, I guess since this

13 was a Supplemental brief without the Court's permission and

14 outside of the Court's procedures and we haven't had an

15 opportunity to respond to these new legal arguments apparently

16 that are being made about trade secrets, because previously,

17 the trade secrets were referenced in the initial Motion.

18         But again, we didn't know what we were responding to.

19 It was very nonspecific.  It was very vague.  We would ask that

20 we at least be allowed to respond to the portions of that

21 Supplemental submission that addressed trade secrets, because

22 it was not part of the Court's procedures.  It was dropped on

23 us at the last minute.  We should have an opportunity to

24 respond.

25         MR. ZAHRALDDIN:  We have no objection to Mr. Colby

1  responding to those portions.  I'm all for schedules, but when

2  I try to talk to Mr. Colby and others, no one gives me a

3  schedule.  They file Motions.  So more than happy to do that,

4  Your Honor.

5          THE COURT:  All right. I'm going to say this for the

6  last time.  Guys, I get that you're all invested in this, in

7  terms of what you're doing.  But it does not move the ball one

8  bit by filing, not cooperating.  I thought things were going a

9  little smoother and that we were just kind of moving along.  We

10  had some different players who were running this.

11          We seem to be playing pretty well together and that

12  we would be able to move, you know, pretty expeditiously

13  through this without a lot of complications.  So with that

14  being said, to the extent you believe that there are some

15  things in the Supplement that was not -- because putting aside

16  the issue of whether the Supplement was even filed, you have

17  said that they talked about trade secrets, but they weren't

18  specific.

19          Had they not filed that and obviously, no discovery,

20  because after the TRO, you just sort of respond to what you

21  think it is, that's what would have happened.  And you could

22  have said, well, it was vague, so we really need a little more

23  time to respond.  That's how I'm treating that.

24          MR. COLBY:  Right.

25          THE COURT:  So that is a different issue.  Anything

```
 1  else, I don't -- I'm not addressing.  You may want to -- I know

 2  there was a whole lot of new cases cited.  You know, you may

 3  want to give me some legal -- but only to the extent I think I

 4  read -- and I'm not even going to, because I read so much, that

 5  it may just be cases relating to the standard, what it is,

 6  trade secrets, how you determine whether trade secrets are

 7  something that needs to be protected.  You can respond to all

 8  of that, because I would have wanted that anyway.  That is

 9  something new.

10          MR. COLBY:  Appreciate that, Your Honor.  That's all

11  I'm asking.

12          THE COURT:  Okay.  How much time do you need for --

13  because that will dictate when you're going to have a hearing?

14          MR. COLBY:  Oh, I think if we can -- I think

15  scheduling the hearing with all the various parties' schedules

16  is the more difficult part.  So we should do that and we'll --

17          THE COURT:  You'll work from backwards --

18          MR. COLBY:  I mean, we'll --

19          THE COURT:  -- from there?

20          MR. COLBY:  -- get it -- yeah, we'll get it done.

21          THE COURT:  All right.  So the week of the 23rd --

22  hold on.  Week of the 23rd.  I -- again, have Monday and Friday

23  and the afternoon of Tuesday, the afternoon of Wednesday.  But

24  that -- you know, I think we need more days.  So we have the

25  23rd and the 27th and then we have the 30th and we have a trial
```

```
 1   in -- on the 1st -- on the 3rd.  So right now, we're looking at

 2   23rd, 27th, 30.  For entire days.

 3           MR. COLBY:  Yep.  So speaking for most of the folks

 4   on this side of the room, but not Mr. Caponi.  It looks like we

 5   could do the 23rd.  We can't do the 27th. We could do the 30th.

 6           THE COURT:  Okay.  So the 23rd or the 30th, correct?

 7           MR. COLBY:  Correct.

 8           THE COURT:  All right.  Mr. Kodosky or Mr.

 9   Zahralddin, what are we talking about from your side?

10           MR. ZAHRALDDIN:  I'm not that important, Your Honor.

11   But Mr. Kodosky says he clear, so -- and I'll move things

12   around if I need to.

13           THE COURT:  Okay.  The 23rd or the 30th are the two

14   days.  Subject to confirmation with Mr. Caponi, correct?

15           MR. COLBY:  I'd hate to think we leave him out so --

16           THE COURT:  I'm not even going to comment on that.

17           Mr. Alexander isn't here and Mr. Caponi, the two of

18   them, you know, I think they have one of those sports

19   relationships, where we're on the court, we're on the field is

20   all out war.

21           MR. COLBY:  They're, like, brothers, Your Honor.

22   They just --

23           THE COURT:  It's all-out war --

24           MR. COLBY:  -- you know, they fight like brothers.

25           THE COURT:  -- while we're on the field or in the
```

274

```
 1    Court or on the big -- wherever you are.  And then, afterwards,

 2    we're all, let's go get a drink together.  I see -- that's a --

 3    never mind.  But in any event, that's where we are.  I will

 4    hold the 23rd and the 30th open until you call and confirm

 5    which one of those work.

 6              MR. KODOSKY:  Okay.  I will speak with Mr. Colby and

 7    include other folks on email and hopefully we'll get

 8    something --

 9              THE COURT:  All right.

10              MR. KODOSKY:  -- done.

11              THE COURT:  All right.  That concludes the matters

12    that are scheduled before the Court today.

13              The Court is adjourned until tomorrow at 10:30.

14              UNIDENTIFIED SPEAKER:  Uh-huh.

15              THE COURT:  10:30. Thank you, counsel.  And hopefully

16    that you will be able to get out the courtroom and whatever was

17    going on is over.  If not, there are lots of restaurants on

18    Locus Street.  There's hotels, restaurants, Chinatown, if you

19    want to go get food so you can get out, okay?  Thank you.

20              MR. COLBY:  Thank you, Your Honor.

21              MR. KODOSKY:  Thank you, Your Honor.

22              MR. ZAHRALDDIN:  Thank you, Your Honor.

23              THE COURT:  All right.

24         (Proceedings adjourned)

25
```

<u>C E R T I F I C A T E</u>

       I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: | : | Case No.  23-10763 |
| | : | |
| STREAM TV NETWORKS, INC.   CH: 11 | : | ADV. No.  23-00057 |
| | : | |
| Stream Tv Networks, Inc. Vs | : | Philadelphia, Pennsylvania |
| Shadron L Stastney | | November 27, 2023 |
| | : | 10:58 a.m. |
| A) Motion Re: Motion For | : | |
| Preliminary Injunction Request | : | |
| For Temporary Restraining Order | : | |
| Filed By Alastair Crawford, | : | |
| Delaware And Other Law Firms | : | |
| Representing And Acting In | : | |
| Concert With John Doe(S) And/Or | : | |
| Jane Doe(S), Jane Doe(S), John | : | |
| Doe(S), Asaf Gola, Kevin Gollop, | : | |
| Hawk Investment Holdings Limited, | : | |
| Investment Banks Employed By John | : | |
| Doe(S) And/Or Jane Doe(S), | : | |
| Krzysztof Kabacinski, Arthur | : | |
| Leonard Robert "Bob" Morton, | : | |
| Seecubic B.V., Sls Holdings Vi, | : | |
| Llc, Shadron L Stastney, | : | |
| Seecubic, Inc., Patric Theune | : | |
| Represented By Rafael X. | : | |
| Zahralddin | : | |
| | : | |
| B) Motion For Sanctions For | : | |
| Violation Of The Automatic Stay | : | |
| Filed By Stream Tv Networks, Inc. | : | |
| Represented By Rafael X. | : | |
| Zahralddin | : | |

. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                    Keith Kodosky, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   600 Peachtree Street NE
                                   Suite 4700
                                   Atlanta, GA 30308
                                   404-991-2183

                                   Rafael X. Zahralddin
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

                                   Kevin F. Shaw
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-295-9436

For Hawk Investment Holdings       Steven Caponi, Esq.
Ltd:                               K&L Gates
                                   600 N. King Street, Suite 901
                                   Wilmington, DE 19801
                                   302-416-7080

                                   Jonathan N. Edel, Esq.
                                   300 South Tryon St., Suite 1000
                                   Charlotte, NC 28202

For SeeCubic, Inc.:                Eben P. Colby, Esq.
                                   Marley Ann Brumme, Esq.
                                   Skadden Arps Slate Meagher &
                                   Flom, LLP
                                   500 Boylston Street, 23rd Floor
                                   Boston, MA 021116
                                   617-573-4800

For SLS Holdings VI, LLC:          Davis Lee Wright, Esq.
                                   Robinson Cole, LLP
                                   1201 North Market Street
                                   Wilmington, DE 19801
                                   302-516-1703

<u>APPEARANCES</u>:

For Rembrandt 3D Holding                Andrew Peter Demarco
Ltd.:                                   Devlin Law Firm, LLC
                                        1526 Gilpin Avenue
                                        Wilmington, DE 19806
                                        302-449-9010


For Shadron L. Stastney:                Terence M. Grugan
                                        Ballard Spahr
                                        1735 Market Street, 51st Floor
                                        Philadelphia, PA 19103
                                        215-864-8320

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Christopher Michaels
(By Mr. Kodosky)            8                      211
(By Mr. Colby)                      196
(By Mr. Caponi)                     203

```
 1   NOVEMBER 27, 2023                              10:58 A.M.

 2            THE BAILIFF:  All rise.

 3            THE COURT:  Good morning, counsel.

 4            UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

 5            MR. KODOSKY:  Good morning, Your Honor.

 6            THE COURT:  Okay.  If I recall correctly -- well,

 7   this the matter of Stream TV and Technovative, Inc., and it is

 8   a motion for a preliminary injunction.  I'm not quite sure if

 9   it's preliminary at this point, but that's what it's called.

10   And if I recall correctly after our rather lengthy telephone

11   conference, last -- was that Friday?

12            MR. KODOSKY:  Wednesday, Your Honor.

13            THE COURT:  Oh, it was Wednesday, the day before

14   Thanksgiving.  Yes, indeed.  If I recall correctly, what we

15   planned for today's hearing is for the Debtor movant to

16   conclude its case in chief with the testimony of its, of Mr.

17   Michaels, correct?  And then once that occurs, we were going to

18   then have the Respondents -- I have an echo.  Is that -- I'm

19   hearing and echo.  Okay.  Then the Respondents were going to

20   commence their rebuttal.  Well, I guess -- is it a rebuttal

21   witness or is it their response to the Debtor's case in chief?

22            UNIDENTIFIED SPEAKER:  It would be our response.

23            THE COURT:  Right.  I don't know why we're calling

24   them a rebuttal, but we're not even there yet.  Are we okay,

25   John?  We did address one technical problem.  I think Ken
```

1    addressed that one.

2              UNIDENTIFIED SPEAKER:  I got --

3              THE COURT:  Okay.  I'm waiting for Taylor (phonetic)

4    to bring me a -- I guess we can continue on this.  okay.  Let's

5    start with entry of appearances, please.  First for the Debtor

6    movant.

7              MR. KODOSKY:  Keith Kodosky along with my partner,

8    Rafael --

9              MR. ZAHRALDDIN:  Zahralddin.

10             MR. KODOSKY:  -- Zahralddin.

11             THE COURT:  Thank you very much.

12             MR. KODOSKY:  And Your Honor, we also have Mr. Kevin

13   Shaw --

14             MR. ZAHRALDDIN:  Kevin Shaw.

15             MR. KODOSKY:  -- as well in the court with us.

16             THE COURT:  Okay.  Who's here for the responding

17   parties?

18             MS. BRUMME:  Morning, Your Honor.  Marley Ann Brumme

19   and Eben Colby of Skadden Arps for SeeCubic, Inc.

20             THE COURT:  For SeeCubic.

21             MR. CAPONI:  Morning, Your Honor.  Steven Caponi from

22   K&L Gates on behalf of Hawk.

23             MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

24   of Robinson and Cole on behalf of SLS Holding Vincenzo, LLC.

25   Terence Burgan from Ballard Bar in Manhattan.  Anyone else

1  morning?

2          MR. GRUGAN:  Good morning, Your Honor.  Terance

3  Grugan from Ballard Spahr on behalf of Mr. Stastney.

4          THE COURT:  Anyone else?

5          MR. DEMARCO:  Morning, Your Honor.  Andrew DeMarco

6  from Devlin Law Firm here for Rembrandt.

7          THE COURT:  Are there any preliminary matters or can

8  we commence with the testimony of Mr. Michaels?

9          MR. KODOSKY:  Your Honor, I think we should commence

10  with the testimony and if there's anything that we need to

11  bring up later, I'll alert you to it for on the -- on the

12  Debtor's side.

13          THE COURT:  Mr. Colby?  Ms. Brumme?

14          MR. COLBY:  No, Your Honor.

15          THE COURT:  Mr. Caponi?  Anyone else?  Okay.  Let's

16  begin.

17          MR. KODOSKY:  Thank you, Your Honor.

18          THE CLERK:  Mr. Michaels, can you hear me?

19          MR. MICHAELS:  Yes, I can.

20         CHRISTOPHER MICHAELS, DEBTOR'S WITNESS, SWORN

21          THE CLERK:  Thank you.  Could you please state and

22  spell your name for the record?

23          THE WITNESS:  Christopher Michaels, spelled,

24  C-H-R-I-S-T-O-P-H-E-R Michaels, M-I-C-H-A-E-L-S.

25          THE CLERK:  And if you could please state your

1   address for the record.

2           THE WITNESS:  My residence address is 12417 Country

3   Day Circle, usually abbreviated, CIR for the post office, Fort

4   Myers Florida, 33913.

5           THE CLERK:  Thank you.

6                        DIRECT EXAMINATION

7   BY MR. KODOSKY:

8   Q    Good morning, Mr. Michaels.  Can you hear me okay?

9           THE COURT:  Can we see him?

10           THE WITNESS:  Yes, I can.

11           THE COURT:  Can we see him.  Okay.  There we go.

12   BY MR. KODOSKY:

13   Q    To begin, Mr. Michaels, I'd like to start with just a few

14   questions regarding your personal background.

15           THE COURT:  Before we begin, counsel, Mr. Michaels,

16   do you have any -- can you adjust your camera, so that we can

17   see that you have nothing in front of you on -- if you're at a

18   desk or wherever it is you're seated.

19           THE WITNESS:  I can try.  Let's me see.  We have --

20   so I'm not sure what you're seeing.

21           THE COURT:  Or if you can just attest that there's no

22   documents or there's nothing in front of you.

23           THE WITNESS:  The only thing in front of me is -- I

24   deactivated my iPad meeting.  I put it in airplane mode and I

25   have a silent cell phone and then the computer monitor itself.

```
 1              THE COURT:  Okay, but --

 2              THE WITNESS:  And then just a mic.

 3              THE COURT:  But no document?

 4              THE WITNESS:  There's no papers.

 5              THE COURT:  All right.

 6              THE WITNESS:  No document.

 7              THE COURT:  All right.

 8              THE WITNESS:  -- in front of me.

 9              THE COURT:  All right.  Thank you.  You may proceed,

10   Mr. Kodosky.

11              MR. KODOSKY:  Thank you, Your Honor.

12   BY MR. KODOSKY:

13   Q    Mr. Michaels, I'd like to start with a few questions

14   regarding your personal background.  Do you hold any degrees?

15   A    I hold a degree in Chemistry from Bucknell University.  I

16   hold a juris doctorate from Syracuse University and a Master in

17   Business Administration from the Wharton School University of

18   Pennsylvania.

19   Q    What years did you receive those degrees?

20   A    The degree from Bucknell 1989, '90s.  I finished early in

21   -- but the law degree was in 1993 and 2014 MBA.

22   Q    Thank you.  Are you a member of any bars?

23   A    Yes, the New York State Bar Association.  I was admitted

24   in New Jersey, but I let that lapse once my family moved out of

25   the state and I am a registered patent attorney.
```

1   Q     What year did you become a registered patent attorney?

2   A     I actually passed the agent's exam in 1990 and once you

3   pass the -- so I was admitted in April of 1990, but all you do

4   is inform that you are now an attorney and they move you from

5   an agent to patent attorney status.  It is not a

6   reregistration.  It's the same registration, 1990.

7   Q     Can you very briefly describe how one becomes a patent

8   attorney?  Is there a process?

9   A     Yes.  To be qualified to sit for the registration exam,

10  you need a technical background and the patent office changes

11  that from time to time, but generally, what they call the hard

12  sciences, physics, chemistry.  For a long time, biology, for

13  example, didn't even qualify.  And once they've approved your

14  -- you have the proper technical background, they allow you to

15  sit for a registration exam and once passed, they submit you to

16  an ethics review and then you become registered as someone

17  authorized to represent individuals before -- individuals and

18  companies before the patent and trademark office.

19  Q     Are you familiar with the term USPTO?

20  A     Yes, the United States Patent and Trademark Office.

21  Q     Thank you.  Are you a member of a law firm?

22  A     Yes.  I -- the image behind me is the foyer of my law

23  firm, Brown and Michael's.  Mike Brown has retired but practice

24  has been in existence since about 1980 it's had various

25  successors and partners come and go, but its current

```
 1   incarnation is Brown and Michael's.

 2   Q     And where is the firm located?

 3   A     Ithaca, New York.

 4   Q     Any other branch offices?

 5   A     We have -- we're going to be moving our offices up into

 6   Syracuse, but right now, we're largely working as remote.  I,

 7   for example, am sitting in Florida.  My current business

 8   partner is in Syracuse and one of our long term patent agents

 9   is in Pittsburgh, Rochester, New York, so we work largely

10   remotely.

11   Q     And when did you begin to practice at Brown and Michaels,

12   PC?

13   A     1989.

14   Q     Are you the managing partner of the firm?

15   A     Yes.

16   Q     What year did you become managing partner?

17   A     January 1st, 1994.

18   Q     There's been reference made to Rembrandt in these

19   proceedings.  Are you also employed by Rembrandt 3D Holding

20   Limited?

21   A     I am an officer of the company.  I do not receive

22   compensation or W-2 employment, but I'm an appointed officer.

23   Q     And what office do you hold specifically?

24   A     Chief financial officer.

25   Q     And there are actually two companies with Rembrandt in the
```

1   name.  Is that correct?

2   A    Yes.

3   Q    What is the second company's name?

4   A    Rembrandt 3D Corp.  And it's a Delaware Corporation.

5   Q    In broad terms, can you please explain the difference

6   between the two companies?

7   A    Yes.  Rembrandt 3D Holding Limited is a holding company.

8   It owns most, if not all, of the intellectual property that is

9   related to these two companies for Rembrandt.  The Rembrandt 3D

10  Corp is an operating company.  It provides the installations,

11  purchases, contracts for our supply displays and then provides

12  services to clients who receive the displays.  For example,

13  Rembrandt 3D Corp was the entity that sold the system to the

14  Frank L. Wright Museum, Pittsburgh Airport, et cetera and where

15  you can see installations of the no glasses 3D product prepared

16  by the Rembrandt companies.

17  Q    Switching gears.  Are you familiar with the Debtor, Stream

18  TV Networks, Inc.?

19  A    Yes.

20  Q    Are you familiar with Stream's Ultra D products?

21  A    Yes.

22  Q    What do you know about those products?

23  A    We -- a fair amount, but we -- it is limited to what we

24  are able to see as users of the system.  We've not seen any of

25  the internal code.  We evaluated extensively the Stream TV

1   products before litigation was commenced and after and during

2   that litigation in the 2016, '17 litigation in the Southern

3   District of New York.  Part of the mediation process was we

4   were provided examples of the displays that they were selling

5   at the time.  And I sat in a room with executives and discussed

6   with our various team members the Ultra D product and what it

7   was capable of doing relative to various other products that we

8   had manufactured and various products that Phillips had

9   manufactured in the past.

10  Q    And we're going to come back to that.  In the meantime,

11  I'd like to ask you, does Rembrandt currently have a business

12  relationship with Stream TV?

13  A    Yes.

14  Q    Could you --

15  A    We have a settlement agreement -- go ahead.  Sorry.

16  Q    I was just going to ask if you could please explain.

17  A    Sure.  The resolution of the litigation between Stream TV

18  Networks, Inc. and Rembrandt was a settlement agreement and

19  license agreement that provided for a number of things.  One, a

20  cash payment; two, honoring the Rembrandt intellectual

21  property; three, the supply of at cost displays through

22  production agreements to be negotiated, but at all times at

23  cost.  And we're now up to, you know, millions of units that

24  would be owed under that agreement.  That works for both

25  companies, in that we're providing at least cost.  It's not

1  that Stream would be losing money, but we are now moving our

2  supplier from other sources to Stream.

3  Q    You referenced earlier Rembrandt's intellectual property.

4  What right does Stream TV have to use Rembrandt's IP under the

5  license agreement?

6  A    Stream is a nonexclusive licensee.  That allows them to

7  use it.  It does not allow them to transfer any rights to that

8  technology other than to a consumer.  And that's fairly

9  standard in the industry.  But the -- if they wanted to do a

10 deal where they transferred out a manufacturing license, for

11 example, to somebody else, they would have to come back to

12 Rembrandt and Rembrandt would directly license that

13 manufacturer, if we were willing to do so at all.  But in any

14 rate, we're -- the main existing relationship is going to be a

15 supplier -- Stream TV Networks to be a supplier to Rembrandt

16 and Rembrandt to have supplied technology in the form of a

17 license to Stream.

18 Q    I apologize if you've already mentioned this, but how long

19 has Stream TV had the license with Rembrandt?

20 A    That was actually the subject of the 2017 litigation.  It

21 involved a contract that purported to give a license to them

22 and in return, it was to give certain monetary and ownership

23 rights to Rembrandt.  As opposed to litigating that to

24 fruition,  we reached the settlement agreement in 2021.  So

25 arguably, the rights existed from 2010 forward.  And in fact,

1   that was the result.  I mean, as part of the settlement is --

2   and they exist today subject to performance under the

3   agreement.

4   Q    Thank you.  What about the other Debtor in this matter?

5   Are you familiar with Technovative Media, Inc.?

6   A    Yes.

7   Q    What do you know about Technovative's business?

8   A    Our understanding is that Technovative is a subsidiary to

9   Stream and is a holding company that controls various other

10   subsidiaries that are actively attempting to use Rembrandt's

11   technology without paying a license fee, without agreeing to

12   the other terms of the agreement.  So that is our -- I mean,

13   we -- our understanding is that it's Technovative that controls

14   those entities.

15   Q    And we'll come back to that.  In the meantime, does

16   Rembrandt have a business relationship with Technovative?

17   A    No, other than -- depending on how you define business

18   relationship.  Our license agreement is with Stream, the top --

19   our understanding is the top entity.  That's not an accident.

20   That was a purposeful -- they were purposely added as the

21   defendant in the litigation and the party with which we were

22   contracting with to resolve the agreement and the settlement.

23   Q    Does Technovative have any right to use Rembrandt's IP

24   under the license agreement?

25   A    Only if they're supplying product to Stream.

1   Q    Are you familiar with SeeCubic, Inc., which sometimes in

2   this proceeding has been referred to as SeeCubic of Delaware?

3   A    Yes.

4   Q    What do you know about SeeCubic, Inc.?

5   A    Our understanding is that SeeCubic, Inc., is actively

6   trying to use and is using Rembrandt technology and trying to

7   provide content for no glasses 3D using Rembrandt tools and

8   providing and offering to sell no glasses 3D TVs.  They have --

9   we have provid -- and we have pursued litigation to enjoin them

10  from doing so.  The -- that is, I mean, I can keep going on,

11  but that's the general gist of what I understand at this point.

12  Q    And we'll speak about that, but what is your understanding

13  as to whether or not SeeCubic, Inc. is a competitor of Stream

14  TV?

15  A    I think they're about as competitive as an entity can be.

16  They're actively on their website and in their PPM saying

17  they're taking over the technology of Stream TV.  They're

18  working with employees that worked back in the day with 3D

19  Fusion, the predecessor to Rembrandt.  They're trying to market

20  all of the same products and services as Stream.  So they're a

21  competitor.

22  Q    Does Rembrandt have a business relationship with SeeCubic,

23  Inc.?

24  A    No.

25  Q    Has Rembrandt ever had a business relationship with

1  SeeCubic, Inc.?

2  A     No.

3  Q     Does SeeCubic, Inc. have any right to use Rembrandt's IP

4  under the license agreement with Stream TV?

5  A     No.

6  Q     Are you familiar with an entity that's been referred to on

7  these proceedings as SCBV, SeeCubic BV?

8  A     Yes.

9  Q     What do you know about --

10  A     Yes.

11  Q     What -- I'm sorry to interrupt you.  What do you know

12  about SeeCubic BV?

13  A     It is our understanding that SeeCubic BV is a Netherlands

14  corporation that employs a number of people that used to work

15  for 3D Fusion Rembrandt and then it was controlled by Stream

16  through Technovative to design and develop various tools for 3D

17  content creation and the hardware for a no glasses, 3D TV.

18  They actively have access to Rembrandt's trade secrets and are

19  actively using technology covered in Rembrandt patents in

20  creation of various prototypes and products for Stream and --

21  well now, SeeCubic of Delaware.

22  Q     Is SCBV using Rembrandt's IP with Rembrandt's blessing?

23  A     Only if they're creating product for Stream.  In that

24  configuration, we license Stream and they're free to have

25  product made for itself and provide products to the world.

1    They are not free, SCBV is not free to provide that to any

2    other entity, not Technovative and not even -- and certainly

3    not SeeCubic of Delaware.

4    Q    I take it, Rembrandt does not have a business relationship

5    with SCBV.  Is that correct?

6    A    That is correct, other than as a -- that is a -- we have a

7    relationship with Stream, but not with SCBV directly.

8    Q    Has Rembrandt ever had a direct business relationship with

9    SCBV?

10   A    No.

11   Q    Does SCBV have any right to use Rembrandt's IP under the

12   license agreement?

13   A    Only to make product and provide services through Stream.

14   So no, not -- they can't provide anything to any other party

15   outside of our licensing.

16   Q    Do you know Mr. Shadron Stastney?

17   A    Yes.

18   Q    When did you first meet Mr. Stastney?

19   A    I believe the first time we met or spoke, for that matter,

20   was during the mediation process in the Southern District of

21   New York litigation between Rembrandt and Stream.

22   Q    You listened to the testimony that Mr. Stastney provided

23   in connection with a TRO proceeding back on October 6th 2023.

24   Is that correct?

25   A    Yes, I did.

1  Q    Did you note any inaccuracies in Mr. Stastney's testimony?

2  A    I did.

3  Q    We'll come back to that.  Now, Rembrandt filed a brief in

4  support of the Debtor's motion for a temporary restraining

5  order.  Correct?

6  A    Yes.

7  Q    Why does Rembrandt support the Debtor's TRO motion?

8  A    For a variety of reasons, but it really goes back to the

9  the core of Rembrandt's interests.  The -- specifically, we're

10 looking to protect our intellectual property and to see it

11 commercialized effectively.  We have licensed Stream.  Stream,

12 continuing to do business in the no-glasses 3D space, is in our

13 interest.  That means they can pay us.  That means that Stream

14 can provide us the products we're looking to sell to other

15 customers, which quite frankly, is where we will make far more

16 revenue than from the licensees.  So we are very interested in

17 not seeing the technology leak into the marketplace.  We do not

18 want to see our tools and techniques, and the things that we

19 have developed, and the trade secrets go to particular

20 jurisdictions in, specifically, China.  India would be, of

21 course, concern to us.  So we're interested in seeing that

22 technology protected.

23 Q    Are you familiar with SeeCubic Inc.'s business model?

24 A    I am familiar with their business model and the private

25 placement memo they've published.

1   Q    The private placement memorandum, that's also referred to

2   as a PPM, correct?

3   A    Yes.

4   Q    Are you familiar with the 2020 SeeCubic PPM that's been

5   submitted and marked, and introduced as an exhibit in this

6   case?

7   A    Yes.

8           MR. KODOSKY:  Your Honor, I am going to ask the

9   witness to take a look at what has been previously introduced

10  as Debtor's Exhibit Number 6.  If I may, I've got a copy for

11  the Court in this binder that I can pass out.

12          THE COURT:  Okay.  Is it -- right.  Well, let's start

13  -- I know I thought the parties had no objection to me looking

14  at documents prior -- but this has been admitted into evidence

15  already.  All right.  And is it in another binder, or you just

16  put this together for my ease?

17          MR. KODOSKY:  For your ease.

18          THE COURT:  All right.  Let's -- anybody object to me

19  looking at it in that binder?

20          MR. COLBY:  No, Your Honor.

21          THE COURT:  All right.  Great.  So I don't have to go

22  searching through binders.  Great.  Okay.

23          MR. KODOSKY:  And the witness, I've -- in preparation

24  for today, I had sent the witness a copy of --

25          THE COURT:  He doesn't need to pull any documents.

1    That's why I asked him what did he have in front of him.  Don't

2    take out anything.

3              Jon, how are we going to do this?  Can we pull it up?

4              MR. EDEL:  Is it the complaint?

5              MR. KODOSKY:  It's Exhibit Number 6.  It is --

6              THE COURT:  SeeCubic, Inc.  It was admitted in

7    Debtor's Cases 6?

8              MR. KODOSKY:  I believe so, Your Honor.

9              THE COURT:  In this proceeding?

10             MR. KODOSKY:  Yes, Your Honor.  And I've got a second

11   copy if --

12             THE COURT:  Well, we have to have him look at it.

13   How's he going to -- had anybody through that through?  Because

14   typically, when we have a Zoom hearing, we pull up the document

15   on the screen so that the witness can see it.  That means you

16   don't need to see me.  I don't care.  Can we take me off and

17   can we add another --

18             MR. EDEL:  I just don't have it.  Do you have a --

19             MR. KODOSKY:  I can email it to you.

20             THE COURT:  Yes.

21             MR. KODOSKY:  I've got a PDF that I can --

22             MR. EDEL:  Yeah.

23             THE COURT:  Yes.  Would you?  Oh, I thought -- yes,

24   no one -- PDF document.  Send it to you, Jon?

25             MR. EDEL:  Not from this side.  We've --

1              THE COURT:  Okay.  Counsel, can you send all of the

2     documents that you intend to have this witness testify

3     regarding?  Because the only way -- we want to make sure that

4     we are in control of the documents and that we're all looking

5     at the same documents, and that there's nothing different.

6              Yes, Jon?

7              MR. KODOSKY:  I'm happy to, Your Honor.

8              THE COURT:  Doing --

9              MR. KODOSKY:  I would just ask for your email

10    address --

11             MR. EDEL:  Share them and then --

12             MR. KODOSKY:  -- and I will send those to you.

13             THE COURT:  Wait, what did you say?  Hold on.  Hold

14    on.

15             MR. EDEL:  I'm just wondering if it's easier for them

16    to share on their end.

17             THE COURT:  Is it on your -- can you share it?

18             MR. EDEL:  But that might complicate things.

19             THE COURT:  That's going to complicate, okay.  Here's

20    what we're going to do.  I'm going to take a few minutes so

21    that you can email the documents to Jon, and then we'll have

22    all of them.  And when I say a few minutes, I'm not even moving

23    from here.  We're just going to be in recess for a few minutes

24    so that we can deal with the technical issues, okay?  So we're

25    off the record for now.

1    (Record taken)

2         THE COURT:  All right.  You may proceed, Mr. Kodosky.

3         MR. KODOSKY:  Thank you, Your Honor.

4    BY MR. KODOSKY:

5    Q    Mr. Michaels, are you able to see on your screen Debtor's

6    Exhibit Number 6?

7    A    Yes.  Yes, I am.

8    Q    Do you recognize this to be the SeeCubic 2020 PPM that you

9    had referenced before we just took this short break?

10   A    Yes, I do.

11   Q    If we can please take a look at page 13 of 34.  And

12   specifically, what I'd like to direct your attention to, Mr.

13   Michaels, is the part of this page that begins, "Business

14   Model" in bold.  If you can see that paragraph, and take a

15   moment to review it, please.

16   A    Yes, I've reviewed it.

17        THE COURT:  Wait a minute.  Counsel, where are we at?

18        MR. KODOSKY:  On page 13 of 34, which is page -- I'm

19   sorry.  Jon, if you can scroll to the bottom of the page to see

20   what the page number is of this.  It says 4 at the bottom, but

21   it's page 13 of 34, so --

22        THE COURT:  Well, how about we use the number,

23   because this also has been -- was this file of record?

24   Apparently.  All right.  Page 4, business model.  All right.

25   Page 4.  I don't know whether it's 13 or -- well, for my

1    reference, page 4.  Okay.

2    BY MR. KODOSKY:

3    Q    Mr. Michaels, if you could take a moment to review the

4    business model description from the SeeCubic 2020 PPM, and

5    please let us know when you've finished reviewing that.

6    A    I have finished reviewing it.

7    Q    Had you seen this PPM and this business model description

8    before today?

9    A    Yes, I have.

10   Q    And is this the provision that, at least partly, informs

11   your understanding of the SeeCubic, Inc. business model?

12   A    Yes, it is.

13   Q    Thank you.

14            MR. KODOSKY:  If we can please show the witness

15   Debtor's Exhibit Number 5.  Previously introduced, which is the

16   -- well, I'll hold off.

17   BY MR. KODOSKY:

18   Q    Do you recognize this to be the SeeCubic 2022 PPM that you

19   had referenced earlier?

20   A    Yes, I do.

21            THE COURT:  Which year?

22            MR. KODOSKY:  2022. Jon, I'd like to begin by

23   directing the witness to page 10 of 29.

24            THE COURT:  And that is Exhibit -- what, again?

25   Five?

25

```
1              MR. KODOSKY:  Yes, Your Honor.

2              THE COURT:  Exhibit 5.  And that is page 10 down at

3    the bottom or -- because I have PPM 9 and then -- yes, okay.

4    BY MR. KODOSKY:

5    Q    You see, Mr. Philips (sic), the section that begins in

6    bold, "The Company"?

7    A    Yes, I do.

8    Q    Where it states, "The company was founded in 2020 by the

9    secured creditors of Stream TV Networks, Inc. to acquire

10   substantially all of the assets of Stream TV, including all

11   subsidiaries and all the technology assets."  And it goes on to

12   state that, "The company's technology, when licensed to a

13   consumer device manufacturing partner, and incorporated as a

14   component of any panel device" -- and it lists, "-- television,

15   monitor, phone, etcetera, displays content in glasses-free 3D."

16   Do you see that?

17   A    I do.

18   Q    Is that consistent with your understanding of SeeCubic's

19   business model, where they license, or intend to license the

20   technology?

21   A    Yes, it is.

22             MR. KODOSKY:  If we could please take a look at page

23   28, please.

24             THE WITNESS:  Are you waiting on me?  I can see page

25   28, if that's the question.
```

```
 1                   MR. KODOSKY:  I'm sorry.  I am --

 2                   THE COURT:  Wait, 28?  That's a different -- Jon, are

 3    we on 28?

 4                   MR. EDEL:  I'm on 28 of 29 on the file, but we want

 5    the page, actual page 28?

 6                   THE COURT:  At the bottom.

 7                   MR. KODOSKY:  Yes.  The page 28.  It would be 26 of

 8    29.  I'm sorry, Jon.

 9                   MR. EDEL:  Gotcha, yup.

10                   THE COURT:  I mean, I just looked down at the bottom.

11    Okay.

12    BY MR. KODOSKY:

13    Q   Mr. Michaels, could you please read into the record the

14    third paragraph there and the certain important transactions

15    section that begins, "The company also".  Do you see that?

16    A    "The company also maintains licensing arrangements for

17    various technologies and products with a variety of

18    manufacturers.  Each agreement requires payment per product

19    sold or for use of technology, or -- as applicable."

20    Q   How do you interpret this provision?

21    A   I believe --

22                   MR. COLBY:  Objection.

23                   THE WITNESS:  -- it is my understanding upon reading

24    it that it --

25                   THE COURT:  Objection.  Objection.  Basis?
```

```
 1              THE WITNESS:  Sorry, I didn't hear the objection.

 2              MR. COLBY:  Yeah.  Objection, Your Honor.  Relevance.

 3   The witness testified he has no -- or Rembrandt has no business

 4   relationship with SeeCubic, Inc.  He's reading out of a

 5   document that he didn't prepare, and has testified merely that

 6   he saw it.  So I don't know exactly where this is going.  I'm

 7   trying to give Mr. Kodosky some rope, but I don't see the

 8   relevance of Mr. Michaels testifying about what this document

 9   means.

10              THE COURT:  Counsel, response?  His objection is on

11   relevance.

12              MR. KODOSKY:  Mr. Michaels has already stated that he

13   is familiar with SeeCubic's business model based on these PPM

14   materials, that he has a problem with the business model, and

15   my next question is going to be what problem, if any, he has

16   with the business model and why --

17              THE COURT:  Okay.

18              MR. KODOSKY:  -- it resulted in litigation.

19              THE COURT:  All right.  Mr. Colby, withdrawing your

20   objection?

21              MR. COLBY:  I would withdraw for that --

22              THE COURT:  All right.

23              MR. COLBY:  -- forthcoming question, Your Honor.

24              THE COURT:  All right.  Keep going.

25   BY MR. KODOSKY:
```

1    Q    Mr. Michaels, what problem, if any, do you have with the

2    business model, SeeCubic, Inc. business model description, that

3    you've looked at in these PPM materials?

4    A    The company's business model, as stated, requires a

5    license from Rembrandt, and I read the two sentences in this

6    third paragraph as stating that they have a license from

7    Rembrandt and Philips.  Specifically, the per product sold is

8    the format of the Philips license, and the for use of the

9    technology is the format of the Rembrandt license to Stream,

10   and that I personally negotiated with Shad & Stastney, who

11   likely wrote this.  So my understanding is the company is

12   falsely claiming that it has the licenses it needs when it does

13   not.

14   Q    In other words, SeeCubic does not own any of the

15   technology as attempting to license the others, correct?

