**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*.[1] | Bankr. Case No. 23-10763 (AMC) (Jointly Administered) |
| The Debtors. | |

## DESIGNATION OF RECORD ON APPEAL AND
## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

Appellant, Visual Semiconductor ("VSI"), by and through his undersigned counsel,

designates the following items to be included in the record on appeal, pursuant to the *Notice of*

*Appeal and Statement of Election* dated December 4, 2024 [ECF No. 861], from the *Order (A)*

*Approving Bidding Procedures and Form of Asset Purchase Agreement in Connection with the*

*Sale of Substantially all of the Debtors' Assets, (B) Approving Procedures for the Assumption and*

*Assignment of Executory Contracts and Unexpired Leases, (C) Approving Procedures for*

*Selection of Stalking Horse Bidder and Bid Protections, and (D) Granting Related Relief* [ECF

No. 811] and sets forth his statement of issues to be presented on appeal:

## I.      Record on Appeal[2]

| | ECF DKT. NO. | DOCKET DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 750 | 09/30/24 | (Expedited) Motion of William A. Homony in His Capacity As Chapter 11 Trustee For (I) an Order (A) Approving the Bidding Procedures And Form Of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling a Sale By Auction, (C) Approving Procedures |

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] All items designated herein include all exhibits, filed with, attached to, or otherwise referenced in such pleadings.

| | | | for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G), and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
|---|---|---|---|
| 2. | 752 | 10/01/24 | Visual Semiconductor, Inc. Objection to the Expedited Consideration of Motion of William A. Homony In His Capacity As Chapter 11 Trustee For (I) An Order (A) Approving Bidding Procedures And Form Of Asset Purchase Agreement for the Sale of Substantially all of The Debtor's Assets Including Approval Of The Provisions For Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner Of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief |
| 3. | 754 | 10/02/24 | Order on Motion for Approval of Bid Procedure |
| 4. | 788 | 11/06/24 | Visual Semiconductor, Inc. Objection to Motion Of William A. Homony In His Capacity As Chapter 11 Trustee For (I) An Order (A) Approving Bidding Procedures And Form Of Asset Purchase Agreement For The Sale Of Substantially All Of The Debtor's Assets Including Approval Of The Provisions For Designation Of A Stalking Horse, (B) Establishing The Notice Procedures And Approving The Form And Manner Of Notice Thereof And Scheduling And Auction, (C) Approving Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Scheduling A Sale Hearing, (E) Granting Expedited Consideration Pursuant To Local Rule Of Bankruptcy Procedure 5070-1(G); And (F) Granting Related Relief, And (Ii) An Order Approving (A) The Sale |

2

| | | | |
|---|---|---|---|
| | | | Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto And (C) Granting Related Relief |
| 5. | 789 | 11/06/24 | Rembrandt 3d Holding Ltd.'s Objection to Motion Of William A. Homony In His Capacity As Chapter 11 Trustee For (I) An Order (A) Approving Bidding Procedures And Form Of Asset Purchase Agreement For The Sale Of Substantially All Of The Debtor's Assets Including Approval Of The Provisions For Designation Of A Stalking Horse, (B) Establishing The Notice Procedures And Approving The Form And Manner Of Notice Thereof And Scheduling And Auction, (C) Approving Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Scheduling A Sale Hearing, (E) Granting Expedited Consideration Pursuant To Local Rule Of Bankruptcy Procedure 5070-1(G); And (F) Granting Related Relief, And (Ii) An Order Approving (A) The Sale Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto And (C) Granting Related Relief |
| 6. | 795 | 11/11/24 | Praecipe To Substitute Exhibit "B" To Motion Of William A. Homony In His Capacity As Chapter 11 Trustee For (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling A Sale By Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G), and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment Of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
| 7. | **796** | **Transcript attached as Exh. A.** | **Transcript of Hearing re: Hearing held on November 7, 2024** |

79229957;1

| 8. | 801 | 11/12/24 | Hawk Investment Holdings Ltd.'s (1) Reply in Support of Motion Of William A. Homony In His Capacity As Chapter 11 Trustee For (I) An Order (A) Approving Bidding Procedures And Form Of Asset Purchase Agreement For The Sale Of Substantially All Of The Debtor's Assets Including Approval Of The Provisions For Designation Of A Stalking Horse, (B) Establishing The Notice Procedures And Approving The Form And Manner Of Notice Thereof And Scheduling And Auction, (C) Approving Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Scheduling A Sale Hearing, (E) Granting Expedited Consideration Pursuant To Local Rule Of Bankruptcy Procedure 5070-1(G); And (F) Granting Related Relief, And (Ii) An Order Approving (A) The Sale Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto And (C) Granting Related Relief |
| 9. | 803 | 11/13/24 | Praecipe to Substitute Exhibit "A" to Motion Of William A. Homony In His Capacity As Chapter 11 Trustee For (I) An Order (A) Approving Bidding Procedures And Form Of Asset Purchase Agreement For The Sale Of Substantially All Of The Debtor's Assets Including Approval Of The Provisions For Designation Of A Stalking Horse, (B) Establishing The Notice Procedures And Approving The Form And Manner Of Notice Thereof And Scheduling And Auction, (C) Approving Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Scheduling A Sale Hearing, (E) Granting Expedited Consideration Pursuant To Local Rule Of Bankruptcy Procedure 5070-1(G); And (F) Granting Related Relief, And (Ii) An Order Approving (A) The Sale Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto And (C) Granting Related Relief |
| 10. | **807** | **Transcript attached as Exh. B** | **Transcript of Hearing re: Hearing held on November 13, 2024** |

| 11. | 810 | 11/19/24 | Support Document Asset List of Stream and Technovative re 363 Sale |
| 12. | 811 | 11/20/24 | Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement in Connection with the Sale of Substantially all of the Debtors' Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Approving Procedures for Selection of Stalking Horse Bidder and Bid Protections, and (D) Granting Related Relief |

79229957;1

## II.    Statement of Issues on Appeal

1.    Whether the Bankruptcy Court erred in approving the bidding procedures without first determining, in an adversary proceeding, whether the assets made available for sale by the Trustee constitute property of the estate.

2.    Whether the Bankruptcy Court erred in approving the bidding procedures, without evidence or an evidentiary hearing, and finding the sale process and the Bidding Procedures were fair, reasonable, and appropriate under the circumstances and designed to maximize the value of the Assets, without evidence or an evidentiary hearing.

3.    Whether the Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that (i) the Stalking Horse Bidder is a Qualified Bidder, (ii) the Stalking Horse Bid is a Qualified Bid for all purposes, and (iii) the Stalking Horse Bidder is not an insider or affiliate of the Debtors with no common identity of incorporators, directors, or controlling stakeholders between the Stalking Horse and the Debtors.

4.    Whether the Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that the Bidding Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets.

5.    Whether the Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that the Asset Purchase Agreement was  negotiated in good faith and at arm's length between the parties and may serve as a reasonable and appropriate baseline for soliciting other bids for the Assets.

79229957;1

6.      Whether the Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that the Stalking Horse Bid represents the highest and best offer the Trustee received to date with respect to the Assets.

7.      Whether the Bankruptcy Court erred in finding that the Trustee shall have no personal liability for any obligations of the Debtors' estates without evidence or an evidentiary hearing.

8.      Whether the Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that the Trustee's purported list of Debtor Assets for sale through the 363 sale process was accurate, complete, and satisfactorily disclosed any encumbrances or other limitations associated with the Assets.

9.      Whether the Bankruptcy Court erred in requiring VSI and Rembrandt to annotate the Trustee's purported list of Debtor Assets for sale in order to satisfy the Trustee's disclosure obligations with respect to the Assets being made available for sale.

Dated: New York, New York
     December 18, 2024

**AKERMAN LLP**

By: ___*/s/R. Adam Swick*_____
     Donald N. David (SBN # 304846)
     1251 Avenue of the Americas, 37th Floor
     New York, NY 10020
     Telephone: (212) 880-3856
     Facsimile: (212) 880-8965
     Email: donald.david@akerman.com

     -and-

     R. Adam Swick (admitted *pro hac vice*)
     500 W. 5th Street, Suite 1210
     Austin, TX 78701
     Telephone: (737) 999-7100
     Facsimile: (512) 623-6701
     Email: adam.swick@akerman.com

79229957;1

-and-

John H. Thompson (admitted *pro hac vice*)
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Telephone: (202) 393-6222
Facsimile: (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Appellant Visual
Semiconductor Inc.*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : |
|  | : Case No.  23-10763 |
|  | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : ADV. No.  23-00057 |
| AND TECHNOVATIVE MEDIA, | : |
| INC. | : Philadelphia, Pennsylvania |
|  | : November 7, 2024 |
| Motion to Reconsider (related | : 11:14 a.m. |
| Documents Order on Motion to | : |
| Approve Compromise under Rule | : |
| 9019) Filed by Visual | : |
| Semiconductor, Inc. Represented | : |
| by Donald N. David (Counsel) | : |
|  | : |
| . . . . . . . . . . . . . . . . : |  |

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Trustee:              Michael D. Vagnoni, Esq.
                              Obermayer Rebmann Maxwell &
                              Hippel LLP
                              Centre Square West
                              1500 Market Street, Suite 3400
                              Philadelphia, PA 19102
                              215-665-3066

                              Steven M. Coren, Esq.
                              Kaufman Coren & Ress, P.C.
                              Two Commerce Square
                              Suite 3900
                              2001 Market Street
                              Philadelphia, PA 19103-2713

For Rembrandt:                Andrew Peter Demarco
                              Devlin Law Firm, LLC
                              1526 Gilpin Avenue
                              Wilmington, DE 19806
                              302-449-9010

                              Chris Michaels

<u>APPEARANCES</u> (Continued):

For VSI:                           John H. Thompson
                                   Akerman
                                   750 Ninth Street, N.W.
                                   Suite 750
                                   Washington, D.C. 20001
                                   202-393-6222

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

1   NOVEMBER 7, 2024                              10:00 A.M.

2           THE COURT:  Perfect timing, gentlemen.  Morning,

3   Steve.

4           MR. COREN:  Good morning.  How are you, Judge?

5           THE COURT:  I'm doing okay.  Hanging in.  Vagnoni?

6           MR. VAGNONI:  Good morning, Your Honor.

7           THE COURT:  Good morning.  All right.  Well Pam, it's

8   10:00.

9           THE CLERK:  Okay.  All right.  Today's Thursday,

10  November 7th, the 10:00 list.  The only matter on the list is

11  Stream TV Network's motion to reconsider the motion to approve

12  compromise filed by VSI.  Appearances please.

13          MR. VAGNONI:  Morning, Your Honor.  Michael Vagnoni

14  and Ed George on behalf of William Homony, the Chapter 11

15  Trustee.  Also with us today is Steve Coren, special counsel

16  for the Trustee.

17          MR. COREN:  Right.

18          THE COURT:  Okay.

19          MR. THOMPSON:  Good morning, Your Honor.  John

20  Thompson of Akerman LLP on behalf of VSI.  Morning.

21          THE COURT:  All right.  Well maybe no one else wants

22  to make their appearance known.

23          MR. DEMARCO:  Good morning, Your Honor.  This is

24  Andrew DeMarco with Devlin Law Firm here for Rembrandt.

25          THE COURT:  Okay.  All right.  Drive safely.

1          MR. DEMARCO:  Oh, I'm parked, Your Honor.

2          THE COURT:  Okay.  All right.  Okay.  All right.

3    Well, if no one else wants to enter their appearance.  I have

4    read all of the briefs, and I guess I just wanted to see if

5    there were any additional arguments that were different than

6    the arguments already set forth in the briefs.  So if you do,

7    I'd like to hear them.

8          MR. THOMPSON:  Your Honor, I would like to make a

9    presentation if I may, right?  We've asked for a consideration

10   for some important and very fundamental reasons.  In short, we

11   believe that the Court should reconsider the 9019 settlement

12   agreement because it is fatally flawed.  There are a number of

13   points of new information that the Court was not privy to in

14   making its decision to enter the order approving the 9019

15   settlement agreement.  And therefore, we think that it, again,

16   is flawed for a number of reasons.

17         The first is that the Trustee didn't complete his

18   assignment as issued to him through the Court's appointment

19   order.  And as a result, the Hawk party's claims and the

20   conversion of their notes were never truly investigated or

21   vetted by the Trustee despite protestations to the contrary.

22         Accordingly, the allowance of the secured claim in

23   the amount of $180 million, $150 million of that being

24   permitted to a credit bid is patently unreasonable in our view.

25         As set forth in greater detail in our objection, the

1  Trustee's settlement to the sale motion, the Trustee's

2  settlement agreement sets up a framework for sale process

3  that's both unworkable from a legal and practical perspective

4  and unfair to all stakeholders, including potential competing

5  bidders and unsecured creditors because it establishes an

6  unlevel playing field that advantages the Hawk parties, the

7  stalking horse, to the detriment of all others.

8         Finally, the 9019 settlement agreement failed to

9  negotiate and provide a fiduciary out to permit the

10  consideration of any debtor deal that might arise after the

11  entry of disagreement with the Hawk parties. Specifically,

12  better deals that would ensure administrative solvency for the

13  estates, achieve meaningfully better recoveries for all

14  creditors, including unsecured creditors.  And we've seen the

15  negative fallout from the failure to secure such a fiduciary

16  out time and time again in this case, even if the Court has

17  not. As Trustees similarly rejected reasonable and considerably

18  better offers after offers in favor of some blind lot loyalty

19  to Hawk's outcome and the 9019 settlement.

20         Those aren't just VSI offers to be clear, Your Honor.

21  Those are offers coming from multiple parties and interests in

22  the case.  The bottom line is the Trustee is unwilling or

23  unable to take yes for an answer and achieve a better result

24  for the Debtor's estates and a better recovery for creditors of

25  those estates based upon the unreasonable and unwavering

1    allegiance to this 9019 settlement agreement.

2           That's never made any -- and that settlement

3    agreement has never made any sense, but it's definitely one

4    that does not make sense now in wake of the multiple offers and

5    compromise that would improve outcomes for all parties and do

6    so in a fair way.

7           Accordingly, we believe that the Court should grant

8    our motion to reconsider, vacate its prior order approving the

9    9019 settlement.  Your Honor, I'll take your questions if you

10   have any.

11          THE CLERK:  Judge, you're on mute.

12          THE COURT:  I'm sorry about that.  I don't have any

13   questions, but thank you, Mr. Thompson.

14          MR. THOMPSON:  Thank you.

15          THE COURT:  Mr. Vagnoni, Mr. Coren, you're welcome to

16   respond but you don't have it.  It's totally up to you.

17          MR. VAGNONI:  Your Honor, Michael Vagnoni on behalf

18   of the Trustee.  I'll keep it simple.  This is a situation

19   where the Trustee was given a mandate by the bankruptcy court.

20   I know counsel with VSI just indicated without any evidence

21   that the Trustee didn't fulfill his function.  We disagree

22   wholeheartedly.  We -- since the beginning of this case, I

23   think Your Honor is well aware that not only did the Court

24   appoint a Trustee, but the Court also granted relief from the

25   automatic stay to Hawk to go forward with the 225 action, which

1  they attempted to do.

2          He gave the Court -- the Trustee, a very short

3  timeframe.  During which time the Trustee met with all of the

4  parties who were at play here, met with VSI, or the Debtor.  We

5  couldn't really tell which.  But with Mr. Rajan's group on

6  multiple occasions.  Met with Hawk.  Met with SeeCubic, Inc.

7  And met with Rembrandt.  And the result of those meetings and

8  the shortened timeframe that we had to operate in and extensive

9  -- and this speaks a little bit to the conversion issue that

10  Mr. Thompson alluded to.  Met with the Debtor's chancery court

11  attorney, Andy Dupre, at McCarty & English who now is at

12  Akerman.

13          And we're left with the very clear impression and

14  opinion that the 225 action was careless at best, and could

15  result in and would likely result in the estate having no

16  assets for unsecured creditors.

17          Because of that, Your Honor, the Trustee entered into

18  a settlement agreement with Hawk that would guarantee money

19  into the estate, and would get, our hope is, money to unsecured

20  creditors.  The multiple offers that Mr. Thompson alluded to --

21  again, I'm not sure what offers he's talking about, but we have

22  spent time with VSI to vet the proposals that they would like

23  to make and have found them to be lacking in evidentiary

24  support.  And the Trustee has chosen to move forward with the

25  Hawk settlement.

1          The Court evaluated that settlement at the 9019

2    hearing.  Found that the Trustee met all the Martin factors,

3    and approved the settlement.  We don't believe that VSI has

4    established grounds for this Court to reconsider to the extent

5    that 8008 would permit that.  And we believe that the motion

6    should be denied in its entirety.

7          THE COURT:  Okay.  Thank you, Mr. Vagnoni.

8          MR. VAGNONI:  Mr. George, I think that you're not on

9    mute, so when you're not on mute, we hear all of your email

10   rings, your phone calls.

11         THE COURT:  Okay, good.  All right.  Thanks, Mr.

12   George.  All right.  Mr. Coren, did you want to add anything to

13   that?

14         MR. COREN:  Yes.  I would just briefly, Your Honor.

15   Because the notion that we didn't do our due diligence or

16   investigation is preposterous.  I was hired to do just that.

17   And in fact, I participated in some of those meetings, reviewed

18   lots of the documents, interviewed the Debtor's counsel in the

19   225 action at length.  Looked at the materials from that case.

20   And I rendered a judgment and an opinion and gave advice, which

21   I will only talk of at the highest level to the Trustee.

22         And I wholeheartedly, given that analysis and my

23   experience and my review, concluded that this settlement was in

24   the best interest of the estate.  Wholeheartedly support that

25   there were serious risks as Mr. Vagnoni points out, which if

1   they didn't go well for the estate, would have resulted in the

2   estate having nothing.  I viewed those risks as real, and we

3   did an analysis of them, and I cancelled the trustee

4   accordingly.  And I did weigh in and participate in looking at

5   what are referred to as subsequent offers that -- in the

6   judgment of Mr. Thompson or his client he thinks are better to

7   the estate.  And I counseled along with bankruptcy counsel, the

8   Trustee.  And in my view to the extent that I looked at the

9   support for them, much of them was a illusory much like that,

10  which was present to Judge Coleman and she wholeheartedly

11  rejected it.

12          So I support the settlement.  I counseled the Trustee

13  accordingly as bankruptcy counsel.  And reject wholeheartedly

14  the notion that he did not perform his functions under the

15  bankruptcy code and the mandate.  He did precisely that as did

16  his professionals.  Thank you.

17          THE COURT:  Thanks, Mr. Coren.  Okay.  Well, I'm

18  going to take the matter under advisement.  I hope to have out

19  an opinion and order on this I hope in the next week or so.  So

20  you'll see that soon, all right.  Thank you all for your

21  presentation today and I'll talk to you guys soon.

22          MR. THOMPSON:  Your Honor, before -- I think you

23  indicated at the last hearing last week that you would rule

24  with respect to the motion to quash.

25          THE COURT:  Yeah.

1          MR. THOMPSON:  With a specific request, with a

2   specific regard to the sale and the procedures order.

3          THE COURT:  Yes.  And so, that will be part of the

4   opinion and order, my ruling on the discovery.

5          MR. THOMPSON:  Will be part of your consideration to

6   -- of the reconsideration motion?

7          THE COURT:  So I'm going to rule on the motion for

8   reconsideration.  And I'm also going to rule on the discovery

9   in connection with the reconsideration. But there is also

10  outstanding discovery regarding the bid procedures and things

11  like that.  So I'm going to just rule on the discovery with

12  regard to the motion for reconsideration topic.

13         MR. THOMPSON:  Okay.  But the sale topic is different

14  from the reconsideration topic, Your Honor, with respect to

15  discovery.

16         THE COURT:  Yes, absolutely.

17         MR. THOMPSON:  Right.

18         THE COURT:  So there's, you know, there were three

19  topics for discovery.  One I've already ruled on, right?

20         MR. THOMPSON:  Correct.

21         THE COURT:  And now there's the discovery in

22  connection with today's hearing.  And then there's also

23  discovery in connection with the bid procedure motion.

24         MR. THOMPSON:  Yes, Your Honor.  The bid procedure

25  motion, of course, is going forward on the 13th.  And the

1   question is whether we will get an opportunity to have the

2   discovery, in particular the deposition discovery, that we

3   asked for and need in advance of that hearing.  For the reasons

4   we set forth in our objection filed last night, it's pretty

5   critical.  And I would hope that the Court would see the need

6   to have that discovery done in advance of the hearing as it's

7   only really helpful I would think to Your Honor before the

8   hearing.

9       (Telephone ringing)

10       THE COURT:  Mr. Thompson, are you having technical

11  difficulties there?

12       MR. THOMPSON:  I'm trying to decline the call, Your

13  Honor.

14       THE COURT:  That's okay.

15       MR. VAGNONI:  Your Honor, it remains the Trustee's

16  position that that discovery on a procedures motion is not

17  appropriate under the circumstances and is once again designed

18  to delay these proceedings, which the Trustee hopes to wrap up

19  as soon as possible.

20       MR. THOMPSON:  Your Honor, I reject that contention

21  in the main, right?  We're not doing anything to delay this

22  process.  It's actually quite to the contrary.  We've asked

23  that the Trustee for some time now respect to discovery on

24  these topics, all of which we think go to the Trustee's

25  inability to sell these assets as set forth in our sale

1  objection.

2       And we frankly think that the issues raised are of

3  pretty monumental importance to the case at large.  And the

4  idea that nobody would be able to cross-examine this Trustee

5  about his judgment and his understanding of the assets that he

6  purports to want to sell through a 363 sale.  It's just so

7  quite exceptional.  I don't see that as merely a process issue,

8  and I would hope that the Court does not have.

9       MR. DEMARCO:  Your Honor, if I may very briefly?

10      THE COURT:  Yeah, Mr. DeMarco?

11      MR. DEMARCO:  Yes.  Hi.  I just wanted to note that

12  we agree, that Rembrandt agrees and joins with the request for

13  that discovery as we filed in our objection and as Mr. Thompson

14  noted.  And if Your Honor wishes to hear more about our

15  position, we are happy to discuss as well.  But I wanted to

16  note that we join for the same reasons.

17      THE COURT:  Okay.  Thank you, Mr. DeMarco.  I mean,

18  I'll be candid with both you and Mr. Thompson.  I'm not

19  persuaded by your motion for reconsideration.  And in all of my

20  years of practice, I have never once seen discovery requested

21  in connection with a motion for bid procedure.  I've just never

22  seen it.  Given the fact that this Trustee was appointed by

23  Judge Coleman and was clearly, in my opinion, the most

24  objective party here, they've got no skin in the game.  They

25  just want to make the right calls.  It's just a really high

1   burden for VSI and Rembrandt to overcome. While I appreciate

2   your zealous advocacy, you know, I am inclined to deny the

3   motion for reconsideration and deny the discovery in connection

4   with that and the bid procedure motion.

5           MR. THOMPSON:  The bid procedure and sale motion,

6   right, Your Honor? I mean, so the sale -- there's no discovery

7   in connect with the sale.

8           THE COURT:  At this point, I mean, you know, I'll put

9   together an order.  But at this point, I just -- I've never

10  seen -- I've never even seen a request.

11          MR. THOMPSON:  Your Honor, I would just direct your

12  attention to the cases that were cited in our objection, which

13  are manifold.  And all of them involve --

14          THE COURT:  I'm not saying it's never done.  But Mr.

15  Thompson, you have to understand that you've come into this

16  case relatively recently, and the parties have been around.

17  And I've seen some of the actions that they've taken.  Not on

18  your watch.  And that has affected my view of your client.

19          And like I said, you know, all of those cases that

20  you may have cited, I think that their facts are probably quite

21  different than the facts that I have before me, which is that

22  I've got a Trustee, right?  I mean, the appointment of a

23  Chapter 11 Trustee.  It's a very extraordinary event.  I've

24  only done it once in my career.  And when you do it, you do it

25  because you absolutely have to do it.  Because you're balancing

1   the interests of having a completely independent person, you

2   know, making these calls.

3        So given that extraordinary event, you know, I'm

4   going to give the Trustee a great deal of deference.  I just

5   am, okay?

6        MR. MICHAELS:  Your Honor, this is Chris Michaels for

7   Rembrandt.

8        THE COURT:  Yes.

9        MR. MICHAELS:  This -- I appreciate your comments

10  about this being an extraordinary case.

11       THE COURT:  Yeah.

12       MR. MICHAELS:  I have been involved from the very

13  beginning.  Rembrandt has been litigating its intellectual

14  property disputes.  Thought it had settled those.  All parties

15  in this matter, Chadron Stastney, Matthew Rajan, all signed off

16  on a settlement agreement saying, yes.  Our trade secrets have

17  been included in Ultra-D.  Our patents cover the products are

18  being sold.  And the Trustee is moving forward planning to sell

19  our technology, right?  I mean, we -- our question is very

20  simple, right?  Have you removed Rembrandt's technology from

21  the very assets that are trying to be sold?  If the answer is

22  yes, let's figure that out.  We've offered numerous times to do

23  that in an expedited and effectual way, to no avail.  And we

24  have asked if they're not in there, what are you doing with

25  respect to assumption or rejection of our license, to no

1    definitive answer.

2         And we are now saying, we now see from the Trustee's

3    papers that SSG is offering assets for sale.  That is patent

4    infringement under section 271.  If, and only if, they are not

5    covered by the license we issued Stream.  And this is -- this

6    should be basic question.  Are you assuming our license?  Are

7    they covered or are they committing patent infringement?

8    Absent any discovery, absent any assumption or rejection of our

9    license, we are left to go litigate a patent infringement case

10   against SSG because they're the ones that are actively

11   offering. All of the employees at SSG that are doing that are

12   likewise guilty of patent infringement.

13        And unless, of course, the Trustee has assumed

14   Rembrandt's license, then they're covered by the license.

15   These are basic questions that should be answers.  And I don't

16   under -- I've never been involved in a case where a trustee or

17   debtor in possession didn't answer them.  So I appreciate that

18   this is a very unique situation, but it's also simply resolved,

19   right?  From our perspective, the Trustee could provide basic

20   information that would move this case forward and tell us

21   whether or not we need to file additional litigation or not.

22        But, you know, we're not new to raising these

23   concerns, right?  I mean, there is a settlement agreement.

24   We've been -- we are part of the TRO mentioned directly.  And

25   so, I think that our request for these basic things are things

1  that can certainly be resolved in a week or two.  I mean, they

2  can decide.  I mean, are you assuming it or are you rejecting

3  the license?  That's a one sentence answer.  You know, is that

4  -- so we think the request for discovery is reasonable in this

5  context, especially how many issues that it can resolve.  I

6  can't image there's going to be any bidders, save the stalking

7  horse bidder, they're going to come in and walk themselves into

8  all these IP disputes.

9         And, you know, Rembrandts here.  But, I mean, forget

10  Rembrandt.  I mean, Phillips has 1,500 plus patents at issue,

11  most of which they've sold off to Leia that is actively trying

12  to license those out. I mean, companies don't walk into almost

13  certain patent infringement cases with companies like Phillips

14  to enforce, right?  This is, this is absolutely guaranteed to

15  this ambiguity in what the assets are and whether or not they

16  need licenses or have licenses from Phillips and Rembrandt is a

17  virtual certainty that anybody is going to either not bid or

18  just walk away from this.  This is designed for failure.

19         And quite frankly, we talked about the concern about

20  an action in chancery court to determine whether or not some

21  debt was owed.  And that's a trivial expense for litigation.

22  Patent infringement costs the average for a case of this size

23  is somewhere between 7 and $15 million dollars.  Where is the

24  estate going to get the money to defend, right?  I mean, it's

25  going to render this estate with almost absolute certainty

```
 1   administratively insolvent as soon as Rembrandt acts.  And

 2   we're all on -- all of Rembrandt's attorneys by the way are on

 3   contingency fee, and originally signed on for a patent

 4   infringement action.  So it's not like Rembrandt doesn't have

 5   counsel that's going to enforce.  But I don't see that the

 6   estate has prepared itself for litigation in multiple

 7   jurisdictions, right?

 8            So I -- with respect, I think this is a unique

 9   situation that has potentially unique issues that would warrant

10   this basic discovery.

11            THE COURT:  Okay.

12            MR. VAGNONI:  Your Honor, I'm not sure what role Mr.

13   Michaels or Mr. DeMarco play in VSI's motion for

14   reconsideration.  They -- there were a number of misstates made

15   by Mr. Michaels just now that I can address.  The -- you know,

16   the issue of the settlement agreement, I don't -- I don't think

17   I know which one he's talking about because the one I know Chad

18   Stasney did not sign and was not a party to.

19            The issue of all the patent infringement claims he

20   allegedly has would only be an issue if the Debtor had sold

21   TVs, which it clearly hasn't.  There are no operations in the

22   Debtor.  What the Debtor is selling is its assets, including

23   interests in foreign subsidiaries that have technology.  And

24   there -- we don't know of any technology that Rembrandt has

25   sold or that Rembrandt has in that technology nor are we
```

```
 1  selling that technology.  We're selling the subsidiary.

 2          That being said, there is little or no evidence, I

 3  would say no evidence for the vast majority of what Mr.

 4  Michaels just said. We're here on a 9019 hearing, and I don't

 5  know what his comments lend to that.

 6          MR. THOMPSON:  Your Honor, I must respond to what Mr.

 7  Vagnoni just said.  In that, first of all, we're actually

 8  talking about what this Court asked to be placed at the end of

 9  this hearing.  So I don't think it's about the 9019

10  reconsideration.  But rather with the respect to discovery

11  related to the sale and bid procedures motion filed by this

12  Trustee.

13          THE COURT:  I agree.  Mr. Vagnoni, they're talking

14  about, you know, he -- Mr. Thompson had invited me to comment

15  on the discovery related to the procedures motion --

16          MR. VAGNONI:  Understood.

17          THE COURT:  -- that's coming up.  So I think that

18  they're kind of highlighting issues and obstacles that they

19  believe that the Trustee faces in connection with that, and why

20  they think it's, you know, I should grant some discovery.  So I

21  think that's really what the focus was of Mr. Michaels.

22          MR. THOMPSON:  That's right, Your Honor.  And I think

23  it's important to note based upon what Mr. Vagnoni just said.

24  We have no contentions about what the Trustee is selling or is

25  not selling.  I wish the Trustee knew what he is selling.  I
```

1  wish his advisors knew what they were selling.  I don't believe

2  they do.  And as set forth in our objection pretty clearly, and

3  as had been made clear on the record on June 5th, the Trustee

4  does not understand these assets.  He does not understand the

5  implications, let alone the encumbrances upon some of these

6  assets, including the rights that Rembrandt has just raised.

7          And so, if they -- if the Trustee did, we would be

8  having a different discussion right now.  But he doesn't, and

9  his advisors don't.  And that's important.

10          MR. VAGNONI:  Pretty clearly as to what the Trustee

11 is selling.

12          THE COURT:  All right.  Well, I mean, I think what

13 I'm hearing them say, Mr. Vagnoni, is that they don't think you

14 know what you're selling.  But do you know what you're selling

15 as part of this motion?

16          MR. VAGNONI:  As part of the --

17          THE COURT:  The motion for the bid procedures.

18          MR. VAGNONI:  Absolutely.  The Trustee is selling all

19 of the assets of the Debtors, including their equitable rights

20 in the foreign subsidiaries that they -- that they have.  That

21 is what they're selling.

22          MR. THOMPSON:  Are they selling the right to license?

23          MR. VAGNONI:  I'm not -- I don't think I'm on the

24 stand here.  And I don't think that -- no.  The Trustee is not

25 selling a license.

1           MR. THOMPSON:  Okay.  Well, that's what it says in

2    SSTs teaser.

3           MR. VAGNONI:  I don't believe so.  And again, we're

4    not here on that today.

5           MR. THOMPSON:  Well, that's why we need discovery is

6    what I would argue, Your Honor.  Because it says very clearly

7    in the SSG teaser that what the Trustee is purporting to sell

8    are the capabilities to license the so-called Ultra-D

9    technology, which incorporates other people's IP, including,

10   but not limited to Rembrandts.  And that's why we think it

11   destroys value. And that's why we think the Trustee doesn't

12   understand what its selling.  And that's why we think we need

13   discovery.

14          MR. MICHAELS:  Your Honor, with respect to the teaser

15   that it was put out, it references the very Phillips license

16   that specifically prohibits a transfer under a change of

17   control provision, right?  There's huge numbers of patents that

18   we have sent the Trustee as part of our discussions and we

19   filed it with our papers a list of assets that we needed to

20   understand the status of that had been licensed from Phillips.

21   A blue box software for example.  I mean, there's a huge

22   laundry list of assets that were provided by Phillips that were

23   used to create and are used to implement the Ultra-D

24   technology.  Are those included or not?  Are those -- those are

25   -- if they're not included by the way, you can't be using

1    Rembrandt's technology because ours is reliant on that -- those

2    software and that no how and that technology.

3            So if we answered that question, right, that they

4    have put front and center in their marketing piece, we would

5    know whether or not Rembrandt's technology is included.

6    Because if it's not, if they're not using the Phillips

7    technology, they're not, we're not involved, right?  We back

8    right off.  They get rid of us.  We are not making any motions.

9    So these are basic, basic, factual pieces of information that

10   are -- they have made front and center.  I mean, we certainly

11   have been raising them for years.  But they've said right in

12   their paper, in their marketing materials, that this is subject

13   to a Phillips license.

14           THE COURT:  Mr. Michaels, thank you for that.  So Mr.

15   Vagnoni, I guess what I'm hearing Mr. Thompson and Mr. Michaels

16   saying is they want to drill down into the weeds, understand

17   exactly what is being sold so that they understand what's

18   happening and if there's going to be future litigation.  And

19   so, they seem confused about that.  I think it's certainly fair

20   for them to understand exactly what is being sold.  I myself

21   haven't got into the weeds about the schedules in terms of

22   exactly what's being sold.  But I think that that's certainly

23   something that they need to know.

24           And I'm not going to put you on the spot here today,

25   but certainly I'd like them to understand exactly what's being

 1   sold so that they can take whatever litigation positions that

 2   are necessary and then they can make arguments to me.  But it

 3   sounds like they don't know that.  And it sounds like you might

 4   not want to be in the position to answer that, but I think it's

 5   a fair request to understand what's being sold as part of this

 6   sale.

 7          So I'm going to rule on the motion for

 8   reconsideration and the discovery related to that.  I'm going

 9   to urge Mr. Vagnoni to get back to Mr. Thompson and Mr.

10   Michaels about exactly what's, you know, what's being sold.

11   And then my hope is that when we meet again that Mr. Thompson

12   and Mr. Michaels will report to me that they know what's being

13   sold, and that they can raise whatever issues come up as a

14   results of that.  And then the Court will address it then,

15   okay?

16       (Proceedings adjourned at 10:30 p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

      I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                              :
IN RE:                        : Case No.  23-10763
                              :
STREAM TV NETWORKS, INC.   CH: 11 :
AND TECHNOVATIVE MEDIA,       :
INC.                          : Philadelphia, Pennsylvania
                              : November 13, 2024
                              : 11:00 a.m.
. . . . . . . . . . . . . . . :
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For SeeCubic, Inc.: | Marley Brumme, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010<br><br>Christopher Michaels |
| For SSG Capital Advisors: | Samuel Charlton |
| For VSI: | John H. Thompson<br>Akerman<br>750 Ninth Street, N.W.<br>Suite 750<br>Washington, D.C. 20001<br>202-393-6222 |
| For Hawk Investment Holdings Ltd.: | Steven Caponi, Esq.<br>Margaret Westbrook, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |

```
                                    Jonathan N. Edel, Esq.
                                    300 South Tryon St., Suite 1000
                                    Charlotte, NC 28202

For the Trustee:                    Michael D. Vagnoni, Esq.
                                    Obermayer Rebmann Maxwell &
                                    Hippel LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia, PA 19102
                                    215-665-3066

                                    Steven M. Coren, Esq.
                                    Kaufman Coren & Ress, P.C.
                                    Two Commerce Square
                                    Suite 3900
                                    2001 Market Street
                                    Philadelphia, PA 19103-2713
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 13, 2024                            11:00 A.M.

 2            THE COURT:  Okay.  Is there anyone else on the phone

 3   who is here for a case other than Stream TV?  Okay.  Thank you.

 4            Party who just joined the call, the last four digits

 5   6443.  Could you identify -- I'm sorry, 6643, could you

 6   identify yourself, please?

 7            MR. CHARLTON:  Yes.  Samuel Charlton with SSG Capital

 8   Advisers.

 9            THE CLERK:  Yes, with the last four digits 4063.  Can

10   I have your last name, please?

11            All rise.

12            THE COURT:  Morning.  Please be seated.  Court is now

13   in session.  All right.  This is the call on the 11:00 list.

14   The only matter remaining on the list is number 23, Stream TV

15   Networks and we have several parties on the phone and in the

16   courtroom.

17            Do you want to start with the people in the

18   courtroom, first?

19            UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah, let's start

20   with the people in the courtroom.

21            THE COURT:  Okay.  We're going to start with the

22   people in the courtroom and get everyone's appearances.

23            Appearances, please, on Stream TV.

24            UNIDENTIFIED SPEAKER:  Come sit at the table.

25   Welcome.
```

1          MR. THOMPSON:  Morning, Your Honor.  John Thompson of

2    Akerman on behalf of VSI and with me today is my colleague Adam

3    Swick and retired Judge Nick Clark from the Western District of

4    Texas.

5          THE COURT:  Welcome.

6          MR. CLARK:  Morning, Your Honor.

7          THE COURT:  It's good to see you.

8          MR. CLARK:  Thank you.

9          MR. DEMARCO:  Good morning, Your Honor.  This is

10   Andrew DeMarco from Devlin Law Firm here representing

11   Rembrandt.  Also here with me is Christopher Michaels from

12   Brown and Michaels who will be handling any argument today.

13         THE COURT:  Welcome.

14         MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

15   from K&L Gates on behalf of Hawk.

16         THE COURT:  Okay.

17         MS. BRUMME:  Good morning, Your Honor.  Marley Ann

18   Brumme of Skadden Arps on behalf of SeeCubic.

19         THE COURT:  Okay.  Great.  I thought you guys were

20   going on the phone.  You're going to be outnumbered.

21         MR. CAPONI:  Yeah.

22         THE COURT:  No, you're here.  Okay.  All right.

23   We're just entering appearance, so come on up and say hello.

24         MR. VAGNONI:  Good morning, Your Honor.  Michael

25   Vagnoni on behalf of Bill Homony, Chapter 11 Trustee.  I have

```
 1   with me Ed George and Steve Coran from Coran and Ress.

 2              THE COURT:  Okay.

 3              MR. CORAN:  Morning.

 4              THE COURT:  Good morning.  All right.  How about the

 5   people on the phone?  Did you want to note your appearance if

 6   there's anywhere there?

 7              Do we have anyone?

 8              UNIDENTIFIED SPEAKER:  Yeah.  Yeah.

 9              THE COURT:  We do?  The parties on the line, if every

10   -- if you could each speak one at a time and tell us who you're

11   here for on Stream TV and enter your appearances, please.

12              MR. EDEL:  This is Jonathan Edel from K&L Gates on

13   behalf of Hawk Investment Holdings.

14              THE COURT:  Okay.  Anyone else or you think that's

15   it?

16              UNIDENTIFIED SPEAKER:  They might just be observing.

17              THE COURT:  Okay.  Fine.

18              All right.  Well, welcome back, everybody.  I know

19   we're here on the reconsideration, which I will -- I guess I

20   just wanted to address the discovery issue.  So the last time

21   we were talking on the phone, you guys had raised an issue

22   about the assets that were being sold and you had concerns

23   about whether there were licenses and I think Mr. Vagnoni, I

24   was giving you a week to try to clarify for them what assets

25   were going to be sold.
```

1              So have you had any productive conversations

2   hopefully with them?

3              MR. VAGNONI:  Your Honor, we took your direction from

4   the last hearing, and we provided both VSI, accounts for VSI

5   and accounts with Rembrandt.  A fairly exhausted list of what

6   the assets are.  Not just the assets that we are -- that the

7   Trustee is selling, but the assets that are embedded in the

8   downstream subsidiaries whose equity we are selling as well.

9              That, I think, would have satisfied the Court's

10  concern in that regard.  I have a copy of what we sent.  I

11  didn't bring multiple copies.  It's very thick.  But we did

12  provide that.  We did also receive a email on Friday of last

13  week asking for a meet and confer to discuss what discovery

14  would be taking place.

15             We did not engage in that meet and confer.  We didn't

16  take your comments last week as we thought everything was

17  quashed to that point based on your ruling.  So we did not meet

18  and confer.  We were preparing for the hearing.  But we -- and

19  we did not engage in any discovery again, because we thought

20  the discovery request had been quashed by Your Honor.

21             But again, we did provide them with a listing --

22             THE COURT:  Okay.  Well, let me --

23             MR. VAGNONI:  -- on the --

24             THE COURT:  -- see if they feel like they have a

25  better understanding.

1    So do you gentlemen have a better understanding of

2    exactly what's being sold?

3    MR. MICHAELS:  We have no better understanding.  Most

4    simply, are they accepting -- assuming, rejecting saying that

5    the Rembrandt contract is invalid, valid?  What is their

6    position?  Where is our IP?  Have they removed it?

7    They're disclosure, this voluminous thing they

8    described has a single sentence that says, "software," right?

9    There's no discussion of -- we have asked over and over again,

10   are you in control of the software professional development

11   system?  I.E., do you have the username and password?  No

12   response.

13   THE COURT:  Uh-huh.

14   MR. MICHAELS:  We have no idea what they have.  More

15   so, we're the ones that have provided a far more extensive list

16   of what assets we believe could be in that estate and we've

17   told them what documents we're relying upon and asked them,

18   what is the status of each of these individuals assets?  No

19   response.

20   THE COURT:  Okay.  So --

21   MR. MICHAELS:  We are no more clear than we have --

22   THE COURT:  -- I've been with you guys up until this

23   point.  But now, you know, they've got some serious concerns.

24   You know, their belief is that the sale of the asset is going

25   to violate all of these rights.  It's going to spawn all of

 1   this litigation about the licenses, right?  That's their

 2   concern.

 3           And I'm willing to consider a sale of this, but at

 4   the very basic level, we need to understand exactly what is

 5   being sold, right?  And it sounds like today they don't know.

 6           So he just said that you said it's software.  Do you

 7   have something more specific than just the word software in

 8   terms of this being sold?

 9           MR. VAGNONI:  There was -- Your Honor, first of all,

10   let me just address a couple of things that Mr. Michaels said.

11   I think he indicated once again to the Court that he hasn't

12   been made aware of whether or not the sale will include an

13   assumption and assignment of the Rembrandt license.

14           Paragraph 27 of our motion clearly indicates that

15   that license is not part of the sale transaction.  It is not

16   going to be acquired by the stock and horse purchaser.

17   However, if there is a competitive bid, a bid that is a

18   superior bid to the stock and horse bid that wants the

19   Rembrandt license, absolutely we would entertain an assumption.

20   There would have to be discussion about what --

21           THE COURT:  Okay.  So let's -- what we're going to do

22   today, just so I have an idea, we're just going to take this

23   issue by issue.  So you're saying that the license is not part

24   of the sale --

25           MR. VAGNONI:  That's correct.

```
 1              THE COURT:  -- but you would contemplate bids on it.
 2    I'm not sure how you'd write that into the bid procedure, but
 3    we can talk about that in a minute.
 4              So what's your response to that?
 5              MR. MICHAELS:  It's not an assignable license.  It's
 6    not their option to decide to sell it or not.  That's -- and
 7    neither is the Phillips license.  It is -- we have -- we did
 8    not need Mr. Vagnoni to explain to us whether or not our
 9    license was assignable.  It is absolutely note and all the case
10    law is --
11              THE COURT:  Okay.  Well --
12              MR. MICHAELS:  -- if I don't mind?
13              THE COURT:  Yeah.
14              MR. MICHAELS:  Our issue isn't that the contract is
15    -- that they're attempting to assign it.  They are clear
16    they're not attempting to assign the contract.  It's the
17    intellectual property that is the basis of that.  I mean,
18    saying I'm not handing you a piece of the car, the car title
19    is, you know, that -- but I'm going to hand them the keys to
20    the Lamborghini.  I mean, we're concerned about the keys and
21    the Lamborghini, not the piece of paper that says we own it.
22    We already have that.  I don't need them to tell me we have
23    that.
24              THE COURT:  Yeah.  Yeah, yeah.
25              MR. THOMPSON:  Your Honor, if I might add?
```

```
 1              THE COURT:  Yeah.

 2              MR. THOMPSON:  There's a real problem with the bid

 3   procedures in addition to those that Mr. Michaels rose --

 4   raised.  In this circumstance, Mr. Vagnoni has just told the

 5   Court as his email to us told us that they are, I guess,

 6   excluding the asset that is the Rembrandt license.  The reasons

 7   you just heard.  It doesn't matter whether they wanted to

 8   assume it and assign it, they could not.

 9              But in this circumstance, right, they're suggesting

10   that some other party out there might come in and bid for it.

11   Well, how do we have a bid process where --

12              THE COURT:  Yeah, yeah.  Okay.

13              MR. THOMPSON:  -- some other parties actually

14   consider --

15              THE COURT:  Well, tell me this.  If he -- if we have

16   -- let's say we have the bid, we had the auction, right, and

17   Hawk's the only one that shows up and under their purchase

18   agreement, they're not going to get it.  Then does that take

19   care of your issue entirely because --

20              MR. MICHAELS:  Not in any way, Your Honor.  I mean,

21   we have listed out a huge number of trade secrets.  We have a

22   bunch of patents.  The very assets that they have listed where

23   they've talked about TV's, prototypes, demos, those are all --

24   were all alleged back in 2017 to have been covered by

25   Rembrandt --
```

```
 1              THE COURT:  All right.  So let me just, like -- I'm
 2    sorry.  Let me just be more specific.  So I want to take it
 3    issue by issue.
 4              MR. MICHAELS:  Uh-huh.
 5              THE COURT:  So at least I understand.  So he had
 6    thrown out this comment that he's not attending to sell certain
 7    licenses unless someone else bids for it.  So with regard to
 8    those licenses, if there's no other bidder and the stocking
 9    horse gets it, Hawk gets it, then with regard to that license,
10    then I think we're all in agreement that the license isn't
11    being sold at all, right?
12              So I think you wouldn't have an issue if there's no
13    stocking horse -- if it's just a stocking horse bidder and
14    there's no other bidders with regard to the license.
15              MR. MICHAELS:  With respect, we would.  The issue
16    with the license -- it's not a question of will they assume or
17    reject it in the future.  It's SSG offering for sale
18    Rembrandt's patented technology.  That's a violation of Section
19    271.  That's present today patent infringement -- you -- they
20    do not have a license to the Rembrandt technology.
21              THE COURT:  Hold on a second.  Who is that person?
22              All right.  So I would ask everyone on the phone line
23    to try to mute your phone because we're -- someone's not muted,
24    so we're hearing everything in the courtroom that's going on
25    there.  So could everyone just take a moment?  How do they mute
```

1    their line?

2          UNIDENTIFIED SPEAKER:  Star six.

3          THE COURT:  So if you could just hit star six,

4    everyone on the line, I'd appreciate that.

5          MR. VAGNONI:  Your Honor, if I may -- raise that

6    issue for a very specific reason.  SSG is not offering that

7    license for sale.  That is not part of the AP --

8          THE COURT:  So when we say license, let's just drill

9    down a little bit.  License of what?

10          MR. VAGNONI:  Absolutely.  Very vague.

11          THE COURT:  License of what?

12          MR. VAGNONI:  There is a 2021 settlement agreement

13   that a single line in it that is a -- called a grant of rights.

14   In that grant of rights, Rembrandt reports to give the rights

15   -- the nonexclusive rights to use their intellectual property.

16          By the way, that settlement agreement was entered

17   into the day or the day before Rembrandt -- they became a

18   creditor by virtue of that and then were a petitioning creditor

19   in Stream's failed involuntary bankruptcy in Delaware.  We take

20   significant issue with that agreement as a whole.  But let's

21   just take it as it is.  That license agreement comes out of a

22   settlement agreement.  And like I said, the -- SSG is not

23   offering that for sale.  However, in the -- which you'll hear

24   about when we get to testimony.

25          In negotiations with VSI and with Rembrandt, it's

1   been made clear to us that if a transaction was to occur with

2   VSI, that the Rembrandt license would have no problem being

3   assumed.

4            And in fact, there are -- there is a post-petition

5   agreement that was entered into by Rembrandt Stream and VSI

6   that was not court approved that purported to do just that.

7   Give VSI rights in that license.  And exclude Streams

8   subsidiaries from the use of that technology pursuant to that

9   license.

10           So that is why I indicated to the Court that if there

11  was a transaction that was a higher and better bid, which VSI

12  and Rembrandt are free to bid in this process.  They've been

13  free all along.  They've had access to the data room if they

14  wanted it.

15           The VSI is the only person who's taken up that offer.

16  That is what I was referring to.  Not that it was generally

17  assignable.  We don't think anybody has interest in it and we

18  also don't think we are selling any assets that have that --

19  Rembrandt intellectual property in that -- in the asset.

20           MR. MICHAELS:  Your Honor, I'd like -- I apologize.

21  I'd really like a chance to finish answering your question that

22  you had asked previously.

23           THE COURT:  Yes, that's fine.

24           MR. MICHAELS:  So the -- you asked whether the issue

25  would be resolved if the Hawk party's just didn't take -- it

 1   isn't a question of SSG selling our license.  It isn't an

 2   active patent infringement.  The active patent infringement is

 3   offering for sale in a patented invention on why Rembrandt,

 4   right?

 5          And the TVs, all of the assets that Mr. Vagnoni

 6   clearly lists are being offered for sale.  That is the active

 7   patient infringement.  SSG has committed patent infringement.

 8   All five of those individuals have committed patent

 9   infringement.  The Trustee has committed patent infringement

10   unless they can show that they have a license.

11          So when Rembrandt is asking about the status of its

12   license, it is, are we suing those individuals and those

13   entities tomorrow?  They -- it is -- if they have a license, we

14   can't.  That is a full and absolute complete defense.

15          The agreement that Mr. Vagnoni's referring to is

16   Streams former counsel, almost immediately after filing the

17   petition contacted Rembrandt and said, we know we need a

18   license to your technology as an administrative claim.  We need

19   to resolve this.  And we signed a settlement amendment that

20   extended the time that prevented the estate from becoming

21   administratively insolvent due to the fees that were going to

22   be due to Rembrandt.

23          They have said they're not honoring that settlement

24   amendment.  The arrears are $3 million.  Does the estate have

25   $3 million to have that license?

1          THE COURT:  So I'm trying to -- I feel like there's

2   litigation that's going to be spawned, right, by -- under the

3   licenses and I'm just trying to have a very basic understanding

4   of what is purportedly being sold by the Debtor.

5          MR. THOMPSON:  They don't know, Your Honor.

6          THE COURT:  I --

7          MR. THOMPSON:  And that's --

8          THE COURT:  -- and I get that.  And I -- so I'm -- I

9   think that we have, like first thing -- what happened?  Okay.

10  Good.  Thank you for muting everybody.

11         So the first step to me seems that we should at least

12  come to an agreement, or at least I need to understand what is

13  being sold.  So can we just focus on that for instance.

14         All right.  So I think one of the comments -- and so,

15  you said before, like, they had described software or something

16  that was, like, their general description.  So did you, Mr.

17  Vagnoni, describe on some schedule that software is going to be

18  sold as part of this?

19         MR. VAGNONI:  Your Honor, I will -- if I may, to

20  preface what -- the answer to that question.  What the Trustee

21  is selling is all of the assets of Stream, which are clearly

22  listed in schedules, which are a public document they have

23  access to.

24         Mr. Rajan, who is the head of VSI, signed those

25  scheduled, I believe, and he certainly took part in preparing

1   them.  So he should know exactly what is in those schedules.

2   The other assets that are being sold in the APA are the equity

3   interest and all the subsidiaries of Technovative.

4        The software, the intellectual property, the license

5   to Phillips, all of that is contained in downstream

6   subsidiaries.  We are not selling those assets per say.  We're

7   selling the equity in those assets.

8        And this is typical of a case where a Chapter 11 or

9   Chapter 7 Trustee walks into a mess and sees that it's

10  spiraling out of control and tries to bring some control to the

11  situation and get the estate some money before there is no

12  money.

13       THE COURT:  Okay.  So again, my focus for right now

14  is, I'm just trying to understand what the assets are.  So he's

15  telling me that he's purporting to sell the equity and the

16  entities that presumably are in possession perhaps of your

17  property, is that your understanding there?

18       MR. MICHAELS:  Mr. Vagnoni just described the process

19  as typical, right?  An IP -- a technology case of this sort,

20  purporting to sell intellectual property rights is anything but

21  typical.  And I think --

22       THE COURT:  Okay.  So let's just focus on -- I just

23  want to drill down on what assets are being sold.  So he's told

24  me that he's selling equity in entities that presumably possess

25  your intellectual property.  Can we agree on that?

```
 1              MR. MICHAELS:  Yes.

 2              THE COURT:  Okay.  Good.  All right.  That's

 3    progress.

 4              MR. MICHAELS:  That's one -- I mean, that's one

 5    aspect of what he said.

 6              THE COURT:  Okay.  Fine.  That's one aspect.  Okay.

 7    So tell me -- so your concern, though, is that when he purports

 8    to sell the equity in these companies, then the buyer who takes

 9    possession of the -- like, they buy the equity, right?  Now,

10    they're going to own, you know, via that equity, everything,

11    you know, tangible and intangible that those entities own.  And

12    your -- and so your position is that some of the assets that

13    they own are your property?

14              MR. MICHAELS:  Yes.

15              THE COURT:  Okay.

16              MR. EDEL:  Your Honor, if I may --

17              THE COURT:  Yeah.

18              MR. EDEL:  -- since I'm representing Hawk.  The --

19    Mr. Vagnoni is correct.  We're -- the stalking horse is

20    acquiring the equity.  Stream is a holding company.  All the

21    operating entities, the main operating entities in the

22    Netherlands and requiring the stock that owns the stock that

23    owns the stock that owns that entity.  The fundamental dispute

24    here is that Rembrandt believes that its trade secrets, its

25    knowledge, its know-how is embedded in everything that Stream
```

1    does.

2           So every TV that it has, every computer that it

3    touches, somehow can -- you know, involves their intellectual

4    property.  Now, there's intellectual property such as patents.

5    Rembrandt brought patent litigation many years ago, but it was

6    dismissed, and they have not asserted a patent case.

7           They're really talking about the intellectual

8    property.  We disagree.  We believe that the technology that

9    Stream developed through its operating subsidiaries overseas is

10   -- belongs to Stream.  If my client acquires the stock, it's

11   acquiring that entity, the good, the bad, and the ugly.

12          And if that means that entity, if Rembrandt believes

13   that entity has put intellectual property into a TV or trade

14   secrets, we'll duke it out after the fact.  But what this is

15   all about, this is Rembrandt and attached to the hip of Mr.

16   Rajan trying to stop at every opportunity this case moving

17   forward.

18          THE COURT:  Okay.  I know.

19          MR. EDEL:  Rembrandt --

20          THE COURT:  You believe there's spoilers and I --

21          MR. EDEL:  Well, Your Honor, I think it's -- it's not

22   just, I think.  As Mr. Vagnoni indicated, they entered into a

23   settlement.  They're standing before Your Honor before today

24   trying to hold up this sale.  Rembrandt entered into an

25   agreement during the pendency of the bankruptcy and amended it

1    with Mr. Rajan where they identified all of their technology,

2    all of their knowhow, how they believed it was being used in

3    everything and said, if Mr. Rajan gets the company, all is good

4    in the world.  No one else is allowed to have it.

5           And then come before the Court today and say, we have

6    no idea how he's using our stuff.  Well, they had a pretty good

7    idea when they were executing documents, you know, in the

8    shadows during the pendency of a bankruptcy.  But now they want

9    to come, Mr. Rajan, who founded the company, ran the company

10   until he was -- you know, the Court determined he was

11   uncredible and removed him.  And throughout the entire pendency

12   of the second bankruptcy which dismisses fraudulent at the aide

13   of Rembrandt to today, they're attached at the hip.

14          This is, with all due respect to the Court, my client

15   has been through this process for many, many years.  It's a

16   very simple sale.  Nobody else, and I think this cannot be

17   lost, nobody else is interested in these assets.  No one has

18   come forward to the pendency of the bankruptcy.

19          THE COURT:  All right.  But we aren't going to get

20   into this.  But from what I understood, the data room is not

21   complete.  I mean, there's --

22          MR. MICHAELS:  That's right, Your Honor.

23          MR. EDEL:  The --

24          MR. MICHAELS:  That's by design.

25          MR. EDEL:  -- data room is not complete because the

```
 1    data room does not include the fraudulent documents Mr. Rajan

 2    created during the bankruptcy, for example --

 3              THE COURT:  Okay.  Well --

 4              MR. EDEL:  -- these purchase orders that don't exist.

 5              THE COURT:  I would like to just -- I would like to

 6    be able to have civil conversations here today.  And I

 7    understand you guys don't like each other.  I know that.  So to

 8    the extent that we could -- I understand.  Like, I call it

 9    spoilers.  You think that they're spoilers.  You guys think

10    that they're selling your assets, and everyone is really

11    annoyed with each other.  I get the sentiment.  I understand

12    that.

13              Okay.  But it doesn't help me get to the point.  So

14    let me tell you what I think is one possibility here, right?

15    So Mr. Vagnoni wants to sell the equity in these companies, if

16    there's -- if we get to the point of a sale and there's no

17    other bidders and Hawk picks up these assets, then under 363

18    when he gets all this stuff, to the extent that you think that

19    he's misusing it, then you're going to sue Hawk, right?  Aren't

20    you going to sue Hawk?

21              MR. MICHAELS:  We already have.  They're in --

22              THE COURT:  Yeah.  Yeah.

23              MR. MICHAELS:  -- we're in litigation in Delaware.

24    But I think what I'm trying to be clear here is that Mr.

25    Vagnoni has -- they're talking about a bunch of equity, and
```

1    he's also put on their asset list that they are selling devices

2    that are accused of being -- infringing over on Rembrandt's

3    patterns and Stream, under the guidance of DLA Piper, took a

4    license.

5            Stream again renewed that -- negotiated again are

6    Armstrong T -- they advised them to do that.  Lewis Brisbois,

7    same thing.  We have numerous law firms evaluating these claims

8    and saying this was a good idea.  We have Mr. Homony testify.

9    He's done no investigation as to whether this is a good idea or

10   not.  And they ignored the issue.

11           They have not -- if the Rembrandt is not valid, we're

12   hearing, you know, testimony that may or may not -- this

13   Rembrandt license may or may not be valid.  It was, you know,

14   executed in 2021 right before a bankruptcy.

15           So if it's not valid, that means all the activity

16   that the estate to date are infringing a patent.  I just want

17   to be clear that that's the argument, is that this estate goes

18   almost instantaneously administratively insolvent.  And we are

19   looking for and we will ask the Courts -- the District Courts

20   to enjoin any transfer of our intellectual property.

21           Now we have licensed Stream.  We have -- we are

22   arguing that the license is valid but cannot be transferred.

23   You may not transfer our intellectual property.  You take a

24   ring, and you put it in a box and say, well, I'm just selling

25   this box, whatever may be in it.

1              You know, we've evaluated what's inside the box.

2    What's inside of SeeCubic B.V. is Rembrandt technology.  We've

3    gone through that multiple law firms representing Stream.  And

4    we have determined that a license was necessary.  And SSG does

5    not get covered by ignorance.  There's no, I didn't know, Your

6    Honor.  It defends patent infringement.

7              They are actively offering for sale assets that

8    include that were directly laid out in the complaints back in

9    2017.  And while Mr. Caponi said it was dismissed, it was a

10   jurisdictional.  Every patent case under *TC Heartland*, the

11   Supreme Court case was dismissed and had to be brought in the

12   home state of the corporation.

13             And we immediately entered mediation, and they

14   insisted the DLA Piper's counsel and Streams officers, most

15   notably, Shadron Stastney, insisted that the patents be

16   included in the license agreement.

17             So this idea that they weren't important to Stream is

18   not supported by the facts in any way, shape, or form.  And we

19   are asking for clarity, is the Trustee operating and is SSG

20   operating under the license?  I.E. they therefore can't be sued

21   for trying to sell a TV covered by one of our patterns.

22             THE COURT:  Okay.  It sounds like they want to sell

23   equity and entities who have hard assets that contain your

24   intellectual property.  So the owner of the equity will

25   presumably then own these hard assets that have your

1   intellectual property embedded in them.  That's what I

2   understand?

3           MR. EDEL:  That's Your Honor, that's if it indeed a

4   -- a bidder is capable of determining what they're buying or

5   what the assets underneath that equity.

6           UNIDENTIFIED SPEAKER:  Your Honor?

7           MR. EDEL:  We have a whole list -- excuse me.  We

8   have a whole list of items that purport to the assets of the

9   Debtors.  I'm telling you today that that is an incomplete list

10  that was filed on this docket reported to this set of assets

11  that are being sold, that's substantially all of the assets of

12  the Debtors and we can show that.

13          More than that, the data room is breath of lots of

14  information.  And the process -- and I know Your Honor wants to

15  focus on the assets, I will focus on the assets, but as Mr.

16  Caponi tried to raise the broader issues.  The broader issue

17  here is that this trustee has agreed to transfer this set of

18  assets to one party and one party only and that is the Hawk

19  parties, right?

20          And they've done pursuant to 9019 settlement

21  agreement that purports just to be a settlement agreement, but

22  it's a sub rosa plan, because there's no other entity out

23  there, whether they be a strategic buyer or another competitor

24  of a Stream TV that would be interested in these assets under

25  these conditions based upon these encumbrances.  And it's not

1    just --

2              THE COURT:  Okay.  So gentlemen --

3              MR. EDEL:  -- not --

4              THE COURT:  -- let's just take a moment here.  So in

5    terms of the bid procedures, I have concerns I think that you

6    guys raised.  Some legitimate concerns, which we'll get to,

7    right?

8              So I see, like, several different areas that need to

9    be addressed over time.  The first is, you need to know what is

10   being sold.  They're selling the equities that contain the

11   equity of entities that own the tangible property that has your

12   intellectual property.  So now you know.  They're -- that's

13   what they're trying to sell.

14             So the first step is, I'd just like to get some

15   clarity and make sure that we're all on the same page as to

16   exactly what's being sold.  Then we'll go through the bid

17   procedures and all of the many objections, some of which I

18   thought were meritorious.  But some of the issues that you're

19   raising are really important issues.

20             But to me, they appear closer to sale issues, right?

21   It's going to be a huge issue when you object to the sale,

22   right?  I'm going to -- it looks like I'm going to need some

23   briefs on all of the very important issues that you have to

24   raise.  But those are issues that, you know, that I think are

25   more appropriately dealt with then, right?

```
 1              So in terms of, you want discovery.  So the discovery
 2    that you want, I think it's important for you to get discovery
 3    if it's necessary on what assets are being sold.  But we have
 4    that -- we now have that nailed down.
 5              So let's focus first on what exactly is being sold.
 6    So you're selling the equity that has hard assets, that has
 7    their intellectual property embedded in it.  So let's --
 8              MR. VAGNONI:  Allegedly, Your Honor.  There's been
 9    no --
10              THE COURT:  Oh, okay.
11              MR. VAGNONI:  -- there's been --
12              THE COURT:  That's fine.  I understand you're not
13    conceding anything.  But I just want, for clarity sake, to
14    understand what it -- you know, what's being sold.
15              MR. MICHAELS:  Your Honor, their agent, SSG, as
16    investment banker, sent out a teaser that purported to sell the
17    capability of making licenses of the Ultra-D technology.
18    Rembrandt's technology or IP is in it and so is Phillips.
19              THE COURT:  Okay.  So what we're -- so that's not --
20    what I'm talking about, like, a hard asset.  Now you're talking
21    about some technology, is that --
22              MR. MICHAELS:  In some cases, it is a hard asset.
23    There are -- this lens technology they patented.
24              MR. SWICK:  Your Honor, Adam Swick, Akerman on behalf
25    of Visual Semi, VSI.  The issue is they have a stalking horse
```

1    bidder that has been at odds with the former debtor --

2            THE COURT:  Clearly.  Yeah.

3            MR. SWICK:  Yeah, yeah.  And so, they took control of

4    the Debtors' assets, they broke into the Debtors' offices,

5    stole TVs, they stole intellectual property.  They've been

6    using them.  They've been showing.  There's emails and letters

7    and we'd love to get discovery from the Trustees, because we

8    believe the Trustee knows all of this.

9            And so, they have TVs in different locations.  They

10   have different hard assets.  All this is purporting to be sold

11   by the Trustee who hasn't gotten it back, because that's the

12   stalking horse and they need the stalking horse to be able to

13   go out and raise money to fulfil their obligations.  And as of

14   the filings last night, the stalking horse doesn't have the

15   money to pay for the 363 as it is right now.

16           So yeah, what we need is discovery on where are all

17   these TVs?  They're all over the world.  They're in the

18   different offices of SeeCubic and the Hawk parties.  I mean,

19   Mr. Caponi up here, he represents the Hawk party's and Robert

20   Morten (phonetic), who's subject to a cold shoulder, which is

21   the worst crime of moral turpitude in the U.K.  It's supposed

22   to end your career and that's who these guys have hitched their

23   wagon to.  So we just need discovery to find the assets so we

24   -- if they want us to participate in a 363 sales process, how

25   are we going to do that if we don't know where the TVs are?

1    Who's --

2              THE COURT:  Okay.

3              MR. SWICK:  -- using them?

4              THE COURT:  So again, let's just focus back on what I

5    care about.  What I care about is, I want to know what they're

6    purportedly selling.

7              MR. SWICK:  They don't know.

8              THE COURT:  Okay.  And I know you say that.  But why

9    don't we just go through all of the concerns you have about the

10   identity of the assets?

11             Yes?

12             UNIDENTIFIED SPEAKER:  Your Honor, going -- sort of

13   taking a broad step back, how we ended up here.  My client has

14   a security interest.  Again, Stream's the holding company.  Has

15   no assets, other than stock and subsidiaries.

16             My client's security interest was primarily in the

17   stock and subsidiaries, not in the assets of the subsidiaries.

18   The 225 action, which we settled through the 9019, we were a

19   day away from taking control of that stock.

20             This settlement and this sale is effectively the same

21   thing.  It's selling the stock.  The companies that -- whatever

22   assets are in those companies that my client shows up and there

23   was TVs -- before my client and everybody else shows up,

24   there's TVs there, they own them.  If they're not, they don't.

25             It's the stock.  They want to drill down into -- and

1  if we get into this level, what TV is sitting in Copenhagen and

2  what software is on that TV, we're going to be here for six

3  years.  One, we're never going to know because it's in

4  Copenhagen.  But, we're going to be here for six years.  This

5  is a sale of stock, the security interest was in the stock.

6  And absent the settlement, my client would have already had

7  it's one day hearing in a court of chancery and owned the

8  stock, this would all be muted.  This is a path of least

9  resistance to an estate that never had any money and doesn't

10 have any money. This deal is --

11          THE COURT:  Okay. I understand that you're buying the

12 stock.  But in order for any potential bidder to understand

13 what they're buying, right, they know that they're getting the

14 stock.  But presumably, they'd like to get a better idea of

15 what the hard assets or the intangibles are of the entities

16 whose stock you're purchasing, right?

17          So I think it's reasonable that there should at least

18 be some general description of -- you know, it doesn't have to

19 be, like, I don't need, like, a audit, right, of every single

20 TV or every single hard asset.

21          But isn't there some kind of --

22          UNIDENTIFIED SPEAKER:  Your Honor --

23          THE COURT:  -- schedule that we could put together

24 that would say, you know, all the -- I mean, I don't know.  Are

25 you just purporting to say that all of the equipment and all of

 1  the -- you know, every personal property owned by these

 2  entities. But do we have, like, a vague description of, like --

 3          UNIDENTIFIED SPEAKER:  Well, there's --

 4          THE COURT:  -- you know, approximately this many TVs

 5  or approximately this many --

 6          MR. VAGNONI:  Yes, Your Honor.

 7          THE COURT:  -- other things.

 8          MR. VAGNONI:  The --

 9          THE COURT:  Okay.

10          MR. VAGNONI:  -- answer is yes.  We have a list that

11  we're happy to share with you.

12          The -- one thing I want to point out to Your Honor is

13  the process that we -- that was started over a month ago that

14  was teasers were sent out to over 500 different entities, both

15  strategic and financial, by SSG.  Mr. Victor is going to

16  testify about that for you as part of the sale procedure.

17          We got exactly zero interest from those teasers.

18  Nobody asked the question of who -- what is in there.  The only

19  parties that expressed an interest were VSI and not Rembrandt

20  and a purported investor in VSI.

21          And we have worked with VSI, who by the way Your

22  Honor, I think you're getting the picture that they are in the

23  unique position to know exactly what those assets are that are

24  being sold.  Exactly what they are.

25          VSI has expressed no interest in bidding on these.

1   They wanted to go down a sale process, which we will describe

2   to you why that is not a possibility.  But not even speaking to

3   Mr. Michaels comments about the lawsuits and the estate being

4   administratively insolvent.

5            The purchaser is assuming all liability.  Not just

6   from Rembrandt under an IP claim, but they're assuming any

7   liability from any alleged IP infringement.  And they're fully

8   indemnifying the bankruptcy estates, the Trustee, and the

9   Trustees professionals.

10           MR. MICHAELS:  Exactly, Your Honor.

11           MR. VAGNONI:  We think that we are insulated -- and

12   that was based on what we think are hollow threats, but that

13   doesn't mean there won't be a lawsuit and that the Defense

14   won't impair the unsecured creditor's ability to get a

15   distribution.  That's what we're trying to protect here.

16   That's what we're trying to specify.

17           THE COURT:  Okay.  So Mr. Vagnoni, let me tell you

18   what I'm interested in.  You know, in a 363 sale, you know,

19   you're -- my concern is, I just want to make this a transparent

20   process so that any potential bidder could understand what is

21   being sold, right?

22           So it sounds like you -- you know, you have this

23   teaser.  I haven't seen what the teaser says, but this list of

24   all of the -- you were saying that there was a schedule that

25   the owner of VSI -- what was his name again?

1            MR. VAGNONI:  Mr. Rajan.

2            THE COURT:  Mr. Rajan?  Okay.  So Mr. Rajan, at some

3   point, put together some kind of a schedule of what each of

4   these entities owned.

5            MR. VAGNONI:  Schedule A.  Oh, I'm sorry.  Yes, the

6   Schedules A and B to the -- the official schedules of the

7   Debtors.

8            THE COURT:  Okay.

9            MR. MICHAELS:  Excuse me, Your Honor.  I have to --

10  correct.  Is that your -- is this the Trustees schedule or are

11  you suggesting --

12           THE COURT:  I think --

13           MR. MICHAELS:  -- that this is Mr. Rajans schedule.

14           THE COURT:  No, I thought you were saying Stream's

15  schedule?

16           MR. VAGNONI:  The Debtors.

17           THE COURT:  Yeah.

18           MR. MICHAELS:  Okay.  So it wasn't Mr. Rajan's

19  schedule, just -- correct?

20           THE COURT:  Yeah.  No, no, no.

21           MR. MICHAELS:  Correct.

22           THE COURT:  I'm trying to understand.  So when Stream

23  filed for bankruptcy, they had a file scheduled in the

24  statement of financial affairs and as part of that you have to

25  schedule Schedule A, which is the real property and Schedule B,

1    which is the personal property.

2          So when he put those schedules together, did he --

3    and he was putting together the personal property owned by the

4    entities whose equity you're selling in the sale, Mr. Vagnoni?

5          MR. VAGNONI:  That's correct.  And Your Honor, there

6    is zero intellectual property in that Schedule B.

7          THE COURT:  Okay.  But -- so I think that one issue

8    that I'm identifying is that the personal property that was

9    scheduled in Schedule B of Stream contained hard pieces of

10   equipment or something that they are now claiming has their

11   intellectual property embedded in.

12         I'm just trying to understand everyone's position.

13   You're saying that in Schedule B is a list of a bunch of hard

14   assets, right?  And they're saying that in those pieces of hard

15   assets are some of their IP embedded in it?

16         MR. VAGNONI:  Stream -- Your Honor, Steam is a

17   holding company.

18         THE COURT:  Yes.

19         MR. VAGNONI:  They're --

20         THE COURT:  No, I understand.

21         MR. VAGNONI:  I --

22         THE COURT:  I understand they're a holding company,

23   but they put together Schedule B and Schedule B included hard

24   assets owned by their subsidiaries and affiliates, correct?

25         MR. VAGNONI:  No, Your Honor.

1          THE COURT:  Okay.

2          MR. VAGNONI:  It was a list of assets that, again, we

3  -- the Trustee had no part in drafting.

4          THE COURT:  Right, because this is before your time.

5          MR. VAGNONI:  It was well before our time.  And we --

6          THE COURT:  So what -- let's describe.  What's on

7  Schedule B?

8          MR. VAGNONI:  It is a various list of equipment.  On

9  Schedule B there is some office furniture.  There's nothing

10  that we see that could contain Rembrandt's --

11          THE COURT:  Well, I don't -- okay.  At this point --

12          MR. VAGNONI:  -- intellectual property.

13          THE COURT:  -- let's -- okay.  We're not going to be

14  able to resolve today whether -- you're not going to come to an

15  agreement with them as to whether or not their technology is

16  embedded in it.  I just need --

17          MR. VAGNONI:  Right.

18          THE COURT:  -- to understand the argument, just so I

19  can try and move the case forward, okay?

20          MR. VAGNONI:  Absolutely.

21          THE COURT:  So what is on Schedule B?  So it's the

22  furniture --

23          MR. VAGNONI:  I don't have it with me and I can't

24  speak to what exactly is on it.

25          THE COURT:  So does anyone have Schedule B of the --

1          MR. MICHAELS:  Your Honor, I would just note that

2    there is an extensive list, over 800 pages long, attached to

3    Mr. Rajan's declaration in support of the filing --

4          THE COURT:  Okay.

5          MR. MICHAELS:  -- right?  So --

6          MR. VAGNONI:  That's not what we're talking about.

7          MR. MICHAELS:  I'm sure it's not.  I would just to

8    Your Honor that that's --

9          THE COURT:  Okay.

10         MR. MICHAELS:  -- on the record.

11         THE COURT:  Okay.  So -- but you're saying Schedule

12   B.  So we're talking about the sale of equity of these

13   entities.  Let's just call these entities, you know, the

14   subsidiaries, or I guess we just call them the entities.

15         So the entity stock is purported -- that's what

16   you're trying to sell.  But these entities own certain hard

17   assets, correct?  Aside from office equipment --

18         MR. VAGNONI:  Correct.

19         THE COURT:  -- and furniture, right?

20         MR. VAGNONI:  Correct.

21         THE COURT:  There's some -- there's other things.

22   TVs, right?

23         MR. VAGNONI:  Potentially.  We -- and Your Honor,

24   again, we --

25         THE COURT:  When you say potentially, see that just -

1    - I just want to understand, you know, what is being sold.

2           MR. VAGNONI:  There -- when I say potentially, there

3    are prototypes that are created by the Debtors downstream --

4           THE COURT:  Entities.

5           MR. VAGNONI:  -- subsidiaries.

6           THE COURT:  Let's just focus on the entities.  What

7    do the entities own?  That's what I really want to focus on.

8           MR. VAGNONI:  And again, I can give you the list we

9    sent them.  The entities own intellectual property, they own

10   equipment that allows them to make protypes of -- they're not

11   TVs.  They are screens --

12          THE COURT:  Uh-huh.

13          MR. VAGNONI:  -- that show the technology to

14   potential investors or purchasers.

15          THE COURT:  Yeah.

16          MR. VAGNONI:  They own licenses, the Phillips

17   license.  And really that's about it.  The downstream entities

18   are meant to house intellectual property, they're meant to

19   house licenses, and they're meant to do research and

20   development.

21          THE COURT:  Okay.  So hold on one second.

22          MR. VAGNONI:  And the Trustees can testify to that.

23          THE COURT:  So I presume, though, that your client,

24   Mr. Rajan, that he was the owner of Stream, right?  He knew

25   what all of these subsidiaries owned.  Didn't he know that?

1              UNIDENTIFIED SPEAKER:  Yes, and he knows what was

2    taken by the stalking horse bidder and never returned after --

3              THE COURT:  Okay.

4              UNIDENTIFIED SPEAKER:  -- contempt of court --

5              THE COURT:  Yes.

6              UNIDENTIFIED SPEAKER:  -- in various litigations.

7              THE COURT:  Okay.  So --

8              UNIDENTIFIED SPEAKER:  And there's bonding --

9              THE COURT:  Again --

10             UNIDENTIFIED SPEAKER:  -- machines that are tens of

11   millions of dollars.

12             THE COURT:  -- this is what I care about.  I just

13   want to identify the assets that are being sold.  So doesn't it

14   seem that Mr. Rajan knows exactly what assets are owned by the

15   entities?

16             MR. MICHAELS:  I would say, Your Honor, he does have

17   an understanding in -- probably in fairly good detail, and

18   that's the point that he has been making to the Trustee at

19   nauseum.

20             THE COURT:  Okay.  So -- but --

21             MR. MICHAELS:  Right.

22             THE COURT:  -- so you --

23             MR. MICHAELS:  Your Honor, I just -- if I may, just

24   to complete the thought.  It's that they don't understand that

25   there are other encumbrances including Rembrandt's license,

1    including the Phillips license on that property.  And I would

2    say importantly that there is material amounts of assets that

3    have been in violation of the TRO, absconded with by Mr.

4    Stastney --

5              THE COURT:  So if you --

6              MR. MICHAELS:  -- and that has --

7              THE COURT:  -- you think that -- that's a complete

8    separate issue.

9              MR. MICHAELS:  Well, it's not, Your Honor --

10             THE COURT:  That you think that.

11             MR. MICHAELS:  -- because that intellectual property

12   that is in those prototypes, samples that are taken to market

13   to try to get investors and customers to buy or purchase the

14   ultimately asset that is Stream TVs product, those things have

15   the intellectual property not only of Stream TV, but also

16   Rembrandt and also Phillips embedded in it.

17             There's -- I mean, it was no accident that Mr.

18   Stastney on behalf of SeeCubic, Inc. and the Hawk party's

19   absconded with monitors that this trustee actually witnessed

20   with Mr. Stastney giving him a demonstration.

21             THE COURT:  Okay.  So who --

22             MR. MICHAELS:  That happened.

23             THE COURT:  So you're saying that Hawk has monitors

24   and Stream has monitors of the entities?

25             MR. MICHAELS:  I'm saying that the Hawk parties,

1  specifically Mr. Stastney, SeeCubic, Inc. definitely had took

2  both monitors that are samples.  They were displayed to be able

3  to sell the product.  It obviously has embedded technology in

4  it.  He took servers.  He took computers.  All of that would

5  have had his code in it, including Rembrandt's code.

6          THE COURT:  Okay.  So -- but are you saying that

7  that's not part of the sale or it is part of the sale?

8          MR. MICHAELS:  I'm just suggesting to you that those

9  particular assets are not on the list.  It was just filed by

10 the Trustee in support of the asset listing.

11         THE COURT:  All right.  All right.  So hold on one

12 second.

13         UNIDENTIFIED SPEAKER:  Your Honor?

14         THE COURT:  No, hold on.  Hold on one second.

15         You guys can all have a seat.  We're going to be here

16 for a little bit.

17         So he's saying that some of the assets are not in the

18 possession of Stream.  That they're in the possession of Hawk.

19 What's your response to that Mr. Vagnoni?

20         MR. VAGNONI:  Your Honor, there -- it's clear to the

21 Trustee that there are assets that are not in his possession.

22         THE COURT:  And are they in the possession of Hawk?

23         MR. VAGNONI:  We are not aware of that, Your Honor.

24 We -- what we are --

25         THE COURT:  So -- okay.  Let me just ask you one

1   question.  Do you think that there are assets owned by Stream

2   that are not in Streams possession?

3          MR. VAGNONI:  Yes, there is -- there's a bonding

4   machine in China --

5          THE COURT:  Okay.

6          MR. VAGNONI:  -- that the Trustee has neither the

7   money or nor the wherewithal to get.  We've gotten various

8   reports -- that was the subject of mediation which --

9          THE COURT:  So does Hawk own any -- does Hawk -- is

10  Hawk in possession of any assets by Stream?

11         MR. VAGNONI:  Not that I'm aware of, Your Honor.

12  SCBV, SeeCubic B.V. has prototypes.  There is -- Mr. Stastney

13  is the director of SCBV.  There is -- we have no indication

14  that Hawk is in possession of anything.  If they are, that --

15  we've heard of tail of it, but we've never been given any

16  evidence that they have -- that Hawk has anything that is --

17         THE COURT:  Why do you guys think that Hawk has the

18  Stream properties?

19         UNIDENTIFIED SPEAKER:  Well, Hawk and its

20  subsidiaries broke into Streams offices and took them.

21         THE COURT:  Okay.  So let's stop right there.

22         UNIDENTIFIED SPEAKER:  Yeah.

23         THE COURT:  Okay.  So let's go the Hawk person.

24         So they're accusing you guys of having broken into

25  Streams building and stolen things.  So what's your response to

1    that?

2           MR. CAPONI:  My response, Your Honor, it's part of

3    the same delusion arguments we've been dealing with for six

4    years.  The -- as a result of the original settlement

5    agreement, the -- give you a brief history.  Mr. Rajan borrowed

6    a bunch of money, never repaid it, the secured lenders reached

7    an accommodation with all the other directors and shareholders

8    to restructure, that led to an omnibus settlement agreement.

9           Following the omnibus settlement agreement, Mr.

10   Stastney took control and operated the entities for quite a

11   period of time before that was reversed.  And when that was

12   reversed by the Delaware Supreme Court, they went back to the

13   Court of Chancery, and they were orders entered that required

14   everything to be turned back over.

15          Vice Chancelor Laster supervised that turning back

16   over and Mr. Rajan took back control of the company.  Ever

17   since then, like a child afraid of the dark, they're constantly

18   saying there's this here, there's this under that bed, but

19   there's no evidence, no Judge, no ruling, no nothing.  I can't

20   disprove the negative.

21          My client lent money; my client is not here.  My

22   client here is a collateral agent for SeeCubic, Inc., which

23   owns the debt and we're just exercising our debt rights.  They

24   want to --

25          THE COURT:  Okay.

1              MR. CAPONI:  -- full stop --

2              THE COURT:  It's helpful --

3              MR. CAPONI:  -- we have nothing.

4              THE COURT:  -- for me if I just get answers to my

5       questions.  So I just want you on the record, do you believe

6       that Hawk is in possession of any property owned by Stream?

7              MR. CAPONI:  Hawk?  No.

8              THE COURT:  Okay.

9              MR. MICHAELS:  Excuse me, Your Honor.  I'm sorry.

10             THE COURT:  Yes.

11             MR. MICHAELS:  We each refer to the Hawk party's that

12      includes SeeCubic, Inc. Delaware and Mr. Stastney in his

13      individual capacity.

14             THE COURT:  Okay.  So with that --

15             MR. MICHAELS:  We have evidence of that.

16             THE COURT:  -- those --

17             MR. MICHAELS:  Now, Mister -- I'm sorry.

18             THE COURT:  Okay.  So do any of those entities, do

19      you know?  And if you don't know, that's fine.

20             MR. CAPONI:  Well, I am not -- what I -- no, I am not

21      aware of them in possession of anything.  I am --

22             THE COURT:  That's owned by Stream?

23             MR. CAPONI:  -- Jon may be able to address this, but

24      when Skadden was representing SeeCubic, Inc. in the Court of

25      Chancery, Schedules were put together, everything was turned

 1   back over, it was done in detail.  My client was not involved

 2   in that.  What I can say, Your Honor, and this gets to, again,

 3   the whole -- of today.

 4          There is this concept on the part of the other side

 5   that once SeeCubic, Inc. took over through the omnibus

 6   agreement, every piece of paper, every pen, every everything is

 7   in -- somehow contains something that belongs to them.  So if

 8   there's a laptop, there's a TV.  If there was a pitcher for

 9   water that was in a conference room, they're claiming it's got

10   Rembrandt's technology.  We don't agree with any of that.

11          We think we own the pitcher.  We can -- we've gone

12   around and around in multiple courts with them about who owns

13   this, who owns that.  As we stand here today, they don't have

14   any shred of evidence.  They don't have a court order.  They

15   don't have a document.  They don't have a bill of sale.  They

16   don't have a photograph.  They don't have anything to

17   substantiate what they're saying.

18          My client has nothing that belongs to Rembrandt.  My

19   client has nothing that belongs to this debtor.  It is my

20   understanding as I stand here today and neither does Mr.

21   Stastney or does SeeCubic, Inc.  We're never going to reach

22   agreement of this.

23          You could have discovery until the cow comes home,

24   they're going to say, well, no, no, we think it's in there

25   somewhere.  Now, if it's not in the trunk, slash the tires and

 1   see if he, like, you know, hid it in the tires.

 2           THE COURT:  So I understand your position, okay?  But

 3   I don't want to keep going around and around with the

 4   arguments, okay?

 5           MR. CAPONI:  The answer is no, we don't have it.

 6           THE COURT:  That's great.  That's all I need to hear.

 7           MR. CAPONI:  Absolutely.

 8           MR. MICHAELS:  Your Honor, I think it's important

 9   that Mr. Caponi just told you that his client does not have it,

10   but he also told you that the Delaware Court supervised the

11   return of assets that was under court order to return after the

12   Delaware Supreme Court's decision.

13           He's not telling you that his client doesn't have it

14   and he doesn't know about anybody else.  I will tell you that

15   we have evidence that Mr. Stastney and SeeCubic, Inc. of

16   Delaware did take assets, does possess assets now.  Has used

17   those assets.

18           THE COURT:  Well, okay.  So just describe for me what

19   the basis of that evidence is.

20           MR. MICHAELS:  The basis of that evidence is, I'll

21   start with just the Trustee.  The Trustee saw those assets

22   during a meeting that he had with Mr. Stastney, in which --

23           THE COURT:  When you say trustee, you're saying?

24           MR. MICHAELS:  I'm saying Mr. Homony.

25           THE COURT:  Okay.

```
 1              MR. MICHAELS:  Right?

 2              THE COURT:  Hello?

 3              MR. MICHAELS:  Who admitted to our client that it was

 4    -- that he had actually observed it.  That's one.

 5              THE COURT:  He had observed what?

 6              MR. MICHAELS:  He had observed a monitor built by

 7    Stream TV in --

 8              THE COURT:  Uh-huh.

 9              MR. MICHAELS:  - the possession of Shad Stastney

10    during the pendency of this bankruptcy.

11              THE COURT:  Okay.  So --

12              MR. CAPONI:  Your Honor, if I --

13              THE COURT:  Yeah.

14              MR. CAPONI:  -- this goes to when SeeCubic, Inc.

15    verses SeeCubic, B.V.  SeeCubic, Inc. after everything was

16    turned around, continued to develop its own technology in this

17    space.  That's -- they believe that everything in SeeCubic,

18    that's it's been developing, again, incorporates Streams

19    technology, which therefore incorporates Rembrandt's

20    technology.

21              So are there TVs?  Yes.  Are there laptops?  Yes.  Do

22    they belong to them?  No.  Have they -- and I would just put it

23    to the Court this way, if they believe this information or

24    these assets were retained, why did they not go to the Court of

25    Chancery, get an order to establish that?
```

1          Why during the year plus that I've been coming to

2    this court and the bankruptcy have they not, when Mr. Rajan

3    controls everything, get relief from the Court?

4          THE COURT:  Okay.  So let's everyone just return to

5    my focus, which is what is being sold?

6          Did you want to say something, ma'am?

7          MS. BRUMME:  Yes, briefly, Your Honor.

8          THE COURT:  Who do you represent?

9          MS. BRUMME:  Marley Ann Brumme from Skadden on behalf

10   of SeeCubic, Inc., the Delaware entity.  And contrary to what

11   our friends over here have to say, the supervision process of

12   the return of the assets from SeeCubic, Inc. back to Stream was

13   supervised by Vice Chancelor Laster and we've been hearing for

14   a year at least that SeeCubic, Inc. has not returned things.

15         That Mr. Stastney has things and until this bit of

16   evidence that he's presented here today about the Trustee

17   apparently seeing a demo unit, we've never seen any evidence to

18   substantiate that SeeCubic, Inc., the US entity and Mr.

19   Stastney, retained any assets.

20         What I think is getting lost here is that Stream TV,

21   as I think Your Honor understands, is a holding company.  The

22   demo units were developed and built by SeeCubic B.V. in the

23   Netherlands, which is five entities down in the corporate

24   structure.  Any demo unit that has been produced and especially

25   one that Mr. Homony has seen would be from SeeCubic B.V., which

1    is not a debtor here.

2           Further, Mr. Stastney, which they love to impugn

3    here.

4           THE COURT:  The entity that you just said, though,

5    are they trying to sell the equity in that entity?  The one

6    that's not the Debtor?

7           MS. BRUMME:  It's five levels down.  So Stream --

8           THE COURT:  But they are trying?  That is being sold

9    as part of the --

10          MS. BRUMME:  The equity would be sold in the first

11   level subsidiaries.

12          THE COURT:  And so they would own that equity?

13          MS. BRUMME:  And then it would waterfall down.

14          THE COURT:  Okay.

15          MS. BRUMME:  Mr. Stastney notably is the director of

16   SeeCubic B.V. the Netherlands entity that develops all the

17   tech, and Mr. Stastney was installed as director by a

18   Netherlands Court when moving Mr. Rajan.

19          So any sort of implication that Mr. Stastney and

20   SeeCubic, Inc. are unlawfully retaining anything, there's no

21   evidence of that, one.  And two, they can't conflate SeeCubic,

22   Inc. and what's going on at SeeCubic B.V.

23          THE COURT:  Okay.  Thank you.  Okay.  Let's stop one

24   second.

25          So I think what would be helpful for me is if we

1   could focus on all the potential bidders that are out there

2   that are not in this courtroom.  And my job is to make sure

3   that they understand exactly what is being sold.  So just

4   describing the equity, obviously, is not sufficient, because,

5   you know, the -- each of the entities whose equity is being

6   sold has some kind of personal property and that, I think, is

7   the schedule that I'd like to focus on.

8          So what is -- so is there, like, a schedule as part

9   of your, you know, proposed asset purchase agreement that

10  lists, you know, what is owned by the entities whose stock is

11  being sold?

12         MR. VAGNONI:  We -- Your Honor, we do not have the

13  schedule together yet.  But we do have the list of assets that

14  were turned over to --

15         THE COURT:  Okay.

16         MR. VAGNONI:  -- VSI.

17         THE COURT:  So let's be clear.  I don't want to set

18  up any procedures until we're clear on exactly what assets are

19  being sold, so that other potential bidders can have some idea.

20         So this is what I would envision if I was a potential

21  bidder.  I see that the stock is being sold.  I'd want to see

22  some general description of the assets that are owned by those

23  entities, so I know what it is that I'm buying.  Now, obviously

24  you can't give me, like, pictures, so that's what we engage in

25  the due diligence process, right?  A potential bidder --

1           MR. VAGNONI:  Correct.  And --

2           THE COURT:  -- would see, like, a schedule that says,

3    you know, ten TVs and -- or whatever TVs.

4           MR. VAGNONI:  Correct, Your Honor.

5           THE COURT:  And then if their interest has peaked,

6    they would do their due diligence.  And if they wanted to, they

7    could go out and go look at all this stuff or go look in the

8    room or do whatever.

9           MR. VAGNONI:  So Your Honor --

10          THE COURT:  Yeah.

11          MR. VAGNONI:  -- that -- I -- you're correct in what

12   you're saying.  And the process that was setup by SSG was that

13   a teaser would go out to drum up interest in potential bidders.

14          THE COURT:  So what does the teaser say, just so I

15   understand?  Do you have it?

16          MR. VAGNONI:  Yeah, I absolutely do.

17          THE COURT:  All right.  Show me a teaser.

18          MR. VAGNONI:  I have a book of art --

19          MR. MICHAELS:  Your Honor, if I may?  As you're

20   looking through the teaser, you will note that is specifically

21   mentions the Phillips license.  Attached to that Phillips

22   license is a laundry list of software assets --

23          THE COURT:  Uh-huh.

24          MR. MICHAELS:  -- by title, function, what they do.

25          THE COURT:  Uh-huh.

1        MR. MICHAELS:  And we have asked since March whether

2   or not those are being included in the assets with zero

3   response.

4        You had said -- you had made an offhand comment

5   earlier about, well, you're not asking for an audit for

6   anything.  However, the Phillips license requires an audit.

7   That that technology has been removed at termination of that

8   license, which would be caused by a change of control, I.E.,

9   sale of the entity.

10       THE COURT:  That's a sale issue to me.  You object to

11  the sale, because that's not permitted.  As for the bid

12  procedure stage, I just need to identify what assets are being

13  sold.

14       MR. MICHAELS:  My point to you, Your Honor, is there

15  is already a long list of software assets provided in the

16  Phillips license, along with a bunch of know-how and that -- a

17  simple question.  Is this being included in the sale or not?

18  Is what we have asked.  And I think is a touchstone for the

19  kind of list we are looking for here.

20       In addition, it seems that the retention of an expert

21  to walk through the Rembrandt list, we've provided a detailed

22  list of those trade secrets in the Delaware case and can --

23  that can ascertain whether or not those assets are or are not

24  included.

25       THE COURT:  Okay.

1          Mr. Vagnoni, did you have the teaser?

2          MR. VAGNONI:  I do, by a book.

3          THE COURT:  Okay.  How -- the teaser is the binder?

4          MR. VAGNONI:  No, it's in the binder.

5          THE COURT:  Oh, okay.  All right.  So go ahead.

6    Which -- what's the tab of this?

7          MR. VAGNONI:  Tab four.

8          THE COURT:  Okay.  And you guys -- I'm presuming

9    you've seen the teaser?

10          MR. CAPONI:  I have in front of me, Your Honor.

11          THE COURT:  Oh, good.

12          MR. MICHAELS:  We saw it.  It's filed in the papers.

13    But we --

14          MR. VAGNONI:  And Your Honor, if I may?

15          MR. MICHAELS:  -- did not get it.

16          MR. VAGNONI:  That teaser was -- as I'm sure you're

17    aware, the initial document that was sent out, again, to over

18    500 different entities, that then invited them to contact SSG

19    so they could go into --

20          THE COURT:  Okay.

21          MR. VAGNONI:  -- a more complete data room.

22          THE COURT:  I see that this is a one-piece teaser,

23    right?

24          MR. VAGNONI:  Correct.

25          THE COURT:  But as part of any potential sale, we

 1    need to have schedules of -- you know, schedules of, you know,

 2    what's being sold.  Like, what's owned by those entities,

 3    something, a description.  Like, TVs or, you know,

 4    approximately --

 5              MR. VAGNONI:  So --

 6              THE COURT:  -- 100 TVs or something.

 7              MR. VAGNONI:  Correct.  And the irony of that

 8    comment, Your Honor, is that yes, there would be a schedule

 9    available to any potential bidder --

10              THE COURT:  Uh-huh.

11              MR. VAGNONI:  -- who wanted to come in and do due

12    diligence.  There has been zero bidders that have even

13    scratched the surface of learning about this technology.  The

14    only entity that desired to look in the data room was VSI,

15    who's made is abundantly clear to the Trustee that they have no

16    interest in bidding on the purchase of these assets.

17              THE COURT:  So is your position, Mr. Vagnoni, that

18    this teaser provides sufficient information to potential

19    bidders that would allow them to show interest in this?

20              MR. VAGNONI:  Yes.

21              THE COURT:  So this one page, if someone likes what

22    they see, then they'll proceed with you?  And if they don't,

23    like, this is sufficient information to kind of vet whether --

24              MR. VAGNONI:  So --

25              THE COURT:  -- there's interest out there?

1              MR. VAGNONI:  Correct.  And the Trustee hired SSG as

2    his investment banker and SSG as we've seen them do in numerous

3    occasions, initiates contact by first identifying potential

4    parties.  They identified 500 plus different entities that they

5    sent that out to.  Again, both financial and people in the

6    industry.  And they sent that teaser out to those entities.

7              THE COURT:  Okay.  Fine.  And they didn't get a

8    response.  Okay.

9              MR. VAGNONI:  They got it with -- let me be clear.

10   They got one response from someone other than Rembrandt and

11   Rembrandt -- VSI and VSIs purported investor.  That party

12   declined to sign an NDA once they spoke to SSG.  And we'll --

13   Mr. Victor will describe why.

14             THE COURT:  Okay.  All right.  Well, I'll --

15             MR. SWICK:  Your Honor, I would --

16             THE COURT:  -- this teaser.

17             MR. SWICK:  Excuse me.  I would just add that I think

18   Mr. Vagnoni -- I think Mr. Vagnoni has just given us an

19   admission against interest.

20             THE COURT:  A what?

21             MR. SWICK:  And a --

22             THE COURT:  A what?

23             MR. SWICK:  An admission against interest, right?

24   That this teaser yielded no bidders, other than the people who

25   already know about these assets.  And why would there be no

```
1   bidders?  Well, probably because they read things in a teaser

2   like this and they're sophisticated actors and they understand

3   the --

4             THE COURT:  Okay.  So --

5             MR. SWICK:  -- effort to license things --

6             THE COURT:  Okay.

7             MR. SWICK:  -- that they cannot --

8             THE COURT:  All right.

9             MR. SWICK:  -- license.

10            THE COURT:  I understand.

11            MR. SWICK:  Is not appropriate.

12            THE COURT:  Okay.

13            MR. SWICK:  Okay.

14            THE COURT:  Fine.

15            MR. VAGNONI:  That --

16            THE COURT:  All right.  So --

17            MR. VAGNONI:  -- is quite a leap, Your Honor.

18            THE COURT:  Okay.  So as part of the sale process,

19  though, will there be a more robust description then?  Like

20  schedules of the assets owned by these entities?  Something?

21  Some description?

22            MR. VAGNONI:  Your Honor, and again, Mr. Victor is

23  prepared to testify today.  But at this point after a month out

24  in the market and there having been no interest in --

25            THE COURT:  Are you suggesting that because there's
```

1  no interest in the market that there's no need to prepare

2  schedules?

3          MR. VAGNONI:  No, no, no.  There are -- schedules are

4  being prepared.

5          THE COURT:  Okay.

6          MR. VAGNONI:  That will be attached to the APA to

7  make it clear what is being -- but I think they're going to be

8  more simplistic than what you are considering.

9          THE COURT:  Okay.  So what --

10          MR. VAGNONI:  Any potential --

11          THE COURT:  -- so just generally describe what it is.

12  It's going to be, like, equipment or software or --

13          MR. VAGNONI:  Lists all of the assets of Stream and

14  the equity interest in Technovative subsidiaries.  Now, Your

15  Honor, that doesn't mean that if someone who had interest in

16  getting due diligence on these assets --

17          THE COURT:  Couldn't come in and --

18          MR. VAGNONI:  -- wanted to get more information.

19          THE COURT:  Yeah.

20          MR. VAGNONI:  That SSG wouldn't give them whatever

21  they wanted.  If they said, we want to know exactly what

22  SeeCubic, Inc. holds, they would have it.  And a lot of that is

23  already in the data room.  That's part of the process that SSG

24  runs.

25          THE COURT:  Okay.  I understand --

1          MR. VAGNONI:  You don't send out a teaser that has --

2          THE COURT:  Okay.  I understand.

3          MR. VAGNONI:  -- hundreds of pages.

4          THE COURT:  Yes?

5          UNIDENTIFIED SPEAKER:  Well, the data room, which was

6    prepared, then Your Honor asks for a list of assets, they

7    provide a list of assets.

8          THE COURT:  In the data room?

9          UNIDENTIFIED SPEAKER:  A lot of these assets weren't

10   in the data room before.

11         THE COURT:  Okay.

12         UNIDENTIFIED SPEAKER:  The Phillips IP wasn't there.

13   And I also want to say, this investor, he provided 170-million-

14   dollar proof funds.  When they asked for it -- so liquid funds

15   in an account.  They said, we just want to do some due

16   diligence, all right?  They sat on that for three months.  That

17   took $1.8 million from our investor.

18         So this investment you're talking about, these are

19   the entities who want to buy these assets, bind this company to

20   a plan.  It's getting sorted at every turn, because they're

21   married to this 9019 with the Hawk parties.  But we have real

22   money.  We want to pay unsecured creditors.  We have to have

23   due diligence.  We've got to get forward on this. And I mean --

24         THE COURT:  Weren't you guys going to put together a

25   plan or something?

```
 1              UNIDENTIFIED SPEAKER:  Yeah, but we have --

 2              THE COURT:  So did you file the plan?

 3              UNIDENTIFIED SPEAKER:  No, we're going -- we have to

 4  get diligence to know where the assets are so we can have it --

 5  they want an unconditional offer for almost $200 million for

 6  these assets.  We want to give it to them.  But we also need to

 7  know, where's the bonding machine?  Is it still functional?

 8  They said we could access to it.  Then they said, oh, here's

 9  some photos.  We're not going to give you access to it and the

10  photos are two and a half years old, because they don't know --

11  like, the bonding machine is tens of millions of dollars.

12              THE COURT:  Okay.  All right.  Okay.

13              All right.  So --

14              MR. CLARK:  Can I make a brief intervention?

15              THE COURT:  Yes.

16              MR. CLARK:  I apologize.  And I won't make very many

17  interventions in this matter because there are people here who

18  know a lot more about this case than I do.  I'm a recent entry.

19              But I appreciate the Court's concern about making

20  sure that you have an open and fair bid procedure so that you

21  can have a true 363 sale.  The problem that we have here is

22  this case reminds me a lot of *Fiskarata* (phonetic) we have a

23  secured claim from a secured creditor that I understand lent in

24  terms of hard money about $39 million.  Maybe 45, depending on

25  whether you count some additional advances by Mr. Stastney.
```

1    But now we have a 9019 that says their actual claim is $180

2    million.  And that they can credit the -- their 150 million of

3    it.

4              As in *Fiskarata* with a credit bid of $150 million,

5    that means that the stalking horse bidder doesn't actually have

6    to put up anymore in terms of cash than the seven and a half

7    million dollars that they said they were going to credit.

8              THE COURT:  They're going to credit it.  Right.

9              MR. CLARK:  So for seven and a half million dollars,

10   they get in the door.  Anybody else who wants to play this game

11   has to come up with cash, cash in the amount of $157.5 million.

12             MR. VAGNONI:  That's not accurate.

13             MR. CLARK:  Excuse me.  I'm sorry, maybe it's less.

14   But it's a lot more than $39 million, that's for sure.

15             And that's -- and to me, that's the real story here.

16   That we have a bid process where the amount of money that

17   anybody else who wants to play this game has to come up with,

18   certainly north of $100 million in order to be able to play

19   this game and be prepared to close in December.

20             If we were talking about a plan process so I could

21   understand how we could come up with a structure where $170

22   million or such might end up being -- be folded into a plan.

23   But on a expedited sale process, where the proposed bidders

24   don't know for sure what's going to be sold until --

25             THE COURT:  Why do you say it's a expedited sale

1    process?

2         MR. CLARK:  -- we get to today.

3         THE COURT:  Why do you say it's an expedited sale

4    process?

5         MR. CLARK:  Well, it's expedited in the sense that

6    the bid procedures motion contemplates that the bids will be

7    received -- binding bids will be received by Friday of this

8    week.  So that gives whoever's going to buy this, other than

9    Hawk, two days to do the due diligence that we're talking

10   about.  Two days.  And that the Trustee will then make a

11   decision on Monday.  And then the sale will close in December.

12        Now, as a practical matter, that's not what I would

13   call an open and transparent process.  So if you want to know

14   why there aren't other bidders here, it seems to me it's

15   straight forward.  With a 180 -- 157.5-million-dollar credit

16   bid in place, nobody's going to come to the table.

17        THE COURT:  So I think, though, what I'm hearing is

18   that the credit bid is a hurdle to other potential bidders from

19   entering the situation?  Unfortunately, I've already approved

20   the settlement, the 9019 agreement that they have.  So that's

21   what Hawk is.  I mean, and they --

22        MR. CLARK:  I understand that, Your Honor.  And --

23        THE COURT:  -- and because I've approved that, they

24   have -- they're allowed a credit bid.  That's just part of the

25   system.

1          MR. CLARK:  And candidly, Your Honor, as I look

2     through this, looking at it from the standpoint, you know,

3     obviously I've sat in your position.  So I asked the same kinds

4     of questions I would like to think that you would ask.  And

5     what occurred to me in this particular case is there is a

6     motion to reconsider and I'm glad that it hasn't been ruled on

7     yet because it strikes me that this process is fundamentally

8     flawed because of the provisions that were put in that 9019,

9     that they were all but certain to assure that there would be no

10    other bidders.

11          THE COURT:  Okay.  Thank you, sir.

12          MR. CLARK:  Thank you, Your Honor.

13          THE COURT:  You're welcome.

14          MR. VAGNONI:  And Your Honor, just so we're clear on

15    the -- there are very limited issues that's why in the motion

16    to reconsider one of which isn't --

17          THE COURT:  Let's focus on the bid procedure, shall

18    we?  I think I'd like to just hone in on some of those things.

19    I don't want to hear re-argument on something I already heard

20    on.  Okay.  So I want to talk about some of the substantive

21    concerns that Rembrandt and VSI has raised in their objections,

22    if we could turn to that for a minute.  Let me just get this.

23    Okay.  So I wanted to take, for instance, the bonding

24    equipment.  So is the bonding equipment being sold as part of

25    the sale?

1          MR. VAGNONI:  Yes, Your Honor.  It is.  The problem

2    we have with the bonding equipment is there are disputes as to

3    who owns the bonding equipment.

4          THE COURT:  Okay.

5          MR. VAGNONI:  But what we believe is that either the

6    Debtor owns it and the Debtor did list the bonding equipment in

7    its Schedule B.

8          THE COURT:  Uh-huh.

9          MR. VAGNONI:  And the rest of the things in Schedule

10   B are office equipment and FF&E.  But the Debtor alleges that

11   it owns it.  There has been -- there has been allegations that

12   that bonding equipment was transferred to SeeCubic B.V.  The

13   Debtor downstream, the Stream downstream subsidiary.

14         THE COURT:  Transferred by whom?  Who transferred it?

15         MR. VAGNONI:  So and I can't speak to this directly

16   because I was not involved at the time, but it was my

17   understanding that at the time of the omnibus agreement that --

18   and correct me if I'm wrong, but that their allegation that

19   that -- that the bonding equipment was transferred by the

20   controlling entity -- by the Debtor to SeeCubic B.V.  Whether

21   or not it's the Debtor's property or SeeCubic B.V.'s property,

22   that bonding equipment is being transferred.

23         THE COURT:  Okay.  All right.  Just give me a minute

24   to go through all of this for one moment.  Okay.  So this is

25   how I would like to proceed.  Before I sign off on any bid

1  procedure order, I'd like to see what the schedules are to the

2  purchase agreement.  I just -- I think that we should put

3  together the schedule, but I don't think that you have the

4  schedule here today, right?

5          But what I envision is, since it does seem to be an

6  issue, what is being sold, I'd like someone to put together the

7  schedules and then I'd like you to -- and you could break it

8  out any way you want.  Perhaps you could say that this entity,

9  you know, has these assets and that's what could be part of the

10  sale when you buy the equity of that entity.

11         And then what I'd like to do is I'd like to invite

12  VSI and Rembrandt to look at those schedules and to point out

13  the very many issues that I think that they're going to have

14  with those schedules as to potentially flag the issues that you

15  have with regard to each of those entities.

16         And then what I think we should do for any potential

17  bidder is they should see a list of the scheduled assets that

18  actually do have some asterisks to them, which might note there

19  were objections or concerns that you guys have to those assets,

20  right?  So that whoever is, you know, potentially interested in

21  buying the assets will see your asterisk, right?  And then

22  either we'll get them in as bidders or not.  So I think the

23  first thing I'd like to do is I'd like to get that schedule

24  together --

25         MR. THOMPSON:  Your Honor, if I may be heard just on

1   one of those asterisks because we just heard about the bonding

2   machine.

3            THE COURT:  Uh-huh.

4            MR. THOMPSON:  If you look at what the Trustee just

5   filed with respect to the bonding machine, it's got conditions

6   all over the place, right?  And it is not guaranteeing --

7            THE COURT:  Could you -- which one?  Could you --

8            MR. THOMPSON:  -- not guaranteeing the transfer right

9   to any buyer, right?

10           THE COURT:  Okay.

11           MR. THOMPSON:  So --

12           MR. GEORGE:  But the buyer will know that.

13           MR. THOMPSON:  Well, it would not have known that --

14           THE COURT:  Okay.  Could we just stop and just take a

15  moment that you're selling something that you may or may not

16  have.  That just does seem a little curious.

17           MR. THOMPSON:  Thank you, Your Honor.

18           THE COURT:  Doesn't it seem a little curious?

19           MR. THOMPSON:  That's precisely our --

20           MR. VAGNONI:  Your Honor.

21           MR. THOMPSON:  We may or may not be in possession of

22  it.

23           THE COURT:  Okay.  All right.  Argument for the

24  Trustee.  I just have to get an answer to the question why is

25  it not weird to say that you're going to sell something but

1  then not be sure if you're actually going to get it.

2          MR. THOMPSON:  Your Honor --

3          THE COURT:  I'd like to hear from the Trustee.  I'm

4  sorry, I didn't mean you, I met the guy standing behind the

5  asterisk --

6          MR. HOMONY:  Prior to my appointment, as you can tell

7  -- was a complete and utter disaster.

8          THE COURT:  It still kind of seems like a disaster

9  which I'm trying to clean up.  Yes.

10          MR. HOMONY:  I want you to appreciate Stream used to

11  own the bond equipment --

12          THE COURT:  Uh-huh.

13          MR. HOMONY:  -- before the omnibus agreement which

14  set all this off.

15          THE COURT:  Okay.

16          MR. HOMONY:  At some point, we were informed that a

17  receiver -- again prior to my getting on the scene -- a

18  receiver was appointed to oversee Technovative in Delaware

19  District Court.  I believe that receiver retitled the bonding

20  equipment into the Netherlands subsidiary --

21          THE COURT:  Okay.

22          MR. HOMONY:  -- the equity of which I'm selling --

23          THE COURT:  Okay.  Yeah.

24          MR. HOMONY:  -- because it's in China, there's issues

25  with warehouse liens, past due rent.

1          THE COURT:  But presumably that's something that's

2   being sold --

3          MR. HOMONY:  It is being sold, Your Honor.

4          THE COURT:  -- if you can get through -- if you can

5   jump through all those hurdles.

6          MR. HOMONY:  It is being sold.  But as I'm sure you

7   can appreciate in other cases, somebody's holding that asset

8   that might demand --

9          THE COURT:  Okay.  But that's okay.

10          MR. HOMONY:  -- $500,000.

11          THE COURT:  That's okay.  I mean --

12          MR. HOMONY:  Before it gets --

13          THE COURT:  So perhaps with regard to the bonding

14   equipment, there'll be a very long asterisk which will describe

15   exactly where it is and all the claims subject to it.  And you

16   guys would be able to add something to that as well.

17          MR. THOMPSON:  Your Honor, there's an omnibus order

18   -- an omnibus agreement that was overturned by the Delaware

19   Supreme Court.  And thereafter there was a chancery court

20   opinion directing the return of all the equipment including

21   that.

22          THE COURT:  Let me just tell you where I'm focused

23   at.

24          MR. THOMPSON:  Okay.

25          THE COURT:  Where I'm focused at is, I just want to

1    know what's being sold even if it's subject to a million

2    caveats, right?  So we're going to work together and we're

3    going to come up with a schedule so at least a normal person

4    will at least know this is what's being sold.

5            Now, just based on my preliminary observation, I

6    don't believe anybody will be bidding for these asset because

7    you guys are hopping up and down.  You really think that -- you

8    know, that it's your stuff that's going to fall on this

9    litigation.  I just want to tell you what I think that the

10   logical conclusion of all of this is going to be.  That if we

11   ever get to a sale, there will be no other bidders because

12   you'd have to be crazy to enter this like firestorm of like,

13   you know, litigation, right?

14           So what it's going to be is we're going to have Hawk,

15   who wants to be the buyer.  They're the stalking horse bidder.

16   No one else is going to bid.  And you guys are going to raise a

17   slew of objections to the sale, right?  And if I have -- I have

18   Hawk, right, who's going to then say, you know, Your Honor, I'm

19   going to -- this is what I want to buy and I know that they're

20   hopping mad and they're going to sue me and that they're going

21   to -- they have all these, you know, issues or whatever.

22           And then at that point, if I approve the sale to them

23   that I'm delivering that to them, Hawk is going to pay them

24   whatever they're going to pay and then you guys, Hawk and you

25   guys are going to fight it out, right?  And then I don't have

1   to resolve, right, exactly who owns what or whatever, because

2   they're going to be doing all of that, right?  And then you can

3   engage in that fight.  But all of your jumping up and down, it

4   does have a chilling effect on the bidding as well, right.  It

5   will make it -- it will basically guarantee that Hawk will be

6   the buyer of these assets at the end of the day.

7           MR. THOMPSON:  That's already been guaranteed, Your

8   Honor.

9           THE COURT:  Okay.

10          MR. GEORGE:  Your Honor, if I may.  This is --

11          THE COURT:  Yes.

12          MR. HOMONY:  Your Honor, I can address --

13          MR. GEORGE:  I would just like to --

14          THE COURT:  Okay.

15          MR. HOMONY:  This case has been drawn out for a long

16  time.  And as I'm sure you can appreciate, Stream is a pre-

17  revenue company.  It has no revenues, it has no ability to

18  generate loans.  Part of the Hawk settlement provided that Hawk

19  through SeeCubic would continue to fund the Netherlands,

20  SeeCubic BV, which is an operating entity with real people

21  there who really care about this technology, have lived with it

22  for 20 years and want to see it commercialized.

23          The longer this goes, their livelihoods are put in

24  jeopardy.  The value of these assets is put in jeopardy because

25  if I have an outside -- a date where they have agreed to fund,

1    which is December 10th.  If the sale isn't closed by December

2    10th, there's no funding secured for those people in SeeCubic

3    BV, and not only their lives, but the value of these assets

4    will disappear.

5            Right now, through the carveout I think my and my

6    team have managed to secure between 9- and $10 million in cash

7    for the benefit of unsecured creditors, which would otherwise

8    vanish.  And so I just -- I want everybody in this room to

9    appreciate --

10           THE COURT:  Yes.  I get it.

11           MR. HOMONY:  Okay.

12           THE COURT:  I understand.

13           MR. HOMONY:  Thank you, Your Honor.

14           THE COURT:  Thank you.  Okay.  Hold on one second.  I

15    don't want to hear from anyone right now.  Okay.

16           So Mr. Vagnoni, when -- and you can talk to your

17    colleagues here, but when do you think you could put together a

18    schedule of what be -- I mean, if this is going to be going out

19    for bidders, we need to have like a schedule.  So when would

20    you be able to put together some schedules?

21           MR. VAGNONI:  We'd have to do it -- I do have to

22    speak with -- but we have to do it immediately.

23           THE COURT:  Why don't you talk to your people and

24    tell me how soon you could get those schedules together?  Go

25    talk to them.

1          MR. VAGNONI:  Thank you, Your Honor.

2          THE COURT:  You're welcome.  So while they're doing

3    that, I didn't realize the whole room was empty.  Perhaps what

4    we'll do is while they're doing that can I just run through the

5    rest of my list because I have a 12:30 list as well.  So I'm

6    just going to -- you can keep all your stuff here.  Keep all

7    your stuff here.  I'm just going to run through my 11:00 list.

8    Oh, with the other parties.  Yeah.  Yeah.  But so just sit

9    tight.

10          Pam, what else do we have going on at 11:00?

11          THE CLERK:  11 should be all --

12          THE COURT:  Oh, good.  Excellent.  Okay.  Good.  So

13    hold tight right there.  So I just want to take a short break

14    and I'll be right back.

15          THE CLERK:  Okay.

16      (Recess)

17          THE CLERK:  Court is back in session.

18          THE COURT:  All right.  Mr. Vagnoni, when do you

19    think you'll have those schedules for me?

20          MR. VAGNONI:  We can have them filed by tomorrow.

21          THE COURT:  Okay.  Great.  So what I would like is --

22    what I envision is that there will be schedules identifying

23    what the assets are.  And I think that for instance, with the

24    bonding equipment, you should drop an asterisk that says, you

25    know, we are actually not in possession of the bonding

1   equipment and whatever caveats you think there may be to

2   actually a buyer taking possession of them.  I think you should

3   add that to that.

4         MR. VAGNONI:  Absolutely.  And Your Honor, just to be

5   clear, you know, with the foreign subsidiaries, the Trustee

6   isn't in possession of those assets either, but they are in the

7   possession of subsidiaries of --

8         THE COURT:  Okay.  So you should just -- I just want

9   this to be clearly laid out where everything is.  So if someone

10  were to look at this, they understand these are the issues that

11  I face if I put in a bid.

12        MR. VAGNONI:  Understood.

13        THE COURT:  Okay.  Then I'd like you guys to take a

14  look at the schedules because before it goes out to other

15  potential bidders, I'd like to get your input.  And I think

16  that you have lots of different issues like, you know, you

17  could say that, you know, these assets are subject to our

18  claims and put whatever, you know, statements in there that you

19  think would be appropriate.

20        And I think just to be clear that, you know, if you

21  have an asterisk, you know, you might have an asterisk saying

22  these are the Debtors comments about, you know, like maybe just

23  say a footnote, why don't you have a footnote, right?  You put

24  a footnote and you say this is debtor's position that these

25  assets are not in our possession or whatever.  Put whatever

1   caveat.

2          And then we're also going to have footnotes with you

3   guys and you're going to -- so the potential bidder will know

4   that the statements that are being made with regard to your

5   footnotes are your comments and are not the Debtor's comments,

6   right?  And you -- I'm willing to include that just because I

7   think that you have some serious concerns and people should

8   know them.  So it would say something like Rembrandt believes

9   that with regard to these assets, that there are these issues

10  implicated on intellectual properties embedded in them and, you

11  know, this is going to spawn litigation or whatever.  Yes?

12          MR. MICHAELS:  I think the main issue here, I think

13  it's been handled by Whitehall and it was a jeweler who had

14  taken in property on -- jewels on consignment, embedded them in

15  rings and wanted to go to a bankruptcy sale where they just

16  sold it all off subject to the rights of the vendors who had

17  given them tools on consignment.  And I think it was somewhere

18  in the neighborhood of 193 adversary proceedings would have

19  been necessary.

20          And the court said tough.  You need to figure out

21  what the assets of the estate are and you need to have those

22  adversary proceedings by trying to go forward.  And it is -- I

23  understand the Court's desire to move through a process, but

24  saying with an asterisk Rembrandt may or may not sue you for IP

25  infringement is the courts have determined that's not an

1  acceptable process.  It is in and of itself subjecting the

2  estate to additional liability for making that transfer in the

3  first place which was not authorized --

4          THE COURT:  Okay.  Would you not want me to add your

5  comments to the schedule?

6          MR. MICHAELS:  We would like -- we would certainly

7  like the ability to enter the comments, but we -- what we

8  believe is necessary in this situation is to ascertain what are

9  actually the assets of the estate, and what else is on the

10 record.

11         THE COURT:  Okay.  So let me tell you my skepticism

12 with that comment.  With respect to the client, the guy that he

13 used to be.  This -- the guy who was replaced by the Trustee.

14 He had a pretty good idea of what's in all of these entities,

15 because up until, you know, earlier this year, wasn't he in

16 control of all those assets?  Okay.  Well, regardless, this is

17 we're going to do.

18         You've got litigation issues with regard to the

19 license, and I'm going to look at that because you're going to

20 file a sale objection and it's going to lay out every single

21 objection you have to the sale and they are going to respond to

22 that and I am going to address all of those arguments, okay?

23 So this is what we're going to do.  You guys, you can add

24 footnotes and all I care about your footnotes is that you put

25 in the preamble of whatever footnotes you want to add to the

```
 1   schedule that these are comments made on your behalf, not on

 2   the Debtor's behalf so that people who read it understand it.

 3              MR. MICHAELS:  We do have one request --

 4              THE COURT:  Yeah.

 5              MR. MICHAELS:  -- that we've been making for a while

 6   now.

 7              THE COURT:  Yeah.

 8              MR. MICHAELS:  And that is that the Trustee specify

 9   with particularity, whether he is relying on the Rembrandt

10   license or not.

11              THE COURT:  What do you mean you're relying upon the

12   Rembrandt license?

13              MR. MICHAELS:  If they are offering for sale assets

14   Rembrandt has alleged have -- are covered by patent inventions,

15   we have the right to bring suit against anybody who is offering

16   those for sale.

17              THE COURT:  I don't think that Mr. Vagnoni thinks

18   that you have the right to sue them.  Do you -- Mr. Vagnoni, do

19   you think that they have the right to sue you arising out of

20   the sale of the assets that --

21              MR. VAGNONI:  Absolutely not.

22              THE COURT:  See so they just disagree.  That's just a

23   sale -- that's a sale argument that you can make in front of me

24   that I'll consider.

25              MR. MICHAELS:  With respect, we provided the case law
```

1  that says we do not need leave of this Court.  We can file in

2  any jurisdiction and SSG is not a part of this bankruptcy.  I

3  mean, I appreciate they're professional, but they're actively

4  offering our patented technology for sale.  That's an

5  infringement under 35 USC.  And it's the only --

6          THE COURT:  I disagree.

7          MR. MICHAELS:  -- defense to that because --

8          THE COURT:  So you're sitting here and you're making

9  an argument and they just disagree with the argument.  And I'm

10 going to consider it.  Don't include it in your brief because

11 it's a sale objection, right?  You're going to say, Judge, you

12 don't have the authority to do this.  No one should be selling

13 this, right.  You're going to tell me that and I'm going to

14 look at your case law and your legal argument and I'm going to

15 look at theirs and then I will give you a decision on that.

16         MR. MICHAELS:  I respect what you're saying about

17 with regard to the sale process.

18         THE COURT:  Uh-huh.

19         MR. MICHAELS:  My question is different than that, is

20 we -- Rembrandt has the ability to go after SSG today in a

21 different court for patent infringement unless the Trustee is

22 claiming that they are covered by a valid, current, paid up

23 license with Rembrandt.  And I'm asking the Trustee to clarify.

24 Are they saying that they have -- that Stream has a valid paid

25 up license with Rembrandt?

1          THE COURT:  Your response, Mr. Vagnoni?

2          MR. VAGNONI:  It sounds like he's asking me to

3   testify under threat of suit of the Trustee's professionals.

4          THE COURT:  Okay.  Well, in any case, I would like to

5   have any footnotes that you want to add to the schedules by,

6   let's say Wednesday.  So on Friday, if you could just put

7   together whatever footnotes that you want, just tell them,

8   like, do a black line, right?  And then send them a black line

9   of the schedules.

10          But let's talk about the scheduling here, right?  So

11  I know you're telling me, Hawk, that you have to have this, you

12  know, this all is done by the 10th.  But I need to have, you

13  know, the schedules nailed down so that a potential bidder

14  would know exactly what they're buying.  So we need to get that

15  done first.  I can't -- we can't send this out for bidding

16  until that's done.

17          So once the schedules are done on Friday because

18  they're going to give you their comments by just say Friday

19  morning at 9 a.m., right?  So you -- did you say tomorrow

20  you're going to get them?  So what time tomorrow do we have the

21  schedule?

22          MR. VAGNONI:  Yeah, by afternoon.

23          THE COURT:  In the afternoon?

24          MR. VAGNONI:  And look, if we can get them in today,

25  we're going to get them in today.

1              THE COURT:  Okay.

2              MR. VAGNONI:  But we would like to have a week until

3    tomorrow and we're going to do it as soon as we possibly can.

4              THE COURT:  Okay.  So then Friday by 5 p.m.  I'd like

5    you to hand your black line of what the schedule looks like

6    back to them, okay.  So that they can attach that to the

7    purchase agreement.  Yes?

8              MR. SWICK:  Well, we have 48 -- like Monday by 5:00?

9    Like I have to fly home tonight, so I don't know whether it

10   will be tomorrow, that's Thursday.  So --

11             MR. VAGNONI:  We're not going to be here until

12   tomorrow.

13             MR. SWICK:  It might be quite voluminous.  Like I'm

14   not sure what they're going to --

15             THE COURT:  Okay.  That's fine.  You can have until

16   Monday, just to send out -- to add the footnote.  So let's say

17   by Monday 9:00 a.m. you're going to get them your footnotes to

18   the schedules.  Now, so on Monday, you guys are going to have

19   the schedules, right?  And you already presumably have your

20   asset purchase agreement.

21             So let's just talk about the bidding procedure.  Oh,

22   also the data room.  They've got some serious concerns about

23   what's in the data room.  So by the time that this goes live

24   and we send this out for people to bid on or show interest,

25   what's going on with the data room?  And can you make sure you

1   populate it with actual, like, information?  Who's -- when do

2   you -- okay.  So when do you think -- come on up, Mr. Victor.

3   When will the data room actually be sold with things that are

4   clear about what's being sold?

5          MR. VICTOR:  Good afternoon, Your Honor.  Scott

6   Victor for SSG.  The data room is full.  The data room has been

7   accessed by one party; VSI, who is made up of all the insiders

8   of the Debtor.

9          THE COURT:  Okay.  Let's just focus on what's in the

10  data room.  So is there--

11         MR. VICTOR:  The data room is fully set up.  And has

12  been for over a month.

13         THE COURT:  Okay.  Because they said there was

14  missing information in the data room.  Is it possible that they

15  looked at the data room before it was 100 percent complete?

16         MR. VICTOR:  They looked at it after it was 100

17  percent.

18         THE COURT:  Okay.

19         MR. VICTOR:  And they will complain about anything at

20  any time to stall the process.  There's nothing wrong with the

21  data room.

22         THE COURT:  Okay.  So you think that there's -- so

23  everything in the data room is there that would be.  So --

24         MR. VICTOR:  Yes.

25         THE COURT:  -- yeah.

1              MR. VICTOR:  But, Your Honor.

2              THE COURT:  Yeah.

3              MR. VICTOR:  Not one single party has signed an NDA

4   other than an insider of the Debtors and has requested access

5   to the data room.

6              THE COURT:  I understand.  This is going to be a very

7   short period.  I understand.  Yeah.  I'm aware of that.  Okay.

8   It's your position is that the data room has everything --

9              MR. VICTOR:  The data room is fully complete --

10             THE COURT:  Okay.

11             MR. VICTOR:  -- and needs nothing further.  We

12  understand that it is appropriate to file schedules to the APA

13  like in every other case.  That will be done tomorrow.  We'll

14  have until Monday to black line it and add their asterisks.

15  But I have to put on the record that in my 41 years of

16  experience, I've never been threatened by counsel as many times

17  that we've been threatened by Rembrandt.

18             Who are they to sue SSG?  My employees who are

19  working on this, we're not selling their intellectual property.

20  We're not infringing on their patent rights.  We're selling the

21  equity of subsidiaries that may or may not have any

22  intellectual property that may or may not belong or rightfully

23  be licensed by Rembrandt. So I take complete offense to that.

24             THE COURT:  Understood.

25             MR. THOMPSON:  Your Honor, I just might say though

1   that the Trustee of course, has a responsibility to make sure

2   that everything that he is attempting to sell below the --

3          MR. VICTOR:  Your Honor, the people --

4          MR. THOMPSON:  Excuse me.

5          MR. VICTOR:  -- and its subsidiaries --

6          THE COURT:  Let him finish his statement, Mr. Victor.

7   Go ahead.

8          MR. THOMPSON:  All of the assets that the Trustee is

9   purporting to sell, have full disclosure with regards to those

10  assets. And I think the point that Rembrandt has been making is

11  that disclosure has been incomplete to date.  I understand that

12  Mr. Victor suggests that everything is in the data room and

13  therefore any reasonable bidder could make a determination as

14  to what exposure they may or may not have.  We would argue that

15  is incorrect.

16         THE COURT:  Okay.  Thank you.

17         I understand, Mr. Victor.

18         MR. VICTOR:  Thank you, Your Honor.

19         THE COURT:  You're welcome.  Okay.

20         So Mr. Vagnoni, let's just talk about some deadlines,

21  okay?  So we have to pick a date for a sale hearing.  We have

22  to pick a date for a sale objection deadline.  And I'd also

23  like to get any replies by the Debtor to any objections.

24         MR. VAGNONI:  Well --

25         THE COURT:  All right.  So we should also start with

```
 1   like the bid deadline, okay.  So you're saying that -- so the
 2   big deadline right now you're suggesting is the 18th, but
 3   that's in like five days and we don't even have the schedules.
 4   We don't have them.  So I don't think we need a long time
 5   because I think that we could all agree that given everything
 6   I've heard today, I highly doubt anyone is going to be placing
 7   a bid, but you know, we should still put it out there for at
 8   least a couple weeks to see if you're going to generate any
 9   bids, okay.
10           So let's look at the calendar here.  All right.  So
11   presumably you'll have the final form of the schedule on the
12   18th.  So I think that we could get -- we can have a bid
13   deadline be December 2nd.  December 2nd.  And then that means
14   -- well, I'm sorry.  Yeah.  December 2nd and then we could have
15   an auction on the 3rd.  You guys are going to do that in your
16   offices, right?
17           MR. GEORGE:  If one is required.
18           THE COURT:  If one is required.  All right.  And so
19   then after that, we just need to -- we need to decide when
20   we're going to have the sale hearing.
21           MR. VAGNONI:  Your Honor.
22           THE COURT:  Yes?
23           MR. VAGNONI:  We have a sale closing deadline of
24   December 10th.  We're going to -- this is extremely tight with
25   those --
```

1          THE COURT:  I'm going to give you -- I mean, let me

2    just look at the schedule here.  Okay.  So the 10th is a

3    Tuesday.  All right.  Okay.  So I think what we should do is we

4    should have the sale hearing on -- I think we should have it on

5    the 10th of December.  Okay.  And I'll give you a ruling on the

6    10th because we're going to back into that all the objections

7    for when people are going to file objections to the sale.

8          MR. VAGNONI:  Okay.  Your Honor, that's going to put

9    us out of the agreement we have with Hawk.

10          THE COURT:  Okay.  So Hawk, I'm looking at my

11    schedule and I'm trying to give you a hearing as soon as I can,

12    and I'm -- you know, they're the ones who gave you the deadline

13    of December 10th, is that right?

14          MR. VAGNONI:  It was -- yeah, Hawk and SeeCubic.

15    Yeah.

16          THE COURT:  Yeah.  Okay.  So I'm trying to work with

17    you guys here, but I'm not going to be able to have a hearing

18    in the first week of December because I think we have a lot

19    going on then.  I mean, I guess we could try to have it on the

20    4th.

21       (Court and clerk confer)

22          THE COURT:  So I think what we should do then let's

23    have a sale hearing on the 4th of December at 1:00 p.m.  And

24    we'll make a sale objection deadline next Friday the 22nd, and

25    any responses to the objection should be filed by the 29th.

1    The deadline again is the 2nd, the auction is the 3rd.  We'll

2    have the hearing on the 4th.

3            MR. THOMPSON:  Well, Your Honor.

4            THE COURT:  Yeah.

5            MR. THOMPSON:  Your Honor, I would only make two

6    observations, right?  One, first that it's pretty clear that

7    Rome is not burning.  Notwithstanding protestations to the

8    contrary.  And we once again see the accommodation of the Hawk

9    parties even with regards to scheduling on something that was

10   completely within their control in terms of providing -- the

11   Trustee providing this list of assets well before now.

12           And frankly having other potential bidders have

13   access to this information in the data room.  It is

14   regrettable, although not too terribly unforeseeable that

15   nobody else was interested, given the information that they

16   would have and the concerns that any probable bidder would have

17   given what they know and what the risks probably are.

18           But beyond that, I just want the record to reflect

19   that there seems to be some suggestion that all VSI has done

20   throughout this process has been an obstructor.  We have tried

21   multiple times to provide alternative financing, in the way of

22   DIP financing to proposals.  And I am aware of Rembrandt having

23   made a proposal before that.

24           Mr. Vagnoni, during our hearing suggested that none

25   of those things were acceptable.  All of them -- I will

1   contend, Your Honor, all of them, each and every one was better

2   than the outcome that this trustee has decided is the only

3   track he can go down.

4          THE COURT:  I have one question.  Where is Phillips

5   in all this litigation?

6          MR. GEORGE:  Ready to cancel the --

7          THE COURT:  Excuse me?

8          MR. GEORGE:  Probably about ready to cancel the

9   license.

10          MR. VAGNONI:  Probably.  Your Honor --

11          THE COURT:  Where are they?  Like I haven't seen

12   them.  Like you're jumping up and down, but where's Phillips?

13          MR. GEORGE:  I spoken to Alex Damvelt if you'd like

14   to hear about that.  And I've spoken to Phillips as well.

15          MR. VAGNONI:  Your Honor, he's testified -- he's

16   testified enough.  Your Honor, the proposals that we received

17   -- and I don't want to prolong this anymore.  I know Your Honor

18   has made a ruling on dates.  The proposals that the Trustee has

19   received so far are from the same individual who found it has

20   grossly mismanaged the Debtor's --

21          THE COURT:  Mr. Vagnoni, I'm giving you everything

22   you want.

23          MR. VAGNONI:  I agree.

24          THE COURT:  I'm moving forward with the bid

25   procedure, and --

```
 1              MR. VAGNONI:  And I acknowledge that.

 2              THE COURT:  Okay.

 3              MR. VAGNONI:  And I thank you.  But to sit here and

 4    listen to --

 5              THE COURT:  There's zealous advocates --

 6              MR. THOMPSON:  I'm going to object to this line --

 7              THE COURT:  -- being paid to be --

 8              MR. THOMPSON:  -- to this line of -- I'm going to

 9    object.

10              THE COURT:  Everybody.  So Mr. Vagnoni, I don't need

11    to hear anything more from anybody.

12              MR. VAGNONI:  Thank you, Your Honor.

13              THE COURT:  Okay.  So I'll hear from all of you.

14    Just make sure you put in those briefs.  My law clerk is

15    waiting with baited breath to see all of your sale objections

16    because he's got to do a lot of research.  So next Friday,

17    okay.  We'll be taking a close look at all of that.  So please

18    include all of your arguments then.  Okay, everybody. I will --

19              MR. THOMPSON:  Thank you, Your Honor.

20              MR. VAGNONI:  Thank you, Your Honor.

21              THE COURT:  All right.  Thank you.  I have a 12:30

22    hearing.  Don't need to stand for me.  Okay.

23         (Proceedings adjourned at 12:47 p.m.)

24

25
```

C E R T I F I C A T E

      I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader