**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bky Case No. 23-10763 (AMC) (Jointly Administered) |
| The Debtors. | |

**MOTION OF VISUAL SEMICONDUCTOR, INC. TO STAY THE ORDER
(A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND INTERESTS, (B) AUTHORIZING THE TRUSTEE TO ENTER
INTO AND PERFORM DEBTORS' OBLIGATIONS UNDER THE ASSET
PURCHASE AGREEMENT, (C) APPROVING ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (D) GRANTING RELATED RELIEF PENDING RESOLUTION OF APPEAL**

Visual Semiconductor, Inc. ("**VSI**"), by and through undersigned counsel, hereby moves, pursuant to 11 U.S.C. §105(a) and Bankruptcy Rule 8007, for an order staying the relief granted by the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Court**") on December 9, 2024, titled *Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* [ECF No. 876] (the "**Sale Order**"), pending resolution of the appeal filed by creditor VSI of the Court's entry of the Sale Order (the "**Appeal**").

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ..................................................................................... 1

PRELIMINARY STATEMENT ................................................................................ 4

BACKGROUND ........................................................................................................ 4

LEGAL STANDARD................................................................................................. 13

ARGUMENT .............................................................................................................. 14

    a.    VSI has a High Likelihood of Success on the Merits ........................... 14

        i.    The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates. ............................................. 15

        ii.    The 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court.................................................................................... 18

        iii.    The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard. ............................................. 21

    b.    VSI will Suffer Irreparable Harm if Enforcement of the Sale Order is Not Stayed Pending Appeal ..................................................................... 23

    c.    A Stay Pending Appeal Would Not Substantially Harm Other Parties with an Interest in the Litigation ..................................................................... 25

    d.    A Stay Pending Appeal is in the Public Interest .................................................. 25

CONCLUSION............................................................................................................ 26

79203867;3

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Conine (In re Robertson)*,
  203 F.3d 855 (5th Cir. 2000) ...............................................................13

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015)..............................................................21

*Boggs Contracting, Inc. v. Freismuth*,
  2021 U.S. Dist. LEXIS 252335 (M.D. Fla. Dec. 27, 2021)...................21

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*,
  211 B.R. 813 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ...................................1, 18

*Coleman v. Commonwealth Land Title Ins. Co.*,
  No. CIV. A. 09-679, 2010 WL 2545539 (E.D. Pa. June 18, 2010).......................10

*Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*,
  415 B.R. 86 (Bankr. D. Del. 2009) ........................................................18

*Darby v. Zimmerman (In re Popp)*,
  323 B.R. 260 (B.A.P. 9th Cir.2005)........................................................13

*Energy Future Holdings Corp. v. Del. Tr. Co.*,
  648 F. App'x 277 (3d Cir. 2016) ............................................................15

*Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*,
  2013 WL 4804816 (D.N.J. Sept. 9, 2013) ..............................................13

*G4S Secure Integration LLC v. United States*,
  161 Fed. Cl. 387 (2022) ..........................................................................21

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986)....................................................................17

*In re Bidermann Indus. U.S.A.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997).....................................................19

*In re Blixseth*,
  No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) ............19

*In re Braniff Airways, Inc.*,
  700 F.2d 935 (5th Cir. 1983) ..................................................................16

1

*In re Coburn*,
  250 B.R. 401 (Bankr. M.D. Fla. 1999) ...................................................................13

*In re Crowthers McCall Pattern, Inc.*,
  114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...................................................................16

*In re DeCurtis Holdings*,
  2023 WL 5153645 ...................................................................................................20

*In re Innkeepers USA Trust*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................19

*In re Interiors of Yesterday, LLC*,
  Case No. 02-30356 (LMW), 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007)...................13

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015).............................................................................11, 20

*In re Summit Global Logistics, Inc.*,
  2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) .........................................19

*In re Univ. Heights Ass'n*,
  2007 Bankr. LEXIS 1200 (Bankr. N.D.N.Y. Jan. 22, 2007) ...................................19

*In re Westpoint Stevens Inc.*,
  333 B.R. 30 (S.D.N.Y. 2005)...................................................................................17

*In re Whitehall Jewelers Holdings, Inc.*,
  Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) ...............12, 14

*In re Worcester Country Club Acres, LLC*,
  655 B.R. 41 (Bankr. D. Mass. 2023) .....................................................................13

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
  780 F.2d 1223 (5th Cir. 1986) ...............................................................................17

*Jones v. GE Capital Mortgage Co. (In re Jones)*,
  179 B.R. 450 (Bankr. E.D. Pa. 1995) ....................................................................12

*Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*,
  2023 U.S. Dist. LEXIS 25025 (M.D. Fla. Feb. 14, 2023) ......................................21

*Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*,
  2012 U.S. Dist. LEXIS 200492 (S.D. Fla. 2012)...................................................21

*Mendez v. Puerto Rican Int'l Cos.*,
  553. F.3d 709, 712 (3d Cir. 2009).........................................................................10

2

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) ...............................................................12

*Moody v. Amoco Oil Co.*,
   734 F.2d 1200 (7th Cir. 1984), cert denied, 469 U.S. 982 (1984) ............................12

*Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007)...............................................................................16, 17

*News Am. Mktg. In-Store, LLC v. Emmel*,
   429 F. App'x 851 (11th Cir. 2011) (unpublished) ....................................................21

*Nken v. Holder*,
   556 U.S. 418 (2009).....................................................................................................11

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*,
   119 F.3d 349 (5th Cir. 1997) .......................................................................................16

*Ross v. A V Car & Home, LLC (In re Brown)*,
   Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625 (Bankr. D.C. Jan. 30, 2019) ....................................................................................................13

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
   2008 WL 2498048(3d Cir. June 24, 2008) .................................................................13

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
   895 F.3d 1304 (Fed. Cir. 2018)...................................................................................21

*Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*,
   362 F.3d 603 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) ...........................................................................................................................13

**Statutes**

11 U.S.C. §105(a) ..............................................................................................................1

11 U.S.C. § 363 (f)......................................................................................................13, 20

Section 363 of the Bankruptcy Code ..................................................................13, 17, 20

Section 541 of the Bankruptcy Code ...............................................................................15

**Rules**

Bankruptcy Rule 6004(h)....................................................................................................7

Bankruptcy Rule 8007 ........................................................................................................1

3

## PRELIMINARY STATEMENT

1.      The Court should stay the Sale Order pending the appeal. Beyond the facts that the assets cannot be sold "free and clear" and SeeCubic as proposed stalking horse (the "**Proposed Purchaser**") is not a "good faith" purchaser, as discussed at length herein, there are a plethora of other reasons why VSI has a high likelihood of success on the merits for a judgment that the Sale Transaction cannot go forward. For example, (a) the Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, *before* approving a sale, a court must first determine whether such property constitutes property of the estates; (b) the 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved; and (c) the proposed sale process is neither fair nor reasonable and is subject to a heightened scrutiny standard.

## BACKGROUND

2.      This matter revolves around the Trustee's attempts to sell the assets of the Debtors to the Hawk Parties (as defined below), contrary to law and against the interests of other stakeholders in the cases.

3.      On January 4, 2024 the Debtor, in Adv. Case No 23-00057-AMC, obtained a Temporary Restraining Order ("**Bankruptcy TRO**") (Adv. No. 119) preventing the Hawk Parties from using the Debtors' technology to compete with the Debtors. Prior to even the entry of the Bankruptcy TRO, prepetition on August 9, 2022, the Delaware Chancery Court had already issued a temporary restraining order enjoining SeeCubic, Inc. from selling Stream's assets, which assets the Hawk Parties have been  unlawfully in their possession since then (the "**Delaware TRO**" together with the Bankruptcy TRO, the "**TROs**").

4.      The Hawk Parties' efforts to take control of the Debtors' property preceded and precipitated the filing of the Chapter 11 Cases, continued throughout this case in violation of the

79203867;3

automatic stay and a Worldwide Stay Order (defined below)[2], and continued after entry of the

Bankruptcy TRO. Since entry of the TROs, the Debtors, Rembrandt, and VSI have, at various

points throughout the case sought to enforce the automatic stay, the Worldwide Stay Order, and

the TROs against the *ultra vires* actions of the Hawk Parties to take control of the Debtors assets,

which efforts, once a Chapter 11 Trustee was appointed, shifted to utilizing the Trustee to take

control of those assets. Notwithstanding the Hawk Parties' constant violations of the automatic

stay, the Worldwide Stay Order, and the TROs, the Court refused to sanction or prevent the Hawk

Parties from repeatedly violating  these multiple court orders through their unlawful possession of

estate assets, which possession persists to today. While the 9109 Agreement with the Hawk Parties

ignores all of their stay and TRO violations throughout the case, the Trustee's proposed sale cannot

overcome Rembrandt's property interests (and the sale's immediate infringement upon

Rembrandt's intellectual property rights).  As such, if completed the sale would itself be violation

of the TRO and, if consummated as proposed, it will destroy all the value in the estate by rendering

the Debtors' IP unusable and the StreamTV Debtors' hopelessly unable to reorganize – all while

irrevocably destroying Rembrandt's trade secrets without a remedy.  The Court failed to address

these violations or their clear consequences: the TRO transgressors will achieve the precise

purpose of their transgressions – transfer and assignment of title to the assets they have

misappropriated, controlled, and/or sought to possess since the commencement of these cases – all

under the "color of law" and with the imprimatur of the Court and its appointed fiduciary, the

Trustee.

---

[2]On December 14, 2023, in light of the Hawk Parties' extra-territorial misconduct and misappropriation, possession, and control of Debtor assets, the predecessor judge in this bankruptcy proceeding (Judge Magdeline D. Coleman) recognized the ongoing damage to the Debtors estates and potential harms to third parties (e.g. Rembrandt) and issued a Stipulated Order Restating and Enforcing the Worldwide Automatic Stay (the "**Worldwide Stay Order**," attached hereto as **<u>Exhibit A</u>**) (Docket #517).

79203867;3

5.      On June 7, 2024, the Court entered an order approving the Trustee's Settlement (the "**9019 Agreement**") with Hawk Investment Holdings, Ltd., in its capacity as Collateral Agent for the secured noteholders of SeeCubic, Inc., SLS Holdings VI, LLC, and various individuals who received releases, including Arthur Leonard, Robert Morton, Shadron L. Stastney, Alastair Crawford, Asaf Gola, Kevin Gollop, Patrick Miles, Patric Theune, and Krzysztof Kabacinski (collectively, the "**Hawk Parties**"). The Court entered the 9019 Agreement despite the obvious weakness of the evidentiary record, an exceptionally large claim allowance, and clear conflicts between the Debtors' estates and the Hawk Parties, specifically SeeCubic, Inc. and its principal, Shadron Stastney.

6.      Nearly four months later, on September 30, 2024, the Trustee filed the Sale Motion, despite a multitude of alternative funding, purchase, and plan proposals from VSI and Rembrandt to the Trustee to achieve a better outcome for all stakeholders than the one contemplated by the 9019 Agreement – including for unsecured creditors. The process contemplated by the Sale Motion disproportionately benefited the Hawk Parties at the expense of all other stakeholders.

7.      As anticipated, the sales process produced no bids beyond that of SeeCubic as proposed stalking horse bidder. In fact, according to SSG's (defined below) statements on the record at the November 13, 2024 hearing, no other party has expressed any interest whatsoever.[3] Indeed, as the Court heard from the Trustee and his advisors at the November 13th hearing, after the Trustee's marketing efforts, no prospective bidder was sufficiently interested in the Debtors' assets to sign a simple NDA to access the sale data room. Only VSI signed an NDA, but the Trustee's investment banker did not even bother sending VSI the teaser used to market the Debtors' assets .Given the glaring issues and legal defects regarding the sale, the likelihood of VSI

---

[3] Which statements were reinforced by SSG's testimony at the December 4, 2024 sale hearing. *See* December 4, 2024 Hearing Transcript attached hereto as **Exhibit B** at 63:22-25, 64:1-4.

placing a bid was non-existent, and no other party could reasonably be expected to submit a bid under the circumstances. Considering the asset value involved, that no contacted party was interested enough to sign an NDA is an indictment of the Trustee's marketing and sale process, which is borne out by the inexplicable fact that none of the most-likely bidders for the 3-D no glasses technology (i.e. Ultra-D technology) appear to have sent teasers or contacted in any way.[4]

8.     The Trustee has failed to properly assess or disclose what is being sold and does not even know what he is actually selling. In contravention of his duties to inventory and marshal the estates' assets, the Trustee refused to recover millions of dollars in the Debtors' property from the Hawk Parties or wrest control of high-value assets from SeeCubic, Inc. and its principal, Mr. Stastney. Indeed, during the limited cross-examination that the Court permitted at the sale hearing, the Trustee admitted that he made no effort to inventory or marshal the estates' assets (see December 4, 2024 Hearing Transcript at 25:7-14[5]), nor did he make an effort to determine whether the assets implicated by the proposed sale (and identified by the Asset Purchase Agreement) are actually property of the Debtors' estates (see *Id*. Pages 26-29). Meanwhile, the Trustee willfully ignores the conduct and conflicts of interest presented by Mr. Stastney occupying both sides of the Trustee's purported "363 sale" transaction – actively controlling SeeCubic, B.V. and its assets (as sole director) while serving as "stalking horse bidder" for assets ***already in his possession, custody, or control***. Even if a third party were to purchase the assets, the Trustee has failed to obtain any assurance that the Hawk Parties will relinquish the Debtors' property or cease their

---

[4]*See* December 4, 2024 Hearing Transcript, attached hereto as **Exhibit B** at 72:10, 73:21 for cross-examination transcript testimony of SSG's Scott Victor regarding the 23 licensees identified in the Philips License Agreement and whether those most likely bidders for the Ultra-D technology were contacted.
[5]*See* December 4, 2024 Hearing Transcript at 25:7-14 ("Question: Did you ever do an inventory of the assets of Stream TV? Answer: Well, that was one of the issues in the case that is not typical in a Chapter 11 Trustee case. There were no operations and it was unclear at the time, and remains unclear, exactly which entities of Mr. Rajan's have possession of tangible assets, records, et cetera. So I don't believe Stream TV has certainly any significant tangible assets. And if they do, I have not been aware -- made aware of them or know their location or who is in control of them.")

79203867;3

unauthorized use of the Debtors' intellectual property. In open defiance of multiple court orders, the Hawk Parties have refused to turn over the Debtors' assets for years, further undermining the viability of the sale.

9.      Inexplicably, the Court allowed the Trustee's counsel to unilaterally withdraw (without prejudice) a sanctions motion against VSI that contained a fraudulent and altered exhibit and misrepresentations by counsel regarding the same –over VSI's objections and notwithstanding the motion being joined as a contested matter. In another unexplained decision, the Court required VSI and Rembrandt to help "cure" the Trustee's failure to adequately disclose the assets being sold pursuant to the 363 sale by annotating a late-filed and deficient asset listing.

10.      The Trustee chose "the Secured Creditors," *a.k.a.,* the Hawk Parties, as the proposed stalking horse bidder and acquiesced to allowing their claim of $180 million (Sale Motion ⁋ 30(I)(a)), $150 million to be used as a credit bid (Sale Motion ⁋ 30(I)(b)), despite the dubious nature and amount of the Hawk Parties' claims and the Trustee's failure to investigate the conversion of the Hawk Parties' notes pursuant to a debt-to-equity conversion agreement of which the Trustee was well aware.

11.      VSI has repeatedly emphasized that allowing such credit bid was inappropriate on its face. The insider stalking horse bidder should not have been permitted to credit bid in light of the history, facts and circumstances of these cases, the disputes surrounding the legitimacy of its claims, and – most importantly – the stalking horse's theft and control of the Debtors' assets before and during the pendency of this bankruptcy case. Designating such a malevolent insider as the stalking horse is wholly inequitable to legitimate creditors and constitutes "cause" to deny credit bidding rights. Additionally, in these Chapter 11 cases, the credit bid also inevitably chilled

bidding, rather than providing any value to the estates, which Courts have found to be cause enough to deny the right to credit bid.

12.     At the hearing to approve the bidding procedures on November 13, 2024, the Court did not hear testimony or receive other evidence in support of the Trustee's proposed bidding procedures, and the Trustee never filed nor otherwise offered evidence to buttress or rationalize the relief sought in his Bidding Procedures Order (defined below).  Indeed, the hearing to approve the Trustee's proposed bidding procedures was not an evidentiary hearing at all.[6]  Rather, at the close of the hearing the Court informed VSI and other parties in interest that the sale hearing to be held on December 4, 2024 to approve the sale transaction would be their opportunity to make their cases. *See* November 13, 2024 Hearing Transcript, Attached hereto as **Exhibit C** 83:12-18 ("THE COURT: Okay. So I'll hear from all of you. Just make sure you put in those briefs. My law clerk is waiting with baited breath to see all of your sale objections because he's got to do a lot of research. So next Friday, okay. We'll be taking a close look at all of that. So please include all of your arguments then"). Notwithstanding the lack of an evidentiary hearing and the absence of any evidentiary support of any kind from the Trustee, the proposed order approving the bidding procedures (the "**Bidding Procedures Order**")[7], was signed by the Court and granted exceptional, unsupported, and unwarranted findings and relief that included:

> i.     findings that "the Trustee has articulated good and sufficient reasons for authorizing the Bidding Procedures," that such procedures "are fair, reasonable, and appropriate  under the circumstances and designed to maximize value of the Assets" (Bidding Procedures Order ¶ B);

---

[6]See generally the November 13, 2024 Bidding Procedures hearing transcript, attached hereto as **Exhibit C**.
[7]As entered at Docket No. 811.

79203867;3

ii.     a finding that "the Bidding Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets" (Bidding Procedures Order ¶ B);

iii.     a finding that the Asset Purchase Agreement "was negotiated in good faith an at arm's length between the parties and may serve as a reasonable and appropriate baseline for soliciting other bids for the Assets" (Bidding Procedures Order ¶ C); and

iv.     ordering related relief that "the Trustee shall have no personal liability for any obligations of the Debtors' estates" (Bidding Procedures Order ¶ 21), and that "notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry" (Bidding Procedures Order ¶ 23).

13.     Mysteriously, the Court was able to make all of the foregoing findings of fact and conclusions of law and issue the sweeping relief contained in the Bidding Procedures Order without a single piece of evidence. If the November 13, 2024 Bidding Procedures hearing met the legal standard for conducting an evidentiary hearing for a contested matter in federal bankruptcy proceedings, then it is fair to say that there is no standard at all.

14.     At the ensuing Sale hearing, on December 4, 2024, VSI and Rembrandt, came prepared to present their witnesses and arguments in accordance with the Court's promises that the sale hearing would be their opportunity to present their case in chief. However, the Court denied VSI and Rembrandt this opportunity. First, the Court severely limited and then curtailed VSI's cross-examination of the only two witnesses offered by the Trustee in support of his Sale

Motion – the Trustee himself and his investment banker at SSG (defined below).[8]  Thereafter, the

Court denied VSI and Rembrandt the right to put on witnesses or other evidence in support of their

case in chief.[9]  Finally, the Court cut the hearing off without the opportunity for any oral argument,

suggesting that "[the Court] had heard all [it] needed to hear" and would read the briefs.  *See e.g.*

December 4, 2024 Hearing Transcript, attached hereto as **Exhibit B** 50:5-9 ("Okay. And I don't

need to hear from that witness today, and I'm not going to hear from him today. I'm happy to hear

all the arguments that you've listed in your  briefs, but I'm not taking testimony from that

gentleman. I don't need that for part of the sale process."); *Id.* 74:13-20 ("I don't have any need to

hear from any witnesses about the sale. What I was interested—if there were any concerns. Like,

the concerns I was interested in hearing about today was the sale process, . . . And I've heard all

of your questions, and I don't have any concerns about this sale. I don't.").

15.    This "sale hearing" failed to meet the standard for an "evidentiary hearing" or

afford VSI and Rembrandt any material due process.  The Court constricted cross-examination of

the Trustee's only two witnesses in such a manner as to deny any meaningful exposure of the most

important facts underlying the proposed sale (i.e. "free and clear" transfer, and "good faith

purchaser" status) – and the relief sought most by the Trustee and Proposed Purchaser.

16.    Moreover, at the same December 4, 2024 hearing, the Court permitted the Trustee

to file a materially different form of Sale Order (which modified the "deal terms" originally set

forth in the 9019 Agreement) less than three hours before the hearing without opportunity for

sufficient review, let alone adequate opposition or discovery.

17.    Entering the Sale Order that permits the transfer of non-estate property "free and

clear" of liens, claims, and encumbrances and confers "good faith purchaser" status on the stalking

---

[8]*See* December 4, 2024 Sale Hearing Transcript, attached hereto as **Exhibit B**, 22:25, 23:14.
[9]*See* December 4, 2024 Sale Hearing Transcript, attached hereto as **Exhibit B**, 74:6, 75:13, 76:15-19.

79203867;3

horse bidder without an evidentiary record permitting the Court to grant such relief is clearly problematic – indeed, it is fatal to the requested relief. The only evidence the Trustee submitted in support of his requested sale order relief were two declarations (one from the Trustee and one from SSG Advisors, LLC ("**SSG**") as investment banker), and neither established any facts in support of (i) free and clear transfer or (ii) good faith purchaser status.  As noted above, no material cross-examination was permitted by the Court.  Also as noted above, the Court denied VSI's and Rembrandt's request to put on evidence to contest the "free and clear" and "good faith" findings.

18.     Since the appointment of the Trustee, there have been numerous instances in the Chapter 11 Proceedings in which the Court acted to limit VSI's rights to due process, including with respect  to the Court's repeated refusal to permit VSI's reasonable discovery. On June 16, 2024, Akerman LLP filed a Notice of Appearance as counsel for VSI and promptly filed an Objection to the Motion for Turnover [ECF No. 672] (the "**Objection to Turnover**") and a Motion to Reconsider the order granting the 9019 Agreement [ECF No. 686] (the "**Motion to Reconsider**").

19.     On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum on the Trustee concerning the issues raised in the Objection to Turnover and Motion to Reconsider (the "**Original Discovery Requests**").  Among other things, the Original Discovery Requests sought information regarding exhibits to the Trustee's Motion for Turnover that were clearly altered and representations that were demonstrably false and misleading.  Rather than account for the altered exhibit documents and misleading statements in his Motion for Turnover, the Trustee moved to quash the Original Discovery Requests, sought entry of a protective order, and moved to withdraw the offensive Motion for Turnover without prejudice [see ECF No. 724].

20.     On September 30, 2024, the Court entered the *Order Granting Motion to Withdraw Turnover Action* [ECF No. 776]. The same day, the Court entered the *Order Granting Motion to Quash* [ECF No. 777].  More recently, at the hearing on November 14, 2024, the Court entered an order [ECF No. 805] denying the reconsideration motion and granting the motion to quash remaining discovery, including discovery relating to the sale process. Effectively, taken together, these orders have completely denied VSI any form of discovery whatsoever, including with respect to the all-important sale process.

21.     Taken together, the Court's actions and orders quashed discovery regarding: (i) the 9019 Agreement reconsideration; (ii) the Debtors' engagement of conflicted investment banker, SSG; (iii) the Trustee's failure to enforce the TRO or return assets to the Debtors' estates; (iv) the bid procedures; and most recently, the Trustee's proposed 363 Sale, including but not limited to: (a) assets recovered to the estate, (b) intellectual property assets, (c) bonding machine title, and efforts to control subsidiaries and assets purportedly held there.  As a consequence of all of the foregoing, the Sale Motion was approved and the Sale Order entered on virtually no evidence whatsoever – and certainly insufficient evidence to justify the broad and sweeping relief sought by the Trustee and obtained in the Sale Order.  Accordingly, the Sale Order should be stayed to afford the opportunity to properly prosecute its appeal without the onset of irreparable harm.

## LEGAL STANDARD

22.     Generally a party can move at any time for a stay pending the outcome of another related case, the outcome of another appeal, and for any reason under the Court's discretion so long as this test is met:  "(1) whether a stay would unduly prejudice or present a clear tactical advantage to the nonmovant, (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set. …" *Coleman v. Commonwealth Land Title Ins. Co.*, No. CIV. A. 09-679, 2010 WL 2545539, at *2 (E.D. Pa. June

18, 2010). The Court's power to stay a proceeding is "a matter of its discretion to control its docket." *Mendez v. Puerto Rican Int'l Cos.*, 553. F.3d 709, 712 (3d Cir. 2009) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)).

23.    In determining whether a stay pending appeal is appropriate, a court considers the following four factors: "(1) whether the [party] has made a strong showing of the likelihood of success on the merits; (2) will the [party] suffer irreparable injury absent a stay; (3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest." *In re Revel AC, Inc.,* 802 F.3d 558, 565 (3d Cir. 2015) (citing *Repub. Of Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). *See also Nken v. Holder*, 556 U.S. 418, 426 (2009) (same). In its decision in *Nken v. Holder,* the Supreme Court stated that the first two factors are "the most critical factors" to be considered, *Revel*, 802 F.3d at 568 (citing *Nken)*, but all four factors weigh in favor of a stay in the present case.

24.    Courts "balance . . . and consider the relative strength of the four factors," while recognizing that the first factor, likelihood of success, is the most important one. *Revel*, 802 F.3d at 568. *See also* 16A Charles Alan Wright *et al*., *Federal Practice and Procedure* § 3954 (5th ed. 2024 update) ("The four factors should be balanced; thus, for example, if the balance of harms tips heavily enough in the stay applicant's favor then the showing of likelihood of success need not be as strong, and vice versa.").

## ARGUMENT

### a.    VSI has a High Likelihood of Success on the Merits

25.    Beyond the fact that the Proposed Purchaser is not a "good faith" purchaser, as discussed at length herein, there are multiple other reasons why VSI has a high likelihood of success on the merits for a determination that the Sale Transaction cannot go forward.

26.    This is because (a) the Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, a court must first determine whether such property constitutes property of the estates; (b) the 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved; and (c) the proposed sale process is neither fair nor reasonable and is subject to a heightened scrutiny standard.

i.    <u>The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates.</u>

27.    The Court has failed to address whether the assets were property of the estate, despite clear and plentiful evidence to the contrary. It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date. *Jones v. GE Capital Mortgage Co. (In re Jones)*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition") (*citing First Fid. Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019) (recognizing the "general bankruptcy rule [that] the estate cannot possess anything more than the debtor itself did outside bankruptcy" and that "[a] debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.").

28.    A debtor (or in this case, the Trustee), may not sell property unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the

estate – *in an adversary proceeding, not a contested matter*. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at \*9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. B.A.P. 2001)).

29.    This is Third Circuit law.[10] Bankruptcy courts have consistently made this finding. *See also Anderson v. Conine (In re Robertson)*, 203 F.3d 855 (5th Cir. 2000) (holding that Section 363(f) does not allow a trustee to sell property that is not property of the estate); *In re Worcester Country Club Acres, LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (holding that because the ownership of the land was disputed, it "must be adjudicated in order to determine if they are property of the Debtor's bankruptcy estate, they cannot be sold under § 363(b) or (c) and pursuant to § 363(f)(4) prior to a resolution of those issues."); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (it was necessary to determine whether an asset was property of the estate in order to then decide whether the trustee was entitled to sell the asset pursuant to Section 363(f))); *Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir.2005); *Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*, 2013 WL 4804816, at \*3 (D.N.J. Sept. 9, 2013) ("it is well-settled that a 'bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property"). A sale under Section 363 "cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate' . . . ." *In re Interiors of Yesterday, LLC*, Case No. 02-30356 (LMW) , 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007). *See also Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 605–06 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) (this Court

---

[10] *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin),* 2008 WL 2498048(3d Cir. June 24, 2008) at \*1. In *SLW Capital,* a debtor included a provision in the confirmed plan which invalidated a mortgage assignee's claim for a secured interest. The Third Circuit held that lien invalidation can occur only through litigation in an adversary proceeding which provides greater procedural protection and, therefore "the adversary proceeding Rule at issue here is mandatory and establishes a right to specific process that must be afforded. Its mandatory nature is grounded in principles of due process that trump `finality.'" *Id.* at \*6.

"may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property."); *Ross v. A V Car & Home, LLC (In re Brown)*, Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr. D.C. Jan. 30, 2019) (court may not authorize sale of property where ownership of a portion of the property is in dispute).

30.     Further, it is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4)).

31.     The Trustee has not even attempted to meet that burden: In the December 4, 2024 hearing on the Sale Motion, VSI repeatedly asked the Trustee whether an extensive inventory had ever been conducted regarding the Debtors' assets and those that might belong to VSI.  The Trustee provided vague responses (*See e.g.* Hearing Transcript December 4, 2024 25:5-13 (Q: Did you ever do an inventory of the assets of Stream TV? A: Well, that was one of the issues in the case that is not typical in a Chapter 11 Trustee case. There were no operations and it was unclear at the time, and remains unclear, exactly which entities of Mr. Rajan's have possession of tangible assets, records, et cetera. So I don't believe Stream TV has certainly any significant tangible assets. And if they do, I  have not been aware—made aware of them or know their location or who is in control of them.")). The Trustee mischaracterizes "*as is, where is*" to absolve himself of his obligations to the estate. "As is, where is" describes the assets condition, not the estate's title or the Trustee's authority to convey.

79203867;3

32.     The Court also failed to address whether the assets were property of the estate, despite clear evidence to the contrary. In fact, it is evident that, as described herein, the trustee is attempting to sell the assets on an "as-is, where-is" basis, without understanding (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used and continue to use, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to the Proposed Purchaser has been completed.

33.     Despite all the evidence to the contrary, the Court failed to properly address whether the property is that of the Debtors' estates under section 541 of the Bankruptcy Code.  In fact, faced with this issue at the December 4, 2024 hearing,  the Court repeatedly stated that the inquiry was not "relevant." *See e.g.* Hearing Transcript December 4, 2024 38:3-24 (when cross-examining the Trustee about certain critical Debtor software assets (i.e. Stream production code embedded with Rembrandt source code house on servers in California), the Court interjected "Well, who cares? All that we care about are assets now. All right?" and went on to declare "you're talking about some servers from California.  I don't really understand how its relevant." Hearing Transcript December 4, 2024 40:10-12).

     ii.     <u>The 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court.</u>

34.     Further, it is evident that the sale transaction contemplated by the Sale Motion is sale that cannot be approved, as it clearly constitutes an impermissible *sub rosa* plan of reorganization that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent.

35.     When a sale process and/or settlement in bankruptcy has the ultimate effect of dictating the terms of any future reorganization plan, the bankruptcy court must deem the

transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. "The hallmark of such a plan is that it dictates the terms of a reorganization plan." E*nergy Future Holdings Corp. v. Del. Tr. Co*., 648 F. App'x 277 (3d Cir. 2016). This is because it "short circuits" the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

36.     Thus, *sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted."). Where a settlement circumvents creditors' rights to vote on key provisions, that settlement can be said to dictate the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

37.     This is precisely the circumstance of this case. The terms of the proposed sale process, as outlined in the 9019 Agreement and in the Sale Motion, clearly constitute a *sub rosa* plan of reorganization. Among other things, the sale seeks to improperly channel consideration to specific creditor groups – as discussed herein, the Trustee has selected the Hawk Parties as the stalking horse and agreed to give them an allowed claim of $180 million, $150 million of which may be used as a credit bid. This is blatantly at the expense of the Debtors' other creditors – pursuant to the 9019 Agreement, $7,500,000 would be carved out to pay administrative and general unsecured creditors. Notably, if a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until Hawk's $180 million claim is paid in

full. As such, it essentially ensures that the Debtors' unsecured creditors, and perhaps even administrative expense claimants, receive pennies on the dollar. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

38.    Further, the Debtors impermissibly seek to use the 363 Sale to bind the Debtors' creditors to a treatment of their claims without having that proposed treatment tested by the standards of the Bankruptcy Code. Such a proposed sale cannot proceed. See, e.g., *In re Westpoint Stevens Inc.,* 333 B.R. 30, 52 (S.D.N.Y. 2005) ("Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved[.]"); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226-28 (5th Cir. 1986) (same).

39.    Quite simply, a 363 sale is not a substitute for a plan of reorganization. *See Westpoint Stevens Inc*., 333 B.R. at 52 (noting when a proposed transaction specifies terms for a reorganization plan, the parties and the court "must scale the hurdles erected in Chapter 11") (citation omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (The "trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization."); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (finding that section 363 does not permit a debtor to abrogate the protections afforded creditors by section 1129 and the plan confirmation process).

40.     The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the interest of the estates, and not unfair to the creditors. The proposed sale fails each of these requirements.

      iii.    <u>The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard.</u>

41.     VSI has been repeatedly criticized in these Chapter 11 Cases for allegedly "making noise", yet this characterization fails to acknowledge the underlying frustration borne from a sense of being ignored regarding clearly fatal flaws in this sale process. The proposed buyer is an insider with a well-documented history of misconduct relating to the assets proposed to be sold.  The Court has failed to address the Proposed Purchaser's insider status.

42.     SeeCubic is certainly an insider with respect to the Debtors. Indeed, SeeCubic has exerted an inordinate amount of control over the Debtors' assets and sale process, and has time and time again violated the automatic stay and the Bankruptcy TRO in place. Control of SeeCubic rests with Stastney, who was both Vice Chairman of the Board of Directors and Chief Financial Officer of Debtor Stream shortly before he orchestrated an asset takeover with the Hawk Parties through the invalidated Omnibus Agreement. Stastney had access to the Debtors' financials, sensitive customer information, investor database, and other critical data. He siphoned key personnel from the Debtors and ultimately used the Dutch court system to install himself as director of the Debtors' R&D subsidiary, a position he uses today to exert control over the Debtors' engineering development activities. *See Robertson Declaration* ⁋⁋ 7, 33, 54, attached hereto as **Exhibit D**.

43.     Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required

where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders . . . the proposed sale is subject to heightened scrutiny.").

44.    This heightened scrutiny also applies to a sale proposed by a trustee, rather than a debtor in possession. *In re Blixseth*, No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010). In *Blixseth*, the court refused to approve a sale of property as proposed by the trustee to a secured creditor credit-bid. The court found that the creditor had "very close ties to the debtor" and refused to apply the standard applicable to non-insider sales or to give deference to the trustee's business judgment. Instead, the court applied the more rigorous *Bidermann* standard for evaluating insider transactions. As such, the court denied the bidding procedures proposed by the trustee. In applying heightened scrutiny, courts are concerned with "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

45.    This transaction would not withstand heightened scrutiny. As in *Bidermann*, SeeCubic and the Hawk Parties clearly have "very close ties" to the Trustee. As detailed herein and in the SSG Objection, the Hawk Parties have a long history of improperly possessing the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this Court's orders, specifically including the TRO that in effect through November 12, 2024.  If this Court were to examine "the integrity and entire fairness of the transaction at issue" it could not reasonably conclude that this transaction was acceptable.

46.    The Court did not apply a heightened scrutiny standard in examining the transaction, and has not considered these arguments in these Chapter 11 Cases.

**b.    VSI will Suffer Irreparable Harm if Enforcement of the Sale Order is Not Stayed Pending Appeal**

47.    Because likelihood of success - the most important of the factors - is strong, the other interests that this court must balance are less important.  *Revel*, *Wright & Miller*, 802 F.3d at 568.  Nevertheless, the other three factors also support a stay.  Absent a stay, VSI will be irreparably harmed by the Sale Transaction and the related deprivation of their procedural and due process rights.

48.    Allowing the sale process to go forward would be devastating to VSI.  Although Section 363 of the Bankruptcy Code allows a debtor to sell its bankruptcy assets free and clear of liens and interests, that privilege exists only if certain circumstances are met. In a case with facts similar to those at bar, *In re DeCurtis Holdings LLC,* the United States Bankruptcy Court for the District of Delaware ultimately enjoined the sale and use of the assets by the debtor, finding that the sale would result in irreparable harm to the objecting entity and money damages would not compensate for the harm. *In re DeCurtis Holdings*, 2023 WL 5153645, at *22; 11 U.S.C. § 363 (f) (providing "such entity could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction of such interest"; where on a debtor's motion to sell assets pursuant to section 363 of

the Bankruptcy Code, a permanent injunction was found to be appropriate to prohibit the debtor's

sale, disclosure, or use of the information incorporated into the assets because misappropriation

of confidential business information could cause irreparable harm, as could violation of a

restrictive covenant, loss of control over reputation, and loss of goodwill.)

49.     Injury that "cannot be undone through monetary remedies" is irreparable. *Boggs

Contracting, Inc. v. Freismuth*, 2021 U.S. Dist. LEXIS 252335, at *9 (M.D. Fla. Dec. 27, 2021).

Here, the Hawk Parties' conduct caused and continues to cause several "hard-to-measure harms,

such as impaired goodwill and competitive position, that can justify injunctions." *Tex. Advanced

Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1331 (Fed. Cir. 2018).

50.     As a primary matter, an owner's "loss of control over its intellectual property

rights" is a prototypical form of irreparable harm. *E.g., Lead Creation Inc. v. P'ships &

Unincorporated Ass'ns Identified on Schedule A*, 2023 U.S. Dist. LEXIS 25025, at *12 (M.D. Fla.

Feb. 14, 2023). "The right to exclude competitors from using one's property rights is important,"

and "the need to protect this exclusivity" warrants an injunction. *E.g., Apple Inc. v. Samsung Elecs.

Co*., 809 F.3d 633, 642 (Fed. Cir. 2015); *accord News Am. Mktg. In-Store, LLC v. Emmel*, 429 F.

App'x 851, 853 (11th Cir. 2011) (unpublished) (permanent injunction barring defendant from any

further disclosures of confidential information); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs.

Worldwide, LLC*, 2012 U.S. Dist. LEXIS 200492, at *31-32 (S.D. Fla. 2012) ("some form of

permanent injunction is appropriate with regard to [defendant's] use of Plaintis' Confidential

Information").

51.     Further, the injury to competitiveness caused by misappropriation of valuable

confidential information is a classic form of irreparable harm, as such injury cannot be reversed or

79203867;3

repaired. *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) ("lost opportunity to compete on a level playing field" found sufficient to prove irreparable harm).

> **c.** **A Stay Pending Appeal Would Not Substantially Harm Other Parties with an Interest in the Litigation**

52.    The harm to other persons consists of an inability to carry out the Sale Transaction in the precise manner in which it was designed by the Trustee, to the Hawk Parties' sole benefit. The Debtors themselves are arguably are not harmed by the stay pending appeal, and may ultimately benefit.  The Trustee designed the sale process to benefit just the Hawk Parties, in contravention with his mandate to maximize the benefits to the Debtors and their estates. As discussed above, the sale transaction as contemplated in the sale motion would be harmful to other parties in interest, including the Debtors and their creditors.  Moreover, the Trustee and the Hawk Parties admitted that they did not close the sale transaction on December 10, 2024, as they told the Court and other participating parties they would at the December 4, 2024 sale hearing.  Indeed, upon information and belief, the Hawk Parties still have not closed the sale transaction as of this filing, because SeeCubic, Inc. has not wired the outstanding $7 million it was required to pay under the 9019 Settlement Agreement ordered by this Court.  Given the passage of time since the December 9, 2024 Sale Order's entry, one can only presume that the Hawk Parties are either unwilling or unable to close.  Clearly there can be no harm to the Hawk Parties when they have not met their obligations under the Court-ordered 9019 Settlement Agreement or the Court's Sale Order.

> **d.** **A Stay Pending Appeal is in the Public Interest**

53.    There is public interest in the finality of proceedings in the bankruptcy court as all courts. But there is an equal public interest in resolution of material disputed issues of law that can cause irreparable injury to the parties before that irreparable injury occurs.

79203867;3

54.     Beyond these general public interest concerns, there is the fact that the proposed sale transaction is clearly against the public interest: the sale process contemplated by the Sale Motion disproportionately benefits the Proposed Purchaser at the expense of all other stakeholders. The proposed Sale Motion results in the Debtors' assets being unjustly distributed to the Hawk Parties, in blatant contravention of the primary goal of maximizing recoveries for all creditors. As described herein, the sale process as contemplated  was inappropriate on its face. The insider stalking horse bidder should not have been permitted to credit bid given the facts and circumstances of these cases and the disputes surrounding the legitimacy of its claims. This is wholly inequitable to legitimate creditors and constitutes "cause" to deny credit bidding rights.

55.     Finally, a stay is in the public interest because it affords comfort and confidence that the nation's bankruptcy courts are courts of law, that procedural and substantive due process are always required, that evidence matters, and that mistakes, misjudgments, and injustice can be remedied – even if and when speed and finality are important.  Unsecured creditors in this case and future litigants confronting these issues will have the assurance that they and their claims will not become casualties of unsafe haste toward flawed but "final" judgments borne primarily of convenience for a favored few.

## <u>CONCLUSION</u>

A stay must be granted at this time pending resolution of the appeal in order to preserve the only valuable assets of this estate for the benefit of all creditors and equity.

*/Remainder of page intentionally left blank]*

79203867;3

Dated: New York, New York
      December 23, 2024

**AKERMAN LLP**

By:   */s/R. Adam Swick*

      Donald N. David (SBN # 304846)
      1251 Avenue of the Americas, 37th Floor
      New York, NY 10020
      Telephone: (212) 880-3856
      Facsimile: (212) 880-8965
      Email: donald.david@akerman.com

      -and-

      R. Adam Swick (admitted *pro hac vice*)
      500 W. 5th Street, Suite 1210
      Austin, TX 78701
      Telephone: (737) 999-7100
      Facsimile: (512) 623-6701
      Email: adam.swick@akerman.com

      -and-

      John H. Thompson (admitted pro hac vice)
      750 Ninth Street, N.W., Suite 750
      Washington, D.C. 20001
      Telephone: (202) 393-6222
      Facsimile: (202) 393-5959
      Email: john.thompson@akerman.com

      -and-

      Leif M. Clark (Admitted Pro Hac Vice)
      Leif M Clark Consulting PLLC
      1105 Bonner
      Houston, TX 77007
      Telephone: (210) 663-5183
      Email: lmclark@leifmclark.com

      *Attorneys for Visual Semiconductor, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on December 23, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.


 */s/ John Thompson*
John Thompson

79203867;3