UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : |
|  | : Case No.  23-10763 |
|  | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
| AND TECHNOVATIVE MEDIA, | : |
| INC. | : Philadelphia, Pennsylvania |
|  | : November 13, 2024 |
|  | : 11:00 a.m. |

. . . . . . . . . . . . . . . . . :


BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

| | |
|---|---|
| For SeeCubic, Inc.: | Marley Brumme, Esq. |
| | Skadden Arps Slate Meagher & |
| | Flom, LLP |
| | 500 Boylston Street, 23rd Floor |
| | Boston, MA 021116 |
| | 617-573-4800 |
| | |
| For Rembrandt: | Andrew Peter Demarco |
| | Devlin Law Firm, LLC |
| | 1526 Gilpin Avenue |
| | Wilmington, DE 19806 |
| | 302-449-9010 |
| | |
| | Christopher Michaels |
| | |
| For SSG Capital Advisors: | Samuel Charlton |
| | |
| For VSI: | John H. Thompson |
| | Akerman |
| | 750 Ninth Street, N.W. |
| | Suite 750 |
| | Washington, D.C. 20001 |
| | 202-393-6222 |
| | |
| For Hawk Investment Holdings | Steven Caponi, Esq. |
| Ltd.: | Margaret Westbrook, Esq. |
| | K&L Gates |
| | 600 N. King Street, Suite 901 |
| | Wilmington, DE 19801 |
| | 302-416-7080 |

```
                                    Jonathan N. Edel, Esq.
                                    300 South Tryon St., Suite 1000
                                    Charlotte, NC 28202

For the Trustee:                    Michael D. Vagnoni, Esq.
                                    Obermayer Rebmann Maxwell &
                                    Hippel LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia, PA 19102
                                    215-665-3066

                                    Steven M. Coren, Esq.
                                    Kaufman Coren & Ress, P.C.
                                    Two Commerce Square
                                    Suite 3900
                                    2001 Market Street
                                    Philadelphia, PA 19103-2713
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 13, 2024                          11:00 A.M.

 2            THE COURT:  Okay.  Is there anyone else on the phone

 3   who is here for a case other than Stream TV?  Okay.  Thank you.

 4            Party who just joined the call, the last four digits

 5   6443.  Could you identify -- I'm sorry, 6643, could you

 6   identify yourself, please?

 7            MR. CHARLTON:  Yes.  Samuel Charlton with SSG Capital

 8   Advisers.

 9            THE CLERK:  Yes, with the last four digits 4063.  Can

10   I have your last name, please?

11            All rise.

12            THE COURT:  Morning.  Please be seated.  Court is now

13   in session.  All right.  This is the call on the 11:00 list.

14   The only matter remaining on the list is number 23, Stream TV

15   Networks and we have several parties on the phone and in the

16   courtroom.

17            Do you want to start with the people in the

18   courtroom, first?

19            UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah, let's start

20   with the people in the courtroom.

21            THE COURT:  Okay.  We're going to start with the

22   people in the courtroom and get everyone's appearances.

23            Appearances, please, on Stream TV.

24            UNIDENTIFIED SPEAKER:  Come sit at the table.

25   Welcome.
```

1          MR. THOMPSON:  Morning, Your Honor.  John Thompson of

2    Akerman on behalf of VSI and with me today is my colleague Adam

3    Swick and retired Judge Nick Clark from the Western District of

4    Texas.

5          THE COURT:  Welcome.

6          MR. CLARK:  Morning, Your Honor.

7          THE COURT:  It's good to see you.

8          MR. CLARK:  Thank you.

9          MR. DEMARCO:  Good morning, Your Honor.  This is

10   Andrew DeMarco from Devlin Law Firm here representing

11   Rembrandt.  Also here with me is Christopher Michaels from

12   Brown and Michaels who will be handling any argument today.

13         THE COURT:  Welcome.

14         MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

15   from K&L Gates on behalf of Hawk.

16         THE COURT:  Okay.

17         MS. BRUMME:  Good morning, Your Honor.  Marley Ann

18   Brumme of Skadden Arps on behalf of SeeCubic.

19         THE COURT:  Okay.  Great.  I thought you guys were

20   going on the phone.  You're going to be outnumbered.

21         MR. CAPONI:  Yeah.

22         THE COURT:  No, you're here.  Okay.  All right.

23   We're just entering appearance, so come on up and say hello.

24         MR. VAGNONI:  Good morning, Your Honor.  Michael

25   Vagnoni on behalf of Bill Homony, Chapter 11 Trustee.  I have

1    with me Ed George and Steve Coran from Coran and Ress.

2              THE COURT:  Okay.

3              MR. CORAN:  Morning.

4              THE COURT:  Good morning.  All right.  How about the

5    people on the phone?  Did you want to note your appearance if

6    there's anywhere there?

7              Do we have anyone?

8              UNIDENTIFIED SPEAKER:  Yeah.  Yeah.

9              THE COURT:  We do?  The parties on the line, if every

10   -- if you could each speak one at a time and tell us who you're

11   here for on Stream TV and enter your appearances, please.

12             MR. EDEL:  This is Jonathan Edel from K&L Gates on

13   behalf of Hawk Investment Holdings.

14             THE COURT:  Okay.  Anyone else or you think that's

15   it?

16             UNIDENTIFIED SPEAKER:  They might just be observing.

17             THE COURT:  Okay.  Fine.

18             All right.  Well, welcome back, everybody.  I know

19   we're here on the reconsideration, which I will -- I guess I

20   just wanted to address the discovery issue.  So the last time

21   we were talking on the phone, you guys had raised an issue

22   about the assets that were being sold and you had concerns

23   about whether there were licenses and I think Mr. Vagnoni, I

24   was giving you a week to try to clarify for them what assets

25   were going to be sold.

1          So have you had any productive conversations

2    hopefully with them?

3          MR. VAGNONI:  Your Honor, we took your direction from

4    the last hearing, and we provided both VSI, accounts for VSI

5    and accounts with Rembrandt.  A fairly exhausted list of what

6    the assets are.  Not just the assets that we are -- that the

7    Trustee is selling, but the assets that are embedded in the

8    downstream subsidiaries whose equity we are selling as well.

9          That, I think, would have satisfied the Court's

10   concern in that regard.  I have a copy of what we sent.  I

11   didn't bring multiple copies.  It's very thick.  But we did

12   provide that.  We did also receive a email on Friday of last

13   week asking for a meet and confer to discuss what discovery

14   would be taking place.

15         We did not engage in that meet and confer.  We didn't

16   take your comments last week as we thought everything was

17   quashed to that point based on your ruling.  So we did not meet

18   and confer.  We were preparing for the hearing.  But we -- and

19   we did not engage in any discovery again, because we thought

20   the discovery request had been quashed by Your Honor.

21         But again, we did provide them with a listing --

22         THE COURT:  Okay.  Well, let me --

23         MR. VAGNONI:  -- on the --

24         THE COURT:  -- see if they feel like they have a

25   better understanding.

1          So do you gentlemen have a better understanding of

2    exactly what's being sold?

3          MR. MICHAELS:  We have no better understanding.  Most

4    simply, are they accepting -- assuming, rejecting saying that

5    the Rembrandt contract is invalid, valid?  What is their

6    position?  Where is our IP?  Have they removed it?

7          They're disclosure, this voluminous thing they

8    described has a single sentence that says, "software," right?

9    There's no discussion of -- we have asked over and over again,

10   are you in control of the software professional development

11   system?  I.E., do you have the username and password?  No

12   response.

13         THE COURT:  Uh-huh.

14         MR. MICHAELS:  We have no idea what they have.  More

15   so, we're the ones that have provided a far more extensive list

16   of what assets we believe could be in that estate and we've

17   told them what documents we're relying upon and asked them,

18   what is the status of each of these individuals assets?  No

19   response.

20         THE COURT:  Okay.  So --

21         MR. MICHAELS:  We are no more clear than we have --

22         THE COURT:  -- I've been with you guys up until this

23   point.  But now, you know, they've got some serious concerns.

24   You know, their belief is that the sale of the asset is going

25   to violate all of these rights.  It's going to spawn all of

1  this litigation about the licenses, right?  That's their

2  concern.

3            And I'm willing to consider a sale of this, but at

4  the very basic level, we need to understand exactly what is

5  being sold, right?  And it sounds like today they don't know.

6            So he just said that you said it's software.  Do you

7  have something more specific than just the word software in

8  terms of this being sold?

9            MR. VAGNONI:  There was -- Your Honor, first of all,

10  let me just address a couple of things that Mr. Michaels said.

11  I think he indicated once again to the Court that he hasn't

12  been made aware of whether or not the sale will include an

13  assumption and assignment of the Rembrandt license.

14            Paragraph 27 of our motion clearly indicates that

15  that license is not part of the sale transaction.  It is not

16  going to be acquired by the stock and horse purchaser.

17  However, if there is a competitive bid, a bid that is a

18  superior bid to the stock and horse bid that wants the

19  Rembrandt license, absolutely we would entertain an assumption.

20  There would have to be discussion about what --

21            THE COURT:  Okay.  So let's -- what we're going to do

22  today, just so I have an idea, we're just going to take this

23  issue by issue.  So you're saying that the license is not part

24  of the sale --

25            MR. VAGNONI:  That's correct.

1        THE COURT:  -- but you would contemplate bids on it.

2   I'm not sure how you'd write that into the bid procedure, but

3   we can talk about that in a minute.

4        So what's your response to that?

5        MR. MICHAELS:  It's not an assignable license.  It's

6   not their option to decide to sell it or not.  That's -- and

7   neither is the Phillips license.  It is -- we have -- we did

8   not need Mr. Vagnoni to explain to us whether or not our

9   license was assignable.  It is absolutely note and all the case

10  law is --

11       THE COURT:  Okay.  Well --

12       MR. MICHAELS:  -- if I don't mind?

13       THE COURT:  Yeah.

14       MR. MICHAELS:  Our issue isn't that the contract is

15  -- that they're attempting to assign it.  They are clear

16  they're not attempting to assign the contract.  It's the

17  intellectual property that is the basis of that.  I mean,

18  saying I'm not handing you a piece of the car, the car title

19  is, you know, that -- but I'm going to hand them the keys to

20  the Lamborghini.  I mean, we're concerned about the keys and

21  the Lamborghini, not the piece of paper that says we own it.

22  We already have that.  I don't need them to tell me we have

23  that.

24       THE COURT:  Yeah.  Yeah, yeah.

25       MR. THOMPSON:  Your Honor, if I might add?

1           THE COURT:  Yeah.

2           MR. THOMPSON:  There's a real problem with the bid

3   procedures in addition to those that Mr. Michaels rose --

4   raised.  In this circumstance, Mr. Vagnoni has just told the

5   Court as his email to us told us that they are, I guess,

6   excluding the asset that is the Rembrandt license.  The reasons

7   you just heard.  It doesn't matter whether they wanted to

8   assume it and assign it, they could not.

9           But in this circumstance, right, they're suggesting

10  that some other party out there might come in and bid for it.

11  Well, how do we have a bid process where --

12          THE COURT:  Yeah, yeah.  Okay.

13          MR. THOMPSON:  -- some other parties actually

14  consider --

15          THE COURT:  Well, tell me this.  If he -- if we have

16  -- let's say we have the bid, we had the auction, right, and

17  Hawk's the only one that shows up and under their purchase

18  agreement, they're not going to get it.  Then does that take

19  care of your issue entirely because --

20          MR. MICHAELS:  Not in any way, Your Honor.  I mean,

21  we have listed out a huge number of trade secrets.  We have a

22  bunch of patents.  The very assets that they have listed where

23  they've talked about TV's, prototypes, demos, those are all --

24  were all alleged back in 2017 to have been covered by

25  Rembrandt --

1            THE COURT:  All right.  So let me just, like -- I'm

2    sorry.  Let me just be more specific.  So I want to take it

3    issue by issue.

4            MR. MICHAELS:  Uh-huh.

5            THE COURT:  So at least I understand.  So he had

6    thrown out this comment that he's not attending to sell certain

7    licenses unless someone else bids for it.  So with regard to

8    those licenses, if there's no other bidder and the stocking

9    horse gets it, Hawk gets it, then with regard to that license,

10   then I think we're all in agreement that the license isn't

11   being sold at all, right?

12           So I think you wouldn't have an issue if there's no

13   stocking horse -- if it's just a stocking horse bidder and

14   there's no other bidders with regard to the license.

15           MR. MICHAELS:  With respect, we would.  The issue

16   with the license -- it's not a question of will they assume or

17   reject it in the future.  It's SSG offering for sale

18   Rembrandt's patented technology.  That's a violation of Section

19   271.  That's present today patent infringement -- you -- they

20   do not have a license to the Rembrandt technology.

21           THE COURT:  Hold on a second.  Who is that person?

22           All right.  So I would ask everyone on the phone line

23   to try to mute your phone because we're -- someone's not muted,

24   so we're hearing everything in the courtroom that's going on

25   there.  So could everyone just take a moment?  How do they mute

1   their line?

2           UNIDENTIFIED SPEAKER:  Star six.

3           THE COURT:  So if you could just hit star six,

4   everyone on the line, I'd appreciate that.

5           MR. VAGNONI:  Your Honor, if I may -- raise that

6   issue for a very specific reason.  SSG is not offering that

7   license for sale.  That is not part of the AP --

8           THE COURT:  So when we say license, let's just drill

9   down a little bit.  License of what?

10          MR. VAGNONI:  Absolutely.  Very vague.

11          THE COURT:  License of what?

12          MR. VAGNONI:  There is a 2021 settlement agreement

13  that a single line in it that is a -- called a grant of rights.

14  In that grant of rights, Rembrandt reports to give the rights

15  -- the nonexclusive rights to use their intellectual property.

16          By the way, that settlement agreement was entered

17  into the day or the day before Rembrandt -- they became a

18  creditor by virtue of that and then were a petitioning creditor

19  in Stream's failed involuntary bankruptcy in Delaware.  We take

20  significant issue with that agreement as a whole.  But let's

21  just take it as it is.  That license agreement comes out of a

22  settlement agreement.  And like I said, the -- SSG is not

23  offering that for sale.  However, in the -- which you'll hear

24  about when we get to testimony.

25          In negotiations with VSI and with Rembrandt, it's

1   been made clear to us that if a transaction was to occur with

2   VSI, that the Rembrandt license would have no problem being

3   assumed.

4           And in fact, there are -- there is a post-petition

5   agreement that was entered into by Rembrandt Stream and VSI

6   that was not court approved that purported to do just that.

7   Give VSI rights in that license.  And exclude Streams

8   subsidiaries from the use of that technology pursuant to that

9   license.

10          So that is why I indicated to the Court that if there

11  was a transaction that was a higher and better bid, which VSI

12  and Rembrandt are free to bid in this process.  They've been

13  free all along.  They've had access to the data room if they

14  wanted it.

15          The VSI is the only person who's taken up that offer.

16  That is what I was referring to.  Not that it was generally

17  assignable.  We don't think anybody has interest in it and we

18  also don't think we are selling any assets that have that --

19  Rembrandt intellectual property in that -- in the asset.

20          MR. MICHAELS:  Your Honor, I'd like -- I apologize.

21  I'd really like a chance to finish answering your question that

22  you had asked previously.

23          THE COURT:  Yes, that's fine.

24          MR. MICHAELS:  So the -- you asked whether the issue

25  would be resolved if the Hawk party's just didn't take -- it

1   isn't a question of SSG selling our license.  It isn't an

2   active patent infringement.  The active patent infringement is

3   offering for sale in a patented invention on why Rembrandt,

4   right?

5           And the TVs, all of the assets that Mr. Vagnoni

6   clearly lists are being offered for sale.  That is the active

7   patient infringement.  SSG has committed patent infringement.

8   All five of those individuals have committed patent

9   infringement.  The Trustee has committed patent infringement

10  unless they can show that they have a license.

11          So when Rembrandt is asking about the status of its

12  license, it is, are we suing those individuals and those

13  entities tomorrow?  They -- it is -- if they have a license, we

14  can't.  That is a full and absolute complete defense.

15          The agreement that Mr. Vagnoni's referring to is

16  Streams former counsel, almost immediately after filing the

17  petition contacted Rembrandt and said, we know we need a

18  license to your technology as an administrative claim.  We need

19  to resolve this.  And we signed a settlement amendment that

20  extended the time that prevented the estate from becoming

21  administratively insolvent due to the fees that were going to

22  be due to Rembrandt.

23          They have said they're not honoring that settlement

24  amendment.  The arrears are $3 million.  Does the estate have

25  $3 million to have that license?

1          THE COURT:  So I'm trying to -- I feel like there's

2   litigation that's going to be spawned, right, by -- under the

3   licenses and I'm just trying to have a very basic understanding

4   of what is purportedly being sold by the Debtor.

5          MR. THOMPSON:  They don't know, Your Honor.

6          THE COURT:  I --

7          MR. THOMPSON:  And that's --

8          THE COURT:  -- and I get that.  And I -- so I'm -- I

9   think that we have, like first thing -- what happened?  Okay.

10  Good.  Thank you for muting everybody.

11         So the first step to me seems that we should at least

12  come to an agreement, or at least I need to understand what is

13  being sold.  So can we just focus on that for instance.

14         All right.  So I think one of the comments -- and so,

15  you said before, like, they had described software or something

16  that was, like, their general description.  So did you, Mr.

17  Vagnoni, describe on some schedule that software is going to be

18  sold as part of this?

19         MR. VAGNONI:  Your Honor, I will -- if I may, to

20  preface what -- the answer to that question.  What the Trustee

21  is selling is all of the assets of Stream, which are clearly

22  listed in schedules, which are a public document they have

23  access to.

24         Mr. Rajan, who is the head of VSI, signed those

25  scheduled, I believe, and he certainly took part in preparing

1    them.  So he should know exactly what is in those schedules.

2    The other assets that are being sold in the APA are the equity

3    interest and all the subsidiaries of Technovative.

4          The software, the intellectual property, the license

5    to Phillips, all of that is contained in downstream

6    subsidiaries.  We are not selling those assets per say.  We're

7    selling the equity in those assets.

8          And this is typical of a case where a Chapter 11 or

9    Chapter 7 Trustee walks into a mess and sees that it's

10    spiraling out of control and tries to bring some control to the

11    situation and get the estate some money before there is no

12    money.

13          THE COURT:  Okay.  So again, my focus for right now

14    is, I'm just trying to understand what the assets are.  So he's

15    telling me that he's purporting to sell the equity and the

16    entities that presumably are in possession perhaps of your

17    property, is that your understanding there?

18          MR. MICHAELS:  Mr. Vagnoni just described the process

19    as typical, right?  An IP -- a technology case of this sort,

20    purporting to sell intellectual property rights is anything but

21    typical.  And I think --

22          THE COURT:  Okay.  So let's just focus on -- I just

23    want to drill down on what assets are being sold.  So he's told

24    me that he's selling equity in entities that presumably possess

25    your intellectual property.  Can we agree on that?

1              MR. MICHAELS:  Yes.

2              THE COURT:  Okay.  Good.  All right.  That's

3    progress.

4              MR. MICHAELS:  That's one -- I mean, that's one

5    aspect of what he said.

6              THE COURT:  Okay.  Fine.  That's one aspect.  Okay.

7    So tell me -- so your concern, though, is that when he purports

8    to sell the equity in these companies, then the buyer who takes

9    possession of the -- like, they buy the equity, right?  Now,

10   they're going to own, you know, via that equity, everything,

11   you know, tangible and intangible that those entities own.  And

12   your -- and so your position is that some of the assets that

13   they own are your property?

14             MR. MICHAELS:  Yes.

15             THE COURT:  Okay.

16             MR. EDEL:  Your Honor, if I may --

17             THE COURT:  Yeah.

18             MR. EDEL:  -- since I'm representing Hawk.  The --

19   Mr. Vagnoni is correct.  We're -- the stalking horse is

20   acquiring the equity.  Stream is a holding company.  All the

21   operating entities, the main operating entities in the

22   Netherlands and requiring the stock that owns the stock that

23   owns the stock that owns that entity.  The fundamental dispute

24   here is that Rembrandt believes that its trade secrets, its

25   knowledge, its know-how is embedded in everything that Stream

1   does.

2        So every TV that it has, every computer that it

3   touches, somehow can -- you know, involves their intellectual

4   property.  Now, there's intellectual property such as patents.

5   Rembrandt brought patent litigation many years ago, but it was

6   dismissed, and they have not asserted a patent case.

7        They're really talking about the intellectual

8   property.  We disagree.  We believe that the technology that

9   Stream developed through its operating subsidiaries overseas is

10  -- belongs to Stream.  If my client acquires the stock, it's

11  acquiring that entity, the good, the bad, and the ugly.

12       And if that means that entity, if Rembrandt believes

13  that entity has put intellectual property into a TV or trade

14  secrets, we'll duke it out after the fact.  But what this is

15  all about, this is Rembrandt and attached to the hip of Mr.

16  Rajan trying to stop at every opportunity this case moving

17  forward.

18       THE COURT:  Okay.  I know.

19       MR. EDEL:  Rembrandt --

20       THE COURT:  You believe there's spoilers and I --

21       MR. EDEL:  Well, Your Honor, I think it's -- it's not

22  just, I think.  As Mr. Vagnoni indicated, they entered into a

23  settlement.  They're standing before Your Honor before today

24  trying to hold up this sale.  Rembrandt entered into an

25  agreement during the pendency of the bankruptcy and amended it

1   with Mr. Rajan where they identified all of their technology,

2   all of their knowhow, how they believed it was being used in

3   everything and said, if Mr. Rajan gets the company, all is good

4   in the world.  No one else is allowed to have it.

5          And then come before the Court today and say, we have

6   no idea how he's using our stuff.  Well, they had a pretty good

7   idea when they were executing documents, you know, in the

8   shadows during the pendency of a bankruptcy.  But now they want

9   to come, Mr. Rajan, who founded the company, ran the company

10  until he was -- you know, the Court determined he was

11  uncredible and removed him.  And throughout the entire pendency

12  of the second bankruptcy which dismisses fraudulent at the aide

13  of Rembrandt to today, they're attached at the hip.

14         This is, with all due respect to the Court, my client

15  has been through this process for many, many years.  It's a

16  very simple sale.  Nobody else, and I think this cannot be

17  lost, nobody else is interested in these assets.  No one has

18  come forward to the pendency of the bankruptcy.

19         THE COURT:  All right.  But we aren't going to get

20  into this.  But from what I understood, the data room is not

21  complete.  I mean, there's --

22         MR. MICHAELS:  That's right, Your Honor.

23         MR. EDEL:  The --

24         MR. MICHAELS:  That's by design.

25         MR. EDEL:  -- data room is not complete because the

1   data room does not include the fraudulent documents Mr. Rajan

2   created during the bankruptcy, for example --

3                 THE COURT:  Okay.  Well --

4                 MR. EDEL:  -- these purchase orders that don't exist.

5                 THE COURT:  I would like to just -- I would like to

6   be able to have civil conversations here today.  And I

7   understand you guys don't like each other.  I know that.  So to

8   the extent that we could -- I understand.  Like, I call it

9   spoilers.  You think that they're spoilers.  You guys think

10  that they're selling your assets, and everyone is really

11  annoyed with each other.  I get the sentiment.  I understand

12  that.

13                Okay.  But it doesn't help me get to the point.  So

14  let me tell you what I think is one possibility here, right?

15  So Mr. Vagnoni wants to sell the equity in these companies, if

16  there's -- if we get to the point of a sale and there's no

17  other bidders and Hawk picks up these assets, then under 363

18  when he gets all this stuff, to the extent that you think that

19  he's misusing it, then you're going to sue Hawk, right?  Aren't

20  you going to sue Hawk?

21                MR. MICHAELS:  We already have.  They're in --

22                THE COURT:  Yeah.  Yeah.

23                MR. MICHAELS:  -- we're in litigation in Delaware.

24  But I think what I'm trying to be clear here is that Mr.

25  Vagnoni has -- they're talking about a bunch of equity, and

1   he's also put on their asset list that they are selling devices

2   that are accused of being -- infringing over on Rembrandt's

3   patterns and Stream, under the guidance of DLA Piper, took a

4   license.

5           Stream again renewed that -- negotiated again are

6   Armstrong T -- they advised them to do that.  Lewis Brisbois,

7   same thing.  We have numerous law firms evaluating these claims

8   and saying this was a good idea.  We have Mr. Homony testify.

9   He's done no investigation as to whether this is a good idea or

10  not.  And they ignored the issue.

11          They have not -- if the Rembrandt is not valid, we're

12  hearing, you know, testimony that may or may not -- this

13  Rembrandt license may or may not be valid.  It was, you know,

14  executed in 2021 right before a bankruptcy.

15          So if it's not valid, that means all the activity

16  that the estate to date are infringing a patent.  I just want

17  to be clear that that's the argument, is that this estate goes

18  almost instantaneously administratively insolvent.  And we are

19  looking for and we will ask the Courts -- the District Courts

20  to enjoin any transfer of our intellectual property.

21          Now we have licensed Stream.  We have -- we are

22  arguing that the license is valid but cannot be transferred.

23  You may not transfer our intellectual property.  You take a

24  ring, and you put it in a box and say, well, I'm just selling

25  this box, whatever may be in it.

1          You know, we've evaluated what's inside the box.

2   What's inside of SeeCubic B.V. is Rembrandt technology.  We've

3   gone through that multiple law firms representing Stream.  And

4   we have determined that a license was necessary.  And SSG does

5   not get covered by ignorance.  There's no, I didn't know, Your

6   Honor.  It defends patent infringement.

7          They are actively offering for sale assets that

8   include that were directly laid out in the complaints back in

9   2017.  And while Mr. Caponi said it was dismissed, it was a

10  jurisdictional.  Every patent case under *TC Heartland*, the

11  Supreme Court case was dismissed and had to be brought in the

12  home state of the corporation.

13         And we immediately entered mediation, and they

14  insisted the DLA Piper's counsel and Streams officers, most

15  notably, Shadron Stastney, insisted that the patents be

16  included in the license agreement.

17         So this idea that they weren't important to Stream is

18  not supported by the facts in any way, shape, or form.  And we

19  are asking for clarity, is the Trustee operating and is SSG

20  operating under the license?  I.E. they therefore can't be sued

21  for trying to sell a TV covered by one of our patterns.

22         THE COURT:  Okay.  It sounds like they want to sell

23  equity and entities who have hard assets that contain your

24  intellectual property.  So the owner of the equity will

25  presumably then own these hard assets that have your

1   intellectual property embedded in them.  That's what I

2   understand?

3        MR. EDEL:  That's Your Honor, that's if it indeed a

4   -- a bidder is capable of determining what they're buying or

5   what the assets underneath that equity.

6        UNIDENTIFIED SPEAKER:  Your Honor?

7        MR. EDEL:  We have a whole list -- excuse me.  We

8   have a whole list of items that purport to the assets of the

9   Debtors.  I'm telling you today that that is an incomplete list

10  that was filed on this docket reported to this set of assets

11  that are being sold, that's substantially all of the assets of

12  the Debtors and we can show that.

13       More than that, the data room is breath of lots of

14  information.  And the process -- and I know Your Honor wants to

15  focus on the assets, I will focus on the assets, but as Mr.

16  Caponi tried to raise the broader issues.  The broader issue

17  here is that this trustee has agreed to transfer this set of

18  assets to one party and one party only and that is the Hawk

19  parties, right?

20       And they've done pursuant to 9019 settlement

21  agreement that purports just to be a settlement agreement, but

22  it's a sub rosa plan, because there's no other entity out

23  there, whether they be a strategic buyer or another competitor

24  of a Stream TV that would be interested in these assets under

25  these conditions based upon these encumbrances.  And it's not

1   just --

2           THE COURT:  Okay.  So gentlemen --

3           MR. EDEL:  -- not --

4           THE COURT:  -- let's just take a moment here.  So in

5   terms of the bid procedures, I have concerns I think that you

6   guys raised.  Some legitimate concerns, which we'll get to,

7   right?

8           So I see, like, several different areas that need to

9   be addressed over time.  The first is, you need to know what is

10  being sold.  They're selling the equities that contain the

11  equity of entities that own the tangible property that has your

12  intellectual property.  So now you know.  They're -- that's

13  what they're trying to sell.

14          So the first step is, I'd just like to get some

15  clarity and make sure that we're all on the same page as to

16  exactly what's being sold.  Then we'll go through the bid

17  procedures and all of the many objections, some of which I

18  thought were meritorious.  But some of the issues that you're

19  raising are really important issues.

20          But to me, they appear closer to sale issues, right?

21  It's going to be a huge issue when you object to the sale,

22  right?  I'm going to -- it looks like I'm going to need some

23  briefs on all of the very important issues that you have to

24  raise.  But those are issues that, you know, that I think are

25  more appropriately dealt with then, right?

1          So in terms of, you want discovery.  So the discovery

2    that you want, I think it's important for you to get discovery

3    if it's necessary on what assets are being sold.  But we have

4    that -- we now have that nailed down.

5          So let's focus first on what exactly is being sold.

6    So you're selling the equity that has hard assets, that has

7    their intellectual property embedded in it.  So let's --

8          MR. VAGNONI:  Allegedly, Your Honor.  There's been

9    no --

10          THE COURT:  Oh, okay.

11          MR. VAGNONI:  -- there's been --

12          THE COURT:  That's fine.  I understand you're not

13    conceding anything.  But I just want, for clarity sake, to

14    understand what it -- you know, what's being sold.

15          MR. MICHAELS:  Your Honor, their agent, SSG, as

16    investment banker, sent out a teaser that purported to sell the

17    capability of making licenses of the Ultra-D technology.

18    Rembrandt's technology or IP is in it and so is Phillips.

19          THE COURT:  Okay.  So what we're -- so that's not --

20    what I'm talking about, like, a hard asset.  Now you're talking

21    about some technology, is that --

22          MR. MICHAELS:  In some cases, it is a hard asset.

23    There are -- this lens technology they patented.

24          MR. SWICK:  Your Honor, Adam Swick, Akerman on behalf

25    of Visual Semi, VSI.  The issue is they have a stalking horse

1   bidder that has been at odds with the former debtor --

2          THE COURT:  Clearly.  Yeah.

3          MR. SWICK:  Yeah, yeah.  And so, they took control of

4   the Debtors' assets, they broke into the Debtors' offices,

5   stole TVs, they stole intellectual property.  They've been

6   using them.  They've been showing.  There's emails and letters

7   and we'd love to get discovery from the Trustees, because we

8   believe the Trustee knows all of this.

9          And so, they have TVs in different locations.  They

10  have different hard assets.  All this is purporting to be sold

11  by the Trustee who hasn't gotten it back, because that's the

12  stalking horse and they need the stalking horse to be able to

13  go out and raise money to fulfil their obligations.  And as of

14  the filings last night, the stalking horse doesn't have the

15  money to pay for the 363 as it is right now.

16         So yeah, what we need is discovery on where are all

17  these TVs?  They're all over the world.  They're in the

18  different offices of SeeCubic and the Hawk parties.  I mean,

19  Mr. Caponi up here, he represents the Hawk party's and Robert

20  Morten (phonetic), who's subject to a cold shoulder, which is

21  the worst crime of moral turpitude in the U.K.  It's supposed

22  to end your career and that's who these guys have hitched their

23  wagon to.  So we just need discovery to find the assets so we

24  -- if they want us to participate in a 363 sales process, how

25  are we going to do that if we don't know where the TVs are?

 1   Who's --

 2           THE COURT:  Okay.

 3           MR. SWICK:  -- using them?

 4           THE COURT:  So again, let's just focus back on what I

 5   care about.  What I care about is, I want to know what they're

 6   purportedly selling.

 7           MR. SWICK:  They don't know.

 8           THE COURT:  Okay.  And I know you say that.  But why

 9   don't we just go through all of the concerns you have about the

10   identity of the assets?

11           Yes?

12           UNIDENTIFIED SPEAKER:  Your Honor, going -- sort of

13   taking a broad step back, how we ended up here.  My client has

14   a security interest.  Again, Stream's the holding company.  Has

15   no assets, other than stock and subsidiaries.

16           My client's security interest was primarily in the

17   stock and subsidiaries, not in the assets of the subsidiaries.

18   The 225 action, which we settled through the 9019, we were a

19   day away from taking control of that stock.

20           This settlement and this sale is effectively the same

21   thing.  It's selling the stock.  The companies that -- whatever

22   assets are in those companies that my client shows up and there

23   was TVs -- before my client and everybody else shows up,

24   there's TVs there, they own them.  If they're not, they don't.

25           It's the stock.  They want to drill down into -- and

1   if we get into this level, what TV is sitting in Copenhagen and

2   what software is on that TV, we're going to be here for six

3   years.  One, we're never going to know because it's in

4   Copenhagen.  But, we're going to be here for six years.  This

5   is a sale of stock, the security interest was in the stock.

6   And absent the settlement, my client would have already had

7   it's one day hearing in a court of chancery and owned the

8   stock, this would all be muted.  This is a path of least

9   resistance to an estate that never had any money and doesn't

10  have any money. This deal is --

11          THE COURT:  Okay. I understand that you're buying the

12  stock.  But in order for any potential bidder to understand

13  what they're buying, right, they know that they're getting the

14  stock.  But presumably, they'd like to get a better idea of

15  what the hard assets or the intangibles are of the entities

16  whose stock you're purchasing, right?

17          So I think it's reasonable that there should at least

18  be some general description of -- you know, it doesn't have to

19  be, like, I don't need, like, a audit, right, of every single

20  TV or every single hard asset.

21          But isn't there some kind of --

22          UNIDENTIFIED SPEAKER:  Your Honor --

23          THE COURT:  -- schedule that we could put together

24  that would say, you know, all the -- I mean, I don't know.  Are

25  you just purporting to say that all of the equipment and all of

1  the -- you know, every personal property owned by these

2  entities. But do we have, like, a vague description of, like --

3        UNIDENTIFIED SPEAKER:  Well, there's --

4        THE COURT:  -- you know, approximately this many TVs

5  or approximately this many --

6        MR. VAGNONI:  Yes, Your Honor.

7        THE COURT:  -- other things.

8        MR. VAGNONI:  The --

9        THE COURT:  Okay.

10        MR. VAGNONI:  -- answer is yes.  We have a list that

11  we're happy to share with you.

12        The -- one thing I want to point out to Your Honor is

13  the process that we -- that was started over a month ago that

14  was teasers were sent out to over 500 different entities, both

15  strategic and financial, by SSG.  Mr. Victor is going to

16  testify about that for you as part of the sale procedure.

17        We got exactly zero interest from those teasers.

18  Nobody asked the question of who -- what is in there.  The only

19  parties that expressed an interest were VSI and not Rembrandt

20  and a purported investor in VSI.

21        And we have worked with VSI, who by the way Your

22  Honor, I think you're getting the picture that they are in the

23  unique position to know exactly what those assets are that are

24  being sold.  Exactly what they are.

25        VSI has expressed no interest in bidding on these.

1   They wanted to go down a sale process, which we will describe

2   to you why that is not a possibility.  But not even speaking to

3   Mr. Michaels comments about the lawsuits and the estate being

4   administratively insolvent.

5         The purchaser is assuming all liability.  Not just

6   from Rembrandt under an IP claim, but they're assuming any

7   liability from any alleged IP infringement.  And they're fully

8   indemnifying the bankruptcy estates, the Trustee, and the

9   Trustees professionals.

10         MR. MICHAELS:  Exactly, Your Honor.

11         MR. VAGNONI:  We think that we are insulated -- and

12   that was based on what we think are hollow threats, but that

13   doesn't mean there won't be a lawsuit and that the Defense

14   won't impair the unsecured creditor's ability to get a

15   distribution.  That's what we're trying to protect here.

16   That's what we're trying to specify.

17         THE COURT:  Okay.  So Mr. Vagnoni, let me tell you

18   what I'm interested in.  You know, in a 363 sale, you know,

19   you're -- my concern is, I just want to make this a transparent

20   process so that any potential bidder could understand what is

21   being sold, right?

22         So it sounds like you -- you know, you have this

23   teaser.  I haven't seen what the teaser says, but this list of

24   all of the -- you were saying that there was a schedule that

25   the owner of VSI -- what was his name again?

1          MR. VAGNONI:  Mr. Rajan.

2          THE COURT:  Mr. Rajan?  Okay.  So Mr. Rajan, at some

3   point, put together some kind of a schedule of what each of

4   these entities owned.

5          MR. VAGNONI:  Schedule A.  Oh, I'm sorry.  Yes, the

6   Schedules A and B to the -- the official schedules of the

7   Debtors.

8          THE COURT:  Okay.

9          MR. MICHAELS:  Excuse me, Your Honor.  I have to --

10  correct.  Is that your -- is this the Trustees schedule or are

11  you suggesting --

12         THE COURT:  I think --

13         MR. MICHAELS:  -- that this is Mr. Rajans schedule.

14         THE COURT:  No, I thought you were saying Stream's

15  schedule?

16         MR. VAGNONI:  The Debtors.

17         THE COURT:  Yeah.

18         MR. MICHAELS:  Okay.  So it wasn't Mr. Rajan's

19  schedule, just -- correct?

20         THE COURT:  Yeah.  No, no, no.

21         MR. MICHAELS:  Correct.

22         THE COURT:  I'm trying to understand.  So when Stream

23  filed for bankruptcy, they had a file scheduled in the

24  statement of financial affairs and as part of that you have to

25  schedule Schedule A, which is the real property and Schedule B,

1   which is the personal property.

2          So when he put those schedules together, did he --

3   and he was putting together the personal property owned by the

4   entities whose equity you're selling in the sale, Mr. Vagnoni?

5          MR. VAGNONI:  That's correct.  And Your Honor, there

6   is zero intellectual property in that Schedule B.

7          THE COURT:  Okay.  But -- so I think that one issue

8   that I'm identifying is that the personal property that was

9   scheduled in Schedule B of Stream contained hard pieces of

10  equipment or something that they are now claiming has their

11  intellectual property embedded in.

12         I'm just trying to understand everyone's position.

13  You're saying that in Schedule B is a list of a bunch of hard

14  assets, right?  And they're saying that in those pieces of hard

15  assets are some of their IP embedded in it?

16         MR. VAGNONI:  Stream -- Your Honor, Steam is a

17  holding company.

18         THE COURT:  Yes.

19         MR. VAGNONI:  They're --

20         THE COURT:  No, I understand.

21         MR. VAGNONI:  I --

22         THE COURT:  I understand they're a holding company,

23  but they put together Schedule B and Schedule B included hard

24  assets owned by their subsidiaries and affiliates, correct?

25         MR. VAGNONI:  No, Your Honor.

1          THE COURT:  Okay.

2          MR. VAGNONI:  It was a list of assets that, again, we

3  -- the Trustee had no part in drafting.

4          THE COURT:  Right, because this is before your time.

5          MR. VAGNONI:  It was well before our time.  And we --

6          THE COURT:  So what -- let's describe.  What's on

7  Schedule B?

8          MR. VAGNONI:  It is a various list of equipment.  On

9  Schedule B there is some office furniture.  There's nothing

10 that we see that could contain Rembrandt's --

11         THE COURT:  Well, I don't -- okay.  At this point --

12         MR. VAGNONI:  -- intellectual property.

13         THE COURT:  -- let's -- okay.  We're not going to be

14 able to resolve today whether -- you're not going to come to an

15 agreement with them as to whether or not their technology is

16 embedded in it.  I just need --

17         MR. VAGNONI:  Right.

18         THE COURT:  -- to understand the argument, just so I

19 can try and move the case forward, okay?

20         MR. VAGNONI:  Absolutely.

21         THE COURT:  So what is on Schedule B?  So it's the

22 furniture --

23         MR. VAGNONI:  I don't have it with me and I can't

24 speak to what exactly is on it.

25         THE COURT:  So does anyone have Schedule B of the --

1          MR. MICHAELS:  Your Honor, I would just note that

2 there is an extensive list, over 800 pages long, attached to

3 Mr. Rajan's declaration in support of the filing --

4          THE COURT:  Okay.

5          MR. MICHAELS:  -- right?  So --

6          MR. VAGNONI:  That's not what we're talking about.

7          MR. MICHAELS:  I'm sure it's not.  I would just to

8 Your Honor that that's --

9          THE COURT:  Okay.

10          MR. MICHAELS:  -- on the record.

11          THE COURT:  Okay.  So -- but you're saying Schedule

12 B.  So we're talking about the sale of equity of these

13 entities.  Let's just call these entities, you know, the

14 subsidiaries, or I guess we just call them the entities.

15          So the entity stock is purported -- that's what

16 you're trying to sell.  But these entities own certain hard

17 assets, correct?  Aside from office equipment --

18          MR. VAGNONI:  Correct.

19          THE COURT:  -- and furniture, right?

20          MR. VAGNONI:  Correct.

21          THE COURT:  There's some -- there's other things.

22 TVs, right?

23          MR. VAGNONI:  Potentially.  We -- and Your Honor,

24 again, we --

25          THE COURT:  When you say potentially, see that just -

 1   - I just want to understand, you know, what is being sold.

 2           MR. VAGNONI:  There -- when I say potentially, there

 3   are prototypes that are created by the Debtors downstream --

 4           THE COURT:  Entities.

 5           MR. VAGNONI:  -- subsidiaries.

 6           THE COURT:  Let's just focus on the entities.  What

 7   do the entities own?  That's what I really want to focus on.

 8           MR. VAGNONI:  And again, I can give you the list we

 9   sent them.  The entities own intellectual property, they own

10   equipment that allows them to make protypes of -- they're not

11   TVs.  They are screens --

12           THE COURT:  Uh-huh.

13           MR. VAGNONI:  -- that show the technology to

14   potential investors or purchasers.

15           THE COURT:  Yeah.

16           MR. VAGNONI:  They own licenses, the Phillips

17   license.  And really that's about it.  The downstream entities

18   are meant to house intellectual property, they're meant to

19   house licenses, and they're meant to do research and

20   development.

21           THE COURT:  Okay.  So hold on one second.

22           MR. VAGNONI:  And the Trustees can testify to that.

23           THE COURT:  So I presume, though, that your client,

24   Mr. Rajan, that he was the owner of Stream, right?  He knew

25   what all of these subsidiaries owned.  Didn't he know that?

1              UNIDENTIFIED SPEAKER:  Yes, and he knows what was

2    taken by the stalking horse bidder and never returned after --

3              THE COURT:  Okay.

4              UNIDENTIFIED SPEAKER:  -- contempt of court --

5              THE COURT:  Yes.

6              UNIDENTIFIED SPEAKER:  -- in various litigations.

7              THE COURT:  Okay.  So --

8              UNIDENTIFIED SPEAKER:  And there's bonding --

9              THE COURT:  Again --

10             UNIDENTIFIED SPEAKER: -- machines that are tens of

11   millions of dollars.

12             THE COURT:  -- this is what I care about.  I just

13   want to identify the assets that are being sold.  So doesn't it

14   seem that Mr. Rajan knows exactly what assets are owned by the

15   entities?

16             MR. MICHAELS:  I would say, Your Honor, he does have

17   an understanding in -- probably in fairly good detail, and

18   that's the point that he has been making to the Trustee at

19   nauseum.

20             THE COURT:  Okay.  So -- but --

21             MR. MICHAELS:  Right.

22             THE COURT:  -- so you --

23             MR. MICHAELS:  Your Honor, I just -- if I may, just

24   to complete the thought.  It's that they don't understand that

25   there are other encumbrances including Rembrandt's license,

1    including the Phillips license on that property.  And I would

2    say importantly that there is material amounts of assets that

3    have been in violation of the TRO, absconded with by Mr.

4    Stastney --

5              THE COURT:  So if you --

6              MR. MICHAELS:  -- and that has --

7              THE COURT:  -- you think that -- that's a complete

8    separate issue.

9              MR. MICHAELS:  Well, it's not, Your Honor --

10             THE COURT:  That you think that.

11             MR. MICHAELS:  -- because that intellectual property

12   that is in those prototypes, samples that are taken to market

13   to try to get investors and customers to buy or purchase the

14   ultimately asset that is Stream TVs product, those things have

15   the intellectual property not only of Stream TV, but also

16   Rembrandt and also Phillips embedded in it.

17             There's -- I mean, it was no accident that Mr.

18   Stastney on behalf of SeeCubic, Inc. and the Hawk party's

19   absconded with monitors that this trustee actually witnessed

20   with Mr. Stastney giving him a demonstration.

21             THE COURT:  Okay.  So who --

22             MR. MICHAELS:  That happened.

23             THE COURT:  So you're saying that Hawk has monitors

24   and Stream has monitors of the entities?

25             MR. MICHAELS:  I'm saying that the Hawk parties,

1    specifically Mr. Stastney, SeeCubic, Inc. definitely had took

2    both monitors that are samples.  They were displayed to be able

3    to sell the product.  It obviously has embedded technology in

4    it.  He took servers.  He took computers.  All of that would

5    have had his code in it, including Rembrandt's code.

6               THE COURT:  Okay.  So -- but are you saying that

7    that's not part of the sale or it is part of the sale?

8               MR. MICHAELS:  I'm just suggesting to you that those

9    particular assets are not on the list.  It was just filed by

10   the Trustee in support of the asset listing.

11              THE COURT:  All right.  All right.  So hold on one

12   second.

13              UNIDENTIFIED SPEAKER:  Your Honor?

14              THE COURT:  No, hold on.  Hold on one second.

15              You guys can all have a seat.  We're going to be here

16   for a little bit.

17              So he's saying that some of the assets are not in the

18   possession of Stream.  That they're in the possession of Hawk.

19   What's your response to that Mr. Vagnoni?

20              MR. VAGNONI:  Your Honor, there -- it's clear to the

21   Trustee that there are assets that are not in his possession.

22              THE COURT:  And are they in the possession of Hawk?

23              MR. VAGNONI:  We are not aware of that, Your Honor.

24   We -- what we are --

25              THE COURT:  So -- okay.  Let me just ask you one

1   question.  Do you think that there are assets owned by Stream

2   that are not in Streams possession?

3          MR. VAGNONI:  Yes, there is -- there's a bonding

4   machine in China --

5          THE COURT:  Okay.

6          MR. VAGNONI:  -- that the Trustee has neither the

7   money or nor the wherewithal to get.  We've gotten various

8   reports -- that was the subject of mediation which --

9          THE COURT:  So does Hawk own any -- does Hawk -- is

10  Hawk in possession of any assets by Stream?

11         MR. VAGNONI:  Not that I'm aware of, Your Honor.

12  SCBV, SeeCubic B.V. has prototypes.  There is -- Mr. Stastney

13  is the director of SCBV.  There is -- we have no indication

14  that Hawk is in possession of anything.  If they are, that --

15  we've heard of tail of it, but we've never been given any

16  evidence that they have -- that Hawk has anything that is --

17         THE COURT:  Why do you guys think that Hawk has the

18  Stream properties?

19         UNIDENTIFIED SPEAKER:  Well, Hawk and its

20  subsidiaries broke into Streams offices and took them.

21         THE COURT:  Okay.  So let's stop right there.

22         UNIDENTIFIED SPEAKER:  Yeah.

23         THE COURT:  Okay.  So let's go the Hawk person.

24         So they're accusing you guys of having broken into

25  Streams building and stolen things.  So what's your response to

1    that?

2           MR. CAPONI:  My response, Your Honor, it's part of

3    the same delusion arguments we've been dealing with for six

4    years.  The -- as a result of the original settlement

5    agreement, the -- give you a brief history.  Mr. Rajan borrowed

6    a bunch of money, never repaid it, the secured lenders reached

7    an accommodation with all the other directors and shareholders

8    to restructure, that led to an omnibus settlement agreement.

9           Following the omnibus settlement agreement, Mr.

10   Stastney took control and operated the entities for quite a

11   period of time before that was reversed.  And when that was

12   reversed by the Delaware Supreme Court, they went back to the

13   Court of Chancery, and they were orders entered that required

14   everything to be turned back over.

15          Vice Chancelor Laster supervised that turning back

16   over and Mr. Rajan took back control of the company.  Ever

17   since then, like a child afraid of the dark, they're constantly

18   saying there's this here, there's this under that bed, but

19   there's no evidence, no Judge, no ruling, no nothing.  I can't

20   disprove the negative.

21          My client lent money; my client is not here.  My

22   client here is a collateral agent for SeeCubic, Inc., which

23   owns the debt and we're just exercising our debt rights.  They

24   want to --

25          THE COURT:  Okay.

1          MR. CAPONI:  -- full stop --

2          THE COURT:  It's helpful --

3          MR. CAPONI:  -- we have nothing.

4          THE COURT:  -- for me if I just get answers to my

5     questions.  So I just want you on the record, do you believe

6     that Hawk is in possession of any property owned by Stream?

7          MR. CAPONI:  Hawk?  No.

8          THE COURT:  Okay.

9          MR. MICHAELS:  Excuse me, Your Honor.  I'm sorry.

10         THE COURT:  Yes.

11         MR. MICHAELS:  We each refer to the Hawk party's that

12    includes SeeCubic, Inc. Delaware and Mr. Stastney in his

13    individual capacity.

14         THE COURT:  Okay.  So with that --

15         MR. MICHAELS:  We have evidence of that.

16         THE COURT:  -- those --

17         MR. MICHAELS:  Now, Mister -- I'm sorry.

18         THE COURT:  Okay.  So do any of those entities, do

19    you know?  And if you don't know, that's fine.

20         MR. CAPONI:  Well, I am not -- what I -- no, I am not

21    aware of them in possession of anything.  I am --

22         THE COURT:  That's owned by Stream?

23         MR. CAPONI:  -- Jon may be able to address this, but

24    when Skadden was representing SeeCubic, Inc. in the Court of

25    Chancery, Schedules were put together, everything was turned

1   back over, it was done in detail.  My client was not involved

2   in that.  What I can say, Your Honor, and this gets to, again,

3   the whole -- today.

4          There is this concept on the part of the other side

5   that once SeeCubic, Inc. took over through the omnibus

6   agreement, every piece of paper, every pen, every everything is

7   in -- somehow contains something that belongs to them.  So if

8   there's a laptop, there's a TV.  If there was a pitcher for

9   water that was in a conference room, they're claiming it's got

10  Rembrandt's technology.  We don't agree with any of that.

11         We think we own the pitcher.  We can -- we've gone

12  around and around in multiple courts with them about who owns

13  this, who owns that.  As we stand here today, they don't have

14  any shred of evidence.  They don't have a court order.  They

15  don't have a document.  They don't have a bill of sale.  They

16  don't have a photograph.  They don't have anything to

17  substantiate what they're saying.

18         My client has nothing that belongs to Rembrandt.  My

19  client has nothing that belongs to this debtor.  It is my

20  understanding as I stand here today and neither does Mr.

21  Stastney or does SeeCubic, Inc.  We're never going to reach

22  agreement of this.

23         You could have discovery until the cow comes home,

24  they're going to say, well, no, no, we think it's in there

25  somewhere.  Now, if it's not in the trunk, slash the tires and

```
1    see if he, like, you know, hid it in the tires.

2              THE COURT:  So I understand your position, okay?  But

3    I don't want to keep going around and around with the

4    arguments, okay?

5              MR. CAPONI:  The answer is no, we don't have it.

6              THE COURT:  That's great.  That's all I need to hear.

7              MR. CAPONI:  Absolutely.

8              MR. MICHAELS:  Your Honor, I think it's important

9    that Mr. Caponi just told you that his client does not have it,

10   but he also told you that the Delaware Court supervised the

11   return of assets that was under court order to return after the

12   Delaware Supreme Court's decision.

13             He's not telling you that his client doesn't have it

14   and he doesn't know about anybody else.  I will tell you that

15   we have evidence that Mr. Stastney and SeeCubic, Inc. of

16   Delaware did take assets, does possess assets now.  Has used

17   those assets.

18             THE COURT:  Well, okay.  So just describe for me what

19   the basis of that evidence is.

20             MR. MICHAELS:  The basis of that evidence is, I'll

21   start with just the Trustee.  The Trustee saw those assets

22   during a meeting that he had with Mr. Stastney, in which --

23             THE COURT:  When you say trustee, you're saying?

24             MR. MICHAELS:  I'm saying Mr. Homony.

25             THE COURT:  Okay.
```

1            MR. MICHAELS:  Right?

2            THE COURT:  Hello?

3            MR. MICHAELS:  Who admitted to our client that it was

4   -- that he had actually observed it.  That's one.

5            THE COURT:  He had observed what?

6            MR. MICHAELS:  He had observed a monitor built by

7   Stream TV in --

8            THE COURT:  Uh-huh.

9            MR. MICHAELS:  - the possession of Shad Stastney

10   during the pendency of this bankruptcy.

11            THE COURT:  Okay.  So --

12            MR. CAPONI:  Your Honor, if I --

13            THE COURT:  Yeah.

14            MR. CAPONI:  -- this goes to when SeeCubic, Inc.

15   verses SeeCubic, B.V.  SeeCubic, Inc. after everything was

16   turned around, continued to develop its own technology in this

17   space.  That's -- they believe that everything in SeeCubic,

18   that's it's been developing, again, incorporates Streams

19   technology, which therefore incorporates Rembrandt's

20   technology.

21            So are there TVs?  Yes.  Are there laptops?  Yes.  Do

22   they belong to them?  No.  Have they -- and I would just put it

23   to the Court this way, if they believe this information or

24   these assets were retained, why did they not go to the Court of

25   Chancery, get an order to establish that?

1          Why during the year plus that I've been coming to

2    this court and the bankruptcy have they not, when Mr. Rajan

3    controls everything, get relief from the Court?

4          THE COURT:  Okay.  So let's everyone just return to

5    my focus, which is what is being sold?

6          Did you want to say something, ma'am?

7          MS. BRUMME:  Yes, briefly, Your Honor.

8          THE COURT:  Who do you represent?

9          MS. BRUMME:  Marley Ann Brumme from Skadden on behalf

10   of SeeCubic, Inc., the Delaware entity.  And contrary to what

11   our friends over here have to say, the supervision process of

12   the return of the assets from SeeCubic, Inc. back to Stream was

13   supervised by Vice Chancelor Laster and we've been hearing for

14   a year at least that SeeCubic, Inc. has not returned things.

15         That Mr. Stastney has things and until this bit of

16   evidence that he's presented here today about the Trustee

17   apparently seeing a demo unit, we've never seen any evidence to

18   substantiate that SeeCubic, Inc., the US entity and Mr.

19   Stastney, retained any assets.

20         What I think is getting lost here is that Stream TV,

21   as I think Your Honor understands, is a holding company.  The

22   demo units were developed and built by SeeCubic B.V. in the

23   Netherlands, which is five entities down in the corporate

24   structure.  Any demo unit that has been produced and especially

25   one that Mr. Homony has seen would be from SeeCubic B.V., which

1  is not a debtor here.

2         Further, Mr. Stastney, which they love to impugn

3  here.

4         THE COURT:  The entity that you just said, though,

5  are they trying to sell the equity in that entity?  The one

6  that's not the Debtor?

7         MS. BRUMME:  It's five levels down.  So Stream --

8         THE COURT:  But they are trying?  That is being sold

9  as part of the --

10        MS. BRUMME:  The equity would be sold in the first

11 level subsidiaries.

12        THE COURT:  And so they would own that equity?

13        MS. BRUMME:  And then it would waterfall down.

14        THE COURT:  Okay.

15        MS. BRUMME:  Mr. Stastney notably is the director of

16 SeeCubic B.V. the Netherlands entity that develops all the

17 tech, and Mr. Stastney was installed as director by a

18 Netherlands Court when moving Mr. Rajan.

19        So any sort of implication that Mr. Stastney and

20 SeeCubic, Inc. are unlawfully retaining anything, there's no

21 evidence of that, one.  And two, they can't conflate SeeCubic,

22 Inc. and what's going on at SeeCubic B.V.

23        THE COURT:  Okay.  Thank you.  Okay.  Let's stop one

24 second.

25        So I think what would be helpful for me is if we

1  could focus on all the potential bidders that are out there

2  that are not in this courtroom.  And my job is to make sure

3  that they understand exactly what is being sold.  So just

4  describing the equity, obviously, is not sufficient, because,

5  you know, the -- each of the entities whose equity is being

6  sold has some kind of personal property and that, I think, is

7  the schedule that I'd like to focus on.

8          So what is -- so is there, like, a schedule as part

9  of your, you know, proposed asset purchase agreement that

10  lists, you know, what is owned by the entities whose stock is

11  being sold?

12          MR. VAGNONI:  We -- Your Honor, we do not have the

13  schedule together yet.  But we do have the list of assets that

14  were turned over to --

15          THE COURT:  Okay.

16          MR. VAGNONI:  -- VSI.

17          THE COURT:  So let's be clear.  I don't want to set

18  up any procedures until we're clear on exactly what assets are

19  being sold, so that other potential bidders can have some idea.

20          So this is what I would envision if I was a potential

21  bidder.  I see that the stock is being sold.  I'd want to see

22  some general description of the assets that are owned by those

23  entities, so I know what it is that I'm buying.  Now, obviously

24  you can't give me, like, pictures, so that's what we engage in

25  the due diligence process, right?  A potential bidder --

1          MR. VAGNONI:  Correct.  And --

2          THE COURT:  -- would see, like, a schedule that says,

3    you know, ten TVs and -- or whatever TVs.

4          MR. VAGNONI:  Correct, Your Honor.

5          THE COURT:  And then if their interest has peaked,

6    they would do their due diligence.  And if they wanted to, they

7    could go out and go look at all this stuff or go look in the

8    room or do whatever.

9          MR. VAGNONI:  So Your Honor --

10         THE COURT:  Yeah.

11         MR. VAGNONI:  -- that -- I -- you're correct in what

12   you're saying.  And the process that was setup by SSG was that

13   a teaser would go out to drum up interest in potential bidders.

14         THE COURT:  So what does the teaser say, just so I

15   understand?  Do you have it?

16         MR. VAGNONI:  Yeah, I absolutely do.

17         THE COURT:  All right.  Show me a teaser.

18         MR. VAGNONI:  I have a book of art --

19         MR. MICHAELS:  Your Honor, if I may?  As you're

20   looking through the teaser, you will note that is specifically

21   mentions the Phillips license.  Attached to that Phillips

22   license is a laundry list of software assets --

23         THE COURT:  Uh-huh.

24         MR. MICHAELS:  -- by title, function, what they do.

25         THE COURT:  Uh-huh.

1              MR. MICHAELS:  And we have asked since March whether

2    or not those are being included in the assets with zero

3    response.

4              You had said -- you had made an offhand comment

5    earlier about, well, you're not asking for an audit for

6    anything.  However, the Phillips license requires an audit.

7    That that technology has been removed at termination of that

8    license, which would be caused by a change of control, I.E.,

9    sale of the entity.

10             THE COURT:  That's a sale issue to me.  You object to

11   the sale, because that's not permitted.  As for the bid

12   procedure stage, I just need to identify what assets are being

13   sold.

14             MR. MICHAELS:  My point to you, Your Honor, is there

15   is already a long list of software assets provided in the

16   Phillips license, along with a bunch of know-how and that -- a

17   simple question.  Is this being included in the sale or not?

18   Is what we have asked.  And I think is a touchstone for the

19   kind of list we are looking for here.

20             In addition, it seems that the retention of an expert

21   to walk through the Rembrandt list, we've provided a detailed

22   list of those trade secrets in the Delaware case and can --

23   that can ascertain whether or not those assets are or are not

24   included.

25             THE COURT:  Okay.

1          Mr. Vagnoni, did you have the teaser?

2          MR. VAGNONI:  I do, by a book.

3          THE COURT:  Okay.  How -- the teaser is the binder?

4          MR. VAGNONI:  No, it's in the binder.

5          THE COURT:  Oh, okay.  All right.  So go ahead.

6  Which -- what's the tab of this?

7          MR. VAGNONI:  Tab four.

8          THE COURT:  Okay.  And you guys -- I'm presuming

9  you've seen the teaser?

10         MR. CAPONI:  I have in front of me, Your Honor.

11         THE COURT:  Oh, good.

12         MR. MICHAELS:  We saw it.  It's filed in the papers.

13  But we --

14         MR. VAGNONI:  And Your Honor, if I may?

15         MR. MICHAELS:  -- did not get it.

16         MR. VAGNONI:  That teaser was -- as I'm sure you're

17  aware, the initial document that was sent out, again, to over

18  500 different entities, that then invited them to contact SSG

19  so they could go into --

20         THE COURT:  Okay.

21         MR. VAGNONI:  -- a more complete data room.

22         THE COURT:  I see that this is a one-piece teaser,

23  right?

24         MR. VAGNONI:  Correct.

25         THE COURT:  But as part of any potential sale, we

1    need to have schedules of -- you know, schedules of, you know,

2    what's being sold.  Like, what's owned by those entities,

3    something, a description.  Like, TVs or, you know,

4    approximately --

5              MR. VAGNONI:  So --

6              THE COURT:  -- 100 TVs or something.

7              MR. VAGNONI:  Correct.  And the irony of that

8    comment, Your Honor, is that yes, there would be a schedule

9    available to any potential bidder --

10             THE COURT:  Uh-huh.

11             MR. VAGNONI:  -- who wanted to come in and do due

12   diligence.  There has been zero bidders that have even

13   scratched the surface of learning about this technology.  The

14   only entity that desired to look in the data room was VSI,

15   who's made is abundantly clear to the Trustee that they have no

16   interest in bidding on the purchase of these assets.

17             THE COURT:  So is your position, Mr. Vagnoni, that

18   this teaser provides sufficient information to potential

19   bidders that would allow them to show interest in this?

20             MR. VAGNONI:  Yes.

21             THE COURT:  So this one page, if someone likes what

22   they see, then they'll proceed with you?  And if they don't,

23   like, this is sufficient information to kind of vet whether --

24             MR. VAGNONI:  So --

25             THE COURT:  -- there's interest out there?

1          MR. VAGNONI:  Correct.  And the Trustee hired SSG as

2    his investment banker and SSG as we've seen them do in numerous

3    occasions, initiates contact by first identifying potential

4    parties.  They identified 500 plus different entities that they

5    sent that out to.  Again, both financial and people in the

6    industry.  And they sent that teaser out to those entities.

7          THE COURT:  Okay.  Fine.  And they didn't get a

8    response.  Okay.

9          MR. VAGNONI:  They got it with -- let me be clear.

10   They got one response from someone other than Rembrandt and

11   Rembrandt -- VSI and VSIs purported investor.  That party

12   declined to sign an NDA once they spoke to SSG.  And we'll --

13   Mr. Victor will describe why.

14         THE COURT:  Okay.  All right.  Well, I'll --

15         MR. SWICK:  Your Honor, I would --

16         THE COURT:  -- this teaser.

17         MR. SWICK:  Excuse me.  I would just add that I think

18   Mr. Vagnoni -- I think Mr. Vagnoni has just given us an

19   admission against interest.

20         THE COURT:  A what?

21         MR. SWICK:  And a --

22         THE COURT:  A what?

23         MR. SWICK:  An admission against interest, right?

24   That this teaser yielded no bidders, other than the people who

25   already know about these assets.  And why would there be no

 1  bidders?  Well, probably because they read things in a teaser

 2  like this and they're sophisticated actors and they understand

 3  the --

 4          THE COURT:  Okay.  So --

 5          MR. SWICK:  -- effort to license things --

 6          THE COURT:  Okay.

 7          MR. SWICK:  -- that they cannot --

 8          THE COURT:  All right.

 9          MR. SWICK:  -- license.

10          THE COURT:  I understand.

11          MR. SWICK:  Is not appropriate.

12          THE COURT:  Okay.

13          MR. SWICK:  Okay.

14          THE COURT:  Fine.

15          MR. VAGNONI:  That --

16          THE COURT:  All right.  So --

17          MR. VAGNONI:  -- is quite a leap, Your Honor.

18          THE COURT:  Okay.  So as part of the sale process,

19  though, will there be a more robust description then?  Like

20  schedules of the assets owned by these entities?  Something?

21  Some description?

22          MR. VAGNONI:  Your Honor, and again, Mr. Victor is

23  prepared to testify today.  But at this point after a month out

24  in the market and there having been no interest in --

25          THE COURT:  Are you suggesting that because there's

1    no interest in the market that there's no need to prepare

2    schedules?

3              MR. VAGNONI:  No, no, no.  There are -- schedules are

4    being prepared.

5              THE COURT:  Okay.

6              MR. VAGNONI:  That will be attached to the APA to

7    make it clear what is being -- but I think they're going to be

8    more simplistic than what you are considering.

9              THE COURT:  Okay.  So what --

10             MR. VAGNONI:  Any potential --

11             THE COURT:  -- so just generally describe what it is.

12   It's going to be, like, equipment or software or --

13             MR. VAGNONI:  Lists all of the assets of Stream and

14   the equity interest in Technovative subsidiaries.  Now, Your

15   Honor, that doesn't mean that if someone who had interest in

16   getting due diligence on these assets --

17             THE COURT:  Couldn't come in and --

18             MR. VAGNONI:  -- wanted to get more information.

19             THE COURT:  Yeah.

20             MR. VAGNONI:  That SSG wouldn't give them whatever

21   they wanted.  If they said, we want to know exactly what

22   SeeCubic, Inc. holds, they would have it.  And a lot of that is

23   already in the data room.  That's part of the process that SSG

24   runs.

25             THE COURT:  Okay.  I understand --

1          MR. VAGNONI:  You don't send out a teaser that has --

2          THE COURT:  Okay.  I understand.

3          MR. VAGNONI:  -- hundreds of pages.

4          THE COURT:  Yes?

5          UNIDENTIFIED SPEAKER:  Well, the data room, which was

6    prepared, then Your Honor asks for a list of assets, they

7    provide a list of assets.

8          THE COURT:  In the data room?

9          UNIDENTIFIED SPEAKER:  A lot of these assets weren't

10   in the data room before.

11         THE COURT:  Okay.

12         UNIDENTIFIED SPEAKER:  The Phillips IP wasn't there.

13   And I also want to say, this investor, he provided 170-million-

14   dollar proof funds.  When they asked for it -- so liquid funds

15   in an account.  They said, we just want to do some due

16   diligence, all right?  They sat on that for three months.  That

17   took $1.8 million from our investor.

18         So this investment you're talking about, these are

19   the entities who want to buy these assets, bind this company to

20   a plan.  It's getting sorted at every turn, because they're

21   married to this 9019 with the Hawk parties.  But we have real

22   money.  We want to pay unsecured creditors.  We have to have

23   due diligence.  We've got to get forward on this. And I mean --

24         THE COURT:  Weren't you guys going to put together a

25   plan or something?

1          UNIDENTIFIED SPEAKER:  Yeah, but we have --

2          THE COURT:  So did you file the plan?

3          UNIDENTIFIED SPEAKER:  No, we're going -- we have to

4   get diligence to know where the assets are so we can have it --

5   they want an unconditional offer for almost $200 million for

6   these assets.  We want to give it to them.  But we also need to

7   know, where's the bonding machine?  Is it still functional?

8   They said we could access to it.  Then they said, oh, here's

9   some photos.  We're not going to give you access to it and the

10  photos are two and a half years old, because they don't know --

11  like, the bonding machine is tens of millions of dollars.

12          THE COURT:  Okay.  All right.  Okay.

13          All right.  So --

14          MR. CLARK:  Can I make a brief intervention?

15          THE COURT:  Yes.

16          MR. CLARK:  I apologize.  And I won't make very many

17  interventions in this matter because there are people here who

18  know a lot more about this case than I do.  I'm a recent entry.

19          But I appreciate the Court's concern about making

20  sure that you have an open and fair bid procedure so that you

21  can have a true 363 sale.  The problem that we have here is

22  this case reminds me a lot of *Fiskarata* (phonetic) we have a

23  secured claim from a secured creditor that I understand lent in

24  terms of hard money about $39 million.  Maybe 45, depending on

25  whether you count some additional advances by Mr. Stastney.

1    But now we have a 9019 that says their actual claim is $180

2    million.  And that they can credit the -- their 150 million of

3    it.

4              As in *Fiskarata* with a credit bid of $150 million,

5    that means that the stalking horse bidder doesn't actually have

6    to put up anymore in terms of cash than the seven and a half

7    million dollars that they said they were going to credit.

8              THE COURT:  They're going to credit it.  Right.

9              MR. CLARK:  So for seven and a half million dollars,

10   they get in the door.  Anybody else who wants to play this game

11   has to come up with cash, cash in the amount of $157.5 million.

12             MR. VAGNONI:  That's not accurate.

13             MR. CLARK:  Excuse me.  I'm sorry, maybe it's less.

14   But it's a lot more than $39 million, that's for sure.

15             And that's -- and to me, that's the real story here.

16   That we have a bid process where the amount of money that

17   anybody else who wants to play this game has to come up with,

18   certainly north of $100 million in order to be able to play

19   this game and be prepared to close in December.

20             If we were talking about a plan process so I could

21   understand how we could come up with a structure where $170

22   million or such might end up being -- be folded into a plan.

23   But on a expedited sale process, where the proposed bidders

24   don't know for sure what's going to be sold until --

25             THE COURT:  Why do you say it's a expedited sale

1 | process?

2 |      MR. CLARK:  -- we get to today.

3 |      THE COURT:  Why do you say it's an expedited sale

4 | process?

5 |      MR. CLARK:  Well, it's expedited in the sense that

6 | the bid procedures motion contemplates that the bids will be

7 | received -- binding bids will be received by Friday of this

8 | week.  So that gives whoever's going to buy this, other than

9 | Hawk, two days to do the due diligence that we're talking

10 | about.  Two days.  And that the Trustee will then make a

11 | decision on Monday.  And then the sale will close in December.

12 |      Now, as a practical matter, that's not what I would

13 | call an open and transparent process.  So if you want to know

14 | why there aren't other bidders here, it seems to me it's

15 | straight forward.  With a 180 -- 157.5-million-dollar credit

16 | bid in place, nobody's going to come to the table.

17 |      THE COURT:  So I think, though, what I'm hearing is

18 | that the credit bid is a hurdle to other potential bidders from

19 | entering the situation?  Unfortunately, I've already approved

20 | the settlement, the 9019 agreement that they have.  So that's

21 | what Hawk is.  I mean, and they --

22 |      MR. CLARK:  I understand that, Your Honor.  And --

23 |      THE COURT:  -- and because I've approved that, they

24 | have -- they're allowed a credit bid.  That's just part of the

25 | system.

1          MR. CLARK:  And candidly, Your Honor, as I look

2     through this, looking at it from the standpoint, you know,

3     obviously I've sat in your position.  So I asked the same kinds

4     of questions I would like to think that you would ask.  And

5     what occurred to me in this particular case is there is a

6     motion to reconsider and I'm glad that it hasn't been ruled on

7     yet because it strikes me that this process is fundamentally

8     flawed because of the provisions that were put in that 9019,

9     that they were all but certain to assure that there would be no

10    other bidders.

11         THE COURT:  Okay.  Thank you, sir.

12         MR. CLARK:  Thank you, Your Honor.

13         THE COURT:  You're welcome.

14         MR. VAGNONI:  And Your Honor, just so we're clear on

15    the -- there are very limited issues that's why in the motion

16    to reconsider one of which isn't --

17         THE COURT:  Let's focus on the bid procedure, shall

18    we?  I think I'd like to just hone in on some of those things.

19    I don't want to hear re-argument on something I already heard

20    on.  Okay.  So I want to talk about some of the substantive

21    concerns that Rembrandt and VSI has raised in their objections,

22    if we could turn to that for a minute.  Let me just get this.

23    Okay.  So I wanted to take, for instance, the bonding

24    equipment.  So is the bonding equipment being sold as part of

25    the sale?

1          MR. VAGNONI:  Yes, Your Honor.  It is.  The problem

2    we have with the bonding equipment is there are disputes as to

3    who owns the bonding equipment.

4          THE COURT:  Okay.

5          MR. VAGNONI:  But what we believe is that either the

6    Debtor owns it and the Debtor did list the bonding equipment in

7    its Schedule B.

8          THE COURT:  Uh-huh.

9          MR. VAGNONI:  And the rest of the things in Schedule

10   B are office equipment and FF&E.  But the Debtor alleges that

11   it owns it.  There has been -- there has been allegations that

12   that bonding equipment was transferred to SeeCubic B.V.  The

13   Debtor downstream, the Stream downstream subsidiary.

14         THE COURT:  Transferred by whom?  Who transferred it?

15         MR. VAGNONI:  So and I can't speak to this directly

16   because I was not involved at the time, but it was my

17   understanding that at the time of the omnibus agreement that --

18   and correct me if I'm wrong, but that their allegation that

19   that -- that the bonding equipment was transferred by the

20   controlling entity -- by the Debtor to SeeCubic B.V.  Whether

21   or not it's the Debtor's property or SeeCubic B.V.'s property,

22   that bonding equipment is being transferred.

23         THE COURT:  Okay.  All right.  Just give me a minute

24   to go through all of this for one moment.  Okay.  So this is

25   how I would like to proceed.  Before I sign off on any bid

1   procedure order, I'd like to see what the schedules are to the

2   purchase agreement.  I just -- I think that we should put

3   together the schedule, but I don't think that you have the

4   schedule here today, right?

5           But what I envision is, since it does seem to be an

6   issue, what is being sold, I'd like someone to put together the

7   schedules and then I'd like you to -- and you could break it

8   out any way you want.  Perhaps you could say that this entity,

9   you know, has these assets and that's what could be part of the

10  sale when you buy the equity of that entity.

11          And then what I'd like to do is I'd like to invite

12  VSI and Rembrandt to look at those schedules and to point out

13  the very many issues that I think that they're going to have

14  with those schedules as to potentially flag the issues that you

15  have with regard to each of those entities.

16          And then what I think we should do for any potential

17  bidder is they should see a list of the scheduled assets that

18  actually do have some asterisks to them, which might note there

19  were objections or concerns that you guys have to those assets,

20  right?  So that whoever is, you know, potentially interested in

21  buying the assets will see your asterisk, right?  And then

22  either we'll get them in as bidders or not.  So I think the

23  first thing I'd like to do is I'd like to get that schedule

24  together --

25          MR. THOMPSON:  Your Honor, if I may be heard just on

1    one of those asterisks because we just heard about the bonding

2    machine.

3            THE COURT:  Uh-huh.

4            MR. THOMPSON:  If you look at what the Trustee just

5    filed with respect to the bonding machine, it's got conditions

6    all over the place, right?  And it is not guaranteeing --

7            THE COURT:  Could you -- which one?  Could you --

8            MR. THOMPSON:  -- not guaranteeing the transfer right

9    to any buyer, right?

10           THE COURT:  Okay.

11           MR. THOMPSON:  So --

12           MR. GEORGE:  But the buyer will know that.

13           MR. THOMPSON:  Well, it would not have known that --

14           THE COURT:  Okay.  Could we just stop and just take a

15   moment that you're selling something that you may or may not

16   have.  That just does seem a little curious.

17           MR. THOMPSON:  Thank you, Your Honor.

18           THE COURT:  Doesn't it seem a little curious?

19           MR. THOMPSON:  That's precisely our --

20           MR. VAGNONI:  Your Honor.

21           MR. THOMPSON:  We may or may not be in possession of

22   it.

23           THE COURT:  Okay.  All right.  Argument for the

24   Trustee.  I just have to get an answer to the question why is

25   it not weird to say that you're going to sell something but

```
 1   then not be sure if you're actually going to get it.
 2              MR. THOMPSON:  Your Honor --
 3              THE COURT:  I'd like to hear from the Trustee.  I'm
 4   sorry, I didn't mean you, I met the guy standing behind the
 5   asterisk --
 6              MR. HOMONY:  Prior to my appointment, as you can tell
 7   -- was a complete and utter disaster.
 8              THE COURT:  It still kind of seems like a disaster
 9   which I'm trying to clean up.  Yes.
10              MR. HOMONY:  I want you to appreciate Stream used to
11   own the bond equipment --
12              THE COURT:  Uh-huh.
13              MR. HOMONY:  -- before the omnibus agreement which
14   set all this off.
15              THE COURT:  Okay.
16              MR. HOMONY:  At some point, we were informed that a
17   receiver -- again prior to my getting on the scene -- a
18   receiver was appointed to oversee Technovative in Delaware
19   District Court.  I believe that receiver retitled the bonding
20   equipment into the Netherlands subsidiary --
21              THE COURT:  Okay.
22              MR. HOMONY:  -- the equity of which I'm selling --
23              THE COURT:  Okay.  Yeah.
24              MR. HOMONY:  -- because it's in China, there's issues
25   with warehouse liens, past due rent.
```

1              THE COURT:  But presumably that's something that's

2    being sold --

3              MR. HOMONY:  It is being sold, Your Honor.

4              THE COURT:  -- if you can get through -- if you can

5    jump through all those hurdles.

6              MR. HOMONY:  It is being sold.  But as I'm sure you

7    can appreciate in other cases, somebody's holding that asset

8    that might demand --

9              THE COURT:  Okay.  But that's okay.

10              MR. HOMONY:  -- $500,000.

11              THE COURT:  That's okay.  I mean --

12              MR. HOMONY:  Before it gets --

13              THE COURT:  So perhaps with regard to the bonding

14    equipment, there'll be a very long asterisk which will describe

15    exactly where it is and all the claims subject to it.  And you

16    guys would be able to add something to that as well.

17              MR. THOMPSON:  Your Honor, there's an omnibus order

18    -- an omnibus agreement that was overturned by the Delaware

19    Supreme Court.  And thereafter there was a chancery court

20    opinion directing the return of all the equipment including

21    that.

22              THE COURT:  Let me just tell you where I'm focused

23    at.

24              MR. THOMPSON:  Okay.

25              THE COURT:  Where I'm focused at is, I just want to

1  know what's being sold even if it's subject to a million

2  caveats, right?  So we're going to work together and we're

3  going to come up with a schedule so at least a normal person

4  will at least know this is what's being sold.

5          Now, just based on my preliminary observation, I

6  don't believe anybody will be bidding for these asset because

7  you guys are hopping up and down.  You really think that -- you

8  know, that it's your stuff that's going to fall on this

9  litigation.  I just want to tell you what I think that the

10  logical conclusion of all of this is going to be.  That if we

11  ever get to a sale, there will be no other bidders because

12  you'd have to be crazy to enter this like firestorm of like,

13  you know, litigation, right?

14          So what it's going to be is we're going to have Hawk,

15  who wants to be the buyer.  They're the stalking horse bidder.

16  No one else is going to bid.  And you guys are going to raise a

17  slew of objections to the sale, right?  And if I have -- I have

18  Hawk, right, who's going to then say, you know, Your Honor, I'm

19  going to -- this is what I want to buy and I know that they're

20  hopping mad and they're going to sue me and that they're going

21  to -- they have all these, you know, issues or whatever.

22          And then at that point, if I approve the sale to them

23  that I'm delivering that to them, Hawk is going to pay them

24  whatever they're going to pay and then you guys, Hawk and you

25  guys are going to fight it out, right?  And then I don't have

1  to resolve, right, exactly who owns what or whatever, because

2  they're going to be doing all of that, right?  And then you can

3  engage in that fight.  But all of your jumping up and down, it

4  does have a chilling effect on the bidding as well, right.  It

5  will make it -- it will basically guarantee that Hawk will be

6  the buyer of these assets at the end of the day.

7          MR. THOMPSON:  That's already been guaranteed, Your

8  Honor.

9          THE COURT:  Okay.

10          MR. GEORGE:  Your Honor, if I may.  This is --

11          THE COURT:  Yes.

12          MR. HOMONY:  Your Honor, I can address --

13          MR. GEORGE:  I would just like to --

14          THE COURT:  Okay.

15          MR. HOMONY:  This case has been drawn out for a long

16  time.  And as I'm sure you can appreciate, Stream is a pre-

17  revenue company.  It has no revenues, it has no ability to

18  generate loans.  Part of the Hawk settlement provided that Hawk

19  through SeeCubic would continue to fund the Netherlands,

20  SeeCubic BV, which is an operating entity with real people

21  there who really care about this technology, have lived with it

22  for 20 years and want to see it commercialized.

23          The longer this goes, their livelihoods are put in

24  jeopardy.  The value of these assets is put in jeopardy because

25  if I have an outside -- a date where they have agreed to fund,

```
 1    which is December 10th.  If the sale isn't closed by December

 2    10th, there's no funding secured for those people in SeeCubic

 3    BV, and not only their lives, but the value of these assets

 4    will disappear.

 5            Right now, through the carveout I think my and my

 6    team have managed to secure between 9- and $10 million in cash

 7    for the benefit of unsecured creditors, which would otherwise

 8    vanish.  And so I just -- I want everybody in this room to

 9    appreciate --

10            THE COURT:  Yes.  I get it.

11            MR. HOMONY:  Okay.

12            THE COURT:  I understand.

13            MR. HOMONY:  Thank you, Your Honor.

14            THE COURT:  Thank you.  Okay.  Hold on one second.  I

15    don't want to hear from anyone right now.  Okay.

16            So Mr. Vagnoni, when -- and you can talk to your

17    colleagues here, but when do you think you could put together a

18    schedule of what be -- I mean, if this is going to be going out

19    for bidders, we need to have like a schedule.  So when would

20    you be able to put together some schedules?

21            MR. VAGNONI:  We'd have to do it -- I do have to

22    speak with -- but we have to do it immediately.

23            THE COURT:  Why don't you talk to your people and

24    tell me how soon you could get those schedules together?  Go

25    talk to them.
```

1          MR. VAGNONI:  Thank you, Your Honor.

2          THE COURT:  You're welcome.  So while they're doing

3   that, I didn't realize the whole room was empty.  Perhaps what

4   we'll do is while they're doing that can I just run through the

5   rest of my list because I have a 12:30 list as well.  So I'm

6   just going to -- you can keep all your stuff here.  Keep all

7   your stuff here.  I'm just going to run through my 11:00 list.

8   Oh, with the other parties.  Yeah.  Yeah.  But so just sit

9   tight.

10          Pam, what else do we have going on at 11:00?

11          THE CLERK:  11 should be all --

12          THE COURT:  Oh, good.  Excellent.  Okay.  Good.  So

13   hold tight right there.  So I just want to take a short break

14   and I'll be right back.

15          THE CLERK:  Okay.

16      (Recess)

17          THE CLERK:  Court is back in session.

18          THE COURT:  All right.  Mr. Vagnoni, when do you

19   think you'll have those schedules for me?

20          MR. VAGNONI:  We can have them filed by tomorrow.

21          THE COURT:  Okay.  Great.  So what I would like is --

22   what I envision is that there will be schedules identifying

23   what the assets are.  And I think that for instance, with the

24   bonding equipment, you should drop an asterisk that says, you

25   know, we are actually not in possession of the bonding

1    equipment and whatever caveats you think there may be to

2    actually a buyer taking possession of them.  I think you should

3    add that to that.

4           MR. VAGNONI:  Absolutely.  And Your Honor, just to be

5    clear, you know, with the foreign subsidiaries, the Trustee

6    isn't in possession of those assets either, but they are in the

7    possession of subsidiaries of --

8           THE COURT:  Okay.  So you should just -- I just want

9    this to be clearly laid out where everything is.  So if someone

10   were to look at this, they understand these are the issues that

11   I face if I put in a bid.

12          MR. VAGNONI:  Understood.

13          THE COURT:  Okay.  Then I'd like you guys to take a

14   look at the schedules because before it goes out to other

15   potential bidders, I'd like to get your input.  And I think

16   that you have lots of different issues like, you know, you

17   could say that, you know, these assets are subject to our

18   claims and put whatever, you know, statements in there that you

19   think would be appropriate.

20          And I think just to be clear that, you know, if you

21   have an asterisk, you know, you might have an asterisk saying

22   these are the Debtors comments about, you know, like maybe just

23   say a footnote, why don't you have a footnote, right?  You put

24   a footnote and you say this is debtor's position that these

25   assets are not in our possession or whatever.  Put whatever

1    caveat.

2          And then we're also going to have footnotes with you

3    guys and you're going to -- so the potential bidder will know

4    that the statements that are being made with regard to your

5    footnotes are your comments and are not the Debtor's comments,

6    right?  And you -- I'm willing to include that just because I

7    think that you have some serious concerns and people should

8    know them.  So it would say something like Rembrandt believes

9    that with regard to these assets, that there are these issues

10   implicated on intellectual properties embedded in them and, you

11   know, this is going to spawn litigation or whatever.  Yes?

12         MR. MICHAELS:  I think the main issue here, I think

13   it's been handled by Whitehall and it was a jeweler who had

14   taken in property on -- jewels on consignment, embedded them in

15   rings and wanted to go to a bankruptcy sale where they just

16   sold it all off subject to the rights of the vendors who had

17   given them tools on consignment.  And I think it was somewhere

18   in the neighborhood of 193 adversary proceedings would have

19   been necessary.

20         And the court said tough.  You need to figure out

21   what the assets of the estate are and you need to have those

22   adversary proceedings by trying to go forward.  And it is -- I

23   understand the Court's desire to move through a process, but

24   saying with an asterisk Rembrandt may or may not sue you for IP

25   infringement is the courts have determined that's not an

1    acceptable process.  It is in and of itself subjecting the

2    estate to additional liability for making that transfer in the

3    first place which was not authorized --

4             THE COURT:  Okay.  Would you not want me to add your

5    comments to the schedule?

6             MR. MICHAELS:  We would like -- we would certainly

7    like the ability to enter the comments, but we -- what we

8    believe is necessary in this situation is to ascertain what are

9    actually the assets of the estate, and what else is on the

10   record.

11            THE COURT:  Okay.  So let me tell you my skepticism

12   with that comment.  With respect to the client, the guy that he

13   used to be.  This -- the guy who was replaced by the Trustee.

14   He had a pretty good idea of what's in all of these entities,

15   because up until, you know, earlier this year, wasn't he in

16   control of all those assets?  Okay.  Well, regardless, this is

17   we're going to do.

18            You've got litigation issues with regard to the

19   license, and I'm going to look at that because you're going to

20   file a sale objection and it's going to lay out every single

21   objection you have to the sale and they are going to respond to

22   that and I am going to address all of those arguments, okay?

23   So this is what we're going to do.  You guys, you can add

24   footnotes and all I care about your footnotes is that you put

25   in the preamble of whatever footnotes you want to add to the

1   schedule that these are comments made on your behalf, not on

2   the Debtor's behalf so that people who read it understand it.

3          MR. MICHAELS:  We do have one request --

4          THE COURT:  Yeah.

5          MR. MICHAELS:  -- that we've been making for a while

6   now.

7          THE COURT:  Yeah.

8          MR. MICHAELS:  And that is that the Trustee specify

9   with particularity, whether he is relying on the Rembrandt

10  license or not.

11         THE COURT:  What do you mean you're relying upon the

12  Rembrandt license?

13         MR. MICHAELS:  If they are offering for sale assets

14  Rembrandt has alleged have -- are covered by patent inventions,

15  we have the right to bring suit against anybody who is offering

16  those for sale.

17         THE COURT:  I don't think that Mr. Vagnoni thinks

18  that you have the right to sue them.  Do you -- Mr. Vagnoni, do

19  you think that they have the right to sue you arising out of

20  the sale of the assets that --

21         MR. VAGNONI:  Absolutely not.

22         THE COURT:  See so they just disagree.  That's just a

23  sale -- that's a sale argument that you can make in front of me

24  that I'll consider.

25         MR. MICHAELS:  With respect, we provided the case law

1    that says we do not need leave of this Court.  We can file in

2    any jurisdiction and SSG is not a part of this bankruptcy.  I

3    mean, I appreciate they're professional, but they're actively

4    offering our patented technology for sale.  That's an

5    infringement under 35 USC.  And it's the only --

6              THE COURT:  I disagree.

7              MR. MICHAELS:  -- defense to that because --

8              THE COURT:  So you're sitting here and you're making

9    an argument and they just disagree with the argument.  And I'm

10   going to consider it.  Don't include it in your brief because

11   it's a sale objection, right?  You're going to say, Judge, you

12   don't have the authority to do this.  No one should be selling

13   this, right.  You're going to tell me that and I'm going to

14   look at your case law and your legal argument and I'm going to

15   look at theirs and then I will give you a decision on that.

16             MR. MICHAELS:  I respect what you're saying about

17   with regard to the sale process.

18             THE COURT:  Uh-huh.

19             MR. MICHAELS:  My question is different than that, is

20   we -- Rembrandt has the ability to go after SSG today in a

21   different court for patent infringement unless the Trustee is

22   claiming that they are covered by a valid, current, paid up

23   license with Rembrandt.  And I'm asking the Trustee to clarify.

24   Are they saying that they have -- that Stream has a valid paid

25   up license with Rembrandt?

1          THE COURT:  Your response, Mr. Vagnoni?

2          MR. VAGNONI:  It sounds like he's asking me to

3   testify under threat of suit of the Trustee's professionals.

4          THE COURT:  Okay.  Well, in any case, I would like to

5   have any footnotes that you want to add to the schedules by,

6   let's say Wednesday.  So on Friday, if you could just put

7   together whatever footnotes that you want, just tell them,

8   like, do a black line, right?  And then send them a black line

9   of the schedules.

10          But let's talk about the scheduling here, right?  So

11   I know you're telling me, Hawk, that you have to have this, you

12   know, this all is done by the 10th.  But I need to have, you

13   know, the schedules nailed down so that a potential bidder

14   would know exactly what they're buying.  So we need to get that

15   done first.  I can't -- we can't send this out for bidding

16   until that's done.

17          So once the schedules are done on Friday because

18   they're going to give you their comments by just say Friday

19   morning at 9 a.m., right?  So you -- did you say tomorrow

20   you're going to get them?  So what time tomorrow do we have the

21   schedule?

22          MR. VAGNONI:  Yeah, by afternoon.

23          THE COURT:  In the afternoon?

24          MR. VAGNONI:  And look, if we can get them in today,

25   we're going to get them in today.

1          THE COURT:  Okay.

2          MR. VAGNONI:  But we would like to have a week until

3   tomorrow and we're going to do it as soon as we possibly can.

4          THE COURT:  Okay.  So then Friday by 5 p.m.  I'd like

5   you to hand your black line of what the schedule looks like

6   back to them, okay.  So that they can attach that to the

7   purchase agreement.  Yes?

8          MR. SWICK:  Well, we have 48 -- like Monday by 5:00?

9   Like I have to fly home tonight, so I don't know whether it

10  will be tomorrow, that's Thursday.  So --

11         MR. VAGNONI:  We're not going to be here until

12  tomorrow.

13         MR. SWICK:  It might be quite voluminous.  Like I'm

14  not sure what they're going to --

15         THE COURT:  Okay.  That's fine.  You can have until

16  Monday, just to send out -- to add the footnote.  So let's say

17  by Monday 9:00 a.m. you're going to get them your footnotes to

18  the schedules.  Now, so on Monday, you guys are going to have

19  the schedules, right?  And you already presumably have your

20  asset purchase agreement.

21         So let's just talk about the bidding procedure.  Oh,

22  also the data room.  They've got some serious concerns about

23  what's in the data room.  So by the time that this goes live

24  and we send this out for people to bid on or show interest,

25  what's going on with the data room?  And can you make sure you

1  populate it with actual, like, information?  Who's -- when do

2  you -- okay.  So when do you think -- come on up, Mr. Victor.

3  When will the data room actually be sold with things that are

4  clear about what's being sold?

5          MR. VICTOR:  Good afternoon, Your Honor.  Scott

6  Victor for SSG.  The data room is full.  The data room has been

7  accessed by one party; VSI, who is made up of all the insiders

8  of the Debtor.

9          THE COURT:  Okay.  Let's just focus on what's in the

10  data room.  So is there--

11          MR. VICTOR:  The data room is fully set up.  And has

12  been for over a month.

13          THE COURT:  Okay.  Because they said there was

14  missing information in the data room.  Is it possible that they

15  looked at the data room before it was 100 percent complete?

16          MR. VICTOR:  They looked at it after it was 100

17  percent.

18          THE COURT:  Okay.

19          MR. VICTOR:  And they will complain about anything at

20  any time to stall the process.  There's nothing wrong with the

21  data room.

22          THE COURT:  Okay.  So you think that there's -- so

23  everything in the data room is there that would be.  So --

24          MR. VICTOR:  Yes.

25          THE COURT:  -- yeah.

1          MR. VICTOR:  But, Your Honor.

2          THE COURT:  Yeah.

3          MR. VICTOR:  Not one single party has signed an NDA

4  other than an insider of the Debtors and has requested access

5  to the data room.

6          THE COURT:  I understand.  This is going to be a very

7  short period.  I understand.  Yeah.  I'm aware of that.  Okay.

8  It's your position is that the data room has everything --

9          MR. VICTOR:  The data room is fully complete --

10         THE COURT:  Okay.

11         MR. VICTOR:  -- and needs nothing further.  We

12  understand that it is appropriate to file schedules to the APA

13  like in every other case.  That will be done tomorrow.  We'll

14  have until Monday to black line it and add their asterisks.

15  But I have to put on the record that in my 41 years of

16  experience, I've never been threatened by counsel as many times

17  that we've been threatened by Rembrandt.

18         Who are they to sue SSG?  My employees who are

19  working on this, we're not selling their intellectual property.

20  We're not infringing on their patent rights.  We're selling the

21  equity of subsidiaries that may or may not have any

22  intellectual property that may or may not belong or rightfully

23  be licensed by Rembrandt. So I take complete offense to that.

24         THE COURT:  Understood.

25         MR. THOMPSON:  Your Honor, I just might say though

1    that the Trustee of course, has a responsibility to make sure

2    that everything that he is attempting to sell below the --

3              MR. VICTOR:  Your Honor, the people --

4              MR. THOMPSON:  Excuse me.

5              MR. VICTOR:  -- and its subsidiaries --

6              THE COURT:  Let him finish his statement, Mr. Victor.

7    Go ahead.

8              MR. THOMPSON:  All of the assets that the Trustee is

9    purporting to sell, have full disclosure with regards to those

10   assets. And I think the point that Rembrandt has been making is

11   that disclosure has been incomplete to date.  I understand that

12   Mr. Victor suggests that everything is in the data room and

13   therefore any reasonable bidder could make a determination as

14   to what exposure they may or may not have.  We would argue that

15   is incorrect.

16             THE COURT:  Okay.  Thank you.

17             I understand, Mr. Victor.

18             MR. VICTOR:  Thank you, Your Honor.

19             THE COURT:  You're welcome.  Okay.

20             So Mr. Vagnoni, let's just talk about some deadlines,

21   okay?  So we have to pick a date for a sale hearing.  We have

22   to pick a date for a sale objection deadline.  And I'd also

23   like to get any replies by the Debtor to any objections.

24             MR. VAGNONI:  Well --

25             THE COURT:  All right.  So we should also start with

1   like the bid deadline, okay.  So you're saying that -- so the

2   big deadline right now you're suggesting is the 18th, but

3   that's in like five days and we don't even have the schedules.

4   We don't have them.  So I don't think we need a long time

5   because I think that we could all agree that given everything

6   I've heard today, I highly doubt anyone is going to be placing

7   a bid, but you know, we should still put it out there for at

8   least a couple weeks to see if you're going to generate any

9   bids, okay.

10          So let's look at the calendar here.  All right.  So

11  presumably you'll have the final form of the schedule on the

12  18th.  So I think that we could get -- we can have a bid

13  deadline be December 2nd.  December 2nd.  And then that means

14  -- well, I'm sorry.  Yeah.  December 2nd and then we could have

15  an auction on the 3rd.  You guys are going to do that in your

16  offices, right?

17          MR. GEORGE:  If one is required.

18          THE COURT:  If one is required.  All right.  And so

19  then after that, we just need to -- we need to decide when

20  we're going to have the sale hearing.

21          MR. VAGNONI:  Your Honor.

22          THE COURT:  Yes?

23          MR. VAGNONI:  We have a sale closing deadline of

24  December 10th.  We're going to -- this is extremely tight with

25  those --

1            THE COURT:  I'm going to give you -- I mean, let me

2   just look at the schedule here.  Okay.  So the 10th is a

3   Tuesday.  All right.  Okay.  So I think what we should do is we

4   should have the sale hearing on -- I think we should have it on

5   the 10th of December.  Okay.  And I'll give you a ruling on the

6   10th because we're going to back into that all the objections

7   for when people are going to file objections to the sale.

8            MR. VAGNONI:  Okay.  Your Honor, that's going to put

9   us out of the agreement we have with Hawk.

10            THE COURT:  Okay.  So Hawk, I'm looking at my

11   schedule and I'm trying to give you a hearing as soon as I can,

12   and I'm -- you know, they're the ones who gave you the deadline

13   of December 10th, is that right?

14            MR. VAGNONI:  It was -- yeah, Hawk and SeeCubic.

15   Yeah.

16            THE COURT:  Yeah.  Okay.  So I'm trying to work with

17   you guys here, but I'm not going to be able to have a hearing

18   in the first week of December because I think we have a lot

19   going on then.  I mean, I guess we could try to have it on the

20   4th.

21        (Court and clerk confer)

22            THE COURT:  So I think what we should do then let's

23   have a sale hearing on the 4th of December at 1:00 p.m.  And

24   we'll make a sale objection deadline next Friday the 22nd, and

25   any responses to the objection should be filed by the 29th.

1   The deadline again is the 2nd, the auction is the 3rd.  We'll

2   have the hearing on the 4th.

3           MR. THOMPSON:  Well, Your Honor.

4           THE COURT:  Yeah.

5           MR. THOMPSON:  Your Honor, I would only make two

6   observations, right?  One, first that it's pretty clear that

7   Rome is not burning.  Notwithstanding protestations to the

8   contrary.  And we once again see the accommodation of the Hawk

9   parties even with regards to scheduling on something that was

10  completely within their control in terms of providing -- the

11  Trustee providing this list of assets well before now.

12          And frankly having other potential bidders have

13  access to this information in the data room.  It is

14  regrettable, although not too terribly unforeseeable that

15  nobody else was interested, given the information that they

16  would have and the concerns that any probable bidder would have

17  given what they know and what the risks probably are.

18          But beyond that, I just want the record to reflect

19  that there seems to be some suggestion that all VSI has done

20  throughout this process has been an obstructor.  We have tried

21  multiple times to provide alternative financing, in the way of

22  DIP financing to proposals.  And I am aware of Rembrandt having

23  made a proposal before that.

24          Mr. Vagnoni, during our hearing suggested that none

25  of those things were acceptable.  All of them -- I will

1   contend, Your Honor, all of them, each and every one was better

2   than the outcome that this trustee has decided is the only

3   track he can go down.

4           THE COURT:  I have one question.  Where is Phillips

5   in all this litigation?

6           MR. GEORGE:  Ready to cancel the --

7           THE COURT:  Excuse me?

8           MR. GEORGE:  Probably about ready to cancel the

9   license.

10          MR. VAGNONI:  Probably.  Your Honor --

11          THE COURT:  Where are they?  Like I haven't seen

12  them.  Like you're jumping up and down, but where's Phillips?

13          MR. GEORGE:  I spoken to Alex Damvelt if you'd like

14  to hear about that.  And I've spoken to Phillips as well.

15          MR. VAGNONI:  Your Honor, he's testified -- he's

16  testified enough.  Your Honor, the proposals that we received

17  -- and I don't want to prolong this anymore.  I know Your Honor

18  has made a ruling on dates.  The proposals that the Trustee has

19  received so far are from the same individual who found it has

20  grossly mismanaged the Debtor's --

21          THE COURT:  Mr. Vagnoni, I'm giving you everything

22  you want.

23          MR. VAGNONI:  I agree.

24          THE COURT:  I'm moving forward with the bid

25  procedure, and --

1              MR. VAGNONI:  And I acknowledge that.

2              THE COURT:  Okay.

3              MR. VAGNONI:  And I thank you.  But to sit here and

4    listen to --

5              THE COURT:  There's zealous advocates --

6              MR. THOMPSON:  I'm going to object to this line --

7              THE COURT:  -- being paid to be --

8              MR. THOMPSON:  -- to this line of -- I'm going to

9    object.

10             THE COURT:  Everybody.  So Mr. Vagnoni, I don't need

11   to hear anything more from anybody.

12             MR. VAGNONI:  Thank you, Your Honor.

13             THE COURT:  Okay.  So I'll hear from all of you.

14   Just make sure you put in those briefs.  My law clerk is

15   waiting with baited breath to see all of your sale objections

16   because he's got to do a lot of research.  So next Friday,

17   okay.  We'll be taking a close look at all of that.  So please

18   include all of your arguments then.  Okay, everybody. I will --

19             MR. THOMPSON:  Thank you, Your Honor.

20             MR. VAGNONI:  Thank you, Your Honor.

21             THE COURT:  All right.  Thank you.  I have a 12:30

22   hearing.  Don't need to stand for me.  Okay.

23       (Proceedings adjourned at 12:47 p.m.)

24

25

# C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
John Buckley, CET-623
Digital Court Proofreader