# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| IN RE: | : Case No.  23-10763-amc |
| | : |
| STREAM TV NETWORKS, INC.  CH: 11 | : |
| AND NETWORKS, INC. AND | : Philadelphia, Pennsylvania |
| TECHNOVATIVE MEDIA, INC. | : December 4, 2024 |
| | : 12:53 p.m. |
| . . . . . . . . . . . . . . . . . | : |


BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE


<u>APPEARANCES</u>:

For the Chapter 11 Trustee:     Michael D. Vagnoni, Esq.
                                Edmond M. George, Esq.
                                Obermayer Rebmann Maxwell &
                                Hippel LLP
                                Centre Square West
                                1500 Market Street, Suite 3400
                                Philadelphia, PA 19102
                                215-665-3066

                                Steven M. Coren, Esq.
                                Kaufman Coren & Ress, P.C.
                                Two Commerce Square
                                Suite 3900
                                2001 Market Street
                                Philadelphia, PA 19103-2713
                                215-735-8700

For Visual Semiconductor,       John H. Thompson. Esq.
Inc.:                           Akerman
                                750 Ninth Street, N.W.
                                Washington, D.C. 20001
                                202-824-1760

                                R. Adam Swick, Esq.
                                Akerman
                                500 West 5th Street, Suite 1210
                                Austin, TX 8701
                                737-999-7103

```
For Rembrandt:              Andrew Peter Demarco
                            Devlin Law Firm, LLC
                            1526 Gilpin Avenue
                            Wilmington, DE 19806
                            302-449-9010


For Leia Inc.:             Keri P. Ebeck
                            Michael Watters
                            Bernstein & Berkley, Attorneys
                            at Law
                            601 Grant Street, 9th Floor
                            Pittsburgh, PA 15219
                            412-456-8100


SeeCubic, Inc.:            Marley Brumme, Esq.
                            Skadden Arps Slate Meagher &
                            Flom, LLP
                            500 Boylston Street, 23rd Floor
                            Boston, MA 021116
                            617-573-4800


Also Appearing:            Rediah Braham
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| WITNESSES:               |        |       |          |         |
|                          |        |       |          |         |
| William Homony           |        |       |          |         |
|   (By Mr. Thompson) | 24 |       |          |         |
|   (By Mr. Michaels) |    | 52   |          |         |
| J. Scott Victor          |        |       |          |         |
|   (By Mr. Swick) | 61   |       |          |         |
|   (By Mr. Vagnoni) | 71 |       |          |         |

```
 1  DECEMBER 4, 2024                            12:53 P.M.

 2          THE COURT:  The 1:00 matter is the matter of Stream

 3  TV Networks.  It is a motion to approve a sale.

 4          I know we have several parties in the courtroom.  We

 5  will take their appearances first, and then we will go to the

 6  people on the phone.

 7          MR. GEORGE:  Good morning, Your Honor.  Ed, Edmond

 8  George.

 9          THE COURT:  It is afternoon.  I always say --

10          MR. GEORGE:  Good afternoon, Your Honor.

11          Edmond George and Michael Vagnoni from the Obermayer

12  firm on behalf of William Homony, the Chapter 11 Trustee.

13          MR. COREN:  Good afternoon, Your Honor.

14          Steve Coren, Special Counsel for the Trustee.

15          THE COURT:  Okay.

16          MR. THOMPSON:  Good afternoon, Your Honor.  John

17  Thompson, as well as my colleague, Adam Swick, from Akerman.

18  On behalf, excuse me, on behalf of VSI.

19          MR. DEMARCO:  Good morning, Your Honor.

20          Andrew DeMarco from the Devlin Law Firm, here on

21  behalf of Rembrandt, with my co-counsel, Chris Michaels, also

22  from Rembrandt.

23          THE COURT:  Sir, do you want to put your name of the

24  record?  Come on up to the podium.

25          MR. BRAHAM:  My name is Rediah Braham (phonetic).
```

1    I'm a creditor from Stream TV.

2              THE COURT:  Okay.

3              MR. BRAHAM:  They owe me a lot of money.

4              THE COURT:  Okay.

5              MR. BRAHAM:  I'm a very poor guy.  I cannot afford to

6    get --

7              THE COURT:  Oh.

8              MR. BRAHAM:  -- a lawyer or anybody.

9              THE COURT:  Okay.

10             MR. BRAHAM:  But right now, Mathu is offering us 90

11   cents to a dollar.  I am very humbly requesting to kindly give

12   the company back to Mathu and let him pay everybody so we can

13   survive.

14             THE COURT:  Okay.

15             MR. BRAHAM:  I just wanted to say that.

16             THE COURT:  No problem.

17             MR. BRAHAM:  Thank you.

18             THE COURT:  Thanks for letting us know.

19             MR. BRAHAM:  Thank you.

20             THE COURT:  Okay.  All right.  So I thought perhaps

21   you would -- did you want to say something?  Pam is giving me a

22   look.

23             Yeah, go ahead.  What is your thought?

24             THE CLERK:  There might be people on the phone.

25             THE COURT:  Oh, I forgot.  I am sorry.  Yeah, people

 1  on the phone.

 2          Would you please put your appearance on?

 3          MS. EBECK:  Good afternoon, Your Honor.  Keri Ebeck

 4  on behalf of Leia Inc.  I also have my co-counsel Michael

 5  Watters on the phone.  If any -- we are basically here to

 6  listen, but if anything comes up, Mr. Watters will be handling.

 7          THE COURT:  All right.  Thanks, Ms. Ebeck.

 8          Anyone else on the phone?

 9          Good.  Okay.  That was easy.

10          All right.  Mr. George, I thought perhaps you could

11  do a proffer.  Would you want to do a proffer?

12          MR. GEORGE:  I will, Your Honor.  DO you want to --

13          THE COURT:  Unless you guys --

14          All right.  Well, you do the proffering, and we will

15  see what they say.

16          MR. GEORGE:  Okay.

17          THE COURT:  Okay.

18          MR. GEORGE:  Your Honor, I will deal with the other

19  exhibits and things after I am done with the proffer.

20          We have two witnesses today, Mr. Homony who is the

21  Chapter 11 Trustee, and Mr. Victor.  They have both filed

22  declarations in this case which we have marked in our Exhibit

23  Book as 1 and 2.  We have asked that those be moved into the

24  record.

25          If called to the stand, Mr. Homony would testify

1   consistent with his declaration;

2          That he was retained as a Chapter 11 Trustee in this

3   case after the management was removed pursuant to a motion to

4   appoint a Chapter 11 Trustee;

5          That he retained SSG Capital advisors to conduct the

6   sale process for the assets;

7          That he has experience as a trustee in this vicinage;

8          That he had robust and good-faith negotiations with

9   Hawke and SLS that resulted in the Hawe settlement;

10         That he approved putting the Debtor's assets up for

11  sale;

12         He approved the stalking horse bid and designated the

13  stalking horse bidder as the successful or winning bidder,

14  there having been no parties expressing any interest in the

15  purchase of the assets, even following the subsequent and

16  additional teaser information that Your Honor directed at the

17  hearing on the bidding protections;

18         That his decision to sell was grounded in business

19  judgment based on the fact that when he took over the case,

20  there was no money in the case.  The Estates were

21  administratively insolvent.  The Estates have been in a

22  protracted fight with the secured creditors for a number of

23  years.  There had been three previous bankruptcies, two of

24  which were dismissed on the basis of bad faith;

25         That the Bankruptcy Court provided a very limited

Case 23-10763-amc   Doc 802-1   Filed 12/09/24   Entered 12/09/24 09:03:09   Desc
12/4/2024 Hearing Transcript of 79   Page 8 of 78

8

1   extension of time within which the Trustee could find a

2   purchaser for the property, or for the assets;

3          That he applied to the Bankruptcy Court for an

4   extension of the automatic stay, and was given until July 15th

5   to effectuate the transfer or the settlement, with a July 15th

6   scheduled hearing date in the Delaware 225 action;

7          The Trustee made a decision that selling the assets

8   pursuant to the sharing and settlement agreement with Hawk was

9   in the best interest of the creditors;

10          That at the time, there was a lawsuit that gave the

11   secured creditors relief to go back to Delaware to redo the

12   Board of the Debtor's;

13          That there were no business activities, no workers,

14   no factory, no raw materials, no finished goods, no WIP, a

15   bonding machine that was palleted and located in China, and no

16   accounts receivable, as well as $3 million in purported

17   administrative expenses in favor of the Lewis Brisbois firm.

18          Accordingly, the Trustee, based on those factors,

19   made a decision to sell the assets of the property.

20          The Trustee did meet with and tried to work with Mr.

21   Rajan and VSI to entertain legitimate proposals from VSI to buy

22   or restructure the operations of the Debtor.  Neither VSI or

23   Mr. Rajan ever demonstrated a viable proposal that was

24   supported by a commitment of a financial nature that would

25   allow the Trustee to make a decision to make an arrangement

1   with Mr. Rajan or VSI.

2           That he requested VSI fund a DIP in order to fund

3   litigation in the case, which VSI failed to do, and the Trustee

4   eventually settled with Hawk.

5           And even after the Hawk settlement, the Trustee

6   continued to discuss potential acquisitions with the VSI

7   parties, so much so that he held off on filing the procedures

8   motion for about ten days while he continued to communicate

9   with the Hawk parties, or I mean the VSI parties, but within

10  that time, there was no proposal that was made;

11          That the Trustee authorized the sale motion and

12  procedures motions, that he reviewed the results of SSG's

13  efforts and believes that a robust and full marketing of the

14  assets have occurred.

15          He has reviewed the results of the sale process, and

16  having received no bids, has concluded in the exercise of

17  business judgment, that the stalking horse bid in the highest,

18  best, and only bid for the assets of the Estate.  And that was

19  all Mr. that Homony would testify.

20          THE COURT:  Okay. All right.  Did you gentlemen want

21  to respond to the proffer that was made?

22          MR. THOMPSON:  Well, Your Honor, on behalf of VSI, I

23  would object to the timing and sufficiency of the testimony

24  that has been put in by proffer.  But we will, of course, get

25  an opportunity to cross-examine both witnesses.

1            I think there is a preliminary matter though, Your

2   Honor, that I think we need to take up based upon these

3   proffers and the declarations that were filed yesterday for

4   something that was filed this morning, which was an amended

5   order, form of order, for this sale.

6            Your Honor, I guess, let me take the podium, because

7   it is going to be a minute.

8            THE COURT:  Okay.

9            MR. THOMPSON:  Your Honor, I have been doing this a

10  while.  And to say that this is one of the more exceptional

11  last-minute orders I have seen would be putting it graciously.

12           This sale order demonstrably changes the terms of the

13  agreement, and ultimately, the sale, that this Trustee purports

14  to want to do with this stalking horse.  It bears very little

15  resemblance to what this Court approved in the 9019 sale or

16  9019 settlement agreement providing for a sale.

17           It includes unconstitutional releases, injunctions,

18  gatekeeper provisions, a whole ration of relief.  And it is all

19  being granted, I guess, at the 11th hour by the Trustee and

20  asking this Court to bless it, because this stalking horse

21  bidder will not go forward on the agreement that they struck in

22  May and ultimately had approved in June.  They have been

23  telling us for months and months as we tried to propose

24  alternatives and ask this Court to reconsider that 9019

25  settlement agreement.

1        It is not -- there is nothing we can do about it.  It

2   is too -- it is binding.  So if it is binding, it is also

3   binding upon the Hawk parties.  This stalking horse bidder came

4   to this process saying that they would abide by the agreement

5   that was struck in June and that this Court approved.  They are

6   not doing that.

7        This Trustee is now saying that because they might

8   back out and they will not agree without the Court blessing

9   this additional relief.  It is quite a red line.  Unless they

10  do that, excuse me --

11        THE COURT:  Let's listen to Mr. George.

12        MR. THOMPSON:  Unless they do that, this sale isn't

13  going through, at least that is what we read.  And I don't

14  think it is very complicated, Your Honor.

15        THE COURT:  Let's just drill down to the specifics.

16  The one provision of the revised sale order that I had a

17  question about was that all along, it was my understanding that

18  Hawk was taking the position that if I agreed to the sale, that

19  whatever litigation you may face by VSI and Rembrandt, you were

20  going to face.

21        But when I read the paragraphs 13, 14, and 15 of the

22  sale order, it sort of purports now to making me a gatekeeper

23  to any kind of litigation.  That was my understanding of that,

24  of those provisions.  And the concern I had about those

25  provisions are that I don't care to be that gatekeeper.  If I

1    do authorize the sale, then whatever litigation they may want

2    to bring, they are going to bring.

3         MR. GEORGE:  Well, Your Honor, first of all, let me

4    just say two things.  I think Mr. Thompson is a little over his

5    skis what he says that --

6         THE COURT:  All right.  Well, let's just assume

7    everyone is emotional.  I know, I mean, you guys are all going

8    to count, you know --

9         MR. GEORGE:  But that is just -- yeah.  But to say --

10        THE COURT:  -- paint the other person as, you know.

11        MR. GEORGE:  Understood.  But to say that there is

12   any indication that Hawk isn't going to close, it is just wrong

13   and improper.

14        THE COURT:  Well, but what they are saying is that --

15        MR. GEORGE:  It's a form of --

16        THE COURT:  -- what they are saying is that it is --

17   let's do this.  Let's not respond, and preferably, let's not

18   state things emotively.  All right?  So let's just take away

19   what he was saying.  He was saying that there are provisions in

20   there that are either unconstitutional, that there is a lot of

21   changes.  And I would have to agree with him, Mr. George, there

22   are a lot of changes.  We had to review these changes today.

23        MR. GEORGE:  Understood, Judge.

24        THE COURT:  But specifically, the point that I just

25   raised is something that is near and dear to their heart, that

Case 23-10763-amc   Doc 902-1   Filed 12/09/24   Entered 12/09/24 08:03:09   Desc
12/4/2024 Hearing Transcript   Page 14 of 79   Page 13 of 78

13

1    they have been hopping mad since the beginning of time about

2    what you guys want to do here with regard to their licensing

3    rights.  And they do seem to want to sue someone.

4           So I am not going to be the gatekeeper of that

5    litigation.  I am not going to decide if something is

6    meritorious.  So at this point, I am not really interested in

7    making those revisions to the sale or that you suggested.

8           So you could respond to that point.

9           MR. GEORGE:  No, that is fair enough, Your Honor.

10   Because I think the Trustee's intention, and I think we have

11   said all along is that we are selling interests in these

12   downstream entities.  And if the parties on that side of the

13   table feel like they have claims, nothing we are doing is going

14   to change that because we don't own those downstream assets.

15          THE COURT:  Okay.  So reconcile what these new

16   paragraphs say though.

17          MR. GEORGE:  Well --

18          THE COURT:  These new paragraphs now say that I'm

19   supposed to be a gatekeeper.

20          MR. GEORGE:  -- sure.  I can work on this with the

21   counsel to Hawk, and maybe we can address that.

22          THE COURT:  Okay.

23          MR. COREN:  Thank you, Your Honor.  Yes.  We just

24   confirmed, their -- the litigation and the claims of SeeCubic

25   or of Rembrandt that are going on in the District of Delaware

1   right now, and any claim that intellectual property litigation

2   is going to move forward against the Debtors an assumed

3   liability under the asset purchase agreement, as is made clear

4   in the order.  That is not subject to the gatekeeper provision.

5   That is going to go forward and that litigation is going to be

6   able to move forward.  And if that needs to be made more clear

7   here, we absolutely will.

8              THE COURT:  Okay.  I just want to clarify that VSI

9   and Rembrandt are going to have the right to pursue all of

10  their arguments with regards to the infringements.  Okay?

11             MR. MICHAELS:  That is absolutely, correct, Your

12  Honor.

13             THE COURT:  And right now, I don't feel like that

14  language is clear.

15             MR. GEORGE:  Your Honor?

16             THE COURT:  Yeah?

17             MR. MICHAELS:  With respect --

18             MR. GEORGE:  Before Mr. Michaels starts --

19             THE COURT:  Uh-huh.

20             MR. GEORGE:  -- is he a witness or a lawyer?  Because

21  the last time he sat at that table and he testified.  I know

22  you said don't be emotive.

23             MR. MICHAELS:  I am a lawyer.

24             MR. GEORGE:  I am doing everything I could do.  Mr.

25  Coren left a dent in my knee from kicking me because I sat

Case 23-10763-amc   Doc 802-1   Filed 12/09/24   Entered 12/09/24 08:03:09   Desc
12/4/2024 Hearing Transcript   Page 16 of 79   Page 15 of 78

15

 1  while Mr. Michaels testified and advocated at the same time.

 2  So I would like that clarification.  Why is he here, is he a

 3  witness?  If he is, he can't make presentations.

 4          THE COURT:  I thought he was a lawyer.

 5          Are you a lawyer, sir?

 6          MR. MICHAELS:  Yeah, I am serving as an attorney for

 7  Rembrandt 3D.

 8          THE COURT:  Okay.  He is serving as an attorney, so

 9  he is making argument.

10          MR. GEORGE:  Fair enough.

11          THE COURT:  Okay.

12          MR. MICHAELS:  Your Honor, I would like to read, not

13  -- no -- you said, let's get to what the facts are rather than

14  emotive response.  Well, the language they added to Section EE

15  in the proposed order states the Buyer asserts that it will --

16          THE COURT:  Yeah, I read that.

17          MR. MICHAELS:  -- not consummate the transaction.

18          THE COURT:  Okay.  So they are going to take

19  responsibility for assumed liabilities, at the assumed

20  liabilities are your litigation.  We looked at the defined term

21  of assumed liabilities, and that is part of it.

22          Let's just all agree to the concept.  I am telling

23  you right now that I am not approving any sale order unless

24  they preserve their rights to go after Hawk in connect

25          MR. MICHAELS:  Understood, Judge.

1          THE COURT:  Okay.  Hawk, would you like to say

2   something?

3          MR. CAPONI:  Yes, Your Honor.  Just to be clear, Hawk

4   is not the purchaser or the stalking horse.  Hawk is the

5   collateral agent SeeCubic, so --

6          THE COURT:  Okay.  When I say Hawk --

7          MR. CAPONI:  -- if we are going after somebody --

8          THE COURT:  -- it's like the umbrella.

9          MR. CAPONI:  -- like, let's try to drop Hawk if we

10  don't --

11         THE COURT:  Sure.

12         -- we can be a little clearer about that, that is

13  all.

14         THE COURT:  Yeah, whoever the Buyer is, they are --

15         MR. CAPONI:  We are going to buy it.

16         THE COURT:  -- going to face all of this litigation.

17         MR. CAPONI:  That is correct, Judge.

18         THE COURT:  Okay.

19         MR. THOMPSON:  So Your Honor, to be clear, and we can

20  submit testimony and we are here with witness of our own, the

21  action that initiates the right to sue, the transfer, is the

22  closing.  Right?  Stream has a license from Rembrandt and it is

23  perfectly valid.  They have not committed any IP infringement.

24  I asked them to clarify, is Scott Victor running around

25  providing offering for sale assets of the company covered by

 1    our license.  Right?  We believe they are.

 2            Rembrandt's position is actually, we don't have the

 3    right to sue Stream and its executives because they have a

 4    valid license to our technology. What they don't have the right

 5    to do is to transfer our trade secrets to another party --

 6            THE COURT:  I understand.

 7            MR. THOMPSON:  -- and effectively, what they are

 8    doing.

 9            THE COURT:  I understand.

10            MR. MICHAELS:  And so what I am saying is the day of

11    the closing, SCBV, Stream, all of its officers, are violating

12    1830 -- U.S.C. 1832, right?  Not the day before, not the

13    minute.  That is the transaction that does it.  And those that

14    are receiving it are likewise violating that statute.  And SCBV

15    is implicated, Stream, all of the executives involved.

16            And this is purporting, the reason I started reading

17    this clause is I think it is the most important thing that they

18    have submitted.  The Buyer is unwilling to proceed.  There was

19    an asset purchase agreement that was submitted for everybody

20    to, you know, to get approved, and there was a 9019 settlement.

21    And they are not willing to proceed, that is what they have

22    said.  Unless we get these unique protections that you are just

23    providing five minutes before I got in my car to drive to this

24    hearing today, they are not going to proceed.

25            So they have told us everything we need to know.

1 This sale isn't happening.  I would move, at the beginning of

2 this, to say this sale is no longer before this Court, the

3 Buyer won't go.

4          THE COURT:  I just clarified that if the sale does go

5 through, you will be able to sue the Buyer.

6          MR. MICHAELS:  With respect, Your Honor.  That is an

7 issue I certainly care deeply about.  The issue I am bringing

8 before, the nuance of what I am stating today is that there was

9 a motion to approve the (audio interference) purchase and the

10 sale.  And the Buyer has told the Trustee they are unwilling to

11 proceed unless the deal that they sought approval for changes,

12 right?  They are calling off the sale.

13          My request is that the motion be denied and they come

14 back again when they have worked out what their asset purchase

15 agreement is going to be and we have a time to actually respond

16 to the asset purchase agreement being asked for approval for

17 this Court.

18          THE COURT:  I am confused by how you are

19 characterizing this.  They did make a lot of changes.  But the

20 assumed liabilities definition includes the litigation you guys

21 have, so the Buyer is agreeing to still be on the hook for

22 that.  So what changes are they asking for that makes this sale

23 not able to go forward?

24          MR. MICHAELS:  They have -- I mean, I am looking

25 right at Section EE, and it says, specifically, unless the

Case 23-10763-amc    Doc 902-1    Filed 12/06/24    Entered 12/06/24 09:03:04    Desc
12/4/2024 Hearing Transcript    Page 20 of 78    Page 19 of 78

19

 1   asset purchase agreement specifically provides, and this Court

 2   specifically orders, that the Buyer, its properties, its

 3   successors and assigned and their respective property and the

 4   assets will not have any liability whatsoever with respect to

 5   require to satisfy in a manner whether in law and equity,

 6   whether by payment, setoff or otherwise, directly or

 7   indirectly, any claim or lien or any successor or transfer

 8   liability, excuse me, ability for either of the Debtors, other

 9   than the assumed liabilities.

10           THE COURT:  Other than the assumed liabilities.  So

11   they are in the assumed liabilities.

12           MR. MICHAELS:  I understand Rembrandt is in the

13   assumed liabilities.  That, and I do appreciate that your

14   statements with regard to Rembrandt's claims. But Your Honor --

15           THE COURT:  The Debtor can't get sued anymore, right?

16           MR. MICHAELS:  -- what I am raising --

17           THE COURT:  Uh-huh.

18           MR. MICHAELS:  -- is that this is not the asset

19   purchase agreement that they moved for approval.  They have

20   radically changed it.

21           THE COURT:  In what way have they radically changed

22   it?

23           MR. MICHAELS:  Well, I am looking at a redline

24   agreement which I have had five minutes to read.  So I would

25   ask for a continuance for the opportunity to answer that

1    question fulsome.

2           THE COURT:  Summarize for me, give me, like, the

3    biggest ticket item --

4           MR. MICHAELS:  The point is, Your Honor, five minutes

5    was insufficient time for me to review all of the changes.

6           THE COURT:  You said the purchase agreement has

7    changed.  I agree that there were revisions, but I had time to

8    look at the blackline.  I had concerns, and I just raised my

9    concerns with them to clarify that your litigation will go

10   forward.  But other than that, can you even point to something

11   that is --

12          MR. MICHAELS:  Your Honor, I can, right?

13          THE COURT:  Yeah?

14          MR. MICHAELS:  Your Honor pointed to the gatekeeper

15   provision.

16          THE COURT:  Right.

17          MR. MICHAELS:  I will point to the injunction.

18          THE COURT:  And I am striking that.  There is -- you

19   are going to be able to go after the Buyer.

20          MR. MICHAELS:  And the injunction, the injunctive

21   relief that they have got in -- that they are suggesting in 14?

22          THE COURT:  The injunctive relief --

23          MR. MICHAELS:  -- right?  They are looking for

24   injunctive relief for these stalking horse bidders as protected

25   parties under this revised agreement, which basically --

1          THE COURT:  All right.  Let me just make this clear.

2          MR. MICHAELS:  Okay.

3          THE COURT:  You guys, Rembrandt and VSI, you can go

4   crazy with whatever litigation you want against the Buyer.

5   Period.  End of story.

6          I will make sure that if I do enter the sale order

7   you have got those rights.  Okay?

8          MR. MICHAELS:  Your Honor, the problem is, they are,

9   the stalking horse bidder, through the Trustee, is now making

10  this as Mr. Michaels clearly pointed out in their own language,

11  the contingency for their participation in this sale.

12         THE COURT:  But they have asked for things in the

13  blackline proposed sale order that I am not going to give them.

14  It seemed to me that were asking me to be a gatekeeper for your

15  litigation against them.  I am not going to do that.

16         So what other changes are there to the proposed sale

17  order that you think is so dramatic?

18         MR. MICHAELS:  Well, I think it is exceptional that

19  they are actually suggesting that they are not prepared unless

20  they get it.  Which means, if Your Honor is not going to give

21  it, they are not prepared to close.

22         THE COURT:  Okay.  Well, I just told them that I am

23  not going to give it to them, and they said okay.

24         MR. MICHAELS:  So I think what we need is a

25  representation from the stalking horse bidder today and now

```
1   that they will close, notwithstanding the fact that Your Honor

2   will not provide that relief.

3           THE COURT:  Go ahead, Ms. Brumme.

4           MS. BRUMME:  Good afternoon, Your Honor.

5           Marley Brumme from Skadden Arps for the Buyer, the

6   stalking horse bidder, SeeCubic Inc.

7           I am not sure where Counsel has gotten the idea that

8   we are backing out of this as a purchase agreement or the sale

9   in any way, shape, or form.  And I am certainly not sure where

10  they have gotten the idea that there has been discussions of

11  that that they haven't been a part of between our client and

12  the Trustee.

13          But to be clear, yes, my client is prepared to move

14  forward with the sale, fully understanding that the Counsel on

15  this side of the table over here is going to probably, as you

16  said, sue us every which way to Sunday --

17          THE COURT:  Uh-huh.

18          MS. BRUMME:  -- on violations --

19          THE COURT:  Yep.

20          MS. BRUMME:  -- so.

21          THE COURT:  Thank you.  All right.  Now let's do

22  this.  So we have two witnesses for today.  Who do you -- do

23  you need to cross-examine both of them?

24          MR. THOMPSON:  Yes.  And --

25          THE COURT:  All right.  And let's just be absolutely
```

Case 23-10763-amc   Doc 902-1   Filed 12/09/24   Entered 12/09/24 00:03:09   Desc
12/4/2024 Hearing Transcript   Page 24 of 79     Page 23 of 78

23

 1  crystal clear about what kind of cross-examination questions I

 2  am going to permit today.  I am not going to permit any cross-

 3  examination questions about issues that I have already

 4  resolved.  I don't want to hear them.  We have already heard

 5  all of them.  So the extent that you are questioning the 9019

 6  order and the fact that Hawk has been approved as, you know,

 7  the person under that 9019 order.  And that they have --

 8  whether they have acted in good faith in this case or not, I

 9  don't want to hear any questions.  I have already heard all of

10  them.

11          I just want to hear questions about whatever they

12  have said in the affidavits that they just recently filed that

13  have to do with my sale today.  Those are the only questions

14  that I feel like entertaining today.  Okay?

15          All right.  So do you want to bring up the Trustee

16  first?

17          MR. GEORGE:  Mr. Homony.

18          THE COURT:  Yeah.  Yep, that is fine.

19          You can go ahead and start.

20      (Trustee sworn)

21          THE CLERK:  Can you please state your name and spell

22  your last name for the record?

23          MR. HOMONY:  William A. Homony, H-O-M-O-N-Y.

24          THE CLERK:  Okay.  Thank you.

25          MR. HOMONY:  Sure.  1730 Maple Avenue, Hatfield,

```
 1   Pennsylvania, 19440.

 2        (Audio interference)

 3            MR. GEORGE:  -- 1 through 6.

 4            MR. THOMPSON:  Thank you.  John Thompson on behalf of

 5   VSI.

 6                          DIRECT EXAMINATION

 7   BY MR. THOMPSON:

 8   Q    Good afternoon, Mr. Homony.

 9   A    Good afternoon.

10   Q    Mr. Homony, how long have you been a Chapter 11 Trustee?

11   A    Well, this is my first engagement as a Chapter 11 Trustee,

12   and it began in January of 2024.

13   Q    Okay.  Mr. Homony, do you remember a meeting or a set of

14   communications that you had with the VSI constituents'

15   principals?

16   A    I've had many, so.

17   Q    Do you remember having them shortly after your appointment

18   in January?

19   A    Sure.

20   Q    Did you ask those principals for assistance in

21   understanding the Stream TV case?

22   A    Yes.

23   Q    Did you exchange email with them?

24   A    Sure, yes.

25   Q    Did you give them directions?
```

Case 23-10763-amc   Doc 802-1   Filed 12/06/24   Entered 12/06/24 08:07:09   Desc
12/4/2024 Hearing Transcript   Page 26 of 79   Page 25 of 78

25

1  A     Did I give them direction?

2  Q     Did you give them directions?

3  A     I think I asked for documents in support for positions

4  that they wanted me to advocate.

5  Q     Okay.  Did you ever do an inventory of the assets of

6  Stream TV?

7  A     Well, that was one of the issues in the case that is not

8  typical in a Chapter 11 Trustee case.  There were no operations

9  and it was unclear at the time, and remains unclear, exactly

10  which entities of Mr. Rajan's have possession of tangible

11  assets, records, et cetera.  So I don't believe Stream TV has

12  certainly any significant tangible assets.  And if they do, I

13  have not been aware -- made aware of them or know their

14  location or who is in control of them.

15  Q     That was a long example, Mr. Homony.  So I am going to

16  break it down.  I asked you the question did you do an

17  inventory of Stream's assets; yes or no?

18  A     I would say generally, yes.

19  Q     You did?

20  A     Yes.

21  Q     How did you do that inventory?

22  A     Through reading through various materials, the case

23  filings, the various adversary matters, the history of the

24  case, the filings in the Chapter 11 case up through my

25  appointment, and other records I obtained from either Stream or

Case 23-10763-amc   Doc 902-1   Filed 12/09/24   Entered 12/09/24 09:03:09   Desc
12/4/2024 Hearing Transcript - Page 27   Page 26 of 78

26

1   VSI personnel.

2   Q    Did you talk to other parties?

3   A    Yes.

4   Q    Who were those parties?

5   A    Those parties were, again, Mr. Rajan, Nicole Maneen, the

6   employees of SeeCubic, B.V. in the Netherlands.  I certainly

7   spoke to Mr. Stastney over time, his counsel, Hawk's counsel,

8   all of the relevant parties and interests that you would think

9   a Chapter 11 Trustee would talk to in this situation.

10  Q    And did you accumulate an asset list from all of those

11  communications in that investigation?

12  A    Again, I think the assets that I identified through my

13  investigation are included in the APA, both those that are

14  being purchased as well as the excluded assets.

15  Q    All of the assets are identified in the APA?

16  A    I believe, generally, the assets of Stream are identified

17  in the APA, yes.

18  Q    And those assets are assets that are being transferred

19  under this sale, correct?

20  A    Stream is identifying a, certainly, a set of assets to the

21  Buyer, yes.

22  Q    If you were to look at the APA, which is on the docket --

23  A    Uh-huh.

24  Q    -- and certainly, we can have you take a look at it, but

25  it describes all of the assets that Stream TV holds or may

```
1   hold, correct?

2   A    Yes, except for the specifically identified excluded

3   assets, yes.

4   Q    Okay.  That includes, among other things, physical

5   property, intellectual property, yes?

6   A    I would suggest that they are -- I don't believe I am

7   transferring any tangible property of Stream, and I don't

8   believe I am transferring any intellectual property that is

9   owned by Stream.

10  Q    You don't believe that you are actually transferring any

11  intellectual property owned by Stream?

12  A    No.

13  Q    You are doing this as an as is where is sale, right?

14  A    That's correct.

15  Q    What does that mean, Mr. Homony?

16  A    That means, buyer beware.  The Buyer gets the assets in

17  any condition, in any form, no reps or warranties.  They can't

18  come back.  There is no recourse to the Estate.

19  Q    Wherever they are, right?

20  A    Correct.

21  Q    Does the location, possession, or circumstance, right,

22  change who owns that property?

23  A    Can you repeat that?  I am sorry.

24  Q    Does the location, you said as is and where is, right?

25  A    Uh-huh.
```

Case 23-10763-amc   Doc 902-1   Filed 12/09/24   Entered 12/09/24 00:03:09   Desc
12/4/2024 Hearing Transcript   Page 29 of 79   Page 28 of 78

28

1  Q    Does the location or the condition change who owns the

2  property?

3  A    No.

4  Q    It is the Debtor's, it is part of the Debtor's Estate,

5  right?

6  A    Well, certain assets are a part of the Debtor's Estate.

7  Q    So for instance, the bonding machine that is in Asia is a

8  Debtor asset, right?

9  A    Well, as I have testified before, there is certainly a

10 cloud over the title in the way in which it was -- the way it

11 was explained to me as being addressed when a Receiver was

12 appointed over Technovative before this bankruptcy case was

13 initiated.  I do believe it is listed as an asset of Stream on

14 Stream's Schedules.  So the extent it is owned by the Debtor,

15 and I misspoke previously, this is the only tangible piece of

16 equipment that the Debtor's Estate may own.  However, it may be

17 titled already in the Netherlands under the SCBV.  Either way,

18 in this proposed sale, it is being conveyed to the Buyer.

19 Q    But the only document that you have ever seen is a receipt

20 that tells you that Stream TV is the owner of that; is that

21 correct?

22         MR. GEORGE:  Objection to form, Your Honor.

23         MR. THOMPSON:  Excuse me, I will rephrase.

24 BY MR. THOMPSON:

25 Q    Is the owner of the bonding machine located in Asia is

```
1   Stream TV?

2   A    I am not sure I have ever seen a bill of sale or anything

3   like that.  I think it was manufactured over time, many, many

4   years ago.  And my understanding is it has been in China for

5   over a decade.  So I don't know that I have seen a specific

6   document that you just referenced.

7   Q    You suggested that somebody had told you that there might

8   be cloud over that title to the bonding machine; is that right?

9   A    That is correct.

10  Q    Who told you that?

11  A    I think -- I think I've read it many things, and I believe

12  that SCBV personnel have referenced the fact that, I believe,

13  the Receiver may have put it in SCB's name in order to pay for

14  the storage, et cetera, in China for a period of time.

15  Q    You said that the SCBV Receiver would have put it in

16  SCBV's name?

17  A    He may have titled it in their name for it.

18  Q    So how would the SCBV Receiver have retitled a piece of

19  property that the Stream Estate owned?

20  A    I don't know how he did it.

21  Q    You wouldn't know how he did it. Have you seen any

22  document that establishes any right, title, or interests over

23  the bonding machine in SCBV, aside from what people have told

24  you?

25  A    Not that comes to mind.
```

Case 23-10763-amc   Doc 902-1   Filed 12/09/24   Entered 12/09/24 09:03:09   Desc
12/4/2024 Hearing Transcript   Page 31 of Page 30 of 78

30

1    Q    Nothing, huh?  Okay. But nevertheless, your asset purchase

2    agreement and the documents that you have filed in favor of

3    this sale suggest that there is some potential that the bidder

4    or the Buyer would not actually receive title of that; is that

5    right?

6    A    No, not at all.  I think it is very clear that the Buyer

7    will get title, regardless of how it is currently titled.  They

8    are either going to get it if Stream owns it or if SCBV owns

9    it.  They are going to get it through the equity interest of

10   SCBV.  So they will have control over that asset regardless of

11   who currently has title.

12   Q    That is important.  So they do have control if they buy

13   these assets?

14   A    Control over what?

15   Q    Over SCBV.

16   A    Well, ultimately I am transferring what I believe, the

17   defined term, transferred interests, in the APA, which

18   constitutes three subsidiaries of Technovative, which is one of

19   the Debtor entities.  And so they will be the economic interest

20   holder in Ultra-d Ventures, which is a non-Debtor foreign

21   subsidiary.  That entity ultimately, I believe, indirectly owns

22   SCBV.  So I would suggest that ultimately they will have

23   control should they choose to exercise it over SCBV.

24   Q    SCBV ultimately is owned by the Topco's Technovative and

25   Stream TV that are Debtors in this case, right?

Case 23-10763-amc   Doc 902-1   Filed 12/06/24   Entered 12/06/24 08:03:09   Desc
12/4/2024 Hearing Transcript Page 32 of Page 31 of 78

31

1          MR. GEORGE:  Objection, Your Honor.

2          THE COURT:  Okay.  What was your objection, Mr.

3   George?

4          MR. GEORGE:  I think he said that it was owned by

5   Technovative and Stream TV.  Oh, I am sorry.

6          MR. THOMPSON:  Let me rephrase.

7          THE WITNESS:  Yes, sir.

8   BY MR. THOMPSON:

9   Q   Does the ownership interest of SCBV, wherever it is in the

10  stack, ultimately run up through Technovative at the first

11  level and Stream TV at the second?

12  A   Well, I wouldn't say the first level.  There are many

13  foreign subsidiary levels before you get to the U.S. Debtor

14  Technovative.  So as I just described, I believe it is

15  Technovative, which is a U.S. Debtor.  It is Ultra-d Ventures,

16  which is a non-Debtor foreign subsidiary who then owns another

17  foreign subsidiary, Ultra D cooperative who then owns SCBV.

18  It's a chain.

19  Q   Yes, I understand, and I thought my question was

20  accounting for it.  Perhaps it wasn't, but thank you for the

21  clarification, Mr. Homony. The question really is who controls

22  all of those subsidiaries, including SCBV?

23  A   Ultimately, I believe the buyer will be able to exercise

24  control of them.

25  Q   The buyer.  Who does right now?

1   A     Who does right now?

2   Q     Yes.

3   A     Exercise control over SCBV?

4   Q     All of the subsidiaries below Technovative.

5   A     Well, I have -- the Debtor's Estates have an ownership

6   interest in Ultra-d Ventures.

7   Q     They control everything below Technovative, do they not?

8   A     I wouldn't -- I wouldn't, I mean, the facts and

9   circumstances change depending on what a particular entity

10  would want to do.

11  Q     Well, does the sale process, Mr. Homony, who has control?

12  Because we just talked about the Hawk parties, if they are the

13  successful Buyers, they would have control for purposes of the

14  bonding machine we talked about.  Does that change the process

15  from what exists right now?

16  A     Well, obviously --

17  Q     In a case where you sit as the Trustee to these Debtors?

18  A     Well, I guess, maybe I am speculating.  I would suggest

19  that the Buyer is going to exercise control over all of those

20  entities post-closing.

21  Q     And they would do so because?

22  A     Because of the legal ownership interest in the corporate

23  structure I just described.

24  Q     Right.  And right now, who has control of the legal

25  ownership interests?

Case 23-10763-amc   Doc 902-1   Filed 12/06/24   Entered 12/06/24 00:03:09   Desc
12/4/2024 Hearing Transcript - Page 34 of 79   Page 33 of 78

33

```
 1  A    Well, ultimately, Technovative has ownership interest, an

 2  economic ownership interest in, as I described.

 3  Q    And who has control over Technovative --

 4  A    I do.

 5  Q    -- and the Stream Debtors?

 6  A    Okay.

 7  Q    Thank you.  That is where I was really going, Mr. Homony.

 8  A    Okay.  Uh-huh.

 9  Q    Right.  You have control, right?

10  A    I have an ownership interest in --

11  Q    You can control, right?

12  A    Well, that is a -- to me, that is a legal conclusion, that

13  is a different determination.

14  Q    Okay.

15  A    I don't think I have control over SCBV.

16  Q    You don't think you have control?

17  A    I do not have it right now, no.

18  Q    Did you ever review any of the court proceedings or orders

19  out of the Netherlands Court?

20  A    I don't know specifically.  I do know that there was a

21  dispute as to who could exercise, I guess, control as the

22  director of SCBV.  And I believe the Court in Netherlands, over

23  Stream's objection, appointed Mr. Stastney as the director of

24  See -- SCBV, I believe.  That is a recollection from months

25  ago.
```

```
1    Q    So is Mr. Stastney in control?

2            MR. GEORGE:  Your Honor, I object.  Control is a

3    label --

4            THE COURT:  I am really confused about all of this.

5            MR. GEORGE:  -- matters.  I am sorry.

6            THE COURT:  He has got whatever he has got.  And

7    there is a corporate structure.  It sounds like he owns certain

8    equity interests.  And term, if you are asking about, like,

9    daily operations, it sounds like he is not in control of those.

10           What is the point of all of this questioning?

11           MR. THOMPSON:  Your Honor, I am getting there, right?

12   I am asking for --

13           THE COURT:  What is your point?

14           MR. THOMPSON:  My point is that there is control of

15   certain assets that ultimately are, that run to the benefit of

16   at a minimum, or are controlled by the Stream TV and

17   Technovative Debtors.

18           THE COURT:  And?

19           MR. THOMPSON:  And that matters for purposes of this

20   sale for reasons --

21           THE COURT:  Why?  Right.  So it is what it is.  I

22   mean, they own the equity interests.  They have the rights that

23   they have.  You are not the Buyer, so you are not asking about

24   clarification, so what is the objection?  What is the concern

25   here?
```

1          MR. THOMPSON:  Well, I am getting there, Your Honor.

2    I am trying to show that Mr. Homony has control over all of the

3    subsidiaries, and could take control so that he could actually

4    realize the assets and the value of those assets.  And control,

5    in this particular instance, the transfer of those assets.

6          THE COURT:  Yes, Mr. George?

7          MR. GEORGE:  Your Honor, I think this is all

8    irrelevant.  I am going to move to strike the testimony related

9    to this issue of control.

10         THE COURT:  I happen to agree.  I think it is

11   irrelevant.  I mean, you are trying to ask him questions that

12   would suggest that the Trustee has certain powers that you

13   would like to see him exercise, that he doesn't appear to

14   choose to exercise.  He wants to sell the assets that he has.

15   He wants to sell the shares of the subsidiaries as part of the

16   sale, so.

17         MR. THOMPSON:  Fine, Your Honor.  I will move on and

18   we will talk about the assets that he has.

19         THE COURT:  Okay.

20         MR. THOMPSON:  Your Honor, may I speak to this

21   objection?

22         THE COURT:  Excuse me?

23         MR. THOMPSON:  May I speak to this objection?

24         THE COURT:  Okay.

25         MR. THOMPSON:  The relevance, Your Honor, is that the

 1  Trustee and the stalking horse bidder have routinely and

 2  consistently made the point that this is an asset sale only of

 3  stock in corporations.  And we just came across testimony that

 4  the Trustee provided that there is bonding equipment that the

 5  Buyer is getting by either directly the asset being owned by

 6  Stream or by taking control of the entity SeeCubic B.V., which

 7  owns the bonding equipment.  And either way, it affects a

 8  transfer of ownership of the bonding equipment.  This concept

 9  is going to be incredibly relevant throughout all of

10  Rembrandt's claims.

11          THE COURT:  Sure.  Well they wouldn't --

12          MR. THOMPSON:  We would --

13          THE COURT:  -- the bonding equipment for a while.

14  The bonding equipment is going to the Buyer, that is no

15  surprise.  He just clarified that is really the only hard

16  tangible property that is going to the Buyer that Stream owns,

17  correct, sir?

18          THE WITNESS:  Yes, correct.

19          THE COURT:  Yeah.  So yeah, okay.

20          MR. GEORGE:  And Your Honor, I think that further,

21  that this is just an effort to try to make it look like the

22  Trustee didn't do his job.  It is really an attack on him as a

23  person --

24          THE COURT:  Yeah.

25          MR. GEORGE:  -- and the job that he did here.

 1           THE COURT:  And I don't see its relevance to the line

 2   of questioning that you are pursuing with the Trustee right now

 3   about, you know, who is the corporate structure or who is

 4   controlling the daily operations.  I don't think any of that is

 5   relevant.

 6           MR. THOMPSON:  Your Honor, I have heard it and I will

 7   move on.

 8           THE COURT:  Thank you.

 9           MR. THOMPSON:  I would only suggest that they will

10   become readily apparent why.

11           THE COURT:  Okay.

12           MR. THOMPSON:  All right.  So --

13           MR. GEORGE:  But Your Honor, if they become relevant,

14   it will be on another day, it won't be today because none of

15   this (simultaneous speech).

16           THE COURT:  All right, Mr. George.  Mr. George, I

17   understand.  Let's go.

18   BY MR. THOMPSON:

19   Q    Mr. Homony, you are familiar with the Stream operations

20   prior to the bankruptcy, correct?

21   A    Well, I wouldn't call them operations.  I am certainly

22   familiar with -- I don't believe Stream has really operated

23   since the omnibus agreement in 2020.

24   Q    So it did operate?

25   A    Prior to the omnibus date, they had operations --

```
 1  Q     They had operations.

 2  A     -- as far as I know.  Yes.

 3  Q     Did they have operations in California?

 4  A     I'm not sure that I paid much attention to the location of

 5  the operations, et cetera.  It really was not a factor in my

 6  evaluation of where we are today in 2024, and how to best move

 7  these cases forward and provide a recovery for assets, so.

 8  Q     Do they have assets in California?

 9  A     When?

10  Q     Anytime.

11  A     Well, I --

12          THE COURT:  Well, who cares?  All that we care about

13  are assets now.  All right?  Are you asking questions --

14          MR. THOMPSON:  Well --

15          THE COURT:  -- about assets now in California?

16          MR. THOMPSON:  -- Your Honor, this is relevant.

17          THE COURT:  Okay.  So what is your point?

18          MR. THOMPSON:  I promise you it is relevant.

19          THE COURT:  Just tell me your point, sir.

20          MR. THOMPSON:  My point is that there were assets in

21  California.

22          THE COURT:  Uh-huh.

23          MR. THOMPSON:  There were servers in California.

24          THE COURT:  Uh-huh.

25  BY MR. THOMPSON:
```

1   Q    They were in -- they were Stream's servers and they had

2   Stream's production code on them.  Do you know about that, Mr.

3   Homony?

4   A    When?

5   Q    They had the -- this, they were on these servers in 2020.

6   They were as recently, I believe, as 2021.

7        MR. GEORGE:  Your Honor, is that testimony?  Because

8   that doesn't sound like a question.

9        MR. THOMPSON:  Well, again, I can't --

10       THE COURT:  Well, he was asking about what I asked

11  him.

12       MR. THOMPSON:  -- be asked to do it both ways, right?

13       THE COURT:  Okay.  But so why do we care about the

14  servers in California at some prior date that is no longer --

15       MR. THOMPSON:  Because it has property of the Stream

16  Estate on it, on those servers.  And there is source code,

17  there is production code created by Stream TV, Stream TV's

18  employees, Stream TV's engineers, and that was done with

19  Rembrandt's IT and trade secrets.

20       THE COURT:  Okay.  So -- yeah.  Yeah.  So this sounds

21  like a legal argument.  It doesn't sounds like --

22       MR. THOMPSON:  It -- I -- Your Honor, I am simply

23  trying to establish what this trustee, who is just represented

24  to this Court, there's only item of -- of -- one asset, a hard

25  asset.  There's more than one asset, and it --

```
 1              THE COURT:  Okay.  Well --

 2              MR. THOMPSON:  -- and --

 3              THE COURT:  -- he just said that there's only one.

 4    If you disagree, then we'll have to agree to disagree.

 5              MR. THOMPSON:  I think I need to establish whether

 6    this trustee -- I'll use Mr. George's words -- did his job to

 7    investigate and marshal the assets, and I'm trying to probe

 8    that.  I'm trying to test that proposition.  He suggested he

 9    did.

10              THE COURT:  Well, he's -- you're talking about some

11    servers from California.  I don't really understand how it's

12    relevant.

13              Yes, Mr. George?

14              MR. GEORGE:  Your Honor, in addition, if there -- as

15    Mr. Homony testified -- if there are assets, wherever they are,

16    they're going to belong to the purchaser, and -- and that's the

17    facts of the matter.

18              There hasn't been a single fact established that

19    there are servers in California -- that there's anything on

20    them that's relevant to the hearing on approval of the sale

21    motion.  That's what we're here for today.

22              MR. THOMPSON:  Your Honor, I'm trying to find out

23    where -- what assets Mr. Homony knows about, and he's only told

24    us one.

25              THE COURT:  Yes.
```

Case 23-10763-amc   Doc 902-1   Filed 12/06/24   Entered 12/06/24 00:03:09   Desc
12/4/2024 Hearing Transcript   Page 42 of 78   Page 41 of 78

41

```
 1              MR. THOMPSON:  And if that's -- if his answer is --

 2              THE COURT:  That's the one --

 3              MR. THOMPSON:  -- I didn't investigate --

 4              THE COURT:  -- that's the one.

 5  BY MR. THOMPSON:

 6  Q     Did you do any investigation of any other assets, hard

 7  assets or intellectual property assets, for the -- for the

 8  estate.

 9              MR. GEORGE:  Objection to form, Judge.  It's

10  compounded because he lists the two together.  He already

11  testified there wasn't any, like, intellectual --

12              THE COURT:  I think you've already asked him, and he

13  already said the only tangible property that he's investigated

14  is the bonding equipment.  That's it.

15              MR. THOMPSON:  Okay.  So that's the only

16  investigation.

17  BY MR. THOMPSON:

18  Q     Mr. Homony, did you have a meeting with Mr. Rajan, Ms.

19  Menine and their former counsel from Lewis Brisbois, who is no

20  longer counsel at the time, in -- on March 7th, 2024?

21              MR. GEORGE:  Objection, Your Honor, to the extent

22  that there's facts that are stated in that question that aren't

23  in evidence.  He's saying that Lewis Brisbois was not VSI's

24  attorney.  We disagree with that wholly.

25              THE COURT:  Okay.  Do you have any recollection of
```

```
 1   this March meeting, sir?

 2              THE WITNESS:  I do.  I believe it's the -- yes.  I

 3   do.

 4   BY MR. THOMPSON:

 5   Q    During that meeting, did you make representations to the

 6   VSI team that they were the subject of a civil conspiracy?

 7   A    No.

 8   Q    You didn't say that?

 9   A    Absolutely not.

10   Q    Okay.  Were you shown a list of assets that needed to be

11   returned to Stream TV?

12   A    I believe they identified certain assets they -- they

13   believe were not returned in connection with the Delaware

14   Chancery Court matter.

15   Q    They included displays; did they not?

16              THE COURT:  If you don't remember, it's okay.

17              THE WITNESS:  I don't recall.

18   BY MR. THOMPSON:

19   Q    Phones?

20   A    I don't recall specific assets that they may have

21   identified.

22   Q    You don't remember any of the assets on that list?

23   A    I remember they provided a list.  I just don't remember

24   today the specificity.

25   Q    Were you -- were you aware that there was an obligation to
```

```
 1   return assets to the Stream TV estate from Hawk and -- and

 2   SeeCubic.  SeeCubic, Inc. -- excuse me -- to be more precise.

 3   A    I try -- I'm trying to recall exactly the legal position

 4   of the -- of -- of the Delaware Chancery Court matter when I

 5   was appointed as a trustee here.  I know there an order

 6   that required, I believe, the return of assets that SeeCubic

 7   had under the prior omnibus that was ultimately overturned.  So

 8   again, I know -- I know VSI's argument was there were assets

 9   that were never returned to Stream that should have been.

10   Q    What did you do with that list of assets that they had

11   given you?

12   A    Well, I think I took it under advisement.  I mean, at the

13   time, you have to appreciate this case and -- and the -- the

14   fighting and the unknowns at the time that I was appointed and

15   trying to figure out where the most valuable assets are.

16   Right?  And so there can be assets, some of which have the

17   minimus value, some have no value, some are a burden, and so, I

18   think, I identified the most valuable assets and have proposed

19   to sell them.  And so could there be other assets out there

20   that are not specifically identified?  Of course.  And that --

21   that is under the broader description in the APA that provides

22   for a sale of both known and unknown assets to the extent they

23   fall in those categories described in the APA.

24   Q    You don't quite remember what was on that list, but could

25   it have had software?
```

 1              MR. GEORGE:  Objection, Your Honor.  He asked him to

 2   speculate.

 3              THE COURT:  Yeah.  He's already answered the

 4   question.

 5              MR. THOMPSON:  Okay.

 6   BY MR. THOMPSON:

 7   Q    So I think what you said in response to my question about

 8   what you did was to find the -- was to identify the most

 9   valuable assets.  Do you not think that software code for a

10   technology company was a value asset -- valuable asset?

11              THE COURT:  Okay.  He --

12              MR. GEORGE:  Your Honor, objection.

13              THE COURT:  -- already answered the question.

14              MR. GEORGE:  It hasn't been established that --

15              MR. THOMPSON:  I -- I didn't ask that question, and

16   I --

17              THE COURT:  You asked him --

18              MR. THOMPSON:  Asked him to --

19              THE COURT:  -- if he identified the most valuable

20   assets and if there's something there that, you know, that

21   he -- that wasn't on that, then he didn't conclude that it was

22   very valuable.

23              I have to admit, sir, I really feel like what you're

24   doing here is you're trying to make legal argument, and I

25   simply don't want to hear it.  What are the factual questions

1   that you have --

2          MR. THOMPSON:  I'm trying to establish --

3          THE COURT:  -- related to this --

4          MR. THOMPSON:  -- Your Honor, what assets this

5   trustee knew about and did not know about.

6          MR. GEORGE:  And -- and why is that relevant, Judge,

7   if all of the assets are being transferred?  Wherever they are

8   in an --

9          THE COURT:  I agree with Mr. George.

10         MR. THOMPSON:  It matters.  It matters because the

11  condition of those assets, if they are encumbered by licenses,

12  that --

13         THE COURT:  Yes.

14         MR. THOMPSON:  -- the trustee does not --

15         THE COURT:  -- and you're going to sue them.  I get

16  the point, yes.

17         MR. THOMPSON:  Your Honor, I think it's more than

18  that, but --

19         THE COURT:  Yeah.  So what is it?  You want to sue

20  them.  I get it.

21         MR. THOMPSON:  It's -- it's not --

22         THE COURT:  But what's --

23         MR. THOMPSON:  -- it's -- it's not about that.

24  It's --

25         THE COURT:  It's a sale issue, just tell me --

1          MR. THOMPSON:  Because Your Honor, it cannot be sold

2    free and clear that way.  They do not have 363(f) rights, and

3    they certainly don't have it to -- for this stalking horse.

4          THE COURT:  And that's your legal argument, and I

5    will take that under advisement.

6          MR. THOMPSON:  Your Honor, I understand.  I am trying

7    to adduce the facts that demonstrate that.  That's all.

8          THE COURT:  No.  Okay.  It's not facts.  It's legal

9    argument.  I completely disagree with you, sir.  Okay.  So --

10         MR. THOMPSON:  I -- you know, I -- okay.  I -- I've

11   heard -- I've heard the Court, and I will try to move on.

12         THE COURT:  Okay.

13         MR. THOMPSON:  All right.

14   BY MR. THOMPSON:

15   Q   Mr. Homony, during that meeting, were you presented with

16   purchase orders that were --

17         THE COURT:  Why are we talking about this?  Why are

18   we talking about what was discussed at the meeting?

19         MR. THOMPSON:  Your Honor, that would have been an

20   asset of the estate.

21         THE COURT:  Okay.  So all of the assets that they own

22   are being transferred to the buyer, so I don't understand how

23   it's relevant to talk about what assets were discussed at that

24   meeting or were not.  Explain that to me.  Why is that

25   relevant?

 1          MR. THOMPSON:  Because this trustee had an obligation

 2   to maximize the value for all state creditors.

 3          THE COURT:  Right.  And he said he identified the

 4   most valuable assets.  And --

 5          MR. THOMPSON:  Okay.  Your Honor, if I have -- may

 6   have a moment, maybe we can --

 7          THE COURT:  Yeah.

 8          MR. THOMPSON:  -- cut this short, and let Mister --

 9          THE COURT:  Great. Thanks.

10          MR. THOMPSON:  Your Honor, in the -- in the interest

11   of trying to be briefer.  We will -- I'm -- I will pass to

12   Mr. Michaels.  Thank you.

13          MR. MICHAELS:  Just -- our exhibits, we have binders

14   and -- and copies that we provided opposing counsel.  I can

15   give them to the Court.  Some of these are not premarked

16   because we had to print them this morning, and I just had them

17   in a hurry because they dealt with cross for the -- for the

18   decks, but I'll -- I'll come hand them up if that's okay, if I

19   can approach?

20          THE COURT:  Okay.

21          MR. MICHAELS:  And there's -- there's a couple here

22   that I think we'll just hand up when we bring them up --

23          THE COURT:  Okay.

24          MR. MICHAELS:  -- if that's okay.  They're not in

25   this.

 1              MR. GEORGE:  Your Honor, I just want to point out

 2   that Mr. Michaels is listed as a witness in the witness list,

 3   so I -- who's telling the truth here?  Is he a lawyer?  Is he a

 4   witness?  Is he both?  I mean, you know, this game that's being

 5   played here --

 6              THE COURT:  Well, who's being called as a witness?  I

 7   thought we're --

 8              MR. GEORGE:  In the -- in the witness list in the

 9   documents that we just received.

10              THE COURT:  We have him and we have Scott Victor.

11   Those are the witnesses for today.

12              MR. MICHAELS:  Your Honor, we brought witnesses

13   today.  That's what you --

14              THE COURT:  I don't -- okay.  So why do I need to

15   hear from any witnesses from your side?

16              MR. MICHAELS:  What's that?

17              THE COURT:  Who am I hearing from?  Give me an

18   example.

19              MR. MICHAELS:  Stephen Blumenthal.

20              THE COURT:  And why do I need to hear from him?

21              MR. MICHAELS:  Your Honor, we were told at the June

22   5th hearing by you that -- that the timeframe for discussing

23   our assets that are being -- attempted to be included in the

24   transfer and sale, that this was the hearing that we should

25   prepare for and bring our arguments.

1           THE COURT:  All right.  But I'm just talking about

2    legal argument.  I don't need to hear from witnesses.  You've

3    briefed all of your legal arguments.  That's what I care about.

4           Thanks.

5           UNIDENTIFIED SPEAKER:  Okay.

6           MR. GEORGE:  And Your Honor, Mr. Blumenthal is not on

7    the list of witnesses.  Mr. Michaels is, the lawyer, but

8    Mr. Blumenthal --

9           MR. MICHAELS:  All right.  I mean --

10          MR. GEORGE:  -- which one is he here today?

11          THE COURT:  All right.  All right.

12          MR. MICHAELS:  Your Honor, I'm not going to be able

13   to scream over Mr. George.  Can I --

14          MR. GEORGE:  I'm not screaming.  I'm just making a

15   point.

16          THE COURT:  Yeah.

17          MR. MICHAELS:  Okay.  What he's referring to is a set

18   of documents handed to him by VSI.  That's not our witness

19   list.  We -- we're calling one witness.

20          THE COURT:  Yeah.  Okay.

21          MR. MICHAELS:  Stephen Blumenthal.

22          THE COURT:  I don't really -- so who's the witness

23   that you want to call, sir?

24          MR. MICHAELS:  Stephen Blumenthal.

25          THE COURT:  Yeah.  And what is he going to testify

1    to?

2          MR. MICHAELS:  He's going to testify to the assets

3    that we have in this estate and how easy it is to determine

4    that our assets are being transferred and where they're found.

5          THE COURT:  Okay.  And I don't need to hear from that

6    witness today, and I'm not going to hear from him today.  I'm

7    happy to hear all the arguments that you've listed in your

8    briefs, but I'm not taking testimony from that gentleman.  I

9    don't need that for part of the sale process.

10          The assets are what they are.  They've listed them.

11   I mean, let's face it.  The assets are mostly equity, right?

12   There's one piece of hard asset.  The rest of this is -- deal

13   is equity.

14          MR. MICHAELS:  Your Honor, with respect, we followed

15   your instructions in understanding that this was going to be

16   our day to bring our evidence, and the rug's being pulled out

17   from under us.

18          I -- I -- I stand dumbfounded that we couldn't rely

19   on this Court's statements that this was going to be our --

20          MR. GEORGE:  Well, Your Honor --

21          THE COURT:  But the statements I made in the prior

22   hearing specifically were that you should put in your brief to

23   the objection to the sale every legal argument you have about

24   the licenses.  This is like your main argument, right?  So you

25   did that.  You gave the briefing, and we're looking at the

1 briefing, and we've seen their responses, and we're going to

2 take everything under advisement.

3   So it's a legal issue.  I don't understand how this

4 is a --

5   MR. MICHAELS:  Let me ask just a procedural question.

6 Are you saying that our declaration submission by Stephen

7 Blumenthal is being taken into evidence?

8   THE COURT:  I will take that into evidence.

9   MR. MICHAELS:  All right.  Can I proceed with --

10   THE COURT:  Yes.

11   MR. MICHAELS:  -- cross?  Okay.

12   MR. MICHAELS:  This is -- again, I -- we received

13 their declarations at past 5:00 p.m.  I'd already arrived --

14   THE COURT:  Okay.  It can't be a surprise, right?

15   MR. MICHAELS:  What's that?

16   THE COURT:  We all -- it can't be a surprise.  We

17 know the sale process, right?  We understand what happened.

18   MR. MICHAELS:  Your Honor, I'm only apologizing for

19 not marking the exhibits.

20   THE COURT:  Okay.  That's fine, not a problem.

21   MR. MICHAELS:  Right.

22   MR. GEORGE:  What are you marking it?

23   MR. MICHAELS:  This is --

24   MR. GEORGE:  No.  What are you calling it?  The

25 number.

| | |
|---|---|
| 1 | MR. MICHAELS:  What? |
| 2 | MR. GEORGE:  Just call it Rem. |
| 3 | MR. MICHAELS:  Rembrandt Exhibit 1. |
| 4 | THE COURT:  Okay.  We'll do -- |
| 5 | CROSS-EXAMINATION |
| 6 | BY MR. MICHAELS: |
| 7 | Q    Mr. Homony, do you recognize the document we've put before |
| 8 | you? |
| 9 | A    Yes.  It looks like the teaser sent out by my investment |
| 10 | banker, SSG. |
| 11 | Q    Okay.  Can you jump to the assets overview? |
| 12 | A    Okay. |
| 13 | Q    In that section, does it describe that the assets include |
| 14 | Ultra-D technology? |
| 15 | A    Yes. |
| 16 | Q    Does it provide a list of the features and diverse |
| 17 | applications of the technology? |
| 18 | A    There's a -- a heading that describes the unique features |
| 19 | in diverse applications of technology, yes. |
| 20 | Q    And are the things listed under that heading, would you |
| 21 | agree that those are features and diverse applications of the |
| 22 | technology? |
| 23 | MR. GEORGE:  Objection to form, Your Honor. To the |
| 24 | extent he knows. |
| 25 | THE COURT:  Okay. |

```
 1                  MR. MICHAELS:  I -- I am --

 2                  THE COURT:  Well, it says what is says, so what is

 3   the question?

 4   BY MR. MICHAELS:

 5   Q    Do you agree with what it says?

 6   A    I -- I don't know the technology at -- at the, kind of,

 7   level that would --

 8                  THE COURT:  Wasn't this prepared by Scott Victor?

 9   Right -- was this?  Yeah.  Okay.  So --

10                  MR. GEORGE:  So he's going to be a witness.

11                  THE COURT:  Yeah.

12                  MR. MICHAELS:  I mean, he can say, I don't know.  I

13   had no -- no hand in preparing this.

14                  THE COURT:  Okay.  Fine.

15                  MR. MICHAELS:  That -- that's the answer.

16                  THE COURT:  So you didn't --

17                  THE WITNESS:  No.  No.  I -- I did not prepare it.

18                  THE COURT:  Yeah.  Okay.

19                  THE WITNESS:  I reviewed it before it went out.

20   BY MR. MICHAELS:

21   Q    Do you recall getting lists of questions from Rembrandt

22   regarding the status of certain software?

23   A    I -- I know we've engaged with Rembrandt numerous times

24   since my appointment.  I know Rembrandt has provided certainly

25   lots of things with respect to their position in -- in terms of
```

1   their alleged intellectual property.  We certainly met with

2   Rembrandt.  We even put Rembrandt in direct contact with SEBV's

3   engineering team.

4   Q    Uh-huh.

5   A    I was a party to that meeting in which there was a lot of

6   back and forth, questions about the source code the technology,

7   how it's housed, et cetera.

8   Q    So you brought up the very next thing I was going to, so I

9   appreciate that.  In that meeting, do you recall Rembrandt

10  questioning the Eindhoven (phonetic) team whether they were

11  using a modern version controlled software management system?

12  A    I don't recall that specifically, no.

13  Q    So when you set up that meeting, did you feel that you, in

14  your power as trustee, that you had authority to ask the

15  Eindhoven team to meet with Rembrandt at your direction?

16  A    I have authority to task anybody to -- to meet with

17  anybody.

18  Q    Okay.  So was it within your authority to ask them to

19  provide further information:  Number of files, file names,

20  etcetera, for the source code that was on the secure server

21  that you've listed in your asset list?

22        MR. GEORGE:  Objection to form, Your Honor.  It

23  assumes facts not in evidence.  There's no indication that

24  there was source code on any of those servers that Rembrandt

25  has an interest in.

 1          MR. MICHAELS:  You're -- with respect, the APA lists

 2    the -- that as an asset.  It's -- the exact words are, Source

 3    code on a secure server.

 4          THE COURT:  Okay.

 5          MR. MICHAELS:  I mean, if he doesn't know that, then

 6    the asset list is inaccurate.

 7          THE COURT:  Okay.  And what --

 8          MR. GEORGE:  I believe that's --

 9          THE COURT:  -- my questions are --

10          MR. GEORGE:  I'm sorry, Your Honor.

11          THE COURT:  I just -- I'm so confused because, I

12    mean, the assets are what they are.  Are you trying to make the

13    same point that he was trying to make about, you know, what is

14    the point about the assets?  The assets have been listed on the

15    schedule to the assets of purchase agreement, so what is the

16    relevance of your line of questioning, sir?

17          MR. MICHAELS:  The -- the relevance is whether he --

18    if there's an asset listed, does he know where is, as is, for

19    that -- for that asset, right?

20          UNIDENTIFIED SPEAKER:  Your Honor --

21          MR. GEORGE:  Your Honor, I -- I just want to object

22    to this because the only source code and -- and -- and servers

23    are in SeeCubic B.V. a non-debtor.  Stream doesn't have any of

24    those assets, and they weren't listed.  There was no scheduled

25    source code.

1          MR. THOMPSON:  Objection.  He's testifying, Your

2     Honor.

3          THE COURT:  Okay.  Well, I'm going to clarify that

4     the assets that are being sold are on the schedules.  They're

5     either on there or they're not, so I don't want to talk about

6     it.  It's there or not, right?

7          MR. GEORGE:  But what I -- and what I'm objecting to

8     specifically is Mr. Michaels trying to make it appear that

9     we're selling assets in SeeCubic B.V.

10          THE COURT:  Right.  They're only -- you're only

11     saying they're shares.  Yeah.  Right.

12          MR. GEORGE:  And the assets that were -- excuse me --

13     the assets that were listed as to B.V. were listed at the

14     Court's instruction that we list the downstream assets, so the

15     question was inappropriate.  He knows it is, but he asked it

16     anyway.

17          MR. MICHAELS:  With respect, I don't believe it's

18     inappropriate.  We are asking about an asset listing on their

19     schedule.

20          THE COURT:  Okay.  But --

21          MR. MICHAELS:  And -- and -- and if I may, Your

22     Honor.  The -- the asset isn't shares in a corporation that may

23     have control of some software.  Stream listed as its asset,

24     Source code on a secure server, not held in some other

25     corporate entity, Source code on a secure server, and I'm

1   asking, what is that?  What -- where is it?  What is it?  And

2   that's -- I think that's a perfectly valid question about the

3   assets that are subject to this asset.

4           MR. GEORGE:  If he has a document that reflects that,

5   he should show the witness because I don't believe there's any

6   such doc.

7           UNIDENTIFIED SPEAKER:  Do you guys have the APM?  Is

8   that in the -- in the folder you have there?

9           MR. MICHAELS:  It's on the list of assets on the

10  beginning of the schedule --

11          UNIDENTIFIED SPEAKER:  Okay.  Well, if we're just --

12          THE COURT:  She's trying to understand what you're

13  asking.

14          MR. MICHAELS:  I'm asking --

15          THE COURT:  I know, just show us the document.

16          MR. MICHAELS:  We have -- we have an electronic --

17          UNIDENTIFIED SPEAKER:  You don't have an APA in

18  printed form; do you not?

19          MR. MICHAELS:  No.  Okay.

20          THE COURT:  So --

21          MS. RUSSELL:  Your Honor?

22          THE COURT:  Yes.  Who is this speaking?

23          MS.  RUSSELL:  This -- this is Alyssa Russell from --

24  from Skadden along with -- with Marley.  I'm on the phone here

25  representing SeeCubic.

1            I was just -- further the objection here to the

2    relevance as the APA makes clear Rembrandt's IP and any

3    physical assets that contain its IP to the extent it's found

4    valid and existing and enforceable, they're excluded assets.

5    We -- we don't think any of this is relevant here today.

6            MR. MICHAELS:  We certainly care about Rembrandt's

7    assets, but I'm asking about their schedule on the APA that is

8    here to be approved in the sale to be approved, and asking,

9    What is the source code?  Where is the source code?  With

10   respect, they've said that they're --

11           MS. RUSSELL:  The -- we appreciate your effort to --

12   to conduct this diligence, but -- but the stalking horse

13   purchaser has conducted their diligence and we are comfortable

14   taking these assets on an as is, where is basis, and, again,

15   don't -- don't believe this line of questioning is relevant.

16           THE COURT:  I'm inclined to agree with her.

17   BY MR. MICHAELS:

18   Q    The -- how is it that you determined that intellectual

19   property belonging to Rembrandt, Phillips, or any other third

20   party were not on the source code on a secure server --

21           THE COURT:  Okay.  I'm -- this is the legal argument.

22   You're talking about, you know, the fact that you think that

23   the sale is impermissible because it's infringing upon your

24   rights.  I get that.  It's a legal argument.

25           I don't want to hear any questions about that.  The

 1  assets are what they are.  The only person who's bid upon them

 2  has done their due diligence, and to the extent that you

 3  believe that the sale is going to violate your rights, you can

 4  bring whatever litigation you want.  We simply are going to

 5  have to agree to disagree on this matter, sir.

 6         I don't want to hear any more questions about the

 7  assets.  The assets are what they are.  They're on the

 8  schedules.  The buyer has done their due diligence, and you can

 9  make whatever legal argument you want to make, but I don't need

10  to hear any questions about it.  It's simply not relevant.

11         Okay.  So I think we're done with you, sir.

12         Mr. Victor, do you want to come up here?

13         MR. GEORGE:  Your Honor, do you want to proffer or

14  just --

15         THE COURT:  On Mr. Victor?

16         MR. GEORGE:  Yeah.

17         THE COURT:  Quickly.

18         MR. GEORGE:  Okay.

19         THE COURT:  Come on, Mr. Victor.  Come on up here.

20         Thanks, sir.

21         THE WITNESS:  Would you like --

22         THE COURT:  You can leave that.

23         MR. GEORGE:  Your Honor, in accordance with this

24  declaration, he would testify that SSG was retained to market

25  the stream assets, as well as the equity interest held by

 1  Technovative Media in the following companies:  Technology

 2  Holdings Delaware LLC, Media Holdings Company LLC, Ultra-D

 3  Ventures CV a Kirkcow (phonetic) entity that pers retention

 4  approved by this Court, SSG conducted a robust marketing of the

 5  assets, contacted over 500 potential purchasers, solicitation

 6  including everyone from television networks to OEM

 7  manufacturers, to financial purchasers, that SSG and its staff

 8  created a data room and in it was sales information populated

 9  by documentation for the veteran trustee.

10          The following in a procedures hearing, SSG sent out a

11  second teaser with the comments of Rembrandt and BSI contained

12  and that the additional teaser did not generate any additional

13  interest in the assets being sold.  Only one party accessed the

14  data room as of December 2nd, '24; there have been no other

15  bids on the assets, that the stalking horse offer provides

16  substantial benefit to the estate and in his opinion, the

17  stalking horse offer ties to the best offer that could be

18  obtained, under the circumstances, for the asset.

19          THE COURT:  Thanks, Mr. George.

20          Tashay, can you swear our witness in?

21              J. SCOTT VICTOR, WITNESS, SWORN

22          THE COURT:  Okay.  You want to ask Mr. Victor -- oh,

23  sorry.

24          THE WITNESS:  Yes, J. Scott Victor, V-I-C-T-O-R.

25          THE CLERK:  Thank you.

```
1              THE WITNESS:  300 Bar Harbor Drive, West Conshohocken

2    in Pennsylvania, 19428.

3                          DIRECT EXAMINATION

4    BY MR. SWICK:

5    Q    Good afternoon, Mr. Victor.  How are you?

6    A    Good, how are you?

7    Q    Good.  I'm Adam Swick with Akerman on behalf of VSI.  Talk

8    about your role; how are you retained in this matter?

9    A    I was retained by the Chapter 11 Trustee, on behalf of my

10   firm, SSG advisors, to run a sale process for the debtor's

11   assets.

12   Q    All right.  How did you become familiar with the debtor's

13   assets?

14   A    We were first aware of the debtor's assets when we were

15   hired by the secured creditor in the fall of 2022, to run an

16   Article IX process which was stayed by order of the Chancery

17   Court of Delaware.

18   Q    I -- and who was the secured creditor that you referred

19   to?

20   A    Hawk and SeeCubic.

21   Q    Okay.  And that's -- SeeCubic is the purchaser for here

22   today, correct?

23   A    One of them.  Yes.

24   Q    Let's -- so when you were engaged, what were your duties

25   when you were engaged?
```

1   A     By the trustee?

2   Q     Correct.  Yes.

3   A     To reengage, understand the -- what was going on since our

4   engagement with the secured creditor terminated in January of

5   2023.  We became familiar, we read up on all the litigation

6   that had occurred since our termination.  And our job was to

7   put together a sale process for the assets of the debtor,

8   including the equity interest of the subsidiaries, held by

9   Technovative, and to put together a teaser, get information to

10  populate a data room, and to come up with a world-wide buyer

11  list to maximize the value of these assets.

12  Q     All right.  So how did you come up with your world-wide

13  buyer list?

14  A     I had my team do research, as they do on every deal, and

15  come up with a buyer's list of strategic, operational financial

16  buyers that may be interested in this technology.

17  Q     All right.  We're going to do --

18           MR. SWICK:  Did that work, Your Honor?

19           THE COURT:  Yeah.

20           MR. SWICK:  All right.  Let's just label it VSI

21  Exhibit 1, it's Mr. Victor's declaration that was filed last

22  night.

23           Mr. THOMPSON:  It's also --

24           MR. SWICK:  Huh?

25           Mr. THOMPSON:  It's also RT2.

```
 1                MR. SWICK:  Oh.

 2                Mr. THOMPSON: Scott's declaration.

 3                THE COURT:  No.

 4                MR. THOMPSON:  This seat's really low, Your Honor.

 5                MR. SWICK:  My seat's really low, too, if that's what

 6   you're saying.

 7   BY MR. SWICK:

 8   Q    All right.  Would you please take a look at paragraph 20?

 9   A    Paragraph 20, you say?

10   Q    Yes.

11   A    Yes.

12   Q    All right.  So it says that you reached out to 550

13   prospective buyers around the world; what does "reached out"

14   mean?

15   A    It means that the teaser that we prepared, that I believe

16   you showed Mr. Homony here, which was Rembrandt 1, was sent out

17   to these 550 buyers that we came up with that we reviewed with

18   the trustee and his team as potential buyers.  So that teaser,

19   along with an email, was sent out to those 550 and follow-up

20   calls to all of them.  That's how we reach out in the sale

21   process.

22   Q    Okay.  And did -- and no one expressed any interest

23   besides VSI and Jacob -- I forgot his last name, but at

24   Continental?

25   A    Continental Energy, yes.  So no one signed an NDA other
```

```
 1  than VSI and Continental advisors, which was an alleged

 2  investor into VSI; but we had multiple conversations with

 3  multiple potential strategic buyers who ultimately passed

 4  without even signing an NDA.

 5  Q    So how many -- you said multiple, can you give me an

 6  approximation of how many?

 7  A    Dozens.

 8  Q    Dozens.  But no one went the next step for an NDA?

 9  A    No one.

10  Q    Did Rembrandt ever express any interest in purchasing the

11  debtor's assets?

12  A    Not to us directly, but I believe maybe to the trustee and

13  trustee's counsel, but no, I never had any direct reach-out by

14  Rembrandt, ever.

15  Q    Okay.  So even though they reached out to, at least, the

16  trustee or trustee's counsel, did you send them that teaser

17  went you sent it out to the 550 people?

18  A    I don't know.

19  Q    Did you send the teaser to VSI when you sent it out to

20  those 550 people?

21  A    Well, VSI was already under NDA and we gave VSI access to

22  the data room and provided additional diligence to VSI's

23  representative, Bud -- I can't remember his last name at this

24  moment, but he requested several additional pieces of

25  information including the cash burn rate at SeeCubic BV, which
```

 1  we gave him, literally, up until the last minute.

 2  Q    No, I understand that.  But my question was, did you

 3  provide VSI with the teaser when you sent it out to the 550

 4  parties?

 5  A    I don't think so.

 6  Q    Okay.

 7  A    But I can't be sure.

 8  Q    So the Continental Advisory firm that we talked about, did

 9  you send the teaser to them?

10  A    We did send the teaser to them, as well as the NDA, which

11  they signed.

12  Q    But did you send the teaser to them when you sent it out

13  to the 550?

14  A    They were not included in the 550, no.

15  Q    And then we've -- there's been a plan on file now, it has

16  just been for a couple of days, but the plan sponsor is an XD

17  called CanAm Financial in Canada.  Have you ever heard of them

18  before?

19  A    What's the name?

20  Q    Can -- C-A-N-A-M.

21  A    No.

22       MR. GEORGE:  Your Honor, can we just have an offer of

23  proof of the relevance of what's in that plan?

24       THE COURT:  Yeah, I don't -- well, the plan is not at

25  issue for today.

1          MR. GEORGE:  Right.

2          MR. SWICK:  Well, we have some -- it's -- all I want

3   to prove is there was an entity that has interest in these

4   debtor's assets, that I don't think got the teaser or was

5   contacted by Mr. Victor.

6          THE COURT:  Did you -- sounds like you know them,

7   though, because they're part of the plan?

8          MR. SWICK:  They're the plan sponsor.  Yeah.

9          THE COURT:  Did you not give them the teaser?

10          MR. SWICK:  I -- well, we have now.  Into this

11   process.

12          THE COURT:  Okay.  Well, are you saying that they're

13   a potential interested bidder on these assets?

14          MR. SWICK:  They're not going to -- we don't want a

15   bid, we have a plan on file.

16          THE COURT:  Oh, okay. All right.

17          MR. SWICK:  Yeah.

18          THE COURT:  So but what's the relevance of Mr.

19   Victor's --

20          MR. SWICK:  Because CanAm is interested in spending,

21   like, $300 million on these debtors.

22          THE COURT:  How is that relevant to what Mr. Victor

23   was hired to do?

24          MR. SWICK:  Well, he was hired to go find people who

25   want to spend money on the assets and he didn't contact them or

```
 1   know who they were --

 2           THE COURT:  Mr. Victor --

 3           MR. SWICK:  -- or another part of the bids --

 4           THE COURT:  -- contacted over 500 people, I think

 5   that's pretty impressive.

 6           MR. SWICK:  No, and not only that, Your Honor --

 7           THE COURT:  And if you knew of someone that might be

 8   a potential interested buyer, I would think you'd forward all

 9   that information along to them.

10           If your point is that Mr. Victor didn't send a teaser

11   to this person who is part of your plan, I don't really see how

12   that's relevant if you, you know, he -- he did a good job.  He

13   sent it out to 500 people, and he didn't get any response.  So

14   any other questions?

15           MR. SWICK:  Yeah, I have more questions, Your Honor.

16           THE COURT:  Okay.

17   BY MR. SWICK:

18   Q    All right.  Mr. Victor, let's look at paragraph -- I'm

19   sorry, just give me one second.  Go to paragraph 11.

20   A    Yes.

21   Q    All right.  So we're just going to read it out loud, it's

22   a short paragraph, just to save time.

23           "I met with VSI representatives who, after an

24           extensive discussion of SSG's approach to marketing

25           the debtor's assets, were satisfied that I could
```

| | |
|---|---|
| 1 | perform the services of an investment banker fully |
| 2 | and without conflicts.  VSI withdrew its objections |
| 3 | to SSG's retention." |
| 4 | Did I read that correctly? |
| 5 | A    Yes, you did. |
| 6 | Q    All right.  Is that totally correct, Mr. Victor? |
| 7 | A    It is correct because I spoke with counsel for VSI who's |
| 8 | here at the table today, along with his colleagues.  They had |
| 9 | objected to our retention, claiming that we had a conflict |
| 10 | because we were retained in the fall of 2022 to do an Article |
| 11 | IX sale for the secured lender; they objected; we had a phone |
| 12 | call, probably two; and they withdrew the objection. |
| 13 | MR. SWICK:  May I approach, Your Honor? |
| 14 | THE COURT:  Yep.  Thank you. |
| 15 | BY MR. SWICK: |
| 16 | Q    So Mr. Victor, this is an email from Mr. Thompson to Mr. |
| 17 | Coren, Michael Vagnoni, and Ed George.  I want to direct your |
| 18 | attention to paragraph 2.  Okay?  I'm going to read this out |
| 19 | loud, too. |
| 20 | "Moreover, we believe we, in the trustee, were |
| 21 | negotiating good faith regarding VSI's proposed plan |
| 22 | of reorganization.  And thus, we agree to one, |
| 23 | withdraw VSI's objection to SSG's engagement; two, |
| 24 | postpone the hearing on our motion to compel and your |
| 25 | motion to quash originally set for September 18th to |

1          November 7th, simultaneously resetting the trustee's

2          motion to withdraw and VSI's motion for

3          reconsideration.

4          "However, within a few short days of postponing the

5          hearing, the trustee reversed its prior commitments

6          with respect to VSI's plan, rejected VSI's proposed

7          full payment plan, and filed an expedited sale and

8          good procedures motion."

9          Did I read that correctly?

10         MR. GEORGE:  Your Honor, I'm going to object.  This

11   is a hearsay document; Mr. Victor's not copied on it.

12         THE WITNESS:  I'm not copied.

13         THE COURT:  Yeah.  Well --

14         THE WITNESS:  I don't know if I've ever seen this.

15   But okay, you've read it.

16         THE COURT:  Okay.  So I'm going to sustain that

17   objection.  He's not part of this.

18         MR. SWICK:  Okay.

19   BY MR. SWICK:

20   Q    Were you part of any conversations where the attorneys in

21   this case and you were involved and mentioned and said hey,

22   we're going to withdraw this objection under certain conditions

23   that weren't just based on your qualifications?

24   A    No.

25   Q    No recollection whatsoever?

1    A    None.

2    Q    Okay.  Let's go back just a little bit and talk about your

3    previous retention involving these parties and these assets,

4    back in -- I think you said it was 2020 for SeeCubic and Hawk?

5    A    The fall of 2022.

6    Q    Oh, 2022.  Okay.  How were you approached for that

7    representation?

8        MR. GEORGE:  Your Honor, I'm going to object to the

9    relevance of this.

10       THE COURT:  Yeah.  What's the relevance of this?

11       MR. SWICK:  The relevance, Your Honor, is that we

12   have a sale process where no one has expressed any real

13   interest, the assets are going to the entity that held all of

14   the assets, weren't retained by the trustee, and no one could

15   even bid on the assets.  And so -- and then the investment

16   banker who did all of the solicitation was previously hired by

17   the Hawk parties and that's who these assets are going to

18   who've always retained them this entire time.

19       So the process -- this is going into legal argument

20   so I know exactly where you're going to go --

21       THE COURT:  I know.  Uh-huh.  That's right.

22       MR. SWICK:  -- so I'm going to -- that is, once

23   again, factual predicate for the legal argument, which is where

24   we are.

25       THE COURT:  Okay.  I'm going to sustain the

 1 | objection.

 2 |        MR. SWICK:  All right.

 3 |        No further questions.

 4 |        THE COURT:  All right.  Anyone else?

 5 |        MR. VAGNONI:  Can we go off of Rembrandt Exhibit 1,

 6 | the market excel sheet.  Do you have that up there?

 7 |        THE WITNESS:  I have it.

 8 |        THE COURT:  Okay.

 9 |        MR. VAGNONI:  All set?

10 |        THE WITNESS:  Yes.

11 |                CROSS-EXAMINATION

12 | BY MR. VAGNONI:

13 | Q    Okay.  So this document, can you describe for me how it

14 | was created?

15 | A    Yes.  My team created this one-page teaser which is

16 | standard operating procedure to sell a company.

17 | Q    Okay.

18 | A    Or to finance a company, or whatever.  But a one-page

19 | teaser is standard operating procedure in the hundreds and

20 | hundreds of sales that I have done.

21 | Q    Okay.  Thank you.  The assets overview section, who

22 | provided you the information to write that section of the

23 | teaser?

24 | A    My team put it together, speaking with, specifically, the

25 | engineering team in the Netherlands.

```
 1   Q     Okay.

 2   A     At SeeCubic BV.

 3   Q     So this mentions the license with Phillips; do you see

 4   that reference?

 5   A     Yes.

 6   Q     Did your team read the Phillips licensing agreement?

 7   A     We had it, yes.

 8   Q     But in the 550 --

 9   A     In fact, it's in the data room.

10   Q     Right.  So in terms of the 550 companies, or entities,

11   that you contacted, did you reach out to the 23 or so licensees

12   in that Phillips agreement that are basically working in the

13   same technology?

14         MR. GEORGE:  Your Honor, I have an objection here.

15   He doesn't represent Phillips.  Leia, who, I understand is a

16   successor to Phillips is on the telephone.  So I don't

17   understand what standing he has to raise questions about the

18   Phillips license.  He's not the licensor, doesn't have any

19   interest in it.  He may -- his company may be a licensee, but

20   there are many of them out there.

21         THE COURT:  Sustained.

22         MR. VAGNONI:  Your Honor, I'm not asking about -- I'm

23   asking -- the companies he contacted, there's a list of

24   companies that have licensed the Phillips technology already.

25   They would be the prime companies to reach out to to sell these
```

1   assets.  I'm asking if he reached out to any of those 23.

2            THE COURT:  Okay.

3   BY MR. VAGNONI:

4   A    I don't know the answer.

5   Q    Did you --

6   A    As I sit here.

7   Q    Did you reach out to Leia?

8   A    I don't know.

9   Q    Did you reach out to Dimenco?  Dimenco.

10  A    I don't know.

11  Q    How about Magnetic 3D?

12  A    Do not know.

13  Q    All right.  So having listed some of the major players in

14  no glasses 3D TV, you're --

15           MR. GEORGE:  Objection, Your Honor.  He's testifying.

16           THE COURT:  Yeah.

17           MR. GEORGE:  He's calling -- we haven't even heard

18  these names until he just said them, now he's testifying --

19           MR. VAGNONI:  Well, that's telling.

20           THE COURT:  He hasn't -- so he hasn't asked these

21  people.  So any other questions for Mr. Victor?

22           MR. VAGNONI:  Let me just take a second here and look

23  at my notes.

24           No.  I'm all set.  Thank you.

25           THE COURT:  Okay.  All right.  No more questions for

**TheRecordXchange**
www.trxchange.com · (800) 406-1290

1   Mr. Victor then?

2            Okay.  You may step down, sir.  Thank you.

3            THE WITNESS:  Thank you.

4            MR. THOMPSON:  Your Honor, before you move on --

5            THE COURT:  Yeah.

6            MR. THOMPSON:  -- I may be able to -- I have some

7   suspicion of where this may go, but we had also, a witness list

8   and expected to be able to call witnesses on behalf of VSI and

9   our case-in-chief and that included -- that includes Mr.

10  Charles Bud Roberston (phonetic), Ms. Nicole Menine, Matthu

11  Rajan, among others.  And I want to know whether we're going to

12  have that opportunity.

13           THE COURT:  I don't have any need to hear from any

14  witnesses about the sale.  What I was interested -- if there

15  were any concerns.  Like, the concerns I was interested in

16  hearing about today was the sale process, if you thought that

17  there was something that Mr. Victor should have done or if you

18  had questions for the trustee.  And I've heard all of your

19  questions, and I don't have any concerns about this sale.  I

20  don't.

21           So that doesn't leave me to have any questions or

22  need to hear from your witnesses.  Okay?

23           MR. THOMPSON:  Our witnesses are going to testify

24  about the disposition of the assets that this trustee says he's

25  selling.

Case 23-10763-amc   Doc 902-1   Filed 12/09/24   Entered 12/09/24 08:03:09   Desc
12/4/2024 Hearing Transcript   Page 76 of 78   Page 75 of 78

75

1          THE COURT:  Right.  And I think that the assets are

2     what they are and the buyer has reviewed the schedules and has

3     done their due diligence and is going to accept the assets as

4     is, wherever they are.

5          MR. THOMPSON:  But the disposition of those assets

6     matters, Your Honor.

7          THE COURT:  The disposition?  There's going to be a

8     sale and the buyer's going to get the assets.

9          MR. THOMPSON:  The assets that are Stream TV assets

10    that remain in the hands of the now winning bidder, the

11    stalking horse.

12         THE COURT:  The buyer's going to get the assets on

13    the schedules.  Okay?

14         MR. GEORGE:  Will we have an opportunity to respond

15    to their filing of this morning, requesting a new order?  And

16    then changes to the asset purchase agreement.

17         THE COURT:  I'm going to give you 48 hours.  If you

18    guys have any response to that, then -- okay.  Would you like

19    72 hours?

20         MR. GEORGE:  Is Monday morning -- what's the

21    difference --

22         THE COURT:  Monday morning is fine.  You can have

23    Monday morning to respond to the blackline order.

24         MR. WATTERS:  Your Honor, this is Michael Watters,

25    for Shepherd Mullen, I'm counsel to Leia, Inc.  I -- I have

```
1   some concerns about the sale order as well.  I am sitting here

2   listening to the characterization of the sale, you know, your

3   characterization of the sale, I think, is inconsistent with the

4   redline order.  I don't know if it's appropriate to raise that

5   now --

6             THE COURT:  Okay.  No.  Yeah.

7             MR. WATTERS:  -- order.  All right.

8             THE COURT:  Yeah.  All right.  I hear you.

9             So Pam, just mark on the docket --

10             MR. WATTERS:  Yeah.

11             THE COURT:  -- that any concerns with the blackline

12   order should be filed Monday close of business, 5:00 p.m.

13             Okay?  Anything else?

14             MR. WATTERS:  Okay.

15             MR. SWICK:  I guess I just want to raise it formally,

16   and then to say we wanted to bring Matthu Rajan, Bud Roberston,

17   Nicole Menine, to testify, that's been denied.

18             THE COURT:  Yeah.  I find it totally irrelevant.

19   Thank you.

20             MR. GEORGE:  Your Honor, I would move into evidence

21   our exhibits 1 through 6 and ask the Court to take judicial

22   notice of the motion to approve the Hawk settlement which is

23   docket number 630; the evidentiary record from that hearing,

24   which is 670; the 9019 order which is 653; the trustee opinion

25   which is 548; the order granting Hawk relief from stay, which
```

Case 23-10763-amc    Doc 902-1    Filed 12/09/24    Entered 12/09/24 00:03:09    Desc
12/4/2024 Hearing Transcript    Page 78 of Page 77 of 78

77

```
 1   is 549; and the reservation of rights by Leia which is 841.

 2            THE COURT:  Okay.  So moved.

 3            MS. RUSSEL:  Your Honor, Alyssa Russel from Skinner &

 4   Skinner on behalf of SeeCubic.  Regarding the request to

 5   respond to the redline order, the APA contemplates an outside

 6   date for answering the order of December 7th and our client has

 7   a target closing -- outside date for closing of December 10th.

 8            THE COURT:  Yep.  I'm going to resolve --

 9            MS. RUSSEL:  Your Honor has already --

10            THE COURT:  -- everything before the 10th.

11            MS. RUSSEL:  Okay.  I was going to say --

12            MR. THOMPSON:  Your Honor, no one put them here -- no

13   one put them here but them.

14            THE COURT:  Huh?  Yeah.  Okay.  I'm going to enter an

15   order prior to the 10th.  All right.  I think that concludes

16   our business here today.

17            MR. THOMPSON:  Thank you, Your Honor.

18            MS. RUSSEL:  Thank you, very much.  Ma'am?  Thanks.

19       (Proceedings adjourned)

20

21

22

23

24

25
```

C E R T I F I C A T E

       I hereby certify that the foregoing is a true and

correct transcript from the electronic sound recording of the

proceedings in the above-entitled matter.


_John Buckley_____
John Buckley, CET-623
Digital Court Proofreader