**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>STREAM TV NETWORKS, INC., *et al.*,<br>Debtors.[1] | Chapter 11<br><br>Bky. No. 23-10763 (AMC) |

Ashely M. Chan, United States Bankruptcy Judge

## <u>OPINION</u>

### I.  INTRODUCTION

On December 9, 2024, after notice and a hearing, the Court entered an order (the "Sale Order")[2] approving the sale (the "Sale") of substantially all assets (the "Assets") of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative," and together with Stream, the "Debtors") to SeeCubic, Inc. ("SeeCubic"), as requested by the motion (the "Sale Motion")[3] of William Homony (the "Trustee"), in his capacity as the chapter 11 trustee of the Debtors' bankruptcy estates.  Two parties, Visual Semiconductor, Inc. ("VSI") and Rembrandt 3d Holding Ltd. ("Rembrandt"), filed objections to the Sale Motion (the "VSI Sale Objection" and the "Rembrandt Sale Objection", and together, the "Sale Objections").[4]  The Sale Order overruled those Sale Objections.

On December 10, 2024, VSI and Rembrandt filed a joint notice of appeal of the Sale

---

[1] This case is being jointly administered with the case of *In re Technovative Media, Inc.* (Case No. 23-10764) (AMC).

[2] Bankr. Docket No. 876

[3] Bankr. Docket No. 750

[4] Bankr. Docket Nos. 815, 816.  A third party, Leia Inc. ("Leia"), which is assignee to Philips' rights under the Philips License (defined *infra*) filed a reservation of rights with respect to the Sale Motion, stating that it "has no specific opposition to the Sale Motion" but its non-opposition was not a waiver of any rights or remedies Leia may have with respect to certain patents subject to the Philips License.  Bankr. Docket No. 841.

Order (the "Appeal").[5]  The Appeal is currently pending.  Pursuant to Local Bankruptcy Rule

8003-1, the Court issues this opinion in support of the Sale Order.

## II.     RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### A.     Background Prior to the Trustee's Appointment

In many ways, the procedural and factual background relevant to the Sale Motion spans

the entirety of the Debtors' long-running, contentious, and prior to the Sale, relatively

unproductive bankruptcy cases.  The Trustee was appointed on January 12, 2024[6], after the

Debtors' cases had been languishing for nearly 10 months with Mathu Rajan ("Mr. Rajan") at the

helm of the Debtors.  In ordering the appointment of a chapter 11 trustee, Judge Coleman[7], the

undersigned's predecessor, issued a lengthy opinion explaining the basis and need for such a rare

measure (the "Trustee Opinion").[8]  The Trustee Opinion began its detailed recitation of the

relevant procedural and factual background, which the undersigned adopts here in full, by

observing that "[t]he history of the Debtors, their relationship with their creditors, and, in

particular from the Court's perspective, the events during these bankruptcy cases, are

convoluted, and for the most part, riddled with strife."[9]  Upon his appointment the Trustee

replaced Mr. Rajan as the party in control of the Debtors' estates, but Mr. Rajan remains actively

involved in the case as the head of VSI.  Unfortunately, as detailed below, the delay,

contentiousness, and obstruction that plagued the Debtors' cases prior to the Trustee's

appointment have largely persisted.

---

[5] Bankr. Docket No. 877

[6] Bankr. Docket No. 558
[7] These cases were transferred to the undersigned in April 2024 as a result of Judge Coleman's retirement from the bench.

[8] Bankr. Docket No. 548

[9] Bankr. Docket No. 548 at 2

### B.    The Settlement Motion

Upon his appointment the Trustee retained general bankruptcy counsel, as well as special litigation counsel (together, the "Trustee's Counsel"), for two pieces of litigation to which the Debtors were parties: one that had been pending in the Delaware Court of Chancery at the time the Debtors filed their bankruptcy petitions (the "225 Action"), and one that the Debtors had initiated post-petition in this Court (the "Adversary Action" and together with the 225 Action, the "Litigation").  On May 6, 2024, the Trustee filed a motion (the "Settlement Motion") seeking approval of a settlement between the Trustee, on the one hand, and Hawk Investment Holdings, Ltd. ("Hawk"), as collateral agent for the secured noteholders of SeeCubic, on the other, resolving the Litigation (the "Settlement").[10]  In general, the Settlement provided for:

(a)    an allowed secured claim for Hawk in the amount of $180 million (the "Allowed Secured Claim"), subject to dollar-for-dollar increase for any amounts funded to SeeCubic ("SCBV"), Technovative's Dutch research and development subsidiary, between appointment of the Trustee and closing on a sale of the Debtors' assets;

(b)    SeeCubic's ability to credit bid $150 million of the Allowed Secured Claim in the Sale of the Debtors' Assets, with no bid protections (the "Stalking Horse Bid");

(c)    the asserted secured claims of SLS Holdings VI, LLC and SeeCubic were to be withdrawn upon the entry of an order approving the Settlement Motion;

(d)    the Trustee would seek approval of certain bid procedures in connection with the Sale (the "Bid Procedures"); and

(e)    the Debtors' estates would receive a carve-out (the "Carve-Out") from the

---

[10] Bankr. Docket No. 630.  In addition to the Trustee and Hawk, SeeCubic was also a signatory to the Settlement Agreement.

Sale proceeds in the amount of $7.5 million in cash, plus 10% of each dollar in excess of the Stalking Horse Bid, as well as the rights to a $1 million bond the Debtors posted in the 225 Action.

On May 20, 2024, VSI and Rembrandt each filed objections to the Settlement Motion (the "Settlement Objections").[11]  VSI and Rembrandt argued, *inter alia*, that the Trustee had not established what assets were being sold and whether they had been secured by the Trustee, that the technology proposed to be sold was embedded with non-transferable intellectual property owned by Rembrandt and Koninklijke Philips Electronics N.V. ("Philips"), and that credit bidding was inappropriate where Hawk and SeeCubic did not have a bona fide secured claim and Rembrandt had objected to their claims.[12]

On June 5, 2024 the Court held an evidentiary hearing on the Settlement Motion, at which both VSI and Rembrandt appeared and cross-examined the Trustee on the Settlement.[13] On June 6, 2024, the Court entered an order granting the Settlement Motion, approving the Settlement, and overruling the Settlement Objections (the "Settlement Order").[14]  In so doing, the Court found that the Settlement represented a valid exercise of the Trustee's business judgment, was informed by extensive research, investigation, and negotiation by the Trustee, and was in the best interests of the Debtors' estates and all stakeholders.  Settlement Order, at ¶¶ 4, 7.

On June 20, 2024, Rembrandt filed a notice of appeal of the Settlement Order.[15]  Also on June 20, 2024, VSI filed a motion for reconsideration of approval of the Settlement (the

---

[11] Bankr. Docket Nos. 642, 643

[12] Rembrandt objected to the secured claims of Hawk and SeeCubic on May 2, 2024, which the Court overruled on June 20, 2024.  Bankr. Docket Nos. 628, 679.

[13] *See* Bankr. Docket No. 670 (the "Settlement Hearing Transcript").

[14] Bankr. Docket No. 653

[15] Bankr. Docket No. 685

"Settlement Reconsideration Motion").[16]  VSI requested (a) reconsideration to provide for a "fiduciary out" permitting the Trustee to rescind the Settlement if entry into it or execution of its terms would result in a breach of the Trustee's fiduciary duties, (b) clarification that the Settlement Order was without prejudice to parties' ability to object to the Sale process or Bid Procedures or to their ability to seek reconsideration of the Allowed Secured Claim pursuant to Bankruptcy Rule 3008 and §502(j) of the Bankruptcy Code, and (c) reconsideration of the Settlement's approval, based on alleged misstatements at the hearing on the Settlement Motion related to purchase orders VSI procured for Stream's product and whether SCBV is permitted, as an affiliate of Stream, to use a license from Phillips (the "Philips License").

The Trustee objected to the Settlement Reconsideration Motion on July 5, 2024, and on November 7, 2024, the Court held a hearing.  On November 14, 2024, the Court entered an order denying the Settlement Reconsideration Motion (the "Reconsideration Denial Order").[17]  On November 27, 2024, VSI filed a notice of appeal of the Reconsideration Denial Order.[18]

### C.    SSG Retention Application

On August 14, 2024, the Trustee filed an application to employ SSG Advisors, LLC ("SSG") as his investment banker to handle the marketing of the Debtors' Assets in contemplation of the Sale (the "SSG Retention Application").[19]  SSG's Declaration in support of

---

[16] Bankr. Docket No. 686

[17] Bankr. Docket No. 805

[18] Bankr. Docket No. 821

[19] Bankr. Docket No. 715.  The Trustee had filed an application on May 2, 2024 to engage Capstone Capital Markets LLC ("Capstone") as his investment banker (the "Capstone Retention Application").  Bankr. Docket No. 624.  VSI, Rembrandt, and the U.S. Trustee each objected to Capstone's retention.  Bankr. Docket Nos. 633, 635, 661.  The Court notes that VSI's objection asserted a prior relationship with Capstone that would disqualify it from being disinterested, but further proceedings on that objection called into question the veracity of the representations therein.  *See generally* Settlement Hearing Transcript, at 7:12 to 8:20.  Nonetheless, on July 26, 2024, the Trustee withdrew the Capstone Retention Application.  Bankr. Docket No. 711.

the application disclosed a connection to Hawk and SeeCubic (the "Hawk/SeeCubic

Connection") based on SSG's pre-petition retention by those entities to market the assets of

Stream and Technovative for potential sale under Article 9 of the Uniform Commercial Code.

On August 21, 2024, VSI objected to the SSG Retention Application (the "SSG

Retention Objection").[20]  VSI argued that SSG's prior engagement by Hawk and SeeCubic to

market and sell the same assets that are the subject of the Sale, contrary to orders from the

Delaware Court of Chancery and the Delaware Supreme Court (the "Delaware Courts"),

disqualified it as a disinterested person free of interests adverse to the Debtors' estates, as

required for retention under § 327 of the Bankruptcy Code.  VSI argued that the SSG Retention

Application and supporting Declaration failed to adequately disclose SSG's conflict, and that the

relationship between SSG, Hawk, and SeeCubic rendered SSG unable to market the Assets in a

fair manner that would attract the highest and best price.

On September 6, 2024, the Trustee filed an amended SSG Retention Application,[21]

attaching an amended Declaration in support that provided further information regarding the

Hawk/SeeCubic Connection.  Thereafter, VSI withdrew the SSG Retention Objection on

September 18, 2024.[22]  With no other objections to the SSG Retention Application, on

September 20, 2024, the Court entered an order granting it (the "SSG Retention Order").[23]

D.    **The Bid Procedures**

As contemplated by the Settlement, the Sale Motion filed on September 30, 2024 sought

the approval of the Bid Procedures as the initial step in the Sale process.  At the time the Trustee

---

[20] Bankr. Docket No. 717.  It is not clear to the Court why VSI titled the SSG Retention Objection as a limited objection, as VSI sought unqualified denial of the SSG Retention Application.

[21] Bankr. Docket No. 732

[22] Bankr. Docket No. 739

[23] Bankr. Docket No. 741

filed the Sale Motion on September 30, 2024, he sought an expedited hearing on the Bid

Procedures in order to accomplish a Sale by mid-November.[24]  The following day, VSI filed an

objection to expedited consideration of the Bid Procedures.[25]  Among the reasons VSI objected

was that "as the Trustee is keenly aware, VSI *is on the cusp* of filing a plan of reorganization

providing nearly full payment on all allowed claims."[26] (emphasis added).  The Court denied the

Trustee's request for expedited consideration and set a hearing for consideration of the Bid

Procedures on November 13, 2024.[27]

     The Bid Procedures set forth in the Sale Motion incorporated the terms of the Settlement

the Court previously approved, including SeeCubic's $150 million credit bid serving as the

Stalking Horse Bid, as well as the Carve-Out for administrative and unsecured claims.  On

November 6, 2024, VSI and Rembrandt each filed an objection to the Bid Procedures (the "VSI

Bid Procedures Objection" and the "Rembrandt Bid Procedures Objection", and together, the

"Bid Procedures Objections").[28]

     The VSI Bid Procedures Objection took issue with the Bid Procedures on a litany of

grounds (the "VSI Bid Procedures Arguments"), some of which VSI had already asserted in its

Settlement Objection and which the Court had already overruled by the Settlement Order.  VSI

argued that:

     (a)    the Trustee had failed to determine what assets were being sold, and had

failed to marshal and secure the Debtors' assets in the face of continued violations by Hawk,

SeeCubic, and related parties of this Court's January 2024 temporary restraining order entered in

---

[24] Bankr. Docket No. 750
[25] Bankr. Docket No. 752

[26] Bankr. Docket No. 752 at 3
[27] Bankr. Docket No. 754

[28] Bankr. Docket Nos. 788, 789

the Adversary Proceeding (the "TRO") and orders by the Delaware Courts;

     (b)     the Assets subject to the Sale could not be sold because they were embedded with non-transferable intellectual property belonging to Rembrandt and Philips;

     (c)     SeeCubic was an inappropriate stalking horse bidder, and credit bid rights should not be approved in connection with the Bid Procedures;

     (d)     the "teaser" SSG used to attract initial interest in the Sale from prospective buyers was inadequate and misleading;

     (e)     the information and documentation in the data room the Trustee and SSG had collected for potential bidders was inadequate to support the value a potential purchaser needed to bid;

     (f)     the Bid Procedures together with the Settlement constituted an impermissible *sub rosa* plan;

     (g)     neither the Bid Procedures nor the Sale was fair or reasonable and was subject to heightened scrutiny because SeeCubic is an insider of the Debtors;

     (h)     the proposed timeline for the Sale was not adequately supported;

     (i)     SeeCubic is not entitled to a finding that it qualifies as a good faith purchaser under § 363(m) of the Bankruptcy Code; and

     (j)     the Court should not waive the 14-day stay for the effectiveness of a sale order imposed by Bankruptcy Rules 6004(h) and 6006(d).

The Rembrandt Bid Procedures Objection likewise objected on numerous grounds (the "Rembrandt Bid Procedures Arguments"), also repeating certain arguments made and overruled in connection with the Court's prior approval of the Settlement.  Rembrandt argued that:

     (a)     the proposed Sale should be denied and no further sale efforts made until

the Trustee determines what the Debtors' assets are and where they are, and has removed

Rembrandt's and Philips' technology from the products to be sold;

      (b)    the proposed Sale would violate the Debtor's license with Rembrandt and

the Philips License, giving rise to immediate contract and intellectual property enforcement

claims against the purchaser;

      (c)    Rembrandt is Technovative's only creditor, entitling it to the proceeds of

the Sale before any distribution on account of the Allowed Secured Claim;

      (d)    Technovative's prior violations of Rembrandt's rights were at the

direction of Hawk and SeeCubic;

      (e)    the Debtors' assets have been "obfuscated and hidden" by Hawk and

SeeCubic such that there is nothing of value to sell; and

      (f)    there is a reasonable alternative to the Sale that would maintain value

without violating the existing license agreements.[29]

The Court held a hearing on the Bid Procedures on November 13, 2024, and in response

to the objections raised by VSI and Rembrandt that the Trustee did not know what he was selling

or whether he could sell it, directed the parties to jointly supplement the list of assets to be sold in

connection with the Stalking Horse Bid, including any disclaimers regarding the Trustee's alleged

ability to sell such Assets.[30]  The parties did so, and the Trustee then filed revised schedules and

exhibits to the Asset Purchase Agreement underlying the Stalking Horse Bid (the "Stalking Horse

---

[29] Although the Rembrandt Bid Procedures Objection was opaque on this final point, the Court presumes Rembrandt is referring to the plan of reorganization that VSI represented it was "on the cusp of filing" on October 1, 2024. *See* Bankr. Docket No. 752.  As discussed *infra,* VSI filed a proposed plan and disclosure statement on December 3, 2024.

[30] *See* Bankr. Docket No. 807

APA"),[31] reflecting Rembrandt's desired disclaimers, on November 19, 2024 (the "APA Supplement").[32]  Among other things, Rembrandt's comments incorporated in the APA Supplement advised that its license to Stream "is non-assignable and non-transferable . . . all Rembrandt Intellectual property [*sic*] must be removed from the assets of the Debtor prior to sale or the Debtor and Buyer will both risk claims under 18 U.S. Code §1832 providing for fines . . . imprisonment . . . and up to three times the damages . . . and attorney's fees[.]"

On November 20, 2024, the Court entered an order approving the Bid Procedures (the "Bid Procedures Order"),[33] finding them fair, reasonable, and appropriate under the circumstances to maximize the value of the Assets.  Pursuant to those procedures, (a) bids for the Assets were due on December 2, 2024 at 12:00 p.m. (the "Bid Deadline"), (b) if any such bids were received, the Trustee and SSG would conduct an auction (the "Auction") for the Assets on December 3, 2024, and (c) a hearing to consider the Sale was scheduled for December 4, 2024.

On December 2, 2024, after the Bid Deadline had passed, the Trustee filed a notice advising that no Qualified Bids (as defined in the Bid Procedures) were received by the Bid Deadline, and therefore the Auction was canceled and the Stalking Horse Bid by SeeCubic was declared the Successful Bid (also as defined in the Bid Procedures) for the Assets.[34]

On December 3, 2024, over two months after representing the filing of its plan was imminent, and after the Bid Procedures had been considered, approved, and the Bid Deadline had passed, VSI filed a proposed plan (the "VSI Plan") and disclosure statement.[35]

---

[31] Bankr. Docket No. 795

[32] Bankr. Docket No. 810

[33] Bankr. Docket No. 811

[34] Bankr. Docket No. 845

[35] Bankr. Docket Nos. 847, 848

On December 4, 2024, VSI filed a notice of appeal of the Bid Procedures Order.[36]

### E.      VSI's Subpoena to the Trustee

Weaved throughout the procedural history of the Settlement Motion, the SSG Retention Application, and the Bid Procedures Motion was VSI's discovery efforts aimed at the Trustee with respect to each, in certain instances even after the Court had approved them.  On July 26, 2024, VSI filed a notice of its intention to take the oral deposition of the Trustee on August 9, 2024, and sought the Trustee's production of documents in connection therewith by August 7, 2024 (the "Subpoena Duces Tecum").[37]  On August 24, 2024, VSI filed a notice of an amended Subpoena Duces Tecum (the "Amended Subpoena Duces Tecum"), setting the Trustee's deposition for September 3, 2024, and requiring document production by August 30, 2024.[38]

On August 29, 2024, the Trustee filed an expedited motion to quash the Amended Subpoena Duces Tecum and for a protective order (the "Motion to Quash").[39]  On August 30, 2024, the Court entered an order temporarily quashing the Amended Subpoena Duces Tecum until a full hearing on the merits could be held.[40]  Before that hearing was held, however, VSI filed notice of a second Subpoena Duces Tecum directed to the Trustee (the "Second Subpoena Duces Tecum"), setting the Trustee's deposition for October 29, 2024, and requiring document production by October 24, 2024.[41]

On November 7, 2024, the Court held a hearing on the Amended Subpoena Duces Tecum

---

[36] Bankr. Docket No. 861

[37] Bankr. Docket No. 712

[38] Bankr. Docket No. 718

[39] Bankr. Docket No. 724

[40] Bankr. Docket No. 726

[41] Bankr. Docket No. 761.  The Trustee subsequently filed a praecipe to attach the Second Subpoena Duces Tecum to the Motion to Quash.  Bankr. Docket No. 771.

and the Motion to Quash, after which it entered an order granting the motion (the "First Quash

Order").[42]  In so doing, the Court found that the deposition topics listed in and the documents

sought by the Amended Subpoena Duces Tecum related either to (a) a stay enforcement and

turnover motion the Trustee had filed against VSI and Mr. Rajan but had obtained Court

authority to withdraw (the "Stay Enforcement Motion"),[43] (b) SSG's retention, which had

already been approved by entry of the SSG Retention Order, and to which VSI had previously

withdrawn its objection, or (c) the Settlement Order and VSI's request that the Court reconsider

approval of the Settlement.  The Court therefore determined that the Amended Subpoena Duces

Tecum sought information and documents on issues already resolved by the Court or for which

the Trustee could not possibly testify or produce relevant documents.

A week later, on November 14, 2024, the Court held a hearing on the Second Subpoena

Duces Tecum and the Motion to Quash, after which it granted the motion with respect to all

remaining deposition topics and document requests not addressed in the First Quash Order (the

"Second Quash Order").[44]

### F.    The Sale Objections and the Sale Hearing

VSI and Rembrandt filed their Sale Objections on November 22, 2024.[45]  The VSI Sale

Objection rehashed the VSI Bid Procedure Arguments, summarized *supra.*  The Rembrandt Sale

Objection likewise rehashed the Rembrandt Bid Procedure Arguments, summarized *supra.*  As

noted above, a number of those arguments had already been pressed in opposition to the

Settlement.  As such, VSI and Rembrandt were asserting many of the same positions for the

---

[42] Bankr Docket No. 777

[43] Bankr Docket Nos. 646, 781

[44] Bankr. Docket No. 805

[45] Bankr. Docket No. 815, 816

second or third times.

At a hearing held on December 4, 2024 (the "Sale Hearing"), with the Bid Procedures having been approved, the Auction canceled after no Qualified Bids were received, and the Stalking Horse Bid declared the Successful Bid for the Assets, the Trustee sought approval of the Sale to the Stalking Horse.  In advance of the Sale Hearing, the Trustee filed declarations from himself (the "Trustee Sale Declaration") and Scott Victor of SSG ("Mr. Victor") in support of the Sale (the "SSG Sale Declaration").[46]  At the Sale Hearing, the Court accepted proffers of the testimony the Trustee and Mr. Victor would give on direct examination, consistent with their Declarations, and allowed VSI and Rembrandt to cross-examine both witnesses.  The Court subsequently admitted both the Trustee Sale Declaration and the SSG Sale Declaration.

Both VSI and Rembrandt also sought to present testimony from their own witnesses at the Sale Hearing.  VSI advised that it intended to call Charles "Bud" Robertson, Mr. Rajan, and Nicole Menine, "among others," to testify "about the disposition of the assets that this trustee says he's selling."[47]  Rembrandt advised that it intended to call Stephen Blumenthal, Managing Director of Rembrandt, to testify "to the assets that we have in this estate and how easy it is to determine that our assets are being transferred and where they're found."[48]  The Court, however, after hearing the proposed subjects of these potential witnesses' testimony, determined it was not required in order to determine whether the Sale should be approved.[49]  The Court did, however, admit the Declaration of Mr. Blumenthal (the "Blumenthal Declaration")[50] upon Rembrandt's

---

[46] Bankr. Docket Nos. 850, 852

[47] *See* Bankr. Docket No. 878 (the "Sale Hearing Transcript"), at 74:6 to 74:12, 74:23 to 74:25

[48] Sale Hearing Transcript, at 48:17 to 48:20, 50:2 to 50:4

[49] Sale Hearing Transcript, at 49:22 to 50:9, 74:13 to 75:4

[50] Bankr. Docket No. 816-1

request.[51]

At the conclusion of the Sale Hearing, the Court took the matter under advisement and allowed VSI and Rembrandt until December 9, 2024 to object to the Trustee's revised proposed form of the Sale Order, which had been filed on the morning of the Sale Hearing (the "Proposed Sale Order").[52]  VSI and Rembrandt did so (the "Proposed Sale Order Objections"),[53] and on December 9, 2024 also filed a notice appealing the Sale Order *before it had been even been entered*.[54]

On December 9, 2024, upon consideration of the evidence adduced at the Sale Hearing, and after review of the Proposed Sale Order and the Proposed Sale Order Objections, the Court entered the Sale Order, striking certain provisions it deemed inappropriate.  The Appeal followed the next day, amended to reflect the Court's actual entry of the Sale Order.

## III.    DISCUSSION

### 1.    Legal Standard for a Sale Under § 363(b)

The Trustee sought authority to sell the Assets pursuant to § 363(b) and (f) of the Bankruptcy Code.  Section 363(b) permits a debtor or trustee, after notice and a hearing, to sell property of the estate outside of the ordinary course of business.  11 U.S.C. § 363(b).  In order for the Sale to be proper, the Trustee must "satisfy [his] fiduciary duty to the debtor, creditors and equity holders, [by articulating some] business justification for using, selling, or leasing the property outside the ordinary course of business." *Sheehan v. Dobin*, 2011 WL 1627051, at *3,

---

[51] Sale Hearing Transcript, at 51:5 to 51:8.  Rembrandt also filed a declaration from Christopher Michaels, and VSI filed declarations in support of its Sale Objection from Charles "Bud" Robertson and Mark Hsu, both former employees of Stream.  Bankr. Docket Nos. 815-1 and 859.  However, neither Rembrandt nor VSI sought the admission of these declarations into evidence at the Sale Hearing.

[52] Bankr. Docket No. 853

[53] Bankr. Docket Nos. 871, 872

[54] Bankr. Docket No. 873

(D.N.J. Apr. 28, 2011) (quoting *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir.1986)).

The standard under § 363(b) is well-settled – a debtor or trustee may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment. *In re Elpida Memory, Inc.*, 2012 WL 6090194, at *5, 2012 Bankr. LEXIS 5367, at *17 (Bankr. D. Del. Nov. 16, 2012). In determining whether a sale meets this standard, the courts in this Circuit require that a sale satisfy four considerations: (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith. *Id.*

Section 363(f) permits the sale of estate assets "free and clear of any interest in such property of an entity other than the estate," provided one of five circumstances is met: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f). Relevant to the Sale here, § 363(f)(4) permits a sale if a third party's interest is in bona fide dispute, meaning "there is an objective basis for either a factual or legal dispute as to the validity of the debt." *See, e.g., In re Williamsburg Boutique LLC,* 663 B.R. 217, 225 (Bankr. S.D.N.Y. Oct. 9, 2024) (quoting and citing cases). It is not for the bankruptcy court, however, to actually resolve the dispute; it must only determine whether a bone fide dispute exists. *Id.*

### 2.    Application

The Court finds that the Sale of the Assets to SeeCubic pursuant to the Stalking Horse

15

APA and the APA Supplement represents a sound exercise of the Trustee's business judgment.
The Trustee Sale Declaration, the SSG Sale Declaration, and the proffered testimony of the
Trustee and Mr. Victor at the Sale Hearing established this.

Upon his appointment in January 2024, the Trustee evaluated the Debtors' operations,
prospects, and ability to successfully reorganize, and determined that the Debtors were not
operating, had not operated for several years, and had no manufacturing capabilities or saleable
finished goods.  To wit, the Trustee inherited the Debtors with no business activities, no
employees, no manufacturing facility, no raw materials, no goods to sell, no work in progress,
and no accounts receivable.  The Trustee was also faced with an administrative expense claim
from the Debtors' bankruptcy counsel in excess of $3 million.

The Trustee evaluated the Litigation and determined that settlement with the Debtors'
secured creditors, resolving the parties' claims and providing a path for exposing the Debtors'
Assets to a sale process, would be the best avenue for creditor recovery.   Prior to doing so, the
Trustee proposed to VSI that it provide financing to fund the Litigation, but VSI failed to do so.
The Trustee had robust and good faith negotiations with the Debtors' secured creditors in
arriving at the Settlement, and as noted *supra,* the Court has already approved the Settlement as a
reasonable exercise of the Trustee's judgment.

In conjunction with the Settlement, the Trustee determined, based on the estates' lack of
funding or operations, administrative insolvency, and protracted and expensive disputes with the
Debtors' secured creditors, that the Sale of the Assets was in the best interests of creditors.  The
approved Settlement allowed for SeeCubic to credit bid up to $150 million of the Allowed
Secured Claim for the Assets, but the Trustee also met with VSI and Mr. Rajan to entertain any
proposals to buy the Assets or restructure the Debtors' operations.  VSI did not, however, present

an actionable proposal backed by any financial commitment.

The Trustee retained SSG to conduct the sale process contemplated by the Settlement. Specifically, SSG was to market Stream's Assets, as well as Technovative's equity interests in non-debtor subsidiaries Technology Holdings Delaware LLC, Media Holdings Company LLC, and Ultra-D Ventures CV. SSG contacted approximately 550 potential purchasers, including operational and strategic parties and financial purchasers, with a one-page teaser intended to attract third-party interest in the Assets. SSG then followed up with potential targets. In anticipation of interested parties' due diligence requests, SSG also created and populated a virtual data room. SSG received only limited responses, and only two parties executed the nondisclosure agreement required to access the data room: VSI and Continental Advisory Services, LLC ("Continental"), whose principal was a VSI investor. Continental accessed the data room, and SSG and SCBV personnel participated in multiple calls with Continental, but Continental ultimately advised SSG that it was not moving forward with a bid. Following entry of the Bid Procedures Order, SSG also sent out a second teaser to all third parties previously targeted, with comments from Rembrandt and VSI regarding the Assets. Still, as of the Bid Deadline, only VSI and Continental had accessed the data room. VSI did not submit a Qualified Bid.

Notwithstanding SSG's substantial efforts to market the Assets and obtain competing Qualified Bids for them, no parties other than SeeCubic expressed any interest in purchasing them. With no competing Qualified Bids, the Trustee canceled the Auction and determined that the Stalking Horse Bid from SeeCubic represented the highest, best, and only bid for the Assets.

Nothing in the cross-examination of the Trustee or Mr. Victor by VSI and Rembrandt undermined this evidence. Rather, Rembrandt focused on what Assets were being sold and

whether they included Rembrandt's intellectual property.  The APA, however, made clear that such intellectual property was an Excluded Asset.  As the Court observed at the Sale Hearing multiple times, the Assets to be sold "are what they are," and were set forth in the APA and its schedules.  SeeCubic agreed to purchase those Assets on an "as is, where is" basis, and to the extent Rembrandt believes SeeCubic's use of the Assets after closing violates its rights, litigation against the purchaser is not barred.

VSI focused on SSG's failure to provide it and an entity called CanAm Financial ("CanAm"), which is the VSI Plan's sponsor, with the teaser sent to potential purchasers.  With respect to VSI, Mr. Rajan, the founder, and until appointment of the Trustee, head of the Debtors, is the head of VSI.  The Court finds it puzzling that VSI would attempt to call into question SSG's marketing process by pointing to its failure to provide VSI with a one-page teaser about the Assets; presumably there is no person with greater knowledge about the Assets than Mr. Rajan, and no teaser was going to help VSI decide whether to submit a bid for them. Even with Mr. Rajan's institutional knowledge of the Assets, VSI did not deem them attractive enough to submit a bid.  Likewise, the Court found unpersuasive VSI's attempts to impugn SSG's marketing process based on its failure to send the teaser to CanAm, an entity which was not known to SSG until the VSI Plan was filed just before the Sale Hearing.  As the Court observed at the Sale Hearing, SSG reached out to nearly 550 parties, and if VSI was aware of a party that was potentially interested in the Assets, whether SSG was or not, VSI should have made that party aware of the data room and potential auction.  Rembrandt focused on SSG's failure to provide the teaser to the approximately 20 licensees identified in Philips' licensing agreement "that are basically working in the same technology."  However, where SSG marketed the Assets to nearly 550 potential operational, strategic, and financial purchasers, the Court is

unpersuaded by Rembrandt's attempts to poke holes in SSG's process by pointing to isolated parties not contacted. Mr. Rajan has spent the entirety of these bankruptcy cases spouting the value of the Debtors' business, and the fact that not one potential purchaser came to the Trustee with a bid, qualified or unqualified, leaves the Court with the firm conclusion that reaching out to Rembrandt's wish list of targets would have been similarly fruitless.

Nothing in the Blumenthal Declaration undermines the Sale process. Rather, it largely details the technological aspects of glasses-free 3D viewing technology, the history of and disputes arising from the relationship between Rembrandt and Stream, and the resulting May 2021 settlement agreement between them that resolved Rembrandt's intellectual property infringement claims against Stream. Almost the entirety of the Rembrandt Declaration is irrelevant to whether the Sale should be approved. Mr. Blumenthal does reiterate Rembrandt's argument that Stream's UltraD technology is dependent on Rembrandt's and Philips' technology, and that because Stream's licenses from Rembrandt and Philips are not transferable, SeeCubic's failure to obtain new licenses will render the Assets worthless. Blumenthal Declaration, at ¶¶127-129. The Court, however, dispensed with this argument at the Sale Hearing, finding that the Sale, with the exception of a piece of bonding equipment located in China, is a deal for Technovative's equity stake in certain non-debtor subsidiaries, and to the extent Rembrandt believes that the sale violates its intellectual property rights, its litigation claims are preserved.[55]

In sum, the evidence at the Sale Hearing established that, given the posture and circumstances of the Debtors and these cases, the Trustee satisfied his fiduciary duties in reaching the Settlement, marketing the Assets for sale, and declaring the Stalking Horse Bid the winning bid after no other bids were received. The Trustee has sound business justification for

---

[55] Sale Hearing Transcript, at 50:10 to 50:13, 56:3 to 56:11; and 58:21 to 59:10

the Sale, and he is faced with non-operational Debtors, enormous liabilities, and little funding. The sale price, consisting of the $150 million credit bid approved by the Settlement Order as well as a Carve-Out of nearly $10 million for administrative and unsecured claims, is fair under the circumstances. Additionally, the Court finds that adequate and reasonable notice of the Bid Procedures and the Sale were provided, and does not credit VSI's and Rembrandt's arguments that SSG failed to market the Assets adequately.

The Court had no evidence that SeeCubic did not act in good faith in connection with the Sale. Rather, SeeCubic exercised the credit bid right it was granted under the Settlement, and no further participation or action was required because no Auction was had. While VSI and Rembrandt argue mightily that SeeCubic and its principal, Shadron Statsney, are conflicted actors who have previously attempted to obtain and/or control the Assets by improper means, the test for good faith relates to the sale process. As the Third Circuit Court of Appeals stated in *In re Abbotts Dairies of Penn., Inc.*, "[t]he requirement that a purchaser act in good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." 788 F.2d 143, 147 (3d Cir. 1986) (internal quotations and citations omitted). Here, there was no evidence of any such conduct by SeeCubic. To the contrary, there were no other bidders, and the Trustee testified that his settlement negotiations with Hawk and SeeCubic regarding the Allowed Secured Claim and SeeCubic's credit bid rights were robust, in good faith, and arms'-length. That credit bid right then served as the foundation for the Stalking Horse Bid, which was the only bid. The Court finds, in light of those facts, that SeeCubic is entitled to a finding that it acted in good faith in connection with the Sale.

Finally, the Court finds that the Assets may be sold free and clear of any interests of third parties pursuant to § 363(f).  Rembrandt asserts it (and Philips) has intellectual property that may not be transferred to SeeCubic.  To the extent those rights exist, they are excluded under the APA.  To the extent Rembrandt is arguing that Technovative's *equity interests* in non-debtor subsidiaries may not be sold because those subsidiaries are in possession of the intellectual property, the Court finds that this argument lacks merit.  Even if it did not, however, it fails to prevent the Sale because whether the assets containing Rembrandt's (and Philips') intellectual property are property of *the Debtors' bankruptcy estate*, and therefore subject to the Sale, is the subject of bona fide dispute because property of the estate only includes all legal or equitable interests of the debtor in property.  11 U.S.C §541(a)(1); *In re Revel AC, Inc.,* 802 F.3d 558, 573 (3d Cir. 2015) (a bona fide dispute in the § 363(f)(4) context means that there is an objective basis, either in law or fact, to cast doubt on the asserted interest).

## IV.    CONCLUSION

For the reasons discussed above, the Court entered the Sale Order, approving the Sale of the Assets to SeeCubic pursuant to § 363(b) and (f) of the Bankruptcy Code.

Dated:  January 8, 2025

_____
ASHELY M. CHAN
CHIEF U.S. BANKRUPTCY JUDGE