# Exhibit A

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

IN RE: Visual Semiconductor, Inc. and Rembrandt 3D Holding Ltd.

*Petitioners.*

*On Petition for a Writ of Mandamus and Prohibition to the*
*United States Bankruptcy Court for the Eastern District of Pennsylvania in*
*Case No. [•]*
*Judge [•]*

---

## EMERGENCY JOINT PETITION FOR (I) WRIT OF MANDAMUS; (II) WRIT OF PROHIBITION; (III) MOTION FOR STAY PENDING APPEAL; AND (IV) IN THE ALTERNATIVE, MOTION FOR WITHDRAWAL OF REFERENCE TO BANKRUPTCY COURT

---

Donald N. David, SBN: 304846
Mark S. Lichtenstein (*pro hac vice* admission to be applied for)
AKERMAN LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Telephone: (212) 880-3800
Facsimile: (212) 880-8965
Email:
donald.david@akerman.com
mark.lichtenstein@akerman.com

December 9, 2024

R. Adam Swick (*pro hac vice* admission to be applied for)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile: (512) 623-6701
Email: adam.swick@akerman.com

John H. Thompson (*pro hac vice* admission to be applied for)
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile: (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor, Inc.*

- and -

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

- and –

*/s/ Chris Michaels*
Chris Michaels, Esq.
michaels@bpmlegal.com
Brown & Michaels, PC
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850

*Attorneys for Rembrandt 3D Holding Ltd.*

79079341;4

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a) and Federal Rule of Appellate Procedure 26.1, counsel for Petitioners Visual Semiconductor, Inc. and Rembrandt 3D Holding Ltd. certify the following:

1. The full name of every party represented by us is Visual Semiconductor, Inc. and Rembrandt 3D Holding Ltd.

2. There are no other real parties in interest represented by us.

3. All parent corporations and any publicly held companies that own 10% or more of the stock of the parties that we represent are as follows: None.

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us or that are expected to appear in this court are:

**Akerman LLP:**

> Donald N. David, SBN: 304846
> Mark S. Lichtenstein
> AKERMAN LLP
> 1251 Avenue of the Americas
> 37th Floor
> New York, NY 10020
> Telephone: (212) 880-3800
> Facsimile: (212) 880-8965
> Email: donald.david@akerman.com
>        mark.lichtenstein@akerman.com
>
> R. Adam Swick
> AKERMAN LLP
> 500 West 5th Street, Suite 1210

3

Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

John H. Thompson
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

**Devlin Law Firm LLC:**

Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

**Brown & Michaels, PC:**

Chris Michaels, Esq.
michaels@bpmlegal.com
BROWN & MICHAELS, PC
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850

5.  Provide the case titles and numbers of any case known to be pending in
this court or any other court or agency that will directly affect or be directly
affected by this court's decision in the pending appeal:

- *In re Stream TV Networks, Inc.*, Case No.: 23-10763 (AMC) in the United States Bankruptcy Court for the Eastern District of Pennsylvania

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees): Not Applicable.

Dated: December 9, 2024

/s/ *Adam Swick*
Adam Swick

*Attorney for Visual Semiconductor, Inc.*

/s/ *Andrew DeMarco*
Andrew DeMarco

*Attorney for Rembrandt 3D Holding Ltd.*

79079341;4

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

RELIEF SOUGHT ...............................................................................1

QUESTION PRESENTED ....................................................................2

STATEMENT OF JURISDICTION........................................................3

INTRODUCTION ................................................................................3

STATEMENT OF THE CASE...............................................................6

STANDARD OF REVIEW .................................................................18

I.      A WRIT OF MANDAMUS SHOULD ISSUE...........................23

II.     A WRIT OF PROHIBITION SHOULD ISSUE..........................31

III.    THE COURT SHOULD STAY THE SALE ORDER PENDING
        APPEAL. .................................................................................34

        a.      Petitioners Have a High Likelihood of Success on the Merits ..........36

                1.      The Trustee may not sell the Debtors' property unless
                        that property constitutes property of the Debtors' estates
                        and, before approving a sale, the Court must first
                        determine whether such property constitutes property of
                        the estates. ...............................................................37

                2.      The 9019 Agreement and Sale Motion taken together
                        constitute an improper *sub rosa* plan of reorganization
                        that cannot be approved by this Court. ....................41

                3.      The Proposed Sale Process is Neither Fair nor
                        Reasonable and is Subject to a Heightened Scrutiny
                        Standard. ..................................................................44

        b.      Petitioners will Suffer Irreparable Harm if Enforcement of the
                Sale Order is Not Stayed Pending Appeal ..........................................47

        c.      A Stay Pending Appeal Would Not Substantially Harm Other
                Parties with an Interest in the Litigation .............................................50

        d.      A Stay Pending Appeal is in the Public Interest .................................50

        e.      The Court Should Not Require a Bond Pending the Appeal ..............51

79079341;4

IV.    THE REFERENCE SHOULD BE WITHDRAWN. ....................................52

    a.    Withdrawal of the Reference is Mandatory Under 28 U.S.C.
       § 157(d) ...............................................................................................52

    b.    In the Alternative, the District Court Should Withdraw the
       Reference Under the Discretionary Standard of Section 157 .............57

CONCLUSION....................................................................................................57

CERTIFICATE OF COMPLIANCE.....................................................................60

CERTIFICATE OF SERVICE ............................................................................62

79079341;4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Conine (In re Robertson)*,
203 F.3d 855 (5th Cir. 2000) ...........................................................................27

*Apple Inc. v. Samsung Elecs. Co*.,
809 F.3d 633 (Fed. Cir. 2015) .........................................................................38

*Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*,
504 B.R. 754 (S.D.N.Y. 2014) .........................................................................24

*Boggs Contracting, Inc. v. Freismuth*,
2021 U.S. Dist. LEXIS 252335 (M.D. Fla. Dec. 27, 2021) ..............................37

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004)..........................................................................................13

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims
(In re Papercraft Corp.)*,
211 B.R. 813 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998).........1, 16, 34

*Contratian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*,
600 F.3d 231 (2d Cir.2010) ..............................................................................14

*Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*,
415 B.R. 86 (Bankr. D. Del. 2009).....................................................................34

*Darby v. Zimmerman (In re Popp)*,
323 B.R. 260 (B.A.P. 9th Cir.2005) ..................................................................28

*Eli Global, LLC v. Univ. Directories, LLC*,
532 B.R. 249 (M.D.N.C. 2015) .........................................................................45

*Energy Future Holdings Corp. v. Del. Tr. Co*.,
648 F. App'x 277 (3d Cir. 2016) .......................................................................31

*Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*,
2013 WL 4804816 (D.N.J. Sept. 9, 2013).........................................................28

iii

*G4S Secure Integration LLC v. United States*,
    161 Fed. Cl. 387 (2022) ......................................................................38

*In re 388 Route 22 Readington Holdings, LLC*,
    2021 WL 4811409 (3d Cir. Oct. 15, 2021), *cert. denied*, 142 S. Ct. 1674 (U.S.
    2022) ...............................................................................................15

*In re Abbotts Dairies of Pennsylvania, Inc.*
    788 F.2d 143 (3d Cir. 1986) ..........................................16, 17, 19, 33

*In re Bidermann Indus. U.S.A.*,
    203 B.R. 547 (Bankr. S.D.N.Y. 1997).........................................35, 36

*In re BigCommerce, Inc.*,
    890 F.3d 978 (Fed. Cir. 2018) ...........................................................13

*In re Blixseth*,
    No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010)........35

*In re Braniff Airways, Inc.*,
    700 F.2d 935 (5th Cir. 1983) .......................................................31, 32

*In re Coburn*,
    250 B.R. 401 (Bankr. M.D. Fla. 1999).............................................27

*In re Colony Hill Assocs.*,
    111 F.3d 269 (2d Cir. 1997) ...............................................................18

*In re Crowthers McCall Pattern, Inc.*,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990)...............................................31

*In re DeCurtis Holdings*,
    2023 WL 5153645 ...............................................................................37

*In re Filtercorp Partners, L.P.*,
    163 F.3d 570 (9th Cir. 1998) ..............................................................18

*In re ICL Holding Co., Inc.*,
    802 F.3d 547 (3d Cir. 2015) ..............................................................14

*In re Innkeepers USA Trust*,
    442 B.R. 227 (Bankr. S.D.N.Y. 2010)...............................................36

iv

*In re Interiors of Yesterday, LLC,*
    Case No. 02-30356 (LMW), 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007)
    ................................................................................................28

*In re K & D Indus. Servs. Holding Co., Inc.,*
    850 F. App'x 966 (6th Cir. 2021) ......................................................15

*In re McCrory Corp.,*
    160 B.R. 502 (S.D.N.Y. 1993) ...........................................................45

*In re Micron Tech., Inc.,*
    875 F.3d 1091 (Fed. Cir. 2017) .........................................................13

*In re Palmer Equip., LLC,*
    623 B.R. 804 (Bankr. D. Utah 2020) .................................................14

*In re Revel AC, Inc.,*
    802 F.3d 558 (3d Cir. 2015) .................................................24, 25, 36

*In re Sindesmos Hellinikes-Kinotitos of Chicago,*
    607 B.R. 898 (N.D. Ill. 2019) ............................................................40

*In re Stream TV Networks, Inc.,*
    Case No.: 23-10763 (AMC) ................................................................1

*In re Summit Global Logistics, Inc.,*
    2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008)...................35

*In re Univ. Heights Ass'n,*
    2007 Bankr. LEXIS 1200 (Bankr. N.D.N.Y. Jan. 22, 2007).............35

*In re Westpoint Stevens Inc.,*
    333 B.R. 30 (S.D.N.Y. 2005) .......................................................32, 33

*In re Whitehall Jewelers Holdings, Inc.,*
    Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008).27,
    28

*In re Worcester Country Club Acres, LLC,*
    655 B.R. 41 (Bankr. D. Mass. 2023) .................................................27

79079341;4

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
  780 F.2d 1223 (5th Cir. 1986) ...........................................................32

*Jones v. GE Capital Mortgage Co. (In re Jones)*,
  179 B.R. 450 (Bankr. E.D. Pa. 1995) .................................................26

*Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*,
  2023 U.S. Dist. LEXIS 25025 (M.D. Fla. Feb. 14, 2023)...................38

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,
  105 F.3d 837 (2d Cir.), *cert. denied,* 520 U.S. 1196, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997) .............................................................................14

*Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit, Inc. (In re Made in Detroit, Inc.)*,
  414 F.3d 576 (6th Cir. 2005) ..............................................................14

*Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*,
  2012 U.S. Dist. LEXIS 200492 (S.D. Fla. 2012) ...............................38

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019).........................................26

*Moody v. Amoco Oil Co.*,
  734 F.2d 1200 (7th Cir. 1984), cert denied, 469 U.S. 982 (1984)......................26

*Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) .........................................................31, 33

*News Am. Mktg. In-Store, LLC v. Emmel*,
  429 F. App'x 851 (11th Cir. 2011) (unpublished)...............................38

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................25

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*,
  119 F.3d 349 (5th Cir. 1997) ..............................................................31

*Pursuit Capital Mgmt. Fund 1 v. Burtch (In re Pursuit Capital Mgmt. LLC)*,
  874 F.3d 124 (3d Cir. 2017) ...............................................................15

vi

*Republic of Phil. v. Westinghouse Electric Corp.*,
    949 F.2d 653 (3d Cir.1991) .......................................................................24

*Rodriguez v. Countrywide Home Loans, Inc.*,
    421 B.R. 341 (S.D. Tex. 2009) ................................................................42

*Ross v. A V Car & Home, LLC (In re Brown)*,
    Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL
    413625 (Bankr. D.C. Jan. 30, 2019) .......................................................28

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
    2008 WL 2498048(3d Cir. June 24, 2008) ..............................................27

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
    895 F.3d 1304 (Fed. Cir. 2018) ..............................................................38

*United States v. Salerno*,
    932 F.2d 117 (2d Cir.1991) .....................................................................14

*Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*,
    362 F.3d 603 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353
    (9th Cir. 2005) .........................................................................................28

**Statutes**

U.S.C. § 157(a) ................................................................................................2, 41

11 U.S.C. § 363(m) .....................................................................................passim

28 U.S.C. § 157 ........................................................................................4, 42, 45

28 U.S.C. § 157(d) ......................................................................................passim

28 U.S.C. § 1334(b) .........................................................................................2, 41

28 U.S.C. § 1651(a) ............................................................................................13

All Writs Act, 28 U.S.C. § 1651 ......................................................................2, 13

Section 363 of the Bankruptcy Code ..................................................16, 28, 33, 37

Section 363(f) of the Bankruptcy Code ..............................................22, 27, 28, 37

UCC Article 9 ......................................................................................................20

79079341;4

## Rules

Bankruptcy Rule 8007 .................................................................................................40

Fed. R. App. P. 21(d)(1) ...........................................................................................48

Fed. R. App. P. 26.1 .....................................................................................................3

Fed. R. App. P. 26.1(b) .................................................................................................4

Fed. R. App. P. 32(a)(5) ............................................................................................48

Fed. R. App. P. 32(a)(6) ............................................................................................48

Fed. R. App. P. 6004(h) ...............................................................................................9

Fed R. Bankr. P. 5011 ................................................................................................42

Fed. R. Bankr. P. 5011(a) ..........................................................................................41

Fed. R. Bankr. P. 8007 ...............................................................................................40

Fed. R. Bankr. P. 8007(a)(1) ......................................................................................24

Fed. R. Bankr. P. 8007(b)(2)(A) .................................................................................24

Fed. R. Civ. P. 26 .......................................................................................................44

Fed. R. Civ. P. 30 and Rule 32 ...................................................................................44

Local Bankruptcy Rule 5011-1 ....................................................................................42

*Local Rule of Bankruptcy Procedure 5070-1(g)* ..........................................................1

Rule 21(a)(2) ..............................................................................................................50

Rule 47.4(a) ..................................................................................................................3

Rule 5011(c) of Bankruptcy Rules ..............................................................................41

## Other Authorities

Adv. No. 119 .................................................................................................................4

Sixth Amendment .......................................................................................................45

79079341;4

Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3954 (5th ed. 2024 update).............................................................................................................25

Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution..........................................................................................................44

79079341;4

## RELIEF SOUGHT

Petitioners Visual Semiconductor Inc. ("**VSI**") and Rembrandt 3D Holding

Ltd. ("**Rembrandt**") respectfully and jointly request that the U.S. District Court for

the Eastern District of Pennsylvania (the "**District Court**") grant (i) an emergency

petition for writ of mandamus, (ii) a writ of prohibition; (iii) a motion for stay

pending appeal of the Sale Motion; (iv) a temporary restraining order preventing the

United States Bankruptcy Court for the Eastern District of Pennsylvania

(the "**Bankruptcy Court**") from approving the motion[1] for sale of the assets of

Stream TV Networks, Inc. and Technovative Media, Inc. (the "**Debtors**") filed by

the Court-appointed chapter 11 trustee (the "**Trustee**") in *In re Stream TV Networks,*

*Inc.*, Case No.: 23-10763 (AMC) in the United States Bankruptcy Court for the

Eastern District of Pennsylvania (the "**Bankruptcy Court Proceeding**"); and, (v) in

the alternative, withdraw the reference of the dispute and transfer it to the District

Court.

---

[1] *Motion for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* (Docket No. 750 in the Bankruptcy Court Proceeding, the "**Sale Motion**").

## QUESTION PRESENTED

1. Whether mandamus should issue because the Bankruptcy Court erred in (i) failing to evaluate whether the proposed sale of assets that incorporate non-debtor property can be granted "free and clear" of liens, claims, and encumbrances under section 363(f) of the Bankruptcy Code; (ii) failing to evaluate whether the Proposed Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; and (iii) failing to allow Petitioners to make a proper evidentiary record regarding the same. Relatedly, whether the Trustee should be allowed to transfer control of trade secrets owned by Rembrandt to SeeCubic's control in violation of 18 USC 1832, and whether a Proposed Purchaser can be considered a good faith purchaser while committing a crime, specifically conspiring in the theft of trade secrets under in violation of 18 USC 1832.

2. Whether prohibition should issue because it will (i) prevent the Bankruptcy Court from interfering with the District Court's determination of the case pending appeal, (ii) prohibit the Bankruptcy Court from issuing orders in matters over which it has no jurisdiction - specifically here, authorizing the transfer of assets that do not constitute property of the estate under section 541 of the Bankruptcy Code.

79079341;4

3. Whether an emergency stay of the order granting the Sale Motion should be granted by this Court.

4. Whether the reference should be withdrawn.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to grant prohibition and mandamus relief under the All Writs Act, 28 U.S.C. § 1651.

This Court has jurisdiction to grant the withdrawal of the reference under 28 U.S.C. § 1334(b) and U.S.C. § 157(a).

## INTRODUCTION

Mandamus and prohibition are an extraordinary measures reserved for extraordinary circumstances. But this case is extraordinary in every respect.

Petitioners have been extremely vocal and abundantly clear throughout the Bankruptcy Court Proceeding in their opposition to the conduct of the Trustee as well as the Hawk Parties (as defined below), specifically relating to the identity and activities of the proposed stalking horse - now Purchaser (as defined below), and their lack of good faith.  However, the Bankruptcy Court has turned a blind eye to the points and cautions that the Petitioners have repeatedly attempted to raise, opting instead to serially deny Petitioners the ability to make a proper evidentiary record.

The key questions presented here are targeted, and the answers are clear: The assets the Trustee proposes to sell and transfer contain property owned by non-debtor

79079341;4

third parties, and thus the sale does not qualify for 363(f) treatment and cannot be approved as an assignment/transfer "free and clear" of the claims and encumbrances under the Bankruptcy Code.  Moreover, the Proposed Purchaser is not a "good faith" purchaser, and as such, the sale of the Debtors' assets to the Proposed Purchaser should clearly be disallowed.  The Bankruptcy Court's dismissal of the Petitioners' arguments throughout the Bankruptcy Court Proceedings were steeped in explicit violations of due process and a mistaken view (or complete lack of view) of sections 363(f) and 363(m) of the Bankruptcy Code in light of the assets and circumstances involved in this case.

SeeCubic/Hawk and the Trustee are conspiring to transfer Rembrandt's trade secrets from Stream's control to SeeCubic's control without authorization from Rembrandt in violation of 18 USC 1832. This subjects all those involved in the conspiracy to civil and criminal liability but those parties are asking this court to sanction their criminal theft of trade secrets that do not belong to the estate. A purchaser committing a crime through the sale cannot be a good faith purchaser.

Further, the District Court should stay entry of the order submitted by the Trustee granting the sale of the assets (the "**Sale Order**") pending the appeal. Beyond the facts that the assets cannot be sold "free and clear" and the Proposed Purchaser is not a "good faith" purchaser, as discussed at length herein, there are a plethora of other reasons why Petitioners have a high likelihood of success on the

4

merits for a judgment that the Sale Transaction cannot go forward. For example, (a) the Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, *before* approving a sale, a court must first determine whether such property constitutes property of the estates; (b) the 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved; and (c) the proposed sale process is neither fair nor reasonable and is subject to a heightened scrutiny standard.

Finally, the reference should be withdrawn as mandatory under 28 U.S.C. § 157(d). The majority of courts find withdrawal of the reference mandatory when a claim or defense entails "material and substantial consideration" of non-Bankruptcy Code federal law.   Petitioners submit that (i) withdrawal of the reference is *mandatory* under 28 U.S.C. § 157(d) because the proceedings will involve substantial and material consideration of non-bankruptcy federal law (including law relating to due process and intellectual property) and (ii) in the alternative, the District Court should withdraw the reference under the discretionary standard of 28 U.S.C. § 157 because it is indisputably best suited to apply that non-bankruptcy law to the painstakingly litigated facts and related issues and to decide those issues as expeditiously and economically as possible.

79079341;4

## STATEMENT OF THE CASE

This matter revolves around the Trustee's attempts to sell the assets of the Debtors to the Hawk Parties (as defined below), contrary to law and against the interests of other stakeholders in the cases.

On January 4, 2024 the Debtor, in Adv. Case No 23-00057-AMC, obtained a Temporary Restraining Order ("**Bankruptcy TRO**") (Adv. No. 119) preventing the Hawk Parties from using the Debtors' technology to compete with the Debtors. Prior to even the entry of the Bankruptcy TRO, prepetition on August 9, 2022, the Delaware Chancery Court had already issued a temporary restraining order enjoining SeeCubic, Inc. from selling Stream's assets, which assets the Hawk Parties have been unlawfully in their possession since then (the "**Delaware TRO**" together with the Bankruptcy TRO, the "**TROs**").

The Hawk Parties' efforts to take control of the Debtors' property preceded and precipitated the filing of the Chapter 11 Cases, continued throughout this case in violation of the automatic stay and a Worldwide Stay Order (defined below)[2], and continued after entry of the Bankruptcy TRO. Since entry of the TROs, the Debtors, Rembrandt, and VSI have, at various points throughout the case sought to enforce

---

[2] On December 14, 2023, in light of the Hawk Parties' extra-territorial misconduct and misappropriation, possession, and control of Debtor assets, the predecessor judge in this bankruptcy proceeding (Judge Magdeline D. Coleman) recognized the ongoing damage to the Debtors estates and potential harms to third parties (e.g. Rembrandt) and issued a Stipulated Order Restating and Enforcing the Worldwide Automatic Stay (the "**Worldwide Stay Order**," attached hereto as __Exhibit A__) (Docket #517).

the automatic stay, the Worldwide Stay Order, and the TROs against the *ultra vires* actions of the Hawk Parties to take control of the Debtors assets, which efforts, once a Chapter 11 Trustee was appointed, shifted to utilizing the Trustee to take control of those assets. Notwithstanding the Hawk Parties' constant violations of the automatic stay, the Worldwide Stay Order, and the TROs, the Bankruptcy Court refused to sanction or prevent the Hawk Parties from repeatedly violating these multiple court orders through their unlawful possession of estate assets, which possession persists to today. While the 9109 Agreement with the Hawk Parties ignores all of their stay and TRO violations throughout the case, the Trustee's proposed sale cannot overcome Rembrandt's property interests (and the sale's immediate infringement upon Rembrandt's intellectual property rights). As such, if completed the sale would itself be violation of the TRO and, if consummated as proposed, it will destroy all the value in the estate by rendering the Debtors' IP unusable and the StreamTV Debtors' hopelessly unable to reorganize – all while irrevocably destroying Rembrandt's trade secrets without a remedy. The Bankruptcy Court failed to address these violations or their clear consequences: the TRO transgressors will achieve the precise purpose of their transgressions – transfer and assignment of title to the assets they have misappropriated, controlled, and/or sought to possess since the commencement of these cases – all under the "color of law" and with the imprimatur of the Bankruptcy Court and its appointed fiduciary, the Trustee.

7

On June 7, 2024, the Bankruptcy Court entered an order approving the Trustee's Settlement (the "**9019 Agreement**") with Hawk Investment Holdings, Ltd., in its capacity as Collateral Agent for the secured noteholders of SeeCubic, Inc., SLS Holdings VI, LLC, and various individuals who received releases, including Arthur Leonard, Robert Morton, Shadron L. Stastney, Alastair Crawford, Asaf Gola, Kevin Gollop, Patrick Miles, Patric Theune, and Krzysztof Kabacinski (collectively, the "**Hawk Parties**"). The Bankruptcy Court entered the 9019 Agreement despite the obvious weakness of the evidentiary record, an exceptionally large claim allowance, and clear conflicts between the Debtors' estates and the Hawk Parties, specifically SeeCubic, Inc. and its principal, Shadron Stastney.

Nearly four months later, on September 30, 2024, the Trustee filed the Sale Motion, despite a multitude of alternative funding, purchase, and plan proposals from VSI and Rembrandt to the Trustee to achieve a better outcome for all stakeholders than the one contemplated by the 9019 Agreement – including for unsecured creditors. The process contemplated by the Sale Motion disproportionately benefited the Hawk Parties at the expense of all other stakeholders.

As anticipated, the sales process produced no bids beyond that of SeeCubic as proposed stalking horse bidder (the "**Proposed Purchaser**"). In fact, according to SSG's (defined below) statements on the record at the November 13, 2024 hearing,

8

no other party has expressed any interest whatsoever. [3] Indeed, as the Court heard

from the Trustee and his advisors at the November 13th hearing, after the Trustee's

marketing efforts, no prospective bidder was sufficiently interested in the Debtors'

assets to sign a simple NDA to access the sale data room. Only VSI signed an NDA,

but the Trustee's investment banker did not even bother sending VSI the teaser used

to market the Debtors' assets.   Given the glaring issues and legal defects regarding

the sale, the likelihood of VSI placing a bid is practically non-existent, and no other

party could reasonably be expected to submit a bid under the circumstances. Given

the asset value involved, that no contacted party was interested enough to sign an

NDA is an indictment of the Trustee's marketing and sale process, which is borne

out by the inexplicable fact that none of the most-likely bidders for the 3-D no

glasses technology (i.e. Ultra-D technology) appear to have sent teasers or contacted

in any way.[4]

The Trustee has failed to properly assess or disclose what is being sold and

does not even know what he is actually selling. In contravention of his duties to

inventory and marshal the estates' assets, the Trustee refused to recover millions of

dollars in the Debtors' property from the Hawk Parties or wrest control of high-value

---

[3] Which statements were reinforced by SSG's testimony at the December 4, 2024 sale hearing. *See* December 4, 2024 Hearing Transcript attached hereto as **Exhibit B** at 63:22-25, 64:1-4.

[4] *See* December 4, 2024 Hearing Transcript, attached hereto as **Exhibit B** at 72:10, 73:21 for cross-examination transcript testimony of SSG's Scott Victor regarding the 23 licensees identified in the Philips License Agreement and whether those most likely bidders for the Ultra-D technology were contacted.

assets from SeeCubic, Inc. and its principal, Mr. Stastney. Indeed, during the limited cross-examination that the Bankruptcy Court permitted at the sale hearing, the Trustee admitted that he made no effort to inventory or marshal the estates' assets (see December 4, 2024 Hearing Transcript at 25:7-14[5]), nor did he make an effort to determine whether the assets implicated by the proposed sale (and identified by the Asset Purchase Agreement) are actually property of the Debtors' estates (see *Id*. Pages 26-29), Meanwhile, the Trustee willfully ignores the conduct and conflicts of interest presented by Mr. Stastney occupying both sides of the Trustee's purported "363 sale" transaction – actively controlling SeeCubic, B.V. and its assets (as sole director) while serving as "stalking horse bidder" for assets *already in his possession, custody, or control*. Even if a third party were to purchase the assets, the Trustee has failed to obtain any assurance that the Hawk Parties will relinquish the Debtors' property or cease their unauthorized use of the Debtors' intellectual property. In open defiance of multiple court orders, the Hawk Parties have refused to turn over the Debtors' assets for years, further undermining the viability of the sale.

---

[5] *See* December 4, 2024 Hearing Transcript at 25:7-14 ("Question: Did you ever do an inventory of the assets of Stream TV? Answer: Well, that was one of the issues in the case that is not typical in a Chapter 11 Trustee case. There were no operations and it was unclear at the time, and remains unclear, exactly which entities of Mr. Rajan's have possession of tangible assets, records, et cetera. So I don't believe Stream TV has certainly any significant tangible assets. And if they do, I have not been aware -- made aware of them or know their location or who is in control of them.")

79079341;4

Bizarrely, the Bankruptcy Court allowed the Trustee's counsel to unilaterally withdraw (without prejudice) a sanctions motion against VSI that contained a fraudulent and altered exhibit and misrepresentations by counsel regarding the same –over VSI's objections and notwithstanding the motion being joined as a contested matter. In another troubling move, the Bankruptcy Court forced VSI and Rembrandt to help "fix" the Trustee's failure to adequately disclose the assets being sold pursuant to the 363 sale by annotating a late-filed and deficient asset listing.

The Trustee chose "the Secured Creditors," *a.k.a.,* the Hawk Parties, as the proposed stalking horse bidder and acquiesced to allowing their claim of $180 million (Sale Motion ⁋ 30(I)(a)), $150 million to be used as a credit bid (Sale Motion ⁋ 30(I)(b)), despite the dubious nature and amount of the Hawk Parties' claims and the Trustee's failure to investigate the conversion of the Hawk Parties' notes pursuant to a debt-to-equity conversion agreement the Trustee was well aware of.

The Petitioners have repeatedly emphasized that allowing such credit bid was inappropriate on its face. The insider stalking horse bidder should not have been permitted to credit bid in light of the history, facts and circumstances of these cases, the disputes surrounding the legitimacy of its claims, and – most importantly – the stalking horse's theft and control of the Debtors' assets before and during the pendency of this bankruptcy case. Designating such a malevolent insider as the stalking horse is wholly inequitable to legitimate creditors and constitutes "cause"

11

to deny credit bidding rights. Additionally, in these Chapter 11 cases, the credit bid also inevitably chilled bidding, rather than providing any value to the estates, which Courts have found to be cause enough to deny the right to credit bid.

At the hearing to approve the bidding procedures on November 13, 2024, the Bankruptcy Court did not hear testimony or receive other evidence in support of the Trustee's proposed bidding procedures, and the Trustee never filed nor otherwise offered evidence to buttress or rationalize the relief sought in his Bidding Procedures Order (defined below).   Indeed, the hearing to approve the Trustee's proposed bidding procedures was not an evidentiary hearing at all.[6]  Rather, at the close of the hearing the Court informed the Petitioners and other parties in interest that the sale hearing to be held on December 4, 2024 to approve the sale transaction would be their opportunity to make their cases. *See* November 13, 2024 Hearing Transcript, Attached hereto as **Exhibit C** 83:12-18 ("THE COURT: Okay. So I'll hear from all of you. Just make sure you put in those briefs. My law clerk is waiting with baited breath to see all of your sale objections because he's got to do a lot of research. So next Friday, okay. We'll be taking a close look at all of that. So please include all of your arguments then"). Notwithstanding the lack of an evidentiary hearing and the absence of any evidentiary support of any kind from the Trustee, the proposed order

---

[6] See generally the November 13, 2024 Bidding Procedures hearing transcript, attached hereto as **Exhibit C**.

approving the bidding procedures (the "**Bidding Procedures Order**")[7], was signed
by the Bankruptcy Court and granted exceptional, unsupported, and unwarranted
findings and relief that included:

    i.    findings that "the Trustee has articulated good and sufficient reasons
for authorizing the Bidding Procedures," that such procedures "are fair,
reasonable, and appropriate  under the circumstances and designed to
maximize value of the Assets" (Bidding Procedures Order ⁋ B);

    ii.    a finding that "the Bidding Procedures were negotiated in good faith
and at arm's length and are reasonably designed to promote a
competitive and robust bidding process to generate the greatest level of
interest in the Assets" (Bidding Procedures Order ⁋ B);

    iii.    a finding that the Asset Purchase Agreement "was negotiated in good
faith an at arm's length between the parties and may serve as a
reasonable and appropriate baseline for soliciting other bids for the
Assets" (Bidding Procedures Order ⁋ C); and

    iv.    ordering related relief that "the Trustee shall have no personal liability
for any obligations of the Debtors' estates" (Bidding Procedures Order
⁋ 21), and that "notwithstanding Bankruptcy Rule 6004(h), the terms

---

[7] As entered at Docket No. 811.

13

and conditions of this Order are immediately effective and enforceable upon its entry" (Bidding Procedures Order ¶ 23).

Mysteriously, the Bankruptcy Court was able to make all of the foregoing findings of fact and conclusions of law and issue the sweeping relief contained in the Bidding Procedures Order without a single piece of evidence. If the November 13, 2024 Bidding Procedures hearing met the legal standard for conducting an evidentiary hearing for a contested matter in satisfaction of the Federal Rules and due process requirements, then it is fair to say that we bankruptcy practitioners have no standard at all.

At the ensuing hearing, on December 4, 2024, VSI and Rembrandt, came prepared to present their witnesses and arguments in accordance with the Bankruptcy Court's promise that the sale hearing would be their opportunity to present their case in chief. However, the Bankruptcy Court denied VSI and Rembrandt this opportunity. First, the Bankruptcy Court severely limited and then curtailed Petitioners cross-examination of the only two witnesses offered by the Trustee in support of his Sale Motion – the Trustee himself and his investment banker at SSG (defined below).[8] Thereafter, the Court denied VSI and Rembrandt the right to put on witnesses or other evidence in support of their case in chief.[9]

---

[8] *See* December 4, 2024 Sale Hearing Transcript, attached hereto as **Exhibit B**, 22:25, 23:14.
[9] *See* December 4, 2024 Sale Hearing Transcript, attached hereto as **Exhibit B**, 74:6, 75:13, 76:15-19.

14

Finally, the Court cut the hearing off without the opportunity for any oral argument, suggesting that "she had heard all she needed to hear" and would read the briefs. *See e.g.* December 4, 2024 Hearing Transcript, attached hereto as **Exhibit B** 50:5-9 ("Okay. And I don't need to hear from that witness today, and I'm not going to hear from him today. I'm happy to hear all the arguments that you've listed in your briefs, but I'm not taking testimony from that gentleman. I don't need that for part of the sale process."); *Id.* 74:13-20 ("I don't have any need to hear from any witnesses about the sale. What I was interested -- if there were any concerns. Like, the concerns I was interested in hearing about today was the sale process, . . . And I've heard all of your questions, and I don't have any concerns about this sale. I don't.").

This "sale hearing" failed to meet the standard for an "evidentiary hearing" or afford VSI and Rembrandt any material due process.  The Court constricted cross-examination of the Trustee's only two witnesses in such a manner as to deny any meaningful exposure of the most important facts underlying the proposed sale (i.e. "free and clear" transfer, and "good faith purchaser" status) – and the relief sought most by the Trustee and Proposed Purchaser.

Moreover, at the same December 4, 2024 hearing, the Bankruptcy Court permitted the Trustee to file a materially different form of Sale Order (which modified the "deal terms" originally set forth in the 9019 Agreement) less than three

15

hours before the hearing without opportunity for sufficient review, let alone adequate opposition or discovery.

Entering the proposed sale order that permits the transfer of non-estate property "free and clear" of liens, claims, and encumbrances and confers "good faith purchaser" status on the stalking horse bidder without an evidentiary record permitting the Court to grant such relief is clearly problematic – indeed, it is fatal to the requested relief. The only evidence the Trustee submitted in support of his requested sale order relief were two declarations (one from the Trustee and one from SSG Advisors, LLC ("**SSG**") as investment banker), and neither established any facts in support of (i) free and clear transfer or (ii) good faith purchaser status. As noted above, no material cross-examination was permitted by the Court. Also as noted above, the Bankruptcy Court denied VSI's and Rembrandt's request to put on evidence to contest the "free and clear" and "good faith" findings.

There have been numerous instances in the Chapter 11 Proceedings in which the Bankruptcy Court took problematic actions and entered problematic orders, as described above, including with respect to the Bankruptcy Court's repeated refusal to permit Petitioners' reasonable discovery. On June 16, 2024, Akerman LLP filed a Notice of Appearance as counsel for VSI and promptly filed an Objection to the Motion for Turnover [ECF No. 672 in the Bankruptcy Court Proceedings] (the "**Objection to Turnover**") and a Motion to Reconsider the order granting the

16

9019 Agreement [ECF No. 686 in the Bankruptcy Court Proceedings] (the "**Motion to Reconsider**").

On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum on the Trustee concerning the issues raised in the Objection to Turnover and Motion to Reconsider (the "**Original Discovery Requests**").  Among other things, the Original Discovery Requests sought information regarding exhibits to the Trustee's Motion for Turnover that were clearly altered and representations that were demonstrably false and misleading.  Rather than account for the altered exhibit documents and misleading statements in his Motion for Turnover, the Trustee moved to quash the Original Discovery Requests, sought entry of a protective order, and moved to withdraw the offensive Motion for Turnover without prejudice [see ECF No. 724 in the Bankruptcy Court Proceedings].

On September 30, 2024, the Bankruptcy Court entered the *Order Granting Motion to Withdraw Turnover Action* [ECF No. 776 in the Bankruptcy Court Proceedings]. The same day, the Bankruptcy Court entered the *Order Granting Motion to Quash* [ECF No. 777 in the Bankruptcy Court Proceedings].  More recently, at the hearing on November 14, 2024, the Bankruptcy Court entered an order [ECF No. 805 in the Bankruptcy Court Proceedings] denying the reconsideration motion and granting the motion to quash remaining discovery, including discovery relating to the sale process. Effectively, taken together, these

17

orders have completely denied Petitioners any form of discovery whatsoever, including with respect to the all-important sale process.

Taken together, these orders by the Bankruptcy Court quashed discovery regarding: (i) the 9019 Agreement reconsideration; (ii) the Debtors' engagement of conflicted investment banker, SSG; (iii) the Trustee's failure to enforce the TRO or return assets to the Debtors' estates; (iv) the bid procedures; and most recently, the Trustee's proposed 363 Sale, including but not limited to: (a) assets recovered to the estate, (b) intellectual property assets, (c) bonding machine title, and efforts to control subsidiaries and assets purportedly held there.

## STANDARD OF REVIEW

The All Writs Act permits this Court to "issue all writs necessary or appropriate in aid of" its jurisdiction, including mandamus and prohibition. 28 U.S.C. § 1651(a).

Mandamus relief is warranted when (1) the "right to issuance of the writ is clear and indisputable"; (2) the petitioner has "no other adequate means" of obtaining relief; and (3) "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.,* 542 U.S. 367, 381 (2004) (quotation omitted). Those requirements, "however demanding, are not insuperable." *Id.*

Indeed, the Supreme Court has recognized that mandamus is properly employed to "confine an inferior court to a lawful exercise of its prescribed

18

jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche,* 319 U.S. at 26. Mandamus may also be used to address "basic" and "undecided" legal questions where district courts are "deeply split on the answer." *In re Micron Tech., Inc.,* 875 F.3d 1091, 1095 (Fed. Cir. 2017) (citing *Schlagenhauf v. Holder,* 379 U.S. 104, 110 (1964)); *In re BigCommerce, Inc.,* 890 F.3d 978, 981 (Fed. Cir. 2018) ("[M]andamus may be appropriate 'to further supervisory or instructional goals where issues are unsettled and important.'")

Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts generally apply some form of a business judgment test in determining whether to approve a proposed use, sale, or lease of estate property under section 363(b)(1). *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.),* 650 F.3d 593, 601 (5th Cir. 2011); *In re Stearns Holdings, LLC*, 607 B.R. 781, 792 (Bankr. S.D.N.Y. 2019); *In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005); *see generally* Collier on Bankruptcy ("Collier") ¶ 363.02 (16th ed. 2020).

Section 363(f) of the Bankruptcy Code authorizes a trustee or DIP to sell property "free and clear of any interest in such property of an entity other than the estate," but only if: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and

19

the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in *bona fide* dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

Here, these elements are clearly not met. As a primary matter, and as discussed at length below, a debtor (or in this case, the Trustee), cannot sell property unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the estate – *in an adversary proceeding, not a contested matter*. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. B.A.P. 2001)). In addition, it is not contested that Rembrandt's intellectual property clearly does not constitute property of the estates.

The case law is clear that the Bankruptcy Court lacks jurisdiction here because (a) it cannot authorize the sale of non-debtor property at all (let alone "free and clear") (See III.A.1 herein), and (b) the Court cannot make a factual determination about "the assets" (estate and non-debtor assets) without any evidence, and as discussed herein at length, the Bankruptcy Court has not attempted to get such evidence or permitted the Petitioners to put on such evidence.

79079341;4

Historically, Section 363(m) of the Bankruptcy Code limits appellate jurisdiction over an unstayed sale order issued by a bankruptcy court to the narrow issue of whether the property was sold to a good faith purchaser. 11 U.S.C. § 363(m); *Contratian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.),* 600 F.3d 231, 247–48 (2d Cir.2010); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 105 F.3d 837, 839 (2d Cir.) ("*Gucci I*"), *cert. denied,* 520 U.S. 1196, 117 S.Ct. 1552, 1553, 137 L.Ed.2d 701 (1997); *see also United States v. Salerno,* 932 F.2d 117, 123 (2d Cir.1991); *See Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit, Inc. (In re Made in Detroit, Inc.)*, 414 F.3d 576 (6th Cir. 2005); *see also In re Palmer Equip., LLC*, 623 B.R. 804, 808 (Bankr. D. Utah 2020) (section 363(m)'s protection is vital to encouraging buyers to purchase the debtor's property and thus ensuring that adequate sources of financing are available).

The Third Circuit, has further held that an appeal is not moot as long as it is possible to grant effective relief without impacting the validity of the sale. *See In re ICL Holding Co., Inc.*, 802 F.3d 547, 554 (3d Cir. 2015) (section 363(m) did not moot the government's appeal of the terms for the ordered distribution of escrowed funds for administrative expenses and settlement proceeds from the sale of substantially all of the debtors' assets since the court could order redistribution of the sale proceeds without disturbing the sale); *see also In re 388 Route 22 Readington Holdings, LLC*, 2021 WL 4811409, *2 (3d Cir. Oct. 15, 2021) ("Put

21

simply, § 363(m) moots a challenge to a sale when '(1) the underlying sale or lease was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease.'") (citations omitted), *cert. denied*, 142 S. Ct. 1674 (U.S. 2022); *In re K & D Indus. Servs. Holding Co., Inc.*, 850 F. App'x 966, 968-69 (6th Cir. 2021) ("Because § 363(m) 'limits appellate review of a consummated sale … regardless of the merits of legal arguments raised against it,' and because we cannot grant effective relief without disturbing the sales, the appeals to the district court are moot.") (citation omitted).

Under Third Circuit case law, § 363(m) moots a challenge to a sale if two conditions are satisfied: "(1) the underlying sale or lease was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease; and "an additional step because we are first required to ask whether the purchaser at the sale 'purchased ... [the] property in good faith" *Pursuit Capital Mgmt. Fund 1 v. Burtch (In re Pursuit Capital Mgmt. LLC)*, 874 F.3d 124 (3d Cir. 2017).

Here, the purchaser clearly did not purchase the property in good faith, and the Petitioner was denied the chance to put on evidence to that effect, in violation of its rights to due process.

22

## I.   <u>A WRIT OF MANDAMUS SHOULD ISSUE</u>

The Bankruptcy Court was clearly erroneous. The Bankruptcy Court failed to make a finding of good faith, and refused to entertain any evidence demonstrating the absence of good faith, despite manifest examples in the record and Petitioners repeated efforts to raise this concern at every turn. Indeed, in *Visual Semiconductor, Inc.'s Objection to Motion of William Homony in His Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear Of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* [Docket No. 815 in the Bankruptcy Court Case] (the **"VSI Sale Objection"**), VSI laid out this very issue for the court:

> Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale. *Abbotts Dairies*, 788 F.2d at 149–50. A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.* at 147. A good faith purchaser under the Bankruptcy Code is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147. In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." *Abbotts Dairies*, 788 F.2d at 148. In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. See Abbotts Dairies, 788 F.2d at 147-48. Ironically, the Sale Motion relies heavily on *Abbott Dairies* and cites the types of misconduct that would destroy a purchaser's good faith status. *Sale Motion* ⊩ 64.

23

The Stalking Horse Bidder, with the Trustee's blessing, has misappropriated
the estates assets, availed itself of material nonpublic information, denied
prospective bidders material information necessary to make an informed
assessment and decision regarding the assets vale, and improperly suppressed
the assets value; and intentionally chilled the market and bidding for the
Debtors' assets.

SeeCubic and the Hawk Parties would fail this test at every level: (1) the sale
was not negotiated at arm's length, made particularly evident by SGG's
historical relationship with Hawk; (2) Stastney, as chief executive of the
SeeCubic as the Stalking Horse Bidder is also the sole director of the Debtors'
R&D subsidiary; and (3) as discussed throughout the Declaration and this
Objection, there has been collusion between the Trustee and the proposed
Stalking Horse Bidder throughout this process.

For the reasons already discussed herein, any acquisition of the Debtors'
assets by SeeCubic and Hawk is not in good faith and should not be afforded
the protections of section 363(m) of the Bankruptcy Code.

VSI Sale Objection, ¶73-77.

In reviewing the applicability of section 363(m) to a sale of property of the

debtor's estate, the question of whether the Hawk Parties are a good faith purchaser

is a mixed question of law and fact. See *In re Abbotts Dairies of Pennsylvania, Inc.*

788 F.2d 143, 147 (3d Cir. 1986) (stating standard of review regarding "the question

of whether [purchaser] was a good faith purchaser . . . is mixed").

Section 363(m) reads in relevant part:

The reversal or modification on appeal of an authorization under subsection
(b) or (c) of this section of a sale or lease of property does not affect the
validity of a sale or lease under such authorization to an entity that purchased
or leased such property in good faith, whether or not such entity knew of the
pendency of the appeal, unless such authorization and such sale or lease were
stayed pending appeal.

79079341;4

11 U.S.C. § 363(m) (emphasis added). Section 363(m) renders moot any appeal of an order approving sale of property to a good faith purchaser if "(1) the underlying sale or lease was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998).

Under section 363(m), a sale of assets may not be reversed or modified if the property was sold to an "entity that purchased . . . [the] property in good faith." 11 U.S.C. § 363(m). Even if a party fails to obtain a stay of a sale order, that party may still challenge the sale on the grounds that the entity who purchased the property did not do so in good faith. See, e.g., *In re Filtercorp Partners, L.P.*, 163 F.3d 570, 576-77 (9th Cir. 1998); *In re Colony Hill Assocs.*, 111 F.3d 269, 272 (2d Cir. 1997). "`The requirement that a purchaser act in good faith . . . speaks to the integ-rity of his conduct in the course of the sale proceedings." Id. (*quoting In re Rock Industry Machine Corporation*, 572 F.2d 1195, 1197 (7th Cir. 1978).

Because "neither the Bankruptcy Code nor the Bankruptcy Rules attempt to define `good faith[,]' [c]ourts applying section 363(m) . . . have . . . turned to traditional equitable principles, holding that the phrase encompasses one who purchases in `good faith' and for `value.'" *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). The Third Circuit has determined that, in

25

reviewing the "good faith" of a purchaser, the court must first "determine whether there was any impermissible collusion between the purchaser and the debtor." *Id*. at 151. If there was such collusion, the court "should then determine whether the purchaser paid "value" for the assets purchased." *Id*. Finally, "if the court determines that [the purchaser] did not pay `value,' it [must] . . . determine whether it has the power to undo the sale to [the purchaser]." *Id*.

It is clear that the Proposed Purchaser – directly or through its Chairman and CEO, Shadron L. Stastney, as an individual – has held wrongful possession and exercised control over the Debtors' assets for more than 4 years. SeeCubic (a) seized those assets prior and pursuant to a settlement agreement[10] that was found to be void *ab initio* by the Delaware Supreme Court[11]; (b) retained all significant assets on remand to the Delaware Chancery Court, despite multiple court orders[12], arguing that it should not have to return them because the assets had been improved while in SeeCubic's wrongful possession[13]; (c) retained computer servers in Silicon Valley that stored not only Stream's valuable source code, but the intellectual property of Philips and Rembrandt as well[14]; (d) controlled all aspects of the Debtors' technology in the Netherlands by installing SeeCubic CEO Stastney as director of

---

[10] See 11/22/24 Robertson Declaration at ¶¶ 12, 15-16, 18, 105-106, 111-114, and 117.
[11] See 11/22/24 Robertson Declaration at ¶ 21.
[12] See 11/22/24 Robertson Declaration at ¶¶ 24-25 and 28-30.
[13] See 11/22/24 Robertson Declaration at ¶ 28.
[14] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶¶ 27 and 96-102. See also 12/4/24 Hsu Declaration at ¶¶ 3-4.

the Debtors' three Dutch subsidiaries[15]; and (e) executed an improper return of Stream's most valuable tangible asset, the optical bonding equipment, by transferring possession to a non-debtor subsidiary which – under the control of SeeCubic CEO Stastney – refused to surrender the property to Stream during the pendency of these Bankruptcy Cases[16].

SeeCubic attempted to sell the Debtors' assets rather than return them to the Debtors, engaging an investment banker to conduct a UCC Article 9 sale of the assets. The sale was stopped only by injunctive relief and a subsequent status quo order[17].

SeeCubic was found in contempt of court[18] for returning the shares of Technovative stock to Stream while simultaneously coordinating with Stream's secured lender to seize immediate control by appointing SeeCubic CEO Stastney director of Technovative through purported proxy rights, violating the spirit of the Chancery Court's order that Stream was entitled to possess its assets and recommence business in an effort to satisfy its creditors.

---

[15] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶¶ 45, 47-52, 54, and 103.
[16] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶¶ 59 and 86-87.
[17] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶¶ 23-24 and 37.
[18] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶¶ 31-32 and 92.

27

SeeCubic exercised influence wherever possible to ensure that the Debtors'
technology was used to develop SeeCubic customer relationships in competition
with, and to the detriment of, the Debtors.[19]

SeeCubic attempted to register a trademark belonging the Debtors during the
pendency of these Bankruptcy Cases, and even during the pendency of the
Adversary Case[20].

Despite a Bankruptcy TRO in effect since January 4, 2024 and extended on
multiple occasions – most recently until January 13, 2025[21] – SeeCubic continuously
and publicly maintained six public websites stating that SeeCubic is the owner of
the Debtors' technology[22].

As described above, there are many reasons why the Proposed Purchaser
cannot receive "good faith" purchaser status. But the absence of any evidence at all
in support of a "good faith" designation rings the death nell to conferring such relief:

    i.    There was no evidence of "good faith" offered by the Trustee or Proposed
Purchaser at the December 4, 2024 sale hearing;

    ii.    There was no evidence of "good faith" offered by the Trustee or Proposed
Purchaser at the November 13, 2024 hearing on the bid procedures
(because it was not an evidentiary hearing, and nothing was submitted by
any party in support of a "good faith" finding);

---

[19] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶¶ 38, 51, and 61.

[20] See Adversary Case 23-00057-amc, Debtors' Exhibit 71. See also **Exhibit E**, 11/27/23 Hearing Transcript at 53:1-57:18.

[21] Adversary Case 23-00057-amc, ECF 157.

[22] See **Exhibit D,** 11/22/24 Robertson Declaration at ¶ 107.

   iii.    The order entered by the Bankruptcy Court approving the bid procedures was entered without any evidence, and nevertheless made "good faith" findings regarding the proposed sale transaction;

   iv.    As described herein, SeeCubic, Inc., Shadron Stastney, and Hawk have all engaged in TRO violations, stay violations, and other inequitable conduct making them ineligible for "good faith" purchaser status;

   v.    Stastney & SeeCubic, Inc. misappropriated and systematically exercised dominion and control over the Debtors' assets, and thus the "transfer" of assets occurring through the proposed 363 sale is simply a transfer of title.[23]

The Bankruptcy Court failed to examine whether or not the Proposed Purchaser was a "good faith" purchaser, despite clear evidence that the Proposed Purchaser was not, and over repeated cries from Petitioners to do so. Thus, the Bankruptcy Court was clearly erroneous.

In addition to the above defects with respect to "good faith" purchaser status, there are extensive defects regarding section 363(f) of the Bankruptcy Code, namely that the assets cannot be sold "free and clear". As an initial matter, in the asset purchase agreement proposed by the Trustee, the Trustee proposes to sell all assets of the Debtors' estates (with minor exceptions), but then ignores the fact that Rembrandt's property is embedded within the StreamTV estate property he purports

---

[23] Stastney, SeeCubic, and Hawk failed to testify or otherwise submit evidence of good faith. The Bankruptcy Court denied any and all efforts to adduce evidence regarding SeeCubic and Stastney's bad faith. The Bankruptcy Court Proceeding record establishes that there is cause to believe that Stastney, SeeCubic, Inc., and Hawk engaged in conduct that (i) violated applicable DE state court orders, (ii) violated the automatic stay, (iii) violated the Bankruptcy Court's December 2023 World-wide Stay, and (iv) violated the Bankruptcy Court's TRO with respect to StreamTV estate property.

to sell – this is illegal, contrary to controlling legal authority[24], and does not qualify

under any of the statutory sections set forth in 363(f). Further, the Trustee has

offered no evidence that such proposed 363(f)[25] sale qualifies under any of that Code

section's statutory provisions: (i) there was no evidence in either the Trustee's

declaration or the investment banker's declaration that the assets being sold as part

of the 363 sale were property of the Debtors' estates and had no encumbrances by

any other party (such as trade secrets and patent licensors, Rembrandt or Philips);

and (ii) there was no evidence at the December 4, 2024 sale hearing that the Trustee

had any meaningful understanding of the Debtors' assets that the Trustee was

purporting to "sell", let alone an understanding for how those assets may be

encumbered. Indeed, the limited cross-examination opportunity afforded by the

Court demonstrated that the Trustee was not aware of and did not investigate assets

in California that were being transferred despite containing non-estate property

(specifically Rembrandt's trade secrets and other IP contained within the StreamTV

production code housed on the California-based servers).[26] Moreover, the limited

cross-examination established that the Trustee falsely asserts that the only asset

---

[24] *See e.g. In re Whitehall Jewelers Holdings, Inc.,* Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008); *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin),* 2008 WL 2498048(3d Cir. June 24, 2008)
[25] Section 363(f) of the Bankruptcy Code authorizes a trustee or DIP to sell property "free and clear of any interest in such property of an entity other than the estate," but only if: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in *bona fide* dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f). As discussed herein, none of these elements are met.
[26] See December 4. 2024 hearing transcript page 38, line 3 – 7.

being transferred by StreamTV is the bonding machine (notwithstanding evidence that SeeCubic, Inc. and Shad Stastney previously stole and continue to possess property of the estate (e.g. TVs, tablets, and source code).[27] [28]

## II.    A WRIT OF PROHIBITION SHOULD ISSUE.

The requirements for a writ of prohibition are similar to those for mandamus. A Writ of Prohibition involves a proceeding between an inferior court and a superior court, as a result of which the superior court exercises control to prevent the inferior court from exceeding the limits of its powers and jurisdiction." *Yohn,* 76 F.3d at 521. *Title 42 Pa.R.A.P. Rule 3307* outlines the method by which a party seeking a writ of prohibition must comply.  In order for the Writ of Prohibition to be granted, the party seeking such relief must satisfy a two-pronged test established in *Carpentertown Coal and Coke Co., et. al. v. Laird,* 61 A.2d 426 (Pa. 1948). First, there must be no adequate remedy at law; second, there must be extreme necessity for the relief requested to secure an order and regularity in the judicial process. *Larsen v. Kaufman,* 579 A.2d 1302, 1307 (Pa. 1990), citing *Carpentertown, supra.* These elements are clearly met here, for the reasons discussed below.

A petitioner seeking a writ of prohibition must demonstrate that: "(1) no other adequate means exist to attain the relief [s]he desires, (2) the party's right to issuance

---

[27] See December 4. 2024 hearing transcript page 28, line 9 – 18

[28] See 11/22/24 Robertson Declaration attached hereto as **Exhibit D**, at ¶¶ 12, 15-16, 18, 105-106, 111-114, and 117.

79079341;4

of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010) (internal quotations omitted).

A court may issue a writ of prohibition where a lower court has "assumed jurisdiction of a matter beyond its legal cognizance." *Smith v. Whitney*, 116 U.S. 167, 176, 29 L. Ed. 601, 6 S. Ct. 570, 574 (1886). The writ should not be issued when the plaintiff has an adequate alternative remedy. *See In re Centrotextil*, 620 F.2d 690, 691 (8th Cir. 1980). The writ of prohibition, like the writ of mandamus, is an extraordinary writ, and the power to issue it should be "sparingly exercised." *See Parr v. United States*, 351 U.S. 513, 520, 100 L. Ed. 1377, 76 S. Ct. 912, 916(1956).  Stated differently, a writ of prohibition may be issued to (i) prevent a lower court from interfering with the higher court's determination of a case pending appeal, (ii) prohibit a lower court from issuing orders in matters over which the lower court has no jurisdiction.

The case at bar is clearly a good candidate for the writ of prohibition: First, if the District Court issues the relief requested herein with respect to the stay pending appeal, then the District Court will hear Petitioners' arguments as described herein, and thus the Bankruptcy Court should be prohibited from entering the Sale Order. This is simply intuitive, as one proceeding should bar the other.

Further, as described herein at length, the Bankruptcy Court does not have the authority to authorize the transfer of assets that do not constitute property of the estate under section 541 of the Bankruptcy Code. A writ of prohibition is appropriate when "the proceedings of any tribunal, corporation, board or person exercising judicial functions. . . . are without or in excess of the jurisdiction of such tribunal, corporation, board or person." *Alper v. Eighth Judicial Dist. Court of Nev.*, 131 Nev. 430, 433, 352 P.3d 28, 30 (2015); *Lawrence v. United States Bankr. Court,* 153 F. App'x 552, 554 (11th Cir. 2005) (A writ of prohibition "affords an expeditious and effective means of confining an inferior court to a lawful exercise of its prescribed jurisdiction or compelling a court to exercise its authority"); *Williams v. Minnesota*, No. 24-cv-2548 (NEB/DJF), 2024 U.S. Dist. LEXIS 181871, at *2 (D. Minn. Aug. 8, 2024), citing *State of Missouri v. United States Bankruptcy Court for the E.D. of Ark.*, 647 F.2d 768, 770 n.3 (8th Cir. 1981) (citing *Ex Parte Republic of Peru*, 318 U.S. 578, 583, 63 S. Ct. 793, 87 L. Ed. 1014 (1943)). Specifically here, the Bankruptcy Court does not possess the authority to transfer Rembrandt's intellectual property (trade secrets and patent-protected technology) embedded in the Debtors' source code, production code, and other physical assets (e.g. TVs, tablets, phones, and computer servers).

As described at length herein and in Petitioners' pleadings, a debtor (or in this case, the Trustee), may not sell property unless that property constitutes property of

the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must *first* determine whether the property the debtor proposes to sell constitutes property of the estate. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. B.A.P. 2001)).  Moreover, the Bankruptcy Court could not determine whether the assets he plans to sell are (i) property of the estate or (ii) Rembrandt's intellectual property incorporated into the  Debtor's technology through a simple contested matter (such as the contested Sale Motion). Rather that determination requires an adversary proceeding in order to afford the third-party non-debtor the full panoply of due process rights *in advance* of depriving them of their property through a court-ordered 363 sale.  See *Id.* (citing *In re SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)* 2008 WL 2498048 (3d Cir. June 24, 2008) at *12).  Accordingly, legal precedent, due process, and fundamental fairness militate against permitting the Bankruptcy Court to enter the Sale Order, particularly upon the paucity of evidence on the record and in support of the Trustee's order.

## III.    THE COURT SHOULD STAY THE SALE ORDER PENDING APPEAL.

Ordinarily, a motion requesting a stay must be made in the bankruptcy court (Fed. R. Bankr. P. 8007(a)(1)). The movant may bypass the bankruptcy court only if "moving first in the bankruptcy court would be impracticable" (Fed. R. Bankr. P.

79079341;4

8007(b)(2)(A)). The circumstances of this case clearly meet this standard.  To make a showing of impracticability, it should be demonstrated that it "was not practicable to seek relief from the bankruptcy court" and require "a showing that . . .to be effective, relief must be immediate, and that based upon what occurred in the bankruptcy court, relief from it is improbable." *Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*, 504 B.R. 754, 761 (S.D.N.Y. 2014) (citing 10 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 8005.11, at 10-8005 (16th ed. 2013) (quotation marks and brackets omitted)). Here, the Bankruptcy Court has made it abundantly clear that the Sale Order is to be entered imminently, which order would make relief impossible.

In considering whether to grant a stay pending appeal, courts consider the following four factors: (1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest. *See, e.g., Republic of Phil. v. Westinghouse Electric Corp.,* 949 F.2d 653, 658 (3d Cir.1991); *In re Revel AC, Inc.,* 802 F.3d 558, 565 (3d Cir. 2015); *See also Nken v. Holder*, 556 U.S. 418, 426 (2009) (same).  In its decision in *Nken v. Holder,* the Supreme Court stated that the first two factors are "the most critical factors" to be considered, *Revel*, 802 F.3d at 568 (citing *Nken)*, but all four factors weigh in favor of a stay in the present case.

35

79079341;4

And there is a recognized hierarchy within the Supreme Court's two most critical factors. Courts "balance . . . and consider the relative strength of the four factors," while recognizing that the first factor, likelihood of success, is the most important one. *Revel*, 802 F.3d at 568. *See also* 16A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3954 (5th ed. 2024 update) ("The four factors should be balanced; thus, for example, if the balance of harms tips heavily enough in the stay applicant's favor then the showing of likelihood of success need not be as strong, and vice versa.").

### a.    Petitioners Have a High Likelihood of Success on the Merits

Beyond the fact that the Proposed Purchaser is not a "good faith" purchaser, as discussed at length herein, there are multiple other reasons why Petitioners have a high likelihood of success on the merits for a determination that the Sale Transaction cannot go forward.

This is because (a) the Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, a court must first determine whether such property constitutes property of the estates; (b) the 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved; and (c) the proposed sale process is neither fair nor reasonable and is subject to a heightened scrutiny standard.

36

1.    <u>The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates.</u>

The Bankruptcy Court has failed to address whether the assets were property of the estate, despite clear and plentiful evidence to the contrary. It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date. *Jones v. GE Capital Mortgage Co. (In re Jones)*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition") (*citing First Fid. Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case continue in bankruptcy -- no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019) (recognizing the "general bankruptcy rule [that] the estate cannot possess anything more than the debtor itself did outside bankruptcy" and that "[a] debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.").

A debtor (or in this case, the Trustee), may not sell property unless that property constitutes property of the debtor's bankruptcy estate and, before approving

a sale, the bankruptcy court must determine whether the property the debtor proposes

to sell constitutes property of the estate – *in an adversary proceeding, not a contested*

*matter. In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL

2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*,

266 B.R. 163, 172 (9th Cir. B.A.P. 2001)).

This is Third Circuit law.[29] Bankruptcy courts have consistently made this

finding. *See also Anderson v. Conine (In re Robertson)*, 203 F.3d 855 (5th Cir. 2000)

(holding that Section 363(f) does not allow a trustee to sell property that is not

property of the estate); *In re Worcester Country Club Acres, LLC*, 655 B.R. 41, 47

(Bankr. D. Mass. 2023) (holding that because the ownership of the land was

disputed, it "must be adjudicated in order to determine if they are property of the

Debtor's bankruptcy estate, they cannot be sold under § 363(b) or (c) and pursuant

to § 363(f)(4) prior to a resolution of those issues."); *In re Coburn*, 250 B.R. 401,

403 (Bankr. M.D. Fla. 1999) (it was necessary to determine whether an asset was

property of the estate in order to then decide whether the trustee was entitled to sell

the asset pursuant to Section 363(f))); *Darby v. Zimmerman (In re Popp)*, 323 B.R.

260, 266 (B.A.P. 9th Cir.2005); *Fresh Prepared Foods, Inc. v. Farm Ridge Foods*

---

[29] *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin),* 2008 WL 2498048(3d Cir. June 24, 2008) at *1.
In *SLW Capital,* a debtor included a provision in the confirmed plan which invalidated a mortgage assignee's claim
for a secured interest. The Third Circuit held that lien invalidation can occur only through litigation in an adversary
proceeding which provides greater procedural protection and, therefore "the adversary proceeding Rule at issue here
is mandatory and establishes a right to specific process that must be afforded. Its mandatory nature is grounded in
principles of due process that trump `finality.'" *Id.* at *6.

*LLC*, 2013 WL 4804816, at *3 (D.N.J. Sept. 9, 2013) ("it is well-settled that a 'bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property"). A sale under Section 363 "cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate' . . . ." *In re Interiors of Yesterday, LLC*, Case No. 02-30356 (LMW) , 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007). *See also Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 605–06 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) (this Court "may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property."); *Ross v. A V Car & Home, LLC (In re Brown)*, Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr. D.C. Jan. 30, 2019) (court may not authorize sale of property where ownership of a portion of the property is in dispute).

Further, it is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4)).

39

The Trustee has not even attempted to meet that burden: In the December 4, 2024 hearing on the Sale Motion, VSI repeatedly asked the Trustee whether an extensive inventory had ever been conducted regarding the Debtors' assets and those that might belong to VSI.  The Trustee provided vague responses (*See e.g.* Hearing Transcript December 4, 2024 25:5-13 (Q: Did you ever do an inventory of the assets of Stream TV? A: Well, that was one of the issues in the case that is not typical in a Chapter 11 Trustee case. There were no operations and it was unclear at the time, and remains unclear, exactly which entities of Mr. Rajan's have possession of tangible assets, records, et cetera. So I don't believe Stream TV has certainly any significant tangible assets. And if they do, I  have not been aware -- made aware of them or know their location or who is in control of them.")). The Trustee mischaracterizes "*as is, where is*" to absolve himself of his obligations to the estate. "As is, where is" describes the assets condition, not the estate's title or the Trustee's authority to convey.

The Bankruptcy Court also failed to address whether the assets were property of the estate, despite clear evidence to the contrary. In fact, it is evident that, as described herein, the trustee is attempting to sell the assets on an "as-is, where-is" basis, without understanding (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used and continue to use, (iii) if the Hawk Parties will turn over the Debtors' property to a

40

successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to the Proposed Purchaser has been completed.

Despite all the evidence to the contrary, the Bankruptcy Court failed to properly address whether the property is that of the Debtors' estates under section 541 of the Bankruptcy Code.  In fact, faced with this issue at the December 4, 2024 hearing, , the Bankruptcy Court repeatedly stated that the inquiry was not "relevant." *See e.g.* Hearing Transcript December 4, 2024 38:3-24 (when cross-examining the Trustee about certain critical Debtor software assets (i.e. Stream production code embedded with Rembrandt source code house on servers in California), the Court interjected "Well, who cares? All that we care about are assets now. All right?" and went on to declare "you're talking about some servers from California.  I don't really understand how its relevant." Hearing Transcript December 4, 2024 40:10-12).

      2.    <u>The 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court.</u>

Further, it is evident that the sale transaction contemplated by the Sale Motion is sale that cannot be approved, as it clearly constitutes an impermissible *sub rosa* plan of reorganization that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent.

When a sale process and/or settlement in bankruptcy has the ultimate effect of dictating the terms of any future reorganization plan, the bankruptcy court must deem the transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. "The hallmark of such a plan is that it dictates the terms of a reorganization plan." E*nergy Future Holdings Corp. v. Del. Tr. Co*., 648 F. App'x 277 (3d Cir. 2016). This is because it "short circuits" the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

Thus, *sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted."). Where a settlement circumvents creditors' rights to vote on key provisions, that settlement can be said to dictate the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

This is precisely the circumstance of this case. The terms of the proposed sale process, as outlined in the 9019 Agreement and in the Sale Motion, clearly constitute

42

a *sub rosa* plan of reorganization. Among other things, the sale seeks to improperly channel consideration to specific creditor groups – as discussed herein, the Trustee has selected the Hawk Parties as the stalking horse and agreed to give them an allowed claim of $180 million, $150 million of which may be used as a credit bid. This is blatantly at the expense of the Debtors' other creditors – pursuant to the 9019 Agreement, $7,500,000 would be carved out to pay administrative and general unsecured creditors. Notably, if a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until Hawk's $180 million claim is paid in full. As such, it essentially ensures that the Debtors' unsecured creditors, and perhaps even administrative expense claimants, receive pennies on the dollar. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

Further, the Debtors impermissibly seek to use the 363 Sale to bind the Debtors' creditors to a treatment of their claims without having that proposed treatment tested by the standards of the Bankruptcy Code. Such a proposed sale cannot proceed. See, e.g., *In re Westpoint Stevens Inc.,* 333 B.R. 30, 52 (S.D.N.Y.

79079341;4

2005) ("Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved[.]"); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226-28 (5th Cir. 1986) (same).

Quite simply, a 363 sale is not a substitute for a plan of reorganization. *See Westpoint Stevens Inc.*, 333 B.R. at 52 (noting when a proposed transaction specifies terms for a reorganization plan, the parties and the court "must scale the hurdles erected in Chapter 11") (citation omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (The "trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization."); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (finding that section 363 does not permit a debtor to abrogate the protections afforded creditors by section 1129 and the plan confirmation process).

The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the interest of the estates, and not unfair to the creditors. The proposed sale fails each of these requirements.

        3.    <ins>The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard.</ins>

Petitioners have been repeatedly criticized in these Chapter 11 Cases for allegedly "making noise", yet this characterization fails to acknowledge the

underlying frustration borne from a sense of being ignored regarding clearly fatal flaws in this sale process. The proposed buyer is an insider with a well-documented history of misconduct relating to the assets proposed to be sold.  The Bankruptcy Court has failed to address the Proposed Purchaser's insider status.

SeeCubic is certainly an insider with respect to the Debtors. Indeed, SeeCubic has exerted an inordinate amount of control over the Debtors' assets and sale process, and has time and time again violated the automatic stay and the Bankruptcy TRO in place. Control of SeeCubic rests with Stastney, who was both Vice Chairman of the Board of Directors and Chief Financial Officer of Debtor Stream shortly before he orchestrated an asset takeover with the Hawk Parties through the invalidated Omnibus Agreement. Stastney had access to the Debtors' financials, sensitive customer information, investor database, and other critical data. He siphoned key personnel from the Debtors and ultimately used the Dutch court system to install himself as director of the Debtors' R&D subsidiary, a position he uses today to exert control over the Debtors' engineering development activities. *See Robertson Declaration* ¶¶ 7, 33, 54, attached hereto as **Exhibit D**.

Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp*

45

*Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders . . . the proposed sale is subject to heightened scrutiny.").

This heightened scrutiny also applies to a sale proposed by a trustee, rather than a debtor in possession. *In re Blixseth*, No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010). In *Blixseth*, the court refused to approve a sale of property as proposed by the trustee to a secured creditor credit-bid. The court found that the creditor had "very close ties to the debtor" and refused to apply the standard applicable to non-insider sales or to give deference to the trustee's business judgment. Instead, the court applied the more rigorous *Bidermann* standard for

46

evaluating insider transactions. As such, the court denied the bidding procedures proposed by the trustee. In applying heightened scrutiny, courts are concerned with "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

This transaction would not withstand heightened scrutiny. As in *Bidermann*, SeeCubic and the Hawk Parties clearly have "very close ties" to the Trustee. As detailed herein and in the SSG Objection, the Hawk Parties have a long history of improperly possessing the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this Court's orders, specifically including the TRO that in effect through November 12, 2024. If this Court were to examine "the integrity and entire fairness of the transaction at issue" it could not reasonably conclude that this transaction was acceptable.

The Bankruptcy Court did not apply a heightened scrutiny standard in examining the transaction, and has not considered these arguments in the Bankruptcy Court Proceedings.

### b. Petitioners will Suffer Irreparable Harm if Enforcement of the Sale Order is Not Stayed Pending Appeal

Because likelihood of success - the most important of the factors - is strong, the other interests that this court must balance are less important. *Revel*, *Wright &*

47

*Miller*, 802 F.3d at 568. Nevertheless, the other three factors also support a stay. Absent a stay, Petitioners will be irreparably harmed by the Sale Transaction and the related deprivation of their procedural and due process rights.

Allowing the sale process to go forward would be devastating to Petitioners. Although Section 363 of the Bankruptcy Code allows a debtor to sell its bankruptcy assets free and clear of liens and interests, that privilege exists only if certain circumstances are met. In a case with facts similar to those at bar, *In re DeCurtis Holdings LLC,* the United States Bankruptcy Court for the District of Delaware ultimately enjoined the sale and use of the assets by the debtor, finding that the sale would result in irreparable harm to the objecting entity and money damages would not compensate for the harm. *In re DeCurtis Holdings*, 2023 WL 5153645, at *22; 11 U.S.C. § 363 (f) (providing "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest"; where on a debtor's motion to sell assets pursuant to section 363 of the Bankruptcy Code, a permanent injunction was found to be appropriate to prohibit the debtor's sale, disclosure, or use of the  information incorporated into the assets because misappropriation of confidential business information could cause irreparable harm, as could violation of a restrictive covenant, loss of control over reputation, and loss of goodwill.)

Injury that "cannot be undone through monetary remedies" is irreparable. *Boggs Contracting, Inc. v. Freismuth*, 2021 U.S. Dist. LEXIS 252335, at *9 (M.D. Fla. Dec. 27, 2021). Here, the Hawk Parties' conduct caused and continues to cause several "hard-to-measure harms, such as impaired goodwill and competitive position, that can justify injunctions." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1331 (Fed. Cir. 2018).

As a primary matter, an owner's "loss of control over its intellectual property rights" is a prototypical form of irreparable harm. *E.g., Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, 2023 U.S. Dist. LEXIS 25025, at *12 (M.D. Fla. Feb. 14, 2023). "The right to exclude competitors from using one's property rights is important," and "the need to protect this exclusivity" warrants an injunction. *E.g., Apple Inc. v. Samsung Elecs. Co*., 809 F.3d 633, 642 (Fed. Cir. 2015); *accord News Am. Mktg. In-Store, LLC v. Emmel*, 429 F. App'x 851, 853 (11th Cir. 2011) (unpublished) (permanent injunction barring defendant from any further disclosures of confidential information); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, 2012 U.S. Dist. LEXIS 200492, at *31-32 (S.D. Fla. 2012) ("some form of permanent injunction is appropriate with regard to [defendant's] use of Plaintis' Confidential Information").

Further, the injury to competitiveness caused by misappropriation of valuable confidential information is a classic form of irreparable harm, as such injury cannot

49

be reversed or repaired. *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) ("lost opportunity to compete on a level playing field" found sufficient to prove irreparable harm).

### c. A Stay Pending Appeal Would Not Substantially Harm Other Parties with an Interest in the Litigation

The harm to other persons consists of an inability to carry out the Sale Transaction in the precise manner in which it was designed by the Trustee, to the Hawk Parties' sole benefit. The Debtors themselves are arguably are not harmed by the stay pending appeal, and may ultimately benefit.  The Trustee designed the sale process to benefit just the Hawk Parties, in contravention with his mandate to maximize the benefits to the Debtors and their estates. As discussed above, the sale transaction as contemplated in the sale motion would be harmful to other parties in interest, including the Debtors and their creditors.

### d. A Stay Pending Appeal is in the Public Interest

There is public interest in the finality of proceedings in the bankruptcy court as all courts. But there is an equal public interest in resolution of material disputed issues of law that can cause irreparable injury to the parties before that irreparable injury occurs.

Beyond these general public interest concerns, there is the fact that the proposed sale transaction is clearly against the public interest: the sale process contemplated by the Sale Motion disproportionately benefits the Proposed Purchaser

50

at the expense of all other stakeholders. The proposed Sale Motion results in the Debtors' assets being unjustly distributed to the Hawk Parties, in blatant contravention of the primary goal of maximizing recoveries for all creditors. As described herein, the sale process as contemplated  was inappropriate on its face. The insider stalking horse bidder should not have been permitted to credit bid given the facts and circumstances of these cases and the disputes surrounding the legitimacy of its claims. This is wholly inequitable to legitimate creditors and constitutes "cause" to deny credit bidding rights.

Finally, a stay is in the public interest because it affords comfort and confidence that the nation's bankruptcy courts are courts of law, that procedural and substantive due process are always required, that evidence matters, and that mistakes, misjudgments, and injustice can be remedied – even if and when speed and finality are important.  Unsecured creditors in this case and future litigants confronting these issues will have the assurance that they and their claims will not become casualties of unsafe haste toward flawed but "final" judgments borne primarily of convenience for a favored few.

e.    **The Court Should Not Require a Bond Pending the Appeal**

Bankruptcy Rule 8007 refers twice to a bond pending appeal.  Subsection (a), which addresses initial motions to the bankruptcy court, states that the items of relief a movant must seek includes "the approval of a bond or other security provided to

51

obtain a stay of judgment."  Subsection (c), however, which addresses motions in a

higher court, states:  "The district court, BAP, or court of appeals *may* condition

relief on filing a bond or other security with the bankruptcy court" (emphasis added).

Use of the word "may" indicates that a bond is not mandatory; the same is true when

the motion is made in the bankruptcy court.  *In re Sindesmos Hellinikes-Kinotitos of*

*Chicago*, 607 B.R. 898, 913 (N.D. Ill. 2019) (under Bankruptcy Rule 8007, "bonds

on stays pending bankruptcy appeals are discretionary" and "are not mandatory").

Even if a bond were mandatory, or the Court deemed that Petitioners should

provide a bond, the amount of the bond is also subject to the court's discretion, and

can be in a small or *de minimis* amount.  Given the strong likelihood of success on

the merits and the balancing of the other factors relevant to a stay discussed above

(particularly the deprivation of meaningful due process throughout the proceeding),

Petitioners respectfully ask that the Court dispense with a bond requirement in this

case or, alternatively, that the Court set a small or *de minimis* amount for a bond.

## IV.    THE REFERENCE SHOULD BE WITHDRAWN.

### a.    Withdrawal of the Reference is Mandatory Under 28 U.S.C. § 157(d)

Under 28 U.S.C. § 1334(b), district courts have original but *not exclusive*

jurisdiction of "all civil proceedings arising under title 11, or arising in or related to

cases under title 11."  *See* 28 U.S.C. § 1334(b).  Each district court may, however,

"provide that any or all cases under title 11 and any or all proceedings arising under

title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." *See* 28 U.S.C. § 157(a). Further, pursuant to Rule 5011(c) of Bankruptcy Rules, under which district judges may stay proceedings pending disposition of a motion to withdraw the reference "on such terms and conditions as the judge deems proper."

However, under 28 U.S.C. § 157(d), the reference must be withdrawn "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." In either case, the District Court hears the motion for withdrawal of the reference. *See* Fed. R. Bankr. P. 5011(a) ("A motion for withdrawal of a case or proceeding shall be heard by a district judge."); *see also* Fed R. Bankr. P. 5011, advisory committee's note ("The withdrawal decision is committed exclusively to the district court."); Local Bankruptcy Rule 5011-1 (motion for withdrawal of the reference is first presented to the bankruptcy court for report and recommendation).

The majority of courts find withdrawal of the reference mandatory when a claim or defense entails "material and substantial consideration" of non-Bankruptcy Code federal law. *Rodriguez v. Countrywide Home Loans, Inc.*, 421 B.R. 341, 348 (S.D. Tex. 2009) (collecting cases). To find that a claim "involves 'substantial and material consideration' of non-bankruptcy federal law, the court must find the claim

79079341;4

will involve an interpretation of the federal law rather than the mere application of well-settled law." *Id.* (citing *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996)).

Petitioners submit that (i) withdrawal of the reference is *mandatory* under 28 U.S.C. § 157(d) because the proceedings will involve substantial and material consideration of non-bankruptcy federal law (including law relating to due process and intellectual property) and (ii) in the alternative, the District Court should withdraw the reference under the discretionary standard of 28 U.S.C. § 157 because it is indisputably best suited to apply that non-bankruptcy law to the painstakingly litigated facts and related issues and to decide those issues as expeditiously and economically as possible.

With respect to the due process considerations raised, the denial of Petitioners' opportunity to present witnesses, seek discovery, conduct depositions, and otherwise build an evidentiary record constitutes a violation of several key procedural rights under both state and federal law. In addition to the Bankruptcy Court's limitation of Petitioners' cross-examination and refusal to hear from Petitioners' witnesses at the Sale Hearing, as described herein, the Bankruptcy Court has denied Petitioners any form of discovery whatsoever.

On June 16, 2024, Akerman LLP filed a Notice of Appearance as counsel for VSI and promptly filed an Objection to the Motion for Turnover [ECF No. 672 in

the Bankruptcy Court Proceedings] (the "**Objection to Turnover**") and a Motion to

Reconsider the order granting the 9019 Agreement [ECF No. 686 in the Bankruptcy

Court Proceedings] (the "**Motion to Reconsider**").

On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum

on the Trustee concerning the issues raised in the Objection to Turnover and Motion

to Reconsider (the "**Original Discovery Requests**").    Among other things, the

Original Discovery Requests sought information regarding exhibits to the Trustee's

Motion for Turnover that were clearly altered and representations that were

demonstrably false and misleading.    Rather than account for the altered exhibit

documents and misleading statements in his Motion for Turnover, the Trustee moved

to quash the Original Discovery Requests, sought entry of a protective order, and

moved to withdraw the offensive Motion for Turnover without prejudice [see ECF

No. 724 in the Bankruptcy Court Proceedings].

On September 30, 2024, the Bankruptcy Court entered the *Order Granting*

*Motion to Withdraw Turnover Action* [ECF No. 776 in the Bankruptcy Court

Proceedings]. The same day, the Bankruptcy Court entered the *Order Granting*

*Motion to Quash* [ECF No. 777 in the Bankruptcy Court Proceedings].    More

recently, at the hearing on November 14, 2024, the Bankruptcy Court entered an

order [ECF No. 805 in the Bankruptcy Court Proceedings] denying the

reconsideration motion and granting the motion to quash remaining discovery,

including discovery relating to the sale process. Effectively, taken together, these orders have completely denied Petitioners any form of discovery, including with respect to the sale process.

At the federal level, these violations implicate the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution, which guarantee the right to a fair hearing and an opportunity to be heard. Specifically, the failure to allow discovery or to present witnesses contravenes Federal Rule of Civil Procedure 26, which guarantees parties the right to obtain discovery regarding any non-privileged matter relevant to the subject matter of the action. Additionally, Federal Rule of Civil Procedure 30 and Rule 32 protect a party's right to take depositions as a means of preserving testimony and building an evidentiary record. The deprivation of these rights also violates the right to a fair trial under the Sixth Amendment, as it denies a party the opportunity to present their case fully. Consequently, the deprivation of Petitioners' due process, as described herein, clearly violate non governing fair procedural practice and due process.

Further, with respect to issues relating to intellectual property, case law supports withdrawal of the reference. *See, e.g., Eli Global, LLC v. Univ. Directories, LLC,* 532 B.R. 249, 252-53 (M.D.N.C. 2015) ("The resolution of Defendant Debtors' trademark infringement claim will require significant consideration of non-Title 11 federal law."); *In re McCrory Corp.,* 160 B.R. 502, 505-07 (S.D.N.Y. 1993)

56

(finding both mandatory and discretionary withdrawal appropriate because "it would be economically and administratively prudent for a district judge, experienced in trademark law, rather than a bankruptcy judge to handle these matters"; transferring the proceedings to another district court).

**b.** **In the Alternative, the District Court Should Withdraw the <u>Reference Under the Discretionary Standard of Section 157</u>**

In the event the District Court declines to order withdrawal of the reference under the mandatory provision in 28 U.S.C. § 157(d), Petitioners request the District Court order withdrawal under the discretionary provision.

## CONCLUSION

For the foregoing reasons, this Court should grant the relief requested herein, and request the court permit the expanded word count in light of the unique circumstances at bar.

Dated:        December 9, 2024            Respectfully submitted,


                                          */s/ Donald N. David*
                                          Donald N. David, SBN: 304846
                                          Mark S. Lichtenstein
                                          AKERMAN LLP
                                          1251 Avenue of the Americas
                                          37th Floor
                                          New York, NY 10020
                                          Telephone: (212) 880-3800
                                          Facsimile: (212) 880-8965
                                          Email: donald.david@akerman.com
                                                 mark.lichtenstein@akerman.com
                                          -and-

R. Adam Swick (Admitted *Pro Hac Vice*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson *(Admitted Pro Hac Vice)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor, Inc.*

**- and -**

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

- and –

*/s/ Chris Michaels*
Chris Michaels, Esq.
michaels@bpmlegal.com
Brown & Michaels, PC
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850

58

*Attorneys for Rembrandt 3D Holding Ltd.*

79079341;4

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

Dated:          December 9, 2024          Respectfully submitted,


                                          */s/ R. Adam Swick*
                                          Donald N. David, SBN: 304846
                                          Mark Lichtenstein (Admitted *Pro Hac Vice*)
                                          AKERMAN LLP
                                          1251 Avenue of the Americas
                                          37th Floor
                                          New York, NY 10020
                                          Telephone: (212) 880-3800
                                          Facsimile: (212) 880-8965
                                          Email: donald.david@akerman.com
                                                 mark.lichtenstein@akerman.com
                                          -and-

                                          R. Adam Swick (*Pro Hac Vice to be applied
                                          f)*
                                          AKERMAN LLP
                                          500 West 5th Street, Suite 1210
                                          Austin, TX 78701
                                          Telephone: (737) 999-7103
                                          Facsimile:   (512) 623-6701
                                          Email: adam.swick@akerman.com

                                          -and-

                                          John H. Thompson (Admitted *Pro Hac Vice*)
                                          AKERMAN LLP
                                          750 Ninth Street, N.W. 750

79079341;4

Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

- and -

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

- and –

*/s/ Chris Michaels*
Chris Michaels, Esq.
michaels@bpmlegal.com
Brown & Michaels, PC
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850

*Attorneys for Rembrandt 3D Holding Ltd.*

79079341;4

# CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 21(a)(2), I hereby certify that

on December 9, 2024, I dispatched a copy of the foregoing Petition by Federal

Express to be served on the Bankruptcy Court judge at the address below and served

a copy of the same on the below counsel of record via electronic mail:

> Chief Judge Ashely M. Chan
> United States Bankruptcy Court Judge
> for the Eastern District of Pennsylvania
> Robert N.C. Nix Sr. Federal Courthouse
> 900 Market Street, Suite 204
> Philadelphia, PA 19107
> (215) 408-2830

Dated:        December 9, 2024            Respectfully submitted,

> /s/ R. Adam Swick
> Donald N. David, SBN: 304846
> Mark Lichtenstein (Admitted *Pro Hac Vice*)
> AKERMAN LLP
> 1251 Avenue of the Americas
> 37th Floor
> New York, NY 10020
> Telephone: (212) 880-3800
> Facsimile: (212) 880-8965
> Email: donald.david@akerman.com
>        mark.lichtenstein@akerman.com
> -and-
>
> R. Adam Swick (Admitted *Pro Hac Vice*)
> AKERMAN LLP
> 500 West 5th Street, Suite 1210
> Austin, TX 78701
> Telephone: (737) 999-7103
> Facsimile:   (512) 623-6701
> Email: adam.swick@akerman.com

-and-

John H. Thompson *(Admitted Pro Hac Vice)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor, Inc.*

- and -

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

- and –

*/s/ Chris Michaels*
Chris Michaels, Esq.
michaels@bpmlegal.com
Brown & Michaels, PC
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850

*Attorneys for Rembrandt 3D Holding Ltd.*

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

## <u>STIPULATED ORDER RESTATING AND ENFORCING THE WORLDWIDE AUTOMATIC STAY</u>

 Upon consideration of the *Emergency Motion for Entry of an Order Enforcing the Automatic Stay and for Sanctions for Willful Stay Violation* (D.I. 49) and *Additional Supplement to Debtors' Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations* (D.I. 458) and the *Supplement* filed November 8, 2023, filed by Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession (collectively, "Debtors"); this Court having jurisdiction with respect to Stream to consider the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334 and the

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (…4092) and Technovative Media, Inc. (…5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

132238519.1
317213620.1

*Amended Standing Order of Reference of the United States District Court for the Eastern District*

*of Pennsylvania*, dated November 8, 1990; and this Court being able to issue a final order

consistent with Article III of the United States Constitution; and venue of the Stream chapter 11

case and venue of the Stream chapter 11 case in this district being proper pursuant to 28 U.S.C. §§

1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and by

agreement of the parties which obviated the need for a hearing; and after due deliberation and

sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT**:

Pursuant to Section 362, 365, 525, and 541 of the Bankruptcy Code, and subject to the exceptions

to the automatic stay contained in the Bankruptcy Code section (including section 362(b)) and the

right of any party in interest to seek relief from the automatic stay in accordance with Bankruptcy

Code section 362(d), pursuant to Section 362 of the Bankruptcy Code:

(a)    The filing of a petition under the Bankruptcy Code on the petition date,

March 15, 2023, operated as a stay, applicable to all entities,[2] on the following:

> (1)    the commencement or continuation, including the issuance
> or employment of process, of a judicial, administrative, or other
> action or proceeding against the Debtors that was or could have been
> commenced before the commencement of these Chapter 11 cases,
> or to recover a claim against the Debtors that arose before the
> commencement of these Chapter 11 cases;

---

[2] "Entity" is defined in the Bankruptcy Code to include a person, estate, trust, governmental unit, and United States Trustee.  Bankruptcy Code section 101(15).  "Person," in turn, is defined in the Bankruptcy Code to include an individual, partnership, and corporation.  Bankruptcy Code section 101(41).

(2)      the enforcement, against the Debtors or against property of the Debtors' estates,[3] of a judgment obtained before the commencement of these Chapter 11 cases;

(3)      any act to obtain possession of property of the Debtors' estates or of property from the Debtors' estates or to exercise control over property of the Debtors' estates;

(4)      any act to create, perfect, or enforce any lien against property of the Debtors' estates;

(5)      any act to create, perfect, or enforce against property of the Debtors any lien to the extent that such lien secures a claim that arose before the commencement of these Chapter 11 cases;

(6)      any act to collect, assess, or recover a claim against the Debtors that arose before the commencement of these Chapter 11 cases;

(7)      the setoff of any debt owing to the Debtors that arose before the commencement of these Chapter 11 cases against any claim against the Debtors; and

(8)      the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a Debtor that is a corporation for a taxable period the bankruptcy court may determine.

(b)      The commencement of a bankruptcy case creates an estate.  Except as provided in Bankruptcy Code section 541(b) and (c)(2), such estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the bankruptcy case, wherever located and by whomever held.

(c)      Nothing in this Order is intended to, or shall, alter the provisions or modify

---

[3] As used herein, "estate" has the meaning set forth in Bankruptcy Code section 541.

the protections of the Bankruptcy Code, including Bankruptcy Code section 362, nor shall anything in this Order extend the stay to non-debtor property or property that is not property of the Debtors' estates, or determine whether any property is or is not property of the Debtors' estates. Nothing herein shall constitute a determination regarding any pending motions or proceedings (including motions for relief from, or seeking to enforce, the automatic stay) or grant of any injunction or injunctive relief requested or currently pending before the Court, nor shall anything herein constitute a determination whether or not a stay violation has or has not occurred.

(d)     Entry of this Order shall not affect the exceptions to the automatic stay contained in section 362 (including section 362(b)) of the Bankruptcy Code or the right of any party in interest to seek relief from the automatic stay in accordance with section 362(d) of the Bankruptcy Code or the right of any party in interest to assert any rights under 362(e) of the Bankruptcy Code.  This Order is intended to be declarative of and coterminous with, and shall neither abridge, enlarge nor modify, the rights and obligations of any party under sections 362 (including 362(e)), 365, 525, and 541 of the Bankruptcy Code or any other provision of the Bankruptcy Code.  Nothing here constitutes a waiver by any party interest of any rights or defenses under any such sections.

(e)     This Order does not constitute an anti-suit injunction of any pending action brought under the laws of any foreign jurisdiction or any future action directed by such a court or brought before such a court; the parties' rights with respect to such matters are fully reserved, including as to the subject of matters and proceedings currently pending before this Court.

(f)     In accordance with the Bankruptcy Code, the Bankruptcy Rules, and applicable law, upon request of a party in interest, and after notice and a hearing, this Court may grant relief from the restraints imposed herein in the event that is necessary, appropriate, and

warranted to terminate, annul, modify, or condition the injunctive relief herein. To the extent the

stay has been terminated with respect to a party in interest in accordance with the Bankruptcy

Code, the Bankruptcy Rules, and applicable law, nothing herein shall affect that termination.

      (g)    Nothing herein shall constitute a determination that this Court has

jurisdiction over any party.

      (h)    The Debtors are authorized and empowered, but not directed, to serve, and

may use reasonable methods of providing notice of this Order, such as, and including but not

limited to, publication, certified and non-certified mail service.

Dated:  December 14th, 2023

MAGDELINE D. COLEMAN
United States Bankruptcy Judge

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                      :
IN RE:                                : Case No.  23-10763-amc
                                      :
STREAM TV NETWORKS, INC.  CH: 11 :
AND NETWORKS, INC. AND                : Philadelphia, Pennsylvania
TECHNOVATIVE MEDIA, INC.              : December 4, 2024
                                      : 12:53 p.m.
. . . . . . . . . . . . . . . . . . . :
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Chapter 11 Trustee:    Michael D. Vagnoni, Esq.
                               Edmond M. George, Esq.
                               Obermayer Rebmann Maxwell &
                               Hippel LLP
                               Centre Square West
                               1500 Market Street, Suite 3400
                               Philadelphia, PA 19102
                               215-665-3066

                               Steven M. Coren, Esq.
                               Kaufman Coren & Ress, P.C.
                               Two Commerce Square
                               Suite 3900
                               2001 Market Street
                               Philadelphia, PA 19103-2713
                               215-735-8700

For Visual Semiconductor,      John H. Thompson. Esq.
Inc.:                          Akerman
                               750 Ninth Street, N.W.
                               Washington, D.C. 20001
                               202-824-1760

                               R. Adam Swick, Esq.
                               Akerman
                               500 West 5th Street, Suite 1210
                               Austin, TX 8701
                               737-999-7103

```
For Rembrandt:              Andrew Peter Demarco
                            Devlin Law Firm, LLC
                            1526 Gilpin Avenue
                            Wilmington, DE 19806
                            302-449-9010


For Leia Inc.:              Keri P. Ebeck
                            Michael Watters
                            Bernstein & Berkley, Attorneys
                            at Law
                            601 Grant Street, 9th Floor
                            Pittsburgh, PA 15219
                            412-456-8100


SeeCubic, Inc.:             Marley Brumme, Esq.
                            Skadden Arps Slate Meagher &
                            Flom, LLP
                            500 Boylston Street, 23rd Floor
                            Boston, MA 021116
                            617-573-4800


Also Appearing:             Rediah Braham
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

| | | | | |
|---|---|---|---|---|
| William Homony | | | | |
| (By Mr. Thompson) | 24 | | | |
| (By Mr. Michaels) | | 52 | | |
| J. Scott Victor | | | | |
| (By Mr. Swick) | 61 | | | |
| (By Mr. Vagnoni) | 71 | | | |

```
 1   DECEMBER 4, 2024                              12:53 P.M.

 2          THE COURT:  The 1:00 matter is the matter of Stream

 3   TV Networks.  It is a motion to approve a sale.

 4          I know we have several parties in the courtroom.  We

 5   will take their appearances first, and then we will go to the

 6   people on the phone.

 7          MR. GEORGE:  Good morning, Your Honor.  Ed, Edmond

 8   George.

 9          THE COURT:  It is afternoon.  I always say --

10          MR. GEORGE:  Good afternoon, Your Honor.

11          Edmond George and Michael Vagnoni from the Obermayer

12   firm on behalf of William Homony, the Chapter 11 Trustee.

13          MR. COREN:  Good afternoon, Your Honor.

14          Steve Coren, Special Counsel for the Trustee.

15          THE COURT:  Okay.

16          MR. THOMPSON:  Good afternoon, Your Honor.  John

17   Thompson, as well as my colleague, Adam Swick, from Akerman.

18   On behalf, excuse me, on behalf of VSI.

19          MR. DEMARCO:  Good morning, Your Honor.

20          Andrew DeMarco from the Devlin Law Firm, here on

21   behalf of Rembrandt, with my co-counsel, Chris Michaels, also

22   from Rembrandt.

23          THE COURT:  Sir, do you want to put your name of the

24   record?  Come on up to the podium.

25          MR. BRAHAM:  My name is Rediah Braham (phonetic).
```

Case 23-10763-amc 065Doc 934-1 DoFiled101/22/25 FileEnte4209122/25ate61:407:469 Desc
Exhibit A   Mandamus Petition   Page 90 of 541

5

```
 1    I'm a creditor from Stream TV.

 2              THE COURT:  Okay.

 3              MR. BRAHAM:  They owe me a lot of money.

 4              THE COURT:  Okay.

 5              MR. BRAHAM:  I'm a very poor guy.  I cannot afford to

 6    get --

 7              THE COURT:  Oh.

 8              MR. BRAHAM:  -- a lawyer or anybody.

 9              THE COURT:  Okay.

10              MR. BRAHAM:  But right now, Mathu is offering us 90

11    cents to a dollar.  I am very humbly requesting to kindly give

12    the company back to Mathu and let him pay everybody so we can

13    survive.

14              THE COURT:  Okay.

15              MR. BRAHAM:  I just wanted to say that.

16              THE COURT:  No problem.

17              MR. BRAHAM:  Thank you.

18              THE COURT:  Thanks for letting us know.

19              MR. BRAHAM:  Thank you.

20              THE COURT:  Okay.  All right.  So I thought perhaps

21    you would -- did you want to say something?  Pam is giving me a

22    look.

23              Yeah, go ahead.  What is your thought?

24              THE CLERK:  There might be people on the phone.

25              THE COURT:  Oh, I forgot.  I am sorry.  Yeah, people
```

1    on the phone.

2              Would you please put your appearance on?

3              MS. EBECK:  Good afternoon, Your Honor.  Keri Ebeck

4    on behalf of Leia Inc.  I also have my co-counsel Michael

5    Watters on the phone.  If any -- we are basically here to

6    listen, but if anything comes up, Mr. Watters will be handling.

7              THE COURT:  All right.  Thanks, Ms. Ebeck.

8              Anyone else on the phone?

9              Good.  Okay.  That was easy.

10             All right.  Mr. George, I thought perhaps you could

11   do a proffer.  Would you want to do a proffer?

12             MR. GEORGE:  I will, Your Honor.  DO you want to --

13             THE COURT:  Unless you guys --

14             All right.  Well, you do the proffering, and we will

15   see what they say.

16             MR. GEORGE:  Okay.

17             THE COURT:  Okay.

18             MR. GEORGE:  Your Honor, I will deal with the other

19   exhibits and things after I am done with the proffer.

20             We have two witnesses today, Mr. Homony who is the

21   Chapter 11 Trustee, and Mr. Victor.  They have both filed

22   declarations in this case which we have marked in our Exhibit

23   Book as 1 and 2.  We have asked that those be moved into the

24   record.

25             If called to the stand, Mr. Homony would testify

1   consistent with his declaration;

2          That he was retained as a Chapter 11 Trustee in this

3   case after the management was removed pursuant to a motion to

4   appoint a Chapter 11 Trustee;

5          That he retained SSG Capital advisors to conduct the

6   sale process for the assets;

7          That he has experience as a trustee in this vicinage;

8          That he had robust and good-faith negotiations with

9   Hawke and SLS that resulted in the Hawe settlement;

10          That he approved putting the Debtor's assets up for

11   sale;

12          He approved the stalking horse bid and designated the

13   stalking horse bidder as the successful or winning bidder,

14   there having been no parties expressing any interest in the

15   purchase of the assets, even following the subsequent and

16   additional teaser information that Your Honor directed at the

17   hearing on the bidding protections;

18          That his decision to sell was grounded in business

19   judgment based on the fact that when he took over the case,

20   there was no money in the case.  The Estates were

21   administratively insolvent.  The Estates have been in a

22   protracted fight with the secured creditors for a number of

23   years.  There had been three previous bankruptcies, two of

24   which were dismissed on the basis of bad faith;

25          That the Bankruptcy Court provided a very limited

1    extension of time within which the Trustee could find a

2    purchaser for the property, or for the assets;

3              That he applied to the Bankruptcy Court for an

4    extension of the automatic stay, and was given until July 15th

5    to effectuate the transfer or the settlement, with a July 15th

6    scheduled hearing date in the Delaware 225 action;

7              The Trustee made a decision that selling the assets

8    pursuant to the sharing and settlement agreement with Hawk was

9    in the best interest of the creditors;

10             That at the time, there was a lawsuit that gave the

11   secured creditors relief to go back to Delaware to redo the

12   Board of the Debtor's;

13             That there were no business activities, no workers,

14   no factory, no raw materials, no finished goods, no WIP, a

15   bonding machine that was palleted and located in China, and no

16   accounts receivable, as well as $3 million in purported

17   administrative expenses in favor of the Lewis Brisbois firm.

18             Accordingly, the Trustee, based on those factors,

19   made a decision to sell the assets of the property.

20             The Trustee did meet with and tried to work with Mr.

21   Rajan and VSI to entertain legitimate proposals from VSI to buy

22   or restructure the operations of the Debtor.  Neither VSI or

23   Mr. Rajan ever demonstrated a viable proposal that was

24   supported by a commitment of a financial nature that would

25   allow the Trustee to make a decision to make an arrangement

Case 2:23-cv-06528-PD Doc-9-34-1 Filed 01/22/25 Entered 01/22/25 16:41:46 Desc
Exhibit A    Mandamus Petition    Page 94 of 541

9

1  with Mr. Rajan or VSI.

2          That he requested VSI fund a DIP in order to fund

3  litigation in the case, which VSI failed to do, and the Trustee

4  eventually settled with Hawk.

5          And even after the Hawk settlement, the Trustee

6  continued to discuss potential acquisitions with the VSI

7  parties, so much so that he held off on filing the procedures

8  motion for about ten days while he continued to communicate

9  with the Hawk parties, or I mean the VSI parties, but within

10  that time, there was no proposal that was made;

11          That the Trustee authorized the sale motion and

12  procedures motions, that he reviewed the results of SSG's

13  efforts and believes that a robust and full marketing of the

14  assets have occurred.

15          He has reviewed the results of the sale process, and

16  having received no bids, has concluded in the exercise of

17  business judgment, that the stalking horse bid in the highest,

18  best, and only bid for the assets of the Estate.  And that was

19  all Mr. that Homony would testify.

20          THE COURT:  Okay. All right.  Did you gentlemen want

21  to respond to the proffer that was made?

22          MR. THOMPSON:  Well, Your Honor, on behalf of VSI, I

23  would object to the timing and sufficiency of the testimony

24  that has been put in by proffer.  But we will, of course, get

25  an opportunity to cross-examine both witnesses.

 1          I think there is a preliminary matter though, Your

 2   Honor, that I think we need to take up based upon these

 3   proffers and the declarations that were filed yesterday for

 4   something that was filed this morning, which was an amended

 5   order, form of order, for this sale.

 6          Your Honor, I guess, let me take the podium, because

 7   it is going to be a minute.

 8          THE COURT:  Okay.

 9          MR. THOMPSON:  Your Honor, I have been doing this a

10   while.  And to say that this is one of the more exceptional

11   last-minute orders I have seen would be putting it graciously.

12          This sale order demonstrably changes the terms of the

13   agreement, and ultimately, the sale, that this Trustee purports

14   to want to do with this stalking horse.  It bears very little

15   resemblance to what this Court approved in the 9019 sale or

16   9019 settlement agreement providing for a sale.

17          It includes unconstitutional releases, injunctions,

18   gatekeeper provisions, a whole ration of relief.  And it is all

19   being granted, I guess, at the 11th hour by the Trustee and

20   asking this Court to bless it, because this stalking horse

21   bidder will not go forward on the agreement that they struck in

22   May and ultimately had approved in June.  They have been

23   telling us for months and months as we tried to propose

24   alternatives and ask this Court to reconsider that 9019

25   settlement agreement.

Case 2:23-cv-06520-PC-3D-1   Document 1   Filed 01/22/25   Entered 09/04/22/25 16:41:4679   Desc
Exhibit A   Mandamus Petition   Page 96 of 541

11

1          It is not -- there is nothing we can do about it.  It

2    is too -- it is binding.  So if it is binding, it is also

3    binding upon the Hawk parties.  This stalking horse bidder came

4    to this process saying that they would abide by the agreement

5    that was struck in June and that this Court approved.  They are

6    not doing that.

7          This Trustee is now saying that because they might

8    back out and they will not agree without the Court blessing

9    this additional relief.  It is quite a red line.  Unless they

10   do that, excuse me --

11         THE COURT:  Let's listen to Mr. George.

12         MR. THOMPSON:  Unless they do that, this sale isn't

13   going through, at least that is what we read.  And I don't

14   think it is very complicated, Your Honor.

15         THE COURT:  Let's just drill down to the specifics.

16   The one provision of the revised sale order that I had a

17   question about was that all along, it was my understanding that

18   Hawk was taking the position that if I agreed to the sale, that

19   whatever litigation you may face by VSI and Rembrandt, you were

20   going to face.

21         But when I read the paragraphs 13, 14, and 15 of the

22   sale order, it sort of purports now to making me a gatekeeper

23   to any kind of litigation.  That was my understanding of that,

24   of those provisions.  And the concern I had about those

25   provisions are that I don't care to be that gatekeeper.  If I

1   do authorize the sale, then whatever litigation they may want

2   to bring, they are going to bring.

3          MR. GEORGE:  Well, Your Honor, first of all, let me

4   just say two things.  I think Mr. Thompson is a little over his

5   skis what he says that --

6          THE COURT:  All right.  Well, let's just assume

7   everyone is emotional.  I know, I mean, you guys are all going

8   to count, you know --

9          MR. GEORGE:  But that is just -- yeah.  But to say --

10         THE COURT:  -- paint the other person as, you know.

11         MR. GEORGE:  Understood.  But to say that there is

12  any indication that Hawk isn't going to close, it is just wrong

13  and improper.

14         THE COURT:  Well, but what they are saying is that --

15         MR. GEORGE:  It's a form of --

16         THE COURT:  -- what they are saying is that it is --

17  let's do this.  Let's not respond, and preferably, let's not

18  state things emotively.  All right?  So let's just take away

19  what he was saying.  He was saying that there are provisions in

20  there that are either unconstitutional, that there is a lot of

21  changes.  And I would have to agree with him, Mr. George, there

22  are a lot of changes.  We had to review these changes today.

23         MR. GEORGE:  Understood, Judge.

24         THE COURT:  But specifically, the point that I just

25  raised is something that is near and dear to their heart, that

Case 2:21-cr-00763-am-065208-PK34-1 Document 011/22/25 Filed 01/22/25 16:44:4679 Desc
Exhibit A   Mandamus Petition   Page 98 of 541

13

 1   they have been hopping mad since the beginning of time about

 2   what you guys want to do here with regard to their licensing

 3   rights.  And they do seem to want to sue someone.

 4          So I am not going to be the gatekeeper of that

 5   litigation.  I am not going to decide if something is

 6   meritorious.  So at this point, I am not really interested in

 7   making those revisions to the sale or that you suggested.

 8          So you could respond to that point.

 9          MR. GEORGE:  No, that is fair enough, Your Honor.

10   Because I think the Trustee's intention, and I think we have

11   said all along is that we are selling interests in these

12   downstream entities.  And if the parties on that side of the

13   table feel like they have claims, nothing we are doing is going

14   to change that because we don't own those downstream assets.

15          THE COURT:  Okay.  So reconcile what these new

16   paragraphs say though.

17          MR. GEORGE:  Well --

18          THE COURT:  These new paragraphs now say that I'm

19   supposed to be a gatekeeper.

20          MR. GEORGE:  -- sure.  I can work on this with the

21   counsel to Hawk, and maybe we can address that.

22          THE COURT:  Okay.

23          MR. COREN:  Thank you, Your Honor.  Yes.  We just

24   confirmed, their -- the litigation and the claims of SeeCubic

25   or of Rembrandt that are going on in the District of Delaware

1  right now, and any claim that intellectual property litigation

2  is going to move forward against the Debtors an assumed

3  liability under the asset purchase agreement, as is made clear

4  in the order.  That is not subject to the gatekeeper provision.

5  That is going to go forward and that litigation is going to be

6  able to move forward.  And if that needs to be made more clear

7  here, we absolutely will.

8          THE COURT:  Okay.  I just want to clarify that VSI

9  and Rembrandt are going to have the right to pursue all of

10  their arguments with regards to the infringements.  Okay?

11          MR. MICHAELS:  That is absolutely, correct, Your

12  Honor.

13          THE COURT:  And right now, I don't feel like that

14  language is clear.

15          MR. GEORGE:  Your Honor?

16          THE COURT:  Yeah?

17          MR. MICHAELS:  With respect --

18          MR. GEORGE:  Before Mr. Michaels starts --

19          THE COURT:  Uh-huh.

20          MR. GEORGE:  -- is he a witness or a lawyer?  Because

21  the last time he sat at that table and he testified.  I know

22  you said don't be emotive.

23          MR. MICHAELS:  I am a lawyer.

24          MR. GEORGE:  I am doing everything I could do.  Mr.

25  Coren left a dent in my knee from kicking me because I sat

1   while Mr. Michaels testified and advocated at the same time.

2   So I would like that clarification.  Why is he here, is he a

3   witness?  If he is, he can't make presentations.

4            THE COURT:  I thought he was a lawyer.

5            Are you a lawyer, sir?

6            MR. MICHAELS:  Yeah, I am serving as an attorney for

7   Rembrandt 3D.

8            THE COURT:  Okay.  He is serving as an attorney, so

9   he is making argument.

10           MR. GEORGE:  Fair enough.

11           THE COURT:  Okay.

12           MR. MICHAELS:  Your Honor, I would like to read, not

13  -- no -- you said, let's get to what the facts are rather than

14  emotive response.  Well, the language they added to Section EE

15  in the proposed order states the Buyer asserts that it will --

16           THE COURT:  Yeah, I read that.

17           MR. MICHAELS:  -- not consummate the transaction.

18           THE COURT:  Okay.  So they are going to take

19  responsibility for assumed liabilities, at the assumed

20  liabilities are your litigation.  We looked at the defined term

21  of assumed liabilities, and that is part of it.

22           Let's just all agree to the concept.  I am telling

23  you right now that I am not approving any sale order unless

24  they preserve their rights to go after Hawk in connect

25           MR. MICHAELS:  Understood, Judge.

```
 1              THE COURT:  Okay.  Hawk, would you like to say

 2   something?

 3              MR. CAPONI:  Yes, Your Honor.  Just to be clear, Hawk

 4   is not the purchaser or the stalking horse.  Hawk is the

 5   collateral agent SeeCubic, so --

 6              THE COURT:  Okay.  When I say Hawk --

 7              MR. CAPONI:  -- if we are going after somebody --

 8              THE COURT:  -- it's like the umbrella.

 9              MR. CAPONI:  -- like, let's try to drop Hawk if we

10   don't --

11              THE COURT:  Sure.

12              -- we can be a little clearer about that, that is

13   all.

14              THE COURT:  Yeah, whoever the Buyer is, they are --

15              MR. CAPONI:  We are going to buy it.

16              THE COURT:  -- going to face all of this litigation.

17              MR. CAPONI:  That is correct, Judge.

18              THE COURT:  Okay.

19              MR. THOMPSON:  So Your Honor, to be clear, and we can

20   submit testimony and we are here with witness of our own, the

21   action that initiates the right to sue, the transfer, is the

22   closing.  Right?  Stream has a license from Rembrandt and it is

23   perfectly valid.  They have not committed any IP infringement.

24   I asked them to clarify, is Scott Victor running around

25   providing offering for sale assets of the company covered by
```

1  our license.  Right?  We believe they are.

2          Rembrandt's position is actually, we don't have the

3  right to sue Stream and its executives because they have a

4  valid license to our technology. What they don't have the right

5  to do is to transfer our trade secrets to another party --

6          THE COURT:  I understand.

7          MR. THOMPSON:  -- and effectively, what they are

8  doing.

9          THE COURT:  I understand.

10         MR. MICHAELS:  And so what I am saying is the day of

11  the closing, SCBV, Stream, all of its officers, are violating

12  1830 -- U.S.C. 1832, right?  Not the day before, not the

13  minute.  That is the transaction that does it.  And those that

14  are receiving it are likewise violating that statute.  And SCBV

15  is implicated, Stream, all of the executives involved.

16         And this is purporting, the reason I started reading

17  this clause is I think it is the most important thing that they

18  have submitted.  The Buyer is unwilling to proceed.  There was

19  an asset purchase agreement that was submitted for everybody

20  to, you know, to get approved, and there was a 9019 settlement.

21  And they are not willing to proceed, that is what they have

22  said.  Unless we get these unique protections that you are just

23  providing five minutes before I got in my car to drive to this

24  hearing today, they are not going to proceed.

25         So they have told us everything we need to know.

1   This sale isn't happening.  I would move, at the beginning of

2   this, to say this sale is no longer before this Court, the

3   Buyer won't go.

4           THE COURT:  I just clarified that if the sale does go

5   through, you will be able to sue the Buyer.

6           MR. MICHAELS:  With respect, Your Honor.  That is an

7   issue I certainly care deeply about.  The issue I am bringing

8   before, the nuance of what I am stating today is that there was

9   a motion to approve the (audio interference) purchase and the

10  sale.  And the Buyer has told the Trustee they are unwilling to

11  proceed unless the deal that they sought approval for changes,

12  right?  They are calling off the sale.

13          My request is that the motion be denied and they come

14  back again when they have worked out what their asset purchase

15  agreement is going to be and we have a time to actually respond

16  to the asset purchase agreement being asked for approval for

17  this Court.

18          THE COURT:  I am confused by how you are

19  characterizing this.  They did make a lot of changes.  But the

20  assumed liabilities definition includes the litigation you guys

21  have, so the Buyer is agreeing to still be on the hook for

22  that.  So what changes are they asking for that makes this sale

23  not able to go forward?

24          MR. MICHAELS:  They have -- I mean, I am looking

25  right at Section EE, and it says, specifically, unless the

 1   asset purchase agreement specifically provides, and this Court

 2   specifically orders, that the Buyer, its properties, its

 3   successors and assigned and their respective property and the

 4   assets will not have any liability whatsoever with respect to

 5   require to satisfy in a manner whether in law and equity,

 6   whether by payment, setoff or otherwise, directly or

 7   indirectly, any claim or lien or any successor or transfer

 8   liability, excuse me, ability for either of the Debtors, other

 9   than the assumed liabilities.

10           THE COURT:  Other than the assumed liabilities.  So

11   they are in the assumed liabilities.

12           MR. MICHAELS:  I understand Rembrandt is in the

13   assumed liabilities.  That, and I do appreciate that your

14   statements with regard to Rembrandt's claims. But Your Honor --

15           THE COURT:  The Debtor can't get sued anymore, right?

16           MR. MICHAELS:  -- what I am raising --

17           THE COURT:  Uh-huh.

18           MR. MICHAELS:  -- is that this is not the asset

19   purchase agreement that they moved for approval.  They have

20   radically changed it.

21           THE COURT:  In what way have they radically changed

22   it?

23           MR. MICHAELS:  Well, I am looking at a redline

24   agreement which I have had five minutes to read.  So I would

25   ask for a continuance for the opportunity to answer that

1   question fulsome.

2          THE COURT:  Summarize for me, give me, like, the

3   biggest ticket item --

4          MR. MICHAELS:  The point is, Your Honor, five minutes

5   was insufficient time for me to review all of the changes.

6          THE COURT:  You said the purchase agreement has

7   changed.  I agree that there were revisions, but I had time to

8   look at the blackline.  I had concerns, and I just raised my

9   concerns with them to clarify that your litigation will go

10  forward.  But other than that, can you even point to something

11  that is --

12         MR. MICHAELS:  Your Honor, I can, right?

13         THE COURT:  Yeah?

14         MR. MICHAELS:  Your Honor pointed to the gatekeeper

15  provision.

16         THE COURT:  Right.

17         MR. MICHAELS:  I will point to the injunction.

18         THE COURT:  And I am striking that.  There is -- you

19  are going to be able to go after the Buyer.

20         MR. MICHAELS:  And the injunction, the injunctive

21  relief that they have got in -- that they are suggesting in 14?

22         THE COURT:  The injunctive relief --

23         MR. MICHAELS:  -- right?  They are looking for

24  injunctive relief for these stalking horse bidders as protected

25  parties under this revised agreement, which basically --

1          THE COURT:  All right.  Let me just make this clear.

2          MR. MICHAELS:  Okay.

3          THE COURT:  You guys, Rembrandt and VSI, you can go

4    crazy with whatever litigation you want against the Buyer.

5    Period.  End of story.

6          I will make sure that if I do enter the sale order

7    you have got those rights.  Okay?

8          MR. MICHAELS:  Your Honor, the problem is, they are,

9    the stalking horse bidder, through the Trustee, is now making

10   this as Mr. Michaels clearly pointed out in their own language,

11   the contingency for their participation in this sale.

12         THE COURT:  But they have asked for things in the

13   blackline proposed sale order that I am not going to give them.

14   It seemed to me that were asking me to be a gatekeeper for your

15   litigation against them.  I am not going to do that.

16         So what other changes are there to the proposed sale

17   order that you think is so dramatic?

18         MR. MICHAELS:  Well, I think it is exceptional that

19   they are actually suggesting that they are not prepared unless

20   they get it.  Which means, if Your Honor is not going to give

21   it, they are not prepared to close.

22         THE COURT:  Okay.  Well, I just told them that I am

23   not going to give it to them, and they said okay.

24         MR. MICHAELS:  So I think what we need is a

25   representation from the stalking horse bidder today and now

1   that they will close, notwithstanding the fact that Your Honor

2   will not provide that relief.

3            THE COURT:  Go ahead, Ms. Brumme.

4            MS. BRUMME:  Good afternoon, Your Honor.

5            Marley Brumme from Skadden Arps for the Buyer, the

6   stalking horse bidder, SeeCubic Inc.

7            I am not sure where Counsel has gotten the idea that

8   we are backing out of this as a purchase agreement or the sale

9   in any way, shape, or form.  And I am certainly not sure where

10  they have gotten the idea that there has been discussions of

11  that that they haven't been a part of between our client and

12  the Trustee.

13           But to be clear, yes, my client is prepared to move

14  forward with the sale, fully understanding that the Counsel on

15  this side of the table over here is going to probably, as you

16  said, sue us every which way to Sunday --

17           THE COURT:  Uh-huh.

18           MS. BRUMME:  -- on violations --

19           THE COURT:  Yep.

20           MS. BRUMME:  -- so.

21           THE COURT:  Thank you.  All right.  Now let's do

22  this.  So we have two witnesses for today.  Who do you -- do

23  you need to cross-examine both of them?

24           MR. THOMPSON:  Yes.  And --

25           THE COURT:  All right.  And let's just be absolutely

```
 1   crystal clear about what kind of cross-examination questions I
 2   am going to permit today.  I am not going to permit any cross-
 3   examination questions about issues that I have already
 4   resolved.  I don't want to hear them.  We have already heard
 5   all of them.  So the extent that you are questioning the 9019
 6   order and the fact that Hawk has been approved as, you know,
 7   the person under that 9019 order.  And that they have --
 8   whether they have acted in good faith in this case or not, I
 9   don't want to hear any questions.  I have already heard all of
10   them.
11            I just want to hear questions about whatever they
12   have said in the affidavits that they just recently filed that
13   have to do with my sale today.  Those are the only questions
14   that I feel like entertaining today.  Okay?
15            All right.  So do you want to bring up the Trustee
16   first?
17            MR. GEORGE:  Mr. Homony.
18            THE COURT:  Yeah.  Yep, that is fine.
19            You can go ahead and start.
20       (Trustee sworn)
21            THE CLERK:  Can you please state your name and spell
22   your last name for the record?
23            MR. HOMONY:  William A. Homony, H-O-M-O-N-Y.
24            THE CLERK:  Okay.  Thank you.
25            MR. HOMONY:  Sure.  1730 Maple Avenue, Hatfield,
```

1    Pennsylvania, 19440.

2        (Audio interference)

3            MR. GEORGE:  -- 1 through 6.

4            MR. THOMPSON:  Thank you.  John Thompson on behalf of

5    VSI.

6                         DIRECT EXAMINATION

7    BY MR. THOMPSON:

8    Q    Good afternoon, Mr. Homony.

9    A    Good afternoon.

10   Q    Mr. Homony, how long have you been a Chapter 11 Trustee?

11   A    Well, this is my first engagement as a Chapter 11 Trustee,

12   and it began in January of 2024.

13   Q    Okay.  Mr. Homony, do you remember a meeting or a set of

14   communications that you had with the VSI constituents'

15   principals?

16   A    I've had many, so.

17   Q    Do you remember having them shortly after your appointment

18   in January?

19   A    Sure.

20   Q    Did you ask those principals for assistance in

21   understanding the Stream TV case?

22   A    Yes.

23   Q    Did you exchange email with them?

24   A    Sure, yes.

25   Q    Did you give them directions?

1    A    Did I give them direction?

2    Q    Did you give them directions?

3    A    I think I asked for documents in support for positions

4    that they wanted me to advocate.

5    Q    Okay.  Did you ever do an inventory of the assets of

6    Stream TV?

7    A    Well, that was one of the issues in the case that is not

8    typical in a Chapter 11 Trustee case.  There were no operations

9    and it was unclear at the time, and remains unclear, exactly

10    which entities of Mr. Rajan's have possession of tangible

11    assets, records, et cetera.  So I don't believe Stream TV has

12    certainly any significant tangible assets.  And if they do, I

13    have not been aware -- made aware of them or know their

14    location or who is in control of them.

15    Q    That was a long example, Mr. Homony.  So I am going to

16    break it down.  I asked you the question did you do an

17    inventory of Stream's assets; yes or no?

18    A    I would say generally, yes.

19    Q    You did?

20    A    Yes.

21    Q    How did you do that inventory?

22    A    Through reading through various materials, the case

23    filings, the various adversary matters, the history of the

24    case, the filings in the Chapter 11 case up through my

25    appointment, and other records I obtained from either Stream or

 1  VSI personnel.

 2  Q    Did you talk to other parties?

 3  A    Yes.

 4  Q    Who were those parties?

 5  A    Those parties were, again, Mr. Rajan, Nicole Maneen, the

 6  employees of SeeCubic, B.V. in the Netherlands.  I certainly

 7  spoke to Mr. Stastney over time, his counsel, Hawk's counsel,

 8  all of the relevant parties and interests that you would think

 9  a Chapter 11 Trustee would talk to in this situation.

10  Q    And did you accumulate an asset list from all of those

11  communications in that investigation?

12  A    Again, I think the assets that I identified through my

13  investigation are included in the APA, both those that are

14  being purchased as well as the excluded assets.

15  Q    All of the assets are identified in the APA?

16  A    I believe, generally, the assets of Stream are identified

17  in the APA, yes.

18  Q    And those assets are assets that are being transferred

19  under this sale, correct?

20  A    Stream is identifying a, certainly, a set of assets to the

21  Buyer, yes.

22  Q    If you were to look at the APA, which is on the docket --

23  A    Uh-huh.

24  Q    -- and certainly, we can have you take a look at it, but

25  it describes all of the assets that Stream TV holds or may

1  hold, correct?

2  A    Yes, except for the specifically identified excluded

3  assets, yes.

4  Q    Okay.  That includes, among other things, physical

5  property, intellectual property, yes?

6  A    I would suggest that they are -- I don't believe I am

7  transferring any tangible property of Stream, and I don't

8  believe I am transferring any intellectual property that is

9  owned by Stream.

10  Q    You don't believe that you are actually transferring any

11  intellectual property owned by Stream?

12  A    No.

13  Q    You are doing this as an as is where is sale, right?

14  A    That's correct.

15  Q    What does that mean, Mr. Homony?

16  A    That means, buyer beware.  The Buyer gets the assets in

17  any condition, in any form, no reps or warranties.  They can't

18  come back.  There is no recourse to the Estate.

19  Q    Wherever they are, right?

20  A    Correct.

21  Q    Does the location, possession, or circumstance, right,

22  change who owns that property?

23  A    Can you repeat that?  I am sorry.

24  Q    Does the location, you said as is and where is, right?

25  A    Uh-huh.

1   Q    Does the location or the condition change who owns the

2   property?

3   A    No.

4   Q    It is the Debtor's, it is part of the Debtor's Estate,

5   right?

6   A    Well, certain assets are a part of the Debtor's Estate.

7   Q    So for instance, the bonding machine that is in Asia is a

8   Debtor asset, right?

9   A    Well, as I have testified before, there is certainly a

10  cloud over the title in the way in which it was -- the way it

11  was explained to me as being addressed when a Receiver was

12  appointed over Technovative before this bankruptcy case was

13  initiated.  I do believe it is listed as an asset of Stream on

14  Stream's Schedules.  So the extent it is owned by the Debtor,

15  and I misspoke previously, this is the only tangible piece of

16  equipment that the Debtor's Estate may own.  However, it may be

17  titled already in the Netherlands under the SCBV.  Either way,

18  in this proposed sale, it is being conveyed to the Buyer.

19  Q    But the only document that you have ever seen is a receipt

20  that tells you that Stream TV is the owner of that; is that

21  correct?

22          MR. GEORGE:  Objection to form, Your Honor.

23          MR. THOMPSON:  Excuse me, I will rephrase.

24  BY MR. THOMPSON:

25  Q    Is the owner of the bonding machine located in Asia is

1   Stream TV?

2   A    I am not sure I have ever seen a bill of sale or anything

3   like that.  I think it was manufactured over time, many, many

4   years ago.  And my understanding is it has been in China for

5   over a decade.  So I don't know that I have seen a specific

6   document that you just referenced.

7   Q    You suggested that somebody had told you that there might

8   be cloud over that title to the bonding machine; is that right?

9   A    That is correct.

10  Q    Who told you that?

11  A    I think -- I think I've read it many things, and I believe

12  that SCBV personnel have referenced the fact that, I believe,

13  the Receiver may have put it in SCB's name in order to pay for

14  the storage, et cetera, in China for a period of time.

15  Q    You said that the SCBV Receiver would have put it in

16  SCBV's name?

17  A    He may have titled it in their name for it.

18  Q    So how would the SCBV Receiver have retitled a piece of

19  property that the Stream Estate owned?

20  A    I don't know how he did it.

21  Q    You wouldn't know how he did it. Have you seen any

22  document that establishes any right, title, or interests over

23  the bonding machine in SCBV, aside from what people have told

24  you?

25  A    Not that comes to mind.

Case 2:23-cv-06520-PG-984-1 Document 01/22/25 Filed 04/22/25 16:41.4679 Desc
Exhibit A   Mandamus Petition   Page 115 of 541

30

1   Q     Nothing, huh?  Okay. But nevertheless, your asset purchase

2   agreement and the documents that you have filed in favor of

3   this sale suggest that there is some potential that the bidder

4   or the Buyer would not actually receive title of that; is that

5   right?

6   A     No, not at all.  I think it is very clear that the Buyer

7   will get title, regardless of how it is currently titled.  They

8   are either going to get it if Stream owns it or if SCBV owns

9   it.  They are going to get it through the equity interest of

10  SCBV.  So they will have control over that asset regardless of

11  who currently has title.

12  Q     That is important.  So they do have control if they buy

13  these assets?

14  A     Control over what?

15  Q     Over SCBV.

16  A     Well, ultimately I am transferring what I believe, the

17  defined term, transferred interests, in the APA, which

18  constitutes three subsidiaries of Technovative, which is one of

19  the Debtor entities.  And so they will be the economic interest

20  holder in Ultra-d Ventures, which is a non-Debtor foreign

21  subsidiary.  That entity ultimately, I believe, indirectly owns

22  SCBV.  So I would suggest that ultimately they will have

23  control should they choose to exercise it over SCBV.

24  Q     SCBV ultimately is owned by the Topco's Technovative and

25  Stream TV that are Debtors in this case, right?

Case 2:23-cv-06520-PD-934-1 Document 1-1 Filed 01/22/25 Filed 01/22/25 Page 116 of 41 679 Desc
Exhibit A   Mandamus Petition   Page 116 of 541

31

1          MR. GEORGE:  Objection, Your Honor.

2          THE COURT:  Okay.  What was your objection, Mr.

3  George?

4          MR. GEORGE:  I think he said that it was owned by

5  Technovative and Stream TV.  Oh, I am sorry.

6          MR. THOMPSON:  Let me rephrase.

7          THE WITNESS:  Yes, sir.

8  BY MR. THOMPSON:

9  Q    Does the ownership interest of SCBV, wherever it is in the

10  stack, ultimately run up through Technovative at the first

11  level and Stream TV at the second?

12  A    Well, I wouldn't say the first level.  There are many

13  foreign subsidiary levels before you get to the U.S. Debtor

14  Technovative.  So as I just described, I believe it is

15  Technovative, which is a U.S. Debtor.  It is Ultra-d Ventures,

16  which is a non-Debtor foreign subsidiary who then owns another

17  foreign subsidiary, Ultra D cooperative who then owns SCBV.

18  It's a chain.

19  Q    Yes, I understand, and I thought my question was

20  accounting for it.  Perhaps it wasn't, but thank you for the

21  clarification, Mr. Homony. The question really is who controls

22  all of those subsidiaries, including SCBV?

23  A    Ultimately, I believe the buyer will be able to exercise

24  control of them.

25  Q    The buyer.  Who does right now?

1    A    Who does right now?

2    Q    Yes.

3    A    Exercise control over SCBV?

4    Q    All of the subsidiaries below Technovative.

5    A    Well, I have -- the Debtor's Estates have an ownership

6    interest in Ultra-d Ventures.

7    Q    They control everything below Technovative, do they not?

8    A    I wouldn't -- I wouldn't, I mean, the facts and

9    circumstances change depending on what a particular entity

10   would want to do.

11   Q    Well, does the sale process, Mr. Homony, who has control?

12   Because we just talked about the Hawk parties, if they are the

13   successful Buyers, they would have control for purposes of the

14   bonding machine we talked about.  Does that change the process

15   from what exists right now?

16   A    Well, obviously --

17   Q    In a case where you sit as the Trustee to these Debtors?

18   A    Well, I guess, maybe I am speculating.  I would suggest

19   that the Buyer is going to exercise control over all of those

20   entities post-closing.

21   Q    And they would do so because?

22   A    Because of the legal ownership interest in the corporate

23   structure I just described.

24   Q    Right.  And right now, who has control of the legal

25   ownership interests?

1   A    Well, ultimately, Technovative has ownership interest, an

2   economic ownership interest in, as I described.

3   Q    And who has control over Technovative --

4   A    I do.

5   Q    -- and the Stream Debtors?

6   A    Okay.

7   Q    Thank you.  That is where I was really going, Mr. Homony.

8   A    Okay.  Uh-huh.

9   Q    Right.  You have control, right?

10  A    I have an ownership interest in --

11  Q    You can control, right?

12  A    Well, that is a -- to me, that is a legal conclusion, that

13  is a different determination.

14  Q    Okay.

15  A    I don't think I have control over SCBV.

16  Q    You don't think you have control?

17  A    I do not have it right now, no.

18  Q    Did you ever review any of the court proceedings or orders

19  out of the Netherlands Court?

20  A    I don't know specifically.  I do know that there was a

21  dispute as to who could exercise, I guess, control as the

22  director of SCBV.  And I believe the Court in Netherlands, over

23  Stream's objection, appointed Mr. Stastney as the director of

24  See -- SCBV, I believe.  That is a recollection from months

25  ago.

1  Q    So is Mr. Stastney in control?

2            MR. GEORGE:  Your Honor, I object.  Control is a

3  label --

4            THE COURT:  I am really confused about all of this.

5            MR. GEORGE:  -- matters.  I am sorry.

6            THE COURT:  He has got whatever he has got.  And

7  there is a corporate structure.  It sounds like he owns certain

8  equity interests.  And term, if you are asking about, like,

9  daily operations, it sounds like he is not in control of those.

10            What is the point of all of this questioning?

11            MR. THOMPSON:  Your Honor, I am getting there, right?

12  I am asking for --

13            THE COURT:  What is your point?

14            MR. THOMPSON:  My point is that there is control of

15  certain assets that ultimately are, that run to the benefit of

16  at a minimum, or are controlled by the Stream TV and

17  Technovative Debtors.

18            THE COURT:  And?

19            MR. THOMPSON:  And that matters for purposes of this

20  sale for reasons --

21            THE COURT:  Why?  Right.  So it is what it is.  I

22  mean, they own the equity interests.  They have the rights that

23  they have.  You are not the Buyer, so you are not asking about

24  clarification, so what is the objection?  What is the concern

25  here?

1              MR. THOMPSON:  Well, I am getting there, Your Honor.

2     I am trying to show that Mr. Homony has control over all of the

3     subsidiaries, and could take control so that he could actually

4     realize the assets and the value of those assets.  And control,

5     in this particular instance, the transfer of those assets.

6              THE COURT:  Yes, Mr. George?

7              MR. GEORGE:  Your Honor, I think this is all

8     irrelevant.  I am going to move to strike the testimony related

9     to this issue of control.

10              THE COURT:  I happen to agree.  I think it is

11     irrelevant.  I mean, you are trying to ask him questions that

12     would suggest that the Trustee has certain powers that you

13     would like to see him exercise, that he doesn't appear to

14     choose to exercise.  He wants to sell the assets that he has.

15     He wants to sell the shares of the subsidiaries as part of the

16     sale, so.

17              MR. THOMPSON:  Fine, Your Honor.  I will move on and

18     we will talk about the assets that he has.

19              THE COURT:  Okay.

20              MR. THOMPSON:  Your Honor, may I speak to this

21     objection?

22              THE COURT:  Excuse me?

23              MR. THOMPSON:  May I speak to this objection?

24              THE COURT:  Okay.

25              MR. THOMPSON:  The relevance, Your Honor, is that the

```
 1   Trustee and the stalking horse bidder have routinely and
 2   consistently made the point that this is an asset sale only of
 3   stock in corporations.  And we just came across testimony that
 4   the Trustee provided that there is bonding equipment that the
 5   Buyer is getting by either directly the asset being owned by
 6   Stream or by taking control of the entity SeeCubic B.V., which
 7   owns the bonding equipment.  And either way, it affects a
 8   transfer of ownership of the bonding equipment.  This concept
 9   is going to be incredibly relevant throughout all of
10   Rembrandt's claims.
11           THE COURT:  Sure.  Well they wouldn't --
12           MR. THOMPSON:  We would --
13           THE COURT:  -- the bonding equipment for a while.
14   The bonding equipment is going to the Buyer, that is no
15   surprise.  He just clarified that is really the only hard
16   tangible property that is going to the Buyer that Stream owns,
17   correct, sir?
18           THE WITNESS:  Yes, correct.
19           THE COURT:  Yeah.  So yeah, okay.
20           MR. GEORGE:  And Your Honor, I think that further,
21   that this is just an effort to try to make it look like the
22   Trustee didn't do his job.  It is really an attack on him as a
23   person --
24           THE COURT:  Yeah.
25           MR. GEORGE:  -- and the job that he did here.
```

1          THE COURT:  And I don't see its relevance to the line

2    of questioning that you are pursuing with the Trustee right now

3    about, you know, who is the corporate structure or who is

4    controlling the daily operations.  I don't think any of that is

5    relevant.

6          MR. THOMPSON:  Your Honor, I have heard it and I will

7    move on.

8          THE COURT:  Thank you.

9          MR. THOMPSON:  I would only suggest that they will

10   become readily apparent why.

11         THE COURT:  Okay.

12         MR. THOMPSON:  All right.  So --

13         MR. GEORGE:  But Your Honor, if they become relevant,

14   it will be on another day, it won't be today because none of

15   this (simultaneous speech).

16         THE COURT:  All right, Mr. George.  Mr. George, I

17   understand.  Let's go.

18   BY MR. THOMPSON:

19   Q    Mr. Homony, you are familiar with the Stream operations

20   prior to the bankruptcy, correct?

21   A    Well, I wouldn't call them operations.  I am certainly

22   familiar with -- I don't believe Stream has really operated

23   since the omnibus agreement in 2020.

24   Q    So it did operate?

25   A    Prior to the omnibus date, they had operations --

```
1   Q    They had operations.

2   A    -- as far as I know.  Yes.

3   Q    Did they have operations in California?

4   A    I'm not sure that I paid much attention to the location of

5   the operations, et cetera.  It really was not a factor in my

6   evaluation of where we are today in 2024, and how to best move

7   these cases forward and provide a recovery for assets, so.

8   Q    Do they have assets in California?

9   A    When?

10  Q    Anytime.

11  A    Well, I --

12          THE COURT:  Well, who cares?  All that we care about

13  are assets now.  All right?  Are you asking questions --

14          MR. THOMPSON:  Well --

15          THE COURT:  -- about assets now in California?

16          MR. THOMPSON:  -- Your Honor, this is relevant.

17          THE COURT:  Okay.  So what is your point?

18          MR. THOMPSON:  I promise you it is relevant.

19          THE COURT:  Just tell me your point, sir.

20          MR. THOMPSON:  My point is that there were assets in

21  California.

22          THE COURT:  Uh-huh.

23          MR. THOMPSON:  There were servers in California.

24          THE COURT:  Uh-huh.

25  BY MR. THOMPSON:
```

```
1    Q    They were in -- they were Stream's servers and they had

2    Stream's production code on them.  Do you know about that, Mr.

3    Homony?

4    A    When?

5    Q    They had the -- this, they were on these servers in 2020.

6    They were as recently, I believe, as 2021.

7              MR. GEORGE:  Your Honor, is that testimony?  Because

8    that doesn't sound like a question.

9              MR. THOMPSON:  Well, again, I can't --

10             THE COURT:  Well, he was asking about what I asked

11   him.

12             MR. THOMPSON:  -- be asked to do it both ways, right?

13             THE COURT:  Okay.  But so why do we care about the

14   servers in California at some prior date that is no longer --

15             MR. THOMPSON:  Because it has property of the Stream

16   Estate on it, on those servers.  And there is source code,

17   there is production code created by Stream TV, Stream TV's

18   employees, Stream TV's engineers, and that was done with

19   Rembrandt's IT and trade secrets.

20             THE COURT:  Okay.  So -- yeah.  Yeah.  So this sounds

21   like a legal argument.  It doesn't sounds like --

22             MR. THOMPSON:  It -- I -- Your Honor, I am simply

23   trying to establish what this trustee, who is just represented

24   to this Court, there's only item of -- of -- one asset, a hard

25   asset.  There's more than one asset, and it --
```

```
1              THE COURT:  Okay.  Well --

2              MR. THOMPSON:  -- and --

3              THE COURT:  -- he just said that there's only one.

4    If you disagree, then we'll have to agree to disagree.

5              MR. THOMPSON:  I think I need to establish whether

6    this trustee -- I'll use Mr. George's words -- did his job to

7    investigate and marshal the assets, and I'm trying to probe

8    that.  I'm trying to test that proposition.  He suggested he

9    did.

10             THE COURT:  Well, he's -- you're talking about some

11   servers from California.  I don't really understand how it's

12   relevant.

13             Yes, Mr. George?

14             MR. GEORGE:  Your Honor, in addition, if there -- as

15   Mr. Homony testified -- if there are assets, wherever they are,

16   they're going to belong to the purchaser, and -- and that's the

17   facts of the matter.

18             There hasn't been a single fact established that

19   there are servers in California -- that there's anything on

20   them that's relevant to the hearing on approval of the sale

21   motion.  That's what we're here for today.

22             MR. THOMPSON:  Your Honor, I'm trying to find out

23   where -- what assets Mr. Homony knows about, and he's only told

24   us one.

25             THE COURT:  Yes.
```

```
 1              MR. THOMPSON:  And if that's -- if his answer is --

 2              THE COURT:  That's the one --

 3              MR. THOMPSON:  -- I didn't investigate --

 4              THE COURT:  -- that's the one.

 5   BY MR. THOMPSON:

 6   Q    Did you do any investigation of any other assets, hard

 7   assets or intellectual property assets, for the -- for the

 8   estate.

 9              MR. GEORGE:  Objection to form, Judge.  It's

10   compounded because he lists the two together.  He already

11   testified there wasn't any, like, intellectual --

12              THE COURT:  I think you've already asked him, and he

13   already said the only tangible property that he's investigated

14   is the bonding equipment.  That's it.

15              MR. THOMPSON:  Okay.  So that's the only

16   investigation.

17   BY MR. THOMPSON:

18   Q    Mr. Homony, did you have a meeting with Mr. Rajan, Ms.

19   Menine and their former counsel from Lewis Brisbois, who is no

20   longer counsel at the time, in -- on March 7th, 2024?

21              MR. GEORGE:  Objection, Your Honor, to the extent

22   that there's facts that are stated in that question that aren't

23   in evidence.  He's saying that Lewis Brisbois was not VSI's

24   attorney.  We disagree with that wholly.

25              THE COURT:  Okay.  Do you have any recollection of
```

```
 1   this March meeting, sir?

 2           THE WITNESS:  I do.  I believe it's the -- yes.  I

 3   do.

 4   BY MR. THOMPSON:

 5   Q    During that meeting, did you make representations to the

 6   VSI team that they were the subject of a civil conspiracy?

 7   A    No.

 8   Q    You didn't say that?

 9   A    Absolutely not.

10   Q    Okay.  Were you shown a list of assets that needed to be

11   returned to Stream TV?

12   A    I believe they identified certain assets they -- they

13   believe were not returned in connection with the Delaware

14   Chancery Court matter.

15   Q    They included displays; did they not?

16           THE COURT:  If you don't remember, it's okay.

17           THE WITNESS:  I don't recall.

18   BY MR. THOMPSON:

19   Q    Phones?

20   A    I don't recall specific assets that they may have

21   identified.

22   Q    You don't remember any of the assets on that list?

23   A    I remember they provided a list.  I just don't remember

24   today the specificity.

25   Q    Were you -- were you aware that there was an obligation to
```

```
 1  return assets to the Stream TV estate from Hawk and -- and
 2  SeeCubic.  SeeCubic, Inc. -- excuse me -- to be more precise.
 3  A    I try -- I'm trying to recall exactly the legal position
 4  of the -- of -- of the Delaware Chancery Court matter when I
 5  was appointed as a trustee here.  I know there was an order
 6  that required, I believe, the return of assets that SeeCubic
 7  had under the prior omnibus that was ultimately overturned.  So
 8  again, I know -- I know VSI's argument was there were assets
 9  that were never returned to Stream that should have been.
10  Q    What did you do with that list of assets that they had
11  given you?
12  A    Well, I think I took it under advisement.  I mean, at the
13  time, you have to appreciate this case and -- and the -- the
14  fighting and the unknowns at the time that I was appointed and
15  trying to figure out where the most valuable assets are.
16  Right?  And so there can be assets, some of which have the
17  minimus value, some have no value, some are a burden, and so, I
18  think, I identified the most valuable assets and have proposed
19  to sell them.  And so could there be other assets out there
20  that are not specifically identified?  Of course.  And that --
21  that is under the broader description in the APA that provides
22  for a sale of both known and unknown assets to the extent they
23  fall in those categories described in the APA.
24  Q    You don't quite remember what was on that list, but could
25  it have had software?
```

```
 1              MR. GEORGE:  Objection, Your Honor.  He asked him to

 2   speculate.

 3              THE COURT:  Yeah.  He's already answered the

 4   question.

 5              MR. THOMPSON:  Okay.

 6   BY MR. THOMPSON:

 7   Q    So I think what you said in response to my question about

 8   what you did was to find the -- was to identify the most

 9   valuable assets.  Do you not think that software code for a

10   technology company was a value asset -- valuable asset?

11              THE COURT:  Okay.  He --

12              MR. GEORGE:  Your Honor, objection.

13              THE COURT:  -- already answered the question.

14              MR. GEORGE:  It hasn't been established that --

15              MR. THOMPSON:  I -- I didn't ask that question, and

16   I --

17              THE COURT:  You asked him --

18              MR. THOMPSON:  Asked him to --

19              THE COURT:  -- if he identified the most valuable

20   assets and if there's something there that, you know, that

21   he -- that wasn't on that, then he didn't conclude that it was

22   very valuable.

23              I have to admit, sir, I really feel like what you're

24   doing here is you're trying to make legal argument, and I

25   simply don't want to hear it.  What are the factual questions
```

 1 | that you have --

 2 |         MR. THOMPSON:  I'm trying to establish --

 3 |         THE COURT:  -- related to this --

 4 |         MR. THOMPSON:  -- Your Honor, what assets this

 5 | trustee knew about and did not know about.

 6 |         MR. GEORGE:  And -- and why is that relevant, Judge,

 7 | if all of the assets are being transferred?  Wherever they are

 8 | in an --

 9 |         THE COURT:  I agree with Mr. George.

10 |         MR. THOMPSON:  It matters.  It matters because the

11 | condition of those assets, if they are encumbered by licenses,

12 | that --

13 |         THE COURT:  Yes.

14 |         MR. THOMPSON:  -- the trustee does not --

15 |         THE COURT:  -- and you're going to sue them.  I get

16 | the point, yes.

17 |         MR. THOMPSON:  Your Honor, I think it's more than

18 | that, but --

19 |         THE COURT:  Yeah.  So what is it?  You want to sue

20 | them.  I get it.

21 |         MR. THOMPSON:  It's -- it's not --

22 |         THE COURT:  But what's --

23 |         MR. THOMPSON:  -- it's -- it's not about that.

24 | It's --

25 |         THE COURT:  It's a sale issue, just tell me --

```
 1              MR. THOMPSON:  Because Your Honor, it cannot be sold
 2   free and clear that way.  They do not have 363(f) rights, and
 3   they certainly don't have it to -- for this stalking horse.
 4              THE COURT:  And that's your legal argument, and I
 5   will take that under advisement.
 6              MR. THOMPSON:  Your Honor, I understand.  I am trying
 7   to adduce the facts that demonstrate that.  That's all.
 8              THE COURT:  No.  Okay.  It's not facts.  It's legal
 9   argument.  I completely disagree with you, sir.  Okay.  So --
10              MR. THOMPSON:  I -- you know, I -- okay.  I -- I've
11   heard -- I've heard the Court, and I will try to move on.
12              THE COURT:  Okay.
13              MR. THOMPSON:  All right.
14   BY MR. THOMPSON:
15   Q   Mr. Homony, during that meeting, were you presented with
16   purchase orders that were --
17              THE COURT:  Why are we talking about this?  Why are
18   we talking about what was discussed at the meeting?
19              MR. THOMPSON:  Your Honor, that would have been an
20   asset of the estate.
21              THE COURT:  Okay.  So all of the assets that they own
22   are being transferred to the buyer, so I don't understand how
23   it's relevant to talk about what assets were discussed at that
24   meeting or were not.  Explain that to me.  Why is that
25   relevant?
```

```
 1              MR. THOMPSON:  Because this trustee had an obligation

 2    to maximize the value for all state creditors.

 3              THE COURT:  Right.  And he said he identified the

 4    most valuable assets.  And --

 5              MR. THOMPSON:  Okay.  Your Honor, if I have -- may

 6    have a moment, maybe we can --

 7              THE COURT:  Yeah.

 8              MR. THOMPSON:  -- cut this short, and let Mister --

 9              THE COURT:  Great. Thanks.

10              MR. THOMPSON:  Your Honor, in the -- in the interest

11    of trying to be briefer.  We will -- I'm -- I will pass to

12    Mr. Michaels.  Thank you.

13              MR. MICHAELS:  Just -- our exhibits, we have binders

14    and -- and copies that we provided opposing counsel.  I can

15    give them to the Court.  Some of these are not premarked

16    because we had to print them this morning, and I just had them

17    in a hurry because they dealt with cross for the -- for the

18    decks, but I'll -- I'll come hand them up if that's okay, if I

19    can approach?

20              THE COURT:  Okay.

21              MR. MICHAELS:  And there's -- there's a couple here

22    that I think we'll just hand up when we bring them up --

23              THE COURT:  Okay.

24              MR. MICHAELS:  -- if that's okay.  They're not in

25    this.
```

 1              MR. GEORGE:  Your Honor, I just want to point out

 2    that Mr. Michaels is listed as a witness in the witness list,

 3    so I -- who's telling the truth here?  Is he a lawyer?  Is he a

 4    witness?  Is he both?  I mean, you know, this game that's being

 5    played here --

 6              THE COURT:  Well, who's being called as a witness?  I

 7    thought we're --

 8              MR. GEORGE:  In the -- in the witness list in the

 9    documents that we just received.

10              THE COURT:  We have him and we have Scott Victor.

11    Those are the witnesses for today.

12              MR. MICHAELS:  Your Honor, we brought witnesses

13    today.  That's what you --

14              THE COURT:  I don't -- okay.  So why do I need to

15    hear from any witnesses from your side?

16              MR. MICHAELS:  What's that?

17              THE COURT:  Who am I hearing from?  Give me an

18    example.

19              MR. MICHAELS:  Stephen Blumenthal.

20              THE COURT:  And why do I need to hear from him?

21              MR. MICHAELS:  Your Honor, we were told at the June

22    5th hearing by you that -- that the timeframe for discussing

23    our assets that are being -- attempted to be included in the

24    transfer and sale, that this was the hearing that we should

25    prepare for and bring our arguments.

1        THE COURT:  All right.  But I'm just talking about

2   legal argument.  I don't need to hear from witnesses.  You've

3   briefed all of your legal arguments.  That's what I care about.

4        Thanks.

5        UNIDENTIFIED SPEAKER:  Okay.

6        MR. GEORGE:  And Your Honor, Mr. Blumenthal is not on

7   the list of witnesses.  Mr. Michaels is, the lawyer, but

8   Mr. Blumenthal --

9        MR. MICHAELS:  All right.  I mean --

10       MR. GEORGE:  -- which one is he here today?

11       THE COURT:  All right.  All right.

12       MR. MICHAELS:  Your Honor, I'm not going to be able

13   to scream over Mr. George.  Can I --

14       MR. GEORGE:  I'm not screaming.  I'm just making a

15   point.

16       THE COURT:  Yeah.

17       MR. MICHAELS:  Okay.  What he's referring to is a set

18   of documents handed to him by VSI.  That's not our witness

19   list.  We -- we're calling one witness.

20       THE COURT:  Yeah.  Okay.

21       MR. MICHAELS:  Stephen Blumenthal.

22       THE COURT:  I don't really -- so who's the witness

23   that you want to call, sir?

24       MR. MICHAELS:  Stephen Blumenthal.

25       THE COURT:  Yeah.  And what is he going to testify

```
 1    to?

 2          MR. MICHAELS:  He's going to testify to the assets

 3    that we have in this estate and how easy it is to determine

 4    that our assets are being transferred and where they're found.

 5          THE COURT:  Okay.  And I don't need to hear from that

 6    witness today, and I'm not going to hear from him today.  I'm

 7    happy to hear all the arguments that you've listed in your

 8    briefs, but I'm not taking testimony from that gentleman.  I

 9    don't need that for part of the sale process.

10          The assets are what they are.  They've listed them.

11    I mean, let's face it.  The assets are mostly equity, right?

12    There's one piece of hard asset.  The rest of this is -- deal

13    is equity.

14          MR. MICHAELS:  Your Honor, with respect, we followed

15    your instructions in understanding that this was going to be

16    our day to bring our evidence, and the rug's being pulled out

17    from under us.

18          I -- I -- I stand dumbfounded that we couldn't rely

19    on this Court's statements that this was going to be our --

20          MR. GEORGE:  Well, Your Honor --

21          THE COURT:  But the statements I made in the prior

22    hearing specifically were that you should put in your brief to

23    the objection to the sale every legal argument you have about

24    the licenses.  This is like your main argument, right?  So you

25    did that.  You gave the briefing, and we're looking at the
```

```
 1   briefing, and we've seen their responses, and we're going to

 2   take everything under advisement.

 3          So it's a legal issue.  I don't understand how this

 4   is a --

 5          MR. MICHAELS:  Let me ask just a procedural question.

 6   Are you saying that our declaration submission by Stephen

 7   Blumenthal is being taken into evidence?

 8          THE COURT:  I will take that into evidence.

 9          MR. MICHAELS:  All right.  Can I proceed with --

10          THE COURT:  Yes.

11          MR. MICHAELS:  -- cross?  Okay.

12          MR. MICHAELS:  This is -- again, I -- we received

13   their declarations at past 5:00 p.m.  I'd already arrived --

14          THE COURT:  Okay.  It can't be a surprise, right?

15          MR. MICHAELS:  What's that?

16          THE COURT:  We all -- it can't be a surprise.  We

17   know the sale process, right?  We understand what happened.

18          MR. MICHAELS:  Your Honor, I'm only apologizing for

19   not marking the exhibits.

20          THE COURT:  Okay.  That's fine, not a problem.

21          MR. MICHAELS:  Right.

22          MR. GEORGE:  What are you marking it?

23          MR. MICHAELS:  This is --

24          MR. GEORGE:  No.  What are you calling it?  The

25   number.
```

```
 1                  MR. MICHAELS:  What?

 2                  MR. GEORGE:  Just call it Rem.

 3                  MR. MICHAELS:  Rembrandt Exhibit 1.

 4                  THE COURT:  Okay.  We'll do --

 5                         CROSS-EXAMINATION

 6   BY MR. MICHAELS:

 7   Q    Mr. Homony, do you recognize the document we've put before

 8   you?

 9   A    Yes.  It looks like the teaser sent out by my investment

10   banker, SSG.

11   Q    Okay.  Can you jump to the assets overview?

12   A    Okay.

13   Q    In that section, does it describe that the assets include

14   Ultra-D technology?

15   A    Yes.

16   Q    Does it provide a list of the features and diverse

17   applications of the technology?

18   A    There's a -- a heading that describes the unique features

19   in diverse applications of technology, yes.

20   Q    And are the things listed under that heading, would you

21   agree that those are features and diverse applications of the

22   technology?

23                  MR. GEORGE:  Objection to form, Your Honor.  To the

24   extent he knows.

25                  THE COURT:  Okay.
```

 1              MR. MICHAELS:  I -- I am --

 2              THE COURT:  Well, it says what is says, so what is

 3  the question?

 4  BY MR. MICHAELS:

 5  Q    Do you agree with what it says?

 6  A    I -- I don't know the technology at -- at the, kind of,

 7  level that would --

 8              THE COURT:  Wasn't this prepared by Scott Victor?

 9  Right -- was this?  Yeah.  Okay.  So --

10              MR. GEORGE:  So he's going to be a witness.

11              THE COURT:  Yeah.

12              MR. MICHAELS:  I mean, he can say, I don't know.  I

13  had no -- no hand in preparing this.

14              THE COURT:  Okay.  Fine.

15              MR. MICHAELS:  That -- that's the answer.

16              THE COURT:  So you didn't --

17              THE WITNESS:  No.  No.  I -- I did not prepare it.

18              THE COURT:  Yeah.  Okay.

19              THE WITNESS:  I reviewed it before it went out.

20  BY MR. MICHAELS:

21  Q    Do you recall getting lists of questions from Rembrandt

22  regarding the status of certain software?

23  A    I -- I know we've engaged with Rembrandt numerous times

24  since my appointment.  I know Rembrandt has provided certainly

25  lots of things with respect to their position in -- in terms of

1    their alleged intellectual property.  We certainly met with

2    Rembrandt.  We even put Rembrandt in direct contact with SEBV's

3    engineering team.

4    Q    Uh-huh.

5    A    I was a party to that meeting in which there was a lot of

6    back and forth, questions about the source code the technology,

7    how it's housed, et cetera.

8    Q    So you brought up the very next thing I was going to, so I

9    appreciate that.  In that meeting, do you recall Rembrandt

10   questioning the Eindhoven (phonetic) team whether they were

11   using a modern version controlled software management system?

12   A    I don't recall that specifically, no.

13   Q    So when you set up that meeting, did you feel that you, in

14   your power as trustee, that you had authority to ask the

15   Eindhoven team to meet with Rembrandt at your direction?

16   A    I have authority to task anybody to -- to meet with

17   anybody.

18   Q    Okay.  So was it within your authority to ask them to

19   provide further information:  Number of files, file names,

20   etcetera, for the source code that was on the secure server

21   that you've listed in your asset list?

22        MR. GEORGE:  Objection to form, Your Honor.  It

23   assumes facts not in evidence.  There's no indication that

24   there was source code on any of those servers that Rembrandt

25   has an interest in.

1             MR. MICHAELS:  You're -- with respect, the APA lists

2    the -- that as an asset.  It's -- the exact words are, Source

3    code on a secure server.

4             THE COURT:  Okay.

5             MR. MICHAELS:  I mean, if he doesn't know that, then

6    the asset list is inaccurate.

7             THE COURT:  Okay.  And what --

8             MR. GEORGE:  I believe that's --

9             THE COURT:  -- my questions are --

10            MR. GEORGE:  I'm sorry, Your Honor.

11            THE COURT:  I just -- I'm so confused because, I

12   mean, the assets are what they are.  Are you trying to make the

13   same point that he was trying to make about, you know, what is

14   the point about the assets?  The assets have been listed on the

15   schedule to the assets of purchase agreement, so what is the

16   relevance of your line of questioning, sir?

17            MR. MICHAELS:  The -- the relevance is whether he --

18   if there's an asset listed, does he know where is, as is, for

19   that -- for that asset, right?

20            UNIDENTIFIED SPEAKER:  Your Honor --

21            MR. GEORGE:  Your Honor, I -- I just want to object

22   to this because the only source code and -- and -- and servers

23   are in SeeCubic B.V. a non-debtor.  Stream doesn't have any of

24   those assets, and they weren't listed.  There was no scheduled

25   source code.

```
 1              MR. THOMPSON:  Objection.  He's testifying, Your

 2   Honor.

 3              THE COURT:  Okay.  Well, I'm going to clarify that

 4   the assets that are being sold are on the schedules.  They're

 5   either on there or they're not, so I don't want to talk about

 6   it.  It's there or not, right?

 7              MR. GEORGE:  But what I -- and what I'm objecting to

 8   specifically is Mr. Michaels trying to make it appear that

 9   we're selling assets in SeeCubic B.V.

10              THE COURT:  Right.  They're only -- you're only

11   saying they're shares.  Yeah.  Right.

12              MR. GEORGE:  And the assets that were -- excuse me --

13   the assets that were listed as to B.V. were listed at the

14   Court's instruction that we list the downstream assets, so the

15   question was inappropriate.  He knows it is, but he asked it

16   anyway.

17              MR. MICHAELS:  With respect, I don't believe it's

18   inappropriate.  We are asking about an asset listing on their

19   schedule.

20              THE COURT:  Okay.  But --

21              MR. MICHAELS:  And -- and -- and if I may, Your

22   Honor.  The -- the asset isn't shares in a corporation that may

23   have control of some software.  Stream listed as its asset,

24   Source code on a secure server, not held in some other

25   corporate entity, Source code on a secure server, and I'm
```

```
 1   asking, what is that?  What -- where is it?  What is it?  And

 2   that's -- I think that's a perfectly valid question about the

 3   assets that are subject to this asset.

 4              MR. GEORGE:  If he has a document that reflects that,

 5   he should show the witness because I don't believe there's any

 6   such doc.

 7              UNIDENTIFIED SPEAKER:  Do you guys have the APM?  Is

 8   that in the -- in the folder you have there?

 9              MR. MICHAELS:  It's on the list of assets on the

10   beginning of the schedule --

11              UNIDENTIFIED SPEAKER:  Okay.  Well, if we're just --

12              THE COURT:  She's trying to understand what you're

13   asking.

14              MR. MICHAELS:  I'm asking --

15              THE COURT:  I know, just show us the document.

16              MR. MICHAELS:  We have -- we have an electronic --

17              UNIDENTIFIED SPEAKER:  You don't have an APA in

18   printed form; do you not?

19              MR. MICHAELS:  No.  Okay.

20              THE COURT:  So --

21              MS. RUSSELL:  Your Honor?

22              THE COURT:  Yes.  Who is this speaking?

23              MS. RUSSELL:  This -- this is Alyssa Russell from --

24   from Skadden along with -- with Marley.  I'm on the phone here

25   representing SeeCubic.
```

1          I was just -- further the objection here to the

2     relevance as the APA makes clear Rembrandt's IP and any

3     physical assets that contain its IP to the extent it's found

4     valid and existing and enforceable, they're excluded assets.

5     We -- we don't think any of this is relevant here today.

6          MR. MICHAELS:  We certainly care about Rembrandt's

7     assets, but I'm asking about their schedule on the APA that is

8     here to be approved in the sale to be approved, and asking,

9     What is the source code?  Where is the source code?  With

10    respect, they've said that they're --

11         MS. RUSSELL:  The -- we appreciate your effort to --

12    to conduct this diligence, but -- but the stalking horse

13    purchaser has conducted their diligence and we are comfortable

14    taking these assets on an as is, where is basis, and, again,

15    don't -- don't believe this line of questioning is relevant.

16         THE COURT:  I'm inclined to agree with her.

17    BY MR. MICHAELS:

18    Q    The -- how is it that you determined that intellectual

19    property belonging to Rembrandt, Phillips, or any other third

20    party were not on the source code on a secure server --

21         THE COURT:  Okay.  I'm -- this is the legal argument.

22    You're talking about, you know, the fact that you think that

23    the sale is impermissible because it's infringing upon your

24    rights.  I get that.  It's a legal argument.

25         I don't want to hear any questions about that.  The

```
 1   assets are what they are.  The only person who's bid upon them

 2   has done their due diligence, and to the extent that you

 3   believe that the sale is going to violate your rights, you can

 4   bring whatever litigation you want.  We simply are going to

 5   have to agree to disagree on this matter, sir.

 6            I don't want to hear any more questions about the

 7   assets.  The assets are what they are.  They're on the

 8   schedules.  The buyer has done their due diligence, and you can

 9   make whatever legal argument you want to make, but I don't need

10   to hear any questions about it.  It's simply not relevant.

11            Okay.  So I think we're done with you, sir.

12            Mr. Victor, do you want to come up here?

13            MR. GEORGE:  Your Honor, do you want to proffer or

14   just --

15            THE COURT:  On Mr. Victor?

16            MR. GEORGE:  Yeah.

17            THE COURT:  Quickly.

18            MR. GEORGE:  Okay.

19            THE COURT:  Come on, Mr. Victor.  Come on up here.

20            Thanks, sir.

21            THE WITNESS:  Would you like --

22            THE COURT:  You can leave that.

23            MR. GEORGE:  Your Honor, in accordance with this

24   declaration, he would testify that SSG was retained to market

25   the stream assets, as well as the equity interest held by
```

1   Technovative Media in the following companies:  Technology

2   Holdings Delaware LLC, Media Holdings Company LLC, Ultra-D

3   Ventures CV a Kirkcow (phonetic) entity that pers retention

4   approved by this Court, SSG conducted a robust marketing of the

5   assets, contacted over 500 potential purchasers, solicitation

6   including everyone from television networks to OEM

7   manufacturers, to financial purchasers, that SSG and its staff

8   created a data room and in it was sales information populated

9   by documentation for the veteran trustee.

10        The following in a procedures hearing, SSG sent out a

11  second teaser with the comments of Rembrandt and BSI contained

12  and that the additional teaser did not generate any additional

13  interest in the assets being sold.  Only one party accessed the

14  data room as of December 2nd, '24; there have been no other

15  bids on the assets, that the stalking horse offer provides

16  substantial benefit to the estate and in his opinion, the

17  stalking horse offer ties to the best offer that could be

18  obtained, under the circumstances, for the asset.

19        THE COURT:  Thanks, Mr. George.

20        Tashay, can you swear our witness in?

21             J. SCOTT VICTOR, WITNESS, SWORN

22        THE COURT:  Okay.  You want to ask Mr. Victor -- oh,

23  sorry.

24        THE WITNESS:  Yes, J. Scott Victor, V-I-C-T-O-R.

25        THE CLERK:  Thank you.

```
 1              THE WITNESS:  300 Bar Harbor Drive, West Conshohocken

 2   in Pennsylvania, 19428.

 3                          DIRECT EXAMINATION

 4   BY MR. SWICK:

 5   Q    Good afternoon, Mr. Victor.  How are you?

 6   A    Good, how are you?

 7   Q    Good.  I'm Adam Swick with Akerman on behalf of VSI.  Talk

 8   about your role; how are you retained in this matter?

 9   A    I was retained by the Chapter 11 Trustee, on behalf of my

10   firm, SSG advisors, to run a sale process for the debtor's

11   assets.

12   Q    All right.  How did you become familiar with the debtor's

13   assets?

14   A    We were first aware of the debtor's assets when we were

15   hired by the secured creditor in the fall of 2022, to run an

16   Article IX process which was stayed by order of the Chancery

17   Court of Delaware.

18   Q    I -- and who was the secured creditor that you referred

19   to?

20   A    Hawk and SeeCubic.

21   Q    Okay.  And that's -- SeeCubic is the purchaser for here

22   today, correct?

23   A    One of them.  Yes.

24   Q    Let's -- so when you were engaged, what were your duties

25   when you were engaged?
```

```
 1    A    By the trustee?

 2    Q    Correct.  Yes.

 3    A    To reengage, understand the -- what was going on since our

 4    engagement with the secured creditor terminated in January of

 5    2023.  We became familiar, we read up on all the litigation

 6    that had occurred since our termination.  And our job was to

 7    put together a sale process for the assets of the debtor,

 8    including the equity interest of the subsidiaries, held by

 9    Technovative, and to put together a teaser, get information to

10    populate a data room, and to come up with a world-wide buyer

11    list to maximize the value of these assets.

12    Q    All right.  So how did you come up with your world-wide

13    buyer list?

14    A    I had my team do research, as they do on every deal, and

15    come up with a buyer's list of strategic, operational financial

16    buyers that may be interested in this technology.

17    Q    All right.  We're going to do --

18              MR. SWICK:  Did that work, Your Honor?

19              THE COURT:  Yeah.

20              MR. SWICK:  All right.  Let's just label it VSI

21    Exhibit 1, it's Mr. Victor's declaration that was filed last

22    night.

23              Mr. THOMPSON:  It's also --

24              MR. SWICK:  Huh?

25              Mr. THOMPSON:  It's also RT2.
```

```
 1                    MR. SWICK:  Oh.

 2                    Mr. THOMPSON: Scott's declaration.

 3                    THE COURT:  No.

 4                    MR. THOMPSON:  This seat's really low, Your Honor.

 5                    MR. SWICK:  My seat's really low, too, if that's what

 6    you're saying.

 7    BY MR. SWICK:

 8    Q    All right.  Would you please take a look at paragraph 20?

 9    A    Paragraph 20, you say?

10    Q    Yes.

11    A    Yes.

12    Q    All right.  So it says that you reached out to 550

13    prospective buyers around the world; what does "reached out"

14    mean?

15    A    It means that the teaser that we prepared, that I believe

16    you showed Mr. Homony here, which was Rembrandt 1, was sent out

17    to these 550 buyers that we came up with that we reviewed with

18    the trustee and his team as potential buyers.  So that teaser,

19    along with an email, was sent out to those 550 and follow-up

20    calls to all of them.  That's how we reach out in the sale

21    process.

22    Q    Okay.  And did -- and no one expressed any interest

23    besides VSI and Jacob -- I forgot his last name, but at

24    Continental?

25    A    Continental Energy, yes.  So no one signed an NDA other
```

1   than VSI and Continental advisors, which was an alleged

2   investor into VSI; but we had multiple conversations with

3   multiple potential strategic buyers who ultimately passed

4   without even signing an NDA.

5   Q    So how many -- you said multiple, can you give me an

6   approximation of how many?

7   A    Dozens.

8   Q    Dozens.  But no one went the next step for an NDA?

9   A    No one.

10  Q    Did Rembrandt ever express any interest in purchasing the

11  debtor's assets?

12  A    Not to us directly, but I believe maybe to the trustee and

13  trustee's counsel, but no, I never had any direct reach-out by

14  Rembrandt, ever.

15  Q    Okay.  So even though they reached out to, at least, the

16  trustee or trustee's counsel, did you send them that teaser

17  went you sent it out to the 550 people?

18  A    I don't know.

19  Q    Did you send the teaser to VSI when you sent it out to

20  those 550 people?

21  A    Well, VSI was already under NDA and we gave VSI access to

22  the data room and provided additional diligence to VSI's

23  representative, Bud -- I can't remember his last name at this

24  moment, but he requested several additional pieces of

25  information including the cash burn rate at SeeCubic BV, which

 1 | we gave him, literally, up until the last minute.
 2 | Q    No, I understand that.  But my question was, did you
 3 | provide VSI with the teaser when you sent it out to the 550
 4 | parties?
 5 | A    I don't think so.
 6 | Q    Okay.
 7 | A    But I can't be sure.
 8 | Q    So the Continental Advisory firm that we talked about, did
 9 | you send the teaser to them?
10 | A    We did send the teaser to them, as well as the NDA, which
11 | they signed.
12 | Q    But did you send the teaser to them when you sent it out
13 | to the 550?
14 | A    They were not included in the 550, no.
15 | Q    And then we've -- there's been a plan on file now, it has
16 | just been for a couple of days, but the plan sponsor is an XD
17 | called CanAm Financial in Canada.  Have you ever heard of them
18 | before?
19 | A    What's the name?
20 | Q    Can -- C-A-N-A-M.
21 | A    No.
22 |        MR. GEORGE:  Your Honor, can we just have an offer of
23 | proof of the relevance of what's in that plan?
24 |        THE COURT:  Yeah, I don't -- well, the plan is not at
25 | issue for today.

1            MR. GEORGE:  Right.

2            MR. SWICK:  Well, we have some -- it's -- all I want

3    to prove is there was an entity that has interest in these

4    debtor's assets, that I don't think got the teaser or was

5    contacted by Mr. Victor.

6            THE COURT:  Did you -- sounds like you know them,

7    though, because they're part of the plan?

8            MR. SWICK:  They're the plan sponsor.  Yeah.

9            THE COURT:  Did you not give them the teaser?

10           MR. SWICK:  I -- well, we have now.  Into this

11   process.

12           THE COURT:  Okay.  Well, are you saying that they're

13   a potential interested bidder on these assets?

14           MR. SWICK:  They're not going to -- we don't want a

15   bid, we have a plan on file.

16           THE COURT:  Oh, okay. All right.

17           MR. SWICK:  Yeah.

18           THE COURT:  So but what's the relevance of Mr.

19   Victor's --

20           MR. SWICK:  Because CanAm is interested in spending,

21   like, $300 million on these debtors.

22           THE COURT:  How is that relevant to what Mr. Victor

23   was hired to do?

24           MR. SWICK:  Well, he was hired to go find people who

25   want to spend money on the assets and he didn't contact them or

 1  know who they were --

 2            THE COURT:  Mr. Victor --

 3            MR. SWICK:  -- or another part of the bids --

 4            THE COURT:  -- contacted over 500 people, I think

 5  that's pretty impressive.

 6            MR. SWICK:  No, and not only that, Your Honor --

 7            THE COURT:  And if you knew of someone that might be

 8  a potential interested buyer, I would think you'd forward all

 9  that information along to them.

10            If your point is that Mr. Victor didn't send a teaser

11  to this person who is part of your plan, I don't really see how

12  that's relevant if you, you know, he -- he did a good job.  He

13  sent it out to 500 people, and he didn't get any response.  So

14  any other questions?

15            MR. SWICK:  Yeah, I have more questions, Your Honor.

16            THE COURT:  Okay.

17  BY MR. SWICK:

18  Q   All right.  Mr. Victor, let's look at paragraph -- I'm

19  sorry, just give me one second.  Go to paragraph 11.

20  A    Yes.

21  Q   All right.  So we're just going to read it out loud, it's

22  a short paragraph, just to save time.

23            "I met with VSI representatives who, after an

24            extensive discussion of SSG's approach to marketing

25            the debtor's assets, were satisfied that I could

1                     perform the services of an investment banker fully

2                     and without conflicts.  VSI withdrew its objections

3                     to SSG's retention."

4                     Did I read that correctly?

5    A    Yes, you did.

6    Q    All right.  Is that totally correct, Mr. Victor?

7    A    It is correct because I spoke with counsel for VSI who's

8    here at the table today, along with his colleagues.  They had

9    objected to our retention, claiming that we had a conflict

10   because we were retained in the fall of 2022 to do an Article

11   IX sale for the secured lender; they objected; we had a phone

12   call, probably two; and they withdrew the objection.

13                    MR. SWICK:  May I approach, Your Honor?

14                    THE COURT:  Yep.  Thank you.

15   BY MR. SWICK:

16   Q    So Mr. Victor, this is an email from Mr. Thompson to Mr.

17   Coren, Michael Vagnoni, and Ed George.  I want to direct your

18   attention to paragraph 2.  Okay?  I'm going to read this out

19   loud, too.

20                    "Moreover, we believe we, in the trustee, were

21                    negotiating good faith regarding VSI's proposed plan

22                    of reorganization.  And thus, we agree to one,

23                    withdraw VSI's objection to SSG's engagement; two,

24                    postpone the hearing on our motion to compel and your

25                    motion to quash originally set for September 18th to

```
 1                  November 7th, simultaneously resetting the trustee's

 2                  motion to withdraw and VSI's motion for

 3                  reconsideration.

 4                  "However, within a few short days of postponing the

 5                  hearing, the trustee reversed its prior commitments

 6                  with respect to VSI's plan, rejected VSI's proposed

 7                  full payment plan, and filed an expedited sale and

 8                  good procedures motion."

 9                  Did I read that correctly?

10                  MR. GEORGE:  Your Honor, I'm going to object.  This

11    is a hearsay document; Mr. Victor's not copied on it.

12                  THE WITNESS:  I'm not copied.

13                  THE COURT:  Yeah.  Well --

14                  THE WITNESS:  I don't know if I've ever seen this.

15    But okay, you've read it.

16                  THE COURT:  Okay.  So I'm going to sustain that

17    objection.  He's not part of this.

18                  MR. SWICK:  Okay.

19    BY MR. SWICK:

20    Q    Were you part of any conversations where the attorneys in

21    this case and you were involved and mentioned and said hey,

22    we're going to withdraw this objection under certain conditions

23    that weren't just based on your qualifications?

24    A    No.

25    Q    No recollection whatsoever?
```

1    A     None.

2    Q     Okay.  Let's go back just a little bit and talk about your

3    previous retention involving these parties and these assets,

4    back in -- I think you said it was 2020 for SeeCubic and Hawk?

5    A     The fall of 2022.

6    Q     Oh, 2022.  Okay.  How were you approached for that

7    representation?

8             MR. GEORGE:  Your Honor, I'm going to object to the

9    relevance of this.

10            THE COURT:  Yeah.  What's the relevance of this?

11            MR. SWICK:  The relevance, Your Honor, is that we

12   have a sale process where no one has expressed any real

13   interest, the assets are going to the entity that held all of

14   the assets, weren't retained by the trustee, and no one could

15   even bid on the assets.  And so -- and then the investment

16   banker who did all of the solicitation was previously hired by

17   the Hawk parties and that's who these assets are going to

18   who've always retained them this entire time.

19            So the process -- this is going into legal argument

20   so I know exactly where you're going to go --

21            THE COURT:  I know.  Uh-huh.  That's right.

22            MR. SWICK:  -- so I'm going to -- that is, once

23   again, factual predicate for the legal argument, which is where

24   we are.

25            THE COURT:  Okay.  I'm going to sustain the

1    objection.

2              MR. SWICK:  All right.

3              No further questions.

4              THE COURT:  All right.  Anyone else?

5              MR. VAGNONI:  Can we go off of Rembrandt Exhibit 1,

6    the market excel sheet.  Do you have that up there?

7              THE WITNESS:  I have it.

8              THE COURT:  Okay.

9              MR. VAGNONI:  All set?

10             THE WITNESS:  Yes.

11                         CROSS-EXAMINATION

12   BY MR. VAGNONI:

13   Q    Okay.  So this document, can you describe for me how it

14   was created?

15   A    Yes.  My team created this one-page teaser which is

16   standard operating procedure to sell a company.

17   Q    Okay.

18   A    Or to finance a company, or whatever.  But a one-page

19   teaser is standard operating procedure in the hundreds and

20   hundreds of sales that I have done.

21   Q    Okay.  Thank you.  The assets overview section, who

22   provided you the information to write that section of the

23   teaser?

24   A    My team put it together, speaking with, specifically, the

25   engineering team in the Netherlands.

Case 23-07263-am-06598-934-1 Document 122/25 Filed 00/04/22/25 16:41:4679 Desc
Exhibit A   Mandamus Petition   Page 157 of 541

72

1    Q    Okay.

2    A    At SeeCubic BV.

3    Q    So this mentions the license with Phillips; do you see

4    that reference?

5    A    Yes.

6    Q    Did your team read the Phillips licensing agreement?

7    A    We had it, yes.

8    Q    But in the 550 --

9    A    In fact, it's in the data room.

10   Q    Right.  So in terms of the 550 companies, or entities,

11   that you contacted, did you reach out to the 23 or so licensees

12   in that Phillips agreement that are basically working in the

13   same technology?

14        MR. GEORGE:  Your Honor, I have an objection here.

15   He doesn't represent Phillips.  Leia, who, I understand is a

16   successor to Phillips is on the telephone.  So I don't

17   understand what standing he has to raise questions about the

18   Phillips license.  He's not the licensor, doesn't have any

19   interest in it.  He may -- his company may be a licensee, but

20   there are many of them out there.

21        THE COURT:  Sustained.

22        MR. VAGNONI:  Your Honor, I'm not asking about -- I'm

23   asking -- the companies he contacted, there's a list of

24   companies that have licensed the Phillips technology already.

25   They would be the prime companies to reach out to to sell these

 1   assets.  I'm asking if he reached out to any of those 23.

 2            THE COURT:  Okay.

 3   BY MR. VAGNONI:

 4   A     I don't know the answer.

 5   Q     Did you --

 6   A     As I sit here.

 7   Q     Did you reach out to Leia?

 8   A     I don't know.

 9   Q     Did you reach out to Dimenco?  Dimenco.

10   A     I don't know.

11   Q     How about Magnetic 3D?

12   A     Do not know.

13   Q     All right.  So having listed some of the major players in

14   no glasses 3D TV, you're --

15            MR. GEORGE:  Objection, Your Honor.  He's testifying.

16            THE COURT:  Yeah.

17            MR. GEORGE:  He's calling -- we haven't even heard

18   these names until he just said them, now he's testifying --

19            MR. VAGNONI:  Well, that's telling.

20            THE COURT:  He hasn't -- so he hasn't asked these

21   people.  So any other questions for Mr. Victor?

22            MR. VAGNONI:  Let me just take a second here and look

23   at my notes.

24            No.  I'm all set.  Thank you.

25            THE COURT:  Okay.  All right.  No more questions for

```
 1   Mr. Victor then?

 2              Okay.  You may step down, sir.  Thank you.

 3              THE WITNESS:  Thank you.

 4              MR. THOMPSON:  Your Honor, before you move on --

 5              THE COURT:  Yeah.

 6              MR. THOMPSON:  -- I may be able to -- I have some

 7   suspicion of where this may go, but we had also, a witness list

 8   and expected to be able to call witnesses on behalf of VSI and

 9   our case-in-chief and that included -- that includes Mr.

10   Charles Bud Roberston (phonetic), Ms. Nicole Menine, Matthu

11   Rajan, among others.  And I want to know whether we're going to

12   have that opportunity.

13              THE COURT:  I don't have any need to hear from any

14   witnesses about the sale.  What I was interested -- if there

15   were any concerns.  Like, the concerns I was interested in

16   hearing about today was the sale process, if you thought that

17   there was something that Mr. Victor should have done or if you

18   had questions for the trustee.  And I've heard all of your

19   questions, and I don't have any concerns about this sale.  I

20   don't.

21              So that doesn't leave me to have any questions or

22   need to hear from your witnesses.  Okay?

23              MR. THOMPSON:  Our witnesses are going to testify

24   about the disposition of the assets that this trustee says he's

25   selling.
```

 1          THE COURT:  Right.  And I think that the assets are

 2  what they are and the buyer has reviewed the schedules and has

 3  done their due diligence and is going to accept the assets as

 4  is, wherever they are.

 5          MR. THOMPSON:  But the disposition of those assets

 6  matters, Your Honor.

 7          THE COURT:  The disposition?  There's going to be a

 8  sale and the buyer's going to get the assets.

 9          MR. THOMPSON:  The assets that are Stream TV assets

10  that remain in the hands of the now winning bidder, the

11  stalking horse.

12          THE COURT:  The buyer's going to get the assets on

13  the schedules.  Okay?

14          MR. GEORGE:  Will we have an opportunity to respond

15  to their filing of this morning, requesting a new order?  And

16  then changes to the asset purchase agreement.

17          THE COURT:  I'm going to give you 48 hours.  If you

18  guys have any response to that, then -- okay.  Would you like

19  72 hours?

20          MR. GEORGE:  Is Monday morning -- what's the

21  difference --

22          THE COURT:  Monday morning is fine.  You can have

23  Monday morning to respond to the blackline order.

24          MR. WATTERS:  Your Honor, this is Michael Watters,

25  for Shepherd Mullen, I'm counsel to Leia, Inc.  I -- I have

 1   some concerns about the sale order as well.  I am sitting here

 2   listening to the characterization of the sale, you know, your

 3   characterization of the sale, I think, is inconsistent with the

 4   redline order.  I don't know if it's appropriate to raise that

 5   now --

 6             THE COURT:  Okay.  No.  Yeah.

 7             MR. WATTERS:  -- order.  All right.

 8             THE COURT:  Yeah.  All right.  I hear you.

 9             So Pam, just mark on the docket --

10             MR. WATTERS:  Yeah.

11             THE COURT:  -- that any concerns with the blackline

12   order should be filed Monday close of business, 5:00 p.m.

13             Okay?  Anything else?

14             MR. WATTERS:  Okay.

15             MR. SWICK:  I guess I just want to raise it formally,

16   and then to say we wanted to bring Matthu Rajan, Bud Roberston,

17   Nicole Menine, to testify, that's been denied.

18             THE COURT:  Yeah.  I find it totally irrelevant.

19   Thank you.

20             MR. GEORGE:  Your Honor, I would move into evidence

21   our exhibits 1 through 6 and ask the Court to take judicial

22   notice of the motion to approve the Hawk settlement which is

23   docket number 630; the evidentiary record from that hearing,

24   which is 670; the 9019 order which is 653; the trustee opinion

25   which is 548; the order granting Hawk relief from stay, which

1    is 549; and the reservation of rights by Leia which is 841.

2              THE COURT:  Okay.  So moved.

3              MS. RUSSEL:  Your Honor, Alyssa Russel from Skinner &

4    Skinner on behalf of SeeCubic.  Regarding the request to

5    respond to the redline order, the APA contemplates an outside

6    date for answering the order of December 7th and our client has

7    a target closing -- outside date for closing of December 10th.

8              THE COURT:  Yep.  I'm going to resolve --

9              MS. RUSSEL:  Your Honor has already --

10             THE COURT:  -- everything before the 10th.

11             MS. RUSSEL:  Okay.  I was going to say --

12             MR. THOMPSON:  Your Honor, no one put them here -- no

13   one put them here but them.

14             THE COURT:  Huh?  Yeah.  Okay.  I'm going to enter an

15   order prior to the 10th.  All right.  I think that concludes

16   our business here today.

17             MR. THOMPSON:  Thank you, Your Honor.

18             MS. RUSSEL:  Thank you, very much.  Ma'am?  Thanks.

19        (Proceedings adjourned)

20

21

22

23

24

25

C E R T I F I C A T E


      I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT C

```
                UNITED STATES BANKRUPTCY COURT

             FOR THE DISTRICT OF PENNSYLVANIA

                                    :
IN RE:                              : Case No.  23-10763
                                    :
STREAM TV NETWORKS, INC.   CH: 11 :
AND TECHNOVATIVE MEDIA,             :
INC.                                : Philadelphia, Pennsylvania
                                    : November 13, 2024
                                    : 11:00 a.m.
. . . . . . . . . . . . . . . . . .:


             BEFORE THE HONORABLE ASHELY M. CHAN
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

 For SeeCubic, Inc.:              Marley Brumme, Esq.
                                  Skadden Arps Slate Meagher &
                                  Flom, LLP
                                  500 Boylston Street, 23rd Floor
                                  Boston, MA 021116
                                  617-573-4800


 For Rembrandt:                   Andrew Peter Demarco
                                  Devlin Law Firm, LLC
                                  1526 Gilpin Avenue
                                  Wilmington, DE 19806
                                  302-449-9010


                                  Christopher Michaels

 For SSG Capital Advisors:        Samuel Charlton

 For VSI:                         John H. Thompson
                                  Akerman
                                  750 Ninth Street, N.W.
                                  Suite 750
                                  Washington, D.C. 20001
                                  202-393-6222


 For Hawk Investment Holdings     Steven Caponi, Esq.
 Ltd.:                            Margaret Westbrook, Esq.
                                  K&L Gates
                                  600 N. King Street, Suite 901
                                  Wilmington, DE 19801
                                  302-416-7080
```

```
                                    Jonathan N. Edel, Esq.
                                    300 South Tryon St., Suite 1000
                                    Charlotte, NC 28202

For the Trustee:                    Michael D. Vagnoni, Esq.
                                    Obermayer Rebmann Maxwell &
                                    Hippel LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia, PA 19102
                                    215-665-3066

                                    Steven M. Coren, Esq.
                                    Kaufman Coren & Ress, P.C.
                                    Two Commerce Square
                                    Suite 3900
                                    2001 Market Street
                                    Philadelphia, PA 19103-2713
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1  NOVEMBER 13, 2024                           11:00 A.M.
 2              THE COURT:  Okay.  Is there anyone else on the phone
 3  who is here for a case other than Stream TV?  Okay.  Thank you.
 4              Party who just joined the call, the last four digits
 5  6443.  Could you identify -- I'm sorry, 6643, could you
 6  identify yourself, please?
 7              MR. CHARLTON:  Yes.  Samuel Charlton with SSG Capital
 8  Advisers.
 9              THE CLERK:  Yes, with the last four digits 4063.  Can
10  I have your last name, please?
11              All rise.
12              THE COURT:  Morning.  Please be seated.  Court is now
13  in session.  All right.  This is the call on the 11:00 list.
14  The only matter remaining on the list is number 23, Stream TV
15  Networks and we have several parties on the phone and in the
16  courtroom.
17              Do you want to start with the people in the
18  courtroom, first?
19              UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah, let's start
20  with the people in the courtroom.
21              THE COURT:  Okay.  We're going to start with the
22  people in the courtroom and get everyone's appearances.
23              Appearances, please, on Stream TV.
24              UNIDENTIFIED SPEAKER:  Come sit at the table.
25  Welcome.
```

1       MR. THOMPSON:  Morning, Your Honor.  John Thompson of

2  Akerman on behalf of VSI and with me today is my colleague Adam

3  Swick and retired Judge Nick Clark from the Western District of

4  Texas.

5       THE COURT:  Welcome.

6       MR. CLARK:  Morning, Your Honor.

7       THE COURT:  It's good to see you.

8       MR. CLARK:  Thank you.

9       MR. DEMARCO:  Good morning, Your Honor.  This is

10  Andrew DeMarco from Devlin Law Firm here representing

11  Rembrandt.  Also here with me is Christopher Michaels from

12  Brown and Michaels who will be handling any argument today.

13       THE COURT:  Welcome.

14       MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

15  from K&L Gates on behalf of Hawk.

16       THE COURT:  Okay.

17       MS. BRUMME:  Good morning, Your Honor.  Marley Ann

18  Brumme of Skadden Arps on behalf of SeeCubic.

19       THE COURT:  Okay.  Great.  I thought you guys were

20  going on the phone.  You're going to be outnumbered.

21       MR. CAPONI:  Yeah.

22       THE COURT:  No, you're here.  Okay.  All right.

23  We're just entering appearance, so come on up and say hello.

24       MR. VAGNONI:  Good morning, Your Honor.  Michael

25  Vagnoni on behalf of Bill Homony, Chapter 11 Trustee.  I have

1   with me Ed George and Steve Coran from Coran and Ress.

2              THE COURT:  Okay.

3              MR. CORAN:  Morning.

4              THE COURT:  Good morning.  All right.  How about the

5   people on the phone?  Did you want to note your appearance if

6   there's anywhere there?

7              Do we have anyone?

8              UNIDENTIFIED SPEAKER:  Yeah.  Yeah.

9              THE COURT:  We do?  The parties on the line, if every

10  -- if you could each speak one at a time and tell us who you're

11  here for on Stream TV and enter your appearances, please.

12             MR. EDEL:  This is Jonathan Edel from K&L Gates on

13  behalf of Hawk Investment Holdings.

14             THE COURT:  Okay.  Anyone else or you think that's

15  it?

16             UNIDENTIFIED SPEAKER:  They might just be observing.

17             THE COURT:  Okay.  Fine.

18             All right.  Well, welcome back, everybody.  I know

19  we're here on the reconsideration, which I will -- I guess I

20  just wanted to address the discovery issue.  So the last time

21  we were talking on the phone, you guys had raised an issue

22  about the assets that were being sold and you had concerns

23  about whether there were licenses and I think Mr. Vagnoni, I

24  was giving you a week to try to clarify for them what assets

25  were going to be sold.

1           So have you had any productive conversations

2    hopefully with them?

3           MR. VAGNONI:  Your Honor, we took your direction from

4    the last hearing, and we provided both VSI, accounts for VSI

5    and accounts with Rembrandt.  A fairly exhausted list of what

6    the assets are.  Not just the assets that we are -- that the

7    Trustee is selling, but the assets that are embedded in the

8    downstream subsidiaries whose equity we are selling as well.

9           That, I think, would have satisfied the Court's

10   concern in that regard.  I have a copy of what we sent.  I

11   didn't bring multiple copies.  It's very thick.  But we did

12   provide that.  We did also receive a email on Friday of last

13   week asking for a meet and confer to discuss what discovery

14   would be taking place.

15          We did not engage in that meet and confer.  We didn't

16   take your comments last week as we thought everything was

17   quashed to that point based on your ruling.  So we did not meet

18   and confer.  We were preparing for the hearing.  But we -- and

19   we did not engage in any discovery again, because we thought

20   the discovery request had been quashed by Your Honor.

21          But again, we did provide them with a listing --

22          THE COURT:  Okay.  Well, let me --

23          MR. VAGNONI:  -- on the --

24          THE COURT:  -- see if they feel like they have a

25   better understanding.

```
 1              So do you gentlemen have a better understanding of

 2   exactly what's being sold?

 3              MR. MICHAELS:  We have no better understanding.  Most

 4   simply, are they accepting -- assuming, rejecting saying that

 5   the Rembrandt contract is invalid, valid?  What is their

 6   position?  Where is our IP?  Have they removed it?

 7              They're disclosure, this voluminous thing they

 8   described has a single sentence that says, "software," right?

 9   There's no discussion of -- we have asked over and over again,

10   are you in control of the software professional development

11   system?  I.E., do you have the username and password?  No

12   response.

13              THE COURT:  Uh-huh.

14              MR. MICHAELS:  We have no idea what they have.  More

15   so, we're the ones that have provided a far more extensive list

16   of what assets we believe could be in that estate and we've

17   told them what documents we're relying upon and asked them,

18   what is the status of each of these individuals assets?  No

19   response.

20              THE COURT:  Okay.  So --

21              MR. MICHAELS:  We are no more clear than we have --

22              THE COURT:  -- I've been with you guys up until this

23   point.  But now, you know, they've got some serious concerns.

24   You know, their belief is that the sale of the asset is going

25   to violate all of these rights.  It's going to spawn all of
```

```
 1   this litigation about the licenses, right?  That's their

 2   concern.

 3              And I'm willing to consider a sale of this, but at

 4   the very basic level, we need to understand exactly what is

 5   being sold, right?  And it sounds like today they don't know.

 6              So he just said that you said it's software.  Do you

 7   have something more specific than just the word software in

 8   terms of this being sold?

 9              MR. VAGNONI:  There was -- Your Honor, first of all,

10   let me just address a couple of things that Mr. Michaels said.

11   I think he indicated once again to the Court that he hasn't

12   been made aware of whether or not the sale will include an

13   assumption and assignment of the Rembrandt license.

14              Paragraph 27 of our motion clearly indicates that

15   that license is not part of the sale transaction.  It is not

16   going to be acquired by the stock and horse purchaser.

17   However, if there is a competitive bid, a bid that is a

18   superior bid to the stock and horse bid that wants the

19   Rembrandt license, absolutely we would entertain an assumption.

20   There would have to be discussion about what --

21              THE COURT:  Okay.  So let's -- what we're going to do

22   today, just so I have an idea, we're just going to take this

23   issue by issue.  So you're saying that the license is not part

24   of the sale --

25              MR. VAGNONI:  That's correct.
```

Case 2:10763-am-065286c-P0D34-1DocEment 001/223/25FileEntered 09/04/22/25d6:41:46685 Desc
Exhibit A   Mandamus Petition   Page 173 of 541

9

```
 1              THE COURT:  -- but you would contemplate bids on it.
 2    I'm not sure how you'd write that into the bid procedure, but
 3    we can talk about that in a minute.
 4              So what's your response to that?
 5              MR. MICHAELS:  It's not an assignable license.  It's
 6    not their option to decide to sell it or not.  That's -- and
 7    neither is the Phillips license.  It is -- we have -- we did
 8    not need Mr. Vagnoni to explain to us whether or not our
 9    license was assignable.  It is absolutely note and all the case
10    law is --
11              THE COURT:  Okay.  Well --
12              MR. MICHAELS:  -- if I don't mind?
13              THE COURT:  Yeah.
14              MR. MICHAELS:  Our issue isn't that the contract is
15    -- that they're attempting to assign it.  They are clear
16    they're not attempting to assign the contract.  It's the
17    intellectual property that is the basis of that.  I mean,
18    saying I'm not handing you a piece of the car, the car title
19    is, you know, that -- but I'm going to hand them the keys to
20    the Lamborghini.  I mean, we're concerned about the keys and
21    the Lamborghini, not the piece of paper that says we own it.
22    We already have that.  I don't need them to tell me we have
23    that.
24              THE COURT:  Yeah.  Yeah, yeah.
25              MR. THOMPSON:  Your Honor, if I might add?
```

```
 1              THE COURT:  Yeah.

 2              MR. THOMPSON:  There's a real problem with the bid

 3    procedures in addition to those that Mr. Michaels rose --

 4    raised.  In this circumstance, Mr. Vagnoni has just told the

 5    Court as his email to us told us that they are, I guess,

 6    excluding the asset that is the Rembrandt license.  The reasons

 7    you just heard.  It doesn't matter whether they wanted to

 8    assume it and assign it, they could not.

 9              But in this circumstance, right, they're suggesting

10    that some other party out there might come in and bid for it.

11    Well, how do we have a bid process where --

12              THE COURT:  Yeah, yeah.  Okay.

13              MR. THOMPSON:  -- some other parties actually

14    consider --

15              THE COURT:  Well, tell me this.  If he -- if we have

16    -- let's say we have the bid, we had the auction, right, and

17    Hawk's the only one that shows up and under their purchase

18    agreement, they're not going to get it.  Then does that take

19    care of your issue entirely because --

20              MR. MICHAELS:  Not in any way, Your Honor.  I mean,

21    we have listed out a huge number of trade secrets.  We have a

22    bunch of patents.  The very assets that they have listed where

23    they've talked about TV's, prototypes, demos, those are all --

24    were all alleged back in 2017 to have been covered by

25    Rembrandt --
```

```
 1              THE COURT:  All right.  So let me just, like -- I'm
 2    sorry.  Let me just be more specific.  So I want to take it
 3    issue by issue.
 4              MR. MICHAELS:  Uh-huh.
 5              THE COURT:  So at least I understand.  So he had
 6    thrown out this comment that he's not attending to sell certain
 7    licenses unless someone else bids for it.  So with regard to
 8    those licenses, if there's no other bidder and the stocking
 9    horse gets it, Hawk gets it, then with regard to that license,
10    then I think we're all in agreement that the license isn't
11    being sold at all, right?
12              So I think you wouldn't have an issue if there's no
13    stocking horse -- if it's just a stocking horse bidder and
14    there's no other bidders with regard to the license.
15              MR. MICHAELS:  With respect, we would.  The issue
16    with the license -- it's not a question of will they assume or
17    reject it in the future.  It's SSG offering for sale
18    Rembrandt's patented technology.  That's a violation of Section
19    271.  That's present today patent infringement -- you -- they
20    do not have a license to the Rembrandt technology.
21              THE COURT:  Hold on a second.  Who is that person?
22              All right.  So I would ask everyone on the phone line
23    to try to mute your phone because we're -- someone's not muted,
24    so we're hearing everything in the courtroom that's going on
25    there.  So could everyone just take a moment?  How do they mute
```

Case 2:3t-107:63-am-06520c-9834-1Do Fidert.00123/25 Filert.00122/25 pr.6:141.4685 Desc
Exhibit A   Mandamus Petition   Page 176 of 541

12

1    their line?

2            UNIDENTIFIED SPEAKER:  Star six.

3            THE COURT:  So if you could just hit star six,

4    everyone on the line, I'd appreciate that.

5            MR. VAGNONI:  Your Honor, if I may -- raise that

6    issue for a very specific reason.  SSG is not offering that

7    license for sale.  That is not part of the AP --

8            THE COURT:  So when we say license, let's just drill

9    down a little bit.  License of what?

10           MR. VAGNONI:  Absolutely.  Very vague.

11           THE COURT:  License of what?

12           MR. VAGNONI:  There is a 2021 settlement agreement

13   that a single line in it that is a -- called a grant of rights.

14   In that grant of rights, Rembrandt reports to give the rights

15   -- the nonexclusive rights to use their intellectual property.

16           By the way, that settlement agreement was entered

17   into the day or the day before Rembrandt -- they became a

18   creditor by virtue of that and then were a petitioning creditor

19   in Stream's failed involuntary bankruptcy in Delaware.  We take

20   significant issue with that agreement as a whole.  But let's

21   just take it as it is.  That license agreement comes out of a

22   settlement agreement.  And like I said, the -- SSG is not

23   offering that for sale.  However, in the -- which you'll hear

24   about when we get to testimony.

25           In negotiations with VSI and with Rembrandt, it's

 1  been made clear to us that if a transaction was to occur with

 2  VSI, that the Rembrandt license would have no problem being

 3  assumed.

 4          And in fact, there are -- there is a post-petition

 5  agreement that was entered into by Rembrandt Stream and VSI

 6  that was not court approved that purported to do just that.

 7  Give VSI rights in that license.  And exclude Streams

 8  subsidiaries from the use of that technology pursuant to that

 9  license.

10          So that is why I indicated to the Court that if there

11  was a transaction that was a higher and better bid, which VSI

12  and Rembrandt are free to bid in this process.  They've been

13  free all along.  They've had access to the data room if they

14  wanted it.

15          The VSI is the only person who's taken up that offer.

16  That is what I was referring to.  Not that it was generally

17  assignable.  We don't think anybody has interest in it and we

18  also don't think we are selling any assets that have that --

19  Rembrandt intellectual property in that -- in the asset.

20          MR. MICHAELS:  Your Honor, I'd like -- I apologize.

21  I'd really like a chance to finish answering your question that

22  you had asked previously.

23          THE COURT:  Yes, that's fine.

24          MR. MICHAELS:  So the -- you asked whether the issue

25  would be resolved if the Hawk party's just didn't take -- it

1    isn't a question of SSG selling our license.  It isn't an

2    active patent infringement.  The active patent infringement is

3    offering for sale in a patented invention on why Rembrandt,

4    right?

5              And the TVs, all of the assets that Mr. Vagnoni

6    clearly lists are being offered for sale.  That is the active

7    patient infringement.  SSG has committed patent infringement.

8    All five of those individuals have committed patent

9    infringement.  The Trustee has committed patent infringement

10   unless they can show that they have a license.

11             So when Rembrandt is asking about the status of its

12   license, it is, are we suing those individuals and those

13   entities tomorrow?  They -- it is -- if they have a license, we

14   can't.  That is a full and absolute complete defense.

15             The agreement that Mr. Vagnoni's referring to is

16   Streams former counsel, almost immediately after filing the

17   petition contacted Rembrandt and said, we know we need a

18   license to your technology as an administrative claim.  We need

19   to resolve this.  And we signed a settlement amendment that

20   extended the time that prevented the estate from becoming

21   administratively insolvent due to the fees that were going to

22   be due to Rembrandt.

23             They have said they're not honoring that settlement

24   amendment.  The arrears are $3 million.  Does the estate have

25   $3 million to have that license?

Case 2:23-cv-06526-PD Doc 9-1 Document 1 Filed 01/23/25 Entered 01/22/25 16:41:45 Desc
Exhibit A   Mandamus Petition   Page 179 of 541

15

1          THE COURT:  So I'm trying to -- I feel like there's

2    litigation that's going to be spawned, right, by -- under the

3    licenses and I'm just trying to have a very basic understanding

4    of what is purportedly being sold by the Debtor.

5          MR. THOMPSON:  They don't know, Your Honor.

6          THE COURT:  I --

7          MR. THOMPSON:  And that's --

8          THE COURT:  -- and I get that.  And I -- so I'm -- I

9    think that we have, like first thing -- what happened?  Okay.

10   Good.  Thank you for muting everybody.

11          So the first step to me seems that we should at least

12   come to an agreement, or at least I need to understand what is

13   being sold.  So can we just focus on that for instance.

14          All right.  So I think one of the comments -- and so,

15   you said before, like, they had described software or something

16   that was, like, their general description.  So did you, Mr.

17   Vagnoni, describe on some schedule that software is going to be

18   sold as part of this?

19          MR. VAGNONI:  Your Honor, I will -- if I may, to

20   preface what -- the answer to that question.  What the Trustee

21   is selling is all of the assets of Stream, which are clearly

22   listed in schedules, which are a public document they have

23   access to.

24          Mr. Rajan, who is the head of VSI, signed those

25   scheduled, I believe, and he certainly took part in preparing

Case 2:21-cr-00536-PSG-1 Document 934-1 Filed 01/23/25 Entered 09/04/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition   Page 180 of 541

16

 1  them.  So he should know exactly what is in those schedules.

 2  The other assets that are being sold in the APA are the equity

 3  interest and all the subsidiaries of Technovative.

 4        The software, the intellectual property, the license

 5  to Phillips, all of that is contained in downstream

 6  subsidiaries.  We are not selling those assets per say.  We're

 7  selling the equity in those assets.

 8        And this is typical of a case where a Chapter 11 or

 9  Chapter 7 Trustee walks into a mess and sees that it's

10  spiraling out of control and tries to bring some control to the

11  situation and get the estate some money before there is no

12  money.

13        THE COURT:  Okay.  So again, my focus for right now

14  is, I'm just trying to understand what the assets are.  So he's

15  telling me that he's purporting to sell the equity and the

16  entities that presumably are in possession perhaps of your

17  property, is that your understanding there?

18        MR. MICHAELS:  Mr. Vagnoni just described the process

19  as typical, right?  An IP -- a technology case of this sort,

20  purporting to sell intellectual property rights is anything but

21  typical.  And I think --

22        THE COURT:  Okay.  So let's just focus on -- I just

23  want to drill down on what assets are being sold.  So he's told

24  me that he's selling equity in entities that presumably possess

25  your intellectual property.  Can we agree on that?

```
 1              MR. MICHAELS:  Yes.

 2              THE COURT:  Okay.  Good.  All right.  That's

 3   progress.

 4              MR. MICHAELS:  That's one -- I mean, that's one

 5   aspect of what he said.

 6              THE COURT:  Okay.  Fine.  That's one aspect.  Okay.

 7   So tell me -- so your concern, though, is that when he purports

 8   to sell the equity in these companies, then the buyer who takes

 9   possession of the -- like, they buy the equity, right?  Now,

10   they're going to own, you know, via that equity, everything,

11   you know, tangible and intangible that those entities own.  And

12   your -- and so your position is that some of the assets that

13   they own are your property?

14              MR. MICHAELS:  Yes.

15              THE COURT:  Okay.

16              MR. EDEL:  Your Honor, if I may --

17              THE COURT:  Yeah.

18              MR. EDEL:  -- since I'm representing Hawk.  The --

19   Mr. Vagnoni is correct.  We're -- the stalking horse is

20   acquiring the equity.  Stream is a holding company.  All the

21   operating entities, the main operating entities in the

22   Netherlands and requiring the stock that owns the stock that

23   owns the stock that owns that entity.  The fundamental dispute

24   here is that Rembrandt believes that its trade secrets, its

25   knowledge, its know-how is embedded in everything that Stream
```

1    does.

2            So every TV that it has, every computer that it

3    touches, somehow can -- you know, involves their intellectual

4    property.  Now, there's intellectual property such as patents.

5    Rembrandt brought patent litigation many years ago, but it was

6    dismissed, and they have not asserted a patent case.

7            They're really talking about the intellectual

8    property.  We disagree.  We believe that the technology that

9    Stream developed through its operating subsidiaries overseas is

10   -- belongs to Stream.  If my client acquires the stock, it's

11   acquiring that entity, the good, the bad, and the ugly.

12           And if that means that entity, if Rembrandt believes

13   that entity has put intellectual property into a TV or trade

14   secrets, we'll duke it out after the fact.  But what this is

15   all about, this is Rembrandt and attached to the hip of Mr.

16   Rajan trying to stop at every opportunity this case moving

17   forward.

18           THE COURT:  Okay.  I know.

19           MR. EDEL:  Rembrandt --

20           THE COURT:  You believe there's spoilers and I --

21           MR. EDEL:  Well, Your Honor, I think it's -- it's not

22   just, I think.  As Mr. Vagnoni indicated, they entered into a

23   settlement.  They're standing before Your Honor before today

24   trying to hold up this sale.  Rembrandt entered into an

25   agreement during the pendency of the bankruptcy and amended it

 1   with Mr. Rajan where they identified all of their technology,

 2   all of their knowhow, how they believed it was being used in

 3   everything and said, if Mr. Rajan gets the company, all is good

 4   in the world.  No one else is allowed to have it.

 5            And then come before the Court today and say, we have

 6   no idea how he's using our stuff.  Well, they had a pretty good

 7   idea when they were executing documents, you know, in the

 8   shadows during the pendency of a bankruptcy.  But now they want

 9   to come, Mr. Rajan, who founded the company, ran the company

10   until he was -- you know, the Court determined he was

11   uncredible and removed him.  And throughout the entire pendency

12   of the second bankruptcy which dismisses fraudulent at the aide

13   of Rembrandt to today, they're attached at the hip.

14            This is, with all due respect to the Court, my client

15   has been through this process for many, many years.  It's a

16   very simple sale.  Nobody else, and I think this cannot be

17   lost, nobody else is interested in these assets.  No one has

18   come forward to the pendency of the bankruptcy.

19            THE COURT:  All right.  But we aren't going to get

20   into this.  But from what I understood, the data room is not

21   complete.  I mean, there's --

22            MR. MICHAELS:  That's right, Your Honor.

23            MR. EDEL:  The --

24            MR. MICHAELS:  That's by design.

25            MR. EDEL:  -- data room is not complete because the

 1   data room does not include the fraudulent documents Mr. Rajan

 2   created during the bankruptcy, for example --

 3          THE COURT:  Okay.  Well --

 4          MR. EDEL:  -- these purchase orders that don't exist.

 5          THE COURT:  I would like to just -- I would like to

 6   be able to have civil conversations here today.  And I

 7   understand you guys don't like each other.  I know that.  So to

 8   the extent that we could -- I understand.  Like, I call it

 9   spoilers.  You think that they're spoilers.  You guys think

10   that they're selling your assets, and everyone is really

11   annoyed with each other.  I get the sentiment.  I understand

12   that.

13          Okay.  But it doesn't help me get to the point.  So

14   let me tell you what I think is one possibility here, right?

15   So Mr. Vagnoni wants to sell the equity in these companies, if

16   there's -- if we get to the point of a sale and there's no

17   other bidders and Hawk picks up these assets, then under 363

18   when he gets all this stuff, to the extent that you think that

19   he's misusing it, then you're going to sue Hawk, right?  Aren't

20   you going to sue Hawk?

21          MR. MICHAELS:  We already have.  They're in --

22          THE COURT:  Yeah.  Yeah.

23          MR. MICHAELS:  -- we're in litigation in Delaware.

24   But I think what I'm trying to be clear here is that Mr.

25   Vagnoni has -- they're talking about a bunch of equity, and

Case 2:23-cv-06524-PD Document 93-1 Filed 01/23/25 Filed 09/22/25 16:21:46 Desc
Exhibit A   Mandamus Petition   Page 185 of 541

21

```
 1   he's also put on their asset list that they are selling devices
 2   that are accused of being -- infringing over on Rembrandt's
 3   patterns and Stream, under the guidance of DLA Piper, took a
 4   license.
 5          Stream again renewed that -- negotiated again are
 6   Armstrong T -- they advised them to do that.  Lewis Brisbois,
 7   same thing.  We have numerous law firms evaluating these claims
 8   and saying this was a good idea.  We have Mr. Homony testify.
 9   He's done no investigation as to whether this is a good idea or
10   not.  And they ignored the issue.
11          They have not -- if the Rembrandt is not valid, we're
12   hearing, you know, testimony that may or may not -- this
13   Rembrandt license may or may not be valid.  It was, you know,
14   executed in 2021 right before a bankruptcy.
15          So if it's not valid, that means all the activity
16   that the estate to date are infringing a patent.  I just want
17   to be clear that that's the argument, is that this estate goes
18   almost instantaneously administratively insolvent.  And we are
19   looking for and we will ask the Courts -- the District Courts
20   to enjoin any transfer of our intellectual property.
21          Now we have licensed Stream.  We have -- we are
22   arguing that the license is valid but cannot be transferred.
23   You may not transfer our intellectual property.  You take a
24   ring, and you put it in a box and say, well, I'm just selling
25   this box, whatever may be in it.
```

1          You know, we've evaluated what's inside the box.

2     What's inside of SeeCubic B.V. is Rembrandt technology.  We've

3     gone through that multiple law firms representing Stream.  And

4     we have determined that a license was necessary.  And SSG does

5     not get covered by ignorance.  There's no, I didn't know, Your

6     Honor.  It defends patent infringement.

7          They are actively offering for sale assets that

8     include that were directly laid out in the complaints back in

9     2017.  And while Mr. Caponi said it was dismissed, it was a

10    jurisdictional.  Every patent case under *TC Heartland*, the

11    Supreme Court case was dismissed and had to be brought in the

12    home state of the corporation.

13         And we immediately entered mediation, and they

14    insisted the DLA Piper's counsel and Streams officers, most

15    notably, Shadron Stastney, insisted that the patents be

16    included in the license agreement.

17         So this idea that they weren't important to Stream is

18    not supported by the facts in any way, shape, or form.  And we

19    are asking for clarity, is the Trustee operating and is SSG

20    operating under the license?  I.E. they therefore can't be sued

21    for trying to sell a TV covered by one of our patterns.

22         THE COURT:  Okay.  It sounds like they want to sell

23    equity and entities who have hard assets that contain your

24    intellectual property.  So the owner of the equity will

25    presumably then own these hard assets that have your

1  intellectual property embedded in them.  That's what I

2  understand?

3          MR. EDEL:  That's Your Honor, that's if it indeed a

4  -- a bidder is capable of determining what they're buying or

5  what the assets underneath that equity.

6          UNIDENTIFIED SPEAKER:  Your Honor?

7          MR. EDEL:  We have a whole list -- excuse me.  We

8  have a whole list of items that purport to the assets of the

9  Debtors.  I'm telling you today that that is an incomplete list

10  that was filed on this docket reported to this set of assets

11  that are being sold, that's substantially all of the assets of

12  the Debtors and we can show that.

13          More than that, the data room is breath of lots of

14  information.  And the process -- and I know Your Honor wants to

15  focus on the assets, I will focus on the assets, but as Mr.

16  Caponi tried to raise the broader issues.  The broader issue

17  here is that this trustee has agreed to transfer this set of

18  assets to one party and one party only and that is the Hawk

19  parties, right?

20          And they've done pursuant to 9019 settlement

21  agreement that purports just to be a settlement agreement, but

22  it's a sub rosa plan, because there's no other entity out

23  there, whether they be a strategic buyer or another competitor

24  of a Stream TV that would be interested in these assets under

25  these conditions based upon these encumbrances.  And it's not

```
 1   just --

 2              THE COURT:  Okay.  So gentlemen --

 3              MR. EDEL:  -- not --

 4              THE COURT:  -- let's just take a moment here.  So in

 5   terms of the bid procedures, I have concerns I think that you

 6   guys raised.  Some legitimate concerns, which we'll get to,

 7   right?

 8              So I see, like, several different areas that need to

 9   be addressed over time.  The first is, you need to know what is

10   being sold.  They're selling the equities that contain the

11   equity of entities that own the tangible property that has your

12   intellectual property.  So now you know.  They're -- that's

13   what they're trying to sell.

14              So the first step is, I'd just like to get some

15   clarity and make sure that we're all on the same page as to

16   exactly what's being sold.  Then we'll go through the bid

17   procedures and all of the many objections, some of which I

18   thought were meritorious.  But some of the issues that you're

19   raising are really important issues.

20              But to me, they appear closer to sale issues, right?

21   It's going to be a huge issue when you object to the sale,

22   right?  I'm going to -- it looks like I'm going to need some

23   briefs on all of the very important issues that you have to

24   raise.  But those are issues that, you know, that I think are

25   more appropriately dealt with then, right?
```

```
 1            So in terms of, you want discovery.  So the discovery

 2   that you want, I think it's important for you to get discovery

 3   if it's necessary on what assets are being sold.  But we have

 4   that -- we now have that nailed down.

 5            So let's focus first on what exactly is being sold.

 6   So you're selling the equity that has hard assets, that has

 7   their intellectual property embedded in it.  So let's --

 8            MR. VAGNONI:  Allegedly, Your Honor.  There's been

 9   no --

10            THE COURT:  Oh, okay.

11            MR. VAGNONI:  -- there's been --

12            THE COURT:  That's fine.  I understand you're not

13   conceding anything.  But I just want, for clarity sake, to

14   understand what it -- you know, what's being sold.

15            MR. MICHAELS:  Your Honor, their agent, SSG, as

16   investment banker, sent out a teaser that purported to sell the

17   capability of making licenses of the Ultra-D technology.

18   Rembrandt's technology or IP is in it and so is Phillips.

19            THE COURT:  Okay.  So what we're -- so that's not --

20   what I'm talking about, like, a hard asset.  Now you're talking

21   about some technology, is that --

22            MR. MICHAELS:  In some cases, it is a hard asset.

23   There are -- this lens technology they patented.

24            MR. SWICK:  Your Honor, Adam Swick, Akerman on behalf

25   of Visual Semi, VSI.  The issue is they have a stalking horse
```

1    bidder that has been at odds with the former debtor --

2              THE COURT:  Clearly.  Yeah.

3              MR. SWICK:  Yeah, yeah.  And so, they took control of

4    the Debtors' assets, they broke into the Debtors' offices,

5    stole TVs, they stole intellectual property.  They've been

6    using them.  They've been showing.  There's emails and letters

7    and we'd love to get discovery from the Trustees, because we

8    believe the Trustee knows all of this.

9              And so, they have TVs in different locations.  They

10   have different hard assets.  All this is purporting to be sold

11   by the Trustee who hasn't gotten it back, because that's the

12   stalking horse and they need the stalking horse to be able to

13   go out and raise money to fulfil their obligations.  And as of

14   the filings last night, the stalking horse doesn't have the

15   money to pay for the 363 as it is right now.

16             So yeah, what we need is discovery on where are all

17   these TVs?  They're all over the world.  They're in the

18   different offices of SeeCubic and the Hawk parties.  I mean,

19   Mr. Caponi up here, he represents the Hawk party's and Robert

20   Morten (phonetic), who's subject to a cold shoulder, which is

21   the worst crime of moral turpitude in the U.K.  It's supposed

22   to end your career and that's who these guys have hitched their

23   wagon to.  So we just need discovery to find the assets so we

24   -- if they want us to participate in a 363 sales process, how

25   are we going to do that if we don't know where the TVs are?

```
 1   Who's --

 2              THE COURT:  Okay.

 3              MR. SWICK:  -- using them?

 4              THE COURT:  So again, let's just focus back on what I

 5   care about.  What I care about is, I want to know what they're

 6   purportedly selling.

 7              MR. SWICK:  They don't know.

 8              THE COURT:  Okay.  And I know you say that.  But why

 9   don't we just go through all of the concerns you have about the

10   identity of the assets?

11              Yes?

12              UNIDENTIFIED SPEAKER:  Your Honor, going -- sort of

13   taking a broad step back, how we ended up here.  My client has

14   a security interest.  Again, Stream's the holding company.  Has

15   no assets, other than stock and subsidiaries.

16              My client's security interest was primarily in the

17   stock and subsidiaries, not in the assets of the subsidiaries.

18   The 225 action, which we settled through the 9019, we were a

19   day away from taking control of that stock.

20              This settlement and this sale is effectively the same

21   thing.  It's selling the stock.  The companies that -- whatever

22   assets are in those companies that my client shows up and there

23   was TVs -- before my client and everybody else shows up,

24   there's TVs there, they own them.  If they're not, they don't.

25              It's the stock.  They want to drill down into -- and
```

1   if we get into this level, what TV is sitting in Copenhagen and

2   what software is on that TV, we're going to be here for six

3   years.  One, we're never going to know because it's in

4   Copenhagen.  But, we're going to be here for six years.  This

5   is a sale of stock, the security interest was in the stock.

6   And absent the settlement, my client would have already had

7   it's one day hearing in a court of chancery and owned the

8   stock, this would all be muted.  This is a path of least

9   resistance to an estate that never had any money and doesn't

10  have any money. This deal is --

11          THE COURT:  Okay. I understand that you're buying the

12  stock.  But in order for any potential bidder to understand

13  what they're buying, right, they know that they're getting the

14  stock.  But presumably, they'd like to get a better idea of

15  what the hard assets or the intangibles are of the entities

16  whose stock you're purchasing, right?

17          So I think it's reasonable that there should at least

18  be some general description of -- you know, it doesn't have to

19  be, like, I don't need, like, a audit, right, of every single

20  TV or every single hard asset.

21          But isn't there some kind of --

22          UNIDENTIFIED SPEAKER:  Your Honor --

23          THE COURT:  -- schedule that we could put together

24  that would say, you know, all the -- I mean, I don't know.  Are

25  you just purporting to say that all of the equipment and all of

Case 2:23-07763-am-065208-9134-1 Doc Filed 01/23/25 Filed 04/22/25 16:30:45 Desc
Exhibit A   Mandamus Petition   Page 193 of 541

29

```
 1   the -- you know, every personal property owned by these

 2   entities. But do we have, like, a vague description of, like --

 3             UNIDENTIFIED SPEAKER:  Well, there's --

 4             THE COURT:  -- you know, approximately this many TVs

 5   or approximately this many --

 6             MR. VAGNONI:  Yes, Your Honor.

 7             THE COURT:  -- other things.

 8             MR. VAGNONI:  The --

 9             THE COURT:  Okay.

10             MR. VAGNONI:  -- answer is yes.  We have a list that

11   we're happy to share with you.

12             The -- one thing I want to point out to Your Honor is

13   the process that we -- that was started over a month ago that

14   was teasers were sent out to over 500 different entities, both

15   strategic and financial, by SSG.  Mr. Victor is going to

16   testify about that for you as part of the sale procedure.

17             We got exactly zero interest from those teasers.

18   Nobody asked the question of who -- what is in there.  The only

19   parties that expressed an interest were VSI and not Rembrandt

20   and a purported investor in VSI.

21             And we have worked with VSI, who by the way Your

22   Honor, I think you're getting the picture that they are in the

23   unique position to know exactly what those assets are that are

24   being sold.  Exactly what they are.

25             VSI has expressed no interest in bidding on these.
```

Case 2:23-cv-06520-PD-1 Document 134-1 Filed 01/22/25 Filed 01/22/25 Entered 01/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition   Page 194 of 541

30

 1   They wanted to go down a sale process, which we will describe

 2   to you why that is not a possibility.  But not even speaking to

 3   Mr. Michaels comments about the lawsuits and the estate being

 4   administratively insolvent.

 5          The purchaser is assuming all liability.  Not just

 6   from Rembrandt under an IP claim, but they're assuming any

 7   liability from any alleged IP infringement.  And they're fully

 8   indemnifying the bankruptcy estates, the Trustee, and the

 9   Trustees professionals.

10          MR. MICHAELS:  Exactly, Your Honor.

11          MR. VAGNONI:  We think that we are insulated -- and

12   that was based on what we think are hollow threats, but that

13   doesn't mean there won't be a lawsuit and that the Defense

14   won't impair the unsecured creditor's ability to get a

15   distribution.  That's what we're trying to protect here.

16   That's what we're trying to specify.

17          THE COURT:  Okay.  So Mr. Vagnoni, let me tell you

18   what I'm interested in.  You know, in a 363 sale, you know,

19   you're -- my concern is, I just want to make this a transparent

20   process so that any potential bidder could understand what is

21   being sold, right?

22          So it sounds like you -- you know, you have this

23   teaser.  I haven't seen what the teaser says, but this list of

24   all of the -- you were saying that there was a schedule that

25   the owner of VSI -- what was his name again?

```
 1                   MR. VAGNONI:  Mr. Rajan.

 2                   THE COURT:  Mr. Rajan?  Okay.  So Mr. Rajan, at some

 3    point, put together some kind of a schedule of what each of

 4    these entities owned.

 5                   MR. VAGNONI:  Schedule A.  Oh, I'm sorry.  Yes, the

 6    Schedules A and B to the -- the official schedules of the

 7    Debtors.

 8                   THE COURT:  Okay.

 9                   MR. MICHAELS:  Excuse me, Your Honor.  I have to --

10    correct.  Is that your -- is this the Trustees schedule or are

11    you suggesting --

12                   THE COURT:  I think --

13                   MR. MICHAELS:  -- that this is Mr. Rajans schedule.

14                   THE COURT:  No, I thought you were saying Stream's

15    schedule?

16                   MR. VAGNONI:  The Debtors.

17                   THE COURT:  Yeah.

18                   MR. MICHAELS:  Okay.  So it wasn't Mr. Rajan's

19    schedule, just -- correct?

20                   THE COURT:  Yeah.  No, no, no.

21                   MR. MICHAELS:  Correct.

22                   THE COURT:  I'm trying to understand.  So when Stream

23    filed for bankruptcy, they had a file scheduled in the

24    statement of financial affairs and as part of that you have to

25    schedule Schedule A, which is the real property and Schedule B,
```

Case 2:23-cv-06524-P934-1 Document 11-1 Filed 01/23/25 Filed 01/22/25 Entered 01/22/25 16:43:46 Desc
Exhibit A   Mandamus Petition   Page 196 of 541

32

 1    which is the personal property.

 2           So when he put those schedules together, did he --

 3    and he was putting together the personal property owned by the

 4    entities whose equity you're selling in the sale, Mr. Vagnoni?

 5           MR. VAGNONI:  That's correct.  And Your Honor, there

 6    is zero intellectual property in that Schedule B.

 7           THE COURT:  Okay.  But -- so I think that one issue

 8    that I'm identifying is that the personal property that was

 9    scheduled in Schedule B of Stream contained hard pieces of

10    equipment or something that they are now claiming has their

11    intellectual property embedded in.

12           I'm just trying to understand everyone's position.

13    You're saying that in Schedule B is a list of a bunch of hard

14    assets, right?  And they're saying that in those pieces of hard

15    assets are some of their IP embedded in it?

16           MR. VAGNONI:  Stream -- Your Honor, Steam is a

17    holding company.

18           THE COURT:  Yes.

19           MR. VAGNONI:  They're --

20           THE COURT:  No, I understand.

21           MR. VAGNONI:  I --

22           THE COURT:  I understand they're a holding company,

23    but they put together Schedule B and Schedule B included hard

24    assets owned by their subsidiaries and affiliates, correct?

25           MR. VAGNONI:  No, Your Honor.

1          THE COURT:  Okay.

2          MR. VAGNONI:  It was a list of assets that, again, we

3   -- the Trustee had no part in drafting.

4          THE COURT:  Right, because this is before your time.

5          MR. VAGNONI:  It was well before our time.  And we --

6          THE COURT:  So what -- let's describe.  What's on

7   Schedule B?

8          MR. VAGNONI:  It is a various list of equipment.  On

9   Schedule B there is some office furniture.  There's nothing

10  that we see that could contain Rembrandt's --

11         THE COURT:  Well, I don't -- okay.  At this point --

12         MR. VAGNONI:  -- intellectual property.

13         THE COURT:  -- let's -- okay.  We're not going to be

14  able to resolve today whether -- you're not going to come to an

15  agreement with them as to whether or not their technology is

16  embedded in it.  I just need --

17         MR. VAGNONI:  Right.

18         THE COURT:  -- to understand the argument, just so I

19  can try and move the case forward, okay?

20         MR. VAGNONI:  Absolutely.

21         THE COURT:  So what is on Schedule B?  So it's the

22  furniture --

23         MR. VAGNONI:  I don't have it with me and I can't

24  speak to what exactly is on it.

25         THE COURT:  So does anyone have Schedule B of the --

Case 2:10-cv-06524-PAR-CMR Document 934-1 Filed 01/23/25 Filed 01/22/25 06:45:46 Desc
Exhibit A  Mandamus Petition  Page 198 of 541

34

1          MR. MICHAELS:  Your Honor, I would just note that

2    there is an extensive list, over 800 pages long, attached to

3    Mr. Rajan's declaration in support of the filing --

4          THE COURT:  Okay.

5          MR. MICHAELS:  -- right?  So --

6          MR. VAGNONI:  That's not what we're talking about.

7          MR. MICHAELS:  I'm sure it's not.  I would just to

8    Your Honor that that's --

9          THE COURT:  Okay.

10          MR. MICHAELS:  -- on the record.

11          THE COURT:  Okay.  So -- but you're saying Schedule

12    B.  So we're talking about the sale of equity of these

13    entities.  Let's just call these entities, you know, the

14    subsidiaries, or I guess we just call them the entities.

15          So the entity stock is purported -- that's what

16    you're trying to sell.  But these entities own certain hard

17    assets, correct?  Aside from office equipment --

18          MR. VAGNONI:  Correct.

19          THE COURT:  -- and furniture, right?

20          MR. VAGNONI:  Correct.

21          THE COURT:  There's some -- there's other things.

22    TVs, right?

23          MR. VAGNONI:  Potentially.  We -- and Your Honor,

24    again, we --

25          THE COURT:  When you say potentially, see that just -

 1   - I just want to understand, you know, what is being sold.

 2              MR. VAGNONI:  There -- when I say potentially, there

 3   are prototypes that are created by the Debtors downstream --

 4              THE COURT:  Entities.

 5              MR. VAGNONI:  -- subsidiaries.

 6              THE COURT:  Let's just focus on the entities.  What

 7   do the entities own?  That's what I really want to focus on.

 8              MR. VAGNONI:  And again, I can give you the list we

 9   sent them.  The entities own intellectual property, they own

10   equipment that allows them to make protypes of -- they're not

11   TVs.  They are screens --

12              THE COURT:  Uh-huh.

13              MR. VAGNONI:  -- that show the technology to

14   potential investors or purchasers.

15              THE COURT:  Yeah.

16              MR. VAGNONI:  They own licenses, the Phillips

17   license.  And really that's about it.  The downstream entities

18   are meant to house intellectual property, they're meant to

19   house licenses, and they're meant to do research and

20   development.

21              THE COURT:  Okay.  So hold on one second.

22              MR. VAGNONI:  And the Trustees can testify to that.

23              THE COURT:  So I presume, though, that your client,

24   Mr. Rajan, that he was the owner of Stream, right?  He knew

25   what all of these subsidiaries owned.  Didn't he know that?

```
 1              UNIDENTIFIED SPEAKER:  Yes, and he knows what was

 2    taken by the stalking horse bidder and never returned after --

 3              THE COURT:  Okay.

 4              UNIDENTIFIED SPEAKER:  -- contempt of court --

 5              THE COURT:  Yes.

 6              UNIDENTIFIED SPEAKER:  -- in various litigations.

 7              THE COURT:  Okay.  So --

 8              UNIDENTIFIED SPEAKER:  And there's bonding --

 9              THE COURT:  Again --

10              UNIDENTIFIED SPEAKER:  -- machines that are tens of

11    millions of dollars.

12              THE COURT:  -- this is what I care about.  I just

13    want to identify the assets that are being sold.  So doesn't it

14    seem that Mr. Rajan knows exactly what assets are owned by the

15    entities?

16              MR. MICHAELS:  I would say, Your Honor, he does have

17    an understanding in -- probably in fairly good detail, and

18    that's the point that he has been making to the Trustee at

19    nauseum.

20              THE COURT:  Okay.  So -- but --

21              MR. MICHAELS:  Right.

22              THE COURT:  -- so you --

23              MR. MICHAELS:  Your Honor, I just -- if I may, just

24    to complete the thought.  It's that they don't understand that

25    there are other encumbrances including Rembrandt's license,
```

1   including the Phillips license on that property.  And I would

2   say importantly that there is material amounts of assets that

3   have been in violation of the TRO, absconded with by Mr.

4   Stastney --

5            THE COURT:  So if you --

6            MR. MICHAELS:  -- and that has --

7            THE COURT:  -- you think that -- that's a complete

8   separate issue.

9            MR. MICHAELS:  Well, it's not, Your Honor --

10           THE COURT:  That you think that.

11           MR. MICHAELS:  -- because that intellectual property

12  that is in those prototypes, samples that are taken to market

13  to try to get investors and customers to buy or purchase the

14  ultimately asset that is Stream TVs product, those things have

15  the intellectual property not only of Stream TV, but also

16  Rembrandt and also Phillips embedded in it.

17           There's -- I mean, it was no accident that Mr.

18  Stastney on behalf of SeeCubic, Inc. and the Hawk party's

19  absconded with monitors that this trustee actually witnessed

20  with Mr. Stastney giving him a demonstration.

21           THE COURT:  Okay.  So who --

22           MR. MICHAELS:  That happened.

23           THE COURT:  So you're saying that Hawk has monitors

24  and Stream has monitors of the entities?

25           MR. MICHAELS:  I'm saying that the Hawk parties,

1   specifically Mr. Stastney, SeeCubic, Inc. definitely had took

2   both monitors that are samples.  They were displayed to be able

3   to sell the product.  It obviously has embedded technology in

4   it.  He took servers.  He took computers.  All of that would

5   have had his code in it, including Rembrandt's code.

6              THE COURT:  Okay.  So -- but are you saying that

7   that's not part of the sale or it is part of the sale?

8              MR. MICHAELS:  I'm just suggesting to you that those

9   particular assets are not on the list.  It was just filed by

10  the Trustee in support of the asset listing.

11             THE COURT:  All right.  All right.  So hold on one

12  second.

13             UNIDENTIFIED SPEAKER:  Your Honor?

14             THE COURT:  No, hold on.  Hold on one second.

15             You guys can all have a seat.  We're going to be here

16  for a little bit.

17             So he's saying that some of the assets are not in the

18  possession of Stream.  That they're in the possession of Hawk.

19  What's your response to that Mr. Vagnoni?

20             MR. VAGNONI:  Your Honor, there -- it's clear to the

21  Trustee that there are assets that are not in his possession.

22             THE COURT:  And are they in the possession of Hawk?

23             MR. VAGNONI:  We are not aware of that, Your Honor.

24  We -- what we are --

25             THE COURT:  So -- okay.  Let me just ask you one

1   question.  Do you think that there are assets owned by Stream

2   that are not in Streams possession?

3           MR. VAGNONI:  Yes, there is -- there's a bonding

4   machine in China --

5           THE COURT:  Okay.

6           MR. VAGNONI:  -- that the Trustee has neither the

7   money or nor the wherewithal to get.  We've gotten various

8   reports -- that was the subject of mediation which --

9           THE COURT:  So does Hawk own any -- does Hawk -- is

10  Hawk in possession of any assets by Stream?

11          MR. VAGNONI:  Not that I'm aware of, Your Honor.

12  SCBV, SeeCubic B.V. has prototypes.  There is -- Mr. Stastney

13  is the director of SCBV.  There is -- we have no indication

14  that Hawk is in possession of anything.  If they are, that --

15  we've heard of tail of it, but we've never been given any

16  evidence that they have -- that Hawk has anything that is --

17          THE COURT:  Why do you guys think that Hawk has the

18  Stream properties?

19          UNIDENTIFIED SPEAKER:  Well, Hawk and its

20  subsidiaries broke into Streams offices and took them.

21          THE COURT:  Okay.  So let's stop right there.

22          UNIDENTIFIED SPEAKER:  Yeah.

23          THE COURT:  Okay.  So let's go the Hawk person.

24          So they're accusing you guys of having broken into

25  Streams building and stolen things.  So what's your response to

1    that?

2              MR. CAPONI:  My response, Your Honor, it's part of

3    the same delusion arguments we've been dealing with for six

4    years.  The -- as a result of the original settlement

5    agreement, the -- give you a brief history.  Mr. Rajan borrowed

6    a bunch of money, never repaid it, the secured lenders reached

7    an accommodation with all the other directors and shareholders

8    to restructure, that led to an omnibus settlement agreement.

9              Following the omnibus settlement agreement, Mr.

10   Stastney took control and operated the entities for quite a

11   period of time before that was reversed.  And when that was

12   reversed by the Delaware Supreme Court, they went back to the

13   Court of Chancery, and they were orders entered that required

14   everything to be turned back over.

15             Vice Chancelor Laster supervised that turning back

16   over and Mr. Rajan took back control of the company.  Ever

17   since then, like a child afraid of the dark, they're constantly

18   saying there's this here, there's this under that bed, but

19   there's no evidence, no Judge, no ruling, no nothing.  I can't

20   disprove the negative.

21             My client lent money; my client is not here.  My

22   client here is a collateral agent for SeeCubic, Inc., which

23   owns the debt and we're just exercising our debt rights.  They

24   want to --

25             THE COURT:  Okay.

```
 1              MR. CAPONI:  -- full stop --

 2              THE COURT:  It's helpful --

 3              MR. CAPONI:  -- we have nothing.

 4              THE COURT:  -- for me if I just get answers to my

 5   questions.  So I just want you on the record, do you believe

 6   that Hawk is in possession of any property owned by Stream?

 7              MR. CAPONI:  Hawk?  No.

 8              THE COURT:  Okay.

 9              MR. MICHAELS:  Excuse me, Your Honor.  I'm sorry.

10              THE COURT:  Yes.

11              MR. MICHAELS:  We each refer to the Hawk party's that

12   includes SeeCubic, Inc. Delaware and Mr. Stastney in his

13   individual capacity.

14              THE COURT:  Okay.  So with that --

15              MR. MICHAELS:  We have evidence of that.

16              THE COURT:  -- those --

17              MR. MICHAELS:  Now, Mister -- I'm sorry.

18              THE COURT:  Okay.  So do any of those entities, do

19   you know?  And if you don't know, that's fine.

20              MR. CAPONI:  Well, I am not -- what I -- no, I am not

21   aware of them in possession of anything.  I am --

22              THE COURT:  That's owned by Stream?

23              MR. CAPONI:  -- Jon may be able to address this, but

24   when Skadden was representing SeeCubic, Inc. in the Court of

25   Chancery, Schedules were put together, everything was turned
```

1  back over, it was done in detail. My client was not involved

2  in that. What I can say, Your Honor, and this gets to, again,

3  the whole -- of today.

4       There is this concept on the part of the other side

5  that once SeeCubic, Inc. took over through the omnibus

6  agreement, every piece of paper, every pen, every everything is

7  in -- somehow contains something that belongs to them. So if

8  there's a laptop, there's a TV. If there was a pitcher for

9  water that was in a conference room, they're claiming it's got

10  Rembrandt's technology. We don't agree with any of that.

11       We think we own the pitcher. We can -- we've gone

12  around and around in multiple courts with them about who owns

13  this, who owns that. As we stand here today, they don't have

14  any shred of evidence. They don't have a court order. They

15  don't have a document. They don't have a bill of sale. They

16  don't have a photograph. They don't have anything to

17  substantiate what they're saying.

18       My client has nothing that belongs to Rembrandt. My

19  client has nothing that belongs to this debtor. It is my

20  understanding as I stand here today and neither does Mr.

21  Stastney or does SeeCubic, Inc. We're never going to reach

22  agreement of this.

23       You could have discovery until the cow comes home,

24  they're going to say, well, no, no, we think it's in there

25  somewhere. Now, if it's not in the trunk, slash the tires and

1    see if he, like, you know, hid it in the tires.

2              THE COURT:  So I understand your position, okay?  But

3    I don't want to keep going around and around with the

4    arguments, okay?

5              MR. CAPONI:  The answer is no, we don't have it.

6              THE COURT:  That's great.  That's all I need to hear.

7              MR. CAPONI:  Absolutely.

8              MR. MICHAELS:  Your Honor, I think it's important

9    that Mr. Caponi just told you that his client does not have it,

10   but he also told you that the Delaware Court supervised the

11   return of assets that was under court order to return after the

12   Delaware Supreme Court's decision.

13             He's not telling you that his client doesn't have it

14   and he doesn't know about anybody else.  I will tell you that

15   we have evidence that Mr. Stastney and SeeCubic, Inc. of

16   Delaware did take assets, does possess assets now.  Has used

17   those assets.

18             THE COURT:  Well, okay.  So just describe for me what

19   the basis of that evidence is.

20             MR. MICHAELS:  The basis of that evidence is, I'll

21   start with just the Trustee.  The Trustee saw those assets

22   during a meeting that he had with Mr. Stastney, in which --

23             THE COURT:  When you say trustee, you're saying?

24             MR. MICHAELS:  I'm saying Mr. Homony.

25             THE COURT:  Okay.

```
 1              MR. MICHAELS:  Right?

 2              THE COURT:  Hello?

 3              MR. MICHAELS:  Who admitted to our client that it was

 4   -- that he had actually observed it.  That's one.

 5              THE COURT:  He had observed what?

 6              MR. MICHAELS:  He had observed a monitor built by

 7   Stream TV in --

 8              THE COURT:  Uh-huh.

 9              MR. MICHAELS:  - the possession of Shad Stastney

10   during the pendency of this bankruptcy.

11              THE COURT:  Okay.  So --

12              MR. CAPONI:  Your Honor, if I --

13              THE COURT:  Yeah.

14              MR. CAPONI:  -- this goes to when SeeCubic, Inc.

15   verses SeeCubic, B.V.  SeeCubic, Inc. after everything was

16   turned around, continued to develop its own technology in this

17   space.  That's -- they believe that everything in SeeCubic,

18   that's it's been developing, again, incorporates Streams

19   technology, which therefore incorporates Rembrandt's

20   technology.

21              So are there TVs?  Yes.  Are there laptops?  Yes.  Do

22   they belong to them?  No.  Have they -- and I would just put it

23   to the Court this way, if they believe this information or

24   these assets were retained, why did they not go to the Court of

25   Chancery, get an order to establish that?
```

1          Why during the year plus that I've been coming to

2    this court and the bankruptcy have they not, when Mr. Rajan

3    controls everything, get relief from the Court?

4          THE COURT:  Okay.  So let's everyone just return to

5    my focus, which is what is being sold?

6          Did you want to say something, ma'am?

7          MS. BRUMME:  Yes, briefly, Your Honor.

8          THE COURT:  Who do you represent?

9          MS. BRUMME:  Marley Ann Brumme from Skadden on behalf

10   of SeeCubic, Inc., the Delaware entity.  And contrary to what

11   our friends over here have to say, the supervision process of

12   the return of the assets from SeeCubic, Inc. back to Stream was

13   supervised by Vice Chancelor Laster and we've been hearing for

14   a year at least that SeeCubic, Inc. has not returned things.

15         That Mr. Stastney has things and until this bit of

16   evidence that he's presented here today about the Trustee

17   apparently seeing a demo unit, we've never seen any evidence to

18   substantiate that SeeCubic, Inc., the US entity and Mr.

19   Stastney, retained any assets.

20         What I think is getting lost here is that Stream TV,

21   as I think Your Honor understands, is a holding company.  The

22   demo units were developed and built by SeeCubic B.V. in the

23   Netherlands, which is five entities down in the corporate

24   structure.  Any demo unit that has been produced and especially

25   one that Mr. Homony has seen would be from SeeCubic B.V., which

1   is not a debtor here.

2            Further, Mr. Stastney, which they love to impugn

3   here.

4            THE COURT:  The entity that you just said, though,

5   are they trying to sell the equity in that entity?  The one

6   that's not the Debtor?

7            MS. BRUMME:  It's five levels down.  So Stream --

8            THE COURT:  But they are trying?  That is being sold

9   as part of the --

10           MS. BRUMME:  The equity would be sold in the first

11   level subsidiaries.

12           THE COURT:  And so they would own that equity?

13           MS. BRUMME:  And then it would waterfall down.

14           THE COURT:  Okay.

15           MS. BRUMME:  Mr. Stastney notably is the director of

16   SeeCubic B.V. the Netherlands entity that develops all the

17   tech, and Mr. Stastney was installed as director by a

18   Netherlands Court when moving Mr. Rajan.

19           So any sort of implication that Mr. Stastney and

20   SeeCubic, Inc. are unlawfully retaining anything, there's no

21   evidence of that, one.  And two, they can't conflate SeeCubic,

22   Inc. and what's going on at SeeCubic B.V.

23           THE COURT:  Okay.  Thank you.  Okay.  Let's stop one

24   second.

25           So I think what would be helpful for me is if we

1    could focus on all the potential bidders that are out there

2    that are not in this courtroom.  And my job is to make sure

3    that they understand exactly what is being sold.  So just

4    describing the equity, obviously, is not sufficient, because,

5    you know, the -- each of the entities whose equity is being

6    sold has some kind of personal property and that, I think, is

7    the schedule that I'd like to focus on.

8              So what is -- so is there, like, a schedule as part

9    of your, you know, proposed asset purchase agreement that

10   lists, you know, what is owned by the entities whose stock is

11   being sold?

12             MR. VAGNONI:  We -- Your Honor, we do not have the

13   schedule together yet.  But we do have the list of assets that

14   were turned over to --

15             THE COURT:  Okay.

16             MR. VAGNONI:  -- VSI.

17             THE COURT:  So let's be clear.  I don't want to set

18   up any procedures until we're clear on exactly what assets are

19   being sold, so that other potential bidders can have some idea.

20             So this is what I would envision if I was a potential

21   bidder.  I see that the stock is being sold.  I'd want to see

22   some general description of the assets that are owned by those

23   entities, so I know what it is that I'm buying.  Now, obviously

24   you can't give me, like, pictures, so that's what we engage in

25   the due diligence process, right?  A potential bidder --

```
 1              MR. VAGNONI:  Correct.  And --

 2              THE COURT:  -- would see, like, a schedule that says,

 3    you know, ten TVs and -- or whatever TVs.

 4              MR. VAGNONI:  Correct, Your Honor.

 5              THE COURT:  And then if their interest has peaked,

 6    they would do their due diligence.  And if they wanted to, they

 7    could go out and go look at all this stuff or go look in the

 8    room or do whatever.

 9              MR. VAGNONI:  So Your Honor --

10              THE COURT:  Yeah.

11              MR. VAGNONI:  -- that -- I -- you're correct in what

12    you're saying.  And the process that was setup by SSG was that

13    a teaser would go out to drum up interest in potential bidders.

14              THE COURT:  So what does the teaser say, just so I

15    understand?  Do you have it?

16              MR. VAGNONI:  Yeah, I absolutely do.

17              THE COURT:  All right.  Show me a teaser.

18              MR. VAGNONI:  I have a book of art --

19              MR. MICHAELS:  Your Honor, if I may?  As you're

20    looking through the teaser, you will note that is specifically

21    mentions the Phillips license.  Attached to that Phillips

22    license is a laundry list of software assets --

23              THE COURT:  Uh-huh.

24              MR. MICHAELS:  -- by title, function, what they do.

25              THE COURT:  Uh-huh.
```

1          MR. MICHAELS:  And we have asked since March whether

2    or not those are being included in the assets with zero

3    response.

4          You had said -- you had made an offhand comment

5    earlier about, well, you're not asking for an audit for

6    anything.  However, the Phillips license requires an audit.

7    That that technology has been removed at termination of that

8    license, which would be caused by a change of control, I.E.,

9    sale of the entity.

10          THE COURT:  That's a sale issue to me.  You object to

11    the sale, because that's not permitted.  As for the bid

12    procedure stage, I just need to identify what assets are being

13    sold.

14          MR. MICHAELS:  My point to you, Your Honor, is there

15    is already a long list of software assets provided in the

16    Phillips license, along with a bunch of know-how and that -- a

17    simple question.  Is this being included in the sale or not?

18    Is what we have asked.  And I think is a touchstone for the

19    kind of list we are looking for here.

20          In addition, it seems that the retention of an expert

21    to walk through the Rembrandt list, we've provided a detailed

22    list of those trade secrets in the Delaware case and can --

23    that can ascertain whether or not those assets are or are not

24    included.

25          THE COURT:  Okay.

```
 1                    Mr. Vagnoni, did you have the teaser?

 2                    MR. VAGNONI:  I do, by a book.

 3                    THE COURT:  Okay.  How -- the teaser is the binder?

 4                    MR. VAGNONI:  No, it's in the binder.

 5                    THE COURT:  Oh, okay.  All right.  So go ahead.

 6      Which -- what's the tab of this?

 7                    MR. VAGNONI:  Tab four.

 8                    THE COURT:  Okay.  And you guys -- I'm presuming

 9      you've seen the teaser?

10                    MR. CAPONI:  I have in front of me, Your Honor.

11                    THE COURT:  Oh, good.

12                    MR. MICHAELS:  We saw it.  It's filed in the papers.

13      But we --

14                    MR. VAGNONI:  And Your Honor, if I may?

15                    MR. MICHAELS:  -- did not get it.

16                    MR. VAGNONI:  That teaser was -- as I'm sure you're

17      aware, the initial document that was sent out, again, to over

18      500 different entities, that then invited them to contact SSG

19      so they could go into --

20                    THE COURT:  Okay.

21                    MR. VAGNONI:  -- a more complete data room.

22                    THE COURT:  I see that this is a one-piece teaser,

23      right?

24                    MR. VAGNONI:  Correct.

25                    THE COURT:  But as part of any potential sale, we
```

1    need to have schedules of -- you know, schedules of, you know,

2    what's being sold.  Like, what's owned by those entities,

3    something, a description.  Like, TVs or, you know,

4    approximately --

5              MR. VAGNONI:  So --

6              THE COURT:  -- 100 TVs or something.

7              MR. VAGNONI:  Correct.  And the irony of that

8    comment, Your Honor, is that yes, there would be a schedule

9    available to any potential bidder --

10             THE COURT:  Uh-huh.

11             MR. VAGNONI:  -- who wanted to come in and do due

12   diligence.  There has been zero bidders that have even

13   scratched the surface of learning about this technology.  The

14   only entity that desired to look in the data room was VSI,

15   who's made is abundantly clear to the Trustee that they have no

16   interest in bidding on the purchase of these assets.

17             THE COURT:  So is your position, Mr. Vagnoni, that

18   this teaser provides sufficient information to potential

19   bidders that would allow them to show interest in this?

20             MR. VAGNONI:  Yes.

21             THE COURT:  So this one page, if someone likes what

22   they see, then they'll proceed with you?  And if they don't,

23   like, this is sufficient information to kind of vet whether --

24             MR. VAGNONI:  So --

25             THE COURT:  -- there's interest out there?

1          MR. VAGNONI:  Correct.  And the Trustee hired SSG as

2    his investment banker and SSG as we've seen them do in numerous

3    occasions, initiates contact by first identifying potential

4    parties.  They identified 500 plus different entities that they

5    sent that out to.  Again, both financial and people in the

6    industry.  And they sent that teaser out to those entities.

7          THE COURT:  Okay.  Fine.  And they didn't get a

8    response.  Okay.

9          MR. VAGNONI:  They got it with -- let me be clear.

10   They got one response from someone other than Rembrandt and

11   Rembrandt -- VSI and VSIs purported investor.  That party

12   declined to sign an NDA once they spoke to SSG.  And we'll --

13   Mr. Victor will describe why.

14         THE COURT:  Okay.  All right.  Well, I'll --

15         MR. SWICK:  Your Honor, I would --

16         THE COURT:  -- this teaser.

17         MR. SWICK:  Excuse me.  I would just add that I think

18   Mr. Vagnoni -- I think Mr. Vagnoni has just given us an

19   admission against interest.

20         THE COURT:  A what?

21         MR. SWICK:  And a --

22         THE COURT:  A what?

23         MR. SWICK:  An admission against interest, right?

24   That this teaser yielded no bidders, other than the people who

25   already know about these assets.  And why would there be no

```
 1    bidders?  Well, probably because they read things in a teaser
 2    like this and they're sophisticated actors and they understand
 3    the --
 4              THE COURT:  Okay.  So --
 5              MR. SWICK:  -- effort to license things --
 6              THE COURT:  Okay.
 7              MR. SWICK:  -- that they cannot --
 8              THE COURT:  All right.
 9              MR. SWICK:  -- license.
10              THE COURT:  I understand.
11              MR. SWICK:  Is not appropriate.
12              THE COURT:  Okay.
13              MR. SWICK:  Okay.
14              THE COURT:  Fine.
15              MR. VAGNONI:  That --
16              THE COURT:  All right.  So --
17              MR. VAGNONI:  -- is quite a leap, Your Honor.
18              THE COURT:  Okay.  So as part of the sale process,
19    though, will there be a more robust description then?  Like
20    schedules of the assets owned by these entities?  Something?
21    Some description?
22              MR. VAGNONI:  Your Honor, and again, Mr. Victor is
23    prepared to testify today.  But at this point after a month out
24    in the market and there having been no interest in --
25              THE COURT:  Are you suggesting that because there's
```

1    no interest in the market that there's no need to prepare

2    schedules?

3            MR. VAGNONI:  No, no, no.  There are -- schedules are

4    being prepared.

5            THE COURT:  Okay.

6            MR. VAGNONI:  That will be attached to the APA to

7    make it clear what is being -- but I think they're going to be

8    more simplistic than what you are considering.

9            THE COURT:  Okay.  So what --

10           MR. VAGNONI:  Any potential --

11           THE COURT:  -- so just generally describe what it is.

12   It's going to be, like, equipment or software or --

13           MR. VAGNONI:  Lists all of the assets of Stream and

14   the equity interest in Technovative subsidiaries.  Now, Your

15   Honor, that doesn't mean that if someone who had interest in

16   getting due diligence on these assets --

17           THE COURT:  Couldn't come in and --

18           MR. VAGNONI:  -- wanted to get more information.

19           THE COURT:  Yeah.

20           MR. VAGNONI:  That SSG wouldn't give them whatever

21   they wanted.  If they said, we want to know exactly what

22   SeeCubic, Inc. holds, they would have it.  And a lot of that is

23   already in the data room.  That's part of the process that SSG

24   runs.

25           THE COURT:  Okay.  I understand --

```
 1              MR. VAGNONI:  You don't send out a teaser that has --

 2              THE COURT:  Okay.  I understand.

 3              MR. VAGNONI:  -- hundreds of pages.

 4              THE COURT:  Yes?

 5              UNIDENTIFIED SPEAKER:  Well, the data room, which was

 6   prepared, then Your Honor asks for a list of assets, they

 7   provide a list of assets.

 8              THE COURT:  In the data room?

 9              UNIDENTIFIED SPEAKER:  A lot of these assets weren't

10   in the data room before.

11              THE COURT:  Okay.

12              UNIDENTIFIED SPEAKER:  The Phillips IP wasn't there.

13   And I also want to say, this investor, he provided 170-million-

14   dollar proof funds.  When they asked for it -- so liquid funds

15   in an account.  They said, we just want to do some due

16   diligence, all right?  They sat on that for three months.  That

17   took $1.8 million from our investor.

18              So this investment you're talking about, these are

19   the entities who want to buy these assets, bind this company to

20   a plan.  It's getting sorted at every turn, because they're

21   married to this 9019 with the Hawk parties.  But we have real

22   money.  We want to pay unsecured creditors.  We have to have

23   due diligence.  We've got to get forward on this. And I mean --

24              THE COURT:  Weren't you guys going to put together a

25   plan or something?
```

```
1              UNIDENTIFIED SPEAKER:  Yeah, but we have --

2              THE COURT:  So did you file the plan?

3              UNIDENTIFIED SPEAKER:  No, we're going -- we have to

4    get diligence to know where the assets are so we can have it --

5    they want an unconditional offer for almost $200 million for

6    these assets.  We want to give it to them.  But we also need to

7    know, where's the bonding machine?  Is it still functional?

8    They said we could access to it.  Then they said, oh, here's

9    some photos.  We're not going to give you access to it and the

10   photos are two and a half years old, because they don't know --

11   like, the bonding machine is tens of millions of dollars.

12             THE COURT:  Okay.  All right.  Okay.

13             All right.  So --

14             MR. CLARK:  Can I make a brief intervention?

15             THE COURT:  Yes.

16             MR. CLARK:  I apologize.  And I won't make very many

17   interventions in this matter because there are people here who

18   know a lot more about this case than I do.  I'm a recent entry.

19             But I appreciate the Court's concern about making

20   sure that you have an open and fair bid procedure so that you

21   can have a true 363 sale.  The problem that we have here is

22   this case reminds me a lot of Fiskarata (phonetic) we have a

23   secured claim from a secured creditor that I understand lent in

24   terms of hard money about $39 million.  Maybe 45, depending on

25   whether you count some additional advances by Mr. Stastney.
```

1    But now we have a 9019 that says their actual claim is $180

2    million.  And that they can credit the -- their 150 million of

3    it.

4           As in *Fiskarata* with a credit bid of $150 million,

5    that means that the stalking horse bidder doesn't actually have

6    to put up anymore in terms of cash than the seven and a half

7    million dollars that they said they were going to credit.

8           THE COURT:  They're going to credit it.  Right.

9           MR. CLARK:  So for seven and a half million dollars,

10   they get in the door.  Anybody else who wants to play this game

11   has to come up with cash, cash in the amount of $157.5 million.

12          MR. VAGNONI:  That's not accurate.

13          MR. CLARK:  Excuse me.  I'm sorry, maybe it's less.

14   But it's a lot more than $39 million, that's for sure.

15          And that's -- and to me, that's the real story here.

16   That we have a bid process where the amount of money that

17   anybody else who wants to play this game has to come up with,

18   certainly north of $100 million in order to be able to play

19   this game and be prepared to close in December.

20          If we were talking about a plan process so I could

21   understand how we could come up with a structure where $170

22   million or such might end up being -- be folded into a plan.

23   But on a expedited sale process, where the proposed bidders

24   don't know for sure what's going to be sold until --

25          THE COURT:  Why do you say it's a expedited sale

Case 2:23-cv-06524-PBT Document 1 Filed 01/23/25 Entered 01/22/25 16:39:46 Desc
Exhibit A   Mandamus Petition   Page 222 of 541

58

1  process?

2       MR. CLARK:  -- we get to today.

3       THE COURT:  Why do you say it's an expedited sale

4  process?

5       MR. CLARK:  Well, it's expedited in the sense that

6  the bid procedures motion contemplates that the bids will be

7  received -- binding bids will be received by Friday of this

8  week.  So that gives whoever's going to buy this, other than

9  Hawk, two days to do the due diligence that we're talking

10  about.  Two days.  And that the Trustee will then make a

11  decision on Monday.  And then the sale will close in December.

12       Now, as a practical matter, that's not what I would

13  call an open and transparent process.  So if you want to know

14  why there aren't other bidders here, it seems to me it's

15  straight forward.  With a 180 -- 157.5-million-dollar credit

16  bid in place, nobody's going to come to the table.

17       THE COURT:  So I think, though, what I'm hearing is

18  that the credit bid is a hurdle to other potential bidders from

19  entering the situation?  Unfortunately, I've already approved

20  the settlement, the 9019 agreement that they have.  So that's

21  what Hawk is.  I mean, and they --

22       MR. CLARK:  I understand that, Your Honor.  And --

23       THE COURT:  -- and because I've approved that, they

24  have -- they're allowed a credit bid.  That's just part of the

25  system.

Case 2:23-cv-06520-PSG-JDE Document 934-1 Filed 01/23/25 Entered 09/04/22/25 16:30:14685 Desc
Exhibit A   Mandamus Petition   Page 223 of 541

59

1        MR. CLARK:  And candidly, Your Honor, as I look

2   through this, looking at it from the standpoint, you know,

3   obviously I've sat in your position.  So I asked the same kinds

4   of questions I would like to think that you would ask.  And

5   what occurred to me in this particular case is there is a

6   motion to reconsider and I'm glad that it hasn't been ruled on

7   yet because it strikes me that this process is fundamentally

8   flawed because of the provisions that were put in that 9019,

9   that they were all but certain to assure that there would be no

10  other bidders.

11       THE COURT:  Okay.  Thank you, sir.

12       MR. CLARK:  Thank you, Your Honor.

13       THE COURT:  You're welcome.

14       MR. VAGNONI:  And Your Honor, just so we're clear on

15  the -- there are very limited issues that's why in the motion

16  to reconsider one of which isn't --

17       THE COURT:  Let's focus on the bid procedure, shall

18  we?  I think I'd like to just hone in on some of those things.

19  I don't want to hear re-argument on something I already heard

20  on.  Okay.  So I want to talk about some of the substantive

21  concerns that Rembrandt and VSI has raised in their objections,

22  if we could turn to that for a minute.  Let me just get this.

23  Okay.  So I wanted to take, for instance, the bonding

24  equipment.  So is the bonding equipment being sold as part of

25  the sale?

1          MR. VAGNONI:  Yes, Your Honor.  It is.  The problem

2     we have with the bonding equipment is there are disputes as to

3     who owns the bonding equipment.

4          THE COURT:  Okay.

5          MR. VAGNONI:  But what we believe is that either the

6     Debtor owns it and the Debtor did list the bonding equipment in

7     its Schedule B.

8          THE COURT:  Uh-huh.

9          MR. VAGNONI:  And the rest of the things in Schedule

10    B are office equipment and FF&E.  But the Debtor alleges that

11    it owns it.  There has been -- there has been allegations that

12    that bonding equipment was transferred to SeeCubic B.V.  The

13    Debtor downstream, the Stream downstream subsidiary.

14         THE COURT:  Transferred by whom?  Who transferred it?

15         MR. VAGNONI:  So and I can't speak to this directly

16    because I was not involved at the time, but it was my

17    understanding that at the time of the omnibus agreement that --

18    and correct me if I'm wrong, but that their allegation that

19    that -- that the bonding equipment was transferred by the

20    controlling entity -- by the Debtor to SeeCubic B.V.  Whether

21    or not it's the Debtor's property or SeeCubic B.V.'s property,

22    that bonding equipment is being transferred.

23         THE COURT:  Okay.  All right.  Just give me a minute

24    to go through all of this for one moment.  Okay.  So this is

25    how I would like to proceed.  Before I sign off on any bid

1   procedure order, I'd like to see what the schedules are to the

2   purchase agreement.  I just -- I think that we should put

3   together the schedule, but I don't think that you have the

4   schedule here today, right?

5          But what I envision is, since it does seem to be an

6   issue, what is being sold, I'd like someone to put together the

7   schedules and then I'd like you to -- and you could break it

8   out any way you want.  Perhaps you could say that this entity,

9   you know, has these assets and that's what could be part of the

10  sale when you buy the equity of that entity.

11         And then what I'd like to do is I'd like to invite

12  VSI and Rembrandt to look at those schedules and to point out

13  the very many issues that I think that they're going to have

14  with those schedules as to potentially flag the issues that you

15  have with regard to each of those entities.

16         And then what I think we should do for any potential

17  bidder is they should see a list of the scheduled assets that

18  actually do have some asterisks to them, which might note there

19  were objections or concerns that you guys have to those assets,

20  right?  So that whoever is, you know, potentially interested in

21  buying the assets will see your asterisk, right?  And then

22  either we'll get them in as bidders or not.  So I think the

23  first thing I'd like to do is I'd like to get that schedule

24  together --

25         MR. THOMPSON:  Your Honor, if I may be heard just on

1  one of those asterisks because we just heard about the bonding

2  machine.

3           THE COURT:  Uh-huh.

4           MR. THOMPSON:  If you look at what the Trustee just

5  filed with respect to the bonding machine, it's got conditions

6  all over the place, right?  And it is not guaranteeing --

7           THE COURT:  Could you -- which one?  Could you --

8           MR. THOMPSON:  -- not guaranteeing the transfer right

9  to any buyer, right?

10          THE COURT:  Okay.

11          MR. THOMPSON:  So --

12          MR. GEORGE:  But the buyer will know that.

13          MR. THOMPSON:  Well, it would not have known that --

14          THE COURT:  Okay.  Could we just stop and just take a

15  moment that you're selling something that you may or may not

16  have.  That just does seem a little curious.

17          MR. THOMPSON:  Thank you, Your Honor.

18          THE COURT:  Doesn't it seem a little curious?

19          MR. THOMPSON:  That's precisely our --

20          MR. VAGNONI:  Your Honor.

21          MR. THOMPSON:  We may or may not be in possession of

22  it.

23          THE COURT:  Okay.  All right.  Argument for the

24  Trustee.  I just have to get an answer to the question why is

25  it not weird to say that you're going to sell something but

1    then not be sure if you're actually going to get it.

2              MR. THOMPSON:  Your Honor --

3              THE COURT:  I'd like to hear from the Trustee.  I'm

4    sorry, I didn't mean you, I met the guy standing behind the

5    asterisk --

6              MR. HOMONY:  Prior to my appointment, as you can tell

7    -- was a complete and utter disaster.

8              THE COURT:  It still kind of seems like a disaster

9    which I'm trying to clean up.  Yes.

10             MR. HOMONY:  I want you to appreciate Stream used to

11   own the bond equipment --

12             THE COURT:  Uh-huh.

13             MR. HOMONY:  -- before the omnibus agreement which

14   set all this off.

15             THE COURT:  Okay.

16             MR. HOMONY:  At some point, we were informed that a

17   receiver -- again prior to my getting on the scene -- a

18   receiver was appointed to oversee Technovative in Delaware

19   District Court.  I believe that receiver retitled the bonding

20   equipment into the Netherlands subsidiary --

21             THE COURT:  Okay.

22             MR. HOMONY:  -- the equity of which I'm selling --

23             THE COURT:  Okay.  Yeah.

24             MR. HOMONY:  -- because it's in China, there's issues

25   with warehouse liens, past due rent.

1            THE COURT:  But presumably that's something that's

2    being sold --

3            MR. HOMONY:  It is being sold, Your Honor.

4            THE COURT:  -- if you can get through -- if you can

5    jump through all those hurdles.

6            MR. HOMONY:  It is being sold.  But as I'm sure you

7    can appreciate in other cases, somebody's holding that asset

8    that might demand --

9            THE COURT:  Okay.  But that's okay.

10           MR. HOMONY:  -- $500,000.

11           THE COURT:  That's okay.  I mean --

12           MR. HOMONY:  Before it gets --

13           THE COURT:  So perhaps with regard to the bonding

14   equipment, there'll be a very long asterisk which will describe

15   exactly where it is and all the claims subject to it.  And you

16   guys would be able to add something to that as well.

17           MR. THOMPSON:  Your Honor, there's an omnibus order

18   -- an omnibus agreement that was overturned by the Delaware

19   Supreme Court.  And thereafter there was a chancery court

20   opinion directing the return of all the equipment including

21   that.

22           THE COURT:  Let me just tell you where I'm focused

23   at.

24           MR. THOMPSON:  Okay.

25           THE COURT:  Where I'm focused at is, I just want to

1    know what's being sold even if it's subject to a million

2    caveats, right?  So we're going to work together and we're

3    going to come up with a schedule so at least a normal person

4    will at least know this is what's being sold.

5            Now, just based on my preliminary observation, I

6    don't believe anybody will be bidding for these asset because

7    you guys are hopping up and down.  You really think that -- you

8    know, that it's your stuff that's going to fall on this

9    litigation.  I just want to tell you what I think that the

10   logical conclusion of all of this is going to be.  That if we

11   ever get to a sale, there will be no other bidders because

12   you'd have to be crazy to enter this like firestorm of like,

13   you know, litigation, right?

14           So what it's going to be is we're going to have Hawk,

15   who wants to be the buyer.  They're the stalking horse bidder.

16   No one else is going to bid.  And you guys are going to raise a

17   slew of objections to the sale, right?  And if I have -- I have

18   Hawk, right, who's going to then say, you know, Your Honor, I'm

19   going to -- this is what I want to buy and I know that they're

20   hopping mad and they're going to sue me and that they're going

21   to -- they have all these, you know, issues or whatever.

22           And then at that point, if I approve the sale to them

23   that I'm delivering that to them, Hawk is going to pay them

24   whatever they're going to pay and then you guys, Hawk and you

25   guys are going to fight it out, right?  And then I don't have

1  to resolve, right, exactly who owns what or whatever, because

2  they're going to be doing all of that, right?  And then you can

3  engage in that fight.  But all of your jumping up and down, it

4  does have a chilling effect on the bidding as well, right.  It

5  will make it -- it will basically guarantee that Hawk will be

6  the buyer of these assets at the end of the day.

7          MR. THOMPSON:  That's already been guaranteed, Your

8  Honor.

9          THE COURT:  Okay.

10         MR. GEORGE:  Your Honor, if I may.  This is --

11         THE COURT:  Yes.

12         MR. HOMONY:  Your Honor, I can address --

13         MR. GEORGE:  I would just like to --

14         THE COURT:  Okay.

15         MR. HOMONY:  This case has been drawn out for a long

16  time.  And as I'm sure you can appreciate, Stream is a pre-

17  revenue company.  It has no revenues, it has no ability to

18  generate loans.  Part of the Hawk settlement provided that Hawk

19  through SeeCubic would continue to fund the Netherlands,

20  SeeCubic BV, which is an operating entity with real people

21  there who really care about this technology, have lived with it

22  for 20 years and want to see it commercialized.

23         The longer this goes, their livelihoods are put in

24  jeopardy.  The value of these assets is put in jeopardy because

25  if I have an outside -- a date where they have agreed to fund,

 1   which is December 10th.  If the sale isn't closed by December

 2   10th, there's no funding secured for those people in SeeCubic

 3   BV, and not only their lives, but the value of these assets

 4   will disappear.

 5          Right now, through the carveout I think my and my

 6   team have managed to secure between 9- and $10 million in cash

 7   for the benefit of unsecured creditors, which would otherwise

 8   vanish.  And so I just -- I want everybody in this room to

 9   appreciate --

10          THE COURT:  Yes.  I get it.

11          MR. HOMONY:  Okay.

12          THE COURT:  I understand.

13          MR. HOMONY:  Thank you, Your Honor.

14          THE COURT:  Thank you.  Okay.  Hold on one second.  I

15   don't want to hear from anyone right now.  Okay.

16          So Mr. Vagnoni, when -- and you can talk to your

17   colleagues here, but when do you think you could put together a

18   schedule of what be -- I mean, if this is going to be going out

19   for bidders, we need to have like a schedule.  So when would

20   you be able to put together some schedules?

21          MR. VAGNONI:  We'd have to do it -- I do have to

22   speak with -- but we have to do it immediately.

23          THE COURT:  Why don't you talk to your people and

24   tell me how soon you could get those schedules together?  Go

25   talk to them.

1            MR. VAGNONI:  Thank you, Your Honor.

2            THE COURT:  You're welcome.  So while they're doing

3    that, I didn't realize the whole room was empty.  Perhaps what

4    we'll do is while they're doing that can I just run through the

5    rest of my list because I have a 12:30 list as well.  So I'm

6    just going to -- you can keep all your stuff here.  Keep all

7    your stuff here.  I'm just going to run through my 11:00 list.

8    Oh, with the other parties.  Yeah.  Yeah.  But so just sit

9    tight.

10            Pam, what else do we have going on at 11:00?

11            THE CLERK:  11 should be all --

12            THE COURT:  Oh, good.  Excellent.  Okay.  Good.  So

13    hold tight right there.  So I just want to take a short break

14    and I'll be right back.

15            THE CLERK:  Okay.

16       (Recess)

17            THE CLERK:  Court is back in session.

18            THE COURT:  All right.  Mr. Vagnoni, when do you

19    think you'll have those schedules for me?

20            MR. VAGNONI:  We can have them filed by tomorrow.

21            THE COURT:  Okay.  Great.  So what I would like is --

22    what I envision is that there will be schedules identifying

23    what the assets are.  And I think that for instance, with the

24    bonding equipment, you should drop an asterisk that says, you

25    know, we are actually not in possession of the bonding

```
 1  equipment and whatever caveats you think there may be to

 2  actually a buyer taking possession of them.  I think you should

 3  add that to that.

 4            MR. VAGNONI:  Absolutely.  And Your Honor, just to be

 5  clear, you know, with the foreign subsidiaries, the Trustee

 6  isn't in possession of those assets either, but they are in the

 7  possession of subsidiaries of --

 8            THE COURT:  Okay.  So you should just -- I just want

 9  this to be clearly laid out where everything is.  So if someone

10  were to look at this, they understand these are the issues that

11  I face if I put in a bid.

12            MR. VAGNONI:  Understood.

13            THE COURT:  Okay.  Then I'd like you guys to take a

14  look at the schedules because before it goes out to other

15  potential bidders, I'd like to get your input.  And I think

16  that you have lots of different issues like, you know, you

17  could say that, you know, these assets are subject to our

18  claims and put whatever, you know, statements in there that you

19  think would be appropriate.

20            And I think just to be clear that, you know, if you

21  have an asterisk, you know, you might have an asterisk saying

22  these are the Debtors comments about, you know, like maybe just

23  say a footnote, why don't you have a footnote, right?  You put

24  a footnote and you say this is debtor's position that these

25  assets are not in our possession or whatever.  Put whatever
```

Case 2:23-cv-06520-PD Doc #1-1 Filed 01/23/25 Entered 09/04/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition    Page 234 of 541

70

1  caveat.

2          And then we're also going to have footnotes with you

3  guys and you're going to -- so the potential bidder will know

4  that the statements that are being made with regard to your

5  footnotes are your comments and are not the Debtor's comments,

6  right?  And you -- I'm willing to include that just because I

7  think that you have some serious concerns and people should

8  know them.  So it would say something like Rembrandt believes

9  that with regard to these assets, that there are these issues

10  implicated on intellectual properties embedded in them and, you

11  know, this is going to spawn litigation or whatever.  Yes?

12          MR. MICHAELS:  I think the main issue here, I think

13  it's been handled by Whitehall and it was a jeweler who had

14  taken in property on -- jewels on consignment, embedded them in

15  rings and wanted to go to a bankruptcy sale where they just

16  sold it all off subject to the rights of the vendors who had

17  given them tools on consignment.  And I think it was somewhere

18  in the neighborhood of 193 adversary proceedings would have

19  been necessary.

20          And the court said tough.  You need to figure out

21  what the assets of the estate are and you need to have those

22  adversary proceedings by trying to go forward.  And it is -- I

23  understand the Court's desire to move through a process, but

24  saying with an asterisk Rembrandt may or may not sue you for IP

25  infringement is the courts have determined that's not an

Case 2:23-cv-06564-DSF-PLA Document 1-1 Filed 01/22/25 Entered 01/22/25 16:41:46 Desc
Exhibit A Mandamus Petition Page 235 of 541

71

1    acceptable process.  It is in and of itself subjecting the

2    estate to additional liability for making that transfer in the

3    first place which was not authorized --

4              THE COURT:  Okay.  Would you not want me to add your

5    comments to the schedule?

6              MR. MICHAELS:  We would like -- we would certainly

7    like the ability to enter the comments, but we -- what we

8    believe is necessary in this situation is to ascertain what are

9    actually the assets of the estate, and what else is on the

10   record.

11             THE COURT:  Okay.  So let me tell you my skepticism

12   with that comment.  With respect to the client, the guy that he

13   used to be.  This -- the guy who was replaced by the Trustee.

14   He had a pretty good idea of what's in all of these entities,

15   because up until, you know, earlier this year, wasn't he in

16   control of all those assets?  Okay.  Well, regardless, this is

17   we're going to do.

18             You've got litigation issues with regard to the

19   license, and I'm going to look at that because you're going to

20   file a sale objection and it's going to lay out every single

21   objection you have to the sale and they are going to respond to

22   that and I am going to address all of those arguments, okay?

23   So this is what we're going to do.  You guys, you can add

24   footnotes and all I care about your footnotes is that you put

25   in the preamble of whatever footnotes you want to add to the

```
 1   schedule that these are comments made on your behalf, not on

 2   the Debtor's behalf so that people who read it understand it.

 3              MR. MICHAELS:  We do have one request --

 4              THE COURT:  Yeah.

 5              MR. MICHAELS:  -- that we've been making for a while

 6   now.

 7              THE COURT:  Yeah.

 8              MR. MICHAELS:  And that is that the Trustee specify

 9   with particularity, whether he is relying on the Rembrandt

10   license or not.

11              THE COURT:  What do you mean you're relying upon the

12   Rembrandt license?

13              MR. MICHAELS:  If they are offering for sale assets

14   Rembrandt has alleged have -- are covered by patent inventions,

15   we have the right to bring suit against anybody who is offering

16   those for sale.

17              THE COURT:  I don't think that Mr. Vagnoni thinks

18   that you have the right to sue them.  Do you -- Mr. Vagnoni, do

19   you think that they have the right to sue you arising out of

20   the sale of the assets that --

21              MR. VAGNONI:  Absolutely not.

22              THE COURT:  See so they just disagree.  That's just a

23   sale -- that's a sale argument that you can make in front of me

24   that I'll consider.

25              MR. MICHAELS:  With respect, we provided the case law
```

```
 1    that says we do not need leave of this Court.  We can file in

 2    any jurisdiction and SSG is not a part of this bankruptcy.  I

 3    mean, I appreciate they're professional, but they're actively

 4    offering our patented technology for sale.  That's an

 5    infringement under 35 USC.  And it's the only --

 6              THE COURT:  I disagree.

 7              MR. MICHAELS:  -- defense to that because --

 8              THE COURT:  So you're sitting here and you're making

 9    an argument and they just disagree with the argument.  And I'm

10    going to consider it.  Don't include it in your brief because

11    it's a sale objection, right?  You're going to say, Judge, you

12    don't have the authority to do this.  No one should be selling

13    this, right.  You're going to tell me that and I'm going to

14    look at your case law and your legal argument and I'm going to

15    look at theirs and then I will give you a decision on that.

16              MR. MICHAELS:  I respect what you're saying about

17    with regard to the sale process.

18              THE COURT:  Uh-huh.

19              MR. MICHAELS:  My question is different than that, is

20    we -- Rembrandt has the ability to go after SSG today in a

21    different court for patent infringement unless the Trustee is

22    claiming that they are covered by a valid, current, paid up

23    license with Rembrandt.  And I'm asking the Trustee to clarify.

24    Are they saying that they have -- that Stream has a valid paid

25    up license with Rembrandt?
```

Case 2:23-10763-am-065 Doc 934-1 Doc Filed 01/23/25 Filed 09/04/22/25 16:45:4685 Desc
Exhibit A   Mandamus Petition   Page 238 of 541

74

1           THE COURT:  Your response, Mr. Vagnoni?

2           MR. VAGNONI:  It sounds like he's asking me to

3   testify under threat of suit of the Trustee's professionals.

4           THE COURT:  Okay.  Well, in any case, I would like to

5   have any footnotes that you want to add to the schedules by,

6   let's say Wednesday.  So on Friday, if you could just put

7   together whatever footnotes that you want, just tell them,

8   like, do a black line, right?  And then send them a black line

9   of the schedules.

10          But let's talk about the scheduling here, right?  So

11  I know you're telling me, Hawk, that you have to have this, you

12  know, this all is done by the 10th.  But I need to have, you

13  know, the schedules nailed down so that a potential bidder

14  would know exactly what they're buying.  So we need to get that

15  done first.  I can't -- we can't send this out for bidding

16  until that's done.

17          So once the schedules are done on Friday because

18  they're going to give you their comments by just say Friday

19  morning at 9 a.m., right?  So you -- did you say tomorrow

20  you're going to get them?  So what time tomorrow do we have the

21  schedule?

22          MR. VAGNONI:  Yeah, by afternoon.

23          THE COURT:  In the afternoon?

24          MR. VAGNONI:  And look, if we can get them in today,

25  we're going to get them in today.

 1          THE COURT:  Okay.

 2          MR. VAGNONI:  But we would like to have a week until

 3  tomorrow and we're going to do it as soon as we possibly can.

 4          THE COURT:  Okay.  So then Friday by 5 p.m.  I'd like

 5  you to hand your black line of what the schedule looks like

 6  back to them, okay.  So that they can attach that to the

 7  purchase agreement.  Yes?

 8          MR. SWICK:  Well, we have 48 -- like Monday by 5:00?

 9  Like I have to fly home tonight, so I don't know whether it

10  will be tomorrow, that's Thursday.  So --

11          MR. VAGNONI:  We're not going to be here until

12  tomorrow.

13          MR. SWICK:  It might be quite voluminous.  Like I'm

14  not sure what they're going to --

15          THE COURT:  Okay.  That's fine.  You can have until

16  Monday, just to send out -- to add the footnote.  So let's say

17  by Monday 9:00 a.m. you're going to get them your footnotes to

18  the schedules.  Now, so on Monday, you guys are going to have

19  the schedules, right?  And you already presumably have your

20  asset purchase agreement.

21          So let's just talk about the bidding procedure.  Oh,

22  also the data room.  They've got some serious concerns about

23  what's in the data room.  So by the time that this goes live

24  and we send this out for people to bid on or show interest,

25  what's going on with the data room?  And can you make sure you

1  populate it with actual, like, information?  Who's -- when do

2  you -- okay.  So when do you think -- come on up, Mr. Victor.

3  When will the data room actually be sold with things that are

4  clear about what's being sold?

5          MR. VICTOR:  Good afternoon, Your Honor.  Scott

6  Victor for SSG.  The data room is full.  The data room has been

7  accessed by one party; VSI, who is made up of all the insiders

8  of the Debtor.

9          THE COURT:  Okay.  Let's just focus on what's in the

10 data room.  So is there--

11         MR. VICTOR:  The data room is fully set up.  And has

12 been for over a month.

13         THE COURT:  Okay.  Because they said there was

14 missing information in the data room.  Is it possible that they

15 looked at the data room before it was 100 percent complete?

16         MR. VICTOR:  They looked at it after it was 100

17 percent.

18         THE COURT:  Okay.

19         MR. VICTOR:  And they will complain about anything at

20 any time to stall the process.  There's nothing wrong with the

21 data room.

22         THE COURT:  Okay.  So you think that there's -- so

23 everything in the data room is there that would be.  So --

24         MR. VICTOR:  Yes.

25         THE COURT:  -- yeah.

1             MR. VICTOR:  But, Your Honor.

2             THE COURT:  Yeah.

3             MR. VICTOR:  Not one single party has signed an NDA

4    other than an insider of the Debtors and has requested access

5    to the data room.

6             THE COURT:  I understand.  This is going to be a very

7    short period.  I understand.  Yeah.  I'm aware of that.  Okay.

8    It's your position is that the data room has everything --

9             MR. VICTOR:  The data room is fully complete --

10            THE COURT:  Okay.

11            MR. VICTOR:  -- and needs nothing further.  We

12   understand that it is appropriate to file schedules to the APA

13   like in every other case.  That will be done tomorrow.  We'll

14   have until Monday to black line it and add their asterisks.

15   But I have to put on the record that in my 41 years of

16   experience, I've never been threatened by counsel as many times

17   that we've been threatened by Rembrandt.

18            Who are they to sue SSG?  My employees who are

19   working on this, we're not selling their intellectual property.

20   We're not infringing on their patent rights.  We're selling the

21   equity of subsidiaries that may or may not have any

22   intellectual property that may or may not belong or rightfully

23   be licensed by Rembrandt. So I take complete offense to that.

24            THE COURT:  Understood.

25            MR. THOMPSON:  Your Honor, I just might say though

```
 1   that the Trustee of course, has a responsibility to make sure

 2   that everything that he is attempting to sell below the --

 3            MR. VICTOR:  Your Honor, the people --

 4            MR. THOMPSON:  Excuse me.

 5            MR. VICTOR:  -- and its subsidiaries --

 6            THE COURT:  Let him finish his statement, Mr. Victor.

 7   Go ahead.

 8            MR. THOMPSON:  All of the assets that the Trustee is

 9   purporting to sell, have full disclosure with regards to those

10   assets. And I think the point that Rembrandt has been making is

11   that disclosure has been incomplete to date.  I understand that

12   Mr. Victor suggests that everything is in the data room and

13   therefore any reasonable bidder could make a determination as

14   to what exposure they may or may not have.  We would argue that

15   is incorrect.

16            THE COURT:  Okay.  Thank you.

17            I understand, Mr. Victor.

18            MR. VICTOR:  Thank you, Your Honor.

19            THE COURT:  You're welcome.  Okay.

20            So Mr. Vagnoni, let's just talk about some deadlines,

21   okay?  So we have to pick a date for a sale hearing.  We have

22   to pick a date for a sale objection deadline.  And I'd also

23   like to get any replies by the Debtor to any objections.

24            MR. VAGNONI:  Well --

25            THE COURT:  All right.  So we should also start with
```

 1   like the bid deadline, okay.  So you're saying that -- so the

 2   big deadline right now you're suggesting is the 18th, but

 3   that's in like five days and we don't even have the schedules.

 4   We don't have them.  So I don't think we need a long time

 5   because I think that we could all agree that given everything

 6   I've heard today, I highly doubt anyone is going to be placing

 7   a bid, but you know, we should still put it out there for at

 8   least a couple weeks to see if you're going to generate any

 9   bids, okay.

10          So let's look at the calendar here.  All right.  So

11   presumably you'll have the final form of the schedule on the

12   18th.  So I think that we could get -- we can have a bid

13   deadline be December 2nd.  December 2nd.  And then that means

14   -- well, I'm sorry.  Yeah.  December 2nd and then we could have

15   an auction on the 3rd.  You guys are going to do that in your

16   offices, right?

17          MR. GEORGE:  If one is required.

18          THE COURT:  If one is required.  All right.  And so

19   then after that, we just need to -- we need to decide when

20   we're going to have the sale hearing.

21          MR. VAGNONI:  Your Honor.

22          THE COURT:  Yes?

23          MR. VAGNONI:  We have a sale closing deadline of

24   December 10th.  We're going to -- this is extremely tight with

25   those --

```
 1            THE COURT:  I'm going to give you -- I mean, let me

 2    just look at the schedule here.  Okay.  So the 10th is a

 3    Tuesday.  All right.  Okay.  So I think what we should do is we

 4    should have the sale hearing on -- I think we should have it on

 5    the 10th of December.  Okay.  And I'll give you a ruling on the

 6    10th because we're going to back into that all the objections

 7    for when people are going to file objections to the sale.

 8            MR. VAGNONI:  Okay.  Your Honor, that's going to put

 9    us out of the agreement we have with Hawk.

10            THE COURT:  Okay.  So Hawk, I'm looking at my

11    schedule and I'm trying to give you a hearing as soon as I can,

12    and I'm -- you know, they're the ones who gave you the deadline

13    of December 10th, is that right?

14            MR. VAGNONI:  It was -- yeah, Hawk and SeeCubic.

15    Yeah.

16            THE COURT:  Yeah.  Okay.  So I'm trying to work with

17    you guys here, but I'm not going to be able to have a hearing

18    in the first week of December because I think we have a lot

19    going on then.  I mean, I guess we could try to have it on the

20    4th.

21        (Court and clerk confer)

22            THE COURT:  So I think what we should do then let's

23    have a sale hearing on the 4th of December at 1:00 p.m.  And

24    we'll make a sale objection deadline next Friday the 22nd, and

25    any responses to the objection should be filed by the 29th.
```

 1  The deadline again is the 2nd, the auction is the 3rd.  We'll

 2  have the hearing on the 4th.

 3          MR. THOMPSON:  Well, Your Honor.

 4          THE COURT:  Yeah.

 5          MR. THOMPSON:  Your Honor, I would only make two

 6  observations, right?  One, first that it's pretty clear that

 7  Rome is not burning.  Notwithstanding protestations to the

 8  contrary.  And we once again see the accommodation of the Hawk

 9  parties even with regards to scheduling on something that was

10  completely within their control in terms of providing -- the

11  Trustee providing this list of assets well before now.

12          And frankly having other potential bidders have

13  access to this information in the data room.  It is

14  regrettable, although not too terribly unforeseeable that

15  nobody else was interested, given the information that they

16  would have and the concerns that any probable bidder would have

17  given what they know and what the risks probably are.

18          But beyond that, I just want the record to reflect

19  that there seems to be some suggestion that all VSI has done

20  throughout this process has been an obstructor.  We have tried

21  multiple times to provide alternative financing, in the way of

22  DIP financing to proposals.  And I am aware of Rembrandt having

23  made a proposal before that.

24          Mr. Vagnoni, during our hearing suggested that none

25  of those things were acceptable.  All of them -- I will

 1   contend, Your Honor, all of them, each and every one was better

 2   than the outcome that this trustee has decided is the only

 3   track he can go down.

 4          THE COURT:  I have one question.  Where is Phillips

 5   in all this litigation?

 6          MR. GEORGE:  Ready to cancel the --

 7          THE COURT:  Excuse me?

 8          MR. GEORGE:  Probably about ready to cancel the

 9   license.

10          MR. VAGNONI:  Probably.  Your Honor --

11          THE COURT:  Where are they?  Like I haven't seen

12   them.  Like you're jumping up and down, but where's Phillips?

13          MR. GEORGE:  I spoken to Alex Damvelt if you'd like

14   to hear about that.  And I've spoken to Phillips as well.

15          MR. VAGNONI:  Your Honor, he's testified -- he's

16   testified enough.  Your Honor, the proposals that we received

17   -- and I don't want to prolong this anymore.  I know Your Honor

18   has made a ruling on dates.  The proposals that the Trustee has

19   received so far are from the same individual who found it has

20   grossly mismanaged the Debtor's --

21          THE COURT:  Mr. Vagnoni, I'm giving you everything

22   you want.

23          MR. VAGNONI:  I agree.

24          THE COURT:  I'm moving forward with the bid

25   procedure, and --

```
 1              MR. VAGNONI:  And I acknowledge that.

 2              THE COURT:  Okay.

 3              MR. VAGNONI:  And I thank you.  But to sit here and

 4  listen to --

 5              THE COURT:  There's zealous advocates --

 6              MR. THOMPSON:  I'm going to object to this line --

 7              THE COURT:  -- being paid to be --

 8              MR. THOMPSON:  -- to this line of -- I'm going to

 9  object.

10              THE COURT:  Everybody.  So Mr. Vagnoni, I don't need

11  to hear anything more from anybody.

12              MR. VAGNONI:  Thank you, Your Honor.

13              THE COURT:  Okay.  So I'll hear from all of you.

14  Just make sure you put in those briefs.  My law clerk is

15  waiting with baited breath to see all of your sale objections

16  because he's got to do a lot of research.  So next Friday,

17  okay.  We'll be taking a close look at all of that.  So please

18  include all of your arguments then.  Okay, everybody. I will --

19              MR. THOMPSON:  Thank you, Your Honor.

20              MR. VAGNONI:  Thank you, Your Honor.

21              THE COURT:  All right.  Thank you.  I have a 12:30

22  hearing.  Don't need to stand for me.  Okay.

23         (Proceedings adjourned at 12:47 p.m.)

24

25
```

C E R T I F I C A T E


     I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_John Buckley_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bky. Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

**DECLARATION OF CHARLES M. ROBERTSON IN SUPPORT OF VISUAL SEMICONDUCTOR, INC.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR AN ORDER APPROVING (A) THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO AND (C) GRANTING RELATED RELIEF**

I, Charles M. Robertson, hereby declare under penalty of perjury:

    1.      My legal name is Charles M. Robertson, but professionally I am known by the nickname Bud Robertson. I was employed by Stream TV Networks, Inc. ("Stream"), a debtor in the above captioned Chapter 11 bankruptcy case, as Vice President of Business Development from shortly after its formation in 2009. From approximately May 2018 through December 2020, I served as Executive Vice President and was closely involved with Stream's global operations and business development. From January 2021 through December 2023, I provided full-time executive consulting services to Stream as an independent contractor, and from the appointment of William A. Homony in his capacity as chapter 11 trustee for Stream (the "Trustee") in January 2024 until the present, I have provided contract services to Stream on an occasional basis.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

2.      From May 2018 until December 2020, I also served as Chief Executive Officer of Stream's R&D subsidiary in the Netherlands, SeeCubic, B.V. ("SCBV"). I resigned that position shortly after ownership of SCBV was ceded to SeeCubic, Inc. ("SeeCubic") pursuant to an improvident injunction issued by the Delaware Court of Chancery. During that time, I became quite familiar with all operational aspects of SCBV.

3.      For most of 2024, I have provided executive consulting services to Visual Semiconductor, Inc. ("VSI"), assisting in its efforts to develop a Plan of Reorganization that will enable Stream to successfully reorganize and exit the bankruptcy.

4.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors, personal experiences and interactions, and information learned from my review of relevant documents.  If called upon, I can and will testify competently to the facts set forth herein.

5.      I submit this declaration in connection with *Visual Semiconductor Inc.'s Objection to Motion of William A. Homony in his Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*.

## Preliminary Statement

6.      I have been intimately involved with virtually all aspects of litigation and operations involving Stream from the time a settlement agreement (the "Omnibus Agreement")[2] purported to transfer Stream's assets (the "Assets") to SeeCubic in May 2020 until the appointment of the Trustee in January 2024. Since the time of the Trustee's appointment, I have closely followed

---

[2] ECF 48, Exhibit O

all filings and hearings in this Bankruptcy Case, I have testified in the Adversary Case, and I have been intimately involved with VSI's efforts to develop a Bankruptcy Plan of Reorganization for the benefit of Stream and all its creditors.

7.      From May 2020 to the present, SeeCubic has (a) obtained Stream's assets pursuant to an improvident preliminary injunction; (b) retained possession of Stream's assets despite numerous court orders mandating their return; (c) taken post-petition legal action in the Netherlands to seize control of Stream's Dutch subsidiaries which conduct Stream's R&D activities and own its intellectual property; and (d) used the Assets for its own benefit despite a Bankruptcy Court Temporary Restraining Order enjoining it from doing so.

8.      What follows is a detailed chronology of how the Assets were stripped from the Debtors, wrongfully retained by SeeCubic (the Stalking Horse in the proposed 363 Sale), and used by SeeCubic in violation of the standing TRO.

### General Pre-Petition Timeline Pertaining to the Debtors' Assets

9.      As of January 2020, Stream owed $6 million plus interest to its senior secured lender, SLS Holdings VI, LLC ("SLS") whose managing member is Shadron L. Stastney ("Stastney"). As a benefit afforded to him because of the convertible loans provided by SLS (the "SLS Convertible Notes"), Stastney served on Stream's Board of Directors. Elevated to Vice Chairman of the Board and appointed Chief Financial Officer in 2018, Stastney was a true insider of Stream.

10.     On January 30, 2020, Stastney resigned his positions at Stream and announced his intention to serve a default notice to Stream and pursue a foreclosure action on the Assets, which had been pledged by Stream as security for the SLS Convertible Notes. The Assets included 100%

of the stock shares of Technovative Media, Inc. ("Technovative"), which directly or indirectly owned all of Stream's subsidiary entities.

11.     Stastney filed a foreclosure action in the Delaware Superior Court on March 23, 2020[3]. Stream subsequently filed its answer, affirmative defenses, and counterclaims. The Superior Court set a preliminary hearing for June 2021, approximately 14 months later.

12.     Although the foreclosure action in Superior Court had not yet been adjudicated, Stastney began an immediate campaign of declaring that Stream was in foreclosure and that the Assets belonged to SLS. One target of his misinformation campaign was MotivIT, a vendor that housed Stream's computer servers and the intellectual property stored on them (the Ultra-D™ technology, or "Ultra-D"). Instructed by Stastney to hold the servers for the benefit of SLS[4] and take direction only from SLS, MotivIT subsequently blocked Stream's rightful access to its own hardware and computer source code.

13.     In a meeting on May 4, 2020, Stream's newly expanded board of directors voted to establish a Resolution Committee consisting solely of two new directors – Kevin Gollop ("Gollop") and Asaf Gola ("Gola") – to settle Stream's debt with SLS and its junior secured lender, Hawk Investment Holdings Limited ("Hawk"). Two days later, on May 6, 2020, Gollop and Gola signed the Omnibus Agreement, which purported to transfer all Assets to a "newco" (SeeCubic) as satisfaction of the debts and settlement of ongoing litigation.

14.     Stream management immediately challenged the validity of the Omnibus Agreement, which had been signed by directors but not ratified by Class B Voting Shareholders as required by Stream's charter. Stream took subsequent corporate action to discharge the directors who had formed the Resolution Committee and executed the Omnibus Agreement.

---

[3] C.A. No. N20C-03-225 MMJ CCLD
[4] Stastney email of March 12, 2020 to MotivIT

15.     SeeCubic was founded as a Delaware corporation on May 20, 2020 to receive the Assets. Despite Stream's objections to the validity of the Omnibus Agreement, SeeCubic began seizing Stream assets wherever and however possible. On the title page of its June 2, 2020 private placement memorandum, SeeCubic declared itself "Owner of the brand Ultra-D."[5]

16.     Despite being removed from their directorships in May 2020, Gola and Gollop continued to represent themselves as directors of Stream. On August 24, 2020, using Stream's letterhead, they signed a Delegation of Authority Letter[6] which purported to give a third-party power of attorney to represent some of Stream's subsidiaries for the purpose of assuming the facility lease and taking possession of Stream's valuable, proprietary optical bonding equipment (the "Bonding Equipment").

17.     Upon learning that SeeCubic representatives were attempting to seize its multi-million-dollar Bonding Equipment in China, Stream filed for injunctive relief in the Delaware Court of Chancery on September 8, 2020[7]. SeeCubic filed a counterclaim a week later, seeking validation and enforcement of the Omnibus Agreement.

18.     After 3 months of discovery, briefings, and hearings, the Chancery Court issued an improvident[8] Preliminary Injunction on December 8, 2020 which awarded all of Stream's assets to SeeCubic pending final adjudication of the competing motions. Stream was ordered to surrender its ownership of all subsidiaries, its intellectual property, its Bonding Equipment, its trademarks, its business computers and data (including email), its bank accounts, and even the right to conduct business under the Stream name.

---

[5] ECF 48, Exhibit Q
[6] ECF 48, Exhibit S
[7] C.A. No. 2020-0766-JTL
[8] The Preliminary Injunction (ECF 48, Exhibits U and V) and the Partial Final Judgment (ECF 48, Exhibit X) which followed were subsequently overturned by the Delaware Supreme Court on June 15, 2022 (ECF 48, Exhibit Y).

19.     With more than $18 million in unsecured debt and few remaining assets with which to service that debt, Stream filed for chapter 11 Bankruptcy protection on February 24, 2021[9]. Stream sought turnover of estate property and rejection of the Omnibus Agreement as an executory contract since the Assets had not yet been fully transferred and since SeeCubic had not yet made payment to Stream through issuance of SeeCubic stock shares. However, the Bankruptcy Court gave deference to the Chancery Court injunction (even though it was preliminary) and dismissed Stream's Bankruptcy case as a bad faith filing on May 17, 2021.

20.     On November 10, 2021, the Chancery Court issued a Partial Final Judgment[10] finding the Omnibus Agreement valid and the Asset transfers to SeeCubic justified.

21.     On December 21, 2021, Stream appealed the Chancery Court ruling to the Delaware Supreme Court[11]. The case was heard on April 6, 2022, and on June 15, 2022, the high court – sitting *en banc* – issued a unanimous 5-0 Opinion[12] that REVERSED and VACATED the lower court ruling and REMANDED the case to the Chancery Court to unwind the damage that had been done to Stream. On July 1, 2022, the Delaware Supreme Court issued its corresponding Mandate[13] to the Chancery Court.

22.     The same day the Mandate was issued, Stream filed a Motion for Entry of Final Order and Judgment Consistent with the Mandate. After suffering for two years from the hostile takeover and improvident injunction, Stream simply wanted control and possession of the Assets once again so it could resume business.

---

[9] U.S. Bankruptcy Court for the District of Delaware, Case No. 21-10433 (KBO)
[10] ECF 48, Exhibit X
[11] Delaware Supreme Court, No. 360, 2021
[12] ECF 48, Exhibit Y
[13] ECF 48, Exhibit Z

23.     Despite the Delaware Supreme Court ruling, SeeCubic failed to return the Assets. On July 31, 2022, SeeCubic informed Stream that (a) it intended to sell the Assets rather than return them as mandated and (b) it was in the process of engaging an investment banker (later identified as SSG Advisors, LLC ("SSG")) to market and sell the Assets on behalf of Hawk, which was acting as collateral agent for SeeCubic.

24.     On August 1, 2022, Stream requested a Temporary Restraining Order against Hawk and SeeCubic to prevent the sale of the Assets. On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court Opinion, the Chancery Court issued a TRO enjoining SeeCubic[14]. Vice Chancellor Laster specifically stated his expectations:

> SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. **SeeCubic must do so based on a status quo where Stream has title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous**.

25.     On August 10, 2022, the Chancery Court issued an Order Granting Partial Final Judgment[15] in favor of Stream. The order stated:

> Pending transfer of the Assets from SeeCubic to Stream, **SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets**, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream.

26.     Following the Partial Final Judgment Order of the Chancery Court, SeeCubic finally began returning limited assets, most of which had little value to Stream's business: outdated demonstrators with expired credentials, certain website domains (but not all), select email archives (but not all), a copy of computer source code but not the servers and master code itself, and some inventory of 4K-resolution Ultra-D displays manufactured in 2016-2017. Stream repeatedly

---

[14] ECF 48, Exhibit AA (emphasis added)
[15] ECF 48, Exhibit BB (emphasis added)

provided a significant list of unreturned assets to SeeCubic, but these efforts were futile. A non-
comprehensive list of assets withheld by SeeCubic includes:

    a. 8K-resolution and other advanced Ultra-D technology demonstrators
    b. Optical bonding equipment for mass production
    c. Silicon Valley computer servers and source code/intellectual property
    d. Business computers, business data, and email archives
    e. Administrative control of key business websites

27.    Notably, SeeCubic argued that it had paid the balance due on Stream's Silicon
Valley computer servers, and thus, the hardware belonged to them. Vice Chancellor Laster allowed
SeeCubic to maintain possession of the servers (and the intellectual property stored on them),
ordering only that SeeCubic allow Stream to make a copy of the computer code. The Court did not
require SeeCubic to delete the data or provide proof thereof; it simply allowed SeeCubic to
maintain possession of Stream's IP in contravention of the Delaware Supreme Court Mandate.

28.    While returning assets of marginal value such as 6-year-old inventory and outdated
desktop computers with expired software, SeeCubic continued to argue that other key assets had
been "improved" while under SeeCubic control and therefore should not have to be returned to
Stream. It also argued that sorting "legacy" assets from "improved" assets would be a difficult or
impossible task. The Chancery Court considered these arguments and issued an Opinion on
September 28, 2022[16] which stated:

> Hawk and SeeCubic have argued that SeeCubic holds some assets that are
> Disputed Assets, either because they are not Legacy Stream Assets, or because
> they are not easily segregated from Legacy Stream Assets. SeeCubic's claims on
> this point seem somewhat exaggerated. In any event, **in light of the Mandate, the
> more important consideration is to require SeeCubic to return Stream's assets
> expeditiously**. (*9/28/22 Opinion* at p. 7)
>
> As a result of the Mandate, Stream has equitable title to the Legacy Stream Assets.
> **With that equitable ownership interest comes the right to use the Legacy
> Stream Assets to conduct business and make efforts to satisfy the claims of**

---

[16] 9/28/22 Chancery Court Opinion (*See* Exhibit A, emphasis added)

**Hawk and Stream's other creditors**. If Stream does not get the Legacy Stream Assets back, Stream will lose that opportunity forever. Stream therefore faces a threat of irreparable harm. (*id* at p. 8)

SeeCubic also faces a degree of harm because it has been running a business using the Legacy Stream Assets for the past eighteen months. As a result of the Supreme Court Decision, however, **SeeCubic currently has no equitable right to carry on that business**. SeeCubic's interests currently are derivative of Hawk's, and Hawk's only interest is that of a creditor. (*id* at pp 8-9)

29.     The Chancery Court recognized that the most expeditious way for SeeCubic to

return the bulk of the Assets would be through the transfer of Technovative stock shares:

The parties' submissions make clear that there is a comparatively easy means of transferring the vast bulk of the Legacy Stream Assets from SeeCubic to Stream. That outcome can be achieved by causing SeeCubic to transfer to Stream the equity in what had been Stream's principal operating subsidiary, Technovative Media, Inc. SeeCubic exercised its rights under the Omnibus Agreement through a similar transfer, and it makes sense to unwind that action by reversing that transfer. There will be follow-on issues to resolve, but the transfer offers a means of substantially implementing the Mandate in a single step. (*id* at p. 7)

30.     Finally, on September 30, 2022, the Chancery Court issued a Mandatory Injunction

Order[17] in which SeeCubic was enjoined from the following:

- SeeCubic may not use the Server Information [Stream's proprietary computer code] for any purpose other than pursuing a claim, including for any business purpose.

- SeeCubic may not use information relating to the Sample Displays for any other purpose, including for any business purpose.

- SeeCubic may not use information relating to the Bonding Equipment for any other purpose, including for any business purpose.

- SeeCubic may not use the documentation relating to the [3D] Lenses for any other purpose, including for any business purpose.

- As an adjunct to the mandatory relief set forth in this order, SeeCubic and any persons acting in concert with it are prohibited from taking any steps to interfere with Stream's ability to recover the Sample Displays, the Bonding Equipment, the Server Information, or the Lenses...

The 9/30/22 Injunction Order further stated:

---

[17] 9/30/22 Chancery Court Mandatory Injunction Order (*See* Exhibit B)

- SeeCubic appears to contend that the Bonding Equipment is a Disputed Asset because SeeCubic satisfied Stream's debt to the landlord who owned the premises where the bonding equipment was housed after Stream abandoned the premises and failed to pay rent. SeeCubic can seek to recover the Bonding Equipment or the incremental value that SeeCubic conferred through its general claim for unjust enrichment or through a specific claim based on the Bonding Equipment. In light of the Mandate, the first priority is to return the Bonding Equipment to Stream.

- SeeCubic shall return the Bonding Equipment to Stream within ten days.

31.     On September 30, 2022, SeeCubic transferred the Technovative shares to Stream but coordinated with Hawk for a simultaneous execution of proxy rights that Hawk purported to have as a creditor. Hawk issued asset marshalling orders and appointed Stastney as the sole director of Technovative in furtherance of its goal to sell the Assets.

32.     In response to Stream's Emergency Motion for Post-Judgment Enforcement, on October 3, 2022, the Chancery Court issued an Order mandating the surrender of Technovative shares to Stream and an Opinion[18] finding Stastney, SeeCubic, and Hawk in contempt:

> **This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings.** He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's. (*10/3/22 Opinion* at pp. 1-2, emphasis added)

Despite finding Stastney, SeeCubic, and Hawk in contempt, the Vice Chancellor imposed no sanction on them other than ordering the Technovative shares to be immediately vested with Stream and requiring Hawk to refrain from any action against Stream for 10 business days. On September 28, 2022, the Vice Chancellor had stated that Stream had "the right to use the Legacy

---

[18] ECF 48, Exhibit K

Stream Assets to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors," but less than a week later, he only afforded Stream two weeks to possess its assets unmolested.

33.     Although title to the Technovative shares was transferred to Stream, no physical assets were transferred. The return of assets through the transfer of stock shares was largely symbolic and of no practical effect, as SeeCubic maintained control over assets it possessed solely through the improvident injunction. Stastney maintained dominion and control of the company's technology through his directorships of SCBV, which conducts R&D operations, and Ultra-D Cooperatief ("UDC"), which owns the Debtors' patent portfolio.

34.     With Technovative ownership finally returned to Stream, Mathu Rajan executed various corporate resolutions and conducted board meetings from October 3, 2022 through October 11, 2023 to restore his position as director of Stream's subsidiaries, including the three Dutch entities. These steps returned legal control of the foreign assets to Stream, although there was no transfer of possession. Stream explored options to retain Dutch legal counsel to register the changes of directorship with the Netherlands Chamber of Commerce but was unable to complete the process before Hawk commenced its next action.

35.     On October 17, 2022, after waiting 10 business days as instructed by the Chancery Court, Hawk once again asserted its purported proxy rights, issued asset marshalling orders, and appointed Stastney as the sole director of Technovative in furtherance of its goal to sell the Assets in a UCC Article 9 sale. Knowing that Stream had served Hawk debt conversion notices and would challenge Hawk's rights as a creditor, Hawk simultaneously filed an action in the Chancery Court to determine the validity of Stastney as a disputed director of Technovative (the "225 Action")[19].

---

[19] ECF 48, Exhibit CC

36.     Aware that Stream had executed corporate resolutions restoring Mathu Rajan as director of Stream's subsidiaries, Stastney, SLS, SeeCubic, and Hawk – through Dutch counsel De Brauw Blackstone Westbroak N.V. ("De Brauw") – filed a Writ of Summons on October 20, 2022 in the Amsterdam Court seeking to have Mathu Rajan's appointment invalidated and Stastney confirmed as director of Stream's three Dutch subsidiaries (the "Amsterdam Action"). Notably, Stastney included those same Dutch subsidiaries as plaintiffs in the action.

37.     In response, the Chancery Court issued a Status Quo Order[20] and appointed a Receiver *Pendante Lite* (the "Receiver") to oversee the operations of Technovative. The Status Quo Order required Stastney, SeeCubic, Hawk, and SLS to withdraw their Amsterdam Action, but it also froze all Assets, which remained out of Stream's reach despite the Mandate of the Delaware Supreme Court more than four months previous and several subsequent Opinions and Orders of the Chancery Court.

38.     Over the next few months, Stastney – who remained registered as director in the Netherlands Chamber of Commerce – directed the operations of SCBV and pushed SeeCubic business development projects forward with the Receiver by representing them as projects owned by, and for the benefit of, SCBV. The Receiver allowed the projects to proceed.

39.     On February 21, 2023, Rembrandt 3D Holding Ltd ("Rembrandt") filed suit against Technovative, Hawk, and SeeCubic in the U.S. District Court for the District of Delaware[21] alleging misappropriation of trade secrets and seeking injunctive relief. The complaint asserted that rights to Rembrandt IP had been licensed to Stream but could not be used by Stream's subsidiaries **except for the express benefit of Stream**. Since the projects being authorized by Technovative were for the benefit of SeeCubic and Hawk – or for the benefit of SCBV at the very

---

[20] ECF 48, Exhibit DD
[21] C.A. No. 23-193-GBW

least – the projects violated Rembrandts IP rights. I understand that the case against Technovative is currently stayed due to this Bankruptcy but is still proceeding against SeeCubic and Hawk.

40.     Still without access to its Assets nine months following the Delaware Supreme Court Opinion, Stream filed for chapter 11 bankruptcy protection on March 15, 2023. The Receiver resigned his position and returned management of Technovative to Stream.

41.     On March 30, 2023, Mathu Rajan was registered at the Netherlands Chamber of Commerce as director of Stream's three Dutch subsidiaries based on corporate resolutions previously executed in October 2022. I personally worked with a Dutch notary, who analyzed the documents, confirmed both their validity and appropriateness for the purpose, and facilitated the registration changes. Stastney was deregistered in the process. Accordingly, Stream once again had dominion and control of its overseas assets, if not actual possession.

42.     Despite the worldwide stay afforded Stream in bankruptcy, on April 2, 2023, Stastney, SLS, SeeCubic, and Hawk – through De Brauw – sent a letter to Stream's Dutch notary demanding documentary evidence supporting the Netherlands registration changes and requesting the notary to "inform us as soon as possible what steps you deem appropriate in mitigating the consequences of the Director Changes, including options for undoing these filings."[22]

43.     Simultaneously, De Brauw notified management of SCBV that Mathu Rajan's appointment was invalid, and that the Notary was "being questioned." Counsel for SCBV manager Patric Theune ("Theune") sent a letter to Stream on April 3, 2023[23] stating, in part, that (a) SCBV had doubts about the legitimacy of Mathu Rajan's status as director and (b) Theune would not relinquish possession of the Bonding Equipment to Stream.

---

[22] ECF 76, Exhibit D
[23] ECF 76, Exhibit E

44.     On April 5, 2023, Stream filed an *Amended Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3 ) Imposing Sanctions for Willful Stay Violations* (the "Turnover Motion")[24], providing details about the Bonding Equipment and other key assets that SeeCubic had willfully failed to return[25]. In conjunction with the filing, Stream also filed a *Motion for Expedited Hearing on Emergency Motion Directing the Turnover of Property of Debtor's Estate*[26].

45.     The same day, on April 5, 2023, DeBrauw filed a Writ of Summons in the Netherlands[27], renewing the Amsterdam Action it had withdrawn in October 2022. Once again, Stastney, SeeCubic, SLS, and Hawk were attempting to remove Mathu Rajan as director of Stream's Dutch subsidiaries and appoint Stastney in his place. The Writ also attempted to block Mathu Rajan's efforts to secure the return of the Bonding Equipment to Stream.

46.     On April 7, 2023, Stream filed a Supplement[28] to its amended motion for an expedited hearing, informing the Bankruptcy Court of the actions by Stastney and his associates to interfere with assets of the Debtors' estates.

47.     On April 14, 2023, the Bankruptcy Court held an emergency hearing. Judge Coleman stated:

> Now, I don't appreciate people going to another jurisdiction and to get another court to decide that they own it and that nothing should happen and no direction should be made with respect to the turnover or release of that equipment.  Because that's exactly what you guys have asked for. I'm reading it and I don't appreciate that. That's not going to happen. (*4/14/23 Hearing Transcript* at 117:7-13)
>
> I want the matters in the Netherlands, which is scheduled for next week to just hold on a minute, because I'm concerned that this is going to have some impact on what I'm doing. It's going to have some impact on whether the Debtor believes to

---

[24] ECF 76
[25] ECF 76, Exhibit C
[26] ECF 77
[27] ECF 90, Exhibit A
[28] ECF 90

have their rights here in this Court, and it belongs to them here. And I need to protect those rights with respect to their ability to control these things. (*Id*. at 181:7-13)

48. Despite instructions to refrain from pursuing the Amsterdam Action, Stastney and his associates pushed forward. The case was briefed over the next two months and resulted in a hearing in Amsterdam Court on June 28, 2023. I testified as a witness on behalf of Stream in that hearing and observed the entire proceeding.

49. Based in part on testimony from Theune, who refused to acknowledge Mathu Rajan's authority, and on SeeCubic's assertion that it would continue to provide funding to SCBV through a promissory note while U.S. litigation was pending, the Amsterdam judge issued a ruling on June 29, 2023. The Summary Judgment appointed Jasper Berkenbosch ("Berkenbosch") as an "independent" interim director of all three Stream Dutch subsidiaries, with Berkenbosch serving in such capacity until a U.S. court determined whether Hawk or Stream had the legal right to appoint a director. Stastney had succeeded in removing control of the Debtors' subsidiaries from the Debtors.

50. When informed by Stream's counsel that the Amsterdam Action had proceeded, Judge Coleman expressed her displeasure[29]:

> I'm hoping it was just the [Amsterdam] Court on its own decided to do that. And I want everybody to know that, if it was not, **there are going to be some serious consequences**. Because I was clear that nothing was to go before that [Court]…

Despite the Court's admonition that there would be consequences for the affirmative actions of Stastney, SeeCubic, SLS, and Hawk in the Amsterdam Court, there were none. Their ongoing pattern of ignoring Court orders and instructions produced no repercussions once again.

---

[29]June 29, 2023 *Hearing Transcript* at p.177:19-22

51.    Berkenbosch communicated to Stream that SCBV intended to continue its work on SeeCubic projects and enter into a contract with Hyundai Mobis as the next step in an ongoing SeeCubic automotive project. Stream informed Berkenbosch that the Hyundai project would violate certain third-party licenses, including Stream's license with Rembrandt. Berkenbosch indicated that SCBV management and employees were strongly encouraging him to proceed, and that SeeCubic had threatened to withhold funding guaranteed by the promissory note if SCBV did not sign the Hyundai agreement.

52.    Berkenbosch did not serve long as the interim director of Stream's Dutch subsidiaries. Upon learning of the Hyundai project, on August 6, 2023, Rembrandt sent Berkenbosch a cease and desist letter which detailed the license terms it had reached with Stream, the infringement SCBV was committing by engaging with SeeCubic as a non-licensee, and the consequences faced by SCBV, Berkenbosch, and Berkenbosch's firm, Jones Day, for trade secret violations. Faced with potential claims that could equal the $1.2 billion value of Rembrandt's license with Stream, Berkenbosch resigned.

53.    On August 12, 2023, Stream filed an Adversary Complaint[30] against Stastney, SLS, Hawk, Arthur Leonard Robert Morton ("Morton," principal of Hawk), SeeCubic, Gollop, Gola, SCBV, Theune, and other parties named and unnamed working in concert with them. The complaint (a) detailed the status of Stastney, Gollop, and Gola as a true insiders of the Debtors[31]; (b) detailed the seizure and retention of the Debtors' Assets by SeeCubic; (c) provided a list of assets wrongfully retained by SeeCubic and the other defendants[32]; (d) detailed the ongoing use of those assets to the detriment of the Debtors[33]; (e) alleged breach of contract, breach of fiduciary

---

[30] Adversary Case 23-00057-amc, ECF 01
[31] Adversary Case 23-00057-amc, ECF 01 at ¶¶ 55-81
[32] Adversary Case 23-00057-amc, ECF 01 at ¶ 128
[33] Adversary Case 23-00057-amc, ECF 01 at ¶¶ 126-127

duty, negligence, fraudulent conveyance, and tortious interference; (f) sought injunctive relief and turnover of assets; and (g) sought to have the SeeCubic, SLS, and Hawk bankruptcy claims subject to equitable subordination, disallowance, recharacterized as equity interests, or subject to right to set off under 11 U.S.C. § 558.

54.     After Berkenbosch's resignation on August 18, 2023, the Amsterdam Action resumed with additional briefings by the parties. On September 13, 2023, during a second hearing held in Amsterdam Court, Stastney testified about 12 or 13 projects he had developed for the benefit of SCBV, which qualified him to serve as a beneficial director of the Stream Dutch entities. Faced with (a) a lack of independent director options due to the Rembrandt IP claim and (b) Stastney's willingness to serve as a director with revenue-generating projects in hand, the Amsterdam judge issued a new ruling on September 20, 2023. The new Summary Judgment appointed Stastney as interim director, a position he has now held for more than a year. Accordingly, Stastney continues to exercise dominion and control over the Debtors' R&D operations, its technology, its intellectual property, its trademarks, its websites, its business data, and its position in the global market as developer of industry-leading glasses-free 3D.

55.     On September 30, 2023, Stream filed a *Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction* [34] to prevent Stastney, in his newly restored position of power as director of Stream's Dutch subsidiaries, from using estate assets for the benefit of SeeCubic as he had done previously. That commenced a series of hearings in Bankruptcy Court on October 6, 2024, October 16, 2024 and October 30, 2024, with more to follow in November and December.

---

[34] Adversary Case 23-00057-amc, ECF 27

56.     On November 6, 2023, Stream filed an *Additional Supplement to Debtors'
Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the
Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations*[35],
once again documenting assets that SeeCubic had failed to return and was using as a direct
competitor to Stream.

57.     Due to motions practice that received higher priority (*i.e.* SeeCubic's Motion to
Dismiss, Stream's Adversary Complaint and Motion for TRO), Stream's Turnover Motion of April
5, 2023 was put in abeyance and ignored for many months, even when Stream counsel pressed the
matter at the end of October 2023[36]. The Turnover Motion remains in limbo to this date, more than
a year and a half after being filed.

58.     Shortly after the Trustee was appointed, Stream contract employee Nicole Maneen
worked diligently to educate the Trustee about Stream's technology, its business prospects, its
history, and other material facts that might enable him to carry out the Court's mandate
successfully. On March 7, 2023, Mrs. Maneen provided a list of assets that had never been returned
to Stream[37], with the expectation that the Trustee would marshal them and secure their return for
the benefit of the Debtors' estates.

59.     On March 11, 2023, the Trustee made initial efforts to secure the return of Stream's
assets, writing to Theune at SCBV. The Trustee stated, "I am directing the relocation of Stream's

---

[35] ECF 458

[36] Stream Counsel: I'd like to clarify the record if I may. We did file an emergency motion for enforcement of the stay
against all activity regarding the debtor's estate. Everything, not just the bonding equipment. It was filed. It was
vociferously objected to. We decided -- Your Honor said hey, you guys need to stop bringing things on an emergency
basis. You put it into abeyance. It's been sitting in abeyance, and it was finally, through discussions with your
chambers, set for November 15th. But to say that this is a brand-new issue. It's not our fault that the motion went into
abeyance and there were intervening issues with both yourself and with Mr. Rajan. But to say that we didn't think this
was a problem, we did. We filed it.
Judge Coleman: All right. And is the one that never -- never mind. So for some reason, the clerks all -- no. I'm not
going to throw anybody under the bus. (*10/30/23 Hearing Transcript* at 100:23-101:13)
[37] Attachment to Maneen email of March 7, 2024 (*See* Exhibit C)

bonding equipment as well as the return of the assets identified on the attached itemized list. I've copied Nicole [Maneen] on this email who will be coordinating with you on the logistics."[38] Theune responded on March 12, 2024, "I cannot simply ignore Shad [Stastney] and take your instructions instead without his acknowledgement. … I thus have copied Shad in this e-mail, and kindly request him for guidance on what's happening and how to deal with this."[39] To my knowledge, there was no response from Stastney, who remained silent on the matter. Two days later, on March 14, 2023, Theune proposed a plan to return the Bonding Equipment, requesting significant funds and time for inspections and other unnecessary steps.[40]

60.     VSI offered to provide funds necessary to release the Bonding Equipment from the warehouse and ship it to a location where the equipment could be used by a strategic partner to begin generating revenue for the Debtors. However, on March 26, 2023, the Trustee sent an email to Mrs. Maneen stating, "I'm not directing anyone in the Netherlands to do anything without funding. … **The DIP needs to be advanced in the amount of at least $5 million** without any commitment to following VSI's proposed path forward."[41] From that point forward, it appears the Trustee gave up any pursuit of marshalling estate assets.

61.     With most of its activity overseas, SeeCubic operates beyond the view of the Bankruptcy Court, where it can violate the TRO with impunity. I have been privy to communications from individuals who have invested in both SeeCubic and VSI. These investors have shared direct communications from Stastney in which he updated SeeCubic stakeholders about activity in this Bankruptcy case, progress with "28 projects across 25 customers" (who were all engaged in proof-of-concept stages of negotiations with SeeCubic and SCBV, which is under

---

[38] Trustee email of March 11, 2023 (*See* Exhibit D)
[39] Theune email of March 12, 2023 (*See* Exhibit E)
[40] Theune email of March 14, 2023 (*See* Exhibit F)
[41] Trustee email of March 26, 2023 (*See* Exhibit G, emphasis added)

Stastney's control as sole director), and investment opportunities to finance the Stalking Horse

carve-out required for the 363 Sale. Meeting dates, participating individuals like Stastney and

Theune, and other details have been shared with VSI by investors concerned about the ongoing

TRO violations.

62.     On May 6, 2024, Rembrandt notified counsel for SeeCubic and Hawk that it had

become aware of a planned May 7, 2024 meeting to be held by their clients in violation of the

TRO. Counsel for SeeCubic failed to acknowledge Rembrandt's email at all. Hawk's counsel

eventually responded, but only two days after the alleged meeting had occurred. Hawk's counsel

stated:

> It is up to the Debtors to determine whether they believe a violation occurred or
> needs to be addressed. The Debtors have not taken any action or voiced any
> concerns. The e-mails also suggest Rembrandt believes its technology may have
> been improperly used. But there is no pending motion or order defining or dealing
> with the use of Rembrandt's technology.

63.     On multiple occasions, VSI informed the Trustee that it believed violations were

being committed by Stastney, SeeCubic, Hawk, SCBV, and Theune. The Trustee was notified

about fundraising meetings conducted in April 2024 and May 2024, including a global Zoom

teleconference on May 28, 2024 that was recorded by both SeeCubic and the investor who reported

the meeting to VSI. VSI specifically encouraged the Trustee to contact Stastney and request a copy

of the Zoom recording as an easy step to confirm whether or not a violation had occurred. To my

knowledge, the Trustee made no effort to investigate the alleged violations.

64.     I am personally aware of TRO violations that have occurred, as confirmed by the

Trustee via email to me (though he offered an explanation in an attempt to allay my concerns).

Pursuant to the IP license between Stream's non-debtor Curacao subsidiary, Ultra-D Ventures C.V.

("UDV"), and Koninklijke Philips N.V. ("Philips"), UDV is obligated to file quarterly royalty

reports in the Philips customer portal. As UDV is a non-debtor subsidiary with Mathu Rajan registered as the sole director, reporting requirements are the responsibility of Stream consultants like Suby Joseph and me. Mr. Joseph made repeated requests to the Trustee for Q1 2024 sales data, to no avail. Mr. Joseph made repeated requests to the Trustee for Q2 2024 sales data, also to no avail. When the reporting obligations became seriously overdue, Philips issued a default notice to Mr. Joseph. That's when I got personally involved.

65.     On September 10, 2024, I sent an email to the Trustee[42] and informed him of the seriousness of failing to report sales as required. The consequence could have been cancellation of the Philips license, which would have made the Debtors' estate assets virtually worthless. In my email, I stated:

> Accurate sales information required for the Philips royalty reporting can only be provided by SeeCubic B.V., which is currently under the direction of Shad Stastney. You are aware of this, as you obtained such information for Q4 2023 on January 29, 2024 – just in time to provide it to Suby for posting in the Philips licensee portal as required per contract. Either Mr. Stastney has refused to provide such information for the first two quarters of 2024, or you have not yet requested it. Regardless, Ultra-D Ventures is in breach, and Stream faces irreparable harm if the license is terminated.
>
> It is of particular significance that SeeCubic B.V. has been enjoined by TRO since January 4, 2024 and SHOULD, therefore, have no sales to report. However, the royalty report MUST be accurate. If SeeCubic B.V. has, in fact, sold any units (even demonstrator samples), those sales must be reported to Philips. The license fees for such sales are minimal, as you saw from the Philips Q4 2023 invoice. Termination of the license becomes much more likely if a fraudulent royalty report is filed. It is up to you to obtain true and accurate sales data and authorize the royalty reporting immediately.

66.     On September 10, 2024, the Trustee sent an email to me[43], stating:

> **Bud, the TRO is no longer in effect.  I settled that issue.**
> During Q1 no displays were delivered. As a result, the reporting is empty.
> During Q2 two (2) 12.3-inch display demonstrators were delivered to a customer.
> Please have Suby submit the appropriate reports through the Philips portal. Once

---

[42] See Exhibit H
[43] See Exhibit H (emphasis added)

the reporting is remitted, I will be adding myself as the primary licensee contact in the database.

The Trustee's email included two attachments, one for Q1 2024 and one for Q2 2024. The Q2 2024 report[44] clearly documented the sale of technology demonstrator units by SCBV and the Trustee's knowledge and approval of it. This is further confirmed by the September 2024 Monthly Operating Report[45], which indicates a royalty payment made to Philips pursuant to the Philips license agreement. This confirms that the Debtors' subsidiaries, under the direction of Stastney, have sold products containing the Debtors' technology in violation of the TRO.

67.     The Trustee's statement to me that "the TRO is no longer in effect. I settled that issue" seemed odd to me. It is my understanding that only the Court can lift a restraining order. If the 9019 Settlement between Stream and its secured creditors had indeed "settled" the issue when the Court approved the 9019 Settlement on June 7, 2024, why was the TRO subsequently extended by the Court three more times on July 30, 2024[46], September 27, 2024[47], and November 7, 2024[48]?

68.     On November 8, 2024, Mr. Joseph received an invoice via email from Philips related to Q3 2024 data reported to Philips by the Trustee. The invoice[49] showed a balance due of € 25.00, indicating that more technology samples had been sold in Q3 2024. The royalty report filed by the Trustee[50] shows sales of 10 units of 15.6" 3D center console demonstrator displays for the automotive market were sold during the reporting period.

69.     As detailed in the October 31, 2024 SCBV Balance Sheet[51] provided by SSG in response to VSI's due diligence requests, SCBV has accepted € 29,347,375 (approximately $30.8

---

[44] Q2 2024 Philips Royalty Report (*see* Exhibit I)
[45] ECF 769-1
[46] Adversary Case 23-00057-amc, ECF 148
[47] Adversary Case 23-00057-amc, ECF 150
[48] Adversary Case 23-00057-amc, ECF 152
[49] Q3 2024 Philips Royalty Invoice (see Exhibit J)
[50] Q3 2024 Philips Royalty Report (*see* Exhibit K)
[51] SCBV Balance Sheet (*see* Exhibit L)

million) in funding from SeeCubic since SeeCubic took control of Stream's subsidiary in December 2020. In exchange for such funding, SCBV has continued to engage in projects at the direction of Stastney for the benefit of SeeCubic, despite clear instructions from Stream that SeeCubic has no such authority and is operating as a direct competitor to the Debtors. Worse still, management of Stream informed Theune and other SCBV employees that SeeCubic projects infringe third-party technology licenses obtained by Stream, and that such infringement puts the Debtors at significant risk. SCBV continues to work on SeeCubic projects to the exclusion of any of the Debtors' projects, with one SCBV executive commenting: "Our boss is whoever pays us."

70.     To date, SeeCubic maintains dominion and control over significant estate assets that have neither been returned to the Trustee nor even identified by SeeCubic. The proposed 363 Sale, with its catchall terminology, appears to be an attempt to use the bankruptcy process to "cleanse" title to all assets, wherever located, without them ever needing to be disclosed or physically transferred.

**The Bonding Equipment**

71.     On March 12, 2015, Stream entered into an agreement with Iinuma Gauge Manufacturing Co. ("Iinuma") for the manufacture and purchase of Small Production Line ("SPL") and Mass Production Line ("MPL") optical bonding equipment (together, the Bonding Equipment)[52]. The sales agreement clearly specified that Stream, not its subsidiary SCBV, was the purchaser.

72.     A few months later, the SPL was delivered by Iinuma and installed at the manufacturing facility of Stream's Original Equipment Manufacturer, Pegatron, in Suzhou, China.

---

[52] ECF 49-1

In early 2016, the MPL was delivered by Iinuma and also installed at the Pegatron facility in Suzhou.

73. In 2016 and 2017, the Bonding Equipment was used to manufacture thousands of glasses-free 3D displays, achieving a 96% yield and confirming viability for mass production. I personally observed the Bonding Equipment in operation at Pegatron.

74. Dissatisfied with the economic terms of the Pegatron OEM relationship, Stream elected to remove its Bonding Equipment from the Pegatron facility and signed a lease to rent a warehouse in Suzhou from Hold Jumper (Suzhou) Packing Company ("HJPC") on December 12, 2018. Iinuma assisted with the disassembly, packing, and transportation of the Bonding Equipment to the HJPC warehouse.

75. From 2018-2020, Stream paid HJPC more than $1.2 million for warehouse rent. However, as the Covid-19 pandemic impacted Stream's ability to showcase its must-see Ultra-D technology, raise capital, and secure customers, Stream fell behind in its payments and worked out a repayment plan with to HJPC to satisfy its obligations.

76. In May 2020, Mathu and Raja Rajan executed a Stockholder Consent that removed Gola, Gollop, and Krzysztof Kabacinski as directors of Stream. Though the Consent was dated May 6, Vice Chancellor Laster concluded that "[i]t was not until May 9 that the Rajan brothers informed Gola and Kabacinski that they had been removed as directors. It was not until May 11 that Stream notified Gollop of his removal." (Chancery Court *PI Opinion* at p.12). Vice Chancellor Laster did not challenge the validity of the Stockholder Consent, just the timing as it related to execution of the Omnibus Agreement. This will become important in August 2020.

77. Stream sold a lot of screens in mid-2020 to one of its primary customers, Marvel Digital ("MD"). The top executive at MD offered to pay the overhead for a cooperative optical

bonding operation beneficial to both Stream and MD, and the companies began exploring logistical plans for strategic collaboration.

78.      In parallel with its negotiations with MD, Stream also negotiated with Chinese government officials in Hefei and Beijing. Both cities wanted "bragging rights" to have Stream's technology headquartered in their cities and prepared proposals to pay warehouse space and other operating costs if Stream moved its cutting-edge equipment from Suzhou.

79.      In short, Stream had several options available for resolving its Bonding Equipment warehouse needs and open balance with HJPC. MD made arrangements with Stream to pay the outstanding balance with HJPC in exchange for a the mutually beneficial bonding operation contemplated between the companies.

80.      In July and August 2020, SeeCubic discovered that Stream was selling its inventory of 65" glasses-free displays and was exploring options to reassemble the Bonding Equipment in a new location to enable a restart of production. SeeCubic sought to take control of the Bonding Equipment, preventing Stream from realizing revenue that could be used to retire the secured debt.

81.      Despite the fact that Gola and Gollop were removed as directors of Stream in May 2020, they signed a Delegation of Authority Letter[53] as directors, on Stream letterhead, on August 24, 2020, empowering a Delegate of their choice to "represent [Stream] and all its subsidiaries…in liaising with commercial landlords…including negotiating arrear repayment plans and agreements, renegotiation of lease conditions." The Letter further stated:

> The Delegate may represent [Stream] in performing viewings and inspections, including inspections of all Company equipment and other assets stored or transported to its premises, including industrial real estate locations least from companies in China. He may also arrange transportation of goods and machinery in and out of such facilities.

---

[53] ECF 48, Exhibit S

Purporting to act with authority from, and on behalf of Stream, Gola and Gollop empowered a third party to seize Stream's Bonding Equipment.

82. Shortly after Stream filed for a Temporary Restraining Order with the Delaware Chancery Court on September 8, 2020 to prevent SeeCubic from continuing to seize the Assets, Vice Chancellor Laster issued a Status Quo Order on September 23, 2020.

83. The Status Quo Order had two significant negative impacts on Stream: (a) it scared off MD from making payments to HJPC in cooperation with Stream for the planned optical bonding joint venture, and (b) it prohibited Stream from raising new capital, so Stream's overall debt and the balance owed to HJPC continued to grow.

84. April 23, 2021 – a settlement agreement with HJPC was entered into and signed by the then-director of Stream's China subsidiary. The balance due per that settlement agreement was approximately $900K. However, with the dismissal of Stream's initial bankruptcy case in May 2021, the provisions of the Chancery Court Preliminary Injunction were once again in effect, and Stream was unable to consummate its settlement with respect to the Bonding Equipment.

85. SeeCubic subsequently paid the warehouse balance on behalf of Stream's China subsidiary and claimed title to the Bonding Equipment, which remained in the HJPC warehouse.

86. Upon issuance of the Delaware Supreme Court Mandate and the Chancery Court's subsequent order that SeeCubic return the Bonding Equipment to Stream, SeeCubic elected to transfer the equipment to SCBV and argued that returning the asset to Stream's subsidiary was as good as returning it to Stream. Although no Bill of Sale or other change of title paperwork has ever been produced, SeeCubic and SCBV both claim that SCBV is now the owner of the Bonding Equipment. As such, SCBV has refused to release the Bonding Equipment to Stream despite many requests by Stream.

87.     Now that Stastney is the sole director of SCBV, he once again exerts dominion and control over Stream's Bonding Equipment, which has remained out of reach and unavailable for Stream to initiate its optical bonding co-venture with Cystar International ("Cystar," an affiliate of MD). Stastney refusal to enable the return of the Bonding Equipment is one aspect of Stream's Adversary Case in which is alleges tortious interference.

### Technovative Stock Shares

88.     As stated above, upon execution of the Omnibus Agreement, SeeCubic made every effort at self-help to seize Stream's assets. Primary of these were the stock certificates of Technovative, the top-level entity which owns all the downstream subsidiaries as previously described.

89.     In September 2020, prior to the commencement of the Chancery Court litigation, and long before there was any adjudication of the validity of the Omnibus Agreement, Stastney gained entry into Stream's corporate offices while no Stream personnel were on site, using an office key he had retained from his time as an employee 9 months earlier. Entering without permission, he searched Stream's office for the Technovative stock certificates.

90.     Unable to find the stock certificates, on September 4, 2020, Stastney created documentation declaring the certificates officially lost, used power of attorney granted to him through the Omnibus Agreement, and created new stock certificates which I believe were registered with the State of Delaware. Simultaneously, he executed new corporate documents establishing himself as the sole director of Technovative, with the power to direct all of the downstream subsidiaries.

91. Stastney and SeeCubic retained title and control of the Technovative shares until the Chancery Court issued its Mandatory Injunction on September 30, 2022 and demanded the return of the shares to Stream.

92. As stated above, Stastney coordinated a scheme with Hawk whereby Stastney signed the stock certificates back to Stream but had Hawk exercise purported proxy rights to vote the shares as a secured creditor and appoint Stastney as the director. The maneuver was executed over the course of "an extended lunch hour" as observed by Vice Chancellor Laster, who found Stastney, SeeCubic, and Hawk in contempt for their obvious attempt to thwart the order of the Court.

93. After a two-week delay imposed by the Chancery Court, Hawk once again attempted to exercise its proxy rights and filed the 225 Action so that the Vice Chancellor would determine whether Hawk or Stream had the right to appoint the Technovative director(s). The 225 Action did not dispute that Stream owned the Technovative shares, only that Stream did not have the right to appoint the Technovative director. Hawk's stated purpose for appointing Stastney as director of Technovative was to further its plan to arrange a UCC Article 9 sale of the Assets for the benefit of Hawk (as collateral agent for SeeCubic).

94. The 225 Action was stayed by this Bankruptcy Case. Stream remains in control of Technovative, and this Court has appointed the Trustee to serve as the interim managing director of Technovative.

**Computer Servers and Intellectual Property**

95. Stream's Ultra-D technology and other intellectual property was developed at SCBV, its R&D facility in the Netherlands. Computer code and other non-tangible IP has been stored on SCBV servers since the formation of SCBV in 2011 and was the only storage location

of the company's intellectual property until 2019. Although a secondary engineering team was established in Germany in 2018, the Netherlands servers were the primary repository of all the computer code.

96.     In 2019, Stream engaged a product engineering team in Silicon Valley, USA to facilitate translation of development computer code into computer code more suited for mass production. Stream established an engineering office in Fremont, California, leased servers from Dell, and engaged a third-party vendor, MotivIT, to provide server storage facilities and IT support.

97.     Stream's Silicon Valley engineering team worked to productize the Ultra-D computer code for most of 2019 and the early part of 2020. As the global pandemic hit and Stream was faced with fundraising challenges, Stream fell approximately $50,000 behind on its payments to MotivIT. In March 2020, I personally engaged in negotiations with Derrick Bowker, a MotivIT executive who agreed to a 3-installment payment plan that would bring the Stream account current[54]. Stream made the first of the agreed payments on March 11, 2020 in the amount of $17,475, with the understanding that Mr. Bowker would obtain the necessary approvals to fully execute the agreement.

98.     Despite several attempts I made to get a signed settlement agreement so that subsequent installment payments could be made, MotivIT went radio silent and failed to respond to my emails. I was unaware at the time, and would not learn until documents were produced in discovery during the Chancery Court litigation later in the year, that MotivIT's retreat from settlement with Stream was prompted by Stastney.

99.     On March 12, 2020, the day after MotivIT agreed in principle to settlement terms with me on behalf of Stream, Stastney sent an email to MotivIT declaring that Stream was in

---

[54] The MotivIT Settlement Agreement was agreed to in principal but never signed (see Exhibit M)

foreclosure and that all Assets were now the property of SLS. He instructed Mr. Bowker to hold

the servers for the benefit of SLS and to take direction only from SLS. MotivIT subsequently

blocked Stream's rightful access to its own hardware and computer source code.

100.    Stream management became consumed with the May 6, 2020 Omnibus Agreement

asset transfer and related actions related to the dispute thereof. With the pandemic causing a global

shutdown of operations, Stream furloughed its Silicon Valley engineers. The Silicon Valley servers

were not needed for any development work, and Stream focused its energy on other critical issues.

101.    On September 9, 2020, however, Mathu Rajan emailed a letter to MotivIT to re-

establish control of the servers. Mr. Bowker responded via email on September 10, 2020, stating:

> In view of a court order you received from the new company, we have received
> payment from them and technically the new company is the owner of the
> equipment.  You must secure a court order against the new company that these
> equipment are owned by Stream TV if wish to reclaim them.

When asked to produce the "court order" upon which MotivIT had decided to transfer Stream's

servers to Stastney, Mr. Bowker emailed a copy of the SLS Superior Court complaint of March 23,

2020, a foreclosure action that had not been litigated, let alone become and order of the court.

Stastney had sent MotivIT his court filing and misrepresented it as a court order, leading MotivIT

to believe that Stastney was the new owner and the servers should be surrendered to him. SeeCubic

subsequently paid the past due balance and claimed ownership of the server hardware in Chancery

Court when it came time to return the Assets to Stream as mandated by the Delaware Supreme

Court.

102.    When Vice Chancellor Laster ordered the return of certain assets to Stream, he

accepted SeeCubic's argument that it had paid for the Silicon Valley servers and should therefore

not be required to surrender them to Stream. Instead, he ordered that Stream be allowed to copy

the data only; SeeCubic was allowed to retain the servers and all the data on them even though it

was no longer entitled to possess Stream's intellectual property. To this date, SeeCubic maintains

dominion and control of Stream's Silicon Valley servers and the computer data stored on them.

103.    A greater number of computer servers, and a wider range of computer code and

intellectual property, resides with SCBV in the Netherlands. SeeCubic seized control of SCBV at

the time of the improvident injunction of the Chancery Court on December 8, 2020. As stated

above, Stastney has never relinquished his position as director of SCBV except for the brief period

that Berkenbosch was appointed interim director by the Amsterdam Court. Stastney has had

operational control of SCBV since September 20, 2023, and through his position, he can and does

direct the employees of SCBV and exercise control over all of Stream's intellectual property

situated in the Netherlands: the patent portfolio, engineering source code, trade secrets, know-how,

specialized equipment, and more.

### Websites, Email, and Business Data

104.    For more than a decade, Stream owned and maintained several website domains

that included     www.ultra-d.com,     www.streamtvnetworks.com,     www.seecubic.com,

www.streamtvinternational.com, several other domains, and various extensions thereof. All

website hosting was implemented through SCBV, which also handled global IT for Stream.

Stream's email servers were hosted on local servers at the SCBV facility, which also hosted storage

for data sharing through software like SharePoint. SCBV also provided BitLocker global

encryption for Stream's business computers.

105.    When the Chancery Court issued the preliminary injunction on December 8, 2020,

Stastney seized control of SCBV and directed the IT manager to (a) change the BitLocker

passwords to all of Stream's business computers, making them inaccessible to users; (b) change

the email passwords so that Stream could no longer access mail archives (unless stored locally) or

receive send and receive new email; (c) provide Stastney with administrative access to all of
Stream's email (including attorney-client privileged communication related to the Chancery Court
litigation which was still ongoing); and (d) revoke access by Stream to all data stored on SCBV
servers, which included business, financial, personnel, and legal data.

106. SeeCubic immediately seized the SCBV domain (www.seecubic.com) as its own to
replace the www.seecubic.co domain it had been using upon the company's formation. The
personnel page of the website was updated to include both SeeCubic manage and staff as well as
SCBV engineers. Stream's historical achievements (fundraising, testimonials, etc.) were ascribed
to SeeCubic.

107. All other domains were populated with a single landing page that announced the
takeover of Ultra-D by SeeCubic:

> **Stream TV Networks, along with all subsidiaries and all associated assets, has
> been acquired by SeeCubic, Inc.** The groundbreaking glasses-free 3D technology,
> UltraD, was developed by SeeCubic BV in the Netherlands and is now the
> cornerstone of a new & innovative international company, SeeCubic, Inc. A new
> and invigorated management team has been created with industry leading senior
> executives who have merged their vision with the technology from the core
> engineers who developed this revolutionary product.

Notably, this acquisition and ownership announcement by SeeCubic still remains active for six
domains[55] in violation of the TRO which specifically states that SeeCubic "shall not on any website
… make any representations with respect to ownership or development of such technology,
purported to be owned and/or developed by Stream and/or its subsidiaries." (*TRO* at 9(b)(ii)).

108. Following the Delaware Supreme Court Mandate and Chancery Court order to
return Stream's assets, Stastney caused SCBV to provide Stream with mid-level access to the

---

[55] 5 domains (www.stvinternational.com, www.stvinternational.eu, www.stvinternational.nl,
www.streamtvinternational.eu, and www.stvi.eu) all have "pointers" that redirect to www.streamtvinternational.nl,
which publishes language in violation of the TRO.

following domains: www.streamtvnetworks.com (and .net), www.streamtvinternational.com, www.ultra-d.com. However, despite several requests, Stream has never been given full administrator access to Amazon Web Services necessary to migrate the sites to a hosting service under Stream's control. As a result, Stream has been forced to register new domains for www.streamtvnetworks.tech and www.ultra-d.tech, which it does control, and place redirect pointers on its historical domains.

109.    Stastney directed SCBV to create archive files of Stream email existing prior to December 8, 2020 and return those archival files to Stream, but only for personnel currently or recently engaged by Stream. SCBV retained all historical mail for personnel that abandoned Stream for SeeCubic in 2020, even though email communication is the property of the company, not the employees. Email data from Stream's VP of Sales, with valuable contact information and business leads, was retained by Stastney through SCBV because Stream's former sales team, including Leo Riley, Duncan Humpreys, and Simon Ford, are now employees of SeeCubic. The same is true for email archives for Franklin Rodgers and Bill Hennessey, Stream's former accounting team. Archives for engineers are also missing. And of course, Stastney refused to surrender his own business emails that were generated using Stream's domain while Stastney was an officer and director. What does Stastney have to hide, and why has SeeCubic been allowed to retain business data that it is not entitled to? All told there are 14 business email accounts that have not been returned.

110.    Similarly, Stream was never granted access to the business, financial, and customer data stored on SCBV servers. SCBV had always been the global hub for data management, but once Stream was severed, it was never restored. SCBV initially argued that after almost two years of Stastney's control through SeeCubic, it was too difficult to sort the data, and Stream must be

restricted from accidentally accessing anything it was not entitled to. Suggestions to sort data by file date and segregate anything more recent than December 8, 2020 were met with silence, and Stream has been forced to operate without any meaningful historical data that was not backed up on local drives.

111.     SCBV also exerted its IT muscle remotely. As directed by Stastney immediately following the Chancery Court preliminary injunction, SCBV changed the BitLocker encryption passwords on all Stream business computer systems. As a result, Stream was left with non-functioning equipment and no access to critical information required to operate in any meaningful capacity. The lockout turned my laptop computer into a paperweight.

112.     Shortly after the Chancery Court preliminary injunction, SeeCubic contacted me and demanded that I surrender my business laptop, technology demonstrator units, and any other assets of Stream I might have in my possession. On December 14, 2020, I provided Stastney with a rough inventory of assets in my possession or under my control[56], which included a U-Haul storage locker in Los Angeles that housed primarily outdated equipment.

113.     I helped coordinate the surrender of assets from Sara Brewer, one of Stream's content creators who also lives and works in Henderson, Nevada. Mrs. Brewer had only a high-end content creation laptop computer, two 65" 3D screens for previewing her work, some business equipment and marketing materials.

114.     On January 29, 2021, SeeCubic arranged pickup of my business laptop, a 5.5" 3D technology demonstrator [phone] panel, two 27" 3D technology demonstrators with player PCs, and more as detailed in the inventory list I supplied to Stastney. SeeCubic picked up all assets from Mrs. Brewer and me via a local courier, who delivered them to a storage facility in San Ramon.

---

[56] Robertson email of December 14, 2020 to SeeCubic (see Exhibit O)

The freight company made a reasonably detailed list of assets Mrs. Brewer and I surrendered to SeeCubic, notating equipment serial numbers where available.[57]

115.    In July 2021, after receiving notices from U-Haul about past-due storage fees, I informed SeeCubic that the contents of the locker were due to be sold at auction for non-payment. SeeCubic responded that there was no interest in the items stored there and they were willing to let the locker contents be sold. Those items were obviously unavailable for return to Stream, as SeeCubic allowed them to be lost.

116.    Following the Delaware Supreme Court invalidation of the Omnibus Agreement and the Chancery Court's order that assets should be returned to Stream, on October 12, 2022, SeeCubic arranged for me to access the San Ramon storage locker where the assets from Mrs. Brewer and me had been shipped almost two years earlier. I traveled from Nevada to Northern California and accessed the storage facility with a driver who would truck the assets back to Nevada for me. I was greatly disheartened to see how few assets were located there for pickup. There were no laptop computers, no 65" 3D displays. The case for the 5.5" demonstrator was there, but the box was empty. Any asset of reasonable value was missing. I photographed the locker and all its contents before returning all assets to Nevada for storage.

117.    Suby Joseph surrendered the laptop computer he used as VP of Finance directly to Stastney's home. Amanda Gonzalez and Nicole Maneen surrendered the laptop computers they used as executive assistants to Stastney. Grazina Seskeviciute, Stream's VP of Content Creation stationed in the Netherlands and employed through SCBV, surrendered her high-end content creation laptop computer to the receptionist at SCBV at Stastney's request. None of these business computers were ever returned to Stream, despite multiple requests and court filings.

---

[57] Addendum to Robertson email of December 14, 2020 to SeeCubic (see Exhibit O)

## Conclusion

118.     From May 2020 through the present, Stream had its assets seized or was forced to surrender them to SeeCubic, first pursuant to the Omnibus Agreement, then through lack of turnover enforcement by the Chancery Court, then through litigation in the Netherlands that empowered Stastney to exercise dominion and control of the Debtors' most valuable assets.

119.     Nobody but the Stalking Horse SeeCubic – not Stream's former management or the Trustee himself – has a reasonably accurate idea of just what the estate assets are, where they are located, what condition they are in, or what their value is. Conducting a 363 Sale of the assets as-is/where-is does a great disservice to all parties in interest.


Date: November 22, 2024

Charles M. Robertson

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: | : | Case No.  23-10763 |
| | : | |
| STREAM TV NETWORKS, INC.  CH: 11 | : | ADV. No.  23-00057 |
| | : | |
| Stream Tv Networks, Inc. Vs | : | Philadelphia, Pennsylvania |
| Shadron L Stastney | | November 27, 2023 |
| | : | 10:58 a.m. |
| A) Motion Re: Motion For | : | |
| Preliminary Injunction Request | : | |
| For Temporary Restraining Order | : | |
| Filed By Alastair Crawford, | : | |
| Delaware And Other Law Firms | : | |
| Representing And Acting In | : | |
| Concert With John Doe(S) And/Or | : | |
| Jane Doe(S), Jane Doe(S), John | : | |
| Doe(S), Asaf Gola, Kevin Gollop, | : | |
| Hawk Investment Holdings Limited, | : | |
| Investment Banks Employed By John | : | |
| Doe(S) And/Or Jane Doe(S), | : | |
| Krzysztof Kabacinski, Arthur | : | |
| Leonard Robert "Bob" Morton, | : | |
| Seecubic B.V., Sls Holdings Vi, | : | |
| Llc, Shadron L Stastney, | : | |
| Seecubic, Inc., Patric Theune | : | |
| Represented By Rafael X. | : | |
| Zahralddin | : | |
| | : | |
| B) Motion For Sanctions For | : | |
| Violation Of The Automatic Stay | : | |
| Filed By Stream Tv Networks, Inc. | : | |
| Represented By Rafael X. | : | |
| Zahralddin | : | |

. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                          Keith Kodosky, Esq.
Lewis Brisbois Bisgaard & Smith
600 Peachtree Street NE
Suite 4700
Atlanta, GA 30308
404-991-2183

Rafael X. Zahralddin
Lewis Brisbois Bisgaard & Smith
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
302-985-6004

Kevin F. Shaw
Lewis Brisbois Bisgaard & Smith
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
302-295-9436

For Hawk Investment Holdings Ltd:     Steven Caponi, Esq.
K&L Gates
600 N. King Street, Suite 901
Wilmington, DE 19801
302-416-7080

Jonathan N. Edel, Esq.
300 South Tryon St., Suite 1000
Charlotte, NC 28202

For SeeCubic, Inc.:          Eben P. Colby, Esq.
Marley Ann Brumme, Esq.
Skadden Arps Slate Meagher & Flom, LLP
500 Boylston Street, 23rd Floor
Boston, MA 021116
617-573-4800

For SLS Holdings VI, LLC:     Davis Lee Wright, Esq.
Robinson Cole, LLP
1201 North Market Street
Wilmington, DE 19801
302-516-1703

APPEARANCES:

For Rembrandt 3D Holding          Andrew Peter Demarco
Ltd.:                             Devlin Law Firm, LLC
                                  1526 Gilpin Avenue
                                  Wilmington, DE 19806
                                  302-449-9010


For Shadron L. Stastney:          Terence M. Grugan
                                  Ballard Spahr
                                  1735 Market Street, 51st Floor
                                  Philadelphia, PA 19103
                                  215-864-8320

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Christopher Michaels
  (By Mr. Kodosky)       8                 211
  (By Mr. Colby)                 196
  (By Mr. Caponi)               203

```
 1  NOVEMBER 27, 2023                              10:58 A.M.

 2          THE BAILIFF:  All rise.

 3          THE COURT:  Good morning, counsel.

 4          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

 5          MR. KODOSKY:  Good morning, Your Honor.

 6          THE COURT:  Okay.  If I recall correctly -- well,

 7  this the matter of Stream TV and Technovative, Inc., and it is

 8  a motion for a preliminary injunction.  I'm not quite sure if

 9  it's preliminary at this point, but that's what it's called.

10  And if I recall correctly after our rather lengthy telephone

11  conference, last -- was that Friday?

12          MR. KODOSKY:  Wednesday, Your Honor.

13          THE COURT:  Oh, it was Wednesday, the day before

14  Thanksgiving.  Yes, indeed.  If I recall correctly, what we

15  planned for today's hearing is for the Debtor movant to

16  conclude its case in chief with the testimony of its, of Mr.

17  Michaels, correct?  And then once that occurs, we were going to

18  then have the Respondents -- I have an echo.  Is that -- I'm

19  hearing and echo.  Okay.  Then the Respondents were going to

20  commence their rebuttal.  Well, I guess -- is it a rebuttal

21  witness or is it their response to the Debtor's case in chief?

22          UNIDENTIFIED SPEAKER:  It would be our response.

23          THE COURT:  Right.  I don't know why we're calling

24  them a rebuttal, but we're not even there yet.  Are we okay,

25  John?  We did address one technical problem.  I think Ken
```

```
 1   addressed that one.

 2           UNIDENTIFIED SPEAKER:  I got --

 3           THE COURT:  Okay.  I'm waiting for Taylor (phonetic)

 4   to bring me a -- I guess we can continue on this.  okay.  Let's

 5   start with entry of appearances, please.  First for the Debtor

 6   movant.

 7           MR. KODOSKY:  Keith Kodosky along with my partner,

 8   Rafael --

 9           MR. ZAHRALDDIN:  Zahralddin.

10           MR. KODOSKY:  -- Zahralddin.

11           THE COURT:  Thank you very much.

12           MR. KODOSKY:  And Your Honor, we also have Mr. Kevin

13   Shaw --

14           MR. ZAHRALDDIN:  Kevin Shaw.

15           MR. KODOSKY:  -- as well in the court with us.

16           THE COURT:  Okay.  Who's here for the responding

17   parties?

18           MS. BRUMME:  Morning, Your Honor.  Marley Ann Brumme

19   and Eben Colby of Skadden Arps for SeeCubic, Inc.

20           THE COURT:  For SeeCubic.

21           MR. CAPONI:  Morning, Your Honor.  Steven Caponi from

22   K&L Gates on behalf of Hawk.

23           MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

24   of Robinson and Cole on behalf of SLS Holding Vincenzo, LLC.

25   Terence Burgan from Ballard Bar in Manhattan.  Anyone else
```

1  morning?

2          MR. GRUGAN:  Good morning, Your Honor.  Terance

3  Grugan from Ballard Spahr on behalf of Mr. Stastney.

4          THE COURT:  Anyone else?

5          MR. DEMARCO:  Morning, Your Honor.  Andrew DeMarco

6  from Devlin Law Firm here for Rembrandt.

7          THE COURT:  Are there any preliminary matters or can

8  we commence with the testimony of Mr. Michaels?

9          MR. KODOSKY:  Your Honor, I think we should commence

10  with the testimony and if there's anything that we need to

11  bring up later, I'll alert you to it for on the -- on the

12  Debtor's side.

13          THE COURT:  Mr. Colby?  Ms. Brumme?

14          MR. COLBY:  No, Your Honor.

15          THE COURT:  Mr. Caponi?  Anyone else?  Okay.  Let's

16  begin.

17          MR. KODOSKY:  Thank you, Your Honor.

18          THE CLERK:  Mr. Michaels, can you hear me?

19          MR. MICHAELS:  Yes, I can.

20          CHRISTOPHER MICHAELS, DEBTOR'S WITNESS, SWORN

21          THE CLERK:  Thank you.  Could you please state and

22  spell your name for the record?

23          THE WITNESS:  Christopher Michaels, spelled,

24  C-H-R-I-S-T-O-P-H-E-R Michaels, M-I-C-H-A-E-L-S.

25          THE CLERK:  And if you could please state your

 1   address for the record.

 2            THE WITNESS:  My residence address is 12417 Country

 3   Day Circle, usually abbreviated, CIR for the post office, Fort

 4   Myers Florida, 33913.

 5            THE CLERK:  Thank you.

 6                     DIRECT EXAMINATION

 7   BY MR. KODOSKY:

 8   Q    Good morning, Mr. Michaels.  Can you hear me okay?

 9            THE COURT:  Can we see him?

10            THE WITNESS:  Yes, I can.

11            THE COURT:  Can we see him.  Okay.  There we go.

12   BY MR. KODOSKY:

13   Q    To begin, Mr. Michaels, I'd like to start with just a few

14   questions regarding your personal background.

15            THE COURT:  Before we begin, counsel, Mr. Michaels,

16   do you have any -- can you adjust your camera, so that we can

17   see that you have nothing in front of you on -- if you're at a

18   desk or wherever it is you're seated.

19            THE WITNESS:  I can try.  Let's me see.  We have --

20   so I'm not sure what you're seeing.

21            THE COURT:  Or if you can just attest that there's no

22   documents or there's nothing in front of you.

23            THE WITNESS:  The only thing in front of me is -- I

24   deactivated my iPad meeting.  I put it in airplane mode and I

25   have a silent cell phone and then the computer monitor itself.

```
 1              THE COURT:  Okay, but --

 2              THE WITNESS:  And then just a mic.

 3              THE COURT:  But no document?

 4              THE WITNESS:  There's no papers.

 5              THE COURT:  All right.

 6              THE WITNESS:  No document.

 7              THE COURT:  All right.

 8              THE WITNESS:  -- in front of me.

 9              THE COURT:  All right.  Thank you.  You may proceed,

10    Mr. Kodosky.

11              MR. KODOSKY:  Thank you, Your Honor.

12    BY MR. KODOSKY:

13    Q    Mr. Michaels, I'd like to start with a few questions

14    regarding your personal background.  Do you hold any degrees?

15    A    I hold a degree in Chemistry from Bucknell University.  I

16    hold a juris doctorate from Syracuse University and a Master in

17    Business Administration from the Wharton School University of

18    Pennsylvania.

19    Q    What years did you receive those degrees?

20    A    The degree from Bucknell 1989, '90s.  I finished early in

21    -- but the law degree was in 1993 and 2014 MBA.

22    Q    Thank you.  Are you a member of any bars?

23    A    Yes, the New York State Bar Association.  I was admitted

24    in New Jersey, but I let that lapse once my family moved out of

25    the state and I am a registered patent attorney.
```

1    Q     What year did you become a registered patent attorney?

2    A     I actually passed the agent's exam in 1990 and once you

3    pass the -- so I was admitted in April of 1990, but all you do

4    is inform that you are now an attorney and they move you from

5    an agent to patent attorney status.  It is not a

6    reregistration.  It's the same registration, 1990.

7    Q     Can you very briefly describe how one becomes a patent

8    attorney?  Is there a process?

9    A     Yes.  To be qualified to sit for the registration exam,

10   you need a technical background and the patent office changes

11   that from time to time, but generally, what they call the hard

12   sciences, physics, chemistry.  For a long time, biology, for

13   example, didn't even qualify.  And once they've approved your

14   -- you have the proper technical background, they allow you to

15   sit for a registration exam and once passed, they submit you to

16   an ethics review and then you become registered as someone

17   authorized to represent individuals before -- individuals and

18   companies before the patent and trademark office.

19   Q     Are you familiar with the term USPTO?

20   A     Yes, the United States Patent and Trademark Office.

21   Q     Thank you.  Are you a member of a law firm?

22   A     Yes.  I -- the image behind me is the foyer of my law

23   firm, Brown and Michael's.  Mike Brown has retired but practice

24   has been in existence since about 1980 it's had various

25   successors and partners come and go, but its current

Case 2:24-cv-06540-BRM-ESK Document 11 Filed 11/22/25 Entered 11/22/25 16:21:46 Desc
Exhibit A    Mandamus Petition    Page 297 of 541

11

1   incarnation is Brown and Michael's.

2   Q    And where is the firm located?

3   A    Ithaca, New York.

4   Q    Any other branch offices?

5   A    We have -- we're going to be moving our offices up into

6   Syracuse, but right now, we're largely working as remote.  I,

7   for example, am sitting in Florida.  My current business

8   partner is in Syracuse and one of our long term patent agents

9   is in Pittsburgh, Rochester, New York, so we work largely

10  remotely.

11  Q    And when did you begin to practice at Brown and Michaels,

12  PC?

13  A    1989.

14  Q    Are you the managing partner of the firm?

15  A    Yes.

16  Q    What year did you become managing partner?

17  A    January 1st, 1994.

18  Q    There's been reference made to Rembrandt in these

19  proceedings.  Are you also employed by Rembrandt 3D Holding

20  Limited?

21  A    I am an officer of the company.  I do not receive

22  compensation or W-2 employment, but I'm an appointed officer.

23  Q    And what office do you hold specifically?

24  A    Chief financial officer.

25  Q    And there are actually two companies with Rembrandt in the

1    name.  Is that correct?

2    A    Yes.

3    Q    What is the second company's name?

4    A    Rembrandt 3D Corp.  And it's a Delaware Corporation.

5    Q    In broad terms, can you please explain the difference

6    between the two companies?

7    A    Yes.  Rembrandt 3D Holding Limited is a holding company.

8    It owns most, if not all, of the intellectual property that is

9    related to these two companies for Rembrandt.  The Rembrandt 3D

10   Corp is an operating company.  It provides the installations,

11   purchases, contracts for our supply displays and then provides

12   services to clients who receive the displays.  For example,

13   Rembrandt 3D Corp was the entity that sold the system to the

14   Frank L. Wright Museum, Pittsburgh Airport, et cetera and where

15   you can see installations of the no glasses 3D product prepared

16   by the Rembrandt companies.

17   Q    Switching gears.  Are you familiar with the Debtor, Stream

18   TV Networks, Inc.?

19   A    Yes.

20   Q    Are you familiar with Stream's Ultra D products?

21   A    Yes.

22   Q    What do you know about those products?

23   A    We -- a fair amount, but we -- it is limited to what we

24   are able to see as users of the system.  We've not seen any of

25   the internal code.  We evaluated extensively the Stream TV

1   products before litigation was commenced and after and during

2   that litigation in the 2016, '17 litigation in the Southern

3   District of New York.  Part of the mediation process was we

4   were provided examples of the displays that they were selling

5   at the time.  And I sat in a room with executives and discussed

6   with our various team members the Ultra D product and what it

7   was capable of doing relative to various other products that we

8   had manufactured and various products that Phillips had

9   manufactured in the past.

10  Q    And we're going to come back to that.  In the meantime,

11  I'd like to ask you, does Rembrandt currently have a business

12  relationship with Stream TV?

13  A    Yes.

14  Q    Could you --

15  A    We have a settlement agreement -- go ahead.  Sorry.

16  Q    I was just going to ask if you could please explain.

17  A    Sure.  The resolution of the litigation between Stream TV

18  Networks, Inc. and Rembrandt was a settlement agreement and

19  license agreement that provided for a number of things.  One, a

20  cash payment; two, honoring the Rembrandt intellectual

21  property; three, the supply of at cost displays through

22  production agreements to be negotiated, but at all times at

23  cost.  And we're now up to, you know, millions of units that

24  would be owed under that agreement.  That works for both

25  companies, in that we're providing at least cost.  It's not

1  that Stream would be losing money, but we are now moving our

2  supplier from other sources to Stream.

3  Q    You referenced earlier Rembrandt's intellectual property.

4  What right does Stream TV have to use Rembrandt's IP under the

5  license agreement?

6  A    Stream is a nonexclusive licensee.  That allows them to

7  use it.  It does not allow them to transfer any rights to that

8  technology other than to a consumer.  And that's fairly

9  standard in the industry.  But the -- if they wanted to do a

10 deal where they transferred out a manufacturing license, for

11 example, to somebody else, they would have to come back to

12 Rembrandt and Rembrandt would directly license that

13 manufacturer, if we were willing to do so at all.  But in any

14 rate, we're -- the main existing relationship is going to be a

15 supplier -- Stream TV Networks to be a supplier to Rembrandt

16 and Rembrandt to have supplied technology in the form of a

17 license to Stream.

18 Q    I apologize if you've already mentioned this, but how long

19 has Stream TV had the license with Rembrandt?

20 A    That was actually the subject of the 2017 litigation.  It

21 involved a contract that purported to give a license to them

22 and in return, it was to give certain monetary and ownership

23 rights to Rembrandt.  As opposed to litigating that to

24 fruition,  we reached the settlement agreement in 2021.  So

25 arguably, the rights existed from 2010 forward.  And in fact,

```
 1   that was the result.  I mean, as part of the settlement is --

 2   and they exist today subject to performance under the

 3   agreement.

 4   Q    Thank you.  What about the other Debtor in this matter?

 5   Are you familiar with Technovative Media, Inc.?

 6   A    Yes.

 7   Q    What do you know about Technovative's business?

 8   A    Our understanding is that Technovative is a subsidiary to

 9   Stream and is a holding company that controls various other

10   subsidiaries that are actively attempting to use Rembrandt's

11   technology without paying a license fee, without agreeing to

12   the other terms of the agreement.  So that is our -- I mean,

13   we -- our understanding is that it's Technovative that controls

14   those entities.

15   Q    And we'll come back to that.  In the meantime, does

16   Rembrandt have a business relationship with Technovative?

17   A    No, other than -- depending on how you define business

18   relationship.  Our license agreement is with Stream, the top --

19   our understanding is the top entity.  That's not an accident.

20   That was a purposeful -- they were purposely added as the

21   defendant in the litigation and the party with which we were

22   contracting with to resolve the agreement and the settlement.

23   Q    Does Technovative have any right to use Rembrandt's IP

24   under the license agreement?

25   A    Only if they're supplying product to Stream.
```

Case 2:24-cv-06534-JDB-PD34-Doc Filed 11/22/25 Filed 12/00/24 22 Page 16 141 4256 Desc
Exhibit A   Mandamus Petition   Page 302 of 541

16

```
1    Q    Are you familiar with SeeCubic, Inc., which sometimes in

2    this proceeding has been referred to as SeeCubic of Delaware?

3    A    Yes.

4    Q    What do you know about SeeCubic, Inc.?

5    A    Our understanding is that SeeCubic, Inc., is actively

6    trying to use and is using Rembrandt technology and trying to

7    provide content for no glasses 3D using Rembrandt tools and

8    providing and offering to sell no glasses 3D TVs.  They have --

9    we have provid -- and we have pursued litigation to enjoin them

10   from doing so.  The -- that is, I mean, I can keep going on,

11   but that's the general gist of what I understand at this point.

12   Q    And we'll speak about that, but what is your understanding

13   as to whether or not SeeCubic, Inc. is a competitor of Stream

14   TV?

15   A    I think they're about as competitive as an entity can be.

16   They're actively on their website and in their PPM saying

17   they're taking over the technology of Stream TV.  They're

18   working with employees that worked back in the day with 3D

19   Fusion, the predecessor to Rembrandt.  They're trying to market

20   all of the same products and services as Stream.  So they're a

21   competitor.

22   Q    Does Rembrandt have a business relationship with SeeCubic,

23   Inc.?

24   A    No.

25   Q    Has Rembrandt ever had a business relationship with
```

```
 1   SeeCubic, Inc.?

 2   A     No.

 3   Q     Does SeeCubic, Inc. have any right to use Rembrandt's IP

 4   under the license agreement with Stream TV?

 5   A     No.

 6   Q     Are you familiar with an entity that's been referred to on

 7   these proceedings as SCBV, SeeCubic BV?

 8   A     Yes.

 9   Q     What do you know about --

10   A     Yes.

11   Q     What -- I'm sorry to interrupt you.  What do you know

12   about SeeCubic BV?

13   A     It is our understanding that SeeCubic BV is a Netherlands

14   corporation that employs a number of people that used to work

15   for 3D Fusion Rembrandt and then it was controlled by Stream

16   through Technovative to design and develop various tools for 3D

17   content creation and the hardware for a no glasses, 3D TV.

18   They actively have access to Rembrandt's trade secrets and are

19   actively using technology covered in Rembrandt patents in

20   creation of various prototypes and products for Stream and --

21   well now, SeeCubic of Delaware.

22   Q     Is SCBV using Rembrandt's IP with Rembrandt's blessing?

23   A     Only if they're creating product for Stream.  In that

24   configuration, we license Stream and they're free to have

25   product made for itself and provide products to the world.
```

1    They are not free, SCBV is not free to provide that to any

2    other entity, not Technovative and not even -- and certainly

3    not SeeCubic of Delaware.

4    Q    I take it, Rembrandt does not have a business relationship

5    with SCBV.  Is that correct?

6    A    That is correct, other than as a -- that is a -- we have a

7    relationship with Stream, but not with SCBV directly.

8    Q    Has Rembrandt ever had a direct business relationship with

9    SCBV?

10   A    No.

11   Q    Does SCBV have any right to use Rembrandt's IP under the

12   license agreement?

13   A    Only to make product and provide services through Stream.

14   So no, not -- they can't provide anything to any other party

15   outside of our licensing.

16   Q    Do you know Mr. Shadron Stastney?

17   A    Yes.

18   Q    When did you first meet Mr. Stastney?

19   A    I believe the first time we met or spoke, for that matter,

20   was during the mediation process in the Southern District of

21   New York litigation between Rembrandt and Stream.

22   Q    You listened to the testimony that Mr. Stastney provided

23   in connection with a TRO proceeding back on October 6th 2023.

24   Is that correct?

25   A    Yes, I did.

1    Q    Did you note any inaccuracies in Mr. Stastney's testimony?

2    A    I did.

3    Q    We'll come back to that.  Now, Rembrandt filed a brief in

4    support of the Debtor's motion for a temporary restraining

5    order.  Correct?

6    A    Yes.

7    Q    Why does Rembrandt support the Debtor's TRO motion?

8    A    For a variety of reasons, but it really goes back to the

9    the core of Rembrandt's interests.  The -- specifically, we're

10   looking to protect our intellectual property and to see it

11   commercialized effectively.  We have licensed Stream.  Stream,

12   continuing to do business in the no-glasses 3D space, is in our

13   interest.  That means they can pay us.  That means that Stream

14   can provide us the products we're looking to sell to other

15   customers, which quite frankly, is where we will make far more

16   revenue than from the licensees.  So we are very interested in

17   not seeing the technology leak into the marketplace.  We do not

18   want to see our tools and techniques, and the things that we

19   have developed, and the trade secrets go to particular

20   jurisdictions in, specifically, China.  India would be, of

21   course, concern to us.  So we're interested in seeing that

22   technology protected.

23   Q    Are you familiar with SeeCubic Inc.'s business model?

24   A    I am familiar with their business model and the private

25   placement memo they've published.

Case 23-10763-amc Doc 934 Doc Filed 01/22/25 Filed Entered 01/22/25 16:41:46 Desc
Exhibit A    Mandamus Petition    Page 306 of 541

20

1  Q    The private placement memorandum, that's also referred to

2  as a PPM, correct?

3  A    Yes.

4  Q    Are you familiar with the 2020 SeeCubic PPM that's been

5  submitted and marked, and introduced as an exhibit in this

6  case?

7  A    Yes.

8         MR. KODOSKY:  Your Honor, I am going to ask the

9  witness to take a look at what has been previously introduced

10  as Debtor's Exhibit Number 6.  If I may, I've got a copy for

11  the Court in this binder that I can pass out.

12         THE COURT:  Okay.  Is it -- right.  Well, let's start

13  -- I know I thought the parties had no objection to me looking

14  at documents prior -- but this has been admitted into evidence

15  already.  All right.  And is it in another binder, or you just

16  put this together for my ease?

17         MR. KODOSKY:  For your ease.

18         THE COURT:  All right.  Let's -- anybody object to me

19  looking at it in that binder?

20         MR. COLBY:  No, Your Honor.

21         THE COURT:  All right.  Great.  So I don't have to go

22  searching through binders.  Great.  Okay.

23         MR. KODOSKY:  And the witness, I've -- in preparation

24  for today, I had sent the witness a copy of --

25         THE COURT:  He doesn't need to pull any documents.

```
 1   That's why I asked him what did he have in front of him.  Don't

 2   take out anything.

 3           Jon, how are we going to do this?  Can we pull it up?

 4           MR. EDEL:  Is it the complaint?

 5           MR. KODOSKY:  It's Exhibit Number 6.  It is --

 6           THE COURT:  SeeCubic, Inc.  It was admitted in

 7   Debtor's Cases 6?

 8           MR. KODOSKY:  I believe so, Your Honor.

 9           THE COURT:  In this proceeding?

10           MR. KODOSKY:  Yes, Your Honor.  And I've got a second

11   copy if --

12           THE COURT:  Well, we have to have him look at it.

13   How's he going to -- had anybody through that through?  Because

14   typically, when we have a Zoom hearing, we pull up the document

15   on the screen so that the witness can see it.  That means you

16   don't need to see me.  I don't care.  Can we take me off and

17   can we add another --

18           MR. EDEL:  I just don't have it.  Do you have a --

19           MR. KODOSKY:  I can email it to you.

20           THE COURT:  Yes.

21           MR. KODOSKY:  I've got a PDF that I can --

22           MR. EDEL:  Yeah.

23           THE COURT:  Yes.  Would you?  Oh, I thought -- yes,

24   no one -- PDF document.  Send it to you, Jon?

25           MR. EDEL:  Not from this side.  We've --
```

Case 23-10763-amc Doc 934-1 Filed 11/22/25 Entered 11/00/04/22/25 16:24:04:56 Desc
Exhibit A   Mandamus Petition   Page 308 of 541

22

 1            THE COURT:  Okay.  Counsel, can you send all of the

 2   documents that you intend to have this witness testify

 3   regarding?  Because the only way -- we want to make sure that

 4   we are in control of the documents and that we're all looking

 5   at the same documents, and that there's nothing different.

 6            Yes, Jon?

 7            MR. KODOSKY:  I'm happy to, Your Honor.

 8            THE COURT:  Doing --

 9            MR. KODOSKY:  I would just ask for your email

10   address --

11            MR. EDEL:  Share them and then --

12            MR. KODOSKY:  -- and I will send those to you.

13            THE COURT:  Wait, what did you say?  Hold on.  Hold

14   on.

15            MR. EDEL:  I'm just wondering if it's easier for them

16   to share on their end.

17            THE COURT:  Is it on your -- can you share it?

18            MR. EDEL:  But that might complicate things.

19            THE COURT:  That's going to complicate, okay.  Here's

20   what we're going to do.  I'm going to take a few minutes so

21   that you can email the documents to Jon, and then we'll have

22   all of them.  And when I say a few minutes, I'm not even moving

23   from here.  We're just going to be in recess for a few minutes

24   so that we can deal with the technical issues, okay?  So we're

25   off the record for now.

Case 2:24-cv-07634-JKP-BDH Doc 31-4 Filed 11/22/25 Entered 12/00/04/22 Page 241 of 256 Desc
Exhibit A   Mandamus Petition   Page 309 of 541

23

```
1        (Record taken)
2              THE COURT:  All right.  You may proceed, Mr. Kodosky.
3              MR. KODOSKY:  Thank you, Your Honor.
4   BY MR. KODOSKY:
5   Q    Mr. Michaels, are you able to see on your screen Debtor's
6   Exhibit Number 6?
7   A    Yes.  Yes, I am.
8   Q    Do you recognize this to be the SeeCubic 2020 PPM that you
9   had referenced before we just took this short break?
10  A    Yes, I do.
11  Q    If we can please take a look at page 13 of 34.  And
12  specifically, what I'd like to direct your attention to, Mr.
13  Michaels, is the part of this page that begins, "Business
14  Model" in bold.  If you can see that paragraph, and take a
15  moment to review it, please.
16  A    Yes, I've reviewed it.
17             THE COURT:  Wait a minute.  Counsel, where are we at?
18             MR. KODOSKY:  On page 13 of 34, which is page -- I'm
19  sorry.  Jon, if you can scroll to the bottom of the page to see
20  what the page number is of this.  It says 4 at the bottom, but
21  it's page 13 of 34, so --
22             THE COURT:  Well, how about we use the number,
23  because this also has been -- was this file of record?
24  Apparently.  All right.  Page 4, business model.  All right.
25  Page 4.  I don't know whether it's 13 or -- well, for my
```

```
 1  reference, page 4.  Okay.

 2  BY MR. KODOSKY:

 3  Q    Mr. Michaels, if you could take a moment to review the

 4  business model description from the SeeCubic 2020 PPM, and

 5  please let us know when you've finished reviewing that.

 6  A    I have finished reviewing it.

 7  Q    Had you seen this PPM and this business model description

 8  before today?

 9  A    Yes, I have.

10  Q    And is this the provision that, at least partly, informs

11  your understanding of the SeeCubic, Inc. business model?

12  A    Yes, it is.

13  Q    Thank you.

14           MR. KODOSKY:  If we can please show the witness

15  Debtor's Exhibit Number 5.  Previously introduced, which is the

16  -- well, I'll hold off.

17  BY MR. KODOSKY:

18  Q    Do you recognize this to be the SeeCubic 2022 PPM that you

19  had referenced earlier?

20  A    Yes, I do.

21           THE COURT:  Which year?

22           MR. KODOSKY:  2022. Jon, I'd like to begin by

23  directing the witness to page 10 of 29.

24           THE COURT:  And that is Exhibit -- what, again?

25  Five?
```

```
 1              MR. KODOSKY:  Yes, Your Honor.
 2              THE COURT:  Exhibit 5.  And that is page 10 down at
 3   the bottom or -- because I have PPM 9 and then -- yes, okay.
 4   BY MR. KODOSKY:
 5   Q    You see, Mr. Philips (sic), the section that begins in
 6   bold, "The Company"?
 7   A    Yes, I do.
 8   Q    Where it states, "The company was founded in 2020 by the
 9   secured creditors of Stream TV Networks, Inc. to acquire
10   substantially all of the assets of Stream TV, including all
11   subsidiaries and all the technology assets."  And it goes on to
12   state that, "The company's technology, when licensed to a
13   consumer device manufacturing partner, and incorporated as a
14   component of any panel device" -- and it lists, "-- television,
15   monitor, phone, etcetera, displays content in glasses-free 3D."
16   Do you see that?
17   A    I do.
18   Q    Is that consistent with your understanding of SeeCubic's
19   business model, where they license, or intend to license the
20   technology?
21   A    Yes, it is.
22              MR. KODOSKY:  If we could please take a look at page
23   28, please.
24              THE WITNESS:  Are you waiting on me?  I can see page
25   28, if that's the question.
```

```
 1                MR. KODOSKY:  I'm sorry.  I am --

 2                THE COURT:  Wait, 28?  That's a different -- Jon, are

 3   we on 28?

 4                MR. EDEL:  I'm on 28 of 29 on the file, but we want

 5   the page, actual page 28?

 6                THE COURT:  At the bottom.

 7                MR. KODOSKY:  Yes.  The page 28.  It would be 26 of

 8   29.  I'm sorry, Jon.

 9                MR. EDEL:  Gotcha, yup.

10                THE COURT:  I mean, I just looked down at the bottom.

11   Okay.

12   BY MR. KODOSKY:

13   Q    Mr. Michaels, could you please read into the record the

14   third paragraph there and the certain important transactions

15   section that begins, "The company also".  Do you see that?

16   A    "The company also maintains licensing arrangements for

17   various technologies and products with a variety of

18   manufacturers.  Each agreement requires payment per product

19   sold or for use of technology, or -- as applicable."

20   Q    How do you interpret this provision?

21   A    I believe --

22                MR. COLBY:  Objection.

23                THE WITNESS:  -- it is my understanding upon reading

24   it that it --

25                THE COURT:  Objection.  Objection.  Basis?
```

 1              THE WITNESS:  Sorry, I didn't hear the objection.

 2              MR. COLBY:  Yeah.  Objection, Your Honor.  Relevance.

 3   The witness testified he has no -- or Rembrandt has no business

 4   relationship with SeeCubic, Inc.  He's reading out of a

 5   document that he didn't prepare, and has testified merely that

 6   he saw it.  So I don't know exactly where this is going.  I'm

 7   trying to give Mr. Kodosky some rope, but I don't see the

 8   relevance of Mr. Michaels testifying about what this document

 9   means.

10              THE COURT:  Counsel, response?  His objection is on

11   relevance.

12              MR. KODOSKY:  Mr. Michaels has already stated that he

13   is familiar with SeeCubic's business model based on these PPM

14   materials, that he has a problem with the business model, and

15   my next question is going to be what problem, if any, he has

16   with the business model and why --

17              THE COURT:  Okay.

18              MR. KODOSKY:  -- it resulted in litigation.

19              THE COURT:  All right.  Mr. Colby, withdrawing your

20   objection?

21              MR. COLBY:  I would withdraw for that --

22              THE COURT:  All right.

23              MR. COLBY:  -- forthcoming question, Your Honor.

24              THE COURT:  All right.  Keep going.

25   BY MR. KODOSKY:

1  Q    Mr. Michaels, what problem, if any, do you have with the

2  business model, SeeCubic, Inc. business model description, that

3  you've looked at in these PPM materials?

4  A    The company's business model, as stated, requires a

5  license from Rembrandt, and I read the two sentences in this

6  third paragraph as stating that they have a license from

7  Rembrandt and Philips.  Specifically, the per product sold is

8  the format of the Philips license, and the for use of the

9  technology is the format of the Rembrandt license to Stream,

10  and that I personally negotiated with Shad & Stastney, who

11  likely wrote this.  So my understanding is the company is

12  falsely claiming that it has the licenses it needs when it does

13  not.

14  Q    In other words, SeeCubic does not own any of the

15  technology as attempting to license the others, correct?

16  A    To my knowledge, they don't own any of it.  You're right,

17  but if it's .001 percent, that isn't -- they don't own the

18  technology they're referencing here, and it's necessary to

19  provide hardware, software, or content creation that was

20  developed by Philips 3D Fusion, Rembrandt, and then Stream TV

21  Networks.  So --

22  Q    Is it accurate to state that all business between

23  SeeCubic, Inc. and SCBV was blocked at least through September

24  20th, 2023, when Mr. Stastney was appointed as director of

25  SCBV?

 1           MR. COLBY:  Objection.

 2           THE WITNESS:  I'm sorry.  I didn't follow --

 3           THE COURT:  I didn't follow either.

 4           THE WITNESS:  -- that question.

 5           THE COURT:  So, restate the question.  Before you

 6  object, Mr. Colby, he's going to restate it, because I didn't

 7  understand it either.  Not that I'm the witness, but I'm trying

 8  to follow.  What was your question, Mr. Kodosky?

 9  BY MR. KODOSKY:

10  Q    Was all business between SeeCubic and SCBV blocked,

11  B-L-O-C-K-E-D, at least through September 20th of '23 when Mr.

12  Stastney was appointed as director of SCBV?

13  A    I think I --

14           MR. COLBY:  Objection.

15           THE WITNESS:  -- understand your --

16           THE COURT:  Okay, wait a minute.  He's objecting.

17           MR. COLBY:  Well, the witness has no firsthand

18  knowledge.  I don't understand the basis, how he could be

19  testifying as to a relationship or not between two companies of

20  which he's not a part, and testified as to one of them he has

21  no business relationship.

22           THE COURT:  Okay.  Counsel?

23           MR. KODOSKY:  He does have firsthand knowledge, Your

24  Honor.  He's already described what rights SCBV and SeeCubic,

25  Inc. have to use the Rembrandt IP that's been licensed to

 1   Stream TV.

 2           MR. COLBY:  That has to do, Your Honor, with, I

 3   guess, Stream TV's ability to use Rembrandt technology.  The

 4   question was whether or not all business was blocked between

 5   SeeCubic, Inc. and SeeCubic BV.  That has nothing to do with

 6   Rembrandt's --

 7           THE COURT:  Well, I guess he can rephrase this thing.

 8   Rephrase the question.  I understand what he's asking.  He's

 9   just not stating it --

10           MR. COLBY:  Okay.

11           THE COURT:  -- succinctly.

12           MR. COLBY:  Then --

13           THE COURT:  Rephrase the question.

14   BY MR. KODOSKY:

15   Q    To your knowledge, Mr. Michaels, does SeeCubic intend to

16   have SCBV supply SeeCubic's customers with Ultra D products and

17   services?

18           MR. COLBY:  Objection, Your Honor.

19           THE WITNESS:  That is my understanding.

20           THE COURT:  Wait.  He objected.

21           MR. COLBY:  I don't know --

22           THE WITNESS:  Okay.

23           MR. COLBY:  -- Mr. Michaels can testify firsthand

24   knowledge about what SeeCubic, Inc. intends to do.  He read it

25   out of this document, but so can all of us.  That's not

 1   firsthand knowledge.  He can testify about what the document

 2   says, I guess, but not as to SeeCubic's intent.

 3            MR. KODOSKY:  Rembrandt has sued both entities, Your

 4   Honor, for exactly this purpose.

 5            THE COURT:  Okay.  So I guess based on -- you can

 6   ask --

 7            MR. COLBY:  I know that bringing a lawsuit gives you

 8   firsthand knowledge about it, but he can testify why he's --

 9            THE COURT:  Counsel, I mean, just rephrase it.

10   BY MR. KODOSKY:

11   Q    Do Ultra D products require a license to the Rembrandt

12   intellectual property to be made, used, sold, offered for sale,

13   exported or imported, Mr. Michaels?

14   A    Yes.

15   Q    Do Ultra D products require a license to the Philips

16   intellectual property to be made, used, sold, offered for sale,

17   exported or important?

18   A    Yes.

19   Q    Do Ultra D products require a license to the Stream TV

20   intellectual property to be made, used, sold, offered for sale,

21   exported or imported?

22   A    Yes.

23   Q    Do Ultra D products require a license to the Ultra D

24   Cooperatief U.A. intellectual property to be made, used, sold,

25   offered for sale, exported or imported?

```
 1   A     Yes.

 2               THE COURT:  Who?  Ultra D Cooperatief?

 3               MR. KODOSKY:  U.A.  Yes, Your Honor.

 4   BY MR. KODOSKY:

 5   Q     Does SeeCubic, Inc. have a license from Rembrandt?

 6   A     No.

 7   Q     Does SeeCubic, Inc. have a license from Philips?

 8   A     No.

 9   Q     Does SeeCubic, Inc. have a license from Stream?

10   A     No.

11   Q     Does SeeCubic, Inc. have a license from Ultra D

12   Cooperatief U.A.?

13   A     No.

14   Q     Does SCBV have a license from Rembrandt?

15   A     No.

16   Q     Does SCBV have a license from Philips?

17   A     No.

18   Q     Does SCBV have a license from Stream?

19   A     No.

20   Q     Does SCBV have a license from Ultra D Cooperatief U.A.?

21   A     No.

22   Q     Prior to Mr. Stastney being appointed director of the

23   Netherland subsidiaries of Stream TV, what ability to SeeCubic,

24   Inc. have to do business with SCBV, absent the licenses, in

25   your view?
```

1          MR. COLBY:  Objection, Your Honor.

2          THE COURT:  Basis?

3          MR. COLBY:  Same basis.  And Mr. Michaels, I suppose,

4   can testify about what various parties may or may not be able

5   to do under the Rembrandt license, but other licenses between

6   Philips or these other entities that he's not a part of, I

7   don't think he has firsthand knowledge.

8          THE COURT:  We already answered on that one.

9          MR. COLBY:  Well --

10         THE COURT:  This is the new question.  I mean, you

11  objected and he already testified that he didn't have a

12  license.  SeeCubic didn't have a license with any of the above,

13  Philips, Rembrandt, Stream, Ultra D, and SCBV, Inc. did not

14  have a license from any of the above, from my own short hands.

15  And then he went on to another question.  So you didn't object

16  to those.  I kind of think it's too late to object to his

17  answer, to those he's already answered.  Now, there was a new

18  question that you then objected to.  Now, the new question,

19  you're objecting on the basis that he doesn't have firsthand

20  knowledge with respect to that particular question?

21         MR. COLBY:  Correct, Your Honor.

22         THE COURT:  All right.  Counsel, response?

23         MR. KODOSKY:  He has already answered that --

24         THE COURT:  Well, that, but this is a new question.

25  The new question was -- and I forgot what it was.  What was the

Case 28-1-0753-am-0654 Doc 934 Doc Filed 11/22/25 Filed 12/06/22 Entered 04/22/25 16:34:04 Page 341 of 256 Desc
Exhibit A   Mandamus Petition   Page 320 of 541

34

```
 1  new question that you were objecting to -- that Mr. Colby was

 2  objecting to?

 3          MR. KODOSKY:  And I'm able to limit it -- maybe this

 4  will address his objection to the Rembrandt.  Without having a

 5  license from Rembrandt --

 6          THE COURT:  Okay.

 7          MR. KODOSKY:  -- what ability to SeeCubic, Inc. have

 8  to do business with SeeCubic BV absent the Rembrandt license?

 9  It's actually the question I asked him earlier about being

10  blocked until Mr. Stastney became a director.

11          THE COURT:  All right.  Let's -- I mean, you're

12  trying to rephrase it.  I get he objected and he's trying to

13  address that.  So the question now is what, Mr. Kodosky?

14  BY MR. KODOSKY:

15  Q    Prior to September 20th, 2023, when Mr. Stastney was

16  appointed a director, was SeeCubic, Inc. blocked in their

17  contract with SCBV?

18  A    Yes, for the sale of a no-glasses 3D product.  I mean,

19  they could sell pencils back and forth, but for the relevant

20  technology, they needed a license from all the entities you

21  mentioned.

22  Q    And it's --

23          MR. COLBY:  Your Honor, I wasn't quite quick enough.

24  That was the same objectionable question as before.  Again, if

25  Mr. Kodosky wants to ask about the implications of a Rembrandt
```

 1   license or not having a Rembrandt license, I think that's

 2   appropriate, but asking whether or not the -- you know, such a

 3   broad question -- Mr. Michaels doesn't have sufficient

 4   firsthand knowledge to answer that.

 5           THE COURT:  Okay.

 6           MR. COLBY:  And I thought --

 7           THE COURT:  What?

 8           MR. COLBY:  I thought we'd agree to limit it to

 9   Rembrandt, but then the question was --

10           THE COURT:  Right.  It was -- okay.  So the objection

11   is that Mr. Michaels does not have firsthand knowledge

12   regarding the relationship between SeeCubic, Inc. and SCBV with

13   respect to, I guess, an agreement between those parties to sell

14   the technology or use the technology?

15           That was the objection, Mr. Colby?

16           MR. COLBY:  Yes, Your Honor.  It's Mr. Michaels would

17   seem to have a basis to testify about the implications of the

18   Rembrandt license, but not quite so broadly about the

19   relationship between the -- I'm trying to be economical in my

20   objections here, Your Honor, but at the same time, I would like

21   to keep us focused on things about which the witness has

22   firsthand knowledge.

23           THE COURT:  All right.

24           MR. COLBY:  And I think if the question were asked

25   about the implications of the Rembrandt licenses that were

1   properly sold is --

2            MR. KODOSKY:  These relate on each other, Your Honor,

3   to the extent that you need the Rembrandt license and the

4   Stream license to be able to do business.  He does have

5   firsthand knowledge regarding the Rembrandt license.  He's

6   already testified to that, and I believe he's also -- I'm going

7   to be asking him what action Rembrandt took when it learned

8   that an independent director had been appointed and --

9            THE COURT:  So your response is that he has firsthand

10  knowledge because Rembrandt didn't have a license with SeeCubic

11  or SCBV, that prior to that, it wasn't authorized to use the

12  license?

13           MR. KODOSKY:  Before Mr. Stastney --

14           THE COURT:  Just prior to that.  That's all you've

15  got to -- okay.  Did you -- the question is, and I think the

16  question is, that prior to 9/20/23, did SCBV or SeeCubic have a

17  license from Rembrandt or Stream to use the technology?  Is

18  that the question?

19           MR. KODOSKY:  The technology is the Ultra-D.  And

20  it's --

21           THE COURT:  The -- use Ultra-D technology.

22           MR. KODOSKY:  And it's made up of licenses from

23  Rembrandt.

24           THE COURT:  I get that.

25           MR. KODOSKY:  From Philips.

1          THE COURT:  But is that what -- so you're just

2   saying --

3          MR. KODOSKY:  Stream.

4          THE COURT:  -- prior to that they didn't have

5   authority, or they weren't using it?  What's the question?

6   What was the -- what existed prior to 9/2023 that you're asking

7   him about?

8          MR. COLBY:  Right.  And my objection is to Mr.

9   Michaels testifying as to things beyond the Rembrandt

10  technology.

11         THE COURT:  Okay.

12         MR. COLBY:  So if the question were to be limited to

13  the Rembrandt technology licenses or lack of licenses.  I have

14  no --

15         THE COURT:  Well, and what --

16         MR. COLBY:  -- objection.

17         THE COURT:  -- about his knowledge with respect to

18  the Stream license to those -- because he already testified

19  that he knew that they didn't have a license from Stream or --

20  from Stream.  He already testified that he knew that.

21         MR. COLBY:  Yeah.  If he has firsthand knowledge of a

22  license from Stream, that's fine.  I don't think Mr. Michaels

23  has any firsthand knowledge of any relationship between, for

24  example, Philips and SCBV or SeeCubic, Inc., or as between

25  Ultra-D and SCBV.  So I think if we --

Case 28-10764-amc Doc 654 Doc P934-1 Filed 01/22/25 Filed 12/00/04/22/25 1634 16 41 46 56 Desc
Exhibit A   Mandamus Petition   Page 324 of 541

38

```
 1              THE COURT:  Well, he's already testified regarding
 2    that.
 3              MR. COLBY:  He --
 4              THE COURT:  And said it.
 5              MR. COLBY:  You're right.  He testified what did and
 6    didn't exist.  He didn't actually give his basis for firsthand
 7    knowledge as -- again, I'm trying to be economical in my
 8    objection.
 9              THE COURT:  Well, counsel, you didn't object at the
10    time.  I'm just saying.  Like, all right.  We're not going to
11    get bogged down.  I mean, I already heard what I -- I mean,
12    this isn't a jury here.  Can you just rephrase the question?
13    Otherwise, I'm going to sustain his objection.
14    BY MR. KODOSKY:
15    Q    As a director of the Netherland subs --
16    A    Uh-huh.
17    Q    -- is not -- is Mr. Stastney attempting to use color of
18    law or act under a color of law to disrupt the arrangement, Mr.
19    Michaels?
20    A    Yes.
21              MR. COLBY:  Objection.
22              THE COURT:  All right.  Objection -- all right.  I
23    knew you were going to object.  Basis for objection, counsel?
24              MR. COLBY:  If the witness has firsthand knowledge of
25    some actions, he can testify as to those.  But I don't think
```

```
 1    that's been established.  I don't understand --

 2              THE COURT:  Right.

 3              MR. COLBY:  -- I thought we were talking about the

 4    implications of the Rembrandt license, who has it and who

 5    doesn't.

 6              THE COURT:  Well, I think -- I get what he's trying

 7    to -- but you have to lay a foundation.  You have to tell me

 8    how he knows all of this stuff.  I'm going to sustain.  But you

 9    need to lay a foundation.

10    BY MR. KODOSKY:

11    Q    All right.  Mr. Michaels, when did you learn, or did you

12    learn that SC -- or that SeeCubic, Inc. was attempting to

13    utilize SCBV inappropriately without having a license from

14    Rembrandt?

15    A    Yes, we learned it from Shadron Stastney's testimony in

16    the bankruptcy and in this hearing.

17    Q    What action did Rembrandt take upon learning that

18    information?

19    A    It took a variety of actions, not the least of which was

20    to request more information about what the actual activities

21    were.  That resulted in us getting copies of the 2022 PPM that

22    we have on -- on the screen.  And it expressly states that

23    they're trying to license out our technology.  Even claiming to

24    have a license to do so.  So that -- that's -- and to our

25    knowledge, that has not happened yet, even though they are
```

1   expressly stating they intend to do so.  And that's with him as

2   director of that entity, we are very concerned that they will

3   actively start transferring information and technology out to

4   parties that are unlicensed.

5   Q    Let me ask you a different way, Mr. Michaels.  Before Mr.

6   Stastney was appointed director on September 20th of 2023, who

7   had the authority to your knowledge to make that decision?

8   A    Stream TV and specifically Matthu -- Matthu Rajan.

9   Q    And at some point, did you become aware that SeeCubic,

10  Inc. and Mr. Stastney were attempting to have remove Mr. Rajan

11  removed as director of the Netherlands subsidiaries?

12  A    Yes.

13  Q    Did you at some point become aware of who replaced Mr.

14  Rajan as the director of the Netherlands subsidiaries?

15  A    It is our understanding that there was first -- Ian Liston

16  (phonetic) who was -- I think is his name, was -- was added as

17  a receiver and then dismissed when the bankruptcy was filed.

18  And later an attorney from Jones Day was appointed by the

19  Netherlands Court as a -- as an -- the independent director.

20  Q    And that's the gentlemen, his name -- do you recall his

21  name?  Jasper?

22  A    That sounds familiar.  I wrote him an email.  I'd -- I'd

23  easily be refreshed -- my recollection would be refreshed by

24  that email.  But I don't recall his name exactly.

25  Q    So is it fair to say that there was a period of time after

```
 1   Mr. Rajan was removed and before Mr. Stastney was appointed
 2   that there was a "independent or neutral director" making that
 3   decision?
 4   A    Yes.
 5   Q    And upon learning that an independent director had been
 6   appointed, what action did Rembrandt take to express his view
 7   on whether or not the technology could be used?
 8   A    I sent the independent director an email outlining our
 9   position, importantly referencing the publicly available
10   documents that went into those rights further, and specifically
11   requested that we setup a meeting or a phone call with US IP
12   Practitioners to review the situation.
13   Q    And what response did you receive from the independent
14   director?
15   A    The -- we received a response that -- that he had talked
16   to various people we have -- for many years accused of taking
17   our trade secrets and that we had heavily documented the
18   exchange of trade secrets with specifically Dr. Barenbrug
19   (phonetic) and had told him that they weren't using our trade
20   secrets.  And that was sufficient for him, and we responded
21   then.
22   Q    What was your response?
23              MR. COLBY:  Objection, Your Honor.
24              THE COURT:  Wait, wait, wait.  Okay.  Objection,
25   Mister --
```

1          MR. COLBY:  Witness is testifying as to hearsay.

2   What somebody else told him out of court.

3          THE COURT:  Okay.

4          Counsel?

5          MR. KODOSKY:  Your Honor, first of all, it's not

6   being offered for the truth of the matter being asserted, and

7   I'd also like to provide the Court with a cite that hearsay at

8   the preliminary injunction stage, the Court does -- the Court

9   may rely on affidavits and hearsay materials, which would not

10  be admissible evidence.  It is the --

11         THE COURT:  What case is that?

12         MR. KODOSKY:  *Kos Pharms*, K-O-S, Pharms --

13         THE COURT:  All right.

14         MR. KODOSKY:  -- P-H-A-R-M-S.

15         THE COURT:  K-O-S.

16         MR. KODOSKY:  I'm sorry?

17         THE COURT:  K-O-S.

18         MR. KODOSKY:  K-O-S space Pharms, P-H-A-R-M-S.

19         THE COURT:  Oh Kos pharms.  Okay.

20         MR. KODOSKY:  369 F.3d at 718.  And that cite is

21  actually referenced in a Western District of Pennsylvania, June

22  9th, 2022, case opinion, styled *Not an LLC v. Bureau of*

23  *Alcohol*, Civil Action number 2:22-CV-747.

24         THE COURT:  And what's the circuit for the *Kos*

25  *Pharms*?

```
 1                 MR. KODOSKY:  Third Circuit, Your Honor.

 2                 THE COURT:  What year?

 3                 MR. KODOSKY:  I want to say that it's from 2001.  But

 4    if I can maybe get back to you over break?

 5                 THE COURT:  Okay.  So Kos Pharms cited in a case

 6    called Not an LLC v. who?

 7                 MR. KODOSKY:  Bureau of Alcohol, from the Western

 8    District of Pennsylvania, June 9th, 2022.

 9                 THE COURT:  Okay.

10    BY MR. KODOSKY:

11    Q    What response --

12                 THE COURT:  Wait a minute, wait a minute.

13                 MR. KODOSKY:  Oh, sorry.

14                 THE COURT:  I've got to rule.  I've got to rule,

15    counsel.  You said that at a hearing on a preliminary

16    injunction, the Court can consider hearsay matters.  You also

17    believe it's not hearsay because it's not being offered for the

18    truth of the matter, correct?

19                 MR. KODOSKY:  Correct.

20                 THE COURT:  What is it being offered for?

21                 MR. KODOSKY:  I'd have to --

22                 THE COURT:  I mean --

23                 MR. COLBY:  I don't feel terribly strong about this

24    objection.

25                 THE COURT:  Right.
```

 1             MR. COLBY:  I think the testimony on balance was

 2   actually helpful to us.

 3             THE COURT:  Right.  I mean --

 4             MR. COLBY:  But I would like to --

 5             THE COURT:  -- he spoke to someone whose --

 6             MR. COLBY:  Yeah.

 7             THE COURT:  -- his understanding in the response from

 8   the independent director was that -- responded that he didn't

 9   believe that they were using their technology.

10             MR. COLBY:  Right.  We'll take a look at the cases.

11   I do think, you know, those have not necessarily --

12             THE COURT:  Other --

13             MR. COLBY:  Hearsay free for all are not the rules

14   we've been living under to date in this hearing.

15             THE COURT:  Right.  But also, counsel --

16             MR. COLBY:  I'd like to keep this focused.

17             THE COURT:  -- other than what somebody else told

18   him, told the independent director.  Somebody -- this other

19   doctor or whatever his name was, he could -- his understanding

20   of what the response was is sufficient.  Was that -- he

21   responded, his understanding was that they didn't believe they

22   were using trade secrets.

23             MR. COLBY:  Right, right.  Yeah.

24             THE COURT:  And that could be understanding.  He just

25   couldn't tell me that -- what it says.  So we'll strike the

 1   portion about Mr. -- the independent director.  We don't know

 2   his name.  We're not talking about Mr. Liston.  We're talking

 3   about the independent director who was a Jones Day attorney?

 4            MR. KODOSKY:  Jasper Berkenbosch, I believe was his

 5   name, Your Honor.

 6            And actually, SCBV is a Defendant in this case.  And

 7   so, to the extent that he was serving as an independent

 8   director of one of the Defendants in the case -- party

 9   admission.

10            THE COURT:  That's a new one.

11            MR. COLBY:  Yes, it --

12            THE COURT:  What's your response to that?

13            MR. COLBY:  Your Honor, I don't feel terribly

14   strongly about this because I --

15            THE COURT:  Right.  Because -- all right.

16            MR. COLBY:  -- think the statement was helpful so --

17            THE COURT:  So it's a party admission.  It's a -- I

18   was going to strike the portion about who told him what,

19   because the real bottom line is, he responded, we're not using

20   your trade secrets.  That was his understanding of the response

21   from Mr. Berkenbosch.

22            MR. COLBY:  Correct.  I'm fine with that.

23            THE COURT:  Okay.  All right.  So -- and now that you

24   said it's a statement -- a party admission, because Mr.

25   Berkenbosch was the independent director of one of the

```
1    Defendants, it -- I think it can all come in, but okay.
2            So I'll admit it as a party admission and then we'll
3    move on. It was going to come in anyway, but except for that --
4            MR. KODOSKY:  Thank you, Your Honor.
5            THE COURT:  -- one limited portion.  Go ahead.
6    BY MR. KODOSKY:
7    Q    Ultimately, Mr. Michaels, what action did Mr. Berkenbosch
8    take in response to Rembrandts concerns?
9    A    We -- we included the US headquarters of Jones Day, again,
10   outlining our positions and requesting a meeting.  I found it
11   highly unlikely that a reputable IP firm would conduct the
12   actions that SCBV and SeeCubic were attempting.  And then Mr.
13   Berkenbosch, the independent director of SCBV resigns -- well,
14   or sent a letter to the Court asking to resign.  And that was
15   apparently granted.
16   Q    And then after he resigned is when Mr. Stastney was
17   appointed director?
18   A    Yes.
19   Q    What assurances have you received from Mr. Stastney since
20   he's been appointed director that he would not act in
21   contravention of Rembrandts instructions or wishes?
22   A    It's my understanding and directly from his mouth, both in
23   court and our out of court discussions that he fully intends to
24   license out the technology, including our -- what is Rembrandt
25   technology and Philips without paying any license fee to
```

1   Rembrandt or honoring the license in any way.

2   Q    And is that one of, if not the primary reason, why

3   Rembrandt supports the Debtors Motion for a TRO?

4   A    Yes, and it's why we've brought a similar action in

5   Delaware to enjoin SeeCubic from doing the same.

6   Q    And that's great timing.  The SeeCubic, Inc. filed a

7   response to the Debtors Motion for a TRO in this matter.  It's

8   a Docket 77 on page 26.

9            THE COURT:  Wait a minute.  Response.  Docket entry

10  what?

11           MR. KODOSKY:  Docket 77.  It's the SeeCubic, Inc.

12           THE COURT:  In the adversary proceeding or in the

13  bankruptcy?

14           MR. KODOSKY:  in the advisory, Your Honor.

15           THE COURT:  Okay.

16           Response.  Okay.  77 in adversary.  We just want to

17  keep the record straight, because I doubt hardly it was number

18  77 in the bankruptcy.  We were up to 400 or 500 or something in

19  the bankruptcy.

20           Okay.  So you want us to bring that up?

21           MR. KODOSKY:  No, if I can just Mr. Michaels for his

22  reaction to, in footnote 17 --

23           THE COURT:  Well, can we --

24           MR. KODOSKY:  -- of SeeCubic, Inc.'s --

25           THE COURT:  -- see footnote 17, so we all know what

Case 28-10784-am 0654 Doc 934 - Doc Filed 01/22/25 Filed 12/00/01/22/25 16 441 4 256 Desc
Exhibit A   Mandamus Petition   Page 334 of 541

48

```
 1   we're talking about?

 2            Jon, can you pull that up?

 3            MR. KODOSKY:  And it should be on page 26, 32 of 39.

 4            THE COURT:  Page what?

 5            MR. KODOSKY:  The page number is 26 at the bottom of

 6   the page.  But on the top, it's page 32 of 39.

 7            THE COURT:  On the docket.  But in the pleading

 8   itself, it's page 26, correct?

 9            MR. KODOSKY:  That is correct.

10            THE COURT:  All right.  And so, you want him to

11   review footnote 17?

12            MR. KODOSKY:  Yes, he had just mentioned about --

13   that he had filed a TRO against SeeCubic, among other parties,

14   in the District of Delaware.  And footnote 17, this is from --

15            THE COURT:  Wait a minute.  Let him read it and tell

16   me what that -- does that relate to his testimony or whatever.

17   BY MR. KODOSKY:

18   Q    Please take a moment, Mr. Michaels, and review footnote 17

19   there on page 26.

20   A    Yes, I've read it.

21   Q    My question to you was going to be, what is your reaction

22   to, do you see where it states, "The District of Delaware

23   applied this reasoning in its denial of the Motion filed in the

24   summer of 2023 of nonparty Rembrandt 3D Holdings, Ltd. for a

25   TRO against SeeCubic among parties based on similar
```

Case 23-10763-amc Doc 934 Filed 11/22/25 Entered 06/01/22/25 16:54:04 256 Desc
Exhibit A   Mandamus Petition   Page 335 of 541

49

1   allegations."  Do you see that?

2   A    Yes.

3   Q    The Court did not deny Rembrandt 3D Holdings, Ltd. TRO

4   Motion, correct?

5   A    It did not.

6   Q    In other words, this statement in the SeeCubic, Inc.

7   response is inaccurate, correct?

8   A    It is with respect to the TRO Motion.

9   Q    Is it accurate to state that on August 1st, 2023 -- or I'm

10  sorry, prior to that, that Rembrandt had withdrew its TRO

11  Motion?

12  A    Yes, after hearing the representations by SeeCubic's

13  counsel during the bankruptcy hearing with the Court, we

14  understood that they were going to discontinue their activities

15  in the Netherlands to have their own director appointed.  And

16  we wrote the Court -- the District Court in Delaware saying

17  that the basis of our TRO was no longer valid because --

18  because that -- they were discontinuing that Motion to have a

19  new director appointed.

20  Q    So in other words, Rembrandt withdrew its TRO Motion based

21  on representations made by Defendants counsel in this court?

22  A    Yes, well, in the bankruptcy court.  I don't know if this

23  is the same -- it's a different -- I think it's under a

24  different docket.

25  Q    Understood.

Case 2:23-cv-10763-DP9-34  Doc Filed 01/22/25 File Entered 01/02/22/25 pagee6541 of 4256 Desc
Exhibit A    Mandamus Petition    Page 336 of 541

50

1   A     But yes.

2   Q     And then not only did they not cease and desist in their

3   efforts to take over the Netherland subsidiaries, but they

4   included this misrepresentation in their brief stating that the

5   District of Delaware denied Rembrandt's TRO, would you agree

6   with that?

7   A     Yes.

8   Q     Mr. Micheals, did you ever personally test Stream TV

9   products to make sure that the content was protected?

10  A     Yes, I was in a room full of Rembrandt associated people

11  evaluating the Stream TV products that they had provided during

12  the mediation and one that we had purchased prior to bringing

13  the litigation.

14  Q     And what did you find whenever you investigated whether or

15  not the content was protected?

16  A     With respect to content being protected, we actively tried

17  to get access to the firmware and various tools that were being

18  used, especially for real time conversion. But also, evaluating

19  some of the hardware components and we could not access them.

20  We --

21  Q     Do you have any personal knowledge as to whether or not

22  the content is protected now via the actions of the Netherland

23  subsidiaries?

24  A     Only what I've heard testimony in this proceeding.  Every

25  Stream TV product that we have reviewed in the past has been

Case 2:23-cv-01064-DeB-P934-Doc ment 01/22/25 Filed 12/00/24 22 age 6541 of 256 Desc
Exhibit A   Mandamus Petition   Page 337 of 541

51

```
 1   protected.  And while we -- we could tell that our technology

 2   was being used by various techniques of providing content and

 3   seeing how it was processed and then processing it through our

 4   tools and it coming out the same, the -- we could tell that it

 5   was being -- that our tools were incorporated.  However, we

 6   were not able to see the tools or reverse engineer those tools

 7   from those products.

 8   Q    Have you personally investigated whether Mr. Stastney

 9   and/or SeeCubic, Inc. have been involved with moving IP assets

10   owned by Stream TV to SeeCubic, Inc.?

11   A    I have investigated that, yes, and I have seen that they

12   have done -- attempted to do so.

13            MR. KODOSKY:  Your Honor, I'd like to show the

14   witness first Exhibit Number 71.

15            If I can, Kevin, get another binder with 71?

16            Permission to approach, Your Honor?

17            THE COURT:  This is another binder?

18            MR. KODOSKY:  Yes, Your Honor.

19            THE COURT:  And have you sent those documents to

20   Mister --

21            MR. KODOSKY:  Yes, I have -- Your Honor.  I have.

22            THE COURT:  Okay.  All right.  All right.

23            Any objection to that being handed up, Mr. Colby?

24            MR. COLBY:  No objection to it being handed up.

25            Which document?
```

```
 1              MR. KODOSKY:  The second one.

 2              THE COURT:  Counsel, just give me a minute.  I want

 3   to try to organize my desk here.

 4              MR. KODOSKY:  No problem, Your Honor.

 5              THE COURT:  Okay.  All right.  What am I looking at,

 6   counsel?

 7              MR. KODOSKY:  I'm sorry, Your Honor?

 8              THE COURT:  What am I looking at?

 9              MR. KODOSKY:  Exhibit 71.

10              THE COURT:  Okay.  Okay.  All right.  All right.

11              We brought that up.  Go ahead.

12   BY MR. KODOSKY:

13   Q    Mr. Michaels, you stated that you personally investigated

14   whether or not SeeCubic, Inc., and/or Mr. Stastney were

15   involved with moving Stream Intellectual Property IP assets

16   from Stream to SeeCubic, Inc.  Do you recall testifying to that

17   just a few moments ago?

18   A    Yes.

19   Q    What is being shown to you on the screen is what -- a

20   document that's been marked for identification as Debtors

21   Exhibit Number 71.  Do you recognize this document?

22   A    Yes, I do.

23   Q    Is this a document that you uncovered as part of the

24   investigation that you performed?

25   A    Yes, it is.
```

```
1   Q    Could you please describe for us what this document is?

2   A    This is an application to register a trademark for

3   SeeCubic Inc for the mark SeeCubic.

4   Q    And what was the date of this -- did you call it an

5   application?

6   A    Yes, I did.

7   Q    What is the date of this application?

8   A    The application was filed on October 18th, 2023.

9   Q    So the application was filed after this TRO was filed?

10  A    Yes, it was.

11        MR. KODOSKY:  If we can scroll down to the second

12  page.

13  BY MR. KODOSKY:

14  Q    Do you see where it states at the top, first use anywhere

15  date?

16  A    Yes.

17  Q    Where it states that SeeCubic -- I'm sorry.  Could you

18  please describe what it states?

19  A    So the first use anywhere refers to the first time a mark

20  has been used in commerce in the sale of goods or sale of

21  services.  And that date is June 1st -- it's purported to be

22  June 1st, 2020.  The first use in commerce actually references

23  commerce that the federal government can regulate.  So it has

24  to be interstate or international commerce, and they're saying

25  that at some point it was at least as early as December 8th,
```

```
 1  2020, that it crossed state lines or international boundaries.
 2  Q    And you were physically present in this courtroom with us
 3  during the hearing that was held on October 27th, correct?
 4  A    Yes.
 5  Q    You drove down from upstate New York to be here?
 6  A    Yes.
 7  Q    And do you recall Mr. Rajan being shown website materials
 8  and news articles prior to June 1st of 2020 using the SeeCubic
 9  mark?
10  A    Yes, I do.
11  Q    And based on that, do you believe that that first use
12  anywhere date of June 1st, 2020, is accurate?
13  A    Well, it's certainly not accurate with respect to SeeCubic
14  Inc.  The first use was by Stream TV and/or SC BV.
15  Q    And do you see the webpage URL there of SeeCubic.com?
16  A    Yes.
17  Q    And the information as to who submitted this application,
18  do you see that on this second page?
19  A    Yes.
20  Q    Who was it submitted by?
21  A    Shadron Stastney.
22  Q    On behalf of SeeCubic Inc?
23  A    On behalf of SeeCubic Inc.
24  Q    I'd like to direct your attention to page -- the bottom of
25  page 3, under the section that begins in all bold,
```

```
 1    "Declaration."  Do you see where I'm referring to?

 2    A    Yes.

 3    Q    If you could please explain what this section is referring

 4    to.

 5              THE COURT:  Wait, where are we, counsel?

 6              MR. KODOSKY:  I'm sorry, Your Honor.  Bottom of page

 7    3, top of page 4, the part that states --

 8              THE COURT:  Oh, declaration.

 9              MR. KODOSKY:  -- declaration.

10              THE COURT:  Okay.  Thank you.

11              THE WITNESS:  This is -- the declaration filed under

12    penalty of perjury in our federal system, it's where the

13    applicant is required to make certain representations with

14    respect to their belief in their ability to register the mark.

15    This is a very important aspect of the application.  In our

16    internal training, you know, for our attorneys, we have them

17    take this very seriously and it can be the basis of

18    invalidating the mark if registered if any of these provisions

19    are violated, and this frequently is used to do so.  In

20    addition, the person signing the declaration is risking

21    prosecution for perjury, and there are times when that's taken

22    very seriously and in fact enforced.

23    BY MR. KODOSKY:

24    Q    It's a potential criminal liability?

25    A    Yes.
```

1   Q    And here, the person signing the declaration was who?  Mr.

2   Stastney?  Is that accurate?

3   A    Yes.

4   Q    On page 4, do you see the checkmark in the box in the

5   section that says, "to the best of the signatory's knowledge

6   and belief, no other persons except if applicable concurrent

7   users have the right to use the mark in commerce either in the

8   identical form or in such near resemblance as to be likely when

9   used on or in connection with the goods, services of such other

10  persons, to cause confusion or mistake or to deceive."  Do you

11  see that?

12  A    I do.

13  Q    Restated, is that Mr. Stastney stating to the best of his

14  knowledge and belief that, for example, Stream TV does not have

15  any right to use the word SeeCubic?

16  A    That's exactly what it means.  And I might add, it's not

17  just Stream.  It would be SeeCubic BV.  And he certainly would

18  know that they did not -- that they might have a reason to

19  register the mark as well.

20  Q    And then the next box with a checkmark there, do you see

21  where it states, "To the best of the signatory's knowledge --"

22  And again, signatory would be Mr. Stastney?

23  A    Yes.

24  Q    "To the best of the signatory's knowledge, information,

25  and belief, formed after an inquiry reasonable under the

```
 1   circumstances, the allegations and other factual contentions

 2   made above have evidentiary support."  Do you see that?

 3   A    Yes.

 4   Q    What does that -- what does that mean?

 5   A    That the -- and in particular with respect to when you're

 6   claiming use, that you're going to be -- you're actually going

 7   to be able to show the sale, a contract for sale, purchase

 8   order, some product or service being exchanged in commerce

 9   that's defined by our various regulations and statues related

10   to our trademark issues.  And in this case, it would also

11   reference as to whether or not there was, going up to the prior

12   paragraph, whether or not some other party had a better right

13   and had earlier use with respect to the mark.  And as director

14   of SeeCubic BV, he certainly would have known that SeeCubic BV

15   had many, many years of prior use of this mark as well as

16   Stream TV using it when he was CFO of Stream TV.  That would be

17   better rights than SeeCubic Inc.  I mean, this is -- has to be

18   knowingly false that he filed it, in these statements.

19   Q    And if he is called to testify, it would be fair

20   questioning in your view for us to ask him what evidentiary

21   support was being referenced in this box?

22   A    Absolutely.  In any trademark to speak --

23           MR. COLBY:  Objection.  Objection.

24           THE COURT:  Woah, objection.

25           MR. COLBY:  Objection, Your Honor.  I think it's for
```

Case 2:23-cv-07653-DOC-DFM Document 1-1 Filed 11/22/25 Entered 11/22/25 16:54:14 Desc
Exhibit A   Mandamus Petition   Page 344 of 541

58

1   the Court to decide what's fair questioning, not Mr. Michaels.

2            THE COURT:  Response?  You can rephrase that.

3   Sustained, but you can rephrase.

4   BY MR. KODOSKY:

5   Q    Mr. Phillips -- is it fair to as Mr. Stastney what the

6   evidentiary support he has?

7            THE COURT:  Objection.

8            MR. COLBY:  Objection.  Yeah, to the extent he's

9   asking for opinion testimony.

10           THE COURT:  For an opinion.

11           MR. COLBY:  Yeah.

12           THE COURT:  Hasn't been qualified as an expert.

13           MR. COLBY:  I also just don't see the point of the

14   question.

15           THE COURT:  Right.

16           MR. COLBY:  I mean, he can ask him --

17           THE COURT:  He can ask him --

18           MR. COLBY:  Right.  Ask Mr. Stastney.  Go ahead.

19           MR. KODOSKY:  We intend to ask.

20           THE COURT:  Right.  But you don't have to ask him

21   whether you can ask him.  You can ask me if you can ask him.

22   Move on.  I'll sustain the objection.

23           MR. KODOSKY:  And -- okay.  Thank you, Your Honor.

24   BY MR. KODOSKY:

25   Q    The next box that has a checkmark in it, Mr. Michaels, I'm

Case 2:23-cv-00654-DBB-DAO Document 1 Filed 11/22/25 Entered 01/22/25 16:41:42 Desc
Exhibit A   Mandamus Petition   Page 345 of 541

59

```
 1   not going to read all of that into the record, but is that

 2   referring to the potential criminal liability and the fines or

 3   imprisonment that you had referred to earlier in making false

 4   statements in an application?

 5   A    Yes.  It refers to 18 USC 1001 specifically.  But any

 6   attorney in our office that prepared and filed such an

 7   application like this, it would be grounds for immediate

 8   dismissal.  Zero exception.  We've never -- I mean, in 40

 9   something years, we've never had anybody that would have filed

10   something like this, knowing even if they believed it was

11   untrue, if there was a dispute like there is currently between

12   two companies, we would have filed a statement with the

13   application or something to indicate that other uses were

14   claiming rights to the mark.  We would not have just blanketly

15   said we were entitled to this registration, absent informing

16   the patent and trademark office of the other party's rights or

17   claim to rights.

18   Q    And right below those boxes with the checkmarks, do you

19   see the electronic signature of Mr. Shad L. Stastney?

20   A    Yes.

21   Q    CEO of SeeCubic Inc?

22   A    Yes.

23   Q    Dated October 18th, 2023?

24   A    Yes.

25   Q    Which was after the TRO motion was filed and after at
```

```
 1   least two hearings were held in connection with that motion,

 2   correct?

 3   A    Yes.

 4           MR. KODOSKY:  If we can please scroll down to page 6.

 5           THE COURT:  Hold on one second.  Sorry.  I'm sorry.

 6   You may continue.

 7           MR. KODOSKY:  Thank you, Your Honor.

 8   BY MR. KODOSKY:

 9   Q    Directing your attention to page 6 of this document, Mr.

10   Michaels.

11   A    Uh-huh.

12   Q    It's being shown on the screen.  Do you see that?

13   A    Yes, I do.

14   Q    Is this the evidentiary support that was submitted by Mr.

15   Stastney and SeeCubic Inc in support of their declaration?

16   A    It is.  It's referred to as a specimen showing the mark in

17   use on their website.  And it's -- you're required to file

18   something showing how the mark is being used in actual

19   practice.

20   Q    And so the evidence that they submitted was the same

21   website materials that we looked at in the last hearing?

22           MR. COLBY:  Objection, Your Honor.

23           THE WITNESS:  I don't know if -- I don't recall if we

24   looked at this in the last hearing, but --

25           THE COURT:  All right.  Hold on.  Hold on, Mr.
```

1    Michaels, objection.  Objection.

2             MR. COLBY:  Yeah.  The objection is I don't think

3    that it was established -- it's been established that these are

4    the same or that Mr. Michaels can -- is in a position to do

5    that as the same website that was shown by Debtors in the last

6    hearing.

7             MR. KODOSKY:  We can pull up the exhibit from the

8    last hearing and compare.  There's the $170 million language

9    that we asked Mr. Rajan about.

10             THE COURT:  Wait a minute, wait a minute, we don't

11   need you to testify, counsel.  All you can do is say were you

12   present at the last hearing?  Did you see this exhibit?  Is it

13   the same?  Pull it up, unless Mr. Colby's going to say it was,

14   pull it up.  If it is and you want to waste your time, go

15   ahead.  Pull it up.  You said it was -- what exhibit was it at

16   the last hearing?  You need some time for that, counsel?

17             MR. KODOSKY:  I should be able to get to it pretty

18   quickly, Your Honor.  Exhibit 60 was the SeeCubic website as of

19   October 27th, 2023.

20             THE COURT:  All right.  So pull up Exhibit -- do we

21   have that?

22             MR. KODOSKY:  If not, I can email it to --

23             THE COURT:  Well, he's going to have to send it to

24   you so that he can look at it.

25             So while we're doing that, we're going to take a

```
 1   five-minute break.  Court is in recess until 12:45.  Okay.  I

 2   only need five -- actually, I want to give you five minutes.

 3           All right.  I'll be back at 12:45.

 4       (Recess taken)

 5           THE BAILIFF:  All rise.

 6           THE COURT:  Please be seated.

 7           I took my pen?  That is why I do not go back in

 8   chambers.  Two emergencies.  And I think I left my pen.  Let's

 9   hope I have one more.

10           All right, counsel.  Before we begin, I think there's

11   some concern about who's on -- who's observing?  That right,

12   John?

13           THE CLERK:  Yeah.

14           THE COURT:  All right.  Let's just have them identify

15   themselves, please?

16           THE CLERK:  I have someone on here just labelled as

17   Creditor.  Could you identify who you are, please?

18           MR. HAWKINS:  Did you want my name?

19           THE CLERK:  I'm sorry?

20           MR. HAWKINS:  Did you want my name?

21           THE COURT:  Yes.

22           THE CLERK:  Well, we're trying to figure out who --

23           THE COURT:  Creditor.

24           THE CLERK:  -- is virtually in the courtroom, yes.

25           MR. HAWKINS:  I'm just a creditor.  Small creditor.
```

```
 1                THE COURT:  Well, what's -- what's your name, small
 2   creditor?  This is the judge.
 3                MR. HAWKINS:  John.
 4                THE COURT:  John?
 5                MR. HAWKINS:  John Hawkins.
 6                THE COURT:  John Hawkins.
 7                MR. HAWKINS:  Correct.
 8                THE COURT:  And okay.  Who else?
 9                MR. HAWKINS:  I'm insignificant, Judge.
10                THE COURT:  No, you're not.  Everybody in my
11   courtroom is significant.  I wouldn't say that you're
12   insignificant, sir.
13                MR. HAWKINS:  I appreciate that.  Thank you.
14                THE COURT:  All right.  Who else is observing?
15                THE CLERK:  So I have a phone number ending in 4843.
16                THE COURT:  And who is that?
17                THE CLERK:  Again, phone number ending in 4843.
18                THE COURT:  Can they hear us?
19                THE CLERK:  They should be able to hear us.
20                I'm just going to let you know, we're probably going
21   to remove you then.
22                MR. BLUMENTHAL:  Can you hear me now?
23                THE COURT:  Yes.  Who are you?
24                MR. BLUMENTHAL:  Steven Blumenthal.
25                THE COURT:  And your relationship to the case, Mr.
```

```
 1   Blumenthal?

 2              MR. BLUMENTHAL:  I'm the CEO of Rembrandt 3D Holding.

 3              THE COURT:  Okay.  Okay.  Who else we have, John?

 4              THE CLERK:  A phone number ending in 9793.

 5              THE COURT:  Give them a little -- do you know who

 6   that is?

 7              MR. COLBY:  I don't know the phone number.  We do

 8   have two colleagues observing remotely, one whose name you can

 9   see, Rebecca Ritchie and also Becky Gonzalez-Rivas.

10              THE COURT:  Yeah.  I think we're more like who we

11   can't identify.

12              MR. COLBY:  Yeah, yeah.  And Ms. Gonzalez-Rivas is

13   4843.  I just got confirmation.

14              THE CLERK:  Oh.  What is it?  Gonzalez?

15              THE COURT:  Okay.  That's 4843.  Who else we have?

16   That everybody?

17              THE CLERK:  I have someone just named Steven.

18              MR. COLBY:  That was Steven Blumenthal who spoke up

19   earlier, I believe.

20              THE COURT:  No there's two people.

21              THE CLERK:  Then I'm looking for someone just named

22   creditor.

23              THE COURT:  Wait, I thought that was Mr. Hawkins.

24   Small -- he said he's a small creditor.

25              THE CLERK:  Gotcha.
```

```
 1                    THE COURT:  And then we had --

 2                    THE CLERK:  Sorry, Mr. Hawkins.

 3                    THE COURT:  And then we have -- so I have four people

 4    so far.  How many unidentified people you have?

 5                    THE CLERK:  A phone number ending in 9793.

 6                    THE COURT:  Hello?  Maybe they -- can they -- give

 7    them a time.  Maybe they're on mute.

 8                    THE CLERK:  Yeah.

 9                    THE COURT:  Give them a chance to come off mute.  Are

10    they on mute?

11                    THE CLERK:  Again, it's a 516 number ending in 9793.

12                    THE COURT:  I feel like we're at bingo.  Is that

13    anybody's colleague?  Does anybody recognize this number?

14                    MS. BRUMME:  Yes, Your Honor, I believe that's Tom

15    Warns of K&L Gates.

16                    THE COURT:  Well, can he not respond?

17                    MS. BRUMME:  He may have stepped away from the Zoom.

18                    THE CLERK:  It's possible.

19                    THE COURT:  Is that your colleague, counsel?

20                    MS. BRUMME:  That's Tom Warns with K&L Gates, Mr.

21    Caponi's colleague.

22                    THE CLERK:  That's Tom Warns, okay.

23                    THE COURT:  Is that your colleague?  716 -- what's

24    the number?

25                    THE CLERK:  That was the one ending in 9793.
```

1            MS. BRUMME:  Yeah, he's just messaged me.  He's

2    trying to respond, but we can't hear him.

3            THE COURT:  That's fine.  All right.  Okay.  Okay.

4            THE CLERK:  And lastly, and I think I recognize this

5    number, though, ending in 4411?  Ending in 4411.

6            THE COURT:  What's the beginning?  A 215?

7            THE CLERK:  A 215 number.

8            THE COURT:  That's not Eileen, is it?

9            THE CLERK:  No, but I thought that it might be

10   Callahan.

11           THE COURT:  Who?

12           THE CLERK:  Mr. Callahan, but I'm not 100 percent

13   sure.

14           THE COURT:  All right.  Who's on -- who's 4411?

15           THE CLERK:  That's the last one.

16           MR. COLBY:  Your Honor, both -- it seems like Mr.

17   Warns and our colleague Ms. Gonzalez-Rivas were trying to

18   unmute to respond --

19           THE COURT:  That's fine.

20           MR. COLBY:  -- and weren't able to.  Others may be

21   having the same issue.

22           THE CLERK:  Right.

23           THE COURT:  Right.  That's -- okay.  Can we unmute

24   441 -- that's why I was asking, can they respond?

25           THE CLERK:  If they're on a phone, they're not seeing

```
 1    the prompt to unmute off the Zoom.  It's a little clunky.

 2              THE COURT:  But they can hear us.

 3              THE CLERK:  They can hear us, but they might not be

 4    able to --

 5              THE COURT:  So if you're on 441 -- ending in 4411,

 6    could you please unmute your telephone and at least advise us

 7    who we are?  Which is why we need to start requiring that you

 8    put a name.

 9              THE CLERK:  Well, the problem is they beep in while

10    we're in the middle of stuff, so I'm not -- yeah.

11              THE COURT:  All right.  Last call, 4411.

12              THE CLERK:  Should I dump them?

13              THE COURT:  Dump them and they can call back.

14              THE CLERK:  All right.

15              THE COURT:  I mean, or they can email you.  I mean if

16    it's someone -- because it's a 215.

17              THE CLERK:  Right.

18              THE COURT:  They can email you.  They have your email

19    and Ms. Godfrey's email address to say I got kicked off.  I

20    want to hear, okay.  All right.

21              MR. ALEXANDER:  Your Honor, I think we can see all

22    the names.  I saw Mr. Crawford, who's a party.  Mr. Wallace is

23    Rembrandt.

24              THE COURT:  Right.  It was only the people who did

25    not have identifications that we wanted to know who they were,
```

```
 1   only because they're not in the courtroom and I can't see them.

 2            Yes, counsel?

 3            MS. BRUMME:  I believe 215 ending in 4411 is Mr.

 4   Callahan.

 5            THE CLERK:  I thought so, damn.

 6            THE COURT:  Well, he didn't answer.  Did you kick him

 7   off?

 8            THE CLERK:  Yes.

 9            THE COURT:  He's going to have to call back.  Sorry,

10   Mr. Callahan -- Mr. Callahan is upstairs.

11            THE CLERK:  I was going to say, he's got to walk down

12   a block or whatever.

13            THE COURT:  Come take the elevator down unless he's

14   working from home.  I don't know.  I don't know their schedule.

15   They could be working from home because our staff rotates also

16   and they work what two days remotely, three days remotely?

17            THE CLERK:  Yeah, two.

18            THE COURT:  And in the mornings, I actually do my

19   hearings telephonically and if I come in, I come in for the

20   afternoon.  Or unless today, I come in for the morning.

21            All right.  You may proceed --

22            THE CLERK:  I'm sure we're doing him a favor.

23            THE COURT:  What?

24            THE CLERK:  I'm sure we're doing him a favor.

25            THE COURT:  I'm sure.
```

1          Mr. Kodosky, you may continue.

2          MR. KODOSKY:  Thank you, Your Honor.

3   BY MR. KODOSKY:

4   Q    Mr. Michaels, before we took a break, we were looking at

5   what has been marked for identification as Debtor's Exhibit

6   Number 71, page 6 of 6.

7   A    Yes.  Yes.

8   Q    Which is the evidentiary material submitted by Mr.

9   Stastney and SeeCubic Inc in support of their trademark

10  application?

11         MR. KODOSKY:  I'm sorry, John.  If we can go back to

12  Exhibit 71?

13         THE COURT:  Oh, we're back to 71.

14         THE CLERK:  71.

15         MR. KODOSKY:  Page 6 of 6?  There we go.

16         THE COURT:  Page 6.

17         MR. KODOSKY:  And I had made the representation that

18  these materials were the same website materials that we had

19  looked at in the last hearing.  Over break, I was incorrect

20  about my exhibit reference number.  It was Exhibit 61, not

21  Exhibit 60.  But we now have Exhibit 61 on the screen and if we

22  can please scroll down to the third page.  Right there.

23  BY MR. KODOSKY:

24  Q    Do you see the third page of Exhibit 61 to be able to

25  compare it with the sixth page of Exhibit 71, Mr. Michaels?

 1   A    Yes.

 2   Q    And does that appear to be the same materials?

 3   A    Yes, it does.

 4         MR. KODOSKY:  Staying on Exhibit 71, if we can scroll

 5   below a little bit further.

 6   BY MR. KODOSKY:

 7   Q    We're next going to see the picture of the astronaut that

 8   we had seen on Exhibit 5 earlier today from the 2022 PPM.  Do

 9   you see that astronaut?

10   A    I do.

11         THE COURT:  Wait a minute.  The astronaut on exhibit

12   -- on the snow -- astronaut -- is that an astronaut on the

13   snowboard?  Where am I at?  Okay.  Is that a snowboard?  I

14   mean, that's what I would call it.  I don't know.  Maybe it's

15   an electronic something.  Okay.  So we're looking at the

16   astronaut on page --

17         MR. KODOSKY:  The cover page of Exhibit 5.  The

18   SeeCubic Inc 2022 private placement memorandum.

19         THE WITNESS:  Yes.

20         THE COURT:  Wait a minute.  Exhibit 5, you said?

21         MR. KODOSKY:  Yes, Your Honor.

22         THE COURT:  Of which PPM?

23         MR. KODOSKY:  2022.  And then back to Exhibit 71.

24   The last piece of evidentiary support they submitted, below the

25   astronaut picture.  I'm sorry, if we can scroll below the

Case 28-10784-amc Doc 654-6 934 Doc 9 Filed 11/22/25 Filed 12/00/04/22 Page 674 of 256 Desc
Exhibit A   Mandamus Petition   Page 357 of 541

71

```
 1  astronaut picture, there's a quote there.

 2  BY MR. KODOSKY:

 3  Q    "Quite frankly, 3-D glasses have never failed to be

 4  anything but a headache inducing, slightly blurry mess for me.

 5  That might be why a recent demo of a new glasses free 3-D TV

 6  blew me away.  It just works."  Do you see that, Mr. Michaels?

 7  That quote from ARS --

 8  A    Yes, I do.

 9          MR. KODOSKY:  If we go back to Exhibit 61, John, page

10  7.  This is the SeeCubic.com website on page 7 -- right there.

11  BY MR. KODOSKY:

12  Q    Do you see that same quote?  The "Quite frankly, 3-D

13  glasses have never failed to be anything but a headache

14  inducing, slightly blurry mess for me.  That might be why a

15  recent demo of a new glasses free 3-D TV blew me away.  It just

16  works."  Do you see that, Mr. Michaels?

17  A    Yes.

18  Q    So the same quote from the SeeCubic website was submitted

19  by Mr. Stastney and SeeCubic Inc on October 18th, 2023, as part

20  of their trademark application?

21  A    Yes.

22  Q    And you were in court at the last hearing when --

23  A    Yes.

24  Q    -- we established that this quote was actually written

25  about Stream TV and SeeCubic and not SeeCubic Inc.  Do you
```

1    recall that testimony from Mr. Rajan?

2    A    Yes.  Yes, I do.

3    Q    Thank you.

4         MR. KODOSKY:  Move to admit Exhibit 71, Your Honor.

5         THE COURT:  Any objection, counsel?

6         MR. COLBY:  No, Your Honor.

7         THE COURT:  All right.  Exhibit 71, which is the

8    application, right?

9         MR. KODOSKY:  Correct.

10        THE COURT:  Admitted.

11       (Debtor's Exhibit 71 admitted into evidence)

12        THE COURT:  Okay.

13        MR. KODOSKY:  Next, if we can take a look at Exhibit

14   77, what has been marked for identification as Exhibit 77.  If

15   we can scroll to the second page.

16   BY MR. KODOSKY:

17   Q    Do you recognize this document, Mr. Michaels?

18   A    Yes.

19   Q    What is it?

20   A    It is a application to register a trademark, or a service

21   mark filed on October 18th, 2023, by SeeCubic Inc.

22        MR. KODOSKY:  Sorry, Your Honor.  Exhibit 78 is the

23   next document that I intended to show this witness.

24        THE COURT:  78?

25        MR. KODOSKY:  Apologies, yes.

```
 1                THE COURT:  Not 77?

 2                MR. KODOSKY:  Correct.

 3                THE COURT:  Which appears to be the same as 71.

 4                MR. KODOSKY:  Correct.

 5                THE COURT:  Okay.  Exhibit 78, okay.

 6  BY MR. KODOSKY:

 7  Q    Mr. Michaels, you are being shown what has been marked for

 8  identification as Debtor's Exhibit Number 78.  Do you recognize

 9  this document?

10  A    Yes, I do.

11  Q    What is it?

12  A    It is a trademark -- or an application to register a

13  trademark or service mark filed on May 26th, 2023.  The mark is

14  for SeeCubic Labs.  The owner of the mark is purported to be

15  SeeCubic Inc.

16                MR. KODOSKY:  And if we can scroll down to show who

17  signed the declaration on page 4 of 5.

18  BY MR. KODOSKY:

19  Q    Who submitted this?

20  A    Shad Stastney.

21  Q    After having made the same representations by checking the

22  boxes above his electronic signature?

23  A    Yes.

24                MR. KODOSKY:  Move to admit, Your Honor.

25                THE COURT:  Any objection, Mr. Colby?
```

1          MR. COLBY:  No, Your Honor.

2          THE COURT:  So D-78 admitted.

3      (Debtor's Exhibit 78 admitted into evidence)

4          MR. KODOSKY:  Next, we'd like to ask Mr. Michaels to

5   please take a look at the document that has been marked for

6   identification as Debtor's Exhibit Number 72.

7   BY MR. KODOSKY:

8   Q    You recognize this document, Mr. Michaels?

9   A    I do.

10  Q    Is this a document that you had uncovered as part of your

11  investigation?

12  A    Yes.  It's a -- do you want me to go onto what it is?

13  Q    Yes, sir.

14  A    This is the coversheet that's filed when recording an

15  assignment of a trademark filed with the patent trademark

16  office.  And it becomes a public record of the transfer.

17  Q    And what is the date of this document?

18  A    The -- the document itself, the coversheet was prepared

19  and filed on February 16th, 2022, and alleges to be recording a

20  document executed on December 8th, 2020.

21  Q    And are you able to tell us who filed this document?

22  A    Yes.  I -- you can go down and it -- it'll show that.  The

23  person submitting it was Shad Stastney.

24  Q    And what trademarks is this document related to?

25  A    If you go down, there'll be a schedule.  But it has a

1  number -- Ultra D if you go down it'll show the --

2  Q    Actually, I'm -- if we can go back up, I believe it was on

3  page 1.  Property numbers?  Total --

4  A    Yeah.  Property numbers -- it'll be under property

5  numbers, three.  So in this case, it was SeeCube and Ultra --

6  two different files for SeeCube and Ultra -- and then another

7  one for Ultra D.

8  Q    And so if you could briefly explain what this document is

9  attempting to do?

10 A    It is recording the assignment of intellectual property

11 from -- this indicates in this case, three trademark registry -

12 - two trademark registrations and one trademark registration

13 application.  The trademark registration application is the

14 first one, where it just lists the serial number and that was

15 for a mark owned by Stream transferring to SeeCubic Inc.  Then

16 the next one is the registration for -- registration for

17 SeeCube.  And even though it's the same mark, you can have

18 different registrations for different classes of goods and

19 services.  And then finally, Ultra D was being transferred from

20 Stream to SeeCubic.

21 Q    And what support -- what evidentiary support was submitted

22 by Mr. Stastney and SeeCubic Inc in support of this purported

23 assignment?

24 A    The omnibus agreement that was later invalidated by the

25 Delaware Supreme Court.

```
 1    Q    So this was dated February of 2022.  You were present

 2    during the last and previous hearings when the June 15th, 2022,

 3    Delaware Supreme Court opinion was referenced invalidating the

 4    omnibus agreement, correct?

 5    A    Yes, I was.  Yes.

 6    Q    And so in other words, this was filed by Mr. Stastney and

 7    SeeCubic Inc approximately four months prior to the omnibus

 8    agreement being invalidated?

 9    A    Yes.

10    Q    As part of your investigation, did you uncover any

11    documents showing that any reverse action was taken by Mr.

12    Stastney and/or SeeCubic Inc after the Delaware Supreme Court

13    issued its opinion on June 15th of 2022?

14    A    No, there are none filed with the patent trademark office.

15    They would have shown up in the same search that uncovered this

16    one.

17              MR. KODOSKY:  Move to admit, Your Honor.

18              THE COURT:  Any objection?

19              MR. COLBY:  No, Your Honor.

20         (Debtor's Exhibit 72 admitted into evidence)

21              MR. KODOSKY:  I'd next like to show Mr. Michaels what

22    has been marked for identification as Debtor's Exhibit Number

23    74.

24    BY MR. KODOSKY:

25    Q    Do you recognize this document, Mr. Michaels?
```

1   A     Yes.

2   Q     Is this a document that you uncovered as part of your

3   investigation?

4   A     Yes.

5   Q     Can you please explain what it is?

6   A     It is also a recording of a -- in this case, a security

7   interest in the underlying property identified therein.  It

8   records a security interest provided by SeeCubic Inc to Hawk

9   Investment Holdings Limited.

10  Q     What was the date that this was recorded?

11  A     June 15th, 2022.

12  Q     So the same day that the Delaware Supreme Court issued an

13  opinion invalidating the omnibus agreement, SeeCubic Inc filed

14  an assignment of the SeeCube and the Ultra D -- I'm sorry, a

15  security interest in the SeeCube and the Ultra D to Hawk

16  Investment Holdings Limited?  Is that accurate?

17  A     Yes.  If you page down a bit --

18          MR. COLBY:  Objection.

19          THE COURT:  Wait a minute.  Wait a minute.

20  Objection.

21          MR. COLBY:  Objection, Your Honor.

22          THE WITNESS:  Oh, I'm sorry.

23          MR. COLBY:  I believe Mr. Kodosky previously

24  referenced the June 15th date.  There's also an execution date

25  of June 11th.

```
 1                    THE COURT:  Well, he said when it was filed.

 2                    MR. KODOSKY:  Recorded.

 3                    THE COURT:  Recorded.

 4                    MR. KODOSKY:  Correct.

 5                    MR. COLBY:  Right.  So I just want to make sure

 6    we're --

 7                    THE COURT:  Well, he said recorded.  I know there's a

 8    difference between both of these and when they were executed

 9    and when they were filed.

10                    MR. COLBY:  Thank you.

11                    THE COURT:  All right.  All right.  And you can point

12    out when you cross-examine when they were executed.  But he was

13    clear when they were -- when it was filed.

14                    All right.  Go ahead.

15    BY MR. KODOSKY:

16    Q    Mr. Michaels, you were answering?

17    A    If you page down on the document, it'll show the effected

18    properties.  And it's the same -- same properties.

19    Q    And, who are the attorneys listed there in terms of having

20    -- would the attorneys there have prepared this assignment

21    document?

22    A    I don't know if they prepared the assignment document.  We

23    do know that they filed the -- they were the ones that recorded

24    the document with the patent and trademark offices.  They're

25    listed as the correspondence address and the name of the
```

 1  submitter is Alison Lasher, who is identified as being

 2  associated with Scadden.

 3  Q    So this assignment was recorded the same day that the

 4  Delaware Supreme Court opinion was issued.  Did your

 5  investigation uncover any reverse action taken by Scadden or

 6  SeeCubic Inc or Mr. Stastney or Hawk after June 15th, 2022?  In

 7  other words, reassigning it back to Stream TV?

 8  A    My search was to look at all transactions related to these

 9  marks, and there's no reversal of this transaction and it would

10  have shown up in my search if there had been one.

11          MR. KODOSKY:  Move to admit Exhibit 74, Your Honor?

12          THE COURT:  Any objection?

13          MR. COLBY:  No objection.

14          THE COURT:  Okay.  Admitted.

15      (Debtor's Exhibit 74 admitted into evidence)

16          MR. KODOSKY:  Next ask to show Mr. Michaels what has

17  been marked for identification as Debtor's Exhibit Number 73.

18  BY MR. KODOSKY:

19  Q    Do you recognize this document, Mr. Michaels?

20  A    Yes.

21  Q    What is it?

22  A    This is what is referred to as a statement of use.  And

23  it's filed with the patent and trademark office at various

24  times to affirm that the mark is being used in commerce that

25  the federal government can regulate, and to show the nature of

1   that use as being consistent with the registration application

2   or registration.

3            MR. KODOSKY:  If we can scroll to page 5.

4   BY MR. KODOSKY:

5   Q    I'm sorry.  What trademark is this referencing?

6   A    The SeeCube.

7            MR. KODOSKY:  If we can please scroll to page 5 of 8.

8            THE COURT:  Did somebody come on?  Did somebody

9   leave?

10            THE CLERK:  Callahan came back in.

11            UNIDENTIFIED SPEAKER:  -- Callahan came back, and

12   this is someone named Patrick Miles.

13            THE COURT:  All right.  And who's he?  Mr. Miles, who

14   are you associated with?  Hello?  Anybody know who Patrick

15   Miles is?

16            MR. COLBY:  My guess is that it is a Patrick Miles

17   who is or was an investor, is an investor in Stream TV and

18   SeeCubic.

19            UNIDENTIFIED SPEAKER:  He just hung up.

20            THE COURT:  Okay.  I mean, I can't see who comes and

21   goes in the court.  If you're here, I'm going to assume that

22   you have some interest.  But our goal is to gatekeep.  Again

23   because we don't want people who have no interest just

24   listening in and -- I mean, they can because it's open to the

25   public but typically we'll know who they are.  And we don't

1   anybody disrupting so we're keeping everybody on mute.

2              Okay.  You may continue.  I apologize.  This is D73,

3   counsel, you were asking Mr. Michaels questions regarding?

4   BY MR. KODOSKY:

5   Q    Yes.  If -- on page 5 of 8, if you're able to tell us who

6   signed the declaration making the same representations that Mr.

7   Stastney had made earlier on this document.

8              THE COURT:  Page 5 of 8?

9              THE WITNESS:  Yes.  This was signed by --

10             THE COURT:  Wait a minute.

11             THE WITNESS:  I'm sorry, was that an objection?

12             THE COURT:  Okay, the --

13             MR. KODOSKY:  Declarations.

14             THE COURT:  -- declarations?

15             MR. KODOSKY:  Yes, Your Honor.

16             THE COURT:  Okay.

17  BY MR. KODOSKY:

18  Q    Who signed this declaration, Mr. Michaels?

19  A    Raja Rajan as chief operating officer of Stream.

20  Q    And what is the date that he signed it?

21  A    This was back in March 28th of 2018.

22  Q    And if we scroll to page 6 of 8, it appears there some

23  materials that were submitted along with this, pages 6, 7.  Do

24  you see those materials?

25  A    Yes, I do.

1  Q    And does that indicate to you -- what does that indicate

2  to you?

3  A    These are specimens showing the actual use and in somewhat

4  of an ideal specimen.  And it is showing the mark being used on

5  the box and the actual product itself, which is what the patent

6  trademark is looking for.  It's indicating the source of the

7  goods.  That's its primary functionality in term of a trademark

8  or service mark.  In this case a trademark.  And this is the

9  back of the TV showing SeeCube (sic) being used and then the

10 box it came in.  That's the classic way a trademark is used.

11 Q    So whereas SeeCubic, Inc., and Mr. Stastney submitted

12 website materials containing quotes written about Stream TV,

13 when Stream TV was filing their materials, they actually

14 included pictures of the product in the box and the mark being

15 used, correct?

16 A    Yes.

17           MR. KODOSKY:  Move to admit Debtor's Exhibit Number

18 73, Your Honor.

19           THE COURT:  Any objection?

20           MR. COLBY:  No objection, Your Honor.

21           THE COURT:  Admitted.

22     (Debtor's Exhibit 73 admitted into evidence)

23 BY MR. KODOSKY:

24 Q    Next ask that Mr. Michaels be shown what has been marked

25 for identification as Debtor's Exhibit Number 80.  Do you

1    recognize this document, Mr. Michaels?

2    A    Yes, I do.

3    Q    What is it?

4         THE COURT:  Hold on.

5         MR. KODOSKY:  I'm sorry, Your Honor.

6         THE COURT:  Okay.  What is it?  Go ahead.

7    BY MR. KODOSKY:

8    Q    What is it, Mr. Michaels?

9    A    This is the -- a copy of the registration certificate for

10   SeeCube.

11   Q    What's the date of this document?

12   A    This was registered on June 5th, 2018.

13        MR. KODOSKY:  Move to admit, Your Honor.

14        THE COURT:  Any objection?

15        MR. COLBY:  No objection, Your Honor.

16        THE COURT:  Okay.

17        (Debtor's Exhibit 80 admitted into evidence)

18   BY MR. KODOSKY:

19   Q    Shifting gears, Mr. Michaels.  What interaction, if any,

20   have you had with the Receiver, Mr. Liston, in this case?

21   A    We reached out to Ian Liston in a variety of ways.  One,

22   wanted to express our rights as we understood them in hoping to

23   enter into a productive conversation with respect to providing

24   the use of the TV's.  Secondly, we reached out with a specific

25   project we were working on, and we offered to pay the

 1  production costs of setting up an entire line to start

 2  fulfilling our needs for, our need/hope for the TV units.  This

 3  would be a cost completely born by Rembrandt.  We received zero

 4  response to both inquiries.

 5  Q    And who -- if you're able to say, I don't know if you're

 6  able to say or if it would be violating any confidentiality

 7  provisions, but are you able to say who the Rembrandt proposal

 8  was with, whose companies?

 9  A    We were -- yes, I can.  It was -- we were looking to do a

10  project with James Cameron and the associated companies that

11  managed some of their 3D creation content.  And we were looking

12  to create a series of hardware and content solutions that would

13  be used in both provision of the 3D content he creates, but

14  also to advertise it in movie theaters with the no glasses 3D

15  TV.

16  Q    Is that the same James Cameron who directed the movie

17  Titanic and the move Avatar and so forth, Terminator?

18  A    Yes.

19  Q    And I'm sorry, what response did you receive from the

20  Receiver in regards to your proposal?

21  A    Silence.  Nothing.

22  Q    Again, shifting gears.  The Defendants have noted that

23  they intend to call Bart Barenbrug as a rebuttal witness in

24  this matter.  Do you know Mr. Barenbrug?

25  A    I've never met him.  But I certainly know of him and have

1  read his declarations and numerous email interactions with

2  Steven Blumenthal.

3  Q    What declaration are you referring to?

4  A    He filed a declaration in 2017 in the Southern District of

5  New York action, the *Rembrandt v. Stream*.  He was also a

6  defendant in that case.

7           MR. KODOSKY:  Would ask that Mr. Michaels be shown

8  what has been marked for identification as Debtor's Exhibit

9  Number 84.

10           THE COURT:  Is this another binder?

11           MR. KODOSKY:  I apologize, Your Honor.  We've got a

12  hard copy.

13           THE COURT:  Have you sent that to --

14           MR. KODOSKY:  Yes, Your Honor.

15           THE COURT:  Okay.

16           MR. KODOSKY:  Yes, Your Honor.

17           THE COURT:  All right, because mine went up to 80.  I

18  just wanted to make sure.  And have you shared that with Mr.

19  Colby?

20           MR. KODOSKY:  Yes, Your Honor.  Permission to

21  approach?

22           THE COURT:  Yes.  All right.

23  BY MR. KODOSKY:

24  Q    Mr. Michaels, you're being shown what has been marked for

25  identification as Debtor's Exhibit Number 84.  Do you recognize

1   this document?

2   A    Yes, I do.

3   Q    What is it?

4   A    This is the declaration of Bart Barenbrug filed in the

5   action brought by Rembrandt against Stream and the other named

6   Defendants, the Rajan's, Walter Roelen, Bart Barenbrug, Peter

7   Roelen, and Hans Zuidema.  This was filed on February 6th,

8   2017.

9   Q    Can you please point us to the provision of this

10  declaration pertaining to a nondisclosure agreement that you

11  had referenced earlier?

12  A    Yes.  It's paragraph 7.  He -- I mean, basically this

13  entire thing is untrue.  But it says, "During my time with my

14  discussions with 3D Fusion Corp, paren, I was never employed by

15  the company, end paren.  I did not enter into a nondisclosure

16  agreement NDA with a New York Company or negotiate such an

17  agreement in New York.  I do recall reviewing a draft NDA.  I

18  have never -- I never received an employment contract with 3D

19  Fusion EUBD.  And to the best of my knowledge, the DNA was

20  never fully consummated.  I never received or acknowledged

21  receipt of an executed DNA."

22            MR. KODOSKY:  Move to admit, Your Honor.

23            MR. COLBY:  Objection, Your Honor.  I think it's

24  hearsay.  Plus Mr. Barenbrug will be here to testify himself.

25            THE COURT:  All right.  Counsel, hearsay.

 1              MR. COLBY:  I also don't see the relevance of it to

 2    the present TRO motion.

 3              MR. KODOSKY:  And to the hearsay, Your Honor, I did

 4    promise to get back to you with a case cite for that Kos Pharms

 5    case over break.  It's 369 F.3d --

 6              THE COURT:  Wait a minute.  Wait a minute.  Let me go

 7    -- well, you just can give -- give me the name again.  Which

 8    was the name of the case?

 9              MR. KODOSKY:  The name of the case is Kos Pharms --

10              THE COURT:  Versus?

11              MR. KODOSKY:  It's Kos Pharmaceuticals Inc., versus

12    -- I'm going to pronounce it Andrx, A-N-D-R-X, A-N-D-R-X

13    Corporation.  It's a May 24th, 2004 3d Circuit opinion with a

14    case cite of 369 F.3d 700.

15              THE COURT:  Okay.  And it is 3d Circuit what?

16              MR. KODOSKY:  May 24th, 200 --

17              THE WITNESS:  Four.

18              MR. KODOSKY:  Four.

19              THE COURT:  And that addresses the issue of hearsay

20    materials in a preliminary injunction hearing?

21              MR. KODOSKY:  Thus formal evidentiary requirements

22    applying in --

23              THE COURT:  Preliminary injunction.

24              MR. KODOSKY:  It was also a trademark infringement

25    case, Your Honor.

Case 2:23-cv-00634-DGP Doc 934-1 Filed 11/22/25 Entered 11/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition   Page 374 of 541

88

1           THE COURT:  And the court said what because my law

2    clerk is out on another meeting, so.  Oh, he's back.  Perfect

3    timing because there was a case that they cited and I said,

4    well, you're going to have to tell me what it says because my

5    law clerk is not here.  He's out on another meeting.

6           MR. ZAHRALDDIN:  Your Honor -- this is Zahralddin.  I

7    think in order -- instead of just whispering to Mr. Kodosky.

8    The reason this is relevant is there's been testimony here that

9    everything is fine as long as the folks as SCVB are handling

10   the trade secrets.  The trade secrets, as the testimony will

11   show and as the documents will show, have been in the past

12   mishandled by the same people at SCBV (sic) that are still

13   there.  The same engineers that were there before.  So it's

14   entirely relevant to hear about these same trade secrets, the

15   Rembrandt Trade Secrets and the Stream Trade Secrets through

16   Mr. Michaels who is worried obviously that his trade secrets

17   will be misused as are we worried that they're being misused.

18           THE COURT:  Let me just say this.  The focus of this

19   TRO as I understand it is to say you want a restraining order

20   saying don't use -- not don't use.  Don't license or use our

21   technology.  Our meaning Stream and Rembrandt's technology that

22   apparently was somebody else's technology that is now somebody

23   else's technology.  All of which doesn't look good to me, but

24   I'm going to keep that comment to myself.  About, you know,

25   who's using what and who's using whatever.

```
 1              But in any event, you're saying it's relevant because
 2    you believe that these people in the Netherlands because that's
 3    -- and I don't mean to say these people in a bad way.  But the
 4    folks, that might be a better word.  The folks in the
 5    Netherlands are using or plan to use technology that they
 6    shouldn't be using, or licensing, not using because I'm not
 7    saying -- I haven't heard anything that says they can't use it.
 8    But they can only use it for -- at least the allegation from
 9    Rembrandt and Stream is they could only use it for a specific
10    purpose.  And you believe that they are going to use this for
11    some unallowed purpose.
12              MR. ZAHRALDDIN:  Well, we've heard testimony to that
13    effect, Your Honor, from Mr. Stastney.
14              THE COURT:  Well, Mr. Stastney hasn't testified yet.
15    But you believe you heard it from him in the Netherland
16    proceedings, no?
17              MR. ZAHRALDDIN:  Oh, no.  He testified, Your Honor.
18    He did.  He testified on October and indicated that -- that was
19    the most recent issue that we had was with --
20              THE COURT:  Well, was that in the other hearing?
21              MR. KODOSKY:  No.
22              MR. ZAHRALDDIN:  No.
23              MR. COLBY:  Your Honor, Mr. Stastney was called as
24    part of the Debtor's other case.
25              THE COURT:  As of cross?
```

Case 2:24-cv-00654-DBP Doc 9-34 Filed 11/22/25 Entered 11/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition   Page 376 of 541

90

```
 1              MR. COLBY:  Part of the Debtor's.

 2              MR. KODOSKY:  Part of the Debtor's yeah.

 3              THE COURT:  Listen, these -- no offense, these

 4  hearings -- I just said that to my law clerk.  This is all

 5  starting to blur together --

 6              MR. COLBY:  Understand.

 7              THE COURT:  -- because I've had so many -- and I'm

 8  glad you guys are keeping it straight.  And I'm sure that if I

 9  go back and think about it I will.  But this TRO hearing, Mr.

10  Stastney was called as of cross, correct?

11              MR. COLBY:  Right.

12              MR. ZAHRALDDIN:  Yes.  He was part of our -- one of

13  our witnesses and --

14              THE COURT:  Right.  And you believed that his

15  testimony at that time --

16              MR. ZAHRALDDIN:  He indicated that there was some

17  sort of sublicensing protection that would allow him to use the

18  technology through the SCVB.  This is directly relevant because

19  the folks at SCVB have committed trade secret violations in the

20  past, have been the subject of the original -- the same people,

21  including Mr. Barenbrug, if I'm pronouncing his name correctly,

22  and that's why this is relevant testimony.  It is simply to

23  show that that testimony may not be as stalwart as we would --

24  they'd like it to be.

25              THE COURT:  Do you want to try and impeach Mr.
```

1    Barenbrug before -- Barenbrug --

2            MR. ZAHRALDDIN:  I don't believe it's impeachment,

3    Your Honor.  I believe we are asking Mr. Michaels what has

4    happened in a prior case where Mr. Barenbrug -- it's not our

5    fault that they chose the guy who --

6            THE COURT:  All right.  Keep the commentary.  I don't

7    need to hear that.

8            MR. ZAHRALDDIN:  I'm just explaining that it's not

9    our choice to put Mr. Barenbrug up.  Mr. Barenbrug happens to

10   be the person primarily who where the evidence was shown or

11   will show signed a declaration here in the United States saying

12   that he did not sign an MDA.  And we would like to walk through

13   the rest of this to show the MDA that he signed.

14           THE COURT:  So what's -- is Mr. Michaels a -- is he

15   rebutting something? What's he doing?

16           MR. ZAHRALDDIN:  He's simply showing that Mr.

17   Barenbrug, a former engineer at 3D Fusion, an engineer --

18           THE COURT:  Well, he says he wasn't an engineer, and

19   he said he didn't have an MDA.

20           MR. ZAHRALDDIN:  It's interesting because there's a

21   -- here's a signed employment agreement.

22           THE COURT:  Oh, I -- okay.

23           MR. ZAHRALDDIN:  That's what we would like to show,

24   Your Honor.  That's why it's relevant.

25           THE COURT:  Why -- okay.  Are you anticipating -- I

1   mean, I get it.  I get the question is -- I mean, if Mr.

2   Barenbrug --

3          MR. COLBY:  You nailed it, Your Honor.  You nailed

4   it.

5          THE COURT:  Barenbrug comes and testifies, and he

6   says all these things and you got signed documents, why do I

7   need Mr. Michaels to tell me anything because you can ask him,

8   did you sign this?

9          MR. ZAHRALDDIN:  I'm not worried about that, Your

10  Honor.  He may never ask him that question and they cancel him.

11         THE COURT:  Well, then you can ask him.

12         MR. ZAHRALDDIN:  Well, he may never show up if --

13  once this is shown.

14         THE COURT:  Well, that's their problem.

15         MR. ZAHRALDDIN:  But it's our problem if we can't get

16  in the evidence in our case in chief.  Our case in chief was

17  responding to Mr. Stastney and his allegation that everything's

18  fine if it goes over to the engineers at the SCVB because

19  they're protect the licenses and the technology.

20         THE COURT:  And so you're rebutting Mr. Stastney's

21  testimony that these people at -- I mean, these folks at SC,

22  SB, SCVB are protecting the license because they're not doing

23  anything untoward.  And your response is that the people at S -

24  - you want Mr. Michaels to testify that no, they're not

25  protecting it.  And they're not protecting it because they've

1    done these things in the past.  And is that past behavior?  Is

2    that MO?  I don't know what that -- I mean, listen.  I don't

3    know.

4            MR. COLBY:  Your Honor, I think there's an overarch

5    of the larger overarching problem with this, which is that

6    we've gotten really far removed from what a TRO or a

7    preliminary injunction is supposed to be about.  It's supposed

8    to be about the potential for immediate.  And the Debtor's have

9    the burden of showing that there is going to be an immediate

10   irreparable harm.  What they're now saying is we should be

11   granted this injunctive relief because Mr. Barenbrug and others

12   are careless.  And so, something bad might happen.  That's

13   essentially what they're trying to say.  They're trying to

14   impugn their character as stewards of technology of the

15   confidentiality of technology.  And therefore, you know, we

16   should get injunctive relief.

17           THE COURT:  Well --

18           MR. COLBY:  That's just on its face fails the test

19   that's required for --

20           THE COURT:  Well, I'm not quite sure if it's that --

21   as that limited as you're saying.  Because what I'm

22   understanding them to say is we're going to have irreparable

23   harm because these people in charge of our technology are not

24   protecting it and they haven't in the past.  So that's the

25   indication that they're not protecting it.  And we're going to

1   suffer harm because they're not protecting it.  That's -- I

2   mean, it's not as limited as you're saying, which is that they

3   might.  They're saying they didn't do it and we don't believe

4   they're doing it now and we're going to be irreparably harmed.

5           MR. COLBY:  There's a number of issues with that.

6           THE COURT:  Woah.  I was talk -- you'll get a chance.

7   I'm having a conversation with Mr. Colby here.

8           MR. COLBY:  There's a number of issues with that.

9   Including that these are the same engineers and it's the same

10  operation that Stream TV itself, the Debtor's owned and

11  operated prior to Judge Laster's opinion in 2020.  And

12  subsequent to the reversal under the Delaware Supreme Court.

13  So it's just like --

14          THE COURT:  Well, I mean, all of this -- listen.

15  I'll probably say something I'll regret.  But this seems to be

16  that engineer from here, to here, to here, to here and -- never

17  mind.  Never mind.  I just don't look to -- never mind.

18          MR. ZAHRALDDIN:  Your Honor --

19          THE COURT:  Go ahead.

20          MR. ZAHRALDDIN:  -- I have to say, let me respond to

21  just a couple things.  The law does not say, it's not

22  characterized irreparable harm the way Mr. Colby set it up.

23  We've cited plenty of cases in this district that all say the

24  same thing.  Any showing of a harm to a trade secret that it

25  may be revealed is irreparable.  Any showing of it is

1    irreparable.  We have those cases.

2          So it's overstating.  This is not -- when you're

3    talking about intellectual property and trade secrets, which

4    are not protected like patens or copyrights or trademarks,

5    there's a very significant issue.  Very significant issue with

6    irreparable harm.  It is immediate.  And, you know, Mr. Kodosky

7    can discuss those a little bit further if you'd like us to.

8          THE COURT:  Well, no.  I mean, we're going far a

9    field because the issue that is -- the precise evidentiary

10   issue is whether Mr. Michaels should be allowed to testify

11   regarding Mr. Barenbrug's relationship with the IP at issue.

12   I'm going to call it IP.  I don't know if that's the trademark.

13   Is it trademark, IP?  What's the correct --

14         MR. ZAHRALDDIN:  It's a trade secret, Your Honor.

15         THE COURT:  Trade secret.

16         MR. ZAHRALDDIN:  The nondisclosure agreement is what

17   the employee would be forced to keep the secret --

18         THE COURT:  Right.

19         MR. ZAHRALDDIN:  -- the trade secret secret.

20         THE COURT:  But was that issue in this TRO hearing is

21   that it's technology that allegedly belongs to the Debtor that

22   they believe is at risk because the entity in the Netherlands

23   is likely to do something with the Debtor's asset that they're

24   not allowed to do.  And that the Debtor will suffer irreparable

25   harm if they're not prevented from doing whatever it is you

```
 1  think they're going to do to harm, or they are doing with

 2  respect to that technology.  And with respect to Mr. Michaels'

 3  testimony, his testimony is that Mr. Barenbrug did not protect

 4  this in the -- I guess did not protect it when he was working

 5  at Rembrandt and can't be trusted to --

 6          MR. ZAHRALDDIN:  Well, and at Stream, Your Honor.

 7  Because this all is the timeline, and these are materials that

 8  Mr. Michaels got through a discovery when he sued Stream

 9  originally.

10          THE COURT:  And sued Mr. Barenbrug.

11          MR. ZAHRALDDIN:  Excuse me?

12          THE COURT:  And sued Mr. Barenbrug.

13          MR. ZAHRALDDIN:  Yes, and all the other engineers

14  that were involved in the --

15          THE COURT:  That allegedly were working for this

16  other company and somehow ended up at Stream and now it's

17  SeeCubic.

18          MR. ZAHRALDDIN:  Which then led to the settlement

19  that we're talking about and that's why it's relevant.  It's

20  relevant because it shows that Mr. Barenbrug and the other

21  engineers have -- well, I --

22          THE COURT:  Can't be trusted with the IP trade --

23  they could be trusted when they were at Stream.

24          MR. ZAHRALDDIN:  That's I believe --

25          MR. COLBY:  It's like a character point, Your Honor.
```

 1  It's tempting to get in at a TRO based on impugning --

 2          THE COURT:  Well --

 3          MR. ZAHRALDDIN:  It's a violation of the trade

 4  secret.

 5          THE COURT:  Well, I'm seeing about impugning.  The

 6  question for me -- again, I have my own thoughts on this stuff

 7  and I'm trying to restrain myself from saying something that's

 8  likely irrelevant.  It's highly irrelevant, just my view of

 9  this.  It's not going to have anything to do on how I decide.

10  But what I'm hearing is that we're going to be harmed because

11  the engineers who are in charge and who are supposedly

12  protecting -- and that's the word.  I'm going to use supposedly

13  or allegedly, protecting our trade secret technology are not

14  protecting it and can't -- and Mr. Stastney testified that they

15  are and there's nothing going on.  And they're saying, no, you

16  can't because these people -- these people that I'm -- I hate

17  using that word, these people, but the engineers have a

18  propensity not to protect trademark, which -- anyway, so that's

19  what I'm hearing.

20          MR. COLBY:  Yeah.  Based upon an NDA with -- or -- or

21  not, and a declaration in a different case from five years ago.

22  I think what -- what -- what the appropriate focus should be is

23  what protections are in place now and -- and the --

24          THE COURT:  Well, the protection that I heard was in

25  place from Mr. Stastney was that, you know, I guess the

 1  engineers, or whoever's working on protecting these assets, and

 2  their position is these people can't -- whoever you're relying

 3  on can't be trusted to protect it.

 4          MR. COLBY:  And that's -- that's the point.  It's

 5  attempting to obtain injunctive relief based on

 6  the -- impuging the reputation --

 7          THE COURT:  You don't have to impugn anyone's

 8  reputation.  You can see what they did or didn't do and tell

 9  me, no, I'm not doing that.

10          MR. COLBY:  And that's -- and that's -- and that's

11  what the focus should be, not -- not attempting to -- and it

12  is.  They're saying that they can't be trusted.  That is

13  impuging somebody's --

14          THE COURT:  Well, I'm not saying they can't be

15  trusted.  They're saying this is what they did in the past.  We

16  believe they're doing it right now.  Is that impuging your

17  reputation?  Maybe it is.  I don't know.

18          MR. COLBY:  It's impuging their character as

19  stewards of trade -- of trade secrets.  It's attempting to get

20  injunctive relief now based on what -- what Debtors say is

21  their -- their character or -- for protecting trade secrets.

22          THE COURT:  Is that their character or their history?

23          MR. COLBY:  Either -- that -- that's what --

24          THE COURT:  That's a little different.

25          MR. COLBY:  That's what character testimony is.

 1   That's what character evidence is.

 2            THE COURT:  Well, no.  Character testimony isn't

 3   necessarily your history.  I mean, it could include that, but

 4   I'm not quite -- and you may be right, Mr. Colby.  I'm trying

 5   to figure out --

 6            MR. COLBY:  It's also -- it's -- it's an allegation.

 7   It's a claim that they made in the past in a lawsuit that was,

 8   you know, dismissed.

 9            THE COURT:  Settled.  No.  It was settled.

10            MR. COLBY:  Well, the -- the claim for violation of

11   an NDA, I believe, was the contract claim that was settled.

12   That was between Stream TV and -- that was between Stream TV

13   and Rembrandt, not Mr. Barenbrug.

14            THE COURT:  Well, I don't know.

15            MR. COLBY:  That was --

16            THE COURT:  I don't know because --

17            MR. COLBY:  That was Stream TV and Rembrandt.

18            THE COURT:  -- I don't have -- I don't have the

19   settlement, unless someone put it in evidence, because it could

20   be and I just don't recall.

21            MR. ZAHRALDDIN:  Your Honor, let me -- let me stop

22   Mr. Colby before he misrepresents something yet again about

23   that --

24            THE COURT:  All right.  Ba, ba, ba --

25            MR. ZAHRALDDIN:  No, no, because this is important.

Case 23-10763-amc Doc 654 Doc 1934-1 Filed 01/22/25 Filed 12/09/24 Entered 01/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition   Page 386 of 541

100

```
 1                THE COURT:  Wait a minute.

 2                MR. ZAHRALDDIN:  This is important.  They keep on

 3   saying --

 4                THE COURT:  Wait.  Wait, wait, wait.  Wait, wait,

 5   wait.  I have told all of you guys, I don't like the, you know,

 6   misrepresent -- he maybe -- he is not recalling correctly,

 7   he's -- something.  But don't -- don't throw those words out.

 8   I don't like those words.

 9                MR. COLBY:  And particularly, it wasn't even -- I --

10   that was very uncivil, and I've done my best to be civil.

11   That -- it wasn't even that I misrepresented something or

12   misstated something.  It was that I was about to.  And

13   that's -- that's --

14                THE COURT:  All right.  All right.

15                MR. COLBY:  -- frankly, the same point they're making

16   about Mr. Barenbrug.

17                THE COURT:  So let's just get to the point.  What was

18   it that you wanted to tell me, because I said I thought it was

19   settled, and Mr. Colby said only with Stream.  And you're going

20   to tell me something else.

21                MR. ZAHRALDDIN:  Well, Your Honor, the part that was

22   dismissed without prejudice was the patent infringement piece,

23   because the Supreme Court decided the Hartland (phonetic) case

24   and said that all patent infringement cases had to be refiled

25   in the place of incorporation, which would be Delaware.
```

```
 1              THE COURT:  Okay.
 2              MR. ZAHRALDDIN:  They instead, as I think has been
 3    produced in evidence in this Court before, have said, no, we
 4    didn't pursue that, we didn't pursue anything further because
 5    we had a settlement.  We had a settlement so we don't pursue
 6    the patent cases.  It's been put into papers without the
 7    qualification of without prejudice multiple times.
 8              THE COURT:  Okay.
 9              MR. ZAHRALDDIN:  So that is a misrepresentation.
10    That is not a disparaging comment.  It is a less -- a less than
11    accurate --
12              THE COURT:  All right.
13              MR. ZAHRALDDIN:  -- portrayal of a dismissal.
14              THE COURT:  Okay.  So it's a less -- let's use
15    the -- let's keep to the phrase.
16              MR. ZAHRALDDIN:  We can tone it down if you'd like
17    but --
18              THE COURT:  Yes.
19              MR. ZAHRALDDIN:  -- that would offend most people.
20              THE COURT:  Less than accurate representation.  And
21    maybe the -- maybe because they didn't think -- I mean, to me,
22    it was without prejudice.  I would put it in there because it
23    means something.  Maybe there's a reason they didn't.  I don't
24    know.  But I would not jump to the conclusion that it -- I
25    could -- I don't know about counsel, but I could come to find
```

Case 24-00654-PD Document: 4 Filed: 12/09/24 Page 143 of 256

that it was a mis- -- it wasn't even a -- we just didn't think it was relevant. I don't know. But the whole point is don't use misrepresentation. Use inaccurate, not a complete representation. The word misrepresentation just has so much --

MR. ZAHRALDDIN: I will -- I will --

THE COURT: Please use -- that's for everybody.

MR. ZAHRALDDIN: But I'll make sure I do that in the future. I just know that oftentimes, because it's such a large record, a lot of things slip by --

THE COURT: Well, they might slip by for now, but if it's on the record, I will read the transcript.

MR. ZAHRALDDIN: Okay.

THE COURT: Don't ever believe, because I don't recall the specifics, that when it comes time to decide, that I'm not going to go over these 50 transcripts. This is not something that I'm just going to do off the top of my head.

So you can point out and say, well, I'd like to make the record complete because Mr. Colby did not give a complete representation --

MR. ZAHRALDDIN: I will do so in the future.

THE COURT: All right. Then -- and Mister -- that's for everybody in here. So Mr. Zahralddin, you want to point out that there were some things omitted by Mr. Colby that would give a more complete representation of what occurred with respect to the --

```
 1                MR. ZAHRALDDIN:  The settlement.

 2                THE COURT:  -- action in --

 3                MR. ZAHRALDDIN:  The settlement.

 4                THE COURT:  -- in the Southern District of New York,

 5    which I think you've already said --

 6                MR. ZAHRALDDIN:  Yes, ma'am.

 7                THE COURT:  -- that it was a case that required the

 8    filing in Delaware.  It was dismissed without prejudice.

 9                MR. ZAHRALDDIN:  Yes, ma'am.

10                THE COURT:  And the parties resolved the entire

11    litigation, which is why you didn't go to Delaware.  "You"

12    meaning --

13                MR. ZAHRALDDIN:  Not me, but Stream obviously and --

14                THE COURT:  Stream -- not Stream --

15                MR. ZAHRALDDIN:  Stream and Rembrandt --

16                THE COURT:  -- Rembrandt did not go.

17                MR. ZAHRALDDIN:  -- decided to settle, yes.

18                THE COURT:  Okay.

19                MR. ZAHRALDDIN:  Which I believe was in testimony in

20    prior hearings --

21                THE COURT:  And what SeeCubic --

22                MR. ZAHRALDDIN:  -- here.

23                THE COURT:  -- would not know because it didn't even

24    exist at the time.

25                MR. ZAHRALDDIN:  Well, SeeCubic wouldn't have because
```

1    Mr. Stastney is the one who signed that agreement.

2            THE COURT:  Okay.

3            MR. ZAHRALDDIN:  And Mr. Stastney was the CFO at that

4    time of Stream.

5            MR. COLBY:  So --

6            THE COURT:  So Mr. Stastney, who is now the --

7            MR. ZAHRALDDIN:  CEO of SeeCubic.

8            THE COURT:  Would have had that information.

9            MR. ZAHRALDDIN:  Yes, he would have.

10           THE COURT:  In his -- in his capacity as an officer

11   of --

12           MR. ZAHRALDDIN:  He was, I think, vice chair of the

13   board as well as CFO of Stream at the time, and he's the one

14   who executed the settlement agreement, which we've heard

15   testimony on before in here.

16           MR. COLBY:  Yes.  Your Honor, if I might?  All of

17   this was covered in great detail the first time Mr. Michaels

18   testified and when Mr. Stastney testified on the Hawk motions.

19   I don't have --

20           THE COURT:  Do you really think I recall that?

21           MR. COLBY:  Yeah.  No, no.

22           THE COURT:  Come on, Counsel.

23           MR. COLBY:  That's why I'm trying to --

24           THE COURT:  And nobody has said they wanted to

25   incorporate by reference any of that testimony.  And to be

 1  honest, you know, I don't recall it.  I recall some of it.

 2  That's why I'm asking, did I see this settlement agreement?

 3          MR. COLBY:  And that's why, Your Honor, that's why I

 4  bring it up.  Not to suggest that you should have recall of it

 5  sitting here today, but simply to say that I don't know why we

 6  seem to have a controversy over this.  The record -- it's in

 7  the record.  It's abundantly clear --

 8          THE COURT:  But it's not a record --

 9          MR. COLBY:  -- what happened.

10          THE COURT:  -- I'm going to look at for this.

11          MR. COLBY:  Right.

12          THE COURT:  Nobody's asking me to go -- because it

13  would be inappropriate for me to say, well, I heard this in

14  here and I'm going to incorporate it here without having the

15  parties address it.  I mean, it's not a continuation of the

16  same matter.  They involve the same parties but they're a

17  different record.  And I don't -- unless the parties ask me to,

18  I do not go look at records in a prior matter.  Now, some

19  things I just may recall and I might drop a footnote saying the

20  Court, you know, based on my understanding, understood

21  something.

22          MR. COLBY:  Well, I think we're talking about it

23  primarily as background for the evidentiary objection for Mr.

24  Michaels' testimony today, not because it's relevant to the

25  current motion.

1          THE COURT:  Right.

2          MR. COLBY:  That's why we're talking about it.

3  So -- but my broader point was it's all in the -- it's all in

4  the record.  I don't think we agree about the facts.  The facts

5  are the facts.

6          THE COURT:  But the facts for me today --

7          MR. COLBY:  Right.

8          THE COURT:  -- are whether the technology, trademark,

9  IP, whatever the appropriate term, is at risk for the Debtor

10  being harmed.  And that is what I am trying to ultimately

11  decide, at least with respect to a TRO.  Okay.  And your

12  position is it's irrelevant because what Mr. Bru -- Barenbrug

13  did in -- what year is this?  2017.  How many years is that?

14  Eight years ago?  No.  That's eight and seven is '25.  Six

15  years ago?  Or soon to be -- soon to be seven.

16          MR. ZAHRALDDIN:  Soon to be seven.

17          THE COURT:  Soon to be seven years ago has no bearing

18  on what -- whether the assets, the trademark of the Debtor is

19  at risk.

20          MR. COLBY:  Correct, Your Honor.  And suffice it to

21  say there was a dispute between Rembrandt and Stream and,

22  apparently, Mr. Barenbrug in that 2017 time period.  There was

23  a dispute.  Rembrandt has made allegations.  The litigation,

24  what happened happened.  Those are just simply facts.

25          The point that I'm making is that that's not -- I'm

1   sure there's, like everything else, two sides to that story.

2   We don't need to litigate it here today.  It's irrelevant

3   and -- it's irrelevant to try to litigate it for its own sake

4   and it's not relevant to the present question about whether or

5   not, you know, injunctive relief is warranted now here today

6   with respect to those assets in the Netherlands.

7         THE COURT:  Well, I understand why the Debtors think

8   it's relevant because they think their IP, trademark, trade

9   secrets are not going to be protected because one of the

10  persons in -- who's allegedly protecting it -- and I don't know

11  Mr. Barenbrug's position, but he's an engineer, I gather.  He's

12  one of the engineers working presently on the disputed IP.

13  Okay.

14        And the question becomes then, is this person who is

15  charged, presumably charged, with protecting the assets of the

16  Debtor can be -- will protect -- will protect that.  And

17  they're saying, no, you can't, see what he did.

18        And so my question again, is this something better

19  left to confronting Mr. Barenbrug about when he testify -- if

20  and when he testifies.  Their position is if you do not call

21  Mr. Barenbrug, they will be unable to show that the people who

22  are in charge of protecting the IT weren't going to protect it.

23  That's their position.

24        MR. COLBY:  Understand that.

25        THE COURT:  And so what I have to figure out is do I

1   let it in now, because you may not call Mr. Barenbrug --

2           MR. ZAHRALDDIN:  Or he may make himself unavailable

3   once he has --

4           THE COURT:  Well, we don't know what he does or won't

5   do.  The question becomes, is how then do they show that it

6   might not be protected by these -- this engineer?  That's the

7   issue for me.  All this other stuff about who did what in New

8   York or said what, this is their attempt to show that it's not

9   being protected and it's not because they're relying on people

10  who have not protected trademarks in the past.

11          MR. ZAHRALDDIN:  And, Your Honor, you were talking

12  about it, is this a character issue or is it an acts issue?

13  It's an acts issue.  And that's something I wasn't able to yet

14  address and I'd like to discuss it with you.

15          THE COURT:  Okay.  You believe it's --

16          MR. ZAHRALDDIN:  Every single time that you have a

17  trade -- there is a common fact pattern with trade secret

18  violations.  Trade secrets can't be protected like other parts

19  of intellectual property.  So what normally happens is a bunch

20  of employees will leave one place, go to the next --

21          THE COURT:  Uh-huh.

22          MR. ZAHRALDDIN:  -- and then it will be a contract,

23  and whatever's not covered by contract is covered by the trade

24  secret laws.  Usually the contract contains a non-disclosure

25  agreement or confidentiality provision.  That's the basis for

```
 1   the fact pattern.  Oftentimes, it's hard to figure out whether

 2   or not they've actually done this or not.

 3              In this case, it's not that difficult to see this

 4   because we have a prior act.  And, again, these are the same

 5   engineers that went from Philips to 3D Fusion, then to Stream.

 6   And it was --

 7              THE COURT:  And then from Stream to where?

 8              MR. ZAHRALDDIN:  Well, right now they're still

 9   supposed to be with Stream, but they have an interim CEO who's

10   taken over our subsidiary.

11              THE COURT:  Oh, okay.  Okay.

12              MR. ZAHRALDDIN:  So --

13              THE COURT:  So they are now -- whoa, whoa, whoa.

14              MR. ZAHRALDDIN:  So they're now at the SC BV.

15              THE COURT:  They're at SC BV, who was related

16   to -- is some --

17              MR. ZAHRALDDIN:  It was, yeah, an indirect

18   subsidiary.

19              THE COURT:  -- related to -- to Stream.

20              MR. ZAHRALDDIN:  Yes.

21              THE COURT:  They are -- I don't know how -- I mean,

22   I'm not -- nobody's saying they're not related to Stream,

23   unless you're telling me they're not, Mr. Colby, because I see

24   you moving around over there.

25              MR. COLBY:  They are.  Sorry, I'm -- I'm very
```

1   interested to respond but I'm doing my best to not.

2          THE COURT:  The problem, as I see it, is that --

3          MR. ZAHRALDDIN:  Your Honor, we had to discipline

4   these engineers once before.  It resulted --

5          THE COURT:  I don't want to hear all that.

6          MR. ZAHRALDDIN:  No, no.  I'm saying it resulted in a

7   billion dollar claim in this case with Rembrandt.

8          THE COURT:  Oh, I -- well -- well, if we're really

9   going to be frank, they came from Rembrandt and then --

10          MR. ZAHRALDDIN:  And they --

11          THE COURT:  Ah, ah, ah, ah --

12          MR. ZAHRALDDIN:  You're right.

13          THE COURT:  They had some association with Rembrandt,

14   whether they were employees, consultant, something.

15          MR. ZAHRALDDIN:  We believe --

16          THE COURT:  Wait, wait, wait.  And Mr. Rajan, I

17   definitely recall this, said that when they got sued, they knew

18   that the people, the engineers that were now related to -- in

19   the company with -- however they were related to Stream, they

20   knew that they had some relationship, and he said some other

21   word, and I think he may have said were engineers at Rembrandt,

22   but I'm going to use the word association, affiliation, some

23   relationship with Rembrandt.  And during the course of the

24   litigation, they came to understand that that association was

25   much more than what they understood.

```
 1              MR. ZAHRALDDIN:  Yes, ma'am.

 2              THE COURT:  Okay?  And then -- then -- then, you

 3      know, you kind of -- never mind.

 4              MR. ZAHRALDDIN:  But that's -- that's exactly it,

 5      Your Honor.

 6              THE COURT:  But they are now these same engineers who

 7      had some -- at least during the course of the litigation,

 8      according to Mr. Rajan, had some affiliation with Rembrandt,

 9      were now affiliated with Stream and now SC BV and now SeeCubic.

10              So you're now saying these same people who went from

11      here to here to here to here, we don't believe our -- our

12      Stream is being protected.  That's what I get out of this.

13              MR. COLBY:  Understand, Your Honor, a couple of

14      things.  I think this demonstrates why -- two primary points

15      really.  I think this demonstrates why we should limit the

16      degree to which the parties, the Debtors, are trying to address

17      their current request for a TRO by litigating issues that were

18      a part of litigation five years ago, and that was resolved.

19      Like I said, there are, I'm sure, two sides to that story.  I'm

20      resisting the urge to litigate it here just by --

21              THE COURT:  Well, I'm not --

22              MR. COLBY:  -- testifying from the podium.

23              THE COURT:  -- quite sure that the parties are trying

24      to litigate it, but go ahead.

25              MR. COLBY:  Well -- and so it's -- it's -- I think
```

 1  we'd all be well served by staying focused on, you know, the

 2  current issue at hand, protections around trade secrets at

 3  SeeCubic BV and not trying to relitigate these old claims.

 4          Secondly, these -- just -- the -- I'm not sure that

 5  the facts are quite as they've been portrayed, at least in the

 6  following sense.  These individuals had been at SeeCubic BV

 7  since 2011.  They were at Philips prior to that.  There's not

 8  been hopscotching from entity to entity.  They've been at

 9  SeeCubic BV since 2011.

10          THE COURT:  I'm not saying hopscotching.

11          MR. COLBY:  And -- and -- so I -- and then to Mr.

12  Zahralddin's point about trade secret cases where employees

13  move from one company to another, that's not happening here.

14  There's no claim that the engineers are about to leave to go

15  to --

16          THE COURT:  I'm not talking about them leaving, and

17  I --

18          MR. COLBY:  Right.

19          THE COURT:  I'm just repeating the history as has

20  been set forth in this company as to the evolution of these

21  engineers --

22          MR. COLBY:  And --

23          THE COURT:  -- and where they've gone -- and where

24  they started, where they went, and where they are.

25          MR. COLBY:  And I'm not sure that that's -- I'm not

 1    sure that that evolution is accurate.  I don't think it is, but

 2    I'm -- again, I'm trying not to relitigate all that here.

 3            THE COURT:  Well, you're telling me -- so you're

 4    saying Mr. --

 5            MR. COLBY:  But they've been at -- they've been at

 6    SC SeeCubic BV since 2011.

 7            THE COURT:  That's nice.

 8            MR. COLBY:  The ownership by virtue of this

 9    litigation and the omnibus agreement has changed, but they've

10    been at SeeCubic BV since 2011.  This is not a case where

11    employees have moved to a new entity or have plans to move to a

12    new entity.  They've been there doing the same work while

13    people fight about who -- who owns them.

14            THE COURT:  Well, I think it's more than they fight

15    about who owns it.  These engineers are engineers.  They

16    probably just want to do their work, leave me alone and then

17    pay me.  Okay?  I suspect that's what they want.

18            MR. COLBY:  Probably.

19            THE COURT:  Okay.  But, Counsel, you cannot, unless

20    somebody's telling me I have a misunderstanding of what the

21    testimony in -- was here, was that these people were at

22    Michaels -- I mean at Philips, Philips, Rembrandt claimed they

23    worked for their predecessor, whatever their name is because I

24    cannot recall --

25            MR. ZAHRALDDIN:  3D Fusion.

Case 2:23-cr-00654-DCN Document 934 Filed 01/22/25 Entered 01/22/25 16:45:46 Desc
Exhibit A   Mandamus Petition   Page 400 of 541

114

1          THE COURT:  -- 3D Fusions, which they said they

2   didn't, they ended up at Stream, Rembrandt sued Stream saying

3   these people really work for us and took our technology to you.

4   I think that was the -- I haven't read the complaint, but based

5   on the testimony that I've heard, that was what was going on.

6          MR. COLBY:  No.  There was no trade secret claim in

7   that case.

8          THE COURT:  Whatever -- whatever --

9          MR. COLBY:  It was a patent case.

10         THE COURT:  Whatever it was, the claim from Rembrandt

11  is that you took our information and went to Stream with it.

12  Mr. Rajan's testimony was, during the course of the litigation,

13  we claim to understand that that was a more -- I'm not sure

14  what word he used, deeper, maybe, relationship between these

15  engineers and Rembrandt.  And then these engineers ended up at

16  SC BV.  They went from here to here.  Sometimes maybe you reap

17  what you sow.

18         But in any event, these same engineers have had a

19  relationship with -- with Philips, perhaps with Rembrandt, and

20  definitely with Stream and Stream's subsidiary -- whatever --

21  however related company or something.  Or they have a

22  relationship, maybe not directly with Stream, but a company

23  related to Stream because it's owned by a subsidiary who's a

24  subsidiary of Technovative, who's owned by Stream, or whatever.

25  But they're not some unrelated, unknown entity.  And that's the

1    course of where they've gone.  Okay?

2         And what I'm hearing is Mr. Barenbrug in particular,

3    you know, said one thing here and we believe he's not going to

4    protect us because he did this.  I don't know if he is or

5    isn't.

6         So we have spent more time than necessary trying to

7    figure out whether I'm going to allow Mr. Michaels testify

8    regarding what Mr. Barenbrug did in a hearing and whether, in

9    fact, Mr. Baren- -- what he really, I'm sure, wants to show is

10   that Mr. Barenbrug actually had some sort of -- whatever that

11   relationship was, and we -- and they -- and that somehow will

12   show that if Mr. Barenbrug is one of the people who's supposed

13   to be protecting it, he likely will not.  That's what this is

14   about.

15        And you're saying, who cares what he did in '17.

16   That didn't mean he's doing it today.  Is that what

17   you're -- even if -- even if we find that what he did in '17 is

18   correct, what does that have to do with today?

19        MR. COLBY:  It's an allegation from 2017.

20        THE COURT:  Well, it's an allegation that this is

21   what he said and we have some document.  Again, the question

22   becomes:  Do we just wait until Mr. Barenbrug testifies and

23   then they confront him with this?  And what happens if he

24   doesn't?  How do they then prove that the engineers who were

25   supposed to be protecting this can't be trusted to protect?

1   Then they go call Mr. Barenbrug?  Maybe you call him.  I don't

2   know.

3             MR. COLBY:  I think, Your Honor, I mean, that's part

4   of the problem with the -- that's part of the problem with

5   where we are on this request for injunctive relief to begin it.

6   It's incumbent upon the Debtors to establish that there is a

7   serious risk of irreparable, imminent harm and -- and they

8   really have not, other than Mr. Rajan's sort of say-so, they've

9   really not put forth any evidence that there is a lack of

10  protections around the trade secrets at --

11            THE COURT:  Well, they want to with the information

12  about Mr. Barenbrug.

13            MR. COLBY:  And -- and the idea that somebody was on

14  the receiving end of allegations related to a patent seven

15  years ago, therefore, warrants immediate injunctive relief now

16  is what I'm suggesting, it's insufficient, it's not relevant.

17  We should be focused on what's here.

18            THE COURT:  Well, we're not -- okay.

19            MR. COLBY:  Or we're going to end up relitigating the

20  2017 case --

21            THE COURT:  Well, we're not relitigating anything.

22            MR. COLBY:  -- and the history of the employees and

23  why they left Philips and the fact that Philips was getting out

24  of business.  I mean, there's a whole other --

25            THE COURT:  I don't need to know -- the whole point

```
 1  of the matter is the history is what the history is, and I'm

 2  going to -- I'm going to see it the way I see it.  And that's

 3  just the way it is.

 4           MR. ZAHRALDDIN:  Your Honor, we're not trying to show

 5  any of that.  We just want to show that we have two documents,

 6  one of which has already been partially discussed where Mr.

 7  Barenbrug says under oath A, B, C, D, E, and F.  And --

 8           THE COURT:  And what relevance does it have --

 9           MR. ZAHRALDDIN:  It's relevant because, Your Honor,

10  unfortunately, maybe Mr. Colby doesn't remember his own

11  comments from 10 minutes ago, he says this was not a trade

12  secret case.  As I explained, all trade secret cases are

13  non-disclosure agreement contract disputes unless you're going

14  under the statute, one statute of which had no private right of

15  action and didn't exist at that time, which is a defend trade

16  secret act.  You have trade secrets that you go under state law

17  under statute and then you always have a contractual dispute.

18  That is what was focused on in this case.  So it was

19  completely -- all that was left was a trade secret case.  So

20  this is completely -- maybe a failed --

21           THE COURT:  Inaccurate description.

22           MR. ZAHRALDDIN:  An inaccurate description.  So what

23  we're simply trying to do is show that this was an act by this

24  engineer who is now here, and I'm going to give him the benefit

25  of the doubt even though --
```

1          THE COURT:  Even -- no.  No comment.

2          MR. ZAHRALDDIN:  He doesn't know who he's supposed to

3    be listening to at this point.  We don't even know if we can

4    call him since he's one of our employees, because we have an

5    interim director over there at this point in time.

6          THE COURT:  Well, apparently the interim director

7    didn't -- couldn't force them to testify.

8          MR. ZAHRALDDIN:  Apparently.

9          THE COURT:  Apparently he couldn't because the only

10   reason they agreed to testify was because their personal

11   attorneys -- personal attorreys directed them to do so, which

12   is why I was a little irate because I couldn't understand why,

13   if these parties were so -- wanted to bring these people, why

14   they didn't go to the company and ask the company.

15         MR. ZAHRALDDIN:  And the --

16         THE COURT:  I already said what I was going to.

17   Don't get me started on that again.

18         MR. ZAHRALDDIN:  I just don't know who their personal

19   attorneys are, Your Honor.

20         THE COURT:  I don't know either.  I have no -- and I

21   was assured that their personal attorney was not the company's

22   attorney.

23         MR. ZAHRALDDIN:  Or SeeCubic's attorney or

24   Mr. Stastney's attorney or anybody else.

25         THE COURT:  Well, I didn't know --

1          MR. ZAHRALDDIN:  We weren't sure of any of those

2     things.

3          THE COURT:   -- that they were there -- they weren't

4     the company's.  I didn't ask anybody if they were

5     Mr. Stastney's.  I didn't ask anybody if they were SeeCubic

6     Inc.'s.  I didn't ask anybody if they were Hawk's, SLS, or

7     anybody else's attorney.  I understood that they were their

8     personal attorney, having nothing to do with any of the

9     parties, and that they had engaged their own counsel for their

10    own reason.  I guess they felt they had to, whatever, given

11    what was going on in the Netherlands.  That is what I

12    understood.

13         I'm not going to rehear that because I'm just going

14    to be a little more annoyed and I -- I -- the way I am is I say

15    what I have to say the day I say it.  You come back and talk to

16    me tomorrow and I'll be going, well, that was yesterday, and I

17    want to leave that for last Wednesday.

18         MR. ZAHRALDDIN:  I've -- I wholeheartedly agree.  And

19    we simply want to be able to show what was done by the prior

20    engineers.  It happens to be it's also Mr. Barenbrug.  And we

21    also have information as to why he doesn't want to come here.

22    It has nothing to do --

23         THE COURT:  Well, I don't know why he don't want to

24    come.  That has nothing to do with whether you get to put in

25    the information about who's supposed to be protecting this -- I

1    don't know what you guys want to call it now.  Trade secrets,

2    is that --

3          MR. ZAHRALDDIN:  It's intellectual property.  It's

4    our intellectual property.

5          THE COURT:  I said IP but I was heard -- said no,

6    it's trade secret.  I don't know what --

7          MR. ZAHRALDDIN:  It's --

8          THE COURT:  Whatever it is, the asset, I'm going to

9    call it the asset of the Debtor that you're trying to protect,

10   which I understand, I'm sure there's a disagreement, but what

11   I'm hearing, that the Debtor has a license with Rembrandt and

12   that's the asset the Debtor wants to protect.

13         MR. ZAHRALDDIN:  As well as our trade secrets which

14   are --

15         THE COURT:  Whatever else that is.

16         MR. ZAHRALDDIN:  On top of that, yes.

17         THE COURT:  But that's the asset.  And you believe

18   it's not being protected because the people in charge of

19   protecting it -- which, really, I'm not sure how the engineers

20   are in charge because they're going to do what they're told.

21         MR. ZAHRALDDIN:  That's not --

22         THE COURT:  They're not the ones running out here

23   supposedly licensing this.

24         MR. ZAHRALDDIN:  No.  But that's the problem, Your

25   Honor.  That's what they've seen.  Mr. Theune and all the other

```
 1   folks are all engineers.

 2            THE COURT:  I don't want to hear about them.

 3            MR. ZAHRALDDIN:  They're all engineers, though, Your

 4   Honor.  There's nobody running the place other -- it's been in

 5   limbo --

 6            THE COURT:  Well, somebody's --

 7            MR. ZAHRALDDIN:  -- during this dispute.

 8            THE COURT:  -- in charge of this company.

 9            MR. ZAHRALDDIN:  The engineers are in charge.  There

10   is no other person who's there.

11            THE COURT:  Mr. Stastney is there.  Now, is he

12   direct -- supposed to be directing them?

13            MR. ZAHRALDDIN:  Well, we can -- we can discuss

14   that --

15            THE COURT:  Ah, ah, ah.  I didn't --

16            MR. ZAHRALDDIN:  Not now but we can discuss it when

17   it comes up.

18            THE COURT:  When Mr. Stastney come up here and

19   testify, you can ask him whatever.

20            MR. ZAHRALDDIN:  That's exactly what I'm going to do.

21            THE COURT:  But I'm -- that's not my point.  My point

22   is, are these people the people running the company, Mr.

23   Barenbrug?

24            MR. ZAHRALDDIN:  They certainly would be the ones who

25   would have access to the technology and access or ability to
```

1    open up the technology to other people --

2            THE COURT:  Why would they do that?  They're not

3    running the company.

4            MR. ZAHRALDDIN:  Because that's what was -- the

5    testimony was let's go to Hyundai (phonetic) and theirs is an

6    open kimono business plan.  They give them --

7            THE COURT:  But that's a company.

8            MR. ZAHRALDDIN:  Excuse me, Your Honor?

9            THE COURT:  That's the company.  How does that --

10           MR. COLBY:  That also wasn't the testimony.

11           THE COURT:  Well, okay.  Well, maybe you mis -- mis

12   --is there such a word as misremembering?  Probably not but I'm

13   going to use it anyway because my kids use it all the time.  I

14   misremembered.

15           Yeah, okay.  But that's the point.  We have spent

16   more than enough time on whether I -- I could have just said

17   I'll allow it for what it's worth, and whether I'll consider

18   it, I don't know.  I think that's probably what I should have

19   done, because we have already spent I don't know how much time

20   trying to figure out whether I'm going to allow this for what

21   it's worth, which may be nothing.

22           And, you know -- and, Counsel, I think that's going

23   to be typically my approach, is I'll allow it for what it's

24   worth, whatever weight I think it is I'll give it, and if

25   somebody thinks I shouldn't have, because somebody is not going

1  to like what my -- somebody's not going to like my decision and

2  so, dimes to doughnuts, somebody's going to -- well, I don't

3  know if you can do one on a -- but at some point appeal and you

4  want to preserve the record.  I get it.  And that's why I'm

5  being very cautious about my evidentiary rulings because I know

6  this is what -- this is not even for me.  This is for the

7  district court.  Let's call it like it is.  Okay.  And so now

8  that we have spent --

9           Jon, what time we started talking about this?  Do you

10  keep track of time?  Well, we know it was before Mr. Sutton

11  (phonetic) returned --time you got back.

12           UNIDENTIFIED SPEAKER:  It was one --

13           THE COURT:  No, two.

14           MR. CAPONI:  One thing we probably all agree on is

15  that we spent some time on this, Your Honor.

16           THE COURT:  Yes.  Too much time.  So I'm going to do

17  what I should have done at the beginning.  I'll allow it for

18  what it's worth, which may be nothing.  I may give no weight to

19  it.

20           UNIDENTIFIED SPEAKER:  But --

21           THE COURT:  Who's saying "but" over here?  Did I hear

22  somebody say something?

23           UNIDENTIFIED SPEAKER:  No.  No, ma'am.

24           THE COURT:  All right.  Who's talking?

25           UNIDENTIFIED SPEAKER:  Here's some information.

```
 1              THE COURT:  No thank you.  My watch is going to give

 2   me information on Adco (phonetic) records.

 3              UNIDENTIFIED SPEAKER:  Oh, Adco --

 4              MR. CAPONI:  Your Honor?

 5              THE COURT:  Uh-huh?

 6              MR. CAPONI:  Sorry.  Logistically, what time do you

 7   think we'll be going to today and would this be an appropriate

 8   time to take a break so no one gets angry?

 9              THE COURT:  Well, I did take a snack when I went

10   back.

11              MR. CAPONI:  Okay.

12              THE COURT:  Because I had to deal --

13              MR. CAPONI:  I was talking about Mr. Colby, not you,

14   Your Honor.

15              THE COURT:  No.  I -- I have -- I have recognized

16   that I can be -- which I accuse my kids of being hangry.

17   Apparently, I have the same trait.  And I thought I was doing

18   pretty good.  I haven't gotten angry today.  But I also walked

19   a mile and a half this morning before I came in here to set the

20   tone.  So that would be fine.

21              I also probably can go late.  I just have to confirm

22   that -- not with -- I need to confirm with the CSOs how late

23   they want us in here.  You know, I went to midnight.  They were

24   very unhappy with me.  So I don't plan to do that.  Okay.

25   Extremely unhappy.  So we can -- we need to go 6, 6:30, I need
```

1   to confirm with them first.  That's not a problem because I

2   made my schedule so that was a possibility.

3          And we still haven't even finished Mr. Michaels.  And

4   then we have to do Mr. Stastney, which we have not -- I

5   don't -- I think our schedule did not -- I think our next

6   hearing on this is with the two Zoom witnesses; right?

7          MR. COLBY:  Yes, ma'am.  And we're waiting for the

8   other side to provide some dates, is my understanding.

9          THE COURT:  But we didn't have a continued date from

10  today.

11         UNIDENTIFIED SPEAKER:  Correct.

12         MR. COLBY:  Correct.  Correct, Your Honor.

13         THE COURT:  You guys think about that, okay,

14  about -- because there's no way we're going to get through

15  Mister -- unless you have five minutes for --

16         MR. COLBY:  I actually don't expect to be long with

17  Mr. Michaels.

18         THE COURT:  But I don't expect we're going to finish

19  Mr. Michaels and Mr. Stastney today, are we?

20         MR. COLBY:  I don't know.  It depends, I suppose, on

21  how much cross for Mr. Stastney.  I don't -- Ms. Brumme's

22  actually going to handle Mr. Stastney as a witness.

23         THE COURT:  Oh, the boss is going to handle it;

24  right?  Right.  Okay.

25         So what I would suggest is you guys think about some

 1   dates in the events we do not get through Mr. Stastney's

 2   testimony.  We already -- what date do we have -- we don't have

 3   dates for the Zoom people -- I'm calling them the Zoom people.

 4   The Netherlands folks we don't have.  And it's almost December.

 5   I -- I'd like to at least rule on this if I have to while in

 6   the same time striving to get the other -- working on that.

 7          MR. ZAHRALDDIN:  And, Your Honor, we also have a

 8   rebuttal witness to their engineers as well, Mr. Banergy

 9   (phonetic), which I need to get names for.  So we mentioned him

10   on Wednesday as well.  But he would be remote.  He would be by

11   Zoom as well.

12          THE COURT:  I get it as -- the thing about remote, we

13   can do it in -- we don't need a whole day.  If you say, I want

14   to do this witness from 12 to 6, we can do that.  The problem

15   is, is that, and I'm not sure -- you know, I have allowed one

16   attorney to -- with all the witnesses here because she had

17   medical issues.

18          When I was talking, when we were trying to look

19   through the logistics, it's not going to work for half of us to

20   be here and half of the attorneys on Zoom.  It just,

21   logistically, is not going to work.  I know we have two of

22   these things, but I don't -- we can't do that.  I have two at

23   one time.  The old one and the new one.  Or might have bought

24   -- is this the one we're sharing with everybody?

25          THE CLERK:  Yes.  What -- what do you mean two to

1 have?

2          THE COURT:  Like half the people on one screen, half

3 on another.

4          THE CLERK:  I mean, in theory, there would just be

5 another bubble on the -- on the screen.

6          THE COURT:  I know.  They told me that that's not

7 going to work.  Never mind.

8          So, in theory, I thought about it but it didn't make

9 sense.  But, you know, I don't know if people want to just keep

10 running to Philadelphia for a half a day.  That's the -- I

11 mean --

12          UNIDENTIFIED SPEAKER:  Understand.

13          THE COURT:  You know, but if that's the way it's

14 going to work, maybe you do it two afternoons so you come in on

15 the Monday, you're doing Monday afternoon, you stay overnight,

16 you do it Tuesday afternoon, we're done.  Instead of the other

17 way.  So think about all of that.

18          And, again, I'm going to tell everybody, Ms.

19 Godfrey's gone December 31st and I'm not quite sure -- you

20 know, she had 30 years as a courtroom deputy so whoever's new

21 is not going to have any experience.  Not saying they're not

22 going to do a good job.  I'm sure whoever is going to do a

23 great job.  I'm just saying you're going to have to be patient

24 at that point.

25          Okay?  All right.  We'll go in recess.  Let's say

```
 1   3:15, unless you guys need longer to run and get something to

 2   eat.  Around here, I don't know what they have now.  Chinatown

 3   but that's kind of far.  What do they have?

 4            UNIDENTIFIED SPEAKER:  Not for a half an hour.

 5            MR. CAPONI:  3:30?

 6            THE COURT:  3:30.  45 minutes.  If you need longer,

 7   just come back.  Court is in recess until 3:30.

 8            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

 9            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10       (Recess taken)

11            THE CLERK:  All rise.

12            THE COURT:  Please be seated.

13            Okay.  We left with Mr. Michaels going to be examined

14   regarding Exhibit 84 and whatever else.  And again, I reserve

15   to give it whatever weight, if any, with respect to these

16   matters.

17            All right.  And with respect to the issue of

18   addressing the issue of a preliminary injunction, what it says

19   is well-established that a preliminary injunction is

20   customarily granted on the basis of procedures that are less

21   formal and evidence that is less complete than in a trial on

22   the merits.

23            So I mean, at this point, I am not even sure if we

24   are talking about, really talking about a TRO because a TRO --

25            Oh, is that rain?  I know it couldn't be rain.
```

1              MR. COLBY:  It looks like the 4:15 is a little early.

2              THE COURT:  I am like, it can't be rain.

3              You know, in my experience, which is, you know, for

4    what it is worth, when I needed a TRO, I had a hearing in the

5    morning and I had a decision by the afternoon, at most, the

6    next day.

7              This hearing, this has been going on since October

8    6th.  Is this really a TRO or are we doing a -- what are we

9    doing that -- you know?  And so that is why I am kind of, you

10   know, is this really a temporary restraining order?  Is this a

11   TRO, a permanent?  What exactly are we doing here?  That is

12   sort of my question.

13             When you said to me that a preliminary injunction is,

14   you know, you don't have all of the niceties with a formal

15   final trial.  But we are doing that.  I mean, I don't know.

16             Mr. Zahralddin, you stood up, so you tell me.

17             MR. ZAHRALDDIN:  Well, Your Honor, certainly I agree

18   with you that a TRO would have been a lot nicer earlier on.  I

19   think we have probably had enough evidence for a preliminary

20   injunction.  But certainly, a permanent injunction would have

21   required a much higher standard in discovery, I would imagine.

22             But I do think that the case law that we presented

23   discussed both preliminary injunction and TRO as having a

24   little bit of an easier evidentiary process, so to speak,

25   because you are trying to do your best to prevent harm that we

Case 23-12763-amc Doc 654 Doc 1934 Filed 01/22/25 Filed 12/09/24 Entered 01/22/25 16:41:46 Desc
Exhibit A   Mandamus Petition   Page 416 of 541

130

1    believe is imminent to give us time to preserve whatever the

2    status quo is we are protecting, up until we get to see whether

3    or not we, you know, warrants a --

4            THE COURT:  Uh-huh.

5            MR. ZAHRALDDIN:  -- permanent injunction, yeah.

6            Plus, you have the overlay in this case of a lot of

7    the same activity, we believe, are violations of the automatic

8    stay.  Which again, you know, I have discussed with you before,

9    I think at the --on the conference, and I floated it out to

10   other folks too, in some very brief preliminary discussions,

11   nothing too deep, that a lot of the same evidence is applicable

12   to sanctions and/or any sort of other finding of actual

13   violations of the stay.  So I agree with you.  I think, you

14   know, we should have already had the benefits of the automatic

15   stay here.

16           THE COURT:  Well, you already have the benefits of

17   the automatic stay.

18           MR. ZAHRALDDIN:  Yeah, well, it doesn't seem like it.

19   We have people going into other courts in other places.  We

20   have presented case law that indicates that even if it is a

21   non-debtor subsidiary, if anything happens in those

22   subsidiaries that would affect the distribution in this case,

23   both the technology and the money owed to Stream from the

24   subsidiary qualify for that.  We have people going in to the

25   trademark office, not --

1          THE COURT:  Yeah, but I didn't have that until today,

2  so.

3          MR. ZAHRALDDIN:  Well, that is -- that happened,

4  because it only happened two weeks ago, that there was --

5          THE COURT:  Oh, so even if I had issued it,

6  supposedly, I had granted it.  I am not saying I would, I am

7  not saying I wouldn't.

8          MR. ZAHRALDDIN:  I --

9          THE COURT:  But had I, that wouldn't have been

10  evidence that I would have -- but the whole point of the matter

11  is, I am sort of thinking this through.  And where, I mean, is

12  this really a TRO at this point?

13          MR. COLBY:  Your Honor, I think the fact that seven

14  or eight weeks have gone by since it was first filed, and no

15  calamity has befallen the Debtor's assents belies, you know,

16  belies the purported basis for it in the first place.  There is

17  no imminent irreparable harm.

18          THE COURT:  Or maybe people stopped doing what they

19  were --

20          MR. COLBY:  It was supposedly about the --

21          THE COURT:  But Counsel, it could be that people

22  stopped doing what they were doing.  I don't know.

23          MR. COLBY:  Well, there was a --

24          MR. ZAHRALDDIN:  Well, I am sorry, I didn't --

25          THE COURT:  No, no, it is Mr. Colby's turn.

 1          MR. ZAHRALDDIN:  -- I didn't realize because he is

 2   behind me.

 3          MR. COLBY:  The Debtors came through the door raising

 4   hue and cry about a threat to the Philips license.  And that

 5   just doesn't -- hasn't panned out.  I think there is sufficient

 6   record to deny the request.

 7          In terms of whether or not this could be a permanent

 8   injunction, that would require discovery.  And in my -- and so

 9   I don't think that is appropriate now.  And in my experience, a

10   preliminary injunction also incorporates some discovery into

11   the process.  And I think it makes no sense whatsoever to begin

12   that process now.  The Debtors have the burden here.

13          THE COURT:  Well, a preliminary --

14          MR. COLBY:  The Debtors have the burden here, and

15   they failed to demonstrate --

16          THE COURT:  Well, I don't know what they failed to do

17   or not --

18          MR. COLBY:  --any need --

19          THE COURT:  -- failed to do at this point.

20          MR. COLBY:  -- for this.

21          THE COURT:  I don't know.  My question simply was

22   where do the parties believe we are?  And the case law that

23   they gave me said that in a preliminary injunction, it is

24   customarily granted on the basis of procedures that are less

25   formal, and evidence that is less complete than a trial on the

 1    merits.  And we have been treating this sort of like a trial on

 2    the merits as opposed to a preliminary hearing on whether I

 3    should issue, well, first the TRO, I don't know about whether

 4    that is where we are, or whether I should issue a preliminary

 5    injunction.

 6           And so that really, I mean, I have been thinking

 7    about this all along, having nothing to do with the issue of

 8    the level of evidence or the issue of hearsay about

 9    particularly where we are given the length of time that has

10    expired in terms of the hearing that started on October 6th.

11    It is almost going to be 60 days later.  I am not sure whether

12    a -- you know, TRO is like, you get it right then and there.

13    This sort of morphed into this something beyond that.  So I

14    mean, I don't know if that is what I am really looking at or

15    looking at a preliminary injunction.  I don't know, I guess I

16    will have to figure that out.

17           But whether it is a TRO or a preliminary injunction,

18    the case law seems to suggest that hearsay and a less stringent

19    evidentiary standard is allowed in a preliminary injunction

20    TRO.  So that really went to two different things.  One was the

21    evidentiary record, and the other was just what are we doing

22    here?  Because this isn't something that I am just thinking of

23    now.  I have been saying for a bit now, like, what exactly are

24    we doing?

25           So with respect to the evidence, the Third Circuit

 1  has said what it said with respect to the stringent evidentiary

 2  rules, either in the TRO or preliminary injunction.  This is

 3  not a hearing on a permanent injunction, clearly.  So with

 4  respect to that, I think the rules are not as stringent, which

 5  is why I said, you know, I had already read this case while we

 6  were taking, which is I said I will, you know, I will allow it

 7  for what it is worth and give it whatever weight.

 8          But at some point, we have to get this done because I

 9  will be -- you know, I don't know.  I have only heard one side,

10  you know?  And sometimes, you only hear one side.  Well, in the

11  ex parte, you get it without anybody's -- you just get it on

12  the papers.  But typically, you know, you come in, you make

13  your arguments.  The other party makes theirs, and then the

14  judge, you know, gives you a TRO and then schedules, if

15  necessary, or you know, within whatever the time period is for

16  a preliminary injection.  But mine were always simple.

17          MR. COLBY:  Yeah.  Your Honor, I mean --

18          THE COURT:  They weren't this complicated.

19          MR. COLBY:  And one of the consequences of this, and

20  I think, again, it speaks to the, really, a basis for denying

21  the request is that the purported basis for it, the longer this

22  goes on, it keeps shifting.

23          So initially, it was all about the Philips license.

24  There was a passing reference to trade secrets in the initial

25  papers.  Mr. Rajan's declaration said nothing about concern

1   about the security of trade secrets.  If it was that mission

2   critical, that important, you would think he would have brought

3   it to the Court's attention, and he didn't.

4           Then, when Mr. Stastney testifies as part of their

5   case, and he is asked over and over again, so you are not about

6   to issue a sublicense?  You are not about to issue a

7   sublicense?  He said no, we have demonstration projects that

8   are months from being completed.  Then, the customer decides if

9   they want to do it.  Then, we have to talk about what that

10  might look like.  And so that whole basis for this motion was

11  what had zero evidentiary support, and it could have been

12  denied then.  We have now moved to this trade secret issue, and

13  that wasn't really part of the --

14          THE COURT:  Was the trade secret never referenced or

15  it was --

16          MR. COLBY:  There was a passing reference.

17          THE COURT:  It was referenced?

18          MR. COLBY:  It was referenced.  But again, if it was

19  such a critical thing, you would think it would have merited a

20  sentence or two in Mr. Rajan's declaration that he had some

21  concerns about the security of trade secrets.  So now, we are

22  litigating that issue.  And there is no evidence --

23      (Phone system chiming)

24          THE COURT:  Are we getting more people?

25          MR. COLBY:  There has been no evidence about what the

1    specific trade secret protections are or are not at SCBV

2    (phonetic) right now.

3              THE COURT:  Oh, this is Mister --

4              MR. ZAHRALDDIN:  Michaels.

5              THE COURT:  No, Mr. Rajan's --

6              MR. ZAHRALDDIN:  Mr. Rajan did testify, yeah.

7              THE COURT:  -- testimony was that there is some,

8    based on his observation, he believes --

9              MR. COLBY:  In April.

10             THE COURT:  It doesn't matter.

11             MR. COLBY:  Well --

12             THE COURT:  Well, you know, have they changed?  He

13   believes that it is what it is.  Not -- will you tell me there

14   are some things I am not concerned about?  I will tell you

15   frankly, all of you, there are.  And somebody better have a

16   good explanation why I shouldn't be concerned.

17             So while this may have morphed into some other

18   things, and whether whatever, maybe this was better in

19   violation of a state litigation., I think what I understood

20   prompted this was Mr. Stastney's testimony at the hearing in

21   the Dutch court, for which we have no transcript.  A transcript

22   would have ended all of this.  It would have said what he said

23   or what did not say.  It is a he said/she said, well, maybe he

24   said/he said, in this case.

25             And so yes, while it has gone from we are going to

1   lose our license because Mr. Stastney has testified that he

2   plans to license this, and that he is not protecting our

3   assets.  That is pretty much what I was hearing.

4           And now, it is like he didn't protect it because they

5   aren't using some sort of whatever term it is.

6       (Phone system chiming)

7           MR. COLBY:  It is blocked, Your Honor.  They encrypt

8   the algorithm.

9           THE COURT:  If it is not encrypted or whatever.  You

10  are going to bring somebody to say it is, so it's protected.

11  Therefore, we don't need an injunction because we're not.  We

12  have Mr. -- you know, we have all of this other,

13  notwithstanding Mr. Stastney's testimony that he is not going

14  to license, there is evidence that he said he would.  Now, is

15  he doing it?  I don't know.

16          Okay.  I am just telling you what I have seen.  I

17  haven't heard Mr. Stastney's explanation in response to any of

18  this stuff, other than his original testimony.

19          MR. COLBY:  Correct, yeah, which I think addressed

20  that squarely.

21          THE COURT:  Okay.  And so that, to me, is some

22  issues.  And then, there are some other issues about what they

23  are doing, who they are doing it with, and whether they like

24  it.  Whether you guys like it or not, there is a license that

25  was granted by someone else to the Debtor.  And I don't think

Case 2:23-cr-00654-DRL Document 934 Filed 01/22/25 Entered 01/22/25 16:41:46 Desc
Exhibit A    Mandamus Petition    Page 424 of 541

138

1    anybody is arguing that Rembrandt licensed something to the

2    Debtor.  There may be a dispute over what that license entailed

3    and what it allowed the Debtor to do with it.  But it is clear,

4    whatever that license was or is, SCBV did not just come out of

5    nowhere.  It didn't.  There is a -- it used that license,

6    whether it was authorized, unauthorized, given to them,

7    whatever.  Okay?  That is not disputed.

8         What I think you guys, is well, we took it and we did

9    something else with it.  I am not a IP lawyer.  I don't know

10   how IP works.  I mean, I have an idea, but I have never been

11   involved in IP litigation.  I know in bankruptcy what it means

12   in terms of use and reject, and all of that other stuff.  But I

13   can tell you, at some point, this is either assets that the

14   Debtor has and the Debtor did something with the license, or it

15   didn't.  Because there is no dispute that the Debtor had some

16   kind of license.  What the Debtor did with that license and

17   what other parties did with it thereafter, that is all you guys

18   are all fighting about.  That is what you are fighting about.

19        But at the end of the day, the license originated

20   with the Debtor.  It means something.  And what somebody did

21   with it or improved on it, if it originated with the Debtor, it

22   is an asset of the Debtor that the Debtor has done something

23   with or hasn't done something with.

24        And so to that extent, I will tell you, if anybody is

25   doing anything with assets that belong to the Debtor's estate,

1   we are going to have a problem.  That is just the bottom line.

2   I don't care how it got to me.  I don't care if he mentioned it

3   first day, second day, fourth day, eighth day.  If you are

4   doing something that you are not supposed to be doing with an

5   asset that belongs to the Debtor, you have a problem.  And I

6   don't care whether we call it TRO, preliminary injunction, it

7   is not permanent, that is where we are.

8          And so they are saying they mean, SCB -- SeeCubic's

9   -- we are not doing anything with the assets of the Debtor,

10  nothing.  We are not selling it, we are not doing anything.  We

11  are -- everything is for the benefit of whoever ultimately gets

12  it.  That is what I am hearing.  And so at the end of the day,

13  you guys need to give me what I need to figure out what is

14  going on with these assets.  Either they are being protected or

15  they are not, are they are being licensed or they are not?  Are

16  they being used by somebody else or they are not?  That is what

17  the issue is for me.  And all of this third-party, sixth-party,

18  whatever, that is what I am focusing on.  And I think

19  sometimes, in the heat of the battle, you guys forget what it

20  is that I need.

21          MR. COLBY:  If I might, Your Honor?

22          MR. ZAHRALDDIN:  Can I speak for one second?

23          MR. COLBY:  We have directly addressed the question

24  about licensing in Mr. Stastney's first testimony when he was

25  called by the Debtors.

1              THE COURT:  Uh-huh.

2              MR. COLBY:  And there has been no -- and the

3    statement was that they are doing the development projects.

4    The work that they are doing, it is happing at SeeCubic B, as

5    has always been the case, and that any of those proof of

6    concept projects aren't complete.  And any potential future

7    licensing, parallel licensing, sublicensing, whatever it may

8    be, is well off in the future if it is going to happen at all.

9    That is the testimony so far.  There is no testimony contrary

10   to that, and no evidence contrary to that other than documents

11   from 2022 --

12             THE COURT:  Well, what about 2023?

13             MR. COLBY:  -- when the situation was entirely

14   different.

15             THE COURT:  Well, they have got the -- there is a PMB

16   or PPM from 2023.

17             MR. COLBY:  There --

18             THE COURT:  I don't recall what it says.

19        (Phone system chiming)

20             MR. COLBY:  There is a subscription agreement which

21   simply has representations about the existence of lawsuits and

22   whether or not they would --

23             THE COURT:  I don't recall what it says.

24             MR. COLBY:  Right.

25             THE COURT:  And I mean, I was -- I said I don't know.

 1          MR. COLBY:  So that was not a 2023 statement about

 2   licensing.  There is nothing in there about licensing.

 3          THE COURT:  I don't recall.  I am going to take the I

 4   don't recall, because I was wondering about did they say that

 5   it is disputed, what did we do?  But all of that, to me, I have

 6   the Debtor saying this, that -- and Mr. Stastney saying

 7   whatever he said.  And then they are saying well, no, based on

 8   these things, we don't believe  -- this is our contradiction to

 9   his testimony, and that we think you should also look at these

10   things, because we don't think you should believe Mr. Stastney.

11   We don't think you should believe him because whatever, for

12   whatever reason.

13          MR. COLBY:  Right.  And those things are the PPMs

14   from 2020 and 2022, where first of all, they are old.  So they

15   don't speak to any potential immediate irreparable harm.  And

16   secondly, those came into existence during a period of time --

17          THE COURT:  I know when they came in.

18          MR. COLBY:  -- prior to --

19          THE COURT:  Uh-huh.

20          MR. COLBY:  -- the Supreme Court case.  So --

21          THE COURT:  When was the Supreme Court decision?

22          MR. KODOSKY:  June 15th, 2022.

23          MR. COLBY:  June.

24          MR. ZAHRALDDIN:  June 15th, 2022, Your Honor.

25          MR. COLBY:  And the PPM is dated Q1 -- or Q2 2022.

 1              MR. KODOSKY:  And the trademark application was

 2  October of --

 3              THE COURT:  To say --

 4              MR. COLBY:  We haven't gotten to the trademark

 5  application yet.

 6              THE COURT:  Yeah, because that is --

 7              MR. COLBY:  I am just --

 8              THE COURT:  Counsel?

 9              MR. COLBY:  Yep.

10              THE COURT:  They are what they are.

11              MR. COLBY:  Yep.

12              THE COURT:  And I need an explanation.

13              MR. COLBY:  Yep.

14              THE COURT:  And it better be a good one.

15              MR. COLBY:  Yep, yep.  And so there will be.  I am

16  just simply focusing on, you know, this issue about Philips.

17              THE COURT:  So where we are now is that we have a

18  claim that SeeCubic, Inc. and all of these other people are

19  causing irreparable harm to the Debtor.  Mr. Rajan has

20  testified that, you know, they are not protecting them, they

21  are not doing this.  That is why you are bring Mr. Barenbrug.

22              MR. COLBY:  Barenbrug, correct.

23              MR. ZAHRALDDIN:  Right.  If there was no evidence,

24  there would be no need to rebut them with Mr. Barenbrug.

25              THE COURT:  Well, there is evidence and they are

1    going to try to rebut it.

2         MR. COLBY:  Yep.

3         THE COURT:  And then, there is the evidence of all of

4    this trademark stuff, all of this other things, the website.

5    All of those things are evidence to say don't believe Mr.

6    Stastney because he is saying different things over here.  So

7    there is evidence, Counsel.  I am not going to say there is

8    not, because their -- what they have tried to do, is put

9    evidence -- they called Mr. Stastney as a cross, but they have

10   put in all of this other stuff, don't -- Judge, don't believe

11   him.  He is not credible because look at all of these other

12   things he is doing.

13        MR. ZAHRALDDIN:  Your Honor --

14        MR. COLBY:  Right.

15        THE COURT:  Okay.  So that is sufficient for me to

16   say okay, now what do I do with it?  So I didn't intend to come

17   out here and do a colloquy with Counsel about where we are, but

18   I am just trying to get your guys to focus.

19        MR. COLBY:  Yes.

20        MR. ZAHRALDDIN:  I understand that, Your Honor.  And

21   let me just say, because there was a lot, and I am not going to

22   respond to everything.  I mean, there was a nice final argument

23   that he made, and we are going to leave that alone.

24        But I am going to say this.  You asked when did all

25   of this happen and what is it we are worried about?  Mr.

 1  Stastney, SeeCubic, Hawk, anyone who is involved as a creditor

 2  in this case, should not be touching anything that is a

 3  Debtor's asset.  Nothing.  And we have been begging for help

 4  since April.  It didn't just happen, it has been continuing.

 5          THE COURT:  Well, then why didn't -- well, we are

 6  where we are.

 7          MR. ZAHRALDDIN:  I understand that.  I understand

 8  that.  But to say oh, just forget about everything that has

 9  happened, et cetera.  Our rights are rooted under *Butner* and

10  our state law rights.  And the state law right now, and the

11  Federal Bankruptcy Law says everything should have been turned

12  over to us.  Then, if they want to do something with it, and

13  that is Stream, what Stream owns.  Then, if they want to do

14  something, they can come in.  They can file state relief

15  motions.  They can object to our plan.  They did none of that,

16  and that is the problem.

17          THE COURT:  So you are -- you basically want me to

18  say stop doing what you are doing with all of that.  And that

19  is how I am looking it is, is there going to be irreparable

20  harm to the Debtor?

21          MR. COLBY:  Right.

22          THE COURT:  And this proof of concept stuff, I get

23  it.  You know?

24          MR. ZAHRALDDIN:  I will get to it here.

25          THE COURT:  Don't interrupt me.

```
 1              MR. ZAHRALDDIN:  I won't interrupt you, I am just

 2   saying --

 3              THE COURT:  I love to interrupt people, but I get to

 4   interrupt.  I do it all the time.

 5              MR. ZAHRALDDIN:  I know, I know.

 6              THE COURT:  I am working on it, but I am not getting

 7   good at it.  Maybe by the end of my -- maybe when I finish my

 8   sentence, well, sooner, I guess.  Maybe by that time ,I will

 9   have gotten not to interrupt.  But the point I am making is

10   that if, in fact, these license -- whatever this process is,

11   gets out, it is not going to be for the benefit of any -- even

12   if it ultimately belongs to the secured creditors, okay?

13              MR. COLBY:  Right.

14              THE COURT:  If it gets out into the general world,

15   public, whatever word you want to use, it is going to be worth

16   zero.

17              MR. COLBY:  Well --

18              THE COURT:  Because everybody else will have access

19   to it.

20              MR. COLBY:  Right.  And Your Honor, I think that

21   speaks to, frankly, an issue I have with the basis of this

22   motion in the first place.  As Mr. Stastney previously

23   testified, it is in the secured creditors' interest to preserve

24   this value.  It is in the secured creditors' interest --

25              THE COURT:  Yeah, but it is also --
```

1           MR. COLBY:  -- to have SCBV be successful.

2           THE COURT:  Uh-huh.

3           MR. COLBY:  And to have technology that has value and

4    isn't, you know, stolen by others.

5           THE COURT:  I get that.  But it is also SCB -- SB --

6           MR. ZAHRALDDIN:  SCBV.

7           THE COURT:  -- SCBV to the extent it operates, it is

8    supposed to be for the benefit of who ultimately gets it.  And

9    nobody is supposed to be doing things that does not benefit

10   both the Debtor and the Secured Creditor.

11          MR. COLBY:  Right.

12          THE COURT:  And so I don't know how much of that is

13   preferring one over the other.

14          MR. COLBY:  Yeah, we are --

15          MR. ZAHRALDDIN:  Your Honor, you are also

16   forgetting --

17          MR. COLBY:  We are highly aligned --

18          MR. ZAHRALDDIN:  -- you are also forgetting the

19   unsecured creditors because the unsecured creditors do not

20   benefit from the secured creditors walking away and reinstating

21   what was de facto, de facto reinstating what was part of the

22   omnibus agreement, where none of those people got paid.  And it

23   was for the benefit of the shareholders at the SeeCubic level,

24   okay?

25          THE COURT:  But that is for another day.

1          MR. ZAHRALDDIN:  All right.  Well --

2          THE COURT:  So at the end of the day, my job is to

3   make sure that the assets of this estate are protected.  And

4   does that mean that there is nothing going on that they are at

5   risk?  I don't do anything, I say no.  If I find that they are

6   at risk, I say something.

7          And so where we are is, we have heard Mr. Stastney

8   say I am not doing anything.  And they are saying, no, George,

9   look at all of these things that he did, this, that.  I have to

10  now weigh that.  You guys are arguing the end results, but I

11  have to go and say okay, well, the Debtor said this is what

12  they are doing, this is what they are doing.  Mr. Stastney says

13  I am not, you are going to bring in some other people who

14  presumably will support his position.  And then I am going to

15  look at everything and say are these assets at risk of -- of

16  the Debtors, at risk of having -- being irreparably harmed with

17  respect to these assets.  If they are, I, you know, it's not --

18  I'd probably issue a preliminary injunction.  I don't know why

19  a TRO.  If they're not, I don't do anything.  I said there's

20  nothing, denied.  And that's where we are.

21         And so, I think we've gone astray by arguing all

22  these things about who's what and who's -- the bottom line is,

23  and nobody has told me otherwise.  The underlying license is an

24  asset of who?

25         MR. ZAHRALDDIN:  The Debtors.

1          THE COURT:  Both debtors?  One debtor?

2          MR. ZAHRALDDIN:  The Stream is the ultimate signatory

3  and -- well, sorry.  Excuse me.

4          THE COURT:  All right.

5          MR. ZAHRALDDIN:  Stream --

6          THE COURT:  Don't worry about it.

7          MR. ZAHRALDDIN:  Okay.  Yeah.

8          THE COURT:  I have what I have in the record.

9          MR. COLBY:  Yeah.  Yeah.

10          MR. ZAHRALDDIN:  Okay.

11          MR. COLBY:  The license is, the license between

12  Philips and one of these entities, that entity is Ultra-D

13  Ventures, which is one of the --

14          MR. ZAHRALDDIN:  Yeah, not under control --

15          MR. COLBY:  -- subsidiaries.

16          MR. ZAHRALDDIN:  -- of Mr. Stastney but independent.

17          MR. COLBY:  It's an indirect --

18          THE COURT:  I don't need all that commentary.

19          MR. COLBY:  It's an indirect subsidiary --

20          THE COURT:  Uh-huh.

21          MR. COLBY:  -- of Stream.

22          THE COURT:  Uh-huh.

23          MR. COLBY:  And then the work, the technical

24  expertise to know --

25          THE COURT:  Back up.

1          MR. COLBY:  -- about the people are at SeeCubic B.V.

2          THE COURT:  I get where they're at.

3          MR. COLBY:  Yeah, they're at --

4          MR. ZAHRALDDIN:  Yeah, but --

5          THE COURT:  But there is a license between Rembrandt

6    and the Debtor?

7          MR. ZAHRALDDIN:  Yes, ma'am.

8          THE COURT:  Okay.  And those people who are at SCBV

9    were there by virtue of some alleged relationship with

10   Rembrandt.  Alleged.

11         MR. COLBY:  Yeah.  No, and I just -- that's --

12         THE COURT:  And so -- counsel.

13         So the issue is, is what does that license mean?  I

14   don't know and until somebody decides and the Debtor says this

15   is my license and you're using it in SCBV --

16         MR. COLBY:  Right.

17         THE COURT:  -- we've got a problem.

18         MR. COLBY:  So --

19         MR. ZAHRALDDIN:  Well that's -- Your Honor, that's

20   what -- Mr. Michaels is the counterparty to that --

21         THE COURT:  I get that.

22         MR. COLBY:  Yeah, if we're --

23         MR. ZAHRALDDIN:  -- for that license.

24         MR. COLBY:  If we're talking about the Rembrandt

25   license, that's a different issue.  I think that'll be

 1   addressed today and probably also by Mr. Barenbrug.

 2           The -- just one slight correction.  The folks at

 3   SeeCubic B.V., really are descendants, direct descendants of

 4   the Philips operation, when Philips decided it wasn't -- they -

 5   -

 6           THE COURT:  And so they had --

 7           MR. COLBY:  -- worked there and they did this.

 8           THE COURT:  So let me back up.

 9           MR. COLBY:  Not Rembrandt, I guess is my point.

10           THE COURT:  Wait a minute.

11           MR. COLBY:  But there was --

12           THE COURT:  So when Rembrandt -- and counsel, I don't

13   know how you get around this, because I think about all these

14   things.  Rembrandt sued Stream, sued Mr. -- among other people,

15   Mr. Barenbrug.

16           MR. COLBY:  Correct.

17           MR. ZAHRALDDIN:  Uh-huh.

18           THE COURT:  Okay.  And there was a settlement --

19           MR. COLBY:  Correct.

20           THE COURT:  -- with respect to that.

21           MR. COLBY:  Correct.

22           THE COURT:  Well, if there wasn't a settlement.

23   You're shaking your head.  Mr. Stastney was somehow involved in

24   that case.

25           MR. CAPONI:  Your Honor, and I'd just correct the

 1    record on this.

 2              THE COURT:  Uh-huh.

 3              MR. CAPONI:  The New York litigation ended with the

 4    claims being dismissed.  Rembrandt -- and this was all while

 5    Mr. Rajan controlled the company.  Mr. Rajan defended that

 6    litigation.

 7              THE COURT:  And Mr. -- wait a minute.  And so, Mr.

 8    Michaels testimony that he directly talked to Mr. Stastney is a

 9    lie?

10              MR. CAPONI:  Mr. Stastney was an employee under Mr.

11    Rajan.

12              THE COURT:  Doesn't matter.  He was involved or not.

13    I don't want to hear about whether he was --

14              MR. COLBY:  Yep.

15              THE COURT:  -- an employee or not.

16              MR. CAPONI:  Well, Your Honor, it's relevant for this

17    factor.

18              THE COURT:  Okay.

19              MR. CAPONI:  This was not an entity controlled by Mr.

20    Stastney --

21              THE COURT:  Okay.

22              MR. CAPONI:  -- with the secured creditors during the

23    course of the New York litigation.  It was controlled by Mr.

24    Rajan.

25              THE COURT:  And Mr. -- wait a minute.  And Mr.

 1   Stastney was not an officer or a board member or anything else

 2   at that time?

 3          MR. CAPONI:  He was an officer.

 4          MR. ZAHRALDDIN:  He was both, Your Honor.

 5          THE COURT:  So don't tell me he was an employee.  He

 6   was also an officer.

 7          MR. CAPONI:  Well, he was under Mr. Rajan.  He wasn't

 8   directing the --

 9          THE COURT:  Was --

10          MR. CAPONI:  -- litigation, Your Honor.  Your Honor,

11   if I may just --

12          THE COURT:  But he was an officer.

13          MR. CAPONI:  He was an officer.

14          THE COURT:  And a board member.

15          MR. CAPONI:  And he was sent --

16          THE COURT:  Yes.

17          THE COURT:  -- to negotiate the litigation.

18          MR. CAPONI:  Your Honor --

19          THE COURT:  But so --

20          MR. CAPONI:  -- the point being --

21          THE COURT:  -- so who controlled -- the point of the

22   matter is, there was some sort of settlement.  I don't care

23   what you --

24          MR. CAPONI:  There was not, Your Honor.  May I

25   clarify the record on that because --

1          THE COURT:  Okay.

2          MR. CAPONI:  -- it's important.

3          THE COURT:  All right.  There wasn't a settlement.

4    What happened?

5          MR. CAPONI:  There was not a settlement.  There was a

6    mediation.  Rembrandt wanted there to be a settlement.

7    Rembrandt filed a Motion after the mediation to enforce a

8    settlement agreement.

9          THE COURT:  Uh-huh.

10          MR. CAPONI:  It was litigated.  Both the magistrate

11   who oversaw the mediation and the District Court ruled, there

12   was no meeting of the minds and there was no settlement.  Full

13   stop, New York litigation ends.  Years later, in the context of

14   getting ready for the bankruptcy that was kicked out as being

15   fraudulent, they -- Mr. Rajan signs a settlement agreement with

16   Rembrandt.

17          So there was no New York litigation resolved via a

18   settlement.  The New York litigation was resolved because the

19   case was dismissed.

20          THE COURT:  Dismissed by the Court or dismissed by

21   the party?

22          MR. CAPONI:  By the Court.

23          MR. ZAHRALDDIN:  Can I object to the testimony?

24          MR. CAPONI:  By the Court.

25          MR. ZAHRALDDIN:  But Your Honor, why can't we --

```
 1              MR. CAPONI:  And there is a --

 2              MR. ZAHRALDDIN:  -- look at the actual written

 3   document?

 4              MR. CAPONI:  -- written opinion, Your Honor.

 5              THE COURT:  You know what?  I don't need anybody to

 6   tell me anything.

 7              MR. ZAHRALDDIN:  I'm just asking.

 8              THE COURT:  Don't tell me anything.

 9              Somebody put the -- just put the record in -- put the

10   docket in the record.  I just want --

11              MR. ZAHRALDDIN:  Yes, ma'am.

12              THE COURT:  -- the docket in the record.  I don't

13   need your interpretation, his interpretation.

14              MR. ZAHRALDDIN:  That's what I'm asking.  That's all

15   I'm asking.

16              THE COURT:  Just put it all in.  And the -- it really

17   isn't relevant to me --

18              MR. COLBY:  That's -- yeah.

19              THE COURT:  -- because at the bottom line is either

20   the Debtor believes this is a -- and I have to -- I can, for

21   instance, in the context of a Motion for Relief from State, if

22   the parties dispute ownership, I can, for the purpose of the

23   Motion for Relief, make a determination solely for that

24   purpose, whether in fact a party, for instance, or the mortgage

25   company says I have a mortgage, the Debtor says, you don't have
```

```
 1   one.  I never signed any papers.  I didn't do anything.  Okay.
 2   I will have a hearing and I will say for the purposes of this
 3   Motion, I will find, for this purpose only, it's not a final
 4   determination, I'll find there's a mortgage.
 5           But you guys are going to -- either I have to make a
 6   final determination or you're going to go to state court and
 7   have a final determination.  So -- but it's because they're --
 8   you know, the parties are asserting.  The same way the Debtor
 9   says, I own this.  Okay.  I own it.  And somebody ultimately
10   has to determine ownership.  I may have to say for the purposes
11   of what I'm doing, determine whether it's more -- it's -- that
12   the Debtor has an interest, doesn't have an interest.  But
13   solely for the purpose of making my decision as to whether I'm
14   going to rule one way or the other.
15           MR. COLBY:  If I could ask --
16           THE COURT:  And so, that's what exists here.
17           MR. COLBY:  If I could ask a question, Your Honor,
18   just so I can be sure to be as responsive as possible to what
19   you're speaking about and focusing on.
20           Are you referring to the Rembrandt license?  Is that
21   what you're discussing?
22           THE COURT:  Well, the license that the Debtor says it
23   has an interest in, that SCBV is using.
24           MR. COLBY:  Right.  So I think there are two that the
25   Debtor says -- has an interest in.  There are two licenses at
```

```
 1   issue.  There's the Philips license, which we've talked about
 2   quite a bit.
 3               THE COURT:  Uh-huh.
 4               MR. COLBY:  And then there is the 2021 settlement
 5   with Rembrandt, which creates what we've been referring to as
 6   the Rembrandt license.
 7               MR. ZAHRALDDIN:  And Your Honor --
 8               THE COURT:  Oh, don't interrupt him.
 9               MR. COLBY:  And so, I guess I don't think anybody
10   disputes that the Philips license exists.  I don't think the
11   Court needs to make a ruling on that.
12               THE COURT:  But to the extent the Philip license
13   exists, the Debtors asserting, I guess, some sort of interest
14   in that.  I don't know if the Debtor has an interest or not.
15               Do I have to make that determination now?  All I have
16   to say is the Debtor is asserting an interest, believes that
17   these -- this entity is using its asset, because they had to
18   have gotten it from somewhere.  The SCBV did not, at least I
19   haven't seen it --
20               MR. ZAHRALDDIN:  They're not a party.
21               THE COURT:  -- in the record anywhere, a license from
22   Philips and SCBV, unless it got one lately and I haven't seen
23   it.
24               MR. COLBY:  But we have the license, well, first of
25   all, it's with -- it's currently with Ultra-D Ventures.  It is
```

```
 1   in the record.  The --

 2           THE COURT:  Uh-huh.

 3           MR. COLBY:  -- both the license is in the record and

 4   the 2014 amendment.

 5           THE COURT:  And the license from Ultra-D to SCBV is

 6   in there?

 7           MR. COLBY:  No.

 8           MR. ZAHRALDDIN:  No.

 9           MR. COLBY:  There is the --

10           THE COURT:  That's the point, that I don't see

11   anything, but anybody giving anything to SCBV.

12           MR. ZAHRALDDIN:  And --

13           MR. COLBY:  Well, the --

14           THE COURT:  And I don't know who owns this stuff.  I

15   don't know.  Somebody's going to have to figure this out.  I'm

16   not an IP --

17           MR. COLBY:  Yes, the --

18           THE COURT:  -- I'm not trying to do IP.

19           MR. COLBY:  The Ultra-D license includes SeeCubic,

20   B.V.

21           THE COURT:  Oh, it says that they include it?

22           MR. COLBY:  I believe --

23           MR. ZAHRALDDIN:  No, Your Honor, what it says --

24           THE COURT:  You know what?

25           MR. ZAHRALDDIN:  Again --
```

1          THE COURT:  We're going astray.

2          MR. ZAHRALDDIN:  We are.

3          THE COURT:  We're going astray.

4          MR. ZAHRALDDIN:  We are.

5          THE COURT:  All I was trying to figure out is, was

6   this a preliminary injunction and trying to give you guys some

7   guidance for where I was and what I was trying to figure out.

8   And from my perspective, if this is assets of the Debtor's

9   estate, I have to do something, if I believe there's

10  irreparable harm.

11         The first thing I have to figure out is, for the

12  purposes of this motion, or for TRO / preliminary injunction,

13  because that's what it's slash called, is this assets that

14  could be possibly assets of the Debtor?  If I look at the

15  documents and go no way, then I don't even get to irreparable

16  harm.

17         MR. COLBY:  Got it.

18         THE COURT:  If I get to and say possible, then I have

19  to say, okay, what, if anything, needs to be done to protect

20  these assets?  The answer could be, yeah, its assets, like,

21  possible assets.  Nothing needs to be done.  It's possible

22  assets, something needs to be done.

23         But that's where I am, and I was hoping people would

24  just kind of focus on that.  I was trying to --

25         MR. COLBY:  Sure.

```
1              THE COURT:  -- get people to -- I have spent God

2    knows how much time, again, asking questions that I probably

3    shouldn't have and just let the parties go.

4              MR. COLBY:  Well --

5              MR. CAPONI:  Your Honor, if I may briefly?

6              THE COURT:  Uh-huh.

7              MR. COLBY:  Sorry.  Sorry.

8              THE COURT:  Well, okay.

9              MR. COLBY:  Sorry, Mr. Caponi.

10             THE COURT:  Mr. Caponi.

11             MR. COLBY:  Am I allowed to interrupt Mr. Caponi?

12   Mr. Zahralddin.  We're on the same team.

13             MR. CAPONI:  He can interrupt me all he wants.

14             MR. COLBY:  Okay.  So that's up with the -- there has

15   been discussion.  I think even Mr. Rajan concedes that the

16   Philips license includes affiliates and that definition would

17   include SeeCubic, B.V.

18             I think there is a separate issue that I'm not an

19   expert on, a separate sort of bankruptcy law issue about

20   whether or not, what the Debtors own is sort of in the assets

21   of the subsidiary or the interest in the subsidiary.  I think

22   we have submitted some briefing on that and if -- to the extent

23   we need to argue it, we can argue it.  I don't know that that's

24   an evidentiary issue.

25             THE COURT:  We're not getting into that today.
```

1                  MR. COLBY:  Right.

2                  THE COURT:  Not today.  And not --

3                  MR. COLBY:  Not today.  Right.

4                  THE COURT:  -- no, and not, you know, if you

5      submitted something I'll look at.

6                  Mr. Caponi?

7                  MR. CAPONI:  Yes, Your Honor.  To your point, and

8      it'd well taken.  But I would like to address one issue, which

9      is the notion.  And I understand Your Honor's desire to get to

10     the heart of it.

11                 This is not a we issue.  The Debtor filed a Motion.

12     The Debtor bears the burden of establishing each of its

13     elements, what the property's with specificity, because the

14     Court ultimately has to enter an order.  If the Court enters an

15     order, in order for it be worth the paper it's written on, it

16     has to have specificity.

17                 What asset belongs to the estate, how it's being

18     used, and how it's not, et cetera.  To the extent, and as Mr.

19     Colby has pointed out, this thing has morphed.  I mean, I came

20     here, my client, as far as I'm concerned, this is a TRO.

21     That's what the Debtor filed.

22                 If the Debtor wanted to file something else, it

23     should have, it could have withdrawn the Motion, filed the new

24     Motion.

25                 THE COURT:  Well, there was a TRO preliminary

1    injunction.

2            MR. CAPONI:  That's fine, Your Honor.

3            To the extent the Court has questions.  To the extent

4    the Debtor has failed to make order out of chaos or created, in

5    my view, chaos out of order, that's the Debtors fault problem

6    -- issue.  It's not clients.  And I would just like to remind

7    the Court, it's the Debtor that bears the burden.  And --

8            THE COURT:  I know that, counsel.

9            MR. CAPONI:  -- I'm happy to answer questions and

10   bring clarity to the Court.  But to the extent that the Debtor

11   filed the -- you know, a TRO Motion / preliminary injunction.

12   Then the Stay.  And then a --

13           THE COURT:  Well, the Stay?  What Stay?

14           MR. CAPONI:  -- a claim in District Court.  And

15   then --

16           THE COURT:  Wait a minute.  The Stay has nothing to

17   do with this.

18           MR. CAPONI:  Your Honor, it has this to do with it.

19   To the extent the Debtor's argument is -- Mr. Zahralddin is

20   arguing.  Like, there was this -- these assets and they're so

21   important and we got to get control of them and that's been our

22   focus.

23           The Debtor's been scattershot throughout this whole

24   -- it is the conductor of a bankruptcy.  It gets to decide the

25   flow, the tempo, what gets raised.  The chaos was created by

```
 1   all these things the Debtors filed.

 2              THE COURT:  Well, one of them was because --

 3              MR. CAPONI:  And then one other thing.

 4              THE COURT:  I will take responsibility for one that

 5   kind fell through the crack and we just --

 6              MR. CAPONI:  Right.

 7              THE COURT:  -- left it out there.  So that one --

 8              MR. CAPONI:  That's us, Your Honor.

 9              THE COURT:  -- that's on the Court.

10              MR. CAPONI:  Everything else is the Debtor.

11              And then I don't think -- I think it has to be

12   mentioned, that this asset that we're talking about in the

13   Netherlands that seems so near and dear to the Debtor's heart

14   is an asset that the Debtor has refused to fund for years, even

15   during the course of this bankruptcy.  I think that's relevant

16   to Your Honor, because if I --

17              THE COURT:  Well, counsel --

18              MR. CAPONI:  -- believed that I had an extremely

19   valuable asset, I had a classic Ferrari that Your Honor is

20   sitting in a garage somewhere and I -- I'm going to pay the

21   rent on the garage so my car -- that car doesn't get towed out.

22   If I don't, I think that says something about --

23              THE COURT:  But your client just --

24              MR. CAPONI:  -- what I think the value of the car --

25              THE COURT:  Well, your client --
```

**TheRecordXchange**
www.trxchange.com · (800) 406-1290

1          MR. CAPONI:  -- is in the garage.

2          THE COURT:  -- just told me or you guys just told me

3    you guys' no longer fund.  And does that same apply that you no

4    longer funding and so it's just going to go to the wind?

5          MR. CAPONI:  Ultimately, Your Honor, this thing may

6    go to the wind, and if the assets don't get -- and I think this

7    is the point.  If the employees aren't paid, these employees

8    that -- whose knowledge in their head seem so paramount to the

9    Debtor, why is the Debtor letting them potentially just walk

10   out the door because they're not getting paid?  If these assets

11   in the Netherlands are so near and dear to Rembrandts heart and

12   the Debtor's heart, why are they sitting back, letting them

13   potentially go into a Dutch bankruptcy?

14         THE COURT:  Because you guys have been paying.  Why

15   wouldn't he?

16         MR. ZAHRALDDIN:  Well, that's not it, Your Honor.

17         MR. CAPONI:  It goes to the sincerity of the

18   argument.

19         MR. ZAHRALDDIN:  Your Honor, excuse me.

20         THE COURT:  Whoa, whoa, whoa, whoa.

21         MR. ZAHRALDDIN:  Let me ask a question.  Let me just

22   ask a question.

23         We came in here and asked to fund early on and you

24   said, "No, I can't do it at this time.  I don't see it as

25   assets to the Debtor, and that's what we're going to do."

1          So it -- you know, to sit there and now recreate

2     history when we came in and asked, please, let us go over

3     there.

4          THE COURT:  You did, and I said --

5          MR. ZAHRALDDIN:  Now --

6          THE COURT:  -- go finish your funding, you already --

7     and it wasn't that I was going to let you do it because it

8     wasn't an asset.  I said they already had a source of funding.

9          MR. CAPONI:  Right.

10         MR. ZAHRALDDIN:  I understand, Your Honor.  But

11    here's the -- let me finish, Mr. Caponi, please.

12         Then during the interim, during the interim, they go

13    and take over the asset.  How are we supposed to control the

14    asset when they've gone and filed things in the Netherlands to

15    take control of an asset which they have no collateral

16    involvement in period.

17         THE COURT:  I don't know.  I'm not going to make that

18    determination.

19         But I think that there's enough to go around for

20    everybody.

21         So Mr. Caponi, I said no funding.  They did come in

22    and ask for VSI to pay the money.  I don't know -- but I said

23    no, because they already had a source of funding.  Why was I

24    going to let the Debtor go incur debt when somebody else was

25    already funding?

1          And so, that's really what happened is, I said no and

2    your client graciously or whatever in his best interest, I'm

3    not going to use the word graciously, but figured that it was

4    in his best interest to continue to fund.  And then I don't

5    know who went and filed for independent director.  I don't know

6    who went.

7          MR. ZAHRALDDIN:  Well, it's on the caption, Your

8    Honor.  It's on the caption.

9          THE COURT:  I don't know why, but at some point,

10   whatever involvement the Debtor had, or the Debtors represented

11   or the Debtors -- or whatever Mr. Rajan's role is in the

12   Debtor, was opposed to being involved in SCBV.  And he was

13   removed.

14          So I don't know.  Listen, there's enough blame to go

15   around for everybody in here.  So let's not everybody play the

16   martyr.  Okay.  Let's not play I'm bad, they good.  There's

17   good and bad on every part.  And at the rate you guys going,

18   you don't want to know what my perception is.

19          MR. ZAHRALDDIN:  Your Honor --

20          THE COURT:  You don't.

21          MR. ZAHRALDDIN:  -- I just want to make sure that --

22   I've been asking.  We -- you asked us to have some progress.

23   We filed a plan.  The plan resolves our issues with Rembrandt.

24   The plan has purchase orders.  The plan wants to move forward.

25          THE COURT:  They can have all the purchase orders it

```
 1   want.  Unless you guys are selling stuff, I don't care about

 2   purchase orders.

 3           MR. ZAHRALDDIN:  Well, we'd like to go to production,

 4   but our main piece of equipment and we had to go find -- is

 5   being locked up somewhere in China because of their

 6   interference.

 7           THE COURT:  I thought you guys were mediating that.

 8           MR. ZAHRALDDIN:  We're trying to, Your Honor.  But

 9   every single time we bring something, there's some brand-new

10   issue that slows it down.

11           THE COURT:  Oh, okay.

12           MR. ZAHRALDDIN:  But look.  I simply want to say,

13   we're trying to do what we're supposed to.  But we've been --

14   I've seen it in their papers and otherwise, somewhere we're

15   creating litigation chaos.  They have gone outside of this

16   jurisdiction.  They've messed with stuff within this

17   jurisdiction.  What are we supposed to do?  Say it's okay, not

18   file something to prevent it?

19           THE COURT:  All right.

20           MR. ZAHRALDDIN:  The scatter shot of this --

21           THE COURT:  All right.  There's enough blame -- I've

22   already said, I'm going to say it again.  There's enough blame

23   to go around for everybody and nobody has clean hands as far as

24   I'm concerned.

25           And so, you don't want to be there with me.  You do
```

1    not.  You do not want to -- you do not want me to have that

2    view, because it's not going to be good for anybody.  Now --

3              MR. ZAHRALDDIN:  Understood, Your Honor.

4              THE COURT:  -- I understand Mr. DeMarco -- who's Mr.

5    DeMarco?

6              MR. DEMARCO:  That's me, Your Honor.

7              THE COURT:  What do you want to say, Mr. DeMarco?

8              MR. DEMARCO:  I believe my matters been addressed,

9    Your Honor, and I won't derail things further.  If it's

10   necessary, I'll confer with my client and --

11             THE COURT:  All right.

12             MR. DEMARCO:  -- if we need to file something.

13             THE COURT:  So where are we at after an hour of me

14   taking us off the rails?  Is that -- to the extent this is

15   either a TRO or preliminary injunction -- to the extent this is

16   a TRO / preliminary injunction, the standard is, we can have

17   some hearsay, which is what this was supposed to start out

18   about and solely be on a ruling with respect to Mr. --

19             MR. KODOSKY:  Kodosky.

20             THE COURT:  -- Kodosky's argument that -- in response

21   to the hearsay.

22             We have now gone off on a tangent about what I think

23   you guys should be giving me and the bottom line is as I see

24   it, the Debtor is alleging that their interest or interest in

25   whatever that license, in SCBV is not being protected and it's

 1  not being protected because allegedly Mr. Stastney was going to

 2  license it.  This is the evidence that they provided.  Mr. --

 3  he's not protected it because it's not encrypted and he's doing

 4  all these bad things, and I should stop him.

 5           And Mr. Stastney's response is, I'm not licensed it,

 6  we're not doing bad things, and we're going to put on Mr.

 7  Barenbrug and somebody else to say we're not doing these bad

 8  things.

 9           That's all I really need, and all of this other side

10  show is really not helpful.

11           MR. COLBY:  Yeah.  Thank you, Your Honor.

12           THE COURT:  Okay.

13           MR. COLBY:  I agree.

14           THE COURT:  All right.  With that all being said,

15  counsel, Mr. Kodosky, after an hour, you can start with Mr. --

16  continue with Mr. Michaels testimony.

17           MR. KODOSKY:  Thank you, Your Honor.

18           THE COURT:  Go ahead.

19           And Mr. Caponi, I -- sorry for cutting you off.

20           MR. CAPONI:  No problem, Your Honor.  He has more

21  important --

22           MR. COLBY:  So am I.  So am I.

23           MR. CAPONI:  -- things to say than me.

24           THE COURT:  I tend to do that.  I'm, like, okay --

25  because I know what I want to hear, and you guys are just

1    complicating it.

2           Go ahead, Mr. Kodosky.

3           MR. KODOSKY:  Permission to approach, Your Honor,

4    with what is --

5           THE COURT:  Yes.

6           MR. KODOSKY:  -- been marked for identification as

7    Debtors Exhibit Number 85.

8           THE COURT:  And you have that, John?  On the --

9           MR. ZAHRALDDIN:  He does.

10           UNIDENTIFIED SPEAKER:  Yes.

11           THE COURT:  Okay.

12           UNIDENTIFIED SPEAKER:  Yeah.

13           THE COURT:  I have 84, which is the definition that

14    Mr. Michaels identified has something to do with some

15    litigation somewhere.  Okay.

16           All right.  85.  Mr. Michaels, are you back?

17           THE WITNESS:  Yes.

18           THE COURT:  Who's talking?  Whoever's talking, please

19    turn your phone off, because I can -- can you hear them, John?

20           UNIDENTIFIED SPEAKER:  I think it was him.  I think

21    it was his background.

22           THE COURT:  Okay.

23           Go ahead.

24    BY MR. KODOSKY:

25    Q    Mr. Michaels, well you are being shown what has been

1    marked for identification as debtors Exhibit 85.  Do you

2    recognize this document?

3    A    I do.

4    Q    What is it?

5    A    It's the nondisclosure and non-circumvention agreement

6    that was signed with Bart Barenbrug and 3D Fusion, Inc.

7    Q    The nondisclosure and non-circumvention agreement that he

8    had denied executing as part of his declaration?

9    A    Yes, it is.

10            MR. KODOSKY:  Move to admit, Your Honor.

11            MR. COLBY:  No objection, Your Honor.

12            THE COURT:  Okay.  Admitted.

13        (Debtor's Exhibit 85 admitted into evidence)

14            MR. KODOSKY:  Thank you.

15   BY MR. KODOSKY:

16   Q    Mr. Michaels, and we can set that document aside.  Is it

17   your understanding that SeeCubic, Inc. has a sublicense

18   business model?

19   A    Yes, from the PPM and their testimony.

20   Q    Is your --

21            THE COURT:  Who is talking?

22            MR. COLBY:  I'm not certain, but it looks like Mr.

23   Blumenthal is not muted based on the screen.

24            THE COURT:  Can you --

25            MR. COLBY:  And I thought the box flashed on there

```
 1   when -- it happens when somebody's speaking.

 2             THE COURT:  And who's --

 3             MR. COLBY:  Now he's muted.

 4             THE COURT:  -- he again?

 5             MR. COLBY:  Now he's muted.

 6             THE COURT:  Who is Mr. Blumenthal?

 7             MR. ZAHRALDDIN:  Mr. Blumenthal is the CEO of

 8   Rembrandt, Your Honor.

 9             THE COURT:  CEO?  Okay.  All right.

10             Okay.  I guess he did not like that answer.

11             Okay.  Sublicensing.  Okay.  Go ahead.

12   BY MR. KODOSKY:

13   Q    Is your understanding that Stream TV is selling components

14   or actual TV's?

15   A    Stream TV is selling actual TV's, and we have a number of

16   units of those TV's.

17   Q    And have you tested content on a Stream TV actual unit?

18   A    Yes.

19   Q    Were you able to remove any of the content from the TV?

20   A    We were able to remove -- I mean, we were able to deliver

21   content to it externally.  But we are not able to access any of

22   the processing of that content internal to the -- that is

23   internal to the TV.

24   Q    Is it your assessment that Stream TV had strong security

25   protocols on content?
```

1   A    Yes, our team has a number of people that are

2   sophisticated and understand how to deliver and manage content

3   in audio visual equipment and we were not able to get access to

4   it.

5   Q    At the last hearing that was held on October, I believe it

6   was 27th, 2023, did you hear the testimony of Mr. Rajan that

7   the security --

8   A    Yes.

9   Q    -- that the security protocols by SeeCubic, Inc. on

10  content were removed on 8K TV's, automotive, and gaming?

11  A    I did and that -- that was very distressing to myself and

12  Rembrandt staff.

13  Q    Did you hear that some content companies thought the TV's

14  produced by SeeCubic, Inc. were so bad that they were even

15  mapping directly to the device?

16  A    Yes.

17  Q    Did you know that Stream TV has begun to work with content

18  companies and is maintaining security protocols?

19  A    Yes.

20  Q    If the content files are released that contain trade

21  secrets, do you think that is irreparable damage to Stream TV?

22  A    Yes, and to Rembrandt, which is more my concern.  But I

23  understand for the Motion that it's about Stream TV, yes.

24  Q    Thank you.  The Eindhoven engineers that were working at

25  Rembrandt, with a Rembrandt processor, prior to working with

1    Stream TV, is that correct?

2              THE COURT:  Wait, what was the question?

3    BY MR. KODOSKY:

4    A    Yes.

5              MR. KODOSKY:  Eindhoven engineers.  E-I-N-D-H-O-V-E-

6    N.

7              THE COURT:  Oh, Eindhoven --

8              MR. KODOSKY:  Eindhoven.

9              THE COURT:  -- engineers.  What about them?  I'm

10   sorry.  He understood, I didn't.  What was the question?

11             MR. KODOSKY:  We're working at Rembrandt with a

12   Rembrandt predecessor prior to working with Stream TV.

13             MR. COLBY:  Objection, Your Honor.  I don't think

14   it's been established that Mr. Michaels was involved with that

15   predecessor at that time.  I don't think it's been established

16   that he has firsthand knowledge.

17             THE COURT:  Okay.

18             MR. KODOSKY:  I'm asking if he knows.

19             THE COURT:  Well, how does he know?  You can ask him

20   how does he know.

21             MR. KODOSKY:  I haven't had the opportunity yet.

22             THE COURT:  All right.  Well, his objection's

23   sustained.  Establish a foundation on how he would know the

24   Eindhoven engineers were working for Rembrandt's predecessor

25   prior to -- what was the question -- prior to --

1           MR. KODOSKY:  Prior to working with Stream TV.

2   BY MR. KODOSKY:

3   Q    Do you have any understanding, Mister --

4   A    Yes.

5   Q    -- Michaels?  Based on what?

6   A    My law firm has been representing Stephen Blumenthal and

7   the companies that he's worked with for 30-something years.  I

8   was involved in the litigation and read the testimony, heard

9   the testimony as various Stream TV employees, and have seen

10  numerous documents going back and forth between engineers in

11  Eindhoven and Stephen Blumenthal.  And I -- just up until

12  today, that that has not been disputed that those engineers

13  worked with 3DFusion and Stephen Blumenthal for roughly 18

14  months before they went to go work for Stream TV, or more

15  accurately, SeeCubic BV, a subsidiary of Stream TV.

16  Q    Were there 45 meetings with meeting notes and a list of

17  attendees with Steve Blumenthal?

18  A    Yes, and I reviewed those.

19  Q    Who attended the 45 meetings?

20  A    There are a number -- I think it's 7 to 12 engineers and

21  individuals from the -- the Ein -- what's been referred to as

22  the Eindhoven team.  They're mostly former Phillips employees

23  that left Phillips to come work with 3DFusion and Stephen

24  Blumenthal, and Stephen Blumenthal's former business partner in

25  3DFusion, Ilya Sorokin.

```
 1   Q    Were the four trade secret claims discussed in the 45

 2   meetings?

 3   A    Those trade secrets were.  They weren't claims at that

 4   point.  They were trade secrets that were going back and forth

 5   between that team and -- and Stephen Blumenthal.

 6   Q    Who were the engineers who signed NDAs with Rembrandt?

 7   A    I'd have to look back through the full records, but at

 8   least Walter Roelen, Hans Zuidema, Bart Barenbrug.  And I -- I

 9   think there are a number of others.  I'd have to look through

10   our documents to refresh my recollection as to the names.

11   Q    And I believe one of the names that you mentioned was

12   Walter Roelen, R-O-E-L-E-N; is that correct?

13   A    Yes.

14   Q    Was Roelen paid by Rembrandt's predecessor?

15   A    Yes.

16   Q    Did he hold himself out as a de facto agent?

17   A    Yes, and he was the director and CEO of the Netherlands'

18   entity of 3DFusion.

19   Q    Was code on some of the trade secrets claims shared with

20   Steve Blumenthal?

21   A    Yes, and -- and in and amongst that entire team.

22   Q    What is the risk for Stream TV and Rembrandt if that trade

23   secret is leaked out?

24   A    Once -- once leaked, it's going to be gone forever.  The

25   entities working in this space are in China, Korea, India,
```

1    Japan, Taiwan.  I mean, these countries are not known for

2    respecting intellectual property.  You know, to date, as far as

3    we know, Stream TV has never released any of that code, even

4    though they were putting it to use without our permission.  And

5    we were upset about that and eventually reached that license

6    agreement.  To our knowledge, other than -- I believe the only

7    time we accused them of disclosing it was in a patent

8    application for one aspect of the trade secret information that

9    we outlined in our complaints.  But other than that, they've

10   kept it secret as far as we know.

11   Q    If the Phillips license is canceled, what is the damage to

12   Stream TV and I guess, by extension, to Rembrandt?

13   A    Well, Rembrandt has other sources in their other licensees

14   to the Phillips license that we can work with and have been in

15   the past.  For Stream, it would largely be the end of the road.

16   The -- the -- the technology is completely reliant on Phillips

17   2D-plus-Depth system, and they have hundreds -- I think it's

18   even up to about 1,500 patents -- that were -- has now been

19   sold to Leia but is now -- but anybody who had a license,

20   they've -- they've had to honor that, similar to selling a

21   building.  They have to honor the -- the leases to any existing

22   tenants.  So if lost, I -- Phillips is no longer capable of --

23   of issuing a new license, and Leia has its own business

24   strategy for how it wants to work with partners in that -- in

25   that space.  And so it'd be catastrophic.  And there's quite a

 1   bit of incentive for Phillips and/or Leia to want to be in a

 2   position to cancel that license.  The licenses being issued

 3   today are many multiples in order to magnitude higher value

 4   than what Stream was able to purchase that license for.

 5          MR. COLBY:  Objection, Your Honor.  I move to strike

 6   the witness's answer.  He's testifying about what Leia would

 7   want to do or what Phillips would want to do.  Mr. Michaels was

 8   initially proffered as an expert.  The Court denied that

 9   request.  If he wants to testify about Rembrandt and

10   Rembrandt's license fine, but he shouldn't be permitted to

11   testify about Phillips', you know, what their -- what would be

12   more valuable to them and why they'd be incented to cancel the

13   license.  He just has no firsthand knowledge of that.  It's not

14   appropriate.

15          THE COURT:  Counsel?

16          MR. KODOSKY:  I can ask what his understanding is

17   based on.  I believe that he can explain where that foundation

18   is coming from.

19          THE COURT:  Tell me what is -- you can ask him what,

20   you know, his understanding of how he came to that.

21   BY MR. KODOSKY:

22   Q    You mentioned -- Mr. Michaels, you mentioned Leia.  Who is

23   Leia and what is your understanding based on?

24          THE COURT:  How do you spell that?

25          THE WITNESS:  So Leia --

 1            MR. KODOSKY:  I'm sorry.

 2            THE WITNESS:  I'm sorry.  Is there an objection?

 3            THE COURT:  How do you spell Leia?  I have it as L-E

 4  -- I'm sure it's wrong.

 5            MR. KODOSKY:  L-E-I-A?

 6            THE WITNESS:  L -- yes.

 7  BY MR. KODOSKY:

 8  Q    Go ahead, Mr. Michaels.

 9  A    So they're an entity based out of California.  And they

10  Have been acquiring companies and technology in the no-glasses

11  3D space.  They bought Dimenco, which is a former subsidiary or

12  spin out of -- of Phillips, and they purchased the Phillips

13  patent estate relating to the hardware for no-glasses 3D TV.

14  And that's a matter of public record from the assignments going

15  back and forth and their press release.  I've also spoken to

16  representatives in the business development office at Leia a

17  number of times and emailed back and forth.

18  Q    Is there a risk to Stream TV and I guess, by extension,

19  Rembrandt when SeeCubic, Inc. and Mr. Stastney have been

20  telling people that they're going to sublicense the whole

21  industry?

22  A    It's literally impossible.  I mean, it -- it is a legal

23  impossibility.  The licenses are a record and prohibit that

24  specifically.  Virtually, any intellectual property attorney

25  would render the same conclusion.

1          MR. COLBY:  Objection, Your Honor.  Mr. Michaels

2    isn't able to testify about what the Phillips license allows or

3    doesn't allow.  His company is not a party to that.  He's not

4    an expert.  And so I don't think he has a basis to be -- for --

5    for the testimony he just offered.

6          MR. KODOSKY:  I believe that Mr. Micheals -- I can

7    ask him if he's reviewed the Phillips license.  I believe that

8    he has, Your Honor.

9          THE COURT:  Okay, but I -- I thought he said that his

10   -- some of his companies had licenses --

11         MR. COLBY:  Yeah, exactly.

12         THE COURT:  -- with Phillips.

13         MR. KODOSKY:  Mr. Rembrandt has a license with

14   Phillips.  It's not the Ultra-D ventures license.  They're

15   different.  Two different companies, two different licenses.

16         THE COURT:  Well, I guess he can --

17         MR. COLBY:  He's not an expert.

18         THE COURT:  -- say based on his own license, but he

19   can't tell me what they would do with respect to somebody

20   else's --

21         MR. COLBY:  Okay.

22         THE COURT:  -- licenses.

23         MR. COLBY:  That's what we discussed when this came

24   up last name.  He can testify about his own license, but not --

25         MR. KODOSKY:  Your Honor, the license with Phillips

1   has been produced as an exhibit.  It's been entered into the

2   record in this case.  And if asked, I believe Mr. Michaels will

3   say that he's reviewed it.

4          MR. COLBY:  But just because somebody's reviewed a

5   document doesn't give them the ability to come in and freely

6   testify their opinion as to what legally it permits and doesn't

7   permit.  Mr. Rajan testified about that.  He's a party to it.

8   He testified to his understanding.

9          THE COURT:  Well, his understanding.

10          MR. COLBY:  Right.

11          THE COURT:  Mr. Stastney --

12          MR. COLBY:  Mr. Stastney testified about it -- his

13   understanding.  Mr. Michaels -- his company is not a party to

14   it.  It's just not appropriate evidence.

15          MR. KODOSKY:  Mr. Stastney is not a party to the

16   contract either -- to the license agreement either.

17          MR. COLBY:  Yeah, he was --

18          MR. KODOSKY:  SeeCubic, Inc. is not a party to the

19   license agreement.

20          THE COURT:  Well, you couldn't -- you should've

21   objected when he said it, and we have it in the record.  It is

22   what it is.

23          MR. COLBY:  And he was overseeing.  During the period

24   of time when the omnibus agreement was in place, he was

25   overseeing the assets of Stream, which included the license and

1   the subsidiaries, and those sorts of things.  So --

2            THE COURT:  That's his understanding of what it

3   meant.

4            MR. COLBY:  Yeah, yeah, and he had personal

5   involvement with it.

6   BY MR. KODOSKY:

7   Q    As part of the diligence to give out the license, what did

8   you review?

9   A    One of the critical documents we reviewed and discussed,

10  even at the first mediation hearing, was whether or not Stream

11  had acquired a license from Phillips and -- because we knew

12  that was essential for them to be able to meet the terms of the

13  settlement agreement and particularly providing millions of

14  units of TVs that Rembrandt is relying upon to capture the

15  value from that license.  It was every single one of our trade

16  secrets that we have listed in that agreement references the

17  Phillips 2D-plus-Depth technology.  It is the -- our technology

18  is based off of that original Phillips, so -- so Phillips

19  license.  So if they did not -- if Stream did not have a

20  Phillips license that fully satisfied the ability to

21  manufacture TVs for us, we would not have entered into the --

22  the settlement agreement as we had.

23  Q    When Mr. Stastney testified back on October 6th and said

24  that SeeCubic was talking to over 100 companies, in your view,

25  is that a violation of the automatic stay in this case?

```
 1              MR. COLBY:  Objection, Your Honor.

 2              THE COURT:  Counsel, response?

 3              MR. KODOSKY:  What's the objection?

 4              MR. COLBY:  The objection is --

 5              THE COURT:  The objection is he's not the judge who's

 6  going to say it's a violation of the stay.  And what's his

 7  basis?  Is he a bankruptcy lawyer?

 8  BY MR. KODOSKY:

 9  Q    Is there a risk or a potential --

10              THE COURT:  Are you withdrawing that question?

11              MR. KODOSKY:  I'll withdraw the question, Your Honor.

12              THE COURT:  All right.  Sustained, Mr. Colby.

13  BY MR. KODOSKY:

14  Q    Is there --

15              THE COURT:  Oh, it's withdrawn.  I don't have to

16  sustain.

17  BY MR. KODOSKY:

18  Q    Is there a risk --

19              MR. COLBY:  I agreed to it anyway, Your Honor.

20  BY MR. KODOSKY:

21  Q    Is there a risk to harm to See -- I'm sorry, to Stream TV

22  and Rembrandt by virtue of SeeCubic, Inc. and Mr. Stastney

23  speaking to over a hundred companies regarding sublicensing?

24  A    Yes.

25  Q    What is your understanding of the current status of the
```

1    Phillips patents?

2    A    The -- the Phillips patents, just to hone in, they have

3    hundreds of thousands of patents.  But the -- the 1,500 or so

4    that are listed as related to no-glasses 3D hardware have been

5    sold to Leia, Inc., and that's been made a public record.  They

6    maintain patents related to contract -- content creation and

7    certain tools, and they would still maintain the rights to some

8    of their software and knowhow that they had licensed out to

9    3DFusion and to Stream over the years.

10   Q    Are you familiar, Mr. Michaels. with the term, "parallel

11   licensing?"

12   A    I am.

13   Q    What's the difference between parallel licensing and sub

14   licensing if there is a difference?

15   A    Well, it's about 180 degrees difference.  The -- a

16   sublicense is that I sell you a building and, or I mean, I rent

17   you a building and allow you to bring in tenants as you see fit

18   and to rent out apartments to others and make a profit on that.

19   And a parallel license is I've rented you a single apartment.

20   If you have a friend who wants to rent an apartment, you must

21   refer them to me, and I will issue the lease for that

22   apartment, and you're to have no part of it.  You have no right

23   to represent me in that -- in that transaction.  And it is my

24   building, and I will control the license.

25            MR. COLBY:  Objection, Your Honor.  I'd move to

1    strike the witness's testimony.  It sounds an awful lot like

2    the expert testimony that he was attempted to be proffered to

3    give, which was denied.  There is no basis in the questions for

4    why that's relevant to the Rembrandt license.

5          MR. KODOSKY:  And five minutes ago, Your Honor, that

6    he reviewed as part of his due diligence, the language.  He is

7    a member of the patent bar.  Having reviewed the language, I

8    certainly feel it's appropriate for him to give his

9    understanding of the difference between the -- between the two.

10          MR. COLBY:  Yeah.  So I think a lay witness is not

11    permitted to give an opinion that's based on scientific,

12    technical, or otherwise specialized knowledge.  And it sounds

13    as though that's precisely what he's being offered for.

14          MR. KODOSKY:  He's a patent attorney with --

15          MR. COLBY:  He's either an expert, and it wasn't

16    disclosed.

17          THE COURT:  Well, he's not as -- but I think I will

18    allow it for what's it's worth to say what is a parallel

19    license.  And he's said it in terms of an apartment -- and

20    sublicense.  I mean, the term sublicensing -- is that a

21    technical term?  You believe it's a technical term?  If it's a

22    technical, and he's offering it as an expert, then, yes, I

23    would agree, I would sustain.  But how -- I mean, is this based

24    on his -- some understand -- how does he know this?

25    BY MR. KODOSKY:

1  Q    Mr. Michaels, how did you obtain your understanding of the

2  term parallel licensing?

3  A    I've worked on thousands of licenses.  I represented

4  Lucent, a number of companies in the display industry; Corning

5  -- I've done a number of licenses with Corning; Samsung, Canon,

6  Nikon, Picvue Electronics.  Take your pick.  I mean, I -- I

7  don't know that I can list them all now, but the -- I have a

8  fair understanding of the types of licenses that are offered

9  and negotiated.  These are pretty basic, I mean, I -- I don't

10  even know that it -- these are pretty basic concepts in terms

11  of what's being offered.  It's just -- it's not exclusive

12  versus exclusive, you know, are somewhat self-explanatory

13  terms.  But this was a non-exclusive license.  I also have a

14  business background, and the -- the value of a non-exclusive

15  versus an exclusive license or a license that carries with it

16  the right to sublicense is something that I have immense

17  experience as a business professional and with respect to how

18  Rembrandt it conducts its business.  So I'm happy to testify to

19  any of those facts.  But in this particular instance, I can

20  spec -- I can testify with specificity as to how it affects the

21  value ascribed to the technology that we license out as to

22  whether or not we are licensing something with the right to

23  grant sublicenses or not.

24  Q    Mr. Michaels --

25          THE COURT:  Whoa, whoa, whoa, whoa.

1          MR. COLBY:  That sounded an awful lot like an

2   expert's CV.  If Mr. Michaels is being offered as an expert, we

3   think that's inappropriate and shouldn't be allowed.  If Mr.

4   Michaels wants to testify about something specific to Rembrandt

5   and the Rembrandt license, which is at issue here, that may be

6   a different story, but that sort of untethered expert testimony

7   is improper because it's undisclosed expert testimony or it's

8   improper lay opinion that requires technical or specialized

9   knowledge.

10          MR. KODOSKY:  And cert --

11          MR. COLBY:  That's precisely what the witness just

12   said.

13          MR. KODOSKY:  I think, Your Honor, that they opened

14   the door with Mr. Stastney's testimony on this in the first

15   place.  And to the extent that he's got direct experience

16   working with thousands of licenses and speak to what parallel

17   licensing means, it sounds like he said that it's a pretty

18   basic concept that would benefit the Court to have that

19   testimony.

20          THE COURT:  Basic.  So it's a basic concept that

21   anybody would know without having to be an expert.  I know what

22   a sublicense is, and I'm not an expert.

23          MR. COLBY:  This is -- but it's testimony.  It's sort

24   of free floating --

25          THE COURT:  I mean --

1    MR. COLBY:  -- expert testimony about what -- Mr.

2    Stastney did address this, but again, that's based upon -- and

3    Mr. Rajan, I believe, addressed this too.  That's based upon

4    the fact that they have been part of companies that were the

5    counterparty to the Phillips license.  Mr. Michaels is not.

6         THE COURT:  And he was saying -- and so I will

7    sustain -- can you sustain in part -- to the extent his

8    testimony was as Rembrandt -- he said, I know as Rembrandt that

9    we're a party to these things, I'll allow that.  But just

10   general free flowing, no, no, no.

11        So you have to ask him in the context of -- because

12   he said he was -- he represented Rembrandt, he was involved, he

13   know what all these things are.  What does he -- based on that

14   experience, what is his understanding of what a parallel

15   license is versus a sublicense.

16        MR. COLBY:  And I --

17        MR. KODOSKY:  As allowed, Your Honor?

18        THE COURT:  Wait a minute.

19        MR. COLBY:  I apologize for interrupting, and I'm

20   trying to be economical with my objections to keep moving, but

21   I also think it's important to stay focused on the issues that

22   the Court identified.

23        THE COURT:  Why?  I don't know -- well, and maybe

24   they think it's important, and I get why they think it's

25   important because they think that it's important.  And maybe

```
 1    I'm just -- never mind.  Never mind.  Then we're going to go

 2    off on a whole tangent.

 3            Just go ahead.  You can ask him and restrict it to

 4    his experience with Rembrandt.

 5    BY MR. KODOSKY:

 6    Q    Restricted to your experience with Rembrandt, Mr.

 7    Michaels, does that change your answer at all?

 8            MR. KODOSKY:  Go ahead.  I'm sorry.

 9            THE COURT:  What answer?  We didn't allow the answer.

10    BY MR. KODOSKY:

11    Q    Please answer the question as limited to your experience

12    with Rembrandt.

13    A    Sure.  My experience with Rembrandt is that we are --

14    Rembrandt is willing to license its technology on a non-

15    exclusive basis with a -- with without a right to sublicense

16    for a much smaller amount in terms of cash and TVs that will be

17    provide to us.  And we would, if somebody wanted to exclusively

18    license our technology or obtain a license with the right to

19    sublicense others.  For example, if Stream were to enter the

20    market with a no-glasses 3D TV, and Samsung or LG, or any large

21    manufacturer wanted to go into business to manufacture a

22    similar TV, they would approach Phillips, Rembrandt, and

23    potentially Stream as well, and we would be able to negotiate a

24    fee all over again.  And at this point with a successful TV on

25    the market, it would be worth even more.  So it has a
```

1   substantial value to us to be in control of that technology,

2   and it would have a substantial value to us that Stream and

3   Rembrandt are collectively selling TVs that are the only no-

4   glasses 3D TVs on the market.  So it would -- I don't believe

5   this is radical thinking that if you were the only one that can

6   provide something that other people value, you can command a

7   much higher price.  So sub licensing or send -- send -- selling

8   something to Hyundai Motors that they get manufactured with

9   somebody who has no obligation to Stream or Rembrandt

10  significantly hurts the value of the product that Rembrandt is

11  hoping to acquire.  And it would certainly hurt the value of

12  Stream -- both of its intellectual property, its current

13  assets, its ability to sell other TVs, et cetera.

14  Q    Did you hear Mr. Rajan testify at the last hearing that

15  SeeCubic, Inc is doing $600,000 a month in revenue?

16  A    Yes.

17         THE COURT:  Who's doing 600,000 in revenue?

18         MR. KODOSKY:  SeeCubic, Inc.

19         THE COURT:  SeeCubic, Inc., okay.

20  BY MR. KODOSKY:

21  Q    If the 600,000 in revenue is being diverted to another

22  company, does that have an impact upon the Debtors or

23  Rembrandt?

24  A    Yes.  The -- Rembrandt has current litigation pending

25  against SeeCubic, Inc.  Our motion for preliminary injunction

1    was denied because there was a monetary potential for a license

2    fee even though that license fee is valued at roughly $2

3    billion.  And to our knowledge, SeeCubic, Inc. does not have $2

4    billion to pay it.  But diverting income and revenue to a

5    different entity certainly compromises their ability to satisfy

6    the likely judgment that's coming against them for their

7    activities to date.

8    Q    Did you hear Mr. Rajan testify in the last hearing that he

9    believed that SCBV is essentially -- that SeeCubic, Inc. is

10   bloating the expenses in the subsidiaries by $650,000 a month,

11   basically to have excess employees to work on SeeCubic Inc.

12   projects as opposed to the four or five employees that would be

13   needed to -- that he would believe would be necessary to work

14   on the Stream TV projects?

15   A    I -- I heard the testimony and have my own opinion.

16   Q    What is your opinion?

17             THE COURT:  Whoa --

18             MR. COLBY:  Objection.

19             THE COURT:  -- whoa, whoa, objection.

20             MR. COLBY:  He can ask the question if he heard the

21   testimony.  I was preparing to object to the next question.

22             THE COURT:  Which is?  What was the next question?

23             MR. COLBY:  I'm just waiting.

24             MR. KODOSKY:  What is your opinion.

25             MR. COLBY:  But I believe the question was --

1               THE COURT:  About what?

2               MR. COLBY:  -- what is your opinion about that.

3               MR. KODOSKY:  The number of employees that SCBV

4    needs, whether it's to be involved with Rembrandt associated or

5    affiliated projects or SeeCubic Inc projects.

6               MR. COLBY:  So Mr. Michaels has no factual basis

7    whatsoever to be testifying about the work that's happening at

8    SeeCubic BV or SeeCubic Inc.  He may have an opinion about

9    whatever Rembrandt work is happening, if there is any, but

10   should not be permitted to testify as to his opinion as to

11   staffing levels in a company he has no involvement with.

12              THE COURT:  Counsel?

13              MR. KODOSKY:  All Stream work, Your Honor, is

14   Rembrandt work.

15              THE COURT:  Well, that's all fine and well, but what

16   knowledge does Mr. Micheals has of the operations of SC BV?

17              MR. KODOSKY:  If the question is whether or not four

18   or five key employees over the Netherlands versus the 30 or 40

19   that SeeCubic is using to bloat the expenses over there.

20              THE COURT:  How would he know?

21              MR. KODOSKY:  That's what I was hoping to ask him.

22              THE COURT:  No, you didn't ask -- okay.

23              MR. KODOSKY:  He said that he's got an opinion on it.

24              THE COURT:  So what?  I can have an opinion on it

25   too.  That doesn't mean anything.  No offense, Mr. Kodosky.

 1   I'm not trying to be flippant.  But you have to establish some

 2   basis as to how he would know, one, how many employees are

 3   necessary, how many projects, what's his basis for that?

 4   Presumably, he was involved in some develop -- I don't know why

 5   he would know that.

 6           MR. COLBY:  What work is being done.

 7           THE COURT:  Wait a minute.

 8           MR. COLBY:  Oh, sorry.

 9           THE COURT:  No, I said one, he would have to know how

10   many employees for a -- what type of contract.  How many is

11   involved.  The basis for his knowledge.  And that, you know,

12   based on his involvement in other projects, this is -- he can

13   tell me that.  That doesn't necessarily mean it's bloated.  But

14   he can tell me what he thinks is a good number, but he has to

15   tell me how he would know that, just in general.

16           MR. KODOSKY:  I believe he said that he was here at

17   the last hearing.

18           THE COURT:  I get he can hear whatever he wants.  My

19   question is what is his personal knowledge as to why.  If he

20   says I have been involved in projects developing whatever

21   they're developing, and typically you need ten employees to do

22   this type of work.  Then that's his opinion as to how many

23   employees are needed for that type of work.  Then you can tie

24   it up later, but you've got to tell me how he would even know

25   that.  Not necessary even related to SC BV.

```
1              MR. COLBY:  That's my -- yeah.

2              THE COURT:  Just to how many -- you know, we've --

3    I've been involved in a project for Rembrandt when they were

4    developing the glasses, I don't know.  And you have -- in that

5    project, we were doing proof of concepts for this dollar

6    amount, and we had X amount of engineers or this amount of

7    employees, and then you could somehow relate that.  But he just

8    can't say I think I heard somebody say.

9              MR. COLBY:  Even, Your Honor, even I would still

10   maintain that the objection goes beyond that.  Even if Mr.

11   Michaels were to testify in my past experience at Rembrandt, we

12   did this type of work and we did this many people, if he's --

13   he can't, by definition, because he doesn't know -- opine on

14   the staffing levels at SeeCubic BV.  And so if he can't do

15   that, who cares, frankly what they're --

16             THE COURT:  Well, he can if they're similar --

17   similar projects.

18             MR. COLBY:  But he doesn't know if it's similar

19   projects.

20             THE COURT:  Well, that's not --

21             MR. COLBY:  So like there's no way --

22             THE COURT:  Well, you haven't asked -- you haven't

23   asked him what he knows.

24             MR. COLBY:  -- no way to connect it over so it's --

25             THE COURT:  I don't know what the point is.
```

1    MR. COLBY:  -- it's by definition not relevant is

2    what I was getting to.

3    THE COURT:  But you don't know because he hasn't

4    asked him what he knows and how he knows, other than he heard

5    Mr. Rajan say it.  That's the point.  The point is you can't

6    just because you heard somebody say, say I think this.  You

7    have to say based on my own knowledge -- this is how we staffed

8    it.  Based on my knowledge, this is what they're doing because

9    Mr. Stastney has testified to what these projects are and who

10   they're for.  He may say based on my experience, we did this

11   based on what I heard Mr. Stastney say, I think this.  But you

12   got to give me something other than he heard somebody say.

13   MR. KODOSKY:  Actually, Mr. Stastney refused to tell

14   us who their projects were for.

15   THE COURT:  Doesn't care what he told you who it was

16   for.  He told you what they were doing.  But that doesn't

17   matter.  You still have to establish how Mr. Micheals would

18   know what is proper staffing.

19   BY MR. KODOSKY:

20   Q    What personal knowledge, Mr. Micheals, do you have

21   regarding proper staffing levels at SC BV?

22   A    My -- I used to be CEO of New Pics, LLC (phonetic).  We

23   received roughly four million dollars in New York State Energy

24   Research Development grants.  We built our displays from

25   scratch.  We built all of our own production equipment.  We

```
 1   built those displays with the head of the company, the founder,
 2   Chad Mower (phonetic).  And he had a technical assistant, and I
 3   would go over every once in a while, to assist.  But we were
 4   able to build the world's largest plasma address liquid crystal
 5   display at the time with two full time people and me helping
 6   out every once in a while.
 7   Q    Tell us how that relates to SC BV?
 8              MR. COLBY:  I object.
 9              THE WITNESS:  The --
10              THE COURT:  Well, woah.  He's objecting.
11              MR. COLBY:  Yeah, I object.  There again, we've
12   gotten very far from what's supposed to be the core issue of
13   this TRO hearing.  Mr. Michaels' view on staffing levels have
14   nothing to do with whether or not there's some threat to the
15   Phillips license or whether or not there are adequate
16   protections around trade secrets.  We are so far afield right
17   now, and we just need to focus on the issues the Court
18   identified and move on.
19              THE COURT:  All right, Mr. Kodosky, he's objecting on
20   the basis of relevance.  How is this relevant to me deciding
21   whether I'm going to issue a preliminary injunction?
22              MR. KODOSKY:  I have nothing further, Your Honor.
23   We'll reserve for rebuttal.
24              THE COURT:  All right.
25              MR. KODOSKY:  Thank you.
```

1              THE COURT:  All right.  For redirect, okay.

2              Mr. Colby, you got about -- I'm going to -- what is

3    the motion?  What do they say?  Okay.  Of course, they say

4    whatever I want.

5              MR. COLBY:  It's nice to be the judge.

6              THE COURT:  Yeah.  Three dollars will get me a cup of

7    coffee.

8              All right.  Go ahead.

9                        CROSS-EXAMINATION

10   BY MR. COLBY:

11   Q    Mr. Michaels, you described earlier today a process when

12   you examined the Stream TV technology.  Do you recall that

13   testimony?

14   A    Yes.

15   Q    That was in 2019, correct?

16   A    It would have -- that would have been in 2017, '18, '19.

17   We've done so again in '20, '21, and '22.  I don't know that --

18   again, I think early 2023, we've looked at various aspects of

19   the Stream TVs.

20   Q    Okay.  You've not conducted that type of examination of

21   any technology that's being used by SeeCubic BV in 2023,

22   correct?

23             MR. KODOSKY:  Object.  Misstates his testimony.  He

24   said that some of it was in 2023.

25             MR. COLBY:  He said 2022.  I'm asking --

1          THE COURT:  He said early 2023.

2          THE WITNESS:  In '23.

3     BY MR. COLBY:

4     Q    Okay.  So but the units that you examined, those came from

5     who?  From Stream TV?

6     A    Yes, and more accurately, people they sold TVs to supply

7     some of those TVs for Rembrandt.

8     Q    Okay.  And the units that are being used by the folks at

9     SeeCubic BV in 2023, you've not examined those in 2023,

10    correct?

11    A    I have not.

12    Q    So you're not in a position to testify about what trade

13    secret protections are in place on the technology that's being

14    used by SeeCubic BV in 2023, correct?

15    A    Our understanding -- that, I don't believe, is correct.

16    And our understanding comes from SeeCubic's position in the

17    Delaware litigation.  Part of the unknown, and that we would

18    find out in discovery very early, is whether or not SeeCubic

19    has been making anything.

20          One of the issues that was raised by both parties is

21    whether or not everything that SeeCubic has been providing or

22    offering for sale was provided by Stream, which would mean that

23    it was licensed and therefore, they would not be liable for

24    patent infringement and for trade secret misappropriation for

25    offers to sell or sales of those TVs.  If you are representing

1    to us that SeeCubic is --

2            THE COURT:  Wait a minute.  That's enough.  That's

3    enough.  That's enough.  That's enough.

4    BY MR. COLBY:

5    Q    Mr. Micheals, I'm simply asking whether or not you've

6    conducted that type of examination on the units that are being

7    used by SeeCubic BV in 2023.  I think the answer was no,

8    correct?

9    A    I have not conducted that in -- that -- I'm not aware that

10   SeeCubic has made anything.  And so my understanding is that

11   they were largely selling or entirely selling products made by

12   Stream TV.  If SeeCubic is actually making product, I

13   appreciate that information.  That will be helpful.

14   Q    I'm asking about --

15   A    But right now --

16           THE COURT:  So he said no because they haven't

17   produced any.

18   BY MR. COLBY:

19   Q    Right.  I'm asking about SeeCubic BV.

20   A    I understand.

21   Q    Okay.

22   A    Oh, SeeCubic BV.

23   Q    Yes.

24   A    I -- SeeCubic BV, my understanding is that their efforts

25   were incorporated into the TVs sold by Stream TV.  So yes, I

 1 | believe I have reviewed what they have been preparing to my
 2 | knowledge today.
 3 | Q    And to the extent that that's true, the last time that you
 4 | conducted that exam -- that type of examination was in early
 5 | 2023?
 6 | A    Yes.  I'd have to look at the -- it was about the time
 7 | that we -- I sent the email to Ian Lifton (phonetic) and then
 8 | shortly thereafter, we had accessed additional units to review.
 9 | Q    And Mr. Micheals, you -- the proof-of-concept projects
10 | that have been talked about in this hearing, you have not had
11 | any opportunity to examine the technology that is -- I'm sorry.
12 | Let me start that over again.  The proof-of-concept projects,
13 | you're not involved in those, correct?
14 | A    I am not personally involved in those projects, no.
15 | Q    You're not an employee of SeeCubic BV?
16 | A    I am not an employee of SeeCubic BV.
17 | Q    You're not a principal of SeeCubic BV?
18 | A    I am not.
19 | Q    You've not been a party to any conversations that SeeCubic
20 | BV may have had with the counterparties to those proof-of-
21 | concept projects?
22 | A    Only in the respect of our communications with the
23 | independent director.
24 | Q    Right.
25 | A    And I should add, Mathu Rajan and Bud Robertson (phonetic)

1    to the extent they had knowledge and were involved in those

2    conversations.

3    Q    Right.  You personally -- you personally haven't been

4    involved in those conversations, correct?  With the

5    counterparties on these proof-of-concept projects, right?

6    A    With the counterparty, no.  Not -- I haven't directly

7    spoken to any of the counterparties.

8    Q    The units that you examined in early 2023, do you know

9    when they were manufactured?

10   A    I do not, but it is -- I don't know the exact date of

11   manufacture.  But I believe that it was prior to the omnibus

12   agreement being signed.

13   Q    Okay.  So prior to 2020 or earlier?

14   A    Yes.

15   Q    So you've not examined any of the devices that have been

16   manufactured, if any, at SeeCubic BV since 2020?

17   A    Not that I'm aware of, no.

18   Q    Mr. Micheals, you don't know whether or not the projects

19   that are currently being worked on at SeeCubic BV, you don't

20   know whether or not those use any Rembrandt technology,

21   correct?

22   A    I'm not sure I follow exactly the negatives in your

23   question.  It is our understanding that those projects are

24   incorporating Rembrandt technology and Phillips technology.

25   Q    You're not involved in those projects, correct?

1   A    I am not directly talking to the third parties, and I am

2   not an employee or officer of SC BV.  Those are the questions

3   you asked me.  But I'm -- I've been provided information about

4   those projects, and I've heard testimony about those projects

5   by Shadron Stastney.  So I -- so our understanding, giving you

6   my best understanding, is that it includes our technology.

7   Q    Right.  Your understanding is based upon what you've heard

8   here in this courtroom?

9   A    It's based on conversations with people that have examined

10  those products.  It's based on what -- we included pictures in

11  our Delaware complaint of what SeeCubic was offering.  It's

12  part of the evidence.  It's based on what SeeCubic has put on

13  its own website.  I mean, there's -- there's a very large

14  complaint with a large number of exhibits in the Delaware

15  complaint that was filed back in March that details our basis

16  for bringing that case and making those allegations.  And I can

17  go on at length, but we have beliefs and understanding that

18  that tech -- those projects include our technology.

19  Q    Right.  I guess I'm asking a more precise question.  Given

20  that you have no first-hand involvement in those projects, you

21  don't know whether or not they rely on any Rembrandt

22  technology.  You don't know that first-hand, correct?

23  A    I don't agree with that statement.

24  Q    You do agree with the statement that you don't have any

25  involvement in those -- any first-hand involvement in those

 1   projects, correct?

 2   A    I do.

 3   Q    Mr. Michaels, you've not been party to any conversations

 4   between SeeCubic Inc and Phillips, correct?

 5   A    I have not been on the phone when SeeCubic has spoken to

 6   Phillips.  That is correct.

 7   Q    And you have no first-hand involvement in the current --

 8   you have no first-hand involvement in the current security

 9   arrangements around trade secrets in IP at SeeCubic BV,

10   correct?

11   A    I'm -- you need to repeat -- I didn't follow that, I'm

12   sorry.  I'm not --

13   Q    Sure.

14   A    Just not understanding what you --

15   Q    Sure.  You don't work at SeeCubic BV, correct?

16   A    I do not work at SeeCubic BV.

17   Q    Right.  So you're not involved in -- you have no first-

18   hand involvement in whatever protections SeeCubic BV currently

19   has around trade secrets and IP, correct?

20   A    I do not.

21        MR. COLBY:  Just one minute, Your Honor.

22        THE COURT:  Uh-huh.

23        MR. COLBY:  I don't have any other questions at this

24   time, Your Honor.

25        Mr. Caponi may.

1                      CROSS-EXAMINATION

2   BY MR. CAPONI:

3   Q    Good afternoon, Mr. Micheals.  Steve Caponi from K&L

4   Gates.  How are you?

5   A    Good.

6   Q    Good.  So you were involved with the New York litigation

7   we've been discussing today, correct?

8   A    Yes.

9   Q    And you participated in the mediation, correct?

10  A    Yes.

11  Q    And the mediation when the mediation concluded, did not

12  result in a settlement, correct?

13  A    Incorrect.

14  Q    You filed a motion with the magistrate arguing that a

15  settlement had been reached and the magistrate rejected that

16  argument, correct?

17  A    Incorrect.

18  Q    Are you aware that the magistrate issued a written

19  decision rejecting the notion that the mediation had resulted

20  in a settlement?

21  A    I am aware that the magistrate provided a writing.  It was

22  not a decision and it held that there were two types of

23  potential agreement, a phase 1 or a phase 2.  And then she

24  recommended that the action be taken to the district court to

25  litigate further and have a hearing as to whether or not it was

 1  a phase 1 agreement.  And as part of that, the -- we were

 2  proceeding down that path when the bankruptcy case was filed.

 3  We notified the court to stay the proceedings to continue the

 4  case.  We were then proceeded to -- when the bankruptcy was

 5  dismissed, we then proceeded to reenter mediation and

 6  settlement discussions that resulted in the settlement

 7  agreement that we have today.

 8  Q    When was the mediation?

 9  A    We started our mediation in 2018 and had numerous sessions

10  related to settlement and mediation, many of them outside the

11  presence of --

12  Q    Mr. Micheals, I appreciate that.  My question was more

13  direct.  What year was the mediation?

14            MR. ZAHRALDDIN:  Objection, Your Honor.

15            THE COURT:  Which mediation?  He said --

16            MR. CAPONI:  The mediation in New York.

17            THE COURT:  He said they'd started in whatever and

18  then it was stayed and then they started after the bankruptcy.

19            MR. CAPONI:  I'm getting there.

20  BY MR. CAPONI:

21  Q    When did the mediation in New York start, Mr. Michaels?

22  A    It started in 2018.

23  Q    And when did the magistrate issue a writing, as you call

24  it, saying that a settlement agreement had not been reached?

25  A    I'd have to look back.  I think it was 2020-ish.  Because

```
 1   it had come out -- or maybe it was 2021, because we were

 2   actively working on our response and preparing for the hearing

 3   when Stream filed for bankruptcy in the first instance.

 4   Q    And it's your testimony that the magistrate found that

 5   there was a possibility that a settlement had been reached and

 6   you just needed further proceedings in front of the district

 7   court?

 8   A    It is our -- I mean, it says what it says.  I mean, it's

 9   right in the record.  I'm not trying to -- I would rather not

10   even characterize it.  But it is certainly not true that she

11   made a decision.  She didn't have the power to do what you're

12   proposing.  But it -- she provided a writing that is on the

13   record that can be reviewed.  We talked about how we're getting

14   far afield.  I -- there is a written settlement agreement that

15   the parties reached.

16   Q    Excuse me, Mr. Micheals, I'm not asking you to --

17             THE COURT:  All right, woah, woah, woah, woah.

18             MR. KODOSKY:  Objection, Your Honor.

19             MR. ZAHRALDDIN:  Objection, Your Honor.

20             THE COURT:  Woah, woah, listen.  I get it.  She wrote

21   an opinion.  It says what it says.  He has his interpretation.

22   She's a magistrate.  They only have so much power.

23             MR. CAPONI:  Okay.  One more question, Your Honor.

24             THE COURT:  They only have so much power.

25   BY MR. CAPONI:
```

Case 2:10-bk-10763-cam Doc 1934 Filed 01/22/25 Entered 01/22/25 16:41:46 Desc
Case 23-12783-amc Doc 654-1 Filed 12/09/24 Page 1 of 1 Page 4256

206

Exhibit A   Mandamus Petition   Page 492 of 541

1  Q    Mr. Michaels, that magistrate that you said had no

2  authority to determine whether there had been a settlement,

3  that was the magistrate who oversaw the mediation, correct?

4  A    It was Magistrate Parker, yes, Katharine Parker.

5  Q    So to answer my question, the judicial officer in front of

6  whom you mediated was the magistrate that issued that opinion,

7  correct?

8  A    Yes.

9  Q    Thank you.

10         MR. ZAHRALDDIN:  Objection, Your Honor.

11         THE COURT:  What basis?  It's -- look.  I'm not -- I

12  don't know what this --

13         MR. ZAHRALDDIN:  Mischaracterizing the witness's

14  testimony.

15         THE COURT:  It is what it is.

16         MR. ZAHRALDDIN:  He restated it and said, oh, it's an

17  opinion.

18         THE COURT:  The magistrate -- listen.

19         MR. ZAHRALDDIN:  It's a typical gotcha maneuver.

20         THE COURT:  The magistrate said what they said.  The

21  ultimate determination belongs with a different court.  I'm not

22  an idiot and I wish you guys would stop it.  The magistrate --

23  the same way there are certain things that I can make a final

24  determination on and there's certain things I cannot.  I could

25  issue whatever I want on matters that I do not have the

```
 1    authority to make a final determination.  I issue.  I say what

 2    I say.  I send it to the district court.  The district court

 3    makes the final determination.

 4          So I can say whatever I want to say on matters that I

 5    do not have the authority to make a final decision and I am in

 6    basically the same role on certain things as the magistrate

 7    judge.  So I don't know what you guys are wasting your time

 8    for.  The magistrate can say whatever he or she wanted.  Is

 9    there a ruling by the district court, otherwise, I don't want

10    to hear it.

11          You guys can fight, put it in the record, it doesn't

12    matter to me what is what.  Okay.  And I don't know what this

13    has to do with anything, and I don't know why you even -- I

14    mean, why he's even talking about that.  It is what it is.

15          So Mr. -- you want to follow up, Mr. Caponi?

16          MR. CAPONI:  Yes, Your Honor.

17          THE COURT:  Because you want to tell me the district

18    court?

19          MR. CAPONI:  Just to tie the bow on it.

20    BY MR. CAPONI:

21    Q   Mr. Michaels, the district court adopted and approved the

22    magistrate's writing, as you refer to it, correct?

23    A   I don't remember.  I mean, it's in the record.  We reached

24    a settlement agreement.  None of this is -- I don't --

25    Q   Mr. Micheals, that wasn't my question.
```

```
 1                THE COURT:  All right, so.

 2                MR. KODOSKY:  Objection, Your Honor.

 3                THE COURT:  So he said he doesn't remember.  Somebody

 4    want to tell me, was the report -- because it would have

 5    been --

 6                MR. CAPONI:  Yes, Your Honor.  We'll give it to Your

 7    Honor.

 8                THE COURT:  Yeah.  Resubmit it.

 9                MR. CAPONI:  The magistrate's report was affirmed by

10    the court.

11                THE COURT:  A report and -- I would have done a

12    report and recommendation.  My report and recommendation don't

13    mean anything because the district court tells me they go and

14    got it.

15                MR. CAPONI:  Your Honor, I will submit it to you.

16                THE COURT:  Right.  And somebody gives me -- because

17    he said they resumed mediation.  I don't know how you -- I

18    don't know.

19                MR. CAPONI:  You'll see it in the record, Your Honor.

20    It's crystal clear.

21                THE COURT:  All right.

22                MR. CAPONI:  Thank you.

23                THE COURT:  And if somebody want to give me the

24    docket, they can give me the docket.

25                Yes, counsel?
```

1          MR. DEMARCO:  Yes, Your Honor.  Just request that my

2   client be able to finish the answer to that question.  I

3   believe he was still talking when there was an interjection --

4          UNIDENTIFIED SPEAKER:  Interruption.

5          MR. DEMARCO:  -- between.

6          THE COURT:  All right.  So his answer was he does not

7   recall whether the District Court adopted it or not, which does

8   not necessarily mean it was the end of the litigation.  It

9   could have meant the District Court sent you guys back to the

10  magistrate.  I don't know.  Somebody give me the dockets.

11         MR. DEMARCO:  That's right.

12         THE COURT:  Okay.  Because I think his testimony is,

13  is that we started a mediation and then the District Court said

14  there wasn't or the magistrate said something.  That was the

15  bankruptcy, then we went back and resumed mediation, which

16  possibly could have happened because unless the District Court

17  dismissed the matters, it would have still been pending.  So

18  somebody give me the dockets.  I don't know what the relevance

19  is.  Can somebody tell me what the relevance is?

20         You brought it up, Mr. Zahralddin.  Your client

21  brought it up.

22         MR. ZAHRALDDIN:  Well, we -- you're right, Your

23  Honor.  So the relevance of the settlement is only the fact

24  that we got to a settlement eventually.  Whether or not --

25  there was determinative -- even if -- let's say -- because I

1   haven't looked at the very end of this record in a while.

2   Let's say the settlement was pushed aside.  That doesn't end

3   the litigation.  That means it's open litigation.  All I know

4   is when they approached us --

5            THE COURT:  All right.  Just --

6            MR. ZAHRALDDIN:  -- there was a settlement.

7            THE COURT:  Put the docket in an I will --

8            MR. ZAHRALDDIN:  Yes.

9            THE COURT:  To the extent it's relevant.  I don't

10  know what the relevance is, but put it in.  Put in in.

11           MR. ZAHRALDDIN:  We will do so.  Thank you, Your

12  Honor.

13           THE COURT:  All right.

14           MR. DEMARCO:  I have no further questions, Your

15  Honor.

16           THE COURT:  All right.  Any further for you, Mr.

17  Colby or Ms. Brumme?

18           MR. COLBY:  No, Your Honor.

19           THE COURT:  Okay.  Any redirect?

20           MR. ZAHRALDDIN:  Briefly, I think, Your Honor.

21           THE COURT:  All right.

22           MR. KODOSKY:  Just very briefly, Your Honor.

23           THE COURT:  Okay.  Yes and it has to be limited to

24  what these two gentleman asked, okay?

25           MR. KODOSKY:  Understood.  Thank you, Your Honor.

```
 1                    REDIRECT EXAMINATION
 2   BY MR. KODOSKY:
 3   Q    Mr. Michaels, you were asked whether or not you were -- if
 4   you had participated in any of the conversations that SeeCubic
 5   Inc. has had with Phillips.  Do you recall receiving that
 6   question from Mr. Colby?
 7   A    Yes.
 8   Q    If SeeCubic, Inc., has no license agreement with Phillips,
 9   what business or what basis -- or I guess, what potential for
10   harm exists by SeeCubic, Inc., having conversations with
11   Phillips about the license agreement?
12           MR. COLBY:  Objection, Your Honor.
13           THE COURT:  Yes.
14           MR. COLBY:  It's a question about two parties of
15   which Mr. Michaels doesn't belong.
16           MR. KODOSKY:  He asked the original question, Your
17   Honor --
18           MR. COLBY:  He's asking --
19           MR. KODOSKY:  -- as to whether or not he participated
20   in any of those conversations.  And I'm asking if they should
21   even be having those conversations with Phillips, if it's -- if
22   they're not a party to the agreement.
23           MR. COLBY:  He has no first hand knowledge of what
24   those conversations were.
25           MR. KODOSKY:  He asked him the question.
```

```
1              MR. COLBY:  If --

2              THE COURT:  Wait.  Woah.  Woah.

3              MR. COLBY:  -- if any, so how could he render an

4   opinion on harm that could come from conversations that he's

5   not a part of, has no idea what they're about?  No idea if they

6   occurred, when they occurred, who they were with.

7              THE COURT:  Or if they even occurred.

8              MR. COLBY:  Or if they even occurred.

9              MR. KODOSKY:  He asked the question, Your Honor.

10             THE COURT:  I know the question, counsel, was Mr.

11  Michaels, were you party to any conversation between SeeCubic

12  Inc. --

13             MR. KODOSKY:  Yes.

14             THE COURT:  -- and --

15             MR. KODOSKY:  Phillips.

16             THE COURT:  -- Phillips.  Okay.  He said no, so the

17  question is -- okay.  Your question is, should they have been

18  having a conversation.  Based on what?  I'm asking him.

19             MR. COLBY:  Yeah.

20             MR. KODOSKY:  And I'll ask him the same question

21  related to Rembrandt.

22  BY MR. KODOSKY:

23  Q    If Rembrandt was contacted by SeeCubic Inc., regarding the

24  Stream TV license agreement with Rembrandt, would that be

25  appropriate?
```

1              MR. COLBY:  Objection.  It calls for speculation.

2              MR. KODOSKY:  It goes to the harm.  He stood up here

3    30 minutes ago saying we're not showing any harm.

4              THE COURT:  All right, but that's not the point,

5    Mister --

6              MR. KODOSKY:  Kodosky.

7              THE COURT:  -- Kodosky.  The question is, when you

8    get to redirect, you get to ask him questions related to the

9    questions that were asked by the other parties on cross.  The

10   only questions that Mr. Colby had and I'm -- and I apologize.

11   I'm about to forget Mr. Colby's name and I apologize.  Same as

12   Kodosky.  I'm -- it's getting late.  I'm stuttering on names.

13   The only thing that he asked him was what -- with respect to

14   did you examine the Stream TV technology?  He said he did.

15             Did he examine the SCBV units?  No.  And was he able

16   to determine if they were different?  Asked him about the proof

17   of concept projects, the current projects.  Then he asked him,

18   did -- he was party to any conversation with Phillips and then

19   he had firsthand knowledge of any security arrangements between

20   SCBV currently have with respect to the units that are, if any,

21   being produced.  So you can ask him anything with respect to

22   those areas.

23             MR. KODOSKY:  He was -- Your Honor, he was

24   specifically asked whether or not he participated in any of the

25   conversations between SeeCubic, Inc. -- and I've got it written

 1    down on my notes and Phillips.

 2            THE COURT:  And he said he wasn't.

 3            MR. COLBY:  So --

 4            MR. KODOSKY:  My answer is no.

 5            MR. COLBY:  And --

 6            MR. KODOSKY:  My question to him is --

 7            THE COURT:  Woah, woah, woah.

 8            MR. KODOSKY:  Let me finish --

 9            THE COURT:  Let him finish, Mr. Colby.

10            MR. KODOSKY:  -- Mr. Colby.  My question to him is,

11    is it appropriate for a nonparty to the license agreement to be

12    having conversations with the licensor?

13            THE COURT:  But the --

14            MR. KODOSKY:  He's a licensor, Rembrandt.

15            THE COURT:  But the assumption is is that they were

16    talking about the license with Phillips and the Stream entities

17    and we have no information about what SeeCubic, Inc., was

18    talking to Phillips about.

19            MR. KODOSKY:  And my only question is, is it even

20    appropriate for a nonparty to be speaking to the licensor about

21    somebody else's license agreement?

22            THE COURT:  But we don't -- be the -- sustained.

23            MR. KODOSKY:  Okay.  Thank you, Your Honor.

24            THE COURT:  Sustained.  Sustained.  Okay.  next

25    question.  That's it?

1        MR. KODOSKY:  Thank you, Your Honor.  That's all.

2        THE COURT:  All right.  Anything else from anybody

3   with respect to Mr. Michaels?

4        MR. COLBY:  Not from me, Your Honor.

5        MR. CAPONI:  Not from me, Your Honor.

6        THE COURT:  All right.  Mr. DeMarco, do you have any

7   questions?

8        MR. DEMARCO:  No, Your Honor.  Just if my client may

9   be allowed to, I guess, return home to Florida -- his folks.

10       THE COURT:  To do what?

11       MR. DEMARCO:  Just to step down.

12       THE COURT:  Oh, okay.  All right, Mr. Michaels,

13  unless you want to stick around and listen, you are excused.

14  I -- you may --

15       THE WITNESS:  Thank you, Your Honor.

16       THE COURT:  -- you can stay and listen, but not as a

17  witness, just as an observer or as counsel for -- co-counsel

18  for Mister --

19       MR. BLUMENTHAL:  Blumenthal.

20       THE COURT:  I'm sorry.  I was trying to --

21       THE WITNESS:  Understood Your Honor.  I will stick

22  around but I'm going to go stop my video and go on mute.

23       THE COURT:  Okay.  Thank you.  All right.  So does

24  the Debtor rest with respect to its request for a TRO,

25  preliminary injection, rest in its case in chief with the right

```
 1    to recall, I guess?

 2               MR. ZAHRALDDIN:  We do, Your Honor.

 3               THE COURT:  All right.  Mr. Colby, it's -- do you

 4    want to start with Mr. Stastney or do you want to --

 5               MR. COLBY:  So, take our cues from the Court.

 6               THE COURT:  Well, how long do you think?

 7               MR. COLBY:  Well, I think for a direct, I'm guessing,

 8    but 60 to 90 minutes.

 9               THE COURT:  Oh, Lord.  Okay.  That will take us to

10    7:00 -- I was prepared to go to 7:30.

11               MR. COLBY:  If we're lucky --

12               THE COURT:  Right.

13               MR. COLBY:  -- it'll take us to 7:30.  There's also a

14    matter we were just hoping to get some clarity on and that is

15    exactly what we'll be doing on Wednesday, so we know whether or

16    not we need to be here or not be here.

17               THE COURT:  Wednesday -- what is on for Wed --

18               UNIDENTIFIED SPEAKER:  Wednesday is the 2019 motion,

19    Your Honor.

20               MR. COLBY:  And so -- sorry.  Before we get into it,

21    I guess I'm asking the Court's preference whether we start with

22    Mr. Stastney, which we're happy to do all the issues are still

23    fresh or whether we talk about what we're doing on Wednesday.

24    I suspect that will eat up a little bit of time.

25               THE COURT:  A lot of time.  It always does.
```

1          MR. COLBY:  The way these things go.

2          THE COURT:  Well, it would make -- well, do you think

3   it would make sense to have Mr. Stastney's direct testimony and

4   then we can have him just come back for cross and then redirect

5   or would you prefer it to be all on one day?

6          MR. COLBY:  I think it's generally better when it's

7   all on one day.

8          THE COURT:  Okay.  I do, too, but I'm giving you that

9   option.  So that means that we're not going to start Mr.

10  Stastney and that means we can devote some time to figuring out

11  what will happen on Wednesday.  I will be honest, at this

12  point, my mind is a little -- what are we -- what is listed for

13  Wednesday?  Was Mr. -- is Mr. Parks' on -- application on?

14         UNIDENTIFIED SPEAKER:  No, ma'am.  We moved that to

15  December the 11th.

16         THE COURT:  Okay.  What's on -- that -- everybody's

17  understanding of what's on for the 20 -- for the 29th, right?

18         MR. KODOSKY:  It's simply the 2019 motion.

19         THE COURT:  Which is to --

20         MR. KODOSKY:  The 2019 motion.

21         THE COURT:  -- whether they were required on the 2019

22  whatever to disclose --

23         MR. KODOSKY:  Well, required and obviously, it's

24  continuing disclosure.

25         THE COURT:  All right.

 1           MR. KODOSKY:  Even -- I mean, it's --

 2           THE COURT:  That's it?

 3           MR. KODOSKY:  That's it.

 4           THE COURT:  Do we need just legal argument on that or

 5  do we need some evidence?

 6           MR. CAPONI:  Your Honor, so from our perspective, we

 7  think it's a legal issue.

 8           THE COURT:  That's what I'm thinking.

 9           MR. ZAHRALDDIN:  It's my motion.

10           MR. CAPONI:  But it's the Debtor's motion.

11           MR. ZAHRALDDIN:  It's my motion, so you know --

12           MR. CAPONI:  As I said before, the Debtor is the

13  conductor of their own symphony.

14           MR. ZAHRALDDIN:  -- I would, except for someone who

15  keeps trying to take it over, so --

16           THE COURT:  All right.  Listen.  All right, guys.

17  I'm the only one that can be snarky.

18           MR. ZAHRALDDIN:  I'm not trying to be snarky.  I'm

19  stating a fact.  You asked me and then Mr. Caponi had to answer

20  instead.

21           THE COURT:  All right.

22           MR. CAPONI:  Sorry.  I thought you pointed at me.  I

23  didn't mean to jump in.

24           THE COURT:  Okay.  all right.  I'm the only one that

25  gets to jump in.  So Mr. --

```
 1              MR. ZAHRALDDIN:  Your Honor --

 2              THE COURT:  -- Zahralddin.

 3              MR. ZAHRALDDIN:  -- I think that --

 4              THE COURT:  You believe --

 5              MR. ZAHRALDDIN:  -- only Mr. Rajan would be a witness

 6   on Wednesday.

 7              THE COURT:  About what?

 8              MR. ZAHRALDDIN:  Well, Mr. Rajan has the knowledge

 9   about the various parties.  In their responses, the opponents

10   to the motion indicated that we were trying to get information

11   that we already know about, et cetera.  I don't believe that's

12   the case.  I believe that it doesn't matter what was given in a

13   prior proceeding.  2019 is an ongoing and temporal disclosure

14   requirement.  It can happen at any time and it really just

15   comes from whether or not a parties (sic) were acting in

16   concert.

17              The only thing that's relevant prior to this, I think

18   has already been put into the record.  You know about the

19   omnibus agreement.  You know about the continuing lack of

20   compliance with post remand injunctions.  So the only thing

21   that we would need to put forward is what's happened here as

22   well as the -- we -- I guess we have documents or we have

23   discussions of documents in the prior proceedings in Chancery

24   Court, but we've never seen those and they have not been

25   produced here, which is the important issue.
```

1      So if Your Honor believes we don't need an

2  evidentiary hearing --

3      THE COURT:  Counsel, I don't beli -- I don't tell

4  people how to run their cases.  I just thought the issue was

5  who was subject to the rule.

6      MR. ZAHRALDDIN:  Yes.

7      THE COURT:  And you believe that the response, which

8  I have not looked at -- I'll look at tonight or tomorrow,

9  probably tomorrow and research whatever I need to do.

10  Hopefully not all night long.  And hopefully my staff won't

11  be -- my law, my two law -- well, my law clerks will not have

12  to spend their night, either, looking at, you know, trying to

13  figure this out and we'll have discussions about what is the

14  issue.  But you believe that on the 2019 C, that the

15  information should be disclosed because --

16      MR. ZAHRALDDIN:  The parties were acting in concert.

17      THE COURT:  What parties were acting in concert?

18      MR. ZAHRALDDIN:  Hawk, SeeCubic.  I think about -- I

19  believe it's 50 some odd shareholders that were subject to the

20  omnibus agreement, whoever these eight or nine or other people

21  that Mr. Caponi has mentioned in court, Mr. Morton (phonetic),

22  Albany (phonetic).  They have filed concerted actions.  They

23  filed the motion to dismiss together.  They filed the motion

24  for a trustee together and all of that --

25      THE COURT:  So you believe disclosures by groups,

 1   committees and entities.  And you believe that the -- either

 2   the group -- well, we know they're not a committee.  They're

 3   either groups or entities who are required to disclose a

 4   verified statement setting forth the information in paragraph

 5   C, which you know, just the information portion.

 6          MR. ZAHRALDDIN:  Yes, Your Honor.

 7          THE COURT:  Okay.  And that you believe that really

 8   what I have to determine is whether these groups of creditors,

 9   parties, whatever we're calling them, fit the definition of

10   group or entities who are required to comply --

11          MR. ZAHRALDDIN:  Yes.

12          THE COURT:  -- with the 2019 --

13          MR. ZAHRALDDIN:  An entity is a definition broader

14   than a person.

15          THE COURT:  Right.  I know.  Okay.

16          MR. ZAHRALDDIN:  And it's in the bankruptcy code and

17   it encompasses all kinds of things.

18          THE COURT:  So -- and the response was we're not

19   required to comply because we don't meet these definitions.

20          MR. ZAHRALDDIN:  And they said they had individual

21   counsel, et cetera, but that's not the test, so we will look at

22   that on Wednesday.

23          THE COURT:  All right.  Okay.  But isn't that just a

24   legal issue as to what does that mean, who is required to be --

25   to comply with 2019?  I guess if I made a finding as to what

 1   that means, I would then have to apply that legal definition to

 2   the various entities who the Debtor has asserted must comply.

 3          MR. ZAHRALDDIN:  And any actions --

 4          THE COURT:  And then I will need some evidence of who

 5   these people are, unless you stipulate that -- who they are.

 6   Not their relationship, but you believe that these are the

 7   various persons, who you believe it applies to and why you

 8   believe.  And Mr. Caponi says these are the various people, but

 9   I don't think it applies.  We all agree that who the various

10   people, person entities groups are?

11          MR. ZAHRALDDIN:  Well, some have not been disclosed,

12   other than on the record, we've heard hints of things.

13          THE COURT:  Okay.

14          MR. ZAHRALDDIN:  And we have stuff that's been put

15   into the record in the Chancery Court.

16          THE COURT:  All right.

17          MR. ZAHRALDDIN:  But you know, if --

18          THE COURT:  So I'm going to need some evidence

19   because even if I conclude that this is what it means, I still

20   have to say, do these people constitute a group, do they

21   constitute an entity and how?  I can -- so if I have a legal

22   argument, that's great, but I need to apply the legal argument

23   to the facts of the matter.

24          MR. ZAHRALDDIN:  And it would be things that are

25   occurring -- that occurred now and before and they're all

1   judicial actions --

2          THE COURT:  So you can --

3          MR. ZAHRALDDIN:  -- whether contract --

4          THE COURT:  So can you guys stipulate to that or --

5          MR. ZAHRALDDIN:  I would love to do that and just do

6   argument.  We can stipulate that the omnibus agreement exists.

7   We can stipulate that the side letter agreement exists.

8          THE COURT:  What you do -- this is what you do.  You

9   can talk to Mr. Caponi.  You guys can stipulate to the facts.

10  I'm not telling you you have to.  And then you just come in,

11  you say this is what this means and this is why it doesn't

12  agree, it doesn't apply in these facts or you can't agree and

13  you bring somebody who has to tell me who the groups are, the

14  entities are and then make your legal arguments and I have to

15  figure out do these groups, entities, not committees, are they

16  subject to the 2019.  So you guys can either agree to all these

17  things or you can make a record.

18         MR. ZAHRALDDIN:  Yes, ma'am.

19         THE COURT:  So that's what I expect.  And what time

20  is this scheduled for on Wednesday?

21         UNIDENTIFIED SPEAKER:  Oh, I think it's --

22         MR. ZAHRALDDIN:  11:30, I think.

23         THE COURT:  We have an 11:30 list?

24         THE CLERK:  It's Number 3 on the 11:30 list.

25         THE COURT:  How many we have on the 11:30 list?

```
 1              THE CLERK:  Three.

 2              THE COURT:  Oh, okay.  Show up at 12:00.

 3              MR. ZAHRALDDIN:  Okay.

 4              THE COURT:  Who else we have?  Back up.  Let me see

 5  who we have before --

 6              THE CLERK:  Number two is something settled, stipped

 7  to be filed.

 8              THE COURT:  Okay.  And then number one.

 9              THE CLERK:  And number one --

10              THE COURT:  Settled --

11              THE CLERK:  Number one is a confirmation hearing for

12  like a chapter 11 investment, 1982 Investment, LLC.

13              THE COURT:  And did they file a report of planned

14  voting?  Because if they didn't, I don't think I'm having a

15  confirmation hearing.  That could take a while.

16              THE CLERK:  Yeah.  October 13.  Wait.  Hold on.

17              THE COURT:  I have to -- I'm -- I just don't want you

18  guys to come here.  And sit and have to wait and Wednesdays

19  tend to be on 11:30 I never know what I'm going to get.  We

20  have two matters before you.  One is resolved.  Right?

21              THE CLERK:  Correct.

22              THE COURT:  And the second one is a confirmation

23  hearing?

24              THE CLERK:  Yeah.  I just want to get on to the

25  actual docket.
```

1            THE COURT:  Right.  If they don't have a report of

2    plan voting, I'm not having confirmation hearings --

3            THE CLERK:  I see it.  It's a Chapter 11.

4            THE COURT:  -- then you guys might as well show up at

5    11:30.

6            THE CLERK:  October 13th.  Report of planned voting

7    filed on October 13th.

8            THE COURT:  Oh, yeah.  Well, I guess I'm having a

9    hearing.  12:30.  Show up at 12:30.

10            MR. ZAHRALDDIN:  Okay.

11            THE COURT:  That shouldn't take -- unless did we file

12    any objections to confirmation you see on the docket?  No?

13            THE CLERK:  Looking for objections, no.

14            THE COURT:  Yeah.  No objections.  Might be just a 20

15    minute proposition where they go through and give me the report

16    of planned voting, say everybody voted in favor and then we --

17            THE CLERK:  Because at one point, there was a motion

18    to convert it, but that got withdrawn.

19            THE COURT:  Right.  I still haven't gotten -- been

20    able to get on here.  Okay.  12:00, guys.  Just show up at

21    12:00.

22            UNIDENTIFIED SPEAKER:  Okay.

23            THE COURT:  That should give them a half an hour

24    to -- because I don't see an objection and then usually they

25    just make a proffer and I'm done in 15 minutes.

1          MR. ZAHRALDDIN:  So we're going to start at 12:00,

2    start with whatever witnesses and evidence gets put in and then

3    whenever that's in, argument.

4          THE COURT:  Yes.  And hopefully that's not going to

5    take too long.

6          MR. ZAHRALDDIN:  Well, I'm hopeful we can stipulate

7    the things that are in the record below.  There won't be that

8    many of them.

9          THE COURT:  Right.  Here are the groups.  Here are

10   the people and here's the other people.

11         MR. CAPONI:  I mean, look, I'd like to, Your Honor,

12   but I'm not optimistic, given -- what I just heard was there's

13   eight unidentified people.  I mean, Debtor doesn't -- can't

14   identify the people.  I think that's going to require evidence.

15         MR. ZAHRALDDIN:  That's the point of disclosure, Your

16   Honor.  Mr. Caponi maybe he needs to understand that, but when

17   he raises the issue --

18         THE COURT:  Oh, come on now.  Come on, guys.

19         MR. ZAHRALDDIN:  I'm just saying, Your Honor --

20         MR. CAPONI:  I don't understand the law, Your Honor.

21         MR. ZAHRALDDIN:  Your Honor, he's telling me that I

22   can't identify the people, he hasn't identified, potentially is

23   required to identify.  I don't understand that circular

24   argument.

25         THE COURT:  All right.  So your position is, there

 1   were some people who have been identified and others who should

 2   have been, but have not been because they didn't comply with

 3   the rules.  And you're going to put on evidence that there was

 4   a mention of this person, that person, that person, and we

 5   believe these people are covered by the rules and should have

 6   been disclosed.  By who, I don't know because if they're not --

 7            MR. ZAHRALDDIN:  Well, Your Honor, part of the issue

 8   is we're going to have certain lists of people that were in the

 9   Chancery Court that were revealed there.  And then we have

10   heard here from Mr. Caponi and others of other people, mostly

11   equity holders that are sitting behind SeeCubic, behind perhaps

12   Albany or Hawk.  Albany is the trustee for Hawk.

13            THE COURT:  Okay.

14            MR. ZAHRALDDIN:  And what we're going to ask is, did

15   these people disappear?

16            THE COURT:  Is Hawk some people in Ca -- where --

17   Hawk is in Canada?

18            MR. ZAHRALDDIN:  Hawk is in the Channel Islands.

19            THE COURT:  Who is it?

20            MR. ZAHRALDDIN:  Hawk is the second lien creditor we

21   believe --

22            THE COURT:  Oh, I know they are --

23            MR. ZAHRALDDIN:  -- has been converted.

24            THE COURT:  -- but I'm like, enlighten me, because

25   Channel Islands is not coming --

1          MR. CAPONI:  Off of England.

2          THE COURT:  Off of -- okay.  So they're the

3    British -- no, not the British, but --

4          MR. CAPONI:  Yes.

5          THE COURT:  Is there somebody in Canada?

6          MR. ZAHRALDDIN:  Not that we know of --

7          THE COURT:  Oh, well then it was Britain.

8          MR. ZAHRALDDIN:  -- but we could be surprised.

9          THE COURT:  I don't know.  I thought -- I knew it was

10   another country.  I was opting for Canada.

11          MR. ZAHRALDDIN:  We have people in the UK.  We have

12   some folks in the Channel Islands.

13          THE COURT:  I know.  That -- okay.  I get it.  I

14   recall.

15          MR. ZAHRALDDIN:  And look Your Honor, the rule -- and

16   I think the opposing counsel took and/or the parties took

17   umbrage at the fact that there are some pretty strict penalties

18   for not disclosing.  We didn't make up the penalties that are

19   in the rule.  There's some pretty serious penalties in there.

20          THE COURT:  Do I have some option or I have to put --

21   I have to --

22          MR. ZAHRALDDIN:  It does say that in the Court's

23   discretion, here are the things that could happen and of course

24   there's plenty of --

25          THE COURT:  Yes.  But you --

1          MR. ZAHRALDDIN:  -- case law that said that --

2          THE COURT:  Unless -- listen --

3          MR. ZAHRALDDIN:  -- there's some -- they're pretty

4    draconian remedies, but you don't have to do that.  There can

5    be other things that can be done.

6          THE COURT:  Right.  Typically, if somebody has a

7    valid legal basis for making an argument, I don't know any

8    court who's going to penalize you, unless you have your

9    argument has no basis whatsoever and it's just off the wall.

10          MR. ZAHRALDDIN:  Well, I'm not talking about fee

11   shifting, Your Honor.  I'm not talking about that.

12          THE COURT:  I'm not saying that.

13          MR. ZAHRALDDIN:  Yeah.

14          THE COURT:  I'm talking about assessing penalties,

15   assessing --

16          MR. ZAHRALDDIN:  Right.  Got you.

17          THE COURT:  -- failure to comply with the rules.  If

18   you have a valid argument -- I don't know how you penalize

19   people, but if you have an argument that has no basis in law,

20   none whatsoever, and you're making it up, then you have a

21   problem.  I'm just saying yes.  Okay.  It provides for it.

22   But, you know --

23          MR. ZAHRALDDIN:  So hopefully we can get to something

24   that's stipulated because everything else is on the record.

25          THE COURT:  If you can agree to these things, but you

1  can't agree to the rest and then you put some testimony.  Or

2  you can't agree to anything.  So, 12:00 on Wednesday.  Is

3  anybody going to appear by Zoom?  If Mr. Rajan still has the

4  flu, he's on the zone.

5           MR. ZAHRALDDIN:  I'll tell him that, Your Honor.

6           THE COURT:  No -- I had it once.  I'm going to just

7  tell all of you.  You do not want that.  I had COVID and that.

8  COVID was a breeze.  This thing, hope.  I think I had to cancel

9  a hearing, I was so sick.  I have not been that sick in about

10  10 years.  So if he has the flu --

11           MR. ZAHRALDDIN:  Stay home.

12           THE COURT:  Stay home.  Or anybody that has the flu.

13           MR. ZAHRALDDIN:  Right.

14           THE COURT:  I have my shot now.  You can do whatever

15  you want, but you don't want to get --

16           MR. CAPONI:  Yeah.  I don't know, on our side, Your

17  Honor.  Obviously, we're going to have to see what evidence

18  gets put on to decide what our response is going to be, so I'd

19  be --

20           THE COURT:  Would you at least talk to Mr.

21  Zahralddin --

22           MR. CAPONI:  We will.

23           THE COURT:  -- and say --

24           MR. CAPONI:  Absolutely, Your Honor.  I mean --

25           THE COURT:  Who are the people you believe and who

```
 1   are the people you should have been disclosed and hopefully

 2   that'll shrink it, but if not, you'll have to put your -- you

 3   know, another day of --

 4          MR. CAPONI:  Yeah.  I think it's unlikely to end

 5   Wednesday, but, you know, we've -- I'll make good progress.

 6          THE COURT:  Jesus.

 7          MR. ZAHRALDDIN:  I think it will end Wednesday

 8   because I'm a glass half full guy.  I believe we sent over a

 9   list of things.  I'll look at it and revise it.

10          MR. ZAHRALDDIN:  I think it would have come over last

11   week, but I'll look at it again and see if I can cut it down --

12          THE COURT:  All right.  So --

13          MR. ZAHRALDDIN:  -- based on the Court's discussion

14   with me and we'll see if we can get therapist.

15          THE COURT:  All right.  In the meantime, you guys

16   have to figure out a time to have Mr. Stastney's testimony and

17   the two Dutch witnesses.

18          MR. ZAHRALDDIN:  And the one California witness.

19          THE COURT:  And the one California witness.  We need

20   all -- is -- two, three day -- guys come on.  Can we like --

21   never mind.  I'm going to give you your day in court, but the

22   more -- you know, I -- are we going to finish this before the

23   end of the year?

24          MR. ZAHRALDDIN:  I hope so, since it's our assets at

25   risk.
```

```
 1              THE COURT:  Well, counsel, they were at risk when you
 2   ca -- never mind.
 3              MR. ZAHRALDDIN:  Well, it --
 4              THE COURT:  It --
 5              MR. ZAHRALDDIN:  -- that doesn't make it any --
 6              MR. CAPONI:  Like any good dance partner, we're
 7   following the Debtor's lead, so we'll end when they -- you're
 8   tired of dancing.
 9              MR. ZAHRALDDIN:  I didn't think it was going to end
10   with a dance with Mr. Caponi.  I have to tell you that.
11              THE COURT:  Well, whatever.  I -- you need to
12   seriously exchange dates with each other --
13              MR. ZAHRALDDIN:  Yeah.
14              THE COURT:  -- about --
15              MR. ZAHRALDDIN:  We're simply waiting, Your Honor.
16   We're -- our witness is actually --
17              MR. CAPONI:  I've asked.
18              MR. ZAHRALDDIN:  -- waiting for them and then they've
19   got to figure out -- I mean, we're on two different time zones,
20   so we'll figure it out.
21              THE COURT:  Just let me know.  I will try to
22   accommodate.  Right now, I looked in my December.  I didn't --
23   am I -- or maybe I was in January or --
24              MR. ZAHRALDDIN:  Not between Christmas and New
25   Year's, I hope.
```

1      THE COURT:  I typically close chambers between

2  Christmas and New Year's.

3      MR. ZAHRALDDIN:  I know.  You mentioned that and I

4  was --

5      THE COURT:  I guess I won't be this year --

6      MR. ZAHRALDDIN:  No, no, I was happy to hear that.  I

7  don't want to be here.

8      THE COURT:  Because I want to get this done, at lest

9  some of this case done before the end of the year.  I do plan

10  to be away, I don't know, between January 2nd and the 9th.

11  Otherwise my husband might divorce me.  So I may be a way --

12      MR. ZAHRALDDIN:  I don't want to see you in that

13  condition, if not getting a lunch makes things bad I don't want

14  to do that.

15      THE COURT:  Listen I'm not a big -- I don't like

16  vacations.  This will --a vacation.  So right now the 2nd

17  through the 9th.  And I will know for sure by the end of this

18  week when we'll be away.

19      MR. CAPONI:  Your Honor, we're just -- because the

20  Debtor's have just finished their case and chief on the TRO,

21  we're just getting started.  So I think that proceeding has to

22  run its course.  I think as new proceedings, new issues come

23  up, and we begin hearings on them -- speaking only for myself

24  and without speaking to my client about it first -- we would be

25  amenable to, you know, equitable time limits in order to make

Case 2:23-cv-10763-... Doc 1934 Filed 01/22/25 Entered 01/22/25 16:45:46 Desc
Exhibit A   Mandamus Petition   Page 520 of 541

234

1   the parties prioritize on what's important.

2           THE COURT:  That would make sense, and I did not do

3   that.  I typically try not to because I don't want to deprive

4   people of their opportunity to present their case, but right

5   now, we have been going for -- part of it was my -- today was

6   my question, which I should've never asked or commented that

7   took us astray, but we may have to -- I may have to ask the

8   parties for how much time, and say I'm going to strictly

9   enforce the time.  That way we can concentrate, and I will try

10  my best not to ask questions or comments, and then that way we

11  can get through.

12          And hopefully -- because at the end of the day, a lot

13  of this is about Stream and not about Technovative, so I'm not

14  quite sure whether this would -- you know, no matter what

15  happens in the other actions, otherwise -- other than granting

16  a motion to dismiss, would do away with the Stream stuff or

17  appointing a Chapter 11 Trustee.  And that still won't make it

18  go away because then some other body -- another person would

19  have to come and figure out what they want to do.  So I'm not

20  quite sure how this is going to streamline anything for me, but

21  I will do my best to get some of it off and decided so the

22  parties can have a better idea of what they're doing, with

23  respect to Technovative, anyway.

24          MR. CAPONI:  Just one last note.  On Wednesday, I

25  don't know what the Debtor's intents are, what witnesses

1  they'll need, what we may need to respond to.  My understanding

2  is that they have Mr. Stastney on their list.  He's not

3  available in person on Wednesday.  I believe he could testify

4  by Zoom, if his testimony is necessary.  I just don't know

5  whether or not --

6            MR. COLBY:  Well, certainly, we're -- we gave it to

7  him last week.  I know it was a holiday, so I'm not going to

8  hold him to that and I hope you don't either, Your Honor, or

9  me.  I'm happy to see if we even need Mr. Stastney, if he were

10  available, in case we need to call him, because I don't want to

11  be in a situation where they object to --

12            THE COURT:  Well, I mean --

13            MR. COLBY:  -- and I have to find an alternative.

14            THE COURT:  -- the Zoom seems to be working.

15            MR. COLBY:  Right.

16            THE COURT:  It has worked.

17            MR. CAPONI:  And we have no objection to Mr. Stastney

18  appearing by Zoom.

19            THE COURT:  Okay.  And then we'll just give him the

20  Zoom link, and if someone else wants to participate -- I just

21  want people to identify themselves when they're here, because I

22  can't see and support -- and we have had incidences where

23  people have just gone off about observers just not liking what

24  I'm saying or not liking the consequences of what the Debtor --

25  or Debtor's friends, and just being very rude and obnoxious.

```
 1              MR. COLBY:  I understand.

 2              THE COURT:  I want to avoid that.  I mean, it could

 3    be in court and do it, too, but at least I can call the

 4    Marshall to come get them.

 5              So we will start at 12 on Wednesday.  If Mr. Stastney

 6    needs to testify as a witness, he can appear by Zoom.

 7              Any other witness -- Mr. Rajan (phonetic), if he's

 8    sick, he's Zoom.

 9              Any other witness?

10              MR. CAPONI:  I'd have to look, Your Honor, to see,

11    because we -- it was -- I don't know if I have the list.

12              Was there anybody else we listed, Mr. Shaw?  Do you

13    know?

14              MR. SHAW:  Eileen, if we need her.

15              THE COURT:  Oh.  Hi, Eileen.

16              UNIDENTIFIED SPEAKER:  Hi, Judge.  I'm trying to log

17    in.

18              THE COURT:  Well, we're getting ready to shut down,

19    so don't worry about it.  I'll call you later about those

20    emergencies.

21              Oh, wait.  Hold on, Eileen.  Hold on.

22              You have access to dates that are available in

23    December.  Just give them --

24              UNIDENTIFIED SPEAKER:  Yep.

25              THE COURT:  All right.  What --
```

```
 1              UNIDENTIFIED SPEAKER:  Yeah, if you can give me just
 2    two seconds.
 3              THE COURT:  Okay.
 4              UNIDENTIFIED SPEAKER:  I can, hopefully.
 5              MR. CAPONI:  Your Honor, while she's looking for the
 6    dates, just because you mentioned you don't necessarily see
 7    everything that hits the docket, I just wanted to let the Court
 8    know that the district court did deny the motion to withdraw
 9    the reference.  That issue was kind of hanging out there.
10              MR. COLBY:  You saw that already.  I would've thought
11    you'd already seen that, Your Honor.
12              THE COURT:  Oh.
13              MR. COLBY:  Yeah.  She had basically said that the
14    motion to be withdrawn --
15              THE COURT:  Wait, when was it issued?
16              MR. CAPONI:  November 16th.
17              MR. COLBY:  Yeah.
18              THE COURT:  They typically mail me a copy.
19              MR. CAPONI:  It echoed our discussion where it said
20    that if she needs to do a trial, she'll do a trial.
21              THE COURT:  Yeah, after I do the magistrate work.
22              MR. COLBY:  It echoed the thing, so same thing.
23              THE COURT:  That's typically what happens is they're
24    like, you do everything.
25              MR. COLBY:  There are other aspects of it
```

```
 1   highlighted, but Your Honor can read it.

 2          MR. CAPONI:  You can read it, Judge.

 3          THE COURT:  What does she want me to do?

 4          MR. CAPONI:  She didn't -- it's Judge Marsten

 5   (phonetic) and the only highlights are they -- whoever wrote it

 6   adopted most of what Skadden put into their pleadings on the

 7   prior history.  I'm sure that's what they want to talk about.

 8          THE COURT:  Oh, okay.  Well, what am I supposed to do

 9   with that?

10          MR. COLBY:  I don't think anything, Your Honor.

11          MR. CAPONI:  Nothing, Your Honor.  I just wanted to

12   let you know that the decision came down because I know you --

13          MR. COLBY:  Yeah.

14          MR. CAPONI:  -- mentioned you don't always get

15   notified.

16          THE COURT:  No, I don't, and I don't read the

17   documents.  No, I have asked the IT to make this one of their

18   cases.  I can make certain cases where any filings I get notice

19   of.

20          MR. COLBY:  I'm surprised you didn't get it.

21          THE COURT:  And I thought they had already done that,

22   but apparently not yet.

23          We did or you didn't see?  Okay.

24          MR. CAPONI:  Okay.  Okay, so you did see it.  All

25   right.
```

```
1              THE COURT:  Somebody saw it.

2              MR. CAPONI:  All right.

3              THE COURT:  The 16th.  When was that?  And I didn't

4   see it?

5              MR. CAPONI:  Yeah.

6              MR. KODOSKY:  Your Honor, I didn't find out about it

7   until Wednesday of last week, so --

8              THE COURT:  They typically do send us a copy, a

9   courtesy copy, but I don't have a JA, so who knows where my,

10  you know -- I don't know.  All right.

11             MR. CAPONI:  Your Honor, I ask one --

12             UNIDENTIFIED SPEAKER:  It's plugged in.  I'm in now.

13             MR. CAPONI:  All right.

14             THE COURT:  All right.  What do I have available in

15  December?

16             UNIDENTIFIED SPEAKER:  Okay.  I have Monday, December

17  4th.  I don't see anything on your calendar.

18             THE COURT:  Anything personal on the 4th?

19             UNIDENTIFIED SPEAKER:  I don't have anything with --

20  I'm looking at your calendar and I don't see anything there for

21  December 4th.

22             THE COURT:  All right.  I'm good then, the 4th.

23             What else?

24             UNIDENTIFIED SPEAKER:  This next week, we did have

25  something but it got cancelled for the 5th.  It was settled.
```

```
 1   Hold on.  That was Hollis (phonetic).  That was --

 2              THE COURT:  So that would be the -- so we would have

 3   all day on the 4th?

 4              UNIDENTIFIED SPEAKER:  Um-hum.

 5              THE COURT:  A half a day on the 5th, because I would

 6   hear my regular list?

 7              UNIDENTIFIED SPEAKER:  Right, exactly.

 8              THE COURT:  What's on the 6th?

 9              UNIDENTIFIED SPEAKER:  All right.  On the 6th.  Let

10   me see what I have on December the 6th.  Okay.  I don't think

11   we have anything.

12              THE COURT:  That's a --

13              UNIDENTIFIED SPEAKER:  We have a trial on the 6th.

14              THE COURT:  What trial?  Who's that?

15              UNIDENTIFIED SPEAKER:  Financial Investments.  It's a

16   trial and a motion to be considered to get a default order at

17   12:30.

18              THE COURT:  Okay, so that's out.

19              UNIDENTIFIED SPEAKER:  Um-hum.  And let's see.  The

20   7th, I have just a regular 9:30 and an 11:00.  Hold on one sec

21   here.  It looks like we do have a 9:30 and an 11:00 on the 7th.

22   Let me see.

23              THE COURT:  Anything --

24              UNIDENTIFIED SPEAKER:  You have MJ Fencing (phonetic)

25   and our holiday party.
```

```
 1                THE COURT:  That's -- the holiday party is for the

 2    EDPA.  That one?

 3                UNIDENTIFIED SPEAKER:  Yeah.

 4                THE COURT:  I haven't attended in two years.  I guess

 5    I have to go.

 6                UNIDENTIFIED SPEAKER:  Okay.  Yes.  I think that's

 7    not until 6:00, though.

 8                THE COURT:  Right, but I did promise to show up this

 9    year.

10                MR. CAPONI:  It's the inner-workings.

11                THE COURT:  All right.

12                UNIDENTIFIED SPEAKER:  You have until, like, say

13    12:30 to --

14                THE COURT:  To 6:00.

15                UNIDENTIFIED SPEAKER:  I'd say 5:00.

16                THE COURT:  I only go for a little bit.  Okay.  So

17    that's -- so we have that date, the 7th, right?

18                UNIDENTIFIED SPEAKER:  Right.  The 7th, correct?

19                THE COURT:  So from 12:30 to 6:00?

20                UNIDENTIFIED SPEAKER:  Um-hum.

21                THE COURT:  Okay.

22                UNIDENTIFIED SPEAKER:  All right.  The following

23    week, let me just see.  All right.  On the 11th, we do have

24    Stream TV.

25                THE COURT:  Well, we can't -- we're not adding
```

```
 1   anything to that.  Keep going.
 2          UNIDENTIFIED SPEAKER:  Okay.  The 12th, let me see.
 3   It looks like -- oh, I have nothing.
 4          THE COURT:  That's a Thursday?
 5          UNIDENTIFIED SPEAKER:  The 12th is a Tuesday.
 6          THE COURT:  Tuesday.
 7          UNIDENTIFIED SPEAKER:  I mean, we have our regular
 8   list.
 9          THE COURT:  So we have the afternoon from 12 to 6,
10   7 --
11          UNIDENTIFIED SPEAKER:  Yeah.
12          THE COURT:  -- on Tuesday the 12th.
13          What about the 13th?  That's a Thursday.
14          UNIDENTIFIED SPEAKER:  The 13th --
15          MR. CAPONI:  Wednesday.
16          THE COURT:  A Wednesday.
17          UNIDENTIFIED SPEAKER:  Let me look.
18          THE COURT:  Look on -- on the Wednesdays, my personal
19   calendar, I always have -- I have my injections every other
20   week.
21          UNIDENTIFIED SPEAKER:  Yeah.
22          THE COURT:  So I don't even know what -- I did it
23   last week, so the 11th I have to go.
24          UNIDENTIFIED SPEAKER:  So you did it last Wednesday
25   which is the 29th.
```

```
 1                    THE COURT:  No, the 29th --

 2                    UNIDENTIFIED SPEAKER:  No, no, no.

 3                    THE COURT:  -- is this Wednesday.

 4                    UNIDENTIFIED SPEAKER:  I'm sorry.  Which was the

 5     22nd, so you would have that on the 6th.

 6                    THE COURT:  Right, that's the next one.

 7                    UNIDENTIFIED SPEAKER:  Right.  And then you would

 8     have the next one on the 20th.

 9                    THE COURT:  Yes, okay.

10                    UNIDENTIFIED SPEAKER:  Injection.

11                    THE COURT:  Yeah, um-hum.

12                    UNIDENTIFIED SPEAKER:  So on -- it looks like the

13     13th is a good day, as well.

14                    THE COURT:  Would that --

15                    UNIDENTIFIED SPEAKER:  A Wednesday.

16                    THE COURT:  The afternoon from the 12 to 6?

17                    UNIDENTIFIED SPEAKER:  From the 12 -- from 12:00 on.

18     We have something at 11:30, but that's our typical 11:30

19     Chapter 11 cases.

20                    THE COURT:  Okay.

21                    UNIDENTIFIED SPEAKER:  So we have the 13th is good,

22     and then the 14th, we have -- I believe we have Stream TV on

23     the 14th, as well.

24                    THE COURT:  For what?

25                    UNIDENTIFIED SPEAKER:  A continued hearing, isn't it?
```

 1              THE COURT:  A what hearing?

 2              UNIDENTIFIED SPEAKER:  It's a continued.

 3              THE COURT:  I think we kept that date open in case

 4    they needed it.  Keep it open, see what they tell us.  We'll

 5    see what you guys tell us.

 6              UNIDENTIFIED SPEAKER:  Yeah.

 7              THE COURT:  All right.

 8              UNIDENTIFIED SPEAKER:  Okay.

 9              THE COURT:  And then the 15th, what do we have?

10              UNIDENTIFIED SPEAKER:  And the 15th, I have nothing,

11    which is a Friday.  Let's see if you have anything.

12              THE COURT:  Typically not, unless I have --

13              UNIDENTIFIED SPEAKER:  A Penn Dental --

14              THE COURT:  Hmm, I'll call and figure it out.  There

15    is one appointment on there, it's Soffer, S-O-F-F-E-R, nothing

16    can come --

17              UNIDENTIFIED SPEAKER:  Okay.

18              THE COURT:  I think that might be the 22nd.

19              UNIDENTIFIED SPEAKER:  Oh, okay.

20              THE COURT:  So, never mind.

21              UNIDENTIFIED SPEAKER:  On the 15th, I've got, see

22    Penn Dental.

23              THE COURT:  What time?

24              UNIDENTIFIED SPEAKER:  At 1:00.

25              THE COURT:  Ugh, all right.  Let me -- let's hold up

1    on that and I'll figure that out.

2              UNIDENTIFIED SPEAKER:  Okay.  And then if we go to

3    the following week --

4              THE COURT:  Which is Christmas week, right?

5              UNIDENTIFIED SPEAKER:  Which is the week before

6    Christmas, yes.

7              THE COURT:  Oh.

8              UNIDENTIFIED SPEAKER:  We have a trial on 12/18.

9              THE COURT:  That's --

10             UNIDENTIFIED SPEAKER:  Well, it's actually status and

11   a trial on Trains Joel Specialty (phonetic), again.  So --

12             THE COURT:  I think that one will go.  That's a

13   Monday, right?

14             UNIDENTIFIED SPEAKER:  Correct.  And then on Tuesday,

15   the 19th, we have no trials.

16             THE COURT:  Well, we can have the afternoon.  I hope

17   somebody is writing this.  The 19th, 12 to 6.

18             UNIDENTIFIED SPEAKER:  The 19th is good.

19             THE COURT:  Next?

20             UNIDENTIFIED SPEAKER:  Let's see.  The 20th, I don't

21   have anything on your calendar.

22             THE COURT:  That's a Wednesday?

23             UNIDENTIFIED SPEAKER:  That's a Wednesday, correct.

24             THE COURT:  So we have 12 to 6 on Wednesday the 20th.

25             UNIDENTIFIED SPEAKER:  Yeah, the 20th looks good, as

```
 1   well.  And then let's see, the 21st, we have typical, you know,

 2   I don't have anything --

 3           THE COURT:  From 12 to 6 for Thursday?  12 to 6 for

 4   that day.

 5           UNIDENTIFIED SPEAKER:  Sorry?

 6           THE COURT:  12 to 6?  That's the 20th, you said?

 7           UNIDENTIFIED SPEAKER:  The 21st.

 8           THE COURT:  21st.

 9           UNIDENTIFIED SPEAKER:  The 20th and the 21st are

10   good, Judge.

11           THE COURT:  All right.  And what about the -- that's

12   all right.  It's first thing in the morning.

13           UNIDENTIFIED SPEAKER:  Oh, okay.  All right then.  So

14   the 20th and 21st are good.  All right.  And then the 22nd you

15   have something.  Dr. Soffer?

16           THE COURT:  Nothing can come between that.  What time

17   is that?  4:00 probably.

18           UNIDENTIFIED SPEAKER:  It's at 4:00, correct.

19           THE COURT:  Right.  So you guys can have some 10:30

20   to 3 on that day.

21           MR. CAPONI:  That's 20.

22           THE COURT:  Okay.

23           UNIDENTIFIED SPEAKER:  Okay, and then it's Christmas.

24           THE COURT:  Anybody want hearings the week of

25   Christmas?  Oh, wait.  The 22nd, forget it.  That Monday is
```

```
1    Christmas, right?

2              MR. CAPONI:  Correct.

3              UNIDENTIFIED SPEAKER:  Christmas is Monday the 22nd,

4    yes.

5              THE COURT:  26th, anybody want?  No.  27?

6              MR. COLBY:  Going once, going twice.

7              THE COURT:  28?  No.  And then you have to because

8    I'm not going to -- if I go away, I'm leaving on the 2nd and I

9    won't be back until the 9th, so think about that.

10             MR. COLBY:  We will make every effort to fit it in.

11   We have a range of options.

12             THE COURT:  You have a range of options.

13             MR. COLBY:  We will do what we can.

14             THE COURT:  Okay.  And that's to finish both,

15   assuming that we don't finish the hearing on the 19th, on

16   Wednesday.  That's to finish that and to finish Mr. Stastney's

17   testimony, the two Dutch witnesses, and Mr. who from

18   California?

19             MR. ZAHRALDDIN:  Mr. Banerjee (phonetic).

20             THE COURT:  Banerjee?

21             MR. ZAHRALDDIN:  Croschek (phonetic) Banerjee.

22             THE COURT:  Okay.  All right.  I think we should be

23   able to get at least -- how many witnesses do we have?  Four

24   witnesses?  Even if we do one day for each one of these

25   witnesses, four hours, four or five hours, we should get all
```

1   four of them done.  I think we have enough dates to get four

2   people done.

3            MR. COLBY:  Well, in effort to keep it short, I think

4   that colloquy today was helpful.  I don't know if you noticed,

5   but after we had that, I was very brief with Mr. Michaels,

6   so --

7            THE COURT:  It wasn't to tell you to be brief, but I

8   mean, I think sometimes as litigators, you guys think you're

9   playing to a jury, and sometimes, you get caught up into hours.

10  I litigated once.  I know sometimes I lost the forest for the

11  trees -- whatever.  I didn't see the forest.  I saw the trees,

12  and it's very easy to get done.  And so I understand.  I just

13  sometimes think that people don't focus on what is it that I

14  need to give the Judge on the trier of fact to get what I want.

15  And I'm not -- you know, even though sometimes I get a little

16  irate, I tend very much to try to be very -- take my emotions

17  out of any decision that I make, for the most part.

18            MR. COLBY:  We appreciate that.

19            MR. ZAHRALDDIN:  May I release my witness, Judge?

20            THE COURT:  Oh.  What witness?

21            MR. ZAHRALDDIN:  Eileen.

22            THE COURT:  Oh, yes, Ms. -- yes, Eileen.

23            MR. ZAHRALDDIN:  All right, Eileen.  I'm hanging up

24  on you.

25            THE COURT:  All right, and this will be over.

```
1                   MR. ZAHRALDDIN:  Thank you.

2                   UNIDENTIFIED SPEAKER:  I have a question.

3                   MR. ZAHRALDDIN:  Oh, she has a question.

4                   UNIDENTIFIED SPEAKER:  Judge, all these dates are for

5    the adversary?

6                   THE COURT:  Yes.  They are for the preliminary

7    injunction --

8                   UNIDENTIFIED SPEAKER:  Okay.

9                   THE COURT:  -- TRO.

10                  UNIDENTIFIED SPEAKER:  Okay.  And what happened to

11   the motion for Stie (phonetic)?  That was scheduled also for

12   today, but I guess you never got to it, right?

13                  MR. ZAHRALDDIN:  Well, Your Honor, I think what we

14   discussed was if we could get to a compromise on the worldwide

15   piece of it, that we would wait to see when Your Honor had a

16   little more room on the calendar.  So depending upon what days

17   come back, maybe we can --

18                  THE COURT:  Well, I thought the parties were going to

19   try to see if you could submit an order that had been entered

20   in --

21                  MR. ZAHRALDDIN:  Absolutely.  And what I did --

22                  THE COURT:  Are you working on that?

23                  MR. ZAHRALDDIN:  I stayed late on Wednesday instead

24   of going out and seeing all the people that came back home, got

25   out a version of the order, and we attached, I think, three --
```

 1   no, I think four or five -- I might be, you know, misstating

 2   that, but we attached several from other cases to the motion so

 3   they could look at those cases, they could send us orders.

 4   Otherwise, I am waiting for them to send me something back.  I

 5   just --

 6           THE COURT:  And then if you guys can agree on

 7   language, do I even need to hear anything and it's an agreed

 8   order?  If not --

 9           MR. ZAHRALDDIN:  I'll send competing orders in.

10           THE COURT:  Then just send me and all I'm going to

11   have -- because first of all, one, why should I do it.  That's

12   legal argument.  Why should I?  And then if I do, this is what

13   it should say.  That shouldn't take too long.  Shouldn't.

14           MR. ZAHRALDDIN:  Shouldn't.

15           THE COURT:  Shouldn't take too long.

16           MR. ZAHRALDDIN:  Shouldn't.

17           THE COURT:  Shouldn't.  All right.  So why don't you

18   continue the discussions with counsel on that order, and then

19   if you can submit an agreed order, we'll try to put it on, on

20   one of those days.

21           MR. ZAHRALDDIN:  And what I also will do is I will

22   try to respond to the latest questions in the mediation and see

23   if I can't push that, as well, because that might solve at

24   least part of what we requested in our stay violations motion.

25           THE COURT:  All right.  And I understand with respect

```
 1   to the stay violations motion, you may be able to come to a

 2   stipulated record on that, relying and citing to the records in

 3   the various hearings that we've had.

 4           MR. ZAHRALDDIN:  Yes, Your Honor.

 5           THE COURT:  And that would, you know, make it easier

 6   that we wouldn't have to be in court and would actually be

 7   addressing some of the issues.

 8               Anything further from anyone?

 9           MR. ZAHRALDDIN:  Your Honor, the only other thing

10   that my client has requested is that to the extent that there

11   is relief requested in the TRO that doesn't -- that Mr.

12   Barenbach (phonetic) and I've got to get Mr. Hodges (phonetic)

13   -- the two folks from the Netherlands --

14           THE COURT:  This is Barenbrug (phonetic)?

15           MR. ZAHRALDDIN:  Yeah.  To the extent that they or

16   Mr. Banerjee have no impact on some of the relief that we've

17   requested -- for example, the trademark issue has nothing to do

18   with anybody in the Netherlands, etcetera.  Would you consider

19   looking at those issues and maybe disposing of them beforehand?

20           THE COURT:  What issue?

21           MR. ZAHRALDDIN:  The trademark.  The filing of a --

22   and I can't say it any other way --

23           THE COURT:  Oh, wait.  You're asking me with respect

24   to violation of the automatic stay by filing with Mister --

25           MR. ZAHRALDDIN:  Or giving us a TRO.  For example, to
```

1    please stop filing things falsely with the USPTO.

2           THE COURT:  Well, that wouldn't -- well, I wouldn't

3    say please stop filing things falsely.  I might say don't file

4    anything until we resolve this matter.

5           MR. COLBY:  Yeah, I think -- I mean, we -- I

6    understand --

7           MR. ZAHRALDDIN:  Either one would be nice.

8           MR. COLBY:  I understand Mr. Zahralddin to be

9    requesting for partial relief.

10          MR. ZAHRALDDIN:  That's what I --

11          MR. COLBY:  They just closed their case.  Now, we

12   haven't had any chance to respond --

13          MR. ZAHRALDDIN:  Understood.

14          MR. COLBY:  -- with our own witnesses, so I think

15   that's premature.

16          THE COURT:  Well, I would think --

17          MR. ZAHRALDDIN:  It can --

18          THE COURT:  -- without granting anybody's request,

19   don't file anything.  I don't think I should have to tell

20   anybody that.  Don't do it until at least you come here and I

21   figure something else, unless, listen, if you want to -- again,

22   if your counsel tells you that you believe you can proceed, and

23   you proceed and you do at your own risk, and if I find that,

24   you know, even if counsel may have had reasonable basis to tell

25   you to do something, that has nothing to do with 360 2K.

1          MR. ZAHRALDDIN:  Yeah.

2          THE COURT:  Okay?  I always tell people, I error on

3  the side of caution.  If there's even a likelihood that your

4  actions are going to violate the State or could be deemed a

5  violation, come ask for a relief.  That's all I tell people.

6          MR. ZAHRALDDIN:  And Your Honor, Mr. Colby is right.

7  I should not be asking for --

8          THE COURT:  No.

9          MR. ZAHRALDDIN:  -- that relief prematurely, but if

10  we get to a point where we're not looking at rebuttal, I may

11  ask again.

12          THE COURT:  Well, all I can tell you is my -- I

13  caution people.  Proceed at your own risk.  I'm not saying I'm

14  going to tell you what you did was improper, but if it turns

15  out it is and it's a violation of the State, it's a costly,

16  very costly, decision.  So again, people can do whatever they

17  want.  I would just say --

18          MR. COLBY:  Thank you, Your Honor.

19          THE COURT:  -- don't do it.

20          MR. ZAHRALDDIN:  Let's just hear the evidence on it

21  and the explanation and then --

22          THE COURT:  Well, let me just say you can have all

23  the -- people will go do things and they can have a valid

24  explanation.  That doesn't mean it's not a violation.  It only

25  means what your sanctions are going to be.

1            MR. ZAHRALDDIN:  I understand.

2            THE COURT:  I'm not -- and I don't want anybody to

3    say that I'm finding that it was or wasn't or any of those

4    things.  I'll hear the explanation and I'll, you know -- I've

5    only heard one side.  I've only seen one document, one side

6    documents, but just a caution people.  Proceed at your own

7    risk.

8            MR. ZAHRALDDIN:  Understood.

9            THE COURT:  All right.

10           MR. CAPONI:  That's all the Debtor's have, Your

11   Honor.

12           THE COURT:  All right.  That concludes the matters

13   that are scheduled before the Court today.  Court is adjourned

14   until -- tomorrow is Tuesday, right?

15           MR. CAPONI:  Um-hum.

16           THE COURT:  10:30.

17           UNIDENTIFIED SPEAKER:  Yep.

18           THE COURT:  10:30.  Thank you.

19           MR. COLBY:  Thank you, Your Honor.

20           THE COURT:  All right.

21       (Proceedings adjourned)

22

23

24

25

C E R T I F I C A T E

      I hereby certify that the foregoing is a true and
correct transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader