## UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*. | Bankr. Case No. 23-10763 (AMC) |
| Debtors. [1] | (Jointly Administered) |

### *AMENDED* JOINT DESIGNATION OF RECORD ON APPEAL AND STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

Appellants, Visual Semiconductor ("VSI") and Rembrandt 3D Holding Ltd ("Rembrandt"), by and through their undersigned counsel, designates the following items to be included in the record on appeal, pursuant to the *Joint Notice of Appeal and Statement of Election* dated February 11, 2025 [ECF No. 941], from the *Order* denying Stay Motion [ECF No. 938] and sets forth his statement of issues to be presented on appeal:

## I.    Record on Appeal[2]

| | ECF DKT. NO. | DOCKET DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 750 | 09/30/24 | (Expedited) Motion of William A. Homony in His Capacity As Chapter 11 Trustee For (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling a Sale By Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G), and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, |

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] All items designated herein include all exhibits, filed with, attached to, or otherwise referenced in such pleadings.

| | | | Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
|---|---|---|---|
| 2. | 752 | 10/01/24 | Visual Semiconductor, Inc. Objection to the Expedited Consideration Of Motion of William A. Homony In His Capacity As Chapter 11 Trustee For (I) An Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner Of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief |
| 3. | 754 | 10/02/24 | Order on Motion for Approval of Bid Procedure |
| 4. | 788 | 11/06/24 | Visual Semiconductor, Inc. Objection to Motion Of William A. Homony In His Capacity as Chapter 11 Trustee for (I) an Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of The Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief |
| 5. | 789 | 11/06/24 | Rembrandt 3d Holding Ltd.'s Objection to Motion of William A. Homony In His Capacity As Chapter 11 Trustee for (I) an Order (A) Approving Bidding Procedures |

| | | | |
|---|---|---|---|
| | | | and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief |
| 6. | 795 | 11/11/24 | Praecipe to Substitute Exhibit "B" To Motion of William A. Homony In His Capacity as Chapter 11 Trustee for (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling A Sale By Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G), and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment Of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
| 7. | 801 | 11/12/24 | Hawk Investment Holdings Ltd.'s (I) Reply in Support of Motion of William A. Homony In His Capacity as Chapter 11 Trustee for (I) An Order (A) Approving Bidding Procedures and Form Of Asset Purchase Agreement for the Sale Of Substantially All of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); And (F) |

| | | | |
|---|---|---|---|
| | | | Granting Related Relief, and (II) an Order Approving (A) the Sale Of The Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief |
| 8. | 803 | 11/13/24 | Praecipe to Substitute Exhibit "A" to Motion of William A. Homony In His Capacity as Chapter 11 Trustee For (I) an Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of The Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief |
| 9. | **807** | **Transcript attached as Exhibit A** | **Transcript of Hearing re: Hearing held on November 13, 2024** |
| 10. | 810 | 11/19/24 | Support Document Asset List of Stream and Technovative re 363 Sale |
| 11. | 811 | 11/20/24 | Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement in Connection with the Sale of Substantially all of the Debtors' Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Approving Procedures for Selection of Stalking Horse Bidder and Bid Protections, and (D) Granting Related Relief |
| 12. | 814 | 11/21/24 | Notice of Assumption or Assignment of Executory Contracts and Unexpired Leases |
| 13. | 815 | 11/22/24 | Visual Semiconductor, Inc's Objection to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and |

80210405;1

| | | | Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Relating Relief |
|---|---|---|---|
| 14. | 816 | 11/22/24 | Rembrandt 3D Holding Ltd's Objection to the Sale of Substantially All of the Debtors' Assets |
| 15. | 819 | 11/27/24 | Stream TV Networks Inc's Chapter 11 Monthly Operating Report for Case No. 23-10763 for the Month Ending; 10/31/2024 |
| 16. | 820 | 11/27/24 | Technovative Media, Inc.'s Chapter 11 Monthly Operating Report for Case Number 23-10764 for the Month Ending: 10/31/2024 |
| 17. | 822 | 11/27/24 | Stream TV Networks Inc's Chapter 11 Monthly Operating Report for Case Number 23-10763 for the Month Ending: 10/31/2024 |
| 18. | 823 | 11/27/24 | Technovative Media Inc's Chapter 11 Monthly Operating Report for Case Number 23-10764 for the Month Ending 10/31/2024 |
| 19. | 824 | 11/27/24 | Rembrandt 3D Holdings Ltd's Motion Seeking (I) Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief |
| 20. | 826 | 11/27/24 | Visual Semiconductor Inc's Motion to Reconsider November 14, 2024 Order Quashing the Remaining VSI Discovery (ECF No. 805) and Grant Appropriate Relief |
| 21. | 827 | 11/27/24 | Visual Semiconductor Inc's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion to Reconsider and/or Clarify November 14, 2024 Order Quashing the Remaining VSI Discovery (ECF No. 805) |
| 22. | 827 | 11/27/24 | Visual Semiconductor Inc's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion to Reconsider and/or Clarify November 14, 2024 Order Quashing the Remaining VSI Discovery (ECF No. 805) |
| 23. | 835 | 11/29/24 | Omnibus Response of William A. Homony, in His Capacity as Chapter 11 Trustee, to the Objections to the Trustee's Motion for, *Inter Alia,* an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |

80210405;1

| 24. | 836 | 11/29/24 | Hawk Investment Holdings Ltd's (I) Joinder to the Omnibus Response of William A Homony, in His Capacity as Chapter 11 Trustee, to the Objections to the Trustee's Motion for, *Inter Alia,* an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
|-----|-----|----------|---|
| 25. | 837 | 11/30/24 | SeeCubi Inc's Joinder to Responses in Support of the Trustee's Motion for, *Inter Alia,* an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
| 26. | 839 | 12/02/24 | Rembrandt 3D Holding Ltd Third-Party Complaint and Injunctive Relief Against Stream TV Networks Iinc and Technovative Media Inc |
| 27. | 843 | 12/02/24 | Order Denying (ECF No. 827) Motion for an Expedited Hearing on (ECF No. 826) Motion to Reconsider Order Dated November 14, 2024 |
| 28. | 844 | 12/02/24 | Order Denying (ECF No. 825) Motion for Expedited Hearing on (ECF No. 824) Motion for Sanctions Against Parties Who Violated the Temporary Restraining Order, Enforcement of the Temporary Restraining Order, and for Injunctive Relief |
| 29. | 847 | 12/03/24 | Disclosure Statement for Stream TV Networks Inc's Chapter 11 Plan or Reorganization |
| 30. | 848 | 12/03/24 | Chapter 11 Plan of Reorganization by Stream TV Networks Inc and Technovative Media Inc |
| 31. | 850 | 12/03/24 | Declaration of William A. Homony in His Capacity as Chapter 11 Trustee, in Support of the Motion for an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |
| 32. | 876 | 12/09/24 | Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee To Enter Into and Perform Debtors' Obligations Under The Asset Purchase Agreement, (C) Approving Assumption |

80210405;1

| | | | And Assignment Of Certain Executory Contracts And Unexpired Leases, And (D) Granting Related Relief |
|---|---|---|---|
| 33. | 852 | 12/03/24 | Declaration of J. Scott Victor in Support of Chapter 11 Trustee's Motion for Entry of an Order (I) Authorizing and Approving, But Not Directing, the Sale of the Assets, in Each Case with such Sale Being and Clear of Any and All Liens, Claims, Encumbrances and Interests, (II) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (III) Granting Related Relief |
| 34. | 853 | 12/04/24 | Praecipe to Amend and Substitute Exhibit "C" to Sale Motion |
| 35. | 859 | 12/04/24 | Declaration of Mark Hsu in Support of Visual Semiconductor Inc's Objection to Trustee's Sale Motion |
| 36. | 871 | 12/08/24 | Rembrandt 3D Holding Ltd.'s Response to Praecipe to Substitute Exhibit "C" to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief |
| 37. | 872 | 12/09/24 | Visual Semiconductor Inc's Objection and Joinder to Rembrandt 3D Holding Ltd's Response to Praecipe to Substitute Exhibit "C" to Motion of William A Homony in His Capacity as Chapter 11 Trustee for an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C ) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief |
| 38. | 874 | 12/09/24 | Interested Party Leia Inc's Objection to the Proposed From of Order Approving Trustee's Sale Motion |
| 39. | 876 | 12/09/24 | Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief |

80210405;1

| 40. | 877 | 12/10/24 | Amended Joint Notice of Appeal and Statement of Election re Sale Order [ECF No. 876] filed by Rembrandt 3D Holding Ltd and Visual Semiconductor Inc |
| 41. | 878 | 12/11/24 **Transcript attached as Exhibit B** | Transcript of Hearing re: Hearing Held on December 4, 2024 |
| 42. | 886 | 12/16/24 | Chapter 11 Monthly Operating Report of Stream TV Networks Inc for Month Ending: 11/30/2024 |
| 43. | 887 | 12/16/24 | Chapter 11 Monthly Operating Report of Technovative Media Inc for Case Number 23-10764 for the Month Ending: 11/30/2024 |
| **44.** | **893** | **Transcript attached as Exhibit. C** | **Transcript of Hearing re: Hearing held on December 18, 2024** |
| 45. | 898 | 12/23/24 | Motion of Visual Semiconductor, Inc. to Stay the Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief Pending Resolution of Appeal |
| 46. | 915 | 1/06/25 | Notice of Closing on Sale of Substantially All of the Assets of Stream TV Networks, Inc. and Technovative Media Inc. |
| 47. | 934 | 1/22/25 | Response of William A. Homony, In His Capacity as Chapter 11 Trustee, to the Motion of Visual Semiconductor, Inc. to Stay the Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and Granting Related Relief Pending Resolution Appeal |
| 48. | 932 | 1/22/25 | Chapter 11 Monthly Operating Report of Stream TV Networks Inc for Month Ending: 12/31/2024 |

80210405;1

| 49. | 933 | 1/22/25 | Chapter 11 Monthly Operating Report of Technovative Media Inc for Case Number 23-10764 for the Month Ending: 12/31/2024 |
| 50. | | 2/25/25 | Visual Semiconductor Inc Administrative Proof of Claim No. 27 |
| 51. | | **Claims Register attached as Exhibit D.** | **Claims Register as of February 25, 2025, Claims Number 1-1 through 27-1** |

## II.   Statement of Issues on Appeal

1.   Whether the Bankruptcy Court erred in denying the Stay Motion and rendering the Stay Motion as moot.

2.   Whether the Bankruptcy Court erred in finding that VSI delayed in filing the Stay Motion and set the Stay Motion for hearing more than a month and a half after the Sale Order becoming effective.

3.   Whether the Bankruptcy Court erred in finding that VSI waived its right to seek a stay pending resolution of the Appeal before the Closing could occur.

Dated: New York, New York
February 27, 2025

By:   */s/R. Adam Swick*
Donald N. David (SBN # 304846)
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Telephone: (212) 880-3856
Facsimile: (212) 880-8965
Email: donald.david@akerman.com

-and-

R. Adam Swick (admitted *pro hac vice*)
AKERMAN LLP
500 W. 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7100
Email: adam.swick@akerman.com

80210405;1

-and-

John H. Thompson (admitted *pro hac vice*)
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Telephone: (202) 393-6222
Facsimile: (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Appellant Visual Semiconductor Inc.*

-and –

By: ___*/s/ Andrew DeMarco*_____
Andrew DeMarco (SBN: 326294)
DEVLIN LAW FIRM LLC
156 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile:  (302) 353-4251
Email: ademarco@devlinlawfirm.com

-and-

Christopher D. Michaels
BROWN & MICHAELS PC
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850
Email: michaels@bpmlegal.com

*Attorneys for Appellant Rembrandt 3D Holding Ltd*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                      :
IN RE:                                : Case No.  23-10763
                                      :
STREAM TV NETWORKS, INC.   CH: 11 :
AND TECHNOVATIVE MEDIA,               :
INC.                                  : Philadelphia, Pennsylvania
                                      : November 13, 2024
                                      : 11:00 a.m.
. . . . . . . . . . . . . . . . . .:
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For SeeCubic, Inc.: | Marley Brumme, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010<br><br>Christopher Michaels |
| For SSG Capital Advisors: | Samuel Charlton |
| For VSI: | John H. Thompson<br>Akerman<br>750 Ninth Street, N.W.<br>Suite 750<br>Washington, D.C. 20001<br>202-393-6222 |
| For Hawk Investment Holdings<br>Ltd.: | Steven Caponi, Esq.<br>Margaret Westbrook, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |

```
                                    Jonathan N. Edel, Esq.
                                    300 South Tryon St., Suite 1000
                                    Charlotte, NC 28202

For the Trustee:                    Michael D. Vagnoni, Esq.
                                    Obermayer Rebmann Maxwell &
                                    Hippel LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia, PA 19102
                                    215-665-3066

                                    Steven M. Coren, Esq.
                                    Kaufman Coren & Ress, P.C.
                                    Two Commerce Square
                                    Suite 3900
                                    2001 Market Street
                                    Philadelphia, PA 19103-2713
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 13, 2024                              11:00 A.M.

 2           THE COURT:  Okay.  Is there anyone else on the phone

 3   who is here for a case other than Stream TV?  Okay.  Thank you.

 4           Party who just joined the call, the last four digits

 5   6443.  Could you identify -- I'm sorry, 6643, could you

 6   identify yourself, please?

 7           MR. CHARLTON:  Yes.  Samuel Charlton with SSG Capital

 8   Advisers.

 9           THE CLERK:  Yes, with the last four digits 4063.  Can

10   I have your last name, please?

11           All rise.

12           THE COURT:  Morning.  Please be seated.  Court is now

13   in session.  All right.  This is the call on the 11:00 list.

14   The only matter remaining on the list is number 23, Stream TV

15   Networks and we have several parties on the phone and in the

16   courtroom.

17           Do you want to start with the people in the

18   courtroom, first?

19           UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah, let's start

20   with the people in the courtroom.

21           THE COURT:  Okay.  We're going to start with the

22   people in the courtroom and get everyone's appearances.

23           Appearances, please, on Stream TV.

24           UNIDENTIFIED SPEAKER:  Come sit at the table.

25   Welcome.
```

1          MR. THOMPSON:  Morning, Your Honor.  John Thompson of

2    Akerman on behalf of VSI and with me today is my colleague Adam

3    Swick and retired Judge Nick Clark from the Western District of

4    Texas.

5          THE COURT:  Welcome.

6          MR. CLARK:  Morning, Your Honor.

7          THE COURT:  It's good to see you.

8          MR. CLARK:  Thank you.

9          MR. DEMARCO:  Good morning, Your Honor.  This is

10   Andrew DeMarco from Devlin Law Firm here representing

11   Rembrandt.  Also here with me is Christopher Michaels from

12   Brown and Michaels who will be handling any argument today.

13         THE COURT:  Welcome.

14         MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

15   from K&L Gates on behalf of Hawk.

16         THE COURT:  Okay.

17         MS. BRUMME:  Good morning, Your Honor.  Marley Ann

18   Brumme of Skadden Arps on behalf of SeeCubic.

19         THE COURT:  Okay.  Great.  I thought you guys were

20   going on the phone.  You're going to be outnumbered.

21         MR. CAPONI:  Yeah.

22         THE COURT:  No, you're here.  Okay.  All right.

23   We're just entering appearance, so come on up and say hello.

24         MR. VAGNONI:  Good morning, Your Honor.  Michael

25   Vagnoni on behalf of Bill Homony, Chapter 11 Trustee.  I have

1   with me Ed George and Steve Coran from Coran and Ress.

2          THE COURT:  Okay.

3          MR. CORAN:  Morning.

4          THE COURT:  Good morning.  All right.  How about the

5   people on the phone?  Did you want to note your appearance if

6   there's anywhere there?

7          Do we have anyone?

8          UNIDENTIFIED SPEAKER:  Yeah.  Yeah.

9          THE COURT:  We do?  The parties on the line, if every

10  -- if you could each speak one at a time and tell us who you're

11  here for on Stream TV and enter your appearances, please.

12         MR. EDEL:  This is Jonathan Edel from K&L Gates on

13  behalf of Hawk Investment Holdings.

14         THE COURT:  Okay.  Anyone else or you think that's

15  it?

16         UNIDENTIFIED SPEAKER:  They might just be observing.

17         THE COURT:  Okay.  Fine.

18         All right.  Well, welcome back, everybody.  I know

19  we're here on the reconsideration, which I will -- I guess I

20  just wanted to address the discovery issue.  So the last time

21  we were talking on the phone, you guys had raised an issue

22  about the assets that were being sold and you had concerns

23  about whether there were licenses and I think Mr. Vagnoni, I

24  was giving you a week to try to clarify for them what assets

25  were going to be sold.

1          So have you had any productive conversations

2   hopefully with them?

3          MR. VAGNONI:  Your Honor, we took your direction from

4   the last hearing, and we provided both VSI, accounts for VSI

5   and accounts with Rembrandt.  A fairly exhausted list of what

6   the assets are.  Not just the assets that we are -- that the

7   Trustee is selling, but the assets that are embedded in the

8   downstream subsidiaries whose equity we are selling as well.

9          That, I think, would have satisfied the Court's

10  concern in that regard.  I have a copy of what we sent.  I

11  didn't bring multiple copies.  It's very thick.  But we did

12  provide that.  We did also receive a email on Friday of last

13  week asking for a meet and confer to discuss what discovery

14  would be taking place.

15         We did not engage in that meet and confer.  We didn't

16  take your comments last week as we thought everything was

17  quashed to that point based on your ruling.  So we did not meet

18  and confer.  We were preparing for the hearing.  But we -- and

19  we did not engage in any discovery again, because we thought

20  the discovery request had been quashed by Your Honor.

21         But again, we did provide them with a listing --

22         THE COURT:  Okay.  Well, let me --

23         MR. VAGNONI:  -- on the --

24         THE COURT:  -- see if they feel like they have a

25  better understanding.

1              So do you gentlemen have a better understanding of

2    exactly what's being sold?

3              MR. MICHAELS:  We have no better understanding.  Most

4    simply, are they accepting -- assuming, rejecting saying that

5    the Rembrandt contract is invalid, valid?  What is their

6    position?  Where is our IP?  Have they removed it?

7              They're disclosure, this voluminous thing they

8    described has a single sentence that says, "software," right?

9    There's no discussion of -- we have asked over and over again,

10   are you in control of the software professional development

11   system?  I.E., do you have the username and password?  No

12   response.

13             THE COURT:  Uh-huh.

14             MR. MICHAELS:  We have no idea what they have.  More

15   so, we're the ones that have provided a far more extensive list

16   of what assets we believe could be in that estate and we've

17   told them what documents we're relying upon and asked them,

18   what is the status of each of these individuals assets?  No

19   response.

20             THE COURT:  Okay.  So --

21             MR. MICHAELS:  We are no more clear than we have --

22             THE COURT:  -- I've been with you guys up until this

23   point.  But now, you know, they've got some serious concerns.

24   You know, their belief is that the sale of the asset is going

25   to violate all of these rights.  It's going to spawn all of

1   this litigation about the licenses, right?  That's their

2   concern.

3          And I'm willing to consider a sale of this, but at

4   the very basic level, we need to understand exactly what is

5   being sold, right?  And it sounds like today they don't know.

6          So he just said that you said it's software.  Do you

7   have something more specific than just the word software in

8   terms of this being sold?

9          MR. VAGNONI:  There was -- Your Honor, first of all,

10  let me just address a couple of things that Mr. Michaels said.

11  I think he indicated once again to the Court that he hasn't

12  been made aware of whether or not the sale will include an

13  assumption and assignment of the Rembrandt license.

14         Paragraph 27 of our motion clearly indicates that

15  that license is not part of the sale transaction.  It is not

16  going to be acquired by the stock and horse purchaser.

17  However, if there is a competitive bid, a bid that is a

18  superior bid to the stock and horse bid that wants the

19  Rembrandt license, absolutely we would entertain an assumption.

20  There would have to be discussion about what --

21         THE COURT:  Okay.  So let's -- what we're going to do

22  today, just so I have an idea, we're just going to take this

23  issue by issue.  So you're saying that the license is not part

24  of the sale --

25         MR. VAGNONI:  That's correct.

1           THE COURT:  -- but you would contemplate bids on it.

2   I'm not sure how you'd write that into the bid procedure, but

3   we can talk about that in a minute.

4           So what's your response to that?

5           MR. MICHAELS:  It's not an assignable license.  It's

6   not their option to decide to sell it or not.  That's -- and

7   neither is the Phillips license.  It is -- we have -- we did

8   not need Mr. Vagnoni to explain to us whether or not our

9   license was assignable.  It is absolutely note and all the case

10  law is --

11          THE COURT:  Okay.  Well --

12          MR. MICHAELS:  -- if I don't mind?

13          THE COURT:  Yeah.

14          MR. MICHAELS:  Our issue isn't that the contract is

15  -- that they're attempting to assign it.  They are clear

16  they're not attempting to assign the contract.  It's the

17  intellectual property that is the basis of that.  I mean,

18  saying I'm not handing you a piece of the car, the car title

19  is, you know, that -- but I'm going to hand them the keys to

20  the Lamborghini.  I mean, we're concerned about the keys and

21  the Lamborghini, not the piece of paper that says we own it.

22  We already have that.  I don't need them to tell me we have

23  that.

24          THE COURT:  Yeah.  Yeah, yeah.

25          MR. THOMPSON:  Your Honor, if I might add?

```
 1              THE COURT:  Yeah.

 2              MR. THOMPSON:  There's a real problem with the bid

 3   procedures in addition to those that Mr. Michaels rose --

 4   raised.  In this circumstance, Mr. Vagnoni has just told the

 5   Court as his email to us told us that they are, I guess,

 6   excluding the asset that is the Rembrandt license.  The reasons

 7   you just heard.  It doesn't matter whether they wanted to

 8   assume it and assign it, they could not.

 9              But in this circumstance, right, they're suggesting

10   that some other party out there might come in and bid for it.

11   Well, how do we have a bid process where --

12              THE COURT:  Yeah, yeah.  Okay.

13              MR. THOMPSON:  -- some other parties actually

14   consider --

15              THE COURT:  Well, tell me this.  If he -- if we have

16   -- let's say we have the bid, we had the auction, right, and

17   Hawk's the only one that shows up and under their purchase

18   agreement, they're not going to get it.  Then does that take

19   care of your issue entirely because --

20              MR. MICHAELS:  Not in any way, Your Honor.  I mean,

21   we have listed out a huge number of trade secrets.  We have a

22   bunch of patents.  The very assets that they have listed where

23   they've talked about TV's, prototypes, demos, those are all --

24   were all alleged back in 2017 to have been covered by

25   Rembrandt --
```

1           THE COURT:  All right.  So let me just, like -- I'm

2    sorry.  Let me just be more specific.  So I want to take it

3    issue by issue.

4           MR. MICHAELS:  Uh-huh.

5           THE COURT:  So at least I understand.  So he had

6    thrown out this comment that he's not attending to sell certain

7    licenses unless someone else bids for it.  So with regard to

8    those licenses, if there's no other bidder and the stocking

9    horse gets it, Hawk gets it, then with regard to that license,

10   then I think we're all in agreement that the license isn't

11   being sold at all, right?

12          So I think you wouldn't have an issue if there's no

13   stocking horse -- if it's just a stocking horse bidder and

14   there's no other bidders with regard to the license.

15          MR. MICHAELS:  With respect, we would.  The issue

16   with the license -- it's not a question of will they assume or

17   reject it in the future.  It's SSG offering for sale

18   Rembrandt's patented technology.  That's a violation of Section

19   271.  That's present today patent infringement -- you -- they

20   do not have a license to the Rembrandt technology.

21          THE COURT:  Hold on a second.  Who is that person?

22          All right.  So I would ask everyone on the phone line

23   to try to mute your phone because we're -- someone's not muted,

24   so we're hearing everything in the courtroom that's going on

25   there.  So could everyone just take a moment?  How do they mute

1   their line?

2          UNIDENTIFIED SPEAKER:  Star six.

3          THE COURT:  So if you could just hit star six,

4   everyone on the line, I'd appreciate that.

5          MR. VAGNONI:  Your Honor, if I may -- raise that

6   issue for a very specific reason.  SSG is not offering that

7   license for sale.  That is not part of the AP --

8          THE COURT:  So when we say license, let's just drill

9   down a little bit.  License of what?

10          MR. VAGNONI:  Absolutely.  Very vague.

11          THE COURT:  License of what?

12          MR. VAGNONI:  There is a 2021 settlement agreement

13   that a single line in it that is a -- called a grant of rights.

14   In that grant of rights, Rembrandt reports to give the rights

15   -- the nonexclusive rights to use their intellectual property.

16          By the way, that settlement agreement was entered

17   into the day or the day before Rembrandt -- they became a

18   creditor by virtue of that and then were a petitioning creditor

19   in Stream's failed involuntary bankruptcy in Delaware.  We take

20   significant issue with that agreement as a whole.  But let's

21   just take it as it is.  That license agreement comes out of a

22   settlement agreement.  And like I said, the -- SSG is not

23   offering that for sale.  However, in the -- which you'll hear

24   about when we get to testimony.

25          In negotiations with VSI and with Rembrandt, it's

 1   been made clear to us that if a transaction was to occur with

 2   VSI, that the Rembrandt license would have no problem being

 3   assumed.

 4          And in fact, there are -- there is a post-petition

 5   agreement that was entered into by Rembrandt Stream and VSI

 6   that was not court approved that purported to do just that.

 7   Give VSI rights in that license.  And exclude Streams

 8   subsidiaries from the use of that technology pursuant to that

 9   license.

10          So that is why I indicated to the Court that if there

11   was a transaction that was a higher and better bid, which VSI

12   and Rembrandt are free to bid in this process.  They've been

13   free all along.  They've had access to the data room if they

14   wanted it.

15          The VSI is the only person who's taken up that offer.

16   That is what I was referring to.  Not that it was generally

17   assignable.  We don't think anybody has interest in it and we

18   also don't think we are selling any assets that have that --

19   Rembrandt intellectual property in that -- in the asset.

20          MR. MICHAELS:  Your Honor, I'd like -- I apologize.

21   I'd really like a chance to finish answering your question that

22   you had asked previously.

23          THE COURT:  Yes, that's fine.

24          MR. MICHAELS:  So the -- you asked whether the issue

25   would be resolved if the Hawk party's just didn't take -- it

1    isn't a question of SSG selling our license.  It isn't an

2    active patent infringement.  The active patent infringement is

3    offering for sale in a patented invention on why Rembrandt,

4    right?

5           And the TVs, all of the assets that Mr. Vagnoni

6    clearly lists are being offered for sale.  That is the active

7    patient infringement.  SSG has committed patent infringement.

8    All five of those individuals have committed patent

9    infringement.  The Trustee has committed patent infringement

10   unless they can show that they have a license.

11          So when Rembrandt is asking about the status of its

12   license, it is, are we suing those individuals and those

13   entities tomorrow?  They -- it is -- if they have a license, we

14   can't.  That is a full and absolute complete defense.

15          The agreement that Mr. Vagnoni's referring to is

16   Streams former counsel, almost immediately after filing the

17   petition contacted Rembrandt and said, we know we need a

18   license to your technology as an administrative claim.  We need

19   to resolve this.  And we signed a settlement amendment that

20   extended the time that prevented the estate from becoming

21   administratively insolvent due to the fees that were going to

22   be due to Rembrandt.

23          They have said they're not honoring that settlement

24   amendment.  The arrears are $3 million.  Does the estate have

25   $3 million to have that license?

1          THE COURT:  So I'm trying to -- I feel like there's

2   litigation that's going to be spawned, right, by -- under the

3   licenses and I'm just trying to have a very basic understanding

4   of what is purportedly being sold by the Debtor.

5          MR. THOMPSON:  They don't know, Your Honor.

6          THE COURT:  I --

7          MR. THOMPSON:  And that's --

8          THE COURT:  -- and I get that.  And I -- so I'm -- I

9   think that we have, like first thing -- what happened?  Okay.

10  Good.  Thank you for muting everybody.

11          So the first step to me seems that we should at least

12  come to an agreement, or at least I need to understand what is

13  being sold.  So can we just focus on that for instance.

14          All right.  So I think one of the comments -- and so,

15  you said before, like, they had described software or something

16  that was, like, their general description.  So did you, Mr.

17  Vagnoni, describe on some schedule that software is going to be

18  sold as part of this?

19          MR. VAGNONI:  Your Honor, I will -- if I may, to

20  preface what -- the answer to that question.  What the Trustee

21  is selling is all of the assets of Stream, which are clearly

22  listed in schedules, which are a public document they have

23  access to.

24          Mr. Rajan, who is the head of VSI, signed those

25  scheduled, I believe, and he certainly took part in preparing

1    them.  So he should know exactly what is in those schedules.

2    The other assets that are being sold in the APA are the equity

3    interest and all the subsidiaries of Technovative.

4            The software, the intellectual property, the license

5    to Phillips, all of that is contained in downstream

6    subsidiaries.  We are not selling those assets per say.  We're

7    selling the equity in those assets.

8            And this is typical of a case where a Chapter 11 or

9    Chapter 7 Trustee walks into a mess and sees that it's

10   spiraling out of control and tries to bring some control to the

11   situation and get the estate some money before there is no

12   money.

13           THE COURT:  Okay.  So again, my focus for right now

14   is, I'm just trying to understand what the assets are.  So he's

15   telling me that he's purporting to sell the equity and the

16   entities that presumably are in possession perhaps of your

17   property, is that your understanding there?

18           MR. MICHAELS:  Mr. Vagnoni just described the process

19   as typical, right?  An IP -- a technology case of this sort,

20   purporting to sell intellectual property rights is anything but

21   typical.  And I think --

22           THE COURT:  Okay.  So let's just focus on -- I just

23   want to drill down on what assets are being sold.  So he's told

24   me that he's selling equity in entities that presumably possess

25   your intellectual property.  Can we agree on that?

```
 1              MR. MICHAELS:  Yes.

 2              THE COURT:  Okay.  Good.  All right.  That's

 3    progress.

 4              MR. MICHAELS:  That's one -- I mean, that's one

 5    aspect of what he said.

 6              THE COURT:  Okay.  Fine.  That's one aspect.  Okay.

 7    So tell me -- so your concern, though, is that when he purports

 8    to sell the equity in these companies, then the buyer who takes

 9    possession of the -- like, they buy the equity, right?  Now,

10    they're going to own, you know, via that equity, everything,

11    you know, tangible and intangible that those entities own.  And

12    your -- and so your position is that some of the assets that

13    they own are your property?

14              MR. MICHAELS:  Yes.

15              THE COURT:  Okay.

16              MR. EDEL:  Your Honor, if I may --

17              THE COURT:  Yeah.

18              MR. EDEL:  -- since I'm representing Hawk.  The --

19    Mr. Vagnoni is correct.  We're -- the stalking horse is

20    acquiring the equity.  Stream is a holding company.  All the

21    operating entities, the main operating entities in the

22    Netherlands and requiring the stock that owns the stock that

23    owns the stock that owns that entity.  The fundamental dispute

24    here is that Rembrandt believes that its trade secrets, its

25    knowledge, its know-how is embedded in everything that Stream
```

1    does.

2           So every TV that it has, every computer that it

3    touches, somehow can -- you know, involves their intellectual

4    property.  Now, there's intellectual property such as patents.

5    Rembrandt brought patent litigation many years ago, but it was

6    dismissed, and they have not asserted a patent case.

7           They're really talking about the intellectual

8    property.  We disagree.  We believe that the technology that

9    Stream developed through its operating subsidiaries overseas is

10   -- belongs to Stream.  If my client acquires the stock, it's

11   acquiring that entity, the good, the bad, and the ugly.

12          And if that means that entity, if Rembrandt believes

13   that entity has put intellectual property into a TV or trade

14   secrets, we'll duke it out after the fact.  But what this is

15   all about, this is Rembrandt and attached to the hip of Mr.

16   Rajan trying to stop at every opportunity this case moving

17   forward.

18          THE COURT:  Okay.  I know.

19          MR. EDEL:  Rembrandt --

20          THE COURT:  You believe there's spoilers and I --

21          MR. EDEL:  Well, Your Honor, I think it's -- it's not

22   just, I think.  As Mr. Vagnoni indicated, they entered into a

23   settlement.  They're standing before Your Honor before today

24   trying to hold up this sale.  Rembrandt entered into an

25   agreement during the pendency of the bankruptcy and amended it

1   with Mr. Rajan where they identified all of their technology,

2   all of their knowhow, how they believed it was being used in

3   everything and said, if Mr. Rajan gets the company, all is good

4   in the world.  No one else is allowed to have it.

5           And then come before the Court today and say, we have

6   no idea how he's using our stuff.  Well, they had a pretty good

7   idea when they were executing documents, you know, in the

8   shadows during the pendency of a bankruptcy.  But now they want

9   to come, Mr. Rajan, who founded the company, ran the company

10  until he was -- you know, the Court determined he was

11  uncredible and removed him.  And throughout the entire pendency

12  of the second bankruptcy which dismisses fraudulent at the aide

13  of Rembrandt to today, they're attached at the hip.

14          This is, with all due respect to the Court, my client

15  has been through this process for many, many years.  It's a

16  very simple sale.  Nobody else, and I think this cannot be

17  lost, nobody else is interested in these assets.  No one has

18  come forward to the pendency of the bankruptcy.

19          THE COURT:  All right.  But we aren't going to get

20  into this.  But from what I understood, the data room is not

21  complete.  I mean, there's --

22          MR. MICHAELS:  That's right, Your Honor.

23          MR. EDEL:  The --

24          MR. MICHAELS:  That's by design.

25          MR. EDEL:  -- data room is not complete because the

```
 1   data room does not include the fraudulent documents Mr. Rajan
 2   created during the bankruptcy, for example --
 3              THE COURT:  Okay.  Well --
 4              MR. EDEL:  -- these purchase orders that don't exist.
 5              THE COURT:  I would like to just -- I would like to
 6   be able to have civil conversations here today.  And I
 7   understand you guys don't like each other.  I know that.  So to
 8   the extent that we could -- I understand.  Like, I call it
 9   spoilers.  You think that they're spoilers.  You guys think
10   that they're selling your assets, and everyone is really
11   annoyed with each other.  I get the sentiment.  I understand
12   that.
13              Okay.  But it doesn't help me get to the point.  So
14   let me tell you what I think is one possibility here, right?
15   So Mr. Vagnoni wants to sell the equity in these companies, if
16   there's -- if we get to the point of a sale and there's no
17   other bidders and Hawk picks up these assets, then under 363
18   when he gets all this stuff, to the extent that you think that
19   he's misusing it, then you're going to sue Hawk, right?  Aren't
20   you going to sue Hawk?
21              MR. MICHAELS:  We already have.  They're in --
22              THE COURT:  Yeah.  Yeah.
23              MR. MICHAELS:  -- we're in litigation in Delaware.
24   But I think what I'm trying to be clear here is that Mr.
25   Vagnoni has -- they're talking about a bunch of equity, and
```

1   he's also put on their asset list that they are selling devices

2   that are accused of being -- infringing over on Rembrandt's

3   patterns and Stream, under the guidance of DLA Piper, took a

4   license.

5           Stream again renewed that -- negotiated again are

6   Armstrong T -- they advised them to do that.  Lewis Brisbois,

7   same thing.  We have numerous law firms evaluating these claims

8   and saying this was a good idea.  We have Mr. Homony testify.

9   He's done no investigation as to whether this is a good idea or

10  not.  And they ignored the issue.

11          They have not -- if the Rembrandt is not valid, we're

12  hearing, you know, testimony that may or may not -- this

13  Rembrandt license may or may not be valid.  It was, you know,

14  executed in 2021 right before a bankruptcy.

15          So if it's not valid, that means all the activity

16  that the estate to date are infringing a patent.  I just want

17  to be clear that that's the argument, is that this estate goes

18  almost instantaneously administratively insolvent.  And we are

19  looking for and we will ask the Courts -- the District Courts

20  to enjoin any transfer of our intellectual property.

21          Now we have licensed Stream.  We have -- we are

22  arguing that the license is valid but cannot be transferred.

23  You may not transfer our intellectual property.  You take a

24  ring, and you put it in a box and say, well, I'm just selling

25  this box, whatever may be in it.

1           You know, we've evaluated what's inside the box.

2    What's inside of SeeCubic B.V. is Rembrandt technology.  We've

3    gone through that multiple law firms representing Stream.  And

4    we have determined that a license was necessary.  And SSG does

5    not get covered by ignorance.  There's no, I didn't know, Your

6    Honor.  It defends patent infringement.

7           They are actively offering for sale assets that

8    include that were directly laid out in the complaints back in

9    2017.  And while Mr. Caponi said it was dismissed, it was a

10   jurisdictional.  Every patent case under *TC Heartland*, the

11   Supreme Court case was dismissed and had to be brought in the

12   home state of the corporation.

13          And we immediately entered mediation, and they

14   insisted the DLA Piper's counsel and Streams officers, most

15   notably, Shadron Stastney, insisted that the patents be

16   included in the license agreement.

17          So this idea that they weren't important to Stream is

18   not supported by the facts in any way, shape, or form.  And we

19   are asking for clarity, is the Trustee operating and is SSG

20   operating under the license?  I.E. they therefore can't be sued

21   for trying to sell a TV covered by one of our patterns.

22          THE COURT:  Okay.  It sounds like they want to sell

23   equity and entities who have hard assets that contain your

24   intellectual property.  So the owner of the equity will

25   presumably then own these hard assets that have your

1    intellectual property embedded in them.  That's what I

2    understand?

3            MR. EDEL:  That's Your Honor, that's if it indeed a

4    -- a bidder is capable of determining what they're buying or

5    what the assets underneath that equity.

6            UNIDENTIFIED SPEAKER:  Your Honor?

7            MR. EDEL:  We have a whole list -- excuse me.  We

8    have a whole list of items that purport to the assets of the

9    Debtors.  I'm telling you today that that is an incomplete list

10   that was filed on this docket reported to this set of assets

11   that are being sold, that's substantially all of the assets of

12   the Debtors and we can show that.

13           More than that, the data room is breath of lots of

14   information.  And the process -- and I know Your Honor wants to

15   focus on the assets, I will focus on the assets, but as Mr.

16   Caponi tried to raise the broader issues.  The broader issue

17   here is that this trustee has agreed to transfer this set of

18   assets to one party and one party only and that is the Hawk

19   parties, right?

20           And they've done pursuant to 9019 settlement

21   agreement that purports just to be a settlement agreement, but

22   it's a sub rosa plan, because there's no other entity out

23   there, whether they be a strategic buyer or another competitor

24   of a Stream TV that would be interested in these assets under

25   these conditions based upon these encumbrances.  And it's not

```
 1   just --

 2            THE COURT:  Okay.  So gentlemen --

 3            MR. EDEL:  -- not --

 4            THE COURT:  -- let's just take a moment here.  So in

 5   terms of the bid procedures, I have concerns I think that you

 6   guys raised.  Some legitimate concerns, which we'll get to,

 7   right?

 8            So I see, like, several different areas that need to

 9   be addressed over time.  The first is, you need to know what is

10   being sold.  They're selling the equities that contain the

11   equity of entities that own the tangible property that has your

12   intellectual property.  So now you know.  They're -- that's

13   what they're trying to sell.

14            So the first step is, I'd just like to get some

15   clarity and make sure that we're all on the same page as to

16   exactly what's being sold.  Then we'll go through the bid

17   procedures and all of the many objections, some of which I

18   thought were meritorious.  But some of the issues that you're

19   raising are really important issues.

20            But to me, they appear closer to sale issues, right?

21   It's going to be a huge issue when you object to the sale,

22   right?  I'm going to -- it looks like I'm going to need some

23   briefs on all of the very important issues that you have to

24   raise.  But those are issues that, you know, that I think are

25   more appropriately dealt with then, right?
```

```
 1              So in terms of, you want discovery.  So the discovery

 2    that you want, I think it's important for you to get discovery

 3    if it's necessary on what assets are being sold.  But we have

 4    that -- we now have that nailed down.

 5              So let's focus first on what exactly is being sold.

 6    So you're selling the equity that has hard assets, that has

 7    their intellectual property embedded in it.  So let's --

 8              MR. VAGNONI:  Allegedly, Your Honor.  There's been

 9    no --

10              THE COURT:  Oh, okay.

11              MR. VAGNONI:  -- there's been --

12              THE COURT:  That's fine.  I understand you're not

13    conceding anything.  But I just want, for clarity sake, to

14    understand what it -- you know, what's being sold.

15              MR. MICHAELS:  Your Honor, their agent, SSG, as

16    investment banker, sent out a teaser that purported to sell the

17    capability of making licenses of the Ultra-D technology.

18    Rembrandt's technology or IP is in it and so is Phillips.

19              THE COURT:  Okay.  So what we're -- so that's not --

20    what I'm talking about, like, a hard asset.  Now you're talking

21    about some technology, is that --

22              MR. MICHAELS:  In some cases, it is a hard asset.

23    There are -- this lens technology they patented.

24              MR. SWICK:  Your Honor, Adam Swick, Akerman on behalf

25    of Visual Semi, VSI.  The issue is they have a stalking horse
```

1    bidder that has been at odds with the former debtor --

2              THE COURT:  Clearly.  Yeah.

3              MR. SWICK:  Yeah, yeah.  And so, they took control of

4    the Debtors' assets, they broke into the Debtors' offices,

5    stole TVs, they stole intellectual property.  They've been

6    using them.  They've been showing.  There's emails and letters

7    and we'd love to get discovery from the Trustees, because we

8    believe the Trustee knows all of this.

9              And so, they have TVs in different locations.  They

10   have different hard assets.  All this is purporting to be sold

11   by the Trustee who hasn't gotten it back, because that's the

12   stalking horse and they need the stalking horse to be able to

13   go out and raise money to fulfil their obligations.  And as of

14   the filings last night, the stalking horse doesn't have the

15   money to pay for the 363 as it is right now.

16             So yeah, what we need is discovery on where are all

17   these TVs?  They're all over the world.  They're in the

18   different offices of SeeCubic and the Hawk parties.  I mean,

19   Mr. Caponi up here, he represents the Hawk party's and Robert

20   Morten (phonetic), who's subject to a cold shoulder, which is

21   the worst crime of moral turpitude in the U.K.  It's supposed

22   to end your career and that's who these guys have hitched their

23   wagon to.  So we just need discovery to find the assets so we

24   -- if they want us to participate in a 363 sales process, how

25   are we going to do that if we don't know where the TVs are?

1    Who's --

2              THE COURT:  Okay.

3              MR. SWICK:  -- using them?

4              THE COURT:  So again, let's just focus back on what I

5    care about.  What I care about is, I want to know what they're

6    purportedly selling.

7              MR. SWICK:  They don't know.

8              THE COURT:  Okay.  And I know you say that.  But why

9    don't we just go through all of the concerns you have about the

10   identity of the assets?

11             Yes?

12             UNIDENTIFIED SPEAKER:  Your Honor, going -- sort of

13   taking a broad step back, how we ended up here.  My client has

14   a security interest.  Again, Stream's the holding company.  Has

15   no assets, other than stock and subsidiaries.

16             My client's security interest was primarily in the

17   stock and subsidiaries, not in the assets of the subsidiaries.

18   The 225 action, which we settled through the 9019, we were a

19   day away from taking control of that stock.

20             This settlement and this sale is effectively the same

21   thing.  It's selling the stock.  The companies that -- whatever

22   assets are in those companies that my client shows up and there

23   was TVs -- before my client and everybody else shows up,

24   there's TVs there, they own them.  If they're not, they don't.

25             It's the stock.  They want to drill down into -- and

1    if we get into this level, what TV is sitting in Copenhagen and

2    what software is on that TV, we're going to be here for six

3    years.  One, we're never going to know because it's in

4    Copenhagen.  But, we're going to be here for six years.  This

5    is a sale of stock, the security interest was in the stock.

6    And absent the settlement, my client would have already had

7    it's one day hearing in a court of chancery and owned the

8    stock, this would all be muted.  This is a path of least

9    resistance to an estate that never had any money and doesn't

10   have any money. This deal is --

11            THE COURT:  Okay. I understand that you're buying the

12   stock.  But in order for any potential bidder to understand

13   what they're buying, right, they know that they're getting the

14   stock.  But presumably, they'd like to get a better idea of

15   what the hard assets or the intangibles are of the entities

16   whose stock you're purchasing, right?

17            So I think it's reasonable that there should at least

18   be some general description of -- you know, it doesn't have to

19   be, like, I don't need, like, a audit, right, of every single

20   TV or every single hard asset.

21            But isn't there some kind of --

22            UNIDENTIFIED SPEAKER:  Your Honor --

23            THE COURT:  -- schedule that we could put together

24   that would say, you know, all the -- I mean, I don't know.  Are

25   you just purporting to say that all of the equipment and all of

1    the -- you know, every personal property owned by these

2    entities. But do we have, like, a vague description of, like --

3            UNIDENTIFIED SPEAKER:  Well, there's --

4            THE COURT:  -- you know, approximately this many TVs

5    or approximately this many --

6            MR. VAGNONI:  Yes, Your Honor.

7            THE COURT:  -- other things.

8            MR. VAGNONI:  The --

9            THE COURT:  Okay.

10            MR. VAGNONI:  -- answer is yes.  We have a list that

11    we're happy to share with you.

12            The -- one thing I want to point out to Your Honor is

13    the process that we -- that was started over a month ago that

14    was teasers were sent out to over 500 different entities, both

15    strategic and financial, by SSG.  Mr. Victor is going to

16    testify about that for you as part of the sale procedure.

17            We got exactly zero interest from those teasers.

18    Nobody asked the question of who -- what is in there.  The only

19    parties that expressed an interest were VSI and not Rembrandt

20    and a purported investor in VSI.

21            And we have worked with VSI, who by the way Your

22    Honor, I think you're getting the picture that they are in the

23    unique position to know exactly what those assets are that are

24    being sold.  Exactly what they are.

25            VSI has expressed no interest in bidding on these.

```
 1   They wanted to go down a sale process, which we will describe
 2   to you why that is not a possibility.  But not even speaking to
 3   Mr. Michaels comments about the lawsuits and the estate being
 4   administratively insolvent.
 5          The purchaser is assuming all liability.  Not just
 6   from Rembrandt under an IP claim, but they're assuming any
 7   liability from any alleged IP infringement.  And they're fully
 8   indemnifying the bankruptcy estates, the Trustee, and the
 9   Trustees professionals.
10          MR. MICHAELS:  Exactly, Your Honor.
11          MR. VAGNONI:  We think that we are insulated -- and
12   that was based on what we think are hollow threats, but that
13   doesn't mean there won't be a lawsuit and that the Defense
14   won't impair the unsecured creditor's ability to get a
15   distribution.  That's what we're trying to protect here.
16   That's what we're trying to specify.
17          THE COURT:  Okay.  So Mr. Vagnoni, let me tell you
18   what I'm interested in.  You know, in a 363 sale, you know,
19   you're -- my concern is, I just want to make this a transparent
20   process so that any potential bidder could understand what is
21   being sold, right?
22          So it sounds like you -- you know, you have this
23   teaser.  I haven't seen what the teaser says, but this list of
24   all of the -- you were saying that there was a schedule that
25   the owner of VSI -- what was his name again?
```

1           MR. VAGNONI:  Mr. Rajan.

2           THE COURT:  Mr. Rajan?  Okay.  So Mr. Rajan, at some

3  point, put together some kind of a schedule of what each of

4  these entities owned.

5           MR. VAGNONI:  Schedule A.  Oh, I'm sorry.  Yes, the

6  Schedules A and B to the -- the official schedules of the

7  Debtors.

8           THE COURT:  Okay.

9           MR. MICHAELS:  Excuse me, Your Honor.  I have to --

10  correct.  Is that your -- is this the Trustees schedule or are

11  you suggesting --

12           THE COURT:  I think --

13           MR. MICHAELS:  -- that this is Mr. Rajans schedule.

14           THE COURT:  No, I thought you were saying Stream's

15  schedule?

16           MR. VAGNONI:  The Debtors.

17           THE COURT:  Yeah.

18           MR. MICHAELS:  Okay.  So it wasn't Mr. Rajan's

19  schedule, just -- correct?

20           THE COURT:  Yeah.  No, no, no.

21           MR. MICHAELS:  Correct.

22           THE COURT:  I'm trying to understand.  So when Stream

23  filed for bankruptcy, they had a file scheduled in the

24  statement of financial affairs and as part of that you have to

25  schedule Schedule A, which is the real property and Schedule B,

1    which is the personal property.

2           So when he put those schedules together, did he --

3    and he was putting together the personal property owned by the

4    entities whose equity you're selling in the sale, Mr. Vagnoni?

5           MR. VAGNONI:  That's correct.  And Your Honor, there

6    is zero intellectual property in that Schedule B.

7           THE COURT:  Okay.  But -- so I think that one issue

8    that I'm identifying is that the personal property that was

9    scheduled in Schedule B of Stream contained hard pieces of

10   equipment or something that they are now claiming has their

11   intellectual property embedded in.

12          I'm just trying to understand everyone's position.

13   You're saying that in Schedule B is a list of a bunch of hard

14   assets, right?  And they're saying that in those pieces of hard

15   assets are some of their IP embedded in it?

16          MR. VAGNONI:  Stream -- Your Honor, Steam is a

17   holding company.

18          THE COURT:  Yes.

19          MR. VAGNONI:  They're --

20          THE COURT:  No, I understand.

21          MR. VAGNONI:  I --

22          THE COURT:  I understand they're a holding company,

23   but they put together Schedule B and Schedule B included hard

24   assets owned by their subsidiaries and affiliates, correct?

25          MR. VAGNONI:  No, Your Honor.

```
 1                  THE COURT:  Okay.

 2                  MR. VAGNONI:  It was a list of assets that, again, we

 3    -- the Trustee had no part in drafting.

 4                  THE COURT:  Right, because this is before your time.

 5                  MR. VAGNONI:  It was well before our time.  And we --

 6                  THE COURT:  So what -- let's describe.  What's on

 7    Schedule B?

 8                  MR. VAGNONI:  It is a various list of equipment.  On

 9    Schedule B there is some office furniture.  There's nothing

10    that we see that could contain Rembrandt's --

11                  THE COURT:  Well, I don't -- okay.  At this point --

12                  MR. VAGNONI:  -- intellectual property.

13                  THE COURT:  -- let's -- okay.  We're not going to be

14    able to resolve today whether -- you're not going to come to an

15    agreement with them as to whether or not their technology is

16    embedded in it.  I just need --

17                  MR. VAGNONI:  Right.

18                  THE COURT:  -- to understand the argument, just so I

19    can try and move the case forward, okay?

20                  MR. VAGNONI:  Absolutely.

21                  THE COURT:  So what is on Schedule B?  So it's the

22    furniture --

23                  MR. VAGNONI:  I don't have it with me and I can't

24    speak to what exactly is on it.

25                  THE COURT:  So does anyone have Schedule B of the --
```

1              MR. MICHAELS:  Your Honor, I would just note that

2    there is an extensive list, over 800 pages long, attached to

3    Mr. Rajan's declaration in support of the filing --

4              THE COURT:  Okay.

5              MR. MICHAELS:  -- right?  So --

6              MR. VAGNONI:  That's not what we're talking about.

7              MR. MICHAELS:  I'm sure it's not.  I would just to

8    Your Honor that that's --

9              THE COURT:  Okay.

10             MR. MICHAELS:  -- on the record.

11             THE COURT:  Okay.  So -- but you're saying Schedule

12   B.  So we're talking about the sale of equity of these

13   entities.  Let's just call these entities, you know, the

14   subsidiaries, or I guess we just call them the entities.

15             So the entity stock is purported -- that's what

16   you're trying to sell.  But these entities own certain hard

17   assets, correct?  Aside from office equipment --

18             MR. VAGNONI:  Correct.

19             THE COURT:  -- and furniture, right?

20             MR. VAGNONI:  Correct.

21             THE COURT:  There's some -- there's other things.

22   TVs, right?

23             MR. VAGNONI:  Potentially.  We -- and Your Honor,

24   again, we --

25             THE COURT:  When you say potentially, see that just -

1  - I just want to understand, you know, what is being sold.

2          MR. VAGNONI:  There -- when I say potentially, there

3  are prototypes that are created by the Debtors downstream --

4          THE COURT:  Entities.

5          MR. VAGNONI:  -- subsidiaries.

6          THE COURT:  Let's just focus on the entities.  What

7  do the entities own?  That's what I really want to focus on.

8          MR. VAGNONI:  And again, I can give you the list we

9  sent them.  The entities own intellectual property, they own

10 equipment that allows them to make protypes of -- they're not

11 TVs.  They are screens --

12         THE COURT:  Uh-huh.

13         MR. VAGNONI:  -- that show the technology to

14 potential investors or purchasers.

15         THE COURT:  Yeah.

16         MR. VAGNONI:  They own licenses, the Phillips

17 license.  And really that's about it.  The downstream entities

18 are meant to house intellectual property, they're meant to

19 house licenses, and they're meant to do research and

20 development.

21         THE COURT:  Okay.  So hold on one second.

22         MR. VAGNONI:  And the Trustees can testify to that.

23         THE COURT:  So I presume, though, that your client,

24 Mr. Rajan, that he was the owner of Stream, right?  He knew

25 what all of these subsidiaries owned.  Didn't he know that?

 1              UNIDENTIFIED SPEAKER:  Yes, and he knows what was

 2    taken by the stalking horse bidder and never returned after --

 3              THE COURT:  Okay.

 4              UNIDENTIFIED SPEAKER:  -- contempt of court --

 5              THE COURT:  Yes.

 6              UNIDENTIFIED SPEAKER:  -- in various litigations.

 7              THE COURT:  Okay.  So --

 8              UNIDENTIFIED SPEAKER:  And there's bonding --

 9              THE COURT:  Again --

10              UNIDENTIFIED SPEAKER: -- machines that are tens of

11    millions of dollars.

12              THE COURT:  -- this is what I care about.  I just

13    want to identify the assets that are being sold.  So doesn't it

14    seem that Mr. Rajan knows exactly what assets are owned by the

15    entities?

16              MR. MICHAELS:  I would say, Your Honor, he does have

17    an understanding in -- probably in fairly good detail, and

18    that's the point that he has been making to the Trustee at

19    nauseum.

20              THE COURT:  Okay.  So -- but --

21              MR. MICHAELS:  Right.

22              THE COURT:  -- so you --

23              MR. MICHAELS:  Your Honor, I just -- if I may, just

24    to complete the thought.  It's that they don't understand that

25    there are other encumbrances including Rembrandt's license,

1  including the Phillips license on that property.  And I would

2  say importantly that there is material amounts of assets that

3  have been in violation of the TRO, absconded with by Mr.

4  Stastney --

5          THE COURT:  So if you --

6          MR. MICHAELS:  -- and that has --

7          THE COURT:  -- you think that -- that's a complete

8  separate issue.

9          MR. MICHAELS:  Well, it's not, Your Honor --

10          THE COURT:  That you think that.

11          MR. MICHAELS:  -- because that intellectual property

12  that is in those prototypes, samples that are taken to market

13  to try to get investors and customers to buy or purchase the

14  ultimately asset that is Stream TVs product, those things have

15  the intellectual property not only of Stream TV, but also

16  Rembrandt and also Phillips embedded in it.

17          There's -- I mean, it was no accident that Mr.

18  Stastney on behalf of SeeCubic, Inc. and the Hawk party's

19  absconded with monitors that this trustee actually witnessed

20  with Mr. Stastney giving him a demonstration.

21          THE COURT:  Okay.  So who --

22          MR. MICHAELS:  That happened.

23          THE COURT:  So you're saying that Hawk has monitors

24  and Stream has monitors of the entities?

25          MR. MICHAELS:  I'm saying that the Hawk parties,

1   specifically Mr. Stastney, SeeCubic, Inc. definitely had took

2   both monitors that are samples.  They were displayed to be able

3   to sell the product.  It obviously has embedded technology in

4   it.  He took servers.  He took computers.  All of that would

5   have had his code in it, including Rembrandt's code.

6           THE COURT:  Okay.  So -- but are you saying that

7   that's not part of the sale or it is part of the sale?

8           MR. MICHAELS:  I'm just suggesting to you that those

9   particular assets are not on the list.  It was just filed by

10  the Trustee in support of the asset listing.

11          THE COURT:  All right.  All right.  So hold on one

12  second.

13          UNIDENTIFIED SPEAKER:  Your Honor?

14          THE COURT:  No, hold on.  Hold on one second.

15          You guys can all have a seat.  We're going to be here

16  for a little bit.

17          So he's saying that some of the assets are not in the

18  possession of Stream.  That they're in the possession of Hawk.

19  What's your response to that Mr. Vagnoni?

20          MR. VAGNONI:  Your Honor, there -- it's clear to the

21  Trustee that there are assets that are not in his possession.

22          THE COURT:  And are they in the possession of Hawk?

23          MR. VAGNONI:  We are not aware of that, Your Honor.

24  We -- what we are --

25          THE COURT:  So -- okay.  Let me just ask you one

```
 1   question.  Do you think that there are assets owned by Stream

 2   that are not in Streams possession?

 3              MR. VAGNONI:  Yes, there is -- there's a bonding

 4   machine in China --

 5              THE COURT:  Okay.

 6              MR. VAGNONI:  -- that the Trustee has neither the

 7   money or nor the wherewithal to get.  We've gotten various

 8   reports -- that was the subject of mediation which --

 9              THE COURT:  So does Hawk own any -- does Hawk -- is

10   Hawk in possession of any assets by Stream?

11              MR. VAGNONI:  Not that I'm aware of, Your Honor.

12   SCBV, SeeCubic B.V. has prototypes.  There is -- Mr. Stastney

13   is the director of SCBV.  There is -- we have no indication

14   that Hawk is in possession of anything.  If they are, that --

15   we've heard of tail of it, but we've never been given any

16   evidence that they have -- that Hawk has anything that is --

17              THE COURT:  Why do you guys think that Hawk has the

18   Stream properties?

19              UNIDENTIFIED SPEAKER:  Well, Hawk and its

20   subsidiaries broke into Streams offices and took them.

21              THE COURT:  Okay.  So let's stop right there.

22              UNIDENTIFIED SPEAKER:  Yeah.

23              THE COURT:  Okay.  So let's go the Hawk person.

24              So they're accusing you guys of having broken into

25   Streams building and stolen things.  So what's your response to
```

1   that?

2           MR. CAPONI:  My response, Your Honor, it's part of

3   the same delusion arguments we've been dealing with for six

4   years.  The -- as a result of the original settlement

5   agreement, the -- give you a brief history.  Mr. Rajan borrowed

6   a bunch of money, never repaid it, the secured lenders reached

7   an accommodation with all the other directors and shareholders

8   to restructure, that led to an omnibus settlement agreement.

9           Following the omnibus settlement agreement, Mr.

10  Stastney took control and operated the entities for quite a

11  period of time before that was reversed.  And when that was

12  reversed by the Delaware Supreme Court, they went back to the

13  Court of Chancery, and they were orders entered that required

14  everything to be turned back over.

15          Vice Chancelor Laster supervised that turning back

16  over and Mr. Rajan took back control of the company.  Ever

17  since then, like a child afraid of the dark, they're constantly

18  saying there's this here, there's this under that bed, but

19  there's no evidence, no Judge, no ruling, no nothing.  I can't

20  disprove the negative.

21          My client lent money; my client is not here.  My

22  client here is a collateral agent for SeeCubic, Inc., which

23  owns the debt and we're just exercising our debt rights.  They

24  want to --

25          THE COURT:  Okay.

1           MR. CAPONI:  -- full stop --

2           THE COURT:  It's helpful --

3           MR. CAPONI:  -- we have nothing.

4           THE COURT:  -- for me if I just get answers to my

5    questions.  So I just want you on the record, do you believe

6    that Hawk is in possession of any property owned by Stream?

7           MR. CAPONI:  Hawk?  No.

8           THE COURT:  Okay.

9           MR. MICHAELS:  Excuse me, Your Honor.  I'm sorry.

10          THE COURT:  Yes.

11          MR. MICHAELS:  We each refer to the Hawk party's that

12   includes SeeCubic, Inc. Delaware and Mr. Stastney in his

13   individual capacity.

14          THE COURT:  Okay.  So with that --

15          MR. MICHAELS:  We have evidence of that.

16          THE COURT:  -- those --

17          MR. MICHAELS:  Now, Mister -- I'm sorry.

18          THE COURT:  Okay.  So do any of those entities, do

19   you know?  And if you don't know, that's fine.

20          MR. CAPONI:  Well, I am not -- what I -- no, I am not

21   aware of them in possession of anything.  I am --

22          THE COURT:  That's owned by Stream?

23          MR. CAPONI:  -- Jon may be able to address this, but

24   when Skadden was representing SeeCubic, Inc. in the Court of

25   Chancery, Schedules were put together, everything was turned

 1   back over, it was done in detail.  My client was not involved

 2   in that.  What I can say, Your Honor, and this gets to, again,

 3   the whole -- of today.

 4        There is this concept on the part of the other side

 5   that once SeeCubic, Inc. took over through the omnibus

 6   agreement, every piece of paper, every pen, every everything is

 7   in -- somehow contains something that belongs to them.  So if

 8   there's a laptop, there's a TV.  If there was a pitcher for

 9   water that was in a conference room, they're claiming it's got

10   Rembrandt's technology.  We don't agree with any of that.

11        We think we own the pitcher.  We can -- we've gone

12   around and around in multiple courts with them about who owns

13   this, who owns that.  As we stand here today, they don't have

14   any shred of evidence.  They don't have a court order.  They

15   don't have a document.  They don't have a bill of sale.  They

16   don't have a photograph.  They don't have anything to

17   substantiate what they're saying.

18        My client has nothing that belongs to Rembrandt.  My

19   client has nothing that belongs to this debtor.  It is my

20   understanding as I stand here today and neither does Mr.

21   Stastney or does SeeCubic, Inc.  We're never going to reach

22   agreement of this.

23        You could have discovery until the cow comes home,

24   they're going to say, well, no, no, we think it's in there

25   somewhere.  Now, if it's not in the trunk, slash the tires and

```
 1    see if he, like, you know, hid it in the tires.

 2            THE COURT:  So I understand your position, okay?  But

 3    I don't want to keep going around and around with the

 4    arguments, okay?

 5            MR. CAPONI:  The answer is no, we don't have it.

 6            THE COURT:  That's great.  That's all I need to hear.

 7            MR. CAPONI:  Absolutely.

 8            MR. MICHAELS:  Your Honor, I think it's important

 9    that Mr. Caponi just told you that his client does not have it,

10    but he also told you that the Delaware Court supervised the

11    return of assets that was under court order to return after the

12    Delaware Supreme Court's decision.

13            He's not telling you that his client doesn't have it

14    and he doesn't know about anybody else.  I will tell you that

15    we have evidence that Mr. Stastney and SeeCubic, Inc. of

16    Delaware did take assets, does possess assets now.  Has used

17    those assets.

18            THE COURT:  Well, okay.  So just describe for me what

19    the basis of that evidence is.

20            MR. MICHAELS:  The basis of that evidence is, I'll

21    start with just the Trustee.  The Trustee saw those assets

22    during a meeting that he had with Mr. Stastney, in which --

23            THE COURT:  When you say trustee, you're saying?

24            MR. MICHAELS:  I'm saying Mr. Homony.

25            THE COURT:  Okay.
```

```
1              MR. MICHAELS:  Right?

2              THE COURT:  Hello?

3              MR. MICHAELS:  Who admitted to our client that it was

4    -- that he had actually observed it.  That's one.

5              THE COURT:  He had observed what?

6              MR. MICHAELS:  He had observed a monitor built by

7    Stream TV in --

8              THE COURT:  Uh-huh.

9              MR. MICHAELS:  - the possession of Shad Stastney

10   during the pendency of this bankruptcy.

11             THE COURT:  Okay.  So --

12             MR. CAPONI:  Your Honor, if I --

13             THE COURT:  Yeah.

14             MR. CAPONI:  -- this goes to when SeeCubic, Inc.

15   verses SeeCubic, B.V.  SeeCubic, Inc. after everything was

16   turned around, continued to develop its own technology in this

17   space.  That's -- they believe that everything in SeeCubic,

18   that's it's been developing, again, incorporates Streams

19   technology, which therefore incorporates Rembrandt's

20   technology.

21             So are there TVs?  Yes.  Are there laptops?  Yes.  Do

22   they belong to them?  No.  Have they -- and I would just put it

23   to the Court this way, if they believe this information or

24   these assets were retained, why did they not go to the Court of

25   Chancery, get an order to establish that?
```

1          Why during the year plus that I've been coming to

2    this court and the bankruptcy have they not, when Mr. Rajan

3    controls everything, get relief from the Court?

4          THE COURT:  Okay.  So let's everyone just return to

5    my focus, which is what is being sold?

6          Did you want to say something, ma'am?

7          MS. BRUMME:  Yes, briefly, Your Honor.

8          THE COURT:  Who do you represent?

9          MS. BRUMME:  Marley Ann Brumme from Skadden on behalf

10   of SeeCubic, Inc., the Delaware entity.  And contrary to what

11   our friends over here have to say, the supervision process of

12   the return of the assets from SeeCubic, Inc. back to Stream was

13   supervised by Vice Chancelor Laster and we've been hearing for

14   a year at least that SeeCubic, Inc. has not returned things.

15         That Mr. Stastney has things and until this bit of

16   evidence that he's presented here today about the Trustee

17   apparently seeing a demo unit, we've never seen any evidence to

18   substantiate that SeeCubic, Inc., the US entity and Mr.

19   Stastney, retained any assets.

20         What I think is getting lost here is that Stream TV,

21   as I think Your Honor understands, is a holding company.  The

22   demo units were developed and built by SeeCubic B.V. in the

23   Netherlands, which is five entities down in the corporate

24   structure.  Any demo unit that has been produced and especially

25   one that Mr. Homony has seen would be from SeeCubic B.V., which

1   is not a debtor here.

2           Further, Mr. Stastney, which they love to impugn

3   here.

4           THE COURT:  The entity that you just said, though,

5   are they trying to sell the equity in that entity?  The one

6   that's not the Debtor?

7           MS. BRUMME:  It's five levels down.  So Stream --

8           THE COURT:  But they are trying?  That is being sold

9   as part of the --

10          MS. BRUMME:  The equity would be sold in the first

11  level subsidiaries.

12          THE COURT:  And so they would own that equity?

13          MS. BRUMME:  And then it would waterfall down.

14          THE COURT:  Okay.

15          MS. BRUMME:  Mr. Stastney notably is the director of

16  SeeCubic B.V. the Netherlands entity that develops all the

17  tech, and Mr. Stastney was installed as director by a

18  Netherlands Court when moving Mr. Rajan.

19          So any sort of implication that Mr. Stastney and

20  SeeCubic, Inc. are unlawfully retaining anything, there's no

21  evidence of that, one.  And two, they can't conflate SeeCubic,

22  Inc. and what's going on at SeeCubic B.V.

23          THE COURT:  Okay.  Thank you.  Okay.  Let's stop one

24  second.

25          So I think what would be helpful for me is if we

1   could focus on all the potential bidders that are out there

2   that are not in this courtroom.  And my job is to make sure

3   that they understand exactly what is being sold.  So just

4   describing the equity, obviously, is not sufficient, because,

5   you know, the -- each of the entities whose equity is being

6   sold has some kind of personal property and that, I think, is

7   the schedule that I'd like to focus on.

8            So what is -- so is there, like, a schedule as part

9   of your, you know, proposed asset purchase agreement that

10  lists, you know, what is owned by the entities whose stock is

11  being sold?

12           MR. VAGNONI:  We -- Your Honor, we do not have the

13  schedule together yet.  But we do have the list of assets that

14  were turned over to --

15           THE COURT:  Okay.

16           MR. VAGNONI:  -- VSI.

17           THE COURT:  So let's be clear.  I don't want to set

18  up any procedures until we're clear on exactly what assets are

19  being sold, so that other potential bidders can have some idea.

20           So this is what I would envision if I was a potential

21  bidder.  I see that the stock is being sold.  I'd want to see

22  some general description of the assets that are owned by those

23  entities, so I know what it is that I'm buying.  Now, obviously

24  you can't give me, like, pictures, so that's what we engage in

25  the due diligence process, right?  A potential bidder --

1              MR. VAGNONI:  Correct.  And --

2              THE COURT:  -- would see, like, a schedule that says,

3    you know, ten TVs and -- or whatever TVs.

4              MR. VAGNONI:  Correct, Your Honor.

5              THE COURT:  And then if their interest has peaked,

6    they would do their due diligence.  And if they wanted to, they

7    could go out and go look at all this stuff or go look in the

8    room or do whatever.

9              MR. VAGNONI:  So Your Honor --

10             THE COURT:  Yeah.

11             MR. VAGNONI:  -- that -- I -- you're correct in what

12   you're saying.  And the process that was setup by SSG was that

13   a teaser would go out to drum up interest in potential bidders.

14             THE COURT:  So what does the teaser say, just so I

15   understand?  Do you have it?

16             MR. VAGNONI:  Yeah, I absolutely do.

17             THE COURT:  All right.  Show me a teaser.

18             MR. VAGNONI:  I have a book of art --

19             MR. MICHAELS:  Your Honor, if I may?  As you're

20   looking through the teaser, you will note that is specifically

21   mentions the Phillips license.  Attached to that Phillips

22   license is a laundry list of software assets --

23             THE COURT:  Uh-huh.

24             MR. MICHAELS:  -- by title, function, what they do.

25             THE COURT:  Uh-huh.

1          MR. MICHAELS:  And we have asked since March whether

2     or not those are being included in the assets with zero

3     response.

4          You had said -- you had made an offhand comment

5     earlier about, well, you're not asking for an audit for

6     anything.  However, the Phillips license requires an audit.

7     That that technology has been removed at termination of that

8     license, which would be caused by a change of control, I.E.,

9     sale of the entity.

10          THE COURT:  That's a sale issue to me.  You object to

11     the sale, because that's not permitted.  As for the bid

12     procedure stage, I just need to identify what assets are being

13     sold.

14          MR. MICHAELS:  My point to you, Your Honor, is there

15     is already a long list of software assets provided in the

16     Phillips license, along with a bunch of know-how and that -- a

17     simple question.  Is this being included in the sale or not?

18     Is what we have asked.  And I think is a touchstone for the

19     kind of list we are looking for here.

20          In addition, it seems that the retention of an expert

21     to walk through the Rembrandt list, we've provided a detailed

22     list of those trade secrets in the Delaware case and can --

23     that can ascertain whether or not those assets are or are not

24     included.

25          THE COURT:  Okay.

1          Mr. Vagnoni, did you have the teaser?

2          MR. VAGNONI:  I do, by a book.

3          THE COURT:  Okay.  How -- the teaser is the binder?

4          MR. VAGNONI:  No, it's in the binder.

5          THE COURT:  Oh, okay.  All right.  So go ahead.

6  Which -- what's the tab of this?

7          MR. VAGNONI:  Tab four.

8          THE COURT:  Okay.  And you guys -- I'm presuming

9  you've seen the teaser?

10          MR. CAPONI:  I have in front of me, Your Honor.

11          THE COURT:  Oh, good.

12          MR. MICHAELS:  We saw it.  It's filed in the papers.

13  But we --

14          MR. VAGNONI:  And Your Honor, if I may?

15          MR. MICHAELS:  -- did not get it.

16          MR. VAGNONI:  That teaser was -- as I'm sure you're

17  aware, the initial document that was sent out, again, to over

18  500 different entities, that then invited them to contact SSG

19  so they could go into --

20          THE COURT:  Okay.

21          MR. VAGNONI:  -- a more complete data room.

22          THE COURT:  I see that this is a one-piece teaser,

23  right?

24          MR. VAGNONI:  Correct.

25          THE COURT:  But as part of any potential sale, we

1   need to have schedules of -- you know, schedules of, you know,

2   what's being sold.  Like, what's owned by those entities,

3   something, a description.  Like, TVs or, you know,

4   approximately --

5          MR. VAGNONI:  So --

6          THE COURT:  -- 100 TVs or something.

7          MR. VAGNONI:  Correct.  And the irony of that

8   comment, Your Honor, is that yes, there would be a schedule

9   available to any potential bidder --

10          THE COURT:  Uh-huh.

11          MR. VAGNONI:  -- who wanted to come in and do due

12  diligence.  There has been zero bidders that have even

13  scratched the surface of learning about this technology.  The

14  only entity that desired to look in the data room was VSI,

15  who's made is abundantly clear to the Trustee that they have no

16  interest in bidding on the purchase of these assets.

17          THE COURT:  So is your position, Mr. Vagnoni, that

18  this teaser provides sufficient information to potential

19  bidders that would allow them to show interest in this?

20          MR. VAGNONI:  Yes.

21          THE COURT:  So this one page, if someone likes what

22  they see, then they'll proceed with you?  And if they don't,

23  like, this is sufficient information to kind of vet whether --

24          MR. VAGNONI:  So --

25          THE COURT:  -- there's interest out there?

1              MR. VAGNONI:  Correct.  And the Trustee hired SSG as

2   his investment banker and SSG as we've seen them do in numerous

3   occasions, initiates contact by first identifying potential

4   parties.  They identified 500 plus different entities that they

5   sent that out to.  Again, both financial and people in the

6   industry.  And they sent that teaser out to those entities.

7              THE COURT:  Okay.  Fine.  And they didn't get a

8   response.  Okay.

9              MR. VAGNONI:  They got it with -- let me be clear.

10  They got one response from someone other than Rembrandt and

11  Rembrandt -- VSI and VSIs purported investor.  That party

12  declined to sign an NDA once they spoke to SSG.  And we'll --

13  Mr. Victor will describe why.

14             THE COURT:  Okay.  All right.  Well, I'll --

15             MR. SWICK:  Your Honor, I would --

16             THE COURT:  -- this teaser.

17             MR. SWICK:  Excuse me.  I would just add that I think

18  Mr. Vagnoni -- I think Mr. Vagnoni has just given us an

19  admission against interest.

20             THE COURT:  A what?

21             MR. SWICK:  And a --

22             THE COURT:  A what?

23             MR. SWICK:  An admission against interest, right?

24  That this teaser yielded no bidders, other than the people who

25  already know about these assets.  And why would there be no

```
 1   bidders?  Well, probably because they read things in a teaser

 2   like this and they're sophisticated actors and they understand

 3   the --

 4            THE COURT:  Okay.  So --

 5            MR. SWICK:  -- effort to license things --

 6            THE COURT:  Okay.

 7            MR. SWICK:  -- that they cannot --

 8            THE COURT:  All right.

 9            MR. SWICK:  -- license.

10            THE COURT:  I understand.

11            MR. SWICK:  Is not appropriate.

12            THE COURT:  Okay.

13            MR. SWICK:  Okay.

14            THE COURT:  Fine.

15            MR. VAGNONI:  That --

16            THE COURT:  All right.  So --

17            MR. VAGNONI:  -- is quite a leap, Your Honor.

18            THE COURT:  Okay.  So as part of the sale process,

19   though, will there be a more robust description then?  Like

20   schedules of the assets owned by these entities?  Something?

21   Some description?

22            MR. VAGNONI:  Your Honor, and again, Mr. Victor is

23   prepared to testify today.  But at this point after a month out

24   in the market and there having been no interest in --

25            THE COURT:  Are you suggesting that because there's
```

1    no interest in the market that there's no need to prepare

2    schedules?

3              MR. VAGNONI:  No, no, no.  There are -- schedules are

4    being prepared.

5              THE COURT:  Okay.

6              MR. VAGNONI:  That will be attached to the APA to

7    make it clear what is being -- but I think they're going to be

8    more simplistic than what you are considering.

9              THE COURT:  Okay.  So what --

10             MR. VAGNONI:  Any potential --

11             THE COURT:  -- so just generally describe what it is.

12   It's going to be, like, equipment or software or --

13             MR. VAGNONI:  Lists all of the assets of Stream and

14   the equity interest in Technovative subsidiaries.  Now, Your

15   Honor, that doesn't mean that if someone who had interest in

16   getting due diligence on these assets --

17             THE COURT:  Couldn't come in and --

18             MR. VAGNONI:  -- wanted to get more information.

19             THE COURT:  Yeah.

20             MR. VAGNONI:  That SSG wouldn't give them whatever

21   they wanted.  If they said, we want to know exactly what

22   SeeCubic, Inc. holds, they would have it.  And a lot of that is

23   already in the data room.  That's part of the process that SSG

24   runs.

25             THE COURT:  Okay.  I understand --

1          MR. VAGNONI:  You don't send out a teaser that has --

2          THE COURT:  Okay.  I understand.

3          MR. VAGNONI:  -- hundreds of pages.

4          THE COURT:  Yes?

5          UNIDENTIFIED SPEAKER:  Well, the data room, which was

6   prepared, then Your Honor asks for a list of assets, they

7   provide a list of assets.

8          THE COURT:  In the data room?

9          UNIDENTIFIED SPEAKER:  A lot of these assets weren't

10  in the data room before.

11         THE COURT:  Okay.

12         UNIDENTIFIED SPEAKER:  The Phillips IP wasn't there.

13  And I also want to say, this investor, he provided 170-million-

14  dollar proof funds.  When they asked for it -- so liquid funds

15  in an account.  They said, we just want to do some due

16  diligence, all right?  They sat on that for three months.  That

17  took $1.8 million from our investor.

18         So this investment you're talking about, these are

19  the entities who want to buy these assets, bind this company to

20  a plan.  It's getting sorted at every turn, because they're

21  married to this 9019 with the Hawk parties.  But we have real

22  money.  We want to pay unsecured creditors.  We have to have

23  due diligence.  We've got to get forward on this. And I mean --

24         THE COURT:  Weren't you guys going to put together a

25  plan or something?

1          UNIDENTIFIED SPEAKER:  Yeah, but we have --

2          THE COURT:  So did you file the plan?

3          UNIDENTIFIED SPEAKER:  No, we're going -- we have to

4    get diligence to know where the assets are so we can have it --

5    they want an unconditional offer for almost $200 million for

6    these assets.  We want to give it to them.  But we also need to

7    know, where's the bonding machine?  Is it still functional?

8    They said we could access to it.  Then they said, oh, here's

9    some photos.  We're not going to give you access to it and the

10   photos are two and a half years old, because they don't know --

11   like, the bonding machine is tens of millions of dollars.

12         THE COURT:  Okay.  All right.  Okay.

13         All right.  So --

14         MR. CLARK:  Can I make a brief intervention?

15         THE COURT:  Yes.

16         MR. CLARK:  I apologize.  And I won't make very many

17   interventions in this matter because there are people here who

18   know a lot more about this case than I do.  I'm a recent entry.

19         But I appreciate the Court's concern about making

20   sure that you have an open and fair bid procedure so that you

21   can have a true 363 sale.  The problem that we have here is

22   this case reminds me a lot of *Fiskarata* (phonetic) we have a

23   secured claim from a secured creditor that I understand lent in

24   terms of hard money about $39 million.  Maybe 45, depending on

25   whether you count some additional advances by Mr. Stastney.

1    But now we have a 9019 that says their actual claim is $180

2    million.  And that they can credit the -- their 150 million of

3    it.

4              As in *Fiskarata* with a credit bid of $150 million,

5    that means that the stalking horse bidder doesn't actually have

6    to put up anymore in terms of cash than the seven and a half

7    million dollars that they said they were going to credit.

8              THE COURT:  They're going to credit it.  Right.

9              MR. CLARK:  So for seven and a half million dollars,

10   they get in the door.  Anybody else who wants to play this game

11   has to come up with cash, cash in the amount of $157.5 million.

12             MR. VAGNONI:  That's not accurate.

13             MR. CLARK:  Excuse me.  I'm sorry, maybe it's less.

14   But it's a lot more than $39 million, that's for sure.

15             And that's -- and to me, that's the real story here.

16   That we have a bid process where the amount of money that

17   anybody else who wants to play this game has to come up with,

18   certainly north of $100 million in order to be able to play

19   this game and be prepared to close in December.

20             If we were talking about a plan process so I could

21   understand how we could come up with a structure where $170

22   million or such might end up being -- be folded into a plan.

23   But on a expedited sale process, where the proposed bidders

24   don't know for sure what's going to be sold until --

25             THE COURT:  Why do you say it's a expedited sale

1    process?

2            MR. CLARK:  -- we get to today.

3            THE COURT:  Why do you say it's an expedited sale

4    process?

5            MR. CLARK:  Well, it's expedited in the sense that

6    the bid procedures motion contemplates that the bids will be

7    received -- binding bids will be received by Friday of this

8    week.  So that gives whoever's going to buy this, other than

9    Hawk, two days to do the due diligence that we're talking

10   about.  Two days.  And that the Trustee will then make a

11   decision on Monday.  And then the sale will close in December.

12           Now, as a practical matter, that's not what I would

13   call an open and transparent process.  So if you want to know

14   why there aren't other bidders here, it seems to me it's

15   straight forward.  With a 180 -- 157.5-million-dollar credit

16   bid in place, nobody's going to come to the table.

17           THE COURT:  So I think, though, what I'm hearing is

18   that the credit bid is a hurdle to other potential bidders from

19   entering the situation?  Unfortunately, I've already approved

20   the settlement, the 9019 agreement that they have.  So that's

21   what Hawk is.  I mean, and they --

22           MR. CLARK:  I understand that, Your Honor.  And --

23           THE COURT:  -- and because I've approved that, they

24   have -- they're allowed a credit bid.  That's just part of the

25   system.

1          MR. CLARK:  And candidly, Your Honor, as I look

2    through this, looking at it from the standpoint, you know,

3    obviously I've sat in your position.  So I asked the same kinds

4    of questions I would like to think that you would ask.  And

5    what occurred to me in this particular case is there is a

6    motion to reconsider and I'm glad that it hasn't been ruled on

7    yet because it strikes me that this process is fundamentally

8    flawed because of the provisions that were put in that 9019,

9    that they were all but certain to assure that there would be no

10   other bidders.

11          THE COURT:  Okay.  Thank you, sir.

12          MR. CLARK:  Thank you, Your Honor.

13          THE COURT:  You're welcome.

14          MR. VAGNONI:  And Your Honor, just so we're clear on

15   the -- there are very limited issues that's why in the motion

16   to reconsider one of which isn't --

17          THE COURT:  Let's focus on the bid procedure, shall

18   we?  I think I'd like to just hone in on some of those things.

19   I don't want to hear re-argument on something I already heard

20   on.  Okay.  So I want to talk about some of the substantive

21   concerns that Rembrandt and VSI has raised in their objections,

22   if we could turn to that for a minute.  Let me just get this.

23   Okay.  So I wanted to take, for instance, the bonding

24   equipment.  So is the bonding equipment being sold as part of

25   the sale?

1          MR. VAGNONI:  Yes, Your Honor.  It is.  The problem

2     we have with the bonding equipment is there are disputes as to

3     who owns the bonding equipment.

4          THE COURT:  Okay.

5          MR. VAGNONI:  But what we believe is that either the

6     Debtor owns it and the Debtor did list the bonding equipment in

7     its Schedule B.

8          THE COURT:  Uh-huh.

9          MR. VAGNONI:  And the rest of the things in Schedule

10    B are office equipment and FF&E.  But the Debtor alleges that

11    it owns it.  There has been -- there has been allegations that

12    that bonding equipment was transferred to SeeCubic B.V.  The

13    Debtor downstream, the Stream downstream subsidiary.

14         THE COURT:  Transferred by whom?  Who transferred it?

15         MR. VAGNONI:  So and I can't speak to this directly

16    because I was not involved at the time, but it was my

17    understanding that at the time of the omnibus agreement that --

18    and correct me if I'm wrong, but that their allegation that

19    that -- that the bonding equipment was transferred by the

20    controlling entity -- by the Debtor to SeeCubic B.V.  Whether

21    or not it's the Debtor's property or SeeCubic B.V.'s property,

22    that bonding equipment is being transferred.

23         THE COURT:  Okay.  All right.  Just give me a minute

24    to go through all of this for one moment.  Okay.  So this is

25    how I would like to proceed.  Before I sign off on any bid

1   procedure order, I'd like to see what the schedules are to the

2   purchase agreement.  I just -- I think that we should put

3   together the schedule, but I don't think that you have the

4   schedule here today, right?

5           But what I envision is, since it does seem to be an

6   issue, what is being sold, I'd like someone to put together the

7   schedules and then I'd like you to -- and you could break it

8   out any way you want.  Perhaps you could say that this entity,

9   you know, has these assets and that's what could be part of the

10  sale when you buy the equity of that entity.

11          And then what I'd like to do is I'd like to invite

12  VSI and Rembrandt to look at those schedules and to point out

13  the very many issues that I think that they're going to have

14  with those schedules as to potentially flag the issues that you

15  have with regard to each of those entities.

16          And then what I think we should do for any potential

17  bidder is they should see a list of the scheduled assets that

18  actually do have some asterisks to them, which might note there

19  were objections or concerns that you guys have to those assets,

20  right?  So that whoever is, you know, potentially interested in

21  buying the assets will see your asterisk, right?  And then

22  either we'll get them in as bidders or not.  So I think the

23  first thing I'd like to do is I'd like to get that schedule

24  together --

25          MR. THOMPSON:  Your Honor, if I may be heard just on

 1   one of those asterisks because we just heard about the bonding

 2   machine.

 3          THE COURT:  Uh-huh.

 4          MR. THOMPSON:  If you look at what the Trustee just

 5   filed with respect to the bonding machine, it's got conditions

 6   all over the place, right?  And it is not guaranteeing --

 7          THE COURT:  Could you -- which one?  Could you --

 8          MR. THOMPSON:  -- not guaranteeing the transfer right

 9   to any buyer, right?

10          THE COURT:  Okay.

11          MR. THOMPSON:  So --

12          MR. GEORGE:  But the buyer will know that.

13          MR. THOMPSON:  Well, it would not have known that --

14          THE COURT:  Okay.  Could we just stop and just take a

15   moment that you're selling something that you may or may not

16   have.  That just does seem a little curious.

17          MR. THOMPSON:  Thank you, Your Honor.

18          THE COURT:  Doesn't it seem a little curious?

19          MR. THOMPSON:  That's precisely our --

20          MR. VAGNONI:  Your Honor.

21          MR. THOMPSON:  We may or may not be in possession of

22   it.

23          THE COURT:  Okay.  All right.  Argument for the

24   Trustee.  I just have to get an answer to the question why is

25   it not weird to say that you're going to sell something but

```
 1   then not be sure if you're actually going to get it.

 2            MR. THOMPSON:  Your Honor --

 3            THE COURT:  I'd like to hear from the Trustee.  I'm

 4   sorry, I didn't mean you, I met the guy standing behind the

 5   asterisk --

 6            MR. HOMONY:  Prior to my appointment, as you can tell

 7   -- was a complete and utter disaster.

 8            THE COURT:  It still kind of seems like a disaster

 9   which I'm trying to clean up.  Yes.

10            MR. HOMONY:  I want you to appreciate Stream used to

11   own the bond equipment --

12            THE COURT:  Uh-huh.

13            MR. HOMONY:  -- before the omnibus agreement which

14   set all this off.

15            THE COURT:  Okay.

16            MR. HOMONY:  At some point, we were informed that a

17   receiver -- again prior to my getting on the scene -- a

18   receiver was appointed to oversee Technovative in Delaware

19   District Court.  I believe that receiver retitled the bonding

20   equipment into the Netherlands subsidiary --

21            THE COURT:  Okay.

22            MR. HOMONY:  -- the equity of which I'm selling --

23            THE COURT:  Okay.  Yeah.

24            MR. HOMONY:  -- because it's in China, there's issues

25   with warehouse liens, past due rent.
```

```
 1              THE COURT:  But presumably that's something that's
 2   being sold --
 3              MR. HOMONY:  It is being sold, Your Honor.
 4              THE COURT:  -- if you can get through -- if you can
 5   jump through all those hurdles.
 6              MR. HOMONY:  It is being sold.  But as I'm sure you
 7   can appreciate in other cases, somebody's holding that asset
 8   that might demand --
 9              THE COURT:  Okay.  But that's okay.
10              MR. HOMONY:  -- $500,000.
11              THE COURT:  That's okay.  I mean --
12              MR. HOMONY:  Before it gets --
13              THE COURT:  So perhaps with regard to the bonding
14   equipment, there'll be a very long asterisk which will describe
15   exactly where it is and all the claims subject to it.  And you
16   guys would be able to add something to that as well.
17              MR. THOMPSON:  Your Honor, there's an omnibus order
18   -- an omnibus agreement that was overturned by the Delaware
19   Supreme Court.  And thereafter there was a chancery court
20   opinion directing the return of all the equipment including
21   that.
22              THE COURT:  Let me just tell you where I'm focused
23   at.
24              MR. THOMPSON:  Okay.
25              THE COURT:  Where I'm focused at is, I just want to
```

 1   know what's being sold even if it's subject to a million

 2   caveats, right?  So we're going to work together and we're

 3   going to come up with a schedule so at least a normal person

 4   will at least know this is what's being sold.

 5           Now, just based on my preliminary observation, I

 6   don't believe anybody will be bidding for these asset because

 7   you guys are hopping up and down.  You really think that -- you

 8   know, that it's your stuff that's going to fall on this

 9   litigation.  I just want to tell you what I think that the

10   logical conclusion of all of this is going to be.  That if we

11   ever get to a sale, there will be no other bidders because

12   you'd have to be crazy to enter this like firestorm of like,

13   you know, litigation, right?

14           So what it's going to be is we're going to have Hawk,

15   who wants to be the buyer.  They're the stalking horse bidder.

16   No one else is going to bid.  And you guys are going to raise a

17   slew of objections to the sale, right?  And if I have -- I have

18   Hawk, right, who's going to then say, you know, Your Honor, I'm

19   going to -- this is what I want to buy and I know that they're

20   hopping mad and they're going to sue me and that they're going

21   to -- they have all these, you know, issues or whatever.

22           And then at that point, if I approve the sale to them

23   that I'm delivering that to them, Hawk is going to pay them

24   whatever they're going to pay and then you guys, Hawk and you

25   guys are going to fight it out, right?  And then I don't have

1   to resolve, right, exactly who owns what or whatever, because

2   they're going to be doing all of that, right?  And then you can

3   engage in that fight.  But all of your jumping up and down, it

4   does have a chilling effect on the bidding as well, right.  It

5   will make it -- it will basically guarantee that Hawk will be

6   the buyer of these assets at the end of the day.

7           MR. THOMPSON:  That's already been guaranteed, Your

8   Honor.

9           THE COURT:  Okay.

10          MR. GEORGE:  Your Honor, if I may.  This is --

11          THE COURT:  Yes.

12          MR. HOMONY:  Your Honor, I can address --

13          MR. GEORGE:  I would just like to --

14          THE COURT:  Okay.

15          MR. HOMONY:  This case has been drawn out for a long

16  time.  And as I'm sure you can appreciate, Stream is a pre-

17  revenue company.  It has no revenues, it has no ability to

18  generate loans.  Part of the Hawk settlement provided that Hawk

19  through SeeCubic would continue to fund the Netherlands,

20  SeeCubic BV, which is an operating entity with real people

21  there who really care about this technology, have lived with it

22  for 20 years and want to see it commercialized.

23          The longer this goes, their livelihoods are put in

24  jeopardy.  The value of these assets is put in jeopardy because

25  if I have an outside -- a date where they have agreed to fund,

```
 1    which is December 10th.  If the sale isn't closed by December

 2    10th, there's no funding secured for those people in SeeCubic

 3    BV, and not only their lives, but the value of these assets

 4    will disappear.

 5            Right now, through the carveout I think my and my

 6    team have managed to secure between 9- and $10 million in cash

 7    for the benefit of unsecured creditors, which would otherwise

 8    vanish.  And so I just -- I want everybody in this room to

 9    appreciate --

10            THE COURT:  Yes.  I get it.

11            MR. HOMONY:  Okay.

12            THE COURT:  I understand.

13            MR. HOMONY:  Thank you, Your Honor.

14            THE COURT:  Thank you.  Okay.  Hold on one second.  I

15    don't want to hear from anyone right now.  Okay.

16            So Mr. Vagnoni, when -- and you can talk to your

17    colleagues here, but when do you think you could put together a

18    schedule of what be -- I mean, if this is going to be going out

19    for bidders, we need to have like a schedule.  So when would

20    you be able to put together some schedules?

21            MR. VAGNONI:  We'd have to do it -- I do have to

22    speak with -- but we have to do it immediately.

23            THE COURT:  Why don't you talk to your people and

24    tell me how soon you could get those schedules together?  Go

25    talk to them.
```

1           MR. VAGNONI:  Thank you, Your Honor.

2           THE COURT:  You're welcome.  So while they're doing

3   that, I didn't realize the whole room was empty.  Perhaps what

4   we'll do is while they're doing that can I just run through the

5   rest of my list because I have a 12:30 list as well.  So I'm

6   just going to -- you can keep all your stuff here.  Keep all

7   your stuff here.  I'm just going to run through my 11:00 list.

8   Oh, with the other parties.  Yeah.  Yeah.  But so just sit

9   tight.

10          Pam, what else do we have going on at 11:00?

11          THE CLERK:  11 should be all --

12          THE COURT:  Oh, good.  Excellent.  Okay.  Good.  So

13  hold tight right there.  So I just want to take a short break

14  and I'll be right back.

15          THE CLERK:  Okay.

16     (Recess)

17          THE CLERK:  Court is back in session.

18          THE COURT:  All right.  Mr. Vagnoni, when do you

19  think you'll have those schedules for me?

20          MR. VAGNONI:  We can have them filed by tomorrow.

21          THE COURT:  Okay.  Great.  So what I would like is --

22  what I envision is that there will be schedules identifying

23  what the assets are.  And I think that for instance, with the

24  bonding equipment, you should drop an asterisk that says, you

25  know, we are actually not in possession of the bonding

1   equipment and whatever caveats you think there may be to

2   actually a buyer taking possession of them.  I think you should

3   add that to that.

4             MR. VAGNONI:  Absolutely.  And Your Honor, just to be

5   clear, you know, with the foreign subsidiaries, the Trustee

6   isn't in possession of those assets either, but they are in the

7   possession of subsidiaries of --

8             THE COURT:  Okay.  So you should just -- I just want

9   this to be clearly laid out where everything is.  So if someone

10  were to look at this, they understand these are the issues that

11  I face if I put in a bid.

12            MR. VAGNONI:  Understood.

13            THE COURT:  Okay.  Then I'd like you guys to take a

14  look at the schedules because before it goes out to other

15  potential bidders, I'd like to get your input.  And I think

16  that you have lots of different issues like, you know, you

17  could say that, you know, these assets are subject to our

18  claims and put whatever, you know, statements in there that you

19  think would be appropriate.

20            And I think just to be clear that, you know, if you

21  have an asterisk, you know, you might have an asterisk saying

22  these are the Debtors comments about, you know, like maybe just

23  say a footnote, why don't you have a footnote, right?  You put

24  a footnote and you say this is debtor's position that these

25  assets are not in our possession or whatever.  Put whatever

```
 1   caveat.

 2            And then we're also going to have footnotes with you

 3   guys and you're going to -- so the potential bidder will know

 4   that the statements that are being made with regard to your

 5   footnotes are your comments and are not the Debtor's comments,

 6   right?  And you -- I'm willing to include that just because I

 7   think that you have some serious concerns and people should

 8   know them.  So it would say something like Rembrandt believes

 9   that with regard to these assets, that there are these issues

10   implicated on intellectual properties embedded in them and, you

11   know, this is going to spawn litigation or whatever.  Yes?

12            MR. MICHAELS:  I think the main issue here, I think

13   it's been handled by Whitehall and it was a jeweler who had

14   taken in property on -- jewels on consignment, embedded them in

15   rings and wanted to go to a bankruptcy sale where they just

16   sold it all off subject to the rights of the vendors who had

17   given them tools on consignment.  And I think it was somewhere

18   in the neighborhood of 193 adversary proceedings would have

19   been necessary.

20            And the court said tough.  You need to figure out

21   what the assets of the estate are and you need to have those

22   adversary proceedings by trying to go forward.  And it is -- I

23   understand the Court's desire to move through a process, but

24   saying with an asterisk Rembrandt may or may not sue you for IP

25   infringement is the courts have determined that's not an
```

1   acceptable process.  It is in and of itself subjecting the

2   estate to additional liability for making that transfer in the

3   first place which was not authorized --

4           THE COURT:  Okay.  Would you not want me to add your

5   comments to the schedule?

6           MR. MICHAELS:  We would like -- we would certainly

7   like the ability to enter the comments, but we -- what we

8   believe is necessary in this situation is to ascertain what are

9   actually the assets of the estate, and what else is on the

10  record.

11          THE COURT:  Okay.  So let me tell you my skepticism

12  with that comment.  With respect to the client, the guy that he

13  used to be.  This -- the guy who was replaced by the Trustee.

14  He had a pretty good idea of what's in all of these entities,

15  because up until, you know, earlier this year, wasn't he in

16  control of all those assets?  Okay.  Well, regardless, this is

17  we're going to do.

18          You've got litigation issues with regard to the

19  license, and I'm going to look at that because you're going to

20  file a sale objection and it's going to lay out every single

21  objection you have to the sale and they are going to respond to

22  that and I am going to address all of those arguments, okay?

23  So this is what we're going to do.  You guys, you can add

24  footnotes and all I care about your footnotes is that you put

25  in the preamble of whatever footnotes you want to add to the

```
 1   schedule that these are comments made on your behalf, not on

 2   the Debtor's behalf so that people who read it understand it.

 3           MR. MICHAELS:  We do have one request --

 4           THE COURT:  Yeah.

 5           MR. MICHAELS:  -- that we've been making for a while

 6   now.

 7           THE COURT:  Yeah.

 8           MR. MICHAELS:  And that is that the Trustee specify

 9   with particularity, whether he is relying on the Rembrandt

10   license or not.

11           THE COURT:  What do you mean you're relying upon the

12   Rembrandt license?

13           MR. MICHAELS:  If they are offering for sale assets

14   Rembrandt has alleged have -- are covered by patent inventions,

15   we have the right to bring suit against anybody who is offering

16   those for sale.

17           THE COURT:  I don't think that Mr. Vagnoni thinks

18   that you have the right to sue them.  Do you -- Mr. Vagnoni, do

19   you think that they have the right to sue you arising out of

20   the sale of the assets that --

21           MR. VAGNONI:  Absolutely not.

22           THE COURT:  See so they just disagree.  That's just a

23   sale -- that's a sale argument that you can make in front of me

24   that I'll consider.

25           MR. MICHAELS:  With respect, we provided the case law
```

1   that says we do not need leave of this Court.  We can file in

2   any jurisdiction and SSG is not a part of this bankruptcy.  I

3   mean, I appreciate they're professional, but they're actively

4   offering our patented technology for sale.  That's an

5   infringement under 35 USC.  And it's the only --

6           THE COURT:  I disagree.

7           MR. MICHAELS:  -- defense to that because --

8           THE COURT:  So you're sitting here and you're making

9   an argument and they just disagree with the argument.  And I'm

10  going to consider it.  Don't include it in your brief because

11  it's a sale objection, right?  You're going to say, Judge, you

12  don't have the authority to do this.  No one should be selling

13  this, right.  You're going to tell me that and I'm going to

14  look at your case law and your legal argument and I'm going to

15  look at theirs and then I will give you a decision on that.

16          MR. MICHAELS:  I respect what you're saying about

17  with regard to the sale process.

18          THE COURT:  Uh-huh.

19          MR. MICHAELS:  My question is different than that, is

20  we -- Rembrandt has the ability to go after SSG today in a

21  different court for patent infringement unless the Trustee is

22  claiming that they are covered by a valid, current, paid up

23  license with Rembrandt.  And I'm asking the Trustee to clarify.

24  Are they saying that they have -- that Stream has a valid paid

25  up license with Rembrandt?

1          THE COURT:  Your response, Mr. Vagnoni?

2          MR. VAGNONI:  It sounds like he's asking me to

3  testify under threat of suit of the Trustee's professionals.

4          THE COURT:  Okay.  Well, in any case, I would like to

5  have any footnotes that you want to add to the schedules by,

6  let's say Wednesday.  So on Friday, if you could just put

7  together whatever footnotes that you want, just tell them,

8  like, do a black line, right?  And then send them a black line

9  of the schedules.

10         But let's talk about the scheduling here, right?  So

11  I know you're telling me, Hawk, that you have to have this, you

12  know, this all is done by the 10th.  But I need to have, you

13  know, the schedules nailed down so that a potential bidder

14  would know exactly what they're buying.  So we need to get that

15  done first.  I can't -- we can't send this out for bidding

16  until that's done.

17         So once the schedules are done on Friday because

18  they're going to give you their comments by just say Friday

19  morning at 9 a.m., right?  So you -- did you say tomorrow

20  you're going to get them?  So what time tomorrow do we have the

21  schedule?

22         MR. VAGNONI:  Yeah, by afternoon.

23         THE COURT:  In the afternoon?

24         MR. VAGNONI:  And look, if we can get them in today,

25  we're going to get them in today.

1          THE COURT:  Okay.

2          MR. VAGNONI:  But we would like to have a week until

3   tomorrow and we're going to do it as soon as we possibly can.

4          THE COURT:  Okay.  So then Friday by 5 p.m.  I'd like

5   you to hand your black line of what the schedule looks like

6   back to them, okay.  So that they can attach that to the

7   purchase agreement.  Yes?

8          MR. SWICK:  Well, we have 48 -- like Monday by 5:00?

9   Like I have to fly home tonight, so I don't know whether it

10  will be tomorrow, that's Thursday.  So --

11         MR. VAGNONI:  We're not going to be here until

12  tomorrow.

13         MR. SWICK:  It might be quite voluminous.  Like I'm

14  not sure what they're going to --

15         THE COURT:  Okay.  That's fine.  You can have until

16  Monday, just to send out -- to add the footnote.  So let's say

17  by Monday 9:00 a.m. you're going to get them your footnotes to

18  the schedules.  Now, so on Monday, you guys are going to have

19  the schedules, right?  And you already presumably have your

20  asset purchase agreement.

21         So let's just talk about the bidding procedure.  Oh,

22  also the data room.  They've got some serious concerns about

23  what's in the data room.  So by the time that this goes live

24  and we send this out for people to bid on or show interest,

25  what's going on with the data room?  And can you make sure you

1    populate it with actual, like, information?  Who's -- when do

2    you -- okay.  So when do you think -- come on up, Mr. Victor.

3    When will the data room actually be sold with things that are

4    clear about what's being sold?

5              MR. VICTOR:  Good afternoon, Your Honor.  Scott

6    Victor for SSG.  The data room is full.  The data room has been

7    accessed by one party; VSI, who is made up of all the insiders

8    of the Debtor.

9              THE COURT:  Okay.  Let's just focus on what's in the

10   data room.  So is there--

11             MR. VICTOR:  The data room is fully set up.  And has

12   been for over a month.

13             THE COURT:  Okay.  Because they said there was

14   missing information in the data room.  Is it possible that they

15   looked at the data room before it was 100 percent complete?

16             MR. VICTOR:  They looked at it after it was 100

17   percent.

18             THE COURT:  Okay.

19             MR. VICTOR:  And they will complain about anything at

20   any time to stall the process.  There's nothing wrong with the

21   data room.

22             THE COURT:  Okay.  So you think that there's -- so

23   everything in the data room is there that would be.  So --

24             MR. VICTOR:  Yes.

25             THE COURT:  -- yeah.

```
 1              MR. VICTOR:  But, Your Honor.

 2              THE COURT:  Yeah.

 3              MR. VICTOR:  Not one single party has signed an NDA

 4   other than an insider of the Debtors and has requested access

 5   to the data room.

 6              THE COURT:  I understand.  This is going to be a very

 7   short period.  I understand.  Yeah.  I'm aware of that.  Okay.

 8   It's your position is that the data room has everything --

 9              MR. VICTOR:  The data room is fully complete --

10              THE COURT:  Okay.

11              MR. VICTOR:  -- and needs nothing further.  We

12   understand that it is appropriate to file schedules to the APA

13   like in every other case.  That will be done tomorrow.  We'll

14   have until Monday to black line it and add their asterisks.

15   But I have to put on the record that in my 41 years of

16   experience, I've never been threatened by counsel as many times

17   that we've been threatened by Rembrandt.

18              Who are they to sue SSG?  My employees who are

19   working on this, we're not selling their intellectual property.

20   We're not infringing on their patent rights.  We're selling the

21   equity of subsidiaries that may or may not have any

22   intellectual property that may or may not belong or rightfully

23   be licensed by Rembrandt. So I take complete offense to that.

24              THE COURT:  Understood.

25              MR. THOMPSON:  Your Honor, I just might say though
```

1    that the Trustee of course, has a responsibility to make sure

2    that everything that he is attempting to sell below the --

3              MR. VICTOR:  Your Honor, the people --

4              MR. THOMPSON:  Excuse me.

5              MR. VICTOR:  -- and its subsidiaries --

6              THE COURT:  Let him finish his statement, Mr. Victor.

7    Go ahead.

8              MR. THOMPSON:  All of the assets that the Trustee is

9    purporting to sell, have full disclosure with regards to those

10   assets. And I think the point that Rembrandt has been making is

11   that disclosure has been incomplete to date.  I understand that

12   Mr. Victor suggests that everything is in the data room and

13   therefore any reasonable bidder could make a determination as

14   to what exposure they may or may not have.  We would argue that

15   is incorrect.

16             THE COURT:  Okay.  Thank you.

17             I understand, Mr. Victor.

18             MR. VICTOR:  Thank you, Your Honor.

19             THE COURT:  You're welcome.  Okay.

20             So Mr. Vagnoni, let's just talk about some deadlines,

21   okay?  So we have to pick a date for a sale hearing.  We have

22   to pick a date for a sale objection deadline.  And I'd also

23   like to get any replies by the Debtor to any objections.

24             MR. VAGNONI:  Well --

25             THE COURT:  All right.  So we should also start with

```
 1   like the bid deadline, okay.  So you're saying that -- so the
 2   big deadline right now you're suggesting is the 18th, but
 3   that's in like five days and we don't even have the schedules.
 4   We don't have them.  So I don't think we need a long time
 5   because I think that we could all agree that given everything
 6   I've heard today, I highly doubt anyone is going to be placing
 7   a bid, but you know, we should still put it out there for at
 8   least a couple weeks to see if you're going to generate any
 9   bids, okay.
10            So let's look at the calendar here.  All right.  So
11   presumably you'll have the final form of the schedule on the
12   18th.  So I think that we could get -- we can have a bid
13   deadline be December 2nd.  December 2nd.  And then that means
14   -- well, I'm sorry.  Yeah.  December 2nd and then we could have
15   an auction on the 3rd.  You guys are going to do that in your
16   offices, right?
17            MR. GEORGE:  If one is required.
18            THE COURT:  If one is required.  All right.  And so
19   then after that, we just need to -- we need to decide when
20   we're going to have the sale hearing.
21            MR. VAGNONI:  Your Honor.
22            THE COURT:  Yes?
23            MR. VAGNONI:  We have a sale closing deadline of
24   December 10th.  We're going to -- this is extremely tight with
25   those --
```

1          THE COURT:  I'm going to give you -- I mean, let me

2   just look at the schedule here.  Okay.  So the 10th is a

3   Tuesday.  All right.  Okay.  So I think what we should do is we

4   should have the sale hearing on -- I think we should have it on

5   the 10th of December.  Okay.  And I'll give you a ruling on the

6   10th because we're going to back into that all the objections

7   for when people are going to file objections to the sale.

8          MR. VAGNONI:  Okay.  Your Honor, that's going to put

9   us out of the agreement we have with Hawk.

10         THE COURT:  Okay.  So Hawk, I'm looking at my

11  schedule and I'm trying to give you a hearing as soon as I can,

12  and I'm -- you know, they're the ones who gave you the deadline

13  of December 10th, is that right?

14         MR. VAGNONI:  It was -- yeah, Hawk and SeeCubic.

15  Yeah.

16         THE COURT:  Yeah.  Okay.  So I'm trying to work with

17  you guys here, but I'm not going to be able to have a hearing

18  in the first week of December because I think we have a lot

19  going on then.  I mean, I guess we could try to have it on the

20  4th.

21      (Court and clerk confer)

22         THE COURT:  So I think what we should do then let's

23  have a sale hearing on the 4th of December at 1:00 p.m.  And

24  we'll make a sale objection deadline next Friday the 22nd, and

25  any responses to the objection should be filed by the 29th.

```
 1   The deadline again is the 2nd, the auction is the 3rd.  We'll

 2   have the hearing on the 4th.

 3            MR. THOMPSON:  Well, Your Honor.

 4            THE COURT:  Yeah.

 5            MR. THOMPSON:  Your Honor, I would only make two

 6   observations, right?  One, first that it's pretty clear that

 7   Rome is not burning.  Notwithstanding protestations to the

 8   contrary.  And we once again see the accommodation of the Hawk

 9   parties even with regards to scheduling on something that was

10   completely within their control in terms of providing -- the

11   Trustee providing this list of assets well before now.

12            And frankly having other potential bidders have

13   access to this information in the data room.  It is

14   regrettable, although not too terribly unforeseeable that

15   nobody else was interested, given the information that they

16   would have and the concerns that any probable bidder would have

17   given what they know and what the risks probably are.

18            But beyond that, I just want the record to reflect

19   that there seems to be some suggestion that all VSI has done

20   throughout this process has been an obstructor.  We have tried

21   multiple times to provide alternative financing, in the way of

22   DIP financing to proposals.  And I am aware of Rembrandt having

23   made a proposal before that.

24            Mr. Vagnoni, during our hearing suggested that none

25   of those things were acceptable.  All of them -- I will
```

 1   contend, Your Honor, all of them, each and every one was better

 2   than the outcome that this trustee has decided is the only

 3   track he can go down.

 4          THE COURT:  I have one question.  Where is Phillips

 5   in all this litigation?

 6          MR. GEORGE:  Ready to cancel the --

 7          THE COURT:  Excuse me?

 8          MR. GEORGE:  Probably about ready to cancel the

 9   license.

10          MR. VAGNONI:  Probably.  Your Honor --

11          THE COURT:  Where are they?  Like I haven't seen

12   them.  Like you're jumping up and down, but where's Phillips?

13          MR. GEORGE:  I spoken to Alex Damvelt if you'd like

14   to hear about that.  And I've spoken to Phillips as well.

15          MR. VAGNONI:  Your Honor, he's testified -- he's

16   testified enough.  Your Honor, the proposals that we received

17   -- and I don't want to prolong this anymore.  I know Your Honor

18   has made a ruling on dates.  The proposals that the Trustee has

19   received so far are from the same individual who found it has

20   grossly mismanaged the Debtor's --

21          THE COURT:  Mr. Vagnoni, I'm giving you everything

22   you want.

23          MR. VAGNONI:  I agree.

24          THE COURT:  I'm moving forward with the bid

25   procedure, and --

```
 1              MR. VAGNONI:  And I acknowledge that.

 2              THE COURT:  Okay.

 3              MR. VAGNONI:  And I thank you.  But to sit here and

 4   listen to --

 5              THE COURT:  There's zealous advocates --

 6              MR. THOMPSON:  I'm going to object to this line --

 7              THE COURT:  -- being paid to be --

 8              MR. THOMPSON:  -- to this line of -- I'm going to

 9   object.

10              THE COURT:  Everybody.  So Mr. Vagnoni, I don't need

11   to hear anything more from anybody.

12              MR. VAGNONI:  Thank you, Your Honor.

13              THE COURT:  Okay.  So I'll hear from all of you.

14   Just make sure you put in those briefs.  My law clerk is

15   waiting with baited breath to see all of your sale objections

16   because he's got to do a lot of research.  So next Friday,

17   okay.  We'll be taking a close look at all of that.  So please

18   include all of your arguments then.  Okay, everybody. I will --

19              MR. THOMPSON:  Thank you, Your Honor.

20              MR. VAGNONI:  Thank you, Your Honor.

21              THE COURT:  All right.  Thank you.  I have a 12:30

22   hearing.  Don't need to stand for me.  Okay.

23          (Proceedings adjourned at 12:47 p.m.)

24

25
```

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                      :
IN RE:                                : Case No.  23-10763-amc
                                      :
STREAM TV NETWORKS, INC.  CH: 11      :
AND NETWORKS, INC. AND                : Philadelphia, Pennsylvania
TECHNOVATIVE MEDIA, INC.              : December 4, 2024
                                      : 12:53 p.m.
. . . . . . . . . . . . . . . . . .   :
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

```
For the Chapter 11 Trustee:   Michael D. Vagnoni, Esq.
                              Edmond M. George, Esq.
                              Obermayer Rebmann Maxwell &
                              Hippel LLP
                              Centre Square West
                              1500 Market Street, Suite 3400
                              Philadelphia, PA 19102
                              215-665-3066

                              Steven M. Coren, Esq.
                              Kaufman Coren & Ress, P.C.
                              Two Commerce Square
                              Suite 3900
                              2001 Market Street
                              Philadelphia, PA 19103-2713
                              215-735-8700

For Visual Semiconductor,     John H. Thompson. Esq.
Inc.:                         Akerman
                              750 Ninth Street, N.W.
                              Washington, D.C. 20001
                              202-824-1760

                              R. Adam Swick, Esq.
                              Akerman
                              500 West 5th Street, Suite 1210
                              Austin, TX 8701
                              737-999-7103
```

```
For Rembrandt:                    Andrew Peter Demarco
                                  Devlin Law Firm, LLC
                                  1526 Gilpin Avenue
                                  Wilmington, DE 19806
                                  302-449-9010


For Leia Inc.:                    Keri P. Ebeck
                                  Michael Watters
                                  Bernstein & Berkley, Attorneys
                                  at Law
                                  601 Grant Street, 9th Floor
                                  Pittsburgh, PA 15219
                                  412-456-8100


SeeCubic, Inc.:                   Marley Brumme, Esq.
                                  Skadden Arps Slate Meagher &
                                  Flom, LLP
                                  500 Boylston Street, 23rd Floor
                                  Boston, MA 021116
                                  617-573-4800


Also Appearing:                   Rediah Braham
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
                              INDEX

                        Direct   Cross   Redirect   Recross

WITNESSES:

William Homony
    (By Mr. Thompson)        24
    (By Mr. Michaels)                52
J. Scott Victor
    (By Mr. Swick)           61
    (By Mr. Vagnoni)         71
```

| | |
|---|---|
| 1 | DECEMBER 4, 2024                                    12:53 P.M. |

2          THE COURT:  The 1:00 matter is the matter of Stream

3  TV Networks.  It is a motion to approve a sale.

4          I know we have several parties in the courtroom.  We

5  will take their appearances first, and then we will go to the

6  people on the phone.

7          MR. GEORGE:  Good morning, Your Honor.  Ed, Edmond

8  George.

9          THE COURT:  It is afternoon.  I always say --

10          MR. GEORGE:  Good afternoon, Your Honor.

11          Edmond George and Michael Vagnoni from the Obermayer

12  firm on behalf of William Homony, the Chapter 11 Trustee.

13          MR. COREN:  Good afternoon, Your Honor.

14          Steve Coren, Special Counsel for the Trustee.

15          THE COURT:  Okay.

16          MR. THOMPSON:  Good afternoon, Your Honor.  John

17  Thompson, as well as my colleague, Adam Swick, from Akerman.

18  On behalf, excuse me, on behalf of VSI.

19          MR. DEMARCO:  Good morning, Your Honor.

20          Andrew DeMarco from the Devlin Law Firm, here on

21  behalf of Rembrandt, with my co-counsel, Chris Michaels, also

22  from Rembrandt.

23          THE COURT:  Sir, do you want to put your name of the

24  record?  Come on up to the podium.

25          MR. BRAHAM:  My name is Rediah Braham (phonetic).

1   I'm a creditor from Stream TV.

2            THE COURT:  Okay.

3            MR. BRAHAM:  They owe me a lot of money.

4            THE COURT:  Okay.

5            MR. BRAHAM:  I'm a very poor guy.  I cannot afford to

6   get --

7            THE COURT:  Oh.

8            MR. BRAHAM:  -- a lawyer or anybody.

9            THE COURT:  Okay.

10            MR. BRAHAM:  But right now, Mathu is offering us 90

11   cents to a dollar.  I am very humbly requesting to kindly give

12   the company back to Mathu and let him pay everybody so we can

13   survive.

14            THE COURT:  Okay.

15            MR. BRAHAM:  I just wanted to say that.

16            THE COURT:  No problem.

17            MR. BRAHAM:  Thank you.

18            THE COURT:  Thanks for letting us know.

19            MR. BRAHAM:  Thank you.

20            THE COURT:  Okay.  All right.  So I thought perhaps

21   you would -- did you want to say something?  Pam is giving me a

22   look.

23            Yeah, go ahead.  What is your thought?

24            THE CLERK:  There might be people on the phone.

25            THE COURT:  Oh, I forgot.  I am sorry.  Yeah, people

1    on the phone.

2          Would you please put your appearance on?

3          MS. EBECK:  Good afternoon, Your Honor.  Keri Ebeck

4    on behalf of Leia Inc.  I also have my co-counsel Michael

5    Watters on the phone.  If any -- we are basically here to

6    listen, but if anything comes up, Mr. Watters will be handling.

7          THE COURT:  All right.  Thanks, Ms. Ebeck.

8          Anyone else on the phone?

9          Good.  Okay.  That was easy.

10         All right.  Mr. George, I thought perhaps you could

11   do a proffer.  Would you want to do a proffer?

12         MR. GEORGE:  I will, Your Honor.  DO you want to --

13         THE COURT:  Unless you guys --

14         All right.  Well, you do the proffering, and we will

15   see what they say.

16         MR. GEORGE:  Okay.

17         THE COURT:  Okay.

18         MR. GEORGE:  Your Honor, I will deal with the other

19   exhibits and things after I am done with the proffer.

20         We have two witnesses today, Mr. Homony who is the

21   Chapter 11 Trustee, and Mr. Victor.  They have both filed

22   declarations in this case which we have marked in our Exhibit

23   Book as 1 and 2.  We have asked that those be moved into the

24   record.

25         If called to the stand, Mr. Homony would testify

1   consistent with his declaration;

2         That he was retained as a Chapter 11 Trustee in this

3   case after the management was removed pursuant to a motion to

4   appoint a Chapter 11 Trustee;

5         That he retained SSG Capital advisors to conduct the

6   sale process for the assets;

7         That he has experience as a trustee in this vicinage;

8         That he had robust and good-faith negotiations with

9   Hawke and SLS that resulted in the Hawe settlement;

10        That he approved putting the Debtor's assets up for

11  sale;

12        He approved the stalking horse bid and designated the

13  stalking horse bidder as the successful or winning bidder,

14  there having been no parties expressing any interest in the

15  purchase of the assets, even following the subsequent and

16  additional teaser information that Your Honor directed at the

17  hearing on the bidding protections;

18        That his decision to sell was grounded in business

19  judgment based on the fact that when he took over the case,

20  there was no money in the case.  The Estates were

21  administratively insolvent.  The Estates have been in a

22  protracted fight with the secured creditors for a number of

23  years.  There had been three previous bankruptcies, two of

24  which were dismissed on the basis of bad faith;

25        That the Bankruptcy Court provided a very limited

1   extension of time within which the Trustee could find a

2   purchaser for the property, or for the assets;

3           That he applied to the Bankruptcy Court for an

4   extension of the automatic stay, and was given until July 15th

5   to effectuate the transfer or the settlement, with a July 15th

6   scheduled hearing date in the Delaware 225 action;

7           The Trustee made a decision that selling the assets

8   pursuant to the sharing and settlement agreement with Hawk was

9   in the best interest of the creditors;

10          That at the time, there was a lawsuit that gave the

11  secured creditors relief to go back to Delaware to redo the

12  Board of the Debtor's;

13          That there were no business activities, no workers,

14  no factory, no raw materials, no finished goods, no WIP, a

15  bonding machine that was palleted and located in China, and no

16  accounts receivable, as well as $3 million in purported

17  administrative expenses in favor of the Lewis Brisbois firm.

18          Accordingly, the Trustee, based on those factors,

19  made a decision to sell the assets of the property.

20          The Trustee did meet with and tried to work with Mr.

21  Rajan and VSI to entertain legitimate proposals from VSI to buy

22  or restructure the operations of the Debtor.  Neither VSI or

23  Mr. Rajan ever demonstrated a viable proposal that was

24  supported by a commitment of a financial nature that would

25  allow the Trustee to make a decision to make an arrangement

1   with Mr. Rajan or VSI.

2          That he requested VSI fund a DIP in order to fund

3   litigation in the case, which VSI failed to do, and the Trustee

4   eventually settled with Hawk.

5          And even after the Hawk settlement, the Trustee

6   continued to discuss potential acquisitions with the VSI

7   parties, so much so that he held off on filing the procedures

8   motion for about ten days while he continued to communicate

9   with the Hawk parties, or I mean the VSI parties, but within

10  that time, there was no proposal that was made;

11         That the Trustee authorized the sale motion and

12  procedures motions, that he reviewed the results of SSG's

13  efforts and believes that a robust and full marketing of the

14  assets have occurred.

15         He has reviewed the results of the sale process, and

16  having received no bids, has concluded in the exercise of

17  business judgment, that the stalking horse bid in the highest,

18  best, and only bid for the assets of the Estate.  And that was

19  all Mr. that Homony would testify.

20         THE COURT:  Okay. All right.  Did you gentlemen want

21  to respond to the proffer that was made?

22         MR. THOMPSON:  Well, Your Honor, on behalf of VSI, I

23  would object to the timing and sufficiency of the testimony

24  that has been put in by proffer.  But we will, of course, get

25  an opportunity to cross-examine both witnesses.

1            I think there is a preliminary matter though, Your

2   Honor, that I think we need to take up based upon these

3   proffers and the declarations that were filed yesterday for

4   something that was filed this morning, which was an amended

5   order, form of order, for this sale.

6            Your Honor, I guess, let me take the podium, because

7   it is going to be a minute.

8            THE COURT:  Okay.

9            MR. THOMPSON:  Your Honor, I have been doing this a

10  while.  And to say that this is one of the more exceptional

11  last-minute orders I have seen would be putting it graciously.

12           This sale order demonstrably changes the terms of the

13  agreement, and ultimately, the sale, that this Trustee purports

14  to want to do with this stalking horse.  It bears very little

15  resemblance to what this Court approved in the 9019 sale or

16  9019 settlement agreement providing for a sale.

17           It includes unconstitutional releases, injunctions,

18  gatekeeper provisions, a whole ration of relief.  And it is all

19  being granted, I guess, at the 11th hour by the Trustee and

20  asking this Court to bless it, because this stalking horse

21  bidder will not go forward on the agreement that they struck in

22  May and ultimately had approved in June.  They have been

23  telling us for months and months as we tried to propose

24  alternatives and ask this Court to reconsider that 9019

25  settlement agreement.

1            It is not -- there is nothing we can do about it.  It

2   is too -- it is binding.  So if it is binding, it is also

3   binding upon the Hawk parties.  This stalking horse bidder came

4   to this process saying that they would abide by the agreement

5   that was struck in June and that this Court approved.  They are

6   not doing that.

7            This Trustee is now saying that because they might

8   back out and they will not agree without the Court blessing

9   this additional relief.  It is quite a red line.  Unless they

10  do that, excuse me --

11           THE COURT:  Let's listen to Mr. George.

12           MR. THOMPSON:  Unless they do that, this sale isn't

13  going through, at least that is what we read.  And I don't

14  think it is very complicated, Your Honor.

15           THE COURT:  Let's just drill down to the specifics.

16  The one provision of the revised sale order that I had a

17  question about was that all along, it was my understanding that

18  Hawk was taking the position that if I agreed to the sale, that

19  whatever litigation you may face by VSI and Rembrandt, you were

20  going to face.

21           But when I read the paragraphs 13, 14, and 15 of the

22  sale order, it sort of purports now to making me a gatekeeper

23  to any kind of litigation.  That was my understanding of that,

24  of those provisions.  And the concern I had about those

25  provisions are that I don't care to be that gatekeeper.  If I

 1    do authorize the sale, then whatever litigation they may want

 2    to bring, they are going to bring.

 3            MR. GEORGE:  Well, Your Honor, first of all, let me

 4    just say two things.  I think Mr. Thompson is a little over his

 5    skis what he says that --

 6            THE COURT:  All right.  Well, let's just assume

 7    everyone is emotional.  I know, I mean, you guys are all going

 8    to count, you know --

 9            MR. GEORGE:  But that is just -- yeah.  But to say --

10            THE COURT:  -- paint the other person as, you know.

11            MR. GEORGE:  Understood.  But to say that there is

12    any indication that Hawk isn't going to close, it is just wrong

13    and improper.

14            THE COURT:  Well, but what they are saying is that --

15            MR. GEORGE:  It's a form of --

16            THE COURT:  -- what they are saying is that it is --

17    let's do this.  Let's not respond, and preferably, let's not

18    state things emotively.  All right?  So let's just take away

19    what he was saying.  He was saying that there are provisions in

20    there that are either unconstitutional, that there is a lot of

21    changes.  And I would have to agree with him, Mr. George, there

22    are a lot of changes.  We had to review these changes today.

23            MR. GEORGE:  Understood, Judge.

24            THE COURT:  But specifically, the point that I just

25    raised is something that is near and dear to their heart, that

1  they have been hopping mad since the beginning of time about

2  what you guys want to do here with regard to their licensing

3  rights.  And they do seem to want to sue someone.

4         So I am not going to be the gatekeeper of that

5  litigation.  I am not going to decide if something is

6  meritorious.  So at this point, I am not really interested in

7  making those revisions to the sale or that you suggested.

8         So you could respond to that point.

9         MR. GEORGE:  No, that is fair enough, Your Honor.

10  Because I think the Trustee's intention, and I think we have

11  said all along is that we are selling interests in these

12  downstream entities.  And if the parties on that side of the

13  table feel like they have claims, nothing we are doing is going

14  to change that because we don't own those downstream assets.

15         THE COURT:  Okay.  So reconcile what these new

16  paragraphs say though.

17         MR. GEORGE:  Well --

18         THE COURT:  These new paragraphs now say that I'm

19  supposed to be a gatekeeper.

20         MR. GEORGE:  -- sure.  I can work on this with the

21  counsel to Hawk, and maybe we can address that.

22         THE COURT:  Okay.

23         MR. COREN:  Thank you, Your Honor.  Yes.  We just

24  confirmed, their -- the litigation and the claims of SeeCubic

25  or of Rembrandt that are going on in the District of Delaware

1   right now, and any claim that intellectual property litigation

2   is going to move forward against the Debtors an assumed

3   liability under the asset purchase agreement, as is made clear

4   in the order.  That is not subject to the gatekeeper provision.

5   That is going to go forward and that litigation is going to be

6   able to move forward.  And if that needs to be made more clear

7   here, we absolutely will.

8          THE COURT:  Okay.  I just want to clarify that VSI

9   and Rembrandt are going to have the right to pursue all of

10  their arguments with regards to the infringements.  Okay?

11         MR. MICHAELS:  That is absolutely, correct, Your

12  Honor.

13         THE COURT:  And right now, I don't feel like that

14  language is clear.

15         MR. GEORGE:  Your Honor?

16         THE COURT:  Yeah?

17         MR. MICHAELS:  With respect --

18         MR. GEORGE:  Before Mr. Michaels starts --

19         THE COURT:  Uh-huh.

20         MR. GEORGE:  -- is he a witness or a lawyer?  Because

21  the last time he sat at that table and he testified.  I know

22  you said don't be emotive.

23         MR. MICHAELS:  I am a lawyer.

24         MR. GEORGE:  I am doing everything I could do.  Mr.

25  Coren left a dent in my knee from kicking me because I sat

1    while Mr. Michaels testified and advocated at the same time.

2    So I would like that clarification.  Why is he here, is he a

3    witness?  If he is, he can't make presentations.

4              THE COURT:  I thought he was a lawyer.

5              Are you a lawyer, sir?

6              MR. MICHAELS:  Yeah, I am serving as an attorney for

7    Rembrandt 3D.

8              THE COURT:  Okay.  He is serving as an attorney, so

9    he is making argument.

10             MR. GEORGE:  Fair enough.

11             THE COURT:  Okay.

12             MR. MICHAELS:  Your Honor, I would like to read, not

13   -- no -- you said, let's get to what the facts are rather than

14   emotive response.  Well, the language they added to Section EE

15   in the proposed order states the Buyer asserts that it will --

16             THE COURT:  Yeah, I read that.

17             MR. MICHAELS:  -- not consummate the transaction.

18             THE COURT:  Okay.  So they are going to take

19   responsibility for assumed liabilities, at the assumed

20   liabilities are your litigation.  We looked at the defined term

21   of assumed liabilities, and that is part of it.

22             Let's just all agree to the concept.  I am telling

23   you right now that I am not approving any sale order unless

24   they preserve their rights to go after Hawk in connect

25             MR. MICHAELS:  Understood, Judge.

```
 1              THE COURT:  Okay.  Hawk, would you like to say

 2    something?

 3              MR. CAPONI:  Yes, Your Honor.  Just to be clear, Hawk

 4    is not the purchaser or the stalking horse.  Hawk is the

 5    collateral agent SeeCubic, so --

 6              THE COURT:  Okay.  When I say Hawk --

 7              MR. CAPONI:  -- if we are going after somebody --

 8              THE COURT:  -- it's like the umbrella.

 9              MR. CAPONI:  -- like, let's try to drop Hawk if we

10    don't --

11              THE COURT:  Sure.

12              -- we can be a little clearer about that, that is

13    all.

14              THE COURT:  Yeah, whoever the Buyer is, they are --

15              MR. CAPONI:  We are going to buy it.

16              THE COURT:  -- going to face all of this litigation.

17              MR. CAPONI:  That is correct, Judge.

18              THE COURT:  Okay.

19              MR. THOMPSON:  So Your Honor, to be clear, and we can

20    submit testimony and we are here with witness of our own, the

21    action that initiates the right to sue, the transfer, is the

22    closing.  Right?  Stream has a license from Rembrandt and it is

23    perfectly valid.  They have not committed any IP infringement.

24    I asked them to clarify, is Scott Victor running around

25    providing offering for sale assets of the company covered by
```

1    our license.  Right?  We believe they are.

2              Rembrandt's position is actually, we don't have the

3    right to sue Stream and its executives because they have a

4    valid license to our technology. What they don't have the right

5    to do is to transfer our trade secrets to another party --

6              THE COURT:  I understand.

7              MR. THOMPSON:  -- and effectively, what they are

8    doing.

9              THE COURT:  I understand.

10             MR. MICHAELS:  And so what I am saying is the day of

11   the closing, SCBV, Stream, all of its officers, are violating

12   1830 -- U.S.C. 1832, right?  Not the day before, not the

13   minute.  That is the transaction that does it.  And those that

14   are receiving it are likewise violating that statute.  And SCBV

15   is implicated, Stream, all of the executives involved.

16             And this is purporting, the reason I started reading

17   this clause is I think it is the most important thing that they

18   have submitted.  The Buyer is unwilling to proceed.  There was

19   an asset purchase agreement that was submitted for everybody

20   to, you know, to get approved, and there was a 9019 settlement.

21   And they are not willing to proceed, that is what they have

22   said.  Unless we get these unique protections that you are just

23   providing five minutes before I got in my car to drive to this

24   hearing today, they are not going to proceed.

25             So they have told us everything we need to know.

1    This sale isn't happening.  I would move, at the beginning of

2    this, to say this sale is no longer before this Court, the

3    Buyer won't go.

4           THE COURT:  I just clarified that if the sale does go

5    through, you will be able to sue the Buyer.

6           MR. MICHAELS:  With respect, Your Honor.  That is an

7    issue I certainly care deeply about.  The issue I am bringing

8    before, the nuance of what I am stating today is that there was

9    a motion to approve the (audio interference) purchase and the

10   sale.  And the Buyer has told the Trustee they are unwilling to

11   proceed unless the deal that they sought approval for changes,

12   right?  They are calling off the sale.

13          My request is that the motion be denied and they come

14   back again when they have worked out what their asset purchase

15   agreement is going to be and we have a time to actually respond

16   to the asset purchase agreement being asked for approval for

17   this Court.

18          THE COURT:  I am confused by how you are

19   characterizing this.  They did make a lot of changes.  But the

20   assumed liabilities definition includes the litigation you guys

21   have, so the Buyer is agreeing to still be on the hook for

22   that.  So what changes are they asking for that makes this sale

23   not able to go forward?

24          MR. MICHAELS:  They have -- I mean, I am looking

25   right at Section EE, and it says, specifically, unless the

1   asset purchase agreement specifically provides, and this Court

2   specifically orders, that the Buyer, its properties, its

3   successors and assigned and their respective property and the

4   assets will not have any liability whatsoever with respect to

5   require to satisfy in a manner whether in law and equity,

6   whether by payment, setoff or otherwise, directly or

7   indirectly, any claim or lien or any successor or transfer

8   liability, excuse me, ability for either of the Debtors, other

9   than the assumed liabilities.

10          THE COURT:  Other than the assumed liabilities.  So

11   they are in the assumed liabilities.

12          MR. MICHAELS:  I understand Rembrandt is in the

13   assumed liabilities.  That, and I do appreciate that your

14   statements with regard to Rembrandt's claims. But Your Honor --

15          THE COURT:  The Debtor can't get sued anymore, right?

16          MR. MICHAELS:  -- what I am raising --

17          THE COURT:  Uh-huh.

18          MR. MICHAELS:  -- is that this is not the asset

19   purchase agreement that they moved for approval.  They have

20   radically changed it.

21          THE COURT:  In what way have they radically changed

22   it?

23          MR. MICHAELS:  Well, I am looking at a redline

24   agreement which I have had five minutes to read.  So I would

25   ask for a continuance for the opportunity to answer that

1    question fulsome.

2              THE COURT:  Summarize for me, give me, like, the

3    biggest ticket item --

4              MR. MICHAELS:  The point is, Your Honor, five minutes

5    was insufficient time for me to review all of the changes.

6              THE COURT:  You said the purchase agreement has

7    changed.  I agree that there were revisions, but I had time to

8    look at the blackline.  I had concerns, and I just raised my

9    concerns with them to clarify that your litigation will go

10   forward.  But other than that, can you even point to something

11   that is --

12             MR. MICHAELS:  Your Honor, I can, right?

13             THE COURT:  Yeah?

14             MR. MICHAELS:  Your Honor pointed to the gatekeeper

15   provision.

16             THE COURT:  Right.

17             MR. MICHAELS:  I will point to the injunction.

18             THE COURT:  And I am striking that.  There is -- you

19   are going to be able to go after the Buyer.

20             MR. MICHAELS:  And the injunction, the injunctive

21   relief that they have got in -- that they are suggesting in 14?

22             THE COURT:  The injunctive relief --

23             MR. MICHAELS:  -- right?  They are looking for

24   injunctive relief for these stalking horse bidders as protected

25   parties under this revised agreement, which basically --

1          THE COURT:  All right.  Let me just make this clear.

2          MR. MICHAELS:  Okay.

3          THE COURT:  You guys, Rembrandt and VSI, you can go

4    crazy with whatever litigation you want against the Buyer.

5    Period.  End of story.

6          I will make sure that if I do enter the sale order

7    you have got those rights.  Okay?

8          MR. MICHAELS:  Your Honor, the problem is, they are,

9    the stalking horse bidder, through the Trustee, is now making

10   this as Mr. Michaels clearly pointed out in their own language,

11   the contingency for their participation in this sale.

12         THE COURT:  But they have asked for things in the

13   blackline proposed sale order that I am not going to give them.

14   It seemed to me that were asking me to be a gatekeeper for your

15   litigation against them.  I am not going to do that.

16         So what other changes are there to the proposed sale

17   order that you think is so dramatic?

18         MR. MICHAELS:  Well, I think it is exceptional that

19   they are actually suggesting that they are not prepared unless

20   they get it.  Which means, if Your Honor is not going to give

21   it, they are not prepared to close.

22         THE COURT:  Okay.  Well, I just told them that I am

23   not going to give it to them, and they said okay.

24         MR. MICHAELS:  So I think what we need is a

25   representation from the stalking horse bidder today and now

1    that they will close, notwithstanding the fact that Your Honor

2    will not provide that relief.

3              THE COURT:  Go ahead, Ms. Brumme.

4              MS. BRUMME:  Good afternoon, Your Honor.

5              Marley Brumme from Skadden Arps for the Buyer, the

6    stalking horse bidder, SeeCubic Inc.

7              I am not sure where Counsel has gotten the idea that

8    we are backing out of this as a purchase agreement or the sale

9    in any way, shape, or form.  And I am certainly not sure where

10   they have gotten the idea that there has been discussions of

11   that that they haven't been a part of between our client and

12   the Trustee.

13             But to be clear, yes, my client is prepared to move

14   forward with the sale, fully understanding that the Counsel on

15   this side of the table over here is going to probably, as you

16   said, sue us every which way to Sunday --

17             THE COURT:  Uh-huh.

18             MS. BRUMME:  -- on violations --

19             THE COURT:  Yep.

20             MS. BRUMME:  -- so.

21             THE COURT:  Thank you.  All right.  Now let's do

22   this.  So we have two witnesses for today.  Who do you -- do

23   you need to cross-examine both of them?

24             MR. THOMPSON:  Yes.  And --

25             THE COURT:  All right.  And let's just be absolutely

1    crystal clear about what kind of cross-examination questions I

2    am going to permit today.  I am not going to permit any cross-

3    examination questions about issues that I have already

4    resolved.  I don't want to hear them.  We have already heard

5    all of them.  So the extent that you are questioning the 9019

6    order and the fact that Hawk has been approved as, you know,

7    the person under that 9019 order.  And that they have --

8    whether they have acted in good faith in this case or not, I

9    don't want to hear any questions.  I have already heard all of

10   them.

11           I just want to hear questions about whatever they

12   have said in the affidavits that they just recently filed that

13   have to do with my sale today.  Those are the only questions

14   that I feel like entertaining today.  Okay?

15           All right.  So do you want to bring up the Trustee

16   first?

17           MR. GEORGE:  Mr. Homony.

18           THE COURT:  Yeah.  Yep, that is fine.

19           You can go ahead and start.

20       (Trustee sworn)

21           THE CLERK:  Can you please state your name and spell

22   your last name for the record?

23           MR. HOMONY:  William A. Homony, H-O-M-O-N-Y.

24           THE CLERK:  Okay.  Thank you.

25           MR. HOMONY:  Sure.  1730 Maple Avenue, Hatfield,

```
 1   Pennsylvania, 19440.

 2        (Audio interference)

 3            MR. GEORGE:  -- 1 through 6.

 4            MR. THOMPSON:  Thank you.  John Thompson on behalf of

 5   VSI.

 6                           DIRECT EXAMINATION

 7   BY MR. THOMPSON:

 8   Q    Good afternoon, Mr. Homony.

 9   A    Good afternoon.

10   Q    Mr. Homony, how long have you been a Chapter 11 Trustee?

11   A    Well, this is my first engagement as a Chapter 11 Trustee,

12   and it began in January of 2024.

13   Q    Okay.  Mr. Homony, do you remember a meeting or a set of

14   communications that you had with the VSI constituents'

15   principals?

16   A    I've had many, so.

17   Q    Do you remember having them shortly after your appointment

18   in January?

19   A    Sure.

20   Q    Did you ask those principals for assistance in

21   understanding the Stream TV case?

22   A    Yes.

23   Q    Did you exchange email with them?

24   A    Sure, yes.

25   Q    Did you give them directions?
```

25

1   A     Did I give them direction?

2   Q     Did you give them directions?

3   A     I think I asked for documents in support for positions

4   that they wanted me to advocate.

5   Q     Okay.  Did you ever do an inventory of the assets of

6   Stream TV?

7   A     Well, that was one of the issues in the case that is not

8   typical in a Chapter 11 Trustee case.  There were no operations

9   and it was unclear at the time, and remains unclear, exactly

10  which entities of Mr. Rajan's have possession of tangible

11  assets, records, et cetera.  So I don't believe Stream TV has

12  certainly any significant tangible assets.  And if they do, I

13  have not been aware -- made aware of them or know their

14  location or who is in control of them.

15  Q     That was a long example, Mr. Homony.  So I am going to

16  break it down.  I asked you the question did you do an

17  inventory of Stream's assets; yes or no?

18  A     I would say generally, yes.

19  Q     You did?

20  A     Yes.

21  Q     How did you do that inventory?

22  A     Through reading through various materials, the case

23  filings, the various adversary matters, the history of the

24  case, the filings in the Chapter 11 case up through my

25  appointment, and other records I obtained from either Stream or

1   VSI personnel.

2   Q    Did you talk to other parties?

3   A    Yes.

4   Q    Who were those parties?

5   A    Those parties were, again, Mr. Rajan, Nicole Maneen, the

6   employees of SeeCubic, B.V. in the Netherlands.  I certainly

7   spoke to Mr. Stastney over time, his counsel, Hawk's counsel,

8   all of the relevant parties and interests that you would think

9   a Chapter 11 Trustee would talk to in this situation.

10  Q    And did you accumulate an asset list from all of those

11  communications in that investigation?

12  A    Again, I think the assets that I identified through my

13  investigation are included in the APA, both those that are

14  being purchased as well as the excluded assets.

15  Q    All of the assets are identified in the APA?

16  A    I believe, generally, the assets of Stream are identified

17  in the APA, yes.

18  Q    And those assets are assets that are being transferred

19  under this sale, correct?

20  A    Stream is identifying a, certainly, a set of assets to the

21  Buyer, yes.

22  Q    If you were to look at the APA, which is on the docket --

23  A    Uh-huh.

24  Q    -- and certainly, we can have you take a look at it, but

25  it describes all of the assets that Stream TV holds or may

1   hold, correct?

2   A   Yes, except for the specifically identified excluded

3   assets, yes.

4   Q   Okay.  That includes, among other things, physical

5   property, intellectual property, yes?

6   A   I would suggest that they are -- I don't believe I am

7   transferring any tangible property of Stream, and I don't

8   believe I am transferring any intellectual property that is

9   owned by Stream.

10  Q   You don't believe that you are actually transferring any

11  intellectual property owned by Stream?

12  A   No.

13  Q   You are doing this as an as is where is sale, right?

14  A   That's correct.

15  Q   What does that mean, Mr. Homony?

16  A   That means, buyer beware.  The Buyer gets the assets in

17  any condition, in any form, no reps or warranties.  They can't

18  come back.  There is no recourse to the Estate.

19  Q   Wherever they are, right?

20  A   Correct.

21  Q   Does the location, possession, or circumstance, right,

22  change who owns that property?

23  A   Can you repeat that?  I am sorry.

24  Q   Does the location, you said as is and where is, right?

25  A   Uh-huh.

```
 1  Q    Does the location or the condition change who owns the

 2  property?

 3  A    No.

 4  Q    It is the Debtor's, it is part of the Debtor's Estate,

 5  right?

 6  A    Well, certain assets are a part of the Debtor's Estate.

 7  Q    So for instance, the bonding machine that is in Asia is a

 8  Debtor asset, right?

 9  A    Well, as I have testified before, there is certainly a

10  cloud over the title in the way in which it was -- the way it

11  was explained to me as being addressed when a Receiver was

12  appointed over Technovative before this bankruptcy case was

13  initiated.  I do believe it is listed as an asset of Stream on

14  Stream's Schedules.  So the extent it is owned by the Debtor,

15  and I misspoke previously, this is the only tangible piece of

16  equipment that the Debtor's Estate may own.  However, it may be

17  titled already in the Netherlands under the SCBV.  Either way,

18  in this proposed sale, it is being conveyed to the Buyer.

19  Q    But the only document that you have ever seen is a receipt

20  that tells you that Stream TV is the owner of that; is that

21  correct?

22          MR. GEORGE:  Objection to form, Your Honor.

23          MR. THOMPSON:  Excuse me, I will rephrase.

24  BY MR. THOMPSON:

25  Q    Is the owner of the bonding machine located in Asia is
```

1   Stream TV?

2   A    I am not sure I have ever seen a bill of sale or anything

3   like that.  I think it was manufactured over time, many, many

4   years ago.  And my understanding is it has been in China for

5   over a decade.  So I don't know that I have seen a specific

6   document that you just referenced.

7   Q    You suggested that somebody had told you that there might

8   be cloud over that title to the bonding machine; is that right?

9   A    That is correct.

10  Q    Who told you that?

11  A    I think -- I think I've read it many things, and I believe

12  that SCBV personnel have referenced the fact that, I believe,

13  the Receiver may have put it in SCB's name in order to pay for

14  the storage, et cetera, in China for a period of time.

15  Q    You said that the SCBV Receiver would have put it in

16  SCBV's name?

17  A    He may have titled it in their name for it.

18  Q    So how would the SCBV Receiver have retitled a piece of

19  property that the Stream Estate owned?

20  A    I don't know how he did it.

21  Q    You wouldn't know how he did it. Have you seen any

22  document that establishes any right, title, or interests over

23  the bonding machine in SCBV, aside from what people have told

24  you?

25  A    Not that comes to mind.

1   Q    Nothing, huh?  Okay. But nevertheless, your asset purchase

2   agreement and the documents that you have filed in favor of

3   this sale suggest that there is some potential that the bidder

4   or the Buyer would not actually receive title of that; is that

5   right?

6   A    No, not at all.  I think it is very clear that the Buyer

7   will get title, regardless of how it is currently titled.  They

8   are either going to get it if Stream owns it or if SCBV owns

9   it.  They are going to get it through the equity interest of

10  SCBV.  So they will have control over that asset regardless of

11  who currently has title.

12  Q    That is important.  So they do have control if they buy

13  these assets?

14  A    Control over what?

15  Q    Over SCBV.

16  A    Well, ultimately I am transferring what I believe, the

17  defined term, transferred interests, in the APA, which

18  constitutes three subsidiaries of Technovative, which is one of

19  the Debtor entities.  And so they will be the economic interest

20  holder in Ultra-d Ventures, which is a non-Debtor foreign

21  subsidiary.  That entity ultimately, I believe, indirectly owns

22  SCBV.  So I would suggest that ultimately they will have

23  control should they choose to exercise it over SCBV.

24  Q    SCBV ultimately is owned by the Topco's Technovative and

25  Stream TV that are Debtors in this case, right?

1            MR. GEORGE:  Objection, Your Honor.

2            THE COURT:  Okay.  What was your objection, Mr.

3    George?

4            MR. GEORGE:  I think he said that it was owned by

5    Technovative and Stream TV.  Oh, I am sorry.

6            MR. THOMPSON:  Let me rephrase.

7            THE WITNESS:  Yes, sir.

8    BY MR. THOMPSON:

9    Q    Does the ownership interest of SCBV, wherever it is in the

10   stack, ultimately run up through Technovative at the first

11   level and Stream TV at the second?

12   A    Well, I wouldn't say the first level.  There are many

13   foreign subsidiary levels before you get to the U.S. Debtor

14   Technovative.  So as I just described, I believe it is

15   Technovative, which is a U.S. Debtor.  It is Ultra-d Ventures,

16   which is a non-Debtor foreign subsidiary who then owns another

17   foreign subsidiary, Ultra D cooperative who then owns SCBV.

18   It's a chain.

19   Q    Yes, I understand, and I thought my question was

20   accounting for it.  Perhaps it wasn't, but thank you for the

21   clarification, Mr. Homony. The question really is who controls

22   all of those subsidiaries, including SCBV?

23   A    Ultimately, I believe the buyer will be able to exercise

24   control of them.

25   Q    The buyer.  Who does right now?

```
 1   A     Who does right now?

 2   Q     Yes.

 3   A     Exercise control over SCBV?

 4   Q     All of the subsidiaries below Technovative.

 5   A     Well, I have -- the Debtor's Estates have an ownership

 6   interest in Ultra-d Ventures.

 7   Q     They control everything below Technovative, do they not?

 8   A     I wouldn't -- I wouldn't, I mean, the facts and

 9   circumstances change depending on what a particular entity

10   would want to do.

11   Q     Well, does the sale process, Mr. Homony, who has control?

12   Because we just talked about the Hawk parties, if they are the

13   successful Buyers, they would have control for purposes of the

14   bonding machine we talked about.  Does that change the process

15   from what exists right now?

16   A     Well, obviously --

17   Q     In a case where you sit as the Trustee to these Debtors?

18   A     Well, I guess, maybe I am speculating.  I would suggest

19   that the Buyer is going to exercise control over all of those

20   entities post-closing.

21   Q     And they would do so because?

22   A     Because of the legal ownership interest in the corporate

23   structure I just described.

24   Q     Right.  And right now, who has control of the legal

25   ownership interests?
```

```
 1   A     Well, ultimately, Technovative has ownership interest, an

 2   economic ownership interest in, as I described.

 3   Q     And who has control over Technovative --

 4   A     I do.

 5   Q     -- and the Stream Debtors?

 6   A     Okay.

 7   Q     Thank you.  That is where I was really going, Mr. Homony.

 8   A     Okay.  Uh-huh.

 9   Q     Right.  You have control, right?

10   A     I have an ownership interest in --

11   Q     You can control, right?

12   A     Well, that is a -- to me, that is a legal conclusion, that

13   is a different determination.

14   Q     Okay.

15   A     I don't think I have control over SCBV.

16   Q     You don't think you have control?

17   A     I do not have it right now, no.

18   Q     Did you ever review any of the court proceedings or orders

19   out of the Netherlands Court?

20   A     I don't know specifically.  I do know that there was a

21   dispute as to who could exercise, I guess, control as the

22   director of SCBV.  And I believe the Court in Netherlands, over

23   Stream's objection, appointed Mr. Stastney as the director of

24   See -- SCBV, I believe.  That is a recollection from months

25   ago.
```

1   Q    So is Mr. Stastney in control?

2          MR. GEORGE:  Your Honor, I object.  Control is a

3   label --

4          THE COURT:  I am really confused about all of this.

5          MR. GEORGE:  -- matters.  I am sorry.

6          THE COURT:  He has got whatever he has got.  And

7   there is a corporate structure.  It sounds like he owns certain

8   equity interests.  And term, if you are asking about, like,

9   daily operations, it sounds like he is not in control of those.

10          What is the point of all of this questioning?

11          MR. THOMPSON:  Your Honor, I am getting there, right?

12   I am asking for --

13          THE COURT:  What is your point?

14          MR. THOMPSON:  My point is that there is control of

15   certain assets that ultimately are, that run to the benefit of

16   at a minimum, or are controlled by the Stream TV and

17   Technovative Debtors.

18          THE COURT:  And?

19          MR. THOMPSON:  And that matters for purposes of this

20   sale for reasons --

21          THE COURT:  Why?  Right.  So it is what it is.  I

22   mean, they own the equity interests.  They have the rights that

23   they have.  You are not the Buyer, so you are not asking about

24   clarification, so what is the objection?  What is the concern

25   here?

1           MR. THOMPSON:  Well, I am getting there, Your Honor.

2    I am trying to show that Mr. Homony has control over all of the

3    subsidiaries, and could take control so that he could actually

4    realize the assets and the value of those assets.  And control,

5    in this particular instance, the transfer of those assets.

6           THE COURT:  Yes, Mr. George?

7           MR. GEORGE:  Your Honor, I think this is all

8    irrelevant.  I am going to move to strike the testimony related

9    to this issue of control.

10          THE COURT:  I happen to agree.  I think it is

11   irrelevant.  I mean, you are trying to ask him questions that

12   would suggest that the Trustee has certain powers that you

13   would like to see him exercise, that he doesn't appear to

14   choose to exercise.  He wants to sell the assets that he has.

15   He wants to sell the shares of the subsidiaries as part of the

16   sale, so.

17          MR. THOMPSON:  Fine, Your Honor.  I will move on and

18   we will talk about the assets that he has.

19          THE COURT:  Okay.

20          MR. THOMPSON:  Your Honor, may I speak to this

21   objection?

22          THE COURT:  Excuse me?

23          MR. THOMPSON:  May I speak to this objection?

24          THE COURT:  Okay.

25          MR. THOMPSON:  The relevance, Your Honor, is that the

1   Trustee and the stalking horse bidder have routinely and

2   consistently made the point that this is an asset sale only of

3   stock in corporations.  And we just came across testimony that

4   the Trustee provided that there is bonding equipment that the

5   Buyer is getting by either directly the asset being owned by

6   Stream or by taking control of the entity SeeCubic B.V., which

7   owns the bonding equipment.  And either way, it affects a

8   transfer of ownership of the bonding equipment.  This concept

9   is going to be incredibly relevant throughout all of

10  Rembrandt's claims.

11          THE COURT:  Sure.  Well they wouldn't --

12          MR. THOMPSON:  We would --

13          THE COURT:  -- the bonding equipment for a while.

14  The bonding equipment is going to the Buyer, that is no

15  surprise.  He just clarified that is really the only hard

16  tangible property that is going to the Buyer that Stream owns,

17  correct, sir?

18          THE WITNESS:  Yes, correct.

19          THE COURT:  Yeah.  So yeah, okay.

20          MR. GEORGE:  And Your Honor, I think that further,

21  that this is just an effort to try to make it look like the

22  Trustee didn't do his job.  It is really an attack on him as a

23  person --

24          THE COURT:  Yeah.

25          MR. GEORGE:  -- and the job that he did here.

1          THE COURT:  And I don't see its relevance to the line

2  of questioning that you are pursuing with the Trustee right now

3  about, you know, who is the corporate structure or who is

4  controlling the daily operations.  I don't think any of that is

5  relevant.

6          MR. THOMPSON:  Your Honor, I have heard it and I will

7  move on.

8          THE COURT:  Thank you.

9          MR. THOMPSON:  I would only suggest that they will

10 become readily apparent why.

11         THE COURT:  Okay.

12         MR. THOMPSON:  All right.  So --

13         MR. GEORGE:  But Your Honor, if they become relevant,

14 it will be on another day, it won't be today because none of

15 this (simultaneous speech).

16         THE COURT:  All right, Mr. George.  Mr. George, I

17 understand.  Let's go.

18 BY MR. THOMPSON:

19 Q    Mr. Homony, you are familiar with the Stream operations

20 prior to the bankruptcy, correct?

21 A    Well, I wouldn't call them operations.  I am certainly

22 familiar with -- I don't believe Stream has really operated

23 since the omnibus agreement in 2020.

24 Q    So it did operate?

25 A    Prior to the omnibus date, they had operations --

1   Q    They had operations.

2   A    -- as far as I know.  Yes.

3   Q    Did they have operations in California?

4   A    I'm not sure that I paid much attention to the location of

5   the operations, et cetera.  It really was not a factor in my

6   evaluation of where we are today in 2024, and how to best move

7   these cases forward and provide a recovery for assets, so.

8   Q    Do they have assets in California?

9   A    When?

10  Q    Anytime.

11  A    Well, I --

12          THE COURT:  Well, who cares?  All that we care about

13  are assets now.  All right?  Are you asking questions --

14          MR. THOMPSON:  Well --

15          THE COURT:  -- about assets now in California?

16          MR. THOMPSON:  -- Your Honor, this is relevant.

17          THE COURT:  Okay.  So what is your point?

18          MR. THOMPSON:  I promise you it is relevant.

19          THE COURT:  Just tell me your point, sir.

20          MR. THOMPSON:  My point is that there were assets in

21  California.

22          THE COURT:  Uh-huh.

23          MR. THOMPSON:  There were servers in California.

24          THE COURT:  Uh-huh.

25  BY MR. THOMPSON:

1   Q    They were in -- they were Stream's servers and they had

2   Stream's production code on them.  Do you know about that, Mr.

3   Homony?

4   A    When?

5   Q    They had the -- this, they were on these servers in 2020.

6   They were as recently, I believe, as 2021.

7           MR. GEORGE:  Your Honor, is that testimony?  Because

8   that doesn't sound like a question.

9           MR. THOMPSON:  Well, again, I can't --

10          THE COURT:  Well, he was asking about what I asked

11  him.

12          MR. THOMPSON:  -- be asked to do it both ways, right?

13          THE COURT:  Okay.  But so why do we care about the

14  servers in California at some prior date that is no longer --

15          MR. THOMPSON:  Because it has property of the Stream

16  Estate on it, on those servers.  And there is source code,

17  there is production code created by Stream TV, Stream TV's

18  employees, Stream TV's engineers, and that was done with

19  Rembrandt's IT and trade secrets.

20          THE COURT:  Okay.  So -- yeah.  Yeah.  So this sounds

21  like a legal argument.  It doesn't sounds like --

22          MR. THOMPSON:  It -- I -- Your Honor, I am simply

23  trying to establish what this trustee, who is just represented

24  to this Court, there's only item of -- of -- one asset, a hard

25  asset.  There's more than one asset, and it --

```
1              THE COURT:  Okay.  Well --

2              MR. THOMPSON:  -- and --

3              THE COURT:  -- he just said that there's only one.

4   If you disagree, then we'll have to agree to disagree.

5              MR. THOMPSON:  I think I need to establish whether

6   this trustee -- I'll use Mr. George's words -- did his job to

7   investigate and marshal the assets, and I'm trying to probe

8   that.  I'm trying to test that proposition.  He suggested he

9   did.

10             THE COURT:  Well, he's -- you're talking about some

11  servers from California.  I don't really understand how it's

12  relevant.

13             Yes, Mr. George?

14             MR. GEORGE:  Your Honor, in addition, if there -- as

15  Mr. Homony testified -- if there are assets, wherever they are,

16  they're going to belong to the purchaser, and -- and that's the

17  facts of the matter.

18             There hasn't been a single fact established that

19  there are servers in California -- that there's anything on

20  them that's relevant to the hearing on approval of the sale

21  motion.  That's what we're here for today.

22             MR. THOMPSON:  Your Honor, I'm trying to find out

23  where -- what assets Mr. Homony knows about, and he's only told

24  us one.

25             THE COURT:  Yes.
```

```
 1              MR. THOMPSON:  And if that's -- if his answer is --

 2              THE COURT:  That's the one --

 3              MR. THOMPSON:  -- I didn't investigate --

 4              THE COURT:  -- that's the one.

 5   BY MR. THOMPSON:

 6   Q    Did you do any investigation of any other assets, hard

 7   assets or intellectual property assets, for the -- for the

 8   estate.

 9              MR. GEORGE:  Objection to form, Judge.  It's

10   compounded because he lists the two together.  He already

11   testified there wasn't any, like, intellectual --

12              THE COURT:  I think you've already asked him, and he

13   already said the only tangible property that he's investigated

14   is the bonding equipment.  That's it.

15              MR. THOMPSON:  Okay.  So that's the only

16   investigation.

17   BY MR. THOMPSON:

18   Q    Mr. Homony, did you have a meeting with Mr. Rajan, Ms.

19   Menine and their former counsel from Lewis Brisbois, who is no

20   longer counsel at the time, in -- on March 7th, 2024?

21              MR. GEORGE:  Objection, Your Honor, to the extent

22   that there's facts that are stated in that question that aren't

23   in evidence.  He's saying that Lewis Brisbois was not VSI's

24   attorney.  We disagree with that wholly.

25              THE COURT:  Okay.  Do you have any recollection of
```

```
 1   this March meeting, sir?

 2            THE WITNESS:  I do.  I believe it's the -- yes.  I

 3   do.

 4   BY MR. THOMPSON:

 5   Q    During that meeting, did you make representations to the

 6   VSI team that they were the subject of a civil conspiracy?

 7   A    No.

 8   Q    You didn't say that?

 9   A    Absolutely not.

10   Q    Okay.  Were you shown a list of assets that needed to be

11   returned to Stream TV?

12   A    I believe they identified certain assets they -- they

13   believe were not returned in connection with the Delaware

14   Chancery Court matter.

15   Q    They included displays; did they not?

16            THE COURT:  If you don't remember, it's okay.

17            THE WITNESS:  I don't recall.

18   BY MR. THOMPSON:

19   Q    Phones?

20   A    I don't recall specific assets that they may have

21   identified.

22   Q    You don't remember any of the assets on that list?

23   A    I remember they provided a list.  I just don't remember

24   today the specificity.

25   Q    Were you -- were you aware that there was an obligation to
```

 1   return assets to the Stream TV estate from Hawk and -- and

 2   SeeCubic.  SeeCubic, Inc. -- excuse me -- to be more precise.

 3   A    I try -- I'm trying to recall exactly the legal position

 4   of the -- of -- of the Delaware Chancery Court matter when I

 5   was appointed as a trustee here.  I know there was an order

 6   that required, I believe, the return of assets that SeeCubic

 7   had under the prior omnibus that was ultimately overturned.  So

 8   again, I know -- I know VSI's argument was there were assets

 9   that were never returned to Stream that should have been.

10   Q    What did you do with that list of assets that they had

11   given you?

12   A    Well, I think I took it under advisement.  I mean, at the

13   time, you have to appreciate this case and -- and the -- the

14   fighting and the unknowns at the time that I was appointed and

15   trying to figure out where the most valuable assets are.

16   Right?  And so there can be assets, some of which have the

17   minimus value, some have no value, some are a burden, and so, I

18   think, I identified the most valuable assets and have proposed

19   to sell them.  And so could there be other assets out there

20   that are not specifically identified?  Of course.  And that --

21   that is under the broader description in the APA that provides

22   for a sale of both known and unknown assets to the extent they

23   fall in those categories described in the APA.

24   Q    You don't quite remember what was on that list, but could

25   it have had software?

```
1              MR. GEORGE:  Objection, Your Honor.  He asked him to

2   speculate.

3              THE COURT:  Yeah.  He's already answered the

4   question.

5              MR. THOMPSON:  Okay.

6   BY MR. THOMPSON:

7   Q    So I think what you said in response to my question about

8   what you did was to find the -- was to identify the most

9   valuable assets.  Do you not think that software code for a

10  technology company was a value asset -- valuable asset?

11             THE COURT:  Okay.  He --

12             MR. GEORGE:  Your Honor, objection.

13             THE COURT:  -- already answered the question.

14             MR. GEORGE:  It hasn't been established that --

15             MR. THOMPSON:  I -- I didn't ask that question, and

16  I --

17             THE COURT:  You asked him --

18             MR. THOMPSON:  Asked him to --

19             THE COURT:  -- if he identified the most valuable

20  assets and if there's something there that, you know, that

21  he -- that wasn't on that, then he didn't conclude that it was

22  very valuable.

23             I have to admit, sir, I really feel like what you're

24  doing here is you're trying to make legal argument, and I

25  simply don't want to hear it.  What are the factual questions
```

```
1   that you have --

2            MR. THOMPSON:  I'm trying to establish --

3            THE COURT:  -- related to this --

4            MR. THOMPSON:  -- Your Honor, what assets this

5   trustee knew about and did not know about.

6            MR. GEORGE:  And -- and why is that relevant, Judge,

7   if all of the assets are being transferred?  Wherever they are

8   in an --

9            THE COURT:  I agree with Mr. George.

10           MR. THOMPSON:  It matters.  It matters because the

11  condition of those assets, if they are encumbered by licenses,

12  that --

13           THE COURT:  Yes.

14           MR. THOMPSON:  -- the trustee does not --

15           THE COURT:  -- and you're going to sue them.  I get

16  the point, yes.

17           MR. THOMPSON:  Your Honor, I think it's more than

18  that, but --

19           THE COURT:  Yeah.  So what is it?  You want to sue

20  them.  I get it.

21           MR. THOMPSON:  It's -- it's not --

22           THE COURT:  But what's --

23           MR. THOMPSON:  -- it's -- it's not about that.

24  It's --

25           THE COURT:  It's a sale issue, just tell me --
```

1            MR. THOMPSON:  Because Your Honor, it cannot be sold

2  free and clear that way.  They do not have 363(f) rights, and

3  they certainly don't have it to -- for this stalking horse.

4            THE COURT:  And that's your legal argument, and I

5  will take that under advisement.

6            MR. THOMPSON:  Your Honor, I understand.  I am trying

7  to adduce the facts that demonstrate that.  That's all.

8            THE COURT:  No.  Okay.  It's not facts.  It's legal

9  argument.  I completely disagree with you, sir.  Okay.  So --

10            MR. THOMPSON:  I -- you know, I -- okay.  I -- I've

11  heard -- I've heard the Court, and I will try to move on.

12            THE COURT:  Okay.

13            MR. THOMPSON:  All right.

14  BY MR. THOMPSON:

15  Q    Mr. Homony, during that meeting, were you presented with

16  purchase orders that were --

17            THE COURT:  Why are we talking about this?  Why are

18  we talking about what was discussed at the meeting?

19            MR. THOMPSON:  Your Honor, that would have been an

20  asset of the estate.

21            THE COURT:  Okay.  So all of the assets that they own

22  are being transferred to the buyer, so I don't understand how

23  it's relevant to talk about what assets were discussed at that

24  meeting or were not.  Explain that to me.  Why is that

25  relevant?

```
 1              MR. THOMPSON:  Because this trustee had an obligation

 2   to maximize the value for all state creditors.

 3              THE COURT:  Right.  And he said he identified the

 4   most valuable assets.  And --

 5              MR. THOMPSON:  Okay.  Your Honor, if I have -- may

 6   have a moment, maybe we can --

 7              THE COURT:  Yeah.

 8              MR. THOMPSON:  -- cut this short, and let Mister --

 9              THE COURT:  Great. Thanks.

10              MR. THOMPSON:  Your Honor, in the -- in the interest

11   of trying to be briefer.  We will -- I'm -- I will pass to

12   Mr. Michaels.  Thank you.

13              MR. MICHAELS:  Just -- our exhibits, we have binders

14   and -- and copies that we provided opposing counsel.  I can

15   give them to the Court.  Some of these are not premarked

16   because we had to print them this morning, and I just had them

17   in a hurry because they dealt with cross for the -- for the

18   decks, but I'll -- I'll come hand them up if that's okay, if I

19   can approach?

20              THE COURT:  Okay.

21              MR. MICHAELS:  And there's -- there's a couple here

22   that I think we'll just hand up when we bring them up --

23              THE COURT:  Okay.

24              MR. MICHAELS:  -- if that's okay.  They're not in

25   this.
```

 1            MR. GEORGE:  Your Honor, I just want to point out

 2   that Mr. Michaels is listed as a witness in the witness list,

 3   so I -- who's telling the truth here?  Is he a lawyer?  Is he a

 4   witness?  Is he both?  I mean, you know, this game that's being

 5   played here --

 6            THE COURT:  Well, who's being called as a witness?  I

 7   thought we're --

 8            MR. GEORGE:  In the -- in the witness list in the

 9   documents that we just received.

10            THE COURT:  We have him and we have Scott Victor.

11   Those are the witnesses for today.

12            MR. MICHAELS:  Your Honor, we brought witnesses

13   today.  That's what you --

14            THE COURT:  I don't -- okay.  So why do I need to

15   hear from any witnesses from your side?

16            MR. MICHAELS:  What's that?

17            THE COURT:  Who am I hearing from?  Give me an

18   example.

19            MR. MICHAELS:  Stephen Blumenthal.

20            THE COURT:  And why do I need to hear from him?

21            MR. MICHAELS:  Your Honor, we were told at the June

22   5th hearing by you that -- that the timeframe for discussing

23   our assets that are being -- attempted to be included in the

24   transfer and sale, that this was the hearing that we should

25   prepare for and bring our arguments.

1              THE COURT:  All right.  But I'm just talking about

2      legal argument.  I don't need to hear from witnesses.  You've

3      briefed all of your legal arguments.  That's what I care about.

4              Thanks.

5              UNIDENTIFIED SPEAKER:  Okay.

6              MR. GEORGE:  And Your Honor, Mr. Blumenthal is not on

7      the list of witnesses.  Mr. Michaels is, the lawyer, but

8      Mr. Blumenthal --

9              MR. MICHAELS:  All right.  I mean --

10             MR. GEORGE:  -- which one is he here today?

11             THE COURT:  All right.  All right.

12             MR. MICHAELS:  Your Honor, I'm not going to be able

13     to scream over Mr. George.  Can I --

14             MR. GEORGE:  I'm not screaming.  I'm just making a

15     point.

16             THE COURT:  Yeah.

17             MR. MICHAELS:  Okay.  What he's referring to is a set

18     of documents handed to him by VSI.  That's not our witness

19     list.  We -- we're calling one witness.

20             THE COURT:  Yeah.  Okay.

21             MR. MICHAELS:  Stephen Blumenthal.

22             THE COURT:  I don't really -- so who's the witness

23     that you want to call, sir?

24             MR. MICHAELS:  Stephen Blumenthal.

25             THE COURT:  Yeah.  And what is he going to testify

1    to?

2          MR. MICHAELS:  He's going to testify to the assets

3    that we have in this estate and how easy it is to determine

4    that our assets are being transferred and where they're found.

5          THE COURT:  Okay.  And I don't need to hear from that

6    witness today, and I'm not going to hear from him today.  I'm

7    happy to hear all the arguments that you've listed in your

8    briefs, but I'm not taking testimony from that gentleman.  I

9    don't need that for part of the sale process.

10          The assets are what they are.  They've listed them.

11   I mean, let's face it.  The assets are mostly equity, right?

12   There's one piece of hard asset.  The rest of this is -- deal

13   is equity.

14          MR. MICHAELS:  Your Honor, with respect, we followed

15   your instructions in understanding that this was going to be

16   our day to bring our evidence, and the rug's being pulled out

17   from under us.

18          I -- I -- I stand dumbfounded that we couldn't rely

19   on this Court's statements that this was going to be our --

20          MR. GEORGE:  Well, Your Honor --

21          THE COURT:  But the statements I made in the prior

22   hearing specifically were that you should put in your brief to

23   the objection to the sale every legal argument you have about

24   the licenses.  This is like your main argument, right?  So you

25   did that.  You gave the briefing, and we're looking at the

```
 1  briefing, and we've seen their responses, and we're going to

 2  take everything under advisement.

 3              So it's a legal issue.  I don't understand how this

 4  is a --

 5              MR. MICHAELS:  Let me ask just a procedural question.

 6  Are you saying that our declaration submission by Stephen

 7  Blumenthal is being taken into evidence?

 8              THE COURT:  I will take that into evidence.

 9              MR. MICHAELS:  All right.  Can I proceed with --

10              THE COURT:  Yes.

11              MR. MICHAELS:  -- cross?  Okay.

12              MR. MICHAELS:  This is -- again, I -- we received

13  their declarations at past 5:00 p.m.  I'd already arrived --

14              THE COURT:  Okay.  It can't be a surprise, right?

15              MR. MICHAELS:  What's that?

16              THE COURT:  We all -- it can't be a surprise.  We

17  know the sale process, right?  We understand what happened.

18              MR. MICHAELS:  Your Honor, I'm only apologizing for

19  not marking the exhibits.

20              THE COURT:  Okay.  That's fine, not a problem.

21              MR. MICHAELS:  Right.

22              MR. GEORGE:  What are you marking it?

23              MR. MICHAELS:  This is --

24              MR. GEORGE:  No.  What are you calling it?  The

25  number.
```

```
 1                    MR. MICHAELS:  What?

 2                    MR. GEORGE:  Just call it Rem.

 3                    MR. MICHAELS:  Rembrandt Exhibit 1.

 4                    THE COURT:  Okay.  We'll do --

 5                              CROSS-EXAMINATION

 6   BY MR. MICHAELS:

 7   Q    Mr. Homony, do you recognize the document we've put before

 8   you?

 9   A    Yes.  It looks like the teaser sent out by my investment

10   banker, SSG.

11   Q    Okay.  Can you jump to the assets overview?

12   A    Okay.

13   Q    In that section, does it describe that the assets include

14   Ultra-D technology?

15   A    Yes.

16   Q    Does it provide a list of the features and diverse

17   applications of the technology?

18   A    There's a -- a heading that describes the unique features

19   in diverse applications of technology, yes.

20   Q    And are the things listed under that heading, would you

21   agree that those are features and diverse applications of the

22   technology?

23                    MR. GEORGE:  Objection to form, Your Honor.  To the

24   extent he knows.

25                    THE COURT:  Okay.
```

```
 1              MR. MICHAELS:  I -- I am --

 2              THE COURT:  Well, it says what is says, so what is

 3    the question?

 4    BY MR. MICHAELS:

 5    Q    Do you agree with what it says?

 6    A    I -- I don't know the technology at -- at the, kind of,

 7    level that would --

 8              THE COURT:  Wasn't this prepared by Scott Victor?

 9    Right -- was this?  Yeah.  Okay.  So --

10              MR. GEORGE:  So he's going to be a witness.

11              THE COURT:  Yeah.

12              MR. MICHAELS:  I mean, he can say, I don't know.  I

13    had no -- no hand in preparing this.

14              THE COURT:  Okay.  Fine.

15              MR. MICHAELS:  That -- that's the answer.

16              THE COURT:  So you didn't --

17              THE WITNESS:  No.  No.  I -- I did not prepare it.

18              THE COURT:  Yeah.  Okay.

19              THE WITNESS:  I reviewed it before it went out.

20    BY MR. MICHAELS:

21    Q    Do you recall getting lists of questions from Rembrandt

22    regarding the status of certain software?

23    A    I -- I know we've engaged with Rembrandt numerous times

24    since my appointment.  I know Rembrandt has provided certainly

25    lots of things with respect to their position in -- in terms of
```

1    their alleged intellectual property.  We certainly met with

2    Rembrandt.  We even put Rembrandt in direct contact with SEBV's

3    engineering team.

4    Q    Uh-huh.

5    A    I was a party to that meeting in which there was a lot of

6    back and forth, questions about the source code the technology,

7    how it's housed, et cetera.

8    Q    So you brought up the very next thing I was going to, so I

9    appreciate that.  In that meeting, do you recall Rembrandt

10   questioning the Eindhoven (phonetic) team whether they were

11   using a modern version controlled software management system?

12   A    I don't recall that specifically, no.

13   Q    So when you set up that meeting, did you feel that you, in

14   your power as trustee, that you had authority to ask the

15   Eindhoven team to meet with Rembrandt at your direction?

16   A    I have authority to task anybody to -- to meet with

17   anybody.

18   Q    Okay.  So was it within your authority to ask them to

19   provide further information:  Number of files, file names,

20   etcetera, for the source code that was on the secure server

21   that you've listed in your asset list?

22        MR. GEORGE:  Objection to form, Your Honor.  It

23   assumes facts not in evidence.  There's no indication that

24   there was source code on any of those servers that Rembrandt

25   has an interest in.

```
 1              MR. MICHAELS:  You're -- with respect, the APA lists

 2   the -- that as an asset.  It's -- the exact words are, Source

 3   code on a secure server.

 4              THE COURT:  Okay.

 5              MR. MICHAELS:  I mean, if he doesn't know that, then

 6   the asset list is inaccurate.

 7              THE COURT:  Okay.  And what --

 8              MR. GEORGE:  I believe that's --

 9              THE COURT:  -- my questions are --

10              MR. GEORGE:  I'm sorry, Your Honor.

11              THE COURT:  I just -- I'm so confused because, I

12   mean, the assets are what they are.  Are you trying to make the

13   same point that he was trying to make about, you know, what is

14   the point about the assets?  The assets have been listed on the

15   schedule to the assets of purchase agreement, so what is the

16   relevance of your line of questioning, sir?

17              MR. MICHAELS:  The -- the relevance is whether he --

18   if there's an asset listed, does he know where is, as is, for

19   that -- for that asset, right?

20              UNIDENTIFIED SPEAKER:  Your Honor --

21              MR. GEORGE:  Your Honor, I -- I just want to object

22   to this because the only source code and -- and -- and servers

23   are in SeeCubic B.V. a non-debtor.  Stream doesn't have any of

24   those assets, and they weren't listed.  There was no scheduled

25   source code.
```

1              MR. THOMPSON:  Objection.  He's testifying, Your

2     Honor.

3              THE COURT:  Okay.  Well, I'm going to clarify that

4     the assets that are being sold are on the schedules.  They're

5     either on there or they're not, so I don't want to talk about

6     it.  It's there or not, right?

7              MR. GEORGE:  But what I -- and what I'm objecting to

8     specifically is Mr. Michaels trying to make it appear that

9     we're selling assets in SeeCubic B.V.

10             THE COURT:  Right.  They're only -- you're only

11    saying they're shares.  Yeah.  Right.

12             MR. GEORGE:  And the assets that were -- excuse me --

13    the assets that were listed as to B.V. were listed at the

14    Court's instruction that we list the downstream assets, so the

15    question was inappropriate.  He knows it is, but he asked it

16    anyway.

17             MR. MICHAELS:  With respect, I don't believe it's

18    inappropriate.  We are asking about an asset listing on their

19    schedule.

20             THE COURT:  Okay.  But --

21             MR. MICHAELS:  And -- and -- and if I may, Your

22    Honor.  The -- the asset isn't shares in a corporation that may

23    have control of some software.  Stream listed as its asset,

24    Source code on a secure server, not held in some other

25    corporate entity, Source code on a secure server, and I'm

1   asking, what is that?  What -- where is it?  What is it?  And

2   that's -- I think that's a perfectly valid question about the

3   assets that are subject to this asset.

4           MR. GEORGE:  If he has a document that reflects that,

5   he should show the witness because I don't believe there's any

6   such doc.

7           UNIDENTIFIED SPEAKER:  Do you guys have the APM?  Is

8   that in the -- in the folder you have there?

9           MR. MICHAELS:  It's on the list of assets on the

10  beginning of the schedule --

11          UNIDENTIFIED SPEAKER:  Okay.  Well, if we're just --

12          THE COURT:  She's trying to understand what you're

13  asking.

14          MR. MICHAELS:  I'm asking --

15          THE COURT:  I know, just show us the document.

16          MR. MICHAELS:  We have -- we have an electronic --

17          UNIDENTIFIED SPEAKER:  You don't have an APA in

18  printed form; do you not?

19          MR. MICHAELS:  No.  Okay.

20          THE COURT:  So --

21          MS. RUSSELL:  Your Honor?

22          THE COURT:  Yes.  Who is this speaking?

23          MS.  RUSSELL:  This -- this is Alyssa Russell from --

24  from Skadden along with -- with Marley.  I'm on the phone here

25  representing SeeCubic.

1              I was just -- further the objection here to the

2      relevance as the APA makes clear Rembrandt's IP and any

3      physical assets that contain its IP to the extent it's found

4      valid and existing and enforceable, they're excluded assets.

5      We -- we don't think any of this is relevant here today.

6              MR. MICHAELS:  We certainly care about Rembrandt's

7      assets, but I'm asking about their schedule on the APA that is

8      here to be approved in the sale to be approved, and asking,

9      What is the source code?  Where is the source code?  With

10     respect, they've said that they're --

11             MS. RUSSELL:  The -- we appreciate your effort to --

12     to conduct this diligence, but -- but the stalking horse

13     purchaser has conducted their diligence and we are comfortable

14     taking these assets on an as is, where is basis, and, again,

15     don't -- don't believe this line of questioning is relevant.

16             THE COURT:  I'm inclined to agree with her.

17     BY MR. MICHAELS:

18     Q    The -- how is it that you determined that intellectual

19     property belonging to Rembrandt, Phillips, or any other third

20     party were not on the source code on a secure server --

21             THE COURT:  Okay.  I'm -- this is the legal argument.

22     You're talking about, you know, the fact that you think that

23     the sale is impermissible because it's infringing upon your

24     rights.  I get that.  It's a legal argument.

25             I don't want to hear any questions about that.  The

 1    assets are what they are.  The only person who's bid upon them

 2    has done their due diligence, and to the extent that you

 3    believe that the sale is going to violate your rights, you can

 4    bring whatever litigation you want.  We simply are going to

 5    have to agree to disagree on this matter, sir.

 6            I don't want to hear any more questions about the

 7    assets.  The assets are what they are.  They're on the

 8    schedules.  The buyer has done their due diligence, and you can

 9    make whatever legal argument you want to make, but I don't need

10    to hear any questions about it.  It's simply not relevant.

11            Okay.  So I think we're done with you, sir.

12            Mr. Victor, do you want to come up here?

13            MR. GEORGE:  Your Honor, do you want to proffer or

14    just --

15            THE COURT:  On Mr. Victor?

16            MR. GEORGE:  Yeah.

17            THE COURT:  Quickly.

18            MR. GEORGE:  Okay.

19            THE COURT:  Come on, Mr. Victor.  Come on up here.

20            Thanks, sir.

21            THE WITNESS:  Would you like --

22            THE COURT:  You can leave that.

23            MR. GEORGE:  Your Honor, in accordance with this

24    declaration, he would testify that SSG was retained to market

25    the stream assets, as well as the equity interest held by

1   Technovative Media in the following companies:  Technology

2   Holdings Delaware LLC, Media Holdings Company LLC, Ultra-D

3   Ventures CV a Kirkcow (phonetic) entity that pers retention

4   approved by this Court, SSG conducted a robust marketing of the

5   assets, contacted over 500 potential purchasers, solicitation

6   including everyone from television networks to OEM

7   manufacturers, to financial purchasers, that SSG and its staff

8   created a data room and in it was sales information populated

9   by documentation for the veteran trustee.

10          The following in a procedures hearing, SSG sent out a

11  second teaser with the comments of Rembrandt and BSI contained

12  and that the additional teaser did not generate any additional

13  interest in the assets being sold.  Only one party accessed the

14  data room as of December 2nd, '24; there have been no other

15  bids on the assets, that the stalking horse offer provides

16  substantial benefit to the estate and in his opinion, the

17  stalking horse offer ties to the best offer that could be

18  obtained, under the circumstances, for the asset.

19          THE COURT:  Thanks, Mr. George.

20          Tashay, can you swear our witness in?

21              J. SCOTT VICTOR, WITNESS, SWORN

22          THE COURT:  Okay.  You want to ask Mr. Victor -- oh,

23  sorry.

24          THE WITNESS:  Yes, J. Scott Victor, V-I-C-T-O-R.

25          THE CLERK:  Thank you.

1            THE WITNESS:  300 Bar Harbor Drive, West Conshohocken

2    in Pennsylvania, 19428.

3                           DIRECT EXAMINATION

4    BY MR. SWICK:

5    Q    Good afternoon, Mr. Victor.  How are you?

6    A    Good, how are you?

7    Q    Good.  I'm Adam Swick with Akerman on behalf of VSI.  Talk

8    about your role; how are you retained in this matter?

9    A    I was retained by the Chapter 11 Trustee, on behalf of my

10   firm, SSG advisors, to run a sale process for the debtor's

11   assets.

12   Q    All right.  How did you become familiar with the debtor's

13   assets?

14   A    We were first aware of the debtor's assets when we were

15   hired by the secured creditor in the fall of 2022, to run an

16   Article IX process which was stayed by order of the Chancery

17   Court of Delaware.

18   Q    I -- and who was the secured creditor that you referred

19   to?

20   A    Hawk and SeeCubic.

21   Q    Okay.  And that's -- SeeCubic is the purchaser for here

22   today, correct?

23   A    One of them.  Yes.

24   Q    Let's -- so when you were engaged, what were your duties

25   when you were engaged?

1   A      By the trustee?

2   Q      Correct.  Yes.

3   A      To reengage, understand the -- what was going on since our

4   engagement with the secured creditor terminated in January of

5   2023.  We became familiar, we read up on all the litigation

6   that had occurred since our termination.  And our job was to

7   put together a sale process for the assets of the debtor,

8   including the equity interest of the subsidiaries, held by

9   Technovative, and to put together a teaser, get information to

10  populate a data room, and to come up with a world-wide buyer

11  list to maximize the value of these assets.

12  Q      All right.  So how did you come up with your world-wide

13  buyer list?

14  A      I had my team do research, as they do on every deal, and

15  come up with a buyer's list of strategic, operational financial

16  buyers that may be interested in this technology.

17  Q      All right.  We're going to do --

18             MR. SWICK:  Did that work, Your Honor?

19             THE COURT:  Yeah.

20             MR. SWICK:  All right.  Let's just label it VSI

21  Exhibit 1, it's Mr. Victor's declaration that was filed last

22  night.

23             Mr. THOMPSON:  It's also --

24             MR. SWICK:  Huh?

25             Mr. THOMPSON:  It's also RT2.

1          MR. SWICK:  Oh.

2          Mr. THOMPSON: Scott's declaration.

3          THE COURT:  No.

4          MR. THOMPSON:  This seat's really low, Your Honor.

5          MR. SWICK:  My seat's really low, too, if that's what

6  you're saying.

7  BY MR. SWICK:

8  Q     All right.  Would you please take a look at paragraph 20?

9  A     Paragraph 20, you say?

10  Q     Yes.

11  A     Yes.

12  Q     All right.  So it says that you reached out to 550

13  prospective buyers around the world; what does "reached out"

14  mean?

15  A     It means that the teaser that we prepared, that I believe

16  you showed Mr. Homony here, which was Rembrandt 1, was sent out

17  to these 550 buyers that we came up with that we reviewed with

18  the trustee and his team as potential buyers.  So that teaser,

19  along with an email, was sent out to those 550 and follow-up

20  calls to all of them.  That's how we reach out in the sale

21  process.

22  Q     Okay.  And did -- and no one expressed any interest

23  besides VSI and Jacob -- I forgot his last name, but at

24  Continental?

25  A     Continental Energy, yes.  So no one signed an NDA other

```
 1   than VSI and Continental advisors, which was an alleged

 2   investor into VSI; but we had multiple conversations with

 3   multiple potential strategic buyers who ultimately passed

 4   without even signing an NDA.

 5   Q    So how many -- you said multiple, can you give me an

 6   approximation of how many?

 7   A    Dozens.

 8   Q    Dozens.  But no one went the next step for an NDA?

 9   A    No one.

10   Q    Did Rembrandt ever express any interest in purchasing the

11   debtor's assets?

12   A    Not to us directly, but I believe maybe to the trustee and

13   trustee's counsel, but no, I never had any direct reach-out by

14   Rembrandt, ever.

15   Q    Okay.  So even though they reached out to, at least, the

16   trustee or trustee's counsel, did you send them that teaser

17   went you sent it out to the 550 people?

18   A    I don't know.

19   Q    Did you send the teaser to VSI when you sent it out to

20   those 550 people?

21   A    Well, VSI was already under NDA and we gave VSI access to

22   the data room and provided additional diligence to VSI's

23   representative, Bud -- I can't remember his last name at this

24   moment, but he requested several additional pieces of

25   information including the cash burn rate at SeeCubic BV, which
```

```
1   we gave him, literally, up until the last minute.

2   Q    No, I understand that.  But my question was, did you

3   provide VSI with the teaser when you sent it out to the 550

4   parties?

5   A    I don't think so.

6   Q    Okay.

7   A    But I can't be sure.

8   Q    So the Continental Advisory firm that we talked about, did

9   you send the teaser to them?

10  A    We did send the teaser to them, as well as the NDA, which

11  they signed.

12  Q    But did you send the teaser to them when you sent it out

13  to the 550?

14  A    They were not included in the 550, no.

15  Q    And then we've -- there's been a plan on file now, it has

16  just been for a couple of days, but the plan sponsor is an XD

17  called CanAm Financial in Canada.  Have you ever heard of them

18  before?

19  A    What's the name?

20  Q    Can -- C-A-N-A-M.

21  A    No.

22       MR. GEORGE:  Your Honor, can we just have an offer of

23  proof of the relevance of what's in that plan?

24       THE COURT:  Yeah, I don't -- well, the plan is not at

25  issue for today.
```

 1              MR. GEORGE:  Right.

 2              MR. SWICK:  Well, we have some -- it's -- all I want

 3    to prove is there was an entity that has interest in these

 4    debtor's assets, that I don't think got the teaser or was

 5    contacted by Mr. Victor.

 6              THE COURT:  Did you -- sounds like you know them,

 7    though, because they're part of the plan?

 8              MR. SWICK:  They're the plan sponsor.  Yeah.

 9              THE COURT:  Did you not give them the teaser?

10              MR. SWICK:  I -- well, we have now.  Into this

11    process.

12              THE COURT:  Okay.  Well, are you saying that they're

13    a potential interested bidder on these assets?

14              MR. SWICK:  They're not going to -- we don't want a

15    bid, we have a plan on file.

16              THE COURT:  Oh, okay. All right.

17              MR. SWICK:  Yeah.

18              THE COURT:  So but what's the relevance of Mr.

19    Victor's --

20              MR. SWICK:  Because CanAm is interested in spending,

21    like, $300 million on these debtors.

22              THE COURT:  How is that relevant to what Mr. Victor

23    was hired to do?

24              MR. SWICK:  Well, he was hired to go find people who

25    want to spend money on the assets and he didn't contact them or

1    know who they were --

2              THE COURT:  Mr. Victor --

3              MR. SWICK:  -- or another part of the bids --

4              THE COURT:  -- contacted over 500 people, I think

5    that's pretty impressive.

6              MR. SWICK:  No, and not only that, Your Honor --

7              THE COURT:  And if you knew of someone that might be

8    a potential interested buyer, I would think you'd forward all

9    that information along to them.

10             If your point is that Mr. Victor didn't send a teaser

11   to this person who is part of your plan, I don't really see how

12   that's relevant if you, you know, he -- he did a good job.  He

13   sent it out to 500 people, and he didn't get any response.  So

14   any other questions?

15             MR. SWICK:  Yeah, I have more questions, Your Honor.

16             THE COURT:  Okay.

17   BY MR. SWICK:

18   Q    All right.  Mr. Victor, let's look at paragraph -- I'm

19   sorry, just give me one second.  Go to paragraph 11.

20   A    Yes.

21   Q    All right.  So we're just going to read it out loud, it's

22   a short paragraph, just to save time.

23             "I met with VSI representatives who, after an

24             extensive discussion of SSG's approach to marketing

25             the debtor's assets, were satisfied that I could

1              perform the services of an investment banker fully

2              and without conflicts.  VSI withdrew its objections

3              to SSG's retention."

4         Did I read that correctly?

5  A    Yes, you did.

6  Q    All right.  Is that totally correct, Mr. Victor?

7  A    It is correct because I spoke with counsel for VSI who's

8  here at the table today, along with his colleagues.  They had

9  objected to our retention, claiming that we had a conflict

10 because we were retained in the fall of 2022 to do an Article

11 IX sale for the secured lender; they objected; we had a phone

12 call, probably two; and they withdrew the objection.

13         MR. SWICK:  May I approach, Your Honor?

14         THE COURT:  Yep.  Thank you.

15 BY MR. SWICK:

16 Q    So Mr. Victor, this is an email from Mr. Thompson to Mr.

17 Coren, Michael Vagnoni, and Ed George.  I want to direct your

18 attention to paragraph 2.  Okay?  I'm going to read this out

19 loud, too.

20         "Moreover, we believe we, in the trustee, were

21         negotiating good faith regarding VSI's proposed plan

22         of reorganization.  And thus, we agree to one,

23         withdraw VSI's objection to SSG's engagement; two,

24         postpone the hearing on our motion to compel and your

25         motion to quash originally set for September 18th to

1              November 7th, simultaneously resetting the trustee's

2              motion to withdraw and VSI's motion for

3              reconsideration.

4              "However, within a few short days of postponing the

5              hearing, the trustee reversed its prior commitments

6              with respect to VSI's plan, rejected VSI's proposed

7              full payment plan, and filed an expedited sale and

8              good procedures motion."

9              Did I read that correctly?

10             MR. GEORGE:  Your Honor, I'm going to object.  This

11  is a hearsay document; Mr. Victor's not copied on it.

12             THE WITNESS:  I'm not copied.

13             THE COURT:  Yeah.  Well --

14             THE WITNESS:  I don't know if I've ever seen this.

15  But okay, you've read it.

16             THE COURT:  Okay.  So I'm going to sustain that

17  objection.  He's not part of this.

18             MR. SWICK:  Okay.

19  BY MR. SWICK:

20  Q    Were you part of any conversations where the attorneys in

21  this case and you were involved and mentioned and said hey,

22  we're going to withdraw this objection under certain conditions

23  that weren't just based on your qualifications?

24  A    No.

25  Q    No recollection whatsoever?

```
 1   A     None.

 2   Q     Okay.  Let's go back just a little bit and talk about your

 3   previous retention involving these parties and these assets,

 4   back in -- I think you said it was 2020 for SeeCubic and Hawk?

 5   A     The fall of 2022.

 6   Q     Oh, 2022.  Okay.  How were you approached for that

 7   representation?

 8             MR. GEORGE:  Your Honor, I'm going to object to the

 9   relevance of this.

10             THE COURT:  Yeah.  What's the relevance of this?

11             MR. SWICK:  The relevance, Your Honor, is that we

12   have a sale process where no one has expressed any real

13   interest, the assets are going to the entity that held all of

14   the assets, weren't retained by the trustee, and no one could

15   even bid on the assets.  And so -- and then the investment

16   banker who did all of the solicitation was previously hired by

17   the Hawk parties and that's who these assets are going to

18   who've always retained them this entire time.

19             So the process -- this is going into legal argument

20   so I know exactly where you're going to go --

21             THE COURT:  I know.  Uh-huh.  That's right.

22             MR. SWICK:  -- so I'm going to -- that is, once

23   again, factual predicate for the legal argument, which is where

24   we are.

25             THE COURT:  Okay.  I'm going to sustain the
```

```
 1   objection.

 2            MR. SWICK:  All right.

 3            No further questions.

 4            THE COURT:  All right.  Anyone else?

 5            MR. VAGNONI:  Can we go off of Rembrandt Exhibit 1,

 6   the market excel sheet.  Do you have that up there?

 7            THE WITNESS:  I have it.

 8            THE COURT:  Okay.

 9            MR. VAGNONI:  All set?

10            THE WITNESS:  Yes.

11                         CROSS-EXAMINATION

12   BY MR. VAGNONI:

13   Q    Okay.  So this document, can you describe for me how it

14   was created?

15   A    Yes.  My team created this one-page teaser which is

16   standard operating procedure to sell a company.

17   Q    Okay.

18   A    Or to finance a company, or whatever.  But a one-page

19   teaser is standard operating procedure in the hundreds and

20   hundreds of sales that I have done.

21   Q    Okay.  Thank you.  The assets overview section, who

22   provided you the information to write that section of the

23   teaser?

24   A    My team put it together, speaking with, specifically, the

25   engineering team in the Netherlands.
```

1  Q    Okay.

2  A    At SeeCubic BV.

3  Q    So this mentions the license with Phillips; do you see

4  that reference?

5  A    Yes.

6  Q    Did your team read the Phillips licensing agreement?

7  A    We had it, yes.

8  Q    But in the 550 --

9  A    In fact, it's in the data room.

10 Q    Right.  So in terms of the 550 companies, or entities,

11 that you contacted, did you reach out to the 23 or so licensees

12 in that Phillips agreement that are basically working in the

13 same technology?

14       MR. GEORGE:  Your Honor, I have an objection here.

15 He doesn't represent Phillips.  Leia, who, I understand is a

16 successor to Phillips is on the telephone.  So I don't

17 understand what standing he has to raise questions about the

18 Phillips license.  He's not the licensor, doesn't have any

19 interest in it.  He may -- his company may be a licensee, but

20 there are many of them out there.

21       THE COURT:  Sustained.

22       MR. VAGNONI:  Your Honor, I'm not asking about -- I'm

23 asking -- the companies he contacted, there's a list of

24 companies that have licensed the Phillips technology already.

25 They would be the prime companies to reach out to to sell these

```
 1   assets.  I'm asking if he reached out to any of those 23.

 2          THE COURT:  Okay.

 3   BY MR. VAGNONI:

 4   A    I don't know the answer.

 5   Q    Did you --

 6   A    As I sit here.

 7   Q    Did you reach out to Leia?

 8   A    I don't know.

 9   Q    Did you reach out to Dimenco?  Dimenco.

10   A    I don't know.

11   Q    How about Magnetic 3D?

12   A    Do not know.

13   Q    All right.  So having listed some of the major players in

14   no glasses 3D TV, you're --

15          MR. GEORGE:  Objection, Your Honor.  He's testifying.

16          THE COURT:  Yeah.

17          MR. GEORGE:  He's calling -- we haven't even heard

18   these names until he just said them, now he's testifying --

19          MR. VAGNONI:  Well, that's telling.

20          THE COURT:  He hasn't -- so he hasn't asked these

21   people.  So any other questions for Mr. Victor?

22          MR. VAGNONI:  Let me just take a second here and look

23   at my notes.

24          No.  I'm all set.  Thank you.

25          THE COURT:  Okay.  All right.  No more questions for
```

1   Mr. Victor then?

2           Okay.  You may step down, sir.  Thank you.

3           THE WITNESS:  Thank you.

4           MR. THOMPSON:  Your Honor, before you move on --

5           THE COURT:  Yeah.

6           MR. THOMPSON:  -- I may be able to -- I have some

7   suspicion of where this may go, but we had also, a witness list

8   and expected to be able to call witnesses on behalf of VSI and

9   our case-in-chief and that included -- that includes Mr.

10  Charles Bud Roberston (phonetic), Ms. Nicole Menine, Matthu

11  Rajan, among others.  And I want to know whether we're going to

12  have that opportunity.

13          THE COURT:  I don't have any need to hear from any

14  witnesses about the sale.  What I was interested -- if there

15  were any concerns.  Like, the concerns I was interested in

16  hearing about today was the sale process, if you thought that

17  there was something that Mr. Victor should have done or if you

18  had questions for the trustee.  And I've heard all of your

19  questions, and I don't have any concerns about this sale.  I

20  don't.

21          So that doesn't leave me to have any questions or

22  need to hear from your witnesses.  Okay?

23          MR. THOMPSON:  Our witnesses are going to testify

24  about the disposition of the assets that this trustee says he's

25  selling.

1           THE COURT:  Right.  And I think that the assets are

2   what they are and the buyer has reviewed the schedules and has

3   done their due diligence and is going to accept the assets as

4   is, wherever they are.

5           MR. THOMPSON:  But the disposition of those assets

6   matters, Your Honor.

7           THE COURT:  The disposition?  There's going to be a

8   sale and the buyer's going to get the assets.

9           MR. THOMPSON:  The assets that are Stream TV assets

10  that remain in the hands of the now winning bidder, the

11  stalking horse.

12          THE COURT:  The buyer's going to get the assets on

13  the schedules.  Okay?

14          MR. GEORGE:  Will we have an opportunity to respond

15  to their filing of this morning, requesting a new order?  And

16  then changes to the asset purchase agreement.

17          THE COURT:  I'm going to give you 48 hours.  If you

18  guys have any response to that, then -- okay.  Would you like

19  72 hours?

20          MR. GEORGE:  Is Monday morning -- what's the

21  difference --

22          THE COURT:  Monday morning is fine.  You can have

23  Monday morning to respond to the blackline order.

24          MR. WATTERS:  Your Honor, this is Michael Watters,

25  for Shepherd Mullen, I'm counsel to Leia, Inc.  I -- I have

1    some concerns about the sale order as well.  I am sitting here

2    listening to the characterization of the sale, you know, your

3    characterization of the sale, I think, is inconsistent with the

4    redline order.  I don't know if it's appropriate to raise that

5    now --

6              THE COURT:  Okay.  No.  Yeah.

7              MR. WATTERS:  -- order.  All right.

8              THE COURT:  Yeah.  All right.  I hear you.

9              So Pam, just mark on the docket --

10             MR. WATTERS:  Yeah.

11             THE COURT:  -- that any concerns with the blackline

12   order should be filed Monday close of business, 5:00 p.m.

13             Okay?  Anything else?

14             MR. WATTERS:  Okay.

15             MR. SWICK:  I guess I just want to raise it formally,

16   and then to say we wanted to bring Matthu Rajan, Bud Roberston,

17   Nicole Menine, to testify, that's been denied.

18             THE COURT:  Yeah.  I find it totally irrelevant.

19   Thank you.

20             MR. GEORGE:  Your Honor, I would move into evidence

21   our exhibits 1 through 6 and ask the Court to take judicial

22   notice of the motion to approve the Hawk settlement which is

23   docket number 630; the evidentiary record from that hearing,

24   which is 670; the 9019 order which is 653; the trustee opinion

25   which is 548; the order granting Hawk relief from stay, which

1   is 549; and the reservation of rights by Leia which is 841.

2           THE COURT:  Okay.  So moved.

3           MS. RUSSEL:  Your Honor, Alyssa Russel from Skinner &

4   Skinner on behalf of SeeCubic.  Regarding the request to

5   respond to the redline order, the APA contemplates an outside

6   date for answering the order of December 7th and our client has

7   a target closing -- outside date for closing of December 10th.

8           THE COURT:  Yep.  I'm going to resolve --

9           MS. RUSSEL:  Your Honor has already --

10          THE COURT:  -- everything before the 10th.

11          MS. RUSSEL:  Okay.  I was going to say --

12          MR. THOMPSON:  Your Honor, no one put them here -- no

13  one put them here but them.

14          THE COURT:  Huh?  Yeah.  Okay.  I'm going to enter an

15  order prior to the 10th.  All right.  I think that concludes

16  our business here today.

17          MR. THOMPSON:  Thank you, Your Honor.

18          MS. RUSSEL:  Thank you, very much.  Ma'am?  Thanks.

19      (Proceedings adjourned)

20

21

22

23

24

25

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                     :
IN RE:                               : Case No.  23-10763-amc
                                     :
STREAM TV NETWORKS, INC.  CH: 11     :
AND NETWORKS, INC. AND               : Philadelphia, Pennsylvania
TECHNOVATIVE MEDIA, INC.             : December 18, 2024
                                     : 11:03 a.m.
. . . . . . . . . . . . . . . . . . .:
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

```
For the Chapter 11 Trustee:    Michael D. Vagnoni, Esq.
                               Obermayer Rebmann Maxwell &
                               Hippel LLP
                               Centre Square West
                               1500 Market Street, Suite 3400
                               Philadelphia, PA 19102
                               215-665-3066

For Visual Semiconductor,      John H. Thompson. Esq.
Inc.:                          Akerman
                               750 Ninth Street, N.W.
                               Washington, D.C. 20001
                               202-824-1760

For Rembrandt:                 Andrew Peter Demarco
                               Devlin Law Firm, LLC
                               1526 Gilpin Avenue
                               Wilmington, DE 19806
                               302-449-9010

SeeCubic, Inc.:                Alyssa Russell, Esq.
                               Skadden Arps Slate Meagher &
                               Flom, LLP
                               320 South Canal Street
                               Chicago, IL 60606
                               312-407-0705
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   DECEMBER 18, 2024                              11:03 A.M.

 2            THE COURT:  Number 37, Stream TV, motion to extend

 3   time for deadlines, timing, and amount of certain obligations

 4   in the sharing and carve-out agreement.  Appearances, please?

 5            Tasha, what's with the echo?

 6            MR. VAGNONI:  Good morning, Your Honor.  Michael

 7   Vagnoni on behalf of the Chapter 11 Trustee.

 8            THE COURT:  Okay.

 9            MR. THOMPSON:  And John Thompson of Akerman LLP on

10   behalf of VSI.

11            THE COURT:  Okay.  Anyone else on the phone?

12            MR. DEMARCO:  Andrew DeMarco.

13            THE COURT:  Yeah.

14            MR. DEMARCO:  Yes, Your Honor.  Andrew DeMarco from

15   Devlin Law Firm here for Rembrandt.  With me is --

16            THE COURT:  Okay.  Yeah.

17            MR. VAGNONI:  Your Honor, Michael Vagnoni on behalf

18   of Chapter 11 Trustee, we filed this motion on November 12 a

19   response was due on November 26th.  On December 4th, we filed

20   an opposition.  We would ask that the order be entered granting

21   our motion today.

22            THE COURT:  Okay.  So I see you filed a late

23   objection, sir?

24            MR. THOMPSON:  We did, Your Honor, and that's because

25   of change of circumstances.  We expected as this trustee had
```

1   represented in court on the 4th at the sale hearing that

2   because of the urgency, they were going to close on the 10th.

3   They haven't.  To our understanding, that transaction still has

4   not closed.  And it is our understanding what we thought was

5   just a simple ministerial matter to move the date from the

6   original August 2nd date -- I don't know why that stayed

7   around, but August 2nd date to December 10th.

8          Beyond that, we thought that there were other

9   adjustments that seemed to be -- or at least at first blush,

10  seemed to be simply ministerials (sic) and change of terms,

11  timing, et cetera, based upon the transaction adjustments by

12  the trustee and by the parties, the purchasers.

13         However, it appears now that what really is happening

14  is they don't have the money to close.  They've been working

15  through the trustee.  And this motion now -- the background is

16  very distracting.

17         THE COURT:  It's very distracting.  There's a very

18  weird echo going on and we're not sure why.

19         THE CLERK:  We had it all last week.

20         THE COURT:  Yeah.  Okay.  It's not just you.  It was

21  happening earlier today.

22         MR. THOMPSON:  Okay.  So the point is that what's

23  happening, it appears is a greater degree of flexibility both

24  with respect to --

25         THE COURT:  So they're not just pushing the deadline

1  back.  You're saying that they're asking for substantive?

2          MR. THOMPSON:  Well, it does seem substantive, right?

3  They've suggested that they've increased the overall

4  consideration to the estate and to the trustee.  But rather --

5          THE COURT:  Say that again.

6          MR. THOMPSON:  They have suggested that the overall

7  consideration -- I think it's paragraph 26 in their proposed,

8  their motion -- that they are getting $500,000 of incremental

9  money, right?  And that is on the basis of a released bond that

10 was originally posted by Stream TV in the underlying Chancery

11 Court proceeding.  I'm sorry.  This is really --

12         THE COURT:  Okay.  So let me just first -- okay.  So

13 Mr. Vagnoni, has the Hawke closing not been consummated?

14         MR. VAGNONI:  Your Honor, we have -- all the

15 documents are signed.  We have a paper closing.  We're simply

16 waiting for the wire to come through.  We don't think it's a

17 matter of not having the money.  From the trustee's

18 perspective, we are, you know, somewhat disappointed that it

19 hasn't closed already.  Everything for the closing to take

20 place has happened.  We are just waiting for the wire to come

21 through.

22         THE COURT:  So do we have Hawke on the line today?

23 Mr. Vagnoni?  We don't.

24         MR. VAGNONI:  I don't know, Your Honor.

25         THE COURT:  Okay.  Well, it's just kind of weird that

 1   we don't have Hawke on the line and that the closing -- so what

 2   is the holdup on the wire, Mr. Vagnoni?  Do you know what the

 3   problem is?

 4          MR. VAGNONI:  He and I did talk -- and I can't speak

 5   for them.  I think Hawke is not on the line because we

 6   certified no opposition and there was no opposition filed.  And

 7   we anticipated the Court would enter the order.  I don't have

 8   an explanation for the wire not coming through other than that

 9   they are working on it and we should have it very shortly.

10   We're waiting for an update today.

11          MR. THOMPSON:  Your Honor, it seemed to us that the

12   10th was this urgent day --

13          THE COURT:  Right.  And I thought there was a credit

14   bid.  Isn't this a credit bid?  So why --

15          MR. THOMPSON:  Yes.

16          THE COURT:  So I don't understand why -- so what

17   actual hard cash were you expecting?  Like, how much are you

18   expecting you to wire to you?

19          MR. VAGNONI:  There is a carve-out, Your Honor, that

20   it's going to the estate.

21          THE COURT:  Okay.  Right.  And how much is the

22   carve-out?

23          MR. VAGNONI:  Seven million dollars were named, Your

24   Honor.  They've paid $1 million.  Another seven million is

25   going to be wired.  And again, we anticipate that wire hitting

1    any minute now.  They have instructions.  Everything is ready

2    to go --

3             THE COURT:  So why do you think it's going to happen

4    shortly?  Because it hasn't happened before.  It was supposed

5    to happen last week.  So why do you think it's --

6             MS. RUSSELL:  If I could, Your Honor?

7             THE COURT:  Yeah.

8             MS. RUSSELL:  This is Alyssa Russell of Skadden Arps

9    regarding the funds.

10            THE COURT:  Yeah.

11            MS. RUSSELL:  There was a delay in the transfer last

12   week because VSI and filed that our residency -- in district

13   court.  And we had to give a few days to let that play out and

14   see what was going to happen regarding the sale order and

15   whether it was going to be stayed.  And that was a matter of

16   our client gathering the funds.  It was just logistical.  And

17   as the money comes through, we expect it to post in the coming

18   days.

19            THE COURT:  Okay.

20            MS. RUSSELL:  But at this time, like he said, the

21   paper is signed and it's just a matter of money coming in.  And

22   it should be, you know, in the coming days.

23            MR. THOMPSON:  Your Honor, I don't know why our

24   motions practice would have stopped their sale closing.

25            THE COURT:  Because they thought you were going to

1   appeal it and they didn't want to give him the money.  Well,

2   that's just their explanation.

3           Okay.  So Mr. Vagnoni, I thought I've seen these

4   extension motions before which weren't controversial.  So was

5   there any substantive difference between this motion and prior

6   motions that you've filed in front of me?

7           MR. VAGNONI:  I don't know.  I don't think there is

8   any difference other than I think Mr. Thompson more or less

9   explained the increase to the estate of $500,000.  I think he

10  tried to explain that it was in exchange for a bond release

11  which was already contemplated in the original agreement.  It

12  was more to, you know --

13          THE COURT:  Okay.  So isn't this -- so Mr. Vagnoni,

14  did you disclose the $500,000 and the motion originally when

15  you filed it?

16          MR. VAGNONI:  Oh, absolutely.

17          THE COURT:  Okay.  So you knew about it then, so why

18  didn't you file a timely objection?

19          MR. THOMPSON:  Your Honor, this was mostly about the

20  problem with the closing time.

21          THE COURT:  Okay.  So the closing is a separate

22  issue, completely different than this.

23          MR. THOMPSON:  Well, this is related, Your Honor,

24  because they were supposed to pay $1.5 million within two days

25  of the procedures order.

1          THE COURT:  So to the extent that you have an issue

2    with them not complying with something, then you need to file

3    a, you know, a motion related to that issue.  Not this one.

4          MR. THOMPSON:  Right.

5          THE COURT:  So what objection do you have to this

6    motion in front of me?

7          MR. THOMPSON:  Well, first I would object, Your

8    Honor, that they haven't closed and they're in default.

9          THE COURT:  That's totally irrelevant to this motion.

10         MR. THOMPSON:  Well, they're in default

11   under -- they're in default under the current order approving

12   the 90-day extension.

13         THE COURT:  Mr. Thompson, let me explain to you the

14   way that things work in this court.  When people file motions,

15   there's an objection deadline and then a hearing date.  If you

16   have an objection to the underlying motion, you have to file a

17   response by the deadline.  You didn't file any objection to

18   this and there's nothing in here, then, that you really can

19   object to.  To the extent that you have other issues, then I

20   suggest you file a separate motion.

21         MR. THOMPSON:  Your Honor, we have an issue, as I

22   said, with the fact that it has become apparent to us that the

23   purpose of this motion -- and this is after they failed to

24   close on the 10th, which was the all-important date -- that the

25   purpose of this motion was actually to provide greater

1   liquidity and flexibility to SeeCubic and Hawke.  That's what

2   the --

3           THE COURT:  Okay.  But you didn't file an objection,

4   so I'm going to grant the motion.

5           MR. THOMPSON:  I understand, Your Honor.

6           THE COURT:  Thank you.

7           MR. THOMPSON:  I am merely making the point.

8           THE COURT:  All right.  Well, I find it interesting

9   that they haven't closed.  I had no idea.  I mean, I'm happy to

10  know about it, but hopefully it'll happen soon.

11          MR. THOMPSON:  It's rules for thee.  We understand.

12          THE COURT:  Yep.  All right.  Thanks, everybody.

13      (Proceedings adjourned at 11:12 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT D

# Eastern District of Pennsylvania
# Claims Register

### 23-10763-amc Stream TV Networks, Inc. and Technovative Media, Inc.

| | |
|---|---|
| **Chief Judge:** Ashely M. Chan | **Chapter:** 11 |
| **Office:** Philadelphia | **Last Date to file claims:** 05/13/2025 |
| **Trustee:** WILLIAM A. HOMONY | **Last Date to file (Govt):** 08/11/2025 |

| *Creditor:* (14767055)<br>DeMartino and Associates LLC<br>875 Union Ave.<br>Boulder, CO 80304 | **Claim No: 1**<br>*Original Filed Date:* 03/31/2023<br>*Original Entered Date*: 03/31/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |
|---|---|---|

Amount claimed: $6250.00
Priority  claimed: $6250.00

*History:*

| | | |
|---|---|---|
| Details | 1-1 | 03/31/2023 Claim #1 filed by DeMartino and Associates LLC, Amount claimed: $6250.00 (Administrator, EPOC) |

*Description:*
*Remarks:*

| *Creditor:* (14773843)<br>Rembrandt 3D Holding Ltd<br>Suites 5&6 Horsfords Business Centre,<br>Long Point Road, Nevis, West<br>Indies | **Claim No: 2**<br>*Original Filed Date:* 04/14/2023<br>*Original Entered Date*: 04/14/2023 | *Status:*<br>*Filed by:* AT<br>*Entered by:* ANDREW PETER DEMARCO<br>*Modified:* |
|---|---|---|

Amount claimed: $1212407000.00

*History:*

| | | |
|---|---|---|
| Details | 2-1 | 04/14/2023 Claim #2 filed by Rembrandt 3D Holding Ltd, Amount claimed: $1212407000.00 (DEMARCO, ANDREW) |

*Description:* (2-1) A settlement agreement with debtor dated May 23, 2021.
*Remarks:*

| *Creditor:* (14767089)<br>Internal Revenue Service<br>Centralized Insolvency Operation<br>2970 Market St.<br>Mail Stop 5 Q30 133<br>Philadelphia, PA 19104-5016 | **Claim No: 3**<br>*Original Filed Date:* 04/25/2023<br>*Original Entered Date*: 04/25/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* JOHN F LINDINGER<br>*Modified:* |
|---|---|---|

Amount claimed: $6032.60
Priority  claimed: $4775.77

*History:*

| | | |
|---|---|---|
| Details | 3-1 | 04/25/2023 Claim #3 filed by Internal Revenue Service, Amount claimed: $6032.60 (LINDINGER, JOHN) |

*Description:*
*Remarks:*

| Creditor: (14776727)<br>City of Philadelphia Law Department<br>Tax & Revenue Unit<br>Bankruptcy Group, MSB<br>1401 John F. Kennedy Blvd., 5th Floor<br>Philadelphia, PA 19102-1595 | Claim No: 4<br>*Original Filed Date*: 04/26/2023<br>*Original Entered Date*: 04/26/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: MEGAN N. HARPER<br>*Modified*: |
|---|---|---|

*No amounts claimed*

*History:*

| Details | 4-1 | 04/26/2023 Claim #4 filed by City of Philadelphia Law Department, Amount claimed: (HARPER, MEGAN) |
|---|---|---|

*Description:* (4-1) Unliquidated Claims

*Remarks:*

| Creditor: (14779644)<br>Matrex Exhibits Inc.<br>1755 South Naperville<br>Wheaton, IL 60189 | Claim No: 5<br>*Original Filed Date*: 05/05/2023<br>*Original Entered Date*: 05/05/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: EPOC Administrator<br>*Modified*: |
|---|---|---|

Amount claimed: $107200.73

*History:*

| Details | 5-1 | 05/05/2023 Claim #5 filed by Matrex Exhibits Inc., Amount claimed: $107200.73 (Administrator, EPOC) |
|---|---|---|

*Description:*

*Remarks:*

| Creditor: (14783348)<br>Hawk Investment Holdings Ltd c/o Rosco Maunder<br>PO Box 232, Newport House, 15 the Grange<br>St Peter Port<br>Guernsey<br>GY14LA<br>UK | Claim No: 6<br>*Original Filed Date*: 05/19/2023<br>*Original Entered Date*: 05/19/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: Belinda W.<br>*Modified*: |
|---|---|---|

Amount claimed: $178432069.68     Amount allowed: $178432069.68

*History:*

| Details | 6-1 | 05/19/2023 Claim #6 filed by Hawk Investment Holdings Ltd c/o Rosco Maunder, Amount claimed: $178432069.68 (W., Belinda) |
|---|---|---|
| | 679 | 06/20/2024 Order Denying Rembrandt 3D Holding LTD.'s Objection to Proofs of Claims #:6 filed by Hawk Investment Holdings LTD as Collateral Agent, ,9 Filed by SLS Holdings VI, LLC, and No. 14 filed by SeeCubic, Inc.(related document(s)628). The Objection is Denied as moot. (K., Marie) |

*Description:*

*Remarks:*

| Creditor: (14783653)<br>Penn Park Investments LLC<br>2009 Chestnut Street<br>Philadelphia<br>Pennsylvania<br>, | Claim No: 7<br>*Original Filed Date*: 05/22/2023<br>*Original Entered Date*: 05/22/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: EPOC Administrator<br>*Modified*: |
|---|---|---|

*History:*

| Details | 7-1 | 05/22/2023 Claim #7 filed by Penn Park Investments LLC, Amount claimed: $81372.70 (Administrator, EPOC) |
|---|---|---|

*Description:*

*Remarks:*

Amount claimed: $81372.70

*History:*

| Details | 7-1 | 05/22/2023 Claim #7 filed by Penn Park Investments LLC, Amount claimed: $81372.70 (Administrator, EPOC) |

*Description:*

*Remarks:*

| *Creditor:*    (14783852)<br>Jamuna Travels, Inc.<br>6439 Market Street<br>Upper Darby, PA 19082-6439 | **Claim No: 8**<br>*Original Filed Date*: 05/22/2023<br>*Original Entered Date*: 05/22/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |

Amount claimed: $130944.25

*History:*

| Details | 8-1 | 05/22/2023 Claim #8 filed by Jamuna Travels, Inc., Amount claimed: $130944.25 (Administrator, EPOC) |

*Description:*

*Remarks:*

| *Creditor:*    (14767920)<br>SLS Holdings VI, LLC<br>c/o Brittany S. Ogden, Esq.<br>QUARLES & BRADY LLP<br>33 East Main Street, Suite 900<br>Madison, Wisconsin 53703 | **Claim No: 9**<br>*Original Filed Date*: 05/23/2023<br>*Original Entered Date*: 05/23/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* DAVIS LEE WRIGHT<br>*Modified:* |

Amount  claimed: $17222484.06

Secured claimed: $17222484.06

*History:*

| Details | 9-1 | 05/23/2023 Claim #9 filed by SLS Holdings VI, LLC, Amount claimed: $17222484.06 (WRIGHT, DAVIS) |
| | 679 | 06/20/2024 Order Denying Rembrandt 3D Holding LTD.'s Objection to Proofs of Claims #:6 filed by Hawk Investment Holdings LTD as Collateral Agent, ,9 Filed by SLS Holdings VI, LLC, and No. 14 filed by SeeCubic, Inc.(related document(s)628). The Objection is Denied as moot. (K., Marie) |

*Description:* (9-1) Secured Proof of Claim

*Remarks:*

| *Creditor:*    (14767075)<br>Global Tax Management<br>656 E Swedesford Rd , Suite 200<br>Wayne, PA 19087 | **Claim No: 10**<br>*Original Filed Date*: 05/19/2023<br>*Original Entered Date*: 05/23/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:*<br>*Modified:* |

Amount claimed: $44515.81

*History:*

| Details | 10-1 | 05/19/2023 Claim #10 filed by Global Tax Management, Amount claimed: $44515.81 (D., Virginia) |

*Description:*

*Remarks:*

| *Creditor:*    (14767135)<br>Porter Digital Signage<br>241 N Caldwell Circle<br>Downingtown, PA 19335 | **Claim No: 11**<br>*Original Filed Date*: 05/23/2023<br>*Original Entered Date*: 05/23/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Jeffrey S Porter<br>*Modified:* |

*History:*

| Details | 11-1 | 05/23/2023 Claim #11 filed by Porter Digital Signage, Amount claimed: $9000.00 (Porter, Jeffrey) |

*Description:* (11-1) Professional Services

*Remarks:* (11-1) Unpaid invoices

Amount claimed: $9000.00

*History:*

| Details | 11-1 | 05/23/2023 Claim #11 filed by Porter Digital Signage, Amount claimed: $9000.00 (Porter, Jeffrey) |

*Description:* (11-1) Professional Services

*Remarks:* (11-1) Unpaid invoices

---

| *Creditor:*    (14784305)<br>McCarter & English, LLP<br>Joseph Lubertazzi, Jr.<br>Four Gateway Center<br>100 Mulberry Street<br>Newark, NJ 07102 | **Claim No: 12**<br>*Original Filed Date*: 05/23/2023<br>*Original Entered Date*: 05/23/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |

Amount claimed: $2859902.63

*History:*

| Details | 12-1 | 05/23/2023 Claim #12 filed by McCarter & English, LLP, Amount claimed: $2859902.63 (Administrator, EPOC) |

*Description:*

*Remarks:*

---

| *Creditor:*    (14784423)<br>Ian R. Liston, Esq., as Receiver Pendente Lite<br>222 Delaware Avenue<br>Suite 800<br>Wilmington, DE 19801-222 | **Claim No: 13**<br>*Original Filed Date*: 05/23/2023<br>*Original Entered Date*: 05/23/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |

No amounts claimed

*History:*

| Details | 13-1 | 05/23/2023 Claim #13 filed by Ian R. Liston, Esq., as Receiver Pendente Lite, Amount claimed: (Administrator, EPOC) |

*Description:*

*Remarks:* (13-1) Filer Comment: See Annex A.

---

| *Creditor:*    (14784456)<br>SeeCubic, Inc.<br>c/o Skadden, Arps, Slate, Meagher & Flom<br>Attn: Eben P. Colby<br>500 Boylston Street<br>Boston, Massachusetts 02116 | **Claim No: 14**<br>*Original Filed Date*: 05/23/2023<br>*Original Entered Date*: 05/23/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Joseph Oliver Larkin<br>*Modified:* |

No amounts claimed

*History:*

| Details | 14-1 | 05/23/2023 Claim #14 filed by SeeCubic, Inc., Amount claimed: (Larkin, Joseph) |
| | 679 | 06/20/2024 Order Denying Rembrandt 3D Holding LTD.'s Objection to Proofs of Claims #:6 filed by Hawk Investment Holdings LTD as Collateral Agent, ,9 Filed by SLS Holdings VI, LLC, and No. 14 filed by SeeCubic, Inc.(related document(s)628). The Objection is Denied as moot. (K., Marie) |

*Description:*

*Remarks:*

2/25/25, 9:44 AM                                          Live Database Area

| | | |
|---|---|---|
| Creditor:        (14767171)<br>Wai Ming Chiu<br>1798 Cape Coral Dr<br>San Jose, CA 95133 | **Claim No: 15**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/24/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: Donna R.<br>*Modified*: |

Amount claimed: $44386.09

*History:*

Details      15-1   05/24/2023 Claim #15 filed by Wai Ming Chiu, Amount claimed: $44386.09 (R., Donna)

*Description:*

*Remarks:*

| | | |
|---|---|---|
| Creditor:        (14784678)<br>Marcum LLP<br>Attn: John Heller<br>201 East Las Olas Boulevard 21st Floor<br>Ft. Lauderdale FL 33301 | **Claim No: 16**<br>*Original Filed Date*: 05/23/2023<br>*Original Entered Date*: 05/24/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: Donna R.<br>*Modified*: |

Amount claimed: $162654.34

*History:*

Details      16-1   05/23/2023 Claim #16 filed by Marcum LLP, Amount claimed: $162654.34 (R., Donna)

*Description:*

*Remarks:*

| | | |
|---|---|---|
| Creditor:        (14784696)<br>IMG Media, Ltd.<br>Jennifer R. Hoover<br>Benesch, Friedlander, Coplan & Aronoff<br>LLP<br>1313 N. Market St., Ste 1201<br>Wilmington, DE 19801 | **Claim No: 17**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/24/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: EPOC Administrator<br>*Modified*: |

Amount claimed: $426437.00

*History:*

Details      17-1   05/24/2023 Claim #17 filed by IMG Media, Ltd., Amount claimed: $426437.00 (Administrator, EPOC)

*Description:*

*Remarks:*

| | | |
|---|---|---|
| Creditor:        (14784706)<br>Trans World International, LLC<br>c/o J. Hoover<br>Benesch Friedlander Coplan & Aronoff<br>LLP<br>1313 N. Market St., Ste. 1201<br>Wilmington, DE 19801<br>Wilmington, DE 19801 | **Claim No: 18**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/24/2023 | *Status*:<br>*Filed by*: CR<br>*Entered by*: EPOC Administrator<br>*Modified*: |

Amount claimed: $480000.00

*History:*

Details      18-1   05/24/2023 Claim #18 filed by Trans World International, LLC, Amount claimed: $480000.00
                              (Administrator, EPOC)

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (14767041)<br>Cittone Demers & Arneri LLP<br>11 Broadway<br>Suite 615<br>New York, NY 10040 | **Claim No: 19**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/24/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |

Amount claimed: $6065.00

*History:*

| Details | 19-1 | 05/24/2023 Claim #19 filed by Cittone Demers & Arneri LLP, Amount claimed: $6065.00 (Administrator, EPOC) |
|---|---|---|

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (14784805)<br>Siemens Industry Software Inc.<br>8005 SW Boeckman Road<br>Wilsonville, OR 97070-8005 | **Claim No: 20**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/24/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |

Amount claimed: $444816.13

*History:*

| Details | 20-1 | 05/24/2023 Claim #20 filed by Siemens Industry Software Inc., Amount claimed: $444816.13 (Administrator, EPOC) |
|---|---|---|

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (14784807)<br>CT Lien Solutions<br>PO Box 301133<br>Dallas, TX 75303-1133 | **Claim No: 21**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/24/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* EPOC Administrator<br>*Modified:* |

Amount claimed: $262.10

*History:*

| Details | 21-1 | 05/24/2023 Claim #21 filed by CT Lien Solutions, Amount claimed: $262.10 (Administrator, EPOC) |
|---|---|---|

*Description:*

*Remarks:* (21-1) Account Number (last 4 digits):3451

| | | |
|---|---|---|
| *Creditor:* (14767171)<br>Wai Ming Chiu<br>1798 Cape Coral Dr<br>San Jose, CA 95133 | **Claim No: 22**<br>*Original Filed Date*: 05/24/2023<br>*Original Entered Date*: 05/30/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Donna R.<br>*Modified:* |

Amount claimed: $44386.09

*History:*

| Details | 22-1 | 05/24/2023 Claim #22 filed by Wai Ming Chiu, Amount claimed: $44386.09 (R., Donna) |
|---|---|---|

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (14786427)<br>US Legal Support<br>16825 Northchase Drive, ste 900<br>Houston, TX 77060 | **Claim No: 23**<br>*Original Filed Date*: 05/30/2023<br>*Original Entered Date*: 05/31/2023 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Donna R.<br>*Modified:* |

Amount claimed: $2164.97

*History:*

| Details | 23-1 | 05/30/2023 Claim #23 filed by US Legal Support, Amount claimed: $2164.97 (R., Donna) |
|---|---|---|

*Description:*

*Remarks:*

| Creditor: (14767134)<br>Polsinelli PC<br>222 Delaware Avenue, Suite 1101<br>Wilmington, DE 19801 | Claim No: 24<br>Original Filed Date: 06/08/2023<br>Original Entered Date: 06/08/2023 | Status:<br>Filed by: CR<br>Entered by: EPOC Administrator<br>Modified: |
|---|---|---|
| Amount claimed: $276931.00 | | |

History:

| | Details | 24-1 | 06/08/2023 Claim #24 filed by Polsinelli PC, Amount claimed: $276931.00 (Administrator, EPOC) |
|---|---|---|---|

Description:

Remarks:

| Creditor: (14767031)<br>California Franchise Tax Board<br>Bankruptcy Section, MS: A-340<br>PO Box 2952<br>Sacramento, CA 95812-2952 | Claim No: 25<br>Original Filed Date: 07/14/2023<br>Original Entered Date: 07/14/2023 | Status:<br>Filed by: CR<br>Entered by: EPOC Administrator<br>Modified: |
|---|---|---|
| Amount claimed: $4952.34<br>Priority claimed: $4279.10 | | |

History:

| Details | 25-1 | 07/14/2023 Claim #25 filed by California Franchise Tax Board, Amount claimed: $4952.34 (Administrator, EPOC) |
|---|---|---|

Description:

Remarks: (25-1) Account Number (last 4 digits):2372

| Creditor: (14771263)<br>Rembrandt 3D Holding Ltd<br>c/o Andrew DeMarco<br>DEVLIN LAW FIRM LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806 | Claim No: 26<br>Original Filed Date: 10/22/2024<br>Original Entered Date: 10/22/2024 | Status:<br>Filed by: CR<br>Entered by: ANDREW PETER DEMARCO<br>Modified: |
|---|---|---|
| Amount claimed: $1212407000.00 | | |

History:

| Details | 26-1 | 10/22/2024 Claim #26 filed by Rembrandt 3D Holding Ltd, Amount claimed: $1212407000.00 (DEMARCO, ANDREW) |
|---|---|---|

Description:

Remarks:

| Creditor: (14981960)<br>Visual Semiconductor Inc<br>c/o R. Adam Swick<br>Akerman LLP<br>500 W 5th St., Ste 1210<br>Austin, TX 78701 | Claim No: 27<br>Original Filed Date: 02/25/2025<br>Original Entered Date: 02/25/2025 | Status:<br>Filed by: CR<br>Entered by: RANDALL ADAM SWICK<br>Modified: |
|---|---|---|
| Amount claimed: $1288511.01<br>Priority claimed: $1288511.01 | | |

History:

| Details | 27-1 | 02/25/2025 Claim #27 filed by Visual Semiconductor Inc, Amount claimed: $1288511.01 (SWICK, RANDALL) |
|---|---|---|

Description:

Remarks:

## Claims Register Summary

**Case Name:** Stream TV Networks, Inc. and Technovative Media, Inc.

**Case Number:** 23-10763-amc

**Chapter:** 11

**Date Filed:** 03/15/2023

**Total Number Of Claims:** 27

| | |
|---|---|
| **Total Amount Claimed*** | $2,626,895,338.53 |
| **Total Amount Allowed*** | $178,432,069.68 |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| **Secured** | $17,222,484.06 | |
| **Priority** | $1,303,815.88 | |
| **Administrative** | | |
| **Unassigned (unsecured)** | $2,608,369,038.59 | $178,432,069.68 |

---

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/25/2025 22:44:30 | | |
| **PACER Login:** | AkermanDAL | **Client Code:** 097630-00423558 |
| **Description:** Claims Register | **Search Criteria:** 23-10763-amc Filed or Entered From: 1/1/2023 Filed or Entered To: 12/31/2025 |
| **Billable Pages:** 3 | **Cost:** 0.30 |