## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (DJB)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)**[1] |
| | : | |

**OBJECTION OF WILLIAM A. HOMONY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATES OF STREAM TV NETWORKS, INC., AND TECHNOVATIVE MEDIA, INC., TO THE MOTION OF VISUAL SEMICONDUCTOR, INC.  FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503 AND LOCAL RULE OF BANKRUPTCY PROCEDURE 3002-2**

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative," and collectively with Stream, the "Debtors"), by and through his counsel, Steven M. Coren, Esquire and Coren & Ress, P.C., files this Objection to the Motion for Allowance of Administrative Expense Claim (D.I. 966) (the "Motion")[2], filed by Visual Semiconductor, Inc. ("VSI") and in opposition to the relief requested in the Motion (the "Objection"), the Trustee respectfully states:

## I.     <u>INTRODUCTION</u>

As the Court considers VSI's Motion seeking a $1.288 million administrative claim, it is significant to highlight that VSI founder and CEO, Mathu Rajan ("Rajan"), is the Debtors' President and CEO—who was removed from operational control by this Court because of gross

---

[1] On April 10, 2023, the Court entered an order directing joint administration of the above-captioned cases. (D.I. 95).

[2] The Motion refers to the Stream estate as the entity against which an administrative claim is asserted.

mismanagement and disqualifying conflicts which necessitated the Trustee's appointment by Opinion and Order entered January 5, 2024 (the "Trustee Order" and "Trustee Opinion") (D.I 549 and 548, respectively).  This Court held, *inter alia,* that:

(i)    the Debtors, under Rajan's leadership, breached their fiduciary duties to creditors and disclosure obligations to the Court in failing to disclose that VSI had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock;

(ii)    Debtors' management, specifically Rajan, contemporaneously and improperly acted as a fiduciary of the Debtors and VSI;

(iii)    "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony . . . was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinctions between the entities and his roles with each"; and,

(iv)    "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness."

Trustee Opinion at 60-61.

Simply stated, VSI is an equity investor in Stream, **not a creditor**. *See* Rajan Affidavit, D.I. #660-1 (a copy of which is attached as Exhibit A), at ¶ 4 ("VSI is a party in interest in the Stream bankruptcy proceedings as an equity holder of Stream . . .")).  VSI's eleventh hour effort to morph into an administrative creditor is a ruse, and its alleged creditor status is compellingly debunked by, among other things:

(a)    this Court's findings in the Trustee Opinion at 44 ("Mr. Rajan testified that VSI had been paying all expenses of the Debtors since the inception of their bankruptcy cases, in

exchange for shares in Stream");

(b)       numerous filings in Stream's bankruptcy cases;[3]

(c)       Rajan's sworn testimony at deposition and hearings before this Court that culminated in the appointment of the Trustee; and,

(d)       numerous documents contemporaneously prepared, including no less than seven Stock Purchase Agreements, which compellingly establish that VSI advanced monies or paid expenses in return for shares of Stream, not as a creditor with a debt to be repaid.

Against this backdrop, VSI's recently filed administrative claim in the amount of $1,288,511.01 (the "Admin Claim") (Claim No. 27), is a sham. Rather than benefitting the Debtors' bankruptcy estates, Rajan and VSI have acted solely in their conflicted self-interests—making filing after filing opposing virtually every action taken by the Trustee and thereby significantly increasing the administrative burden on Debtors' bankruptcy estates to the substantial detriment of the Estate's innocent, real creditors.

### FACTS

1.       On January 5, 2024, this Court entered an opinion and order appointing a Chapter 11 Trustee to oversee the Debtors' bankruptcy cases.

2.       The Trustee Opinion noted, *inter alia*, the continued "acrimony" and "lack of progress" by the Debtors while under Rajan's control and ultimately held that, due to the gross mismanagement and lack of transparency under Rajan's leadership (i) a Chapter 11 trustee must

---

[3] Filed at the outset of these cases, Debtors represented in Stream's List of Equity Security Holders that VSI owned over eighty percent (80%) of Stream's voting shares. (D.I. 58). VSI was never listed as a creditor in either of the Debtors' Schedules of Assets and Liabilities or any filings by either Debtor.  Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs are attached as Exhibits B (Stream) and C (Technovative).

be appointed to administer the Debtors' cases, and (ii) Rajan was no longer authorized to act on behalf of the Debtors' estates. (D.I. 548).

3.      In the interest of judicial economy, the Trustee incorporates the factual and legal determinations of this Court in the Trustee Opinion and the Court's Opinion entered January 8, 2025 (the "Sale Opinion"), issued in connection with the Sale Motion and Sale Order described below. (D.I. 916).

4.      Rajan is no stranger to bad faith bankruptcy filings, as he orchestrated two prior bad faith filings involving Stream, both of which were dismissed by the Delaware bankruptcy court.

5.      The first was a Chapter 11 case initiated by the Stream TV Debtor on February 24, 2021, and docketed *In re: Stream TV Networks, Inc.*, Bankr. D. Del. No. 21-10433-KBO (the "Delaware Voluntary Bankruptcy Case"), and the second was an involuntary Chapter 7 case initiated on May 23, 2021, by, *inter alia*, purported creditor Rembrandt 3D Holdings Ltd. ("Rembrandt"), docketed *In re Stream TV Networks, Inc.*, Bankr. D. Del. 21-10848 (the "Delaware Involuntary Bankruptcy Case"). In each case, Rajan controlled Stream.

6.      The Delaware Bankruptcy Court dismissed both bankruptcy cases within a three-month period as having been filed in bad faith to divert the Debtors' assets to Rajan and VTI (the predecessor of VSI and alter ego of Rajan).  The Delaware Bankruptcy Court further found that the Delaware Involuntary Bankruptcy Case was a ruse concocted by Rajan and frequent collaborator in Rajan's chaotic litigation strategy, Rembrandt 3D Holding, Ltd. ("Rembrandt"), to fix a contrived claim for Rembrandt to end-run the Delaware Bankruptcy Court's dismissal of the Delaware Voluntary Bankruptcy Case and imposed a twelve (12) month bar on Stream re-filing another bankruptcy proceeding. *See* Trustee Opinion at 6.

7.      The Trustee Opinion identifies rampant breaches by Rajan of his fiduciary duties to the Debtors—to line his pockets and those of VSI—and those findings are important here.

8.      The Trustee Opinion made clear that Rajan was not capable of managing the Debtors through their respective Chapter 11 cases. At almost every important juncture during the Debtors' Chapter 11 cases, Rajan proved to be a faithless fiduciary who was unreliable, untruthful, cagey, engaged in self-dealing and who entered into transactions that disadvantaged the Debtors in favor of his and VSI's self-interests.

9.      On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment for William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date") as well as an Application for the Entry of an Order Approving the Appointment of the Trustee (the "Application") (D.I. 554 and 553 respectively).

10.     As of the Appointment Date, the Debtors had no operations, no employees, no manufacturing, no products, no warehouses, no inventory, and virtually no money in their respective estates.

11.      Rajan's misbehavior continued after he was removed and the Trustee was appointed, as Rajan mislead the Trustee while he was getting up to speed, and offered illusory financial support from VSI in a scheme to regain control of the Debtors' assets.

12.     The Trustee engaged in discussions with VSI and Rajan regarding a Debtor in Possession loan, which VSI and Rajan were either unable or unwilling to provide.

13.     Having concluded that Rajan and VSI were unreliable, the Trustee reached a settlement with the secured creditors (the "Hawk Settlement Agreement").  The Trustee filed his 9019 Motion seeking Court approval of the Hawk Settlement Agreement on May 6, 2024 (D.I.

630), which this Court approved on June 6, 2024 over VSI's objection (the "9019 Order") (D.I. 653).

14.     The Hawk Settlement Agreement provided for the sale of the Debtors' assets under the auspices of the Trustee's investment banker SSG Capital Advisors, LLC ("SSG"), with secured creditor SeeCubic, Inc. ("SeeCubic") as the Stalking Horse Bidder.

15.     VSI objected to the Trustee's retention of his initial investment banker Capstone Capital Markets LLC based upon misrepresentations to the Court that Capstone had signed an NDA with VSI and had a conflict; however, it was later established that the allegation was false. Consequently, VSI's then counsel withdrew, and the objection to Capstone's retention was withdrawn.[4]

16.     When VSI objected to the Bid Procedures and data room contents, the Court afforded it the opportunity to comment publicly and supplement the Trustee's disclosures to potential bidders.  VSI used that opportunity to chill bids by threatening purchasers with jail for patent infringement should they buy the assets.

17.     No bids were received for the Debtors' assets apart from the Stalking Horse bid from SeeCubic.

18.     On December 9, 2024, the Court approved the sale of the Debtors' assets over VSI's objection (the "Sale Order") (D.I. 876). Once the Sale Order was entered, the Trustee and SeeCubic worked diligently to consummate the Sale, which closed on January 3, 2025.  *See* Notice of Closing on the Sale of Substantially All of the Assets filed on January 6, 2025 (the "Notice of Closing").

---

[4] Capstone ultimately withdrew as the Trustee's proposed investment banker because it was unable to agree with the United States Trustee in connection with a limitation of liability clause in its proposed engagement agreement.  The Trustee selected SSG as his investment banker and the Court approved SSG's retention on September 20, 2024 (D.I. 741).

(D.I. 915).

19.    Since the Trustee's appointment, VSI has objected to, sought reconsideration of, and/or appealed virtually every Motion filed by the Trustee and every order entered by this Court. VSI even filed a meritless Mandamus Petition in the District Court (which was promptly denied) and a motion to stay the Sale Order (which was also denied).

20.    The following filings highlight VSI's obstructionist behavior:

| VSI FILINGS | | |
|---|---|---|
| **Bankruptcy Docket Number** | **Date Entered in the Bankruptcy Docket** | **Brief Description** |
| 633 | 5/9/2024 | Objection of Visual Semiconductor, Inc. to Application to Employ Capstone Capital Markets LLC as Investment Banker. |
| 642 | 5/20/2024 | Objection of Visual Semiconductor, Inc. to the Motion of the Chapter 11 Trustee to Approve Settlement Agreement And Mutual Release with Hawk Investment Holdings, Ltd, as Collateral Agent for The Secured Noteholders of SeeCubic, Inc., Pursuant to Fed. R. Bankr. P. 9109(a) and 11 U.S.C. § 105. |
| 686 | 6/20/2024 | Visual Semiconductor, Inc.'s Motion to Reconsider and/or Clarify Order Approving Settlement Agreement Between Chapter 11 Trustee and Hawk Investment Holdings, Ltd (ECF No. 653). |
| 712 | 7/26/2024 | Notice to Take Deposition of: William A. Homony as the Chapter 11 Trustee Subpoena Duces Tecum Filed by Visual Semiconductor, Inc.[5] |

---

[5] The Court denied and/or quashed repeated efforts to depose the Trustee and others, finding that the discovery requests were improper as they related to matters already decided and no longer at issue.

| 717 | 8/21/2024 | Limited Objection of Visual Semiconductor, Inc. to Motion to Employ SSG Advisors, LLC as Investment Banker |
| 718 | 8/24/2024 | Amended Notice to Take Deposition of: William A. Homony as the Chapter 11 Trustee Subpoena Duces Tecum Filed by Visual Semiconductor, Inc. |
| 728 | 9/4/2024 | Objection of Visual Semiconductor, Inc. to Motion to Quash and Motion to Compel Discovery. |
| 735 | 9/12/2024 | Motion of Visual Semiconductor, Inc. to Expedite Motion to Compel Discovery. |
| 752 | 10/1/2024 | Objection of Visual Semiconductor, Inc. to Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 761 | 10/11/2024 | Second Notice to Take Deposition of: William A. Homony, as Chapter 11 Trustee. |
| 762 | 10/11/2024 | Notice to Take Deposition of: designated representative of Hawk Investment Holdings Ltd. |
| 763 | 10/11/2024 | Notice to Take Deposition of Bob Morton. |
| 764 | 10/11/2024 | Notice to Take Deposition of Alastair Crawford. |
| 765 | 10/11/2024 | Notice to Take Deposition of Kevin Gollop. |
| 766 | 10/11/2024 | Certificate of Conference as to Subpoena and Scheduling of Deposition for Hawk Investment Holdings Ltd. |
| 788 | 11/6/2024 | Objection of Visual Semiconductor, Inc. to Trustee's Motion for, inter alia, an Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets Including Approval of Provisions for Designation of A Stalking Horse, (B) |

| | | |
|---|---|---|
| | | Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief. |
| 798 | 11/12/2024 | Praecipe to Supplement VSI's Objection to Trustee's Motion for, inter alia, an Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets Including Approval of Provisions for Designation of A Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief, and (II) an Order Approving (A) the Sale of Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief. |
| 815 | 11/22/2024 | Visual Semiconductor, Inc.'s Objection to Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests,  (B) Approving the Assumption and Assignment of Certain |

| | | |
|---|---|---|
| | | Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief. |
| 821 | 11/27/2024 | Visual Semiconductor, Inc. Notice of Appeal of Motion to Reconsider. |
| 826 | 11/27/2024 | Visual Semiconductor, Inc.'s Motion to Reconsider Motion to Quash. |
| 827 | 11/27/2024 | Motion to Expedite Visual Semiconductor, Inc.'s Motion to Reconsider Motion to Quash. |
| 828 | 11/27/2024 | Visual Semiconductor, Inc.'s Joinder to Motion for Sanctions. |
| 847 | 12/4/2024 | Motion to Approve Disclosure Statement and (ii) Procedures for the Solicitation and Tabulation of Votes to Accept or Reject Visual Semiconductor, Inc.'s Chapter 11 Plan of Reorganization; and (iii) Related Notice and Objection Procedures. |
| 859 | 12/4/2024 | Declaration re: of Mark Hsu in further support of Visual Semiconductor, Inc.'s Objection to Trustee's Sale Motion. |
| 861 | 12/4/2024 | Visual Semiconductor, Inc. Notice of Appeal of Bidding Procedures Order. |
| 873 | 12/9/2024 | Visual Semiconductor, Inc. and Rembrandt 3D Holding Ltd.'s Joint Notice of Appeal of Sale Order. |
| 877 | 12/10/2024 | Visual Semiconductor, Inc. and Rembrandt 3D Holding Ltd.'s Amended Joint Notice of Appeal of Sale Order. |
| 891 | 12/18/2024 | Objection of Visual Semiconductor, Inc. to Motion to Extend Deadlines, Timing and Amount of Certain Obligations in the Sharing and Carve-Out Agreement Between the Trustee and Hawk Investment Holdings, Ltd. |
| 941 | 2/11/2025 | Visual Semiconductor, Inc. Notice of Appeal of Order Denying Stay Pending Appeal. |

21. Any funds alleged to have been advanced by VSI were not authorized as administrative expenses, did not benefit the Debtors' bankruptcy estates, and were paid by VSI, if at all, to preserve its business opportunity to confiscate Debtors' assets for Rajan and VSI, and were expended without reasonable expectation of repayment.

22. On the contrary, as Rajan, VSI, and Stream represented to the Trustee and as they admitted on numerous occasions, and as numerous documentary admissions make clear, VSI advanced sums or paid expenses as an equity investment in Stream for which Stream issued shares of stock to VSI, and not as loans for which a repayment obligation accrued.

The following establishes the point:

- Rajan's deposition testimony on August 14, 2023, at pp. 77-79:

    Q.    What arrangement does VSI have with Stream whereby it's paying Stream's employees?

    A.    There's prepetition – some postpetition by mainly prepetition subscription agreements. It's signed-up subscription agreements paying Stream TV expenses, paying legal expenses, paying for vendors, paying for supply chain, paying for production, paying for a wide range of expenses…

    Q.    And all of those expenses during the pendency of the bankruptcy continue to be paid by VSI?

    A.    Yeah. VSI has been paying, correct. That is correct.

    Q.    And what does VSI get in exchange for paying all of Stream's expenses?

    A.    Shares. It's equity.

    Q.    … How often is VSI getting issued this equity? …

    A.    Once or twice a week.

***

> Q.    Approximately how much money per month is VSI paying for expenses associated with Stream in exchange for receiving shares in Stream?
>
> A.    … since the bankruptcy has been filed, it's probable a million and a half.  It will be 2 million soon. …

Selected pages of the deposition testimony are attached as Exhibit D.

- Rajan's hearing testimony on August 17, 2023 at pp. 205-206:

> Q.    VSI has been paying all the expenses of the Debtor since filing a bankruptcy, correct?
>
> A.    Yes, that is correct.
>
> Q.    And for all the money that VSI spends, it receives an allotment of stock in Stream, correct?
>
> A.    That is correct.
>
> Q.    And again, that stock for the payments is pursuant to subscription agreements, correct?
>
> A.    Yeah, that's correct….
>
> Q.    You've entered into post-petition subscription agreements with VSI, whereby VSI receives shares in Stream in exchange for paying expenses of Stream, correct?
>
> A.    Correct.

Selected pages of the hearing testimony are attached as Exhibit E.

- Shortly after he was appointed, the Trustee reached out by email to Debtors' counsel, Rafael Zharalddin, to inquire about "Stream TV Funding."  Debtors' counsel responded that VSI provided funding through VSI's purchases of Stream shares:

**From:** William Homony <bhomony@mctllp.com>
**Sent:** Wednesday, January 17, 2024 10:34 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>
**Subject:** [EXT] Stream TV Funding

Hi Rafael, is there a formal funding mechanism currently in place with VSI?  Seems we'll need funds to cover upcoming costs including the $100k owed to BMC.

Thanks.

**William A. Homony, CIRA**

Debtors' counsel responded:

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Wednesday, January 17, 2024 10:54 AM
**To:** William Homony <bhomony@mctllp.com>
**Cc:** Michael.vagnoni@obermayer.com <Michael.vagnoni@obermayer.com>; 'George, Edmond' <Edmond.George@obermayer.com>
**Subject:** RE: Stream TV Funding

Yes.  There is a subscription agreement open for shares (they understand the shares are likely to be extinguished).

The shares are key to pushing the conversion agreements into surplus.

Let me find out where things are and I will revert back to you.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

The January 17, 2024 email exchange is attached as Exhibit F.

- Seven Stock Purchase Agreements between Stream and VSI—**four of which were entered into post-petition**—dated: February 27, 2023 (for a total Purchase Price of $1,427,355); February 27, 2023 (for a total Purchase Price of $1,525,275); March 10, 2023 (for a total purchase price of $750,000); July 6, 2023 (for a total Purchase Price of $35,000,000); July 10, 2023 (for a total Purchase Price of $2,000,000); September 11, 2023 (for a total Purchase Price of $5,000,000); and September 11, 2023 (for a total Purchase Price of $5,000,000).  Copies of the Stock Purchase Agreements are attached as Exhibits G1-G7.

- Affidavit of Mathu Rajan Regarding Capstone Capital Markets LLC dated June 12,

2024:

2.      I am President and Chief Executive Officer of [VSI] and have held those posts since the company's formation in 2022.  I also serve as one of the directors on the company's board.

3.  I am also the sole director of Stream Networks, Inc. [sic] … a position I have held since the company's formation in 2009.  I was also Chief Executive Officer and maintained operational control of Stream from its inception until January 5, 2024, when the U.S. Bankruptcy Court for the Eastern District of Pennsylvania issued an order appointing a chapter 11 trustee….

4.  VSI is a party in interest in the Stream bankruptcy proceedings as an equity holder of Stream and the proposed sponsor of a plan of reorganization….

A copy of Rajan's Affidavit is attached as Exhibit A.

• Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs,

attached as Exhibits B (Stream) and C (Technovative).

• VSI email and spreadsheet dated December 22, 2023 from VSI/Stream Financial Executive

to VSI Director Daniel Rink, with a copy to Rajan, re: "Updated Issuances of Stream TV shares to

VSI" (a copy of which is attached as Exhibit H):

Please see a summary of Stream TV share issuances to VSI against the subscription agreements as of Nov 30, 2023.  The summary tab shows you the issuances against each agreement and the Detail tab shows you the issuances each month.  The issuances post petition and as reflected in the MORs are identified separately.  I have updated the tally per the revised MORs that were submitted.

These shares are recorded in the corporate ledger and only digitally issued. No physical share certificates are issued….

• Nine Amended Monthly Operating Reports ("MORs") filed by the Debtor in December

2023, shortly before the Trustee was appointed, covering the periods from the Petition Date in

March 2023 through November 2023 (relevant portions of which are attached as Exhibits I-1to I-

9).  Each month, VSI provides a report identifying the summary of expenses paid by VSI on behalf

of Stream for that month and declaring the number of Stream shares to be issued in return.  The

report for June 2023 follows:


**Visual
Semiconductor
Inc.**

December 7, 2023

Mr. Thomas Park
Chief Financial Officer
Stream TV Networks, Inc.
2009 Chestnut Street
Third Floor
Philadelphia, PA 19103

Dear Mr. Park:

Enclosed please find a summary of expenses paid by Visual Semiconductor, Inc. on behalf of
Stream TV Networks, Inc. for June 2023. As you can see, these expenses total **$243,871.98** for
the reporting period.

Accordingly, and pursuant to the stock purchase agreement between VSI and Stream which
specifies a per-share purchase price of $1.50, Stream should issue **162,581 shares** of its Class A
Common stock to VSI as soon as practicable.

Detailed accounting for the expense summary is available upon request.

Thank you for your assistance in making sure this additional equity issuance to VSI is
appropriately recorded.

Respectfully,

_____
Daniel J. Rink
Director

Enc.  Financial Summary June 2023

23.    The Motion is supported by two Declarations, one from Nicole Maneen, and one from Suby Joseph.  In paragraphs 2 and 3 of the Maneen Declaration, Maneen declares under penalty of perjury that:

> 2. Prior to the Steam bankruptcy filing, [VSI] paid certain [Stream] expenses on behalf of Steam as an equity investment pursuant to stock purchase agreements between Stream and VSI.

> 3. After the Stream bankruptcy filing, and after the pre-petition stock purchase agreements had been satisfied, VSI made additional payments on behalf of Stream.

24.    The Maneen declaration is materially false to the extent it suggests—and it does—that VSI made payments post-petition that were not associated with stock purchase agreements between VSI and Stream: "3.  After the Stream bankruptcy filing, and after the pre-petition stock purchase agreements had been satisfied VSI made additional payments on behalf of Stream."

25.    As Maneen knows but omitted from her Declaration, VSI and Stream entered into four post-petition stock purchase agreements for a total purchase price of $47,000,000, which were funded by the payment of Stream expenses post-petition after the pre-petition stock purchase agreements had been satisfied. *See* Exhibit I.

26.    Paragraphs 2 and 3 of the Joseph Declaration are similarly false and misleading, as they falsely suggest that post-petition payments by VSI were not associated with stock purchase agreements.

27.    Not only is the Motion substantively meritless, it fails to provide the detail and support mandated by the Court order (the "Admin Order") (D.I. #948) setting a deadline for asserting a claim for administrative priority expenses pursuant to Section 503 of the Bankruptcy Code. In that regard, the Motion was to comply with "L.B.R. 3002-2 and **must include supporting**

**documentation substantiating the amount and validity of the claim**." *See* Admin Order
(emphasis added).

28.    As is facially evident, the Motion violates the Admin Order because it does not
contain supporting documentation substantiating the amount and validity of the payments for
which an administrative claim is sought.

## II.    APPLICABLE LAW

29.    Section 503 of the Bankruptcy Code provides in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative
> expenses, . . . including-
>> (1)
>>> (A) the actual, necessary costs and expenses of
>>> preserving the estate[.]

11 U.S.C. § 503.

30.    The administrative treatment of a claim is intended to (1) encourage parties to deal
with the insolvent debtor post-petition to facilitate the debtor's rehabilitation and (2) ensure the
efforts of creditors do not unjustly enrich the estate. *See In re Jefferson Investment Company*, 151
B.R. 920, 922 (Bankr. E.D. Mo. 1993) (citations omitted); *see also, In re Molnar Bros.*, 200 B.R.
555, 559 (Bankr. D.N.J. 1996) (policy behind giving priority to administrative claimants is to keep
administrative costs to a minimum to preserve the debtor's estate).

31.    To recover an administrative claim under this provision, a claimant must be a
"creditor" of the debtor and must provide a "substantial contribution" to the debtor's estate.  *In re
Lease-A-Fleet, Inc*., 148 B.R. 419, 426 (Bankr. E.D. Pa. 1992) (citing *In re St. Mary Hospital*, 120
B.R. 25, 28, 30-31 (E.D. Pa. 1990), aff'd, 931 F.2d 51 (3rd Cir. 1991); *In re FRG, Inc.*, 124 B.R.
653, 657 (Bankr. E.D. Pa. 1991)).

32.    While "substantial contribution" is not defined in the Bankruptcy Code, the Third

Circuit has held:

> In "determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors."

*In re Tropicana Entm't LLC*, 498 Fed. Appx. 150, 152 (3d Cir. 2012) (quoting *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994)).

33.     As the party seeking allowance of an administrative expense, VSI bears the burden of proof, a burden that it cannot meet.   *In re Massetti,* 95 B.R. 360, 363 *(Bankr. E.D. Pa. 1989); see also In re Blessing Industries, Inc.,* 263 B.R. 268*, 272 (Bankr. N.D. Iowa 2001*). Further, "[s]ince the affording of priority status to one creditor has an impact upon other creditors of the debtor's estate and conflicts with the goal of bankruptcy to provide creditors with an equal distribution of a debtor's resources, this court has consistently held that administrative claims must be narrowly construed."  *In re Lease-A-Fleet, Inc.*, 140 B.R. 840, 844 (Bankr. E.D. Pa. 1992) (collecting cases).

34.     Courts applying Section 503 do so narrowly - Section 503(b)(1)(A) was not enacted to "saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses."  *Id.* (quoted reference omitted).

35.     Finally, since VSI is an insider of the Debtor the request for administrative expense is subject to higher scrutiny.  *See In re Keystone Surplus Metals, Inc.,* 445 B.R. 483, 488 (Bankr. E.D. Pa. 2010) (citing *Arney v. MRI Tanglewood Rental Investments, Inc. (In re The Alpha Corporation of Virginia),* 979 F.2d 847 (4th Cir 1993).

## III.   ARGUMENT

### A.   VSI is Not a Creditor of the Debtors.

37.     VSI is an affiliate of the Debtors under the common control of Rajan, and an insider of the Debtors.

38.     In the Schedules of Assets and Liabilities and Statements of Financial Affairs filed by the Debtors, VSI is reflected as: (i) an equity holder of Stream holding over eighty percent (80%) of the voting control over Stream, (ii) having no interest in Technovative, and (iii) being neither a creditor nor a shareholder of Technovative.  *See* Schedules of Assets and Liabilities and Statements of Financial Affairs attached, respectively, as Exhibits B (Stream) and C (Technovative).

39.     VSI is not a creditor of the Debtors, and the advances identified in the Motion were made, if at all, in return for shares of Stream.  No loan was contemplated, there was no agreement to repay the advances and no document evidencing a loan or a repayment obligation is alleged or exists.

### B.   The Motion Fails to Demonstrate Any Benefit to the Debtors.

40.     In the Motion, VSI claims that "[b]oth prior and after the Chapter 11 Trustee's appointment, VSI made extensive and significant payments that benefitted Stream's estate. . .". The allegations are conclusory, and no specific benefit is disclosed. *See* Motion at Paragraph 7.

41.     The Motion fails to allege—let alone establish—how the expenditures benefitted Stream's bankruptcy estate and does nothing to justify the allowance.

42.     VSI advances were made in exchange for shares of Stream, not as loans, and not as administrative expenses that prime other creditors.

43.     As of August 14, 2023, VSI had made payments on behalf of Stream totaling roughly $1.5 million—all the while swearing that no creditor relationship existed, and that there was no repayment obligation.

44.     There are no agreements, communications, or other evidence to suggest—let alone establish—that this arrangement of payment for shares changed after the Trustee's appointment.

45.     Of course, had Stream been obligated to VSI for any prepetition claims, those claims would have been provided for and reflected in Stream's Schedules.

46.     If any advances were indeed made, they were on the same terms previously represented by VSI, namely, that additional Stream shares were being obtained for money allegedly advanced.

47.     VSI is now seeking by sleight of hand to transform advances made to acquire equity into loans.

**C.      VSI's Pre-Appointment Advances were not Loans to Stream.**

48.     The amounts alleged to have benefited Stream, which VSI claims to have advanced, are not intuitive or self-authenticating. It is VSI's burden to demonstrate how each expenditure benefited Stream's bankruptcy estate.

49.     Examples of these confusing entries and the lack of detail supporting an allowed pre-Trustee appointment administrative claim include:

(a) Software ($636.00);

(b) Funding BoA ($29,476.83);

(c) Funding to M&T ($196,000.00);

(d) Legal Fee ($2,962,42);

(e) Insurance ($434.32);

(f) Office ($763.07);

(g) Travel ($17,905.73);

(f) Consultant ($103,900.82);

(g) Bank Charges ($231.00 and $141.32); and

(g) Storage ($28,28.00).

50. Moreover, there is no explanation or support as to how these individual expenditures by VSI benefited Stream's bankruptcy estate.

51. It is also important to note that VSI's prior efforts to obtain Court approval for providing DIP financing while the debtors were in possession were denied due to Rajan wearing too many hats and failing to be candid with the Court.

52. This Court specifically found that the DIP loans proposed by Stream and VSI could not be approved because funding was readily available directly from SeeCubic without the necessity of Stream incurring debt. Trustee Opinion at 41-42.

53. The Court further found that the Debtor was unable to establish that Stream was even responsible for funding SCBV's operations. *Id.* at 41.

54. Finally, conflicts of interest infected and torpedoed the proposed financing: "the evidence at the hearing made clear to the Court that the proposal to have the Debtors incur $1 million in post-petition administrative debt to VSI… was also fatally flawed because Mr. Rajan was on both sides of the proposed transaction." *Id.* at 42.

55. VSI seeks to employ Section 503 as a back door to overcome the twice denied DIP loans, and the Motion should be denied.

**D.      VSI's Claimed Post-Appointment Expenditures Provided No Benefit to the Debtors' Bankruptcy Estates and Benefitted Only VSI and Rajan.**

56.      The Trustee did not agree that advances as to which he was made aware (or authorized) would be obligations of the Debtor.  To the contrary, the Trustee was told that VSI made advances in return for shares of Stream, and he understood that all advances would be treated in that manner.

57.      For a short period after his appointment while evaluating the Debtors and the positions of the parties in interest in the bankruptcy cases, the Trustee received three wires from VSI ($31,125.00 on 2/5/24, $21,125.00 on 2/20/24 and $21,125.00 on 3/8/24 the last returned to VSI on 3/12/24) and used those funds to pay alleged Stream's contract employees in an effort to preserve the status quo and ensure that no individuals were harmed as a result of management being removed from control of the Debtors.  Shortly thereafter the Trustee determined not to accept any further monies from VSI for any reason and advised VSI of same.

58.      After determining that VSI and Stream's contract employees (acting for the benefit of VSI and Rajan) were acting in their own self-interest and that Stream had no operations or the need for "employees", the Trustee advised VSI that any further dealings would require Court approval and began negotiating a potential Debtor-in-possession financing and a viable path forward for the Debtors.  A deal between the Trustee and VSI was never reached.

59.      As of May 6, 2024, VSI was on notice the Hawk Settlement Agreement, the Court-approved plan to sell the Debtors' assets, and the secured creditors' commitment to advance necessary funds to preserve the value of the assets to be sold.

60.      From that point forward, it is ludicrous for VSI to suggest—and patently fraudulent for it to claim—that it was making advances at the Trustee's request as an administrative obligation of the Debtors' bankruptcy estates.

61.     While the Debtors were not in possession and the Trustee was in control, VSI was not authorized to incur debt on behalf of the Debtors' bankruptcy estates, and Rajan was not authorized to conduct any business on behalf of the Debtors.

62.     Stream had no ongoing operations as of the Appointment Date; yet VSI alleges to have incurred almost $1,000,000.00 in expenses since that time for which Stream's bankruptcy estate should be liable.

63.     The Motion also includes expenditures ordinarily incurred by debtors in possession; however, the debtors did not operate at any point after the Appointment Date. These expenditures include the same description as the expenditures claimed pre-appointment and ironically exceed the expenditures while acting as a debtor in possession by a factor of three.

64.     VSI claims expenditures for: (a) accounting ($3,251.50) without providing any information on who was paid, by whom, why the expense was incurred, or how it benefitted Stream's bankruptcy estate; (b) Funding to and from Tristate ($52,300.00) without explaining how it benefitted Stream; (c) Legal ($28,157.53) without explaining which firm was paid, who they represented, and in which matter the services were provided; (d) Payroll ($812,000.00) without identifying the payees and what the person was doing for a debtor that was not operating; and (e) Sales ($36,765.30) when Stream was not selling or operating at all after the Appointment Date.

65.     VSI's claim that the Trustee induced the advances is pure nonsense. While the Trustee did not object to the payments because he was told that VSI made them in return for shares of Stream, he did not authorize the incurrence of an administrative expense.

**E.     VSI's Disclosure Statement Accompanying its Plan Did Not Disclose the Existence of Administrative Claims in Favor of VSI in the Amounts Claimed in the Motion.**

66.     Following the entry of the Sale Order on December 3, 2024, VSI filed a Plan of

Reorganization (the "Plan") and Disclosure Statement (the "Disclosure").  *See* D.I. 848 and 847.

67.     Neither the Plan nor the Disclosure mentions VSI holding an administrative claim

or seeking payment for any claim.

68.     The Disclosure identifies administrative claims totaling $4-7 million; however,

these amounts are based on the $3 million prepetition fee claim of the Debtors' counsel (to which

the Trustee has objected), the Trustee's fees, and those of his professionals. The VSI administrative

claim is not mentioned and is not included because VSI knew that no such claim existed.

69.     The failure to disclose or discuss VSI's alleged $1.2 million administrative claim

as late as December 2024 is significant. Its absence supports the Trustee's position that the alleged

advances were made without any expectation of repayment.

## V.     <u>CONCLUSION</u>

In light of the foregoing facts and authorities, the Trustee respectfully submits that the

Motion should be denied.


Respectfully submitted,


Dated: March 24, 2025                    By: */s/ Steven M. Coren*
                                        Steven M. Coren, Esquire
                                        COREN & RESS, P.C.
                                        Two Commerce Square, Suite 3900
                                        2001 Market Street
                                        Philadelphia, PA 19103
                                        Telephone: (215) 735-8700
                                        scoren@kcr-law.com

                                        Special Counsel to the Trustee