**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VISUAL SEMICODUCTOR, INC.<br><br>    Plaintiff<br><br>    v.<br><br>REMBRANDT 3D HOLDING, LTD.;<br>WILLIAM A. HOMONY,<br>INDIVIDUALLY (AS *ULTRA VIRES*),<br>AND, AS JOHN DOE 2, IN HIS<br>OFFICIAL CAPACITY AS TRUSTEE;<br>AND JOHN DOES (MORE FULLY SET<br>FORTH BELOW)<br><br>    Defendants | Chapter 11<br>Bky No. 23-10763 (DJB)<br><br>Adv. No. _____ (DJB)<br><br>**Jury Trial Demanded**<br><br>**Adversary Proceeding**<br><br>Claims for Relief:<br>1) Declaratory Judgment<br>2) Injunction<br>3) Breach of Contract (including Breach of Covenant of Good Faith and Fair Dealing)<br>4) Unjust Enrichment<br>5) Promissory Estoppel<br>6) Conversion<br>7) Conspiracy/Aiding and Abetting |

<u>**ADVERSARY COMPLAINT**</u>

Plaintiff Visual Semiconductor, Inc., by and through its undersigned counsel, Matthew B. Weisberg, Esquire, hereby files this Adversary Complaint, and VSI avers:

**I.    THE PARTIES**

1.    Plaintiff, Visual Semiconductor, Inc. ("VSI"), is a registered corporation organized under the laws of Wyoming with an office address in Wyoming. VSI is headquartered in Pennsylvania.

2.    Defendant, Rembrandt 3D Holding, Ltd. ("Rembrandt") is a corporation organized and existing under the laws of the Island of Nevis, West Indies with a registered address in the West Indies.

1

3.  Defendant, William A. Homony ("Homony"), is instant Chapter 11 trustee, sued both as John Doe, in his official capacity, and individually, as acting *ultra vires*.

> **Commented [BR1]:** Shouldn't we identify the John Does here?

## II.  JURISDICTION AND VENUE

4.  Federal Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different U.S. States and foreign countries, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.  This Honorable bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of reference of the United States District Court for the Eastern District of Pennsylvania.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1357 and § 1367, which claims are part of the same case or controversy, 18 U.S.C. § 1836.

6.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), (K), and (O).

7.  Venue is proper pursuant to 28 U.S.C. § 1409 because the adversary proceeding arises in, and is related to, the above caption jointly administered bankruptcy estate pending in the United States Bankruptcy Court of the Eastern District of Pennsylvania.

## III.  BACKGROUND OF THE PARTIES

8.  Plaintiff VSI was founded to develop and commercialize glasses – free holographic display technology for use in commercial and consumer markets globally.

9.  Defendant Rembrandt engages in the development and commercialization of advanced display technologies and is the owner of all the assets of Defendant, John Does, 3D Fusion Corp., a Delaware corporation, and its wholly-owned Dutch subsidiaries, 3D Fusion Holding B.V. and 3D Fusion EU B.V., Eindhoven, The Netherlands (collectively "3D Fusion").

2

10. Defendant, John Doe, Stephen K. Blumenthal, is the CEO and sole shareholder of Rembrandt.

11. Defendant, John Doe, Stream TV Networks, Inc. ("Stream"), is a Delaware corporation and instant debtor.

12. Stream engages in the business of developing glasses – free 3D display technology. Stream's assets were sold in December 2024 in a contested § 363 sale coordinated by Homony.

13. Defendant, John Doe, SeeCubic, Inc. ("SeeCubic"), is a Delaware corporation with offices in New York.

14. SeeCubic was founded by Defendants, John Does, Stastney and Morton, in June 2020 for the purpose of receiving the assets and intellectual property of Stream pursuant to a settlement agreement that was later invalidated by the Delaware Supreme Court in June 2022.

15. Notwithstanding the reversal, SeeCubic acquired title to the Stream assets through the Homony-brokered § 363 sale.

16. Defendant, John Doe, Shadron L. Stastney ("Stastney"), resides in New Jersey. Stastney was a senior investor and lender of Stream and was also its chief financial officer and vice chairman of its board of directors. Upon information and belief, Stastney is a chief executive of SeeCubic. Upon information and belief, Stastney formed SeeCubic to seize the assets of Stream.

17. Stastney settled SEC charges regarding breaches of fiduciary duty in unrelated investments in September 2013, barring Stastney from investment and advisory work for 18 months. In the Matter of Shadron L. Stastney, United States Securities and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (September 18, 2013) (published).

3

18. Defendant, John Doe, Hawk Investment Holdings Ltd. ("Hawk"), is an entity formed under the laws of Guernsey, United Kingdom Channel Islands. Hawk is the alter ego of Defendant, John Doe, Morton. Upon information and belief, Morton owns and/or controls Hawk through entities owned and controlled by him, including Defendant, John Doe, Albany Directors Ltd. Hawk was Stream's largest secured creditor before transferring its debt to SeeCubic.

19. Defendant, John Doe, Arthur Leonard Robert "Bob" Morton ("Morton"), upon information and belief, owns and/or controls Hawk through entities owned and controlled by him, including Albany Directors Ltd.

20. The UK Financial Conduct Authority banned all UK banks and brokers from participating in any take-over activity in which Morton is involved (known as "Cold Shouldering").

## IV. OPERATIVE FACTS

### A. Introduction

21. In 2024, VSI Rembrandt, with Blumenthal executing as CEO, entered into a Litigation Funding and Confirmation Agreement ("LFCA") and subsequent amendments which entitled VSI to certain rights regarding Rembrandt's litigation, which VSI funded.

22. Key rights afforded to VSI pursuant to the LFCA and its amendments included absolute pre-approval of any settlement Rembrandt might wish to consider, and the right to immediate ownership of or access to Stream's Ultra-D technology if Rembrandt succeeded in obtaining such ownership or access.

23. Notwithstanding the LFCA, Blumenthal and Rembrandt negotiated and executed a settlement agreement ("Settlement").

24. By executing the settlement agreement without VSI consent, Blumenthal and Rembrandt breached their agreement with VSI.

4

25. Homony aided and abetted the Rembrandt breach to reach a global settlement that would end federal litigation in which Homony was personally named as a Defendant (accused of patent infringement and misappropriation of trade secrets, *inter alia*).

26. Upon information and belief, Homony advocated for the settlement primarily to shield himself and his advisers from the consequences of an unlawful sale of non-estate assets to a bad-faith "stalking horse bidder."

27. Homony conspired with certain other Defendants to transfer assets of debtors, Stream and Technovative, through a carefully designed scheme that benefited Defendants at the expense of the debtors and other parties in interest.

28. To achieve the liquidation goal, Homony conspired with Stastney, SeeCubic, Hawk, and other parties, Defendants, John Does, to seize the debtors' assets through a scheme ultimately struck down by the Delaware Supreme Court.

29. Homony awarded his co-conspirators funds, allowed claims and gave them preferential treatment so they could claim legal title to the debtors' assets at virtually no cost.

    **B.**    **Homony's Infringement of Rembrandt's Intellectual Property**

30. Stream's Ultra-D Technology assets incorporate Rembrandt's intellectual property.

31. The Rembrandt IP was not removed nor returned by Homony before he sold Stream's assets to SeeCubic in accordance with a settlement agreement between Stream as the debtor, Hawk as the collateral agent for Stream's secured creditors; and SeeCubic as the stalking horse bidder (approved by Homony).  ("SeeCubic 9019 Settlement").

    **C.**    **LFCA Contract and Subsequent Amendments**

32. With Homony committed to conducting a § 363 sale of Stream's assets despite infringement warnings from Rembrandt, it became clear to VSI and Rembrandt that they had a

5

common interest in preventing the unlawful transfer of Stream's assets to an unlicensed party like SeeCubic, and in protecting Stream's other parties in interest from the actions of Homony.

33. However, Rembrandt lacked the financial resources necessary.

34. VSI agreed to provide litigation funding to Rembrandt to pursue legal options in various venues.

35. On November 5, 2024, Rembrandt and VSI entered into the LFCA whereby VSI would provide litigation funding to Rembrandt to receive certain consideration in return, including the right to guide litigation strategy, among others.

36. Pursuant to the agreement, litigation funding was paid by VSI to (a) Blumenthal directly for Rembrandt's benefit; and (b) to Brown & Michaels, P.C., Defendant, John Doe, counsel for Rembrandt.

> **Commented [BR2]:** We didn't identify Brown & Michaels as a Defendant earlier. This is the first reference. Should we do so earlier?

37. When it became clear that the imminent § 363 sale would result in additional legal expenses for Rembrandt, Rembrandt and VSI amended the LFCA ("LFCA Amendment # 1") on November 20, 2024, to increase VSI's financial support.

38. LFCA Amendment # 1 increased the amount of weekly litigation funding by VSI and also that VSI counsel would draft initial documents for Rembrandt review and subsequent filing-thereby reducing direct litigation costs to Rembrandt.

39. Pursuant to LFCA Amendment # 1, litigation funding was paid by VSI to (a) Blumenthal directly for Rembrandt's benefit; and (b) to Brown & Michaels, P.C., counsel for Rembrandt.

40. As an alternative to Homony's proposed asset sale, VSI filed a disclosure statement and accompanying plan of reorganization for which it was to provide additional reorganization funding.

41. The proposed plan would provide recoveries for not only Hawk and SeeCubic but for all of Stream's unsecured creditors as well.

42. The plan was filed on December 3, 2024.

43. On December 30, 2024, SeeCubic, Hawk, VSI and Rembrandt amended the LFCA a second time ("LFCA Amendment # 2").

44. LFCA Amendment # 2 not only adjusted the amount of VSI financial support again but also changed the payment direction so that litigation funding was paid by VSI directly to Blumenthal for allocation at Rembrandt's sole discretion.

45. In essence, the LFCA, along with its two amendments, provided that Rembrandt would work exclusively with VSI in connection with the pending litigation against SeeCubic, Stastney, and Homony, with the shared goal of recovering technology wrongfully transferred from Stream.

46. VSI made litigation funding payments to Rembrandt and its counsel pursuant to the LFCA and its amendments.

47. Additionally, VSI paid its own counsel to draft and review documents for Rembrandt's benefit.

48. VSI made these payments with a reasonable expectation that Rembrandt would adhere to the mutually agreed litigation strategy and secure VSI pre-approval before negotiating any settlement.

49. Rembrandt did not have the authority to conduct settlement negotiations or enter into any settlement agreement without the expressed pre-approval of VSI, which was neither consulted nor solicited by Rembrandt.

**D. The Stream Technology and its Dependence on Third-Party Intellectual Property of Philips and Rembrandt**

7

50. Stream was founded in 2009 by Mathu Rajan ("Rajan"), and over the course of several years, the company developed glasses-free 3D technology trademarked Ultra-D™.

51. The Ultra-D solution was created around the foundation of technology that Stream licensed from non-party, Koninklijke Philips N.V. ("Philips"), via a non-exclusive, nontransferable, non-sublicensable basis in 2011.

52. Stream paid for the Philips' license which is held by Defendant, John Doe, Ultra-D Ventures, C.V., a curacao company that was formerly a subsidiary of Stream but is now owned by SeeCubic (following the § 363 sale of Stream's assets).

53. Certain engineers employed by Stream through its Netherlands subsidiary, Defendant, John Doe, SeeCubic, B.V. ("SCBV"), had previously worked for Blumenthal.

> **Commented [BR3]:** This is the first time we identify SCBV as a Defendant. Should we do so in the earlier section?

54. During their work-for-hire period, the Stream engineers developed improvements to the Philips technology using a Philips license obtained by Blumenthal.

55. After joining Stream and its subsidiary SCBV in 2011, these engineers incorporated trade secrets and other confidential information developed with Blumenthal into the Ultra-D solution for the benefit of Stream.

56. Stream's executives were unaware that their R&D engineers had access or wrongfully appropriated third-party intellectual property until Rembrandt filed a Complaint against Stream in 2017 in the Supreme Court of New York.

**E.    The Rembrandt Lawsuit and the Mediated Stastney – Rembrandt Term Sheet**

57. While attending the Consumer Electronics Show in Las Vegas, Nevada, in January 2017, to promote Ultra-D Stream's management and key engineers the Rembrandt New York lawsuit was served.

8

58. Stream's engineers denied any wrongdoing to Stream management; some of them admitted they had previously worked with Blumenthal to improve Philips technology but exclusively denied that they wrongfully used any proprietary information or were bound by nondisclosure or confidentiality documents.

59. Other Stream engineers denied even knowing Blumenthal.

60. Based on the representations of its engineers, Stream defended itself against the Rembrandt New York lawsuit – which was later removed from the Supreme Court of the State of New York to the United States District Court for the Southern District of New York.

61. Rembrandt and Stream were ordered into mediation whereupon ultimately Blumenthal was authorized to bind Rembrandt and Stastney similarly on behalf of Stream.

62. Presented with evidence that Stream's engineers had executed non- disclosure agreements and had shared detailed and proprietary information with Blumenthal during their work-for-hire period, Stastney capitulated to Rembrandt's demands for a general settlement.

63. On April 9, 2019, the settlement was memorialized in a term sheet ("Stastney-Rembrandt term sheet") signed by Stastney, Blumenthal, and the Honorable Magistrate Judge Katharine H. Parker.  .

F. **The Settlement between Stream and Rembrandt**

64. At the time the term sheet was executed – and for nearly two years afterwards – Stream Management was unaware of the evidence Rembrandt had provided Stastney.

65. It was not until 2021 that it was learned:  (a) many of Stream's engineers, including some who claimed they did not even know Blumenthal, had signed non-disclosure agreements; (b) Blumenthal had minutes for at least 45 separate engineering meetings with Stream's personnel; (c) Blumenthal possessed significant portions of computer code that predated the formation of SCBV and was used by Stream's engineers in the Ultra-D solution;

9

and (d) Blumenthal's claims extended beyond the three Rembrandt patents to include 175 trade secrets ("Rembrandt Trade Secrets").

66. Stream Management disputed the validity of the term sheet for two years believing Stastney had agreed to an overly generous settlement to increase the chances of foreclosing on Stream as the secured creditor.

67. Rembrandt sought to enforce the timesheet or resume litigation but its case against Stream was stayed by Stream's February 2021 bankruptcy filing.

68. Rembrandt approached Stream to renew settlement discussions in May 2021 making it clear that Rembrandt intended to file an adversary proceeding in the Stream bankruptcy if the settlement could not be finalized.

69. To avoid the adversary proceeding, Stream negotiated the terms of a long form agreement that effectively mirrored the timesheet.

70. Final points were discussed and incorporated into a document that the parties intended to submit to the bankruptcy court for approval.

71. Before the finalization of the long form agreement, the bankruptcy court dismissed Stream's Chapter 11 case on May 17, 2021.

72. Nonetheless, the parties completed their negotiations and executed a settlement agreement on May 23, 2021 ("Rembrandt Settlement").

    **G.**    **The Homony Adversary Complaint against Rembrandt and VSI**

73. On April 30, 2025, Homony filed an adversary complaint against VSI, Rembrandt and Rembrandt's counsel, and Rajan, challenging Rembrandt's bankruptcy claims ("The Homony Complaint").

    **H.**    **The Continuous Attempt by Stream's Alleged Secured Creditors to Secure Stream's Assets**

74. On March 26, 2020, SLS filed a complaint in Delaware Superior Court seeking to foreclose on all the assets of Stream pursuant to security agreements pledging Stream's assets as collateral for loans provided by SLS.

75. Unable to obtain Stream's assets through a quick foreclosure, Stastney, along with three of Stream's directors – Defendants, John Doe, Kevin Gollop, Asaf Gola, and Krzysztof Kabacinski – in early May 2020 to establish a debt resolution committee and entered into a settlement ("Omnibus Agreement") whereby all of Stream's assets would be transferred to Stastney's new company (SeeCubic) while leaving Stream's debt behind.

76. The Omnibus Agreement also gave preferential treatment concerning Stream's shareholders over the founding shareholders.

77. Stream's management denied the validity of the omnibus agreement as it violated the company's charter (prohibiting transfer of the assets without proper approval).

78. Ultimately, on June 15, 2022, the Delaware Supreme Court determined the Omnibus Agreement was void *ab initio*.

**I.     Seizure of Stream's Assets and Failure to Return Them**

79. In March 2020, Stastney began to seize Stream's assets immediately upon filing the foreclosure-notifying the third-party custodian of Stream's Silicon Valley computer servers (on which its valuable production code was stored), that he "had foreclosed" and was now the new owner of those assets.

80. He presented a filed copy and was non-adjudicated Superior Court complaint as proof of his ownership and convinced the unsuspecting vendor to block Stream's access to its own computers and transfer control of them to Stastney representatives.

81. While Stream management contested the validity of the Omnibus Agreement, Stastney, and his co-conspirators, continued to seize Stream's assets.

82. On August 24, 2020, despite being removed as Stream's directors three months earlier, Gollop and Gola executed a delegation of authority on Stream letterhead purporting to empower a third party to act on behalf of Stream in its China operations for the purpose of transferring Stream's bonding equipment to SeeCubic.

83. Kabacinski sent threatening communications to the CEO of Stream's R&D subsidiary, SCBV, related to inventory shipments, alleging fraud and other crimes by those who acted contrary to the (later invalidated) Omnibus Agreement.

84. On September 8, 2020, Stream sought injunctive relief from the Delaware Court of Chancery to prevent Stastney and SeeCubic from continuing their efforts to seize Stream's assets.

85. Despite the mandate from the Delaware Supreme Court, SeeCubic argued that it should not have to return assets that had been "improved" while SeeCubic exercised control over them for the prior eighteen months. When Vice Chancellor Laster ordered the assets returned anyway (with the caveat that SeeCubic could pursue unjust enrichment claims later), Hawk engaged Defendant, John Doe, SSG Advisors LLC ("SSG"), to sell the assets in a UCC Article 9 sale rather than return them to Stream.

86. SeeCubic, Hawk, and SSG set a sale date and prepared to market the assets in pursuit of the Article 9 sale, which was stopped when Stream was granted injunctive relief.

87. SeeCubic refused to surrender critical Stream assets, including technology demonstrators, the bonding equipment, and control of Stream's subsidiaries.

88. SeeCubic was specifically ordered to surrender control of Stream's subsidiaries by transferring ownership of the Technovative stock shares to Stream.

89. Stastney, SeeCubic and Hawk executed a scheme which transferred the shares to Stream before Hawk exercised purported proxy rights to seize control (not ownership) of those

12

shares and appointed Stastney the new director of Technovative, thereby maintaining the status quo.

90. Stastney, SeeCubic, and Hawk were held in contempt of court.

**J.     The Rembrandt Amendment between Stream and Rembrandt.**

91. While drafting the Stream Plan of Reorganization ("POR"), Stream and Rembrandt began negotiations to amend certain terms of the Rembrandt Settlement.

92. Over the course of the following month, the parties reached agreement on an amendment (the "Rembrandt Amendment"), which was executed by Stream and Rembrandt on August 12, 2023.

93. All past due cash payments were reset to a schedule tied to confirmation of the Stream POR, to which Rembrandt served as plan proponent. Nothing in the Rembrandt Amendment created new or additional obligations for Stream, and all terms tracked with the proposed Stream POR.

**K.     Stream and Rembrandt Enter into the Licensing Covenant with VSI.**

94. Stream, Rembrandt, and VSI were not "collusive" as alleged in the Homony Complaint, but they did have a common goal from June 2023 through January 2024 (and beyond): protecting the Stream estate and its respective licensors by preventing third parties from infringing technologies for which they had no license and no legal right to access.

95. With the Stream POR on file and ready for consideration by the Court, and with the Stream Adversary Case initiated to prevent the defendants therein from tortiously interfering with Stream and infringing the technologies of Rembrandt and Philips, VSI sought to further cement a relationship with Rembrandt by negotiating supplemental terms to the Rembrandt Amendment.

13

96. Those negotiations led to an agreement reached on August 14, 2023 (the "Licensing Covenant").

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Visual Semiconductor, Inc., respectfully requests judgment against Defendants.

Dated: September 2, 2025               Respectfully submitted,

/s/ Mathew Weisberg

WEISBERG LAW
7 S Morton Ave, Morton, PA 19070
(610) 550-8042
www.weisberglawoffices.com
mweisberg@weisberglawoffices.com

*Attorney for Plaintiff*

14