### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 23-10763-DJB |
| Debtor. | |

### THIRD DECLARATION OF MATHU RAJAN

I, Mathu Rajan, hereby declare under penalty of perjury:

**Background on Stream TV's License with Rembrandt**

1. Stream TV obtained a license from Rembrandt because Rembrandt alleged that a number of Dutch engineers previously employed by a Rembrandt predecessor company had joined Stream TV and brought Rembrandt technology with them.

2. While Stream TV management was aware that one or two individuals had worked at the predecessor company, assurances were given that no technology had been transferred.

3. After litigation was filed, however, it was disclosed to Shad Stasney that multiple Dutch engineers had, in fact, worked at the predecessor company and had brought technology over to Stream TV.

4. This information was not disclosed to the rest of Stream TV's management, including the Rajan brothers and Dan Rink.

**Discovery of Technology Transfer**

5. In 2021, after I began engaging directly with Rembrandt, I, along with Rajarajan and Dan Rink, learned—through Rembrandt's disclosures to the Rajans (and not through Stasney)—the full extent of the Dutch engineers' prior work at Rembrandt's predecessor company and the technology they transferred to Stream TV.

6. Stasney was aware of this fact, which explains why he settled with Rembrandt while at Stream TV.

1

7. Despite this, several Dutch engineers told me, my brother Rajan, and Dan Rink that they did not even know who Steve Blumenthal was.

8. Yet the record reflects more than 45 meetings, extensive meeting notes, source code, and significant technology transfers.

**Rationale for Licensing**

9. Stream TV acted prudently by signing a license with Rembrandt.

10. Later, Visual Semiconductor signed its own license with Rembrandt because Visual Semiconductor was preparing to take over Stream TV through a plan of reorganization.

11. Importantly, the Rembrandt license does not allow sublicensing. Neither does the Philips license, although the Philips license would have remained intact because the entire corporate value chain would have been acquired, whereas the Rembrandt license resided specifically with Stream TV.

12. Because the Philips license was downstream in the corporate structure, Visual Semiconductor proposed acquiring its own Rembrandt license and purchasing Technovative to preserve the chain of rights.

**SeeCubic Transaction**

13. SeeCubic entered into a deal with Bill Homony that bypassed both the Rembrandt and Philips licenses—despite the fact that neither license permits sublicensing.

14. Stream TV and Visual Semiconductor have always sold complete TVs or chips and film directly.

15. By contrast, SeeCubic has pursued a sublicensing model, which allowed them to manipulate the Stream TV trustee into approving a transaction that effectively circumvented the license agreements.

16. This constitutes intellectual property infringement disguised as a trustee-approved transaction.

17. For this reason, we believe the proposed §363 transaction by SeeCubic is unlawful.

**Visual Semiconductor's Hybrid Agreement with Rembrandt**

18. Visual Semiconductor subsequently restructured its relationship with Rembrandt through the Litigation Funding and Cooperation Agreement ("LFCA"), a hybrid agreement that incorporated licensing rights.

19. The $3.6 million referenced by Chris Michaels was not merely funding, but primarily license fees, tied to both technology access and the obligation to supply TVs to Rembrandt—Rembrandt's ultimate goal.

20. Visual Semiconductor also advanced additional funds to Rembrandt because Rembrandt was failing to protect its own rights.

21. For example, Rembrandt neglected to pursue turnover actions or to compel server access through depositions and subpoenas that would have revealed the presence of Rembrandt and Philips technology on both U.S. and Netherlands servers.

**Collusion Between Homony and SeeCubic**

22. Bill Homony colluded with SeeCubic in connection with the §363 transaction to create a complex deal structure designed to preserve SeeCubic's sublicensing model while bypassing the licensing restrictions imposed by both the Philips and Rembrandt agreements.

23. This convoluted structure stood in stark contrast to Visual Semiconductor's approach, which proposed maintaining the licenses and corporate structure intact so that no licensing restrictions would be violated.

24. It was precisely because SeeCubic's §363 structure attempted to circumvent these restrictions that Judge Coleman issued the TRO.

**Legal Principle**

25. Under Delaware law, U.S. law, and federal precedent, licensing agreements are fully enforceable with such restrictions.

26. There is no legal principle exempting technology licenses from conditions on authority.

**Conclusion**

27.    For these reasons, the trustee's reliance on SeeCubic's sublicensing model is fundamentally defective, and the proposed 9019 settlement must be rejected.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 7, 2025        **Stream TV Networks, Inc.**

By: _/s/ Mathu Rajan_

Title:    Mathu Rajan
        Chief Executive Officer

4