UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : Case No. 23-10763 |
| STREAM TV NETWORKS, INC. CH: 11<br>AND NETWORKS, INC. AND<br>TECHNOVATIVE MEDIA, INC. | : Philadelphia, Pennsylvania<br>: September 8, 2025<br>: 9:30 a.m. |
| . . . . . . . . . . . . . . . . . . | : |

BEFORE THE HONORABLE DEREK J. BAKER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Trustee: | Michael D. Vagnoni, Esq.<br>Obermayer Rebmann Maxwell & Hippel LLP<br>Centre Square West<br>1500 Market Street, Suite 3400<br>Philadelphia, PA 19102<br>215-665-3066 |
| | Steven M. Coren, Esq.<br>Andrew Belli<br>Kaufman Coren & Ress, P.C.<br>Two Commerce Square<br>Suite 3900<br>2001 Market Street<br>Philadelphia, PA 19103-2713<br>215-735-8700 |
| For SeeCubic, Inc.: | Marley Brumme, Esq.<br>Skadden Arps Slate Meagher & Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010 |

APPEARANCES: (Continued)

For SSG Advisors: Jeffrey Kurtzman
Kurtzman Steady LLC
555 E City Ave, Suite 480
Bala Cynwyd, PA 19004
215-715-2814

For Visual Semiconductor: Matthew Weisberg
Daniel Rink

Proceedings recorded by electronic sound recording; transcript produced by TheRecordXchange.

INDEX


| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES: | | | | |
| William Homony | | | | |
| (By Mr. Coren) | 32 | | | |
| (By Ms. Brumme) | | 35 | | |
| (By Mr. Rink) | | 60 | | |
| John D. Simmons | | | | |
| (By Mr. Coren) | 67 | | | |
| (By Ms. Brumme) | | 71 | | |
| (By Mr. Rink) | | 79 | | |
| Christopher A. Michaels | | | | |
| (By Mr. Coren) | 82 | | | |
| (By Mr. Weisberg) | | 89 | | |
| (By Mr. Rink) | | 113 | | |
| (By Mr. Demarco) | | | 126 | |
| Mathu Rajan | | | | |
| (By Mr. Rink) | 138 | | | |
| (By Mr. Coren) | | 178 | | |
| Charles Robertson | | | | |
| (By Mr. Rink) | 201 | | 218 | |
| (By Mr. Coren) | | 213 | | |
| Christopher Michaels | | | | |
| (By Mr. DeMarco) | 222 | | | |
| (By Mr. Weisberg) | | 229 | | |

SEPTEMBER 8, 2025 9:30 A.M.

THE BAILIFF: All rise.

THE COURT: Good morning. Please be seated.

UNIDENTIFIED SPEAKER: Good morning, Your Honor.

THE COURT: Good morning.

THE BAILIFF: This is the Monday, September 8, 2025, calendar for Judge Derek Baker. We have one matter on the list. 9:30 a.m. list is Stream TV Networks and Technovative Media, Inc., motion to approve compromise under Rule 99T with Rembrandt 3D Holding, et cetera.

THE COURT: All right. Good morning, everyone. Can I have appearances please? Those first in the courtroom. I'll start with the Trustee.

MR. COREN: Good morning, Your Honor. Steven Coren. My partner Andrew Belli, special counsel for the Trustee.

THE COURT: Good morning.

MR. VAGNONI: Good morning, Your Honor. Michael Vagnoni, counsel to the Trustee.

THE COURT: Good morning.

MR. DEMARCO: Good morning, Your Honor. Andrew DeMarco, Devlin Law Firm, here for Rembrandt 3D.

THE COURT: Good morning.

MS. BRUMME: Good morning, Your Honor. Marley Brumme from Skadden, Arps for SeeCubic.

THE COURT: Good morning.

MR. RAJAN: Mathu Rajan on behalf of Visual Semiconductor.

MR. RINK: Daniel Rink on behalf of Visual Semiconductor.

THE COURT: Good morning, Mr. Rink.

MR. RINK: Good morning.

MR. WEISBERG: Matthew Weisberg on behalf of Visual Semiconductor and the movant on a couple motions.

THE COURT: Good morning.

All right. Anyone else need to make an appearance in the courtroom? Okay. I'll take appearances from those on Zoom who need to make an appearance. I see Mr. Kurtzman.

MR. KURTZMAN: Good morning, Your Honor. Jeffrey Kurtzman, Kurtzman Steady, on behalf of SSG Advisors and various employees of SSG who are defendants in the district court action.

THE COURT: Okay. All right. So I see Mr. Blumenthal (phonetic) is on. I see Mr. Robertson (phonetic) is on. Who is Mr. Pecora?

MR. PECORA: I am an officer with Rembrandt, just observing.

THE COURT: Oh, okay. Okay, great. Okay.

All right. If we can, I'd like to try and deal with a couple quick procedural issues and a couple quick administrative issues and then we can talk about how the best

proceed today. The first is, I have a motion for leave to file a reply from the Trustee. That was filed at docket number 1056. I didn't enter an order on that. I don't know if anybody has any position on that. I mean, it was filed several weeks ago. I didn't see anybody filing an objection or anything relative to those issues. Is there any reason why the Court can't enter that order and grant the Trustee leave to file the reply that was attached to their motion?

Okay. I hear no response. So we will enter an order granting the trustee leave to file that reply. And so Mr. Coren, I'd ask you, after we enter that order, just to have the reply that was attached to your motion just docketed as a separate docket entry.

MR. COREN: Will do you, Your Honor.

THE COURT: The second item I have is Mr. Weisberg's motion to withdraw. And obviously Mister -- I see Mr. Rink is here. Are you substituting in?

MR. RINK: At this moment, we're co-counsel.

THE COURT: Okay. So do I need to act on the motion to withdraw, Mr. Weisberg, at this time?

MR. WEISBERG: Your Honor, at this time I don't -- can I have a sidebar, Your Honor?

THE COURT: Excuse me?

MR. WEISBERG: May I have a sidebar, Your Honor?

THE COURT: Sure. Mr. Coren.

(Sidebar at 9:34 a.m., not transcribed)

THE COURT: All right. At the request of the parties, the Court had a brief sidebar conversation with counsel -- or with Mr. Weisberg as well as Mr. Coren to discuss the scheduling related to the -- Mr. Weisberg's motion to withdraw. What the Court is inclined to do is it will -- obviously, that motion had two aspects to it. The first was a motion to stay the proceedings. The second was a motion to withdraw. The Court's going to deny the motion to stay the proceedings because we're all here today and it appears we're ready to proceed.

Secondly, with respect to the motion to withdraw, the Court will set that for a date and time to be determined by the Court. Relatively short order, but nonetheless, we will set that for a separate hearing date, at which time the Court will take that matter up on the merits related to the withdraw, if it is still necessary in light of ongoing representations of VSI.

Okay. Any parties have any questions related to that?

MR. WEISBERG: Thank you, Your Honor.

THE COURT: Okay. All right. Before I ask certain of my questions, I had a couple of -- I wanted to ask the parties if there was any update that I should be aware of?

MR. COREN: Yes, Your Honor. As Your Honor will

recall, you directed us to try and come here this morning with a scheduling order in connection with the Trustee's objection to LBBS's fee application. And if not, Your Honor was going to consider putting in a scheduling order. We did reach an agreement over the weekend as to a proposed scheduling order, and I have authority to put that in the record. Perhaps we should probably prepare some formal scheduling order to submit it to Your Honor, but I will place the agreement on the record so that the Court will have it and then we'll submit something in writing.

THE COURT: That's perfect. Thank you.

MR. COREN: And what we have agreed, Your Honor, is -- first thing is, LBBS will file its response to the Trustee's objection on or before September 25, 2025. The parties may take discovery with a discovery cutoff of November 28, 2025. The parties shall file a pretrial memoranda and identify exhibits and witnesses on or before 5:00 p.m., one week prior to the hearing date. And then the parties request a hearing date as promptly as possible after the discovery cutoff of November 28, 2025, consistent with the schedule of the Court and the availability of the partners and their counsel/witnesses. Perhaps we could have a conference call of some sort so that we could come up with dates that the Court has available, and -- or we'll talk to chambers, find out available dates, and then get back to the Court after we can

vet that with clients and witnesses. But it would be sometime after the discovery cutoff.

THE COURT: Do the parties expect that they would need -- how much time do the parties expect that they would need on the trial?

MR. COREN: Yeah. I don't -- we didn't really talk about that, so I guess that's something we should raise and maybe put it in our proposed scheduling order, maybe add that. Just giving thought to it, I'm thinking a few days, but I don't know if it's any more than that.

THE COURT: Okay. Well, I think what we'll do is we will get -- we'll wait for your proposed order. In the interim, we will look at our schedule. Do you want it before the holidays? Do you want it after the holidays? Right? And so we'll get you some dates that fall into those various categories. They probably will not be consecutive, only because -- unless I do it during the holidays, which I'm sure no one wants.

MR. COREN: Right.

THE COURT: I don't know that I have consecutive days that I can block off.

MR. COREN: Yeah. We're already into December, so we recognize it's likely to spill into next year.

THE COURT: Okay.

MR. COREN: And perhaps that's more sensible to find

something in perhaps January, but we'll see what the Court's calendar looks like.

THE COURT: Okay. All right. Excellent. That's great. All right. Is there anything else? Any further updates from the parties relative to the issues for today?

MR. COREN: No. Thank you, Your Honor.

THE COURT: Okay. All right. So I think when we spoke, I was going to allocate three hours for those in support of the motion, three hours for those that are opposing the motion. Using your time however you wanted to use it, either in directs, crosses, and the like. I do want to -- if the parties want to, I'm happy to take opening statements. I won't count them against your time, but I will ask that they be very brief. But I have a couple questions that I would like to ask of the parties just to make sure I have it correct in my mind as to how we think we're proceeding today and what we think we're accomplishing.

So do the parties want to give opening statements, or do you just want me to ask my questions?

MR. COREN: Your Honor, I mean, we've submitted a comprehensive motion, a reply brief, which is now in the record. I don't see the need for opening statements. I think we're going to be presenting a lot of evidence by the various declarations that we have. I think they've all been filed, although they'll be offered into the record today. And as Your

Honor has been proceeding, I think they'll be offered in those -- for example, the Trustee and our intellectual property counsel, their -- we'll offer in their declarations and make them available for cross-examination. And we may supplement a little bit with some direct testimony. So in that sense, our time is short.

THE COURT: Okay.

MR. COREN: Although you never know what happens.

MS. BRUMME: From our perspective, that makes total sense.

THE COURT: Okay.

MR. RINK: Visual Semiconductor would like to make an introduction --

THE COURT: Okay.

MR. RINK: -- of me as well as a short statement.

THE COURT: Okay. All right. Well, then let me ask the Trustee my question, and then I'll come sort of down the line --

MR. RINK: Okay.

THE COURT: -- because that's sort of the way I had it written on my --

MR. RINK: Thank you.

THE COURT: -- on my papers. So first, what does the Trustee expect out of things today? And what I mean by that is when I read the motion and I sort of understood that the

Trustee is asking for approval of a settlement with Rembrandt and entry of a judgment against SeeCubic; is that correct?

MR. COREN: Yes, Your Honor.

THE COURT: Okay. Rembrandt, is that your understanding?

MR. DEMARCO: Yes, Your Honor.

THE COURT: Okay. All right. Well, that was easy. SeeCubic, I'll start with you. Do you have -- other than obviously the issues that were raised in your objection, do you disagree with what's being requested today?

MS. BRUMME: Yeah. As submitted in our papers, Your Honor, we think for entry of a judgment, a 99T motion is not the proper vehicle for an enforceable judgment. If there's an adversary proceeding to be had or something like that, fine. We have no issue cross-examining, taking testimony today, that might be useful somewhere. But to the extent that they're looking for a judgment out of a 9019, we think that's inappropriate.

THE COURT: Okay. Hang on. I want to make sure that you speak into the microphone just to make sure it gets picked up. That's the first thing.

MS. BRUMME: Yeah. Apologies.

THE COURT: The second thing is -- and you can sit down --

MS. BRUMME: Thanks.

THE COURT: -- because it's probably easier with the microphone. Okay. So I read in your papers the argument that Part 7 should apply, and I read that at paragraph 35(d) of the response, but it was sort of at the very end. So I guess my question is, what -- like why do you think Part 7 has to apply?

MS. BRUMME: Well, Your Honor, for an enforceable judgment to be collected on and entered against SeeCubic, I would -- a 9019 approval of compromise, we just don't believe is the appropriate vehicle.

THE COURT: So are you objecting to the approval of the settlement?

MS. BRUMME: We are objecting to any aspect of it requiring or entering an order stating that SeeCubic is obligated to pay for whatever portion of the settlement that is allocated, according to those parties, to SeeCubic.

THE COURT: Okay. But I guess that's why I'm asking the question sort of very pointedly, right? Because to the extent that they're asking for approval of a -- they're asking for two things, approval of a 9019 and entry of a judgment. So my first question is, do you object to the approval of the 9019?

MS. BRUMME: I object to the motion to the extent it seeks to get an order or a judgment entered against SeeCubic. Whatever they do between themselves is really none of my business. But to the extent that the amount is going to be

ordered against SeeCubic, when we had absolutely no say in that amount, that's where we object.

THE COURT: Right. So I think that's why I'm asking the question the way I'm asking it, right? So do you have a -- you don't have an -- what I heard you just say was, you don't object to the settlement agreement, but you object to the entry of a judgment against SeeCubic as part of that motion?

MS. BRUMME: Correct.

THE COURT: Okay. So I think I understand that. And the reasoning behind that, as I read your papers, is because you believe Part 7 should apply to the entry of a judgment?

MS. BRUMME: That is part of it, yes.

THE COURT: What's the other part of it?

MS. BRUMME: As we argued in our papers, the Trustee was not entitled to allocate an amount to us for settlement that we had no part in reaching, but that's less on procedure and more on merits.

THE COURT: I was going to say, that's on the merits, right?

MS. BRUMME: Yes.

THE COURT: Okay.

MS. BRUMME: Yes.

THE COURT: So are you prepared to litigate the merits today?

MS. BRUMME: Yes.

THE COURT: Okay. So the only procedural issue would be if we take the proceedings today, proceed, have all the witnesses, have everybody testify, they file an adversary proceeding, we can enter the judgment in connection with the adversary proceeding based on the record that was done in connection with this motion. Would you disagree with that?

MS. BRUMME: I would not.

THE COURT: Okay. Is there any reason why under Rule 9014(c) I couldn't deem Rule 7058 to apply and enter a separate judgment in connection with the current motion practice?

MS. BRUMME: I'm sorry. Could you repeat that?

THE COURT: Sure. Is there any reason why I couldn't deem Rule 7058, which talks about the entry of a separate judgment --

MS. BRUMME: Yeah.

THE COURT: -- is there any reason why I couldn't enter -- why I couldn't deem that rule to be applicable in connection with this contested matter pursuant to Rule 9014(c)?

MS. BRUMME: Sure. I think that would be in the Court's discretion, yes.

THE COURT: Okay. All right. Okay. That's very helpful. Thank you. All right. I'll hear from counsel for VSI.

MR. COREN: I'm sorry, Your Honor.

THE COURT: Yes.

MR. COREN: May I respond to that very briefly?

THE COURT: After I hear from VSI.

MR. COREN: I think he's switching to the merits on the --

THE COURT: Okay. I can separate them in my own mind. Okay.

MR. RINK: Your Honor, good morning.

THE COURT: Good morning.

MR. RINK: My name is Daniel Rink, and if it please the Court, I'd like to give a short introduction of myself since I'm a newcomer here.

THE COURT: Sure.

MR. RINK: I began my professional career in Philadelphia 50 years ago, and I'm currently the general counsel of VSI. I was awarded a Juris Doctor degree from Villanova Law School here in the Philadelphia area, an LLM and tax degree from New York University. I gained a CPA certificate in Pennsylvania along the way, even though I now retired from that. And some of my early child experiences on the legal side was I represented Muhammad Ali before the IRS, which was an interesting thing to tell my grandkids. And I've also been a CFO of various entities, including Parkway Corporation here in Philadelphia, as well as Atlantic Ridge Field Arco Chemical Company in Tokyo. So that's by way of my background.

I'd like to make a statement on behalf of Visual Semiconductor, which sometimes is referred to as VSI. Your Honor, VSI has invested substantial financial resources in supporting and propping up Stream TV Networks through its most troubled times. But for VSI's infusion of capital and ongoing support, Stream TV would likely have collapsed, leaving unsecured creditors with no hope of recovery at this juncture. This significant contribution provides VSI a heightened stake in these proceedings and underscores the importance of honoring VSI's contractual rights, particularly its consent provisions, which were fundamental conditions of VSI's support.

VSI appears today to oppose the approval of the proposed settlement between Rembrandt and the Chapter 11 Trustee. This settlement is unauthorized. It directly violates VSI's hybrid agreement with Rembrandt, and it threatens to strip VSI of its control over the Ultra-D technology without lawful consent.

At the center of this dispute is a hybrid contract. VSI and Rembrandt entered into a dual structured agreement. First, a technology license, granting Rembrandt conditional rights to exploit the Ultra-D glasses-free technology. And second, a litigation funding and cooperation agreement, sometimes referred to -- we refer to it as a hybrid agreement, under which VSI funded litigation and retained absolute authority over the settlement decisions.

This was not a standard commercial agreement. Indeed, VSI's willingness to invest significant capital into Stream TV and its legal backgrounds was predicated on this protective structure. It should not have poured resources into a venture without ironclad assurances that its control over the technology and litigation outcomes were preserved. It was directly structured so that the Ultra-D technology could not be commercialized, licensed, or litigated without VSI's express consent. Settlement authority and licensing rights were tied together as conditions precedent.

The proposed settlement reached without VSI's consent consists of a double breach. On the litigation side, Rembrandt agreed to resolve claims without securing VSI's mandatory written approval. On the technology side, Rembrandt purported to license or otherwise convey rights in the Ultra-D technology that they never held outright.

Under Delaware law, this is not a mere damages issue. In Thompson Street v. Sonova, the Delaware Supreme Court reaffirmed the conditions precedent are strictly enforceable, where clearly expressed. VSI's consent is such a condition, without it Rembrandt had no authority to act, rendering its settlement and any purported license voidable.

The Trustee compounds this breach by aiding and abetting Rembrandt. The Trustee seeks to use the rule 9019 to bless an unauthorized act, asking this Court to approve a

settlement that Rembrandt had no legal power to make.

The Trustee attempts to expand estate rights beyond the Debtor or Rembrandt proposed. A Trustee cannot manufacture authority to settle or transfer the Ultra-D technology where none existed. This is classic tortious interference, including a counterparty to disregard negotiated consent provisions. This interference is all the more egregious because VSI made substantial financial contributions to keep Stream TV afloat in reliance on those very consent requirements. The Trustee's approach attempts to strip VSI of the benefit of its bargain, despite VSI's pivotal right in preserving the estate's value for its creditors.

Both Delaware and federal law support VSI's positions. The various authorities converge on one point of consent. Consent conditions in licensing and settlement agreements are binding, enforceable, and not subject to judicial disregard. If this settlement is proposed, VSI loses its bargain for control over the Ultra-D technology and the litigation tied to it. Rembrandt benefits from acting outside its authority, and the substantial financial support VSI provided to preserve Stream's operations and the value of the Ultra-D technology would be rendered meaningless as VSI would be denied the benefit of the bargain that struck that support. And the Trustee secures a settlement at the direct expense of contractual rights he is bound to respect.

Conversely, denying the motion preserves VSI's intellectual property interests, honors Delaware contract law, and protects the integrity of the 9019, which requires settlements to be fair, equitable, and authorized.

In conclusion, Your Honor, this Court cannot approve a settlement based upon authorized acts. To do so would not only violate fundamental legal principles, but also effectively penalize VSI, the party whose substantial financial support kept Stream TV alive, by stripping away the rights it bargained for in return. VSI's consent was a material condition precedent, not a formality. Both Rembrandt and the Trustee ignored it in violation of Delaware law, federal patent law, and bankruptcy principles.

For these reasons, Your Honor, Visual Semiconductor respectfully requests that the Court deny the Trustee's motion to approve the settlement with Rembrandt, and grant such other relief is views as just and proper. Thank you, Your Honor.

THE COURT: Thank you, Mr. Rink. So my question, I guess, is this relative to VSI's opposition to the proposed settlement agreement? So the Court only has jurisdiction over the estate and the Trustee. If you're taking the position that the settlement agreement as entered into by Rembrandt violates whatever contracts VSI has with Rembrandt, I don't know why that's an issue for this Court, unless you -- and I'm saying this because this is probably what's going to have to come out

in connection with the testimony or the evidence, is how does that change -- your claims against Rembrandt are unaffected by the 9019 as I see it. Really what the issue becomes is, is why can't the Trustee, in connection with the Chapter 11 case of Stream TV, enter into a settlement with a creditor -- that you think you have a claim against that creditor, that's fine, and I'm not adjudicating that claim. But why does your claims against the creditor impact the Trustee's ability to settle with that creditor?

MR. RINK: Because the creditor, without Rembrandt in this case, without our approval, had no right to enter into the settlement. And therefore it appears to VSI that this is -- it's a stool with one leg, and you need agreement on both sides that is valid and proper, and VSI is of the position that we don't have that here.

THE COURT: Okay. I mean it sounds to me like what you're saying is you believe that if Rembrandt enters into this contract with the Trustee, that VSI has a breach of contract claim against Rembrandt. He may or may not, but I don't know why VSI having that breach of contract claim with Rembrandt would affect the Trustee and Rembrandt entering into a settlement agreement.

MR. RINK: Well, I mean, without -- if this settlement goes through, then VSI has lost its rights to the technology. So our position, it goes far beyond a damages

claim.

THE COURT: Okay.

MR. RINK: Thank you, sir.

THE COURT: All right. Thank you. All right. Mr. Coren, did you want to respond on the procedural issue? And then I see Mr. DeMarco has stood up, and I'll give you a very brief opportunity to respond.

MR. COREN: I did, Your Honor. And in light of the argument, I'd like two minutes to respond --

THE COURT: Okay.

MR. COREN: -- to that. But on the procedural, let me just point out, I think Your Honor is correct. You could enter a judgment under other provisions, but the reason why no adversary is necessary is because we already have a court order. The court order that this omnibus motion is not only enforcing an agreement, it's enforcing a court order. The indemnity is in the court order. The agreement is in the court order. We already have the determination before the Court. So what we are doing by way of the omnibus proceeding is to request that the Court bless the settlement and enter the judgment, which is called for in light of existing judgments in court orders that are final.

And I would also point out that in terms of the settlement itself, one must -- we must have both. The settlement is void. If there is no judgment entered by way of

the indemnification request, that voids the settlement. So they are intertwined. We can't do one without the other. I guess we could do one today and one tomorrow, but that seems to be totally unnecessary, especially since the orders we're trying to enforce are just that, orders. We don't need to commence a new adversary to get a judgment. We already have an order that we're enforcing.

THE COURT: So Mr. Coren, then let me ask, the way that you phrased that leads me to raise this question. Does it make sense then, rather than talking about the 9019 elements, to focus on whether or not there's an underlying right to a judgment in the first place? Because if what you just said -- what I heard you just say, is if there's no judgment, then there's no settlement upon which to reach. Now that's a little bit inconsistent with the settlement agreement I read, but if that's what you're representing as the deal, I'll take you at your word on that.

MR. COREN: That's in the agreement, Your Honor. There is a condition precedent that if there is no judgment for indemnification entered, then the agreement is void.

THE COURT: By 12/31.

MR. COREN: No. I forget the period of time.

THE COURT: Well, we can go through it, but.

MR. COREN: I thought it was like a six -- there was a period of time, and I didn't do the calculation.

THE COURT: Uh-huh.

MR. COREN: But you need both, is what I'm saying. You don't need both today, but you need both. And what we're suggesting is why do you need to commence an adversary to enforce a court order that already exists and contains that indemnification obligation?

THE COURT: I understand that procedural argument, and I think what I heard Ms. Brumme say was, if I can incorporate Rule 7058 into Rule 9014(C), which I think I can, then I can enter a judgment in connection with that if it's appropriate. My question to you is a little bit different, which is, should we be focusing on -- if it's what your position is -- or if it's the Trustee's position that the entry of a judgment is a condition precedent to this settlement agreement even being a proper issue, right? Should we just deal with that and determine whether or not there is a right to a judgment against SeeCubic as a fundamental preliminary issue, and if you win on that, then we proceed to the 9019, and if you lose on that, then we don't?

MR. COREN: No. I think it's backwards --

THE COURT: Okay.

MR. COREN: -- because --

THE COURT: That's fine.

MR. COREN: -- we're trying to enforce a settlement. If Your Honor doesn't enforce the settlement, getting a

judgment to satisfy the settlement amount doesn't make any sense.

THE COURT: Okay.

MR. COREN: First thing Your Honor has to do is rule on the settlement. Then Your Honor has to determine whether entitled to an indemnification judgment. We need both. If we don't get both, then the settlement will self-destruct, but if Your Honor doesn't rule in our favor on the 9019, it kind of moots out whether we're trying to get an indemnification and judgment. So I think we need to -- that's the correct way to proceed.

And I would -- in terms of the merits argument about the breach of the -- alleged breach of an agreement based upon a secret -- and I repeat that, secret agreement between Rembrandt and VSI, which was not brought to the Trustee's attention until an objection was filed. He had no clue that that dispute or potential existed when he negotiated a settlement. And think about that. He's settling with express parties, not only creditors here, a plaintiff in a district court litigation. If, in fact, there's some secret agreement that Rembrandt doesn't control the litigation, which is a party, then there's a fraud on the Court. Then it's not the real party in interest in a case that's proceeding in the district court, and there will be sanctions and a dismissal of that case because who are we supposed to settle with? We put a

case on hold with the district court approval because we settled with a party to that case.

And now we're being told that the party to that case perhaps is not really the real party in interest. There's some secret agreement controlling the litigation or controlling a settlement. Well, at a minimum, Rembrandt has apparent authority to settle with the Trustee who has no idea about this secret agreement. And the bottom line is, if it is a breach of some other agreement, which Rembrandt says it isn't, that's irrelevant, as Your Honor points out. We settled with a party. We settled with a creditor. No secret agreement can void that, change it, or require us to get their permission. It just doesn't work that way. You deal with the parties who are before you.

THE COURT: Okay.

MR. COREN: Thank you.

THE COURT: Mr. DeMarco?

MR. DEMARCO: Yes, Your Honor. Thank you for the opportunity to respond to these points. So first, I do want to address this issue regarding an agreement between Rembrandt and VSI. As Your Honor noted, if there is a dispute regarding that contract, that's a contract dispute that can be handled in a separate matter, does not need to derail this Court's discussion here today about the 9019 and the approval thereof.

The settlement agreement between the Trustee and

Rembrandt stands on its own, and if there is some alleged breach, then that can be handled in a separate matter and need not be addressed here today. But because it has come up several times, I do want to just address briefly, there is no agreement, secret or otherwise, that prevents Rembrandt from settling with the Trustee. As we have submitted in papers through the Second Declaration of Christopher Michaels -- which we are prepared to discuss today, though again, we think that it would unnecessarily derail today's discussions. Through that, we have established through sworn testimony that whatever agreement VSI is relying on was, to begin, breached by VSI at the outset and thus not available to them.

It's not a valid agreement because of the manner in which it was obtained. It was disavowed by VSI's own attorneys on multiple occasions because they understood the unethical manner in which it was obtained. And finally, even if the agreement were valid, it's unenforceable as a matter of law. So there are a cascading waterfall of issues and reasons why a Rule 11 basis wouldn't even exist for such a claim. But we don't need to litigate that here today. And I would offer that litigating that here today would derail these proceedings in a way that's not necessary.

I can answer any questions Your Honor has on this issue if Your Honor does wish to delve deeper. And as I say, we are prepared to go forward if Your Honor does want to dive

into this issue. But we don't think that's necessary here today. We can proceed with the agreement and the approval between Rembrandt and VSI -- or sorry, Rembrandt and the Trustee.

THE COURT: I'll let the parties proceed however they want in terms of whatever presentations they want to make on the merits of the propriety of the 9019, as well as the entry of the judgment against SeeCubic. However the parties wish to proceed, they can proceed.

MR. DEMARCO: Yes, Your Honor.

THE COURT: All right. All right. I'm going to put you on your clock, Mr. Coren. And Mr. DeMarco, you're included in that first -- in the three hours, as well as those are in support for three hours. Those are in opposition also get three hours. So that's the way I would sort of allocate it. So I'll allow you to proceed, Mr. Coren.

MR. COREN: Yes, Your Honor. We would offer into evidence the declaration of the Trustee. May we? I think we should probably hand around exhibit, but does Your Honor have one?

THE COURT: That would be great if you have them.

MR. COREN: Is one enough for the Court, Your Honor?

THE COURT: One is fine for me. I don't know if the witness will need one. Do we want to -- I haven't started the clock yet. Does Rembrandt have exhibits that they want to hand

up? Does SeeCubic? Does VSI? Does anybody want to just get all the exhibits out of the way, so we get all the papers up here now?

MR. DEMARCO: Yes, Your Honor.

THE COURT: All right.

MR. DEMARCO: May I approach?

THE COURT: You may. That's Rembrandt.

MR. DEMARCO: With courtesy copies, second declaration --

THE COURT: Oh, okay. Do you have a copy for the witness?

MR. DEMARCO: Yes.

THE COURT: Okay.

MR. DEMARCO: It is currently --

THE COURT: All right. Yeah. Why don't you -- let's bring them all up so that we just get them out of the way right now. Thank you. Same one for the witness, right?

MR. DEMARCO: Yeah. Same one.

THE COURT: All right. Ms. Brumme, yeah?

MS. BRUMME: Yeah. I think just to minimize the paper here, most, if not everything I would use is in the Trustee's book already. If there's anything additional, would it be okay to hand it up on its own?

THE COURT: Piecemeal? That's fine.

MS. BRUMME: Thank you.

THE COURT: Okay. You're saving the trees. I get it.

MS. BRUMME: Yes.

MR. DEMARCO: In regard to, Your Honor, we are submitting testimony. I believe that still --

THE COURT: I'm sorry. I didn't hear you. You need to speak into a microphone.

MR. DEMARCO: I just wanted to clarify, Your Honor, whether -- we were seeking to submit that testimony into the record. I was just making clear that that was what was occurring.

THE COURT: No. That's not what's occurring, but we'll do it when it's your witness's time.

MR. DEMARCO: Yes, Your Honor.

THE COURT: Yeah. Okay.

MR. COREN: If I may add just one thing, Your Honor. One of our exhibits in there is a judgment entered in California against SeeCubic. I just want to point out for anyone that wants to see it, but we have a certified copy of that judgment here in the courtroom, which is at times necessary to authenticate it for entry in evidence. I want to -- happy to offer the certified copy into evidence, but everyone has a copy of it in the book.

THE COURT: At 13?

MR. COREN: Don't have it in front of me.

MR. VAGNONI: It is Exhibit 10.

THE COURT: Oh.

MR. VAGNONI: But Exhibit D to Exhibit 10. It's Exhibit D to Mr. Homony's declaration.

THE COURT: Okay. All right. Well, we can deal with it when we get there if there's an objection.

MR. COREN: I mean, I'm happy to just put it in evidence.

THE COURT: I think that's -- I think it's 13 as well in your binder. Okay. All right. So you're offering Mr. Homony's declaration. That's the docket at docket number 1054 that was on the docket; is that correct?

MR. COREN: Yes, Your Honor.

THE COURT: Okay. It's also Exhibit Number 10 in the binder. Is there any objection to the Court taking the declaration of Mr. Homony in as his direct testimony?

MS. BRUMME: No objection.

MR. RINK: None, sir.

THE COURT: Okay. Any parties -- Mr. DeMarco, no?

MR. DEMARCO: No objection, Your Honor.

THE COURT: All right. Any parties wish to cross-examine Mr. Homony?

MR. COREN: If I may have him take --

THE COURT: Well, I'm going to find out if anybody needs to cross him first.

MR. COREN: Yeah. I was going to put him on the stand and ask him a question or two in addition to his declaration, but --

THE COURT: Okay. All right.

MR. COREN: 1Be very brief.

THE COURT: Okay.

WILLIAM HOMONY, SWORN

THE CLERK: Please state your name for the record.

THE WITNESS: William Homony.

THE CLERK: Can you spell your last name?

THE WITNESS: H-O-M-O-N-Y.

THE CLERK: Please state your address.

THE WITNESS: 1730 Maple Avenue, Hatfield, Pennsylvania, 19440.

DIRECT EXAMINATION

BY MR. COREN:

Q Good morning, Mr. Homony.

A Good morning.

Q We put your declaration in evidence, so my question is not for you to tell us everything in your declaration. All I wanted you to do is to provide the Court and the parties with a very high-level view as to why you entered into this settlement and why, in your business judgment, you think it's in the best interest of the estate and creditors.

A Sure. So having sold the Debtors' assets at this point,

the next hurdle in the case for it to proceed and to provide a recovery for creditors was to settle with -- or to deal with Rembrandt's claims that they've asserted in the case.

And so my first effort there was to file a complaint, which was essentially to void the underlying agreement, which serves as the basis for Rembrandt's asserted $1.2 billion claim. Having done that, there was a hearing at which point Rembrandt expressed a willingness to discuss settlement with the Trustee, at which point, subsequent to that, in the middle of May, we held a settlement conference with Rembrandt. Which, you know, six weeks later resulted in the execution of the settlement agreement, which is proposed to be approved by the Court today.

The settlement agreement, if approved, would pave the way for this case to proceed to finality through a plan of liquidation, provide a recovery for creditors, eliminate the depletion of assets through continuing and ongoing litigation with a party that has shown itself to -- shown itself a strong willingness to fight for their rights with respect to their intellectual property. They have fought this particular fight since 2015 or 2016, Your Honor, and this will provide finality and peace with respect to the debtors and to Rembrandt.

The settlement terms themselves, I think, are very beneficial to the estate. To be perfectly honest, I could not have imagined a better deal for the estate when it comes to resolving its issues with Rembrandt. The $1.2 billion claim

has been reduced and is allowed in the amount of $1 million as a general unsecured claim as against Stream. As well as a settlement payment in the amount of $1.25 million, 100,000 of which will be paid from the estate. And $1.15 million will be sought through the entry of a judgment against SeeCubic. At which point I will not have any obligation to try to collect. I will assign that judgment if it's entered to Rembrandt, and they will proceed with whatever collection efforts they think are appropriate to try to collect the $1.15 million. The estate will have no -- has no recourse with respect to that.

And it provides finality through releases. All the claims Rembrandt has asserted against myself, my professionals, the estate, will be disallowed and waived. And as I mentioned, we could proceed to finality with these bankruptcy cases.

Q And I know it's mentioned in your declaration. In addition to what you've testified to and your experience as a trustee and someone in bankruptcy matters for many, many years, did you have the benefit of professional advice counseling you as to whether or not this was a good settlement for the estate and its creditors?

A Yes. I had the advice of special counsel, my general bankruptcy counsel, as well as my intellectual property counsel with respect to addressing all the issues. As between the Debtors and Rembrandt, as well as my experience in dealing with complex litigation matters for about 25 years now, I believe

that the judgment award we are seeking is, again, very beneficial to the estate in the sense that I would expect to incur well in excess of $1.25 million to defend the claims that Rembrandt has asserted against myself and my professionals. And not only would the estate have to incur the obligations to defend me, but I have an obligation to defend or indemnify SSG as well through their retention application and retention order. And this court has already ordered me to indemnify and to pay SSG $20,000 in connection with them being named as defendants in the Rembrandt district court case.

And so for those reasons, I believe the settlement is very beneficial to the estate.

MR. COREN: Nothing further, Your Honor.

THE COURT: Okay. Do the parties wish to cross-examine?

MR. DEMARCO: Nothing from Rembrandt, Your Honor.

MS. BRUMME: Yes.

THE COURT: All right. Ms. Brumme.

CROSS-EXAMINATION

BY MS. BRUMME:

Q Good morning, Mr. Homony.

A Good morning.

Q Do you have the book of exhibits that's from the Trustee there?

A Yes.

Q That's yours? Okay. Would you mind turning to tab 2, which is -- apologies, it is tab 7, the proposed settlement and the agreement in this case?
A Did you say tab 2? I'm sorry.
Q 7, I apologize.
A 7.
Q Yeah.
A Yes.
Q Okay. And you recognize that as the proposed settlement with Rembrandt in this action?
A I do, yes.
Q Okay. The proposed settlement would resolve a number of different disputes between Rembrandt on the one hand and yourself, the Debtors' estates, and anyone you're obligated to indemnify on the other hand, correct?
A Yes, that's correct.
Q And that includes Rembrandt's proof of claim, as you've mentioned?
A Yes.
Q And that includes three pending appeals of various orders from this court?
A Yes, that's true.
Q And that includes a Delaware District Court case against the Debtor, Technovative?
A Yes.

Q And that includes a Rembrandt adversary proceeding?
A Yes.
Q And it includes the Pennsylvania District Court case?
A Yes.
Q So that's the proof of claim plus six litigations?
A Yes, that's correct.
Q Okay. If you look at -- you've mentioned before, and it's in paragraph 6 of the proposed settlement, there's a $1.25 million cash payment proposed to be made to Rembrandt, correct?
A I am proposing to make a $100,000 payment, the balance of 1.15. I'm seeking the entry of a judgment against SeeCubic in connection with their indemnification obligations.
Q Sure. But actual cash that will go to Rembrandt, whoever it's coming from, 1.25 million?
A Well, I don't -- again, I don't know how much cash Rembrandt's going to receive. I can only guarantee they'll get $100,000 from the estate.
Q Okay. And to summarize your declaration and the answer you just gave a minute ago, that $1.25 million amount, whatever, cash or otherwise, made sense because the legal fees for continuing to litigate those six actions we just talked about would probably exceed 1.25 million, correct?
A Well, I don't think that was my testimony. I think -- and my declaration. I have assigned that -- the value of the 1.25 to a single case, the Pennsylvania District Court case. And as

explained in my declaration, I provide the rationale for why certain matters got zero consideration and others got consideration.
Q Okay. Well, let's talk about that. Your declaration, I believe, is tab 10 in the binder?
A Yes.
Q Do you recognize that as the declaration you've submitted?
A Yes.
Q Okay. Could you look at paragraph 27 for me?
A Yes.
Q And starting at paragraph 27 and going on for a couple, that's the portion where you provide your rationale for assigning all the 1.25 million to the Pennsylvania District Court case, correct?
A Yes. And I believe 28 as well.
Q Yeah.
A Yes.
Q Okay. And in paragraph 27, you say that the Pennsylvania District Court action is the only one of the six that exposes the Debtors to liability and the on-growing accrual of defense costs. Do you see that?
A Yes.
Q Okay. Let's talk about the Delaware District Court case. That case is brought against Technovative and SeeCubic, alleging misappropriation of trade secrets, correct?

A I believe it was brought against Technovative. I think the relief against Technovative may have been limited to an injunction, but I don't recall.
Q Okay. And you state in your declaration that that case is currently stayed, correct?
A That's correct.
Q And that would be the result of the automatic stay because Technovative is a debtor in this case?
A Yes. That case against Technovative has been stayed since Stream's voluntary petition.
Q Yeah. And in your view, that stay does not expose the Debtors to any ongoing defense costs or potential liability? Am I understanding your declaration correctly?
A That's correct.
Q Okay. The stay is temporary, correct?
A Well, it can be.
Q Yeah. Doesn't mean that Technovative is out of the case, correct?
A Not technically, they're not. They're still a defendant.
Q And at some point, that case may or will likely resume, correct?
A Not as to -- I would never imagine it continuing with Technovative. Rembrandt has filed a proof of claim which asserts the same claims that were brought in that -- the district court action. And so resolving Rembrandt's claims in

the bankruptcy case, I think, would ultimately -- that claim is duplicative. So --

Q Okay.

A -- that case goes away, I think, just by virtue of Rembrandt's filing of its proof of claim in the Debtors' bankruptcy cases.

Q Okay. Do you recall that your counsel sent a letter to SeeCubic in March of this year demanding to be indemnified with respect to certain litigations?

A Yes.

Q And the Delaware District Court action was one of those litigations?

A It was a named action, yes.

Q Why demand indemnity if you think it wouldn't be -- result in any further defense costs or potential liability?

A Well, that's my belief. You never know. I mean, parties do all kinds of things. As you well know from this case, I can't stop parties from pursuing their own rights, whether in good faith, in bad faith, et cetera. So it's a belt and suspenders, putting them on notice that there could be potential for indemnity obligations in connection with that case.

Q Okay. So on March 2025, your view was that that Delaware District Court case could expose the Debtors to potential liability and ongoing defense costs?

A Like I said, there's always the possibility. But, in my view, I didn't believe that the estate would incur any obligations in connection with that.
Q So that was just gratuitous to include it in the letter?
A It was a belt and suspenders. Again, you know, Rembrandt could seek to lift the stay, at which point, I would have to incur the cost to defend against that, et cetera. So there's always a possibility.
Q Okay. Great. You haven't argued in this court, Mr. Homony, that the Delaware District Court action is covered by the indemnity provisions between the Trustee and SeeCubic, correct?
A I'm sorry. Are we talking about the same case still?
Q Delaware, yeah.
A Have I argued that -- can you repeat that? I'm sorry.
Q Sure. Let me rephrase it. We were just talking about a letter sent to SeeCubic in March where the Delaware District Court case was included in a demand for indemnity, correct? You're not seeking to have this Court order that the Trustee or any of the indemnified parties be indemnified with respect to anything with the Delaware District Court action, correct?
A Not today, no. Not in this proceeding.
Q Okay. Let's talk about the appeals, the bankruptcy appeals. Can you look at paragraph 28?
A Yes.

Q And that paragraph discusses your rationale for assigning no consideration to the appeals?
A Yes.
Q Okay. And you're confident that the Debtors will prevail in those?
A I am fairly confident, yes.
Q Okay. And that Rembrandt, as you say, only has a, I think the word you used was remote possibility of success?
A I do feel like the bankruptcy court orders will ultimately be withheld, but again --
Q Okay.
A -- no guarantees.
Q And so as a result, there's little potential liability and little expenditure of further defense costs, correct?
A In connection with Rembrandt, yes, that's true.
Q Okay. And I believe you testified in response to Mr. Coren's question a moment ago -- and I'm paraphrasing, but Rembrandt has been -- had a strong willingness to fight for its rights, correct?
A Yes, that's true.
Q And I would put that a little differently, as they've been a little litigious with respect to its IP, correct?
A Yes. They've advocated very strongly for their positions.
Q Okay. And its past conduct suggests that it would, in fact, appeal further, even if you were to prevail on those

appeals?
A It certainly might, to the Third Circuit. I guess that's possible.
Q Okay. Can you take a look at paragraph 36 of your declaration?
A Yes.
Q And here you've acknowledged that Rembrandt would likely be appealing further on any sort of adverse things against them?
A It's certainly possible, yes.
Q Okay. And if it does so, you would incur additional defense costs with further appeals?
A Sure. There would be motion practice with respect to those appeals, yes.
Q Okay. Now let's talk about Pennsylvania. Now one of the reasons that your declaration -- it's in paragraph 33 if you want to look at it. You say the defense costs will exceed the 1.25 million in part because the case is complex, yes?
A Yes.
Q And part of that is you say Rembrandt's listed 70 people in initial disclosures that may need to be deposed?
A I mean, that was one of many considerations, yeah.
Q Okay. You know there's a limit of 10, correct?
A I, as a non-attorney, was not aware of that, but I'll take you at your word, yes.

Q Okay. So assuming that you'd have to pay to defend (sic) 70 is a bit of a stretch, correct?
A Correct. If I'm limited to 10, I can only pay for 10.
Q Okay. And I want to be just clear where we are in the Pennsylvania District Court case. There's been no adjudication that the Debtors, you, anyone else is actually liable to Rembrandt, correct?
A There's been no adjudication, no.
Q There's potential liability, but no adjudication?
A Always, yes.
Q Your view, though, is that the case is substantively meritless; is that right?
A Generally, I would say that. I would say, again, having experience in complex litigation for many years, there have been cases I felt very good about, and judges have felt the other way, and so there's always the chance that there will be liability at some level down the road.
Q Got it. And you've moved to dismiss that case?
A I have.
Q Okay. And that's still pending?
A It is pending. I would note that one of the counts and the one that would likely be ruled on is that it was filed in the wrong forum.
Q Uh-huh.
A They didn't get relief under the Barton Doctrine, and so

my belief is they would just refile that case here in bankruptcy court, and I would have to incur -- start that -- incur those costs all over again.
Q Okay. So let's talk about the indemnification provisions between SeeCubic on the one hand, and we'll just say the Trustee, and we'll include the other indemnified parties in that if that's okay?
A Okay. Sure.
Q Okay. Now you negotiated those provisions, correct, with the assistance of counsel?
A Yes. In the asset purchase agreement, yes.
Q Okay. And the concern there was that Rembrandt would seek to enforce its rights suing the Debtors or the Trustee with respect to the sale of the Debtors' assets to SeeCubic, correct?
A Yes. They made it very clear that that litigation would be forthcoming many times, and that was a key term and consideration in negotiating that asset purchase agreement.
Q Okay. You'd agree with me that the three bankruptcy appeals that Rembrandt has filed are not within the scope of the indemnity provisions?
A No. I'm not suggesting they're not. I believe they likely are. At least some of them are with respect to the sale of the assets.
Q The appeals?

A Some of the appeals are of the sale order, I believe.
Q Okay. And you agree with me that the Rembrandt adversary proceeding isn't covered by the indemnity provisions?
A I don't agree with that necessarily either. That case has now been dismissed and was not appealed, so that matter has gone away. That's why there's been no value assigned to that case. There's no longer -- it's not to say that I don't believe Rembrandt might not owe indemnity to the Trustee and his professionals in that case. The demand is not just -- a specific demand for monetary recovery hasn't been made, but I'm not giving up the fact that SeeCubic has indemnification obligations with respect to that case.
Q Back to the appeals for a second. Do you recall we talked about a March 2025 letter to SeeCubic demanding indemnity?
A Yes.
Q You didn't ask then for indemnity with respect to the appeals, correct?
A If I could look at the letter, I'm not sure.
Q Of course.
A I know the three adversary proceedings are in there. I'm not sure if the appeals are.
Q Yeah. It's 5.
A I'm sorry?
Q It's 5.
A 5, thank you. Yeah. I do not see the sale appeals

referenced in the letter.
Q And that's because you didn't believe that they were covered by the indemnity provisions, correct?
A Well, I don't know if that's what I believe. It's just not in the letter.
Q Okay. Well, earlier you testified that you included the Delaware District Court action as belt and suspenders just in case, correct?
A That's right.
Q Any reason not to also include the appeals?
A It may have just been a mistake or an oversight.
Q Okay. Now of all of these litigations we've discussed, we've agreed -- you've stated there's always potential for additional liability and potential for more defense costs, correct?
A That's true.
Q Okay. And yet the entirety of the settlement payment, the 1.25 million you allocated to Pennsylvania District Court?
A That's right. And I -- can I explain, or --
Q Let me ask you one more question.
A Okay.
Q That's -- two more questions, sorry. That's the only action where any of that payment is allocated, correct?
A That's correct.
Q And that's true that when SeeCubic responded to your

letter demanding indemnity, that's the only one where SeeCubic did not outright state we don't have any obligations with respect to this case, correct?
A There was not a -- I guess there was not an outright denial, although I would suggest there was not an acceptance of its obligations to indemnify me for an action, which was -- clearly falls under the indemnity --
Q Okay.
A -- obligations.
Q But arguably, you'd agree with me that was not an outright denial?
A Could I -- I'm sorry, could I look at the letter?
Q That's 6. Yeah, tab 6.
A Okay. Well, I would suggest that I made a specific demand as to being indemnified for that specific action, the Pennsylvania action. And that SeeCubic didn't seem to think that was a specific enough request for that action. So I think I made the request, and I think it was denied.
Q Did SeeCubic not invite discussion? Let's talk.
A In connection with a settlement that it had knowledge that it already, I believe, occurred, it may have suggested a dialogue. But at that point, the settlement was signed a week later -- less than a week later.
Q You just said a settlement that they had knowledge had occurred. They, is SeeCubic?

A Yes.

Q You have no basis, do you, Mr. Homony, to understand what SeeCubic knew or didn't know about a potential settlement, correct?

A Sure. Mr. Michaels -- when we had our -- when we had resolved informally before it was formally documented, I believe Mr. Michaels requested our permission or authority to speak to SeeCubic about the agreement we had reached because Mr. Michaels was hoping to, I believe, reach a global resolution with all three parties. We said, feel free to discuss it with SeeCubic. I've seen an email from Mr. Michaels to SeeCubic's counsel, I believe, that details that there has been a settlement reached with the Trustee, and I believe the open issue was how much SeeCubic was going to pay.

Q So you've seen a document where Mr. Michaels sent SeeCubic's counsel. Do you know which counsel?

A I don't. I apologize. I do believe it's an exhibit in somebody's binder here.

Q Okay. And you believe that that communicated details of the proposed settlement?

A Yes.

Q Okay. But you don't know for sure?

A I know generally the framework is discussed, and I believe, as I mentioned, the open issue was how much SeeCubic was willing to pay.

Q Okay. Got it. So of the $1.25 million settlement amount, you testified earlier, 100,000 will come from the estate?
A Correct.
Q And then the rest would be a judgment against SeeCubic, correct?
A Correct.
Q Okay. And I think it's fairly clear, but just so we're clear, you reached that agreement with Rembrandt and the number, for example, on your own, without input from SeeCubic?
A That's correct.
Q Okay. And your position in the motion in here today is that you're entitled to do that because SeeCubic refused to fulfill defense and indemnity obligations, correct?
A I do believe they declined. I also believe that I saved SeeCubic a lot of money by agreeing to pay that amount, or for a judgment for that amount, I think. And I also have concerns that -- quite frankly, that SeeCubic has the financial wherewithal to fulfill its indemnity obligations.
Q All right. We'll come back to that. I just want to be clear. The entirety of your efforts to engage with SeeCubic with respect to any defense and indemnity obligations for the Pennsylvania case, was that one letter, correct?
A Yes.
Q You didn't send a follow-up letter?
A No. We didn't send a follow-up letter. Again, the

history of this case is that SeeCubic knew exactly what was going to happen. It happened. They had notice of the complaint that was filed against me. They certainly should know that those complaints trigger their indemnity obligations and to wait three months and respond with a, you know, basically shrugging your shoulders, I think further efforts would have been fruitless. And again, I have serious concerns about their financial ability to pay any indemnity obligations to this estate.

Q Okay. So no follow-up email, no phone call, no effort whatsoever other than that one letter, correct?

A Not to my knowledge, no.

Q Okay. And you claimed that it's because you thought it would be, I think you said fruitless, to try to do that. And in part, you state that's because you don't believe that SeeCubic had the financial wherewithal to defend or indemnify?

A Yes.

Q And one of the data points that you used in coming to that view was the delay back in December of the closing of the sale, correct?

A That's correct.

Q That was December 2024 and the closing was the first week of January of this year?

A Yes, that's correct.

Q So that was roughly nine months and one week ago?

A Yes.
Q Okay. Since the closing, you haven't had any conversations or received any information from SeeCubic or anyone representing SeeCubic about its financial condition, correct?
A Other than the judgment that's been entered as an exhibit where they chose not to defend and default judgments were entered against both SeeCubic and Mr. Stasney individually in the amount of, I think it's approximately $6.8 million.
Q So that's no. You haven't, from SeeCubic directly or anyone representing SeeCubic, had any conversation, any information about its financial position directly from SeeCubic?
A No, I have not. No.
Q Okay. And you made no efforts to understand SeeCubic's financial position as of March when you sent the indemnity demand, correct?
A Correct. But I -- my history with them would, I believe shows that SeeCubic had no money. It would go out similar to VSI and a lot of these other firms and raise money as they needed it. And they obviously struggled to do that to purchase the assets, which was a material event in this case. We would put a lot of the fighting to the side, and they struggled to raise the necessary money to close that transaction, which closed in January. I sent the letter in March. I was sued

before the sale had actually closed. And so I had serious concerns.
Q Okay. But again, that was based on the events around the closing nine months ago, correct?
A Nine months ago today, but not when I made the decision to settle.
Q Okay. So six months ago?
A Well, I think I made the decision in June. So yeah. Six months after the sale closed.
Q Six after, yes.
A Yes.
Q Apologies. After the closing, SeeCubic owned the transferred assets, correct?
A Yes, they're the buyer. Correct.
Q You'd agree with me that fundraising would probably be easier post-closing once the assets were in hand?
A That's what I was told. But you know, there is a thing called investor fatigue, and SeeCubic has been fighting this fight for a long time. And I'm sure it -- I don't know how investors felt, but it struggled to raise the money to buy the assets, so.
Q Okay. But again, you don't have any information post-closing?
A That's correct.
Q Okay. Now you've mentioned a few times one of the other

data points that led you to believe SeeCubic could not fulfill its obligations. Was the entry of a default in a case out in California?

A Yes.

Q Okay. That default was entered in June?

A Yes. I learned that after I entered into the settlement agreement. It just -- it further supports my view of -- in my view -- further supports my view of SeeCubic's ability to its financial issues and its inability to fund its indemnity obligations.

Q Okay. But that default entered in June doesn't and can't explain why you didn't follow up in March, April, or May, correct?

A That has nothing to do with that, no.

Q Okay. Mr. Homony, you have no personal knowledge of the facts or circumstances surrounding that judgment, correct?

A Only what I read, no. No personal facts.

Q You didn't reach out to SeeCubic to ask at any point?

A No.

Q You don't have any idea what happened there other than that you can see there's a document on the docket?

A That's correct.

Q Okay. Do you understand that SeeCubic has any appeal rights with connection to that judgment?

A I don't.

Q Okay. So I just want to recap quickly kind of the series of events. You sent one letter to SeeCubic in March?
A Uh-huh.
Q That was the only opportunity you directly asked SeeCubic to get involved, correct?
A Yes, I believe so.
Q Okay. And you didn't follow up with SeeCubic because you assumed that SeeCubic couldn't or wouldn't fulfill its obligations?
A That's one of the reasons. I don't -- I don't -- I don't recall exactly. I had obviously dialogue with my counsel on those issues. But in my mind, that's one of the reasons.
Q What are the other reasons?
A That we didn't follow up with another letter?
Q Uh-huh.
A Well, I don't know why --
Q I --
A I don't know why we have to follow up. I mean, I made a demand. It's --
Q Uh-huh.
A -- like when you file a complaint, you don't have to ask twice. You serve it on somebody, they either honor the obligation or -- or respond or they get a default judgment entered against them. And so I view that similarly here. SeeCubic was well aware before I sent that demand, that notice

of demand, that it had had underlying obligations. I put them on formal notice and got no response. And in the interim, I settled for a number that I think ultimately saved SeeCubic millions and millions and millions of dollars, and -- which I think is reasonable. And that's -- that's what happened.
Q Okay. Do you recall that in the letter -- the demand letter, your counsel referenced that there were some pending deadlines in the case?
A I don't recall that, but --
Q Okay. Would pending deadlines not be another -- a good reason to follow up and say, "Hey, guys, what's going on here?"
A Again, I don't know why I have to follow up. I -- I did what I think was necessary to put -- put SeeCubic on notice that they had a -- an obligation to indemnify, and they chose to ignore it until -- until they recognized that I had settled in principle with Rembrandt. At which point, they responded. I don't -- I don't think he would have responded to the letter had it not been for that communication from Mr. Michaels --
Q But you don't have any --
A -- but that's speculation.
Q That's all speculation?
A Yes, ma'am.
Q Okay. Thanks. You're aware that in the letter that you sent to SeeCubic, you don't -- you're just asking for payment of fees, correct?

A Well, that's specifically referenced, but I think I'm asking them to fulfill their obligations under the asset purchase agreement, which I believe goes beyond just payment, but --
Q Okay. But nowhere do you say, "Hey, take over the defense"? You actually specifically ask that the defense be taken over via the payment of fees, correct?
A I'm not sure if that's the wording, again.
Q Okay. Well, the document speaks for itself.
A Yes.
Q All right. So one of the reasons, or at least it sounds like a primary reason you didn't follow-up, so there's two, one, you didn't think you needed to, and two, you didn't think it would be worthwhile because of SeeCubic's financial position, correct?
A Yes.
Q Okay. But you didn't make any efforts to find out if your assumption about SeeCubic's financial presumption -- financial condition was correct?
A No, not -- not -- not subsequent to March. Again, once, you know, we did -- we did find the California judgment and that, again, was just I think further support for my view of SeeCubic's financial condition.
Q After the fact though, correct?
A That's right. Yes.

Q And the -- and as you testified, you don't know anything about the facts and circumstances surrounding that judgment?
A I do not.
Q Okay. SeeCubic did respond to your letter, correct?
A Yes.
Q Okay. And I think you agreed with me a moment ago, you don't have anything other than speculation for assuming the timing of when that letter came to you?
A That's speculation, yes.
Q Okay. When SeeCubic responded, it specifically asked to be involved in any discussions about settlement with Rembrandt of the Pennsylvania case, correct?
A I'm sorry. I don't -- I don't know if it asked to -- I think -- I don't think it asked to be in discussions, but it says that the indemnity, I guess, includes SeeCubic's authority to direct any settlement.
Q Okay. But it asked to -- that thoroughly read is asking to be at least involved in some way, told, consulted --
A Yeah, but it already knew. That's the -- that's the -- it had already known from Mr. Michaels' communication that the settlement was on the cusp of being finalized. And so it's -- it's a bit disingenuous.
Q But you don't have that communication and you don't remember anything about it other than it's an email?
A I -- I know it's an exhibit in somebody's binder. I saw

it in preparation for today.

Q Okay.

A And so that was around -- that was in the middle of June. June 12th-ish I believe that email was dated.

Q Okay. Notwithstanding what SeeCubic had to say about the settlement and any -- whether you think it's disingenuous or not, any request to direct or be involved in the amount, you didn't respond to SeeCubic's letter at all, correct?

A We had not. Again, six days before I executed the settlement agreement with Rembrandt.

Q And you didn't even tell SeeCubic that you were going to execute that agreement, did you?

A No.

Q Do you know that SeeCubic found out when it was filed on the docket?

A Found out what?

Q That they -- there was an agreement?

A Again, I think that's disingenuous. I think it knew June 12th that I was finalizing the agreement with Rembrandt. So to suggest that that was their first opportunity, I don't think is an accurate -- it's a mischaracterization, and I think -- you know, they've had an opportunity now. It's been on file since July -- whenever it was, early July to engage in some kind of a discussion perhaps about an amount, what they were willing to pay, what they weren't willing to pay, if they

felt they had any obligation. And we just got an outright objection. I view that as a further rejection of your -- of SeeCubic's indemnity obligations. The objection to the request, that's exactly what it is. I'm requesting 1.15 million and it's been rejected again.

So that's -- that's the way I look -- I view this.

Q Okay. If SeeCubic were to call and say, "Hey, let's talk tomorrow," would you be willing to do that?

A I would.

Q Okay. Great.

MS. BRUMME: I don't have anything else.

THE COURT: All right. Thank you, Ms. Brumme.

Mr. Rink, do you have any questions for this witness?

MR. RINK: I do.

THE COURT: All right.

(Counsel confer)

CROSS-EXAMINATION

BY MR. RINK:

Q Mr. Homony, good morning.

A Good morning.

Q Could I ask you to refer to some of the questions to our witness exhibit book?

A To your witness exhibit book?

Q Yes. The white one. Or I think it's there in front of you. And the questions, if any, would refer to the second tab.

It's called Doug -- or Bud Robertson's First Declaration.
A Okay.
Q Okay. Just that document.
A Okay.
Q Okay?
A Yes.

MR. RINK: Your Honor, if I can follow up on the statement that I made earlier? I just want to make one further clarification.

This isn't a simple damages case. VSI's consent is a condition precedent. Without it, Rembrandt has no authority to settle or transfer Ulta D rights. The Trustee cannot bless unauthorized acts through the Rule 10 -- or 9019. Delaware contract law requires this Court to enforce the conditions as written. And authority is a threshold issue for laws -- of licenses under Delaware law.

THE COURT: Okay.

MR. RINK: Okay. I would like to proceed to questions for Mr. Homony.

THE COURT: You may.

MR. RINK: Okay.

BY MR. RINK:
Q Good morning.
A Good morning.
Q Is authority to sign a threshold issued or a mandatory

issue in Delaware? Do you know?
A I do not.
Q How about the Third Circuit?
A I do not. Generally, every agreement I've seen includes reps and warranties, that the party has the right to settle whatever obligations are being settled.
Q Have 9019s been turned down in courts around the country because of lack of authority to sign?
A Not to my knowledge.
Q What would prevent VSI from going after the estate for the stripping of the VSI rights?
A I -- are you -- I'm assuming that you're speaking of the VSI rights in the agreement --
Q Yes.
A -- with -- between VSI and Rembrandt?
Q Yes, sir.
A I'm not a party to that agreement. I had no knowledge of that agreement. When I executed the settlement with Rembrandt, I believe Rembrandt had the appropriate authority. I had no knowledge that it -- that there was any issues whatsoever. And so --
Q Okay. What was the size of the Rembrandt prepetition claim? Do you recall that?
A They asserted a $1.2 billion claim.
Q Why wouldn't VSI be able to claim that? Do you happen to

know that?
A I don't know why they would. They're not the party that filed the claim. There's no notice of transfer of claim on -- on the docket or other public information. I -- I don't know why I would even think, and I didn't think, I had to deal with VSI in connection with trying to resolve my issues, the estate's issues with Rembrandt.
Q Okay. Continuing along that vein, before finalizing the settlement with Rembrandt, were you aware of any agreement between Rembrandt and VSI that restricted Rembrandt's ability to settle this litigation?
A No.
Q When did you first become aware of this agreement?
A When I believe it's attached as exhibits to VSI's objection to the pending 9019 motion.
Q Okay. Thank you. So you negotiated and signed the settlement with Rembrandt without knowing the Rembrandt/VSI agreement?
A That's correct.
Q Okay. In fact, at your deposition, you were shown amendment number 2, which is referenced in that book there. It's an exhibit to Mr. Robertson's first declaration. That reads, "Rembrandt shall not propose or agree to any settlement in the legal actions without VSI's prior written consent and approval." Do you recall that?

A I recall that document.

Q Yeah. Okay. That amendment explicitly required Rembrandt to obtain VSI's prior written consent before entering into any settlement that covered litigation, correct?

A I -- I mean, I'm not a party to that agreement. I don't -- and it says what it says. I don't know what the parties thought or why they entered into that agreement. So -- and -- and I know Rembrandt's challenging the validity of that specific amendment number 2. It says what it says.

Q Okay. So you never obtained VSI's consent or contacted them before entering into this settlement agreement, the 9019?

A No.

Q Rembrandt, according to the agreement, did -- well, it did not have VSI's consent at the time you settled into the agreement. Is that your understanding?

A Did you ask me if Rembrandt had VSI's consent to enter into the agreement?

Q In other words, to the best of your knowledge, did VSI -- or Rembrandt have VSI's consent to enter into the settlement agreement?

A I have no knowledge of that.

Q Would you say that Rembrandt's act of signing the settlement with you was in a direct violation of that consent requirement, as far as you can tell?

UNIDENTIFIED SPEAKER: Objection, Your Honor. Calls

for a legal conclusion.

THE COURT: Sustained.

THE WITNESS: Again, I'm not a --

THE COURT: I sustained the objection.

THE WITNESS: Oh, I'm sorry.

THE COURT: You don't have to answer that.

THE WITNESS: I apologize, Your Honor.

MR. RINK: Okay. We can move on from that.

BY MR. RINK:

Q Amendment number 2 to the agreement, likewise, prohibited Rembrandt from sublicensing or transferring any technology. Do you happen to recall that?

A I believe that's what the document says, yes.

Q Therefore, any settlement agreement terms involving the Alter D technology would also be unauthorized because VSI didn't approve it?

A I mean, that's VSI's interpretation. I'm not a party --

MR. COREN: Objection, Your Honor. This is -- all he's doing is asking him to weigh in --

THE COURT: He already answered.

MR. COREN: -- his view of the law.

THE COURT: He already answered.

MR. COREN: I'll be a little quicker in my --

THE COURT: Okay.

MR. COREN: -- objections.

BY MR. RINK:
Q Would you say, to the best of your knowledge, that Stream TV's interests in the technology were intertwined with the VSI/Rembrandt interests, to the best of your knowledge?
A Can you repeat that? I'm sorry.
Q Yeah. Would you say that Stream TV's interests in the technology were entangled with the VSI/Rembrandt agreement?
A No.
Q Without VSI's approval, what authority did you see for going ahead and signing the settlement?
A Again, I had no idea VSI -- I would never -- and in my 25 years of doing this and assisting other trustees have never entered into an agreement with another party and had -- had to -- outside of what the agreement said, which was -- and it says it in this agreement, that Rembrandt has the authority, has not sold its claim, and has the rights to execute this agreement, et cetera. I had no reason to further dig into Rembrandt's potential involvement with VSI.
Q Thank you, sir.
THE COURT: All right. I have no questions for Mr. Homony. Do you have any further redirect, Mr. Coren?
MR. COREN: No. No redirect.
THE COURT: Okay. All right.
THE WITNESS: Thank you.
THE COURT: You may stand down, Mr. Homony. Thank

you.

(Counsel confer)

THE COURT: Is everyone okay to continue? Does anyone need a break?

MR. RINK: Could we take ten, Your Honor?

THE COURT: That's fine. All right. We'll come back at -- we're going to take a recess for ten minutes. We'll come back at 11:10.

MR. RINK: Thank you.

THE COURT: Thank you.

(Recess taken)

THE BAILIFF: All rise.

THE COURT: Good morning. Please be seated.

All right. Mr. Coren, your next witness?

MR. COREN: The Trustee calls John Simmons.

JOHN D. SIMMONS, SWORN

THE CLERK: Please state your name for the record.

THE WITNESS: It's John D. Simmons, S-I-M-M-O-N-S.

THE CLERK: State your address for the record.

THE WITNESS: It's 1 Righter Parkway, Wilmington, Delaware, 19803.

DIRECT EXAMINATION

BY MR. COREN:

Q Good morning, Mr. Simmons.

A Good morning.

MR. COREN: If I may, at this point, Your Honor, offer Mr. Simmons' declaration into evidence, then I'll have a few preliminary questions and then I will turn him over for cross-examination.

THE COURT: Anyone have -- this is tab 11, docket number 1055, the declaration of John Simmons. Anyone have an objection to the Court taking Mr. Simmons' declaration in as his direct testimony?

MS. BRUMME: No objection.

MR. RINK: No, sir.

THE COURT: Okay. All right. You can proceed.

BY MR. COREN:

Q Mr. Simmons, would you please tell us your educational and professional background?

A So I'm an electrical engineer. I'm a licensed professional engineer. In addition, I have a BS in engineering from Drexel. Then I'm also a registered patent attorney. I was a patent agent before becoming a lawyer. I went to law school at night while I was a patent agent. So I've been doing this for 25 years now.

Q And if you would, just briefly, in terms of your profession as an attorney, tell the Court the types of matters that you're involved in?

A Sure. So Panitch Schwarze, my law firm, is an intellectual property law boutique. So all we do are patent,

trademark, copyright, trade secret cases. And I -- so I do litigation. I formerly did patent prosecution and trademark prosecution, but now I primarily do civil litigation for complex cases, such as patent infringement, like the issue in the Rembrandt case, trade secret misappropriation, and we oftentimes have breach of contract, like breach of confidentiality agreements or breach of employment agreements associated with the case.

Q And could you estimate how many cases you have been involved in as an attorney?

A Yeah. I've had over a hundred cases. I've -- I've also had experience between the United States Patent Office, Patent Trial and Appeal Board, and the Trademark Trial and Appeal Board. So I've done Inter Partes Reexaminations, and Inter Partes Reviews and post-grant reviews with the -- with the patent office, which is kind of like an administrative trial.

Q Thank you. Now, I know in your declaration you discuss in some detail the cost associated with matters of the sort that are at issue in the Pennsylvania District Court action. You talk about attorney's fees and expert expenses and things of that sort. But how much experience do you have in terms of actually being the lawyer in the case or evaluating cases to counsel clients whether they should enter into settlement and negotiations?

A I'd say 98 percent of the cases that I've worked on have

that type of analysis. Well, most patent cases are very expensive, they're very long and drawn out, and oftentimes they get referred to mediation. So you have to evaluate what are the fees going to be going forward, what are the sum costs, and you know, what's -- what's an appropriate settlement offer or demand.

Q Yep. If you would -- there's a very detailed analysis of the fees and expenses. Did you also take a look at and counsel the Trustee as to the merits -- your view of the merits of the Pennsylvania District Court litigation?

A So I did. I reviewed the patents. There's three patents at issue in -- in the case. They're all related, but they all have different claims. Then there's the -- the trade secrets, which are slightly vague, I would say, in the complaint. And also the agreement. And came to the conclusion that the cost of defending the case would be somewhere in the order of, through appeal and appeals for the IPRs that would eventually be brought along with it, would be in the order of 10 to $15 million in fees.

So even though we have what we believe would be initial meritorious defenses to the patent infringement claims and the trade -- misappropriation of trade secrets claims, it really didn't make sense to litigate it. And on the off chance that you would actually lose, which is a possibility -- you never know what kind of jury you're going to get -- the

liability would be upwards of over $100 million, according to Rembrandt.

MR. COREN: Nothing further, Your Honor. I'll pass the witness for cross-examination.

THE COURT: All right. Before I go to you, Mr. DeMarco, do you have any questions?

MR. DEMARCO: No, Your Honor.

THE COURT: Okay. All right. Ms. Brumme.

MS. BRUMME: Thank you.

CROSS-EXAMINATION

BY MS. BRUMME:

Q Good morning, Mr. Simmons.

A Good morning.

Q Do you have the Trustee's book of exhibits up in front of you there? Do you mind turning to tab 11?

A Got it.

Q 11?

UNIDENTIFIED SPEAKER: It's the black book.

THE WITNESS: Yep.

UNIDENTIFIED SPEAKER: Okay.

THE WITNESS: I'm there.

BY MS. BRUMME:

Q You should recognize that, I hope. Is this the declaration you've submitted in this case?

A I do. I just reread it again this morning.

Q Great. So you have been counseling the Trustee on the Pennsylvania District Court action?
A Yes.
Q And you mentioned that that case involves claims for patent infringement, trade secret misappropriation, and then the breach of contract?
A Correct.
Q Okay. And you testified here in your declaration notes that you estimated the potential, just the legal fees in that case, to be anywhere from $10 to $15 million?
A That's correct.
Q Okay. And so that by the $1.25 million payment in the proposed settlement with Rembrandt, that saves the trustee 9 to 14, roughly, million dollars?
A Also correct.
Q Okay. And in order to be retained in this case to advise the trustee, you had to have your application approved by the Court, correct?
A I'm sorry?
Q To be retained by the trustee, that was approved by the Court, your engagement?
A Yes.
Q Okay. And your billing rate approved by the Court is $640 an hour?
A Yeah, that's a discounted rate.

Q Yeah. Okay. Are you aware that if you do $10 to $15 million at that rate, it's upward of 15,000 to 23,000 hours?
A Well, if there's going to be more than one attorney on the case --
Q Sure. But assuming --
A -- but yes. That includes -- that's just not fees, that's also disbursements. So you're looking at expert witnesses, depositions, translations, Hague Convention, that sort of thing.
Q Sure. Okay. Now, you made a number of assumptions that you walked through in your declaration in arriving at the $10 to $15 million number, correct?
A Yes.
Q Okay. Can you look at paragraph 12 for me? And in paragraph 12, you cite the American Intellectual Property Law Association economic survey, correct?
A That is correct.
Q I am unfortunately familiar with that document myself. It's quite a read. In your declaration here, you note that a case with damages in excess of $25 million -- Rembrandt is asserting more than 25 million, correct?
A So my understanding is -- I could be wrong --
Q Yeah.
A -- but my understanding is that Rembrandt claims it's more than $100 million in damages.

Q Okay.
A So this is going to be on the higher end of the spectrum.
Q Sure. But the economic survey, the highest it goes in terms of breaking data down, is $25 million or more in damages?
A That's right.
Q Okay. And you state that the data suggests that on average, a patent infringement litigation for a case with one patent and damages in excess of $25 million would have on average 5.25 million in legal fees. Do you see that?
A Yes.
Q And you attach a page of the economic survey to the back of your declaration?
A Correct.
Q Okay. Do you see that the -- if you look at that page, which is the last page of the document?
A Yep, I see it.
Q The 5.25 million is not the average, is it, Mr. Simmons?
A I can't read it.
Q It's actually the 75th percentile.
A Okay. Yeah.
Q Are you contending that Rembrandt's case would be in the 75th percentile of cases for --
A Well, this is for a single patent case.
Q Uh-huh.
A The Rembrandt case is three patents plus trade secrets

plus breach of contract.
Q Okay. The three patents are related though, correct?
A They're related, but they have different claims.
Q And they're, in fact, continuation patents of each other?
A They are.
Q Okay. So that's not three fully separate patents, correct?
A Well, yes it is. They're three separate granted patents --
Q Poor --
A -- with three separate inventions in them.
Q Poorly phrased question. Some of the work related to defend one of those patents would certainly overlap with the others, correct?
A There would be overlap.
Q And the same for the trade secrets?
A The trade secrets are different than the patents.
Q Sure. But some of the work doing --
A Actually --
Q -- the work you would need to be doing to defend the patent cases would overlap presumably with some of the trade secret work, correct?
A I don't know that that's true.
Q Okay.
A The trade sec -- so necessarily, a trade secret can't be

in the patent, otherwise it'd be public information --
Q Sure.
A -- so it's different analyses.
Q Okay. But you're not saying that it would be a wholly -- strike that. If you look at the Exhibit on the back of your declaration, the average is in fact $4.4 million?
A Okay. For a single patent case. Correct.
Q Okay, again. And could you look at paragraph 20, please? And before we do that, the difference between 5.25 and 4.4 is nearly a million dollars difference in the average?
A Yes, but I've had a case of almost a similar fact pattern through patents, technical patents, trade secrets, breach of confidentiality agreement, and that case was upwards of $10 million through appeal.
Q Who was that against?
A Harvard.
Q Harvard. Do you remember who represented Harvard?
A Yeah, it was Pepper Hamilton.
Q Got it. All right. So in paragraph 20, you mentioned that one of the reasons that the case would cost this much as -- I'm paraphrasing -- discovery would be expensive, correct?
A Yes. There's going to be -- there's foreign witnesses on the witness list. There's a lot of witnesses. And I know you can't exceed ten, but you can seek leave of the Court.

Q Sure. But have you ever seen leave of the Court to take 70?
A I personally have never seen 70 witnesses in an initial disclosure before, which goes along with the pattern that Rembrandt aggressively litigates, and I think when you have an aggressive party on the other side, it usually runs up fees.
Q Sure. I think we've all been there.
A Yeah. Right.
Q So it would be somewhere, you would think, with leave of Court above 10, but certainly not 70, correct?
A Correct.
Q Okay. So the estimate there for the cost of depositions is probably a bit high?
A Yeah, I didn't add this up. I didn't say, okay, here's the depositions plus this plus this. These are just to give you a flavor for how expensive it is.
Q Okay, great. You referenced a few minutes ago inter partes reviews, correct?
A Correct.
Q That's IPR at the patent office?
A IPRs, right.
Q Yep. And you talk about in paragraph 15 and 16 and 17, you reference IPRs. Is that correct?
A Yes.
Q Okay. And in these couple of paragraphs here, you

estimate for the Rembrandt case, where there's three patents, that's just shy of $2 million for IPR review and appeals?
A Right.
Q Okay. The IPR would be filed by the trustee though, correct? Not Rembrandt.
A That's right.
Q Okay. So that's completely voluntary, correct?
A Well, almost every patent litigation that you have these days, there's a parallel IPR.
Q Not required though. Correct?
A It's not required, but it's good sound legal strategy.
Q Okay.
A I don't think I've been in a case in recent years where there hasn't been a parallel IPR --
Q Sure.
A -- and that would be three IPRs.
Q Sure. But that $2 million, it wouldn't necessarily have to be spent. Correct?
A Wouldn't have to be. There's times when you wouldn't do an IPR.
Q Okay.
A But this case probably lends itself to it.
Q Okay. I have nothing further.
A Thank you.
Q Thanks.

THE COURT: All right. Thank you.
Mr. Rink?
MR. RINK: Yes.
THE COURT: Any questions?
MR. RINK: Your Honor, if I may, Your Honor, if I may, before I get to Mr. Simmons, I'd like to make some additional points for your consideration.
THE COURT: I think you can just question the witness. We'll deal with all of the legal argument at the end.
MR. RINK: Thank you.
THE COURT: All right. You bet.

CROSS-EXAMINATION

BY MR. RINK:
Q Mr. Simmons, good morning.
A Good morning.
Q What do you know about the Defense of Trade Secret Act?
A The Defense Trade Secret Act. It's a federal act for theft of trade secrets, misappropriation of trade secrets.
Q And do you know how long it's been around?
A At least five years.
Q What is conversion from the standpoint of intellectual property?
A So conversion -- you can have conversion. It's rare, but conversion is basically like theft. So you can convert intellectual property, if it's merged into the document. So

it's primarily used in cases where you don't have copyrights or patents or trademarks.
Q Like knowhow kinds of things?
A Like knowhow, or I have a case right now where it's about electrical drawings, where we're claiming that the electrical drawings have merged into the document and therefore you can have a conversion claim, otherwise copyright would preempt it.
Q If VSI was in charge of Rembrandt's rights, wouldn't the estate have to come up with these same millions of dollars we've just been discussing?
A I'm not sure I understand the question.
Q To defend. In other words, if VSI were to be in charge of Rembrandt's rights as we're alleging, under the contract with Rembrandt, wouldn't the estate still have to come up with these millions of dollars to defend the estate?
A If they were going to defend the case, not settle.
Q That's all I have, sir. Thank you.
THE COURT: All right. I don't have any questions for Mr. Simmons.
THE WITNESS: Thank you, Your Honor.
THE COURT: Any redirect?
MR. COREN: No, sir.
THE COURT: All right.
Mr. DeMarco, no?
All right. You can stand down. Thank you very much,

Mr. Simmons.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. Mr. Coren, your next witness.

MR. COREN: Trustee calls Christopher Michaels.

THE CLERK: State your name for the record.

MR. MICHAELS: My name is Christopher Allen Michaels,

THE CLERK: Spell your last name.

MR. MICHAELS: M-I-C-H-A-E-L-S.

THE CLERK: Address of record?

MR. MICHAELS: My address is 12417 Country Day Circle, Fort Myers, Florida 33918.

THE COURT: Just so I understand, are you presenting this witness? Is Mr. DeMarco presenting this witness? Are you doing it jointly? Just so I know who to come to for --

MR. COREN: Well, I think probably both.

THE COURT: Okay.

MR. COREN: But I'm merely, since we relied on his declaration -- he has a second declaration which will be handled separately, but we did submit it in connection with our filing.

THE COURT: Okay.

MR. COREN: And it segues right into my offering the declaration of Mr. Michaels, which was issued in support of the trustee's 9019 motion, offered it into evidence.

THE COURT: So that's Docket Number 1057 at tab

number 12 in the trustee's binder?

MR. COREN: Yes, sir.

THE COURT: Okay. Any objection to the Court accepting into evidence the declaration of Christopher A. Michaels in support of the trustee's motion under 9019, Docket Number 1057, as his direct testimony?

MS. BRUMME: No objection.

MR. RINK: No, sir.

THE COURT: All right. That'll be admitted.

(Trustee's Exhibit 1057 admitted into evidence)

DIRECT EXAMINATION

BY MR. COREN:

Q Before I pass you for cross-examination, if you would just tell the Court and the parties your educational and professional background.

A Sure.

THE COURT: I think that's covered under Tab 3. You don't need to do that.

MR. COREN: It is and I'll pass him for cross-examination.

THE COURT: All right. So Mr. DeMarco, do you want to do his second declaration --

MR. DEMARCO: Yes.

THE COURT: -- so it's all at one time. There we go.

MR. DEMARCO: Yes, Your Honor, I'd like to move that

second declaration and its exhibits and submit that for the Court.

THE COURT: All right. Anyone have any objection to the Court receiving into evidence the second declaration of Christopher A. Michaels in support of motion under 9019 Docket Number 1078.

MS. BRUMME: Answered my question. I was going to ask which one we were looking at. No objection.

MR. RINK: No objection.

MR. WEISBERG: Your Honor, VSI has an objection.

THE COURT: Okay.

MR. WEISBERG: The objection is that it assume that Mr. --

THE COURT: Can you speak into the microphone?

MR. WEISBERG: I'm sorry, Your Honor.

THE COURT: Just -- yep.

MR. WEISBERG: A lot of people at these tables. Excuse me for a second.

THE COURT: You can do it at the podium. Mr. DeMarco will come back.

MR. WEISBERG: Okay. Your Honor, it seems that Mr. Michaels' second declaration is merely an ad hominem attack on myself and prior counsel. It seems to have no relationship. Aside from it being an impermissible ad hominem attack, I question both the relevance -- well, I propound that it's

irrelevant. It doesn't have anything to do with this 9019 settlement agreement proposal, and it's hearsay.

And further, it's parole evidence if Mr. Michaels is seemingly trying to -- I don't even understand. I frankly don't understand what the declaration's supposed to do, but if Mr. Michaels is trying to seek to alter the terms of the hybrid agreement, litigation funding, cooperation agreement, it's parole. So for those three or four reasons, aside from the fact that the fifth reason would be, again, I don't understand what it's trying to prove, but I guess that would go under relevance. I would object.

THE COURT: All right, so I understand the objection so I can hear from Mr. DeMarco. The objection is that it's irrelevant?

MR. WEISBERG: Correct.

THE COURT: That it contains hearsay?

MR. WEISBERG: Correct.

THE COURT: And that it's an impermissible attempt to admit parole evidence?

MR. WEISBERG: Correct.

THE COURT: Okay. I can deal with the relevance issue in my review of the ultimate declaration and the supports that are raised in connection with the issues at play before the Court. So I'm not concerned about the relevance issue. I'll give it the weight to which I deem it appropriate.

With respect to the hearsay issue, which items are hearsay?

MR. WEISBERG: Mr. Michaels' declaration, and thus his testimony, incorporates a telephone call or seeks to incorporate a telephone call, which I would -- I don't want to testify. I can't testify, but without the telephone call transcript being admitted, it's totally out of context. As far as I understand, the call was not recorded, and Mr. DeMarco -- I mean, Mr. Michaels is seeking to admit just pieces of it.

And to do so is not only an impermissible substitute for his own testimony and perhaps rebuttal testimony, but in itself hearsay. And it even has emails out of context. It's incorporating -- talks about prior counsel, who wasn't even on the call. It contains conclusions that are Court conclusions. I respectfully suggest that the whole thing's hearsay.

THE COURT: Okay. Let me here from Mr. DeMarco on that issue.

MR. DEMARCO: Yes, please. Your Honor, I -- perhaps Your Honor can assist me. As far as I understand, the hearsay objection, as Your Honor ruled out, I will leave the relevance issue to the side. But on the hearsay issue, it sounds like it's just this issue of the discussion of a phone call. My understanding of the objection is that it is hearsay because it is out of context, which I would suggest is fodder for cross. That's not a hearsay exception.

Insofar as I must offer a hearsay exception, I would actually say it's not hearsay. It's party opponent. Any testimony that's coming from VSI would not be hearsay as a party opponent. But as I said, I understood the --

THE COURT: Wait, I'm sorry. I'm sorry. Let me make sure I understand that because I was going to have the same question. So the scope of the testimony that is contained within the declaration that is objected to is -- insofar as the testimony is relaying comments made by VSI.

Is that the objection, Mr. Weisberg?

MR. WEISBERG: Well, it's comments made by myself, Mr. Michaels, and about comments made about comments made of prior counsel.

THE COURT: Okay.

MR. WEISBERG: Mr. Rajan was not on that call. He's a corporate representative of VSI.

MR. DEMARCO: Your Honor, if I may?

THE COURT: Oh, I'm sorry. I didn't know who said that. The -- well, he can testify about his side of the conversation. That's not hearsay.

MR. WEISBERG: Okay.

THE COURT: Right? I mean I think we all agree, right? He's here. He can testify about what he said in that telephone call. The question is can he testify about what people said back to him? Right. That's the issue. Right?

MR. DEMARCO: That's what it sounds like, Your Honor, and to the extent that it's VSI or VSI attorneys, that's clearly party opponents.

THE COURT: Well, we can deal with that. I'm not sure I am completely there yet, but I understand the position. And why don't we do this. To the extent that those issues come up in connection with the declaration, right, on testimony that he would be giving concerning comments made by parties other than himself, we will raise them and deal with them in the context of the questioning. Okay?

So then the third issue that you raised was the impermissible attempt to submit parole evidence.

MR. WEISBERG: Yes.

THE COURT: So with respect to the parole evidence issue, that is only relevant in connection with the agreement between Rembrandt and VSI, correct?

MR. WEISBERG: Correct.

THE COURT: Correct.

MR. DEMARCO: As I understand the objection, Your Honor.

THE COURT: Okay. And is that agreement being -- going to be off -- I mean, I hate to sort of -- everybody give me a preview of coming attractions, but is that going to be entered into evidence at some point, that agreement?

MR. DEMARCO: My understanding is that VSI may try to

enter that agreement.

THE COURT: Well then we'll deal with it --

MR. DEMARCO: I reserve all objections at that point, but --

THE COURT: Then we'll deal with it then.

MR. DEMARCO: Okay.

THE COURT: Okay. I'm going to reserve on your objections. I'm not overruling them, but I'm going to reserve on them and I'll address them in the context of the testimony as it comes in to the extent it's appropriate. You are perfectly entitled to object at the time that you think an issue may be coming up that would raise one of those issues.

MR. WEISBERG: Thank you, Your Honor. And except for the relevance, Your Honor.

THE COURT: Except for the relevance, which I'll deal with in the context of my ultimate review.

MR. WEISBERG: Thank you, Your Honor.

THE COURT: All right. All right, so with those caveats, the Court will accept into evidence the second declaration of Christopher Michaels in support of motion under 9019 at Docket Number 1078, with the caveats that the Court has raised on the record.

(Rembrandt 3D's Exhibit 1078 admitted into evidence)

THE COURT: All right. I'll offer him for cross-examination. Ms. Brumme?

MS. BRUMME: None for this witness.

MR. WEISBERG: May I cross-examination, Your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. WEISBERG:

Q Mr. Michaels, what's your position with Rembrandt?

A For Rembrandt 3D Holding Limited, I am the outside patent counsel, and I am internally the chief financial officer.

Q So you're both a party, a corporate designee, and its counsel?

A I am. Brown & Michaels PC is the outside law firm for the company, and I am a partner in that law firm. I'm also an officer in the company.

Q Is Brown & Michaels, PC employed in any respect with regard to this 9019 transaction?

A Yes, we are outside counsel for Rembrandt 3D Holding Limited.

Q And how is that not a conflict of interest?

MR. DEMARCO: Objection, Your Honor. Calls for a legal conclusion. I mean, also relevance.

THE COURT: There's a pending objection. I'm not sure I understand the relevance, either. Can you outline for me the relevance, Mr. Weisberg?

MR. WEISBERG: Sure. So Mr. Michaels is intending to testify, or has testified through his declaration, his opinion

as to the lawsuit funding and cooperation agreement and amendments. I'm asking only if he can provide that opinion because it may be a conflict of interest. He's both outside counsel, inside counsel, and an insider.

THE COURT: Well, I'm assuming he's going to take the position in all three that it's all consistent.

MR. WEISBERG: Maybe all consistent, but now he's being cross-examined against his own client.

THE COURT: Well, that's okay. Then you can cross-examine him that way, but I don't know that it's a conflict of interest.

MR. WEISBERG: Fair enough.

THE COURT: Okay.

BY MR. WEISBERG:

Q I see that in your declaration, you've paginated your paragraphs of your declar -- I mean, not paginated, you've numbered the paragraphs of your declaration as it relates to the exhibits. Is that correct? So if you were --

A I don't have it in front of me.

Q You don't have your own declaration in front of you?

A I was told not to bring anything up.

MR. WEISBERG: Your Honor, I submitted my copy for the witness.

THE COURT: You have a second declaration? Oh, I'm sorry. Sorry about that. There it is.

THE WITNESS: So which declaration are you referring to?

MR. WEISBERG: Your second declaration.

THE WITNESS: Okay. I've got that in front of me now.

BY MR. WEISBERG:

Q Please take a look.

A I am.

Q I'm -- your declaration is numbered one, two, three, four, and so forth. Is that right? And cited to those numbers, some of those numbers are exhibits that are found underneath. Is that correct?

A There are paragraph numbers --

Q Yes.

A -- in my declaration. There are page numbers, then there are headings at the top. There are tab numbers. There's a lot of numbers. Which numbers are you asking me to look at?

Q I'll get to that. If you turn to paragraph number 37 on page 7.

A Okay.

Q References Exhibit 13, an email you sent to me.

A Okay, I see it.

Q In that email, you stated that you agreed with Ackerman that the hybrid agreement Amendment Number 2 was not valid. Is that correct?

A I don't see the word hybrid anywhere in this email.
Q That Amendment Number 2 was not valid. Let me read it to you. We agreed with Ackerman that Amendment Number 2 was not valid.
A That's what it says, and that is also true.
Q Well, are you fighting with me then?
A What's that?
Q Why are you fighting with me then?
A I'm --
Q I'm asking you what it says.
A -- not fighting you. I'm asking. You --
Q We agreed with Ackerman --
THE COURT: Hang on. One at a time.
MR. WEISBERG: I'm sorry.
THE COURT: It won't be able to be picked up if you're doing it like that.
BY MR. WEISBERG:
Q We agreed with Ackerman that Amendment Number 2 was not valid. Is that correct?
A That is what this email says, yes.
Q Okay. Where's that confirmation email?
A The email we're talking about right here, it's Exhibit --
Q Where's the confirmation that Ackerman and VSI agreed that Amendment Number 2 was not valid?
A So we -- I believe earlier in my declaration, I provided

the email that I sent to the Ackerman attorneys when I first became aware of Amendment 2, referencing and immediately set up a series of phone calls, and Ackerman's response was instantaneous. When I got John Thompson and then subsequently Adam Swick on the phone. They're like, this is not a thing. We're absolutely not participating in this kind of agreement. Both law firms would have been guilty of a champertous, unethical arrangement. Neither law firm was agreeing to the amendment. You've got it flipped. The agreement, the litigation funding agreement from November, Ackerman and Brown & Michaels were signatories. So without our agreement, right, there was no amendment to that agreement. This purported Amendment 2 required both law firms to participate, and both law firms said no fricken way. Right. We were absolutely, positively not willing to enter this unethical arrangement that was being proposed.

We weren't willing back in October when it was originally thrown out. We all got on a phone call with Ackerman, Trevor Coddington, Dan Rink was on the phone, all the parties, and this was being bandied about -- we need settlement authority. And I made the statement then, this is not a permissible agreement. Trevor Coddington from Ackerman agreed, we can't do this. And it was agreed that Trevor Coddington would draft the final version of the litigation funding agreement and the common interest agreement and submit it.

And we signed it, right, because he drafted something that was ethical and permissible. Right? Neither Ackerman or Brown & Michaels or any of the attorneys were willing to do anything closely resembling what you guys were trying to put in. You know, it was the -- it was sent to Steve Blumenthal over the holidays while his wife is being diagnosed with cancer and without communicating with either Ackerman or Brown & Michaels. They would have gotten the exact same response.

Q What are you talking about? I'm asking you for one question.

A Sure.

Q Where is the confirmation that you sent to me, Mathu Weisberg, that Amendment Number 2 was not valid?

A I think I just answered your question.

Q No, you didn't. Where is the confirmation? You purport that I am acting unethically, and you purport that VSI is acting impermissibly, and you said we've sent you emails to prove that. Where are those emails?

A So this is -- so I have sent you -- I mean, there are numerous emails attached to --

Q Sir, I'm asking you one question.

A I understand.

Q Do you agree with Ackerman that Amendment Number 2 was not valid? Now you fought me over that for a little bit, but it says what it says. Where's the confirmation of that agreement?

A My testimony -- that numerous conversations with Ackerman disavowing any willingness to participate --

Q Testimony here today. But you said you sent me emails, so I'm asking you where is that email? Where is that agreement?

A The whole point is there is no agreement on Amendment Number 2.

Q Well, I understand that.

A I'm not sure --

THE COURT: I think -- hang on.

THE WITNESS: I'm not understanding.

THE COURT: Hang on. Hang on. We're sort of going around here. I believe the question that Mr. Weisberg is asking is your email at Exhibit Number 13, third paragraph, fourth paragraph, says we agreed with Ackerman that Amendment Number 2 was not valid. That's what the email says?

THE WITNESS: Yes.

THE COURT: Okay. He's asking you is did Ackerman send you an email that says we agree that Amendment Number 2 is not valid? That's his question. It's a yes or no question.

THE WITNESS: I understand. No.

THE COURT: Okay. Are we --

BY MR. WEISBERG:

Q How --

THE COURT: Are we good? Is that what -- did we get what we wanted?

MR. WEISBERG: Yes.
THE COURT: Okay.
THE WITNESS: So for what it's worth, I did not understand that that's the question you were asking.
Thank you, Your Honor.
THE COURT: Uh-huh.
BY MR. WEISBERG:
Q VSI would not take any action to enforce it. Do you have any confirmation of that?
A Yes, I have numerous conversations with the --
Q I'm not asking you for conversations. I'm asking for documentation that you said you forwarded to me in your declaration and thus I'm acting unethically. I'm asking for that email.
A Are you asking for confirmation, or are you asking for an email, because an attorney's repre --
Q I'm asking for a confirmation in a document.
A Well, that I can provide. So if you're -- the confirmation that Ackerman did not believe that Amendment 2 was enforceable --
Q Yes.
A -- right -- and had agreed with that was found in a variety of respects, not the least of which is that VSI was asking -- the officers of VSI were asking to attend and in fact run --

Q Asking for the document. Just point us to the page.

MR. DEMARCO: Objection, Your Honor.

THE WITNESS: I'm answering the question.

THE COURT: Hang on. There's an objection pending. I think we're getting lost in some of the questioning here, right? It's just going to be faster if we just try and focus on the question that he's asking.

Mr. Weisberg, I think the question you're asking is, just like we did on the first one -- in your email, Exhibit 13, you said VSI agreed that Amendment Number 2 or that Ackerman agreed that VS -- we agreed with Ackerman that Amendment Number 2 was not valid. He's asking you is there an email from Ackerman that says that. The answer's no. Right? Fine.

Next question. VSI -- did you also -- the statement also says we agreed with Ackerman that VSI would not take action to try to enforce it. He's asking you, is there an email from Ackerman that says we are not going to take action to enforce it?

THE WITNESS: There is no email that says what you just said, Your Honor.

THE COURT: Okay, that's fine.

So Mr. Weisberg, he's now going to testify as to why he thinks Ackerman gave him that. The argument about what relevance that has, we can argue about, but that's, I think, the difference, right? Is that what we're concerned about?

That you're concerned that the Court is going to simply take his word for it without any kind of other documentary support?

MR. WEISBERG: I'm concerned.

THE COURT: Okay. Got it. Understood.

BY MR. WEISBERG:

Q In the next paragraph, Exhibit 13, you state, "Your objection was surprising to us because VSI specifically asked Rembrandt in writing to settle with the trustee on the very terms we have reached." What page is that?

A Can you tell me where you are? I have no idea what document or what --

Q The next -- sorry. I can't be any more specific.

THE COURT: That's what he's asking you, right?

THE WITNESS: What --

THE COURT: Paragraph 5 on Exhibit 13.

THE WITNESS: Thank you.

THE COURT: Says, "Your objection was surprising to us because VSI specifically asked Rembrandt in writing to settle with the trustee." He's asking where's that email.

THE WITNESS: That is in the -- Bud Robertson sent us a term sheet to purchase Rembrandt for $35 million on the condition that we went and settled with the trustee. We had had numerous conversations of what we were proposing, the terms we were going to be proposing for that settlement, discussions amongst counsel, and then the written documentation came from

Bud Robertson, copying everybody on the term sheet, asking us to go settle.

BY MR. WEISBERG:

Q And where's that? What page? What exhibit number is that?

A I'm going to have to look through the documents.

Q Sure. Are you referring to Exhibit 14 page 1?

THE COURT: Well, he's answering your question.

MR. WEISBERG: Okay.

THE COURT: You have to wait until he answers.

THE WITNESS: It's hundreds of pages. I don't have the pages memorized, so it's going to take me a minute to look it up. If you want me to go do that, I will do that.

BY MR. WEISBERG:

Q Well let's move forward then.

A Are you withdrawing the question?

Q Was that agreement that you discussed that you say is in writing -- which I believe you, okay -- was that agreement consummated between Bud Robertson, Rembrandt -- well, VSI and Rembrandt?

A You've referenced multiple agreements. Which agreement are you referring to?

Q The one that you said there were markups. Bud Robertson had made markups. Bud Robertson is -- on behalf of VSI, had made markups to a term sheet.

A Did Rembrandt sell itself to VSI for $35 million?
Q Yes.
A No.
Q What's the point of it?
A I'm not sure I'm understanding what you're asking.
Q You're posturing. You're saying your objection was surprising to us because VSI specifically asked Rembrandt in writing to settle with the trustee on the very terms that we have reached. Did you actually reach those terms?
A On the very terms that we had discu -- yes. We had discussed what we were going to propose to the trustee as part of the settlement. We had discussed what was agreeable to Rembrandt to settle with SeeCubic, and we were absolutely in hopes of settling with all parties. And did VSI show up with $35 million? No, they did not.
Q Okay. So how was it reached? You went to law school, sir. You're a very intelligent man. How is that a reached deal?
A Oh, you're refer -- the deal we reached was with the trustee.
Q I understand that, but that's not what you just testified to. You testified to a term sheet that was marked up by Bud Robertson on behalf of VSI and you.
A Yes.
Q Was those terms reached?

A I'm going to Exhibit 13 -- back from looking for the other call. What I was intending to communicate with my language was that the terms we reached with the trustee were identical to what we had discussed with VSI.
Q But you didn't say that, did you?
A I believe I do. Do you want me to read the sentence? But it says that VSI specifically asked Rembrandt in writing to settle with the trustee, and then it goes on to say on the very terms we have reached. That's referencing the settlement with the trustee, on the very terms we have reached. In other words --
Q So I just said about two minutes ago, I believe you. Right.
A Yeah.
Q So that's an expression I use a lot when I'm speaking with lawyers and other people. Right. But it seems that, to summarize just this one document, we agreed with Ackerman that Amendment Number 2 was not valid was not in writing, and VSI would not take any action to enforce was not in writing. And thirdly, the very terms that we have reached at the very least was ambiguous. Would you agree with me there?
A I don't think the terms that we've reached with the trustee are ambiguous. They're documented, they're the 9019 motion.
Q I'm not asking whether the terms of the trustee, I'm

asking you whether your email's ambiguous. Everybody writes emails all the time back and forth. In fact, I respond to you. I just had an oral, painful biopsy today.

A So you're asking me whether my email is ambiguous? Is that the question?

Q Well, that sentence is ambiguous because you just corrected it yourself.

A All right. With respect, I don't believe I corrected it. I believed I read it into the record, and to me it's very clear, on the very terms we have reached, right, is referencing the 9019 settlement agreement we are currently discussing.

Q Okay, I'll let the Court --

A I mean I just --

Q I'll let the Court weigh it for itself. I'm not the judge. My next question. I read your declaration's exhibits.

A Uh-huh.

Q How many times did I say to you, I don't understand what you're talking about?

A In this conversation?

Q No. Well, I may have said it in this conversation, but I'm talking about in emails and in our initial conversation.

A I don't recall.

Q It was more than once. You would agree with that, right?

A I only have recollection of you saying it once actually at the beginning of the call, that you were unfamiliar with the

facts and background of the case and appreciated Neil and I giving you, you know, a rundown of some of the history.

Q Did you ever tell me that conversation was going to be remitted to the Court, in your words, in a declaration? Did you ever tell me that when we were on the phone between two professionals discussing something that I had no idea about?

MR. DEMARCO: Objection, Your Honor. Relevance.

MR. WEISBERG: How's that not relevant?

THE COURT: Well, I mean it's relevant as to whether he told him. I'm not sure.

MR. DEMARCO: I guess my confusion, whether Mr. Michaels told Mr. Weisberg Mr. Weisberg's statements were read into this record, the relevance of that is what I'm questioning, Your Honor and objecting to, Your Honor.

THE WITNESS: So, at one point --

THE COURT: Well --

THE WITNESS: -- I'm sorry --

THE COURT: Overruled. I mean, I can determine the relevance at the time.

MR. DEMARCO: Yes, Your Honor.

THE COURT: I think he's -- it's a different -- that goes to a credibility issue, I think.

MR. WEISBERG: I think that's exactly why --

THE COURT: But the underlying merits issue I'm struggling with the relevance of.

THE WITNESS: Am I to answer?

THE COURT: No.

BY MR. WEISBERG:

Q Did I put --

THE COURT: Oh yes, I'm sorry. Yes.

THE WITNESS: Okay. So at one point during the conversation, I had referenced your duty of candor to the Court, and you asked me to elaborate on that. And I specifically stated that we had provided you documentation that directly contradicted the information and the positions that you had taken, and that you had a duty to either withdraw your objection or to correct your prior filings.

And yes, we would expect you to do that, and we certainly were not putting you on notice for our health. So yes, I told you directly that not only would that conversation, but everything I sent you on August 15th would make it into the record. And we expected -- we frankly -- we fully expected that any reasonable attorney would have done exactly what we had proposed. I gave you the professional opportunity to fix what you had filed. I've only had this come up a handful of times --

THE COURT: Hang on.

THE WITNESS: And every single time I shared with you this also. I shared with you this --

MR. WEISBERG: Objection, Your Honor. This is a

narrative.

THE COURT: But he's entitled to ques -- you asked him an open-ended question, so he's entitled to answer.

MR. WEISBERG: Okay.

THE COURT: But my -- I'm struggling with why this is relevant for purposes of approval of the 9019 and entry of a judgment against SeeCubic as opposed to why it's relevant in connection with the motion to withdraw, which we've tabled. The reason why I asked that question is this. I think I understand the testimony. You can correct me if I misunderstand it, but I think I understand the testimony to be the following.

VSI believes that there is an agreement in place where it has the right to direct Rembrandt vis-à-vis settlements with the trustee. Rembrandt says that's not correct. Mr. Weisberg is say -- you indicated in your declaration all the reasons why you think you've outlined why there is no agreement. Mr. Weisberg is saying, I don't see the documents where we agreed with you that Amendment Number 2 was not in effect. Do you have them?

And your answer is, I don't have documents that say exactly those words, but I believe based on course of conduct there's other issues at play. Have I adequately summarized where we are?

THE WITNESS: Just substitute the word, document, for

email. There's not a -- he asked me if there was an email --

THE COURT: Okay.

THE WITNESS: -- where Ackerman responded and I was -- when -- where we got into it being a very long-winded response is it -- are there any documents? I would say absolutely, and I've submitted them, and there are plenty of documents that confirm that VSI's attorneys, Ackerman, did not believe Amendment Number 2 was valid. The very fact that they continued the representation, because all the law firms were in discussion in that room over there as to if VSI was going to push Amendment Number 2, we all were going to have to withdraw as counsel.

THE COURT: All right.

THE WITNESS: So there's plenty of documents. It's just there was no email.

THE COURT: I think those are withdrawal questions. I don't know that that's relevant for purposes of --

MR. WEISBERG: Okay.

THE COURT: -- 9019, but I'm happy to be corrected if I'm misunderstanding.

MR. WEISBERG: Well, I also believe, separate and apart from what Your Honor observed, that Rembrandt is arguing that the attorneys have waived the Litigation Funding and Cooperation Agreement by their words or --

THE COURT: Well, that's a different question.

MR. WEISBERG: Yes. So I'll ask that.

THE COURT: Okay.

BY MR. WEISBERG:

Q What document do you reference where the attorneys have, on behalf of VSI, waived the Lawsuit Funding and Cooperation Agreement?

A So basically, the documents that I've submitted that included Ackerman were -- the only reason any of the law firms were continuing to work at all on the case, every filing they made from there on was because Amendment Number 2 was agreed among counsel was not valid. The Amendment 2, Ackerman, Trevor Coddington, myself, we all weighed in, was an unethical ask. We would not participate in such an agreement. Every filing they made, every email back and forth to us all assumed that it wasn't. VSI was making requests to participate in ways, and Ackerman told us that they could not participate in those settlement discussions. There are things that I have not included in my declaration that were confidential discussions of settlement positions that I would like to keep confidential. I mean, we were all supposed to keep the litigation funding agreement and the common interest agreement confidential. At one point, we had talked about disclosing it, and we were ordered not only by the officers -- Mathu Rajan himself, was sending us emails demanding it not be disclosed. So when I say we were surprised that you included it in your papers, that was

a very different position than VSI had taken in the past, and we did not disclose it.

We did not tell the trustee about it, because VSI had asserted it was something to be kept confidential under the common interest agreement. So there are reams and reams of documents that show that Ackerman's attorneys did not believe that Amendment Number 2 was valid.

BY MR. WEISBERG:

Q And that's not in this binder I see.

A I've identified that it is in this binder. All of these, their continued participation in and of itself was -- every single one was cop -- they were copied back and forth. Why in the world would be --

THE COURT: I think he's asking a different question.

THE WITNESS: Uh-huh.

THE COURT: Based on what you just testified to, what specific documents in the second declaration of Christopher Michaels and that binder, what specific documents support that statement? That's all he's asking.

THE WITNESS: Okay. That's going to take me a minute.

THE COURT: And the question is, whereby the lawyers for VSI agreed that the enforcement of the Second Amendment was waived.

MR. WEISBERG: Yes.

THE COURT: That's your question?

MR. WEISBERG: Yes.

THE COURT: Which specific documents in your binder say from the lawyers of VSI that the enforcement of the Second Amendment was waived?

THE WITNESS: I'm going through 22 exhibits, 23 exhibits.

MR. WEISBERG: That takes a while.

THE WITNESS: Exhibit 20 copies all of the attorneys from Ackerman referencing a potential amen --

THE COURT: You don't have to read them. You just have to tell me which ones they are. Exhibit 20.

THE WITNESS: Exhibit 20.

BY MR. WEISBERG:

Q Who is --

THE WITNESS: Exhibit 19, Exhibit 18, Exhibit 16, Exhibit 15, Exhibit 14, Exhibit 12. And then I think the rest are unrelated to the agreement.

BY MR. WEISBERG:

Q Okay. Going to Exhibit 12, you testified that Exhibit 12, among the others that you said, is confirmation that VSI, through its attorneys or otherwise, waived the Litigation Funding Agreement. Is that correct?

A Yes.

Q Okay. But Exhibit 12 -- and your answer is you said a lot

of exhibits -- but Exhibit 12 is the Litigation Funding Confirmation Agreement.

A It is the first one that includes as signatories, Ackerman and Brown & Michaels, that we were parties to the totality of agreement.

Q I'm not asking you to explain it.

A Okay.

Q I don't understand. How could a waiver of an agreement be the agreement itself?

A You're asking about a waiver of Amendment Number 2 to this agreement.

Q Right.

A The agreement was valid. It was signed by all four entities. Right. And you're proposing to try to put forward an amendment to an agreement.

Q I understand you have a legal disagreement with --

MR. DEMARCO: Your Honor, can my client please answer the question?

MR. WEISBERG: The question was --

THE COURT: He did.

THE WITNESS: Well, I was in the middle --

THE COURT: He did.

THE WITNESS: -- of the answer.

BY MR. WEISBERG:

Q So your -- to be clear, Exhibit 12 -- you rattled off

about five exhibits. Exhibit 12 is your confirmation that the Litigation Funding and Confirmation Agreement waives the Litigation Funding and Confirmation Agreement. Is that what you're saying?

A I am saying --

THE COURT: That's not exactly right. He's saying --

MR. WEISBERG: And it waives Amendment 2.

THE COURT: He's saying the Exhibit 12, which is the Litigation Funding and Confirmation Agreement, is the evidence that waives the Second Amendment to the agreement. That's what he's saying.

MR. WEISBERG: That's fine.

BY MR. WEISBERG:

Q Is that what you're saying?

A I am saying that -- Your Honor, with respect, the question was very open-ended in terms of what documents in my exhibit supported the position, and I have identified those documents. And what I went back to was the original agreement that had the lawyer's approval, that had the client's approval, and that everybody, all counsel, had reviewed many times. It was actually drafted by VSI's counsel. And I'm saying there was no basis to amend that agreement that bound me, Rembrandt, Ackerman.

THE COURT: I understand the answer.

THE WITNESS: Okay. But I --

THE COURT: I understand.

THE WITNESS: Fair enough.

BY MR. WEISBERG:

Q And who is N.T. Wallace, by the way?

A Neil Wallace. He is an attorney for Rembrandt 3D Holding Limited and an officer of Rembrandt 3D Corp.

Q Were any of the emails you referenced as the purported waiver written by anybody but yourself or Mr. Wallace? And said differently, is there any of the emails that you just cited written by anybody but Rembrandt?

A I mean, I'd have to go through them. I don't know.

Q Please.

A Okay, here we go. The emails that I've sent around had included emails from other people. So just going through Exhibit 14, one of them references an email from Steve Blumenthal, which also comes forward from an email from Dan Rink of VSI. Exhibit 14. One, let's see. Well, the Amendment Number 2 was created by Dan Rink.

Q Mr. Michaels, would you agree that the exhibits speak for themselves?

A I'm not -- you've asked me to identif --

Q Okay, but I'm ready to conclude. Would you agree that the exhibits speak for themselves?

A I'm sorry, I couldn't hear your question.

Q Would you agree that the exhibits speak for themselves?

THE COURT: Would you agree that the exhibits speak for themselves?

THE WITNESS: Oh, thank you. Yes.

MR. WEISBERG: Okay. Thank you.

May I be seated, Your Honor?

THE COURT: Oh, you may.

MR. WEISBERG: Thank you.

MR. RINK: Your Honor, I have additional questions for this witness.

THE COURT: Ordinarily I wouldn't allow more than one lawyer on behalf of a client to question a witness, but I will in this case.

MR. RINK: Thank you.

CROSS-EXAMINATION

BY MR. RINK:

Q Could I direct the witness to our witness book, the VSI.

A Sure.

Q Mr. Michaels, I believe it's the second tab in that book, references something called the first declaration of Bud Robertson.

A Yes.

Q And attached to that declaration are the Litigation Finance Agreement and its two amendments, and I'll be focusing on those in my questioning.

MR. RINK: And may I suggest to the Court that our

binder be put into evidence for that Litigation Funding Agreement and the two amendments as part of the binder?

THE COURT: So you want the Court to accept into evidence the exhibits, the Litigation Funding and Confirmation Agreement?

MR. RINK: Yes, sir.

THE COURT: That's Exhibit Number 1 to the Mr. Robertson declaration?

MR. RINK: That's correct.

THE COURT: There's the amendment. And then Exhibit Number 3, which is the Amendment Number 2, which is the Litigation Funding and Confirmation Agreement Number 2 --

MR. RINK: That's correct.

THE COURT: -- dated December 30th, 2024?

MR. RINK: That's correct.

THE COURT: All right.

MR. RINK: And there's only two amendments.

THE COURT: Okay.

MR. RINK: There's no further amendments.

THE COURT: Any objection?

MR. DEMARCO: Other than my standing relevance objection, nothing further, Your Honor.

THE COURT: Okay. Any objection, Mr. Coren? Okay. Ms. Brumme? Okay, well the Court will accept -- just for the record, the documents are identified with the docket reference

1058, and it's Exhibit Number 2 and Exhibit Number 3 to the Robertson declaration. Those two documents will be admitted as V1 and V2.

(VSI's Exhibit V1 and V2 admitted into evidence)

MR. RINK: Thank you, sir.

BY MR. RINK:

Q Mr. Michaels, did VSI ever provide authority for Rembrandt to sign the Litigation Funding Agreement?

A Not only authority, they asked us to -- I'm sorry, the Litigation Funding or the settlement agreement?

Q I'm asking about the -- oh, I'm sorry. You're right. The settlement agreement.

A Yes. We discussed it with them in full, and we went forward. I contacted Mr. Coren somewhere in the neighborhood of a day or two after they sent us an offer to purchase Rembrandt for $35 million with the condition precedent that we actually reached a settlement with the trustee.

Q Were you aware that there are cases of the Section 9019 settlements being rejected because of lack of authority to sign?

A I don't know that I'm specifically aware of that as a provision for overturning a 9019 agreement, but I do generally know that I am a transactional attorney. A rep and warranty that authority to sign is required in most cases, and it was in our case.

Q Were you aware that the Third Circuit requires authority to sign in order to have a binding settlement?
A Pretty much the same answer. Generally, yes. I don't know of a specific case.
Q And how about under Delaware law?
A Same response.
Q I think you mentioned earlier that you're the Chief Financial Officer of Rembrandt 3D Holdings?
A Yes.
Q And you also serve as an attorney as well for them?
A Yes.
Q Okay. You're familiar with the Litigation Funding and Cooperation Agreement, which sometimes is called the LFCA, that Rembrandt entered into with VSI in November 2024. Is that right?
A The one on November 5th, 2024, I was aware of and helped negotiate.
Q And Rembrandt executed several amendments to the agreement, including Amendment Number 2. Is that correct, to your knowledge?
A No.
Q There's a signed agreement.
A That's not the question you asked, but Steve Blumenthal signed an agreement sent to him by you that was not sent to either Ackerman or Brown & Michaels.

Q The Litigation Funding Agreement has a consent requirement that's pretty clear and unambiguous, that flatly forbids Rembrandt from settling the litigation without first obtaining VSI's written approval. Is that correct?

A No. The Litigation Funding Agreement on November 5th has no such provision. You did not include the entire agreement. But just to be clear, what is attached in exhibit is missing half the agreement. There's a common interest agreement that is attached to my declaration. It's actually specifically referenced in the document you submitted, but you left it off. I mean, the reason you left -- I mean, I don't know the reason you left it off, but it's the one that includes the signatures of the law firms.

Q So VSI never provided its consent on these transactions, on these documents?

A I'm sorry, I don't understand what you're saying.

Q Yeah, in other words --

A I literally can't hear you. Could you speak up?

Q How's that?

A That's better.

Q Well, I'm almost on top of it.

A If you could enunciate. You're just muttering. All I'm hearing is a little bit of white noise.

MR. RINK: Sorry, Your Honor.

THE COURT: That's all right. I can hear you.

MR. RINK: Okay.

BY MR. RINK:

Q So I'm saying you did not secure VSI's consent before the signing of these documents, the settlement agreement.

A Could you identify which document you referenced?

Q Settlement agreement.

A The settlement agreement with the trustee?

Q Yes.

A I just articulated that we discussed it with them, got their consent. Bud Robertson sent us a revised term sheet offering us $35 million to buy us with the express condition that we go settle. So we absolutely had VSI's consent. We did not need VSI's consent. There was no agreement requiring us to get it, but we had it.

Q Would you say that VSI's consent right was structured as a condition precedent?

A Yes, that's exactly how it's identified in the term sheet.

Q If a party acts in violation of a condition precedent like this, the act is generally considered unauthorized and voidable, and not simply a breach that can be remedied later. Would you agree with that?

MR. DEMARCO: Objection, Your Honor. I understand Mr. Michaels as an attorney, but this is calling for a legal conclusion and during a factual examination.

THE COURT: He's not picking up? Who? Oh, you have

to be in a microphone, or you've got to speak a lot louder.

MR. DEMARCO: Understood, Your Honor. I can speak a lot louder, but let me try to -- oh thank you. Appreciate that. My objection was, I understand that Mr. Michaels is an attorney, but this is calling for a legal conclusion during a factual examination. So that's my objection.

THE COURT: I think I'll sustain it, but I think you can rephrase the question, Mr. Rink.

MR. RINK: I think I'll just move on, Your Honor.

THE COURT: Okay.

BY MR. RINK:

Q Rembrandt had filed proof of claims in the Chapter 11 case asserting that it was owed approximately $1.2 billion in value from the debtor. Is that correct?

A Yes.

Q Under the proposed settlement agreement, Rembrandt had agreed to extinguish that $1.2 billion claim and accept instead an allowed claim of $1 million plus a contingent interest in a future judgment. Is that correct?

A I don't believe that is correct.

Q How much of the Rembrandt agreement is actually guaranteed?

A Well, the terms of the 9019 agreement we've reached with the trustee are of record, and I'd rather just reference that agreement. You're misquoting the document and the amounts,

but --

THE COURT: He can ask you the question, and you can answer if you know.

THE WITNESS: So roughly $100,000 is guaranteed. I would argue that a judgment against SeeCubic is potentially also guaranteed. It's just we have to go get it, but I don't know. So does that answer your question? I'm not trying to be --

BY MR. RINK:

Q That's fine. That's fine, sir. So to summarize, Rembrandt effectively gave up a $1.2 billion claim in exchange for a $1 million claim in bankruptcy and a remote hope of another $1.15 million?

A Those aren't the only pieces of consideration that we got, and certainly not the most important.

Q And what was the most important?

A We were in litigation with the trustee over the settlement agreement we had reached with Stream. Of paramount importance to Rembrandt was Section 10 of that agreement that licensed Rembrandt back -- that allowed us to go manufacture the three million units of TVs. That's how the $1.2 billion number came about, is three million times a $400 margin was $1.2 billion. We retained that as we're going forward. So, I mean, you're describing -- we didn't give up the 1.2 billion. The very basis that we laid out in our proof of claim we're retaining as

part of our settlement. I mean, that is what -- you know, we got most of what we were asking for.
Q So in essence, by -- excuse me -- SeeCubic getting the technology, Rembrandt has no more 3D display business. Is that correct?
A No.
Q Could you explain that, please?
A Well, Rembrandt 3D Holding Limited is an IP holding company. We own the IP regardless of the outcome of any of this litigation. So we're completely unaffected by what SeeCubic is doing, et cetera. Rembrandt 3D Corp., which is the Delaware operating company, has been operating for many years, sold many displays. None of those displays are Stream TV. I mean, we've contracted with other parties. The Frank Lloyd Wright Museum has an existing project of ours, the Pittsburgh Airport. I think we've sold more 3D displays on Amazon than any of the parties here. And none of those involve Stream or Ultra-D or any of these technologies.
Q Thank you. In essence, then, this deal gives Rembrandt virtually nothing of concrete value in return for a billion-dollar-plus claim and all related rights. That's the reality of the exchange, do you think?
A I do not think. For all the reasons I've said, the basis of our $1.2 billion valuation of our proof of claim is being maintained in our settlement. So either -- however valuable

the $1.2 billion claim was when we filed the proof of claim, it is still that valuable today. So you can argue it's worth nothing, which seems to be where you are. But, I mean, it maintained its value in pretty much identical form -- not pretty much, identical form -- to the way it was in the original agreement.
Q Did you ever notify VSI or include them in talks regarding this settlement?
A Yes. Before we went and made these terms, we expressed clearly many times what we were going to propose. We not only disclosed it to VSI, we put it in our papers that were part of various motions, that this was our settlement position, that we wanted the right to manufacture our TVs, we wanted our IP respected, we wanted payment and those are the terms that we settled on. I mean, it's not a mystery to anyone, and it's public record how Rembrandt intended to settle. But more specifically, before we approached the trustee, we discussed our plans with VSI, and they included it in their term back to us after that conversation.
Q Thank you. As I recall, Mr. Homony has testified that he was completely unaware of the LFCA or VSI's consent veto -- excuse me. Is that correct?
A We certainly never told him.
Q The settlement agreement specifies that Rembrandt was warranting that it had the necessary authority to enter into

the settlement.
A Yes.
Q And it did, in your opinion?
A Yes, absolutely.
Q Excuse me. I'm quickly going through my questions. The settlement provides broad releases to the trustee's professionals, his attorneys and agents, insulating them from any claims. Were there any other benefits flowing to the trustee side of the table under the settlement agreement?
A I mean, yes, as a technical issue.
Q Please, could you elaborate?
A And I'm going to reference the agreement. I mean, there are a number of rights flowing backwards and forwards, and I would say the document is what it is. It provides releases to the individuals. That's one piece of the consideration that you referenced. In their papers, they included that they were avoiding legal expense. They are avoiding having to chase SeeCubic for indemnification. There's a host of benefits that come to the trustee and their advisors -- damage to their reputation if a judgment went away -- I mean if a judgment came down the wrong way for them. So I don't know that I can enumerate every single one, but I would point to, there is a document that lays it all out, and I would just say the settlement agreement should control.
Q In one of your declarations, and forgive me, I don't have

the specific one, you mentioned, for example, that the licensing covenant and the LFCA did not restrict or prevent a settlement with the trustee or the debtor. Is that correct?
A The licensing covenant is a separate document that we executed with VSI --
Q Yes.
A -- that was known to the trustee, that had been filed in open court, and it does not have a provision that restricted our settlement with the trustee or with Stream. The restricted parties were SeeCubic and then some related entities.
Q You portrayed VSI as nothing more than a passive funder who overreached for control. You suggested VSI's requests for control were repeatedly refused by Rembrandt due to champerty claims, implying that VSI never actually obtained any control rights. Is that a proper portrayal of your position?
A Among other things, that and Ackerman. I mean, neither law firm were willing to enter the kind of agreement that was being proposed or were aware that you were sending those documents back and forth to our client without our knowledge. So no. Yes, that's -- yes, it's correct that it's champertous. There's a whole host of other ethical and legal issues associated with those agreements -- I mean, or proposed amendment.
Q You insinuated that VSI control was somehow imagined, or that VSI later omitted mention of its control roles,

essentially questioning whether VSI oversight's roles were real. You still have that impression?

A I'm sorry, I did not follow your question. A bunch of the words did not -- I couldn't understand.

Q I'll try it again.

A Thank you.

Q You insinuated that VSI's control was somehow imagined, and that VSI later omitted mention of its control role, essentially questioning whether VSI's oversight was real. Do you still have that impression?

A VSI never had any control over Rembrandt's cases. They multiple times they tried to assert that control, and their own attorneys -- and, well, Rembrandt certainly did -- but their own attorneys told them that, no, you cannot do what you're asking. In one instance it was raised that if they had that kind of control, we would all have to disclose VSI as having been the real party in interest in the bankruptcy and Delaware case. And my recollection is it was Mathu Rajan actually sent an email saying, absolutely, positively, you're forbidden from disclosing LFCA. And we said, well, okay. We asked Ackerman to get control of their client, and we absolutely were not letting VSI control settlement or participate in any agreement. We asked Ackerman specifically to have their ethics counsel review the situation and asked whether they were withdrawing. They decided they didn't have to because Amendment Number 2 was

not a thing.
Q That's the end of my questioning. Thank you, sir.
MR. RINK: All right, thank you.
THE COURT: All right. Does anyone have -- I don't have any questions for Mr. Michaels. Does anyone have any questions?
Any further redirect, Mr. Coren?
MR. COREN: No, sir.
THE COURT: Mr. DeMarco?
MR. DEMARCO: I do have some redirect, Your Honor?
THE COURT: You difficult?
MR. COREN: I do, yes.
THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. DEMARCO:
Q Good afternoon, Mr. Michaels.
A Thank you.
Q So we've heard a great deal about this proposed Second Amendment to this funding agreement. Based on your knowledge, having reviewed the agreement and spoken with various parties involved, was this proposed Second Amendment ever a legal document?
A Absolutely not.
Q Could you please explain why not?
A We found out about it when we were heading into mediation

with SeeCubic, and I wasn't there for the call, but we understood that Mathu was demanding that he be the one to represent Rembrandt at that mediation. And my question was, on what planet would that be a thing? Right? There's no way we were going to agree to that. And eventually a copy of this Second Amendment that Dan Rink had sent to Steve Blumenthal over the holidays -- demanding it, purporting it was just changing payment terms -- and had him sign it, and I mean we were --

Q I want to focus on that for a moment.

A Uh-huh.

Q So to be clear, are you saying that the first time you learned of this agreement was when it was forwarded to you?

A Yes.

Q And when it was forwarded to you, was that when you learned that there had been communications going on with your client, who was a represented party, without your knowledge?

A Yes. That was -- Steve Blumenthal forwarded me a copy of an email Dan Rink had sent him. It had a redlined document that showed redlines to payment terms, and Steve was, I mean, just in crisis. I mean, his wife was being diagnosed with cancer. He was upset. He had been told that we had fully reviewed it and approved it, and he just signed it and sent it back.

Q Yeah, I want to come back to that, but just to be clear,

you were forwarded an email in which there was an exchange between your client, who was represented, and the other side with their attorney and principal?
A Yes.
Q Now, you mentioned that this document, purported Second Amendment, was signed by Mr. Blumenthal, the CEO of Rembrandt?
A He has told me that he did, yes.
Q You briefly got into Mr. Blumenthal's circumstances. Could you tell me what you're aware of, what was going on in Mr. Blumenthal's life at that time, insofar as you're aware of that or know it?
A I've known Steve for 35 years. I've known his wife. She was being diagnosed with another bout of cancer. He was incredibly distraught, worrying about bankruptcy litigation that he thought was on appeal, and quite frankly it was just not on his radar screen. We were seeking dates to attend a mediation, and he was basically begging for it to be as far away as he could. Right. Because he was just not in a mental spa -- and they knew that. He had disclosed that to VSI. That's why he was encouraging them to make an offer to buy him out.
Q So VSI, to your knowledge, was aware of Mr. Blumenthal's sensitive state?
A Yes. We were all on phone calls leading up to them making an acquisition offer. He was very open to an offer at that

point.
Q And was Mr. Blumenthal's medical situation, between him and his wife, was the financial situation of that known to all parties?
A Absolutely.
Q Are you aware of whether VSI made any representation that funding, which had stopped, would be resumed upon signing of this purported Second Amendment?
A So yes. They had cut off funding basically exactly when Steve needed it the most and counted on it in making medical arrangements for -- and they stopped and they said, oh well, we need to change it to a lower amount and et cetera. And he agreed to that.
Q And you mentioned that the agreement that was given to Mr. Blumenthal, again without you being copied, which you found out about later, that this agreement contained changes that were not reflected in the redlines of the agreement?
A Yes.
Q Now, based on the conversations you had with VSI's counsel, did you bring this up with VSI's attorneys when you learned about this communication with your client?
A Yes.
Q What were those conversations like?
A I came loaded to bear. I mean, this is a client I've known for 35 years. I was deeply upset, and my original

assumption was that Ackerman knew about this and were trying to do an end run. I sent them an email. I had a good working relationship with John Thompson. I called him, and his reaction was instant, apologizing profusely. Absolutely not. He had no idea. I started going into the champerty issues, and he's like, oh my God, there's no way we're participating in anything like that. The Amendment Number 2 is not a thing. There's no way this is an agreement. We don't agree to it. We're not agreeing to be continuing in representation over this. And we probably talked for about an hour and a half. Neil Wallace and I also spoke at various times to Adam Swick. In all cases, we are absolutely, positively not agreeing to this. Trevor Coddington and Adam Swick worked down the hall from each other, and I raised -- Trevor had told them that this is an agreement. We don't need Trevor to tell us, but this is absolutely not an allowable agreement.

Q Sorry. So during your conversations with VSI's counsel, they were asking you whether there were documents that sort of evinced that Ackerman was aware of this issue, and you had pointed to, I believe, Exhibits 20, 19, 16, 15, and 14?

A Yes.

Q I wanted to give you the opportunity. Could you briefly explain why those documents evinced that?

A We forwarded the email that Dan Rink had sent Steve Blumenthal with the inaccurately redlined document to John

Thompson. They came back with, and pointing out, we're not copied on this. We know that you're not, either. And they said absolutely. That was the primary thing. A bunch of the other issues going back and forth at the time were the participation in mediation, and we left it to Ackerman, but they were quite clear that they were going to explain to their client that there was no way Mathu was attending our mediation. We had a confidentiality obligation, so we couldn't tell them about what we had discussed in that mediation. There were various demands that we do so, and we didn't honor those demands. And I had numerous conversations with Ackerman related to our collective filings in the bankruptcy case and appeals and whatnot.

Q And part of the reason why you had mentioned, I believe with VSI's counsel, you mentioned that part of the reason why Ackerman's -- apart from the fact that it was a reflection on the way in which this document came into existence -- you mentioned that according to Exhibit 12, if there were to be any amendments, both Brown & Michaels and Ackerman would have needed their sign-on. Right?

A Absolutely.

Q And as we mentioned earlier, neither side was even copied when this was sent to your represented client?

A No. I mean, we hadn't seen it. I mean, it would be tantamount to them asking us to -- that they were planning to

falsify a bunch of documents and that Ackerman and Brown & Michaels would agree to file it on their behalf. No. I mean, neither law firm was willing to participate in the type of arrangement that this proposed Amendment Number 2 was going to be laying out.

Q Let's put aside the issue of whether this was a valid agreement because of the manner in which it came into existence or whether Ackerman disavowed it or not. Even if this agreement were, let's just say, of proper providence, based on your understanding of it, would it be enforceable?

A Absolutely not. No. It's a matter of law. It's a champertous agreement. A part of what I do, being a patent attorney, is I'm involved a lot of -- as counsel in advising in litigation, but finding funding, doing valuations. So I've worked with Tiritika (phonetic) Burford (phonetic), all of them. None of them will enter this kind of agreement. They put it right on their website. Burford actually has, we will never take control, we will never do all this thing. And they make it -- it's not a flaw, it's a feature kind of discussion. They're not allowed to. Right? I mean, so they just make it sound good for their potential client base, the people that they're going to invest in litigation. So if the biggest litigation funders out there are putting right out on their website that this isn't the kind of agreement that's ethical or possible to enter into -- and they would if they could. I mean

they would love to get settlement control, but they can't. The only way they can get it is to buy the company. And so numerous emails going back and forth at this point -- Steve was interested in selling Rembrandt -- was, look, if you want this level of control, buy Rembrandt. Then you own it.

Q Did VSI ever buy Rembrandt?

A They did not.

Q Okay. So I want to move just to one last thing to touch on, which is there's this underlying agreement that the Second Amendment purports to change. What is Rembrandt's position over whether that underlying agreement has been breached?

A So absolutely breached in a variety of respects, not the least of which, they just stopped paying. I mean, they're obligated to pay for Rembrandt's counsel from November forward, and they just stopped. Right. And that was the issue -- that they were supposed to pay something to Steve directly, and then they were supposed to pay the attorneys and all the legal costs.

Q So this purported Second Amendment -- this purported amendment -- would be to a dead agreement?

A Right. The other thing I would point out is that Bud Robertson, while we were negotiating the term sheet, he specifically wrote us and said that the agreement had ended by its own terms in December. Right. We were not approaching them about the settlement with the trustee because we thought

they had any control. We were doing it because we were interested in selling Rembrandt. Right. We were saying, hey, this is a package. This makes the company more valuable if we hone our litigation strategy and what we're looking for. And VSI, right after that, went public in a reverse merger.

Q So at the end of the day, Rembrandt had the authority to enter into this 9019 agreement with the trustee?

A Absolutely.

Q All right.

MR. DEMARCO: Nothing further, Your Honor.

THE COURT: Ms. Brumme, any recross?

MS. BRUMME: No, Your Honor.

THE COURT: Mr. Rink?

MR. RINK: No, sir.

THE COURT: Okay. All right. You can stand down, Mr. Michaels. Thank you very much. I think we're going to take a lunch break. We can come back at 2:00. Right now what I have for the parties is the trustee has two hours and 35 minutes and 48 seconds remaining. The objectors have one hour, 17 minutes and 24 seconds remaining. All right, we'll stand in recess until 2:00 today.

(Recess taken)

THE BAILIFF: All rise.

THE COURT: Good afternoon. Please be seated.

All right. Mr. Coren, your next witness.

MR. COREN: I have no additional witnesses at this time, Your Honor. I just want to move into evidence the exhibits in our binder, three of them, the three declarations 10, 11, and 12 have already been admitted and we would at this time move the remaining exhibits into evidence.

THE COURT: Okay. Is there any objection to the Court receiving into evidence the exhibits that were identified in the trustee's exhibit binder, tabs 1 through 14 that were reflected on the exhibit list? Or no, I'm sorry, they were not all on the exhibit list. 14 is not on the exhibit list.

MR. COREN: No. 1 through 13.

THE COURT: 1 through 13 that was filed at Docket Number 1073.

MS. BRUMME: No, Your Honor.

MR. RINK: No objection.

THE COURT: All right. No objection from SeeCubic?

UNIDENTIFIED SPEAKER: No, sir.

THE COURT: No objection from VSI.

MR. COREN: And at this point we would also move in Exhibit 14, which is in the binder but is not on the list. It was added subsequently and it's of record. It's a new adversary filed by VSI and on the docket.

THE COURT: And what is -- I mean, there's been, obviously, no testimony about it, but what's the proffered purpose of the exhibit?

MR. COREN: I think what it does is provide additional evidence to the obstructive nature of VSI's behavior in this entire bankruptcy case. All they've been doing is trying to run up the fees and make threats and do whatever. They're the trustee and actually his father. Got the names suing his father for conspiracy and I think --

THE COURT: Whoever is on the line, you are open in the courtroom.

MR. COREN: I think if Your Honor would peruse that, you may be directing people in for sanctions. It's pretty egregious.

THE COURT: What is the -- SeeCubic, what is your position on Exhibit 14?

MS. BRUMME: Oh, no objection.

THE COURT: VSI?

UNIDENTIFIED SPEAKER: No, sir.

UNIDENTIFIED SPEAKER: No relevance, Your Honor.

THE COURT: You object on the basis of relevance?

MR. RINK: Yes.

THE COURT: Right. All right. The Court will accept into evidence Exhibit Number 14 and will review the matter for relevance and give it the weight the Court affords it.

(Trustee's Exhibit 14 admitted into evidence)

MR. COREN: Thank you.

THE COURT: All right.

Mr. DeMarco, do you have further witnesses to call?

MR. DEMARCO: No, Your Honor.

THE COURT: Okay. Got to speak up. You got to yell it or you got to speak at the microphone.

MR. DEMARCO: I've always been told I'm too loud, Your Honor, so I shackle my voice, but we'll move in the rest of the exhibits that were not part of Mr. Michaels' first declaration and second and --

THE COURT: Okay. All right. Is there any objection to the Court receiving into evidence -- I think we already accepted into evidence the second declaration subject to the limitations that we already noted on the record earlier this morning, correct?

MR. DEMARCO: I believe that's correct, Your Honor.

THE COURT: Okay. All right.

MR. DEMARCO: Making sure that that was taken care of.

THE COURT: All right, so I think that's addressed. Okay. I'll turn the matter to SeeCubic first. You have any witnesses to call?

MS. BRUMME: No, Your Honor, just the cross-examination.

THE COURT: Okay. And you did not have separate exhibits, correct?

MS. BRUMME: We filed a list but the ones we used

were completely overlapping --

THE COURT: Perfect.

MS. BRUMME: -- with what's already gone in.

THE COURT: Okay. That's okay.

MS. BRUMME: Yep.

THE COURT: All right. VSI?

MR. RINK: Your Honor, I'd like to call Mathu --

THE COURT: Okay.

MR. RINK: -- Rajan to the witness stand.

THE COURT: Mr. Rajan, you can take the stand.

MATHU RAJAN, SWORN

MR. RINK: And Your Honor, could you remind us how much time we have on our clock?

THE COURT: You have one hour and 17 minutes.

MR. RINK: Thank you.

THE BAILIFF: State your name for the record.

THE WITNESS: Mathu Rajan.

THE BAILIFF: Spell your last name.

THE WITNESS: R-A-J-A-N.

THE BAILIFF: State your address.

THE WITNESS: Address 1105 William Penn Drive, Bensalem, PA 19020.

DIRECT EXAMINATION

BY MR. RINK:

Q Good afternoon, Mr. Rajan. Could you state your name and

your current position please?
A My name is Mathu Rajan and I'm the CEO and founder of Visual Semiconductor and I was the founder of Stream TV Networks.
Q So you were previously employed at Stream TV?
A Yes, I was.
Q In what capacity?
A I was the founder and CEO.
Q How many years have you been involved in the glasses free industry, 3D industry?
A Now it will be about 15 years.
Q Could you describe your experience in the 3D technology field specifically related to Ultra D and Stream TV's 3D team?
A Yeah, I mean we were in glasses free 3D and then we were working on a range of devices and we ended up hiring a team in the Netherlands and they were sort of our 3D team for a while and were also involved in productization and those things and we worked closely with them.
Q Mr. Rajan, did VSI ever grant actual authority to Rembrandt for the settlement agreement?
A Absolutely not. No. No, not whatsoever. There was a discussion. What happened was we had a hybrid agreement that dealt with our I -- VSI had a license of Rembrandt just like Stream TV had one. It was restructured in the hybrid agreement and then in parallel, there was a discussion about buying

Rembrandt so we could own the technology. They were pushing us to buy them even though we had the hybrid agreement and we were interested, too. And basically what we had told them is, you know, we buy your company, but if you guys don't have the Stream TV technology back, what are we going to do? You know, with the hybrid agreement, we were taking risk and we know you could lose on appeal, the trustee could beat you in Court. Now, we could lose it, but if we are going to go spend 35 million bucks, we need to make sure there's something here. And we specifically told them, and there's conditions precedent. Was not a blanket authority. It was conditions precedent on what they needed to achieve in order to buy. And that was specifically to get the entire Stream TV technology back in order for us to buy them first. And it was a non-binding term sheet and more importantly, the hybrid agreement says they are not to even propose without our permission. So they had absolutely no apparent authority.

Q Are you aware of cases where the section 9019 settlements have been rejected because of lack of authority?

MR. COREN: Object to the form, Your Honor. To ask a layperson if he's aware of unidentified cases which allegedly stand for the proposition that counsel says. It's not a proper question and it's irrelevant and the answer advances the ball not a bit.

THE COURT: I understand the relevance objection, but

I think -- I mean he could ask him the question if he knows if he's aware of any cases.

THE WITNESS: There is over six cases, maybe more around the country where 9019s were declined because one of the parties did not have the authority to sign. That is also in some of my declarations. I gave the case law. It is well-familiar all over the United States. If you sign a 9019 and somebody on the other side doesn't have authority to sign, it is not to go forward.

And furthermore, the purpose of a 9019 is to make a settlement bulletproof. So when -- if the settlement is overturned, that means it's void ab initio, which is going to wreak havoc on the entire state. So therefore, authority to sign is critical to the 9019.

BY MR. RINK:

Q Are you aware of the fact that there are cases in both the Third Circuit and Delaware that require authority to sign it?

MR. COREN: Same objection, Your Honor.

THE WITNESS: It is mandatory in Delaware --

THE COURT: Oh --

THE WITNESS: -- to have --

THE COURT: -- Mr. Rajan --

THE WITNESS: I'm sorry.

THE COURT: -- there's an objection pending.

THE WITNESS: Oh, I'm sorry. I didn't see him.

MR. DEMARCO: I believe Mr. Coren was first.

MR. COREN: Yeah. Same objection. Relevance.

MR. DEMARCO: And the other thing I just wanted to note is this is backdooring in a legal brief that was sort of file last minute -- without a chance to respond, so that's the other concern I have, Your Honor.

THE COURT: Okay. Okay. I'm not sure that that's a basis for the objection. I understand the relevance objection, but I'm going to overrule that.

THE WITNESS: I gave him my case law. Oh, I'm not supposed to answer or I am supposed to answer?

THE COURT: No, you can answer.

THE WITNESS: Sorry.

THE COURT: No problem.

THE WITNESS: It gets confusing. I'm sorry. Now, I gave him my declarations and there are numerous cases in Delaware and in fact Delaware is mandatory and these contracts are under Delaware law that you must have authority to file. And again, this is a hybrid agreement. We are not just a litigation funder. It also, if you look at it, that 3.6 million that Chris Michaels keeps referring to was our license fees that were, in essence, suspended through the hybrid agreement because we didn't have the technology.

The license agreement we had with Rembrandt was restructured. In Delaware it is mandatory that you must

determine authority to sign, in particular when you get into license agreements. It is absolutely mandatory and there's binding case law in the Third Circuit, which I also gave, that clearly says you must have authority to sign resolved before you approve a settlement agreement.

MR. RINK: Your Honor, VSI would like to request permission to provide the Court with some citations of cases in the federal system, Third Circuit and in Delaware on this issue.

THE COURT: Well, I thought Mr. Rajan just testified that they were all incorporated in his declaration, but if what you're asking for is --

MR. COREN: New ones.

THE COURT: -- to do a post-trial submission, either a brief or a proposed findings and conclusions, I'm going to address that at the end of the record.

MR. RINK: Okay, thank you sir.

BY MR. RINK:

Q Mr. Rajan, have you provided declarations in this proceeding regarding the litigation funding agreement and the related agreements?

A Yes, I have.

Q As an industry expert and industry veteran, is it common for technology and content license agreements to include restrictions on licensing to other third-party companies or on

the assignment of licensed technology or content rights from a funder or a vendor?

A It is common throughout the entire industry. When you have technology agreements between a vendor and a user or a customer where there are restrictions on that vendor, it is absolutely common. This is not a litigation funding agreement. We are not Blackstone giving money to McDonald's because they're mad at Omaha Steaks. That has nothing to do with it. This was a technology agreement that we had with Rembrandt. These are assets that the company was interested in. In fact, we were promised these assets from Rembrandt and that's the only reason why we were funding it. And basically it is common and it is common and especially in Delaware to put all kinds of restrictions on the technology company.

Q Did Stream TV litigate in the Delaware courts?

A Yes we did.

Q If so, how many years did Stream TV litigate in the Delaware courts?

A We litigated for five years. We're well-familiar with the Delaware courts and we won five-zero in the Delaware Supreme Court because of a transaction that SeeCubic did that was not copacetic.

Q Did Stream TV or its counsel ever argue in front of the Delaware Supreme Court?

A Yes, we did. I wrote the brief.

Q Did any Stream TV executives ever argue in front of the U.S. Court of Appeals for the Third Circuit?

A Yes, we were having problems in the Delaware Chancery Court after we won in the Supreme Court. So I took my employment agreement, went to the Third Circuit because the judge in the Chancery Court was not listening to the Supreme Court and I got a warning given by the Third Circuit to stop using -- opinion because it was void. I had to file a mandatory injunction because they weren't following the Supreme Court. So yes, we're well-familiar with the Third Circuit and they're familiar with this case.

Q When did Stream TV and Mr. Shad Stasney sign a term sheet with Rembrandt?

A I think that was 2019.

Q And when did Stream TV and Rembrandt sign an agreement with you?

A I signed the long form agreement in 2021. Shad Stasney, though, negotiated all the terms in 2019.

Q Why did Stream TV sign a license with Rembrandt? What were the allegations surrounding that license and what ultimately happened?

A Well, there's two parts of it. There's 2019 and 2021. I didn't know the whole story until 2021, when I engaged directly with Chris Michaels, but apparently what happened was, and I only knew a little bit of the story and didn't get the whole

story, the Netherlands people were working at Rembrandt or the Rembrandt predecessor company and we thought there was only like one or two and they said there was no technology transfer. We found out that there was a huge number of people at the Netherlands company working for Rembrandt before they came to Stream. A number of them signed NDAs. They told us they didn't even know who Steve Blumenthal was, a number of them. And apparently there was source code and all kinds of things that were brought over to Stream TV and Chris Michaels provided the evidence. I was shocked and that's why I signed it in 2021. It was completely different than what you, me and my -- the story me, you and my brother were told.
Q When did Stream TV sign a license agreement with Phillips?
A That would have been at the beginning of the company back in 2010 or 2011.
Q And what did Phillips give to Stream TV under those license agreements?
A They had like -- they had like 1,200 patents and they gave different manufacturing technology, source codes, and all kinds of technologies that we picked up on hard drives and took to the Netherlands office.
Q Is Phillips and Rembrandt technology inside the Stream TV code base --
A Yes, it is.
Q -- as part of the Stream TV technology?

A Yeah, it's Rembrandt and Phillips technology is interwoven throughout the entire Stream TV code base and technology. It's in the California server and it's on the server in the Netherlands.

Q But why did Visual Technology sign a license agreement with Rembrandt?

A Because when we, Stream TV, won in the Delaware Supreme Court and were having all kinds of problems in the Chancery, we filed bankruptcy here and we needed to basically pay off the creditors, but there was no way to settle the creditors and doing like a 363 or a Chapter 7 or selling assets because you would have broken all the licenses, which is an IP infringement and a whole host of legal Problems. So we went and got a license of Rembrandt because Rembrandt was at the Stream TV level, Phillips was downstream, and that's why Stream TV and Technovative are both in the bankruptcy. We wanted to take over Technovative through our reorganization plan. We had numerous legal experts look at it. There was no way to sell these assets without being engaged in massive IP infringement.

Q Why did Visual Semiconductor not need a license with Phillips?

A Because we were going to buy Technovative through a reorganization.

Q What was your role in negotiating the litigation funding and cooperative agreement --

A Most of it was done --
Q -- between VSI and Rembrandt?
A -- was done with Bud Robertson and he handled most of it. It was principal to principal between me and Steve Blumenthal and Bud Robertson. The law firms were only involved in an amendment for joint cooperation, which is like a glorified NDA and hey, we'll work together on litigation. But the broad strokes of the litigation funding agreement, they were negotiated principal to principal. They were not negotiated between Ackerman and Brown and Michaels. That is categorically false.
Q What percentage of the funding agreement did you personally draft or negotiate?
A I was involved at the tail ends of the agreements and the amendments and Amendment 2 because Bud Robertson, unfortunately, when we were getting the signature, had to go get on a family cruise. So I had to jump in and get it done with Steve Blumenthal, but I was involved at the tail ends of it when the agreements were being put together.
Q And what were VSI's main objectives in entering into the funding agreement?
A The issue was we had -- VSI had a license agreement with Rembrandt. Stream TV had one, and the problem was Rembrandt would call over there every 90 days saying we want money, we want money under the license agreement. And we kept say -- and

the problem is even though we won in the Delaware Supreme Court, we never got the assets back. VSI didn't have it. Stream TV didn't have it. We only got a small percentage of the assets. SeeCubic kept control of the Netherlands, kept control of the bonding machine, kept control of the Phillips licenses, short run production equipment, the Google project. So we had a little percentage and we're like, what in the world are we paying license fees on when we don't have possession of the assets? This is insane. But those guys desperately needed money. So we said, okay, we'll give you the money you guys are looking for, we'll give you a couple hundred thousand bucks, but we're going to restructure our license agreement because this thing's out of control. You're constantly haranguing us for money, so we will restructure a license agreement and then we will give you money, because Steve was desperate for money, because he said his lawyers were bailing on him, weren't helping him, and they were falling apart in terms of the litigation in 2024.

So we said fine. And then the other part, which is controversial, he wanted to change his legal team. If you look at the contract, he wanted other lawyers brought in and he wanted Neil Wallace and in particular, Chris Michaels, to take a back seat. He wanted new people brought in. He said they don't have the skillset to do litigation in order to beat the trustee with his, you know, high-powered team. It's going to

be an all-out war. I need to upgrade the talent. These guys just want to go cut a deal or whatever and, you know, he's never going to get the technology back and he is not going to be able to go into production with what he's got.
Q Some people have suggested that the funding agreement was just that, just the funding agreement. How do you respond to that characterization?
A That is nonsense. That is being done to try to argue that, you know, oh, we took control of their litigation. We took control of their technology and their assets. That was the deal. We restructured the license agreement. We were supposed to get the technology, if they actually got it back, but we were willing to take the risk of giving them money because they may or may not get it back. And then we were controlling the technology and the way Steve got his money back, we still had to go give him the TVs. And if you look at it, the license fees were suspended, but if we got the technology back, it would have been paid out over time on a reasonable basis. But it was the control of the technology. It was predominantly a technology agreement.
Q What was happening with regard to the alternate technology and Rembrandt technology? What was happening with the licenses? How were the payments structured giving them this from the very beginning part of the agreement?
A They were owed very hefty license fees and Stream TV

agreed to very hefty license agreement payments. And also, they wanted TVs. So as part of this payment, because they were arguing that the license fees are past due even though we don't have possession of the technology, they were saying you've got to pay us. And we did pay even before the litigation funding agreement, like a couple hundred thousand. Every time they would call over there saying we need money, we just gave them some money to go away. And we restructured all of the payments, created a more reasonable payment schedule, and then we were supposed to get the technology if they got it back. And also, that presupposes that there will be an all-out effort to get the technology, not go and surrender the white flag.

Q What changes did you negotiate in the first amendment to the LFCA?

A The first amendment and the initial agreement, that also wasn't followed. The initial agreement, because Steve was worried about his team, it specifically says Ackerman's going to be in charge. And then they came up with an excuse. They were -- and you know, we gave 300,000 in cash to them. We must have spent at least 600,000 through Ackerman on those guys getting all kinds of pro bono legal work. That doesn't even include the other law firms where they got a couple hundred thousand of free legal work. Basically we -- Ackerman was supposed to be in charge of the legal, but it was mainly their IP good, who's very good. And then -- and also we restructured

all the technology payments.
Q Same question with regard to --
A But --
Q -- number 2.
A Yeah. But they -- they didn't follow with Ackerman in charge. They were fighting with Ackerman and they said, oh, there's a conflict, conflict. And every lawyer we spoke to said, oh, that could be easily handled with waiver agreements. But there was an excuse, so we had to then go and try to get a third-party law firm, and we ran into issues with that. But that's -- that's a separate issue.
Q Same question --
A We got --
Q -- for number -- amendment number 2.
A Yeah. I mean, we -- we went and got a third-party law firm for them, and the problem was they backed out at the 11th hour, of Blank and Rome (sic). And the reason is, they looked at the case file and they said there's going to have to be massive litigation, to be blunt, against the Trustee, and they didn't want to do it unless we could assure that -- my understanding -- because these are all hearsay and third party -- was they didn't want to do it unless they -- they were sure that the clients were committed to going all out. Because if you start something like this, you better go all the way.
Then by the time we found a law firm, it was somebody

that -- it had spun off from Armstrong Teasdale. By then, they were in full breach of the agreement and we were introducing them to the new law firm. And then that fell apart because by then Rembrandt was an all-out breach of the agreement.

Q What provisions in amendment number 2 protected VSI's interests?

A What happened was we had the initial agreement, and they were floundering all 2024. They had the TRO. They weren't enforcing it. Then all they had to do was file a turnover action to get their stuff back. They could have used subpoena power to open up the servers and prove their stuff was in there. They didn't do any of it. They were floundering all over the place. And then -- you know, and I got messages from Steve saying he doesn't have money to even pay the stenographer. So they said they didn't have money for depositions. They didn't do depositions.

And so what happened was, we said, okay, we're going to give you all this money, but if you guys lose the 363, we're not obligated to keep paying you. And of course they lost the 363, because by the time they actually started doing something, it was too late and it was -- you know, it was like a halfhearted effort. Whatever. So the contract ends, but they needed money. And Steve needed money for his personal issues. So without a contract -- without a live contract, we continued for weeks on end paying under the old structure, you know, a

premium. We were paying huge amounts of money with no paperwork out of good faith.

Then we needed amendment 2 because we had almost like six weeks of payments with no paperwork. So that money was rolled over into amendment 2. And Steve wanted to make sure. He was scared to death I was going to cut off the money. And I said, "Steve, I'll keep paying you here, but we've got to have some paperwork." And I even kept paying him and paying him without the paperwork as a sign of good faith. And what happened on amendment 2, he said he had had enough. He wanted his legal team changed.

And if you look at it, the payment then goes to Steve and Steve is to disburse the money. The initial part, it was split between Steve and Brown & Michaels. And all those rates were determined by Steve. He decided what to pay. And if you look at it, he had a tapering on amendment 2 because he was hoping by then he'd have a whole brand-new legal team in place to take over for the legal expenses. And so he negotiated all of it. And what we put in there was, you can't propose. Okay? You can't propose. We made it more clear. "You are to give us that technology if you get it." But we were willing to take the risk. He goes and does litigation. He may get it back, he may not get it back. And they were going so slow, I didn't know if they were ever going to get it back. So -- but we were willing to take the risk.

But in parallel, we did start discussions on buying their company, because, to be honest, we wanted to own the patents and the technology because they're not easy to work with. I didn't want to go to production with a license with these guys because they'll be blowing up the company every -- every three weeks.

Q Did Rembrandt agree to amendment number 2?

A They -- Steve Blumenthal absolutely, unequivocally he agreed to it. He's in sound mind. He was happy to sign with it. They were -- they did not complain about the agreements. They didn't complain about anything until they got a meeting with Shad Stasney to talk settlement. All of a sudden there's a crisis.

Q Do you believe that it's a valid, binding agreement?

A It is absolutely, unequivocally valid, it is binding. And authority to sign must be resolved in Delaware, the Third Circuit, and 9019s. It is absolutely, unequivocally binding.

Q Could you explain the relationship between Steve Blumenthal, Chris Michaels, and the Devin law -- Delvin Law Firm (sic) immediately prior to the signature and the litigation funding agreement?

A Those guys are all good friends. They've been working together for years. But at the time he signed the litigation funding -- I think the relationship is much better now. At that point, he told me it was completely deteriorating. They

weren't doing the filings. He told me Devlin was threatening to pull him out. And -- and I was on phone calls where Chris Michaels was complaining, "Oh, I've been in this for 15 years. I don't know where this thing is going," and all this other stuff. So it was deteriorating and they were on the verge of defaulting on some of their filings. They didn't file the turnover action, they didn't file to open up the servers. They -- they did the adversary complaint, but they didn't serve half the people. It was just a mess. And it was just completely falling apart where it was all just going to fade away. And to be honest with you, what they did was they used our money to get the Trustee back to the table. The Trustee's admitted it. He's doing a deal because he sued him. And to get SeeCubic to the table. And then he was trying to run away with it.

Q Did Mr. Blumenthal personally engage in negotiations on the finance agreement?

A He did 90 percent of it.

Q Were those negotiations contingent on a -- conducted on a principal to principal basis?

A The agreement was, because Chris Michaels wanted to lead the discussions on litigation funding and also on the technology license, and when they were falling apart in 2024 -- and I told Steve, I said,

"Steve, he's a very smart guy. He knows patents

like" -- "you know, like the back of his hand. We can't work with him because he's obviously very upset. He wants money. This is out of control. Either you negotiate with us principal to principal or we're out. And if you lose your stuff, you lose your stuff."

So he agreed to principal to principal. And -- and the reason why he also needed amendment 2, he told me that these guys are contingent. And as soon as he got money, they were asking him for all kinds of money and they were complaining the fees he was paying them was not enough. And I said, "Wait a minute. I thought they're contingent." "Yeah, but they know I have money, so they want it."

Q To your knowledge, was Mr. Blumenthal of sound mind and judgment when he signed the agreement and the amendments?

A He's a brilliant man. He's very sound on judgment. Okay.

Q Why do you think Rembrandt later acted in breach of the funding agreement despite those negotiated terms?

MR. DEMARKO: Objection. Calls for speculation.

THE COURT: Sustained.

THE WITNESS: I'm not supposed to answer?

THE COURT: No.

THE WITNESS: Okay. Thanks.

BY MR. RINK:

Q Why did amendment number 2 require Rembrandt's ability to

settle the litigation without VSI's consent?
A You mean with our consent?
Q Without our consent. In other words, restricted their ability without our consent.
A Oh, we didn't want them to make proposals because -- okay. Whether they sue the Trustee and the Trustee gives them money, congratulations. We don't really care. We're not a litigation funding company. What we were worried about is is that they were going to lose the technology. And so we didn't want them making proposals. Whatever they do in terms of money stuff, we could care less. The issue is what are they doing with the assets? And even now, here we are, what, almost two years since the Trustee came in? Still haven't gotten the servers open with a -- a subpoena or deposition. And we know it's in there. It doesn't take that hard to prove their case. Really, it only takes one or two days to prove their case. But they haven't done anything. So if we are to receive the assets, we are in control of the assets and we have a right to direct what happens with the assets. That is the law in Delaware.
Q Why was VSI's prior approval of any settlement agreement important to you during the negotiations?
A I wasn't going to do it without it. And they -- and they -- and they basically induced us into it. And then what happened was, they kept saying, buy, buy, buy the company in order to get them to go -- file the litigation funding

agreement. And what I kept telling them is, "We'll buy your company. It's because we want to own it and we don't have to deal with this anymore."

And we also had a big issue. They created a big loophole, when we started doing discovery, where they were sublicensing one of their other companies. And it's like, what are we buying? We're going to buy a technology where you can just go and sublicense yourself right back?

Q Did Rembrandt agree to purchase the litigation -- or pursue the litigation as directed by VSI and VSI -- until VSI later secured the assets or abandoned the pursuit?

A They had agreed to do that, but they didn't do it. They were in breach of the contract all over the place.

Q And what rights did VSI have in the event that Rembrandt acquired ownership or access to the Stream Ultra-D technology?

A Supposed to go back to VSI. We do have to start making those license payments, and then we do have to give them -- they want all those TVs. We have to still get them their TVs and all that.

Q Based upon your experience, do you believe that the Delaware courts would override a contract that restricts technology that outlines technology transfer that involves --

A Not --

Q -- technology --

A Not even a --

Q -- licenses?

A -- one percent chance.

MR. COREN: Objection, Your Honor. Now he's going to opine on what Delaware courts are going to do?

THE COURT: Sustained.

BY MR. RINK:

Q Did VSI provide financial support under the funding agreement?

A Yes, we did.

Q If so, approximately how much funding did VSI contribute?

A We provided hundreds of thousands of dollars. We provided hundreds of thousands of dollars through other law firms, which they got the benefit of. We were continuing to pay them even when they were in breach of contract. And then what happened was they went to a meeting with Shad. They said we could not attend that meeting. And then we pleaded with them and said, "Can you at least let Ackerman attend the meeting?" They wouldn't allow Ackerman to attend the meeting. Wouldn't let us to attend the meeting. Their answer was, "Buy our company tomorrow and" -- with no proper due diligence -- and, "Buy our company tomorrow and then you can come to the company."

And the other big issue is they got the story backwards. I looked up that judge and he has a rule in his chambers, you have to disclose when you have funding arrangements or you come for settlement talks. And I gave them

a warning saying, "You better tell him." And they didn't want to disclose it to the judge, just like they didn't want to disclose it to the Trustee.

Q Can you describe how the payments were made and to whom they were sent?

A There was money sent to Steve Blumenthal's consulting company, there was money sent directly to Brown & Michael (sic), and eventually all the money went to Blumenthal and Blumenthal was paying his law firms.

Q And what was the expected benefit to VSI in return for these payments?

A One, we got our technology license restructured, which we appreciated, and -- and two, if they did get the technology, we were going to get it back.

Q Do you have an idea of how much was actually spent with regard to outside law firms?

A Ackerman, I'm just guessing, was probably 600,000. Louis Brisbois added their bill, which they're fighting over, was a couple hundred thousand. The first bankruptcy was a couple hundred thousand. So I don't know, it's probably like a million and a half, 2 million. Something like that.

Q How would you describe Rembrandt's overall litigation performance in 2024?

A A disaster.

Q Why was the TRO placed in 2024?

A Because SeeCubic was using the technology for sublicensing model and Rembrandt and Philips' contract blocked sublicensing. And so the judge called me and we went through it and we proved that they were running around with the technology, which they weren't supposed to, and they -- more importantly, they were sublicensing. And the problem is with Rembrandt, we signed up for a bunch of trade secrets. So once the trade secrets are out, they're out. So they were put on a TRO.
Q And what were the benefits of the TRO to Rembrandt?
A The benefit of Rembrandt is is it -- you know, they weren't -- we don't know what really happened, but they were not supposed to be licensing anybody during that time period to preserve it while it was -- while the case was ongoing, they were not supposed to be sublicensing anybody. And so that kept it preserved. But we did find out in 2024 that SeeCubic was still running around with the technology, offering sublicenses all over the place in direct violation of TRO. And that was one of our frustrations of Rembrandt. They could have easily gone in and shut it down, and they didn't do it.
Q And what happened to the TRO in 2024?
A They never went to enforce it. Judge Chan kept extending it, extending it, extending it. And they didn't -- what happened was they were supposed to do depositions. They did ask for depositions, and then Steve texted me saying he didn't have money for stenographers and this and that. I'm like,

"Dude, you're going to lose your company because you can't even hire a stenographer." And they basically didn't enforce the TRO and the 363 went through. And there was Philips' report submitted in 2024 that showed SeeCubic was using the technology.
Q Beyond the TRO, how did Rembrandt perform in other litigation matters during 2024?
A I mean, they did better once Ackerman started helping them, but they didn't like serve people and they -- it was just halfhearted.
Q Why was Steve Blumenthal attempting to replace Mr. Michaels and Mr. Wallace (phonetic) in 2024?
A Because without a stronger team, he had no hope of ever getting the technology back.
Q Can you explain a common interest agreement between the parties?
A The common interest agreement was basically like a glorified NDA. It says we're going to work on these litigations together. The law firms are sharing information, and they're sharing those kinds of information. The law firms were not involved in negotiating that contract. And that amendment 2, it specifically says the other parts of the agreement, like the common interest in amendment 1 and the agreement, are left alone. Only some small changes, because we also needed a vehicle to accept all the money that we gave for

weeks on end that had no paperwork behind it. That's all we did with amendment 2. They weren't involved in the negotiations. This was Steve, Bud, and me, and it was predominantly Bud and Steve.

Q So after Mr. Blumenthal attempting to replace Mr. Michaels and Mr. Wallace, how did this change affect Rembrandt's ability to manage the litigation effectively?

A They -- they knew they were getting wound down. I mean, we were on Zoom calls where he said Trevor was going to be in charge and -- in terms of Ackerman. And you know, that's one of the reasons why Chris Michaels is arguing so much. He knew he was getting pushed to the side and he wasn't going to be, you know, in charge anymore, and -- that was rubbing him the wrong way.

Q What did it suggest about Mr. Blumenthal's confidence of Rembrandt's existing counsel strategy?

A He said they're good for like negotiation, but they can't handle litigation.

Q Did this episode affect your confidence or VSI's confidence in Rembrandt's ability to uphold its contractual litigation obligations?

A Yeah. We were very worried about it.

Q Are you familiar with the Chapter 11 Trustee's proposed Section 9019 settlement with Rembrandt?

A Yes.

Q Was VSI consulted or asked to consult -- consent before Rembrandt entered into that proposed settlement agreement?
A We were not asked before and we were not asked after. It came out in the public that we had the agreement. They never contacted us afterwards to find out what the deal was with this hybrid agreement. There -- VSI was never contacted. To the best of my knowledge, our lawyers were never contacted. They never asked any questions about authority to sign, didn't ask about anything, and they gave the impression they were going to ask the court to approve an unauthorized settlement agreement.
Q Did Mr. Homony contact VSI to discuss this agreement?
A Nope.
Q Did the Trustee contact VSI's lawyers?
A Not to my knowledge, no. After it came out, they never asked any questions about it, never asked what the implications are, never asked about any of it. They looked like they were just going to double down and hope, because he's Trustee, he's going to just get approved.
Q And how did the settlement affect VSI's contractual rights under the funding agreement?
A They are basically taking our assets away from us, even though they have no authority on us. They basically are stripping us of our assets that we are entitled to at VSI, because they're basically doing a deal -- we have a deal with another company and somebody's coming in and giving them money.

That's called tortuous interference.
Q How does the settlement affect VSI's contractual rights under the funding agreement?
A They're -- again, they're taking away our assets, they're reducing our litigation rights, they're reducing our asset ownership. I don't know how you can do that, but they're basically stripping stuff out of a nondebtor entity.
Q And what harm would approval of the settlement agreement cause VSI and its rights to the technology?
A It will cause irreparable harm because part of the technology is trade secrets, which is protected under the defense of Trade Secret Act, and now we're being walled off from it.
Q To your knowledge, did the Trustee collect the Stream TV assets back?
A He didn't collect -- to the best of my knowledge, I don't think he collected anything back. There's assets all over the place. They didn't go to get any of them.
Q How was Rembrandt performing in 2024 in terms of defending its technology property rights?
A They did better once they started working with Ackerman. And then once they stopped working with Ackerman, it all fell apart.
Q To your knowledge, is the Philips and Rembrandt technology stored on the California server?

A Yes, it's on there.
Q To the best of your knowledge, is that technology also stored in the Netherlands server?
A Yes, it is.
Q Was Stream TV Networks using Philips and Rembrandt technology in these -- in its operations?
A Yes, it did.
Q How did Stream TV obtain the Philips technology?
A It signed a license with Philips.
Q And how did Stream obtain the Rembrandt technology?
A It signed a license with Rembrandt.
Q What specifically did Stream TV receive from Philips in connection with the --
A It had 1,200 --
Q -- use of that technology?
A -- patents --
THE COURT: You're going to have to let him ask his question before you --
THE WITNESS: I'm so sorry.
THE COURT: -- start to answer.
THE WITNESS: I'm sorry. I'm sorry.
MR. RINK: I'm sorry. I'll repeat, sir.
THE WITNESS: That's okay. Please do.
BY MR. RINK:
Q What's specifically did Stream TV receive from Philips in

connection with the use of that technology?

A 1,200 patents, a couple terabytes of source code, optical designs, manufacturing technology, just an enormous amount of technology. We loaded up in servers and took it to the Netherlands office.

Q Mr. Michaels claims that the funding agreement was really a litigation funding agreement, period. From your involvement in drafting the litigation -- the negotiating the agreement, how accurate is that statement?

A That's just not true. He's just doing that to try to make it easier to say it's not valid.

Q Did Mr. Michaels omit the fact that the agreement also contained technology license provisions and transfer obligations?

A Yes. His declarations are incomplete and misleading.

Q Mr. Michaels stated that VSI has no consent rights over the settlement. Can you explain how amendment 2 addresses the settlement proposal and why that contradicts his statements?

A They're not even supposed to be proposing agreements with regards to the technology or, you know, also technically money, which is I guess the litigation part of it. But anything with regards to the technology and those things, they're not supposed to be doing that. If you -- if you heard him up here, he has saying things like, "Well, we still have specific performance against the Trustee," but they're going to prove

the 363 with prejudice and somehow some miracle is going to happen on the specific performance. He's not even supposed to be proposing without our preapproval, because we're supposed to get the technology.

Q Mr. Michaels suggested that the hybrid agreement terminated in May of 2025 of this year. What actually happened to extend and continue the agreement?

A We were paying the agreement, we continued to pay throughout the breach, and it was an anticipatory breach. They're breaching all over the place. We stopped the payment because they were breaching. There is no sunset on the agreement. And basically we did run different scenarios because they called and said that our weekly payments were incorrect, and that's what Steve claimed. We did a Zoom call. We showed them all the wire statements, showed them the account being, and they said, "Oh, well I guess we miscalculated." And then they came back the next day and started demanding, "You must buy our company immediately." Well, they figured that they calculated wrong.

But we walked them through how all the payments worked and where they were. We ran different scenarios. And then he found out under amendment 1 they actually owe us money. If you include amendment 2, we do have to pay them some money. It was -- at that time, it was only like 80,000 bucks. But there's no sunset on the provision. And we stopped paying it.

And now we have sued them and we're suing the Trustee because of tortuous interference, and we're going to basically, you know, and if we have to pay something to cure it, we're happy to pay to cure it. But, you know, what we can't do is. pay somebody all kinds of money, and basically, you know, they don't follow any of the provisions. We're not paying for the pleasure of their company. We're paying for them for specific performance.

Q Did VSI continue to fund Rembrandt after Amendment 2, contrary to Mr. Michaels claim --

A Yes, we did.

Q -- that the agreement expired?

A Yes. We were giving them money. We were even giving them money after the breach. We were even giving them money after they went to meetings without us. We went to meetings and they were threatening to say, oh, we're going to get somebody else with a Philips' license and go make the TVs; we're still paying them.

Q It's been alleged that VSI breached the licensing covenant by failing to pay $3.6 million.

A Well --

Q What were the actual conditions precedent for payment?

A When we did the hybrid --

Q And when those conditions --

A -- hybrid -- I'm sorry.

Q -- ever triggered --
A When we did the hybrid agreement, the $3.6 million was restructured and it's specifically tied to that they have to get the technology back. We have to get it. Then we can begin paying the 3.6 million. We were not -- it was restructured. If you read the agreement, it was restructured.
Q It's been claimed that even mentioning the funding agreement breached a common interest agreement. Was that true or was discretion necessary to protect VSI's interest in court?
A Yeah. We had a common interest agreement that we would work together on different litigations and share information. And if one of us like got hit with a subpoena, we'll tell the other one. And -- and that was in the agreement, as like an addendum it's not part of the main agreement. The main agreement was about the technology and giving them money and all those things. It's just a standard, like a joint defense agreement. That's all it is, just a glorified joint defense agreement. And on Amendment 2, we said all the other stuff is still in full force and effect, and all we're doing is making this minor change.
Q Mr. Michaels implied that VSI failed to honor its obligations. What do the payment records and wire transfers you personally reviewed show about VSI's performance?
A We paid hundreds of thousands of dollars.
Q In a second declaration, Mr. Michaels characterized VSI as

an overreaching funder. Based upon your negotiations, was VSI a passive financer or did it hold a bargained rights?

A Okay. First of all, there are very few companies on this planet that are going to go honor a license agreement, pay somebody money for a license agreement when that company doesn't even have the assets and the company who's going to use the technology doesn't have the assets. There's very few people on this planet that would do that. And if it was so easy, they would have had other people funding their stuff and they couldn't do it. And as far as overreaching, I don't know what person would go give the kind of money we gave them, which is hundreds of thousands of dollars of cash, maybe 1.5 million in in-kind legal services that we paid for, and when we don't even have the company t-shirts back and somehow we're an overreaching funder. I think we've been more than generous with them. We still said we'll pay them the 3.6 million. We still said we will give them the TVs. We didn't cut any of those parts of the deal. We could have started doing stuff like that. We didn't, and as a sign of good faith.

And then Number 2, we said if you guys ever get it back, we'll go and buy your company. And we gave the Trustee $170 million proof of funds. He blew off our investor, but we gave him $170 million proof of funds. So we had people to go to, to go and get the money if they would ever perform.

Q Mr. Michaels claimed that VSI has no role in licensing

technology. How does Amendment Number 2's technology transfer clause contradict that claim?

A I don't understand. Can you repeat that? What was the question?

Q Yeah. Mr. Michaels claims that VSI had no role in licensing technology. How does Amendment Number 2's technology transfer clause contradict that claim?

A I don't know what he's talking about, VSI had a license for Rembrandt, and the agreement says all over it that they're supposed to give us the technology. I don't know what he's talking about.

Q Did Mr. Michaels acknowledge in his declaration that $370,000 VSI spent directly to Rembrandt and his counsel?

A Did he acknowledge that?

Q Yes.

A I'm not sure if he did, or if he didn't. I mean, we did put the wire transfers on the docket so -- and he got the money, because -- and he was pushing Steve to get him more money.

Q What additional legal expenses did companies led by you incur that benefited Rembrandt, but were ignored in Mr. Michaels' testimony?

A Yeah. He got all kinds of free legal work from Ackerman and Lewis Brisbois and Armstrong Teasdale, and probably some other people too.

Q Mr. Michaels suggested that VSI's consent rights could be reduced to damages only. Based upon your knowledge, what were the rights, conditions, precedent, or mere covenants?
A I know of no legal form anywhere in the world where authority to sign is not critical of a technology contract. I've never heard of it.
Q Based upon your experience, why do you believe Mr. Michaels' testimony birthed his first and second declarations were inaccurate and misleading?
A Because he's hoping to just ram through the 9019 and run away with the technology. Or run away with some money from the Trustees, basically throwing in the towel on the technology.
Q In your experience, did Rembrandt lawfully settle with the Trustee without VSI's written consent?
A No, absolutely not. I mean -- okay, then everybody can do it. I sign a contract, somebody else is going to come along, give them some money, and they'll run away with your stuff. It's absurd.
Q If the Trustee testified that VSI had no settlement approval rights, how does that square with the explicit language you negotiated, and Rembrandt signed?
A His testimony is a complete misrepresentation.
Q Did both VSI and Rembrandt execute Amendment 2 after the 363 sale?
A Yes, we did. Absolutely, we signed it afterwards. We --

Q After it signed the VSI --
A Because we said okay --
Q Sorry.
A -- you guys lost, but we'll hang in there, we will support you, and you guys keep on, you know, fighting the good fight.
Q And after it was signed, did VSI continue to fund Rembrandt?
A Yeah. We paid them hundreds of thousands of dollars.
Q If the Trustee were to suggest that Amendment Number 2 is a nullity, what evidence is there that both parties acted on it?
A They took money. They took money on it. They were also filing more litigations. The lawsuit that got the Trustee to the table, we paid for.
Q The payments you talk about here, have these been documented in wire confirmations?
A Yeah. It's on the -- it's on the docket.
Q Why was it essential for VSI to have veto power over settlements, particularly as it related to protecting the Ultra-D technology, the technology transfer provisions in USI's licensing rights --
A If you're not going to get the technology back, there's no value there at all. There's no value for the money. You're basically taking investors' money and just wasting it away. And number two, the Trustee likes to do settlements, so there

could have been a deal worked out, where we could have gotten the technology back if enough pressure was put on them to basically recognize Rembrandt and Philips' IP rights.

Q And why did VSI negotiate the clause requiring Rembrandt to immediately transfer streamed Ultra-D technology if obtained?

A That was the only way we were going to do the deal, or else we weren't going to do it. And the basis of our relation with Rembrandt, again, it's a technology license, technology relationship, and technology contracts have broad authority on restrictions.

Q Are you saying that if VSI funded more than half a million dollars, they would have done so without these protections?

A We wouldn't have given them a penny.

Q If the transfer testified that VSI's role has minor, how does that compare to the protections you personally negotiated, as core provisioners of Amendment Number 2?

Q He's just saying that, because if you look at the agreement, he was being pushed to the back seat, and he wasn't in charge of the legal anymore. He wasn't going to have a big role in it, and Ackerman and all of them were taking it in a different direction, and that was a big bone of contention.

Q How would the --

A That's why he's saying all that.

Q I'm sorry. How would the settlement affect VSI's

contractual rights to pre-approve settlements?
A First of all, they're just ripping apart our contract. I don't know how they have the authority to do that, and basically the Trustee will be engaged in tortious interference.
Q In your opinion would approving the settlement create a risk that VSI could sue for tortious interference, until the end --
A We have already started suing for tortious interference. Those assets are under our contractual control. We expect, you know, if he's going to go and now put up a barrier for us to pursue our rights and strip assets out of our company, we're absolutely going to ramp up the litigation. And, you know, they were able to keep the litigation cost to a minimum because last year it was Rembrandt. Now it's VSI, and it's a different ballgame.
Q What's your understanding of the term "conversion" with respect to intellectual property?
A Yeah. When they -- on the asset purchase agreement, they transfer the server and had Rembrandt on there. That's Rembrandt and Philips on there. That is conversion, and then they transferred title in the subsidiary through the stock sale; that's conversion.
Q Have you heard of the Defense of Trade Secrets Act?
A Yeah. Everybody in Silicon Valley is worried about it.
Q Could you briefly explain your understanding of that?

A If you give somebody access to trade secrets in exchange for money, it's a violation of an act of Congress. In the Rembrandt agreement, we signed for trade secrets, and now SeeCubic has them, and they don't have a license.
Q Based upon your knowledge, do you believe that the Trustee engaged in a violation of the Defense of Trade Secrets Act?
A Yes.
Q Do you believe the Trustee engaged in conversion of intellectual property or trade secrets?
A Yes.
Q Do you believe that this conduct involved Philips and Rembrandt technology and trade secrets?
A Yes.
Q Thank you, Mr. Rajan.
MR. RINK: Thank you, Mr. Rajan.
THE COURT: You're not done. Mr. Rajan?
THE WITNESS: Yeah.
THE COURT: You're not done.
THE WITNESS: Oh, I'm sorry.
THE COURT: Thank you. Mr. Coren, do you have any cross-examination?
MR. COREN: I do, Your Honor.

CROSS-EXAMINATION

BY MR. COREN:
Q Mr. Rajan, pull out the litigation funding and

confirmation amendment Number 2. Do you have it before you? It's in -- perhaps attached to one of your declarations, or it's in the book? It's the second tab of the VSI folder.

MR. RINK: It's Mr. Robertson's first declaration.

BY MR. COREN:

Q Let me know when you have it.

A Yeah, I have it. Do you want me to go to Amendment 2?

Q Amendment 2. You signed that, correct?

A One second here. Yes.

Q Page 4, that's your signature, right?

A Yeah. That's my signature.

Q Okay. Turn to page 3.

A Yes.

Q Item, it's Section E, other terms. You get down to Number 5, and second sentence, it says, "Rembrandt shall not propose or agree to any settlement in the legal actions without VSI's prior written consent and approval." Did I read that correctly?

A Yes.

Q Now you testified, I thought, that you had a discussion with Rembrandt where Rembrandt wanted to keep that provision a secret. Do you recall that testimony?

A I didn't say that. Chris Michaels said that, and that's not true.

Q Well --

A In fact, the exact opposite. I told him he had to tell the Delaware District Court, he better disclose these provisions to the Court. We got into a huge fight because I looked up what the rules were for that judge, and they were the ones that went and hid it when they had the meeting with that Judge, Rashad, and they also didn't tell the Trustee. That is -- I never testified to that, he said it.
Q Uh-huh. So he told you he was not going to tell anyone; that's what he told?
A Yeah. He was going to hide it.
Q He was -- when did he tell you that?
A It would have been when they were having the meeting with Shad, and we were fighting over going to the meeting. I said, you guys better tell --
Q The questions was when?
A -- you better tell the Judge.
Q Give me a date.
A When was the meeting with Shad? I think it was after New Year's. I don't know the exact date. It was in Q1 for sure.
Q What year?
A 2025.
Q Okay. And what was the status of the Pennsylvania District Court action at the time?
A Which one? You mean when they sued the Trustee?
Q Sued the Trustee and others in Pennsylvania. Yeah.

A Yeah. They had already sued in Pennsylvania.
Q So that case was pending, right? Based on your memory.
A Yeah, it was filed.
Q Yeah.
A I don't think anything happened with it.
Q Yeah.
A I don't even know if they served that many people yet. Did they --
Q Well --
A -- serve anybody?
Q -- let me ask you this. You were told that -- you claimed that Mr. Michaels told you they were going to keep that provision a secret from the Court. Is that your testimony?
A From the Judge, yeah.
Q Well, how many judges were they going to keep it a secret from?
A I don't know. I have no idea. They didn't follow the agreement at all. They're breaking the contract all over the place. Got me --
Q Well, let me ask you. When you found out that they were going to keep it a secret from the Court, did you do anything to make sure that the Court was --
A Yes.
Q -- aware of this provision?
A I went and looked it up. I went and got the contact

information from the judge. I threatened Neil Wallace, that attorney back there, saying, I'm going to the Judge, you guys better go tell them. And then, basically Ackerman called and said, look, let's not get into a fight with them. Let's calm them down. And then I had a long -- or I don't want to break lawyer/client. But a conversation with a lawyer saying, they have to go tell the judges because some of these judges, you know, you have the regular rules and they have their personal rules. And this guy, he had -- I actually tried to find the email. I printed out that judge gave like, it wasn't a binding opinion on Delaware District Court, but it was kind of like, hey, this is what you should do if somebody is giving you money for litigation. I think I printed that out. I emailed them. And Ackerman said, look, you know, let's stay calm. Let's try to work things out with them, and let's just all bring it to a conclusion. Ackerman was trying to calm everybody down. But I even printed it out. I said, you guys got to go tell them.

Q All right. Did anyone disclose that to any court that you're aware of?

A The litigation funding agreement?

Q Either the -- well, I'm looking --

A LSCA?

Q -- in particular at the provision relating to who controls settlement of Rembrandt litigation.

A But what's your question?

Q Did anyone bring that to the attention of any court, to your knowledge?
A I don't think they told anybody, no.
Q Did you know that they didn't tell the Court?
A Yeah. I knew they didn't tell the Delaware District Court judge.
Q Well, how about the Pennsylvania District Court judge? Did you know they didn't tell him?
A No, I didn't know they didn't tell him.
Q Well, did you tell him?
A No, I didn't tell them. Because --
Q How about the Bankruptcy Court? Did anyone tell the Bankruptcy Court where Rembrandt was bringing litigation? Did anyone tell the Bankruptcy Court that Rembrandt didn't control settlement of the litigation that they were bringing?
A I don't understand your question. You're saying did I go to --
Q Did anyone? Did anyone tell the Court of this secret agreement where VSI, rather than Rembrandt, controlled Rembrandt's litigation? Did anyone tell the Court?
A I don't --
Q Yes, or no?
A I don't know what they did.
Q Did you?
A I didn't tell them.

Q And did you -- you knew that they were not telling the Court because Michaels told you he wanted to keep it a secret, right?

A Yeah. I knew he didn't tell the Delaware District Court; that is correct.

Q Yeah.

A And I -- and I got very upset. I gave them threatening emails. I printed it out, and I was counseled to stay calm, not to go start a huge firestorm, try to get everybody to work together.

Q All right. You've said that three times, and you're running the clock. Stay focused on my questions. Now why didn't you tell the District Court that VSI, rather than Rembrandt, controls Rembrandt's litigation? Why didn't you disclose that to the Court?

A We didn't file in that filing. We didn't have any filings in the Court. We didn't go into their lawsuits and file on their behalf. The way it was working. was they were using Devlin and some other law firms for the filing. Then we originally had it set up where Ackerman was going to do the filings, but they didn't like that. Then we contacted Blank and Rome. Blank and Rome fell apart, and then we finally found a lawyer to basically -- who agreed to go work with them, and we were setting up the call to introduce them, and then they were in full-on breach at that point. So that lawyer would

have been the one that was filing. We did not go in and basically join their lawsuits and sue other people for them. That's not how it worked.

Q Before I move on, sir, can we agree that based on your conversations with Michaels and Ackerman and perhaps other, it was your understanding that this provision about who controls settlement of Rembrandt's litigation was kept secret from every court in which they had litigation pending? That's your knowledge.

A That Rembrandt kept it a secret?

Q Yes.

A I didn't -- I don't know what they did. I have -- I only knew about the Delaware District Court. The Eastern District Court, what I heard was they filed. Nobody was given discovery. Nobody was given service. It was just sitting there dormant.

Q All right. Sir --

A They didn't do anything.

Q -- you're rambling.

A You don't know what they did.

Q That's not my question.

A I don't know what they did.

Q Now you know that the Pennsylvania District Court action is specifically identified as one of the legal actions in this Amendment Number 2; you know that, right?

A Yeah.
Q And it lists the litigation in the Bankruptcy Court as covered. Right?
A Yeah.
Q Right. But you're not aware of any disclosure to any court of that provision we've been talking about, that who controls settlement, correct?
MR. WEISBERG: Objection, Your Honor. I think this has been belabored. Asked and answered.
THE WITNESS: Yeah. I don't --
THE COURT: Overruled. You can re-ask your question.
BY MR. COREN
Q Sir you're not aware of disclosure to any court in any action that's identified in this agreement, correct?
A I'm not aware of Rembrandt disclosing to any of those people.
Q And you, as a party to this agreement, you didn't disclose it to any court, correct?
A I did not disclose it to any court because we did not file in those actions. Had we filed, obviously, we would have disclosed. But the way the deal is structured is Rembrandt and Rembrandt's attorneys are supposed to take care of their own litigation. We didn't go and say, hey, we're going to sue with you and go start suing people for you and with you. We never agreed to that.

Q Now you submitted a second declaration, correct?
A Yeah.
Q Are you a little confused about your authority, sir?
A Am I confused about my authority?
Q Yeah. Are you a little confused about your authority?
A I don't know what that means.
Q Well, you submitted a declaration to this Court on September 7, 2025, correct?
A Yes.
Q Do you have that declaration before you? It's your second declaration.
A I don't know if it's in here. I don't know if it's in here. I don't see it.
THE CLERK: I think the last tab.
THE WITNESS: Last tab?
THE CLERK: I think it's in there.
THE WITNESS: Okay. Yeah.
BY MR. COREN:
Q Do you have it in front of you?
A Yeah.
Q Turn to page 5. Is that your signature?
A Yeah.
Q You filed that with this court, correct?
A Yeah.
Q And you filed this on behalf of the Debtor, Stream TV

Networks, Inc., correct?
A No, I filed it on behalf of ESI.
Q Well, what does it say, sir? It says Stream TV Networks, Inc., by Mathu Rajan, title Chief Executive Officer.
A Yeah. It should have said VSI.
Q So you made a mistake --
A Yeah. We did.
Q -- about your authority, correct?
A Yeah. I did address it --
Q You did it again --
A -- in the document.
Q -- on page 7. You got your authority wrong on page 7, right? You've pretended to have authority to act on behalf of the Debtor, Stream TV Networks, Inc., correct?
MR. WEISBERG: Objection, Your Honor. It's argumentative the way it's phrased. He said he made a mistake.
THE WITNESS: It should have said VSI. Sorry about that.
BY MR. COREN:
Q Yeah. Well, you know, sir, that you were removed from being the operator of the Debtor and a Chapter 11 Trustee, meaning Mr. Homony, was appointed, correct?
A Correct.
Q So you knew from that moment on, you had no authority to act on behalf of Stream TV Networks, correct?

A Correct.
Q And you read the opinion which caused your removal, correct?
A Yes.
Q And you read the provisions about how you were breaching your fiduciary duties to the Debtor. You read all that, right?
A Yeah.
Q And you read all of the rather unpleasant things that Bankruptcy Judge Coleman had to say about you and your conflicts of interest, relating to the Debtor. You remember reading all that, right?
A Correct.
Q Well, don't you think you should have been a little more careful in submitting a declaration in this court?
A Yes. It was a mistake. I apologize. It should have said Visual Semiconductor.
Q Okay. Who prepared the declaration?
A I prepared it, and I worked with Amanda Gonzalez, who's here to submit it.
Q Did any lawyer review it?
A We worked on it a little bit with our legal counsel and Dan Rink, but we were rushing, and we got it out, and we should have fixed this.
Q You would agree with me that candor to the Tribunal is rather important, right?

A Yes, I would.
Q Now are the Trustees' exhibits up there? I see a book of the Trustees' exhibits --
A Yeah.
Q -- pass by.
A No. Yeah.
Q Do you have it, sir?
A Yeah.
Q Turn to Exhibit 14.
A Yes.
Q That's the recently filed adversary complaint, correct?
A Correct.
Q And that's the one you testified about where you were suing --
THE COURT: Hang on. Hang on. Hang on. Mr. Rajan, you need to move one of the books there, in front of the camera.
THE WITNESS: Oh.
THE COURT: There you go.
THE WITNESS: Okay.
THE COURT: All right. Mr. Coren, you can continue.
BY MR. COREN:
Q Do you have that adversary complaint in front of you?
A Yes.
Q That's the one you testified to, how you were. Now it's

no longer -- Rembrandt's no longer the sheriff in town. Now it's VSI who's going to be suing the Trustee, correct?
A Correct.
Q And this is your first salvo suing the Trustee recently, correct?
A I don't know what you mean by salvo?
Q Well, this adversary complaint was filed on September 2, 2025 --
A Oh, you mean, is it recent?
Q Yes.
A Yeah. If it's recent, yeah.
Q And you drafted this complaint, didn't you?
A Actually, this was drafted by our counsel, Matt Weisberg.
Q Did you read it before it was filed?
A Well, we drafted one. He drafted one. He, you know, he made changes, and then we're in the process of changing it again.
Q My question was, did you read it before it was filed; yes or no?
A We went through it, yes.
Q Who's we? I asked about you.
A Yes.
Q Did you notice it looks like it's a draft?
A Yes.
Q And the draft has comments talking to somebody. Did you

notice that when you read it, before it was filed?
A We had a copy, and a different copy was filed.
Q So this filing is a mistake; is that what you're telling me?
A Yeah. It'll be corrected tomorrow.
Q Is that what you're telling me, this is a mistake?
A It's incomplete, yes.
Q This is the only filed version, correct?
A Currently, yes.
Q Now if you look on paragraph 3, there's a comment. Shouldn't we identify the John Doe's here and a question mark? Who is asking the question, to your knowledge? Are you still with me?
A Yeah. I believe that came from somebody that works at our company.
Q Who's this somebody that works at your company?
A It's Bud Robertson.
Q Okay.
A That's -- the initials of BR.
Q And who was he asking that question to, if you know?
A He was asking it to our attorney.
Q Now there's another question on Paragraph 36. Do you see that question? We didn't identify Brown and Michaels as a defendant earlier. This is the first reference. Should we do so earlier; do see those questions?

A Yeah.

MR. WEISBERG: I object to these questions, Your Honor. What's the relevance?

THE COURT: I don't know, but --

MR. WEISBERG: Okay.

THE COURT: I'm sure he will lay it out as part of his cross-examination. He's putting his time on the clock on it.

MR. WEISBERG: Fair enough.

BY MR. COREN:

Q Who asked those questions? Is that Mr. Robertson?

A If it says BR, that would be Bud Robertson.

Q Well, it doesn't say anyone.

A No, on the comments. You asked about the comments.

Q Oh, okay. I got you.

A The comment in the left-hand corner, you'll see the initial.

Q I see BR, so that's Robertson.

A Correct.

Q And you think he's talking to lawyers?

A Correct.

Q When you read this and it got filed, did you realize there were really no causes of action in this document anywhere?

A Yes.

Q So you identified that mistake, too?

A Yeah. That'll be fixed tomorrow.
Q Tomorrow? You'll file a new one tomorrow?
A Yeah.
Q Any other planned litigation against the Trustee?
A Yes.
Q What's coming next?
A Do I have to answer that?
THE COURT: There's no one objecting.
MR. WEISBERG: I'll object to --
THE WITNESS: Yeah. Why don't you object.
MR. WEISBERG: Is there a planned litigation strategy. It's not been speculated, so it's not relevant.
THE COURT: He can testify if he has personal knowledge of it, without disclosing any information derived from his counsel.
BY MR. COREN:
Q What litigation is planned --
A So I have -- I should answer that?
Q -- next against the Trustee, sir?
THE COURT: You can answer to the extent you have personal knowledge about the proposed cause of action that you haven't gotten from your counsel.
THE WITNESS: Okay, sure. We're filing to remove him.
BY MR. COREN:
Q You're filing to remove him?

A Yes.
Q What court are you going to file that in, if you know?
A Here.
Q Here? Okay. And do you have an ETA when we can expect that filing?
THE COURT: Mr. Rajan, you need to move the book.
THE WITNESS: Oh, sorry.
THE COURT: It's in front of the camera.
THE WITNESS: No, I don't have the exact ETA.
BY MR. COREN:
Q Have you seen a draft of it?
A Yes.
Q Let me ask you this. Has VSI brought any litigation against SeeCubic relating to things that the VSI thinks SeeCubic has, that it has no right to have?
A You'll see that tomorrow.
Q You're doing that tomorrow too?
A Yeah.
Q What court is that coming in?
A Here.
Q Bankruptcy court?
A Uh-huh.
Q Judge Baker is going to be rather busy. Anything else you can think of that you're planning?
A I'm looking at Rule 11, through you and your co-counsel.

Q I see. What are you going to accuse me of?
A We're still working on it.
Q Working on it?
A Yeah.
Q Okay. Keep working. You heard Mr. Michaels' testimony about discussions about ethical issues having to do with the legality of this Amendment 2, and the view of various lawyers, including Ackerman, that that amendment was illegal and unenforceable. Do you recall that testimony?
A Yes. I heard him say that. That is correct.
Q Was today the first time you heard about such a discussion, or did you hear about a discussion that happened at some prior time involving Ackerman, Mr. Michaels, and perhaps others?
A Yeah. When they went to their meetings without us, I had heard that Chris Michaels was yelling and screaming about it.
Q About this particular document?
A About all of it.
Q And who was he, excuse me, yelling and screaming at?
A Pretty much anybody he could talk to.
Q Was he yelling and screaming at you?
A No. At that point, he wasn't really talking to me that much anymore.
Q I'm sorry. I can't hear you.
A At that point, he wasn't really talking to me too much

anymore.
Q Right. And were you aware of Ackerman's view on the subject?
A Yes. My understanding is that Ackerman is issuing a declaration to refute what he said.
Q To refute what Mr. Michaels said?
A Yeah. Because, as you saw, the so-called email evidence doesn't exist.
Q Yeah. Well, what really happened is that Ackerman withdrew as your counsel, right?
A Excuse me?
Q Ackerman withdrew as VSI's counsel.
A No. We had a relationship together, and I got new counsel, and we ended the relationship. But we didn't -- they didn't withdraw for any reason or anything like that, or anything associated with that, and you have no evidence. And they will be issuing a declaration.
Q Who replaced Ackerman?
A Matt Weisberg.
Q And do you know the first thing that happened when Mr. Weisberg came in and entered an appearance?
MR. WEISBERG: Objection, Your Honor. This not only calls for attorney/client privilege regimen, but I really don't understand why.
MR. COREN: I didn't ask him about a communication.

THE COURT: He didn't ask about the communication. He just asked whether he knew what happened after you came in. He can answer that so long as he's not disclosing anything that came from you. Again, I'm not sure what any of this has --

THE WITNESS: He made an appearance.

THE COURT: relevance to. Mr. Rajan I don't know what any of this has relevance to the approval of the 99 team, but it's your time, so I'll let you do what you want.

MR. COREN: I appreciate that.

BY MR. COREN:

Q Do you know what happened?

A He made an appearance.

Q Yeah. And then he dropped your administrative claim in the middle of the trial, right?

A Correct.

Q And you know he's petitioned to withdraw as your counsel in this case?

A Well, let him speak for himself. I mean, as far as I know, he's still our attorney.

Q That wasn't my question. Do you know he has filed a motion to withdraw as counsel?

A Yes.

MR. COREN: I have nothing further.

THE COURT: Okay. Mr. DeMarco, do you have any questions?

MR. DEMARCO: May I confer with my client, very briefly, Your Honor?

THE COURT: Sure.

MR. COREN: How much time did I use, Your Honor?

THE COURT: About 20 minutes.

MR. DEMARCO: Your Honor, for me, how much time remains?

THE COURT: Two hours and eight minutes.

MR. DEMARCO: Thank you, Your Honor. Your Honor, I have no cross for Mr. Rajan. I do wish you to know that I do wish to call Mr. Michaels in rebuttal with his testimony, when the time has occurred.

THE COURT: Okay. I do not have any questions for Mr. Rajan at this time. Is there any recross, or redirect by Ms. Bromme, by VSI?

MR. DEMARCO: No, sir.

THE COURT: Okay. All right. You can stand down, Mr. Rajan

THE WITNESS: All right. Thank you.

THE COURT: VSI can call its next witness. You have 24 minutes left.

MR. RINK: Thank you, sir.

MR. DEMARCO: A 24-minute block.

MR. RINK: Your Honor, I would like to call as a witness someone who is on Zoom today.

THE COURT: Okay.

MR. RINK: His name is Bud Robertson.

THE COURT: Okay.

MR. RINK: Mr. Robertson is an executive at VSI. He is on the West Coast, and he has all the documents, the complete document package that we prepared for the Court today. He has the same document, so I don't believe we need to worry about the presentation of him; if that's okay with you.

THE COURT: Okay. All right. Are you intending to call him on direct, or offer his declarations as his direct testimony?

MR. RINK: I was offering to question him on direct.

THE COURT: Okay. All right.

Mr. Robertson, can you hear me?

MR. ROBERTSON: I can. Can you hear me?

THE COURT: I can. All right. Mr. Robertson, can you please raise your right hand?

CHARLES ROBERTSON, SWORN

THE COURT: Okay. Mr. Robertson, because we're doing this remotely, and they're not asking to have your declarations admitted, I'm going to ask you not to review any materials that are in front of you unless you are directed to do so by counsel. Okay?

THE WITNESS: Understood. Yes.

THE COURT: All right. You can proceed, Mr. Rink.

MR. RINK: Thank you, sir.

DIRECT EXAMINATION

BY MR. RINK:

Q Thank you, sir. Could you state your full name and your current position, please, Mr. Robertson?

A My name? Yeah. My name is Charles Robertson, R-O-B-E-R-T-S-O-N. I go by the nickname Bud professionally, and I'm Vice President of Operations for VSI.

Q Were you previously employed at Stream TV?

A I was.

Q And what was your capacity there?

A It changed over a several-year period, but it ended as Executive Vice President.

Q And how many years have you been in the 3D industry?

A I first got involved with that in '20 -- the beginning of 2011, so 14 years, almost 15.

Q Have you provided declarations in this court proceeding regarding the funding agreement?

A Yes, I have.

Q As an industry expert and industry veteran, is it common in technology and content licensing deals to include restrictions on licensing to other third-party companies, or on the assignment of licensed technology rights or content rights, from a funder and a vendor?

A I don't have explicit prior experience with the funding

and lending, but generally the LFCA included a whole technology component, which was one of the primary purposes of that was to -- it's called litigation funding and confirmation agreement. So it was confirming the technology license that had been executed prior. And it's my understanding that -- my experience, that it's common to have those kinds of -- certain kinds of restrictions, you know, on a case-by-case basis.

Q And what was your role in negotiating that agreement?

A The LFCA?

Q Yes.

A Initial litigation --

Q Yes.

Q -- funding agreement?

A I was the primary point of contact. We did a lot of principle-to-principle negotiation. The lawyers were aware that this negotiation was going on, and they wanted to weigh in at the end, and they added the Exhibit A, which was the confidentiality, and shared -- I forget what it was called now, but the common interest agreement. But in terms of the actual main agreement, which I think is about four pages, if I remember, that was -- I was heavily involved in that. Probably 90 percent of the back and forth was documented by me. There were versions that went back and forth over a period of some time, I don't know, maybe a week or two, perhaps.

Q What percentage did you personally negotiate of that

agreement?
A I'd say probably 80 to 90 percent. Some of it was relay. A lot of -- well, frankly, a lot of it was relay from Mathu Rajan. I would come back and say, okay, this is the latest proposal, and he would --- Mathu would give me some counterpoints, and then I would be the one to relay that with Steve.
Q And what were VSI's main objectives in this agreement?
A Well, primarily to, and it appeared to me to be the same with Rembrandt, is that we wanted to confirm that the original Stream license and that the licensing covenant that VSI was part of, that those obligations would be honored on both sides. And for VSI, we wanted to restructure the payment terms of the licensing covenant, which had initially been tied to a plan of reorganization, but it was becoming clear that a plan of reorganization was unlikely to be approved in the Court based on a 363 sale. So we wanted to talk about a common interest in how to move forward on -- on the litigation side, but also to restructure VSI's financial obligations to Rembrandt by tying it to a successful outcome.
Q Some have suggested that the LFCA is strictly a funding agreement. How would you respond to that characterization?
A No. As I just said, it was as much or more about confirming the technology licenses that had been put in, or the licenses put in place through the licensing covenant as much as

anything else.
Q Can you explain in this hybrid agreement what was happening with regard to the alternative technology and the Rembrandt's technology?
A I'm sorry, can you repeat that? I didn't quite understand?
Q Yeah, can you explain in the hybrid agreement what was happening with regard to the alternative technology and the Rembrandt technology?
A The Ultra D technology, and the Rembrandt technology?
Q Yes.
A Well, the Ultra D technology was potentially in the process of being sold in a 363 sale at that time in November of 2024 when the LFCA was agreed to. And we agreed with Rembrandt that they had strong intellectual property claims that they wanted to pursue. We were going to give them some funding to allow them to pursue those.
We believed, as did they, that they would ultimately be entitled to, at a minimum, if the Rembrandt agreement with Stream were voided or rejected by the Trustee, that they would be entitled to the Stream technology under, I think it's paragraph 10 of the original 2021 agreement. And that if Rembrandt got bad access to a technology that they were entitled -- that we believed they would be entitled to if the agreement or settlement were rejected. That when Rembrandt got

that access or ownership, then that would be shared with Stream -- sorry, shared with VSI, so that VSI could be the one to deliver the products, the at-cost products under the agreement and make those payments. So it was really designed to say, hey, Rembrandt, you have some underlying IP. That's your leverage to get access to the Ultra-D technology, and when you get that access, this is how VSI can satisfy that commitment.

Q Are you familiar with the joint cooperation or common interest agreement between VSI and Rembrandt?

A Yeah, I've read it. I didn't draft it. That came from the lawyers as an exhibit to the LFCA. I was heavily involved in the actual agreement itself. That was an add-on as was testified earlier, it was kind of an expanded confidentiality agreement about there was going to be sharing of documents between Rembrandt and VSI and that those documents would remain confidential, or if not, under what circumstances they could and would be revealed.

Q With regard to the amendments at the LFCA, how were they structured and what changes were negotiated in Number 1 amendment?

A In the first amendment, my recollection is that it was primarily an increase in the weekly legal expense that VSI was going to provide, because that was executed, I believe, on November 20th. At that point, the hearing for the sale had already been set for December 9th, if I remember correctly, and

it was clear that the sale was going to proceed and the amount of litigation that might be required for appeals would expand. And so I think that was the primary change was that the weekly payment by VSI went up.

Q With regard to amendment Number 2, how was that negotiated and what prompted its creation?

A Well, that was primarily because the LFCA and Amendment 1 contained certain termination provisions and one of which was, you know, a 363 sale approved by the Court if VSI is not the prevailing bidder. And that, in fact, did not happen, so it -- so it terminated by its own terms. But Rembrandt, in particular, Steve Blumenthal, wanted those continued payments, and so we said that in order to continue to make payments, we need to have some valid agreement that they would continue under, and, you know, putting in an amendment that expands the terms and changes the termination date. You know, protects you and gives us an agreement under which we can continue making payments.

Q Can you explain any provisions in amendment Number 2 that protected Stream TV's interests?

A Stream TV's interests --

Q Yes.

A -- or VSI?

Q I'm sorry, VSI's.

A I don't remember the paragraph numbers, I'm not referring

to the document. But there was in other terms, I think it was called Section E. There was -- there's a clause that says that VSI must be consulted before Rembrandt can propose or enter into a settlement agreement. And then there was another clause that confirmed that if Rembrandt gets access to the Stream technology, then it would immediately make that ownership or access transfer to Stream to -- to VSI.

Q Did Rembrandt agree to amendment Number 2?

A Steve Blumenthal signed it. Yes, correct.

Q Well, what did amendment Number 2 require, regarding Rembrandt's ability to settle the litigation without VSI's consent?

A It required written preapproval from VSI to enter into any agreement.

Q And why was that important?

A Well, we were funding the litigation and the whole purpose of that litigation funding and confirmation agreement was to confirm our license to the Rembrandt technology, which has zero value if you're not also working with the Stream technology. Rembrandt as a standalone, has no value. So what we were attempting to do was to help Rembrandt enforce its rights, intellectual property rights, and through that process gain access to the Ultra D technology, which does have value in satisfying purchase orders that VSI had obtained and other such things. So that was the real value.

Q And what rights did VSI have in the event Rembrandt acquired ownership or access to the Stream Ultra D technology?
A As I said, VSI -- well, Rembrandt was obligated to immediately transfer the ownership or access to the Ultra D technology should it obtain them.
Q What sort of financial report support was provided by VSI to Rembrandt, under this agreement?
A The -- the details are in my declaration. I put together a table from wire confirmation and other banking information. But I believe the amount paid was $270,500 paid directly to Steve Blumenthal on behalf of Rembrandt and to Chris Michaels as required under the agreement.
Q And what were the expected benefits of making these payments?
A Well, I think I've already answered that. The benefit was that, you know, if Rembrandt prevailed in its litigation, then VSI would have access to the technology to satisfy sort of its customers.
Q Why was Mr. Blumenthal attempting to replace Chris Matthews and Neil Wallace in 2024?
A You know, I can't read the man's mind, but he did, you know, tell me as we talked about VSI bringing in additional litigation, that he wanted an attorney that was more appropriate for litigation that was anticipated ahead and that this had been long and drawn out and that his current team he

didn't feel was qualified for the task.
Q How does the current 9019 settlement affect VSI's contractual rights under the LFCA?
A Well, I think the biggest thing, again, VSI was funding the litigation to obtain access to the Ultra D technology; that was the primary purpose of it. And in this settlement agreement, that doesn't happen. So Mr. Michaels testified earlier, and it was very confusing to me that he says his $1.2 billion is still protected, but he didn't explain in any way how. And in my reading of the 9019 settlement agreement, that is not retained. Can you hear me okay?
Q Yeah, we can. Thank you.
A Okay. And so if Rembrandt didn't protect its right to get access to the technology under paragraph 10 of the original 2021 settlement, if it's willing to give that up and say we'll just take some cash settlement and the right to go chase things later, that's giving away a right and an access that VSI had, you know, bargained for when we made the payments and entered into, you know, Amendment 2.
Q To your knowledge, is Philips and Rembrandt technology stored on the Catholic's California server?
A To my knowledge, yes.
Q And same question with regard to the Netherland server?
A Yes. I was the CEO of SeeCubic, BV, the Dutch R&D firm for almost two years. Actually, technically, it was a little

over two years. And I was living over there for almost two years, and I'm very familiar with what the engineers had there. And I also liaised with Mark Sue (phonetic), who was part of the Silicon Valley engineering team. So I know what he was working with over in California, which came from the Netherlands as the source. And that was in his declaration, the Mark Sue declaration of December 9 -- sorry, December 4, 2024.

Q How was a Stream TV using the Philips and Rembrandt technology in its operations?

A A Stream license to Philips technology, that was source code, computer code, optical designs, a wide variety of things. That was the foundation that we started with when we did the license in 2011, when Stream did the license. And then that technology, that foundation of the Philips foundation was built on over the course of more than a decade to become the Ultra D that everybody has been fighting for over the past few years. And so it was foundational, and there were royalty reporting requirements and payments and that sort of thing. And did you ask me about the Rembrandt technology, as well?

Q Yes, I did.

A So on the Rembrandt side, at Stream, most of us were unaware of any, probably all of us were unaware of any of the claims of Rembrandt until they filed suit in 2017. The Dutch engineers that we had hired said they were not using the

Rembrandt technology. But ultimately, over time, through discovery and discussion, it became clear that the guys we hired had in fact carried some of the work they'd done with Steve Blumenthal, into Stream's R&D facility. And that was the result of the settlement, is to cover some things like the liveliness and borders are two specific functions, but have been mentioned repeatedly over time. And those were absolutely integrated industry and products that were produced in 2016, 2017, and we're still being sold in 2020.

Q And how did Stream come about acquiring the Philips' technology?

A It was just a license deal. Matthew Rajan went to the Netherlands, sat down with the Philips' people, and over time, they hammered out an agreement, and it was just a 15-year license.

Q Same question with regard to Rembrandt technology.

A Well, it's a longer story than I think we have time for here today. But, you know, the litigation started in 2017. Shad Stasney, who was the Stream CFO and Vice Chairman, said I'll represent Stream. It was ordered into mediation. They signed a term sheet in April of 2019 that said these are the terms. I know Matthew Rajan thought the settlement was far too generous based on evidence that he was aware of. But then over time, by 2021, it became clear that there was significant evidence that our engineer, the same are at the time, that the

Dutch engineers had in fact executed nondisclosure agreements. There had been lots of meeting minutes, and Stream had an untenable position that, in fact, there wasn't access to the Rembrandt technology. So we agreed to settle in a long-form agreement, Stream did, that was essentially mirroring the Stasney term sheet of 2019.

Q We're running out of time, Mr. Robertson, so I'm going to go quickly. I have a few more questions for you. It's been claimed that the LFSA is merely a litigation funding agreement. Based upon your experience having drafted and negotiated, can you comment on that?

A I already did. It's as much about the technology license confirmation than it is about litigation funding. It's a two-part agreement, so they both have weight, but you can't discount the technology part.

Q And you personally negotiated amendment Number 2, right? Up until the 11th hour, I had a family vacation planned, and I had to step away with the document nearly finalized.

Q And did both VSI and Rembrandt execute amendment Number 2 after the 363 sale?

A Yes, correct.

MR. RINK: And I'll ask one more question, and I'm done, Your Honor.

BY MR. RINK:

Q What would happen to VSI's bargain for rights to acquire

Stream Ultra D's technology if the settlement goes through?

A Well, that's the crux of the matter is that VSI has funded the litigation with the expectation that Rembrandt would prevail in obtaining at least access to the Ultra-D technology under its original agreement and that that access would be forwarded to VSI. So if VSI is unable to obtain that access, then Rembrandt, through the settlement, has given away a valuable right to VSI.

Q Thank you, Mr. Robertson.

MR. RINK: I'm finished, Your Honor.

THE COURT: Okay. Does anyone have cross-examination for Mr. Robertson?

MR. COREN: Yes, sir.

CROSS-EXAMINATION

BY MR. COREN:

Q Mr. Robertson, Steve Coren, how are you?

A I'm okay, Steve. Thank you.

Q Do you have the settlement agreement between Rembrandt and the Trustee, before you?

A I can. The proposed settlement agreement under the 9019?

Q Yeah. The agreement that has been executed by the Trustee and Rembrandt and is seeking bankruptcy court approval?

A Let me just confirm with you that that is -- I've got to go to the top of the document, make sure I'm looking at the right one. So that's -- so 1040 is your omnibus motion, and I

believe that was Exhibit F?
Q It should be, yeah.
A 1040-6; is that correct?
Q Correct.
A Okay. Yes, I have that in front of me.
Q And you just said, paraphrasing, kind of the ballgame was your concern that somehow by way of this agreement, Rembrandt had given up VSI's potential rights to the technology you've been describing, correct?
A That's correct.
Q What if I were to tell you, sir, that this agreement didn't do anything of the sort and, in fact, did the opposite? It reserved Rembrandt's rights, if any, to that technology. Would that surprise you?
A No. Because it reserves Rembrandt's rights to go after an adverse party that has been fighting tooth and nail with Stream for five years, to take the technology.
Q Uh-huh. So --
A So as -- as we understand the agreement, since you're asking me about my understanding, as we understand the agreement, there is no commitment on the part of the Trustee or the Debtors to ensure that Rembrandt gets that access.
Q Yeah. Well, I'm talking about paragraph 3. You understood that, correct? Did you hear the question, Mr. Robertson?

A No, I'm sorry. I heard a reference to paragraph 3, and I scrolled to it to look at it, but I didn't hear a question that came. I'm sorry.
Q It is in fact, Paragraph 3, which preserved Rembrandt's rights, if any, to try to acquire that technology, correct?
A It protects Rembrandt's rights against third parties, which is what I said. It now puts the burden on Rembrandt to go collect such access from a party that wasn't part of the original settlement agreement. So Stream and the Trustee, as we understand this, are abrogating their right to guarantee that access. And, in fact, number B says it's taking no position on the nature or the extent of such rights.
Q Well, how --
A And they have no obligation to act or assist.
Q Is it your understanding that the Trustee is in the possession of that technology? Or do you want him to go get it back from SeeCubic, or from somewhere else?
A Yes. I -- I understand that he's not in the possession of that technology. And the expectation is that he would have to negotiate that with See-Cubic in some way, because that's an obligation of the debtors who are rejecting the contract. It's not an obligation of a third party who was never part of that agreement. And that is why --
Q And you think somehow the Trustee had an obligation to do VSI's bidding or Rembrandt's bidding to try to go get some

technology that he doesn't have? Do you think that's the Trustee's job?
A I think the Trustee's job is to arrange a global settlement that satisfies the parties. And a global settlement in this case could and should have involved SeeCubic.
Q But you would agree, would you not, that as part of this agreement, Rembrandt did not give up or surrender its right to try to acquire that technology, and it's in fact expressly preserved, correct?
A Its right is preserved to pursue an adverse third party, correct.
Q Right. And you think that perhaps Rembrandt or VSI's pursuit perhaps would have been a little easier if somehow the Trustee was required to champion that pursuit along with you? Is that what you're upset about?
A Upset is not the right word. So let's -- let's not mischaracterize it. The concern to us is that there is no obligation to act or assist. And that the obligation that would have and should have come through a rejection of the settlement agreement, that's an obligation of the debtors. And the debtors are completely punting on the obligation, saying, well, you guys just go over there and I'm not going to help you at all. And you know they're not going to lift a finger to help you either; five years of history shows that. So that essentially is just, you know, those rights are being thrown

away. They're preserved on paper, but in practicality, there is no way that's going to happen.

Q Right. And that's what VSI -- that's what's really driving the objection, correct?

A Yes. The purpose of the LFCA was to confirm the relationship between Rembrandt and VSI on the technology side with the goal of getting access to the Stream technology through Rembrandt's rights. VSI funded that and that end goal is now being completely ignored or virtually ignored.

Q How did the litigation -- strike that. So is it fair to say, as you understand it, the agreement doesn't give up Rembrandt's right to try to acquire that technology from a third party, or VSI's right to try to acquire that technology for a third party. You just think it makes it harder if the Trustee is not on your team trying to do that; is that fair?

A They don't waive their rights, but it puts the onus on them instead of the Debtor's, where it belongs. Correct.

Q So what this document says is the Trustee will take no position, but Rembrandt and VSI are free to move forward and try to acquire that technology, and there's nothing in this agreement that's going to prevent that, correct?

A Correct.

MR. COREN: Nothing further.

THE COURT: Okay. Mr. DeMarco, do you have questions for Mr. Robertson?

MR. DEMARCO: No. Just reserve our right to call Michael Michaels. That's all.

THE COURT: Okay. I don't have any questions for Mr. Robertson at this time. Do you have further redirect?

MR. RINK: I have two short questions, Your Honor.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. RINK:

Q Mr. Rembrandt, sorry, it's a long day. Mr. Robertson, the rights to pursue the technology currently belongs to Rembrandt, but in your opinion, based upon your negotiation of this agreement, isn't the point really that VSI should have the rights to approve that and pursue those rights?

A Yes. That's what was negotiated and agreed to in the Second Amendment.

Q And the last question, do you think the authority to sign is important, relative to the agreement you negotiated?

A I think it's important to any agreement. If you don't have the authority to enter in the agreement, then the agreement -- how can that have any effect?

MR. RINK: Thank you, Mr. Robertson. Any further recross, Mr. Coren?

MR. COREN: No, Your Honor.

All right. Thank you, Mr. Robertson. You're excused.

THE WITNESS: Thank you.

THE COURT: Does VSI have further witnesses to present?

MR. RINK: No, Your Honor.

MR. WEISBERG: Your Honor, with that, VSI would like to move as a trustee to -- I'm sorry it has been a long day, their exhibits into evidence as well.

THE COURT: So the only exhibits I have -- because I'm not taking the declarations because they weren't used as the direct exam. So the exhibits I'm taking in are V1, which I took in earlier, which is docket 1058, Exhibit 2, that's the second amendment or the first amendment to the litigation funding and confirmation agreement.

V2, which is 1058, Exhibit number 3, which is the second amendment to the litigation funding and confirmation agreement. And docket number 1081, which was the second Rajan declaration that he was crossed on. But I don't think that -- I mean, are there other exhibits that I should be taking in?

MR. WEISBERG: Can we move those declarations in?

Mr. Robertson's --

MR. COREN: I would object to that, Your Honor.

THE COURT: Yeah, if he's going to object, I don't know that there's a base to have it moved in now.

Are there other exhibits other than the declarations that I should be taking in?

You want to take a couple minutes and, we can take a break. Why don't we take a five minute break? You all can let me know that and then I guess we'll be back on rebuttal if there's any rebuttal needed.

MR. WEISBERG: In terms of rebuttal, sorry to interrupt, Your Honor.

THE COURT: Sure.

MR. WEISBERG: In fact, I don't think I was interrupting, but can we offer the declaration of Adam Swick and his colleague John, I forget his last name Thompson or something like that, at the Ackerman firm that was indicated that there's rebutting Mr. Michaels' testimony about their willingness to absolve the litigation funding agreement.

THE COURT: If he's not present to testify, no. Unless the trustee's going to agree.

MR. COREN: He's going to object.

THE COURT: That's what I figured. But again, look, I'm not sure I understand the relevance of a lot of those issues. I really don't in connection with the 9019.

MR. WEISBERG: Yeah.

THE COURT: And maybe you all will educate me when we have a further discussion. But I'm just not seeing it right now based on what I understand the issues to be. And I think I can, based on what I understand the issues to be.

So, we're going to take a -- why don't we take 10

minutes, we'll come back at 4:15. My staff may need to change, but we'll come back at 4:15. We'll do any rebuttal case that's needed and then we'll talk about next steps from there. Okay?

MR. WEISBERG: Would the Court permit Mr. Swick to testify via telephone in rebuttal?

THE COURT: Well, I don't think it's rebuttal --

MR. COREN: Your Honor, they're out of time.

THE COURT: I think it's your case in chief and you only got two minutes, so. Why don't you all talk and we'll be back at 4:15 and we'll figure out where we go from there.

All right, Court will stand in recess until 4:15.

(Recess taken)

THE CLERK: And FYI to everybody. The recording is back in progress.

THE BAILIFF: All rise.

THE COURT: Good afternoon. Please be seated.

All right. Mr. Coren, where are we relative to the trustee's position on rebuttal?

MR. COREN: I think we have some time left and as I understand it, Mr. Michaels wants to take the stand on the rebuttal briefly. I think that's problem -- it's within our collective time period. The trustee would permit it and we certainly don't object to it.

THE COURT: Okay. All right, so the intention would be to proceed with Mr. Michaels on rebuttal?

Yes?

MR. COREN: Yes.

THE COURT: Okay. All right, are you going to recall Mr. Michaels?

MR. DEMARCO: Yes, Your Honor.

THE COURT: All right. Are you going to be directing him Mr. DeMarco?

MR. DEMARCO: Yes.

THE COURT: Okay. Mr. Michaels, you're still under oath from your prior testimony. Do you understand that?

THE WITNESS: Yes.

THE COURT: Okay.

MR. DEMARCO: Good afternoon, Mr. Michaels.

THE COURT: I'm sorry, before we begin, ordinarily right, they would only have a few minutes left. I don't know how long this rebuttal is going to go and I don't know to what issues are going to be raised and so I'm going to give them leave on time necessary for them to address issues that are raised in rebuttal.

MR. COREN: No objection.

THE COURT: Okay.

DIRECT EXAMINATION

BY MR. DEMARCO:

Q Mr. Michaels, do you recall the conversation between Mr. Rajan and Mr. Coren regarding the disclosing of this second

amendment with various courts?

A Yes, I do.

Q Why didn't Rembrandt disclose this purported second amendment?

A We had agreed with Ackerman that if it was valid it would've had to have been disclosed in Delaware and in all of the bankruptcy cases and we agreed with them that because it was not valid that we did not have to disclose it in any of those forums and did not do so.

Q Could you briefly explain why this agreement was not valid in everyone's consideration?

A First and foremost, the attorneys agreed that as counsel had not reviewed it and should have been copied on it, we were all rejecting the agreement that each of the law firms was subject and specifically named in the agreement and required to act under the agreement. We were objecting to its terms and it's not the type, it was a champertous agreement that we were not willing to enter. That was true of both Ackerman and Brown and Michaels. In addition, they were incredibly apologetic that an attorney working for VSI had been communicating with our client without our knowledge and without being copied. I think they were aware, but the testimony today confirmed that this was intentional by VSI's principles is to exclude Rembrandt's counsel and I think they were -- as I said, it was almost instant. They absolutely said right away that this was

not an amendment, that was valid, validly obtained and it was not an ethical agreement to have entered into.

Q And that was because of the hidden terms in the red lines, the fact that it was obtained without counsel being copied on the email, et cetera.

MR. WEISBERG: Objection, Your Honor. Leading.

THE COURT: Sustained.

BY MR. DEMARCO:

Q I just wanted to confirm that apart from the agreement of counsel, were there other considerations as to why this agreement was not valid that entered into everyone's consideration?

A Yes. The --

MR. WEISBERG: Objection, Your Honor, to this line of rebuttal. I don't know what it's rebutting, number one and number two, it's really a legal conclusion as to whether the agreement is valid. Whether Ackerman, according to Mr. Michaels, disavowed it, per se, or Ackerman per Ackerman, which we could call in rebuttal to the rebuttal does not disavow it or what have you, it doesn't matter what everybody says it says.

THE COURT: He can testify as to why he doesn't believe the agreement was valid.

MR. WEISBERG: Okay.

THE COURT: And that's the question that is being

raised whether or not I find that the agreement is valid is a different issue, but he can testify as to why he believes it one way or the other.

MR. WEISBERG: Sure.

THE COURT: He believes it not to be valid. Mr. Rajan believes it to be valid. I've heard both testimony, I'll have to make a determination of whether it is.

MR. WEISBERG: Yes, Your Honor.

THE COURT: Okay.

MR. DEMARCO: So just very briefly then, Mr. Michaels, apart from the fact that counsel had agreed, what were the independent basis of that rationale?

THE WITNESS: So the independent basis were, first and foremost, that it had been sent to our client without counsel. Right away without even reading it, they said that absolutely you guys get to weigh in, you're rejecting it, we understand that. Once we got into the substance of it, it was, I think the predominant discussion was about the champerty issues and us giving settlement authority to VSI. We said if that was going to be maintained, we had to withdraw. We were withdrawing as counsel. You weren't going to find any counsel that would agree to that provision. So there would be no representation of VSI.

Mr. Rajan, you had asked me originally, he had referenced that Ackerman was unwilling to take on the

representation of Rembrandt and that's why this was coming up. As we were threatening to withdraw, they were threatening to withdraw in terms of -- when I say threatening, that's the wrong word. We were discussing whether or not we collectively would've had to withdraw.

As we went forward I pointed out that not only had it been sent to my client without copying us, but that the red line conveyed inaccurately that it was just changing payment terms where they provided all of these, what they're claiming our assignment of rights in a second amendment, you know, to an agreement that had been negotiated directly with counsel back in November.

BY MR. DEMARCO:

Q Mr. Michaels, so do you recall the testimony from Mr. Robertson and Mr. Rajan where they were referring to some sort of license agreement component to this agreement? What exactly is this license agreement's being referred to by Mr. Rajan and Mr. Robertson?

A There was never a license agreement to VSI, it was the license agreement that Stream had settled in 2021, well 2019, in the term sheet in 2021. So if it Stream’s, it belongs to VSI, is the only explanation I can view in their brain, but it specifically references the Stream settlement agreement. And there are provisions in that agreement that give Rembrandt rights. There's a grant clause in Section 10, that is what

Rembrandt has been arguing for, for years and is in fact what we're getting out of the settlement agreement. The only thing that matters out of that settlement agreement is Section 10 and that's being preserved. Yes, they're rejecting the agreement, but under bankruptcy code 3625(n) that maintains. So we're getting everything and anything we ever wanted out of that settlement agreement we're getting.

Q Mr. Rajan and Mr. Robertson both referenced that Rembrandt was looking for new counsel at some point. Could you briefly explain what was going on with Rembrandt at that time?

A So back in October there was just got, it looked like the 363 sale was going through. Rembrandt was stating that, look, it's going to go to SeeCubic, at all time this technology was developed by Steve shared with a group in Eindhoven. They joined SeeCubic BV, which was owned by Stream for a bit and now it was going to be owned by SeeCubic. And we were interested in going after the technology, I mean we didn't, like -- suing people in bankruptcy was not why our reason to exist. And so we were not planning to appeal, we were not, we were planning -- we already had a Delaware action, we were going to pursue that and continue that further. Stream wanted us to join -- excuse me, Visual Semiconductor wanted us to join them in their appeal, and we said, "We're not bankruptcy experts", I mean this is all about what an appropriate 363 sale should include. We want bankruptcy. If you going to, we're going to do that,

we want to bring in expert bankruptcy counsel. I had proposed Janice Grubin from Damon and Barclay and they -- VSI had wanted to bring in Blank and Rome. I don't know what happened with Blank and Rome. They, they -- my understanding is they declined. I do know what happened with Damon and Barkley and Janice Grubin is that, they put forward a retainer agreement and VSI didn't come up with the funding, right. So you know, right away, they were supposed to bring in outside counsel and they didn't. So.

Q So finally we heard from both Mr. Rajan and Mr. Robertson, this question of where the technology still reside. To your knowledge, does the trustee still have this technology?

A To our understanding, it was sold and we argued this at the time that it was being sold to SeeCubic, and it to the extent that any entity had possession of the Rembrandt trade secrets and we're implementing the Rembrandt technology and creating devices that were shipped into the US. It was from SeeCubic BV, sent materials to SeeCubic Inc. And you know, at this point, that's who we understand has control of the assets.

MR. DEMARCO: Okay, with that Your Honor, I will end the rebuttal direct.

THE COURT: Okay.

MR. WEISBERG: Cross, Your Honor?

THE COURT: You have cross-examination?

MR. WEISBERG: Yes, I can.

THE COURT: Well first let me start with Ms. Brumme, I'm assuming, no? Okay.

All right, Mr. Weisberg.

MR. WEISBERG: One minute, Your Honor, I just lost my train of thought.

THE COURT: No problem, I'm sorry.

MR. WEISBERG: May I continue, Your Honor?

THE COURT: You may.

MR. WEISBERG: I think I found where --

THE COURT: Okay.

MR. WEISBERG: -- I was looking for.

THE COURT: No problem.

CROSS-EXAMINATION

By MR. WEISBERG:

Q So, Mr. Michaels, is your -- Steve Blumenthal is Rembrandt, is that correct? What is his position with Rembrandt?

MR. DEMARCO: Objection, Your Honor. Beyond the scope of rebuttal direct.

THE COURT: It's foundational question.

THE WITNESS: Steve Blumenthal is the CEO of Rembrandt 3D holding limited, and he owns a hundred percent of the shares of Rembrandt 3D holding limited. That's a Nuevos corporation.

BY MR. WEISBERG:

Q And he signed all three, the original and the two amendments of the lawsuit funding and cooperation agreement, is that correct?

A I don't believe you've referenced it correctly, but I think what you're referring to is the litigation funding in confirmation agreement?

Q Yes.

A There was on November 5th and then the agreement that he signed and I participated and saw that execution, the -- without us being informed, there was a, what purported to be an amendment to that in November 20th and then a later document that, Daniel Rink sent to him that he has told us, he told me that he had signed.

Q So are you now attempting to contend to the Court that the document, specifically amendment two, and your client's sign should not be enforced?

A Yes.

Q Why are you not at stopped from that?

A Why am I personally or why is Rembrandt?

Q Why is that argument not stopped? Your client signed it.

A Before, I was asked earlier about all the various reasons. One, my client's signature was obtained by an attorney violating the rules of ethics, both in Delaware and in Pennsylvania. The agreement that my client was asked to sign violates the rules of ethics in Pennsylvania and in Delaware.

The agreement that my client was asked to sign, tries, purports to amend that your position in other parts of the argument had been terminated. If the agreement had terminated, it was in December, as Mr. Robertson testified to, it was a terminated agreement. It wasn't amending a valid agreement. If we go through the document itself, it was obtained by fraud. It was represented to Mr. Blumenthal, that the only changes that were being made were the payment terms and the red line only shows the changes to the payments, not all of the other changes that were being made. So we can keep going through it, but it's not an agreement that any lawyer could continue to represent Rembrandt 3D holding under the terms that it purports to do is, I think, the most critical aspect. But, as I said, the attorneys involved in repudiating it for on behalf of VSI really started and ended with the fact that Dan Rink was sending copies of agreements and neither they or I had seen. That's all they needed to hear, absolutely, you guys are rejecting it, we understand.

Q Has your client taken in this litigation, in this trial, the position that you just espoused? Has your client testified to this?

A Has my client testified to this?

Q Mr. Blumenthal?

A Yes, Mr. Blumenthal has, but I mean he is my client, but in this case the party of interest is Rembrandt 3D holding

limited, of which I am the Chief Financial Officer and the Attorney. And yes, we have testified to that effect.
Q But Mr. Blumenthal, the signatory to the agreement that you're now seeking to disavow, has not testified to any of this. Has he?
A The -- to any of this, you -- it is a wide open thing. I don't know what you're -- he -- he has testified numerous times in this bankruptcy proceeding. He's filed a declaration.
Q I don't doubt that he's testified in his life. I'm asking you at this trial, Mr. Blumenthal has not disavowed this amendment, has he?
A Rembrandt in 3D Holding has disavowed this -- this amendment. That's the party that's here. Mr. Blumenthal happens to be CEO, and he did not testify. We -- you called for a 30(b)(6) deposition --
Q But this isn't a deposition --
A -- and Rembrandt showed up and you cancelled it.
Q -- it's a trial.
A Yes. I understand we're at trial and that Rembrandt 3D Holding has come forward and disavowed. Because Mr. Blumenthal was not privy to the phone calls that I had with Ackerman's -- with --with Ackerman. And -- and all of the discussions that Trevor Coddington and I had had about negotiating and -- and finalizing the agreement in the first instance.
Q Are you mad that Mr. Blumenthal signed a document that you

didn't see?
A Am I mad?
Q Well, do you find it improper?
A I absolutely find it improper.
Q Is it improper that a principal speaks to another principal to try to resolve litigation?
A I find it incredibly unethical.
Q You find everything unethical.
A That Daniel Rink sent my client an agreement without copying me, and that he sent him an agreement that purported to show all the changes in a red line where he hid most of the changes. I have had everyone's --
Q I don't want to hear war stories. Answer my questions, please.
A Am I angry that Daniel Rink did that? Absolutely.
Q Okay. Is it improper for a principal to contact a principal to resolve litigation?
A As a general proposition, that is generally okay. It is not okay if they're being directed to do so with assisted -- one of them being assisted with counsel. The counsel that is directing that action can be held to -- to have violated the ethical provisions. There's, like, tons of ethical opinions that say that.
Q So the person, the testimonial person, we know corporations don't testify, people do. The person that is

testifying that the Blumenthal signature should be disavowed is you.

A I'm not testifying that the Blumenthal signature should be disavowed. I am testifying that the agreement that purportedly binds Rembrandt 3D Holding is not binding for all the reasons I've articulated. Steve's only information that he has, and we're not contesting -- Rembrandt 3D Holding is not contesting that Stephen Blumenthal signed this document unethically communicated to my client by Daniel Rink.

Q But legally unethically. That's the only phrase you use.

A So the -- so the only thing, he has no other information relevant to this situation. That's it, he signed it.

Q Just a stupid client.

A Stephen Blumenthal is many things --

Q He was described by my client as brilliant.

A -- but he is not stupid in any way, shape, or form. What he did do, is rely on the fact that this red line agreement was what it purported to be, and that it had been shared among counsel that he was receiving it from an attorney. Every other communication in our interactions with all of the lawyers, they always copied other counsel. So this was the first time, as far as I know, I mean who knows what other communication Daniel Rink has sent in thousands of emails that he was privy to that counsel had not been copied on, he -- he had -- he did not realize how outside of the box Daniel Rink was. He did not

realize that the red line agreement had no relationship to what he was actually being asked to sign.

Q Tell me about Mr. Blumenthal. What's his background? What's his educational background?

MR. DEMARCO: Objection, Your Honor. I think we're going well beyond the scope now. We're going to get to the educational background of Mr. Blumenthal?

MR. WEISBERG: Well, his counsel says he's not competent to testify to this document. I want to know if he's competent.

THE WITNESS: I didn't say that.

MR. DEMARCO: I don't think that's what he -- I don't think that's what he's -- I don't think that's what he testified to. I think what he's testifying to -- I think what he has testified to is, there is -- he's not saying that it wasn't signed. He's not saying that the signature was obtained fraud -- was forged. He's saying that the signature was obtained through means that he doesn't believe would justify enforcement of the Second Amendment. Right?

THE WITNESS: Exactly.

MR. DEMARCO: Okay.

THE COURT: I understand the issue.

MR. WEISBERG: Okay. Fair enough, Your Honor.

THE COURT: I'm not sure I understand the relevance, but I understand the issue.

MR. WEISBERG: Fair enough, Your Honor. That's all I have. Thank you.

THE COURT: All right. Any further cross? No.

Any further redirect?

MR. DEMARCO: No, Your Honor.

THE COURT: Okay.

MR. DEMARCO: As fast as possible, we'll ask to step down.

THE COURT: All right.

All right, Mr. Michaels, you can stand down.

Any further rebuttal from the trustee?

MR. COREN: No, Your Honor.

THE COURT: Any further -- well, is there any -- I don't know that there's surrebuttal but.

MR. WEISBERG: Your Honor, we could call on the telephone, Adam Swick of Ackerman, to --

THE COURT: I --

MR. WEISBERG: -- disavow what is so-called -- to disavow that. If he --

THE COURT: Here's --

MR. WEISBERG: -- if he -- Your Honor, I'm interrupting.

MR. WEISBERG: -- here's -- I'm going -- I'm going to ask the parties how they'd like to proceed. There is a -- there is a sort of legal question that I do have a question

about, that I think is probably going to end up in the VSI court. Does -- but I'll ask both parties and I'll ask you both to -- if you want to answer me right now, you can. And if you want to think about it, that's fine. We'll talk about it.

Do either of the parties think that I need to resolve the enforceability of the Second Amendment for the litigation funding agreement as a precursor to whether Rembrandt could enter into a settlement agreement with the trustee?

MR. COREN: I'm prepared to answer that question, Your Honor, and the answer is no.

THE COURT: Okay.

MR. RINK: Your Honor, short answer; yes.

THE COURT: Okay. I'm going to need then, as part of the briefing and explanation as to why. Because one of the things that has been raised by VSI is that the Court has the authority to disapprove a 9019 settlement if a counterparty to the estate does not have authority to enter into the agreement. That's the -- that's the legal question that I am framing. And it has been represented that there are at least six and potentially more cases on that topic, so I would need to see those cases. Because that's a new one for me.

MR. RINK: We're happy to give it.

THE COURT: I'm not saying it's not right, I'm just saying it's a new one. So that is an issue that is -- that is new to me on that topic, and that's the only context in which I

can see this being relevant for purposes of the 9019 settlement.

What I can guarantee you is the following, regardless of what I decide on the 9019, I am not making a finding as to whether or not that agreement is in place, and whether or not that agreement entitles one party to take rights against another party that are not in the estate. Because that's outside of my jurisdiction and I'm not going to decide that. I don't know if that's helpful, but, you know, in terms of how the parties need to be thinking about best allocating their resources, I want to put that out there. Because there's been a lot of -- that's why I keep saying, I'm not sure what this relevance is. Because there's been probably two plus hours of testimony about the enforceability of an agreement and whose rights are impacted by whose that do not affect the estate. And I'm not sure what relevance that has for purposes of me making a determination relative to whether or not the trustee has properly exercised his business judgment and entering into a settlement.

Does that make sense to the parties?

MR. WEISBERG: Yes.

MR. COREN: Absolutely.

THE COURT: Okay.

MR. RINK: Yes, Your Honor. And VSI will make that --

THE COURT: Okay.

MR. RINK: -- submission.

THE COURT: So, how would you all like to proceed? I'm not going to obviously issue a ruling today. Do you want to -- I don't know if supplemental briefing, right, post-trial briefing would be helpful. If it would be more beneficial for you all to work on proposed findings of fact and conclusions of law. In addition to the topic that I, you know, in addition to the one -- the one legal issue that I've already articulated.

So how would parties like to proceed on that and how much time do we think we need, given that the trustee has indicated they need a disposition in relatively prompt order? So, I know I threw a lot at you.

MR. WEISBERG: Your Honor, if we could have, in lieu of proposed findings of fact and conclusions of the law, just supplemental briefing and oral argument.

THE COURT: Okay.

MR. COREN: That's fine, Your Honor.

THE COURT: Okay.

MR. DEMARCO: I apologize, Your Honor. I can't hear the --

THE COURT: VSI indicated that rather than do proposed findings and conclusions, they would just prefer to do a post-trial brief.

MR. DEMARCO: Yes, Your Honor. That's I want.

THE COURT: Okay.

Ms. Brumme?

MS. BRUMME: Yeah. No objection.

THE COURT: That's what you want to do? Okay.

All right. Then here's what I'm -- here's what I will do. I will order the part -- go ahead.

MR. COREN: Oh. I'm sorry, Your Honor. I was going to just address the timing. I would think since they're raising this unique issue, we ought to hear what they have to say first and then respond to it.

MR. WEISBERG: 21 days, Your Honor?

THE COURT: I think -- I think what I -- I think what I'm implying Mr. Coren to say, is he'd like to see your brief first.

MR. COREN: Simply stated, yeah.

MR. WEISBERG: Oh. Maybe --

THE COURT: I don't know. I don't know that I --

MR. WEISBERG: At least you're --

THE COURT: -- I don't know that I need that, but here's what I will do. I would ask the parties to file their post-trial briefs no later than September 29. There'll be simultaneous submissions, not to exceed 20 pages double spaced. I would ask that the brief to the extent it's greater than 10 pages, have a table of contents and a table of authorities.

I will also allow the parties, to the extent that they believe that there is anything raised in those

supplemental briefs that need to have a rebuttal, to have that filed no later than Monday, October the 6th. Not to exceed five pages, single space -- or double spaced.

I have -- the reason why I'm putting rather strict page limits is, I do have pretty extensive briefing from the parties on a lot of the issues coming in. So I don't need those rehashed. But there are some unique issues here because the trustee is asking for both approval of the 9019 and entry of a judgment against SeeCubic. And then there's these issues around whether or not the trustee -- or the counterparty to the estate has authority to enter into the settlement agreement.

All, so any questions?

MR. WEISBERG: I brought -- I'm sorry, Dan.

MR. RINK: Please, go ahead.

MR. WEISBERG: No, no, no. Age before beauty.

MR. RINK: Your Honor, would it be possible to request a brief oral argument somewhere in this process?

THE COURT: When you say brief, what do you mean? I mean, if you're doing, if we're doing essentially 35 pages of briefing, how much more oral argument do the parties think I would need?

MR. COREN: None. If Your Honor needs it, you'll tell us.

MR. RINK: Well, no more than 30 minutes.

THE COURT: Okay. All right.. I can -- all right.

I'll give you all a date after October the 6th. It'll be pretty quickly after October the 6th for a brief, and it will be brief, limited to 30 minutes either side of oral argument. That can be done in person or via Zoom. Because it will only be oral argument, there'll be no witness testimony. The record is closed. So there's no, we're not -- I'm not taking additional evidence.

MR. WEISBERG: Would Your Honor like a -- the declarations that Mr. Coren had pointed out that Mr. Rajan had filed, and he indicated on the signature line the debtor instead of VSI. Would like that corrected? You got it? All right.

THE COURT: I'll take them in as they are.

MR. WEISBERG: Okay.

THE COURT: I understand the testimony --

MR. WEISBERG: Okay.

THE COURT: -- so.

All right. Any other questions from the parties?

MR. COREN: No, Your Honor.

THE COURT: Okay. All right. So we will -- we'll enter a docket entry with those deadlines. It won't have the -- it won't have the itemization of the written materials that I put on the record. It will just say with the limitations set on the record. So you'll see that probably later tomorrow.

And then I will get you all a oral argument date

after the 6th. And I'll just put that on the -- I'll just put that on the docket as well. And it, like I said, it will just be a Zoom argument. The parties are welcome to come into court, but they don't have to.

MR. WEISBERG: Thank you for that, Your Honor.

THE COURT: All right. Are there any other -- are there any other matters that require my attention related to Stream TV at this time, other than the rescheduling of the motion to withdraw?

MR. WEISBERG: No. You're good.

THE COURT: Okay. I hear no response. The Court will stand in recess until tomorrow morning at 10 a.m. or the call of the Clerk, whichever is earlier.

MR. WEISBERG: May we all be excused?

THE COURT: Me?

MR. WEISBERG: Yes.

THE COURT: Are we off the record?

MR. WEISBERG: Yes.

THE CLERK: Not yet.

MR. WEISBERG: Oh.

THE CLERK: I -- Your Honor --

MR. WEISBERG: Whose is this?

MR. RINK: That's how we end it.

(Proceedings adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

John Buckley

John Buckley, CET-623
Digital Court Proofreader