**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (DJB) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (DJB) |
| Debtor. | (Jointly Administered) |

**LEWIS BRISBOIS BISGAARD & SMITH, LLP'S RESPONSE TO THE OBJECTION OF
WILLIAM HOMONY CHAPTER 11 TRUSTEE TO THE SIXTH REQUEST FOR
PAYMENT ON ACCOUNT FOR COMPENSATION AND REIMBURSEMENT OF
EXPENSES OF LEWIS BRISBOIS BISGAARD & SMITH LLP FOR THE PERIODS
DECEMBER 1, 2023 THROUGH DECEMBER 31, 2023 AND JANUARY 1, 2024
THROUGH JANUARY 15, 2024 AND THE FINAL APPLICATION OF LBBS FOR
ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF
EXPENSES FOR THE PERIOD FROM MARCH 15, 2023, THROUGH JANUARY 15, 2024**

Lewis Brisbois Bisgaard & Smith, LLP ("LBBS") files its response (this "Response") to

the *Objection of William Homony, Chapter 11 Trustee to the Sixth Request for Payment on Account*

*for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP*

*("LBBS") for the Periods December 1, 2023 through December 31, 2023 and January 1, 2024*

*through January 15, 2024*, ("Sixth Fee Request"[2]) *and the Final Application of LBBS ("Final*

*Application"[3]* together with the Sixth Fee Request, the "Final Fee Application") *for Allowance*

---

[1]      The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV
Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009
Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2]      Docket No. 722. Lewis Brisbois Bisgaard & Smith, LLP, after speaking to Chambers, will provide the Court
with the documents corresponding to all referenced docket numbers in the Response and will do so shortly after the
filing of this Response during the week of September 29, 2025.

[3]      Docket No. 723.

*and Payment of Compensation and Reimbursement of Expenses for the Period from March 15,*
*2023, through January 15, 2024* (the "Objection") (Docket No. 808).  In support of this Response,
LBBS respectfully represents as follows:

## I.   PRELIMINARY STATEMENT

1.      In his Objection to the Final Fee Application, William A. Homony, in his capacity
as the chapter 11 trustee (the "Chapter 11 Trustee") in these cases (the "Chapter 11 Cases") seeks
the "disallowance in full of or, at a minimum, a substantial reduction of the fees and expense
reimbursement sought by LBBS," based upon an unsupported and specious claims of "sordid and
conflicted relationships between LBBS, VSI, and Rembrandt, untimely and inadequate disclosures
by LBBS," and "other wrongdoing on the part of LBBS."  Objection at ¶ 14.

2.      As set forth below, these allegations are not based in fact and are easily contradicted
by the record.  For the following reasons, the Chapter 11 Trustee's Objection should be denied in
its entirety:

- First, Judge Coleman entered a final order approving the retention of LBBS following (a) comprehensive discussions with the U.S. Trustee (the "U.S. Trustee") and (b) timely, adequate, and complete disclosures by LBBS (*see* Docket No. 184);

- Second, the U.S. Trustee and LBBS worked closely together to negotiate a stipulation that resolved all of the U.S. Trustee's objections to the Final Fee Application (Docket No. 779);

- Third, Judge Chan approved the stipulation between the United States Trustee and LBBS by an order entered on October 31, 2024 (Docket No. 779);

- Fourth, the Bankruptcy Code and Third Circuit precedent require this Court to review the Final Fee Application on a prospective basis, not using the hindsight approach advocated by the Chapter 11 Trustee which has been overruled by the United States Supreme Court and abrogated by statute;

- Fifth, the Chapter 11 Trustee's generalized (or *Gestalt*) Objection to the Final Fee Application does not meet the standards for fee objections in bankruptcy cases under Third Circuit precedent; and

- Sixth, there is no conflict which disqualifies LBBS as all connections and

relationships were fully and timely disclosed and such status approved by the parties to the case, including the United States Trustee and the Court.

Each of the Objections now made by the Chapter 11 Trustee is completely devoid of merit. The Chapter 11 Trustee knows or should know that LBBS has made a fulsome disclosure of the relationship between the Debtors, VSI, and Mr. Rajan. Mr. Zahralddin, on behalf of the firm, made three separate disclosures in support of the LBBS retention application in consultation with the United States Trustees.[4] How much of this relationship was required to be disclosed to support the LBBS retention application was explicitly vetted with the United States Trustee and those disclosures resolved any remaining objections or concerns regarding the LBBS retention.

3.      Not only did LBBS's prior disclosures adequately address non-debtor entities owned by Mr. Rajan and his family, the record is replete with documents that explain the reason for their creation. Notably, the Disclosure Statement and Plan of Reorganization (with accompanying Restructuring Support Agreement filed in these cases on July 13, 2023, (Docket No. 293) described in detail why those entities were created. Prior to the filing of the plan, the lengthy history of the dispute between the parties who supported the founders, Mr. Rajan and his family, and the parties who supported SeeCubic, Inc.("SCI") and opposed to the Rajan family, was detailed in multiple filings. Mr. Rajan, for example, filed a 391-page declaration in support of the bankruptcy filing with supporting exhibits that included a description of the corporate structure of the Debtor, including the ownership structure. *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and TechnoVative Media, Inc. Chapter 11 Petition, Supporting Emergency*

---

[4] The firm submitted three separate disclosures related to the LBBS Retention Application pursuant to sections 328 and 1103(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The original Declaration was dated April 3, 2023 (Docket No. 70-1) (the "Original Declaration"), the first supplemental Declaration was dated April 28, 2023 (Docket No. 180) and second supplemental Declaration (the "Supplemental Declarations") was filed December 7, 2023 to address prior representation of Stream by Scott Cousins, a then newly arrived partner at LBBS.

*Relief, and First Day Motions,* (Docket No. 48) paragraphs 22-24, and Exhibit E. Another indication of the lack of merit to the Chapter 11 Trustee's allegations is that the primarily *ad hominem* attack on LBBS and its partners, as "insiders" of the Debtor, is a clumsy attempt to create a relationship where none exists. The Bankruptcy Code's definition of who is an "insider" in relation to a debtor corporation makes it plain that LBBS is not an insider.[5]

4.    The Chapter 11 Trustee's purported objections based on the Court's original approval of LBBS's application to be appointed Debtors' counsel would require this Court to imagine a "sordid conflict of interest" that never existed. See *Response of the Debtors, Stream TV Networks, Inc., and TechnoVative Media, Inc. to Hawk Investment Holdings Ltd.'s Objection to Debtors' First Fee Application*, Docket No 446 ("Debtor's Response to Hawk Fee Objection"). In Mr. Zahralddin's Supplemental Declaration dated April 28, 2023, for example, he made ample disclosure of not just his prior firm's representation of Visual Technologies, Inc. ("VTI"), but also of Mr. Rajan's ownership interest in that company. This was reviewed by the United States Trustee, which then discussed the retention application with LBBS, resulting in the resolution of all objections by the United States Trustee, and resulted in an approval by Judge Coleman, which approval was not appealed. There was no disclosure of Visual Semiconductor, Inc. in the retention

---

[5]    (31) The term "insider" includes— (A) if the debtor is an individual— (i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control; **(B) if the debtor is a corporation— (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor**; (C) if the debtor is a partnership— (i) general partner in the debtor; (ii) relative of a general partner in, general partner of, or person in control of the debtor; (iii) partnership in which the debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the debtor; (D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor; (E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and (F) managing agent of the debtor.

11 USC § 101(31) (emphasis added).

application because there has never been any illicit payment agreement, or any agreement for that matter for payment by a third party, as was disclosed in response to another frivolous fee objection filed by the Hawk against LBBS, which was withdrawn[6] after the objector was presented with a request for sanctions and fee shifting under 28 U.S.C. § 1927 and a violation of Rule 9011. See Debtor's Response to Hawk Fee Objection, Docket No. 446.

5.      The fact that VSI was a plan proponent and was underwriting and backstopping a rights offering in a plan does not amount to an illicit and hidden third party agreement to pay for any fees. VSI's role in these cases is evident in the record of this bankruptcy and spelled out in at least four major documents. These documents are: (1) the Disclosure Statement [D.I. 293] (defined below); (2) the *Declaration of Mathu Rajan in Support of Debtors' Opposition to Hawk Investment Holdings Limited's Supplement to Motion to Compel Discovery and Impose Sanctions for Failure to Comply* [D.I. 326]; (3) the *Debtor's Post-Trial Brief in (I) Opposition to Motion of Hawk Investment Holdings Ltd. Pursuant to Section 1112(b) of the Bankruptcy Code Either (A)(1) to Dismiss the Debtors' Chapter 11 Cases or (2) to Convert Such Cases to Cases Under Chapter 7 or, (B) in the Alternative, Pursuant to Section 1104(a) of the Bankruptcy Code to Appoint a Chapter 11 Trustee; and (II) in Opposition to Emergency Motion for Relief From Stay Filed by Hawk Investment Holdings, Ltd.* [D.I. 432]; and (4) *Debtors' Post-Trial Reply Brief* [D.I. 437].

6.      The Chapter 11 Trustee's purported objections calling into question the merits of the Disclosure Statement and Plan of Reorganization (with accompanying Restructuring Support Agreement) for which LBBS advocated on behalf of its client, the Debtors, are marked by the

---

[6] *Motion to Approve Entry of a Stipulated Order Settling Objections to Fee Applications, Objection to Retention of CFO by the Debtors, and Continuance of Matters Filed by Stream TV Networks, Inc.,* Docket No. 510 and *Stipulation And Order Regarding Settling Objections To Fee Applications, Objection To Retention Of CFO By The Debtors, And Continuance Of Matter*s, Docket No. 516.

same apparent unfamiliarity with, or conscious disregard for, the documents of record in these
chapter 11 cases. Though completely ignored by the Chapter 11 Trustee, the Disclosure Statement
and Plan of Reorganization described the basic terms of a deal that would have infused Stream TV
with $144,000,000 in financing from Visual Semiconductors, Inc. ("VSI") as needed to fulfill two
product orders totaling $160,000,000 and thereby generate revenues sufficient to pay off all
secured creditors and provide a substantial recovery for unsecured creditors. The Plan, if
approved, would have also secured a payment of $31,500,000 for shares in the reorganized Debtors
which would have allowed the Debtors to negotiate a resolution with their secured creditors and
deliver a 50% recovery to unsecured creditors. The Plan even provided for an opportunity to
participate in the rights offering in the plan, which was being backstopped by VSI, and which was
being used to fund an exit facility for the Debtors.

7.      Notably, and in furtherance of the proposed Plan of Reorganization, VSI hired its
own counsel (Akerman LLP) and a special board committee was formed to ensure that all
negotiations between the Debtors and VSI were kept at arms-length and not controlled by Mr.
Rajan.

8.      The Chapter 11 Trustee also attempts, in vain, to criticize LBBS for coordinating
with counsel for VSI and Rembrandt in development of the proposed Plan of Reorganization and
other matters related to it. This objection ignores the fact that Stream TV, VSI and Rembrandt
were parties to a Common Interest Agreement – a perfectly ethical and common arrangement –
and that the coordination among counsel was exactly what one would expect under such an
agreement, particularly in the context of the negotiation of a bankruptcy plan. It should also be
noted that that the "secured" creditors, Hawk and SCI, in Stream TV were given the opportunity

to be made parties to the Common Interest Agreement and negotiate the terms of the bankruptcy plan, but declined.  *See* Disclosure Statement [Docket No. 293] at 14, n.5.

9.     Furthermore, without a creditors' committee in the case, having the largest unsecured creditor participate and support a plan, is not an exotic result,.  Rembrandt was also part of a critical licensing dispute, which the plan and settlement resolved.  Resolving the intellectual property disputes gave comfort and was a critical to willing funding for production of the glasses free televisions.

10.     The Hawk parties were ardently opposed to the Debtors' plan and declined anything but a lump sum payment of the face value of their contested "secured" claims, or the technology, even at the expense of not being paid. These were impractical solutions and would result in a complete decimation of any recovery for the unsecured creditors.  Because the Hawk parties included not only Hawk, SLS, and SCI, but also former shareholders of Stream, this was also problematic from the point of view of the absolute priority rule.  Even more compelling is the fact that the settlement agreement was in the same form and substance, it was almost identical to a settlement signed by Shadron Stastney when he was the CFO of Stream. Absent gamesmanship or outright deceit, it would be logical that the Debtors and their advisors hoped that reaching the same resolution with Rembrandt that the CEO of SCI, Inc. reached would not be controversial.

11.     More importantly, in order to fulfill the purchase orders, Stream had to clean up the intellectual property licensing dispute with Rembrandt.  Stream also had still not been given back its assets, and without its manufacturing equipment, inventory, or access to its foreign subsidiaries where small scale production for demonstration samples were made, which prompted the bankruptcy filing, the Debtors, VSI, and Rembrandt came up with a solution based on a plan of

reorganization. The Hawk parties objected to almost all relief sought by the Debtors related to the fulfillment of the pending purchase orders. *See* Debtor's Response to Hawk Fee Objection. The arrangement with VSI brought financing, both exit and operating, and supply chain financing, including a customer willing to provide manufacturing capability in order to have its purchase order fulfilled.  There is nothing sordid about wanting to produce TVs to begin to pay the Debtors' creditors, including the "secured" creditors, and the unsecured creditors, many of which would have either been critical vendors or assumed executory contracts.

12.     Finally, the Trustee attempts to lay blame on Lewis Brisbois for delays and, at times, the need to amend and supplement Stream TV's Monthly Operating Reports required to be filed under the Bankruptcy Rules. Perhaps most importantly for purposes of this fee application, LBBS and the United States Trustee already specifically addressed any perceived inefficiencies in LBBS's time entries associated with the MOR's in their settlement of the Trustee's objection to LBBS's fee application. The United States Trustee specifically referenced the MORs and related time entries (and a few entries related to work that, in their estimation, should have been done by a financial advisor) as the explicit basis for the negotiated reduction. These negotiations resulted in a stipulation resolving the objections of the United States Trustee in the full to the final fee application of LBBS.

13.     Despite the fact that LBBS resolved the issue with the United States Trustee over the MORs and other reporting deficiencies, LBBS feels it is necessary for the Court to understand the circumstances underlying the reporting and the alleged LBBS delays. The Chapter 11 Trustee chooses to ignore all that was occurring as those MOR's became due for filing. Shortly after the cases were filed, Mr. Rajan, who was the only remaining employee of the Debtor, was diagnosed with leukemia.

14.     Further, the Debtors, under LBBS's advice and counsel, applied for Court approval to re-hire former Stream employees (the "Employee Motion"). Through no fault of LBBS, the Employee Motion was continued by the Court thirteen (13) times and was not heard until November 15, 2023. The Debtor was stymied in its efforts to bring its employees back to the Company to fulfill the above-mentioned purchase orders, stabilize the company's operations, preserve customer relationships, and keep its proprietary know-how intact. Ultimately, the Employee Motion was withdrawn as Judge Coleman ruled in Court that the employment motion was in the ordinary course.

15.     Given Mr. Rajan's medical condition and ties to VSI, LBBS also acted prudently on the Debtors' behalf by moving for authorization to retain an independent CFO, Thomas Jo Hung Park, to oversee the companies' financial operations. This motion was filed on June 14, 2023, but was not decided until January 10, 2024, the date on which Judge Coleman executed an Order authorizing Mr. Park's retention. Mr. Park would have been the point person for the MORs and any other reporting. This is a seven month delay.

16.     Finlly, the Debtors' books and records were never fully returned to the Debtors by SCI, which hampered its ability operate in the normal course. All of the foregoing events had an impact on the Debtors' ability to timely file their MOR's (and meet other filing obligations).

17.     Two important facts must be noted, first, and as described in paragraph 11 above, LBBS moved swiftly and prudently to stabilize the Debtors' work force, operations, and independent management. However, through no fault of LBBS, some of the standard early stage milestones in a chapter 11 case were not timely addressed by the Court. Compounding these delays was the relentless litigation initiated by a competitor of the Debtors (who had also failed in a hostile

takeover bid), and that competitor's interference with the Debtor's foreign subsidiaries and vital equipment. The competitor's conduct was ultimately found to be so egregious that the Court entered a TRO against the competitor.

18.     As was related in the Debtors motion for a temporary restraining order, the above-mentioned competitor pursued collateral litigation in the Netherlands which succeeded in undermining the Debtors' access to its intellectual property and infringed its existing licenses. This was done in direct contravention of Judge Coleman's admonishment to the competitor not to take any such action without court approval. After months of hearings, the Court issued the TRO to protect the Debtor's intellectual property rights under all the Debtors' licenses, whether directly or through subsidiary licenses as a third party beneficiary. These licenses are the subject of the Licensing Covenant, and the subject licenses underpinned the Debtor's Ultra-D technology. To state that this case was unusual is an understatement.

19.     The Chapter 11 Trustee's Objection quotes at the Court's criticism of the Licensing Covenant and the benefit that it gave to VSI. The Trustee's insinuation that LBBS advocating for the Licensing Covenant was corrupt is factually wrong, and legally unsupported as the decision to enter that agreement was well within the Debtors business judgment, and consistent with its exclusivity rights, at the time the Licensing Covenant was executed. The very acts that lead to the TRO were being carried out are the "origin story" of the Licensing Covenant.

20.     Second, any perceived issues with the thoroughness and/or accuracy of the MOR's were discussed and resolved among LBBS and the United States in the stipulation resolving all their issues with the MORs. After the appointment of the Chapter 11 Trustee, the United States Trustee withdrew the motion to dismiss the bankruptcy cases that it had filed, without prejudice,

asked for more time to review the fee application, and ultimately resolved the MOR issues and other deficiencies in its negotiations with LBBS over the final fee application.

21.    LBBS is the largest known administrative creditor in this case.  In its view, each of the foregoing facts begs the question as to why the Chapter 11 Trustee would seek, without support, the "disallowance in full of or, at a minimum, a substantial reduction of the fees and expense reimbursement sought by LBBS."  Objection at ¶ 14.  LBBS submits there are at least three possible explanations for the Chapter 11 Trustee's conduct:

- First, for some undisclosed reason, the Chapter 11 Trustee and his professionals hold a level of acrimony towards LBBS that is inconsistent with his fiduciary duty to all creditors (including LBBS which is the holder of the largest administrative claim in these Chapter 11 Cases), particularly given the Court's approval of a final order authorizing the retention of LBBS as counsel to the Debtors and the additional disclosures make by LBBS in response to its the dialogue with the U.S. Trustee, which dialogue is typical between the U.S. Trustee and estate professionals, not least of which because the estate balances making required disclosures with avoiding unnecessary expense;[7]

- Second, the Chapter 11 Trustee's professionals have undertaken a wasteful task of objecting to LBBS' Final Fee Application that provides no benefit "at the time at which the service was rendered" to the Chapter 11 Cases (other than to benefit the Chapter 11 Trustee's professionals), especially given the review and agreement with the U.S. Trustee, the party with the actual statutory obligation to review professional fees;[8] and

---

[7]    Of course, the Chapter 11 Trustee is held to "high fiduciary standards of conduct," *In re Consolidated Bancshares*, 785 F.2d 1249, 1255 (5th Cir. 1986), with a concurrent "obligation of candor to the court and fiduciary obligations to the estate." *In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989) (citations omitted); "Trustees and attorneys for trustees are held to high fiduciary standards of conduct." *In re Marvel Entm't Grp.,* 140 F.3d 463 (3d Cir. 1998) at 474.

[8]    *See* 11 U.S.C. § 330(a)(3)(C) ("In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including . . . whether the services were necessary to the administration of, or *beneficial at the time at which the service was rendered* toward the completion of, a case under this title. . . .") (emphasis added).

- Third, if these Chapter 11 Cases are administratively insolvent (as acknowledged by counsel to the Chapter 11 Trustee), the only way for the Chapter 11 Trustee to sustain these cases is to delay the payment of the administrative claims of LBBS as set forth in the Final Fee Application.

22.    The Chapter 11 Trustee's assertion that these cases were filed in bad faith is rebutted conclusively by the fact that Judge Coleman did not dismiss or convert these cases, which would have been a proper judicial response to a bad faith filing.  Instead, the Court continued these cases with the appointment of a chapter 11 trustee, and the case remains active to this date.  This fact cannot be reconciled with the assertion of a bad faith filing.

23.    In sum, LBBS believes that once the evidentiary record has been established that it will be clear to the Court that the Objection was filed for an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase litigation costs," Fed. R. Bankr. P. 9011(b)(1), and designed to "multipl[y] the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927.  As such, LBBS requests that that this Court enter an order sanctioning the conduct of the Chapter 11 Trustee and his professionals, including paying for all costs of defending the Final Fee Application.  As is argued and articulated in detail below, the United States Supreme Court in *Baker Botts L.L.P. v. ASARCO LLC* held that such sanctions are exactly the remedy when frivolous fee objections are filed against estate professionals.  There is no doubt that the Chapter 11 Trustee's objection herein is frivolous and filed for several improper purposes.  Most likely, the motivation for the objection is the Chapter 11 Trustee's desire to get paid for his and his professional's own

---

The fees paid the Chapter 11 Trustee's professionals are paid by the estate, and "overpayments diminish the pot ultimately to repay creditors."  *In re Consolidated Bancshares*, 785 F.2d 1249, 1255, n.6 (5th Cir. 1986). Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging "meaningful creditor participation in the reorganization process," *Richton*, 15 Bankr. at 855-56 (citation omitted), and "keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." *Lebron v. Mechem Fin., 27 F.3d 937 (3d Cir. 1994)* (citing *Otte v. U.S.*, 419 U.S. 43, 53, 42 L. Ed. 2d 212, 95 S. Ct. 247 (1974).

personal benefit at the expense of LBBS.  This has now been exacerbated by what appears to be

"seller's remorse" in backing SCI, which the Trustee has characterized as follows: "SeeCubic's

bad faith is underscored by its history of financial instability. SeeCubic failed to close the APA on

time due to an inability to raise funds, and in June 2025, a California court entered a $7.5 million

judgment against it." *See* Docket No. 1056-1 at 6.

## II.     BACKGROUND[9]

### A.     The Bankruptcy Court Entered a Final Order Approving
###        the Retention of LBBS after Full and Complete Disclosures by the Firm

24.     On April 3, 2023, LBBS filed its *Application Pursuant to 11 U.S.C. § 327(a) of the*

*Bankruptcy Code for Authority to Employ Lewis Brisbois Bisgaard & Smith LLP as Counsel for*

*the Debtors* (Docket No. 70) (the "LBBS Retention Application").  As set forth more fully in the

Zahralddin Declaration, filed herewith, LBBS was retained as counsel to the Debtors and its

engagement approved on an hourly basis following the entry of the LBBS Final Retention Order

by the Bankruptcy Court.[10]   Zahralddin Decl. at ¶ 40.   The LBBS Retention Application

specifically averred that LBBS is a "disinterested person," as that term is defined in section 101(14)

of the Bankruptcy Code, in that, except as otherwise disclosed herein, LBBS and its attorneys: (a)

---

[9]      Additional factual background related to the Chapter 11 Cases is set forth in the *Declaration of Rafael X. Zahralddin-Aravena in Support of Objection of William Homony, Chapter 11 Trustee to the Sixth Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, for the Periods December 1, 2023 through December 31, 2023 and January 1, 2024 through January 15, 2024* (the "Zahralddin Declaration").  *See* Exhibit A.

[10]     Capitalized terms used in this Response but not otherwise defined herein shall have the meanings ascribed to such terms in the Zahralddin Declaration.

*are not creditors, equity holders, or insiders of Debtors. . . .*"[11]  LBBS Retention Application at ¶ 2 (emphasis added); *see also* Zahralddin Decl. at ¶ 38

25.     The retention application and any revisions to the firm's disclosures were the subject of extensive and cooperative negotiations with the U.S. Trustee and resulted in a final non-appealable order to retain LBBS.  Zahralddin Decl. at ¶ 39.  Nothing in the Objection reveals any new information regarding the status of LBBS as disinterested when it was counsel to the Debtors or otherwise cast doubt on the Court's final decision authorizing the retention of LBBS.

**B.    The U.S. Trustee's Objections to the LBBS Final Fee Application were Resolved**

26.     On August 28, 2024, LBBS filed the Final Fee Application.[12]  The Final Fee Application conforms with the requirements of section 330(a)(3) of the Bankruptcy Code and Rule 2016(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), setting forth the time expended, the rates charged for such services, professional services rendered under the categories of service governed by Local Rule 2016-2(e), and the expenses incurred.  Zahralddin Decl. at ¶ 58.

27.     Following the submission of the Final Fee Application, LBBS communicated frequently with the U.S. Trustee regarding scheduling and extensions of time for the U.S. Trustee to review and object to the Final Fee Application.  Zahralddin Decl. at ¶ 59.

28.     After a thorough review of the Final Fee Application by the U.S. Trustee and further discussions with LBBS, the U.S. Trustee and LBBS reached an agreement to reduce the

---

[11]     While the Objection refers to LBBS being an "insider" of the Debtors, Objection at ¶ [8], as set forth in the LBBS Retention Application, neither LBBS nor its attorneys are insiders of Debtors within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 101(31). Moreover, the relationship between the Debtors, Visual Semiconductor, Inc. ("VSI") and Mr. Rajan have been fully, and repeatedly disclosed. *See* Zahralddin Decl. at ¶¶ 16 and 20 .

[12]     Additional factual background related to LBBS' monthly and interim fee applications is set forth in the Zahralddin Declaration. *See* Zahralddin Decl. at ¶¶ 49-57.

compensation amount of LBBS by $235,226.00, which is a reduction of over 8% of the total fees. LBBS also agreed that it would not seek any additional allowance beyond the aggregate sum of $2,692,933.00 for professional services and $49,799.10 for reimbursement of expenses, for a total aggregate sum of $2,742,732.10 (the "Reduced Compensation Request"). Zahralddin Decl. at ¶ 60.

29.    Notably, the United States Trustee indicated it had done a fulsome review of the LBBS Final Fee Application and expressed no issues with the clarity of LBBS's time entries. This stands in stark contrast to the baseless assertions in the Objection, which inexplicably states in four different instances that it couldn't perform the review because the entries were too vague. *See* Objection, at paragraph 41, 93, 100, and 101. Of importance to rebutting the Chapter 11 Trustee's baseless assertions in the Objection, the United States Trustee asked for an extension of time to do a detailed review of the Final Fee Application and then found no deficiency. *See* Docket No. 779.

30.    The likely explanation for the inability of the Trustee and particularly Mr. Coren who was "tasked" with the fee application review, to articulate a serious basis to object is either the entries are not vague, but Mr. Coren has an absolute lack of experience in both bankruptcy and the review of fee applications, or the position is dishonest gamesmanship and an intentional abdication of the Chapter 11 Trustee's fiduciary obligations.

### C.    The Administrative Insolvency of the Chapter 11 Cases

31.    As set forth more fully in the Zahralddin Declaration, the Chapter 11 Cases are administratively insolvent. Zahralddin Decl. at ¶[61]. Indeed, the Chapter 11 Trustee's counsel, Michael Vagnoni, responded that the case has always been administratively insolvent. *Id.* LBBS should not be forced to finance the Chapter 11 Cases if the Chapter 11 Trustee cannot pay administrative creditors in full and on time and if he is using the Objection to delay the payment of the Final Fee Application. It is telling that the Chapter 11 Trustee's professionals have not filed

163701904.1

- 15 -

one disclosure as to fees and quickly settled a matter with Raja Rajan, the brother of Mathu Rajan when threatened with a request to disclose what has been spent by the Chapter 11 Trustee in these cases. *See* Docket Nos. 28, 33, 34, and 37.

### III.   ARGUMENT

####   A.   The U.S. Trustee is "Watchdog" Over Professional Retention Applications

32.   The U.S. Trustee is often seen as a "watchdog" of the bankruptcy system, ensuring compliance with the Bankruptcy Code.  *In re Fleming Companies, Inc.,* 304 B.R. 85 (2003)).  As part of the "watchdog" responsibility, the U.S. Trustee monitors professional retention applications. The U.S. Trustee Manual states in relevant part that "[p]ursuant to 28 U.S.C. § 586(a)(3)(I), the USTP has an important responsibility to review applications in chapter 11 cases to employ law and other professional firms ("professional firms") that will seek payment from the bankruptcy estate." United States Trustee Manual Volume 3 at page 99. The U.S. Trustee Manual further states:

> Although all parties in a case may object to the adequacy of a professional firm's disclosures and to a professional firm's retention because of potential or actual conflicts, it is usually only the USTP that makes inquiries or files objections. Our role as the 'watchdog' of the bankruptcy system is to faithfully read and apply the Code and Rules and to raise issues that we have identified so that the court may make the ultimate determination on a professional firm's employment. Id.

The U.S. Trustee Manual provides detailed instructions regarding the types of disclosures required. It also notes that the United States Trustee must grapple with an "increasingly complex profile of professional firms subject to the disclosure and conflict provisions of 11 U.S.C §§ 327 and 1103 and Fed. R. Bankr. P. 2014." It states that these market conditions "makes both our review of employment applications and the court's decision on such applications more challenging." *Id*. Finally, the United States Trustee Manual notes that it is within the "discretion" of the United

States Trustee personnel to make further inquiries and request expanded disclosure in order to review a retention application. *Id.*

33.     Not surprisingly, that is exactly the process followed by LBBS and the United States Trustee during the LBBS retention application process which resulted in a request for more disclosure following discussions with the United States Trustee. The process culminated in an approved retention order for LBBS which included the appropriate finding by Judge Coleman that LBBS was disinterested. Docket No. 185.  **This is a final non-appealable order.**

34.     The Chapter 11 Trustee and his counsel attempt to relitigate the LBBS retention, Judge Coleman's order and findings of fact regarding LBBS and its status as a disinterested party. Notably, the Objection omits the supplemental disclosures made by Mr. Zahralddin, each of which was a result of the discussions with the United States Trustee.  This is a material misstatement to the Court. This material misrepresentation is a central aspect of the Chapter 11 Trustee's "argument" and makes their fee objection frivolous and, thus, sanctionable.

**B.      The U.S. Trustee is a "Watchdog" Over Professional Fee Applications**

35.     Another area in which the U.S. Trustee has primary responsibility as a "watchdog" of the bankruptcy system is ensuring compliance with the Bankruptcy Code regarding professional fees.  Pursuant to the U.S. Trustee Manual, "28 U.S.C. § 586(a)(3)(I) specifically requires the U.S. Trustee to monitor employment applications and, when appropriate, to file with the court comments with respect to the approval of such applications."   United States Trustee Manual Volume 3 at page 92.   Pursuant to 28 U.S.C.A. § 586(a)(3), the U.S. Trustee may review applications for compensation and reimbursement of expenses whenever deemed appropriate and may file comments or objections with the court. Under regulations at 28 C.F.R. Pt. 58, App. A, the U.S. Trustee will review applications in accordance with procedural guidelines and has the discretion to request additional information or to determine whether to file comments or

163701904.1

objections.   In any event, the Chapter 11 Trustee misstates the law in its Objection. The US Trustee's citation in paragraph 23 of its Objection to the US Trustee handbook clearly refers to a fiduciary duty to review the fee applications of its own professionals, not the prior Debtors' counsel, who ceased to be lawyers to the estate upon the release of the Debtor in Possession when the Chapter 11 Trustee was appointed. *See* Objection at paragraph 23.

36.     Even if we were to accept that the Chapter 11 Trustee has a fiduciary obligation to review the fee applications of the prior Debtors' counsel, who ceased to be lawyers to the estate, clearly this is the case in which at minimum there should have been coordination with the Office of the United States Trustee. Counsel for the Debtor had a meeting with the trial lawyers who were assigned to the case who told him that they **had no discussions with the Chapter 11 Trustee or his counsel.** Zahralddin Decl. at ¶ 62. While other parties may object to a professional's fee application, in a case which is administratively insolvent and where the estate professional and the Office of the United States Trustee have previously settled any objection to the Final Fee Application, the motives of the Chapter 11 Trustee and the tactics they have employed suggest that they have self-interested agenda that violates their fiduciary obligations to the estate.

37.     One particular diatribe in the Objection is representative. The Chapter 11 Trustee takes issue with LBBS's representation of the Debtor with respect to its relationship with VSI. The Chapter 11 Trustee alleges that LBBS actively advanced the interest of VSI "at the expense of the Debtors and their estates" but completely misapprehends the reality of the bankruptcy proceedings at the time LBBS was engaged by the Debtors. Rather LBBS advised Debtors in the exercise of their privileged business judgment.

38.     The business judgment rule is used to evaluate the decisions of boards of directors. *Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC)*, 551 B.R. 749, 761 (D. Del. 2016),

*aff'd*, 682 Fed. App'x 125 (3d Cir. 2017).  Under the business judgment rule, a court will not "second-guess the fiduciary's decision as long as it has any rational business purpose, even if the decision ends up being flawed in hindsight." *Id.*  This is because the officers and directors are not the "guarantors of negative outcomes from imperfect business decisions." *Segway Inc. v. Hong Cai, a/k/a/ Judy Cai*, 2023 WL 8643017, at *5 (Del. Ch. Dec. 14, 2023).

39.    The business judgment rule is not a substantive rule of law; instead, the business judgment rule is a presumption that, when making a business decision, the corporation's officers and directors "acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (*overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). To be sure, disinterested business decisions regarding Licensing Covenant are precisely the type of business decisions shielded by the business judgment rule.

40.    On August 14, 2023, the Debtors, VSI, and Rembrandt entered into a Licensing Covenant consistent with the reasons the Court found compelling enough to grant its motion for a temporary restraining order, which the Court granted in late November 2023 but was issued on  January 4, 2024. See Adversary Docket Nos. 28 ("TRO Motion") and 119 ("TRO").  Stream's Ultra-D technology was developed, in part, based on certain intellectual property including a portfolio of glasses-free 3D patents licensed from Philips pursuant to a Technology License Agreement dated December 8, 2011.  The agreement expressly provided Stream a worldwide, non-exclusive, **non-transferable license without the right to grant sublicenses**

41.    Other foundational IP "building blocks" were licensed from Rembrandt 3D Holdings Ltd. ("Rembrandt").  Stream has a technology license from Rembrandt which allows it to use the Rembrandt technology incorporated into Stream's Ultra-D solution. A separate License

Covenant executed on August 14, 2023 specifically prohibited issuing a license of any kind for Rembrandt IP to SCI, Hawk, Stastney himself, SLS, Morton, Crawford, or any associated entity. Even though Stream communicated that limitation to SeeCubic BV ("SCBV") on multiple occasions, SCBV continued to work on non-Stream projects using the Rembrandt IP. Worse still, SCBV refused to identify the projects it was working on. Stastney was an insider of Stream by virtue of his position as a director of Stream and as Stream's chief financial officer. Stastney is currently the managing member of SLS and the chairman and chief executive officer of SCI, the competitor of the Debtor created to destroy the Debtor and leave its unsecured creditors unpaid.

42. As related in the Motion, on June 28, 2023, during the pendency of these bankruptcy cases and despite specific instructions from Judge Coleman to take no action without court approval, Stastney, SLS, SCI, and Hawk proceeded with litigation against Mathu Rajan, Stream's director and CEO, in Amsterdam Court. Defendants succeeded in having Mr. Rajan removed as director of Stream's Dutch subsidiary companies, blocking Stream's ability to direct the research and development activities of its global staff, blocking Stream's access to technology demonstrator units historically used to generate sales and new business development, impacting Stream's ability to fulfill customer orders, and harming Stream's reputation among its investors, customers, and strategic partners.

43. Furthermore, also as detailed in the TRO Motion, Stastney testified during a September 13, 2023, summary proceeding in Amsterdam Court on behalf of plaintiffs there which included himself; SLS; SCI; and Hawk. See TRO Motion, Exhibit D, Declaration of Mathu Rajan in Support of Motion for Temporary Restraining Order ("Rajan Decl."), ¶ 2; Exhibit E, Declaration of Charles M. Robertson in Support of Motion for Temporary Restraining Order ("Robertson Decl."), ¶ 7. Stastney testified that SCI was currently working with twelve or thirteen customers

using the glasses-free 3D technology developed by Stream.  Exh. D, Rajan Decl., ¶ 3; Exh. E,
Robertson Decl., ¶¶ 6, 10.  Stastney further testified that the glasses-free 3D technology is being
or would be sub-licensed to these companies as part of SCI's business model.  Exh. D, Rajan Decl.,
¶ 4; Exh. E, Robertson Decl., ¶ 7.  Stastney also testified that SCI obtained its rights to use Stream's
glasses-free 3D technology **through a sublicense it obtained from Stream's Dutch subsidiary,
SCBV.**  Exh. D, Rajan Decl., ¶ 5; Exh. E, Robertson Decl., ¶ 8.  As noted above, **any issuance of
a sublicense, whether to SCI or its customers, was a direct violation of the technology license
Stream obtained from Philips through Stream's subsidiary, Ultra-D Ventures C.V.**  Exh. D,
Rajan Decl., ¶ 6; Exh. E, Robertson Decl., ¶ 9.  The Philips license, which is foundational to
Stream's glasses-free 3D technology, specifically prohibits sub-licensing.  Id.

44.    That is precisely why Stream's business model is based on the sale of components,
not the licensing of technology.  Exh. E, Robertson Decl., ¶ 9.  SCI's unauthorized use of the
Philips technology, as embedded in the Stream technology, violates the Philips license and presents
potential of irreparable harm to Stream should Philips decide to revoke its license.  Id.

45.    Stastney openly admitted in Amsterdam Court that SCI is in direct competition with
Stream, though it is using a completely different business model; Stream intends to sell
components to its customers, whereas SCI intends to license the technology to its customers.  Exh.
D, Rajan Decl., ¶ 7; Exh. E, Robertson Decl., ¶ 7.  SCI's use of Stream's license from Philips –
and worse still, its intent to issue sublicenses to its customers – presented a serious and immediate
threat of irreparable harm to Stream.  If SCI was allowed to violate Stream's license from Philips,
it was possible that Philips would revoke the license, depriving Stream of the opportunity to use
and monetize its own glasses-free technology in which it has invested in excess of $160 million
over a period of more than ten years.  Exh. D, Rajan Decl., ¶ 9; Exh. E, Robertson Decl., ¶

12. Stastney's open admissions in Amsterdam Court clearly demonstrated the ongoing and unauthorized use of Stream's technology by SCI and underscored the necessity for Stream to obtain injunctive relief.

46. The TRO Motion requested relief because "If Defendants are not enjoined from using Stream's Bankruptcy Assets and from offering the licensed technology and source code to others in violation of the terms of the Philips and Rembrandt licenses, Debtors will suffer irreparable harm; the threatened harm to Debtors outweighs any harm that the temporary restraining order may do to the Defendants; there is a substantial likelihood that Debtors will prevail on the merits of their claims at trial; and granting the temporary restraining order will serve the public interest." TRO Motion, at 7.

47. The TRO Motion specifically asked the Court for an order enjoining Defendants from causing the breach of Stream's glasses-free 3D technology licensing agreements by wrongfully sub-licensing such technology, thereby subjecting Stream to irreparable harm. Stastney had also recently asserted SCI obtained its right to use Stream's glasses-free 3D technology through a sublicense SCI obtained from Stream's Dutch subsidiary, SCBV. Any such issuance of a sublicense, whether to SCI or its customers, is a direct violation of the technology license Stream obtained from Koninklijke Philips Electronics N.V. ("Philips") through Stream's subsidiary, Ultra-D Ventures C.V ("UDV"). The Philips license, which is foundational to Stream's glasses-free 3D technology, specifically prohibits sub-licensing and the Debtors had an obligation to seek judicial relief to enjoin this wrongful conduct.

48. SCI's use of Stream's technology license and its intent to issue sublicenses to its customers presented a serious and immediate threat of irreparable harm to Stream. Stream's licenses specifically prohibit sublicensing, so even if Stream's subsidiary, SCBV, were able to

issue a license on behalf of the parent, it would be breaching the licenses.  The licenses cost Stream over

49.     $10,000,000 in minimum fees and royalties and Stream's competitor, SCI, is effectively taking the technology, which would cause Stream to lose the millions of dollars that Stream has invested in the upfront fees.  If SCI and SCBV had been allowed to violate the terms of Stream's licenses, there exists the possibility that the licensors would revoke the licenses, depriving Stream of the opportunity to use and monetize its own glasses-free technology in which it has invested in excess of $160 million over a period of more than ten years.  Further, as the technology progresses it is not at all clear that Stream would be able to obtain new licenses at all and certainly not on as favorable of terms. Though the license is technically executed by Stream TV's wholly-owned subsidiary, the license is fully usable for any of Stream TV's subsidiary **that it controls.**  Those related entities are called "Affiliates" and that flexibility is very useful for international tax planning options, however, the SCI entities had taken measures to take over the subsidiaries which change of control would invalidate the licenses.

50.     The Court agreed in the TRO Order which included this holding:

> Although there was conflicting testimony at the TRO Hearing regarding whether Mr. Stastney and/or SeeCubic, Inc. intended to sublicense or otherwise transfer the rights under technology licenses held by Stream and/or Stream subsidiaries, including licenses from Koninklijke Philips Electronics ("Philips") and/or Rembrandt, as noted by the Court at the TRO Status Hearing, that testimony is sufficient to cause the Court concern that such activity, to the extent contemplated or intended, **could involve property of a debtor's estate and needed to be enjoined pending the Final Hearing.**

The Court also prohibited the following activity:

> No Defendant shall, prior to the conclusion of the Final Hearing, take any action to sublicense, transfer, assign, or otherwise dispose of or affect any license or technology held or purported to be held by the Debtors' estates, including but not limited to the Ultra- D technology, and the Philips or Rembrandt licenses.

The Court was clear in its order, and TRO hearings were held over multiple days, weeks, and such hearings were evidentiary hearings, which was not the result of the Debtors actions but of the heavy litigation tactics used by the SeeCubic parties.

51.     It is clear that the Debtors and their counsel were protecting fundamental assets of the Debtors by entering into the Licensing Covenant because Mr. Stastney and his company circumvented the automatic stay, and continued to pursue any angle they could in order to control the Debtors' technology to their commercial benefit and to the detriment of the estate and its unsecured creditors.  It even says as much in the recitals to the Licensing Covenant:

> WHEREAS, Stream has filed for bankruptcy in the Eastern District of Pennsylvania (Case No. 23-10763); and has filed a Disclosure Statement (Docket Entry 293) on July 13,2023 that **describes plan for VSI to provide funding to Stream;**
>
> WHEREAS, the VSI Parties understand that the current Settlement Agreement includes a non exclusive license from Rembrandt to Stream, the VSI Parties **want the plan for reorganization to have an optimal chance of success** and to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors, and shareholders of Stream;
>
> WHEREAS, the VSI Parties would like to enter into a Licensing Covenant with Rembrandt to prevent **certain lenders, creditors, and shareholders of Stream attempting to commercialize the technology and products developed by Stream**;

Licensing Covenant (emphasis added).

52.     It is important for the Court to note that the former insiders of the Debtor who staged a takeover through a foreclosure by agreement, which was invalidated because it conflicted with the company charter, are the purported lenders, shareholders, and creditors whose actions were detailed in the TRO Motion and in the TRO.  The "secured" lenders signed conversion

agreements to convert their secured loans ***back*** to shares, once new money came into the company to encourage further investment, because they had begun as shareholders. The conversion agreements were relied upon by other later investors who would have never invested had it not been for the existence of those conversion agreements to reduce the debt the company was carrying. Many of these same shareholders funded the litigation against the Debtors in this bankruptcy court and in the appeal in Delaware which overturned the decision that gave them all of the Debtors' assets.

53.     At the time of the entry by the Debtors into the Licensing Agreement, and protected both by the Debtors Business Judgement and the Debtors rights to exclusivity, wanting to preserve funding sources for its plan to allow it to fulfill the production orders it had in hand and needing to preserve the technology which was not only important to its proposed plan, but was the most valuable asset in the company is not only not a violation of the Debtors' fiduciary obligations, but a valid exercise of its fiduciary duties.

### C.     Fee Applications Must Be Reviewed Prospectively

#### 1.     The Majority Rule:  The Prospective Approach

54.     The majority rule in the United States is that professional fees must be assessed using a prospective analysis that considers whether the services were "reasonably likely to benefit the estate" at the time they were performed, and "is an objective test based on the services that a reasonable lawyer would have performed in the same circumstances." *In re Broughton Ltd. P'ship*, 474 B.R. 206 (Bankr. N.D. Tex. 2012).

55.     The majority rule is consistent with the plain language of the 1994 amendments to section 330(a) of the Bankruptcy Code which directs Bankruptcy Courts to consider "whether the services were necessary to the administration of, or beneficial *at the time at which the service was*

*rendered*" in determining fee compensation.  11 U.S.C. § 330(a)(3)(C) (emphasis added).  The

temporal language in § 330(a)(3)(C) was added by the 1994 Amendments to the Bankruptcy Code.

Additionally, section 330(a)(4)(A)(ii) of the Bankruptcy Code requires a Bankruptcy Court to

disallow compensation for services "not reasonably likely to benefit the debtor's estate."  11

U.S.C. § 330(a)(4)(A)(ii).  Read together, the plain language of these texts forecloses the use of a

retrospective, material benefit standard.

### 2. Third Circuit Rejects the Hindsight Approach to Fees and Adopts the Prospective Approach

56.  In 2000, the Third Circuit rejected the "actual benefit" standard concluding that

such a standard departed from the statute by imposing a "heightened standard" and requiring

evaluation "by hindsight."  *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131-32 (3d Cir. 2000),

*overruled on other grounds, Lamie v. United States Tr.*, 540 U.S. 526 (2003).  In *Top Grade*, the

Third Circuit rejected and overturned both the Bankruptcy Court and District Court which had

ruled and affirmed, respectively, that a law firm had to show an actual benefit to the estate to

recover fees, holding:

> We do not agree . . . .  We will, therefore, adopt the test proposed by Hellring
> Lindeman that its application be evaluated pursuant to the standards set forth in §
> 330(a)(4)(A) and not by some heightened standard or by hindsight.  Accordingly,
> the debtor's attorney must show that the representation was reasonably likely to
> benefit the debtor's estate.[13]

*Top Grade Sausage, Inc.*, 227 F.3d at 132.

---

[13] Lower Courts in the Third Circuit, including the United States Bankruptcy Court for the Eastern District of Pennsylvania, have also used the prospective standard.  *In re Hosp. Partners of Am., Inc.*, 597 B.R. 763 (Bankr. D. Del. 2019) ("The standards set forth in § 330 reflect the realities of legal practice, where trustees or professionals often act without complete information about what the ultimate results of those actions might be"); *In re Grasso*, 586 B.R. 110, 145 (Bankr. E.D. Pa. 2018) ("In evaluating the value the Firm's services, this Court has been careful not to apply the benefit of hindsight."); *In re Wireless Telecomms., Inc.*, 449 B.R. 228, 232 (Bankr. M.D. Pa. 2011) ("The Objector has misunderstood the concept of benefit.  It is the prospective likelihood of benefit to the estate that is critical, not the actual results").

57.    In applying *Top Grade Sausage* and concluding that lawyers are not guarantors of

the Debtors' success, whether through a "theory, proceedings, or strategy," the Bankruptcy Court

for the Eastern District of Pennsylvania recently held as follows:

> Section 330(a)(4)(A) does not require a trustee or their professional show their
> services provided an actual benefit to the estate. *In re Top Grade Sausage, Inc.*,
> 227 F.3d 123, 132 (3d Cir. 2000). Instead, they must show their services were
> "*reasonably likely to benefit the debtor's estate*" at the time they were rendered.
> *Id.* (emphasis added); *see also In re Hosp. Partners of Am., Inc.*, 597 B.R. 763, 767
> (Bankr. Del. 2019) ("As a practical matter, bankruptcy professionals are not
> guarantors of the success of a particular theory, proceeding, or strategy."); *In re
> Grasso*, 586 B.R. 110, 144 (Bankr. E.D. Pa. 2018) (Section 330(a) "must be applied
> without the benefit of hindsight.")

*In re Jeffery*, Case No. 16-15037 (PMM),2023 Bankr. LEXIS 2671, *12 (Bankr. E.D. Pa. 2023)

(emphasis added).

### D.    A Generalized or *Gestalt* Objection to a Fee Application is Invalid

58.    In addition, fee applications cannot be disallowed based on a general objection. A

properly-prepared fee application which identifies timekeepers, tasks, and rates is presumptively

valid. Objectors who wish to overcome that presumption can only meet their burden with a

particularized objection and failure to do so is fatal. Significantly, a "gestalt objection" or

"generalized objection" is inadequate. As the court in *Blackwood* held:

> The amount requested by a fee application cannot be considered unreasonable simply
> because *one party feels* it is excessive: "Objectors *have the responsibility to challenge
> [the] information* [presented in a fee application] and *to produce evidence controverting
> that produced by the applicant. . . . '[A] gestalt reaction that there was too much time
> spent . . . isn't good enough.*'" *Hunt's Health Care*, 161 Bankr. at 981-982 (quoting
> *Steinlauf v. Continental Ill. Corp. (In re Continental Ill.* Sec. Litig.) 962 F.2d 566, 570
> (7th Cir. 1992))

*In re Blackwood Assocs., L.P.*, 165 B.R. 108, 111-12 (Bankr. E.D.N.Y. 1994) (emphasis added).

As such, the Chapter 11 Trustee is prohibited from lodging generalized or "gestalt objections."

59.    A proper fee application must list each activity, its date, the attorney who performed

the work, a description of the nature and substance of the work performed, and the time spent on

the work. *In re C & A Enterprises, Inc.*, 132 B.R. 303, 308 (Bankr. W.D. Pa. 1991); *In re Affinito & Son, Inc.*, 63 B.R. 495, 497 (Bankr. W.D. Pa. 1986); *In re Lindberg Products, Inc.,* 50 B.R. 220, 221 (Bankr. N.D. Ill. 1985); *In re Anderson,* 49 B.R. 725, 733 (Bankr. D. Haw. 1985); *Cohen & Thiros, P.C. v. Keen Enterprises, Inc.,* 44 B.R. 570, 573 (N.D. Ind. 1984).  The LBBS Final Fee Application complies with this standard.

60.     The Third Circuit requires particularized objections by an objector and a hearing so that a good-faith applicant can have an opportunity to address any objection and to supplement their fee applications to address any deficiencies.  *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 846 (3d Cir. 1994). The Third Circuit allows a trial court to provide guidance and allow for a resubmission, even multiple resubmissions, to address any shortcomings in a fee application. This is a practice the Third Circuit acknowledged can be used to alleviate the demand on court time to resolve fee disputes. *Id.*  The Third Circuit also held that if a court disallows fees of a "good faith applicant," 11 U.S.C. §§ 329(b), 330(a); Rule 2017(b), and the Fifth Amendment of the United States Constitution all "mandate" a hearing. *Id.*  The Third Circuit held that the hearing is a requirement so that an applicant can "present evidence or argument that the fee application meets the prerequisites for compensation." *Id.*  The *Busy Beaver* court defined a "good faith applicant" as "a fee applicant who reasonably and in good faith attempts to comply with the applicable rules governing the format and substance of fee applications." *Id.*

61.     The Third Circuit summarized the process it requires for fee application with the following comments:

> In sum, if after initial review the bankruptcy court determines that, while the fee applicant made a good faith effort to comply with the particularization requirements of § 330(a), Rule 2016(a), and applicable local rules, either the information provided does not allow for a reliable determination of compensability (because it is too vague or otherwise), or that the court would benefit from legal argument, it may allow the professional a reasonable time to supplement the application with

either a more detailed description of the questionable services, or with a memorandum of points and authorities in support of the application. If the bankruptcy court at any time, irrespective of any opportunity to supplement, denies some amount of the requested compensation, and if it determines the applicant sought in good faith to comply with the aforementioned specificity requirements, it should notify the applicant of its particular reasons for denying the fees, and, should he or she make a timely request for one, allow the professional the occasion to defend his or her fee application with legal arguments and/or evidence (of market practices, etc.) at a hearing.  Moreover, if after the hearing the court adheres to its views and disallows some of the requested compensation, it should enter sufficient findings of fact and conclusions of law in the record to facilitate appellate review.[14]

*Busy Beaver*, 19 F.3d at 847.

62.    Here, the Chapter 11 Trustee has an obligation, a "responsibility," to challenge the specific, detailed information included in a fee application and provide evidence to support its objection.  A generalized objection fails to meet the objecting party's burden and should be denied on this basis alone. Notably, *Busy Beaver*, in its analysis of the requirement that fee objections must be particularized, also discussed the various reasons that objections by the client, creditors, and the U.S. Trustee were often not forthcoming, and concluded that "[c]onsequently, the task of reviewing fee applications falls by default onto the bankruptcy courts."  *Busy Beaver*, 19 F.3d at 843.  However, courts in the Third Circuit and outside of the Circuit all apply the particularized objection requirement to any objecting party.  *See, e.g., Klika*, Case No. 05-10707 (MFW), 2008 Bankr. LEXIS 462 at *10-11 (objection by debtor to Trustee's counsel fees); *In re Hunt's Health Care*, 161 B.R. 971, 982 (Bankr. N.D. Ind. 1993) (applying the requirements of a particularized objection to both the District Court and a creditor stating:  "Just as the district court . . . could not

---

[14]      *Busy Beaver*, as controlling precedent, is adhered to by courts in the Third Circuit.  *See, e.g., In re Klika*, , 2008 Bankr. LEXIS 462, *10-11 (Bankr. D. Del. 2008); *In re Murray*, Chapter 13, Bky. No. 06-13821ELF, 2007 Bankr. LEXIS 2737, *9 (Bankr. E.D. Pa. 2007); *In re Bechtold*, Case No. 06-20586REF, Chapter 13, 2007 Bankr. LEXIS 1838, *33 (Bankr. E.D. Pa. 2007); *In re Wise*, 365 B.R. 516, 528 (Bankr. E.D. Pa. 2007).  The *Busy Beaver* requirement for particularized fee objections has also been adopted by other courts, including Circuit Bankruptcy Appellate Panels.  *See Bachman v. Pelofsky (In re Peterson)*, 251 B.R. 359, 366 (Bankr. 8th Cir. 2000) ("We agree with the *Busy Beaver* Court that fee applicants are entitled to a meaningful hearing regarding the reasonableness of their requested fees"); *Chamberlain v. Kula (In re Kula)*, 213 B.R. 729, 742 (Bankr. 8th Cir. 2000); *Grunau v. Waage (In re Grunau)*, 376 B.R. 322, 331 (M.D. Fla. 2007).

properly reduce fees for 'inarticulable and unsubstantiated dissatisfaction with the lawyers' efforts to economize, this court should not heed a creditor's unexplained dissatisfaction.'"); *In re Blackwood Assocs., L.P.*, 165 B.R. at 111   (applying the requirements of objecting with particularity to "any entity" making an objection).[15]

63.    Conversely, a party objecting to the amount of time spent on services has the burden of proving that too much time was spent, and cannot meet his or her burden merely by alleging general dissatisfaction with the results.  *See In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 840 (Bankr. D. Vt. 1987); *Blackwood*, 165 B.R. at 112.   A party objecting to a fee application has a responsibility to challenge with specificity the information presented and to produce evidence controverting that produced by the applicant.  *See S.T.N. Enterprises*, 70 B.R. at 840; *Blackwood*, 165 B.R. at 112 (quoting *In re Continental Illinois Security Litigation*, 962 F.2d 566, 570 (7th Cir. 1992)). The Chapter 11 Trustee has fallen drastically short of this requirement here.

### E.    LBBS is Not an Insider of the Debtors

64.    The Objection refers to LBBS as an "insider" and attempts to support the LBBS fee application review by Coren by saying this review is part of a review of all insiders.  This assertion is baseless. The United States Bankruptcy Code states as follows:

> (31) The term "insider" includes— (A) if the debtor is an individual— (i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control; (B) if the debtor is a corporation— (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in

---

[15] Judge Mayer recently wrote in November 2023 when discussing the Third Circuit's directive to Bankruptcy Courts regarding fee review: "The role of this Court is not to calculate a professional's compensation to an unblemished exactitude.  Rather, this Court's primary responsibility is to review, prevent, and correct '*reasonably discernable* abuses' in a professional's fee application." *Jeffery*, 2023 Bankr. LEXIS 2671 at *12-13 (emphasis added).  As such, a Bankruptcy Court within the Third Circuit has instructed Bankruptcy Courts to not "become enmeshed in a meticulous analysis of every detailed facet of the professional representation."[15] *Jeffery*, 2023 Bankr. LEXIS 2671 at *12 (citing *Busy Beaver*, 19 F.3d at 844-845) (quoting *Lindy Bros. Builders, Inc. v. Am. Radiator & Std. Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir. 1976) (*en banc*)).  "Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled."  *Id.*

which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor; (C) if the debtor is a partnership— (i) general partner in the debtor; (ii) relative of a general partner in, general partner of, or person in control of the debtor; (iii) partnership in which the debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the debtor; (D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor; (E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and (F) managing agent of the debtor.

U.S.C. § 101(31).

65.     As set forth more fully in the Zahralddin Declaration, LBBS is not an insider of the Debtors.  Zahralddin Decl. at ¶¶ 65-67.

66.     Notably, the Chapter 11 Trustee was provided the entire Debtor file yet strained to find any evidence of any conflict or purported insider status. This failure is telling.

### F.     The Filing of the Objection Had No Reasonable Basis and Triggers Bankruptcy Rule 9011

67.     Courts have repeatedly stated that counsel must "undertake a proper inquiry into the law and facts" and, that in the event that a position is "without merit," proceeding in spite of known facts and law without a good faith basis (as is the case here), liability under Rule 9011 adheres to counsel as an operation of law. *In re Sowers*, 97 B.R. 480, 485 (Bankr. N.D. Ind. 1989). As such, counsel is mandated to undertake efforts to make certain an attorney or attorneys are not behaving in a manner that lacks even rudimentary support in both law and fact.  The present litigation over the Objection is the result of the Chapter 11 Trustee and its counsel failing to undertake the requisite analysis of case law on fee applications.  The Chapter 11 Trustee and its counsel ignore binding precedent in the Third Circuit. The Objection is a paradigmatic example of a pleading that was filed in violation of Rule 9011.

68.     Bankruptcy Rule 9011 adapts Federal Rule of Civil Procedure Rule 11 to bankruptcy proceedings.  As such, it is implicated by the Objection.  *See generally Sowers*, 97 B.R. 480.  Rule 9011 differs from Rule 11 in crucial ways, salient to the Objection. *See generally*

*id.* at 484 (discussing Rule 9011, the court noted that "Rule 9011 comes into play when an attorney or a party signs and submits a pleading or paper, the contents of which have not been subject to a reasonable inquiry or which is not well-grounded in fact and warranted by existing law."). Courts have held that Bankruptcy Rule 9011 triggers automatically, the moment an attorney applies his or her signature to a pleading. *See In re Two Star Surgical Supply Inc.*, 70 B.R. 241 (Bankr. E.D.N.Y. 1987) (holding that a violation of Rule 9011 is *immediate* upon the signing and filing of – in that case – a complaint that denied allegations that were known to be irrefutably and indisputably true). The automatic trigger of Rule 9011 is a crucial differentiating factor from Rule 11, though they have been deemed to be similar enough on a substantive level for the case law of Rule 11 to apply in Rule 9011 contexts as well. *See, e.g., In re Mapson*, 93 B.R. 161, 168 (Bankr. C.D. Ill. 1988); *see also Szabo Food Service Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir. 1987) (noting that, since Rule 11 and Rule 9011 are designed to discourage unnecessary filings, its violation *is complete the moment the offending paper is filed*).

69.     Discussing the shared aspects of Rule 9011 and Rule 11, courts have found that the "test under Rule 11 is objective: litigation must be grounded in an objectively reasonable view of the facts and the law, and, if it is not, the lawyer or party proceeding recklessly must foot the bill." *In re Ronco, Inc.*, 838 F.2d 212, 217 (7th Cir. 1988). The Objection is grounded in neither an objectively reasonable view of the facts nor prevailing law. It is clear from the law cited *supra* discussing the development of the "prospective" view of fee applications and what constitutes "reasonable" work at any given time in a bankruptcy case that the objecting party herein, and any other party joining in this Objection had no reasonable or otherwise defensible basis for the Objection. As such, the objecting party and its counsel have violated Rule 9011 and are subject to sanction by this Court.

70.   For the avoidance of doubt: the Chapter 11 Trustee and its counsel should have been aware that the standard for fee applications has changed nationwide since the implementation of the Bankruptcy Code. Moreover, even prior to the resolution of various circuit splits on the subject, only the Fifth Circuit was a holdout regarding examining professional fees; and in any event the Fifth Circuit has now decisively reversed its prior rulings, not just once, but twice[16]

71.   The filing of a pleading that is unsupported – or insufficiently supported – by the facts and law governing a bankruptcy case is itself sufficient to support 9011 sanctions.  The Objection is not just unsupported and legally deficient.  It is also a litigation tactic designed to utilize the fee application process to pay for unnecessary detour and frolic on the part of the Chapter 11 Trustee and its professionals for its own monetary gain. These actions should prevent their counsel from receiving the compensation to which LBBS is entitled.

72.   Additionally, the Objection impermissibly mounts a gestalt objection, despite the well-settled law precluding such a generalized fee application objection.  *See, e.g., Busy Beaver*, 19 F.3d at 846; *C & A Enterprises,* 132 B.R. at 308; *Affinito*, 63 B.R. 495.  The purpose for the ban on gestalt, generalized objections is to provide estate professionals the opportunity to confront and address perceived deficiencies with a fee application, encouraging transparency and

---

[16]   As noted above, Congress amended the statutory provision in 1994 to specifically abrogate any test that would review fees in hindsight, any test that assessed and approved fees using a standard which relied on the actual results of a professional's actions as opposed to an objective assessment of fees, taking into account the circumstances existing at the time the reviews were rendered.  The "hindsight" or "actual results" approach requires a retrospective review of a professional's request for approval of fees and expenses, one which assesses the work completed as of the time it was planned and executed, and not in hindsight based on "actual results."  The retrospective standard was also the majority rule amongst both Circuits and lower courts in Circuits which had not engaged in appellate review of standards for review of fee applications.  Only one Circuit, the Fifth Circuit retained a standard based upon "actual results," also known as a review in hindsight.  *See Andrews & Kurth L.L.P. v. Family Snacks (In re Pro-Snax Distribs.)*, 157 F.3d 414 (5th Cir. 1998).  Once Congress amended the statute in 1994 to eliminate the review of fees based on results, as opposed to retrospectively, the Fifth Circuit overruled its prior precedent as inconsistent with the amendments.  *See Edwards Family P'ship v. Johnson (In re Cmty. Home Fin. Servs.)*, 990 F.3d 422, 427 (5th Cir. 2021) ("In awarding fees, hindsight is *irrelevant*; retrospect is *irrelevant*; 'material benefit to the bankruptcy estate' is *irrelevant*.") (emphasis added).  Significantly, the Third Circuit followed the majority rule before the 1994 amendments to the Bankruptcy Code and after.

effectuating the public's interest in efficient insolvency proceedings.  *See id*.  The Objection was filed in derogation of established case law both in this Circuit and throughout the country, which, on its own would likely constitute a violation of Rule 9011.  In combination with the lack of support for the Objection and its role as a litigation tactic, the filing of the gestalt objection is certainly another violation of Rule 9011.

### G.   Because the Objection is Unreasonable and Vexatious, Sanctions Against the Chapter 11 Trustee's Professionals is Warranted

73.   Bankruptcy Rule 9011 is not the only deterrent against the weaponization of fee application litigation.  28 U.S.C. § 1927 provides that "[a]ny attorney . . . admitted to conduct cases in any court in the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The conduct of the Chapter 11 Trustee is vexatious and has multiplied the proceedings in these Chapter 11 Cases. This court is authorized to implement these sanctions.  *See In Volpert*, 110 F.3d 494 (7th Cir. 1997). Sanctions under Section 1927 can be cumulative with sanctions under Rule 9011 – they are not mutually exclusive and courts frequently apply both Section 1927 and Rule 9011 to deter impermissible conduct by a party. *See, e.g., Sowers*, 97 B.R. at 484 ("To an extent these two provisions [Rule 9011 and § 1927] overlap, so that the same act may constitute a violation of either or both of them").  The primary difference between Section 1927 and Rule 9011 is that Rule 9011 is *automatic* when an offending paper is filed and served, whereas Section 1927 requires the Court to make a determination as to what level of sanction to apply.  *Id*. at 487 ("[C]ounsel has violated both [Rule 9011] and § 1927 [;] we must determine the appropriate sanction or award.  Under . . . 9011, sanctions are mandatory once a violation of the Rule has occurred.  Under § 1927, whether . . . sanctions are imposed is a question committed to the court's discretion").

74.     The Objection is squarely a violation of Rule 9011 due to the fact that it was filed

with no basis in law or fact.  These sanctions are automatic, as the Objection's lack of foundation

and good faith basis for such a pleading is clear. The United States Supreme Court stated the

following, in pertinent part, in its landmark *ASARCO* decision to address concerns that not

allowing a Debtor's counsel to charge the estate for defending fees would lead to a weaponizing

of the fee application process:

> To the extent the United States harbors any concern about the possibility of frivolous
> objections to fee applications, we note that 'Federal Rule of Bankruptcy Procedure 9011—
> bankruptcy's analogue to Civil Rule 11—authorizes the court to impose sanctions for bad-
> faith litigation conduct, which may include 'an order directing payment ... of some or all
> of the reasonable attorneys' fees and other expenses incurred as a direct result of the
> violation.'
>
> *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, fn. 4, (2015)(quoting *Law v. Siegel,*
> 571 U.S. 415, 427, 134 S.Ct. 1188, 1198, 188 L.Ed.2d 146 (2014)).

This Court can and should also find that the Objection is sanctionable under Section 1927 as it

seeks to weaponize the fee application process in a manner that was deemed impermissible and

sanctionable in *ASARCO*.

75.     Mr. Coren was not hired to pursue fee objections.  His retention was not expanded

pursuant to the requirements and representations in his firm's filed retention application.[17] The

---

[17] Mr. Coren and his firm were hired to review the adversary complaint filed by the Debtors against the Hawk Parties
and litigation in Chancery Court ("Litigation").  In the Application of the Chapter 11 Trustee to Employ Steven M.
Coren, Esquire and Coren & Ress, P.C. as Special Counsel (Docket No. 579)("Coren Application") which was filed
on January 31, 2024, specifically limited the retention to review the Litigation and justified the retention because Mr.
Coren is a "lender liability" expert. See Coren Application at ¶ 13,17, and 21.  The Coren Application also included
an assurance that if the retention was to expand, an appropriate disclosure would be made. Id. at 13 In relevant part,
the Coren Application states:

The Trustee reserves the right to broaden or expand the engagement of C&R as appropriate in the exercise of his
business judgment, subject to the consent of C&R, in which event the expanded engagement shall be disclosed to this
Honorable Court by a Supplemental Affidavit to be filed by C&R.

position Mr. Coren, his firm, and the Chapter 11 Trustee have taken in regard to disclosure as a basis to invalidate their fees is extremely unequitable in light of his own failures to timely disclose the unauthorized expansion in his retention. Only upon cross examining Mr. Zahralddin at a hearing and the related redirect was it revealed that Mr. Coren had failed to file his required disclosures for his expanded role for the Chapter 11 Trustee despite months having passed since he engaged in reviewing and then filing the objection to the LBBS fees. See Docket 1009, Transcript page 264 Lines 18-25-65 Line 1; See also Docket No. 579 ("The Trustee seeks to employ C&R as his special litigation counsel in this case in connection with: (i) the Adversary Case (as existing or as may be amended) and (ii) the Chancery Case. The Trustee reserves the right to broaden or expand the engagement of C&R as appropriate in the exercise of his business judgment, subject to the consent of C&R, **in which event the expanded engagement shall be disclosed to this Honorable Court by a Supplemental Affidavit to be filed by C&R**")(emphasis added).

76.     Mr. Coren did not update his disclosures until April 18, 2025, and then he finally included various new expanded roles in his engagement for the Chapter 11 Trustee, which included objecting to the Final Fee Application. *See* Docket No. 1012.  Mr. Coren filed his retention motion on January 31, 2024, and he filed the Final Fee Application Objection on November 20, 2024. Under the logic of the objections he has advanced for the Chapter 11 Trustee against LBBS, he should forfeit all fees for failing to strictly amend his disclosures. The same logic extends to any professional who has worked on the Final Fee Application Objection working for the Chapter 11 Trustee.  Mr. Coren's delay was not the product of negotiations or discussions with

---

Id.

There also is not a need for further review of fees because the United States Trustee has done a thorough review and stipulated to a settlement with LBBS.

the United States Trustee.  Mr. Coren simply failed to update his required disclosures until it was pointed out in open Court.

77.     First, in contrast, LBBS worked diligently with the Office of the United States Trustee to expand its disclosures and Judge Coleman approved the LBBS retention.  Second, Mr. Coren and his firm are engaging is duplicative unnecessary work as the United States Trustee has reviewed the fee applications, in detail, and unlike Mr. Coren and his team, did not find that the entries were too "vague" to review.  Third, Mr. Coren and his team should have recused themselves as they are also administrative claimants and are motivated by collecting their own fees without dilution.  Fourth, Mr. Coren was hired on an hourly basis at rates that might be appropriate for a special counsel for lender liability litigation but are not appropriate for fee examination work, a fact that would have been disclosed and then should have been approved by the Court before the Chapter 11 Trustee engaged in the unnecessary fee related to this frivolous fee objection.

## IV.    <u>CONCLUSION</u>

WHEREFORE, LBBS respectfully request that this Court enter an order (a) approving the Application, (b) overruling the Objection, (c) granting sanctions, and (d) granting such other and further relief as may be just and proper under the circumstances.

Dated: September 25, 2025              Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

/s/ *Rafael Zahralddin Aravena*
Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Email: Rafael.Zahralddin@lewisbrisbois.com

-and-

_Counsel to Lewis Brisbois Bisgard & Smith LLP_