# EXHIBIT "2"

# In The Matter Of:

*In Re: Stream TV Networks, Inc. Technovative Median Inc
Bankrtupcy Rule 2004 Examination*

---

*Mathu Rajan PMQ*
*November 13, 2023*

---

*Behmke Reporting and Video Services, Inc.*

*455 Market Street, Suite 1800*

*San Francisco, California  94105*

*(415) 597-5600*

Original File 41812PMQRajanUSTP_NL.txt

Min-U-Script® with Word Index

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit transcripts   Page 3 of 171

In Re: Stream TV Networks, Inc. Technovative Median Ins
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

Page 1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4   - - - - - - - - - - - - - - -
 5   In Re:                    )  CASE NO.
 6   STREAM TV NETWORKS, INC., )  23-10763 (MDC)
 7        Debtor.             )  CASE NO.
 8   TECHNOVATIVE MEDIAN, INC., )  23-10764 (MDC)
 9        Debtor              )  CHAPTER 11
10   - - - - - - - - - - - - - - -
11
12
13          BANKRUPTCY RULE 2004 EXAMINATION
14                 OF MATHU RAJAN
15              PERSON MOST QUALIFIED
16          RE:  STREAM TV NETWORKS, INC.
17          AND TECHNOVATIVE MEDIAN, INC.
18            MONDAY, NOVEMBER 13, 2023
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22          BY:  NICOLE MONTAGANO, COURT REPORTER
23                 455 MARKET STREET, SUITE 1800
24              SAN FRANCISCO, CALIFORNIA  94105
25                                     (415) 597-5600
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8       Bankruptcy Rule 2004 Examination of MATHU RAJAN,
 9   taken on behalf of the Office of The U.S. Trustee herein,
10   pursuant to the Rules of Civil Procedure, taken before
11   me, the undersigned, Nicole Montagano, Court
12   Reporter and Notary Public in and for the
13   Commonwealth of Pennsylvania, at the offices
14   of Federal Building, 900 Market Street, Suite 320,
15   Philadelphia, Pennsylvania, on Monday, November 13,
16   2023, beginning at 10:20 a.m. pursuant to Order
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE UNITED STATES TRUSTEE:
 3        OFFICE OF THE UNITED STATES TRUSTEE
 4        BY:  KEVIN P. CALLAHAN, TRIAL ATTORNEY
 5        900 Market Street, Suite 320
 6        Philadelphia, Pennsylvania  19107
 7        Telephone:  (215) 597-2554
 8        Email:  Kevin.P.Callahan@usdoj.gov
 9
10   FOR DEBTORS, STREAM TV NETWORKS, INC. AND TECHNOVATIVE MEDIAN, INC.
11        LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
12        BY:  RAFAEL X. ZAHRALDDIN-ARAVENA, ATTORNEY AT LAW
13             KEVIN SHAW, ATTORNEY AT LAW
14             BENNETT G. FISHER, ATTORNEY AT LAW
15        500 Delaware Avenue, Suite 700
16        Wilmington, Delaware  19801
17        Telephone:  (302) 985-6000
18        Email:  Rafael.Zahralddin@lewisbrisbois.com
19             Kevin.shaw@lewisbrisbois.com
20             Bennett.Fisher@lewisbrisbois.com
21
22   ALSO PRESENT:
23        JOHN SCHANNE, ESQUIRE
24        FREDERIC J. BAKER, ESQUIRE
25        JAMES GANNONE, BANKRUPTCY ANALYST
```

Page 4

```
 1               INDEX
 2   MONDAY, NOVEMBER 13, 2023            PAGE
 3   PROCEEDINGS                           6
 4   MATHU RAJAN
 5       Examination by MR. CALLAHAN       10
 6
 7               -oOo-
 8
 9
10    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
11               PAGE LINE
12               (None.)
13
14               -oOo-
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
 1                EXHIBITS
 2             MATHU RAJAN
 3  NUMBER        DESCRIPTION              PAGE
 4             (NONE OFFERED.)
 5
 6                 -oOo-
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 6**

```
 1         S T I P U L A T I O N
 2  -----------------------------------------------------
 3    (It is hereby stipulated and agreed by and between
 4    Counsel for the respective parties that reading,
 5    signing, sealing, certification and filing are
 6    waived.)
 7  -----------------------------------------------------
 8         P R O C E E D I N G S
 9  -----------------------------------------------------
10  COURT REPORTER:
11  Mr.  Callahan?
12  ATTORNEY CALLAHAN:
13  Yes.
14  COURT REPORTER:
15  How do you get your copy?  Do you want
16    email?
17  ATTORNEY CALLAHAN:
18  Yes.
19  COURT REPORTER:
20  kevin.p.callahan@usdoj.gov.
21  ATTORNEY CALLAHAN:
22  Correct.
23  COURT REPORTER:
24  And do you want mini and regular size?
25  ATTORNEY CALLAHAN:
```

---

**Page 7**

```
 1  Mini and regular?
 2  COURT REPORTER:
 3  Or just one size?
 4  ATTORNEY CALLAHAN:
 5  Would that be regular size?  Yeah.
 6    Both.
 7  COURT REPORTER:
 8  Both.
 9  ATTORNEY CALLAHAN:
10  Yeah.
11  COURT REPORTER:
12  Okay, sure.  Attorney Zahralddin.
13  ATTORNEY ZAHRALDDIN:
14  Zahralddin (corrects pronunciation).
15  COURT REPORTER:
16  Okay.
17  Do you want to order a copy?
18  ATTORNEY ZAHRALDDIN:
19  Sure.  Please.
20  COURT REPORTER:
21  Is email okay?
22  ATTORNEY ZAHRALDDIN:
23  Yes.
24  COURT REPORTER:
25  And mini or regular size?
```

---

**Page 8**

```
 1  ATTORNEY ZAHRALDDIN:
 2  Yes.
 3  COURT REPORTER:
 4  Which one?
 5  ATTORNEY ZAHRALDDIN:
 6  I'm sorry.  Mini is fine.
 7  COURT REPORTER:
 8  Do you want me to swear in the witness?
 9  ATTORNEY CALLAHAN:
10  Yes, please.  Thank you.
11  COURT REPORTER:
12  And Mr. Rajan, if you could just keep
13    your voice up because we're a little distant.
14  MR. RAJAN:
15  Okay.
16  COURT REPORTER:
17  Mr. Rajan, would you raise your right
18    hand, please?
19                  ---
20               MATHU RAJAN,
21    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
22    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
23    FOLLOWS:
24                  ---
25  COURT REPORTER:
```

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
Exhibit transcripts    Page 5 of 171

In Re: Stream TV Networks, Inc. Technovative Media, Inc.    Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination    November 13, 2023

Page 9

1  Thank you.
2  ATTORNEY CALLAHAN:
3      Thank you.  Good morning, everyone.  My
4      name is Kevin Callahan.  I'm Counsel to the United
5      States Trustee.  With me today is Frederic J. Baker,
6      the assistant United States Trustee.  John Schanne,
7      trial attorney and James Gannone, bankruptcy analyst.
8  This is the 2004 examination authorized
9      by the consent order entered on October 3rd, 2023 by
10     Chief Bankruptcy Judge Magdeline Coleman.  The U.S.
11     Trustee is authorized to conduct this examination of
12     a designated representative of Stream TV Network,
13     Inc., Bankruptcy number 23-10763 and Technovative
14     Media, Inc.  Both cases are assigned to Chief
15     Bankruptcy Judge Magdeline Coleman.
16 The order and subpoena for the 2004
17     examination was served upon Debtors' Counsel by
18     consent.  The Debtors filed petitions under Chapter
19     11 of the Bankruptcy Code on March 15, 2023.  The
20     cases are jointly administered.
21 Good morning, Mr. Rajan and good
22     morning, Mr. Zahralddin.  And I apologize it I --
23 ATTORNEY ZAHRALDDIN:
24 You did perfect.  Thank you.
25                           ---

Page 10

1      EXAMINATION
2      ---
3      BY ATTORNEY CALLAHAN:
4  Q.  And you've already been sworn under oath.  Could
5      you just please explain how and why the Debtors
6      determined you to be the designated representative to
7      speak on behalf of the Debtors today?
8  A.  I'm the CEO of the company.
9  Q.  Okay.
10     We'll break that down.  Could you tell me your
11     relationship with, I'm going to use the term Stream
12     TV.
13 Q.  Okay.
14     What is your relationship?
15 A.  I'm the founder and CEO of Stream TV, so I
16     started the company.
17 Q.  Okay.
18     And with respect to Technovative, Inc.?
19 A.  Yeah, I started Technovative.
20 Q.  And what is your relationship to Technovative,
21     Inc.
22 A.  I'm the founder of Technovative.
23 Q.  Do you have a title with the company, sir?
24 A.  I mean, I operate as the CEO of all the
25     subsidiaries.  I was actively sort of operating as

Page 11

1      CEO of the subsidiaries in addition to Stream.
2      Obviously there's issues in the Netherlands, but I
3      was acting as CEO and all those subsidiaries.
4  Q.  Okay.
5      Now I'm going to show you a copy of the consent
6      order.  I'm going to provide you a copy as well as
7      the Counsel.  I've already given a copy to the court
8      reporter.
9      ATTORNEY ZAHRALDDIN:
10     Thank you.
11     BY ATTORNEY CALLAHAN:
12 Q.  So we're going to take a look at this consent
13     order, Mr. Rajan.  And have you seen this document
14     before?
15 A.  Yeah.
16 Q.  And that is a document that authorizes the United
17     States Trustee to take this examination.
18 A.  Correct.
19 Q.  And did you read the contents of the document?
20 A.  Yeah.
21 Q.  So let's go through that if I can.  And of
22     course, when I ask you questions and I refer to the
23     Debtor, I need both Debtors unless I say --
24 A.  Right.
25 Q.  Okay.

Page 12

1      So your response is on behalf of Stream TV --
2  A.  And Technovative.
3  Q.  Did you have any questions with respect to this
4      document when you got it?
5  A.  No, not really.
6  Q.  So you're familiar with let's go to Attachment B,
7      first of all.  And that was directed to the
8      designated representative of both Stream TV and
9      Technovative.  And when you get there let me know.
10     Do you see it, sir?
11 A.  Uh-huh (yes).
12 Q.  Is that a yes?
13 A.  Yes.
14 Q.  If you could try to say yes or no.
15 A.  Yeah, yeah, yes.
16 Q.  I understand what you're saying, but for record,
17     we need affirmative responses.
18     Okay.
19     Attachment B identifies and defines the word
20     document. Do you understand that?
21 A.  Correct.
22 Q.  And do you understand document is expansive, that
23     it contains or describes any kind of communication
24     that was set forth in the topics that were attached
25     to Attachment A?

Page 13

1  A.  Yeah.

2  Q.  **You understand that?**

3  A.  Correct.

4  Q.  **So can you tell me a little bit about how you**
5  **made that investigation and produced the documents in**
6  **response to the subpoena?**

7  A.  We went through each one of the questions and
8  then went and pulled all the documents from the
9  company records and answered the questions.

10 Q.  **Okay.**
11 **We're going to come back to that for a moment.**
12 **So you are the -- you describe yourself as the CEO**
13 **of both companies?**

14 A.  Correct.

15 Q.  **Are there other officers of the Debtor?**

16 A.  Thomas Park is proposed to be CFO for Stream TV.
17 And a number of the employees of Stream TV are
18 working right now as 1099.  They're waiting for that
19 motion to get approved to come back to Stream TV.

20 Q.  **Okay.  I'm asking you now, but we'll come back to**
21 **this.**
22 **Did all those persons that you've identified as**
23 **independent contractors and Mr. Park, who is awaiting**
24 **approval as the chief financial officer, participate**
25 **in the production of the documents that you provided?**

Page 14

1  A.  Mr. Park did a small amount.  It was our
2  employees that helped pull documents and get
3  information.

4  Q.  **Do you know if Mr. Park reviewed those documents**
5  **that were submitted in response to the subpoena?**

6  A.  Some of the documents, just the ones that were
7  involving him.

8  Q.  **Let me go back, generally now.  You assisted or**
9  **prepared on your own the documents that were filed by**
10 **the Debtors in this bankruptcy case?**

11      ---

12 (WHEREUPON, THERE WAS A BRIEF INTERRUPTION IN THE
13 PROCEEDINGS.)

14      ---

15      **ATTORNEY CALLAHAN:**
16 And just one second.  For the court
17 reporter, can you just identify yourself for the
18 record?

19      **ATTORNEY SHAW:**
20 Yeah.  Kevin Shaw, Lewis, Brisbois for
21 the Debtors.

22      **ATTORNEY CALLAHAN:**
23 Okay.
24 And I didn't mention this.  We did
25 mention this before the exam but there is also

Page 15

1  somebody on the phone today.  Could you just identify
2  yourself, sir?

3      **ATTORNEY ZAHRALDDIN:**
4  Bennett, you can identify yourself.  I
5  know we spelled your name out before.

6      **ATTORNEY FISHER:**
7  Yeah.  This is Bennett Fisher from
8  Houston, Texas.  I'm a partner of Lewis, Brisbois
9  Bisgaard and Smith, representing the Debtors.

10      **ATTORNEY CALLAHAN:**
11 Okay.  Thank you.
12 And Mr. Fisher is not going to ask
13 questions or otherwise participate in this exam.
14 Correct?

15      **ATTORNEY ZAHRALDDIN:**
16 He's just listening in.

17      **ATTORNEY CALLAHAN:**
18 All right.  Thank you.

19      **BY ATTORNEY CALLAHAN:**

20 Q.  **Mr. Rajan, back to our exam.  You assisted in the**
21 **preparation of the documents filing these bankruptcy**
22 **cases.**
23 **Correct?**

24 A.  Yes, but with a caveat.  There was that period of
25 time where I got sick and went into the hospital.  So

Page 16

1  I wasn't as involved as I normally would have been.
2  But since I came out of the hospital then I've gotten
3  more involved in all the preparation.

4  Q.  **What was the period of time that you were**
5  **hospitalized?**

6  A.  I was in the hospital from May all the way
7  through July.  But I was getting sick in April.
8  Didn't know what was going on.  We're fine now.
9  We're doing great now.

10 Q.  **All right.**
11 **So let's go back for a moment.  With respect to**
12 **the initial bankruptcy documents that were filed with**
13 **the bankruptcy court, the petitions, the Chapter 11**
14 **schedules and the Statement of Financial Affairs.**
15 **Did you participate in the preparation?**

16 A.  I did participate.  Not as much as I should have
17 back then.  That's when I was starting to get sick.
18 But since I've come back out of the hospital I'm
19 heavily involved in it.

20 Q.  **Do you know who was assisting?**

21 A.  Yeah, it was Amanda Gonzalez, Dan Rink and Suby
22 Joseph a little bit was helping also.

23 Q.  **And at that time were they employed by Stream TV**
24 **or was Technovative?**

25 A.  They were getting paid by VSI at that time

---

Page 17

1    because we were having issues with the Stream bank
2    account.
3    Q.  We'll come back again.  With respect to the
4    filing of the Chapter 11 petitions, schedules and
5    Statement of Financial Affairs, did they participate
6    and assist you in the preparation?
7    A.  Yes.
8    Q.  You recall you signed those documents --
9    A.  Yeah, I signed them.
10   Q.  -- under penalty of perjury.
11   A.  Yeah.
12   Q.  Now the monthly operating reports for the months
13   of March through July, did you participate in the
14   preparation and filing of those documents?
15   A.  Not as much as I should have.  I did look at it
16   briefly but I didn't go in detail like we're doing
17   now.  I was in the hospital.
18   Q.  While you were in the hospital.  So do you know
19   who produced the documents or information that was
20   filled out in this operating --
21   A.  Yeah, it was Amanda, Dan and Suby.
22       COURT REPORTER:
23   Dan and who?
24       THE WITNESS:
25   Suby, S-U-B-Y.

---

Page 18

1        BY ATTORNEY CALLAHAN:
2    Q.  And his first name?
3    A.  That's his first name.
4    Q.  Oh, and his last name?
5    A.  Joseph.
6    Q.  Suby Joseph.  Okay, thank you.
7    Now, recently, or at least in the last several
8    months when you returned, you also assisted in the
9    preparation --
10   A.  Yeah, I --
11   Q.  Let me finish my question.  You also assisted in
12   the preparation of the Debtors Chapter 11 plan and
13   disclosure statement.
14   A.  Correct.
15   Q.  And you authorized the filing of that document.
16   Those documents.  You also reviewed all pleadings
17   filed by your Counsel or the Debtor's Counsel in this
18   case.
19   Correct?
20   A.  Correct.
21   Q.  And did you authorize those filings?
22   A.  Yeah, we authorized it, yes.
23   Q.  Okay.
24   Let's talk about the consent order again.
25   Attachment B you talked about, you said you provided

---

Page 19

1    all the documents as defined in Attachment B in
2    response to the topics set forth in Attachment A.
3    Correct?
4    A.  Yes.
5    Q.  Did you include copies of all electronic
6    transmissions, including emails and texts, in
7    response to the topics set forth --
8    A.  Yes.
9    Q.  -- in the subpoena?
10   A.  Yes.
11   Q.  Tell me how the search for those documents was
12   conducted.
13   A.  Everybody went through all their devices and
14   emails and text messages and started pulling
15   documents.
16   Q.  Okay.
17   When you say everybody, would that be the people
18   identified --
19   A.  Correct.
20   Q.  -- in your submission?
21   A.  Amanda, Dan, Suby, myself, and any of the other
22   employees, if they were involved with the vendor.
23   Amanda coordinates all the vendors, but some of them
24   may have had conversations with vendors, so we told
25   them to help Amanda go find emails and invoices and

---

Page 20

1    evidence.
2    Q.  So you mentioned Amanda here.  What is her role
3    with Stream?
4    A.  She coordinates the -- she's basically the
5    receptacle where invoices come in and request for
6    payment for vendors or customers or requests for
7    expenses go to Amanda.  Before we had the bankruptcy,
8    we have an issue.  We had everything connected
9    through Microsoft SharePoint and Microsoft 360.  And
10   even the bank accounts were attached to QuickBooks.
11   Since we filed in the bankruptcy, we haven't received
12   our -- the other guys won't give us our software
13   back.  So Amanda has been manually collecting it and
14   then making arrangements for payment for various
15   expenses in the company.  She's been doing it
16   manually.  We used to have everything automated.
17   There would be an accountant who double checked
18   everything.  But right now we're doing it manually
19   until we get -- hopefully on Wednesday, we'll get
20   our software back and then we'll have everything
21   automated.
22   Q.  So let's go back.  When you said request, for
23   example, invoicing from vendors and receipts from
24   vendors, Amanda would be the person responsible for
25   -- well, first she called her the receptacle.  She

In Re: Stream TV Networks, Inc. Technovative Media, Inc.
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

Page 21

1  receives these documents.
2  A.  She receives most of it or somebody would contact
3  her and say, hey, we have a vendor needs to get paid.
4  And then she would receive like, an invoice or
5  paperwork and start to make arrangements for payment.
6  Q.  And this was the situation since the bankruptcy
7  was filed on March 15?
8  A.  Yeah, that's the process we've been using.
9  Q.  And how about prior to March?
10  A.  Prior to it, everything was automated through
11  Microsoft 360 and Microsoft SharePoint.  What
12  happened was we got an incorrect ruling in the
13  Chancery Court.  The other team went and took our
14  software.  They're supposed to return -- the court
15  order is to return it back.  And also we're in the
16  bankruptcy.  They won't turn it back.  Hopefully
17  Wednesday that'll get fixed.  So in the interim,
18  Amanda's been doing it manually.  That's why it's
19  been taking us long -- before what would happen is
20  it would go to an email, then it would automatically
21  get inputted into QuickBooks and accountant -- and
22  the accountant department would double check it and
23  then make arrangements for it to get paid.  So then
24  all you have to do then is print and you have your
25  monthly statements here.  We're doing everything

Page 22

1  manually.  We're inputting manually.
2  Q.  Other than Amanda -- that's Ms. Gonzalez.
3  Correct?
4  A.  Correct.
5  Q.  Would there be any other person responsible for
6  doing that task?
7  A.  Amanda's responsible for doing the task.  There
8  are people helping Amanda.  My mother helps sometimes
9  inputting the QuickBooks, and then Suby helps
10  sometimes a little bit.  But Amanda's one that's been
11  inputting into QuickBooks.
12  Q.  And what's your mother's name?
13  A.  Jeeva.
14  Q.  Spell it.
15  A.  J-E-E-V-A.
16  Q.  Okay.
17  So since March, was Amanda an employee of Stream
18  TV and Technovative?
19  A.  She's been 1099 until we get our employee motion
20  approved.  Once we get our employee motion, then they
21  go to W2.
22  Q.  And prior to the petition on March 15, was Amanda
23  an employee of the Debtor?
24  A.  She was an employee of Stream TV for years.  And
25  then when we lost in the Chancery Court in the

Page 23

1  omnibus agreement, said, you can't have a Stream TV
2  bank account.  You're not allowed to use Stream name.
3  So we set up VSI and she was working at VSI until
4  we're able to get her back into Stream because we're
5  blocked legally.  And then we won in the Supreme
6  Court.  There was court orders to turn everything
7  back, but the other side refused to turn it back, so
8  we couldn't send her into Stream.
9  Q.  So VSI stands for --
10  A.  Visual Semiconductor.
11  COURT REPORTER:
12  Visual --
13  THE WITNESS:
14  Semiconductor, Inc.
15  BY ATTORNEY CALLAHAN:
16  Q.  So at the time of the filing of the bankruptcy
17  petition, was Amanda an employee or a contractor?
18  A.  She's 1099.
19  Q.  Of VSI as well.
20  A.  She was 1099 at VSI.  What happened was we went
21  and asked for a DIP account at Bank of America.  And
22  Bank of America said they couldn't do it.  They sent
23  me to a regional office.  They couldn't set up the
24  DIP account.  Then we had a Stream bank account.
25  There was not a DIP account.  We were told, don't use

Page 24

1  non-DIP bank accounts.  You have to be careful.  So
2  VSI was paying for Stream.  When I went to the
3  hospital, Amanda got a DIP account at Key Bank, but
4  they wouldn't activate it until I went in there
5  physically.  So I had to get out of the hospital, go
6  over there.  Then they said, oh, we have a 60-day due
7  diligence period after you come in.
8  So VSI was paying.  Then in the interim period,
9  miraculously, in August, Bank of America changed our
10  bank account to a DIP status.  So we started using
11  the Bank of America account.  Then everybody became
12  1099 for Stream.  Then we set up -- then Key Bank
13  just came online, now.  We got through the approval
14  process.
15  Then Bank of America, the performance of the bank
16  account was horrible.  It was taking three days to
17  get wires out.  Every time money was coming in,
18  they're going really slow.  So Raph and some of his
19  contacts made arrangements for us to set up a bank
20  account at M and T, a DIP account.  And we're lucky
21  we did it because ten days or two weeks ago, Bank of
22  America just shut down the DIP account and took the
23  money.
24  Q.  Okay.
25  We'll get to that.

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit Transcripts   Page 9 of 171

In Re: Stream TV Networks, Inc. Technology Meeting, Inc.                                    Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination                                                           November 13, 2023

Page 25

1  A.  Yeah.  Right now everybody's 1099 at Stream now
2  since August.
3  Q.  And I want to get back to at least the beginning
4  days of the bankruptcy petition.  Who was responsible
5  for the collection or retention or storage of
6  documents responsive to our request?  So I think I
7  understand you say and please affirm that Amanda was
8  the primary person --
9  A.  For invoices and receipts.
10  Q.  -- for invoices and receipts.  And how about
11  disbursements?
12  A.  Disbursements come in from the employees and then
13  they go to Amanda.
14  Q.  So Amanda would also receive the request for
15  disbursements either from employees or contractors or
16  from vendors?
17  A.  Correct.
18  Q.  And did Amanda have authority to make transfers
19  from VSI accounts to make payments to vendors or
20  contractors?
21  A.  No.
22  Q.  Who would have that authority?
23  A.  She would contact me and say, hey, we have this
24  bill.  Can we pay it?  And I would give her the
25  clearance to go ahead.

Page 26

1  Q.  And when you say clearance, what kind of
2  clearance?
3  A.  I would say yes.
4  Q.  How would that be transmitted?  Do you see her in
5  person?
6  A.  No, no.  I would email her, or she'd call me on
7  the phone and I would say, it's approved.  Or I would
8  text her.
9  Q.  So text or emails, either from Amanda to you
10  saying, we need to make a payment to a vendor or an
11  institution or employer or a contractor?
12  A.  Correct.
13  Q.  And then you would respond by email or a text
14  indicating you approve, then you kind of disburse the
15  money.
16  A.  Right.  And then she would go to my mother, who
17  would do the wire transfer.
18  Q.  So your mother has access to VSI account.
19  A.  VSI account, not Stream accounts.
20  Q.  Okay.
21  The VSI account.  So she would actually be the
22  person involved in making the transfer.
23  A.  Right.
24  Q.  Okay.
25  So back to the search for documents.  Is it your

Page 27

1  testimony that you conducted the search through
2  Amanda?
3  A.  No, everybody was searching for invoices and
4  documents and helping Amanda to collect them.
5  Q.  Okay.
6  And then prior, when you received this consent
7  order with the subpoena attached and the topics
8  discussed and the documents defined, did you discuss
9  this with your Counsel?
10  A.  You mean how we're doing this?
11  Q.  Yes.
12  A.  Yes, we told them how we were going to do -- how
13  we're doing this.
14  Q.  And did you discuss with Counsel the documents
15  that you did produce?
16  A.  I mean we sent the documents over.
17  Q.  And was there any discussion with respect to the
18  list of documents that were provided?
19  A.  Oh, yeah.
20  Q.  Okay.
21  Are there any documents in your -- do you know
22  whether there are any documents that would have been
23  responsive to any of the topics that were set forth
24  that were either withheld by anybody or lost or
25  destroyed?

Page 28

1  A.  No, I don't think so.  We've given everything
2  over.
3  Q.  So it's your understanding you've given
4  everything.  All right.
5  So we're going to start talking about operating
6  reports.  And of course you signed the operating
7  reports were filed.  I have a list.
8  ---
9  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
10  ---
11  BY ATTORNEY CALLAHAN:
12  Q.  Mr. Rajan, do you recognize that document?
13  A.  Yes.
14  Q.  Could you describe what it is?
15  A.  This is a monthly operating report.
16  Q.  And it's monthly operating report of Stream TV.
17  Correct?
18  A.  Correct.
19  Q.  Can you tell me under whose direction were the
20  operating reports prepared?
21  A.  Well, the operating reports were prepared by
22  Amanda, Dan and Suby.
23  Q.  What's Dan's last name?
24  A.  Dan Rink.
25  Q.  What is his relationship with Stream?

Page 29

1  A.  He was with Stream and then he switched over to
2  VSI.  He was going to go to Stream once we had the
3  DIP account sent over, but he's decided to stay at
4  VSI right now.
5  Q.  Okay.
6  And what was he doing for Stream when the
7  bankruptcy petition was filed?
8  A.  He was doing both legal work and helping with
9  operational and accounting work.
10  Q.  And what did Amanda do?  Did Amanda actually
11  prepare this operating report?
12  A.  It was Amanda and some help from Dan and Suby.
13  Q.  And you -- as well as you.
14  Right?
15  A.  Yeah.  Correct.
16  Q.  All right.
17  If you go to page two of 28, the PDF page, get
18  you there.
19  A.  July.
20  Q.  I may have given you the incorrect.  I meant to
21  give you the March operating report.
22      ATTORNEY ZAHRALDDIN:
23  Yeah.  This is June.  This is June.
24      ATTORNEY CALLAHAN:
25  Let me get that out.

Page 30

1      BY ATTORNEY CALLAHAN:
2  Q.  All right, let's go back to March operating
3  report page -- it's docket entry 188, filed May 5,
4  2023.
5  A.  May 5, which page?
6  Q.  If you look at the PDF, it should show 2 of 28.
7  A.  Yeah, second page.  Right.
8  Q.  I'm asking you to look at the identification of
9  accounts receivable at the time of filing this.  Do
10  you see that, sir?
11  A.  Right.
12  Q.  What accounts receivable or owed to Stream TV as
13  of the date of this operating report?
14  A.  There's a couple of things.  One is there may
15  have been some units that were unpaid.  Also, we were
16  in the middle of projects when everything stopped, so
17  there was probably unpaid project fees.  So we had
18  contracts with like Bosch where they were paying like
19  $250,000, $400,000 a quarter.  So everything got
20  stopped.  So it's still probably not been collected
21  at this point.  Once we hopefully get past Wednesday,
22  then a lot of those things will get straightened out
23  quickly.
24  Q.  Who besides yourself would have information as to
25  whether that money's been collected?

Page 31

1  A.  Well, one, Amanda, and then two, Dan and Suby,
2  and then also whoever was working -- whichever
3  employees were working on those projects.  So it
4  could have been people like Bud Robertson.  It could
5  have been some of our people in Asia.  It depends on
6  which customer was generating that accounts
7  receivable.
8  Q.  So is there a list that the Debtor had of
9  accounts receivable at the time of filing this case?
10  A.  Again, what happened was we won in the Supreme
11  Court.  They were ordered to turn over the company
12  laptops for, like, Amanda and Nicole and Dan and a
13  whole number of people.  And also our Microsoft
14  SharePoint and our company Network 360, they have
15  refused.  So what we have on our devices, when you
16  pull these things out of your devices, some of it
17  will remain, but we still have it.  Some of the
18  records on our devices when they removed it in
19  December 2020.  But the whole records are on those
20  things that they're refusing to turn over even though
21  they're under court order.  So the short answer is
22  maybe.
23  Q.  Well, you understand that this information was
24  prepared and provided to the United States Trustee
25  and filed with the bankruptcy court.

Page 32

1  A.  Yeah.  So there's going to be records that will
2  say 112, but I may or may not have 100 percent of the
3  paperwork for the $112,000.  We only have part of it.
4  Q.  So you don't have a list of accounts receivable
5  or a journal that indicates --
6  A.  No, we have journals that have accounts
7  receivable.  We have journals that have accounts
8  receivable.  What I'm saying is that not all the
9  paperwork for -- when we had it before, we had all
10  the paperwork on the company network.  So some of the
11  accounts receivable paperwork.  We have journals
12  where we keep all of our accounts receivable, but not
13  all the paperwork has returned back.  So it'll be
14  listed in our journals as $112,000.  But we may not
15  have 100 percent of the paperwork.  We'll have
16  probably most of it.
17  Q.  Okay.
18  So page 13 of 28.  And that is a first page of
19  the balance sheet that Stream TV networks provided.
20  And it's monthly operating report.  If you go down to
21  the middle of the page, you'll see a listing for
22  accounts receivable.  And that item has a balance
23  owed of $167,751.  Can you explain why it's listed at
24  that amount, but that the amount listed on the
25  operating report is $112,875?

Page 33

1  A.  Well, if you see here it says $167,000, then he
2  has $54,000 for doubtful accounts.
3  Q.  Okay.
4  A.  So that's why there's a difference.
5  Q.  Okay.
6  Let's go to the last page of the balance sheet.
7  Page 17 of 28.  And it's the last line, total
8  liabilities and equity.  Do you see that?  It appears
9  that the balance sheet indicates total liabilities
10  and equity at $91,621,218.46.
11  Is that what it says?
12  A.  Yeah.
13  Q.  Okay.
14  And do you have any understanding of that --
15  that's the total net worth of the company.  Is that
16  your --
17  A.  Well, okay.  So there's a couple of things here.
18  There is force liquidation value, and then you have
19  enterprise value.  Obviously, you're using GAAP
20  accounting or whatever for the assets and
21  liabilities.  So if you're talking forced
22  liquidation, that's a different value.  If you're
23  talking about enterprise value, that's a different
24  value.  So, you know, on the assets and liabilities.
25  Yeah, they may show this as the asset and liability,

Page 34

1  but I wouldn't use this as the only method to create
2  valuation.
3  Q.  But at the time of preparing the document, that
4  was the balance.
5  A.  That's the balance sheet number, correct.
6  Q.  Let's take a look at the April operating report.
7  Let me go back to the March report.  Did you sign
8  that?
9  A.  Yeah, I signed it.  I should have signed.
10  Q.  It's your signature?
11  A.  Yeah.
12  Q.  Okay.
13  Did you provide express written permission for
14  Counsel to affix your electronic signature on there?
15  A.  Yeah, I said, go ahead and use my signature.
16  Q.  Do you recall actually signing the document?
17  A.  No, it was electronic signature.
18  Q.  And was the document complete at the time and did
19  you review it prior to providing your signature?
20  A.  I looked at it, not as much as I am now, but,
21  yes, I did look at it.
22  Q.  And to best your knowledge, was it complete and
23  correct?
24  A.  It was complete.
25  Q.  Let's talk about the April operating report.

Page 35

1  First have you signed that document?
2  A.  Yes, I signed it.
3  Q.  And did you review the contents of the report
4  before signing it?
5      ATTORNEY ZAHRALDDIN:
6  Counsel, do I have April?
7      ATTORNEY CALLAHAN:
8  I hope you do.
9      ATTORNEY ZAHRALDDIN:
10  I was only given one document.
11      ATTORNEY CALLAHAN:
12  I gave him two, I thought.
13      ATTORNEY ZAHRALDDIN:
14  Sorry.
15      THE WITNESS:
16  No, I have March and I have April.
17      ATTORNEY ZAHRALDDIN:
18  Thank you.
19      ATTORNEY CALLAHAN:
20  You're welcome.
21      BY ATTORNEY CALLAHAN:
22  Q.  Mr. Rajan, did you sign the April operating
23  report?
24  A.  I believe so, but I can't find a signature.
25  Yeah.

Page 36

1  Q.  Looks like for the record, it's document number
2  224, filed May 26, '23, page 9 of 12?
3  A.  Yes.
4  Q.  Is that your signature?
5  A.  Yes.
6  Q.  Did you review this document before it was filed?
7  A.  Yes.
8  Q.  Discuss it with your Counsel?
9  A.  Yes.
10  Q.  Okay.
11  This document has a statement of operations.  If
12  you go to -- that's page one of one, but called
13  Stream TV Network's profit and loss statement.
14  A.  Which page?
15  Q.  It's attached at the very end.  It's actually an
16  exhibit to the operating report.  So it's like 13 of
17  -- that's the document.
18  A.  Okay.
19  Q.  Do you see that document?  Did you review that
20  before filing operating report?
21  A.  Not as closely as I should have.
22  Q.  What is it?
23  A.  It's the PNL for Stream TV.
24  Q.  Does Stream TV prepare this document every month?
25  A.  Yes, it does.

Page 37

1  Q.  Okay.
2    And can you tell me why it wasn't attached to any
3    of the other operating reports?
4  A.  No, I can't.
5  Q.  And it seems to reflect that there were no sales,
6    no income, no expenses.  Would that be a correct
7    description --
8  A.  Yeah.
9  Q.  -- of what's in this --
10  A.  That's a correct description.
11  Q.  And this is for April of 2023.
12    Correct?
13  A.  Yeah.
14  Q.  And can you tell me why a balance sheet was not
15    attached to this document?
16  A.  It should have been attached.
17  Q.  Are you aware of one?
18  A.  Yeah, we have balance sheets in the company.
19  Q.  Is there any reason why it wasn't included in any
20    of the documents that you provided in response to the
21    subpoena?
22  A.  No.  It should have been included.
23  Q.  Does somebody review the balance sheet on a
24    monthly basis?
25  A.  It's mainly Suby Joseph that's doing that.

Page 38

1  Q.  And what is Suby Joseph's role with Stream TV?
2  A.  It's financial.  He does accounting, also does
3    forecasting.
4  Q.  Who else is Suby Joseph employed by?
5  A.  He was with VSI.  He's now 1099 at Stream.
6  Q.  And when you say VSI, are they employees of VSI
7    at the time of filing bankruptcy?
8  A.  At the time of filing, they were 1099.
9  Q.  Of VSI as well?
10  A.  Yeah.
11  Q.  Okay.
12    Were they employees of VSI in 2022?  When I say
13    they, I mean Amanda Gonzalez.
14  A.  They were 1099.
15  Q.  Did they receive 1099 forms?
16  A.  Yeah.
17  Q.  Okay.
18    Let me go to the May operating report.  Mr.
19    Rajan, take a look at that document.  And this is the
20    monthly operating report for Stream TV Networks, Inc.
21    Docker number 253, filed on June 21, 2023.  And this
22    is for the monthly report for May of 2023.  And Mr.
23    Rajan, take a look at your signature, if you could
24    please and tell me that's operating that you helped
25    prepare filed with the bankruptcy court.

Page 39

1  A.  Yeah, that is correct.
2  Q.  Your signature appears on page 9 of 24.  You see
3    that, sir?
4  A.  Yeah.
5  Q.  If you look on that page, you'll see that the
6    Debtor reports that there was no income from salary
7    or wages.
8    Correct?  Self-employment, gross income from all
9    other sources, zero, zero, zero.
10    Right?
11  A.  Correct.
12  Q.  Expenses, zero.
13    Correct?
14  A.  Correct.
15  Q.  If you go to the balance sheet on page 14 of 24.
16    Are you there, Mr. Rajan?
17  A.  Yeah, I'm here.
18  Q.  Okay.
19    Take a look at the last line, the total
20    liabilities and equity.  And you'll see columns for
21    the month, March 15, 2023, at the top, March 31.  You
22    see that, sir?
23  A.  Yeah.
24  Q.  April 30 and May 31.  And what is the total
25    liabilities and equity stated there?

Page 40

1  A.  You're on total current liabilities?
2  Q.  No, the last line, total liabilities and equity.
3  A.  $99 million.
4  Q.  Okay, that's 99, I think, $961,459.
5  A.  Yeah.
6  Q.  And that is different than it was reported for
7    the March operating report.  Do you call that where
8    it was 91 days?
9  A.  I need to see the March one again.
10  Q.  You should have it.
11    Right?
12  A.  So it was 91.
13  Q.  Right.
14  A.  Oh, wait a second.  Yeah, 91 and this one is 98.
15  Q.  So you understand that's a revision from the
16    amount that was presently stated on the balance
17    sheet.
18  A.  Correct.
19  Q.  Were you aware of that change before today?
20  A.  Yes.
21  Q.  And could you tell me how that change occurred?
22  A.  Again, the issue is we were supposed to get all
23    of our assets back.  We won in Supreme Court at the
24    beginning of the bankruptcy --
25  Q.  Pre-petition.

Page 41

1 Right?
2 A.  Right, yeah.
3 Q.  Let's go post-petition.
4 A.  I know, that's what I'm saying.  We have not
5 received it yet.  So as the case is going forward,
6 they are doing the best they can to estimate assets
7 and liabilities without having our equipment back,
8 having our records back, having our financials back.
9 If we had all of our stuff back like we're supposed
10 to, you wouldn't have any of these issues.
11 Q.  I'm not sure how the numbers have changed
12 without --
13 A.  Because they're estimating the value of assets
14 that we have title to, but no possession, and they're
15 withholding the records.
16 Q.  Okay.
17 A.  So if we had all the assets back, you wouldn't
18 have any of these issues.
19 Q.  So if you could take a look at the -- again, on
20 the balance sheet of the May operating report.  A
21 couple of lines up from the bottom, there's something
22 called additional paid in capital.  And there's two
23 entries there in the first column, Visual Technology.
24 A.  Okay.
25 Which page are you on?

Page 42

1 Q.  I'm on the balance sheet of page 14 to 24.  Are
2 we on June?
3 A.  I'm in May.
4 Q.  I'm sorry.  I'm still in May.  I apologize.  If
5 you go up seven or eight lines up, you'll see an item
6 called Visual Technology Innovations.  So you see
7 that?  Page 14 of 24.
8 A.  Yeah, I'm here.  Okay.  Yeah.
9 Q.  Visual Technology Innovations.  Immediately below
10 Visual Semiconductor.
11 A.  Correct.
12 Q.  And you see columns to the right, different
13 dates.  March 15, 2023, March 31, 2023, April 30,
14 2023, and May 31, 2023.  Do you see those numbers
15 change or those numbers?
16 A.  Yeah, I see them.
17 Q.  So it would appear with Visual Technology
18 Innovations that there was paid in capital of
19 $3,942,120.  Do you read it that way, sir?
20 A.  Yeah, correct.
21 Q.  What is that?
22 A.  When we lost in the Chancery Court in 2020, we
23 had a company set up Glasses Free Technologies.  Then
24 we had a company called VPI, which is doing a
25 stitching and tiling technology.  Then we had to set

Page 43

1 up Visual Semiconductor, which was starting to do
2 hologram technology.  So in 2021, were operating with
3 Glasses Free and VTI.  Then we switched over in 2022
4 to Visual Semiconductor.
5 Q.  Mr. Rajan, the visual technology innovations in
6 visual semiconductor indicates that there was paid in
7 capital, each of approximately $7 or $8 million.
8 Would you agree with that?
9 A.  Yeah.
10 Q.  Was that paid in capital before or after the
11 bankruptcy was filed?
12 A.  GFT and VTI was all before the bankruptcy.
13 That's Visual Technology Innovations.  Visual
14 Semiconductor, most of this, if not all of it, was
15 probably prior to the bankruptcy filing.
16 Q.  And how about VSI?
17 A.  VSI was probably most, if not all of it, was
18 prior to the bankruptcy filing.
19 A.  Okay.
20 Q.  Do you know why those two entries, Visual
21 Technology and Visual Semiconductor, don't appear on
22 the balance sheet for the March operating report?
23 A.  I mean I think that was a revision from the March
24 operating report.
25 Q.  And you know who would have made that revision?

Page 44

1 A.  That would have probably been Suby Joseph.
2 Q.  Upon whose direction?
3 A.  We had told him to make sure everything was
4 accurate, and then he was updating it.
5 Q.  But there was no note attached to either the May
6 operating report or the June operating -- I'm sorry,
7 balance sheet indicating that that was a revision.
8 Correct?
9 A.  Correct.
10 Q.  Because, as I said, March operated -- balance
11 sheet showed $91,621,218.  So it's about an $8.3
12 million difference in that entry.
13 Correct?
14 A.  Correct.
15 Q.  Let's go to the June operating report.  And
16 again, for the record, that is docket number 300,
17 filed on July 20, '23.  And Mr. Rajan, did you sign
18 -- is that your signature on page --
19 A.  Which one?  I have May.
20 Q.  June I had handed out erroneously earlier.
21     ATTORNEY ZAHRALDDIN:
22 Okay.  We may have handed it back to
23 you, but May, April, March agreements.
24     ATTORNEY CALLAHAN:
25 Page 9 of 12, document number 300.

Page 45

1      ATTORNEY ZAHRALDDIN:
2   Do you have June, Mr. Rajan?
3      THE WITNESS:
4   No.
5      ATTORNEY ZAHRALDDIN:
6   Neither one of us has I -- I swear
7   we're not eating them over here.
8      ATTORNEY CALLAHAN:
9   I know.
10     BY ATTORNEY CALLAHAN:
11  Q.  I don't have a lot of questions about this.  I
12    just want you to verify that you signed it.  Mr.
13    Rajan, do you have that in front of you?
14  A.  Yeah.
15  Q.  Look at page 9 of 12.  When you get to it let me
16    know.
17  A.  June.
18  Q.  Docket number 300.  Yes, June.
19  A.  Yes.
20  Q.  And you're there?
21  A.  Yeah.
22  Q.  Did you sign that?
23  A.  Yes.
24  Q.  Did you go over it with your Counsel before
25    filing it?

Page 47

1   I don't know what that $575 is.  It may have been a
2   payment or something like that.
3   Q.  Do you know who prepared this document?  The
4     balance sheets?
5   A.  It would have been Suby Joseph and help from the
6     other two.
7   Q.  And he would be aware of why there would be a
8     difference of possibly $500 in one month on the
9     balance sheet?
10  A.  Yeah.
11  Q.  But you're not aware of why that changed.
12    Correct?
13  A.  Well, this says earnings, so I assume some money
14    may have come in or something.
15  Q.  What kind of income would the Debtor have?
16  A.  I mean, there's still equipment and things that
17    may need -- like TVs or something that may have
18    needed to have been paid.
19  Q.  Okay.  All right.
20    Let's move to the July operating record.  Mr.
21    Rajan, please just identify that for the record what
22    that is.
23  A.  This is the July operating report.
24  Q.  Yes, sir.  And this is filed on docket number --
25    I don't have it.  Did you sign that document, Mr.

Page 46

1   A.  Yes, we went over it.
2   Q.  And who assisted in the preparation of this
3     document?
4   A.  The same people.
5   Q.  And you note that -- you checked off that a
6     statement of operation was filed operate loss
7     statement, but it was not attached to the monthly
8     report?
9   A.  Yes.
10  Q.  You did file a balance sheet.  And Mr. Rajan,
11    again, we're looking at the last entry, total
12    liabilities and equity.  And if you could just tell
13    me if you understand why or if you know why that
14    entry changes from April 30, 2023, to May 30, 2023.
15    It looks like --
16  A.  Which entry?
17  Q.  The total liabilities and equity.  The last line
18    on the balance sheet from April 30, 2023, May 31,
19    2023.  You see the numbers are -- the totals are
20    different.
21  A.  Correct.
22  Q.  Any understanding or knowledge of why they're
23    different?
24  A.  It looks like it's about $500.  I don't know what
25    cost -- yeah, he has earnings post-petition, $575.

Page 48

1   Rajan?
2   A.  Yes.
3   Q.  I'm going to turn to page two of that document.
4     I'm sorry, I don't have it paginated.  The page of
5     the document shows up as the top line receipts and
6     disbursements.  When you see that, let me know.
7      ATTORNEY ZAHRALDDIN:
8   It's paginated at the bottom.  You've
9   got it a two at the bottom.
10     ATTORNEY CALLAHAN:
11  Oh, good.  Thank you.  Page two.  Thank
12  you.
13     ATTORNEY ZAHRALDDIN:
14  No worries.
15     BY ATTORNEY CALLAHAN:
16  Q.  Okay.
17    Let's go through some of the entries here.  Cash
18    balance, beginning of month, $1,740.
19    Correct?
20  A.  Correct.
21  Q.  And then Part E says disbursements made by third
22    party for the benefit of the estate.  Do you see
23    that?
24  A.  Correct.
25  Q.  And how much was that?

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

In Re: Stream TV Networks, Inc. Technology & Media Apps
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

---

Page 49

1 A.  $750,813.

2 Q.  And from what source were those funds paid by
3 this third party?

4 A.  VSI paid it for Stream TV because that's -- VSI
5 was making payments for Stream TV.  That's when we're
6 having a problem with the DIP account.  So VSI had to
7 make payments.

8 Q.  And note that it says in that column, current
9 month.  That means for July of 2023.

10 A.  Correct.

11 Q.  So is it your testimony that VSI made
12 disbursements for the benefit of Stream TV in the
13 month of July in the amount of $750,813?

14 A.  It's our testimony that, if you remember, when we
15 came to the court, we said there was a problem
16 because when I was in the hospital.  Two, we had
17 issues with the bank account.  So they were trying to
18 use this statement to begin making revisions.  So
19 from the beginning of the bankruptcy up until this
20 point, we had spent about $750,000.

21 Q.  I'm just using that term because it appears in
22 the column to the right.  It says $753,313,
23 cumulative.  Do you see that?

24 A.  Yeah, cumulative, correct.

25 Q.  But according to this report, $750,813 was paid

---

Page 50

1 in July of 2023 on behalf of Stream TV.
2 Correct?

3 A.  Cumulatively.

4 Q.  Well, it says current month.

5 A.  Yes, it says current month.  It says it in both
6 columns.  Correct.

7 Q.  It says $750,813 in the current month of July of
8 2023, cumulative.  Presumably you knew that was from
9 March 15, 2023, the filing date.

10 A.  Correct.

11 Q.  So prior to July, it would appear that this
12 operating report indicates that only $3,000 -- well,
13 $3,000 and change were paid prior to July of 2023.

14 A.  It's $753,000 from the bankruptcy through this
15 date.  The current month was not $750,000.  It's a
16 smaller number and they're reflecting it in the
17 current month.  But they should have written an
18 explanation.

19 Q.  When you say they, who are they?

20 A.  The team that was preparing it.

21 Q.  Can you just identify the team?

22 A.  It's Suby and Amanda and Dan.

23 Q.  But you testified that you reviewed these prior
24 to filing this.  So you acknowledge this is an
25 inaccurate report?

---

Page 51

1 A.  It was a mistake.  Correct.

2 Q.  Okay.

3 A.  Because in June of -- you will recall in June of
4 2023, you testified at a hearing before Judge
5 Coleman.

6 A.  I wasn't in June.

7 Q.  Are you sure?

8 A.  No, I was in the hospital.

9 Q.  When did you testify?

10 A.  I didn't testify until middle of August.

11      ATTORNEY ZAHRALDDIN:
12 Well, we can check.

13      THE WITNESS:
14 June, I wasn't there.

15      BY ATTORNEY CALLAHAN:
16 Q.  Now you'll note that if VSI was paying expenses
17 of Stream in March, April --

18 A.  March, April, May, June, and July.

19 Q.  And why didn't that information show up on the
20 operating reports that there were payments made?

21 A.  In my testimony in August, what I said was, I was
22 in the hospital.  I didn't get a chance to review the
23 monthly operating report as closely as I should have.
24 The box should have been checked off.  That is what I
25 testified to.  And we will revise it.  I said in

---

Page 52

1 August we will start doing revisions.  They went back
2 and started making the revisions in August.

3      ATTORNEY ZAHRALDDIN:
4 Mr. Callahan, would you prefer I wait
5 till later to ask a question?

6      ATTORNEY CALLAHAN:
7 You can.

8      ATTORNEY ZAHRALDDIN:
9 Mr. Rajan, though VSI and the Debtor
10 share some common folks, particularly under the
11 conditions that you've described with the omnibus
12 agreement, are they two separate companies?

13      THE WITNESS:
14 They're two separate companies.

15      ATTORNEY ZAHRALDDIN:
16 And Mr. Rink, who we've talked about,
17 is he part of any sort of committee or other
18 governance at VSI?

19      THE WITNESS:
20 He's on the board of VSI.  He's staying
21 at VSI.

22      ATTORNEY ZAHRALDDIN:
23 Okay.
24 So he's on the board.  Is he on any
25 other special committee?

---

**Page 53**

1    THE WITNESS:
2  He's on a committee that also oversees
3  any money that's transferred to Stream TV.
4    ATTORNEY ZAHRALDDIN:
5  And in his capacity involved in the
6  operating reports, when has he provided to you
7  information regarding the transfer of shares or
8  Subscription Agreements to validate any of the
9  payments that VSI was making. At what point in time
10  did he report those things?
11    THE WITNESS:
12  He does it on a regular basis.
13    ATTORNEY ZAHRALDDIN:
14  Okay.
15  And up until we looked at this stuff
16  recently, was he doing it on a monthly, a quarterly,
17  biannually. When did we get those letters from him?
18    THE WITNESS:
19  He essentially does it monthly, but now
20  he's doing it even faster. He's doing it even
21  faster. Roughly, they fall monthly, but he's doing
22  it even faster.
23    ATTORNEY ZAHRALDDIN:
24  That's all.
25    BY ATTORNEY CALLAHAN:

**Page 54**

1  Q.  Mr. Rajan, when did you first learn that the
2  operating reports filed in March, April, May and June
3  did not contain accurate information?
4  A.  When I got out of the hospital.
5  Q.  And when did you get out of the hospital?
6  A.  I got out at the very end of July. Then in
7  August is when I found that the box wasn't checked.
8  It wasn't checked for two reasons. One, the DIP
9  account in Stream wasn't working. So they had VSI
10  paying the expenses. And then you're supposed to
11  check the box on the monthly operating report. If a
12  third party is paying on behalf of the Debtor, it
13  wasn't checked. So then they're trying to fix the
14  expenses. So when we filed the bankruptcy, we tried
15  to set up the DIP account. We didn't have the DIP
16  account, and then I ended up in the hospital. So the
17  only way they could pay the Stream bills was to wire
18  it straight in from VSI to the vendors. But once he
19  got out, we were able to get the DIP account
20  operational. So now we're paying out of the Stream
21  DIP account, which has made it a lot easier.
22  Q.  So I'm going to show you a copy of an email.
23  A.  Thank you.
24  Q.  Mr. Rajan, this is an email from Bennett Fisher,
25  who's on the phone line here, to my colleague James

**Page 55**

1  Gannone, with copies to certain individuals. This
2  email was sent on June 1, 2023. You'd read it to
3  yourself and tell me if you recall reviewing a copy
4  of this.
5  A.  I wasn't copied on this email. I had heard about
6  it. This is when I was in the hospital. But this is
7  what I was trying to explain to you earlier. We've
8  sort of started from scratch with the books and
9  records in March. So it's not as easy because we're
10  doing everything manually. It's not as easy as it
11  was before because they're not giving the company
12  records back even though they're under court order,
13  and they're doing that on purpose to mess us up. And
14  so we're trying to do it by hand before it was all
15  automated through Microsoft 360.
16  Q.  Well, tell me again, why it would appear from
17  this email, though it's not explicitly stated, you
18  were aware of this email.
19  Right?
20  A.  Yeah, I know they're having problems with the
21  balance sheet because they're doing it by -- they're
22  doing it by hand.
23    ATTORNEY ZAHRALDDIN:
24  Mr. Callahan, can I ask one question?
25    ATTORNEY CALLAHAN:

**Page 56**

1  Go ahead.
2    ATTORNEY ZAHRALDDIN:
3  Mr. Rajan, my understanding is that you
4  have a balance sheet from the available records, as
5  you testified here, and that balance sheet is kind of
6  the best we can do at this time, and that's been
7  carried forward.
8  Is that correct?
9    THE WITNESS:
10  Correct. Once we get our records back,
11  then it's easy to reconcile it.
12    BY ATTORNEY CALLAHAN:
13  Q.  Yeah, I'm trying to understand, Mr. Rajan, why
14  the operating reports were incorrect and they have
15  not been corrected. You acknowledge that the
16  operating reports were inaccurate with respect to
17  responses to certain information for the months March
18  through June.
19  A.  Correct. The reason why they were inaccurate was
20  the starting point on the balance sheet was not
21  correct. Two, we had a problem with the bank account
22  for Stream TV, so they were sending it in. They're
23  inputting everything by hand, which is terribly time
24  consuming as opposed to automation. So they are
25  making mistakes by doing everything manually when 89

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit Transcripts   Page 17 of 171
In Re: Stream TV Networks, Inc. Technology and Media Aps
Bankrtupcy Rule 2004 Examination
Mathu Rajan PMQ
November 13, 2023

Page 57

1 percent of it was done automatically.
2 Q.  Well, let's just go through some of the questions
3 proposed in the July operating report where the
4 Debtor acknowledges that they were making -- that
5 disbursements were being made on the Debtor's behalf.
6 You'll see on part four, general and administrative
7 expenses.  It would appear that $750,829 was paid.
8 A.  Which page?
9 Q.  Page two of the July operating report.
10 A.  Right here.  Yeah, that's -- where are you?
11 Q.  Down at bottom, part four, section E.
12 Do you see that, sir?
13 A.  Yeah.
14 Q.  And were those administrative expenses -- what
15 were they composed of?
16 A.  Okay.
17 Again, this should really be cumulative, not in
18 the current month, but that would have been expenses
19 that the company incurred from the beginning of the
20 bankruptcy.
21 Q.  So let's go to page eight, part seven
22 questionnaire during this reporting period.  When you
23 get there, let me know.  Part A, were any payments
24 made on pre-petition debt in response to this
25 operating report was no.

Page 58

1 A.  Pre-petition debt, correct.  Yeah.
2 Q.  So when this July report was filed, you knew that
3 VSI had made payments to parties on behalf of.
4 A.  No, it's not pre-petition.
5 Q.  Before I get there, you said no, but I wanted to
6 just make sure you understand your response.  When
7 you filed the July operating report, you were aware
8 that VSI since the petition date, cumulative.  You
9 acknowledged the entry was incorrect, but cumulative
10 had made disbursements of over $750,000 for Stream
11 TV.
12 A.  Correct.
13 Q.  The question posed here is, were any payments
14 made on pre-petition debt?  And the response here is
15 no.  So your testimony today is that VSI on behalf of
16 Stream --
17 A.  Oh, you're talking about like in 2021?
18 Q.  No, I'm talking about since March of 15th, 2023.
19 Did VSI make any payments on behalf of Stream to any
20 pre-petition debt owed by Stream?
21 A.  I don't think so.
22 Q.  And what is the basis of your response?
23 A.  I don't know of any pre-petition.  You're saying
24 pre-petition debt paid post-petition?
25 Q.  Yes, sir.

Page 59

1 A.  Yeah, I don't know of any pre-petition debt.
2 Q.  Okay.
3 And we're going to talk a little bit about the
4 bank statements and the disbursements made later, but
5 your testimony right now is that we don't believe
6 any --
7 A.  I don't think so.
8 Q.  -- pre-petition debt was paid on behalf of the
9 Stream.  Okay.
10 Let's go down the line here.  Were any payments
11 made to or on behalf of insiders?  And again, you
12 acknowledge that VSI disbursements were done
13 cumulatively.
14 A.  Correct.
15 Q.  March 15, 2023.  And the Debtor here, and you
16 signed this operating report, says that there were no
17 payments made on behalf of insiders.
18 Is that a correct statement?
19 A.  Yeah, that is a correct statement.
20 Q.  Were you paid money by VSI on behalf of Stream
21 since March 15, 2023?
22 A.  Yeah, I have a paycheck.
23 Q.  Has your mother been paid?
24 A.  Yeah, but she's not an insider.
25 Q.  Okay.

Page 60

1 What is your understanding of an insider?
2 A.  Insider is somebody who's like a significant
3 shareholder.
4 Q.  Anything else?
5 A.  No.
6 Q.  Could it be a relative of a significant
7 shareholder?
8 A.  No.
9 Q.  You're the CEO of the company.  You're an
10 insider.
11 A.  Yeah, I'm an insider.
12 Q.  And yet you said there were no insiders paid
13 according to this operating report?
14 A.  Yeah, I'm getting paid.  Yes, I'm getting paid.
15 Q.  So this is not an accurate statement.
16 A.  That is not accurate.
17 ATTORNEY ZAHRALDDIN:
18 Mr. Rajan, were you paid directly to
19 the Debtor or are you saying that this was a payment
20 made by VSI?
21 THE WITNESS:
22 I was getting payments from VSI and now
23 I'm getting payments from the Debtor.
24 BY ATTORNEY CALLAHAN:
25 Q.  And were you, Mr. Rajan, any other officers paid

Page 61

1   by VSI on behalf of Stream?
2 A.  Did VSI pay Stream officers?
3 Q.  Yes.
4 A.  No.
5     ATTORNEY ZAHRALDDIN:
6   Mr. Callahan, can I ask a question?
7     ATTORNEY CALLAHAN:
8   Yes.
9     ATTORNEY ZAHRALDDIN:
10   I apologize for that, for stepping in.
11   Mr. Rajan, are there any other officers at this time
12   of Stream TV?
13     THE WITNESS:
14   Thomas Park.  But he's not getting
15   paid.
16     ATTORNEY ZAHRALDDIN:
17   Is there a reason there are no other
18   officers at this time or employees?
19     THE WITNESS:
20   We have a motion that hasn't gotten
21   approved yet.  The first day motion.
22     ATTORNEY ZAHRALDDIN:
23   Okay.
24   Thank you, Mr. Rajan.
25     BY ATTORNEY CALLAHAN:

Page 62

1 Q.  Okay.
2   Do you have a brother who works for Stream TV?
3 A.  He doesn't work for Stream TV.
4 Q.  Did he ever work for Stream TV?
5 A.  He used to.
6 Q.  How about for Technovative?
7 A.  Yeah, a long time ago.
8 Q.  Let me just go back for a moment.  With respect
9   to the Technovative operating reports filed by the
10   Debtor, they indicate no income.
11   Is that a correct statement?
12 A.  No income?  Yeah, no income.
13 Q.  Have payments been made on behalf of
14   Technovative?
15 A.  Since the bankruptcy filing?
16 Q.  Yes, sir.
17 A.  No, not since the bankruptcy filing.
18     ATTORNEY ZAHRALDDIN:
19   Can I ask a question real quick just to
20   the refresh?
21     THE WITNESS:
22   Okay.  So there's no payments to the
23   subsidiaries.  We did have a legal case in the
24   Netherlands which is part of the Debtor and the
25   Debtor's estate where money was paid for the court

Page 63

1   cases.  And there's a question on how to classify.
2     BY ATTORNEY CALLAHAN:
3 Q.  How was that transaction -- how was that done?
4   VSI?
5 A.  VSI wired money into the law firms.  And let me
6   think here.  Some of our shareholders may have wired
7   money straight to the law firms and got shares in
8   VSI.  And then we're still in the process trying to
9   figure out how to classify.
10     ATTORNEY ZAHRALDDIN:
11   Mr. Rajan, was the Debtor a named party
12   in any of the Netherlands actions?
13     THE WITNESS:
14   It's difficult to tell because they
15   don't have it set up like they do in the U.S.  I was
16   definitely a named person.  Thomas Park, I believe
17   was a named person.  But it's for the Stream TV
18   assets.  So the case was about Stream TV.
19     ATTORNEY ZAHRALDDIN:
20   But there was no Debtor entity that was
21   a party except for maybe Mr. Park.  But that wasn't
22   in his capacity as CFO for Stream.
23   Correct?
24     THE WITNESS:
25   It was in his capacity as a Stream

Page 64

1   represent -- as somebody who's working for Stream.
2     ATTORNEY ZAHRALDDIN:
3   Okay.
4   Is that why he was sued?  Because he's
5   working for Stream?
6     THE WITNESS:
7   Stream was putting him in as the
8   director for the subsidiaries.
9     ATTORNEY ZAHRALDDIN:
10   I discussed this with you.  The legal
11   ramifications of that.  We were in the process of
12   discussing it with the U.S. Trustee, but I wanted to
13   make sure, we made sure that fact was clear is that
14   the Debtors are not parties in the entity over there.
15   Correct?  In those proceedings for
16   which you said there's law firms.
17     THE WITNESS:
18   Yeah.  It's not named per se, but it's
19   about the Debtor and the Debtors' estate.
20     ATTORNEY ZAHRALDDIN:
21   Okay, fair enough.
22     ATTORNEY CALLAHAN:
23   I may have to take a quick minute break
24   here.
25   ---

Page 65

1    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
2    ---
3    BY ATTORNEY CALLAHAN:
4    Q.   All right.  We're back on the record.  And Mr.
5    Rajan, I'd like you to look at the July operating
6    report.  There was an attachment to the operating
7    reports towards the back to show you the copy I have.
8    It's called schedule one.  VSI expenses paid on
9    behalf of Stream.  When you get there, let me know.
10   Are you there, sir?
11   A.   Yes.
12   Q.   Could you identify that document, please?
13   A.   These are VSI expenses.  I'm sorry, Stream TV
14   expenses that VSI paid.
15   Q.   Okay.
16   And who prepared this document?
17   A.   This would have been Amanda and Suby and Dan.
18   Q.   All right.
19   And previously you testified that Amanda Gonzalez
20   is responsible for, you said, a receptacle of
21   documents, particularly expenses and receipts and
22   invoices that were used to decide who to pay and when
23   to pay -- for VSI to decide who to pay and when to
24   pay.
25   Correct?

Page 66

1    A.   Correct.
2    Q.   And you testified that your mother, Jeeva Rajan,
3    is that her name?
4    A.   Yes.
5    Q.   Would actually do the wire transfer for VSI.
6    A.   Stream TV.  I'm doing it.
7    Q.   Okay.
8    Well, the Stream TV expenses, you decided which
9    expenses should be paid on VSI.
10   A.   Correct.  And then when Stream pays the vendors
11   or pays expenses, now I have to go into the branch
12   and do it.
13   Q.   I'm talking about from March 15, 2023 to July.
14   A.   Oh, to July.  Yeah, that was VSI was sending
15   money.
16   Q.   And was there any other party involved in that
17   process of VSI making payments?
18   A.   The wire transfer?
19   Q.   Yes, sir.
20   A.   No, my mother did the wire transfers and then
21   Amanda was helping.  Okay.
22   Q.   At the time, Amanda -- since this bankruptcy was
23   filed, Amanda was an independent contractor for VSI
24   during this time period from March through July of
25   2023?

Page 67

1    A.   Yes.
2    Q.   Okay.
3    Was there anyone else who works exclusively for
4    VSI involved in that process?
5    A.   Yeah, I mean, the employees would get receipts
6    and invoices and disbursement forms and get them to
7    Amanda.  And Amanda would take care of it from there.
8    Q.   You're using that word employees?
9    A.   I'm sorry, 1099.
10   Q.   From March 15, 2023, to July of 2023, did Stream
11   have any employees?
12   A.   Just me and Thomas Park, but he's not getting
13   paid or anything.
14   Q.   And how about Technovative?  Did Technovative
15   have any employees from March 15 to 2023?
16   A.   It's me.
17   Q.   Just you.  Okay.
18   Did VSI have any employees from March 15, 2023,
19   to July 2023?
20   A.   No, they're 1099.
21   Q.   Okay.
22   And who are the officers of VSI?
23   A.   I'm an officer at VSI, but the control now is
24   with an independent board.
25   Q.   And who are the members of that board?

Page 68

1    A.   It's Dan Rink, Joe Corso, and Tom Sego.
2    Q.   Tom Sego.
3    A.   Yeah, S-E-G-O.
4    Q.   All right.
5    Now back to the schedule one again.  And you said
6    this was prepared by a number of people, including
7    Suby Joseph and Amanda Gonzalez.
8    A.   Amanda and then Dan and Suby helped.
9    Q.   And did you review this document before it was
10   attached to the operating report and filed?
11   A.   Yes.
12   Q.   And do you believe it contains accurate
13   information?
14   A.   I believe so, yes.
15   Q.   All right.
16   Let's go through it.  Again, just to familiarize
17   yourself again with this document, you'll see columns
18   at the top indicating cost center.  You see that?
19   And who defined these labels below?  Accounting,
20   development, total development, marketing, the
21   miscellaneous payroll sales.  Who created this
22   document?
23   A.   This is -- who created this document?
24   Q.   Yes, sir.
25   A.   Then it would have been predominantly Amanda,

Page 69

1  with Suby and Dan helping her.
2  Q.  And again with these three -- Dan Rink, you're
3  talking about?
4  A.  Yeah.
5  Q.  Okay.
6  A.  A little bit.
7  Q.  And you, of course, because you're here,
8  testifying on --
9  A.  But I didn't go into the computer and start
10  typing.  They were typing it.
11  Q.  But you're familiar with it now.
12  A.  I'm familiar, yes.
13  Q.  So let's talk about some of the amounts.  And
14  again, top column has date periods, so it'd be
15  3/16/23 to March 31, '23 and April, May, June.  And
16  would the last column be a total.  Appears that way.
17  A.  Yeah.
18  Q.  2023 post-petition.
19  A.  Yeah.
20  Q.  So did VSI.  Were there any parties other than
21  VSI who made payments or disbursements on behalf of
22  Stream since March 16, 2023?
23  A.  The only issue which we have to figure out is the
24  legal expenses in the Netherlands.  Some of the
25  shareholders wired the law firms.

Page 70

1  Q.  Shareholders of whom?
2  A.  VSI.
3  Q.  Okay.
4  Did you identify those shareholders?  Do you know
5  who they are?
6  A.  Yes.
7  A.  The Walpoles.
8  Q.  Spell that.
9  A.  W-A-L-P-O-L-E-S.
10  Q.  Walpoles?
11  A.  Yeah.
12  ATTORNEY ZAHRALDDIN:
13  Can I also go off the record for 1
14  second?  I apologize.
15  ---
16  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
17  ---
18  BY ATTORNEY CALLAHAN:
19  Q.  Can you identify again Mr. Walpoles in connection
20  with funding --
21  A.  He's a VSI shareholder.
22  Q.  Okay.
23  And he's made a commitment to fund --
24  A.  Instead of sending the money to VSI, we're in a
25  bit of a rush because they scheduled a hearing in the

Page 71

1  Netherlands.  So he sent money to the law firm.
2  Q.  And who does the law firm represent?
3  A.  Well, they represent me, Mr. Park and the Debtor
4  and the Debtor's estate.  We were running the
5  subsidiary.  They were trying to block us from
6  running the subsidiary.
7  Q.  When you're saying subsidiary, do you mean a
8  subsidiary of Stream or a subsidiary of Technovative?
9  A.  Well both.
10  Q.  All right.
11  So other than Mr. Walpole, has any other party
12  paid any expenses on behalf of Stream since March of
13  2023?
14  A.  Not that I remember.  I don't think so.
15  Q.  As far as you know today --
16  A.  As far as I know.
17  Q.  -- there's no record.
18  A.  I don't remember that.
19  Q.  All right.
20  Let's talk a little bit about this schedule.
21  ATTORNEY ZAHRALDDIN:
22  Mr. Callahan, can I ask a question?
23  Did Mr. Walpole receive shares in Stream or in VSI
24  for his payment?
25  THE WITNESS:

Page 72

1  VSI.
2  ATTORNEY ZAHRALDDIN:
3  Okay.  Thank you.
4  BY ATTORNEY CALLAHAN:
5  Q.  Was Mr. Walpole -- who negotiated on behalf of
6  VSI with Mr. Walpole and his purchases, shares and
7  stock at VSI?
8  A.  It was a little bit me, and then it was Dan Rink.
9  Q.  When you say a little bit of you, what do you
10  mean by that?
11  A.  I was calling, said, hey, we need money.  And
12  then Dan went and took care of the paperwork and the
13  pricing and all those things.
14  Q.  And have you participated in negotiations with
15  other shareholders for the sale of shareholders --
16  sale of shares in VSI to other potential shareholders
17  in connection with this bankruptcy case?
18  A.  Since the independent committee came in, they've
19  taken over the fundraising activities.
20  Q.  How about since March 15th, 2023?
21  A.  In the beginning of March, I was involved.  From
22  May onwards, the independent committee was involved
23  in negotiating fundraising.
24  Q.  You say independent committee.  Does that mean
25  independent of you?

---

Page 73

1  A.  Yeah.
2  Q.  So they are authorized to take actions without
3  your consent?
4  A.  Yeah.
5  Q.  Okay.
6      Again, back to the columns here.
7  A.  Now I understand.  You asked that question about
8  why it was in cumulative and monthly.  Now I remember
9  why it was in both.  They didn't have a
10  reconciliation of the shares.  So under accounting
11  rules, my understanding is you had to put it in both
12  columns.
13  Q.  Both columns of what?
14  A.  The question you asked before the break, why was
15  the 750 in both --
16  Q.  Cumulative as opposed to current?
17  A.  Cumulative.  It was also current.  They didn't
18  get a reconciliation of the shares.
19  Q.  What do you mean?
20  A.  My understanding, when they were doing the
21  monthly operating report, you had to list it in both.
22  Q.  Yeah, you used the term let they.  Who are you
23  -- who are you referring to when you say they did
24  this or they did that?
25  A.  Well, the whole team, Amanda, a little bit Suby,

---

Page 74

1  some Dan, our lawyers.  My understanding is under
2  accounting rules, if you don't have reconciliation
3  shares, you have to list it in both.  Once you get
4  the reconciliation shares, then you can disburse it
5  like this.  Like $86,000 here.  They didn't have a
6  reconciliation of the shares.  That's why it's listed
7  in both.
8  Q.  Okay.
9      Let's talk about some of the items on this
10  document.  You could go down to development and
11  there's a disbursement in April of 2023 of $22,500.
12  Third item down, fourth item down.  Under
13  development, there's bank fees, charges, fees and
14  travel.
15      ATTORNEY ZAHRALDDIN:
16  It's on the schedule.  It's the very
17  last -- there you go.
18      BY ATTORNEY CALLAHAN:
19  Q.  Do you see that, sir?
20  A.  Yeah.
21  Q.  Development total $22,500.
22  A.  Right.
23  Q.  What was that expense?
24  A.  The exact expense?
25  Q.  Yeah.  What was it disbursement for?  It says

---

Page 75

1  fees under development.
2  A.  I don't remember exactly what it was.  It would
3  have been something relating to.  Oh, it was probably
4  -- that is for the electronics for the production
5  fees.
6  Q.  What are electronics for production fees.
7  A.  Okay.
8  So right now we're going to be shipping TDs.  And
9  so there's NRE fees for -- it's called non-recurring
10  engineering fees for the cost to set up like a mold
11  for the electronics.  That $22,000 is for the mold
12  for the electronics.
13  Q.  Okay.
14      Is there an invoice that was generated?
15  A.  Yeah.
16  Q.  Can you tell me why that wasn't provided?
17  A.  I'm not sure that it wasn't.
18  Q.  We're going to go over the documents.
19  A.  Okay.
20  Q.  You think it was.
21  A.  It'll be on the bank statements that should have
22  been paid for.
23  Q.  Is it one company that this fee was paid to?
24  A.  It was paid to our vendors, yeah.
25  Q.  One vendor or multiple vendors?

---

Page 76

1  A.  It's probably just one vendor.
2  Q.  Do you know who it might be?
3  A.  Probably Joveai.
4  Q.  Could you spell that?
5  A.  J-O-V-E-A-I.
6  Q.  J-O-V-E-A-I.  And you believe that document, that
7  receipt or invoice will appear on bank statements?
8  A.  Yeah.
9  Q.  Okay.
10  And then the following month, there was a fee of
11  $2,500 filed in June by a fee of $2,500.
12  A.  Yeah.  That's server cost for our software.  So
13  that probably went to either Amazon or Gift Hub, one
14  of those guys.
15  Q.  And you believe there's a receipt or an invoice
16  or some document showing that.
17  A.  Yeah, that's to house the software because we're
18  getting ready for production.
19  Q.  Because you said earlier that, for example, Ms.
20  Gonzalez, Amanda would receive invoices and somebody,
21  you or somebody in Stream or VSI would have seen this
22  document and then authorized a wire transfer.
23  A.  Correct.
24  Q.  And you believe there are invoices you think
25  might be Google or --

---

Page 77

1 A.  No, Amazon or Gift Hub.
2 Q.  Okay.
3 A.  So these are all getting ready for production.
4 Q.  There's a travel expense of $575 in this section
5   called Development.  Do you know what that travel was
6   for?
7 A.  That was probably for an investor meeting.
8 Q.  Investor meeting on behalf of Stream.
9 A.  Yeah.
10 Q.  So other than VSI, has Stream issued shares of
11   stock to any other party?
12 A.  No, just to VSI.
13 Q.  Let's get down to marketing.  There's a series of
14   what appear to be for roadshow.  Do you see that?
15 A.  Yeah.
16 Q.  May I characterize them for ease of -- so we
17   understand what we're talking about as invoices or
18   expenses?
19 A.  Yeah.
20 Q.  And what is a roadshow?
21 A.  That's either for customers or it was for
22   investors.
23 Q.  What does that mean, a roadshow?  What is it?
24 A.  That's the terminology used in QuickBooks.
25 Q.  It's the terminology for what?  I didn't hear

Page 78

1   you.
2 A.  That's the terminology they use inside
3   QuickBooks.
4 Q.  Okay.
5 A.  It is the title for QuickBooks.  So usually we
6   took the TV and we had to ship it somewhere, and then
7   somebody went and did a demonstration.
8 Q.  How many TVs does Stream have in its possession
9   today?
10 A.  For demonstration purposes?
11 Q.  Yes, sir.
12 A.  Probably about 30.
13 Q.  And how many people are involved in the roadshow
14   from Stream?
15 A.  It could have been one of about 25 people.
16 Q.  And are they all independent contractors for
17   Stream?
18 A.  Yeah.  They're waiting to become W2 now.
19 Q.  Okay.
20   Yeah, you said that going forward from September.
21 A.  They're all former Stream employees before all of
22   this happened.
23 Q.  Okay.
24   So they are -- a roadshow is an independent
25   contractor or soon to be employee of Stream going out

Page 79

1   to different places and demonstrating Stream TV
2   technology.  Would that be a fair description of what
3   a roadshow is?
4 A.  Yeah, I mean, it would have been for different
5   purposes.  Some of it would have gone under roadshow,
6   some of it would have gone under general travel.  So
7   the roadshow would have definitely included showing
8   of the TV, whereas travel would have been just for
9   plane tickets and other things.
10 Q.  Okay.
11   What will be entailed with an expense that if
12   it's not plane tickets or travel or compensation as
13   an independent contractor.
14 A.  We may have to rent like, a conference room.
15 Q.  And there are invoices for this that were --
16 A.  That's what it was.
17 Q.  Do you know why those invoices were not submitted
18   as a response to our production requests?
19 A.  I don't know the details of these --
20   COURT REPORTER:
21   I'm sorry.  It's hard, you're not
22   letting me get the question out first.   Can you --
23   Do you know why they were not submitted as a response
24   to our --
25   ATTORNEY CALLAHAN:

Page 80

1   Production request?
2   THE WITNESS:
3   I don't know the details of these
4   roadshows other than -- you're asking what type of
5   expenses would show up in a roadshow?
6   BY ATTORNEY CALLAHAN:
7 Q.  Yes, sir.
8 A.  I don't know if they rented hotel conference
9   rooms during that time period.
10 Q.  Well, all of these items on this sheet were
11   presented to you for authorization to make payment.
12 A.  Right.  I don't remember them -- okay, let me be
13   clear.  I don't remember during this time period them
14   renting a hotel conference room.  So this would have
15   been predominantly the movement of the TV cost
16   associated moving the TV to a location.
17   ATTORNEY ZAHRALDDIN:
18   Mr. Callahan, can I ask a quick
19   question?  Mr. Rajan, how much these TVs weigh?
20   THE WITNESS:
21   About 100 pounds.
22   ATTORNEY ZAHRALDDIN:
23   And you need to have -- are they
24   sensitive?  I mean explain the --
25   THE WITNESS:

---

Page 81

1  Yeah, they're 100 pounds.  They have to
2  go in special packaging and then we have to make
3  arrangements for shipment.  A lot of times, because
4  they're so fragile, they will have somebody actually
5  drive it in a truck to the location.
6      BY ATTORNEY CALLAHAN:
7  Q.  Suppose these folks who would drive it in a
8  truck, whether the truck is rented, they would --
9  they meaning these companies that are doing business
10  with Stream would present an invoice to Stream for
11  payment and VSI would make this payment?
12 A.  Before August they were sending the bills to VSI
13  and VSI was paying it.  But these are Stream
14  expenses.
15 Q.  But you knew them to be Stream expenses, you
16  authorized the payment.
17 A.  Right.
18 Q.  They're Stream expenses even though VSI was
19  paying them.
20 A.  Correct.  For these are all Stream expenses.
21  These are all customers and investors for the Stream
22  bankruptcy.  And it's all for the Ultra D technology.
23 Q.  Let's talk about legal.  And what is the legal
24  expense listed here on schedule one?
25 A.  Well, one is bank -- is a wire transfer fee.

---

Page 82

1  The other one is BMC.
2  Q.  Okay.
3  General, $5,000 of payment was made to BMC.
4  A.  Yeah.
5  Q.  It's a bankruptcy charge?
6  A.  Yeah.
7  Q.  They're the entity that does noticing for the
8  bankruptcy case.
9  Correct?
10 A.  Correct.
11 Q.  Okay.
12  Let's get down to T and E.  What does that stand
13  for under MISC?
14 A.  I don't remember what T and E is.
15 Q.  Looks like about $9,183 paid total from March
16  through June.
17 A.  I'll have to find out for you.  I don't remember
18  what T and E is.
19 Q.  Well, who would know what expenses it would be
20  comprised of and categorized as T and E expenses?
21 A.  I have to ask, Amanda.
22 Q.  So you don't know?
23 A.  I don't remember exactly what it was.
24 Q.  Okay.
25  And rent.  There are a number of disbursements

---

Page 83

1  made by VSI on behalf of Stream.  And the first one
2  looks like $1,600 with a footnote rent paid to Taiwan
3  landlord.  Do you see that, sir?
4  A.  Yes.
5  Q.  And are you aware of the receipt that was
6  presented to Stream that VSI paid?
7  A.  Correct.
8  Q.  And the next one, April 23rd -- April 23,
9  $11,116.97.  That was paid, according to the
10  footnote, to the Beijing office.
11  Correct?
12 A.  Correct.  For their rental payment.
13 Q.  And what is the use of that property?
14 A.  We have right now 1099, soon to be W2 people
15  working there.
16 Q.  Say that again.  I'm sorry.
17 A.  We have 1099 people, soon to be W2 people working
18  in that office.
19 Q.  Could you identify them, please?
20 A.  All their names?
21 Q.  Yeah.
22 A.  Yeah, I have them on a list.
23 Q.  We have a list of -- and you anticipate that
24  Stream will be making them employees of Stream?
25 A.  W2, correct.

---

Page 84

1  Q.  What do they do in Beijing?
2  A.  They're doing -- one, they are doing sales.
3  They're handling the customers.  Two, they're
4  preparing components for the production right now,
5  like the mechanical and the backlight and the chassis
6  for the TV.  They're almost finished for the
7  production.
8  Then they also negotiated a deal for bonding
9  because the other side ran away with the street
10  bonding machine.  They put a deal together for us for
11  another company who has bonding equipment.  It's a
12  company in Japan.  They have bonding equipment both
13  in Japan and in China.  They're working with that
14  company to get the bonding equipment ready for
15  production.
16  Then they're negotiating a deal with several
17  other companies right now, like Lenovo.  If we get
18  our Google Lens returned, hopefully Wednesday goes
19  well in the court, they'll be handling the Google
20  project and getting Google up and running.  They were
21  the ones running the Google project.
22  And then they're working on a contract
23  manufacturer to make the TVs for Southern Telecom.
24  And they're working with Systar to get, assuming
25  things go well, to get the Stream TV bonding

---

Page 85

1  equipment installed for the production.
2      ATTORNEY ZAHRALDDIN:
3  Mr. Callahan, can I ask a quick
4  question?  Mr. Rajan, it might help if you explain
5  the difference between the bonding, the chip, and the
6  electronics as part of why we had offices in
7  different places for the company.
8      THE WITNESS:
9  Okay.  So the bonding, we have a 3D
10  film that we make in Japan.  We design it.  It's
11  glued to a panel.  And all your devices have a glass
12  panel, so it gets glued to the panel.  The bonding
13  machine actually does the gluing.  And then we design
14  chips in Silicon Valley.  And then we have companies
15  who -- they're Taiwan companies, but they're
16  actually going to make it here in the U.S. because
17  everything's happening.  They make the board that
18  holds the chip, and then they mount the chip onto the
19  board, and all those go to the contract manufacturer.
20      BY ATTORNEY CALLAHAN:
21  Q.  Is there somebody who serves as the manager of
22    the Beijing office?
23  A.  Yeah.  Who is that?
24  A.  His name is Mr. Liu.  It's short for Liuzhen.
25  Q.  Can you spell it?

Page 86

1  A.  L-I-U-Z-H-E-N.
2  Q.  And how many contractors other than Mr. Liu are
3    there at that office?
4  A.  I believe off the top of my head, it's over 20.
5    It's 23 or 25 right now.  That's just in Beijing.
6    And then we have people in Taiwan and Japan.
7  Q.  How many people are in -- well, with respect to
8    rent, it appears that since March of 2023, rent was
9    -- through June of 2023, there was rent paid with
10    respect to a warehouse in Taiwan?
11  A.  Correct.
12  Q.  And at the time of the petition, was the Debtor
13    current with the rent obligations to the warehouse in
14    Taiwan.
15    Correct?
16  A.  Yes, I think so.
17  Q.  Is it your understanding that the rent of $1,600
18    paid over the last four months to keep it current?
19  A.  Yes, it's current.
20  Q.  And how often does the rent come due on the rent
21    in Taiwan warehouse?
22  A.  It's a monthly rent, but it's paid sometimes
23    monthly, sometimes it's paid bimonthly.
24  Q.  What is the monthly rent?
25  A.  I think it's $1,600.

Page 87

1  Q.  So do you believe, has the Debtor made any
2    payments other than the $1,600 to the warehouse in
3    Taiwan?  I'm sorry, the Debtor or VSI or anyone else
4    on the Debtor's behalf?
5  A.  No.
6  Q.  So $1,600 is the only payment that's been made to
7    the warehouse?
8  A.  No.  If you look at this, it says $1,600 in
9    March.  Then there's a $3,200 in May for two months.
10  Q.  Okay, got it.
11  A.  And then for Beijing, the payment was made in
12    April.
13  Q.  You said you had an office in Japan.
14  A.  We have people in Japan.
15  Q.  Okay.
16    But not an office?
17  A.  Not yet.  We're about to have.
18  Q.  When you say people, do you mean contractors?
19  A.  Contractors.
20  Q.  And soon to be employees of Stream?
21  A.  Correct.
22  Q.  And were they contractors for Stream before the
23    bankruptcy was filed?
24  A.  No, they were employees.
25  Q.  They were employees.  Okay.

Page 88

1  A.  All these people were all Stream people.
2  Q.  Okay.
3    So the Debtor has at least a residence or mailing
4    address of 20th and Chestnut Street here in
5    Philadelphia.
6    Correct?
7  A.  Correct.
8  Q.  Is there rent owed to that entity?  Who owns that
9    property?
10  A.  The law firm that's there.  Young Park
11    Associates.
12  Q.  Young Park Associates.  And the Debtor has a --
13    does the Debtor do any business there?
14  A.  Yeah, we use the office there.
15  Q.  Is there a lease obligation?
16  A.  Yes.
17  Q.  And how much is the monthly rent?
18  A.  The old rent, they wanted a new deal because they
19    have back rent.  It was roughly about $3,000 or so.
20    It used to be the new deal because they want to get
21    caught up on payments.  They would like to have,
22    like, $12,000 a month until they get caught up.
23  Q.  Have any payments been made to the Philadelphia
24    landlord since the bankruptcy was filed?
25  A.  No, not since the bankruptcy.

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
In Re: Stream TV Networks, Inc. Technology Media Apps   Exhibit Transcripts   Page 25 of 171
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

Page 89

1 Q. And you say you're using that? You meaning the
2   Debtors are using that as an office?
3 A. Yeah.
4 Q. What business is conducted there?
5 A. We have meetings.
6 Q. Meetings? Do you have to pay electric? Do you
7   have to pay electric?
8 A. We're supposed to.
9 Q. You haven't paid?
10 A. No, we haven't paid yet, since the bankruptcy.
11 Q. Now what else is there? Are there laptops? Do
12   any of the contractors work there?
13 A. Occasionally they go in but not that often.
14 Q. Where is Amanda Gonzalez? Where does she live or
15   work?
16 A. She lives in New Jersey. Suby lives outside of
17   Philadelphia, so occasionally, once in a while they
18   go in. There is computers there and office equipment
19   and videoconference equipment.
20 Q. Okay.
21   Next category is shipping. And there appears to
22   be a couple disbursements made by VSI on Stream's
23   behalf. What has the Debtor shipped since the
24   bankruptcy was filed?
25 A. That would have been the TVs.

Page 90

1 Q. So the transportation cost of moving the TVs for
2   roadshow purposes are listed in the shipping --
3 A. No.
4 Q. -- entry?
5 A. Roadshow essentially means somebody went
6   somewhere for a demo. This could be like shipping
7   for a customer who wants to use the TV by themselves.
8 Q. So have any TVs been sold or given to customers?
9 A. Yeah.
10 Q. How many since the bankruptcy was filed?
11 A. Probably seven or eight.
12 Q. So how would Stream book that income from the
13   sale? They're sold, right?
14 A. They're not income, no.
15 Q. Are the TVs sold by Stream?
16 A. No, they're customers using the TVs to get their
17   products ready for the next production run. So this
18   shipping is not, somebody bought ten TVs. We ship
19   them ten TVs. This is an example. Lenovo wanted
20   a 65-inch unit. They would like to sell a 65-inch
21   unit that has a camera on it for videoconference
22   purposes, but in 3D without glasses. So we shipped
23   them a 65-inch TV that they're using to come up with
24   their specs on what they want for the next production
25   run. It's not that we've sold them that 65. They're

Page 91

1   just using it to get ready for the next production
2   run. It's using it for development purposes.
3 Q. Does you have any -- does Stream have any
4   expectation that those TVs will be returned to be
5   sold in the ordinary course, once business begins?
6 A. They'll probably buy them. I don't know if
7   they'll return them.
8 Q. Okay.
9   How many TVs have been shipped since March 15,
10   2023?
11 A. For development purposes not including roadshow,
12   would have been about at least 8 to 11.
13 Q. Okay.
14   There was a trade fair that appears to have been
15   in April of 2023. What was that?
16 A. Yeah, that's Taiwan.
17 Q. It was in Taiwan?
18 A. Yeah.
19 Q. And who attended that trade fair?
20 A. Our Taiwan team and some of the Beijing people
21   and the Japanese team.
22 Q. And what was the nature of this expense? What
23   was the expense?
24 A. The customers wanted to -- we met with the
25   customers at the show since we filed the bankruptcy.

Page 92

1   So they were all going to be there. So everybody met
2   in one location and then they were discussing all
3   their production plans. So we met with like, Hisense
4   and Skyworth and LG and Samsung and Apple and a
5   number of companies came there and met with us at the
6   show.
7 Q. And then we come to under again, this category of
8   what appears to be miscellaneous travel. Do you see
9   that, Mr. Rajan?
10   ATTORNEY ZAHRALDDIN:
11   Last page.
12   BY ATTORNEY CALLAHAN:
13 Q. There's three travels, but let's just talk about
14   the one under miscellaneous, four columns.
15 A. Yeah, that's the one I was talking about. That
16   would be, like, plane tickets and hotels and all
17   kinds of stuff.
18 Q. So we have about a total of $82,000 in travel
19   expense Stream that was funded by VSI.
20   Correct?
21 A. Correct.
22 Q. Do you have an estimate of what the travel has
23   been since June of 2023? Have you traveled?
24 A. I haven't hardly traveled since June. I did a
25   couple of small trips since September. I haven't

In Re: Stream TV Networks, Inc. Technology Media Ups
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

Page 93

1 done any trips.  Then there is personnel traveling in
2 June, July, and August and October.
3 Q.  And again, you believe that there were receipts
4 demonstrating that airfare, for example, or hotel
5 stays.
6 A.  Yeah.  And a lot of this is also coming here for
7 court and stuff like that, like Bud Robertson flying
8 and stuff.
9 Q.  Does the company have credit cards?
10 A.  We have debit cards.  Debit Visa cards.
11 Q.  Debit Visa cards.  And with what account?  The
12 Chase bank accounts that you previously submitted?
13 A.  Yeah.
14 Q.  There's a consultant charge here in April of 2023
15 of $10,000.  And for whom -- to whom was that?
16 A.  Where is that?
17 Q.  Under sales.  Who was the consultant $10,000 was
18 paid?
19 A.  That was somebody who's helping to set up the
20 booth.
21 Q.  Who was the person's name?
22 A.  Oh, the name of the consultant.  I don't have
23 their name.  I can get that for you.
24 Q.  Well, would there be an expected receipt of some
25 sort?

Page 94

1 A.  Yes.
2 Q.  Let me go back up further back to --
3 A.  And the trade fair would have been a fee for the
4 floor space.
5 A.  Okay.
6 Q.  Well, there's two trade fairs here.  One is
7 $6,400 in April, up top and under miscellaneous, and
8 then a $10,000 miscellaneous.  I'm sorry, $10,000
9 trade fair under sales.  Do you see that?
10 A.  Yeah.
11 Q.  What's the difference between the two?
12 A.  One is you had to pay initial fee to hold it, and
13 then you had to pay additional fees for the floor
14 space and everything.
15 Q.  Well, it just says trade fair.  Do you have an
16 invoice for both items?
17 A.  Yeah, we have paperwork for it.
18 Q.  Any reason why you didn't supply it pursuant to
19 our production request?
20 A.  Should be in there.
21 Q.  We'll go over it.
22 A.  Okay.
23 Q.  Yeah, I didn't say it.  You don't know --
24 A.  Yeah, we have it.  I mean, she should have given
25 it.

Page 95

1 Q.  Yeah.  Okay.
2 Let me go back up to payroll.  Looks like
3 consulting fees of total for this time period of
4 $426,988.69.  What was that for?
5 A.  Where is it?
6 Q.  Under payroll cost center.  You'll see three
7 items, bank charges, benefits and consulting fees.
8 A.  Okay.
9 Q.  Can you tell me that -- what was that expense?
10 A.  Which one?  The consulting fee?
11 Q.  Yes, sir.
12 A.  Yeah, that's the 1099 people.
13 Q.  1099 people?
14 A.  That's the payroll.
15 Q.  Payroll.  Okay.
16 A.  For all the people.
17 Q.  So Stream had expenses of at least in 2023 for
18 that four-month period of $426,988.69.
19 A.  Correct.
20 Q.  And your statement today is that's all for 1099?
21 A.  Yeah, that's all the people.
22 Q.  Contractors?  Is there a reason why you call the
23 consulting fees in this category?
24 A.  It's what they had in QuickBooks.
25 Q.  Okay.

Page 96

1 And how about again, was there a distinction
2 between the consulting fees in that category and
3 consultant?
4 A.  Yeah, that consultant is the person who helped
5 with the trade show.
6 Q.  Don't the independent contractors also help with
7 trade shows?
8 A.  No, this is the person who designed the booth and
9 everything.  And you had to pay for the booth.
10 Q.  And going up one line on payroll benefits of
11 $114,705.  What is that for?
12 A.  That's all the health insurance.
13 Q.  And Stream pays health insurance for whom?
14 A.  For the 1099 people.  And the reason why there's
15 a bump there is that we also pay for the people in
16 Asia, they pay quarterly.  So that's why in April,
17 there's a bump in the expense.
18 Q.  So VSI decided to pay these expenses on behalf of
19 Stream.  Does Stream have to account and provide
20 invoices to VSI to allow that transfer?
21 A.  VSI buy shares in Stream.  Then VSI has a deal
22 with Stream to buy shares of equity in Stream.  Then
23 Stream is using it for general business purposes.
24 And now that's why that 750 was in both columns.
25 They didn't have a reconciliation on the shares

In Re: Stream TV Networks, Inc. Technology Media Apps                        Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination                                           November 13, 2023

Page 97

1    between VSI and Stream at the time the MOR was filed.
2    So that's why accounting wise, you have to list it in
3    both.
4    Q.  Okay.
5    A.  Then Stream spends it on general business
6    expenses.  VSI is the plan sponsor for Stream TV.
7    Q.  All right.
8        I think we're going to take a break in it in
9    about 15, 20 minutes, if that's okay.
10   A.  Okay.  All right.
11       ATTORNEY ZAHRALDDIN:
12   And then you'll run through, you think,
13   the backup?
14       ATTORNEY CALLAHAN:
15   Yes.
16       ATTORNEY ZAHRALDDIN:
17   Okay.  All right.
18       BY ATTORNEY CALLAHAN:
19   Q.  So, Mr. Rajan, I want to ask you a little bit
20   about the August and July operating reports.  August
21   and September.  And I don't think -- actually this
22   may be a good time for a break because I don't think
23   I have it.  So we'll take a lunch break.
24   A.  Yes.  Okay.
25       ---

Page 98

1    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
2        ---
3        BY ATTORNEY CALLAHAN:
4    Q.  Mr. Rajan, good afternoon.  We are back on the
5    record.  Tell us a little bit about the committee in
6    VSI.  When was that first formed?
7    A.  I think it was formed in July.
8    Q.  July 2023?
9    A.  Yes.
10   Q.  And who participated in the formation of the
11   committee?
12   A.  Dan Rink, Joe Corso and Tom Sego.
13   Q.  And yourself?
14   A.  No, I'm out by the independent committee.
15   They're making decisions independent of me.
16   Q.  Okay.
17       What is their relationship to VSI?  What's Mr.
18   Rank's relationship to VSI before the committee was
19   formed?
20   A.  Well, he was working there as 1099, doing legal
21   work and operational work and accounting work.  And
22   then Tom Sego and Joe --
23   Q.  Stop there with Mr. Rink, when did he start doing
24   that work on behalf of VSI?
25   A.  Since the formation of VSI.

Page 99

1    Q.  And when was that formed?
2    A.  In 2022.
3    Q.  And as a result of -- you said something about
4    it previously, was that a result of litigation in
5    Delaware?
6    A.  Yeah.  Because what happened was under the
7    omnibus agreement, Stream TV was not allowed to have
8    a bank account, was not allowed to use the Stream TV
9    name.  So we couldn't -- Stream TV didn't have an
10   account or anything.  We had to set up another
11   company.  And we had engineers who wanted to join us.
12   We couldn't bring them into Stream TV, so they went
13   into VSI.
14   Q.  When you say we, are you talking about yourself?
15   A.  Yeah, I mean the whole team.  I mean, all the 65
16   percent of the employees at Stream stayed with me
17   after the omnibus.  They didn't want to go with CQ to
18   Delaware.
19   Q.  Okay.
20       When you say me, you just say stay with you and
21   me.
22   A.  Me.
23   Q.  That represents VSI?
24   A.  Correct, yes.
25   Q.  So, and again, what is your title with VSI?

Page 100

1    A.  I'm the founder.
2    Q.  Founder and CEO.
3    A.  CEO.
4    Q.  So I asked you about the formation of this
5    committee.  Was that a part of your recommendation or
6    did you form the committee?
7    A.  Yeah, we had some discussions of legal Counsel
8    and also VSI is the plan sponsor.  VSI has submitted
9    a reorganization plan for Stream TV, which is being
10   updated.  We've been receiving input from investors,
11   customers, vendors.  So we're updating the
12   reorganization plan by VSI, was submitting a
13   reorganization plan.  So we felt it was best that we
14   should cause more separation between VSI and Stream
15   TV.  So the independent committee makes all decisions
16   for VSI to Stream and even a number of the VSI
17   decisions they make it.
18   Q.  Okay.
19       Let's try to unpack that a little bit.  Are you
20   involved in any decision-making decisions made by VSI
21   in connection with its funding of Stream?
22   A.  Right now, very little, almost insignificant.
23   Q.  How about in July of 2023?
24   A.  I got to look at the date when we filed the
25   reorganization plan.  Post reorganization plan, no.

In Re: Stream TV Networks, Inc. Technology Media Apps
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

---

Page 101

1 And then in the run up to it, I was sort of phasing
2 out and they were taking over.
3 Q.  Okay.
4 **We're going to talk a little bit about the**
5 **operating reports, which indicate that VSI sent or**
6 **deposited monies into a Stream Debtor possession**
7 **account.**
8 A.  Wired, yeah.
9 Q.  **Wired.  Okay.**
10 **When was that done?**
11 A.  Once the DIP account was operational.
12 Q.  **And who authorized that deposit into the Stream?**
13 **DIP account?**
14 A.  I said go ahead and send the money in, yeah.
15 Q.  **And who did you say that to?**
16 A.  I said that to my mother.  I told her to wire the
17 money for VSI Stream.
18 Q.  **So your mother has authority to --**
19 A.  Send money -- she didn't have authority.  She
20 pushes the button on the wire, but she doesn't have
21 authority on spending.
22 Q.  **Does Mr. Rink have authority on spending?**
23 A.  Yeah, for VSI, yeah.
24 Q.  **Did he authorize the transfer deposit of money**
25 **into the Stream DIP account to your mother?**

---

Page 102

1 A.  Yes.  Dan Rink and the independent committee have
2 authorized money to go from VSI to Stream.
3 Q.  **Is there a writing evidencing that?**
4 A.  Yeah, they have a signed Subscription Agreements.
5 Q.  **And as part of their Subscription Agreements, do**
6 **they authorize the deposit of money to the Stream to**
7 **pay Stream expenses?**
8 A.  Yeah, that's part of the deal.
9 Q.  **Is there any instructions on that authorization**
10 **to pay specific expenses or some expenses?**
11 A.  There's before the DIP account, and then there's
12 post DIP account.
13 Q.  **When we talk about before DIP account, that would**
14 **include the period of time between March of 2023**
15 **through July of 2023.**
16 A.  I got to find out the exact date that the DIP
17 account was operational.  I think it was around
18 either July or August.
19 Q.  **So for purposes of our discussion, let's just say**
20 **August 1 is the date that --**
21 A.  I prefer to say pre and post DIP account.  It's
22 too difficult to get the exact date.  So there's
23 pre-DIP account, then there's post DIP account.
24 Pre-DIP account --
25 **ATTORNEY ZAHRALDDIN:**

---

Page 103

1 I don't mean to interrupt you, but I
2 thought it might help you to see the actual bank
3 account statement, which I think you guys already
4 have, because I believe the first notation of Debtor
5 in possession was in August, for the month of August.
6 Does that help you?
7 **THE WITNESS:**
8 Yeah, but I'm not sure how accurate
9 this is because when we speak to Bank of America,
10 they said they can't do it.  Then we get a letter in
11 the mail saying, oh, we already did it.  So when they
12 actually did it, I don't know.
13 **ATTORNEY ZAHRALDDIN:**
14 This is the only document --
15 **THE WITNESS:**
16 They're verbally telling us they
17 couldn't do it.  Then all of a sudden we get a letter
18 in the mail saying, oh, we already did it.  So I
19 don't know when the switches were flipped.  And what
20 happened in the back office of Bank of America.
21 **ATTORNEY ZAHRALDDIN:**
22 Well, Bank of America has a date on
23 here, so it would have been at the end.  It wouldn't
24 have been until September.  You wouldn't have
25 received this.  This is an August account.  It would

---

Page 104

1 have been after the end of it.
2 **THE WITNESS:**
3 Okay.  But I don't know, in their back
4 office when they turned it on.
5 **ATTORNEY ZAHRALDDIN:**
6 I hear you.  I understand.
7 **THE WITNESS:**
8 I mean, what they send me in the mail,
9 that's fine, but that's after the fact.  Like with
10 the other banks, when they open the DIP account, they
11 tell you that the bank account is open.  So there's
12 pre-DIP account and post DIP account.  So pre-DIP
13 account VSI was paying expenses on behalf of Stream.
14 The only time VSI was paying expenses for Stream was
15 when there are issues with the DIP account.  When the
16 DIP account has been working because there's a
17 Subscription Agreement between VSI and Stream, VSI
18 just sends money to Stream and then Stream is paying
19 out of the DIP account.
20 **BY ATTORNEY CALLAHAN:**
21 Q.  **And pre-DIP account period of time, the structure**
22 **of a transaction would be if an invoice is presented**
23 **to Stream for payment for services rendered or for**
24 **independent contractors, you would discuss that**
25 **demand for payment or request for payment with Amanda**

---

1  Gonzalez and authorize VSI to make that payment.
2  A.  Correct.
3  Q.  Okay.
4  And do you have any interaction with the
5  committee of VSI today?
6  A.  Yeah.
7  Q.  Okay.
8  And in terms of paying expenses of VSI, do you
9  instruct or request VSI committee to authorize
10  payment?
11  A.  For Stream?
12  Q.  Yes sir.
13  A.  No, right now Stream is paying.
14  Q.  Stream is paying.  How about with respect -- now
15  there has been one deposit from VSI to Stream.
16  Correct?  $219,000?
17  A.  I believe there's been multiple deposits.
18  Q.  Since when?
19  A.  Since the bankruptcy.
20  Q.  No, into Streams bank account?
21  A.  Yeah.
22  Q.  Into Stream's DIP account.
23  A.  Yeah.
24  Q.  You didn't open a DIP account until September or
25  August?

1  A.  No, again, we're not being accurate.  We had a
2  Bank of America account.  Bank of America told us
3  they can't do a DIP account.  Then we went and opened
4  up other DIP accounts.  One was at Key Bank.  Then
5  Key Bank, it did get open but they said there's a 60
6  day hold on it.  Then -- which we're now past.  Then
7  we opened up an account at M and T and during the
8  summer we suddenly discovered oh, Bank of America has
9  changed the designation without telling us that it
10  was indirectly that the account has been switched to
11  DIP.  Once it was switched to DIP and we found out by
12  accident, we then started sending money into the DIP
13  account and spending out of the DIP account.
14  Then inexplicably, about two weeks ago or so,
15  Bank of America just shuts down the DIP account, took
16  the money out of the account and lucky for us, we
17  have a DIP account at M and T and Key Bank.  So we
18  started using M and T account.  So we've had multiple
19  wires into the Stream DIP account.
20  We don't have the exact dates of when Bank of
21  America made their account a DIP account.  I can't
22  give you the exact dates.  We found out second and
23  third hand that it had become a DIP account.  We just
24  started using it more actively as soon as we found
25  out it was a DIP account.

1  Q.  So two things with respect to your response, you
2  use the term we and us.  Who are you referring to
3  when you were saying we and us with respect to your
4  communications with M and T Bank?
5  A.  Okay.
6  I use the word we a lot.  M and T I communicate
7  with them.
8  Q.  You personally?
9  A.  Yeah, me personally.
10  Q.  And on whose behalf?
11  A.  Stream.
12  Q.  Okay.
13  And how about with respect to Bank of America
14  when you use the term we and us, your difficulties of
15  opening --
16  A.  That was me.
17  Q.  That was you on behalf of Stream?
18  A.  Correct.
19  Q.  And your testimony is you believe that there were
20  deposits made since the bankruptcy case in accounts M
21  and T Bank and Key Bank --
22  A.  Now, Key bank, we only put in like $100 on that
23  account.
24  Q.  And how about with respect to M and T Bank?
25  A.  M and T Bank, the exact amount so far spent out

1  of M and T is probably $50,000 to $75,000, maybe
2  more.
3  Q.  And that's on behalf of Stream expenses?
4  A.  Yeah.
5  Q.  And to your knowledge, have those operating
6  reports -- I'm sorry.  Have those bank statements
7  been supplied to our office in response?
8  A.  No, that was last week for this month, November.
9  Q.  What do you mean last week?  What date?
10  A.  Last week's date.  I mean, it would have been --
11  would have been the week of November 5.
12  Q.  Okay.
13  Q.  And is there a reason why you didn't produce
14  those documents?
15  ATTORNEY ZAHRALDDIN:
16  I don't think, we haven't filed --
17  THE WITNESS:
18  We haven't filed November MORs yet.
19  ATTORNEY ZAHRALDDIN:
20  I'm sorry.  If were supposed to file
21  -- I mean, on a rolling basis, we're getting stuff.
22  But did you want November as well?
23  ATTORNEY CALLAHAN:
24  Well, I think we asked in our
25  production request, but we'll go through that.

Page 109

1    ATTORNEY ZAHRALDDIN:
2    Yeah.
3    THE WITNESS:
4    Oh, I didn't know you wanted it.  Yeah.
5    we can send it right away.
6    ATTORNEY ZAHRALDDIN:
7    Yeah.
8    THE WITNESS:
9    Whatever we're missing, we'll send it
10   on Thursday.
11   BY ATTORNEY CALLAHAN:
12   Q.  Is the M and T Bank account still open?
13   A.  Yeah, it's working.
14   Q.  And deposits are -- is it a Debtor in possession
15   account?
16   A.  Yeah.  M and T is DIP account, Key Bank is DIP
17   account.  Key Bank is now working but we didn't do
18   anything with it.  We're using mainly M and T.
19   Q.  Okay.
20   Let's take a look at the September operating
21   report.
22   A.  Okay.
23   Q.  And Mr. Rajan, I'm going to ask you if you
24   recognize your signature.  Did you sign that report?
25   It's on page 9 of 12.

Page 110

1    A.  Yes.
2    Q.  And do you recognize that as the monthly
3    operating report you reviewed and signed under
4    penalty of perjury?
5    A.  Yes.
6    Q.  If you go to page 2 of 12 it indicates that in
7    the month of September, Stream TV received $219,000.
8    Do you see that, sir?
9    A.  Correct.
10   Q.  And then on the cumulative column, it has
11   $221,000.
12   Correct?
13   A.  Yeah.
14   Q.  Do you have a recollection of why -- what $2,000
15   was received by Stream before September of 2020?
16   A.  I have to look into that.
17   ATTORNEY ZAHRALDDIN:
18   May I ask a question?  Do you know the
19   amounts for both Technovative and for Stream in terms
20   of --
21   THE WITNESS:
22   Oh, yeah, I think that's your fees.
23   ATTORNEY ZAHRALDDIN:
24   And the Delta, do you understand why
25   there was a Delta?  Because that would be a little

Page 111

1    bit more than the Delta.
2    THE WITNESS:
3    Yeah.  One is for Stream, one is for
4    techno.
5    ATTORNEY ZAHRALDDIN:
6    Correct.  And the amounts for those
7    are?  Do you remember?
8    THE WITNESS:
9    It was roughly about this amount.
10   ATTORNEY ZAHRALDDIN:
11   Okay.
12   And do you know why there's an extra
13   Delta?  Why there's an extra amount of money still
14   left in there?
15   THE WITNESS:
16   No, I don't know why there's extra
17   money left in.
18   BY ATTORNEY CALLAHAN:
19   Q.  Okay.
20   Mr. Rajan, not filed immediately after the
21   operating report was filed, there was a supplement
22   -- there was a supplement filed to the September
23   operating report, and there were several documents
24   attached and I will give them to you.
25   Mr. Rajan, there's a letter dated November 1,

Page 112

1    2023 from Visual Semiconductor, Inc., 1105 William
2    Penn Drive, Bensalem, Pennsylvania, 19020.
3    Do you see the document, sir?
4    A.  Yeah.
5    Q.  Can you describe what this document is?
6    A.  Yeah.  This is a reconciliation on the shares.
7    Q.  Of?
8    A.  Between VSI and Stream.
9    Q.  And who is this letter -- it says, to whom it
10   may concern, dear sirs?  Who did you expect -- you
11   meaning Mathu Rajan, did you expect that this letter
12   should be provided to?
13   A.  It can be used by both VSI, Stream TV, legal
14   Counsel, other third parties that might need it.
15   Q.  And it says -- who sent this letter?
16   A.  Dan Rink.
17   Q.  And did you see this letter before today?
18   A.  Yeah, I've seen these letters before.
19   Q.  And are you familiar with the account
20   reconciliation that's referenced by Mr. Rink?
21   A.  Yes.
22   Q.  Do you have a copy of that?
23   A.  I mean, I have this letter.
24   Q.  The next document is also attached to the
25   supplement to the operating report.  There you go.

Page 113

1  A.  Got it.
2  Q.  And Mr. Rajan, do you recognize this document?
3  A.  Yes.
4  Q.  It's a letter date is September 30, 2023 from
5     Visual Semiconductor, Inc.
6     Correct?
7  A.  Correct.
8  Q.  And to whom is it addressed?
9  A.  It's addressed to Thomas Park.
10  Q.  And his title is Chief Financial Officer, Stream
11     TV Network, 2009 Chestnut Street, Third Floor,
12     Philadelphia, PA, 19103.
13  A.  Yes.
14  Q.  And did you discuss this letter with Mr. Park?
15  A.  I believe Mr. Rink did.
16  Q.  Let's go back to how often do you speak to Mr.
17     Park?
18  A.  About like three times a week.
19  Q.  Okay.
20     When was the last time you spoke to Mr. Park?
21  A.  Just like three days ago, two days ago.
22  Q.  And is Mr. Park still working for the Debtor?
23  A.  Yeah.
24  Q.  For Stream?
25  A.  Yeah.

Page 114

1  Q.  And is he being paid?
2  A.  No.
3  Q.  And what duties is he performing for Stream TV?
4  A.  One, he's been helping with fundraising.  Two,
5     he's helping with the reorganization of Stream.  He's
6     our structuring person, so he was going to take over
7     some of our subsidiaries, and that got interrupted
8     about like 45 days ago.
9  Q.  So why would Mr. Rink be sending -- if Mr. Park
10     is not being paid for his services, do you know why
11     Mr. Park is receiving correspondence from Mr. Rink
12     regarding this subject?
13  A.  No, he's not getting cash payment, but he is
14     doing work.  And then he has a motion pending in the
15     court.
16  Q.  Do you know what Mr. Park did in response to this
17     letter?
18  A.  What do you mean?  They're doing the account
19     reconciliation.
20  Q.  Is Mr. Park involved in the account
21     reconciliation?
22  A.  Yeah, he's involved in it.
23  Q.  And are you aware whether there's been any other
24     deposits by Stream since September 30 of 2023 to the
25     Stream Debtor in possession account?

Page 115

1  A.  Yeah.
2  Q.  And were there any deposits made in October?
3  A.  Yes.
4  Q.  Do you know how much?
5  A.  I would like to combine both October and
6     November.  It's probably 150, maybe 200.  Something
7     like that.  Now the activity is picking up, so
8     there's things going on.
9  Q.  You say activity is picking up.  Does that mean
10     there are more costs and expenses that Stream TV
11     is --
12  A.  For November and December, yeah, it's picking up.
13  Q.  So in September, with respect to the $219,000,
14     was that an amount that was requested by Stream to
15     VSI?
16  A.  Let's go slow again.  Hang on a second.  So you
17     have VSI and you have Stream TV.  VSI is plan
18     sponsor.  VSI already signed a deal to pay for -- to
19     buy shares in Stream TV and to give money to Stream
20     TV for both not only the plan reorganization, and
21     also even extra money in case their additional Stream
22     needs money for operational expenses.  So they
23     already had a deal.
24     Deal back in February, March, whatever.  And then
25     there was more deals in July.  So that deal was

Page 116

1  consummated.  What VSI is doing now is simply sending
2  money against that deal that was already done.  Then
3  Stream is using that money to get ready for the next
4  production run and commence the production run.  But
5  the deal between VSI and Stream in terms of sending
6  money that was done months ago.
7  So all VSI is doing is sending money to Stream
8  right now, so we don't have a problem with the DIP
9  account, is just sending money that it had already
10  agreed to give to Stream a while ago.  That money is
11  over $45 million.
12  Q.  Okay.
13  So I'm going to focus on the monies that was
14  deposited.
15  A.  Correct.  That's against the $45 million.
16  Q.  Was that $219,000 a fixed amount that VSI agreed
17     pursuant to the Subscription Agreement to deposit
18     into the Debtor in possession account in September.
19  A.  They wired the money in September.
20  Q.  Right.
21  A.  Correct.
22  Q.  But was it obligated or did it promise to pay --
23     deposit $219,000 or more or less?
24  A.  It was more.
25  Q.  Okay.

In Re: Stream TV Networks, Inc. Technology Media Ips
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

---

Page 117

1  And how was this $219,000 -- who decided it
2  would be $219,000 as opposed to a million dollars?
3  A.  Oh, that was me.
4  Q.  Okay.
5  And why did you have that amount that VSI would
6  deposit?  How did you calculate that?
7  A.  Because we had expenses that week.
8  Q.  Okay.
9  And do you believe through September, did Stream
10  pay all the expenses as they came due in September of
11  2020?
12  A.  Correct, yes.
13  Q.  You haven't paid the rent for the building in
14  Philadelphia.
15  Correct?
16  A.  Yeah, the Philadelphia guy.  The reason is that
17  we were under the impression that for people who are
18  on the unsecured creditor list, if you don't get your
19  -- what the hell is it called?  What's that
20  statement called again?  The disclaimer for the
21  unsecured solicitation.  We're not supposed to
22  solicit them.
23      ATTORNEY ZAHRALDDIN:
24      Mr. Rajan is referring to the
25      disclosure statement.

---

Page 118

1      THE WITNESS:
2      Yeah, they're on the --
3      BY ATTORNEY CALLAHAN:
4  Q.  That's not what I'm asking.  I'm asking about
5  current obligations.
6  A.  Yeah, but they're operating -- the landlord in
7  Philadelphia and Stream TV are operating under the
8  assumption that for vendors that fall under that
9  list, until the disclosure statement is approved,
10  we're not supposed to solicit them.  The ones that
11  were getting paid earlier, there was no negative
12  balance from those people.  And so the landlord, he
13  wanted to set up a creditor committee and he's
14  waiting for the disclosure statement to get approved.
15  Then we're going to pay him.
16  Q.  Okay.
17  A.  What I'm trying to find out is if the Debtor
18  Stream and Technovative, if applicable, is current on
19  its post-petition obligations.
20  A.  Yes, as bills are due, yes.
21  Q.  Administrative expenses would show up on the
22  operating report.
23  A.  Correct.
24  Q.  Okay.
25  Your Counsel has sought approval of a fee

---

Page 119

1  application.
2  A.  Correct.
3  Q.  For a certain amount.  In fact, there's been two
4  applications.  If the court approves those
5  application, is it Stream's intent to pay those?
6  A.  Of course, we're going to pay.
7  Q.  Okay.
8  So what source of funds would the Debtor have to
9  pay those expenses if they came due in November?
10  A.  Because Stream TV has with VSI, a Subscription
11  Agreement is over $45 million.
12  Q.  Okay.
13  A.  And VSI has over 150 shareholders.
14  Q.  So when you're talking about these subscription
15  -- there's several Subscription Agreements.
16  Correct?
17  A.  Yeah.
18  Q.  And when is the most recent -- when was the most
19  recent one made?
20  A.  July or August.
21  Q.  Of 2023?
22  A.  Yeah.
23  Q.  And was VSI's deposit of $219,000 in September
24  part of that Subscription Agreement that they would
25  fund Stream in exchange for shares of Stream?

---

Page 120

1  A.  Yes.
2  Q.  So is it your belief that that Subscription
3  Agreement -- your belief, Stream's belief, that
4  Subscription Agreement will require VSI to deposit
5  monies into Stream DIP accounts going forward?
6  A.  Yeah, that's what we're doing.
7  Q.  Is there any reason why VSI can't complete the
8  Subscription Agreement obligation and just deposit
9  whatever sum was due from the July 2023 Subscription
10  Agreement that they can't fund whatever that amount
11  was?  I think you just said some million dollars.
12  A.  It's $45 million.
13  Q.  Okay.
14  Why can't they deposit $45 million in November?
15  A.  Into the Stream bank account?
16  Q.  Uh-huh (yes).
17  A.  Because we're using the money for production.
18  Right now we put in a large amount of money from VSI.
19  The exact amount of money Stream is going to need on
20  a go forward we haven't figured that out yet.  We
21  don't know what the allowable claims are from the
22  secured people.  We think they're equity.
23  Then on the unsecured we have a proposal that we
24  are revising.  Then we have some feel for what the
25  legal expenses are going to be, but we're not exactly

---

Page 121

1    sure.  But as the bills are due, we're going to pull
2    it down.  But we're not in the habit of giving out
3    free equity if we don't need to.
4    Q.   Okay.
5    A.   I mean, why would we go and dilute everybody
6    money that we don't need?  Right now the purchase
7    orders are financed.  We have purchase order finance
8    in place.  The customers are working with --
9         ATTORNEY ZAHRALDDIN:
10   Mr. Callahan, can I just interrupt one
11   second?  Mr. Rajan, please do me a favor.  Start
12   using pronouns.
13        THE WITNESS:
14   Okay.
15        ATTORNEY ZAHRALDDIN:
16   Because when you say we, you need to
17   say who it is who has the financing.
18        THE WITNESS:
19   Okay.
20   So first of all, Stream -- as a
21   fiduciary Stream, we should not be giving out extra
22   equity that isn't needed.  We don't know the exact
23   amount of money that is needed beyond production
24   expenses for Stream.  Production expenses for Stream
25   we have a very good handle on it.  And those monies

Page 122

1    are being covered by people like BOE EVolt.  The
2    customers are working with the VSI financers to open
3    up letters of credit and go to production on $160
4    million PO, which will also produce $55 million in
5    gross margin.
6    The operating expenses for Stream on a
7    go forward basis, not including the so-called secured
8    lenders, which we don't think they are secured, look
9    like they're very small.  These guys are only like
10   two million or something.  And then there's some
11   money for some of the unsecured.  The unsecured also
12   a lot of them have shares in the company, so they're
13   not going to cost that much.
14   Then the so-called secured guys, our
15   position is they're equity.  They sign conversion
16   agreements.  We've given them conversion notices.
17   There's no UCC filing, just so you know, on Stream TV
18   from Hawk, none.
19        BY ATTORNEY CALLAHAN:
20   Q.   Let's go back to the issue we're talking about is
21   operating expenses for Stream going forward and
22   administrative expenses.
23   A.   Yes.
24   Q.   So let's take a look at the -- I don't know if I
25   gave you the September 30, 2023.

Page 123

1    A.   Yes.
2    Q.   Let's take a look at the bank statement that was
3    attached to that.  And this appears to be a bank
4    statement with the Bank of America, Stream TV
5    Networks, Inc., Debtor in possession 23-10763.
6    Beginning balance on September 1, $3,168.
7    Do you see that?
8    A.   Where?  Yeah.
9    Q.   I'm going to go to that right away.  Let's take a
10   look at the deposits.  Next page.  On September 5,
11   there was a deposit of $50,000.  And do you have an
12   understanding of what that deposit was?
13   A.   Yeah, it was an incoming wire transfer.
14   Q.   And who authorized that incoming wire transfer?
15   A.   I did.
16   Q.   You did?
17   A.   Yeah.
18   Q.   On behalf of VSI?
19   A.   Yeah, on behalf of Stream TV.  I told them, go
20   ahead and send the money over.
21   Q.   Who did you tell?
22   A.   Amanda.
23   Q.   Yeah, from VSI.  This money came from VSI?
24   A.   Correct.
25   Q.   And who from VSI authorizes transfer?

Page 124

1    A.   All the money from VSI has already been pre-
2    approved under the Subscription Agreement?
3    Q.   Yes.  From a VSI bank account.
4    Right?
5    A.   Yeah.
6    Q.   Chase Bank.
7    A.   Correct.
8    Q.   And who has authority to transfer funds from
9    Chase bank on behalf of VSI?
10   A.   If Stream TV okays it, then VSI is already pre-
11   approved through the independent committee.
12   Q.   Got it.
13   Q.   And Amanda and everybody over there to go ahead
14   and send the money over.
15   Q.   So you, Mathu Rajan, directs the money
16   transferred from VSI to Stream of $50,000.
17   A.   Because it's been pre-approved by the independent
18   company.
19   Q.   But you have access and you have authority to
20   transfer --
21   A.   I didn't transfer it.  I authorized it.
22   Q.   Well, we used the phrase hit a button before.
23   I'm not talking about hitting a button.  You
24   authorized the transfer.
25   A.   Authorized the transfer, correct.

Page 125

1  Q.  And how did you do that?  Did you send an email,
2    a text, a letter?
3  A.  Text messages.  I would have sent it both to
4    Amanda and also to my mother, who had sent it over.
5  Q.  Okay.
6    That was $50,000 on September 5.
7  A.  Correct.
8  Q.  And then on that same day, there's another
9    $10,000.  Would that authorization come from you as
10   well?
11 A.  Yes.
12 Q.  Okay.
13   And the next item deposit is a counter credit of
14   $9,000.  Tell me where that came from.
15 A.  I don't remember what the counter credit is.
16 Q.  Do you have a recollection of three transactions
17   on September 5?  It appears it may have been done in
18   the same sequence here?
19 A.  Yeah.  I don't know what.
20      ATTORNEY ZAHRALDDIN:
21   Mr. Rajan, was there a check or
22   something that was brought into the bank?
23      THE WITNESS:
24   There might have been, yeah.  It's
25   probably a check or something.

Page 126

1      BY ATTORNEY CALLAHAN:
2  Q.  But you don't know?
3  A.  It was probably a check or something.
4  Q.  Would that be something that Ms. Gonzalez would
5    know?
6  A.  It should be.
7  Q.  Shouldn't Stream have some record of this counter
8    credit, where it came from?  It's money coming in?
9  A.  Yeah, it should.
10 Q.  It should.  Do you know why it hasn't -- there's
11   been no documents submitted supporting that
12   transaction?
13 A.  No, I don't.  I mean, we can find out.  We'll get
14   it to you.
15 Q.  It's money that's come into a Debtor in
16   possession from an unknown source, at least
17   presently.  Do you agree with that?  You don't know?
18 A.  It would have been from one of our other
19   accounts.  It's probably deposit check.
20 Q.  And again, your Counsel -- our account, who
21   would that be if not Stream?
22      ATTORNEY ZAHRALDDIN:
23   Mr. Callahan, we thought there were
24   checks in there, but we'll check right now.  If they
25   didn't make it to the dropbox.  I don't know.  We'll

Page 127

1    have to check that out.
2      ATTORNEY CALLAHAN:
3    We do not have copies of any checks.
4    We'll go through this but --
5      ATTORNEY ZAHRALDDIN:
6    I apologize.  I will make sure we get
7    that.
8      BY ATTORNEY CALLAHAN:
9  Q.  All right.
10   Next one is a wire transfer.  And of course you
11   made the statement, our accounts, Mr. Rajan, are you
12   aware of accounts that haven't -- that are not
13   disclosed other than Bank of America, M and T and Key
14   Bank?  Does Stream TV or Technovative have any other
15   bank accounts?
16 A.  When they changed it from a regular account to a
17   DIP account -- I'm just guessing.  I got to double
18   check.  There may have been some money in the Stream
19   bank account prior to becoming a DIP account.  This
20   could have been the transfer.
21 Q.  Okay.
22   And I saw another entity called Stream
23   Acquisition.  Is that another entity?
24 A.  No, they wouldn't give us our email ID back, so
25   we came up with a name so we could have email for

Page 128

1    Stream, but it's Stream.
2  Q.  All right.
3    And then the next entry is 97.  Looks like
4    another transfer from VSI, the amount of $70,000.
5    And again, was that transaction done in the same way
6    and manner that you described for the first deposit?
7  A.  Yeah.
8  Q.  And then on September 25, there was a counter
9    credit in the amount of $80,000.  And do you have a
10   recollection of what that transaction was about?
11 A.  No.
12 Q.  Okay.
13   And then we go to withdrawals and other debits.
14   And if you go down to 9/11/23, it says, transfer
15   Stream TV networks to Brown and Michaels.  What is
16   Brown and Michaels?
17 A.  That is probably that Netherlands.  I'm not sure.
18      ATTORNEY CALLAHAN:
19   No, go ahead.
20      ATTORNEY ZAHRALDDIN:
21   Mr. Rajan, you -- you have to testify.
22      THE WITNESS:
23   I believe it could be that Netherlands
24   -- the Netherlands litigation.
25      BY ATTORNEY CALLAHAN:

Page 129

1  Q.  So you don't have, at least today, a recollection
2  of what that transfer was about in the amount of
3  $50,000?
4  A.  I think that's for the Netherlands transaction,
5  but I'm not sure.
6  Q.  Could it be related to the Rembrandt company?
7  A.  Oh, yeah, correct.  You're correct.  That's for
8  Rembrandt.
9      ATTORNEY ZAHRALDDIN:
10  Thank you, Mr. Callahan.
11      BY ATTORNEY CALLAHAN:
12  Q.  What is Brandon Michaels?
13  A.  That's Chris Michaels' Company.
14  Q.  Chris Michaels?
15  A.  Yes.
16  Q.  And what was that transfer for?
17  A.  That's for the license fee.
18  Q.  License fee?
19  A.  Yeah.
20  Q.  And what license fee are you referring to?
21  A.  Stream TV has a license with Rembrandt.
22  Q.  And did that require -- how's the $50,000
23  calculated?  Is that a monthly charge?
24  A.  Yes, part of a monthly charge.
25  Q.  Okay.

Page 130

1  And were payments to Brandon Michaels paid since
2  March of 2023, since the bankruptcy was filed?
3  A.  Yes.
4  Q.  Do you know from what source of funds those
5  payments were made?
6  A.  Oh, you mean prior to this?
7  Q.  Yes.
8  A.  I don't know if there was any fees paid prior to
9  this.
10  Q.  Well, pursuant to the contract or license fee,
11  how often are payments supposed to be made?
12  A.  Some of it is part of the production, some of it
13  is post confirmation.  Then some of it is for some of
14  their expenses, for court expenses.
15  Q.  So is Stream paying expenses of Rembrandt in this
16  bankruptcy proceeding?
17  A.  No, not in the bankruptcy proceedings.
18  Q.  And was there an invoice provided to Stream with
19  respect to the payment of this?
20  A.  Yeah, they gave us paperwork.
21  Q.  Is it Debtor current with any obligation of
22  license fee to Brandon Michael?
23  A.  Well, most of it is on hold until the plan
24  confirmation.
25  Q.  Is it possible or likely that the fee -- license

Page 131

1  fee was -- when was the license first entered into?
2  Was it before March of 2023?
3  A.  Yeah.
4  Q.  So it's a pre-petition obligation?
5  A.  Yeah, it's on the schedule.
6  Q.  Do you know if the Debtors filed a motion to
7  assume any contracts?
8  A.  They're one of the people involved in our
9  reorganization plan.
10  Q.  Yes, but do you know if any part prior to the
11  filing of the plan and disclosure statement?
12  A.  No.  I don't think it's prior to it.  They're
13  part of the plan confirmation.
14      COURT REPORTER:
15  I didn't hear the last part of that.
16  No, not prior.  I don't think it was prior to what?
17      THE WITNESS:
18  The plan confirmation.  They're part of
19  the plan confirmation.
20      BY ATTORNEY CALLAHAN:
21  Q.  Attached to the -- a supplement to the September
22  monthly operating report is the statement.  We
23  recognize that statement, Mr. Rajan?
24  A.  Yes.
25  Q.  Could you just read it for the court -- for the

Page 132

1  court reporter, please?
2  A.  There were payments made on VSI on behalf of
3  Stream's behalf in August.  However, those
4  transactions have not been reconciled at the time MOR
5  was due.  The shares were distributed in November per
6  confirmation letter from VSI dated November 1.
7  Therefore, third party payments made in August will
8  be reflected on November MOR.
9  Q.  And who wrote this?
10  A.  This would have been written by Amanda and with
11  the help of Dan Rink.
12  Q.  At whose direction?
13  A.  She was in charge of putting that in with the
14  help of legal Counsel.
15      ATTORNEY ZAHRALDDIN:
16  Can I ask one question, Ms. Callahan,
17  I'm sorry?
18  Mr. Rajan, did legal Counsel instruct
19  and castigate Mr. Rink for earlier letters that
20  didn't have enough detail in them?
21      THE WITNESS:
22  Yes.  Okay.
23      ATTORNEY ZAHRALDDIN:
24  Okay.  And did we then provide
25  documents to VSI that we said needed to conform, so

Page 133

1  that we could conform to our obligations for
2  reporting to the -- to the Office of United States
3  Trustee?
4      THE WITNESS:
5  Yes.
6      ATTORNEY ZAHRALDDIN:
7  Okay.  Thank you, Mr. Rajan.
8      BY ATTORNEY CALLAHAN:
9  Q.  How often do you have discussions with Mr. Rink
10  in connection with the agreements between VSI and the
11  Stream?
12  A.  About two to three times a week.
13  Q.  And how long have you been in business with Mr.
14  Rink?  How long have you known him?
15  A.  Over ten years.
16  Q.  And he's -- he -- during the course of that ten
17  years, was he an officer of Stream at one time?
18  A.  Early on in Stream he was.
19  Q.  And is there a reason why he's no longer an
20  officer of Stream?
21  A.  Yeah, we lost in Chancery Court and then he went
22  to VSI.
23  Q.  All right.  I'm ready to -- to move onto the
24  next category, which is the document production.
25  One second.

Page 134

1      ---
2  (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
3      ---
4      BY ATTORNEY CALLAHAN:
5  Q.  Okay.  We talked about the balance sheet earlier,
6  that it went from in March of 2023, the balance sheet
7  that was attached to the operating report, to the May
8  and following June, that the balance sheet had
9  difference amounts, and --
10  A.  About $7,000.
11  Q.  -- about $8 million.
12  Right?
13  A.  $8 million?
14  I'm sorry.  Okay.
15  Q.  And part of that is the assets change.  And how
16  -- how were those asset figures changed?  Who --
17  who decided to revise those documents, the balance
18  sheets for this company?
19  A.  That would have been Amanda and -- it would have
20  been Amanda.  If she got some help from some other
21  people, then it was Amanda.
22  Q.  Is Amanda -- does she have a CPA or is she a
23  financial analyst?
24  A.  She's not a financial analyst, no.
25  Q.  As I understood your testimony earlier, Amanda

Page 135

1  typically just takes instructions from you to do
2  anything, including making payments to vendors on
3  behalf of the Stream -- of -- of Stream.
4  A.  That's -- that's regarding disbursement of
5  funds.
6  Q.  But who would change a balance sheet figures
7  from --
8  A.  Not Amanda was doing this with the help of
9  Counsel.  And also, she was getting help from Suby
10  and Dan.
11  Q.  Do you have any understanding of why there was an
12  $8 million difference in the valuation of certain
13  assets from --
14  A.  Yeah.  Because if you look at the statement, they
15  didn't include the money from VTI and glasses-free
16  technology in the -- one of the statements.  Then in
17  the next statement, they did include it.  That's an
18  oversight.  We apologize.  She should have put an
19  asterisk there and explained it.
20  Q.  Okay.  And we went back to the T-1 document where
21  T -- I'm sorry, VSI identified certain categories of
22  payments, and one of those categories was to the
23  independent contractors.  I think in the category it
24  said consultants.  It also had benefits.
25  And -- and why would Stream pay benefits to

Page 136

1  those independent contractors if they're independent
2  contractors?
3  A.  Because for years they were employees, though
4  we're still continuing their health insurance.
5  Q.  But what obligation would the Debtor have to make
6  those payments?
7  A.  We don't have a legal obligation.  It's a moral
8  obligation.
9  Q.  Yeah.
10  A.  They're working for our company.  They had health
11  insurance.  There was an incorrect court ruling
12  through no fault of their own, which should have
13  never happened.  They're doing work for Stream TVs
14  that were covering the benefits.
15  Q.  So did DSI make those benefit payments on behalf
16  of those independent contractors when they were with
17  VSI?
18  A.  Yeah.
19  Q.  Give me an idea -- you mentioned something about
20  Bank of America sweeping an account.
21  Do -- do you have --
22  A.  They didn't sweep an account.  They didn't sweep
23  it.
24  Q.  They didn't sweep it?
25  A.  Okay.  I'm sorry.  They closed the account and

Page 137

1  took the money, yes.  And they're sending us a check
2  in the mail.
3  Q.  And how much would that be?
4  A.  I think it's like $28,000 or $30,000.
5  Q.  And do you have a document from BOA indicating
6  that they're going to send it or do you have an idea
7  of when that will be sent?
8  A.  They said they mailed it last week, so it should
9  arrive sometime this week.
10  Q.  Let me go back to the Subscription Agreement in
11  July, $45 billion.
12  Just how did this all come about?  Like, you had
13  prior Prepetition Subscription Agreements --
14  A.  Which I --
15  Q.  -- which was VSI and Stream?
16  A.  Correct.
17  Q.  And why was there a Subscription Agreement
18  reached in July of 2023?
19  A.  Well, there was multiple Subscription Agreements
20  that totaled $45, it wasn't one.  So one, we wanted
21  to have enough Subscription Agreements in place if
22  Stream needed it -- if Stream needed it.
23  And then -- and then we also made arrangements -
24  -- Stream TV and VSI had made arrangements for
25  financing for the Purchase Orders, which we've done.

Page 138

1  So -- then now we're trying to ascertain exactly how
2  much money Stream needs on the go forward, not
3  including the Purchase Orders.
4  Q.  All right.
5  Let's -- I'm going to move onto a new category
6  here.
7  ATTORNEY ZAHRALDDIN:
8  Can I ask a couple of questions?  Is
9  that okay?
10  Mr. Rajan, can -- can you explain to
11  me -- for the Subscription Agreements, can you
12  explain to me where VSI is getting the money from all
13  these?
14  You don't have to give individual
15  names, or shareholders or anything else like that.
16  But in other words, VSI is raising funds.  And where
17  are these funds coming from?
18  THE WITNESS:
19  VSI has 150 shareholders.  Those
20  shareholders are bringing in their investor contacts
21  to finance Stream TV.  So the Purchase Orders, we
22  have $160 million worth of Purchase Orders
23  collectively.  And we have financing in place for the
24  Purchase Orders and the production that was arranged
25  by some of the Stream shareholders.

Page 139

1  Stream did have a deal with BOE
2  prepetition.  The balance were -- made arrangements
3  for the POs, and letters of credit and things are
4  being opened up right now for the production.  Then
5  expenses for Stream are being covered by the Stream
6  shareholders and their contacts.  So so far, we spent
7  over almost $2 million now in the bankruptcy, and
8  we'll be spending more over the next few months or so
9  while we're winding up the bankruptcy.
10  ATTORNEY ZAHRALDDIN:
11  And in the process of getting these
12  investors, what's the next step after someone has
13  said, I'm, I'm going -- I'm -- I'm interested in
14  this opportunity?  What happens next?
15  THE WITNESS:
16  Well, right now the Purchase Order
17  financing is being put in place for the orders, and
18  then AnaStream needs money.  We collect money from
19  VSI and then we -- Stream disperses it out.
20  ATTORNEY ZAHRALDDIN:
21  Right.  But what documents are put into
22  place at VSI with these shareholders?
23  THE WITNESS:
24  They -- they already have Subscription
25  Agreements in place.

Page 140

1  ATTORNEY ZAHRALDDIN:
2  And then the Subscription Agreements
3  -- and this would be my last question.
4  When Mr. Rink is filling out the letter
5  that he attached, what is he doing in terms of the
6  Subscription Agreement?  What is he doing in terms of
7  the information he's getting?
8  THE WITNESS:
9  He's reconciling the amount of money
10  that VSI has sent versus the Subscription Agreements
11  already signed.  And then they're calculating the
12  number of shares that VSI is supposed to receive.
13  ATTORNEY ZAHRALDDIN:
14  And -- and the information he's
15  getting, who -- who is -- who is -- who's keeping
16  all the spreadsheets?
17  THE WITNESS:
18  That's Suby Joseph that's doing that on
19  the reconciliation.
20  BY ATTORNEY CALLAHAN:
21  Q.  Why aren't you on the committee, Mr. Rajan?
22  A.  Because I'm at Stream.  So we're making it
23  independent.  And it's really a legal question.
24  ATTORNEY ZAHRALDDIN:
25  I can answer that, if you'd like?

---

Page 141

1  Because it -- it has to do with --
2  with attacks that came from Mr. Capone and Mr. Colby.
3  They have put papers into the court saying that Mr.
4  Rajan is on both sides of the transaction.  They've
5  been doing that for the last two years.  I don't see
6  how that is relevant to any of this.
7  So we instructed Mr. Rajan and we told
8  VSI they needed to get separate Counsel, which they
9  did, in Ackerman Senterfitt.  And that that's who
10  negotiated the plan with us.  And that's who gave
11  them advice when we agreed with it, to set up an
12  independent committee to put some separation so that
13  we could reduce the noise and the attacks on Mr.
14  Rajan being on both sides of the transaction.
15      THE WITNESS:
16  The -- the VSI shareholders have made
17  arrangements in place, and it's now being put in
18  place the $160 million worth of Purchase Orders,
19  which generates $55 million for Stream TV.
20      BY ATTORNEY CALLAHAN:
21  Q.  Okay.  And respectfully, you still are managing
22  the transactions, at least in September, showing the
23  wire transfers from VSI to the Stream -- to Stream
24  VIP account.
25  Correct?

---

Page 142

1  A.  No.  And what I said was, Stream said go ahead
2  and send the money.  That money's already been
3  preapproved by the independent committee.
4  Q.  But it's in a V -- it's in a -- it's in a VSI
5  bank account?
6  A.  It was in a VSI bank account, correct.
7  Q.  Mr. Rajan, this is a copy of the document that
8  was sent to me from your Counsel.  And it's titled
9  Response to the United States Trustees Request for
10  the Production of Documents by the Debtor Pursuant to
11  Federal Bankruptcy Procedure 2004 and Local Rule
12  2004-1.
13  Are you familiar with the topics that are covered
14  by the Production Request and your Counsel's
15  responses?
16  A.  Yes.
17  Q.  Did you assist in the preparation of the
18  responses to the Request for Production?
19  A.  Yes.
20  Q.  And do you agree with the Responses to the
21  Production that was supplied by your Counsel?
22  A.  Correct.
23  Q.  All right.  Let's go over this a little bit.
24  And I also -- if I can turn this on so we can
25  see the documents.  I have the documents.  But if you

---

Page 143

1  can see, it might be a little easier to --
2  So do you see, the -- this is the Response.
3  Can you see that Mr. Rajan?
4  A.  Yeah.
5  Q.  So there's inquiries and then the document
6  production.  I'm going to go over the document
7  production with you, if I can find my arrow here.
8  So did you see the documents that were supplied
9  in response to each of the inquiries?
10  A.  I didn't see every single one.  I saw them
11  sending stuff over.
12  Q.  Okay.  Well -- well, I'm going to ask you a
13  couple of questions as I said.
14  Did you prepare those documents on behalf of
15  Stream TV?
16  A.  I didn't prepare every single document, no, I
17  gave what I had.
18  Q.  Did you see all the documents that were prepared?
19  A.  I saw a lot of them.  I wouldn't say I saw every
20  single one.  But I don't --
21  Q.  Now, I'm going to -- you're going to hear paper
22  shuffling, I misplaced a document.
23  I want you to look at -- we're going to go
24  through these bank accounts.
25  Okay?

---

Page 144

1  So the first document is the Chase statements.
2  And I have copies, which I will disseminate.
3      ---
4  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
5      ---
6      ATTORNEY CALLAHAN:
7  Okay, folks, I need to -- we need to
8  go off the record for a minute.
9      ---
10  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
11      ---
12      BY ATTORNEY CALLAHAN:
13  Q.  Mr. Rajan, thank you for your patience on that.
14  Can you take a look at the document that we've
15  given you, The Response to the United States Trustees
16  Request, that document?
17  A.  Oh, this one?
18  Okay.
19  Q.  And now I'm going to ask you to -- first, tell
20  me with respect topic number one, that was a request
21  that you identify how the financial obligations of
22  Stream TV Networks, Inc and Technovative Media, Inc.
23  and collectively with Stream, the Debtors have been
24  paid during the bankruptcy proceeding, when they have
25  been paid, at whose directions they have been paid

---

In Re: Stream TV Networks, Inc. Technology Media Aps
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

---

Page 145

1  and by whom the payments have been made.
2  A.  Correct.
3  Q.  Do you recall that Request for Production of
4  Documents?
5  A.  Correct.
6  Q.  And if you just look at the screen, and we can
7  provide -- so I've provided some of the documents in
8  paper.  But this -- this was the format of the
9  document response that was provided to our office.
10  A.  Okay.
11  Q.  So I'm going to open up inquiry number one,
12  document production.  It was prepared by Suby Joseph.
13  A.  He uploaded, but it would have been Amanda and
14  Suby Joseph.
15  Q.  All right.  Let's just identify the documents as
16  you see them on the screen.
17  Chase 2879 is that a bank account statement?
18  Here are the bank account statements?
19  A.  Yeah.
20  Q.  B -- BOFA, Bank of America 2950 -- 50.  That is
21  a bank statements --
22  A.  Correct.
23  Q.  -- from Bank of America?
24  Chase 0125, bank statements?
25  A.  Yes.

Page 146

1  Q.  Inquiry number one, note on payroll figures?
2  Inquiry one, transactions to fund Stream.  Another
3  one from transactions to fund Stream of BOFA.
4  Inquiry number one, transactions to fund Stream.
5  Looks like they may be duplicates, which we'll see.
6  Same with the next one.  Inquiry one, transactions to
7  fund Stream 2879.  Note on payroll figures we'll go
8  through.  Again, inquiry one, Chase 0125.
9  Transactions to fund Stream 2879.
10  So it appears from this, and I'll confirm with
11  you, that many of those documents are duplicates of
12  documents that you've given.  But we'll go over that
13  to make sure that they --
14  A.  Okay.  Some of them are Excel, some of them are
15  PDF.
16  Q.  Same information?
17  A.  Yeah.  Just one is in Excel and one on the PDF.
18  Q.  So tell me, with respect to inquiry none -- one,
19  how was the search conducted for these documents in
20  response to inquiry -- topic number one?
21  A.  They were going through their --
22  Q.  Everybody?
23  A.  -- all the independent contractors and myself
24  were going through emails and other places where it
25  has some of the information.

Page 147

1  Q.  Did you, Mr. Rajan, discuss with Counsel the
2  subpoena and the topics, including this topic prior
3  to conducting the search?
4  A.  Yeah.
5  Q.  And did you have any questions about the extent
6  of the search for documents?
7  A.  Yeah, I had questions on what we're supposed to
8  turnover, I believe.
9  Q.  And do you feel -- do you believe you were
10  satisfied with those responses?
11  A.  I was until I came here today and you explained
12  stuff to me, so -- I thought I was.  So whatever
13  we're missing, we'll get it to you on Thursday.
14  Okay?
15  So --
16  Q.  Well, let's take a look at this document.
17  A.  Okay.
18  Q.  Let's just -- let's start --
19  A.  Well, this is my first 2004 exam, so --
20  Q.  -- let's start with the Chase account, four
21  numbers ending 0125.
22  And you have a copy of it in there in that packet
23  that I gave you?  Keep going.  In the back there.
24  That's -- there's two sets of Chase accounts.
25  Is that the one that was ending 0125?

Page 148

1  A.  Yes.
2  Q.  Looks to be a copy of a bank statement from
3  Chase.  The account name is Visual Semiconductor,
4  Inc., 1105 William Penn Drive, Bensalem,
5  Pennsylvania.
6  Right?
7  A.  Yes.
8  Q.  And that's your home address.
9  Correct?
10  A.  Yes.
11  Q.  It's beginning balance of $2,511.93.  And that
12  was on, looks like March 1st, 2023.
13  Correct.
14  A.  Which one, I have April?
15  Q.  I'm just looking at the March statement first.
16  A.  I have August.
17  Q.  It should be in order.
18  A.  I don't know.  I have April.
19  Q.  May I see that?
20      ATTORNEY ZAHRALDDIN:
21  Well, March -- I have March there.
22      ATTORNEY CALLAHAN:
23  You have March there Rafael?
24      ATTORNEY ZAHRALDDIN-ARAVENA:
25  Uh-huh (yes).

---

Page 149

1  You need March, Mr. Rajan?
2      THE WITNESS:
3  Yeah, I think it was just this.
4      ATTORNEY ZAHRALDDIN-ARAVENA:
5  Here you go.  Here's -- here's March.
6  Yeah.
7      THE WITNESS:
8  Oh, thanks.
9      BY ATTORNEY CALLAHAN:
10 Q.  Do you see that, Mr. Rajan?
11 A.  Yeah.
12 Q.  March 1st, 2023?
13 A.  No, this isn't VSI.  This isn't VSI.
14 Q.  Yeah, that's the document.  Is that VSI?
15 A.  No.
16 Q.  0125?
17 A.  That's a different account.
18 Q.  So let's talk about that one a little bit.
19 A.  No, that's not --
20 Q.  -- Citywall output.
21 A.  -- no, that's not it.
22     ATTORNEY ZAHRALDDIN-ARAVENA:
23 Can I ask what this is?
24     THE WITNESS:
25 It's the wrong one.

---

Page 150

1      ATTORNEY ZAHRALDDIN-ARAVENA:
2  I know.  But what is this?
3      THE WITNESS:
4  It's the wrong one.
5      ATTORNEY ZAHRALDDIN-ARAVENA:
6  Okay.
7      ATTORNEY CALLAHAN:
8  Well, no, before you ask that, do we
9  know what it is?
10     ATTORNEY ZAHRALDDIN-ARAVENA:
11 Okay.
12     ATTORNEY CALLAHAN:
13 Yeah.
14     ATTORNEY ZAHRALDDIN-ARAVENA:
15 I -- I can --
16 So, Mr. Rajan, can you please explain
17 what Citywall Capital is?
18     THE WITNESS:
19 No, he wanted to go into that later.
20 Right?
21     BY ATTORNEY CALLAHAN:
22 Q.  Well, we --
23     ATTORNEY ZAHRALDDIN-ARAVENA:
24 No, no.  I mean, either way, it
25 doesn't --

---

Page 151

1      THE WITNESS:
2  Yeah, Citywall Capital, that was doing
3  my travel expenses at VSI.
4      BY ATTORNEY CALLAHAN:
5  Q.  Well, who -- what is Citywall Capital?
6  A.  It was just another company I set up when I set
7  up VSI, because -- that was over a year ago in 2022,
8  because some people wanted me to get involved in,
9  like, private equity deals.  And I was using it for
10 my travel expenses.
11 Q.  For you personally?
12 A.  Yeah, I had -- well, for business for VSI.
13 Q.  But not for Stream?
14 A.  No, on Stream -- once the DIP account was set
15 up, then we -- then all the travel expenses are
16 booked through Stream.
17     ATTORNEY ZAHRALDDIN-ARAVENA:
18 Mr. Rajan, does the chase account have
19 a debit card?  Is that why?
20     THE WITNESS:
21 Uh-huh (yes).  Yeah.  So we use it for,
22 like, Uber, and to buy plane tickets and so forth.
23     BY ATTORNEY CALLAHAN:
24 Q.  Okay.  But you confuse me.  Is the company formed
25 for your personal travel on behalf of --

---

Page 152

1  A.  VSI.
2  Q.  -- VSI?
3  Okay.  You said twice now.
4  Not for Stream?
5  A.  Right, in 2022.  Then in 2023, when we filed
6  bankruptcy, we went to go set up the DIP account for
7  Stream.  The DIP account for Stream was not working.
8  So until the DIP account was working, we had VSI pay
9  for expenses.  Citywall Capital did pay for travel.
10 that I did, it wasn't that much travel, during --
11 from March until the DIP account was set up.
12 But once we got the DIP account set up, any
13 travel I did for Stream was booked through Stream.
14 Q.  Okay.  But you were now -- from March 2023
15 through the date that the DIP account was open, --
16 A.  Correct.
17 Q.  -- the City Capital entity was paying -- it was
18 a debit card that -- with Chase, that you were --
19 you, Mathu Rajan was using for whose benefit?
20 A.  For travel expenses at that time would have been
21 predominantly Stream.
22 Q.  That's -- that's -- we're still two out of
23 three for visual semiconductor.  That's why I'm
24 confused.  You said twice it was VSI; now you said
25 Stream.

---

Page 153

1  A.  No, no, no, let's -- let's go slow.
2  Q.  No, I know what you said, but I --
3  A.  No, I know.  But I think we're still confused.
4  So let me -- let me unconfuse you.
5  Okay.
6  2022 --
7  Q.  I don't want to know about 2022.
8  A.  You don't understand.  Just bear with me one
9  second.
10  2022, VSI and Citywall Capital were set up.  So
11  the practice was my travel expenses in VSI were done
12  through Citywall Capital.
13  Then we get to March of 2023, we went to go set
14  up the DIP account at Stream because the DIP account
15  was not functional.  Travel expenses for Stream were
16  booked through Citywall Capital.  So up until the DIP
17  account.  So VSI was paying expenses or Stream.  And
18  for my travel, I did it through Citywall Capital,
19  so --
20  Q.  I -- I pulled up the Citywall Capital bank
21  statements with Chase.  2879 is the serial accounts.
22  Right?
23  A.  Yeah.
24  Q.  So if you look through a series of these, it
25  appears to be --

Page 154

1  A.  Travel expenses.
2  Q.  -- expenses with Uber, San Francisco in March
3  16, 2023?
4  A.  Correct.
5  Q.  These are exclusively travel expenses for Mathu
6  Rajan.
7  A.  Correct, --
8  Q.  Right?
9  A.  -- yeah.
10  Q.  And how were -- how did you receive a bill from
11  the Beverly Hill (sic) Marriott -- Beverly Hills
12  Marriott on March 20th?  Was that made payable to by
13  Stream?
14  A.  Yeah, I -- I -- I booked the -- I booked the
15  hotel and these are all Stream travel expenses.
16  Q.  So when you went to the hotel and you presented a
17  card with --
18  ---
19  (WHEREUPON, THERE WAS A BRIEF INTERRUPTION IN THE
20  PROCEEDINGS.)
21  ---
22  BY ATTORNEY CALLAHAN:
23  Q.  When you -- when you went to the Beverly Hills
24  Marriott, you went to the hotel and they asked how
25  are you going to pay for this --

Page 155

1  A.  Right.
2  Q.  -- what did you present them with?
3  A.  Citywall Capital card.
4  Q.  So why would you say Stream would be the -- be
5  making the payments?
6  A.  Well, Stream didn't -- Stream didn't have a DIP
7  account.
8  Q.  But what agreement did -- does Citywall Capital
9  have with Stream requiring Citywall Capital to pay
10  for Stream's travel expenses for you?
11  A.  VSI had Subscription Agreements with Stream.  VSI
12  advanced money and paid expenses for Stream for the
13  other employees.  They were booked through VSI --
14  or, sorry, 1099.  For mine, it was booked through
15  Citywall Capital.  And we paid all my travel through
16  VSI, wired that money to Citywall Capital and paid
17  for it.
18  Q.  What services did you perform while you were --
19  for Stream while you were in San Francisco?
20  A.  This is all -- this is all fundraising, meeting
21  with customers, meeting with vendors.  That meeting
22  there was for the NBA, for the Beverly Hills
23  Marriott.
24  And we have a Work Order now from the NBA to do
25  the world's first glasses free broadcast.

Page 156

1  Q.  So those invoices -- or other invoices first.
2  For example, with Uber --
3  A.  Yeah.
4  Q.  -- or Alaska?
5  And why wouldn't it be on behalf of VSI as it was
6  prior to the bankruptcy was filed?  Why Stream now,
7  when it should have been VSI?
8  A.  I don't understand.
9  Q.  I don't understand --
10  A.  I don't understand your question.
11  But once the DIP account was set up, now all
12  expenses are being run through the DIP account.
13  Q.  I -- I need to understand what was going on from
14  when we started this --
15  A.  Okay.
16  Q.  -- request for information.  It was from March
17  15, 2023 --
18  A.  Okay.
19  Q.  -- to some date when the -- we think sometime
20  in August, perhaps September, but whatever date the
21  BFA account was fully operational --
22  A.  Correct.
23  Q.  -- why Stream would be obliged to make these
24  payments?
25  Is it because you say today that you were on

---

Page 157

1  business for Stream?
2  A.  No, it's because this is all for Stream TV.  Let
3  -- let me be clear -- let me be very clear here.
4  VSI was set up.  And because Stream TV did not have a
5  bank account, the employees couldn't go back to
6  Stream.  And everything we've been doing is to get
7  Stream TV operational again.
8  So those are all investor meetings to go out and
9  raise money for Stream TV or it was to do customer
10  meetings for Stream TV.  This is all Stream TV
11  activity.
12  Q.  Where does Capital (sic) Cities (sic) get its
13  funds that were placed in this bank account?
14  A.  VSI.
15  Q.  And why?  What's -- there is -- is there an
16  agreement?
17  A.  I mean, I -- that was the practice we were using
18  2022 is paying the travel expenses.
19  Q.  Well, it was a practice in 2023 as well --
20  A.  Yeah.
21  Q.  -- for VSI to pay Capital (sic) City (sic) to
22  pay your travel expenses?
23  A.  Correct.
24  Q.  I don't understand how Stream gets in there.
25  That's a legal obligation.

---

Page 158

1  ATTORNEY ZAHRALDDIN-ARAVENA:
2  May I ask a question?
3  Mr. Rajan, does -- does -- when you
4  go to the NBA, right, does -- does -- does the
5  presentation to the NBA include any VSI technology?
6  THE WITNESS:
7  No, all the -- all the meetings are
8  using the Stream TV technology.  They're all Ultra D
9  devices, all Ultra D demonstrations, all Ultra D
10  discussions on Ultra D patents, all discussions on
11  how the technology works and it's all Ultra D devices
12  at those meetings.
13  If it's a Stream device, and it's Stream
14  technology and Stream patents being discussed, it's a
15  Stream meeting.
16  Q.  Because you say so?
17  A.  No, that's reality.  If it's a Stream asset in
18  the meeting, then what is it?
19  ATTORNEY ZAHRALDDIN:
20  Mr. Rajan, you don't have to be
21  combative.  Just -- just let me take a step back.
22  Let me ask you a question.
23  THE WITNESS:
24  Sure.
25  ATTORNEY ZAHRALDDIN:

---

Page 159

1  So what is the relationship -- what
2  -- what does VSI do for Stream?
3  THE WITNESS:
4  VSI is raising money to finance Stream
5  TV.
6  ATTORNEY ZAHRALDDIN:
7  And what else does it do?
8  THE WITNESS:
9  They -- it -- it did start in 2023, a
10  hologram project.  But that's less than 1 percent of
11  the funds for VSI.
12  ATTORNEY ZAHRALDDIN:
13  Does VSI have any agreements currently
14  with Stream that are pending?
15  THE WITNESS:
16  Yes.
17  ATTORNEY ZAHRALDDIN:
18  And what are those agreements?
19  THE WITNESS:
20  It's Subscription Agreements.
21  ATTORNEY ZAHRALDDIN:
22  Any other agreements?
23  THE WITNESS:
24  It also has a Distribution Agreement to
25  distribute the technology to customers.

---

Page 160

1  ATTORNEY ZAHRALDDIN:
2  Okay.  Thank you, Mr. Rajan.
3  BY ATTORNEY CALLAHAN:
4  Q.  Let's go to the -- did you find the March 2023
5  bank statement for the 0125? I thought we gave it to
6  you?
7  A.  The which -- which one?
8  ATTORNEY ZAHRALDDIN:
9  I think I just --
10  ATTORNEY CALLAHAN:
11  He has got it.
12  ATTORNEY ZAHRALDDIN:
13  Yeah, he's got it because I gave him my
14  copy.  He's got it.
15  ATTORNEY CALLAHAN:
16  March 2023?
17  Okay.
18  ATTORNEY ZAHRALDDIN:
19  Uh-huh (yes).
20  THE WITNESS:
21  I have --
22  ATTORNEY ZAHRALDDIN:
23  Excuse me.  That's Ms. Godfrey.
24  THE WITNESS:
25  -- I have July, and I have June, I

---

Page 161

1   have April.
2   ---
3   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
4   ---
5       ATTORNEY CALLAHAN:
6   Back on the record?
7       COURT REPORTER:
8   Yes.
9       ATTORNEY CALLAHAN:
10  Thank you.
11      BY ATTORNEY CALLAHAN:
12  Q.  Mr. Rajan, I'm trying to find a March report, but
13  I have it up on the screen.  And this is the Chase
14  bank -- bank statement for March 1st to March 31st,
15  2023.
16  Let me ask you a couple of questions about it.
17  I'm going to go to -- the beginning balance was
18  $2,511.93.  And there were deposits of $526,382.95
19  during the month of March 2023.
20  So let me ask you a little bit about the deposits
21  that were made into that account.  The first deposit
22  was made on March 3rd from a Todd Tuls, T-U-L-S, from
23  Rising City, Nebraska.
24  Can you tell me what this transaction is about?
25  A.  Yeah, he's a -- a -- a VSI investor.

Page 162

1   Q.  Okay.
2   Do you know why he deposited $200,000 into the
3   VSI account in March 3rd --
4   A.  He bought shares in VSI.
5   Q.  Okay.
6   And did you negotiate with Mr. Tuls regarding his
7   purchase of shares in VSI?
8   A.  I knew about it.  Some other people in VSI were
9   talking to him.
10  Q.  Okay.  Who would that be?
11  A.  Well, it would have been Dan Rank.  And some
12  other people also in VSI were involved in it.
13  Q.  Do you understand what the purpose of that
14  transaction, what did Mr. Tuls expect to get for the
15  purchase of the shares in VSI?
16  A.  He got shares.
17  Q.  Just simply, he -- he gave $200,000 --
18  A.  For shares.
19  Q.  -- just for shares?
20  A.  Yeah -- no, not for the Debtor, for -- for VSI.
21  Q.  I'm sorry, VSI, yes?
22  A.  Yes.
23  Q.  And why did he purchase those shares?
24  A.  I assume he likes the company.
25  Q.  But you were not part of any introduction by Mr.

Page 163

1   -- to Mr. Tuls of the company?
2   A.  No, I've -- I've known him for years.
3   Q.  And were there any promises made to Mr. Tuls with
4   respect to the shares or the value of the company?
5   A.  Oh, oh, we -- yeah.  I mean, we need to
6   research --
7       ATTORNEY ZAHRALDDIN:
8   When -- when -- when -- I'm sorry,
9   excuse me.  Can you -- when you -- I'm going to
10  hold you to the same thing.
11  When you say the company, which
12  company?
13      ATTORNEY CALLAHAN:
14  VSI.
15      ATTORNEY ZAHRALDDIN:
16  Thank you.
17      THE WITNESS:
18  Yes.  I mean, he believes that VSI will
19  grow and flourish, yes.
20      BY ATTORNEY CALLAHAN:
21  Q.  And grow and flourish in what respect?  Would it
22  be in -- in connection with the reorganization of
23  Stream TV networks?
24  A.  Yes, that's part of it.
25  Q.  You mentioned something about a hologram business

Page 164

1   that didn't seem to work out or flourish?
2   A.  I didn't say it didn't work out, I said we're
3   just starting a hologram business.
4   Q.  So does VSI have any other business model or
5   objective than -- other than the reorganization of
6   Stream TV network?
7   A.  Yes, it does.
8   Q.  Okay.  It does have other objectives?  What
9   objectives?
10  A.  It started a hologram project.  Colossus Free
11  Hologram.
12  Q.  I thought you said that was not part of --
13  really part of the business?
14  A.  No, I said that's a small part of it.
15  Q.  What percentage was it?
16  A.  Less than 5 percent --
17  Q.  So --
18  A.  -- right now.
19  Q.  -- primarily it's the Stream reorganization that
20  VSI is tied?
21  A.  But the Stream reorganization.  And also -- yes.
22  And also, there's -- yes, it's the Stream
23  reorganization.
24  Q.  Okay.  And -- and let's go to another one here.
25  There's a James Feeley who made a number of deposits

Page 165

1  in March?
2  A.  Correct?
3  Q.  $80,000 on March 6th.  $30,000 on March 10th.
4  Who is James Feeley?
5  A.  He's a shareholder.
6  Q.  Okay.  How did he come -- become a shareholder
7  with VSI?
8  A.  We've known him for years.  And so he invested.
9  Q.  And we meaning?
10  A.  I've known him for years.  And so has all the
11  other members of the VSI organization.
12  Q.  Is he -- to your knowledge is he familiar with
13  Stream TV?
14  A.  Yeah.
15  Q.  And he was also aware of the difficulties Stream
16  TV had with respect -- and I say difficulties, the
17  litigation it had with various entities in the
18  Delaware Chancery Court?
19  A.  Oh, yeah, he's aware.
20  Q.  And he was aware of that and he still deposited
21  this money?
22  A.  Yeah.
23  Q.  What is -- the next one is Cottage & Castle
24  Ventures.
25  Would that be a company owned by Mr. Feeley --

Page 166

1  A.  I think so, yeah.
2  Q.  -- $30,000?
3  A.  Yeah, I think so.
4  Q.  And again, the investment was in the same terms?
5  And it's somebody you've known -- you've personally
6  known for some time?
7  A.  Uh-huh (yes).  And so have the other employees
8  -- the other 1099s.
9  Q.  Do you know if he's a creditor of Stream TV?  Is
10  he owed money by Stream TV?
11  A.  I don't think so.
12  Q.  And the same with Cottage & Castle?
13  A.  Yeah, I don't think so.
14  Q.  Mark Lombardi and Marie Lombardi, who are they?
15  A.  They're shareholders.
16  Q.  And do you know them personally?
17  A.  Yeah.
18  Q.  And are they -- have they invested previously
19  with VSI?
20  A.  They may have.  I don't think so.
21  Q.  Do they make regular inquiries of the Stream
22  reorganization case?
23  A.  Yeah.
24  Q.  And to whom would they direct those inquiries?
25  A.  Some people call me.  Sometimes they call Thomas

Page 167

1  Park.
2  Q.  And then there's a book transfer credit from
3  Linda Johnson.
4  Do you know what that was about?
5  A.  It's probably an ACH, not a wire.
6  Q.  Do you know who Linda Johnson is?
7  A.  She's an investor.
8  COURT REPORTER:
9  She is -- she is what?
10  THE WITNESS:
11  An investor.
12  BY ATTORNEY CALLAHAN:
13  Q.  If we go down to Keith Newton and Laura Newton
14  from Western Springs, Illinois.  Who are they?
15  A.  They're investors.
16  Q.  And, again, the same conversations, have you --
17  you know them personally?
18  A.  Yeah.
19  Q.  How about Carol Chittenden and Newman Chittenden,
20  do you know who they are?
21  A.  Yeah, they're an investor in -- in the company.
22  Q.  And, again, you've known that personally?
23  A.  Uh-huh (yes).
24  Q.  That is yes?
25  A.  Yeah.

Page 168

1  Q.  And were you involved in any negotiations with
2  respect to the investment in VSI stock?
3  A.  Most of it was Dan Rink, but I did talk to them.
4  Q.  How long have you known Dan Rink?
5  A.  Ten years.
6  Q.  Sharjah Uae.
7  A.  Where?
8  Q.  March 24.
9  A.  No, I think it's cereals and vegetables.
10  Q.  I think that's the Pierce S-H-A-R-J-A-H U-A-E.
11  A.  No, you got to go up one line higher.  Go to the
12  right.
13  Q.  Cereals and vegetables?
14  A.  Yeah, that's it.
15  Q.  What is that?  That's a trading company?  And
16  it's invested in --
17  A.  VSI.
18  Q.  -- VSI?  And do you know the individuals who are
19  represented -- who are the individuals involved in
20  that company?
21  A.  That's the Walpoles.
22  Q.  Okay.  Thank you.  David Lombardi?
23  A.  Yeah, we know him.
24  Q.  And is he a -- did you know him personally?
25  A.  Uh-huh (yes).

Page 169

1  Q.  Yes?
2  A.  Yes.
3  Q.  VA Kaiser?
4  A.  Yes.
5  Q.  Another investor?
6  A.  Uh-huh (yes).
7  Q.  Are there contracts with these folks they have
8    representing the purchase of these shares?
9  A.  Yeah, they have paperwork with VSI.
10 Q.  Robert S. French, Sunny Hill, California?
11 A.  Correct.
12 Q.  Pardon me?
13 A.  Yeah, he's an investor.
14 Q.  And, again, you -- you know this person?
15 A.  Yeah.
16 Q.  What's the deposit of March 27th and 28th?  Do
17   you know what those source of funds were?
18 A.  Yeah.  Now, I think some of these credits, they
19   may actually -- the ones you're asking about
20   earlier, I think they're ACH's not wires.  That's why
21   they're showing up like that.
22 Q.  Okay.  But what are they?  What is the source of
23   those funds?
24 A.  It would have been an investor who may have sent
25   it through an ACH.  And the ones that you're asking

Page 170

1  earlier that I couldn't recognize, I think they're
2  ACH's.
3      COURT REPORTER:
4  Attorney Callahan, could you make it a
5  little bigger?
6      ATTORNEY ZAHRALDDIN:
7  It's just very difficult.
8      THE WITNESS:
9  Yeah, like see --
10     COURT REPORTER:
11 The ACH.
12     THE WITNESS:
13 -- when they have the ACH, they're
14 not giving all the information.
15     COURT REPORTER:
16 Thank you.  Thanks.
17     THE WITNESS:
18 I don't know why they aren't.
19     ATTORNEY ZAHRALDDIN:
20 You don't -- you don't know why?
21     THE WITNESS:
22 Yeah.
23     BY ATTORNEY CALLAHAN:
24 Q.  So --
25 A.  Like here, they don't -- they don't give all the

Page 171

1  information.
2  Q.  -- so this is -- you produced bank statements
3    and -- from two entities, Chase and Bank of America
4    in response to our request?
5  A.  Correct.
6  Q.  Take a look at the response that your attorney
7    provided.  And I just want you to confirm some of
8    those responses -- those statements in that
9    response.
10   And, again, in response topic one, how the
11   financial obligations of Stream TV have been paid,
12   when they have been paid and whose direction they've
13   been paid, by whom the statements have been made.
14   You believe that those bank statements indicate in
15   response to our Production Request?
16 A.  Yeah.  But now, you've explained it to me, you
17   want -- you want September -- I'm sorry, you want
18   November and October.  So I have to send it to you on
19   Thursday.
20 Q.  Okay.  And in the response, it states no amounts
21   have been paid on behalf of Technovative, other than
22   the payments to the claim to the noticing agent
23   obtained by the Debtors.
24 A.  And we have an issue with Netherlands -- the
25   Netherlands Counsel.  We -- we have to talk to them.

Page 172

1      ATTORNEY ZAHRALDDIN:
2  We've -- we've discussed that.  And
3  we'll -- we'll make a disclosure on it.  But it's
4  not definitive that that's a -- an estate issue.  We
5  have to get that sorted out.
6      BY ATTORNEY CALLAHAN:
7  Q.  And the next paragraph, requests for
8    reimbursement of expenses by independent contractors
9    and invoices were forwarded to Amanda Gonzalez at
10   Visual Semiconductors.
11   Right?
12 A.  Correct.
13 Q.  And she was an independent contractor for VSI
14   prior to August 2023.
15   Right?
16 A.  Yeah.
17 Q.  And going forward, she is now a full-time
18   employee for Stream?
19 A.  Yeah, W-2 is what we're -- we have a motion on
20   Wednesday.
21 Q.  What is her salary?
22 A.  $3,400 a month.
23 Q.  And then the next page, it says payments to
24   independent contractors are reviewed by Debtors
25   Counsel.

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
Exhibit Transcripts    Page 46 of 171
In Re: Stream TV Networks, Inc. Technovative Media, Inc.
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

Page 173

1   Is that your understanding?
2   A.  Yes.
3   Q.  And did you again discuss your responses to this
4   Production Request with your Counsel when you
5   completed it?
6   A.  Yes, we went over it with Counsel.
7       ATTORNEY ZAHRALDDIN:
8   If I may, can ask one question?
9   Mr. Rajan, do you recall a meeting we
10  had with both folks from VSI and with Stream in order
11  to prepare or respond to this?
12      THE WITNESS:
13  Yes.
14      ATTORNEY ZAHRALDDIN:
15  Do you know how long that
16  teleconference was, roughly?
17      THE WITNESS:
18  Well, it was more than one day, I don't
19  know.  It was like eight hours or something.
20      ATTORNEY ZAHRALDDIN:
21  Yes.
22  And -- and, of course, we -- we
23  apologized because Mr. -- Mr. Alexander left the
24  firm and so we rushed to go through in detail but to
25  really get down to granular detail.

Page 174

1   Do you remember the discussions?
2       THE WITNESS:
3   Yeah.
4       ATTORNEY ZAHRALDDIN:
5   Can you tell me who was -- who was on
6   that call?
7       THE WITNESS:
8   Dan Rink was there, Suby Joseph, Amanda
9   Gonzalez Bennett from Lewis Brisbois, you were there,
10  I was there, Bud Robertson was there.  I think my
11  brother was there on -- in the initial phases on one
12  of the calls.  But a number of people were there.
13      ATTORNEY ZAHRALDDIN:
14  Okay.  Thank you.
15      BY ATTORNEY CALLAHAN:
16  Q.  Okay.  Who is BOE?
17  A.  Beijing Optical Electrical.  They're a panel
18  company.  They make, like, panels for, like, your
19  phone and your TV.
20  Q.  All right.  It says on page three, BOE has
21  offered supply chain financing for the assistance of
22  fulfillment of Purchase Orders directly to Stream.
23  And such financing will be presented to court for
24  approval.
25  A.  Correct.

Page 175

1   Q.  And what is the name of this entity again?
2   A.  BOE?
3   Q.  Yes.
4   A.  Yeah, Beijing Optical Electrical.
5   Q.  Okay.  And are there any documents evidencing
6   this offer?
7   A.  Yeah, we -- we've submitted to several times.
8       COURT REPORTER:
9   You submitted what?
10      THE WITNESS:
11  We submitted the document to the court
12  several times.
13      BY ATTORNEY CALLAHAN:
14  Q.  To the court?  You mean you filed something with
15  the court --
16  A.  Yes.
17  Q.  -- referencing Beijing?
18  A.  You should have a copy, too, in here.
19      ATTORNEY ZAHRALDDIN:
20  Yeah, I thought we had the supply chain
21  financing --
22      THE WITNESS:
23  Yeah, it --
24      ATTORNEY ZAHRALDDIN:
25  -- attached.

Page 176

1       THE WITNESS:
2   -- yeah, it's in there.
3       ATTORNEY ZAHRALDDIN:
4   If we didn't, please -- please tell
5   me.
6       ATTORNEY CALLAHAN:
7   Okay.  There's a reference here in the
8   -- the email response from Mr. Shaw that there's an
9   Exhibit B.  We didn't get an Exhibit B.
10      THE WITNESS:
11  Oh, the exhibits?
12      ATTORNEY ZAHRALDDIN:
13  Oh, it's not in the -- it's not in the
14  folder?
15      ATTORNEY CALLAHAN:
16  I didn't see it.
17      ATTORNEY ZAHRALDDIN:
18  I'm sorry if it's not in here.  But
19  this is response inquiry two.
20  Right?
21      ATTORNEY CALLAHAN:
22  Yeah.
23      ATTORNEY ZAHRALDDIN:
24  So we're not inquiry two, this is --
25  this is inquiry one.

In Re: Stream TV Networks, Inc. Technology & Media Apps
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

Page 177

1     ATTORNEY CALLAHAN:
2     Oh, inquiry two you're saying?
3     ATTORNEY ZAHRALDDIN:
4     Yes, yes, yes.
5     ATTORNEY CALLAHAN:
6     I didn't get to do a search and type
7     BOE.
8     ATTORNEY ZAHRALDDIN:
9     No, no, hold on.
10    So just -- because it's supposed to be
11    in there.  So I'm sorry if it's not.
12    ATTORNEY CALLAHAN:
13    Yeah, again.
14    This?
15    ATTORNEY ZAHRALDDIN:
16    Yeah.
17    Do we have an English translation at
18    all?
19    ATTORNEY CALLAHAN:
20    No, that is English.
21    THE WITNESS:
22    It is English.
23    ATTORNEY ZAHRALDDIN:
24    Oh, it is -- it is?  Yeah, it's
25    partially in -- I'm sorry.

Page 178

1     THE WITNESS:
2     They do one paragraph in Chinese, one
3     paragraph in English.
4     ATTORNEY ZAHRALDDIN:
5     I haven't been to the eye doctor in a
6     bit.
7     BY ATTORNEY CALLAHAN:
8  Q. Where does it say BOE?
9  A. Their subsidiary is Hefei Optical.  So it's HOE.
10    So each -- BOE is the parent.  Then each subsidiary,
11    each city is underneath.  So it will be like Hefei
12    Optical Electrical, Shenzhen Optical Electrical and
13    so on.
14 Q. Okay.  There's a reference to BOE, but --
15    ATTORNEY ZAHRALDDIN:
16    I'm sorry, that should be a little --
17    a little clearer, that BOE means BOE.
18    Mr. Rajan, can you explain how big BOE
19    is?
20    THE WITNESS:
21    They're a $40 billion in revenue
22    company.  They're the number one panel supplier in
23    the world.  They ship 600 million panels a year.
24    BY ATTORNEY CALLAHAN:
25 Q. Okay.  Let's talk about this agreeable -- I

Page 179

1     didn't realize this was BOE.
2     ATTORNEY ZAHRALDDIN:
3     Yeah, yeah, I'm sorry.  That was our
4     -- we should have connected the dots for you there.
5     I apologize.
6     BY ATTORNEY CALLAHAN:
7  Q. This is -- well, I should have copies of that.
8     Who signed it on behalf of BOE?
9  A. That's the way they sign it in China.  It's the
10    company stamp.  The company secretary was the --
11 Q. But you signed it on behalf of --
12 A. Stream TV.
13 Q. And it was signed when?
14 A. 20 -- end of 2018.
15 Q. '18?
16 A. Yeah.
17 Q. Five years ago?
18 A. Yeah.
19 Q. Have you had any correspondence, I'm going to
20    call it BOE, since then?
21 A. Yeah, we talk to them three times a week.  We
22    have a big meeting with them this week.
23 Q. Three times a week you said?
24 A. Yeah, yeah.  We have a huge meeting with them
25    this week.

Page 180

1  Q. And who's the person you speak to that's
2     authorized to negotiate for the BOE?
3  A. Henry Chow, Wang -- Wang Chow -- I'm sorry,
4     Wang Lee also represents them as well.
5  Q. So this was -- was Street -- Street -- the
6     litigation with Hoff and other parties didn't start
7     in 2018, it wasn't until 2020.
8     Correct?
9  A. Correct.
10 Q. So at that time, why didn't BOE offer and provide
11    supply chain financing in 2018 or 2019?
12 A. The -- what happened was, we got -- we sold a
13    bunch of TVs.  We were getting the production ready
14    in 2019.  We were -- we had signed a contract with
15    Google and Bosch in 2019.  We were getting set up for
16    production in 2020.  Then they had made arrangements
17    for an equity investor for us also in 2020.  And
18    that's when they signed the omnibus in the middle of
19    the night to stop the production.
20    And they were supplying supply chain finance in
21    2020.  And Hawk tried to stop it.  And that's exactly
22    why they stopped -- they did the omnibus.  They
23    wanted to stop the production.  Because once we went
24    to production, we would have had a ton of money.
25    They would have had no other choice to use equity.

---

Page 181

1  They didn't want to go to equity even though they
2  were contractually obligated.  They tried to get out
3  of it by signing the omnibus in the middle of the
4  night.
5  Q.  So describe for me supply chain financing.  What
6  is your understanding?
7  A.  Supply chain financing means that they will
8  basically -- okay.
9  So let's say you have a TV, and Stream TV and
10 VSI, whatever have to supply the -- the 3D chip and
11 the 3D film.  They will buy -- they will pay for the
12 chip and the film, ship it to where the contract
13 manufacturer is making the device.  So they'll
14 finance all the orders, so -- you know, so we don't
15 have to come up with money to pay for the chips and
16 the film for a Purchase Order, they'll finance it.
17 So as an example, the chip and the film might
18 cost 30 bucks.  We'll sell it for $100.
19 Q.  Wait, wait, stop.
20 We meaning who?
21 A.  Stream TV.
22 Q.  Not VSI?
23 A.  VSI and Stream TV --
24 Q.  Well, VSI -- I'm sorry for interrupting, but
25 let's try to be clear.  VSI seems to be the exclusive

---

Page 182

1  distributor of Stream products?
2  A.  Correct, right.
3  Q.  Does that also include VSI being a part of the
4  production process?
5  A.  Yes.  So just -- just bear with me 1 second.
6  This deal was done before VSI.
7  Q.  Right.
8  A.  Okay?  So I'm -- I'm talking about how this deal
9  was constructed.  And this is -- you know, and
10 they're extremely flexible and that sort of thing.
11 So right now, let's say when this is signed,
12 Stream TV is making a TV, which it was going to do in
13 2020.  We had a deal with Google.  And BOE is the one
14 that actually brought Google in for Stream TV.  BOE
15 pays for the chip and the film.  Then the chip and
16 the film gets shipped to the contract manufacturer
17 who makes the device.  The components may cost $20.
18 BOE might charge an extra $10 or so, and we sell that
19 to the customer for, we'll say, $100, $120.  Stream
20 TV pockets about $70 to $80.  BOE makes 10 bucks and
21 the vendors make $20 to $30.
22 So the reason why we have supply chain finance
23 is, these orders are very large.  So Stream TV
24 doesn't have to come up with money to finance the
25 Purchase Orders.  We just simply collect the profit.

---

Page 183

1  So we have two Purchase Orders now for $160 million.
2  So people like BOE will finance those Purchase Orders
3  for us and we collect that money.  The gross margin.
4  Q.  Is it your understanding, that that contract or
5  agreement that was entered into in 2018 is still
6  valid and enforceable against BOA?
7  A.  Yeah, they're working with us right now.  They're
8  heavily involved in the whole thing.  They gave
9  panels for Southern Telecom.  They introduced --
10 they set up the contract manufacturer for Southern
11 Telecom.  And they're helping with the Purchase Order
12 finance.  We have a huge meeting in China this week
13 with BOE.  They're heavily involved in the project
14 right now.  Then Evolve Capital is helping us with
15 Purchase Order finance.
16 And the customers, because we -- we're putting a
17 TV together right now for the next production run,
18 the customers are now in the process of working with
19 the VSI investors to open up like letters of credit,
20 and get the supply chain financed and operational so
21 Stream TV can start to receive that profit on those
22 orders.  The orders we have now, it's $55 million in
23 gross margin that Stream TV will collect.  That's
24 over and above whatever money VSI is going to give
25 Stream TV.

---

Page 184

1  Q.  What do you mean VSI gives to Stream?
2  A.  VSI already has a deal for $35 to $40 million
3  from --
4  Q.  With?
5  A.  -- Stream TV.  VSI signed a Subscription
6  Agreement to Stream TV --
7  Q.  Right.  Okay.
8  A.  -- for $35 to $45 million.
9  Q.  $45 million?
10 A.  Then there's an additional $55 million from the
11 Purchase Orders, which are now -- we're now
12 commencing an additional $55 million.
13 Q.  Tell me about Evolt Capital.
14 A.  Sure.  That's a company down in Florida that
15 helps with the supply chain finance.  And also
16 issuing bonds.  And they're working with VSI.
17 Q.  And your -- your Counsel's response says that
18 the VSI is separately entering into an agreement, not
19 Stream.
20 Correct?
21 A.  Uh-huh (yes).
22     ATTORNEY ZAHRALDDIN:
23 Mr. Callahan, can I ask a quick --
24 So, Mr. Rajan, Evolt, can you tell me
25 what they typically work in?

---

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit Transcripts   Page 49 of 171

In Re: Stream TV Networks, Inc. Technology Litigation, et al.                    Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination                                               November 13, 2023

Page 185

1      THE WITNESS:
2   Yeah, they -- they charge 1 to 2
3   percent a month for supply chain finance.  So let's
4   say you have $160 million in Purchase Orders.  The
5   cost of goods, let's say, is -- we'll say $80
6   million.  They'll charge about 1 to 2 percent on that
7   per month.  So, you know, fully loaded, they'll get
8   about 4 percent.
9   So out of $80 million, a company like
10  Evolt will get about $3 million out of that $55
11  million.
12     ATTORNEY ZAHRALDDIN:
13  And, Mr. Rajan, what type of other
14  deals are they known as their, kind of, sweet spot or
15  specialty as an equity fund?
16     THE WITNESS:
17  Yeah, they're also bringing investor
18  capital for VSI.  So VSI is working with Evolt
19  Capital and a group of investors now to buy shares
20  and put bonds into VSI.  That's happening.
21     ATTORNEY ZAHRALDDIN:
22  And what are the bonds?  What are the
23  amounts?
24     THE WITNESS:
25  The bonds are -- I believe they're $20

Page 186

1   million each.  And they have a -- I think it's 14
2   percent a year interest.
3      ATTORNEY ZAHRALDDIN:
4   Mr. Rajan, when we were looking for
5   financing and we were having difficulty even
6   entertaining DIP financing, why is it that Evolt
7   Capital was interested in this company?
8      THE WITNESS:
9   Because we have Purchase Orders from
10  customers, and we also have more customers coming
11  online.  So they see a huge opportunity to finance
12  the supply chain.
13     ATTORNEY ZAHRALDDIN:
14  Are they -- are they an equity fund
15  that specializes in factoring?
16     THE WITNESS:
17  Yeah, yeah.  They do supply chain
18  finance, which I just explained.  And then also we
19  have other investors at VSI.  Our shareholders
20  brought them in and they're financing the purchase
21  orders and the operations stream.
22     ATTORNEY ZAHRALDDIN:
23  Would it be fair to say that they're
24  one of the only investors, lenders, etcetera, that
25  really focused in on the value of the collateral

Page 187

1   being the purchase orders?
2      THE WITNESS:
3   I wouldn't say they're the only one.
4   We have about like five or six of them now.
5      ATTORNEY CALLAHAN:
6   Okay.
7      THE WITNESS:
8   They're one of many, but, yes, they're
9   showing tremendous -- you know, they're healthy.
10  They're very healthy.
11     ATTORNEY ZAHRALDDIN:
12  You're right.  I could limit it.  But
13  that is --
14     THE WITNESS:
15  There's a number of people.
16     ATTORNEY ZAHRALDDIN:
17  Thank you.
18     BY ATTORNEY CALLAHAN:
19 Q.  All right.  Let's go topic three.  I'm sorry,
20  topic - that is another document.  Okay.
21  Mr. Rajan, topic three.  We requested that you
22  provide information regarding the issuance of shares
23  from Stream and or Techno to ESI.  And these are the
24  documents you provided in response to our request,
25  with respect to Subscription Agreements cover.  I'll

Page 188

1   that it appears that there were some duplicates
2   submitted, but we'll go through them.  Do you recall
3   why this document was submitted in response to our
4   request?
5  A.  Yeah, it's the subscription thing.
6  Q.  Well, stock Purchase Agreement, VSI 230706?
7  A.  Correct.
8  Q.  And what was that agreement reached?
9  A.  You got to go up to the top.  Go up to the first
10  stage.  That's okay.  Yeah, keep going up and the
11  date's up at the top under detail right there.
12 Q.  July 6th, 2023.
13 A.  July 6th, 2023.
14 Q.  This is the $45,000,000?
15 A.  No, that's $35,000,000
16 Q.  Well, you referenced one for $45,000,000.
17 A.  No, I said 35, and then there's some other ones
18  too.
19 Q.  Okay.
20 A.  Somewhere in the neighborhood of 40.
21 Q.  And this was reached between who?  Who are the
22  persons who negotiated this agreement?  If you go
23  down the signatures --
24 A.  Joe Corso.
25 Q.  And what is his --

Page 189

1  A.  He's at VSI.
2  Q.  And what does he do at VSI?
3  A.  He's on the board of VSI.
4  Q.  When you say the board, is he also a member of
5   the committee?
6  A.  Uh-huh (yes).
7  Q.  And you signed this as well on behalf of Stream.
8   Correct?
9  A.  Correct.
10  Q.  And could you just describe the agreement?
11  A.  It's common shares.
12  Q.  How much?
13  A.  Well, how many shares?  You got to go up and
14   read.  It's in there.  You got to go find it.  No,
15   that's a different one.  Where's that at?  Oh.
16  Q.  Knocked myself out there.
17  A.  Yeah, this is it.  Okay.
18  Q.  July 6th, 2023 effective date.  So VSI purchases
19   23,000,000 shares plus.
20   Correct?
21  A.  Yeah.
22  Q.  Price of $1.50 per share?
23  A.  Correct.
24  Q.  Were any prior Subscription Agreements for a
25   consideration of higher price per share?

Page 190

1  A.  Uh-huh (yes).
2  Q.  And why was this price negotiated $1.50 per
3   share?
4  A.  There was a group of investors that were working
5   on VSI that wanted to buy Stream TV and then we ended
6   up, Stream TV ended up going to bankruptcy.  So a
7   different group came in and started negotiating
8   different prices.
9  Q.  So when you say group, who?
10  A.  Corso and those people were negotiating.
11  Q.  On behalf of?
12  A.  The ESI.
13  Q.  But this is around the same time that people,
14   investors were purchasing shares in VSI.
15   Correct?
16  A.  Yeah, in VSI, correct.
17  Q.  It was part of the Purchase Agreement with VSI
18   for these individual investors, an agreement that VSI
19   would purchase shares of stock in Stream?
20  A.  No, it didn't say anything.  It was - hang on a
21   second.  You're talking about when investors put
22   money into VSI?
23  Q.  Yes, sir.
24  A.  Yes.  They are putting money in for, one, growing
25   a hologram business, and two, for VSI to help finance

Page 191

1   Stream TV.
2      ATTORNEY CALLAHAN:
3   Can you scroll to the bottom of that,
4   Kevin?  Hold on.  Scroll up a little.
5      ATTORNEY SHAW:
6   More?
7      ATTORNEY CALLAHAN:
8   No, down a little.  One more.  Okay.
9   And go up one page.  Okay.  Thank you.
10     BY ATTORNEY CALLAHAN:
11  Q.  So you see what appears to be a photograph of the
12   signature page?
13  A.  Correct.
14  Q.  Is there any reason why it was a photograph copy
15   as opposed to just simply the page 9 of 13 bond?
16  A.  Corso, my understanding was he was at his house
17   in upstate New York, so he could only sign it by
18   signing it and using his phone.
19  Q.  That's fine.  Okay.  And this is stock Purchase
20   Agreement is September 11, 2023.  Are you familiar
21   with this document?
22  A.  Correct.
23  Q.  Just describe it for us, please.
24  A.  It's the stock Purchase Agreement.
25  Q.  And how was that negotiated?

Page 192

1  A.  It would have been between myself and one of the
2   members of the independent committee.
3  Q.  Okay.  And isn't there a motion before the court
4   that you're aware of seeking permission to sell
5   stock?
6      ATTORNEY ZAHRALDDIN:
7   We are considering withdrawing that
8   motion because there's no reason for -- we're not a
9   public company and it doesn't involve property in the
10   state.  Property was created afterwards.  We can talk
11   about it, but right now it's not up because we had a
12   lot of stuff to put up.
13     THE WITNESS:
14   The discussions that I heard on the
15   Zoom call, our lawyer was talking to the judge and
16   said it's ordinary course of business.
17     BY ATTORNEY CALLAHAN:
18  Q.  So I'm going to go to the signature page, Mr.
19   Rajan.  Do you recall signing that?
20  A.  Yes.
21  Q.  Mr. Corso.  And again, given what appears to be a
22   photograph of the signature page, is the same reason
23   why you signed this?
24  A.  Yes.
25  Q.  Does VSI have -- its business address is your

Page 193

1  home.
2  Correct?
3  A.  Yeah.
4    **COURT REPORTER:**
5  Can we take a five minute break, sir?
6  Can we take a five minute break?
7    **ATTORNEY CALLAHAN:**
8  Sure.
9    **COURT REPORTER:**
10  Thank you.
11  ---
12  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
13  ---
14    **BY ATTORNEY CALLAHAN:**
15  Q.  **Mr. Rajan, thank you.  We just took a break and I**
16  **want to talk to you a little bit more about the**
17  **relationship between VSI and Stream TV.**
18  A.  Sure.
19  Q.  **And again, the genesis of VSI when it was first**
20  **formed and the purpose for which it was formed.**
21  A.  Okay.  Let me just back up here.  Okay.  This is
22  my two cents.  Okay.  Stream TV had this technology.
23  It was a huge amount of work went into the
24  technology and we had to figure out the bonding.
25  Stream TV did it.  And we had to get the electronics

Page 194

1  ready.  We sold 5000 TV's, but the electronics were
2  not that great.  We were signing -- we signed with
3  Google.  We signed with Bosch.  If you look in the
4  packet, there's even a letter there from Google
5  saying that they were interested in potentially
6  investing in Stream TV.  We're in full throated due
7  diligence.  We had almost 50 companies that were
8  supposed to get final samples.  This is all 2019.
9  Then what happened was in 2019, we told the
10  lenders, you have to convert into equity.  And the
11  lenders got upset.  One of them was Qualcomm's
12  engineering arm.  They converted into equity.  And
13  they're some of the people that are on the VSI
14  management waiting to join Stream.  And what happened
15  was were getting the production set up in 2020.
16  Instead of making 5,000 units, we were going to make
17  hundreds of thousands, going to 1,000,000.  They, in
18  the middle of the night, the secured lenders went and
19  signed that omnibus agreement, which was blatantly
20  illegal.  And Stream TV was stopped dead in its
21  tracks.  And 35 percent of the employees went with
22  the other side.  Sixty-Five (65) percent was set,
23  stayed with us.
24  We had no warning this was coming.  We had to set
25  up another company to keep the supply chain going,

Page 195

1  keep the employees with pay.  You know, they have
2  families to take care of.  I had to pay 65 percent of
3  the employees and keep the project alive and pay
4  lawyers to fight it out in the court.  And that's why
5  these other companies are set up along the way.
6  Recently, VSI went into the hologram, glasses-free
7  hologram business.  So we have product that VSI can
8  sell.  But it was predominantly set up because we
9  knew that the omnibus was blatantly illegal.
10  Eventually we would be reunited with the technology.
11  That's why VSI was set up to basically keep Stream
12  TV alive until we were reunited with the technology.
13  And then our problem is now we filed in the
14  bankruptcy and they're not giving the Stream TV
15  assets back.  They didn't follow the court orders in
16  Delaware and they're refusing to give us our assets
17  back.  We had the hearing on Wednesday, the Stream TV
18  assets back.  The VSI was set up to basically keep
19  Stream TV going and to finance Stream TV and get it
20  into production again.
21  Q.  **Okay.  And what year was VSI formed?**
22  A.  It was in 2022.  The reason why we went with VSI
23  - the other companies, first GFT and VTI were looking
24  at other glasses free 3D technologies, but the
25  technologies were no good.  They were looking at what

Page 196

1  they call stitching and tiling, which is what our
2  competitors use.  And we just didn't like the
3  technology.  So we just said forget it.  We need to
4  do hologram.  So VSI was set up for hologram.  It
5  took a year for us to find hologram, and then it was
6  paying for Stream TV since it paid for the Supreme
7  Court fight and then it was financing it post Supreme
8  Court fight.  We thought we won in the Supreme Court,
9  we were going to get everything back immediately and
10  that never happened.  So that's why.  One reason I'm
11  having problem with the records is I had everything
12  on Microsoft 360 and I'm doing it through my phone
13  stuff and so are the other employees and it's very
14  difficult.  We don't even have our company laptops.
15  Q.  **Okay.  And the company was formed 2022.  What**
16  **state was it incorporated in?**
17  A.  Wyoming.
18  Q.  **Any reason why Wyoming?**
19  A.  All the VC guys and all the tech companies are
20  all going to Wyoming at zero taxes.  Wyoming is now
21  the new hot thing.  Used to be Nevada, but Nevada,
22  they were raising taxes like crazy.  So everybody's
23  going to Wyoming.  But in our contracts, we say you
24  follow Delaware law, Pennsylvania law.
25  Q.  **And the articles and all the other necessary**

**BEHMKE REPORTING AND VIDEO SERVICES, INC.**
(415) 597-5600

Page 197

1  requirements for Wyoming waw were filed in Wyoming?
2  A.  Yes.
3  Q.  Who were the original officers of VSI?
4  A.  It was me.
5  Q.  Just you?
6  A.  Yeah.
7  Q.  And who were the shareholders of VSI at the
8  inception?
9  A.  Oh, I registered the company.
10  Q.  Right.
11  A.  Then people put money in as soon as we
12  registered.
13  Q.  Investors?
14  A.  Yeah.
15  Q.  And in the meantime, you were litigating with
16  Stream TV and its creditors?
17  A.  Yeah, and the creditor, and the Supreme Court.
18  And then in the Supreme Court.
19  Q.  Okay.  And I wanted to ask you about this
20  committee that was formed, the dates it was formed.
21  A.  Yeah.
22  Q.  Let go back from that.  Who are the directors of
23  VSI?
24  A.  It's Joe Corso, Tom Sagan, Dan Rink.  I'm a
25  director, but I don't participate.

Page 198

1      ATTORNEY ZAHRALDDIN:
2  Mr. Rajan, sometimes I think you're
3  answering or you're answering the next question.
4  He's asking for all the directors and you can't just
5  -- is it just those three?
6      THE WITNESS:
7  And me too.  I'm a director, but I
8  don't participate.
9      ATTORNEY ZAHRALDDIN:
10  Okay.
11      BY ATTORNEY CALLAHAN:
12  Q.  Okay.  But you're also the chief executive
13  officer of the Debtor.
14  A.  Correct.  Oh, yeah.
15  Q.  Also I said Debtor.  My mistake.
16  A.  But control now is given to that board of VSI.
17  Q.  And that's what I'd like to explore with you.
18  How is the control given to the board?
19  A.  We set up the --
20  Q.  I'm sorry.  We used the word board, but did you
21  mean committee?
22  A.  Board and committee.  There's two things.  Okay.
23  There's a board, then they have a committee, a
24  special committee set up for anything to do with
25  Stream TV, where I'm not supposed to even attend

Page 199

1  meetings.
2  Q.  And have you attended the meetings?
3  A.  For Stream TV, no.  What they did do was they
4  called me in the beginning of the meeting, somebody
5  was going, and then they told me to leave the meeting
6  and I left the meeting.
7  Q.  Okay.  And who are the members of the committee?
8  A.  It's Joe Corso, Tom Sagan and Dan Rink.
9  Q.  The three directors?
10  A.  Correct.
11  Q.  Except for you?
12  A.  Yeah.
13  Q.  And how was that accomplished?  Was there a
14  resolution?
15  A.  Yeah, they had resolution.  They had resolutions.
16  Q.  Have you seen those resolutions?
17  A.  I mean, I saw them drafting it, but I wasn't
18  allowed to participate until I left.  But I know they
19  did do resolutions.
20  Q.  But you as the CEO, what duties do you have as
21  the CEO of VSI?
22  A.  Now, not much.  I did have a lot before, but not
23  now.
24  Q.  Well, you did testify that you have authority to
25  direct your mother to make transfers.

Page 200

1  A.  No, I'm doing that from Stream TV.  No, no, no.
2  VSI has money.  It's raising from investors.  VSI
3  owes money to Stream TV through subscriptions.  And
4  also there's been profits coming from the PO's.  When
5  I inform VSI, because Amanda tells me that there's
6  expenses, and I just double check that the expenses
7  are correct and say go ahead and send money over.
8  That's all.  And then I go to the bank now from
9  Stream TV and I send the wire out from Stream TV.
10  But the monies have already been pre-approved from
11  VSI from the committee.
12  Q.  But they're not in -- for example, now, Stream
13  has the Debtor in possession account.
14  A.  Correct.
15  Q.  And there were deposits made, I believe, in
16  August or September, of $219,000.
17  A.  Correct.
18  Q.  We had some questions about the counter credit,
19  but both of those transfers were, deposits were made
20  from VSI.
21  A.  Right.
22  Q.  I understand your testimony earlier today was
23  that you actually on behalf of VSI, directed the
24  deposit of monies or transfer of monies to --
25  A.  No, no, no, no, no, no, no, no.

Page 201

1 Q. Well, then who directed that transfer?
2 A. That is the independent committee.
3 Q. But do they have authority over that Chase Bank
4 account?
5 A. Yeah.
6 Q. I'm sorry, they do?
7 A. Yeah. They're in charge of the money. They
8 could stop money from going to Stream TV. Then we'd
9 be in a litigation situation. But all the money is
10 pre-approved. All I'm verifying as a double check is
11 that Stream TV expense correct. So let's say
12 somebody wants $10,000 for a trade show. Is that
13 expense correct? And then I have to go to the Stream
14 bank now. They won't let us have online banking
15 because it's a DIP account. I think that's why I got
16 into trouble with Bank of America. And I have to go
17 do the wire transfer and I sign the paper up at M&T.
18 So I'm signing papers now at M&T for Stream TV.
19 Q. Okay. We don't know M&T because we haven't seen
20 bank statements yet.
21 A. Yeah. I can go with in and pick it up.
22 Q. Okay. Any other questions on -- one moment,
23 please. Anything else?
24 A. No.
25    ATTORNEY CALLAHAN:

Page 202

1    Okay. I think what we're going to do
2 is stop the examination now and we'll have a
3 discussion off the record and we'll come back and
4 discuss what we want to do. All right.
5    ---
6 (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
7    ---
8    ATTORNEY CALLAHAN:
9    Okay. We're back on the record. After
10 an off the record conversation, the Debtor and the
11 U.S. Trustee have come to an agreement to adjourn
12 this 2004 meeting to examination to December 11th at
13    10:00 a.m. At which time, Mr. Rajan, you will appear
14 again.
15    THE WITNESS:
16    Yes.
17    ATTORNEY CALLAHAN:
18 And the Debtor has agreed to following
19 production of certain documents. The Debtor has
20 agreed to file its monthly operating report for
21 October. All these documents will be filed by
22 November 27th.
23    ATTORNEY ZAHRALDDIN:
24 Submitted in the file.
25    ATTORNEY CALLAHAN:

Page 203

1 Submit, yes. Thank you. Submitted the
2 documents and file the operating report by November
3 27th and that includes documents relating to the
4 payment of Stream TV or VSI previously between Amanda
5 Gonzalez and Mathu Rajan. The Debtor will submit all
6 books and records in connection with the preparation
7 and filing of its schedule statement of financial
8 affairs and monthly operating reports. Those
9 documents would include all accounts receivable
10 journals, all accounts payable journals, profit and
11 loss statements. The Debtor will also provide copies
12 of all invoices in connection with all expenses paid
13 since the filing of the bankruptcy case. Monthly
14 bank statements from Key Bank and M&T Bank from March
15 15, 2023 through the present date.
16 The Debtor will provide more
17 information regarding the commitment of $45,000,000
18 to fund Stream from VSI. The Debtor will provide a
19 copy of an invoice or a receipt in connection with
20 the Debtor's payment of $50,000 to Brown and Michael.
21 The Debtor will provide copies of all agreements and
22 other information with respect to the shareholders of
23 VSI who deposited monies in the VSI accounts since
24 March 15th, 2023. The Debtor will submit all
25 documents with respect to setting up the independent

Page 204

1 board, also known as the Committee of VSI. And the
2 Debtor will also supply all, copies of all emails,
3 texts, and any other communication from Mr. Rajan to
4 VSI authorizing payment of expenses of Stream TV.
5 I think I've covered it. Anyone else
6 have any other comments?
7    BY ATTORNEY CALLAHAN:
8 Q. Mr. Rajan, was my recitation correct of our off
9 the record discussion?
10 A. Yes, yes, yes. That's fine.
11    ATTORNEY CALLAHAN:
12 Okay. Thank you. We have no further
13 questions for today.
14    THE WITNESS:
15 Thank you.
16    ATTORNEY ZAHRALDDIN:
17 Off the record.
18    * * * * * * * *
19    DEPOSITION CONCLUDED AT 4:23 P.M.
20    * * * * * * * *
21
22
23
24
25

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
In Re: Stream TV Networks, Inc. Technologies Media Apps   Page 54 of 171
Exhibit Transcripts
Bankrtupcy Rule 2004 Examination
Mathu Rajan PMQ
November 13, 2023

Page 205

1    COMMONWEALTH OF PENNSYLVANIA  )

2    COUNTY OF PHILADELPHIA        )

3                      CERTIFICATE

4    I, Nicole S. Montagano, a Notary Public in

5    and for the Commonwealth of Pennsylvania, do hereby

6    certify:

7    That the witness, Mathu Rajan, whose

8    testimony appears in the foregoing deposition, was

9    duly sworn by me on 11/13/23 and that the transcribed

10   deposition of said witness is a true record of the

11   testimony given by said witness;

12   That the proceeding is herein recorded fully

13   and accurately;

14   That I am neither attorney nor counsel for,

15   nor related to any of the parties to the action in

16   which these depositions were taken, and further that I

17   am not a relative of any attorney or counsel employed

18   by the parties hereto, or financially interested in

19   this action.

20   Dated the 16th day of November, 2023.

21   READ AND SIGN:  WAIVED.

22

23        *Nicole Montagano*

24

25             Nicole Montagano, Court Reporter

## $

**$1,600 (6)**
83:2;86:17,25;87:2,
6,8
**$1,740 (1)**
48:18
**$1.50 (2)**
189:22;190:2
**$10 (1)**
182:18
**$10,000 (6)**
93:15,17;94:8,8;
125:9;201:12
**$100 (3)**
107:22;181:18;
182:19
**$11,116.97 (1)**
83:9
**$112,000 (2)**
32:3,14
**$112,875 (1)**
32:25
**$114,705 (1)**
96:11
**$12,000 (1)**
88:22
**$120 (1)**
182:19
**$160 (5)**
122:3;138:22;
141:18;183:1;185:4
**$167,000 (1)**
33:1
**$167,751 (1)**
32:23
**$2 (1)**
139:7
**$2,000 (1)**
110:14
**$2,500 (2)**
76:11,11
**$2,511.93 (2)**
148:11;161:18
**$20 (3)**
182:17,21;185:25
**$200,000 (2)**
162:2,17
**$219,000 (9)**
105:16;110:7;
115:13;116:16,23;
117:1,2;119:23;200:16
**$22,000 (1)**
75:11
**$22,500 (2)**
74:11,21
**$221,000 (1)**
110:11
**$250,000 (1)**
30:19
**$28,000 (1)**
137:4

**$3 (1)**
185:10
**$3,000 (3)**
50:12,13;88:19
**$3,168 (1)**
123:6
**$3,200 (1)**
87:9
**$3,400 (1)**
172:22
**$3,942,120 (1)**
42:19
**$30 (1)**
182:21
**$30,000 (3)**
137:4;165:3;166:2
**$35 (2)**
184:2,8
**$35,000,000 (1)**
188:15
**$40 (2)**
178:21;184:2
**$400,000 (1)**
30:19
**$426,988.69 (2)**
95:4,18
**$45 (9)**
116:11,15;119:11;
120:12,14;137:11,20;
184:8,9
**$45,000,000 (3)**
188:14,16;203:17
**$5,000 (1)**
82:3
**$50,000 (7)**
108:1;123:11;
124:16;125:6;129:3,
22;203:20
**$500 (2)**
46:24;47:8
**$526,382.95 (1)**
161:18
**$54,000 (1)**
33:2
**$55 (6)**
122:4;141:19;
183:22;184:10,12;
185:10
**$575 (3)**
46:25;47:1;77:4
**$6,400 (1)**
94:7
**$7 (1)**
43:7
**$7,000 (1)**
134:10
**$70 (1)**
182:20
**$70,000 (1)**
128:4
**$75,000 (1)**
108:1
**$750,000 (3)**

49:20;50:15;58:10
**$750,813 (4)**
49:1,13,25;50:7
**$750,829 (1)**
57:7
**$753,000 (1)**
50:14
**$753,313 (1)**
49:22
**$8 (4)**
43:7;134:11,13;
135:12
**$8.3 (1)**
44:11
**$80 (3)**
182:20;185:5,9
**$80,000 (2)**
128:9;165:3
**$82,000 (1)**
92:18
**$86,000 (1)**
74:5
**$9,000 (1)**
125:14
**$9,183 (1)**
82:15
**$91,621,218 (1)**
44:11
**$91,621,218.46 (1)**
33:10
**$961,459 (1)**
40:4
**$99 (1)**
40:3

## '

**'18 (1)**
179:15
**'23 (3)**
36:2;44:17;69:15

## A

**able (2)**
23:4;54:19
**above (1)**
183:24
**access (2)**
26:18;124:19
**accident (1)**
106:12
**accomplished (1)**
199:13
**according (3)**
49:25;60:13;83:9
**account (122)**
17:2;23:2,21,24,24,
25;24:3,10,11,16,20,
20,22;26:18,19,21;
29:3;49:6,17;54:9,15,
16,19,21;56:21;93:11;
96:19;99:8,10;101:7,

11,13,25;102:11,12,13,
17,21,23,23,24;103:3,
25;104:10,11,12,12,13,
15,16,19,21;105:20,22,
24;106:2,3,7,10,13,13,
15,16,17,18,19,21,21,
23,25;107:23;109:12,
15,16,17;112:19;
114:18,20,25;116:9,
18;120:15;124:3;
126:20;127:16,17,19,
19;136:20,22,25;
141:24;142:5,6;
145:17,18;147:20;
148:3;149:17;151:14,
18;152:6,7,8,11,12,15;
153:14,14,17;155:7;
156:11,12,21;157:5,
13;161:21;162:3;
200:13;201:4,15;
203:10
**accountant (3)**
20:17;21:21,22
**accounting (8)**
29:9;33:20;38:2;
68:19;73:10;74:2;
97:2;98:21
**accounts (28)**
20:10;24:1;25:19;
26:19;30:9,12;31:6,9;
32:4,6,7,11,12,22;33:2;
93:12;106:4;107:20;
120:5;126:19;127:11,
12,15;143:24;147:24;
153:21;203:9,23
**accurate (7)**
44:4;54:3;60:15,16;
68:12;103:8;106:1
**ACH (4)**
167:5;169:25;
170:11,13
**ACH's (2)**
169:20;170:2
**Ackerman (1)**
141:9
**acknowledge (2)**
50:24;56:15;59:12
**acknowledged (1)**
58:9
**acknowledges (1)**
57:4
**Acquisition (1)**
127:23
**acting (1)**
11:3
**actions (2)**
63:12;73:2
**activate (1)**
24:4
**actively (2)**
10:25;106:24
**activities (1)**
72:19

**activity (3)**
115:7;9;157:11
**actual (1)**
103:2
**actually (13)**
26:21;29:10;34:16;
36:15;66:5;81:4;85:13,
16;97:21;103:12;
169:19;182:14;200:23
**addition (1)**
11:1
**additional (5)**
41:22;94:13;115:21;
184:10,12
**address (3)**
88:4;148:8;192:25
**addressed (1)**
113:8,9
**adjourn (1)**
202:11
**administrative (4)**
57:6,14;118:21;
122:22
**advanced (1)**
155:12
**advice (1)**
141:11
**Affairs (1)**
16:14;17:5;203:8
**affirm (1)**
25:7
**affirmative (1)**
12:17
**affix (1)**
34:14
**afternoon (1)**
98:4
**afterwards (1)**
192:10
**again (42)**
17:3;18:24;31:10;
40:9,22;41:19;44:16;
46:11;55:16;57:17;
59:11;68:5,16,17;69:2,
14;70:19;73:6;83:16;
92:7;93:3;96:1;99:25;
106:1;115:16;117:20;
126:20;128:5;146:8;
157:7;166:4;167:16,
22;169:14;171:10;
173:3;175:1;177:13;
192:21;193:19;195:20;
202:14
**against (3)**
116:2,15;183:6
**agent (1)**
171:22
**ago (10)**
24:21;62:7;106:14;
113:21,21;114:8;
116:6,10;151:7;179:17
**agree (3)**
43:8;126:17;142:20

**agreeable (1)**
178:25

**agreed (5)**
116:10,16;141:11;
202:18,20

**agreement (31)**
23:1;52:12;99:7;
104:17;116:17;119:11,
24;120:3,4,8,10;124:2;
137:10,17;140:6;
155:8;157:16;159:24;
183:5;184:6,18;188:6,
8,22;189:10;190:17,
18;191:20,24;194:19;
202:11

**agreements (22)**
44:23;53:8;102:4,5;
119:15;122:16;133:10;
137:13,19,21;138:11;
139:25;140:2,10;
155:11;159:13,18,20,
22;187:25;189:24;
203:21

**ahead (9)**
25:25;34:15;56:1;
101:14;123:20;124:13;
128:19;142:1;200:7

**airfare (1)**
93:4

**Alaska (1)**
156:4

**Alexander (1)**
173:23

**alive (2)**
195:3,12

**allow (1)**
96:20

**allowable (1)**
120:21

**allowed (4)**
23:2;99:7,8;199:18

**almost (4)**
84:6;100:22;139:7;
194:7

**along (2)**
195:5

**Amanda (60)**
16:21;17:21;19:21,
23,25;20:2,7,13,24;
22:2,8,17,22;23:17;
24:3;25:7,13,14,18;
26:9;27:2,4,28:22;
29:10,10,12;31:1,12;
38:13;50:22;65:17,19;
66:21,22,23;67:7,7;
68:7,8,25;73:25;76:20;
82:21;89:14;104:25;
123:22;124:13;125:4;
132:10;134:19,20,21,
22,25;135:8;145:13;
172:9;174:8;200:5;
203:4

**Amanda's (3)**

**Amazon (2)**
76:13;77:1

**America (22)**
23:21,22;24:9,11,15,
22;103:9,20,22;106:2,
2,8,15,21;107:13;
123:4;127:13;136:20;
145:20,23;171:3;
201:18

**amount (21)**
14:1;32:24,24;
40:16;49:13;107:25;
111:9,13;115:14;
116:16;117:5;119:3;
120:10,18,19;121:23;
128:4,9;129:2;140:9;
193:23

**amounts (6)**
69:13;110:19;111:6;
134:9;171:20;185:23

**analyst (2)**
134:23,24

**AnaStream (1)**
139:18

**answered (1)**
13:9

**anticipate (1)**
83:23

**apologize (6)**
42:4;61:10;70:14;
127:6;135:18;179:5

**apologized (1)**
173:23

**appear (8)**
42:17;43:21;50:11;
55:16;57:7;76:7;
77:14;202:13

**appears (15)**
33:8;39:2;49:21;
69:16;86:8;89:21;
91:14;92:8;123:3;
125:17;146:10;153:25;
188:1;191:11;192:21

**Apple (1)**
92:4

**applicable (1)**
118:18

**application (2)**
119:1,5

**applications (1)**
119:4

**approval (4)**
13:24;24:13;118:25;
174:24

**approve (1)**
26:14

**approved (8)**
13:19;22:20;26:7;
61:21;118:9,14;124:2,
11

**approves (1)**
119:4

**approximately (1)**
43:7

**April (27)**
16:7;34:6,25;35:6,
16,22;37:11;39:24;
42:13;44:23;46:14,18;
51:17,18;54:2;69:15;
74:11;83:8,8;87:12;
91:15;93:14;94:7;
96:16;148:14,18;161:1

**aren't (2)**
140:21;170:18

**arm (1)**
194:12

**around (2)**
102:17;190:13

**arranged (1)**
138:24

**arrangements (10)**
20:14;21:5,23;
24:19;81:3;137:23,24;
139:2;141:17;180:16

**arrive (1)**
137:9

**arrow (1)**
143:7

**articles (1)**
196:25

**ascertain (1)**
138:1

**Asia (2)**
31:5;96:16

**asset (3)**
33:25;134:16;
158:17

**assets (12)**
33:20,24;40:23;41:6,
13,17;63:18;134:15;
135:13;195:15,16,18

**assist (2)**
17:6;142:17

**assistance (1)**
174:21

**assisted (5)**
14:8;15:20;18:8,11;
46:2

**assisting (1)**
16:20

**associated (1)**
80:16

**Associates (2)**
88:11,12

**assume (3)**
47:13;131:7;162:24

**assuming (1)**
84:24

**assumption (1)**
118:8

**asterisk (1)**
135:19

**attached (17)**
12:24;20:10;27:7;
36:15;37:2,15,16;44:5;

46:7;68:10;111:24;
112:24;123:3;131:21;
134:7;140:5;175:25

**Attachment (7)**
12:6,19,25;18:25;
19:1,2;65:6

**attacks (2)**
141:2,13

**attend (1)**
198:25

**attended (2)**
91:19;199:2

**ATTORNEY (244)**
10:3;11:9,11;14:15,
19,22;15:3,6,10,15,17,
19,18:1;23:15;28:11;
29:22,24;30:1;35:5,7,
9,11,13,17,19,21;
44:21,24;45:1,5,8,10;
48:7,10,13,15;51:11,
15;52:3,6,8,15,22;53:4,
13,23,25;55:23,25;
56:2,12;60:17,24;61:5,
7,9,16,22,25;62:18;
63:2,10,19;64:2,9,20,
22;65:3;70:12,18;
71:21;72:2,4;74:15,18;
79:25;80:6,17,22;81:6;
85:2,20;92:10,12;
97:11,14,16,18;98:3;
102:25;103:13,21;
104:5,20;108:15,19,
23;109:1,6,11;110:17,
23;111:5,10,18;
117:23;118:3;121:9,
15;122:19;125:20;
126:1,22;127:2,5,8;
128:18,20,25;129:9,
11;131:20;132:15,23;
133:6,8;134:4;138:7;
139:10,20;140:1,13,20,
24;141:20;144:6,12;
148:20,22,24;149:4,9,
22;150:1,5,7,10,12,14,
21,23;151:4,17,23;
154:22;158:1,19,25;
159:6,12,17,21;160:1,
3,8,10,12,15,18,22;
161:5,9,11;163:7,13,
15,20;167:12;170:4,6,
19,23;171:6;172:1,6;
173:7,14,20;174:4,13,
15;175:13,19,24;
176:3,6,12,15,17,21,
23;177:1,3,5,8,12,15,
19,23;178:4,7,15,24;
179:2,6;184:22;
185:12,21;186:3,13,
22;187:5,11,16,18;
191:2,5,7,10;192:6,17;
193:7,14;198:1,9,11;
201:25;202:8,17,23,
25;204:7,11,16

**August (24)**
24:9;25:2;51:10,21;
52:1,2;54:7;81:12;
93:2;97:20,20;102:18,
20;103:5,5,25;105:25;
119:20;132:3,7;
148:16;156:20;172:14;
200:16

**authority (10)**
25:18,22;101:18,19,
21,22;124:8,19;
199:24;201:3

**authorization (3)**
80:11;102:9;125:9

**authorize (5)**
18:21;101:24;102:6;
105:1,9

**authorized (12)**
18:15,22;73:2;
76:22;81:16;101:12;
102:2;123:14;124:21,
24,25;180:2

**authorizes (2)**
11:16;123:25

**authorizing (1)**
204:4

**automated (4)**
20:16,21;21:10;
55:15

**automatically (2)**
21:20;57:1

**automation (1)**
56:24

**available (1)**
56:4

**awaiting (1)**
13:23

**aware (6)**
37:17;40:19;47:7,
11;55:18;58:7;83:5;
114:23;127:12;165:15,
19,20;192:4

**away (3)**
84:9;109:5;123:9

**B**

**back (62)**
13:11,19,20;14:8;
15:20;16:11,17,18;
17:3;20:13,20,22;
21:15,16;23:4,7,7;
25:3;26:25;30:2;
32:13;34:7;40:23;41:7,
8,8,9,17;44:22;52:1;
55:12;56:10;62:8;65:4,
7;68:5;73:6;88:19;
94:2,2;95:2;98:4;
103:20;104:3;113:16;
115:24;122:20;127:24;
135:20;137:10;147:23;
157:5;158:21;161:6;
193:21;195:15,17,18;

196:9;197:22;202:3,9
**backlight (1)**
  84:5
**backup (1)**
  97:13
**balance (35)**
  32:19,22;33:6,9;
  34:4,5;37:14,18,23;
  39:15;40:16;41:20;
  42:1;43:22;44:7,10,
  46:10,18;47:4,9;48:18;
  55:21;56:4,5,20;
  118:12;123:6;134:5,6,
  8,17;135:6;139:2;
  148:11;161:17
**bank (91)**
  17:1;20:10;23:2,21,
  22,24;24:1,3,9,10,11,
  12,15,15,19,21;49:17;
  56:21;59:4;74:13;
  75:21;76:7;81:25;
  93:12;95:7;99:8;103:2,
  9,20,22;104:11;
  105:20;106:2,2,4,5,8,
  15,17,20;107:4,13,21,
  21,22,24,25;108:6;
  109:12,16,17;120:15;
  123:2,3,4;124:3,6,9;
  125:22;127:13,14,15,
  19;136:20;142:5,6;
  143:24;145:17,18,20,
  21,23,24;148:2;
  153:20;157:5,13;
  160:5;161:14,14;
  171:2,3,14;200:8;
  201:3,14,16,20;203:14,
  14,14
**banking (1)**
  201:14
**bankruptcy (51)**
  14:10;15:21;16:12,
  13;20:7,11;21:6,16;
  23:16;25:4;29:7;
  31:25;38:7,25;40:24;
  43:11,12,15,18;49:19;
  50:14;54:14;57:20;
  62:15,17;66:22;72:17;
  81:22;82:5,8;87:23;
  88:24,25;89:10,24;
  90:10;91:25;105:19;
  107:20;130:2,16,17;
  139:7,9;142:11;
  144:24;152:6;156:6;
  190:6;195:14;203:13
**banks (1)**
  104:10
**basically (4)**
  20:4;181:8;195:11,
  18
**basis (5)**
  37:24;53:12;58:22;
  108:21;122:7
**bear (2)**

153:8;182:5
**became (1)**
  24:11
**become (3)**
  78:18;106:23;165:6
**becoming (1)**
  127:19
**begin (1)**
  49:18
**beginning (10)**
  25:3;40:24;48:18;
  49:19;57:19;72:21;
  123:6;148:11;161:17;
  199:4
**begins (1)**
  91:5
**behalf (44)**
  10:7;12:1;50:1;
  54:12;57:5;58:3,15,19;
  59:8,11,17,20;61:1;
  62:13;65:9;69:21;
  71:12;72:5;77:8;83:1;
  87:4;89:23;96:18;
  98:24;104:13;107:10,
  17;108:3;123:18,19;
  124:9;132:2,3;135:3;
  136:15;143:14;151:25;
  156:5;171:21;179:8,
  11;189:7;190:11;
  200:23
**Beijing (9)**
  83:10;84:1;85:22;
  86:5;87:11;91:20;
  174:17;175:4,17
**belief (3)**
  120:2,3,3
**believes (1)**
  163:18
**below (2)**
  42:9;68:19
**benefit (4)**
  48:22;49:12;136:15;
  152:19
**benefits (5)**
  95:7;96:10;135:24,
  25;136:14
**Bennett (4)**
  15:4,7;54:24;174:9
**Bensalem (2)**
  112:2;148:4
**besides (1)**
  30:24
**best (4)**
  34:22;41:6;56:6;
  100:13
**Beverly (4)**
  154:11,11,23;155:22
**beyond (1)**
  121:23
**BFA (1)**
  156:21
**biannually (1)**
  53:17

**big (2)**
  178:18;179:22
**bigger (1)**
  170:5
**bill (2)**
  25:24;154:10
**billion (2)**
  137:11;178:21
**bills (4)**
  54:17;81:12;118:20;
  121:1
**bimonthly (1)**
  86:23
**Bisgaard (1)**
  15:9
**bit (20)**
  13:4;16:22;22:10;
  59:3;69:6;70:25;
  71:20;72:8,9;73:25;
  97:19;98:5;100:19;
  101:4;111:1;142:23;
  149:18;161:20;178:6;
  193:16
**blatantly (2)**
  194:19;195:9
**block (1)**
  71:5
**blocked (1)**
  23:5
**BMC (2)**
  82:1,3
**BOA (2)**
  137:5;183:6
**board (14)**
  52:20,24;67:24,25;
  85:17,19;189:3,4;
  198:16,18,20,22,23;
  204:1
**BOE (23)**
  122:1;139:1;174:16,
  20;175:2;177:7;178:8,
  10,14,17,17,18;179:1,
  8,20;180:2,10;182:13,
  14,18,20;183:2,13
**BOFA (2)**
  145:20;146:3
**bond (1)**
  191:15
**bonding (10)**
  84:8,10,11,12,14,25;
  85:5,9,12;193:24
**bonds (4)**
  184:16;185:20,22,25
**book (2)**
  90:12;167:2
**booked (2)**
  151:16;152:13;
  153:16;154:14,14;
  155:13,14
**books (2)**
  55:8;203:6
**booth (3)**
  93:20;96:8,9

**Bosch (3)**
  30:18;180:15;194:3
**both (26)**
  11:23;12:8;13:13;
  29:8;50:5;71:9;73:9,
  11,13,15,21;74:3,7;
  84:12;94:16;96:24;
  97:3;110:19;112:13;
  115:5,20;125:3;141:4,
  14;173:10;200:19
**bottom (5)**
  41:21;48:8,9;57:11;
  191:3
**bought (2)**
  90:18;162:4
**box (3)**
  51:24;54:7,11
**branch (1)**
  66:11
**Brandon (3)**
  129:12;130:1,22
**break (13)**
  10:10;64:23;65:1;
  70:16;73:14;97:8,22,
  23;98:1;193:5,6,12,15
**BRIEF (2)**
  14:12;154:19
**briefly (1)**
  17:16
**bring (1)**
  99:12
**bringing (2)**
  138:20;185:17
**Brisbois (3)**
  14:20;15:8;174:9
**broadcast (1)**
  155:25
**brother (2)**
  62:2;174:11
**brought (3)**
  125:22;182:14;
  186:20
**Brown (3)**
  128:15,16;203:20
**bucks (2)**
  181:18;182:20
**Bud (3)**
  31:4;93:7;174:10
**building (1)**
  117:13
**bump (2)**
  96:15,17
**bunch (1)**
  180:13
**business (17)**
  81:9;88:13;89:4;
  91:5;96:23;97:5;
  133:13;151:12;157:1;
  163:25;164:3,4,13;
  190:25;192:16,25;
  195:7
**button (3)**
  101:20;124:22,23

**buy (8)**
  91:6;96:21,22;
  115:19;151:22;181:11;
  185:19;190:5

---

**C**

**calculate (1)**
  117:6
**calculated (1)**
  129:23
**calculating (1)**
  140:11
**California (1)**
  169:10
**call (9)**
  26:6;40:7;95:22;
  166:25,25;174:6;
  179:20;192:15;196:1
**CALLAHAN (120)**
  10:3;11:11;14:15,
  22;15:10,17,19;18:1;
  23:15;28:11;29:24;
  30:1;35:7,11,19,21;
  44:24;45:8,10;48:10,
  15;51:15;52:4,6;53:25;
  55:24,25;56:12;60:24;
  61:6,7,25;63:2;64:22;
  65:3;70:18;71:22;
  72:4;74:18;79:25;80:6,
  18;81:6;85:3,20;92:12;
  97:14,18;98:3;104:20;
  108:23;109:11;111:18;
  118:3;121:10;122:19;
  126:1,23;127:2,8;
  128:18,25;129:10,11;
  131:20;132:16;133:8;
  134:4;140:20;141:20;
  144:6,12;148:22;
  149:9;150:7,12,21;
  151:4,23;154:22;
  160:3,10,15;161:5,9,
  11;163:13,20;167:12;
  170:4,23;172:6;
  174:15;175:13;176:6,
  15,21;177:1,5,12,19;
  178:7,24;179:6;
  184:23;187:5,18;
  191:2,7,10;192:17;
  193:7,14;198:11;
  201:25;202:8,17,25;
  204:7,11
**called (12)**
  20:25;36:12;41:22;
  42:6,24;65:8;75:9;
  77:5;117:19,20;
  127:22;199:4
**calling (1)**
  72:11
**calls (1)**
  174:12
**came (14)**
  16:2;24:13;49:15;

In Re: Stream TV Networks, Inc. Technologies Medias Apps
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

72:18;92:5;117:10;
119:9;123:23;125:14;
126:8;127:25;141:2;
147:11;190:7
**camera (1)**
90:21
**can (63)**
11:21;13:4;14:17;
15:4;25:24;28:19;
32:23;37:2,14;41:6;
50:21;51:12;52:7;
55:24;56:6;61:6;
62:19;70:13,19;71:22;
74:4;75:16;79:22;
80:18;85:3,25;93:23;
95:9;109:5;112:5,13;
121:10;126:13;132:16;
138:8,10,10,11;
140:25;142:24,24;
143:1,3,7;144:14;
145:6;149:23;150:15,
16;161:24;163:9;
173:8;174:5;178:18;
183:21;184:23,24;
191:3;192:10;193:5,6;
195:7;201:21
**can't (10)**
23:1;35:24;37:4;
103:10;106:3,21;
120:7,10,14;198:4
**capacity (3)**
53:5;63:22,25
**capital (26)**
41:22;42:18;43:7,
10;150:17;151:2,5;
152:9,17;153:10,12,16,
18,20;155:3,8,9,15,16;
157:12,21;183:14;
184:13;185:18,19;
186:7
**Capone (1)**
141:2
**card (4)**
151:19;152:18;
154:17;155:3
**cards (4)**
93:9,10,10,11
**care (3)**
67:7;72:12;195:2
**careful (1)**
24:1
**Carol (1)**
167:19
**carried (1)**
56:7
**case (12)**
14:10;18:18;31:9;
41:5;62:23;63:18;
72:17;82:8;107:20;
115:21;166:22;203:13
**cases (2)**
15:22;63:1
**Cash (2)**

48:17;114:13
**castigate (1)**
132:19
**Castle (2)**
165:23;166:12
**categories (2)**
135:21,22
**categorized (1)**
82:20
**category (7)**
89:21;92:7;95:23;
96:2;133:24;135:23;
138:5
**caught (2)**
88:21,22
**cause (1)**
100:14
**caveat (1)**
15:24
**center (2)**
68:18;95:6
**cents (1)**
193:22
**CEO (11)**
10:8,15,24;11:1,3;
13:12;60:9;100:2,3;
199:20,21
**cereals (2)**
168:9,13
**certain (6)**
55:1;56:17;119:3;
135:12,21;202:19
**CFO (2)**
13:16;63:22
**chain (13)**
174:21;175:20;
180:11,20;181:5,7;
182:22;183:20;184:15;
185:3;186:12,17;
194:25
**chance (1)**
51:22
**chancellor (1)**
197:17
**Chancery (5)**
21:13;22:25;42:22;
133:21;165:18
**change (6)**
40:19,21;42:15;
50:13;134:15;135:6
**changed (6)**
24:9;41:11;47:11;
106:9;127:16;134:16
**changes (1)**
46:14
**Chapter (3)**
16:13;17:4;18:12
**characterize (1)**
77:16
**charge (9)**
82:5;93:14;129:23,
24;132:13;182:18;
185:2,6;201:7

**charges (2)**
74:13;95:7
**Chase (16)**
93:12;124:6,9;
144:1;145:17,24;
146:8;147:20,24;
148:3;151:18;152:18;
153:21;161:13;171:3;
201:3
**chassis (1)**
84:5
**check (13)**
21:22;51:12;54:11;
125:21,25;126:3,19,
24;127:1,18;137:1;
200:6;201:10
**checked (6)**
20:17;46:5;51:24;
54:7,8,13
**checks (2)**
126:24;127:3
**Chestnut (2)**
88:4;113:11
**chief (3)**
13:24;113:10;
198:12
**China (3)**
84:13;179:9;183:12
**Chinese (1)**
178:2
**chip (8)**
85:5,18,18;181:10,
12,17;182:15,15
**chips (2)**
85:14;181:15
**Chittenden (2)**
167:19,19
**choice (1)**
180:25
**Chow (2)**
180:3,3
**Chris (2)**
129:13,14
**Cities (1)**
157:12
**City (4)**
152:17;157:21;
161:23;178:11
**Citywall (15)**
149:20;150:17;
151:2,5;152:9;153:10,
12,16,18,20;155:3,8,9,
15,16
**claim (1)**
171:22
**claims (1)**
120:21
**classify (2)**
63:1,9
**clear (5)**
64:13;80:13;157:3,
3;181:25
**clearance (3)**

25:25;26:1,2
**clearer (1)**
178:17
**closed (1)**
136:25
**closely (2)**
36:21;51:23
**Colby (1)**
141:2
**Coleman (1)**
51:5
**collateral (1)**
186:25
**colleague (1)**
54:25
**collect (5)**
27:4;139:18;182:25;
183:3,23
**collected (2)**
30:20,25
**collecting (1)**
20:13
**collection (1)**
25:5
**collectively (2)**
138:23;144:23
**Colossus (1)**
164:10
**column (6)**
41:23;49:8,22;69:14,
16;110:10
**columns (9)**
39:20;42:12;50:6;
68:17;73:6,12,13;
92:14;96:24
**combative (1)**
158:21
**combine (1)**
115:5
**coming (7)**
24:17;93:6;126:8;
138:17;186:10;194:24;
200:4
**commence (1)**
116:4
**commencing (1)**
184:12
**comments (1)**
204:6
**commitment (2)**
70:23;203:17
**committee (32)**
52:17,25;53:2;72:18,
22,24;98:5,11,14,18;
100:5,6,15;102:1;
105:5,9;118:13;
124:11;140:21;141:12;
142:3;189:5;192:2;
197:20;198:21,22,23,
24;199:7;200:11;
201:2;204:1
**common (2)**
52:10;189:11

**communicate (1)**
107:6
**communication (2)**
12:23;204:3
**communications (1)**
107:4
**companies (12)**
13:13;52:12,14;
81:9;84:17;85:14,15;
92:5;194:7;195:5,23;
196:19
**company (51)**
10:8,16,23;13:9;
20:15;31:11,14;32:10;
33:15;37:18;42:23,24;
55:11;57:19;60:9;
75:23;84:11,12,14;
85:7;93:9;99:11;
122:12;124:18;129:6,
13;134:18;136:10;
151:6,24;162:24;
163:1,4,11,12;165:25;
167:21;168:15,20;
174:18;178:22;179:10,
10;184:14;185:9;
186:7;192:9;194:25;
196:14,15;197:9
**compensation (1)**
79:12
**competitors (1)**
196:2
**complete (4)**
34:18,22,24;120:7
**completed (1)**
173:5
**components (2)**
84:4;182:17
**composed (1)**
57:15
**comprised (1)**
82:20
**computer (1)**
69:9
**computers (1)**
89:18
**concern (1)**
112:10
**CONCLUDED (1)**
204:19
**conditions (1)**
52:11
**conducted (4)**
19:12;27:1;89:4;
146:19
**conducting (1)**
147:3
**conference (3)**
79:14;80:8,14
**confirm (2)**
146:10;171:7
**confirmation (6)**
130:13,24;131:13,
18,19;132:6

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
In Re: Stream TV Networks, Inc. Technology Media Apps   Exhibit Transcripts   Page 59 of 171
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

conform (2)
132:25;133:1
confuse (1)
151:24
confused (2)
152:24;153:3
connected (2)
20:8;179:4
connection (8)
70:19;72:17;100:21;
133:10;163:22;203:6,
12,19
consent (5)
11:5,12;18:24;27:6;
73:3
consideration (1)
189:25
considering (1)
192:7
constructed (1)
182:9
consultant (5)
93:14,17,22;96:3,4
consultants (1)
135:24
consulting (5)
95:3,7,10,23;96:2
consuming (1)
56:24
consummated (1)
116:1
contact (2)
21:2;25:23
contacts (2)
24:19;138:20;139:6
contain (1)
54:3
contains (2)
12:23;68:12
contents (2)
11:19;35:3
continuing (1)
136:4
contract (8)
84:22;85:19;130:10;
180:14;181:12;182:16;
183:4,10
contractor (6)
23:17;26:11;66:23;
78:25;79:13;172:13
contractors (19)
13:23;25:15,20;
78:16;86:2;87:18,19,
22;89:12;95:22;96:6;
104:24;135:23;136:1,
2,16;146:23;172:8,24
contracts (4)
30:18;131:7;169:7;
196:23
contractually (1)
181:2
control (3)
67:23;198:16,18

conversation (1)
202:10
conversations (2)
19:24;167:16
conversion (2)
122:15,16
convert (1)
194:10
converted (1)
194:12
coordinates (2)
19:23;20:4
copied (1)
55:5
copies (8)
19:5;55:1;127:3;
144:2;179:7;203:11,
21;204:2
copy (14)
11:5,6,7;54:22;55:3;
65:7;112:22;142:7;
147:22;148:2;160:14;
175:18;191:14;203:19
corrected (1)
56:15
correspondence (2)
114:11;179:19
Corso (8)
68:1;98:12;188:24;
190:10;191:16;192:21;
197:24;199:8
cost (11)
46:25;68:18;75:10;
76:12;80:15;90:1;
95:6;122:13;181:18;
182:17;185:5
costs (1)
115:10
Cottage (2)
165:23;166:12
couldn't (8)
23:8,22,23;99:9,12;
103:17;157:5;170:1
Counsel (24)
11:7;18:17,17;27:9,
14;34:14;35:6;36:8;
45:24;100:7;112:14;
118:25;126:20;132:14,
18;135:9;141:8;142:8,
21;147:1;171:25;
172:25;173:4,6
Counsel's (2)
142:14;184:17
counter (5)
125:13,15;126:7;
128:8;200:18
couple (8)
30:14;33:17;41:21;
89:22;92:25;138:8;
143:13;161:16
course (9)
11:22;28:6;69:7;
91:5;119:6;127:10;

133:16;173:22;192:16

court (52)
11:7;14:16;16:13;
17:22;21:13,14;22:25;
23:6,6,11;31:11,21,25;
38:25;40:23;42:22;
49:15;55:12;62:25;
79:20;84:19;93:7;
114:15;119:4;130:14;
131:14,25;132:1;
133:21;136:11;141:3;
161:7;165:18;167:8;
170:3,10,15;174:23;
175:8,11,14,15;192:3;
193:4,9;195:4,15;
196:7,8,8;197:17,18
cover (1)
187:25
covered (4)
122:1;139:5;142:13;
204:5
covering (1)
136:14
CPA (1)
134:22
CQ (1)
99:17
crazy (1)
196:22
create (1)
34:1
created (3)
68:21,23;192:10
credit (10)
93:9;122:3;125:13,
15;126:8;128:9;139:3;
167:2;183:19;200:18
creditor (3)
117:18;118:13;
166:9
creditors (1)
197:16
credits (1)
169:18
cumulative (10)
49:23,24;50:8;
57:17;58:8,9;73:8,16,
17;110:10
Cumulatively (2)
50:3;59:13
current (16)
40:1;49:8;50:4,5,7,
15,17;57:18;73:16,17;
86:13,18,19;118:5,18;
130:21
currently (1)
159:13
customer (4)
31:6;90:7;157:9;
182:19
customers (17)
20:6;77:21;81:21;
84:3;90:8,16;91:24,25;

100:11;121:8;122:2;
155:21;159:25;183:16,
18;186:10,10

**D**

Dan (29)
16:21;17:21,23;
19:21;28:22,24;29:12;
31:1,12;50:22;65:17;
68:1,8;69:1,2;72:8,12;
74:1;98:12;102:1;
112:16;132:11;135:10;
162:11;168:3,4;174:8;
197:24;199:8
Dan's (1)
28:23
date (18)
30:13;50:9,15;58:8;
69:14;100:24;102:16,
20,22;103:22;108:9,
10;113:4;152:15;
156:19,20;189:18;
203:15
date's (1)
188:11
dated (2)
111:25;132:6
dates (4)
42:13;106:20,22;
197:20
David (1)
168:22
day (4)
61:21;106:6;125:8;
173:18
days (7)
24:16,21;25:4;40:8;
113:21,21;114:8
dead (1)
194:20
deal (18)
84:8,10,16;88:18,20;
96:21;102:8;115:18,
23,24,25;116:2,5;
139:1;182:6,8,13;
184:2
deals (3)
115:25;151:9;
185:14
dear (1)
112:10
debit (5)
93:10,10,11;151:19;
152:18
debits (1)
128:13
debt (7)
57:24;58:1,14,20,24;
59:1,8
Debtor (52)
11:23;13:15;22:23;
31:8;39:6;47:15;52:9;

54:12;57:4;59:15;
60:19,23;62:10,24;
63:11,20,14;64:19;71:3;
86:12;87:1,3;88:3,12,
13;89:23;101:6;103:4;
109:14;113:22;114:25;
116:18;118:17;119:8;
123:5;126:15;130:21;
136:5;142:10;162:20;
198:13,15;200:13;
202:10,18,19;203:5,11,
16,18,21,24;204:2
Debtor's (6)
18:17;57:5;62:25;
71:4;87:4;203:20
Debtors (13)
10:5,7;11:23;14:10,
21;15:9;18:12;64:14;
89:2;131:6;144:23;
171:23;172:24
Debtors' (1)
64:19
December (3)
31:19;115:12;
202:12
decide (2)
65:22,23
decided (5)
29:3;66:8;96:18;
117:1;134:17
decision-making (1)
100:20
decisions (4)
98:15;100:15,17,20
defined (3)
19:1;27:8;68:19
defines (1)
12:19
definitely (2)
63:16;79:7
definitive (1)
172:4
Delaware (5)
99:5,18;165:18;
195:16;196:24
Delta (2)
110:24,25;111:1,13
demand (1)
104:25
demo (1)
90:6
demonstrating (2)
79:1;93:4
demonstration (2)
78:7,10
demonstrations (1)
158:9
department (1)
21:22
depends (1)
31:5
deposit (19)
101:12,24;102:6;

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit Transcripts   Page 60 of 171

In Re: Stream TV Networks, Inc. Technology Media Apps                    Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination                                        November 13, 2023

105:15;116:17,23;
117:6;119:23;120:4,8,
14;123:11,12;125:13;
126:19;128:6;161:21;
169:16;200:24
**deposited (5)**
101:6;116:14;162:2;
165:20;203:23
**DEPOSITION (1)**
204:19
**deposits (11)**
105:17;107:20;
109:14;114:24;115:2;
123:10;161:18,20;
164:25;200:15,19
**describe (6)**
13:12;28:14;112:5;
181:5;189:10;191:23
**described (2)**
52:11;128:6
**describes (1)**
12:23
**description (3)**
37:7,10;79:2
**design (2)**
85:10,13
**designated (2)**
10:6;12:8
**designation (1)**
106:9
**designed (1)**
96:8
**destroyed (1)**
27:25
**detail (5)**
17:16;132:20;
173:24,25;188:11
**details (2)**
79:19;80:3
**determined (1)**
10:6
**development (9)**
68:20;20;74:10,13,
21;75:1;77:5;91:2,11
**device (3)**
158:13;181:13;
182:17
**devices (7)**
19:13;31:15,16,18;
85:11;158:9,11
**didn't (48)**
14:24;16:8;17:16;
51:10,19,22;54:15;
69:9;73:9,17;74:5;
77:25;94:18,23;96:25;
99:9,17;101:19;
105:24;108:13;109:4,
17;124:21;126:25;
131:15;132:20;135:15;
136:22,22,24;143:10,
16;155:6,6;164:1,2,2;
176:4,9,16;177:6;
179:1;180:6,10;181:1;

190:20;195:15;196:2
**difference (7)**
33:4;44:12;47:8;
85:5;94:11;134:9;
135:12
**different (13)**
33:22,23;40:6;
42:12;46:20,23;79:1,4;
85:7;149:17;189:15;
190:7,8
**difficult (4)**
63:14;102:22;170:7;
196:14
**difficulties (3)**
107:14;165:15,16
**difficulty (1)**
186:5
**diligence (2)**
24:7;194:7
**dilute (1)**
121:5
**DIP (63)**
23:21,24,25;24:3,10,
20,22;29:3;49:6;54:8,
15,15,19,21;101:11,13,
25;102:11,12,13,16,21,
23;104:10,12,15,16,19;
105:22,24;106:3,4,11,
11,12,13,15,17,19,21,
23,25;109:16,16;
116:8;120:5;127:17,
19;151:14;152:6,7,8,
11,12,15;153:14,14,16;
155:6;156:11,12;
186:6;201:15
**direct (2)**
166:24;199:25
**directed (3)**
12:7;200:23;201:1
**direction (4)**
28:19;44:2;132:12;
171:12
**directions (1)**
144:25
**directly (2)**
60:18;174:22
**director (3)**
64:8;197:25;198:7
**directors (3)**
197:22;198:4;199:9
**directs (1)**
124:15
**disburse (2)**
26:14;74:4
**disbursement (4)**
67:6;74:11,25;135:4
**disbursements (13)**
25:11,12,15;48:6,21;
49:12;57:5;58:10;59:4,
12;69:21;82:25;89:22
**disclaimer (1)**
117:20
**disclosed (1)**

127:13
**disclosure (6)**
18:13;117:25;118:9,
14;131:11;172:3
**discovered (1)**
106:8
**discuss (8)**
27:8,14;36:8;
104:24;113:14;147:1;
173:3;202:4
**discussed (4)**
27:8;64:10;158:14;
172:2
**discussing (2)**
64:12;92:2
**discussion (9)**
27:17;28:9;102:19;
144:4,10;161:3;202:3,
6;204:9
**discussions (6)**
100:7;133:9;158:10,
10;174:1;192:14
**disperses (1)**
139:19
**disseminate (1)**
144:2
**distinction (1)**
96:1
**distribute (1)**
159:25
**distributed (1)**
132:5
**Distribution (1)**
159:24
**distributor (1)**
182:1
**Docker (1)**
38:21
**docket (4)**
30:3;44:16;45:18;
47:24
**doctor (1)**
178:5
**document (61)**
11:13,16,19;12:4,20,
22;18:15;28:12;34:3,
16,18;35:1,10;36:1,6,
11,17,19,24;37:15;
38:19;44:25;46:3;47:3,
25;48:3,5;65:12,16;
68:9,17,22,23;74:10;
76:6,16,22;103:14;
112:3,5,24;113:2;
133:24;135:20;137:5;
142:7;143:5,6,16,22;
144:1,14,16;145:9,12;
147:16;149:14;175:11;
187:20;188:3;191:21
**documents (56)**
13:5,8,25;14:2,4,6,9;
15:21;16:12;17:8,14,
19;18:16;19:1,11,15;
21:1;25:6;26:25;27:4,

8,14,16,18,21,22;
37:20;65:21;75:18;
108:14;111:23;126:11;
132:25;134:17;139:21;
142:10,25,25;143:8,14,
18;145:4,7,15;146:11,
12,19;147:6;175:5;
187:24;202:19,21;
203:2,3,9,25
**doesn't (5)**
62:3;101:20;150:25;
182:24;192:9
**dollars (2)**
117:2;120:11
**don't (85)**
23:25;28:1;32:4;
43:21;45:11;46:24;
47:1,25;48:4;58:21,23;
59:1,5,7;63:15;71:14,
18;74:2;75:2;79:19;
80:3,8,12,13;82:14,17,
22,23;91:6;93:22;
94:23;96:6;97:21,22;
103:1,12,19;104:3;
106:20;108:16;111:16;
116:8;117:18;120:21;
121:3,6,22;122:8,24;
125:15,19;126:2,13,17,
25;129:1;130:8;
131:12,16;136:7;
138:14;141:5;143:20;
148:18;153:7,8;156:8,
9,10;157:24;158:20;
166:11,13,20;170:18,
20,20,25,25;173:18;
181:14;196:14;197:25;
198:8;201:19
**done (12)**
57:1;59:12;63:3;
93:1;101:10;116:2,6;
125:17;128:5;137:25;
153:11;182:6
**dots (1)**
179:4
**double (5)**
20:17;21:22;127:17;
200:6;201:10
**doubtful (1)**
33:2
**down (18)**
10:10;24:22;32:20;
57:11;59:10;74:10,12,
12;77:13;82:12;
106:15;121:2;128:14;
167:13;173:25;184:14;
188:23;191:8
**drafting (1)**
199:17
**drive (4)**
81:5,7;112:2;148:4
**dropbox (1)**
126:25
**DSI (1)**

136:15
**due (9)**
24:6;86:20;117:10;
118:20;119:9;120:9;
121:1;132:5;194:6
**duplicates (3)**
146:5,11;188:1
**during (9)**
57:22;66:24;80:9,
13;106:7;133:16;
144:24;152:10;161:19
**duties (2)**
114:3;199:20

**E**

**earlier (10)**
44:20;55:7;76:19;
118:11;132:19;134:5,
25;169:20;170:1;
200:22
**Early (1)**
133:18
**earnings (2)**
46:25;47:13
**ease (1)**
77:16
**easier (2)**
54:21;143:1
**easy (3)**
55:9,10;56:11
**eating (1)**
45:7
**effective (1)**
189:18
**eight (4)**
42:5;57:21;90:11;
173:19
**either (8)**
25:15;26:9;27:24;
44:5;76:13;77:21;
102:18;150:24
**electric (2)**
89:6,7
**Electrical (4)**
174:17;175:4;
178:12,12
**electronic (3)**
19:5;34:14,17
**electronics (7)**
75:4,6,11,12;85:6;
193:25;194:1
**else (9)**
38:4;60:4;67:3;87:3;
89:11;138:15;159:7;
201:23;204:5
**email (13)**
21:20;26:6,13;54:22,
24;55:2,5,17,18;125:1;
127:24,25;176:8
**emails (6)**
19:6,14,25;26:9;
146:24;204:2

employed (2)
16:23;38:4
employee (8)
22:17,19,20,23,24;
23:17;78:25;172:18
employees (28)
13:17;14:2;19:22;
25:12,15;31:3;38:6,12;
61:18;67:5,8,11,15,18;
78:21;83:24;87:20,24,
25;99:16;136:3;
155:13;157:5;166:7;
194:21;195:1,3;196:13
employer (1)
26:11
end (5)
36:15;54:6;103:23;
104:1;179:14
ended (3)
54:16;190:5,6
ending (2)
147:21,25
enforceable (1)
183:6
engineering (2)
75:10;194:12
engineers (1)
99:11
English (4)
177:17,20,22;178:3
enough (3)
64:21;132:20;
137:21
entailed (1)
79:11
entered (2)
131:1;183:5
entering (1)
184:18
enterprise (2)
33:19,23
entertaining (1)
186:6
entities (2)
165:17;171:3
entity (8)
63:20;64:14;82:7;
88:8;127:22,23;
152:17;175:1
entries (3)
41:23;43:20;48:17
entry (8)
30:3;44:12;46:11,14,
16;58:9;90:4;128:3
equipment (8)
41:7;47:16;84:11,12,
14;85:1;89:18,19
equity (20)
33:8,10;39:20,25;
40:2;46:12,17;96:22;
120:22;121:3,22;
122:15;151:9;180:17,
25;181:1;185:15;

186:14;194:10,12
erroneously (1)
44:20
ESI (2)
187:23;190:12
essentially (2)
53:19;90:5
estate (5)
48:22;62:25;64:19;
71:4;172:4
estimate (2)
41:6;92:22
estimating (1)
41:13
etcetera (1)
186:24
even (14)
20:10;31:20;53:20,
20,22;55:12;81:18;
100:16;115:21;181:1;
186:5;194:4;196:14;
198:25
Eventually (1)
195:10
Everybody (8)
19:13,17;24:11;
27:3;92:1;121:5;
124:13;146:22
everybody's (2)
25:1;196:22
everything's (1)
85:17
evidence (1)
20:1
evidencing (2)
102:3;175:5
EVolt (6)
122:1;184:13,24;
185:10,18;186:6
Evolve (1)
183:14
exact (8)
74:24;102:16,22;
106:20,22;107:25;
120:19;121:22
exactly (5)
75:2;82:23;120:25;
138:1;180:21
exam (1)
14:25;15:13,20;
147:19
EXAMINATION (4)
10:1;11:17;202:2,12
example (7)
20:23;76:19;90:19;
93:4;156:2;181:17;
200:12
Excel (2)
146:14,17
except (2)
63:21;199:11
exchange (1)
119:25

exclusive (1)
181:25
exclusively (2)
67:3;154:5
Excuse (2)
160:23;163:9
executive (1)
198:12
exhibit (3)
36:16;176:9,9
exhibits (1)
176:11
expansive (1)
12:22
expect (3)
112:10,11;162:14
expectation (1)
91:4
expected (1)
93:24
expense (12)
74:23,24;77:4;
79:11;81:24;91:22,23;
92:19;95:9;96:17;
201:11,13
expenses (75)
20:7,15;37:6;39:12;
51:16;54:10,14;57:7,
14,18;65:8,13,14,21;
66:8,9,11;69:24;71:12;
77:18;80:5;81:14,15,
18,20;82:19,20;95:17;
96:18;97:6;102:7,10,
10;104:13,14;105:8;
108:3;115:10,22;
117:7,10;118:21;
119:9;120:25;121:24,
24;122:6,21,22;
130:14,14,15;139:5;
151:3,10,15;152:9,20;
153:11,15,17;154:1,2,
5,15;155:10,12;
156:12;157:18,22;
172:8;200:6,6;203:12;
204:4
explain (9)
10:5;32:23;55:7;
80:24;85:4;138:10,12;
150:16;178:18
explained (4)
135:19;147:11;
171:16;186:18
explanation (1)
50:18
explicitly (1)
55:17
explore (1)
198:17
express (1)
34:13
extent (1)
147:5
extra (6)

111:12,13,16;
115:21;121:21;182:18
extremely (1)
182:10
eye (1)
178:5

F

fact (3)
64:13;104:9;119:3
factoring (1)
186:15
fair (8)
64:21;79:2;91:14,
19;94:3,9,15;186:23
fairs (1)
94:6
fall (2)
53:21;118:8
familiar (7)
12:6;69:11,12;
112:19;142:13;165:12;
191:20
familiarize (1)
68:16
families (1)
195:2
far (4)
71:15,16;107:25;
139:6
faster (3)
53:20,21,22
fault (1)
136:12
favor (1)
121:11
February (1)
115:24
Federal (1)
142:11
fee (15)
75:23;76:10,11;
81:25;94:3,12;95:10;
118:25;129:17,18,20;
130:10,22,25;131:1
feel (2)
120:24;147:9
Feeley (3)
164:25;165:4,25
fees (15)
30:17;74:13,13;75:1,
5,6,9,10;94:13;95:3,7,
23;96:2;110:22;130:8
felt (1)
100:13
few (1)
139:8
fiduciary (1)
121:21
fight (3)
195:4;196:7,8
figure (3)

63:9;69:23;193:24
figured (1)
120:20
figures (4)
134:16;135:6;146:1,
7
file (5)
46:10;108:20;
202:20,24;203:2
filed (45)
14:9;16:12;18:17;
20:11;21:7;28:7;29:7;
30:3;31:25;36:2,6;
38:21,25;43:11;44:17;
46:6;47:24;54:2,14;
58:2,7;62:9;66:23;
68:10;76:11;87:23;
88:24;89:24;90:10;
91:25;97:1;100:24;
108:16,18;111:20,21,
22;130:2;131:6;152:5;
156:6;175:14;195:13;
197:1;202:21
filing (21)
15:21;17:4,14;
18:15;23:16;30:9;
31:9;36:20;38:7,8;
43:15,18;45:25;50:9,
24;62:15,17;122:17;
131:11;203:7,13
filings (1)
18:21
filled (1)
17:20
filling (1)
140:4
film (7)
85:10;181:11,12,16,
17;182:15,16
final (1)
194:8
finance (18)
121:7;138:21;
141:17;159:4;180:20;
181:14,16;182:22,24;
183:2,12,15;184:15;
185:3;186:11,18;
190:25;195:19
financed (2)
121:7;183:20
financers (1)
122:2
financial (10)
13:24;16:14;17:5;
38:2;113:10;134:23,
24;144:21;171:11;
203:7
financials (1)
41:8
financing (14)
121:17;137:25;
138:23;139:17;174:21,
23;175:21;180:11;

181:5,7;186:5,6,20;
196:7
**find (11)**
19:25;35:24;82:17;
102:16;118:17;126:13;
143:7;160:4;161:12;
189:14;196:5
**fine (4)**
16:8;104:9;191:19;
204:10
**finish (1)**
18:11
**finished (1)**
84:6
**firm (4)**
71:1,2;88:10;173:24
**firms (4)**
63:5,7;64:16;69:25
**first (26)**
12:7;18:2,3;20:25;
32:18;35:1;41:23;
54:1;61:21;79:22;
83:1;98:6;103:4;
121:20;128:6;131:1;
144:1,19;147:19;
148:15;155:25;156:1;
161:21;188:9;193:19;
195:23
**FISHER (4)**
15:6,7,12;54:24
**Five (4)**
179:17;187:4;193:5,
6
**fix (1)**
54:13
**fixed (2)**
21:17;116:16
**flexible (1)**
182:10
**flipped (1)**
103:19
**floor (3)**
94:4,13;113:11
**Florida (1)**
184:14
**flourish (3)**
163:19,21;164:1
**flying (1)**
93:7
**focus (1)**
116:13
**focused (1)**
186:25
**folder (1)**
176:14
**folks (5)**
52:10;81:7;144:7;
169:7;173:10
**follow (2)**
195:15;196:24
**following (3)**
76:10;134:8;202:18
**footnote (2)**

83:2,10
**force (1)**
33:18
**forced (1)**
33:21
**forecasting (1)**
38:3
**forget (1)**
196:3
**form (1)**
100:6
**format (1)**
145:8
**formation (3)**
98:10,25;100:4
**formed (11)**
98:6,7,19;99:1;
151:24;193:20,20;
195:21;196:15;197:20,
20
**former (1)**
78:21
**forms (2)**
38:15;67:6
**forth (5)**
12:24;19:2,7;27:23;
151:22
**forward (9)**
41:5;56:7;78:20;
120:5,20;122:7,21;
138:2;172:17
**forwarded (1)**
172:9
**found (4)**
54:7;106:11,22,24
**founder (4)**
10:15,22;100:1,2
**four (5)**
57:6,11;86:18;
92:14;147:20
**four-month (1)**
95:18
**fourth (1)**
74:12
**fragile (1)**
81:4
**Francisco (2)**
154:2;155:19
**Free (6)**
42:23;43:3;121:3;
155:25;164:10;195:24
**French (1)**
169:10
**front (1)**
45:13
**fulfillment (1)**
174:22
**full (1)**
194:6
**full-time (1)**
172:17
**fully (2)**
156:21;185:7

**functional (1)**
153:15
**fund (11)**
70:23;119:25;
120:10;146:2,3,4,7,9;
185:15;186:14;203:18
**funded (1)**
92:19
**funding (2)**
70:20;100:21
**fundraising (4)**
72:19,23;114:4;
155:20
**funds (11)**
49:2;119:8;124:8;
130:4;135:5;138:16,
17;157:13;159:11;
169:17,23
**further (2)**
94:2;204:12

## G

**GAAP (1)**
33:19
**Gannone (1)**
55:1
**gave (9)**
35:12;122:25;
130:20;141:10;143:17;
147:23;160:5,13;
162:17;183:8
**general (5)**
57:6;79:6;82:3;
96:23;97:5
**generally (1)**
14:8
**generated (1)**
75:14
**generates (1)**
141:19
**generating (1)**
31:6
**genesis (1)**
193:19
**gets (3)**
85:12;157:24;
182:16
**GFT (2)**
43:12;195:23
**Gift (2)**
76:13;77:1
**given (13)**
11:7;28:1,3;29:20;
35:10;90:8;94:24;
122:16;144:15;146:12;
192:21;198:16,18
**gives (1)**
184:1
**giving (5)**
55:11;121:2,21;
170:14;195:14
**glass (1)**

85:11
**Glasses (5)**
42:23;43:3;90:22;
155:25;195:24
**glasses-free (2)**
135:15;195:6
**glued (2)**
85:11,12
**gluing (1)**
85:13
**Godfrey (1)**
160:23
**goes (1)**
84:18
**Gonzalez (12)**
16:21;22:2;38:13;
65:19;68:7;76:20;
89:14;105:1;126:4;
172:9;174:9;203:5
**good (5)**
48:11;97:22;98:4;
121:25;195:25
**goods (1)**
185:5
**Google (10)**
76:25;84:18,19,20,
21;180:15;182:13,14;
194:3,4
**governance (1)**
52:18
**granular (1)**
173:25
**great (2)**
16:9;194:2
**gross (4)**
39:8;122:5;183:3,23
**group (4)**
185:19;190:4,7,9
**grow (2)**
163:19,21
**growing (1)**
190:24
**guessing (1)**
127:17
**guy (1)**
117:16
**guys (6)**
20:12;76:14;103:3;
122:9,14;196:19

## H

**habit (1)**
121:2
**hand (4)**
55:14,22;56:23;
106:23
**handed (2)**
44:20,22
**handle (1)**
121:25
**handling (2)**
84:3,19

**Hang (2)**
115:16;190:20
**happen (1)**
21:19
**happened (11)**
21:12;23:20;31:10;
78:22;99:6;103:20;
136:13;180:12;194:9,
14;196:10
**happening (2)**
85:17;185:20
**happens (1)**
139:14
**hard (1)**
79:21
**hardly (1)**
92:24
**hasn't (2)**
61:20;126:10
**haven't (12)**
20:11;89:9,10;92:24,
25;108:16,18;117:13;
120:20;127:12;178:5;
201:19
**Hawk (2)**
122:18;180:21
**He's (36)**
15:16;29:3;38:5;
52:20,20,24;53:2,20,
20,21;61:14;64:4;
67:12;70:21,23;114:4,
5,5,13,22;118:13;
133:16,19;140:7,9,14;
160:13,14;161:25;
165:5,19;166:9;
169:13;189:1,3;198:4
**head (1)**
86:4
**health (4)**
96:12,13;136:4,10
**healthy (2)**
187:9,10
**hear (4)**
77:25;104:6;131:15;
143:21
**heard (2)**
55:5;192:14
**hearing (3)**
51:4;70:25;195:17
**heavily (3)**
16:19;183:8,13
**Hefei (1)**
178:9,11
**HELD (6)**
28:9;134:2;144:4,
10;161:3;202:6
**hell (1)**
117:19
**help (13)**
19:25;29:12;47:5;
85:4;96:6;103:2,6;
132:11,14;134:20;
135:8,9;190:25

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
Exhibit Transcripts    Page 63 of 171

In Re: Stream TV Networks, Inc. Technology Madison Apps    Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination    November 13, 2023

helped (4)
   14:2;38:24;68:8;
   96:4
helping (11)
   16:22;22:8;27:4;
   29:8;66:21;69:1;
   93:19;114:4,5;183:11,
   14
helps (3)
   22:8;9;184:15
Henry (1)
   180:3
here's (2)
   149:5,5
hey (4)
   21:3;25:23;72:11;
   139:13
higher (2)
   168:11;189:25
Hill (2)
   154:11;169:10
Hills (3)
   154:11,23;155:22
Hisense (1)
   92:3
hit (1)
   124:22
hitting (1)
   124:23
HOE (1)
   178:9
Hoff (1)
   180:6
hold (6)
   94:12;106:6;130:23;
   163:10;177:9;191:4
holds (1)
   85:18
hologram (12)
   43:2;159:10;163:25;
   164:3,10,11;190:25;
   195:6,7;196:4,4,5
home (2)
   148:8;193:1
hope (1)
   35:8
hopefully (4)
   20:19;21:16;30:21;
   84:18
horrible (1)
   24:16
hospital (15)
   15:25;16:2,6,18;
   17:17,18;24:3,5;49:16;
   51:8,22;54:4,5,16;55:6
hospitalized (1)
   16:5
hot (1)
   196:21
hotel (6)
   80:8,14;93:4;154:15,
   16,24
hotels (1)

92:16
hours (1)
   173:19
house (2)
   76:17;191:16
Houston (1)
   15:8
how's (1)
   129:22
Hub (2)
   76:13;77:1
huge (4)
   179:24;183:12;
   186:11;193:23
hundreds (1)
   194:17

                I

I'd (2)
   65:5;198:17
I'll (3)
   82:17;146:10;
   187:25
I'm (101)
   10:8,11,15,22;11:5,
   6;13:20;15:8;16:18;
   30:8;32:8;39:17;41:4,
   11;42:1,3,4,4,8;44:6;
   48:3,4;49:21;54:22;
   56:13;58:18;60:11,14,
   14,23;65:13;66:6,13,
   67:9,23;69:12;75:17;
   79:21;83:16;87:3;
   94:8;98:14;100:1;
   103:8;108:6,20;
   109:23;116:13;118:4,
   4,17;123:9;124:23;
   127:17;128:17;129:5;
   132:17;133:23;134:14;
   135:21;136:25;138:5;
   139:13,13,13;140:22;
   143:6,12,21;144:19;
   145:11;148:15;152:23;
   161:12,17;162:21;
   163:8,9;171:17;
   176:18;177:11,25;
   178:16;179:3,19;
   180:3;181:24;182:8,8;
   187:19;192:18;196:10,
   12;197:24;198:7,20,
   25;200:1;201:6,10,18
I've (9)
   11:7;16:2,18;
   112:18;145:7;163:2,2;
   146:10;204:5
ID (1)
   127:24
idea (2)
   136:19;137:6
identification (1)
   30:8
identified (3)

13:22;19:18;135:21
identifies (1)
   12:19
identify (11)
   14:17;15:1,4;47:21;
   50:21;65:12;70:4,19;
   83:19;144:21;145:15
illegal (1)
   194:20;195:9
Illinois (1)
   167:14
Immediately (3)
   42:9;111:20;196:9
impression (1)
   117:17
inaccurate (3)
   50:25;56:16,19
Inc (10)
   10:18,21;23:14;
   38:20;112:1;113:5;
   123:5;144:22,22;148:4
inception (1)
   197:8
include (7)
   19:5;102:14;135:15,
   17;158:5;182:3;203:9
included (3)
   37:19,22;79:7
includes (1)
   203:3
including (7)
   19:6;68:6;91:11;
   122:7;135:2;138:3;
   147:2
income (9)
   37:6;39:6,8;47:15;
   62:10,12,12;90:12,14
incoming (2)
   123:13,14
incorporated (1)
   196:16
incorrect (5)
   21:12;29:20;56:14;
   58:9;136:11
incurred (1)
   57:19
independent (32)
   13:23;66:23;67:24;
   72:18,22,24,25;78:16,
   24;79:13;96:6;98:14,
   15;100:15;102:1;
   104:24;124:11,17;
   135:23;136:1,1,16;
   140:23;141:12;142:3;
   146:23;172:8,13,24;
   192:2;201:2;203:25
indicate (3)
   62:10;101:5;171:14
indicates (5)
   32:5;33:9;43:6;
   50:12;110:6
indicating (4)
   26:14;44:7;68:18;

137:5
indirectly (1)
   106:10
individual (2)
   138:14;190:18
individuals (3)
   55:1;168:18,19
inexplicably (1)
   106:14
inform (1)
   200:5
information (19)
   14:3;17:19;30:24;
   31:23;51:19;53:7;
   54:3;56:17;68:13;
   140:7,14;146:16,25;
   156:16;170:14;171:1;
   187:22;203:17,22
initial (3)
   16:12;94:12;174:11
Innovations (5)
   42:6,9,18;43:5,13
input (1)
   100:10
inputted (1)
   21:21
inputting (4)
   22:1,9,11;56:23
inquiries (2)
   143:5,9;166:21,24
inquiry (12)
   145:11;146:1,2,4,6,
   8,18,20;176:19,24,25;
   177:2
inside (1)
   78:2
insider (5)
   59:24;60:1,2,10,11
insiders (3)
   59:11,17;60:12
insignificant (1)
   100:22
installed (1)
   85:1
Instead (2)
   70:24;194:16
institution (1)
   26:11
instruct (2)
   105:9;132:18
instructed (1)
   141:7
instructions (2)
   102:9;135:1
insurance (4)
   96:12,13;136:4,11
intent (1)
   119:5
interaction (1)
   105:4
interest (1)
   186:2
interested (3)

139:13;186:7;194:5
interim (1)
   21:17;24:8
interrupt (2)
   103:1;121:10
interrupted (1)
   114:7
interrupting (1)
   181:24
INTERRUPTION (2)
   14:12;154:19
into (39)
   15:25;21:21;22:11;
   23:4,8;63:5;66:11;
   69:9;99:12,13;101:6,
   12,25;105:20,22;
   106:12,19;110:16;
   116:18;120:5,15;
   125:22;126:15;131:1;
   139:21;141:3;150:19;
   161:21;162:2;183:5;
   184:18;185:20;190:22;
   193:23;194:10,12;
   195:6,20;201:16
introduced (1)
   183:9
introduction (1)
   162:25
invested (3)
   165:8;166:18;
   168:16
investigation (1)
   13:5
investing (1)
   194:6
investment (2)
   166:4;168:2
investor (13)
   77:7,8;138:20;
   157:8;161:25;167:7,
   11,21;169:5,13,24;
   180:17;185:17
investors (15)
   77:22;81:21;100:10;
   139:12;167:15;183:19;
   185:19;186:19,24;
   190:4,14,18,21;
   197:13;200:2
invoice (9)
   21:4;75:14;76:7,15;
   81:10;94:16;104:22;
   130:18;203:19
invoices (17)
   19:25;20:5;25:9,10;
   27:3;65:22;67:6;76:20,
   24;77:17;79:15,17;
   96:20;156:1,1;172:9;
   203:12
invoicing (1)
   20:23
involve (1)
   192:9
involved (21)

16:1,3,19;19:22;
26:22;53:5;66:16;
67:4;72:21,22;78:13;
100:20;114:20,22;
131:8;151:8;162:12;
168:1,19;183:8,13
**involving (1)**
14:7
**isn't (4)**
121:22;149:13,13;
192:3
**issuance (1)**
187:22
**issue (6)**
20:8;40:22;69:23;
122:20;171:24;172:4
**issued (1)**
77:10
**issues (6)**
11:2;17:1;41:10,18;
49:17;104:15
**issuing (1)**
184:16
**it'd (1)**
69:14
**it'll (2)**
32:13;75:21
**it's (124)**
21:18;26:7;28:3,16;
30:3,20;32:20,23;33:7;
34:10;36:1,15,15,16,
23;37:25;38:2;44:11;
46:24;48:8;49:14;
50:14,15,22;55:9,10,
17;56:11;58:4;63:14,
17;64:18,18;65:8;
67:16;68:1;74:6,16,16;
75:9;76:1;77:25;79:12,
21;81:22;82:5;84:11;
85:10,24;86:4,5,19,22,
22,23,25;90:25;91:2;
95:24;102:21;109:13,
25;113:4,9;115:6,12;
120:12;124:17;125:24;
126:8,15,19;128:1;
131:4,5,12;136:7;
137:4;140:23;141:17;
142:4,4,4,8;148:11;
149:25;150:4;157:2;
158:11,13,13,14,17;
159:20;164:19,22;
166:5;167:5;168:9,16;
170:7;172:3;176:2,13,
13,18;177:10,11,24;
178:9;179:9;183:22;
186:1;188:5;189:11,
14;191:24;192:11,16;
196:13;197:24;199:8;
200:2;201:15
**item (5)**
32:22;42:5;74:12,
12;125:13
**items (4)**

74:9;80:10;94:16;
95:7

**J**

**James (3)**
54:25;164:25;165:4
**Japan (6)**
84:12,13;85:10;
86:6;87:13,14
**Japanese (1)**
91:21
**Jeeva (2)**
22:13;66:2
**J-E-E-V-A (1)**
22:15
**Jersey (1)**
89:16
**Joe (6)**
68:1;98:12,22;
188:24;197:24;199:8
**Johnson (2)**
167:3,6
**join (2)**
99:11;194:14
**Joseph (12)**
16:22;18:5,6;37:25;
38:4;44:1;47:5;68:7;
140:18;145:12,14;
174:8
**Joseph's (1)**
38:1
**journal (1)**
32:5
**journals (6)**
32:6,7,11,14;203:10,
10
**Joveai (1)**
76:3
**J-O-V-E-A-I (2)**
76:5,6
**Judge (2)**
51:4;192:15
**July (40)**
16:7;17:13;29:19;
44:17;47:20,23;49:9,
13;50:1,7,11,13;51:18;
54:6;57:3,9;58:2,7;
65:5;66:13,14,24;
67:10,19;93:2;97:20;
98:7,8;100:23;102:15,
18;115:25;119:20;
120:9;137:11,18;
160:25;188:12,13;
189:18
**June (27)**
29:23,23;38:21;
42:2;44:6,15,20;45:2,
17,18;51:3,3,6,14,18;
54:2;55:2;56:18;
69:15;76:11;82:16;
86:9;92:23,24;93:2;
134:8;160:25

**K**

**Kaiser (1)**
169:3
**keep (9)**
32:12;86:18;147:23;
188:10;194:25;195:1,
3,11,18
**keeping (1)**
140:15
**Keith (1)**
167:13
**Kevin (2)**
14:20;191:4
**Key (11)**
24:3,12;106:4,5,17;
107:21,22;109:16,17;
127:13;203:14
**kind (6)**
12:23;26:1,14;
47:15;56:5;185:14
**kinds (1)**
92:17
**knew (5)**
50:8;58:2;81:15;
162:8;195:9
**Knocked (1)**
189:16
**knowledge (4)**
34:22;46:22;108:5;
165:12
**known (10)**
133:14;163:2;165:8,
10;166:5,6;167:22;
168:4;185:14;204:1

**L**

**labels (1)**
68:19
**landlord (4)**
83:3;88:24;118:6,12
**laptops (3)**
31:12;89:11;196:14
**large (2)**
120:18;182:23
**last (21)**
18:4,7;28:23;33:6,7;
39:19;40:2;46:11,17;
69:16;74:17;86:18;
92:11;108:8,9,10;
113:20;131:15;137:8;
140:3;141:5
**later (3)**
52:5;59:4;150:19
**Laura (1)**
167:13
**law (9)**
63:5,7;64:16;69:25;
71:1,2;88:10;196:24,
24
**lawyer (1)**

192:15
**lawyers (2)**
74:1;195:4
**learn (1)**
54:1
**lease (1)**
88:15
**least (8)**
18:7;25:3;88:3;
91:12;95:17;126:16;
129:1;141:22
**leave (1)**
199:5
**Lee (1)**
180:4
**left (5)**
111:14,17;173:23;
199:6,18
**legal (15)**
29:8;62:23;64:10;
69:24;81:23,23;98:20;
100:7;112:13;120:25;
132:14,18;136:7;
140:23;157:25
**legally (1)**
23:5
**lenders (5)**
122:8;186:24;
194:10,11,18
**Lenovo (2)**
84:17;90:19
**Lens (3)**
84:18
**less (3)**
116:23;159:10;
164:16
**let's (53)**
11:21;12:6;16:11;
18:24;20:22;30:2;
33:6;34:6,25;41:3;
44:15;47:20;48:17;
57:2,21;59:10;68:16;
69:13;71:20;74:9;
77:13;81:23;82:12;
92:13;100:19;102:19;
109:20;113:16;115:16;
122:20,24;123:2,9;
138:5;142:23;145:15;
147:16,18,18,20;
149:18;153:1,1;160:4;
164:24;178:25;181:9,
25;182:11;185:3,5;
187:19;201:11
**letter (15)**
103:10,17;111:25;
112:9,11,15,17,23;
113:4,14;114:17;
125:2;132:6;140:4;
194:4
**letters (6)**
53:17;112:18;122:3;
132:19;139:3;183:19
**letting (1)**

79:22
**Lewis (1)**
14:20;15:8;174:9
**LG (1)**
92:4
**liabilities (11)**
33:8,9,21,24;39:20,
25;40:1,2;41:7;46:12,
17
**liability (1)**
33:25
**license (8)**
129:17,18,20,21;
130:10,22,25;131:1
**likely (1)**
130:25
**likes (1)**
162:24
**limit (1)**
187:12
**Linda (2)**
167:3,6
**line (9)**
33:7;39:19;40:2;
46:17;48:5;54:25;
59:10;96:10;168:11
**lines (2)**
41:21;42:5
**liquidation (2)**
33:18,22
**list (11)**
27:18;28:7;31:8;
32:4;73:21;74:3;83:22,
23;97:2;117:18;118:9
**listed (6)**
32:14,23,24;74:6;
81:24;90:2
**listening (1)**
15:16
**listing (1)**
32:21
**litigating (1)**
197:15
**litigation (5)**
99:4;128:24;165:17;
180:6;201:9
**little (25)**
13:4;16:22;22:10;
59:3;69:6;71:20;72:8,
9;73:25;97:19;98:5;
100:19,22;101:4;
110:25;142:23;143:1;
149:18;161:20;170:5;
178:16,17;191:4,8;
193:16
**Liu (2)**
85:24;86:2
**Liuzhen (1)**
85:24
**L-I-U-Z-H-E-N (1)**
86:1
**live (1)**
89:14

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
Exhibit Transcripts    Page 65 of 171

In Re: Stream TV Networks, Inc. Technology Markets App                                     Mathu Rajan PMQ
Bankrtupcy Rule 2004 Examination                                                          November 13, 2023

lives (2)
 89:16,16
loaded (1)
 185:7
Local (1)
 142:11
location (3)
 80:16;81:5;92:2
Lombardi (3)
 166:14,14;168:22
long (6)
 21:19;62:7;133:13,
 14;168:4;173:15
longer (1)
 133:19
look (29)
 11:12;17:15;30:6,8;
 34:6,21;38:19,23;39:5,
 19;41:19;45:15;65:5;
 87:8;100:24;109:20;
 110:16;122:8,24;
 123:2,10;135:14;
 143:23;144:14;145:6;
 147:16;153:24;171:6;
 194:3
looked (2)
 34:20;53:15
looking (5)
 46:11;148:15;186:4;
 195:23,25
Looks (10)
 36:1;46:15,24;
 82:15;83:2;95:2;
 128:3;146:5;148:2,12
loss (3)
 36:13;46:6;203:11
lost (4)
 22:25;27:24;42:22;
 133:21
lot (10)
 30:22;45:11;54:21;
 81:3;93:6;107:6;
 122:12;143:19;192:12;
 199:22
lucky (2)
 24:20;106:16
lunch (1)
 97:23

## M

M&T (4)
 201:17,18,19;203:14
machine (2)
 84:10;85:13
mail (4)
 103:11,18;104:8;
 137:2
mailed (1)
 137:8
mailing (1)
 88:3
mainly (2)

37:25;109:18
makes (3)
 100:15;182:17,20
making (17)
 20:14;26:22;49:5,
 18;52:2;53:9;56:25;
 57:4;66:17;83:24;
 98:15;135:2;140:22;
 155:5;181:13;182:12;
 194:16
management (1)
 194:14
manager (1)
 85:21
managing (1)
 141:21
manner (1)
 128:6
manually (8)
 20:13,16,18;21:18;
 22:1,1;55:10;56:25
manufacturer (5)
 84:23;85:19;181:13;
 182:16;183:10
many (9)
 78:8,13;86:2,7;
 90:10;91:9;146:11;
 187:8;189:13
March (76)
 17:13;21:7,9;22:17,
 22;29:21;30:2;34:7;
 35:16;39:21,21;40:7,9;
 42:13,13;43:22,23;
 44:10,23;50:9;51:17,
 18;54:2;55:9;56:17;
 58:18;59:15,21;66:13,
 24;67:10,15,18;69:15,
 22;71:12;72:20,21;
 82:15;86:8;87:9;91:9;
 102:14;115:24;130:2;
 131:2;134:6;148:12,
 15,21,21,23;149:1,5,
 12;152:11,14;153:13;
 154:2,12;156:16;
 160:4,16;161:12,14,14,
 19,22;162:3;165:1,3,3;
 168:8;169:16;203:14,
 24
margin (3)
 122:5;183:3,23
Marie (1)
 166:14
Mark (1)
 166:14
marketing (2)
 68:20;77:13
Marriott (4)
 154:11,12,24;155:23
Mathu (5)
 112:11;124:15;
 152:19;154:5;203:5
May (51)
 16:6;19:24;29:20;

30:3,5,14;32:2,2,14;
 33:25;36:2;38:18,22;
 39:24;41:20;42:3,4,14;
 44:5,19,22,23;46:14,
 18;47:1,14,17,17;
 51:18;54:2;63:6;
 64:23;69:15;72:22;
 77:16;79:14;87:9;
 97:22;110:18;112:10;
 125:17;127:18;134:7;
 146:5;148:19;158:2;
 166:20;169:19,24;
 173:8;182:17
maybe (4)
 31:22;63:21;108:1;
 115:6
mean (37)
 10:24;27:10,16;
 38:13;43:23;47:16;
 67:5;71:7;72:10,24;
 73:19;77:23;79:4;
 80:24;87:18;94:24;
 99:15,15;103:1;104:8;
 108:9,10,21;112:23;
 114:18;115:9;121:5;
 126:13;130:6;150:24;
 157:17;163:5,18;
 175:14;184:1;198:21;
 199:17
meaning (5)
 81:9;89:1;112:11;
 165:9;181:20
means (4)
 49:9;90:5;178:17;
 181:7
meant (1)
 29:20
meantime (1)
 197:15
mechanical (1)
 84:5
Media (1)
 144:22
meeting (15)
 77:7,8;155:20,21,21;
 158:15,18;173:9;
 179:22,24;183:12;
 199:4,5,6;202:12
meetings (8)
 89:5,6;157:8,10;
 158:7,12;199:1,2
member (1)
 189:4
members (4)
 67:25;165:11;192:2;
 199:7
mention (2)
 14:24,25
mentioned (3)
 20:2;136:19;163:25
mess (1)
 55:13
messages (2)

19:14;125:3
met (4)
 91:24;92:1,3,5
method (1)
 34:1
Michael (2)
 130:22;203:20
Michaels (5)
 128:15,16;129:12,
 14;130:1
Michaels' (1)
 129:13
Microsoft (7)
 20:9,9;21:11,11;
 31:13;55:15;196:12
middle (6)
 30:16;32:21;51:10;
 180:18;181:3;194:18
might (9)
 76:2,25;85:4;103:2;
 112:14;125:24;143:1;
 181:17;182:18
million (34)
 40:3;43:7;44:12;
 116:11,15;117:2;
 119:11;120:11,12,14;
 122:4,4,10;134:11,13;
 135:12;138:22;139:7;
 141:18,19;178:23;
 183:1,22;184:2,8,9,10,
 12;185:4,6,9,10,11;
 186:1
mine (1)
 155:14
minute (4)
 64:23;144:8;193:5,6
minutes (1)
 97:9
miraculously (1)
 24:9
MISC (1)
 82:13
miscellaneous (5)
 68:21;92:8,14;94:7,8
misplaced (1)
 143:22
missing (2)
 109:9;147:13
mistake (2)
 51:1;198:15
mistakes (1)
 56:25
model (1)
 164:4
mold (2)
 75:10,11
moment (4)
 13:11;16:11;62:8;
 201:22
money (76)
 24:17,23;26:15;
 47:13;53:3;59:20;
 62:25;63:5,7;66:15;

70:24;71:1;72:11;
 101:14,17,19,24;102:2,
 6;104:18;106:12,16;
 111:13,17;115:19,21,
 22;116:2,3,6,7,9,10,19;
 120:17,18,19;121:6,
 23;122:11;123:20,23;
 124:1,14,15;126:8,15;
 127:18;135:15;137:1;
 138:2,12;139:18,18;
 140:9;142:2;155:12,
 16;157:9;159:4;
 165:21;166:10;180:24;
 181:15;182:24;183:3,
 24;190:22,24;197:11;
 200:2,3,7;201:7,8,9
money's (2)
 30:25;142:2
monies (8)
 101:6;116:13;120:5;
 121:25;200:10,24,24;
 203:23
month (21)
 36:24;39:21;47:8;
 48:18;49:9,13;50:4,5,
 7,15,17;57:18;76:10;
 88:22;103:5;108:8;
 110:7;161:19;172:22;
 185:3,7
monthly (27)
 17:12;21:25;28:15,
 16;32:20;37:24;38:20,
 22;46:7;51:23;53:16,
 19,21;54:11;73:8,21;
 86:22,23,24;88:17;
 110:2;129:23,24;
 131:22;202:20;203:8,
 13
months (7)
 17:12;18:8;56:17;
 86:18;87:9;116:6;
 139:8
MOR (3)
 97:1;132:4,8
moral (1)
 136:7
more (16)
 16:3;100:14;106:24;
 108:2;111:1;115:10,
 25;116:23,24;139:8;
 173:18;186:10;191:6,
 8;193:16;203:16
MORs (1)
 108:18
most (8)
 21:2;32:16;43:14,
 17;119:18,18;130:23;
 168:3
mother (11)
 22:8;26:16,18;
 59:23;66:2,20;101:16,
 18,25;125:4;199:25
mother's (1)

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
In Re: Stream TV Networks, Inc. Technology Media Apps   Exhibit Transcripts   Page 66 of 171
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

22:12
**motion (10)**
13:19;22:19,20;
61:20,21;114:14;
131:6;172:19;192:3,8
**mount (1)**
85:18
**move (3)**
47:20;133:23;138:5
**movement (1)**
80:15
**moving (2)**
80:16;90:1
**much (13)**
16:16;17:15;34:20;
48:25;80:19;88:17;
115:4;122:13;137:3;
138:2;152:10;189:12;
199:22
**multiple (4)**
75:25;105:17;
106:18;137:19
**myself (4)**
19:21;146:23;
189:16;192:1

## N

**name (16)**
15:5;18:2,3,4;22:12;
23:2;28:23;66:3;
85:24;93:21,22,23;
99:9;127:25;148:3;
175:1
**named (4)**
63:11,16,17;64:18
**names (2)**
83:20;138:15
**nature (1)**
91:22
**NBA (4)**
155:22,24;158:4,5
**Nebraska (1)**
161:23
**necessary (1)**
196:25
**need (18)**
11:23;12:17;26:10;
40:9;47:17;72:11;
80:23;112:14;120:19;
121:3,6,16;144:7,7;
149:1;156:13;163:5;
196:3
**needed (7)**
47:18;121:22,23;
132:25;137:22,22;
141:8
**needs (4)**
21:3;115:22;138:2;
139:18
**negative (1)**
118:11
**negotiate (2)**

162:6;180:2
**negotiated (6)**
72:5;84:8;141:10;
188:22;190:2;191:25
**negotiating (4)**
72:23;84:16;190:7,
10
**negotiations (2)**
72:14;168:1
**neighborhood (1)**
188:20
**Neither (1)**
45:6
**net (1)**
33:15
**Netherlands (11)**
11:2;62:24;63:12;
69:24;71:1;128:17,23,
24;129:4;171:24,25
**Network (4)**
31:14;32:10;113:11;
164:6
**Network's (1)**
36:13
**networks (6)**
32:19;38:20;123:5;
128:15;144:22;163:23
**Nevada (2)**
196:21,21
**new (6)**
88:18,20;89:16;
138:5;191:17;196:21
**Newman (1)**
167:19
**Newton (2)**
167:13,13
**next (22)**
83:8;89:21;90:17,
24;91:1;112:24;116:3;
123:10;125:13;127:10;
128:3;133:24;135:17;
139:8,12,14;146:6;
165:23;172:7,23;
183:17;198:3
**Nicole (1)**
31:12
**night (3)**
180:19;181:4;
194:18
**noise (1)**
141:13
**non-DIP (1)**
24:1
**none (2)**
122:18;146:18
**non-recurring (1)**
75:9
**normally (1)**
16:1
**notation (1)**
103:4
**note (6)**
44:5;46:5;49:8;

51:16;146:1,7
**notices (1)**
122:16
**noticing (2)**
82:7;171:22
**November (7)**
108:8,11,18,22;
111:25;115:6,12;
119:9;120:14;132:5,6,
8;171:18;202:22;203:2
**NRE (1)**
75:9
**number (24)**
13:17;31:13;34:5;
36:1;38:21;44:16,25;
45:18;47:24;50:16;
68:6;82:25;92:5;
100:16;140:12;144:20;
145:11;146:1,4,20;
164:25;174:12;178:22;
187:15
**numbers (5)**
41:11;42:14,15;
46:19;147:21

## O

**oath (1)**
10:4
**objective (1)**
164:5
**objectives (2)**
164:8,9
**obligated (2)**
116:22;181:2
**obligation (8)**
88:15;120:8;130:21;
131:4;136:5,7,8;
157:25
**obligations (6)**
86:13;118:5,19;
133:1;144:21;171:11
**obliged (1)**
156:23
**obtained (1)**
171:23
**Obviously (2)**
11:2;33:19
**Occasionally (2)**
89:13,17
**occurred (1)**
40:21
**October (5)**
93:2;115:2,5;
171:18;202:21
**OFF (14)**
28:9;46:5;51:24;
70:13;86:4;144:4,8,10;
161:3;202:3,6,10;
204:8,17
**offer (2)**
175:6;180:10
**offered (1)**

174:21
**office (15)**
23:23;83:10,18;
85:22;86:3;87:13,16;
88:14;89:2,18;103:20;
104:4;108:7;133:2;
145:9
**officer (6)**
13:24;67:23;113:10;
133:17,20;198:13
**officers (7)**
13:15;60:25;61:2,11,
18;67:22;197:3
**offices (1)**
85:6
**often (5)**
86:20;89:13;113:16;
130:11;133:9
**okays (1)**
124:10
**old (1)**
88:18
**omnibus (9)**
23:1;52:11;99:7,17;
180:18,22;181:3;
194:19;195:9
**Once (14)**
22:20;29:2;30:21;
54:18;56:10;74:3;
89:17;91:5;101:11;
106:11;151:14;152:12;
156:11;180:23
**one (100)**
13:7;14:16;22:10;
30:14;31:1;35:10;
36:12,12;37:17;40:9,
14;44:19;45:6;47:8;
54:8;55:24;65:8;68:5;
75:23,25;76:1,13;
78:15;81:24,25;82:1;
83:1,8;84:2;92:2,14,
15;94:6,12;95:10;
96:10;105:15;106:4;
111:3,3;114:4;119:19;
121:10;126:18;127:10;
131:8;132:16;133:17,
25;135:16,22;137:20,
20;143:10,20;144:17,
20;145:11;146:1,2,3,4,
6,6,8,17,17,18,20;
147:25;148:14;149:18,
25;150:4;153:8;160:7;
164:24;165:23;168:11;
171:10;173:8,18;
174:11;176:25;178:2,
2,22;182:13;186:24;
187:3,8;188:16;
189:15;190:24;191:8,
9;192:1;194:11;
196:10;201:22
**ones (6)**
14:6;84:21;118:10;
169:19,25;188:17

**online (4)**
24:13;186:11;
201:14
**only (15)**
32:3;34:1;35:10;
50:12;54:17;69:23;
87:6;103:14;104:14;
107:22;115:20;122:9;
186:24;187:3;191:17
**onto (3)**
85:18;133:23;138:5
**onwards (1)**
72:22
**open (3)**
104:10,11;105:24;
106:5;109:12;122:2;
145:11;152:15;183:19
**opened (3)**
106:3,7;139:4
**opening (1)**
107:15
**operate (2)**
10:24;46:6
**operated (1)**
44:10
**operating (71)**
10:25;17:12,20;28:5,
6,15,16,20,21;29:11,
21;30:2,13;32:20,25;
34:6,25;35:22;36:16,
20;37:3;38:18,20,24;
40:7;41:20;43:2,22,24;
44:6,6,15;47:20,23;
50:12;51:20,23;53:6;
54:2,11;56:14,16;57:3,
9,25;58:7;59:16;60:13;
62:9;65:5,6;68:10;
73:21;97:20;101:5;
108:5;109:20;110:3;
111:21,23;112:25;
118:6,7,22;122:6,21;
131:22;134:7;202:20;
203:2,8
**operation (1)**
46:6
**operational (9)**
29:9;54:20;98:21;
101:11;102:17;115:22;
156:21;157:7;183:20
**operations (2)**
36:11;186:21
**opportunity (2)**
139:14;186:11
**opposed (4)**
56:24;73:16;117:2;
191:15
**Optical (5)**
174:17;175:4;178:9,
12,12
**order (15)**
11:6,13;18:24;
21:15;27:7;31:21;
55:12;121:7;139:16;

148:17;155:24;173:10;
181:16;183:11,15
**ordered (1)**
31:11
**orders (23)**
23:6;121:7;137:25;
138:3,21,22,24;
139:17;141:18;174:22;
181:14;182:23,25;
183:1,2,22,22;184:11;
185:4;186:9,21;187:1;
195:15
**ordinary (2)**
91:5;192:16
**organization (1)**
165:11
**original (1)**
197:3
**otherwise (1)**
15:13
**out (50)**
15:5;16:2,18;17:20;
24:5,17;29:25;30:22;
31:16;44:20;54:4,5,6,
19,20;63:9;69:23;
78:25;79:22;82:17;
98:14;101:2;102:16;
104:19;106:11,13,16,
22,25;107:25;118:17;
120:20;121:2,21;
126:13;127:1;139:19;
140:4;152:22;157:8;
164:1,2;172:5;181:2;
185:9,10;189:16;
193:24;195:4;200:9
**output (1)**
149:20
**outside (1)**
89:16
**over (39)**
24:6;27:16;28:2;
29:1,3;31:11,20;43:3;
45:7,24;46:1;58:10;
64:14;72:19;75:18;
86:4,18;94:21;101:2;
114:6;116:11;119:11,
13;123:20;124:13,14;
125:4;133:15;139:7,8;
142:23;143:6,11;
146:12;151:7;173:6;
183:24;200:7;201:3
**oversees (1)**
53:2
**oversight (1)**
135:18
**owed (5)**
30:12;32:23;58:20;
88:8;166:10
**owes (1)**
200:3
**own (2)**
14:9;136:12
**owned (1)**

165:25
**owns (1)**
88:8

## P

**PA (1)**
113:12
**packaging (1)**
81:2
**packet (2)**
147:22;194:4
**page (39)**
29:17,17;30:3,5,7;
32:18,18,21;33:6,7;
36:2,12,14;39:2,5,15;
41:25;42:1,7;44:18,25;
45:15;48:3,4,11;57:8,
9,21;92:11;109:25;
110:6;123:10;172:23;
174:20;191:9,12,15;
192:18,22
**paginated (2)**
48:4,8
**paid (61)**
16:25;21:3,23;
41:22;42:18;43:6,10;
47:18;49:2,4,25;50:13;
57:7;58:24;59:8,20,23;
60:12,14,14,18,25;
61:15;62:25;65:8,14;
66:9;67:13;71:12;
75:22,23,24;82:15;
83:2,6,9;86:9,18,22,23;
89:9,10;93:18;114:1,
10;117:13;118:11;
130:1,8;144:24,25,25;
155:12,15,16;171:11,
12,13,21;196:6;203:12
**panel (5)**
85:11,12,12;174:17;
178:22
**panels (3)**
174:18;178:23;
183:9
**paper (3)**
143:21;145:8;
201:17
**papers (2)**
141:3;201:18
**paperwork (11)**
21:5;32:3,9,10,11,
13,15;72:12;94:17;
130:20;169:9
**paragraph (3)**
172:7;178:2,3
**Pardon (1)**
169:12
**parent (1)**
178:10
**Park (21)**
13:16,23;14:1,4;
61:14;63:16,21;67:12;

71:3;88:10,12;113:9,
14,17,20,22;114:9,11,
16,20;167:1
**part (27)**
32:3;48:21;52:17;
57:6,11,21,23;62:24;
85:6;100:5;102:5,8;
119:24;129:24;130:12;
131:10,13,15,18;
134:15;162:25;163:24;
164:12,13,14;182:3;
190:17
**partially (1)**
177:25
**participate (9)**
13:24;15:13;16:15,
16;17:5,13;197:25;
198:8;199:18
**participated (2)**
72:14;98:10
**particularly (2)**
52:10;65:21
**parties (5)**
58:3;64:14;69:20;
112:14;180:6
**partner (1)**
15:8
**party (9)**
48:22;49:3;54:12;
63:11,21;66:16;71:11;
77:11;132:7
**past (2)**
30:21;106:6
**patents (2)**
158:10,14
**patience (1)**
144:13
**PAUSE (1)**
134:2
**pay (36)**
25:24;54:17;61:2;
65:22,23,23,24;89:6,7;
94:12,13;96:9,15,16,
18;102:7,10;115:18;
116:22;117:10;118:15;
119:5,6,9;135:25;
152:8,9;154:25;155:9;
157:21,22;181:11,15;
195:1,2,3
**payable (2)**
154:12;203:10
**paycheck (1)**
59:22
**paying (20)**
24:2,8;30:18;51:16;
54:10,12,20;81:13,19;
104:13,14,18;105:8,13,
14;130:15;152:17;
153:17;157:18;196:6
**payment (25)**
20:6,14;21:5;26:10;
47:2;60:19;71:24;
80:11;81:11,11,16;

82:3;83:12;87:6,11;
104:23,25,25;105:1,
10;114:13;130:19;
203:4,20;204:4
**payments (34)**
25:19;49:5,7;51:20;
53:9;57:23;58:3,13,19;
59:10,17;60:22,22,23;
62:13,22;66:17;69:21;
87:2;88:21,23;130:1,5,
11;132:2,7;135:2,22;
136:6,15;145:1;155:5;
156:24;171:22;172:23
**payroll (8)**
68:21;95:2,6,14,15;
96:10;146:1,7
**pays (4)**
66:10,11;96:13;
182:15
**PDF (4)**
29:17;30:6;146:15,
17
**penalty (2)**
17:10;110:4
**pending (2)**
114:14;159:14
**Penn (2)**
112:2;148:4
**Pennsylvania (3)**
112:2;148:5;196:24
**people (42)**
19:17;22:8;31:4,5,
13;46:4;68:6;78:13,15;
83:14,17,17;86:6,7;
87:14,18;88:1,1;91:20;
95:12,13,16,21;96:14,
15;117:17;118:12;
120:22;122:1;131:8;
134:21;151:8;162:8,
12;166:25;174:12;
183:2;187:15;190:10,
13;194:13;197:11
**per (6)**
64:18;132:5;185:7;
189:22,25;190:2
**percent (13)**
32:2,15;57:1;99:16;
159:10;164:16;185:3,
6,8;186:2;194:21,22;
195:2
**percentage (1)**
164:15
**perform (1)**
155:18
**performance (1)**
24:15
**performing (1)**
114:3
**perhaps (1)**
156:20
**period (12)**
15:24;16:4;24:7,8;
57:22;66:24;80:9,13;

95:3,18;102:14;104:21
**periods (1)**
69:14
**perjury (2)**
17:10;110:4
**permission (2)**
34:13;192:4
**person (12)**
20:24;22:5;25:8;
26:5,22;63:16,17;96:4,
8;114:6;169:14;180:1
**person's (1)**
93:21
**personal (1)**
151:25
**personally (8)**
107:8,9;151:11;
166:5,16;167:17,22;
168:24
**personnel (1)**
93:1
**persons (2)**
13:22;188:22
**petition (6)**
22:22;23:17;25:4;
29:7;58:8;86:12
**petitions (2)**
16:13;17:4
**phases (1)**
174:11
**phasing (1)**
101:1
**Philadelphia (7)**
88:5,23;89:17;
113:12;117:14,16;
118:7
**phone (6)**
15:1;26:7;54:25;
174:19;191:18;196:12
**photograph (3)**
191:11,14;192:22
**phrase (1)**
124:22
**physically (1)**
24:5
**pick (1)**
201:21
**picking (3)**
115:7,9,12
**Pierce (1)**
168:10
**place (7)**
121:8;137:21;
138:23;139:17,22,25;
141:18
**placed (1)**
157:13
**places (3)**
79:1;85:7;146:24
**plan (17)**
18:12;97:6;100:8,9,
12,13,25,25;115:17,20;
130:23;131:9,11,13,18,

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
In Re: Stream TV Networks, Inc. Technology Media Apps Exhibit Transcripts    Page 68 of 171

Mathu Rajan PMQ
November 13, 2023

Bankrtupcy Rule 2004 Examination

19;141:10

**plane (4)**
79:9,12;92:16;
151:22

**plans (1)**
92:3

**pleadings (1)**
18:16

**please (13)**
10:5;25:7;38:24;
47:21;65:12;83:19;
121:11;132:1;150:16;
176:4,4;191:23;201:23

**plus (1)**
189:19

**PM (1)**
204:19

**PNL (1)**
36:23

**PO (1)**
122:4

**PO's (1)**
200:4

**pockets (1)**
182:20

**point (4)**
30:21;49:20;53:9;
56:20

**POs (1)**
139:3

**posed (1)**
58:13

**position (1)**
122:15

**possession (10)**
41:14;78:8;101:6;
103:5;109:14;114:25;
116:18;123:5;126:16;
200:13

**possible (1)**
130:25

**possibly (1)**
47:8

**Post (7)**
100:25;102:12,21,
23;104:12;130:13;
196:7

**post-petition (5)**
41:3;46:25;58:24;
69:18;118:19

**potential (1)**
72:16

**potentially (1)**
194:5

**pounds (2)**
80:21;81:1

**practice (3)**
153:11;157:17,19

**pre (1)**
102:21

**pre- (2)**
124:1,10

**preapproved (1)**

142:3

**pre-approved (3)**
124:17;200:10;
201:10

**pre-DIP (5)**
102:23,24;104:12,
12,21

**predominantly (4)**
68:25;80:15;152:21;
195:8

**prefer (2)**
52:4;102:21

**preparation (10)**
15:21;16:3,15;17:6,
14;18:9,12;46:2;
142:17;203:6

**prepare (6)**
29:11;36:24;38:25;
143:14,16;173:11

**prepared (9)**
14:9;28:20,21;
31:24;47:3;65:16;
68:6;143:18;145:12

**preparing (3)**
34:3;50:20;84:4

**Prepetition (2)**
137:13;139:2

**Pre-petition (11)**
40:25;57:24;58:1,4,
14,20,23,24;59:1,8;
131:4

**present (3)**
81:10;155:2;203:15

**presentation (1)**
158:5

**presented (5)**
80:11;83:6;104:22;
154:16;174:23

**presently (2)**
40:16;126:17

**Presumably (1)**
50:8

**previously (5)**
65:19;93:12;99:4;
166:18;203:4

**Price (3)**
189:22,25;190:2

**prices (1)**
190:8

**pricing (1)**
72:13

**primarily (1)**
164:19

**primary (1)**
25:8

**print (1)**
21:24

**prior (22)**
21:9,10;22:22;27:6;
34:19;43:15,18;50:11,
13,23;127:19;130:6,8;
131:10,12,16,16;
137:13;147:2;156:6;

172:14;189:24

**private (1)**
151:9

**probably (21)**
30:17,20;32:16;
43:15,17;44:1;75:3;
76:1,3,13;77:7;78:12;
90:11;91:6;108:1;
115:6;125:25;126:3,
19;128:17;167:5

**problem (6)**
49:6,15;56:21;
116:8;195:13;196:11

**problems (1)**
55:20

**Procedure (1)**
142:11

**proceeding (2)**
130:16;144:24

**PROCEEDINGS (4)**
14:13;64:15;130:17;
154:20

**process (9)**
21:8;24:14;63:8;
64:11;66:17;67:4;
139:11;182:4;183:18

**produce (3)**
27:15;108:13;122:4

**produced (3)**
13:5;17:19;171:2

**product (1)**
195:7

**production (47)**
13:25;75:4,6;76:18;
77:3;79:18;80:1;84:4,
7,15;85:1;90:17,24;
91:1;92:3;94:19;
108:25;116:4,4,
120:17;121:23,24;
122:3;130:12;133:24;
138:24;139:4;142:10,
14,18,21;143:6,7;
145:3,12;171:15;
173:4;180:13,16,19,23,
24;182:4;183:17;
194:15;195:20;202:19

**products (2)**
90:17;182:1

**profit (4)**
36:13;182:25;
183:21;203:10

**profits (1)**
200:4

**project (7)**
30:17;84:20,21;
159:10;164:10;183:13;
195:3

**projects (2)**
30:16;31:3

**promise (1)**
116:22

**promises (1)**
163:3

**pronouns (1)**
121:12

**property (3)**
83:13;88:9;192:9,10

**proposal (1)**
120:23

**proposed (2)**
13:16;57:3

**provide (11)**
11:6;34:13;96:19;
132:24;145:7;180:10;
187:22;203:11,16,18,
21

**provided (14)**
13:25;18:25;27:18;
31:24;32:19;37:20;
53:6;75:16;112:12;
130:18;145:7,9;171:7;
187:24

**providing (1)**
34:19

**public (1)**
192:9

**pull (3)**
14:2;31:16;121:1

**pulled (2)**
13:8;153:20

**pulling (1)**
19:14

**purchase (30)**
121:6,7;137:25;
138:3,21,22,24;
139:16;141:18;162:7,
15,23;169:8;174:22;
181:16;182:25;183:1,
2,11,15;184:11;185:4;
186:9,20;187:1;188:6;
190:17,19;191:19,24

**purchases (2)**
72:6;189:18

**purchasing (1)**
190:14

**purpose (3)**
55:13;162:13;
193:20

**purposes (8)**
78:10;79:5;90:2,22;
91:2,11;96:23;102:19

**pursuant (4)**
94:18;116:17;
130:10;142:10

**pushes (1)**
101:20

**put (14)**
73:11;84:10;107:22;
120:18;135:18;139:17,
21;141:3,12,17;
185:20;190:21;192:12;
197:11

**putting (4)**
64:7;132:13;183:16;
190:24

**pronouns (1)**
121:12

**Q**

**Qualcomm's (1)**
194:11

**quarter (1)**
30:19

**quarterly (2)**
53:16;96:16

**questionnaire (1)**
57:22

**quick (5)**
62:19;64:23;80:18;
85:3;184:23

**QuickBooks (8)**
20:10;21:21;22:9,
11;77:24;78:3,5;95:24

**quickly (1)**
30:23

**R**

**Rafael (1)**
148:23

**raise (1)**
157:9

**raising (4)**
138:16;159:4;
196:22;200:2

**Rajan (77)**
11:13;15:20;28:12;
35:22;38:19,23;39:16;
43:5;44:17;45:2,13;
46:10;47:21;48:1;
52:9;54:1,24;56:3,13;
60:18,25;61:11,24;
63:11;65:5;66:2;
80:19;85:4;92:9;
97:19;98:4;109:23;
111:20,25;112:11;
113:2;117:24;121:11;
124:15;125:21;127:11;
128:21;131:23;132:18;
133:7;138:10;140:21;
141:4,7,14;142:7;
143:3;144:13;147:1;
149:1,10;150:16;
151:18;152:19;154:6;
158:3,20;160:2;
161:12;173:9;178:18;
184:24;185:13;186:4;
187:21;192:19;193:15;
198:2;202:13;203:5;
204:3,8

**ramifications (1)**
64:11

**ran (1)**
84:9

**Rank (1)**
162:11

**Rank's (1)**
98:18

**Raph (1)**

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
In Re: Stream TV Networks, Inc. Technology Media Apps    Page 69 of 171
Exhibit Transcripts
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

24:18
reached (3)
  137:18;188:8,21
read (5)
  11:19;42:19;55:2;
  131:25;189:14
ready (9)
  76:18;77:3;84:14;
  90:17;91:1;116:3;
  133:23;180:13;194:1
real (1)
  62:19
reality (1)
  158:17
realize (1)
  179:1
really (7)
  12:5;24:18;57:17;
  140:23;164:13;173:25;
  186:25
reason (17)
  37:19;56:19;61:17;
  94:18;95:22;96:14;
  108:13;117:16;120:7;
  133:19;182:22;191:14;
  192:8,22;195:22;
  196:10,18
reasons (1)
  54:8
recall (8)
  17:8;34:16;51:3;
  55:3;145:3;173:9;
  188:2;192:19
receipt (5)
  76:7,15;83:5;93:24;
  203:19
receipts (7)
  20:23;25:9,10;48:5;
  65:21;67:5;93:3
receivable (11)
  30:9,12;31:7,9;32:4,
  7,8,11,12,22;203:9
receive (8)
  21:4;25:14;38:15;
  71:23;76:20;140:12;
  154:10;183:21
received (6)
  20:11;27:6;41:5;
  103:25;110:7,15
receives (2)
  21:1,2
receiving (2)
  100:10;114:11
recent (2)
  119:18,19
recently (3)
  18:7;53:16;195:6
receptacle (3)
  20:5,25;65:20
recitation (1)
  204:8
recognize (6)
  28:12;109:24;110:2;

113:2;131:23;170:1
recollection (4)
  110:14;125:16;
  128:10;129:1
recommendation (1)
  100:5
reconcile (1)
  56:11
reconciled (1)
  132:4
reconciliation (11)
  73:10,18;74:2,4,6;
  96:25;112:6,20;
  114:19,21;140:19
reconciling (1)
  140:9
record (24)
  12:16;14:18;28:9;
  36:1;44:16;47:20,21;
  65:4;70:13;71:17;
  98:5;126:7;134:2;
  144:4,8,10;161:3,6;
  202:3,6,9,10;204:9,17
records (12)
  13:9;31:18,19;32:1;
  41:8,15;55:9,12;56:4,
  10;196:11;203:6
reduce (1)
  141:13
refer (1)
  11:22
reference (2)
  176:7;178:14
referenced (2)
  112:20;188:16
referencing (1)
  175:17
referring (4)
  73:23;107:2;117:24;
  129:20
reflect (1)
  37:5
reflected (1)
  132:8
reflecting (1)
  50:16
refresh (1)
  62:20
refused (2)
  23:7;31:15
refusing (2)
  31:20;195:16
regarding (6)
  53:7;114:12;135:4;
  162:6;187:22;203:17
regional (1)
  23:23
registered (2)
  197:9,12
regular (3)
  53:12;127:16;
  166:21
reimbursement (1)

172:8
related (1)
  129:6
relating (2)
  75:3;203:3
relationship (8)
  10:11,14,20;28:25;
  98:17,18;159:1;193:17
relative (1)
  60:6
relevant (1)
  141:6
remain (1)
  31:17
Rembrandt (4)
  129:6,8,21;130:15
remember (13)
  49:14;71:14,18;
  73:8;75:2;80:12,13;
  82:14,17,23;111:7;
  125:15;174:1
removed (1)
  31:18
rendered (1)
  104:23
rent (17)
  79:14;82:25;83:2;
  86:8,8,9,13,17,20,20,
  22,24;88:8,17,18,19;
  117:13
rental (1)
  83:12
rented (2)
  80:8;81:8
renting (1)
  80:14
reorganization (14)
  100:9,12,13,25,25;
  114:5;115:20;131:9;
  163:22;164:5,19,21,
  23;166:22
report (54)
  28:15,16;29:11,21;
  30:3,13;32:20,25;34:6,
  7,25;35:3,23;36:16,20;
  38:18,20,22;40:7;
  41:20;43:22,24;44:6,
  15;46:8;47:23;49:25;
  50:12,25;51:23;53:10;
  54:11;57:3,9,25;58:2,
  7;59:16;60:13;65:6;
  68:10;73:21;109:21,
  24;110:3;111:21,23;
  112:25;118:22;131:22;
  134:7;161:12;202:20;
  203:2
reported (1)
  40:6
reporter (15)
  11:8;14:17;17:22;
  23:11;79:20;131:14;
  132:1;161:7;167:8;
  170:3,10,15;175:8;

193:4,9
reporting (2)
  57:22;133:2
reports (18)
  17:12;28:6,7,20,21;
  37:3;39:6;51:20;53:6;
  54:2;56:14,16;62:9;
  65:7;97:20;101:5;
  108:6;203:8
represent (3)
  64:1;71:2,3
representative (2)
  10:6;12:8
represented (1)
  168:19
representing (2)
  15:9;169:8
represents (2)
  99:23;180:4
request (21)
  20:5,22;25:6,14;
  80:1;94:19;104:25;
  105:9;108:25;142:9,
  14,18;144:16,20;
  145:3;156:16;171:4,
  15;173:4;187:24;188:4
requested (2)
  115:14;187:21
requests (3)
  20:6;79:18;172:7
require (2)
  120:4;129:22
requirements (1)
  197:1
requiring (1)
  155:9
research (1)
  163:6
residence (1)
  88:3
resolution (2)
  199:14,15
resolutions (3)
  199:15,16,19
respect (25)
  10:18;12:3;16:11;
  17:3;27:17;56:16;
  62:8;86:7,10;105:14;
  71:1,3,13,24;115:13;
  130:19;144:20;146:18;
  163:4,21;165:16;
  168:2;187:25;203:22,
  25
respectfully (1)
  141:21
respond (2)
  26:13;173:11
response (32)
  12:1;13:6;14:5;19:2,
  7;37:20;57:24;58:6,14,
  22;79:18,23;107:1;
  108:7;114:16;142:9;
  143:2,9;144:15;145:9;

146:20;171:4,6,9,10,
  15,20;176:8,19;
  184:17;187:24;188:3
responses (8)
  12:17;56:17;142:15,
  18,20;147:10;171:8;
  173:3
responsible (5)
  20:24;22:5,7;25:4;
  65:20
responsive (2)
  25:6;27:23
result (2)
  99:3,4
retention (1)
  25:5
return (3)
  21:14,15;91:7
returned (4)
  18:8;32:13;84:18;
  91:4
reunited (2)
  195:10,12
revenue (1)
  178:21
review (7)
  34:19;35:3;36:6,19;
  37:23;51:22;68:9
reviewed (5)
  14:4;18:16;50:23;
  110:3;172:24
reviewing (1)
  55:3
revise (2)
  51:25;134:17
revising (1)
  120:24
revision (4)
  40:15;43:23,25;44:7
revisions (3)
  49:18;52:1,2
Right (91)
  11:24;13:18;15:18;
  16:10;20:18;25:1;
  26:16,23;28:4;29:4,14,
  16;30:2,7,11;39:10;
  40:11,13;41:1,2;42:12;
  47:19;49:22;55:19;
  57:10;59:5;65:4,18;
  68:4,15;71:10,19;
  74:22;75:8;80:12;
  81:17;83:14;84:4,17;
  86:5;90:13;97:7,10,17;
  100:22;105:13;109:5;
  116:8,20;120:18;
  121:6;123:9;124:4;
  126:24;127:9;128:2;
  133:23;134:12;138:4;
  139:4,16,21;142:23;
  145:15;148:6;150:20;
  152:5;153:22;154:8;
  155:1;158:4;164:18;
  168:12;172:11,15;

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
In Re: Stream TV Networks, Inc. Technology Matters Inc.    Exhibit Transcripts    Page 70 of 171
Bankrtupcy Rule 2004 Examination

Mathu Rajan PMQ
November 13, 2023

174:20;176:20;182:2,
7,11;183:7,14,17;
184:7;187:12,19;
188:11;192:11;197:10;
200:21;202:4

**Rink (25)**
16:21;28:24;52:16;
68:1;69:2;72:8;98:12,
23;101:22;102:1;
112:16,20;113:15;
114:9,11;132:11,19;
133:9,14;140:4;168:3,
4;174:8;197:24;199:8

**Rising (1)**
161:23

**roadshow (12)**
77:14,20,23;78:13,
24;79:3,5,7;80:5;90:2,
5;91:11

**roadshows (1)**
80:4

**Robert (1)**
169:10

**Robertson (3)**
31:4;93:7;174:10

**role (2)**
20:2;38:1

**rolling (1)**
108:21

**room (2)**
79:14;80:14

**rooms (1)**
80:9

**Roughly (4)**
53:21;88:19;111:9;
173:16

**Rule (1)**
142:11

**rules (2)**
73:11;74:2

**ruling (2)**
21:12;136:11

**run (9)**
90:17,25;91:2;
97:12;101:1;116:4,4;
156:12;183:17

**running (4)**
71:4,6;84:20,21

**rush (1)**
70:25

**rushed (1)**
173:24

**S**

**Sagan (2)**
197:24;199:8

**salary (2)**
39:6;172:21

**sale (3)**
72:15,16;90:13

**sales (5)**
37:5;68:21;84:2;

93:17;94:9

**same (12)**
46:4;125:8,18;
128:5;146:6,16;
163:10;166:4,12;
167:16;190:13;192:22

**samples (1)**
194:8

**Samsung (1)**
92:4

**San (2)**
154:2;155:19

**satisfied (1)**
147:10

**saw (5)**
127:22;143:10,19,
19;199:17

**saying (13)**
12:16;26:10;32:8;
41:4;58:23;60:19;
71:7;103:11,18;107:3;
141:3;177:2;194:5

**schedule (7)**
65:8;68:5;71:20;
74:16;81:24;131:5;
203:7

**scheduled (1)**
70:25

**schedules (2)**
16:14;17:4

**scratch (1)**
55:8

**screen (3)**
145:6,16;161:13

**scroll (2)**
191:3,4

**se (1)**
64:18

**search (7)**
19:11;26:25;27:1;
146:19;147:3,6;177:6

**searching (1)**
27:3

**second (11)**
14:16;30:7;40:14;
70:14;106:22;115:16;
121:11;133:25;153:9;
182:5;190:21

**secretary (1)**
179:10

**section (2)**
57:11;77:4

**secured (5)**
120:22;122:7,8,14;
194:18

**seeking (1)**
192:4

**seem (1)**
164:1

**seems (2)**
37:5;181:25

**Sego (4)**
68:1,2;98:12,22

**S-E-G-O (1)**
68:3

**Self-employment (1)**
39:8

**sell (5)**
90:20;181:18;
182:18;192:4;195:8

**Semiconductor (12)**
23:10,14;42:10;43:1,
4,6,14,21;112:1;113:5;
148:3;152:23

**Semiconductors (1)**
172:10

**send (14)**
23:8;101:14,19;
104:8;109:5,9;123:20;
124:14;125:1;137:6;
142:2;171:18;200:7,9

**sending (12)**
56:22;66:14;70:24;
81:12;106:12;114:9;
116:1,5,7,9;137:1;
143:11

**sends (1)**
104:18

**sensitive (1)**
80:24

**sent (13)**
23:22;27:16;29:3;
55:2;71:1;101:5;
112:15;125:3,4;137:7;
140:10;142:8;169:24

**Senterfitt (1)**
141:9

**separate (3)**
52:12,14;141:8

**separately (1)**
184:18

**separation (2)**
100:14;141:12

**September (29)**
78:20;92:25;97:21;
103:24;105:24;109:20;
110:7,15;111:22;
113:4;114:24;115:13;
116:18,19;117:9,10;
119:23;122:25;123:6,
10;125:6,17;128:8;
131:21;141:22;156:20;
171:17;191:20;200:16

**sequence (1)**
125:18

**serial (1)**
153:21

**series (2)**
77:13;153:24

**server (1)**
76:12

**serves (1)**
85:21

**services (3)**
104:23;114:10;
155:18

**set (39)**
12:24;19:2,7;23:3,
23;24:12,19;27:23;
42:23,25;54:15;63:15;
75:10;93:19;99:10;
118:13;141:11;151:6,
6,14;152:6,11,12;
153:10,13;156:11;
157:4;180:15;183:10;
194:15,22,24;195:5,8,
11,18;196:4;198:19,24

**sets (1)**
147:24

**setting (1)**
203:25

**seven (3)**
42:5;57:21;90:11

**several (6)**
18:7;84:16;111:23;
119:15;175:7,12

**share (4)**
52:10;189:22,25;
190:3

**shareholder (5)**
60:3,7;70:21;165:5,6

**shareholders (19)**
63:6;69:25;70:1,4;
72:15,15,16;119:13;
138:15,19,20,25;139:6,
22;141:16;166:15;
186:19;197:7;203:22

**SharePoint (3)**
20:9;21:11;31:14

**shares (36)**
53:7;63:7;71:23;
72:6,16;73:10,18;74:3,
4,6;77:10;96:21,22,25;
112:6;115:19;119:25;
122:12;132:5;140:12;
162:4,7,15,16,18,19,
23;163:4;169:8;
185:19;187:22;189:11,
13,19;190:14,19

**Sharjah (1)**
168:6

**S-H-A-R-J-A-H (1)**
168:10

**SHAW (4)**
14:19,20;176:8;
191:5

**she'd (1)**
26:6

**she's (7)**
20:4,15;22:19;
23:18;59:24;134:24;
167:7

**sheet (25)**
32:19;33:6,9;34:5;
37:14,23;39:15;40:17;
41:20;42:1;43:22;44:7,
11;46:10,18;47:9;
55:21;56:4,5,20;80:10;
134:5,6,8;135:6

**sheets (3)**
37:18;47:4;134:18

**Shenzhen (1)**
178:12

**ship (4)**
78:6;90:18;178:23;
181:12

**shipment (1)**
81:3

**shipped (4)**
89:23;90:22;91:9;
182:16

**shipping (5)**
75:8;89:21;90:2,6,18

**short (6)**
31:21;65:1;70:16;
85:24;98:1;193:12

**Shouldn't (1)**
126:7

**show (12)**
11:5;30:6;33:25;
51:19;54:22;65:7;
80:5;91:25;92:6;96:5;
118:21;201:12

**showed (1)**
44:11

**showing (5)**
76:16;79:7;141:22;
169:21;187:9

**shows (2)**
48:5;96:7

**shuffling (1)**
143:22

**shut (1)**
24:22

**shuts (1)**
106:15

**sic (5)**
154:11;157:12,12,
21,21

**sick (3)**
15:25;16:7,17

**side (3)**
23:7;84:9;194:22

**sides (2)**
141:4,14

**sign (10)**
34:7;35:22;44:17;
45:22;47:25;109:24;
122:15;179:9;191:17;
201:17

**signature (14)**
34:10,14,15,17,19;
35:24;36:4;38:23;
39:2;44:18;109:24;
191:12;192:18,22

**signatures (1)**
188:23

**signed (25)**
17:8,9;28:6;34:9,9;
35:1,2;45:12;59:16;
102:4;110:3;115:18;
140:11;179:8,11,13;

180:14,18;182:11;
184:5;189:7;192:23;
194:2,3,19
**significant (2)**
60:2,6
**signing (7)**
34:16;35:4;181:3;
191:18;192:19;194:2;
201:18
**Silicon (1)**
85:14
**simply (4)**
116:1;162:17;
182:25;191:15
**single (3)**
143:10,16,20
**sirs (1)**
112:10
**situation (2)**
21:6;201:9
**six (1)**
187:4
**Sixty-Five (1)**
194:22
**Skyworth (1)**
92:4
**slow (3)**
24:18;115:16;153:1
**small (4)**
14:1;92:25;122:9;
164:14
**smaller (1)**
50:16
**Smith (1)**
15:9
**so-called (2)**
122:7,14
**software (5)**
20:12,20;21:14;
76:12,17
**sold (7)**
90:8,13,15,25;91:5;
180:12;194:1
**solicit (2)**
117:22;118:10
**solicitation (1)**
117:21
**somebody (16)**
15:1;21:2;37:23;
60:2;64:1;76:20,21;
78:7;81:4;85:21;90:5,
18;93:19;166:5;199:4;
201:12
**someone (1)**
139:12
**sometime (2)**
137:9;156:19
**sometimes (6)**
22:8,10;86:22,23;
166:25;198:2
**somewhere (3)**
78:6;90:6;188:20
**soon (6)**

78:25;83:14,17;
87:20;106:24;197:11
**Sorry (30)**
35:14;42:4;44:6;
48:4;65:13;67:9;
79:21;83:16;87:3;
94:8;108:6,20;132:17;
134:14;135:21;136:25;
155:14;162:21;163:8;
171:17;176:18;177:11,
25;178:16;179:3;
180:3;181:24;187:19;
198:20;201:6
**sort (6)**
10:25;52:17;55:8;
93:25;101:1;182:10
**sorted (1)**
172:5
**sought (1)**
118:25
**source (6)**
49:2;119:8;126:16;
130:4;169:17,22
**sources (1)**
39:9
**Southern (1)**
84:23;183:9,10
**space (2)**
94:4,14
**speak (4)**
10:7;103:9;113:16;
180:1
**special (3)**
52:25;81:2;198:24
**specializes (1)**
186:15
**specialty (1)**
185:15
**specific (1)**
102:10
**specs (1)**
90:24
**Spell (4)**
22:14;70:8;76:4;
85:25
**spelled (1)**
15:5
**spending (4)**
101:21,22;106:13;
139:8
**spends (1)**
97:5
**spent (3)**
49:20;107:25;139:6
**spoke (1)**
113:20
**sponsor (3)**
97:6;100:8;115:18
**spot (1)**
185:14
**spreadsheets (1)**
140:16
**Springs (1)**

167:14
**stage (1)**
188:10
**stamp (1)**
179:10
**stand (1)**
82:12
**stands (1)**
23:9
**start (11)**
21:5;28:5;52:1;69:9;
98:23;121:11;147:18,
20;159:9;180:6;183:21
**started (12)**
10:16,19;19:14;
24:10;52:2;55:8;
106:12,18,24;156:14;
164:10;190:7
**starting (4)**
16:17;43:1;56:20;
164:3
**state (2)**
192:10;196:16
**stated (3)**
39:25;40:16;55:17
**Statement (32)**
16:14;17:5;18:13;
36:11,13;46:6,7;49:18;
59:18,19;60:15;62:11;
95:20;103:3;117:20,
25;118:9,14;123:2,4;
127:11;131:11,22,23;
135:14,17;145:17;
148:2,15;160:5;
161:14;203:7
**statements (18)**
21:25;59:4;75:21;
76:7;108:6;135:16;
144:1;145:18,21,24;
153:21;171:2,8,13,14;
201:20;203:11,14
**States (6)**
11:17;31:24;133:2;
142:9;144:15;171:20
**status (1)**
24:10
**stay (2)**
29:3;99:20
**stayed (2)**
99:16;194:23
**staying (1)**
52:20
**stays (1)**
93:5
**step (2)**
139:12;158:21
**stepping (1)**
61:10
**still (14)**
30:20;31:17;42:4;
47:16;63:8;109:12;
111:13;113:22;136:4;
141:21;152:22;153:3;

165:20;183:5
**stitching (2)**
42:25;196:1
**stock (8)**
72:7;77:11;168:2;
188:6;190:19;191:19,
24;192:5
**Stop (7)**
98:23;180:19,21,23;
181:19;201:8;202:2
**stopped (4)**
30:16,20;180:22;
194:20
**storage (1)**
25:5
**straight (2)**
54:18;63:7
**straightened (1)**
30:22
**Stream (334)**
10:11,15;11:1;12:1,
8;13:16,17,19;16:23;
17:1;20:3;22:17,24;
23:1,2,4,8,24;24:2,12;
25:1;26:19;28:16,25;
29:1,2,6;30:12;32:19;
36:13,23,24;38:1,5,20;
49:4,5,12;50:1;51:17;
53:3;54:9,17,20;56:22;
58:10,16,19,20;59:9,
20;61:1,2,12;62:2,3,4;
63:17,18,22,25;64:1,5,
7;65:9,13;66:6,8,10;
67:10;69:22;71:8,12,
23;76:21;77:8,10;78:8,
14,17,21,25;79:1;
81:10,10,13,15,18,20,
21;83:1,6,24,24;84:25;
87:20,22;88:1;90:12,
15;91:3;92:19;95:17;
96:13,19,19,21,22,22,
23;97:1,5,6;99:7,8,9,
12,16;100:9,14,16,21;
101:6,12,17,25;102:2,
6,7;104:13,14,17,18,
18,23;105:11,13,14,15;
106:19;107:11,17;
108:3;110:7,15,19;
111:3;112:8,13;
113:10,24;114:3,5,24,
25;115:10,14,17,19,19,
21;116:3,5,7,10;117:9;
118:7,18;119:10,25,
25;120:5,15,19;
121:20,21,24,24;122:6,
17,21;123:4,19;
124:10,16;126:7,21;
127:14,18,22;128:1,1,
15;129:21;130:15,18;
133:11,17,18,20;135:3,
3,25;136:13;137:15,
22,22,24;138:2,21,25;
139:1,5,5,19;140:22;

141:19,23,23;142:1;
143:15;144:22,23;
146:2,3,4,7,9;151:13,
14,16;152:4,7,7,13,13,
21,25;153:14,15,17;
154:13,15;155:4,6,6,9,
11,12,19;156:6,23;
157:1,2,4,6,7,9,10,10,
24;158:8,13,13,14,15,
17;159:2,4,14;163:23;
164:6,19,21,22;165:13,
15;166:9,10,21;
171:11;172:18;173:10;
174:22;179:12;181:9,
21,23;182:1,12,14,19,
23;183:21,23,25;
184:1,5,6,19;186:21;
187:23;189:7;190:5,6,
19;191:1;193:17,22,
25;194:6,14,20;
195:11,14,17,19,19;
196:6;197:16;198:25;
199:3;200:1,3,9,9,12;
201:8,11,13,18;203:4,
18;204:4
**Stream's (6)**
89:22;105:22;119:5;
120:3;132:3;155:10
**Streams (1)**
105:20
**street (5)**
84:9;88:4;113:11;
180:5,5
**structure (1)**
104:21
**structuring (1)**
114:6
**stuff (10)**
41:9;53:15;92:17;
93:7,8;108:21;143:11;
147:12;192:12;196:13
**subject (1)**
114:12
**submission (1)**
19:20
**Submit (3)**
203:1,5,24
**submitted (13)**
14:5;79:17,23;
93:12;100:8;126:11;
175:7,9,11;188:2,3;
202:24;203:1
**submitting (1)**
100:12
**subpoena (6)**
13:6;14:5;19:9;27:7;
37:21;147:2
**Subscription (30)**
53:8;102:4,5;
104:17;116:17;119:10,
14,15,24;120:2,4,8,9;
124:2;137:10,13,17,19,
21;138:11;139:24;

140:2,6,10;155:11;
159:20;184:5;187:25;
188:5;189:24
**subscriptions (1)**
200:3
**subsidiaries (6)**
10:25;11:1,3;62:23;
64:8;114:7
**subsidiary (7)**
71:5,6,7,8,8;178:9,
10
**Suby (26)**
16:21;17:21,25;
18:6;19:21;22:9;
28:22;29:12;31:1;
37:25;38:1,4;44:1;
47:5;50:22;65:17;68:7,
8;69:1;73:25;89:16;
135:9;140:18;145:12,
14;174:8
**S-U-B-Y (1)**
17:25
**sudden (1)**
103:17
**suddenly (1)**
106:8
**sued (1)**
64:4
**sum (1)**
120:9
**summer (1)**
106:8
**Sunny (1)**
169:10
**supplement (4)**
111:21,22;112:25;
131:21
**supplied (3)**
108:7;142:21;143:8
**supplier (1)**
178:22
**supply (16)**
94:18;174:21;
175:20;180:11,20;
181:5,7,10;182:22;
183:20;184:15;185:3;
186:12,17;194:25;
204:2
**supplying (1)**
180:20
**supporting (1)**
126:11
**Suppose (1)**
81:7
**supposed (14)**
21:14;40:22;41:9;
54:10;89:8;108:20;
117:21;118:10;130:11;
140:12;147:7;177:10;
194:8;198:25
**Supreme (6)**
23:5;31:10;40:23;
196:6,7,8;197:17,18

**sure (17)**
41:11;44:3;51:7;
58:6;64:13,13;75:17;
103:8;121:1;127:6;
128:17;129:5;146:13;
158:24;184:14;193:8,
18
**swear (1)**
45:6
**sweep (3)**
136:22,22,24
**sweeping (1)**
136:20
**sweet (1)**
185:14
**switched (4)**
29:1;43:3;106:10,11
**switches (1)**
103:19
**sworn (1)**
10:4
**Systar (1)**
84:24

**T**

**T-1 (1)**
135:20
**Taiwan (10)**
83:2;85:15;86:6,10,
14,21;87:3;91:16,17,
20
**talk (17)**
18:24;34:25;59:3;
69:13;71:20;74:9;
81:23;92:13;101:4;
102:13;149:18;168:3;
171:25;178:25;179:21;
192:10;193:16
**talked (3)**
18:25;52:16;134:5
**talking (17)**
28:5;33:21,23;58:17,
18;66:13;69:3;77:17;
92:15;99:14;119:14;
122:20;124:23;162:9;
182:8;190:21;192:15
**task (2)**
22:6,7
**taxes (2)**
196:20,22
**TDs (1)**
75:8
**team (7)**
21:13;50:20,21;
73:25;91:20,21;99:15
**tech (1)**
196:19
**techno (2)**
111:4;187:23
**Technologies (3)**
42:23;195:24,25
**Technology (22)**

41:23;42:6,9,17,25;
43:2,5,13,21;79:2;
81:22;135:16;158:5,8,
11,14;159:25;193:22,
24;195:10,12;196:3
**Technovative (19)**
10:18,19,20,22;12:2,
9;16:24;22:18;62:6,9,
14;67:14,14;71:8;
110:19;118:18;127:14;
144:22;171:21
**Telecom (3)**
84:23;183:9,11
**teleconference (1)**
173:19
**telling (2)**
103:16;106:9
**tells (1)**
200:5
**ten (6)**
24:21;90:18,19;
133:15,16;168:5
**term (5)**
10:11;49:21;73:22;
107:2,14
**terminology (3)**
77:24,25;78:2
**terms (6)**
105:8;110:19;116:5;
140:5,6;166:4
**terribly (1)**
56:23
**testified (6)**
50:23;51:4,25;56:5;
65:19;66:2
**testify (4)**
51:9,10;128:21;
199:24
**testifying (1)**
69:8
**testimony (9)**
27:1;49:11,14;
51:21;58:15;59:5;
107:19;134:25;200:22
**Texas (1)**
15:8
**texts (2)**
19:6;204:3
**thanks (2)**
149:8;170:16
**that'll (1)**
21:17
**That's (107)**
16:17;18:3;21:8,18;
22:2,10;33:4,15,22,23;
34:5;36:12,17;37:10,
25;38:24;40:4,15;41:4;
43:13;49:4,5;53:3,24;
56:6;57:10;74:6;76:12,
17;77:21,24;78:2;
79:16;86:5;87:6;
88:10;91:16;92:15;
95:12,14,20,21;96:12,

16,24;97:2,9;102:8;
104:9,9;108:3;110:22;
112:20;116:15;118:4;
120:6;126:15;129:4,7,
13,17;135:4,4,17;
140:18,18;141:9,10;
147:24;148:8;149:14,
17,19,21;152:22,22,23;
157:25;158:17;159:10;
160:23;163:24;164:14;
168:10,14,15,21;
169:20;172:4;179:9;
180:1,18,21;183:23;
184:14;185:20;188:10,
15;189:15;191:19;
195:4,11;196:10;
198:17;200:8;201:15;
204:10
**there's (61)**
11:2;30:14;32:1;
33:4,17;41:21,22;
47:16;62:22;63:1;
64:16;71:17;74:11,13;
75:9;76:15;77:4,13;
87:9;92:13;93:14;
94:6;96:14,17;102:11,
11,22,23;104:11,16;
105:17;106:5;111:12,
13,16,25;114:23;
115:8;119:3,15;
122:10,17;125:8;
126:10;143:5;147:24;
164:22,25;167:2;
176:7,8;178:14;
184:10;187:15;188:17;
192:8;194:4;198:22,
23;200:4,5
**Therefore (1)**
132:7
**they'll (7)**
84:19;91:6,7;181:13,
16;185:6,7
**They're (89)**
13:18;21:14;24:18;
31:20,21;41:13,14;
46:22;50:16;52:14;
54:13;55:11,12,13,20,
21,21;56:22;67:20;
78:18,21;81:1,4,18;
82:7;84:2,3,3,6,13,16,
22,24;85:15,15;90:13,
14,16,23,25;98:15;
103:16;114:18;118:2,
6;120:22;122:9,12,15;
131:8,12,18;136:1,10,
13;137:1,6;140:11;
158:8;166:15;167:15,
21;169:20,21;170:1,
13;174:17;178:21,22;
180:18;183:7,7,11,13;
184:16;185:17,25;
186:20,23;187:3,8,8,9,
10;194:13;195:14,16;

200:12;201:7
**they've (3)**
72:18;141:4;171:12
**third (8)**
48:21;49:3;54:12;
74:12;106:23;112:14;
113:11;132:7
**Thomas (5)**
13:16;61:14;63:16;
67:12;113:9;166:25
**though (7)**
31:20;52:9;55:12,
17;81:18;136:3;181:1
**thought (8)**
35:12;103:2;126:23;
147:12;160:5;164:12;
175:20;196:8
**thousands (1)**
194:17
**three (16)**
24:16;69:2;92:13;
95:6;113:18,21;
125:16;133:12;152:23;
174:20;179:21,23;
187:19,21;198:5;199:9
**throated (1)**
194:6
**Thursday (3)**
109:10;147:13;
171:19
**tickets (4)**
79:9,12;92:16;
151:22
**tied (1)**
164:20
**tiling (2)**
42:25;196:1
**till (1)**
52:5
**times (7)**
81:3;113:18;133:12;
175:7,12;179:21,23
**title (5)**
10:23;41:14;78:5;
99:25;113:10
**titled (1)**
142:8
**today (14)**
10:7;15:1;40:19;
58:15;71:15;78:9;
95:20;105:5;112:17;
129:1;147:11;156:25;
200:22;204:13
**Todd (1)**
161:22
**together (2)**
84:10;183:17
**told (10)**
19:24;23:25;27:12;
44:3;101:16;106:2;
123:19;141:7;194:9;
199:5
**Tom (6)**

68:1,2;98:12,22;
197:24;199:8
**ton (1)**
180:24
**took (8)**
21:13;24:22;72:12;
78:6;106:15;137:1;
193:15;196:5
**top (8)**
39:21;48:5;68:18;
69:14;86:4;94:7;188:9,
11
**topic (7)**
144:20;146:20;
147:2;171:10;187:19,
20,21
**topics (7)**
12:24;19:2,7;27:7,
23;142:13;147:2
**total (15)**
33:7,9,15;39:19,24;
40:1,2;46:11,17;68:20;
69:16;74:21;82:15;
92:18;95:3
**totaled (1)**
137:20
**totals (1)**
46:19
**towards (1)**
65:7
**tracks (1)**
194:21
**trade (9)**
91:14,19;94:3,6,9,
15;96:5,7;201:12
**trading (1)**
168:15
**transaction (10)**
63:3;104:22;126:12;
128:5,10;129:4;141:4,
14;161:24;162:14
**transactions (8)**
125:16;132:4;
141:22;146:2,3,4,6,9
**transfer (27)**
26:17,22;53:7;66:5,
18;76:22;81:25;96:20;
101:24;123:13,14,25;
124:8,20,21,24,25;
127:10,20;128:4,14;
129:2,16;167:2;
200:24;201:1,17
**transferred (2)**
53:3;124:16
**transfers (5)**
25:18;66:20;141:23;
199:25;200:19
**translation (1)**
177:17
**transmissions (1)**
19:6
**transmitted (1)**
26:4

**transportation (1)**
90:1
**travel (27)**
74:14;77:4,5;79:6,8,
12;92:8,18,22;151:3,
10,15,25;152:9,10,13,
20;153:11,15,18;
154:1,5,15;155:10,15;
157:18,22
**traveled (2)**
92:23,24
**traveling (1)**
93:1
**travels (1)**
92:13
**tremendous (1)**
187:9
**tried (3)**
54:14;180:21;181:2
**trips (2)**
92:25;93:1
**trouble (1)**
201:16
**truck (3)**
81:5,8,8
**Trustee (5)**
11:17;31:24;64:12;
133:3;202:11
**Trustees (2)**
142:9;144:15
**try (3)**
12:14;100:19;
181:25
**trying (10)**
49:17;54:13;55:7,
14;56:13;63:8;71:5;
118:17;138:1;161:12
**Tuls (5)**
161:22;162:6,14;
163:1,3
**T-U-L-S (1)**
161:22
**turn (7)**
21:16;23:6,7;31:11,
20;48:3;142:24
**turned (1)**
104:4
**turnover (1)**
147:8
**TV (131)**
10:12,15;12:1,8;
13:16,17,19;16:23;
22:18,24;23:1;28:16;
30:12;32:19;36:13,23,
24;38:1,20;49:4,5,12;
50:1;53:3;56:22;
58:11;61:12;62:2,3,4;
63:17,18;65:13;66:6,8;
78:6;79:1,8;80:15,16;
84:6,25;90:7,23;97:6;
99:7,8,9,12;100:9,15;
110:7;112:13;113:11;
114:3;115:10,17,19,

20;118:7;119:10;
122:17;123:4,19;
124:10;127:14;128:15;
129:21;137:24;138:21;
141:19;143:15;144:22;
157:2,4,7,9,10,10;
158:8;159:5;163:23;
164:6;165:13,16;
166:9,10;171:11;
174:19;179:12;181:9,
9,21,23;182:12,12,14,
20,23;183:17,21,23,25;
184:5,6;190:5,6;191:1;
193:17,22,25;194:6,
20;195:12,14,17,19,19;
196:6;197:16;198:25;
199:3;200:1,3,9,9;
201:8,11,18;203:4;
204:4
**TV's (1)**
194:1
**TVs (15)**
47:17;78:8;80:19;
84:23;89:25;90:1,8,15,
16,18,19;91:4,9;
136:13;180:13
**twice (2)**
152:3,24
**two (38)**
24:21;29:17;31:1;
35:12;41:22;43:20;
47:6;48:3,9,11;49:16;
52:12,14;54:8;56:21;
57:9;84:3;87:9;94:6,
11;106:14;107:1;
113:21;114:4;119:3;
122:10;133:12;141:5;
147:24;152:22;171:3;
176:19,24;177:2;
183:1;190:25;193:22;
198:22
**type (3)**
80:4;177:6;185:13
**typically (2)**
135:1;184:25
**typing (2)**
69:10,10

## U

**Uae (1)**
168:6
**U-A-E (1)**
168:10
**Uber (3)**
151:22;154:2;156:2
**UCC (1)**
122:17
**Ultra (6)**
81:22;158:8,9,9,10,
11
**unconfuse (1)**
153:4

**under (26)**
10:4;17:10;28:19;
31:21;52:10;55:12;
73:10;74:1,12;75:1;
79:5,6;82:13;92:7,14;
93:17;94:7,9;95:6;
99:6;110:3;117:17;
118:7,8;124:2;188:11
**underneath (1)**
178:11
**understood (1)**
134:25
**unit (2)**
90:20,21
**United (5)**
11:16;31:24;133:2;
142:9;144:15
**units (2)**
30:15;194:16
**unknown (1)**
126:16
**unless (1)**
11:23
**unpack (1)**
100:19
**unpaid (2)**
30:15,17
**unsecured (5)**
117:18,21;120:23;
122:11,11
**up (87)**
23:3,23;24:12,19;
41:21;42:5,5,23;43:1;
48:5;49:19;51:19;
53:15;54:15,16;55:13;
63:15;75:10;80:5;
84:20;88:21,22;90:23;
93:19;94:2,7;95:2;
96:10;99:10;101:1;
106:4,7;115:7,9,12;
118:13,21;122:3;
127:25;139:4,9;
141:11;145:11;151:6,
7,15;152:6,11,12;
153:10,14,16,20;
156:11;157:4;161:13;
168:11;169:21;180:15;
181:15;182:24;183:10,
19;188:9,9,10,11;
189:13;190:6,6;191:4,
9;192:11,12;193:21;
194:15,25;195:5,8,11,
18;196:4;198:19,24;
201:17,21;203:25
**updated (1)**
100:10
**updating (2)**
44:4;100:11
**uploaded (1)**
145:13
**Upon (1)**
44:2
**upset (1)**

194:11
**upstate (1)**
191:17
**use (17)**
10:11;23:2,25;34:1,
15;49:18;78:2;83:13;
88:14;90:7;99:8;107:2,
6,14;151:21;180:25;
196:2
**used (10)**
20:16;62:5;65:22;
73:22;77:24;88:20;
112:13;124:22;196:21;
198:20
**using (23)**
21:8;24:10;33:19;
49:21;67:8;89:1,2;
90:16,23;91:1,2;96:23;
106:18,24;109:18;
116:3;120:17;121:12;
151:9;152:19;157:17;
158:8;191:18
**usually (1)**
78:5

## V

**VA (1)**
169:3
**valid (1)**
183:6
**validate (1)**
53:8
**Valley (1)**
85:14
**valuation (2)**
34:2;135:12
**value (8)**
33:18,19,22,23,24;
41:13;163:4;186:25
**various (2)**
20:14;165:17
**VC (1)**
196:19
**vegetables (2)**
168:9,13
**vendor (5)**
19:22;21:3;26:10;
75:25;76:1
**vendors (16)**
19:23,24;20:6,23,24;
25:16,19;54:18;66:10;
75:24,25;100:11;
118:8;135:2;155:21;
182:21
**Ventures (1)**
165:24
**verbally (1)**
103:16
**verify (1)**
45:12
**verifying (1)**
201:10

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
In Re: Stream TV Networks, Inc. Technology Media Apps    Page 74 of 171
Bankrtupcy Rule 2004 Examination    Exhibit Transcripts

Mathu Rajan PMQ
November 13, 2023

versus (1)
140:10

videoconference (2)
89:19;90:21

VIP (1)
141:24

Visa (2)
93:10,11

Visual (20)
23:10,12;41:23;42:6,
9,10,17;43:1,4,5,6,13,
13,20,21;112:1;113:5;
148:3;152:23;172:10

VPI (1)
42:24

VSI (270)
16:25;23:3,3,9,19,
20;24:2,8;25:19;26:18,
19,21;29:2,4;38:5,6,6,
9,12;43:16,17;49:4,4,6,
11;51:16;52:9,18,20,
21;53:9;54:9,18;58:3,
8,15,19;59:12,20;
60:20,22;61:1,2;63:4,
5,8;65:8,13,14,23;66:5,
9,14,17,23;67:4,18,22,
23;69:20,21;70:2,21,
24;71:23;72:1,6,7,16;
76:21;77:10,12;81:11,
12,13,18;83:1,6;87:3;
89:22;92:19;96:18,20,
21,21;97:1,6;98:6,17,
18,24,25;99:13,23,25;
100:8,8,12,14,16,16,
20;101:5,17,23;102:2;
104:13,14,17,17;105:1,
5,8,9,15;112:8,13;
115:15,17,17,18;116:1,
5,7,16;117:5;119:10,
13;120:4,7,18;122:2;
123:18,23,23,25;124:1,
3,9,10,16;128:4;132:2,
6,25;133:10,22;
135:21;136:17;137:15,
24;138:12,16,19;
139:19,22;140:10,12;
141:8,16,23;142:4,6;
149:13,13,14;151:3,7,
12;152:1,2,8,24;
153:10,11,17;155:11,
11,13,16;156:5,7;
157:4,14,21;158:5;
159:2,4,11,13;161:25;
162:3,4,7,8,12,15,20,
21;163:14,18;164:4,
20;165:7,11;166:19;
168:2,17,18;169:9;
172:13;173:10;181:10,
22,23,24,25;182:3,6;
183:19,24;184:1,2,5,
16,18;185:18,18,20;
186:19;188:6;189:1,2,
3,18;190:5,14,16,17,

18,22,25;192:25;
193:17,19;194:13;
195:6,7,11,18,21,22;
196:4;197:3,7,23;
198:16;199:21;200:2,
2,5,11,20,23;203:4,18,
23,23;204:1,4

VSI's (1)
119:23

VTI (4)
43:3,12;135:15;
195:23

**W**

W2 (5)
22:21;78:18;83:14,
17,25

W-2 (1)
172:19

wages (1)
39:7

wait (4)
40:14;52:4;181:19,
19

waiting (4)
13:18;78:18;118:14;
194:14

Walpole (4)
71:11,23;72:5,6

Walpoles (4)
70:7,10,19;168:21

W-A-L-P-O-L-E-S (1)
70:9

Wang (3)
180:3,3,4

wants (2)
90:7;201:12

warehouse (5)
86:10,13,21;87:2,7

warning (1)
194:24

wasn't (17)
16:1;37:2,19;51:6,
14;54:7,8,9,13;55:5;
63:21;75:16,17;
137:20;152:10;180:7;
199:17

waw (1)
197:1

way (8)
16:6;42:19;54:17;
69:16;128:5;150:24;
179:9;195:5

we'd (1)
201:8

We'll (28)
10:10;13:20;17:3;
20:19,20;24:25;32:15;
94:21;97:23;108:25;
109:9;126:13,24,25;
127:4;139:8;146:5,7,
12;147:13;172:3,3;

181:18;182:19;185:5;
188:2;202:2,3

we're (68)
11:12;13:11;16:8,9;
17:16;20:18;21:15,25;
22:1;23:4,4;24:20;
27:10,13;28:5;41:9;
45:7;46:11;49:5;
54:20;55:9,14;59:3;
63:8;65:4;70:24;75:8,
18;76:17;77:17;87:17;
89:8;97:8;100:11;
101:4;106:1,6;108:21;
109:9,18;117:21;
118:10,15;119:6;
120:6,17,25;121:1,2;
122:20;136:4;138:1;
139:9;140:22;143:23;
147:7,13;152:22;
153:3;164:2;172:19;
176:24;183:16;184:11;
192:8;194:6;202:1,9

we've (15)
21:8;28:1;52:16;
55:7;90:25;100:10;
106:18;122:16;137:25;
144:14;157:6;165:8;
172:2,2;175:7

Wednesday (6)
20:19;21:17;30:21;
84:18;172:20;195:17

week (13)
108:8,9,11;113:18;
117:7;133:12;137:8,9;
179:21,22,23,25;
183:12

week's (1)
108:10

weeks (2)
24:21;106:14

weigh (1)
80:19

welcome (1)
35:20

Western (1)
167:14

what's (9)
22:12;28:23;37:9;
94:11;98:17;117:19;
139:12;157:15;169:16

Where's (1)
189:15

whereas (1)
79:8

WHEREUPON (12)
14:12;28:9;65:1;
70:16;98:1;134:2;
144:4,10;154:19;
161:3;193:12;202:6

whichever (1)
31:2

who's (6)
54:25;60:2;64:1;

93:19;140:15;180:1

whole (5)
31:13,19;73:25;
99:15;183:8

whose (7)
28:19;44:2;107:10;
132:12;144:25;152:19;
171:12

William (2)
112:1;148:4

winding (1)
139:9

wire (16)
26:17;54:17;66:5,18,
20;76:22;81:25;
101:16,20;123:13,14;
127:10;141:23;167:5;
200:9;201:17

wired (7)
63:5,6;69:25;101:8,
11;106:19;155:16

wires (3)
24:17;106:19;
169:20

wise (1)
97:2

withdrawals (1)
128:13

withdrawing (1)
192:7

withheld (1)
27:24

withholding (1)
41:15

without (5)
41:7,12;73:2;90:22;
106:9

WITNESS (94)
17:24;23:13;35:15;
45:3;51:13;52:13,19;
53:1,11,18;56:9;60:21;
61:13,19;62:21;63:13,
24;64:6,17;71:25;80:2,
20,25;85:8;103:7,15;
104:2,7;108:17;109:3,
8;110:21;111:2,8,15;
118:1;121:13,18;
125:23;128:22;131:17;
132:21;133:4;138:18;
139:15,23;140:8,17;
141:15;149:2,7,24;
150:3,18;151:1,20;
158:6,23;159:3,8,15,
19,23;160:20,24;
163:17;167:10;170:8,
12,17,21;173:12,17;
174:2,7;175:10,22;
176:1,10;177:21;
178:1,20;185:1,16,24;
186:8,16;187:2,7,14;
192:13;198:6;202:15;
204:14

won (4)

23:5;31:10;40:23;
196:8

won't (3)
20:12;21:16;201:14

word (4)
12:19;67:8;107:6;
198:20

words (1)
138:16

work (17)
29:8,9;62:3,4;89:12,
15;98:21,21,21,24;
114:14;136:13;155:24;
164:1,2;184:25;193:23

working (27)
13:18;23:3;31:2,3;
54:9;64:1,5;83:15,17;
84:13,22,24;98:20;
104:16;109:13,17;
113:22;121:8;122:2;
136:10;152:7,8;183:7,
18;184:16;185:18;
190:4

works (3)
62:2;67:3;158:11

world (1)
178:23

world's (1)
155:25

worries (1)
48:14

worth (3)
33:15;138:22;
141:18

wouldn't (10)
24:4;34:1;41:10,17;
103:23,24;127:24;
143:19;156:5;187:3

writing (1)
102:3

written (3)
34:13;50:17;132:10

wrong (2)
149:25;150:4

wrote (1)
132:9

Wyoming (7)
196:17,18,20,20,23;
197:1,1

**Y**

year (5)
151:7;178:23;186:2;
195:21;196:5

years (10)
22:24;133:15,17;
136:3;141:5;163:2;
165:8,10;168:5;179:17

York (1)
191:17

You'd (2)
55:2;140:25

you'll (9)
32:21;39:5,20;42:5;
51:16;57:6;68:17;
95:6;97:12
you're (35)
12:6,16;23:2;33:19,
21,22;35:20;40:1;
45:20;47:11;54:10;
58:17,23;60:9,9;67:8;
69:2,7,11;71:7;79:21;
80:4;89:1;119:14;
129:7;143:21;169:19,
25;177:2;187:12;
190:21;192:4;198:2,3,
12
you've (10)
10:4;13:22;28:3;
48:8;52:11;146:12;
166:5,5;167:22;171:16
Young (2)
88:10,12

## Z

ZAHRALDDIN (121)
11:9;15:3,15;29:22;
35:5,9,13,17;44:21;
45:1,5;48:7,13;51:11;
52:3,8,15,22;53:4,13,
23;55:23;56:2;60:17;
61:5,9,16,22;62:18;
63:10,19;64:2,9,20;
70:12;71:21;72:2;
74:15;80:17,22;85:2;
92:10;97:11,16;
102:25;103:13,21;
104:5;108:15,19;
109:1,6;110:17,23;
111:5,10;117:23;
121:9,15;125:20;
126:22;127:5;128:20;
129:9;132:15,23;
133:6;138:7;139:10,
20;140:1,13,24;
148:20;158:19,25;
159:6,12,17,21;160:1,
8,12,18,22;163:7,15;
170:6,19;172:1;173:7,
14,20;174:4,13;
175:19,24;176:3,12,17,
23;177:3,8,15,23;
178:4,15;179:2;
184:22;185:12,21;
186:3,13,22;187:11,
16;192:6;198:1,9;
202:23;204:16
ZAHRALDDIN-ARAVENA (10)
148:24;149:4,22;
150:1,5,10,14,23;
151:17;158:1
zero (5)
39:9,9,9,12;196:20
Zoom (1)

192:15

## 0

0125 (6)
145:24;146:8;
147:21,25;149:16;
160:5

## 1

1 (10)
55:2;70:13;102:20;
111:25;123:6;132:6;
159:10;182:5;185:2,6
1,000,000 (1)
194:17
10 (1)
182:20
10:00 (1)
202:13
100 (4)
32:2,15;80:21;81:1
1099 (20)
13:18;22:19;23:18,
20;24:12;25:1;38:5,8,
14,15;67:9,20;83:14,
17;95:12,13,20;96:14;
98:20;155:14
1099s (1)
166:8
10th (1)
165:3
11 (5)
16:13;17:4;18:12;
91:12;191:20
1105 (2)
112:1;148:4
112 (1)
32:2
11th (1)
202:12
12 (5)
36:2;44:25;45:15;
109:25;110:6
13 (3)
32:18;36:16;191:15
14 (4)
39:15;42:1,7;186:1
15 (15)
21:7;22:22;39:21;
42:13;50:9;59:15,21;
66:13;67:10,15,18;
91:9;97:9;156:17;
203:15
150 (3)
115:6;119:13;
138:19
15th (3)
58:18;72:20;203:24
16 (2)
69:22;154:3
17 (1)

33:7
188 (1)
30:3
19020 (1)
112:2
19103 (1)
113:12
1st (3)
148:12;149:12;
161:14

## 2

2 (4)
30:6;110:6;185:2,6
20 (4)
44:17;86:4;97:9;
179:14
200 (1)
115:6
2004 (3)
142:11;147:19;
202:12
2004-1 (1)
142:12
2009 (1)
113:11
2018 (4)
179:14;180:7,11;
183:5
2019 (5)
180:11,14,15;194:8,
9
2020 (10)
31:19;42:22;110:15;
117:11;180:7,16,17,
21;182:13;194:15
2021 (2)
43:2;58:17
2022 (11)
38:12;43:3;99:2;
151:7;152:5;153:6,7,
10;157:18;195:22;
196:15
2023 (76)
30:4;37:11;38:21,
22;39:21;42:13,13,14,
14;46:14,14,18,19;
49:9;50:1,8,9,13;51:4;
55:2;58:18;59:15,21;
66:13,25;67:10,10,15,
18,19;69:18,22;71:13;
72:20;74:11;86:8,9;
91:10,15;92:23;93:14;
95:17;98:8;100:23;
102:14,15;112:1;
113:4;114:24;119:21;
120:9;122:25;130:2;
131:2;134:6;137:18;
148:12;149:12;152:5,
14;153:13;154:3;
156:17;157:19;159:9;
160:4,16;161:15,19;

172:14;188:12,13;
189:18;191:20;203:15,
24
20th (2)
88:4;154:12
21 (1)
38:21
224 (1)
36:2
23 (2)
83:8;86:5
23,000,000 (1)
189:19
230706 (1)
188:6
23-10763 (1)
123:5
23rd (1)
83:8
24 (5)
39:2,15;42:1,7;168:8
25 (3)
78:15;86:5;128:8
253 (1)
38:21
26 (1)
36:2
27th (3)
169:16;202:22;
203:3
28 (4)
29:17;30:6;32:18;
33:7
2879 (4)
145:17;146:7,9;
153:21
28th (1)
169:16
2950 (1)
145:20

## 3

3/16/23 (1)
69:15
30 (10)
39:24;42:13;46:14,
14,18;78:12;113:4;
114:24;122:25;181:18
300 (3)
44:16,25;45:18
31 (6)
39:21,24;42:13,14;
44:18;69:15
31st (1)
161:14
35 (2)
188:17;194:21
360 (5)
20:9;21:11;31:14;
55:15;196:12
3D (5)
85:9;90:22;181:10,

11;195:24
3rd (2)
161:22;162:3

## 4

4 (1)
185:8
4:23 (1)
204:19
40 (1)
188:20
45 (1)
114:8

## 5

5 (7)
30:3,5;108:11;
123:10;125:6,17;
164:16
5,000 (1)
194:16
50 (2)
145:20;194:7
5000 (1)
194:1

## 6

60 (1)
106:5
600 (1)
178:23
60-day (1)
24:6
65 (4)
90:25;99:15;194:22;
195:2
65-inch (3)
90:20,20,23
6th (4)
165:3;188:12,13;
189:18

## 7

750 (2)
73:15;96:24

## 8

8 (1)
91:12
89 (1)
56:25

## 9

9 (6)
36:2;39:2;44:25;
45:15;109:25;191:15
9/11/23 (1)

```
 1        IN THE UNITED STATES BANKRUPTCY COURT

 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                                  -  -  -
       IN RE:                    ) Chapter 11
 4                               )
       STREAM TV NETWORKS,       ) Bankruptcy No. 23-10763
 5     INC.,                     ) (MDC)
                                 )
 6              Debtor,          )
                                 )
 7     TECHNOVATIVE MEDIA,       )
       INC.,                     ) Bankruptcy No. 23-10764
 8                               ) (MDC)
                Debtor.          )
 9                               )
                                 )
10                               )
                                 )
11                               )

12

13

14

15

16

17

18      REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
       WITHOUT AUTHORIZATION FROM THE CERTIFYING
19     AGENCY

20

21

22

23

24

25
```

1          2004 EXAMINATION OF AMANDA GONZALEZ, a

2     witness herein, called by the U.S. Trustee for

3     examination, taken pursuant to the Federal

4     Rules of Bankruptcy Procedure, by and before

5     Alyssa A. Repsik, Court Reporter and a notary

6     public in and for the Commonwealth of

7     Pennsylvania, held at 900 Market Street, Room

8     320, Philadelphia, Pennsylvania on Wednesday,

9     December 20, 2023, at 10:12 a.m.

10    COUNSEL PRESENT:

11    For the Debtor:
      Rafael X. Zahralddin, Esq.
12    Lewis Brisbois Bisgaard & Smith
      500 Delaware Avenue, Suite 700
13    Wilmington, DE 19801
      Rafael.zahralddin@lewisbrisbois.com
14
      Bennett G. Fisher, Esq.
15    Lewis Brisbois Bisgaard & Smith
      24 Greenway Plaza, Suite 1400
16    Houston, TX 77046
      Bennett.fisher@lewisbrisbois.com
17

18    For the United States Trustee:
      Kevin P. Callahan, Esq.
19    John Schanne, Esq.
      Office of the United States Trustee
20    Robert NC Nix, Sr., Federal Building
      900 Market Street, Room 320
21    Philadelphia, PA 19107
      Kevin.p.callahan@usdoj.gov
22    John.schanne@usdoj.gov

23
      Also Present:  James Gannone
24                   Frederick Baker

25

− − −<br>
I N D E X

WITNESS                                         PAGE

Amanda Gonzalez

  By Attorney Callahan                              5

1          P R O C E E D I N G S

2              AMANDA GONZALEZ, a witness herein,

3     having been first duly sworn, was examined and

4     testified as follows:

5              ATTORNEY CALLAHAN:  Good

6     morning.  My name Kevin Callahan, I'm counsel

7     to the United States Trustee.

8              This is the continued 2004

9     examination of the debtor began on November

10    13th, 2023, at which time Mathu Rajan provided

11    testimony as the debtor's selected witness

12    pursuant to a subpoena, served through

13    acceptance of counsel, which subpoena required

14    a representative under FRBP 7030 and FRCP 30 to

15    testimony.

16             The U.S. Trustee is authorized to

17    conduct this examination of the designated

18    representative of Stream TV Network, Inc.,

19    Bankruptcy No. 23-10763, and Technovative

20    Media, Inc., 23-10764.

21             In the meeting room today on behalf

22    of the United States Trustee is myself,

23    Frederic J. Baker, assistant United States

24    trustee, John Schanne, trial attorney , and

25    James Gannone, bankruptcy financial analyst.

... Networks, Inc. & Technovative Media, Inc.

1          And if you don't mind, if you could

2     introduce yourselves, the representatives of

3     the debtor.

4               ATTORNEY FISHER:  Sure.

5     Bennett Fisher, B-E-N-N-E-T-T, Fisher,

6     F-I-S-H-E-R, on behalf of Stream TV and

7     Technovative.

8          And with me today is lead counsel on

9     the case, Rafael Zahralddin, and our debtor's

10    representative, Amanda Gonzalez.

11                     EXAMINATION

12    ATTORNEY CALLAHAN:

13         Q.    And, Ms. Gonzalez, good morning.

14         A.    Good morning.

15         Q.    I'm going to ask you a series of

16    questions about the debtor.

17               ATTORNEY CALLAHAN:  And is it

18    correct that the debtor has designated

19    Ms. Gonzalez as the designee?

20               ATTORNEY ZAHRALDDIN:  Yes, the

21    debtor has designated Ms. Gonzalez as the

22    designee.

23    BY ATTORNEY CALLAHAN:

24         Q.    Okay.  And at the previous

25    examination the debtor's representative and

1    counsel acknowledged -- representative, I mean,

2    Mathu Rajan and counsel acknowledged that the

3    initial production of documents was

4    insufficient under the requirements of the

5    subpoena.

6            The examination was continued to

7    December 18th, and for circumstances that don't

8    have to go in to today, it was continued to

9    today and this examination was continued to

10   allow the debtor to produce the documents and

11   testify about them.

12           Ms. Gonzalez, you were not here at

13   the prior examination.  I'm going to ask you

14   some questions about why the debtor designated

15   you to testify on their behalf today.

16       A.    Okay.  I am the keeper of the

17   documents.  I know where pretty much everything

18   is that they needed to be produced.

19           So I was designated to gather all

20   that information, as well as I prepared the

21   MORs and balance sheets with Bennett for the

22   filings.

23       Q.    Okay.  And can you tell me a little

24   bit about your relationship with Stream TV and

25   Technovative?

1    A.    Sure.  I started at Stream on

2  April 22, 2019, pretty much one year before

3  everything went downhill.

4         So I was hired to be Roger Rajan's

5  executive assistant.  I also helped with, you

6  know, office duties other than assisting him.

7  I never actually met Mathu until after the

8  other side tried to take over and do whatever

9  they did.

10         Actually, I never met him in person

11  until the end of that year but it was all

12  electronic and, you know, I was helping with

13  the filings for the court and things like that.

14         So now I've become a paralegal.

15    Q.    Well, do you have a title with

16  Stream TV?

17    A.    Project manager now.

18    Q.    And when did you become project

19  manager?

20    A.    He changed our roles last year.

21    Q.    In 2022?

22    A.    Yes.  Yep.

23    Q.    Excuse me.  And what were you doing

24  before that?  Before 2019 when you went to work

25  for -- first went to work for Stream?

1      A.    I was a business manager for Steve

2  Harbaugh.  I don't know if you've heard of

3  Harbaugh Villages over in Mullica Hill?  He

4  owns that.

5          He has a construction company down

6  in Avalon Stone Harbor and he also has storage

7  facilities all through Gloucester County.

8      Q.    And by way of educational

9  background?

10     A.    High school.

11     Q.    Okay.  And you've worked in it --

12 worked with respect to managing companies --

13     A.    Managing companies.  I did

14 bookkeeping ever since I was 20.  I'm not an

15 accountant by any means, but I'm good with

16 numbers, for the most part.  He might disagree.

17         But, yeah, I've done bookkeeping my

18 whole adult career.

19     Q.    So you're --

20     A.    In certain aspects.  I'm sorry.

21     Q.    Go ahead.  Please, if I interrupt,

22 please keep going.

23         So the company filed on March 15,

24 2023.  Were you employed by Stream TV prior to

25 that date?

1      A.    Only up until 2020, the end of 2020.

2   And then we were no longer employees because of

3   what happened.

4      Q.    And when -- just generally describe

5   what happened.

6      A.    So Shadron Shastney, Alastair

7   Crawford, Hawk, among several others, decided

8   that they wanted to take over the company.  So

9   they drew up an omnibus agreement.  The omnibus

10  agreement was, in their eye, valid.  We never

11  actually went to court in reference to it until

12  September of 2020.

13          Laster, you know, took their side on

14  many of the matters and gave them, I guess, a

15  preliminary injunction maybe.  Sorry.  It's so

16  much.

17          And then we kept fighting.  I know

18  we went to the Supreme Court and we won five to

19  zero to over -- overturn Laster's rulings.  We

20  were all excited.

21          And then they never gave us our

22  assets back.  They never followed any of the

23  rules of the Supreme Court.  Laster did try to

24  enforce it as much as he could -- or I should

25  say as much as he wanted to -- and we still to

1    this day do not have our assets back.

2             But we're trying to, you know, push

3    through.  If that hadn't happened, we would be

4    in production.  We would be in the stores.  You

5    would see us everywhere.  But because they

6    decided to be greedy, here we are.

7        Q.    Okay.  And when did you -- when were

8    you rehired by Stream?

9        A.    I am still not hired.  I'm a

10   contractor right now for Stream.

11       Q.    Okay.  And what is the arrangement?

12   Do you have a relationship -- contractual

13   relationship with Stream as an independent

14   contractor?

15       A.    No.  I bill them biweekly.  So we

16   get paid twice a month on the 7th and the 22nd

17   of every month.  And, no, there's really no

18   contract.

19            It's just the hopes that, you know,

20   we get back up and running, we become employees

21   again.

22       Q.    So from March 15th -- and that's,

23   again, the filing date of both Stream and

24   Technovative -- you were acting as an

25   independent contractor?

1          A.     Absolutely.

2          Q.     And you were being paid monthly from

3     March through February?

4          A.     Bimonthly.  Yep.

5          Q.     Bimonthly.  And who was paying you

6     for your services?

7          A.     Up until -- I don't remember what

8     month, but there was -- it was VSI until, I

9     want to say, July.  I don't remember exactly

10    when Stream started paying us again.

11                    ATTORNEY FISHER:  Kevin, can I

12    clarify something?

13                    ATTORNEY CALLAHAN:  Are you

14    going to ask a question?

15                    ATTORNEY FISHER:  No.

16                    ATTORNEY CALLAHAN:  No.

17                    ATTORNEY FISHER:  No, just a

18    clarification, because I think you mean the

19    same thing.  You said bimonthly instead of

20    semimonthly.

21                    ATTORNEY CALLAHAN:  Okay.

22                    ATTORNEY FISHER:  Because I

23    think she said she's being paid, you know,

24    every two weeks, twice a month.  So when she

25    submits an invoice, you used the word

1     "bimonthly" or she used the word "bimonthly."

2                    THE WITNESS:  I think I did,

3     yeah.  It's just twice a month.

4                    ATTORNEY FISHER:  It's every

5     two months, not twice a month.

6                    ATTORNEY CALLAHAN:  Okay.  She

7     used the word "bimonthly."

8                    THE WITNESS:  Sorry.

9                    ATTORNEY CALLAHAN:  But I

10    assumed it was semimonthly.

11    BY ATTORNEY CALLAHAN:

12         Q.    So it's twice a month?

13         A.    Yes.  Correct.  The 7th and the

14    22nd.

15         Q.    All right.  So are there other

16    individuals who are being made as independent

17    contractors --

18         A.    Yes.

19         Q.    -- twice a month?

20         A.    Yep.

21         Q.    And that's at least since March

22    of -- March 15, 2023?

23         A.    Yes.

24         Q.    Okay.  How many other contractors?

25         A.    So three.  Three others.  Plus we

Stream TV Networks, Inc. & Technovative Media, Inc.

1   have contractors in China that we pay, as well.

2        Q.   Okay.  And, again, you described

3   your duties as helping prepare the monthly

4   reports?

5        A.   Yep.  Ever since we filed for

6   bankruptcy I deal with the monthly reports.  I

7   deal with the -- I reconcile the bank accounts.

8   I work with Jeeva Rajan.

9             She does a lot of the banking.  I

10  don't have access to the bank accounts, but I

11  do get the bank statements and I reconcile them

12  with QuickBooks.

13            That doesn't sound like a lot, does

14  it?  And that's it, I think.

15       Q.   Okay.  With respect to the bank

16  statements, isn't it correct that bank

17  statements that Stream had showed little or no

18  activities --

19       A.   Absolutely.

20       Q.   -- since the filing of the case?

21       A.   Until recently.  Right.

22       Q.   Just had someone walk in.

23            Okay.  Now I'm going to show you a

24  document that was filed with the Bankruptcy

25  Court.  Not an exhibit.

1          And can you tell me if you had seen

2     this document before?

3          A.     Yes.

4          Q.     And could you describe for me what

5     you think it is?

6          A.     This is the -- this is where you

7     requested -- inquired on certain points that we

8     had to -- yeah, we had to produce documents on.

9          Q.     Okay.  This is, for the record, a

10    consent order that was filed by the Bankruptcy

11    Court that authorized this 2004 examination.

12          And, Ms. Gonzalez, I'm going to ask

13    you to take a look at Exhibit A.

14          Are you there?

15          A.     Yep.

16          Q.     And, Ms. Gonzalez, I will represent

17    to you that that was an attachment that was

18    filed with the Bankruptcy Court indicating the

19    topics that we wanted to discuss with the

20    designated representative of the debtor.

21          A.     Okay.

22          Q.     And I'm going to ask you some

23    questions with respect to the topics.

24          And you have seen this document

25    before?

1    A.    Yep.

2    Q.    Okay.  Do you see Topic 1?

3    A.    Mm-hmm.

4    Q.    The question is, "How the financial

5  obligations of Stream TV Networks and

6  Technovative Media, and collectively with

7  Stream, the debtors, have been paid during the

8  bankruptcy proceeding, when they have been

9  paid, at whose direction they have been paid,

10  and by whom the payments have been made."

11       Is that correct?

12    A.    Yep.

13    Q.    And if you go to Attachment B, which

14  defines "Documents."

15       Do you see that?

16    A.    Mm-hmm.

17    Q.    And did you read that previously?

18    A.    I did.

19    Q.    And did you discuss that with other

20  people in the company and Stream TV and

21  Technovative?

22    A.    Yeah.  We had an internal meeting

23  about it.

24    Q.    And who was present at the internal

25  meeting?

Deposition of Amanda Gonzalez                                  ... Networks, Inc. & Technovative Media, Inc.

1        A.    Myself, Mathu, Suby, and Nicole.

2        Q.    Okay.  And I'm going to go back to

3    Topic 1, and I'm going to ask you how -- what

4    did you do to find documents relating to

5    responding to Topic No. 1?

6        A.    Okay.  So a lot of -- a lot of the

7    payments were, you know, up until recently,

8    were paid through VSI.  And so Mathu -- what

9    would happen is the bills come in.  I put them

10   in the system, and then when it came time to

11   pay them -- some our auto debited so it's

12   already known that that's approved because we

13   set that up.

14            And then there's other invoices that

15   come in that have to be approved by Mathu.  So

16   via phone call or message, text message, we

17   would say, "Hey, can we pay this today?"  You

18   know, "They're looking for payment," or

19   whatever.  And then Mathu would "yes" or "no"

20   -- mostly yes.

21            And depending on which vendor it

22   is -- there's only two I really pay -- I pay

23   through credit card.  Ms. Rajan would pay it.

24   She pays 99 percent of the bills.

25       Q.    Okay.  So how -- when you say you

1    put into the system and then there were certain

2    items that were auto debited?

3        A.    Right.

4        Q.    From what source would they be auto

5    debited?

6        A.    The bank account.  They would come

7    right out of the bank account.

8        Q.    And which bank account would that

9    be?

10       A.    It was VSI.

11       Q.    So --

12       A.    Yeah.  Until recently.

13       Q.    So were you keeping the books and

14   records for VSI, as well?

15       A.    I was reconciling them for

16   Ms. Rajan.  I didn't, you know, really have

17   anything to do with VSI, per se.  But I would

18   help her with the books and records.

19       Q.    So unless you were --

20       A.    To make sure they were --

21       Q.    I'm sorry.

22       A.    That's okay.

23       Q.    Did Ms. Rajan have a -- was she

24   employed by VSI?

25       A.    She's a contractor, as well.

1    Q.    Okay.  But for Stream?

2    A.    I believe so.  But I believe she

3    also is -- I don't know.  I really don't know

4    how that relationship works.

5    Q.    Were you -- are you familiar with a

6    company called "Inovatures" or "Innovations"?

7    A.    That's her.  Inoventures.

8    Q.    And what company is that?

9    A.    That's her.  That's her contracting

10   company.  That's the name she goes under.

11   Q.    And was that Ino- --

12   A.    Inoventures.  It's okay.

13   Q.    -- Inoventures a contractor for

14   Stream?

15   A.    As far as I know, yes.

16   Q.    Well, you're familiar with the

17   payments made to contractors from the books and

18   records?

19   A.    Right.  Yes.

20   Q.    Are payments made to Inoventures on

21   behalf of Stream?

22   A.    Yes.  Yep.

23   Q.    Okay.  All right.  Let's talk

24   about -- so you're saying with respect to Topic

25   No. 1 -- that's the system that you use --

1   bills would come in?

2      A.    Yep.

3      Q.    And then -- and I don't want to put

4   words in your mouth, but if you think

5   differently -- but bills would come in, you

6   would review them, and then what would you do

7   with, for example, paper bills?

8      A.    We don't really -- we don't get any.

9      Q.    Okay.  So they were electronic --

10      A.    It's all electronic, yes.

11      Q.    -- invoices?

12      A.    Mm-hmm.

13      Q.    And where would the electronic

14   invoices go?

15      A.    They are E-mailed to -- everybody is

16   instructed to copy me:  Ms. Rajan, and Mathu,

17   and sometimes Suby.

18      Q.    Would there be an accounts payable

19   journal that would be created to show all these

20   payables during a given month?

21      A.    Yeah, it's in -- we put them in all

22   through QuickBooks.  So there's -- it's all

23   right there.  Yeah.

24      Q.    Okay.  All right.  Topic No. 2, "Any

25   agreements to pay prepetition or postpetition

1    claims as per the term 'claim' is defined in

2    the bankruptcy code, asserted against the

3    debtors and any agreement to guarantee the

4    payment of such claims."

5           Did you discuss this with your -- in

6    your team -- I think you called it a team

7    meeting?

8       A.    It was a team meeting.  Honestly,

9    that meeting was just to divvy up the inquiries

10    of what you needed.  I think I did, I want to

11    say, 10 or 11.

12           Yeah.  11.  I worked on 11.  So any

13    E-mails that I got with the invoices, they're

14    all in that Box that we created under

15    inquiry 11.  Other things were divvied up

16    mostly to Suby.  And I'm just looking --

17               ATTORNEY ZAHRALDDIN:  Mr.

18    Callahan, can I ask a question just to clarify?

19           Ms. Gonzalez, can you please

20    identify who Suby is?

21               THE WITNESS:  Suby.  Suby

22    Joseph.  He does the -- forecasting the

23    financials for Stream TV.

24               ATTORNEY ZAHRALDDIN:  Does he

25    have any other tasks related to the books and

 1      records?

 2                        THE WITNESS:  No.

 3                        ATTORNEY ZAHRALDDIN:  Okay.

 4      BY ATTORNEY CALLAHAN:

 5          Q.    Okay.  Let's go back to Topic 2.

 6          A.    Okay.

 7          Q.    Did you say you did not participate

 8      in the -- the production of any documents with

 9      respect to this topic?

10          A.    No.

11          Q.    You did not?

12          A.    Mm-hmm.

13                        THE REPORTER:  Is that a yes

14      or a no?

15                        THE WITNESS:  No.  Sorry.

16                        ATTORNEY ZAHRALDDIN:  What's

17      question two?

18                        THE WITNESS:  "Any agreement

19      to pay any prepetition or postagreement claims

20      asserted against the debtors and any agreement

21      to guarantee the payment of such claims."

22      BY ATTORNEY CALLAHAN:

23          Q.    You don't recall --

24          A.    I don't.

25          Q.    -- being involved in this topic --

Stream Networks, Inc. & Technovative Media, Inc.

1      A.     No.

2      Q.     -- investigation?

3      A.     No.

4      Q.     Okay.  Question No. 3, "Information

5  regarding the issuance of shares from Stream

6  and/or Techno to VSI's semiconductor."

7      A.     Yep.  We have sub agreements stating

8  that any money raised through VSI is infused

9  into Stream for shares of Stream.

10     Q.     Okay.  Did you participate or lead

11 any tasks in obtaining information regarding

12 the issuance, other than what you know?

13     A.     No, no.

14     Q.     You did not; correct?

15     A.     Mm-hmm.  Nope.

16     Q.     You did not?

17             ATTORNEY ZAHRALDDIN:  Can I

18 ask a point of clarity?

19             Ms. Gonzalez, don't you prepare the

20 monthly operating reports?

21             THE WITNESS:  I do.

22             ATTORNEY ZAHRALDDIN:  Do the

23 monthly operate reports contain information

24 regarding payments from VSI?

25             THE WITNESS:  Yeah.  VSI sends

Stream Networks, Inc. & Technovative Media, Inc.

1     us a letter monthly now saying, you know, based

2     on the money that they paid on our behalf, or

3     we're putting into our bank accounts that they

4     get a certain number of shares based on the

5     money.

6                    ATTORNEY ZAHRALDDIN:  Okay.

7     So even though you weren't gathering those, you

8     do have information -- you do know?

9                    THE WITNESS:  I do know that,

10    yeah.

11                   ATTORNEY ZAHRALDDIN:  Okay.

12    Thank you.

13    BY ATTORNEY CALLAHAN:

14         Q.    So when this document was presented

15    to Stream and you, you had no information

16    regarding the communications?

17         A.    I just had -- I mean, I have

18    possession of the sub agreements.  I do have

19    those.

20         Q.    But you were not involved in the

21    search for any further communications -- I'm

22    sorry -- for any other information regarding

23    the issuance of shares?

24                   Were you involved in the issuance of

25    shares?

1      A.     Not al all.

2                  ATTORNEY FISHER:   Objection.

3    Form.

4    BY ATTORNEY CALLAHAN:

5      Q.     You can still answer the question.

6      A.     Sorry.

7      Q.     No, was your answer; right?

8      A.     Yeah.  No.

9      Q.     No. 4, "Any agreements, discussions,

10   and understandings of the debtors to designate

11   VSI as an exclusive distributor that will

12   accept orders from and make delivery to

13   third-party customers."

14                 Were you involved in any review of

15   agreements, discussions, and understandings

16   with respect to designating VSI's exclusive

17   distributor?

18     A.     No.  I don't even think I've ever

19   heard that.

20     Q.     Okay.  No. 5 --

21                 ATTORNEY ZAHRALDDIN:

22   Ms. Gonzalez, you realize we have a

23   subscription support agreement with VSI?

24                 THE WITNESS:  I do.

25                 ATTORNEY ZAHRALDDIN:  Okay.

1   She doesn't understand what you mean by those

2   things.

3               THE WITNESS:  Yes.

4               ATTORNEY ZAHRALDDIN:  Do you

5   understand what the subscription support

6   agreement is about?

7               THE WITNESS:  Yeah.

8   Absolutely.

9               ATTORNEY ZAHRALDDIN:  Can you

10  please explain that?

11              THE WITNESS:  I don't know the

12  specifics.  I just know that -- look.  This is

13  me playing dumb because I really have no clue.

14          I know that we're trying to

15  restructure the company so that we can go back

16  into business and market our amazing

17  technology.

18          Like, that's my understanding, so

19  whatever they need me to do, I do.

20  BY ATTORNEY CALLAHAN:

21      Q.    Okay.

22      A.    And preparing the MORs and doing --

23      Q.    All right.  Let me just --

24      A.    -- the balance sheets is what I do.

25      Q.    I want to keep to these topics right

1    here.

2          A.    No.  That's fine.

3          Q.    And when this was received by the

4    debtor and you had a team meeting I want to

5    understand whether you were involved in looking

6    for documents --

7          A.    No.

8          Q.    -- as that's defined in

9    Attachment B.

10               You were not; correct?

11         A.    No, I did not.

12         Q.    When you say no, you mean --

13         A.    No, I did not look for any documents

14   for production for that, no.

15               ATTORNEY FISHER:  All right.

16   Wait for him to finish because she's going to

17   throw something at us.

18               ATTORNEY CALLAHAN:  I'm sorry.

19               THE WITNESS:  I'm sorry.

20               ATTORNEY FISHER:  You're both

21   talking at once so I was just asking Amanda to

22   wait for you to finish speaking before she

23   starts.

24               THE WITNESS:  Sorry.

25               ATTORNEY FISHER:  This goes

Deposition of Amanda Gonzalez                                                       Stream Networks, Inc. & Technovative Media, Inc.

```
 1    for you, too, Kevin.
 2                  ATTORNEY CALLAHAN:  Okay.
 3    BY ATTORNEY CALLAHAN:
 4        Q.    Okay.  You said you were not
 5    involved or participating -- participated in
 6    the negotiations or discussions or agreements.
 7                  Do you have any idea how that was
 8    done?
 9        A.    The -- the --
10        Q.    How those agreements were reached
11    between VSI and Stream to allow Stream -- I'm
12    sorry -- to allow VSI to become an exclusive
13    distributor?
14        A.    No.  All I know is that there's an
15    independent board on VSI's side that negotiated
16    that with Stream.
17                  That's all I know.
18        Q.    Okay.
19                  ATTORNEY ZAHRALDDIN:  But,
20    Ms. Gonzalez, have you ever processed payments
21    for a law firm for VSI?
22                  THE WITNESS:  Yes.
23                  ATTORNEY ZAHRALDDIN:  Okay.
24    Can you identify the law firm, please?
25                  THE WITNESS:  Lewis Brisbois.
```

Deposition of Amanda Gonzalez                                                        Stream TV Networks, Inc. & Technovative Media, Inc.

```
 1              ATTORNEY ZAHRALDDIN:  No.  For
 2    VSI.
 3              THE WITNESS:  Oh, for VSI.  I
 4    have to think because it's been a while.  I've
 5    put in invoices for them.  Who was that?  I
 6    don't remember their names.
 7              ATTORNEY ZAHRALDDIN:  But they
 8    have independent counsel; right?
 9              THE WITNESS:  Yes.  Yes.  They
10    have independent counsel.  I can't remember the
11    name.
12              ATTORNEY ZAHRALDDIN:  Can you
13    also clarify there were no payments to Lewis
14    Brisbois, please?
15              THE WITNESS:  Yeah.  Sorry.  I
16    was thinking of Stream.  I'm sorry.  That's my
17    main thought.
18              ATTORNEY ZAHRALDDIN:  Thank
19    you.
20              THE WITNESS:  I'm sorry.
21              ATTORNEY ZAHRALDDIN:  I know
22    we had a lot in the pleadings, but --
23              THE WITNESS:  I don't have VSI
24    on my brain ever, so I'm sorry.
25    BY ATTORNEY CALLAHAN:
```

1      Q.    Okay.  But I have -- that's not

2  necessarily what I was asking, but I will

3  follow up on that.

4                    ATTORNEY ZAHRALDDIN:  Yes.

5  BY ATTORNEY CALLAHAN:

6      Q.    I think Rafael asked you whether you

7  were involved or aware of a payment to a law

8  firm representing -- who represented VSI?

9      A.    Yes.

10     Q.    And I think he asked do you know who

11 that was?

12     A.    Yeah, I didn't process the payment.

13 I did put in the invoices for them.  And I

14 can't think of their name right now.

15     Q.    Do you remember when?

16     A.    It had to have been in the summer.

17     Q.    This summer?

18     A.    Yeah.  I can't think of the name.

19     Q.    Okay.  We'll come back to that.

20     A.    All right.

21     Q.    All right.  I want to go back to

22 the --

23     A.    I can look it up.  Can I look at my

24 texts?

25                    ATTORNEY FISHER:  No.

1    BY ATTORNEY CALLAHAN:

2        Q.    Similar question for No. 5.  No.

3    Thank you, though.

4              No. 5, "Any agreement, discussion,

5    and understanding by the debtors with VSI to

6    fund the debtor's operations and pay the

7    debtor's expenses since March 15, 2023."

8              And, again, when you had your team

9    meeting going over this document, Attachment A,

10   Topic 5 --

11       A.    That would be the subscription

12   agreements.  So I have those.  I think we all

13   had those.

14              ATTORNEY FISHER:  May I ask a

15   question?

16              Ms. Gonzalez, you referenced sub

17   agreements a few minutes ago.  Are those the

18   subscription agreements?

19              Is "sub" short for subscription?

20              THE WITNESS:  Subscription

21   agreements.  Yes.  Yep.

22   BY ATTORNEY CALLAHAN:

23       Q.    Okay.  But I'm trying to find out

24   whether there were any discussions that -- or

25   E-mails that you found -- well, let me go back.

Deposition of Amanda Gonzalez                          Ideanomics Networks, Inc. & Technovative Media, Inc.

1          Were you assigned to find any

2    agreements, discussion -- any memorialized

3    documents?

4          A.    No.  The only thing I produced for

5    that was the subscription agreements

6    themselves.  That was it.

7          Q.    Excuse me.

8          A.    And then I -- because I didn't have

9    anything to do the -- I wasn't on the E-mails,

10   I wasn't -- so I would not be able to find

11   anything like that in -- as far as

12   correspondence goes because I wasn't as

13   involved.

14              ATTORNEY ZAHRALDDIN:

15   Ms. Gonzalez, who was responsible for putting

16   things into the Box?

17              THE WITNESS:  Me.

18              ATTORNEY ZAHRALDDIN:  Okay.

19              THE WITNESS:  Well, depending

20   on what it was.  Like, for this, it was split.

21              ATTORNEY ZAHRALDDIN:  Okay.

22   Can you please explain -- can you please

23   explain who was putting stuff in the Box?

24              THE WITNESS:  Okay.  So I

25   would put documents into the Box, as I

1   mentioned before we made that folder just for

2   this.

3           So Inquiry 5 would have the

4   subscription agreements, and then whatever -- I

5   don't know who was assigned to it.  I think it

6   might have been Suby -- whatever communications

7   regarding that would have been.

8                   ATTORNEY ZAHRALDDIN:  Can you

9   please explain how Mr. Joseph has access to

10  these things, where he looked?

11                  THE WITNESS:  Suby would have

12  been privy to these E-mails, I would assume, to

13  get the communications.

14  BY ATTORNEY CALLAHAN:

15      Q.    You don't have personal knowledge of

16  that?

17      A.    I don't.

18      Q.    Okay.  No. 6, "Any agreement,

19  discussion, and understanding by the debtors

20  with VSI to fund the debtor's subsidiaries" --

21  excuse me -- "including but not limited to SCBB

22  Netherlands since March 15th."

23          Were you part of the search for

24  documents with respect to any agreement,

25  discussion, or understanding with VSI to

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit transcrips   Page 108 of 171

Deposition of Amanda Gonzalez
In re Stream TV Networks, Inc. & Technovative Media, Inc.

1   fund --

2        A.    No.  I wasn't assigned that task.

3        Q.    No. 7, "Payments made by VSI or

4   persons" -- "or any person or entities on

5   behalf of the debtors to the debtor's officers,

6   directors, and employees."

7        A.    The only person that was paid --

8        Q.    Well, my question is would you be

9   responsible for --

10       A.    No.

11       Q.    -- identifying the payments made by

12  VSI or any person or entity on behalf of the

13  debtors?

14       A.    No.

15       Q.    No. 8, "Payments made by VSI or any

16  person or entity on behalf of the debtor to

17  debtor's affiliates."

18       A.    I mean, no.  No payments.

19       Q.    Would -- this is payments made by

20  VSI, and I think --

21       A.    Yeah.  No.

22       Q.    -- for a moment, it may be an

23  offhand remark, but you said you had nothing to

24  do with VSI?

25       A.    Yeah.  No.  Yeah, no.

1    Q.    So with VSI, that would -- you think

2    would be Ms. --

3    A.    Rajan.

4    Q.    -- Rajan?

5    A.    Yeah.

6    Q.    And that would be Mathu Rajan's

7    mother?

8    A.    Correct.

9    Q.    Do you know who she would get

10   direction from to make payments?

11   A.    I don't.

12   Q.    Okay.

13            ATTORNEY ZAHRALDDIN:  Ms.

14   Gonzalez, can you please explain to me how

15   payments are approved since you're the one who

16   receives all payments?

17            THE WITNESS:  Well, yeah.  As

18   I mentioned before, any payments made for

19   Stream is put into QuickBooks.  Then when the

20   time comes it's either auto debited or we go to

21   Mathu to get it approved.

22            Once he says yes, Ms. Rajan

23   typically pays it.

24            ATTORNEY ZAHRALDDIN:  Okay.

25   BY ATTORNEY CALLAHAN:

1      Q.     Okay.   No. 10, "How the debtors

2   tracked, identified, monitored, and booked for

3   accounting purposes the payments made by VSI or

4   any person or entity on behalf of the debtors

5   to the debtor's officers, directors, and

6   employees, the debtor's affiliates, and any

7   third parties."

8      A.     QuickBooks.

9      Q.     So that was QuickBooks?

10     A.     Yep.

11     Q.     And you believe that would identify

12  all part -- all payments of Stream expenses,

13  and do you think that was the case since March

14  15th --

15     A.     Absolutely.

16     Q.     -- 2023?

17     A.     Yeah.

18            ATTORNEY FISHER:   Wait.   Wait

19  for him to finish.

20            THE WITNESS:   Sorry.

21  BY ATTORNEY CALLAHAN:

22     Q.     Okay.

23     A.     Yeah.   I absolutely do.

24     Q.     Now tell me about No. 11, which you

25  say you were involved with.   "Communications

Stream TV Networks, Inc. & Technovative Media, Inc.

1   between the debtors and VSI involving payments

2   made on debtor's behalf by VSI to third

3   parties."

4        A.    Okay.   The only -- I mean, honestly,

5   the only communication we have is "Here's the

6   invoice," and they would E-mail the invoices to

7   me, Mathu, and Jeeva, and sometimes Suby.

8             When I receive that I put it in into

9   QuickBooks immediately and the process begins.

10        Q.    So all invoices -- all of Stream's

11   invoices, payments would be directed to you?

12        A.    Yes.

13        Q.    And they would come from either the

14   vendor, third party, or somebody in Stream and

15   say, "Here's an invoice"?

16        A.    It's all vendors directly.

17        Q.    And you would get them?

18        A.    Yep.

19        Q.    And then you would --

20        A.    The only --

21        Q.    -- inform VSI that this invoice had

22   to be paid?

23        A.    Yeah.   Well, I would tell Mathu, and

24   then he would go wherever he goes and then he

25   comes back and approves it.

1    Q.    Okay.

2    A.    I think the only --

3    Q.    Would he approve it to you or to his

4    mother, Ms. Rajan?

5    A.    He would approve it to me but then

6    tell her.  Yeah.  He makes sure that I'm okay

7    with it so I -- just in case the vendor is

8    asking so I can go back to them and say, "Okay.

9    We're sending out a check today," or whatever.

10    Q.    Yeah.

11    A.    And then he would go tell his mom to

12    take care of it.  Because most of it is ACH

13    payments.  I don't even think we use checks

14    anymore except for the trustee.

15    Q.    And when you say -- and I don't want

16    to confuse this -- but for the first -- from

17    March until at least July VSI was making those

18    payments; correct?

19    A.    Yes.

20    Q.    Did you receive any -- did you,

21    Ms. Gonzalez, on behalf of Stream, receive any

22    confirmation directly from VSI that the payment

23    was made?

24    A.    Yeah.  Yeah.  Sorry.  Jeeva

25    always -- when she gets the payment, like,

Deposition of Amanda Gonzalez                                          18 x 2 Stream Networks, Inc. & Technovative Media, Inc.

1    she'll print it out.  Like, when she makes the

2    payment she gets a thing from the bank.

3             When she does that she sends in an

4    E-mail to me and Mathu, "This has been paid."

5             So I just put it in a Box.

6        Q.    So in terms of the production of

7    documents for this topic, did you provide the

8    U.S. Trustee, or whoever you were -- your

9    attorney those invoices that -- or E-mails from

10   Ms. Rajan to Stream, you, indicating that the

11   vendors were paid?

12       A.    I don't know if I did.  I would have

13   to check.  I know that I absolutely did every

14   invoice but I don't know if I put in there her

15   receipts.  But if I didn't, I can absolutely

16   put them in there today.  Because it's all --

17             ATTORNEY ZAHRALDDIN:

18   Ms. Gonzalez, can I ask a question?

19             THE WITNESS:  Yeah.

20             ATTORNEY ZAHRALDDIN:  Kevin,

21   do you mind?

22             Did you include E-mails and other

23   correspondence that related to payments in the

24   Box to the extent that you didn't have an

25   invoice or reimbursement forms?

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit transcrips   Page 114 of 171
Deposition of Amanda Gonzalez                                    In re: Stream TV Networks, Inc. & Technovative Media, Inc.

 1                    THE WITNESS:  I mean, every --

 2      we pretty much get invoices for everything.

 3      The only -- the reimbursement forms were more

 4      for -- yeah, like, when we did demos or

 5      something like that, like, we would get

 6      reimbursement forms for that kind of stuff.

 7               But, yeah.  That's all in there.

 8                    ATTORNEY ZAHRALDDIN:  Okay.

 9                    ATTORNEY FISHER:

10      Ms. Gonzalez, before late July --

11                    THE WITNESS:  Do you have a

12      pen?

13                    ATTORNEY FISHER:  You need a

14      pen?

15                    THE WITNESS:  Can I keep this?

16                    ATTORNEY CALLAHAN:  Yes.

17                    ATTORNEY FISHER:  Before late

18      July you didn't get any reports from VSI

19      between March 15th and late July, did you?

20                    THE WITNESS:  No.  No.  And

21      they said it's because they do theirs on a

22      quarterly basis, I believe.  So we didn't see

23      any until the end of June.

24                    ATTORNEY FISHER:  Okay.  And

25      none of that -- until late July you didn't

IonQ, Inc. & Technovative Media, Inc.

1  share any of that information with counsel, did

2  you?

3              THE WITNESS:  No.  Not until I

4  turned in the MOR.  Suby put in -- yeah.

5              ATTORNEY FISHER:  You do

6  realize that every one of those notes that you

7  take down there Kevin can see?

8              THE WITNESS:  That's fine.  I

9  told him I got to check to see if I put those

10  things in there.

11              ATTORNEY FISHER:  Okay.

12              THE WITNESS:  But I don't

13  remember if I did or not.

14  BY ATTORNEY CALLAHAN:

15      Q.    So when you compiled all the

16  information in response to these topics, what

17  did you do then?

18      A.    I put them -- I put them on my

19  desktop.  I organized them, and then I put them

20  into inquiry 11 folder in the Box folder for

21  the U.S. Trustee.

22      Q.    Okay.  And with respect to -- let me

23  go back to that.

24              With respect to Topic 12, "Purchase

25  orders referenced in pleadings in the

1    disclosure statement."  And you can read the

2    rest to yourself.

3         A.    Mm-hmm.

4         Q.    Were you involved in the production

5    of those documents?

6         A.    Yes.

7                   ATTORNEY FISHER:  Objection.

8    Form.

9    BY ATTORNEY CALLAHAN:

10         Q.    Okay.  What did you do with respect

11    to the production of these documents?

12         A.    I actually already had all the

13    purchase orders in a specific folder.  Any time

14    they need to be referenced, I can pull them up

15    immediately.

16         Q.    And when you say "The purchase

17    orders," that's the actual document itself, by

18    way of example, one with SISTAR International,

19    Limited?

20         A.    Absolutely.

21         Q.    Okay.  With respect to these

22    purchase orders, were there other documents,

23    E-mails, letters of intent, any other documents

24    or E-mails that you can think of that were not

25    produced?

1     A.    No.  We produced everything, because

2  the letters of intent were for IQH3D, BBAK

3  Sunny Hill Technology, and the POs were for

4  SISTAR.  And there's another PO not on this

5  list.

6              ATTORNEY ZAHRALDDIN:  Kevin.

7  Kevin, can I ask a question when she finishes?

8              Whenever you're ready.

9              THE WITNESS:  Yeah.  And the

10  others, like Google, they were all letters of

11  intent.  SISTAR was a purchase order and so was

12  Southern Telecom.

13              ATTORNEY ZAHRALDDIN:

14  Ms. Gonzalez, to the extent that the debtor has

15  new opportunities to come up and you get a term

16  sheet, you get maybe an inquiry and

17  correspondence, will you be supplementing that

18  on a rolling basis for the U.S. Trustee?

19              THE WITNESS:  I can get them.

20  I'm not part of that process, but I can

21  absolutely ask for them.

22              ATTORNEY ZAHRALDDIN:  Right.

23  But --

24              ATTORNEY FISHER:  No.  It was

25  never --

1        ATTORNEY ZAHRALDDIN:  -- it's

2    the intention that we put those in there;

3    correct?

4        THE WITNESS:  Yeah.

5    Absolutely.

6        ATTORNEY ZAHRALDDIN:  All

7    right.

8    BY ATTORNEY CALLAHAN:

9        Q.    Okay.  Item -- Topic No. 13, and

10   just explain again how the information was

11   obtained to put in the monthly operating

12   reports.

13       A.    Yep.  So --

14       Q.    Including, without limitation, which

15   book and records were you consulting or looking

16   at to prepare the reports?

17       A.    From the beginning I was just

18   looking at Stream's because I didn't get

19   anything from VSI.  So it was, I mean,

20   basically nothing monthly fees for -- until

21   July.

22        And then I got a report from VSI and

23   that got factored into the monthly reports and

24   we started going from there.

25        And then we actually just recently

1    went back and started implementing VSI into

2    every month starting from March until present.

3            So I didn't do anything with VSI's

4    books.  Suby would send me the numbers of what

5    was spent on Stream's behalf and then I would

6    plug those numbers into the MOR.

7            They also created a letter to the

8    U.S. Trustee, or Tom Park -- I forget --

9    stating how much they spent on behalf of VSI --

10   or Stream, and as of late, how much money was

11   put in directly to Stream's bank accounts and

12   then how many shares were turned around to VSI

13   for that money.

14       Q.    Okay.  And we'll look at them.

15           Okay.  Finally, with respect to this

16   set of topics, were you part of any meeting

17   where the information that you had found, or

18   you, meaning everyone on behalf of Stream?

19       A.    Right.

20       Q.    Were you part of any discussion with

21   counsel about the production of the documents?

22       A.    Yeah.  I mean, we have spoken with

23   them.

24       Q.    When this was completed, I'm talking

25   about, this --

Ogre Document Networks, Inc. & Technovative Media, Inc.

1        A.   I believe -- yeah, because I created

2   the Box, and then we worked with counsel to

3   make sure that everything was in the Box that

4   needed to be in Box.

5        Q.   When you say in the Boxes, you're

6   talking about --

7        A.   Sorry.

8        Q.   -- the Dropbox that was provided?

9        A.   Yeah, it's a Box account.  Yeah.

10  And it's all -- it's just for the trustee,

11  like, all the documents that you requested and

12  they're spelled out by number.

13            So if you went to 11, you would see

14  all those E-mails that I produced.

15       Q.   Okay.  Now, Mr. Rajan has told us

16  and other parties that he was sick for a period

17  of time.

18       A.   Still is.

19       Q.   I don't recall the exact dates, but

20  can you just recount the circumstances that --

21  not why he got sick, obviously, but what did

22  Stream do while he was not -- was he there

23  participating in the discussions regarding the

24  completion of the operating reports?

25       A.   I mean, yes, but not really.  I

1    mean, I worked with Bennett directly.

2          Q.    "Bennett" being Mr. Fisher here to

3    your right?

4          A.    Yeah, Mr. Fisher.  We worked

5    together on it.  If we had -- if I had to go to

6    Mathu, absolutely.  Mathu -- other than him

7    being in the hospital, you wouldn't know he's

8    sick because he won't stop.

9          Q.    Right.

10         A.    So, yeah.  So he's definitely part

11   of the conversations of what's going on with

12   the MORs and everything.

13         Q.    Okay.

14               ATTORNEY ZAHRALDDIN:  Ms. --

15   may I ask a question?

16               ATTORNEY CALLAHAN:  Yeah.

17               ATTORNEY ZAHRALDDIN:

18   Ms. Gonzalez, without -- you know, I'm not

19   asking you to give up any sort of medical

20   information on Mr. Rajan, but can you generally

21   describe what his illness is?

22               THE WITNESS:  Well --

23               ATTORNEY FISHER:  Or symptoms.

24               ATTORNEY ZAHRALDDIN:  Or

25   symptoms or --

1      THE WITNESS:  I can't say, in

2   fact, what it is because I was never told, in

3   fact, what it is, but because I like to do my

4   research and specific things that he had said,

5   it sounds to me that he has some sort of

6   cancer.

7      ATTORNEY ZAHRALDDIN:  Okay.

8   Is he -- is he restricted from being around

9   people?  Do you know?

10      THE WITNESS:  Yes.

11      ATTORNEY ZAHRALDDIN:  And does

12   he work often out of his hospital room?

13      THE WITNESS:  Yes.

14      ATTORNEY ZAHRALDDIN:  Yeah.

15      THE WITNESS:  Do his doctors

16   want to kill him?  Yes.

17      ATTORNEY ZAHRALDDIN:  Yes.  I

18   know.  I've had several conversation with the

19   doctors.

20      THE WITNESS:  They're done.

21      ATTORNEY ZAHRALDDIN:  Didn't

22   mean to put that as an aside.

23      THE WITNESS:  That's okay.

24      ATTORNEY ZAHRALDDIN:  But he

25   has been active even -- the only thing -- let

Deposition of Amanda Gonzalez                     Ledger8 Media Networks, Inc. & Technovative Media, Inc.

1    me ask you this, Ms. Gonzalez.

2                    THE WITNESS:  100 percent.

3                    ATTORNEY ZAHRALDDIN:  What

4    restricts him from attending things or from

5    coming into court?

6                    THE WITNESS:  His doctors.  He

7    would be here if he could, but he can't.  They

8    will not let him out of the hospital.

9                    ATTORNEY ZAHRALDDIN:  Has he

10   tried to schedule around treatments, as well?

11                   THE WITNESS:  Absolutely.

12   Everything is scheduled around what's going on.

13                   ATTORNEY ZAHRALDDIN:  Okay.

14   Thank you.

15                   ATTORNEY FISHER:  He's

16   immunocompromised?

17                   THE WITNESS:  Yes.

18   Absolutely.

19                   ATTORNEY FISHER:  So, you

20   know, Mr. Callahan has been coughing his way

21   through this proceeding today.  That would be

22   dangerous, then, for Mathu?

23                   THE WITNESS:  Even being

24   around me would be because I'm

25   immunocompromised, too, so I can't be around

In re Greenidge Networks, Inc. & Technovative Media, Inc.

1    him.

2                         ATTORNEY FISHER:  So we're all

3    being effected right now?

4                         THE WITNESS:  You're welcome.

5                         ATTORNEY CALLAHAN:  I can't

6    help that situation.

7                         THE WITNESS:  No, you're fine.

8                         ATTORNEY ZAHRALDDIN:  Of

9    course you can't.  Of course you can't.

10                        THE WITNESS:  I'm okay.

11   That's fine.

12                        ATTORNEY CALLAHAN:  I'm

13   staying as far from you all as I can.

14                        ATTORNEY ZAHRALDDIN:  And the

15   United States Trustee has been very, very

16   accommodating with us and we appreciate it, but

17   we do have a real situation.

18                        THE WITNESS:  Yeah.

19                        ATTORNEY CALLAHAN:  No, I

20   understand.  Okay.

21   BY ATTORNEY CALLAHAN:

22        Q.    Okay.  On -- at the last 2004

23   examination on November 13th we had a

24   discussion at the conclusion on the record

25   coming to an agreement to adjourn this to

1    December 11th, at which time it was continued

2    again to today.

3             The debtor made -- had agreed with

4    U.S. Trustee that it would do certain things,

5    and that would include the production of

6    certain documents.

7        A.    Yep.

8        Q.    The debtor agreed to file its

9    monthly operating report for October.  And the

10   debtor also agreed to file amended reports, and

11   those reports were to be filed by

12   November 27th.

13       A.    Okay.

14       Q.    You understand those reports were

15   not filed timely; correct?

16       A.    Yeah, I didn't know there was a

17   deadline.  I mean, I'm sure he mentioned it,

18   but, honestly, it's just me.

19       Q.    Yeah.

20       A.    And I was on vacation right after

21   the first meeting had happened.  He met with us

22   on a Friday and I went away for a week.  I'm

23   the only one that does that stuff.

24             So if he did mention a deadline, I

25   forget.  I don't remember if he did or not.

Deposition of Amanda Gonzalez                          Stream TV Networks, Inc. & Technovative Media, Inc.

1    I'm sure he did because he's very good about

2    being detailed, but it's me.  I have to collect

3    everything.  I have to re-do all the MORs.  I

4    have to do all of that.

5           So if it wasn't on time -- first of

6    all, doing the MORs, again, I'm not a CPA, by

7    any means.  So I had to get a lot of help from

8    Bennett on how to include the VSI information

9    because, basically, I was putting zeros in for

10   everything because that's all we had for Stream

11   so it was a little different.

12          Now I get it.  Like, now I'm good

13   going forward, but I apologize for not making

14   the deadline.  I didn't -- I just --

15     Q.    We're not taking it personally.

16     A.    I can only do so much and I'm

17   trying.  I really am, but...

18     Q.    Okay.  The debtor agreed that they

19   would submit all books and records in

20   preparation of the filing of the schedules and

21   the statement of financial affairs.

22          Do you recall talking to Mr. Rajan

23   after November 13th indicating that documents

24   had to be produced?

25     A.    Yeah.  So he told me -- so I had to

1   produce -- obviously, I had the bank

2   statements, but new bank statements, all the

3   registers, any backup invoices or anything that

4   coincided with those payments.

5        Q.   So just to clarify, and I think we

6   said this earlier, at the last examination the

7   debtor agreed that it would submit all accounts

8   receivable journals, all accounts payable

9   journals, but it -- does the debtor maintain

10  actual documents purporting to be these kinds

11  of financial statements?

12       A.   I mean, honestly, everything is in

13  QuickBooks.  It's just a printout.  So it

14  could --

15       Q.   But why haven't you produced those

16  documents?

17       A.   I was never told -- well, I did what

18  he told me, so if -- in that Box account under

19  the trustee, I created a folder just for the

20  MORs with all backup invoices, registers,

21  statements.  I'm just trying to think what else

22  is in there.

23            I was never told to create an

24  accounts payable or accounts receivable.

25       Q.   So Stream doesn't have those

Stream TV Networks, Inc. & Technovative Media, Inc.

1    particular documents?

2         A.    I mean, I can.  I can go create it

3    now.  You know what I mean?  Like, I can do it.

4    I just wasn't -- I was told I had to actually

5    produce a lot more than that.

6         Q.    Yes, that's correct.

7         A.    Yeah.

8         Q.    But you didn't -- you didn't produce

9    an accounts payable journal or an accounts

10   receivable journal because Stream doesn't have

11   those kinds of documents; correct?

12        A.    We do.  I just have to print it.

13        Q.    So why didn't you print it?

14        A.    Because I didn't know I had to

15   produce it.

16              ATTORNEY FISHER:

17   Ms. Gonzalez, can I ask you?  There are some

18   receivables that are listed on the balance

19   sheet, are there not?

20              THE WITNESS:  Correct.  And

21   payables.

22              ATTORNEY FISHER:  Okay.  And

23   those receivables are current within the last

24   year?

25              THE WITNESS:  No.

Case 23-10763-djb    Doc 1098-2    Filed 09/25/25    Entered 09/25/25 23:21:19    Desc
Exhibit transcrips    Page 129 of 171

Deposition of Amanda Gonzalez                    Greenfield Networks, Inc. & Technovative Media, Inc.

1    ATTORNEY FISHER:  Are they

2    within the last -- were they from 2022?

3    THE WITNESS:  No.  They're

4    from 2020 and previous.

5    ATTORNEY FISHER:  Okay.  So

6    why don't you have the detail for those 2020

7    and previous receivables, or do you have them?

8    THE WITNESS:  I do.

9    ATTORNEY FISHER:  Oh, okay.

10    THE WITNESS:  I'm pretty sure

11    I -- receivables?  Yeah, I think we filed them

12    with the schedule.  Yeah.

13    ATTORNEY FISHER:  Right.  But

14    do you have -- do you have all the backup

15    invoices that you can go out and collect that

16    money or are those still not returned?

17    THE WITNESS:  We do not have

18    any of that.

19    ATTORNEY FISHER:  Okay.  Can

20    you explain, then, to the Court and the U.S.

21    Trustee why we don't have that?

22    THE WITNESS:  Nicely, because

23    they still --

24    ATTORNEY FISHER:  No, no, not

25    nicely.  Just directly.

Deposition of Amanda Gonzalez                        Legal Team Networks, Inc. & Technovative Media, Inc.

1          THE WITNESS:  -- haven't given

2     our assets back.

3          THE REPORTER:  I'm sorry.  Can

4     you stay that again?

5          THE WITNESS:  Yes.  The other

6     side has not given our assets back.

7          ATTORNEY FISHER:  Define who

8     the "other side" is.

9          ATTORNEY ZAHRALDDIN:  Yeah.

10    Okay.

11         ATTORNEY FISHER:  Who's the

12    other side?

13         THE WITNESS:  Shad, Hawk,

14    Alastair.

15         ATTORNEY FISHER:  Full names.

16    Full names.

17         THE WITNESS:  I'm sorry.

18    Shadron, Alastair Crawford, Bob Morton, among

19    others.

20    BY ATTORNEY CALLAHAN:

21         Q.    All right.  So, Ms. Gonzalez, the

22    debtor also agreed, Mr. Rajan also agreed that

23    he would provide copies of all invoices in

24    connection with all expenses paid since the

25    filing of the bankruptcy case?

Deposition of Amanda Gonzalez    Ideastream Networks, Inc. & Technovative Media, Inc.

1    A.    Mm-hmm.

2    Q.    Yes, you understand--

3    A.    Yes.  I do recall that.

4    Q.    -- you recall that was one of the --

5    A.    Yep.

6    Q.    -- items?  And did you --

7    A.    Because I had to load them, yes.

8    Q.    And you provided the invoices?

9    A.    I did.

10    Q.    And is it your understanding that

11    all invoices with respect that were

12    generated --

13    A.    So I'm not completely 100 percent up

14    to date because, again, it's just me putting

15    them in there.

16    Q.    When you say "up to date," do you

17    mean today or, for example, July?

18    A.    I'm done -- March, April, May -- I

19    think I'm done through June.  I have all the

20    invoices.  I just have to load them into your

21    -- your folder so you can see them.

22    Q.    Was there any indication in the

23    folder that you provided to the United States

24    Trustee that it was incomplete?

25    A.    Just an empty folder.

1      Q.    Was there an explanation as to

2   whether more invoices would be forthcoming?

3      A.    No, and that's my fault, I guess,

4   because I didn't -- if I -- I would have loved

5   to call you directly.  I would.

6      Q.    Okay.  We also asked and the debtor

7   agreed to provide copies of monthly bank

8   statements from Key Bank and M&T Bank from

9   March 15, 2023 through the present date.

10         Did you supply those bank

11   statements?

12     A.    They should be in there, yes.

13     Q.    Are you certain?

14     A.    Nope.

15     Q.    Yeah.  Did you -- when the folder

16   was empty did you tell counsel that the folder

17   was empty?

18               ATTORNEY FISHER:  Objection.

19   Don't answer that.  That's a good call for the

20   invasion of the attorney-client privilege.

21               ATTORNEY BAKER:  No.  It's not

22   calling that.  And are you raising

23   attorney-client privilege?  Did you talk to

24   counsel?

25               ATTORNEY FISHER:  What about

 1   something specific?  In other words, did you

 2   talk to --

 3                    ATTORNEY CALLAHAN:  No.  It's

 4   did you talk to counsel or not, yes.  He didn't

 5   ask what she said to counsel.

 6                    ATTORNEY FISHER:  Can I hear

 7   the question again?  I may have jumped the gun,

 8   Fred.  I'm sorry.  Let me hear it.

 9                    (Reporter read back from the

10   record.)

11                    ATTORNEY BAKER:  That's not

12   asking for a legal conclusion or anything.

13   That's not attorney-client.

14                    ATTORNEY FISHER:  No, it's a

15   fact.

16                    ATTORNEY BAKER:  A fact is not

17   attorney client-privilege.  She's not looking

18   for your legal advice.

19                    ATTORNEY ZAHRALDDIN:  It's

20   fine.

21                    ATTORNEY BAKER:  If you want

22   to raise --

23                    ATTORNEY ZAHRALDDIN:  No, it's

24   fine.

25                    ATTORNEY FISHER:  I'll

 1     withdraw it.

 2                        ATTORNEY ZAHRALDDIN:  You can

 3     answer the question.

 4                        THE WITNESS:  No.

 5                        ATTORNEY ZAHRALDDIN:  Okay.

 6     BY ATTORNEY CALLAHAN:

 7          Q.    You did not.  Okay.

 8          A.    And also -- sorry.  I just --

 9          Q.    It's okay.

10                Did the debtor provide more

11     information regarding the commitment of $45

12     million to fund Stream through VSI?

13          A.    What was that?

14          Q.    Did you provide any information

15     regarding the commitment of $45 million to fund

16     Stream from VSI?

17          A.    Just the subscription agreements;

18     whatever the monies were in there.

19          Q.    Whatever was previously furnished;

20     correct?

21          A.    (No audible answer.)

22          Q.    Okay.

23                        THE REPORTER:  Was that a yes

24     or no?

25     BY ATTORNEY CALLAHAN:

1      Q.    Can you answer the question?

2      A.    Yes.

3      Q.    Mr. Rajan also agreed to provide a

4  copy of an invoice or receipt in connection

5  with the debtor's payment of $50,000 to Brown

6  and Michael --

7                  ATTORNEY FISHER:  Can we take

8  a break?

9                  ATTORNEY CALLAHAN:  Sure.

10  Should we take a break?

11              Off the record.

12                  (A recess was taken.)

13  BY ATTORNEY CALLAHAN:

14      Q.    Thank you.  And, Ms. Gonzalez, I

15  have to follow up with a few more questions

16  regarding a conversation we had on the record

17  at the last 2004 examination with Mr. Rajan,

18  who indicated that he would be supplying, on

19  behalf of the debtor, more information and more

20  documents pursuant to our subpoena request.

21              And right before the break I wanted

22  to ask you about an invoice or receipt or

23  documents in connection with the debtor's

24  payment of $50,000 to an entity called Brown

25  and Michael.

IdeaVillage Networks, Inc. & Technovative Media, Inc.

1          Did you produce any of those

2    documents pursuant to the subpoena?

3          A.    I did not, no.

4          Q.    Are you aware of any documents?

5          A.    I know that they're out there.  I

6    have not seen them.  I believe that they were

7    produced to our counsel but I couldn't -- could

8    be incorrect.

9          Q.    Well, other than yourself, who would

10   produce those documents?

11         A.    Either -- it would most likely be

12   Suby Joseph.

13         Q.    Well, those documents were allegedly

14   deposited into the Dropbox; right?

15         A.    Yeah.

16         Q.    But you didn't see them?

17         A.    I didn't put them in there, no.

18         Q.    Were you aware of this request?

19         A.    I read it, yeah, but I didn't --

20   I --

21         Q.    It wasn't read to you.  It was

22   actually an agreement of Mr. Rajan at the 2004

23   exam.

24         A.    Okay.  Then maybe I heard it.

25         Q.    And from whom would you have heard

1  it?

2      A.    Where did I see that?  I did read

3  it.  I don't know where I read it.  I did read

4  it.  Something about needing information about

5  that transaction.

6            It might have been an E-mail that

7  went through our internal about it.

8      Q.    And --

9      A.    And then whoever handled it, handled

10  it.  I didn't.

11      Q.    To your knowledge, you don't know if

12  it was submitted to --

13      A.    I don't.

14      Q.    -- my office?

15      A.    I didn't go through the other Boxes.

16      Q.    Okay.  And what other -- you mean

17  the Boxes in the folders?

18      A.    Yeah.  The inquiries.  I'll call

19  them inquiries from now on.

20      Q.    Okay.  And also the debtor agreed to

21  provide copies of all agreements or other

22  information with respect to the shareholders of

23  VSI who deposited monies in the VSI accounts

24  since March 15, 2023.

25      A.    I'm aware of that, and Suby would

1    have done that.

2         Q.    But you don't know if that was

3    produced?

4         A.    I don't.

5         Q.    And you have not seen any -- do you

6    have any information with respect to those

7    investors?

8         A.    No.  I don't deal with them at all.

9         Q.    I'm sorry.  I said "investors."  I

10   meant shareholders.

11        A.    No, I understand what you meant.

12   Suby strictly handles the shareholders, all of

13   that information.

14        Q.    Do you know why he's not here today?

15        A.    I don't.

16        Q.    Okay.  The debtor also agreed,

17   through Mr. Rajan, to submit all documents with

18   respect to setting up an independent board,

19   also known as the committee of VSI.

20             Are you aware of that request for

21   production?

22        A.    I was not.

23        Q.    And the debtor also agreed that the

24   debtor would supply all copies of all E-mails,

25   texts, and other communication from Mr. Rajan

1    to VSI authorizing payment of expenses of

2    Stream TV.

3              Were you involved in the production

4    of those E-mails?

5         A.    No.

6         Q.    And did you -- so you haven't seen

7    them?  You're not aware of them?

8         A.    No, because I wasn't -- the only

9    approval we got was from Mathu.  So whatever

10   conversation he had was on his end.

11        Q.    Okay.

12              ATTORNEY ZAHRALDDIN:  Can I

13   ask one question?

14              THE WITNESS:  So that could

15   have been --

16              ATTORNEY ZAHRALDDIN:

17   Ms. Gonzalez, what backup is in the folders in

18   regard to payments from VSI?

19              THE WITNESS:  It's all the --

20   the payment registers, the bank statements, and

21   the invoices.  If the invoice is not there for

22   some reason or other, the payment voucher is

23   there from Jeeva.

24              ATTORNEY ZAHRALDDIN:  And let

25   me ask another question.  My understanding in

Deposition of Amanda Gonzalez                                                                 JX-134 Ocean Networks, Inc. & Technovative Media, Inc.

1    your conversation was you created a spread

2    sheet for the U.S. Trustee to facilitate the

3    connection of a payment in the MORs or in any

4    of the other documents and all backup, and then

5    you designated that with a number.

6            Is that incorrect or --

7                    THE WITNESS:  So every

8    transaction is definitely backed up with a --

9    with a transaction ID.  However, I did not

10   create that for VSI.  That was somebody else.

11   That was not me.

12           They gave me those numbers when

13   this -- when I had to start collecting all of

14   the information that I was told about on the

15   17th.  Sorry.

16                   ATTORNEY ZAHRALDDIN:  But,

17   again, whether it came from -- I mean,

18   obviously if there's not a payment from VSI,

19   you wouldn't have those books and records?

20                   THE WITNESS:  Right.

21                   ATTORNEY ZAHRALDDIN:  My

22   question is, is there --

23                   THE WITNESS:  I created the

24   spreadsheet.

25                   ATTORNEY ZAHRALDDIN:  -- is

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit transcrips   Page 141 of 171

Deposition of Amanda Gonzalez                                         Stream TV Networks, Inc. & Technovative Media, Inc.

1   there a spreadsheet --

2                    THE WITNESS:  Yep.

3                    ATTORNEY ZAHRALDDIN:  -- that

4   is designated with a number --

5                    THE WITNESS:  Sorry.

6                    ATTORNEY ZAHRALDDIN: -- that

7   corresponds to each payment?

8                    THE WITNESS:  Yeah.

9                    ATTORNEY ZAHRALDDIN:  Can you

10  please explain that?  Because maybe that's

11  where some of this information is.  In other

12  words --

13                   THE WITNESS:  Okay.

14                   ATTORNEY ZAHRALDDIN:  Thank

15  you.

16                   THE WITNESS:  Yep.  I created

17  spreadsheets and this is kind of how I

18  reconciled the books, as well, so I can make

19  sure everything was correct.

20          I created a spreadsheet with all the

21  transactions, and then I took the transaction

22  numbers that were given to me for each

23  transaction and I input them also into the

24  spreadsheet.

25          So the spreadsheet encompasses the

Case 23-10763-djb   Doc 1098-2   Filed 09/25/25   Entered 09/25/25 23:21:19   Desc
Exhibit transcrips   Page 142 of 171

Deposition of Amanda Gonzalez                    IDEC Networks, Inc. & Technovative Media, Inc.

1  transaction IDs, the date of the transaction,

2  who it went to, how much, what it was for.

3          And then the backup for those

4  transactions are in the folder.

5  BY ATTORNEY CALLAHAN:

6      Q.    So, again, we requested that

7  Mr. Rajan supply certain financial documents,

8  including accounts payable journals, accounts

9  receivable journals, general ledgers and the

10 like.

11         Your prior testimony a little while

12 ago you said that you have QuickBooks?

13     A.    Correct.

14     Q.    And that you can generate those

15 reports?

16     A.    Yes.

17     Q.    But is there any reason why they

18 were not generated until -- they have not been

19 generated, as per our request?

20     A.    I have not done them yet because I

21 was not requested to.  If I was, then you would

22 have them.  That was the easiest part of the

23 whole situation.

24     Q.    Who -- who would have requested?

25 Who would you have expected to request them?

Deposition of Amanda Gonzalez                    Rajan Network, Inc. & Technovative Media, Inc.

1      A.    Mathu, and to be honest, he could

2  have probably mentioned it when we were going

3  over what I needed to do.

4      Q.    Okay.

5      A.    But I was in vacation mode.

6      Q.    Okay.  So, again, we're talking

7  about discussions and communications you've had

8  with Rajan, Mathu Rajan?

9      A.    Yes.

10     Q.    In terms of just specifically

11 payments of invoices, how were those

12 communications made?  Was it a phone call?  A

13 text?  An E-mail?

14     A.    So if I needed something paid,

15 someone was calling me, I would call him 99

16 percent of the time.

17     Q.    So it was a phone conversation?

18     A.    Yes.  The only time I ever messaged

19 him was one particular vendor because he would

20 text me and then I would forward it to Mathu.

21           That's really -- every other time I

22 would call him.  I'm -- I'm more of an "I need

23 an answer now" kind of person.

24     Q.    Yeah.

25     A.    And I never got an answer now, but

Ion Iesearch Networks, Inc. & Technovative Media, Inc.

1     it was a quicker process.

2          Q.     So when did you learn that you would

3     be designated to appear today for this

4     examination?

5          A.     Monday.

6          Q.     Monday?

7          A.     Monday.

8          Q.     Two days ago?

9          A.     Yeah, because Mathu was trying to

10    get out of the hospital and his doctors would

11    not let him.

12         Q.     And who asked you?  Did Mathu ask

13    you to --

14         A.     Yes.

15         Q.     -- testify?

16         A.     Yep.

17         Q.     And what did you do to prepare for

18    this testimony -- for this examination today?

19         A.     I met with our counsel.  I -- that's

20    about it.

21         Q.     Okay.  How long was that meeting?

22         A.     Two hours.

23         Q.     When was that done?

24         A.     Yesterday.

25         Q.     And in preparation for this

1    examination today, did you review the document

2    that's in front of you right now?

3        A.    No.  I didn't review it because I

4    remember going over it when we received it and

5    when we started to compile information and when

6    I had to create the folders for you guys so you

7    could access it directly.

8        Q.    So with respect to each of those

9    topics, to the best -- how did you get, for

10   example, information regarding some of the

11   topics -- or all the topics that we have

12   referenced there that would enable you to

13   testify truthfully today?

14       A.    I mean, I -- it would always be

15   truthfully because I don't do anything else.

16            But, like, I know where a lot of the

17   documents are.  So unless it has to deal with

18   shareholders or anything with VSI, that's

19   outside my realm.

20            But anything that has to do with

21   Stream I know exactly where it is and I

22   would -- I've been doing the MORs and the

23   balance sheets and working with Bennett through

24   this whole process.

25            So I would be the one who, you know

1    , was to, I guess, meet that deadline with all

2    the information.

3         Q.    When you say -- what deadline?  I'm

4    sorry.

5         A.    You said November something

6    everything was supposed to be in by.

7         Q.    Well, actually, the information from

8    the original subpoena was from October; right?

9         A.    Yeah.  That was done --

10        Q.    But --

11        A.    -- a while ago.

12        Q.    But with respect to information

13    requested --

14        A.    The new -- from the last 2004

15    meeting.

16        Q.    -- from November 13th?

17        A.    Yes.  Yes.

18        Q.    Right.

19             ATTORNEY FISHER:  Wait.

20    BY ATTORNEY CALLAHAN:

21        Q.    Yes.  You did not have that

22    information until today?

23        A.    No.  I knew that I had to produce

24    that on November 17th.

25             Is that what you're asking?

1     Q.     Yes.

2     A.     Yeah.  Yeah.  We had a meeting on

3  December 17th -- or sorry -- November 17th

4  telling me exactly what was needed.  And then I

5  was on vacation for -- until the 23rd.

6     Q.     And yet, the production of documents

7  you were -- you're saying you were involved

8  from November 17th --

9     A.     Yes.

10    Q.     -- in the production, and we're

11 telling you that we did not receive

12 information -- all the information that we

13 requested?

14    A.     Yeah, not all the information is in

15 there yet because I was also working on the

16 MORs.

17    Q.     And did you tell your attorney that

18 you did not have all the information?

19    A.     I -- no.  I have the information.  I

20 haven't put it in the Box yet.  So, no, I have

21 not told them that I have not populated those

22 Boxes yet.

23    Q.     And you said you prepared for this

24 for two hours with your counsel, debtor's

25 counsel, in anticipation of this examination

Deposition of Amanda Gonzalez                    Greg Bentley, et al Networks, Inc. & Technovative Media, Inc.

1   today?

2        A.    Yep.

3               ATTORNEY CALLAHAN:  Okay.  I

4   think I need to take a break, a very short,

5   brief one.

6               ATTORNEY ZAHRALDDIN:  Okay.

7               ATTORNEY CALLAHAN:  And we'll

8   be right back.

9               (A recess was taken.)

10  BY ATTORNEY CALLAHAN:

11       Q.   Ms. Gonzalez, thank you.  We're back

12  on the record, and I wanted to ask you again

13  with respect to the subscription agreements

14  between VSI and the debtor.

15            Do you have any knowledge or

16  information with respect to the negotiations

17  and the underlying negotiations and

18  transactions between VSI and the debtor?

19       A.    No.  Not when it -- not in regards

20  to these sub agreements.  In fact, not in

21  regards to anything with VSI, honestly.  I

22  don't -- I didn't have anything to do with them

23  talking to each other in -- yeah, and -- no.

24       Q.    But you don't --

25       A.    I don't have any.

1          Q.    And you do know, of course, that VSI

2     has been funding --

3          A.    Yes.

4          Q.    -- Stream TV?

5          A.    Yeah.  And I read the

6     subscription --

7          Q.    You can continue.

8                    ATTORNEY FISHER:  Let him

9     finish.

10    BY ATTORNEY CALLAHAN:

11         Q.    Please continue.

12         A.    And I read the subscription

13    agreement so I understand, you know, how it's

14    supposed to work sort of, and that's what we've

15    been using.

16         Q.    And you don't have any information

17    or knowledge with respect to the purchase

18    orders that the debtor has with certain

19    entities?

20         A.    I do.  There's two.  Yes.

21         Q.    Well, there's several in the

22    production requests.  Paragraph 12.

23         A.    There's two purchase orders, I

24    believe, and the rest are letters of intent.

25         Q.    Okay.  You're talking about Google,

1    Enuma Gauge Manufacturing?

2         A.    Correct.

3         Q.    SISTAR, Limited, IQH3D, BBAK, Sunny

4    Hill Technology, Limited, and Bosch?

5         A.    Yes.

6         Q.    And do you have -- did you

7    participate in negotiations between Stream TV

8    and these entities?

9              ATTORNEY FISHER:  Objection.

10   Form.

11   BY ATTORNEY CALLAHAN:

12        Q.    Did you --

13             ATTORNEY BAKER:  That's okay.

14   BY ATTORNEY CALLAHAN:

15        Q.    -- participate in any of the

16   negotiations?

17        A.    No.

18        Q.    Okay.  And with respect to the -- do

19   you know where VSI gets its funds to pay for

20   Stream TV expenses?

21        A.    I know it's investors.  I don't know

22   who.

23        Q.    You don't know who the investors

24   are?

25        A.    No.

1      Q.    And they're funding Stream TV

2   obligations?

3      A.    Correct.

4      Q.    Okay.

5            ATTORNEY BAKER:  Okay.  This

6   is concerning to us that a couple of things

7   have been clearly demonstrated this morning.

8            No. 1 is we don't have the -- still,

9   third time, a full production and we were never

10  informed that we didn't have a full production.

11           I mean, there are documents missing,

12  clearly admitted to.  We don't know what they

13  are.  We just know that it's not a full

14  production.  We were promised that it would be

15  a full production by Mr. Rajan at the last 2004

16  exam.

17           In fact, we had been led to believe

18  we had a full production at that exam, too.

19  That's No. 1.

20           No. 2, we did not select the

21  witness; you selected the witness.  You could

22  have produced multiple witnesses here today.

23  Maybe Suby might have been a witness.  I don't

24  know who else.

25           I don't believe that this witness

1    has the information to address many of the

2    topics that were set forth to go to the

3    underlying information, in addition to those

4    things that the witness at the last 2004 said

5    he would produce and he would be able to

6    discuss.

7           So I don't think that the proper

8    witness has been produced; not our

9    responsibility.  Certainly your

10   responsibilities to produce a witness who could

11   testify to that and should have been prepared.

12   It doesn't matter who the witness is.  She

13   needed to be prepared and she's -- she's not

14   prepared.

15          So what -- we're not going to go

16   forward any longer with this examination, hit

17   or miss on various things because the witness

18   is not the appropriate witness.

19                 ATTORNEY FISHER:  Can I

20   respond briefly, not by way of excuse, but by

21   explanation?

22          We could have shown up with a

23   doctors note and no witness and I think that

24   would have been worse.  So the next best thing

25   was to bring Amanda, telling you what she knew

1    and what she had.

2              To the extent that there's any

3    questions about the MORs, Amanda is the person.

4    There's no question about that.  From whatever

5    information she used to put together the MORs,

6    to how they were constructed, to why they were

7    done, of course, you know, I can answer a lot

8    of that, too, and as an officer of the court,

9    I'm happy to.

10             But, you know, it's a bad situation

11   when a doctor says this guy can't leave the

12   hospital.

13                  ATTORNEY BAKER:  Well --

14                  ATTORNEY FISHER:  And you

15   didn't want to do it by Zoom.  I know the

16   doctors opposed.

17                  ATTORNEY BAKER:  My problem

18   is, No. 1, you're saying that Amanda Gonzalez

19   is the witness to testify to the MORs.  She

20   wasn't produced at the first 2004 exam.

21             If Mr. Rajan can't testify to the

22   substance and the in-depth information on the

23   MORs, then both of them could have been

24   produced at that time, but she wasn't produced.

25             And so this is just emblematic of

1   what we're seeing with respect to how you're

2   treating the United States Trustee, who is the

3   watchdog of the system, in rolling information

4   to us, not only rolling information to us, slow

5   rolling information to us.

6           And so, therefore, we don't think

7   this is appropriate to go forward any longer.

8   What we'll do is we'll think about how we want

9   to proceed in this case going forward, but I

10  wanted to express on the record to you,

11  personally, how troubled we are with respect to

12  how this is being handled and how we are led to

13  believe something and then it's completely

14  contrary to what we're led to believe, and that

15  has to do with testimony, representations,

16  promises, commitments and the like.  And

17  apparently none of the commitments that have

18  been made throughout this case to us have been

19  met timely or in fulsome, robust, presentation.

20          So we appreciate you coming down.

21  We understand everything that we --

22                  THE WITNESS:  Am I allowed to

23  say something?

24                  ATTORNEY BAKER:  No.  Thank

25  you.  Don't say anything because your counsel

Deposition of Amanda Gonzalez    Ideastream Networks, Inc. & Technovative Media, Inc.

1    is here.  I'm trying to help them out.

2                    ATTORNEY FISHER:  Thank you.

3                    ATTORNEY BAKER:  Absolutely.

4                    THE WITNESS:  I wasn't --

5    we --

6                    ATTORNEY BAKER:  I tried to

7    help you.  Okay?

8              So we can go off the record now.

9    Thank you very much for your time.  We do

10   appreciate it.

11                        -   -   -

12                    (Thereupon, the examination

13   was concluded at 11:51 a.m.)

14                        -   -   -

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I hereby certify that the
proceedings and evidence are contained fully
and accurately in the stenographic notes taken
by me on the hearing of the within cause, and
that this is a correct transcript of the same.


===============================

Alyssa A. Repsik, Court Reporter

## WORD INDEX

**< $ >**
**$45**  59:*11, 15*
**$50,000**  60:*5, 24*

**< 1 >**
**1**  15:*2*  16:*3, 5*  18:*25*
76:*8, 19*  78:*18*
**10**  20:*11*  35:*1*
**10:12**  2:*9*
**100**  48:*2*  56:*13*
**11**  1:*3*  20:*11, 12, 15*
35:*24*  40:*20*  45:*13*
**11:51**  80:*13*
**11th**  50:*1*
**12**  40:*24*  74:*22*
**13**  43:*9*
**13th**  4:*10*  49:*23*
51:*23*  71:*16*
**1400**  2:*15*
**15**  8:*23*  12:*22*  30:*7*
57:*9*  62:*24*
**15th**  10:*22*  32:*22*
35:*14*  39:*19*
**17th**  65:*15*  71:*24*
72:*3, 8*
**18th**  6:*7*
**19107**  2:*21*
**19801**  2:*13*

**< 2 >**
**2**  19:*24*  21:*5*  76:*20*
**20**  2:*9*  8:*14*
**2004**  2:*1*  4:*8*  14:*11*
49:*22*  60:*17*  61:*22*
71:*14*  76:*15*  77:*4*
78:*20*
**2019**  7:*2, 24*
**2020**  9:*1, 12*  54:*4, 6*
**2022**  7:*21*  54:*2*
**2023**  2:*9*  4:*10*  8:*24*
12:*22*  30:*7*  35:*16*
57:*9*  62:*24*
**22**  7:*2*
**22nd**  10:*16*  12:*14*
**23-10763**  1:*4*  4:*19*
**23-10764**  1:*7*  4:*20*
**23rd**  72:*5*

**24**  2:*15*
**27th**  50:*12*

**< 3 >**
**3**  22:*4*
**30**  4:*14*
**320**  2:*8, 20*

**< 4 >**
**4**  24:*9*

**< 5 >**
**5**  3:*1*  24:*20*  30:*2, 4,*
*10*  32:*3*
**500**  2:*12*

**< 6 >**
**6**  32:*18*

**< 7 >**
**7**  33:*3*
**700**  2:*12*
**7030**  4:*14*
**77046**  2:*16*
**7th**  10:*16*  12:*13*

**< 8 >**
**8**  33:*15*

**< 9 >**
**900**  2:*7, 20*
**99**  16:*24*  68:*15*

**< A >**
**a.m.**  2:*9*  80:*13*
**able**  31:*10*  77:*5*
**Absolutely**  11:*1*
13:*19*  25:*8*  35:*15, 23*
38:*13, 15*  41:*20*
42:*21*  43:*5*  46:*6*
48:*11, 18*  80:*3*
**accept**  24:*12*
**acceptance**  4:*13*
**access**  13:*10*  32:*9*
70:*7*
**accommodating**  49:*16*
**account**  17:*6, 7, 8*
45:*9*  52:*18*
**accountant**  8:*15*
**accounting**  35:*3*

**accounts**  13:*7, 10*
19:*18*  23:*3*  44:*11*
52:*7, 8, 24*  53:*9*
62:*23*  67:*8*
**accurately**  81:*4*
**ACH**  37:*12*
**acknowledged**  6:*1, 2*
**acting**  10:*24*
**active**  47:*25*
**activities**  13:*18*
**actual**  41:*17*  52:*10*
**addition**  77:*3*
**address**  77:*1*
**adjourn**  49:*25*
**admitted**  76:*12*
**adult**  8:*18*
**advice**  58:*18*
**affairs**  51:*21*
**affiliates**  33:*17*  35:*6*
**AGENCY**  1:*18*
**ago**  30:*17*  67:*12*
69:*8*  71:*11*
**agreed**  50:*3, 8, 10*
51:*18*  52:*7*  55:*22*
57:*7*  60:*3*  62:*20*
63:*16, 23*
**agreement**  9:*9, 10*
20:*3*  21:*18, 20*  24:*23*
25:*6*  30:*4*  32:*18, 24*
49:*25*  61:*22*  74:*13*
**agreements**  19:*25*
22:*7*  23:*18*  24:*9, 15*
27:*6, 10*  30:*12, 17, 18,*
*21*  31:*2, 5*  32:*4*
59:*17*  62:*21*  73:*13,*
*20*
**ahead**  8:*21*
**al**  24:*1*
**Alastair**  9:*6*  55:*14,*
*18*
**allegedly**  61:*13*
**allow**  6:*10*  27:*11, 12*
**allowed**  79:*22*
**Alyssa**  2:*5*  81:*10*
**AMANDA**  2:*1*  3:*1*
4:*2*  5:*10*  26:*21*
77:*25*  78:*3, 18*
**amazing**  25:*16*
**amended**  50:*10*

**analyst**  4:*25*
**and/or**  22:*6*
**answer**  24:*5, 7*  57:*19*
59:*3, 21*  60:*1*  68:*23,*
*25*  78:*7*
**anticipation**  72:*25*
**anymore**  37:*14*
**apologize**  51:*13*
**apparently**  79:*17*
**appear**  69:*3*
**appreciate**  49:*16*
79:*20*  80:*10*
**appropriate**  77:*18*
79:*7*
**approval**  64:*9*
**approve**  37:*3, 5*
**approved**  16:*12, 15*
34:*15, 21*
**approves**  36:*25*
**April**  7:*2*  56:*18*
**arrangement**  10:*11*
**aside**  47:*22*
**asked**  29:*6, 10*  57:*6*
69:*12*
**asking**  26:*21*  29:*2*
37:*8*  46:*19*  58:*12*
71:*25*
**aspects**  8:*20*
**asserted**  20:*2*  21:*20*
**assets**  9:*22*  10:*1*
55:*2, 6*
**assigned**  31:*1*  32:*5*
33:*2*
**assistant**  4:*23*  7:*5*
**assisting**  7:*6*
**assume**  32:*12*
**assumed**  12:*10*
**attachment**  14:*17*
15:*13*  26:*9*  30:*9*
**attending**  48:*4*
**Attorney**  3:*1*  4:*5, 24*
5:*4, 12, 17, 20, 23*
11:*11, 13, 15, 16, 17,*
*21, 22*  12:*4, 6, 9, 11*
20:*17, 24*  21:*3, 4, 16,*
*22*  22:*17, 22*  23:*6, 11,*
*13*  24:*2, 4, 21, 25*
25:*4, 9, 20*  26:*15, 18,*
*20, 25*  27:*2, 3, 19, 23*
28:*1, 7, 12, 18, 21, 25*

29:*4*, *5*, *25*  30:*1*, *14*,
*22*  31:*14*, *18*, *21*  32:*8*,
*14*  34:*13*, *24*, *25*
35:*18*, *21*  38:*9*, *17*, *20*
39:*8*, *9*, *13*, *16*, *17*, *24*
40:*5*, *11*, *14*  41:*7*, *9*
42:*6*, *13*, *22*, *24*  43:*1*,
*6*, *8*  46:*14*, *16*, *17*, *23*,
*24*  47:*7*, *11*, *14*, *17*, *21*,
*24*  48:*3*, *9*, *13*, *15*, *19*
49:*2*, *5*, *8*, *12*, *14*, *19*,
*21*  53:*16*, *22*  54:*1*, *5*,
*9*, *13*, *19*, *24*  55:*7*, *9*,
*11*, *15*, *20*  57:*18*, *21*,
*25*  58:*3*, *6*, *11*, *14*, *16*,
*17*, *19*, *21*, *23*, *25*  59:*2*,
*5*, *6*, *25*  60:*7*, *9*, *13*
64:*12*, *16*, *24*  65:*16*,
*21*, *25*  66:*3*, *6*, *9*, *14*
67:*5*  71:*19*, *20*  72:*17*
73:*3*, *6*, *7*, *10*  74:*8*, *10*
75:*9*, *11*, *13*, *14*  76:*5*
77:*19*  78:*13*, *14*, *17*
79:*24*  80:*2*, *3*, *6*
**attorney-client**  57:*20*,
*23*  58:*13*
**audible**  59:*21*
**AUTHORIZATION**
  1:*18*
**authorized**  4:*16*
  14:*11*
**authorizing**  64:*1*
**auto**  16:*11*  17:*2*, *4*
  34:*20*
**Avalon**  8:*6*
**Avenue**  2:*12*
**aware**  29:*7*  61:*4*, *18*
  62:*25*  63:*20*  64:*7*

**< B >**
**back**  9:*22*  10:*1*, *20*
  16:*2*  21:*5*  25:*15*
  29:*19*, *21*  30:*25*
  36:*25*  37:*8*  40:*23*
  44:*1*  55:*2*, *6*  58:*9*
  73:*8*, *11*
**backed**  65:*8*
**background**  8:*9*

**backup**  52:*3*, *20*
  54:*14*  64:*17*  65:*4*
  67:*3*
**bad**  78:*10*
**Baker**  2:*24*  4:*23*
  57:*21*  58:*11*, *16*, *21*
  75:*13*  76:*5*  78:*13*, *17*
  79:*24*  80:*3*, *6*
**balance**  6:*21*  25:*24*
  53:*18*  70:*23*
**bank**  13:*7*, *10*, *11*, *15*,
  *16*  17:*6*, *7*, *8*  23:*3*
  38:*2*  44:*11*  52:*1*, *2*
  57:*7*, *8*, *10*  64:*20*
**banking**  13:*9*
**BANKRUPTCY**  1:*1*,
  *4*, *7*  2:*4*  4:*19*, *25*
  13:*6*, *24*  14:*10*, *18*
  15:*8*  20:*2*  55:*25*
**based**  23:*1*, *4*
**basically**  43:*20*  51:*9*
**basis**  39:*22*  42:*18*
**BBAK**  42:*2*  75:*3*
**began**  4:*9*
**beginning**  43:*17*
**begins**  36:*9*
**behalf**  4:*21*  5:*6*
  6:*15*  18:*21*  23:*2*
  33:*5*, *12*, *16*  35:*4*
  36:*2*  37:*21*  44:*5*, *9*,
  *18*  46:*19*
**believe**  18:*2*  35:*11*
  39:*22*  45:*1*  61:*6*
  74:*24*  76:*17*, *25*
  79:*13*, *14*
**Bennett**  2:*13*  5:*5*
  6:*21*  46:*1*, *2*  51:*8*
  70:*23*
**B-E-N-N-E-T-T**  5:*5*
**Bennett.fisher@lewisb**
**risbois.com**  2:*16*
**best**  70:*9*  77:*24*
**bill**  10:*15*
**bills**  16:*9*, *24*  19:*1*, *5*,
  *7*
**Bimonthly**  11:*4*, *5*, *19*
  12:*1*, *7*
**Bisgaard**  2:*12*, *15*
**bit**  6:*24*

**biweekly**  10:*15*
**board**  27:*15*  63:*18*
**Bob**  55:*18*
**book**  43:*15*
**booked**  35:*2*
**bookkeeping**  8:*14*, *17*
**books**  17:*13*, *18*
  18:*17*  20:*25*  44:*4*
  51:*19*  65:*19*  66:*18*
**Bosch**  75:*4*
**Box**  20:*14*  31:*16*, *23*,
  *25*  38:*5*, *24*  40:*20*
  45:*2*, *3*, *4*, *9*  52:*18*
  72:*20*
**Boxes**  45:*5*  62:*15*, *17*
  72:*22*
**brain**  28:*24*
**break**  60:*8*, *10*, *21*
  73:*4*
**brief**  73:*5*
**briefly**  77:*20*
**bring**  77:*25*
**Brisbois**  2:*12*, *15*
  27:*25*  28:*14*
**Brown**  60:*5*, *24*
**Building**  2:*20*
**business**  8:*1*  25:*16*

**< C >**
**call**  16:*16*  57:*5*, *19*
  62:*18*  68:*12*, *15*, *22*
**Callahan**  2:*18*  3:*1*
  4:*5*, *6*  5:*12*, *17*, *23*
  11:*13*, *16*, *21*  12:*6*, *9*,
  *11*  20:*18*  21:*4*, *22*
  23:*13*  24:*4*  25:*20*
  26:*18*  27:*2*, *3*  28:*25*
  29:*5*  30:*1*, *22*  32:*14*
  34:*25*  35:*21*  39:*16*
  40:*14*  41:*9*  43:*8*
  46:*16*  48:*20*  49:*5*, *12*,
  *19*, *21*  55:*20*  58:*3*
  59:*6*, *25*  60:*9*, *13*
  67:*5*  71:*20*  73:*3*, *7*,
  *10*  74:*10*  75:*11*, *14*
**called**  2:*2*  18:*6*  20:*6*
  60:*24*
**calling**  57:*22*  68:*15*
**cancer**  47:*6*

**card**  16:*23*
**care**  37:*12*
**career**  8:*18*
**case**  5:*9*  13:*20*
  35:*13*  37:*7*  55:*25*
  79:*9*, *18*
**cause**  81:*5*
**certain**  8:*20*  14:*7*
  17:*1*  23:*4*  50:*4*, *6*
  57:*13*  67:*7*  74:*18*
**Certainly**  77:*9*
**certify**  81:*2*
**CERTIFYING**  1:*18*
**changed**  7:*20*
**Chapter**  1:*3*
**check**  37:*9*  38:*13*
  40:*9*
**checks**  37:*13*
**China**  13:*1*
**circumstances**  6:*7*
  45:*20*
**claim**  20:*1*
**claims**  20:*1*, *4*  21:*19*,
  *21*
**clarification**  11:*18*
**clarify**  11:*12*  20:*18*
  28:*13*  52:*5*
**clarity**  22:*18*
**clearly**  76:*7*, *12*
**client-privilege**  58:*17*
**clue**  25:*13*
**code**  20:*2*
**coincided**  52:*4*
**collect**  51:*2*  54:*15*
**collecting**  65:*13*
**collectively**  15:*6*
**come**  16:*9*, *15*  17:*6*
  19:*1*, *5*  29:*19*  36:*13*
  42:*15*
**comes**  34:*20*  36:*25*
**coming**  48:*5*  49:*25*
  79:*20*
**commitment**  59:*11*, *15*
**commitments**  79:*16*,
  *17*
**committee**  63:*19*
**Commonwealth**  2:*6*
**communication**  36:*5*
  63:*25*

**communications** 23:*16, 21* 32:6, *13* 35:25 68:7, *12*

**companies** 8:*12, 13*

**company** 8:5, *23* 9:8 15:*20* 18:6, *8, 10* 25:*15*

**compile** 70:5

**compiled** 40:*15*

**completed** 44:*24*

**completely** 56:*13* 79:*13*

**completion** 45:*24*

**concerning** 76:6

**concluded** 80:*13*

**conclusion** 49:*24* 58:*12*

**conduct** 4:*17*

**confirmation** 37:22

**confuse** 37:*16*

**connection** 55:*24* 60:*4, 23* 65:*3*

**consent** 14:*10*

**constructed** 78:6

**construction** 8:5

**consulting** 43:*15*

**contain** 22:*23*

**contained** 81:*3*

**continue** 74:7, *11*

**continued** 4:8 6:6, *8, 9* 50:*1*

**contract** 10:*18*

**contracting** 18:9

**contractor** 10:*10, 14, 25* 17:25 18:*13*

**contractors** 12:*17, 24* 13:*1* 18:*17*

**contractual** 10:*12*

**contrary** 79:*14*

**conversation** 47:*18* 60:*16* 64:*10* 65:*1* 68:*17*

**conversations** 46:*11*

**copies** 55:*23* 57:7 62:*21* 63:*24*

**copy** 19:*16* 60:*4*

**correct** 5:*18* 12:*13* 13:*16* 15:*11* 22:*14* 26:*10* 34:8 37:*18* 43:*3* 50:*15* 53:6, *11,*

**20** 59:*20* 66:*19* 67:*13* 75:2 76:*3* 81:6

**correspondence** 31:*12* 38:*23* 42:*17*

**corresponds** 66:7

**coughing** 48:*20*

**COUNSEL** 2:*10* 4:*6, 13* 5:8 6:*1, 2* 28:8, *10* 40:*1* 44:*21* 45:2 57:*16, 24* 58:*4, 5* 61:7 69:*19* 72:24, *25* 79:*25*

**County** 8:7

**couple** 76:6

**course** 49:9 74:*1* 78:7

**COURT** 1:*1* 2:5 7:*13* 9:*11, 18, 23* 13:*25* 14:*11, 18* 48:5 54:*20* 78:8 81:*10*

**CPA** 51:6

**Crawford** 9:7 55:*18*

**create** 52:*23* 53:2 65:*10* 70:6

**created** 19:*19* 20:*14* 44:7 45:*1* 52:*19* 65:*1, 23* 66:*16, 20*

**credit** 16:*23*

**current** 53:*23*

**customers** 24:*13*

**< D >**

**dangerous** 48:*22*

**date** 8:*25* 10:*23* 56:*14, 16* 57:9 67:*1*

**dates** 45:*19*

**day** 10:*1*

**days** 69:8

**DE** 2:*13*

**deadline** 50:*17, 24* 51:*14* 71:*1, 3*

**deal** 13:6, *7* 63:8 70:*17*

**debited** 16:*11* 17:2, *5* 34:*20*

**Debtor** 1:6, *8* 2:*11* 4:9 5:*3, 16, 18, 21* 6:*10, 14* 14:*20* 26:*4* 33:*16* 42:*14* 50:*3, 8,*

**10** 51:*18* 52:7, *9* 55:*22* 57:6 59:*10* 60:*19* 62:*20* 63:*16, 23, 24* 73:*14, 18* 74:*18*

**debtors** 15:7 20:*3* 21:*20* 24:*10* 30:5 32:*19* 33:5, *13* 35:*1, 4* 36:*1*

**debtor's** 4:*11* 5:9, *25* 30:*6, 7* 32:*20* 33:5, *17* 35:*5, 6* 36:2 60:5, *23* 72:*24*

**December** 2:9 6:7 50:*1* 72:*3*

**decided** 9:7 10:6

**Define** 55:7

**defined** 20:*1* 26:8

**defines** 15:*14*

**definitely** 46:*10* 65:8

**Delaware** 2:*12*

**delivery** 24:*12*

**demonstrated** 76:7

**demos** 39:*4*

**depending** 16:*21* 31:*19*

**deposited** 61:*14* 62:*23*

**describe** 9:*4* 14:*4* 46:*21*

**described** 13:2

**designate** 24:*10*

**designated** 4:*17* 5:*18, 21* 6:*14, 19* 14:*20* 65:5 66:*4* 69:*3*

**designating** 24:*16*

**designee** 5:*19, 22*

**desktop** 40:*19*

**detail** 54:6

**detailed** 51:2

**different** 51:*11*

**differently** 19:5

**directed** 36:*11*

**direction** 15:9 34:*10*

**directly** 36:*16* 37:22 44:*11* 46:*1* 54:*25* 57:5 70:7

**directors** 33:6 35:5

**disagree** 8:*16*

**disclosure** 41:*1*

**discuss** 14:*19* 15:*19* 20:5 77:6

**discussion** 30:*4* 31:2 32:*19, 25* 44:*20* 49:*24*

**discussions** 24:9, *15* 27:6 30:*24* 45:*23* 68:7

**distributor** 24:*11, 17* 27:*13*

**DISTRICT** 1:2

**divvied** 20:*15*

**divvy** 20:9

**doctor** 78:*11*

**doctors** 47:*15, 19* 48:6 69:*10* 77:*23* 78:*16*

**document** 13:*24* 14:2, *24* 23:*14* 30:9 41:*17* 70:*1*

**documents** 6:3, *10, 17* 14:8 15:*14* 16:4 21:8 26:6, *13* 31:*3, 25* 32:*24* 38:7 41:5, *11, 22, 23* 44:*21* 45:*11* 50:6 51:*23* 52:*10, 16* 53:*1, 11* 60:*20, 23* 61:2, *4, 10, 13* 63:*17* 65:*4* 67:7 70:*17* 72:6 76:*11*

**doing** 7:*23* 25:22 51:6 70:22

**downhill** 7:3

**drew** 9:9

**Dropbox** 45:8 61:*14*

**duly** 4:*3*

**dumb** 25:*13*

**duties** 7:6 13:*3*

**< E >**

**earlier** 52:6

**easiest** 67:22

**EASTERN** 1:2

**educational** 8:8

**effected** 49:*3*

**either** 34:*20* 36:*13* 61:*11*

**electronic** 7:*12* 19:9, *10, 13*

**E-mail** 36:6 38:4 62:6 68:13
**E-mailed** 19:15
**E-mails** 20:13 30:25 31:9 32:12 38:9, 22 41:23, 24 45:14 63:24 64:4
**emblematic** 78:25
**employed** 8:24 17:24
**employees** 9:2 10:20 33:6 35:6
**empty** 56:25 57:16, 17
**enable** 70:12
**encompasses** 66:25
**enforce** 9:24
**entities** 33:4 74:19 75:8
**entity** 33:12, 16 35:4 60:24
**Enuma** 75:1
**Esq** 2:11, 13, 18, 19
**everybody** 19:15
**evidence** 81:3
**exact** 45:19
**exactly** 11:9 70:21 72:4
**exam** 61:23 76:16, 18 78:20
**EXAMINATION** 2:1, 3 4:9, 17 5:11, 25 6:6, 9, 13 14:11 49:23 52:6 60:17 69:4, 18 70:1 72:25 77:16 80:12
**examined** 4:3
**example** 19:7 41:18 56:17 70:10
**excited** 9:20
**exclusive** 24:11, 16 27:12
**Excuse** 7:23 31:7 32:21 77:20
**executive** 7:5
**exhibit** 13:25 14:13
**expected** 67:25
**expenses** 30:7 35:12 55:24 64:1 75:20

**explain** 25:10 31:22, 23 32:9 34:14 43:10 54:20 66:10
**explanation** 57:1 77:21
**express** 79:10
**extent** 38:24 42:14 78:2
**eye** 9:10

**< F >**
**facilitate** 65:2
**facilities** 8:7
**fact** 47:2, 3 58:15, 16 73:20 76:17
**factored** 43:23
**familiar** 18:5, 16
**far** 18:15 31:11 49:13
**fault** 57:3
**February** 11:3
**Federal** 2:3, 20
**fees** 43:20
**fighting** 9:17
**file** 50:8, 10
**filed** 8:23 13:5, 24 14:10, 18 50:11, 15 54:11
**filing** 10:23 13:20 51:20 55:25
**filings** 6:22 7:13
**Finally** 44:15
**financial** 4:25 15:4 51:21 52:11 67:7
**financials** 20:23
**find** 16:4 30:23 31:1, 10
**fine** 26:2 40:8 49:7, 11 58:20, 24
**finish** 26:16, 22 35:19 74:9
**finishes** 42:7
**firm** 27:21, 24 29:8
**first** 4:3 7:25 37:16 50:21 51:5 78:20
**Fisher** 2:13 5:4, 5 11:11, 15, 17, 22 12:4 24:2 26:15, 20, 25 29:25 30:14 35:18 39:9, 13, 17, 24 40:5,

11 41:7 42:24 46:2, 4, 23 48:15, 19 49:2 53:16, 22 54:1, 5, 9, 13, 19, 24 55:7, 11, 15 57:18, 25 58:6, 14, 25 60:7 71:19 74:8 75:9 77:19 78:14 80:2
**F-I-S-H-E-R** 5:6
**five** 9:18
**folder** 32:1 40:20 41:13 52:19 56:21, 23, 25 57:15, 16 67:4
**folders** 62:17 64:17 70:6
**follow** 29:3 60:15
**followed** 9:22
**follows** 4:4
**forecasting** 20:22
**forget** 44:8 50:25
**Form** 24:3 41:8 75:10
**forms** 38:25 39:3, 6
**forth** 77:2
**forthcoming** 57:2
**forward** 51:13 68:20 77:16 79:7, 9
**found** 30:25 44:17
**FRBP** 4:14
**FRCP** 4:14
**Fred** 58:8
**Frederic** 4:23
**Frederick** 2:24
**Friday** 50:22
**front** 70:2
**Full** 55:15, 16 76:9, 10, 13, 15, 18
**fully** 81:3
**fulsome** 79:19
**fund** 30:6 32:20 33:1 59:12, 15
**funding** 74:2 76:1
**funds** 75:19
**furnished** 59:19
**further** 23:21

**< G >**
**Gannone** 2:22 4:25
**gather** 6:19

**gathering** 23:7
**Gauge** 75:1
**general** 67:9
**generally** 9:4 46:20
**generate** 67:14
**generated** 56:12 67:18, 19
**give** 46:19
**given** 19:20 55:1, 6 66:22
**Gloucester** 8:7
**go** 6:8 8:21 15:13 16:2 19:14 21:5 25:15 29:21 30:25 34:20 36:24 37:8, 11 40:23 46:5 53:2 54:15 62:15 77:2, 15 79:7 80:8
**goes** 18:10 26:25 31:12 36:24
**going** 5:15 6:13 8:22 11:14 13:23 14:12, 22 16:2, 3 26:16 30:9 43:24 46:11 48:12 51:13 68:2 70:4 77:15 79:9
**GONZALEZ** 2:1 3:1 4:2 5:10, 13, 19, 21 6:12 14:12, 16 20:19 22:19 24:22 27:20 30:16 31:15 34:14 37:21 38:18 39:10 42:14 46:18 48:1 53:17 55:21 60:14 64:17 73:11 78:18
**Good** 4:5 5:13, 14 8:15 51:1, 12 57:19
**Google** 42:10 74:25
**greedy** 10:6
**Greenway** 2:15
**guarantee** 20:3 21:21
**guess** 9:14 57:3 71:1
**gun** 58:7
**guy** 78:11
**guys** 70:6

**< H >**

handled  62:9  79:12
handles  63:12
happen  16:9
happened  9:3, 5
  10:3  50:21
happy  78:9
Harbaugh  8:2, 3
Harbor  8:6
Hawk  9:7  55:13
hear  58:6, 8
heard  8:2  24:19
  61:24, 25
hearing  81:5
held  2:7
help  17:18  49:6
  51:7  80:1, 7
helped  7:5
helping  7:12  13:3
Hey  16:17
High  8:10
Hill  8:3  42:3  75:4
hired  7:4  10:9
hit  77:16
honest  68:1
Honestly  20:8  36:4
  50:18  52:12  73:21
hopes  10:19
hospital  46:7  47:12
  48:8  69:10  78:12
hours  69:22  72:24
Houston  2:16

< I >
ID  65:9
idea  27:7
identified  35:2
identify  20:20  27:24
  35:11
identifying  33:11
IDs  67:1
illness  46:21
immediately  36:9
  41:15
immunocompromised
  48:16, 25
implementing  44:1
include  38:22  50:5
  51:8
including  32:21

43:14  67:8
incomplete  56:24
incorrect  61:8  65:6
independent  10:13,
  25  12:16  27:15  28:8,
  10  63:18
in-depth  78:22
indicated  60:18
indicating  14:18
  38:10  51:23
indication  56:22
individuals  12:16
inform  36:21
information  6:20
  22:4, 11, 23  23:8, 15,
  22  40:1, 16  43:10
  44:17  46:20  51:8
  59:11, 14  60:19  62:4,
  22  63:6, 13  65:14
  66:11  70:5, 10  71:2,
  7, 12, 22  72:12, 14, 18,
  19  73:16  74:16  77:1,
  3  78:5, 22  79:3, 4, 5
informed  76:10
infused  22:8
initial  6:3
injunction  9:15
Innovations  18:6
Ino  18:11
Inovatures  18:6
Inoventures  18:7, 12,
  13, 20
input  66:23
inquired  14:7
inquiries  20:9  62:18,
  19
inquiry  20:15  32:3
  40:20  42:16
instructed  19:16
insufficient  6:4
intent  41:23  42:2, 11
  74:24
intention  43:2
internal  15:22, 24
  62:7
International  41:18
interrupt  8:21
introduce  5:2
invasion  57:20
investigation  22:2

investors  63:7, 9
  75:21, 23
invoice  11:25  36:6,
  15, 21  38:14, 25  60:4,
  22  64:21
invoices  16:14  19:11,
  14  20:13  28:5  29:13
  36:6, 10, 11  38:9
  39:2  52:3, 20  54:15
  55:23  56:8, 11, 20
  57:2  64:21  68:11
involved  21:25
  23:20, 24  24:14  26:5
  27:5  29:7  31:13
  35:25  41:4  64:3
  72:7
involving  36:1
IQH3D  42:2  75:3
issuance  22:5, 12
  23:23, 24
Item  43:9
items  17:2  56:6
  its  50:8  75:19

< J >
James  2:22  4:25
Jeeva  13:8  36:7
  37:24  64:23
John  2:19  4:24
John.schanne@usdoj.g
ov  2:22
Joseph  20:22  32:9
  61:12
journal  19:19  53:9,
  10
journals  52:8, 9  67:8,
  9
July  11:9  37:17
  39:10, 18, 19, 25
  43:21  56:17
jumped  58:7
June  39:23  56:19

< K >
keep  8:22  25:25
  39:15
keeper  6:16
keeping  17:13
kept  9:17

Kevin  2:18  4:6
  11:11  27:1  38:20
  40:7  42:6, 7
Kevin.p.callahan@usd
oj.gov  2:21
Key  57:8
kill  47:16
kind  39:6  66:17
  68:23
kinds  52:10  53:11
knew  71:23  77:25
know  6:17  7:6, 12
  8:2  9:13, 17  10:2, 19
  11:23  16:7, 18  17:16
  18:3, 15  22:12  23:1,
  8, 9  25:11, 12, 14
  27:14, 17  28:21
  29:10  32:5  34:9
  38:12, 13, 14  46:7, 18
  47:9, 18  48:20  50:16
  53:3, 14  61:5  62:3,
  11  63:2, 14  70:16, 21,
  25  74:1, 13  75:19, 21,
  23  76:12, 13, 24  78:7,
  10, 15
knowledge  32:15
  62:11  73:15  74:17
known  16:12  63:19

< L >
Laster  9:13, 23
Laster's  9:19
late  39:10, 17, 19, 25
  44:10
law  27:21, 24  29:7
lead  5:8  22:10
learn  69:2
leave  78:11
led  76:17  79:12, 14
ledgers  67:9
legal  58:12, 18
letter  23:1  44:7
letters  41:23  42:2,
  10  74:24
Lewis  2:12, 15  27:25
  28:13
limitation  43:14
limited  32:21  41:19
  75:3, 4

**list** 42:*5*
**listed** 53:*18*
**little** 6:2*3* 13:*17*
 51:*11* 67:*11*
**load** 56:*7, 20*
**long** 69:2*1*
**longer** 9:2 77:*16*
 79:7
**look** 14:*13* 25:*12*
 26:*13* 29:2*3* 44:*14*
**looked** 32:*10*
**looking** 16:*18* 20:*16*
 26:5 43:*15, 18* 58:*17*
**lot** 13:*9, 13* 16:6
 28:22 51:7 53:5
 70:*16* 78:7
**loved** 57:4

**< M >**
**M&T** 57:*8*
**main** 28:*17*
**maintain** 52:*9*
**making** 37:*17* 51:*13*
**manager** 7:*17, 19* 8:*1*
**managing** 8:*12, 13*
**Manufacturing** 75:*1*
**March** 8:2*3* 10:22
 11:*3* 12:2*1, 22* 30:7
 32:22 35:*13* 37:*17*
 39:*19* 44:2 56:*18*
 57:9 62:24
**Market** 2:7, *20* 25:*16*
**Mathu** 4:*10* 6:2 7:7
 16:*1, 8, 15, 19* 19:*16*
 34:6, 21 36:7, 23
 38:4 46:6 48:22
 64:9 68:*1, 8, 20* 69:*9,
12*
**matter** 77:*12*
**matters** 9:*14*
**MDC** 1:*5, 8*
**mean** 6:*1* 11:*18*
 23:*17* 25:*1* 26:*12*
 33:*18* 36:4 39:*1*
 43:*19* 44:22 45:25
 46:*1* 47:22 50:*17*
 52:*12* 53:2, *3* 56:*17*
 62:*16* 65:*17* 70:*14*
 76:*11*

**meaning** 44:*18*
**means** 8:*15* 51:7
**meant** 63:*10, 11*
**MEDIA** 1:7 4:*20*
 15:6
**medical** 46:*19*
**meet** 71:*1*
**meeting** 4:2*1* 15:22,
*25* 20:7, 8, *9* 26:4
 30:*9* 44:*16* 50:2*1*
 69:2*1* 71:*15* 72:2
**memorialized** 31:2
**mention** 50:2*4*
**mentioned** 32:*1*
 34:*18* 50:*17* 68:2
**message** 16:*16*
**messaged** 68:*18*
**met** 7:*7, 10* 50:2*1*
 69:*19* 79:*19*
**Michael** 60:*6, 25*
**million** 59:*12, 15*
**mind** 5:*1* 38:2*1*
**minutes** 30:*17*
**missing** 76:*11*
**Mm-hmm** 15:*3, 16*
 19:*12* 21:*12* 22:*15*
 41:*3* 56:*1*
**mode** 68:*5*
**mom** 37:*11*
**moment** 33:22
**Monday** 69:*5, 6, 7*
**money** 22:*8* 23:2, *5*
 44:*10, 13* 54:*16*
**monies** 59:*18* 62:2*3*
**monitored** 35:2
**month** 10:*16, 17*
 11:*8, 24* 12:*3, 5, 12,
19* 19:2*0* 44:2
**monthly** 11:2 13:*3, 6*
 22:2*0, 23* 23:*1* 43:*11,
20, 23* 50:*9* 57:7
**months** 12:*5*
**MOR** 40:4 44:6
**morning** 4:6 5:*13,
14* 76:7
**MORs** 6:2*1* 25:22
 46:*12* 51:*3, 6* 52:2*0*
 65:*3* 70:22 72:*16*
 78:*3, 5, 19, 23*

**Morton** 55:*18*
**mother** 34:7 37:4
**mouth** 19:*4*
**Mullica** 8:*3*
**multiple** 76:22

**< N >**
**name** 4:6 18:*10*
 28:*11* 29:*14, 18*
**names** 28:6 55:*15, 16*
**NC** 2:20
**necessarily** 29:2
**need** 25:*19* 39:*13*
 41:*14* 68:22 73:4
**needed** 6:*18* 20:*10*
 45:4 68:*3, 14* 72:4
 77:*13*
**needing** 62:4
**negotiated** 27:*15*
**negotiations** 27:6
 73:*16, 17* 75:7, *16*
**Netherlands** 32:22
**Network** 4:*18*
**NETWORKS** 1:*4*
 15:5
**never** 7:7, *10* 9:*10,
21, 22* 42:2*5* 47:2
 52:*17, 23* 68:2*5* 76:*9*
**new** 42:*15* 52:2
 71:*14*
**Nicely** 54:22, *25*
**Nicole** 16:*1*
**Nix** 2:20
**Nope** 22:*15* 57:*14*
**notary** 2:*5*
**note** 77:2*3*
**notes** 40:6 81:*4*
**November** 4:9 49:2*3*
 50:*12* 51:2*3* 71:5, *16,
24* 72:*3, 8*
**number** 23:4 45:*12*
 65:5 66:4
**numbers** 8:*16* 44:*4,
6* 65:*12* 66:22

**< O >**
**Objection** 24:2 41:7
 57:*18* 75:*9*
**obligations** 15:5 76:2

**obtained** 43:*11*
**obtaining** 22:*11*
**obviously** 45:2*1* 52:*1*
 65:*18*
**October** 50:*9* 71:*8*
**offhand** 33:2*3*
**Office** 2:*19* 7:6
 62:*14*
**officer** 78:*8*
**officers** 33:*5* 35:*5*
**Oh** 28:*3* 54:*9*
**Okay** 5:2*4* 6:*16, 23*
 8:*11* 10:7, *11* 11:2*1*
 12:6, *24* 13:*2, 15, 23*
 14:*9, 21* 15:2 16:2, *6,
25* 17:22 18:*1, 12, 23*
 19:*9, 24* 21:*3, 5, 6*
 22:*4, 10* 23:6, *11*
 24:2*0, 25* 25:2*1* 27:2,
*4, 18, 23* 29:*1, 19*
 30:2*3* 31:*18, 21, 24*
 32:*18* 34:*12, 24* 35:*1,
22* 36:4 37:*1, 6, 8*
 39:*8, 24* 40:*11, 22*
 41:*10, 21* 43:9 44:*14,
15* 45:*15* 46:*13* 47:7,
*23* 48:*13* 49:*10, 20,
22* 50:*13* 51:*18*
 53:22 54:5, *9, 19*
 55:*10* 57:6 59:5, *7, 9,
22* 61:2*4* 62:*16, 20*
 63:*16* 64:*11* 66:*13*
 68:4, *6* 69:2*1* 73:*3, 6*
 74:2*5* 75:*13, 18* 76:*4,
5* 80:7
**omnibus** 9:*9*
**once** 26:2*1* 34:22
**operate** 22:2*3*
**operating** 22:2*0*
 43:*11* 45:2*4* 50:*9*
**operations** 30:6
**opportunities** 42:*15*
**opposed** 78:*16*
**order** 14:*10* 42:*11*
**orders** 24:*12* 40:2*5*
 41:*13, 17, 22* 74:*18,
23*
**organized** 40:*19*
**original** 71:*8*

outside 70:*19*
overturn 9:*19*
owns 8:*4*

**< P >**
**PA** 2:*21*
**PAGE** 3:*1*
**paid** 10:*16* 11:*2, 23*
 15:*7, 9* 16:*8* 23:*2*
 33:*7* 36:*22* 38:*4, 11*
 55:*24* 68:*14*
**paper** 19:*7*
**Paragraph** 74:*22*
**paralegal** 7:*14*
**Park** 44:*8*
**part** 8:*16* 32:*23*
 35:*12* 42:*20* 44:*16,*
 *20* 46:*10* 67:*22*
**participate** 21:*7*
 22:*10* 75:*7, 15*
**participated** 27:*5*
**participating** 27:*5*
 45:*23*
**particular** 53:*1* 68:*19*
**parties** 35:*7* 36:*3*
 45:*16*
**party** 36:*14*
**pay** 13:*1* 16:*11, 17,*
 *22, 23* 19:*25* 21:*19*
 30:*6* 75:*19*
**payable** 19:*18* 52:*8,*
 *24* 53:*9* 67:*8*
**payables** 19:*20* 53:*21*
**paying** 11:*5, 10*
**payment** 16:*18* 20:*4*
 21:*21* 29:*7, 12* 37:*22,*
 *25* 38:*2* 60:*5, 24*
 64:*1, 20, 22* 65:*3, 18*
 66:*7*
**payments** 15:*10*
 16:*7* 18:*17, 20* 22:*24*
 27:*20* 28:*13* 33:*3, 11,*
 *15, 18, 19* 34:*10, 15,*
 *16, 18* 35:*3, 12* 36:*1,*
 *11* 37:*13, 18* 38:*23*
 52:*4* 64:*18* 68:*11*
**pays** 16:*24* 34:*23*
**pen** 39:*12, 14*
**PENNSYLVANIA**

1:*2* 2:*7, 8*
**people** 15:*20* 47:*9*
**percent** 16:*24* 48:*2*
 56:*13* 68:*16*
**period** 45:*16*
**person** 7:*10* 33:*4, 7,*
 *12, 16* 35:*4* 68:*23*
 78:*3*
**personal** 32:*15*
**personally** 51:*15*
 79:*11*
**persons** 33:*4*
**Philadelphia** 2:*8, 21*
**phone** 16:*16* 68:*12,*
 *17*
**playing** 25:*13*
**Plaza** 2:*15*
**pleadings** 28:*22*
 40:*25*
**Please** 8:*21, 22*
 20:*19* 25:*10* 27:*24*
 28:*14* 31:*22* 32:*9*
 34:*14* 66:*10* 74:*11*
**plug** 44:*6*
**Plus** 12:*25*
**PO** 42:*4*
**point** 22:*18*
**points** 14:*7*
**populated** 72:*21*
**POs** 42:*3*
**possession** 23:*18*
**postagreement** 21:*19*
**postpetition** 19:*25*
**preliminary** 9:*15*
**preparation** 51:*20*
 69:*25*
**prepare** 13:*3* 22:*19*
 43:*16* 69:*17*
**prepared** 6:*20* 72:*23*
 77:*11, 13, 14*
**preparing** 25:*22*
**prepetition** 19:*25*
 21:*19*
**PRESENT** 2:*10, 22*
 15:*24* 44:*2* 57:*9*
**presentation** 79:*19*
**presented** 23:*14*
**pretty** 6:*17* 7:*2*
 39:*2* 54:*10*
**previous** 5:*24* 54:*4, 7*

**previously** 15:*17*
 59:*19*
**print** 38:*1* 53:*12, 13*
**printout** 52:*13*
**prior** 6:*13* 8:*24*
 67:*11*
**privilege** 57:*20, 23*
**privy** 32:*12*
**probably** 68:*2*
**problem** 78:*17*
**Procedure** 2:*4*
**proceed** 79:*9*
**proceeding** 15:*8*
 48:*21*
**proceedings** 81:*3*
**process** 29:*12* 36:*9*
 42:*20* 69:*1* 70:*24*
**processed** 27:*20*
**produce** 6:*10* 14:*8*
 52:*1* 53:*5, 8, 15* 61:*1,*
 *10* 71:*23* 77:*5, 10*
**produced** 6:*18* 31:*4*
 41:*25* 42:*1* 45:*14*
 51:*24* 52:*15* 61:*7*
 63:*3* 76:*22* 77:*8*
 78:*20, 24*
**production** 6:*3* 10:*4*
 21:*8* 26:*14* 38:*6*
 41:*4, 11* 44:*21* 50:*5*
 63:*21* 64:*3* 72:*6, 10*
 74:*22* 76:*9, 10, 14, 15,*
 *18*
**PROHIBITED** 1:*11*
**Project** 7:*17, 18*
**promised** 76:*14*
**promises** 79:*16*
**proper** 77:*7*
**provide** 38:*7* 55:*23*
 57:*7* 59:*10, 14* 60:*3*
 62:*21*
**provided** 4:*10* 45:*8*
 56:*8, 23*
**public** 2:*6*
**pull** 41:*14*
**Purchase** 40:*24*
 41:*13, 16, 22* 42:*11*
 74:*17, 23*
**purporting** 52:*10*
**purposes** 35:*3*

**pursuant** 2:*3* 4:*12*
 60:*20* 61:*2*
**push** 10:*2*
**put** 16:*9* 17:*1* 19:*3,*
 *21* 28:*5* 29:*13* 31:*25*
 34:*19* 36:*8* 38:*5, 14,*
 *16* 40:*4, 9, 18, 19*
 43:*2, 11* 44:*11* 47:*22*
 61:*17* 72:*20* 78:*5*
**putting** 23:*3* 31:*15,*
 *23* 51:*9* 56:*14*

**< Q >**
**quarterly** 39:*22*
**question** 11:*14* 15:*4*
 20:*18* 21:*17* 22:*4*
 24:*5* 30:*2, 15* 33:*8*
 38:*18* 42:*7* 46:*15*
 58:*7* 59:*3* 60:*1*
 64:*13, 25* 65:*22* 78:*4*
**questions** 5:*16* 6:*14*
 14:*23* 60:*15* 78:*4*
**QuickBooks** 13:*12*
 19:*22* 34:*19* 35:*8, 9*
 36:*9* 52:*13* 67:*12*
**quicker** 69:*1*

**< R >**
**Rafael** 2:*11* 5:*9* 29:*6*
**Rafael.zahralddin@le**
**wisbrisbois.com** 2:*13*
**raise** 58:*22*
**raised** 22:*8*
**raising** 57:*22*
**Rajan** 4:*10* 6:*2*
 13:*8* 16:*23* 17:*16, 23*
 19:*16* 34:*3, 4, 22*
 37:*4* 38:*10* 45:*15*
 46:*20* 51:*22* 55:*22*
 60:*3, 17* 61:*22* 63:*17,*
 *25* 67:*12* 68:*8* 76:*15*
 78:*21*
**Rajan's** 7:*4* 34:*6*
**reached** 27:*10*
**read** 15:*17* 41:*1*
 58:*9* 61:*19, 21* 62:*2,*
 *3* 74:*5, 12*
**ready** 42:*8*
**real** 49:*17*
**realize** 24:*22* 40:*6*

**really** 10:*17* 16:*22* 17:*16* 18:*3* 19:*8* 25:*13* 45:*25* 51:*17* 68:*21*
**realm** 70:*19*
**reason** 64:*22* 67:*17*
**recall** 21:*23* 45:*19* 51:*22* 56:*3, 4*
**receipt** 60:*4, 22*
**receipts** 38:*15*
**receivable** 52:*8, 24* 53:*10* 67:*9*
**receivables** 53:*18, 23* 54:*7, 11*
**receive** 36:*8* 37:*20, 21* 72:*11*
**received** 26:*3* 70:*4*
**receives** 34:*16*
**recess** 60:*12* 73:*9*
**reconcile** 13:*7, 11*
**reconciled** 66:*18*
**reconciling** 17:*15*
**record** 14:*9* 49:*24* 58:*10* 60:*11, 16* 73:*12* 79:*10* 80:*8*
**records** 17:*14, 18* 18:*18* 21:*1* 43:*15* 51:*19* 65:*19*
**recount** 45:*20*
**re-do** 51:*3*
**reference** 9:*11*
**referenced** 30:*16* 40:*25* 41:*14* 70:*12*
**regard** 64:*18*
**regarding** 22:*5, 11, 24* 23:*16, 22* 32:*7* 45:*23* 59:*11, 15* 60:*16* 70:*10*
**regards** 73:*19, 21*
**registers** 52:*3, 20* 64:*20*
**rehired** 10:*8*
**reimbursement** 38:*25* 39:*3, 6*
**related** 20:*25* 38:*23*
**relating** 16:*4*
**relationship** 6:*24* 10:*12, 13* 18:*4*
**remark** 33:*23*

**remember** 11:*7, 9* 28:*6, 10* 29:*15* 40:*13* 50:*25* 70:*4*
**report** 43:*22* 50:*9*
**Reporter** 2:*5* 21:*13* 55:*3* 58:*9* 59:*23* 81:*10*
**reports** 13:*4, 6* 22:*20, 23* 39:*18* 43:*12, 16, 23* 45:*24* 50:*10, 11, 14* 67:*15*
**represent** 14:*16*
**representations** 79:*15*
**representative** 4:*14, 18* 5:*10, 25* 6:*1* 14:*20*
**representatives** 5:*2*
**represented** 29:*8*
**representing** 29:*8*
**REPRODUCTION** 1:*11*
**Repsik** 2:*5* 81:*10*
**request** 60:*20* 61:*18* 63:*20* 67:*19, 25*
**requested** 14:*7* 45:*11* 67:*6, 21, 24* 71:*13* 72:*13*
**requests** 74:*22*
**required** 4:*13*
**requirements** 6:*4*
**research** 47:*4*
**respect** 8:*12* 13:*15* 14:*23* 18:*24* 21:*9* 24:*16* 32:*24* 40:*22, 24* 41:*10, 21* 44:*15* 56:*11* 62:*22* 63:*6, 18* 70:*8* 71:*12* 73:*13, 16* 74:*17* 75:*18* 79:*1, 11*
**respond** 77:*20*
**responding** 16:*5*
**response** 40:*16*
**responsibilities** 77:*10*
**responsibility** 77:*9*
**responsible** 31:*15* 33:*9*
**rest** 41:*2* 74:*24*
**restricted** 47:*8*
**restricts** 48:*4*
**restructure** 25:*15*
**returned** 54:*16*

**review** 19:*6* 24:*14* 70:*1, 3*
**right** 10:*10* 12:*15* 13:*21* 17:*3, 7* 18:*19, 23* 19:*23, 24* 24:*7* 25:*23, 25* 26:*15* 28:*8* 29:*14, 20, 21* 42:*22* 43:*7* 44:*19* 46:*3, 9* 49:*3* 50:*20* 54:*13* 55:*21* 60:*21* 61:*14* 65:*20* 70:*2* 71:*8, 18* 73:*8*
**Robert** 2:*20*
**robust** 79:*19*
**Roger** 7:*4*
**roles** 7:*20*
**rolling** 42:*18* 79:*3, 4, 5*
**Room** 2:*7, 20* 4:*21* 47:*12*
**Rules** 2:*4* 9:*23*
**rulings** 9:*19*
**running** 10:*20*

**< S >**
**saying** 18:*24* 23:*1* 72:*7* 78:*18*
**says** 34:*22* 78:*11*
**SCBB** 32:*21*
**Schanne** 2:*19* 4:*24*
**schedule** 48:*10* 54:*12*
**scheduled** 48:*12*
**schedules** 51:*20*
**school** 8:*10*
**se** 17:*17*
**search** 23:*21* 32:*23*
**see** 10:*5* 15:*2, 15* 39:*22* 40:*7, 9* 45:*13* 56:*21* 61:*16* 62:*2*
**seeing** 79:*1*
**seen** 14:*1, 24* 61:*6* 63:*5* 64:*6*
**select** 76:*20*
**selected** 4:*11* 76:*21*
**semiconductor** 22:*6*
**semimonthly** 11:*20* 12:*10*
**send** 44:*4*
**sending** 37:*9*

**sends** 22:*25* 38:*3*
**September** 9:*12*
**series** 5:*15*
**served** 4:*12*
**services** 11:*6*
**set** 16:*13* 44:*16* 77:*2*
**setting** 63:*18*
**Shad** 55:*13*
**Shadron** 9:*6* 55:*18*
**share** 40:*1*
**shareholders** 62:*22* 63:*10, 12* 70:*18*
**shares** 22:*5, 9* 23:*4, 23, 25* 44:*12*
**Shastney** 9:*6*
**sheet** 42:*16* 53:*19* 65:*2*
**sheets** 6:*21* 25:*24* 70:*23*
**she'll** 38:*1*
**short** 30:*19* 73:*4*
**show** 13:*23* 19:*19*
**showed** 13:*17*
**shown** 77:*22*
**sick** 45:*16, 21* 46:*8*
**side** 7:*8* 9:*13* 27:*15* 55:*6, 8, 12*
**Similar** 30:*2*
**SISTAR** 41:*18* 42:*4, 11* 75:*3*
**situation** 49:*6, 17* 67:*23* 78:*10*
**slow** 79:*4*
**Smith** 2:*12, 15*
**somebody** 36:*14* 65:*10*
**sorry** 8:*20* 9:*15* 12:*8* 17:*21* 21:*15* 23:*22* 24:*6* 26:*18, 19, 24* 27:*12* 28:*15, 16, 20, 24* 35:*20* 37:*24* 45:*7* 55:*3, 17* 58:*8* 59:*8* 63:*9* 65:*15* 66:*5* 71:*4* 72:*3*
**sort** 46:*19* 47:*5* 74:*14*
**sound** 13:*13*
**sounds** 47:*5*
**source** 17:*4*

Deposition of Amanda Gonzalez

Rizhao Zhigang Networks, Inc. & Technovative Media, Inc.

**Southern** 42:*12*
**speaking** 26:*22*
**specific** 41:*13* 47:*4*
*58:1*
**specifically** 68:*10*
**specifics** 25:*12*
**spelled** 45:*12*
**spent** 44:*5, 9*
**split** 31:*20*
**spoken** 44:*22*
**spread** 65:*1*
**spreadsheet** 65:*24*
*66:1, 20, 24, 25*
**spreadsheets** 66:*17*
**Sr** 2:*20*
**start** 65:*13*
**started** 7:*1* 11:*10*
*43:24* 44:*1* 70:*5*
**starting** 44:*2*
**starts** 26:*23*
**statement** 41:*1* 51:*21*
**statements** 13:*11, 16,
17* 52:*2, 11, 21* 57:*8,
11* 64:*20*
**STATES** 1:*1* 2:*18,
19* 4:*7, 22, 23* 49:*15*
*56:23* 79:*2*
**stating** 22:*7* 44:*9*
**stay** 55:*4*
**staying** 49:*13*
**stenographic** 81:*4*
**Steve** 8:*1*
**Stone** 8:*6*
**stop** 46:*8*
**storage** 8:*6*
**stores** 10:*4*
**STREAM** 1:*4* 4:*18*
*5:6* 6:*24* 7:*1, 16, 25*
*8:24* 10:*8, 10, 13, 23*
*11:10* 13:*17* 15:*5, 7,
20* 18:*1, 14, 21* 20:*23*
*22:5, 9* 23:*15* 27:*11,
16* 28:*16* 34:*19*
*35:12* 36:*14* 37:*21*
*38:10* 44:*10, 18*
*45:22* 51:*10* 52:*25*
*53:10* 59:*12, 16* 64:*2*
*70:21* 74:*4* 75:*7, 20*
*76:1*

**Stream's** 36:*10*
*43:18* 44:*5, 11*
**Street** 2:*7, 20*
**strictly** 63:*12*
**stuff** 31:*23* 39:*6*
*50:23*
**sub** 22:*7* 23:*18*
*30:16, 19* 73:*20*
**submit** 51:*19* 52:*7*
*63:17*
**submits** 11:*25*
**submitted** 62:*12*
**subpoena** 4:*12, 13*
*6:5* 60:*20* 61:*2* 71:*8*
**subscription** 24:*23*
*25:5* 30:*11, 18, 19, 20*
*31:5* 32:*4* 59:*17*
*73:13* 74:*6, 12*
**subsidiaries** 32:*20*
**substance** 78:*22*
**Suby** 16:*1* 19:*17*
*20:16, 20, 21* 32:*6, 11*
*36:7* 40:*4* 44:*1*
*61:12* 62:*25* 63:*12*
*76:23*
**Suite** 2:*12, 15*
**summer** 29:*16, 17*
**Sunny** 42:*3* 75:*3*
**supplementing** 42:*17*
**supply** 57:*10* 63:*24*
*67:7*
**supplying** 60:*18*
**support** 24:*23* 25:*5*
**supposed** 71:*6* 74:*14*
**Supreme** 9:*18, 23*
**Sure** 5:*4* 7:*1* 17:*20*
*37:6* 45:*3* 50:*17*
*51:1* 54:*10* 60:*9*
*66:19*
**sworn** 4:*3*
**symptoms** 46:*23, 25*
**system** 16:*10* 17:*1*
*18:25* 79:*3*

**< T >**
**take** 7:*8* 9:*8* 14:*13*
*37:12* 40:*7* 60:*7, 10*
*73:4*
**taken** 2:*3* 60:*12*
*73:9* 81:*4*

**talk** 18:*23* 57:*23*
*58:2, 4*
**talking** 26:*21* 44:*24*
*45:6* 51:*22* 68:*6*
*73:23* 74:*25*
**task** 33:*2*
**tasks** 20:*25* 22:*11*
**team** 20:*6, 8* 26:*4*
*30:8*
**Techno** 22:*6*
**technology** 25:*17*
*42:3* 75:*4*
**TECHNOVATIVE**
*1:7* 4:*19* 5:*7* 6:*25*
*10:24* 15:*6, 21*
**Telecom** 42:*12*
**tell** 6:*23* 14:*1* 35:*24*
*36:23* 37:*6, 11* 57:*16*
*72:17*
**telling** 72:*4, 11* 77:*25*
**term** 20:*1* 42:*15*
**terms** 38:*6* 68:*10*
**testified** 4:*4*
**testify** 6:*11, 15* 69:*15*
*70:13* 77:*11* 78:*19,
21*
**testimony** 4:*11, 15*
*67:11* 69:*18* 79:*15*
**text** 16:*16* 68:*13, 20*
**texts** 29:*24* 63:*25*
**Thank** 23:*12* 28:*18*
*30:3* 48:*14* 60:*14*
*66:14* 73:*11* 79:*24*
*80:2, 9*
**theirs** 39:*21*
**thing** 11:*19* 31:*4*
*38:2* 47:*25* 77:*24*
**things** 7:*13* 20:*15*
*25:2* 31:*16* 32:*10*
*40:10* 47:*4* 48:*4*
*50:4* 76:*6* 77:*4, 17*
**think** 11:*18, 23* 12:*2*
*13:14* 14:*5* 19:*4*
*20:6, 10* 24:*18* 28:*4*
*29:6, 10, 14, 18* 30:*12*
*32:5* 33:*20* 34:*1*
*35:13* 37:*2, 13* 41:*24*
*52:5, 21* 54:*11* 56:*19*
*73:4* 77:*7, 23* 79:*6, 8*
**thinking** 28:*16*

**third** 35:*7* 36:*2, 14*
*76:9*
**third-party** 24:*13*
**thought** 28:*17*
**three** 12:*25*
**throw** 26:*17*
**time** 4:*10* 16:*10*
*34:20* 41:*13* 45:*17*
*50:1* 51:*5* 68:*16, 18,
21* 76:*9* 78:*24* 80:*9*
**timely** 50:*15* 79:*19*
**title** 7:*15*
**today** 4:*21* 5:*8* 6:*8,
9, 15* 16:*17* 37:*9*
*38:16* 48:*21* 50:*2*
*56:17* 63:*14* 69:*3, 18*
*70:1, 13* 71:*22* 73:*1*
*76:22*
**told** 40:*9* 45:*15*
*47:2* 51:*25* 52:*17, 18,
23* 53:*4* 65:*14* 72:*21*
**Tom** 44:*8*
**Topic** 15:*2* 16:*3, 5*
*18:24* 19:*24* 21:*5, 9,
25* 30:*10* 38:*7* 40:*24*
*43:9*
**topics** 14:*19, 23*
*25:25* 40:*16* 44:*16*
*70:9, 11* 77:*2*
**tracked** 35:*2*
**transaction** 62:*5*
*65:8, 9* 66:*21, 23*
*67:1*
**transactions** 66:*21*
*67:4* 73:*18*
**TRANSCRIPT** 1:*11*
*81:6*
**treating** 79:*2*
**treatments** 48:*10*
**trial** 4:*24*
**tried** 7:*8* 48:*10* 80:*6*
**troubled** 79:*11*
**Trustee** 2:*2, 18, 19*
*4:7, 16, 22, 24* 37:*14*
*38:8* 40:*21* 42:*18*
*44:8* 45:*10* 49:*15*
*50:4* 52:*19* 54:*21*
*56:24* 65:*2* 79:*2*
**truthfully** 70:*13, 15*
**try** 9:*23*

**trying** 10:2 25:*14*
30:*23* 51:*17* 52:*21*
69:*9* 80:*1*
**turned** 40:*4* 44:*12*
**TV** 1:*4* 4:*18* 5:*6*
6:*24* 7:*16* 8:*24* 15:*5,*
*20* 20:*23* 64:*2* 74:*4*
75:*7, 20* 76:*1*
**twice** 10:*16* 11:*24*
12:*3, 5, 12, 19*
**two** 11:*24* 12:*5*
16:*22* 21:*17* 69:*8, 22*
72:*24* 74:*20, 23*
**TX** 2:*16*
**typically** 34:*23*

**< U >**
**U.S** 2:*2* 4:*16* 38:*8*
40:*21* 42:*18* 44:*8*
50:*4* 54:*20* 65:*2*
**underlying** 73:*17*
77:*3*
**understand** 25:*1, 5*
26:*5* 49:*20* 50:*14*
56:*2* 63:*11* 74:*13*
79:*21*
**understanding** 25:*18*
30:*5* 32:*19, 25* 56:*10*
64:*25*
**understandings** 24:*10,*
*15*
**UNITED** 1:*1* 2:*18,*
*19* 4:*7, 22, 23* 49:*15*
56:*23* 79:*2*
**use** 18:*25* 37:*13*

**< V >**
**vacation** 50:*20* 68:*5*
72:*5*
**valid** 9:*10*
**various** 77:*17*
**vendor** 16:*21* 36:*14*
37:*7* 68:*19*
**vendors** 36:*16* 38:*11*
**Villages** 8:*3*
**voucher** 64:*22*
**VSI** 11:*8* 16:*8*
17:*10, 14, 17, 24* 22:*8,*
*24, 25* 24:*11, 23*
27:*11, 12, 21* 28:*2, 3,*

*23* 29:*8* 30:*5* 32:*20,*
*25* 33:*3, 12, 15, 20, 24*
34:*1* 35:*3* 36:*1, 2, 21*
37:*17, 22* 39:*18*
43:*19, 22* 44:*1, 9, 12*
51:*8* 59:*12, 16* 62:*23*
63:*19* 64:*1, 18* 65:*10,*
*18* 70:*18* 73:*14, 18,*
*21* 74:*1* 75:*19*
**VSI's** 22:*6* 24:*16*
27:*15* 44:*3*

**< W >**
**Wait** 26:*16, 22*
35:*18* 71:*19*
**walk** 13:*22*
**want** 11:*9* 19:*3*
20:*10* 25:*25* 26:*4*
29:*21* 37:*15* 47:*16*
58:*21* 78:*15* 79:*8*
**wanted** 9:*8, 25*
14:*19* 60:*21* 73:*12*
79:*10*
**watchdog** 79:*3*
**way** 8:*8* 41:*18*
48:*20* 77:*20*
**Wednesday** 2:*8*
**week** 50:*22*
**weeks** 11:*24*
**welcome** 49:*4*
**well** 6:*20* 7:*15* 13:*1*
17:*14, 25* 18:*16*
30:*25* 31:*19* 33:*8*
34:*17* 36:*23* 46:*22*
48:*10* 52:*17* 61:*9, 13*
66:*18* 71:*7* 74:*21*
78:*13*
**went** 7:*3, 24, 25* 9:*11,*
*18* 44:*1* 45:*13* 50:*22*
62:*7* 67:*2*
**we're** 10:*2* 23:*3*
25:*14* 37:*9* 49:*2*
51:*15* 68:*6* 72:*10*
73:*11* 77:*15* 79:*1, 14*
**we've** 74:*14*
**Wilmington** 2:*13*
**withdraw** 59:*1*
**witness** 2:*2* 3:*1* 4:*2,*
*11* 12:*2, 8* 20:*21*
21:*2, 15, 18* 22:*21, 25*

23:*9* 24:*24* 25:*3, 7,*
*11* 26:*19, 24* 27:*22,*
*25* 28:*3, 9, 15, 20, 23*
30:*20* 31:*17, 19, 24*
32:*11* 34:*17* 35:*20*
38:*19* 39:*1, 11, 15, 20*
40:*3, 8, 12* 42:*9, 19*
43:*4* 46:*22* 47:*1, 10,*
*13, 15, 20, 23* 48:*2, 6,*
*11, 17, 23* 49:*4, 7, 10,*
*18* 53:*20, 25* 54:*3, 8,*
*10, 17, 22* 55:*1, 5, 13,*
*17* 59:*4* 64:*14, 19*
65:*7, 20, 23* 66:*2, 5, 8,*
*13, 16* 76:*21, 23, 25*
77:*4, 8, 10, 12, 17, 18,*
*23* 78:*19* 79:*22* 80:*4*
**witnesses** 76:*22*
**won** 9:*18*
**word** 11:*25* 12:*1, 7*
**words** 19:*4* 58:*1*
66:*12*
**work** 7:*24, 25* 13:*8*
47:*12* 74:*14*
**worked** 8:*11, 12*
20:*12* 45:*2* 46:*1, 4*
**working** 70:*23* 72:*15*
**works** 18:*4*
**worse** 77:*24*

**< Y >**
**yeah** 8:*17* 12:*3* 14:*8*
15:*22* 17:*12* 19:*21,*
*23* 20:*12* 22:*25*
23:*10* 24:*8* 25:*7*
28:*15* 29:*12, 18*
33:*21, 25* 34:*5, 17*
35:*17, 23* 36:*23* 37:*6,*
*10, 24* 38:*19* 39:*4, 7*
40:*4* 42:*9* 43:*4*
44:*22* 45:*1, 9* 46:*4,*
*10, 16* 47:*14* 49:*18*
50:*16, 19* 51:*25* 53:*7*
54:*11, 12* 55:*9* 57:*15*
61:*15, 19* 62:*18* 66:*8*
68:*24* 69:*9* 71:*9*
72:*2, 14* 73:*23* 74:*5*
**year** 7:*2, 11, 20*
53:*24*

**Yep** 7:*22* 11:*4*
12:*20* 13:*5* 14:*15*
15:*1, 12* 18:*22* 19:*2*
22:*7* 30:*21* 35:*10*
36:*18* 43:*13* 50:*7*
56:*5* 66:*2, 16* 69:*16*
73:*2*
**Yesterday** 69:*24*

**< Z >**
**Zahralddin** 2:*11* 5:*9,*
*20* 20:*17, 24* 21:*3, 16*
22:*17, 22* 23:*6, 11*
24:*21, 25* 25:*4, 9*
27:*19, 23* 28:*1, 7, 12,*
*18, 21* 29:*4* 31:*14, 18,*
*21* 32:*8* 34:*13, 24*
38:*17, 20* 39:*8* 42:*6,*
*13, 22* 43:*1, 6* 46:*14,*
*17, 24* 47:*7, 11, 14, 17,*
*21, 24* 48:*3, 9, 13*
49:*8, 14* 55:*9* 58:*19,*
*23* 59:*2, 5* 64:*12, 16,*
*24* 65:*16, 21, 25* 66:*3,*
*6, 9, 14* 73:*6*
**zero** 9:*19*
**zeros** 51:*9*
**Zoom** 78:*15*

### WORD LIST

**< $ >**
**$45** *(2)*
**$50,000** *(2)*

**< 1 >**
**1** *(7)*
**10** *(2)*
**10:12** *(1)*
**100** *(2)*
**11** *(8)*
**11:51** *(1)*
**11th** *(1)*
**12** *(2)*
**13** *(1)*
**13th** *(4)*
**1400** *(1)*
**15** *(5)*
**15th** *(4)*
**17th** *(5)*
**18th** *(1)*
**19107** *(1)*
**19801** *(1)*

**< 2 >**
**2** *(3)*
**20** *(2)*
**2004** *(10)*
**2019** *(2)*
**2020** *(5)*
**2022** *(2)*
**2023** *(8)*
**22** *(1)*
**22nd** *(2)*
**23-10763** *(2)*
**23-10764** *(2)*
**23rd** *(1)*
**24** *(1)*
**27th** *(1)*

**< 3 >**
**3** *(1)*
**30** *(1)*
**320** *(2)*

**< 4 >**
**4** *(1)*

**< 5 >**
**5** *(6)*
**500** *(1)*

**< 6 >**
**6** *(1)*

**< 7 >**
**7** *(1)*
**700** *(1)*
**7030** *(1)*
**77046** *(1)*
**7th** *(2)*

**< 8 >**
**8** *(1)*

**< 9 >**
**900** *(2)*
**99** *(2)*

**< A >**
**a.m** *(2)*
**able** *(2)*
**Absolutely** *(14)*
**accept** *(1)*
**acceptance** *(1)*
**access** *(3)*
**accommodating** *(1)*
**account** *(5)*
**accountant** *(1)*
**accounting** *(1)*
**accounts** *(14)*
**accurately** *(1)*
**ACH** *(1)*
**acknowledged** *(2)*
**acting** *(1)*
**active** *(1)*
**activities** *(1)*
**actual** *(2)*
**addition** *(1)*
**address** *(1)*
**adjourn** *(1)*
**admitted** *(1)*
**adult** *(1)*
**advice** *(1)*
**affairs** *(1)*
**affiliates** *(2)*
**AGENCY** *(1)*

**ago** *(4)*
**agreed** *(12)*
**agreement** *(13)*
**agreements** *(18)*
**ahead** *(1)*
**al** *(1)*
**Alastair** *(3)*
**allegedly** *(1)*
**allow** *(3)*
**allowed** *(1)*
**Alyssa** *(2)*
**AMANDA** *(8)*
**amazing** *(1)*
**amended** *(1)*
**analyst** *(1)*
**and/or** *(1)*
**answer** *(9)*
**anticipation** *(1)*
**anymore** *(1)*
**apologize** *(1)*
**apparently** *(1)*
**appear** *(1)*
**appreciate** *(3)*
**appropriate** *(2)*
**approval** *(1)*
**approve** *(2)*
**approved** *(4)*
**approves** *(1)*
**April** *(2)*
**arrangement** *(1)*
**aside** *(1)*
**asked** *(4)*
**asking** *(6)*
**aspects** *(1)*
**asserted** *(2)*
**assets** *(4)*
**assigned** *(3)*
**assistant** *(2)*
**assisting** *(1)*
**assume** *(1)*
**assumed** *(1)*
**attachment** *(4)*
**attending** *(1)*
**Attorney** *(177)*
**attorney-client** *(3)*
**audible** *(1)*
**AUTHORIZATION** *(1)*
**authorized** *(2)*

**authorizing** *(1)*
**auto** *(4)*
**Avalon** *(1)*
**Avenue** *(1)*
**aware** *(6)*

**< B >**
**back** *(18)*
**backed** *(1)*
**background** *(1)*
**backup** *(6)*
**bad** *(1)*
**Baker** *(13)*
**balance** *(4)*
**bank** *(18)*
**banking** *(1)*
**BANKRUPTCY** *(13)*
**based** *(2)*
**basically** *(2)*
**basis** *(2)*
**BBAK** *(2)*
**began** *(1)*
**beginning** *(1)*
**begins** *(1)*
**behalf** *(15)*
**believe** *(11)*
**Bennett** *(7)*
**B-E-N-N-E-T-T** *(1)*
**Bennett.fisher@lewisb**
**risbois.com** *(1)*
**best** *(2)*
**bill** *(1)*
**bills** *(5)*
**Bimonthly** *(6)*
**Bisgaard** *(2)*
**bit** *(1)*
**biweekly** *(1)*
**board** *(2)*
**Bob** *(1)*
**book** *(1)*
**booked** *(1)*
**bookkeeping** *(2)*
**books** *(8)*
**Bosch** *(1)*
**Box** *(13)*
**Boxes** *(4)*
**brain** *(1)*
**break** *(4)*
**brief** *(1)*

briefly *(1)*
bring *(1)*
Brisbois *(4)*
Brown *(2)*
Building *(1)*
business *(2)*

**< C >**
call *(7)*
Callahan *(53)*
called *(4)*
calling *(2)*
cancer *(1)*
card *(1)*
care *(1)*
career *(1)*
case *(7)*
cause *(1)*
certain *(9)*
Certainly *(1)*
certify *(1)*
CERTIFYING *(1)*
changed *(1)*
Chapter *(1)*
check *(3)*
checks *(1)*
China *(1)*
circumstances *(2)*
claim *(1)*
claims *(4)*
clarification *(1)*
clarify *(4)*
clarity *(1)*
clearly *(2)*
client-privilege *(1)*
clue *(1)*
code *(1)*
coincided *(1)*
collect *(2)*
collecting *(1)*
collectively *(1)*
come *(8)*
comes *(2)*
coming *(3)*
commitment *(2)*
commitments *(2)*
committee *(1)*
Commonwealth *(1)*
communication *(2)*

communications *(7)*
companies *(2)*
company *(8)*
compile *(1)*
compiled *(1)*
completed *(1)*
completely *(2)*
completion *(1)*
concerning *(1)*
concluded *(1)*
conclusion *(2)*
conduct *(1)*
confirmation *(1)*
confuse *(1)*
connection *(4)*
consent *(1)*
constructed *(1)*
construction *(1)*
consulting *(1)*
contain *(1)*
contained *(1)*
continue *(2)*
continued *(5)*
contract *(1)*
contracting *(1)*
contractor *(5)*
contractors *(4)*
contractual *(1)*
contrary *(1)*
conversation *(5)*
conversations *(1)*
copies *(4)*
copy *(2)*
correct *(19)*
correspondence *(3)*
corresponds *(1)*
coughing *(1)*
COUNSEL *(20)*
County *(1)*
couple *(1)*
course *(4)*
COURT *(13)*
CPA *(1)*
Crawford *(2)*
create *(1)*
created *(9)*
credit *(1)*
current *(1)*
customers *(1)*

**< D >**
dangerous *(1)*
date *(6)*
dates *(1)*
day *(1)*
days *(1)*
DE *(1)*
deadline *(5)*
deal *(4)*
debited *(4)*
Debtor *(31)*
debtors *(11)*
debtor's *(14)*
December *(4)*
decided *(2)*
Define *(1)*
defined *(2)*
defines *(1)*
definitely *(2)*
Delaware *(1)*
delivery *(1)*
demonstrated *(1)*
demos *(1)*
depending *(2)*
deposited *(2)*
describe *(3)*
described *(1)*
designate *(1)*
designated *(9)*
designating *(1)*
designee *(2)*
desktop *(1)*
detail *(1)*
detailed *(1)*
different *(1)*
differently *(1)*
directed *(1)*
direction *(2)*
directly *(7)*
directors *(2)*
disagree *(1)*
disclosure *(1)*
discuss *(4)*
discussion *(6)*
discussions *(6)*
distributor *(3)*
DISTRICT *(1)*
divvied *(1)*

divvy *(1)*
doctor *(1)*
doctors *(6)*
document *(7)*
documents *(37)*
doing *(4)*
downhill *(1)*
drew *(1)*
Dropbox *(2)*
duly *(1)*
dumb *(1)*
duties *(2)*

**< E >**
earlier *(1)*
easiest *(1)*
EASTERN *(1)*
educational *(1)*
effected *(1)*
either *(3)*
electronic *(4)*
E-mail *(4)*
E-mailed *(1)*
E-mails *(11)*
emblematic *(1)*
employed *(2)*
employees *(4)*
empty *(3)*
enable *(1)*
encompasses *(1)*
enforce *(1)*
entities *(3)*
entity *(4)*
Enuma *(1)*
Esq *(4)*
everybody *(1)*
evidence *(1)*
exact *(1)*
exactly *(3)*
exam *(4)*
EXAMINATION *(19)*
examined *(1)*
example *(4)*
excited *(1)*
exclusive *(3)*
Excuse *(4)*
executive *(1)*
exhibit *(2)*
expected *(1)*

expenses  (5)
explain  (8)
explanation  (2)
express  (1)
extent  (3)
eye  (1)

< F >
facilitate  (1)
facilities  (1)
fact  (6)
factored  (1)
familiar  (2)
far  (3)
fault  (1)
February  (1)
Federal  (2)
fees  (1)
fighting  (1)
file  (2)
filed  (8)
filing  (4)
filings  (2)
Finally  (1)
financial  (5)
financials  (1)
find  (4)
fine  (6)
finish  (4)
finishes  (1)
firm  (3)
first  (6)
Fisher  (53)
F-I-S-H-E-R  (1)
five  (1)
folder  (11)
folders  (3)
follow  (2)
followed  (1)
follows  (1)
forecasting  (1)
forget  (2)
Form  (3)
forms  (3)
forth  (1)
forthcoming  (1)
forward  (5)
found  (2)
FRBP  (1)

FRCP  (1)
Fred  (1)
Frederic  (1)
Frederick  (1)
Friday  (1)
front  (1)
Full  (7)
fully  (1)
fulsome  (1)
fund  (5)
funding  (2)
funds  (1)
furnished  (1)
further  (1)

< G >
Gannone  (2)
gather  (1)
gathering  (1)
Gauge  (1)
general  (1)
generally  (2)
generate  (1)
generated  (3)
give  (1)
given  (4)
Gloucester  (1)
go  (22)
goes  (4)
going  (19)
GONZALEZ  (29)
Good  (7)
Google  (2)
greedy  (1)
Greenway  (1)
guarantee  (2)
guess  (3)
gun  (1)
guy  (1)
guys  (1)

< H >
handled  (3)
handles  (1)
happen  (1)
happened  (4)
happy  (1)
Harbaugh  (2)
Harbor  (1)

Hawk  (2)
hear  (2)
heard  (4)
hearing  (1)
held  (1)
help  (5)
helped  (1)
helping  (2)
Hey  (1)
High  (1)
Hill  (3)
hired  (2)
hit  (1)
honest  (1)
Honestly  (5)
hopes  (1)
hospital  (5)
hours  (2)
Houston  (1)

< I >
ID  (1)
idea  (1)
identified  (1)
identify  (3)
identifying  (1)
IDs  (1)
illness  (1)
immediately  (2)
immunocompromised  (2)
implementing  (1)
include  (3)
including  (3)
incomplete  (1)
incorrect  (2)
independent  (7)
in-depth  (1)
indicated  (1)
indicating  (3)
indication  (1)
individuals  (1)
inform  (1)
information  (42)
informed  (1)
infused  (1)
initial  (1)
injunction  (1)
Innovations  (1)

Ino  (1)
Inovatures  (1)
Inoventures  (4)
input  (1)
inquired  (1)
inquiries  (3)
inquiry  (4)
instructed  (1)
insufficient  (1)
intent  (4)
intention  (1)
internal  (3)
International  (1)
interrupt  (1)
introduce  (1)
invasion  (1)
investigation  (1)
investors  (4)
invoice  (9)
invoices  (21)
involved  (12)
involving  (1)
IQH3D  (2)
issuance  (4)
Item  (1)
items  (2)
its  (2)

< J >
James  (2)
Jeeva  (4)
John  (2)
John.schanne@usdoj.g
ov  (1)
Joseph  (3)
journal  (3)
journals  (4)
July  (8)
jumped  (1)
June  (2)

< K >
keep  (3)
keeper  (1)
keeping  (1)
kept  (1)
Kevin  (8)
Kevin.p.callahan@usd
oj.gov  (1)

**Key** *(1)*
**kill** *(1)*
**kind** *(3)*
**kinds** *(2)*
**knew** *(2)*
**know** *(59)*
**knowledge** *(4)*
**known** *(2)*

**< L >**
**Laster** *(2)*
**Laster's** *(1)*
**late** *(5)*
**law** *(3)*
**lead** *(2)*
**learn** *(1)*
**leave** *(1)*
**led** *(3)*
**ledgers** *(1)*
**legal** *(2)*
**letter** *(2)*
**letters** *(4)*
**Lewis** *(4)*
**limitation** *(1)*
**limited** *(4)*
**list** *(1)*
**listed** *(1)*
**little** *(4)*
**load** *(2)*
**long** *(1)*
**longer** *(3)*
**look** *(6)*
**looked** *(1)*
**looking** *(6)*
**lot** *(9)*
**loved** *(1)*

**< M >**
**M&T** *(1)*
**main** *(1)*
**maintain** *(1)*
**making** *(2)*
**manager** *(3)*
**managing** *(2)*
**Manufacturing** *(1)*
**March** *(14)*
**Market** *(3)*
**Mathu** *(22)*
**matter** *(1)*

**matters** *(1)*
**MDC** *(2)*
**mean** *(22)*
**meaning** *(1)*
**means** *(2)*
**meant** *(2)*
**MEDIA** *(3)*
**medical** *(1)*
**meet** *(1)*
**meeting** *(13)*
**memorialized** *(1)*
**mention** *(1)*
**mentioned** *(4)*
**message** *(2)*
**messaged** *(1)*
**met** *(5)*
**Michael** *(2)*
**million** *(2)*
**mind** *(2)*
**minutes** *(1)*
**missing** *(1)*
**Mm-hmm** *(7)*
**mode** *(1)*
**mom** *(1)*
**moment** *(1)*
**Monday** *(3)*
**money** *(6)*
**monies** *(2)*
**monitored** *(1)*
**month** *(10)*
**monthly** *(11)*
**months** *(2)*
**MOR** *(2)*
**morning** *(4)*
**MORs** *(13)*
**Morton** *(2)*
**mother** *(2)*
**mouth** *(1)*
**Mullica** *(1)*
**multiple** *(1)*

**< N >**
**name** *(5)*
**names** *(3)*
**NC** *(1)*
**necessarily** *(1)*
**need** *(5)*
**needed** *(7)*
**needing** *(1)*

**negotiated** *(1)*
**negotiations** *(5)*
**Netherlands** *(1)*
**Network** *(1)*
**NETWORKS** *(2)*
**never** *(11)*
**new** *(3)*
**Nicely** *(2)*
**Nicole** *(1)*
**Nix** *(1)*
**Nope** *(2)*
**notary** *(1)*
**note** *(1)*
**notes** *(2)*
**November** *(9)*
**number** *(4)*
**numbers** *(5)*

**< O >**
**Objection** *(4)*
**obligations** *(2)*
**obtained** *(1)*
**obtaining** *(1)*
**obviously** *(3)*
**October** *(2)*
**offhand** *(1)*
**Office** *(3)*
**officer** *(1)*
**officers** *(2)*
**Oh** *(2)*
**Okay** *(99)*
**omnibus** *(2)*
**once** *(2)*
**operate** *(1)*
**operating** *(4)*
**operations** *(1)*
**opportunities** *(1)*
**opposed** *(1)*
**order** *(2)*
**orders** *(7)*
**organized** *(1)*
**original** *(1)*
**outside** *(1)*
**overturn** *(1)*
**owns** *(1)*

**< P >**
**PA** *(1)*
**PAGE** *(1)*

**paid** *(14)*
**paper** *(1)*
**Paragraph** *(1)*
**paralegal** *(1)*
**Park** *(1)*
**part** *(8)*
**participate** *(4)*
**participated** *(1)*
**participating** *(2)*
**particular** *(2)*
**parties** *(3)*
**party** *(1)*
**pay** *(10)*
**payable** *(5)*
**payables** *(2)*
**paying** *(2)*
**payment** *(16)*
**payments** *(26)*
**pays** *(1)*
**pen** *(2)*
**PENNSYLVANIA** *(3)*
**people** *(2)*
**percent** *(4)*
**period** *(1)*
**person** *(8)*
**personal** *(1)*
**personally** *(2)*
**persons** *(1)*
**Philadelphia** *(2)*
**phone** *(3)*
**playing** *(1)*
**Plaza** *(1)*
**pleadings** *(2)*
**Please** *(12)*
**plug** *(1)*
**Plus** *(1)*
**PO** *(1)*
**point** *(1)*
**points** *(1)*
**populated** *(1)*
**POs** *(1)*
**possession** *(1)*
**postagreement** *(1)*
**postpetition** *(1)*
**preliminary** *(1)*
**preparation** *(2)*
**prepare** *(4)*
**prepared** *(5)*
**preparing** *(1)*

prepetition *(2)*
**PRESENT** *(5)*
presentation *(1)*
presented *(1)*
pretty *(4)*
previous *(3)*
previously *(2)*
print *(3)*
printout *(1)*
prior *(3)*
privilege *(2)*
privy *(1)*
probably *(1)*
problem *(1)*
**Procedure** *(1)*
proceed *(1)*
proceeding *(2)*
proceedings *(1)*
process *(5)*
processed *(1)*
produce *(11)*
produced *(14)*
production *(19)*
**PROHIBITED** *(1)*
**Project** *(2)*
promised *(1)*
promises *(1)*
proper *(1)*
provide *(7)*
provided *(4)*
public *(1)*
pull *(1)*
**Purchase** *(7)*
purporting *(1)*
purposes *(1)*
pursuant *(4)*
push *(1)*
put *(24)*
putting *(5)*

**< Q >**
quarterly *(1)*
question *(19)*
questions *(5)*
**QuickBooks** *(8)*
quicker *(1)*

**< R >**
**Rafael** *(3)*

Rafael.zahralddin@le
wisbrisbois.com *(1)*
raise *(1)*
raised *(1)*
raising *(1)*
**Rajan** *(26)*
**Rajan's** *(2)*
reached *(1)*
read *(10)*
ready *(1)*
real *(1)*
realize *(2)*
really *(9)*
realm *(1)*
reason *(2)*
recall *(5)*
receipt *(2)*
receipts *(1)*
receivable *(4)*
receivables *(4)*
receive *(4)*
received *(2)*
receives *(1)*
recess *(2)*
reconcile *(2)*
reconciled *(1)*
reconciling *(1)*
record *(8)*
records *(7)*
recount *(1)*
re-do *(1)*
reference *(1)*
referenced *(4)*
regard *(1)*
regarding *(11)*
regards *(2)*
registers *(3)*
rehired *(1)*
reimbursement *(3)*
related *(2)*
relating *(1)*
relationship *(4)*
remark *(1)*
remember *(8)*
report *(2)*
**Reporter** *(6)*
reports *(13)*
represent *(1)*
representations *(1)*

representative *(6)*
representatives *(1)*
represented *(1)*
representing *(1)*
**REPRODUCTION**
*(1)*
**Repsik** *(2)*
request *(5)*
requested *(7)*
requests *(1)*
required *(1)*
requirements *(1)*
research *(1)*
respect *(24)*
respond *(1)*
responding *(1)*
response *(1)*
responsibilities *(1)*
responsibility *(1)*
responsible *(2)*
rest *(2)*
restricted *(1)*
restricts *(1)*
restructure *(1)*
returned *(1)*
review *(4)*
right *(33)*
**Robert** *(1)*
robust *(1)*
**Roger** *(1)*
roles *(1)*
rolling *(4)*
**Room** *(4)*
**Rules** *(2)*
rulings *(1)*
running *(1)*

**< S >**
saying *(4)*
says *(2)*
**SCBB** *(1)*
**Schanne** *(2)*
schedule *(2)*
scheduled *(1)*
schedules *(1)*
school *(1)*
se *(1)*
search *(2)*
see *(10)*

seeing *(1)*
seen *(5)*
select *(1)*
selected *(2)*
semiconductor *(1)*
semimonthly *(2)*
send *(1)*
sending *(1)*
sends *(2)*
**September** *(1)*
series *(1)*
served *(1)*
services *(1)*
set *(3)*
setting *(1)*
**Shad** *(1)*
**Shadron** *(2)*
share *(1)*
shareholders *(4)*
shares *(6)*
**Shastney** *(1)*
sheet *(3)*
sheets *(3)*
she'll *(1)*
short *(2)*
show *(2)*
showed *(1)*
shown *(1)*
sick *(3)*
side *(6)*
**Similar** *(1)*
**SISTAR** *(4)*
situation *(4)*
slow *(1)*
**Smith** *(2)*
somebody *(2)*
sorry *(27)*
sort *(3)*
sound *(1)*
sounds *(1)*
source *(1)*
**Southern** *(1)*
speaking *(1)*
specific *(3)*
specifically *(1)*
specifics *(1)*
spelled *(1)*
spent *(2)*
split *(1)*