## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (MDC) |
| Debtor. | |
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered) |

**DECLARATION OF RAFAEL X. ZAHRALDDIN-ARAVENA IN SUPPORT OF LEWIS, BRISBOIS, BISGAARD & SMITH, LLP'S REPLY TO THE OBJECTION OF WILLIAM HOMONY CHAPTER 11 TRUSTEE TO THE SIXTH REQUEST FOR PAYMENT ON ACCOUNT FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES OF LEWIS BRISBOIS BISGAARD & SMITH LLP FOR THE PERIODS DECEMBER 1, 2023 THROUGH DECEMBER 31, 2023 AND JANUARY 1, 2024 THROUGH JANUARY 15, 2024 AND THE FINAL APPLICATION OF LBBS FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM MARCH 15, 2023,THROUGH JANUARY 15, 2024**

I, Rafael X. Zahralddin-Aravena, hereby declare, under penalty of perjury, as follows:

1.      I am a partner at Lewis Brisbois Bisgaard & Smith LLP ("**LBBS**"), a national law firm that maintains an office at 550 E. Swedesford Road, Suite 270, Wayne, PA 19087 (among other places in the United States).

2.      I am an attorney-at-law, duly admitted and in good standing to practice in the State of Delaware, the Commonwealth of Pennsylvania, and the State of New York, as well as the United States District Court for the District of Delaware, the United States District Court for the

---

[1]      The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

Eastern District of Pennsylvania, the Third Circuit Court of Appeals and the United States Supreme Court.

3. I respectfully submit this declaration (the "**Declaration**") in support of the Response to the Chapter 11 Trustee's Objection to the Final Fee Application of LBBS (the "**LBBS Response**").[2]

## I. BACKGROUND

### A. <u>Stream TV Litigation</u>

1. On March 15, 2023 (the "Petition Date"), Debtors Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative" together with Stream, the "Debtors") filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. *In re Stream TV Networks, et al.*, Case No. 23-10763, Docket No. 1 (E.D.PA. Bankr., March 15, 2023).[3]

2. Prior to the filing, two significant orders for product had been negotiated by a distributor Visual Semiconductors Inc. ("VSI"), which would bring $266 million into the estate through a distribution agreement. Docket No. 293 at page 14. The bankruptcy filing was also motivated by the fact that under the Bankruptcy Code (i) a debtor has the ability to recover assets, (ii) collection efforts would be centralized into one forum, and (iii) all stakeholders would be treated fairly pursuant to the absolute priority rule set forth in the Code. As a high technology company whose intellectual property included both its trade secrets and the trade secrets of other parties, the company was particularly sensitive to preserving its relationships witin its current

---

[2] Capitalized terms used in this Declaration but not otherwise defined herein shall have the meanings ascribed to such terms in the LBBS Response.

[3] All references to the docket in the *In re Stream TV Networks, et al*., Case No. 23-10763, (E.D.PA. Bankr., March 15, 2023) shall be referred to as "Docket No." for ease of reference.

supply chain which included many of its unsecured creditors and key employees. The Chapter 11 process brought a promise of stability to the Debtors which attracted significant interest from potential purchasers and investors.

3.      As will be detailed below, quite significantly, the reasons behind the dismissal of both prior bankruptcies in Delaware were no longer relevant at the time of Stream's filing in the Eastern District of Pennsylvania.  Dismissal of the chapter 11 and involuntary chapter 7 filed in Delaware had been premised on a Chancery Court preliminary injunction and a settlement agreement which transferred all the assets of Stream to SeeCubic, Inc. ("SCI"), a "NewCo" established pursuant to the settlement agreement.  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020).  By the time that the Debtors had filed the above captioned chapter 11 in the Eastern District of Pennsylvania, the case in the Delaware state courts had gone well beyond the preliminary injunction of the Chancery Court.  The Chancery Court had issued a permanent injunction and a partial summary judgment. *Stream TV Networks, Inc. v. SeeCubic, Inc*., No. 2020-0766-JTL, 2021 Del. Ch. LEXIS 344 (Ch. Sep. 23, 2021).

4.      The Delaware Supreme Court, in a unanimous *en banc* decision, then vacated the injunction, reversed the declaratory judgment, and remanded the case to the Chancery Court for further proceedings consistent with its opinion.  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022).  Furthermore, this bankruptcy filing was driven by efforts over nine months of trying to effectuate the state Supreme Court mandate to return the assets to Stream, without any progress, even despite the appointment of a receiver in the Chancery Court.[4]

---

[4] The post Supreme Court remand was litigious and did not result in the Debtors' assets being returned to the Debtor, despite the Supreme Court opinion. The Chancery Court found Shad L. Stastney, SeeCubic, Inc., and Hawk Investment Holdings Ltd., in contempt of the Chancery Court's prior post remand order to return the assets of the Debtor. See, *In re Stream TV Networks, Inc. Omnibus Agreement Litig*., 283 A.3d 1183 (Del. Ch. 2022).

The opinion begins with the following summary:

5. The prior history of the Debtors is unique. Several shareholders led by Mr. Alastair Crawford (collectively "Shareholders"), Mr. Shadron Statsney, a former CFO and Vice Chair of the Board of the Debtors, through his company SLS Holdings VI, LLC ("SLS"), and Hawk Investments Holdings Limited ("Hawk" together with the Shareholders and SLS, the "Hawk Parties") and Stream's founders have engaged in a litigation over the assets of the company since 2020. A majority of its assets, including key manufacturing equipment, had been wrongfully taken and retained by the Hawk Parties. Wrongfully or illegally is not a superlative in this matter as the Delaware Supreme Court's mandate is crystal clear, all assets were to be returned to the Debtors.

6. The Hawk Parties initially started a foreclosure action in Delaware Superior Court but abandoned it when the Superior Court indicated that the process would be protracted. The Hawk Parties then embarked on a takeover of the company through the execution of a scheme in

---

On remand, the Chancery Court issued a partial final judgment holding the omnibus agreement did not validly transfer legal title to any of the assets from corporation to assignee. Corporation subsequently filed an emergency motion for post-judgment relief, asserting that assignee, its director, and corporation's secured creditor acted in concert to effectuate a transfer of shares in contumacious violation of prior court orders, and sought order to cancel assignee's purported ownership of shares, vest ownership of those shares with corporation, and bar secured creditor from interfering with corporation's ownership of those shares.

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, 283 A.3d 1183 (Del. Ch. 2022).

As noted by Vice Chancellor Laster, the situation between the parties worsened and necessitated the appointment of a receiver.

The parties proved unable to work cooperatively to rescind the transactions effectuated under the Omnibus Agreement. Eventually, the court issued an order declaring Stream to be the sole owner of the Company's equity . . . . The same order included an injunction. . . . The injunction expired by its terms on October 17, 2022. . . .

After the injunction expired, Hawk purported to exercise its rights under the Hawk Pledge Agreements by voting the shares of the Company to remove Mathu as sole director and replace him with Stastney. Hawk then filed this lawsuit to confirm the validity of those actions. Having witnessed first-hand the parties' inability to work together, the court appointed Ian Liston, Esq., as receiver pendente lite to maintain the status quo (the "Receiver").

*Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at *5 (Del. Ch. Nov. 29, 2022).

which the Debtors' board would settle the "secured parties" claims through an agreement (the "Omnibus Agreement") which would forgive the outstanding secured claims in exchange for transferring all the assets of the Debtors into a newly formed company, SCI. Self-help by the Hawk Parties was carried out before during and after the signing of the invalidated Omnibus Agreement as discussed below.

7. Notably, the Omnibus Agreement made no provision for payment to any unsecured creditors. *See* Docket No. 48, Exhibit O ("Omnibus Agreement") and P ("Letter Agreement"); *see also*, *In re Stream TV Networks, et al.,* Case No. 21-10433, Docket No. 128, Exhibit B (D. DE Bankr., April 16, 2021). Mr. Statsney himself, during cross examination, admitted that the omnibus agreement was designed to ***protect*** certain ***shareholders at the expense of unsecured creditors***. *See* June 28, 2023 Hearing Transcript at 200:13-16.[5] The Rajan family, and many other shareholders who were not related to the Rajan family were also discriminated against and many were threatened with not being transferred over to the NewCo if they were disloyal. *See* June 27, 2023 Hearing Transcript 107:15-23. The unsecured claims are estimated to be more than $17 million.

8. Stream's class B shareholders refused to accept and vote for this deal. The class B vote was required by the Stream charter to effectuate the transfer. Despite the protests of the class B shareholders, the new board majority nevertheless adopted and executed the Omnibus Agreement.[6] On the very same day, SLS, Hawk, and the same fifty-two equity investors executed an additional side agreement pursuant to which they agreed that Hawk and SLS would each

---

[5] References to a "Transcript" herein are to transcripts in the above captioned bankruptcy proceeding.

[6] On May 6 of 2020, Asaf Gola and Kevin Gallop signed the Omnibus Agreement on behalf of Stream. Stastney signed the Omnibus Agreement on behalf of SLS. A representative of Albany Directors Limited signed on behalf of Hawk as the "sole director of Hawk." In addition to SLS and Hawk being parties to the Omnibus Agreement, shareholders Alistair Crawford, Robert Petch, and Patrick Miles also signed on behalf of fifty-two other equity investors.

contribute their outstanding Stream debt to SCI (the new company formed to receive the Stream assets under the Omnibus Agreement), including "all accrued but unpaid interest, fees, and expenses." Letter Agreement at 12–13.  In exchange for their debt contributions to SCI,  Hawk and SLS would receive millions of SCI shares and warrants.  Letter Agreement at 12–13.

9.      Stream challenged the validity of the Omnibus Agreement in the Delaware Court of Chancery.[7]  The acrimony between the parties was severe.  SCI's counsel sent notices and letters to all employees of the Debtors to cease and desist in resisting the takeover or the Hawk Parties would sue the employees personally. *See* Exhibit 1, LBBS Response (Letter to staff person at Stream from Skadden Aarps, counsel to SeeCubic, Inc.). It was also at that time that engineers in Silicon Valley and in China had resolved issues with production that engineers in the Netherlands had failed to resolve.  Several core employees of Stream that had been "fired" and then threatened by SCI have worked as outside contractors for entities formed by Mr. Rajan and his business partners to continue relationships with their trade creditors pending resolution of the litigation over the company. See, *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, and (III) Post-Petition Employee Obligations in the Ordinary Course*, Docket No. 134; *Disclosure Statement for Joint Plan of Reorganization of Stream TV Networks, Inc. and Technovative Media, Inc Pursuant to Chapter 11 of the Bankruptcy Code Disclosure Statement*, Docket No. 293.  These companies include Visual Technology Innovations, Inc. ("VTI") and Visual Semiconductor Incorporated ("VSI").

---

[7]      In the lower court, SCI, in response, sought:

(i) a declaratory judgment that the Omnibus Agreement was valid and binding;

(ii) a permanent injunction ordering Stream and the Rajans to comply with the Omnibus Agreement; and

(iii) a judgment against the Rajans for converting the assets identified in the Omnibus Agreement.

10.    In December 2020, the Delaware Chancery Court issued an opinion finding that SCI was entitled to a preliminary injunction and ratified the Omnibus Agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020). Soon thereafter, Stream sought relief in the United States Bankruptcy Court for the District of Delaware.  Proposed Debtors' counsel was Dilworth Paxson, LLP.  The Hawk Parties opposed the bankruptcy and filed a motion to dismiss the case.

11.    The Delaware Bankruptcy Court dismissed the case as a bad faith filing, describing it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to **nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor** . . . ." *In re Stream TV Networks, Inc*., Case No. 21-10433, Docket No. 198, Hearing Transcript, page 13, l. 16-25 (D. DE Bankr., May 18, 2021)(emphasis added); *see also*, *Id.* at Docket No. 98, *Order Dismissing Chapter 11*.

12.    Unsecured creditors in the case, Jamuna Travels, Inc., Rembrandt 3D Holding, Ltd. ("Rembrandt") and Walsh CHB, Inc., which included a member of the Official Committee of Unsecured Creditors and separately the largest unsecured creditor, filed an involuntary bankruptcy case.  *In re Stream TV Networks, Inc.*, Case No. 21-10848, Docket No. 1, (D. DE Bankr., May 23, 2021). On June 10, 2021, the Delaware Bankruptcy Court dismissed the involuntary bankruptcy action *for the same reasons that it dismissed the original chapter 11*. The Bankruptcy Court wanted to allow the Chancery Court process to conclude. *In re Stream TV Networks, Inc.*, Case No. 21-10848, Docket No. 37, (D. DE Bankr., June 11, 2021).

13.    The Chancery Court then declared the Omnibus Agreement binding and granted a permanent injunction. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 334 (Del. 2022).

14. On appeal, however, the Delaware Supreme Court unanimously held that the validity of the Omnibus Agreement required the affirmative vote of Stream's class B shareholders. The directors Asaf Gola, Kevin Gollop, Crawford, SLS, and Hawk never procured this vote which per the state's highest court was mandatory. Significantly, the entire premise behind the preliminary and permanent injunction was vacated in a unanimous *en banc* decision. On June 15, 2022, the Delaware Supreme Court voided the transfer of Stream's assets to SCI.

15. Remarkably, over and over, parties have misstated, minimized, or mischaracterized the Delaware Supreme Court decision to advance their interests over that of the estate, particularly harming the unsecured creditors who are the most vulnerable class in the Debtors' bankruptcy cases. At the same time, various parties have elevated the Delaware bankruptcy court's dismissals to undermine the current case. This approach is especially disingenuous in light of the fact that the dismissals were predicated on allowing the then pending state court process to run its course and the highest court in Delaware ultimately overturned and invalidated the very document which the Hawk Parties used to justify their self-help and takeover scheme.

16. In any event, this background is critical in understanding the conflicts analysis and the fact that such analysis was critical to the bankruptcy planning process. The basis for the plan of reorganization was fulfilling the open purchase orders that VSI had procured for the Debtors, because the point of the bankruptcy filing was to pay the creditors through operation, both the secured creditors (subject to either settlement or avoidance of their liens, much like any bankruptcy) and the unsecured creditors, many of which were key vendors in the supply chain. To that end, separate counsel was hired for VSI (Akerman LLP), and a special board committee was created to keep negotiations between VSI and the Debtors at arms-length so that Mr. Rajan, who

had been by necessity officer and director in both entities, would not be on both sides of the transaction.

### B.    Eastern District of Pennsylvania Bankruptcy

17.    The Debtors asked for assistance from the Court with recovery of assets beginning with a request two weeks after the Debtors commenced this Chapter 11 proceeding. On March 28, 2023, the Debtors asked Judge Coleman to enforce the automatic stay and impose corresponding sanctions.[8]  The Debtors apprised the Court of Shadron Stastney, SCI, and their counsels' refusal to comply with the Delaware Supreme Court's mandate to turn over the Debtors' valuable assets, including multi-million dollar optical bonding equipment ("Bonding Equipment").[9]

18.    During the bankruptcy process, and shortly after filing the case, Mr. Rajan, who was the only remaining employee of the Debtors, was diagnosed with leukemia.  The Debtors filed their *Debtors' Motion For Entry Of Interim And Final Orders Authorizing Debtors To Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, And (III) Post-Petition Employee Obligations In The Ordinary Course* (the "Employee Motion")(Docket No. 134) on April 21, 2023.  The Employee Motion detailed that there were former and current employees of the Debtors and its subsidiaries spread across several key locations, the United States, the Netherlands, the People's Republic of China, and Taiwan.  Employee Motion at paragraphs14-21. Many of the former employees were independent contractors hired after the omnibus agreement and in the wake of its aftermath. *Id*.  Some of the employees and independent

---

[8]    *See* Docket No. 49 (*Emergency Motion for Entry of an Order Enforcing the Automatic Stay and for Sanctions for Willful Stay Violation*).

[9]    *See* Docket No. 49 at ¶¶ 5-7.  After obtaining information from Technovative's displaced state court receiver regarding the location of the Bonding Equipment in China, Debtors quickly located the Bonding Equipment and attempted to make arrangements for the retrieval of the Bonding Equipment.  *See* Docket No. 76 at 2.3. The pending purchase orders, which would have been used to pay creditors, would have been facilitated and would have been more cost effective than other alternative means of production with the return of the Bonding Equipment.

contractors had been retained by VSI. *Id*. The Employee Motion specifically describes and discloses the relationship between VSI and the Debtors in regard to these employees. *Id*. at 20.

19.     Like many of the vendors and suppliers, these employees had been working with VSI in order to preserve relationships and keep trade secrets and critical manufacturing "know how" intact. *Id*. The Employee Motion stated, as is common for these types of motions, that employee support was critical and that the motion sought authority to bring employees back to Stream as VSI was going to be a plan sponsor and had procured two orders to fulfill. *Id*. at paragraph 79. Providing an incentive to these employees to become full time employees of Stream and also providing tangible evidence of the stability that bankruptcy would bring, the motion asked for priority payments, continuation of benefits, and authority and a determination that the rehiring of employees and subcontractors was in the ordinary course. *Id*. at 80. However, for reasons that are not clear to the undersigned, the Employee Motion was continued **13** times by the Court and not heard until November 15, 2023, 9 months later. *See* Docket No. 171, 173, 209, 271, 275, 280, 290, 353, 361, 382, 388, 420, 444, and 478. At that time, the Court declared on the record that the relief requested was approved as ordinary course. *See* November 15, 2023 Hearing at 42:4-42:9.

20.     As Mr. Rajan's health condition worsened and more medical treatments were needed, the Debtor tried a second strategy to help both alleviate the burden on Mr. Rajan and to ensure there was an independent party at the Debtors to make decisions other than Mr. Rajan. On June 14, 2023, the Debtors filed their *Motion Of The Debtors For Entry Of An Order Authorizing The Debtors To Enter Into An Employment Agreement With Thomas Jung Ho Park As Chief Financial Officer To The Debtors* ("CFO Motion") (Docket No. 234) in order to hire a CFO to assist and step in as an independent officer for the Debtors both because Mr. Rajan had ties to VSI and because Mr. Rajan was ill (though often Mr. Rajan was working from his hospital bed).

21.     The Office of the United States Trustee entered into discussions with the Debtor to have them refile the application under section 327 of the United States Bankruptcy Code which the Debtor filed on July 18, 2023.  See, *Application Of The Debtors For Entry Of An Order Authorizing The Debtors To Retain Thomas Jung Ho Park As Chief Financial Officer To The Debtors*  ("CFO Application")(Docket No. 298").  The CFO Application was continued 12 times and was never heard.  The Debtors resolved the Hawk Parties' objections to the Park retention and the fee applications that were filed at that time by the Debtors by stipulation on December 16, 2023.  On January 10, 2024, Judge Coleman finally signed the Park retention order, eight months after it was originally filed.

22.     On April 5, 2023, the Debtors filed an *Amended Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3 ) Imposing Sanctions for Willful Stay Violations* (the "Amended Motion")(Docket No. 76). which expanded the request from the original focus on the bonding machine and included a request for demonstrator samples, engineering assets, Stream's business laptops, Stream's intellectual property and software, and, significantly, Stream's business records which were housed in servers seized by Mr. Stastney or that were under his control as he moved to take control of the board in the Netherlands R&D subsidiary, SeeCubic, B.V.  *See* Docket No. 76.  Absent this relief, Stream would have difficulty in completing operating reports based upon the lack of historical data which had not been returned and Mr. Rajan's Leukemia treatment.

23.     On April 7, 2023 the Debtors supplemented the Amended Motion with the *Debtors' Supplement to its Amended Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3 ) Imposing Sanctions for Willful Stay Violations* (Docket No. 90, 98, and 114) to address the proceedings in the Netherlands

11

filed by the Hawk Parties to assume control over SeeCubic, B.V.  On April 18, 2023, the Debtors

also filed *Debtors' Motion for Withdrawal Of Writ Of Summons And Evidentiary Hearing For*

*Monetary Damages* (Docket No. 125) which asked the Court for further assistance with respect to

the Hawk Parties' interference with the Debtors' foreign subsidiaries in the Netherlands.

24.    The Court placed the stay enforcement matters "in abeyance," on April 14th and

22nd respectively.  *See* Docket Nos. 122 and 146.  Eventually, the Debtors' persistence was

rewarded with a hearing promised for February 12, 2024, after the "abeyance" and multiple

continuances.  *See* Docket Nos. 483, 496, and 520.

25.    Unable to protect the estate's assets through normal motion practice, on August 14,

2023, Debtors initiated an adversary proceeding captioned as S*tream TV Networks, Inc. v. Stastney*

*et al. (In re Stream TV Networks, Inc.)*, No. 23-00057 (Bankr. E.D. Pa.) (the "Adversary

Proceeding").  On October 1, 2023, the Debtors filed a *Motion for Temporary Restraining Order,*

*Preliminary Injunction and Permanent Injunction*. ("TRO") (Docket No. 30).  Despite the fact that

a temporary restraining order is a summary proceeding which can be held *ex parte* in some

circumstances, the Court delayed the process and spread it out over multiple hearings, at several

points expressing its view that there was enough evidence for a preliminary injunction.  The Court

held multiple evidentiary hearings, over several weeks, and over protest by the Debtors which

provided the Court with controlling Third Circuit caselaw that held that TROs do not require

evidentiary hearings.

26.    On November 6, 2023, the Debtors filed their *Additional Supplement to Debtors'*

*Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the*

*Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations*

(the "Additional Supplement")(Docket No. 458) both in preparation for the February 2024 hearing

date and to request an interim order that could be used to alert foreign parties and entities of the applicability of the worldwide automatic stay created by the Bankruptcy Code.

27.     On December 14, 2023, Judge Coleman entered a *Stipulated Order Restating and Enforcing The Worldwide Automatic Stay* (Docket No. 517) as an interim measure to prevent further damage to the Debtors' assets in the Netherlands and other foreign jurisdictions.

28.     On January 5, 2024, Judge Coleman entered a temporary restraining order ("TRO") (Adversary Docket No. 119). The ruling was announced at an earlier status conference, but the parties submitted competing orders, and the Court entered a revised order based on the proposed orders submitted by the parties.  The Court noted that: "Finally, with respect to whether the issuance of a TRO in this instance serves the public interest, it is well-established that the sanctity of intellectual property rights warrants the issuance of injunctive relief where necessary to protect such rights." *See* TRO at ¶ 8 (citing *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992)).

29.     Notably, the Chapter 11 Trustee, declared at the start of a March 2024 meeting that Mr. Rajan and the Debtors had been the "*victim of a civil conspiracy*," at the hands of the Hawk Parties.[10]  Upon information and belief, this statement was made after two months of investigation and with reliance upon his special litigation counsel, Steve Coren, an "expert" in lender liability cases, and his counsel at Obermeyer, Edmond George and Michael Vagnoni, as well as his own assessment of the litigation.

30.     At the same meeting, I was repeatedly assured by the Chapter 11 Trustee and counsel Michael Vagnoni, that they would do whatever they could to help ensure that LBBS' claim

---

[10]     In March 2024, the Chapter 11 Trustee in these cases, William Hominy, requested that Nicole Maneen of VSI, and Mathu Rajan, the CEO of Stream TV and Technovative, and Rafael Zahralddin, as the Debtors' counsel attend a meeting with the Chapter 11 Trustee, Steve Coren of Coren & Rees, Edmond George of Obermeyer _____, and Michael Vagnoni of Obermeyer.

would be paid.  This assurance was reiterated at various times by Mr. Vagnoni for months after this meeting.  LBBS provided significant time, documents, and even internal memoranda to the Chapter 11 Trustee and his counsel to assist in the specific mandates in Judge Coleman's Memorandum (Docket No. 548) and Order (Docket No. 549) to review the litigation filed by the Debtors.  Though potentially eligible as a substantial contribution, LBBS voluntarily waived the fees in its filed applications for any assistance to the chapter 11 Trustee and their counsel who repeatedly called and requested assistance and information.  During the aforementioned meeting, Mr. Rajan and Mrs. Maneen also provided access to Mr. Coren and his client to documents that the Debtors maintained of the extensive record(s) in the dispute between the Hawk Parties and the Debtors.

31.    Mr. Coren and his client conspicuously failed to mention in the Objection that these documents were shared with him and his counsel in January and February of 2024 (as opposed to later requests in early July for the client's entire file).

C.    **Debtors' Capital Structure**

32.    Another unique characteristic of the Debtors is that its balance sheet was dominated by secured lenders who were subject to conversion agreements.  Hawk and SLS had agreements whereby their secured positions would convert to equity if certain thresholds in new equity raises were reached.  By early 2018 it was clear to Stream management, its financial advisors, and its shareholders that the amount of debt carried by Stream was problematic for raising the necessary expansion capital.  There was general agreement among key stakeholders—including the senior and junior lenders—that converting investor debt to equity would be in the best interest of the company.  In 2018, Stream entered into an agreement with Hawk which provided that the Hawk

14

Notes would convert into equity if and when Stream raised additional equity capital.[11]  Stream and

SLS also entered into a parallel conversion agreement governing the SLS Notes.[12]  A third

conversion agreement was entered into between Intrinsyc Technologies Corporation of Canada

("Intrinsyc") and Stream.  Intrinsyc honored its agreement and converted its secured claim with

Stream into equity in May 2018.[13]  However, SLS and Hawk refused to honor their agreements.

33.     As a result, and driven by the conversion agreements, money raised on behalf of

the Debtors through equity raises whereby VSI purchased shares of Stream, reduced the liability

of the Debtors to the Hawk Parties.  This was a practice that was followed for years prepetition.

Operations were funded by equity raises, including infusions of money from Hawk, which had

multiple conversion agreements and not just one.

### 34.     Debtors' Plan and Restructuring Support Agreement

31.     Judge Coleman asked the Debtors to show some progress on the reorganization of

the Debtors at a June 2023 hearing, so the Debtors began negotiations with VSI and Rembrandt

on a plan, disclosure statement, and restructuring support agreement. *See* Transcript June 23, 2023,

at 167-68. The plan would focus on operations which required a distribution network, assistance

in manufacturing, and the resolution of any issues related to the technology licenses, trade secrets,

and other intellectual property of the Debtors.  On July 13, 2023, the Debtors filed the *Disclosure*

*Statement for Joint Plan Of Reorganization Of Stream TV Networks, Inc. And Technovative Media,*

*Inc. Pursuant to Chapter 11 Of The Bankruptcy Code.*  ("Disclosure Statement") (Docket No.

293).  Included as Exhibits to the Disclosure Statement was the *Joint Plan of Reorganization of*

---

[11]     A true and correct copy of the Hawk Conversion Agreement is attached hereto as Exhibit 1.

[12]     A true and correct copy of the SLS Conversion Agreement is attached hereto as Exhibit 2.

[13]     In May 2018, Intrinsyc honored its Conversion Agreement and accepted equity in Stream. The accrued value of the debt was $1,661,384 at the time of conversion. It was converted on May 2, 2018, to 415,346 common shares of Stream stock.

*StreamTV Networks Inc. and Technovative Media, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* ("Plan") and *Restructuring Support Agreement* ("RSA") which had been negotiated with VSI and Rembrandt.  The Hawk Parties had been invited to participate but their counsel reported to Debtors' counsel that their client rejected the offer to participate.

32.    Mr. Rajan owns shares and is part of the leadership at both VSI and the Debtors. He was the only remaining employee at the Debtors and would have been on both sides of the transaction when VSI and the Debtors were in negotiations.  VSI was created in order to help preserve Stream as a going concern while litigation with the Hawk Parties was pending.  VSI was created in order to continue the founder's glasses free project, with or without the Ultra-D technology.  The voiding of the Omnibus Agreement itself justifies the existence and the creation of VSI.  The Omnibus Agreement stripped the Debtors of all its assets.  It was used to justify scorched earth tactics, including threats to all employees who subsequently left Stream, leaving Mr. Rajan the only party standing at the Debtors.

33.    Despite these circumstances, LBBS proactively advised Mr. Rajan that it would be necessary to make sure that VSI secured independent outside bankruptcy and corporate counsel. VSI therefore hired Akerman. LLP as their counsel.  Akerman instructed VSI to set up an independent committee of its board to review and negotiate the terms of the Plan, Disclosure Statement, and RSA.  Mr. Mark Savarese, Mr. Joe Corso, Mr. Tom Sego, and Mr. Dan Rink served on that committee. *See* Exhibit 2, LBBS Response, Transcript, November 13, 2023, Rule 2004 Examination at 68, 96-102.  As a result, Mr. Rajan was excluded from the internal discussions on the VSI side during the Plan and RSA negotiations.  *Id*. at 98.

34.    The Debtors, Rembrandt, and VSI entered into a confidentiality agreement on July 7, 2023 ("Confidentiality Agreement"), which included restrictions on revealing information

16

related to the restructuring of the Debtors.  The Hawk Parties were invited to sign a confidentiality agreement and participate in the plan drafting process but they refused to do so.   The Confidentiality Agreement is typical in chapter 11 cases to allow plan proponents to negotiate and effectuate strategy.[14]  The Confidentiality Agreement includes non-circumvention obligations and provided that the confidentiality provisions survive the termination of the agreement.  *Id.* at 2 and 3.

### 35.   The Bankruptcy Court Enters a Final Order Approving the Retention of LBBS

35.   On April 3, 2023, LBBS filed its *Application Pursuant to 11 U.S.C. § 327(a) of the Bankruptcy Code for Authority to Employ Lewis Brisbois Bisgaard & Smith LLP as Counsel for the Debtors* (Docket No. 70) (the "LBBS Retention Application").  LBBS was retained as counsel to the Debtors and its engagement approved on an hourly basis following the entry of the LBBS Final Retention Order by the Bankruptcy Court.  .  The LBBS Retention Application specifically averred that LBBS is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code, in that, except as otherwise disclosed herein, LBBS and its attorneys:  (a) *are not creditors, equity holders, or insiders of Debtors. . . .*"[15]  LBBS Retention Application at ¶ 2 (emphasis added).

36.   The retention application and any revisions to the retention order were the subject of extensive and cooperative negotiations with the U.S. Trustee which is not unusual in chapter 11 retention situations.

---

[14]      A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit 3.

[15]      While the Objection refers to LBBS being an "insider" of the Debtors, as set forth in the LBBS Retention Application, neither LBBS nor its attorneys are insiders of Debtors within the meaning of the Bankruptcy Code.  *See* 11 U.S.C. § 101(31).  Moreover, the relationship between the Debtors, Visual Semiconductor, Inc. ("VSI") and Mr. Rajan have been fully, and repeatedly disclosed, as set forth further herein.

37.      On May 3, 2023, the Court entered an order approving the retention of LBBS as counsel to the Debtors (the "LBBS Final Retention Order").  *See* Docket No. 185.  As such, LBBS was retained as counsel to the Debtors and its engagement approved on an hourly basis following the entry of the LBBS Final Retention Order entered by the Bankruptcy Court.

38.      I submitted three separate disclosures related to the LBBS Retention Application pursuant to sections 328 and 1103(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  My original Declaration was dated April 3, 2023 (Docket No. 70-1) (the "Original Declaration"), my supplemental Declaration was dated April 28, 2023 (Docket No. 180) and my second supplemental Declaration (the "Supplemental Declarations") was filed December 7, 2023.  The bulk of the Second Supplemental addressed Scott Cousins joining LBBS and his waiver of any claim he had against the estate owed to Cousins Law LLC which had represented Stream in the Chancery litigation.

39.      On Exhibit A of the Original Declaration, I disclosed the following on behalf of the firm:

> Rafael X. Zahralddin, while working at a prior firm, Elliott Greenleaf P.C., represented Stream TV as a creditors rights and restructuring lawyer in a Chancery case in 2019 which sought an injunction to prevent self-help by certain creditors. He withdrew from the case with permission of the Court after three weeks and was replaced by substitution counsel. He also represented a special purpose vehicle which was to facilitate financing for Stream TV in a bankruptcy filed in Delaware while a lawyer at Armstrong Teasdale in 2020. These prior representations do not pose any material adverse interest.

Original Declaration at Exhibit A, ¶ 1.

40.      Following the filing of the Original Declaration, my then partner Vincent Alexander and I engaged in discussions with the U.S. Trustee regarding the LBBS Retention Application.  The U.S. Trustee requested that LBBS include a statement regarding Larger Chapter

11 Case status in the declaration.  The U.S. Trustee also asked LBBS to include further information

regarding the Chancery case filed against SCI.  In my Supplemental Declaration, filed on April

28, 2023, I disclosed the following:

> In 2020, while I was a partner at Elliott Greenleaf, P.C. ("Elliott Greenleaf"), I served as counsel to Stream and Mathu and Raja Rajan as counterclaimants, in Stream TV Networks, Inc. v. SeeCubic, Inc., C.A. No. 2020-0766 (the "Chancery Case"). Elliott Greenleaf entered its appearance on October 8, 2020, through a substitution of counsel for Buchanan Ingersoll. Jonathan Stemerman served as the primary lawyer in the Chancery Case and Brian Grady served as the lead litigator. I provided bankruptcy and creditors' rights advice on the matter. Elliott Greenleaf filed a motion to withdraw on November 8, 2020, which was granted on November 10, 2020. Scott Cousins, P.C. [sic ] and Salazar & Associates [sic] substituted for Elliott Greenleaf after the firm's withdrawal (I did not have any affiliation with either firm). Elliott Greenleaf's representation was limited to the Chancery Case. I hold no claim against the Debtors, either directly or in connection with Elliott Greenleaf's brief representation in the Chancery Case while I was a lawyer at Elliott Greenleaf. I did not receive any compensation from Stream, Mr. Rajan, or any related entity while I was employed at Elliott Greenleaf. Further, to the extent Elliott Greenleaf is a creditor of the Debtors, I am not entitled to any portion of any potential recovery on such claim, and I am unaware of any basis that Elliot Greenleaf would have a claim against me personally relating to any claim that Elliot Greenleaf may have in these bankruptcy cases.

Supplemental Declaration at ¶ 11.

41.     Working with the U.S. Trustee's counsel, I also included the following disclosure

regarding VTI:

> While I was employed at Armstrong Teasdale, LLP ("Armstrong Teasdale"), Armstrong Teasdale represented Visual Technology Inc. ("VTI") in In re Stream TV Networks, Inc., Case No. 20-10766 (KBO) (Bankr. D. Del.), which was a chapter 11 bankruptcy filing by Stream. VTI is a Nevada corporation that was formed in January 2021. VTI is owned by numerous investors, including Mr. Rajan. Armstrong Teasdale was introduced to VTI through Lawrence G. McMichael, Stream's bankruptcy counsel in the case, and Mr. Rajan. VTI had a six member board at the time, including Mr. Rajan. For the representation of VTI, Armstrong Teasdale took instruction from Tim McCarthy, who was also a VTI board member and was to have a controlling interest in VTI through Burlington Resources Asia Limited. Armstrong Teasdale and its attorneys, including myself, filed notices of appearance in the bankruptcy case on behalf of VTI on March 17, 2021. VTI sought to provide debtor in possession financing in the bankruptcy case to Stream and ultimately serve as a plan sponsor. However, the bankruptcy case was dismissed on May 17, 2021, before any financing or chapter 11 plan was approved. To my knowledge, VTI received no payment or any consideration for services it performed, if any, and it is not owed anything from the Debtors and is not a creditor or interested party in these chapter 11 bankruptcy

cases as a result of this matter or otherwise. VTI paid fees to Armstrong Teasdale for the representation, and no fees were paid to me for the representation. Armstrong Teasdale's representation of VTI in this matter ceased upon dismissal of the bankruptcy case.

Supplemental Declaration at ¶ 12.

42.    In consultation with the U.S. Trustee, I also included the following disclosure:

While I was employed at Armstrong Teasdale, Armstrong Teasdale also represented VTI in In re Stream TV Networks, Inc., Case No. 20-10848(KBO) (Bankr. D. Del.), which was an involuntary bankruptcy filing against Stream. The case was filed on May 23, 2021. Armstrong Teasdale and its attorneys, including myself, filed notices of appearance in the bankruptcy case on behalf of VTI on June 8, 2021. VTI served a similar role in this bankruptcy case as in Case No. 20-10766(KBO). The bankruptcy was dismissed on June 10, 2021. To my knowledge, VTI received no payment or any consideration for services it performed, if any, and it is not owed anything from the Debtors and is not a creditor or interested party in these chapter 11 bankruptcy cases as a result of this matter or otherwise. VTI paid fees to Armstrong Teasdale for the representation, and no fees were paid to me for the representation. Armstrong Teasdale's representation of VTI in this matter ceased upon dismissal of the bankruptcy case. While I was employed at Armstrong Teasdale, Armstrong Teasdale's representation of VTI was limited to Case No. 20-10766(KBO) and Case No. 20-10848(KBO), and Armstrong Teasdale did not represent Mr. Rajan, individually, or any related entity during my employment at Armstrong Teasdale.

Supplemental Declaration at ¶ 13.

43.    I also provided further details regarding a prior disclosure made on April 20, 2023 that VSI Visual Semiconductor, Inc. had wired a flat fee advance payment on behalf of the Debtors. See *Amended Disclosure of Compensation of Attorney for Debtor* ("Amended Compensation Disclosure"). (Docket No. 126); Original Declaration at ¶ 6-7. I had discussed with the U.S. Trustee that VSI was an investor in Stream and had sent the payment directly on behalf of Stream via wire. LBBS was not made aware until after payment had been received. These facts were included in the Amended Compensation Disclosure, the Original Declaration, Supplemental Declaration, and Retention Application.

44.    The Supplemental Declaration also included a resolute affirmation supporting the disinterestedness of LBBS which was the product of extensive review of the internal records of

LBBS through its conflicts department.  The review was also managed and done in consultation

with Mr. Alexander who was the firm's bankruptcy co-practice group chair at that time.  The

Supplemental Declaration states as follows:

> Other than as disclosed in the Declaration and this Supplemental Declaration, I have never
> represented or received payment from Mr. Rajan or any related entity.

Supplemental Declaration at ¶ 14.

> LBBS has never represented VSI, VTI, or Mr. Rajan. LBBS has no other connection, if
> any, with VSI, VTI, or Mr. Rajan other than has been disclosed in the Declaration and this
> Supplemental Declaration. And, other than in connection with these chapter 11 cases,
> LBBS has never represented the Debtors.

Supplemental Declaration at ¶ 15.

45.    As noted in papers filed by Dilworth, Stream's bankruptcy counsel in the Delaware

chapter 11 case, VTI "has no formal affiliation with the Debtor and is an independent operating

company." *In re Stream TV Networks, et al.,* Case No. 21-10433, Docket No. 100, (D. DE Bankr.,

April 2, 2021). Docket No. 100, paragraph 13.   Stream has sold shares to VSI which was disclosed

in operating reports and in multiple disclosures by Mr. Larry McMichaels to support Dilworth

Paxson's retention filed by Debtors' counsel in the initial Delaware bankruptcy. *See Id.* at Docket

Nos. 15 and 186.

### 36.    The U.S. Trustee's Objections to the LBBS Final Fee Application Are Resolved

46.    On September 12, 2023, LBBS submitted its *Local Rule 2016-5 First Request for

Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois

Bisgaard & Smith LLP, for the period March 15, 2023, through April 30, 2023*, filed at Docket

No. 409 (the "**First Monthly Application**").

47.     On September 26, 2023, Hawk Investment Holdings Ltd. ("**Hawk**"), filed its objection to the First Monthly Application at Docket No. 424, which was subsequently scheduled for a hearing on November 15, 2023.

48.     On November 9, 2023, LBBS submitted its *Local Rule 2016-5 Second Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, for the period May 1, 2023, through May 31, 2023*, filed at Docket No. 461 (the "**Second Monthly Application**")

49.     Following the hearing held on November 15, 2023, which was continued, Hawk filed an objection to the Second Monthly Application on November 24, 2023, filed at Docket No. 485 (together, with the first objection, the "**Hawk Fee Application Objections**"). Debtors' counsel discussed with Judge Coleman at a hearing the impropriety of the Hawk Fee Application Objection. Judge Coleman requested briefing on the issues. On December 7, 2023, LBBS submitted its *Brief in Support of First Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP*, (Docket No. 500) ("LBBS Brief").

50.     After hearings, reviewing the LBBS Brief requested by Judge Coleman, and settlement discussions between Hawk and LBBS, the parties entered into a *Stipulation And Order Regarding Settling Objections To Fee Applications, Objection To Retention Of CFO By The Debtors, And Continuance Of Matter* (Docket No. 516 )("Hawk Fee Objection Settlement Order")*.* The Hawk Fee Objection Settlement Order resolved and withdrew the Hawk Fee Application Objections. It was entered into by the parties on December 10, 2023, and entered by the Court on December 14, 2023.  Under this agreement, Hawk agreed to withdraw the objections and LBBS withdrew its request for sanctions and fee shifting under 28 U.S.C. § 1927 and Bankruptcy Rule

9011. Notably, the basis for the Hawk Fee Application Objection was an **unsupported allegation** that LBBS had a conflict because it was allegedly representing VSI and Mr. Rajan at the same time it was representing the Debtors.

51.     On December 12, 2023, LBBS submitted its *Local Rule 2016-5 Third Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, for the period June 1, 2023, through June 30, 2023, and July 1, 2023, through July 31, 2023*, filed at Docket No. 523.

52.     On January 5, 2024, LBBS submitted its *Local Rule 2016-5 Fourth Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, for the period August 1, 2023, through August 31, 2023, and September 1, 2023, through September 30, 2023*, filed at Docket No. 546.

53.     On January 17, 2024, LBBS submitted its *Fifth Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, for the period October 1, 2023, through October 31, 2023, and November 1, 2023, through November 30, 2023*, filed at Docket No. 563.

54.     On August 28, 2024, LBBS submitted its *Sixth Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, for the period December 1, 2023, through December 31, 2023, and January 1, 2024, through January 15, 2024*, filed at Docket No. 722 (the "**Sixth Monthly Application**").

### 37.     The LBBS Final Fee Application

55.     Lastly, on August 28, 2024, LBBS submitted the *Final Application for Compensation for Lewis Brisbois Bisgaard & Smith LLP, Debtor's Attorney, Period 3/15/2023 to 1/15/2024*, filed at Docket No. 723 (the "**Final Fee Application**"). LBBS' fee applications

conform with the requirements of section 330(a)(3) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016(a), setting forth the time expended, the rates charged for such services, professional services rendered under the categories of service governed by Local Rule 2016-2(e), and the expenses incurred.

56.     Following the submission of the Final Fee Application, LBBS communicated frequently with the U.S. Trustee regarding scheduling and extensions of time for the U.S. Trustee to review and object to the Final Fee Application and the Sixth Monthly Application.

57.     After a thorough review of the Final Fee Application by the U.S. Trustee and further discussions with LBBS, the U.S. Trustee and LBBS reached an agreement to reduce the compensation amount of LBBS by $235,226.00, which is a reduction of over 8% of the total fees. The U.S. Trustee had objections to specific time entries related to the preparation of the MORs and some tasks they believed should have been completed by a financial advisor or Mr. Park, whose engagement as CFO was delayed for months.  The U.S. Trustee's professional review of our fee applications complied with applicable Third Circuit controlling precedent governing the approval of fee applications.  Additionally, LBBS agreed that it would not seek any additional allowance beyond the aggregate sum of $2,692,933.00 for professional services and $49,799.10 for reimbursement of expenses, for a total aggregate sum of $2,742,732.10 (the "Reduced Compensation Request").

### 38.     The Administrative Insolvency of the Chapter 11 Cases

58.     LBBS, as an administrative claimant, asked the Chapter 11 Trustee's counsel to provide information to determine whether or not the estate was administratively insolvent in the summer of 2024 and then recently as part of discussions to extend the deadline for the trustee to object to the LBBS fees.  The Chapter 11 Trustee's counsel, Michael Vagnoni, responded that the

case has always been administratively insolvent.  When pressed further Mr. Vagnoni said he "believed" that the carve out would be funded.

59.     LBBS did not understand why the Chapter 11 Trustee was reviewing fees, appearing to duplicate work being done by the U.S. Trustee and asked Mr. Vagnoni why they were reviewing the fees and if they were in communications with the U.S. Trustee.  Mr. Vagnoni stated that "how did LBBS know that they were not speaking to the U.S. Trustee."  I met with the U.S. Trustee soon after, and Mr. Schanne and Mr. Callahan both indicated they did not have any discussions with the Chapter 11 Trustee about the LBBS fees.

60.     Furthermore, Mr. Coren, on behalf of his client, offered to give LBBS $500,000 if they would walk away from their remaining fees.  LBBS responded that it could not take such an offer.  If LBBS were guilty of the various conflicts and "fiduciary" violations how could they take any "settlement."  This belies that the motive behind the Objection is plagued with impermissible self-interest at the expense of the creditors in the case, which is as corrupt as that offer.

61.     On November 18, 2024, the Chapter 11 Trustee filed its *Objection of William Homony, Chapter 11 Trustee to the Sixth Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, ("LBBS"), for the Periods December 1, 2023 through December 31, 2023 and January 1, 2024 through January 15, 2024 (Docket No. #722), and the Final Application of LBBS for Allowance and Payment of Compensation and Reimbursement of Expenses for the Period from March 15, 2023, through January 15, 2024* (Docket No. 808).

    **39.**     **LBBS is Not an Insider of the Debtors**

62.    The Objection refers to LBBS as an "insider" and attempts to support the LBBS fee application review by Coren by saying this review is part of a review of all insiders.  The United States Bankruptcy Code states as follows with respect to the definition of an insider:

> (31) The term "insider" includes— (A) if the debtor is an individual— (i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control; (B) if the debtor is a corporation— (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor; (C) if the debtor is a partnership— (i) general partner in the debtor; (ii) relative of a general partner in, general partner of, or person in control of the debtor; (iii) partnership in which the debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the debtor; (D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor; (E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and (F) managing agent of the debtor.

U.S.C. § 101(31).

63.    LBBS is not an insider of the Debtors as there can be no argument that any of the above statutory definitions is met.

64.    The foregoing constitutes the supplemental statement of LBBS pursuant to sections 328 and 1103 of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 25, 2025, in Wilmington, Delaware

_____
Rafael X. Zahralddin-Aravena
Partner
Lewis, Brisbois, Bisgaard, & Smith, LLP

# EXHIBIT "1"

v180502

## NOTES 1 THROUGH 10 - MAY 2018 AGREEMENT

THIS AGREEMENT (this "**Agreement**"), dated as of January 29, 2018 (the "**Effective Date**"), regardless of when each party countersigns is by and among STREAM TV NETWORKS, INC., a Delaware corporation (the "**Company**"), and HAWK INVESTMENT HOLDINGS LIMITED, (registered in Guernsey with registered number 44994), with its registered office at Newport House, 15 The Grange, St Peter Port, Guernsey GY1 2QL, Channel Islands, a Guernsey holding company ("**Hawk**").

## R E C I T A L S

**WHEREAS**, the Company and Hawk entered into several promissory notes and supporting agreements (each as amended or modified prior to the Effective Date referred to as a "**Note**" and altogether as the "**Hawk Notes**") and each such Note specifically referred to as Hawk 1 through 10 as amended and executed copies of which are annexed hereto (Exhibit A);

| Note | Note Date | ACR (£) | Total value In GBP (£) as of 30-Apr-18 |
|------|-----------|---------|----------------------------------------|
| Hawk 1 | 26-Mar-14 | £3,960,000.00 | £12,658,368.25 |
| Hawk 2-1 | 15-Oct-14 | £825,000.00 | £2,306,439.11 |
| Hawk 2-2 | 5-Dec-14 | £1,214,500.00 | £3,229,014.75 |
| | | £2,039,500.00 | |
| Hawk 3 | 2-Jan-15 | £5,280,000.00 | £14,011,184.37 |
| Hawk 4-1 | 6-Aug-15 | £2,640,000.00 | £6,070,674.44 |
| Hawk 4-2 | 7-Sep-15 | £2,720,000.00 | £6,070,674.44 |
| | | £5,360,000.00 | |
| Hawk 5-1 | 12-Oct-15 | £1,950,000.00 | £4,096,103.84 |
| Hawk 5-2 | 19-Nov-15 | £2,011,500.00 | £4,096,103.84 |
| | | £3,961,500.00 | |
| Hawk 6 | 15-Feb-16 | £1,980,000.00 | £4,011,041.06 |
| Hawk 7 | 8-Jul-16 | £2,310,000.00 | £4,255,230.33 |
| Hawk 8 | 27-Sep-16 | £1,650,000.00 | £2,881,207.74 |
| Hawk 9 | 3-May-17 | £429,000.00 | £650,000.00 |
| Hawk 10 | 11-Dec-17 | £2,310,000.00 | £3,500,000.00 |
| | | £29,280,000.00 | £67,836,042.16 |

**WHEREAS**, the table above is herein incorporated by reference and the terminology in the table shall have the following meanings: (i) the "Hawk" designated **Note** with a number shall

mean a specific Note; (ii) **Note Date** shall mean the date a Note was executed but where there is a
-1 and -2 the first date corresponds to the execution date and the second date corresponds to the
date of the second funding for the same Note; (iii) **ACR (£)** – Actual Cash Received in GBP (for
the avoidance of doubt after deduction of all prepaid interest and arrangement and other fees upon
the funding(s) of each Note; and (iv) the **Total Value as of April 30, 2018 in £** is for both for the
Hawk Notes individually but also as a total for all Hawk Notes (it is understood that if there is any
dispute relative to the calculations in this section, the language in Exhibit A is controlling);

WHEREAS, Hawk has reviewed the calculations for both the ACR (£) and the Total Value
as of April 30, 2018 in £ reflected in the above table and acknowledges its agreement therewith;
and

WHEREAS, the Company and Hawk intend to extinguish and convert the Hawk Notes
as described below.

NOW THEREFORE, in consideration of the premises and the agreements herein
contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Definitions: All capitalized terms used, but not defined herein, shall have the respective
meanings ascribed to them in the Hawk Notes, save where otherwise defined in this Agreement.

2. Conversion of Hawk Note(s) into Equity: Subject to the provisions of clause 3, Hawk
agrees to the extinguishment of each of the Hawk Notes by conversion on a 'first in first out'
basis, according to the chronological dates set forth in the above table, of all principal and
interest then outstanding (each an "**Extinguishment**") (including all the prepaid interest,
arrangement fees and accrued interest to the date of conversion ("**Interest and Fees**") (such
principal, Interest and Fees together the "**Total Value in GBP (£)**") under each such Note into
shares of the Company's stock ("**Conversion**") as stated herein. The Conversion into equity
shall be at a price per share equal to the price per share of the relevant fundraising and on the
same terms for the price per share, cumulative dividend rate, drag rights, conversion rights and
any other economic rights as the same class of stock ("**New Money Stock**"), but junior and
subordinate to such New Money Stock, on the terms set by the new money, issued to new
investors under such fundraising ("**New Money**"), including the value of all and any bonus
warrants issued to new investors, deducting any commissions or other related costs agreed by
Hawk and payable to third party fundraisers. Notwithstanding anything to the contrary in any
document, when there is a legal closing or closings of New Money equal to the ACR (£)
amounts, cleared, certified and evidenced by the Company to Hawk, at the time of each
Extinguishment and/or Conversion, each Total Value in GBP (£) reference relating to the
specific Hawk Note or Notes will be converted to USD ($) by the closing USD/GBP exchange
rate published by the Wall Street Journal five (5) business days before legal closing. The
Company's charter shall specify the rights and preferences of all Company stock, provided that it
specifies that the stock issued to Hawk in connection with each Extinguishment and/or
Conversion is equivalent, from an economic perspective, to the terms and conditions set forth in
the term sheet provided by the Company to Hawk relating to the Company's preferred stock to
be issued to new investors. Hawk shall acknowledge in writing in advance that it has verified the
economic equivalency of the New Money Stock to the Hawk Extinguishment and/or Conversion,
after which Hawk shall not contest such economic equivalency. In the event that there is any
dispute as to the calculation of the number of stock to be issued under each Extinguishment

2

and/or Conversion, Hawk's decision with regard to such calculation shall be on a best efforts basis but final and binding on the parties.

3. Revised Interest. Notwithstanding anything to the contrary in any other document, the Company and Hawk agree that the Hawk Notes will accrue interest on a compounded basis at a rate of twelve percent (12%) on a 365-day basis annually from May 1, 2018 which shall be added to the Total Value in GBP (£) converted under each of the Hawk Notes.

4. Notice. The Company will provide Hawk with notice in a form similar to that attached hereto as Exhibit B ("**Notice**") with respect to any conversion into equity subject to Hawk agreeing the calculation of the number of stock to be issued under each Conversion in accordance with clause 2.

5. Security: Only upon the conversion into equity of all of the Hawk Notes, and if necessary, once Hawk shall have executed a deed releasing all security relating to each such converted Note and each such converted Note shall be rendered unsecured and all security liens associated therewith released, notwithstanding anything to the contrary in any of the Hawk Notes, amendments, or supporting documents and thereafter the Company may borrow for equipment and other trade financing but it shall not under any circumstances without Hawk's prior written consent permit any encumbrances of any nature whatsoever of the intellectual property of the Company. Immediately after the conversion into equity of all of the Hawk Notes pursuant hereto, all related supporting documents shall be revoked and rendered null and void; the Company is fully authorized to notify any and all government authorities to effectuate same. Without limiting the foregoing, upon or as soon as reasonably practicable following completion of the conversion into equity of all of the Hawk Notes, Hawk (i) agrees to submit for recording among the financing statement records of the appropriate state government office a UCC-3 termination statement to terminate the financing statements of record perfecting the security interests granted in connection with the applicable converted Note, and (ii) hereby authorizes, the Company, at the Company's sole expense, to submit such other UCC-3 termination statements necessary or required to terminate the financing statements of record perfecting the security interests granted in connection with the applicable converted Note naming the Company, as debtor, and Hawk, as secured party, in the appropriate state government filing office. Further, upon conversion into equity of each Note, Hawk shall promptly return to the Company the original documents evidencing the Note marked "paid in full" or "canceled."

6. Remaining Notes: If the offering of new capital is terminated prior to the Extinguishment and or/Conversion of all of the Hawk Notes, any of the remaining Hawk Notes which have not been extinguished shall remain in full force. Nothing contained in this Agreement shall be construed as conferring upon Hawk the right to vote, receive distributions or any other rights with respect to the stock issuable upon the conversion of any of the Hawk Notes prior to the actual Conversion of any of the Hawk Notes.

7. Call Right.    The Company may, in its sole discretion, pay up to and including the Total Value in GBP (£), plus interest at the monthly rate of two percent (2%) compounded monthly calculated back to the date or dates of Conversion of each Hawk Note, on all or the applicable portion of the Total Value in GBP (£) to be paid to Hawk by the Company entitling the Company

3

to buy back the stock issued to Hawk, or proportionate amount thereof, under sections two (2) and four (4) hereof.

8. <u>Bonus</u>. Hawk will be given warrants that are cashless in the same format as previously provided to Hawk for: (a) simply signing the aforementioned as long as this whole Agreement remains binding and (b) if the Company is unsuccessful in raising as investment at least USD one hundred million ($100,000,000) total since the Effective Date of this Agreement. Those warrants in this section shall have an exercise price at the same price as set out in sections 2 and 4 above but shall instead entitle Hawk to subscribe for class A common shares at such price per share. The number of warrants shall be two million (2,000,000) as to 8(a) and (b) each.

9. <u>No Other Amendments and Verification</u>. Except as amended by this Agreement, all of the provisions of the Hawk Notes and their supporting documents shall remain unchanged and in full force and effect. Both parties covenant and verify that they have full legal authority for their respective entities in negotiating and executing this Agreement.

10. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and shall constitute the same instrument. Executed counterparts may be delivered by electronic or facsimile transmission.

11. <u>Governing Law</u>. THIS AGREEMENT AND ANY DOCUMENT CREATED THEREFROM SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE USA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW. BOTH PARTIES FURTHER CONSENT TO THE EXCLUSIVE JURISDICTION OF STATE OR FEDERAL COURTS IN WILMINGTON DELAWARE FOR ANY DISPUTE.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the Effective Date.

**STREAM TV NETWORKS, INC.**

By: _____
    Name:  Raja Rajan
    Title:   Chief Operating Officer

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____
    Name: AUTHORISED SIGNATORIES FOR AND ON BEHALF OF
          ALBANY DIRECTORS' LIMITED, SOLE DIRECTOR.

4

Title:

v180502

**EXHIBIT A**

(Hawk Notes and Amendments)

**EXHIBIT B**
(Form for Notice for Conversion into equity)


**TO: HAWK INVESTMENT HOLDINGS LIMITED ("HAWK")**

**ATTENTION:**


The undersigned Stream TV Networks, Inc. (the "**Company**") hereby informs Hawk that it intends to extinguish the following Hawk Note(s) by conversion into the Company's Stock pursuant to the agreement by and between Hawk and the Company dated effective April ____, 2018

| Hawk Note Number(s) being converted | ACR (£) | Calculation of Conversion | Number and Class of shares of Stock |
|---|---|---|---|
|  |  |  |  |


**Stream TV Networks, Inc.**
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103 USA


_____     _____
(Date)                        (Signature)

                              _____
                              (Printed name) Raja Rajan


**Agreed by:**

                    **HAWK INVESTMENT HOLDINGS LIMITED**

                    By: _____
                        Name:
                        Title:

7

# EXHIBIT "2"

180630

# 2018 AGREEMENT

THIS AGREEMENT (this "**Agreement**") with an effective date of January 29, 2018 (the "**Effective Date**") regardless of when it is mutually executed, by and among STREAM TV NETWORKS, INC., a Delaware corporation (the "**Company**") and SLS HOLDINGS VI, LLC, a Delaware limited liability company ("**SLS**"), (both collectively may be referred to as "**Parties**").

## R E C I T A L S

WHEREAS, the Company and SLS have entered into that certain (i) Securities Purchase Agreement, dated August 8, 2011 (the "**First Securities Purchase Agreement**"); (ii) Securities Purchase Agreement, dated February 8, 2012 (the "**Second Securities Purchase Agreement**", together with the First Securities Purchase Agreement, the "**Purchase Agreements**" and each a "**Purchase Agreement**"); (iii) 5% Senior Secured Note, dated August 8, 2011, in the principal amount of US$3,000,000 ("**SLS Note 1**"); (iv) 5% Senior Secured Note, dated February 8, 2012, in the principal amount of US$1,500,000 ("**SLS Note 2**"); (v) 5% Senior Secured Note, dated May 1, 2012, in the principal amount of US$500,000 ("**SLS Note 3**"); (vi) 5% Senior Secured Note, dated July 5, 2012, in the principal amount of US$500,000 ("**SLS Note 4**"); (vii) 5% Senior Secured Note, dated May 29, 2012, in the principal amount of US$500,000 ("**SLS Note 5**", together with SLS Note 1, SLS Note 2, SLS Note 3 and SLS Note 4, the "**SLS Notes**"); (viii) Consent, Waiver and Amendment Agreement, dated March 25, 2014; (ix) Amendment Agreement dated as of March 4, 2015 ("**2015 Amendment**"); (x) Amendment Agreement dated as of July 25, 2016 ("**2016 Amendment**"); and (xi) Amendment Agreement dated as of February 6, 2017 ("**February 2017 Amendment**"), and

WHEREAS, each of the SLS Notes was issued a right to purchase warrants (individually, the "**Old Warrant**" and collectively, the "**Old Warrants**") which entitled SLS to subscribe for and purchase from the Company shares of the Company's Class A common stock (the "**Common Stock**") constituting a stated percentage of the fully diluted shares, as defined in each of the Old Warrants, and

WHEREAS, each of the SLS Notes was issued pursuant to a Purchase Agreement together with supporting documents including security and pledge agreements (together, with the Purchase Agreements, the "**Supporting Agreements**"), and

WHEREAS, the Company and SLS entered into an amendment on or about August 23, 2017 which was entirely replaced by an agreement dated as of December 1, 2017 (the "**Amended and Restated Amendment Agreement**"), and

180630

WHEREAS, Hawk Investment Holdings Limited, a Guernsey holding company registered in Guernsey with registered number 44994, with its registered office at Newport House, 15 The Grange, St. Peter Port, Guernsey GY1 2QL, Channel Islands ("**Hawk**"), has executed of even date herewith that certain "Notes 1 Through 10 – May 2018 Agreement" (the "**Hawk Conversion Agreement**"), the execution and continued effectiveness of which is a precondition to SLS's obligations under this Agreement, and

WHEREAS, the Parties intend to extinguish and/or convert the SLS Notes as described below.

NOW THEREFORE, in consideration of the premises and the agreements herein contained, and intending to be legally bound hereby, the Company and SLS agree as set forth herein:

1.    Definitions. All capitalized terms used, but not defined herein, shall have the respective meanings ascribed to them in the SLS Notes and their Supporting Documents, save where otherwise defined in this Agreement.

2.    New Warrants. The Amended and Restated Amendment Agreement provided for Termination Warrants in an amount equal to 8,810,403 plus 552,750 as Additional Warrants (a total of 9,363,153 warrants, referred to hereafter as "**New Warrants**") which have been issued to SLS with a strike price of $4.00 per share. Those New Warrants in total shall be deemed permanent in exchange for termination of any and all of the Old Warrants, defined above, issued on or before the Effective Date, notwithstanding anything to the contrary.

3.    Bonus Warrants. SLS will be entitled to additional warrants (the "**Bonus Warrants**") in the same format as the New Warrants as follows: (a) 2,000,000 Bonus Warrants upon the execution of this Agreement, and (b) an additional 2,000,000 Bonus Warrants if the Company is unsuccessful in raising as investment at least USD one hundred million ($100,00,000) total since the Effective Date of this Agreement. The Bonus Warrants identified at Section 3(b) above shall not be issued to SLS unless and until the issuance of the 2,000,000 warrants identified at Section 8(b) of the Hawk Conversion Agreement.

4.    Conversion and Extinguishment. The principal amount and accrued interest thereon of all of the SLS Notes  shall be converted and extinguished (**"Extinguishment"**) into securities of the company ("**New Shares**"), on a "first in first out" basis, according to the chronological dates of such SLS Notes, pro rata with the Extinguishment and Conversion of all Hawk Notes (as defined in the Hawk Conversion Agreement). The principal amount and accrued interest of all of the SLS Notes totals $ 8,565,180.25 through February 1, 2019, and such amount will continue to accrue under the terms of the relevant SLS Notes until extinguished in full (such value at any time, the "**Total Accrued Value**"). The conversion into New Shares shall be at a price per share equal to the price per share of the concurrent pro-rated Hawk Conversion and on the same terms for the price per share, cumulative dividend rate, drag rights, conversion rights and any other economic rights as the same class of stock, and otherwise on the same terms as the concurrent pro-rated Hawk Conversion.

180630

5.    Notice:   The Company will provide SLS with notice in a form similar to that attached hereto as Exhibit A ("**Notice**") with respect to the Extinguishment and Conversion of the SLS Notes.

6.    Security: Upon (i) conversion of all of the of the SLS Notes pursuant hereto and all Hawk Notes pursuant to the Hawk Conversion Agreement, and (ii) the effectiveness of the full release of all security relating to all Hawk Notes,  SLS (i) agrees to submit for recording among the financing statement records of the appropriate state government office a UCC-3 termination statement to terminate the financing statements of record perfecting the security interests granted in connection with the converted SLS Notes, and (ii) hereby authorizes, the Company, at the Company's sole expense, to submit such other UCC-3 termination statements necessary or required to terminate the financing statements of record perfecting the security interests granted in connection with the applicable converted SLS Notes naming the Company, as debtor, and SLS, as secured party, in the appropriate state government filing office. Further, upon conversion of the SLS Notes, SLS shall promptly return to the Company the original documents evidencing the SLS Notes marked "paid in full" or "canceled."

7.    Remaining SLS Notes.  If the offering of new capital is terminated prior to the Extinguishment and/or Conversion of all of the Hawk Notes and all SLS Notes, any of the remaining SLS Notes which have not been extinguished shall remain in full force.  Nothing contained in this Agreement shall be construed as conferring upon SLS the right to vote, receive distributions or any other rights with respect to stock issuable upon conversion of any of the SLS Notes prior to the actual Conversion of any of the SLS Notes.

8.    Call Right.  The Company may, in its sole discretion, pay up to and including the Total Accrued Value at the time of such exercise that would have been applicable had the SLS Notes not been converted hereunder to buy back all or any part of the New Shares issued to SLS upon conversion of the SLS Notes hereunder.  If not executed beforehand, such Call Right will terminate as to any New Shares sold by SLS to any third party upon the Company's prior written consent, but will otherwise continue in force until executed by the Company.

9.    No Other Amendments. Except as amended by this Agreement, each of the SLS Notes and their Supporting Documents shall remain unchanged and in full force and effect.  In the event of any conflict between this Agreement and the SLS Notes and their Supporting Documents, the terms and provisions of this Agreement shall govern and control.

10.    Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signing Parties had signed the same document. All counterparts shall be construed together and shall constitute the same instrument.

11.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW.

12.    Effectiveness.  This Agreement shall be deemed effective as of the date first set forth above, regardless of its date of execution.  This Agreement shall cease to be effective as to any

180630

pending or future Extinguishment or Conversion of the SLS Notes, and shall immediately terminate in full, upon any amendment to, or any full or partial termination (whether voluntary or involuntary) of the Hawk Conversion Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the Effective Date first above written.

**STREAM TV NETWORKS, INC.**

By: _____
Name: Mathu Rajan
Title:  CEO

**SLS HOLDINGS VI, LLC**

By: _____
Name:  Shad Stastney
Title:  Managing Member

180630

## EXHIBIT A

## FORM OF NOTICE FOR EXTINGUISHMENT

Date of Notice:

**TO:** SLS HOLDINGS VI, LLC ("SLS")

**ATTENTION:**

The undersigned Stream TV Networks, Inc. (the "**Company**") hereby informs SLS that the following total of SLS Note(s) have this date been extinguished by conversion into the Company's Common Stock pursuant to the Agreement by and between SLS and the Company dated effective January 29th, 2018:

| | Amount | Number of shares and/or Warrants |
|---|---|---|
| **SLS Notes Principal and Accrued Interest (Total Accrued Value)** | | |
| | | |

**Stream TV Networks, Inc.**

2009 Chestnut Street, 3rd Floor

Philadelphia, PA 19103 USA

_____        _____

(Date)                                        (Signature)

                                        _____

                                        (Printed name) Raja Rajan

# EXHIBIT "3"

filed under seal