UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc., *et al.*[1]<br><br>The Debtors. | Chapter 11<br><br>Bky. Case No. 23-10763 (DJB)<br>(Jointly Administered) |

### DECLARATION OF MATHU RAJAN IN RESPONSE TO THE MOTION OF WILLIAM A. HOMONY FOR AN EXAMINATION AND FOR PRODUCTION OF DOCUMENTS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

1. My name is Mathu Rajan, and I am the Founder of Stream TV Networks, Inc. ("Stream"), a debtor in the above-captioned bankruptcy case. I was a Director and the Chief Executive Officer of Stream from its founding in 2009 until January 5, 2024 when this Court appointed William A. Homony as Chapter 11 Trustee (the "Trustee"). As former chief executive, I am personally familiar with Stream's financial activities between 2009 and the end of 2023.

2. I also have voting control of Innoventures Group LLC ("Innoventures"), a company for which the Trustee is seeking an examination and production of documents pursuant to Federal Rule of Bankruptcy Procedure 2004 (a "Rule 2004 Exam"). Innoventures is a family trust established for the benefit of my father, Rajan Rajan, and my mother, Jeeva Rajan. It serves as a vehicle for them to provide consulting services to third parties such as Stream.

3. I am also Founder and Chief Executive Officer of Mediatainment, Inc. ("Mediatainment"), another company for which the Trustee is seeking a Rule 2004 Exam. Mediatainment served as the initial parent company of Stream and provided certain operational funding for Stream in 2010 through a loan as described below.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

1

4. I am authorized to make this declaration on behalf of Innoventures and Mediatainment in connection with the above-captioned bankruptcy case. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

**Introduction**

5. Stream has been a "start-up" company since its inception in 2009 and was completely pre-revenue until at least 2016. As is common in many start-up companies, Stream engaged the services of family members because they often show greater degrees of loyalty and flexibility than standard employees. Such family service providers are often engaged for extended periods of time, because continuity and institutional knowledge add value.

6. The Trustee's initial information requests to Innoventures and Mediatainment were received by Rajan Rajan and Jeeva Rajan, who are 91 years old and 83 years old, respectively. The critical nature of those requests was not fully realized at the time, and I submit the following declaration in an attempt to rectify the oversight, provide substantiation for the bankruptcy claims on file, and indicate to the Trustee and to the Court the cooperative spirit of the parties.

7. As will be demonstrated below, in addition to providing services on a monthly basis, Mediatainment provided critical early-stage funding for Stream. And Innoventures, in addition to providing services on a monthly basis, also stepped up to fund payroll obligations for Stream at a critical time following an improvident injunction imposed by the Delaware Court of Chancery. These are exactly the types of actions that loyal supporters, family, take when a company like Stream has a critical need.

**Innoventures Group LLC**

8.  From May 2011 though January 2019, Innoventures invoiced Stream on a monthly basis for services provided by Jeeva and Rajan Rajan. Such services were generally related to Stream's bookkeeping and other administration functions, manufacturing operations, establishing and maintaining supply chain relationships, setup and optimization of Stream's optical bonding equipment in Asia, quality control oversight, production facility planning, etc.

9.  Invoices from Innoventures were paid in a timely manner by Stream until Stream experienced cash flow problems in early 2019. With Stream needing to conserve cash flow for product engineering and other critical operations, I made the decision on behalf of both Stream and Innoventures to delay payment of Innoventures invoices until Stream's cash flow improved from either increased capital investment from an institutional partner or revenue generation from product sales.

10.  From February 2019 onward, Innoventures invoices were received by Stream, logged as payables in the company's QuickBooks accounting software, and held for future payment. Innoventures provided services on this basis from February 2019 until May 2020 when Stream's secured creditors executed an Omnibus Agreement that purported to settle their debt by allowing them to seize ownership of Stream's assets. As this Court knows, the Omnibus Agreement was ultimately determined to be void *ab initio* by the Delaware Supreme Court in a unanimous 5-0 *en banc* decision in June 2022.[2]

11.  Innoventures submitted 16 invoices to Stream covering the months of February 2019 through May 2020. Those 16 unpaid invoices, which total $118,465.00, describe specific activities conducted during the billing period related to: obtaining a manufacturing license in China, selection of supply chain vendors, negotiation with OEM Pegatron, pack-up and shipping

---

[2] Delaware Supreme Court No. 360, 2021

3

of Stream's SPL and MPL optical bonding equipment, and preparation for a Stream-controlled manufacturing facility, among other things. A true and correct copy of the QuickBooks "Unpaid Bills Report" for Innoventures is attached hereto as **Exhibit A**. True and correct copies of the 16 Innoventures unpaid invoices are attached hereto as **Exhibit B**.

12. To help Stream, Innoventures did more than just defer payment of its invoices for more than a year. On or about December 21, 2020, Innoventures paid the semi-monthly payroll fee of $59,635.96 for Automatic Data Processing, Inc. ("ADP TotalSource") on behalf of Stream because Stream was unable to make the payment itself.

13. Stream's inability to pay ADP TotalSource was a direct result of the Delaware Chancery Court's Preliminary Injunction Order against Stream. On December 8, 2020, Vice Chancellor Laster (i) found that the Omnibus Agreement was likely to be validated, and (ii) enjoined me and other Stream personnel from preventing implementation of the Omnibus Agreement or challenging it anywhere but in the Chancery Court. The Court's *de facto* enforcement of the Omnibus Agreement required Stream to surrender its bank accounts, all cash-on hand, its data servers, business records, technology samples, computer source code, patents and other intellectual property, and all other assets to SeeCubic, Inc. ("SeeCubic"), the beneficiary of the Omnibus Agreement. A true and correct copy of the Omnibus Agreement is attached hereto as **Exhibit J**. A true and correct copy of the Chancery Court Preliminary Injunction Order is attached hereto as **Exhibit K**.

14. When SeeCubic seized Stream's assets in December 2020, many of Stream's employees left Stream to join SeeCubic. However, several employees recognized the injustice of the asset seizure and remained loyal to Stream. As chief executive, it was imperative that I retain these critical human resources and not allow missed payroll to further impact Stream.

4

15.     Following the Chancery Court's improvident injunction in December 2020, SeeCubic seized Stream's bank accounts. I was concerned that efforts would be made to interfere with my personal accounts and those of my family and their business as well. Consequently, some bank accounts were closed, and we don't have documents for some of what transpired in December 2020.

16.     However, what most likely happened is that I paid the ADP TotalSource invoice directly on behalf of Stream, with the debt accruing to the Innoventures family trust. This is corroborated by certain evidence: (i) Stream has no record of paying ADP TotalSource on or about December 21, 2020; (ii) Stream's QuickBooks accounting software indicates a loan from Innoventures, with a transaction description of "ADP Payroll 12-22-20" and a transaction date of December 21, 2020; and (iii) on the date of this Declaration, I personally confirmed with former Stream employee, Charles Robertson, that ADP had, in fact, issued payroll on December 22, 2020. A true and correct copy of Robertson's redacted bank statement reflecting the ADP TotalSource payroll payment is attached hereto as **Exhibit C**.

17.     Innoventures, with the full support of my parents, who were 86-years-old and 77-years-old at the time, agreed to pay the $59,635.96 ADP TotalSource fee on behalf of Stream to make sure Stream's employees received pay for services they had provided to Stream from December 1-15, 2020. The payment was logged by Stream in its QuickBooks accounting records as a payable owed to Innoventures as reimbursement for ADP TotalSource issued December 22, 2020 and is reflected in the "Unpaid Bills Report" attached hereto as **Exhibit A**.

18.     Admittedly, the ADP TotalSource invoice in the amount of $59,635.96 was not scanned and entered into Stream's QuickBooks accounting files because it was not paid directly by Stream, although it should have been entered as supporting documentation for the

5

Innoventures reimbursement entry. It is my understanding that Innoventures did not retain a copy of the ADP TotalSource invoice it paid on Stream's behalf.

19. Jeeva and Rajan Rajan, as the active participants in Innoventures, are willing to make themselves available for deposition if necessary, but they object to the forensic 2004 examination requested by the Trustee, which they deem to be an abuse of authority given the presentation of requested information provided herein.

**Mediatainment, Inc.**

20. As stated above, Mediatainment was the original parent company of Stream, owning 100% of Stream's stock. Mediatainment solicited investment as a holding company, but as development of Stream's Ultra-D technology progressed, it became clear to me that investors preferred to invest in an active, operating company. As a result, shareholders in Mediatainment were offered the opportunity to swap their shares of Mediatainment for shares of Stream itself. Virtually every shareholder did so, obtaining direct fractional ownership of Stream through their Stream shares. Mediatainment retained a minority ownership of Stream, which diluted greatly over the years as Stream raised additional capital.

21. In those early days, however, Stream raised no direct capital and relied on funding from Mediatainment for its limited operational needs.

22. On December 30, 2010, Mediatainment loaned $992,590.68 to Stream for operational funding. The loan was memorialized by a 3-year Convertible Note (the "MT Note"), which I executed as CEO of Stream. The MT Note accrues interest at a rate of 1.2% on the unpaid balance, per annum, monthly in arrears. A true and correct copy of the Convertible Note issued by Stream to Mediatainment is attached hereto as **Exhibit D**.

23. The MT Note contains provisions for an optional conversion in Section 4(A) which states:

6

> At the time of any Financing, as defined above, Holder shall have the option to convert all Notes hereunder into equity of Company under the same economic terms of the Financing. In the event that Holder does not exercise such conversion as part of the Financing then such option or right of conversion shall thereon be forfeited and void thereafter.

Mediatainment, as "Holder" of the MT Note, has never exercised its option to convert the debt to equity, and therefore, the debt remains a liability of Stream.

24. On or about December 1, 2013, Stream and Mediatainment executed an Amendment to Convertible Note extending the maturity date to December 30, 2016. I signed the amendment as CEO of Mediatainment, and Raja Rajan signed on behalf of Stream as its COO. Other than extending the maturity date for another three years, no other terms were changed. The debt remains a liability of Stream. A true and correct copy of the 2013 MT Note Amendment is attached hereto as **Exhibit E**.

25. On or about December 6, 2016, Stream and Mediatainment executed an Amendment to Convertible Note extending the maturity date to December 30, 2019. I signed the amendment as CEO of Mediatainment, and Raja Rajan signed on behalf of Stream as its COO. Other than extending the maturity date for another three years, no other terms were changed. The debt remains a liability of Stream. A true and correct copy of the 2016 MT Note Amendment is attached hereto as **Exhibit F**.

26. My understanding is that the outstanding balance owed on the MT Note at the time Stream filed its chapter 11 bankruptcy petition on March 15, 2023 – the unpaid principal balance less certain amounts deducted from the balance due to payment by Stream of certain Mediatainment expenses – was $895,590.68. That amount was reflected in category "2010-00-10 Convertible Debt" on page 2 of Stream's Balance Sheet at the time of Stream's bankruptcy petition date. A true and correct copy of Stream's Balance Sheet as of March 24, 2023 is attached hereto as **Exhibit G.**

27. It appears that when Stream's bankruptcy Schedule E/F was prepared, there was a typographical error in the entry of the debt owed to Mediatainment. Instead of the $895,590.68 amount reflected in the Balance Sheet, Schedule E/F and subsequent claim number 3.94 reflects a total amount of $890,590.68, $5,000 less than what was reflected on the balance sheet.

28. In addition to providing the loan, Mediatainment also provided bookkeeping and accounting services to Stream on a monthly consulting basis. As it did with Innoventures, Stream paid Mediatainment invoices in a timely manner until it experienced cash flow problems in 2019. To conserve Stream's cash flow for product engineering and other critical operations, payment of Mediatainment invoices was deferred until Stream's cash flow improved.

29. From June 2019 onward, Mediatainment invoices were received by Stream, logged as payables in the company's QuickBooks accounting software, and held for future payment. Mediatainment provided services on this basis from June 2019 until May 2020 when Stream's secured creditors executed the Omnibus Agreement that negatively impacted Stream's financial and business operations as stated above.

30. Mediatainment submitted 12 invoices to Stream covering the months of June 2019 through May 2020. Those 12 unpaid invoices, which total $60,000.00, covered a lot of basic banking and accounting functions: QuickBooks data entry, payroll processing, international and domestic wire transfers, maintenance of accounts receivable and accounts payable, and other general banking. A true and correct copy of the QuickBooks "Unpaid Bills Report" for Mediatainment is attached hereto as **Exhibit H**.

31. My understanding is that 11 of the 12 unpaid Mediatainment monthly invoices were scanned and logged into Stream's QuickBooks software. Unfortunately, one of the payables was logged as a journal entry into Stream's accounts payable, but the underlying invoice was not scanned. That journal entry, however, indicates a Mediatainment invoice date and service

8

description that fall chronologically in the sequence of all open invoices, which had the same monthly amount payable. True and correct copies of the 11 available Mediatainment invoices are attached hereto as **Exhibit I**.

32. Mediatainment is willing to provide a representative for deposition if necessary, but it objects to the forensic 2004 examination requested by the Trustee, which it deems to be an abuse of authority given the presentation of requested information provided herein.

**Availability of Accounting and Legal Data**

33. Stream surrendered its QuickBooks data files to the Trustee shortly after his appointment in January 2024. Accordingly, the Trustee has had access to all of Stream's accounting data and has had the ability to generate the Unpaid Bills Report for Innoventures attached hereto as **Exhibit A**.

34. Similarly, the Trustee has had the ability to view the Innoventures invoices that were scanned and input into QuickBooks and attached hereto as **Exhibit B**.

35. Similarly, the Trustee has had the ability to generate the Unpaid Bills Report for Mediatainment attached hereto as **Exhibit H**.

36. Similarly, the Trustee has had the ability to view the Mediatainment invoices that were scanned and input into QuickBooks and attached hereto as **Exhibit I**.

37. Shortly after the Trustee was appointed in January 2024, I directed Stream employees to give the Trustee access to Stream's corporate file storage on Box.com, a cloud-based backup service Stream employed. The Box folders contained extensive legal documents, including the MT Note and its two amendments. The Trustee has had access to this information for more than a year and a half, but I am attaching them hereto as **Exhibits D, E, and F** for his and the Court's convenience.

38. From 2011 until 2020, Stream's primary storage for its corporate information was a server array located in the Netherlands at SeeCubic, B.V., its R&D subsidiary. While most of Stream's legal, financial, and other documents were backed up on Box.com, certain documents were stored only on the primary servers. All data on those servers were seized by SeeCubic pursuant to the Omnibus Agreement and never returned to Stream, even after the Omnibus Agreement was invalidated by the Delaware Supreme Court in 2022.

39. I informed the Trustee that Stream's critical data remained in the possession of SeeCubic, a party in direct competition with Stream, but to the best of my knowledge, the Trustee made no attempt to seek the return of the data or control of the servers. It is unknown how much of Stream's historical business information remains unavailable to Stream due to the Trustee's failure to secure the return of those critical business assets.

**Concerns About the Legitimate Use of Rule 2004 Exam**

40. With the documentation supplied herein, and with the offer of making representatives of both Innoventures and Mediatainment reasonably available for deposition, there seems to be no legitimate need for an extensive Rule 2004 Exam sought by the Trustee.

41. I have concerns about the motives of the Trustee for seeking such an exam, and about how information obtained by the Trustee may be used or manipulated to achieve ulterior purposes. This concern stems from my personal experience with the Trustee, who sought sanctions against me after obtaining certain business documents of Visual Semiconductor, Inc. ("VSI") from unknown sources and then (i) misrepresenting that such documents were in current use by VSI to undermine his authority,[3] and (ii) removing or allowing the removal of metadata from one document that would have clearly revealed it to be a two-year-old pre-Petition

---

[3] *See* Docket No. 646 at ¶¶ 20-22 and Exhibits A and B thereto

10

manipulated documents and misleading statements to the Court,[5] the Trustee filed an emergency motion to quash discovery,[6] then withdrew his sanctions motion[7] without consequence.[8] True and correct copies of sanctions motion with its manipulated and/or misleading documents filed by the Trustee (Docket 646) are attached hereto as **Exhibit L**. A true and correct copy of VSI's Motion to Compel Discovery (Docket No. 728) is attached hereto as **Exhibit M**.

42.  I believe there is justifiable concern about the Trustee being allowed to go on a "fishing expedition" in search of documents he can use in ways other than his stated purpose.

Executed under penalty of perjury this 29th day of September, 2025.

*[signature]*
Mathu Rajan

I attest to facts stated in the Declaration of Mathu Rajan above.

Executed under penalty of perjury this 29th day of September, 2025.

*[signature]* Jeeva Govinda Rajan
Jeeva Rajan

I attest to facts stated in the Declaration of Mathu Rajan above.

Executed under penalty of perjury this 29th day of September, 2025.

*[signature]*
Rajan Rajan

---

[4] *See* Docket No. 728 at ¶¶ 28-32
[5] *See* Docket No. 678
[6] *See* Docket No. 724
[7] *See* Docket No. 725
[8] The motion to quash was granted by this court. *See* Docket No. 777

11