**<u>EXHIBIT L</u>**

Docket No. 646
Chapter 11 Trustee's
Motion Seeking Turnover and Sanctions

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | **Chapter 11** |
| **In re:** | : | |
| | : | **Bankruptcy No. 23-10763 (AMC)** |
| **Stream TV Networks, Inc.,** *et al*. | : | **(Jointly Administered)**[1] |
| | : | |
| **Debtors.** | : | **Hearing Date: June 26, 2024** |
| | : | **Hearing Time: 11:00 a.m.** |
| | : | **Hearing Place: Courtroom #4** |
| | : | |

### MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY
### AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER
### ENFORCING THE AUTOMATIC STAY AND
### COMPELLING TURNOVER OF ESTATE PROPERTY

William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy

estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative")

(when referred to with Stream, the "Debtors"), by and through his counsel, files this Motion for

Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property (the

"Motion"), and in support thereof, respectfully avers as follows:

### PRELIMINARY STATEMENT

The extraordinary remedy of the appointment of a Chapter 11 Trustee in this case was

necessitated by the Court's finding that the Debtors-in-possession's principal, Mathu Rajan, was

violating his fiduciary duty of loyalty by, *inter alia*, failing to maximize Debtors' estates for the

benefit of creditors. Specifically, Mr. Rajan was found to have grossly mismanaged Debtors'

affairs to improperly benefit Visual Semiconductor, Inc. ("VSI"), another entity under his control.

This Court's admonition was insufficient to curtail Rajan's disloyal conduct, as he

continues to invoke the name and property of the Debtors to benefit VSI and derail the orderly

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

administration of the Debtors' estates. Egregiously, Rajan purports to be communicating on the Debtors' behalf via an email address which utilizes Stream's full corporate name: streamtvnetworksinc@gmail.com. Moreover, Rajan wrongfully possesses and uses Debtors' tangible property to solicit and raise money for VSI.

As set forth in detail below, Rajan and VSI are violating the automatic stay and interfering with the Trustee's exclusive control over the Debtors and their property. Accordingly, the Trustee respectfully requests that the Court enforce the automatic stay to put a stop to the misconduct and compel all Debtor property to be turned over to the Trustee.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C § 157.

2.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The bases for the relief requested herein are sections 362, 105, 541, and 542 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Bankruptcy Rules 9013 and 9014.

4.    The Trustee may proceed by motion because he is not seeking to obtain an injunction; rather, he seeks to enforce an existing injunction—the automatic stay—and thus need not file an adversary proceeding to obtain the relief sought in this Motion. *See, e.g.*, *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1999), *aff'd sub nom. In re Cont'l Airlines, Inc.*, 279 F.3d 226 (3d Cir. 2002) ("In this case, Continental is not seeking an injunction, it is merely seeking to enforce an injunction already in place—that created by sections 1141 and 524 of the Bankruptcy Code and the express terms of the Confirmation Order."); *see also In re Christ Hosp.*, 502 B.R. 158, 183 (Bankr. D.N.J. 2013).

## BACKGROUND

**A.    Bankruptcy Procedural Background.**

5.    On March 15, 2023, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

6.    On April 6, 2023, Hawk Investment Holdings, Ltd. ("Hawk"), a secured creditor of the Debtors, filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeking dismissal or conversion of the Debtors' cases, or, alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion") (D.I. #94).

7.    In the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses.

8.    The Debtors filed an opposition to the 1112/1104 Motion on May 8, 2023 (D.I. #193).

9.    On January 5, 2024, the Court entered a memorandum and order, which, among other things, granted the 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee (the "Trustee Order" and "Trustee Memorandum") (D.I. #549 and #548, respectively).

10.    The Trustee Order specifically states that the Debtors' principal, Mathu Rajan, "is no longer authorized to take any action on behalf of the Debtors' estates."[2]

11.    On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the chapter 11 trustee as well as an Application for

---

[2] This Court may take judicial notice pursuant to Fed. R. Evid. 201 (incorporated into bankruptcy cases by Fed. R. Bankr. P. 9017) of the dockets and the content of the documents filed in the bankruptcy case for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute. *See* FED. R. EVID. 201; *In re Scholl*, 1998 Bankr. LEXIS 1059, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998); *see also In re Indian Palm Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995).

4853-7055-0979 v7

the entry of an Order approving the appointment of the Trustee (D.I. #554 and #553, respectively),

and, on January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of

the Trustee (D.I. #558).

12.     On May 2, 2024, the Trustee filed an Application to Employ Capstone Capital

Markets LLC as Investment Banker (the "Capstone Application") for the purposes of, *inter alia*,

formulating a market strategy for the Debtors' assets with the goal of conducting a section 363

auction for the benefit of the Debtors' estates.

13.     On May 6, 2024, the Trustee filed a motion pursuant to section 9019(a) of the

Bankruptcy Code (the "9019 Motion") seeking approval of a settlement agreement with Hawk, as

collateral agent for itself and other secured creditors. After meeting with a number of purportedly

interested parties – including Hawk, the Debtors' principal Mathu Rajan, VSI and Rembrandt 3D

Holding Ltd. (who purports to be one of the Debtors' largest unsecured creditors) – the Trustee

concluded that only Hawk made a realistic and viable proposal which would facilitate the best path

forward for the bankruptcy estates. The Trustee engaged in substantial negotiations with Hawk,

resulting in the pending settlement, which will secure a recovery for unsecured creditors while

minimizing ongoing administrative fees and costs.

**B.      The Trustee Order Was Necessitated by the Malfeasance of the Debtors' Fiduciary, Mathu Rajan**

14.     Mathu Rajan identified himself as a Director, Secretary, and CEO of both Debtors

in Debtors' chapter 11 bankruptcy petitions and was in control of the Debtors in possession as of

the Petition Date. *See* Trustee Memorandum at p. 8.

15.     As set forth in the Trustee Memorandum, this Court held that Rajan engaged in

numerous instances of malfeasance to the detriment of the Debtors and this bankruptcy proceeding

and in breach of his fiduciary duties, leading to the appointment of the Trustee:

Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtors' operations moving forward, these cases have stalled at virtually every turn. The Court has expressed its concern with the cases' lack of progress and direction on multiple occasions. Furthermore, the evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtors' cases to date, i.e., the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management. **There are many examples, large and small, that highlight (a) the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court**, (b) the relatively directionless nature of these cases to date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date.

Trustee Memorandum at p. 31 (emphasis added).

16.    Included among this Court's many concerns with Rajan's conduct is the conflicting roles he has played as a fiduciary of both the Debtors and as CEO of VSI, a company which Mr. Rajan formed in 2022 and of which he holds the majority of voting stock. Trustee Memorandum at p. 6.

17.    As determined by this Court:

a.    Mr. Rajan "has administered [the Debtors'] estates with an eye towards what he personally wants to accomplish [via VSI] and disclose, rather than acting consistent with his obligations to the Court and the estates' creditors." *Id.* at pp. 45-46;

b.    "Indicative of the Court's chief concern with the Debtors' proposal to obtain financing from VSI, Mr. Rajan was also purporting to testify on behalf of VSI. Although the Debtors ultimately withdrew Mr. Rajan as a representative of VSI when the Court questioned how that could be, Mr. Rajan's dual role was indicative of the Court's trouble with the Debtors' emergency financing proposal: the evidence at the hearing made clear to the Court that the proposal

5

to have the Debtors incur $1 million in post-petition administrative debt to VSI was not only unnecessary given the availability of approximately €700,000 in funding directly from SeeCubic to non-debtor SCBV, but was also fatally flawed because Mr. Rajan was on both sides of the proposed transaction." *Id.* at pp. 41-42;

      c.     "[T]he Court's trust in the Debtor's management[, i.e., Mr. Rajan,] has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification." *Id.* at p. 46;

      d.     "The Court is . . . alarmed about the propriety and motivations of Stream entering into a post-petition transaction that is intended, at least in large part, to protect VSI's interest in Stream's technology and products . . . . " *Id.* at p. 50;

      e.     "[Numerous] transactions [proposed by Mr. Rajan] have had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment." *Id.* at p. 51;

      f.     "The already-discussed transactions and requested relief that appear to be primarily for the benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of the Debtor's estates." *Id.* at p. 59;

      g.     "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles is so entrenched that Mr. Rajan's testimony at Trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinctions between the entities and his roles with each." *Id.* at p. 61; and

h.    "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness." *Id.*

## C.    Rajan's Malfeasance and Breaches of Fiduciary Duty Continue to Present Day

18.    Rajan's use of VSI to the detriment of and in breach of his fiduciary duty to the Debtors' estates continues to this day.

19.    One need look no further than VSI's website (https://visualsemi.com) to establish that VSI and Rajan are competing with the Debtors, in brazen and blatant violation of Rajan's fiduciary duty of loyalty as a director of the Debtors. The website states that VSI "intends to develop and implement new solutions that offer enhanced viewing and user engagement through glasses-free and other advanced technologies," the precise line of business of the Debtors.

20.    In an investment memorandum utilized to court potential investors (the "VSI IM"), VSI references "Ultra-D" technology, which is solely controlled by a wholly-owned subsidiary of the Debtors, and is in no way connected to VSI. A true and correct copy of VSI IM is attached hereto as Exhibit A; *see also* First Day Declaration of Mathu Rajan (D.I. # 48 at ¶¶ 7-9) (providing a detailed description of the Debtors' Ultra-D technology and its benefit to the Debtors).

21.    The VSI IM makes reference to Debtors' Ultra-D technology no less than twenty-one times, and gives the clear (mis)impression to potential investors that Ultra-D technology belongs to VSI. *See* VSI IM at pp. 8, 15, 16, 17, 18, 34, 35, 36, 37, 53.

22.    A similar document issued by VSI, a true and correct copy of which is attached hereto as Exhibit B, states that "[c]ornerstone solutions in [VSI's] portfolio include Ultra-D glasses-free 3D" and that VSI "can bring to market" and has "deployed" the Debtor's technology in locations throughout the world.

7

23.     In addition to touting the Debtors' Ultra-D technology as an asset which should induce investors to put money into VSI, VSI currently possesses equipment that incorporates the Debtors' Ultra-D technology and is actively using it to demonstrate the Debtors' technology to potential investors. This equipment is property of the estate which should have been turned over to the Trustee.

24.     Moreover, VSI also has control over the Debtors' electronic books and records, including source code for essential technology belonging to the Debtors.

25.     Rajan, acting for the benefit of himself and VSI, has further breached his fiduciary duties to the Debtors and usurped the Trustee's exclusive control over the Debtors' estates by purporting to speak and act on behalf of the Debtors via an email account which uses the exact corporate name of Stream – streamtvnetworksinc@gmail.com (the "Sham Email Account").

26.     On May 7, 2024, Mathu Rajan, using the Sham Email Account and a blind copy field, emailed an unknown number of individuals and entities and communicated his intention (and, by necessary implication via use of Stream's corporate name in the Sham Email Account, the Stream's supposed intention) to improperly interfere with the pending 9019 Motion. *See* 5/7/24 Email, a true and correct copy of which is attached hereto as Exhibit C.

27.     As established by Rajan's reference in the May 7, 2024 email to previous communications, the Trustee believes that Rajan has regularly used and plans on continuing to use the Sham Email Account and Stream's corporate name to improperly raise money for the sole benefit of VSI, to delay and derail the Court's consideration of the Trustee's 9019 Motion and the Capstone Application via extrajudicial means, and to otherwise interfere with the Trustee's orderly administration of the Debtors' estates and the Trustee's efforts to maximize the value of the Debtors' assets via a fair sale process. That Rajan does so under the banner of Stream, a Debtor to

8

which he owes fiduciary duties, makes his behavior even more insidious.

28.     On May 8, 2024, five days after the Capstone Application was filed, Rajan contacted Capstone ostensibly to provide an unsolicited general business update on VSI. The representative Rajan spoke to at Capstone was generally aware that Capstone has spoken with the Trustee regarding potential retention in this bankruptcy proceeding and took no action in furtherance of the communication, nor was he asked to take any action on behalf of VSI.

29.     The very next day, VSI filed an objection to the retention of Capstone alleging that VSI had an established relationship with Capstone including the signing of a non-disclosure agreement; however, no non-disclosure agreement was attached to the objection.

30.     Upon investigation, Capstone has determined that the allegations in VSI's objection are unfounded, in that at no point did Capstone enter into a non-disclosure agreement with VSI nor was Capstone retained by VSI. Furthermore, the communications between Capstone and VSI were limited to three brief instances spread over a nearly two year period all initiated by VSI and unsolicited by Capstone. Upon information and belief, Rajan placed the call to Capstone on May 8, 2024 in furtherance of his nefarious intention to further delay the bankruptcy proceedings to his and VSI's benefit and to the detriment of the Debtors' bankruptcy estates and in order to intentionally interfere with the Capstone Agreement and ultimately the Trustee's sale efforts.

31.     On May 13, 2024, VSI filed a misplaced Joinder to the Debtors' Motion for a Temporary Restraining Order (the "Joinder") [D.I. #135 in Adversary Proceeding docket no. 23-00057-AMC] in the adversary proceeding the Trustee is settling as part of the 9019 Motion. In that joinder, VSI stunningly admits to directing and "funding" certain undisclosed "contract employees" of the Debtor to take possession of certain visual bonding equipment, property of the Debtor's bankruptcy estate (the "Equipment"), without any authority and unbeknownst to the

9

Trustee, in order to deliver it to an undisclosed third party "strategic partner" in order to "kick off a venture to generate downstream revenue" and allow the strategic partner to accelerate the "Glasses-Free 3D project." *See* paragraph 9 of the Joinder, a copy of which is attached hereto as Exhibit "D" and incorporated herein.

32.     All of these steps were taken by VSI and Rajan without Bankruptcy Court authority, were concealed from the Trustee, and were in violation of the Trustee Order.

33.     The Trustee is justifiably concerned that VSI and Rajan are continuing to take unauthorized actions or directing action on behalf of the Debtors and potentially obligating the Debtors without authority or Bankruptcy Court approval and therefore respectfully request that this Court enforce the automatic stay to prevent further interference with the Trustee performing his duties under the Bankruptcy Code.

## BASIS FOR RELIEF

### A.    Rajan and VSI Have Exercised Control over Debtors' Property in Violation of the Automatic Stay and in an Attempt to Usurp the Role of the Trustee

34.     The filing of a bankruptcy petition creates an estate consisting of all legal and equitable interests of the debtor in property held as of that date. 11 U.S.C. § 541(a).

35.     Upon the filing of a bankruptcy petition, the automatic stay operates as an injunction against "all entities" from, *inter alia*, any act to "exercise control over property of the estate." 11 U.S.C. §§ 362(a)(3); *see also In re Builders Grp. & Dev. Corp.*, 2013 WL 6198203, at *5 (Bankr. D.P.R. Nov. 27, 2013) ("The automatic stay acts as an injunction to protect the property of the estate and becomes operative by the mere filing of a bankruptcy petition.").

36.     This Court has found that "[t]he automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code . . . [i]mportantly, the automatic stay also protects creditors, since '[w]ithout it, certain creditors would be able to pursue their own remedies against

the debtor's property.'" *In re Scungio Borst & Associates, LLC*, 652 B.R. 644, 651 (Bankr. E.D. Pa. 2023) (citing *Malloy v. J&V Developers, Inc. (In re Malloy)*, 572 B.R. 551, 555 (Bankr. E.D. Pa. 2017); quoting *Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Corp.)*, 901 F.2d 325, 327 (3d Cir. 1990) (internal citation omitted).

37. Upon his appointment, the Trustee assumed sole and exclusive control over the Debtors' property. 11 U.S.C. § 1106(a). The Trustee's appointment completely divests the rights and powers that the Debtors' management and board could previously exercise over the Debtors' property. *See, e.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352-53 (1985) ("[T]he Bankruptcy Code gives the trustee wide-ranging management authority over the debtor. In contrast, the powers of the debtor's directors are severely limited. Their role is to turn over the corporation's property to the trustee and to provide certain information to the trustee and to the creditors. Congress contemplated that when a trustee is appointed, he assumes control of the business, and the debtor's directors are 'completely ousted.'") (internal citations omitted).

38. Beyond the automatic stay, in the Trustee Order, this Court was clear in its intention to remove any authority from Mathu Rajan to take **any** action on behalf of the Debtors' estates. *See* <u>Trustee Order</u>; D.I. #549.

39. A debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The definition of property of the estate is interpreted broadly, and every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of Section 541." *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)) (brackets and quotation marks omitted). It "includes all kinds of property, . . . tangible or intangible." *In re Atl. Bus. & Cmty.*

11

*Corp.*, 901 F.2d 325, 327 (3d Cir. 1990) (citations and quotation marks omitted).

40.     Rajan and VSI have committed willful violations of the automatic stay via their use of Stream's name in the Sham Email Account and their implication in fundraising materials that the Debtors' Ultra-D technology belongs to or is being utilized by VSI. *See, e.g.*, *In re Lehigh Valley Pro. Sports Clubs, Inc.*, 2001 WL 1188409, at *4 (Bankr. E.D. Pa. Sept. 7, 2001) (holding that a baseball league which competed with the Debtor willfully violated the automatic stay when it utilized the name "Lehigh Valley Diamonds," which was the Debtor's team name, for a baseball team and on a website); *Phillips v. Diecast Marketing Innovations, L.L.C. (In re Collecting Concepts)*, 2000 WL 1191026, at *3 (Bankr. E.D. Va. Feb. 28, 2000) (corporate name is property of the estate); *In re Gordos Rest. Corp.*, 643 B.R. 1, 23 (Bankr. S.D.N.Y. 2022) (holding that the Debtor's trade name Gordo's and the goodwill associated with it were property of the estate); *In re Bell*, 2019 WL 494109, at *2 n.1 (Bankr. M.D. Pa. Feb. 7, 2019) (Debtor's trade name was property of the estate); *In re Nettie Lee Shops of Bristol, Inc.*, 49 B.R. 946, 947 (Bankr. W.D. Va. 1985) (holding that "there is little question that [the use of the trade name "Nettie Lee Shop"] constitutes property within the broad definition of § 541"); *In re Golden Plan of California, Inc.*, 37 B.R. 167, 170 (Bankr. E.D. Cal. 1984) ("[A] debtor's corporate name is property of the estate.").

41.     Rajan and VSI have further violated the automatic stay through their failure to turn demonstration equipment over to the Trustee, their use of this equipment for self-serving fundraising purposes, and their control over the Debtors' books and records, including essential source code.

## B.     Damages Under 11 U.S.C. § 362(k)

42.     As a threshold matter, "bankruptcy policy favors… affording a remedy to a debtor damaged by a violation of the stay." *In re Nixon*, 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009).

43.     Section 362(k) states that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k); s*ee also In re Miller*, 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011); *Wingard v. Altoona Reg'l Health Sys. (In re Wingard)*, 382 B.R. 892, 900 (Bankr. W.D. Pa. 2008).

44.     Indeed, under Section 362(k) of the Bankruptcy Code, a party who violates the automatic stay is liable for all reasonable legal fees incurred by those harmed, including debtors and creditors committees. *In re Univ. Med. Ctr.*, 93 B.R. 412 (Bankr. E.D. Pa. 1988), *aff'd in part, rev'd in part sub nom. Univ. Med. Ctr. v. Sullivan*, 122 B.R. 919 (E.D. Pa. 1990), *clarified on denial of reconsideration*, 125 B.R. 121 (E.D. Pa. 1991), *and aff'd sub nom. In re Univ. Med. Ctr.*, 973 F.2d 1065 (3d Cir. 1992).

45.     "The Third Circuit has adopted a broad interpretation of the term 'individual' for purposes of qualifying to recover compensatory damages under § 362(k)(1)" enabling corporate debtors to recover where they have been damaged by willful violations of the automatic stay. *Scungio Borst*, 652 B.R. at 659 n. 6 (citing *Budget Service Co. v. Better Home of Va.*, 804 F.2d 289, 292 (4th Cir. 1986); *Cuffee*, 901 F.2d at 329; *Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.)*, 346 F. 3d 1, 7 (1st Cir. 2003); *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Systems, Inc.)*, 108 F. 3d 881, 884-85 (8th Cir. 1997); *Jove Engineering, Inc. v. IRS*, 92 F. 3d 1539, 1549-53 (11th Cir. 1996); *Johnston Environmental Corp. v. Knight (In re Goodman)*, 991 F. 2d 613, 618-20 (9th Cir. 1993); *Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F. 2d 183, 184-87 (2d Cir. 1990)).

46.     In order to prevail on a claim under section 362(k), the Trustee must demonstrate by a preponderance of the evidence that:

13

(1) the creditor violated the automatic stay; (2) the violation of the stay was
willful; and (3) the willful violation caused some injury. *Dean v. Carr (In re
Dean)*, Bankr. No. 1:11-bk-05680MDF, Adv. Nos. 1:11- ap-00481MDF,
1:11-ap-00505MDF, 2012 WL 4634291, at *5 (Bankr. M.D. Pa. Oct. 1,
2012); *In re Miller*, 447 B.R. 425, 433, n. 10 (Bankr. E.D. Pa. 2011). A
creditor "willfully" violates the automatic stay when the creditor does so with
knowledge of the bankruptcy. *In re Malloy*, 572 B.R. at 555 (citing *In re
Lansaw*, 853 F.3d 657, 664 n.4 (3d Cir. 2017)). "Willfulness does not require
that the creditor intend to violate the automatic stay provision, rather it
requires that the acts which violate the stay be intentional..." *Vu v. Lin (In re
Vu)*, 591 B.R. 596, 603 (Bankr. E.D. Pa. 2018) (quoting *Lansdale Family
Rests., Inc. v. Weis Food Serv. (In re Lansdale Family Rests., Inc.)*, 977 F.2d
826, 829 (3d Cir. 1992)). A good faith mistake of law or dispute as to the
creditor's right to take the action does not negate the willfulness of the
violation. *In re Nixon*, 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009).

*Scungio Borst*, 652 B.R. at 652.

47.     First, the Trustee has demonstrated that Rajan and VSI have violated the automatic

stay by: (i) utilizing the Debtor's name in the Sham Email Account, implying in fundraising

materials that the Debtors' Ultra-D technology belongs to, or is being utilized by, VSI; (ii) refusing

to turn the demonstration equipment over to the Trustee and continuing to use this equipment for

self-serving fundraising purposes; and (iii) maintaining control over the Debtors' books and

records, including essential source code.

48.     Second, the violations of the automatic stay were clearly willful in that Rajan, and

VSI by extension, signed both Debtors' petitions, schedules, and corporate resolutions authorizing

the bankruptcy filings and extensively took part in the bankruptcy cases and negotiated with the

Trustee after his appointment.

49.     Furthermore, even if Rajan and VSI claimed that the violations of the automatic

stay were inadvertent or a mistake, which is highly doubtful, as set forth earlier, even a good faith

mistake of law does not negate the willfulness of the violation.

50.     Finally, the bankruptcy estates of the Debtors, over which the Trustee has sole and

exclusive control, suffered damages, as they were forced to incur professional fees to stop Rajan and VSI's blatant violations of the automatic stay and relentless dissemination of false information to potential investors concerning their connection to and/or control over property of the estate and the Debtors themselves.

51.    The additional attorneys' fees resulting from investigation of automatic stay violations committed by VSI and Rajan and the drafting and filing of this Motion would have been unnecessary but for the willful actions of Rajan and VSI, and will be added to the approximately $3 million administrative burden the Trustee inherited upon his appointment.

52.    The Trustee has demonstrated all of the elements necessary to establish a claim under section 362(k)(1); therefore, this Court is required to assess "actual damages, including costs and attorneys' fees." 11 U.S.C. § 362(k)(1). By including the word "shall" as opposed to the word "may" in the text of the statute, Congress has made this result mandatory, as opposed to permissive.

53.    Moreover, appropriate circumstances exist in this case permitting the Court to impose punitive damages for Rajan and VSI's willful violations of the automatic stay.

54.    Here, even after the Court's scathing opinion pointing out Rajan's questionable loyalties, dubious testimony under oath, gross mismanagement of the Debtors, and malfeasance, Rajan has clearly continued his campaign, through VSI, to exercise control over the Debtors' bankruptcy estates, and, to the detriment of the Debtors' bankruptcy estates and creditors, to take actions that will benefit only him and VSI. Rajan admits openly to potential investors in the Debtors that he intends to delay the proceedings by months in order to prevent the Trustee from administering the Debtors' bankruptcy estates. Rajan and VSI are willing to take these actions, and likely others unknown to the Trustee, despite the fact that the Bankruptcy Court issued the Trustee Order appointing the Trustee and stripping Rajan of the authority to "take any action on

behalf of the Debtors' estates."

55.     It is respectfully submitted that Rajan's aforementioned irrational behavior, willingness to flagrantly disobey Bankruptcy Court Orders, and willful violations of the automatic stay give rise to circumstances that necessitate punitive damages. Combining the above with the fact that the Trustee isn't aware of all of Rajan or VSI's actions or automatic stay violations, it is respectfully submitted that the punitive damages are required in this case as a preventative measure to deter any future violations by Rajan. *See In re Lensaw*, 583 F.3d 657 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1001, 200 L. Ed. 2d 253 (egregious nature of commercial landlord's violations of the automatic stay led to punitive damages to deter future violations); *In re Solfanelli*, 206 B.R. 54 (Bankr. M.D. Pa. 1996), *aff'd and remanded*, 203 F.3d 197 (even though there was nothing malicious about bank's actions, court imposed $10,000 in punitive damages for willful violation of automatic stay); *In re Lile*, 103 B.R. 830 (Bankr. S.D. Tx. 1989) (punitive damages in the amount of $100,000 necessary to deter Internal Revenue Service from willfully violating automatic stay in the future).

**C.     VSI and Rajan Must Turn over All Debtor Property to the Trustee**

56.     Pursuant to section 542 of the Bankruptcy Code, "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of [the Bankruptcy Code] . . . shall deliver to the [debtor], and account for, such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542. Where an entity in possession of property of the estate fails to voluntarily turn over the estate property, a debtor in possession may seek to compel turnover. *In re DBSI, Inc.*, 468 B.R. 663, 669 (Bankr. D. Del. 2011). To do so, a debtor must establish: (a) the property is in the possession, custody, or control of another entity; (b) the property can be used in accordance with the provisions of section

16

363; and (c) the property has more than inconsequential value to the debtor's estate. *Id.*

57.    Rajan's use of the Sham Email Account constitutes the wrongful exercise of control over Debtor property. The value inherent in Stream's trade name (made all the more apparent by Rajan's usurpation) is squarely within the Code's turnover provision. *See, e.g.*, *In re Gordos Rest. Corp.*, 643 B.R. at 37 (directing the turnover of the debtor's trade name and associated goodwill to the trustee).

58.    Rajan and/or VSI are also utilizing equipment belonging to the Debtors for fundraising purposes and are in control of the Debtors' electronic books and records (including source code). The value of such property to the Trustee is obvious and it should be turned over as well.

WHEREFORE, the Trustee respectfully requests the entry of an order substantially in the form attached hereto as Exhibit E, granting the relief requested herein[3] and:

1.    Enforcing the automatic stay provided by Section 362(a) of the Bankruptcy Code against Rajan, VSI, and any other related party against use of communications which, explicitly or by implication, are in the name of the Debtors, and/or state that they own or control Debtors or technology belonging to Debtors (including, but not limited to Ultra-D);

2.    Ordering Rajan and VSI to turn over to the Trustee control of the Debtors' property, including but not limited to the Sham Email Account, all property used to demonstrate Debtors' technology, and the Debtors' electronic books and records (including source code); and

3.    Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

---

[3] A willful violation of the automatic stay may result in liability for damages and civil penalties. The Trustee reserves all rights, including, but not limited to, seeking sanctions and actual and punitive damages pursuant to section 362(k) of the Bankruptcy Code.

/s/ Michael D. Vagnoni
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail addresses:
edmond.george@obertmayer.com
michael.vagnoni@obermayer.com
*Counsel to William Homony, Chapter 11 Trustee*

and

Steven M. Coren, Esquire
Andrew J. Belli, Esquire
COREN & RESS, P.C.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
abelli@kcr-law.com
*Special Counsel to William Homony, Chapter 11 Trustee*

Dated: May 30, 2024

4853-7055-0979 v7

# Exhibit A

# Investment
# Memorandum



# Disclaimer

This investor presentation and other publicly available documents, including the documents incorporated herein by reference, contains, and our officers and representatives may from time to time make, "forward-looking statements" within the meaning of the safe harbor provisions of the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by words such as: "anticipate," "intend," "plan," "goal," "seek," "believe," "project," "estimate," "expect," "strategy," "future," "likely," "may," "should," "will" and similar references to future periods. Examples of forward-looking statements include, among others, statements we make regarding pro forma financial projections, strategy for customer retention, growth and project development. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on our current beliefs, expectations and assumptions regarding the future of our business, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of our control. Our actual results and financial condition may differ materially from those indicated in the forward-looking statements.

Therefore, you should not rely on any of these forward-looking statements. Any forward- looking statement made by us in this investor presentation is based only on information currently available to us and speaks only as of the date on which it is made. We undertake no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise.

The forward-looking statements and projections contained in this presentation are excluded from the safe harbor protection provided by Section 27A of the Securities Act of 1933, as amended. This presentation contains statistics and other data that has been obtained from or compiled from information made available by third-party service providers. We have not independently verified such statistics or data.

These materials and any presentation of which they form a part are neither an offer to sell, nor a solicitation of an offer to purchase, an interest in the Company in any jurisdiction where the offer or sale is not permitted or would be unlawful under the securities laws of such jurisdiction.

**Use of Marks**

All product and company names are trademarks™ or registered® trademarks are tradenames of their respective holders. Disclosure and use of such, and any quotes, images and the like relating thereto and/or associated therewith, does not imply any authorization or approval from, affiliation with or endorsement by the respective holders.

Confidential

# Table of Contents

1. Company Overview

2. Industry Problems

3. Industry Solution

4. The Technology

5. Capitalizing on the Metaverse

6. Market Opportunity

7. Business Model

8. Content Conversion, Distribution & Licensing

9. A Key Technology Relationship

10. Marketing Plan

11. Production

12. Financing Arrangements

13. Management, Sales & Technical Team

Confidential



# The future is 'Glasses-Free'

..the face was the wrong place. We always thought that glasses were not a smart move, from a point of view that people would not really want to wear them. They were intrusive, instead of pushing technology to the background, as we've always believed.

**Sir Jonathan Ive,
Chief Design Officer, Apple**

Confidential

4

# Virtual Reality

Immersive multimedia or computer-simulated reality, replicates an environment that simulates a physical presence in places in the real world or an imagined world, allowing the user to interact in that world.

Virtual realities artificially create sensory experiences, which can include sight, touch, hearing, and smell.



Confidential

5

5

# Augmented Reality

Live direct or indirect view
of a physical, real-world
environment whose elements are
augmented (or supplemented) by
computer-generated
sensory input such as
sound, video, graphics
or GPS data.



# Holograms



Photographic recording of a light field, rather than of an image formed by a lens, and it is used to display a fully three-dimensional image seen without the aid of special glasses or other intermediate optics.

Confidential



"*It's not just Ultra-D is better than the Big Boys – it's that there's no comparison. How they've leaped far past the monolith companies is stunning*"

Robert Elisberg, Huffington Post

"*They were the best-looking glasses-free 3D at the show. It was hard to believe that 3D conversion could be so seamless and effective*"

Mark Henninger, AVS Forum

"*We had all but given up on finding the killer glasses-free 3D Displays we had been hoping for. Then we stumbled upon the Stream TV Networks booth and our jaws proceeded to hit the floor*"

Don Hatfield, MTV Geek

"*Quite frankly, 3D glasses have never failed to be anything but a headache inducing, slightly blurry mess for me. That might be why a recent demo of a new glasses-free 3DTV from Ultra-D blew me away. It just works*"

Kyle Orland, Ars Technica

# Introduction



**Dedicated to bringing richer, more impactful and immersive viewing experiences to a global market through advanced display technology.**

Visual Semiconductor, Inc.  (VSI) has a mission to develop. Manufacture, and sell Glasses-Free products to a global market.  VSI intends to:

- Service Glasses-Free customers in the commercial and consumer markets
    - Execute projects for existing customers
    - Secure new customers
- Create products to satisfy the emerging Metaverse
- Develop a content ecosystem to support advanced visual displays



# Capital Structure

**The capital structure for Visual Semiconductor, Inc. as the company moves forward will be as follows:**

- Pre-IPO Financing
- Expansion Capital
- Public Listing



Confidential

10

# Executive Brief

- VSI will initially manufacture 3D modules and other key components for global consumer electronics brands under license of **our technology**:
    - **Adjustable 3D depth**
    - **Real-Time Conversion of all legacy content**
    - **Applies to products of all kinds and sizes**

- VSI will leverage its strategic relationship with BOE, the **world's biggest panel maker**
    - **Customer acquisition**
    - **Access to high-resolution panel technology**

- Optical bonding equipment has been proven to produce **96% yield**

- Deals are being secured with multiple international municipalities for **Supply Chain Financing** and **Expansion Capital** for additional bonding lines

- Long-term strategies include **development of a content ecosystem** and expansion into other Glasses-Free technologies like **AR/VR, holograms, and the Metaverse.**





Confidential

11

# Value Proposition



**Visual Semiconductor, Inc. intends to secure assets from third-party companies specializing in advanced imaging technologies:**

- Two-view and Multi-view Glasses-Free 3D solutions from Visual Technology Innovations, Inc.
- Modified Light Field Glasses-Free solution from Stream TV Networks, Inc.

Confidential

12

# Industry Problems

**There are 3 major problems facing device makers and content creators in virtually every product category:**

- Panel manufacturers and device makers are developing higher and higher resolution products, but there is no value to the consumer in a 2D market because the human eye cannot appreciate the improvements.

- Consumer TV Manufacturers need to give consumers a reason to purchase 8K displays which have higher selling prices and margins.

- 3D is highly desirable for a variety of consumer and business use cases, including AR/VR. However, previous technology had major limits that prevented adoption.



Panel technology has exceeded consumer benefit in flat 2D







**Need for Glasses**

Limited number of viewers, not practical in public, cumbersome to wear

**Lack of 3D Content**

Lack of traction outside the cinema has resulted in limited 3D content

**Bulky VR headsets**

Head Mounted Displays are bulky and unusable for prolonged use

Confidential

1
3

# Industry Solutions

**VSI technology offers benefits to both consumer brands and their customers:**

- Glasses-Free 3D takes advantage of the extra pixels to make 8K a really compelling and comfortable viewing experience

- Glasses-Free viewing, Adjustable Depth, and Real-Time Conversion eliminate obstacles to 3D adoption



VSI technology allows multiple users to have prolonged and comfortable viewing at home or on the go

Consumers can control the amount of depth, making a more comfortable viewing experience

Real-Time Conversion of 2D and 3D legacy content allows for unlimited media library

Confidential

14



Panel Market
Predicament
and the Ultra-D™
Solution

Confidential

15

# Understanding the Optics

The human eye can generally only perceive about 3K resolution. Therefore, in an underlying 4K screen there would be an additional 1M extra pixels, in an 8K Lite screen there would be additional 13M extra pixels and 8K would utilize an additional 29M pixels.



The Ultra-D technology will automatically allow adjustment to the 3D depth based on customer preference and the optics on the panel.

Light from individual pixels is emitted into space where they merge to form complete images for each eye of the viewer.

# 8m pixels and how 16m and even 32m pixels!



Limiting viewing distance for human vision

*Source: HIS Markit 2017*

Max viewing distance in meters

Typical viewing distance for home televisions

Display size in inches (diagonally)

22" 37" 46" 55" 65" 80" 100"

— 1080 (FHD)  — 2160 (4K)  — 4320 (8K)

Ultra-D™ uses the extra pixels to provide information on 3D depth.
This makes the technology extremely valuable for panel companies as technology advances in producing higher resolution panels continue.

8K pixels for 2D

4K pixels for 2D

**FHD pixels for 2D**

At typical viewing distances, the human eye cannot benefit from additional information from higher and higher resolution panels displaying 2D images

# ...While Also Providing a Critical Driver for Panel Industry Growth

**1** — The Global TV Market is in need of new technology to support sales of 4K and 8K TVs

The current TV market is experiencing declining sales and low uptake / adoption rates of 4K and 8K TVs.

A primary reason 4K penetration remains low is that it does not offer a compelling upgrade in picture quality for its price in standard 2D.

Although 8K offers much higher resolutions in 2D, the human eye is physically unable to detect differences in image quality and so the extra pixels that go into the display are largely wasted.

**2** — Ultra-D Technology gives consumers a reason to upgrade and pay more

Ultra-D's technology enables the human eye to detect the full gamut of pixels at 4K and 8K resolutions in 3D without diminishing brightness or color.

Ultra-D redistributes displayed information, which eliminates both transitions and discrete viewing spots, creating the feeling that the images are really in the room with the viewer

**3** — And enables a rapidly scalable revenue model while solving a major sales problem for TV manufacturers and distributors

Ultra-D's technology will be priced at a small premium to 2D during mass production.

Major supply chain channels will be unlocked as panel and consumer electronics companies seek growth across all devices including tablets.

Initial orders will generate substantial revenues immediately.

Additional monetization will be driven by content conversion to the Ultra-D format.

# The Technology: What is Visual Semiconductor, Inc.?

**Visual Semiconductor, Inc. has a <span style="color:orange">unique</span> and <span style="color:orange">unrivaled</span> 3D-without-glasses display technology that is sold in chips.**



**Here are four ways we set ourselves apart from the competition:**

**1**   **No glasses needed.** Our continuous, 140-degree viewing angle provides a quality 3D experience for multiple viewers without the need for glasses, cameras or head-tracking.

**2**   **Unlimited content.** Our real-time conversion solution can convert virtually any content - 2D or 3D – to glasses-free 3D on the fly. This also applies to AR / VR content.

**3**   **Tailored viewing.** Consumers can easily control the 3D effect, adjusting the amount of 3D pop and depth just like volume.

**4**   **Diverse form factors.** VSI technology is currently being developed in many shapes and sizes ranging from 5" to 75".

# Key Advantages to Glasses-Free 3D Technology

**The technology is an unrivaled, Glasses-Free 3D solution that represents the biggest transformation in display technology since the transition from black & white to color.**



**No Glasses Needed**

The technology creates a quality 3D experience for multiple viewers without the need for glasses, cameras or head-tracking.

**Instant Conversion To 3D**

The technology converts all existing content - 2D or 3D – to Glasses-Free 3D on the fly, without requiring native content, and without diminishing brightness or color in any way.

**User-Controlled**

Consumers can easily control the amount of depth, just like volume, or turn it off entirely.

**Compatible Across All Screens**

The technology is screen size agnostic and is currently being developed in many shapes and sizes ranging from 4" to 65".

# The Technology: Adjustable Depth for Maximum Comfort



The combines 2D picture + 2D depth (2D + Z) in **Proprietary Format** high-definition quality along with proprietary authentication data. Content created using bona fide Visual Semiconductor, Inc. content creation tools are recognized by the Render Engine and displayed in Glasses-Free 3D. A significant benefit is the relatively **low bandwidth required** compared to standard high-resolution transmission.

In the **3D Module**, light from individual pixels is emitted into space, passes through a unique Optical Stack, and merges to form complete images for each eye of the viewer.



 

The depth map enables the **Render Engine** to increase and decrease the amount of overall depth, giving the viewer power to adjust the 3D effect as easily as turning audio volume up or down.

# The Technology: Real-Time Conversion of Legacy Content









**Conversion to Glasses-Free 3D from any source:**

- 2D
- 3D Frame-Pack
- 3D Side-by-Side
- 3D Top-and-Bottom

**30 years ago, virtually nobody had heard of THE INTERNET.**

Now, most people can't imagine a world without it.
We complain when our wi-fi is down.
We're connected at home and on the go.

**Today, there's something new on the horizon**…



**The METAVERSE promises to be just as transformative, offering immersive experiences in globally-connected virtual world.**

Confidential



> **The Metaverse IS where tech is headed.**
> **John Fortt, CNBC**



# What is the Metaverse?

- The Metaverse is an immersive virtual space where users can have real experiences

- Made possible through advancements in cloud technology and graphics processors from Apple, AMD, Intel and nVidia

- It's an opportunity for commerce where consumers – especially young people – spend real money on digital merchandise (as proven by Minecraft, Fortnight, and Roblox)

- When combined with digital transaction concepts like blockchain and NFTs, the possibilities are tremendous








Confidential

24

# Who is creating the Metaverse?

The Metaverse offers such great potential that **Facebook has been rebranded as Meta.** Building on its purchase of Oculus in 2014, the company intends to introduce its massive global user base to immersive social networking and experiences.

**nVidia's Omniverse** is a full end-to-end platform for creating embodied Artificial Intelligences that humans interact with. It connects Nvidia's technologies in speech AI, computer vision, natural language understanding, recommendation engines and simulation technologies. Avatars



Today, I think we LOOK AT the internet, but I think in the future you're going to BE IN the experiences. "

Mark Zuckerberg
CEO, Facebook

∞ Meta



NVIDIA OMNIVERSE

## Who is creating the Metaverse?

**Microsoft Mesh** is a platform that enables its users to connect with presence, share across space, and collaborate in an immersive way as if they were in person regardless of physical location. Customers can leverage Mesh to enhance virtual meetings, conduct virtual design sessions, assist remotely better, learn together virtually, and host virtual social gatherings and meetups.

Roblox is essentially a video game that has 43.2 million daily active users, its own digital currency, and a wide range of entertainment such as a live concert. In 2020, outside developers are the closest thing to an existing digital economy; they consistantly building new games and content to integrate into the existing game, which serves as the base for the growing Metaverse. **The platform's 1.3 million developers are on track to collectively earn $500 million from their creations in 2021.**

Roblox is an online entertainment platform and although they are a company today, it is probably the closest thing to an existing digital economy as they are consistantly building new games and content to integrate into the existing game, which serves as the base for the growing Metaverse.



> "Increasingly, as we embed computing in the real world, you can even embed the real world in computing."
> Satya Nadella
> CEO, Microsoft

**Microsoft Mesh**

**ROBLOX**

# Who is creating the Metaverse?

94 of the largest 100 game development studios use the **Unity** engine. Unity will be a central player in helping businesses build unique metaverse presences – the equivalent of websites or social media pages today. The company recently purchased the digital technology division of special effects company Weta Digital (*Avatar, The Lord of the Rings, Black Widow, Planet of the Apes*) for $1.62 billion to prepare for the metaverse.

**Epic Games** is the company behind video game phenomenon Fortnite, which has moved beyond its core shooting game to social experiences like dance parties and virtual music concerts. Users pay to dress their avatars in different costumes and can build their own islands and games. Epic also owns a large gaming engine, Unreal, used to develop games and other visual effects like TV show backdrops.

Chinese tech giant **Tencent** is the world's largest video gaming firm by revenue and has stakes in major game studios like Epic Games and Activision Blizzard. The South China Morning Post reported this year that Tencent has registered many Metaverse-related trademarks for its social site QQ.

> "Unity will support and shape the Metaverse."
> John Riccitiello
> CEO, Unity Software

Confidential

# Who is creating the Metaverse?

**Snapchat** owner Snap, Inc. has long been building custom avatars and augmented reality filters to overlay digital features on the real world. This year it unveiled its first true augmented reality glasses, available for developers to experiment with creating experiences for the spectacles.

Cloud software firm **Autodesk** makes programs used by architects and engineers to design and create buildings and products. Its software is also used to build virtual worlds for gaming and entertainment.

Like cloud computing, the Metaverse will need plenty of edge computing solutions to make it happen. **Fastly** operates an edge computing infrastructure-as-a-service (IaaS) platform that brings servers and other equipment to the source of data creation. Fastly's platform can move 145 terabytes worth of data per second across 28 countries. Basically, it helps reduce the lag time and latency of decentralization.

**Shopify** made two big moves this year that tie into Metaverse commerce. It acquired the AR app Primer, which allows users to see firsthand the effects of a purchase or project in their space. For the Metaverse, it gives Shopify a powerful tool that subscribers can use to build-out potential stores or shopping experiences in the digital world. It also launched a new NFT platform that will allow digital creators to sell art and other content directly to consumers. The Chicago Bulls were the first to test the offering, launching limited NFTs of the basketball team's 1991 championship rings.



Confidential

# A Significant Challenge for the Metaverse

**Major technology companies are spending billions of dollars to address some of the key challenges in developing a compelling Metaverse, like content creation and basic infrastructure that enables an immersive user experience.**



**But the Metaverse envisioned by many of these tech pioneers is largely dependent on one critical assumption. The question to ask is this...**

Will Metaverse users be willing to wear goggles for extended periods of time?

VSI management believe that the answer is **no**. Augmented Reality and Virtual Reality have gained in popularity since their introductions years ago, but they have not experienced the explosive growth that was predicted. If consumers are not comfortable – physically, emotionally and mentally – they will not embrace new technologies.



The true challenge, then, is creating compelling experiences that are both immersive and comfortable.

# VSI Solutions for the Metaverse



**VSI intends to play a significant role in content creation as well by developing plug-in tools for major third-party software so that developers can make apps, avatars, and experiences that are fully compatible with VSI screens.**

With a whole new universe of content coming online in the years ahead, VSI intends to position itself as a technology provider of glasses-free solutions for comfortable viewing hardware:

- No goggles or glasses
- No headaches or eye strain
- Multi-view optics to accommodate multiple users
- A range of sizes enabling use cases of all kinds

Confidential

30

# Market Opportunity for Glasses-Free Displays

The Global 3D Display Market is expected to grow from $54.84 billion USD in 2017 to $150.81 billion USD by 2023, at a CAGR of 18.4% during the forecast period 2018–2023



Markets (USD billion)

CAGR ~ 18%

*Source: 3D Display Market 2019-2023: Key Findings, Regional Study, Business Trends, Global Segments and Future Prospects, Markets Research Future*

Confidential

31

# Market Opportunity for Glasses-Free Displays

**The panel market is 2 billion panels every year. Each panel is a candidate for this technology.**

**Just 1% of the panel market would result in 20 million panels per year.**

**The emerging Metaverse offers the potential for a significant increase in consumer demand for 3D viewing devices.**

**A significant number of these devices will be featuring Glasses-Free technology.**

**300 Million LAPTOPS**



**1 Billion PHONES**




**200 Million TABLETS**



**200 Million TVs**



**300 Million PC MONITORS**



Confidential

32

# Technology Applications

From big screen televisions to phones and everything in between, the technology has applications in a wide variety of consumer and commercial markets.



**Televisions**

**Laptops & Netbooks**



**PC Monitors**

**Phones**

**Tablets**



Confidential

33

# Digital Signage and Advertising



**Cruise Industry:**

Norwegian Cruise Line provided feedback that indicated a wide use for Ultra-D enabled displays on their ships.

They also expressed interest with 27" and tablet size displays for the on-ship jewelry shop and their Lobby Shopping Channel.



**Sports Bars:**

The 65" Ultra-D screens have been installed in several sports bars in Jamaica. They have proven to be an attraction.  Per the establishment owners, "the locations realized increased revenue with the interest they generated".



## Museums and Art Gallery Circuit:

IQH3D is in discussion with several museums, aquariums, and galleries to utilize the Ultra-D displays for specific visual experiences.


Confidential

34

# Medical



IQH3D has tested the 65" Ultra-D screen in clinics with ultrasound equipment and has had positive results. The screen size requirements are for 27" for the clinics, but there is also potential for adoption of the technology with these systems using smaller format screens in the future.

The medical market represents explosive growth opportunities across the globe as immersive visualization becomes the next big thing in medicine and patient care.



The surgical visualization outside the "germ field" for training and evaluation, remote visualization and non-surgical simulation will prove to be great opportunities for the 65" display sizes with IQH3D in this area.



# Gaming

**The 65" Ultra-D screen is being used at gaming centers in Mexico with X-Box and PlayStation Systems.**

Using 3D games, the effect has been excitedly received by the eSports gaming community.

They want to use the 65" Ultra-D screen in gaming tournaments. They want a 27" screen for individual viewing by the competitive gamers.

They are also investigating sponsorships of eSports events in Mexico and partnering with VSI as part of the marketing plan.

Confidential

36

# Theme Parks and Hotels





Disney 3D Animation Supervisor said,
*"Your display is the best I have ever seen of this type."*

The 65"4K Ultra-D screens are currently being evaluated by several theme park operators in Mexico and the U.S. IQH3D has relationships with Universal and Disney in this area. An initial presentation was made to the Disney Imagineering team in the early summer.

Placement plans include Que Lines at popular rides and strategic future planned attractions. Disney is entertaining a Disney-branded tablet for sale in their Theme Parks and Retail Outlets with a potential tie-in to their Disney+ Service.

Disney and Universal are waiting for prototypes of the new displays to plan their strategies accordingly. IQH3D has already been assigned a vendor number by Disney to expedite the process.

Various Hotel Developers are planning themed resort complexes that will feature Ultra-D technology. Once prototype displays are ready, they can move to the next step to spec the displays into their designs.

Confidential

37

# Glasses-Free HD 3D Display  Signage Board to Gain  Maximum Revenue Share





Signage board is likely to emerge as the biggest user of glasses-free HD 3D display technology. Gaining nearly two-fifth of the share in terms of revenue by the end of 2017, signage board is estimated to surpass US$300 million revenue towards 2022 end.



*Source: Glass-Free HD  3D Display Market  Forecast, Trend Analysis  &
Competition Tracking –  Global Market insights  2017 to 2022 – Fact.MR*

Confidential                    38

38

# Automobile use-case

There are multiple compelling reasons, including making sure that crucial alerts really pop-out when they need to in an attention-catching way.

Plus, parking cameras can present even more accurate 3D views to the driver, so they really get a sense of the space they're working with.

And during navigation, guidance can offer 3D representations of where and when to turn, which can eliminate questions around whether that next corner really is the right corner you're looking for.





Confidential

*Source: Techcrunch, Darrell Etherington, August 12, 2019*

### Proprietary 3D Software in FPGA



**Revenue:**
- Complete 3D video drive train
- 25-30% margin depending on volume

### Proprietary 3D Software in a Custom ASIC



**Revenue:**
- Complete 3D video drive train
- 35-40% margin depending on volume

### Software for Creating and Streaming 3D Content



**Revenue:**
- License Fees (one-time & subscription)
- Per-Unit Royalties
- High-margin revenue up to 100%

### Content Licensing and Distribution



**Revenue:**
- License Fees
- Distribution Fees
- High-margin, recurring revenue

### Capitalizing on the Metaverse



**Revenue:**
- 3D screens as consumer gateways
- License fees for content creation tools
- Back-end royalties

### 3D Modules with Proprietary Optical Designs



**Revenue:**
- Complete module
- 20-30% margin depending on volume and size

# The Business Model

The Company is a technology provider (license type – *"Intel inside"*) to both device makers/distributors and content makers and distributors. It will provide key hardware and software components to customers with the ultimate goal of creating an entire Glasses-Free ecosystem where the Company can also participate in revenue generated by the content itself.

40

Confidential

# Content Creation

Software Development Kits and plug-ins for
popular programs will be sold or licensed to
brand customers and content creators globally.

Planned products include:

➤ SDKs for interactive graphics engines
  ▪ Video games
  ▪ Casino gaming
  ▪ Virtual and augmented reality



Confidential

41

# Content, Conversion, Distribution & Licensing

To maximize revenue potential of the Glasses-Free ecosystem it intends to develop, the Company will negotiate license deals with content creators/distributors in 4 key areas: Film & TV, Live Events, Interactive (Games), and the Metaverse.



**Three key reasons why studios will partner with us:**



### 2D REVENUE GAP

Studios generate most revenue outside the theater, yet they are leaving money on the table when VOD services take over. We bring that money back into their pockets.



### DISTRIBUTION

VSI will provide studio partners a chance to distribute content without needing to use their competitors' services, such as Netflix or Hulu.



### DORMANT 3D

Studios have thousands of hours of blockbuster 3D Movie and TV content going unused. VSI can turn that content into the revenue generator it was meant to be.

# Market Potential in Post-Covid19 World



In China, already, the consumer "is back with a vengeance," Coresight Research Chief Executive & founder Deborah Weinswig said in an interview. "There is a pent-up demand."

The post-Covid-19 world will be associated with a more than ever emphasis on next generation technology, critical for competitive advantages in both business and recreation (gaming).
As ever before, major corporations are relying on remote access in technological and business transactions.
Therefore, 3D technology could significantly benefit the visual support.
As an example, Morgan Stanley has experienced a 95% efficiency rate by using remote access.
On a recreational level, Netflix is

People will spend money on technology advances much more now than before. In today's world, Zoom and Microsoft Skype are examples in which 3D technology could enhance the interactions.



Thus, we anticipate a much greater demand going forward than any of our previous economic models for this space.

Confidential

# Customers



Potential Revenue:
**$20M**



Potential Revenue:
**$100M**



Potential Revenue:
**$20M**



Potential Revenue:
**$100M**



Potential Revenue:
**$15M**



Potential Revenue:
**$10M**

The Company has a relationship with BOE, the world's biggest panel manufacturer to combine their high-resolution panels with the Glasses-Free 3D technology. VSI will leverage this powerful partnership.



Source: IHS Markit

©2019 IHS Markit

**BOE can provide advantages in 3 main ways:**

**1** Introduce VSI to BOE customers, which are major consumer brands in all categories

**2** Assist with Purchase Order financing

**3** Provide access to cutting-edge panel technology to support Glasses-Free innovation

# A Key Technology Relationship

Confidential

45



# The BOE Advantage

- Enormous financial resources
  - Highly influential in the industry
    - Will make forecasts look very tame
      - Can jumpstart the market with huge acceleration
        - Apart from selling through their customers, BOE also plans to sell under their name
          - They currently sell approximately 300 million panels per year

**Visual Semi-Conductor Inc.**

3D kit supply chain

Consigns panels

Sells kits to BOE

京东方 BOE
$30B market cap

3D Display/ Kit Orders

Sells display kits

Suppliers for lens, glue, rendering and conversion ASICs

Approx. $6.4B in Display business revenue based on H1 2017 results annualized

**Existing BOE Customers**

SONY   Skyworth

acer   ASUS   Panasonic

lenovo   HTC   hp

MI Xiaomi   OPPO   Hisense

HUAWEI   DELL

MOTOROLA   NOKIA

Google   amazon

Confidential

46

# Potential to Execute Significant Volume

The 3D Module manufacturing process requires **extremely accurate bonding**. VSI will leverage this bonding equipment and expertise.



# Other 3D Technologies



**The Parallax Barrier** grating is a vertical stripe type polarizing film. When the image seen by the left eye is displayed on the LCD screen , the opaque stripe will block the right eye. Similarly, when the image seen by the right eye is displayed on the LCD screen, the opaque stripes will block the left eye. By separating the visual images of the left eye and the right eye, the viewer can see the 3D image.

**Features:**
The Parallax Barrier will darken the screen and make the experience worse due to the shielding principle.



**Lenticular Lens**
Grating is a cylindrical lens, which divides the image pixels into several subpixels and projects each subpixel in different directions. Two pictures with the same scene and different angles can be seen by both eyes, so that people can feel the three-dimensional effect of the image.

**Features:**
Lenticular lenses do not block backlighting, and the biggest advantage is that brightness will not be greatly affected.

The disadvantage is that the viewing position is fixed, once the line of sight is deflected, it will be affected.



**Directional Backlight**
Pointing to the light source 3D technology refers to placing a layer of optical film behind the liquid crystal, using two groups of LED, through the control of LED

Directed propagation is a directional propagation optical system that allows content to enter the viewer's left and right eyes in a sort of order to produce a stereoscopic effect.

**Features:**
The 3D display effect of the pointing light source is excellent, but the technology is still under development and the products are immature, which is still a long way from the formal commercialization.

# Competition



**Parallax Barrier**    **Lenticular**

**A few other companies have developed Glasses-Free solutions, but none have had any success in the consumer market other than Nintendo. The Lenticular and Parallax Barrier solutions used by the competition do not offer the high-quality viewing experience that our technology provides.**

## Lenticular

The following companies are currently offering glasses-free 3D products based on lenticular solutions:

**Magnetic 3D** - verticals including digital-out-of-home, retail, hospitality, casinos, quick serve restaurants, music and sports venues and theme parks.

**Alioscopy** - digital-out-of-home markets for digital signage, marketing, events and computer graphics 3D imaging.

**Exceptional 3D** - digital-out-of-home markets including digital signage, casino gaming, medical, defense, video gaming and hospitality.

**Dimenco** –"Simulated Reality" uses eye tracking for greater precision with a single user, then augments with third party technologies for haptic (touch) response and 3-dimensional audio.

**EyeFly3D** – this low-cost, user-implemented solution consists of a mobile app and a lenticular sheet sold as a screen protector with additional 3D benefit. The app takes stereo3D content and interleaves the images to use the lenticular lens applied to the phone by the user.

**ROKiT 3D** – this solution allows for playback of stereo 3D content from original side-by-side (half resolution) format. There is no allowance for viewing 2D or full resolution content. Market focus is limited to mobile phones.

**SuperD** (from Tronxyz) – this 2-view solution has been applied to tablets and phones. The company also makes VR headsets.

To compensate for the limitations of conventional lenticular technology…

Magnetic, Alioscopy and Exceptional focus on advertising and other markets where viewing times are so short that uncomfortable viewing zones are acceptable

Dimenco  has moved from out-of-home advertising to a single-user interactive niche that blends specially-produced content with other sensory input to create immersion

EyeFly 3D, ROKiT, and SuperD focus only on phones and tablets because these small devices are basically single-user by default and viewing angles can be fairly narrow.

## Parallax Barrier

The following companies are currently offering or have offered glasses-free 3D products based on parallax barrier solutions:

**Nintendo** – the Nintendo 3DS is probably the most successful product launched with barrier technology. The overall single-user experience made viewing angles less critical and the company was able to partially offset the loss of brightness because they also produce 100% of the content tailored for the device.

Discontinued products include two laptops and the Galapagos phone series from **Sharp**, the Optimus 3D and Thrill phones from **LG**, and the EVO 3D phone from **HTC**.

| | ULTRA-D OPTICAL SYSTEM | LENTICULAR LENSES | PARALLAX BARRIER | INTEGRAL IMAGING | HOLOGRAPHY | VOLUMETRIC |
|---|---|---|---|---|---|---|
| **Horizontal Stereopsis** | X | X | X | X<br>Also enabling vertical stereopsis | X<br>Also enabling vertical stereopsis | X (dependent on implementation)<br>Also enabling vertical stereopsis |
| **Horizontal Motion Parallax** | X | X | X | X<br>Also enabling vertical motion parallax | X<br>Also enabling vertical motion parallax | X<br>Also enabling vertical motion parallax |
| **Size of the Viewing Cones** | No Viewing Cones | Pronounced transitions | Pronounced transitions | Pronounced transitions | No Viewing Cones | No Viewing Cones |
| **Color Reproduction** | No Effect | No Effect | Hampered | No Effect | Poor | Poor |
| **Energy Consumption** | No difference with respect to 2D | No difference with respect to 2D | High | Depends on Implementation | High | High |
| **Feasibility of Mass Production** | High, known processes | High, known processes | High, known processes | No cases | Difficult | Difficult |
| **3D Image Quality** | Good | Fair | Poor | No cases | Poor | Poor |
| **Depth Perception** | Good | Fair | Good | Good | Optimal | Good |
| **Content Availability** | Unlimited | 2D & Stereo to Auto-Stereo possible | 2D & Stereo to Auto-Stereo possible | Difficult | Difficult | Difficult |
| **R&D, Development and Production** | Stream TV | Dimenco, IZON, XYZ, Sony, Multiple Asian manufacturers | Toshiba, Sharp, Zalman, Cyberreality, TriDef, Multiple Asian manufacturers | Toshiba and others apply mostly one-dimensional integral imaging which infact is Lenticular technology again | Holografika, SeeReal | Sony experimental, ViSio |

# Technology Comparison

Confidential

50

# Barriers To Competition



- Legal
- Technical
- Organization
- Content

- Partner Contracts
- Patents
- Know-how handled as trade-secrets

- Encryption
- Rendering as a key control point
- Source authentication
- Display authentication

- Key generation equipment
- Separation of technical controls

- Content ecosystem
- Encryption
- Digital Rights Management

# Marketing Plan











**LEVERAGE EXISTING RELATIONSHIPS**

- BOE
- Brand customers ready to commit
- Brand customers waiting for prototype samples
- Media outlets

**TRADE SHOWS AND SPECIAL EVENTS**

- Support for customer booths with co-branding
- No direct participation and expense
- Support for special events like video game tournaments, special placements, etc.

**ADVERTISING**

- Minimal brand advertising
- Cross-promotion with device makers
- Cross-promotion with content creators and distributors

**PUBLICITY**

- Joint press releases made with customers, BOE and other strategic partners
- Contests and awards
- Social media presence

**INFLUENCERS**

- Provide technology samples or customer product samples to generate interest
- Partner with key Metaverse participants

# Industry Analyst

**Excerpt by Richard Windsor of Radio Free Mobile,** an independent research producer specialising in the digital and mobile ecosystem.  RFM produces an in-depth research product that helps clients to understand and evaluate the players in the digital ecosystem.

- Radio Free Mobile thinks that the digital signage market is ideally suited to the proposition of Ultra-D. This is because it plays to all of the strengths of the technology and its weaknesses are much less of an issue in this particular use case.
- Radio Free Mobile thinks that the case for Ultra-D should be made on this market alone with all of the other opportunities representing "upside for free".
- Radio Free Mobile thinks that digital signage is a market where Ultra-D will see good and stable demand. Of all the addressable markets it is the one where the technology has the most appeal and one where buyers (advertisers) are most likely to be willing to pay a premium to have their message displayed in 3D.
- It is also the market where the technology is likely to have the greatest impact on consumers resulting in higher engagement with the products or messages on display.
- Radio Free Mobile thinks that the Ultra-D investment proposition should stand on this market alone with all of the other opportunities representing upside.



# Financing Arrangements

 Moving and set-up expenses to relocate bonding line from Suzhou, China

 Clean room fully funded

 100% cash in advance for PO financing

 Expansion funding for additional bonding equipment

To facilitate fulfillment of large orders from global consumer brands, VSI is currently in negotiation with several government agencies and municipalities in Asia to establish supply chain financing and expansion capital to add more bonding lines as we grow

Confidential

# Management Team with Hi-Tech Experience



**Mathu Rajan**
**Board Director & CEO**

- Serial entrepreneur who blends the creativity of an inventor with business acumen to commercialize products
- Over 15 years direct marketing experience with global media, consumer products and high-tech companies
- Led development of innovative visual technology in the consumer electronics space, including applications for television, mobile computing devices, and digital signage
- As founder of ZeroWater, he co-invented and obtained several patents on water filtration technology and processes for products that are now sold in retail outlets such as Target, Bed Bath and Beyond, Home Depot, and Walmart
- Experience in M&A deal negotiations with diverse media and electronics entities



**Tracy Rees**
**Board Director & President**

- 20+ years experience in executive management for tech companies
- Management of global engineering and sales operations
- Development of strategic partnerships with industry-leading companies
- Raising capital and investor relations
- Strategic marketing, brand and relationship marketing
- Public company governance



**Glenn Hasen**
**Board Director**

- 30-year technology experience in global Go-to-Market (GTM) strategy and execution
- Domestic and international successes with B2B solutions, corporate integrations, several M&A activities and an IPO
- Focus on revenue performance and efficiency has made him a sought-after Resource for startups and growth-oriented technology organizations

Confidential 5
5

# Management Team with Hi-Tech Experience



**Cliff Morton**
**Board Director**
**& VP of Engineering**

• 30+ years of engineering management and business development experience in high-tech industries
• Developed SW/HW products for mobile, embedded IoT devices and aerospace systems
• International experience includes operational and strategic planning, risk analysis, oversight of remote offices, technical sales, product road maps and more



**Bud Robertson**
**Executive Vice President**

• Served as CEO of Stream TV Networks' R&D subsidiary, SeeCubic B.V. in the Netherlands
• 12 years experience working closely with global sales, business and product teams
• Instrumental in expanding technical operations in Germany and China
• 20-years prior experience in the Film & TV industry

# Sales & Technical Team



**Matt JJ Lo, Global Sales**

- Component experience spread over Purchasing, Importing, Distributing and Manufacturing
- Has overseen transactions worth over $50M with CE firms like Toshiba, NEC, Mitsubishi, Hitachi, etc.
- Wholesaler for Fry's, Costco, Best Buy, for electronics equipment worth over $30M annually

**Sara Brewer, Content Engineer**

- 7 years experience in 3D content creation
- Design and materials creation for corporate marketing, trade shows, and in-house presentations
- Art direction and design for the video gaming and motion picture industries - key art, logos and title treatments, product packaging and marketing materials
- Print and multimedia publishing - layout and retouching



**Ziggy Papartis, Content Engineer**

- 10+ years experience in computer graphics, animation, and design
- Highly-skilled in Glasses-Free 3D content creation
- Exceptional knowledge of 3D content requirements across different platforms
- 8+ years experience in live action filmmaking: directing, producing, shooting, editing, post-production



# Thank you



# Exhibit B



**Visual Semiconductor Inc.**

## MISSION

Visual Semiconductor, Inc. is committed to developing advanced imaging technologies that deliver immersive and impactful viewing experience to a global audience. Cornerstone solutions in the company's portfolio include Ultra-D™ glasses-free 3D as well as a separate hologram technology. VSI sees tremendous opportunities in the commercial, digital out of home market as described below.

## GLASSES-FREE 3D

Ultra-D allows everyone in the room to experience a comfortable, dynamic glasses-free 3D viewing experience. With its use of multi-view optics instead of eye or face tracking, content viewing is not limited to a single user. There are no limits to the number of simultaneous viewers, making it a great solution for public spaces. Ultra-D displays have been deployed in airports, train stations, museums, movie theaters, automotive dealerships, shopping malls, and a variety of other high-visibility locations.

## HOLOGRAM

Equally stunning is the hologram solution VSI can bring to market. The point-of-purchase and on-floor kiosks bring products to life, hovering in mid-air for customer engagement. This technology has already been deployed in key locations for beta testing. Scalable from 3" to 40" in size, these display kiosks enable any digital video to be projected up to 48 inches away from the screen as a hologram.

## 3D DOOH APPLICATIONS

The overall global Digital-Out-Of-Home market size was valued at USD 3.639 Billion in 2016, and is estimated to reach USD 8.393 Billion by 2023, growing at a CAGR of 12.60% from 2017 to 2023. This expanding market offers significant opportunities for impactful advertising that can drive customer engagement.



3D advertising offers key benefits that can enhance advertiser profitability:

- ❖ Longer dwell time by viewers
- ❖ Increased brand recognition and customer recall
- ❖ Increased viewer response

3D DOOH advertising can be deployed in hundreds of indoor and outdoor use cases, including:

- ❖ QSR quick serve restaurants (menu boards, order kiosks)
- ❖ Movie theaters and lobbies (movie previews, product advertising)
- ❖ Shopping malls (wayfinding, advertising, vending machines)
- ❖ General retail outlets (on the sales floor, point-of-purchase, etc.)
- ❖ Transportation (airports, train stations, bus stations, bus stops, buses and train cars, etc.)
- ❖ Internet cafes and video gaming venues (teleconferencing, gaming)
- ❖ Casinos (slot machines, advertising)
- ❖ Hospitality (hotel check-in kiosks, advertising signage)
- ❖ Entertainment venues (sports arenas, concert halls, etc.)
- ❖ Museums (educational)

## EXAMPLE ULTRA-D INSTALLATIONS



Commercial Installations

A few examples of our many physical installations



Taoyuan International Airport, Taiwan



Natural History Museum, London



Hilton Härth Restaurant, Virginia



Toyota, Paris



GameStop, Milan & Munich



Cineplex Movies, Shanghai



Orange Opera Store, Paris

## EXAMPLE HOLOGRAM INSTALLATIONS





# Exhibit C

**From:** Stream TV Networks, Inc. <streamtvnetworksinc@gmail.com>
**Sent:** Tuesday, May 7, 2024 20:38
**Subject:** Follow up on Bankruptcy Update

Dear All:

We are consulting with legal counsel about a potential defamation lawsuit against Shad Stastney for his latest malignment. The information provided in my previous email included actual court filings, direct quotations from court cases, and published articles from law firms and scholars expressing their analysis of important court rulings. Some legal conclusions for consideration include:

1. *"However, somewhat troubling is the Court's observation that **credit bidding, even under §363(k) of the Bankruptcy Code, may be disallowed "for cause"** and that "for cause" does not necessarily mean some action on the part of the secured creditor that caused it to forfeit that right."* (https://www.reedsmith.com/en/perspectives/2010/03/third-circuit-rules-that-philadelphia-newspapers-l)

1. *"On March 22, 2010, the Court of Appeals for the Third Circuit issued its 2-1 opinion (No. 09-4266) in the* Philadelphia Newspapers, LLC *bankruptcy case. The Third Circuit Court, utilizing a strict constructionist viewpoint, held that the Debtor could sell its assets pursuant to a plan of reorganization **without providing secured creditors a right to credit bid their debt**."* (https://www.bipc.com/third-circuit-secured-lenders-do-not-have-absolute-right-to-credit-bid-in-sale-under-plan)

1. *"The* Philadelphia Newspapers *decision is now **the second Circuit-level opinion holding that a secured lender does not have the absolute right to credit bid** under section 1129(b)(2)(A)(iii). The Fifth Circuit reached the same conclusion in the plan confirmation context in the* Pacific Lumber *case [584 F.3d 229 (5th Cir. 2009)]. These two decisions will have a substantial impact on secured lenders, providing, as they do, a powerful tool for debtors to cram down an unpalatable plan. Secured lenders will do well to keep these decisions in mind when negotiating terms in DIP lending or cash collateral orders. At a minimum, such documents should contain a reaffirmation of the lenders' credit bid rights, even if it's not now known whether they would be enforced by a bankruptcy court. In addition,*

*preservation of credit bid rights could be required as additional adequate protection."* ([https://www.bipc.com/third-circuit-secured-lenders-do-not-have-absolute-right-to-credit-bid-in-sale-under-plan](https://www.bipc.com/third-circuit-secured-lenders-do-not-have-absolute-right-to-credit-bid-in-sale-under-plan))

In our research, we have seen no case where a credit bid has been settled in 45 days. We believe, based on our observation of legal precedent, that it will take 6-9 months to resolve SeeCubic's attempted credit bid, and possibly longer. However, this is just our understanding of case law, and no one can ultimately know how this court will rule.

We would remind you that we have just passed the 4-year anniversary of the Omnibus transaction. Many of you invested millions and millions and millions and millions of dollars into the Omnibus transaction, only to have it overturned by the Delaware Supreme Court in a unanimous 5-0 en banc decision. We will see if SeeCubic's attempted credit bid suffers the same fate as the Omnibus transaction.

We hope this information proves helpful in considering what weight to give Mr. Stastney's email, if any.

Best regards,
Mathu Rajan

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# Exhibit D

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (AMC) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (AMC) |
| Debtor. | (Jointly Administered) |

## VISUAL SEMICONDUCTOR, INC.'S JOINDER TO DEBTOR'S MOTION FOR TEMPORARY RESTRAINING ORDER AND TO REMBRANDT 3D HOLDING LIMITED'S JOINDER THERETO

Visual Semiconductor, Inc. ("VSI"), creditor, equity holder and party in interest of the Debtor herein, by and through its counsel, Spector Gadon Rosen Vinci P.C., hereby files this joinder to Debtor's motion for temporary restraining order filed on October 1, 2023 ("Debtor's Motion") and Rembrandt 3D Holding Limited's joinder thereto, and seek enforcement and continuance of the temporary restraining order extended by Court Order dated May 10, 2024 against parties using the Debtor's technology in violation of intellectual property and trade secrets. In support of this motion, VSI states as follows:

1.      VSI is a party in interest, equity holder of the Debtor, proposed plan sponsor of the Debtor, and financier and distributor of the Debtor's technology. VSI has invested funds in the Debtor since VSI's inception in 2022.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

2. The Debtor sought a temporary restraining order from the Bankruptcy Court because actions of SeeCubic, Inc. ("SCI") were damaging and threatening to cause additional damage to the Debtor's estate and parties in interest. Besides the immediate and ongoing loss of potential investors and customers by the Debtor to an alleged secured creditor and competitor, there was a potential threat to one of the Debtor's critical third-party technology licenses. SCI's business model to sublicense the Debtor's technology to its customers violates the Debtor's irreplaceable license from Koninklijke Philips Electronics ("Philips") which specifically prohibits such sublicensing. Furthermore, SCI had failed to obtain a license from Rembrandt 3D Holding Limited ("Rembrandt") for technology that the Debtor had licensed from Rembrandt. The Rembrandt license is non-transferable.

3. The Bankruptcy Court issued a temporary restraining order on January 4, 2024 (Dkt. No. 119, Adv. Case No. 23-00057 (MDC)) against the Debtor's alleged secured creditors and those acting in concert with them to protect the Debtor, its estate, its creditors, and its shareholders from irreparable harm.

4. In the *TRO*, the Court found, <u>inter alia</u>, "there is risk of immediate irreparable injury to Stream's alleged intellectual property in the form of possible permanent loss of Stream's rights in the Philips and Rembrandt licenses, confusion in the marketplace regarding Ultra-D technology, the role of SeeCubic, Inc. in developing the technology…" (*TRO* ¶ 6).

5. In the *TRO*, defendants SCI, Shadron L. Stastney, SLS Holdings VI, LLC, Hawk Investment Holdings Limited ("Hawk"), Arthur Leonard Robert Morton, Alastair Crawford, Krzysztof Kabacinski, Kevin Gollop, Asaf Gola, Patric Theune, SeeCubic BV ("SCBV"), and law firms and investment bankers representing and acting in concert with them (collectively, the "Enjoined Parties") were enjoined from:

*Describ[ing], referenc[ing], display[ing] or portray[ing] the technology, or any improvements thereon,* or make any representations with respect to ownership or development of such technology, purported to be owned and/or developed by Stream and/or its subsidiaries. (*TRO* ¶ 9(b)(ii), emphasis added)

6.      On March 7, 2024, VSI representatives met with the chapter 11 Trustee and the Trustee's counsel. Also in attendance was Rafael Zahralddin, bankruptcy counsel to the Debtor and a party in interest with outstanding administrative claims against the Debtor. In attendance on behalf of VSI were its CEO, Mathu Rajan, and Nicole Maneen. In that meeting, the Trustee stated that Mr. Stastney, Chairman of SCI, had recently met with them to conduct a demonstration of the Glasses-Free 3D technology. The Trustee advised VSI that he had told Mr. Stastney that the technology belonged to the Debtor, a fact that Mr. Stastney acknowledged at the time. However, VSI knows of no efforts made by the Trustee to retain the demonstrator unit on behalf of the Debtor's estate, allowing Mr. Stastney and SCI to retain possession of equipment that (i) contains the Debtor's own intellectual property, (ii) contains technology licensed by the Debtor (through its subsidiary) from Philips, and (iii) contains technology allegedly owned by Rembrandt, to which the Enjoined Parties have no license. By failing to retain an asset clearly identified as an asset of the Debtor's estate, the Trustee gave tacit approval to the Enjoined Parties for continued technology demonstrations to any number of third parties. When VSI has asked Trustee's counsel about the aforementioned, it received no reply.

7.      Upon information and belief, Mr. Stastney, SCI, Hawk, and others working in concert with them have committed multiple violations and continue to violate the *TRO* by displaying Glasses-Free 3D technology for the purpose of raising investment capital to fund the proposed settlement between the Debtor and Hawk, among other things. VSI intends to seek discovery from the Enjoined Parties to ascertain the depth of their *TRO* violations.

8.     The ongoing violations continue to damage the Debtor's estate and all parties in interest by (i) poaching investors from the Debtor for its own benefit, (ii) poaching customers from the Debtor for its own benefit, (iii) putting the irreplaceable Philips license at risk since the Debtor, not SCI, is the Philips licensee, and (iv) creating additional exposure for damages claims by Rembrandt, who have a new claim against Technovative.

9.     VSI has been damaged because it paid certain expenses on behalf of the Debtor, including contract employees working to fulfill the Debtor's existing customer purchase orders. The efforts of these contract employees were blocked by the Enjoined Parties, who failed to return the Debtor's optical bonding equipment (the "Equipment"), and by the Trustee himself for failing to retrieve the Equipment for the benefit of the Debtor despite his commitment to VSI and his obligation to do so. The Debtor's contract employees, funded by VSI, had arranged for delivery of the Equipment to the facility of a strategic partner which would have kicked off a venture to generate downstream revenue. That strategic partner can accelerate the Glasses-Free 3D project upon delivery of the Equipment; however, as plans for Equipment shipment were being finalized, the Trustee requested that VSI provide an unrestricted debtor-in-possession loan to the Debtor in an unrelated transaction. When VSI failed to oblige, the shipment was canceled by the Trustee, who allowed the Equipment to remain under the control of the Enjoined Parties.

10.    VSI is unaware of any efforts made by The Trustee, despite repeated requests by VSI to the Trustee for answers, to obtain the return of or secure any assets of the Debtor's estate, whether it be the bonding equipment for use in product manufacturing, technology demonstrators for use in securing strategic partners and investors, components overdue for customer delivery,

or samples requested by potential customers and investors. These assets remain in the possession

of the Enjoined Parties, some of whom have been found in contempt of court previously[2].

11.     On May 6, 2024, Rembrandt notified counsel for SCI and Hawk that VSI had

become aware of a planned May 7, 2024 meeting to be held by their clients in violation of the

*TRO*. Counsel for SCI failed to acknowledge Rembrandt's email at all. Hawk's counsel

eventually responded, but only two days after the alleged meeting had occurred. Hawk's counsel

stated:

> It is up to the Debtors to determine whether they believe a violation
> occurred or needs to be addressed. The Debtors have not taken any action
> or voiced any concerns. The e-mails also suggest Rembrandt believes its
> technology may have been improperly used. But there is no pending
> motion or order defining or dealing with the use of Rembrandt's
> technology.  See Exhibit "A", a true and correct copy of the email
> correspondence.

12.     The position of Hawk's counsel is untenable because the *TRO* specifically

references the Rembrandt technology and prohibits the Enjoined Parties from:

> Tak[ing] any action to sublicense, transfer, assign, or otherwise dispose of **or
> affect** any license or technology held or purported to be held by the Debtors'
> estates, including but not limited to the Ultra- D technology, and the Philips or
> **Rembrandt licenses**. (*TRO* ¶ 9(a), emphasis added)

Rembrandt does not need to file a separate motion in this court to protect its intellectual property,

as it is clearly covered by the *TRO*. Unauthorized use and/or distribution of its technology does

indeed **affect** the value of its license, perhaps irreparably.

13.     If the Trustee is aware of violative actions (and should be so aware), he should

take action to enforce the *TRO*. Due to a failure to monitor the actions of partis as to whether SCI

---

[2]In his *Opinion* of October 3, 2022, Vice Chancellor Laster of the Delaware Court of Chancery stated: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings." (C.A. No. 2020-0766-JTL p. 1)

and Hawk are violating the *TRO*, the Trustee is failing to secure the Debtor's assets, giving an unfair advantage to the Enjoined Parties, and negatively impacting all other parties in interest.

14.     VSI believes that the TRO must be enforced after May 15, 2024 and there should be an immediate surrender of all Glasses-Free 3D demonstrators by the Enjoined Parties to the Trustee on behalf of the Debtor to ensure that violations of the *TRO* do not continue. This request merely underscores actions that should have occurred following the Delaware Supreme Court's 5-0 en banc decision of June 15, 2022, in which it found the Omnibus Agreement which purported to transfer the Debtor's assets SCI to be invalid and ordered the decision which granted SCI ownership and possession to be REVERSED and VACATED.

15.     Certain Enjoined Parties argued in Chancery Court that they should not have to surrender assets to the Debtor because those assets had been improved during the time invalid possession. The Bankruptcy Court addressed this issue in the *TRO* with unequivocal language that prohibits the Enjoined Parties from using "the technology, **or any improvements thereon**" (*TRO* ¶ 9(b)(ii)). There is no reasonable justification for any of the Enjoined Parties to be making presentations of the Glasses-Free 3D technology.

16.     The assets have never been returned to the Debtor or to the Trustee by SCI and those working in concert with it. As a result, they have continued to represent the Debtor's technology for their own benefit, to the detriment of the Debtor, its estate, and other parties in interest. Put another way, the allegations in the Debtor's Motion not only remain the same, but the circumstances have gotten worse and have increased to the detriment of the Debtor's Estate.

17. VSI respectfully requests that the Court issue a preliminary injunction or further extend the *TRO* until it has had discovery from the Enjoined Parties and an opportunity to be heard on violations of the *TRO*.

Dated:   May 13, 2024                              Respectfully submitted,

By:_____
Leslie Beth Baskin, Esquire
Spector Gadon Rosen Vinci P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103
Direct Phone: 215-241-8926
Fax: 215-531-9145
*Attorneys for Visual Semiconductor, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Leslie B. Baskin, hereby certify that on this 13th day of May, 2024, a true and correct copy of the foregoing Visual Semiconductor, Inc.'s Joinder to Debtor's Motion for Temporary Restraining Order and to Rembrandt 3D Holding Limited's Joinder Thereto has been served, via the Court's electronic filing system, upon all counsel of record.

*Leslie B. Baskin*

Leslie B. Baskin, Esquire

# Exhibit E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | **(Jointly Administered)[1]** |
| **Debtors.** | : | |
| | : | |

## ORDER ENFORCING THE AUTOMATIC STAY AND
## COMPELLING TURNOVER OF ESTATE PROPERTY

AND NOW this _____ day of _____, 2024, upon consideration of the Motion of William A. Homony, Chapter 11 Trustee (the "Trustee") for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property (the "Motion"), and any related responses or objections, it is hereby ORDERED that:

1. The Motion is GRANTED;

2. Mathu Rajan, Visual Semiconductor, Inc., and any related parties are barred by the automatic stay from use of communications which, explicitly or by implication, are in the name of the Debtors, and/or state that they own or control the Debtors or technology belonging to the Debtors (including, but not limited to Ultra-D), and shall immediately cease such communications;

3. Mathu Rajan and Visual Semiconductor, Inc. shall pay to the Trustee damages in an amount to be determined for costs incurred as a result of their violations of the automatic stay; and

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

4. Mathu Rajan shall within five (5) business days turn over to the Trustee all assets of the Debtors, including but not limited to: a) control of the email account streamtvnetworksinc@gmail.com and all other email accounts utilized to conduct the Debtors' activities and b) any and all Debtor property being used to demonstrate the Debtors' technology to potential investors.

5. The Court shall retain exclusive jurisdiction to interpret, implement and compel the terms of this Order.

BY THE COURT:

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

2