**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc., *et al*.** | : | **Bankruptcy No. 23-10763 (DJB)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)[1]** |
|  | : |  |

**OBJECTION OF RESPONDENTS TO THE
MOTION OF LEWIS, BRISBOIS, BISGAARD & SMITH LLP FOR SANCTIONS
PURSUANT TO FED. R. BANKR. P. 9011 AND 28 U.S.C. § 1927**

Steven M. Coren, Esquire
**Coren & Ress, P.C.**
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

Michael D. Vagnoni, Esquire
Edmond M. George, Esquire
**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066

*Counsel to William A. Homony, Chapter 11 Trustee*

---

[1] On April 10, 2023, the Court entered an order directing joint administration of the above-captioned cases. (D.I. 95).

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     FACTUAL AND PROCEDURAL HISTORY .....................................................2

        A.      The Pre-Petition History Of Stream and Attorney Zahralddin-Aravena's Prior
                Stream-Related Bankruptcy Machinations ................................................2

                1.      The Omnibus Agreement and the Delaware Chancery Court Litigation.....2

                2.      VTI's Formation and Zahralddin-Aravena's Emergence as Bankruptcy
                        Architect.........................................................................................4

                3.      The Delaware Voluntary Bankruptcy is Dismissed for Bad Faith ...............8

                4.      The Collusive Rembrandt Settlement, Bad Faith Involuntary Chapter 7,
                        and the VTI-Rembrandt Alliance ...................................................9

                5.      VSI's Formation and Continuation of the Scheme ...................................16

        B.      The Filing of the Instant Cases .............................................................18

                1.      The March 2023 Bankruptcy Filing..................................................18

                2.      LBBS's Retention Application and Zahralddin-Aravena's Misleading
                        Declarations Concealed Their History of Working to Further the
                        Interests of Rajan, VTI/VSI, and Rembrandt.............................................18

                3.      LBBS Continues to Serve VSI and Rembrandt's Interests.......................26

                4.      The Debtors' Monthly Operating Reports .................................................29

        C.      The Court's January 2024 Findings and Appointment of the Chapter 11
                Trustee.........................................................................................31

        D.      Post-Appointment Events and the LBBS Fee Applications.................................34

                1.      LBBS Continues to Advocate for VSI Even After the Trustee's
                        Appointment ...............................................................................34

                2.      The Final LBBS Fee Application, the Trustee's Objection Thereto,
                        and LBBS's Rule 11 Motion................................................................35

        E.      To This Day, LBBS Is Serving The Interests of its True Client, Mathu Rajan .....36

III.    ARGUMENT...............................................................................................36

        A.      Rule 9011 and Section 1927 Impose A High Bar that LBBS Cannot Meet.........36

i

B.    The Trustee's Fee Objection Has Substantial Merit ..............................................38

    1.    The Factual Record Demonstrates that LBBS's True Loyalties Lied
          With Rajan and VSI and Accordingly It Was Not Disinterested and
          Was Not Working For the Benefit of the Estate ........................................38

    2.    LBBS Violated Its Duty to Present Accurate and Timely Information
          Concerning the Debtors' Operations .........................................................43

C.    LBBS's Arguments Are Factually and Legally Baseless .....................................47

    1.    The Estate Is Not Administratively Insolvent and LBBS's Lead
          Argument Is Nonsensical ..........................................................................47

    2.    LBBS's Argument That Its Stipulation With the United States Trustee
          "Resolved All Questions Regarding the Reasonableness and Propriety
          of LBBS's Fees" Is Specious ....................................................................50

    3.    The Trustee Did Not Object to LBBS's Fees Based On Hindsight; To
          the Contrary, Rajan and Attorney Zahralddin-Aravena Have an
          Established History of Attempting to Misuse the Bankruptcy Courts
          to Usurp Stream's Assets For Rajan's Benefit .........................................53

    4.    LBBS Fails to Establish Any Rule 9011 or Section 1927 Violation .........54

IV.   CONCLUSION ..................................................................................................55

## TABLE OF AUTHORITIES

**Cases**

*Brown v. Gerdes*, 321 U.S. 178 (1944)......................................................................... 40

*CT Install Am., LLC v. Boryszewski*, 2024 WL 4582885 (E.D. Pa. Oct. 25, 2024) .................... 37

*In re APW Enclosure Sys., Inc.*, 2007 WL 3112414 (Bankr. D. Del. Oct. 23, 2007).................. 47

*In re Berg*, 268 B.R. 250 (Bankr. D. Mont. 2001).......................................................... 47

*In re BH & P , Inc.*, 949 F.2d 1300 (3d Cir. 1991)......................................................... 42

*In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833 (3d Cir. 1994)..................................... 51

*In re By-Rite Oil Co.*, 87 B.R. 905 (Bankr. E.D. Mich. 1988)...................................... 39, 41

*In re Channel Master Holdings, Inc.*, 309 B.R. 855 (Bankr. D. Del. 2004)............................. 40

*In re Clayton Grain Elevator, Inc.*, 30 B.R. 760 (Bankr. W.D. La. 1983) ............................. 41

*In re Coquico, Inc.*, 508 B.R. 929 (Bankr. E.D. Pa. 2014) ............................................. 49

*In re Delaware Valley Lift Truck Inc.*, 640 B.R. 342 (Bankr. E.D. Pa. 2022)........................... 49

*In re Food Management Group, LLC*, 380 B.R. 677 (Bankr. S.D.N.Y. 2008) ........................... 43

*In re Freeman*, 540 B.R. 129 (Bankr. E.D. Pa. 2015) .................................................... 37

*In re Grasso*, 586 B.R. 110 (Bankr. E.D. Pa. 2018) ................................................*passim*

*In re Jade Mgmt. Servs.*, 386 F. App'x 145 (3d Cir. 2010) ............................................. 42

*In re Redante*, 579 B.R. 354 (Bankr. E.D. Pa. 2018)..................................................... 51

*In re Revco D.S., Inc.*, 126 B.R. 741 (Bankr. N.D. Ohio 1991).......................................... 36

*In re Sandra Cotton, Inc.*, 91 B.R. 657 (W.D.N.Y. 1988)................................................ 41

*In re Smith*, 111 B.R. 81 (Bankr. E.D. Pa. 1990).......................................................... 37

*In re T & D Tool, Inc.*, 125 B.R. 116 (E.D. Pa. 1991)..................................................... 40

*In re Top Grade Sausage, Inc.*, 227 F.3d 123 (3d Cir. 2000) ........................................... 53

*In re Tucker*, 411 B.R. 530 (Bankr. S.D. Ga. 2009) ...................................................... 46

*In re Vascular Access Cntrs., L.P.*, 613 B.R. 613 (Bankr. E.D. Pa. 2020)............................... 42

*In re Whitney Place Partners*, 147 B.R. 619 (Bankr. N.D. Ga. 1992) ................................... 47

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991) ........................... 40

*In re Zagara's Fresh Markets, LLC*, 2006 WL 4452980 (Bankr. D.N.J. Apr. 13, 2006) ........... 46

*In re Zweig*, 35 B.R. 37 (Bankr. N.D. Ga. 1983)......................................................... 41

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986)....................................................... 37

*U.S. Tr. v. Price Waterhouse*, 19 F.3d 138 (3d Cir. 1994) .............................................. 38

*Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19
    (2d Cir. BAP 1997) ...................................................................................... 43

**Statutes and Rules**

11 U.S.C. § 327............................................................................................... 41

11 U.S.C. § 328............................................................................................... 38

11 U.S.C. § 330........................................................................................... 52, 54

11 U.S.C. § 1104............................................................................................. 31

11 U.S.C. § 328............................................................................................... 53

28 U.S.C. § 1927.......................................................................................... 1, 37

28 U.S.C. § 586 ............................................................................................................ 51

Del. Prof. Cond. R. 1.16 ............................................................................................ 3, 4

Fed. R. Bankr. P. 2014 .................................................................................................. 41

Fed. R. Bankr. P. 9011 ............................................................................................ *passim*

**Other Authorities**

Department of Justice's Chapter 11 Trustee Handbook
   https://www.justice.gov/ust/file/ch11handbook-200405.pdf/dl ................................................ 52

Steven M. Coren, Esquire, Coren & Ress, P.C., Michael Vagnoni, Esquire, and Obermayer Rebmann Maxwell & Hippel LLP (collectively, "Respondents"), counsel to William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative," and collectively with Stream, the "Debtors"), file this Objection to the Motion for Sanctions Pursuant to Fed. R. Bankr. P. 9011 and 28 U.S.C. § 1927 (the "Sanctions Motion," D.I. 1185), filed by Lewis, Brisbois, Bisgaard & Smith, LLP ("LBBS") and in opposition to the relief requested in the Sanctions Motion, respectfully state as follows.

## I.   __INTRODUCTION__

LBBS has filed a frivolous sanctions motion which falsely targets the Trustee's counsel for doing exactly what the Bankruptcy Code requires: objecting to a nearly $3 million fee application submitted by a law firm whose loyalties throughout this bankruptcy lay not with the Debtors' estates, but instead with insider Mathu Rajan, his alter ego Visual Semiconductor, Inc. ("VSI"), and purported creditor Rembrandt 3D Holding Ltd. ("Rembrandt") — all parties whose interests were adverse to the estates.  The Sanctions Motion is itself a model of the conduct it purports to condemn: it relies on a factually false administrative insolvency claim and a false supporting declaration, a gross mischaracterization of a stipulation between LBBS and the United States Trustee ("UST"), and the legally untenable contention that a Chapter 11 Trustee cannot object to a professional's fee application because the power to do so lies exclusively with the UST and somehow constitutes an attempt to relitigate that professional's retention.

To the contrary, the Trustee's meritorious objection is grounded in, *inter alia*, this Court's own detailed findings of gross mismanagement by the Debtor while under LBBS's supervision; the extensive history of the Debtor's three bankruptcies, all of which involved current LBBS

1

attorney Rafael Zahralddin-Aravena ("Zahralddin-Aravena," referred to in contemporaneous correspondence as "Raf") and two of which were dismissed as bad faith filings designed to benefit Rajan; LBBS's internal emails confirming that Zahralddin-Aravena described the plan as "really VSI's deal," took strategic direction from VSI's principals and attorneys, and personally negotiated VSI-Rembrandt commercial terms while billing as the Debtors' supposedly disinterested counsel; and in the Debtors' systemic failures to submit accurate filings with this Court.

The Sanctions Motion should be denied.[2]

## II.   FACTUAL AND PROCEDURAL HISTORY

### A.   The Pre-Petition History Of Stream and Attorney Zahralddin-Aravena's Prior Stream-Related Bankruptcy Machinations

#### 1.   The Omnibus Agreement and the Delaware Chancery Court Litigation

Stream is a Delaware corporation founded in 2009 that purported to develop glasses-free, ultra-high-definition 3D display technology ("Ultra-D"). Its CEO, president, and controlling principal is Mathu Rajan ("Rajan"). In late 2020, Stream became embroiled in litigation in the Delaware Court of Chancery (the "Chancery Litigation") with its secured creditors—SLS Holdings VI, LLC ("SLS") and Hawk Investment Holdings Limited ("Hawk")—arising from an Omnibus Agreement dated May 6, 2020 (the "Omnibus Agreement"). Under the Omnibus Agreement, a resolution committee of Stream's independent directors agreed to transfer substantially all of Stream's assets to a new entity, SeeCubic, Inc. ("SeeCubic"), controlled by the secured creditors, in exchange for extinguishment of approximately $150 million in secured debt

---

[2] The exhibits cited in support of the Trustee's Objection are contained in the Appendix ("App. Ex. __") filed contemporaneously herewith.

upon which the Debtor had defaulted.  *See* App. Ex. 1 at 5:13-7:7.  Rajan, who was not entitled to

participate in the equity swap and did not approve the Agreement, immediately sought to undo it.

*Id.*

Zahralddin-Aravena, then at Elliott Greenleaf, P.C., represented Stream, Rajan, and Rajan's

brother Raja Rajan in the Chancery Litigation and, on November 8, 2020, moved to withdraw as

counsel, citing fundamental disagreements with his clients and an irreconcilably broken attorney-

client relationship.  *See* App. Ex. 2 at ¶¶ 4 ("critical matters within the attorney-client relationship

and fundamental disagreements with the Clients have caused Elliott Greenleaf's representation of

Clients to be unreasonably difficult"), 8 (citing Del. Prof. Cond. R. 1.16(b)(4), which permits

withdrawal where a "client insists upon taking action . . . with which the lawyer has a fundamental

disagreement"), 10 (seeking to withdraw under, inter alia, Del. Prof. Cond. R. 1.16(b)(4)).

On December 8, 2020,

> the Delaware Chancery Court entered an order preliminar[il]y
> enjoining Stream, Mr. Rajan and others from, among other things,
> taking any action to interfere with the omnibus agreement including,
> but not limited to, disputing the validity of the agreement except as
> part of the Chancery Court litigation; interfering with the exercise
> of the granted power of attorney; asserting ownership rights to any
> of the assets subject to the omnibus agreement in the stock or
> comparable equity of Stream's subsidiary, TechnoVative, or those
> deemed the Dutch subsidiaries; and transferring, liquidating,
> converting, encumbering or, otherwise, disposing of any of the
> subject assets in a manner inconsistent with the omnibus agreement.
>
> In its opinion accompanying the order the Chancery Court found
> that Mr. Rajan and his brother, who previously served as a director
> and officer of Stream, acted by unanimous written consent to expand
> the board of directors with four outside directors.  It found, at
> subsequent meeting, the board validly created the resolution
> committee to negotiate and resolve outstanding claims.  And on May
> 6th, 2020 the resolution committee approved the omnibus
> agreement and it became effective and binding on Stream. Stream
> failed on the remaining issues before the court.

3

App. Ex. 1 at 7:8-8:5.

### 2. VTI's Formation and Zahralddin-Aravena's Emergence as Bankruptcy Architect

On January 6, 2021, in the wake of the Chancery Court's preliminary injunction, Visual Technology Innovations, Inc. ("VTI") was incorporated in Nevada, listing Rajan as President, Secretary, Treasurer, and Director. App. Ex. 3. As subsequent events would bear out, VTI was established as a special purpose vehicle with one purpose: to finance a new bankruptcy filing by Stream, acquire Stream's Ultra-D assets through that bankruptcy, subvert Stream's secured creditors, and transfer those assets to an entity under Rajan's control.

On January 11, 2021, just months after representing to a court that Stream and the Rajans insisted on taking action with which Zahralddin-Aravena had fundamental disagreement,[3] Zahralddin-Aravena reentered the scene as an attorney at Armstrong Teasdale LLP ("AT"), holding a Zoom meeting with Rajan, Dan Rink, and Suby Joseph concerning Stream TV's corporate structure and "the funding of the retainer and filing a petition." App. Ex. 5. From the earliest stages, therefore, the evidence shows that Zahralddin-Aravena was acting as the architect of a bankruptcy strategy that would serve the interests of VTI and Rajan rather than Stream and its legitimate creditors.

On January 12, 2021, an attorney at Dilworth Paxson LLP – which had been advising Stream for the preceding year regarding a potential bankruptcy and other issues relating to the secured creditors – revealed in an internal email that "I just spoke with Mathu Rajan. He is closing

---

[3] At his deposition, Zahralddin-Aravena testified that the motion he signed and filed with the Chancery Court was false. Despite representing to the court that he had grounds to withdraw under Del. Prof. Cond. R. 1.16(b)(4), (5), (6), *and* (7), see App. Ex. 2 at ¶¶ 5, 7, 8, 10, Zahralddin-Aravena testified that the only actual ground was his boss's desire to fire the client. App. Ex. 4 at 97:7-98:21.

with his investors today and wants to file [Stream's bankruptcy] tonight before some state court judge in Delaware rules against him on something that is pending." App. Ex. 6. Another January 12, 2021 Dilworth email stated that "we need assurance of payment for our services as debtor's counsel since the debtor itself has no operations and no cash flow. Mathu told me that the parent company, in which the investors are putting money, will pay our post bankruptcy fees. . . . This is literally the 5th or 6th time that these guys have called me and said that we 'need to file today and we are wiring the retainer.' I will believe it when we get the retainer." App. Ex. 7.

On February 24, 2021, Stream filed a voluntary Chapter 11 petition in the District of Delaware (Case No. 21-10433-KBO) (the "Delaware Voluntary Bankruptcy"). Shortly thereafter, Stream filed a motion seeking court authorization of up to $1 million in initial financing from VTI. App. Ex. 8. On March 13, 2021, Zahralddin-Aravena emailed AT colleague Jonathan Stemerman: "Might need some help in a new matter. Being hired this weekend. We are being retained to represent VTI—lender and party that is being capitalized and supported by various investors that is financing the bankruptcy of StreamTV." App. Ex. 9. Effective March 15, 2021, VTI (through Zahralddin-Aravena) and Stream (through Dilworth) executed a Joint Defense and Common Interest Agreement for the purpose of "furthering . . . [VTI and Stream's] common interests and joint defense in connection with the chapter 11 of the Debtor." App. Ex. 10. This agreement memorialized the conflicted, intertwined relationship between the Debtor and VTI—the precise pattern that would be replicated in the instant bankruptcy with Rajan-controlled VSI in place of VTI.

The timing of VTI's formation – i.e., weeks after the Chancery Court's holding concerning the validity of the omnibus agreement and days before Rajan's meeting with Zahralddin-Aravena concerning Stream's "corporate structure" and "filing a petition," App. Ex. 5 – establishes that the

only common interest VTI could possibly have had with Stream was Rajan's attempt to enrich himself at the expense of Stream's legitimate secured creditors. As stated in the United States Trustee's omnibus objection to, *inter alia*, the motion concerning DIP financing from VTI, "the Debtor has not demonstrated a need to incur up to $1 million in unsecured, insider debt with administrative priority status. Here, the Debtor appears to no longer own its significant assets, and the entity proposed to provide the financing was formed two months ago by the Debtor's President and CEO and has no purpose other than to fund this case and pay the Debtor's proposed professionals." App. Ex. 11 at ¶ 1.

On March 15, 2021, Zahralddin-Aravena emailed VTI regarding the structural dangers of VTI's involvement in the bankruptcy, specifically warning that current conditions—"no plan, undercapitalization, no DIP, etc."—risked substantive consolidation that would "pull[] VTI into the bankruptcy." App. Ex. 12. He also expressed concern about "the DIP motion and a lack of milestones in showing that VTI is separate from Stream." *Id.* The same day, Zahralddin-Aravena emailed Dilworth concerning the Stream bankruptcy and demonstrating his, Rajan's, and VTI's attempt to use Stream's counsel as their puppet to achieve Rajan's goal of taking over Stream for his own benefit: "Mathu has asked me to pull together the research and a draft of the executory contract motion[, i.e., Zahralddin-Aravena's strategy to have Stream classify the Omnibus Agreement as an executory contract which could be rejected in bankruptcy,] which we will then turn over to you all and I will also look at the fraudulent conveyance issue. Attached is one order and two 'worldwide' stay motions . . . [that] seem applicable to our issues with assets in other jurisdictions." App. Ex. 13.

By March 30, 2021, Dilworth's internal communications expressed alarm that Zahralddin-Aravena was encouraging Dilworth to take positions contrary to the Debtor's interests and the

6

Chancery Court's prior findings concerning the omnibus agreement: "is Raf seriously suggesting an intention to relitigate the state court order from December where the court found the debtor bound by the omni agreement? That is a huge no-no and will get this case tossed fast by the Bankruptcy Court. . . . Some of the things he says to the client make me shake my head and I'm sure the client loves what Raf suggests and then thinks we are not being aggressive enough . . . ." App. Ex. 14.  Dilworth also expressed concern about Rajan's honesty about funding sources and Zahralddin-Aravena's apparent failure to make a reasonable inquiry into the same:

> I have a couple of overarching concerns about VTI's response [to SeeCubic's motion to dismiss the bankruptcy]. . . . [P]erhaps disclosing the identify of Burlington/Tim McCarthy is not a good idea unless Raf and his group have personally spoken with Tim McCarthy and verified real information.  If you recall, Mathu would not allow us to have contact with Burlington or Tim and the documentation we received and that which is available on line is highly questionable – at best.  The website is not protected and has none of the markings of a valid company.  Now, according to VTI's response, this Tim McCarthy is on VTI's board.  If he was really an international investor with projects in Asia and on the boards he says he was, there would be some online presence substantiating this.  There is no news, PR, announcements or anything on any deals in which Burlington or McCarthy were involved. . . . It may be true, but without any information to verify or any ability to speak with the guy or see any actual financial statements, etc. including that information could be extreme fodder for the other side to show that all of this talk of investment/financing is a continued fantasy.

App. Ex. 15.

On April 21, 2021, Dilworth wrote internally concerning Zahralddin-Aravena's insistence on relitigating the Omnibus Agreement: "I am concerned about Raf's group's rabid insistence on the chancery court docs and litigating the validity of the omnibus agreement in the MTD. . . . The fact that they want to go that route suggests, to me and maybe others, that the arguments on ownership of assets, legitimate business operations, attracting financing that are a slam dunk for

7

us if we can make a colorable argument are not as legitimate as the client expresses." App. Ex. 16.

On April 24, 2021, Zahralddin-Aravena sent Dilworth a lengthy email laying bare VTI's true purpose in the bankruptcy: "The whole point of the bankruptcy for VTI is to marry the resources of VTI and Stream. That is the business plan and exit from bankruptcy and the rationale for the investment dollars coming in to VTI. Winning the motion to dismiss is an empty victory if it means that we can't get to the Ultra-D technology." App. Ex. 17. In other words, from the outset, the bankruptcy was structured to benefit VTI (Rajan's entity) by acquiring Stream's technology, not to reorganize for the benefit of creditors. As Dilworth noted in an internal response, "what has Mathu or VTI done to stay outside litigation pending the MTD? This seems like an attempt to lay things on us for malpractice. It isn't a debtor issue and we represent the debtor and have to act in the best interest of the estate. . . . To me, I think Raf's prior firm screwed up and didn't raise things or appeal as they should have and they are looking for a scapegoat. We can win the MTDs if this tangential stuff not involving the debtor was handled by an attorney retained by Mathu." *Id.*

### 3. The Delaware Voluntary Bankruptcy is Dismissed for Bad Faith

On May 17, 2021, the Delaware Bankruptcy Court dismissed the Delaware Voluntary Case, finding that it had been filed in bad faith. The Court's opinion is scathing and confirms the validity of Dilworth's criticism concerning Zahralddin-Aravena's strategy:

> [T]he weight of the evidence, including the timing of the filing days before the Chancery Court was to enter a mandatory injunction permanently enjoining the debtor from laying claim to substantially all of Stream's assets, indicates that Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the omnibus agreement, vitiate the purpose and effect

8

of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor for his own benefit. . . .

Following the loss in Chancery Court and the entry of the injunction order Mr. Rajan established VTI of which he is the controlling shareholder, president, and until recently the sole director.  Using VTI he began to fundraise using Stream's assets despite the injunction.

It is clear, through documentary evidence, that Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value. . . .

This behavior and apparent attempts to avoid the effects of the omnibus agreement and Chancery Court order all for the benefit of Stream's insiders supports the conclusion that Stream did not come to this court as the honest but unfortunate debtor to preserve and maximize value for its stakeholders.

The debtor and VTI, however, have urged this court to look beyond the Chancery Court order and prepetition events leading thereto and highlight their plans and ability to put forth a reorganization that would lead to payment, in full, of its creditors including SLS and Hawk if Stream would be permitted to continue with its filing; however, the repeated maneuverings of Mr. Rajan, the timing of the filing, and the initial goals of the proceeding in the face of the Chancery Court's order cannot be ignored or cured. . . . "The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." . . .

[T]he debtor did not come to this court in good faith, but rather to make one last ditch effort to take away the value and control given to the secured creditors prior to commencement of this case and to redistribute it back to the Rajan[s].

App. Ex. 1 at 13:16-19:7.

> **4.   The Collusive Rembrandt Settlement, Bad Faith Involuntary Chapter 7, and the VTI-Rembrandt Alliance**

On May 18, 2021, Dilworth reported internally that, with his Chapter 11 strategy having failed, "Raf reports that there is substantial interest among unsecured creditors in an involuntary. .

. . We will stay completely out of all of that and Mathu should as well since SeeCubic will try to characterize everything as being engineered by Mathu. He just needs to stand down and let the creditors make whatever decision is in their best interests." App. Ex. 18. Rather than "standing down," Zahralddin-Aravena and the Rajan brothers orchestrated a remarkably conflicted set of transactions with Rembrandt 3D Holding Ltd. and its affiliates ("Rembrandt") in an attempt to achieve through an involuntary bankruptcy what they failed to do through the voluntary Chapter 11, i.e., "through VTI obtain [Stream's assets] at a fraction of what [Rajan] believed was the assets' value." App. Ex. 1 at 14:25-15:4.

Rembrandt was prosecuting litigation against Stream, Rajan, and Raja Rajan in the United States District Court for the Southern District of New York, where it sought unsuccessfully to enforce a settlement term sheet negotiated by Hawk representative Shad Stastney (as Vice Chairman and CFO of Stream). *See* App. Ex. 19. Stream, led by Mathu and Raja Rajan, vigorously opposed and fought for a determination that the settlement term sheet was not enforceable. *Id.* In an April 20, 2025 email, Raja Rajan described the term sheet at issue as designed "intentionally to bankrupt Stream," a sentiment confirmed by Stream's New York counsel, who the following day stated that "the whole thing stems from the actions of a former officer of Stream TV (Shadron 'Shad') who proposed [a] term sheet for settlement with Rembrandt (although not finalized) that would essentially wreck the company finances." *Id.* The S.D.N.Y. ultimately held that the settlement term sheet was unenforceable and the parties remained in active litigation over Rembrandt's claims of intellectual property infringement by Stream. App. Ex. 20.

On May 22, 2021 – just five days after the dismissal of the Delaware Voluntary Bankruptcy as having been filed in bad faith – Bud Robertson, using his "Stream Acquisition Group" email address, set up a Zoom meeting entitled "Stream TV/Rembrandt," copying Zahralddin-Aravena,

10

Raja Rajan, Rembrandt's principals, and Rembrandt's attorney Christopher Michaels.  App. Ex. 21.  On May 23, 2021, Zahralddin-Aravena sent Michaels and Robertson (using his VTI email address) a document entitled "Stream – Joint Defense Common Interest Agreement with VTI and Committee," asking him to "review and return to protect VTI and Rembrandt's interests."  App. Ex. 22.  The executed agreement stated that its purpose was "setting forth [the parties'] agreements regarding certain disputed intellectual property rights asserted by Rembrandt[,]" and expressed their "desire to cooperate in developing and pursuing a common legal strategy in order to protect their respective legal rights and interests in connection with the IP[,]" i.e., Rembrandt's claims against Stream.  App. Ex. 23.

Later the same day, Michaels sent Zahralddin-Aravena a draft settlement agreement among Stream, Rembrandt, and the Rajans (the "Stream Settlement Agreement") and a term sheet between Rembrandt and VTI.  *See* App. Ex. 24.  The Stream Settlement Agreement, executed the same day by Mathu Rajan (on behalf of himself and Stream), Raja Rajan, and Steven Blumenthal on behalf of Rembrandt, called for, *inter alia*, Stream to make immediate payment of a $1,528,000 lump sum plus monthly payments ranging from $28,000 to $40,000 through December 2030, and immediate delivery to Rembrandt of 100 television units plus the right to tens of thousands of additional units at cost in the future.  App. Ex. 25 at ¶¶ 6, 15.  While the Stream Settlement Agreement states that each party was represented by counsel in connection with the document, *id.* at ¶ 19, the evidence shows that Stream lacked its own independent counsel.  Raja Rajan was party to the agreement and involved with VTI and was thus conflicted, and Zahralddin-Aravena was conflicted because of his representation of VTI.

Given that Stream was insolvent with no ongoing operations and no ability to make the payments or delivery of product required by the Stream Settlement Agreement, and the fact that

11

just weeks prior Raja and Stream's counsel had described a substantially identical agreement[4] as designed to intentionally bankrupt Stream, the Stream Settlement Agreement was clearly signed solely for the purpose of providing Rembrandt with bogus creditor status, as Attorney Michaels explained to Zahralddin-Aravena: "Assuming all the documents are agreeable to the Rajans and Stream, this should fully resolve the litigation and Rembrandt will be a creditor with no disputes on amounts owed." App. Ex. 24.

Rembrandt wasted no time in exploiting its bogus creditor status, filing an involuntary Chapter 7 petition against Stream in the United States Bankruptcy Court for the District of Delaware (Case No. 21-10848) the very same day that Michaels and Zahralddin-Aravena negotiated and arranged for the execution of the Stream Settlement Agreement. App. Ex. 26. Also on May 23, 2021, Rembrandt (through Blumenthal) and VTI (through Rajan) entered into a "Payment Agreement" that purported to "provide terms for an investment in Rembrandt by VTI and for modification of a settlement agreement between Stream . . . and Rembrandt." App. Ex. 27. The payment agreement further stated that "VTI agrees to approve a Debtor In Possession budget with Stream that includes a cure amount or critical vendor payment of $1,400,000 to be paid to Rembrandt . . . . Any amounts paid by VTI . . . will be refunded to VTI once Rembrandt is paid by Stream whether through a bankruptcy or a successful intellectual property litigation result." *Id.* at ¶¶ 3-4. This arrangement—where VTI was directing that Stream's bankruptcy budget include large payments to the very creditor that had just filed the involuntary petition— exemplifies the three-way entanglement of Rajan/VTI/Rembrandt that Zahralddin-Aravena would import wholesale into the Pennsylvania bankruptcy cases two years later.

---

[4] As represented by Rembrandt in a filing with this Court, the Stream Settlement Agreement had terms "nearly identical to those negotiated in mediation" in the New York case. D.I. 789 at ¶ 44.

On May 27, 2021, SeeCubic filed an emergency motion for an order dismissing the Delaware Involuntary Bankruptcy, arguing, *inter alia*, that the case should be dismissed for the same reasons the Delaware Voluntary Bankruptcy had been dismissed.  App. Ex. 28.  The next day, Attorney Michaels emailed Zahralddin-Aravena "to touch base on strategy and next steps. . . . I am thinking that our best strategy would be to initiate an action against SeeCubic and potentially Shad personally prior to our answer."  App. Ex. 29.

On June 5, 2021, VTI and Rembrandt executed a comprehensive financing and litigation funding arrangement in which VTI agreed to, *inter alia*: (1) purchase 5% of Rembrandt-Nevis shares over five years for up to $25 million; (2) fund all of Rembrandt's legal costs in the bankruptcy proceedings and any action against SeeCubic; (3) receive a 50% decision-making interest and 50% share in proceeds of any SeeCubic lawsuit funded by VTI; (4) provide Rembrandt-Delaware with a $10 million revolving credit facility; and (5) arrange for AT itself to serve as escrow agent for fund disbursements.  App. Ex. 30.  AT was a direct beneficiary of the agreement, which stated that

> Armstrong Teasdale, as the project manager of the litigation through funding by VTI to provide litigation funding support and escrow agreement that provides for payments to Ferry Joseph, P.A., Brown & Michaels, PC, and SVS 3D Consulting Services and [sic] Armstrong Teasdale with a minimum back end retainer of $2,000,000 for all firms. . . . As lead attorneys for the litigations contemplated herein, Armstrong Teasdale shall have 100% decision-making authority with regard to legal strategy, at the direction of VTI, notwithstanding reasonable consultation with other counsel below.

*Id.* at ¶ 5.

On June 10, 2021, Michaels emailed Zahralddin-Aravena and Jack McLaughlin (counsel to the petitioning creditors) stating: "I imagine that Eben [Colby, attorney for SeeCubic,] will want to know about the relationship between VTI and Rembrandt.  We have three relevant agreements:

13

1) the joint defense agreement; 2) the payment agreement; and 3) the financing agreement.  I imagine we want to keep all three from disclosure under Work Product Doctrine." App. Ex. 31. Zahralddin-Aravena responded that he agreed "all three are attorney work product and protected" and instructed Attorney McLaughlin to "make the objection on the basis that we are considering the chapter 7 route as we have that optionality," which Attorney McLaughlin declined to do. *Id.* The email chain serves as remarkable consciousness of guilt from Attorney Zahralddin-Aravena, who laid bare the plan to frivolously invoke the attorney-client and work product doctrines to conceal material agreements between Rembrandt and VTI.

The Delaware Bankruptcy Court was not deceived by Zahralddin-Aravena's scheme.  On June 10, 2021, Judge Karen Owens dismissed the involuntary Chapter 7 case with prejudice and barred Stream from filing another bankruptcy for one year, App. Ex. 32, stating from the bench that "it's clear to me that this proceeding was filed as another attempt by the parties to circumvent my dismissal order, gain some sort of litigation leverage over the secured lenders and the disputes in the Chancery Court, and essentially get another bite of the appl[e] to try and pursue the previously submitted plan and theories that are already considered and rejected in the prior Chapter 11 proceeding." App. Ex. 33 at 63:24-64:6; *see also id.* at 34:24-35:22 (Judge Owens states in response to Stream's suggestion that the case be converted to a Chapter 11 for purposes of advancing a plan sponsored by VTI that she was "really trying to control my temper. . . . I don't feel like I can continue to sit here silently, as I should sit silently when I was hearing statements that seem to be contradictory to the TRO that was in place in the Chancery Court.  So I just want to tell you I have many concerns, and I'm extremely troubled by what has been put forth in the supposed plan and in VTI's joinder.").

14

With his bad faith involuntary bankruptcy scheme a failure, on June 26, 2021, Zahralddin-Aravena emailed, *inter alia*, Mathu Rajan (at his VTI email address), Attorney Michaels, Attorney McLaughlin, and Attorney Chris Ward (who appeared on behalf of Stream in the Delaware Involuntary Bankruptcy), with a "VTI Meeting Agenda" to "clarify assignments" for various tasks central to Stream, including litigation in the Southern District of New York and appeals of the dismissals of the Delaware Voluntary Bankruptcy and Delaware Involuntary Bankruptcy, further establishing his role as the architect of Stream's bankruptcy strategy.  App. Ex. 34.

In July 2021, Zahralddin, while still at AT, attempted to formalize what had been his de facto simultaneous representation of VTI and Rembrandt by sending proposed conflict waivers to both clients.  App. Ex. 35.  The proposed waiver to Rembrandt contained a signature block for Zahralddin-Aravena and stated that AT "represents VTI with respect to acquiring technology and assets from the Stream TV bankruptcy," and that representing Rembrandt "with respect to potential litigation related to [its] intellectual property rights" was somehow unrelated to the work which had been performed for VTI.  *Id.*  While the VTI waiver was signed by Zahralddin-Aravena, it is unclear whether either waiver was fully executed.  *Id.*  The same day, Zahralddin-Aravena sent a proposed letter to VTI and Rembrandt confirming AT's engagement to represent Rembrandt with VTI as a third-party payor.  App. Ex. 36.  Like the conflict waivers, it is unclear whether the Rembrandt engagement letter was ever signed.

As late as January 2022, Rembrandt was expressing concern about VTI's ability to fund its obligations to Rembrandt, with Zahralddin-Aravena instructing them to email Rajan directly.  App. Ex. 37.

15

### 5.     VSI's Formation and Continuation of the Scheme

On April 4, 2022, Visual Semiconductor, Inc. ("VSI") was incorporated in Wyoming by Rajan, its founder, president, and controlling shareholder.  App. Ex. 38 and 39.  Bud Robertson—who had been Zahralddin-Aravena's point of contact for VTI—was identified as VSI's contact person.  App. Ex. 39.

On July 31, 2022, Attorney Michaels forwarded Zahralddin-Aravena, who had by that time moved from AT to LBBS, all of the agreements involving Rembrandt and VTI, stating that "Rembrandt has 100% fulfilled its end of the agreement, only question left is when are the Rajans/Stream/VTI going to fulfill their end."  App. Ex. 40.  The same day, Attorney Micheals exchanged emails with Zahralddin-Aravena at LBBS indicating that Rajan was attempting to renege on the Stream Settlement Agreement: "I think you can get a sense of how we are reacting to Mathu's latest claims that we have insufficient proof. . . . Any discussion of proof was relevant prior to the settlement agreement and we have ended that litigation."  App. Ex. 41.

On August 18, 2022, Attorney Jonathan Stemerman of AT emailed Zahralddin-Aravena at LBBS with an "FYI.  Mathu, Stream and others were sued for breach of fiduciary duty, conversion, and other causes of action by Hawk," an update Zahralddin-Aravena immediately passed on to Attorney Michaels.  App. Ex. 42.

On October 3, 2022, Zahralddin-Aravena emailed Attorney Michaels an opinion from the Chancery Court case and noted that Hawk would likely start foreclosures on Stream assets within 10 days.  App. Ex. 43.  On October 17, 2022, Hawk filed an action pursuant to 8 Del. C. § 225 in the Delaware Chancery Court (the "Section 225 Litigation") seeking an order confirming Stastney as sole director of Stream subsidiary Technovative Media, Inc.  The Section 225 Litigation was filed

16

after ownership of the Technovative shares was transferred to Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to satisfy the outstanding indebtedness (the "Marshaling Directive"). Stream refused to comply with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the Marshaling Directive.

. . . Hawk responded by filing the Section 225 Action to resolve whether Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17, 2022.  On October 20, 2022, the Delaware Chancery Court entered an order providing that, pending resolution of the Section 225 Action, Technovative was to operate according to the status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action on the issue of whether Stream defaulted under the Hawk Notes.  On November 29, 2022, the Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the underlying factual findings were undisturbed, such that Stream was collaterally estopped from challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes, including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023 . . . .

App. Ex. 44 at pp. 6-7.

17

B.      **The Filing of the Instant Cases**

1.      **The March 2023 Bankruptcy Filing**

On March 15, 2023 (the "Petition Date"), Stream and Technovative (together, the "Debtors") filed voluntary petitions for relief under Chapter 11 in this Court (Bankr. E.D. Pa. Case Nos. 23-10763 and 23-10764), which were signed by Rajan, Zahralddin-Aravena, and another LBBS attorney. *See* D.I. 1. The petitions were filed one day before Stream was scheduled to appear in the Chancery Court for a pre-trial conference in the Delaware Section 225 action, and eight days before a one-day trial on the merits that had been scheduled in that action. *See* D.I. 431 at p. 12. In his First Day Declaration, Rajan expressly admitted that the bankruptcy filings were "necessitated" by the Chancery Court allowing the Secured Creditors "to unlawfully seize, retain, and use the Debtor's assets." D.I. 48, ¶ 94. Thus the Debtors came to this Court for the same reason they filed the two bankruptcies in Delaware, i.e., as a last-ditch effort to circumvent the rulings of the Chancery Court and to benefit Rajan at the expense of the Debtors' secured creditors. At the time of filing, Zahralddin-Aravena had a multi-year, continuous relationship with Rajan and VTI, as well as with Rembrandt and its counsel Christopher Michaels. None of these relationships were adequately disclosed to this Court.

2.      **LBBS's Retention Application and Zahralddin-Aravena's Misleading Declarations Concealed Their History of Working to Further the Interests of Rajan, VTI/VSI, and Rembrandt**

On April 3, 2023, the Debtors filed an Application to Employ LBBS as counsel, accompanied by a declaration from Zahralddin-Aravena. App. Ex. 45. In that declaration, Zahralddin-Aravena swore that "[n]either LBBS nor any attorney of LBBS represents any entity other than Debtors in, or in connection with, Debtors' chapter 11 cases," that "LBBS is a 'disinterested person' as that term is defined in section 101(14) of the Bankruptcy Code," and that

18

"other than disclosed in this Declaration, neither I nor LBBS has any connection with Debtors, their creditors, . . . or any other party with an actual or potential interest in these chapter 11 cases (or their respective attorneys or accountants)." *Id.*, D.I. 70-1 at ¶¶ 1-3. The declaration further stated that, "[b]efore filing these cases, [VSI], an investor in the Debtor, paid a flat non-refundable fee payment on behalf of the Debtors in the amount of $50,000.00 in preparation for filing the Chapter 11 bankruptcies. VSI has been advancing payments for [Stream's] expenses in exchange for equity in [Stream]. . . . There is no balance remaining." *Id.* at ¶ 8. The declaration further disclosed that Zahralddin-Aravena,

> while working at a prior firm, Elliot Greenleaf P.C., represented Stream TV as a creditors rights and restructuring lawyer in a Chancery case in 2019 which sought an injunction to prevent self-help by certain creditors. He withdrew from the case with permission of the Court after three weeks and was replaced by substitution counsel. He also represented a special purpose vehicle which was to facilitate financing for Stream TV in a bankruptcy filed in Delaware while a lawyer at Armstrong Teasdale in 2020. These prior representations do not pose any material adverse interest.

*Id.* at Ex. A.

Zahralddin-Aravena's initial declaration was materially false and misleading in multiple respects:

- **First,** with respect to the Chancery case, Zahralddin-Aravena failed to disclose that he represented not only Stream, but also its principals Mathu and Raja Rajan, and that he requested to withdraw from that matter due to "the client[s'] insist[ence] upon taking action . . . with which the lawyer has a fundamental disagreement," App. Ex. 2 at ¶ 8 (quoting Del. Prof. Cond. R. 1.16(b)(4);

- **Second,** Zahralddin-Aravena was not involved in "a bankruptcy filed in Delaware," he was involved in both the Delaware Voluntary Bankruptcy and the Delaware Involuntary

19

Bankruptcy, which had not ended in 2020 (as the phrase "in 2020" implies) but instead were both filed in 2021;

- **Third,** in the context of the Delaware bankruptcies, Zahralddin-Aravena did not merely represent "a special purpose vehicle" to "facilitate financing."  As documented above, he was the architect of Stream's bankruptcy strategy in both cases, drafted motions for and provided legal advice directly to Dilworth (the Debtor's counsel) in the Delaware Voluntary Case, coordinated with Rembrandt and the Rajans to engineer a sham settlement agreement with Rembrandt necessary to the filing of the Delaware Involuntary Bankruptcy, represented the interests of both VTI and Rembrandt simultaneously by virtue of the joint defense agreement (at a minimum, and possibly directly due to the AT-Rembrandt engagement letter), and structured the tripartite VTI-Stream-Rembrandt alliance that he would now introduce into the instant bankruptcy (with VSI substituted for VTI).  Importantly, Zahralddin-Aravena failed to mention the result of the Delaware bankruptcies, i.e., dismissal due to the finding that "the debtor did not come to this court in good faith, but rather to make one last ditch effort to take away the value and control given to the secured creditors prior to commencement of this case and to redistribute it back to the Rajan[s]," App. Ex. 1 at 19:3-7, the same misconduct LBBS was attempting to perpetrate in this Court;

- **Fourth,** Zahralddin-Aravena failed to discuss his continued representation of VTI and advancement of Rembrandt's interests after the dismissal of the Delaware Involuntary Bankruptcy, and continuing until at least October 2022;

- **Fifth,** Zahralddin-Aravena failed to disclose that VSI—the entity controlled by Rajan that was funding LBBS's fees—was not the independent outside investor it was portrayed to be.  Zahralddin-Aravena acknowledged that the retainer was paid by VSI "on behalf of the

Debtors," but failed to disclose the full scope of the VSI relationship, including that VSI was directing litigation strategy, that Rajan wore simultaneous hats and controlled both Stream and VSI, and that VSI would obtain equity in Stream as compensation for its post-petition funding.

On April 7, 2023—within days of filing the retention application—Zahralddin-Aravena emailed the LBBS team with a candid admission that VSI was his true client: "The investor group funding VSI, the purchase order customers, and other vendors are all concerned about the chapter 7 conversion and we need this filed early today as a result." App. Ex. 46.  This email confirms that Zahralddin-Aravena was taking his direction from the "investor group funding VSI" and prioritizing their concerns over those of the Debtors' creditors—the opposite of the disinterested representation LBBS was sworn to provide.

On April 13, 2023, responding to inquiries from the United States Trustee (which he initially ignored and which had to be reraised), Zahralddin-Aravena provided supplemental disclosures that exacerbated LBBS's disclosure issues by further minimizing his conflicted roles. App. Ex. 47.  Among other things, Zahralddin-Aravena:

- Stated with respect to the Chancery Litigation and fees owed by Stream to unsecured creditor Elliott Greenleaf that "John M. Elliott decided by fiat that the case would be dropped so that the firm could pursue other matters and he engaged in actions in the case and its withdrawal which led to Mr. Zahralddin-Aravena resigning from the firm a few months later. . . . [Zahralddin-Aravena] holds no interest in any fees owed to Elliott Greenleaf."  The statement contradicts Zahralddin-Aravena's motion to withdraw from the Chancery Litigation – which swore that Zahralddin-Aravena needed to withdraw because of disagreement with the client's strategy, see App. Ex. 2 at ¶¶ 4, 8, 10, not because of his then-partner's "fiat" – and failed to mention that Zahralddin-Aravena at the time had pending counterclaims against Elliott Greenleaf in state court

21

litigation, thus providing him with a potential interest in the firm's fees. *See* App. Ex. 48 at ¶¶ 393, 412 (6/29/22 Answer with New Matter and Counterclaim filed by, inter alia, Zahralddin-Aravena asserting counterclaim against Elliott Greenleaf for breach of contract seeking indemnification and payment of a "pro rata share of . . . profits"); and

- described VTI as "the special purpose vehicle which was to finance and act as plan sponsor in Stream's first chapter 11 but was never able to finance the case as the matter was dismissed before DIP financing or a plan moved forward.  As such VTI was not paid or received any consideration for any services it performed, if any, and it is not owed anything by the debtor or its principals."  App. Ex. 47.  These representations again were materially incomplete in that they omitted VTI's coordinated role in both Delaware bankruptcies, the VTI-Rembrandt financing arrangement, Zahralddin-Aravena's own work product for the involuntary proceedings, and the ongoing nature of the VTI/VSI-Rembrandt-Rajan alliance.

On April 28, 2023, Zahralddin-Aravena filed a supplemental declaration in support of LBBS's employment application, swearing that:

- "On or about March 3, 2023, Mathu Rajan . . . contacted me regarding a potential bankruptcy filing for Stream . . . [and LBBS] prepared an engagement letter dated March 7, 2023. . . . LBBS did not provide any services to the Debtors prior to March 14, 2023."  App. Ex. 49 at ¶ 6.  This statement created the clear implication that LBBS was uninvolved with any issues related to Stream prior to March 2023, which is plainly false given that Zahralddin-Aravena's representation of Stream in the instant bankruptcy represented his continuation as Rajan/VTI/VSI's tool in efforts to usurp the assets of the Debtor for the benefit of Rajan and Rembrandt.  Indeed, when Zahralddin-Aravena moved to LBBS in late 2021, he continued to serve the same Rajan/VTI/Rembrandt alliance in exactly the same way he had at AT.  In July 2022, Michaels

22

forwarded to Zahralddin-Aravena at LBBS all existing Rembrandt-VTI agreements, noting that "Rembrandt has 100% fulfilled its end of the agreement, only question left is when are the Rajans/Stream/VTI going to fulfill their end." App. Ex. 40. Zahralddin-Aravena responded the same day, engaging with Michaels concerning the Stream Settlement Agreement. App. Ex. 41. These emails and others demonstrate Zahralddin-Aravena was, while at LBBS, actively managing the obligations arising from agreements he had structured at AT. On October 3, 2022 — just five months before the bankruptcy filing — Zahralddin-Aravena emailed Michaels to advise that Hawk would likely start foreclosures on Stream's assets within ten days. App. Ex. 43. This communication, sent while Zahralddin-Aravena was at LBBS, constitutes intelligence about the Debtor's most critical strategic situation shared with Rembrandt — a party whose interests were directly at odds with the Debtors' secured creditors and potentially with the Debtors' estates themselves. A lawyer who was genuinely not connected to Stream-related matters before March 2023 would have had no such communication and no basis for making it. Finally, the engagement letter was dated March 7, 2023 and Zahralddin-Aravena claims Rajan first contacted him on or about March 3, 2023. This chronology is implausible given the years-long continuous relationship. The "first contact" on March 3 was not an introduction between strangers — it was the continuation of a relationship that had been active since at least 2020. The declaration's framing creates the false impression of an arm's-length engagement when in fact LBBS's involvement from day one was an extension of the VTI/VSI-Rembrandt-Rajan network that Zahralddin-Aravena had been managing for years;

- "LBBS advised representatives of VSI that LBBS does not represent VSI, and that LBBS's duty of undivided loyalty is owed to the Debtors." App. Ex. 49 at ¶ 7. The statement is

23

clearly false given the statement made just weeks prior, i.e., Zahralddin-Aravena's insistence that a filing be made at the behest of VSI's investors. *See* App. Ex. 46;

- "[T]o the extent Elliott Greenleaf is a creditor of the Debtors, I am not entitled to any portion of any potential recovery on such claim, and I am unaware of any basis that Elliott Greenleaf would have a claim against me personally relating to any claim that Elliott Greenleaf may have in these bankruptcy cases," App. Ex. 49 at ¶ 11, again omitting that Elliott Greenleaf had asserted claims against Zahralddin-Aravena for stealing clients using firm resources and that Zahralddin-Aravena had a pending counterclaim against Elliott Greenleaf, *see* App. Ex. 48;

- In the Delaware Voluntary Bankruptcy, AT "was introduced to VTI through Lawrence G. McMichael, Stream's bankruptcy counsel in the case, and Mr. Rajan. . . . For the representation of VTI, Armstrong Teasdale took instruction from Tim McCarthy. . . . VTI sought to provide debtor in possession financing in the bankruptcy case to Stream and ultimately serve as plan sponsor. . . . Armstrong Teasdale's representation of VTI in this matter ceased upon dismissal of the bankruptcy case," App. Ex. 49 at ¶ 12. The claim that AT "took instruction from Tim McCarthy" is directly contradicted by Zahralddin-Aravena's own contemporaneous correspondence. Communications written while the Delaware Voluntary Case was pending show that Zahralddin-Aravena was taking instruction from Rajan directly, drafting motions for Dilworth at Rajan's direction, and coordinating strategy with Rajan and VTI together. The email in which Zahralddin-Aravena wrote to Dilworth, "Mathu has asked me to pull together the research and a draft of the executory contract motion which we will then turn over to you all," App. Ex. 13, identifies Rajan — not Tim McCarthy — as the source of instruction. Similarly, Zahralddin-Aravena's warning to VTI about "no plan, undercapitalization, no DIP, etc.," App. Ex. 12, was addressed to Rajan's group, not to McCarthy. Moreover, Zahralddin-Aravena's declaration again

24

concealed the result of the Delaware bankruptcies – VTI was not simply seeking "to provide debtor in possession financing . . . and ultimately serve as plan sponsor," it was found by the Court to be the vehicle via which Rajan would usurp Stream's assets: "Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value." App. Ex. 1 at 14:25-15:4;

- AT "also represented VTI in [the Delaware Involuntary Bankruptcy]. . . . Armstrong Teasdale's representation of VTI in this matter ceased upon dismissal of the bankruptcy case." App. Ex. 49 at ¶ 13. The statement was misleading as AT's representation of VTI did not end with the May 17, 2021 dismissal. Zahralddin-Aravena continued to serve as the coordinator of the VTI-Rembrandt-Stream alliance throughout the summer and fall of 2021: the June 26, 2021 "VTI Meeting Agenda" coordinating litigation assignments post-dismissal, App. Ex. 34; a July 1, 2021 email considering an "alternative strategy for the creditors," App. Ex. 50; the July 14, 2021 conflict waiver documents sent to VTI and Rembrandt, App. Ex. 35; and the June 25, 2021 AT engagement letter to represent Rembrandt with VTI as third-party payor, App. Ex. 36, all postdate the dismissal and reflect ongoing active work for VTI's benefit, with Zahralddin-Aravena confirming in a January 3, 2022 email (over six months after dismissal of the involuntary) to Rembrandt that he was still VTI's attorney, App. Ex. 51; and

- LBBS "has never represented VSI, VTI, or Mr. Rajan. LBBS has no other connection, if any, with VSI, VTI, or Mr. Rajan other than has been disclosed in the Declaration and this Supplemental Declaration." App. Ex. 49 at ¶ 15. The statement was false, as Zahralddin-Aravena while at LBBS continued to communicate with Attorney Michaels in the same manner he

25

had while representing VTI at AT, sending Michaels multiple emails in 2022 and 2023 designed to advance the interests of VTI and Rembrandt. *See, e.g.,* App. Ex. 41.

### 3.    LBBS Continues to Serve VSI and Rembrandt's Interests

Throughout the bankruptcy proceedings, LBBS operated as a de facto agent of VSI and Rajan rather than as disinterested counsel to the Debtors' estates.   The evidence obtained in discovery confirms that the LBBS-VSI-Rajan relationship was pervasive. *See, e.g.,* App. Ex. 46 (Zahralddin-Aravena identifies the investor group funding VSI as his true constituency).

On April 24, 2023, at a hearing on the Debtors' motion to approve VSI-funded financing through the sale of Stream shares, Zahralddin-Aravena told the Court the Debtors were not selling shares to VSI post-petition and were awaiting approval.  D.I. 178 at 28:10-15; *see also id.* at 31:22-32:1 (Zahralddin-Aravena states that "we're coming to you because we know that there are grave consequences to not getting permission from the court.  So even when things are in the ordinary course people come to get permission, and that's what we did.").  This representation was false; Rajan later admitted that Stream had been issuing shares to VSI every week or two since the petition was filed, in exchange for VSI's post-petition funding of the Debtors.  D.I. 370 at 212:5-213:3.

On April 24, 2023, Zahralddin-Aravena also sent Attorney Michaels an email concerning a plan for Rembrandt.  App. Ex. 52.  This email—sent to counsel for a party whose interests were adverse to the Debtors' estates—confirmed that Zahralddin-Aravena was continuing to advance the Rembrandt side of the tripartite alliance he had constructed in the Delaware bankruptcies. *See also* D.I. 196 at 173:20-25 (9/8/25 hearing: when asked "[w]hat additional legal expenses did companies led by you incur that benefited Rembrandt[,]" Rajan testifies that Rembrandt "got all kinds of free legal work from Ackerman and Lewis Brisbois and Armstrong Teasdale").

On April 27, 2023, LBBS attorney Bennett Fisher sent an email concerning certain bonding equipment purportedly owned by the Debtor which demonstrates the inextricable entanglement between VSI and the Debtor: "One possibility to suggest: Raise money in VSI to fund purchase orders. VSI can manufacture/assemble the 3D TVs . . . to fill purchase orders (from Stream to VSI, based on Stream's purchase orders from its customers) for sale to Stream (for a small, but commercially appropriate markup) and then to be resold to Stream's customers." App. Ex. 53. Fisher noted that one of the "[d]isadvantages" of his plan was that "[t]he transaction between VSI & Stream must appear to be arms-length, which means that some consideration must be paid." *Id.*

On July 4, 2023, Zahralddin-Aravena emailed Rajan at length regarding the plan and disclosure statement, raising concern that the proposed VSI-Stream transaction would be seen as an "insider deal" and suggesting ways to structure it so it would not be characterized as one. App. Ex. 54. Zahralddin-Aravena noted that VSI's counsel at Akerman LLP ("Akerman") had cleared preliminary conflicts and that the key documents between the Debtor and VSI were needed for filing.[5]

On July 6, 2023, LBBS sent a confidentiality agreement to VSI's attorneys at Akerman. App. Ex. 55.

On July 8, 2023, Zahralddin-Aravena emailed VSI's attorneys at Akerman, attaching template documents for formulation of a Chapter 11 plan and related agreements, which he described as "really VSI's deal, so I am sending to you directly." App. Ex. 56. The email also references NDA and Joint Defense documents, indicating Zahralddin-Aravena's continuing intent to hide relevant interactions with parties adverse to the Debtors' estates. *See id.* ("Thanks for the

---

[5] Incredibly given its essential role in the Stream bankruptcy, VSI did not have independent counsel representing it in connection with this matter until after the date of this email, and did not have counsel entered in this proceeding until March 28, 2024. *See* D.I. 611.

call and [f]or letting me know that the NDA and Joint Defense documents are coming (thanks Chris Michaels as well).”); *cf.* App. Ex. 31. VSI’s control over LBBS’s representation extended further to VSI’s Akerman attorneys issuing direct instructions to LBBS concerning the adversary proceeding filed by the Debtors against their secured creditors—with an Akerman attorney stating that delay in drafting the complaint “is ridiculous. Client [VSI] wants it filed tomorrow.” App. Ex. 57. On August 4, 2023, Zahralddin-Aravena emailed Debtor principals, VSI principals, LBBS attorneys, and Akerman attorneys simultaneously, stating that “Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts—we need to get that list and make sure we are asking for injunctive relief.” App. Ex. 58.

Beginning in June 2023, the Debtors represented to the Court that a $300 million financing from Chinese investor Zhongsheng Group Holdings Ltd. (“Zhongsheng”) was imminent. On June 21, 2023, LBBS emailed Rajan concerning the proposed Zhongsheng term sheet, stating: “Any update on counsel for Zhongzhi Enterprise or Zhongsheng Group Holdings or if they will be providing a representative to testify in support of the Debtors? As we have stressed, this is critical. You have requested that we file a term sheet and subscription agreement (which Dale is reviewing), but LBBS still has not had any communications with either of these entities that may be providing equity funding.” App. Ex. 59. Despite this acknowledgment that LBBS had no direct contact with the purported $300 million investor, LBBS filed the Zhongsheng Term Sheet with the Court one business day before the June Hearings, D.I. 258, where it was submitted as evidence of a material pending transaction. On August 4, 2023, after receiving a Rule 11 letter from Hawk asserting the financing was “made up,” LBBS wrote internally: “We must take this letter seriously” and scrambled to find documentation connecting “Zhongzhi and Zhongsheng.” App. Ex. 60 and 61. This basic inquiry should have been performed before—not after—the term sheet was filed. The

28

Zhongsheng Term Sheet was later determined by this Court to have been fabricated, App. Ex. 44 at pp. 32-38, and LBBS facilitated that fraud on the Court.

### 4.      The Debtors' Monthly Operating Reports

Throughout the bankruptcy case, the Debtors filed Monthly Operating Reports ("MORs") reflecting no operations, no employees, no revenue, and no third-party payments. *See* App. Ex. 44 at p. 63. LBBS, as Debtors' counsel, was responsible for supervising its clients' MOR filings and ensuring their accuracy. At the August 2023 hearings, it was revealed—through Rajan's testimony—that VSI had allegedly paid approximately $2 million on behalf of Stream throughout the bankruptcy, D.I. 370 at 212:5-8, notwithstanding MORs reflecting $0 having been spent by third parties on the Debtors' behalf. Rajan characterized the repeated omissions from the MORs as an "oversight" which would be corrected in a few days. *Id.* at 203:9.

Despite Rajan's admission that the MORs were materially inaccurate, and his promises in open Court that they would be fixed promptly, LBBS failed to ensure that the MORs were correct for months, bringing the issue to a head only when it was clear that the pending motions to dismiss the case or appoint a Trustee were going to be granted. On October 17, 2023, an LBBS attorney reminded Zahralddin-Aravena and Stream insiders to

> Please recall that the August MORs have not been filed. The last time I communicated about this, I reminded you that there was a $2,000 transfer from VSI to Stream in August, with no explanation other than ". . . Mathu said to transfer the money because there was a bill that had to be paid by Stream. . . ." Such a transfer cannot be a loan because advance permission from the court, after notice and a hearing, is required before the debtor can borrow any money. I was then told that is was part of a previously executed subscription agreement, but I have not been provided with a copy of that agreement nor a memo detailing how this $2,000 was transferred pursuant to that agreement. The last I inquired (last week), I was told that this was not a priority. . . .

> The September MORs are due on Friday.  We currently have no information. . . . I know that Dan [Rink] is capable of providing the information, as is Bud, but the shell game of who is working for which company is confusing to me and I'm sure (at some point) it's confusing to creditors and the court.  The MORs are a pain in the ass, but it is the best means by which the US Trustee's office can keep tabs on cases.  Not filing them is a road to conversion.

App. Ex. 62 (first two ellipses in original).  Zahralddin-Aravena added his two cents, confirming that the MORs filed by LBBS to that date were inaccurate: "I need all drafts and all back up for the MORs we have to amend and the new ones we have to file.  This SNAFU is going to get the CASE CONVERTED.  I CAN'T BE MORE SERIOUS ABOUT THIS ISSUE." *Id.*

In a December 8, 2023, email, Zahralddin-Aravena sent an alarmed email to Rajan and LBBS attorneys: "can we please get the amended MORs filed before we get creamed on Monday – if you review [SeeCubic's exhibit] list you will see that they are using the current MORs as evidence as to how STREAM IS NOT OUR CLIENT and really it is VSI and as such we should **be disqualified from the case.**"  App. Ex. 63 (emphasis in original).

This Court later found that "[t]he failure of a debtor to properly report income and expenses constitutes evidence of gross mismanagement under §1112(b)(4)(B)" and that "Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable."  App. Ex. 44 at p. 60.  The Court found that "there is no reason that Mr. Park, as the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and finances should not have ensured the disclosure of the funding arrangement with VSI in the MORs.  The fact that it was not done, that it became clear only at Trial, and that the Debtors did not file the Revised MORs until *December* is a breach of the Debtors' fiduciary duties to the estates' creditors and its disclosure obligations

to the Court.  The Court simply does not believe Mr. Rajan that the lack of disclosure was an oversight." *Id.* (emphasis in original).

The U.S. Trustee's December 29, 2023, Motion to Dismiss Debtors' Cases for Cause (D.I. 534) confirmed the pattern of MOR failures, stating that the Debtors: (i) consistently filed reports late or not at all; (ii) engaged in serial amendments calling into question whether any filed information was accurate; (iii) failed to provide information to the U.S. Trustee sufficient to corroborate the filed reports; and (iv) failed to comply with a Rule 2004 Order, including failing to produce a witness competent to testify and making an incomplete document production. D.I. 534 at ¶¶ 3, 44, 46-48, 58.

### C.    The Court's January 2024 Findings and Appointment of the Chapter 11 Trustee

On January 5, 2024, after a multi-month evidentiary hearing on Hawk's pending motions, this Court issued its Memorandum (D.I. 548, App. Ex. 44, the "Trustee Memorandum") finding that cause existed to appoint a Chapter 11 trustee under 11 U.S.C. §§ 1104(a)(1) and (a)(2). The Court's findings constituted a sweeping indictment of the way Rajan—and, by necessary extension, LBBS as Debtor's counsel—had administered the Debtors' estates.

In this regard, this Court held, among other things, that:

- "Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtor's operations moving forward, these cases have stalled at virtually every turn.";

- "[T]he evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtor's cases to date, *i.e.*, the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management."; and

- "There are many examples, large and small, that highlight . . . the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court . . . [and] the relatively directionless nature of these cases to date . . . ."

App. Ex. 44 at p. 31.

Of particular concern was the fact that the "Debtors have proposed certain major transactions in these cases benefitting VSI without clear benefit to the Debtors or the Estates":

> The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles. Certain transactions the Debtors have proposed have only reinforced that concern. As discussed *supra*, the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI. It was therefore denied. The unauthorized post-petition issuance of shares in Stream to VSI also raises serious questions about the administration of these cases for the benefit of VSI. These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

*Id.* at p. 46 (formatting altered).

This Court detailed how the Debtors' proposals "created serious questions about how and for whose benefit these cases are being administered," and the evasive way the Debtors presented that request to the Court. *See id.* at pp. 46-48 ("In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales."); *id*. at p. 50 (detailing concern with a Debtor-proposed licensing covenant which was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries. The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries.").

As this Court held, "[e]ach of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment." *Id.* at p. 51.

Specifically, the Court found the Debtors had grossly mismanaged the estates by: (i) presenting a fabricated $300 million transaction with Zhongsheng; (ii) creating a funding crisis regarding SCBV's payroll; (iii) transferring Stream shares to VSI without adequate disclosure or permission, including misrepresenting to the Court that no such transfers had occurred; (iv) proposing transactions, including the distribution agreement with VSI and the licensing covenant between VSI, Rembrandt, and Stream, that benefited VSI at the expense of the estates; and (v) failing to support the existence of purchase orders and other purported customers with any documentary evidence. *Id.* at pp. 56-60.

The Court further held that cause existed to grant Hawk relief from the automatic stay to conclude the Delaware Section 225 Action. *Id.* at pp. 73-74. While the Court declined to convert or dismiss the cases at that stage—finding that an unconflicted trustee was needed to evaluate the Debtors' assets and reorganizational prospects—it made clear that the appointment of a trustee was an extraordinary remedy warranted by the complete breakdown of confidence in Rajan's management and the role played by Debtor counsel LBBS. *Id.* at pp. 72-73. The Trustee Memorandum stated that the Court needed "a neutral, unconflicted party to deal with VSI at arms-length," *id.* at 73, a tacit acknowledgment that LBBS, as Debtors' counsel, had itself failed to fulfill its fiduciary to the estate by mitigating Rajan's misconduct.

33

On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony as Chapter 11 Trustee.  D.I. 554.  On January 12, 2024, the Court entered the Order approving the appointment of Mr. Homony as Trustee.  D.I. 558.

**D.      Post-Appointment Events and the LBBS Fee Applications**

**1.      LBBS Continues to Advocate for VSI Even After the Trustee's Appointment**

Even after the Trustee's appointment (which was necessitated by, *inter alia*, the Debtors' taking action for the benefit of VSI and Rembrandt), Zahralddin-Aravena continued to provide active legal assistance to VSI and Rembrandt—parties adverse to the estate—in matters directly related to the bankruptcy.   LBBS directly advocated on VSI's behalf during negotiations with the Trustee, including at a March 7, 2024, demonstration of the Debtors' technology conducted by VSI.  D.I. 808, Objection at ¶ 87.  In May 2024, Zahralddin-Aravena was involved in a "VSI-Stream Strategy Call" with VSI's counsel Baskin, Rembrandt's counsel Michaels, and others.  App. Ex. 64.  On May 1, 2024, he was sending edits on documents for the benefit of VSI and Rembrandt. App. Ex. 65.  On May 3, 2024, he directed his staff to send Rembrandt a sample order disallowing claims and attempted to conceal this work by billing it under the "Stream account receivable collection" matter.  App. Ex. 66.  On May 16, 2024, Baskin told Zahralddin: "I think that you too can reply [to a request for an expedited status conference] as you still represent Stream," Zahralddin-Aravena responded: "Not opposed."  App. Ex. 67.   In separate emails dated May 24, 2024 and June 1, 2024, Zahralddin-Aravena emailed Baskin and Rembrandt advice concerning filing mechanics.  App. Ex. 68 and 69.  On June 4, 2024, Zahralddin-Aravena emailed caselaw to Michaels, Baskin, and Rajan, stating "Doesn't this validate Rembrandt's standing?"  App. Ex. 70. On October 10, 2025, Zahralddin-Aravena forwarded documents from Rembrandt's adversary proceeding to VSI.  App. Ex. 74. This conduct—occurring after the Court's explicit findings

concerning the Debtors' gross mismanagement and the VSI-Rajan entanglement—confirms that

LBBS's loyalties throughout its representation lay with VSI and Rajan, not with the Debtors'

estates and their creditors.

### 2. The Final LBBS Fee Application, the Trustee's Objection Thereto, and LBBS's Rule 11 Motion

On August 28, 2024, LBBS filed the Final Application of LBBS for Allowance and

Payment of Compensation and Reimbursement of Expenses for the Period from March 15, 2023

through January 15, 2024 (D.I. 723) (the "Final Fee Application"), seeking final Court approval

for $2,928,159.00 in professional services fees and $49,799.10 in expense reimbursement, net of

prior voluntary reductions, for a total of $2,977,958.10.

On October 28, 2024, LBBS and the United States Trustee filed a stipulation (D.I. 773)

(the "UST-LBBS Stipulation") resolving the U.S. Trustee's informal objection to the Final Fee

Application through an agreed reduction of $235,226, capping the amount of fees for which LBBS

was permitted to seek allowance. *See also* D.I. 779 (Order Granting UST-LBBS Stipulation,

entered October 31, 2024).

On November 20, 2024, the Trustee filed his Objection of William A. Homony, Chapter

11 Trustee, to the Fee Applications (D.I. 808) (the "Fee Objection"), seeking denial of the Final

Fee Application in its entirety.  The Fee Objection details LBBS's sworn misrepresentations and

omissions, failure to maintain disinterestedness, failure to ensure accurate and timely MOR filings,

advancement of VSI's interests at the expense of the Debtors' estates, and the general unworthiness

of compensation for services that were found by this Court to have been rendered primarily for the

benefit of VSI, Rajan, and Rembrandt rather than the Debtors' creditors.

35

On March 6, 2026, LBBS filed its Sanctions Motion against undersigned counsel, seeking to have the Fee Objection stricken and to impose attorney's fees against the Trustee's counsel. D.I. 1185.

### E.      To This Day, LBBS Is Serving The Interests of its True Client, Mathu Rajan

To this day, LBBS continues to advance the interests of Rajan, VTI, and VSI without regard to its duties to the Debtors.  On December 31, 2025, Zahralddin-Aravena and LBBS filed a motion to stay on behalf of VTI and Rajan in *Bunce v. VTI, et al.*, E.D. Pa. No. 23-cv-01740-KNS, stating that LBBS had been retained "[a]s of December 23, 2025." App. Ex. 71 at ¶ 4.  Notably, prior to LBBS's entry into the case, the *Bunce* court held that VTI was Rajan's alter ego and that Rajan, through VTI, "attempted to enrich himself by maintaining control over Stream TV during its bankruptcy" and "was using VTI to funnel money into Stream TV's bankruptcy proceedings[] in contradiction of VTI's representations to Plaintiff." App. Ex. 72 at pp. 8-11, 16.  At his deposition, Attorney Zahralddin-Aravena testified that, in addition to representing Rajan and his alter ego VTI, LBBS currently represents VSI.  App. Ex. 4 at 132:5-11.

### III.    ARGUMENT

### A.      Rule 9011 and Section 1927 Impose A High Bar that LBBS Cannot Meet

Federal Rule of Bankruptcy Procedure 9011(b) provides that an attorney who signs a pleading filed in a bankruptcy case certifies that, to the best of his knowledge, information and belief, formed after reasonable inquiry under the circumstances, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.  Rule 9011 "adopts Rule 11 of the Federal Rules of Civil Procedure . . . with only minor changes for use appropriate to bankruptcy cases." *In re Revco D.S., Inc.*, 126 B.R. 741, 745 (Bankr. N.D. Ohio 1991).  "In deciding whether to impose Rule 11 sanctions, a court must assess

36

whether the conduct was reasonable under the circumstances.   The Third Circuit defines reasonableness as objective knowledge or belief at the time of the filing of the challenged paper that the claim was well-grounded in law and fact.   Sanctions should be imposed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *CT Install Am., LLC v. Boryszewski*, 2024 WL 4582885, at *2 (E.D. Pa. Oct. 25, 2024) (internal quotation marks and citations omitted).

This Court has "made plain [its] distaste for use of" Rule 9011, which "should be very narrowly construed and applied . . . for use only in exceptional circumstances, where counsel's work product is patently frivolous and/or his motivations are improper." *In re Smith*, 111 B.R. 81, 85 (Bankr. E.D. Pa. 1990) (quotation marks and citations omitted).   In other words, Rule 9011 sanctions are imposed only "where it is 'clear that a claim has absolutely no chance of success.'" *In re Freeman*, 540 B.R. 129, 143 (Bankr. E.D. Pa. 2015) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986)).

Section 1927 provides that

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.   "To violate § 1927, an attorney must be found to have: (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct.   A party seeking an award of attorney's fees under § 1927 bears a heavy burden.   Courts should exercise discretion to award § 1927 sanctions only in instances of a serious and studied disregard for the orderly process of justice.   The Third Circuit has held that sanctions may not be imposed under § 1927 absent a

37

finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal.  The attorney's conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *CT Install*, 2024 WL 4582885, at \*2-\*3 (internal quotation marks, alteration marks, and citations omitted).

  **B.**  **The Trustee's Fee Objection Has Substantial Merit**

    **1.**  **The Factual Record Demonstrates that LBBS's True Loyalties Lied With Rajan and VSI and Accordingly It Was Not Disinterested and Was Not Working For the Benefit of the Estate**

11 U.S.C. § 328(c) expressly states that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." *See also U.S. Tr. v. Price Waterhouse*, 19 F.3d 138, 142 (3d Cir. 1994) ("[W]e interpret Section 328(c) to mean that if a non-'disinterested' professional person is improperly employed, or if a professional person ceases to be 'disinterested' 'at any time during such professional person's employment,' the court may deny compensation and reimbursement.").[6]  Furthermore, Section 330(a)(4)(A) of the Bankruptcy Code provides that the court "shall not allow compensation" for services that were not "reasonably likely to benefit the debtor's estate."  "In adjudicating . . . fee applications, the fundamental premise must be that fees

---

[6] Accordingly, LBBS's argument that the Trustee's Fee Objection represents an "attemp[t] to relitigate a final-non appealable order which approved the retention of LBBS," LBBS's Memorandum in Support of Sanctions Motion, D.I. 1185-1 ("R. 11 Br"), at pp. 5-6, 12-14, is meritless.

are awarded as an administrative expense only to the extent that the services were rendered to or for the benefit of the debtor's estate.  Services rendered to or for the benefit of the principals of the debtor are not compensable as an administrative expense." *In re By-Rite Oil Co.*, 87 B.R. 905, 914 (Bankr. E.D. Mich. 1988) (denying fees where counsel for chapter 11 debtor pursued sale for benefit of principal and his company and not for benefit of debtor's estate or creditors).

As set forth in detail above, the facts supporting the Trustee's Fee Objection under both standards are overwhelming as LBBS failed to give full disclosure of Zahralddin-Aravena's multi-year, conflicted relationship with Rajan, VTI, and Rembrandt, including (a) that Stream's prior bankruptcies were dismissed as bad faith filings designed to benefit Rajan and VTI, (b) that Zahralddin-Aravena took direction from VSI's investors and Akerman attorneys, (c) that Zahralddin-Aravena negotiated the Stream Settlement Agreement which resulted in Rembrandt joining as a petitioning creditor in the Debtor's Delaware Involuntary Bankruptcy Case and filing of a $1.2 billion claim against the Debtors in this bankruptcy case,[7] and (d) Zahralddin-Aravena going so far as to describe the Chapter 11 plan filed by him as "really VSI's deal."  Moreover, VSI represented the only possible source of funds to pay LBBS, which necessarily influenced LBBS's allegiances.  These facts support the conclusion that LBBS was not disinterested from the outset, or at minimum ceased to be disinterested during the case, and that the millions of dollars of work for which it is now attempting to bill the estate was not performed for the benefit of the estate, but rather for the benefit of VSI and Rajan.

LBBS, as counsel representing the Debtors-in-Possession, had a fiduciary responsibility to the Debtors' estates and to the bankruptcy court.  *In re Wilde Horse Enterprises, Inc.*, 136 B.R.

---

[7] On April 14, 2023, Rembrandt filed a Proof in Claim in the amount of $1.2 Billion, citing the Stream Settlement Agreement as a basis.  *See* Stream Claim No. 2-1; *see also* Technovative Claim No. 26-1.

830, 840 (Bankr. C.D. Cal. 1991) ("In a Chapter 11 proceeding, the attorney for debtor in possession, as an officer of the court charged to perform duties in the administration of the case, has a high fiduciary duty to the estate represented. . . . [C]ounsel for a corporate Chapter 11 debtor in possession owes a fiduciary duty to the corporate entity estate—the client—and represents *its* interests, not those of the entity's principals." (emphasis in original)); *Brown v. Gerdes*, 321 U.S. 178, 182 (1944) ("In all [reorganization] cases persons who seek compensation for services or reimbursement for expenses are held to fiduciary standards."); *In re T & D Tool, Inc.*, 125 B.R. 116, 120 (E.D. Pa. 1991) ("A debtor-in-possession and counsel who represent it are fiduciaries for the creditors in the highest sense of the term fiduciary.") (internal citations and quotation marks omitted)).  It is readily apparent that LBBS breached its fiduciary duties by devoting an inordinate amount of time advancing positions which, as described in detail herein, were from their outset designed to benefit VSI, Rajan, and Rembrandt.

The services rendered by LBBS, which were already found by this Court to run to the benefit of VSI[8] (as was previously the case regarding the Delaware bankruptcies and VTI), posed no reasonable likelihood of benefit to the Debtors' estate and should not be paid from estate funds. S*ee, e.g.*, *In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861-62 (Bankr. D. Del. 2004) ("[C]hapter 11 is [not] a license to perform services and generate fees in a vacuum without

---

[8] The Trustee Memorandum contains this Court's explicit finding that "[e]ach of [a number of the] transactions [entered into by the Debtors or presented to the Court while the Debtors were represented by LBBS] have had the taint of benefit to VSI without clear benefit to the Debtors and their estates.  Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment."  App. Ex. 44 at p. 51. Because the Court found that the transactions LBBS facilitated (i.e., the VSI Distribution Agreement, the VSI-Rembrandt Licensing Covenant, and the unauthorized share issuances) benefitted VSI and not the estate, services performed by LBBS in connection with those transactions have already been found to not have been "reasonably likely to benefit the debtor's estate."

considering the possibilities of recovery for the professional's constituents.  The Court must conduct an objective inquiry based upon what services a reasonable professional would have performed in the same circumstances.") (internal quotation marks, alteration marks, and citations omitted); *In re Sandra Cotton, Inc.*, 91 B.R. 657, 659 (W.D.N.Y. 1988) (no benefit where the services rendered actually impeded the administration of the estate); *In re By-Rite Oil Co.*, 87 B.R. at  915 (services rendered by counsel for chapter 11 debtor in connection with aborted sale of debtor's assets were not compensable where counsel for chapter 11 debtor pursued sale for benefit of principal and his company and not for benefit of debtor's estate or creditors); *In re Zweig*, 35 B.R. 37, 38 (Bankr. N.D. Ga. 1983) (debtor's counsel was denied fees for services which produced benefit to the debtor but not to the estate); *In re Clayton Grain Elevator, Inc.*, 30 B.R. 760, 762 (Bankr. W.D. La. 1983) (corporate debtor's counsel was denied fees for services which benefited controlling shareholders but had only secondary effect on debtor).

Moreover, LBBS and Attorney Zahralddin-Aravena failed to make complete and accurate disclosures which would have enabled the Court and parties in interest to understand the full extent of its connections with Rajan, VSI, and Rembrandt.  *See supra* at Section II.B.2.  Prior to an applicant's approval as counsel to the debtor, the Federal Rules of Bankruptcy Procedure require the applicant to "state . . . any proposed arrangement for compensation[,] and[] to the best of the applicant's knowledge, all of the [applicant's] connections with the debtor, creditors, [and] any other party in interest . . . ."  Fed. R. Bankr. P. 2014(a) (formatting altered).  The purpose of this requirement is for parties in interest and the bankruptcy court to confirm that the applicant qualifies as a "disinterested person" for the purposes of the Bankruptcy Code.  *See* 11 U.S.C. § 327(a) ("Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that

41

are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.").

The Third Circuit has held that "[u]nder [Rule 2014(a)], all facts that may be pertinent to a court's determination of whether an attorney is disinterested or holds an adverse interest to the estate must be disclosed." *In re Jade Mgmt. Servs.*, 386 F. App'x 145, 150 (3d Cir. 2010) (internal quotation marks, alteration marks, and citations omitted)); *In re Vascular Access Cntrs., L.P.*, 613 B.R. 613, 625 (Bankr. E.D. Pa. 2020) (citing *Jade Mgmt. Servs.*, 386 F. App'x at 150). "These disclosures are not discretionary and lawyers cannot pick and choose which connections are irrelevant or trivial." *Vascular Access*, 613 B.R. at 625 (quotation marks, alteration marks, and citations omitted). "Furthermore, it is not the obligation of the bankruptcy court to search the record for possible conflicts of interest. Instead, that obligation belongs to the party who seeks employment by the estate." *Id.* (internal quotation marks and citations omitted). "[N]egligence does not excuse the failure to disclose a possible conflict of interests." *In re BH & P , Inc.*, 949 F.2d 1300, 1318 (3d Cir. 1991) (quotation marks and citation omitted). "Accordingly, an attorney's subjective good faith efforts are not the measure of the duty of disclosure under Rule 2014(a) and are irrelevant." *Vascular Access*, 613 B.R. at 625 (citing *In re BH & P, Inc.*, 949 F.2d at 1318). "Courts have held that professionals who do not proceed carefully under the requirements of Rule 2014(a) do so at their own risk." *Id.* (internal quotations, alterations, and citations omitted). "Violation of Rule 2014(a) alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connection or fee arrangements were materially adverse to the interests of the estate or were *de minimis*." *Id.*

As set forth in detail above, Attorney Zahralddin's declarations were incomplete and misleading as to Debtor's prior bankruptcy cases, his role in those bankruptcies, and the fact that

42

LBBS's true loyalties lay with Rajan and VSI, and his declaration that his "prior representations do not pose any material adverse interest" is false. Had the truth been told as to the Delaware bankruptcy proceedings—especially in tandem with the fact that VTI successor VSI was the funding source for the payment of LBBS's fees—that required disclosure would have thoroughly debunked the notion that LBBS was a "disinterested person" for purposes of the instant bankruptcy. While Attorney Zahraldin's declaration cleverly mischaracterized his involvement as simply representing "a special purpose vehicle which was to facilitate financing for Stream TV," full disclosure would have revealed that the entity he represented in the Delaware Voluntary Bankruptcy Case – VTI – played the same conflicted role as that played by VSI in the instant bankruptcy case.

Given the foregoing discussion, the Trustee's Fee Objection was not filed for an improper purpose, was supported by existing law and a substantial factual record, and has not unreasonably and vexatiously multiplied these proceedings. Accordingly, this Court has no basis to impose sanctions under Rule 9011 or Section 1927, and LBBS's Sanctions Motion should be denied.

### 2. LBBS Violated Its Duty to Present Accurate and Timely Information Concerning the Debtors' Operations

As Debtors' counsel, LBBS "was responsible for supervising [its] client's conduct and instructing [it] to ensure compliance with the Bankruptcy Code." *In re Grasso*, 586 B.R. 110, 157 (Bankr. E.D. Pa. 2018) (citing *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19, 26 (2d Cir. BAP 1997) ("The debtor's attorney, while not a trustee, nevertheless is charged with the duty of counseling the debtor in possession to comply with its duties and obligations under the law.")); *In re Food Management Group, LLC*, 380 B.R. 677, 708 (Bankr. S.D.N.Y. 2008) (recognizing that an attorney "cannot simply close his or her eyes to matters

43

having an adverse legal and practical consequence for the estate and creditors" (quotation marks

and citation omitted)).

LBBS failed spectacularly in its duty to present accurate and timely information concerning

the Debtors' operations to the Court.  As this Court held:

> The already-discussed transactions and requested relief that appear
> to be primarily for the benefit of VSI are reason enough to find that
> Mr. Rajan has engaged in gross mismanagement of the Debtors'
> estates.  Another glaring example, however, is the Debtors' failure
> to revise knowingly false monthly operating reports, on which the
> Court and all interested parties rely in assessing the Debtors' post-
> petition performance and prospects, until December, months after
> the initial MORs were filed.  Furthermore, as discussed *infra*, the
> Revised MORs … appear to represent facts regarding payments VSI
> has made on behalf of Stream that contradicts Mr. Rajan's testimony
> at Trial, leaving the Court and interested parties unclear as to the
> Debtors' post-petition operations and finances. . . . Importantly in
> the context of these cases, the failure of a debtor to properly report
> income and expenses constitutes evidence of gross mismanagement
> under §1112(b)(4)(B). . . .
>
> Mr. Rajan's flippant explanation for why VSI's millions of dollars
> in payments on behalf of Stream in exchange for Stream shares was
> not disclosed on its MORs is unacceptable.  The Court does not
> attribute any credibility to Mr. Rajan's explanation that this lack of
> disclosure was due to an oversight or attributable to his
> hospitalization. There is no reason that Mr. Park, as the nominal
> CFO of the Debtors, or someone else with knowledge of the
> Debtors' operations and finances should not have ensured the
> disclosure of the funding arrangement with VSI in the MORs. The
> fact that it was not done, that it became clear only at Trial, and that
> the Debtors did not file the Revised MORs until December is a
> breach of the Debtors' fiduciary duties to the estates' creditors and
> its disclosure obligations to the Court. The Court simply does not
> believe Mr. Rajan that the lack of disclosure was an oversight.

App. Ex. 44, Trustee Memorandum at 59-60.

LLBS's shortcomings in that regard are detailed in the December 29, 2023 Motion of the

United States Trustee to Dismiss Debtors' Cases for Cause (D.I. 534, the "U.S. Trustee Motion"),

which alleged that the Debtors' "chapter 11 cases should be dismissed because of the Debtors' (i)

44

failure to timely file accurate and complete reports, (ii) failure to provide information requested

by the U.S. Trustee, and (iii) failure to comply with the Rule 2004 Order of the Court, including a

failure to attend the oral examination with a witness competent to testify and make a complete

production of Court ordered documents":

- "The Debtors have consistently filed reports late, if at all, and have engaged in serial amendments thereto, calling into question whether any of the information of record and signed under penalty of perjury is accurate or merely a placeholder for yet more amendments to come," U.S. Trustee Motion at ¶ 3;

- "The Debtors have not provided information to the U.S. Trustee sufficient to corroborate the information contained in their filed reports. Indeed, the incomplete information that has been provided to the U.S. Trustee indicates that the filed reporting is inaccurate," *id.* at ¶ 4;

- "[T]he Debtors were required to file the first [Bankruptcy Rule 2015.3] Periodic Report [concerning the Debtors' interests in foreign entities] by April 28, 2023, and the next report was due not later than six (6) months thereafter.  The Debtors have not filed any Periodic Report, the first of which is now more than eight (8) months overdue and the second of which is two (2) months overdue," *id.* at ¶ 26;

- "Because the Debtors failed to produce a person prepared and qualified to testify about the topics and the information set forth in the Subpoena, the U.S. Trustee was unable to proceed with the Court ordered [Rule 2004] Examination. This notwithstanding that the Examination was scheduled by the Rule 2004 Order to be held on November 13, 2023, and had been adjourned for more than a month due to the Debtors' failure to produce the documents that had been required by October 25. . . . The documents submitted by the Debtors in response to the Subpoena remain inadequate and fail to provide a complete, accurate, and transparent picture of the financial condition of the Debtors. The Debtors have failed to make complete production of underlying supporting documents, including, without limitation, business ledgers, including income, expense, and payroll statements; accounts payable and receivable journals; and all statements, invoices, and receipts for expenses," *id.* at ¶¶ 36-37;

- "Bankruptcy Code sections 1106 and 1107(a) require a debtor in possession to file the financial reports required by section 704(a)(8). Rule 2015(a) of the Federal Rules of Bankruptcy Procedure also imposes these reporting requirements upon the debtor. Local Bankruptcy Rule 2015-1 requires the debtor to file a copy of the MORs on the docket.  The UST Guidelines explain the reporting requirements and were provided to and discussed with the Debtors. Nevertheless, the Debtors have not filed the MORs on a timely basis. Even more troubling, the Debtors filed MORs and amended MORs that contain inaccurate, contradictory information that demonstrates a failure

45

of transparency with respect to their financial condition. In addition to the issues identified with the untimely and inaccurate MORs, the Debtors have simply failed to file the required Periodic Reports," *id.* at ¶ 44;

- "The Debtors have repeatedly filed untimely MORs throughout the entirety of these bankruptcy cases. Untimely filing of monthly operating reports constitutes 'cause' for dismissal or conversion under Bankruptcy Code section 112(b)(4)(F)," *id.* at ¶ 46;

- "Additionally, the MORs that have been filed have contained numerous contradictory and inconsistent entries that have necessitated multiple rounds of amendments.  Even still, the figures reported in the filed MORs do not match the financial records supplied to the U.S. Trustee pursuant to the production of documents set forth in the Subpoena.  The rolling, incomplete, and incorrect disclosures, on the docket and to the U.S. Trustee, additionally constitute cause for conversion or dismissal," *id.* at ¶ 47;

- Relatedly, simply filing the correct form on time is insufficient to comply with section 1112(b)(4)(F) when the timely filed document contains grossly erroneous material information. 'Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is . . . relevant [under § 1112(b)(4)(F)],'" *id.* at ¶ 48 (*quoting In re Tucker*, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009)); and

- The Debtors' continued failure to provide complete, accurate and transparent disclosures; to comply with the provisions of the Bankruptcy Code, the Federal and Local Bankruptcy Rules, and the UST Guidelines requiring timely filing of the MORs and Periodic Reports; and the failure to comply with the Rule 2004 Order, all as set forth above, demonstrates that the Debtors are unable and unwilling to serve as a fiduciary. By failing to comply with their duty to make spontaneous, full, complete, and timely disclosure in the reporting of their financial matters, the Debtors have failed to comport with their responsibilities as fiduciaries of their estates.  Against that factual backdrop, the Debtors cannot satisfy their burden of demonstrating that the bankruptcy filings are filed and operated in good faith," *id.* at ¶ 58.

Here, this Court's findings concerning the Debtors' egregious behavior with respect to the accuracy and timely filing of its MORs justifies denial of fees to LBBS, as they demonstrate that LBBS "either negligently or willfully failed to implement sufficient client control to ensure that the Debtor complied with the Bankruptcy Rules and Code[.]" *In re Grasso*, 586 B.R. at 157 (citing *In re Zagara's Fresh Markets, LLC*, 2006 WL 4452980, *3 (Bankr. D.N.J. Apr. 13, 2006)

(recognizing the obligation of the debtor's attorney "to supervise clients' conduct for compliance with the Bankruptcy Code" and "instruct the debtor on the appropriate conduct and must develop client control")); *In re Berg*, 268 B.R. 250, 262 (Bankr. D. Mont. 2001) (recognizing that debtor's attorney "must instruct the debtor on appropriate conduct and must develop client control"); *In re Whitney Place Partners*, 147 B.R. 619, 620-21 (Bankr. N.D. Ga. 1992) ("[T]he debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided.").

The above-described gamesmanship and utter disregard of the Rules and this Court's Orders demonstrate misconduct so extensive as to preclude mere negligence; the Debtors' failures while under LBBS's active stewardship could have been nothing but intentional and warrants denial of LBBS's fee application in its entirety. *See In re Grasso*, 586 B.R. at 145 (denying fee application of Chapter 11 debtor's attorney fee due to his failure to provide competent legal representation to debtor in bankruptcy case, which rendered his services valueless to the estate); *In re APW Enclosure Sys., Inc.*, 2007 WL 3112414, at *4 (Bankr. D. Del. Oct. 23, 2007) ("Courts have consistently reduced attorneys' fees for failure to meet the quality of representation expected of competent counsel.").

## C.      LBBS's Arguments Are Factually and Legally Baseless

### 1.      The Estate Is Not Administratively Insolvent and LBBS's Lead Argument Is Nonsensical

LBBS's lead argument – i.e., that because undersigned counsel "admit[s] that this case is administratively insolvent. . . . [i]t is clear that the Trustee has an ulterior motive to knock out the largest administrative creditor to get itself [sic] paid," thus establishing an improper purpose for

47

Rule 11 purposes – is factually baseless. *See* R. 11 Br. at pp. 10-12.[9]  As LBBS is aware by virtue

of the Trustee's Monthly Operating Reports, the Stream Debtor reports a cash balance of over $8

million since the January 3, 2025 closing on the sale of substantially all the Debtors' assets and

accordingly has ample funds to pay administrative expenses. *See, e.g.,* Bankr. D.I. 1173.

In support of its clearly erroneous contention that "this case is administratively insolvent,"

LBBS cites only a September 25, 2025 Declaration filed by Attorney Zahralddin-Aravena in

support of LBBS's reply to the Trustee's fee application objection. *See* R. 11 Br. at p. 10 (citing

Bankr. D.I. 1098-3 at ¶ 58).  The pertinent paragraph of that declaration states:

> LBBS, as an administrative claimant, asked the Chapter 11
> Trustee's counsel to provide information to determine whether or
> not the estate was administratively insolvent in the summer of 2024
> and then recently as part of discussions to extend the deadline for
> the trustee to object to the LBBS fees.  The Chapter 11 Trustee's
> counsel, Michael Vagnoni, responded that the case has always been
> administratively insolvent.  When pressed further Mr. Vagnoni said
> he "believed" that the carve out would be funded.

Bankr. D.I. 1098-3 at ¶ 58.  To the extent that Attorney Zahralddin-Aravena's declaration avers

that Attorney Vagnoni "recently[, i.e., close in time to September 25, 2025,] as part of discussions

to extend the deadline for the trustee to object to the LBBS fees" stated the estate was

administratively insolvent, the declaration was clearly false when made, as the Trustee's fee

objection was filed nearly a year prior to the supposed discussion. *See* Bankr. D.I. 808 (Trustee

Objection to LBBS Fee Application, filed on 11/18/2024).

---

[9] *See also id.* at p. 15. ("Because the case is administratively insolvent and the Respondents wish
to knock out the largest administrative creditor to ensure that the Respondents get paid, they are
clearly proceeding in '(2) [] an unreasonable and vexatious manner.'"); Bankr. D.I. 1185-2
(LBBS's Proposed Order requesting that this Court find that "The Respondents acted with an
improper purpose in failing and maintaining the objections because Respondents acted with an
ulterior motive to sustain these cases to knock out the largest administrative creditor to get
Respondents pain [sic].").

It is telling that LBBS leads off with the gratuitous and offensive contention that the Trustee filed the LBBS Fee Objection because doing so was the only way to "get itself paid" and has supported its argument only with the clearly false contention that the estate is administratively insolvent. Given the more than $8 million in funds currently in the estate – and despite having to defend himself and the estate against an unrelenting onslaught of litigation brought by VSI and Rembrandt – estate funds are sufficient to pay administrative expenses even should this Court order the payment of LBBS's fees in full. Accordingly, LBBS has failed to establish that the LBBS Fee Objection was filed for an improper purpose.

Ironically, the cases LBBS cites on improper purpose indicate that it is LBBS which should be subject to Rule 9011 sanctions by virtue of its aiding and abetting Rajan, VSI, and Rembrandt's continuation of the bad faith conduct found in the Delaware bankruptcies. In *In re Coquico, Inc.*, 508 B.R. 929, 944 (Bankr. E.D. Pa. 2014), sanctions were imposed against a Chapter 7 debtor's principal and counsel after the petition was found to have been filed in bad faith for purpose of avoiding a judgment creditor when counsel was involved in the bankruptcy planning and filing, knew prepetition of the principal's complete reversal on the issue of ownership of the debtor's intellectual property assets, and had "ghostwrote" pleadings filed to advance the debtor's baseless position. *See also id.* at 948 ("It is clear that [the debtor's principal and counsel] together were intent on abusing the legal system to whatever extent was necessary to avoid losing the intellectual property assets."). In *In re Delaware Valley Lift Truck Inc.*, 640 B.R. 342, 350-52, 356-57 (Bankr. E.D. Pa. 2022), this Court sanctioned a law firm that had pursued a Chapter 11 bankruptcy for an entirely improper purpose—to stall a separate shareholder action in district court by one of the debtor's co-owners and effectuate a sale of the debtor's assets premised upon diverting a substantial portion of the purchase price to the owner which had been sued. These cases resonate with this

49

Court's substantiated concerns "about the administration of these cases for the benefit of VSI," App. Ex. 44, Trustee Memorandum at p. 46, conduct which LBBS enabled despite knowing from the outset that substantially similar attempts to avoid Stream's secured creditors were dismissed as bad faith filings in the Delaware bankruptcies.

> **2.      LBBS's Argument That Its Stipulation With the United States Trustee "Resolved All Questions Regarding the Reasonableness and Propriety of LBBS's Fees" Is Specious**

LBBS argues that the UST-LBBS Stipulation "resolved all questions regarding the reasonableness and propriety of LBBS's fees" and thus that the Trustee's Objection is "frivolous" and "shows a complete lack of understanding of the Bankruptcy Code." *See* R. 11 Br. at pp. 12-14.   The contention is unsupported by fact or law, and itself "shows a complete lack of understanding of the Bankruptcy Code."

As with its administrative insolvency argument, LBBS is relying on blatant factual misrepresentations in support of its frivolous Rule 11 Motion.  The UST-LBBS Stipulation in no way, shape, or form "resolved all questions regarding the reasonableness and propriety of LBBS's fees."  To the contrary, it simply states that "the U.S. Trustee raised an informal objection . . . to the relief requested in the Final Fee Application" and that the objection was being "resolved . . . through an agreed reduction of $235,226.00," effectuated via LBBS and the UST's stipulation that "LBBS shall not seek allowance of, or payment on, any amounts beyond the Reduced Compensation Request [of $2,742,732.10]."  Bankr. D.I. 773 at Whereas Clauses and ¶¶ 1-2. Indeed, the UST-LBBS Stipulation expressly states that it "is without prejudice to the rights and interests of all other parties in interest, including, without limitation, the Chapter 11 Trustee, whatever those rights and interests may be."  *Id.* at ¶ 3.  Moreover, the same day that LBBS's Fee Application was filed, an attorney with the Office of the Unites States Trustee noted in an email

50

subsequently forwarded to LBBS that "[w]e'll need to consider our response.  I'm sure there will

be objections from the purported secured creditors and the chapter 11 trustee (at least with respect

to timing by Homony)."  App. Ex. 73.

While LBBS fails to cite to specific provisions of the Bankruptcy Code purportedly

misunderstood by Respondents,[10] the Trustee presumes from the brief's next section that LBBS is

referring to 28 U.S.C. § 586(a)(3)(A), which provides:

> Each United States trustee . . . shall . . . supervise the administration
> of cases and trustees in cases under chapter . . .11 . . . by, whenever
> the United States trustee considers it to be appropriate . . . [,]
> reviewing  .  .  .  applications  filed  for  compensation  and
> reimbursement under section 330 of title 11[] and [] filing with the
> court comments with respect to each application and, if the United
> States Trustee considers it to be appropriate, objections to each
> application[.]

While Section 586(a)(3)(A) authorizes a UST to monitor and object to payment applications

"whenever [he] considers it to be appropriate," nothing in this section (or elsewhere in the Code)

grants the UST the exclusive authority to do so.  *See In re Busy Beaver Bldg. Centers, Inc.*, 19

F.3d 833, 842 (3d Cir. 1994) ( "[W]e think that Congress' grant of authority to the UST to

challenge fee petitions merely bestows the UST with standing and/or encourages the UST to do

so; it in no way signifies by negative implication that the bankruptcy court is without the power

and duty to review fee applications independently when the UST does not object.  Unless the

---

[10] Section B.1 of LBBS's brief is entitled "Respondents Completely Misapprehend the Bankruptcy
Code," R. 11 Br. at p. 12, yet fails to cite to the Bankruptcy Code.  The section cites only Fed. R.
Bankr. P. 9011(b)(2) and *In re Redante*, 579 B.R. 354, 362 (Bankr. E.D. Pa. 2018), a case which
generally discusses Rule 9011(b)(2)'s requirement that legal contentions a party presents to a court
be supported by existing law.

parties in interest or the bankruptcy courts take on this task, many if not most fee applications would receive no effective review.").[11]

To the contrary, Section 330 expressly provides that a court may award compensation to a professional person only "[a]fter notice to the parties in interest and the United States Trustee" and that "[t]he court may, on its own motion on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, *the trustee for the estate*, or any other party in interest, award compensation that is less than the amount of compensation that is requested."  11 U.S.C. § 330 (emphasis added).  Indeed, the Department of Justice's Chapter 11 Trustee Handbook[12] ("Ch. 11 Handbook") counsels that "[t]he trustee has a fiduciary obligation to review professional fee applications and to object where appropriate," taking into account factors which include "whether the services were necessary to the administration of the case, or beneficial at the time at which the services were rendered[.]"  Ch. 11 Handbook at pp. 70-71.

The Trustee was appointed precisely because this Court found gross mismanagement had occurred under Debtors' former management while represented by LBBS.  It would be a remarkable inversion of the Trustee's legal obligations to hold that he should have simply rubber-stamped a nearly $3 million fee application by the firm that served as counsel during the period of that gross mismanagement, particularly given the unique facts here, where this bankruptcy was

---

[11]  While LBBS cites *Busy Beaver* in support of the contention that "[t]he Third Circuit requires particularized objections by an objector and a hearing so that a good-faith applicant can have an opportunity to address any objection and to supplement their fee applications to address any deficiencies," R. 11 Br. at pp. 13-14, the case actually addressed whether a bankruptcy court has "the power and obligation to review fee applications which have not been the subject of an objection by a party in interest or the United States trustee."  *Busy Beaver*, 19 F.3d at 846.  The case does not address objections filed by parties in interest and in no way supports LBBS's insinuation that the Trustee is required to object to LBBS's fees on a line-item basis, rather than for a global failure to meet the requirements of the Bankruptcy Code.

[12] Available at https://www.justice.gov/ust/file/ch11handbook-200405.pdf/dl

Attorney Zahralddin-Aravena's third attempt to use the bankruptcy courts as a vehicle to funnel assets to Rajan at the expense of the Debtors' legitimate secured creditors. No case supports this absurd proposition, and LBBS cites none.

**3.    The Trustee Did Not Object to LBBS's Fees Based On Hindsight; To the Contrary, Rajan and Attorney Zahralddin-Aravena Have an Established History of Attempting to Misuse the Bankruptcy Courts to Usurp Stream's Assets For Rajan's Benefit**

LBBS contends the Trustee's objection is sanctionable because it relies on the "actual benefit" standard rejected by the Third Circuit in *In re Top Grade Sausage, Inc.*, 227 F.3d 123 (3d Cir. 2000), and is challenging LBBS's fees only with the benefit of hindsight. R. 11 Br. at pp. 13, 15. To the contrary, the Trustee's Objection correctly invokes the statutory standards of 11 U.S.C. §§ 328(c) and 330 (a)(4)(A). Under § 330(a)(4)(A), the relevant question is whether services were "reasonably likely to benefit the debtor's estate" — a prospective, objective inquiry, not the retrospective "actual benefit" test rejected in *Top Grade*. *See Top Grade*, 227 F.3d at 132 (adopting "the 'reasonably likely to benefit the debtor's estate' standard set forth in § 330(a)(4)(A)"). Moreover, the Trustee's Objection raises independent grounds rooted in Section 328(c) disinterestedness and disclosure failures that do not depend on any particular "benefit" standard.

The Trustee's Fee Objection is not based on hindsight. It was abundantly clear from the day LBBS filed this case on behalf of the Debtors that the only conceivable purpose served by the instant bankruptcy was to continue the pattern established in the two prior dismissed Delaware bankruptcies: using the courts as a mechanism for Rajan and his alter ego entities to usurp Stream's assets from its secured creditors. When counsel was affirmatively working at the direction of non-debtor third parties like Rajan, VSI, and Rembrandt to advance those parties' interests, such services were not "reasonably likely" to benefit the estate. This is a prospective, objective

53

standard, and it is the correct one under Third Circuit precedent.  Furthermore, the Trustee's Fee

Objection raises significant issues about LBBS's conflicts of interest and failures of disclosure that

go beyond a simple "benefit" analysis.

**4.      LBBS Fails to Establish Any Rule 9011 or Section 1927 Violation**

LBBS's attempt to satisfy the high bar that Rule 9011 and Section 1927 impose falls flat,

as the Trustee's Fee Objection was not filed for an improper purpose.  Simply stated, the Trustee

has a duty to review and, where appropriate, object to professional fee applications.  *See* 11 U.S.C.

§ 330; Ch. 11 Handbook at pp. 70-71.  Filing an objection expressly authorized by the Bankruptcy

Code and the Department of Justice's own guidelines for Chapter 11 trustees is, as a matter of law,

not an improper purpose under Rule 9011(b)(1).   The fact that LBBS finds the Objection

inconvenient or damaging to its interests does not transform a legitimate exercise of the Trustee's

fiduciary duty into sanctionable conduct.

The Objection is also plainly grounded in law and fact.  As set forth in detail in Section

III.B above, the Trustee's Objection rests on well-established statutory authority under 11 U.S.C.

§§ 328(c) and 330(a)(4)(A), as well as controlling Third Circuit precedent.  The factual record

supporting the Objection — which includes this Court's own detailed findings of gross

mismanagement; LBBS's internal emails confirming, inter alia, that Zahralddin-Aravena

described the Chapter 11 plan as "really VSI's deal"; Zahralddin-Aravena's years-long history of

working on behalf of Rajan to usurp the assets of Stream; the materially misleading retention

declarations; and the systemic MOR failures that occurred while LBBS served as Debtors' counsel

— is substantial and can hardly be labeled patently unmeritorious or frivolous.

Finally, the Trustee's Objection has not unreasonably or vexatiously multiplied these

proceedings within the meaning of Section 1927.  Filing a single objection to a fee application in

the normal course of bankruptcy administration is not multiplication of proceedings by any definition of that term. LBBS itself — not the Trustee — chose to respond to that objection by filing the Sanctions Motion, thereby generating the very additional proceedings as to which it now complains.

## V.   **CONCLUSION**

Considering the foregoing facts and authorities, the Trustee and his counsel respectfully submit that LBBS's Motion for Sanctions should be denied.

Respectfully submitted,

Dated: April 8, 2026

By: */s/ Steven M. Coren*
Steven M. Coren, Esquire
COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

and

By: */s/ Michael D. Vagnoni*
Michael D. Vagnoni, Esquire
Edmond M. George, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066

*Counsel to the Trustee*

55