**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** | : |
| | : **Chapter 11** |
| | : |
| **Stream TV Networks, Inc.,** *et al.* | : **Bankruptcy No. 23-10763 (DJB)** |
| | : |
| **Debtors.** | : **(Jointly Administered)** |
| | : |

**APPENDIX IN SUPPORT OF RESPONDENTS' OBJECTION TO THE MOTION OF
LEWIS, BRISBOIS, BISGAARD & SMITH LLP FOR SANCTIONS PURSUANT TO
<u>FED. R. BANKR. P. 9011 AND 28 U.S.C. § 1927</u>**

| App. Ex. No. | Description |
|---|---|
| 1 | Hearing Transcript dismissing STV's voluntary Ch. 11 dated May 17, 2021 (Trustee 27) |
| 2 | Elliott Greenleaf's Motion to Withdraw as Counsel for STV and Rajans dated November 18, 2020 (Trustee 1) |
| 3 | Nevada Business Portal Entity Information page – Visual Technology Innovations, Inc. |
| 4 | Deposition testimony of Rafael Zahralddin, taken on March 30, 2026 |
| 5 | Email dated January 11, 2021 from M. Rajan to R. Zahralddin re: Large VTI investor (Trustee 2) |
| 6 | Email dated January 12, 2021 from L. McMichael to M. Weis and A. Aaronson re: Stream TV |
| 7 | Email dated January 12, 2021 from L. McMichael to A. Aaronson and M. Weis re: Stream TV |
| 8 | DE #30 Stream's Motion for Post-Petition Financing dated March 1, 2021 (Trustee 3) |
| 9 | Email dated March 13, 2021 from R. Zahralddin to D. Going re: Call me if you have some time tomorrow or Sunday (Trustee 4) |
| 10 | Joint Defense Common Interest Agreement between VTI and STV dated March 16, 2021 (Trustee 8) |
| 11 | US Trustee's Omnibus Objection re: Dip Financing and Insurance motions filed on March 18, 2021 |
| 12 | Email dated March 15, 2021 from M. Rajan to A. Von Ahnen re: Substantive Consolidation (Trustee 5) |
| 13 | Email dated March 15, 2021 from R. Zahralddin to A. Aaronson, et al. re: Call with Team today, with attachments (Trustee 6) |
| 14 | Email dated March 30, 2021 from L. McMichael to A. Aaronson re: Schedules for discovery and hearing(s) (Trustee 14) |

| App. Ex. No. | Description |
|---|---|
| 15 | Email dated April 1, 2021 from L. McMichael to A. Aaronson and M. Weis re: VTI Response to MTD April 1 DRAFT--CONFIDENTIAL COMMUNICATION (Trustee 15) |
| 16 | Email dated April 21, 2021 from L. McMichael to A. Aaronson and M. Weis re: Stream: Proposed Orders and Deposition Schedules (Trustee 22) |
| 17 | Email dated April 24, 2021 from L. McMichael to A. Aaronson re: SeeCubic Stay Relief Motion (Trustee 23) |
| 18 | Email dated May 18, 2021 from L. McMichael to A. Aaronson and M. Weis re: Stream (Trustee 28) |
| 19 | Email dated April 21, 2021 from H. Cittone to L. McMichael, et al. re: Stream TV – Rembrandt litigation – Post-petition counsel appointment (Trustee 132) |
| 20 | SDNY DE #98 Order Adopting Magistrate Report & Recommendation dated April 15, 2021 (Trustee 21) |
| 21 | Email dated May 22, 2021 from B. Robertson to R. Zahralddin, et al. re: Zoom Meeting Link - Stream TV/Rembrandt – 3pm ET Today |
| 22 | Email dated May 23, 2021 from B. Robertson to R. Zahralddin, et al. re: zoom link for 130pm meeting now |
| 23 | Joint Defense and Common Interest Agreement entered into on May 23, 2021 |
| 24 | Email dated May 23, 2021 from C. Michaels to R. Zahralddin (12:25am) re: Rembrandt 3D IP Rights (Trustee 29) |
| 25 | Settlement Agreement Stream/Rembrandt dated May 23, 2021 (Trustee 31) |
| 26 | Ch. 7 Involuntary Petition filed May 23, 2021 (Trustee 146) |
| 27 | Payment Agreement between VSI and Rembrandt dated May 23, 2021 |
| 28 | DE Involuntary (21-10848) DE #5 SeeCubic's Emergency Motion to Dismiss filed on May 27, 2021 (Trustee 32) |
| 29 | Email dated May 28, 2021 from C. Michaels to R. Zahralddin re: Phone call (Trustee 33) |
| 30 | Term Sheet between VSI and Rembrandt dated June 5, 2021 |
| 31 | Email dated June 10, 2021 from C. Michaels to R. Zahralddin re: RE: VTI - Rembrandt Agreements (Trustee 42) |
| 32 | Order Granting Emergency Motion of SeeSubic and SLS for an Order Dismissing Ch. 7 Case entered on June 10, 2021 (Trustee 43a) |
| 33 | Transcript of Hearing before Judge Owens on June 10, 2021, DE Involuntary Dismissed With Prejudice (Bankr DE 21-10848, DI 37) (Trustee 43) |
| 34 | Email dated June 26, 2021 from C. Michaels to R. Zahralddin, et al. re: VTI Meeting Agenda Attorney Client Protected by Joint Defense Agreement(s) (Trustee 45) |
| 35 | Email dated July 14, 2021 from R. Zahralddin to M. Rajan, et al. re: P175379 VTI and Rembrandt 3D Conflict Waivers (Trustee 48) |
| 36 | Email dated July 14, 2021 from R. Zahralddin to M. Rajan, et al. re: Weaver Redline to P175379 Rembrandt 3D Engagement Letter copy v. 3.DOCX, with attachment (Trustee 49) |
| 37 | Email dated January 3, 2022 from R. Zahralddin to S. Blumenthal re: Call |
| 38 | VSI Articles of Incorporation dated April 4, 2022 (Trustee 139) |

| App. Ex. No. | Description |
|---|---|
| 39 | VSI Articles of Amendment dated December 31, 2022 (Trustee 140) |
| 40 | Email dated July 31, 2022 from C. Michaels to R. Zahralddin re: VTI-Rembrandt Term Sheet - Signed by VTI (Trustee 51) |
| 41 | Email dated Jul 31, 2022 from R. Zahralddin to C. Michaels re: VTI - Documents for SDNY Motion (Trustee 52) |
| 42 | Email dated August 26, 2022 from R. Zahralddin to C. Michaels re: ALERT – Transaction 67945772 |
| 43 | Email from R. Zahralddin to C. Michaels re: Last week |
| 44 | Memorandum - Trustee Opinion entered on January 1, 2024 (Trustee 87) |
| 45 | Stream TV's Application to Employ Lewis Brisbois Bisgaard & Smith filed on April 3, 2023 (Trustee 56) |
| 46 | Email dated April 27, 2023 from R. Zahralddin to M. Rajan, et al. re: STREAM; TECHNOVATIVE / Chap 11 (Trustee 57) |
| 47 | Email dated April 13, 2023 from R. Zahralddin to K. Callahan re: Stream TV Networks, Inc. 23-10763mdc Technovative Media, Inc. 23-10764mdc LBBS 327 Application, with attachment (Trustee 58) |
| 48 | Defendants' Answer to Plaintiff's Complaint with New Matter and Counterclaim, Montco CCP No. 2021-01427 |
| 49 | Supplemental Declaration of Rafael Zahralddin-Aravena in Support of Stream TV's Application to Employ Lewis Brisbois Bisgaard & Smith filed on April 28, 2023 (Trustee 60) |
| 50 | Email dated July 1, 2021 from C. Michaels to R. Zahralddin, et al. re: Stream TV Networks, Inc. - District Court Ruling on Motion for Stay (Trustee 47) |
| 51 | Email dated January 3, 2022 from R. Zahralddin to S. Blumenthal re: Call |
| 52 | Email dated April 24, 2023 from R. Zahralddin to C. Michael and B. Fisher re: Plan for Rembrandt (Trustee 59) |
| 53 | Email dated April 27, 2023 from B. Robertson to B. Fisher, et al. re: STREAM / Bonding Equipment, need to initiate operations |
| 54 | Email dated July 4, 2023 from R. Zahralddin to M. Rajan re: Disclosure Statement and assessment of Plan (Trustee 64) |
| 55 | Email dated July 6, 2023 from D. David to A. Swick and C. Michaels re: STREAM TV, INC.; Confidentiality Agreement, with attachment |
| 56 | Email dated July 8, 2023 from R. Zahralddin to A. Swick re: Zahralddin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB) (Trustee 68) |
| 57 | Email dated July 30, 2023 from R. Zahralddin to D. David, et al. re: 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX (Trustee 71) |
| 58 | Email dated August 4, 2023 from R. Zahralddin to B. Fisher, et al. re: Zahralddin, Rafael has shared a document with you : motion to withdraw the reference order brief and certificate of service.docx (49.6 KB) (Trustee 75) |
| 59 | Email dated June 21, 2023 from V. Alexander to M. Rajan, et al. re: Stream TV Networks, Inc. - Equity Funding (Trustee 62) |

| App. Ex. No. | Description |
|---|---|
| 60 | Email dated August 4, 2023 from V. Alexander to M. Rajan, et al. re: Stream - Rule 9011 Letter, with attachment (Trustee 73) |
| 61 | Email dated August 4, 2023 from V. Alexander to J. Shammah re: (no subject), w/ attachment (Trustee 74) |
| 62 | Email dated October 18, 2023 from R. Zahralddin to D. Rink, et al. re: THE COMEBACK TRAIL / MORs - August, September CONFIDENTIAL & PRIVILEGED (Trustee 141) |
| 63 | Email dated December 8, 2023 from R. Zahralddin to B. Fisher, et al. re: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX (Trustee 142) |
| 64 | Email dated May 7, 2024 from R. Zahralddin to P. Darivoff re: VSI-Stream Strategy Cal (Trustee 95) |
| 65 | Email dated May 1, 2024 from R. Zahralddin to C. Michaels re: Stream TV-Rembrandt objection to Secured Status of Claimants, w/ attachments (Trustee 90) |
| 66 | Email dated May 3, 2024 from R. Zahralddin to C. Michaels, et al. re: Order disallowing claim (Trustee 91) |
| 67 | Email dated May 16, 2024 from R. Zahralddin to L. Baskin re: Request for status conference—URGENT (Trustee 100) |
| 68 | Email dated May 24, 2024 from R. Zahralddin to C. Michaels, et al. re: TRO and related rules in EDPA (Trustee 102) |
| 69 | Email dated June 1, 2024 from R. Zahralddin to A. DeMarco re: 152032770109 Trustee objection and joinder to Hawk objection re: extending time (Trustee 103) |
| 70 | Email dated June 4, 2024 from R. Zahralddin to C. Michaels, et al. re: Email:Artesanias Hacienda Real S.A. de C.V. v. North Mill Cap..., w/ attachment (Trustee 105) |
| 71 | Supplemental Motion to Stay Bunce litigation (EDPA 23-01740), dated December 31, 2025 (Trustee 115) |
| 72 | Memorandum re: Summary Judgment in Bunce litigation (EDPA 23-01740, Doc 180), dated September 29, 2025 (Trustee 113) |
| 73 | Email dated October 24, 2024 from R. Zahralddin to K. Callahan re: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks |
| 74 | Email dated October 10, 2025 from R. Zahralddin to B. Robertson re: Fw: Ch-24-00142-djb Stipulation – Rembrandt 3D Holdi |

# App. Ex. 1

```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE


                                     .    Chapter 11
IN RE:                               .
                                     .    Case No. 21-10433 (KBO)
STREAM TV NETWORKS, INC.,            .
                                     .
                                     .    Courtroom No. 3
                                     .    824 N. Market Street
                                     .    Wilmington, Delaware 19801
                                     .
                   Debtors.          .    May 17, 2021
. . . . . . . . . . . . . . . . . .       3:00 P.M.

                    TRANSCRIPT OF JUDGE'S RULING
                BEFORE THE HONORABLE KAREN B. OWENS
                  UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:          Martin J. Weis, Esquire
                          DILWORTH PAXSONLLP
                          704 N. King Street
                          P.O. Box 1031
                          Wilmington, DE 19899-1031

                          - and -

                          Lawrence G. McMichael, Esquire
                          Anne M. Aaronson, Esquire
                          Yonit A. Caplow, Esquire
                          1500 Market Street, Suite 3500E
                          Philadelphia, PA 19102


Audio Operator:           Madaline Dungey, ECRO

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email: gMathus@reliable-co.com
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**TRUSTEE 27**

TELEPHONIC APPEARANCES (Cont'd):

For the U.S. Trustee:       Rosa Sierra, Esquire
                            UNITED STATES DEPARTMENT OF JUSTICE
                            OFFICE OF THE UNITED STATES TRUSTEE
                            844 King Street, Suite 2207
                            Lockbox 35
                            Wilmington, Delaware 19801

For SeeCubic, Inc.:         Joseph Larkin, Esquire
                            Jason Liberi, Esquire
                            SKADDEN, ARPS, SLTATE, MEAGHER
                              & FLOM LLP
                            One Rodney Square
                            920 N. King Street
                            Wilmington, Delaware 19801

                            - and -

                            Eben Colby, Esquire
                            500 Boylston Street
                            Boston, MA 02116

For Visual Technology       Jonathan Stemerman, Esquire
Innovations:                Rafael Zahralddin, Esquire
                            ARMSTRONG TEASDALE LLP
                            300 Delaware Avenue, Suite 210
                            Wilmington, Delaware 19801

                            - and -

                            John Sten, Esquire
                            225 Franklin Street, 26th Floor
                            Boston, MA 02110

For the Committee:          Christopher Samis, Esquire
                            POTTER ANDERSON & CORROON LLP
                            HERCULES PLAZA
                            1313 North Market Street, 6th Floor
                            P.O. Box 951
                            Wilmington, Delaware 19801

MATTERS GOING FORWARD:

Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case [Filed: 3/12/2021; D.I.46]

United States Trustee's Motion for an Order Dismissing or Converting This Case to Chapter 7 [Filed: 3/24/2021; D.I. 84]

**Judge's Ruling: 4-20**

4

(Proceedings commence at 3:07 p.m.)

THE COURT: Good afternoon, parties. This is Judge Owens. We're gathered today for a continued hearing in the Stream TV Networks case.

I promised you that I would render my oral ruling on the motions to dismiss after the conclusion of the trial last week and I am prepared to do so. So if you have any issues hearing me please feel free to interrupt given that we're trying to get a complete and accurate record today. So let me just dive in.

So before the court are the motions of the United States Trustee, SeeCubic, Inc., which I will refer to as SeeCubic, and SLS Holdings VI, LLC to dismiss the Chapter 11 petition filed by Stream TV Networks, Inc. The motions are opposed by the debtor and Visual Technology Innovations, Inc., which I will refer to as VTI, but supported by the official committee of unsecured creditors.

The court conducted an evidentiary hearing and heard oral argument on the dismissal motions on May 10th and May 11th. Following the close of argument I took the matter under advisement and advised the parties that I intended to render an oral ruling as expeditiously as possible. I believe that this is warranted in lieu of a written opinion because I wished to avoid the delay associated with issuing such an opinion and because, among other things, certain

aspects of the Ultra-D business as well as other intended business plans of Stream, VTI, and other third parties are dependent on and in some instances, effectively, stayed until this court's ruling on the dismissal motions; however, in rendering this oral ruling I have attempted to be as thorough as possible, so excuse the length.

After considering the motions, oppositions thereto, and all related filings, evidence, and argument presented in connection with the dismissal request, as I mentioned, I am not ready to rule. And for the reasons that I will discuss in more detail I will grant the motions and dismiss the case; however, I am not prepared to do so with prejudice.

Let me start with some brief facts. This case was filed on February 24th, 2021. It was predated by Stream's May 2020 entry into the omnibus agreement with fifty-two of its stockholders as well as its secured creditors SLS and Hawk. SLS and Hawk, collectively, assert note claims aggregating almost $150 million secured by liens on substantially all of the debtor's assets.

Following an asserted default under the notes the parties entered into the omnibus agreement which provided that SLS and Hawk would not foreclose on their collateral and would accept, in satisfaction of their note claims, delivery of Stream's assets by way of SeeCubic; a new entity to be under the secured creditors control.

The omnibus agreement granted the secured creditors, by way of Mr. Stastney, power of attorney to effectuate the asset transfers and allowed Stream's minority investors to swap their shares in Stream for shares in SeeCubic.  Upon the transfer of the assets to SeeCubic the secured notes would be extinguished.  Per the agreement Stream was to receive one million shares of SeeCubic's Class A common stock.

Mr. Rajan, Stream's sole director, CEO and controlling shareholder, is not entitled to participate in the omnibus agreement's equity swap, and did not and continues to not support Stream's entry into the omnibus agreement.  Mr. Rajan didn't approve the omnibus agreement on behalf of Stream.  That was handled by a resolution committee comprised of four outside independent directors with the full power and authority of Stream's board to resolve the claims of SLS and Hawk.

In September 2020 Stream, under the control of Mr. Rajan, commenced litigation in the Delaware Chancery Court seeking both a determination that the omnibus agreement was invalid and an injunction to prevent SeeCubic from taking any action to enforce it.  Stream argued that the directors who approved the agreement were never validly appointed; the agreement was invalid because it constituted a sale of all of Stream's assets which under Section 271 of the Delaware

General Corporation Law required stockholder approval; under its certification of incorporation the agreement required the separate approval of the holders of the majority of the Class B common stock; and finally, that members of the resolution committee breached their fiduciary duties by approving the agreement. SeeCubic filed a competing request for an injunction.

On December 8th, 2020 the Delaware Chancery Court entered an order preliminary enjoining Stream, Mr. Rajan and others from, among other things, taking any action to interfere with the omnibus agreement including, but not limited to, disputing the validity of the agreement except as part of the Chancery Court litigation; interfering with the exercise of the granted power of attorney; asserting ownership rights to any of the assets subject to the omnibus agreement in the stock or comparable equity of Stream's subsidiary, TechnoVative, or those deemed the Dutch subsidiaries; and transferring, liquidating, converting, encumbering or, otherwise, disposing of any of the subject assets in a manner inconsistent with the omnibus agreement.

In its opinion accompanying the order the Chancery Court found that Mr. Rajan and his brother, who previously served as a director and officer of Stream, acted by unanimous written consent to expand the board of directors with four outside directors. It found, at subsequent

meeting, the board validly created the resolution committee to negotiate and resolve outstanding claims. And on My 6th, 2020 the resolution committee approved the omnibus agreement and it became effective and binding on Stream. Stream failed on the remaining issues before the court.

Notably, while the Chancery Court grant only a preliminary injunction, the court concluded its lengthy and thorough opinion by holding that it need not enter a mandatory injunction because it was granting a prohibitive injunction preventing Stream from taking action to interfere with the rights of SLS, Hawk, SeeCubic and others under the omnibus agreement including the power of attorney.

Nonetheless, the court held that,

"Were it necessary to grant a mandatory injunction to enforce the omnibus agreement then the record would be sufficiently clear to support it."

The Chancery Court's order and its findings, which although preliminary, are not being challenged by the parties in this proceeding, and are firm, and compelling.

Following the entry of the Chancery Court's order the parties proceeded to brief whether a mandatory injunction should be granted to enforce the omnibus agreement. These cases were filed a few days from the completion of briefing on that issue and, therefore, prior to the court deciding whether a mandatory injunction should be entered.

Moreover, this case was commenced prior to the full effectuation of Stream's asset transfer to SeeCubic, the issuance of the SeeCubic shares to Stream, and the extinguishment of the secured lenders claims. And while the parties debate the extent of the transfers of the assets that were transferred to SeeCubic, which issue is not currently before the court, they do not dispute that the scope of Stream's assets, subject to the omnibus agreement, is broad encompassing substantially all of Stream's prepetition assets including the equity of its foreign subsidiaries.

Prepetition these assets aggregated to form Stream's business which was to develop technology and hopefully to commercialize its proprietary Ultra-D technology. The collective testimony from relevant witnesses is that this technology, developed from technology initially licensed to Stream from Philips, is the Rolls-Royce of "glasses-free 3D" display technology. This technology allows individuals to view 3D content without the need to wear glasses or goggles.

Shortly after the commencement of this proceeding SeeCubic, SLS and the U.S. Trustee moved to dismiss the case with prejudice for cause under Section 1112(b) because they assert that the case was filed in bad faith. They argue that it was filed not for a proper bankruptcy purpose, but rather to take advantage of the automatic stay, gain a tactical

advantage, and collaterally attack the Chancery Court order. Stream and VTI disagree, arguing that the case was filed in good faith to maximize Stream's assets for the benefit of its unsecured creditors who were left behind and not benefited by the omnibus agreement.

Pursuant to Section 1112(b) of the Bankruptcy Code the court may dismiss a Chapter 11 case for cause if it's in the best interest of the creditors and the estate. In the Third Circuit a Chapter 11 petition is subject to dismissal for cause under 1112(b) if not filed in good faith as only the honest, but unfortunate debtor is eligible to avail itself of the protections afforded by the bankruptcy code.

Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where the petition falls along the spectrum ranging from the clearly accepting to the patently abusive. Among the court's considerations for good faith are whether the petition serves a valid bankruptcy purpose such as preserving a going concern or maximizing the value of the debtor's estate and whether the petition was filed to obtain a tactical advantage.

As for the second question, timing is a key element. Generally the court will evaluate whether the timing of the filing of the Chapter 11 petition includes -- indicates, excuse me, that the primary, if not sole purpose

of the filing was a litigation tactic; however, the focus on a valid bankruptcy purpose and tactical advantage is not meant to limit the court's consideration of other factors.

Courts also look to the Primestone factors which were articulated by the Delaware District Court in the case of Primestone Investment Partners.  And those factors are whether the case is a single asset case; whether there are a few unsecured creditors; whether there is an ongoing business or employees; whether the petition was filed on the eve of foreclosure; whether the matter is a two-party dispute which can be resolved in pending State Court action; whether there is any cash or income; whether there is pressure from non-moving creditors; whether there is a previous bankruptcy petition, the existence of an improper prepetition conduct; whether there is no possibility of reorganization; whether the debtor was formed immediately prepetition; whether the debtor filed solely to create the automatic stay; and finally the subject intent of the debtor.

The focus of the good faith inquiry is whether the petitioner sought to achieve objectives outside the legitimate scope of the bankruptcy laws when filing protection under Chapter 11, and no single factor is determinative.

I agree with the movants that many of the Primestone factors are present here.  It's undisputed that by

virtue of the Chancery Court's order the debtor entered these proceeding without any business operations, employees, cash, income, or ability to generate revenue. Additionally, Stream has no material assets beyond those which are the subject of the omnibus agreement.

As already explained, substantially all of the debtor's assets necessary for a successful reorganization were agreed by the debtor prepetition to be transferred to SeeCubic pursuant to the omnibus agreement and, critically, are the subject of the Chancery Court's order enjoining the debtors and others outside of that litigation from asserting ownership rights in such assets or, otherwise, interfering with the consummation of the omnibus agreement.

The other assets Stream relies on to support a reorganization are based on two alternative an lesser quality "glasses-free 3D" viewing platforms upon which Stream did not develop, focus, or, otherwise, rely on prepetition, and the amount to two possible post-petition sales and distribution support agreements of unknown value that depend on contributions of engineers and other specialists that are not yet employees of Stream.

Parties have also pointed to Stream's intangible goodwill and NOL's, but such assets alone cannot serve as a basis for reorganization. These as well as the proffered alternative platform contracts serve as post rationalizations

for the filing. They were not mentioned in Mr. Rajan's initial first day declaration which focused on Stream's Ultra-D assets. They have been developed throughout the dismissal litigation.

While Stream points out that its currently insolvent and in financial distress given that there are approximately $20 million of unsecured claims asserted against it and it has no assets, operations, and current ability to satisfy such claims the court, after considering and weighing the evidence presented, does not believe that this financial distress was the motivating factor for the commencement of these proceedings, nor do I believe that the debtor entered these proceedings with the hope of preserving its business and maximizing its value for the benefit of its creditors and other stakeholders.

Rather, the weight of the evidence, including the timing of the filing days before the Chancery Court was to enter a mandatory injunction permanently enjoining the debtor from laying claim to substantially all of Stream's assets, indicates that Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the omnibus agreement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the

14

debtor for his own benefit.

Mr. Rajan's prepetition conduct as well as the timeline of circumstances leading to this filing serve as the starting points for this conclusion.

First, as detailed in the Chancery Court's order, Mr. Rajan and his brother took improper actions to neutralize the omnibus agreement after it was approved on behalf of Stream by the resolution committee. When it became clear that the Rajan's would challenge the omnibus agreement there were unsuccessful attempts to reach a resolution with them which followed by the brothers further attempting to nullify the agreement through corporate resolution and through machinations that included trying to change the management of the debtor's subsidiaries and attempting to remove prototype technology from a storage facility.

Approximately five months later Mr. Rajan, via Stream, challenged the omnibus agreement in the Chancery Court and sought an injunction barring SeeCubic from enforcing the omnibus agreement. Following the loss in Chancery Court and the entry of the injunction order Mr. Rajan established VTI of which he is the controlling shareholder, president, and until recently the sole director. Using VTI he began to fundraise using Stream's assets despite the injunction.

It is clear, through documentary evidence, that Mr.

Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value.

It's important to note that while all of this was happening Stream was distressed and some witness testimony indicated that creditors, apart from SLS and Hawk, may have been pursuing Stream for payment, but nevertheless it never sought bankruptcy protection. It was only when briefing was near complete in the Chancery Court that would have allowed the vice chancellor to enter a mandatory injunction that he previewed to the parties was likely that this proceeding was commenced.

This behavior and apparent attempts to avoid the effects of the omnibus agreement and Chancery Court order all for the benefit of Stream's insiders supports the conclusion that Stream did not come to this court as the honest but unfortunate debtor to preserve and maximize value for its stakeholders.

The debtor and VTI, however, have urged this court to look beyond the Chancery Court order and prepetition events leading thereto and highlight their plans and ability to put forth a reorganization that would lead to payment, in full, of its creditors including SLS and Hawk if Stream would be permitted to continue with its filing; however, the

repeated maneuverings of Mr. Rajan, the timing of the filing, and the initial goals of the proceeding in the face of the Chancery Court's order cannot be ignored or cured.

As the Eighth Circuit Court of Appeals aptly opined in the Cedar Shore Resort case,

"The taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal."

It also said,

"The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith."

Debtors seeking the protection of the code should act in conformity with the code's underlying principles of equity and fairness, and any debtor who files bankruptcy in bad faith should not be permitted to enjoy the protections of Chapter 11 even though the debtor might be capable of effectuating a reorganization.

This observation reigns even more poignant here given that, as readily admitted, the lynchpin of any restructuring centers around rejecting the omnibus agreement, stopping all Ultra-D asset transfers to the secured lenders, recapturing the assets that have been transferred and transferring them to VTI, an entity currently controlled and owned by Mr. Rajan. These actions are plainly at odds and cannot be squared with the Chancery Court's order and its

prohibition on the debtor claiming ownership to the assets.

Moreover, whether a benefit can even be achieved for unsecured creditors, if this case were permitted to proceed, is highly questionable given the enormous hurdles that must be overcome. These include, but are not limited to, a successful rejection of the omnibus agreement and unraveling of the effects of such rejection including a determination as to which assets were transferred to SeeCubic, complex actions to claw-back assets already transferred and perhaps even a motion to lift the stay so that the Chancery Court action can be completed; all of this will be vigorously opposed, lengthy, costly and have less then certain endings, and be value destructive to the Ultra-D business.

Even if Stream succeeds the estates will have incurred the estates will have incurred significant administrative expenses and Stream will still need to address the claims and rights of the secured creditors whose claim amounts will only grow as a result of the delay, rejection and attendant litigation.

While VTI may have one or more parties that are interested in or committed to providing it with investment it is unclear whether, when and in what amount that funding will materialize, and whether, when and how much Stream will actually receive. Currently VTI has committed only a small

amount to Stream in the form of a $1 million DIP.

In an acknowledgement of not only the risk attendant to Stream's urged approach for this proceeding, but the likely avalanche of resulting administrative expenses the committee performed its own investigation and analysis of the issues presented and to be presented in this case and ultimately came to the conclusion that the continuation of this case does not present the best option for the creditors and is unlike to achieve any benefit for them.

The committee determined that the case is more akin to a two-party dispute that should proceed outside of bankruptcy. I appreciate the work the committee has done to afform itself and reach its conclusions. I have given them great consideration and weight in reaching my own conclusions today especially given that according to Stream this proceeding was commenced for the benefit of the committee's constituency to whom the committee owes a fiduciary duty.

Faced with the circumstances of this proceeding the committee reached a settlement with SeeCubic that may achieve value for Stream's creditors. That settlement is not before me today; however the debtor and VTI have argued that the settlement supports that this case was filed in good faith as it achieved something that would, otherwise, not be available to creditors outside the bankruptcy; however, the court cannot agree.

The committee is represented by able counsel who used the circumstances presented to the advantage of the creditors.  This does not alter the fact that the debtor did not come to this court in good faith, but rather to make one last ditch effort to take away the value and control given to the secured creditors prior to commencement of this case and to redistribute it back to the Rajan's.

Considering all the facts and circumstances presented I have determined that Stream has filed -- excuse me, Stream has failed to adequately fulfill its burden to show that the bankruptcy filing was filed in good faith and for a legitimate bankruptcy purpose.  It was designed to stop SeeCubic and the debtor's secured creditors from fully implementing the omnibus agreement, to unravel it and to avoid the Chancery Court's order and, very likely, a mandatory injunction.

I will not permit the bankruptcy process to be used in such a fashion and, accordingly, I will dismiss the case; however, as I mentioned, the case will not be dismissed with prejudice.  Stream has significant unsecured debt and no material assets free of the omnibus agreement.  While I cannot predict how the future unfolds; to be clear, this case is being dismissed as a result of Stream's attempt to interfere with the Chancery Court's order and the omnibus agreement.  So I would expect that any future filing would

occur after the completion of the Chancery Court litigation and the omnibus agreement's asset transfers.

So for these reasons I am prepared to dismiss the case and I will do so following the conclusion of today's hearing. I hope to get that order entered promptly within the hour. So unless there is anything further that we need to discuss today we will adjourn today's hearing.

(No verbal response)

THE COURT: Okay. I'm not hearing from anyone -- oh, I apologize. Mr. Larkin?

MR. LARKIN: That wasn't me, Your Honor. I don't have anything. We thank Your Honor for your time and attention to this matter.

MR. SAMIS: Your Honor, it was actually Mr. Samis. If I may be heard just briefly.

THE COURT: Okay. Happy to hear you.

MR. SAMIS: I only will chime-in with one point of clarification. The qualifier that you attached to your ruling at the end about your expectations that any future filing would happen after the litigation had concluded in the Chancery Court is that a directive that Your Honor is making as part of her order dismissing the case?

THE COURT: It's not a directive. I think the parties understand. I will not -- my order will not reflect those as conditions. I just merely proffered my opinion as

when I would expect a filing to be commenced in case a subsequent filing is filed in the jurisdiction outside this court and not before myself.

MR. SAMIS: Thank you, Your Honor.

MR. LARKIN: Your Honor, this is Joe Larkin. I did have one question actually.

In our proposed order we didn't include a Rule 6004(h) waiver and that was because we didn't think the dismissal order, if one was granted, was approving any use or sale of property of the estate. So it's our position, subject to reading the order, that it will be final and effective upon entry and we would like to return to the Chancery Court as soon as possible.

I just wanted to, I guess, ask Your Honor if you had a different view about that issue and whether we should provide some language.

THE COURT: I did not have a differing view. I was prepared to enter the form of order that was attached to your motion. It's slightly different given that there were multiple motions to dismiss filed and that I'm entering it without prejudice, but for the most part it will look, in sum and substance, similar to the order that you submitted.

MR. LARKIN: Thank you.

MR. MCMICHAEL: Your Honor, Larry McMichael. I'm actually not Amy Caplow [ph]. For some reason I am

misidentified on your screen.

First of all, I agree with Mr. Larkin. We don't need a waiver, but we do and will apply for a stay pending appeal, and we will do that promptly. So I think the court would benefit from a written motion rather than oral. So I will prepare a written motion and submit it promptly.

THE COURT: I can tell you that --

UNIDENTIFIED SPEAKER: Your Honor, may I respond to that?

THE COURT: I don't think it's needed. I have given significant thought to this issue actually in anticipation that you were going to move for a stay pending appeal. And given that I found that this case was filed in bad faith entry of an order staying my order would, effectively, be my actions -- excuse me, would, in my mind be me acting as complicit in the bad faith filing. So I will not stay my order and I will deny -- excuse me, I will deny that request.

Normally I would entertain a brief stay to avoid inconveniencing the District Court because I anticipated parties would ask the District Court for a stay pending appeal, and so it's out of professional courtesy that I would grant a brief stay, but, again, on this record and my ruling I will not do so.

MR. MCMICHAEL: Thank you, Your Honor.

THE COURT:  Thank you very much.  That concludes today's hearing.  Again, thank you call for entering my lengthy ruling, but I wanted to give the District Court and other parties a thorough and complete record.  That was my attempt to do so.

With that I thank you all for excellent presentations in connection with the trial and for your time and attention to the matter.  We will consider this hearing adjourned.  Thank you all very much.  Take care.

(Proceedings concluded at 3:32 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski                    May 17, 2021
Mary Zajaczkowski, CET**D-531

# App. Ex. 2

EFiled:  Nov 08 2020 07:55PM EST
Transaction ID 66091359
Case No. 2020-0766-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STREAM TV NETWORKS, INC.,

    Plaintiff,

    v.

SEECUBIC, INC.,

    Defendant.

_____

SEECUBIC, INC.,

    Counterclaim and
    Third-Party
    Plaintiff,

    v.

STREAM TV NETWORKS, INC.,

    Counterclaim Defendant,

  and

MATHU RAJAN, and RAJA RAJAN,

    Third-Party Defendants.

C.A. No. 2020-0766-JTL

### ELLIOTT GREENLEAF, P.C.'S MOTION TO WITHDRAW AS COUNSEL FOR PLAINTIFF/ COUNTERCLAIM DEFENDANT AND THIRD-PARTY DEFENDANTS

Elliott Greenleaf, P.C., ("Elliott Greenleaf") hereby moves the Court,

pursuant to Court of Chancery Rule 5 and Del. Prof. Cond. R. 1.16, (b)(4), (5), (6)

**TRUSTEE 1**

and (7), for an order in the form attached hereto, permitting its withdraw as counsel

for Plaintiff / Counterclaim Defendant Stream TV Networks, Inc., and Third-Party

Defendants Mathu Rajan and Raja Rajan (collectively the "Clients").  In support of

its motion, Elliott Greenleaf states as follows:

1.      One month ago, Elliott Greenleaf was retained by the Clients to assume their representation in this case. The Clients were referred to Elliott Greenleaf by Bruce Castor, a Pennsylvania attorney at the law firm of Rogers Castor.

2.      Notwithstanding the different cases in which the Clients are involved, both in Delaware and Pennsylvania; Elliott Greenleaf's representation has been limited to this specific case. The Clients have been assisted by several law firms; both in Delaware and Pennsylvania, and these law firms have assisted the Clients well before Elliott Greenleaf's retention.

3.      Elliott Greenleaf entered its appearance on October 8, 2020, substituting the previous Clients' counsel, Buchanan Ingersoll & Rooney PC [Trans. ID 66010418].

4.      During the brief attorney-client relationship between Elliott Greenleaf and the Clients, critical matters within the attorney-client relationship and fundamental disagreements with the Clients have caused Elliott Greenleaf's representation of Clients to be unreasonably difficult.

2

5.      Thus, the attorney-client relationship between Elliott Greenleaf l and the Clients has become irreconcilably broken and Elliott Greenleaf respectfully requests that the Court  allow Elliott Greenleaf's withdrawal under Del. Prof. Cond. R. 1.16, (b)(4), (5), (6) and (7) based on its good faith professional considerations, and as a matter of equity.

6.      Elliott Greenleaf has advised the Clients of these concerns both orally and in writing, as well as through Bruce Castor, Esq.

7.      Elliott Greenleaf  feels constrained by the duty of confidentiality- not to provide the Court with specific details regarding the bases for its motion  to withdrawal under Del. Prof. Cond. R. 1.16, (b)(4), (5), (6) and (7).

8. Permissible withdrawal from representation is expressly allowed in certain circumstances under the Rule 1.16 of the Del. Prof. Cond. R., including where: the client insist upon taking action … with which the lawyer has a fundamental disagreement (Rule 1.16(b)(4)); the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services… (Rule 1.16(b)(5)); the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client (Rule 1.16(b)(6); or other good cause for withdrawal exists (Rule 1.16(b)(7)).

9.      Delaware courts permit the withdrawal of counsel under circumstances surrounding the attorney-client relationship. *See Transportes Aeros*

3

*DeAngola v. Ronair, Inc.*, 104 F.R.D. 482 (D. Del. 1985) (multiple withdrawal motions granted where clients were uncooperative); *Amoroso v. Joy Mfg. Co.*, 1987 WL 26911 (Del. Super. Dec. 4, 1987) (withdrawal permitted for non-payment of fees), *Rodriguez v. Rodriguez*, C.A. No. 2018-0866-PWG, 2020 WL 2526623, at *3 (Del. Ch. May 15, 2020) (noting that the client's failure to cooperate is an appropriate reason to withdraw), and *Wink v. Rios*, C.A. No.: 2018-0070-SEM, 2019 Del. Ch. LEXIS 1046, at *1 (Ch. May 2, 2019) (granting a motion to withdraw "due to matters within the attorney-client relationship").

10.   Elliott Greenleaf respectfully, and in good faith, requests that the Court permit its withdrawal under Del. Prof. Cond. R. 1.16(b)(4), (5), (6), (7) based on its professional considerations and on principles of equity. Requiring Elliott Greenleaf to continue to represent the Clients under these circumstances would be unfair to all involved and would not serve the best interests of justice.

WHEREFORE, Elliott Greenleaf respectfully requests that the Court grant its Motion.

Dated:  November 8, 2020

**ELLIOTT GREENLEAF, P.C.**

*/s/*
Rafael X. Zahralddin-Aravena (No. 4166)
Shelley A. Kinsella (No. 4023)
Jonathan M. Stemerman (No. 4510)
1105 N. Market Street, Suite 1700
Wilmington, DE 19801
Telephone: (302) 384-9400
Email: rxza@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com
Email: jms@elliottgreenleaf.com

*Of Counsel:*

Brian J. Grady, Esq.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
Telephone:  (215) 977-1000
Email:
briangrady@elliottgreenleaf.com

*Attorneys for Plaintiff / Counterclaim Defendant and Third-Party Defendants*

WORDS:   604

5

# App. Ex. 3

## Entity Information

### Entity Information

**Entity Name:**

VISUAL TECHNOLOGY INNOVATIONS, INC.

**Entity Number:**

E11483612021-8

**Entity Type:**

Domestic Corporation (78)

**Entity Status:**

Active

**Formation Date:**

01/06/2021

**NV Business ID:**

NV20211985058

**Termination Date:**

**Annual Report Due Date:**

1/31/2027

**Compliance Hold:**

### Registered AGENT INFORMATION

**Name of Individual or Legal Entity:**

Registered Agents Inc * (N)

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

NV20131735999

**Office or Position:**

Manager

**Jurisdiction:**

**Street Address:**

732 S 6TH ST, STE R, Las Vegas, NV, 89101, USA

**Mailing Address:**

## OFFICER INFORMATION

☐ View Historical Data

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| President | Mathu G. Rajan | 1105 William Penn Dr, Bensalem, PA, 19020, USA | 01/06/2021 | Active |
| Secretary | Mathu G. Rajan | 1105 William Penn Dr, Bensalem, PA, 19020, USA | 01/06/2021 | Active |
| Treasurer | Mathu G. Rajan | 1105 William Penn Dr, Bensalem, PA, 19020, USA | 01/06/2021 | Active |
| Director | Mathu G. Rajan | 1105 William Penn Dr, Bensalem, PA, 19020, USA | 01/06/2021 | Active |

**Page 1 of 1, records 1 to 4 of 4**

**CURRENT SHARES**

| Class/Series | Type | Share Number | Value |
|---|---|---|---|
| | Common | 400,000,000 | 0.00001 |

**Page 1 of 1, records 1 to 1 of 1**

Number of No Par Value Shares:

**0**

Total Authorized Capital:

**400,000**

Filing History        Name History        Mergers/Conversions

Return to Search        Return to Results

# App. Ex. 4

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                         Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                          :
                                :  Chapter 11
Stream TV Networks, Inc.,       :
                                :  Case No. 23-10763-DJB
          Debtor.               :
---------------------------:
                                :
In re:                          :
                                :  Chapter 11
Technovative Media, Inc.,       :
                                :  Case No. 23-10764-DJB
          Debtor.               :
---------------------------:

- - -

Monday, March 30, 2026
- - -

Videotaped deposition of RAFAEL X. ZAHRALDDIN, taken pursuant to notice, at the law offices of Coren & Ress, P.C., 2001 Market Street, Philadelphia, Pennsylvania, before Michele L. Murphy, a Registered Professional Reporter and Notary Public, on the above date, beginning at approximately 10:02 a.m.

- - -

TATE & TATE, INC.
Certified Court Reporters
825 Route 73 North, Suite G
Marlton, New Jersey  08053
(856) 983-8484 - (800) 636-8283
www.tate-tate.com

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

## Page 2

APPEARANCES:

COREN & RESS, P.C.
By:  STEVEN M. COREN, ESQUIRE
     Two Commerce Square, Suite 3900
     2001 Market Street
     Philadelphia, PA 19103
     2150735-8700
     scoren@kcr-law.com
     Representing William Homony,
     Chapter 11 Trustee

LEWIS BRISBOIS BISGAARD & SMITH LLP
By:  JONATHAN M. PREZIOSI, ESQUIRE
     One Riverfront Plaza, Suite 800
     Newark, NJ 07102
     973-577-6260
     jonathan.preziosi@lewisbrisbois.com
     Representing Rafael X. Zahralddin

ALSO PRESENT:

Andrew J. Belli, Esquire
William Homony
Keith Kodowsky, Esquire (Via Zoom)
Michael Vagnoni, Esquire (Via Zoom)

- - -

## Page 4

INDEX (Continued):

EXHIBITS

| No. | Ref. |
|-----|------|
| Trustee-80 | 180 |
| Trustee-81 | 182 |
| Trustee-85 | 185 |
| Trustee-86 | 186 |
| Trustee-87 | 188 |
| Trustee-90 | 188 |
| Trustee-91 | 190 |
| Trustee-94 | 191 |
| Trustee-95 | 191 |
| Trustee-112 | 197 |
| Trustee-113 | 199 |
| Trustee-116 | 35 |
| Trustee-117 | 37 |
| Trustee-119 | 135 |
| Trustee-125 | 39 |
| Trustee-130 | 68 |
| Trustee-132 | 69 |
| Trustee-137 | 121 |
| Trustee-138 | 122 |
| Trustee-139 | 134 |
| Trustee-141 | 182 |
| Trustee-142 | 184 |
| Trustee-146 | 108 |
| Trustee-147 | 141 |
| Trustee-148 | 209 |

- - -

## Page 3

INDEX

WITNESS                          PAGE
Rafael X. Zahralddin
  By Mr. Coren                      6

EXHIBITS

| No. | Ref. |
|-----|------|
| Trustee-1 | 13 |
| Trustee-2 | 28 |
| Trustee-3 | 33 |
| Trustee-4 | 35 |
| Trustee-5 | 51 |
| Trustee-6 | 61 |
| Trustee-14 | 64 |
| Trustee-27 | 76 |
| Trustee-28 | 78 |
| Trustee-29 | 81 |
| Trustee-30 | 92 |
| Trustee-31 | 104 |
| Trustee-32 | 114 |
| Trustee-33 | 118 |
| Trustee-34 | 119 |
| Trustee-35 | 120 |
| Trustee-38 | 123 |
| Trustee-41 | 124 |
| Trustee-42 | 126 |
| Trustee-48 | 128 |
| Trustee-51 | 129 |
| Trustee-52 | 132 |
| Trustee-56 | 148 |
| Trustee-58 | 157 |
| Trustee-59 | 164 |
| Trustee-62 | 167 |
| Trustee-64 | 215 |
| Trustee-68 | 219 |
| Trustee-72 | 169 |
| Trustee-73 | 171 |
| Trustee-74 | 172 |
| Trustee-77 | 172 |
| Trustee-79 | 176 |

...Continued

## Page 5

(It is hereby stipulated and agreed by and between counsel that reading, signing, sealing, filing and certification are waived; and that all objections, except as to the form of questions, be reserved until the time of trial.)

- - -

**VIDEO TECHNICIAN:**  Good morning.  We're here today, Monday, March 30, 2026, for the video-recorded deposition of Rafael Zahralddin, taken by Chapter 11 Trustee, in the matters of In Re:  Stream TV Networks, Incorporated, Chapter 11, Case No. 23-10763-DJB and In Re:  Technovative Media, Inc., Case No. 23-10764-DJB, in the United States Bankruptcy Court, Eastern District of Pennsylvania, being held at the offices of Coren and Ress, P.C., in Philadelphia, Pennsylvania.

I am Neal Webb, the videographer.  The court reporter is Michele Murphy.  We represent Tate and Tate Certified Court Reporters.

(856) 983-8484                    Tate & Tate, Inc.                    (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

Page 6

Counsel will you please state your appearances for the record.

MR. COREN: Good morning. Steven Coren on behalf of the Trustee.

MR. PREZIOSI: Good morning. Jonathan Preziosi, Lewis Brisbois, on behalf of Lewis Brisbois.

VIDEO TECHNICIAN: The time now is 10:02 a.m.

The court reporter will please swear in the witness and we can get started.

- - -

...RAFAEL X. ZAHRALDDIN, after having been duly sworn, was examined and testified as follows:

- - -

BY MR. COREN:

Q. Good morning.

A. Good morning.

Q. Would you please state your name for the record?

A. Rafael Zahralddin.

Q. And you are an attorney; is that correct?

Page 7

A. I am.

Q. And when were you admitted to the bar?

A. I believe '93 is my earliest admittance.

Q. And to what jurisdictions are you currently admitted?

A. Pennsylvania, Delaware. I'm inactive in California and also New York. I am a member right now inactive.

Q. Okay. And where and when did you graduate from law school?

A. Delaware Law School was the first law degree I have. That was in '92, '93. And then I went on to Georgetown. I was a fellow at Georgetown as well. I have an LLM, and that was around '95.

Q. And what's the LLM in?

A. International and comparative law.

Q. And if you would, give us your employment background since you graduated from law school, quick, just quick, just name the firms.

A. Well, let's see. So I was a law professor, tenure track law professor at

Page 8

Chapman University in California. I then took a year leave where I clerked for a bankruptcy judge. Then I worked for Pachulski Stang, Ashby and Geddes, Morris James, then Elliott Greenleaf, then Armstrong Teasdale, and then directly from there to Lewis Brisbois.

Q. And when did you join -- when were you at Armstrong?

A. Oh, probably about five years ago. I've been at Lewis Brisbois for about three years.

Q. Can you tell me what preparation, if any, you did for today's deposition?

A. I simply reviewed a lot of these e-mails, because it's been a while since I've seen them. That's pretty much it.

Q. Did you see the Trustee's deposition exhibit index? Was that provided to you?

A. Yeah. Yeah. I looked at that. Again, lots of e-mails.

Q. Yeah. And then you had the opportunity -- I think it was a link -- that you could go look at any document you wanted to look at; is that fair?

Page 9

A. Sure.

Q. And did you avail yourself of that opportunity?

A. Yes. I read through each one of them, but, again, there's a lot of them and it's been a while.

Q. And I didn't expect you to memorize them. They're in the books in front of you.

A. Yeah.

Q. And we won't cover all of them, thank God. We'll pick and choose as we go along.

Did you spend any time meeting with counsel in preparation?

A. I spoke with counsel to go over a few things and also with the -- with Mr. Preziosi and then as well with some of the team members that are still at the firm to go through some of the things that were in the e-mails.

Q. Okay. And can you just -- I don't want to know what you discussed. Just identify the people, if you could.

A. Keith Kodowsky, Bennett Fisher. Keith and Bennett were both involved heavily

3 (Pages 6 to 9)

USBC, Eastern District of PA            Transcript of Chapter 11 Proceedings            Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                        March 30, 2026

Page 10

in many aspects of the representation. And I'm trying to remember. I don't believe that -- I don't believe Scott Cousins was able to join us. I'm not sure if -- Minyao Wang may have been on there as well.

Q. And who is the current managing partner of the firm?

A. Rick Katz.

Q. And who is the immediate prior managing partner?

A. It may have been maybe Bob Smith. Yeah.

Q. Okay. Now, you're familiar with Mathu Rajan --

A. I am.

Q. -- is that right?

When did you first make his acquaintance?

A. One of my former colleagues at Elliott Greenleaf, Bruce Castor, who is a lawyer in this area, Bruce was representing Mr. Rajan in a variety of different matters. He had a Chancery Court issue, so we brought Mr. Rajan in. He met with Jonathan Stemerman in my office, who handled a lot of our

Page 11

chancery cases, and he came in on an expedited injunction in a Chancery Court with us as counsel.

Q. And you entered -- well, who were the parties in that injunction, if you can remember?

A. Yeah. It was -- there was a company called SeeCubic that had been formed. I don't know if they were formally formed yet or not, but there was a man named Shad Stastney. Stastney had been the CFO and had been the vice chair of the Board. There was another guy, Bob -- it'll come to me in a second, but he was Hawk Investments or Hawk Industries. They're a family office out of one of the offshore jurisdictions. They had been investors and involved in this company, and they had put together what was kind of a private foreclosure. However, it didn't get the full support of the founders as required by a charter. So there was a dispute over this foreclosure, and the parties who had gone into a settlement where they had taken all the assets out of the company and put them into this new company and left all the

Page 12

liabilities behind.

So they had gone into court. I think they had insurance counsel at that point in Buchanan Ingersoll. They were unhappy with their representation. Mr. Castor brought them over, and so then we took over that representation.

I think there may have been -- I think Buchanan may have been panel counsel and insurance had run out and they thought that things weren't going the way they wanted. For whatever reason, they came to Bruce, and then Bruce came to us, and we worked together with Mr. Castor on that.

Q. And Bruce was with the firm, with Elliott Greenleaf --

A. No, no. Bruce was on his own. He just didn't have Delaware presence, and so we were Delaware lawyers and he called us up on that.

Q. Okay. And who did you represent in that matter?

A. In that matter, we were representing -- I believe we were representing simply Stream TV. I don't

Page 13

remember if we entered an appearance individually for Mr. Rajan. I think later counsel may have come in and represented Mr. Rajan separately, but I believe at the beginning for our time, it was just Stream TV, but I don't recall whether there was an appearance made for him individually or not.

Q. All right. Let me see if I can refresh your recollection.

A. Sure.

Q. I know it's been a little while ago, but why don't you pull out Trustee Exhibit-1 in your book.

A. Okay.

Q. And this is a motion filed in the Chancery Court in Delaware and it was filed on November 8, 2020, and it was filed by you and others; is that correct?

A. Yes.

Q. And if you look at the first -- the introduction.

A. Yep. I see. It indicates there's third-party defendants, Rajan -- the two Rajan brothers, yeah.

Q. All right. So does this refresh

4 (Pages 10 to 13)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 14

your recollection --

A.  Yeah, yeah.  It does.

Q.  -- that --

A.  And, again, if you go --

Q.  Let me finish, just so we have a clean record.

A.  Sure.

Q.  We're going to have a transcript along with a video.

So it's correct that in this Delaware Chancery Court matter, your firm and you in particular represented Stream TV Networks, Inc., along with Mathu Rajan and his brother, Raja Rajan; is that correct?

A.  Correct.

Q.  Okay.  And you obviously prepared this or it was prepared and it was signed and filed under your signature, correct?

A.  Yes.  It was prepared by Jonathan Stemerman likely and also in conjunction with Brian Grady, who is out of our -- a litigator who is out of our Blue Bell office.

Q.  Right.  Now, you of course read it and were comfortable with it before it was filed under your signature?

Page 15

A.  Yeah, absolutely.

Q.  Okay.  And turn to Paragraph 4.

A.  Okay.

Q.  You wrote that, "During the brief attorney-client relationship between Elliott Greenleaf and the clients, critical matters within the attorney-client relationship and fundamental disagreements with the clients have caused Elliott Greenleaf's representation of clients to be unreasonably difficult," correct?

A.  Correct.

Q.  And Paragraph 5 you wrote that, "The attorney-client relationship had become irreconcilably broken"; is that correct?

A.  That's correct.

Q.  And you've cited various ethical rules supporting your request to withdraw as counsel, correct?

A.  Yes, I did.

Q.  And you did in fact withdraw, correct?

A.  We did withdraw, with the court's permission.

Q.  All right.  Now, that was the first

Page 16

matter in which you represented Stream TV and Mathu Rajan; is that correct?

A.  Correct.

Q.  Can you please identify every matter after this in which you have -- in which you or a firm which you were associated represented Stream TV and/or any of the Rajans?

MR. PREZIOSI:  Excuse me.  Just for clarification, I assume that the second part of that question refers to a time period when the witness was also associated with the subject firm?

MR. COREN:  Correct.

MR. PREZIOSI:  Okay.  As opposed to a prior firm or a former firm subsequently representing the parties.

MR. COREN:  Well, let's see if he can identify every --

BY MR. COREN:

Q.  We'll focus on you.

A.  Sure.  So I believe that we -- the only time we represented Stream TV was in this chancery matter and in the current bankruptcy that's pending in the Eastern

Page 17

District.

Mr. Rajan, as you correct me -- because, again, there may have been some decisions made by Mr. Stemerman or Mr. Grady that I just wasn't involved directly in.  We also represented -- because there may have been some counterclaims that they felt was important to at that time represent them.

I don't believe we've ever represented -- I've never represented Mr. Rajan individually until recently, because he needed a medical stay in a case pending in the Eastern District of Pennsylvania.  He has EML leukemia and asked us to step in to get him a stay.

The case is pretty much done.  There were some sanctions that were imposed against his brother dealing with some discovery issues, and we were just getting to a judgment stage, but he needed to go to City of Hope in LA.  And so myself and a few of my partners at LBBS, we asked for a medical stay, and we represent him in the, you know, maybe in the collection or judgment phase coming up.

5 (Pages 14 to 17)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 18

I don't believe I've ever entered an appearance, but if you have a record of it, I'm happy to look at it to refresh my memory.

Those are the only times that I've represented Stream and/or Mr. Rajan, is in those instances.

Q. Well, did you not enter an appearance in that matter and make an effort to address summary judgment proceedings that were ongoing at the time?

MR. PREZIOSI: I'm sorry. Just for clarification, which matter?

THE COREN: The Bunce matter.

THE WITNESS: No. We entered to get a medical leave in that case. We have not filed any other document, et cetera. The only issue that we had was that medical leave issue at this point, and I believe the judge moved for -- or the other side dropped the remaining aspects that weren't covered by a prior summary judgment. The summary judgment was handled by Matthew Weisberg, not by us.

BY MR. COREN:

Page 19

Q. And what's the status of that litigation, Bunce litigation?

A. The opposing counsel filed to get a final order because they're dropping the remaining parts of the case, and I believe the judge entered a final order. So, you know, there's nothing else is happening until -- we have a status conference maybe coming up. We're not clear whether that's for Mr. Rajan's brother or for us. I'm literally today or tomorrow, we're calling the court to clarify that.

But everything is stayed until June, and we're supposed to report in on Mr. Rajan's health. And from speaking to his brother and someone else at VSI, his health may keep him from doing anything until possibly October.

Q. Are you saying you're not representing Mathu Rajan in that matter?

A. I don't think that's at all what I said. I said we are representing him in that matter.

Q. I thought you mentioned his brother, you were representing his brother?

Page 20

A. No, no, no. I do not represent his brother in that matter, but his brother used to represent Mr. Rajan in that matter. And Mr. Rajan just went through a bone marrow transplant for his leukemia, so I'm not able to get Mr. Rajan all the time, because he's around-the-clock care at this point. So his brother has called me to tell me about his condition, because we do represent him in the case regarding his medical leave and the judge has asked for updates, and so we're in communication with the family based on that.

Q. And a final judgment was entered against Mathu Rajan and VTI; is that correct?

A. Yes.

Q. And the judgment amount, approximately 1.7 million?

A. Yes. I believe that's correct.

Q. Are there any other matters in which you or a firm at which you were associated has represented either Stream or Mathu Rajan other than what you've identified?

A. I don't believe so.

Q. And when you first -- when you began your representation of Stream TV, what was

Page 21

your understanding as to Mathu Rajan's ownership or control of that company?

A. My understanding was that he and his family through a trust were the -- I can't remember if they were preferred shareholders or stockholders, but they had the controlling ownership interest in regard to a couple of important things. That was the crux of the win in the Delaware Supreme Court where I think McCarter and English was representing -- Andy Dupre was representing Stream.

In the charter of the company, it states that the preferred or -- the preferred stockholders, I believe, which is mostly the family and the family trust, that they have to approve any transfer of assets, and they gave three different instances. They said they have to approve a stock sale, exclusive license or a purchase of all the assets to keep the technology within the control of the preferred stockholders.

So that was my understanding of their ownership, and that was the decision of the Supreme Court. They basically overturned

6 (Pages 18 to 21)

Page 22

the private foreclosure or pseudo private foreclosure we discussed before with Mr. Stastney and the Hawk Investment folks.

Q. To your knowledge, has Rajan's, Mathu Rajan's, relationship with Stream ever changed in any material respect?

A. In terms of the ownership?

Q. Ownership and control.

A. I don't believe so. I mean, the company was in a very precarious position because basically everybody else had to resign because of the aggressive nature of the litigation between the Hawk parties and the Stream folks. Employees were sent threatening letters by the Skadden law firm, told if they represented to anyone that they were part of Stream or represented Stream, that they would be prosecuted. So everyone left, except for Mr. Rajan. Mr. Rajan ended up being the last person standing. So he was --

Q. When did that happen, approximately?

A. Oh, you know, I don't remember the year because it's when the first -- but I do remember the day, because it's my birthday.

Page 23

So May 6th six or seven years ago when all of this started, when the omnibus agreement was signed is approximately when it happened.

Q. 2020 perhaps?

A. I just don't remember.

Q. All right. And you're familiar with -- you obviously are as we talked about it a little bit -- the company VTI?

A. Yes.

Q. Tell us what that -- what you know about that company.

A. VTI is a company that was established because of the litigation that was ongoing with Stream and because there was a -- this is a technology that relies heavily on trade secrets and know-how, things that aren't patentable yet or they don't want to patent, things that they don't want to copyright. So in order to keep a trade secret secret, you have to keep it within a certain amount of folks.

So there were different people in the supply chain. There were different people working as engineers in China and in Silicon Valley that had really done a good

Page 24

job to get to producing a TV that was actually usable, not just R&D, which is really what was happening in the subsidiaries in the Scandinavian countries, over in Eindhoven.

So VTI was set up in order to keep all those people together and also keep the team that helped get the production together, the engineers together, and also to serve as a financing function for the first Stream bankruptcy.

Q. And who owned VTI?

A. I believe it was -- Mr. Rajan had the preferred shares, but there was a guy named Tim McCarthy who had come in and who testified at the Stream TV hearings, who had come in with money to fund VTI. Again, a lot of it was based on trying to get the technology that was at Stream, but they had some other technology, and so he was excited about it. He actually flew here from the states. And then there were all kinds of other investors that were there at VTI also waiting to see what would happen with the bankruptcy case.

Page 25

Q. To your understanding, did the federal court in Philadelphia in the Bunce litigation make any findings as to the relationship between Mathu Rajan and VTI?

A. Yes. In a very abbreviated decision based on the fact that the judge kind of gave a nuclear sanction, did not allow any evidence to come in because Mr. Rajan's brother failed to produce certain files a certain way, and he had already been sanctioned prior to that for accusatory AI issues, they made a finding that a guy named Glen Davies in Europe had put together a slide deck which was -- which had a false representation in it and -- that was the allegation, and they were not allowed to put any evidence in in contrary to that, and because Mr. Rajan was the owner of VTI, that it was imputed to him under an alter ego theory. But they could find no -- they found no -- there were allegations of that he took the money for himself or this or that, but the judge refused to make a finding on that. It was an imputed liability under an alter ego finding, from my understanding.

7 (Pages 22 to 25)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                      March 30, 2026

Page 26

Q. Well, in fact, the federal court in Philadelphia held that VTI was the alter ego of Mathu Rajan?

A. I believe that's exactly what I just said, yeah.

Q. And are you aware there were no other owners of VTI, he was the sole owner?

A. He may have been at that point in time, yes. Because after the Supreme bankruptcy was dismissed, there was a dispute with Mr. McCarthy and others because they refused to put money in based upon the fact that the technology wasn't there yet.

Q. And --

A. When that happened, I'm not sure because my --

Q. Okay. This is not a memory test, so --

A. Yeah. Yeah.

Q. -- I'm not worried about that.

Can you tell me what monies, if any, VTI had available to fund or finance activities that it was trying to engage in?

MR. PREZIOSI: I'm sorry, Steve. At what point in time?

Page 27

MR. COREN: Back immediately before and during the Stream bankruptcies in Delaware.

THE WITNESS: I mean, we put Mr. McCarthy up on the stand. He came in.

BY MR. COREN:

Q. That was in the bankruptcy case?

A. In the first bankruptcy in Delaware.

Q. In Delaware?

A. Yeah. That was the only time that I represented VTI until the Bunce case recently.

But we put him up on the stand, and he actually -- I can't remember the numbers, but we're talking upwards of 25-plus million dollars was what he had said they were going to bring in. He was even asked directly on the stand by many lawyers, Skadden, K&L Gates, et cetera, as to would he bring in more or was it contingent on the technology, and he said, no, we're excited about the technology they currently hold. There was a different type of 3D technology that they had, and he said that his investment was

Page 28

not -- I mean, this is all sworn testimony. I'd have to go back and look at it, but I think that's generally the gist of it.

Q. Who reached out to you to engage you to represent VTI?

A. It was a combination of Larry McMichael at Dilworth, who was debtor's counsel, and Mr. Rajan.

Q. You say it was a combination. Who was the first person that contacted you?

A. I don't remember. Probably -- I would expect it probably was Larry, but I couldn't tell you. And I'm sure Mr. Rajan followed right after that.

Q. Take a look at Trustee Exhibit-2, if you would.

A. Okay.

Q. So obviously with these series of e-mails, we have to read backwards to do it chronologically. So go to the first e-mail of the chain from Suby Joseph to you and Richard Engel, copy to Mathu Rajan --

A. Okay.

Q. -- dated January 11, 2021.

Do you have that?

Page 29

A. I do.

Q. And what firm were you with at the time?

A. Armstrong Teasdale.

Q. And Richard Engel?

A. Armstrong.

Q. And if you look on, it's, "Hi Richard/Rafael, I understand you had discussions with Mathu R-A-J regarding the corporate structure. Please see attached the schematic for Stream."

A. Okay.

Q. What was going on, as you understood it, at this time, which is January 11 of 2021?

A. You know, I couldn't tell you with certainty, but I'm sure we were trying to figure out VTI's relationship with Stream, maybe doing conflicts, perhaps having an initial call. I really couldn't tell you. I have no context for this.

Q. Well, this is the precursor for the first Delaware bankruptcy; is it not?

A. Sure.

Q. Do you recall when the first

8 (Pages 26 to 29)

Page 30

Delaware bankruptcy was filed?

A. No, I don't. But, again, there's not much in this that will tell me, other than -- yeah. They may have been getting ready to file and they were coordinating with us, because that was going to be the large VTI investor, says -- yeah. I'm assuming because we were supposed to -- VTI was supposed to be the DIP financier, that they were discussing bankruptcy and how they were going to fund that bankruptcy, and we were going to come in and represent VTI.

Q. So at this point in time, January 11, 2021, were you and your then firm representing VTI?

A. I don't think so, because I think we're talking about -- I don't know. I'd have to see when we signed the retention agreement, but this may have been around that time or right before we did.

Q. Okay. You don't see any -- strike that.

Do you recall there was a Zoom meeting held at which you attended?

A. I have no recollection of the Zoom

Page 31

meeting, but I'm pretty sure it happened and that we attended, because it's here in the e-mail.

Q. And you don't see Dilworth or Larry McMichael on here, do you?

A. No, I don't, because we were -- it looks like we were looking at VTI, and so we were looking at the folks at VTI who were helping out and not the folks at Stream.

There was no one at Stream except for Mr. Rajan, because everyone was waiting to be able to come back without getting attacked or sued for being part of Stream.

Q. You'll see at the bottom of the first page you wrote, "Are you ready to have a call about the funding of the retainer and filing a petition"?

A. Yeah.

Q. And that was a voluntary bankruptcy petition, correct?

A. Correct.

Q. And funding whose retainer?

A. I would imagine it would be funding our retainer, meaning Armstrong Teasdale's.

Q. And you either were represented or

Page 32

anticipated representing VTI in connection with that bankruptcy?

A. Yes. Yes.

Q. Was the retainer ever funded?

A. I believe it was, yes.

Q. How much?

A. I can't remember.

Q. Who funded it?

A. It would have been VTI. It would have been --

Q. Careful. I can't have "would have been." It either was or it wasn't.

A. I don't know. I don't know.

Q. That's a better answer than "would have been."

A. Yeah. I don't know. I can tell you it probably wasn't going to be Stream at that point, but I'm pretty sure it was VTI or somebody related to them.

Q. Let's take a look at Trustee-3.

A. Okay.

Q. You have it in front of you, but do you know how Mr. McMichael and Dilworth got involved in representing Stream?

A. Yeah. It's going to tax me as to

Page 33

the gentleman's name. They have a -- he's represented in the current bankruptcy by another firm here in town that I'm trying to remember who they are too.

There was a large investor here in Philadelphia, because Stream is based in Philadelphia, that worked with Larry McMichael on several cases and deals, and he is the person who connected Larry to Mathu Rajan. And I just -- his name escapes me right now.

Q. Had you worked with Mr. McMichael prior to this?

A. Worked with him?

Q. Any cases where he was involved.

A. Oh, yeah. I mean, I've been involved in cases where he's been involved, not --

Q. So you knew who he was?

A. Yeah.

Q. He wasn't a stranger?

A. No. No, not at all.

Q. Now, back to Exhibit-3, which is a motion filed by Stream in the Delaware bankruptcy case, and it was looking for

9 (Pages 30 to 33)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 34

approval for some financing by Visual Technology Innovations, Inc., or VTI?

A. Yes.

Q. Fair to say that at that point, you and your firm were representing VTI in connection with the Delaware bankruptcy?

A. Yes.

Q. Did you review this motion before it was filed?

A. Either myself or one of my colleagues probably took a look at it, but we --

Q. Probablies don't work. Do you know one way or the other?

A. I can't remember, but it would be odd for the entity funding not to have taken care -- to look at the motion.

Q. It would be your normal course --

A. Yeah.

Q. -- to review something like this before it was --

A. Correct.

Q. -- filed if your client was being asked to provide financing?

A. Yes. That's accurate.

Page 35

Q. Let's take a look at Trustee Exhibit-4.

A. Okay.

Q. Before we do that, unfortunately these are a bit out of order. Let's take a look at Trustee Exhibit-116. It's in your -- probably the last book.

A. 116?

Q. 116.

A. Okay.

Okay.

Q. So this is an e-mail January 24, 2021 from Amanda@Streamacquisitiongroup.com.

A. Okay.

Q. And do you know who Streamacquisitiongroup.com was other than an e-mail address?

A. I can guess, but --

Q. Well, don't guess, but give me your best understanding or recollection, if you have one.

A. I know that several entities were created to avoid running afoul of any restrictions in the chancery case, put into place by Vice Chancellor Laster, who

Page 36

basically said, look, while Stream is kind of up in the air as to what they're going to do with it, you can't use the Stream name. Let's add -- it's like a standstill type of injunction put into place.

So then I believe in order to continue to communicate, Mr. Rajan and other people that were working with Mr. Rajan had different companies or e-mails they had set up to communicate with each other, because the Stream e-mail servers and system had been kind of put into a stasis. So that is what I'm assuming is Stream Acquisition Group. Otherwise I have no idea what Stream Acquisition Group would be.

Q. Did you know an Amanda at Stream?

A. Yes.

Q. And who was that?

A. Amanda -- let's see, her name now -- I think it was Von Ahnen at the time. She's been married since this case. She's now, I think, Amanda Gonzales. Amanda is kind of an administrative person. She works as a paralegal now, I think, kind of general admin type of person that had stayed along with the

Page 37

company.

A lot of tech companies keep people for a while because I'm sure they have some sort of arrangement to get a benefit out of the stock they got in addition to their salaries while they were part of the tech company. So she's been around for quite some time.

Q. Now, Amanda at the time was working for VTI; is that right?

A. I'm not sure if she was working for VTI at that time or not. I know that there were a lot of contractual relationships, and with the litigation going, people couldn't really do it as a full-time job because there was so much strife. So she may have been working there as a contractor, but I know many of the folks that were working in those types of capacities, administrative and otherwise, had other jobs.

Q. All right. Let's take a look at Trustee Exhibit-117, probably in the same book.

A. Okay.

Q. You'll see starting at the bottom

10 (Pages 34 to 37)

Page 38

with an e-mail from Anne Aaronson at Dilworth, this is January 24, 2021, to individuals at VTI, including Amanda. Do you see that?

A. Mm-hmm. Yes, though I'm not on these e-mails, so these --

Q. Got you. No.

A. Other than looking at the book, this is, you know, the second or third time I've seen them.

Q. All right. Had you been interacting with Dan Rink as of this time?

A. I believe we had been talking to Dan. Dan was a lawyer that was acting as general counsel and also in different capacities. I think he may have been the director at different companies at different times related to the, let's call them, the exiles from Stream TV that were still gathered, hoping to do something with the technology once the litigation was sorted out.

Q. You'll see from Ms. Aaronson's e-mail that she circulated a list of creditors, secure and priority, unsecured.

Page 39

Do you have any recollection of having reviewed either that list or the proposed petition and schedules before they were filed in the Delaware bankruptcy?

A. I'm pretty sure that we did not, that I did not. I don't think any of our lawyers other than perhaps Mr. Engel and whoever was running our conflicts. Our conflict lawyers may have run across the list of creditors but not the schedules, no.

I'm pretty sure we would have looked at the top 20 creditors and the secured creditors to do a conflict check, but probably not any deeper than that.

Q. Let's take a look at Exhibit-125.

A. Okay.

Q. Let me ask you this: After the bankruptcy was filed and the various schedules were filed, did you review them?

A. Again, probably not, not in any sort of detail, unless it was pertinent to the issues regarding financing.

Q. Are you familiar with a company first name Rembrandt?

A. Yes.

Page 40

Q. And what do you know about that company?

A. Let's see. What do I know about Rembrandt? I may need some water before we get into Rembrandt.

Q. Just say the word. You want to take a five-minute break?

A. No. I just want to grab some water.

Q. Well, we're going to have to go --

A. No. I hear you. I hear you. If we could do that for two seconds.

MR. COREN: We'll take a couple to get some water. Go off the record.

VIDEO TECHNICIAN: Going off the record. The time is 10:43.

(Brief pause.)

VIDEO TECHNICIAN: Back on the record. The time is 10:44.

BY MR. COREN:

Q. We took a very short break, watering break, to give you some chance to refresh yourself. Now that you're fully refreshed, tell us about Rembrandt.

A. Rembrandt. So Rembrandt was a successor company -- and I'm not sure how

Page 41

they became successor, whether they purchased the stock or something of that nature, a merger or whatever -- with a company called 3D Fusion, and 3D Fusion had been a company involved in this space, the 3D without glasses space.

The reason that Rembrandt and 3D Fusion existed was a guy named -- oh, what is it? Stephen, I want to say, Rosenthal or Rosenbloom, one of the two. I think it was Rosenthal. He had paired up with the engineers at Philips.

So Philips had the original technology here, the Ultra-D, what they call it. They developed that, and then they decided not to continue to do any sort of production of any sort of product. Instead they went into licensing, doing non-exclusive licenses based on their patents. And those -- with the R&D stopping there and then Philips deciding just to give out these licenses, one of the licenses which they gave or sold to Stream, the scientists who -- or the programmers, the technical folks that worked at Philips, moved en masse over to 3D

11 (Pages 38 to 41)

USBC, Eastern District of PA            Transcript of Chapter 11 Proceedings            Case No. 23-10763, 10764-DJB
Monday                                 Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 42

Fusion/Rembrandt.  And like happens often when you have people with this kind of know-how and technology and they move from one to the other, at least my representation of companies, different science-based companies, is that usually leads to an allegation of carrying over -- a violation of non-competes, non-solicitation, trade secrets being moved from one to the other.

So that same group of engineers, who are in one of the downstream subsidiaries to this day in Eindhoven, so the guys that went from Philips went to 3D Fusion/Rembrandt and then went to the SeeCubic of the Netherlands, SeeCubic B.V., and carried with them some of this basic knowledge.

So Rembrandt became known to us or to me through a lawyer named Chris Michaels, who called me up after calling Dilworth and Larry McMichael and they said, look, you need to speak to this guy.

And I said, sure.  What am I talking to him about?

He goes, well, VTI is going to be funding a lot of this going forward, whether

Page 43

we -- if and when we get out of Chancery Court and go to Delaware Supreme Court.  So you should talk to him, because he has a pretty big dispute.

I said, okay, we'll talk to him.

So Chris Michaels --

Q.   Who was it that told you to talk to Chris --

A.   Larry McMichael, the debtor's counsel.  Because he called him and he said, hey, you know, we can talk all about bankruptcy and this and that, but in terms of whether they're going to want to do a settlement or deal with you or -- I'll talk about it in a second.  There had been a settlement that had been half baked or three-quarters baked in the District Court, I believe, Western District of New York, some place like that.  And so he was directed to come just chat with me about it in terms of VTI and what they would do or what their stomach was for trying to work out some sort of deal on the money side.

And so -- then I think I met Steve later, the other principal.  And I say "the

Page 44

other principal," because I think Mr. Michaels has -- he works in a firm that kind of runs on that Silicon Valley model where they probably took some shareholder interest in the companies and he was also acting as the CFO of Rembrandt.

And what Mr. Michaels told me was that they had had a settlement that was actually signed by Mr. Stastney in the court in the -- I think again it was the Western District, and then because of a Supreme Court opinion on venue for infringement cases, they decided -- they would have to refile that in Delaware.  And I'm not certain if they did or not, but I'm pretty sure that they did refile in Delaware.  But that in order to -- what they wanted to do was try to see if we would honor some of the parts of that settlement, and that was, I think, how I was introduced to Rembrandt.

I believe that there was a settlement done in conjunction with the debtors with Larry McMichaels that essentially avoided a huge monetary payment, because what he really wanted, Mr. Michaels

Page 45

and Steve and the other folks at Rembrandt, I think they wanted production of TVs.  They had a few deals that were set up.  I want to say they may have been with some hotel chains to purchase TVs on a large scale, and so that's why they wanted production of TVs, to help satisfy those and other projects.  So they had some prospects that were out there in terms of purchasing these TVs.

That was -- that's my introduction and knowledge of Rembrandt.  And, again, it's that same group of scientists that are now in Eindhoven.  One of the reasons that -- there was a pretty big fight between Stream and Rembrandt for quite some time, and that was because Mr. Rajan and other folks, other engineers, they were adamant that they didn't have any of the technology.  Mr. -- Steve.  Again, I think it's Mr. Rosenthal, but --

Q.   Blumenthal?

A.   Blumenthal.  Excuse me.  Thank you for jogging my memory on that.

Mr. Blumenthal I believe at one point produced some documents that showed that there were certain elements of the

12 (Pages 42 to 45)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 46

Ultra-D. Liveliness I think was one of the issues in some meeting notes with these scientists. And these scientists in Eindhoven, they even swore in affidavits that they never even worked for Rembrandt/3D Fusion, and yet there were pay stubs and other things that were produced. So there was something strange going on there.

But I think that's what convinced Mr. Rajan and several other people that they should try to get a settlement, and that's what eventually happened. There was a settlement that was produced with Rembrandt, and that's what I know about Rembrandt. I mean, there's some subsequent things, but that's, generally speaking, Rembrandt and I's initial meetings and what I know about them.

Q. Who played a role in negotiating the settlement between Stream and Rembrandt, if you know?

A. It was odd, because the settlement that was adopted was -- and we figured -- it was myself --

Q. Focus on my question. It was who, not what, but who played the role of

Page 47

negotiating the settlement?

A. So definitely I know Larry McMichaels and Marty Weis looked at some of this. There were some folks in my firm that looked at it as well. We had some IP lawyers that took a look at the issues, primarily because it was an IP issue, and that was at Armstrong Teasdale. I can't remember which IP lawyers came in to pinch hit for us on that issue. And Mr. Rajan and I'm fairly certain Mr. Michaels was involved. I don't think Steve was involved, Blumenthal, until later, but I believe it was that group of folks that looked at this issue. And then I'm pretty sure we also communicated with Mr. McCarthy on that issue as well.

Q. You mentioned a lot of people, but you didn't mention yourself. What role did you play?

A. Oh, I mean, I talked to Mr. Michaels on this issue. I talked to Mr. Rajan. I did play a role in looking at the issue, but, again, it was very IP driven. And while I do have experience in bankruptcy representing folks that have licensing agreements, we

Page 48

wanted to really run through the numbers with and the provisions with our IP folks.

Q. Did you play a role in negotiating the terms of the settlement between Stream and Rembrandt, yes or no, negotiating the settlement?

A. Yes, sure. Yes, I played a role.

Q. And with whom did you negotiate on the Rembrandt side?

A. With Mr. Michaels.

Q. And tell me what you in fact were negotiating, what terms.

A. Well, okay. So thank you because it brings me back to my train of thought from before.

We looked at the issue. Mr. Stastney had signed off on this settlement. Mr. Rajan had been vehemently opposed to it, because he didn't believe that they had violated any -- he didn't believe that anything that had come from 3D Fusion had ended up at Stream. So we had some resistance there.

We did talk to him. We had to get, as I said, extra evidence of the issue,

Page 49

because it appeared that Mr. Stastney at that point had taken over the negotiation, had gone up, had signed the settlement. And we also discussed with Mr. McMichaels the fact that how could the purported secured creditors have any issue with this settlement, because their CEO approved and signed a settlement which mirrored a lot of the same elements.

So that is how we negotiated and reviewed this. We were going to look at this as a point of either we're going to have to have another fight with another party on a licensing issue, which is going to be a problem, going to put a cloud on the technology. We were representing an investor who did not want a cloud on any of this and it was going to discourage further investment. So we thought it was a win on all sides.

We had an agreement that had been signed by the secured creditor's current CEO and we were going to adopt those provisions. It was a production agreement, not a monetary one, and it was going to get rid of an IP

13 (Pages 46 to 49)

Page 50

dispute with Stream, which would -- I mean, most IP disputes can cripple any company, much less one that's in distress.

Those were the terms we negotiated. That's what we looked at, and that's the rationale which -- again, this is public record, and you guys hold the privilege anyway, but this is public record on the reasons that we got into the settlement to begin with. I think it's in the plan that we filed in the Eastern District of Pennsylvania bankruptcy and it certainly was part of the rationale given prior to that when we looked at this in between the other bankruptcies.

Q. Did your firm play any role in drafting any proposed filings in connection with either of the two Delaware bankruptcies?

A. Other than DIP financing? And, again, we wouldn't have drafted most of that. I think -- because it was a very simple DIP. It was a $1 million DIP, if I remember correctly.

No. No. We did not -- not any of the first-day filings. We did depose and cross-examine the folks that were trying to

Page 51

dismiss the bankruptcy, and Judge Owens indicated that we obviously had standing to do so as somebody who was going to finance the case, but I don't believe we -- I mean, I don't recall us having a huge role in any sort of first-day filing or review of first-day papers.

Q. Let's turn to Trustee Exhibit-5. It would be in your first book.

A. Okay.

Q. Before we get there, we talked at the very beginning about withdrawing as counsel in that Delaware chancery matter. At the firm you were at, were you the lead lawyer? I know you filed the motion to withdraw.

A. Well, I was the -- I'm trying to remember if either Shelly or I was the managing partner at that point in time, but it's hard to say who is the lead lawyer on that, because I usually let John Stemerman run the chancery cases, because I can't be in two places at one time and I was primarily in bankruptcy and doing some chancery. John and I kind of switched off there, but I really

Page 52

wanted John to handle the majority of the chancery cases.

Q. Now, when did you leave that Elliott Greenleaf? When did you leave that firm?

A. I would say in November -- well, I gave -- I talked to Armstrong sometime in November. I left a little bit after Christmas, my entire office did, and --

Q. How many people?

A. We had, I think, five lawyers. Yeah, four lawyers and a law clerk and a paralegal.

Q. And are you involved in any litigation with that firm?

A. Yes.

Q. They sued you and you counterclaimed?

A. No, didn't counterclaim. What I do have is, I have an advancement action and an indemnity action that's going on in District Court in Delaware right now.

Q. You didn't file a counterclaim against Elliott Greenleaf?

A. Only for, I think, only indemnification.

Page 53

Q. Indemnification for what?

A. Because we -- they filed a completely baseless lawsuit.

Q. Against you and others?

A. Yes.

Q. Having to do with leaving the firm?

A. Yes.

Q. And your counterclaim has nothing to do with trying to get any damages against that firm other than indemnity and advancement; is that your testimony?

A. Yeah. That's my understanding of our lawsuit, yes.

Q. Okay. Back on Exhibit-5, Trustee-5. Now, you wrote an e-mail on March 15, 2021 to Mathu Rajan, Dan Rink, Raja Rajan, correct?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. And the subject is substantive consolidation, correct?

A. Correct.

Q. What were you worried about in terms of substantive consolidation?

A. I believe we were discussing issues

14 (Pages 50 to 53)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin                          March 30, 2026

Page 54

about making sure we kept VTI separate from Stream. There had been a lot of argument from, I think, particularly K&L Gates. It was part of their strategy to do their best to eradicate whatever was going on, because these were two competitors going up against each other. So any time that Mr. Rajan would try to keep his group together, they would push some sort of counteroffensive. And one of the things that they had been alleging is, oh, it's just Mr. Rajan, because they created that scenario, right? They had taken all the assets out and they threatened everybody else there. It's just Mr. Rajan, it's just Mr. Rajan. It's been a constant battle either by proxy or directly.

Q. When you say "it's just," meaning VTI is just Mr. Rajan?

A. No. No. Any company Mr. Rajan was related with, but Stream in particular was just Mr. Rajan. That was the argument, that it's just a shell. I mean, there's reams of that in this case currently that's pending in the EPA. There were reams of it before. It's been an argument that was rejected

Page 55

frankly by even Judge Coleman, that she didn't dismiss based on those arguments. She allowed the case to stay open and appointed Mr. Homony. But that was part of the -- this was a reaction to the offensive and the legal arguments by Skadden and by K&L Gates.

Q. Well, the concern was to keep VTI and Stream to make sure that they were viewed as separate entities, correct?

A. Absolutely, yes.

Q. And there was a concern because Mathu Rajan owned and operated VTI and he owned and operated Stream, correct?

A. Correct.

Q. And the notion of substantive consolidation, what two entities were you concerned would be consolidated?

A. I don't believe I was concerned. I believe the concern was brought up because of the arguments that were being made. This is, again, from recollection. And I was explaining to them the limits and what would actually cause substantive consolidation.

Substantive consolidation is very similar to veil piercing under regular

Page 56

corporate law, but there's a lot of things that have to happen for that corporate veil to be pierced. So I was, I believe, as I say in this e-mail, that, you know, it doesn't necessarily -- just because there's people on a call and, yes, we should have a joint defense agreement, which is pretty common in bankruptcies like this, particularly where you have a committee like we had at one point, because there's a separate duty for them to report things and you want to be able to have a free conversation with them, but that was the gist of this discussion. We were talking to them about the issues that you have when you have common ownership on entities and we were discussing other things we needed to put into place to preserve the corporate veil.

Q. Well, your e-mail, the subject is substantive consolidation. You picked that subject; did you not?

A. Correct.

Q. Okay. And you wrote to Mr. Rajan and others, looking at your first paragraph, "While I think we should have a joint defense

Page 57

agreement, me being on a call is not necessarily going to result in substantive consolidation," you wrote, "(in this case pulling VTI into the bankruptcy)," correct?

A. Correct.

Q. "What will do that are the current conditions set up to date in this case, no plan, undercapitalization, no DIP, et cetera."

A. Correct.

Q. That was your concern, that there was a risk as of that point based on the current conditions in the case, there was a risk of substantive consolidation because of no plan, undercapitalization, no DIP, et cetera, correct?

A. Correct. That was my legal advice. And, again, those conditions had been caused by the litigation process and the litigation strategy of the secured creditors.

Q. Well, who was undercapitalized? Which business was undercapitalized or both undercapitalized?

A. Well, obviously Stream was undercapitalized because Stream was in

15 (Pages 54 to 57)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                    Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 58

bankruptcy, at that point in time had no assets. At least there was a colorful argument that the assets were impermissibly moved over to the other company. So, yeah, they were in a lot of -- but, again, they were in a process in chancery. They hadn't gotten to the Delaware Supreme Court yet. But VTI was capitalized. It was capitalized and had investors ready and waiting. That was Mr. McCarthy.

Q. So Stream at that point in time while it was in the bankruptcy in Delaware was undercapitalized. We can agree on that?

A. Extremely distressed, yes. Yes.

Q. Extremely distressed. Didn't have any money to fund a plan at that time, did it?

A. It had commitments from VTI, significant commitments.

Q. Apart from VTI.

A. No, because all of the assets had been taken away by a preliminary injunction.

Q. And did it have any ability to operate, have the money to operate?

A. Not at that time. Again, all of the

Page 59

assets had been taken away.

Q. I understand. You don't have to keep repeating it. The answer is, no, it didn't have the ability to operate?

MR. PREZIOSI: Objection. He can repeat it if it's responsive to the question. So please try not to cut him off when he's answering. The responses are -- his answers are responsive.

BY MR. COREN:

Q. While in bankruptcy, did Stream have the ability to manufacture TVs?

A. No. All of its assets, including its bonding equipment, which was one of the largest unsecured creditors, I think second only to Rembrandt, had been taken. There had been samples. There had been other production capability literally taken with U-Haul trucks in London, here. I mean, the headquarters here was essentially burglarized by Mr. Stastney. He came in without having an injunction or any sort of color of law and told the folks that he lost his keys and got into and stole and took laptops with him. I mean, no. There was --

Page 60

Q. Well, the bonding equipment wasn't in those offices, right?

A. No, no, but laptops with source code was.

Q. Right. Now, let me ask you this: You said something to the effect that Rembrandt was one of the second largest unsecured creditor?

A. Yeah. I think Rembrandt was the largest.

Q. Unsecured creditor?

A. Yeah.

Q. At what point in time are we talking about?

A. Well, I think they had an infringement claim that was -- that pre-dated the bankruptcy filing, pre-dated the omnibus agreement by years. And so they had an open unliquidated --

Q. Piece of litigation?

A. -- claim. Piece of litigation, yes.

Q. But they were not an unsecured creditor on any of the schedules filed by Stream in Delaware, were they?

A. They were not, but that doesn't mean

Page 61

they weren't an unsecured creditor.

Q. You wrote, "I am more concerned with the DIP motion and the lack of milestones in showing that VTI is separate from Stream."

Tell me why you had those concerns.

A. Again, it was the litigation strategy that was articulated in the objections by Skadden and by K&L Gates.

Q. Let's turn to Trustee Exhibit-6 in your book.

A. Okay.

Q. A series of e-mails, and I'm focusing on the one from you on the top of the page March 15, 2021. That's your e-mail, correct?

A. Yes.

Q. And you're writing to the Dilworth team and others, correct?

A. Yes.

Q. Now, at that point in time, we can agree that Mathu Rajan was the owner and controller of VTI and one of the preferred shareholders with controlling rights in the debtor, Stream?

A. Correct.

16 (Pages 58 to 61)

Page 62

Q.  So he was wearing two hats, Mathu?

A.  Yes.

Q.  And you wrote, "Mathu has asked me to pull together the research and a draft of the executory contract motion, which we will then turn over to you all, and I will also look at the fraudulent conveyance issue."

What's that about?

A.  I cannot -- the only thing I can think of for the executory contract motion, because it's not --

Q.  That had to do with the omnibus agreement in Delaware, right?

A.  You know what, you're probably right.  I was thinking it only could have been two things, Rembrandt's settlement or that.  And Rembrandt didn't happen until later.  So you're absolutely right.

Somebody had talked about the issue of whether you could reject the omnibus agreement as an executory contract, and so we had been looking a little bit at that issue and we also were looking at the fraudulent conveyance issue.  I think I had gotten instruction from Mr. McCarthy as well as from

Page 63

Mr. Rajan in his role at VTI to say, okay, look, if we're going to put money into this, we need to know where these assets are and we need to be able to recover these assets and we need to figure out whether or not in bankruptcy we could use those different -- and what the success of that would be and how much it would cost as well since we were going to be funding the DIP.  So all those issues came in to recovery of assets through the bankruptcy process.

Q.  And who were you representing in this role where you were going to --

A.  VTI.

Q.  So you were going to -- representing VTI, you were going to draft a motion to reject the omnibus agreement as an executory contract?

A.  Yeah.

Q.  Did you ever do that?  You ever draft it?

A.  I don't think we did.  I think we may have researched it, but I think we were too involved directly with the issues of the dismissal.  And in addition to that, we

Page 64

hadn't gotten DIP financing yet in the case, which also would have provided -- there would have been provision for a payment of our fees as lender's counsel.

Q.  Turn to Trustee Exhibit-14, if you would.

A.  Okay.

Q.  This series of e-mails involving Dilworth.  Turn to the second page.  There's an e-mail from Ms. Aaronson and Mr. McMichael March 30, 2021.

A.  Okay.

Q.  You'll see it says, "Um, is Raf seriously suggesting an intention to relitigate the state court order from December where the court found the debtor bound by the omni agreement?  This is a huge no-no and will get the case tossed fast by the Bankruptcy Court."

Read that paragraph to yourself, if you would.

A.  I've read it.

Q.  Were you in fact suggesting that intention to relitigate the state court order?

Page 65

A.  It's my position based upon at that point in time the existing caselaw, which was really only a prior opinion by Judge Walsh, which had set the tone I think for the relationship between the Chancery Court and the Bankruptcy Court for over a decade, that unless there was a governance dispute, meaning shareholders were going to take out and put new directors which would then change who was in charge of the -- remaining in the bankruptcy case, that Chancery Court dealt with Chancery Court issues, but once there was federal court jurisdiction by filing a petition, that the Chancery Court would step back.  And for whatever reason, you know, Anne and at times even Marty were very conservative about that and they -- and, again, we had done research as well on the issue of the effect of particularly a non-final order like a preliminary injunction and we felt pretty strongly that those were not the types of orders or the type of situation where the judge would dismiss the case.

Q.  My question is, were you seriously

17 (Pages 62 to 65)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 66

suggesting that, and your answer is yes, correct?

A. Yeah. We discussed that, yeah, based on the research we had done as Delaware lawyers and --

Q. I'm not asking who is right and who is wrong.

MR. PREZIOSI: Steven, please, he was in the middle of an answer.

MR. COREN: Well, we have a limited period of time.

MR. PREZIOSI: I know.

MR. COREN: I'm trying to focus him on the question.

MR. PREZIOSI: I know that, but I could tell you I'm listening intently and the answers may be longer than you'd like or longer than I'd like, but the they're responsive. So I think we just have to let him answer the question.

BY MR. COREN:

Q. Do me a favor, if you can answer the question, first answer the question yes, no and then if you want to go on and explain it --

Page 67

A. I'll answer it -- respectfully, I'll answer it the way I feel I should answer, but repeat your question. I'll answer your question.

Q. The answer to my question in one word is yes; is it not?

A. No. Please repeat your question and then I will answer it.

Q. The question was, were you seriously suggesting an intention to relitigate the state court order, yes or no?

A. Yes. We discussed that strategy.

Q. Well, it wasn't just discussing. Were you suggesting --

A. I have no idea what's going on in Ms. Aaronson's head, none whatsoever.

Q. All right. Let's try it this way: Were you advocating in favor of that strategy, yes or no?

A. Of looking at it, yes. Not advocating. Of looking at it.

Q. Well, you looked at it, right?

A. Yes. We looked at it, yes.

Q. And you concluded it should be --

A. Considered.

Page 68

Q. All right. And they considered it and said no?

A. Right, because they were debtor's counsel.

Q. Okay. Take a look at Trustee Exhibit-130.

A. Okay.

Q. Probably Book 3.

A. Yeah. Okay.

Q. If you go to the bottom of the first page, you see an e-mail from Christopher Michaels April 20, 2021, "Dear Counsel for Stream TV."

A. Okay.

Q. Take a moment and refresh your recollection.

A. It's quite an e-mail, so give me a second.

Q. Yeah. I'll just set the context. This is Mr. Michaels reaching out to debtor counsel to advise of the litigation between Stream and Rembrandt.

A. Correct. Yeah.

Q. And is it fair to say that you learned about this after that point in time

Page 69

or did you know about it already?

A. No, no, I didn't. And, again, other than being in this packet, I hadn't seen this before. The sequence, as I remember, is Larry McMichael calling me and saying, hey, we've had outreach from this party. You know, we've talked to them. We want to, you know, see if you'd like to talk about this since your client is the one that's going to be funding these things.

So I would have received this never, but I understand everything that's in it.

Q. Take a look at Exhibit-132.

A. Okay.

Okay.

Q. You'll see some e-mails back and forth between Mr. McMichael and Henry Cittone or Cittone April 21, 2021.

A. Okay.

Q. Have you seen these before?

A. Other than in this book, no.

Q. Did you know who Mr. Cittone was?

A. If you put a gun to my head, I couldn't describe or tell you who he was. I mean, I may have -- not really, no.

18 (Pages 66 to 69)

Page 70

Q. And did you ever learn, to your knowledge, or no?

**A. No. I didn't really have much interaction with the prior counsel in that case.**

Q. Mr. McMichael -- they're discussing the potential application to retain Mr. Cittone and his firm as special litigation counsel in connection with the Stream/Rembrandt litigation.

A. Yeah. I gathered that, yes, sir.

Q. Do you know whether any such application was ever filed?

**A. Not in my recollection, no.**

Q. Now, you'll see the top of the page Mr. Cittone, he says, "Thanks, Lawrence. Please file the application and we'll get to work on responding to Rembrandt. Stream is a defendant in that case, as the whole thing stems from the actions of a former officer of Stream TV, Shad," Shadron, or Shad, "who proposed a term sheet for settlement with Rembrandt, though not finalized, that would essentially wreck the company finances. Rembrandt is seeking to enforce that as a

Page 71

final settlement. We're about to start a second round of briefing on the matter after the magistrate called," and it kind of continues on.

You had indicated earlier that Mr. Mathu Rajan was adamant that the company was defending the Rembrandt litigation of claims because Stream and Mr. Rajan did not think they were meritorious, correct?

A. Yes. Yes.

Q. He was pretty vehement -- I think you said he was --

A. Yeah.

Q. -- pretty vehement about that?

And did you, sir, or anyone else, to your knowledge, do an independent assessment as to the validity of those claims?

A. Yes.

Q. And when did you do that?

**A. We did that -- it was either -- it was shortly after Mr. McMichaels referred things over to us, because we were looking at this issue and we wanted to figure out -- and, again, Mr. Rajan was adamant that they had done nothing wrong. And so we did an**

Page 72

**independent analysis with our IP counsel on some of the licensing issues and we asked for some information from Mr. Michaels, which eventually did convince Mr. Rajan that the folks in Eindhoven had done something wrong and that there was some liability exposure.**

Q. Now, putting aside there was some liability exposure, did you do any independent analysis as to the potential extent of that exposure?

**A. Yes.**

MR. PREZIOSI: You mean damages?

MR. COREN: Yeah.

THE WITNESS: Yes.

BY MR. COREN:

Q. You personally or others?

**A. Myself and in conjunction with IP counsel at Armstrong.**

Q. And when did you do that?

**A. Again, that time period shortly after Mr. McMichaels asked us to look at this, which was -- again, I'd never seen that e-mail before looking at the book, but it was that time period.**

Page 73

Q. If you turn to -- continue on to Page 3, you'll see this is an e-mail from Raja Rajan to Dan Rink and others, including McMichael, and the last sentence is, "Some people think that Shadron signed the settlement term sheet intentionally to bankrupt Stream. Don't know, but that makes a lot more sense in hindsight."

Did you have conversations other than with Mathu Rajan about the Rembrandt/Stream litigation or the Shad term sheet to resolve that litigation?

A. Yes.

Q. And fair to say that everyone on the company side felt that there was a very good defense to the claims being asserted by Rembrandt at the time?

A. Yes.

Q. And that was the view of the company's general counsel as well, Dan Rink?

A. Yes.

Q. Let me ask you this: When did you start, you or your firm at the time, start your independent analysis as to the Rembrandt versus Stream claims? Can we put that in the

19 (Pages 70 to 73)

Page 74

context of, you know --

A.  It was -- again, it was after the -- it was sometime shortly after whatever that time period of the e-mail.  I would say within a week of that e-mail or two at the most is when we first started talking.  I talked to Mr. Michaels, and he presented me with different evidence, and that's what began our discussions.

Q.  How long did that process take, if you recall?

A.  I would say a couple of weeks at least it took to deal with that issue.  And, again, I think there were two key elements.  One was Mr. Rajan seeing the affidavits that had been signed by the Eindhoven engineers saying they never even worked for 3D Fusion and then seeing the evidence that they had worked for 3D Fusion for over a year or more.  That was the first problem, because he had trusted in that as to the feeling that, hey, there's no way we had any liability here, our engineers are steadfastly, you know, saying that they didn't do anything wrong.  And so that was the first thing.

Page 75

The second was having meeting notes given to him.  The term "liveliness" was actually part of the Ultra-D package of copyrighted tags, right, what they were selling, the brand, and liveliness was one of the big elements in all the materials.  And meeting notes from these engineers' time at 3D Fusion and Rembrandt showed liveliness as a term all over them.  When Mr. Rajan saw those two things, he relented in his position that there was no merit to the claims.

Q.  Are you aware of anything in writing that you've seen where Mr. Rajan changed his view?

A.  Yes; the settlement we ended up signing.

Q.  Other than signing a settlement agreement, as the process was unfolding, do you recall one piece of paper where that occurred?

A.  I'd have to go look.  I have no idea, but I'm pretty sure we had several drafts and discussions with Mr. Rajan that are probably in the materials we turned over to you guys or that Armstrong may have turned

Page 76

over that would have captured that.

Q.  From your perspective, can we agree that the whole point of the first voluntary bankruptcy was to marry the resources of VTI and Stream?

A.  Sure.  Yes.

Q.  Now, let's turn to Exhibit-27.

A.  Okay.

Q.  So a hearing took place in the Bankruptcy Court before Judge Owens, Bankruptcy Court for the District of Delaware, on May 17, 2021.

A.  You said 27?

Q.  May 17.

A.  I'm sorry.  The exhibit.

Q.  Oh, the exhibit.  I'm sorry.  It's 27.

A.  Okay.  Transcript?

Q.  That's the transcript.

A.  Yep.

Q.  And you'll see, if you turn to the second page, that you are indicated as having appeared at that hearing on behalf of VTI, correct?

A.  Yes.

Page 77

Q.  Do you recall the hearing?

A.  Yes.  I'm pretty sure I recall this hearing.

Q.  And what was the outcome of that hearing?

A.  I'd have to go back to her order.  Give me a second, I'll find the ruling.

Q.  Well, the ruling is both on the transcript on a piece of paper which we marked as 27A.

A.  Okay.  Yeah.  It resulted in the dismissal of the case.

Q.  Do you recall making any argument at that hearing?

A.  I'd have to look.

Q.  Without looking, the question was do you recall?  It's okay, you can say no.

A.  I can't remember if Mr. Stemerman or myself or Mr. Sten made argument at that hearing.

Q.  You think somebody on behalf of VTI?

A.  I think we may have mentioned something or said something, yes.

Q.  Okay.  And we can agree that the court entered an order on that date

20 (Pages 74 to 77)

USBC, Eastern District of PA            Transcript of Chapter 11 Proceedings            Case No. 23-10763, 10764-DJB
Monday                                  Videotape Deposition of Rafael X. Zahralddin                          March 30, 2026

Page 78

dismissing the case, correct?

A.  Yes.  Without prejudice, but yes.

Q.  And the court dismissed the case as a bad faith filing, correct?

A.  Correct.

Q.  Let's keep the dates in mind. That's May 17, 2021.  All right?

A.  Okay.

Q.  Let's turn to Exhibit-28, if you would.

A.  Okay.

Q.  At the bottom of the e-mail there's an e-mail between Mr. McMichael and his partner at Dilworth.  The subject is Stream. And he writes, "As of the last call with Mathu, he was leaning away from the strategy of seeking a stay in District Court given my assessment of the limited likelihood of success and the large up-front costs."  The next sentence refers to you and he says, "Raf reports that there is substantial interest among unsecured creditors in an involuntary."

Did you report that to Mr. McMichael?

A.  Yes.  I had several calls that came

Page 79

into me being part of VTI and I referred them over to Jack McLaughlin, as they asked me for a referral on counsel.  So yeah.

Q.  You say -- how many calls did you receive?

A.  Three or four.

Q.  And who called you?

A.  I believe Rembrandt called.  We had some discussions with maybe Enumi (ph), if I'm pronouncing it correctly.  They're the folks that created the bonding equipment. There was a separate -- I can't remember the name of the creditor, but I think they did a lot of their PR work.  They may have been on the committee; they may not have been.  And then there was a guy, his first name is Reggie, who did a lot of the travel stuff, and he may have been on the committee as well, and he had complained to us that committee counsel hadn't communicated with him when they brokered a settlement with the debtor.  So they reached out to us because we were out there and so was Mr. Rajan, and as I said, this was a close group of creditors that were in their supply chain or had known

Page 80

the company for a while.  That's who called us, and we referred them out to someone else.

Q.  And you at the time were counsel for VTI?

A.  Yes.

Q.  Now, VTI was not a creditor, correct?

A.  No.  VTI had been the proposed financing --

Q.  Proposed lender?

A.  Proposed lender, yeah.

Q.  Didn't have a claim, correct?

A.  Well, that's -- maybe.  I don't know.

Q.  Okay.  And what do you recall telling any of the creditors that reached out to you?

A.  I told them they needed to get their own separate counsel and I referred them to Jack McLaughlin.

Q.  Do you recall having any communications with Mr. McLaughlin after that point having to do with the filing of an involuntary?

A.  I don't recall.  I don't recall if I

Page 81

talked to Jack at length or we had e-mail exchanges, but I know I've used Jack a million times as a referral source.  He's a well-respected former U.S. Trustee counsel, does a lot of this work.  So I'm sure we had -- he would probably call me up like any other colleague where I've done referral and talked about it when I'm an active party related to the case.

Q.  Let's turn to Exhibit-29.

A.  (Witness complies.)

Q.  It's a letter from Mr. Christopher Michaels to you, a copy to others, on Sunday, May 23, 2021 at 12:30 a.m.

A.  Okay.

Q.  Do you recall receiving this e-mail?

A.  I don't recall it, but it's here, so I'm assuming I received it, yeah.

Q.  This says, "Rafael, thank you for your time over the last two days."

Tell me what time you spent with Mr. Michaels on May 21, May 22.

A.  We were having discussions about trying to resolve or deal with his claim and whether or not VTI could assist in some way,

21 (Pages 78 to 81)

Page 82

because we were with the people that had the resources. Stream was unable to do anything without it.

Q. So who were you representing in those discussions?

A. VTI.

Q. Now, at that point in time -- so here we are, the voluntary, Delaware voluntary case, had been dismissed on May 17, 2021 as a bad faith filing, correct?

A. Correct.

Q. And here we are on May 23. That's four days later. Let's back it up to, you know, May 21, which was -- or May 22, which was a Saturday. I guess 21 was a Friday. I didn't pull out my calendar to confirm it, but here we are, Mr. Michaels is thanking you for having spent time over the last two days, and that was negotiating a potential settlement between Stream and Rembrandt, correct?

A. Mm-hmm.

Q. Yes?

A. Yes. Yes. Sorry. My apologies.

Q. And who initiated that negotiation

Page 83

which had taken place over those last two days?

A. Mr. McMichael.

Q. Called who?

A. Called Mr. Michaels -- I got to distinguish the two -- and then directed him to call me. And as you saw from before, there was a long e-mail that pre-dated this. So --

Q. Well, that was during the voluntary bankruptcy.

A. Understood, but they sent him my way.

Q. Well, you weren't representing Stream, were you?

A. No. I was representing VTI.

Q. Well, Mr. McMichael was representing Stream, correct?

A. Correct.

Q. Even though the bankruptcy was over, who was Stream's counsel?

A. Larry McMichael.

Q. Did Mr. McMichael play any role in negotiating the settlement between Stream and Rembrandt?

Page 84

A. I'm not sure if Mr. McMichael looked at this or whoever was the counsel of record in the chancery case. Whoever was representing Stream, someone did look at this, yes.

Q. Well, you say that. In your negotiations, who did you talk to from Stream? Who represented Stream?

A. Mr. Rajan obviously represented Stream as well, and I believe he either sent it to Mr. Rink or to some other outside counsel.

Q. Which Rajan?

A. Oh, Mathu. Excuse me. Mathu. Mathu Rajan.

Q. Now, as of this point in time, May 23, 2021, before any settlement agreement was signed, Rembrandt had ongoing litigation against Stream pending in the federal court in New York, correct?

A. Correct.

Q. And now that the bankruptcy had been dismissed, the automatic stay was no longer in effect, correct?

A. Correct.

Page 85

Q. So that litigation in New York could keep going?

A. It could, though I think they had to change venue.

Q. Which sent them for some of the claims to Delaware?

A. To Delaware, correct.

Q. Did you as part of this negotiation of the settlement between Stream and Rembrandt, did you speak directly with independent counsel for Stream, you personally?

A. I think I had discussions with Mr. Rink, but I don't think I would have spoken to anyone else.

Q. Well, you say you think. Did you or didn't you?

A. Don't remember.

Q. Okay. Who drafted the settlement agreement?

A. I don't remember that either.

Q. Did you?

A. I don't remember.

Q. Did you have any discussions with Mr. Michaels about the potential of a new

22 (Pages 82 to 85)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 86

involuntary bankruptcy against Stream?

A. Yeah, because I think he was one of the three creditors, and they asked me for -- about it and a referral. And I said, well, you need to get new counsel, and I sent them along to Jack McLaughlin.

Q. Did Jack McLaughlin play any role representing Rembrandt in connection with the negotiation of the settlement between Stream and Rembrandt?

A. No, because Mr. Michaels is a lawyer and I don't believe they wanted to spend money on it, but that's just conjecture. Mr. Michaels was the main --

Q. Chris Michaels?

A. Chris Michaels, yes. Not McMichaels but Michaels.

Q. Tell me, if you can tell me -- can you tell me why it was that Christopher Michaels representing Rembrandt sent the settlement agreement and related documents to you rather than to counsel for Stream?

A. I don't know.

Q. Didn't strike you as odd?

A. No. As I noted before,

Page 87

Mr. McMichaels sent him my way because he indicated that the financial terms would need to be worked out by VTI, because Stream at that point would not be able to fulfill those, period.

Q. The financial terms of the settlement agreement?

A. Correct.

Q. Only VTI could fulfill them; is that your testimony?

A. At that time, yes, because there was a cloud over the assets.

Q. Let me ask you this: Do you recall -- you read the settlement agreement, correct?

A. Yes.

Q. At the time?

A. Yeah. I read what was drafted by Mr. Stastney and I guess Mr. Cittone and all the other folks, because the settlement agreement was -- the basis or foundation for this settlement agreement was the exact same settlement agreement that was reached in the court in New York.

Q. At the mediation in New York?

Page 88

A. Yes.

Q. By Mr. Stastney?

A. Yes.

Q. Who was --

A. The CFO at that time.

Q. Right.
The same one that Mr. Rajan, Mr. Rink and others at Stream thought would bankrupt the company?

A. Correct.

Q. Okay. And so now you understood, did you not, that money had to flow from Stream to Rembrandt when that settlement agreement was signed, right?

A. I believe there was a component, yes, under certain conditions.

Q. Well, don't you recall an immediate payment of more than a million dollars due?

A. I think there was -- I'd have to look at the document, but I'm almost positive that there had to be a payment contingent upon certain things, which I think were tied to some sort of success in getting back assets.

Q. You don't recall any immediate

Page 89

payment due?

A. No. I don't recall that.

Q. You don't recall that Stream was in breach of the settlement agreement pretty much the moment it signed it?

A. I don't recall that, no.

Q. Do you recall that's not the case or you don't know one way or the other?

A. I know that they have reached accommodation of forbearance a million times in the case as things developed. I know that for a fact.

Q. Can you answer my question? Do you know the answer to my question, whether in fact Stream breached the settlement agreement on the same day it signed it?

A. No. That is inaccurate. At that point in time, we still had a 25-plus million dollar commitment from Mr. McCarthy. So no.

Q. Did Mr. McCarthy -- that commitment was through VTI?

A. Yes.

Q. Did VTI pay any money on account of the Stream settlement agreement within the first week of entering into the agreement?

23 (Pages 86 to 89)

Page 90

A. Not to my knowledge.

Q. Did it have the money?

A. Did Mr. McCarthy?

Q. Did VTI have money in the bank?

A. I had no knowledge of that at that time. No knowledge. All I know is what the commitments were and the testimony in court, which preceded us like two weeks before that.

Q. What due diligence, if any, did you do on that point? Did you do any?

MR. PREZIOSI: I'm sorry. Specifically on what point?

BY MR. COREN:

Q. On the point as to whether or not VTI had the money to fund any of the commitments it was making.

A. I was relying upon the witness that we had just put up and had shown evidence in court, in federal court, under oath that there was more than $25 million, north of --

Q. Sitting in whose account?

A. Sitting in Mr. McCarthy's account, dedicated and earmarked for Stream TV, which I'm not sure where it was going to go when the case was dismissed, but that's what I

Page 91

relied on.

Q. Did Mr. McCarthy ever put up a penny, to your knowledge?

A. I don't know if he reneged or not, because I was no longer involved with VTI at that point.

Q. Now, did you have any conversations with Mr. Christopher Michaels --

A. Yeah.

Q. -- on the subject of what is needed for a creditor to be a petitioning creditor in an involuntary?

A. I don't remember if I had that kind of conversation with him. I think --

Q. You don't know one way or the other?

A. No. No.

Q. Okay. Take a look at 29 again, Exhibit-29. This is the e-mail to you at 12:30 a.m. on May 23, 2021. Last sentence, first paragraph -- or no; third full paragraph, "Assuming all the documents are agreeable to the Rajans and Stream, this should fully resolve the litigation and Rembrandt will be a creditor with no disputes on amounts owed."

Page 92

Do you see that reference?

A. Okay.

Q. Is the answer yes?

A. Yes.

Q. Does that refresh your recollection that you in fact had a discussion with Mr. Michaels about the notion that to be a petitioning creditor in an involuntary, you needed to be a creditor with no disputes on the amounts owed?

A. No, that doesn't.

Q. Doesn't refresh your recollection?

A. No. No. We were looking to remove the issue with a disputed license or IP thing. I have no recollection it had anything to do with an involuntary.

Q. And that doesn't refresh your recollection?

A. No. I've answered that. No. I've been very straightforward with you. If I thought I had that conversation, I would have told you. If you have something else, let me know, but no.

Q. Let's take a look at Exhibit-30.

A. Okay.

Page 93

Q. You see this is a continuation of the same chain we just looked at. So looking at the top is an e-mail on the same day, May 23, 2021, at 4:35 p.m. --

A. Okay.

Q. -- from Christopher Michaels to you, copy to others. "Rafael, these are identical to what I sent last/early this morning except that I removed Stream's address and e-mail from the notice and payment section as you requested this afternoon given that SeeCubic took the servers and domain."

Did you make that request that afternoon?

A. Yes. I'm pretty sure someone had alerted me that because of the omnibus agreement, that the servers and domain were controlled by the secured creditors, and so I alerted them to that fact.

Q. Well, you made a request to modify the settlement agreement between Stream and Rembrandt, correct?

A. Yes.

Q. Okay.

MR. COREN: Let's go off the

24 (Pages 90 to 93)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 94

record.  It's 12 o'clock.

VIDEO TECHNICIAN: Going off the record.  The time is 11:59.

- - -

(Discussion held off the record.)

(Short recess.)

- - -

VIDEO TECHNICIAN: We are back on the record.  The time is 12:15.

BY MR. COREN:

Q.  Ready?

A.  Ready.

Q.  Turn back to Exhibit-1, if you would.  That's not really a sign we're going backwards, but go to Exhibit-1.

A.  Sure.

Q.  And I want you to read to yourself just for context, this is the motion signed by you to withdraw as counsel for Stream, Mathu Rajan, and Raja Rajan in the Delaware Chancery Court.

A.  Yes.

Q.  Take a look at Paragraph 4 and Paragraph 8.  Then I'm going to ask you a

Page 95

question.

A.  I know them.  These are staple motions.  Due to the confidentiality restrictions, they're all written the same way and they're written broadly, but, yes, I'm familiar with them.

Q.  What action did the client want you to take with which you had a fundamental disagreement?

A.  The only reason I state this at all is because it's already public record in the case that was brought against me by John Elliott, and then after he passed away shortly after suing us, his son has taken over.

The motion is very accurate in that there was an irreconcilable conflict between my firm and Mr. Rajan.  That irreconcilable conflict was that I left Elliott Greenleaf specifically, which is borne out in e-mails to Mr. Scheff at Armstrong, I think my memo said, this is it, the straw broke the camel's back, I am now going to talk to you and let's seriously consider an offer.  Because we had been talking, but I wasn't sure if I was

Page 96

going to leave.

Mr. Elliott told me to go fabricate an issue with Mr. Rajan, and I told him I would not do that.  And he kept on saying, well, look, look, look, you know that there has to be something there, right?  He misled you.

And I said, no, he did not mislead me.

I told Mr. Elliott that obviously -- and he said, look, if you proceed with this case, I will not allow anyone else to work for it, so you can do it by yourself.  And I actually had to do a deposition by myself and then Mr. Rink had to do another.  That also is a matter of public record.

I believe that was untenable for me, for the client, and that I was being asked to do something that no lawyer should be asked to do.  As a result, we filed this motion so that Mr. Rajan could get adequate, and his company, could get adequate representation from another firm where the head of the firm was not actively trying to get us out of the case at any -- for any means necessary.

Page 97

That is what happened in that case, and it's a matter of public record in the case pending in Montgomery County.

Q.  Well, you didn't answer my question, so let me ask you again.

A.  Okay.  Go ahead.

Q.  What action did the client insist upon you or your firm taking with which you or your firm had a fundamental disagreement?  What was the action requested by the client?

A.  There was no action.  Are you talking about in Paragraph 4?

Q.  I'm reading Paragraph 8.

A.  Oh, Paragraph 8.

Q.  "Including, but not" --

A.  Oh, again, because of the -- in Delaware -- I don't know if it's the same here.  I believe it is.  But in Delaware, we're not allowed to specify.  You have to give the full range of possibilities, and it says as much in Paragraph 7.  So these are -- 8 just gives you the whole spectrum of things that will cause a withdrawal.

Q.  All right.  Let's take a look at the first one.  "The client insists upon taking

25 (Pages 94 to 97)

USBC, Eastern District of PA       Transcript of Chapter 11 Proceedings       Case No. 23-10763, 10764-DJB
Monday                        Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 98

action with which the lawyer has a fundamental disagreement."  That's Rule 1.16(b)(4).

Did that apply?

A.  No.

Q.  "Client fails substantially to fulfill an obligation to the lawyer regarding the lawyer services."

Did that apply?

A.  No.

Q.  "The representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client."  Cites the rule.

Did that happen?

A.  No.

Q.  And the last one, "Or other good cause for withdrawal exists."  Cites the rule.

Did that happen?

A.  Yes.

Q.  That was the other good cause?

A.  Yes.  Yes, sir.

Q.  Okay.  Turn to Paragraph 4.

A.  Okay.

Page 99

Q.  It refers to fundamental disagreements with the clients.  See that?

A.  Yes.

Q.  What were the fundamental disagreements?

A.  I explained them already.  The head of our firm did not want to proceed with this client and was going to deprive any work going to help that client.

Q.  And why -- did Mr. Elliott tell you why he was taking that position?

A.  Yes.  Mr. Elliott did not like Indian people and he did not believe he was going to get paid, because his experience was that Indian people do not pay.  Yet another reason that I could no longer remain at that firm.

Q.  I still don't know what the fundamental disagreement was between the lawyer and the client.

MR. PREZIOSI:  Objection.  This question really seems to have no potential relevance to the objections to the fee application.  So I'm not instructing him not to answer, but could

Page 100

I get a proffer as to why you believe this is relevant?

MR. COREN:  Because it has to do with his disclosures to the Bankruptcy Court in this case.

MR. PREZIOSI:  How so?

MR. COREN:  Because he made disclosures about prior representations.

MR. PREZIOSI:  Correct, but what does this question --

MR. COREN:  We're not going to continue to debate it.

MR. PREZIOSI:  I'm just asking.

MR. COREN:  Instruct him or not.

MR. PREZIOSI:  I'm going to -- we're going to keep a short leash on this, because you haven't proffered any reason.

BY MR. COREN:

Q.  What was the fundamental disagreement between the client and your firm?

A.  I've answered.

MR. PREZIOSI:  He's answered

Page 101

twice.

THE WITNESS:  I've answered that.  I've answered.

I was there for 13 years, Mr. Coren.  There had to be a reason for me to leave, and I answered.  I gave you.

BY MR. COREN:

Q.  How much was Elliott Greenleaf paid by Stream and the Rajans for the defense of that case?

A.  I'm not sure.  I know they have a claim, and that was a discussion I had at length with -- because I split credit with Brian Grady, because he was coming in to help, and we talked to Mr. Elliott.  We told him that if he pulled out here, it was going to harm the company and I don't know if we were going to get paid, and Mr. Elliott at that point said, I don't care.  I'd rather be out.  I know there's consequences.  Just get me out.

So I can't remember what's on the -- I think there's a proof of claim or something.

Q.  My question was how much were they

26 (Pages 98 to 101)

USBC, Eastern District of PA        Transcript of Chapter 11 Proceedings        Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                 March 30, 2026

Page 102

paid?
   A.  I don't know.  I don't know.
   Q.  That's the answer.
   A.  I don't know.  I don't know.
   Q.  Let's go back to your role in negotiating the settlement agreement between Stream and Rembrandt.
   A.  Okay.
   Q.  We agree that the terms of the settlement agreement that was signed was, in all material respects, the same as the terms of the term sheet at the mediation in the New York proceeding at which Shad made commitments on behalf of Stream, basically the same deal, right?
   A.  Yes.  The foundation was exactly the same.
   Q.  And the economic terms were the same?
   A.  Yeah.
   Q.  Yes?
   A.  Yes.
   Q.  And that's because, is it not, that Chris Michaels made it absolutely clear those were the terms from before, they're

Page 103

non-negotiable, you either do the deal or don't do the deal?  Does that refresh your recollection?
   A.  It doesn't.  I don't remember what Mr. Michaels said in regard to that particular point.
   Q.  So maybe yes, maybe no?
   A.  I don't know.  I wish -- I just don't remember anything about that.
   Q.  Tell me what discussions you had with Mr. Rajan at or about the time the settlement agreement was signed as to whether or not he should do that deal.  Tell me what you remember.
   A.  I remember, again, going through some of the blind spots that he'd had, because Mr. Stastney had taken over the settlement.  We had discussions about how he felt that that was just sabotage by Mr. Stastney due to the labor events with the omnibus agreement and, you know, the absconding with assets and things of that nature.  I mean, it was essentially an inside hostile takeover of the company.  And he, of course, attributed a lot of potential malice

Page 104

behind that.  I told him, I said, let's take a look at this.  We talked about it being kind of production based.
      Again, my recollection was that the payments were supposed to be contingent on certain things happening, but they were a way to get a settlement of the disputed license out of the way.
      Those are the gists of the conversations I had with Mr. Rajan.
   Q.  Let's take a look at Exhibit-31.
   A.  Okay.
   Q.  Do you recognize Exhibit-31 as the settlement agreement entered into as of May 23, 2021 that you negotiated --
   A.  Yes, that I --
   Q.  Let me finish.
      -- between Stream, Rembrandt, and the Rajans?
   A.  Yes.
   Q.  Now, you read this agreement before it was signed; did you not?
   A.  I believe so, yes.
   Q.  Is there any doubt in your mind as to whether or not you read the agreement

Page 105

before it was signed?
   A.  Yes, I'm sure I read through the agreement.
   Q.  Turn to Section 15 entitled Consideration.
   A.  Okay.
   Q.  You have that in front of you?
   A.  I do.
   Q.  Provision provides, "In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration."
      Are you with me?
   A.  Yeah, I'm with you.
   Q.  "Upon execution of this agreement" -- that's May 23, 2021 -- "Stream TV agrees to pay to Rembrandt the lump sum of $1,528,000 U.S. dollars and is due immediately."
   A.  Okay.
   Q.  Did I read that correctly?
   A.  You did.  You did.
   Q.  Was that payment made?
   A.  I have no idea.
   Q.  You knew that as of that minute,

27 (Pages 102 to 105)

USBC, Eastern District of PA        Transcript of Chapter 11 Proceedings        Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 106

Stream didn't have $1.5 million, correct? You knew that?

A. No, but my involvement was related directly to VTI.

Q. You knew Stream didn't have the money, correct?

A. Correct.

Q. And you don't know whether VTI had the money as of May 23, 2021. The only thing you knew was what somebody testified to the month before in the voluntary bankruptcy case, correct?

A. Correct.

Q. To this day, do you know whether that payment was made?

A. I do not.

Q. Now, let's go back to Exhibit-30.

A. Okay.

Q. Now, you were provided with the final settlement documents for execution by this e-mail, were you not, May 23, 2021 at 4:35 p.m.?

A. I don't know what the attachments were. I'm assuming that the attachments were as they are stated here.

Page 107

MR. PREZIOSI: Why aren't the attachments included with the exhibit?

MR. COREN: I have no idea.

MR. BELLI: We got this e-mail right from VSI. You can see it's a printout of Bud Robertson's e-mail. We didn't get the attachments with it.

MR. PREZIOSI: Okay. Thank you.

BY MR. COREN:

Q. Do you know when the involuntary petition was filed?

A. Not off the top of my head, no.

Q. You recall it was filed May 23, 2021?

A. Again, I'm not -- I wasn't in charge of the involuntary, so...

Q. Did you ever read the petition?

A. I did. I think I made one appearance in that case, and Judge Owens asked -- I can't remember if -- it was one of the other two. And I said, I'm here because we're still willing to fund, because that's the instructions that I'd gotten from my client.

Page 108

Q. Let's take a look at Exhibit-146.

A. Okay.
Okay.

Q. It's the involuntary petition filed May 23, 2021, same day as the settlement agreement.

A. Okay.
Okay.

Q. Now, explain to me how it was that -- strike that.
Did you ever consider whether or not Rembrandt was an appropriate petitioning creditor?

A. No.

Q. Did you ever give that a thought?

A. I didn't -- I wasn't involved in the involuntary. Jack McLaughlin took care of that, so, you know --

Q. But you had negotiated the agreement which gave Rembrandt the so-called status as a creditor, right?

A. No. No. That's incorrect. That's an incorrect statement of bankruptcy law.

Q. Well, you negotiated the settlement agreement, correct?

Page 109

A. I did, yes.

Q. And before the settlement agreement was signed, Rembrandt had a disputed claim in a federal court, correct?

A. That's my -- yes. That's my understanding.

Q. Excuse me a second as my wires are all tangled up in my chair. Give me one second.

A. Sure.

Q. Wires ought to be remote.

A. I'm making sure my wires are up here too now so I don't have the same thing happen.

Q. In today's technology, we shouldn't have these wires running around. Come on.
Could you tell me as of the time this petition was filed what obligation, if any, of Stream was in default to Rembrandt?

A. I don't know, because I wouldn't have handled the Stream piece of it. I think the only piece I would have handled was the VTI piece.

Q. Do you think it's a coincidence that the settlement agreement was signed on

28 (Pages 106 to 109)

USBC, Eastern District of PA                Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 110

May 23rd and the involuntary petition was filed later that day? Do you think that's a coincidence?

A. I think it's irrelevant.

Q. It's irrelevant?

A. Yes.

Q. Why is that?

A. Rembrandt had a claim, had an unliquidated claim. I don't know why Larry McMichael or the company didn't put them on the schedules. I don't know why there was no proof of claim filed until later. I don't know what was in the heads of any of those folks. But there was a filed claim, and it is very common in bankruptcy for there to be listed litigation. It may say zero, disputed. I mean, it's not -- this is not an exotic thing we're talking about here.

They had -- it was brought to our attention they had one of the largest claims. They had that claim -- settlement agreement or not, they had that claim. It may have gone from unliquidated to liquidated by virtue of the agreement, and again the agreement wasn't fulfilled, not my issue. My

Page 111

issue was whether or not we had a proper claim.

Q. Well, how about disputed versus undisputed; is that relevant to being a petitioning creditor in an involuntary bankruptcy?

A. I wasn't doing that analysis.

Q. Answer my question.

A. I don't know, because I haven't filed a bunch of involuntaries. I've defended against them, et cetera. I'd have to go and look that up, to be honest with you.

Q. Now, you say Rembrandt had a claim. The claim of Rembrandt was disclosed as disputed litigation. You knew that, right?

A. Where was it disclosed?

Q. The schedules.

MR. PREZIOSI: I'm sorry. Which bankruptcy?

THE WITNESS: No. I don't know. I haven't gone to look and see where it was disclosed. I thought you guys told me it wasn't disclosed, so I was going on that. Are you telling me it

Page 112

was in the schedules?

BY MR. COREN:

Q. The litigation was disclosed. They weren't on the list of creditors.

A. Of creditors. I understand what you're saying now. I understand what you're saying.

I didn't look at the disputed litigation in the schedules or anything like that. My first issue with Rembrandt was the referral over from Larry McMichaels to talk to them.

Q. Now, you tell me you defended involuntary petitions, defended against them?

A. Yeah.

Q. On how many occasions?

A. Maybe two or three. I mean, they're not usual, and people don't like to bring them. So I've only had one we've brought. I mean, I know there's a distinction on bona fide dispute, but as I sit here, I'd have to research to make sure I knew exactly what the law is on that. So the idea of a disputed litigation claim not being able to come in or not, again, that wasn't in my head at the

Page 113

time.

Q. So you don't know whether a creditor whose claim is disputed is a legitimate petitioning creditor?

A. As I sit here, because those are rare occasions, I would have to go back. There's a lot of stuff in the bankruptcy code, and that's not something that I, you know, have committed to memory.

Q. Now, that involuntary bankruptcy proceeding didn't last very long, did it?

A. No, it didn't.

Q. And it was dismissed as the second bad faith filing, correct?

A. Correct. The court wanted it to go to chancery and play itself out there.

Q. And there was a bar ordered precluding Stream from commencing another -- from commencing a bankruptcy for a year, correct?

A. I think it was, if I remember correctly, and you can correct me if I'm wrong, it was a year or coming back for good cause shown after the Chancery Court decision had been completed.

29 (Pages 110 to 113)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 114

Q.  So we just looked at the date.  Can we agree the involuntary petition was filed against Stream on May 23, 2021, correct?

A.  Okay.

Q.  Yes?

A.  I didn't file it, so I'm looking at the petition, yes.  That's --

Q.  It's got a stamp at the top.

A.  Correct.  Yeah.

Q.  Now, let's take a look at Trustee-32.

A.  Okay.
Okay.

Q.  And that was the emergency motion to dismiss that involuntary case, correct?

A.  Correct.

Q.  That was filed on May 27, four days later, correct?

A.  Okay.

Q.  Yes?

A.  Yes.  That's what I see in front of me.

Q.  Now, what role were you playing at that time in connection with the involuntary petition?

Page 115

A.  I think we had some conversations with Mr. McLaughlin.  I think Polsinelli had come in to be debtor's counsel.  So we had conversations with Mr. Ward.

Q.  Who is "we"?

A.  VTI.  VTI.

Q.  I asked about you.

A.  Oh, me?

Q.  Yes.

A.  Representing VTI.

Q.  Who did you have conversations with representing VTI?

A.  You mean at the client?

Q.  After the involuntary was filed, there was a --

A.  Yes.

Q.  -- motion to dismiss was filed four days later?

A.  Yeah.

Q.  You were involved in some way in that case, correct?

A.  Correct.  I understand your question now.  Sorry.

Q.  So who did you speak with on what subjects?

Page 116

A.  Mr. Rajan and again --

Q.  So Mr. Rajan, he was VTI and he was also Stream, correct?

A.  Correct.

Q.  All right.  Who else did you speak with?

A.  Mr. Rink at VTI.

Q.  He was Stream and VTI, correct?

A.  No.  I don't think he was Stream at that time, as a matter of fact.  I think Mr. Rink was kept separate as a general counsel and then later as a director in VTI and also VSI.  I don't have any knowledge of him being part of Stream at that point.  The only person that was an actual employee, officer, director at that time was Mr. Rajan.

Q.  Mathu Rajan?

A.  Mathu Rajan.  Excuse me.  You're right.  Mr. Mathu Rajan.

Q.  All right.

A.  So I spoke to Mr. Rink, Mr. Mathu Rajan, maybe Raja Rajan.  I don't know if he was still involved at that point, and also confirmation with Mr. McCarthy on a few issues.

Page 117

Q.  Did you play any role in discussing strategy in connection with the involuntary bankruptcy proceeding?

A.  Only to the extent that it would have impacted VTI, my client, who was going to fund it.

Q.  The question is, did you play a role in discussing strategy relating to the involuntary, yes or no?

A.  Yes.

Q.  And who did you discuss strategy with?

A.  Likely Mr. McLaughlin and likely Mr. Ward.

Q.  You say likely and likely.  Do you have any memory of --

A.  I don't, but I think I probably -- I know I attended the hearings.  I know I had discussions in the hallway, as we often do in Bankruptcy Court, with the other parties, and I know we were supportive of the involuntary, because we said -- I had the okay to tell the judge that we would continue to fund, particularly if it went into a Chapter 11.  You have an automatic election as of right if

(856) 983-8484                              Tate & Tate, Inc.                              (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 118

the involuntary survives. So on those conditions, and I think I stated it in court, we were there on the funding issue.

Q. Did you discuss strategy dealing with the motion to dismiss the bankruptcy?

A. I'm certain we would have at some point, yes.

Q. Who did you discuss it with?

A. I don't recall. Do you have something to refresh my memory?

Q. I will in a moment, but first I'm asking what your memory is.

A. I don't remember.

Q. How about Christopher Michaels; did you discuss strategy with him?

A. Yes. I could have probably talked to Mr. Michaels on that issue.

Q. Could have probably is not --

A. Again, I don't remember. I think I've stated that. I'm happy to look at something and tell you.

Q. Take a look at Exhibit-33.

A. Thank you.

Q. See if that refreshes your recollection.

Page 119

A. Okay.

Q. It's an e-mail to you Friday, May 28, 2021 at 10:30 p.m. from Christopher Michaels. "Rafael, is there a good time for a call tomorrow? I want to touch base on strategy and next steps. Our answer on the motion to dismiss in the bankruptcy case is due June 6."

Does that refresh your recollection in any way?

A. That he likely contacted me and that he wanted to talk to me because specifically he knew that funding was coming from my client, yes, it does. I don't remember much more other than that.

Q. Take a look at Trustee Exhibit-34.

A. Okay.

Q. A series of e-mails between you and Christopher Michaels. It starts at the bottom from you May 31, 2021 to Christopher Michaels and then at the top Mr. Michaels June 1, 2:27 a.m.

A. Okay.

Q. He should be in the White House.

Do you recall this back and forth

Page 120

having to do with a term sheet between Rembrandt and VTI?

A. Yeah. I think as I've testified before, my recollection was that there were different forbearance and other agreements as the situation evolved either losing funding or moving into another phase or waiting for the Delaware Supreme Court to render a decision. So, yeah, this would be one of the pieces of ongoing, I guess, negotiation and relationship with Rembrandt.

Q. Take a look at Trustee-35.

A. Okay.
Okay.

Q. It's a letter from an Isaac Stevens to Christopher Michaels, copy to others. Attachment is a form Mutual Non-Disclosure Agreement. It says, "Rafael asked me to send you the attached NDA between VTI and Rembrandt for your review and subsequent execution."

A. Okay.

Q. Do you recall that going on at the time?

A. I don't recall it specifically, but

Page 121

it doesn't surprise me that we asked for an NDA.

Q. And what firm were you with at the time?

A. Armstrong.

Q. And Armstrong represented VTI at the time?

A. Yes.

Q. And then Armstrong represented VSI; is that right?

A. Correct. I think so. I think so, yes.

Q. Let's take a look at Exhibit-137.

A. Okay.
Okay.

Q. It's a draft of a term sheet between VTI and Rembrandt and Stephen Blumenthal dated June 3, 2021, correct?

A. Okay.

Q. Did you play -- "okay" is not a good answer.

A. Okay. What's your --

Q. Yes or no?

A. Have I seen this before?

Q. Are you familiar with this document?

31 (Pages 118 to 121)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 122

A. It's been a while, but, yes, I'm familiar with this document.

Q. Okay. And what role did you play in negotiating this document?

A. I couldn't tell you what role I played in this. This may have been mostly Mr. Rink and Mr. Rajan. I don't know.

Q. Okay. Take a look at Exhibit-138.

A. Okay.

Q. It's an e-mail from an attorney, Maxwell Feit, to you and a copy to others.

A. Okay.

Q. Does this one refresh your recollection involving filing of involuntaries?

A. Maybe.

Q. Take a look at it and then --

A. I've read the top part. Do you want me to read through the whole --

Q. No. I think just the top part. Does that help you or it's still foggy?

A. No. I mean, I'm pretty sure that when we're in a case and there's an issue that comes up, like the filing of an involuntary, we do our own research to make

Page 123

sure we understand what the Third Circuit is going to say about the case.

Q. Okay.

A. And I'm sure we had been contacted, you know, whether it was Dan Rink within VTI or talking to Chris Michael. Chris Michaels is not a bankruptcy lawyer. They may have had some questions. We needed to figure out, you know, what the latest technology was, so to speak, on some issue in the involuntary and we had someone do research.

Q. Let me ask you, when did -- do you recall when you left Armstrong? We may have covered that earlier, but is any of this --

A. I don't recall. It was about, I'd say, three years ago in the summer. So maybe three and a half years ago now.

Q. Take a quick look at 38, if you will.

A. Okay.

Q. It's an e-mail from Dan Rink to a number of individuals, you were copied, June 4, 2021.

A. Okay.

Q. He's listed as the internal counsel

Page 124

for VTI.

A. Yes.

Q. You see that reference?

A. Yep.

Q. He says, "All, for what it's worth, we did not reflect Rembrandt as a creditor at the time of the filing but rather a party with whom we were in litigation."

A. Okay.

Q. Does that refresh your recollection on how Rembrandt was described in the prior bankruptcy proceeding?

A. It just refreshes my recollection that Dan Rink is not a bankruptcy lawyer and needed lots of help in this issue. But, yes, this is what they believed or what he stated, but it's an incorrect statement of the law.

Q. Well, it's not an incorrect statement of what was filed?

A. You're absolutely right. It is a correct statement of fact.

Q. Right.

A. Yes.

Q. Turn to Exhibit-41.

A. Okay.

Page 125

Q. This is a filing that you made in the involuntary bankruptcy proceeding on June 8, 2021, correct?

A. Correct.

Q. And you made this filing on behalf of VTI?

A. Yes.

Q. When did you terminate your representation of VTI?

A. I don't know off the top of my head. I really don't.

Q. Well, you went from Armstrong to Lewis Brisbois. That was your next transition?

A. Correct.

Q. Were you representing VTI when you moved to Lewis Brisbois?

A. I don't think so. I think VTI had either run its course. My understanding later on was that Mr. Bunce, who had provided some of the funding for the retainer in one of the two cases, had become disgruntled. There are a lot of disgruntled shareholders in this case on both Stream's side and the other side, and that because of his

32 (Pages 122 to 125)

(856) 983-8484                          Tate & Tate, Inc.                          (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA  Transcript of Chapter 11 Proceedings  Case No. 23-10763, 10764-DJB
Monday      Videotape Deposition of Rafael X. Zahralddin     March 30, 2026

Page 126

saber-rattling or whatever, they decided to kind of put on the shelf VTI.

There's some other people at VSI who had different technology. They were going to have different technology in each company. So we just didn't have anything to do for VTI. I don't think we were actively doing anything for VTI around the time I left. I don't believe we did any -- because we would have done something at Lewis Brisbois at that time, and we didn't open a matter for VTI at Lewis Brisbois until Mr. Rajan's health concerns came up recently. I know that for a fact, because I've spoken to our internal folks to double check who we have retainer agreements with and who we have as our clients and not.

Q. Take a look at Exhibit-42.

A. Okay.

Q. It starts at the bottom with an e-mail from Chris Michaels to Jack McLaughlin and you and others. "Jack and Rafael, I imagine that Eben will want to know about the relationship between VTI and Rembrandt. We have three relevant agreements: one, joint

Page 127

defense agreement; two, the payment agreement; and, three, the financing agreement. I imagine we want to keep all three from disclosure under work product doctrine." It continues on and then you respond. You see that?

A. Mm-hmm.

Q. Do you recall this series of e-mails?

A. I don't recall them, but they're here.

Q. And you answered, "Yes. All three are attorney work product and protected." That was your view?

A. Yeah, that was my view.

Q. And what role was Eben playing at the time?

A. He's counsel for -- he's at Skadden. He's counsel for Mr. Stastney.

Q. Did there come a point in time when you represented Rembrandt?

A. No. Rembrandt always had their own counsel.

Q. Are you sure?

A. Yeah. I'm pretty positive I never

Page 128

represented Rembrandt. We had joint defense agreements. We had things of that nature, but I never represented Rembrandt.

Q. Did you ever consider representing Rembrandt?

A. I think maybe Armstrong had considered doing something. There were supposed to be some litigation of financing that was funded maybe through VTI, but other than that, I don't recall any -- and it would have been jointly with somebody else. I don't think it would have been us representing Rembrandt directly.

Q. Turn to Exhibit-48.

A. Okay.

Q. It's an e-mail from you July 14, 2021 to Mathu Rajan and others. "Here are the proposed conflict waivers for our collective review."

A. Okay.

Q. And then you attach a letter from you dated July 1, 2021 to Stephen Blumenthal, Re: Conflict and waiver of potential conflicts of interest. You write, "Dear Mr. Blumenthal, Rembrandt, 3D Holdings LTD,

Page 129

the company has requested us to represent it with respect to potential litigation related to your intellectual property rights." It continues on.

Do you see that reference?

A. Yeah, I do.

Q. Does that refresh your recollection as to your potential representation of Rembrandt?

A. Not really, other than as I told you, there were provisions in one of the subsequent forbearance kind of rolling agreements where they were considering litigation financing and us coming in. But I don't believe we ever signed on and represented Rembrandt.

Q. Do you recall whether VTI ever executed this waiver?

A. I'm not sure if they -- I'm sure they probably did execute it, because it was part of the discussions, but I couldn't tell you off the top of my head. But like I said, I'd be surprised if we had ever actually represented Rembrandt.

Q. Let's turn to Trustee-51.

33 (Pages 126 to 129)

USBC, Eastern District of PA            Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                              Videotape Deposition of Rafael X. Zahralddin                       March 30, 2026

Page 130

A. Okay.

Q. It's an e-mail from Christopher Michaels to you and others July 31, 2022. "Rafael, this is just following an e-mail I sent you about a year ago, but it has the relevant final agreements. I'm sending other docs, but I will have to send them in batches due to size." And then he ends the e-mail with, "Rembrandt has 100 percent fulfilled its end of the agreement. The only question left is when the Rajans/Stream/VTI going to fulfill their end."

Do you recall this e-mail?

A. Yeah. I do remember e-mails like this periodically, yes.

Q. And who were you representing on July 31, 2022?

A. I don't believe we were representing anyone. I think I was asked to come in and pull some historical data together, but my understanding and my recollection of all of this is that other than being there for historical help, Mr. Robertson and the company directly negotiated, and Mr. Rajan, directly negotiated with Mr. Michaels.

Page 131

Q. Well, are you suggesting that on July 31, 2022 you were not representing any party in connection with the matters with Rembrandt?

A. That's correct. We had not opened up a file. I got calls all the time having been involved in the case before, and we hadn't opened up a file, hadn't received a retainer, hadn't signed a retention agreement, anything like that, but I did get calls often.

Q. So when you got calls, did you say, why are you bothering me for? I'm no longer representing anyone in this matter?

A. I have said that several times. I've also said, happy to facilitate, happy to help out.

I had a good working relationship with Mr. Michaels. I had a good working relationship with Bud Robertson and Mr. Rajan. They would ask me every once in a while for some help. And I also had a good relationship with Mr. Blumenthal who would call me as well.

Q. Well, as of July 31, 2022, had VSI

Page 132

been formed?

A. I don't know. I really don't know.

Q. Were you representing VSI as of July 31, 2022?

A. Not that I recall. I don't think we represented VSI until -- I'm trying to remember if we ever represented VSI until recently, very recently, in relation to the Bunce matter.

Q. Well, that's VTI.

A. No. We represent them both.

Q. Let's take a look at Exhibit-52.

A. Okay.

Q. It's an e-mail you sent to Chris Michaels on July 31, 2022, correct?

A. Yes, it looks like it.

Q. You ask a question about "when was the magistrate recommendation sent to us?"

Do you see that in the second sentence?

A. Yes.

Q. Who is "us"?

A. I am assuming our side of this. I'm assuming Mathu called up and asked me to take a look at something, and we were looking at,

Page 133

you know, can we help out in the situation. I don't know if this was one of the many reoccurring back and forths between Rembrandt and VSI perhaps or VTI. I mean, it says VTI.

I have no idea, you know, where -- or this could be an old subject line. But this looks again like -- a lot of times I'd get a call, they'd ask me, hey, what about this. I'd tell them, it's been a long time, can you get me the documents. And then they would send them to me again, and we'd say, all right, and then either it resulted or it didn't result -- this happens a lot with clients. They call me up, ask for advice, whatever. Sometimes it results in an open matter; sometimes it doesn't.

Q. My question was, who was "us." You haven't gotten to that part of the question.

A. I'm assuming I'm referring to Mathu and one of his companies.

Q. And yourself?

A. Okay. Sure, because I'm sending him an e-mail.

Q. And you don't know who, if anyone, you were representing on July 31, 2022?

34 (Pages 130 to 133)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                      Videotape Deposition of Rafael X. Zahralddin                      March 30, 2026

Page 134

A. I'm pretty sure I wasn't representing anybody at that point --

Q. Okay.

A. -- at Lewis Brisbois. I'm pretty positive about that.

Q. Let's take a look at Exhibit-139.

A. Okay.

Q. The filing of articles of incorporation for Visual Semiconductor, Inc.?

A. Okay.

Q. A/K/A VSI.

A. Yes, sir. I see it.

Q. And it's April 4, 2022. Have you ever seen these before?

A. Not before they were in this book.

Q. When did you first come to represent VSI?

A. I don't think we had any representation of VSI until recently. I really don't.

Q. And what matter are you representing VSI in?

A. To the extent that VSI becomes a target of collection in the Bunce matter, that's when we would advise or talk to VSI.

Page 135

And that would require further authorization and retainers and all kinds of other things. So it's not as if we're actively representing VSI right now.

MR. COREN: Just looking at my watch, it's 1:10. Is this a good time to take -- why we don't take a break until 2:00?

MR. PREZIOSI: Sure.

MR. COREN: And then return. Does that work for you?

THE WITNESS: Yeah. That's fine. That's fine.

MR. COREN: We'll go off the record.

VIDEO TECHNICIAN: Going off the record. The time is 1:12.

- - -

(Short luncheon recess.)

- - -

VIDEO TECHNICIAN: We are back on the record. The time is 2:03.

BY MR. COREN:

Q. Let me direct your attention to Trustee Exhibit-119, 119.

Page 136

A. Okay.

Okay.

Q. And I take it you haven't seen this document before?

A. No. No.

Q. And this is a filing by VSI April -- it's back in 2023 April, identifying the officers and directors of VSI as Mathu Rajan. Mathu, he was a director, president, secretary.

A. Yeah.

Q. Was that your understanding as to the corporate makeup during the debtor's bankruptcy when you were counsel?

A. Here in the Eastern District? Yes, that was my understanding.

Q. And what was your -- did you have an understanding -- did you have any conversations with Mathu Rajan about the formation of VSI?

A. I did not have any conversations about the formation. The only conversations we had were related to later conversations when VSI came in as a plan proponent.

Q. And I think you had told us earlier

Page 137

that there had become issues with VTI, including Bunce and the litigation and problems, that made that no longer a viable kind of counterparty for purposes of the new bankruptcy in the Eastern District of Pennsylvania; is that fair?

A. Yeah, that's fair. Those were limited conversations. I didn't even know Mr. Bunce's name really until much later when we sought the medical leave. But, yes, that's fair.

Q. And you indicated that you had some discussions in the context of VSI becoming a plan proponent in the -- what's the best way to call it? Are we going to call it the Eastern District -- or just call it the PA bankruptcy.

A. That's fine. Yeah.

Q. Which is the one we're here about. Do you recall when that was filed?

A. When the case was filed?

Q. Yeah.

A. Not offhand, but it was, what, maybe two and a half years ago in March. Is that right?

35 (Pages 134 to 137)

Page 138

Q. Of what year?

A. Yeah. My guess is as good as yours.

Q. March 15, 2023?

A. Okay. That sounds right.

Q. Okay. So what I showed you about the officers and directors of VSI, that is after the filing of the PA bankruptcy, which as we've now established is March 15, 2023. So here we are in that same timeframe.

A. Okay.

Q. Correct?

At that point in time -- well, strike that.

Do you recall when VSI was starting to play any potential role in the Stream PA bankruptcy? You filed it May 15, 2023. How soon thereafter, if you --

A. I'm not sure exactly when we first started talking to VSI, though it may have been pretty early on, because, I mean, they didn't have Stream -- they didn't have access to the Stream servers. They were tied up in Eindhoven. So I'm pretty sure -- and we weren't having direct conversations with VSI. It actually came as a huge surprise to us

Page 139

that VSI sent in our retainer, and I didn't see it until after I had gotten report back from Los Angeles, our main office, where they had received the wire.

So I think the first time I ever knew VSI existed was when Vince Alexander and I looked at it and said, wait a second, what's this company this is coming from or why is it coming from this company, and then of course we had to go and do a disclosure on that because we found out after the fact on it.

Q. Who did you contact to find out what was going on about that? Who did you call? Mathu?

A. For VSI?

Q. Yeah. You found out VSI paid your retainer.

A. Probably Suby is who we called, because Suby Joseph was kind of handling the books as a controller almost. I wouldn't call him a CFO, but I think he was more of a controller.

Q. Did you actually place that call?

A. Probably Vince placed that call.

Page 140

Q. You don't know for sure?

A. Yeah. I don't know for sure, but I had -- I remember an excited call from Vince Alexander saying, who is this or whatever, and then we had to chase it down. I think he chased it down.

He was the co-head of the bankruptcy group in the firm, along with the Chapter 7 trustee out in Los Angeles.

Q. Right.

A. So that type of thing would have been escalated to him anyway. So I think he probably handled that.

Q. Okay. Do you have any memory of the first thing that was filed which would have VSI's kind of name on there or information?

A. I'm not sure. I mean, probably notice of appearance probably by Akerman, but if you have something --

Q. Yeah. I actually -- we added, although I didn't supplement and give it to you and we didn't print it, just a docket. It was so --

MR. PREZIOSI: Oh, yes.

MR. COREN: Is it in there or

Page 141

no?

MR. PREZIOSI: It is.

MR. COREN: I don't think it's in my book. Oh, maybe it is.

MR. PREZIOSI: I have it as 147.

MR. COREN: Yeah. I do have it as well. So let's pull it out.

MR. PREZIOSI: 147.

BY MR. COREN:

Q. Let's see if that helps us.

We marked as Exhibit-147 the docket in the PA bankruptcy case.

A. Sure.

Q. So we can just confirm the filing date March 15, 2023.

A. Yep.

Q. And if you would, flip through it and see if you can identify for us the first filing that would have any mention of VSI's potential involvement in the case.

A. All right. Let me --

Q. Take your time.

(Brief pause.)

A. Yeah. I'm still not seeing

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                  March 30, 2026

Page 142

anything.  Maybe I missed it.

Q.  What date are you up to?

A.  April.

Q.  Yeah.  I'm just flipping quickly.  I didn't see it there.

MR. PREZIOSI:  May I suggest something?

MR. COREN:  Sure.

MR. PREZIOSI:  Just as a possibility?

MR. COREN:  I was just looking at entry 59, which is March 29, 2023.

THE WITNESS:  Let me see.

BY MR. COREN:

Q.  Yeah.  Well, that was your -- what you just testified about.

A.  Right.  I don't think until we've got a notice of appearance by maybe the Akerman firm, I don't think that they had filed anything, but I'm...

MR. HOMONY:  611.

MR. COREN:  6/11?

THE WITNESS:  Did you say June?

BY MR. COREN:

Q.  Yeah.  He said 6/11.

Page 143

A.  Okay.

Q.  I don't...

A.  6/11 is just --

MR. COREN:  What did you show me, Andy?  That doesn't seem --

MR. BELLI:  You said you want the first appearance of VSI?

MR. COREN:  Yeah.

MR. BELLI:  It's 611.  That's the --

THE WITNESS:  Oh, you mean -- no, no, no.

MR. COREN:  The No. 611?

MR. BELLI:  Yeah.

MR. COREN:  Not June 11?

MR. BELLI:  No, no, no.

THE WITNESS:  Well, that can't possibly be correct.  That's --

MR. COREN:  That's late.

THE WITNESS:  Yeah.  That's the second counsel that they've used.

MR. BELLI:  Well, that's the first time that the word "visual" appears on the docket I'm searching.

MR. COREN:  Okay.

Page 144

THE WITNESS:  It might be as early as when the first plan was filed, because that's the reason that --

BY MR. COREN:

Q.  Let's zero.  What's that date?  See if we can find it.

A.  That would have been -- I can't tell you when that plan was filed.  I just remember the judge telling us she was tired of just the endless litigation and she instructed us to go do something to move the case forward, like a plan or some sort of other filing, and that's what produced the plan, and also us going to Mathu and saying, you know, you can't negotiate -- you can't put on a hat that says VSI here and the debtor there and negotiate a plan.  You need to go set up -- go get counsel.

Traditionally what you do in these cases, you set up a committee of independent directors or directors, you know, not related to the Rajan family, and they will then work with selecting counsel, you know, doing this and that.  At that point in time, I believe they went to the Akerman firm because Andy

Page 145

Dupre, who had been at McCarter, had won the Delaware Supreme Court opinion for them.  So they went there, and that's when Akerman stepped in and we started to correspond with Akerman as the representatives and lawyers --

Q.  Of VSI?

A.  -- for VSI.  Yeah.

Q.  Let's see if we can search and find that on the docket somewhere.

A.  And I know they came in and made appearances on behalf of VSI at a certain point, but they -- that was, I think, may have been the first time we were really dealing with VSI.

MR. BELLI:  293.

MR. HOMONY:  293 is the plan.

MR. COREN:  293 is the plan.

BY MR. COREN:

Q.  Disclosure statement?

A.  Yeah, with the plan and the restructuring agreements all as --

Q.  And that was filed on July 13, 2023.  Does that seem about right?

A.  Yeah, that does seem about right.

Q.  And at that point in time, VSI, you

37 (Pages 142 to 145)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin                          March 30, 2026

Page 146

were communicating with Akerman for VSI?

A. Yes. And we were also trying to get -- as you can see on 298, we filed an application to employ Thomas Park as the chief financial officer. Again, there were a couple of things that prompted that. You know, one, we had this very vulnerable situation with just one person sitting at the debtor and, two, that one person had then -- he hadn't publicly revealed it, but he had been diagnosed with EML leukemia.

So we tried to get Mr. Park in, and we told him to go get counsel, and all of this was at the direction of an earlier appearing where the judge just said, look, I'm tired of everybody fighting, you need to do more than just be litigating in this case.

We said, okay, Your Honor. And that's where we went on to do the plan and get the plan filed. That had been obviously prior to this date, because we couldn't have put together a plan that quickly and we had negotiations and other discussions. So I would say probably -- I'd have to look at the e-mails, but I would say we were probably

Page 147

engaged one and a half, two months maybe at least.

Q. Working on that potential plan?

A. Working on a plan, yeah.

Q. And who were you dealing with at Akerman?

A. Adam Swift. I think it's Adam Swift. Adam. I'll have to look at his last name. I'm sorry. I'm forgetting Adam's name. He's going to kill me, but -- and then John -- I didn't know John before this, but I did know Adam from the American Bankruptcy Institute. Those are the two guys I primarily dealt with. You guys are familiar, I think, with both the guys.

Q. Yeah. We've dealt with them, yeah.

A. It's not Swift. It's another name, but it's close. I could tell you what position his kid plays in lacrosse, but I can't remember his last name. Long stick defense, by the way.

Q. You see -- let's take a look at your original declaration --

A. Okay.

Q. -- appended to the application to

Page 148

employ Lewis Brisbois. So --

A. Exhibit number?

Q. 56.

A. Okay.
Okay.

Q. Did you draft this declaration?

A. Parts of it. I'm pretty sure it came out of a form that was at the firm and then we went through and drafted --

Q. And you obviously read it?

A. Yeah.

Q. Because you signed it under penalty of perjury?

A. Yes.

Q. Turn to Paragraph 8, if you would.

A. Paragraph 8? Yes.

Q. Where did you get that information? For example, "Before filing these cases, VSI, an investor in the debtor," and then it goes on. It talks about the retainer we talked about earlier.

A. Well, I think once we saw that the payment had come from VSI, not from a Stream account, we spoke to Dan Rink and Suby Joseph. They were the caretakers on any

Page 149

money coming in to VSI -- or from VSI, and then in exchange for that, they were receiving equity, and that was all -- I think that's the way they handled all of this, because they were operating under the understanding that every dollar for dollar that they brought in in equity reduced the amounts owed to the secured creditors under these conversion agreements, several of which had already been paid off with at least one other creditor other than VSI and Mr. Stastney. So it would have come from Suby and Dan.

Q. Who was responsible at your firm for dealing with the monthly operating reports?

A. Bennett Fisher.

Q. An attorney, paralegal?

A. He is an attorney down in the Northern -- Southern District of Texas. Houston I believe is where his main office is. And he had -- I think he's -- so I'm 58. He's probably ten years my senior, has been practicing bankruptcy, had his own firm, been there forever.

Q. And did you read the monthly

38 (Pages 146 to 149)

Page 150

operating reports when they were filed?

A. I don't think -- I think I may have read them subsequent, but they were the responsibility of Bennett. Bennett has a lower rate than I do and he has a lot of experience with the U.S. Trustee's office, so we assigned that over to him as a way to -- it's one of the things that's great about having a firm with lots of offices, you can leverage the lower-priced attorneys in different jurisdictions who have the experience and it would be better than, you know, putting somebody with a higher rate based on geography.

Q. Turn to Exhibit A.

A. Okay.

Q. And you obviously reviewed that before you attached it to your declaration; is that fair?

A. Yes.

Q. Do you know if you actually prepared it?

A. I think we had a paralegal put it together, but then, yeah, we look at the language and try to put in as much as

Page 151

possible without -- there's always a push and pull, because the disclosures you need are on connections, and that's a very ambiguous definition, and if you put in too much and you run up too much of a bill, the U.S. Trustee gets mad.

So we came in and put in as much as we thought was necessary, and then we knew we would be discussing it with the U.S. Trustee, because that's basically what happens in every case.

Q. Well, if we look at No. 1, it says, "Rafael while working at a prior firm, Elliott Greenleaf P.C., represented Stream TV as a creditor's rights and restructuring lawyer in a chancery case in 2019, which sought an injunction to help to prevent self-help by certain creditors."

Why didn't you disclose that you also represented Mathu and Raja Rajan?

A. I'm not sure if we -- just an oversight and then we weren't representing -- we weren't representing either one of the Rajans in this case. I'd have to go back and look.

Page 152

Q. You say -- you continue on, the second sentence, "He withdrew from the case with permission of the court," do you see that reference, "after three weeks"?

A. Yes.

Q. Why didn't you disclose any of the circumstances surrounding the reason for the withdrawal?

A. Because I'm bound by the attorney-client privilege and a ton of ethics rules from putting anything else like that in there. There's no requirement for that.

Q. So let me ask you this: "Was replaced by substitution counsel." Who came in to represent --

A. Lu Salazar, who had his own firm, now he's at Cole Schotz down in Miami, who is a pretty well-known bankruptcy lawyer, and he used Scott Cousins, who is now with our firm, but Scott was also pretty well respected.

I think -- I didn't necessarily recommend Scott because I took him to primary counsel, but I believe Lu and Scott had worked together at Greenberg, because Scott had been the managing partner at Greenberg

Page 153

Traurig --

Q. So were you --

A. -- in Wilmington.

Q. I'm sorry. Did you recommend the replacement counsel?

A. Yeah. They asked me for names, and I gave them a series of names. People ran conflicts, and they ended up with Lu.

Q. Why didn't Lu just enter an appearance when you withdrew yours? Then no filing with the court or permission would have been required.

A. That's not true. In chancery, especially on an expedited basis, the judge is less likely to give you an out of the case because it's such a short timeline unless you have someone waiting.

Q. That's what I'm saying. You didn't have someone waiting; that happened later?

A. No, no, no. We talked to Mr. Salazar as soon as we knew we had to withdraw. I had to go --

Q. So he was ready to come in?

A. Yeah. Yeah.

Q. So are you saying he couldn't have

39 (Pages 150 to 153)

Page 154

just come in and you go out, you don't need any filing?

A. No. I would have needed a filing in chancery.

Q. You need a filing which identifies ethical concerns as the reason?

A. Yes. And, again, it's a staple filing in Delaware. You have to give the spectrum of things that will allow you, without revealing what it is.

Q. You reference a special purpose vehicle to facilitate financing. That was VTI?

A. Yes, that was VTI.

Q. Is there a reason why you didn't disclose the fact that the prior bankruptcy was dismissed as a bad faith filing?

A. Because it's irrelevant to anything in regard to this, because the reasoning for the bad faith filing was that the judge wanted the process to go and get continued and finished up in the Delaware state courts, and at that point in time, we had a decision which overturned the prior injunctive relief and actually granted all of the assets back

Page 155

to Stream TV. So it was irrelevant.

Q. Is that a conscious decision you made or you're just making that now?

A. No. I'm telling you that there would be no reason to put that in here.

Q. Had you given that --

A. It's called the record, first of all, but, no, there would be no reason to put that in there. And, again, we were going to have discussions with the U.S. Trustee. They would tell us what was missing, and then we would file, and that's the way this process works.

Q. Where you make reference to VSI in Paragraph 8 we looked at, advancing payments --

A. Yes.

Q. -- in return for equity, why did you not disclose that the debtor's principal, Mathu Rajan, is VSI's principal as well?

A. Again, it just didn't seem relevant to the disclosure, and I thought that in our first-day affidavit from Mr. Rajan and other accompanying documents that were put into the record, that it disclosed the whole history

Page 156

of the two companies and what had happened and et cetera. So that was probably -- and I think we may have discussed it with the U.S. Trustee as well.

Q. Are you now trying to put your head back and come up with answers or do you actually remember that thought process at the time?

A. I remember the -- which part?

Q. About deciding it was unnecessary to disclose that the two principals were the same, Mathu Rajan.

A. No. What I think we did was more -- we sat, three or four of us, looked at the disclosures, what we normally put into place. Vince Alexander was the head of the bankruptcy group doing the Chapter 11 stuff. Again, my other co-head is a Chapter 7 trustee in Los Angeles, so she didn't really have comments on this. But Vince looked at it, said here's what we want to put in here, and that's what we made a determination on.

I am part of that process, but, again, final signoff is the head of our bankruptcy group. And did we sit there and

Page 157

say let's exclude or not include Mr. Rajan's individual, you know, part in that? No. I don't think we had that discussion. We did have the discussion shortly after, though, about it because we knew that that was going to be something that the secured creditors were going to be arguing, because they wanted to argue that this is an empty shell, can't do anything, can't run, et cetera, which is something that they created with their omnibus agreement.

Q. Turn to Trustee Exhibit-58.

A. Okay.

Q. This is your interaction with Kevin Callahan at the U.S. Trustee's office. It's April 13, 2023.

A. Okay.

Q. You'll see a Question 4.

A. Okay.

Q. Question about VSI and the retainer?

A. Yep.

Q. And you advise the Office of the United States Trustee that VSI is another entity founded by Mathu Rajan which has its own assets and operations. Do you see that?

40 (Pages 154 to 157)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin               March 30, 2026

Page 158

A. Yes.

Q. What operations did VSI have at the time?

A. VSI was holding together all of the supply chain folks that had been involved in the Ultra-D technology before. VSI was looking for other technologies and products. VSI had held together the sales team and the engineering team in Beijing and in Silicon Valley. VSI was trying to negotiate and deal with the folks in Eindhoven. VSI had two open orders if they could get the equipment back and have Stream begin to produce TVs. Those were all the operations of VSI.

Q. Did you ever see those open orders?

A. I did.

Q. And what due diligence, if any, did you do to determine that they were not phony?

A. Well, with the one to Southern Telecom, it was still kind of COVID-ish time period, so people weren't still coming back. But we had -- at least myself and Vince Alexander had at least two to three Zoom meetings with the CEO, CFO, and other folks from Southern Telecom.

Page 159

Southern Telecom is a company that purchased a lot of brands out of bankruptcy, Brookstone being one of them. They have offices in Brooklyn and they have another co-marketing office in Bentonville with Walmart. They began by doing a lot of work in the Far East, kind of party and then plates and things of that nature. That's how they have the connection with some of the big box stores. And then with the purchase of things like Brookstone and some other older TV and radio brands out of bankruptcy, they're repackaging those with their knowledge of manufacturing in Asia as well as these kind of well-known brands.

So they basically said, look, we will fulfill these orders and we want to do it by Super Bowl, because this is a great product, and we'll increase it and we'll give you more as long as we can get going. So that's the diligence I did with them.

In terms of Cystar, Cystar has played a critical role here because they wanted in exchange for taking bonding equipment, transporting it, doing insurance,

Page 160

taking it out of the hands of the secured creditors who were saying, oh, that we gave it to the subsidiary, oh, we don't know where it is, oh, we saved it from the Chinese military. We had extensive discussions with Herbert at Cystar. He had rented property to house the equipment. He had hired the guy from Enuma -- I'm always going to mispronounce it -- the gentleman who used to be the CEO of the company that created the bonding equipment. He had all these things.

And how do I know about all of these things? Because we talked about this with Judge Mayer, who was handling the mediation, and the secured creditors back and forth, asking for new things, like new insurance, tell me this, tell me that, for a period of four to five weeks, intensive conversations on getting the bonding equipment, getting the proper insurance that would satisfy the secured lenders, getting the proper transportation, going to a certain place, getting a guy to put it all back together.

So this is the guy who was the other part of the order. These were legitimate

Page 161

folks, both of them.

Q. And the secured creditors were taking the position that those purchase orders were phony?

A. Yeah, because they're a main competitor. And they also lied directly to me and lied directly to the judge, and they got caught in that lie. I have the e-mails from Margaret Westbrook telling me, oh, I don't know where this is, and then telling me she can't tell me because of attorney-client privilege. Well, if you don't know where these things are, then why would you need attorney-client privilege?

So, I mean, that's a pretty full answer. If you need me to follow up or if you have questions about it, I'm happy to tell you what I know.

Q. Do you recall what the court found about those purchase orders?

A. The court didn't find anything about those purchase orders. The court had an issue with another promise of -- again, not a purchase order but a promise of financing from --

41 (Pages 158 to 161)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                    Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 162

Q.   The $300 million financing?

A.   -- from another company, and what we were able to find out, myself and Vince, was that this was a legitimate, you know, offer from them, but it hadn't gone anything further.  The judge wanted to know if there was any issue.  And in court, she -- and I'd have to go back and look at the transcript. She told Mr. Caponi that this was meritless, we're not going to deal with this now.

Now, she may have -- I think she made some reference in the order, but it wasn't to the Cystar and Southern Telecom orders.  It was to this other -- and, again, our firm was not sanctioned.  Our firm was not, you know -- their Rule 11 motion failed. She just happened to put some provision into the order that references that she didn't trust Mr. Rajan, but didn't say anything about us.

And, again, in this mail storm of litigation with people in China, we did our best and we did a full review of this.  And, again, all of this would have gone in front of a judge and gotten approved under plan and

Page 163

disclosure statement.  So we would have had witnesses then and everything else.  This was only to show that there was some viability here.

Q.   Did you review the debtor's schedules before they were filed?

A.   No.  Mr. Fisher did those.

Q.   When did you ever review them?

A.   We reviewed them when there were issues bought up by the United States Trustee about the operating report.  So we had to go back and double check and see what had been going on, and we had explained to the United States Trustee that all of the books and records from the company were still locked up in a server in Eindhoven.

We also explained to them that we largely were using the work that was produced by the Dilworth firm by Larry's team, McMichaels, and that we had to piece together what we could piece together because we didn't have records and the operations were kind of stalled with all the litigation.  So we had to rely on the best available, and the best available was what had been done by the

Page 164

Dilworth firm.

Q.   Take a look at Exhibit-59.

A.   Okay.

Q.   Turn to the second page.

A.   (Witness complies.)

Q.   If you start at the top, it's kind of in reverse order.  It's an e-mail from you April 24, 2023 to Chris Michaels.

A.   Okay.

Q.   You see it?

A.   Yes, I do.

Q.   You sent that e-mail, correct?

A.   Yes.

Q.   You said, "First we have to revise the schedules to include you.  We'll get this sorted out this week."

The "you" is Rembrandt, correct?

A.   Yes.

Q.   Rembrandt was not listed initially as a creditor, correct?

A.   Correct.

Q.   Was it ever amended to list Rembrandt as a creditor?

A.   I believe so, yes.  But you'd have to ask Mr. Fisher.  Again, I can't be

Page 165

everywhere.

Q.   Well, what, if anything, did you do to make sure the schedules got amended?

A.   I called up the company and I called up Mr. Fisher and said, here's an issue we're having with Rembrandt, please handle this. And it even says at the top of the second page, "First we have to revise the schedules to include you.  We'll get that sorted out this week.  Copying Bennett to start that process."

Q.   And you're pretty sure it was done?

A.   I'm pretty sure it was done.  I mean, obviously if you have something to prove me wrong on that, let me know, but I'm pretty sure we did that.

Q.   We had touched on very briefly that $300 million equity funding that was allegedly available for Stream.  Do you recall that testimony we talked about?

A.   Yeah.

Q.   What role did you personally play in determining the authenticity of that potential financing?

A.   We had --

42 (Pages 162 to 165)

Page 166

Q.  Don't say "we."  I want to know about you.

A.  Sorry.  Me?

Q.  You personally.

A.  We didn't do it by ourselves.  I didn't do it by myself.

Q.  Did you do anything personally?

A.  By myself?

Q.  No.  You could be doing it with other people, but I want to make sure you're doing it.

A.  Yes.  Yes.  Yes.  And we did it -- myself and Vincent Alexander did it together because of the allegations from Mr. Caponi and the Rule 11 issue.

Q.  Right.  The allegation that it was phony?

A.  That it was phony, right.  And I think we did -- I think we had conversations on WeChat, which is a pretty popular way for people in China to have conversations, and we produced -- I think we produced -- and I might be wrong about this, but I thought we produced the WeChat conversations to the judge where the guy said, yes, you know, if

Page 167

you guys can get your bonding equipment back, if you can get this going, our company would be more than happy to fund -- this is a wonderful project.

Now, he didn't give times, he didn't give dates, but the reason that those had been put in front of the court is the other side was saying there's nothing here, there's no one there, no one is interested in this, and they were doing their darnedest to make sure that nobody was interested in investing in the company or helping with production, because they were competitors.  They wanted to take this -- if they weren't going to win in court, they were going to win through attrition and with litigation.

So those are the steps that myself and Vincent Alexander took.  We personally corresponded, felt comfortable enough to say, yes, this is someone who has an interest here.

Q.  Let's take a look at Exhibit-62.

A.  Okay.

Q.  It's an e-mail from your partner, Vincent Alexander, to Mathu Rajan and others,

Page 168

including yourself.  It's dated June 21, 2023, correct?

A.  Yes.

Q.  And the subject is Stream TV Networks, Inc. equity funding, correct?

A.  Correct.

Q.  And that's the $300 million proposed funding of the Chinese company, correct?

A.  Yeah.  I think they said they could have that available, and I believe it was also some smaller amounts to begin with, 30 million or whatever it may have been.

Q.  It references in here that LBBS still has not had any communications with either of these entities that may be providing equity funding.  Do you see that reference?

A.  Yes.

Q.  So this is as of June 21, 2023, correct?

A.  Yeah.

Q.  When did those conversations, if any, take place?

A.  I can't remember.  I'd have to see the WeChat things from the file.  I can't

Page 169

remember.  But we will look for them.

Q.  I'm pretty sure they're in here.

Do you recall what the court said about that funding?

A.  When?

Q.  In the memorandum decision which appointed the Chapter 11 trustee.

A.  I'd have to pull it out, but she was not kind to our client, but she did not say anything about our firm.  And I'm going to be kind to the former judge right now too.

Q.  Let's turn to Exhibit-72.

A.  Okay.  Give me a sec because I got to -- oh, this is an untouched binder.  I'm excited.

Okay.

Q.  So this is a series of e-mails.  One at the top is your partner, Vince Alexander, August 4, 2023.  You remember, the last one was in June relating to this alleged $300 million financing.  Now we're in August.  And Alexander writes, "This is not going to be sufficient.  We need to have a call with William or an appropriate Zhongsheng representative.  I'll make myself available

43 (Pages 166 to 169)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                             Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 170

at any time. We'll get a translator, if necessary. This needs to be arranged ASAP."

MR. PREZIOSI: Steve, I'd just like to note on the record that the attached document or information referenced in the lower e-mail --

MR. COREN: Is not attached.

MR. PREZIOSI: -- is not attached.

MR. COREN: I think you'll find --

MR. PREZIOSI: Was it not available?

MR. COREN: I think you'll find it's the same answer. Andy would know.

MR. BELLI: I don't know. I'd have to go look to see if your firm produced the entirety of this discussion.

MR. PREZIOSI: Okay. We can follow up. Thank you.

BY MR. COREN:

Q. So can we agree that as of August 4, 2023, neither you nor Mr. Alexander or anyone else at your firm, to your knowledge, had had direct contact with this proposed financier

Page 171

of $300 million?

A. That's probably accurate, yes.

Q. Okay. Take a look at Exhibit-73.

A. Okay.
Okay.

Q. You'll see this is a pretty large document with exhibits and you'll see an alleged term sheet attached --

A. Yeah.

Q. -- at the end signed allegedly on behalf of Zhongsheng Group Holdings LTD, investor, and it's a term sheet dated September 17, 2022?

A. Yes.

Q. Between that entity and VSI, signed by Mathu Rajan?

A. Yes.

Q. And those were exhibits to kind of a Rule 11 safe harbor letter --

A. Yep.

Q. -- that says, hey, we think this is bad or phony or whatever, we're going to give you a chance to address it before we seek sanctions?

A. Mm-hmm.

Page 172

Q. And your partner writes back to the e-mail, "We must take this letter seriously and make sure that we have sufficient backup for the Zhongsheng term sheet. At the motion to compel hearing, Judge Coleman also indicated that she is interested in making sure that the Zhongsheng term sheet is truthful, so this issue will not be going away."

A. Yeah.

Q. So you knew that was a rather important issue in the debtor's bankruptcy?

A. Yes.

Q. Exhibit-74.

A. Okay.

Q. Same issue, August 4?

A. Yep.
Did you ask a question or...?

Q. No.

A. Oh, okay. Sorry.

Q. Let's talk WeChat, Exhibit-77.

A. Okay.

Q. So this is a series of e-mails from you, ThomasPark@Streamacquisitiongroup.com. It has some WeChat documents attached from

Page 173

you, and this is August 7, 2023, correct?

A. Okay.

Q. Now, who was on -- were you on this WeChat?

A. I don't know if I was or not. I can't confirm that. You know, they have restrictions. So we may have had some issues getting on, but Jeff Shammah, who is a broker, is the person who made the contact. I guess he's at Blue Ocean something, I believe. And we were trying to involve -- again, involving Tom Park. He was kind of doing things for free, but trying to involve him because Mr. Rajan was sick and, you know, there were different times where we wanted to see if Tom would help out.
So I don't know if I was on this WeChat. I don't know if I could get in, but Mr. Shammah had direct contact with him and was providing us this information.

Q. Well, did this information provided to you satisfy you that that transaction was real?

A. No. The thing that satisfied at least that we had an offer from someone was

44 (Pages 170 to 173)

Page 174

the fact that we talked to Jeff here.  You know, I don't speak Chinese.  I don't speak Mandarin.  We do have some colleagues now who do.  And Vincent and I felt comfortable after talking to Jeff and at least seeing the evidence and doing some research on the -- then again, somebody had signed the term sheet and they were going to buy shares, and my question is, why not see if the money comes in.  And the reason that they didn't want -- that Mr. Caponi didn't want to see the money coming in is because then we'd actually maybe go to production and he would lose, straight out.

Q.  But that term sheet was to VSI and it was a year earlier in 2022?

A.  They gave an indication, Shammah, that these guys were willing to come in and do it.

Q.  Who told you that?

A.  Mr. Shammah.  He's the broker.  He's the guy who set this up.

Q.  And based on that, you vouched for this in court?

A.  Based on that, based on the WeChat

Page 175

that, yes, there was a signed subscription agreement.  And based on the nonsense that was coming from Mr. Caponi telling us that this wasn't the right company, misidentifying it, saying it was a Hong Kong entity when it wasn't, yes, we had extreme doubts that Mr. Caponi was there to make sure that justice was going to be done that day.

Q.  And you don't recall the court basically found that alleged transaction was phony?

MR. PREZIOSI:  Objection to form.

THE WITNESS:  No.  No, I don't.  As matter of fact, that was -- give me the time periods here.

BY MR. COREN:

Q.  The opinion of the court.

A.  Yeah.  And when was that, Mr. Coren?  That opinion was done months later in hindsight from a judge who -- again, I'm not going to be disrespectful to the judge, but with all due respect, we disagree with her assertion there, and was thankful that she didn't attack our firm and just attacked

Page 176

Mr. Rajan.

Q.  Did you ever have a concern about Mr. Rajan's credibility?

A.  I had a concern about Mr. Rajan's health.  I had a concern about how someone who had been constantly hounded by two major law firms that went on a personal character attack.  I think Mr. Rajan is a little bit of a boy scout when it comes to those issues, but I think Mr. Rajan is also a really good salesman, but that's -- I never had a problem with his credibility, because we always had to go check on certain things.  But do I think that in a world where you're not even up to a Series B, much less C, and you're still relying on different shareholders who are offshore people, et cetera, this was -- obviously there had to be something there or they wouldn't have fought so hard or put this much money into it over the years.

Q.  Trustee Exhibit-79.

A.  Okay.

Q.  What role, if any, did you play in the negotiation or preparation of this settlement amendment dated August 12, 2023?

Page 177

A.  I'm sure we worked on this with Mr. Michaels, and this looks like an example at first quick reading of the continuing -- you want to call them forbearance or other agreements, because I think Rembrandt would have loved to have some money directly from VSI or Stream, but at different times were really relying on trying to get the help in the bankruptcy case that they needed to start production.  And I believe this also tied into the plan and disclosure statement.

Q.  Can we agree court approval was neither sought nor obtained with respect to this settlement amendment?

A.  It was attached to our plan and was contingent on plan approval.

Q.  You want to answer my question?  I think the answer is yes.

A.  You don't need to get court approval when something is contingent upon plan approval, which would be court approval.

Q.  Turn to the second page.

A.  Okay.

Q.  Part of this was effective even if there was no plan approval.  Do you see that

45 (Pages 174 to 177)

Page 178

reference?

A. Where, please?

Q. The very bottom, "failure to gain plan acceptance."

A. I have to look at -- yeah, but it says certain things survive, certain things don't.

Q. Well, okay. So it tells you what survives.

A. Correct, but I don't know what Section 1 -- Roman Numeral I, Capital A (1) means. I have to go back and actually look and see what's there. So A (1).

Q. It's right on this two-page document.

A. What is?

Q. What's being referenced.

A. I know. I have to flip back to the first page.

MR. PREZIOSI: Steve, you're not asking him questions. You're just bickering with him. You think that's an appropriate thing to be doing?

MR. COREN: What I think is appropriate is to point out that his

Page 179

testimony was incorrect and I'm giving him a chance to fix it.

THE WITNESS: What testimony? What is it you would like to know?

BY MR. COREN:

Q. You said this document was contingent upon plan acceptance and, therefore, you didn't need court approval, and I'm pointing out and your testimony --

A. Oh, and you're testifying that there's certain things that are still there. Okay.

Q. Yes. That's the point.

A. Okay. Well, the certain pieces that are here talks about reverting to the original settlement terms, which would have been a pre-petition contract, which again doesn't -- again, we've talked about what would happen here. No payments, nothing would be going out.

Q. Let me read it to you.

A. Go ahead.

Q. Bottom of the second page, "In the event Stream's plan of reorganization is not approved, then Section I, A (1), Section I, A

Page 180

(2)(d), and Section I, D shall continue in full force and effect, but the remaining terms shall revert to the original settlement terms."

You see that?

A. Okay.

Q. So there were parts of this settlement amendment that were effective regardless of plan approval. Can we at least agree on that?

A. Yes, there are. You're correct.

Q. And can we also agree that court approval was not sought or obtained with respect to this settlement amendment?

A. Yes.

Q. Thank you.

Let's turn to Exhibit-80.

A. Okay.

Q. It's an e-mail from you on August 13, 2023. The subject, VSI proof of funding.

A. Okay.

Q. You sent this e-mail, correct?

A. Yes.

Q. "Dear Dan, Bud tells me and you all

Page 181

told me that we have the board resolution and some other documents that show the funding. Please send to me immediately."

A. Okay.

Q. Why did you send that?

A. I have no idea.

Q. Did you ever get the documents to show VSI proof of funding?

A. I don't know. Honestly, this is just a floating head in space, because there are -- I don't know in the context of -- I don't know who it was they were saying was sending the proof of funding. I just don't know. Somebody may have called me and had said, hey, we've got this coming in. I mean, Adam Swick -- there's Adam's name -- and John Thompson, they're copied here. I'm assuming this has to do with potentially some funding related to the plan, but I would be totally guessing.

Q. Let's not totally guess when we're testifying under oath.

A. Again, I'm telling you if I were to answer, that's what I would be doing. So I just don't remember.

46 (Pages 178 to 181)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                        Videotape Deposition of Rafael X. Zahralddin                        March 30, 2026

Page 182

Q.  That's a good answer, "I don't remember."

A.  **Thank you.**

Q.  Trustee Exhibit-81.

A.  **Trying to do my best.**
    **What is it, 81?**

Q.  License and covenant dated August 14, 2023.

A.  **Okay.**

Q.  Can we agree that court approval of this license and covenant was neither sought nor obtained?

A.  **That's correct.**

Q.  Let's turn to Exhibit-141.  You'll have to switch books.

A.  **Okay.  Give me a sec.**

Q.  Then we'll be going back to the other one, so leave it.

A.  **I'm nostalgic for the other binder, so that's great.**
    **All right.  141.**

Q.  Series of e-mails.

A.  **Yep.**

Q.  The top one is from you.  The subject, the comeback trail MORs, monthly

Page 183

operating reports, August, September.

A.  **Okay.**

Q.  You said, "I sent around a Zoom.  I need all drafts and all backup for the MORs we have to amend and the new ones we have to file.  This snafu," all caps, "is going to get the case converted," case converted all caps.  "I can't be more serious about this issue," all caps.

A.  **Yes, sir.**

Q.  Do you recall what the court said in the memorandum opinion about the monthly operating reports?

A.  **Yes, I do.**

Q.  Not positive, was it?

A.  **No, it wasn't.**

Q.  And those monthly operating reports were filed by your firm?

A.  **They were filed by our firm.**

Q.  You'll see your e-mail at the bottom of the page the day before.

A.  **Yeah.**

Q.  Same subject?

A.  **Mm-hmm.**

Q.  You write, "Client and Bennett, we

Page 184

need to resolve this issue right now, not tomorrow, not the next day."

A.  **Correct.**

Q.  Do you know when, if at all, it was resolved?

A.  **It was completely resolved.**

Q.  I said do you know when?

A.  **Very soon after that.  I'd have to look and see when we filed the amended MORs.**

Q.  Could that have been towards the end of December?

A.  **No.  Those were refiled after we spoke to the U.S. Trustee and we had a 2004 examination.  While I respect the decision of the U.S. Trustee to do that, I still disagree and so does Bennett as to the reasons why.**

Q.  Let's turn to your e-mail of December 8, 2023, Trustee-142.

A.  **Okay.**

Q.  "Dear Bennett," you wrote, "can we please get the amended MORs filed before we get creamed on Monday.  If you review this list, you will see that they are using the current MORs as evidence as to how," all caps, "Stream is not our client and really is

Page 185

VSI and as such, we should be disqualified from the case," and you highlighted "be disqualified from the case."

A.  **Yep.**

Q.  "They want us not to be paid and be disqualified.  Can we get the MORs filed so I can include them on the exhibit list that is due."

A.  **Yes.**

Q.  Double exclamation point.

A.  **Yeah.**

Q.  This was obviously a rather big deal at the time?

A.  **Yes, it was.**

Q.  Let's turn to Exhibit-85.

A.  **Okay.**
    **Okay.**

Q.  This is your second supplemental declaration; is that fair?

A.  **Yep.**

Q.  And this is -- you filed this on December 7, 2023?

A.  **Mm-hmm.**

Q.  What caused you to file this?

A.  **If I remember correctly, we were**

47 (Pages 182 to 185)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                               Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 186

talking to the U.S. Trustee and we went through all of the information. They told us what they would like to see disclosed, and we filed this. And also Scott Cousins had -- we have an ongoing obligation to disclose, and Scott Cousins had just joined as a partner and he had been involved as the Delaware counsel in the original Stream chancery case.

(Mr. Homony left the conference room.)

Q. Turn to Exhibit-86.

A. Okay.

Q. Motion of the United States Trustee to dismiss debtor's cases for cause under 11 USC 1112 Subpart (b), correct?

A. Mm-hmm.

Q. Did this come as a surprise to you?

A. No, it did not.

Q. And this was filed December 29, 2023?

A. Yes.

Q. And do you recall that the next week the court granted the motion to appoint a Chapter 11 trustee?

A. Yes, but not dismiss the case and no

Page 187

bad faith filing, et cetera. But yes.

Q. You say this didn't come -- why were you not surprised of this filing by the U.S. Trustee? Did they warn you it was coming?

A. We had discussions with the U.S. Trustee. Mr. Baker, not our current judge but Mr. Baker, said, hey, it's just business. He didn't care that Mr. Rajan was at Penn in the cancer ward. We didn't have anybody else, because we couldn't use Mr. Park because he hadn't been retained yet, even though it was eight months of waiting for that retention to happen. That should have happened almost immediately.

So it did not surprise me that without anyone to act on behalf of Stream, without having someone who was retained, and having only -- the only person who could help was Amanda Gonzales, who is a lovely lady but she -- I mean, they made her cry during the 2004 examination.

Mr. Fisher, Bennett, did come to the 2004 to assist, and we were -- again, we had a disagreement with the U.S. Trustee on their opinion of the monthly operating reports. It

Page 188

was more of a form rather than substance issue, and the judge basically said that as soon as the U.S. Trustee doesn't like what's going on, that's going to be a problem in this case. That was one of the reasons that I said this was going to get us into some sort of issue. So it did not come as a surprise.

(Mr. Homony re-entered the conference room.)

Q. Let's turn to Exhibit-90.

A. Okay.

Q. Well, before we do that, let's just make sure we have the dates right. Take a look at Exhibit-87, if you would, which is the court memorandum supporting the appointment of the Chapter 11 trustee.

A. Yes. January 5th.

Q. January 5th, 2024.

A. Correct.

Q. Now we're going to go to Exhibit-90.

A. Okay.

Okay.

Q. It's an e-mail from you -- well, a series of e-mails but dated May 1, 2024,

Page 189

correct?

A. Yes.

Q. Four months after the appointment of the Chapter 11 trustee, approximately?

A. Hold on a second. Let's make sure. When was the date of the --

Q. June 5 we said -- I'm sorry. January 5, and now we're May 1.

A. Yes.

Q. Now, on May 1, 2024, who were you representing?

A. Lewis Brisbois.

Q. Anyone else?

A. No. Lewis Brisbois, who has the largest admin claim in this case.

Q. You were communicating with Chris Michaels, copy to others, including then VSI counsel, Leslie Baskin?

A. Yeah.

Q. And you provided some edits. What were you editing?

A. I think -- again, they always asked me for historical information, so probably something in the facts, but I'd have to see the document in order to tell you exactly.

48 (Pages 186 to 189)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 190

Q. And so you're saying everything you did from this point -- is it fair to say your testimony is that everything you did after the Chapter 11 trustee was appointed was to represent your firm, that's it?

A. Yes. And actually the Chapter 11 trustee asked me early on to come in and help, Obermayer, and you were on some Zoom calls. I came in, assisted where I could, provided information. They begged me to come in, not just you guys but also Leslie, because she didn't have the history in the case. And we were just trying to make sure that whatever viable option was there would be there to help pay our bill.

Q. Take a look at Exhibit-91.

A. I have it.

Q. It's e-mails from you. What claim were you assisting in trying to have it disallowed?

A. Let's see. Likely I had received a request on this dealing with the secured creditor's claims, and as you can see in here, I said, "Please put this in a temporary matter under Stream account receivable

Page 191

collection."

Q. Turn to Trustee-94.

A. Okay.

Q. Looking at the top e-mail, you wrote in writing to Leslie Baskin, copy to Chris Michaels, "I would remove clients from that e-mail string, start a new one and tell them why."

What were you referring to?

A. Let me look at what was down below.

I'm assuming I got called about the TRO and I'm also assuming that I basically was telling Leslie that she had -- let me see if I see anybody on here. Oh, that there are at least on the Rembrandt side, there are clients mixed in -- well, maybe not. You know, I don't know. I'm looking at this and I just don't have the context for it.

Q. And you're representing LBBS?

A. Yes. Yes, seeking $2.7 million.

Q. Turn to Exhibit-95.

A. Yes. Oh, it's Mr. Darivoff, Phil Darivoff. He's the investor who introduced me to Larry McMichaels or introduced Larry McMichaels to Rajan and vice versa, because

Page 192

he was an investor to Stream, and that's how McMichaels got to me.

Q. Okay. 95, Exhibit-95.

A. Okay.

Q. You'll see the subject is VSI/Stream strategy call?

A. Yes.

Q. And who were you representing in this call?

A. LBBS.

Q. Why were they on a VSI/Stream strategy call?

A. Because Mr. Darivoff was preparing an offer to make people whole, get something to unsecured creditors. And he had Al Ciardi, who is a local lawyer that was his lawyer at the time, who is pretty well known in bankruptcy circles, and they had called me to alert me of this potential plan to fund the plan. I'm the largest administrative creditor in the case.

My firm has given me strict instructions to have information about what's going on in this case with this large a receivable.

Page 193

Q. Do you recall entering an appearance on behalf of your firm?

A. I don't believe I need to enter an appearance on behalf of my firm.

Q. I only asked -- we're not debating whether you need to or you're not.

A. Fair enough. No, I don't think we -- because we're already receiving all of the documents, so there was really no reason to spend more money on a case where we haven't been paid.

Q. Let me ask you, did you ever see the claim filed by Rembrandt in your bankruptcy -- in the debtor's bankruptcy?

A. I think I probably looked at it at some point, yeah.

Q. Do you remember it was more than a billion dollars?

A. Yeah.

Q. When you were negotiating the settlement agreement between Stream and Rembrandt that we talked about earlier, did you appreciate that that would give Rembrandt a $1 billion-plus claim against the debtor?

A. That is exactly the same claim that

49 (Pages 190 to 193)

Page 194

they would have had with Mr. Stastney, and that would not -- the resolution was a resolution based upon production.

Q. Do you want to answer my question?

A. Sure.

Q. Did you appreciate --

A. Redo it.

Q. Did you appreciate that the settlement agreement that you were negotiating between Stream and Rembrandt would give Rembrandt a claim against the debtor which was larger than $1 billion?

A. I appreciated that the settlement that we made would eliminate that type of claim. What Rembrandt does with a claim that doesn't get satisfied by the settlement or doesn't get approved or what they do later is on them. What we did was contain liability with our settlement with them, which was reasonable under the business judgment of the debtor at that time, because they had open purchase orders.

Q. I still don't think you've answered my question. I'm only asking what you appreciated, not whether it was a good thing

Page 195

or a bad thing.

A. No, no, no. I said I appreciated -- I had no idea they were going to put a proof of claim in for a billion dollars, but I appreciated that there was severe IP exposure and liability that would be at a much larger number than the resolution through production and providing TVs.

Did they give me a calculation or did my guys at Armstrong give me a calculation of a billion dollars? No. But I don't recall Rembrandt. I don't represent Rembrandt. Rembrandt does what it wants to do.

Q. Do you recall remembering that at the moment the settlement agreement that you had negotiated was executed on May 23, I think it was, 2021, $1.5 million was due? Did you know that?

A. At that point in time, yes, it was due and that was what was done. Subsequent forbearance, et cetera, went away with that, because Mr. Michaels, Mr. Blumenthal, Mr. Rajan got together and they all said, look, we're tilting at windmills until we

Page 196

actually get a plan fixed in place that produces the TVs. You know, all rights reserved. Let's see if we can keep going here, because they believed that the purchase order is real enough to get into an agreement with us.

Q. Did you expect that $1.5 million would be paid on May 23, 2021 when the settlement that you had negotiated was executed?

A. I believe that, yes. If they had gone into another bankruptcy, if there had been some protection, if there had been a resolution of the Chancery Court, that's what was going to happen.

Q. My question was the agreement was signed on May 23, 2021. At the moment it was signed, $1.5 million was due, not later.

A. I had no reason not to believe it was going to be paid. Two parties got together. That was a business term, not a legal term. I had no reason not to believe that that was going to be paid.

Q. Well, you knew Stream didn't have the money. You knew that, right?

Page 197

A. Yes, but I knew that there were equity purchases that could be made at any time to bring money into Stream. That's what had been going on for quite some time, including from Mr. -- the folks at Hawk and Mr. Stastney.

Q. You think they were going to make those equity purchases on May 23, 2021?

A. That's how -- that's the only way they had money coming in, which is reflected in those MORs, which is reflected in the fact that Akerman has been paid, you know, 5, 6, $800,000 to do something in this case, which is reflected on how Ms. Baskin was paid in this case. We're the only people that haven't been paid.

Q. Well, her firm has sued for their fees, correct?

A. Correct.

Q. Akerman sued for its fees?

A. I don't know if they've sued for their fees or not.

Q. How much is Ackerman owed?

A. I don't know. I don't work there.

Q. Turn to Exhibit-112.

50 (Pages 194 to 197)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                        Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 198

A. Okay.

Q. A series of e-mails September 23, 2025.

A. Okay.

Q. The bottom one from Bud Robertson to you and others, "Hi Raf, Mathu said he had a discussion with you earlier regarding proposed next steps. We have drafted a motion to compel a 26(f) conference and a cooling off letter to send to Steve Coren."

Did you have such a discussion?

A. Mathu has a lot of discussions with me, particularly when he's ill. So I think he did call us up and ask if we would come in and help represent him in a variety of different matters, and I told him that we would not be representing him unless he gave us a proper retainer and did so on a timely fashion, because for -- whether it's fair or not, our firm was not going to be extending credit to Mr. Rajan or any sort of entity that Mr. Rajan is involved in without the appropriate retainers.

He ended up not having us come into play here. We only ended up taking a

Page 199

representation in the Bunce matter to get him medical leave.

So he may have had those conversations with me, but my response speaks for itself. We don't represent you guys. You should talk to your counsel of record. And a lot of that was because, you know, we don't have a retainer and we didn't have a retention agreement signed with him.

Q. Take a look at Exhibit-113.

A. Okay.

Q. A memorandum opinion of the federal judge in the Eastern District of Pennsylvania filed September 9, 2025 in the Bunce litigation against VTI and Mathu Rajan, correct?

A. Yes.

Q. And this is the one your firm entered an appearance in, correct?

A. Only after -- way after this opinion and only recently to get the medical leave and to see if there was any issue with a trial on remaining issues after the summary judgment opinion, which are all gone now because they've been dismissed by the

Page 200

opposing counsel.

Q. Turn to Page 3 of the opinion.

A. Okay.

Q. By the way, did you read this opinion?

A. Yeah. I had to when we asked for the medical leave.

Q. So you're saying your firm was not in as of that point in time?

A. No.

Q. He writes the first full paragraph on Paragraph 3, "Recently defendants obtained new counsel."

Do you see that?

A. Yes. That was --

Q. Was that not you?

A. No. Mr. Weisberg, Matthew Weisberg.

Q. Who was it that got you involved after Mr. Weisberg? Did Mr. Weisberg call you?

A. No. No. Mr. Rajan called me and told me that he had some serious issues here at the University of Pennsylvania, mostly involving the fact that he was involved in these litigations and was not taking care of

Page 201

his health, and in order to get a bone marrow transplant, they needed someone to take this seriously.

He had then basically lost his spot in the University of Pennsylvania and had gone to four other hospitals looking for someone who would take him. City of Hope said they would take him. They were more aggressive with some of the treatments, and Mr. Rajan called and begged. He said, can you please help me, because if I don't get this done, I'm going to die.

And so that's why we took the case. We got an appropriate retainer, and we represented Mr. Rajan in this issue, myself and Lee Janiczek, who is in our Philadelphia office, and that is -- or Wayne, however you want to portray it. That's how we ended up here with this. But it was way after this and, you know, for whatever reason, Mr. Weisberg and Mr. Rajan weren't speaking. He was obviously flipped out by that, very ill and asked us to help him. And Mr. Fisher's wife died from the same type of leukemia, so Bennett took great pains to say

51 (Pages 198 to 201)

Page 202

**we should really try to help him.**
        MR. PREZIOSI: Is now an okay time to take a five-minute break?
        MR. COREN: Sure.
        MR. PREZIOSI: I got to touch base with --
        MR. COREN: Take a little more than five. Take what you need.
        MR. PREZIOSI: Five minutes is good.
        THE WITNESS: Okay.
        MR. PREZIOSI: Thanks.
        VIDEO TECHNICIAN: Going off the record. The time is 3:42.
                - - -
        (Short recess.)
                - - -
        VIDEO TECHNICIAN: Back on the record. The time is 4:02.
BY MR. COREN:
    Q. Ready?
    A. Sure.
    Q. Pull your docket out again so we can get some dates fresh. It was the last exhibit in there.

Page 203

    A.  147?
    Q. Yeah, I think so.
    A. Okay.
    Q. And turn to Page 37 of 133. It's July 13, 2023.
    A. Okay.
    Q. And the docket entry 293.
    A. Okay.
    Q. 277 pages containing three documents. The disclosure statement filed by Stream TV Networks, Inc. with attachments. Exhibit A is the proposed plan. Exhibit B, restructuring agreement.
    A. Yeah.
    Q. And filed under your name, correct?
    A. Yeah.
        MR. PREZIOSI: Steve, I'm sorry. Can you give me that docket or document number again?
        MR. COREN: 293.
        MR. PREZIOSI: Thank you. Sorry to interrupt.
        MR. COREN: Page 37 of 133.
        THE WITNESS: Okay.
BY MR. COREN:

Page 204

    Q. And of course you read that filing before it was made?
    A. Yeah. Yeah.
    Q. And I think you had said you had worked on that for some period of time, it just didn't --
    A. I just don't remember how long, but yeah. It would have taken us a while.
    Q. What do you think? A month, two months?
    A. I thought it was a couple months, but maybe not.
    Q. But that's typical in something this large, right?
    A. Yeah.
    Q. You don't generate it overnight?
    A. No. No.
    Q. And what -- it's a big document. Just tell me what you -- a very, very high level, what was the exit strategy from bankruptcy?
    A. If I remember correctly, we had a rights offering which was -- let me take a step back.
        We originally had gone to the

Page 205

secured creditors and said, hey, we want you to be involved in this. We just need you to either sign confidentiality or joint defense agreement, and we gave them a brief sketch of it, said we want to pay you over time, we'll get you paid, we're not going to try to cram you down and not pay you, but obviously we're going to have to go back. We have a fiduciary obligation to make sure the number is right, but we'll make sure that we're taking care of you that way.
        And we got a flat, unless it's a lump-sum payment, we don't even want to talk to you.
        I said, okay.
        So then we went and spoke with Rembrandt. We were current with the Philips license. We didn't have an issue with Philips. And we had to get current with Rembrandt in the sense of this is what's going to happen for us to be able to use their license, and we had the two open orders that were still there and ready to go as long as we could get certain things done.
        So there was money coming in that

52 (Pages 202 to 205)

Page 206

could then be used for production.

Q. From the orders you mean or...?

A. Well, in exchange -- yeah, from the orders. And in exchange for that, VSI would receive equity through the plan, but they were also going to put in some money to underwrite the plan. So I think we had a rights offering in there. I'd have to look at the document to make sure, but there was a rights offering. And I think the last iteration of the plan, what we did in order to extend like a peace offering to the secured creditors is, we gave them the ability to come in and also make a purchase out of the rights offering that would go out to the market. There was a backstop. VSI was also backstopping it to the extent that there was a percentage that wasn't picked up by the market or turned down, say, for example, by the secured creditors. Then they would come in and backstop that, and that's how we would exit the bankruptcy.

Q. So VSI was essentially the funding source --

A. Yes. Yes.

Page 207

Q. -- for the plan?

A. Yes.

Q. And you filed the plan and disclosure -- well, let's bookend. The bankruptcy filing is March 15, 2023, correct?

A. Yeah.

Q. And you filed your plan and disclosure statement July 13, 2023?

A. Mm-hmm.

Q. March, April, May, June, July. About four months essentially?

A. Mm-hmm.

Q. And how much of that -- I know it's tough, we're going back a few years, but, you know, I take it you didn't start working on it before the bankruptcy filing, meaning March 15, 2023, did you?

A. No, because we were approached to come in and help. We had to run conflicts. We had to make sure we had the initial retainer.

We had discussed ways to use the bankruptcy process to resolve this problem with the secured lenders and, you know, being able to marshal our assets back, being able

Page 208

to retrieve things, being able to get the production equipment back, for example, samples, and there were a lot of companies that had worked with Stream in the past, like Bosch, that when they heard we were in bankruptcy and we were kind of removed from the problems with the secured lenders, at least in a better position to bargain with them, they started calling and coming back.

So we didn't have anything drafted frankly until, again, Judge Coleman said she was tired of the litigation, back and forth, this and that. She said, show me something, debtors. It's your responsibility to go get something done productive that moves towards a plan or an exit, and that's when we began working on this.

Q. And who was doing the laboring or on the preparation? Was that you?

A. No, not just me, but I'd have to go back to the -- I mean, I think it was spread around to a lot of folks. I think we also had -- we were working with VSI primarily. We already really had the principal pieces with Rembrandt, and when we spoke to

Page 209

Rembrandt, they said, oh, we're surprised about some of the things in the plan.

I'm like, how are you surprised by this? We've been talking to you trying to deal with this, and it pretty much encapsulates the agreements that we've made with you.

Again, in order to get production done, we didn't need to be embroiled in TROs and things of that nature, which would have been the result of IP litigation. We needed to have a clean slate that way. And in order to get money in, we needed to produce TVs. That was the business judgment that was being exercised by the debtor at that time. That's what the plan laid out.

Q. And let me show you what we've marked as a new exhibit, Trustee-148.

A. Okay.

MR. PREZIOSI: Thank you, Steven.

BY MR. COREN:

Q. This is an Exhibit C to a filing on April 21, 2023, and it's an exclusive distribution agreement.

53 (Pages 206 to 209)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                    Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 210

A. Okay.

Q. And do you recall what that filing was? We can look here.

A. 135. Is it in this bankruptcy or another?

Q. I believe so.

A. There's no -- hold on.

Q. 4/21 --

MR. PREZIOSI: Case number?

BY MR. COREN:

Q. -- 2023. You see it there? It's a motion to approve.

A. Yeah. Yeah. I remember this now.

Q. And what was this all about?

A. We had discussed with the court the odd situation that we had, which I don't think anyone had the same experience where a company has all of its assets taken away, all of its employees run away or were scared away and there's one person left and then everything is transferred to a second company and then a court, highest court in that state, says give it all back, and then that -- again, that competitor who set itself up to do all this stuff fights tooth and nail

Page 211

for over a year, still not returning any equipment, still not returning source codes, still not returning the servers, the e-mail addresses, everything. So we had discussions with the court about, you know, what is ordinary in this case, what is ordinary course. Because you don't need permission from the court in order to effectuate ordinary course transactions, and this company had never produced -- I mean, they produced some TVs at some point, but that's not how they were getting their money. Their money was through subscription agreements. Okay?

And so we filed some motions or we filed a motion with several different pieces to it asking the court to bless these as ordinary course transactions, and this was one of those documents.

Q. Do you recall what the others were?

A. So this one was for subscription agreements, right?

Q. No. This is the distribution agreement.

A. This is the distribution agreement.

Page 212

And then I believe the others were -- I thought the others were -- I could have sworn we also had some for the subscription agreements. That may have been at a different time.

Q. Okay. But anyway, this distribution agreement was between VSI and the debtor, correct?

A. Yeah.

Q. Filed about a month after the bankruptcy was instituted?

A. Yep.

Q. What role did you play in the negotiation of this exclusive distribution agreement?

A. I'm not sure I played -- I mean, I probably had seen it, but at that point, they had a special committee. As you can see, Mr. Corso was one of the directors of VSI. He signed for VSI. And one of the other directors and general counsel, Dan Rink, was also on that special committee.

So more than likely, they did the majority of the negotiations with Mr. Rajan, and Mr. Rajan then shared the documents

Page 213

afterwards with us. And I just can't remember who specifically worked on this. But, yes. I mean, I've read it and I understood it, and -- but I'm not sure if I'm the one who worked on this or Vince or one of the other lawyers.

Q. Well, I guess by looking at your time records, we could probably figure that out.

A. Yeah. Yeah.

Q. We won't take the time now to do it.

A. Sure.

Q. But who represented -- what attorney represented VSI in connection with these negotiations?

A. Again, I'm pretty sure this was -- at this point in time, it probably was Dan Rink that was doing that, the in-house counsel, but it could have also been -- Akerman could have been involved, because Akerman was involved in creating the -- in creating the special committee. And I'd have to see when Akerman was engaged, but I'm pretty sure -- let me restate that.

There may have been a time where we

54 (Pages 210 to 213)

USBC, Eastern District of PA              Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                     Videotape Deposition of Rafael X. Zahralddin              March 30, 2026

Page 214

were saying you need to get somebody else, Mathu, to be on the other side of this. It can't be you negotiating with yourself. Whether Akerman was retained at that point or not, I'm not sure, but Mr. Rink was there the whole time. And I think we also pushed them to get proper bankruptcy counsel to make an appearance, and that's where Akerman came from.

Q. So Mr. Rink was -- he was counsel for VTI back in the VTI days, correct?

A. Yeah. Sure.

Q. Was Mr. Rink ever counsel for Stream, to your knowledge?

A. He may have been counsel for Stream way back when when Stream was in the very beginning in the Chancery Court. He may have been counsel for Stream at the time of the omnibus agreement, maybe. I don't know what his status was other than that because -- I do know what we did in discussions with Akerman. We told them, Dan has to pick where he is, and you're telling me the only person left at Stream is you, Mr. Rajan. And if Dan is going to be doing anything at VSI, he

Page 215

needs to be nothing but VSI. That's my understanding of what they did.

Q. But as you sit here today, you don't really know back in this timeframe whether he was VSI or not?

A. Whether he was VSI? I'm pretty certain he was VSI at that time, Dan Rink, yes.

Again, I can tell clients to do things, we can push them, and they assured us they had those folks and they gave us Mr. Corso. I can't remember -- I'd have to see who -- but there were at least three people, Mr. Corso, Mr. Rink and someone else, that were dealing directly with Akerman.

Is this my copy or would you like this back?

Q. No, no. You can leave that there.

A. Okay. Thanks.

Q. Take a look at Trustee Exhibit-64.

A. Okay.

Okay.

Q. This is an e-mail from you July 4, 2023, correct?

A. Yes.

Page 216

Q. If you go down to the fourth paragraph, started "as noted"?

A. Okay.

Q. You say, "I have heard back from Adam Swick at Akerman that he has cleared preliminary conflicts."

A. Okay.

Q. That's July 4, 2023. See that?

A. Okay.

Q. So Ackerman prior to July 4, 2023 was not representing VSI. Can we agree on that?

A. Sure. Sure.

Q. So back when this exclusive distribution agreement was being negotiated between the debtor, Stream TV Networks, Inc., and VSI, Ackerman was not representing VSI; is that fair?

A. Yes, because this helps clear that up. So, again, it probably was Mr. Rink.

Q. Okay. Well, you say "probably was." Are you aware of any other lawyer with which you or anyone at your firm dealt to negotiate this exclusive distribution agreement?

A. No. And that distribution

Page 217

agreement, I don't know how long ago. It could have even been prepared pre-petition with VSI. I don't know when they ended up finally signing it, but that's all I know.

Q. Well, it's dated March 31, 2023.

A. I understand that, but they could have had, you know, other drafts, other agreements and then decided to put refinements on it because we were pulled together. So that's dated March what?

Q. 31.

A. Okay.

Q. 2023.

A. Yeah. So I think originally -- originally I believe that the debtor thought they were going to be able to come in and get the usual first-day relief and have their equipment come back and they had in hand a distribution agreement that would be turnkey so that all someone needed to do was fulfill the orders, and that didn't happen because we had an onslaught of litigation from then on.

So it may be that they prepared that to show the court good faith, hey, here's what we have, and then we were unable to move

55 (Pages 214 to 217)

Page 218

on that because we were busy dealing with motion to dismiss, motion to convert. We had -- the violations we had from the automatic stay with the -- I mean, there was a lot of stuff that came down the pike that we had to deal with.

Q. But you just gave me a maybe this or maybe that. Do you have any recollection as you sit here today that there was an exclusive distribution agreement that had been prepared prior to the bankruptcy filing on March 15, 2023?

A. Don't know. Don't know. Don't know.

Q. That's fair.

And while you surmise that Dan Rink represented VSI in connection with the negotiation of this agreement, you don't really know, do you?

A. No. No.

Q. Okay.

A. I'd have to find an e-mail or trace it back.

Q. Okay.

A. But I'm encouraged by the fact that

Page 219

it's not Mr. Rajan on both sides of this signing it. So I'm encouraged that someone else was doing the work on the side for VSI other than Mr. Rajan.

Q. Turn to Exhibit-68.

A. Okay.

Q. There's an attachment, Attachment A. This is an e-mail from you to Adam Swick on July 8, 2023, correct?

A. Yes.

Q. And it was on July 4 Adam Swick reported to you they had cleared preliminary conflicts.

A. Okay.

Q. So they're not in the case yet. It's July 4.

A. Okay.

Q. You're writing to Adam Swick on --

A. July 8.

Q. -- July 8, a few days later, correct?

A. Yes.

Q. And July 13, five days after that, you filed your plan and disclosure statement.

A. Okay.

Page 220

Q. Correct? I'm just looking at the docket.

A. Yeah. Sure.

Q. Now, take a look at the attachments to your e-mail to Mr. Swick.

A. Yeah. I can read them.

Q. Were any of those attachments to the plan and disclosure statement filed about a week later?

A. No. There are a million plans out there. So we looked for -- we may have had some pieces and parts to stuff, but once we figured out the deal points, there are a million plans out there, including the Revlon plan which had, you know, a rights offering in it. Once we decided that the rights offering was the way to go, we're not going to reinvent the wheel. We have to go get what we think has been approved in some other courts, you know, a prominent case like Revlon, and then we got to pare it down or modify it to fit what's going on here in this case.

So, no. Those are just -- those are forms. In other words, I pulled some --

Page 221

after -- we may have had some conversations -- again, it was July 4th, but I think we were probably talking to some folks before that, and likely -- I got to go back and see when the judge asked us to look at something, because I'm pretty sure that I worked with our group to try to figure out which way we would attack this. And once we got counsel for VSI here and we said, hey, yeah, let's take a look at a rights offering structure, we were trying to help, you know, get some things done. And I'm pretty sure I didn't just -- I mean, I probably had this or other models or templates that, you know, we look at and kind of collect that we thought might work here.

Q. So you wrote, "Here are the Revlon agreements, which we will need to modify."

That's what you just talked about?

A. Yes. Yes.

Q. Then you wrote, "This is really VSI's deal, so I'm sending to you directly" --

A. Yeah.

Q. -- correct?

Page 222

What do you mean by that?

A. They're the ones funding it. So, you know, they have to go in and make sure they're comfortable with the different provisions in the plan. They got to make sure they got the right protections.

I'm not going to let them negotiate against the debtor. You want certain things. Tell me what they are and let's see if they're reasonable, come back with the draft to us. That would be pretty typical with anybody financing. They're going to give us the money, but we got to make sure we don't give away the farm.

Q. So what did you get from Ackerman between July 8, 2023 and July 13, 2023 to inform what you filed on July 13? Did you get anything?

A. I'm pretty sure we had something, yes.

Q. Do you remember --

A. I don't remember, no, but I'm fairly certain we had multiple drafts that went back and forth. And as a matter of fact, I think in one of your papers you cite me chastising

Page 223

Daniel David, because he went to a wedding and didn't put the documents in a SharePoint. So it set us back a little bit and we had to redo some stuff. So we were actively trading, you know, versions back and forth.

And, again, we could modify the plan a million times. I think we wanted to show the judge we had serious partners, we had a serious pathway, here's what we're going to do, and then we could have modified that, including trying to incorporate some sort of settlement with the secured creditors. But we also wanted to make sure we preserved exclusivity, and filing the plan did that as well.

Q. Take a look at Exhibit-87, which is the decision of the court appointing the Chapter 11 trustee.

A. Okay. What section, what page?

Q. Exhibit-87 is the starting point.

A. Yes.

(Mr. Belli left the conference room.)

Q. Now, if you turn to Page 30 of the opinion.

Page 224

A. Okay.

Q. Can we agree that the court found that current management's actions and inactions constituted gross mismanagement of the estates?

MR. PREZIOSI: Objection to form.

(Mr. Belli re-entered the conference room.)

BY MR. COREN:

Q. It's right in heading No. 2.

A. I know what the heading says.

Yes. That was the court's characterization of this.

Q. And maybe this ties into what the court -- what you testified the court said about move forward with the bankruptcy rather than just making this a litigation forum kind of thing. The court found, Page 31, "Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the debtor's operations moving forward, these cases have stalled at virtually every turn."

Do you recall when the court first

Page 225

started expressing this kind of view? I know you said it had to be before you filed the plan and disclosure statement in July of 2023.

A. Well, I mean, we were frustrated with the court as well. The court did not have regular hearings for us. The court here laments not being able to -- or having to deal with all these emergency motions. The emergencies were caused by a very hostile competitor and secured creditor.

So it's very difficult to start producing TVs when they essentially absconded with a very large piece of production equipment, and it's very difficult to move forward when it takes eight months to get another person retained as an officer and director in the company with only Mr. Rajan, who has interest in both entities.

So I respectfully disagree with the court, but I do note that the court does say here either -- it was either unable or unwilling, and I think after we found out that Mr. Rajan was suffering from leukemia, that it was more unable as opposed to

57 (Pages 222 to 225)

Page 226

unwilling.

Q.   Let me ask you this:  The proposed funding source in the plan that was filed July 13, 2023 was VSI, correct?

A.   Yeah.

Q.   Prior to that, the proposed funding source was that $300 million equity provided by the Zhongsheng term sheet, correct?

A.   Yeah.

Q.   And that is -- the court writes that the debtors filed that purported term sheet on the evening of June 23, the Friday prior to the start of the trial on the pending Hawk motions.  Do you recall that filing?

A.   Yeah.

Q.   And why was that filing withdrawn as the funding source?  Why was that term sheet withdrawn?

A.   These were people that wanted to invest in a company that had some sort of stability, and you have people on the other side who don't want to get paid but wanted the assets instead.  They had set up a company for that express purpose.  It's not even a guess.  And they did everything

Page 227

possible to scare away and disrupt the investor pool that was out there, including former investors that were involved in here that would have funded the case.

So as there was more -- again, once we got the TRO, more people came back because they thought, oh, this must be safe now.  And then she came out with the, you know, opinion that appointed the Chapter 11 trustee, which then threw people again into -- if the company is only getting money from investor pools and those investor pools are constantly being freaked out by litigation and different decisions, positive or negative, that's what you end up with in terms of having to switch around.

These folks had people from K&L Gates' China office coming after them trying to prove that they didn't exist, and it freaked them out and they said, hey, I don't want to touch this, this is way too hot.

Q.   Well, they were obviously successful in persuading the court that that was a phony term sheet?

A.   It wasn't a phony term sheet.

Page 228

Q.   Well, that's what the court found.

MR. PREZIOSI:  Objection.
That's not what the court stated.

BY MR. COREN:

Q.   Turn to Page -- go to Page 43, 45 of the decision.

A.   Page 43, you said?

Q.   Yeah.

A.   Sorry.  I'm almost there.
Okay.

Q.   You see the Subpart (c), "The debtors have financed their post-petition operations by the transfer of Stream shares to VSI without adequate disclosure or court permission"?

A.   Yes, I see that.

Q.   You see that reference?

A.   Mm-hmm.

Q.   And the court writes that at the April 24 hearing on the stock sale motion, "Given that the debtors proposed to fund their cases through the sale of Stream shares to VSI, the court expressly asks whether the debtors had done so post-petition."
Do you recall that?

Page 229

A.   Yeah.  I recall that hearing, yes.

Q.   And the court was advised that they had not.  You were the person that advised the court they had not, correct?

A.   Correct.

Q.   And were waiting for court permission to do so.  That was your representation to the court, correct?

A.   Yes, that was my representation to the court.

Q.   In fact, counsel for the debtors acknowledge that, quote, We're coming to you because we know there are grave consequences to not getting permission from the court.  So even when things are in the ordinary course, people come to get permission, and that's what we did.
That's what you told the court?

A.   Yes.  That's exactly what I told the court.

Q.   The court never gave the permission, correct?

A.   Incorrect.  Incorrect.  And I'll go to my grave on this point.  We received -- in that same transcript the court says, what do

58 (Pages 226 to 229)

Page 230

you want me to do?  Do you want me to just say it's ordinary?  Because she said she didn't have time to have an evidentiary hearing on the employee issue, on the equity issue.

And I said, yes, Your Honor, I'd really like you to do that.

She goes, fine.  Those are ordinary. We have no need to do this.

And then I received a call from her courtroom deputy, and her courtroom deputy said, I'm taking these -- I think it was two or three -- motions off the calendar because the court has given you permission to do these things.

And that's why they came off.  I couldn't have made them come off any other way.

So I'm sorry.  That is something that is completely incorrect and that again --

Q.  What hearing did the court give that permission?

A.  It's the same -- I don't know if it's that hearing or the hearing after, but

Page 231

we had a hearing where -- it kept on getting continued, and I said, Your Honor, you need to give us time.  You need to give us time.

And she said, why are we doing this? And the main -- the reason I brought up the ordinary course piece was because the Hawk parties were arguing and objecting to me getting permission to do these things and saying, well, you know -- and creating -- and the judge said, no.  This happens all the time.  If you have an ordinary course thing, you come and ask permission, because if you don't and you're wrong, there could be some problems.

Now, none of the things we had there would have been problematic, but at the end of the day, that's the issue.  And I have to go back and look, but it's on the record where she says, go ahead.  And then -- again, I received and it's my testimony that her courtroom deputy called me and said, we're taking these three things off because the judge has given you permission.

Q.  Have you ever seen an order granting that permission?

Page 232

A.  I had an oral ruling from the court that says, you want me to say these are ordinary, and they then asked us to take the motions off.

Q.  Well, you told the court it wasn't happening, correct?

A.  No.  I never said that.  What are you talking about?

Q.  You told the court that you came for permission and that it was not going to happen until --

A.  No.

Q.  -- that permission?

A.  And I don't know if it was that hearing or later, but, again, we were getting an objection from the Hawk parties even having the motion, and that was in the context of my discussion.  They were saying, why do we even need to have this motion?  Why do we do this?  Because none of them were bankruptcy lawyers.  They had -- K&L Gates had a part-time bankruptcy lawyer who was on the case who was in North Carolina.  Steve Caponi is a litigator.  He doesn't know anything about bankruptcy law.  They didn't

Page 233

understand anything about these issues, and we were correcting them as debtor's counsel, as we should have.

Q.  I asked you a few minutes ago whether or not you made the representation that --

A.  You read from a quote from me, Mr. Coren, and I acknowledge that is a quote, but you took it out of context and you gave your own idea or spin on it, but --

Q.  Did you tell the court that post-petition the debtor was selling equity to VSI?  Did you tell that to the court or you told the court the opposite?

A.  What are you talking about?  I don't know.  You need to show me.  Is there something in the exhibit?

Q.  I just read it to you.

A.  No.  What you read to me in the exhibit was talking about ordinary course.

Q.  Page 43 of the decision.  Let's try it again.

A.  The court advised they had not, were waiting for court permission to do so.

Q.  The court was advised that they were

59 (Pages 230 to 233)

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                    Videotape Deposition of Rafael X. Zahralddin                              March 30, 2026

Page 234

not selling Stream shares to VSI post-petition --

A.  Yeah.  And let me explain that, of course.

Q.  Let me finish the question.

A.  Go ahead.  Go ahead.

Q.  And you were the person that represented that to the court?

A.  Correct.

Q.  Okay.

A.  Because what we were doing was fulfilling prior contracts.  We had gone through that with the United States Trustee.  There were subscriptions that were entered into pre-petition, which were ongoing obligations, and that's where the funding was coming from.  So --

Q.  There were post-petition obligations to sell shares that were created; were there not?

A.  We -- actually you have to talk to Mr. Fisher, et cetera, but my recollection is that we discovered and confirmed that we didn't have any new ordinary -- any new transactions.  Had there been another

Page 235

transaction, if I'm wrong about that, it would have been because we were told these were ordinary course, go ahead and keep doing it.  There's no other way for money to come in, and we were trying to move towards production.

Q.  Well, you certainly knew when this opinion was filed that as far as the court was concerned, the court never gave that permission, correct?

A.  No.  Until I saw that, I was floored when I saw that.

Q.  Well --

A.  When chambers of a court calls you up and tells you something, that is the judge speaking to you, unless that courtroom deputy has gone completely off grounds and decided just to do whatever he or she wanted, and we know that doesn't usually happen.  And, again, I had a representation in court and then I had chambers call me and expressly tell me, we're taking these off because the court said you can go ahead and do it, you don't need them.  Go take care of the employees or your independent contractors,

Page 236

and if you need to do this in the ordinary course, go ahead and do it.  And then she reverses that in her opinion.

I don't know if she had miscommunications with her outgoing deputy or what it was, but I know what kind of phone call I took.

Q.  Can we agree that the debtors did not appeal this decision?

MR. PREZIOSI:  Appeal -- I'm sorry.  Appeal the order?

BY MR. COREN:

Q.  The decision appointing a Chapter 11 trustee.

A.  How am I supposed to appeal that?  Mr. -- your colleagues over at Obermayer when I was just observing a case had a 30-minute tirade about how I shouldn't even be there because I was no longer counsel to anyone, to which I told them, hey, I'm here for my thing.

Q.  I had a very simple question.  Did the debtors appeal or not?

A.  No.  We couldn't appeal.

Q.  So that was not an appealable order,

Page 237

the appointment of a trustee, Chapter 11 trustee?

A.  No.  You know why we didn't appeal?  Because Mr. Rajan was sick.  There's a million different reasons.  But, no, we did not appeal.

Q.  Well, you knew it was an appealable order --

A.  We were going to have to go -- we were already 2.7 million in the hole.  We're going to do more, Mr. Coren?

Q.  You knew it was an appealable order, correct?

A.  You know this is a ridiculous line of questioning.

Q.  Answer my question, sir.  As an experienced bankruptcy lawyer, you knew the order appointing a Chapter 11 trustee was an appealable order, correct?

A.  Sure.  Would anyone ever do it?  Never.

Q.  Did you know that the sale of stock to raise money in connection with the bankruptcy was not disclosed in the monthly operating report?

Page 238

A. It was disclosed. It just wasn't disclosed in the right place. And when -- I have to go back. Mr. Fisher was handling that. And, again, the issue we ended up that I do know about, which was in 2004, was that they wanted us to check a box on another page and move all the entries to that spot. So, yes, they were disclosed.

Q. Let me ask you this --

A. Which page?

Q. Page 51 of the opinion.

A. Okay.

Q. "VSI purchase orders were not substantiated by anything other than Mr. Rajan's testimony." You see that heading?

A. Okay.

Q. Yes, you're with me?

A. Yes.

Q. Both orders are from VSI, first dated March 20, 2023, in the amount of 12,600,000 and the second dated April 11, 2023, in the amount of 126 million, correct?

A. Yes.

Q. You handled that hearing where that

Page 239

was an issue, correct?

A. Mm-hmm.

Q. Yes?

A. Yes. Yes.

Q. Why didn't you put in evidence other than Mr. Rajan's testimony?

A. Because no one wanted to come in and testify because of the threats they received from Skadden and K&L Gates.

Q. So you discussed with them and asked them to come in and testify?

A. Yes. I begged for them to come in, and we didn't have the right things -- the judge -- when was that hearing? That hearing was in August. The judge had a car accident in August, so we had cancelled hearings. It's the middle of the summer.

There are a million reasons why we couldn't get somebody in there, but we desperately needed somebody to come in and testify to get this going and we couldn't get them in.

Q. Did you try to have them testify remotely?

A. Yes. We tried doing that too. And

Page 240

there were limitations on what the court could even provide us in that instance. We had -- it was a very difficult atmosphere, let's just put it that way.

Q. Was that discussed on the record anywhere, to your knowledge?

A. It was discussed with Mr. Caponi and it was discussed with Mr. Colby.

Q. Well, how about the court?

A. Which part? About being able to get people in remotely?

Q. Bringing in someone other than Mr. Rajan whose testimony was suspect.

A. We just said -- Mr. Rajan's testimony was not suspect. That's a determination done by the court. You're acting as if we brought Mr. Rajan in and he was already suspect.

If the court decided that a man who was sick and again was doing whatever he could to testify and show up, et cetera, that's her determination, but he's not suspect just by virtue of that. She made a ruling on that. Great. But you're asking -- who else are we going to bring in?

Page 241

That's who we had to bring in on those shortened timeframes and that's who me put up on the stand, and we had documentary evidence to that effect and -- you know, I don't know what else to tell you on this. I would have loved those two folks to come in, but the guy from Cystar is coming in from China. The guy from Southern Telecom wanted to get into a deal, not into litigation.

MR. COREN: Let's take five. We'll be finishing up pretty quickly.

MR. PREZIOSI: Okay.

VIDEO TECHNICIAN: Going off the record. The time is 4:51.

- - -

(Short recess.)

- - -

VIDEO TECHNICIAN: Back on the record. The time is 5:03.

MR. COREN: We have no further questions. Thank you for your time today.

THE WITNESS: Thank you.

MR. PREZIOSI: No questions. Thank you.

61 (Pages 238 to 241)

USBC, Eastern District of PA        Transcript of Chapter 11 Proceedings        Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin                      March 30, 2026

Page 242

**VIDEO TECHNICIAN:** This concludes the video deposition. Going off the record at 5:03.

**COURT REPORTER:** Mr. Preziosi, do you want a copy of the transcript?

**MR. PREZIOSI:** Yes, please.

**COURT REPORTER:** Electronic version?

**MR. PREZIOSI:** That would be great.

**COURT REPORTER:** Do you also want an electronic version?

**MR. COREN:** Yes.

- - -

(Witness excused.)

(Videotaped deposition concluded at 5:03 p.m.)

- - -

Page 243

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter, and that this is a true and correct transcript of same.

_____
MICHELE L. MURPHY
RPR-Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

62 (Pages 242 to 243)

(856) 983-8484                          Tate & Tate, Inc.                          (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                         Videotape Deposition of Rafael X. Zahralddin                        March 30, 2026

Page 244

**A**

**a.m** 1:19 6:9 81:14 91:19 119:22
**A/K/A** 134:11
**Aaronson** 38:1 64:10
**Aaronson's** 38:23 67:16
**abbreviated** 25:5
**ability** 58:23 59:4 59:12 206:14
**able** 10:4 20:5 31:12 56:11 63:4 87:4 112:24 162:3 205:21 207:25,25 208:1 217:16 225:8 240:10
**absconded** 225:13
**absconding** 103:22
**absolutely** 15:1 55:10 62:18 102:24 124:20
**acceptance** 178:4 179:7
**access** 138:21
**accident** 239:15
**accommodation** 89:10
**accompanying** 155:24
**account** 89:23 90:21,22 148:24 190:25
**accurate** 34:25 95:16 171:2
**accurately** 243:4
**accusatory** 25:11
**Ackerman** 197:23 216:10,17 222:15
**acknowledge** 229:12 233:8
**acquaintance** 10:18
**Acquisition** 36:13 36:15
**act** 187:16
**acting** 38:14 44:6 240:17
**action** 52:19,20 95:7 97:7,10,11 98:1
**actions** 70:20 224:3
**active** 81:8
**actively** 96:24 126:7 135:3 223:4
**activities** 26:23

**actual** 116:15
**Adam** 147:7,7,8,12 181:16 216:5 219:8,11,18
**Adam's** 147:9 181:16
**adamant** 45:17 71:6 71:24
**add** 36:4
**added** 140:20
**addition** 37:5 63:25 105:9
**address** 18:9 35:17 93:9 171:23
**addresses** 211:4 224:21
**adequate** 96:21,22 228:14
**admin** 36:24 189:15
**administrative** 36:23 37:19 192:20
**admittance** 7:5
**admitted** 7:2,7
**adopt** 49:23
**adopted** 46:22
**advancement** 52:19 53:11
**advancing** 155:15
**advice** 57:17 133:14
**advise** 68:21 134:25 157:22
**advised** 229:2,3 233:23,25
**advocating** 67:18 67:21
**affidavit** 155:23
**affidavits** 46:4 74:15
**afoul** 35:23
**afternoon** 93:11,14
**aggressive** 22:12 201:9
**ago** 8:10 13:11 23:1 123:16,17 130:5 137:24 217:1 233:4
**agree** 58:13 61:21 76:2 77:24 102:9 114:2 170:22 177:12 180:10,12 182:10 216:11 224:2 236:8
**agreeable** 91:22
**agreed** 5:2

**agreement** 23:2 30:19 49:21,24 56:7 57:1 60:18 62:13,21 63:17 64:17 75:18 84:17 85:20 86:21 87:7 87:14,21,22,23 88:14 89:4,15,24 89:25 93:17,21 102:6,10 103:12 103:21 104:14,21 104:25 105:3,16 108:6,19,25 109:2 109:25 110:21,24 110:25 120:18 127:1,2,3 130:10 131:10 157:11 175:2 193:21 194:9 195:16 196:5,16 199:9 203:13 205:4 209:25 211:24,25 212:7,15 214:19 216:15,24 217:1 217:19 218:10,18
**agreements** 47:25 120:5 126:16,25 128:2 129:13 130:6 145:21 149:9 177:5 209:6 211:13,22 212:4 217:8 221:18
**agrees** 105:17
**ahead** 97:6 179:22 231:19 234:6,6 235:3,23 236:2
**Ahnen** 36:20
**AI** 25:11
**air** 36:2
**Akerman** 140:18 142:19 144:25 145:3,5 146:1 147:6 197:12,20 213:20,21,23 214:4,8,22 215:15 216:5
**Al** 192:15
**alert** 192:19
**alerted** 93:16,19
**Alexander** 139:6 140:4 156:16 158:23 166:13 167:18,25 169:18 169:22 170:23
**allegation** 25:16

42:7 166:16
**allegations** 25:21 166:14
**alleged** 169:20 171:8 175:10
**allegedly** 165:19 171:10
**alleging** 54:10
**allow** 25:7 96:12 154:9
**allowed** 25:16 55:3 97:19
**alter** 25:19,24 26:2
**Amanda** 36:16,19 36:22,22 37:9 38:3 187:19
**Amanda@Strea...** 35:13
**ambiguous** 151:3
**amend** 183:5
**amended** 164:22 165:3 184:9,21
**amendment** 176:25 177:14 180:8,14
**American** 147:12
**amount** 20:16 23:21 238:21,23
**amounts** 91:25 92:10 149:8 168:11
**analysis** 72:1,9 73:24 111:7
**and/or** 16:7 18:5 243:22
**Andrew** 2:14
**Andy** 21:11 143:5 144:25 170:15
**Angeles** 139:3 140:9 156:19
**Anne** 38:1 65:16
**answer** 32:14 59:3 66:1,9,20,22,23 67:1,2,2,3,5,8 89:13,14 92:3 97:4 99:25 102:3 111:8 119:6 121:21 161:16 170:15 177:17,18 181:24 182:1 194:4 237:16
**answered** 92:19 100:24,25 101:2,3 101:6 127:12 194:23
**answering** 59:8

**answers** 59:9 66:17 156:6
**anticipated** 32:1
**anybody** 134:2 187:9 191:14 222:12
**anyway** 50:8 140:12 212:6
**Apart** 58:20
**apologies** 82:24
**appeal** 236:9,10,11 236:15,23,24 237:3,6
**appealable** 236:25 237:7,12,19
**appearance** 13:1,7 18:2,8 107:20 140:18 142:18 143:7 153:10 193:1,4 199:19 214:8
**appearances** 6:2 145:11
**appeared** 49:1 76:23
**appearing** 146:15
**appears** 143:23
**appended** 147:25
**application** 70:7,13 70:17 99:24 146:4 147:25
**apply** 98:4,9 243:20
**appoint** 186:23
**appointed** 55:3 169:7 190:4 227:9
**appointing** 223:17 236:13 237:18
**appointment** 188:17 189:3 237:1
**appreciate** 193:23 194:6,8
**appreciated** 194:13 194:25 195:2,5
**approached** 207:18
**appropriate** 108:12 169:24 178:23,25 198:23 201:14
**approval** 34:1 177:12,16,19,21 177:21,25 179:8 180:9,13 182:10
**approve** 21:17,19 210:12
**approved** 49:7

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                               Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

162:25 179:25 194:17 220:19
**approximately** 1:19 20:17 22:22 23:3 189:4
**April** 68:12 69:18 134:13 136:6,7 142:3 157:16 164:8 207:10 209:24 228:20 238:22
**area** 10:21
**argue** 157:8
**arguing** 157:7 231:7
**argument** 54:2,21 54:25 58:3 77:13 77:19
**arguments** 55:2,6 55:20
**Armstrong** 8:5,9 29:4,6 31:24 47:8 52:6 72:19 75:25 95:21 121:5,6,9 123:13 125:12 128:6 195:10
**around-the-clock** 20:7
**arranged** 170:2
**arrangement** 37:4
**articles** 134:8
**articulated** 61:7
**ASAP** 170:2
**Ashby** 8:4
**Asia** 159:14
**aside** 72:7
**asked** 17:14,22 20:11 27:18 34:24 62:3 72:2,22 79:2 86:3 96:18,19 107:21 115:7 120:18 121:1 130:19 132:24 153:6 189:22 190:7 193:5 200:6 201:23 221:5 232:3 233:4 239:10
**asking** 66:6 100:13 118:12 160:16 178:21 194:24 211:17 240:24
**asks** 228:23
**aspects** 10:1 18:21
**asserted** 73:16

**assertion** 175:24
**assessment** 71:16 78:18
**assets** 11:24 21:17 21:20 54:13 58:2 58:3,21 59:1,13 63:3,4,10 87:12 88:24 103:22 154:25 157:25 207:25 210:18 226:23
**assigned** 150:7
**assist** 81:25 187:23
**assisted** 190:9
**assisting** 190:19
**associated** 16:6,13 20:20
**assume** 16:10
**assuming** 30:7 36:13 81:18 91:21 106:24 132:23,24 133:19 181:17 191:11,12
**assured** 215:10
**atmosphere** 240:3
**attach** 128:21
**attached** 29:10 120:19 150:18 170:5,7,9 171:8 172:25 177:15
**attachment** 120:17 219:7,7
**attachments** 106:23 106:24 107:2,7 203:11 220:4,7
**attack** 175:25 176:8 221:8
**attacked** 31:13 175:25
**attended** 30:24 31:2 117:18
**attention** 110:20 135:24
**attorney** 6:24 122:10 127:13 149:17,18 213:13
**attorney-client** 15:5 15:7,14 152:10 161:11,14
**attorneys** 150:10
**attributed** 103:25
**attrition** 167:16
**August** 169:19,21 170:22 172:16 173:1 176:25

180:20 182:8 183:1 239:15,16
**authenticity** 165:23
**authorization** 135:1
**automatic** 84:23 117:25 218:4
**avail** 9:2
**available** 26:22 163:24,25 165:19 168:10 169:25 170:13
**avoid** 35:23
**avoided** 44:24
**aware** 26:6 75:12 216:22

_____

**B**

**b** 3:6 4:2 176:15 186:15 203:12
**B.V** 42:15
**back** 27:1 28:2 31:12 33:23 40:17 48:14 53:14 65:15 69:16 77:6 82:13 88:23 94:9,14 95:23 102:5 106:17 113:6,23 119:25 133:3 135:21 136:7 139:2 151:24 154:25 156:6 158:13,21 160:15 160:23 162:8 163:12 167:1 172:1 178:12,18 182:17 202:18 204:24 205:8 207:14,25 208:2,9 208:12,21 210:23 214:11,16 215:4 215:17 216:4,14 217:18 218:23 221:5 222:10,23 223:3,5 227:6 231:18 238:3 241:18
**background** 7:21
**backstop** 206:16,21
**backstopping** 206:17
**backup** 172:3 183:4
**backwards** 28:19 94:16
**bad** 78:4 82:10 113:14 154:17,20

171:22 187:1 195:1
**baked** 43:16,17
**Baker** 187:6,7
**bank** 90:4
**bankrupt** 73:7 88:9
**bankruptcies** 27:2 50:14,17 56:8
**bankruptcy** 1:1 5:18 8:3 16:25 24:11,25 26:10 27:8,9 29:23 30:1 30:10,11 31:19 32:2 33:2,25 34:6 39:4,18 43:12 47:24 50:12 51:1 51:24 57:4 58:1 58:12 59:11 60:17 63:6,11 64:19 65:6,11 76:4,10 76:11 83:11,20 84:22 86:1 100:4 106:11 108:23 110:15 111:6,20 113:7,10,19 117:3 117:20 118:5 119:7 123:7 124:12,14 125:2 136:14 137:5,17 138:7,16 140:7 141:13 147:12 149:23 152:18 154:16 156:17,25 159:2,12 172:12 177:9 192:18 193:14,14 196:12 204:21 206:22 207:5,16,23 208:6 210:4 212:11 214:7 218:11 224:17 232:21,22 232:25 237:17,24
**bar** 7:3 113:17
**bargain** 208:8
**base** 119:5 202:6
**based** 20:12 24:18 25:6 26:12 33:6 41:19 55:2 57:12 65:1 66:4 104:3 150:14 174:23,25 174:25 175:2 194:3
**baseless** 53:3
**basic** 42:16
**basically** 21:25

22:11 36:1 102:14 151:10 159:16 175:10 188:2 191:12 201:4
**basis** 87:21 153:14
**Baskin** 189:18 191:5 197:14
**batches** 130:7
**battle** 54:15
**becoming** 137:13
**began** 20:24 74:9 159:6 208:16
**begged** 190:10 201:10 239:12
**beginning** 1:18 13:5 51:12 214:17
**behalf** 6:4,7 76:23 77:21 102:14 125:5 145:11 171:11 187:16 193:2,4
**Beijing** 158:9
**believe** 7:4 10:2,3 12:24 13:4 16:22 17:9 18:1,19 19:5 20:18,23 21:15 22:9 24:13 26:4 32:5 36:6 38:13 43:18 44:21 45:23 47:13 48:19,20 51:4 53:25 55:18 55:19 56:3 79:8 84:10 86:12 88:15 96:17 97:18 99:13 100:1 104:23 126:9 129:15 130:18 144:24 149:20 152:23 164:24 168:10 173:11 177:10 193:3 196:11,19 196:22 210:6 212:1 217:15
**believed** 124:16 196:4
**Bell** 14:22
**Belli** 2:14 107:4 143:6,9,14,16,22 145:15 170:16 223:22 224:8
**benefit** 37:4
**Bennett** 9:24,25 149:16 150:4,4 165:10 183:25 184:16,20 187:22

USBC, Eastern District of PA            Transcript of Chapter 11 Proceedings        Case No. 23-10763, 10764-DJB
Monday                            Videotape Deposition of Rafael X. Zahralddin              March 30, 2026

Page 246

201:25
**Bentonville** 159:5
**best** 35:20 54:4
  137:14 162:23
  163:24,25 182:5
**better** 32:14 150:12
  208:8
**bickering** 178:22
**big** 43:4 45:14 75:6
  159:9 185:12
  204:18
**bill** 151:5 190:15
**billion** 193:18
  194:12 195:4,11
**billion-plus** 193:24
**binder** 169:14
  182:19
**birthday** 22:25
**BISGAARD** 2:9
**bit** 23:8 35:5 52:7
  62:22 176:8 223:3
**bless** 211:17
**blind** 103:16
**Blue** 14:22 173:10
**Blumenthal** 45:20
  45:21,23 47:12
  121:17 128:22,25
  131:23 195:23
**board** 11:12 181:1
**Bob** 10:11 11:13
**bona** 112:20
**bonding** 59:14 60:1
  79:11 159:24
  160:11,19 167:1
**bone** 20:4 201:1
**book** 13:13 35:7
  37:23 38:8 51:9
  61:10 68:8 69:21
  72:24 134:15
  141:4
**bookend** 207:4
**books** 9:8 139:21
  163:14 182:15
**borne** 95:20
**Bosch** 208:5
**bothering** 131:13
**bottom** 31:14 37:25
  68:10 78:12
  119:20 126:20
  178:3 179:23
  183:20 198:5
**bought** 163:10
**bound** 64:17 152:9
**Bowl** 159:18
**box** 159:10 238:6

**boy** 176:9
**brand** 75:5
**brands** 159:2,12,15
**breach** 89:4
**breached** 89:15
**break** 40:7,20,21
  135:7 202:3
**Brian** 14:21 101:14
**brief** 15:4 40:16
  141:24 205:4
**briefing** 71:2
**briefly** 165:17
**bring** 27:18,20
  112:18 197:3
  240:25 241:1
**Bringing** 240:12
**brings** 48:14
**Brisbois** 2:9 6:6,7
  8:7,11 125:13,17
  126:10,12 134:4
  148:1 189:12,14
**broadly** 95:5
**broke** 95:22
**broken** 15:15
**broker** 173:9
  174:21
**brokered** 79:21
**Brooklyn** 159:4
**Brookstone** 159:3
  159:11
**brother** 14:14 17:18
  19:10,16,24,25
  20:2,2,8 25:9
**brothers** 13:24
**brought** 10:23 12:6
  55:19 95:12
  110:19 112:19
  149:7 231:5
  240:17
**Bruce** 10:20,21
  12:13,13,15,17
**Buchanan** 12:4,9
**Bud** 107:6 131:20
  180:25 198:5
**Bunce** 18:13 19:2
  25:2 27:12 125:20
  132:9 134:24
  137:2 199:1,14
**Bunce's** 137:9
**bunch** 111:10
**burden** 98:12
**burglarized** 59:20
**business** 57:22
  187:7 194:20
  196:21 209:14

**busy** 218:1
**buy** 174:8

———————————
**C**
**c** 2:1 176:15 209:23
  228:11
**calculation** 195:9
  195:11
**calendar** 82:16
  230:13
**California** 7:9 8:1
**call** 29:20 31:16
  38:18 41:14 56:6
  57:1 78:15 81:6
  83:7 119:5 131:24
  133:8,14 137:15
  137:15,16 139:14
  139:22,24,25
  140:3 169:23
  177:4 192:6,9,12
  198:14 200:19
  230:10 235:21
  236:7
**Callahan** 157:15
**called** 11:8 12:19
  20:8 41:3 42:19
  43:10 71:3 79:7,8
  80:1 83:4,5
  132:24 139:19
  155:7 165:4,4
  181:14 191:11
  192:18 200:21
  201:10 231:21
**calling** 19:11 42:19
  69:5 208:9
**calls** 78:25 79:4
  131:6,11,12 190:9
  235:14
**camel's** 95:22
**cancelled** 239:16
**cancer** 187:9
**capability** 59:18
**capacities** 37:19
  38:16
**Capital** 178:11
**capitalized** 58:8,8
**Caponi** 162:9
  166:14 174:11
  175:3,7 232:24
  240:7
**caps** 183:6,8,9
  184:25
**captured** 76:1
**car** 239:15
**care** 20:7 34:17

101:19 108:17
  187:8 200:25
  205:11 235:24
**Careful** 32:11
**caretakers** 148:25
**Carolina** 232:23
**carried** 42:15
**carrying** 42:7
**case** 1:4,8 5:15,16
  17:12,16 18:15
  19:5 20:10 24:25
  27:8,12 33:25
  35:24 36:21 51:4
  54:23 55:3 57:3,7
  57:13 64:1,18
  65:11,24 70:5,19
  77:12 78:1,3 81:9
  82:9 84:3 89:7,11
  90:25 95:12 96:12
  96:25 97:1,3
  100:5 101:10
  106:12 107:20
  114:15 115:21
  119:7 122:23
  123:2 125:24
  131:7 137:21
  141:13,21 144:12
  146:17 151:11,16
  151:24 152:2
  153:15 177:9
  183:7,7 185:2,3
  186:8,25 188:5
  189:15 190:13
  192:21,24 193:10
  197:13,15 201:13
  210:9 211:6
  219:15 220:20,23
  227:4 232:23
  236:17
**caselaw** 65:2
**cases** 11:1 33:8,15
  33:17 44:12 51:22
  52:2 125:22
  144:20 148:18
  186:14 224:23
  228:22
**Castor** 10:20 12:6
  12:14
**caught** 161:8
**cause** 55:23 97:23
  98:18,22 113:24
  186:14
**caused** 15:9 57:18
  185:24 225:10
**CEO** 49:7,22

158:24 160:10
**certain** 23:21 25:9
  25:10 44:14 45:25
  47:11 88:16,22
  104:6 118:6
  145:11 151:18
  160:22 176:13
  178:6,6 179:11,14
  205:24 215:7
  222:8,23
**certainly** 50:12
  235:7
**certainty** 29:17
**CERTIFICATE**
  243:1
**certification** 5:4
  243:19
**Certified** 1:23 5:25
**CERTIFY** 243:2
**certifying** 243:23
**cetera** 18:17 27:20
  57:9,16 111:11
  156:2 157:9
  176:17 187:1
  195:22 234:22
  240:21
**CFO** 11:11 44:6
  88:5 139:22
  158:24
**chain** 23:23 28:21
  79:25 93:2 158:5
**chains** 45:4
**chair** 11:12 109:8
**chambers** 235:14
  235:21
**chance** 40:21
  171:23 179:2
**Chancellor** 35:25
**chancery** 10:23
  11:1,2 13:16
  14:11 16:24 35:24
  43:1 51:13,22,24
  52:2 58:6 65:5,11
  65:12,14 84:3
  94:22 113:16,24
  151:16 153:13
  154:4 186:8
  196:14 214:17
**change** 65:9 85:4
**changed** 22:6 75:13
**Chapman** 8:1
**Chapter** 1:3,7 2:7
  5:13,15 117:24
  140:8 156:17,18
  169:7 186:24

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                      March 30, 2026

Page 247

188:17 189:4 190:4,6 223:18 227:9 236:13 237:1,18
**character** 176:7
**characterization** 224:14
**charge** 65:10 107:16
**charter** 11:21 21:13
**chase** 140:5
**chased** 140:6
**chastising** 222:25
**chat** 43:20
**check** 39:13 126:15 163:12 176:13 238:6
**chief** 146:5
**China** 23:24 162:22 166:21 227:18 241:8
**Chinese** 160:4 168:8 174:2
**choose** 9:11
**Chris** 42:18 43:6,8 86:15,16 102:24 123:6,6 126:21 132:14 164:8 189:16 191:5
**Christmas** 52:8
**Christopher** 68:11 81:12 86:19 91:8 93:6 118:14 119:3 119:19,20 120:16 130:2
**chronologically** 28:20
**Ciardi** 192:16
**circles** 192:18
**Circuit** 123:1
**circulated** 38:24
**circumstances** 152:7
**cite** 222:25
**cited** 15:17
**Cites** 98:14,18
**Cittone** 69:17,18,22 70:8,16 87:19
**City** 17:20 201:7
**claim** 60:16,21 80:12 81:24 101:12,23 109:3 110:8,9,12,14,21 110:22 111:2,14 111:15 112:24

113:3 189:15 190:19 193:13,24 193:25 194:11,15 194:15 195:4
**claims** 71:8,17 73:16,25 75:11 85:6 110:20 190:23 224:22
**clarification** 16:10 18:12
**clarify** 19:12
**clean** 14:6 209:12
**clear** 19:9 102:24 216:19
**cleared** 216:5 219:12
**clerk** 52:11
**clerked** 8:2
**client** 34:23 69:9 95:7 96:18 97:7 97:10,25 98:6,14 99:8,9,20 100:22 107:25 115:13 117:5 119:14 169:9 183:25 184:25
**clients** 15:6,8,10 99:2 126:17 133:14 191:6,16 215:9
**close** 79:24 147:18
**cloud** 49:15,17 87:12
**co-head** 140:7 156:18
**co-marketing** 159:5
**code** 60:3 113:8
**codes** 211:2
**coincidence** 109:24 110:3
**Colby** 240:8
**Cole** 152:17
**Coleman** 55:1 172:5 208:11
**colleague** 81:7
**colleagues** 10:19 34:11 174:3 236:16
**collect** 221:15
**collection** 17:24 134:24 191:1
**collective** 128:19
**color** 59:22
**colorful** 58:2
**combination** 28:6,9

**come** 11:13 13:3 24:15,17 25:8 30:12 31:12 43:20 48:21 109:16 112:24 115:3 127:20 130:19 134:16 148:23 149:12 153:23 154:1 156:6 174:18 186:17 187:2,22 188:7 190:7,10 198:14 198:24 206:14,21 207:19 217:16,18 222:10 229:16 230:17 231:12 235:4 239:7,11,12 239:20 241:6
**comeback** 182:25
**comes** 122:24 174:10 176:9
**comfortable** 14:24 167:19 174:4 222:4
**coming** 17:25 19:9 101:14 113:23 119:13 129:14 139:8,9 149:1 158:21 174:12 175:3 181:15 187:4 197:10 205:25 208:9 227:18 229:12 234:17 241:7
**commencing** 113:18 113:19
**comments** 156:20
**Commerce** 2:4
**commitment** 89:19 89:20
**commitments** 58:18 58:19 90:7,16 102:14
**committed** 113:9
**committee** 56:9 79:15,18,20 144:20 212:18,22 213:22
**common** 56:7,15 110:15
**communicate** 36:7 36:10
**communicated** 47:15 79:20
**communicating**

146:1 189:16
**communication** 20:12
**communications** 80:22 168:14
**companies** 36:9 37:2 38:17 42:5,6 44:5 133:20 156:1 208:3
**company** 11:7,17 11:24,25 21:2,13 22:10 23:8,11,12 37:1,7 39:23 40:2 40:25 41:3,4 50:2 54:19 58:4 70:24 71:6 73:15 80:1 88:9 96:22 101:17 103:24 110:10 126:5 129:1 130:24 139:8,9 159:1 160:10 162:2 163:15 165:4 167:2,12 168:8 175:4 210:18,21 211:10 225:18 226:20,24 227:11
**company's** 73:20
**comparative** 7:19
**compel** 172:5 198:9
**competitor** 161:6 210:24 225:11
**competitors** 54:6 167:13
**complained** 79:19
**completed** 113:25
**completely** 53:3 184:6 230:20 235:17
**complies** 81:11 164:5
**component** 88:15
**concern** 55:7,11,19 57:11 176:2,4,5
**concerned** 55:17,18 61:2 235:9
**concerns** 61:5 126:13 154:6
**concluded** 67:24 242:17
**concludes** 242:2
**condition** 20:9
**conditions** 57:7,13 57:18 88:16 118:2
**conference** 19:8

186:9 188:10 198:9 223:22 224:9
**confidentiality** 95:3 205:3
**confirm** 82:16 141:15 173:6
**confirmation** 116:24 224:20
**confirmed** 234:23
**conflict** 39:9,13 95:17,19 128:18 128:23
**conflicts** 29:19 39:8 128:24 153:8 207:19 216:6 219:13
**conjecture** 86:13
**conjunction** 14:20 44:22 72:18
**connected** 33:9
**connection** 32:1 34:6 50:16 70:9 86:8 114:24 117:2 131:3 159:9 213:14 218:17 237:23
**connections** 151:3
**conscious** 155:2
**consequences** 101:20 229:13
**conservative** 65:17
**consider** 95:24 108:11 128:4
**consideration** 105:5 105:10,12
**considered** 67:25 68:1 128:7
**considering** 129:13
**consolidated** 55:17
**consolidation** 53:21 53:24 55:16,23,24 56:20 57:3,14
**constant** 54:15
**constantly** 176:6 227:12
**constituted** 224:4
**contact** 139:13 170:25 173:9,19
**contacted** 28:10 119:11 123:4
**contain** 194:18
**contained** 243:4
**containing** 203:9
**context** 29:21 68:19

USBC, Eastern District of PA　　　Transcript of Chapter 11 Proceedings　　　Case No. 23-10763, 10764-DJB
Monday　　　Videotape Deposition of Rafael X. Zahralddin　　　March 30, 2026

Page 248

74:1 94:19 137:13
181:11 191:18
232:18 233:9
**contingent** 27:21
88:21 104:5
177:16,20 179:7
**continuation** 93:1
**continue** 36:7 41:16
73:1 100:12
117:23 152:1
180:1
**continued** 3:25 4:1
154:21 231:2
**continues** 71:4
127:5 129:4
**continuing** 177:3
**contract** 62:5,10,21
63:18 179:17
**contractor** 37:17
**contractors** 235:25
**contracts** 234:12
**contractual** 37:13
**contrary** 25:17
**control** 21:2,21
22:8 243:22
**controlled** 93:18
**controller** 61:22
139:21,23
**controlling** 21:6
61:23
**conversation** 56:12
91:14 92:21
**conversations** 73:9
91:7 104:10 115:1
115:4,11 136:19
136:21,22,23
137:8 138:24
160:18 166:19,21
166:24 168:22
199:4 221:2
**conversion** 149:9
**convert** 218:2
**converted** 183:7,7
**conveyance** 62:7,24
**convince** 72:4
**convinced** 46:9
**cooling** 198:10
**coordinating** 30:5
**copied** 123:22
181:17
**copy** 28:22 81:13
93:7 120:16
122:11 189:17
191:5 215:16
242:5

**Copying** 165:10
**copyright** 23:19
**copyrighted** 75:4
**Coren** 1:15 2:3,3
3:4 5:20 6:3,4,18
16:14,18,20 18:13
18:25 27:1,7
40:12,19 59:10
66:10,13,21 72:14
72:16 90:13 93:25
94:11 100:3,7,11
100:14,20 101:5,7
107:3,10 112:2
135:5,10,14,23
140:25 141:3,7,10
142:8,11,14,22,24
143:4,8,13,15,19
143:25 144:4
145:17,18 170:7
170:10,14,21
175:17,19 178:24
179:5 198:10
202:4,7,20 203:20
203:23,25 209:22
210:10 224:10
228:4 233:8
236:12 237:11
241:10,20 242:13
**corporate** 29:10
56:1,2,18 136:13
**correct** 6:25 13:18
14:10,14,15,18
15:11,12,15,16,19
15:22 16:2,3,14
17:2 20:14,18
31:20,21 34:22
53:16,21,22 55:9
55:13,14 56:22
57:4,5,10,16,17
61:15,18,25 66:2
68:23 71:9 76:24
78:1,4,5 80:7,12
82:10,11,21 83:18
83:19 84:20,21,24
84:25 85:7 87:8
87:15 88:10 93:22
100:9 106:1,6,7
106:12,13 108:25
109:4 113:14,15
113:20,22 114:3,9
114:15,16,18
115:21,22 116:3,4
116:8 121:11,18
124:21 125:3,4,15
131:5 132:15

138:11 143:18
164:12,17,20,21
168:2,5,6,8,20
173:1 178:10
180:11,23 182:13
184:3 186:15
188:20 189:1
197:18,19 199:16
199:19 203:15
207:5 212:8
214:11 215:24
219:9,21 220:1
221:25 226:4,8
229:4,5,8,22
232:6 234:9
235:10 237:13,19
238:23 239:1
243:7
**correcting** 233:2
**correctly** 50:22
79:10 105:21
113:22 185:25
204:22
**correspond** 145:4
**corresponded**
167:19
**Corso** 212:19
215:12,14
**cost** 63:8
**costs** 78:19
**counsel** 5:2 6:1 9:14
9:15 11:3 12:3,9
13:3 15:19 19:3
28:8 38:15 43:10
51:13 64:4 68:4
68:12,21 70:4,9
72:1,19 73:20
79:3,20 80:3,19
81:4 83:21 84:2
84:12 85:11 86:5
86:22 94:20 115:3
116:12 123:25
127:18,19,23
136:14 143:21
144:18,23 146:13
152:14,23 153:5
186:8 189:18
199:6 200:1,13
212:21 213:19
214:7,10,13,15,18
221:9 229:11
233:2 236:19
**counterclaim** 52:18
52:22 53:8
**counterclaimed**

52:17
**counterclaims** 17:7
**counteroffensive**
54:9
**counterparty** 137:4
**countries** 24:4
**County** 97:3
**couple** 21:7 40:12
74:12 146:6
204:11
**course** 14:23 34:18
103:25 125:19
139:10 204:1
211:7,9,18 229:15
231:6,11 233:20
234:4 235:3 236:2
**court** 1:1,23 5:18,23
5:25 6:10 10:23
11:2 12:2 13:16
14:11 19:12 21:9
21:25 25:2 26:1
43:2,2,17 44:9,11
52:21 58:7 64:15
64:16,19,24 65:5
65:6,11,12,13,14
67:11 76:10,11
77:25 78:3,17
84:19 87:24 90:7
90:19,19 94:22
100:5 109:4
113:15,24 117:20
118:2 120:8 145:2
152:3 153:11
161:19,21,22
162:7 167:7,15
169:3 174:24
175:9,18 177:12
177:19,21 179:8
180:12 182:10
183:11 186:23
188:16 196:14
210:15,22,22
211:5,8,17 214:17
217:24 223:17
224:2,16,16,19,25
225:6,6,7,21,21
226:10 227:23
228:1,3,14,19,23
229:2,4,6,8,10,14
229:18,20,21,25
230:14,22 232:1,5
232:9 233:11,13
233:14,23,24,25
234:8 235:8,9,14
235:20,23 240:1,9

240:16,19 242:4,7
242:11
**court's** 15:23
224:13
**courtroom** 230:11
230:11 231:21
235:16
**courts** 154:22
220:20
**Cousins** 10:3
152:19 186:4,6
**covenant** 182:7,11
**cover** 9:10
**covered** 18:21
123:14
**COVID-ish** 158:20
**cram** 205:6
**creamed** 184:22
**created** 35:23 54:11
79:11 157:10
160:10 234:19
**creating** 213:21,22
231:9
**credibility** 176:3,12
**credit** 101:13
198:21
**creditor** 60:8,11,23
61:1 79:13 80:6
91:11,11,24 92:8
92:9 108:13,21
111:5 113:2,4
124:6 149:11
164:20,23 192:21
224:22 225:11
**creditor's** 49:22
151:15 190:23
**creditors** 38:25
39:10,12,13 49:6
57:20 59:15 78:22
79:24 80:16 86:3
93:18 112:4,5
149:8 151:18
157:6 160:2,15
161:2 192:15
205:1 206:13,20
223:12
**cripple** 50:2
**critical** 15:6 159:23
**cross-examine**
50:25
**crux** 21:8
**cry** 187:20
**current** 10:6 16:24
33:2 49:22 57:6
57:13 184:24

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 249

187:6 205:17,19
224:3
**currently** 7:7 27:23
54:23
**cut** 59:7
**Cystar** 159:22,22
160:6 162:13
241:7

**D**

**d** 3:1 180:1,1
**damages** 53:9 72:13
**Dan** 38:12,14,14
53:16 73:3,20
123:5,21 124:14
148:24 149:13
180:25 212:21
213:17 214:22,24
215:7 218:16
**Daniel** 223:1
**Darivoff** 191:22,23
192:13
**darnedest** 167:10
**data** 130:20
**date** 1:18 57:7
77:25 114:1
141:16 142:2
144:5 146:21
189:6
**dated** 28:24 121:18
128:22 168:1
171:12 176:25
182:7 188:25
217:5,10 238:21
238:22
**dates** 78:6 167:6
188:14 202:24
**David** 223:1
**Davies** 25:13
**day** 22:25 42:12
89:16 93:3 106:14
108:5 110:2 175:8
183:21 184:2
231:17
**days** 81:20 82:13,18
83:2 114:17
115:18 214:11
219:20,23
**deal** 43:14,23 74:13
81:24 102:15
103:1,2,13 158:10
162:10 185:12
209:5 218:6
220:13 221:22
225:9 241:9

**dealing** 17:18 118:4
145:14 147:5
149:15 190:22
215:15 218:1
**deals** 33:8 45:3
**dealt** 65:11 147:14
147:16 216:23
**Dear** 68:12 128:24
180:25 184:20
**debate** 100:12
**debating** 193:5
**debtor** 1:5,8 61:24
64:16 68:20 79:22
144:17 146:9
148:19 193:24
194:12,21 209:15
212:7 216:16
217:15 222:8
233:12
**debtor's** 28:7 43:9
68:3 115:3 136:13
155:19 163:5
172:12 186:14
193:14 224:22
233:2
**debtors** 44:23
208:14 226:11
228:12,21,24
229:11 236:8,23
**decade** 65:6
**December** 64:16
184:11,18 185:22
186:19
**decided** 41:16 44:13
126:1 217:8
220:16 235:17
240:19
**deciding** 41:21
156:10
**decision** 21:24 25:5
113:24 120:9
154:23 155:2
169:6 184:14
223:17 228:6
233:21 236:9,13
**decisions** 17:4
227:14
**deck** 25:14
**declaration** 147:23
148:6 150:18
185:19
**dedicated** 90:23
**deeper** 39:14
**default** 109:19
**defendant** 70:19

**defendants** 13:23
200:12
**defended** 111:11
112:13,14
**defending** 71:7
**defense** 56:7,25
73:16 101:9 127:1
128:1 147:21
205:3
**definitely** 47:2
**definition** 151:4
**degree** 7:14
**Delaware** 7:8,13
12:18,19 13:16
14:11 21:9 27:3,9
27:10 29:23 30:1
33:24 34:6 39:4
43:2 44:14,16
50:17 51:13 52:21
58:7,12 60:24
62:13 66:4 76:12
82:8 85:6,7 94:21
97:17,18 120:8
145:2 154:8,22
186:7
**depose** 50:24
**deposition** 1:13
5:12 8:14,18
96:14 242:2,16
**deprive** 99:8
**deputy** 230:11,11
231:21 235:16
236:5
**describe** 69:24
**described** 105:11
124:11
**desperately** 239:20
**detail** 39:21
**determination**
156:22 240:16,22
**determine** 158:18
**determining** 165:23
**developed** 41:15
89:11
**diagnosed** 146:11
**die** 201:12
**died** 201:24
**different** 10:22
21:18 23:22,23
27:24 36:9 38:15
38:17,17 42:5
63:6 74:8 120:5
126:4,5 150:11
173:15 176:16
177:7 198:16

211:16 212:5
222:4 227:13
237:5
**difficult** 15:11
98:14 225:12,15
240:3
**diligence** 90:9
158:17 159:21
**Dilworth** 28:7 31:4
32:23 38:2 42:19
61:17 64:9 78:14
163:19 164:1
**DIP** 30:9 50:18,20
50:21 57:8,15
61:3 63:9 64:1
**direct** 135:24
138:24 170:25
173:19 243:22
**directed** 43:19 83:6
**direction** 146:14
**directly** 8:6 17:5
27:18 54:16 63:24
85:10 106:4
128:13 130:24,25
161:6,7 177:6
215:15 221:23
**director** 38:17
116:12,16 136:9
225:18
**directors** 65:9
136:8 138:6
144:21,21 212:19
212:21
**disagree** 175:23
184:15 225:20
**disagreement** 95:9
97:9 98:2 99:19
100:22 187:24
**disagreements** 15:8
99:2,5
**disallowed** 190:20
**disclose** 151:19
152:6 154:16
155:19 156:11
186:5
**disclosed** 111:15,17
111:23,24 112:3
155:25 186:3
237:24 238:1,2,8
**disclosure** 127:4
139:10 145:19
155:22 163:1
177:11 203:10
207:4,8 219:24
220:8 225:3

228:14
**disclosures** 100:4,8
151:2 156:15
**discourage** 49:18
**discovered** 234:23
**discovery** 17:18
**discuss** 117:11
118:4,8,15
**discussed** 9:22 22:2
49:4 66:3 67:12
156:3 207:22
210:15 239:10
240:5,7,8
**discussing** 30:10
53:25 56:16 67:13
70:6 117:1,8
151:9
**discussion** 56:13
92:6 94:5 101:12
157:3,4 170:18
198:7,11 232:18
**discussions** 29:9
74:9 75:23 79:9
81:23 82:5 85:13
85:24 103:10,18
117:19 129:21
137:13 146:23
155:10 160:5
187:5 198:12
211:4 214:21
**disgruntled** 125:22
125:23
**dismiss** 51:1 55:2
65:23 114:15
115:17 118:5
119:7 186:14,25
218:2
**dismissal** 63:25
77:12
**dismissed** 26:10
78:3 82:9 84:23
90:25 113:13
154:17 199:25
**dismissing** 78:1
**dispute** 11:21 26:10
43:4 50:1 65:7
112:21
**disputed** 92:14
104:7 109:3
110:17 111:3,16
112:8,23 113:3
**disputes** 50:2 91:24
92:9
**disqualified** 185:1,3
185:6

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 250

**disrespectful**
175:22
**disrupt** 227:1
**distinction** 112:20
**distinguish** 83:6
**distress** 50:3
**distressed** 58:14,15
**distribution** 209:25
211:23,25 212:6
212:14 216:15,24
216:25 217:19
218:10
**District** 1:1 5:18
17:1,13 43:17,18
44:11 50:11 52:20
76:11 78:17
136:15 137:5,16
149:19 199:13
**docket** 140:22
141:12 143:24
145:9 202:23
203:7,18 220:2
**docs** 130:7
**doctrine** 127:5
**document** 8:24
18:16 88:20
121:25 122:2,4
136:4 170:5 171:7
178:15 179:6
189:25 203:19
204:18 206:9
**documentary** 241:3
**documents** 45:24
86:21 91:21
106:20 133:10
155:24 172:25
181:2,7 193:9
203:10 211:19
212:25 223:2
**doing** 19:17 29:19
41:18 51:24 111:7
126:7 128:7
144:23 156:17
159:6,25 166:9,11
167:10 173:13
174:6 178:23
181:24 208:18
213:18 214:25
219:3 231:4
234:11 235:3
239:25 240:20
**dollar** 89:19 149:6
149:6
**dollars** 27:17 88:18
105:18 193:18

195:4,11
**domain** 93:12,17
**double** 126:15
163:12 185:10
**doubt** 104:24
**doubts** 175:6
**downstream** 42:11
**draft** 62:4 63:16,21
121:16 148:6
222:10
**drafted** 50:19 85:19
87:18 148:9 198:8
208:10
**drafting** 50:16
**drafts** 75:23 183:4
217:7 222:23
**driven** 47:23
**dropped** 18:20
**dropping** 19:4
**due** 88:18 89:1 90:9
95:3 103:20
105:18 119:8
130:8 158:17
175:23 185:8
195:18,21 196:18
**duly** 6:15
**Dupre** 21:11 145:1
**duty** 56:10

───────── E ─────────

**E** 2:1,1 3:1,6 4:2
**e-mail** 28:20 31:3
35:12,17 36:11
38:1,24 53:15
56:4,19 61:14
64:10 68:11,17
72:24 73:2 74:4,5
78:12,13 81:1,16
83:8 91:18 93:3,9
106:21 107:4,6
119:2 122:10
123:21 126:21
128:16 130:2,4,8
130:13 132:14
133:23 164:7,12
167:24 170:6
172:2 180:19,23
183:20 184:17
188:24 191:4,7
211:3 215:23
218:22 219:8
220:5
**e-mails** 8:16,21 9:20
28:19 36:9 38:6
61:12 64:8 69:16

95:20 119:18
127:9 130:14
146:25 161:8
169:17 172:23
182:22 188:25
190:18 198:2
**earlier** 71:5 123:14
136:25 146:14
148:21 174:16
193:22 198:7
**earliest** 7:4
**early** 138:20 144:2
190:7
**earmarked** 90:23
**East** 159:7
**Eastern** 1:1 5:18
16:25 17:13 50:11
136:15 137:5,16
199:13
**Eben** 126:23 127:16
**economic** 102:18
**editing** 189:21
**edits** 189:20
**effect** 60:6 65:19
84:24 180:2 241:4
**effective** 177:24
180:8
**effectuate** 211:8
**effort** 18:8
**ego** 25:19,25 26:2
**eight** 187:12 225:16
**Eindhoven** 24:5
42:12 45:13 46:4
72:5 74:16 138:23
158:11 163:16
**either** 20:21 31:25
32:12 34:10 39:2
49:12 50:17 51:18
54:16 71:20 84:10
85:21 103:1 120:6
125:19 133:12
151:23 168:15
205:3 225:22,22
**election** 117:25
**electronic** 242:7,12
**elements** 45:25 49:9
74:14 75:6
**eliminate** 194:14
**Elliott** 8:5 10:20
12:16 15:5,9 52:3
52:23 95:13,19
96:2,10 99:10,12
101:8,15,18
151:14
**embroiled** 209:9

**emergencies** 225:10
**emergency** 114:14
225:9
**EML** 17:14 146:11
**employ** 146:4 148:1
**employee** 116:15
230:4
**employees** 22:14
210:19 235:25
**employment** 7:21
**empty** 157:8
**en** 41:25
**encapsulates** 209:6
**encouraged** 218:25
219:2
**ended** 22:19 48:22
75:15 153:8
198:24,25 201:18
217:3 238:4
**endless** 144:10
**ends** 130:8
**enforce** 70:25
**engage** 26:23 28:4
**engaged** 147:1
213:23
**Engel** 28:22 29:5
39:7
**engineering** 158:9
**engineers** 23:24
24:9 41:12 42:10
45:17 74:16,23
**engineers'** 75:7
**English** 21:10
**enter** 18:7 153:9
193:3
**entered** 11:4 13:1
18:1,14 19:6
20:13 77:25
104:14 199:19
234:14
**entering** 89:25
193:1
**entire** 52:8
**entirety** 170:18
**entities** 35:22 55:9
55:16 56:16
168:15 225:19
**entitled** 105:4
**entity** 34:16 157:24
171:15 175:5
198:21
**entries** 238:7
**entry** 142:12 203:7
**Enuma** 160:8
**Enumi** 79:9

**EPA** 54:24
**equipment** 59:14
60:1 79:11 158:12
159:25 160:7,11
160:19 167:1
208:2 211:2
217:18 225:15
**equity** 149:3,7
155:18 165:18
168:5,16 197:2,8
206:5 226:7 230:4
233:12
**eradicate** 54:5
**escalated** 140:12
**escapes** 33:10
**especially** 153:14
**Esquire** 2:3,9,14,15
2:16
**essentially** 44:24
59:20 70:24
103:23 206:23
207:11 225:13
**established** 23:13
138:8
**estates** 224:5
**et** 18:16 27:20 57:8
57:15 111:11
156:2 157:9
176:17 187:1
195:22 234:22
240:21
**ethical** 15:17 154:6
**ethics** 152:10
**Europe** 25:13
**evening** 226:12
**event** 179:24
**events** 103:20
**eventually** 46:12
72:4
**everybody** 22:11
54:13 146:16
**evidence** 25:8,17
48:25 74:8,18
90:18 174:6
184:24 239:5
241:4 243:3
**evidentiary** 230:3
**evolved** 120:6
**exact** 87:22
**exactly** 26:4 102:16
112:22 138:18
189:25 193:25
229:19
**examination** 184:14
187:21

USBC, Eastern District of PA     Transcript of Chapter 11 Proceedings     Case No. 23-10763, 10764-DJB
Monday     Videotape Deposition of Rafael X. Zahralddin     March 30, 2026

Page 251

**examined** 6:15
**example** 148:18
  177:2 206:20
  208:2
**exchange** 149:2
  159:24 206:3,4
**exchanges** 81:2
**excited** 24:20 27:22
  140:3 169:15
**exclamation** 185:10
**exclude** 157:1
**exclusive** 21:19
  209:24 212:14
  216:14,24 218:10
**exclusivity** 223:14
**Excuse** 16:9 45:21
  84:14 109:7
  116:18
**excused** 242:15
**execute** 129:20
**executed** 129:18
  195:17 196:10
**execution** 105:15
  106:20 120:21
**executory** 62:5,10
  62:21 63:17
**exercised** 209:15
**exhibit** 8:19 76:15
  76:16 107:2 148:2
  150:15 185:7
  202:25 203:12,12
  209:18,23 233:17
  233:20
**Exhibit-1** 13:12
  94:14,16
**Exhibit-112** 197:25
**Exhibit-113** 199:10
**Exhibit-116** 35:6
**Exhibit-117** 37:22
**Exhibit-119** 135:25
**Exhibit-125** 39:15
**Exhibit-130** 68:6
**Exhibit-132** 69:13
**Exhibit-137** 121:13
**Exhibit-138** 122:8
**Exhibit-139** 134:6
**Exhibit-14** 64:5
**Exhibit-141** 182:14
**Exhibit-146** 108:1
**Exhibit-147** 141:12
**Exhibit-2** 28:15
**Exhibit-27** 76:7
**Exhibit-28** 78:9
**Exhibit-29** 81:10
  91:18

**Exhibit-3** 33:23
**Exhibit-30** 92:24
  106:17
**Exhibit-31** 104:11
  104:13
**Exhibit-33** 118:22
**Exhibit-34** 119:16
**Exhibit-4** 35:2
**Exhibit-41** 124:24
**Exhibit-42** 126:18
**Exhibit-48** 128:14
**Exhibit-5** 51:8
  53:14
**Exhibit-52** 132:12
**Exhibit-58** 157:12
**Exhibit-59** 164:2
**Exhibit-6** 61:9
**Exhibit-62** 167:22
**Exhibit-64** 215:20
**Exhibit-68** 219:5
**Exhibit-72** 169:12
**Exhibit-73** 171:3
**Exhibit-74** 172:14
**Exhibit-77** 172:21
**Exhibit-79** 176:21
**Exhibit-80** 180:17
**Exhibit-81** 182:4
**Exhibit-85** 185:15
**Exhibit-86** 186:11
**Exhibit-87** 188:15
  223:16,20
**Exhibit-90** 188:11
  188:21
**Exhibit-91** 190:16
**Exhibit-95** 191:21
  192:3
**exhibits** 171:7,18
**exiles** 38:19
**exist** 227:19
**existed** 41:8 139:6
**existing** 65:2
**exists** 98:18
**exit** 204:20 206:22
  208:16
**exotic** 110:18
**expect** 9:7 28:12
  196:7
**expedited** 11:2
  153:14
**expeditiously**
  224:20
**experience** 47:24
  99:14 150:6,12
  210:17
**experienced** 237:17

**explain** 66:24 108:9
  234:3
**explained** 99:6
  163:13,17
**explaining** 55:22
**exposure** 72:6,8,10
  195:5
**express** 226:24
**expressing** 225:1
**expressly** 228:23
  235:21
**extend** 206:12
**extending** 198:20
**extensive** 160:5
**extent** 72:10 117:4
  134:23 206:17
**extra** 48:25
**extreme** 175:6
**Extremely** 58:14,15

**F**

**fabricate** 96:2
**facilitate** 131:16
  154:12
**fact** 15:21 25:6 26:1
  26:12 48:11 49:4
  64:23 89:12,15
  92:6 93:19 116:10
  124:21 126:14
  139:11 154:16
  174:1 175:15
  197:11 200:24
  218:25 222:24
  229:11
**facts** 189:24
**failed** 25:9 162:16
**fails** 98:6
**failure** 178:3
**fair** 8:25 34:4 68:24
  73:14 137:6,7,11
  150:19 185:19
  190:2 193:7
  198:19 216:18
  218:15
**fairly** 47:10 222:22
**faith** 78:4 82:10
  113:14 154:17,20
  187:1 217:24
**false** 25:14
**familiar** 10:13 23:6
  39:23 95:6 121:25
  122:2 147:14
**family** 11:15 20:12
  21:4,16,16 144:22
**far** 159:7 235:8

**farm** 222:14
**fashion** 198:19
**fast** 64:18
**favor** 66:22 67:18
**federal** 25:2 26:1
  65:13 84:19 90:19
  109:4 199:12
**fee** 99:24
**feel** 67:2
**feeling** 74:21
**fees** 64:3 197:18,20
  197:22
**Feit** 122:11
**fellow** 7:16
**felt** 17:7 65:21
  73:15 103:19
  167:19 174:4
**fide** 112:21
**fiduciary** 205:9
**fight** 45:14 49:13
**fighting** 146:16
**fights** 210:25
**figure** 29:18 63:5
  71:23 123:8 213:8
  221:7
**figured** 46:22
  220:13
**file** 30:5 52:22
  70:17 114:6 131:6
  131:8 155:12
  168:25 183:6
  185:24
**filed** 13:15,16,17
  14:18,25 18:16
  19:3 30:1 33:24
  34:9,23 39:3,18
  39:19 50:11 51:15
  53:2 60:23 70:13
  96:20 107:12,14
  108:4 109:18
  110:2,12,14
  111:10 114:2,17
  115:14,17 124:19
  137:20,21 138:16
  140:15 142:20
  144:2,8 145:22
  146:3,20 150:1
  163:6 183:18,19
  184:9,21 185:6,21
  186:4,19 193:13
  199:14 203:10,15
  207:3,7 211:15,16
  212:10 219:24
  220:8 222:17
  225:2 226:3,11

  235:8
**files** 25:9
**filing** 5:3 31:17 51:6
  60:17 65:13 78:4
  80:23 82:10
  113:14 122:14,24
  124:7 125:1,5
  134:8 136:6 138:7
  141:15,20 144:13
  148:18 153:11
  154:2,3,5,8,17,20
  187:1,3 204:1
  207:5,16 209:23
  210:2 218:11
  223:14 226:14,16
**filings** 50:16,24
**final** 19:4,6 20:13
  71:1 106:20 130:6
  156:24
**finalized** 70:23
**finally** 217:4
**finance** 26:22 51:3
**financed** 228:12
**finances** 70:24
**financial** 87:2,6
  98:12 146:5
**financier** 30:9
  170:25
**financing** 24:10
  34:1,24 39:22
  50:18 64:1 80:9
  127:2 128:8
  129:14 154:12
  161:25 162:1
  165:24 169:21
  222:12
**find** 25:20 77:7
  139:13 144:6
  145:8 161:21
  162:3 170:11,14
  218:22
**finding** 25:12,23,25
**findings** 25:3
**fine** 135:13,13
  137:18 230:8
**finish** 14:5 104:17
  234:5
**finished** 154:22
**finishing** 241:11
**firm** 9:18 10:7
  12:15 14:11 16:6
  16:13,16,16 20:20
  22:15 29:2 30:14
  33:3 34:5 44:2
  47:4 50:15 51:14

USBC, Eastern District of PA        Transcript of Chapter 11 Proceedings        Case No. 23-10763, 10764-DJB
Monday                        Videotape Deposition of Rafael X. Zahralddin              March 30, 2026

Page 252

52:4,14 53:6,10 70:8 73:23 95:18 96:23,23 97:8,9 99:7,17 100:23 121:3 140:8 142:19 144:25 148:8 149:14,23 150:9 151:13 152:16,19 162:15 162:15 163:19 164:1 169:10 170:17,24 175:25 183:18,19 190:5 192:22 193:2,4 197:17 198:20 199:18 200:8 216:23
**firms** 7:23 176:7
**first** 7:13 10:17 13:20 15:25 20:24 22:24 24:10 27:9 28:10,20 29:23,25 31:15 39:24 51:9 56:24 66:23 68:10 74:6,20,25 76:3 79:16 89:25 91:20 97:25 112:10 118:11 134:16 138:18 139:5 140:15 141:19 143:7,23 144:2 145:13 155:7 164:14 165:8 177:3 178:19 200:11 224:25 238:20
**first-day** 50:24 51:6 51:7 155:23 217:17
**Fisher** 9:24 149:16 163:7 164:25 165:5 187:22 234:22 238:3
**Fisher's** 201:24
**fit** 220:22
**five** 8:10 52:10 160:18 202:8,9 219:23 241:10
**five-minute** 40:7 202:3
**fix** 179:2
**fixed** 196:1
**flat** 205:12
**flew** 24:21
**flip** 141:18 178:18

**flipped** 201:22
**flipping** 142:4
**floating** 181:10
**floored** 235:11
**flow** 88:12
**focus** 16:21 46:24 66:13
**focusing** 61:13
**foggy** 122:21
**folks** 22:3,14 23:21 31:8,9 37:18 41:24 45:1,16 47:4,14,25 48:2 50:25 59:23 72:5 79:11 87:20 110:14 126:15 158:5,11,24 161:1 197:5 208:22 215:11 221:4 227:17 241:6
**follow** 161:16 170:20
**followed** 28:14
**following** 105:12 130:4
**follows** 6:16
**forbearance** 89:10 120:5 129:12 177:4 195:22
**force** 180:2
**foreclosure** 11:19 11:22 22:1,2
**foregoing** 243:6,19
**forever** 149:24
**forgetting** 147:9
**form** 5:5 120:17 148:8 175:13 188:1 224:7
**formally** 11:9
**formation** 136:20 136:22
**formed** 11:8,9 132:1
**former** 10:19 16:16 70:20 81:4 169:11 227:3
**forms** 220:25
**formulates** 224:22
**forth** 69:17 119:25 160:15 208:12 222:24 223:5
**forths** 133:3
**forum** 224:18
**forward** 42:25 144:12 224:17,23

225:16
**fought** 176:19
**found** 25:20 64:16 139:11,17 161:19 175:10 224:2,19 225:23 228:1
**foundation** 87:21 102:16
**founded** 157:24
**founders** 11:20
**four** 52:11 79:6 82:13 114:17 115:17 156:14 160:18 189:3 201:6 207:11
**fourth** 216:1
**frankly** 55:1 208:11
**fraudulent** 62:7,23
**freaked** 227:13,20
**free** 56:12 173:13
**fresh** 202:24
**Friday** 82:15 119:2 226:12
**front** 9:8 32:22 105:7 114:21 162:24 167:7
**frustrated** 225:5
**fulfill** 87:4,9 98:7 130:12 159:17 217:20
**fulfilled** 110:25 130:9
**fulfilling** 234:12
**full** 11:20 91:20 97:20 161:15 162:23 180:2 200:11
**full-time** 37:15
**fully** 40:22 91:23 243:4
**function** 24:10
**fund** 24:17 26:22 30:11 58:16 90:15 107:23 117:6,23 167:3 192:19 228:21
**fundamental** 15:8 95:8 97:9 98:2 99:1,4,19 100:21
**funded** 32:4,8 128:9 227:4
**funding** 31:16,22,23 34:16 42:25 63:9 69:10 118:3 119:13 120:6

125:21 165:18 168:5,8,16 169:4 180:21 181:2,8,13 181:18 206:23 222:2 226:3,6,17 234:16
**further** 49:18 135:1 162:6 241:20
**Fusion** 41:4,4,8 46:6 48:21 74:17 74:19 75:8
**Fusion/Rembrandt** 42:1,13

_____
**G**

**G** 1:23
**gain** 178:3
**Gates** 27:20 54:3 55:6 61:8 232:21 239:9
**Gates'** 227:18
**gathered** 38:20 70:11
**Geddes** 8:4
**general** 36:24 38:15 73:20 116:11 212:21
**generally** 28:3 46:16
**generate** 204:16
**gentleman** 160:9
**gentleman's** 33:1
**geography** 150:14
**Georgetown** 7:15 7:16
**getting** 17:19 30:4 31:12 88:23 160:19,19,21,23 173:8 211:12 227:11 229:14 231:1,8 232:15
**gist** 28:3 56:13
**gists** 104:9
**give** 7:20 35:19 40:21 41:21 68:17 77:7 97:20 108:15 109:8 140:21 153:15 154:8 159:19 167:5,6 169:13 171:22 175:15 182:16 193:23 194:11 195:9,10 203:18 210:23 222:12,14 230:22 231:3,3

**given** 50:13 75:2 78:17 93:11 155:6 192:22 228:21 230:14 231:23
**gives** 97:22
**giving** 179:1
**glasses** 41:6
**Glen** 25:13
**go** 8:24 9:11,15,19 14:4 17:20 28:2 28:20 40:9,13 43:2 66:24 68:10 75:21 77:6 90:24 93:25 94:16 96:2 97:6 102:5 106:17 111:12 113:6,15 135:14 139:10 144:11,18,18 146:13 151:24 153:22 154:1,21 162:8 163:11 170:17 174:13 176:13 178:12 179:22 188:21 205:8,23 206:15 208:14,20 216:1 220:17,18 221:4 222:3 228:5 229:23 231:18,19 234:6,6 235:3,23 235:24 236:2 237:9 238:3
**God** 9:11
**goes** 42:24 148:19 230:8
**going** 12:11 14:8 27:17 29:13 30:6 30:11,12 32:17,25 36:2 37:14 40:9 40:14 42:24,25 43:13 46:8 49:11 49:12,14,15,18,23 49:25 51:3 52:20 54:5,6 57:2 63:2,9 63:13,15,16 65:8 67:15 69:9 85:2 90:24 94:2,15,25 95:23 96:1 99:8,9 99:14 100:11,16 100:17 101:16,18 103:15 111:25 117:5 120:23 123:2 126:4 130:11 135:16 137:15 139:14

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                            Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 253

144:14 147:10 155:9 157:5,7 159:20 160:8,22 162:10 163:13 167:2,14,15 169:10,22 171:22 172:8 174:8 175:8 175:22 179:20 182:17 183:6 188:4,4,6,21 192:24 195:3 196:3,15,20,23 197:4,7 198:20 201:12 202:13 205:6,8,21 206:6 207:14 214:25 217:16 220:17,22 222:7,12 223:9 232:10 237:9,11 239:21 240:25 241:13 242:2
**Gonzales** 36:22 187:19
**good** 5:9 6:3,5,19 6:20 23:25 73:15 98:17,22 113:23 119:4 121:20 131:18,19,22 135:6 138:2 176:10 182:1 194:25 202:10 217:24
**gotten** 58:7 62:24 64:1 107:24 133:18 139:2 162:25
**governance** 65:7
**grab** 40:8
**graduate** 7:12
**graduated** 7:21
**Grady** 14:21 17:4 101:14
**granted** 154:25 186:23
**granting** 231:24
**grave** 229:13,24
**great** 150:8 159:18 182:20 201:25 240:24 242:10
**Greenberg** 152:24 152:25
**Greenleaf** 8:5 10:20 12:16 15:6 52:4 52:23 95:19 101:8 151:14

**Greenleaf's** 15:9
**gross** 224:4
**grounds** 235:17
**group** 36:13,15 42:10 45:12 47:13 54:8 79:24 140:8 156:17,25 171:11 221:7
**guess** 35:18,19 82:15 87:19 120:10 138:2 173:10 181:21 213:7 226:25
**guessing** 181:20
**gun** 69:23
**guy** 11:13 24:14 25:12 41:8 42:21 79:16 160:7,23,24 166:25 174:22 241:7,8
**guys** 42:12 50:7 75:25 111:24 147:13,14,15 167:1 174:18 190:11 195:10 199:5

———————————
**H**
———————————
**H** 3:6 4:2
**half** 43:16 123:17 137:24 147:1
**hallway** 117:19
**hand** 217:18
**handle** 52:1 165:6
**handled** 10:25 18:23 109:21,22 140:13 149:4 238:25
**handling** 139:20 160:14 238:3
**hands** 160:1
**happen** 22:22 24:24 56:2 62:17 98:15 98:20 109:14 179:19 187:13 196:15 205:21 217:21 232:11 235:19
**happened** 23:3 26:15 31:1 46:12 97:1 153:19 156:1 162:17 187:14
**happening** 19:7 24:3 104:6 232:6
**happens** 42:1

133:13 151:10 231:10
**happy** 18:3 118:20 131:16,16 161:17 167:3
**harbor** 171:19
**hard** 51:20 176:19
**harm** 101:17
**hat** 144:16
**hats** 62:1
**Hawk** 11:14,14 22:3,13 197:5 226:13 231:6 232:16
**head** 67:16 69:23 96:23 99:6 107:13 112:25 125:10 129:22 156:5,16 156:24 181:10
**heading** 224:11,12 238:16
**headquarters** 59:20
**heads** 110:13
**health** 19:15,16 126:12 176:5 201:1
**hear** 40:10,10
**heard** 208:5 216:4
**hearing** 76:9,23 77:1,3,5,14,20 172:5 228:20 229:1 230:4,22,25 230:25 231:1 232:15 238:25 239:14,14
**hearings** 24:16 117:18 225:7 239:16
**heavily** 9:25 23:15
**held** 5:19 26:2 30:24 94:5 158:8
**help** 45:7 99:9 101:15 122:21 124:15 130:23 131:17,22 133:1 151:17 173:16 177:8 187:18 190:8,15 198:15 201:11,23 202:1 207:19 221:11
**helped** 24:8
**helping** 31:9 167:12
**helps** 141:11 216:19
**Henry** 69:17
**Herbert** 160:6

**hey** 43:11 69:5 74:21 133:8 171:21 181:15 187:7 205:1 217:24 221:9 227:20 236:20
**Hi** 29:7 198:6
**high** 204:19
**higher** 150:13
**highest** 210:22
**highlighted** 185:2
**hindsight** 73:8 175:21
**hired** 160:7
**historical** 130:20,23 189:23
**history** 155:25 190:12
**hit** 47:9
**hold** 27:23 50:7 189:5 210:7
**holding** 158:4
**Holdings** 128:25 171:11
**hole** 237:10
**Homony** 2:6,15 55:4 142:21 145:16 186:9 188:9
**honest** 111:12
**Honestly** 181:9
**Hong** 175:5
**honor** 44:18 146:18 230:6 231:2
**Hope** 17:21 201:7
**hoping** 38:20
**hospitals** 201:6
**hostile** 103:24 225:10
**hot** 227:21
**hotel** 45:4
**hounded** 176:6
**house** 119:24 160:7
**Houston** 149:20
**huge** 44:24 51:5 64:17 138:25

———————————
**I**
———————————
**I's** 46:16
**idea** 36:14 67:15 75:22 105:24 107:3 112:23 133:5 181:6 195:3 233:10
**identical** 93:7

**identified** 20:22
**identifies** 154:5
**identify** 9:23 16:4 16:19 141:19
**identifying** 136:7
**ill** 198:13 201:23
**imagine** 31:23 126:23 127:3
**immediate** 10:9 88:17,25
**immediately** 27:1 105:19 181:3 187:14
**impacted** 117:5
**impermissibly** 58:3
**important** 17:8 21:8 172:12
**imposed** 17:17
**imputed** 25:19,24
**in-house** 213:18
**inaccurate** 89:17
**inactions** 224:4
**inactive** 7:9,10
**include** 157:1 164:15 165:9 185:7
**included** 107:2
**including** 38:3 59:13 73:3 97:15 137:2 168:1 189:17 197:5 220:14 223:11 227:2
**incorporate** 223:11
**Incorporated** 5:14
**incorporation** 134:9
**incorrect** 108:22,23 124:17,18 179:1 229:23,23 230:20
**increase** 159:19
**indemnification** 52:25 53:1
**indemnity** 52:20 53:10
**independent** 71:16 72:1,9 73:24 85:11 144:20 235:25
**index** 4:1 8:19
**Indian** 99:13,15
**indicated** 51:2 71:5 76:22 87:2 137:12 172:6
**indicates** 13:22

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                        Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 254

**indication** 174:17
**individual** 157:2
**individually** 13:2,7
   17:11
**individuals** 38:3
   123:22
**Industries** 11:15
**inform** 222:17
**information** 72:3
   140:16 148:17
   170:5 173:20,21
   186:2 189:23
   190:10 192:23
**infringement** 44:12
   60:16
**Ingersoll** 12:4
**initial** 29:20 46:17
   207:20
**initially** 164:19
**initiated** 82:25
**injunction** 11:2,5
   36:5 58:22 59:22
   65:20 151:17
**injunctive** 154:24
**Innovations** 34:2
**inside** 103:23
**insist** 97:7
**insists** 97:25
**instance** 240:2
**instances** 18:6
   21:18
**Institute** 147:13
**instituted** 212:11
**Instruct** 100:14
**instructed** 144:11
**instructing** 99:25
**instruction** 62:25
**instructions** 107:24
   192:23
**insurance** 12:3,10
   159:25 160:16,20
**intellectual** 129:3
**intensive** 160:18
**intention** 64:14,24
   67:10
**intentionally** 73:6
**intently** 66:16
**interacting** 38:11
**interaction** 70:4
   157:14
**interest** 21:7 44:5
   78:21 128:24
   167:20 225:19
**interested** 167:9,11
   172:6

**internal** 123:25
   126:14
**International** 7:19
**interrupt** 203:22
**introduced** 44:19
   191:23,24
**introduction** 13:21
   45:10
**invest** 226:20
**investing** 167:11
**investment** 22:3
   27:25 49:19
**Investments** 11:14
**investor** 30:7 33:5
   49:16 148:19
   171:12 191:23
   192:1 227:2,11,12
**investors** 11:17
   24:23 58:9 227:3
**involuntaries**
   111:10 122:15
**involuntary** 78:22
   80:24 86:1 91:12
   92:8,16 107:11,17
   108:4,17 110:1
   111:5 112:14
   113:10 114:2,15
   114:24 115:14
   117:2,9,21 118:1
   122:25 123:10
   125:2
**involve** 173:11,13
**involved** 9:25 11:17
   17:5 32:24 33:15
   33:17,17 41:5
   47:11,12 52:13
   63:24 91:5 108:16
   115:20 116:23
   131:7 158:5 186:7
   198:22 200:18,24
   205:2 213:20,21
   227:3
**involvement** 106:3
   141:21
**involving** 64:8
   122:14 173:12
   200:24
**IP** 47:5,7,9,23 48:2
   49:25 50:2 72:1
   72:18 92:14 195:5
   209:11
**irreconcilable**
   95:17,18
**irreconcilably**
   15:15

**irrelevant** 110:4,5
   154:18 155:1
**Isaac** 120:15
**issue** 10:23 18:17,18
   47:7,10,14,16,21
   47:22 48:16,25
   49:6,14 62:7,19
   62:22,24 65:19
   71:23 74:13 92:14
   96:3 110:25 111:1
   112:10 118:3,17
   122:23 123:10
   124:15 161:23
   162:7 165:5
   166:15 172:8,12
   172:16 183:9
   184:1 188:2,7
   199:22 201:15
   205:18 230:4,5
   231:17 238:4
   239:1
**issues** 17:19 25:12
   39:22 46:2 47:6
   53:25 56:14 63:10
   63:24 65:12 72:2
   116:25 137:1
   163:10 173:7
   176:9 199:23
   200:22 233:1
**it'll** 11:13
**iteration** 206:11

────────────
          **J**
────────────
**J** 2:14
**Jack** 79:2 80:20
   81:1,2 86:6,7
   108:17 126:21,22
**James** 8:5
**Janiczek** 201:16
**January** 28:24
   29:14 30:14 35:12
   38:2 188:18,19
   189:8
**Jeff** 173:8 174:1,5
**Jersey** 1:24
**job** 24:1 37:15
**jobs** 37:20
**jogging** 45:22
**John** 51:21,24 52:1
   95:12 147:11,11
   181:16
**join** 8:8 10:4
**joined** 186:6
**joint** 56:6,25 126:25
   128:1 205:3

**jointly** 128:11
**Jonathan** 2:9 6:6
   10:24 14:19
**jonathan.preziosi...**
   2:11
**Joseph** 28:21
   139:20 148:25
**judge** 8:3 18:19
   19:6 20:11 25:6
   25:23 51:1 55:1
   65:3,23 76:10
   107:20 117:23
   144:9 146:15
   153:14 154:20
   160:14 161:7
   162:6,25 166:25
   169:11 172:5
   175:21,22 187:6
   188:2 199:13
   208:11 221:5
   223:8 231:10,23
   235:15 239:14,15
**judgment** 17:20,24
   18:9,22,22 20:13
   20:16 194:20
   199:24 209:14
**July** 128:16,22
   130:3,17 131:2,25
   132:4,15 133:25
   145:22 203:5
   207:8,10 215:23
   216:8,10 219:9,11
   219:16,19,20,23
   221:2 222:16,16
   222:17 225:3
   226:4
**June** 19:13 119:8
   119:22 121:18
   123:23 125:3
   142:23 143:15
   168:1,19 169:20
   189:7 207:10
   226:12
**jurisdiction** 65:13
**jurisdictions** 7:6
   11:16 150:11
**justice** 175:8

────────────
          **K**
────────────
**K&L** 27:19 54:3
   55:6 61:8 227:17
   232:21 239:9
**Katz** 10:8
**keep** 19:17 21:21
   23:19,20 24:6,7

37:2 54:8 55:7
   59:3 78:6 85:2
   100:17 127:3
   196:3 235:3
**Keith** 2:15 9:24,25
**kept** 54:1 96:4
   116:11 231:1
**Kevin** 157:14
**key** 74:14
**keys** 59:23
**kid** 147:19
**kill** 147:10
**kind** 11:18 25:6
   36:1,12,22,24
   42:2 44:3 51:25
   71:3 91:13 104:3
   126:2 129:12
   137:4 139:20
   140:16 158:20
   159:7,15 163:23
   164:6 169:9,11
   171:18 173:12
   208:6 221:15
   224:18 225:1
   236:6
**kinds** 24:22 135:2
**knew** 33:19 105:25
   106:2,5,10 111:16
   112:22 119:13
   139:6 151:8
   153:21 157:5
   172:11 196:24,25
   197:1 235:7 237:7
   237:12,17
**know** 9:22 11:9
   13:11 17:23 19:7
   22:23 23:10 29:16
   30:17 32:13,13,16
   32:23 34:13 35:15
   35:22 36:16 37:12
   37:17 38:9 40:1,3
   43:11 46:14,17,20
   47:2 51:15 56:4
   62:14 63:3 65:15
   66:12,15 69:1,7,8
   69:22 70:12 73:7
   74:1,23 80:14
   81:2 82:14 86:23
   89:8,9,11,14 90:6
   91:4,15 92:23
   95:2 96:5 97:17
   99:18 101:11,17
   101:20 102:2,2,4
   102:4 103:8,21
   106:8,14,23

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 255

107:11 108:18
109:20 110:9,11
110:13 111:9,22
112:20 113:2,9
116:22 117:18,18
117:21 122:7
123:5,9 125:10
126:13,23 132:2,2
133:1,2,5,24
137:8 140:1,2
144:15,21,23
145:10 146:7
147:11,12 150:13
150:21 157:2
160:3,12 161:10
161:12,18 162:4,6
162:16 165:15
166:1,25 170:15
170:16 173:5,6,14
173:17,18 174:2
178:10,18 179:4
181:9,11,12,14
184:4,7 191:17,17
195:19 196:2
197:12,21,24
199:7 201:20
207:13,15,24
211:5 214:19,21
215:4 217:1,3,4,7
218:13,13,14,19
220:15,20 221:11
221:14 222:3
223:5 224:12
225:1 227:8
229:13 230:24
231:9 232:14,24
233:16 235:19
236:4,6 237:3,14
237:22 238:5
241:4,5
**know-how** 23:16
42:3
**knowledge** 22:4
42:16 45:11 70:2
71:16 90:1,5,6
91:3 116:13
159:14 170:24
214:14 240:6
**known** 42:17 79:25
192:17
**Kodowsky** 2:15
9:24
**Kong** 175:5
_____
L
_____

**L** 1:16 243:14
**LA** 17:21
**labor** 103:20
**laboring** 208:18
**lack** 61:3
**lacrosse** 147:19
**lady** 187:19
**laid** 209:16
**laments** 225:8
**language** 150:25
**laptops** 59:24 60:3
**large** 30:6 33:5 45:5
78:19 171:6
192:24 204:14
225:14
**largely** 163:18
**larger** 194:12 195:6
**largest** 59:15 60:7
60:10 110:20
189:15 192:20
**Larry** 28:6,12 31:4
33:7,9 42:20 43:9
44:23 47:2 69:5
83:22 110:9
112:11 191:24,24
**Larry's** 163:19
**last/early** 93:8
**Laster** 35:25
**late** 143:19
**latest** 123:9
**law** 1:14 7:12,13,14
7:19,22,24,25
22:15 52:11 56:1
59:22 108:23
112:23 124:17
176:7 232:25
**Lawrence** 70:16
**lawsuit** 53:3,13
**lawyer** 10:21 38:14
42:18 51:15,20
86:11 96:19 98:1
98:7,8,13 99:20
123:7 124:14
151:16 152:18
192:16,17 216:22
232:22 237:17
**lawyers** 12:19 27:19
39:7,9 47:5,9
52:10,11 66:5
145:5 213:6
232:21
**LBBS** 17:22 168:13
191:19 192:10
**lead** 51:14,20
**leads** 42:6

**leaning** 78:16
**learn** 70:1
**learned** 68:25
**leash** 100:17
**leave** 8:2 18:15,18
20:10 52:3,4 96:1
101:6 137:10
182:18 199:2,21
200:7 215:18
**leaving** 53:6
**Lee** 201:16
**left** 11:25 22:19
52:7 95:19 123:13
126:8 130:11
186:9 210:20
214:24 223:22
**legal** 55:5 57:17
196:22
**legitimate** 113:3
160:25 162:4
**lender** 80:10,11
**lender's** 64:4
**lenders** 160:21
207:24 208:7
**length** 81:1 101:13
**Leslie** 189:18
190:11 191:5,13
**let's** 7:24 16:18
32:20 35:1,5 36:4
36:19 37:21 38:18
39:15 40:3 51:8
61:9 67:17 76:7
78:6,9 81:10
82:13 92:24 93:25
95:23 97:24 102:5
104:1,11 106:17
108:1 114:10
121:13 129:25
132:12 134:6
141:8,11 144:5
145:8 147:22
157:1 167:22
169:12 172:21
180:17 181:21
182:14 184:17
185:15 188:11,13
189:5 190:21
196:3 207:4
221:10 222:9
233:21 240:4
241:10
**letter** 81:12 120:15
128:21 171:19
172:2 198:10
**letters** 22:15

**leukemia** 17:14
20:5 146:11
201:25 225:24
**level** 204:20
**leverage** 150:10
**Lewis** 2:9 6:6,7 8:7
8:11 125:13,17
126:10,12 134:4
148:1 189:12,14
**liabilities** 12:1
**liability** 25:24 72:6
72:8 74:22 194:18
195:6
**license** 21:20 92:14
104:7 182:7,11
205:18,22
**licenses** 41:19,22,22
**licensing** 41:18
47:25 49:14 72:2
**lie** 161:8
**lied** 161:6,7
**likelihood** 78:18
**limitations** 240:1
**limited** 66:11 78:18
137:8
**limits** 55:22
**line** 133:6 237:14
**link** 8:23
**liquidated** 110:23
**list** 38:24 39:2,9
112:4 164:22
184:23 185:7
**listed** 110:16 123:25
164:19
**listening** 66:16
**literally** 19:11
59:18
**litigating** 146:17
**litigation** 19:2,2
22:13 23:13 25:3
37:14 38:21 52:14
57:19,19 60:20,21
61:6 68:21 70:9
70:10 71:7 73:11
73:12 84:18 85:1
91:23 110:16
111:16 112:3,9,24
124:8 128:8 129:2
129:14 137:2
144:10 162:22
163:23 167:16
199:15 208:12
209:11 217:22
224:18 227:13
241:9

**litigations** 200:25
**litigator** 14:21
232:24
**little** 13:11 23:8
52:7 62:22 176:8
202:7 223:3
**liveliness** 46:1 75:2
75:5,8
**LLM** 7:16,18
**LLP** 2:9
**local** 192:16
**locked** 163:15
**London** 59:19
**long** 74:10 83:8
113:11 133:9
147:20 159:20
204:7 205:23
217:1
**longer** 66:17,18
84:23 91:5 99:16
131:13 137:3
236:19
**look** 8:24,25 13:20
18:3 28:2,15 29:7
32:20 34:11,17
35:1,6 36:1 37:21
39:15 42:20 47:6
49:11 62:7 63:2
68:5 69:13 72:22
75:21 77:15 84:4
88:20 91:17 92:24
94:24 96:5,5,5,11
97:24 104:2,11
108:1 111:12,22
112:8 114:10
118:20,22 119:16
120:12 121:13
122:8,17 123:18
126:18 132:12,25
134:6 146:15,24
147:8,22 150:24
151:12,25 159:16
162:8 164:2
167:22 169:1
170:17 171:3
178:5,12 184:9
188:15 190:16
191:10 195:25
199:10 206:8
210:3 215:20
220:4 221:5,10,15
223:16 231:18
**looked** 8:20 39:11
47:3,5,14 48:16
50:5,13 67:22,23

(856) 983-8484                          Tate & Tate, Inc.                          (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

84:1 93:2 114:1
139:7 155:15
156:14,20 193:15
220:11
**looking** 31:7,8
33:25 38:8 47:22
56:24 62:22,23
67:20,21 71:22
72:24 77:16 92:13
93:2 114:6 132:25
135:5 142:11
158:7 191:4,17
201:6 213:7 220:1
**looks** 31:7 132:16
133:7 177:2
**Los** 139:3 140:9
156:19
**lose** 174:14
**losing** 120:6
**lost** 59:23 201:4
**lot** 8:15 9:5 10:25
24:17 37:2,13
42:25 47:17 49:8
54:2 56:1 58:5
73:8 79:14,17
81:5 103:25 113:7
125:23 133:7,13
150:5 159:2,6
198:12 199:7
208:3,22 218:5
**lots** 8:21 124:15
150:9
**loved** 177:6 241:6
**lovely** 187:19
**lower** 150:5 170:6
**lower-priced**
150:10
**Lu** 152:16,23 153:8
153:9
**lump** 105:17
**lump-sum** 205:13
**luncheon** 135:19

———————————
**M**
———————————
**M** 2:3,9
**mad** 151:6
**magistrate** 71:3
132:18
**mail** 162:21
**main** 86:14 139:3
149:20 161:5
231:5
**major** 176:6
**majority** 52:1
212:24

**makeup** 136:13
**making** 54:1 77:13
90:16 109:12
155:3 172:6
224:18
**malice** 103:25
**man** 11:10 240:19
**management's**
224:3
**managing** 10:6,10
51:19 152:25
**Mandarin** 174:3
**manufacture** 59:12
**manufacturing**
159:14
**March** 1:11 5:11
53:15 61:14 64:11
137:24 138:3,8
141:16 142:12
207:5,10,17 217:5
217:10 218:12
238:21
**Margaret** 161:9
**marked** 77:10
141:12 209:18
**market** 1:15 2:4
206:16,19
**Marlton** 1:24
**married** 36:21
**marrow** 20:4 201:1
**marry** 76:4
**marshal** 207:25
**Marty** 47:3 65:16
**masse** 41:25
**material** 22:6
102:11
**materials** 75:6,24
**Mathu** 10:14 14:13
16:2 19:20 20:14
20:21 21:1 22:5
25:4 26:3 28:22
29:9 33:9 53:16
55:12 61:21 62:1
62:3 71:6 73:10
78:16 84:14,14,15
94:21 116:17,18
116:19,21 128:17
132:24 133:19
136:8,9,19 139:15
144:14 151:20
155:20 156:12
157:24 167:25
171:16 198:6,12
199:15 214:2
**matter** 12:22,23

14:11 16:1,4,24
18:8,12,13 19:20
19:23 20:2,3
51:13 71:2 96:16
97:2 116:10
126:11 131:14
132:9 133:16
134:21,24 175:15
190:25 199:1
222:24 243:6
**matters** 5:13 10:22
15:6 20:19 131:3
198:16
**Matthew** 18:23
200:17
**Maxwell** 122:11
**Mayer** 160:14
**McCarter** 21:10
145:1
**McCarthy** 24:15
26:11 27:5 47:16
58:10 62:25 89:19
89:20 90:3 91:2
116:24
**McCarthy's** 90:22
**McLaughlin** 79:2
80:20,22 86:6,7
108:17 115:2
117:13 126:21
**McMichael** 28:7
31:5 32:23 33:8
33:12 42:20 43:9
64:10 69:5,17
70:6 73:4 78:13
78:24 83:3,17,22
83:23 84:1 110:10
**McMichaels** 44:23
47:3 49:4 71:21
72:22 86:16 87:1
112:11 163:20
191:24,25 192:2
**mean** 22:9 27:4
28:1 33:16 46:15
47:20 50:1 51:4
54:22 59:19,25
60:25 69:25 72:12
103:23 110:17
112:17,20 115:13
122:22 133:4
138:20 140:17
143:11 161:15
165:14 181:15
187:20 206:2
208:21 211:10
212:16 213:3

218:4 221:13
222:1 225:5
**meaning** 31:24
54:17 65:8 207:16
**means** 96:25 178:12
243:21
**Media** 1:7 5:16
**mediation** 87:25
102:12 160:14
**medical** 17:12,22
18:15,18 20:10
137:10 199:2,21
200:7
**meeting** 9:13 30:24
31:1 46:2 75:1,7
**meetings** 46:17
158:24
**member** 7:10
**members** 9:18
**memo** 95:21
**memorandum**
169:6 183:12
188:16 199:12
**memorize** 9:7
**memory** 18:3 26:17
45:22 113:9
117:16 118:10,12
140:14
**mention** 47:18
141:20
**mentioned** 19:24
47:17 77:22
**merger** 41:3
**merit** 75:11
**meritless** 162:9
**meritorious** 71:9
**met** 10:24 43:24
**Miami** 152:17
**Michael** 2:16 123:6
**Michaels** 42:18
43:6 44:2,7,25
47:11,20 48:10
68:12,20 72:3
74:7 81:13,22
82:17 83:5 85:25
86:11,14,15,16,17
86:20 91:8 92:7
93:6 102:24 103:5
118:14,17 119:4
119:19,21,21
120:16 123:6
126:21 130:3,25
131:19 132:15
164:8 177:2
189:17 191:6

195:23
**Michele** 1:16 5:24
243:14
**middle** 66:9 239:17
**milestones** 61:3
**military** 160:5
**million** 20:17 27:16
50:21 81:3 88:18
89:10,18 90:20
106:1 162:1
165:18 168:7,12
169:21 171:1
191:20 195:18
196:7,18 220:10
220:14 223:7
226:7 237:5,10
238:23 239:18
**mind** 78:6 104:24
**minute** 105:25
**minutes** 202:9
233:4
**Minyao** 10:4
**mirrored** 49:8
**miscommunicatio...**
236:5
**misidentifying**
175:4
**mislead** 96:8
**misled** 96:6
**mismanagement**
224:4
**mispronounce**
160:9
**missed** 142:1
**missing** 155:11
**mixed** 191:16
**Mm-hmm** 38:5
53:17 82:22 127:7
171:25 183:24
185:23 186:16
207:9,12 228:18
239:2
**model** 44:3
**models** 221:14
**modified** 223:10
**modify** 93:20
220:22 221:18
223:6
**moment** 68:15 89:5
118:11 195:16
196:17
**Monday** 1:11 5:10
184:22
**monetary** 44:24
49:24

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 257

**money** 24:17 25:22 26:12 43:23 58:16 58:24 63:2 86:13 88:12 89:23 90:2 90:4,15 106:6,9 149:1 174:9,12 176:20 177:6 193:10 196:25 197:3,10 205:25 206:6 209:13 211:12,13 222:13 227:11 235:4 237:23
**monies** 26:21
**Montgomery** 97:3
**month** 106:11 204:9 212:10
**monthly** 149:15,25 182:25 183:12,17 187:25 237:24
**months** 147:1 175:20 187:12 189:3 204:10,11 207:11 225:16
**morning** 5:10 6:3,5 6:19,20 93:8
**Morris** 8:4
**MORs** 182:25 183:4 184:9,21,24 185:6 197:11
**motion** 13:15 33:24 34:8,17 51:15 61:3 62:5,10 63:16 94:19 95:16 96:20 114:14 115:17 118:5 119:7 162:16 172:4 186:13,23 198:9 210:12 211:16 218:2,2 228:20 232:17,19
**motions** 95:3 211:15 225:9 226:14 230:13 232:4
**move** 42:3 144:11 217:25 224:17 225:15 235:5 238:7
**moved** 18:19 41:25 42:9 58:4 125:17
**moves** 208:15
**moving** 120:7 224:20,23
**multiple** 222:23

**Murphy** 1:17 5:24 243:14
**Mutual** 120:17

_____ N _____

**N** 2:1 3:1
**nail** 210:25
**name** 6:21 7:22 33:1,10 36:3,19 39:24 79:13,16 137:9 140:16 147:9,10,17,20 181:16 203:15
**named** 11:10 24:15 25:12 41:8 42:18
**names** 153:6,7
**nature** 22:12 41:2 103:23 128:2 159:8 209:10
**NDA** 120:19 121:2
**Neal** 5:22
**necessarily** 56:5 57:2 152:21
**necessary** 96:25 151:8 170:2
**need** 40:4 42:20 63:3,4,5 86:5 87:2 144:17 146:16 151:2 154:1,5 161:13,16 169:23 177:19 179:8 183:4 184:1 193:3 193:6 202:8 205:2 209:9 211:7 214:1 221:18 230:9 231:2,3 232:19 233:16 235:24 236:1
**needed** 17:12,20 56:17 80:18 91:10 92:9 123:8 124:15 154:3 177:9 201:2 209:11,13 217:20 239:20
**needs** 170:2 215:1
**negative** 227:14
**negotiate** 48:8 144:15,17 158:10 216:23 222:7
**negotiated** 49:10 50:4 104:15 108:19,24 130:24 130:25 195:17 196:9 216:15
**negotiating** 46:18

47:1 48:3,5,12 82:19 83:24 102:6 122:4 193:20 194:10 214:3
**negotiation** 49:2 82:25 85:8 86:9 120:10 176:24 212:14 218:18
**negotiations** 84:7 146:23 212:24 213:15
**neither** 170:23 177:13 182:11
**Netherlands** 42:14
**Networks** 1:4 5:14 14:13 168:5 203:11 216:16
**never** 17:10 46:5 69:11 72:23 74:17 127:25 128:3 176:11 211:10 229:21 232:7 235:9 237:21
**new** 1:24 7:9 11:25 43:18 65:9 84:20 85:1,25 86:5 87:24,25 102:12 137:4 160:16,16 183:5 191:7 200:13 209:18 234:24,24
**Newark** 2:10
**NJ** 2:10
**no-no** 64:18
**non-competes** 42:8
**Non-Disclosure** 120:17
**non-exclusive** 41:18
**non-final** 65:20
**non-negotiable** 103:1
**non-solicitation** 42:8
**nonsense** 175:2
**normal** 34:18
**normally** 156:15
**north** 1:23 90:20 232:23
**Northern** 149:19
**nostalgic** 182:19
**Notary** 1:18
**note** 170:4 225:21
**noted** 86:25 216:2
**notes** 46:2 75:1,7 243:5

**notice** 1:14 93:10 140:18 142:18
**notion** 55:15 92:7
**November** 13:17 52:5,7
**nuclear** 25:7
**number** 123:22 148:2 195:7 203:19 205:9 210:9
**numbers** 27:15 48:1
**Numeral** 178:11

_____ O _____

**o'clock** 94:1
**oath** 90:19 181:22
**Obermayer** 190:8 236:16
**objecting** 231:7
**objection** 59:5 99:21 175:12 224:6 228:2 232:16
**objections** 5:5 61:8 99:23 243:3
**obligation** 98:7 109:18 186:5 205:9
**obligations** 234:16 234:18
**observing** 236:17
**obtained** 177:13 180:13 182:12 200:12
**obviously** 14:16 23:7 28:18 51:2 57:24 84:9 96:10 146:20 148:10 150:17 165:14 176:18 185:12 201:22 205:7 227:22
**occasions** 112:16 113:6
**occurred** 75:20
**Ocean** 173:10
**October** 19:18
**odd** 34:16 46:21 86:24 210:16
**offensive** 55:5
**offer** 95:24 162:4 173:25 192:14
**offering** 204:23 206:8,10,12,15 220:15,17 221:10

**offhand** 137:23
**office** 10:25 11:15 14:22 52:8 139:3 149:20 150:6 157:15,22 159:5 201:17 227:18
**officer** 70:20 116:16 146:5 225:17
**officers** 136:8 138:6
**offices** 1:15 5:19 60:2 150:9 159:4
**offshore** 11:16 176:17
**oh** 8:10 22:23 33:16 41:8 47:20 54:11 76:16 84:14 97:14 97:16 115:8 140:24 141:4 143:11 160:2,3,4 161:9 169:14 172:20 179:10 191:14,22 209:1 227:7
**okay** 7:11 9:21 10:13 12:21 13:14 14:16 15:2,3 16:15 26:17 28:17 28:23 29:12 30:21 32:21 35:3,10,11 35:14 37:24 39:16 43:5 48:13 51:10 53:14 56:23 61:11 63:1 64:7,12 68:5 68:7,9,14 69:14 69:15,19 76:8,18 77:11,17,24 78:8 78:11 80:15 81:15 85:19 88:11 91:17 92:2,25 93:5,24 97:6 98:24,25 102:8 104:12 105:6,20 106:18 107:8 108:2,3,7,8 114:4,12,13,19 117:22 119:1,17 119:23 120:13,14 120:22 121:14,15 121:19,20,22 122:3,8,9,12 123:3,20,24 124:9 124:25 126:19 128:15,20 130:1 132:13 133:22 134:3,7,10 136:1 136:2 138:4,5,10

(856) 983-8484                          Tate & Tate, Inc.                          (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                          Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 258

140:14 143:1,25
146:18 147:24
148:4,5 150:16
157:13,17,19
164:3,9 167:23
169:13,16 170:19
171:3,4,5 172:15
172:20,22 173:2
176:22 177:23
178:8 179:12,14
180:6,18,22 181:4
182:9,16 183:2
184:19 185:16,17
186:12 188:12,22
188:23 191:3
192:3,4 198:1,4
199:11 200:3
202:2,11 203:3,6
203:8,24 205:15
209:19 210:1
211:14 212:6
215:19,21,22
216:3,7,9,21
217:12 218:21,24
219:6,14,17,25
223:19 224:1
228:10 234:10
238:12,17 241:12
**old** 133:6
**older** 159:11
**omni** 64:17
**omnibus** 23:2 60:17
62:12,20 63:17
93:16 103:21
157:11 214:19
**once** 38:21 65:12
131:21 148:22
220:12,16 221:8
227:5
**ones** 183:5 222:2
**ongoing** 18:10
23:14 84:18
120:10 186:5
234:15
**onslaught** 217:22
**open** 55:3 60:18
126:11 133:15
158:12,15 194:21
205:22
**opened** 131:5,8
**operate** 58:24,24
59:4
**operated** 55:12,13
**operating** 149:5,15
150:1 163:11

183:1,13,17
187:25 237:25
**operations** 157:25
158:2,14 163:22
224:23 228:13
**opinion** 44:12 65:3
145:2 175:18,20
183:12 187:25
199:12,20,24
200:2,5 223:25
227:8 235:8 236:3
238:11
**opportunity** 8:23
9:3
**opposed** 16:16
48:19 225:25
**opposing** 19:3
200:1
**opposite** 233:14
**option** 190:14
**oral** 232:1
**order** 19:4,6 23:19
24:6 35:5 36:6
44:16 64:15,25
65:20 67:11 77:6
77:25 160:25
161:24 162:12,18
164:7 189:25
196:5 201:1
206:11 209:8,12
211:8 231:24
236:11,25 237:8
237:12,18,19
**ordered** 113:17
**orders** 65:22 158:12
158:15 159:17
161:4,20,22
162:14 194:22
205:22 206:2,4
217:21 238:13,20
**ordinary** 211:6,6,9
211:18 229:15
230:2,8 231:6,11
232:3 233:20
234:24 235:3
236:1
**original** 41:13
147:23 179:16
180:3 186:8
**originally** 204:25
217:14,15
**ought** 109:11
**outcome** 77:4
**outgoing** 236:5
**outreach** 69:6

**outside** 84:11
**overnight** 204:16
**oversight** 151:22
**overturned** 21:25
154:24
**owed** 91:25 92:10
149:8 197:23
**Owens** 51:1 76:10
107:20
**owned** 24:12 55:12
55:13
**owner** 25:18 26:7
61:21
**owners** 26:7
**ownership** 21:2,7
21:24 22:7,8
56:15

_____
**P**

**P** 2:1,1
**P.C** 1:15 2:3 5:20
151:14
**p.m** 93:4 106:22
119:3 242:17
**PA** 2:5 137:16
138:7,15 141:13
**Pachulski** 8:4
**package** 75:3
**packet** 69:3
**page** 3:2 31:15
61:14 64:9 68:11
70:15 73:2 76:22
164:4 165:8
177:22 178:19
179:23 183:21
200:2 203:4,23
223:19,24 224:19
228:5,5,7 233:21
238:6,10,11
**pages** 203:9
**paid** 99:14 101:8,18
102:1 139:17
149:10 185:5
193:11 196:8,20
196:23 197:12,14
197:16 205:6
226:22
**pains** 201:25
**paired** 41:11
**panel** 12:9
**paper** 75:19 77:9
**papers** 51:7 222:25
**paragraph** 15:2,13
56:24 64:20 91:20
91:21 94:24,25

97:12,13,14,21
98:24 148:15,16
155:15 200:11,12
216:2
**paralegal** 36:24
52:12 149:17
150:23
**pare** 220:21
**Park** 146:4,12
173:12 187:10
**part** 16:11 22:17
31:13 37:6 50:12
54:4 55:4 75:3
79:1 85:8 116:14
122:18,20 129:21
133:18 156:9,23
157:2 160:25
177:24 240:10
**part-time** 232:22
**particular** 14:12
54:20 103:6
**particularly** 54:3
56:8 65:19 117:24
198:13
**parties** 11:5,22
16:17 22:13
117:20 196:20
231:7 232:16
**partner** 10:7,10
51:19 78:14
152:25 167:24
169:18 172:1
186:6
**partners** 17:22
223:8
**parts** 19:5 44:18
148:7 180:7
220:12
**party** 49:13 69:6
81:8 124:7 131:3
159:7
**passed** 95:13
**patent** 23:18
**patentable** 23:17
**patents** 41:19
**pathway** 223:9
**pause** 40:16 141:24
**pay** 46:6 89:23
99:15 105:17
190:15 205:5,7
**payment** 44:24 64:3
88:18,21 89:1
93:10 105:23
106:15 127:1
148:23 205:13

**payments** 104:5
155:16 179:19
**peace** 206:12
**penalty** 148:12
**pending** 16:25
17:13 54:23 84:19
97:3 226:13
**Penn** 187:8
**Pennsylvania** 1:1
1:16 5:19,21 7:8
17:14 50:11 137:6
199:13 200:23
201:5
**penny** 91:3
**people** 9:23 23:22
23:24 24:7 36:8
37:2,14 42:2
46:10 47:17 52:9
56:5 73:5 82:1
99:13,15 112:18
126:3 153:7
158:21 162:22
166:10,21 176:17
192:14 197:15
215:14 226:19,21
227:6,10,17
229:16 240:11
**percent** 130:9
**percentage** 206:18
**period** 16:12 66:11
72:21,25 74:4
87:5 158:21
160:17 204:5
**periodically** 130:15
**periods** 175:16
**perjury** 148:13
**permission** 15:24
152:3 153:11
211:7 228:15
229:7,14,16,21
230:14,23 231:8
231:12,23,25
232:10,13 233:24
235:10
**person** 22:20 28:10
33:9 36:23,25
116:15 146:8,9
173:9 187:18
210:20 214:23
225:17 229:3
234:7
**personal** 176:7
**personally** 72:17
85:12 165:22
166:4,7 167:18

(856) 983-8484                              Tate & Tate, Inc.                              (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin                March 30, 2026

Page 259

perspective 76:2
persuading 227:23
pertinent 39:21
petition 31:17,20
  39:3 65:14 107:12
  107:18 108:4
  109:18 110:1
  114:2,7,25
petitioning 91:11
  92:8 108:12 111:5
  113:4
petitions 112:14
ph 79:9
phase 17:24 120:7
Phil 191:22
Philadelphia 1:16
  2:5 5:20 25:2 26:2
  33:6,7 201:16
Philips 41:12,13,21
  41:25 42:13
  205:17,19
phone 236:6
phony 158:18 161:4
  166:17,18 171:22
  175:11 227:23,25
pick 9:11 214:22
picked 56:20
  206:18
piece 60:20,21
  75:19 77:9 109:21
  109:22,23 163:20
  163:21 225:14
  231:6
pieces 120:10
  179:14 208:24
  211:16 220:12
pierced 56:3
piercing 55:25
pike 218:5
pinch 47:9
place 35:25 36:5
  43:19 56:17 76:9
  83:1 139:24
  156:15 160:22
  168:23 196:1
  238:2
placed 139:25
places 51:23
plan 50:10 57:8,15
  58:16 136:24
  137:14 144:2,8,12
  144:14,17 145:16
  145:17,20 146:19
  146:20,22 147:3,4
  162:25 177:11,15

177:16,20,25
  178:4 179:7,24
  180:9 181:19
  192:19,20 196:1
  203:12 206:5,7,11
  207:1,3,7 208:16
  209:2,16 219:24
  220:8,15 222:5
  223:6,14 224:21
  225:3 226:3
plans 220:10,14
plates 159:8
play 47:19,22 48:3
  50:15 83:23 86:7
  113:16 117:1,7
  121:20 122:3
  138:15 165:22
  176:23 198:25
  212:13
played 46:18,25
  48:7 122:6 159:23
  212:16
playing 114:23
  127:16
plays 147:19
Plaza 2:10
please 6:1,10,21
  16:4 29:10 59:7
  66:8 67:7 70:17
  165:6 178:2 181:3
  184:21 190:24
  201:11 242:6
point 12:4 18:18
  20:7 26:8,25
  30:13 32:18 34:4
  45:24 49:2,12
  51:19 56:10 57:12
  58:1,11 60:13
  61:20 65:2 68:25
  76:3 80:23 82:7
  84:16 87:4 89:18
  90:10,12,14 91:6
  101:19 103:6
  116:14,23 118:7
  127:20 134:2
  138:12 144:24
  145:12,25 154:23
  178:25 179:13
  185:10 190:2
  193:16 195:20
  200:9 211:11
  212:17 213:17
  214:4 223:20
  229:24
pointing 179:9

points 220:13
Polsinelli 115:2
pool 227:2
pools 227:12,12
popular 166:20
portray 201:18
position 22:10 65:1
  75:10 99:11
  147:19 161:3
  208:8
positive 88:20
  127:25 134:5
  183:15 227:14
possibilities 97:20
possibility 142:10
possible 151:1
  227:1
possibly 19:18
  143:18
post-petition
  228:12,24 233:12
  234:2,18
potential 70:7 72:9
  82:19 85:25 99:23
  103:25 128:23
  129:2,8 138:15
  141:21 147:3
  165:24 192:19
potentially 181:18
PR 79:14
practicing 149:23
pre-dated 60:16,17
  83:8
pre-petition 179:17
  217:2 234:15
precarious 22:10
preceded 90:8
precluding 113:18
precursor 29:22
preferred 21:5,14
  21:14,22 24:14
  61:22
prejudice 78:2
preliminary 58:22
  65:20 216:6
  219:12
preparation 8:13
  9:14 176:24
  208:19
prepared 14:16,17
  14:19 150:21
  217:2,23 218:11
preparing 192:13
presence 12:18
PRESENT 2:13

presented 74:7
preserve 56:17
preserved 223:13
president 136:9
pretty 8:17 17:16
  31:1 32:18 39:5
  39:11 43:4 44:15
  45:14 47:15 56:7
  65:21 71:11,14
  75:22 77:2 89:4
  93:15 122:22
  127:25 134:1,4
  138:20,23 148:7
  152:18,20 161:15
  165:12,13,16
  166:20 169:2
  171:6 192:17
  209:5 213:16,24
  215:6 221:6,12
  222:11,19 241:11
prevent 151:17
Preziosi 2:9 6:5,6
  9:17 16:9,15
  18:11 26:24 59:5
  66:8,12,15 72:12
  90:11 99:21 100:6
  100:9,13,16,25
  107:1,8 111:19
  135:9 140:24
  141:2,5,9 142:6,9
  170:3,8,12,19
  175:12 178:20
  202:2,5,9,12
  203:17,21 209:20
  210:9 224:6 228:2
  236:10 241:12,24
  242:4,6,9
primarily 47:6
  51:23 147:14
  208:23
primary 152:22
principal 43:25
  44:1 155:19,20
  208:24
principals 156:11
print 140:22
printout 107:6
prior 10:9 16:16
  18:21 25:11 33:13
  50:13 65:3 70:4
  100:8 124:11
  146:21 151:13
  154:16,24 216:10
  218:11 226:6,12
  234:12

priority 38:25
private 11:19 22:1
  22:1
privilege 50:7
  152:10 161:12,14
Probablies 34:13
probably 8:10
  28:11,12 32:17
  34:11 35:7 37:22
  39:14,20 44:4
  62:14 68:8 75:24
  81:6 117:17
  118:16,18 129:20
  139:19,25 140:13
  140:17,18 146:24
  146:25 149:22
  156:2 171:2
  189:23 193:15
  212:17 213:8,17
  216:20,21 221:3
  221:13
problem 49:15
  74:20 176:11
  188:4 207:23
problematic 231:16
problems 137:3
  208:7 231:14
proceed 96:11 99:7
proceeding 102:13
  113:11 117:3
  124:12 125:2
proceedings 18:9
  243:3
process 57:19 58:6
  63:11 74:10 75:18
  154:21 155:12
  156:7,23 165:11
  207:23
produce 25:9
  158:13 209:13
produced 45:24
  46:7,13 144:13
  163:18 166:22,22
  166:24 170:18
  211:10,11
produces 196:2
producing 24:1
  225:13
product 41:17
  105:10 127:4,13
  159:19
production 24:8
  41:17 45:2,6
  49:24 59:18 104:3
  167:12 174:13

(856) 983-8484                              Tate & Tate, Inc.                              (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                              Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 260

177:10 194:3
195:7 206:1 208:2
209:8 225:14
235:6
**productive** 208:15
**products** 158:7
**Professional** 1:17
**professor** 7:25,25
**proffer** 100:1
**proffered** 100:18
**programmers** 41:24
**project** 167:4
**projects** 45:7
**prominent** 220:20
**promise** 161:23,24
**prompted** 146:6
**pronouncing** 79:10
**proof** 101:23
110:12 180:20
181:8,13 195:3
**proper** 111:1
160:20,21 198:18
214:7
**property** 129:3
160:6
**proponent** 136:24
137:14
**proposed** 39:2
50:16 70:22 80:8
80:10,11 128:18
168:7 170:25
198:8 203:12
226:2,6 228:21
**prosecuted** 22:18
**prospects** 45:8
**protected** 127:13
**protection** 196:13
**protections** 222:6
**prove** 165:15
227:19
**provide** 34:24
105:11 240:2
**provided** 8:19 64:2
105:10 106:19
125:20 173:21
189:20 190:10
226:7
**provides** 105:9
**providing** 168:16
173:20 195:8
**provision** 64:3
105:9 162:17
**provisions** 48:2
49:23 129:11
222:5

**proxy** 54:16
**pseudo** 22:1
**public** 1:18 50:6,8
95:11 96:16 97:2
243:15
**publicly** 146:10
**pull** 13:12 62:4
82:16 130:20
141:8 151:2 169:8
202:23
**pulled** 101:16 217:9
220:25
**pulling** 57:4
**purchase** 21:20
45:5 159:10 161:3
161:20,22,24
194:22 196:4
206:14 238:13
**purchased** 41:1
159:2
**purchases** 197:2,8
**purchasing** 45:9
**purported** 49:5
226:11
**purpose** 154:11
226:24
**purposes** 137:4
**pursuant** 1:14
**push** 54:9 151:1
215:10
**pushed** 214:6
**put** 11:18,24 25:13
25:16 26:12 27:4
27:14 35:24 36:5
36:12 49:15 56:17
63:2 65:9 69:23
73:25 90:18 91:2
110:10 126:2
144:16 146:22
150:23,25 151:4,7
155:5,8,24 156:5
156:15,21 160:23
162:17 167:7
176:19 190:24
195:3 206:6 217:8
223:2 239:5 240:4
241:3
**putting** 72:7 150:13
152:11

_____
**Q**
**question** 16:11
46:24 59:7 65:25
66:14,20,23,23
67:3,4,5,7,9 77:16

89:13,14 95:1
97:4 99:22 100:10
101:25 111:8
115:22 117:7
130:10 132:17
133:17,18 157:18
157:20 172:18
174:9 177:17
194:4,24 196:16
234:5 236:22
237:16
**questioning** 237:15
**questions** 5:6 123:8
161:17 178:21
241:21,24
**quick** 7:22,22
123:18 177:3
**quickly** 142:4
146:22 241:11
**quite** 37:7 45:15
68:17 197:4
**quote** 229:12 233:7
233:8

_____
**R**
**R** 2:1
**R-A-J** 29:9
**R&D** 24:2 41:20
**radio** 159:12
**Raf** 64:13 78:20
198:6
**Rafael** 1:13 2:12
3:3 5:12 6:14,23
81:19 93:7 119:4
120:18 126:22
130:4 151:13
**raise** 237:23
**Raja** 14:14 53:16
73:3 94:21 116:22
151:20
**Rajan** 10:14,22,24
13:2,4,23,24
14:13,14 16:2
17:2,11 18:5
19:20 20:3,4,6,14
20:21 22:19,19
24:13 25:4,18
26:3 28:8,13,22
31:11 33:10 36:7
36:8 45:16 46:10
47:10,21 48:18
53:16,16 54:7,11
54:14,15,18,19,21
55:12 56:23 61:21
63:1 71:6,8,24

72:4 73:3,10
74:15 75:9,13,23
79:23 84:9,13,15
88:7 94:21,21
95:18 96:3,21
103:11 104:10
116:1,2,16,17,18
116:19,22,22
122:7 128:17
130:24 131:21
136:8,19 144:22
151:20 155:20,23
156:12 157:24
162:19 167:25
171:16 173:14
176:1,8,10 187:8
191:25 195:24
198:21,22 199:15
200:21 201:10,15
201:21 212:24,25
214:24 219:1,4
225:18,24 237:4
240:13,17
**Rajan's** 19:10,15
21:1 22:4,5 25:8
126:12 157:1
176:3,4 238:15
239:6 240:14
**Rajans** 16:8 91:22
101:9 104:19
151:24
**Rajans/Stream/V...**
130:11
**ran** 153:7
**range** 97:20
**rare** 113:6
**rate** 150:5,13
**rationale** 50:6,13
**re-entered** 188:9
224:8
**reached** 28:4 79:22
80:16 87:23 89:9
**reaching** 68:20
**reaction** 55:5
**read** 9:4 14:23
28:19 64:20,22
87:14,18 94:18
104:21,25 105:2
105:21 107:18
122:18,19 148:10
149:25 150:3
179:21 200:4
204:1 213:3 220:6
233:7,18,19
**reading** 5:3 97:13

177:3
**ready** 30:5 31:15
58:9 94:12,13
153:23 202:21
205:23
**real** 173:23 196:5
**really** 23:25 24:3
29:20 37:15 44:25
48:1 51:25 65:3
69:25 70:3 94:15
99:22 125:11
129:10 132:2
134:20 137:9
145:13 156:19
176:10 177:8
184:25 193:9
202:1 208:24
215:4 218:19
221:21 230:7
**reams** 54:22,24
**reason** 12:12 41:7
65:15 95:10 99:16
100:19 101:5
144:3 152:7 154:6
154:15 155:5,8
167:6 174:10
193:9 196:19,22
201:20 231:5
**reasonable** 194:20
222:10
**reasoning** 154:19
**reasons** 45:13 50:9
184:16 188:5
237:5 239:18
**recall** 13:6 29:25
30:23 51:5 74:11
75:19 77:1,2,13
77:17 80:15,21,25
80:25 81:16,17
87:14 88:17,25
89:2,3,6,7 107:14
118:9 119:25
120:23,25 123:13
123:15 127:8,10
128:10 129:17
130:13 132:5
137:20 138:14
161:19 165:20
169:3 175:9
183:11 186:22
193:1 195:12,15
210:2 211:20
224:25 226:14
228:25 229:1
**receivable** 190:25

(856) 983-8484                         Tate & Tate, Inc.                         (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 261

192:25
**receive** 79:5 206:5
**received** 69:11
   81:18 131:8 139:4
   190:21 229:24
   230:10 231:20
   239:8
**receiving** 81:16
   149:3 193:8
**recess** 94:7 135:19
   202:16 241:16
**recognize** 104:13
**recollection** 13:9
   14:1 30:25 35:20
   39:1 55:21 68:16
   70:14 92:5,12,15
   92:18 103:3 104:4
   118:25 119:9
   120:4 122:14
   124:10,13 129:7
   130:21 218:8
   234:22
**recommend** 152:22
   153:4
**recommendation**
   132:18
**record** 6:2,22 14:6
   18:2 40:13,15,18
   50:7,8 84:2 94:1,3
   94:6,10 95:11
   96:16 97:2 135:15
   135:17,22 155:7
   155:25 170:4
   199:6 202:14,19
   231:18 240:5
   241:14,19 242:3
**records** 163:15,22
   213:8
**recover** 63:4
**recovery** 63:10
**redo** 194:7 223:4
**reduced** 149:7
**Ref** 3:7 4:3
**reference** 92:1
   124:3 129:5 152:4
   154:11 155:14
   162:12 168:17
   178:1 228:17
**referenced** 170:6
   178:17
**references** 162:18
   168:13
**referral** 79:3 81:3,7
   86:4 112:11
**referred** 71:21 79:1

80:2,19
**referring** 133:19
   191:9
**refers** 16:11 78:20
   99:1
**refile** 44:13,15
**refiled** 184:12
**refinements** 217:9
**reflect** 124:6
**reflected** 197:10,11
   197:14
**refresh** 13:9,25 18:3
   40:21 68:15 92:5
   92:12,17 103:2
   118:10 119:9
   122:13 124:10
   129:7
**refreshed** 40:22
**refreshes** 118:24
   124:13
**refused** 25:23 26:12
**regard** 21:7 103:5
   154:19
**regarding** 20:10
   29:9 39:22 98:7
   198:7
**regardless** 180:9
**Reggie** 79:17
**Registered** 1:17
**regular** 55:25 225:7
**reinvent** 220:18
**reject** 62:20 63:17
**rejected** 54:25
**related** 32:19 38:18
   54:20 81:9 86:21
   106:3 129:2
   136:23 144:21
   181:19
**relating** 117:8
   169:20
**relation** 132:8
**relationship** 15:5,7
   15:14 22:5 25:4
   29:18 65:5 120:11
   126:24 131:18,20
   131:23
**relationships** 37:13
**relented** 75:10
**relevance** 99:23
**relevant** 100:2
   111:4 126:25
   130:6 155:21
**relied** 91:1
**relief** 154:24 217:17
**relies** 23:15

**relitigate** 64:15,24
   67:10
**rely** 163:24
**relying** 90:17
   176:16 177:8
**remain** 99:16
**remaining** 18:20
   19:5 65:10 180:2
   199:23
**Rembrandt** 39:24
   40:4,5,23,24,24
   41:7 42:17 44:6
   44:20 45:1,11,15
   46:13,14,16,19
   48:5,9 59:16 60:7
   60:9 62:17 68:22
   70:18,23,25 71:7
   73:17,24 75:8
   79:8 82:20 83:25
   84:18 85:10 86:8
   86:10,20 88:13
   91:24 93:22 102:7
   104:18 105:17
   108:12,20 109:3
   109:19 110:8
   111:14,15 112:10
   120:2,11,20
   121:17 124:6,11
   126:24 127:21,22
   128:1,3,5,13,25
   129:9,16,24 130:9
   131:4 133:3
   164:17,19,23
   165:6 177:5
   191:15 193:13,22
   193:23 194:10,11
   194:15 195:12,13
   195:13 205:17,20
   208:25 209:1
**Rembrandt's** 62:16
**Rembrandt/3D**
   46:5
**Rembrandt/Stream**
   73:11
**remember** 10:2
   11:6 13:1 21:5
   22:23,25 23:5
   27:15 28:11 32:7
   33:4 34:15 47:8
   50:21 51:18 69:4
   77:18 79:12 85:18
   85:21,23 91:13
   101:22 103:4,9,14
   103:15 107:21
   113:21 118:13,19

119:14 130:14
   132:7 140:3 144:9
   147:20 156:7,9
   168:24 169:1,19
   181:25 182:2
   185:25 193:17
   204:7,22 210:13
   213:2 215:12
   222:21,22
**remembering**
   195:15
**remote** 109:11
**remotely** 239:24
   240:11
**remove** 92:13 191:6
**removed** 93:9 208:6
**render** 120:8
**rendered** 98:13
**reneged** 91:4
**rented** 160:6
**reoccurring** 133:3
**reorganization**
   179:24
**reorganizational**
   224:21
**repackaging** 159:13
**repeat** 59:6 67:3,7
**repeating** 59:3
**replaced** 152:14
**replacement** 153:5
**report** 19:14 56:11
   78:23 139:2
   163:11 237:25
**reported** 219:12
**reporter** 1:17 5:23
   6:10 242:4,7,11
   243:23
**Reporters** 1:23 5:25
**reports** 78:21
   149:15 150:1
   183:1,13,17
   187:25
**represent** 5:24
   12:21 17:8,23
   20:1,3,9 28:5
   30:12 129:1
   132:11 134:16
   152:15 190:5
   195:12 198:15
   199:5
**representation** 10:1
   12:5,7 15:10
   20:25 25:15 42:4
   96:22 98:11 125:9
   129:8 134:19

199:1 229:8,9
   233:5 235:20
**representations**
   100:8
**representative**
   169:25
**representatives**
   145:5
**represented** 13:3
   14:12 16:1,7,23
   17:6,10,10 18:5
   20:21 22:16,17
   27:12 31:25 33:2
   84:8,9 121:6,9
   127:21 128:1,3
   129:16,24 132:6,7
   151:14,20 201:15
   213:13,14 218:17
   234:8
**representing** 2:6,12
   10:21 12:24,25
   16:17 19:20,22,25
   21:11,11 30:15
   32:1,24 34:5
   47:24 49:16 63:12
   63:15 82:4 83:14
   83:16,17 84:4
   86:8,20 115:10,12
   125:16 128:4,13
   130:16,18 131:2
   131:14 132:3
   133:25 134:2,21
   135:3 151:22,23
   189:11 191:19
   192:8 198:17
   216:11,17
**reproduction**
   243:20
**request** 15:18 93:13
   93:20 190:22
**requested** 93:11
   97:10 129:1
**require** 135:1
**required** 11:20
   153:12
**requirement** 152:12
**research** 62:4 65:18
   66:4 112:22
   122:25 123:11
   174:6
**researched** 63:23
**reserved** 5:6 196:3
**resign** 22:12
**resistance** 48:23
**resolution** 181:1

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                               Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 262

194:2,3 195:7
196:14
**resolve** 73:12 81:24
91:23 184:1
207:23
**resolved** 184:5,6
**resources** 76:4 82:2
**respect** 22:6 129:2
175:23 177:13
180:14 184:14
**respected** 152:20
**respectfully** 67:1
225:20
**respects** 102:11
**respond** 127:6
**responding** 70:18
**response** 199:4
**responses** 59:8
**responsibility** 150:4
208:14
**responsible** 149:14
**responsive** 59:6,9
66:19
**Ress** 1:15 2:3 5:20
**restate** 213:24
**restrictions** 35:24
95:4 173:7
**restructuring**
145:21 151:15
203:13
**result** 57:2 96:20
98:11 133:13
209:11
**resulted** 77:11
133:12
**results** 133:15
**retain** 70:7
**retained** 187:11,17
214:4 225:17
**retainer** 31:16,22
31:24 32:4 125:21
126:15 131:9
139:1,18 148:20
157:20 198:18
199:8 201:14
207:21
**retainers** 135:2
198:23
**retention** 30:18
131:9 187:13
199:9
**retrieve** 208:1
**return** 135:10
155:18
**returning** 211:1,2,3

**revealed** 146:10
**revealing** 154:10
**reverse** 164:7
**reverses** 236:3
**revert** 180:3
**reverting** 179:15
**review** 34:8,20
39:19 51:6 120:20
128:19 162:23
163:5,8 184:22
**reviewed** 8:15 39:2
49:11 150:17
163:9
**revise** 164:14 165:8
**Revlon** 220:14,21
221:17
**Richard** 28:22 29:5
**Richard/Rafael**
29:8
**Rick** 10:8
**rid** 49:25
**ridiculous** 237:14
**right** 7:10 10:16
13:8,25 14:23
15:25 23:6 28:14
30:20 33:11 37:10
37:21 38:11 52:21
54:12 60:2,5
62:13,15,18 66:6
67:17,22 68:1,3
75:4 78:7 88:6,14
96:6 97:24 102:15
107:5 108:21
111:16 116:5,19
116:20 117:25
121:10 124:20,22
133:12 135:4
137:25 138:4
140:10 141:22
142:17 145:23,24
166:16,18 169:11
175:4 178:14
182:21 184:1
188:14 196:25
204:14 205:10
211:22 222:6
224:11 238:2
239:13
**rights** 61:23 129:3
151:15 196:2
204:23 206:8,10
206:15 220:15,16
221:10
**Rink** 38:12 53:16
73:3,20 84:11

85:14 88:8 96:15
116:7,11,21 122:7
123:5,21 124:14
148:24 212:21
213:18 214:5,10
214:13 215:7,14
216:20 218:16
**risk** 57:12,14
**Riverfront** 2:10
**Robertson** 130:23
131:20 198:5
**Robertson's** 107:6
**role** 46:18,25 47:18
47:22 48:3,7
50:15 51:5 63:1
63:13 83:23 86:7
102:5 114:23
117:1,7 122:3,5
127:16 138:15
159:23 165:22
176:23 212:13
**rolling** 129:12
**Roman** 178:11
**room** 186:10 188:10
223:23 224:9
**Rosenbloom** 41:10
**Rosenthal** 41:9,11
45:19
**round** 71:2
**Route** 1:23
**RPR-Notary**
243:15
**rule** 98:2,14,19
162:16 166:15
171:19
**rules** 15:18 152:11
**ruling** 77:7,8 232:1
240:24
**run** 12:10 39:9 48:1
51:22 125:19
151:5 157:9
207:19 210:19
**running** 35:23 39:8
109:16
**runs** 44:3

_____

**S**

**S** 2:1 3:6 4:2
**saber-rattling**
126:1
**sabotage** 103:19
**safe** 171:19 227:7
**salaries** 37:6
**Salazar** 152:16
153:21

**sale** 21:19 228:20
228:22 237:22
**sales** 158:8
**salesman** 176:11
**samples** 59:17
208:3
**sanction** 25:7
**sanctioned** 25:11
162:15
**sanctions** 17:17
171:24
**sat** 156:14
**satisfied** 173:24
194:16
**satisfy** 45:7 160:20
173:22
**Saturday** 82:15
**saved** 160:4
**saw** 75:9 83:7
148:22 235:11,12
**saying** 19:19 69:5
74:17,23 96:4
112:6,7 140:4
144:14 153:18,25
160:2 167:8 175:5
181:12 190:1
200:8 214:1 231:9
232:18
**says** 30:7 64:13
70:16 78:20 81:19
97:21 120:18
124:5 133:4
144:16 151:12
165:7 171:21
178:6 210:23
224:12 229:25
231:19 232:2
**scale** 45:5
**Scandinavian** 24:4
**scare** 227:1
**scared** 210:19
**scenario** 54:12
**schedules** 39:3,10
39:19 60:23
110:11 111:18
112:1,9 163:6
164:15 165:3,8
**Scheff** 95:21
**schematic** 29:11
**school** 7:12,13,22
**Schotz** 152:17
**science-based** 42:5
**scientists** 41:23
45:12 46:3,3
**scoren@kcr-law...**

2:6
**Scott** 10:3 152:19
152:20,22,23,24
186:4,6
**scout** 176:9
**sealing** 5:3
**search** 145:8
**searching** 143:24
**sec** 169:13 182:16
**second** 11:14 16:11
38:9 43:15 59:15
60:7 64:9 68:18
71:2 75:1 76:22
77:7 109:7,9
113:13 132:19
139:7 143:21
152:2 164:4 165:7
177:22 179:23
185:18 189:5
210:21 238:22
**seconds** 40:11
**secret** 23:20,20
**secretary** 136:10
**secrets** 23:16 42:8
**section** 93:10 105:4
178:11 179:25,25
180:1 223:19
**secure** 38:25
**secured** 39:12 49:5
49:22 57:20 93:18
149:8 157:6 160:1
160:15,21 161:2
190:22 205:1
206:13,20 207:24
208:7 223:12
225:11
**see** 7:24 8:18 13:8
13:22 16:18 24:24
29:10 30:18,21
31:4,14 36:19
37:25 38:4,23
40:3 44:17 64:13
68:11 69:8,16
70:15 73:2 76:21
92:1 93:1 99:2
107:5 111:22
114:21 118:24
124:3 127:6 129:5
132:19 134:12
139:2 141:11,19
142:5,13 144:5
145:8 146:3
147:22 152:3
157:18,25 158:15
163:12 164:10

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                        Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

168:16,24 170:17 171:6,7 173:16 174:9,11 177:25 178:13 180:5 183:20 184:9,23 186:3 189:24 190:21,23 191:13 191:14 192:5 193:12 196:3 199:22 200:14 210:11 212:18 213:23 215:13 216:8 221:5 222:9 228:11,16,17 238:15
**SeeCubic** 11:8 42:14,15 93:11
**seeing** 74:15,18 141:25 174:5
**seek** 171:23
**seeking** 70:25 78:17 191:20
**seen** 8:17 38:10 69:3,20 72:23 75:13 121:24 134:14 136:3 212:17 231:24
**selecting** 144:23
**self-help** 151:18
**sell** 234:19
**selling** 75:5 233:12 234:1
**Semiconductor** 134:9
**send** 120:18 130:7 133:11 181:3,5 198:10
**sending** 130:6 133:22 181:13 221:22
**senior** 149:22
**sense** 73:8 205:20
**sent** 22:14 83:12 84:10 85:5 86:5 86:20 87:1 93:8 130:5 132:14,18 139:1 164:12 180:23 183:3
**sentence** 73:4 78:20 91:19 132:20 152:2
**separate** 54:1 55:9 56:10 61:4 79:12 80:19 116:11
**separately** 13:4

**September** 171:13 183:1 198:2 199:14
**sequence** 69:4
**series** 28:18 61:12 64:8 119:18 127:8 153:7 169:17 172:23 176:15 182:22 188:25 198:2
**serious** 183:8 200:22 223:8,9
**seriously** 64:14 65:25 67:9 95:24 172:2 201:3
**serve** 24:9
**server** 163:16
**servers** 36:11 93:12 93:17 138:22 211:3
**services** 98:8
**set** 24:6 36:9 45:3 57:7 65:4 68:19 144:18,20 174:22 210:24 223:3 226:23
**settlement** 11:23 43:14,16 44:8,18 44:22 46:11,13,19 46:21 47:1 48:4,6 48:18 49:3,7,8 50:9 62:16 70:22 71:1 73:6 75:15 75:17 79:21 82:20 83:24 84:17 85:9 85:19 86:9,21 87:7,14,20,22,23 88:13 89:4,15,24 93:21 102:6,10 103:12,18 104:7 104:14 106:20 108:5,24 109:2,25 110:21 176:25 177:14 179:16 180:3,8,14 193:21 194:9,13,16,19 195:16 196:9 223:12
**seven** 23:1
**severe** 195:5
**Shad** 11:10 70:21 70:21 73:11 102:13
**Shadron** 70:21 73:5
**Shammah** 173:8,19

174:17,21
**shared** 212:25
**shareholder** 44:4
**shareholders** 21:5 61:23 65:8 125:23 176:16
**SharePoint** 223:2
**shares** 24:14 174:8 228:13,22 234:1 234:19
**sheet** 70:22 73:6,12 102:12 120:1 121:16 171:8,12 172:4,7 174:8,15 226:8,11,17 227:24,25
**shelf** 126:2
**shell** 54:22 157:8
**Shelly** 51:18
**short** 40:20 94:7 100:17 135:19 153:16 202:16 241:16
**shortened** 241:2
**shortly** 71:21 72:21 74:3 95:14 157:4
**show** 143:4 163:3 181:2,8 208:13 209:17 217:24 223:7 233:16 240:21
**showed** 45:24 75:8 138:5
**showing** 61:4
**shown** 90:18 113:24
**sick** 173:14 237:4 240:20
**side** 18:20 43:23 48:9 73:15 125:24 125:25 132:23 167:8 191:15 214:2 219:3 226:22
**sides** 49:20 219:1
**sign** 94:15 205:3
**signature** 14:18,25
**signed** 14:17 23:3 30:18 44:9 48:17 49:3,8,22 73:5 74:16 84:18 88:14 89:5,16 94:19 102:10 103:12 104:22 105:1 109:3,25 129:15 131:9 148:12

171:10,15 174:7 175:1 196:17,18 199:9 212:20
**significant** 58:19
**signing** 5:3 75:16,17 217:4 219:2
**signoff** 156:24
**Silicon** 23:25 44:3 158:9
**similar** 55:25
**simple** 50:20 236:22
**simply** 8:15 12:25
**sir** 70:11 71:15 98:23 134:12 183:10 237:16
**sit** 112:21 113:5 156:25 215:3 218:9
**sitting** 90:21,22 146:8
**situation** 65:23 120:6 133:1 146:8 210:16
**six** 23:1
**size** 130:8
**Skadden** 22:15 27:19 55:6 61:8 127:18 239:9
**sketch** 205:4
**slate** 209:12
**slide** 25:14
**smaller** 168:11
**Smith** 2:9 10:11
**snafu** 183:6
**so-called** 108:20
**sold** 41:23
**sole** 26:7
**somebody** 32:19 51:3 62:19 77:21 106:10 128:11 150:13 174:7 181:14 214:1 239:19,20
**son** 95:14
**soon** 138:17 153:21 184:8 188:3
**sorry** 18:11 26:24 76:15,16 82:24 90:11 111:19 115:23 147:9 153:4 166:3 172:20 189:7 203:18,22 228:9 230:19 236:11
**sort** 37:4 39:20

41:16,17 43:22 51:6 54:9 59:22 88:23 144:12 188:7 198:21 223:11 226:20
**sorted** 38:21 164:16 165:9
**sought** 137:10 151:17 177:13 180:13 182:11
**sounds** 138:4
**source** 60:3 81:3 206:24 211:2 226:3,7,17
**Southern** 149:19 158:19,25 159:1 162:13 241:8
**space** 41:5,6 181:10
**speak** 42:21 85:10 115:24 116:5 123:10 174:2,2
**speaking** 19:15 46:16 201:21 235:16
**speaks** 199:4
**special** 70:8 154:11 212:18,22 213:22
**specifically** 90:12 95:20 119:12 120:25 213:2
**specify** 97:19
**spectrum** 97:22 154:9
**spend** 9:13 86:12 193:10
**spent** 81:21 82:18
**spin** 233:10
**split** 101:13
**spoke** 9:15 116:21 148:24 184:13 205:16 208:25
**spoken** 85:15 126:14
**spot** 201:4 238:7
**spots** 103:16
**spread** 208:21
**Square** 2:4
**stability** 226:21
**stage** 17:20
**stalled** 163:23 224:24
**stamp** 114:8
**stand** 27:5,14,19 241:3
**standing** 22:20 51:2

USBC, Eastern District of PA                Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin                    March 30, 2026

Page 264

standstill 36:4
Stang 8:4
staple 95:2 154:7
start 71:1 73:23,23
  164:6 165:10
  177:9 191:7
  207:15 225:12
  226:13
started 6:12 23:2
  74:6 138:19 145:4
  208:9 216:2 225:1
starting 37:25
  138:14 223:20
starts 119:19
  126:20
stasis 36:12
Stastney 11:11,11
  22:3 44:9 48:17
  49:1 59:21 87:19
  88:2 103:17,20
  127:19 149:12
  194:1 197:6
state 6:1,21 64:15
  64:24 67:11 95:10
  154:22 210:23
stated 106:25 118:2
  118:20 124:16
  228:3
statement 108:23
  124:17,19,21
  145:19 163:1
  177:11 203:10
  207:8 219:24
  220:8 225:3
states 1:1 5:17
  21:14 24:22
  157:23 163:10,14
  186:13 234:13
status 19:1,8 108:20
  214:20
stay 17:12,15,23
  55:3 78:17 84:23
  218:4
stayed 19:13 36:25
steadfastly 74:23
Stemerman 10:24
  14:20 17:4 51:21
  77:18
stems 70:20
Sten 77:19
stenographic 243:5
step 17:15 65:14
  204:24
Stephen 41:9
  121:17 128:22

stepped 145:4
steps 119:6 167:17
  198:8
Steve 26:25 43:24
  45:1,18 47:12
  170:3 178:20
  198:10 203:17
  232:23
Steven 2:3 6:4 66:8
  209:21
Stevens 120:15
stick 147:20
stipulated 5:1
stock 21:19 37:5
  41:2 228:20
  237:22
stockholders 21:6
  21:15,22
stole 59:24
stomach 43:22
stopping 41:20
stores 159:10
storm 162:21
straight 174:14
straightforward
  92:20
strange 46:8
stranger 33:21
strategy 54:4 57:20
  61:7 67:12,19
  78:16 117:2,8,11
  118:4,15 119:6
  192:6,12 204:20
straw 95:22
Stream 1:4 5:14
  12:25 13:5 14:12
  16:1,7,23 18:5
  20:21,25 21:12
  22:5,14,17,17
  23:14 24:10,16,19
  27:2 29:11,18
  31:9,10,13 32:17
  32:24 33:6,24
  36:1,3,11,13,14
  36:16 38:19 41:23
  45:14 46:19 48:4
  48:22 50:1 54:2
  54:20 55:8,13
  57:24,25 58:11
  59:11 60:24 61:4
  61:24 68:13,22
  70:18,21 71:8
  73:7,25 76:5
  78:14 82:2,20
  83:15,18,24 84:4

84:8,8,10,19 85:9
  85:11 86:1,9,22
  87:3 88:8,13 89:3
  89:15,24 90:23
  91:22 93:21 94:20
  101:9 102:7,14
  104:18 105:11,16
  106:1,5 109:19,21
  113:18 114:3
  116:3,8,9,14
  138:15,21,22
  148:23 151:14
  155:1 158:13
  165:19 168:4
  177:7 184:25
  186:8 187:16
  190:25 192:1
  193:21 194:10
  196:24 197:3
  203:11 208:4
  214:14,15,16,18
  214:24 216:16
  228:13,22 234:1
Stream's 83:21 93:9
  125:24 179:24
Stream/Rembrandt
  70:10
Streamacquisitio...
  35:16
Street 1:15 2:4
strict 192:22
strife 37:16
strike 30:21 86:24
  108:10 138:13
string 191:7
strongly 65:21
structure 29:10
  221:11
stubs 46:6
stuff 79:17 113:7
  156:17 210:25
  218:5 220:12
  223:4
subject 16:13 53:20
  56:19,21 78:14
  91:10 133:6 168:4
  180:20 182:25
  183:23 192:5
subjects 115:25
Subpart 186:15
  228:11
subscription 175:1
  211:13,21 212:3
subscriptions
  234:14

subsequent 46:15
  120:20 129:12
  150:3 195:21
subsequently 16:17
subsidiaries 24:3
  42:11
subsidiary 160:3
substance 188:1
substantial 78:21
substantially 98:6
substantiated
  238:14
substantive 53:20
  53:24 55:15,23,24
  56:20 57:2,14
substitution 152:14
Suby 28:21 139:19
  139:20 148:24
  149:13
success 63:7 78:19
  88:23
successful 227:22
successor 40:25
  41:1
sued 31:13 52:16
  197:17,20,21
suffering 225:24
sufficient 169:23
  172:3
suggest 142:6
suggesting 64:14,23
  66:1 67:10,14
  131:1
suing 95:14
Suite 1:23 2:4,10
sum 105:17
summary 18:9,22
  18:22 199:23
summer 123:16
  239:17
Sunday 81:13
Super 159:18
supervision 243:22
supplement 140:21
supplemental
  185:18
supply 23:23 79:25
  158:5
support 11:20
supporting 15:18
  188:16
supportive 117:21
supposed 19:14
  30:8,9 104:5
  128:8 236:15

Supreme 21:9,25
  26:9 43:2 44:11
  58:7 120:8 145:2
sure 9:1 10:4 13:10
  14:7 16:22 26:15
  28:13 29:17,24
  31:1 32:18 37:3
  37:11 39:5,11
  40:25 42:22 44:15
  47:15 48:7 54:1
  55:8 75:22 76:6
  77:2 81:5 84:1
  90:24 93:15 94:17
  95:25 101:11
  105:2 109:10,12
  112:22 122:22
  123:1,4 127:24
  129:19,19 133:22
  134:1 135:9
  138:18,23 140:1,2
  140:17 141:14
  142:8 148:7
  151:21 165:3,12
  165:13,16 166:10
  167:11 169:2
  172:3,7 175:7
  177:1 188:14
  189:5 190:13
  194:5 202:4,22
  205:9,10 206:9
  207:20 212:16
  213:4,12,16,24
  214:5,12 216:13
  216:13 220:3
  221:6,12 222:3,6
  222:13,19 223:13
  237:20
surmise 218:16
surprise 121:1
  138:25 186:17
  187:15 188:8
surprised 129:23
  187:3 209:1,3
surrounding 152:7
survive 178:6
survives 118:1
  178:9
suspect 240:13,15
  240:18,23
swear 6:11
Swick 181:16 216:5
  219:8,11,18 220:5
Swift 147:7,8,17
switch 182:15
  227:15

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                         Videotape Deposition of Rafael X. Zahralddin                         March 30, 2026

Page 265

switched 51:25
swore 46:4
sworn 6:15 28:1
  212:2
system 36:11

_____
             T
_____

T 3:6 4:2
tags 75:4
take 28:15 32:20
  35:1,5 37:21
  39:15 40:6,12
  65:8 68:5,15
  69:13 74:10 91:17
  92:24 94:24 95:8
  97:24 104:1,11
  108:1 114:10
  118:22 119:16
  120:12 121:13
  122:8,17 123:18
  126:18 132:12,24
  134:6 135:7,7
  136:3 141:23
  147:22 164:2
  167:14,22 168:23
  171:3 172:2
  188:14 190:16
  199:10 201:2,7,8
  202:3,7,8 204:23
  207:15 213:11
  215:20 220:4
  221:10 223:16
  232:3 235:24
  241:10
taken 1:14 5:12
  11:23 34:16 49:2
  54:12 58:22 59:1
  59:16,18 83:1
  95:14 103:17
  204:8 210:18
  243:5
takeover 103:24
takes 225:16
talk 43:3,5,7,11,14
  48:24 69:8 84:7
  95:23 112:11
  119:12 134:25
  172:21 199:6
  205:13 234:21
talked 23:7 47:20
  47:21 51:11 52:6
  62:19 69:7 74:7
  81:1,8 101:15
  104:2 118:16
  148:20 153:20

160:13 165:20
  174:1 179:18
  193:22 221:19
talking 27:16 30:17
  38:13 42:22 56:14
  60:13 74:6 95:25
  97:12 110:18
  123:6 138:19
  174:5 186:1 209:4
  221:3 232:8
  233:15,20
talks 148:20 179:15
tangled 109:8
target 134:24
Tate 1:22,22 5:24
  5:25
tax 32:25
team 9:18 24:8
  61:18 158:8,9
  163:19
Teasdale 8:6 29:4
  47:8
Teasdale's 31:24
tech 37:2,6
technical 41:24
TECHNICIAN 5:9
  6:8 40:14,17 94:2
  94:9 135:16,21
  202:13,18 241:13
  241:18 242:1
technologies 158:7
technology 21:21
  23:15 24:19,20
  26:13 27:21,23,24
  34:2 38:21 41:14
  42:3 45:18 49:16
  109:15 123:9
  126:4,5 158:6
Technovative 1:7
  5:16
Telecom 158:20,25
  159:1 162:13
  241:8
tell 8:13 20:8 23:10
  26:21 28:13 29:16
  29:20 30:3 32:16
  40:23 48:11 61:5
  66:16 69:24 81:21
  86:18,18,19 99:10
  103:10,13 109:17
  112:13 117:22
  118:21 122:5
  129:21 133:9
  144:7 147:18
  155:11 160:17,17

161:11,18 189:25
  191:7 204:19
  215:9 222:9
  233:11,13 235:22
  241:5
telling 80:16 111:25
  144:9 155:4 161:9
  161:10 175:3
  181:23 191:13
  214:23
tells 178:8 180:25
  235:15
templates 221:14
temporary 190:24
ten 149:22
tenure 7:25
term 70:22 73:6,11
  75:2,9 102:12
  120:1 121:16
  171:8,12 172:4,7
  174:7,15 196:21
  196:22 226:8,11
  226:17 227:24,25
terminate 125:8
terms 22:7 43:12,20
  45:9 48:4,12 50:4
  53:23 87:2,6
  102:9,11,18,25
  159:22 179:16
  180:3,4 227:15
test 26:17
testified 6:16 24:16
  106:10 120:3
  142:16 224:16
testify 239:8,11,21
  239:23 240:21
testifying 179:10
  181:22
testimony 28:1
  53:11 87:10 90:7
  165:20 179:1,3,9
  190:3 231:20
  238:15 239:6
  240:13,15
Texas 149:19
thank 9:11 45:21
  48:13 81:19 107:8
  118:23 170:20
  180:16 182:3
  203:21 209:20
  241:21,23,25
thankful 175:24
thanking 82:17
Thanks 70:16
  202:12 215:19

theory 25:20
they'd 133:8
thing 62:9 70:19
  74:25 92:15 106:9
  109:13 110:18
  140:11,15 173:24
  178:23 194:25
  195:1 224:19
  231:11 236:21
things 9:16,19
  12:11 21:8 23:16
  23:18 46:7,15
  54:10 56:1,11,16
  62:16 69:10 71:22
  75:10 88:22 89:11
  97:22 103:22
  104:6 128:2 135:2
  146:6 150:8 154:9
  159:8,11 160:11
  160:13,16 161:13
  168:25 173:13
  176:13 178:6,6
  179:11 205:24
  208:1 209:2,10
  215:10 221:12
  222:8 229:15
  230:15 231:8,15
  231:22 239:13
think 8:23 12:3,8,9
  13:2 19:21 21:10
  28:3 30:16,16
  36:20,22,24 38:16
  39:6 41:10 43:24
  44:1,10,19 45:2
  45:19 46:1,9
  47:12 50:10,20
  52:10,24 54:3
  56:25 59:15 60:9
  60:15 62:10,24
  63:22,22,23 65:4
  66:19 71:9,11
  73:5 74:14 77:21
  77:22 79:13 85:3
  85:13,14,16 86:2
  88:19,22 91:14
  95:21 101:23
  107:19 109:21,24
  110:2,4 113:21
  115:1,2 116:9,10
  117:17 118:2,19
  120:3 121:11,11
  122:20 125:18,18
  126:7 128:6,12
  130:19 132:5
  134:18 136:25

139:5,22 140:5,12
  141:3 142:17,19
  145:12 147:7,15
  148:22 149:3,21
  150:2,2,23 152:21
  156:3,13 157:3
  162:11 166:19,19
  166:22 168:9
  170:10,14 171:21
  176:8,10,14 177:5
  177:18 178:22,24
  189:22 193:7,15
  194:23 195:18
  197:7 198:13
  203:2 204:4,9
  206:7,10 208:21
  208:22 210:17
  214:6 217:14
  220:19 221:3
  222:24 223:7
  225:23 230:12
thinking 62:15
third 38:9 91:20
  123:1
third-party 13:23
Thomas 146:4
ThomasPark@St...
  172:24
Thompson 181:17
thought 12:10
  19:24 48:14 49:19
  88:8 92:21 108:15
  111:23 151:8
  155:22 156:7
  166:23 204:11
  212:2 217:15
  221:15 227:7
threatened 54:13
threatening 22:15
threats 239:8
three 8:11 21:18
  79:6 86:3 112:17
  123:16,17 126:25
  127:2,4,12 152:4
  156:14 158:23
  203:9 215:13
  230:13 231:22
three-quarters
  43:17
threw 227:10
tied 88:22 138:22
  177:10
ties 224:15
tilting 195:25
Tim 24:15

USBC, Eastern District of PA     Transcript of Chapter 11 Proceedings     Case No. 23-10763, 10764-DJB
Monday     Videotape Deposition of Rafael X. Zahralddin     March 30, 2026

Page 266

**time** 5:6 6:8 9:13 13:5 16:12,23 17:8 18:10 20:6 26:9,25 27:11 29:3,14 30:13,20 36:20 37:8,9,12 38:9,12 40:15,18 45:15 51:19,23 54:7 58:1,11,16 58:25 60:13 61:20 65:2 66:11 68:25 72:21,25 73:17,23 74:4 75:7 80:3 81:20,21 82:7,18 84:16 87:11,17 88:5 89:18 90:6 94:3,10 103:11 109:17 113:1 114:24 116:10,16 119:4 120:24 121:4,7 124:7 126:8,11 127:17 127:20 131:6 133:9 135:6,17,22 138:12 139:5 141:23 143:23 144:24 145:13,25 154:23 156:8 158:3,20 170:1 175:16 185:13 192:17 194:21 195:20 197:3,4 200:9 202:3,14,19 204:5 205:5 209:15 212:5 213:8,11,17,25 214:6,18 215:7 230:3 231:3,3,11 241:14,19,21
**timeframe** 138:9 215:4
**timeframes** 241:2
**timeline** 153:16
**timely** 198:18
**times** 18:4 38:18 65:16 81:3 89:10 131:15 133:7 167:5 173:15 177:7 223:7
**tirade** 236:18
**tired** 144:9 146:16 208:12
**today** 5:10 19:11 215:3 218:9 241:22

**today's** 8:14 109:15
**told** 22:16 43:7 44:7 59:23 80:18 92:22 96:2,3,10 101:15 104:1 111:24 129:10 136:25 146:13 162:9 174:20 181:1 186:2 198:16 200:22 214:22 229:18,19 232:5,9 233:14 235:2 236:20
**Tom** 173:12,16
**tomorrow** 19:11 119:5 184:2
**ton** 152:10
**tone** 65:4
**tooth** 210:25
**top** 39:12 61:13 70:15 93:3 107:13 114:8 119:21 122:18,20 125:10 129:22 164:6 165:7 169:18 182:24 191:4
**tossed** 64:18
**totally** 181:19,21
**touch** 119:5 202:5 227:21
**touched** 165:17
**tough** 207:14
**town** 33:3
**trace** 218:22
**track** 7:25
**trade** 23:16,19 42:8
**trading** 223:5
**Traditionally** 144:19
**trail** 182:25
**train** 48:14
**transaction** 173:22 175:10 235:1
**transactions** 211:9 211:18 234:25
**transcript** 14:8 76:18,19 77:9 162:8 229:25 242:5 243:7,20
**transfer** 21:17 228:13
**transferred** 210:21
**transition** 125:14
**translator** 170:1
**transplant** 20:5

201:2
**transportation** 160:22
**transporting** 159:25
**Traurig** 153:1
**travel** 79:17
**treatments** 201:9
**trial** 5:7 199:23 226:13
**tried** 146:12 239:25
**TRO** 191:12 227:6
**TROs** 209:9
**trucks** 59:19
**true** 153:13 243:6
**trust** 21:4,16 162:19
**trusted** 74:21
**trustee** 2:7 5:13 6:4 13:12 28:15 35:1 35:6 37:22 51:8 61:9 64:5 68:5 81:4 119:16 135:25 140:9 151:6,9 155:10 156:4,19 157:12 157:23 163:10,14 169:7 176:21 182:4 184:13,15 186:1,13,24 187:4 187:6,24 188:3,17 189:4 190:4,7 215:20 223:18 227:9 234:13 236:14 237:1,2,18
**Trustee's** 8:18 150:6 157:15
**Trustee-1** 3:8
**Trustee-112** 4:8
**Trustee-113** 4:9
**Trustee-116** 4:9
**Trustee-117** 4:10
**Trustee-119** 4:10
**Trustee-125** 4:11
**Trustee-130** 4:11
**Trustee-132** 4:12
**Trustee-137** 4:12
**Trustee-138** 4:13
**Trustee-139** 4:13
**Trustee-14** 3:11
**Trustee-141** 4:14
**Trustee-142** 4:14 184:18
**Trustee-146** 4:15
**Trustee-147** 4:15

**Trustee-148** 4:16 209:18
**Trustee-2** 3:8
**Trustee-27** 3:11
**Trustee-28** 3:12
**Trustee-29** 3:12
**Trustee-3** 3:9 32:20
**Trustee-30** 3:13
**Trustee-31** 3:13
**Trustee-32** 3:14 114:11
**Trustee-33** 3:14
**Trustee-34** 3:15
**Trustee-35** 3:15 120:12
**Trustee-38** 3:16
**Trustee-41** 3:16
**Trustee-42** 3:17
**Trustee-48** 3:17
**Trustee-5** 3:10 53:14
**Trustee-51** 3:18 129:25
**Trustee-52** 3:18
**Trustee-56** 3:19
**Trustee-58** 3:19
**Trustee-59** 3:20
**Trustee-6** 3:10
**Trustee-62** 3:20
**Trustee-64** 3:21
**Trustee-68** 3:21
**Trustee-72** 3:22
**Trustee-73** 3:22
**Trustee-74** 3:23
**Trustee-77** 3:23
**Trustee-79** 3:24
**Trustee-80** 4:4
**Trustee-81** 4:4
**Trustee-85** 4:5
**Trustee-86** 4:5
**Trustee-87** 4:6
**Trustee-90** 4:6
**Trustee-91** 4:7
**Trustee-94** 4:7 191:2
**Trustee-95** 4:8
**truthful** 172:8
**try** 44:17 46:11 54:8 59:7 67:17 150:25 202:1 205:6 221:7 233:21 239:23
**trying** 10:2 24:18 26:23 29:17 33:3

43:22 50:25 51:17 53:9 66:13 81:24 96:24 132:6 146:2 156:5 158:10 173:11,13 177:8 182:5 190:13,20 209:4 221:11 223:11 227:18 235:5
**turn** 15:2 51:8 61:9 62:6 64:5,9 73:1 76:7,21 78:9 81:10 94:14 98:24 105:4 124:24 128:14 129:25 148:15 150:15 157:12 164:4 169:12 177:22 180:17 182:14 184:17 185:15 186:11 188:11 191:2,21 197:25 200:2 203:4 219:5 223:24 224:24 228:5
**turned** 75:24,25 206:19
**turnkey** 217:19
**TV** 1:4 5:14 12:25 13:6 14:12 16:1,7 16:23 20:25 24:1 24:16 38:19 68:13 70:21 90:23 105:11,17 151:14 155:1 159:12 168:4 203:11 216:16
**TVs** 45:2,5,6,9 59:12 158:13 195:8 196:2 209:13 211:11 225:13
**twice** 101:1
**two** 2:4 13:23 40:11 41:10 50:17 51:23 54:6 55:16 62:1 62:16 74:5,14 75:10 81:20 82:18 83:1,6 90:8 107:22 112:17 125:22 127:1 137:24 146:9 147:1,13 156:1,11 158:11,23 176:6 196:20 204:9

(856) 983-8484     Tate & Tate, Inc.     (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA                Transcript of Chapter 11 Proceedings        Case No. 23-10763, 10764-DJB
Monday                                            Videotape Deposition of Rafael X. Zahralddin                        March 30, 2026

Page 267

205:22 230:12 241:6
**two-page** 178:14
**type** 27:24 36:4,25 65:22 140:11 194:14 201:24
**types** 37:19 65:22
**typical** 204:13 222:11

**_____ U _____**

**U-Haul** 59:19
**U.S** 81:4 105:18 150:6 151:5,9 155:10 156:3 157:15 184:13,15 186:1 187:3,5,24 188:3
**Ultra-D** 41:14 46:1 75:3 158:6
**Um** 64:13
**unable** 82:2 217:25 225:22,25
**undercapitalization** 57:8,15
**undercapitalized** 57:21,22,23,25 58:13
**understand** 29:8 59:2 69:12 112:5 112:6 115:22 123:1 217:6 233:1
**understanding** 21:1 21:3,23 25:1,25 35:20 53:12 109:6 125:19 130:21 136:12,16,18 149:6 215:2
**understood** 29:13 83:12 88:11 213:4
**underwrite** 206:7
**undisputed** 111:4
**unfolding** 75:18
**unfortunately** 35:4
**unhappy** 12:5
**United** 1:1 5:17 157:23 163:10,13 186:13 234:13
**University** 8:1 200:23 201:5
**unliquidated** 60:19 110:9,23
**unnecessary** 156:10
**unreasonable** 98:12
**unreasonably** 15:10

98:13
**unsecured** 38:25 59:15 60:8,11,22 61:1 78:22 192:15
**untenable** 96:17
**untouched** 169:14
**unwilling** 225:23 226:1
**up-front** 78:19
**updates** 20:11
**upwards** 27:16
**usable** 24:2
**USC** 186:15
**use** 36:3 63:6 187:10 205:21 207:22
**usual** 112:18 217:17
**usually** 42:6 51:21 235:19

**_____ V _____**

**Vagnoni** 2:16
**validity** 71:17
**Valley** 23:25 44:3 158:10
**variety** 10:22 198:15
**various** 15:17 39:18
**vehement** 71:11,14
**vehemently** 48:18
**vehicle** 154:12
**veil** 55:25 56:2,18
**venue** 44:12 85:4
**versa** 191:25
**version** 242:8,12
**versions** 223:5
**versus** 73:25 111:3
**viability** 163:3
**viable** 137:3 190:14
**vice** 11:12 35:25 191:25
**video** 5:9 6:8 14:9 40:14,17 94:2,9 135:16,21 202:13 202:18 241:13,18 242:1,2
**video-recorded** 5:11
**videographer** 5:23
**Videotaped** 1:13 242:16
**view** 73:19 75:14 127:14,15 225:1
**viewed** 55:8
**Vince** 139:6,25

140:3 156:16,20 158:22 162:3 169:18 213:5
**Vincent** 166:13 167:18,25 174:4
**violated** 48:20
**violation** 42:7
**violations** 218:3
**virtually** 224:24
**virtue** 110:24 240:23
**visual** 34:1 134:9 143:23
**voluntary** 31:19 76:3 82:8,9 83:10 106:11
**Von** 36:20
**vouched** 174:23
**VSI** 19:16 107:5 116:13 121:9 126:3 131:25 132:3,6,7 133:4 134:11,17,19,22 134:23,25 135:4 136:6,8,20,24 137:13 138:6,14 138:19,24 139:1,6 139:16,17 143:7 144:16 145:6,7,11 145:14,25 146:1 148:18,23 149:1,1 149:11 155:14 157:20,23 158:2,4 158:6,8,10,11,14 171:15 174:15 177:7 180:20 181:8 185:1 189:17 206:4,16 206:23 208:23 212:7,19,20 213:14 214:25 215:1,5,6,7 216:11,17,17 217:3 218:17 219:3 221:9 226:4 228:14,23 233:13 234:1 238:13,20
**VSI's** 140:16 141:20 155:20 221:22
**VSI/Stream** 192:5 192:11
**VTI** 20:14 23:8,12 24:6,12,17,23 25:4,18 26:2,7,22

27:12 28:5 30:7,8 30:12,15 31:7,8 32:1,9,18 34:2,5 37:10,12 38:3 42:24 43:21 54:1 54:18 55:7,12 57:4 58:8,18,20 61:4,22 63:1,14 63:16 76:4,23 77:21 79:1 80:4,6 80:8 81:25 82:6 83:16 87:3,9 89:21,23 90:4,15 91:5 106:4,8 109:23 115:6,6,10 115:12 116:2,7,8 116:12 117:5 120:2,19 121:6,17 123:5 124:1 125:6 125:9,16,18 126:2 126:7,8,11,24 128:9 129:17 132:10 133:4,4 137:1 154:13,14 199:15 214:11,11
**VTI's** 29:18
**vulnerable** 146:7

**_____ W _____**

**wait** 139:7
**waiting** 24:24 31:11 58:9 120:7 153:17 153:19 187:12 229:6 233:24
**waived** 5:4
**waiver** 128:23 129:18
**waivers** 128:18
**Walmart** 159:6
**Walsh** 65:3
**Wang** 10:5
**want** 9:22 23:17,18 40:6,8 41:9 43:13 45:3 49:17 56:11 66:24 69:7 94:18 95:7 99:7 119:5 122:18 126:23 127:3 143:6 156:21 159:17 166:1,10 174:11 174:11 177:4,17 185:5 194:4 201:18 205:1,5,13 222:8 226:22 227:21 230:1,1

232:2 242:5,12
**wanted** 8:24 12:12 44:17,25 45:2,6 48:1 52:1 71:23 86:12 113:15 119:12 154:21 157:7 159:24 162:6 167:13 173:15 223:7,13 226:19,22 235:18 238:6 239:7 241:8
**wants** 195:13
**ward** 115:4 117:14 187:9
**warn** 187:4
**wasn't** 17:5 26:13 32:12,17 33:21 60:1 67:13 95:25 107:16 108:16 110:25 111:7,24 112:25 134:1 162:13 175:4,6 183:16 206:18 227:25 232:5 238:1
**watch** 135:6
**water** 40:4,8,13
**watering** 40:20
**way** 12:11 25:10 34:14 67:2,17 74:22 81:25 83:13 87:1 89:8 91:15 95:5 104:6,8 115:20 119:10 137:14 147:21 149:4 150:7 155:12 166:20 197:9 199:20 200:4 201:19 205:11 209:12 214:16 220:17 221:8 227:21 230:18 235:4 240:4
**Wayne** 201:17
**ways** 207:22
**we'll** 9:11 16:21 40:12 43:5 70:17 135:14 159:19,19 164:15 165:9 170:1 182:17 205:5,10 241:11
**we're** 5:10 14:8 19:9,11,14 20:11 27:16,22 30:17

USBC, Eastern District of PA          Transcript of Chapter 11 Proceedings          Case No. 23-10763, 10764-DJB
Monday                                Videotape Deposition of Rafael X. Zahralddin          March 30, 2026

Page 268

40:9 49:12 63:2
71:1 94:15 97:19
100:11,17 107:23
110:18 122:23
135:3 137:19
162:10 165:5
169:21 171:22
181:21 188:21
189:8 193:5,8
195:25 197:15
205:6,7,10 207:14
209:1 220:17
223:9 229:12
231:21 235:22
237:10
**we've** 17:9 69:6,7
112:19 138:8
142:17 147:16
179:18 181:15
209:4,6,17
**wearing** 62:1
**Webb** 5:22
**WeChat** 166:20,24
168:25 172:21,25
173:4,18 174:25
**wedding** 223:1
**week** 74:5 89:25
164:16 165:10
186:22 220:9
**weeks** 74:12 90:8
152:4 160:18
**Weis** 47:3
**Weisberg** 18:23
200:17,17,19,19
201:21
**well-known** 152:18
159:15
**well-respected** 81:4
**went** 7:15 20:4
41:18 42:12,13,14
117:24 125:12
144:25 145:3
146:19 148:9
176:7 186:1
195:22 205:16
222:23 223:1
**weren't** 12:11 18:21
61:1 83:14 112:4
138:24 151:22,23
158:21 167:14
201:21
**Westbrook** 161:9
**Western** 43:18
44:10
**whatsoever** 67:16

**wheel** 220:18
**White** 119:24
**wife** 201:24
**William** 2:6,15
169:24
**willing** 107:23
174:18
**Wilmington** 153:3
**win** 21:9 49:19
167:14,15
**windmills** 195:25
**wire** 139:4
**wires** 109:7,11,12
109:16
**wish** 103:8
**withdraw** 15:18,21
15:23 51:16 94:20
153:22
**withdrawal** 97:23
98:18 152:8
**withdrawing** 51:12
**withdrawn** 226:16
226:18
**withdrew** 152:2
153:10
**witness** 3:2 6:11
16:12 18:14 27:4
72:15 81:11 90:17
101:2 111:21
135:12 142:13,23
143:11,17,20
144:1 164:5
175:14 179:3
202:11 203:24
241:23 242:15
**witnesses** 163:2
**won** 145:1
**wonderful** 167:4
**word** 40:6 67:6
143:23
**words** 220:25
**work** 34:13 43:22
70:18 79:14 81:5
96:12 99:8 127:4
127:13 135:11
144:22 159:6
163:18 197:24
219:3 221:16
**worked** 8:3 12:14
33:7,12,14 41:25
46:5 74:17,19
87:3 152:24 177:1
204:5 208:4 213:2
213:5 221:7
**working** 23:24 36:8

37:9,11,17,18
131:18,19 147:3,4
151:13 207:15
208:17,23
**works** 36:23 44:2
155:13
**world** 176:14
**worried** 26:20
53:23
**worth** 124:5
**wouldn't** 50:19
109:20 139:21
176:19
**wreck** 70:24
**write** 128:24 183:25
**writes** 78:15 169:22
172:1 200:11
226:10 228:19
**writing** 61:17 75:12
191:5 219:18
**written** 95:4,5
**wrong** 66:7 71:25
72:5 74:24 113:23
165:15 166:23
231:13 235:1
**wrote** 15:4,13 31:15
53:15 56:23 57:3
61:2 62:3 184:20
191:4 221:17,21
**www.tate-tate.com**
1:25

——————————
**X**
——————————
**X** 1:13 2:12 3:1,3,6
4:2 6:14

——————————
**Y**
——————————
**yeah** 8:20,20,22 9:9
10:12 11:7 13:24
14:2,2 15:1 26:5
26:19,19 27:11
30:4,7 31:18
32:16,25 33:16,20
34:19 52:11 53:12
58:4 60:9,12
63:19 66:3,3 68:9
68:19,23 70:11
71:13 72:14 77:11
79:3 80:11 81:18
86:2 87:18 91:9
102:20 105:14
112:15 114:9
115:19 120:3,9
127:15,25 129:6
130:14 135:12

136:11 137:7,18
137:22 138:2
139:17 140:2,20
141:7,25 142:4,15
142:25 143:8,14
143:20 145:7,20
145:24 147:4,16
147:16 148:11
150:24 153:6,24
153:24 161:5
165:21 168:9,21
171:9 172:10
175:19 178:5
183:22 185:11
189:19 193:16,19
200:6 203:2,14,16
204:3,3,8,15
206:3 207:6
210:13,13 212:9
213:10,10 214:12
217:14 220:3,6
221:10,24 226:5,9
226:15 228:8
229:1 234:3
**year** 8:2 22:24
74:19 113:19,23
130:5 138:1
174:16 211:1
**years** 8:10,12 23:1
60:18 101:4
123:16,17 137:24
149:22 176:20
207:14
**Yep** 13:22 76:20
124:4 141:17
157:21 171:20
172:17 182:23
185:4,20 212:12
**York** 7:9 43:18
84:20 85:1 87:24
87:25 102:13

——————————
**Z**
——————————
**Zahralddin** 1:14
2:12 3:3 5:12 6:14
6:23
**zero** 110:16 144:5
**Zhongsheng** 169:24
171:11 172:4,7
226:8
**Zoom** 2:15,16 30:23
30:25 158:23
183:3 190:8

——————————
**0**
——————————

**07102** 2:10
**08053** 1:24

——————————
**1**
——————————
**1** 50:21 119:22
128:22 151:12
178:11,11,13
179:25 188:25
189:8,10 193:24
194:12
**1,528,000** 105:18
**1.16(b)(4)** 98:3
**1.5** 106:1 195:18
196:7,18
**1.7** 20:17
**1:10** 135:6
**1:12** 135:17
**10:02** 1:19 6:9
**10:30** 119:3
**10:43** 40:15
**10:44** 40:18
**100** 130:9
**104** 3:13
**108** 4:15
**11** 1:3,7 2:7 5:13,15
28:24 29:14 30:14
117:24 143:15
156:17 162:16
166:15 169:7
171:19 186:14,24
188:17 189:4
190:4,6 223:18
227:9 236:13
237:1,18 238:22
**11:59** 94:3
**1112** 186:15
**114** 3:14
**116** 35:8,9
**118** 3:14
**119** 3:15 135:25
**12** 94:1 176:25
**12,600,000** 238:22
**12:15** 94:10
**12:30** 81:14 91:19
**120** 3:15
**121** 4:12
**122** 4:13
**123** 3:16
**124** 3:16
**126** 3:17 238:23
**128** 3:17
**129** 3:18
**13** 3:8 101:4 145:22
157:16 180:20
203:5 207:8

(856) 983-8484                        Tate & Tate, Inc.                        (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

USBC, Eastern District of PA    Transcript of Chapter 11 Proceedings    Case No. 23-10763, 10764-DJB
Monday      Videotape Deposition of Rafael X. Zahralddin      March 30, 2026

Page 269

219:23 222:16,17
 226:4
**132** 3:18
**133** 203:4,23
**134** 4:13
**135** 4:10 210:4
**14** 128:16 182:8
**141** 4:15 182:21
**147** 141:6,9 203:1
**148** 3:19
**15** 53:15 61:14
 105:4 138:3,8,16
 141:16 207:5,17
 218:12
**157** 3:19
**164** 3:20
**167** 3:20
**169** 3:22
**17** 76:12,14 78:7
 82:9 171:13
**171** 3:22
**172** 3:23,23
**176** 3:24
**180** 4:4
**182** 4:4,14
**184** 4:14
**185** 4:5
**186** 4:5
**188** 4:6,6
**190** 4:7
**191** 4:7,8
**19103** 2:5
**197** 4:8
**199** 4:9

_____
**2**
**2** 180:1 224:11
**2.7** 191:20 237:10
**2:00** 135:8
**2:03** 135:22
**2:27** 119:22
**20** 39:12 68:12
 238:21
**2001** 1:15 2:4
**2004** 184:13 187:21
 187:23 238:5
**2019** 151:16
**2020** 13:17 23:4
**2021** 28:24 29:15
 30:14 35:13 38:2
 53:15 61:14 64:11
 68:12 69:18 76:12
 78:7 81:14 82:10
 84:17 91:19 93:4
 104:15 105:16

106:9,21 107:15
108:5 114:3 119:3
119:20 121:18
123:23 125:3
128:17,22 195:18
196:8,17 197:8
**2022** 130:3,17 131:2
 131:25 132:4,15
 133:25 134:13
 171:13 174:16
**2023** 136:7 138:3,8
 138:16 141:16
 142:12 145:22
 157:16 164:8
 168:2,19 169:19
 170:23 173:1
 176:25 180:20
 182:8 184:18
 185:22 186:20
 203:5 207:5,8,17
 209:24 210:11
 215:24 216:8,10
 217:5,13 218:12
 219:9 222:16,16
 225:4 226:4
 238:21,23
**2024** 188:19,25
 189:10
**2025** 198:3 199:14
**2026** 1:11 5:11
**209** 4:16
**21** 69:18 81:22
 82:14,15 168:1,19
 209:24
**215** 3:21
**2150735-8700** 2:5
**219** 3:21
**22** 81:22 82:14
**23** 81:14 82:12
 84:17 91:19 93:4
 104:15 105:16
 106:9,21 107:14
 108:5 114:3
 195:17 196:8,17
 197:8 198:2
 226:12
**23-10763-DJB** 1:4
 5:15
**23-10764-DJB** 1:8
 5:17
**23rd** 110:1
**24** 35:12 38:2 164:8
 228:20
**25** 90:20
**25-plus** 27:16 89:18

**26(f)** 198:9
**27** 76:13,17 114:17
**277** 203:9
**27A** 77:10
**28** 3:8 119:3
**29** 91:17 142:12
 186:19
**293** 145:15,16,17
 203:7,20
**298** 146:3

_____
**3**
**3** 68:8 73:2 121:18
 200:2,12
**3:42** 202:14
**30** 1:11 5:11 64:11
 168:11 223:24
**30-minute** 236:17
**300** 162:1 165:18
 168:7 169:21
 171:1 226:7
**31** 119:20 130:3,17
 131:2,25 132:4,15
 133:25 217:5,11
 224:19
**33** 3:9
**35** 3:9 4:9
**37** 4:10 203:4,23
**38** 123:18
**39** 4:11
**3900** 2:4
**3D** 27:24 41:4,4,5,7
 41:25 42:13 48:21
 74:17,19 75:8
 128:25

_____
**4**
**4** 15:2 94:24 97:12
 98:24 123:23
 134:13 157:18
 169:19 170:22
 172:16 215:23
 216:8,10 219:11
 219:16
**4/21** 210:8
**4:02** 202:19
**4:35** 93:4 106:22
**4:51** 241:14
**43** 228:5,7 233:21
**45** 228:5
**4th** 221:2

_____
**5**
**5** 15:13 189:7,8
 197:12

**5:03** 241:19 242:3
 242:17
**51** 3:10 238:11
**56** 148:3
**58** 149:21
**59** 142:12
**5th** 188:18,19

_____
**6**
**6** 3:4 119:8 197:12
**6/11** 142:22,25
 143:3
**61** 3:10
**611** 142:21 143:9,13
**636-8283** 1:24
**64** 3:11
**68** 4:11
**69** 4:12
**6th** 23:1

_____
**7**
**7** 97:21 140:8
 156:18 173:1
 185:22
**73** 1:23
**76** 3:11
**78** 3:12

_____
**8**
**8** 13:17 94:25 97:13
 97:14,22 125:3
 148:15,16 155:15
 184:18 219:9,19
 219:20 222:16
**800** 1:24 2:10
**800,000** 197:13
**81** 3:12 182:6
**825** 1:23
**856** 1:24

_____
**9**
**9** 199:14
**92** 3:13 7:14
**93** 7:4,14
**95** 7:17 192:3
**973-577-6260** 2:11
**983-8484** 1:24

(856) 983-8484      Tate & Tate, Inc.      (800) 636-8283
825 Route 73 North, Suite G, Marlton, NJ 08053

# App. Ex. 5

**From:** Mathu Rajan <mathu.rajan@glasses-free.com>
**Sent:** Monday, January 11, 2021 5:59 PM EST
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**CC:** Richard Engel <RENGEL@atllp.com>; Suby Joseph <suby.joseph@vti-global.com>; dan.rink@glasses-free.com <dan.rink@glasses-free.com>
**Subject:** Re: Large VTI investor

Mathu Rajan is inviting you to a scheduled Zoom meeting.

Topic: Mathu Rajan's Zoom Meeting
Time: Jan 11, 2021 06:00 PM Eastern Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/88065497124?pwd=SFhYeFZjbGlvdEtWMlIvUjJGRURydz09

Meeting ID: 880 6549 7124
Passcode: 105369
One tap mobile
+13017158592,,88065497124#,,,,*105369# US (Washington D.C)
+13126266799,,88065497124#,,,,*105369# US (Chicago)

Dial by your location
        +1 301 715 8592 US (Washington D.C)
        +1 312 626 6799 US (Chicago)
        +1 646 558 8656 US (New York)
        +1 253 215 8782 US (Tacoma)
        +1 346 248 7799 US (Houston)


Sent from my iPhone

On Jan 11, 2021, at 5:53 PM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:


Rick just texted me he can do this -can you send a dial in or I can send around zoom.

Rafael

Rafael

Sent from my iPhone


On Jan 11, 2021, at 5:46 PM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:


I can make that.

Sent from my iPhone


On Jan 11, 2021, at 5:46 PM, Mathu Rajan <mathu.rajan@glasses-free.com> wrote:


Hi guys can we do the call at 6:00 pm est. today.
Thanks

Sent from my iPhone

On Jan 11, 2021, at 5:22 PM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:


Are you ready to have the call about the funding  of the retainer and filing a petition?

**From:** Mathu Rajan <mathu.rajan@glasses-free.com>
**Sent:** Monday, January 11, 2021 12:17 PM
**To:** Richard Engel <RENGEL@atllp.com>
**Cc:** Suby Joseph <suby.joseph@vti-global.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>;dan.rink@glasses-free.com

**TRUSTEE 2**

**Subject:** Large VTI Investor

- Investment amount: $10m
- Closing date: on or before Jan 28, 2021
- Investor will hold approx 37% of the Company post investment on a fully diluted basis

Sent from my iPhone

On Jan 11, 2021, at 12:16 PM, Mathu Rajan <mathu.rajan@glasses-free.com> wrote:

> We are finalizing agreements with AOTEX, which will provide key benefits: they will make an initial payment of USD $250,000 upon signature, which is imminent, and they will provide Letters of Credit to finance the purchase orders of our customers. Based on customer inquiries and commitments, we expect 2021 Q1 sales revenue for initial orders to be in excess of $5 Million, possibly as high as $8 Million.
>
> Sent from my iPhone
>
> On Jan 11, 2021, at 11:23 AM, Richard Engel <RENGEL@atllp.com> wrote:
>
>> Thank you Suby.
>>
>> Best,
>>
>> Rick
>>
>> <image001.jpg>
>> Armstrong Teasdale LLP
>> **Richard W. Engel, Jr.** | Partner
>> 7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847
>> DIRECT: 314.342.4116 | FAX: 314.621.5065 | MAIN OFFICE: 314.621.5070
>> rengel@armstrongteasdale.com
>> www.armstrongteasdale.com
>>
>> Always exceed expectations through teamwork and excellent client service.
>>
>> Please consider the environment before printing this email.
>>
>> ************************PRIVATE AND CONFIDENTIAL************************
>> **This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient or Armstrong Teasdale LLP. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by e-mail (admin@armstrongteasdale.com) or telephone (314-621-5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP shall be understood as neither given nor endorsed by it.**
>>
>> ---
>>
>> **From:** Suby Joseph [mailto:suby.joseph@vti-global.com]
>> **Sent:** Monday, January 11, 2021 9:46 AM
>> **To:** Richard Engel; Rafael X. Zahralddin-Aravena
>> **Cc:** Mathu Rajan
>> **Subject:** Stream TV Corporate Structure
>>
>> **CAUTION:**   **EXTERNAL EMAIL**

Hi Richard, Rafael

I understand you had discussions with Mathu reg the corporate structure. Please see attached the schematic for Stream.

Thanks
Suby Joseph

# App. Ex. 6

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Tuesday, January 12, 2021 12:33 PM EST
**To:** Weis, Martin J. <mweis@dilworthlaw.com>; Aaronson, Anne M. <aaaronson@dilworthlaw.com>
**Subject:** Stream TV

I just spoke with Mathu Rajan. He is closing with his investors today and wants to file tonight before some state court judge in Delaware rules against him on something that is pending. I told him that I doubted that  such timing was realistic, but that we would begin working as soon as we got a retainer, which he claims will be wired today. He wants to have a call with his team and you guys this afternoon. What is a good time? I am jammed but will do my best to participate once a time is established. Let me know.


LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com |www.dilworthlaw.com

# App. Ex. 7

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Tuesday, January 12, 2021 3:45 PM EST
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Weis, Martin J. <mweis@dilworthlaw.com>
**CC:** Caplow, Yonit A. <ycaplow@dilworthlaw.com>; Chapman-Tomlin, Christine <cct@dilworthlaw.com>
**Subject:** RE: Stream TV

I just checked to see if we received the pre-bankruptcy retainer and so far we have not. So don't start doing anything yet.

Equally important is that we need assurance of payment for our services as debtor's counsel since the debtor itself has no operations and no cash flow. Mathu told me that the parent company, in which the investors are putting money, will pay our post bankruptcy fees. We need to be sure that this arrangement is properly disclosed and I explained to Mathu that we need specifics about who was paying us and the source of the cash to pay us. We will need to drill down on the payment arrangements both to be sure that they are real and reliable and to be sure that they are properly disclosed.

This is literally the 5th or 6th time that these guys have called me and said that we "need to file today and we are wiring the retainer." I will believe it when we get the retainer.

I would also be careful about the number of things that we file on the first day. Things like a 105 injunction (which has limited chance of success) and some kind of declaration that the secured debt (specifically Hawk second lien debt) has been converted to equity should be filed later when and if there is an issue to address.

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Tuesday, January 12, 2021 3:28 PM
**To:** Weis, Martin J.
**Cc:** McMichael, Lawrence G.; Caplow, Yonit A.; Chapman-Tomlin, Christine
**Subject:** Stream TV
**Importance:** High

Marty – just passing along the substance of mine and Yonit's call with Stream TV.  We spoke with Dan Rink (an attorney with the company working from Houston) and Amanda (working at the company in South Jersey).  As you probably know, the two principals are Matthu and Raja Rajan (not sure of the correct spellings). They were not on the call.

The call was about the imminent filing of Chapter 11 in DE for Stream TV -  which we will need to update everything to switch the jurisdiction from EDPA.  The client has been gathering and updating the information in the Box.com folder since the spring.  They haven't done much business since last spring, so everything in the Box should be substantially current as of now.

The recently went through a process of converting their two major senior secured debt to equity.  The debt with Hawk was converted, but they held off on completing the SLS conversion, so that remains debt.

As a first day pleading, they'd like to file something saying that their agreements with Hawk and SLS are valid and enforceable.  I'm not sure what this would be right now as I haven't been involved and don't know what agreements they have, but we can figure it out.

Creditors have become nasty with Matthu and Raja. In the Delaware Chancery litigation, the court has entered a stay/TRO enjoining Stream from doing anything relative to the company and its assets, so Matthu and Raja are concerned that by filing for bankruptcy, creditors will bring action against them based on the TRO.  For this reason, they want a 105 injunction to extend the automatic stay to them while the company goes through bankruptcy.

There is also IP litigation in SDNY before a magistrate and judge.  They wanted to know the effect of bankruptcy on this and I told them that it would be initially stayed and we'd have time to figure out what to do with it.

Amanda said they updated the top 20 creditors list and some of the other documents in the Restructuring folder in Box.com.  You should have received an invite to access the documents.

Larry- have we received the retainer?  Should we get started on this?  Is the goal to file as much as we can today or get things ready for filing tomorrow or some other time?

Anne

**ANNE AARONSON |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

# App. Ex. 8

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| Stream TV Networks, Inc. | : Case No. 21-10433 (KBO) |
| | : |
| Debtor. | : **Hearing Date: March 22, 2021 at 10:00 a.m.** |
| | **Objections Due: March 15, 2021 at 4:00 p.m.** |

**MOTION OF STREAM TV NETWORKS, INC. FOR ENTRY OF ORDER: (I)
AUTHORIZING IT TO OBTAIN POST-PETITION FINANCING PURSUANT TO
SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING IT TO
ENTER INTO THE SUPPORT AGREEMENT, AND (III) GRANTING
ADMINISTRATIVE PRIORITY CLAIMS TO LENDER PURSUANT TO SECTION 364
OF BANKRUPTCY CODE AND MODIFYING THE AUTOMATIC STAY TO
IMPLEMENT THE TERMS OF THE ORDER**

Stream TV Networks, Inc., the above-captioned debtor and debtor-in-possession (the

"Debtor" or "Stream" or "Payee"), by undersigned proposed counsel, respectfully represents:

**Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statement**

1.      By this motion (this "Motion"), the Debtor requests (a) entry of an order (the

"Order") authorizing the Debtor to, among other things:  (i) obtain loans and advances and such

other financial accommodations in an initial principal amount not to exceed $200,000, and a total

amount not to exceed $1,000,000 unless otherwise increased by consent of Visual Technology

Innovations, Inc. ("VTI" or "Payor") in a signed writing (the "Facility" or "Loan"), pursuant to

sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) enter

into the Support Agreement and the agreements and instruments contemplated thereby (the

"Support Agreement") and to perform such other and further acts as may be required in

connection with the Support Agreement, and (iii) grant administrative priority claims to VTI in

accordance with the Support Agreement and the Order to secure the Loan; (b) modification of

122148638_3

**TRUSTEE 3**

the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to

permit the Debtor and VTI to implement the terms of the Order; and (c) requesting that this

Court (the "Bankruptcy Court") schedule the Hearing for the entry of the Order on the Motion

within twenty-one days. A copy of the proposed Order is attached hereto as **Exhibit A**. A copy

of the Support Agreement is attached hereto as **Exhibit B**.

2. Material provisions of the Support Agreement are set forth in the following sections

of the Support Agreement and/or the Order.

    a.     ***Borrower***:  Stream TV Networks, Inc. ("Stream" or "Debtor") [Support Agreement, Recitals, page 1].

    b.     ***Lender***: Visual Technology Innovations, Inc. ("VTI" or "Payor") [Support Agreement, Recitals, page 1].

    c.     ***Facility Amount***:  Total commitment of up to the amount of $1,000,000 unless otherwise increased by consent of the Payor in a signed writing (the "Payment Cap"). [Support Agreement, Section 2(a)(1), p. 5]. An initial sum of $200,000.00 in cash will be deposited into the Support Account[1] of the Debtor on or before March 5, 2021, subject to mutual extension thereof (the "**Initial Payment**") upon the request of the Payee from time to time in accordance with the requirements of Section 2(b) of the Support Agreement. [Support Agreement, Section 2(a)(2), Support Obligations and Procedures, p. 5].

    d.     ***Interest Rates***:  Interest on each Payment shall accrue at six percent per annum [Support Agreement, Section 2(e), Support Obligations and Procedures, p. 6].

    e.     ***Payment of Interest***: Interest shall be payable immediately if and to the extent of cash proceeds generated from projects of the Payee and will otherwise accrue until the repayment of the Payments as referenced in Section 2(f) of the Support Agreement.

    f.     ***Repayment of Loan***: The repayment to VTI of all the Payments plus any unpaid interest accrued thereon shall be pursuant to the Plan as approved by the Bankruptcy Court, or upon conversion or dismissal of the Bankruptcy Court [Support Agreement, Section 2(f), Support Obligations and Procedures, p. 6].

    g.     ***Carve-Outs***:  The administrative priority claims granted hereunder to VTI, and any post-petition claims or interests ranking *pari passu* with or junior in priority

---

[1] All terms not defined herein are ascribed the meaning given to them in the Support Agreement

2

to such claims of VTI shall be subject to payment of the Carve-Outs. As used herein, "Carve-Outs" shall mean (a) a payment of an additional retainer of $100,000 to counsel for the Debtor in the Bankruptcy Case; and (b) fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and to the Clerk of the Bankruptcy Court; provided, that nothing herein shall be deemed as a waiver of the rights of VTI to object to any requests for allowance of any fees or expenses [Support Agreement, Section 1, Definitions, page 4].

h.  ***Allowed Professional Fees***: All (a) administrative expenses incurred during the pendency of any Bankruptcy Case that have been allowed by an order of the Bankruptcy Court as well as the payment of an additional retainer of $100,000 to counsel for the Payee in the Bankruptcy Case and (b) other costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in the judgment of the Payee's Board, collectively including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business during the pendency of the Bankruptcy Case. [Support Agreement, Section 1, Definitions, page 4].

i.  ***Use of Proceeds***: The proceeds of the Loan shall be used solely (i) in accordance with the Order, (ii) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including, without limitation, the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no Bankruptcy Case pending; (iii) the payment of any and all (a) administrative expenses incurred during the pendency of any Bankruptcy Case that have been allowed by an order of the Bankruptcy Court as well as the payment of an additional retainer of $100,000 to counsel for the Payee in the Bankruptcy Case and (b) other costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in the judgment of the Payee's Board, collectively including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business during the pendency of the Bankruptcy Case; and (iv) the funding of any amounts necessary to cause the Support Account to contain at least $50,000 at all times prior to the effective date of a Plan; in the case of clauses (i) through (iii) above, solely to the extent that any cash distributions theretofore received by the Payee from any Payee Subsidiary are insufficient to pay such costs and expenses and fund such amounts and obligations in full. [Support Agreement, Section 1, Definitions (page 1)].

j.  ***Conditions Precedent***: The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Support Request relating to such Payment: (i) the representations and warranties of the Payee set forth in Section 3 of the Support Agreement shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no uncured violation by the Payee of the covenants set forth in Section 5 of the Support

3

Agreement. [Support Agreement, Section 2(d), Support Obligations and Procedures (pages 5-6)].

k. ***Events of Default***: (a) The Payee defaults in the performance of, or breaches, any covenant or representation or warranty of the Payee in this Agreement and such default or breach continues for a period of five (5) Business Days after there has been given to the Payee by the Payor a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; (b) the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of five (5) Business Days; (c) the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 90 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 180 days, in each case after there has been given to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; (d) the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and (e) a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor in the nature of an exercise of jurisdiction over all or the majority of Payor's assets, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days. Upon becoming aware of any Default or Event of Default, the Payor or the Payee, as applicable, shall promptly deliver to the Payee [Support Agreement, Section 6 (pages 7-8)].

l. ***Grant of Security Interest***:  None.

m. ***Roll-up of Pre-petition Debt:***  None.

n. ***Priority***:  The Support Agreement shall constitute allowed administrative expenses in the Bankruptcy Case, pursuant to section 364(b) and 503(b)(1) of the Bankruptcy Code, to the extent set forth in the Order or any subsequent order of the Bankruptcy Court. ***Remedies***: Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the non-defaulting Party may continue to enforce the performance of any provision of this Agreement, as applicable, and the Payee, if a non-defaulting Party may pursue any available remedy to collect any unfunded Payments due and owing to the Payee.  [Support Agreement, Section 7 (page 8)].**Jurisdiction**

4

3.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

6.     On February 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtor is a debtor-in-possession and remains in possession of its assets.  No official committee of unsecured creditors has been appointed.

7.     Stream TV was founded in 2009 as a "new media" company to pursue new technologies that enhance user entertainment and communications experiences.  The technology that the Company is currently seeking to launch allows TV and tablet manufacturers to convert two dimensional devices into three dimensional ("3D") without the need for viewing glasses.

8.     On February 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code.  The Debtor is a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this chapter 11 case (the "Chapter 11 Case") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

5

9. The Debtor intends to generate revenue from providing 3D components to final market assemblers (such as TV manufacturers and tablet makers). The Debtor views its approach as similar to how major computer manufacturers use processors in their products and note their products as such.

10. The Debtor intends to restructure its debt through this Chapter 11 Case so that its debt service is reduced to a level that will allow the Company to sustain its operations for the long term.

### Relief Requested

11. The Debtor requests that the Court authorize it to obtain unsecured, administrative priority post-petition financing in the aggregate not to exceed $1,000,000 pursuant to the terms of this Motion, the Support Agreement and the Order. The proposed financing will be provided by VTI.

12. Specifically, the Debtor requests that the Court authorize it to: (i) obtain loans and advances and such other financial accommodations in the initial amount of $200,000, and in aggregate principal amount not to exceed $1,000,000; (ii) enter into the Support Agreement and the agreements and instruments contemplated thereby and to perform such other and further acts as may be required in connection with the Support Agreement, and (iii) grant administrative priority claims to VTI in accordance with the Support Agreement documents and the Order to secure any and all of the Support Agreement obligations; and modify the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor and VTI to implement the terms of the Support Agreement Order.

### The Debtor's Current Support Agreement proposal

13. In the absence of post-petition funding, the Debtor lacks sufficient cash to continue its operations uninterrupted and preserve going concern value.

6

122148638_3

14. Since 2009, the Debtor has raised approximately $150 million from third party investors to help fund its operations. The investments have taken the forms of both debt and equity. The Debtor's senior secured creditor is SLS Holdings VI, LLC ("SLS"). Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of secured notes (the "SLS Notes"). The Debtor pledged substantially all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Notes.

15. The Debtor's junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). Subject to the senior security interest held by SLS, the Debtor pledged substantially all of its assets as security for the Hawk Notes. The Debtor executed a security agreement in connection with the Hawk Notes.

16. During the early stages of productizing its Ultra-D solution, Stream engaged the engineering services of Intrinysc Technologies Corporation of Canada ("Intrinsyc"). The companies worked closely together on multiple projects spanning several years at a cost of several million dollars. In October 2014, Intrinsyc made a loan in the amount of USD $1.5 million to Stream in exchange for Stream's commitment to place purchase orders with Intrinsyc for guaranteed future work. From 2015 to 2018, the maturity date of the debt was extended multiple times in exchange for Stream warrants. In Spring 2018, knowing that similar conversion agreements were being negotiated with SLS and Hawk, Intrinsyc signed a conversion agreement (the "Intrinsyc Conversion Agreement"), which was executed in May 2018.

17. In 2018, the Debtor entered into an agreement with Hawk, which provided that the Hawk Notes would convert into equity if and when the Debtor raised additional equity capital

7

(the "Hawk Conversion Agreement"). The Debtor and SLS contemporaneously entered into a parallel agreement governing the SLS Notes (the "SLS Conversion Agreement" and collectively with the Hawk Conversion Agreement and the Intrinsyc Conversion Agreement, the "Conversion Agreements"). For purposes of this filing, the Hawk Notes and the SLS Notes are characterized as debt that has not yet been converted pursuant to the Conversion Agreements, although this characterization is disputed by the Debtor. Per the Conversion Agreements, conversion of debt to equity is at the discretion of the Debtor.  To date, neither SLS nor Hawk have completed execution of the conversions.

18.  Knowing that the Debtor was in need of funds to fund its operations in bankruptcy, the Debtor commenced discussions with VTI, whose principal is Mathu Rajan (who is also the principal of Debtor), regarding the need and possibilities for DIP financing.[2]

19.  To facilitate operations of the Debtor and to preserve going concern value pending, VTI has offered to provide the Debtor with a Loan Facility requiring administrative priority claims as referenced in the Support Agreement.

20.  The Debtor has reasonably determined that the Loan Facility offered by VTI provides terms most favorable to the Debtor and its estate.

21.  In the sound exercise of its business judgment and fiduciary duties, the Debtor has determined to proceed under the Loan Facility offered by VTI.

### The Loan Facility Should Be Authorized

---

[2] VTI is independent of Stream and Stream is and intends to be treated as an entity separate from VTI.  The principal of both VTI and Stream is Mathu Rajan, who presently owns or controls approximately 11.5% of VTI but anticipates that amount will exceed 98%.  Mathu Rajan also owns 18,200 shares of Stream and is the 40% owner of Akshaya Holdings LLC.  Akshaya Holdings LLC is owned by members of the Rajan family and owns approximately 8.78% of Stream.

8

122148638_3

22. Approval of the Loan Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its current and ongoing operating expense. Unless these expenses are paid, the Debtor will be forced to discontinue any efforts to operate, which would likely result in irreparable harm to its business and jeopardize the Debtor's ability to reorganize and maximize value for all interested parties.

23. The credit provided under the Support Agreement will enable the Debtor to continue to operate in the ordinary course to preserve the value of the estate while the Debtor pursues its reorganization strategy. The availability of credit under the Support Agreement will provide confidence to the Debtor's creditors that will enable and encourage them to continue their relationships with the Debtor. Accordingly, the timely approval of the relief requested herein is imperative.

24. Section 364(b) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the debtor to obtain unsecured credit or unsecured incur debt allowable under section 503(b)(1) as an administrative expense of the estate. 11 U.S.C. § 364(b). The Debtor proposes to obtain the financing set forth in the Support Agreement by providing unsecured administrative priority claims pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code.

25. The Debtor's liquidity needs can be satisfied only if the Debtor is authorized to borrow under the Loan Facility and to use such proceeds to fund its operations. VTI is willing to provide the Loan Facility in exchange for the grant of an administrative priority expense claim pursuant to section 364(b).

122148638_3

26. The Debtor believes it would not be able to obtain post-petition financing or other financial accommodations from any alternative to VTI or on more favorable terms and conditions than those for which approval is sought herein.

27. Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

28. Even under an entire fairness standard, see *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020), the instant transaction should be approved as the terms of the arrangement are extremely favorable to the Debtor. Indeed, the financing here is unsecured and the interest rate is relatively modest. In addition, the Debtor does not have many of the stringent requirements placed on a debtor in a more traditional DIP financing arrangement.

29. The Debtor has been unable to procure the funding required to meet its ongoing operational needs absent granting the proposed administrative priority claims as set forth in the Support Agreement. The Debtor submits that the circumstances of this case require the Debtor to obtain financing pursuant to section 364(b) and, accordingly, the Support Agreement reflects the exercise of its sound business judgment.

10

30. The terms and conditions of the Support Agreement are fair and reasonable and, while they were negotiated with an insider, they are sufficiently favorable to the Debtor under the circumstances that they should be considered to be in good faith.  Accordingly, VTI and all obligations incurred under the Support Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

31. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to: (i) grant the administrative priority claims described above with respect to VTI and to perform such acts as may be requested to assure such priority status; and (ii) implement the terms of the proposed Order.

32. Stay modifications of this kind are ordinary features of post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

### Notice

33. This Motion has been served upon (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for secured creditors believed to be claiming an interest in cash collateral; (c) the Internal Revenue Service; (d) the twenty (20) largest unsecured creditors (by email only);[3] and (e) the Payor.  In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**; and grant such other and further relief as is just and proper.

---

[3] Many of the twenty largest creditors are foreign entities which would be expensive to serve by mail and would not likely receive the mailings prior to the hearing.

11

Dated: March 1, 2021                    /s/ Martin J. Weis

**DILWORTH PAXSON LLP**
Martin J. Weis (I.D. No. 4333)
One Customs House – Suite 500
704 King Street
P.O. Box 1031
Wilmington, DE 19899-1031
Telephone: (302) 571-9800
Facsimile: (302) 655-1480

-and-

**DILWORTH PAXSON LLP**
Lawrence G. McMichael (*admitted pro hac vice*)
Anne M. Aaronson (*admitted pro hac vice*)
Yonit A. Caplow (*admitted pro hac vice*)
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200


*Proposed Counsel for the Debtor and Debtor in Possession*

12

122148638_3

# App. Ex. 9

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Tuesday, March 16, 2021 11:48 PM EDT
**To:** David Going <DGOING@atllp.com>
**CC:** Mathu Rajan <mathu.rajan@vti-global.com>; raja.rajan@vti-global.com <raja.rajan@vti-global.com>; Dan Rink <dan.rink@vti-global.com>; Bud Robertson <bud.robertson@vti-global.com>; Jonathan M. Stemerman <JStemerman@atllp.com>; John A. Sten <JSten@atllp.com>; Isaac D. Stevens <IStevens@atllp.com>
**Subject:** RE: Call me if you have some time tomorrow or Sunday

David,

My responses.  Thank you for your insights.

Mathu, Raja, Bud, and Dan, can you respond to the highlighted (review of fraudulent conveyance and possible preference for David and me?

Rafael

**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

**From:** David Going <DGOING@atllp.com>
**Sent:** Tuesday, March 16, 2021 4:14 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Subject:** RE: Call me if you have some time tomorrow or Sunday

A few immediate comments/questions/thoughts from my initial review of the documents:

1. I understood from our call this morning that our client would be the DIP Lender.  If so, does that party also have a prepetition claim?  If not, do we have a standing problem in opposing the motion to dismiss?
I don't think so as we are a strategic plan proponent where there are several new investors and strategic partners including supply chain contracts which have been entred into to comercializxe the product.  The motion to dimiss says this is an mepty shell with no prospects going forward.  I think we have standing.  Can you tell me why you think there is a standing issue?  Just the lack of a claim?  Wouldn't that prevent new money DIPs from ever coming in?

2. SLS claims the assets were transferred to Newco per the Omnibus Agreement on September 4, 2020.  Assuming that is true, have the SLS and Hawk notes been returned to the Debtor?  Did Newco deliver the 1,000,000 shares under 1.1(f) of the Omnibus Agreement?  Are the shares or right to the shares listed as an asset?
Guys – can you help here – I don't think the shares have been delivered and think we are listing the shares as assets in the schedules and statements but please confirm.

3. Similarly, has the Company received shares of Newco under 1.1(e) resulting from the Mediatainment redemption?
Same

4. Are there any assets owned by Stream TV Networks, Inc. that were not (could not have been) transferred under the Stock Transfer Agreement?  The list of Transferred Assets certainly indicates that a simple stock transfer wasn't sufficient to encompass all of the assets.

5. I don't see Schedule 1.1(b) (Assumed Liabilities) to the Omnibus Agreement.  Was it prepared and delivered?Guys – can you help here Has Newco paid those assumed liabilities?  Guys – can you help here
I'd like to look further into whether the Company's indemnification obligations impact the "executoriness" of the Omnibus Agreement.This is an excellent observation  - thank you.

6. The transfer of the assets directly to SeeCubic should make it more difficult for the recipient of the transfer to establish that the debtor received reasonably equivalent value in exchange.  In addition to the question of the value of the assets transferred, it also puts in issue the value of the debt released, particularly if Hawk was undersecured. I agree, can the guys help here with some thoughts on valuation?

7. As a shareholder of Newco, I'd have some questions/problems with the initial capitalization of SeeCubic.  The May 6, 2020

**TRUSTEE 4**

"Letter Agreement" indicates that both Hawk, SLS and Investors received stock. It appears that both SLS and Hawk took back notes and received equity and warrants in consideration for the contribution of the notes.  It might be interesting to explore whether the value of the contributed note and assets ascribed under the Letter Agreement reconcile with avoidance action valuations.  Do we have an avoidable LBO at Newco? I agree, I think we should discuss this on a call with the client and get the information from them to support or review this issue.

8.        If, for purposes of a fraudulent conveyance analysis, Newco should be considered the holder of the secured debt satisfied under the Omnibus Agreement, Newco should then also be considered the holder of the debt and an insider (statutory or non-statutory) for preference purposes.  Again, even though the Omnibus Agreement treats the liens of Hawk and SLS pari-passu, Hawk's subordinated debt puts it at great risk that it received more by the transfer than it would have received in a 7 liquidation.  Is Hawk an insider?

Guys -  for your information -
The concept of insider is defined in 11 U.S.C. § 101(a)(31). If a debtor is an individual, the term "insider" includes: relatives, any partnership in which the debtor is a general partner, any general partner of the debtor or any corporation in which the debtor is a director, officer, or person in control. If the debtor is a corporation, insiders include: directors, officers, persons in control, partnerships in which the debtor is a general partner, a general partner of the debtor, and the relatives of a general partner, director, officer, or person in control of the debtor.   If the debtor is a partnership, insiders include: general partners, relatives of a general partner in, general partner of, or person in control of the debtor, partnerships in which the debtor is a general partner, persons in control of the debtor. If the debtor is a municipality, insiders include: elected officials of the debtor or relatives of elected officials of the debtor.  An insider of an affiliate of a debtor is an insider of the debtor. Managing agents of debtors are also treated as insiders.

David and Jon – if the omnibus was legitimized by the preliminary injunction and until the day of the filing gave control to See Cubic  does that make SeeCubic or Shad a person in control or an insider?

The list set forth in §101(31) of the Bankruptcy Code is not exhaustive because it is prefaced by the word "includes". Courts have recognized non-statutory insiders that fall within the definition but outside of any of the enumerated categories.  The Third Circuit held in Winstar that: when the relationship between a debtor and a creditor is sufficiently close to suggest that transactions were not conducted at arm's length, the creditor may be considered a non-statutory insider.  Schubert v. Lucent Techs., Inc. (In re Winstar Comm'ns, Inc.), 554 F.3d 382 (3d Circuit 2009).  Mere participation or influence may not be sufficient even if it includes a seat on a debtor's governing body.  In Capmark Fin. Grp. Inc., v. Goldman Sachs Credit Partners L.P., 491 B.R. 335 (S.D.N.Y. 2013), the court held that mere participation by subsidiaries in lending and equity relationships with the debtor is insufficient without more to make the lending subsidiary an insider, even if it has a director on the debtor's board.

We care about the insider designation because a debtor in possession or a trustee may avoid and recover preferential transfers made by a debtor to a creditor only within the 90-day period preceding the filing of the debtor's bankruptcy petition unless the creditor is an insider. If the creditor is an insider, the Bankruptcy Code authorizes the avoidance and recovery of preferential transfers made during the one-year period preceding the filing of the debtor's bankruptcy petition. 11 U.S.C. § 547.

9.        Do we have any of the non-insider investors or creditors on our side?

Yes, that is my understanding. I want to go over with Mathu who and we will be trying to get support for the bankruptcy plan with key people in the supply chain.  Mathu or Bud  can you list who on the top twenty we have a good relationship?

**AT** Armstrong Teasdale

Armstrong Teasdale LLP
**David L. Going** | Partner
7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847
DIRECT: 314.342.8010 | FAX: 314.612.2250 | MAIN OFFICE: 314.621.5070
dgoing@armstrongteasdale.com
www.armstrongteasdale.com

Please consider the environment before printing this email.

---

**From:** Rafael X. Zahralddin-Aravena
**Sent:** Tuesday, March 16, 2021 10:29 AM
**To:** David Going
**Subject:** FW: Call me if you have some time tomorrow or Sunday

---

**From:** Rafael X. Zahralddin-Aravena
**Sent:** Saturday, March 13, 2021 12:03 AM
**To:** John A. Sten <JSten@atllp.com>
**Subject:** Call me if you have some time tomorrow or Sunday

Dear John,

Might need some help in a new matter. Being hired this weekend.

We are being retained to represent VTI – lender and party that is being capitalized and supported by various investors that is financing the bankruptcy of StreamTV.

There is a dispute with a former insider -Shad Stasney- I have included their motion to dismiss.

There are potential other suits against Mr. Stasney and others.

Let me know when you have time.



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

# App. Ex. 10

## JOINT DEFENSE AND COMMON INTEREST AGREEMENT

This Joint Defense and Common Interest Agreement (the "**Agreement**") is entered into as of March 15, 2021 ("**Effective Date**") by and between the undersigned counsel, Armstrong Teasdale LLP ("**AT**"), acting for and on behalf of Visual Technology Innovations, Inc. (the Debtor in Possession Lender) ("**VTI**"), and Dilworth Paxson, LLP ("**Dilworth**") and Stream TV Networks, Inc. ("**Debtor**"), (which clients are hereinafter collectively referred to herein as the "**Parties**"), for the purpose of setting forth their agreements regarding the furthering of the Parties' common interests and joint defense in connection with the chapter 11 of the Debtor, including but not limited to litigation matters and support of the chapter 11 plan process (the "**Stream Chapter 11**").

### WITNESSETH:

WHEREAS, the Parties agree that their defense and representation of the Parties generally involves legal issues that are mutually important to the Parties and substantially similar legal interests, and thus create a commonality of interest between them with respect to the Stream Chapter 11, any related matters, or other actions; and

WHEREAS, the Parties have in the past shared, and may continue to share, confidential information relating to, and in furtherance of, their common legal interests and desire to cooperate in developing and pursuing a common legal strategy in order to protect their respective legal rights and interests in connection with the Stream Chapter 11; and

WHEREAS, the Parties have understood, and continue to understand, that such exchanges of information are intended to be privileged and confidential; and

WHEREAS, the Parties agree that the sharing of information among themselves is in each Party's individual and mutual best interests; and

WHEREAS, the Parties wish to preserve, to the maximum extent possible, any applicable privilege or protection (including, but not limited to, the attorney-client privilege, the attorney work product doctrine, common interest privilege and the business strategy privilege) that they may have specifically relating to all Common Interest Information (as that term is defined below), and to provide a means of sharing between the Parties Common Interest Information specifically relating to the Parties' joint and/or common legal interests therein; and

WHEREAS, prior to the Effective Date the Parties had, or may have had, communications that relate to the subject matter of this Agreement (the "**Early Communications**") and this Agreement is intended to include all such Early Communications; and

122172691_2      1

**TRUSTEE 8**

WHEREAS, the Parties have been fully advised by counsel of the possibility that one of the Parties may in the future decide that it is in its or his best interests to assert positions in connection with the Stream Chapter 11 that may be adverse to the position held or asserted by the other Party, but agree that, until such time as an actual conflict shall emerge or become obvious, it is in their mutual best interests to enter into this Agreement, and believe that the benefits of being a party hereto are such that they would be willing, as a condition precedent to the receipt of Common Interest Information hereunder, to waive any actual, perceived or potential conflicts of interest arising out of, or in connection with, any sharing of Common Interest Information pursuant to this Agreement and any right to seek the disqualification of counsel for any Party based, in whole or in part, on the sharing of such information.

NOW THEREFORE, in consideration of the promises and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is individually acknowledged by each of the undersigned, the undersigned agree and confirm the foregoing recitals and further agree as follows:

1.      Common Interest Information shall include, but not be limited to, the following: all documents, financial information, oral and written communications, recordings, attorney work product, material provided to, or prepared by, any attorney, consultant, financial advisor, expert, or any other professional retained by any Party, tactics and strategy, any trade secrets, and any other material of whatever nature, relating to the Parties or any of the Claims.

2.      All Common Interest Information previously shared or to be shared between the Parties, and all Common Interest Information derived from any Common Interest Information so exchanged, shall be deemed subject to the terms of this Agreement. All Common Interest Information which is privileged or protected as to each of the Parties, and their counsel, shall remain privileged or protected when communicated to the other Party or counsel to the other Party to the maximum extent permitted by law.

3.      If any Party receives a motion or a court order, a subpoena or other request(collectively "**Legal Process**") from any person or entity seeking or requiring production or discovery of any Common Interest Information, the Party subject to the Legal Process shall immediately notify the other Party and shall not produce any Common Interest Information without first permitting the other Party a reasonable opportunity to protect their respective interests by motion in an appropriate forum, except to the extent that such notification has been given, and Legal Process requires the Party served to produce or permit discovery of Common Interest Information before the other Party notified have been able to obtain an order of a court of competent jurisdiction, relieving the Party from whom such Common Interest Information is sought from the obligations of such Legal Process. Subject to the provisions of this Agreement, the obligations of confidentiality and nondisclosure of the Common Interest Information shall be continuous and non-terminating, except by consent of all of the Parties and shall survive the termination or conclusions, in whole or in part, of any claim, action or

dispute arising out of the Stream Chapter 11, as well as any termination or withdrawal by a Party from this Agreement.

122172691_2      3

4.      A Party may voluntarily choose to share with the other Party such Common Interest Information as the Party deems appropriate and consistent with law, and no obligation or duty to share any such Common Interest Information is created by this Agreement.   Nothing in this Agreement shall be construed to affect the separate and independent representation of each client by its respective counsel or to require any Party to share privileged or other information or communications with the other Party. Nothing in this Agreement shall limit the rights of any Party to use or disclose any document or information that has been independently obtained or prepared solely by such Party or its agent, nor shall anything in this Agreement prevent or limit the Party originating or creating any such document or information from using such document or information in any way that such Party, in its sole discretion, shall deem appropriate.

5.      Nothing contained in or contemplated by this Agreement shall be deemed to create an attorney-client or fiduciary relationship between any attorney (or firm) and anyone other than the client of that attorney (or firm).   No attorney (or firm) who has entered into this Agreement shall be disqualified, because of such attorney's (or firm's) participation in this Agreement, from examining or cross-examining any Party hereto or any recipient of Common Interest Information who may testify in any legal proceedings.

6.      Except as set forth in this Agreement (including, without limitation, paragraphs 2and 3), no Party shall share or disclose any Common Interest Information with anyone except (a) the Parties; (b) counsel (both in-house and outside) for the Parties (and their secretaries, support staff and/or legal assistants); and (c) as needed, consultants, experts, advisors, and other professionals specially retained to assist counsel or the Parties in connection with the Stream Chapter 11.   Access to Common Interest Information shall only be provided to such persons to the extent that the Party (or its counsel) determines, in good faith, that the disclosure of the Common Interest Information to such person is necessary in the discharge of its duties to such Party and in relation to the Stream Chapter 11.   Any person to whom Common Interest Information is disclosed who is a non-signatory to this Agreement shall be specifically advised of the existence of this Agreement, the privileged nature of any Common Interest Information shared and the duty to maintain such information in confidence.   All Common Interest Information shared or disclosed pursuant to the terms of this Agreement shall be used by the recipients thereof solely in connection with the Stream Chapter 11 in the pursuit of matters as to which the Parties share a common legal interest and shall not be used or disclosed to anyone for any other purpose whatsoever.   The sharing of Common Interest Information pursuant to this Agreement shall not prevent a Party from asserting any claim, at law or in equity, against the other Party in any proceeding.   In any such proceeding, no Party may use against the other Party (or additional parties to that proceeding) any Common Interest Information received from the other Party or jointly developed by or on behalf of the Parties to this Agreement, nor shall any written or oral statements made by one Party to another Party (or their counsel) covered by this Agreement be deemed an admission or be admissible as against the other Party in any proceeding.   For the avoidance of doubt, in any such proceeding any Party may use any information received or obtained after the termination of this Agreement as to such Party

through discovery or otherwise, notwithstanding that the same information was theretofore received in accordance herewith.

7.     In the event that a Party is no longer involved in the Stream Chapter 11:(a) this Agreement shall continue to be binding on such Party, and such Party's obligation to protect the confidentiality of all Common Interest Information shall continue; and (b) such Party shall, to the extent permitted by law, redact, destroy or return to the Party that disclosed the information all Common Interest Information, including, but not limited to, all documents and records that contain, reveal or reflect any such Common Interest Information.

8.     The Parties agree that any disclosure of Common Interest Information or Early Communications that occurred prior to or after the Effective Date, but before the execution of this Agreement, are subject to and remain subject to this Agreement.

9.     A Party may withdraw from this Agreement at any time and for any reason upon written notification, served by facsimile, electronic mail or hand delivery upon the other Party. In the event that counsel for any Party shall determine that his or its client no longer has, or will no longer have, a commonality of interest with the other Party hereto, such counsel shall promptly provide written notice to the other undersigned counsel of his or its client's withdrawal from this Agreement, upon which this Agreement shall immediately be terminated as to that client.  Except as provided in this Agreement, any withdrawal and resulting termination of this Agreement will be solely on a prospective basis and the withdrawing Party (and any person to whom he, she, or it has disseminated Common Interest Information pursuant to the terms of this Agreement) shall: (a) remain bound by this Agreement; (b) subject to the terms hereof, continue to be obligated to maintain at all times the privileged and confidential nature of all Common Interest Information communicated to that Party; and (c) promptly return to the Party that disclosed the information all such Common Interest Information, including, but not limited to, all documents and records that contain, reflect or reveal any such Common Interest Information.

10.     Within thirty (30) days of receipt of written notice by any Party of the termination of the Stream Chapter 11, each of the Parties shall, to the extent permitted by law, destroy or return to the Party that disclosed the information, if requested by the disclosing Party, all Common Interest Information, including, but not limited to, all documents and records that contain, reveal or reflect any Common Interest Information.  The Parties expressly acknowledge and agree that no adequate remedy is available at law for breach of this Agreement and that, in addition to any other remedies available, performance of this Agreement may be specifically ordered, or a breach hereof may be enjoined, or both.

11.     This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without reference to principles of choice or conflict of laws.

12.     The provisions of this Agreement may only be modified by written agreement signed by both undersigned counsel.

13.     In the event any provision of this Agreement should be held to be invalid, illegal

or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby.

14.     This Agreement is not intended to, and shall not, create rights in any person or entity not a Party hereto.

15.     This Agreement may be executed in counterparts, each of which, when so executed and delivered, shall be deemed to be an original and shall be binding on the Party who, through his or its counsel, signed the counterpart, both of which together shall constitute a single agreement.

16.     This Agreement constitutes the complete agreement of the Parties with respect to the subject matter hereto and memorializes and supersedes any prior or written agreements and applies to all prior and future communications and exchanges of Common Interest Information.

IN WITNESS WHEREOF, the parties have caused this Joint Defense and Common Interest Agreement to be executed as of the Effective Date.


**Visual Technology Innovation Inc.**

By: _____

Rafael X. Zahralddin-Aravena (No. 4166)
Armstrong Teasdale, LLP
*Counsel to VTI*

**Stream TV Networks, Inc.**

By: _____

Martin J. Weis (I.D No. 4333)
Dilworth Paxson, LLP
*Proposed Counsel for Debtor in Possession*

122172691_2     8

# App. Ex. 11

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
|  |  |
| Stream TV Networks, Inc. | Case No. 21-10433 (KBO) |
|  | **Re: D.I. 16, 30** |
|  | **Hearing Date: March 22, 2021 at 10:00 a.m. (ET)** |
| Debtor. | **Objection Deadline: March 18, 2021 at 4:00 p.m. (ET) (For U.S. Trustee)** |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION (A) TO MOTION OF STREAM TV NETWORKS, INC. FOR ENTRY OF ORDER: (I) AUTHORIZING IT TO OBTAIN POST-PETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING IT TO ENTER INTO THE SUPPORT AGREEMENT, AND (III) GRANTING ADMINISTRATIVE PRIORITY CLAIMS TO LENDER PURSUANT TO SECTION 364 OF BANKRUPTCY CODE AND MODIFYING THE AUTOMATIC STAY TO IMPLEMENT THE TERMS OF THE ORDER AND (B) STREAM TV NETWORKS, INC. MOTION FOR AUTHORIZATION TO CONTINUE INSURANCE COVERAGE ENTERED INTO PRE-PETITION AND HONOR OBLIGATIONS RELATED THERETO**

Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U.S. Trustee"), through his undersigned counsel, files this objection and reservations of rights ("Objection") to the *Motion Of Stream Tv Networks, Inc. For Entry Of Order: (I) Authorizing It To Obtain Post-Petition Financing Pursuant To Sections 363 And 364 Of The Bankruptcy Code, (II) Authorizing It To Enter Into The Support Agreement, And (III) Granting Administrative Priority Claims To Lender Pursuant To Section 364 Of Bankruptcy Code And Modifying The Automatic Stay To Implement The Terms Of The Order* ("DIP Financing Motion") filed at D.I. 30 and *Stream TV Networks, Inc. Motion For Authorization To Continue Insurance Coverage Entered Into Pre-Petition And Honor Obligations Related Thereto* ("Insurance Motion") at D.I. 16, and in support of this Objection states as follows:

1

## PRELIMINARY STATEMENT

1.     The U.S. Trustee objects to the DIP Financing Motion because the Debtor has not demonstrated a need to incur up to $1 million in unsecured, insider debt with administrative priority status. Here, the Debtor appears to no longer own its significant assets, and the entity proposed to provide the financing was formed two months ago by the Debtor's President and CEO and has no purpose other than to fund this case and pay the Debtor's proposed professionals.  The Debtor has not established a sound business justification to saddle this estate with up to $1 million in priority unsecured debt, and it is possible this case should not remain in chapter 11.[1]  The U.S. Trustee likewise objects to the Insurance Motion; the Debtor has not developed a record showing that such payments are presently necessary.

2.     Alternatively, the U.S. Trustee requests that this Court reserve ruling on the DIP Financing Motion and the Insurance Motion until the Court adjudicates the Motion to Dismiss (defined below).

## JURISDICTION

3.     Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine the Objection.

4.     The U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district, pursuant to 28 U.S.C. § 586. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts to guard against abuse and over-reaching to assure fairness in the process and adherence to the provisions of the Bankruptcy Code. *See In re United Artists Theatre Co.*, 315

---

[1] If this Court finds that there is a present need for the Debtor to incur a financing obligation, the U.S. Trustee requests and has discussed with the Debtor that such amount should be limited and the authority to borrow should be granted on an interim basis until this Court rules on the Motion to Dismiss (discussed below).

F.3d 217, 225 (3d Cir. 2003) ("U.S. Trustees are officers of the Department of Justice who protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings."); *United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 298 (3d Cir. 1994) ("It is precisely because the statute gives the U.S. Trustee duties to protect the public interest . . . that the Trustee has standing to attempt to prevent circumvention of that responsibility."); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 499 (6th Cir. 1990) ("As Congress has stated, the U.S. trustees are responsible for protecting the public interest and ensuring that the bankruptcy cases are conducted according to [the] law").

5.      Under § 307 of title 11 of the United States Code (the "Bankruptcy Code" or "Code"), the U.S. Trustee has standing to be heard on the issues raised in this Objection.

### PROCEDURAL HISTORY AND FACTUAL BACKGROUND

*Procedural History*

6.      On February 24, 2021 (the "Petition Date"), Stream TV Networks, Inc. (the "Debtor," or the "Company") filed a voluntary petition for relief under chapter 11 of the Code.

7.      The Debtor filed the Application to Retain Dilworth Paxson LLP as Bankruptcy Counsel D.I. 15 and the Insurance Motion D.I. 16 on February 25, 2021.

8.      The Debtor filed the DIP Financing Motion on March 1, 2021.

9.      On March 12, 2021, the Debtor filed the *Declaration of Mathu Rajan In Support of First Day Motions* ("Rajan Declaration") at D.I. 51.

10.     A creditors' meeting under section 341 of the Code is scheduled for March 31, 2021 at 1:00 p.m.

*Debtor's History*

11.     The Debtor was founded in 2009, and as of the date hereof, has never generated revenue.  *See* D.I. 30 at ¶ 1.  Its executive office is in Philadelphia, Pennsylvania and it is

3

incorporated in Delaware. The Debtor does not have any employees nor operations. As of the

Petition Date, the Debtor's sole board member and Chief Executive Officer ("CEO") is Mathu

Rajan ("Mr. Rajan"). Mr. Rajan directly and indirectly owns about nine percent of the Debtor's

equity. *See* Corporate Ownership Statement (Rule 7007.1) at D.I. 5.

12. The Debtor expects to launch a technology that "allows TV and tablet

manufacturers to convert two dimensional devices into three dimensional ("3D") without the need

for viewing glasses." *See* D.I. 30 at ¶ 7.

13. A visit to "streamtvnetworks.com" reveals a message that says

> Stream TV Networks, along with all subsidiaries and all associated
> assets, has been acquired by SeeCubic, Inc. The groundbreaking
> glasses-free 3D technology, UltraD, was developed by SeeCubic
> BV in the Netherlands and is now the cornerstone of a new &
> innovative international company, SeeCubic, Inc.
>
> A new and invigorated management team has been created with
> industry leading senior executives who have merged their vision
> with the technology from the core engineers who developed this
> revolutionary product.

*See* Home Page, www. Streamtvnetworks.com (last visited March 18, 2021 at 5:50 A.M.).

14. SeeCubic and the Debtor have a significant pre-petition litigation history.

***SeeCubic Dispute***

15. On December 8, 2020, Vice Chancellor Laster of the Chancery Court of the State

of Delaware issued a non-final opinion and order in favor of SeeCubic pertaining to competing

motions for preliminary injunctions filed by SeeCubic and the Debtor earlier that year. *See Stream*

*TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-0766-JTL, Opinion and Order Granting

Preliminary Injunction, D.I. 213, 124 (Del. Ch. Dec. 8, 2020) (respectively, "Chancery Court

Opinion" and "Chancery Court Order"). The Debtor moved in the Chancery Court for a

preliminary injunction preventing SeeCubic from enforcing the Omnibus Agreement (defined

4

below), whereas SeeCubic argued the opposite. The competing motions turned on the validity

of the Omnibus Agreement (defined below).

16. In short, the Chancery Court Opinion confirms the validity of a May 2020

agreement ("Omnibus Agreement") between the Debtor, the Debtor's senior secured creditor, SLS

Holdings VI, LLC ("SLS"), the Debtor's junior secured creditor, Hawk Investments Holdings

Limited ("Hawk"), and fifty-two of the Debtor's stockholders ("Equity Investors"). *See* Chancery

Court Opinion, slip. op. at 1-4. Importantly, the Chancery Court held that, in the Omnibus

Agreement,

> [the Debtor] agreed to transfer ***all of*** its assets to SeeCubic, a newly
> formed entity controlled by its secured creditors. [The Debtor] also
> granted its secured creditors a power of attorney to effectuate the
> transfers. [The Debtor's] secured creditors already held security
> interests in all of the [the Debtor's] assets and had the right to
> foreclose on those assets. In the Omnibus Agreement, [the
> Debtor's] secured creditors agreed to release their claims against
> [the Debtor] upon competition if the transfers of [the Debtor's]
> assets to SeeCubic.
>
> If [the Debtor's] secured creditors had foreclosed on [the Debtor's]
> assets, then [the Debtor] and its stockholders would have been left
> with nothing. Instead, the Omnibus Agreement provided [the
> Debtor's] minority investors with the right to swap their shares in
> [the Debtor] for shares in SeeCubic. The Omnibus Agreement also
> provided for the issuance of one million shares in SeeCubic to [the
> Debtor].

*See* Chancery Court Opinion, slip. op. at 1 (emphasis added).[2]

17. The impetus for the execution of the Omnibus Agreement appears to have been the

Debtor's financial struggles. By May 2020, the Debtor "had defaulted on more than $50 million

in debt to its secured creditors, owed another $16 million to trade creditors, and could not pay the

---

[2] Notably, the Chancery Court found "[e]veryone agrees that the Omnibus Agreement encompasses ***all of*** [the
Debtor's] assets." Chancery Court Opinion, slip. op. at 27 (emphasis added).

5

bills as they came due." *See id.*  The Debtor had also missed payroll at the beginning of 2020 and furloughed some employees.  *See id.*

18.    Accordingly, the Chancery Court Order preliminarily enjoined Mr. Rajan from taking any action to interfere with the Omnibus Agreement, including, among other specifically enumerated acts:

> (g) Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, licensing, spending, withdrawing, mortgaging, granting a lien or security interest in, or otherwise disposing of the Assets in a manner inconsistent with the Omnibus Agreement.

Chancery Court Order at ¶ 1 (g).

19.    Included within the Chancery Court Opinion are many "facts as they appear reasonably likely to be found after trial, based on the current record."  *See* Chancery Court Opinion slip. op. at 5.  Among those facts are: (i) several outside directors have resigned from their roles between 2015 and 2020; (ii) throughout its existence, the Debtor's "corporate governance practices have been virtually nonexistent"; (iii) the Debtor "has never held annual meeting of the stockholders and has not kept regular minutes of Board meetings"; and (iv) the Debtor "has officers and employees, but their roles are not well defined."  *See id*. at 6.

20.    As of February 25, 2021, the competing motions appear to have been almost fully briefed by all parties and awaiting final adjudication by the Chancery Court.

21.    SeeCubic has appeared in this case, and on March 12, 2021, filed the *Motion Of SeeCubic, Inc. And SLS Holdings VI, LLC For An Order Dismissing Debtor's Chapter 11 Case* ("Motion to Dismiss") filed at D.I. 46.  A hearing on the Motion to Dismiss is scheduled for April 15, 2021.

*DIP Financing Motion*

22.     Against this backdrop, shortly after the Petition Date, the Debtor filed the DIP Financing Motion without a supporting declaration nor a projected budget for use of the proposed financing. *See* D.I. 30. In sum, the DIP Financing Motion requests authority to borrow up to $1 million ("Financing Obligation") from Visual Technology Innovations, Inc ("VTI"). *See* D.I. 30 at ¶. 2.b. The Debtor requests that the Financing Obligation, which is unsecured, be afforded administrative expense status under sections 364(b) and 503(b)(1). *See id.* at ¶ 2.n.

23.     The proceeds of the financing can be used for

> (ii) the payment of any and all costs and expenses of [Debtor] incurred in the normal course of its business (including, without limitation, the payment of any indemnification or other obligations of the [Debtor] owing to any managers or officers of the [Debtor] at any time when there is no Bankruptcy Case pending; (iii) the payment of any and all (a) administrative expenses incurred during the pendency of any Bankruptcy Case that have been allowed by an order of the Bankruptcy Court as well as the payment of an additional retainer of $100,000 to counsel for the Payee in the Bankruptcy Case and (b) other costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in the judgment of the Payee's Board, collectively including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business during the pendency of the Bankruptcy Case; and (iv) the funding of any amounts necessary to cause the Support Account to contain at least $50,000 at all times prior to the effective date of a Plan[.]

*See id.* at ¶ 2.i.

24.     Mr. Rajan formed VTI in January 2021. *See Declaration Of Lawrence G. McMichael Of Dilworth Paxson LLP And Statement Pursuant To Bankruptcy Rules 2014 And 2016(B) And Local Bankruptcy Rules 2014-1 And 1026-1* ("McMichael 2014 Declaration") at D.I. 15.1, ¶ 11. Mr. Rajan is the "principal of both VTI and [the Debtor]," and he "presently owns or controls approximately 11.5% of VTI but anticipates that amount will exceed 98%." *See* D.I. 30

7

at fn. 2.  Within the last week, VTI has gained at least five more directors, half of which were appointed by Mr. Rajan.  *See* VTI's Response in Support of DIP Financing Motion at D.I. 67.[3]  In addition to the proposed financing, VTI also appears to have funded the retainer of proposed Debtor's counsel, Dilworth Paxson LLP ("Dilworth"), with equity infusions by various entities, many of which are either associated or affiliated with current equity holders of the Debtor.  *See* McMichael 2014 Declaration at ¶. 11; *accord* Supplemental McMichael Declaration at D.I. 60.  There is no information in the record about VTI's financial wherewithal to finance this bankruptcy case.  The Rajan Declaration states that VTI "intends to be an operating company with no present ties to Stream, although there could potentially be interaction between the two companies in the future, including a potential merger of the two entities. VTI has hired employees that had previously been employed with the Debtor."  *See* Rajan Declaration at ¶ 20 b.

25.     The DIP Financing Motion and proposed order thereto requests that this Court grant the protections of section 364(e) of the Code to the Financing Obligation.  Additionally, the Debtor also requests that VTI have no exposure to "lender liability . . . for any claims arising from any and all activities by the Debtor in the operation its business in connection with the Debtor's post-petition restructuring efforts."  *See* D.I. 30-1 at ¶ 17.

***Insurance Motion***

26.     In the Insurance Motion, the Debtor requests authority to pay pre-petition and post-petition amounts due under a business insurance policy and a workers compensation insurance policy.  The amounts due will be paid by non-debtors MediaTainment, Inc. and VTI.  The premium balance remaining on the business policy is $6,240.00, and $1,945.80 is due on the workers compensation policy.

---

[3] It is not clear to the U.S. Trustee whether Mr. Rajan has resigned from VTI's board.

## ARGUMENT

### I.    There is No Need for the Relief Requested in the DIP Financing Motion.

27.    The Debtor has not established a need for the Financing Obligation nor a justification to burden the Debtor with more debts.  Although the DIP Financing Motion is replete with assertions that the Debtor needs the funds to "pay it current and ongoing expense[s]," and that if those expenses are not paid, "the Debtor will be forced to discontinue any efforts to operate, which would likely result in irreparable harm to its business," the only statements in the record in support of these assertions is that the Debtor "retains title by physical possession of most of its business assets," *see* Rajan Declaration at ¶ 59, and  VTI's Response in Support of DIP Financing Motion.  VTI's statement does not settle the central, threshold question in this case: what assets are there to reorganize in this case?

28.    Unlike the usual custom and practice, the Debtor has not submitted a budget showing its expenses in connection with the DIP Financing Motion.  It seems doubtful that assets of significant value remain in the Debtor's estate in light of the Chancery Court Opinion and Order. Parties in interest, therefore, are in the dark about the alleged need to incur the significant Financing Obligation, which is proposed to have priority over all other general unsecured claims in this case.  Although the Debtor's *Initial Monthly Operating Report* filed at D.I. 44 appears to show some line-item disbursements, the bulk of which, appear to be budgeted for "inventory purchases," in the context of a non-operating, pre-revenue business, where a secured creditor appears to have control and ownership over many of the assets, it is hard to understand why such expenses are necessary and what purpose they serve.

29.     Therefore, the U.S. Trustee respectfully submits that this Court should deny the relief requested in the DIP Financing Motion.

## II.     Incurring the Financing Obligations is Not Entirely Fair.

30.     Under entire fairness standard often applied in the context of a financing proposal pursuant to section 364 of the Code, the Financing Obligation is improper, and the Debtor should not, at this juncture, be authorized to incur it.

31.     Under section 364(b) of the Code, "[t]he court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense."  Generally, "courts will almost always defer to the business judgment of a debtor in the selection of the lender." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (noting that "[t]he business judgment rule under Delaware law and the law of numerous other jurisdictions establishes a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.").

32.     The business judgement rule, however, does not apply if one of these four elements is established: "(1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent." *Id*. at 313.  If one of these elements is established, then the transaction must be evaluated under the entire fairness standard, which requires: (1) fair dealing; and (2) fair price. *Id*. at 314.

33.     Here, because Mr. Rajan sits on both sides of the proposed Financing Obligation transaction, he is not disinterested.  The decision to choose VTI as lender and the transaction

10

generally must, therefore, be evaluated under the entire fairness standard. The total amount of the Financing Obligation is $1 million. This is a large sum in the context of a Debtor that is not operating, is pre-revenue, and appears to have lost ownership over many of its assets. This amount is proposed to have priority over all general unsecured claims in this case. It is unclear whether VTI has the financial wherewithal to support this case as it was formed two months ago and "intends to be an operating company" that may merge with the Debtor.

34.     Therefore, the U.S. Trustee submits that this Court should not grant the relief requested in the DIP Financing Motion.

### III.     There Is No Record To Justify The Relief Requested In The Insurance Motion.

35.     Although the U.S. Trustee agrees that maintaining insurance is necessary to preserve estate value, for the same reasons discussed above concerning the failure to show a need for the DIP Financing, the Debtor likewise has not shown a valid reason to have this court sanctify payments by insiders for insurance policies for the benefit of the Debtor, where the Debtor has no employees, no assets, and no operations.

### REQUEST TO ADJOURN MARCH 22, 2021 HEARING

36.     Alternatively, the U.S. Trustee respectfully submits that this Court should reserve ruling on the DIP Financing Motion and Insurance Motion until such time after this Court adjudicates *Motion Of SeeCubic, Inc. And SLS Holdings VI, LLC For An Order Dismissing Debtor's Chapter 11 Case* because authorizing the Debtor to incur such a sizable debt might prove futile if this case is ultimately dismissed. The Debtor, nor any other party in interest, will be prejudiced by this adjournment because the Debtor has not articulated an immediate need for this financing, and it appears trade creditors have not been paid since May 2020.

## RESERVATION OF RIGHTS

37.     The U.S. Trustee reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection, file an appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee requests that this Court Deny the FIP Financing Motion to the extent set forth above, or in the alternative, adjourn the hearing on the DIP Financing Motion until such time after this Court adjudicates the *Motion Of SeeCubic, Inc. And SLS Holdings VI, LLC For An Order Dismissing Debtor's Chapter 11 Case* filed at D.I. 46.

Dated: March 18, 2021.                          Respectfully submitted,
      Wilmington, Delaware
                                               **ANDREW R. VARA**
                                             **UNITED STATES TRUSTEE**

                                 By:  /s/ *Rosa Sierra*
                                        Rosa Sierra
                                        Trial Attorney
                                        United States Department of Justice
                                        Office of the United States Trustee
                                        J. Caleb Boggs Federal Building
                                        844 King Street, Suite 2207, Lockbox35
                                        Wilmington, Delaware 19801
                                        Phone: (302) 573-6492
                                        Fax:    (302) 573-6497
                         Email: rosa.sierra@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Rosa Sierra, hereby attest that on March 18, 2021, I caused to be served a copy of this Omnibus

Objection to DIP Financing Motion and Insurance Motion by electronic service on the registered parties via

the Court's CM/ECF system and upon the following parties:

**Proposed Debtor's Counsel**
DILWORTH PAXSON LLP
Martin J. Weis
One Customs House – Suite 500
704 King Street
P.O. Box 1031
Wilmington, DE 19801
mweis@dilworthlaw.com

Lawrence G. McMichael
Anne M. Aaronson
Yonit A. Caplow
1500 Market St., Suite 3500E
Philadelphia, PA 19102
lmcmichael@dilworthlaw.com
aaaronson@dilworthlaw.com
ycaplow@dilworthlaw.com

*Counsel for SLS*
ROBINSON COLE
Davis Lee Wright (No. 4324)
James F. Lathrop (No. 6492)
1201 N. Market Street, Suite 1406
Wilmington, DE 19801
Telephone: (302) 516-1700
dwright@rc.com
jlathrop@rc.com

QUARLES & BRADY LLP
Brittany S. Ogden
33 East Main Street Suite 900
Madison, Wisconsin 53703
Telephone: (608) 251-5000
Brandon M. Krajewski
411 East Wisconsin Avenue Suite 2400
Milwaukee, Wisconsin 53202
Telephone: (414) 277-5000
Alissa Brice Castañeda
Gabriel M. Hartsell

14

One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 229-5200
brittany.ogden@quarles.com
brandon.krajewski@quarles.com
alissa.castaneda@quarles.com
gabriel.hartsell@quarles.com

*Counsel for SeeCubic*
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Joseph O. Larkin
Jenness E. Parker
Jason M. Liberi
920 N. King Street, One Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Eben P. Colby
Marley Ann Brumme
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Telephone: (617) 573-4800
joseph.larkin@skadden.com
jenness.parker@skadden.com
jason.liberi@skadden.com
eben.colby@skadden.com
marley.brumme@skadden.com

*Counsel for VTI*
ARMSTRONG TEASDALE LLP
Rafael X. Zahralddin-Aravena
Jonathan M. Stemerman
300 Delaware Ave., Suite 210
Wilmington, DE 19801
Telephone: 302-824-7089
rzahralddin@atllp.com
jstemerman@atllp.com

**Counsel for Iinuma Gauge Mfg. Co., Ltd.**
BAYARD
Daniel N. Brogan
dbrogan@bayardlaw.com
600 North King Street, Suite 400
P.O. Box 25130 Wilmington, DE 19899

15

***Counsel for IMG Media, Ltd.; Trans World International LLC; and other affiliates of Endeavor Operating Company, LLC***
Jennifer R. Hoover, Esq.
John C. Gentile, Esq.
BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP
1313 N. Market St., Suite 1201
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
jhoover@beneschlaw.com
jgentile@beneschlaw.com

16

# App. Ex. 12

**From:** Mathu Rajan <mathu.rajan@vti-global.com>
**Sent:** Monday, March 15, 2021 11:47 AM EDT
**To:** Amanda Von Ahnen <amanda.vonahnen@vti-global.com>; Nicole Maneen <nicole.maneen@vti-global.com>; Dan Rink <dan.rink@vti-global.com>; Suby Joseph <suby.joseph@vti-global.com>; Raja Rajan <raja.rajan@vti-global.com>; Bud Robertson <bud.robertson@vti-global.com>
**Subject:** Fwd: Substantive Consolidation

---------- Forwarded message ----------
**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Date:** Mar 15, 2021, 11:39 AM -0400
**To:** Mathu Rajan <mathu.rajan@vti-global.com>, 'Dan Rink' <dan.rink@vti-global.com>, raja.rajan@vti-global.com <raja.rajan@vti-global.com>
**Subject:** Substantive Consolidation

**Attorney Client Communications**

https://www.gibsondunn.com/two-recent-cases-demonstrate-that-disputes-over-substantive-consolidation-are-a-live-issue-for-corporate-debtors-in-chapter-11/

While I think we should have a joint defense agreement, me being on a call is not necessarily going to result in substantive consolidation (in this case, pulling VTI into the bankruptcy).  What will do that are the current conditions set up to date in the case, no plan, undercapitalization, no DIP, etc.

I am more concerned with the DIP motion and a lack of milestones in showing that VTI is separate from Stream.



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner

300 Delaware Avenue, Suite 210, Wilmington, DE 19801

MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

\*\*\*\*\*\*\*\*\*\* **PRIVATE AND CONFIDENTIAL**\*\*\*\*\*\*\*\*\*\*

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is**

**TRUSTEE 5**

authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our **International Legal Notices**.

# App. Ex. 13

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Monday, March 15, 2021 6:57 PM EDT
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>; Weis, Martin J. <mweis@dilworthlaw.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>
**CC:** raja@streamacquisitiongroup.com <raja@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; SAG - SJ <suby@streamacquisitiongroup.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**Subject:** RE: Call with Team today [IWOV-IDOCS.FID4100085]
**Attachment(s):** "2135732 (1).pdf","2135085.pdf","3318996 (1).pdf"

Mathu has asked me to pull together the research and a draft of the executory contract motion which we will then turn over to you all and I will also look at the fraudulent conveyance issue.

Attached is one order and two "worldwide" stay motions filed by Paul Hastings in two cases here in Delaware in front of Judge Sontchi – these both seem applicable to our issues with assets in other jurisdictions.

These might be useful in addition or as a prelude to a more direct stay violation motion.  These are a shield and proactive as opposed to the stay enforcement.

 Armstrong Teasdale

Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

---

**From:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>
**Sent:** Monday, March 15, 2021 3:09 PM
**To:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Weis, Martin J. <mweis@dilworthlaw.com>; 'amanda@streamacquisitiongroup.com' <amanda@streamacquisitiongroup.com>
**Cc:** raja@streamacquisitiongroup.com; dan@streamacquisitiongroup.com; 'SAG - SJ' <suby@streamacquisitiongroup.com>; mathu@streamacquisitiongroup.com; bud@streamacquisitiongroup.com; nicole@streamacquisitiongroup.com
**Subject:** RE: Call with Team today [IWOV-IDOCS.FID4100085]

I can do before 5 after this IDI is finished.

**ANNE AARONSON |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

---

**From:** McMichael, Lawrence G.
**Sent:** Monday, March 15, 2021 2:55 PM
**To:** 'Rafael X. Zahralddin-Aravena'; Weis, Martin J.; 'amanda@streamacquisitiongroup.com'; Aaronson, Anne M.
**Cc:** raja@streamacquisitiongroup.com;dan@streamacquisitiongroup.com; 'SAG - SJ';mathu@streamacquisitiongroup.com;bud@streamacquisitiongroup.com;nicole@streamacquisitiongroup.com
**Subject:** RE: Call with Team today [IWOV-IDOCS.FID4100085]

I am fully booked through 5 PM, but you should proceed without me. As long as Marty or Anne is available, I am superfluous.

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Rafael X. Zahralddin-Aravena [mailto:RZahralddin@atllp.com]
**Sent:** Monday, March 15, 2021 2:53 PM
**To:** Weis, Martin J.; 'amanda@streamacquisitiongroup.com'; McMichael, Lawrence G.; Aaronson, Anne M.
**Cc:** raja@streamacquisitiongroup.com;dan@streamacquisitiongroup.com; 'SAG - SJ';mathu@streamacquisitiongroup.com;bud@streamacquisitiongroup.com;nicole@streamacquisitiongroup.com
**Subject:** RE: Call with Team today [IWOV-IDOCS.FID4100085]

Ok. Same here.

**TRUSTEE 6**

********** PRIVATE AND CONFIDENTIAL**********

This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.

Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.

---

**From:** Weis, Martin J. <mweis@dilworthlaw.com>
**Sent:** Monday, March 15, 2021 2:46 PM
**To:** 'amanda@streamacquisitiongroup.com' <amanda@streamacquisitiongroup.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>; Aaronson, Anne M. <aaaronson@dilworthlaw.com>
**Cc:** raja@streamacquisitiongroup.com;dan@streamacquisitiongroup.com; 'SAG - SJ' <suby@streamacquisitiongroup.com>;mathu@streamacquisitiongroup.com;bud@streamacquisitiongroup.com;nicole@streamacquisitiongroup.com
**Subject:** RE: Call with Team today

---

**CAUTION:**    **EXTERNAL EMAIL**

I am available before 5

**MARTIN WEIS |DILWORTH PAXSON LLP**
ONE CUSTOMS HOUSE | SUITE 500 | 704 KING STREET
P.O. Box 1031| Wilmington, DE 19899-1031
TEL: (302) 571-9800 | FAX: (302)655-1480
MWEIS@DILWORTHLAW.COM | WWW.DILWORTHLAW.COM

---

**From:** amanda@streamacquisitiongroup.com [mailto:amanda@streamacquisitiongroup.com]
**Sent:** Monday, March 15, 2021 2:43 PM
**To:** 'Rafael X. Zahralddin-Aravena'; McMichael, Lawrence G.; Aaronson, Anne M.; Weis, Martin J.
**Cc:** raja@streamacquisitiongroup.com;dan@streamacquisitiongroup.com; 'SAG - SJ';mathu@streamacquisitiongroup.com;bud@streamacquisitiongroup.com;nicole@streamacquisitiongroup.com
**Subject:** Call with Team today

Hi All-

What time is the Dilworth Team and Raf available for a call with us today?

Best Regards,
Amanda Von Ahnen
856-812-7112

---

https://clicktime.symantec.com/3CKEGuFPC7vytwKN6q4w3ui7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

---

https://clicktime.symantec.com/3scrrEpQyXfVqrcddjsxEi7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

# Document Break

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
-----------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
GCX Limited, et al.,[1]                       :   Case No. 19-12031 (___)
                                              :
            Debtors.                          :   (Joint Administration Requested)
                                              :
-----------------------------------------------------------------x
```

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF THE BANKRUPTCY CODE, (II) PERMITTING DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING FORM AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:[2]

**Relief Requested**

1.    The Debtors seek entry an order, substantially in the form attached hereto as

**Exhibit A** (the "Proposed Order"): (a) restating and enforcing the worldwide automatic stay,

anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code; (b) modifying

the worldwide automatic stay, to the extent the Debtors deem appropriate in their sole discretion,

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are GCX Limited (n/a); FLAG Telecom Development Limited (n/a); FLAG Telecom Group Services Limited (n/a); FLAG Telecom Ireland Network DAC (n/a); FLAG Telecom Network Services DAC (n/a); FLAG Telecom Network USA Limited (2662); Reliance FLAG Atlantic France SAS (n/a); Reliance FLAG Telecom Ireland DAC (n/a); Reliance Globalcom Limited (n/a); Reliance Vanco Group Limited (n/a); Vanco Australasia Pty Limited (n/a); Vanco GmbH (n/a); Vanco SAS (n/a); Vanco UK Limited (n/a); Vanco US, LLC (0221); and VNO Direct Limited (n/a). The location of Debtor FLAG Telecom Network USA Limited's principal place of business and the Debtors' service address in Chapter 11 Cases is 3190 S Vaughn Way, # 550, Aurora, CO 80014.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Michael Katzenstein, Chief Restructuring Officer of GCX Limited, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 15, 2019 (the "Petition Date"). Capitalized terms used but not otherwise defined in this motion have the meanings given to them in the First Day Declaration.

01:25159978.2

Case 19-12031-CSS Doc 10 Filed 09/15/19 Page 2 of 20

to proceed with litigation or contested matters commenced before the Petition Date;

(c) approving the form and manner of notice related thereto, substantially in the form attached as

Exhibit 1 to the Proposed Order (the "Notice"); and (d) granting related relief.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the District of Delaware,

dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection

with this motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 362, 365,

525, and 541 of the Bankruptcy Code and Local Rule 9013-1(m).

**Relevant Background**

5. As discussed in the First Day Declaration, the Debtors, together with their non-

Debtor affiliates that are subsidiaries of GCX (the "Company"), are a leading global data

communications service provider with one of the largest global subsea cable and terrestrial

networks. The Company provides its services through a global network of subsea cables,

landing stations, terrestrial networks, IP network and managed network platforms controlled by a

fully global network operating center (collectively, the "GCX Global Network"). The GCX

2

Global Network connects to most of the major telecommunications hubs across the globe, from the developed markets in the U.S. and Europe to key emerging markets in the Middle East and Asia, including India and China. The GCX Global Network consists of, among other things, five owned subsea systems with over 66,000 route kilometres ("rkms"), landed at 46 landing stations in 27 countries. This system further consists of owned and leased terrestrial networks extending over 9,839 rkms in 34 metropolitan areas across 14 countries. These subsea, terrestrial, and managed networks make the Company's operations an integral element to communications for thousands of customer and non-customer businesses and millions of people worldwide.

6. The Company's business is both far-flung and complex. The equipment used in the Company's business, including the backhaul and circuity equipment, is specialized, and the operation and maintenance of GCX Global network presents unique logistical, safety, operational, and sourcing complications.

7. Because of the far-flung and interconnected nature of the Company's business, its ability to properly monitor and maintain its cable systems and network is critical to its business. Even minor disruptions in the service chain could cause significant service interruptions, with potentially catastrophic effects on the Company's business and going-concern value. The Company's business is similarly reliant on the continued operations of its data centers (and smaller micro-centers) and over 1,500 "points of presence" ("PoPs"). Concurrently herewith the Debtors have filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Section 503(b)(9) Claimants and (II) Granting Related Relief* (the "Critical Vendors Motion") seeking authority to pay certain pre- and post-petition claims, in the ordinary course as and when they come due, of

3

certain trade creditors vendors—including many vendors that are not based in the United States —that are vital to the Company's business, whose claims are secured by liens under applicable non-bankruptcy law (including maritime law), and/or whose claims are entitled to priority under the Bankruptcy Code.  The Debtors anticipate that such relief will help deter parties in interest from attempting to exercise remedies or take adverse action against the Debtors in non-U.S. jurisdictions on account of the commencement of these chapter 11 cases.

8.       However, because of unique nature of the Company's business, the Debtors are concerned that non-U.S. creditors and other entities may attempt to exercise remedies or take other actions violating the automatic stay or other provisions of the Bankruptcy Code to the detriment of the Debtors and their estates:

- As explained in the Vendor Payment Motion, significant and valuable Debtor assets are located in non-U.S. jurisdictions and in international waters at any given time.  Because the Debtors' business operations implicate maritime law, certain of the Debtors' non-U.S. creditors could attempt to assert maritime liens against the Debtors' assets.

- Similarly, many of the Debtors' other assets (such as data centers, PoPs, and cable landing stations) are permanently located outside the United States. Unfamiliarity with the chapter 11 process may lead non-U.S. creditors to attempt to enforce claims against the Debtors' foreign situated assets.

- The Debtors are also party to certain key executory contracts.  Upon the commencement of these chapter 11 cases, non-U.S. counterparties to certain leases and executory contracts could attempt to terminate such leases or contracts pursuant to *ipso facto* provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  For example, the Debtors engaged foreign service providers to maintain the undersea cable system who generally must have local government authority to work in the littoral waters of any government.  Unfamiliarity with the chapter 11 process may lead non-U.S. contract counterparties to attempt to terminate leases or contracts pursuant to *ipso facto* provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  Moreover, governmental units outside the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants held by a chapter 11 debtor and required for the Debtors' ongoing business operations, violating

4

01:25159978.2

section 525 of the Bankruptcy Code. This could have a devastating impact on the Debtors' business.

9.      The relief requested herein is requested out of abundance of caution and to better assist the Debtors in informing non-U.S. parties in interest of the broad protections offered by the Bankruptcy Code. To be clear, the Debtors do not seek to expand on those protections or otherwise enlarge their rights under the Bankruptcy Code. Instead, the Debtors believe that a specific order from the Court will help to protect the Debtors and their assets from improper actions, particularly by parties in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections unwittingly.

**Basis for Relief**

I.      **Requested Relief Is Appropriate to Better Enforce the Automatic Stay, Anti-discrimination, and *Ipso Facto* Provisions of the Bankruptcy Code.**

10.      As a result of the commencement of chapter 11 cases, and by operation of section 362 of the Bankruptcy Code, the automatic stay enjoins all persons from, among other things, taking any action to obtain possession of property of the estate or to exercise control over property of the estate.[3] The injunction contained in section 362 is a core protection for debtors, providing them with a "breathing spell from [their] creditors" that is essential to the Debtors' ability to reorganize successfully.[4]

---

[3]    *See* 11 U.S.C. § 362(a)(3).

[4]    *See Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982); *Shugrue v. Air Line Pilots Ass'n Int'l. (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990) (internal citations omitted).

01:25159978.2

11.     Given its fundamental importance to a debtor's reorganization, courts have broadly construed the automatic stay provision of section 362 of the Bankruptcy Code, and have recognized the extraterritorial reach of the automatic stay.[5]

12.     As a corollary to the protection afforded by the automatic stay, section 365(e)(1)(B) of the Bankruptcy Code prohibits counterparties to contracts with a debtor from terminating those contracts because of a debtor's bankruptcy filing.  Specifically, section 365(e) of the Bankruptcy Code invalidates so-called *ipso facto* provisions, which provide for the termination of a contract upon a bankruptcy filing.[6]

13.     Under section 525(a) of the Bankruptcy Code, "governmental units,"—defined, in section 101(27), to include a foreign state or other foreign government, as well as their departments, agencies, or instrumentalities—are prohibited from, among other things, denying, revoking, suspending, or refusing to renew licenses, permits, charters, franchises, or other similar

---

[5]     *See, e.g.*, *In re Nortel Networks, Inc.*, 669 F.3d 128, 138 (3d Cir. 2011) (upholding the bankruptcy court's decision to enforce the automatic stay extraterritorially); *In re Bernard L. Madoff Inv. Secs. LLC*, 2012 WL 1570859 (S.D.N.Y. May 4, 2012) (upholding extraterritorial enforcement of the automatic stay and injunction barring foreign creditor's lawsuit); *In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) ("Given this clear expression of intent by Congress in the express language of the Bankruptcy Code, we conclude that Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate."); *In re Nakash*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) ("[B]ased upon the applicable Code sections [and] other indicia of congressional intent, . . . the automatic stay applies extraterritorially."); *In re McLean Indus.*, 74 B.R. 589, 601 (Bankr. S.D.N.Y. 1987) ("The automatic stay applies extraterritorially.").

[6]     Section 365(e)(1)(B) of the Bankruptcy Code provides (subject to certain limited exceptions) that:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on . . . the commencement of a case under this title.

11 U.S.C. § 365(e)(1)(B).

6

grants held by a chapter 11 debtor on the basis that the debtor has failed to pay a dischargeable debt, commenced a chapter 11 case, or was insolvent prior to the commencement of such case.[7]

14.     Finally, all interests of a debtor in property held as of the commencement of a chapter 11 case automatically become property of the estate and any restrictions or conditions on the transfer of such interests are unenforceable.[8]

15.     Application of the protections afforded a debtor by sections 362, 365, 525, and 541 is automatic with the filing of a chapter 11 petition.  Nonetheless, not all parties affected or potentially affected by the commencement of these chapter 11 cases are aware of these statutory provisions or their significance and global impact.  In light of the international nature of the Debtors' business and operations, particularly, where, as here, the Debtors conduct a significant amount of business overseas and have valuable assets in foreign jurisdictions, it therefore makes sense to advise such parties of the existence, reach, and effects of these provisions.  Indeed, in the event the Proposed Order is not entered, parties located in foreign jurisdictions may inadvertently take action against the Debtors or their property in violation of sections 362 and 365 of the Bankruptcy Code.  Any such violation may disrupt the Debtors' business and impair their ability to successfully monetize their assets and maximize value for their stakeholders.

16.     Section 105(a) of the Bankruptcy Code, moreover, authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.[9]  This section, therefore, authorizes the Court to issue the Proposed Order.

---

[7]     *See* 11 U.S.C. § 525(a); *see also NextWave Pers. Commc'ns*, 537 U.S. 293, 308 (prohibiting the Federal Communications Commission could not cancel a debtor's broadcasting license due to non-payment of licensing fees during the bankruptcy process).

[8]     *See* 11 U.S.C. § 541(c)(1).

[9]     11 U.S.C. § 105(a).

01:25159978.2

17.     Bankruptcy courts in this district and elsewhere have entered orders restating and enforcing the protections set forth in sections 362, 365, 525, and 541 of the Bankruptcy Code under comparable circumstances.[10]  Given the critical importance of ensuring the Debtors' non-U.S. operations are not undermined by noncompliance with U.S. bankruptcy law, similar relief is appropriate here.

18.     Accordingly, the Debtors respectfully request that the Court enter the Proposed Order in the form attached hereto, which restates the applicable provisions of sections 362, 365, 525, and 541 of the Bankruptcy Code and makes clear that those provisions are applicable to all creditors and parties in interest.[11]

## II.     Automatic Stay Should Be Modified in Debtors' Sole Discretion to Continue Litigating Certain Contested Matters.

19.     The Debtors further seek authority, pursuant to sections 105(a), 362(a), and 362(d) of the Bankruptcy Code, to modify the automatic stay, solely to the extent the Debtors deem appropriate in their sole discretion, to proceed with litigation or contested matters commenced before the Petition Date—many of which are pending in jurisdictions outside the United States and involve non-Debtors.[12]  For example, the Debtors are currently appealing foreign tax matters for the purposes of retaining a previously claimed tax refund related to data transmission usage.

---

[10]     *See, e.g.*, *In re Maurice Sporting Goods, Inc.*, No. 17-12481 (CSS) (Bankr. D. Del. Nov. 21, 2017); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. June 27, 2017); *In re CGG Holdings (U.S.) Inc.*, No. 17-11637 (MG) (Bankr. S.D.N.Y. June 15, 2017) (same); *In re BPS US Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 1, 2016); *In re Modular Space Holdings, Inc.*, No. 16-12825 (KJC) (Bankr. D. Del. Dec. 22, 2016).  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.  Copies of these orders are available upon request made to the Debtors' proposed counsel.

[11]     As necessary, the Debtors will provide translations of this Motion, the Order, and/or the Notice.

[12]     *See U. S. Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 370 (1988) (holding that parties in interest may file for relief from the automatic stay); *United States v. State St. Bank & Tr. Co.*, Adv. No. 01-04605, 2002 WL 417013, at *2 (Bankr. D. Del. Mar. 4, 2002) (noting that section 1109 includes debtors and holding that argument that debtor is not a proper party in interest "clearly contravenes the plan language" of the statute).

20.     Cause exists to modify the stay in these limited actions because such relief will permit the Debtors to choose to continue defending actions and contested matters that, for instance, have been the subject of ongoing litigation or other proceedings in venues outside the United States that are close to final resolution.  Such relief would permit the Debtors to liquidate certain claims more efficiently and in accordance with applicable law.

## Reservation of Rights

21.     Nothing contained in this motion or any actions taken by the Debtors pursuant to relief granted in an order approving this motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.

## Notice

22.     The Debtors will provide notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; and (d) counsel to the Ad Hoc Group of 7.00% Senior Secured Notes due 2019.  Notice of this motion and any

9

order entered hereon will be served in accordance with Local Rule 9013-1(m). The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order (a) granting

the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: September 15, 2019
Wilmington, Delaware

/s/ *Jaime Luton Chapman*

M. Blake Cleary (No. 3614)
Matthew B. Lunn (No. 4119)
Jaime Luton Chapman (No. 4936)
Jared W. Kochenash (No. 6557)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

Chris L. Dickerson (*pro hac vice* admission pending)
Brendan M. Gage (*pro hac vice* admission pending)
Robert A. Dixon Jr. (*pro hac vice* admission pending)
**PAUL HASTINGS LLP**
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

- and -

Todd M. Schwartz (*pro hac vice* admission pending)
**PAUL HASTINGS LLP**
1117 S. California Avenue
Palo Alto, California 94304
Telephone: (650) 320-1800
Facsimile: (650) 320-1900

*Proposed Counsel to the Debtors and Debtors in Possession*

10

**EXHIBIT A**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

--------------------------------------------------------------x
:
In re: : Chapter 11
:
GCX Limited, et al.,[1] : Case No. 19-12031 (___)
:
Debtors. : Jointly Administered
:
: **RE: Docket No. __**
:
--------------------------------------------------------------x

## ORDER (I) RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF THE BANKRUPTCY CODE, (II) PERMITTING DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING FORM AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order") (a) restating and enforcing the

worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the

Bankruptcy Code, (b) modifying the automatic stay, (c) approving the form and manner of notice,

and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent

---

[1] The debtors in Chapter 11 Cases, along with the last four digits of each debtor's tax identification number, as applicable, are GCX Limited (n/a); FLAG Telecom Development Limited (n/a); FLAG Telecom Group Services Limited (n/a); FLAG Telecom Ireland Network DAC (n/a); FLAG Telecom Network Services DAC (n/a); FLAG Telecom Network USA Limited (2662); Reliance FLAG Atlantic France SAS (n/a); Reliance FLAG Telecom Ireland DAC (n/a); Reliance Globalcom Limited (n/a); Reliance Vanco Group Limited (n/a); Vanco Australasia Pty Limited (n/a); Vanco GmbH (n/a); Vanco SAS (n/a); Vanco UK Limited (n/a); Vanco US, LLC (0221); and VNO Direct Limited (n/a). The location of Debtor FLAG Telecom Network USA Limited's principal place of business and the Debtors' service address in Chapter 11 Cases is 3190 S Vaughn Way, # 550, Aurora, CO 80014.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Motion.

with Article III of the United States Constitution; and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this

Court having found that the relief requested in the Motion is in the best interests of the Debtors'

estates, their creditors, and other parties in interest; and this Court having found that the Debtors'

notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and no other notice need be provided; and this Court having reviewed the Motion and

having heard the statements in support of the relief requested therein at a hearing before this Court

(the "Hearing"); and this Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Subject to section 362 of the Bankruptcy Code, all persons (including individuals,

partnerships, corporations, and other entities and all those acting on their behalf) and governmental

units, whether of the United States, any state or locality therein or any territory or possession thereof,

or any non-U.S. jurisdiction (including any division, department, agency, instrumentality or service

thereof, and all those acting on their behalf), are hereby stayed, restrained and enjoined from:

    a. commencing or continuing (including the issuance or employment of process) any judicial, administrative, or other action or proceeding against the Debtors that was or could have been commenced before the commencement of these chapter 11 cases or recovering a claim against the Debtors that arose before the commencement of these chapter 11 cases;

    b. enforcing, against the Debtors or against property of their estates, a judgment or order obtained before the commencement of these chapter 11 cases;

    c. taking any action, whether inside or outside the United States, to obtain possession of property of the Debtors' estates, wherever located (including, but not limited to, owned, operated, or leased cable landing stations or property thereon (including backhauls and

2

Case 19-12031-CSS Doc 10 Filed 09/15/19 Page 14 of 20

circuitry property) and any other transportation equipment (including containers), or to exercise control over property of the estates or interfere in any way with the conduct by the Debtors of their businesses, including, without limitation, attempts to interfere with deliveries or events or attempts to arrest, seize or reclaim any equipment, supplies or all other assets in which the Debtors have legal or equitable interests;

d.  taking any action to create, perfect, or enforce any lien against the property of the Debtors' estates;

e.  taking any action to create, perfect, or enforce against property of the Debtors any lien to the extent that such lien secures a claim that arose prior to the commencement of these chapter 11 cases;

f.  taking any action to collect, assess, or recover a claim against the Debtors that arose prior to the commencement of these chapter 11 cases;

g.  offsetting any debt owing to the Debtors that arose before the commencement of these chapter 11 cases against any claim against the Debtors; and

h.  commencing or continuing any proceeding before the United States Tax Court concerning the Debtors, subject to the provisions of 11 U.S.C. § 362(b).

3.  Pursuant to sections 362 and 365 of the Bankruptcy Code, and subject to any relevant provisions and exceptions provided for in the Bankruptcy Code, notwithstanding any provision in a contract ("Contract") or lease ("Lease") or any applicable law, all persons are hereby stayed, restrained, and enjoined from terminating or modifying any and all Contracts and Leases to which the Debtors are party or signatory, at any time after the commencement of these chapter 11 cases, because of a provision in such Contract or Lease that is conditioned on the (a) insolvency or financial condition of the Debtors at any time before the closing of these chapter 11 cases; or (b) commencement of these chapter 11 cases under the Bankruptcy Code.

4.  Pursuant to section 525 of the Bankruptcy Code, all governmental units and other regulatory authorities are prohibited and enjoined from: (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors;

3

Case 19-12031-CSS   Doc 10   Filed 09/15/19   Page 19 of 20

(b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases.

5.      Pursuant to section 541(c) of the Bankruptcy Code, any interest of the Debtors in property is property of the estates, notwithstanding any provision in any agreement, transfer instrument, or applicable nonbankruptcy law, that:  (a) restricts or conditions transfer of such interest by the Debtors; or (b) is conditioned on the insolvency or financial condition of the Debtors or on the commencement of the Debtors' chapter 11 cases, and that effects or gives an option to effect a forfeiture, modification, or termination of the Debtor's interest in property.

6.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order or the Motion shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, Contract, or Lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens.

7.      The form of Notice attached as **Exhibit 1** hereto is approved.  The Debtors are authorized, but not directed, to serve the Notice (including, as the Debtors deem necessary,

4

Case 23-10763-djb · Doc 1208-3 · Filed 04/08/26 · Entered 04/08/26 18:16:51 · Desc
Appendix Part 1 · Exs. 1-20 · Page 202 of 282

Case 19-12031-CSS · Doc 10 · Filed 09/15/19 · Page 16 of 20

translations thereof), upon creditors, governmental units or other regulatory authorities, and parties in interest, wherever located.

8. For the avoidance of doubt, this Order does not expand or enlarge the rights and protections afforded to the Debtors under the Bankruptcy Code.

9. The automatic stay is modified, solely to the extent the Debtors, in their sole discretion, deem appropriate, to permit the Debtors to allow litigation or contested matters commenced before the Petition Date to proceed.

10. This Order remains subject to section 362 of the Bankruptcy Code, including its exceptions. Unless otherwise specified herein, any party that desires to modify the automatic stay must file a motion with the United States Bankruptcy court for the District of Delaware.

11. The terms and conditions of this Order are immediately effective and enforceable upon its entry.

12. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: September \_\_\_\_\_, 2019
       Wilmington, Delaware

_____

UNITED STATES BANKRUPTCY JUDGE

01:25159978.2

## EXHIBIT 1

**Form of Notice**

01:25159978.2

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------------ x
In re:                                                                          :    Chapter 11
                                                                                :
GCX Limited, et al.,[1]                                              :    Case No. 19-12031 (___)
                                                                                :
               Debtors.                                               :    Jointly Administered
                                                                                :
------------------------------------------------------------------ x    **RE: Docket No. __**


**NOTICE OF ENTRY OF ORDER RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY,
ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS
OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on September 15, 2019, the above-captioned debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). These chapter 11 cases are pending before the Honorable Judge [•], United States Bankruptcy Judge, and are being jointly administered under the lead case *In re GCX Limited, et al.*, Case No. 19-_____ (___).

**PLEASE TAKE FURTHER NOTICE** that pursuant to section 362(a) of the Bankruptcy Code, the Debtors' filing of their respective voluntary petitions operates as a self-effectuating, statutory stay or injunction, applicable to all entities and protecting the Debtors from, among other things: (a) the commencement or continuation of a judicial, administrative, or other action or proceeding against the Debtors (i) that was or could have been commenced before the commencement of the Debtors' cases; or (ii) to recover a claim against the Debtors that arose before the commencement of the Debtors' cases; (b) the enforcement, against the Debtors or against any property of the Debtors' bankruptcy estates, of a judgment obtained before the commencement of the Debtors' cases; or (c) any act to obtain possession of property of or from the Debtors bankruptcy estates, or to exercise control over property of the Debtors' bankruptcy estates.[2]

**PLEASE TAKE FURTHER NOTICE** that pursuant to the *Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. __] (the "Order"), entered on September [•], 2019, and attached hereto as **Exhibit A**, all persons wherever located (including individuals, partnerships, corporations, and other entities and all those acting on their behalf), persons party to a contract or agreement with the Debtors, governmental units, whether of the United States, any state or locality therein or any territory or possession thereof, or any foreign country (including any division, department, agency, instrumentality or service thereof, and all those acting on their behalf), are hereby put on notice that they are subject to the Order and must comply with its terms and provisions.

---

[1]  The debtors in Chapter 11 Cases, along with the last four digits of each debtor's tax identification number, as applicable, are GCX Limited (n/a); FLAG Telecom Development Limited (n/a); FLAG Telecom Group Services Limited (n/a); FLAG Telecom Ireland Network DAC (n/a); FLAG Telecom Network Services DAC (n/a); FLAG Telecom Network USA Limited (2662); Reliance FLAG Atlantic France SAS (n/a); Reliance FLAG Telecom Ireland DAC (n/a); Reliance Globalcom Limited (n/a); Reliance Vanco Group Limited (n/a); Vanco Australasia Pty Limited (n/a); Vanco GmbH (n/a); Vanco SAS (n/a); Vanco UK Limited (n/a); Vanco US, LLC (0221); and VNO Direct Limited (n/a). The location of Debtor FLAG Telecom Network USA Limited's principal place of business and the Debtors' service address in Chapter 11 Cases is 3190 S Vaughn Way, # 550, Aurora, CO 80014.

[2]  Nothing herein shall constitute a waiver of the right to assert any claims, counterclaims, defenses, rights of setoff or recoupment or any other claims of the Debtors against any party to the above-captioned cases. The Debtors expressly reserve the right to contest any claims which may be asserted against the Debtors.

01:25159978.2

**PLEASE TAKE FURTHER NOTICE** that any entity that seeks to assert claims or interests against, seek or assert causes of action or other legal or equitable remedies against, or otherwise exercise any rights in law or equity against the Debtors or their estates must do so in front of the Court pursuant to the Order, the Bankruptcy Code, and applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, any governmental agency, department, division or subdivision, or any similar governing authority is prohibited from, among other things: (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors; (b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases as set forth more particularly in the Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, parties to contracts or agreements with the Debtors are prohibited from terminating such contracts or agreements because of a Debtor's bankruptcy filing— except as permitted by the Court under applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to sections 105(a) and 362(k) of the Bankruptcy Code and Rule 9020 of the Federal Rules of Bankruptcy Procedure, among other applicable substantive law and rules of procedure, any person or governmental unit seeking to assert its rights or obtain relief outside of the processes set forth in the Order, the Bankruptcy Code, and applicable law may be subject to proceedings in front of the Court for failure to comply with the Order and applicable law—including contempt proceedings resulting in fines, sanctions, and punitive damages against the entity and its assets inside the United States.

**PLEASE TAKE FURTHER NOTICE** that additional information regarding these chapter 11 cases, including copies of pleadings filed therein, may be obtained by (a) reviewing the publicly available docket of these chapter 11 cases at https://ecf.deb.uscourts.gov/cgi-bin/login.pl (PACER login and password required), (b) accessing the Debtors' publicly available website providing information regarding these chapter 11 cases located online at https://cases.primeclerk.com/GCX, or (c) contacting the following proposed co-counsel for the Debtors:

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **PAUL HASTINGS LLP** |
| M. Blake Cleary (No. 3614) | Chris L. Dickerson |
| Jaime Luton Chapman (No. 4936) | Brendan M. Gage |
| Rodney Square | Robert A. Dixon Jr. |
| 1000 North King Street | 71 South Wacker Drive, Suite 4500 |
| Wilmington, Delaware 19801 | Chicago, Illinois 60606 |
| Telephone: (302) 571-6600 | Telephone: (312) 499-6000 |
| Facsimile: (302) 571-1253 | Facsimile: (312) 499-6100 |
| | - and - |
| | Todd M. Schwartz |
| | 1117 S. California Avenue |
| | Palo Alto, California 94304 |
| | Telephone: (650) 320-1800 |
| | Facsimile: (650) 320-1900 |

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A TO NOTICE**

**Order**

01:25159978.2

# Document Break

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

In re:
      : Chapter 11

GCX Limited, et al.,[1]
      : Case No. 19-12031 (CSS)

   Debtors.
      : Jointly Administered

      : **RE: Docket No. 10**

-------------------------------------------------------x

## ORDER (I) RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF THE BANKRUPTCY CODE, (II) PERMITTING DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING FORM AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order") (a) restating and enforcing the

worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the

Bankruptcy Code, (b) modifying the automatic stay, (c) approving the form and manner of notice,

and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent

---

[1] The debtors in Chapter 11 Cases, along with the last four digits of each debtor's tax identification number, as applicable, are GCX Limited (n/a); FLAG Telecom Development Limited (n/a); FLAG Telecom Group Services Limited (n/a); FLAG Telecom Ireland Network DAC (n/a); FLAG Telecom Network Services DAC (n/a); FLAG Telecom Network USA Limited (2662); Reliance FLAG Atlantic France SAS (n/a); Reliance FLAG Telecom Ireland DAC (n/a); Reliance Globalcom Limited (n/a); Reliance Vanco Group Limited (n/a); Vanco Australasia Pty Limited (n/a); Vanco GmbH (n/a); Vanco SAS (n/a); Vanco UK Limited (n/a); Vanco US, LLC (0221); and VNO Direct Limited (n/a). The location of Debtor FLAG Telecom Network USA Limited's principal place of business and the Debtors' service address in Chapter 11 Cases is 3190 S Vaughn Way, # 550, Aurora, CO 80014.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Motion.

01:25182638.1

with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Subject to section 362 of the Bankruptcy Code, all persons (including individuals, partnerships, corporations, and other entities and all those acting on their behalf) and governmental units, whether of the United States, any state or locality therein or any territory or possession thereof, or any non-U.S. jurisdiction (including any division, department, agency, instrumentality or service thereof, and all those acting on their behalf), are hereby stayed, restrained and enjoined from:

    a.      commencing or continuing (including the issuance or employment of process) any judicial, administrative, or other action or proceeding against the Debtors that was or could have been commenced before the commencement of these chapter 11 cases or recovering a claim against the Debtors that arose before the commencement of these chapter 11 cases;

    b.      enforcing, against the Debtors or against property of their estates, a judgment or order obtained before the commencement of these chapter 11 cases;

    c.      taking any action, whether inside or outside the United States, to obtain possession of property of the Debtors' estates, wherever located (including, but not limited to, owned, operated, or leased cable landing stations or property thereon (including backhauls and

01:25182638.1

2

circuitry property) and any other transportation equipment (including containers), or to exercise control over property of the estates or interfere in any way with the conduct by the Debtors of their businesses, including, without limitation, attempts to interfere with deliveries or events or attempts to arrest, seize or reclaim any equipment, supplies or all other assets in which the Debtors have legal or equitable interests;

d.    taking any action to create, perfect, or enforce any lien against the property of the Debtors' estates;

e.    taking any action to create, perfect, or enforce against property of the Debtors any lien to the extent that such lien secures a claim that arose prior to the commencement of these chapter 11 cases;

f.    taking any action to collect, assess, or recover a claim against the Debtors that arose prior to the commencement of these chapter 11 cases;

g.    offsetting any debt owing to the Debtors that arose before the commencement of these chapter 11 cases against any claim against the Debtors; and

h.    commencing or continuing any proceeding before the United States Tax Court concerning the Debtors, subject to the provisions of 11 U.S.C. § 362(b).

3.    Pursuant to sections 362 and 365 of the Bankruptcy Code, and subject to any relevant provisions and exceptions provided for in the Bankruptcy Code, notwithstanding any provision in a contract ("Contract") or lease ("Lease") or any applicable law, all persons are hereby stayed, restrained, and enjoined from terminating or modifying any and all Contracts and Leases to which the Debtors are party or signatory, at any time after the commencement of these chapter 11 cases, because of a provision in such Contract or Lease that is conditioned on the (a) insolvency or financial condition of the Debtors at any time before the closing of these chapter 11 cases; or (b) commencement of these chapter 11 cases under the Bankruptcy Code.

4.    Pursuant to section 525 of the Bankruptcy Code, all governmental units and other regulatory authorities are prohibited and enjoined from: (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors;

01:25182638.1

3

(b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases.

5. Pursuant to section 541(c) of the Bankruptcy Code, any interest of the Debtors in property is property of the estates, notwithstanding any provision in any agreement, transfer instrument, or applicable nonbankruptcy law, that: (a) restricts or conditions transfer of such interest by the Debtors; or (b) is conditioned on the insolvency or financial condition of the Debtors or on the commencement of the Debtors' chapter 11 cases, and that effects or gives an option to effect a forfeiture, modification, or termination of the Debtor's interest in property.

6. Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order or the Motion shall be deemed: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, Contract, or Lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens.

7. The form of Notice attached as **Exhibit 1** hereto is approved. The Debtors are authorized, but not directed, to serve the Notice (including, as the Debtors deem necessary,

01:25182638.1

4

translations thereof), upon creditors, governmental units or other regulatory authorities, and parties in

interest, wherever located.

*, upon 10 days notice and the filing of a certification of counsel,*

8.      For the avoidance of doubt, this Order does not expand or enlarge the rights and

protections afforded to the Debtors under the Bankruptcy Code.

9.      The automatic stay is modified, solely to the extent the Debtors, in their sole

discretion, deem appropriate, to permit the Debtors to allow litigation or contested matters

commenced before the Petition Date to proceed.

10.      This Order remains subject to section 362 of the Bankruptcy Code, including its

exceptions.  Unless otherwise specified herein, any party that desires to modify the automatic stay

must file a motion with the United States Bankruptcy court for the District of Delaware.

11.      The terms and conditions of this Order are immediately effective and enforceable

upon its entry.

12.      The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

13.      This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

Dated: September **16**, 2019
          Wilmington, Delaware

_____
CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

01:25182638.1

## EXHIBIT 1

**Form of Notice**

01:25182638.1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------- x
In re:                                            :   Chapter 11
                                                  :
GCX Limited, et al.,¹                             :   Case No. 19-_____ (___)
                                                  :
            Debtors.                              :   Jointly Administered
                                                  :
------------------------------------------------- x   RE: Docket No. __
```

## NOTICE OF ENTRY OF ORDER RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on September 15, 2019, the above-captioned debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). These chapter 11 cases are pending before the Honorable Judge [•], United States Bankruptcy Judge, and are being jointly administered under the lead case *In re GCX Limited, et al.*, Case No. 19-_____ (___).

**PLEASE TAKE FURTHER NOTICE** that pursuant to section 362(a) of the Bankruptcy Code, the Debtors' filing of their respective voluntary petitions operates as a self-effectuating, statutory stay or injunction, applicable to all entities and protecting the Debtors from, among other things: (a) the commencement or continuation of a judicial, administrative, or other action or proceeding against the Debtors (i) that was or could have been commenced before the commencement of the Debtors' cases; or (ii) to recover a claim against the Debtors that arose before the commencement of the Debtors' cases; (b) the enforcement, against the Debtors or against any property of the Debtors' bankruptcy estates, of a judgment obtained before the commencement of the Debtors' cases; or (c) any act to obtain possession of property of or from the Debtors bankruptcy estates, or to exercise control over property of the Debtors' bankruptcy estates.²

**PLEASE TAKE FURTHER NOTICE** that pursuant to the *Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. __] (the "Order"), entered on September [•], 2019, and attached hereto as **Exhibit A**, all persons wherever located (including individuals, partnerships, corporations, and other entities and all those acting on their behalf), persons party to a contract or agreement with the Debtors, governmental units, whether of the United States, any state or locality therein or any territory or possession thereof, or any foreign country (including any division, department, agency, instrumentality or service thereof, and all those acting on their behalf), are hereby put on notice that they are subject to the Order and must comply with its terms and provisions.

---

[1]    The debtors in Chapter 11 Cases, along with the last four digits of each debtor's tax identification number, as applicable, are GCX Limited (n/a); FLAG Telecom Development Limited (n/a); FLAG Telecom Group Services Limited (n/a); FLAG Telecom Ireland Network DAC (n/a); FLAG Telecom Network Services DAC (n/a); FLAG Telecom Network USA Limited (2662); Reliance FLAG Atlantic France SAS (n/a); Reliance FLAG Telecom Ireland DAC (n/a); Reliance Globalcom Limited (n/a); Reliance Vanco Group Limited (n/a); Vanco Australasia Pty Limited (n/a); Vanco GmbH (n/a); Vanco SAS (n/a); Vanco UK Limited (n/a); Vanco US, LLC (0221); and VNO Direct Limited (n/a). The location of Debtor FLAG Telecom Network USA Limited's principal place of business and the Debtors' service address in Chapter 11 Cases is 3190 S Vaughn Way, # 550, Aurora, CO 80014.

[2]    Nothing herein shall constitute a waiver of the right to assert any claims, counterclaims, defenses, rights of setoff or recoupment or any other claims of the Debtors against any party to the above-captioned cases. The Debtors expressly reserve the right to contest any claims which may be asserted against the Debtors.

01:25052038

**PLEASE TAKE FURTHER NOTICE** that any entity that seeks to assert claims or interests against, seek or assert causes of action or other legal or equitable remedies against, or otherwise exercise any rights in law or equity against the Debtors or their estates must do so in front of the Court pursuant to the Order, the Bankruptcy Code, and applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, any governmental agency, department, division or subdivision, or any similar governing authority is prohibited from, among other things: (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors; (b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases as set forth more particularly in the Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, parties to contracts or agreements with the Debtors are prohibited from terminating such contracts or agreements because of a Debtor's bankruptcy filing—except as permitted by the Court under applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to sections 105(a) and 362(k) of the Bankruptcy Code and Rule 9020 of the Federal Rules of Bankruptcy Procedure, among other applicable substantive law and rules of procedure, any person or governmental unit seeking to assert its rights or obtain relief outside of the processes set forth in the Order, the Bankruptcy Code, and applicable law may be subject to proceedings in front of the Court for failure to comply with the Order and applicable law—including contempt proceedings resulting in fines, sanctions, and punitive damages against the entity and its assets inside the United States.

**PLEASE TAKE FURTHER NOTICE** that additional information regarding these chapter 11 cases, including copies of pleadings filed therein, may be obtained by (a) reviewing the publicly available docket of these chapter 11 cases at https://ecf.deb.uscourts.gov/cgi-bin/login.pl (PACER login and password required), (b) accessing the Debtors' publicly available website providing information regarding these chapter 11 cases located online at https://cases.primeclerk.com/GCX, or (c) contacting the following proposed co-counsel for the Debtors:

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **PAUL HASTINGS LLP** |
| M. Blake Cleary (No. 3614) | Chris L. Dickerson |
| Jaime Luton Chapman (No. 4936) | Brendan M. Gage |
| Rodney Square | Robert A. Dixon Jr. |
| 1000 North King Street | 71 South Wacker Drive, Suite 4500 |
| Wilmington, Delaware 19801 | Chicago, Illinois 60606 |
| Telephone: (302) 571-6600 | Telephone: (312) 499-6000 |
| Facsimile: (302) 571-1253 | Facsimile: (312) 499-6100 |
| | - and - |
| | Todd M. Schwartz |
| | 1117 S. California Avenue |
| | Palo Alto, California 94304 |
| | Telephone: (650) 320-1800 |
| | Facsimile: (650) 320-1900 |

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

01:25182638.1

## EXHIBIT A TO NOTICE

### Order

01:25182638.1

# Document Break

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                            :

In re:                                : Chapter 11
                                            :

EHT US1, Inc., *et al.*,[1]              : Case No. 21-10036 (CSS)
                                            :

               Debtors.                  : (Joint Administration Requested)
-----------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) RESTATING AND ENFORCING
WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND
*IPSO FACTO* PROTECTIONS OF BANKRUPTCY CODE, (II) PERMITTING
DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING FORM AND
MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

through their proposed undersigned counsel, file this motion (the "Motion") seeking entry of an

order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"): (i) restating

and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto*

protections of the Bankruptcy Code; (ii) modifying the worldwide automatic stay, to the extent

the Debtors deem appropriate in their sole discretion, to proceed with litigation or contested

matters, if any, commenced before the Petition Date; (iii) approving the form and manner of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: EHT US1, Inc.(6703); 5151 Wiley Post Way, Salt Lake City, LLC (1455); ASAP Cayman Atlanta Hotel LLC (2088); ASAP Cayman Denver Tech LLC (7531); ASAP Cayman Salt Lake City Hotel LLC (7546); ASAP Salt Lake City Hotel, LLC (7146); Atlanta Hotel Holdings, LLC (6450); CI Hospitality Investment, LLC (7641); Eagle Hospitality Trust S1 Pte Ltd. (7669); Eagle Hospitality Trust S2 Pte Ltd. (7657); EHT Cayman Corp. Ltd. (7656); Sky Harbor Atlanta Northeast, LLC (6450); Sky Harbor Denver Holdco, LLC (6650); Sky Harbor Denver Tech Center, LLC (8303); UCCONT1, LLC (0463); UCF 1, LLC (6406); UCRDH, LLC (2279); UCHIDH, LLC (6497); Urban Commons 4th Street A, LLC (1768); Urban Commons Anaheim HI, LLC (3292); Urban Commons Bayshore A, LLC (2422); Urban Commons Cordova A, LLC (4152); Urban Commons Danbury A, LLC (4388); Urban Commons Highway 111 A, LLC (4497); Urban Commons Queensway, LLC (6882); Urban Commons Riverside Blvd., A, LLC (4661); and USHIL Holdco Member, LLC (4796). The Debtors' mailing address is 3 Times Square, 9th Floor New York, NY 10036 c/o Alan Tantleff (solely for purposes of notices and communications).

notice related thereto, substantially in the form attached as Exhibit 1 to the Proposed Order (the "Notice"); and (iv) granting related relief.

## Jurisdiction, Venue, and Statutory Bases

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practices and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 362, 365, 525, and 541 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

4.      On January 18, 2021 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. The Debtors are authorized to continue operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed to date in these chapter 11 cases.

2

40000/0600-40010661v1

5.      A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in the *Declaration of Alan Tantleff, Chief Restructuring Officer of Eagle Hospitality Group, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which the Debtors rely upon and incorporate by reference herein, and which is being filed contemporaneously with this Motion.[2]

### Basis for Relief

**I.      Relief Is Appropriate to Ensure Adherence to Automatic Stay, Anti-Discrimination, and *Ipso Facto* Provisions of the Bankruptcy Code.**

6.      As a result of the commencement of chapter 11 cases, and by operation of section 362 of the Bankruptcy Code, the automatic stay enjoins all entities from, among other things, taking any action to obtain possession of property of the estate or to exercise control over property of the estate.[3] The injunction contained in section 362 is a core protection for debtors, providing them with a "breathing spell from [their] creditors" that is essential to the Debtors' ability to reorganize successfully.[4]

7.      Given its fundamental importance to a debtor's reorganization, courts have broadly construed the automatic stay provision of section 362 of the Bankruptcy Code, and have recognized the extraterritorial reach of the automatic stay.[5]

---

[2]   Capitalized terms used but not otherwise defined in this Motion have the meanings given to them in the First Day Declaration.

[3]   *See* 11 U.S.C. § 362(a)(3).

[4]   *See Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982); *Shugrue v. Air Line Pilots Ass'n Int'l. (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990) (internal citations omitted).

[5]   *See, e.g., In re Nortel Networks, Inc.*, 669 F.3d 128, 138 (3d Cir. 2011) (upholding the bankruptcy court's decision to enforce the automatic stay extraterritorially); *In re Bernard L. Madoff Inv. Secs. LLC*, 2012 WL 1570859 (S.D.N.Y. May 4, 2012) (upholding extraterritorial enforcement of the automatic stay and injunction barring foreign creditor's lawsuit); *In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) ("Given this clear expression of intent by Congress in the express language of the Bankruptcy Code, we conclude that Congress intended

3

8.      As a corollary to the protection afforded by the automatic stay, section 365(e)(1)(B) of the Bankruptcy Code prohibits counterparties to contracts with a debtor from terminating those contracts because of a debtor's bankruptcy filing. Specifically, section 365(e) of the Bankruptcy Code invalidates so-called *ipso facto* provisions, which provide for the termination of a contract upon a bankruptcy filing.[6]

9.      Under section 525(a) of the Bankruptcy Code, "governmental units,"—defined, in section 101(27), to include not only a municipality but also a foreign state or other foreign government, as well as their departments, agencies, or instrumentalities—are prohibited from, among other things, denying, revoking, suspending, or refusing to renew licenses, permits, charters, franchises, or other similar grants held by a chapter 11 debtor on the basis that the debtor has failed to pay a dischargeable debt, commenced a chapter 11 case, or was insolvent prior to the commencement of such case.[7]

10.     Finally, all interests of a debtor in property held as of the commencement of a chapter 11 case automatically become property of the estate and any restrictions or conditions on the transfer of such interests are unenforceable.[8]

---

extraterritorial application of the Bankruptcy Code as it applies to property of the estate."); *In re Nakash*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) ("[B]ased upon the applicable Code sections [and] other indicia of congressional intent, . . . the automatic stay applies extraterritorially."); *In re McLean Indus.*, 74 B.R. 589, 601 (Bankr. S.D.N.Y. 1987) ("The automatic stay applies extraterritorially.").

[6]   Section 365(e)(1)(B) of the Bankruptcy Code provides (subject to certain limited exceptions) that:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on . . . the commencement of a case under this title.

11 U.S.C. § 365(e)(1)(B).

[7]   *See* 11 U.S.C. § 525(a); *see also NextWave Pers. Commc'ns*, 537 U.S. 293, 308 (holding the Federal Communications Commission could not cancel a debtor's broadcasting license due to non-payment of licensing fees during the bankruptcy process).

[8]   *See* 11 U.S.C. § 541(c)(1).

4

11.     Although application of the protections afforded a debtor by sections 362, 365, 525, and 541 is automatic with the filing of a chapter 11 petition, not all parties affected or potentially affected by the commencement of these chapter 11 cases are aware of these statutory provisions or their significance and global impact.  In light of the fact that certain Debtors are incorporated outside the United States and have assets located abroad, including bank accounts, it is essential to advise parties outside the United States of the existence, reach, and effects of these provisions.  Indeed, in the event the Proposed Order is not entered, parties located in foreign jurisdictions may inadvertently take action against the Debtors or their property in violation of sections 362 and 365 of the Bankruptcy Code, including attempting to set off the Debtors' funds held in bank accounts to satisfy claims.  Any such violation may disrupt the Debtors' business and impairs their ability to successfully preserve their assets and maximize value for stakeholders.

12.     Section 105(a) of the Bankruptcy Code, moreover, authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[9]  This section, therefore, authorizes the Court to issue the Proposed Order.

13.     Bankruptcy courts in this district and elsewhere have entered orders restating and enforcing the protections set forth in sections 362, 365, 525, and 541 of the Bankruptcy Code under comparable circumstances.[10]  Given the critical importance of ensuring the Debtors' non-

---

[9]     11 U.S.C. § 105(a).

[10]    *See, e.g.*, *In re GCX Limited,* No. 19-12031 (CSS) (Bankr. D. Del. Sept. 15, 2019); *In re Maurice Sporting Goods, Inc.*, No. 17-12481 (CSS) (Bankr. D. Del. Nov. 21, 2017); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. June 27, 2017); *In re BPS US Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 1, 2016); *In re Modular Space Holdings, Inc.*, No. 16-12825 (KJC) (Bankr. D. Del. Dec. 22, 2016); *In re CGG Holdings (U.S.) Inc.*, No. 17-11637 (MG) (Bankr. S.D.N.Y. June 15, 2017*In re: Miami Metals I, Inc., et al.*, No. 18-13359 (SHL) (Bankr. S.D.N.Y. Nov. 21, 2018); *In re Sears Holdings Corporation,* No. 18-23538 (RDD) (Bankr. S.D.N.Y Oct. 15, 2018); *In re China Fishery Group Limited (Cayman), et al.,* No. 16-11895 (JLG) (Bankr. S.D.N.Y. June 30, 2016.  Because of the voluminous nature of the orders cited herein, such orders have

5

U.S. assets and/or operations are not affected by noncompliance with U.S. bankruptcy law, similar relief is appropriate here.

14.     Accordingly, the Debtors respectfully request that the Court enter the Proposed Order in the form attached hereto, which restates the applicable provisions of sections 362, 365, 525, and 541 of the Bankruptcy Code and makes clear that those provisions are applicable to all creditors and parties in

## Notice

15.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Debtors' secured lenders; (d) the United States Attorney's Office for the District of Delaware; and (e) any other parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m)(iii).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

---

not been attached to this motion.  Copies of these orders are available upon request made to the Debtors' proposed counsel.

6

WHEREFORE, the Debtors respectfully request entry of the Proposed Order (a) granting

the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: January 19, 2021
         Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ G. David Dean*
Seth Van Aalten (*pro hac vice* pending)
G. David Dean (No. 6403)
Justin R. Alberto (No. 5126)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 574-2103
Email: svanaalten@coleschotz.com
         ddean@coleschotz.com
         jalberto@coleschotz.com

- and -

**PAUL HASTINGS LLP**
Luc A. Despins, Esq. (pro hac vice pending)
G. Alexander Bongartz, Esq. (pro hac vice pending)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: lucdespins@paulhastings.com
         alexbongartz@paulhastings.com

*Proposed Counsel to Debtors and Debtors in
Possession*

7

# EXHIBIT A

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
In re: : Chapter 11
:
EHT US1, Inc., *et al.*,[1] : Case No. 21-10036 (CSS)
:
Debtors. : (Jointly Administered)
:
: **RE: Docket No. __**
:
-------------------------------------------------------------x

## ORDER (I) RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF BANKRUPTCY CODE, (II) PERMITTING DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING FORM AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (the "Debtors") for entry of an order (this "Order") (i) restating and enforcing the

worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the

Bankruptcy Code, (ii) modifying the automatic stay, (iii) approving the form and manner of

notice, and (iv) granting related relief, all as more fully set forth in the Motion; and upon the

First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: EHT US1, Inc.(6703); 5151 Wiley Post Way, Salt Lake City, LLC (1455); ASAP Cayman Atlanta Hotel LLC (2088); ASAP Cayman Denver Tech LLC (7531); ASAP Cayman Salt Lake City Hotel LLC (7546); ASAP Salt Lake City Hotel, LLC (7146); Atlanta Hotel Holdings, LLC (6450); CI Hospitality Investment, LLC (7641); Eagle Hospitality Trust S1 Pte Ltd. (7669); Eagle Hospitality Trust S2 Pte Ltd. (7657); EHT Cayman Corp. Ltd. (7656); Sky Harbor Atlanta Northeast, LLC (6450); Sky Harbor Denver Holdco, LLC (6650); Sky Harbor Denver Tech Center, LLC (8303); UCCONT1, LLC (0463); UCF 1, LLC (6406); UCRDH, LLC (2279); UCHIDH, LLC (6497); Urban Commons 4th Street A, LLC (1768); Urban Commons Anaheim HI, LLC (3292); Urban Commons Bayshore A, LLC (2422); Urban Commons Cordova A, LLC (4152); Urban Commons Danbury A, LLC (4388); Urban Commons Highway 111 A, LLC (4497); Urban Commons Queensway, LLC (6882); Urban Commons Riverside Blvd., A, LLC (4661); and USHIL Holdco Member, LLC (4796). The Debtors' mailing address is 3 Times Square, 9th Floor New York, NY 10036 c/o Alan Tantleff (solely for purposes of notices and communications).

[2] Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Motion.

40000/0600-40010661v1

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012; and this Court having found that

this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final

order consistent with Article III of the United States Constitution; and this Court having found

that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§

1408 and 1409; and this Court having found that the relief requested in the Motion is in the best

interests of the Debtors' estates, their creditors, and other parties in interest; and this Court

having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion

were appropriate under the circumstances and no other notice need be provided; and this Court

having reviewed the Motion and having heard the statements in support of the relief requested

therein at a hearing before this Court (the "Hearing"); and this Court having determined that the

legal and factual bases set forth in the Motion and at the Hearing establish just cause for the

relief granted herein; and upon all of the proceedings had before this Court; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Subject to section 362 of the Bankruptcy Code, all entities (including individuals,

partnerships, corporations, estates, trusts, governmental units, and other entities and all those

acting on their behalf), whether of the United States, any state or locality therein or any territory

or possession thereof, or any non-U.S. jurisdiction (including any division, department, agency,

instrumentality or service thereof, and all those acting on their behalf), are hereby stayed,

restrained and enjoined from:

    a. commencing or continuing (including the issuance or employment
of process) any judicial, administrative, or other action or
proceeding against the Debtors that was or could have been
commenced before the commencement of these chapter 11 cases or

2

recovering a claim against the Debtors that arose before the commencement of these chapter 11 cases;

b.    enforcing, against the Debtors or against property of their estates, a judgment or order obtained before the commencement of these chapter 11 cases;

c.    taking any action, whether inside or outside the United States, to obtain possession of property of the Debtors' estates, wherever located, or to exercise control over property of the estates or interfere in any way with the conduct by the Debtors of their business, including, without limitation, attempts to interfere with deliveries or events or attempts to arrest, seize or reclaim any assets in which the Debtors have legal or equitable interests;

d.    taking any action to create, perfect, or enforce any lien against the property of the Debtors' estates;

e.    taking any action to create, perfect, or enforce against property of the Debtors any lien to the extent that such lien secures a claim that arose prior to the commencement of these chapter 11 cases;

f.    taking any action to collect, assess, or recover a claim against the Debtors that arose prior to the commencement of these chapter 11 cases; and

g.    offsetting any debt owing to the Debtors that arose before the commencement of these chapter 11 cases, including funds held in bank accounts (wherever located), against any claim against the Debtors.

3.    Pursuant to sections 362 and 365 of the Bankruptcy Code, and subject to any relevant provisions and exceptions provided for in the Bankruptcy Code, notwithstanding any provision in a contract ("Contract") or lease ("Lease") or any applicable law, all entities are hereby stayed, restrained, and enjoined from terminating or modifying any and all Contracts and Leases to which the Debtors are party or signatory, at any time after the commencement of these chapter 11 cases, because of a provision in such Contract or Lease that is conditioned on the (a) insolvency or financial condition of the Debtors at any time before the closing of these chapter 11 cases or (b) commencement of these chapter 11 cases under the Bankruptcy Code.

3

4.      Pursuant to section 525 of the Bankruptcy Code, all governmental units, including municipalities, and other regulatory authorities are prohibited and enjoined from:  (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors; (b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases.

5.      Pursuant to section 541(c) of the Bankruptcy Code, any interest of the Debtors in property is property of the estates, notwithstanding any provision in any agreement, transfer instrument, or applicable nonbankruptcy law, that:  (a) restricts or conditions transfer of such interest by the Debtors; or (b) is conditioned on the insolvency or financial condition of the Debtors or on the commencement of the Debtors' chapter 11 cases, and that effects or gives an option to effect a forfeiture, modification, or termination of the Debtors' interest in property.

6.      The form of Notice attached as **Exhibit 1** hereto is approved.  The Debtors are authorized, but not directed, to serve the Notice (including, as the Debtors deems necessary, translations thereof), upon creditors, governmental units or other regulatory authorities, and parties in interest, wherever located.

7.      For the avoidance of doubt, this Order does not expand or enlarge the rights and protections afforded to the Debtors under the Bankruptcy Code.

8.      The automatic stay is modified, solely to the extent the Debtors, in their sole discretion, deem appropriate, to permit the Debtors to allow litigation or contested matters commenced before the Petition Date to proceed.

4

9.      This Order remains subject to section 362 of the Bankruptcy Code, including its

exceptions.  Unless otherwise specified herein, any party that desires to modify the automatic

stay must file a motion with the United States Bankruptcy court for the District of Delaware.

10.     The terms and conditions of this Order are immediately effective and enforceable

upon its entry.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

12.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

## **EXHIBIT 1**

**Form of Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- x
:
In re: : Chapter 11
:
EHT US1, Inc., *et al.*,[1] : Case No. 21-10036 (CSS)
:
Debtors. : (Jointly Administered)
:
: **RE: Docket No. __**
---------------------------------------------------------------------- x

## NOTICE OF ENTRY OF ORDER RESTATING AND ENFORCING WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on January 18, 2021, the above-captioned debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). These chapter 11 cases are pending before the Honorable Judge Christopher S. Sontchi, United States Bankruptcy Judge, and are being jointly administered under the lead case *EHT US1, Inc., et al.*, Case No. 21-10036 (CSS).

**PLEASE TAKE FURTHER NOTICE** that pursuant to section 362(a) of the Bankruptcy Code, the Debtors' filing of their respective voluntary petitions operates as a self-effectuating, statutory stay or injunction, applicable to all entities and protecting the Debtors from, among other things: (a) the commencement or continuation of a judicial, administrative, or other action or proceeding against the Debtors (i) that was or could have been commenced before the commencement of the Debtors' cases or (ii) to recover a claim against the Debtors that arose before the commencement of the Debtors' cases; (b) the enforcement, against the Debtors or against any property of the Debtors' bankruptcy estates, of a judgment obtained before the commencement of the Debtors' cases; or (c) any act to obtain possession of property of or from the Debtors' bankruptcy estates, or to exercise control over property of the Debtors' bankruptcy estates.[2]

**PLEASE TAKE FURTHER NOTICE** that pursuant to the *Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner Of Notice, and (IV) Granting Related Relief* [Docket No. __] (the "Order"), entered on [•], 2021, and attached hereto as **Exhibit A**, all entities wherever located (including individuals, partnerships, corporations, and other entities and all those acting on their behalf), entities party to a contract or agreement with the Debtors, governmental units, whether of the United States, any state or locality therein or any territory or possession thereof, or any foreign country (including any division, department, agency, instrumentality or service thereof, and all those acting on their behalf), are hereby put on notice that they are subject to the Order and must comply with its terms and provisions.

**PLEASE TAKE FURTHER NOTICE** that any entity that seeks to assert claims or interests against, seek or assert causes of action or other legal or equitable remedies against, or otherwise exercise any rights in law or equity

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: EHT US1, Inc.(6703); 5151 Wiley Post Way, Salt Lake City, LLC (1455); ASAP Cayman Atlanta Hotel LLC (2088); ASAP Cayman Denver Tech LLC (7531); ASAP Cayman Salt Lake City Hotel LLC (7546); ASAP Salt Lake City Hotel, LLC (7146); Atlanta Hotel Holdings, LLC (6450); CI Hospitality Investment, LLC (7641); Eagle Hospitality Trust S1 Pte Ltd. (7669); Eagle Hospitality Trust S2 Pte Ltd. (7657); EHT Cayman Corp. Ltd. (7656); Sky Harbor Atlanta Northeast, LLC (6450); Sky Harbor Denver Holdco, LLC (6650); Sky Harbor Denver Tech Center, LLC (8303); UCCONT1, LLC (0463); UCF 1, LLC (6406); UCRDH, LLC (2279); UCHIDH, LLC (6497); Urban Commons 4th Street A, LLC (1768); Urban Commons Anaheim HI, LLC (3292); Urban Commons Bayshore A, LLC (2422); Urban Commons Cordova A, LLC (4152); Urban Commons Danbury A, LLC (4388); Urban Commons Highway 111 A, LLC (4497); Urban Commons Queensway, LLC (6882); Urban Commons Riverside Blvd., A, LLC (4661); and USHIL Holdco Member, LLC (4796). The Debtors' mailing address is 3 Times Square, 9th Floor New York, NY 10036 c/o Alan Tantleff (solely for purposes of notices and communications).

[2]    Nothing herein shall constitute a waiver of the right to assert any claims, counterclaims, defenses, rights of setoff or recoupment or any other claims of the Debtors against any party to the above-captioned cases. The Debtors expressly reserve the right to contest any claims which may be asserted against the Debtors.

against the Debtors or their estates must do so in front of the Court pursuant to the Order, the Bankruptcy Code, and applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, any governmental agency, department, division or subdivision, or any similar governing authority is prohibited from, among other things: (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors; (b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases as set forth more particularly in the Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, parties to contracts or agreements with the Debtors are prohibited from terminating such contracts or agreements because of a Debtor's bankruptcy filing—except as permitted by the Court under applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to sections 105(a) and 362(k) of the Bankruptcy Code and Rule 9020 of the Federal Rules of Bankruptcy Procedure, among other applicable substantive law and rules of procedure, any entity (including governmental unit) seeking to assert its rights or obtain relief outside of the processes set forth in the Order, the Bankruptcy Code, and applicable law may be subject to proceedings in front of the Court for failure to comply with the Order and applicable law—including contempt proceedings resulting in fines, sanctions, and punitive damages against the entity and its assets inside the United States.

**PLEASE TAKE FURTHER NOTICE** that additional information regarding these chapter 11 cases, including copies of pleadings filed therein, may be obtained by (a) reviewing the publicly available docket of these chapter 11 cases at https://ecf.deb.uscourts.gov/cgi-bin/login.pl (PACER login and password required), (b) accessing the Debtors' publicly available website providing information regarding these chapter 11 cases located online at www.donlinrecano.com/eagle or (c) contacting the following proposed co-counsel for the Debtors:

**COLE SCHOTZ P.C.**

_____

G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801

- and -

**PAUL HASTINGS LLP**
Luc. A. Despins, Esq.
G. Alexander Bongartz, Esq.
200 Park Avenue
New York, New York 10166

*Proposed Counsel to Debtors and Debtors in Possession*

2

## EXHIBIT A TO NOTICE

**Order**

40000/0600-40010661v1

Document Break

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | **Hearing Date:** |
| | **Objection Deadline:** |

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) RESTATING AND ENFORCING
WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND
*IPSO FACTO* PROTECTIONS OF BANKRUPTCY CODE, (II) PERMITTING
DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING FORM AND
MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

through their proposed undersigned counsel, file this motion (the "Motion") seeking entry of an

order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"): (i) restating

and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto*

protections of the Bankruptcy Code; (ii) modifying the worldwide automatic stay, to the extent

the Debtors deem appropriate in their sole discretion, to proceed with litigation or contested

matters, if any, commenced before the Petition Date; (iii) approving the form and manner

ofnotice related thereto, substantially in the form attached as Exhibit 1 to the Proposed Order (the

"Notice"); and (iv) granting related relief.

**Jurisdiction, Venue, and Statutory Bases**

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practices and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 362, 365, 525, and 541 of title 11 of the United States Code (the "Bankruptcy Code").

**Background**

4.      On INSERT PETITION DATE (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court.  The Debtors are authorized to continue operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed to date in these chapter 11 cases.

5.      A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in the *Declaration INSERT TITLE OF DEC* (the "First Day Declaration"), which the Debtors rely upon and incorporate by reference herein, and which is being filed contemporaneously with this Motion.

### Basis for Relief

**I.      Relief Is Appropriate to Ensure Adherence to Automatic Stay, Anti-Discrimination, and *Ipso Facto* Provisions of the Bankruptcy Code.**

6.      As a result of the commencement of chapter 11 cases, and by operation of section 362 of the Bankruptcy Code, the automatic stay enjoins all entities from, among other things, taking any action to obtain possession of property of the estate or to exercise control over property of the estate.[1]  The injunction contained in section 362 is a core protection for debtors, providing them with a "breathing spell from [their] creditors" that is essential to the Debtors' ability to reorganize successfully.[2]

7.      Given its fundamental importance to a debtor's reorganization, courts have broadly construed the automatic stay provision of section 362 of the Bankruptcy Code and have recognized the extraterritorial reach of the automatic stay.[3]

8.      As a corollary to the protection afforded by the automatic stay, section 365(e)(1)(B) of the Bankruptcy Code prohibits counterparties to contracts with a debtor from terminating those contracts because of a debtor's bankruptcy filing.  Specifically, section 365(e) of the Bankruptcy Code invalidates so-called *ipso facto* provisions, which provide for the termination of a contract upon a bankruptcy filing.[4]

---

[1] See 11 U.S.C. § 362(a)(3).

[2] *See Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982); *Shugrue v. Air Line Pilots Ass'n Int'l. (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990) (internal citations omitted).

[3] *See, e.g.*, *In re Nortel Networks, Inc.*, 669 F.3d 128, 138 (3d Cir. 2011) (upholding the bankruptcy court's decision to enforce the automatic stay extraterritorially); *In re Bernard L. Madoff Inv. Secs. LLC*, 2012 WL 1570859 (S.D.N.Y. May 4, 2012) (upholding extraterritorial enforcement of the automatic stay and injunction barring foreign creditor's lawsuit); *In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) ("Given this clear expression of intent by Congress in the express language of the Bankruptcy Code, we conclude that Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate."); *In re Nakash*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) ("[B]ased upon the applicable Code sections [and] other indicia of congressional intent, . . . the automatic stay applies extraterritorially."); *In re McLean Indus.*, 74 B.R. 589, 601 (Bankr. S.D.N.Y. 1987) ("The automatic stay applies extraterritorially.").

[4] Section 365(e)(1)(B) of the Bankruptcy Code provides (subject to certain limited exceptions) that:

9.      Under section 525(a) of the Bankruptcy Code, "governmental units,"—defined, in section 101(27), to include not only a municipality but also a foreign state or other foreign government, as well as their departments, agencies, or instrumentalities—are prohibited from, among other things, denying, revoking, suspending, or refusing to renew licenses, permits, charters, franchises, or other similar grants held by a chapter 11 debtor on the basis that the debtor has failed to pay a dischargeable debt, commenced a chapter 11 case, or was insolvent prior to the commencement of such case.[5]

10.     Finally, all interests of a debtor in property held as of the commencement of a chapter 11 case automatically become property of the estate and any restrictions or conditions on the transfer of such interests are unenforceable.[6]

11.     Although application of the protections afforded a debtor by sections 362, 365, 525, and 541 is automatic with the filing of a chapter 11 petition, not all parties affected or potentially affected by the commencement of these chapter 11 cases are aware of these statutory provisions or their significance and global impact.  In light of the fact that certain Debtor affiliates are incorporated outside the United States and have assets located abroad, including bank accounts, and the Debtors conduct a significant amount of business overseas and have valuable assets in foreign jurisdictions, it is essential to advise parties outside the United States of the existence, reach, and effects of these provisions.  Indeed, in the event the Proposed Order

---

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on . . . the commencement of a case under this title.

11 U.S.C. § 365(e)(1)(B).

[5] *See* 11 U.S.C. § 525(a); *see also NextWave Pers. Commc'ns*, 537 U.S. 293, 308 (holding the Federal Communications Commission could not cancel a debtor's broadcasting license due to non-payment of licensing fees during the bankruptcy process).

[6] *See* 11 U.S.C. § 541(c)(1).

is not entered, parties located in foreign jurisdictions may inadvertently take action against the

Debtors or their property in violation of sections 362 and 365 of the Bankruptcy Code, including

attempting to set off the Debtors' funds held in bank accounts to satisfy claims seize assets due

to non-payment of prepetition claims and the actions of parties hostile to the estate that are

seeking to convert assets preserved by the automatic stay and the filing of the Petition.  Any such

violation may disrupt the Debtors' business and impairs their ability to successfully preserve

their assets and maximize value for stakeholders.

12.     Section 105(a) of the Bankruptcy Code, moreover, authorizes the Court to "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[7]

13.     Bankruptcy courts in this district and elsewhere have entered orders restating and

enforcing the protections set forth in sections 362, 365, 525, and 541 of the Bankruptcy Code

under comparable circumstances.[8]  Given the critical importance of ensuring the Debtors' non-

U.S. operations are not undermined by noncompliance with U.S. bankruptcy law, similar relief is

appropriate here.

14.     Accordingly, the Debtors respectfully request that the Court enter the Proposed

Order in the form attached hereto, which restates the applicable provisions of sections 362, 365,

525, and 541 of the Bankruptcy Code and makes clear that those provisions are applicable to all

creditors and parties in interest.[9]

---

[7] 11 U.S.C. § 105(a).

[8] *See, e.g.*, *In re GCX Limited,* No. 19-12031 (CSS) (Bankr. D. Del. Sept. 15, 2019); *In re Maurice Sporting Goods, Inc.*, No. 17-12481 (CSS) (Bankr. D. Del. Nov. 21, 2017); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. June 27, 2017); *In re BPS US Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 1, 2016); *In re Modular Space Holdings, Inc.*, No. 16-12825 (KJC) (Bankr. D. Del. Dec. 22, 2016); *In re CGG Holdings (U.S.) Inc.*, No. 17-11637 (MG) (Bankr. S.D.N.Y. June 15, 2017*In re: Miami Metals I, Inc., et al.*, No. 18-13359 (SHL) (Bankr. S.D.N.Y. Nov. 21, 2018); *In re Sears Holdings Corporation,* No. 18-23538 (RDD) (Bankr. S.D.N.Y Oct. 15, 2018); *In re China Fishery Group Limited (Cayman), et al.,* No. 16-11895 (JLG) (Bankr. S.D.N.Y. June 30, 2016.  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.  Copies of these orders are available upon request made to the Debtors' proposed counsel.

[9] As necessary, the Debtors will provide translations of this Motion, the Order, and/or the Notice.

15.     The Debtors further seek authority, pursuant to sections 105(a), 362(a), and 362(d) of the Bankruptcy Code, to modify the automatic stay, solely to the extent the Debtors deem appropriate in their sole discretion, to proceed with litigation or contested matters —many of which may proceed  in jurisdictions outside the United States and involve non-Debtors.[10]

16.     Cause exists to modify the stay in these limited actions because such relief will permit the Debtors to choose to defend  actions and contested matters that, the subject of ongoing disputes, whether reduced to litigation or other proceedings in venues outside the United States or will soon commence.  Such relief would permit the Debtors to liquidate certain claims more efficiently and in accordance with applicable law as well as preserve assets which are in peril of dissipation or dilution of value.

### Reservation of Rights

17.     Nothing contained in this motion or any actions taken by the Debtors pursuant to relief granted in an order approving this motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise)

---

[10] *See U. S. Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 370 (1988) (holding that parties in interest may file for relief from the automatic stay); *United States v. State St. Bank & Tr. Co.*, Adv. No. 01- 04605, 2002 WL 417013, at *2 (Bankr. D. Del. Mar. 4, 2002) (noting that section 1109 includes debtors and holding that argument that debtor is not a proper party in interest "clearly contravenes the plan language" of the statute).

satisfied pursuant to this motion are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.

### Notice

1.      The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Debtors' secured lenders; (d) the United States Attorney's Office for the District of Delaware; and (e) any other parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m)(iii).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[INSERT PROPSOED DEBTORS COUNSEL SIGNATURE BLOCK]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | **Re: Docket No. __** |

**ORDER (I) RESTATING AND ENFORCING
WORLDWIDE AUTOMATIC STAY, ANTI-DISCRIMINATION
PROVISIONS, AND *IPSO FACTO* PROTECTIONS OF THE BANKRUPTCY CODE, (II)
PERMITTING DEBTORS TO MODIFY AUTOMATIC STAY, (III) APPROVING
FORM AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order") (a) restating and enforcing the

worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the

Bankruptcy Code, (b) modifying the automatic stay, (c) approving the form and manner of notice,

and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent

with Article III of the United States Constitution; and this Court having found that venue

of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and this Court having found that the relief requested in the Motion is in the best

interests of the Debtors' estates, their creditors, and other parties in interest; and this Court

having found that the Debtors' notice of the Motion and opportunity for a hearing on the

Motion were appropriate under the circumstances and no other notice need be provided;

and this Court having reviewed the Motion and having heard the statements in support of

the relief requested therein at a hearing before this Court (the "Hearing"); and this Court

having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and upon all of the proceedings

had before this Court; and after due deliberation and sufficient cause appearing therefor, it

is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Subject to section 362 of the Bankruptcy Code, all persons (including

individuals, partnerships, corporations, and other entities and all those acting on

their behalf) and governmental units, whether of the United States, any state or

locality therein or any territory or possession thereof, or any non-U.S. jurisdiction

(including any division, department, agency, instrumentality or service thereof, and

all those acting on their behalf), are hereby stayed, restrained and enjoined from:

a.      commencing or continuing (including the issuance or employment
        of process) any judicial, administrative, or other action or
        proceeding against the Debtors that was or could have been
        commenced before the commencement of these chapter 11 cases or
        recovering a claim against the Debtors that arose before the
        commencement of these chapter 11 cases;

b.      enforcing, against the Debtors or against property of their estates, a
        judgment or order obtained before the commencement of these
        chapter 11 cases;

c.      taking any action, whether inside or outside the United States, to
        obtain possession of property of the Debtors' estates, wherever
        located (including, but not limited to, owned, operated, or leased
        facilities or property thereon (including servers and circuitry
        property) and any other transportation equipment (including
        containers), or to exercise control over property of the estates or
        interfere in any way with the conduct by the Debtors of their
        businesses, including, without limitation, attempts to interfere with

deliveries or events or attempts to arrest, seize or reclaim any equipment, supplies or all other assets in which the Debtors have legal or equitable interests;

d.   taking any action to create, perfect, or enforce any lien against the property of the Debtors' estates;

e.   taking any action to create, perfect, or enforce against property of the Debtors any lien to the extent that such lien secures a claim that arose prior to the commencement of these chapter 11 cases;

f.   taking any action to collect, assess, or recover a claim against the Debtors that arose prior to the commencement of these chapter 11 cases;

g.   offsetting any debt owing to the Debtors that arose before the commencement of these chapter 11 cases against any claim against the Debtors; and

3.   Pursuant to sections 362 and 365 of the Bankruptcy Code, and subject to any relevant provisions and exceptions provided for in the Bankruptcy Code, notwithstanding any provision in a contract ("Contract") or lease ("Lease") or any applicable law, all persons are hereby stayed, restrained, and enjoined from terminating or modifying any and all Contracts and Leases to which the Debtors are party or signatory, at any time after the commencement of these chapter 11 cases, because of a provision in such Contract or Lease that is conditioned on the (a) insolvency or financial condition of the Debtors at any time before the closing of these chapter 11 cases; or (b) commencement of these chapter 11 cases under the Bankruptcy Code. Pursuant to section 525 of the Bankruptcy Code, all governmental units and other regulatory authorities are prohibited and enjoined from:  (a) denying, revoking, suspending, or refusing to renew any

license, permit, charter, franchise, or other similar grant to the Debtors;(b)

placing conditions upon such a grant to the Debtors; or (c) discriminating

against the Debtors with respect to such a grant, solely because the Debtors

are debtors under the Bankruptcy Code, may have been insolvent before the

commencement of these chapter 11 cases, or are insolvent during the

pendency of these chapter 11 cases.

4.      Pursuant to section 541(c) of the Bankruptcy Code, any interest of the

Debtors in property is property of the estates, notwithstanding any provision

in any agreement, transfer instrument, or applicable nonbankruptcy law,

that:  (a) restricts or conditions transfer of such interest by the Debtors; or

(b) is conditioned on the insolvency or financial condition of the Debtors or

on the commencement of the Debtors' chapter 11 cases, and that effects or

gives an option to effect a forfeiture, modification, or termination of the

Debtor's interest in property.

5.      Notwithstanding the relief granted in this Order and any actions taken

pursuant to such relief, nothing in this Order or the Motion shall be deemed:

(a) an admission as to the validity, priority, or amount of any particular

claim against a Debtor entity; (b) a waiver of the Debtors' or any other party

in interest's right to dispute any particular claim on any grounds; (c) a

promise or requirement to pay any particular claim; (d) an implication or

admission that any particular claim is of a type specified or defined in this

Order or the Motion; (e) a request or authorization to assume any

agreement, Contract, or Lease pursuant to section 365 of the Bankruptcy

Code; (f) a waiver or limitation of the Debtors' or any other party in

interest's rights under the Bankruptcy Code or any other applicable law; or

(g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens.

6.      The form of Notice attached as **Exhibit 1** hereto is approved.  The Debtors are authorized, but not directed, to serve the Notice (including, as the Debtors deem necessary, translations thereof), upon creditors, governmental units or other regulatory authorities, and parties in interest, wherever located.

For the avoidance of doubt, this Order does not expand or enlarge the rights and protections afforded to the Debtors under the Bankruptcy Code.

9.      The automatic stay is modified, solely to the extent the Debtors, in their sole discretion, deem appropriate, to permit the Debtors to allow litigation or contested matters commenced before the Petition Date to proceed.

10.      This Order remains subject to section 362 of the Bankruptcy Code, including its exceptions.  Unless otherwise specified herein, any party that desires to modify the automatic stay must file a motion with the United States Bankruptcy court for the District of Delaware.

11.      The terms and conditions of this Order are immediately effective and enforceable upon its entry.

12.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13.     This Court retains exclusive jurisdiction with respect to all matters arising

from or related to the implementation, interpretation, and enforcement of this

Order.

Dated: March _____, 2019
Wilmington, Delaware                    _____
                                        UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1**

## **Form of Notice**

**NOTICE OF ENTRY OF ORDER RESTATING AND ENFORCING WORLDWIDE
AUTOMATIC STAY, ANTI-DISCRIMINATION PROVISIONS, AND *IPSO FACTO*
PROTECTIONS OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on September 15, 2019, the above-captioned debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  These chapter 11 cases are pending before the Honorable Judge [•], United States Bankruptcy Judge, and are being jointly administered under the lead case *In re GCX Limited, et al.*, Case No. 19-_____ (___).

**PLEASE TAKE FURTHER NOTICE** that pursuant to section 362(a) of the Bankruptcy Code, the Debtors' filing of their respective voluntary petitions operates as a self-effectuating, statutory stay or injunction, applicable to all entities and protecting the Debtors from, among other things:  (a) the commencement or continuation of a judicial, administrative, or other action or proceeding against the Debtors (i) that was or could have been commenced before the commencement of the Debtors' cases; or (ii) to recover a claim against the Debtors that arose before the commencement of the Debtors' cases; (b) the enforcement, against the Debtors or against any property of the Debtors' bankruptcy estates, of a judgment obtained before the commencement of the Debtors' cases; or (c) any act to obtain possession of property of or from the Debtors bankruptcy estates, or to exercise control over property of the Debtors' bankruptcy estates. Nothing herein shall constitute a waiver of the right to assert any claims, counterclaims, defenses, rights of setoff or recoupment or any other claims of the Debtors against any party to the above-captioned cases.  The Debtors expressly reserve the right to contest any claims which may be asserted against the Debtors.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the *Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. __] (the "Order"), entered on September [•], 2019, and attached hereto as **Exhibit A**, all persons wherever located (including individuals, partnerships, corporations, and other entities and all those acting on their behalf), persons party to a contract or agreement with the Debtors, governmental units, whether of the United States, any state or locality therein or any territory or possession thereof, or any foreign country (including any division, department, agency, instrumentality or service thereof, and all those acting on their behalf), are hereby put on notice that they are subject to the Order and must comply with its terms and provisions.

**PLEASE TAKE FURTHER NOTICE** that any entity that seeks to assert claims or interests against, seek or assert causes of action or other legal or equitable remedies against, or otherwise exercise any rights in law or equity against the Debtors or their estates must do so in front of the Court pursuant to the Order, the Bankruptcy Code, and applicable law.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, any governmental agency, department, division or subdivision, or any similar governing authority is prohibited from, among other things:  (a) denying, revoking, suspending, or refusing to renew any license, permit, charter, franchise, or other similar grant to the Debtors; (b) placing conditions upon such a grant to the Debtors; or (c) discriminating against the Debtors with respect to such a grant, solely because the Debtors are debtors under the Bankruptcy Code, may have been insolvent before the commencement

of these chapter 11 cases, or are insolvent during the pendency of these chapter 11 cases as set forth more particularly in the Order.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Order, parties to contracts or agreements with the Debtors are prohibited from terminating such contracts or agreements because of a Debtor's bankruptcy filing—except as permitted by the Court under applicable law.

PLEASE TAKE FURTHER NOTICE that, pursuant to sections 105(a) and 362(k) of the Bankruptcy Code and Rule 9020 of the Federal Rules of Bankruptcy Procedure, among other applicable substantive law and rules of procedure, any person or governmental unit seeking to assert its rights or obtain relief outside of the processes set forth in the Order, the Bankruptcy Code, and applicable law may be subject to proceedings in front of the Court for failure to comply with the Order and applicable law—including contempt proceedings resulting in fines, sanctions, and punitive damages against the entity and its assets inside the United States.

PLEASE TAKE FURTHER NOTICE that additional information regarding these chapter 11 cases, including copies of pleadings filed therein, may be obtained by (a) reviewing the publicly available docket of these chapter 11 cases at https://ecf.deb.uscourts.gov/cgi-bin/login.pl (PACER login and password required), (b) accessing the Debtors' publicly available website providing information regarding these chapter 11 cases located online at https://cases.omniagentsolutions.com (c) contacting the following proposed co-counsel for the Debtors: [insert info for Dilworth]

[INSERT SIGNATURE BLOCK FOR DILWORTH]

**EXHIBIT A TO NOTICE**

**Order**

# App. Ex. 14

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Tuesday, March 30, 2021 6:31 PM EDT
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>
**CC:** Weis, Martin J. <mweis@dilworthlaw.com>
**Subject:** RE: Schedules for discovery and hearing(s)

The meet and confer is at 5 PM tomorrow for a half hour.

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**

1500 Market Street | Suite 3500E | Philadelphia, PA 19102

Tel: (215) 575-7268 | Fax: (215) 575-7200

lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Tuesday, March 30, 2021 6:27 PM
**To:** McMichael, Lawrence G.
**Cc:** Weis, Martin J.
**Subject:** RE: Schedules for discovery and hearing(s)

What time is the call?

I assume the others will be attending the 341 meeting at 1, so we all will have a conflict then.  I have calls from 9-10 with Schiavo's client in Switzerland, a prep/verification of identity call with Bud and Mathu at either 10 or 11 (waiting to hear back from Bud on the later time since my 11:00 call with Susan Orr's client got cancelled), the 341 at 1, and a call with Crown and Sherwin Williams at 3:30, which should be no more than an hour.

**ANNE AARONSON |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

---

**From:** McMichael, Lawrence G.
**Sent:** Tuesday, March 30, 2021 6:15 PM
**To:** Aaronson, Anne M.
**Cc:** Weis, Martin J.
**Subject:** RE: Schedules for discovery and hearing(s)

Anne: I will try to finesse it at the meet and confer tomorrow. Will you join me on the call?

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**

1500 Market Street | Suite 3500E | Philadelphia, PA 19102

Tel: (215) 575-7268 | Fax: (215) 575-7200

lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Tuesday, March 30, 2021 6:14 PM
**To:** McMichael, Lawrence G.
**Cc:** Weis, Martin J.
**Subject:** RE: Schedules for discovery and hearing(s)

Okay. We should make the other side ask for more time.  The delay could only hurt us in the eyes of the court and if we ask for more time, we will be doing damage to ourselves.  If they ask for it, well, we could say we were being courteous and wanting to ensure that all parties were able to best present their positions.

**ANNE AARONSON |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

---

**From:** McMichael, Lawrence G.
**Sent:** Tuesday, March 30, 2021 6:03 PM
**To:** Aaronson, Anne M.
**Cc:** Weis, Martin J.
**Subject:** RE: Schedules for discovery and hearing(s)

We are definitely not going to re-litigate the omnibus. While the injunction is preliminary, the bankruptcy court can accept as true all of the findings and it would make no difference. It is executory and can be rejected; it is a facially fraudulent transfer intended to benefit shareholders at the expense of

**TRUSTEE 14**

unsecured creditors. That's all we need to blow it up. Everything else is irrelevant.

Mathu needs more time to close on the $30 million and to rally support from unsecured creditors. He is working on both full time. He also claims that he might get to a deal with Hawk which would be huge if it happens. I am not holding my breath.

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Tuesday, March 30, 2021 5:57 PM
**To:** McMichael, Lawrence G.
**Cc:** Weis, Martin J.
**Subject:** FW: Schedules for discovery and hearing(s)

Um, is Raf seriously suggesting an intention to relitigate the state court order from December where the court found the debtor bound by the omni agreement?  That is a huge no-no and will get this case tossed fast by the Bankruptcy Court.  They should have appealed that at the time in the Chancery litigation.  We have plenty of bankruptcy code rights that should preclude dismissal. Even suggesting that the omni agreement is not legitimate or facts surrounding that agreement weren't considered by the bankruptcy court will be the death knell to the good faith of this filing.

Some of the things he says to the client make me shake my head and I'm sure the client loves what Raf suggests and then thinks we are not being aggressive enough by making those arguments.

Should I send him our draft response to the MTDs at some point or hold off until it is ready to file?  I am sure he won't like that we haven't included most of what he has sent over the past few days, but it wasn't included because it is inflammatory and detracts from what should be a narrow consideration as described in your last email to Mathu on him wanting to delay the hearing.  The more delay, the longer the company will be dormant and the weaker our argument will be that the debtor is maintaining customer relations so it can easily restart operations in chapter 11 and the more SeeCubic will try to grab assets, deter investors and deter customers…

**ANNE AARONSON |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Rafael X. Zahralddin-Aravena [mailto:RZahralddin@atllp.com]
**Sent:** Tuesday, March 30, 2021 5:48 PM
**To:** McMichael, Lawrence G.
**Cc:** Mathu Rajan; Aaronson, Anne M.; Jonathan M. Stemerman; Chapman-Tomlin, Christine; dan@streamacquisitiongroup.com; Caplow, Yonit A.; John A. Sten; Isaac D. Stevens; Maryann Millis; amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; nicole; SAG - SJ; bud@streamacquisitiongroup.com
**Subject:** Re: Schedules for discovery and hearing(s)

We need to put all the issues out there that would be needed for an appeal.

If not we make it easy for the Court to make a political decision that isn't grounded in the law.

It has to be stated and argued that this non-final order - no matter which Court it Judge - doesn't eliminate the ability of a debtor not just to file - but to operate in a bankruptcy.

 Larry is right that we need to show ability to fund a some sort of plan which includes our manufacturing, distribution, and strategic partners.  However - the avoidance actions are also assets of the estate.

If Skadden objects to our using what we have to show that there are significant issues related to the legitimacy of the settlement that can be remedied in bankruptcy we should push back for more time.  In the PI - all the things we see are wrong with the settlement weren't put into the record and were not made public - that is a problem.

Rafael

Sent from my iPhone

On Mar 30, 2021, at 5:36 PM, McMichael, Lawrence G. <lmcmichael@dilworthlaw.com> wrote:

> It is unlikely that the Court will give us 3 days on a motion to dismiss. Judge Owens will not view this as an opportunity to re-litigate what happened in the past. She really just needs to be

convinced that the bankruptcy proceeding has a purpose. The focus will be on unpaid creditors under the omnibus agreement, assets still owned by Stream on the petition date, avoidance claims to bring transferred assets back and financing. The latter is the  most important issue and someone from VTI will have to explain what it is willing to do to help reorganize the debtor.

Plus, do you really want to keep the case in limbo for another month? Remember that nothing will happen until she decides the motion to dismiss.

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**

1500 Market Street | Suite 3500E | Philadelphia, PA 19102

Tel: (215) 575-7268 | Fax: (215) 575-7200

lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Mathu Rajan [mailto:mathu@streamacquisitiongroup.com]
**Sent:** Tuesday, March 30, 2021 4:35 PM
**To:** Aaronson, Anne M.; 'Jonathan M. Stemerman'; Chapman-Tomlin, Christine; 'dan@streamacquisitiongroup.com'; Caplow, Yonit A.; Rafael X. Zahralddin-Aravena; John A. Sten; Isaac D. Stevens; Maryann Millis; McMichael, Lawrence G.
**Cc:** amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; 'nicole'; "SAG - SJ"; bud@streamacquisitiongroup.com
**Subject:** RE: Schedules for discovery and hearing(s)

1 Day is not enough
We need 3 days
Push for early May.
We can do a status conference on April 15 th or 19th
Thanks,
Mathu
On Mar 30, 2021, 4:33 PM -0400, McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>, wrote:

I am OK on the 19th but we need to confirm with the client that its team in available on that date.

**LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP**

1500 Market Street | Suite 3500E | Philadelphia, PA 19102

Tel: (215) 575-7268 | Fax: (215) 575-7200

lmcmichael@dilworthlaw.com| www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Tuesday, March 30, 2021 4:30 PM
**To:** 'Jonathan M. Stemerman'; Chapman-Tomlin, Christine; 'dan@streamacquisitiongroup.com'; McMichael, Lawrence G.; Caplow, Yonit A.; Rafael X. Zahralddin-Aravena; John A. Sten; Isaac D. Stevens; Maryann Millis
**Cc:** amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; 'nicole'; "SAG - SJ"; bud@streamacquisitiongroup.com
**Subject:** RE: Schedules for discovery and hearing(s)

Well, on a personal note, that would be a decent excuse to get me out of jury duty that day …

**ANNE AARONSON |DILWORTH PAXSON LLP**

1500 Market Street | Suite 3500E | Philadelphia, PA 19102

Tel: (215) 575-7110 | Fax: (215) 575-7200

aaaronson@dilworthlaw.com| www.dilworthlaw.com

---

**From:** Jonathan M. Stemerman [mailto:JStemerman@atllp.com]
**Sent:** Tuesday, March 30, 2021 4:25 PM
**To:** Chapman-Tomlin, Christine; 'dan@streamacquisitiongroup.com'; McMichael, Lawrence G.; Aaronson, Anne M.; Caplow, Yonit A.; Rafael X. Zahralddin-Aravena; John A. Sten; Isaac D. Stevens; Maryann Millis
**Cc:** amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; 'nicole'; "SAG - SJ"; bud@streamacquisitiongroup.com
**Subject:** RE: Schedules for discovery and hearing(s)

The Court is also proposing Monday, April 19th from 9:30 am to 5:00 pm for a full-day hearing on the Motion to Dismiss, but the parties have not yet agreed on that date.

<image001.jpg>
Armstrong Teasdale LLP
**Jonathan M. Stemerman**| Partner
300 Delaware Avenue, Suite 210, Wilmington, DE  19801

MAIN PHONE: 302.824.7089
CELL: 610.505.7383
jstemerman@atllp.com
www.armstrongteasdale.com

**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

---

**From:** Chapman-Tomlin, Christine <cct@dilworthlaw.com>
**Sent:** Tuesday, March 30, 2021 4:22 PM
**To:** 'dan@streamacquisitiongroup.com' <dan@streamacquisitiongroup.com>; McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>; Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Caplow, Yonit A. <ycaplow@dilworthlaw.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Jonathan M. Stemerman <JStemerman@atllp.com>; John A. Sten <JSten@atllp.com>; Isaac D. Stevens <IStevens@atllp.com>; Maryann Millis <MMillis@atllp.com>
**Cc:** amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; 'nicole' <nicole@streamacquisitiongroup.com>; "SAG - SJ" <suby@streamacquisitiongroup.com>; bud@streamacquisitiongroup.com
**Subject:** RE: Schedules for discovery and hearing(s)

| CAUTION: | EXTERNAL EMAIL |
| --- | --- |

Hello Dan.

I just sent an email to Amanda with the attached court calendar for upcoming hearings. I am unaware of any changes to this calendar.

**CHRISTINE CHAPMAN-TOMLIN |DILWORTH PAXSON LLP**
Paralegal
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7224 | Fax: (215) 575-7200
cct@dilworthlaw.com| www.dilworthlaw.com

---

**From:** dan@streamacquisitiongroup.com [mailto:dan@streamacquisitiongroup.com]
**Sent:** Tuesday, March 30, 2021 4:14 PM
**To:** McMichael, Lawrence G.; Aaronson, Anne M.; Caplow, Yonit A.; Chapman-Tomlin, Christine; 'Rafael X. Zahralddin-Aravena'; 'Jonathan M. Stemerman'; 'John A. Sten'; 'Isaac D. Stevens'; 'Maryann Millis'
**Cc:** amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; 'nicole'; "SAG - SJ"; bud@streamacquisitiongroup.com
**Subject:** Schedules for discovery and hearing(s)

Could the appropriate party(ies) send us an updated listing of the scheduling – there is some confusion on this end? Thanks.

---

https://clicktime.symantec.com/3C2sxXFh245aJf1MVyr4tzA7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email: postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

https://clicktime.symantec.com/3DTMYdCSSkv9wuwuNw2rvm7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email: postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

# App. Ex. 15

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Thursday, April 01, 2021 6:27 PM EDT
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Weis, Martin J. <mweis@dilworthlaw.com>
**Subject:** RE: VTI Response to MTD April 1 DRAFT--CONFIDENTIAL COMMUNICATION

I would talk to John Stem and convey your thoughts. Mathu is pushing him in the opposite direction.

### LAWRENCE G. MCMICHAEL |DILWORTH PAXSON LLP

1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Thursday, April 1, 2021 6:02 PM
**To:** Weis, Martin J.; McMichael, Lawrence G.
**Subject:** FW: VTI Response to MTD April 1 DRAFT--CONFIDENTIAL COMMUNICATION

I have a couple of overarching concerns about VTI's response.  First, I think they spend way too much time on the Chancery Court litigation and disputes between Stream and Stastney to the point that I can see the judge not reading to the argument section where there are helpful points being made. The background section screams out two-party dispute and disagreement with the Chancery Court.  If there is a tactful way to see if they can tone that down a bit or shorten it considerably, I think their response would be much more persuasive. Also, perhaps disclosing the identity of Burlington/Tim McCarthy is not a good idea unless Raf and his group have personally spoken with Tim McCarthy and verified real information. If you recall, Mathu would not allow us to have contact with Burlington or Tim and the documentation we received and that which is available on line is highly questionable – at best.  The website is not protected and has none of the markings of a valid company.  Now, according to VTI's response, this Tim McCarthy is on VTI's board.  If he was really an international investor with projects in Asia and on the boards he says he was, there would be some online presence substantiating this.  There is no news, PR, announcements or anything on any deals in which Burlington or McCarthy were involved.  Nothing even on Burlington's website indicates he is involved in any way other than as a consultant and just has one paragraph basically saying exactly what is in VTI's response – which is also the sole piece of information about the guy available anywhere online.  No pictures of him with Richard Branson or anyone from those other companies …  It may be true, but without any information to verify or any ability to speak with the guy or see any actual financial statements, etc. including that information could be extreme fodder for the other side to show that all of this talk of investment/financing is a continued fantasy.

### ANNE AARONSON |DILWORTH PAXSON LLP

1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

---

**From:** John A. Sten [mailto:JSten@atllp.com]
**Sent:** Thursday, April 1, 2021 5:09 PM
**To:** Aaronson, Anne M.; Weis, Martin J.; McMichael, Lawrence G.
**Cc:** Rafael X. Zahralddin-Aravena; David Going; Jonathan M. Stemerman; Isaac D. Stevens; Maxwell B. Feit
**Subject:** VTI Response to MTD April 1 DRAFT--CONFIDENTIAL COMMUNICATION

To all:

Attached is VTI's draft opposition to SLS's and SeeCubic's Motion to Dismiss.

Best regards,

John A. Sten



John A. Sten
Armstrong Teasdale LLP
225 Franklin St., 26th Fl.
Boston MA 02110
617-217-2030
jsten@atllp.com

********* PRIVATE AND CONFIDENTIAL*********

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the**

**TRUSTEE 15**

official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our **Global Privacy Policy** to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.

Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our **International Legal Notices**.

# App. Ex. 16

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Wednesday, April 21, 2021 1:40 PM EDT
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Weis, Martin J. <mweis@dilworthlaw.com>
**Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

I completely agree.

### Lawrence G. McMichael |Dilworth Paxson LLP

1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Aaronson, Anne M.
**Sent:** Wednesday, April 21, 2021 1:28 PM
**To:** Weis, Martin J.; McMichael, Lawrence G.
**Subject:** FW: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

I am concerned about Raf's group's rabid insistence on the chancery court docs and litigating the validity of the omnibus agreement in the MTD for two reasons – first and foremost, it is an unnecessary side show that will muck up the bankruptcy arguments that do not implicate the validity of that agreement or anything that happened in the Chancery Court and detract from our legitimate bankruptcy purpose arguments and, second, going at the MTD through arguments about the omnibus agreement is the much harder path with a lot of risk.  The fact that they want to go that route suggests, to me and maybe others, that the arguments on ownership of assets, legitimate business operations, attracting financing that are a slam dunk for us if we can make a colorable argument are not as legitimate as the client expresses.   All we need are a few documents and support for real financing, real contractual relationships and ownership of assets and we win.  That they are spending so much time distracted on Shad and the OA is concerning.

### Anne Aaronson |Dilworth Paxson LLP

1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Rafael X. Zahralddin-Aravena [mailto:RZahralddin@atllp.com]
**Sent:** Wednesday, April 21, 2021 1:02 PM
**To:** Weis, Martin J.; John A. Sten
**Cc:** Aaronson, Anne M.; Jonathan M. Stemerman; David Going; McMichael, Lawrence G.
**Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

Yes, we have been asking for a while, I know you all are busy but this is key.

How about 1:30.



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

---

**From:** Weis, Martin J. <mweis@dilworthlaw.com>
**Sent:** Wednesday, April 21, 2021 1:00 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; John A. Sten <JSten@atllp.com>
**Cc:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Jonathan M. Stemerman <JStemerman@atllp.com>; David Going <DGOING@atllp.com>; McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

Can we  have a call this afternoon on this?

### Martin J. Weis |Dilworth Paxson LLP

**TRUSTEE 22**

1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7136 | Fax: (215) 575-7200
mweis@dilworthlaw.com |www.dilworthlaw.com

---

**From:** Rafael X. Zahralddin-Aravena [mailto:RZahralddin@atllp.com]
**Sent:** Wednesday, April 21, 2021 12:59 PM
**To:** Weis, Martin J.; John A. Sten
**Cc:** Aaronson, Anne M.; Jonathan M. Stemerman; David Going
**Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

No day works without the documents.  John  - how long do you need to prepare?  Also, we have no idea what you all are asking so that we can coordinate with you and the committee.

Rafael X. Zahralddin

---

**From:** Weis, Martin J. <mweis@dilworthlaw.com>
**Sent:** Wednesday, April 21, 2021 12:57 PM
**To:** John A. Sten <JSten@atllp.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Jonathan M. Stemerman <JStemerman@atllp.com>; David Going <DGOING@atllp.com>
**Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

What days work for you?  The court order requires them to be done the 26 th to the 28th.

---

**From:** John A. Sten [mailto:JSten@atllp.com]
**Sent:** Wednesday, April 21, 2021 12:40 PM
**To:** Rafael X. Zahralddin-Aravena
**Cc:** Aaronson, Anne M.; Jonathan M. Stemerman; David Going; Weis, Martin J.
**Subject:** Re: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]

I agree. No go without documents. The creditors committee will need time too.

On Apr 21, 2021, at 12:35 PM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:

> Plus, the committee has had no time to review any of the production.
>
> Rafael
>
> ---
>
> **From:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>
> **Sent:** Wednesday, April 21, 2021 12:34 PM
> **To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Jonathan M. Stemerman <JStemerman@atllp.com>; John A. Sten <JSten@atllp.com>; David Going <DGOING@atllp.com>
> **Cc:** Weis, Martin J. <mweis@dilworthlaw.com>
> **Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]
>
> Monday is out for us as well due to conflicting hearings/appointments.  Bud is good with his date.
>
> **ANNE AARONSON |DILWORTH PAXSON LLP**
> 1500 Market Street | Suite 3500E | Philadelphia, PA 19102
> Tel: (215) 575-7110 | Fax: (215) 575-7200
> aaaronson@dilworthlaw.com |www.dilworthlaw.com
>
> ---
>
> **From:** Rafael X. Zahralddin-Aravena [mailto:RZahralddin@atllp.com]
> **Sent:** Wednesday, April 21, 2021 12:33 PM
> **To:** Aaronson, Anne M.; Jonathan M. Stemerman; John A. Sten; David Going
> **Cc:** Weis, Martin J.
> **Subject:** RE: Stream: Proposed Orders and Deposition Schedules [IWOV-IDOCS.FID4245647]
>
> John Sten?
>
> Our last conversation, John and Jon, was that even Monday is a no go as of **yesterday** in terms of preparation for Shad's deposition without the Chancery production, so no we are not ok with Monday without the proper prep time and documents.
>
> Completely unacceptable as it currently stands.
>
> <image001.jpg>
>
> Armstrong Teasdale LLP

**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

********** PRIVATE AND CONFIDENTIAL**********

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read ourGlobal Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

**From:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>
**Sent:** Wednesday, April 21, 2021 12:29 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Jonathan M. Stemerman <JStemerman@atllp.com>; John A. Sten <JSten@atllp.com>; David Going <DGOING@atllp.com>
**Cc:** Weis, Martin J. <mweis@dilworthlaw.com>
**Subject:** FW: Stream: Proposed Orders and Deposition Schedules

**CAUTION:**   **EXTERNAL EMAIL**

Are you all okay with the proposed dates below?  I haven't heard back from Mathu, despite several requests, and we want to identify all discovery issues before a meet and confer so we aren't limited to a single one on the Chancery Court docs, but I want to respond to Larkin as well so that we aren't accused of delay/bad faith.

**ANNE AARONSON |DILWORTH PAXSON LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com |www.dilworthlaw.com

**From:** Larkin, Joseph O [mailto:Joseph.Larkin@skadden.com]
**Sent:** Wednesday, April 21, 2021 11:18 AM
**To:** Liberi, Jason M; Aaronson, Anne M.; Weis, Martin J.; McMichael, Lawrence G.
**Cc:** Colby, Eben P; Brumme, Marley Ann
**Subject:** RE: Stream: Proposed Orders and Deposition Schedules

Anne – Following up on the below, can we nail these dates down today?

**From:** Liberi, Jason M (WIL)
**Sent:** Tuesday, April 20, 2021 12:11 PM
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; 'Weis, Martin J.' <mweis@dilworthlaw.com>; McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Cc:** Colby, Eben P (BOS) <Eben.Colby@skadden.com>; Larkin, Joseph O (WIL) <Joseph.Larkin@skadden.com>; Brumme, Marley Ann (BOS) <Marley.Brumme@skadden.com>
**Subject:** Stream: Proposed Orders and Deposition Schedules

Anne,

Following up on the meet-and-confer yesterday.  First, please let us know at your earliest convenience if the Debtor is OK with the

proposed scheduling order and conf stip & order that we circulated yesterday afternoon, so that they can be submitted to chambers for approval.  Second, we propose the following dates for depositions – please confirm that this works for the Debtor:

- Shad Stastney: Monday 4/26
- Mathu Rajan: Tuesday 4/27
- Charles Robertson: Wednesday 4/28

We are available to discuss at your convenience.  Thanks.

Regards,
Jason

**Jason M. Liberi**
**Skadden, Arps, Slate, Meagher & Flom LLP**
**One Rodney Square | P.O. Box 636 | Wilmington | DE | 19899**
**T: +1.302.651.3023 |F: +1.302.434.3023**
**jason.liberi@skadden.com**

-------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

================================================================================

https://clicktime.symantec.com/3LCEjhoUPUX26ov85poVMTZ7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

https://clicktime.symantec.com/3QA14AokLAxmri9wwCswpEu7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

https://clicktime.symantec.com/3EZd8AKzweAcMAmsQ1hrPsA7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

https://clicktime.symantec.com/3DnRvMJE2nF6rSKdCthQjdS7Vc?u=www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email:postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

# App. Ex. 17

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Saturday, April 24, 2021 10:14 PM EDT
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>
**CC:** Weis, Martin J. <mweis@dilworthlaw.com>
**Subject:** Re: SeeCubic Stay Relief Motion [IWOV-IDOCS.FID4245647]
**Attachment(s):** "image001.jpg"

I agree completely. I will study Raf's email when I get home late tomorrow and respond. But feel free to respond without me.

The MTD is totally winnable if we don't get sucked into side shows created by Mathu and others.

Sent from my iPhone

> On Apr 24, 2021, at 8:29 PM, Aaronson, Anne M. <aaaronson@dilworthlaw.com> wrote:
>
> I would dump this right back on them - what has Mathu or VTI done to stay outside litigation pending the MTD? Have they discussed this with Skadden? This seems like an attempt to lay things on us for malpractice. It isn't a debtor issue and we represent the debtor and have to act in the best interest of the estate. We can ask to extend the stay but Mathu chose to respond at a critical time without addressing a mutual stay. We will surely lose on any such motion and the best we can probably do is obtain an extension of the hearing to the MTD as a stand still. To me, I think Raf's prior firm screwed up and didn't raise things or appeal as they should have and they are looking for a scapegoat. We can win the MTDs if this tangential stuff not involving the debtor was handled by an attorney retained by Mathu.
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** "Rafael X. Zahralddin-Aravena" <RZahralddin@atllp.com>
>> **Date:** April 24, 2021 at 7:56:56 PM EDT
>> **To:** "McMichael, Lawrence G." <lmcmichael@dilworthlaw.com>, "Aaronson, Anne M." <aaaronson@dilworthlaw.com>, "Weis, Martin J." <mweis@dilworthlaw.com>
>> **Cc:** "Jonathan M. Stemerman" <JStemerman@atllp.com>, David Going <DGOING@atllp.com>, "John A. Sten" <JSten@atllp.com>, Mathu Rajan <mathu.rajan@vti-global.com>, dan.rink@vti-global.com, raja.rajan@vti-global.com, bud.robertson@vti-global.com, Amanda Von Ahnen <amanda.vonahnen@vti-global.com>, nicole.maneen@vti-global.com, "Richard L. Scheff" <RLScheff@atllp.com>
>> **Subject: SeeCubic Stay Relief Motion [IWOV-IDOCS.FID4245647]**
>>
>> Dear Dilworth team,
>>
>> I have a few inquiries from VTI regarding the SeeCubic stay relief motion and will be speaking to several investors over the weekend and Monday.
>>
>> The investors and management of VTI have a few issues and concerns.
>>
>> My discussion with Mr. McCarthy was premised by him that the investors, including himself as well as other key investors and institutional investors putting in the substantial investment into VTI are doing so because of Mathu Rajan. They believe he is able to commercialize the technology and hold together the vendors and customers necessary to do so. Tim McCarthy has stressed to me that his support and the support of his institutional investors funding the imminent investments in VTI to be used for Stream is staunchly behind Mathu as the driving force behind the efforts to commercialize the product, which includes reclaiming the IP necessary to take VTI and Stream public.
>>
>> The whole point of the bankruptcy for VTI is to marry the resources of VTI and Stream. That is the business plan and exit from bankruptcy and the rationale for the investment dollars coming in to VTI.
>>
>> Winning the motion to dismiss is an empty victory if it means that we can't get to the Ultra-D technology. That is a very direct blow against future fundraising, as well as the expectations of the current funding from investors like Mr. McCarthy and the institutions that are providing funding for this bankruptcy and continued operations.
>>
>> Skadden's litigation style is to create an emergency at every turn; they do this in a very calculated way. I know there is a lot to do and appreciate your responses.

**TRUSTEE 23**

In short, our client sees what has happened as follows; SeeCubic, Inc. violated the stay by approaching a landlord and inducing them to file an action to sell all the equipment in China so they could buy it at auction and take significant  assets from the company post-petition.  SeeCubic has then used the time we gave them to discuss settlement to file a motion accusing our "side", through an attack on Mathu, of violating the PI to counter balance the potential effect of the Debtor's potential stay enforcement motion, should it need to be filed, after settlement discussions are over. There are grave concerns on the part of VTI with the effect of the pending stay relief motion filed against Mathu on the motion to dismiss and any actions to recover assets through avoidance actions and turnover actions.

The questions being posed to me require an update on the position of the Debtors regarding the SeeCubic stay motion.

1.  What is the Debtor's position on whether or not it is appropriate to have the stay motion heard before the motion to dismiss?  We have grave concerns that the stay relief motion is being used to go after Mathu individually in order to get the Judge to enter findings of fact or holding that will be preclusive of an issue in the motion to dismiss, which is currently scheduled to be heard after the stay relief motion is heard.  It is our understanding that the matter in Philadelphia, which is the focus of their stay relief motion was filed over a year ago by the Rajans and the only reason that there was any activity in the case was because Skadden moved to dismiss the Philadelphia action.  Nothing would have been done by Mathu in that matter had it not been for Skadden's filings in the case on behalf of the individual defendants in those actions.   The "issue" created by this pending case is one created by Skadden itself as they removed Raja's case to Federal Court and then moved to dismiss.  Raja amended his complaint which the Court ruled mooted the motion  to dismiss. Skadden then filed a second motion to dismiss on other grounds which is pending.  Mathu simply removed his case, Skadden filed a motion to dismiss Mathu's case, and Mathu amended his complaint to moot the MTD.  Mathu has indicated he is fine agreeing to a voluntary stay of those proceedings until after the motion to dismiss (or longer) in order to resolve the issue.

2.  VTI is also concerned that there are ostensibly only six or so employees in the nerve center of the company, and Mathu is critical to the efforts to operate and move forward in this reorganization, and any action that subjects him to more litigation, especially while the motion to dismiss is being litigated is prejudicial.  Mathu is working the hardest to raise capital for operations and the bankruptcy, as well as keep options open with customers and orders that are already due and are currently late because of the delays in the bankruptcy.  By itself, his integral role in the company and the bankruptcy, is grounds to not only push back the stay relief requested but *to extend the stay to cover him directly*, not just to object to attempts by SeeCubic to clarify that the stay doesn't apply to him or lift the stay, **especially this early in the case** and as he is one of the key witnesses preparing to be deposed in connection with the motion to dismiss.  Furthermore, Stream TV has informed us that there is an indemnification provision for Mathu Rajan in the company bylaws which is further grounds to support an extension of stay to Mathu.  Mathu Rajan needs to focus on the company as well as simply preparing for the defense against the motion to dismiss.  Forcing him to both litigate this unnecessary stay relief motion as well as go before Chancery prior to the completion of the litigation over the motion to dismiss and distracting him from the bankruptcy is highly prejudicial to the Debtor and to VTI's investment in this case.

3.  VTI has concerns that SeeCubic will continue to violate the stay by directly interfering in its relationships with its creditors because it believes that the PI insulates them from the automatic stay or because they don't think the automatic stay applies to them and will continue efforts to seize assets, especially in other countries. VTI is concerned that the narrative put forth by Skadden in the stay relief motion dangerously  enlarges the scope of the PI in a manner that will impact the motion to dismiss.  They argue that because Mathu has filed an action for fraud and defamation *against the same people who signed the omnibus* that is somehow a violation of the preliminary injunction.  The Philadelphia action are claims sounding in tort and breach of contract, different parties from the ones directly involved in the PI, and which is beyond the scope of the corporate governance dispute which the PI addressed.  The narrative in the motion indicates that SeeCubic's position is that they believe that despite the stay, that they own the assets, and that they are beyond the scope of the stay as a result – even if those assets are in dispute by virtue of the bankruptcy *particularly the ability to avoid transfers and reclaim assets under the bankruptcy code.*   The state court order applies to Mathu, but it is our opinion that we have to fight to prevent what Skadden is doing, which is to use the PI order to gut the powers of the Debtor.  The stay relief motion includes a direct attack on the Debtor's ability to get back assets through an avoidance action or turnover action if we cannot discuss anything about the omnibus agreement or the parties to it.  Read the document carefully, because that is exactly the effect of the findings and holdings they are seeking in that motion which will be used to bolster a defense against a later avoidance action or turnover action by expanding the scope of

the PI.

4. Our client is also concerned that the continued accusations of fraud against the company and the Rajans have not been addressed.  There is no credible allegation and SeeCubic continues to put forward a misleading narrative that the Court found "fraudulent" backdating on a document which was only reviewed in order to determine when the directors who signed the omnibus agreement were fired (if they had been fired before the document was signed, then they would not have had authority to execute the settlement).  We have found no evidence of any misconduct by the Rajans or Stream, and neither has the United States Trustee after reviewing the disclosures required in bankruptcy, nor has litigation in multiple other Courts released any malfeasance to date.  My prior due diligence only showed that the Rajans did not take salary and have overextended their personal credit cards to the overwhelming benefit of Stream, not the other way around.  There is no holding of fraud in the PI and it is a material misrepresentation to the Court to continue to say the Chancery Court held there was fraud.

5. VTI also requests an update on settlement.  Has SLS or SeeCubic actually discussed settlement of the bigger issues  in any way?  Or has the stay enforcement and China been the only focus? They would be ecstatic if there was a settlement with SLS/Shad/SeeCubic, but due to the personal animosity, the pattern of concealment of key aspects of the circumstances on a regular basis by Mr. Stastney to even his own allies, and the litigation approach of Skadden, they are worried that a settlement is a long shot.  As any settlement involves funding from VTI, please keep us apprised of any developments.

These issues are important to VTI and I will be pressed by the investors and board members pretty soon, so I appreciate your response.

Finally, as an aside, anything we say, even in settlement discussions, Eben Colby of Skadden will use in a pleading.  He has told us directly that he doesn't believe that 408 settlement discussions apply to anything but trial evidence.  He does not think settlement discussions are confidential in any way.  He will use anything we say anywhere and at any time to his advantage (while not part of settlement discussions, his quoting of Debtor's counsel in the document he filed is direct evidence of that),  but this was a point of contention in the Chancery Court between him and me when we were trying to get an extension on certain production issues, he said he would think about it and an hour later, without speaking to me, filed a letter detailing our discussion as evidence that we were violating the schedule.  This is just a heads up when you engage in discussion with the other side that they cannot be trusted to extend common professional courtesies.

Thank you in advance for taking the time to review and respond.  I appreciate any and all information you can give to address these concerns.


<image001.jpg>

Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner

300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.


********** **PRIVATE AND CONFIDENTIAL**********

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate**

to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our **Global Privacy Policy** to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.

Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our **International Legal Notices**.

# App. Ex. 18

**From:** McMichael, Lawrence G. <lmcmichael@dilworthlaw.com>
**Sent:** Tuesday, May 18, 2021 10:20 AM EDT
**To:** Aaronson, Anne M. <aaaronson@dilworthlaw.com>; Weis, Martin J. <mweis@dilworthlaw.com>
**Subject:** RE: Stream

I will have Lori open a new matter today and send a final bill for the bankruptcy. Mathu promised to pay us as soon as his first tranche of funding closes, allegedly this week. We'll see.

Your summary of our position on appeal is exactly right. Many bankruptcies result from adverse state court decisions (remember Texaco). I almost feel like we owe it to the debtor bar to straighten this out. Otherwise every successful party in state court, mostly secured creditors like here, will argue that the subsequent bankruptcy is solely for tactical reasons. "Solely" is a word used by the 3rd Circuit and Owens ignored it. Lots of other good arguments and ultimately the 3rd Circuit will need to clarify the law.

LAWRENCE G. MCMICHAEL | DILWORTH PAXSON LLP
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com | www.dilworthlaw.com


-----Original Message-----
From: Aaronson, Anne M.
Sent: Tuesday, May 18, 2021 10:14 AM
To: McMichael, Lawrence G.; Weis, Martin J.
Subject: RE: Stream

I would open a new matter for the appeal.  I don't know enough about the DE District Court Judges to know whether an appeal is a good or bad risk.  I think Judge Owens' decision is bad for struggling companies because it denies them rights that are given by Congress and struggling companies should at least have a chance to reorganize even if the Judge thinks it isn't cost effective or is tainted with subjective intent of management.  There are ways to deal with subjective intent so that it doesn't negatively impact a restructuring -  through oversight, examiner, etc. that are provided by the Code.  On the other hand, if the District Court Judges don't have a lot of bankruptcy experience, I worry that they'll rubber stamp the decision or issue something worse for debtors so it may be better to let this decision lay low and hopefully get swept under the rug if it isn't published.

ANNE AARONSON | DILWORTH PAXSON LLP
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7110 | Fax: (215) 575-7200
aaaronson@dilworthlaw.com | www.dilworthlaw.com

-----Original Message-----
From: McMichael, Lawrence G.
Sent: Tuesday, May 18, 2021 8:33 AM
To: Weis, Martin J.; Aaronson, Anne M.
Subject: Stream

As of the last call with Mathu, he was leaning away from the strategy of seeking a stay in district court, given my assessment of the limited likelihood of success and the large up front cost. Raf reports that there is substantial interest among unsecured creditors in an involuntary. They are forming an informal committee and are retaining Jack McLaughlin as counsel to file an involuntary. We will stay completely out of all of that and Mathu should as well since SeeCubic will try to characterize everything as being engineered by Mathu. He just needs to stand down and let the creditors make whatever decision is in their best interests.

In the meantime, I think that we should still appeal even if we don't seek a stay. The issue in this case is worthy of the Third Circuit (financially distressed debtor seeking to reorganize by recovering fraudulently transferred assets and bringing in new capital, dismissed because the court finds that the primary subjective intent of Mathu was to undo a state court ruling). I plan to tell him that if he wants to appeal, he has to find another $100K for us, and he has 14 days to do it.
Should we open a new matter number for the appeal? Should we close the bankruptcy matter as of yesterday and send a bill to Mathu for the balance owing after the retainer was applied? Let me know your thoughts.

Sent from my iPhone

**TRUSTEE 28**

# App. Ex. 19

**From:** Henry Cittone <hcittone@cdalawllp.com>
**Sent:** Wednesday, April 21, 2021 4:03 PM
**To:** McMichael, Lawrence G.; dan@streamacquisitiongroup.com; raja@streamacquisitiongroup.com
**Cc:** 'Mathu Rajan'; Antoaneta Tarpanova; Weis, Martin J.; Aaronson, Anne M.
**Subject:** RE: Stream TV - Rembrandt litigation - Post-petition counsel appointment

Thanks Lawrence,

Please file the application and we'll get to work on responding to Rembrandt. Stream is a defendant in that case. Also the whole thing stems from the actions of a former officer of Stream TV (Shadron "Shad") who proposed term sheet for settlement with Rembrandt (though not finalized) that would essentially wreck the company finances. Rembrandt is seeking to enforce that as a final settlement - we were about to start a second round of briefing on the matter after the Magistrate called for more briefing by the parties due to Rembrandt's not addressing certain items in its opening brief. Shad is also trying to get his hands on company assets and personnel. Apparently he has loans to Stream TV and has formed a new competing entity Seecubic, Inc.

Best regards,

Henry

**From:** McMichael, Lawrence G.
**Sent:** Wednesday, April 21, 2021 3:50 PM
**To:** Henry Cittone ; dan@streamacquisitiongroup.com; raja@streamacquisitiongroup.com
**Cc:** 'Mathu Rajan' ; Antoaneta Tarpanova ; Weis, Martin J. ; Aaronson, Anne M.
**Subject:** RE: Stream TV - Rembrandt litigation - Post-petition counsel appointment

We can file an application to retain you as "special counsel" for that litigation. It is not a problem being a creditor if your role is limited to the litigation. Is Stream a defendant in that case? If so, it is stayed and there is no need to do anything right now except respond to the inquiries from Rembrandt.

**Lawrence G. McMichael | Dilworth Paxson LLP**
1500 Market Street | Suite 3500E | Philadelphia, PA 19102
Tel: (215) 575-7268 | Fax: (215) 575-7200
lmcmichael@dilworthlaw.com | www.dilworthlaw.com

**From:** Henry Cittone [mailto:hcittone@cdalawllp.com]
**Sent:** Wednesday, April 21, 2021 3:44 PM
**To:** dan@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; McMichael, Lawrence G.
**Cc:** 'Mathu Rajan'; Antoaneta Tarpanova
**Subject:** RE: Stream TV - Rembrandt litigation - Post-petition counsel appointment

Dear Lawrence,

1

**TRUSTEE 132**

Stream TV has asked that we be appointed post-petition counsel so we can assist in the case. We have been counsel of record on the case versus Rembrandt for some time now and are intimately familiar with the details of the case. We're also listed as a creditor in the bankruptcy (which complicates things). Dan and I had a talk yesterday and we believe that if we are appointed post-petition counsel that will solve the issue.

Please let us know what we need to do to be appointed post-petition counsel.

Best regards,

Henry

Henry Cittone | Partner

Cittone Demers & Arneri LLP
11 Broadway, Suite 615, New York, NY 10004
hcittone@cdalawllp.com | 212.710.5619

---

**From:** Henry Cittone
**Sent:** Tuesday, April 20, 2021 8:03 PM
**To:** dan@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; 'McMichael, Lawrence G.' <lmcmichael@dilworthlaw.com>
**Cc:** 'Mathu Rajan' <mathu@streamacquisitiongroup.com>
**Subject:** RE: Stream TV - Rembrandt litigation

Thanks for the kind words Dan.

I'll have comments shortly to you guys.

Best regards,

Henry

---

**From:** dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>
**Sent:** Tuesday, April 20, 2021 8:02 PM
**To:** raja@streamacquisitiongroup.com; Henry Cittone <hcittone@cdalawllp.com>; 'McMichael, Lawrence G.' <lmcmichael@dilworthlaw.com>
**Cc:** 'Mathu Rajan' <mathu@streamacquisitiongroup.com>
**Subject:** RE: Stream TV - Rembrandt litigation

All,

Henry will be sharing his thoughts with us all on the case. His law firm has done a nice job for us since the case was transferred from DLA Piper.

Dan

---

**From:** raja@streamacquisitiongroup.com <raja@streamacquisitiongroup.com>
**Sent:** Tuesday, April 20, 2021 6:55 PM
**To:** dan@streamacquisitiongroup.com; 'Henry Cittone' <hcittone@cdalawllp.com>; 'McMichael, Lawrence G.'

<lmcmichael@dilworthlaw.com>
**Cc:** 'Mathu Rajan' <mathu@streamacquisitiongroup.com>
**Subject:** RE: Stream TV - Rembrandt litigation

*Also what I think is particularly relevant was that Shad Stastney when he was the Vice Chairman and CFO of Stream TV, took over the potential settlement negotiations from Raja and went to a settlement conference with Rembrandt on April 9, 2019. Shadron signed a settlement "term sheet" that provided cash payment to Plaintiffs approximately $20m + over 30 years.*

*What is particularly shocking is Shadron never called Raja during the settlement conference to relay the terms. Raja only learned of the terms that Shad signed from our former lawyers at DLA Piper.*

*When Raja told Plaintiff later what Shad had done in terms of the alleged threat of debt foreclosure, Plaintiff moved to enforce the Shad settlement document of April 9, 2019.*

*What Henry did was largely defend against that enforcement and argued that it was not enforceable and it was only settlement negotiations. The court had not ruled on that issue yet.*

*Some people think that Shadron signed that settlement term sheet intentionally to bankrupt Stream. Don't know but that makes a lot more sense in hindsight.*

---

**From:** dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>
**Sent:** Tuesday, April 20, 2021 7:42 PM
**To:** 'Henry Cittone' <hcittone@cdalawllp.com>
**Cc:** 'McMichael, Lawrence G.' <lmcmichael@dilworthlaw.com>; 'Mathu Rajan' <mathu@streamacquisitiongroup.com>; raja@streamacquisitiongroup.com
**Subject:** Stream TV - Rembrandt litigation

PS Larry: Henry's firm represented Stream pre-petition in the Rembrandt matter

Henry,

Below is the summary of the case that we have included in Stream TV's bankruptcy's filings:

**Rembrandt 3D Holding Ltd v. Stream TV Network, Inc. et al.; No. 17-CV-882 (RA)**

On January 6, 2017, Rembrandt 3D Holding Ltd. ("Plaintiff"), filed suit against the Company in the Supreme Court of New York, New York County. The Company removed the action to the U.S. District Court for the Southern District of New York on February 6, 2017, and then moved to dismiss the case for failure to state a claim. Plaintiff then filed the operative First Amended Complaint on June 23, 2017, alleging patent infringement, breach of a Non-Disclosure Agreement entered into by the parties in 2010, promissory estoppel, and unjust enrichment. The promissory estoppel and unjust enrichment claims are also alleged against the Company's CEO and COO. The Company moved to dismiss the First Amended Complaint in its entirety on the grounds that venue is improper for the patent infringement claims and the remaining causes of action fail to set forth a claim. The motion was fully briefed and argued in April of 2018 before the U.S. District Court for the Southern District of New York. The Court ruled that the venue of New York was improper for the patent infringement claims and such must be removed to the U.S. District Court for either Delaware or Eastern District

3

of Pennsylvania for any further consideration. The Court has also issued an order referring the case pertaining to the non-patent causes of action to a settlement conference before a Federal Magistrate Judge and formally entered a stay of the case on those matters while settlement talks are pending. The Company does not believe the Plaintiff's claims against it have any merit and if a good faith settlement is not reached then will continue to vigorously defend itself against such.

This action is stayed pursuant to the bankruptcy filing.


Please share with Larry (copied here) and Raja and I whatever thoughts you have.

Thank you for calling today.

Dan

---

www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email: postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

4

# App. Ex. 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REMBRANDT 3D HOLDING, LTD.,

                    Plaintiff,

          v.

STREAM TV NETWORK, INC, *et al.*,

                    Defendants.

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

17-CV-882 (RA)

ORDER ADOPTING
REPORT & RECOMMENDATION

RONNIE ABRAMS, United States District Judge:

Plaintiff Rembrandt 3D Holding, Ltd. brings this action against Stream TV Network, Inc., Raja Rajan, Mathau Rajan, Walter Roelen, Bart Barenbrug, Peter Roelen, and Hans Zuidema alleging patent infringement, breach of contract, promissory estoppel, and unjust enrichment. On April 20, 2020, Plaintiff filed a motion to enforce a term sheet entered into by the parties during a settlement conference before the Court. Before the Court is the November 4, 2020 Report and Recommendation of the Honorable Magistrate Judge Parker (the "Report"), which recommends denying Plaintiff's motion. See Dkt. 96. Neither party filed objections to the Report.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Parties may object to a magistrate judge's recommended findings "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); *see also* Report at 21 (advising parties of deadline to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)). "When the parties make no objections to the Report, the Court may adopt the Report if 'there is no clear error on the face of the record.'" *Smith v. Corizon Health Servs.*, No. 14-CV-8839 (GBD) (SN), 2015 WL 6123563, at *1 (S.D.N.Y. Oct. 16, 2015) (*quoting Adee Motor Cars, LLC v. Amato*, 388 F. Supp. 2d

**TRUSTEE 21**

250, 253 (S.D.N.Y. 2005)). "Furthermore, if as here . . . the magistrate judge's report states that failure to object will preclude appellate review and no objection is made within the allotted time, then the failure to object generally operates as a waiver of the right to appellate review." *Hamilton v. Mount Sinai Hosp.*, 331 F. App'x 874, 875 (2d Cir. 2009) (citations omitted).

As no objections to Judge Parker's Report were filed, the Court reviews the Report for clear error. After careful consideration of the record, the Court finds no error and thus adopts the thorough and well-reasoned Report in its entirety. Accordingly, Plaintiff's motion to enforce the term sheet is denied.

Per Judge Parker's recommendation, should Plaintiff wish to pursue damages for a breach of the Settlement Term Sheet (as a Type II preliminary agreement), Plaintiff shall file a renewed motion to enforce the settlement agreement solely addressing whether there was a breach of the Type II preliminary agreement, and if so, if there are recoverable damages, no later than two weeks from the date of this order. Defendants shall file their opposition no later than two weeks after that. No reply brief may be filed.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 90.

SO ORDERED.

Dated:   April 15, 2021
         New York, New York

RONNIE ABRAMS
United States District Judge

2