16   A    To my knowledge, they don't own any of it.  You're right,

17   but if it's .001 percent, that isn't -- they don't own the

18   technology they're referencing here, and it's necessary to

19   provide hardware, software, or content creation that was

20   developed by Philips 3D Fusion, Rembrandt, and then Stream TV

21   Networks.  So --

22   Q    Is it accurate to state that all business between

23   SeeCubic, Inc. and SCBV was blocked at least through September

24   20th, 2023, when Mr. Stastney was appointed as director of

25   SCBV?

```
 1              MR. COLBY:  Objection.

 2              THE WITNESS:  I'm sorry.  I didn't follow --

 3              THE COURT:  I didn't follow either.

 4              THE WITNESS:  -- that question.

 5              THE COURT:  So, restate the question.  Before you

 6   object, Mr. Colby, he's going to restate it, because I didn't

 7   understand it either.  Not that I'm the witness, but I'm trying

 8   to follow.  What was your question, Mr. Kodosky?

 9   BY MR. KODOSKY:

10   Q    Was all business between SeeCubic and SCBV blocked,

11   B-L-O-C-K-E-D, at least through September 20th of '23 when Mr.

12   Stastney was appointed as director of SCBV?

13   A    I think I --

14              MR. COLBY:  Objection.

15              THE WITNESS:  -- understand your --

16              THE COURT:  Okay, wait a minute.  He's objecting.

17              MR. COLBY:  Well, the witness has no firsthand

18   knowledge.  I don't understand the basis, how he could be

19   testifying as to a relationship or not between two companies of

20   which he's not a part, and testified as to one of them he has

21   no business relationship.

22              THE COURT:  Okay.  Counsel?

23              MR. KODOSKY:  He does have firsthand knowledge, Your

24   Honor.  He's already described what rights SCBV and SeeCubic,

25   Inc. have to use the Rembrandt IP that's been licensed to
```

```
1    Stream TV.

2              MR. COLBY:  That has to do, Your Honor, with, I

3    guess, Stream TV's ability to use Rembrandt technology.  The

4    question was whether or not all business was blocked between

5    SeeCubic, Inc. and SeeCubic BV.  That has nothing to do with

6    Rembrandt's --

7              THE COURT:  Well, I guess he can rephrase this thing.

8    Rephrase the question.  I understand what he's asking.  He's

9    just not stating it --

10             MR. COLBY:  Okay.

11             THE COURT:  -- succinctly.

12             MR. COLBY:  Then --

13             THE COURT:  Rephrase the question.

14   BY MR. KODOSKY:

15   Q    To your knowledge, Mr. Michaels, does SeeCubic intend to

16   have SCBV supply SeeCubic's customers with Ultra D products and

17   services?

18             MR. COLBY:  Objection, Your Honor.

19             THE WITNESS:  That is my understanding.

20             THE COURT:  Wait.  He objected.

21             MR. COLBY:  I don't know --

22             THE WITNESS:  Okay.

23             MR. COLBY:  -- Mr. Michaels can testify firsthand

24   knowledge about what SeeCubic, Inc. intends to do.  He read it

25   out of this document, but so can all of us.  That's not
```

```
 1   firsthand knowledge.  He can testify about what the document

 2   says, I guess, but not as to SeeCubic's intent.

 3           MR. KODOSKY:  Rembrandt has sued both entities, Your

 4   Honor, for exactly this purpose.

 5           THE COURT:  Okay.  So I guess based on -- you can

 6   ask --

 7           MR. COLBY:  I know that bringing a lawsuit gives you

 8   firsthand knowledge about it, but he can testify why he's --

 9           THE COURT:  Counsel, I mean, just rephrase it.

10   BY MR. KODOSKY:

11   Q    Do Ultra D products require a license to the Rembrandt

12   intellectual property to be made, used, sold, offered for sale,

13   exported or imported, Mr. Michaels?

14   A    Yes.

15   Q    Do Ultra D products require a license to the Philips

16   intellectual property to be made, used, sold, offered for sale,

17   exported or important?

18   A    Yes.

19   Q    Do Ultra D products require a license to the Stream TV

20   intellectual property to be made, used, sold, offered for sale,

21   exported or imported?

22   A    Yes.

23   Q    Do Ultra D products require a license to the Ultra D

24   Cooperatief U.A. intellectual property to be made, used, sold,

25   offered for sale, exported or imported?
```

```
1    A     Yes.

2             THE COURT:  Who?  Ultra D Cooperatief?

3             MR. KODOSKY:  U.A.  Yes, Your Honor.

4    BY MR. KODOSKY:

5    Q     Does SeeCubic, Inc. have a license from Rembrandt?

6    A     No.

7    Q     Does SeeCubic, Inc. have a license from Philips?

8    A     No.

9    Q     Does SeeCubic, Inc. have a license from Stream?

10   A     No.

11   Q     Does SeeCubic, Inc. have a license from Ultra D

12   Cooperatief U.A.?

13   A     No.

14   Q     Does SCBV have a license from Rembrandt?

15   A     No.

16   Q     Does SCBV have a license from Philips?

17   A     No.

18   Q     Does SCBV have a license from Stream?

19   A     No.

20   Q     Does SCBV have a license from Ultra D Cooperatief U.A.?

21   A     No.

22   Q     Prior to Mr. Stastney being appointed director of the

23   Netherland subsidiaries of Stream TV, what ability to SeeCubic,

24   Inc. have to do business with SCBV, absent the licenses, in

25   your view?
```

1        MR. COLBY:  Objection, Your Honor.

2        THE COURT:  Basis?

3        MR. COLBY:  Same basis.  And Mr. Michaels, I suppose,

4   can testify about what various parties may or may not be able

5   to do under the Rembrandt license, but other licenses between

6   Philips or these other entities that he's not a part of, I

7   don't think he has firsthand knowledge.

8        THE COURT:  We already answered on that one.

9        MR. COLBY:  Well --

10        THE COURT:  This is the new question.  I mean, you

11   objected and he already testified that he didn't have a

12   license.  SeeCubic didn't have a license with any of the above,

13   Philips, Rembrandt, Stream, Ultra D, and SCBV, Inc. did not

14   have a license from any of the above, from my own short hands.

15   And then he went on to another question.  So you didn't object

16   to those.  I kind of think it's too late to object to his

17   answer, to those he's already answered.  Now, there was a new

18   question that you then objected to.  Now, the new question,

19   you're objecting on the basis that he doesn't have firsthand

20   knowledge with respect to that particular question?

21        MR. COLBY:  Correct, Your Honor.

22        THE COURT:  All right.  Counsel, response?

23        MR. KODOSKY:  He has already answered that --

24        THE COURT:  Well, that, but this is a new question.

25   The new question was -- and I forgot what it was.  What was the

1   new question that you were objecting to -- that Mr. Colby was

2   objecting to?

3          MR. KODOSKY:  And I'm able to limit it -- maybe this

4   will address his objection to the Rembrandt.  Without having a

5   license from Rembrandt --

6          THE COURT:  Okay.

7          MR. KODOSKY:  -- what ability to SeeCubic, Inc. have

8   to do business with SeeCubic BV absent the Rembrandt license?

9   It's actually the question I asked him earlier about being

10  blocked until Mr. Stastney became a director.

11         THE COURT:  All right.  Let's -- I mean, you're

12  trying to rephrase it.  I get he objected and he's trying to

13  address that.  So the question now is what, Mr. Kodosky?

14  BY MR. KODOSKY:

15  Q    Prior to September 20th, 2023, when Mr. Stastney was

16  appointed a director, was SeeCubic, Inc. blocked in their

17  contract with SCBV?

18  A    Yes, for the sale of a no-glasses 3D product.  I mean,

19  they could sell pencils back and forth, but for the relevant

20  technology, they needed a license from all the entities you

21  mentioned.

22  Q    And it's --

23         MR. COLBY:  Your Honor, I wasn't quite quick enough.

24  That was the same objectionable question as before.  Again, if

25  Mr. Kodosky wants to ask about the implications of a Rembrandt

1   license or not having a Rembrandt license, I think that's

2   appropriate, but asking whether or not the -- you know, such a

3   broad question -- Mr. Michaels doesn't have sufficient

4   firsthand knowledge to answer that.

5              THE COURT:  Okay.

6              MR. COLBY:  And I thought --

7              THE COURT:  What?

8              MR. COLBY:  I thought we'd agree to limit it to

9   Rembrandt, but then the question was --

10             THE COURT:  Right.  It was -- okay.  So the objection

11  is that Mr. Michaels does not have firsthand knowledge

12  regarding the relationship between SeeCubic, Inc. and SCBV with

13  respect to, I guess, an agreement between those parties to sell

14  the technology or use the technology?

15             That was the objection, Mr. Colby?

16             MR. COLBY:  Yes, Your Honor.  It's Mr. Michaels would

17  seem to have a basis to testify about the implications of the

18  Rembrandt license, but not quite so broadly about the

19  relationship between the -- I'm trying to be economical in my

20  objections here, Your Honor, but at the same time, I would like

21  to keep us focused on things about which the witness has

22  firsthand knowledge.

23             THE COURT:  All right.

24             MR. COLBY:  And I think if the question were asked

25  about the implications of the Rembrandt licenses that were

1    properly sold is --

2           MR. KODOSKY:  These relate on each other, Your Honor,

3    to the extent that you need the Rembrandt license and the

4    Stream license to be able to do business.  He does have

5    firsthand knowledge regarding the Rembrandt license.  He's

6    already testified to that, and I believe he's also -- I'm going

7    to be asking him what action Rembrandt took when it learned

8    that an independent director had been appointed and --

9           THE COURT:  So your response is that he has firsthand

10   knowledge because Rembrandt didn't have a license with SeeCubic

11   or SCBV, that prior to that, it wasn't authorized to use the

12   license?

13          MR. KODOSKY:  Before Mr. Stastney --

14          THE COURT:  Just prior to that.  That's all you've

15   got to -- okay.  Did you -- the question is, and I think the

16   question is, that prior to 9/20/23, did SCBV or SeeCubic have a

17   license from Rembrandt or Stream to use the technology?  Is

18   that the question?

19          MR. KODOSKY:  The technology is the Ultra-D.  And

20   it's --

21          THE COURT:  The -- use Ultra-D technology.

22          MR. KODOSKY:  And it's made up of licenses from

23   Rembrandt.

24          THE COURT:  I get that.

25          MR. KODOSKY:  From Philips.

```
 1              THE COURT:  But is that what -- so you're just

 2    saying --

 3              MR. KODOSKY:  Stream.

 4              THE COURT:  -- prior to that they didn't have

 5    authority, or they weren't using it?  What's the question?

 6    What was the -- what existed prior to 9/2023 that you're asking

 7    him about?

 8              MR. COLBY:  Right.  And my objection is to Mr.

 9    Michaels testifying as to things beyond the Rembrandt

10    technology.

11              THE COURT:  Okay.

12              MR. COLBY:  So if the question were to be limited to

13    the Rembrandt technology licenses or lack of licenses.  I have

14    no --

15              THE COURT:  Well, and what --

16              MR. COLBY:  -- objection.

17              THE COURT:  -- about his knowledge with respect to

18    the Stream license to those -- because he already testified

19    that he knew that they didn't have a license from Stream or --

20    from Stream.  He already testified that he knew that.

21              MR. COLBY:  Yeah.  If he has firsthand knowledge of a

22    license from Stream, that's fine.  I don't think Mr. Michaels

23    has any firsthand knowledge of any relationship between, for

24    example, Philips and SCBV or SeeCubic, Inc., or as between

25    Ultra-D and SCBV.  So I think if we --
```

```
 1              THE COURT:  Well, he's already testified regarding

 2   that.

 3              MR. COLBY:  He --

 4              THE COURT:  And said it.

 5              MR. COLBY:  You're right.  He testified what did and

 6   didn't exist.  He didn't actually give his basis for firsthand

 7   knowledge as -- again, I'm trying to be economical in my

 8   objection.

 9              THE COURT:  Well, counsel, you didn't object at the

10   time.  I'm just saying.  Like, all right.  We're not going to

11   get bogged down.  I mean, I already heard what I -- I mean,

12   this isn't a jury here.  Can you just rephrase the question?

13   Otherwise, I'm going to sustain his objection.

14   BY MR. KODOSKY:

15   Q    As a director of the Netherland subs --

16   A    Uh-huh.

17   Q    -- is not -- is Mr. Stastney attempting to use color of

18   law or act under a color of law to disrupt the arrangement, Mr.

19   Michaels?

20   A    Yes.

21              MR. COLBY:  Objection.

22              THE COURT:  All right.  Objection -- all right.  I

23   knew you were going to object.  Basis for objection, counsel?

24              MR. COLBY:  If the witness has firsthand knowledge of

25   some actions, he can testify as to those.  But I don't think
```

```
 1    that's been established.  I don't understand --

 2              THE COURT:  Right.

 3              MR. COLBY:  -- I thought we were talking about the

 4    implications of the Rembrandt license, who has it and who

 5    doesn't.

 6              THE COURT:  Well, I think -- I get what he's trying

 7    to -- but you have to lay a foundation.  You have to tell me

 8    how he knows all of this stuff.  I'm going to sustain.  But you

 9    need to lay a foundation.

10    BY MR. KODOSKY:

11    Q    All right.  Mr. Michaels, when did you learn, or did you

12    learn that SC -- or that SeeCubic, Inc. was attempting to

13    utilize SCBV inappropriately without having a license from

14    Rembrandt?

15    A    Yes, we learned it from Shadron Stastney's testimony in

16    the bankruptcy and in this hearing.

17    Q    What action did Rembrandt take upon learning that

18    information?

19    A    It took a variety of actions, not the least of which was

20    to request more information about what the actual activities

21    were.  That resulted in us getting copies of the 2022 PPM that

22    we have on -- on the screen.  And it expressly states that

23    they're trying to license out our technology.  Even claiming to

24    have a license to do so.  So that -- that's -- and to our

25    knowledge, that has not happened yet, even though they are
```

1    expressly stating they intend to do so.  And that's with him as

2    director of that entity, we are very concerned that they will

3    actively start transferring information and technology out to

4    parties that are unlicensed.

5    Q    Let me ask you a different way, Mr. Michaels.  Before Mr.

6    Stastney was appointed director on September 20th of 2023, who

7    had the authority to your knowledge to make that decision?

8    A    Stream TV and specifically Matthu -- Matthu Rajan.

9    Q    And at some point, did you become aware that SeeCubic,

10   Inc. and Mr. Stastney were attempting to have remove Mr. Rajan

11   removed as director of the Netherlands subsidiaries?

12   A    Yes.

13   Q    Did you at some point become aware of who replaced Mr.

14   Rajan as the director of the Netherlands subsidiaries?

15   A    It is our understanding that there was first -- Ian Liston

16   (phonetic) who was -- I think is his name, was -- was added as

17   a receiver and then dismissed when the bankruptcy was filed.

18   And later an attorney from Jones Day was appointed by the

19   Netherlands Court as a -- as an -- the independent director.

20   Q    And that's the gentlemen, his name -- do you recall his

21   name?  Jasper?

22   A    That sounds familiar.  I wrote him an email.  I'd -- I'd

23   easily be refreshed -- my recollection would be refreshed by

24   that email.  But I don't recall his name exactly.

25   Q    So is it fair to say that there was a period of time after

1  Mr. Rajan was removed and before Mr. Stastney was appointed

2  that there was a "independent or neutral director" making that

3  decision?

4  A    Yes.

5  Q    And upon learning that an independent director had been

6  appointed, what action did Rembrandt take to express his view

7  on whether or not the technology could be used?

8  A    I sent the independent director an email outlining our

9  position, importantly referencing the publicly available

10 documents that went into those rights further, and specifically

11 requested that we setup a meeting or a phone call with US IP

12 Practitioners to review the situation.

13 Q    And what response did you receive from the independent

14 director?

15 A    The -- we received a response that -- that he had talked

16 to various people we have -- for many years accused of taking

17 our trade secrets and that we had heavily documented the

18 exchange of trade secrets with specifically Dr. Barenbrug

19 (phonetic) and had told him that they weren't using our trade

20 secrets.  And that was sufficient for him, and we responded

21 then.

22 Q    What was your response?

23           MR. COLBY:  Objection, Your Honor.

24           THE COURT:  Wait, wait, wait.  Okay.  Objection,

25 Mister --

1          MR. COLBY:  Witness is testifying as to hearsay.

2    What somebody else told him out of court.

3          THE COURT:  Okay.

4          Counsel?

5          MR. KODOSKY:  Your Honor, first of all, it's not

6    being offered for the truth of the matter being asserted, and

7    I'd also like to provide the Court with a cite that hearsay at

8    the preliminary injunction stage, the Court does -- the Court

9    may rely on affidavits and hearsay materials, which would not

10   be admissible evidence.  It is the --

11         THE COURT:  What case is that?

12         MR. KODOSKY:  *Kos Pharms*, K-O-S, Pharms --

13         THE COURT:  All right.

14         MR. KODOSKY:  -- P-H-A-R-M-S.

15         THE COURT:  K-O-S.

16         MR. KODOSKY:  I'm sorry?

17         THE COURT:  K-O-S.

18         MR. KODOSKY:  K-O-S space Pharms, P-H-A-R-M-S.

19         THE COURT:  Oh Kos pharms.  Okay.

20         MR. KODOSKY:  369 F.3d at 718.  And that cite is

21   actually referenced in a Western District of Pennsylvania, June

22   9th, 2022, case opinion, styled *Not an LLC v. Bureau of*

23   *Alcohol*, Civil Action number 2:22-CV-747.

24         THE COURT:  And what's the circuit for the *Kos*

25   *Pharms*?

```
 1              MR. KODOSKY:  Third Circuit, Your Honor.

 2              THE COURT:  What year?

 3              MR. KODOSKY:  I want to say that it's from 2001.  But

 4  if I can maybe get back to you over break?

 5              THE COURT:  Okay.  So Kos Pharms cited in a case

 6  called Not an LLC v. who?

 7              MR. KODOSKY:  Bureau of Alcohol, from the Western

 8  District of Pennsylvania, June 9th, 2022.

 9              THE COURT:  Okay.

10  BY MR. KODOSKY:

11  Q    What response --

12              THE COURT:  Wait a minute, wait a minute.

13              MR. KODOSKY:  Oh, sorry.

14              THE COURT:  I've got to rule.  I've got to rule,

15  counsel.  You said that at a hearing on a preliminary

16  injunction, the Court can consider hearsay matters.  You also

17  believe it's not hearsay because it's not being offered for the

18  truth of the matter, correct?

19              MR. KODOSKY:  Correct.

20              THE COURT:  What is it being offered for?

21              MR. KODOSKY:  I'd have to --

22              THE COURT:  I mean --

23              MR. COLBY:  I don't feel terribly strong about this

24  objection.

25              THE COURT:  Right.
```

44

```
 1              MR. COLBY:  I think the testimony on balance was

 2   actually helpful to us.

 3              THE COURT:  Right.  I mean --

 4              MR. COLBY:  But I would like to --

 5              THE COURT:  -- he spoke to someone whose --

 6              MR. COLBY:  Yeah.

 7              THE COURT:  -- his understanding in the response from

 8   the independent director was that -- responded that he didn't

 9   believe that they were using their technology.

10              MR. COLBY:  Right.  We'll take a look at the cases.

11   I do think, you know, those have not necessarily --

12              THE COURT:  Other --

13              MR. COLBY:  Hearsay free for all are not the rules

14   we've been living under to date in this hearing.

15              THE COURT:  Right.  But also, counsel --

16              MR. COLBY:  I'd like to keep this focused.

17              THE COURT:  -- other than what somebody else told

18   him, told the independent director.  Somebody -- this other

19   doctor or whatever his name was, he could -- his understanding

20   of what the response was is sufficient.  Was that -- he

21   responded, his understanding was that they didn't believe they

22   were using trade secrets.

23              MR. COLBY:  Right, right.  Yeah.

24              THE COURT:  And that could be understanding.  He just

25   couldn't tell me that -- what it says.  So we'll strike the
```

45

```
 1   portion about Mr. -- the independent director.  We don't know

 2   his name.  We're not talking about Mr. Liston.  We're talking

 3   about the independent director who was a Jones Day attorney?

 4          MR. KODOSKY:  Jasper Berkenbosch, I believe was his

 5   name, Your Honor.

 6          And actually, SCBV is a Defendant in this case.  And

 7   so, to the extent that he was serving as an independent

 8   director of one of the Defendants in the case -- party

 9   admission.

10          THE COURT:  That's a new one.

11          MR. COLBY:  Yes, it --

12          THE COURT:  What's your response to that?

13          MR. COLBY:  Your Honor, I don't feel terribly

14   strongly about this because I --

15          THE COURT:  Right.  Because -- all right.

16          MR. COLBY:  -- think the statement was helpful so --

17          THE COURT:  So it's a party admission.  It's a -- I

18   was going to strike the portion about who told him what,

19   because the real bottom line is, he responded, we're not using

20   your trade secrets.  That was his understanding of the response

21   from Mr. Berkenbosch.

22          MR. COLBY:  Correct.  I'm fine with that.

23          THE COURT:  Okay.  All right.  So -- and now that you

24   said it's a statement -- a party admission, because Mr.

25   Berkenbosch was the independent director of one of the
```

```
 1    Defendants, it -- I think it can all come in, but okay.

 2             So I'll admit it as a party admission and then we'll

 3    move on. It was going to come in anyway, but except for that --

 4             MR. KODOSKY:  Thank you, Your Honor.

 5             THE COURT:  -- one limited portion.  Go ahead.

 6    BY MR. KODOSKY:

 7    Q    Ultimately, Mr. Michaels, what action did Mr. Berkenbosch

 8    take in response to Rembrandts concerns?

 9    A    We -- we included the US headquarters of Jones Day, again,

10    outlining our positions and requesting a meeting.  I found it

11    highly unlikely that a reputable IP firm would conduct the

12    actions that SCBV and SeeCubic were attempting.  And then Mr.

13    Berkenbosch, the independent director of SCBV resigns -- well,

14    or sent a letter to the Court asking to resign.  And that was

15    apparently granted.

16    Q    And then after he resigned is when Mr. Stastney was

17    appointed director?

18    A    Yes.

19    Q    What assurances have you received from Mr. Stastney since

20    he's been appointed director that he would not act in

21    contravention of Rembrandts instructions or wishes?

22    A    It's my understanding and directly from his mouth, both in

23    court and our out of court discussions that he fully intends to

24    license out the technology, including our -- what is Rembrandt

25    technology and Philips without paying any license fee to
```

1  Rembrandt or honoring the license in any way.

2  Q    And is that one of, if not the primary reason, why

3  Rembrandt supports the Debtors Motion for a TRO?

4  A    Yes, and it's why we've brought a similar action in

5  Delaware to enjoin SeeCubic from doing the same.

6  Q    And that's great timing.  The SeeCubic, Inc. filed a

7  response to the Debtors Motion for a TRO in this matter.  It's

8  a Docket 77 on page 26.

9        THE COURT:  Wait a minute.  Response.  Docket entry

10 what?

11       MR. KODOSKY:  Docket 77.  It's the SeeCubic, Inc.

12       THE COURT:  In the adversary proceeding or in the

13 bankruptcy?

14       MR. KODOSKY:  in the advisory, Your Honor.

15       THE COURT:  Okay.

16       Response.  Okay.  77 in adversary.  We just want to

17 keep the record straight, because I doubt hardly it was number

18 77 in the bankruptcy.  We were up to 400 or 500 or something in

19 the bankruptcy.

20       Okay.  So you want us to bring that up?

21       MR. KODOSKY:  No, if I can just Mr. Michaels for his

22 reaction to, in footnote 17 --

23       THE COURT:  Well, can we --

24       MR. KODOSKY:  -- of SeeCubic, Inc.'s --

25       THE COURT:  -- see footnote 17, so we all know what

1    we're talking about?

2            Jon, can you pull that up?

3            MR. KODOSKY:  And it should be on page 26, 32 of 39.

4            THE COURT:  Page what?

5            MR. KODOSKY:  The page number is 26 at the bottom of

6    the page.  But on the top, it's page 32 of 39.

7            THE COURT:  On the docket.  But in the pleading

8    itself, it's page 26, correct?

9            MR. KODOSKY:  That is correct.

10           THE COURT:  All right.  And so, you want him to

11   review footnote 17?

12           MR. KODOSKY:  Yes, he had just mentioned about --

13   that he had filed a TRO against SeeCubic, among other parties,

14   in the District of Delaware.  And footnote 17, this is from --

15           THE COURT:  Wait a minute.  Let him read it and tell

16   me what that -- does that relate to his testimony or whatever.

17   BY MR. KODOSKY:

18   Q    Please take a moment, Mr. Michaels, and review footnote 17

19   there on page 26.

20   A    Yes, I've read it.

21   Q    My question to you was going to be, what is your reaction

22   to, do you see where it states, "The District of Delaware

23   applied this reasoning in its denial of the Motion filed in the

24   summer of 2023 of nonparty Rembrandt 3D Holdings, Ltd. for a

25   TRO against SeeCubic among parties based on similar

1   allegations."  Do you see that?

2   A    Yes.

3   Q    The Court did not deny Rembrandt 3D Holdings, Ltd. TRO

4   Motion, correct?

5   A    It did not.

6   Q    In other words, this statement in the SeeCubic, Inc.

7   response is inaccurate, correct?

8   A    It is with respect to the TRO Motion.

9   Q    Is it accurate to state that on August 1st, 2023 -- or I'm

10  sorry, prior to that, that Rembrandt had withdrew its TRO

11  Motion?

12  A    Yes, after hearing the representations by SeeCubic's

13  counsel during the bankruptcy hearing with the Court, we

14  understood that they were going to discontinue their activities

15  in the Netherlands to have their own director appointed.  And

16  we wrote the Court -- the District Court in Delaware saying

17  that the basis of our TRO was no longer valid because --

18  because that -- they were discontinuing that Motion to have a

19  new director appointed.

20  Q    So in other words, Rembrandt withdrew its TRO Motion based

21  on representations made by Defendants counsel in this court?

22  A    Yes, well, in the bankruptcy court.  I don't know if this

23  is the same -- it's a different -- I think it's under a

24  different docket.

25  Q    Understood.

1   A    But yes.

2   Q    And then not only did they not cease and desist in their

3   efforts to take over the Netherland subsidiaries, but they

4   included this misrepresentation in their brief stating that the

5   District of Delaware denied Rembrandt's TRO, would you agree

6   with that?

7   A    Yes.

8   Q    Mr. Micheals, did you ever personally test Stream TV

9   products to make sure that the content was protected?

10  A    Yes, I was in a room full of Rembrandt associated people

11  evaluating the Stream TV products that they had provided during

12  the mediation and one that we had purchased prior to bringing

13  the litigation.

14  Q    And what did you find whenever you investigated whether or

15  not the content was protected?

16  A    With respect to content being protected, we actively tried

17  to get access to the firmware and various tools that were being

18  used, especially for real time conversion. But also, evaluating

19  some of the hardware components and we could not access them.

20  We --

21  Q    Do you have any personal knowledge as to whether or not

22  the content is protected now via the actions of the Netherland

23  subsidiaries?

24  A    Only what I've heard testimony in this proceeding.  Every

25  Stream TV product that we have reviewed in the past has been

1   protected.  And while we -- we could tell that our technology

2   was being used by various techniques of providing content and

3   seeing how it was processed and then processing it through our

4   tools and it coming out the same, the -- we could tell that it

5   was being -- that our tools were incorporated.  However, we

6   were not able to see the tools or reverse engineer those tools

7   from those products.

8   Q    Have you personally investigated whether Mr. Stastney

9   and/or SeeCubic, Inc. have been involved with moving IP assets

10  owned by Stream TV to SeeCubic, Inc.?

11  A    I have investigated that, yes, and I have seen that they

12  have done -- attempted to do so.

13            MR. KODOSKY:  Your Honor, I'd like to show the

14  witness first Exhibit Number 71.

15            If I can, Kevin, get another binder with 71?

16            Permission to approach, Your Honor?

17            THE COURT:  This is another binder?

18            MR. KODOSKY:  Yes, Your Honor.

19            THE COURT:  And have you sent those documents to

20  Mister --

21            MR. KODOSKY:  Yes, I have -- Your Honor.  I have.

22            THE COURT:  Okay.  All right.  All right.

23            Any objection to that being handed up, Mr. Colby?

24            MR. COLBY:  No objection to it being handed up.

25            Which document?

```
 1                MR. KODOSKY:  The second one.

 2                THE COURT:  Counsel, just give me a minute.  I want

 3    to try to organize my desk here.

 4                MR. KODOSKY:  No problem, Your Honor.

 5                THE COURT:  Okay.  All right.  What am I looking at,

 6    counsel?

 7                MR. KODOSKY:  I'm sorry, Your Honor?

 8                THE COURT:  What am I looking at?

 9                MR. KODOSKY:  Exhibit 71.

10                THE COURT:  Okay.  Okay.  All right.  All right.

11                We brought that up.  Go ahead.

12    BY MR. KODOSKY:

13    Q    Mr. Michaels, you stated that you personally investigated

14    whether or not SeeCubic, Inc., and/or Mr. Stastney were

15    involved with moving Stream Intellectual Property IP assets

16    from Stream to SeeCubic, Inc.  Do you recall testifying to that

17    just a few moments ago?

18    A    Yes.

19    Q    What is being shown to you on the screen is what -- a

20    document that's been marked for identification as Debtors

21    Exhibit Number 71.  Do you recognize this document?

22    A    Yes, I do.

23    Q    Is this a document that you uncovered as part of the

24    investigation that you performed?

25    A    Yes, it is.
```

1  Q    Could you please describe for us what this document is?

2  A    This is an application to register a trademark for

3  SeeCubic Inc for the mark SeeCubic.

4  Q    And what was the date of this -- did you call it an

5  application?

6  A    Yes, I did.

7  Q    What is the date of this application?

8  A    The application was filed on October 18th, 2023.

9  Q    So the application was filed after this TRO was filed?

10  A    Yes, it was.

11        MR. KODOSKY:  If we can scroll down to the second

12  page.

13  BY MR. KODOSKY:

14  Q    Do you see where it states at the top, first use anywhere

15  date?

16  A    Yes.

17  Q    Where it states that SeeCubic -- I'm sorry.  Could you

18  please describe what it states?

19  A    So the first use anywhere refers to the first time a mark

20  has been used in commerce in the sale of goods or sale of

21  services.  And that date is June 1st -- it's purported to be

22  June 1st, 2020.  The first use in commerce actually references

23  commerce that the federal government can regulate.  So it has

24  to be interstate or international commerce, and they're saying

25  that at some point it was at least as early as December 8th,

```
1    2020, that it crossed state lines or international boundaries.

2    Q    And you were physically present in this courtroom with us

3    during the hearing that was held on October 27th, correct?

4    A    Yes.

5    Q    You drove down from upstate New York to be here?

6    A    Yes.

7    Q    And do you recall Mr. Rajan being shown website materials

8    and news articles prior to June 1st of 2020 using the SeeCubic

9    mark?

10   A    Yes, I do.

11   Q    And based on that, do you believe that that first use

12   anywhere date of June 1st, 2020, is accurate?

13   A    Well, it's certainly not accurate with respect to SeeCubic

14   Inc.  The first use was by Stream TV and/or SC BV.

15   Q    And do you see the webpage URL there of SeeCubic.com?

16   A    Yes.

17   Q    And the information as to who submitted this application,

18   do you see that on this second page?

19   A    Yes.

20   Q    Who was it submitted by?

21   A    Shadron Stastney.

22   Q    On behalf of SeeCubic Inc?

23   A    On behalf of SeeCubic Inc.

24   Q    I'd like to direct your attention to page -- the bottom of

25   page 3, under the section that begins in all bold,
```

```
 1   "Declaration."  Do you see where I'm referring to?

 2   A    Yes.

 3   Q    If you could please explain what this section is referring

 4   to.

 5             THE COURT:  Wait, where are we, counsel?

 6             MR. KODOSKY:  I'm sorry, Your Honor.  Bottom of page

 7   3, top of page 4, the part that states --

 8             THE COURT:  Oh, declaration.

 9             MR. KODOSKY:  -- declaration.

10             THE COURT:  Okay.  Thank you.

11             THE WITNESS:  This is -- the declaration filed under

12   penalty of perjury in our federal system, it's where the

13   applicant is required to make certain representations with

14   respect to their belief in their ability to register the mark.

15   This is a very important aspect of the application.  In our

16   internal training, you know, for our attorneys, we have them

17   take this very seriously and it can be the basis of

18   invalidating the mark if registered if any of these provisions

19   are violated, and this frequently is used to do so.  In

20   addition, the person signing the declaration is risking

21   prosecution for perjury, and there are times when that's taken

22   very seriously and in fact enforced.

23   BY MR. KODOSKY:

24   Q    It's a potential criminal liability?

25   A    Yes.
```

1  Q    And here, the person signing the declaration was who?  Mr.

2  Stastney?  Is that accurate?

3  A    Yes.

4  Q    On page 4, do you see the checkmark in the box in the

5  section that says, "to the best of the signatory's knowledge

6  and belief, no other persons except if applicable concurrent

7  users have the right to use the mark in commerce either in the

8  identical form or in such near resemblance as to be likely when

9  used on or in connection with the goods, services of such other

10 persons, to cause confusion or mistake or to deceive."  Do you

11 see that?

12 A    I do.

13 Q    Restated, is that Mr. Stastney stating to the best of his

14 knowledge and belief that, for example, Stream TV does not have

15 any right to use the word SeeCubic?

16 A    That's exactly what it means.  And I might add, it's not

17 just Stream.  It would be SeeCubic BV.  And he certainly would

18 know that they did not -- that they might have a reason to

19 register the mark as well.

20 Q    And then the next box with a checkmark there, do you see

21 where it states, "To the best of the signatory's knowledge --"

22 And again, signatory would be Mr. Stastney?

23 A    Yes.

24 Q    "To the best of the signatory's knowledge, information,

25 and belief, formed after an inquiry reasonable under the

1   circumstances, the allegations and other factual contentions

2   made above have evidentiary support."  Do you see that?

3   A    Yes.

4   Q    What does that -- what does that mean?

5   A    That the -- and in particular with respect to when you're

6   claiming use, that you're going to be -- you're actually going

7   to be able to show the sale, a contract for sale, purchase

8   order, some product or service being exchanged in commerce

9   that's defined by our various regulations and statues related

10  to our trademark issues.  And in this case, it would also

11  reference as to whether or not there was, going up to the prior

12  paragraph, whether or not some other party had a better right

13  and had earlier use with respect to the mark.  And as director

14  of SeeCubic BV, he certainly would have known that SeeCubic BV

15  had many, many years of prior use of this mark as well as

16  Stream TV using it when he was CFO of Stream TV.  That would be

17  better rights than SeeCubic Inc.  I mean, this is -- has to be

18  knowingly false that he filed it, in these statements.

19  Q    And if he is called to testify, it would be fair

20  questioning in your view for us to ask him what evidentiary

21  support was being referenced in this box?

22  A    Absolutely.  In any trademark to speak --

23            MR. COLBY:  Objection.  Objection.

24            THE COURT:  Woah, objection.

25            MR. COLBY:  Objection, Your Honor.  I think it's for

```
 1   the Court to decide what's fair questioning, not Mr. Michaels.

 2           THE COURT:  Response?  You can rephrase that.

 3   Sustained, but you can rephrase.

 4   BY MR. KODOSKY:

 5   Q    Mr. Phillips -- is it fair to as Mr. Stastney what the

 6   evidentiary support he has?

 7           THE COURT:  Objection.

 8           MR. COLBY:  Objection.  Yeah, to the extent he's

 9   asking for opinion testimony.

10           THE COURT:  For an opinion.

11           MR. COLBY:  Yeah.

12           THE COURT:  Hasn't been qualified as an expert.

13           MR. COLBY:  I also just don't see the point of the

14   question.

15           THE COURT:  Right.

16           MR. COLBY:  I mean, he can ask him --

17           THE COURT:  He can ask him --

18           MR. COLBY:  Right.  Ask Mr. Stastney.  Go ahead.

19           MR. KODOSKY:  We intend to ask.

20           THE COURT:  Right.  But you don't have to ask him

21   whether you can ask him.  You can ask me if you can ask him.

22   Move on.  I'll sustain the objection.

23           MR. KODOSKY:  And -- okay.  Thank you, Your Honor.

24   BY MR. KODOSKY:

25   Q    The next box that has a checkmark in it, Mr. Michaels, I'm
```

1  not going to read all of that into the record, but is that

2  referring to the potential criminal liability and the fines or

3  imprisonment that you had referred to earlier in making false

4  statements in an application?

5  A    Yes.  It refers to 18 USC 1001 specifically.  But any

6  attorney in our office that prepared and filed such an

7  application like this, it would be grounds for immediate

8  dismissal.  Zero exception.  We've never -- I mean, in 40

9  something years, we've never had anybody that would have filed

10  something like this, knowing even if they believed it was

11  untrue, if there was a dispute like there is currently between

12  two companies, we would have filed a statement with the

13  application or something to indicate that other uses were

14  claiming rights to the mark.  We would not have just blanketly

15  said we were entitled to this registration, absent informing

16  the patent and trademark office of the other party's rights or

17  claim to rights.

18  Q    And right below those boxes with the checkmarks, do you

19  see the electronic signature of Mr. Shad L. Stastney?

20  A    Yes.

21  Q    CEO of SeeCubic Inc?

22  A    Yes.

23  Q    Dated October 18th, 2023?

24  A    Yes.

25  Q    Which was after the TRO motion was filed and after at

1  least two hearings were held in connection with that motion,

2  correct?

3  A    Yes.

4           MR. KODOSKY:  If we can please scroll down to page 6.

5           THE COURT:  Hold on one second.  Sorry.  I'm sorry.

6  You may continue.

7           MR. KODOSKY:  Thank you, Your Honor.

8  BY MR. KODOSKY:

9  Q    Directing your attention to page 6 of this document, Mr.

10 Michaels.

11 A    Uh-huh.

12 Q    It's being shown on the screen.  Do you see that?

13 A    Yes, I do.

14 Q    Is this the evidentiary support that was submitted by Mr.

15 Stastney and SeeCubic Inc in support of their declaration?

16 A    It is.  It's referred to as a specimen showing the mark in

17 use on their website.  And it's -- you're required to file

18 something showing how the mark is being used in actual

19 practice.

20 Q    And so the evidence that they submitted was the same

21 website materials that we looked at in the last hearing?

22           MR. COLBY:  Objection, Your Honor.

23           THE WITNESS:  I don't know if -- I don't recall if we

24 looked at this in the last hearing, but --

25           THE COURT:  All right.  Hold on.  Hold on, Mr.

1    Michaels, objection.  Objection.

2         MR. COLBY:  Yeah.  The objection is I don't think

3    that it was established -- it's been established that these are

4    the same or that Mr. Michaels can -- is in a position to do

5    that as the same website that was shown by Debtors in the last

6    hearing.

7         MR. KODOSKY:  We can pull up the exhibit from the

8    last hearing and compare.  There's the $170 million language

9    that we asked Mr. Rajan about.

10        THE COURT:  Wait a minute, wait a minute, we don't

11   need you to testify, counsel.  All you can do is say were you

12   present at the last hearing?  Did you see this exhibit?  Is it

13   the same?  Pull it up, unless Mr. Colby's going to say it was,

14   pull it up.  If it is and you want to waste your time, go

15   ahead.  Pull it up.  You said it was -- what exhibit was it at

16   the last hearing?  You need some time for that, counsel?

17        MR. KODOSKY:  I should be able to get to it pretty

18   quickly, Your Honor.  Exhibit 60 was the SeeCubic website as of

19   October 27th, 2023.

20        THE COURT:  All right.  So pull up Exhibit -- do we

21   have that?

22        MR. KODOSKY:  If not, I can email it to --

23        THE COURT:  Well, he's going to have to send it to

24   you so that he can look at it.

25        So while we're doing that, we're going to take a

```
 1   five-minute break.  Court is in recess until 12:45.  Okay.  I
 2   only need five -- actually, I want to give you five minutes.
 3           All right.  I'll be back at 12:45.
 4       (Recess taken)
 5           THE BAILIFF:  All rise.
 6           THE COURT:  Please be seated.
 7           I took my pen?  That is why I do not go back in
 8   chambers.  Two emergencies.  And I think I left my pen.  Let's
 9   hope I have one more.
10           All right, counsel.  Before we begin, I think there's
11   some concern about who's on -- who's observing?  That right,
12   John?
13           THE CLERK:  Yeah.
14           THE COURT:  All right.  Let's just have them identify
15   themselves, please?
16           THE CLERK:  I have someone on here just labelled as
17   Creditor.  Could you identify who you are, please?
18           MR. HAWKINS:  Did you want my name?
19           THE CLERK:  I'm sorry?
20           MR. HAWKINS:  Did you want my name?
21           THE COURT:  Yes.
22           THE CLERK:  Well, we're trying to figure out who --
23           THE COURT:  Creditor.
24           THE CLERK:  -- is virtually in the courtroom, yes.
25           MR. HAWKINS:  I'm just a creditor.  Small creditor.
```

```
 1                THE COURT:  Well, what's -- what's your name, small

 2    creditor?  This is the judge.

 3                MR. HAWKINS:  John.

 4                THE COURT:  John?

 5                MR. HAWKINS:  John Hawkins.

 6                THE COURT:  John Hawkins.

 7                MR. HAWKINS:  Correct.

 8                THE COURT:  And okay.  Who else?

 9                MR. HAWKINS:  I'm insignificant, Judge.

10                THE COURT:  No, you're not.  Everybody in my

11    courtroom is significant.  I wouldn't say that you're

12    insignificant, sir.

13                MR. HAWKINS:  I appreciate that.  Thank you.

14                THE COURT:  All right.  Who else is observing?

15                THE CLERK:  So I have a phone number ending in 4843.

16                THE COURT:  And who is that?

17                THE CLERK:  Again, phone number ending in 4843.

18                THE COURT:  Can they hear us?

19                THE CLERK:  They should be able to hear us.

20                I'm just going to let you know, we're probably going

21    to remove you then.

22                MR. BLUMENTHAL:  Can you hear me now?

23                THE COURT:  Yes.  Who are you?

24                MR. BLUMENTHAL:  Steven Blumenthal.

25                THE COURT:  And your relationship to the case, Mr.
```

1  Blumenthal?

2          MR. BLUMENTHAL:  I'm the CEO of Rembrandt 3D Holding.

3          THE COURT:  Okay.  Okay.  Who else we have, John?

4          THE CLERK:  A phone number ending in 9793.

5          THE COURT:  Give them a little -- do you know who

6  that is?

7          MR. COLBY:  I don't know the phone number.  We do

8  have two colleagues observing remotely, one whose name you can

9  see, Rebecca Ritchie and also Becky Gonzalez-Rivas.

10          THE COURT:  Yeah.  I think we're more like who we

11  can't identify.

12          MR. COLBY:  Yeah, yeah.  And Ms. Gonzalez-Rivas is

13  4843.  I just got confirmation.

14          THE CLERK:  Oh.  What is it?  Gonzalez?

15          THE COURT:  Okay.  That's 4843.  Who else we have?

16  That everybody?

17          THE CLERK:  I have someone just named Steven.

18          MR. COLBY:  That was Steven Blumenthal who spoke up

19  earlier, I believe.

20          THE COURT:  No there's two people.

21          THE CLERK:  Then I'm looking for someone just named

22  creditor.

23          THE COURT:  Wait, I thought that was Mr. Hawkins.

24  Small -- he said he's a small creditor.

25          THE CLERK:  Gotcha.

```
 1              THE COURT:  And then we had --

 2              THE CLERK:  Sorry, Mr. Hawkins.

 3              THE COURT:  And then we have -- so I have four people

 4   so far.  How many unidentified people you have?

 5              THE CLERK:  A phone number ending in 9793.

 6              THE COURT:  Hello?  Maybe they -- can they -- give

 7   them a time.  Maybe they're on mute.

 8              THE CLERK:  Yeah.

 9              THE COURT:  Give them a chance to come off mute.  Are

10   they on mute?

11              THE CLERK:  Again, it's a 516 number ending in 9793.

12              THE COURT:  I feel like we're at bingo.  Is that

13   anybody's colleague?  Does anybody recognize this number?

14              MS. BRUMME:  Yes, Your Honor, I believe that's Tom

15   Warns of K&L Gates.

16              THE COURT:  Well, can he not respond?

17              MS. BRUMME:  He may have stepped away from the Zoom.

18              THE CLERK:  It's possible.

19              THE COURT:  Is that your colleague, counsel?

20              MS. BRUMME:  That's Tom Warns with K&L Gates, Mr.

21   Caponi's colleague.

22              THE CLERK:  That's Tom Warns, okay.

23              THE COURT:  Is that your colleague?  716 -- what's

24   the number?

25              THE CLERK:  That was the one ending in 9793.
```

1              MS. BRUMME:  Yeah, he's just messaged me.  He's

2    trying to respond, but we can't hear him.

3              THE COURT:  That's fine.  All right.  Okay.  Okay.

4              THE CLERK:  And lastly, and I think I recognize this

5    number, though, ending in 4411?  Ending in 4411.

6              THE COURT:  What's the beginning?  A 215?

7              THE CLERK:  A 215 number.

8              THE COURT:  That's not Eileen, is it?

9              THE CLERK:  No, but I thought that it might be

10   Callahan.

11             THE COURT:  Who?

12             THE CLERK:  Mr. Callahan, but I'm not 100 percent

13   sure.

14             THE COURT:  All right.  Who's on -- who's 4411?

15             THE CLERK:  That's the last one.

16             MR. COLBY:  Your Honor, both -- it seems like Mr.

17   Warns and our colleague Ms. Gonzalez-Rivas were trying to

18   unmute to respond --

19             THE COURT:  That's fine.

20             MR. COLBY:  -- and weren't able to.  Others may be

21   having the same issue.

22             THE CLERK:  Right.

23             THE COURT:  Right.  That's -- okay.  Can we unmute

24   441 -- that's why I was asking, can they respond?

25             THE CLERK:  If they're on a phone, they're not seeing

1    the prompt to unmute off the Zoom.  It's a little clunky.

2              THE COURT:  But they can hear us.

3              THE CLERK:  They can hear us, but they might not be

4    able to --

5              THE COURT:  So if you're on 441 -- ending in 4411,

6    could you please unmute your telephone and at least advise us

7    who we are?  Which is why we need to start requiring that you

8    put a name.

9              THE CLERK:  Well, the problem is they beep in while

10   we're in the middle of stuff, so I'm not -- yeah.

11             THE COURT:  All right.  Last call, 4411.

12             THE CLERK:  Should I dump them?

13             THE COURT:  Dump them and they can call back.

14             THE CLERK:  All right.

15             THE COURT:  I mean, or they can email you.  I mean if

16   it's someone -- because it's a 215.

17             THE CLERK:  Right.

18             THE COURT:  They can email you.  They have your email

19   and Ms. Godfrey's email address to say I got kicked off.  I

20   want to hear, okay.  All right.

21             MR. ALEXANDER:  Your Honor, I think we can see all

22   the names.  I saw Mr. Crawford, who's a party.  Mr. Wallace is

23   Rembrandt.

24             THE COURT:  Right.  It was only the people who did

25   not have identifications that we wanted to know who they were,

```
 1    only because they're not in the courtroom and I can't see them.

 2           Yes, counsel?

 3           MS. BRUMME:  I believe 215 ending in 4411 is Mr.

 4    Callahan.

 5           THE CLERK:  I thought so, damn.

 6           THE COURT:  Well, he didn't answer.  Did you kick him

 7    off?

 8           THE CLERK:  Yes.

 9           THE COURT:  He's going to have to call back.  Sorry,

10    Mr. Callahan -- Mr. Callahan is upstairs.

11           THE CLERK:  I was going to say, he's got to walk down

12    a block or whatever.

13           THE COURT:  Come take the elevator down unless he's

14    working from home.  I don't know.  I don't know their schedule.

15    They could be working from home because our staff rotates also

16    and they work what two days remotely, three days remotely?

17           THE CLERK:  Yeah, two.

18           THE COURT:  And in the mornings, I actually do my

19    hearings telephonically and if I come in, I come in for the

20    afternoon.  Or unless today, I come in for the morning.

21           All right.  You may proceed --

22           THE CLERK:  I'm sure we're doing him a favor.

23           THE COURT:  What?

24           THE CLERK:  I'm sure we're doing him a favor.

25           THE COURT:  I'm sure.
```

69

1              Mr. Kodosky, you may continue.

2              MR. KODOSKY:  Thank you, Your Honor.

3    BY MR. KODOSKY:

4    Q    Mr. Michaels, before we took a break, we were looking at

5    what has been marked for identification as Debtor's Exhibit

6    Number 71, page 6 of 6.

7    A    Yes.  Yes.

8    Q    Which is the evidentiary material submitted by Mr.

9    Stastney and SeeCubic Inc in support of their trademark

10   application?

11             MR. KODOSKY:  I'm sorry, John.  If we can go back to

12   Exhibit 71?

13             THE COURT:  Oh, we're back to 71.

14             THE CLERK:  71.

15             MR. KODOSKY:  Page 6 of 6?  There we go.

16             THE COURT:  Page 6.

17             MR. KODOSKY:  And I had made the representation that

18   these materials were the same website materials that we had

19   looked at in the last hearing.  Over break, I was incorrect

20   about my exhibit reference number.  It was Exhibit 61, not

21   Exhibit 60.  But we now have Exhibit 61 on the screen and if we

22   can please scroll down to the third page.  Right there.

23   BY MR. KODOSKY:

24   Q    Do you see the third page of Exhibit 61 to be able to

25   compare it with the sixth page of Exhibit 71, Mr. Michaels?

1  A    Yes.

2  Q    And does that appear to be the same materials?

3  A    Yes, it does.

4         MR. KODOSKY:  Staying on Exhibit 71, if we can scroll

5  below a little bit further.

6  BY MR. KODOSKY:

7  Q    We're next going to see the picture of the astronaut that

8  we had seen on Exhibit 5 earlier today from the 2022 PPM.  Do

9  you see that astronaut?

10 A    I do.

11        THE COURT:  Wait a minute.  The astronaut on exhibit

12 -- on the snow -- astronaut -- is that an astronaut on the

13 snowboard?  Where am I at?  Okay.  Is that a snowboard?  I

14 mean, that's what I would call it.  I don't know.  Maybe it's

15 an electronic something.  Okay.  So we're looking at the

16 astronaut on page --

17        MR. KODOSKY:  The cover page of Exhibit 5.  The

18 SeeCubic Inc 2022 private placement memorandum.

19        THE WITNESS:  Yes.

20        THE COURT:  Wait a minute.  Exhibit 5, you said?

21        MR. KODOSKY:  Yes, Your Honor.

22        THE COURT:  Of which PPM?

23        MR. KODOSKY:  2022.  And then back to Exhibit 71.

24 The last piece of evidentiary support they submitted, below the

25 astronaut picture.  I'm sorry, if we can scroll below the

1   astronaut picture, there's a quote there.

2   BY MR. KODOSKY:

3   Q    "Quite frankly, 3-D glasses have never failed to be

4   anything but a headache inducing, slightly blurry mess for me.

5   That might be why a recent demo of a new glasses free 3-D TV

6   blew me away.  It just works."  Do you see that, Mr. Michaels?

7   That quote from ARS --

8   A    Yes, I do.

9        MR. KODOSKY:  If we go back to Exhibit 61, John, page

10  7.  This is the SeeCubic.com website on page 7 -- right there.

11  BY MR. KODOSKY:

12  Q    Do you see that same quote?  The "Quite frankly, 3-D

13  glasses have never failed to be anything but a headache

14  inducing, slightly blurry mess for me.  That might be why a

15  recent demo of a new glasses free 3-D TV blew me away.  It just

16  works."  Do you see that, Mr. Michaels?

17  A    Yes.

18  Q    So the same quote from the SeeCubic website was submitted

19  by Mr. Stastney and SeeCubic Inc on October 18th, 2023, as part

20  of their trademark application?

21  A    Yes.

22  Q    And you were in court at the last hearing when --

23  A    Yes.

24  Q    -- we established that this quote was actually written

25  about Stream TV and SeeCubic and not SeeCubic Inc.  Do you

```
 1   recall that testimony from Mr. Rajan?

 2   A    Yes.  Yes, I do.

 3   Q    Thank you.

 4        MR. KODOSKY:  Move to admit Exhibit 71, Your Honor.

 5        THE COURT:  Any objection, counsel?

 6        MR. COLBY:  No, Your Honor.

 7        THE COURT:  All right.  Exhibit 71, which is the

 8   application, right?

 9        MR. KODOSKY:  Correct.

10        THE COURT:  Admitted.

11      (Debtor's Exhibit 71 admitted into evidence)

12        THE COURT:  Okay.

13        MR. KODOSKY:  Next, if we can take a look at Exhibit

14   77, what has been marked for identification as Exhibit 77.  If

15   we can scroll to the second page.

16   BY MR. KODOSKY:

17   Q    Do you recognize this document, Mr. Michaels?

18   A    Yes.

19   Q    What is it?

20   A    It is a application to register a trademark, or a service

21   mark filed on October 18th, 2023, by SeeCubic Inc.

22        MR. KODOSKY:  Sorry, Your Honor.  Exhibit 78 is the

23   next document that I intended to show this witness.

24        THE COURT:  78?

25        MR. KODOSKY:  Apologies, yes.
```

1              THE COURT:  Not 77?

2              MR. KODOSKY:  Correct.

3              THE COURT:  Which appears to be the same as 71.

4              MR. KODOSKY:  Correct.

5              THE COURT:  Okay.  Exhibit 78, okay.

6    BY MR. KODOSKY:

7    Q    Mr. Michaels, you are being shown what has been marked for

8    identification as Debtor's Exhibit Number 78.  Do you recognize

9    this document?

10   A    Yes, I do.

11   Q    What is it?

12   A    It is a trademark -- or an application to register a

13   trademark or service mark filed on May 26th, 2023.  The mark is

14   for SeeCubic Labs.  The owner of the mark is purported to be

15   SeeCubic Inc.

16             MR. KODOSKY:  And if we can scroll down to show who

17   signed the declaration on page 4 of 5.

18   BY MR. KODOSKY:

19   Q    Who submitted this?

20   A    Shad Stastney.

21   Q    After having made the same representations by checking the

22   boxes above his electronic signature?

23   A    Yes.

24             MR. KODOSKY:  Move to admit, Your Honor.

25             THE COURT:  Any objection, Mr. Colby?

```
 1              MR. COLBY:  No, Your Honor.

 2              THE COURT:  So D-78 admitted.

 3         (Debtor's Exhibit 78 admitted into evidence)

 4              MR. KODOSKY:  Next, we'd like to ask Mr. Michaels to

 5   please take a look at the document that has been marked for

 6   identification as Debtor's Exhibit Number 72.

 7   BY MR. KODOSKY:

 8   Q    You recognize this document, Mr. Michaels?

 9   A    I do.

10   Q    Is this a document that you had uncovered as part of your

11   investigation?

12   A    Yes.  It's a -- do you want me to go onto what it is?

13   Q    Yes, sir.

14   A    This is the coversheet that's filed when recording an

15   assignment of a trademark filed with the patent trademark

16   office.  And it becomes a public record of the transfer.

17   Q    And what is the date of this document?

18   A    The -- the document itself, the coversheet was prepared

19   and filed on February 16th, 2022, and alleges to be recording a

20   document executed on December 8th, 2020.

21   Q    And are you able to tell us who filed this document?

22   A    Yes.  I -- you can go down and it -- it'll show that.  The

23   person submitting it was Shad Stastney.

24   Q    And what trademarks is this document related to?

25   A    If you go down, there'll be a schedule.  But it has a
```

1  number -- Ultra D if you go down it'll show the --

2  Q    Actually, I'm -- if we can go back up, I believe it was on

3  page 1.  Property numbers?  Total --

4  A    Yeah.  Property numbers -- it'll be under property

5  numbers, three.  So in this case, it was SeeCube and Ultra --

6  two different files for SeeCube and Ultra -- and then another

7  one for Ultra D.

8  Q    And so if you could briefly explain what this document is

9  attempting to do?

10 A    It is recording the assignment of intellectual property

11 from -- this indicates in this case, three trademark registry -

12 - two trademark registrations and one trademark registration

13 application.  The trademark registration application is the

14 first one, where it just lists the serial number and that was

15 for a mark owned by Stream transferring to SeeCubic Inc.  Then

16 the next one is the registration for -- registration for

17 SeeCube.  And even though it's the same mark, you can have

18 different registrations for different classes of goods and

19 services.  And then finally, Ultra D was being transferred from

20 Stream to SeeCubic.

21 Q    And what support -- what evidentiary support was submitted

22 by Mr. Stastney and SeeCubic Inc in support of this purported

23 assignment?

24 A    The omnibus agreement that was later invalidated by the

25 Delaware Supreme Court.

1    Q    So this was dated February of 2022.  You were present

2    during the last and previous hearings when the June 15th, 2022,

3    Delaware Supreme Court opinion was referenced invalidating the

4    omnibus agreement, correct?

5    A    Yes, I was.  Yes.

6    Q    And so in other words, this was filed by Mr. Stastney and

7    SeeCubic Inc approximately four months prior to the omnibus

8    agreement being invalidated?

9    A    Yes.

10   Q    As part of your investigation, did you uncover any

11   documents showing that any reverse action was taken by Mr.

12   Stastney and/or SeeCubic Inc after the Delaware Supreme Court

13   issued its opinion on June 15th of 2022?

14   A    No, there are none filed with the patent trademark office.

15   They would have shown up in the same search that uncovered this

16   one.

17            MR. KODOSKY:  Move to admit, Your Honor.

18            THE COURT:  Any objection?

19            MR. COLBY:  No, Your Honor.

20        (Debtor's Exhibit 72 admitted into evidence)

21            MR. KODOSKY:  I'd next like to show Mr. Michaels what

22   has been marked for identification as Debtor's Exhibit Number

23   74.

24   BY MR. KODOSKY:

25   Q    Do you recognize this document, Mr. Michaels?

1    A    Yes.

2    Q    Is this a document that you uncovered as part of your

3    investigation?

4    A    Yes.

5    Q    Can you please explain what it is?

6    A    It is also a recording of a -- in this case, a security

7    interest in the underlying property identified therein.  It

8    records a security interest provided by SeeCubic Inc to Hawk

9    Investment Holdings Limited.

10   Q    What was the date that this was recorded?

11   A    June 15th, 2022.

12   Q    So the same day that the Delaware Supreme Court issued an

13   opinion invalidating the omnibus agreement, SeeCubic Inc filed

14   an assignment of the SeeCube and the Ultra D -- I'm sorry, a

15   security interest in the SeeCube and the Ultra D to Hawk

16   Investment Holdings Limited?  Is that accurate?

17   A    Yes.  If you page down a bit --

18             MR. COLBY:  Objection.

19             THE COURT:  Wait a minute.  Wait a minute.

20   Objection.

21             MR. COLBY:  Objection, Your Honor.

22             THE WITNESS:  Oh, I'm sorry.

23             MR. COLBY:  I believe Mr. Kodosky previously

24   referenced the June 15th date.  There's also an execution date

25   of June 11th.

1              THE COURT:  Well, he said when it was filed.

2              MR. KODOSKY:  Recorded.

3              THE COURT:  Recorded.

4              MR. KODOSKY:  Correct.

5              MR. COLBY:  Right.  So I just want to make sure

6    we're --

7              THE COURT:  Well, he said recorded.  I know there's a

8    difference between both of these and when they were executed

9    and when they were filed.

10             MR. COLBY:  Thank you.

11             THE COURT:  All right.  All right.  And you can point

12   out when you cross-examine when they were executed.  But he was

13   clear when they were -- when it was filed.

14             All right.  Go ahead.

15   BY MR. KODOSKY:

16   Q    Mr. Michaels, you were answering?

17   A    If you page down on the document, it'll show the effected

18   properties.  And it's the same -- same properties.

19   Q    And, who are the attorneys listed there in terms of having

20   -- would the attorneys there have prepared this assignment

21   document?

22   A    I don't know if they prepared the assignment document.  We

23   do know that they filed the -- they were the ones that recorded

24   the document with the patent and trademark offices.  They're

25   listed as the correspondence address and the name of the

1    submitter is Alison Lasher, who is identified as being

2    associated with Scadden.

3    Q    So this assignment was recorded the same day that the

4    Delaware Supreme Court opinion was issued.  Did your

5    investigation uncover any reverse action taken by Scadden or

6    SeeCubic Inc or Mr. Stastney or Hawk after June 15th, 2022?  In

7    other words, reassigning it back to Stream TV?

8    A    My search was to look at all transactions related to these

9    marks, and there's no reversal of this transaction and it would

10   have shown up in my search if there had been one.

11          MR. KODOSKY:  Move to admit Exhibit 74, Your Honor?

12          THE COURT:  Any objection?

13          MR. COLBY:  No objection.

14          THE COURT:  Okay.  Admitted.

15       (Debtor's Exhibit 74 admitted into evidence)

16          MR. KODOSKY:  Next ask to show Mr. Michaels what has

17   been marked for identification as Debtor's Exhibit Number 73.

18   BY MR. KODOSKY:

19   Q    Do you recognize this document, Mr. Michaels?

20   A    Yes.

21   Q    What is it?

22   A    This is what is referred to as a statement of use.  And

23   it's filed with the patent and trademark office at various

24   times to affirm that the mark is being used in commerce that

25   the federal government can regulate, and to show the nature of

1  that use as being consistent with the registration application

2  or registration.

3           MR. KODOSKY:  If we can scroll to page 5.

4  BY MR. KODOSKY:

5  Q    I'm sorry.  What trademark is this referencing?

6  A    The SeeCube.

7           MR. KODOSKY:  If we can please scroll to page 5 of 8.

8           THE COURT:  Did somebody come on?  Did somebody

9  leave?

10          THE CLERK:  Callahan came back in.

11          UNIDENTIFIED SPEAKER:  -- Callahan came back, and

12  this is someone named Patrick Miles.

13          THE COURT:  All right.  And who's he?  Mr. Miles, who

14  are you associated with?  Hello?  Anybody know who Patrick

15  Miles is?

16          MR. COLBY:  My guess is that it is a Patrick Miles

17  who is or was an investor, is an investor in Stream TV and

18  SeeCubic.

19          UNIDENTIFIED SPEAKER:  He just hung up.

20          THE COURT:  Okay.  I mean, I can't see who comes and

21  goes in the court.  If you're here, I'm going to assume that

22  you have some interest.  But our goal is to gatekeep.  Again

23  because we don't want people who have no interest just

24  listening in and -- I mean, they can because it's open to the

25  public but typically we'll know who they are.  And we don't

1    anybody disrupting so we're keeping everybody on mute.

2            Okay.  You may continue.  I apologize.  This is D73,

3    counsel, you were asking Mr. Michaels questions regarding?

4    BY MR. KODOSKY:

5    Q    Yes.  If -- on page 5 of 8, if you're able to tell us who

6    signed the declaration making the same representations that Mr.

7    Stastney had made earlier on this document.

8            THE COURT:  Page 5 of 8?

9            THE WITNESS:  Yes.  This was signed by --

10           THE COURT:  Wait a minute.

11           THE WITNESS:  I'm sorry, was that an objection?

12           THE COURT:  Okay, the --

13           MR. KODOSKY:  Declarations.

14           THE COURT:  -- declarations?

15           MR. KODOSKY:  Yes, Your Honor.

16           THE COURT:  Okay.

17   BY MR. KODOSKY:

18   Q    Who signed this declaration, Mr. Michaels?

19   A    Raja Rajan as chief operating officer of Stream.

20   Q    And what is the date that he signed it?

21   A    This was back in March 28th of 2018.

22   Q    And if we scroll to page 6 of 8, it appears there some

23   materials that were submitted along with this, pages 6, 7.  Do

24   you see those materials?

25   A    Yes, I do.

1    Q     And does that indicate to you -- what does that indicate

2    to you?

3    A     These are specimens showing the actual use and in somewhat

4    of an ideal specimen.  And it is showing the mark being used on

5    the box and the actual product itself, which is what the patent

6    trademark is looking for.  It's indicating the source of the

7    goods.  That's its primary functionality in term of a trademark

8    or service mark.  In this case a trademark.  And this is the

9    back of the TV showing SeeCube (sic) being used and then the

10   box it came in.  That's the classic way a trademark is used.

11   Q     So whereas SeeCubic, Inc., and Mr. Stastney submitted

12   website materials containing quotes written about Stream TV,

13   when Stream TV was filing their materials, they actually

14   included pictures of the product in the box and the mark being

15   used, correct?

16   A     Yes.

17             MR. KODOSKY:  Move to admit Debtor's Exhibit Number

18   73, Your Honor.

19             THE COURT:  Any objection?

20             MR. COLBY:  No objection, Your Honor.

21             THE COURT:  Admitted.

22        (Debtor's Exhibit 73 admitted into evidence)

23   BY MR. KODOSKY:

24   Q     Next ask that Mr. Michaels be shown what has been marked

25   for identification as Debtor's Exhibit Number 80.  Do you

1    recognize this document, Mr. Michaels?

2    A    Yes, I do.

3    Q    What is it?

4         THE COURT:  Hold on.

5         MR. KODOSKY:  I'm sorry, Your Honor.

6         THE COURT:  Okay.  What is it?  Go ahead.

7    BY MR. KODOSKY:

8    Q    What is it, Mr. Michaels?

9    A    This is the -- a copy of the registration certificate for

10   SeeCube.

11   Q    What's the date of this document?

12   A    This was registered on June 5th, 2018.

13        MR. KODOSKY:  Move to admit, Your Honor.

14        THE COURT:  Any objection?

15        MR. COLBY:  No objection, Your Honor.

16        THE COURT:  Okay.

17        (Debtor's Exhibit 80 admitted into evidence)

18   BY MR. KODOSKY:

19   Q    Shifting gears, Mr. Michaels.  What interaction, if any,

20   have you had with the Receiver, Mr. Liston, in this case?

21   A    We reached out to Ian Liston in a variety of ways.  One,

22   wanted to express our rights as we understood them in hoping to

23   enter into a productive conversation with respect to providing

24   the use of the TV's.  Secondly, we reached out with a specific

25   project we were working on, and we offered to pay the

1  production costs of setting up an entire line to start

2  fulfilling our needs for, our need/hope for the TV units.  This

3  would be a cost completely born by Rembrandt.  We received zero

4  response to both inquiries.

5  Q    And who -- if you're able to say, I don't know if you're

6  able to say or if it would be violating any confidentiality

7  provisions, but are you able to say who the Rembrandt proposal

8  was with, whose companies?

9  A    We were -- yes, I can.  It was -- we were looking to do a

10  project with James Cameron and the associated companies that

11  managed some of their 3D creation content.  And we were looking

12  to create a series of hardware and content solutions that would

13  be used in both provision of the 3D content he creates, but

14  also to advertise it in movie theaters with the no glasses 3D

15  TV.

16  Q    Is that the same James Cameron who directed the movie

17  Titanic and the move Avatar and so forth, Terminator?

18  A    Yes.

19  Q    And I'm sorry, what response did you receive from the

20  Receiver in regards to your proposal?

21  A    Silence.  Nothing.

22  Q    Again, shifting gears.  The Defendants have noted that

23  they intend to call Bart Barenbrug as a rebuttal witness in

24  this matter.  Do you know Mr. Barenbrug?

25  A    I've never met him.  But I certainly know of him and have

1   read his declarations and numerous email interactions with

2   Steven Blumenthal.

3   Q    What declaration are you referring to?

4   A    He filed a declaration in 2017 in the Southern District of

5   New York action, the *Rembrandt v. Stream*.  He was also a

6   defendant in that case.

7           MR. KODOSKY:  Would ask that Mr. Michaels be shown

8   what has been marked for identification as Debtor's Exhibit

9   Number 84.

10          THE COURT:  Is this another binder?

11          MR. KODOSKY:  I apologize, Your Honor.  We've got a

12   hard copy.

13          THE COURT:  Have you sent that to --

14          MR. KODOSKY:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. KODOSKY:  Yes, Your Honor.

17          THE COURT:  All right, because mine went up to 80.  I

18   just wanted to make sure.  And have you shared that with Mr.

19   Colby?

20          MR. KODOSKY:  Yes, Your Honor.  Permission to

21   approach?

22          THE COURT:  Yes.  All right.

23   BY MR. KODOSKY:

24   Q    Mr. Michaels, you're being shown what has been marked for

25   identification as Debtor's Exhibit Number 84.  Do you recognize

1    this document?

2    A    Yes, I do.

3    Q    What is it?

4    A    This is the declaration of Bart Barenbrug filed in the

5    action brought by Rembrandt against Stream and the other named

6    Defendants, the Rajan's, Walter Roelen, Bart Barenbrug, Peter

7    Roelen, and Hans Zuidema.  This was filed on February 6th,

8    2017.

9    Q    Can you please point us to the provision of this

10   declaration pertaining to a nondisclosure agreement that you

11   had referenced earlier?

12   A    Yes.  It's paragraph 7.  He -- I mean, basically this

13   entire thing is untrue.  But it says, "During my time with my

14   discussions with 3D Fusion Corp, paren, I was never employed by

15   the company, end paren.  I did not enter into a nondisclosure

16   agreement NDA with a New York Company or negotiate such an

17   agreement in New York.  I do recall reviewing a draft NDA.  I

18   have never -- I never received an employment contract with 3D

19   Fusion EUBD.  And to the best of my knowledge, the DNA was

20   never fully consummated.  I never received or acknowledged

21   receipt of an executed DNA."

22              MR. KODOSKY:  Move to admit, Your Honor.

23              MR. COLBY:  Objection, Your Honor.  I think it's

24   hearsay.  Plus Mr. Barenbrug will be here to testify himself.

25              THE COURT:  All right.  Counsel, hearsay.

1              MR. COLBY:  I also don't see the relevance of it to

2    the present TRO motion.

3              MR. KODOSKY:  And to the hearsay, Your Honor, I did

4    promise to get back to you with a case cite for that Kos Pharms

5    case over break.  It's 369 F.3d --

6              THE COURT:  Wait a minute.  Wait a minute.  Let me go

7    -- well, you just can give -- give me the name again.  Which

8    was the name of the case?

9              MR. KODOSKY:  The name of the case is Kos Pharms --

10             THE COURT:  Versus?

11             MR. KODOSKY:  It's Kos Pharmaceuticals Inc., versus

12   -- I'm going to pronounce it Andrx, A-N-D-R-X, A-N-D-R-X

13   Corporation.  It's a May 24th, 2004 3d Circuit opinion with a

14   case cite of 369 F.3d 700.

15             THE COURT:  Okay.  And it is 3d Circuit what?

16             MR. KODOSKY:  May 24th, 200 --

17             THE WITNESS:  Four.

18             MR. KODOSKY:  Four.

19             THE COURT:  And that addresses the issue of hearsay

20   materials in a preliminary injunction hearing?

21             MR. KODOSKY:  Thus formal evidentiary requirements

22   applying in --

23             THE COURT:  Preliminary injunction.

24             MR. KODOSKY:  It was also a trademark infringement

25   case, Your Honor.

```
 1          THE COURT:  And the court said what because my law

 2   clerk is out on another meeting, so.  Oh, he's back.  Perfect

 3   timing because there was a case that they cited and I said,

 4   well, you're going to have to tell me what it says because my

 5   law clerk is not here.  He's out on another meeting.

 6          MR. ZAHRALDDIN:  Your Honor -- this is Zahralddin.  I

 7   think in order -- instead of just whispering to Mr. Kodosky.

 8   The reason this is relevant is there's been testimony here that

 9   everything is fine as long as the folks as SCVB are handling

10   the trade secrets.  The trade secrets, as the testimony will

11   show and as the documents will show, have been in the past

12   mishandled by the same people at SCBV (sic) that are still

13   there.  The same engineers that were there before.  So it's

14   entirely relevant to hear about these same trade secrets, the

15   Rembrandt Trade Secrets and the Stream Trade Secrets through

16   Mr. Michaels who is worried obviously that his trade secrets

17   will be misused as are we worried that they're being misused.

18          THE COURT:  Let me just say this.  The focus of this

19   TRO as I understand it is to say you want a restraining order

20   saying don't use -- not don't use.  Don't license or use our

21   technology.  Our meaning Stream and Rembrandt's technology that

22   apparently was somebody else's technology that is now somebody

23   else's technology.  All of which doesn't look good to me, but

24   I'm going to keep that comment to myself.  About, you know,

25   who's using what and who's using whatever.
```

1              But in any event, you're saying it's relevant because

2      you believe that these people in the Netherlands because that's

3      -- and I don't mean to say these people in a bad way.  But the

4      folks, that might be a better word.  The folks in the

5      Netherlands are using or plan to use technology that they

6      shouldn't be using, or licensing, not using because I'm not

7      saying -- I haven't heard anything that says they can't use it.

8      But they can only use it for -- at least the allegation from

9      Rembrandt and Stream is they could only use it for a specific

10     purpose.  And you believe that they are going to use this for

11     some unallowed purpose.

12              MR. ZAHRALDDIN:  Well, we've heard testimony to that

13     effect, Your Honor, from Mr. Stastney.

14              THE COURT:  Well, Mr. Stastney hasn't testified yet.

15     But you believe you heard it from him in the Netherland

16     proceedings, no?

17              MR. ZAHRALDDIN:  Oh, no.  He testified, Your Honor.

18     He did.  He testified on October and indicated that -- that was

19     the most recent issue that we had was with --

20              THE COURT:  Well, was that in the other hearing?

21              MR. KODOSKY:  No.

22              MR. ZAHRALDDIN:  No.

23              MR. COLBY:  Your Honor, Mr. Stastney was called as

24     part of the Debtor's other case.

25              THE COURT:  As of cross?

1          MR. COLBY:  Part of the Debtor's.

2          MR. KODOSKY:  Part of the Debtor's yeah.

3          THE COURT:  Listen, these -- no offense, these

4    hearings -- I just said that to my law clerk.  This is all

5    starting to blur together --

6          MR. COLBY:  Understand.

7          THE COURT:  -- because I've had so many -- and I'm

8    glad you guys are keeping it straight.  And I'm sure that if I

9    go back and think about it I will.  But this TRO hearing, Mr.

10   Stastney was called as of cross, correct?

11         MR. COLBY:  Right.

12         MR. ZAHRALDDIN:  Yes.  He was part of our -- one of

13   our witnesses and --

14         THE COURT:  Right.  And you believed that his

15   testimony at that time --

16         MR. ZAHRALDDIN:  He indicated that there was some

17   sort of sublicensing protection that would allow him to use the

18   technology through the SCVB.  This is directly relevant because

19   the folks at SCVB have committed trade secret violations in the

20   past, have been the subject of the original -- the same people,

21   including Mr. Barenbrug, if I'm pronouncing his name correctly,

22   and that's why this is relevant testimony.  It is simply to

23   show that that testimony may not be as stalwart as we would --

24   they'd like it to be.

25         THE COURT:  Do you want to try and impeach Mr.

1    Barenbrug before -- Barenbrug --

2            MR. ZAHRALDDIN:  I don't believe it's impeachment,

3    Your Honor.  I believe we are asking Mr. Michaels what has

4    happened in a prior case where Mr. Barenbrug -- it's not our

5    fault that they chose the guy who --

6            THE COURT:  All right.  Keep the commentary.  I don't

7    need to hear that.

8            MR. ZAHRALDDIN:  I'm just explaining that it's not

9    our choice to put Mr. Barenbrug up.  Mr. Barenbrug happens to

10   be the person primarily who where the evidence was shown or

11   will show signed a declaration here in the United States saying

12   that he did not sign an MDA.  And we would like to walk through

13   the rest of this to show the MDA that he signed.

14           THE COURT:  So what's -- is Mr. Michaels a -- is he

15   rebutting something? What's he doing?

16           MR. ZAHRALDDIN:  He's simply showing that Mr.

17   Barenbrug, a former engineer at 3D Fusion, an engineer --

18           THE COURT:  Well, he says he wasn't an engineer, and

19   he said he didn't have an MDA.

20           MR. ZAHRALDDIN:  It's interesting because there's a

21   -- here's a signed employment agreement.

22           THE COURT:  Oh, I -- okay.

23           MR. ZAHRALDDIN:  That's what we would like to show,

24   Your Honor.  That's why it's relevant.

25           THE COURT:  Why -- okay.  Are you anticipating -- I

1   mean, I get it.  I get the question is -- I mean, if Mr.

2   Barenbrug --

3              MR. COLBY:  You nailed it, Your Honor.  You nailed

4   it.

5              THE COURT:  Barenbrug comes and testifies, and he

6   says all these things and you got signed documents, why do I

7   need Mr. Michaels to tell me anything because you can ask him,

8   did you sign this?

9              MR. ZAHRALDDIN:  I'm not worried about that, Your

10  Honor.  He may never ask him that question and they cancel him.

11             THE COURT:  Well, then you can ask him.

12             MR. ZAHRALDDIN:  Well, he may never show up if --

13  once this is shown.

14             THE COURT:  Well, that's their problem.

15             MR. ZAHRALDDIN:  But it's our problem if we can't get

16  in the evidence in our case in chief.  Our case in chief was

17  responding to Mr. Stastney and his allegation that everything's

18  fine if it goes over to the engineers at the SCVB because

19  they're protect the licenses and the technology.

20             THE COURT:  And so you're rebutting Mr. Stastney's

21  testimony that these people at -- I mean, these folks at SC,

22  SB, SCVB are protecting the license because they're not doing

23  anything untoward.  And your response is that the people at S -

24  - you want Mr. Michaels to testify that no, they're not

25  protecting it.  And they're not protecting it because they've

1   done these things in the past.  And is that past behavior?  Is

2   that MO?  I don't know what that -- I mean, listen.  I don't

3   know.

4            MR. COLBY:  Your Honor, I think there's an overarch

5   of the larger overarching problem with this, which is that

6   we've gotten really far removed from what a TRO or a

7   preliminary injunction is supposed to be about.  It's supposed

8   to be about the potential for immediate.  And the Debtor's have

9   the burden of showing that there is going to be an immediate

10  irreparable harm.  What they're now saying is we should be

11  granted this injunctive relief because Mr. Barenbrug and others

12  are careless.  And so, something bad might happen.  That's

13  essentially what they're trying to say.  They're trying to

14  impugn their character as stewards of technology of the

15  confidentiality of technology.  And therefore, you know, we

16  should get injunctive relief.

17           THE COURT:  Well --

18           MR. COLBY:  That's just on its face fails the test

19  that's required for --

20           THE COURT:  Well, I'm not quite sure if it's that --

21  as that limited as you're saying.  Because what I'm

22  understanding them to say is we're going to have irreparable

23  harm because these people in charge of our technology are not

24  protecting it and they haven't in the past.  So that's the

25  indication that they're not protecting it.  And we're going to

```
 1   suffer harm because they're not protecting it.  That's -- I

 2   mean, it's not as limited as you're saying, which is that they

 3   might.  They're saying they didn't do it and we don't believe

 4   they're doing it now and we're going to be irreparably harmed.

 5            MR. COLBY:  There's a number of issues with that.

 6            THE COURT:  Woah.  I was talk -- you'll get a chance.

 7   I'm having a conversation with Mr. Colby here.

 8            MR. COLBY:  There's a number of issues with that.

 9   Including that these are the same engineers and it's the same

10   operation that Stream TV itself, the Debtor's owned and

11   operated prior to Judge Laster's opinion in 2020.  And

12   subsequent to the reversal under the Delaware Supreme Court.

13   So it's just like --

14            THE COURT:  Well, I mean, all of this -- listen.

15   I'll probably say something I'll regret.  But this seems to be

16   that engineer from here, to here, to here, to here and -- never

17   mind.  Never mind.  I just don't look to -- never mind.

18            MR. ZAHRALDDIN:  Your Honor --

19            THE COURT:  Go ahead.

20            MR. ZAHRALDDIN:  -- I have to say, let me respond to

21   just a couple things.  The law does not say, it's not

22   characterized irreparable harm the way Mr. Colby set it up.

23   We've cited plenty of cases in this district that all say the

24   same thing.  Any showing of a harm to a trade secret that it

25   may be revealed is irreparable.  Any showing of it is
```

```
 1   irreparable.  We have those cases.

 2            So it's overstating.  This is not -- when you're

 3   talking about intellectual property and trade secrets, which

 4   are not protected like patens or copyrights or trademarks,

 5   there's a very significant issue.  Very significant issue with

 6   irreparable harm.  It is immediate.  And, you know, Mr. Kodosky

 7   can discuss those a little bit further if you'd like us to.

 8            THE COURT:  Well, no.  I mean, we're going far a

 9   field because the issue that is -- the precise evidentiary

10   issue is whether Mr. Michaels should be allowed to testify

11   regarding Mr. Barenbrug's relationship with the IP at issue.

12   I'm going to call it IP.  I don't know if that's the trademark.

13   Is it trademark, IP?  What's the correct --

14            MR. ZAHRALDDIN:  It's a trade secret, Your Honor.

15            THE COURT:  Trade secret.

16            MR. ZAHRALDDIN:  The nondisclosure agreement is what

17   the employee would be forced to keep the secret --

18            THE COURT:  Right.

19            MR. ZAHRALDDIN:  -- the trade secret secret.

20            THE COURT:  But was that issue in this TRO hearing is

21   that it's technology that allegedly belongs to the Debtor that

22   they believe is at risk because the entity in the Netherlands

23   is likely to do something with the Debtor's asset that they're

24   not allowed to do.  And that the Debtor will suffer irreparable

25   harm if they're not prevented from doing whatever it is you
```

1    think they're going to do to harm, or they are doing with

2    respect to that technology.  And with respect to Mr. Michaels'

3    testimony, his testimony is that Mr. Barenbrug did not protect

4    this in the -- I guess did not protect it when he was working

5    at Rembrandt and can't be trusted to --

6         MR. ZAHRALDDIN:  Well, and at Stream, Your Honor.

7    Because this all is the timeline, and these are materials that

8    Mr. Michaels got through a discovery when he sued Stream

9    originally.

10        THE COURT:  And sued Mr. Barenbrug.

11        MR. ZAHRALDDIN:  Excuse me?

12        THE COURT:  And sued Mr. Barenbrug.

13        MR. ZAHRALDDIN:  Yes, and all the other engineers

14   that were involved in the --

15        THE COURT:  That allegedly were working for this

16   other company and somehow ended up at Stream and now it's

17   SeeCubic.

18        MR. ZAHRALDDIN:  Which then led to the settlement

19   that we're talking about and that's why it's relevant.  It's

20   relevant because it shows that Mr. Barenbrug and the other

21   engineers have -- well, I --

22        THE COURT:  Can't be trusted with the IP trade --

23   they could be trusted when they were at Stream.

24        MR. ZAHRALDDIN:  That's I believe --

25        MR. COLBY:  It's like a character point, Your Honor.

```
 1   It's tempting to get in at a TRO based on impugning --
 2           THE COURT:  Well --
 3           MR. ZAHRALDDIN:  It's a violation of the trade
 4   secret.
 5           THE COURT:  Well, I'm seeing about impugning.  The
 6   question for me -- again, I have my own thoughts on this stuff
 7   and I'm trying to restrain myself from saying something that's
 8   likely irrelevant.  It's highly irrelevant, just my view of
 9   this.  It's not going to have anything to do on how I decide.
10   But what I'm hearing is that we're going to be harmed because
11   the engineers who are in charge and who are supposedly
12   protecting -- and that's the word.  I'm going to use supposedly
13   or allegedly, protecting our trade secret technology are not
14   protecting it and can't -- and Mr. Stastney testified that they
15   are and there's nothing going on.  And they're saying, no, you
16   can't because these people -- these people that I'm -- I hate
17   using that word, these people, but the engineers have a
18   propensity not to protect trademark, which -- anyway, so that's
19   what I'm hearing.
20           MR. COLBY:  Yeah.  Based upon an NDA with -- or -- or
21   not, and a declaration in a different case from five years ago.
22   I think what -- what -- what the appropriate focus should be is
23   what protections are in place now and -- and the --
24           THE COURT:  Well, the protection that I heard was in
25   place from Mr. Stastney was that, you know, I guess the
```

1  engineers, or whoever's working on protecting these assets, and

2  their position is these people can't -- whoever you're relying

3  on can't be trusted to protect it.

4        MR. COLBY:  And that's -- that's the point.  It's

5  attempting to obtain injunctive relief based on

6  the -- impugning the reputation --

7        THE COURT:  You don't have to impugn anyone's

8  reputation.  You can see what they did or didn't do and tell

9  me, no, I'm not doing that.

10        MR. COLBY:  And that's -- and that's -- and that's

11  what the focus should be, not -- not attempting to -- and it

12  is.  They're saying that they can't be trusted.  That is

13  impugning somebody's --

14        THE COURT:  Well, I'm not saying they can't be

15  trusted.  They're saying this is what they did in the past.  We

16  believe they're doing it right now.  Is that impugning your

17  reputation?  Maybe it is.  I don't know.

18        MR. COLBY:  It's impugning their character as

19  stewards of trade -- of trade secrets.  It's attempting to get

20  injunctive relief now based on what -- what Debtors say is

21  their -- their character or -- for protecting trade secrets.

22        THE COURT:  Is that their character or their history?

23        MR. COLBY:  Either -- that -- that's what --

24        THE COURT:  That's a little different.

25        MR. COLBY:  That's what character testimony is.

```
 1    That's what character evidence is.

 2            THE COURT:  Well, no.  Character testimony isn't

 3    necessarily your history.  I mean, it could include that, but

 4    I'm not quite -- and you may be right, Mr. Colby.  I'm trying

 5    to figure out --

 6            MR. COLBY:  It's also -- it's -- it's an allegation.

 7    It's a claim that they made in the past in a lawsuit that was,

 8    you know, dismissed.

 9            THE COURT:  Settled.  No.  It was settled.

10            MR. COLBY:  Well, the -- the claim for violation of

11    an NDA, I believe, was the contract claim that was settled.

12    That was between Stream TV and -- that was between Stream TV

13    and Rembrandt, not Mr. Barenbrug.

14            THE COURT:  Well, I don't know.

15            MR. COLBY:  That was --

16            THE COURT:  I don't know because --

17            MR. COLBY:  That was Stream TV and Rembrandt.

18            THE COURT:  -- I don't have -- I don't have the

19    settlement, unless someone put it in evidence, because it could

20    be and I just don't recall.

21            MR. ZAHRALDDIN:  Your Honor, let me -- let me stop

22    Mr. Colby before he misrepresents something yet again about

23    that --

24            THE COURT:  All right.  Ba, ba, ba --

25            MR. ZAHRALDDIN:  No, no, because this is important.
```

```
 1              THE COURT:  Wait a minute.

 2              MR. ZAHRALDDIN:  This is important.  They keep on

 3   saying --

 4              THE COURT:  Wait.  Wait, wait, wait.  Wait, wait,

 5   wait.  I have told all of you guys, I don't like the, you know,

 6   misrepresent -- he maybe -- he is not recalling correctly,

 7   he's -- something.  But don't -- don't throw those words out.

 8   I don't like those words.

 9              MR. COLBY:  And particularly, it wasn't even -- I --

10   that was very uncivil, and I've done my best to be civil.

11   That -- it wasn't even that I misrepresented something or

12   misstated something.  It was that I was about to.  And

13   that's -- that's --

14              THE COURT:  All right.  All right.

15              MR. COLBY:  -- frankly, the same point they're making

16   about Mr. Barenbrug.

17              THE COURT:  So let's just get to the point.  What was

18   it that you wanted to tell me, because I said I thought it was

19   settled, and Mr. Colby said only with Stream.  And you're going

20   to tell me something else.

21              MR. ZAHRALDDIN:  Well, Your Honor, the part that was

22   dismissed without prejudice was the patent infringement piece,

23   because the Supreme Court decided the Hartland (phonetic) case

24   and said that all patent infringement cases had to be refiled

25   in the place of incorporation, which would be Delaware.
```

1              THE COURT:  Okay.

2              MR. ZAHRALDDIN:  They instead, as I think has been

3    produced in evidence in this Court before, have said, no, we

4    didn't pursue that, we didn't pursue anything further because

5    we had a settlement.  We had a settlement so we don't pursue

6    the patent cases.  It's been put into papers without the

7    qualification of without prejudice multiple times.

8              THE COURT:  Okay.

9              MR. ZAHRALDDIN:  So that is a misrepresentation.

10   That is not a disparaging comment.  It is a less -- a less than

11   accurate --

12             THE COURT:  All right.

13             MR. ZAHRALDDIN:  -- portrayal of a dismissal.

14             THE COURT:  Okay.  So it's a less -- let's use

15   the -- let's keep to the phrase.

16             MR. ZAHRALDDIN:  We can tone it down if you'd like

17   but --

18             THE COURT:  Yes.

19             MR. ZAHRALDDIN:  -- that would offend most people.

20             THE COURT:  Less than accurate representation.  And

21   maybe the -- maybe because they didn't think -- I mean, to me,

22   it was without prejudice.  I would put it in there because it

23   means something.  Maybe there's a reason they didn't.  I don't

24   know.  But I would not jump to the conclusion that it -- I

25   could -- I don't know about counsel, but I could come to find

that it was a mis- -- it wasn't even a -- we just didn't think it was relevant. I don't know. But the whole point is don't use misrepresentation. Use inaccurate, not a complete representation. The word misrepresentation just has so much --

MR. ZAHRALDDIN: I will -- I will --

THE COURT: Please use -- that's for everybody.

MR. ZAHRALDDIN: But I'll make sure I do that in the future. I just know that oftentimes, because it's such a large record, a lot of things slip by --

THE COURT: Well, they might slip by for now, but if it's on the record, I will read the transcript.

MR. ZAHRALDDIN: Okay.

THE COURT: Don't ever believe, because I don't recall the specifics, that when it comes time to decide, that I'm not going to go over these 50 transcripts. This is not something that I'm just going to do off the top of my head.

So you can point out and say, well, I'd like to make the record complete because Mr. Colby did not give a complete representation --

MR. ZAHRALDDIN: I will do so in the future.

THE COURT: All right. Then -- and Mister -- that's for everybody in here. So Mr. Zahralddin, you want to point out that there were some things omitted by Mr. Colby that would give a more complete representation of what occurred with respect to the --

1              MR. ZAHRALDDIN:  The settlement.

2              THE COURT:  -- action in --

3              MR. ZAHRALDDIN:  The settlement.

4              THE COURT:  -- in the Southern District of New York,

5    which I think you've already said --

6              MR. ZAHRALDDIN:  Yes, ma'am.

7              THE COURT:  -- that it was a case that required the

8    filing in Delaware.  It was dismissed without prejudice.

9              MR. ZAHRALDDIN:  Yes, ma'am.

10             THE COURT:  And the parties resolved the entire

11   litigation, which is why you didn't go to Delaware.  "You"

12   meaning --

13             MR. ZAHRALDDIN:  Not me, but Stream obviously and --

14             THE COURT:  Stream -- not Stream --

15             MR. ZAHRALDDIN:  Stream and Rembrandt --

16             THE COURT:  -- Rembrandt did not go.

17             MR. ZAHRALDDIN:  -- decided to settle, yes.

18             THE COURT:  Okay.

19             MR. ZAHRALDDIN:  Which I believe was in testimony in

20   prior hearings --

21             THE COURT:  And what SeeCubic --

22             MR. ZAHRALDDIN:  -- here.

23             THE COURT:  -- would not know because it didn't even

24   exist at the time.

25             MR. ZAHRALDDIN:  Well, SeeCubic wouldn't have because

```
 1   Mr. Stastney is the one who signed that agreement.

 2             THE COURT:  Okay.

 3             MR. ZAHRALDDIN:  And Mr. Stastney was the CFO at that

 4   time of Stream.

 5             MR. COLBY:  So --

 6             THE COURT:  So Mr. Stastney, who is now the --

 7             MR. ZAHRALDDIN:  CEO of SeeCubic.

 8             THE COURT:  Would have had that information.

 9             MR. ZAHRALDDIN:  Yes, he would have.

10             THE COURT:  In his -- in his capacity as an officer

11   of --

12             MR. ZAHRALDDIN:  He was, I think, vice chair of the

13   board as well as CFO of Stream at the time, and he's the one

14   who executed the settlement agreement, which we've heard

15   testimony on before in here.

16             MR. COLBY:  Yes.  Your Honor, if I might?  All of

17   this was covered in great detail the first time Mr. Michaels

18   testified and when Mr. Stastney testified on the Hawk motions.

19   I don't have --

20             THE COURT:  Do you really think I recall that?

21             MR. COLBY:  Yeah.  No, no.

22             THE COURT:  Come on, Counsel.

23             MR. COLBY:  That's why I'm trying to --

24             THE COURT:  And nobody has said they wanted to

25   incorporate by reference any of that testimony.  And to be
```

1    honest, you know, I don't recall it.  I recall some of it.

2    That's why I'm asking, did I see this settlement agreement?

3         MR. COLBY:  And that's why, Your Honor, that's why I

4    bring it up.  Not to suggest that you should have recall of it

5    sitting here today, but simply to say that I don't know why we

6    seem to have a controversy over this.  The record -- it's in

7    the record.  It's abundantly clear --

8         THE COURT:  But it's not a record --

9         MR. COLBY:  -- what happened.

10        THE COURT:  -- I'm going to look at for this.

11        MR. COLBY:  Right.

12        THE COURT:  Nobody's asking me to go -- because it

13   would be inappropriate for me to say, well, I heard this in

14   here and I'm going to incorporate it here without having the

15   parties address it.  I mean, it's not a continuation of the

16   same matter.  They involve the same parties but they're a

17   different record.  And I don't -- unless the parties ask me to,

18   I do not go look at records in a prior matter.  Now, some

19   things I just may recall and I might drop a footnote saying the

20   Court, you know, based on my understanding, understood

21   something.

22        MR. COLBY:  Well, I think we're talking about it

23   primarily as background for the evidentiary objection for Mr.

24   Michaels' testimony today, not because it's relevant to the

25   current motion.

1        THE COURT:  Right.

2        MR. COLBY:  That's why we're talking about it.

3   So -- but my broader point was it's all in the -- it's all in

4   the record.  I don't think we agree about the facts.  The facts

5   are the facts.

6        THE COURT:  But the facts for me today --

7        MR. COLBY:  Right.

8        THE COURT:  -- are whether the technology, trademark,

9   IP, whatever the appropriate term, is at risk for the Debtor

10  being harmed.  And that is what I am trying to ultimately

11  decide, at least with respect to a TRO.  Okay.  And your

12  position is it's irrelevant because what Mr. Bru -- Barenbrug

13  did in -- what year is this?  2017.  How many years is that?

14  Eight years ago?  No.  That's eight and seven is '25.  Six

15  years ago?  Or soon to be -- soon to be seven.

16       MR. ZAHRALDDIN:  Soon to be seven.

17       THE COURT:  Soon to be seven years ago has no bearing

18  on what -- whether the assets, the trademark of the Debtor is

19  at risk.

20       MR. COLBY:  Correct, Your Honor.  And suffice it to

21  say there was a dispute between Rembrandt and Stream and,

22  apparently, Mr. Barenbrug in that 2017 time period.  There was

23  a dispute.  Rembrandt has made allegations.  The litigation,

24  what happened happened.  Those are just simply facts.

25       The point that I'm making is that that's not -- I'm

1   sure there's, like everything else, two sides to that story.

2   We don't need to litigate it here today.  It's irrelevant

3   and -- it's irrelevant to try to litigate it for its own sake

4   and it's not relevant to the present question about whether or

5   not, you know, injunctive relief is warranted now here today

6   with respect to those assets in the Netherlands.

7           THE COURT:  Well, I understand why the Debtors think

8   it's relevant because they think their IP, trademark, trade

9   secrets are not going to be protected because one of the

10  persons in -- who's allegedly protecting it -- and I don't know

11  Mr. Barenbrug's position, but he's an engineer, I gather.  He's

12  one of the engineers working presently on the disputed IP.

13  Okay.

14          And the question becomes then, is this person who is

15  charged, presumably charged, with protecting the assets of the

16  Debtor can be -- will protect -- will protect that.  And

17  they're saying, no, you can't, see what he did.

18          And so my question again, is this something better

19  left to confronting Mr. Barenbrug about when he testify -- if

20  and when he testifies.  Their position is if you do not call

21  Mr. Barenbrug, they will be unable to show that the people who

22  are in charge of protecting the IT weren't going to protect it.

23  That's their position.

24          MR. COLBY:  Understand that.

25          THE COURT:  And so what I have to figure out is do I

1  let it in now, because you may not call Mr. Barenbrug --

2         MR. ZAHRALDDIN:  Or he may make himself unavailable

3  once he has --

4         THE COURT:  Well, we don't know what he does or won't

5  do.  The question becomes, is how then do they show that it

6  might not be protected by these -- this engineer?  That's the

7  issue for me.  All this other stuff about who did what in New

8  York or said what, this is their attempt to show that it's not

9  being protected and it's not because they're relying on people

10  who have not protected trademarks in the past.

11         MR. ZAHRALDDIN:  And, Your Honor, you were talking

12  about it, is this a character issue or is it an acts issue?

13  It's an acts issue.  And that's something I wasn't able to yet

14  address and I'd like to discuss it with you.

15         THE COURT:  Okay.  You believe it's --

16         MR. ZAHRALDDIN:  Every single time that you have a

17  trade -- there is a common fact pattern with trade secret

18  violations.  Trade secrets can't be protected like other parts

19  of intellectual property.  So what normally happens is a bunch

20  of employees will leave one place, go to the next --

21         THE COURT:  Uh-huh.

22         MR. ZAHRALDDIN:  -- and then it will be a contract,

23  and whatever's not covered by contract is covered by the trade

24  secret laws.  Usually the contract contains a non-disclosure

25  agreement or confidentiality provision.  That's the basis for

 1  the fact pattern.  Oftentimes, it's hard to figure out whether

 2  or not they've actually done this or not.

 3          In this case, it's not that difficult to see this

 4  because we have a prior act.  And, again, these are the same

 5  engineers that went from Philips to 3D Fusion, then to Stream.

 6  And it was --

 7          THE COURT:  And then from Stream to where?

 8          MR. ZAHRALDDIN:  Well, right now they're still

 9  supposed to be with Stream, but they have an interim CEO who's

10  taken over our subsidiary.

11          THE COURT:  Oh, okay.  Okay.

12          MR. ZAHRALDDIN:  So --

13          THE COURT:  So they are now -- whoa, whoa, whoa.

14          MR. ZAHRALDDIN:  So they're now at the SC BV.

15          THE COURT:  They're at SC BV, who was related

16  to -- is some --

17          MR. ZAHRALDDIN:  It was, yeah, an indirect

18  subsidiary.

19          THE COURT:  -- related to -- to Stream.

20          MR. ZAHRALDDIN:  Yes.

21          THE COURT:  They are -- I don't know how -- I mean,

22  I'm not -- nobody's saying they're not related to Stream,

23  unless you're telling me they're not, Mr. Colby, because I see

24  you moving around over there.

25          MR. COLBY:  They are.  Sorry, I'm -- I'm very

```
 1   interested to respond but I'm doing my best to not.

 2             THE COURT:  The problem, as I see it, is that --

 3             MR. ZAHRALDDIN:  Your Honor, we had to discipline

 4   these engineers once before.  It resulted --

 5             THE COURT:  I don't want to hear all that.

 6             MR. ZAHRALDDIN:  No, no.  I'm saying it resulted in a

 7   billion dollar claim in this case with Rembrandt.

 8             THE COURT:  Oh, I -- well -- well, if we're really

 9   going to be frank, they came from Rembrandt and then --

10             MR. ZAHRALDDIN:  And they --

11             THE COURT:  Ah, ah, ah, ah --

12             MR. ZAHRALDDIN:  You're right.

13             THE COURT:  They had some association with Rembrandt,

14   whether they were employees, consultant, something.

15             MR. ZAHRALDDIN:  We believe --

16             THE COURT:  Wait, wait, wait.  And Mr. Rajan, I

17   definitely recall this, said that when they got sued, they knew

18   that the people, the engineers that were now related to -- in

19   the company with -- however they were related to Stream, they

20   knew that they had some relationship, and he said some other

21   word, and I think he may have said were engineers at Rembrandt,

22   but I'm going to use the word association, affiliation, some

23   relationship with Rembrandt.  And during the course of the

24   litigation, they came to understand that that association was

25   much more than what they understood.
```

```
1            MR. ZAHRALDDIN:  Yes, ma'am.

2            THE COURT:  Okay?  And then -- then -- then, you

3    know, you kind of -- never mind.

4            MR. ZAHRALDDIN:  But that's -- that's exactly it,

5    Your Honor.

6            THE COURT:  But they are now these same engineers who

7    had some -- at least during the course of the litigation,

8    according to Mr. Rajan, had some affiliation with Rembrandt,

9    were now affiliated with Stream and now SC BV and now SeeCubic.

10           So you're now saying these same people who went from

11   here to here to here to here, we don't believe our -- our

12   Stream is being protected.  That's what I get out of this.

13           MR. COLBY:  Understand, Your Honor, a couple of

14   things.  I think this demonstrates why -- two primary points

15   really.  I think this demonstrates why we should limit the

16   degree to which the parties, the Debtors, are trying to address

17   their current request for a TRO by litigating issues that were

18   a part of litigation five years ago, and that was resolved.

19   Like I said, there are, I'm sure, two sides to that story.  I'm

20   resisting the urge to litigate it here just by --

21           THE COURT:  Well, I'm not --

22           MR. COLBY:  -- testifying from the podium.

23           THE COURT:  -- quite sure that the parties are trying

24   to litigate it, but go ahead.

25           MR. COLBY:  Well -- and so it's -- it's -- I think
```

1   we'd all be well served by staying focused on, you know, the

2   current issue at hand, protections around trade secrets at

3   SeeCubic BV and not trying to relitigate these old claims.

4          Secondly, these -- just -- the -- I'm not sure that

5   the facts are quite as they've been portrayed, at least in the

6   following sense.  These individuals had been at SeeCubic BV

7   since 2011.  They were at Philips prior to that.  There's not

8   been hopscotching from entity to entity.  They've been at

9   SeeCubic BV since 2011.

10          THE COURT:  I'm not saying hopscotching.

11          MR. COLBY:  And -- and -- so I -- and then to Mr.

12   Zahralddin's point about trade secret cases where employees

13   move from one company to another, that's not happening here.

14   There's no claim that the engineers are about to leave to go

15   to --

16          THE COURT:  I'm not talking about them leaving, and

17   I --

18          MR. COLBY:  Right.

19          THE COURT:  I'm just repeating the history as has

20   been set forth in this company as to the evolution of these

21   engineers --

22          MR. COLBY:  And --

23          THE COURT:  -- and where they've gone -- and where

24   they started, where they went, and where they are.

25          MR. COLBY:  And I'm not sure that that's -- I'm not

```
 1   sure that that evolution is accurate.  I don't think it is, but

 2   I'm -- again, I'm trying not to relitigate all that here.

 3          THE COURT:  Well, you're telling me -- so you're

 4   saying Mr. --

 5          MR. COLBY:  But they've been at -- they've been at

 6   SC SeeCubic BV since 2011.

 7          THE COURT:  That's nice.

 8          MR. COLBY:  The ownership by virtue of this

 9   litigation and the omnibus agreement has changed, but they've

10   been at SeeCubic BV since 2011.  This is not a case where

11   employees have moved to a new entity or have plans to move to a

12   new entity.  They've been there doing the same work while

13   people fight about who -- who owns them.

14          THE COURT:  Well, I think it's more than they fight

15   about who owns it.  These engineers are engineers.  They

16   probably just want to do their work, leave me alone and then

17   pay me.  Okay?  I suspect that's what they want.

18          MR. COLBY:  Probably.

19          THE COURT:  Okay.  But, Counsel, you cannot, unless

20   somebody's telling me I have a misunderstanding of what the

21   testimony in -- was here, was that these people were at

22   Michaels -- I mean at Philips, Philips, Rembrandt claimed they

23   worked for their predecessor, whatever their name is because I

24   cannot recall --

25          MR. ZAHRALDDIN:  3D Fusion.
```

1          THE COURT:  -- 3D Fusions, which they said they

2    didn't, they ended up at Stream, Rembrandt sued Stream saying

3    these people really work for us and took our technology to you.

4    I think that was the -- I haven't read the complaint, but based

5    on the testimony that I've heard, that was what was going on.

6          MR. COLBY:  No.  There was no trade secret claim in

7    that case.

8          THE COURT:  Whatever -- whatever --

9          MR. COLBY:  It was a patent case.

10         THE COURT:  Whatever it was, the claim from Rembrandt

11   is that you took our information and went to Stream with it.

12   Mr. Rajan's testimony was, during the course of the litigation,

13   we claim to understand that that was a more -- I'm not sure

14   what word he used, deeper, maybe, relationship between these

15   engineers and Rembrandt.  And then these engineers ended up at

16   SC BV.  They went from here to here.  Sometimes maybe you reap

17   what you sow.

18         But in any event, these same engineers have had a

19   relationship with -- with Philips, perhaps with Rembrandt, and

20   definitely with Stream and Stream's subsidiary -- whatever --

21   however related company or something.  Or they have a

22   relationship, maybe not directly with Stream, but a company

23   related to Stream because it's owned by a subsidiary who's a

24   subsidiary of Technovative, who's owned by Stream, or whatever.

25   But they're not some unrelated, unknown entity.  And that's the

1  course of where they've gone.  Okay?

2          And what I'm hearing is Mr. Barenbrug in particular,

3  you know, said one thing here and we believe he's not going to

4  protect us because he did this.  I don't know if he is or

5  isn't.

6          So we have spent more time than necessary trying to

7  figure out whether I'm going to allow Mr. Michaels testify

8  regarding what Mr. Barenbrug did in a hearing and whether, in

9  fact, Mr. Baren- -- what he really, I'm sure, wants to show is

10 that Mr. Barenbrug actually had some sort of -- whatever that

11 relationship was, and we -- and they -- and that somehow will

12 show that if Mr. Barenbrug is one of the people who's supposed

13 to be protecting it, he likely will not.  That's what this is

14 about.

15         And you're saying, who cares what he did in '17.

16 That didn't mean he's doing it today.  Is that what

17 you're -- even if -- even if we find that what he did in '17 is

18 correct, what does that have to do with today?

19         MR. COLBY:  It's an allegation from 2017.

20         THE COURT:  Well, it's an allegation that this is

21 what he said and we have some document.  Again, the question

22 becomes:  Do we just wait until Mr. Barenbrug testifies and

23 then they confront him with this?  And what happens if he

24 doesn't?  How do they then prove that the engineers who were

25 supposed to be protecting this can't be trusted to protect?

1    Then they go call Mr. Barenbrug?  Maybe you call him.  I don't

2    know.

3            MR. COLBY:  I think, Your Honor, I mean, that's part

4    of the problem with the -- that's part of the problem with

5    where we are on this request for injunctive relief to begin it.

6    It's incumbent upon the Debtors to establish that there is a

7    serious risk of irreparable, imminent harm and -- and they

8    really have not, other than Mr. Rajan's sort of say-so, they've

9    really not put forth any evidence that there is a lack of

10   protections around the trade secrets at --

11           THE COURT:  Well, they want to with the information

12   about Mr. Barenbrug.

13           MR. COLBY:  And -- and the idea that somebody was on

14   the receiving end of allegations related to a patent seven

15   years ago, therefore, warrants immediate injunctive relief now

16   is what I'm suggesting, it's insufficient, it's not relevant.

17   We should be focused on what's here.

18           THE COURT:  Well, we're not -- okay.

19           MR. COLBY:  Or we're going to end up relitigating the

20   2017 case --

21           THE COURT:  Well, we're not relitigating anything.

22           MR. COLBY:  -- and the history of the employees and

23   why they left Philips and the fact that Philips was getting out

24   of business.  I mean, there's a whole other --

25           THE COURT:  I don't need to know -- the whole point

1    of the matter is the history is what the history is, and I'm

2    going to -- I'm going to see it the way I see it.  And that's

3    just the way it is.

4            MR. ZAHRALDDIN:  Your Honor, we're not trying to show

5    any of that.  We just want to show that we have two documents,

6    one of which has already been partially discussed where Mr.

7    Barenbrug says under oath A, B, C, D, E, and F.  And --

8            THE COURT:  And what relevance does it have --

9            MR. ZAHRALDDIN:  It's relevant because, Your Honor,

10   unfortunately, maybe Mr. Colby doesn't remember his own

11   comments from 10 minutes ago, he says this was not a trade

12   secret case.  As I explained, all trade secret cases are

13   non-disclosure agreement contract disputes unless you're going

14   under the statute, one statute of which had no private right of

15   action and didn't exist at that time, which is a defend trade

16   secret act.  You have trade secrets that you go under state law

17   under statute and then you always have a contractual dispute.

18   That is what was focused on in this case.  So it was

19   completely -- all that was left was a trade secret case.  So

20   this is completely -- maybe a failed --

21           THE COURT:  Inaccurate description.

22           MR. ZAHRALDDIN:  An inaccurate description.  So what

23   we're simply trying to do is show that this was an act by this

24   engineer who is now here, and I'm going to give him the benefit

25   of the doubt even though --

```
 1              THE COURT:  Even -- no.  No comment.

 2              MR. ZAHRALDDIN:  He doesn't know who he's supposed to

 3   be listening to at this point.  We don't even know if we can

 4   call him since he's one of our employees, because we have an

 5   interim director over there at this point in time.

 6              THE COURT:  Well, apparently the interim director

 7   didn't -- couldn't force them to testify.

 8              MR. ZAHRALDDIN:  Apparently.

 9              THE COURT:  Apparently he couldn't because the only

10   reason they agreed to testify was because their personal

11   attorneys -- personal attorneys directed them to do so, which

12   is why I was a little irate because I couldn't understand why,

13   if these parties were so -- wanted to bring these people, why

14   they didn't go to the company and ask the company.

15              MR. ZAHRALDDIN:  And the --

16              THE COURT:  I already said what I was going to.

17   Don't get me started on that again.

18              MR. ZAHRALDDIN:  I just don't know who their personal

19   attorneys are, Your Honor.

20              THE COURT:  I don't know either.  I have no -- and I

21   was assured that their personal attorney was not the company's

22   attorney.

23              MR. ZAHRALDDIN:  Or SeeCubic's attorney or

24   Mr. Stastney's attorney or anybody else.

25              THE COURT:  Well, I didn't know --
```

1          MR. ZAHRALDDIN:  We weren't sure of any of those

2     things.

3          THE COURT:   -- that they were there -- they weren't

4     the company's.  I didn't ask anybody if they were

5     Mr. Stastney's.  I didn't ask anybody if they were SeeCubic

6     Inc.'s.  I didn't ask anybody if they were Hawk's, SLS, or

7     anybody else's attorney.  I understood that they were their

8     personal attorney, having nothing to do with any of the

9     parties, and that they had engaged their own counsel for their

10    own reason.  I guess they felt they had to, whatever, given

11    what was going on in the Netherlands.  That is what I

12    understood.

13         I'm not going to rehear that because I'm just going

14    to be a little more annoyed and I -- I -- the way I am is I say

15    what I have to say the day I say it.  You come back and talk to

16    me tomorrow and I'll be going, well, that was yesterday, and I

17    want to leave that for last Wednesday.

18         MR. ZAHRALDDIN:  I've -- I wholeheartedly agree.  And

19    we simply want to be able to show what was done by the prior

20    engineers.  It happens to be it's also Mr. Barenbrug.  And we

21    also have information as to why he doesn't want to come here.

22    It has nothing to do --

23         THE COURT:  Well, I don't know why he don't want to

24    come.  That has nothing to do with whether you get to put in

25    the information about who's supposed to be protecting this -- I

1    don't know what you guys want to call it now.  Trade secrets,

2    is that --

3            MR. ZAHRALDDIN:  It's intellectual property.  It's

4    our intellectual property.

5            THE COURT:  I said IP but I was heard -- said no,

6    it's trade secret.  I don't know what --

7            MR. ZAHRALDDIN:  It's --

8            THE COURT:  Whatever it is, the asset, I'm going to

9    call it the asset of the Debtor that you're trying to protect,

10   which I understand, I'm sure there's a disagreement, but what

11   I'm hearing, that the Debtor has a license with Rembrandt and

12   that's the asset the Debtor wants to protect.

13           MR. ZAHRALDDIN:  As well as our trade secrets which

14   are --

15           THE COURT:  Whatever else that is.

16           MR. ZAHRALDDIN:  On top of that, yes.

17           THE COURT:  But that's the asset.  And you believe

18   it's not being protected because the people in charge of

19   protecting it -- which, really, I'm not sure how the engineers

20   are in charge because they're going to do what they're told.

21           MR. ZAHRALDDIN:  That's not --

22           THE COURT:  They're not the ones running out here

23   supposedly licensing this.

24           MR. ZAHRALDDIN:  No.  But that's the problem, Your

25   Honor.  That's what they've seen.  Mr. Theune and all the other

 1   folks are all engineers.

 2            THE COURT:  I don't want to hear about them.

 3            MR. ZAHRALDDIN:  They're all engineers, though, Your

 4   Honor.  There's nobody running the place other -- it's been in

 5   limbo --

 6            THE COURT:  Well, somebody's --

 7            MR. ZAHRALDDIN:  -- during this dispute.

 8            THE COURT:  -- in charge of this company.

 9            MR. ZAHRALDDIN:  The engineers are in charge.  There

10   is no other person who's there.

11            THE COURT:  Mr. Stastney is there.  Now, is he

12   direct -- supposed to be directing them?

13            MR. ZAHRALDDIN:  Well, we can -- we can discuss

14   that --

15            THE COURT:  Ah, ah, ah.  I didn't --

16            MR. ZAHRALDDIN:  Not now but we can discuss it when

17   it comes up.

18            THE COURT:  When Mr. Stastney come up here and

19   testify, you can ask him whatever.

20            MR. ZAHRALDDIN:  That's exactly what I'm going to do.

21            THE COURT:  But I'm -- that's not my point.  My point

22   is, are these people the people running the company, Mr.

23   Barenbrug?

24            MR. ZAHRALDDIN:  They certainly would be the ones who

25   would have access to the technology and access or ability to

1    open up the technology to other people --

2            THE COURT:  Why would they do that?  They're not

3    running the company.

4            MR. ZAHRALDDIN:  Because that's what was -- the

5    testimony was let's go to Hyundai (phonetic) and theirs is an

6    open kimono business plan.  They give them --

7            THE COURT:  But that's a company.

8            MR. ZAHRALDDIN:  Excuse me, Your Honor?

9            THE COURT:  That's the company.  How does that --

10            MR. COLBY:  That also wasn't the testimony.

11            THE COURT:  Well, okay.  Well, maybe you mis -- mis

12    --is there such a word as misremembering?  Probably not but I'm

13    going to use it anyway because my kids use it all the time.  I

14    misremembered.

15            Yeah, okay.  But that's the point.  We have spent

16    more than enough time on whether I -- I could have just said

17    I'll allow it for what it's worth, and whether I'll consider

18    it, I don't know.  I think that's probably what I should have

19    done, because we have already spent I don't know how much time

20    trying to figure out whether I'm going to allow this for what

21    it's worth, which may be nothing.

22            And, you know -- and, Counsel, I think that's going

23    to be typically my approach, is I'll allow it for what it's

24    worth, whatever weight I think it is I'll give it, and if

25    somebody thinks I shouldn't have, because somebody is not going

1  to like what my -- somebody's not going to like my decision and

2  so, dimes to doughnuts, somebody's going to -- well, I don't

3  know if you can do one on a -- but at some point appeal and you

4  want to preserve the record.  I get it.  And that's why I'm

5  being very cautious about my evidentiary rulings because I know

6  this is what -- this is not even for me.  This is for the

7  district court.  Let's call it like it is.  Okay.  And so now

8  that we have spent --

9           Jon, what time we started talking about this?  Do you

10 keep track of time?  Well, we know it was before Mr. Sutton

11 (phonetic) returned --time you got back.

12           UNIDENTIFIED SPEAKER:  It was one --

13           THE COURT:  No, two.

14           MR. CAPONI:  One thing we probably all agree on is

15 that we spent some time on this, Your Honor.

16           THE COURT:  Yes.  Too much time.  So I'm going to do

17 what I should have done at the beginning.  I'll allow it for

18 what it's worth, which may be nothing.  I may give no weight to

19 it.

20           UNIDENTIFIED SPEAKER:  But --

21           THE COURT:  Who's saying "but" over here?  Did I hear

22 somebody say something?

23           UNIDENTIFIED SPEAKER:  No.  No, ma'am.

24           THE COURT:  All right.  Who's talking?

25           UNIDENTIFIED SPEAKER:  Here's some information.

```
 1              THE COURT:  No thank you.  My watch is going to give

 2    me information on Adco (phonetic) records.

 3              UNIDENTIFIED SPEAKER:  Oh, Adco --

 4              MR. CAPONI:  Your Honor?

 5              THE COURT:  Uh-huh?

 6              MR. CAPONI:  Sorry.  Logistically, what time do you

 7    think we'll be going to today and would this be an appropriate

 8    time to take a break so no one gets angry?

 9              THE COURT:  Well, I did take a snack when I went

10    back.

11              MR. CAPONI:  Okay.

12              THE COURT:  Because I had to deal --

13              MR. CAPONI:  I was talking about Mr. Colby, not you,

14    Your Honor.

15              THE COURT:  No.  I -- I have -- I have recognized

16    that I can be -- which I accuse my kids of being hangry.

17    Apparently, I have the same trait.  And I thought I was doing

18    pretty good.  I haven't gotten angry today.  But I also walked

19    a mile and a half this morning before I came in here to set the

20    tone.  So that would be fine.

21              I also probably can go late.  I just have to confirm

22    that -- not with -- I need to confirm with the CSOs how late

23    they want us in here.  You know, I went to midnight.  They were

24    very unhappy with me.  So I don't plan to do that.  Okay.

25    Extremely unhappy.  So we can -- we need to go 6, 6:30, I need
```

```
1    to confirm with them first.  That's not a problem because I
2    made my schedule so that was a possibility.
3            And we still haven't even finished Mr. Michaels.  And
4    then we have to do Mr. Stastney, which we have not -- I
5    don't -- I think our schedule did not -- I think our next
6    hearing on this is with the two Zoom witnesses; right?
7            MR. COLBY:  Yes, ma'am.  And we're waiting for the
8    other side to provide some dates, is my understanding.
9            THE COURT:  But we didn't have a continued date from
10   today.
11           UNIDENTIFIED SPEAKER:  Correct.
12           MR. COLBY:  Correct.  Correct, Your Honor.
13           THE COURT:  You guys think about that, okay,
14   about -- because there's no way we're going to get through
15   Mister -- unless you have five minutes for --
16           MR. COLBY:  I actually don't expect to be long with
17   Mr. Michaels.
18           THE COURT:  But I don't expect we're going to finish
19   Mr. Michaels and Mr. Stastney today, are we?
20           MR. COLBY:  I don't know.  It depends, I suppose, on
21   how much cross for Mr. Stastney.  I don't -- Ms. Brumme's
22   actually going to handle Mr. Stastney as a witness.
23           THE COURT:  Oh, the boss is going to handle it;
24   right?  Right.  Okay.
25           So what I would suggest is you guys think about some
```

```
 1   dates in the events we do not get through Mr. Stastney's

 2   testimony.  We already -- what date do we have -- we don't have

 3   dates for the Zoom people -- I'm calling them the Zoom people.

 4   The Netherlands folks we don't have.  And it's almost December.

 5   I -- I'd like to at least rule on this if I have to while in

 6   the same time striving to get the other -- working on that.

 7          MR. ZAHRALDDIN:  And, Your Honor, we also have a

 8   rebuttal witness to their engineers as well, Mr. Banergy

 9   (phonetic), which I need to get names for.  So we mentioned him

10   on Wednesday as well.  But he would be remote.  He would be by

11   Zoom as well.

12          THE COURT:  I get it as -- the thing about remote, we

13   can do it in -- we don't need a whole day.  If you say, I want

14   to do this witness from 12 to 6, we can do that.  The problem

15   is, is that, and I'm not sure -- you know, I have allowed one

16   attorney to -- with all the witnesses here because she had

17   medical issues.

18          When I was talking, when we were trying to look

19   through the logistics, it's not going to work for half of us to

20   be here and half of the attorneys on Zoom.  It just,

21   logistically, is not going to work.  I know we have two of

22   these things, but I don't -- we can't do that.  I have two at

23   one time.  The old one and the new one.  Or might have bought

24   -- is this the one we're sharing with everybody?

25          THE CLERK:  Yes.  What -- what do you mean two to
```

1  have?

2        THE COURT:  Like half the people on one screen, half

3  on another.

4        THE CLERK:  I mean, in theory, there would just be

5  another bubble on the -- on the screen.

6        THE COURT:  I know.  They told me that that's not

7  going to work.  Never mind.

8        So, in theory, I thought about it but it didn't make

9  sense.  But, you know, I don't know if people want to just keep

10 running to Philadelphia for a half a day.  That's the -- I

11 mean --

12       UNIDENTIFIED SPEAKER:  Understand.

13       THE COURT:  You know, but if that's the way it's

14 going to work, maybe you do it two afternoons so you come in on

15 the Monday, you're doing Monday afternoon, you stay overnight,

16 you do it Tuesday afternoon, we're done.  Instead of the other

17 way.  So think about all of that.

18       And, again, I'm going to tell everybody, Ms.

19 Godfrey's gone December 31st and I'm not quite sure -- you

20 know, she had 30 years as a courtroom deputy so whoever's new

21 is not going to have any experience.  Not saying they're not

22 going to do a good job.  I'm sure whoever is going to do a

23 great job.  I'm just saying you're going to have to be patient

24 at that point.

25       Okay?  All right.  We'll go in recess.  Let's say

1  3:15, unless you guys need longer to run and get something to

2  eat.  Around here, I don't know what they have now.  Chinatown

3  but that's kind of far.  What do they have?

4        UNIDENTIFIED SPEAKER:  Not for a half an hour.

5        MR. CAPONI:  3:30?

6        THE COURT:  3:30.  45 minutes.  If you need longer,

7  just come back.  Court is in recess until 3:30.

8        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10     (Recess taken)

11        THE CLERK:  All rise.

12        THE COURT:  Please be seated.

13        Okay.  We left with Mr. Michaels going to be examined

14  regarding Exhibit 84 and whatever else.  And again, I reserve

15  to give it whatever weight, if any, with respect to these

16  matters.

17        All right.  And with respect to the issue of

18  addressing the issue of a preliminary injunction, what it says

19  is well-established that a preliminary injunction is

20  customarily granted on the basis of procedures that are less

21  formal and evidence that is less complete than in a trial on

22  the merits.

23        So I mean, at this point, I am not even sure if we

24  are talking about, really talking about a TRO because a TRO --

25        Oh, is that rain?  I know it couldn't be rain.

1          MR. COLBY:  It looks like the 4:15 is a little early.

2          THE COURT:  I am like, it can't be rain.

3          You know, in my experience, which is, you know, for

4     what it is worth, when I needed a TRO, I had a hearing in the

5     morning and I had a decision by the afternoon, at most, the

6     next day.

7          This hearing, this has been going on since October

8     6th.  Is this really a TRO or are we doing a -- what are we

9     doing that -- you know?  And so that is why I am kind of, you

10    know, is this really a temporary restraining order?  Is this a

11    TRO, a permanent?  What exactly are we doing here?  That is

12    sort of my question.

13         When you said to me that a preliminary injunction is,

14    you know, you don't have all of the niceties with a formal

15    final trial.  But we are doing that.  I mean, I don't know.

16         Mr. Zahralddin, you stood up, so you tell me.

17         MR. ZAHRALDDIN:  Well, Your Honor, certainly I agree

18    with you that a TRO would have been a lot nicer earlier on.  I

19    think we have probably had enough evidence for a preliminary

20    injunction.  But certainly, a permanent injunction would have

21    required a much higher standard in discovery, I would imagine.

22         But I do think that the case law that we presented

23    discussed both preliminary injunction and TRO as having a

24    little bit of an easier evidentiary process, so to speak,

25    because you are trying to do your best to prevent harm that we

1   believe is imminent to give us time to preserve whatever the

2   status quo is we are protecting, up until we get to see whether

3   or not we, you know, warrants a --

4          THE COURT:  Uh-huh.

5          MR. ZAHRALDDIN:  -- permanent injunction, yeah.

6          Plus, you have the overlay in this case of a lot of

7   the same activity, we believe, are violations of the automatic

8   stay.  Which again, you know, I have discussed with you before,

9   I think at the --on the conference, and I floated it out to

10  other folks too, in some very brief preliminary discussions,

11  nothing too deep, that a lot of the same evidence is applicable

12  to sanctions and/or any sort of other finding of actual

13  violations of the stay.  So I agree with you.  I think, you

14  know, we should have already had the benefits of the automatic

15  stay here.

16         THE COURT:  Well, you already have the benefits of

17  the automatic stay.

18         MR. ZAHRALDDIN:  Yeah, well, it doesn't seem like it.

19  We have people going into other courts in other places.  We

20  have presented case law that indicates that even if it is a

21  non-debtor subsidiary, if anything happens in those

22  subsidiaries that would affect the distribution in this case,

23  both the technology and the money owed to Stream from the

24  subsidiary qualify for that.  We have people going in to the

25  trademark office, not --

1          THE COURT:  Yeah, but I didn't have that until today,

2    so.

3          MR. ZAHRALDDIN:  Well, that is -- that happened,

4    because it only happened two weeks ago, that there was --

5          THE COURT:  Oh, so even if I had issued it,

6    supposedly, I had granted it.  I am not saying I would, I am

7    not saying I wouldn't.

8          MR. ZAHRALDDIN:  I --

9          THE COURT:  But had I, that wouldn't have been

10   evidence that I would have -- but the whole point of the matter

11   is, I am sort of thinking this through.  And where, I mean, is

12   this really a TRO at this point?

13         MR. COLBY:  Your Honor, I think the fact that seven

14   or eight weeks have gone by since it was first filed, and no

15   calamity has befallen the Debtor's assents belies, you know,

16   belies the purported basis for it in the first place.  There is

17   no imminent irreparable harm.

18         THE COURT:  Or maybe people stopped doing what they

19   were --

20         MR. COLBY:  It was supposedly about the --

21         THE COURT:  But Counsel, it could be that people

22   stopped doing what they were doing.  I don't know.

23         MR. COLBY:  Well, there was a --

24         MR. ZAHRALDDIN:  Well, I am sorry, I didn't --

25         THE COURT:  No, no, it is Mr. Colby's turn.

1          MR. ZAHRALDDIN:  -- I didn't realize because he is

2    behind me.

3          MR. COLBY:  The Debtors came through the door raising

4    hue and cry about a threat to the Philips license.  And that

5    just doesn't -- hasn't panned out.  I think there is sufficient

6    record to deny the request.

7          In terms of whether or not this could be a permanent

8    injunction, that would require discovery.  And in my -- and so

9    I don't think that is appropriate now.  And in my experience, a

10   preliminary injunction also incorporates some discovery into

11   the process.  And I think it makes no sense whatsoever to begin

12   that process now.  The Debtors have the burden here.

13         THE COURT:  Well, a preliminary --

14         MR. COLBY:  The Debtors have the burden here, and

15   they failed to demonstrate --

16         THE COURT:  Well, I don't know what they failed to do

17   or not --

18         MR. COLBY:  --any need --

19         THE COURT:  -- failed to do at this point.

20         MR. COLBY:  -- for this.

21         THE COURT:  I don't know.  My question simply was

22   where do the parties believe we are?  And the case law that

23   they gave me said that in a preliminary injunction, it is

24   customarily granted on the basis of procedures that are less

25   formal, and evidence that is less complete than a trial on the

1    merits.  And we have been treating this sort of like a trial on

2    the merits as opposed to a preliminary hearing on whether I

3    should issue, well, first the TRO, I don't know about whether

4    that is where we are, or whether I should issue a preliminary

5    injunction.

6         And so that really, I mean, I have been thinking

7    about this all along, having nothing to do with the issue of

8    the level of evidence or the issue of hearsay about

9    particularly where we are given the length of time that has

10   expired in terms of the hearing that started on October 6th.

11   It is almost going to be 60 days later.  I am not sure whether

12   a -- you know, TRO is like, you get it right then and there.

13   This sort of morphed into this something beyond that.  So I

14   mean, I don't know if that is what I am really looking at or

15   looking at a preliminary injunction.  I don't know, I guess I

16   will have to figure that out.

17        But whether it is a TRO or a preliminary injunction,

18   the case law seems to suggest that hearsay and a less stringent

19   evidentiary standard is allowed in a preliminary injunction

20   TRO.  So that really went to two different things.  One was the

21   evidentiary record, and the other was just what are we doing

22   here?  Because this isn't something that I am just thinking of

23   now.  I have been saying for a bit now, like, what exactly are

24   we doing?

25        So with respect to the evidence, the Third Circuit

1   has said what it said with respect to the stringent evidentiary

2   rules, either in the TRO or preliminary injunction.  This is

3   not a hearing on a permanent injunction, clearly.  So with

4   respect to that, I think the rules are not as stringent, which

5   is why I said, you know, I had already read this case while we

6   were taking, which is I said I will, you know, I will allow it

7   for what it is worth and give it whatever weight.

8          But at some point, we have to get this done because I

9   will be -- you know, I don't know.  I have only heard one side,

10  you know?  And sometimes, you only hear one side.  Well, in the

11  ex parte, you get it without anybody's -- you just get it on

12  the papers.  But typically, you know, you come in, you make

13  your arguments.  The other party makes theirs, and then the

14  judge, you know, gives you a TRO and then schedules, if

15  necessary, or you know, within whatever the time period is for

16  a preliminary injection.  But mine were always simple.

17         MR. COLBY:  Yeah.  Your Honor, I mean --

18         THE COURT:  They weren't this complicated.

19         MR. COLBY:  And one of the consequences of this, and

20  I think, again, it speaks to the, really, a basis for denying

21  the request is that the purported basis for it, the longer this

22  goes on, it keeps shifting.

23         So initially, it was all about the Philips license.

24  There was a passing reference to trade secrets in the initial

25  papers.  Mr. Rajan's declaration said nothing about concern

1    about the security of trade secrets.  If it was that mission

2    critical, that important, you would think he would have brought

3    it to the Court's attention, and he didn't.

4            Then, when Mr. Stastney testifies as part of their

5    case, and he is asked over and over again, so you are not about

6    to issue a sublicense?  You are not about to issue a

7    sublicense?  He said no, we have demonstration projects that

8    are months from being completed.  Then, the customer decides if

9    they want to do it.  Then, we have to talk about what that

10   might look like.  And so that whole basis for this motion was

11   what had zero evidentiary support, and it could have been

12   denied then.  We have now moved to this trade secret issue, and

13   that wasn't really part of the --

14           THE COURT:  Was the trade secret never referenced or

15   it was --

16           MR. COLBY:  There was a passing reference.

17           THE COURT:  It was referenced?

18           MR. COLBY:  It was referenced.  But again, if it was

19   such a critical thing, you would think it would have merited a

20   sentence or two in Mr. Rajan's declaration that he had some

21   concerns about the security of trade secrets.  So now, we are

22   litigating that issue.  And there is no evidence --

23       (Phone system chiming)

24           THE COURT:  Are we getting more people?

25           MR. COLBY:  There has been no evidence about what the

1   specific trade secret protections are or are not at SCBV

2   (phonetic) right now.

3           THE COURT:  Oh, this is Mister --

4           MR. ZAHRALDDIN:  Michaels.

5           THE COURT:  No, Mr. Rajan's --

6           MR. ZAHRALDDIN:  Mr. Rajan did testify, yeah.

7           THE COURT:  -- testimony was that there is some,

8   based on his observation, he believes --

9           MR. COLBY:  In April.

10          THE COURT:  It doesn't matter.

11          MR. COLBY:  Well --

12          THE COURT:  Well, you know, have they changed?  He

13  believes that it is what it is.  Not -- will you tell me there

14  are some things I am not concerned about?  I will tell you

15  frankly, all of you, there are.  And somebody better have a

16  good explanation why I shouldn't be concerned.

17          So while this may have morphed into some other

18  things, and whether whatever, maybe this was better in

19  violation of a state litigation., I think what I understood

20  prompted this was Mr. Stastney's testimony at the hearing in

21  the Dutch court, for which we have no transcript.  A transcript

22  would have ended all of this.  It would have said what he said

23  or what did not say.  It is a he said/she said, well, maybe he

24  said/he said, in this case.

25          And so yes, while it has gone from we are going to

```
 1   lose our license because Mr. Stastney has testified that he
 2   plans to license this, and that he is not protecting our
 3   assets.  That is pretty much what I was hearing.
 4          And now, it is like he didn't protect it because they
 5   aren't using some sort of whatever term it is.
 6      (Phone system chiming)
 7          MR. COLBY:  It is blocked, Your Honor.  They encrypt
 8   the algorithm.
 9          THE COURT:  If it is not encrypted or whatever.  You
10   are going to bring somebody to say it is, so it's protected.
11   Therefore, we don't need an injunction because we're not.  We
12   have Mr. -- you know, we have all of this other,
13   notwithstanding Mr. Stastney's testimony that he is not going
14   to license, there is evidence that he said he would.  Now, is
15   he doing it?  I don't know.
16          Okay.  I am just telling you what I have seen.  I
17   haven't heard Mr. Stastney's explanation in response to any of
18   this stuff, other than his original testimony.
19          MR. COLBY:  Correct, yeah, which I think addressed
20   that squarely.
21          THE COURT:  Okay.  And so that, to me, is some
22   issues.  And then, there are some other issues about what they
23   are doing, who they are doing it with, and whether they like
24   it.  Whether you guys like it or not, there is a license that
25   was granted by someone else to the Debtor.  And I don't think
```

1  anybody is arguing that Rembrandt licensed something to the

2  Debtor.  There may be a dispute over what that license entailed

3  and what it allowed the Debtor to do with it.  But it is clear,

4  whatever that license was or is, SCBV did not just come out of

5  nowhere.  It didn't.  There is a -- it used that license,

6  whether it was authorized, unauthorized, given to them,

7  whatever.  Okay?  That is not disputed.

8          What I think you guys, is well, we took it and we did

9  something else with it.  I am not a IP lawyer.  I don't know

10  how IP works.  I mean, I have an idea, but I have never been

11  involved in IP litigation.  I know in bankruptcy what it means

12  in terms of use and reject, and all of that other stuff.  But I

13  can tell you, at some point, this is either assets that the

14  Debtor has and the Debtor did something with the license, or it

15  didn't.  Because there is no dispute that the Debtor had some

16  kind of license.  What the Debtor did with that license and

17  what other parties did with it thereafter, that is all you guys

18  are all fighting about.  That is what you are fighting about.

19          But at the end of the day, the license originated

20  with the Debtor.  It means something.  And what somebody did

21  with it or improved on it, if it originated with the Debtor, it

22  is an asset of the Debtor that the Debtor has done something

23  with or hasn't done something with.

24          And so to that extent, I will tell you, if anybody is

25  doing anything with assets that belong to the Debtor's estate,

1    we are going to have a problem.  That is just the bottom line.

2    I don't care how it got to me.  I don't care if he mentioned it

3    first day, second day, fourth day, eighth day.  If you are

4    doing something that you are not supposed to be doing with an

5    asset that belongs to the Debtor, you have a problem.  And I

6    don't care whether we call it TRO, preliminary injunction, it

7    is not permanent, that is where we are.

8              And so they are saying they mean, SCB -- SeeCubic's

9    -- we are not doing anything with the assets of the Debtor,

10   nothing.  We are not selling it, we are not doing anything.  We

11   are -- everything is for the benefit of whoever ultimately gets

12   it.  That is what I am hearing.  And so at the end of the day,

13   you guys need to give me what I need to figure out what is

14   going on with these assets.  Either they are being protected or

15   they are not, are they are being licensed or they are not?  Are

16   they being used by somebody else or they are not?  That is what

17   the issue is for me.  And all of this third-party, sixth-party,

18   whatever, that is what I am focusing on.  And I think

19   sometimes, in the heat of the battle, you guys forget what it

20   is that I need.

21             MR. COLBY:  If I might, Your Honor?

22             MR. ZAHRALDDIN:  Can I speak for one second?

23             MR. COLBY:  We have directly addressed the question

24   about licensing in Mr. Stastney's first testimony when he was

25   called by the Debtors.

1          THE COURT:  Uh-huh.

2          MR. COLBY:  And there has been no -- and the

3    statement was that they are doing the development projects.

4    The work that they are doing, it is happing at SeeCubic B, as

5    has always been the case, and that any of those proof of

6    concept projects aren't complete.  And any potential future

7    licensing, parallel licensing, sublicensing, whatever it may

8    be, is well off in the future if it is going to happen at all.

9    That is the testimony so far.  There is no testimony contrary

10   to that, and no evidence contrary to that other than documents

11   from 2022 --

12          THE COURT:  Well, what about 2023?

13          MR. COLBY:  -- when the situation was entirely

14   different.

15          THE COURT:  Well, they have got the -- there is a PMB

16   or PPM from 2023.

17          MR. COLBY:  There --

18          THE COURT:  I don't recall what it says.

19       (Phone system chiming)

20          MR. COLBY:  There is a subscription agreement which

21   simply has representations about the existence of lawsuits and

22   whether or not they would --

23          THE COURT:  I don't recall what it says.

24          MR. COLBY:  Right.

25          THE COURT:  And I mean, I was -- I said I don't know.

1      MR. COLBY:  So that was not a 2023 statement about

2  licensing.  There is nothing in there about licensing.

3      THE COURT:  I don't recall.  I am going to take the I

4  don't recall, because I was wondering about did they say that

5  it is disputed, what did we do?  But all of that, to me, I have

6  the Debtor saying this, that -- and Mr. Stastney saying

7  whatever he said.  And then they are saying well, no, based on

8  these things, we don't believe  -- this is our contradiction to

9  his testimony, and that we think you should also look at these

10 things, because we don't think you should believe Mr. Stastney.

11 We don't think you should believe him because whatever, for

12 whatever reason.

13      MR. COLBY:  Right.  And those things are the PPMs

14 from 2020 and 2022, where first of all, they are old.  So they

15 don't speak to any potential immediate irreparable harm.  And

16 secondly, those came into existence during a period of time --

17      THE COURT:  I know when they came in.

18      MR. COLBY:  -- prior to --

19      THE COURT:  Uh-huh.

20      MR. COLBY:  -- the Supreme Court case.  So --

21      THE COURT:  When was the Supreme Court decision?

22      MR. KODOSKY:  June 15th, 2022.

23      MR. COLBY:  June.

24      MR. ZAHRALDDIN:  June 15th, 2022, Your Honor.

25      MR. COLBY:  And the PPM is dated Q1 -- or Q2 2022.

```
1              MR. KODOSKY:  And the trademark application was

2    October of --

3              THE COURT:  To say --

4              MR. COLBY:  We haven't gotten to the trademark

5    application yet.

6              THE COURT:  Yeah, because that is --

7              MR. COLBY:  I am just --

8              THE COURT:  Counsel?

9              MR. COLBY:  Yep.

10             THE COURT:  They are what they are.

11             MR. COLBY:  Yep.

12             THE COURT:  And I need an explanation.

13             MR. COLBY:  Yep.

14             THE COURT:  And it better be a good one.

15             MR. COLBY:  Yep, yep.  And so there will be.  I am

16   just simply focusing on, you know, this issue about Philips.

17             THE COURT:  So where we are now is that we have a

18   claim that SeeCubic, Inc. and all of these other people are

19   causing irreparable harm to the Debtor.  Mr. Rajan has

20   testified that, you know, they are not protecting them, they

21   are not doing this.  That is why you are bring Mr. Barenbrug.

22             MR. COLBY:  Barenbrug, correct.

23             MR. ZAHRALDDIN:  Right.  If there was no evidence,

24   there would be no need to rebut them with Mr. Barenbrug.

25             THE COURT:  Well, there is evidence and they are
```

143

1    going to try to rebut it.

2              MR. COLBY:  Yep.

3              THE COURT:  And then, there is the evidence of all of

4    this trademark stuff, all of this other things, the website.

5    All of those things are evidence to say don't believe Mr.

6    Stastney because he is saying different things over here.  So

7    there is evidence, Counsel.  I am not going to say there is

8    not, because their -- what they have tried to do, is put

9    evidence -- they called Mr. Stastney as a cross, but they have

10   put in all of this other stuff, don't -- Judge, don't believe

11   him.  He is not credible because look at all of these other

12   things he is doing.

13             MR. ZAHRALDDIN:  Your Honor --

14             MR. COLBY:  Right.

15             THE COURT:  Okay.  So that is sufficient for me to

16   say okay, now what do I do with it?  So I didn't intend to come

17   out here and do a colloquy with Counsel about where we are, but

18   I am just trying to get your guys to focus.

19             MR. COLBY:  Yes.

20             MR. ZAHRALDDIN:  I understand that, Your Honor.  And

21   let me just say, because there was a lot, and I am not going to

22   respond to everything.  I mean, there was a nice final argument

23   that he made, and we are going to leave that alone.

24             But I am going to say this.  You asked when did all

25   of this happen and what is it we are worried about?  Mr.

1    Stastney, SeeCubic, Hawk, anyone who is involved as a creditor

2    in this case, should not be touching anything that is a

3    Debtor's asset.  Nothing.  And we have been begging for help

4    since April.  It didn't just happen, it has been continuing.

5         THE COURT:  Well, then why didn't -- well, we are

6    where we are.

7         MR. ZAHRALDDIN:  I understand that.  I understand

8    that.  But to say oh, just forget about everything that has

9    happened, et cetera.  Our rights are rooted under *Butner* and

10   our state law rights.  And the state law right now, and the

11   Federal Bankruptcy Law says everything should have been turned

12   over to us.  Then, if they want to do something with it, and

13   that is Stream, what Stream owns.  Then, if they want to do

14   something, they can come in.  They can file state relief

15   motions.  They can object to our plan.  They did none of that,

16   and that is the problem.

17        THE COURT:  So you are -- you basically want me to

18   say stop doing what you are doing with all of that.  And that

19   is how I am looking it is, is there going to be irreparable

20   harm to the Debtor?

21        MR. COLBY:  Right.

22        THE COURT:  And this proof of concept stuff, I get

23   it.  You know?

24        MR. ZAHRALDDIN:  I will get to it here.

25        THE COURT:  Don't interrupt me.

1          MR. ZAHRALDDIN:  I won't interrupt you, I am just

2   saying --

3          THE COURT:  I love to interrupt people, but I get to

4   interrupt.  I do it all the time.

5          MR. ZAHRALDDIN:  I know, I know.

6          THE COURT:  I am working on it, but I am not getting

7   good at it.  Maybe by the end of my -- maybe when I finish my

8   sentence, well, sooner, I guess.  Maybe by that time ,I will

9   have gotten not to interrupt.  But the point I am making is

10  that if, in fact, these license -- whatever this process is,

11  gets out, it is not going to be for the benefit of any -- even

12  if it ultimately belongs to the secured creditors, okay?

13         MR. COLBY:  Right.

14         THE COURT:  If it gets out into the general world,

15  public, whatever word you want to use, it is going to be worth

16  zero.

17         MR. COLBY:  Well --

18         THE COURT:  Because everybody else will have access

19  to it.

20         MR. COLBY:  Right.  And Your Honor, I think that

21  speaks to, frankly, an issue I have with the basis of this

22  motion in the first place.  As Mr. Stastney previously

23  testified, it is in the secured creditors' interest to preserve

24  this value.  It is in the secured creditors' interest --

25         THE COURT:  Yeah, but it is also --

```
 1            MR. COLBY:  -- to have SCBV be successful.

 2            THE COURT:  Uh-huh.

 3            MR. COLBY:  And to have technology that has value and

 4   isn't, you know, stolen by others.

 5            THE COURT:  I get that.  But it is also SCB -- SB --

 6            MR. ZAHRALDDIN:  SCBV.

 7            THE COURT:  -- SCBV to the extent it operates, it is

 8   supposed to be for the benefit of who ultimately gets it.  And

 9   nobody is supposed to be doing things that does not benefit

10   both the Debtor and the Secured Creditor.

11            MR. COLBY:  Right.

12            THE COURT:  And so I don't know how much of that is

13   preferring one over the other.

14            MR. COLBY:  Yeah, we are --

15            MR. ZAHRALDDIN:  Your Honor, you are also

16   forgetting --

17            MR. COLBY:  We are highly aligned --

18            MR. ZAHRALDDIN:  -- you are also forgetting the

19   unsecured creditors because the unsecured creditors do not

20   benefit from the secured creditors walking away and reinstating

21   what was de facto, de facto reinstating what was part of the

22   omnibus agreement, where none of those people got paid.  And it

23   was for the benefit of the shareholders at the SeeCubic level,

24   okay?

25            THE COURT:  But that is for another day.
```

1              MR. ZAHRALDDIN:  All right.  Well --

2              THE COURT:  So at the end of the day, my job is to

3    make sure that the assets of this estate are protected.  And

4    does that mean that there is nothing going on that they are at

5    risk?  I don't do anything, I say no.  If I find that they are

6    at risk, I say something.

7              And so where we are is, we have heard Mr. Stastney

8    say I am not doing anything.  And they are saying, no, George,

9    look at all of these things that he did, this, that.  I have to

10   now weigh that.  You guys are arguing the end results, but I

11   have to go and say okay, well, the Debtor said this is what

12   they are doing, this is what they are doing.  Mr. Stastney says

13   I am not, you are going to bring in some other people who

14   presumably will support his position.  And then I am going to

15   look at everything and say are these assets at risk of -- of

16   the Debtors, at risk of having -- being irreparably harmed with

17   respect to these assets.  If they are, I, you know, it's not --

18   I'd probably issue a preliminary injunction.  I don't know why

19   a TRO.  If they're not, I don't do anything.  I said there's

20   nothing, denied.  And that's where we are.

21             And so, I think we've gone astray by arguing all

22   these things about who's what and who's -- the bottom line is,

23   and nobody has told me otherwise.  The underlying license is an

24   asset of who?

25             MR. ZAHRALDDIN:  The Debtors.

1           THE COURT:  Both debtors?  One debtor?

2           MR. ZAHRALDDIN:  The Stream is the ultimate signatory

3    and -- well, sorry.  Excuse me.

4           THE COURT:  All right.

5           MR. ZAHRALDDIN:  Stream --

6           THE COURT:  Don't worry about it.

7           MR. ZAHRALDDIN:  Okay.  Yeah.

8           THE COURT:  I have what I have in the record.

9           MR. COLBY:  Yeah.  Yeah.

10          MR. ZAHRALDDIN:  Okay.

11          MR. COLBY:  The license is, the license between

12   Philips and one of these entities, that entity is Ultra-D

13   Ventures, which is one of the --

14          MR. ZAHRALDDIN:  Yeah, not under control --

15          MR. COLBY:  -- subsidiaries.

16          MR. ZAHRALDDIN:  -- of Mr. Stastney but independent.

17          MR. COLBY:  It's an indirect --

18          THE COURT:  I don't need all that commentary.

19          MR. COLBY:  It's an indirect subsidiary --

20          THE COURT:  Uh-huh.

21          MR. COLBY:  -- of Stream.

22          THE COURT:  Uh-huh.

23          MR. COLBY:  And then the work, the technical

24   expertise to know --

25          THE COURT:  Back up.

```
 1              MR. COLBY:  -- about the people are at SeeCubic B.V.

 2              THE COURT:  I get where they're at.

 3              MR. COLBY:  Yeah, they're at --

 4              MR. ZAHRALDDIN:  Yeah, but --

 5              THE COURT:  But there is a license between Rembrandt

 6   and the Debtor?

 7              MR. ZAHRALDDIN:  Yes, ma'am.

 8              THE COURT:  Okay.  And those people who are at SCBV

 9   were there by virtue of some alleged relationship with

10   Rembrandt.  Alleged.

11              MR. COLBY:  Yeah.  No, and I just -- that's --

12              THE COURT:  And so -- counsel.

13              So the issue is, is what does that license mean?  I

14   don't know and until somebody decides and the Debtor says this

15   is my license and you're using it in SCBV --

16              MR. COLBY:  Right.

17              THE COURT:  -- we've got a problem.

18              MR. COLBY:  So --

19              MR. ZAHRALDDIN:  Well that's -- Your Honor, that's

20   what -- Mr. Michaels is the counterparty to that --

21              THE COURT:  I get that.

22              MR. COLBY:  Yeah, if we're --

23              MR. ZAHRALDDIN:  -- for that license.

24              MR. COLBY:  If we're talking about the Rembrandt

25   license, that's a different issue.  I think that'll be
```

1    addressed today and probably also by Mr. Barenbrug.

2         The -- just one slight correction.  The folks at

3    SeeCubic B.V., really are descendants, direct descendants of

4    the Philips operation, when Philips decided it wasn't -- they -

5    -

6         THE COURT:  And so they had --

7         MR. COLBY:  -- worked there and they did this.

8         THE COURT:  So let me back up.

9         MR. COLBY:  Not Rembrandt, I guess is my point.

10        THE COURT:  Wait a minute.

11        MR. COLBY:  But there was --

12        THE COURT:  So when Rembrandt -- and counsel, I don't

13   know how you get around this, because I think about all these

14   things.  Rembrandt sued Stream, sued Mr. -- among other people,

15   Mr. Barenbrug.

16        MR. COLBY:  Correct.

17        MR. ZAHRALDDIN:  Uh-huh.

18        THE COURT:  Okay.  And there was a settlement --

19        MR. COLBY:  Correct.

20        THE COURT:  -- with respect to that.

21        MR. COLBY:  Correct.

22        THE COURT:  Well, if there wasn't a settlement.

23   You're shaking your head.  Mr. Stastney was somehow involved in

24   that case.

25        MR. CAPONI:  Your Honor, and I'd just correct the

1   record on this.

2           THE COURT:  Uh-huh.

3           MR. CAPONI:  The New York litigation ended with the

4   claims being dismissed.  Rembrandt -- and this was all while

5   Mr. Rajan controlled the company.  Mr. Rajan defended that

6   litigation.

7           THE COURT:  And Mr. -- wait a minute.  And so, Mr.

8   Michaels testimony that he directly talked to Mr. Stastney is a

9   lie?

10          MR. CAPONI:  Mr. Stastney was an employee under Mr.

11  Rajan.

12          THE COURT:  Doesn't matter.  He was involved or not.

13  I don't want to hear about whether he was --

14          MR. COLBY:  Yep.

15          THE COURT:  -- an employee or not.

16          MR. CAPONI:  Well, Your Honor, it's relevant for this

17  factor.

18          THE COURT:  Okay.

19          MR. CAPONI:  This was not an entity controlled by Mr.

20  Stastney --

21          THE COURT:  Okay.

22          MR. CAPONI:  -- with the secured creditors during the

23  course of the New York litigation.  It was controlled by Mr.

24  Rajan.

25          THE COURT:  And Mr. -- wait a minute.  And Mr.

1    Stastney was not an officer or a board member or anything else

2    at that time?

3            MR. CAPONI:  He was an officer.

4            MR. ZAHRALDDIN:  He was both, Your Honor.

5            THE COURT:  So don't tell me he was an employee.  He

6    was also an officer.

7            MR. CAPONI:  Well, he was under Mr. Rajan.  He wasn't

8    directing the --

9            THE COURT:  Was --

10           MR. CAPONI:  -- litigation, Your Honor.  Your Honor,

11   if I may just --

12           THE COURT:  But he was an officer.

13           MR. CAPONI:  He was an officer.

14           THE COURT:  And a board member.

15           MR. CAPONI:  And he was sent --

16           THE COURT:  Yes.

17           THE COURT:  -- to negotiate the litigation.

18           MR. CAPONI:  Your Honor --

19           THE COURT:  But so --

20           MR. CAPONI:  -- the point being --

21           THE COURT:  -- so who controlled -- the point of the

22   matter is, there was some sort of settlement.  I don't care

23   what you --

24           MR. CAPONI:  There was not, Your Honor.  May I

25   clarify the record on that because --

1          THE COURT:  Okay.

2          MR. CAPONI:  -- it's important.

3          THE COURT:  All right.  There wasn't a settlement.

4    What happened?

5          MR. CAPONI:  There was not a settlement.  There was a

6    mediation.  Rembrandt wanted there to be a settlement.

7    Rembrandt filed a Motion after the mediation to enforce a

8    settlement agreement.

9          THE COURT:  Uh-huh.

10         MR. CAPONI:  It was litigated.  Both the magistrate

11   who oversaw the mediation and the District Court ruled, there

12   was no meeting of the minds and there was no settlement.  Full

13   stop, New York litigation ends.  Years later, in the context of

14   getting ready for the bankruptcy that was kicked out as being

15   fraudulent, they -- Mr. Rajan signs a settlement agreement with

16   Rembrandt.

17         So there was no New York litigation resolved via a

18   settlement.  The New York litigation was resolved because the

19   case was dismissed.

20         THE COURT:  Dismissed by the Court or dismissed by

21   the party?

22         MR. CAPONI:  By the Court.

23         MR. ZAHRALDDIN:  Can I object to the testimony?

24         MR. CAPONI:  By the Court.

25         MR. ZAHRALDDIN:  But Your Honor, why can't we --

```
 1              MR. CAPONI:  And there is a --

 2              MR. ZAHRALDDIN:  -- look at the actual written

 3    document?

 4              MR. CAPONI:  -- written opinion, Your Honor.

 5              THE COURT:  You know what?  I don't need anybody to

 6    tell me anything.

 7              MR. ZAHRALDDIN:  I'm just asking.

 8              THE COURT:  Don't tell me anything.

 9              Somebody put the -- just put the record in -- put the

10    docket in the record.  I just want --

11              MR. ZAHRALDDIN:  Yes, ma'am.

12              THE COURT:  -- the docket in the record.  I don't

13    need your interpretation, his interpretation.

14              MR. ZAHRALDDIN:  That's what I'm asking.  That's all

15    I'm asking.

16              THE COURT:  Just put it all in.  And the -- it really

17    isn't relevant to me --

18              MR. COLBY:  That's -- yeah.

19              THE COURT:  -- because at the bottom line is either

20    the Debtor believes this is a -- and I have to -- I can, for

21    instance, in the context of a Motion for Relief from State, if

22    the parties dispute ownership, I can, for the purpose of the

23    Motion for Relief, make a determination solely for that

24    purpose, whether in fact a party, for instance, or the mortgage

25    company says I have a mortgage, the Debtor says, you don't have
```

1    one.  I never signed any papers.  I didn't do anything.  Okay.

2    I will have a hearing and I will say for the purposes of this

3    Motion, I will find, for this purpose only, it's not a final

4    determination, I'll find there's a mortgage.

5           But you guys are going to -- either I have to make a

6    final determination or you're going to go to state court and

7    have a final determination.  So -- but it's because they're --

8    you know, the parties are asserting.  The same way the Debtor

9    says, I own this.  Okay.  I own it.  And somebody ultimately

10   has to determine ownership.  I may have to say for the purposes

11   of what I'm doing, determine whether it's more -- it's -- that

12   the Debtor has an interest, doesn't have an interest.  But

13   solely for the purpose of making my decision as to whether I'm

14   going to rule one way or the other.

15           MR. COLBY:  If I could ask --

16           THE COURT:  And so, that's what exists here.

17           MR. COLBY:  If I could ask a question, Your Honor,

18   just so I can be sure to be as responsive as possible to what

19   you're speaking about and focusing on.

20           Are you referring to the Rembrandt license?  Is that

21   what you're discussing?

22           THE COURT:  Well, the license that the Debtor says it

23   has an interest in, that SCBV is using.

24           MR. COLBY:  Right.  So I think there are two that the

25   Debtor says -- has an interest in.  There are two licenses at

1    issue.  There's the Philips license, which we've talked about

2    quite a bit.

3              THE COURT:  Uh-huh.

4              MR. COLBY:  And then there is the 2021 settlement

5    with Rembrandt, which creates what we've been referring to as

6    the Rembrandt license.

7              MR. ZAHRALDDIN:  And Your Honor --

8              THE COURT:  Oh, don't interrupt him.

9              MR. COLBY:  And so, I guess I don't think anybody

10   disputes that the Philips license exists.  I don't think the

11   Court needs to make a ruling on that.

12             THE COURT:  But to the extent the Philip license

13   exists, the Debtors asserting, I guess, some sort of interest

14   in that.  I don't know if the Debtor has an interest or not.

15             Do I have to make that determination now?  All I have

16   to say is the Debtor is asserting an interest, believes that

17   these -- this entity is using its asset, because they had to

18   have gotten it from somewhere.  The SCBV did not, at least I

19   haven't seen it --

20             MR. ZAHRALDDIN:  They're not a party.

21             THE COURT:  -- in the record anywhere, a license from

22   Philips and SCBV, unless it got one lately and I haven't seen

23   it.

24             MR. COLBY:  But we have the license, well, first of

25   all, it's with -- it's currently with Ultra-D Ventures.  It is

1    in the record.  The --

2              THE COURT:  Uh-huh.

3              MR. COLBY:  -- both the license is in the record and

4    the 2014 amendment.

5              THE COURT:  And the license from Ultra-D to SCBV is

6    in there?

7              MR. COLBY:  No.

8              MR. ZAHRALDDIN:  No.

9              MR. COLBY:  There is the --

10             THE COURT:  That's the point, that I don't see

11   anything, but anybody giving anything to SCBV.

12             MR. ZAHRALDDIN:  And --

13             MR. COLBY:  Well, the --

14             THE COURT:  And I don't know who owns this stuff.  I

15   don't know.  Somebody's going to have to figure this out.  I'm

16   not an IP --

17             MR. COLBY:  Yes, the --

18             THE COURT:  -- I'm not trying to do IP.

19             MR. COLBY:  The Ultra-D license includes SeeCubic,

20   B.V.

21             THE COURT:  Oh, it says that they include it?

22             MR. COLBY:  I believe --

23             MR. ZAHRALDDIN:  No, Your Honor, what it says --

24             THE COURT:  You know what?

25             MR. ZAHRALDDIN:  Again --

```
1              THE COURT:  We're going astray.

2              MR. ZAHRALDDIN:  We are.

3              THE COURT:  We're going astray.

4              MR. ZAHRALDDIN:  We are.

5              THE COURT:  All I was trying to figure out is, was

6    this a preliminary injunction and trying to give you guys some

7    guidance for where I was and what I was trying to figure out.

8    And from my perspective, if this is assets of the Debtor's

9    estate, I have to do something, if I believe there's

10   irreparable harm.

11             The first thing I have to figure out is, for the

12   purposes of this motion, or for TRO / preliminary injunction,

13   because that's what it's slash called, is this assets that

14   could be possibly assets of the Debtor?  If I look at the

15   documents and go no way, then I don't even get to irreparable

16   harm.

17             MR. COLBY:  Got it.

18             THE COURT:  If I get to and say possible, then I have

19   to say, okay, what, if anything, needs to be done to protect

20   these assets?  The answer could be, yeah, its assets, like,

21   possible assets.  Nothing needs to be done.  It's possible

22   assets, something needs to be done.

23             But that's where I am, and I was hoping people would

24   just kind of focus on that.  I was trying to --

25             MR. COLBY:  Sure.
```

1          THE COURT:  -- get people to -- I have spent God

2    knows how much time, again, asking questions that I probably

3    shouldn't have and just let the parties go.

4          MR. COLBY:  Well --

5          MR. CAPONI:  Your Honor, if I may briefly?

6          THE COURT:  Uh-huh.

7          MR. COLBY:  Sorry.  Sorry.

8          THE COURT:  Well, okay.

9          MR. COLBY:  Sorry, Mr. Caponi.

10         THE COURT:  Mr. Caponi.

11         MR. COLBY:  Am I allowed to interrupt Mr. Caponi?

12   Mr. Zahralddin.  We're on the same team.

13         MR. CAPONI:  He can interrupt me all he wants.

14         MR. COLBY:  Okay.  So that's up with the -- there has

15   been discussion.  I think even Mr. Rajan concedes that the

16   Philips license includes affiliates and that definition would

17   include SeeCubic, B.V.

18         I think there is a separate issue that I'm not an

19   expert on, a separate sort of bankruptcy law issue about

20   whether or not, what the Debtors own is sort of in the assets

21   of the subsidiary or the interest in the subsidiary.  I think

22   we have submitted some briefing on that and if -- to the extent

23   we need to argue it, we can argue it.  I don't know that that's

24   an evidentiary issue.

25         THE COURT:  We're not getting into that today.

```
1              MR. COLBY:  Right.

2              THE COURT:  Not today.  And not --

3              MR. COLBY:  Not today.  Right.

4              THE COURT:  -- no, and not, you know, if you

5    submitted something I'll look at.

6              Mr. Caponi?

7              MR. CAPONI:  Yes, Your Honor.  To your point, and

8    it'd well taken.  But I would like to address one issue, which

9    is the notion.  And I understand Your Honor's desire to get to

10   the heart of it.

11             This is not a we issue.  The Debtor filed a Motion.

12   The Debtor bears the burden of establishing each of its

13   elements, what the property's with specificity, because the

14   Court ultimately has to enter an order.  If the Court enters an

15   order, in order for it be worth the paper it's written on, it

16   has to have specificity.

17             What asset belongs to the estate, how it's being

18   used, and how it's not, et cetera.  To the extent, and as Mr.

19   Colby has pointed out, this thing has morphed.  I mean, I came

20   here, my client, as far as I'm concerned, this is a TRO.

21   That's what the Debtor filed.

22             If the Debtor wanted to file something else, it

23   should have, it could have withdrawn the Motion, filed the new

24   Motion.

25             THE COURT:  Well, there was a TRO preliminary
```

 1   injunction.

 2          MR. CAPONI:  That's fine, Your Honor.

 3          To the extent the Court has questions.  To the extent

 4   the Debtor has failed to make order out of chaos or created, in

 5   my view, chaos out of order, that's the Debtors fault problem

 6   -- issue.  It's not clients.  And I would just like to remind

 7   the Court, it's the Debtor that bears the burden.  And --

 8          THE COURT:  I know that, counsel.

 9          MR. CAPONI:  -- I'm happy to answer questions and

10   bring clarity to the Court.  But to the extent that the Debtor

11   filed the -- you know, a TRO Motion / preliminary injunction.

12   Then the Stay.  And then a --

13          THE COURT:  Well, the Stay?  What Stay?

14          MR. CAPONI:  -- a claim in District Court.  And

15   then --

16          THE COURT:  Wait a minute.  The Stay has nothing to

17   do with this.

18          MR. CAPONI:  Your Honor, it has this to do with it.

19   To the extent the Debtor's argument is -- Mr. Zahralddin is

20   arguing.  Like, there was this -- these assets and they're so

21   important and we got to get control of them and that's been our

22   focus.

23          The Debtor's been scattershot throughout this whole

24   -- it is the conductor of a bankruptcy.  It gets to decide the

25   flow, the tempo, what gets raised.  The chaos was created by

1  all these things the Debtors filed.

2            THE COURT:  Well, one of them was because --

3            MR. CAPONI:  And then one other thing.

4            THE COURT:  I will take responsibility for one that

5  kind fell through the crack and we just --

6            MR. CAPONI:  Right.

7            THE COURT:  -- left it out there.  So that one --

8            MR. CAPONI:  That's us, Your Honor.

9            THE COURT:  -- that's on the Court.

10           MR. CAPONI:  Everything else is the Debtor.

11           And then I don't think -- I think it has to be

12  mentioned, that this asset that we're talking about in the

13  Netherlands that seems so near and dear to the Debtor's heart

14  is an asset that the Debtor has refused to fund for years, even

15  during the course of this bankruptcy.  I think that's relevant

16  to Your Honor, because if I --

17           THE COURT:  Well, counsel --

18           MR. CAPONI:  -- believed that I had an extremely

19  valuable asset, I had a classic Ferrari that Your Honor is

20  sitting in a garage somewhere and I -- I'm going to pay the

21  rent on the garage so my car -- that car doesn't get towed out.

22  If I don't, I think that says something about --

23           THE COURT:  But your client just --

24           MR. CAPONI:  -- what I think the value of the car --

25           THE COURT:  Well, your client --

1          MR. CAPONI:  -- is in the garage.

2          THE COURT:  -- just told me or you guys just told me

3     you guys' no longer fund.  And does that same apply that you no

4     longer funding and so it's just going to go to the wind?

5          MR. CAPONI:  Ultimately, Your Honor, this thing may

6     go to the wind, and if the assets don't get -- and I think this

7     is the point.  If the employees aren't paid, these employees

8     that -- whose knowledge in their head seem so paramount to the

9     Debtor, why is the Debtor letting them potentially just walk

10    out the door because they're not getting paid?  If these assets

11    in the Netherlands are so near and dear to Rembrandts heart and

12    the Debtor's heart, why are they sitting back, letting them

13    potentially go into a Dutch bankruptcy?

14         THE COURT:  Because you guys have been paying.  Why

15    wouldn't he?

16         MR. ZAHRALDDIN:  Well, that's not it, Your Honor.

17         MR. CAPONI:  It goes to the sincerity of the

18    argument.

19         MR. ZAHRALDDIN:  Your Honor, excuse me.

20         THE COURT:  Whoa, whoa, whoa, whoa.

21         MR. ZAHRALDDIN:  Let me ask a question.  Let me just

22    ask a question.

23         We came in here and asked to fund early on and you

24    said, "No, I can't do it at this time.  I don't see it as

25    assets to the Debtor, and that's what we're going to do."

```
 1            So it -- you know, to sit there and now recreate

 2   history when we came in and asked, please, let us go over

 3   there.

 4            THE COURT:  You did, and I said --

 5            MR. ZAHRALDDIN:  Now --

 6            THE COURT:  -- go finish your funding, you already --

 7   and it wasn't that I was going to let you do it because it

 8   wasn't an asset.  I said they already had a source of funding.

 9            MR. CAPONI:  Right.

10            MR. ZAHRALDDIN:  I understand, Your Honor.  But

11   here's the -- let me finish, Mr. Caponi, please.

12            Then during the interim, during the interim, they go

13   and take over the asset.  How are we supposed to control the

14   asset when they've gone and filed things in the Netherlands to

15   take control of an asset which they have no collateral

16   involvement in period.

17            THE COURT:  I don't know.  I'm not going to make that

18   determination.

19            But I think that there's enough to go around for

20   everybody.

21            So Mr. Caponi, I said no funding.  They did come in

22   and ask for VSI to pay the money.  I don't know -- but I said

23   no, because they already had a source of funding.  Why was I

24   going to let the Debtor go incur debt when somebody else was

25   already funding?
```

1          And so, that's really what happened is, I said no and

2    your client graciously or whatever in his best interest, I'm

3    not going to use the word graciously, but figured that it was

4    in his best interest to continue to fund.  And then I don't

5    know who went and filed for independent director.  I don't know

6    who went.

7          MR. ZAHRALDDIN:  Well, it's on the caption, Your

8    Honor.  It's on the caption.

9          THE COURT:  I don't know why, but at some point,

10   whatever involvement the Debtor had, or the Debtors represented

11   or the Debtors -- or whatever Mr. Rajan's role is in the

12   Debtor, was opposed to being involved in SCBV.  And he was

13   removed.

14          So I don't know.  Listen, there's enough blame to go

15   around for everybody in here.  So let's not everybody play the

16   martyr.  Okay.  Let's not play I'm bad, they good.  There's

17   good and bad on every part.  And at the rate you guys going,

18   you don't want to know what my perception is.

19          MR. ZAHRALDDIN:  Your Honor --

20          THE COURT:  You don't.

21          MR. ZAHRALDDIN:  -- I just want to make sure that --

22   I've been asking.  We -- you asked us to have some progress.

23   We filed a plan.  The plan resolves our issues with Rembrandt.

24   The plan has purchase orders.  The plan wants to move forward.

25          THE COURT:  They can have all the purchase orders it

1   want.  Unless you guys are selling stuff, I don't care about

2   purchase orders.

3          MR. ZAHRALDDIN:  Well, we'd like to go to production,

4   but our main piece of equipment and we had to go find -- is

5   being locked up somewhere in China because of their

6   interference.

7          THE COURT:  I thought you guys were mediating that.

8          MR. ZAHRALDDIN:  We're trying to, Your Honor.  But

9   every single time we bring something, there's some brand-new

10  issue that slows it down.

11         THE COURT:  Oh, okay.

12         MR. ZAHRALDDIN:  But look.  I simply want to say,

13  we're trying to do what we're supposed to.  But we've been --

14  I've seen it in their papers and otherwise, somewhere we're

15  creating litigation chaos.  They have gone outside of this

16  jurisdiction.  They've messed with stuff within this

17  jurisdiction.  What are we supposed to do?  Say it's okay, not

18  file something to prevent it?

19         THE COURT:  All right.

20         MR. ZAHRALDDIN:  The scatter shot of this --

21         THE COURT:  All right.  There's enough blame -- I've

22  already said, I'm going to say it again.  There's enough blame

23  to go around for everybody and nobody has clean hands as far as

24  I'm concerned.

25         And so, you don't want to be there with me.  You do

1   not.  You do not want to -- you do not want me to have that

2   view, because it's not going to be good for anybody.  Now --

3           MR. ZAHRALDDIN:  Understood, Your Honor.

4           THE COURT:  -- I understand Mr. DeMarco -- who's Mr.

5   DeMarco?

6           MR. DEMARCO:  That's me, Your Honor.

7           THE COURT:  What do you want to say, Mr. DeMarco?

8           MR. DEMARCO:  I believe my matters been addressed,

9   Your Honor, and I won't derail things further.  If it's

10  necessary, I'll confer with my client and --

11          THE COURT:  All right.

12          MR. DEMARCO:  -- if we need to file something.

13          THE COURT:  So where are we at after an hour of me

14  taking us off the rails?  Is that -- to the extent this is

15  either a TRO or preliminary injunction -- to the extent this is

16  a TRO / preliminary injunction, the standard is, we can have

17  some hearsay, which is what this was supposed to start out

18  about and solely be on a ruling with respect to Mr. --

19          MR. KODOSKY:  Kodosky.

20          THE COURT:  -- Kodosky's argument that -- in response

21  to the hearsay.

22          We have now gone off on a tangent about what I think

23  you guys should be giving me and the bottom line is as I see

24  it, the Debtor is alleging that their interest or interest in

25  whatever that license, in SCBV is not being protected and it's

1   not being protected because allegedly Mr. Stastney was going to

2   license it.  This is the evidence that they provided.  Mr. --

3   he's not protected it because it's not encrypted and he's doing

4   all these bad things, and I should stop him.

5          And Mr. Stastney's response is, I'm not licensed it,

6   we're not doing bad things, and we're going to put on Mr.

7   Barenbrug and somebody else to say we're not doing these bad

8   things.

9          That's all I really need, and all of this other side

10  show is really not helpful.

11         MR. COLBY:  Yeah.  Thank you, Your Honor.

12         THE COURT:  Okay.

13         MR. COLBY:  I agree.

14         THE COURT:  All right.  With that all being said,

15  counsel, Mr. Kodosky, after an hour, you can start with Mr. --

16  continue with Mr. Michaels testimony.

17         MR. KODOSKY:  Thank you, Your Honor.

18         THE COURT:  Go ahead.

19         And Mr. Caponi, I -- sorry for cutting you off.

20         MR. CAPONI:  No problem, Your Honor.  He has more

21  important --

22         MR. COLBY:  So am I.  So am I.

23         MR. CAPONI:  -- things to say than me.

24         THE COURT:  I tend to do that.  I'm, like, okay --

25  because I know what I want to hear, and you guys are just

 1   complicating it.

 2          Go ahead, Mr. Kodosky.

 3          MR. KODOSKY:  Permission to approach, Your Honor,

 4   with what is --

 5          THE COURT:  Yes.

 6          MR. KODOSKY:  -- been marked for identification as

 7   Debtors Exhibit Number 85.

 8          THE COURT:  And you have that, John?  On the --

 9          MR. ZAHRALDDIN:  He does.

10          UNIDENTIFIED SPEAKER:  Yes.

11          THE COURT:  Okay.

12          UNIDENTIFIED SPEAKER:  Yeah.

13          THE COURT:  I have 84, which is the definition that

14   Mr. Michaels identified has something to do with some

15   litigation somewhere.  Okay.

16          All right.  85.  Mr. Michaels, are you back?

17          THE WITNESS:  Yes.

18          THE COURT:  Who's talking?  Whoever's talking, please

19   turn your phone off, because I can -- can you hear them, John?

20          UNIDENTIFIED SPEAKER:  I think it was him.  I think

21   it was his background.

22          THE COURT:  Okay.

23          Go ahead.

24   BY MR. KODOSKY:

25   Q    Mr. Michaels, well you are being shown what has been

1    marked for identification as debtors Exhibit 85.  Do you

2    recognize this document?

3    A    I do.

4    Q    What is it?

5    A    It's the nondisclosure and non-circumvention agreement

6    that was signed with Bart Barenbrug and 3D Fusion, Inc.

7    Q    The nondisclosure and non-circumvention agreement that he

8    had denied executing as part of his declaration?

9    A    Yes, it is.

10              MR. KODOSKY:  Move to admit, Your Honor.

11              MR. COLBY:  No objection, Your Honor.

12              THE COURT:  Okay.  Admitted.

13         (Debtor's Exhibit 85 admitted into evidence)

14              MR. KODOSKY:  Thank you.

15    BY MR. KODOSKY:

16    Q    Mr. Michaels, and we can set that document aside.  Is it

17    your understanding that SeeCubic, Inc. has a sublicense

18    business model?

19    A    Yes, from the PPM and their testimony.

20    Q    Is your --

21              THE COURT:  Who is talking?

22              MR. COLBY:  I'm not certain, but it looks like Mr.

23    Blumenthal is not muted based on the screen.

24              THE COURT:  Can you --

25              MR. COLBY:  And I thought the box flashed on there

```
 1  when -- it happens when somebody's speaking.

 2            THE COURT:  And who's --

 3            MR. COLBY:  Now he's muted.

 4            THE COURT:  -- he again?

 5            MR. COLBY:  Now he's muted.

 6            THE COURT:  Who is Mr. Blumenthal?

 7            MR. ZAHRALDDIN:  Mr. Blumenthal is the CEO of

 8  Rembrandt, Your Honor.

 9            THE COURT:  CEO?  Okay.  All right.

10            Okay.  I guess he did not like that answer.

11            Okay.  Sublicensing.  Okay.  Go ahead.

12  BY MR. KODOSKY:

13  Q    Is your understanding that Stream TV is selling components

14  or actual TV's?

15  A    Stream TV is selling actual TV's, and we have a number of

16  units of those TV's.

17  Q    And have you tested content on a Stream TV actual unit?

18  A    Yes.

19  Q    Were you able to remove any of the content from the TV?

20  A    We were able to remove -- I mean, we were able to deliver

21  content to it externally.  But we are not able to access any of

22  the processing of that content internal to the -- that is

23  internal to the TV.

24  Q    Is it your assessment that Stream TV had strong security

25  protocols on content?
```

1    A    Yes, our team has a number of people that are

2    sophisticated and understand how to deliver and manage content

3    in audio visual equipment and we were not able to get access to

4    it.

5    Q    At the last hearing that was held on October, I believe it

6    was 27th, 2023, did you hear the testimony of Mr. Rajan that

7    the security --

8    A    Yes.

9    Q    -- that the security protocols by SeeCubic, Inc. on

10   content were removed on 8K TV's, automotive, and gaming?

11   A    I did and that -- that was very distressing to myself and

12   Rembrandt staff.

13   Q    Did you hear that some content companies thought the TV's

14   produced by SeeCubic, Inc. were so bad that they were even

15   mapping directly to the device?

16   A    Yes.

17   Q    Did you know that Stream TV has begun to work with content

18   companies and is maintaining security protocols?

19   A    Yes.

20   Q    If the content files are released that contain trade

21   secrets, do you think that is irreparable damage to Stream TV?

22   A    Yes, and to Rembrandt, which is more my concern.  But I

23   understand for the Motion that it's about Stream TV, yes.

24   Q    Thank you.  The Eindhoven engineers that were working at

25   Rembrandt, with a Rembrandt processor, prior to working with

1   Stream TV, is that correct?

2           THE COURT:  Wait, what was the question?

3   BY MR. KODOSKY:

4   A    Yes.

5           MR. KODOSKY:  Eindhoven engineers.  E-I-N-D-H-O-V-E-

6   N.

7           THE COURT:  Oh, Eindhoven --

8           MR. KODOSKY:  Eindhoven.

9           THE COURT:  -- engineers.  What about them?  I'm

10  sorry.  He understood, I didn't.  What was the question?

11          MR. KODOSKY:  We're working at Rembrandt with a

12  Rembrandt predecessor prior to working with Stream TV.

13          MR. COLBY:  Objection, Your Honor.  I don't think

14  it's been established that Mr. Michaels was involved with that

15  predecessor at that time.  I don't think it's been established

16  that he has firsthand knowledge.

17          THE COURT:  Okay.

18          MR. KODOSKY:  I'm asking if he knows.

19          THE COURT:  Well, how does he know?  You can ask him

20  how does he know.

21          MR. KODOSKY:  I haven't had the opportunity yet.

22          THE COURT:  All right.  Well, his objection's

23  sustained.  Establish a foundation on how he would know the

24  Eindhoven engineers were working for Rembrandt's predecessor

25  prior to -- what was the question -- prior to --

```
1              MR. KODOSKY:  Prior to working with Stream TV.

2    BY MR. KODOSKY:

3    Q    Do you have any understanding, Mister --

4    A    Yes.

5    Q    -- Michaels?  Based on what?

6    A    My law firm has been representing Stephen Blumenthal and

7    the companies that he's worked with for 30-something years.  I

8    was involved in the litigation and read the testimony, heard

9    the testimony as various Stream TV employees, and have seen

10   numerous documents going back and forth between engineers in

11   Eindhoven and Stephen Blumenthal.  And I -- just up until

12   today, that that has not been disputed that those engineers

13   worked with 3DFusion and Stephen Blumenthal for roughly 18

14   months before they went to go work for Stream TV, or more

15   accurately, SeeCubic BV, a subsidiary of Stream TV.

16   Q    Were there 45 meetings with meeting notes and a list of

17   attendees with Steve Blumenthal?

18   A    Yes, and I reviewed those.

19   Q    Who attended the 45 meetings?

20   A    There are a number -- I think it's 7 to 12 engineers and

21   individuals from the -- the Ein -- what's been referred to as

22   the Eindhoven team.  They're mostly former Phillips employees

23   that left Phillips to come work with 3DFusion and Stephen

24   Blumenthal, and Stephen Blumenthal's former business partner in

25   3DFusion, Ilya Sorokin.
```

1   Q    Were the four trade secret claims discussed in the 45

2   meetings?

3   A    Those trade secrets were.  They weren't claims at that

4   point.  They were trade secrets that were going back and forth

5   between that team and -- and Stephen Blumenthal.

6   Q    Who were the engineers who signed NDAs with Rembrandt?

7   A    I'd have to look back through the full records, but at

8   least Walter Roelen, Hans Zuidema, Bart Barenbrug.  And I -- I

9   think there are a number of others.  I'd have to look through

10  our documents to refresh my recollection as to the names.

11  Q    And I believe one of the names that you mentioned was

12  Walter Roelen, R-O-E-L-E-N; is that correct?

13  A    Yes.

14  Q    Was Roelen paid by Rembrandt's predecessor?

15  A    Yes.

16  Q    Did he hold himself out as a de facto agent?

17  A    Yes, and he was the director and CEO of the Netherlands'

18  entity of 3DFusion.

19  Q    Was code on some of the trade secrets claims shared with

20  Steve Blumenthal?

21  A    Yes, and -- and in and amongst that entire team.

22  Q    What is the risk for Stream TV and Rembrandt if that trade

23  secret is leaked out?

24  A    Once -- once leaked, it's going to be gone forever.  The

25  entities working in this space are in China, Korea, India,

1   Japan, Taiwan.  I mean, these countries are not known for

2   respecting intellectual property.  You know, to date, as far as

3   we know, Stream TV has never released any of that code, even

4   though they were putting it to use without our permission.  And

5   we were upset about that and eventually reached that license

6   agreement.  To our knowledge, other than -- I believe the only

7   time we accused them of disclosing it was in a patent

8   application for one aspect of the trade secret information that

9   we outlined in our complaints.  But other than that, they've

10  kept it secret as far as we know.

11  Q    If the Phillips license is canceled, what is the damage to

12  Stream TV and I guess, by extension, to Rembrandt?

13  A    Well, Rembrandt has other sources in their other licensees

14  to the Phillips license that we can work with and have been in

15  the past.  For Stream, it would largely be the end of the road.

16  The -- the -- the technology is completely reliant on Phillips

17  2D-plus-Depth system, and they have hundreds -- I think it's

18  even up to about 1,500 patents -- that were -- has now been

19  sold to Leia but is now -- but anybody who had a license,

20  they've -- they've had to honor that, similar to selling a

21  building.  They have to honor the -- the leases to any existing

22  tenants.  So if lost, I -- Phillips is no longer capable of --

23  of issuing a new license, and Leia has its own business

24  strategy for how it wants to work with partners in that -- in

25  that space.  And so it'd be catastrophic.  And there's quite a

1    bit of incentive for Phillips and/or Leia to want to be in a

2    position to cancel that license.  The licenses being issued

3    today are many multiples in order to magnitude higher value

4    than what Stream was able to purchase that license for.

5              MR. COLBY:  Objection, Your Honor.  I move to strike

6    the witness's answer.  He's testifying about what Leia would

7    want to do or what Phillips would want to do.  Mr. Michaels was

8    initially proffered as an expert.  The Court denied that

9    request.  If he wants to testify about Rembrandt and

10   Rembrandt's license fine, but he shouldn't be permitted to

11   testify about Phillips', you know, what their -- what would be

12   more valuable to them and why they'd be incented to cancel the

13   license.  He just has no firsthand knowledge of that.  It's not

14   appropriate.

15             THE COURT:  Counsel?

16             MR. KODOSKY:  I can ask what his understanding is

17   based on.  I believe that he can explain where that foundation

18   is coming from.

19             THE COURT:  Tell me what is -- you can ask him what,

20   you know, his understanding of how he came to that.

21   BY MR. KODOSKY:

22   Q    You mentioned -- Mr. Michaels, you mentioned Leia.  Who is

23   Leia and what is your understanding based on?

24             THE COURT:  How do you spell that?

25             THE WITNESS:  So Leia --

```
 1              MR. KODOSKY:  I'm sorry.

 2              THE WITNESS:  I'm sorry.  Is there an objection?

 3              THE COURT:  How do you spell Leia?  I have it as L-E

 4   -- I'm sure it's wrong.

 5              MR. KODOSKY:  L-E-I-A?

 6              THE WITNESS:  L -- yes.

 7   BY MR. KODOSKY:

 8   Q    Go ahead, Mr. Michaels.

 9   A    So they're an entity based out of California.  And they

10   Have been acquiring companies and technology in the no-glasses

11   3D space.  They bought Dimenco, which is a former subsidiary or

12   spin out of -- of Phillips, and they purchased the Phillips

13   patent estate relating to the hardware for no-glasses 3D TV.

14   And that's a matter of public record from the assignments going

15   back and forth and their press release.  I've also spoken to

16   representatives in the business development office at Leia a

17   number of times and emailed back and forth.

18   Q    Is there a risk to Stream TV and I guess, by extension,

19   Rembrandt when SeeCubic, Inc. and Mr. Stastney have been

20   telling people that they're going to sublicense the whole

21   industry?

22   A    It's literally impossible.  I mean, it -- it is a legal

23   impossibility.  The licenses are a record and prohibit that

24   specifically.  Virtually, any intellectual property attorney

25   would render the same conclusion.
```

```
 1              MR. COLBY:  Objection, Your Honor.  Mr. Michaels

 2   isn't able to testify about what the Phillips license allows or

 3   doesn't allow.  His company is not a party to that.  He's not

 4   an expert.  And so I don't think he has a basis to be -- for --

 5   for the testimony he just offered.

 6              MR. KODOSKY:  I believe that Mr. Micheals -- I can

 7   ask him if he's reviewed the Phillips license.  I believe that

 8   he has, Your Honor.

 9              THE COURT:  Okay, but I -- I thought he said that his

10   -- some of his companies had licenses --

11              MR. COLBY:  Yeah, exactly.

12              THE COURT:  -- with Phillips.

13              MR. KODOSKY:  Mr. Rembrandt has a license with

14   Phillips.  It's not the Ultra-D ventures license.  They're

15   different.  Two different companies, two different licenses.

16              THE COURT:  Well, I guess he can --

17              MR. COLBY:  He's not an expert.

18              THE COURT:  -- say based on his own license, but he

19   can't tell me what they would do with respect to somebody

20   else's --

21              MR. COLBY:  Okay.

22              THE COURT:  -- licenses.

23              MR. COLBY:  That's what we discussed when this came

24   up last name.  He can testify about his own license, but not --

25              MR. KODOSKY:  Your Honor, the license with Phillips
```

1    has been produced as an exhibit.  It's been entered into the

2    record in this case.  And if asked, I believe Mr. Michaels will

3    say that he's reviewed it.

4          MR. COLBY:  But just because somebody's reviewed a

5    document doesn't give them the ability to come in and freely

6    testify their opinion as to what legally it permits and doesn't

7    permit.  Mr. Rajan testified about that.  He's a party to it.

8    He testified to his understanding.

9          THE COURT:  Well, his understanding.

10         MR. COLBY:  Right.

11         THE COURT:  Mr. Stastney --

12         MR. COLBY:  Mr. Stastney testified about it -- his

13   understanding.  Mr. Michaels -- his company is not a party to

14   it.  It's just not appropriate evidence.

15         MR. KODOSKY:  Mr. Stastney is not a party to the

16   contract either -- to the license agreement either.

17         MR. COLBY:  Yeah, he was --

18         MR. KODOSKY:  SeeCubic, Inc. is not a party to the

19   license agreement.

20         THE COURT:  Well, you couldn't -- you should've

21   objected when he said it, and we have it in the record.  It is

22   what it is.

23         MR. COLBY:  And he was overseeing.  During the period

24   of time when the omnibus agreement was in place, he was

25   overseeing the assets of Stream, which included the license and

1    the subsidiaries, and those sorts of things.  So --

2          THE COURT:  That's his understanding of what it

3    meant.

4          MR. COLBY:  Yeah, yeah, and he had personal

5    involvement with it.

6    BY MR. KODOSKY:

7    Q    As part of the diligence to give out the license, what did

8    you review?

9    A    One of the critical documents we reviewed and discussed,

10   even at the first mediation hearing, was whether or not Stream

11   had acquired a license from Phillips and -- because we knew

12   that was essential for them to be able to meet the terms of the

13   settlement agreement and particularly providing millions of

14   units of TVs that Rembrandt is relying upon to capture the

15   value from that license.  It was every single one of our trade

16   secrets that we have listed in that agreement references the

17   Phillips 2D-plus-Depth technology.  It is the -- our technology

18   is based off of that original Phillips, so -- so Phillips

19   license.  So if they did not -- if Stream did not have a

20   Phillips license that fully satisfied the ability to

21   manufacture TVs for us, we would not have entered into the --

22   the settlement agreement as we had.

23   Q    When Mr. Stastney testified back on October 6th and said

24   that SeeCubic was talking to over 100 companies, in your view,

25   is that a violation of the automatic stay in this case?

1              MR. COLBY:  Objection, Your Honor.

2              THE COURT:  Counsel, response?

3              MR. KODOSKY:  What's the objection?

4              MR. COLBY:  The objection is --

5              THE COURT:  The objection is he's not the judge who's

6      going to say it's a violation of the stay.  And what's his

7      basis?  Is he a bankruptcy lawyer?

8      BY MR. KODOSKY:

9      Q    Is there a risk or a potential --

10             THE COURT:  Are you withdrawing that question?

11             MR. KODOSKY:  I'll withdraw the question, Your Honor.

12             THE COURT:  All right.  Sustained, Mr. Colby.

13     BY MR. KODOSKY:

14     Q    Is there --

15             THE COURT:  Oh, it's withdrawn.  I don't have to

16     sustain.

17     BY MR. KODOSKY:

18     Q    Is there a risk --

19             MR. COLBY:  I agreed to it anyway, Your Honor.

20     BY MR. KODOSKY:

21     Q    Is there a risk to harm to See -- I'm sorry, to Stream TV

22     and Rembrandt by virtue of SeeCubic, Inc. and Mr. Stastney

23     speaking to over a hundred companies regarding sublicensing?

24     A    Yes.

25     Q    What is your understanding of the current status of the

1   Phillips patents?

2   A    The -- the Phillips patents, just to hone in, they have

3   hundreds of thousands of patents.  But the -- the 1,500 or so

4   that are listed as related to no-glasses 3D hardware have been

5   sold to Leia, Inc., and that's been made a public record.  They

6   maintain patents related to contract -- content creation and

7   certain tools, and they would still maintain the rights to some

8   of their software and knowhow that they had licensed out to

9   3DFusion and to Stream over the years.

10  Q    Are you familiar, Mr. Michaels. with the term, "parallel

11  licensing?"

12  A    I am.

13  Q    What's the difference between parallel licensing and sub

14  licensing if there is a difference?

15  A    Well, it's about 180 degrees difference.  The -- a

16  sublicense is that I sell you a building and, or I mean, I rent

17  you a building and allow you to bring in tenants as you see fit

18  and to rent out apartments to others and make a profit on that.

19  And a parallel license is I've rented you a single apartment.

20  If you have a friend who wants to rent an apartment, you must

21  refer them to me, and I will issue the lease for that

22  apartment, and you're to have no part of it.  You have no right

23  to represent me in that -- in that transaction.  And it is my

24  building, and I will control the license.

25          MR. COLBY:  Objection, Your Honor.  I'd move to

```
 1   strike the witness's testimony.  It sounds an awful lot like
 2   the expert testimony that he was attempted to be proffered to
 3   give, which was denied.  There is no basis in the questions for
 4   why that's relevant to the Rembrandt license.
 5          MR. KODOSKY:  And five minutes ago, Your Honor, that
 6   he reviewed as part of his due diligence, the language.  He is
 7   a member of the patent bar.  Having reviewed the language, I
 8   certainly feel it's appropriate for him to give his
 9   understanding of the difference between the -- between the two.
10          MR. COLBY:  Yeah.  So I think a lay witness is not
11   permitted to give an opinion that's based on scientific,
12   technical, or otherwise specialized knowledge.  And it sounds
13   as though that's precisely what he's being offered for.
14          MR. KODOSKY:  He's a patent attorney with --
15          MR. COLBY:  He's either an expert, and it wasn't
16   disclosed.
17          THE COURT:  Well, he's not as -- but I think I will
18   allow it for what's it's worth to say what is a parallel
19   license.  And he's said it in terms of an apartment -- and
20   sublicense.  I mean, the term sublicensing -- is that a
21   technical term?  You believe it's a technical term?  If it's a
22   technical, and he's offering it as an expert, then, yes, I
23   would agree, I would sustain.  But how -- I mean, is this based
24   on his -- some understand -- how does he know this?
25   BY MR. KODOSKY:
```

1    Q    Mr. Michaels, how did you obtain your understanding of the

2    term parallel licensing?

3    A    I've worked on thousands of licenses.  I represented

4    Lucent, a number of companies in the display industry; Corning

5    -- I've done a number of licenses with Corning; Samsung, Canon,

6    Nikon, Picvue Electronics.  Take your pick.  I mean, I -- I

7    don't know that I can list them all now, but the -- I have a

8    fair understanding of the types of licenses that are offered

9    and negotiated.  These are pretty basic, I mean, I -- I don't

10   even know that it -- these are pretty basic concepts in terms

11   of what's being offered.  It's just -- it's not exclusive

12   versus exclusive, you know, are somewhat self-explanatory

13   terms.  But this was a non-exclusive license.  I also have a

14   business background, and the -- the value of a non-exclusive

15   versus an exclusive license or a license that carries with it

16   the right to sublicense is something that I have immense

17   experience as a business professional and with respect to how

18   Rembrandt it conducts its business.  So I'm happy to testify to

19   any of those facts.  But in this particular instance, I can

20   spec -- I can testify with specificity as to how it affects the

21   value ascribed to the technology that we license out as to

22   whether or not we are licensing something with the right to

23   grant sublicenses or not.

24   Q    Mr. Michaels --

25        THE COURT:  Whoa, whoa, whoa, whoa.

1          MR. COLBY:  That sounded an awful lot like an

2   expert's CV.  If Mr. Michaels is being offered as an expert, we

3   think that's inappropriate and shouldn't be allowed.  If Mr.

4   Michaels wants to testify about something specific to Rembrandt

5   and the Rembrandt license, which is at issue here, that may be

6   a different story, but that sort of untethered expert testimony

7   is improper because it's undisclosed expert testimony or it's

8   improper lay opinion that requires technical or specialized

9   knowledge.

10          MR. KODOSKY:  And cert --

11          MR. COLBY:  That's precisely what the witness just

12   said.

13          MR. KODOSKY:  I think, Your Honor, that they opened

14   the door with Mr. Stastney's testimony on this in the first

15   place.  And to the extent that he's got direct experience

16   working with thousands of licenses and speak to what parallel

17   licensing means, it sounds like he said that it's a pretty

18   basic concept that would benefit the Court to have that

19   testimony.

20          THE COURT:  Basic.  So it's a basic concept that

21   anybody would know without having to be an expert.  I know what

22   a sublicense is, and I'm not an expert.

23          MR. COLBY:  This is -- but it's testimony.  It's sort

24   of free floating --

25          THE COURT:  I mean --

 1              MR. COLBY:  -- expert testimony about what -- Mr.

 2     Stastney did address this, but again, that's based upon -- and

 3     Mr. Rajan, I believe, addressed this too.  That's based upon

 4     the fact that they have been part of companies that were the

 5     counterparty to the Phillips license.  Mr. Michaels is not.

 6              THE COURT:  And he was saying -- and so I will

 7     sustain -- can you sustain in part -- to the extent his

 8     testimony was as Rembrandt -- he said, I know as Rembrandt that

 9     we're a party to these things, I'll allow that.  But just

10     general free flowing, no, no, no.

11              So you have to ask him in the context of -- because

12     he said he was -- he represented Rembrandt, he was involved, he

13     know what all these things are.  What does he -- based on that

14     experience, what is his understanding of what a parallel

15     license is versus a sublicense.

16              MR. COLBY:  And I --

17              MR. KODOSKY:  As allowed, Your Honor?

18              THE COURT:  Wait a minute.

19              MR. COLBY:  I apologize for interrupting, and I'm

20     trying to be economical with my objections to keep moving, but

21     I also think it's important to stay focused on the issues that

22     the Court identified.

23              THE COURT:  Why?  I don't know -- well, and maybe

24     they think it's important, and I get why they think it's

25     important because they think that it's important.  And maybe

1   I'm just -- never mind.  Never mind.  Then we're going to go

2   off on a whole tangent.

3           Just go ahead.  You can ask him and restrict it to

4   his experience with Rembrandt.

5   BY MR. KODOSKY:

6   Q    Restricted to your experience with Rembrandt, Mr.

7   Michaels, does that change your answer at all?

8           MR. KODOSKY:  Go ahead.  I'm sorry.

9           THE COURT:  What answer?  We didn't allow the answer.

10  BY MR. KODOSKY:

11  Q    Please answer the question as limited to your experience

12  with Rembrandt.

13  A    Sure.  My experience with Rembrandt is that we are --

14  Rembrandt is willing to license its technology on a non-

15  exclusive basis with a -- with without a right to sublicense

16  for a much smaller amount in terms of cash and TVs that will be

17  provide to us.  And we would, if somebody wanted to exclusively

18  license our technology or obtain a license with the right to

19  sublicense others.  For example, if Stream were to enter the

20  market with a no-glasses 3D TV, and Samsung or LG, or any large

21  manufacturer wanted to go into business to manufacture a

22  similar TV, they would approach Phillips, Rembrandt, and

23  potentially Stream as well, and we would be able to negotiate a

24  fee all over again.  And at this point with a successful TV on

25  the market, it would be worth even more.  So it has a

1   substantial value to us to be in control of that technology,

2   and it would have a substantial value to us that Stream and

3   Rembrandt are collectively selling TVs that are the only no-

4   glasses 3D TVs on the market.  So it would -- I don't believe

5   this is radical thinking that if you were the only one that can

6   provide something that other people value, you can command a

7   much higher price.  So sub licensing or send -- send -- selling

8   something to Hyundai Motors that they get manufactured with

9   somebody who has no obligation to Stream or Rembrandt

10  significantly hurts the value of the product that Rembrandt is

11  hoping to acquire.  And it would certainly hurt the value of

12  Stream -- both of its intellectual property, its current

13  assets, its ability to sell other TVs, et cetera.

14  Q     Did you hear Mr. Rajan testify at the last hearing that

15  SeeCubic, Inc is doing $600,000 a month in revenue?

16  A     Yes.

17            THE COURT:  Who's doing 600,000 in revenue?

18            MR. KODOSKY:  SeeCubic, Inc.

19            THE COURT:  SeeCubic, Inc., okay.

20  BY MR. KODOSKY:

21  Q     If the 600,000 in revenue is being diverted to another

22  company, does that have an impact upon the Debtors or

23  Rembrandt?

24  A     Yes.  The -- Rembrandt has current litigation pending

25  against SeeCubic, Inc.  Our motion for preliminary injunction

1   was denied because there was a monetary potential for a license

2   fee even though that license fee is valued at roughly $2

3   billion.  And to our knowledge, SeeCubic, Inc. does not have $2

4   billion to pay it.  But diverting income and revenue to a

5   different entity certainly compromises their ability to satisfy

6   the likely judgment that's coming against them for their

7   activities to date.

8   Q    Did you hear Mr. Rajan testify in the last hearing that he

9   believed that SCBV is essentially -- that SeeCubic, Inc. is

10  bloating the expenses in the subsidiaries by $650,000 a month,

11  basically to have excess employees to work on SeeCubic Inc.

12  projects as opposed to the four or five employees that would be

13  needed to -- that he would believe would be necessary to work

14  on the Stream TV projects?

15  A    I -- I heard the testimony and have my own opinion.

16  Q    What is your opinion?

17            THE COURT:  Whoa --

18            MR. COLBY:  Objection.

19            THE COURT:  -- whoa, whoa, objection.

20            MR. COLBY:  He can ask the question if he heard the

21  testimony.  I was preparing to object to the next question.

22            THE COURT:  Which is?  What was the next question?

23            MR. COLBY:  I'm just waiting.

24            MR. KODOSKY:  What is your opinion.

25            MR. COLBY:  But I believe the question was --

1           THE COURT:  About what?

2           MR. COLBY:  -- what is your opinion about that.

3           MR. KODOSKY:  The number of employees that SCBV

4    needs, whether it's to be involved with Rembrandt associated or

5    affiliated projects or SeeCubic Inc projects.

6           MR. COLBY:  So Mr. Michaels has no factual basis

7    whatsoever to be testifying about the work that's happening at

8    SeeCubic BV or SeeCubic Inc.  He may have an opinion about

9    whatever Rembrandt work is happening, if there is any, but

10   should not be permitted to testify as to his opinion as to

11   staffing levels in a company he has no involvement with.

12          THE COURT:  Counsel?

13          MR. KODOSKY:  All Stream work, Your Honor, is

14   Rembrandt work.

15          THE COURT:  Well, that's all fine and well, but what

16   knowledge does Mr. Micheals has of the operations of SC BV?

17          MR. KODOSKY:  If the question is whether or not four

18   or five key employees over the Netherlands versus the 30 or 40

19   that SeeCubic is using to bloat the expenses over there.

20          THE COURT:  How would he know?

21          MR. KODOSKY:  That's what I was hoping to ask him.

22          THE COURT:  No, you didn't ask -- okay.

23          MR. KODOSKY:  He said that he's got an opinion on it.

24          THE COURT:  So what?  I can have an opinion on it

25   too.  That doesn't mean anything.  No offense, Mr. Kodosky.

1    I'm not trying to be flippant.  But you have to establish some

2    basis as to how he would know, one, how many employees are

3    necessary, how many projects, what's his basis for that?

4    Presumably, he was involved in some develop -- I don't know why

5    he would know that.

6              MR. COLBY:  What work is being done.

7              THE COURT:  Wait a minute.

8              MR. COLBY:  Oh, sorry.

9              THE COURT:  No, I said one, he would have to know how

10   many employees for a -- what type of contract.  How many is

11   involved.  The basis for his knowledge.  And that, you know,

12   based on his involvement in other projects, this is -- he can

13   tell me that.  That doesn't necessarily mean it's bloated.  But

14   he can tell me what he thinks is a good number, but he has to

15   tell me how he would know that, just in general.

16             MR. KODOSKY:  I believe he said that he was here at

17   the last hearing.

18             THE COURT:  I get he can hear whatever he wants.  My

19   question is what is his personal knowledge as to why.  If he

20   says I have been involved in projects developing whatever

21   they're developing, and typically you need ten employees to do

22   this type of work.  Then that's his opinion as to how many

23   employees are needed for that type of work.  Then you can tie

24   it up later, but you've got to tell me how he would even know

25   that.  Not necessary even related to SC BV.

```
1              MR. COLBY:  That's my -- yeah.

2              THE COURT:  Just to how many -- you know, we've --

3    I've been involved in a project for Rembrandt when they were

4    developing the glasses, I don't know.  And you have -- in that

5    project, we were doing proof of concepts for this dollar

6    amount, and we had X amount of engineers or this amount of

7    employees, and then you could somehow relate that.  But he just

8    can't say I think I heard somebody say.

9              MR. COLBY:  Even, Your Honor, even I would still

10   maintain that the objection goes beyond that.  Even if Mr.

11   Michaels were to testify in my past experience at Rembrandt, we

12   did this type of work and we did this many people, if he's --

13   he can't, by definition, because he doesn't know -- opine on

14   the staffing levels at SeeCubic BV.  And so if he can't do

15   that, who cares, frankly what they're --

16             THE COURT:  Well, he can if they're similar --

17   similar projects.

18             MR. COLBY:  But he doesn't know if it's similar

19   projects.

20             THE COURT:  Well, that's not --

21             MR. COLBY:  So like there's no way --

22             THE COURT:  Well, you haven't asked -- you haven't

23   asked him what he knows.

24             MR. COLBY:  -- no way to connect it over so it's --

25             THE COURT:  I don't know what the point is.
```

1          MR. COLBY:  -- it's by definition not relevant is

2    what I was getting to.

3          THE COURT:  But you don't know because he hasn't

4    asked him what he knows and how he knows, other than he heard

5    Mr. Rajan say it.  That's the point.  The point is you can't

6    just because you heard somebody say, say I think this.  You

7    have to say based on my own knowledge -- this is how we staffed

8    it.  Based on my knowledge, this is what they're doing because

9    Mr. Stastney has testified to what these projects are and who

10   they're for.  He may say based on my experience, we did this

11   based on what I heard Mr. Stastney say, I think this.  But you

12   got to give me something other than he heard somebody say.

13         MR. KODOSKY:  Actually, Mr. Stastney refused to tell

14   us who their projects were for.

15         THE COURT:  Doesn't care what he told you who it was

16   for.  He told you what they were doing.  But that doesn't

17   matter.  You still have to establish how Mr. Micheals would

18   know what is proper staffing.

19   BY MR. KODOSKY:

20   Q    What personal knowledge, Mr. Micheals, do you have

21   regarding proper staffing levels at SC BV?

22   A    My -- I used to be CEO of New Pics, LLC (phonetic).  We

23   received roughly four million dollars in New York State Energy

24   Research Development grants.  We built our displays from

25   scratch.  We built all of our own production equipment.  We

1    built those displays with the head of the company, the founder,

2    Chad Mower (phonetic).  And he had a technical assistant, and I

3    would go over every once in a while, to assist.  But we were

4    able to build the world's largest plasma address liquid crystal

5    display at the time with two full time people and me helping

6    out every once in a while.

7    Q    Tell us how that relates to SC BV?

8              MR. COLBY:  I object.

9              THE WITNESS:  The --

10             THE COURT:  Well, woah.  He's objecting.

11             MR. COLBY:  Yeah, I object.  There again, we've

12   gotten very far from what's supposed to be the core issue of

13   this TRO hearing.  Mr. Michaels' view on staffing levels have

14   nothing to do with whether or not there's some threat to the

15   Phillips license or whether or not there are adequate

16   protections around trade secrets.  We are so far afield right

17   now, and we just need to focus on the issues the Court

18   identified and move on.

19             THE COURT:  All right, Mr. Kodosky, he's objecting on

20   the basis of relevance.  How is this relevant to me deciding

21   whether I'm going to issue a preliminary injunction?

22             MR. KODOSKY:  I have nothing further, Your Honor.

23   We'll reserve for rebuttal.

24             THE COURT:  All right.

25             MR. KODOSKY:  Thank you.

1          THE COURT:  All right.  For redirect, okay.

2          Mr. Colby, you got about -- I'm going to -- what is

3  the motion?  What do they say?  Okay.  Of course, they say

4  whatever I want.

5          MR. COLBY:  It's nice to be the judge.

6          THE COURT:  Yeah.  Three dollars will get me a cup of

7  coffee.

8          All right.  Go ahead.

9                    CROSS-EXAMINATION

10 BY MR. COLBY:

11 Q    Mr. Michaels, you described earlier today a process when

12 you examined the Stream TV technology.  Do you recall that

13 testimony?

14 A    Yes.

15 Q    That was in 2019, correct?

16 A    It would have -- that would have been in 2017, '18, '19.

17 We've done so again in '20, '21, and '22.  I don't know that --

18 again, I think early 2023, we've looked at various aspects of

19 the Stream TVs.

20 Q    Okay.  You've not conducted that type of examination of

21 any technology that's being used by SeeCubic BV in 2023,

22 correct?

23          MR. KODOSKY:  Object.  Misstates his testimony.  He

24 said that some of it was in 2023.

25          MR. COLBY:  He said 2022.  I'm asking --

```
 1              THE COURT:  He said early 2023.

 2              THE WITNESS:  In '23.

 3  BY MR. COLBY:

 4  Q    Okay.  So but the units that you examined, those came from

 5  who?  From Stream TV?

 6  A    Yes, and more accurately, people they sold TVs to supply

 7  some of those TVs for Rembrandt.

 8  Q    Okay.  And the units that are being used by the folks at

 9  SeeCubic BV in 2023, you've not examined those in 2023,

10  correct?

11  A    I have not.

12  Q    So you're not in a position to testify about what trade

13  secret protections are in place on the technology that's being

14  used by SeeCubic BV in 2023, correct?

15  A    Our understanding -- that, I don't believe, is correct.

16  And our understanding comes from SeeCubic's position in the

17  Delaware litigation.  Part of the unknown, and that we would

18  find out in discovery very early, is whether or not SeeCubic

19  has been making anything.

20              One of the issues that was raised by both parties is

21  whether or not everything that SeeCubic has been providing or

22  offering for sale was provided by Stream, which would mean that

23  it was licensed and therefore, they would not be liable for

24  patent infringement and for trade secret misappropriation for

25  offers to sell or sales of those TVs.  If you are representing
```

```
 1   to us that SeeCubic is --

 2              THE COURT:  Wait a minute.  That's enough.  That's

 3   enough.  That's enough.  That's enough.

 4   BY MR. COLBY:

 5   Q    Mr. Micheals, I'm simply asking whether or not you've

 6   conducted that type of examination on the units that are being

 7   used by SeeCubic BV in 2023.  I think the answer was no,

 8   correct?

 9   A    I have not conducted that in -- that -- I'm not aware that

10   SeeCubic has made anything.  And so my understanding is that

11   they were largely selling or entirely selling products made by

12   Stream TV.  If SeeCubic is actually making product, I

13   appreciate that information.  That will be helpful.

14   Q    I'm asking about --

15   A    But right now --

16              THE COURT:  So he said no because they haven't

17   produced any.

18   BY MR. COLBY:

19   Q    Right.  I'm asking about SeeCubic BV.

20   A    I understand.

21   Q    Okay.

22   A    Oh, SeeCubic BV.

23   Q    Yes.

24   A    I -- SeeCubic BV, my understanding is that their efforts

25   were incorporated into the TVs sold by Stream TV.  So yes, I
```

199

1  believe I have reviewed what they have been preparing to my

2  knowledge today.

3  Q    And to the extent that that's true, the last time that you

4  conducted that exam -- that type of examination was in early

5  2023?

6  A    Yes.  I'd have to look at the -- it was about the time

7  that we -- I sent the email to Ian Lifton (phonetic) and then

8  shortly thereafter, we had accessed additional units to review.

9  Q    And Mr. Micheals, you -- the proof-of-concept projects

10  that have been talked about in this hearing, you have not had

11  any opportunity to examine the technology that is -- I'm sorry.

12  Let me start that over again.  The proof-of-concept projects,

13  you're not involved in those, correct?

14  A    I am not personally involved in those projects, no.

15  Q    You're not an employee of SeeCubic BV?

16  A    I am not an employee of SeeCubic BV.

17  Q    You're not a principal of SeeCubic BV?

18  A    I am not.

19  Q    You've not been a party to any conversations that SeeCubic

20  BV may have had with the counterparties to those proof-of-

21  concept projects?

22  A    Only in the respect of our communications with the

23  independent director.

24  Q    Right.

25  A    And I should add, Mathu Rajan and Bud Robertson (phonetic)

1    to the extent they had knowledge and were involved in those

2    conversations.

3    Q    Right.  You personally -- you personally haven't been

4    involved in those conversations, correct?  With the

5    counterparties on these proof-of-concept projects, right?

6    A    With the counterparty, no.  Not -- I haven't directly

7    spoken to any of the counterparties.

8    Q    The units that you examined in early 2023, do you know

9    when they were manufactured?

10   A    I do not, but it is -- I don't know the exact date of

11   manufacture.  But I believe that it was prior to the omnibus

12   agreement being signed.

13   Q    Okay.  So prior to 2020 or earlier?

14   A    Yes.

15   Q    So you've not examined any of the devices that have been

16   manufactured, if any, at SeeCubic BV since 2020?

17   A    Not that I'm aware of, no.

18   Q    Mr. Micheals, you don't know whether or not the projects

19   that are currently being worked on at SeeCubic BV, you don't

20   know whether or not those use any Rembrandt technology,

21   correct?

22   A    I'm not sure I follow exactly the negatives in your

23   question.  It is our understanding that those projects are

24   incorporating Rembrandt technology and Phillips technology.

25   Q    You're not involved in those projects, correct?

1    A    I am not directly talking to the third parties, and I am

2    not an employee or officer of SC BV.  Those are the questions

3    you asked me.  But I'm -- I've been provided information about

4    those projects, and I've heard testimony about those projects

5    by Shadron Stastney.  So I -- so our understanding, giving you

6    my best understanding, is that it includes our technology.

7    Q    Right.  Your understanding is based upon what you've heard

8    here in this courtroom?

9    A    It's based on conversations with people that have examined

10   those products.  It's based on what -- we included pictures in

11   our Delaware complaint of what SeeCubic was offering.  It's

12   part of the evidence.  It's based on what SeeCubic has put on

13   its own website.  I mean, there's -- there's a very large

14   complaint with a large number of exhibits in the Delaware

15   complaint that was filed back in March that details our basis

16   for bringing that case and making those allegations.  And I can

17   go on at length, but we have beliefs and understanding that

18   that tech -- those projects include our technology.

19   Q    Right.  I guess I'm asking a more precise question.  Given

20   that you have no first-hand involvement in those projects, you

21   don't know whether or not they rely on any Rembrandt

22   technology.  You don't know that first-hand, correct?

23   A    I don't agree with that statement.

24   Q    You do agree with the statement that you don't have any

25   involvement in those -- any first-hand involvement in those

1  projects, correct?

2  A    I do.

3  Q    Mr. Michaels, you've not been party to any conversations

4  between SeeCubic Inc and Phillips, correct?

5  A    I have not been on the phone when SeeCubic has spoken to

6  Phillips.  That is correct.

7  Q    And you have no first-hand involvement in the current --

8  you have no first-hand involvement in the current security

9  arrangements around trade secrets in IP at SeeCubic BV,

10  correct?

11  A    I'm -- you need to repeat -- I didn't follow that, I'm

12  sorry.  I'm not --

13  Q    Sure.

14  A    Just not understanding what you --

15  Q    Sure.  You don't work at SeeCubic BV, correct?

16  A    I do not work at SeeCubic BV.

17  Q    Right.  So you're not involved in -- you have no first-

18  hand involvement in whatever protections SeeCubic BV currently

19  has around trade secrets and IP, correct?

20  A    I do not.

21        MR. COLBY:  Just one minute, Your Honor.

22        THE COURT:  Uh-huh.

23        MR. COLBY:  I don't have any other questions at this

24  time, Your Honor.

25        Mr. Caponi may.

```
 1                        CROSS-EXAMINATION

 2   BY MR. CAPONI:

 3   Q    Good afternoon, Mr. Micheals.  Steve Caponi from K&L

 4   Gates.  How are you?

 5   A    Good.

 6   Q    Good.  So you were involved with the New York litigation

 7   we've been discussing today, correct?

 8   A    Yes.

 9   Q    And you participated in the mediation, correct?

10   A    Yes.

11   Q    And the mediation when the mediation concluded, did not

12   result in a settlement, correct?

13   A    Incorrect.

14   Q    You filed a motion with the magistrate arguing that a

15   settlement had been reached and the magistrate rejected that

16   argument, correct?

17   A    Incorrect.

18   Q    Are you aware that the magistrate issued a written

19   decision rejecting the notion that the mediation had resulted

20   in a settlement?

21   A    I am aware that the magistrate provided a writing.  It was

22   not a decision and it held that there were two types of

23   potential agreement, a phase 1 or a phase 2.  And then she

24   recommended that the action be taken to the district court to

25   litigate further and have a hearing as to whether or not it was
```

1  a phase 1 agreement.  And as part of that, the -- we were

2  proceeding down that path when the bankruptcy case was filed.

3  We notified the court to stay the proceedings to continue the

4  case.  We were then proceeded to -- when the bankruptcy was

5  dismissed, we then proceeded to reenter mediation and

6  settlement discussions that resulted in the settlement

7  agreement that we have today.

8  Q    When was the mediation?

9  A    We started our mediation in 2018 and had numerous sessions

10  related to settlement and mediation, many of them outside the

11  presence of --

12  Q    Mr. Micheals, I appreciate that.  My question was more

13  direct.  What year was the mediation?

14         MR. ZAHRALDDIN:  Objection, Your Honor.

15         THE COURT:  Which mediation?  He said --

16         MR. CAPONI:  The mediation in New York.

17         THE COURT:  He said they'd started in whatever and

18  then it was stayed and then they started after the bankruptcy.

19         MR. CAPONI:  I'm getting there.

20  BY MR. CAPONI:

21  Q    When did the mediation in New York start, Mr. Michaels?

22  A    It started in 2018.

23  Q    And when did the magistrate issue a writing, as you call

24  it, saying that a settlement agreement had not been reached?

25  A    I'd have to look back.  I think it was 2020-ish.  Because

 1    it had come out -- or maybe it was 2021, because we were

 2    actively working on our response and preparing for the hearing

 3    when Stream filed for bankruptcy in the first instance.

 4    Q     And it's your testimony that the magistrate found that

 5    there was a possibility that a settlement had been reached and

 6    you just needed further proceedings in front of the district

 7    court?

 8    A     It is our -- I mean, it says what it says.  I mean, it's

 9    right in the record.  I'm not trying to -- I would rather not

10    even characterize it.  But it is certainly not true that she

11    made a decision.  She didn't have the power to do what you're

12    proposing.  But it -- she provided a writing that is on the

13    record that can be reviewed.  We talked about how we're getting

14    far afield.  I -- there is a written settlement agreement that

15    the parties reached.

16    Q     Excuse me, Mr. Micheals, I'm not asking you to --

17              THE COURT:  All right, woah, woah, woah, woah.

18              MR. KODOSKY:  Objection, Your Honor.

19              MR. ZAHRALDDIN:  Objection, Your Honor.

20              THE COURT:  Woah, woah, listen.  I get it.  She wrote

21    an opinion.  It says what it says.  He has his interpretation.

22    She's a magistrate.  They only have so much power.

23              MR. CAPONI:  Okay.  One more question, Your Honor.

24              THE COURT:  They only have so much power.

25    BY MR. CAPONI:

1    Q    Mr. Michaels, that magistrate that you said had no

2    authority to determine whether there had been a settlement,

3    that was the magistrate who oversaw the mediation, correct?

4    A    It was Magistrate Parker, yes, Katharine Parker.

5    Q    So to answer my question, the judicial officer in front of

6    whom you mediated was the magistrate that issued that opinion,

7    correct?

8    A    Yes.

9    Q    Thank you.

10            MR. ZAHRALDDIN:  Objection, Your Honor.

11            THE COURT:  What basis?  It's -- look.  I'm not -- I

12   don't know what this --

13            MR. ZAHRALDDIN:  Mischaracterizing the witness's

14   testimony.

15            THE COURT:  It is what it is.

16            MR. ZAHRALDDIN:  He restated it and said, oh, it's an

17   opinion.

18            THE COURT:  The magistrate -- listen.

19            MR. ZAHRALDDIN:  It's a typical gotcha maneuver.

20            THE COURT:  The magistrate said what they said.  The

21   ultimate determination belongs with a different court.  I'm not

22   an idiot and I wish you guys would stop it.  The magistrate --

23   the same way there are certain things that I can make a final

24   determination on and there's certain things I cannot.  I could

25   issue whatever I want on matters that I do not have the

1  authority to make a final determination.  I issue.  I say what

2  I say.  I send it to the district court.  The district court

3  makes the final determination.

4          So I can say whatever I want to say on matters that I

5  do not have the authority to make a final decision and I am in

6  basically the same role on certain things as the magistrate

7  judge.  So I don't know what you guys are wasting your time

8  for.  The magistrate can say whatever he or she wanted.  Is

9  there a ruling by the district court, otherwise, I don't want

10 to hear it.

11         You guys can fight, put it in the record, it doesn't

12 matter to me what is what.  Okay.  And I don't know what this

13 has to do with anything, and I don't know why you even -- I

14 mean, why he's even talking about that.  It is what it is.

15         So Mr. -- you want to follow up, Mr. Caponi?

16         MR. CAPONI:  Yes, Your Honor.

17         THE COURT:  Because you want to tell me the district

18 court?

19         MR. CAPONI:  Just to tie the bow on it.

20 BY MR. CAPONI:

21 Q    Mr. Michaels, the district court adopted and approved the

22 magistrate's writing, as you refer to it, correct?

23 A    I don't remember.  I mean, it's in the record.  We reached

24 a settlement agreement.  None of this is -- I don't --

25 Q    Mr. Micheals, that wasn't my question.

```
1              THE COURT:  All right, so.

2              MR. KODOSKY:  Objection, Your Honor.

3              THE COURT:  So he said he doesn't remember.  Somebody

4   want to tell me, was the report -- because it would have

5   been --

6              MR. CAPONI:  Yes, Your Honor.  We'll give it to Your

7   Honor.

8              THE COURT:  Yeah.  Resubmit it.

9              MR. CAPONI:  The magistrate's report was affirmed by

10  the court.

11             THE COURT:  A report and -- I would have done a

12  report and recommendation.  My report and recommendation don't

13  mean anything because the district court tells me they go and

14  got it.

15             MR. CAPONI:  Your Honor, I will submit it to you.

16             THE COURT:  Right.  And somebody gives me -- because

17  he said they resumed mediation.  I don't know how you -- I

18  don't know.

19             MR. CAPONI:  You'll see it in the record, Your Honor.

20  It's crystal clear.

21             THE COURT:  All right.

22             MR. CAPONI:  Thank you.

23             THE COURT:  And if somebody want to give me the

24  docket, they can give me the docket.

25             Yes, counsel?
```

1          MR. DEMARCO:  Yes, Your Honor.  Just request that my

2    client be able to finish the answer to that question.  I

3    believe he was still talking when there was an interjection --

4          UNIDENTIFIED SPEAKER:  Interruption.

5          MR. DEMARCO:  -- between.

6          THE COURT:  All right.  So his answer was he does not

7    recall whether the District Court adopted it or not, which does

8    not necessarily mean it was the end of the litigation.  It

9    could have meant the District Court sent you guys back to the

10   magistrate.  I don't know.  Somebody give me the dockets.

11         MR. DEMARCO:  That's right.

12         THE COURT:  Okay.  Because I think his testimony is,

13   is that we started a mediation and then the District Court said

14   there wasn't or the magistrate said something.  That was the

15   bankruptcy, then we went back and resumed mediation, which

16   possibly could have happened because unless the District Court

17   dismissed the matters, it would have still been pending.  So

18   somebody give me the dockets.  I don't know what the relevance

19   is.  Can somebody tell me what the relevance is?

20         You brought it up, Mr. Zahralddin.  Your client

21   brought it up.

22         MR. ZAHRALDDIN:  Well, we -- you're right, Your

23   Honor.  So the relevance of the settlement is only the fact

24   that we got to a settlement eventually.  Whether or not --

25   there was determinative -- even if -- let's say -- because I

1    haven't looked at the very end of this record in a while.

2    Let's say the settlement was pushed aside.  That doesn't end

3    the litigation.  That means it's open litigation.  All I know

4    is when they approached us --

5              THE COURT:  All right.  Just --

6              MR. ZAHRALDDIN:  -- there was a settlement.

7              THE COURT:  Put the docket in an I will --

8              MR. ZAHRALDDIN:  Yes.

9              THE COURT:  To the extent it's relevant.  I don't

10   know what the relevance is, but put it in.  Put in in.

11             MR. ZAHRALDDIN:  We will do so.  Thank you, Your

12   Honor.

13             THE COURT:  All right.

14             MR. DEMARCO:  I have no further questions, Your

15   Honor.

16             THE COURT:  All right.  Any further for you, Mr.

17   Colby or Ms. Brumme?

18             MR. COLBY:  No, Your Honor.

19             THE COURT:  Okay.  Any redirect?

20             MR. ZAHRALDDIN:  Briefly, I think, Your Honor.

21             THE COURT:  All right.

22             MR. KODOSKY:  Just very briefly, Your Honor.

23             THE COURT:  Okay.  Yes and it has to be limited to

24   what these two gentleman asked, okay?

25             MR. KODOSKY:  Understood.  Thank you, Your Honor.

```
1                          REDIRECT EXAMINATION

2    BY MR. KODOSKY:

3    Q    Mr. Michaels, you were asked whether or not you were -- if

4    you had participated in any of the conversations that SeeCubic

5    Inc. has had with Phillips.  Do you recall receiving that

6    question from Mr. Colby?

7    A    Yes.

8    Q    If SeeCubic, Inc., has no license agreement with Phillips,

9    what business or what basis -- or I guess, what potential for

10   harm exists by SeeCubic, Inc., having conversations with

11   Phillips about the license agreement?

12             MR. COLBY:  Objection, Your Honor.

13             THE COURT:  Yes.

14             MR. COLBY:  It's a question about two parties of

15   which Mr. Michaels doesn't belong.

16             MR. KODOSKY:  He asked the original question, Your

17   Honor --

18             MR. COLBY:  He's asking --

19             MR. KODOSKY:  -- as to whether or not he participated

20   in any of those conversations.  And I'm asking if they should

21   even be having those conversations with Phillips, if it's -- if

22   they're not a party to the agreement.

23             MR. COLBY:  He has no first hand knowledge of what

24   those conversations were.

25             MR. KODOSKY:  He asked him the question.
```

```
 1                MR. COLBY:  If --

 2                THE COURT:  Wait.  Woah.  Woah.

 3                MR. COLBY:  -- if any, so how could he render an

 4   opinion on harm that could come from conversations that he's

 5   not a part of, has no idea what they're about?  No idea if they

 6   occurred, when they occurred, who they were with.

 7                THE COURT:  Or if they even occurred.

 8                MR. COLBY:  Or if they even occurred.

 9                MR. KODOSKY:  He asked the question, Your Honor.

10                THE COURT:  I know the question, counsel, was Mr.

11   Michaels, were you party to any conversation between SeeCubic

12   Inc. --

13                MR. KODOSKY:  Yes.

14                THE COURT:  -- and --

15                MR. KODOSKY:  Phillips.

16                THE COURT:  -- Phillips.  Okay.  He said no, so the

17   question is -- okay.  Your question is, should they have been

18   having a conversation.  Based on what?  I'm asking him.

19                MR. COLBY:  Yeah.

20                MR. KODOSKY:  And I'll ask him the same question

21   related to Rembrandt.

22   BY MR. KODOSKY:

23   Q    If Rembrandt was contacted by SeeCubic Inc., regarding the

24   Stream TV license agreement with Rembrandt, would that be

25   appropriate?
```

1          MR. COLBY:  Objection.  It calls for speculation.

2          MR. KODOSKY:  It goes to the harm.  He stood up here

3    30 minutes ago saying we're not showing any harm.

4          THE COURT:  All right, but that's not the point,

5    Mister --

6          MR. KODOSKY:  Kodosky.

7          THE COURT:  -- Kodosky.  The question is, when you

8    get to redirect, you get to ask him questions related to the

9    questions that were asked by the other parties on cross.  The

10   only questions that Mr. Colby had and I'm -- and I apologize.

11   I'm about to forget Mr. Colby's name and I apologize.  Same as

12   Kodosky.  I'm -- it's getting late.  I'm stuttering on names.

13   The only thing that he asked him was what -- with respect to

14   did you examine the Stream TV technology?  He said he did.

15         Did he examine the SCBV units?  No.  And was he able

16   to determine if they were different?  Asked him about the proof

17   of concept projects, the current projects.  Then he asked him,

18   did -- he was party to any conversation with Phillips and then

19   he had firsthand knowledge of any security arrangements between

20   SCBV currently have with respect to the units that are, if any,

21   being produced.  So you can ask him anything with respect to

22   those areas.

23         MR. KODOSKY:  He was -- Your Honor, he was

24   specifically asked whether or not he participated in any of the

25   conversations between SeeCubic, Inc. -- and I've got it written

```
 1    down on my notes and Phillips.

 2              THE COURT:  And he said he wasn't.

 3              MR. COLBY:  So --

 4              MR. KODOSKY:  My answer is no.

 5              MR. COLBY:  And --

 6              MR. KODOSKY:  My question to him is --

 7              THE COURT:  Woah, woah, woah.

 8              MR. KODOSKY:  Let me finish --

 9              THE COURT:  Let him finish, Mr. Colby.

10              MR. KODOSKY:  -- Mr. Colby.  My question to him is,

11    is it appropriate for a nonparty to the license agreement to be

12    having conversations with the licensor?

13              THE COURT:  But the --

14              MR. KODOSKY:  He's a licensor, Rembrandt.

15              THE COURT:   But the assumption is is that they were

16    talking about the license with Phillips and the Stream entities

17    and we have no information about what SeeCubic, Inc., was

18    talking to Phillips about.

19              MR. KODOSKY:  And my only question is, is it even

20    appropriate for a nonparty to be speaking to the licensor about

21    somebody else's license agreement?

22              THE COURT:  But we don't -- be the -- sustained.

23              MR. KODOSKY:  Okay.  Thank you, Your Honor.

24              THE COURT:  Sustained.  Sustained.  Okay.  next

25    question.  That's it?
```

```
1                    MR. KODOSKY:  Thank you, Your Honor.  That's all.

2                    THE COURT:  All right.  Anything else from anybody

3       with respect to Mr. Michaels?

4                    MR. COLBY:  Not from me, Your Honor.

5                    MR. CAPONI:  Not from me, Your Honor.

6                    THE COURT:  All right.  Mr. DeMarco, do you have any

7       questions?

8                    MR. DEMARCO:  No, Your Honor.  Just if my client may

9       be allowed to, I guess, return home to Florida -- his folks.

10                   THE COURT:  To do what?

11                   MR. DEMARCO:  Just to step down.

12                   THE COURT:  Oh, okay.  All right, Mr. Michaels,

13      unless you want to stick around and listen, you are excused.

14      I -- you may --

15                   THE WITNESS:  Thank you, Your Honor.

16                   THE COURT:  -- you can stay and listen, but not as a

17      witness, just as an observer or as counsel for -- co-counsel

18      for Mister --

19                   MR. BLUMENTHAL:  Blumenthal.

20                   THE COURT:  I'm sorry.  I was trying to --

21                   THE WITNESS:  Understood Your Honor.  I will stick

22      around but I'm going to go stop my video and go on mute.

23                   THE COURT:  Okay.  Thank you.  All right.  So does

24      the Debtor rest with respect to its request for a TRO,

25      preliminary injection, rest in its case in chief with the right
```

```
 1   to recall, I guess?

 2            MR. ZAHRALDDIN:  We do, Your Honor.

 3            THE COURT:  All right.  Mr. Colby, it's -- do you

 4   want to start with Mr. Stastney or do you want to --

 5            MR. COLBY:  So, take our cues from the Court.

 6            THE COURT:  Well, how long do you think?

 7            MR. COLBY:  Well, I think for a direct, I'm guessing,

 8   but 60 to 90 minutes.

 9            THE COURT:  Oh, Lord.  Okay.  That will take us to

10   7:00 -- I was prepared to go to 7:30.

11            MR. COLBY:  If we're lucky --

12            THE COURT:  Right.

13            MR. COLBY:  -- it'll take us to 7:30.  There's also a

14   matter we were just hoping to get some clarity on and that is

15   exactly what we'll be doing on Wednesday, so we know whether or

16   not we need to be here or not be here.

17            THE COURT:  Wednesday -- what is on for Wed --

18            UNIDENTIFIED SPEAKER:  Wednesday is the 2019 motion,

19   Your Honor.

20            MR. COLBY:  And so -- sorry.  Before we get into it,

21   I guess I'm asking the Court's preference whether we start with

22   Mr. Stastney, which we're happy to do all the issues are still

23   fresh or whether we talk about what we're doing on Wednesday.

24   I suspect that will eat up a little bit of time.

25            THE COURT:  A lot of time.  It always does.
```

1          MR. COLBY:  The way these things go.

2          THE COURT:  Well, it would make -- well, do you think

3  it would make sense to have Mr. Stastney's direct testimony and

4  then we can have him just come back for cross and then redirect

5  or would you prefer it to be all on one day?

6          MR. COLBY:  I think it's generally better when it's

7  all on one day.

8          THE COURT:  Okay.  I do, too, but I'm giving you that

9  option.  So that means that we're not going to start Mr.

10  Stastney and that means we can devote some time to figuring out

11  what will happen on Wednesday.  I will be honest, at this

12  point, my mind is a little -- what are we -- what is listed for

13  Wednesday?  Was Mr. -- is Mr. Parks' on -- application on?

14          UNIDENTIFIED SPEAKER:  No, ma'am.  We moved that to

15  December the 11th.

16          THE COURT:  Okay.  What's on -- that -- everybody's

17  understanding of what's on for the 20 -- for the 29th, right?

18          MR. KODOSKY:  It's simply the 2019 motion.

19          THE COURT:  Which is to --

20          MR. KODOSKY:  The 2019 motion.

21          THE COURT:  -- whether they were required on the 2019

22  whatever to disclose --

23          MR. KODOSKY:  Well, required and obviously, it's

24  continuing disclosure.

25          THE COURT:  All right.

```
 1                MR. KODOSKY:  Even -- I mean, it's --

 2                THE COURT:  That's it?

 3                MR. KODOSKY:  That's it.

 4                THE COURT:  Do we need just legal argument on that or

 5      do we need some evidence?

 6                MR. CAPONI:  Your Honor, so from our perspective, we

 7      think it's a legal issue.

 8                THE COURT:  That's what I'm thinking.

 9                MR. ZAHRALDDIN:  It's my motion.

10                MR. CAPONI:  But it's the Debtor's motion.

11                MR. ZAHRALDDIN:  It's my motion, so you know --

12                MR. CAPONI:  As I said before, the Debtor is the

13      conductor of their own symphony.

14                MR. ZAHRALDDIN:  -- I would, except for someone who

15      keeps trying to take it over, so --

16                THE COURT:  All right.  Listen.  All right, guys.

17      I'm the only one that can be snarky.

18                MR. ZAHRALDDIN:  I'm not trying to be snarky.  I'm

19      stating a fact.  You asked me and then Mr. Caponi had to answer

20      instead.

21                THE COURT:  All right.

22                MR. CAPONI:  Sorry.  I thought you pointed at me.  I

23      didn't mean to jump in.

24                THE COURT:  Okay.  all right.  I'm the only one that

25      gets to jump in.  So Mr. --
```

```
1              MR. ZAHRALDDIN:  Your Honor --

2              THE COURT:  -- Zahralddin.

3              MR. ZAHRALDDIN:  -- I think that --

4              THE COURT:  You believe --

5              MR. ZAHRALDDIN:  -- only Mr. Rajan would be a witness

6    on Wednesday.

7              THE COURT:  About what?

8              MR. ZAHRALDDIN:  Well, Mr. Rajan has the knowledge

9    about the various parties.  In their responses, the opponents

10   to the motion indicated that we were trying to get information

11   that we already know about, et cetera.  I don't believe that's

12   the case.  I believe that it doesn't matter what was given in a

13   prior proceeding.  2019 is an ongoing and temporal disclosure

14   requirement.  It can happen at any time and it really just

15   comes from whether or not a parties (sic) were acting in

16   concert.

17             The only thing that's relevant prior to this, I think

18   has already been put into the record.  You know about the

19   omnibus agreement.  You know about the continuing lack of

20   compliance with post remand injunctions.  So the only thing

21   that we would need to put forward is what's happened here as

22   well as the -- we -- I guess we have documents or we have

23   discussions of documents in the prior proceedings in Chancery

24   Court, but we've never seen those and they have not been

25   produced here, which is the important issue.
```

1              So if Your Honor believes we don't need an

2    evidentiary hearing --

3              THE COURT:  Counsel, I don't beli -- I don't tell

4    people how to run their cases.  I just thought the issue was

5    who was subject to the rule.

6              MR. ZAHRALDDIN:  Yes.

7              THE COURT:  And you believe that the response, which

8    I have not looked at -- I'll look at tonight or tomorrow,

9    probably tomorrow and research whatever I need to do.

10   Hopefully not all night long.  And hopefully my staff won't

11   be -- my law, my two law -- well, my law clerks will not have

12   to spend their night, either, looking at, you know, trying to

13   figure this out and we'll have discussions about what is the

14   issue.  But you believe that on the 2019 C, that the

15   information should be disclosed because --

16             MR. ZAHRALDDIN:  The parties were acting in concert.

17             THE COURT:  What parties were acting in concert?

18             MR. ZAHRALDDIN:  Hawk, SeeCubic.  I think about -- I

19   believe it's 50 some odd shareholders that were subject to the

20   omnibus agreement, whoever these eight or nine or other people

21   that Mr. Caponi has mentioned in court, Mr. Morton (phonetic),

22   Albany (phonetic).  They have filed concerted actions.  They

23   filed the motion to dismiss together.  They filed the motion

24   for a trustee together and all of that --

25             THE COURT:  So you believe disclosures by groups,

1    committees and entities.  And you believe that the -- either

2    the group -- well, we know they're not a committee.  They're

3    either groups or entities who are required to disclose a

4    verified statement setting forth the information in paragraph

5    C, which you know, just the information portion.

6              MR. ZAHRALDDIN:  Yes, Your Honor.

7              THE COURT:  Okay.  And that you believe that really

8    what I have to determine is whether these groups of creditors,

9    parties, whatever we're calling them, fit the definition of

10   group or entities who are required to comply --

11             MR. ZAHRALDDIN:  Yes.

12             THE COURT:  -- with the 2019 --

13             MR. ZAHRALDDIN:  An entity is a definition broader

14   than a person.

15             THE COURT:  Right.  I know.  Okay.

16             MR. ZAHRALDDIN:  And it's in the bankruptcy code and

17   it encompasses all kinds of things.

18             THE COURT:  So -- and the response was we're not

19   required to comply because we don't meet these definitions.

20             MR. ZAHRALDDIN:  And they said they had individual

21   counsel, et cetera, but that's not the test, so we will look at

22   that on Wednesday.

23             THE COURT:  All right.  Okay.  But isn't that just a

24   legal issue as to what does that mean, who is required to be --

25   to comply with 2019?  I guess if I made a finding as to what

1   that means, I would then have to apply that legal definition to

2   the various entities who the Debtor has asserted must comply.

3        MR. ZAHRALDDIN:  And any actions --

4        THE COURT:  And then I will need some evidence of who

5   these people are, unless you stipulate that -- who they are.

6   Not their relationship, but you believe that these are the

7   various persons, who you believe it applies to and why you

8   believe.  And Mr. Caponi says these are the various people, but

9   I don't think it applies.  We all agree that who the various

10  people, person entities groups are?

11       MR. ZAHRALDDIN:  Well, some have not been disclosed,

12  other than on the record, we've heard hints of things.

13       THE COURT:  Okay.

14       MR. ZAHRALDDIN:  And we have stuff that's been put

15  into the record in the Chancery Court.

16       THE COURT:  All right.

17       MR. ZAHRALDDIN:  But you know, if --

18       THE COURT:  So I'm going to need some evidence

19  because even if I conclude that this is what it means, I still

20  have to say, do these people constitute a group, do they

21  constitute an entity and how?  I can -- so if I have a legal

22  argument, that's great, but I need to apply the legal argument

23  to the facts of the matter.

24       MR. ZAHRALDDIN:  And it would be things that are

25  occurring -- that occurred now and before and they're all

1    judicial actions --

2            THE COURT:  So you can --

3            MR. ZAHRALDDIN:  -- whether contract --

4            THE COURT:  So can you guys stipulate to that or --

5            MR. ZAHRALDDIN:  I would love to do that and just do

6    argument.  We can stipulate that the omnibus agreement exists.

7    We can stipulate that the side letter agreement exists.

8            THE COURT:  What you do -- this is what you do.  You

9    can talk to Mr. Caponi.  You guys can stipulate to the facts.

10   I'm not telling you you have to.  And then you just come in,

11   you say this is what this means and this is why it doesn't

12   agree, it doesn't apply in these facts or you can't agree and

13   you bring somebody who has to tell me who the groups are, the

14   entities are and then make your legal arguments and I have to

15   figure out do these groups, entities, not committees, are they

16   subject to the 2019.  So you guys can either agree to all these

17   things or you can make a record.

18           MR. ZAHRALDDIN:  Yes, ma'am.

19           THE COURT:  So that's what I expect.  And what time

20   is this scheduled for on Wednesday?

21           UNIDENTIFIED SPEAKER:  Oh, I think it's --

22           MR. ZAHRALDDIN:  11:30, I think.

23           THE COURT:  We have an 11:30 list?

24           THE CLERK:  It's Number 3 on the 11:30 list.

25           THE COURT:  How many we have on the 11:30 list?

```
 1                 THE CLERK:  Three.

 2                 THE COURT:  Oh, okay.  Show up at 12:00.

 3                 MR. ZAHRALDDIN:  Okay.

 4                 THE COURT:  Who else we have?  Back up.  Let me see

 5     who we have before --

 6                 THE CLERK:  Number two is something settled, stipped

 7     to be filed.

 8                 THE COURT:  Okay.  And then number one.

 9                 THE CLERK:  And number one --

10                 THE COURT:  Settled --

11                 THE CLERK:  Number one is a confirmation hearing for

12     like a chapter 11 investment, 1982 Investment, LLC.

13                 THE COURT:  And did they file a report of planned

14     voting?  Because if they didn't, I don't think I'm having a

15     confirmation hearing.  That could take a while.

16                 THE CLERK:  Yeah.  October 13.  Wait.  Hold on.

17                 THE COURT:  I have to -- I'm -- I just don't want you

18     guys to come here.  And sit and have to wait and Wednesdays

19     tend to be on 11:30 I never know what I'm going to get.  We

20     have two matters before you.  One is resolved.  Right?

21                 THE CLERK:  Correct.

22                 THE COURT:  And the second one is a confirmation

23     hearing?

24                 THE CLERK:  Yeah.  I just want to get on to the

25     actual docket.
```

1           THE COURT:  Right.  If they don't have a report of

2    plan voting, I'm not having confirmation hearings --

3           THE CLERK:  I see it.  It's a Chapter 11.

4           THE COURT:  -- then you guys might as well show up at

5    11:30.

6           THE CLERK:  October 13th.  Report of planned voting

7    filed on October 13th.

8           THE COURT:  Oh, yeah.  Well, I guess I'm having a

9    hearing.  12:30.  Show up at 12:30.

10          MR. ZAHRALDDIN:  Okay.

11          THE COURT:  That shouldn't take -- unless did we file

12   any objections to confirmation you see on the docket?  No?

13          THE CLERK:  Looking for objections, no.

14          THE COURT:  Yeah.  No objections.  Might be just a 20

15   minute proposition where they go through and give me the report

16   of planned voting, say everybody voted in favor and then we --

17          THE CLERK:  Because at one point, there was a motion

18   to convert it, but that got withdrawn.

19          THE COURT:  Right.  I still haven't gotten -- been

20   able to get on here.  Okay.  12:00, guys.  Just show up at

21   12:00.

22          UNIDENTIFIED SPEAKER:  Okay.

23          THE COURT:  That should give them a half an hour

24   to -- because I don't see an objection and then usually they

25   just make a proffer and I'm done in 15 minutes.

1        MR. ZAHRALDDIN:  So we're going to start at 12:00,

2   start with whatever witnesses and evidence gets put in and then

3   whenever that's in, argument.

4        THE COURT:  Yes.  And hopefully that's not going to

5   take too long.

6        MR. ZAHRALDDIN:  Well, I'm hopeful we can stipulate

7   the things that are in the record below.  There won't be that

8   many of them.

9        THE COURT:  Right.  Here are the groups.  Here are

10  the people and here's the other people.

11        MR. CAPONI:  I mean, look, I'd like to, Your Honor,

12  but I'm not optimistic, given -- what I just heard was there's

13  eight unidentified people.  I mean, Debtor doesn't -- can't

14  identify the people.  I think that's going to require evidence.

15        MR. ZAHRALDDIN:  That's the point of disclosure, Your

16  Honor.  Mr. Caponi maybe he needs to understand that, but when

17  he raises the issue --

18        THE COURT:  Oh, come on now.  Come on, guys.

19        MR. ZAHRALDDIN:  I'm just saying, Your Honor --

20        MR. CAPONI:  I don't understand the law, Your Honor.

21        MR. ZAHRALDDIN:  Your Honor, he's telling me that I

22  can't identify the people, he hasn't identified, potentially is

23  required to identify.  I don't understand that circular

24  argument.

25        THE COURT:  All right.  So your position is, there

1   were some people who have been identified and others who should

2   have been, but have not been because they didn't comply with

3   the rules.  And you're going to put on evidence that there was

4   a mention of this person, that person, that person, and we

5   believe these people are covered by the rules and should have

6   been disclosed.  By who, I don't know because if they're not --

7              MR. ZAHRALDDIN:  Well, Your Honor, part of the issue

8   is we're going to have certain lists of people that were in the

9   Chancery Court that were revealed there.  And then we have

10  heard here from Mr. Caponi and others of other people, mostly

11  equity holders that are sitting behind SeeCubic, behind perhaps

12  Albany or Hawk.  Albany is the trustee for Hawk.

13             THE COURT:  Okay.

14             MR. ZAHRALDDIN:  And what we're going to ask is, did

15  these people disappear?

16             THE COURT:  Is Hawk some people in Ca -- where --

17  Hawk is in Canada?

18             MR. ZAHRALDDIN:  Hawk is in the Channel Islands.

19             THE COURT:  Who is it?

20             MR. ZAHRALDDIN:  Hawk is the second lien creditor we

21  believe --

22             THE COURT:  Oh, I know they are --

23             MR. ZAHRALDDIN:  -- has been converted.

24             THE COURT:  -- but I'm like, enlighten me, because

25  Channel Islands is not coming --

```
 1              MR. CAPONI:  Off of England.

 2              THE COURT:  Off of -- okay.  So they're the

 3   British -- no, not the British, but --

 4              MR. CAPONI:  Yes.

 5              THE COURT:  Is there somebody in Canada?

 6              MR. ZAHRALDDIN:  Not that we know of --

 7              THE COURT:  Oh, well then it was Britain.

 8              MR. ZAHRALDDIN:  -- but we could be surprised.

 9              THE COURT:  I don't know.  I thought -- I knew it was

10   another country.  I was opting for Canada.

11              MR. ZAHRALDDIN:  We have people in the UK.  We have

12   some folks in the Channel Islands.

13              THE COURT:  I know.  That -- okay.  I get it.  I

14   recall.

15              MR. ZAHRALDDIN:  And look Your Honor, the rule -- and

16   I think the opposing counsel took and/or the parties took

17   umbrage at the fact that there are some pretty strict penalties

18   for not disclosing.  We didn't make up the penalties that are

19   in the rule.  There's some pretty serious penalties in there.

20              THE COURT:  Do I have some option or I have to put --

21   I have to --

22              MR. ZAHRALDDIN:  It does say that in the Court's

23   discretion, here are the things that could happen and of course

24   there's plenty of --

25              THE COURT:  Yes.  But you --
```

```
 1              MR. ZAHRALDDIN:  -- case law that said that --

 2              THE COURT:  Unless -- listen --

 3              MR. ZAHRALDDIN:  -- there's some -- they're pretty

 4   draconian remedies, but you don't have to do that.  There can

 5   be other things that can be done.

 6              THE COURT:  Right.  Typically, if somebody has a

 7   valid legal basis for making an argument, I don't know any

 8   court who's going to penalize you, unless you have your

 9   argument has no basis whatsoever and it's just off the wall.

10              MR. ZAHRALDDIN:  Well, I'm not talking about fee

11   shifting, Your Honor.  I'm not talking about that.

12              THE COURT:  I'm not saying that.

13              MR. ZAHRALDDIN:  Yeah.

14              THE COURT:  I'm talking about assessing penalties,

15   assessing --

16              MR. ZAHRALDDIN:  Right.  Got you.

17              THE COURT:  -- failure to comply with the rules.  If

18   you have a valid argument -- I don't know how you penalize

19   people, but if you have an argument that has no basis in law,

20   none whatsoever, and you're making it up, then you have a

21   problem.  I'm just saying yes.  Okay.  It provides for it.

22   But, you know --

23              MR. ZAHRALDDIN:  So hopefully we can get to something

24   that's stipulated because everything else is on the record.

25              THE COURT:  If you can agree to these things, but you
```

1  can't agree to the rest and then you put some testimony.  Or

2  you can't agree to anything.  So, 12:00 on Wednesday.  Is

3  anybody going to appear by Zoom?  If Mr. Rajan still has the

4  flu, he's on the zone.

5          MR. ZAHRALDDIN:  I'll tell him that, Your Honor.

6          THE COURT:  No -- I had it once.  I'm going to just

7  tell all of you.  You do not want that.  I had COVID and that.

8  COVID was a breeze.  This thing, hope.  I think I had to cancel

9  a hearing, I was so sick.  I have not been that sick in about

10 10 years.  So if he has the flu --

11         MR. ZAHRALDDIN:  Stay home.

12         THE COURT:  Stay home.  Or anybody that has the flu.

13         MR. ZAHRALDDIN:  Right.

14         THE COURT:  I have my shot now.  You can do whatever

15 you want, but you don't want to get --

16         MR. CAPONI:  Yeah.  I don't know, on our side, Your

17 Honor.  Obviously, we're going to have to see what evidence

18 gets put on to decide what our response is going to be, so I'd

19 be --

20         THE COURT:  Would you at least talk to Mr.

21 Zahralddin --

22         MR. CAPONI:  We will.

23         THE COURT:  -- and say --

24         MR. CAPONI:  Absolutely, Your Honor.  I mean --

25         THE COURT:  Who are the people you believe and who

1   are the people you should have been disclosed and hopefully

2   that'll shrink it, but if not, you'll have to put your -- you

3   know, another day of --

4         MR. CAPONI:  Yeah.  I think it's unlikely to end

5   Wednesday, but, you know, we've -- I'll make good progress.

6         THE COURT:  Jesus.

7         MR. ZAHRALDDIN:  I think it will end Wednesday

8   because I'm a glass half full guy.  I believe we sent over a

9   list of things.  I'll look at it and revise it.

10        MR. ZAHRALDDIN:  I think it would have come over last

11  week, but I'll look at it again and see if I can cut it down --

12        THE COURT:  All right.  So --

13        MR. ZAHRALDDIN:  -- based on the Court's discussion

14  with me and we'll see if we can get therapist.

15        THE COURT:  All right.  In the meantime, you guys

16  have to figure out a time to have Mr. Stastney's testimony and

17  the two Dutch witnesses.

18        MR. ZAHRALDDIN:  And the one California witness.

19        THE COURT:  And the one California witness.  We need

20  all -- is -- two, three day -- guys come on.  Can we like --

21  never mind.  I'm going to give you your day in court, but the

22  more -- you know, I -- are we going to finish this before the

23  end of the year?

24        MR. ZAHRALDDIN:  I hope so, since it's our assets at

25  risk.

1          THE COURT:  Well, counsel, they were at risk when you

2    ca -- never mind.

3          MR. ZAHRALDDIN:  Well, it --

4          THE COURT:  It --

5          MR. ZAHRALDDIN:  -- that doesn't make it any --

6          MR. CAPONI:  Like any good dance partner, we're

7    following the Debtor's lead, so we'll end when they -- you're

8    tired of dancing.

9          MR. ZAHRALDDIN:  I didn't think it was going to end

10   with a dance with Mr. Caponi.  I have to tell you that.

11         THE COURT:  Well, whatever.  I -- you need to

12   seriously exchange dates with each other --

13         MR. ZAHRALDDIN:  Yeah.

14         THE COURT:  -- about --

15         MR. ZAHRALDDIN:  We're simply waiting, Your Honor.

16   We're -- our witness is actually --

17         MR. CAPONI:  I've asked.

18         MR. ZAHRALDDIN:  -- waiting for them and then they've

19   got to figure out -- I mean, we're on two different time zones,

20   so we'll figure it out.

21         THE COURT:  Just let me know.  I will try to

22   accommodate.  Right now, I looked in my December.  I didn't --

23   am I -- or maybe I was in January or --

24         MR. ZAHRALDDIN:  Not between Christmas and New

25   Year's, I hope.

233

1          THE COURT:  I typically close chambers between

2     Christmas and New Year's.

3          MR. ZAHRALDDIN:  I know.  You mentioned that and I

4     was --

5          THE COURT:  I guess I won't be this year --

6          MR. ZAHRALDDIN:  No, no, I was happy to hear that.  I

7     don't want to be here.

8          THE COURT:  Because I want to get this done, at lest

9     some of this case done before the end of the year.  I do plan

10    to be away, I don't know, between January 2nd and the 9th.

11    Otherwise my husband might divorce me.  So I may be a way --

12         MR. ZAHRALDDIN:  I don't want to see you in that

13    condition, if not getting a lunch makes things bad I don't want

14    to do that.

15         THE COURT:  Listen I'm not a big -- I don't like

16    vacations.  This will --a vacation.  So right now the 2nd

17    through the 9th.  And I will know for sure by the end of this

18    week when we'll be away.

19         MR. CAPONI:  Your Honor, we're just -- because the

20    Debtor's have just finished their case and chief on the TRO,

21    we're just getting started.  So I think that proceeding has to

22    run its course.  I think as new proceedings, new issues come

23    up, and we begin hearings on them -- speaking only for myself

24    and without speaking to my client about it first -- we would be

25    amenable to, you know, equitable time limits in order to make

1    the parties prioritize on what's important.

2            THE COURT:  That would make sense, and I did not do

3    that.  I typically try not to because I don't want to deprive

4    people of their opportunity to present their case, but right

5    now, we have been going for -- part of it was my -- today was

6    my question, which I should've never asked or commented that

7    took us astray, but we may have to -- I may have to ask the

8    parties for how much time, and say I'm going to strictly

9    enforce the time.  That way we can concentrate, and I will try

10   my best not to ask questions or comments, and then that way we

11   can get through.

12           And hopefully -- because at the end of the day, a lot

13   of this is about Stream and not about Technovative, so I'm not

14   quite sure whether this would -- you know, no matter what

15   happens in the other actions, otherwise -- other than granting

16   a motion to dismiss, would do away with the Stream stuff or

17   appointing a Chapter 11 Trustee.  And that still won't make it

18   go away because then some other body -- another person would

19   have to come and figure out what they want to do.  So I'm not

20   quite sure how this is going to streamline anything for me, but

21   I will do my best to get some of it off and decided so the

22   parties can have a better idea of what they're doing, with

23   respect to Technovative, anyway.

24           MR. CAPONI:  Just one last note.  On Wednesday, I

25   don't know what the Debtor's intents are, what witnesses

```
1    they'll need, what we may need to respond to.  My understanding

2    is that they have Mr. Stastney on their list.  He's not

3    available in person on Wednesday.  I believe he could testify

4    by Zoom, if his testimony is necessary.  I just don't know

5    whether or not --

6              MR. COLBY:  Well, certainly, we're -- we gave it to

7    him last week.  I know it was a holiday, so I'm not going to

8    hold him to that and I hope you don't either, Your Honor, or

9    me.  I'm happy to see if we even need Mr. Stastney, if he were

10   available, in case we need to call him, because I don't want to

11   be in a situation where they object to --

12             THE COURT:  Well, I mean --

13             MR. COLBY:  -- and I have to find an alternative.

14             THE COURT:  -- the Zoom seems to be working.

15             MR. COLBY:  Right.

16             THE COURT:  It has worked.

17             MR. CAPONI:  And we have no objection to Mr. Stastney

18   appearing by Zoom.

19             THE COURT:  Okay.  And then we'll just give him the

20   Zoom link, and if someone else wants to participate -- I just

21   want people to identify themselves when they're here, because I

22   can't see and support -- and we have had incidences where

23   people have just gone off about observers just not liking what

24   I'm saying or not liking the consequences of what the Debtor --

25   or Debtor's friends, and just being very rude and obnoxious.
```

1              MR. COLBY:  I understand.

2              THE COURT:  I want to avoid that.  I mean, it could

3    be in court and do it, too, but at least I can call the

4    Marshall to come get them.

5              So we will start at 12 on Wednesday.  If Mr. Stastney

6    needs to testify as a witness, he can appear by Zoom.

7              Any other witness -- Mr. Rajan (phonetic), if he's

8    sick, he's Zoom.

9              Any other witness?

10             MR. CAPONI:  I'd have to look, Your Honor, to see,

11   because we -- it was -- I don't know if I have the list.

12             Was there anybody else we listed, Mr. Shaw?  Do you

13   know?

14             MR. SHAW:  Eileen, if we need her.

15             THE COURT:  Oh.  Hi, Eileen.

16             UNIDENTIFIED SPEAKER:  Hi, Judge.  I'm trying to log

17   in.

18             THE COURT:  Well, we're getting ready to shut down,

19   so don't worry about it.  I'll call you later about those

20   emergencies.

21             Oh, wait.  Hold on, Eileen.  Hold on.

22             You have access to dates that are available in

23   December.  Just give them --

24             UNIDENTIFIED SPEAKER:  Yep.

25             THE COURT:  All right.  What --

1          UNIDENTIFIED SPEAKER:  Yeah, if you can give me just

2    two seconds.

3          THE COURT:  Okay.

4          UNIDENTIFIED SPEAKER:  I can, hopefully.

5          MR. CAPONI:  Your Honor, while she's looking for the

6    dates, just because you mentioned you don't necessarily see

7    everything that hits the docket, I just wanted to let the Court

8    know that the district court did deny the motion to withdraw

9    the reference.  That issue was kind of hanging out there.

10         MR. COLBY:  You saw that already.  I would've thought

11   you'd already seen that, Your Honor.

12         THE COURT:  Oh.

13         MR. COLBY:  Yeah.  She had basically said that the

14   motion to be withdrawn --

15         THE COURT:  Wait, when was it issued?

16         MR. CAPONI:  November 16th.

17         MR. COLBY:  Yeah.

18         THE COURT:  They typically mail me a copy.

19         MR. CAPONI:  It echoed our discussion where it said

20   that if she needs to do a trial, she'll do a trial.

21         THE COURT:  Yeah, after I do the magistrate work.

22         MR. COLBY:  It echoed the thing, so same thing.

23         THE COURT:  That's typically what happens is they're

24   like, you do everything.

25         MR. COLBY:  There are other aspects of it

1  highlighted, but Your Honor can read it.

2          MR. CAPONI:  You can read it, Judge.

3          THE COURT:  What does she want me to do?

4          MR. CAPONI:  She didn't -- it's Judge Marsten

5  (phonetic) and the only highlights are they -- whoever wrote it

6  adopted most of what Skadden put into their pleadings on the

7  prior history.  I'm sure that's what they want to talk about.

8          THE COURT:  Oh, okay.  Well, what am I supposed to do

9  with that?

10         MR. COLBY:  I don't think anything, Your Honor.

11         MR. CAPONI:  Nothing, Your Honor.  I just wanted to

12 let you know that the decision came down because I know you --

13         MR. COLBY:  Yeah.

14         MR. CAPONI:  -- mentioned you don't always get

15 notified.

16         THE COURT:  No, I don't, and I don't read the

17 documents.  No, I have asked the IT to make this one of their

18 cases.  I can make certain cases where any filings I get notice

19 of.

20         MR. COLBY:  I'm surprised you didn't get it.

21         THE COURT:  And I thought they had already done that,

22 but apparently not yet.

23         We did or you didn't see?  Okay.

24         MR. CAPONI:  Okay.  Okay, so you did see it.  All

25 right.

```
1              THE COURT:  Somebody saw it.

2              MR. CAPONI:  All right.

3              THE COURT:  The 16th.  When was that?  And I didn't

4   see it?

5              MR. CAPONI:  Yeah.

6              MR. KODOSKY:  Your Honor, I didn't find out about it

7   until Wednesday of last week, so --

8              THE COURT:  They typically do send us a copy, a

9   courtesy copy, but I don't have a JA, so who knows where my,

10  you know -- I don't know.  All right.

11             MR. CAPONI:  Your Honor, I ask one --

12             UNIDENTIFIED SPEAKER:  It's plugged in.  I'm in now.

13             MR. CAPONI:  All right.

14             THE COURT:  All right.  What do I have available in

15  December?

16             UNIDENTIFIED SPEAKER:  Okay.  I have Monday, December

17  4th.  I don't see anything on your calendar.

18             THE COURT:  Anything personal on the 4th?

19             UNIDENTIFIED SPEAKER:  I don't have anything with --

20  I'm looking at your calendar and I don't see anything there for

21  December 4th.

22             THE COURT:  All right.  I'm good then, the 4th.

23             What else?

24             UNIDENTIFIED SPEAKER:  This next week, we did have

25  something but it got cancelled for the 5th.  It was settled.
```

1    Hold on.  That was Hollis (phonetic).  That was --

2           THE COURT:  So that would be the -- so we would have

3    all day on the 4th?

4           UNIDENTIFIED SPEAKER:  Um-hum.

5           THE COURT:  A half a day on the 5th, because I would

6    hear my regular list?

7           UNIDENTIFIED SPEAKER:  Right, exactly.

8           THE COURT:  What's on the 6th?

9           UNIDENTIFIED SPEAKER:  All right.  On the 6th.  Let

10   me see what I have on December the 6th.  Okay.  I don't think

11   we have anything.

12          THE COURT:  That's a --

13          UNIDENTIFIED SPEAKER:  We have a trial on the 6th.

14          THE COURT:  What trial?  Who's that?

15          UNIDENTIFIED SPEAKER:  Financial Investments.  It's a

16   trial and a motion to be considered to get a default order at

17   12:30.

18          THE COURT:  Okay, so that's out.

19          UNIDENTIFIED SPEAKER:  Um-hum.  And let's see.  The

20   7th, I have just a regular 9:30 and an 11:00.  Hold on one sec

21   here.  It looks like we do have a 9:30 and an 11:00 on the 7th.

22   Let me see.

23          THE COURT:  Anything --

24          UNIDENTIFIED SPEAKER:  You have MJ Fencing (phonetic)

25   and our holiday party.

```
 1              THE COURT:  That's -- the holiday party is for the

 2   EDPA.  That one?

 3              UNIDENTIFIED SPEAKER:  Yeah.

 4              THE COURT:  I haven't attended in two years.  I guess

 5   I have to go.

 6              UNIDENTIFIED SPEAKER:  Okay.  Yes.  I think that's

 7   not until 6:00, though.

 8              THE COURT:  Right, but I did promise to show up this

 9   year.

10              MR. CAPONI:  It's the inner-workings.

11              THE COURT:  All right.

12              UNIDENTIFIED SPEAKER:  You have until, like, say

13   12:30 to --

14              THE COURT:  To 6:00.

15              UNIDENTIFIED SPEAKER:  I'd say 5:00.

16              THE COURT:  I only go for a little bit.  Okay.  So

17   that's -- so we have that date, the 7th, right?

18              UNIDENTIFIED SPEAKER:  Right.  The 7th, correct?

19              THE COURT:  So from 12:30 to 6:00?

20              UNIDENTIFIED SPEAKER:  Um-hum.

21              THE COURT:  Okay.

22              UNIDENTIFIED SPEAKER:  All right.  The following

23   week, let me just see.  All right.  On the 11th, we do have

24   Stream TV.

25              THE COURT:  Well, we can't -- we're not adding
```

1    anything to that.  Keep going.

2          UNIDENTIFIED SPEAKER:  Okay.  The 12th, let me see.

3    It looks like -- oh, I have nothing.

4          THE COURT:  That's a Thursday?

5          UNIDENTIFIED SPEAKER:  The 12th is a Tuesday.

6          THE COURT:  Tuesday.

7          UNIDENTIFIED SPEAKER:  I mean, we have our regular

8    list.

9          THE COURT:  So we have the afternoon from 12 to 6,

10   7 --

11         UNIDENTIFIED SPEAKER:  Yeah.

12         THE COURT:  -- on Tuesday the 12th.

13         What about the 13th?  That's a Thursday.

14         UNIDENTIFIED SPEAKER:  The 13th --

15         MR. CAPONI:  Wednesday.

16         THE COURT:  A Wednesday.

17         UNIDENTIFIED SPEAKER:  Let me look.

18         THE COURT:  Look on -- on the Wednesdays, my personal

19   calendar, I always have -- I have my injections every other

20   week.

21         UNIDENTIFIED SPEAKER:  Yeah.

22         THE COURT:  So I don't even know what -- I did it

23   last week, so the 11th I have to go.

24         UNIDENTIFIED SPEAKER:  So you did it last Wednesday

25   which is the 29th.

```
 1              THE COURT:  No, the 29th --

 2              UNIDENTIFIED SPEAKER:  No, no, no.

 3              THE COURT:  -- is this Wednesday.

 4              UNIDENTIFIED SPEAKER:  I'm sorry.  Which was the

 5   22nd, so you would have that on the 6th.

 6              THE COURT:  Right, that's the next one.

 7              UNIDENTIFIED SPEAKER:  Right.  And then you would

 8   have the next one on the 20th.

 9              THE COURT:  Yes, okay.

10              UNIDENTIFIED SPEAKER:  Injection.

11              THE COURT:  Yeah, um-hum.

12              UNIDENTIFIED SPEAKER:  So on -- it looks like the

13   13th is a good day, as well.

14              THE COURT:  Would that --

15              UNIDENTIFIED SPEAKER:  A Wednesday.

16              THE COURT:  The afternoon from the 12 to 6?

17              UNIDENTIFIED SPEAKER:  From the 12 -- from 12:00 on.

18   We have something at 11:30, but that's our typical 11:30

19   Chapter 11 cases.

20              THE COURT:  Okay.

21              UNIDENTIFIED SPEAKER:  So we have the 13th is good,

22   and then the 14th, we have -- I believe we have Stream TV on

23   the 14th, as well.

24              THE COURT:  For what?

25              UNIDENTIFIED SPEAKER:  A continued hearing, isn't it?
```

```
 1              THE COURT:  A what hearing?

 2              UNIDENTIFIED SPEAKER:  It's a continued.

 3              THE COURT:  I think we kept that date open in case

 4    they needed it.  Keep it open, see what they tell us.  We'll

 5    see what you guys tell us.

 6              UNIDENTIFIED SPEAKER:  Yeah.

 7              THE COURT:  All right.

 8              UNIDENTIFIED SPEAKER:  Okay.

 9              THE COURT:  And then the 15th, what do we have?

10              UNIDENTIFIED SPEAKER:  And the 15th, I have nothing,

11    which is a Friday.  Let's see if you have anything.

12              THE COURT:  Typically not, unless I have --

13              UNIDENTIFIED SPEAKER:  A Penn Dental --

14              THE COURT:  Hmm, I'll call and figure it out.  There

15    is one appointment on there, it's Soffer, S-O-F-F-E-R, nothing

16    can come --

17              UNIDENTIFIED SPEAKER:  Okay.

18              THE COURT:  I think that might be the 22nd.

19              UNIDENTIFIED SPEAKER:  Oh, okay.

20              THE COURT:  So, never mind.

21              UNIDENTIFIED SPEAKER:  On the 15th, I've got, see

22    Penn Dental.

23              THE COURT:  What time?

24              UNIDENTIFIED SPEAKER:  At 1:00.

25              THE COURT:  Ugh, all right.  Let me -- let's hold up
```

1    on that and I'll figure that out.

2           UNIDENTIFIED SPEAKER:  Okay.  And then if we go to

3    the following week --

4           THE COURT:  Which is Christmas week, right?

5           UNIDENTIFIED SPEAKER:  Which is the week before

6    Christmas, yes.

7           THE COURT:  Oh.

8           UNIDENTIFIED SPEAKER:  We have a trial on 12/18.

9           THE COURT:  That's --

10          UNIDENTIFIED SPEAKER:  Well, it's actually status and

11   a trial on Trains Joel Specialty (phonetic), again.  So --

12          THE COURT:  I think that one will go.  That's a

13   Monday, right?

14          UNIDENTIFIED SPEAKER:  Correct.  And then on Tuesday,

15   the 19th, we have no trials.

16          THE COURT:  Well, we can have the afternoon.  I hope

17   somebody is writing this.  The 19th, 12 to 6.

18          UNIDENTIFIED SPEAKER:  The 19th is good.

19          THE COURT:  Next?

20          UNIDENTIFIED SPEAKER:  Let's see.  The 20th, I don't

21   have anything on your calendar.

22          THE COURT:  That's a Wednesday?

23          UNIDENTIFIED SPEAKER:  That's a Wednesday, correct.

24          THE COURT:  So we have 12 to 6 on Wednesday the 20th.

25          UNIDENTIFIED SPEAKER:  Yeah, the 20th looks good, as

1  well.  And then let's see, the 21st, we have typical, you know,

2  I don't have anything --

3          THE COURT:  From 12 to 6 for Thursday?  12 to 6 for

4  that day.

5          UNIDENTIFIED SPEAKER:  Sorry?

6          THE COURT:  12 to 6?  That's the 20th, you said?

7          UNIDENTIFIED SPEAKER:  The 21st.

8          THE COURT:  21st.

9          UNIDENTIFIED SPEAKER:  The 20th and the 21st are

10  good, Judge.

11          THE COURT:  All right.  And what about the -- that's

12  all right.  It's first thing in the morning.

13          UNIDENTIFIED SPEAKER:  Oh, okay.  All right then.  So

14  the 20th and 21st are good.  All right.  And then the 22nd you

15  have something.  Dr. Soffer?

16          THE COURT:  Nothing can come between that.  What time

17  is that?  4:00 probably.

18          UNIDENTIFIED SPEAKER:  It's at 4:00, correct.

19          THE COURT:  Right.  So you guys can have some 10:30

20  to 3 on that day.

21          MR. CAPONI:  That's 20.

22          THE COURT:  Okay.

23          UNIDENTIFIED SPEAKER:  Okay, and then it's Christmas.

24          THE COURT:  Anybody want hearings the week of

25  Christmas?  Oh, wait.  The 22nd, forget it.  That Monday is

1    Christmas, right?

2              MR. CAPONI:  Correct.

3              UNIDENTIFIED SPEAKER:  Christmas is Monday the 22nd,

4    yes.

5              THE COURT:  26th, anybody want?  No.  27?

6              MR. COLBY:  Going once, going twice.

7              THE COURT:  28?  No.  And then you have to because

8    I'm not going to -- if I go away, I'm leaving on the 2nd and I

9    won't be back until the 9th, so think about that.

10             MR. COLBY:  We will make every effort to fit it in.

11   We have a range of options.

12             THE COURT:  You have a range of options.

13             MR. COLBY:  We will do what we can.

14             THE COURT:  Okay.  And that's to finish both,

15   assuming that we don't finish the hearing on the 19th, on

16   Wednesday.  That's to finish that and to finish Mr. Stastney's

17   testimony, the two Dutch witnesses, and Mr. who from

18   California?

19             MR. ZAHRALDDIN:  Mr. Banerjee (phonetic).

20             THE COURT:  Banerjee?

21             MR. ZAHRALDDIN:  Croschek (phonetic) Banerjee.

22             THE COURT:  Okay.  All right.  I think we should be

23   able to get at least -- how many witnesses do we have?  Four

24   witnesses?  Even if we do one day for each one of these

25   witnesses, four hours, four or five hours, we should get all

1   four of them done.  I think we have enough dates to get four

2   people done.

3          MR. COLBY:  Well, in effort to keep it short, I think

4   that colloquy today was helpful.  I don't know if you noticed,

5   but after we had that, I was very brief with Mr. Michaels,

6   so --

7          THE COURT:  It wasn't to tell you to be brief, but I

8   mean, I think sometimes as litigators, you guys think you're

9   playing to a jury, and sometimes, you get caught up into hours.

10  I litigated once.  I know sometimes I lost the forest for the

11  trees -- whatever.  I didn't see the forest.  I saw the trees,

12  and it's very easy to get done.  And so I understand.  I just

13  sometimes think that people don't focus on what is it that I

14  need to give the Judge on the trier of fact to get what I want.

15  And I'm not -- you know, even though sometimes I get a little

16  irate, I tend very much to try to be very -- take my emotions

17  out of any decision that I make, for the most part.

18         MR. COLBY:  We appreciate that.

19         MR. ZAHRALDDIN:  May I release my witness, Judge?

20         THE COURT:  Oh.  What witness?

21         MR. ZAHRALDDIN:  Eileen.

22         THE COURT:  Oh, yes, Ms. -- yes, Eileen.

23         MR. ZAHRALDDIN:  All right, Eileen.  I'm hanging up

24  on you.

25         THE COURT:  All right, and this will be over.

1          MR. ZAHRALDDIN:  Thank you.

2          UNIDENTIFIED SPEAKER:  I have a question.

3          MR. ZAHRALDDIN:  Oh, she has a question.

4          UNIDENTIFIED SPEAKER:  Judge, all these dates are for

5    the adversary?

6          THE COURT:  Yes.  They are for the preliminary

7    injunction --

8          UNIDENTIFIED SPEAKER:  Okay.

9          THE COURT:  -- TRO.

10         UNIDENTIFIED SPEAKER:  Okay.  And what happened to

11   the motion for Stie (phonetic)?  That was scheduled also for

12   today, but I guess you never got to it, right?

13         MR. ZAHRALDDIN:  Well, Your Honor, I think what we

14   discussed was if we could get to a compromise on the worldwide

15   piece of it, that we would wait to see when Your Honor had a

16   little more room on the calendar.  So depending upon what days

17   come back, maybe we can --

18         THE COURT:  Well, I thought the parties were going to

19   try to see if you could submit an order that had been entered

20   in --

21         MR. ZAHRALDDIN:  Absolutely.  And what I did --

22         THE COURT:  Are you working on that?

23         MR. ZAHRALDDIN:  I stayed late on Wednesday instead

24   of going out and seeing all the people that came back home, got

25   out a version of the order, and we attached, I think, three --

1    no, I think four or five -- I might be, you know, misstating

2    that, but we attached several from other cases to the motion so

3    they could look at those cases, they could send us orders.

4    Otherwise, I am waiting for them to send me something back.  I

5    just --

6           THE COURT:  And then if you guys can agree on

7    language, do I even need to hear anything and it's an agreed

8    order?  If not --

9           MR. ZAHRALDDIN:  I'll send competing orders in.

10           THE COURT:  Then just send me and all I'm going to

11    have -- because first of all, one, why should I do it.  That's

12    legal argument.  Why should I?  And then if I do, this is what

13    it should say.  That shouldn't take too long.  Shouldn't.

14           MR. ZAHRALDDIN:  Shouldn't.

15           THE COURT:  Shouldn't take too long.

16           MR. ZAHRALDDIN:  Shouldn't.

17           THE COURT:  Shouldn't.  All right.  So why don't you

18    continue the discussions with counsel on that order, and then

19    if you can submit an agreed order, we'll try to put it on, on

20    one of those days.

21           MR. ZAHRALDDIN:  And what I also will do is I will

22    try to respond to the latest questions in the mediation and see

23    if I can't push that, as well, because that might solve at

24    least part of what we requested in our stay violations motion.

25           THE COURT:  All right.  And I understand with respect

1   to the stay violations motion, you may be able to come to a

2   stipulated record on that, relying and citing to the records in

3   the various hearings that we've had.

4            MR. ZAHRALDDIN:  Yes, Your Honor.

5            THE COURT:  And that would, you know, make it easier

6   that we wouldn't have to be in court and would actually be

7   addressing some of the issues.

8            Anything further from anyone?

9            MR. ZAHRALDDIN:  Your Honor, the only other thing

10  that my client has requested is that to the extent that there

11  is relief requested in the TRO that doesn't -- that Mr.

12  Barenbach (phonetic) and I've got to get Mr. Hodges (phonetic)

13  -- the two folks from the Netherlands --

14           THE COURT:  This is Barenbrug (phonetic)?

15           MR. ZAHRALDDIN:  Yeah.  To the extent that they or

16  Mr. Banerjee have no impact on some of the relief that we've

17  requested -- for example, the trademark issue has nothing to do

18  with anybody in the Netherlands, etcetera.  Would you consider

19  looking at those issues and maybe disposing of them beforehand?

20           THE COURT:  What issue?

21           MR. ZAHRALDDIN:  The trademark.  The filing of a --

22  and I can't say it any other way --

23           THE COURT:  Oh, wait.  You're asking me with respect

24  to violation of the automatic stay by filing with Mister --

25           MR. ZAHRALDDIN:  Or giving us a TRO.  For example, to

1    please stop filing things falsely with the USPTO.

2              THE COURT:  Well, that wouldn't -- well, I wouldn't

3    say please stop filing things falsely.  I might say don't file

4    anything until we resolve this matter.

5              MR. COLBY:  Yeah, I think -- I mean, we -- I

6    understand --

7              MR. ZAHRALDDIN:  Either one would be nice.

8              MR. COLBY:  I understand Mr. Zahralddin to be

9    requesting for partial relief.

10             MR. ZAHRALDDIN:  That's what I --

11             MR. COLBY:  They just closed their case.  Now, we

12   haven't had any chance to respond --

13             MR. ZAHRALDDIN:  Understood.

14             MR. COLBY:  -- with our own witnesses, so I think

15   that's premature.

16             THE COURT:  Well, I would think --

17             MR. ZAHRALDDIN:  It can --

18             THE COURT:  -- without granting anybody's request,

19   don't file anything.  I don't think I should have to tell

20   anybody that.  Don't do it until at least you come here and I

21   figure something else, unless, listen, if you want to -- again,

22   if your counsel tells you that you believe you can proceed, and

23   you proceed and you do at your own risk, and if I find that,

24   you know, even if counsel may have had reasonable basis to tell

25   you to do something, that has nothing to do with 360 2K.

1          MR. ZAHRALDDIN:  Yeah.

2          THE COURT:  Okay?  I always tell people, I error on

3     the side of caution.  If there's even a likelihood that your

4     actions are going to violate the State or could be deemed a

5     violation, come ask for a relief.  That's all I tell people.

6          MR. ZAHRALDDIN:  And Your Honor, Mr. Colby is right.

7     I should not be asking for --

8          THE COURT:  No.

9          MR. ZAHRALDDIN:  -- that relief prematurely, but if

10    we get to a point where we're not looking at rebuttal, I may

11    ask again.

12         THE COURT:  Well, all I can tell you is my -- I

13    caution people.  Proceed at your own risk.  I'm not saying I'm

14    going to tell you what you did was improper, but if it turns

15    out it is and it's a violation of the State, it's a costly,

16    very costly, decision.  So again, people can do whatever they

17    want.  I would just say --

18         MR. COLBY:  Thank you, Your Honor.

19         THE COURT:  -- don't do it.

20         MR. ZAHRALDDIN:  Let's just hear the evidence on it

21    and the explanation and then --

22         THE COURT:  Well, let me just say you can have all

23    the -- people will go do things and they can have a valid

24    explanation.  That doesn't mean it's not a violation.  It only

25    means what your sanctions are going to be.

```
 1              MR. ZAHRALDDIN:  I understand.

 2              THE COURT:  I'm not -- and I don't want anybody to

 3   say that I'm finding that it was or wasn't or any of those

 4   things.  I'll hear the explanation and I'll, you know -- I've

 5   only heard one side.  I've only seen one document, one side

 6   documents, but just a caution people.  Proceed at your own

 7   risk.

 8              MR. ZAHRALDDIN:  Understood.

 9              THE COURT:  All right.

10              MR. CAPONI:  That's all the Debtor's have, Your

11   Honor.

12              THE COURT:  All right.  That concludes the matters

13   that are scheduled before the Court today.  Court is adjourned

14   until -- tomorrow is Tuesday, right?

15              MR. CAPONI:  Um-hum.

16              THE COURT:  10:30.

17              UNIDENTIFIED SPEAKER:  Yep.

18              THE COURT:  10:30.  Thank you.

19              MR. COLBY:  Thank you, Your Honor.

20              THE COURT:  All right.

21      (Proceedings adjourned)

22

23

24

25
```

C E R T I F I C A T E


      I hereby certify that the foregoing is a true and

correct transcript from the electronic sound recording of the

proceedings in the above-entitled matter.




*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader