# App. Ex. 21

**From:** bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Sent:** Saturday, May 22, 2021 1:55 PM EDT
**To:** stephen3d@mac.com <stephen3d@mac.com>; ntwallace@aol.com <ntwallace@aol.com>; Christopher Michaels <michaels@bpmlegal.com>; raja@streamacquisitiongroup.com <raja@streamacquisitiongroup.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Subject:** Zoom Meeting Link - Stream TV / Rembrandt - 3pm ET Today

Join Zoom Meeting
https://atllp.zoom.us/j/5800034942?pwd=WUd0MzJ5UUlONGpMSHNvNi9KbXNkQT09

Meeting ID: 580 003 4942
Passcode: 550304
One tap mobile
+19292056099,,5800034942#,,,,*550304# US (New York)
8778535247,,5800034942#,,,,*550304# US Toll-free

Dial by your location
    +1 929 205 6099 US (New York)
    877 853 5247 US Toll-free
    +44 131 460 1196 United Kingdom
    0 800 031 5717 United Kingdom Toll-free
Meeting ID: 580 003 4942
Passcode: 550304
Find your local number: https://atllp.zoom.us/u/adIJPXhUVH

Join by SIP
5800034942@zoomcrc.com


Best regards,

Bud Robertson
Stream Acquisition Group

# App. Ex. 22

**From:** bud.robertson@vti-global.com <bud.robertson@vti-global.com>
**Sent:** Sunday, May 23, 2021 1:31 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**CC:** ntwallace@aol.com <ntwallace@aol.com>; stephen3d@mac.com <stephen3d@mac.com>; Chi Eng
<chi@englawfirm.com>; John A. Sten <JSten@atllp.com>
**Subject:** zoom link for 130pm meeting now

Bud Robertson is inviting you to a scheduled Zoom meeting.

Topic: Bud Robertson's Zoom Meeting
Time: May 23, 2021 10:30 AM Pacific Time (US and Canada)

Join Zoom Meeting
https://us05web.zoom.us/j/86331233640?pwd=TjNHS3ZFY2I2eU9zeU5QMHY0NDl3UT09

Meeting ID: 863 3123 3640
Passcode: p3zi5R


Best regards,

Bud Robertson
Visual Technology Innovations, Inc.

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Sunday, May 23, 2021 10:31 AM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** bud.robertson@vti-global.com; ntwallace@aol.com; stephen3d@mac.com; Chi Eng <chi@englawfirm.com>; John A. Sten
<JSten@atllp.com>
**Subject:** Re: Stream - Joint Defense Common Interest Agreement with VTI and Committee AT comments 4.17.21 (002).DOCX.docx
[IWOV-IDOCS.FID4245647]

Arranging now

Christopher A. Michaels
Brown & Michaels, PC
4th Floor M&T Bank Building
118 North Tioga Street
Ithaca, NY 14850
(607) 256-2000 (office)
(607) 256-3628 (fax)
www.bpmlegal.com


On May 23, 2021, at 1:30 PM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:

 My internet just went down - can you all send around a zoom link?

Sent from my iPhone


On May 23, 2021, at 1:01 PM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:

 I will send around a zoom invite.

Sent from my iPhone


On May 23, 2021, at 12:32 PM, Christopher Michaels <michaels@bpmlegal.com> wrote:


Yes

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*


<image001.jpg>

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this

email in error, please delete all message content from your system and notify sender.

---

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Sunday, May 23, 2021 12:23 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** bud.robertson@vti-global.com; ntwallace@aol.com; stephen3d@mac.com; Chi Eng <chi@englawfirm.com>; John A. Sten <JSten@atllp.com>
**Subject:** Re: Stream - Joint Defense Common Interest Agreement with VTI and Committee AT comments 4.17.21 (002).DOCX.docx [IWOV-IDOCS.FID4245647]

Bud - everyone else - can you do about a call at 1:30 Eastern 10:30 Nevada time?

Rafael

Sent from my iPhone


> On May 23, 2021, at 11:51 AM, Christopher Michaels<michaels@bpmlegal.com> wrote:


What time would you like to meet to discuss the various agreements?

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*


<image001.jpg>

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Sunday, May 23, 2021 11:43 AM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** bud.robertson@vti-global.com; ntwallace@aol.com; stephen3d@mac.com; Chi Eng <chi@englawfirm.com>; John A. Sten <JSten@atllp.com>
**Subject:** Re: Stream - Joint Defense Common Interest Agreement with VTI and Committee AT comments 4.17.21 (002).DOCX.docx [IWOV-IDOCS.FID4245647]

Great

Sent from my iPhone


> On May 23, 2021, at 11:20 AM, Christopher Michaels <michaels@bpmlegal.com> wrote:


**CAUTION:   EXTERNAL EMAIL**

I have reviewed and executed on behalf of Rembrandt.  I did not make any changes.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*


<image002.jpg>

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-

client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Sunday, May 23, 2021 10:26 AM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** bud.robertson@vti-global.com
**Subject:** Stream - Joint Defense Common Interest Agreement with VTI and Committee AT comments 4.17.21 (002).DOCX.docx [IWOV-IDOCS.FID4245647]

Can you please review and return to protect VTI and Rembrandt's interests?

<image003.jpg>

Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

<Stream - Joint Defense Common Interest Agreement with VTI and Committee AT comments 4.17.21 (002) fully signed.DOCX.pdf>

# App. Ex. 23

## JOINT DEFENSE AND COMMON INTEREST AGREEMENT

This Joint Defense and Common Interest Agreement (the "**Agreement**") is entered into as of May 23, 2021 ("**Effective Date**") by and between the undersigned counsel, Armstrong Teasdale LLP ("**AT**"), acting for and on behalf of Visual Technology Innovations, Inc. ("**VTI**"), and Brown & Michaels, PC ("**B&M**") and Rembrandt 3D Holding LTD ("**Rembrandt**") (which clients are hereinafter collectively referred to herein as the "**Parties**"), for the purpose of setting forth their agreements regarding certain disputed intellectual property rights asserted by Rembrandt (the "**IP**").

### WITNESSETH:

WHEREAS, the Parties agree that their defense and representation of the Parties generally involves legal issues that are mutually important to the Parties and substantially similar legal interests, and thus create a commonality of interest between them with respect to the IP, any related matters, or other actions; and

WHEREAS, the Parties may share confidential information relating to, and in furtherance of, their common legal interests and desire to cooperate in developing and pursuing a common legal strategy in order to protect their respective legal rights and interests in connection with the IP; and

WHEREAS, the Parties have understood, and continue to understand, that such exchanges of information are intended to be privileged and confidential; and

WHEREAS, the Parties agree that the sharing of information among themselves is in each Party's individual and mutual best interests; and

WHEREAS, the Parties wish to preserve, to the maximum extent possible, any applicable privilege or protection (including, but not limited to, the attorney-client privilege, the attorney work product doctrine, common interest privilege and the business strategy privilege) that they may have specifically relating to all Common Interest Information (as that term is defined below), and to provide a means of sharing between the Parties Common Interest Information specifically relating to the Parties' joint and/or common legal interests therein; and

WHEREAS, the Parties have been fully advised by counsel of the possibility that one of the Parties may in the future decide that it is in its or his best interests to assert positions in connection with the IP that may be adverse to the position held or asserted by the other Party, but agree that, until such time as an actual conflict shall emerge or become obvious, it is in their mutual best interests to enter into this Agreement, and believe that the benefits of being a party hereto are such that they would be willing, as a condition precedent to the receipt of Common Interest Information hereunder, to waive any actual, perceived or potential conflicts of interest arising out of, or in connection with, any sharing of Common Interest Information pursuant to this Agreement and any right to seek the disqualification of counsel for any Party based, in whole or in part, on the sharing of such information.

NOW THEREFORE, in consideration of the promises and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is

1

individually acknowledged by each of the undersigned, the undersigned agree and confirm the foregoing recitals and further agree as follows:

1.      "**Common Interest Information**" shall include, but not be limited to, the following: all documents, financial information, oral and written communications, recordings, attorney work product, material provided to, or prepared by, any attorney, consultant, financial advisor, expert, or any other professional retained by any Party, tactics and strategy, any trade secrets, and any other material of whatever nature, relating to the Parties or the IP.

2.      All Common Interest Information previously shared or to be shared between the Parties, and all Common Interest Information derived from any Common Interest Information so exchanged, shall be deemed subject to the terms of this Agreement.  All Common Interest Information which is privileged or protected as to each of the Parties, and their counsel, shall remain privileged or protected when communicated to the other Party or counsel to the other Party to the maximum extent permitted by law.

3.      If any Party receives a motion or a court order, a subpoena or other request (collectively "**Legal Process**") from any person or entity seeking or requiring production or discovery of any Common Interest Information, the Party subject to the Legal Process shall immediately notify the other Party and shall not produce any Common Interest Information without first permitting the other Party a reasonable opportunity to protect their respective interests by motion in an appropriate forum, except to the extent that such notification has been given, and Legal Process requires the Party served to produce or permit discovery of Common Interest Information before the other Party notified have been able to obtain an order of a court of competent jurisdiction, relieving the Party from whom such Common Interest Information is sought from the obligations of such Legal Process. Subject to the provisions of this Agreement, the obligations of confidentiality and nondisclosure of the Common Interest Information shall be continuous and non-terminating, except by consent of all of the Parties and shall survive the termination or conclusions, in whole or in part, of any claim, action or dispute arising out of the IP, as well as any termination or withdrawal by a Party from this Agreement.

2

4.      A Party may voluntarily choose to share with the other Party such Common Interest Information as the Party deems appropriate and consistent with law, and no obligation or duty to share any such Common Interest Information is created by this Agreement.  Nothing in this Agreement shall be construed to affect the separate and independent representation of each client by its respective counsel or to require any Party to share privileged or other information or communications with the other Party.  Nothing in this Agreement shall limit the rights of any Party to use or disclose any document or information that has been independently obtained or prepared solely by such Party or its agent, nor shall anything in this Agreement prevent or limit the Party originating or creating any such document or information from using such document or information in any way that such Party, in its sole discretion, shall deem appropriate.

5.      Nothing contained in or contemplated by this Agreement shall be deemed to create an attorney-client or fiduciary relationship between any attorney (or firm) and anyone other than the client of that attorney (or firm).  No attorney (or firm) who has entered into this Agreement shall be disqualified, because of such attorney's (or firm's) participation in this Agreement, from examining or cross-examining any Party hereto or any recipient of Common Interest Information who may testify in any legal proceedings.

6.      Except as set forth in this Agreement (including, without limitation, paragraphs 2 and 3), no Party shall share or disclose any Common Interest Information with anyone except (a) the Parties; (b) counsel (both in-house and outside) for the Parties (and their secretaries, support staff and/or legal assistants); (c) members of the Committee; and (d) as needed, consultants, experts, advisors, and other professionals specially retained to assist counsel or the Parties in connection with the IP.  Access to Common Interest Information shall only be provided to such persons to the extent that the Party (or its counsel) determines, in good faith, that the disclosure of the Common Interest Information to such person is necessary in the discharge of its duties to such Party and in relation to the IP.  Any person to whom Common Interest Information is disclosed who is a non-signatory to this Agreement shall be specifically advised of the existence of this Agreement, the privileged nature of any Common Interest Information shared and the duty to maintain such information in confidence.  All Common Interest Information shared or disclosed pursuant to the terms of this Agreement shall be used by the recipients thereof solely in connection with the IP in the pursuit of matters as to which the Parties share a common legal interest and shall not be used or disclosed to anyone for any other purpose whatsoever.  The sharing of Common Interest Information pursuant to this Agreement shall not prevent a Party from asserting any claim, at law or in equity, against the other Party in any proceeding.  In any such proceeding, no Party may use against the other Party (or additional parties to that proceeding) any Common Interest Information received from the other Party or jointly developed by or on behalf of the Parties to this Agreement, nor shall any written or oral statements made by one Party to another Party (or their counsel) covered by this Agreement be deemed an admission or be admissible as against the other Party in any proceeding.  For the avoidance of doubt, in any such proceeding any Party may use any information received or obtained after the termination of this Agreement as to such Party through discovery or otherwise, notwithstanding that the same information was theretofore received in accordance herewith.

7.      In the event that a Party is no longer involved in any dispute, compromise, agreement, or any other arrangement regarding the IP, especially due to the highly confidential nature of information, including but not limited to prior confidentiality and non-disclosure agreements surrounding and concerning the IP and the Parties having agreed the IP and the treatment of the IP is a material aspect of this Agreement: (a) this Agreement shall continue to be binding on such Party, and such Party's obligation to protect the confidentiality of all Common Interest Information shall continue; and (b) such Party shall, to the extent permitted by law, redact, destroy or return to the Party that disclosed the information all Common Interest Information, including, but not limited to, all documents and records that contain, reveal or reflect any such Common Interest Information.

8.      The Parties agree that any disclosure of Common Interest Information prior to or after the Effective Date, but before the execution of this Agreement, are subject to and remain subject to this Agreement.

9.      A Party may withdraw from this Agreement at any time and for any reason upon written notification, served by facsimile, electronic mail or hand delivery upon the other Party. In the event that counsel for any Party shall determine that his or its client no longer has, or will no longer have, a commonality of interest with the other Party hereto, such counsel shall promptly provide written notice to the other undersigned counsel of his or its client's withdrawal from this Agreement, upon which this Agreement shall immediately be terminated as to that client.  Except as provided in this Agreement, any withdrawal and resulting termination of this Agreement will be solely on a prospective basis and the withdrawing Party (and any person to whom he, she, or it has disseminated Common Interest Information pursuant to the terms of this Agreement) shall: (a) remain bound by this Agreement; (b) subject to the terms hereof, continue to be obligated to maintain at all times the privileged and confidential nature of all Common Interest Information communicated to that Party; and (c) promptly return to the Party that disclosed the information all such Common Interest Information, including, but not limited to, all documents and records that contain, reflect or reveal any such Common Interest Information.

10.     Within thirty (30) days of receipt of written notice by any Party under section 9 of this agreement, each of the Parties shall, to the extent permitted by law, destroy or return to the Party that disclosed the information, if requested by the disclosing Party, all Common Interest Information, including, but not limited to, all documents and records that contain, reveal or reflect any Common Interest Information.  The Parties expressly acknowledge and agree that no adequate remedy is available at law for breach of this Agreement and that, in addition to any other remedies available, performance of this Agreement may be specifically ordered, or a breach hereof may be enjoined, or both.

11.     This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without reference to principles of

4

choice or conflict of laws.

12.     The provisions of this Agreement may only be modified by written agreement signed by both undersigned counsel.

13.     In the event any provision of this Agreement should be held to be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby.

14.     This Agreement is not intended to, and shall not, create rights in any person or entity not a Party hereto.

15.     This Agreement may be executed in counterparts, each of which, when so executed and delivered, shall be deemed to be an original and shall be binding on the Party who, through his or its counsel, signed the counterpart, both of which together shall constitute a single agreement.

16.     This Agreement constitutes the complete agreement of the Parties with respect to the subject matter hereto and memorializes and supersedes any prior or written agreements and applies to all prior and future communications and exchanges of Common Interest Information.

IN WITNESS WHEREOF, the parties have caused this Joint Defense and Common Interest Agreement to be executed as of the Effective Date.

**Visual Technology Innovation Inc.**          Rembrandt 3D Holding LTD

By: _____          By: *Christopher Michaels*
Rafael X. Zahralddin-Aravena (No. 4166)   Christopher A. Michaels
Armstrong Teasdale, LLP          Brown & Michaels. PC
*Counsel to VTI*          *Counsel for Rembrandt*

# App. Ex. 24

## bud@streamacquisitiongroup.com

| | |
|---|---|
| **From:** | Christopher Michaels <michaels@bpmlegal.com> |
| **Sent:** | Sunday, May 23, 2021 12:30 AM |
| **To:** | Rafael X. Zahralddin-Aravena |
| **Cc:** | bud@streamacquisitiongroup.com; stephen3d@mac.com; ntwallace@aol.com; 'Chi Eng' |
| **Subject:** | RE: Rembrandt 3D IP Rights |
| **Attachments:** | Stip of Dismissal.docx; 2021-05-22 Settlement Agreement - Rembrandt - Stream.docx; VTI-Rembrandt Term Sheet.docx; Standard Products.pdf; Rembrandt 3D PO#3928.pdf; 2021-05-23 Stream TV - Form of Warrant Rembrandt-Filled out for Rembrandt.docx |

Rafael:

Thank you for your time over the last two days.

I have just finished reviewing the attached documents with my client.  Can we plan call for around 11:00am tomorrow?

I have attached a settlement agreement, warrant agreement (to be executed once Stream TV is funded), Stipulation of Dismissal, standard product list (provided by Stream), and a copy of an invoice from Stream to Rembrandt for a TV that we used to set the price for the 100 4K TVs if Stream is not able to provide those TVs, alternatively, we would accept 8K units added to the prototype section up to 10 a month.  I provided for the At Cost units to be flexible on delivery once Stream is up and running and in turn, Rembrandt also has flexibility when it places its orders.  Assuming all the documents are agreeable to the Rajans and Stream, this should fully resolve the litigation and Rembrandt will be a creditor with no disputes on amounts owed.

I have also attached a proposed term sheet with VTI.  (It is more a bulleted list of discussion topics than a full term sheet)  We are flexible on the details, but this gives us a place to start.

My cell phone number is 607-351-8806.  My direct line below rings my office, my cell, my computer, my ipad, etc all at the same time.  I look forward to speaking with you.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**TRUSTEE 29**

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Saturday, May 22, 2021 8:53 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Re: Rembrandt 3D IP Rights

Please pass along your number when you have the chance.

Rafael

Sent from my iPhone

**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

On May 22, 2021, at 4:32 PM, Christopher Michaels <michaels@bpmlegal.com> wrote:

**CAUTION:**   **EXTERNAL EMAIL**

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

<image001.jpg>

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Christopher Michaels
**Sent:** Tuesday, April 20, 2021 4:09 PM
**To:** mweis@dilworthlaw.com; lmcmichael@dilworthlaw.com; ycaplow@dilworthlaw.com

Cc: 'Chi Eng' <chi@englawfirm.com>; stephen3d@mac.com; ntwallace@aol.com
**Subject:** RE: Rembrandt 3D IP Rights

Additional Exhibits

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

<image001.jpg>

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels
**Sent:** Tuesday, April 20, 2021 3:57 PM
**To:** mweis@dilworthlaw.com; lmcmichael@dilworthlaw.com; ycaplow@dilworthlaw.com
**Cc:** 'Chi Eng' <chi@englawfirm.com>; stephen3d@mac.com; ntwallace@aol.com
**Subject:** Rembrandt 3D IP Rights

Dear counsel for Stream TV:

We understand that there is a hearing on April 26, 2021 in the Stream TV bankruptcy chapter 11 filing and that you are defending motions to dismiss the Stream TV bankruptcy.

We assume that you are aware of our pending litigation against Stream TV, but I have attached copies of our First Amended Complaint filed against Stream TV (additional exhibits sent by separate email).  Regardless of the outcome of the pending motions in the bankruptcy, we feel a negotiated settlement is in the best interest for all parties.

Stephen Blumenthal is the key originator of the intellectual property advancements, which resulted in the developments currently included in the on-screen display of the Stream Networks TVs that we have evaluated. Steve's company, Rembrandt3D Holdings, owns all of the rights to the 3D without glasses technology that were developed by Steve by late 2009 and included in a patent application filed in December of 2009.

In January 2010, Steve started working with the Eindhoven based team, transferring all of his advancements, trade secrets and the know-how he had discovered from over two years, and 1,000's of hours of rendering with the 3DSolutions licensed tools.  The-14-months spent working with his Dutch team included thousands of e-mails, hundreds of Skype calls, 43 3DFusion video projects, and 70 pages of detailed weekly meetings minutes with the same 12 Dutch team members that are now the SeeCubic engineering team.  The technology Stream purports to own was based on the technology disclosed by Steve and 3DFusion to the Rajans and Steve's former Philip's 3DSolution's team, during the time when the "team" was working for the 3DFusion wholly own Dutch Corporate subsidiary, 3DFusionEU.BV.

The lawsuit that we filed against Stream TV and the Rajan's as individuals originally included a patent infringement complaint, which has been separated out by Judge Abrams.  While the Supreme Court's decision in TC Heartland provides that we need to bring the patent infringement case in Philadelphia or Delaware, nothing about the substance of the patent infringement claim has changed.  Rembrandt's First Amended Complaint has provided a detailed claim chart showing how every TV sold by Stream TV includes every element of the patent claims. After years of being on notice of infringement of the Rembrandt patents, Stream TV has not identified a single element of a single claim of Rembrandt's patents that is missing from the Stream TV. Nothing about the Delaware action or the bankruptcy provides anyone a license to Rembrandt's patents.  Neither Stream TV, SeeCubic, or their licenses and customers are going to be able to sell a TV without infringing the Rembrandt's patents.

We thought we had reached a resolution with Stream TV that would have granted Stream TV a license to Rembrandt's technology rights and are seeking to enforce that resolution in the Southern District of New York.

Rembrandt's legal team is obviously working on contingency, while the costs of defending such a case will run into the 10-million-dollar range and be a detriment for any fund raising.  At the end of the day, Rembrandt still wants to see a 3D TV on the market rather than litigate.  Consequently, we still think there is a logical basis to seek a settlement now with a guaranteed outcome, rather than fight over IP rights with either Stream TV or SeeCubic.

Regardless of the outcome of SeeCubic's Delaware litigation or the motion to dismiss in the bankruptcy court, the Rembrandt technology rights are not transferring to SeeCubic. Stream TV can not transfer rights it does not own and Rembrandt's IP is interwoven into all of the technology Stream TV uses in its 3D displays.  I have worked with clients trying to raise money in such a posture and advised private equity companies considering investing in firms with pending IP claims.  While it is possible to raise funds under such a cloud, the investors pay pennies on the dollar for what would be a normal valuation.

I note from SeeCubic's filings that some of the common equity holders were included in SeeCubic in preference to any payments to the unsecured creditors.  I would expect that the unsecured creditors will be unified in opposing the transfer of assets from Stream TV to SeeCubic or argue that any rights in SeeCubic that went to equity holders should be paid to the unsecured creditors instead.

The motion to dismiss is compelling except for its failure to mention the dispute regarding the ownership of the IP and licenses from Rembrandt.  Even if the Delaware court's decision is upheld, I don't see anything in it that would transfer the license that Rembrandt is seeking to enforce against Stream TV.  Assuming the bankruptcy proceeds, without the Rembrandt Licensing rights to the technology, it will not matter whose reorganization plan is approved. Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business.

Ironically, if Stream TV performs its agreement with Rembrandt, Stream TV would have a license and be in a position to claim that the Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization plan to allow it to proceed under license from Rembrandt to pay off the creditors.

We certainly contend that our IP rights are worth far more than Stream TV's liabilities and were clearly not transferred to SeeCubic in the Delaware action, so it seems that about the only asset Stream TV would have to oppose SeeCubic's motion to dismiss is to argue that it has a license from Rembrandt that dominates the assets that would be transferred to SeeCubic and that Stream TV has a going concern value based on the value of the licensing rights purchased from Rembrandt.

I propose that we set up a time to discuss in the near future, preferably in advance of the April 26 hearing.

Chris
IP Counsel for Rembrandt 3D

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

<image001.jpg>

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

<26-7_Exhibit G.pdf>
<26-6_Exhibit F.pdf>
<26-5_Exhibit E.pdf>

4

<26-8_Exhibit H.pdf>
<26-4_Exhibit D.pdf>

# App. Ex. 25

# EXHIBIT "D"

TRUSTEE 31

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

<strong>BACKGROUND</strong>

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

| | | |
|---|---|---|
| 1. | Confidentiality: | The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement. |
| 2. | Costs and Expenses | Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement. |
| 3. | Law: | This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles. |
| 4. | Commencement | Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant |

{00843971.DOCX 1}

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

    a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

    b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice. Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units

(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:

i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");

ii) 2 units on or before three months from Prototype Commencement;

iii) 2 units on or before four months from Prototype Commencement; and

iv) 3 units on or before six months from

Prototype Commencement.

Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States. Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms. At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.)

(3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit.

(4) Tax Matters. Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units.

7. OEM

Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications.

White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks. Rembrandt will not remove any patent number marking applied by Stream.

8. Term

The Term of the Agreement shall continue through December 31, 2030.

9. Rembrandt Grant of Rights

Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this

{00843971.DOCX 1}

Agreement for Rembrandt.

| | |
|---|---|
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein.  Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications

The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed.  Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party.

Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration:<br>a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.<br>b) Stream TV is providing  warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference. |

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c) Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:

a. 12 months @ $28,000/per month
b. 12 months @ $32,000/per month
c. 12 months @ $36,000/per month
d. 79 months @ $40,000/per month

The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

**16. Payments**

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

**17. Representations and Warranties**

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

of this Agreement, (iv) each individual signing this Agreement in a representative capacity acknowledges and represents that he/she is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated Party; and (v) the agreements and understandings identified herein constitute all of the agreements and understandings between and among the Parties with respect to the subject matter hereof.

18. Notices

Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

To Stream TV, ~~Raja Rajan &~~ Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
~~Attention:~~ General Counsel, Mathu and/or Raja Rajan individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email: Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng
Email: chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

{00843971.DOCX 1}

19. Advice of Counsel     Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys.

20. Entire Agreement     It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement.

21. Severability     If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired, and shall remain in full force and effect.

22. Binding Effect     This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of

any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns.

| | |
|---|---|
| 23. Waiver and Amendment | No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto. |
| 24. Further Assurances | Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement. |
| 25. Costs | The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement. |
| 26. Dispute Resolution | In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement. |
| 27. Right to Attorney's Fees in Case of Breach | In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs. |
| 28. Headings | The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement. |

| | |
|---|---|
| 29. Counterparts and Transmission of Signatures | This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement. |
| 30. Authorized Signature | Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity. |
| 31. Joint Preparation | This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements. |

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of Defendants:**     **Signed for and on behalf of Plaintiff:**

_____          _____

Signature                                                      Signature
STREAM TV NETWORK, INC.,                      REMBRANDT 3D HOLDING LTD

By: Mathu Rajan, Chief Executive Officer      By: Stephen Blumenthal, President/CEO

Date: May 23, 2021                                   Date: May 23, 2021


_____

Signature
Mathu Rajan, Individually

Date: May 23, 2021

_____

Signature
Raja Rajan, Individually

Date: May 23, 2021

## SCHEDULE A

1.  Know how and trade secrets related to methodology for:
    a.  efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
    b.  utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
    c.  utilizing the On Screen Display functions of Borders and "Liveliness."
2.  Trademarks
3.  The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

{00843971.DOCX 1}

# Exhibit A

## (Warrant Agreement)

{00843971.DOCX 1}
EAST\165770618.1

# Exhibit B


## (Standard Products)


{00843971.DOCX 1}

# App. Ex. 26

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of **Delaware**
                              (State)

Case number (*If known*): _____ Chapter __7__

☐ Check if this is an
   amended filing

Official Form 205

# Involuntary Petition Against a Non-Individual

12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

| Part 1: | Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed |
|---|---|

**1. Chapter of the Bankruptcy Code**

*Check one:*

☑ Chapter 7
☐ Chapter 11

| Part 2: | Identify the Debtor |
|---|---|

**2. Debtor's name**

Stream TV Networks, Inc.

**3. Other names you know the debtor has used in the last 8 years**

Include any assumed names, trade names, or *doing business as* names.

_____
_____
_____

**4. Debtor's federal Employer Identification Number (EIN)**

☐ Unknown

_27_ – 1224092 __ __ __ __
EIN

**5. Debtor's address**

**Principal place of business**

2009 Chestnut Street
Number      Street

3rd Floor
_____

Philadelphia                 PA    19103
City                         State   ZIP Code

_____
County

**Mailing address, if different**

_____
Number      Street

_____
P.O. Box

_____
City              State   ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number      Street

_____
City              State   ZIP Code

Official Form 205                    Involuntary Petition Against a Non-Individual                    page 1

**TRUSTEE 146**

| Debtor | Steam TV Networks, Inc. | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

**6. Debtor's website** (URL)  www.streamtvnetworks.com

**7. Type of debtor**

- ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other type of debtor. Specify: _____

**8. Type of debtor's business**

*Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☑ None of the types of business listed.
- ☐ Unknown type of business.

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

- ☑ No
- ☐ Yes. Debtor _____  Relationship _____

District _____ Date filed _____ Case number, if known _____
MM / DD / YYYY

Debtor _____  Relationship _____

District _____ Date filed _____ Case number, if known _____
MM / DD / YYYY

---

| Part 3: | Report About the Case |
|---|---|

**10. Venue**

*Check one:*

- ☑ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.
- ☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

- ☑ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.
- ☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

- ☑ No
- ☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

---

Official Form 205 — Involuntary Petition Against a Non-Individual — page 2

Debtor **Stream TV Networks, Inc.**
Name

Case number *(if known)*_____

| 13. Each petitioner's claim | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | Jamuna Travels, Inc. | Travel Services | $ 130,499.25 |
| | Walsh CHB, Inc. | Logistics Services | $ 11,020.00 |
| | Rembrandt 3D Holding Ltd. | Settlement Agreement | $ $1,528,000.00 |
| | | Total of petitioners' claims | $ 1,669,519.25 |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

---

## Part 4:    Request for Relief

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

| Petitioners or Petitioners' Representative | Attorneys |
|---|---|
| **Name and mailing address of petitioner** | |
| Rembrandt 3D Holding Ltd. | John D. McLaughlin, Jr. |
| Name | Printed name |
| 128 Bull Hill Road | Ferry Joseph, P.A. |
| Number   Street | Firm name, if any |
| Newfield     NY     14867 | 824 North Market Street, Suite 1000 |
| City   State   ZIP Code | Number   Street |
| | Wilmington     Delaware   19801 |
| **Name and mailing address of petitioner's representative, if any** | City   State   ZIP Code |
| Stephen Blumenthal | Contact phone  302-575-1555 , ext. 107   Email jmclaughlin@ferryjoseph.com |
| Name | |
| 128 Bull Hill Road | Bar number  4123 |
| Number   Street | |
| Newfield     NY     14867 | State  Delaware |
| City   State   ZIP Code | |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____
MM / DD / YYYY

Stephen R. Blumenthal (May 23, 2021 22:15 EDT)

05/23/2021

X _____
Signature of petitioner or representative, including representative's title

X *[signature]* John D. McLaughlin Jr.
Signature of attorney

Date signed  5/23/2021
MM / DD / YYYY

---

Official Form 205                     Involuntary Petition Against a Non-Individual                     page 3

Debtor _____ Case number (if known)_____
      Name

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| Jamuna Travels, Inc. | Travel Services | $ 130,499.25 |
| | | $ |
| | | $ |
| | Total of petitioners' claims | $ |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

**Part 4:**   **Request for Relief**

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**                             **Attorneys**

Name and mailing address of petitioner

Jamuna Travels, Inc.
_____
Name

6439 Market Street
_____
Number   Street

Upper Darby       PA       18082
_____
City             State       ZIP Code

Name and mailing address of petitioner's representative, if any

Reji Abraham
_____
Name

6439 Market Street
_____
Number   Street

Upper Darby       PA       19082
_____
City             State       ZIP Code

John D. McLaughlin, Jr.
_____
Printed name

Ferry Joseph, P.A.
_____
Firm name, if any

824 North Market Street, Suite 1000
_____
Number   Street

Wilmington       DE       19801
_____
City            State       ZIP Code

Contact phone   302-575-1555   Email jmclaughlin@ferryjoseph.com

Bar number   4123

State       DE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   05-17-2021
          MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

X _____
Signature of attorney

Date signed   5/25/2021
          MM / DD / YYYY

Official Form 205           Involuntary Petition Against a Non-Individual           page 3

Debtor    Stream TV Networks, Inc.                                Case number (if known)_____
          Name

**Name and mailing address of petitioner**

WALSH CHB INC
Name

189 SUNRISE HWY SUITE 302
Number    Street

ROCKVILLE CENTRE    NY    11570
City                    State    ZIP Code

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number    Street

_____
City            State        ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____
           MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

---

John D. McLaughlin, Jr.
Printed name

Ferry Joseph, P.A.
Firm name, if any

824 North Market Street, Suite 1000
Number    Street

Wilmington                Delaware  19801
City                      State      ZIP Code

Contact phone  302-575-1555   Email jmclaughlin@ferryjoseph.com

Bar number    4123

State    Delaware

X _____
Signature of attorney

Date signed  5/23/24
             MM / DD / YYYY

---

**Name and mailing address of petitioner**

_____
Name

_____
Number    Street

_____
City            State        ZIP Code

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number    Street

_____
City            State        ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____
           MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

---

_____
Printed name

_____
Firm name, if any

_____
Number    Street

_____
City            State        ZIP Code

Contact phone _____  Email _____

Bar number    _____

State    _____

X _____
Signature of attorney

Date signed  _____
             MM / DD / YYYY

---

Official Form 205          Involuntary Petition Against a Non-Individual          page 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| Stream TV Networks, Inc. | ) | Case No. |
|  | ) |  |
|  | ) |  |
| Alleged Debtor | ) |  |
|  | ) |  |

### CORPORATE OWNERSHIP STATEMENT PURSUANT TO RULE 7007.1

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for **Jamuna Travels, Inc**. (the "Petitioning Creditor@) in the above captioned action, certifies that the following is a (are) corporations(s), other than the Debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1:

NONE

Dated: *23 May  2021*                      **FERRY JOSEPH, P.A**.

                                        */s/ John D. McLaughlin, Jr.*

                                        _____
                                        John D. McLaughlin, Jr. (No. 4123)
                                        824 North Market Street, Suite 1000
                                        Wilmington, Delaware 19801
                                        Tel:  (302) 575-1555, ext. 107
                                        Fax:  (302) 575-1714
                                        jmclaughlin@ferryjoseph.com

                                        *Counsel to the Petitioning Creditor*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| Stream TV Networks, Inc. | ) | Case No. |
|  | ) |  |
|  | ) |  |
| Alleged Debtor | ) |  |
|  | ) |  |

### CORPORATE OWNERSHIP STATEMENT PURSUANT TO RULE 7007.1

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for **Rembrandt 3D Holding, Ltd**.  (the "Petitioning Creditor") in the above captioned action, certifies that the following is a (are) corporations(s), other than the Debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1:

NONE

Dated: *23 May 2021*                    **FERRY JOSEPH, P.A**.

*/s/ John D. McLaughlin, Jr.*

_____
John D. McLaughlin, Jr. (No. 4123)
824 North Market Street, Suite 1000
Wilmington, Delaware 19801
Tel:  (302) 575-1555, ext. 107
Fax:  (302) 575-1714
jmclaughlin@ferryjoseph.com

*Counsel to the Petitioning Creditor*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Stream TV Networks, Inc. | ) | Case No. |
| | ) | |
| | ) | |
| Alleged Debtor | ) | |
| | ) | |

## CORPORATE OWNERSHIP STATEMENT PURSUANT TO RULE 7007.1

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for **Walsh CHB, Inc**. (the "Petitioning Creditor") in the above captioned action, certifies that the following is a (are) corporations(s), other than the Debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1:

NONE

Dated: *23 May 2021*

**FERRY JOSEPH, P.A**.

*/s/ John D. McLaughlin, Jr.*

_____

John D. McLaughlin, Jr. (No. 4123)
824 North Market Street, Suite 1000
Wilmington, Delaware 19801
Tel: (302) 575-1555, ext. 107
Fax: (302) 575-1714
jmclaughlin@ferryjoseph.com

*Counsel to the Petitioning Creditor*

B2500E (Form 2500E) (12/15)

# United States Bankruptcy Court
## District of Delaware

| | | |
|---|---|---|
| In re | ) | Chapter 7 |
| Stream TV Networks, Inc., | ) | Case No. |
| Alleged Debtor* | ) | |

## <u>SUMMONS TO DEBTOR IN INVOLUNTARY CASE</u>

To the above named debtor:

A petition under title 11, United States Code was filed against you in this bankruptcy court on May 23, 2021, requesting an order for relief under chapter   7  Code   of the Bankruptcy (title 11 of the United States Code).

YOU ARE SUMMONED and required to file with the clerk of the bankruptcy court a motion or answer to the petition within 21 days after the service of this summons. A copy of the petition is attached.

Address of the Clerk:      **824 North Market Street, 3rd Floor**
**Suite 300**
**Wilmington, DE 19801**

At the same time, you must also serve a copy of your motion or answer on petitioner's attorney.

Name and Address of Petitioner's Attorney:

**John D. McLaughlin, Jr.**
**Ferry Joseph, P.A.**
**824 North Market Street, Suite 1000**
**Wilmington. DE 19801**

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 1011(c). If you fail to respond to this summons, the order for relief will be entered.

**UNA O'BOYLE**
Clerk of the Bankruptcy Court

Date: _____      By: _____
Deputy

* Set forth all names, including trade names, used by the debtor within the last 8 years. (Fed. R .Bankr. P. 1005).

B2500E (Form 2500E) (12/15)

## CERTIFICATE OF SERVICE

I, John D. McLaughlin, Jr., certify that on _____, I
served this summons and a copy of the involuntary petition on Stream TV Networks,
Inc., the debtor in this case, by first class United States mail, postage pre-paid and
addressed as follows:

Stream TV Networks, Inc.
Attn: Mathu Rajan, CEO , or officer, managing agent or general agent
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103


If service was made by personal service, by residence service, or pursuant to state law,
I further certify that I am, and at all times during the service of process was, not less
than 18 years of age and not a party to the matter concerning which service of process
was made.

Under penalty of perjury, I declare that the foregoing is true and correct.


Date _____   Signature _____

John D. McLaughlin, Jr.
Ferry Joseph, P.A.
824 North Market Street, Suite 1000
Wilmington, DE 19801

# App. Ex. 27

**PAYMENT AGREEMENT**

**BETWEEN**

**VISUAL TECHNOLOGY INNOVATIONS, INC.**

**AND**

**REMBRANDT 3D HOLDINGS LTD**

**May 23, 2021**

Visual Technology Innovations, Inc. ("VTI") is a Nevada corporation. Rembrandt 3D Holdings, Ltd ("Rembrandt") is a Nevis corporation. VTI and Rembrandt are referred to herein as the "Parties", and each one of them is a "Party".

This payment agreement ("Agreement") details an arrangement between VTI and Rembrandt, intended to provide terms for an investment in Rembrandt by VTI and for modification of a settlement agreement between Stream TV Networks, Inc. ("Stream") and Rembrandt.

| | | |
|---|---|---|
| 1. | Confidentiality: | The Parties agree that this Agreement will be protected by the Joint Defense Agreement executed between the Parties on May 23, 2021. The Parties agree further that the negotiation is subject to Rule 408 of the Federal Rules of Evidence and all discussions or negotiations are inadmissible in any proceeding. |
| 2. | Costs and Expenses: | Each Party shall be responsible for its own costs and expenses in negotiating the terms of this transaction. |
| 3. | Debtor In Possession Budget: | VTI agrees to approve a Debtor In Possession budget with Stream that includes a cure amount or critical vendor payment of $1,400,000 to be paid to Rembrandt and $25,000/month during the pendency of the bankruptcy subject to all court approvals for mission critical vendors, as either a critical vendor or assumed executory contract or through a settlement agreement approved under Bankruptcy Rule 9019. If VTI get court approval to underwrite and fund the Stream bankruptcy plan, VTI will agree to budget payment in full on an accelerated basis of all amounts due under Section 15 Consideration of the Stream Settlement Agreement dated May 23, 2021 pursuant to the terms of the plan and treatment of other unsecured creditors. |
| 4. | VTI Guarantee and Payments: | VTI hereby guarantees payment of the $1,400,000 ("Initial Guarantee Payment") and will make such payment within thirty days of a final order of bankruptcy dismissal. VTI agree to make payments of $25,000/month ("Monthly Payment") starting 15 business days after signing this Agreement in consideration for Consulting Services performed by Rembrandt. Any amounts paid by VTI under this provision will be refunded to VTI once Rembrandt is paid by Stream whether through a bankruptcy or a successful intellectual property litigation result. |
| 5. | Consulting: | Consulting Services will continue until December 31, 2024 or Rembrandt has been paid all amounts owed under the Stream Settlement Agreement |

{00843571.DOCX 1}



by Stream or VTI, whichever is later, and be part of an intellectual property evaluation of the Rembrandt IP and IP related causes of action and potential rights against other parties.

6. Cash Reserves:   VTI agrees that at all times after May 28, 2021, it shall maintain sufficient cash reserves in a US bank to make all payments that are or may become due to be paid to Rembrandt under this Agreement.

7. Law:   This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles.

8. Payments:   VTI shall pay each Monthly Payment by ACH or wire transfer of immediately available funds to an account designated by Rembrandt in writing below:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

9. Notices:   Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

**To VTI:**
Visual Technology Innovations, Inc.


Attention:

and

Armstrong Teasdale LLP
300 Delaware Avenue
Suite 210
Wilmington, DE, 19801
Attention: Rafael X. Zahralddin
Email: rzahralddin@atllp.com

**To Rembrandt:**
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email: Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng

{00843571.DOCX 1}

Email: chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St. 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

| | |
|---|---|
| 10. Advice of Counsel & Joint Preparation: | Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys. This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements. |
| 11. Entire Agreement: | It is expressly understood and agreed that this Agreement along with the Joint Defense Agreement constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement. |
| 12. Waiver and Amendment: | No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto. |
| 13. Further Assurances: | Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement. |

{00843571 DOCX 1}

14. Authorized        Each individual signing this Agreement in a representative capacity
    Signature         acknowledges and represents that he is duly authorized to execute this
                      Agreement in such capacity in the name of, and on behalf of, the
                      designated corporation, partnership, limited liability company, trust or
                      other entity.

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of VTI:**

_____
Signature
Visual Technology Innovations, Inc.
By: Mathu Rajan, President
Date: May 23, 2021

**Signed for and on behalf of Rembrandt:**

_____
Signature
Rembrandt 3D Holding Ltd
By: Stephen Blumenthal, President/CEO
Date: May 23, 2021

{00843571 DOCX 1}

# App. Ex. 28

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>Alleged Debtor. | Chapter 7<br><br>Case No. 21-10848 (KBO) |

**EMERGENCY MOTION OF SEECUBIC, INC.
AND SLS HOLDINGS VI, LLC FOR AN ORDER DISMISSING
<u>INVOLUNTARY CHAPTER 7 CASE</u>**

SeeCubic, Inc. ("**SeeCubic**") and SLS Holdings VI, LLC ("**SLS**" and, together with SeeCubic, the "**Movants**") by and through their undersigned counsel, hereby move (the "**Motion**") this Court for entry of an order dismissing the involuntary Chapter 7 case (the "**Chapter 7 Case**") of the above-captioned debtor Stream TV Networks, Inc. ("**Stream**" or the "**Debtor**") for lack of jurisdiction or, alternatively, pursuant to 11 U.S.C. § 707(a). In support of the Motion, Movants respectfully represent the following:

**PRELIMINARY STATEMENT[1]**

1. On May 17, 2021, this Court dismissed the Debtor's voluntary Chapter 11 bankruptcy proceedings "for cause" because, among other reasons, the case was filed as part of a bad faith attempt to interfere with ongoing litigation between the Debtor and SeeCubic in the Delaware Court of Chancery. Specifically, this Court held that the Debtor "failed to adequately fulfill its burden to show that the bankruptcy filing was filed in good faith and for a legitimate bankruptcy purpose. It was designed to stop SeeCubic and the debtor's secured creditors from fully implementing the omnibus agreement, to unravel it and to avoid the Chancery Court's order

---

[1] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them below.

**TRUSTEE 32**

and, very likely, a mandatory injunction [against the Debtor and the Rajans]."[2]  On May 21, 2021, the Debtor filed a Notice of Appeal of the Chapter 11 Dismissal Order, which has been docketed in the District Court.

2.       Nevertheless, on May 23, 2021, three purported unsecured creditors—none of whom filed objections to the Motions to Dismiss filed by Movants and the U.S. Trustee in Stream's prior Chapter 11 Case or made any request to convert the now-dismissed Chapter 11 Case to Chapter 7 at that time—filed a new, involuntary Chapter 7 Petition against Stream, apparently so that Stream can again obtain the benefit of the automatic stay.  This latest attempt to frustrate the pending Chancery Court Action regarding the Omnibus Agreement should be immediately and summarily dismissed for two reasons.

3.       *First*, due to the pending appeal of this Court's Dismissal Order, this Court lacks jurisdiction over the Chapter 7 Petition under the so-called "divestiture rule."  As the Supreme Court has explained, "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the [appellate court] and divests the [trial] court of its control over those aspects of the case involved in the appeal."  *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).  The divestiture rule therefore bars this Court from considering the Chapter 7 Petition because it would require the Court to reopen issues inextricably intertwined with the current appeal of the Dismissal Order, including the necessary finding that dismissal—rather than conversion to chapter 7—was "in the best interests of creditors and the estate" (*see* 11 U.S.C. § 1112(b)).  Accordingly, the Chapter 7 Petition should be dismissed for lack of jurisdiction.

---

[2]    Hr'g Tr., at 19:8-16, *In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. May 17, 2021) (the "**Motion to Dismiss Ruling**").  A copy of the transcript of the Motion to Dismiss Ruling is attached hereto as Exhibit A.

2

4. *Second*, even assuming this Court does retain jurisdiction over the Chapter 7 Petition, dismissal of the Chapter 7 Case "for cause" is warranted under section 707(a) of the Bankruptcy Code. *See In re MacFarlane Webster Assocs.*, 121 B.R. 694, 696 (Bankr. S.D.N.Y. 1990) (dismissing involuntary chapter 7 case on motion of creditor under section 707(a)). As this Court explained in the Motion to Dismiss Ruling, any federal bankruptcy case involving Stream should only be maintained "after the completion of the Chancery Court litigation and the omnibus agreement's asset transfers." (Motion to Dismiss Ruling at 19:25-20:2.)

5. For these reasons, the Court should dismiss the Chapter 7 Case as soon as practicable. Additionally, in order to effectuate the intent of and to enforce its Dismissal Order, Movants submit that the Court should bar the filing of future successive bankruptcy petitions by, on behalf of, or against the Debtor pending the later to occur of (1) resolution of the Appeal and (2) conclusion of the Chancery Court Action. This relief will further judicial economy and stop the ongoing abuse of process by parties attempting to obstruct the pending Chancery Court Action regarding the Omnibus Agreement.[3]

## LEGAL PREDICATES

6. The legal predicates for the relief requested herein are (a) the divestiture rule articulated by the Supreme Court in *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56 (1982), (b) sections 105(a), 362(d), and 707(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), and (c) Rules 1013, 2002(a)(4), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules, Movants consent to the entry of a final judgment or order with respect to this

---

[3] In the event the Court determines not to dismiss this Chapter 7 Case, Movants submit that immediate relief from the automatic stay should be granted in order to permit the continued prosecution of the Chancery Court Action.

Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND[4]

### I.   DISMISSAL OF STREAM'S PRIOR BANKRUPTCY CASE AND THE SUBSEQUENT APPEAL

7.   On March 12, 2021, Movants filed the *Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case* (Chapter 11 Dkt. No. 46, the "**First Motion to Dismiss**"), generally alleging that the prior Chapter 11 Case was commenced in bad faith as a litigation tactic to forestall the Chancery Court's entry of judgment against Mr. Rajan and the other defendants.  On March 24, 2021, the United States Trustee (the "**U.S. Trustee**") filed the *United States Trustee's Motion for an Order Dismissing or Converting this Case to Chapter 7* (Chapter 11 Dkt. No. 84, the "**UST Motion to Dismiss**" and, together with the First Motion to Dismiss, the "**Motions to Dismiss**"), in which it sought, alternatively, to (i) dismiss the prior Chapter 11 Case or (ii) convert the prior Chapter 11 Case to Chapter 7.  On April 30, 2021, the Unsecured Creditors Committee appointed in the Chapter 11 Case (the "**UCC**") filed the *Statement of the Official Committee of Unsecured Creditors Regarding the Motions to Dismiss this Chapter 11 Case and Joinder to the Omnibus Objection* (Chapter 11 Dkt. No. 159, the "**UCC Statement**") joining in the Motions to Dismiss.

---

[4]   All citations herein to "Chapter 11 Dkt No. __" are to the docket in the Debtor's prior voluntary chapter 11 case, *In re Stream TV Networks, Inc.*, No. 21-10433(KBO) (Bankr. D. Del.) (the "**Chapter 11 Case**").  In light of this Court's familiarity with the Chapter 11 Case, and thus the Debtor, its business, the key parties in these proceedings, the Omnibus Agreement, and the litigation currently pending in the Delaware Court of Chancery (the "**Chancery Court**") as C.A. No. 2020-0766-JTL (the "**Chancery Court Action**"), Movants have omitted those details from this Motion.  Additional background can be found in this Court's Motion to Dismiss Ruling, the First Motion to Dismiss, and the December 8, 2020 opinion in the Chancery Court Action (the "**Chancery Opinion**").  *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-0766-JTL, 2020 WL 7230419 (Del. Ch. Dec. 8, 2020).

4

8. After a two day trial on May 10 and 11, 2021, the Court issued a bench ruling on May 17, 2021 (the "**Motion to Dismiss Ruling**"), granting the Motions to Dismiss, and dismissing the Chapter 11 Case. The Court concluded that the Debtor had failed "to show that the bankruptcy filing was filed in good faith and for a legitimate bankruptcy purpose" and instead found that the filing was "designed to stop SeeCubic and the debtor's secured creditors from fully implementing the omnibus agreement, to unravel it and to avoid the Chancery Court's order and, very likely, a mandatory injunction." (Motion to Dismiss Ruling at 19:8-16.) The Court determined the dismissal would be without prejudice, but explained its belief that "any future filing would occur after the completion of the Chancery Court litigation and the omnibus agreement's asset transfers." (*Id.* at 19:17-20:2.) The Court also rejected the Debtor's motion for a stay pending appeal, finding that granting such relief would be "acting as complicit in the bad faith filing." (*Id.* at 22:10-18.)

9. The Court entered an order memorializing the Motion to Dismiss Ruling that same day (Chapter 11 Dkt. No. 198, the "**Dismissal Order**"). On May 21, 2021, the Debtor filed its *Notice of Appeal Under 28 U.S.C. § 158(a) and Statement of Election* (Chapter 11 Dkt. No. 202, the "**Notice of Appeal**"), commencing an appeal of the Dismissal Order (the "**Appeal**"). The Appeal is currently pending in the District Court for the District of Delaware (the "**District Court**") at case number 21-723. (*See* Chapter 11 Dkt. No. 205.)

10. On May 22, 2021, SeeCubic filed in the Chancery Court Action its *Reply Brief in Further Support of Its Motion for Summary Judgment* (the "**Summary Judgment Reply**").

## II. THIS CHAPTER 7 CASE

11. On May 23, 2021, two days after the Notice of Appeal was filed, the above-captioned Chapter 7 Case was commenced via the filing of an involuntary petition against the Debtor (D.I. 1, the "**Chapter 7 Petition**"). The Chapter 7 Petition was filed by three alleged

creditors—Jamuna Travels, Inc., Walsh CHB, Inc. and Rembrandt 3D Holding Ltd.—who

purportedly hold a total of $1,669,519.25 in unsecured claims against the Debtor (collectively,

the "**Petitioning Creditors**"). None of the Petitioning Creditors objected to the Motions to

Dismiss Stream's prior Chapter 11 Case.

**BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY**

**I. THE APPEAL OF THE DISMISSAL ORDER DIVESTED THIS COURT OF JURISDICTION TO ENTERTAIN THE CHAPTER 7 PETITION[5]**

12. This Court lacks jurisdiction to hear this Chapter 7 Case because the filing of the

Notice of Appeal divested the Court of jurisdiction to do so. The Supreme Court has explained

that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers

jurisdiction on the court of appeals and divests the district court of its control over those aspects

of the case involved in the appeal." *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56,

58 (1982). Thus, the notice of appeal divests the lower court of jurisdiction over the issues that

are on appeal. *In re G–I Holdings, Inc.*, 568 B.R. 731, 763–64 (Bankr. D.N.J. 2017). Known as

the "divestiture rule," this principle applies to prevent "confusion and inefficiency which would

of necessity result were two courts to be considering the same . . . issues simultaneously." *Venen*

*v. Sweet*, 758 F.2d 117, 121 (3d Cir. 1985).

---

[5] To be clear, Movants do not oppose the Chapter 7 Petition at this time on the basis of technical compliance with the number of creditors or amount of claims, etc.; rather, Movants seek dismissal of the Chapter 7 Case on jurisdictional grounds due to the pending Appeal, which this Court has the authority to determine. *See In re QDN, LLC*, 363 F. App'x 873, 876 (3d Cir. 2010) (permitting creditor to "bring the issue of subject matter jurisdiction to the court's attention"). While Bankruptcy Rule 1011 suggests only the debtor may "contest" an involuntary *petition* (*see* Fed. R. Bankr. P. 1011(a)), including, for example, on the grounds enumerated in section 303, any party in interest possesses standing to move to dismiss an involuntary *case*, including under section 707(a). *See, e.g.*, *In re Jr. Food Mart of Arkansas, Inc.*, 234 B.R. 420, 421 (Bankr. E.D. Ark. 1999) ("[T]he Code and case authority clearly permit a party in interest to prosecute a motion to dismiss or abstain."); *see also In re MacFarlane Webster Assocs.*, 121 B.R. at 696 (dismissing involuntary chapter 7 case on motion of creditor under section 707(a)). Pursuant to Bankruptcy Rule 1013, this Court can, and should, resolve the Chapter 7 Petition expeditiously, and dismiss this Chapter 7 Case on the grounds set forth herein. *See* Fed. R. Bankr. P. 1013.

6

13. The test is "a functional one," prohibiting the lower court's consideration of issues "which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process." *In re G–I Holdings*, 568 B.R. at 763; *see also In re Whispering Pines Ests., Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007) (same). Importantly, the rule does not apply to bar a lower court from "enforc[ing] or implement[ing] its order" because "'in implementing an appealed order, the court does not disrupt the appellate process so long as its decision remains intact for the appellate court to review.'" *In re Pursuit Cap. Mgmt., LLC*, No. 14-10610 (LSS), 2017 WL 2537234, at *6 (Bankr. D. Del. June 9, 2017) (citation omitted); *see also In re Washington Mut., Inc.*, 461 B.R. 200, 219 (Bankr. D. Del. 2011) ("The correct statement of the Divestiture Rule is that so long as the lower court is not altering the appealed order, the lower court retains jurisdiction to enforce it."), *vacated in part on other grounds*, No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012). Thus, "the trial court's task is to determine whether the matters before it implicate the appeal or are collateral to those issues involved in it." *In re Pursuit Cap. Mgmt.*, 2017 WL 2537234, at *6; *see also In re G–I Holdings*, 568 B.R. at 764 (divestiture applies where issues on appeal are "identical" to those before the bankruptcy court, and if bankruptcy court's ruling "would interfere with or undermine the appellate process"); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS), 2016 WL 6808958, at *1 (Bankr. D. Del. Nov. 17, 2016) ("[A] lower court may take no action which interferes with the appeal process or with the jurisdiction of the appellate court." (citation omitted)).

14. The Debtor filed the Notice of Appeal of the Dismissal Order on May 21, 2021, and the Appeal has been docketed in the District Court. As of that date, this Court was divested of jurisdiction to entertain and rule upon any issues that that may "implicate the [A]ppeal" or

7

"interfere with or undermine the appellate process." The Appeal squarely places before the District Court several issues that are directly implicated by prosecution of the Chapter 7 Case.

15. *First*, by pursuing the Appeal of the Dismissal Order, the Debtor is ultimately seeking relief that is fundamentally inconsistent with that sought by the Chapter 7 Petition. In the Chapter 11 Case, the Debtor remained "in possession" of the estate and was controlled by its sole director (Mathu Rajan). *See, e.g.*, 11 U.S.C. § 1107(a); *see also* 7 Collier on Bankruptcy ¶ 1107.01 (16th ed. 2021) ("[D]ebtors in possession are the norm in a chapter 11 case . . ."). By its Appeal of the Dismissal Order, the Debtor seeks to reinstate the Chapter 11 Case and administer the Debtor's estate under the supervision of its existing management. Indeed, in opposing dismissal of the Chapter 11 Case the Debtor routinely touted its interest in, and ability to, reorganize and restructure Stream's business using the various powers conferred by the Bankruptcy Code. (*See, e.g.*, Debtor Opposition[6] ¶¶ 45-46 (explaining that by initiating the Chapter 11 Case, the Debtor sought "to preserve the value of its enterprise for all interested parties" and asserting that it had "a viable and valuable business"); VTI Opposition[7] ¶ 42 ("[T]he Company has sought relief here in order to use the unique provisions of the Bankruptcy Code to," among other things, "reorganize the Company to maximize its value for the benefit of all of its creditors, equity holders and employees"). By contrast, a chapter 7 case necessarily involves the ousting of debtor's management; a chapter 7 trustee is appointed as representative of the estate and oversees the debtor's bankruptcy proceedings. *See id.* at §§ 701-704. Thus, the Petitioners in this Chapter 7 Case effectively seek appointment of a trustee to take control of the

---

[6] *Debtor's Response in Opposition to (I) the Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case and (II) the United States Trustee's Motion for an Order Dismissing or Converting the Case to Chapter 7* (Chapter 11 Dkt. No. 100, the "**Debtor Opposition**").

[7] *Visual Technology Innovations, Inc.'s Response in Opposition to the Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case* (Chapter 11 Dkt. No. 101, the "**VTI Opposition**").

Debtor's estate, while the Debtor itself is simultaneously pursuing a Chapter 11 Case led by current management in the District Court. This is precisely the sort of "confusion and inefficiency" that the divestiture rule is designed to avoid. *Venen*, 758 F.2d at 121.

16. *Second*, the Chapter 7 Petition is, in effect, a request for reconsideration of this Court's findings in the Motion to Dismiss Ruling, which are currently before the District Court. In the UST Motion to Dismiss, the U.S. Trustee sought alternative forms of relief: dismissal of the Chapter 11 Case or, alternatively, conversion to Chapter 7. (*See* UST Motion to Dismiss ¶ 36.) Pursuant to section 1112(b), where "cause" exists to dismiss or convert a case, the Court must then determine which of those options is in the "best interests of creditors and the estate." 11 U.S.C. § 1112(b); *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012) ("Section 1112(b) requires a two-step process in which the court first determines whether there is 'cause' to convert or dismiss, and next chooses between conversion and dismissal based on 'the best interest of creditors and the estate.'"). Accordingly, in finding "cause" and granting the primary relief (dismissal), the Court necessarily concluded that dismissal was in the "best interests of creditors and the estate" vis-à-vis conversion. (*See* Motion to Dismiss Ruling at 10:6-8 ("Pursuant to Section 1112(b) of the Bankruptcy Code, the court may dismiss a Chapter 11 case for cause if it's in the best interest of the creditors and the estate.").)

17. Entertaining the Chapter 7 Petition and allowing this Chapter 7 Case to proceed would be tantamount to granting the alternative relief that was rejected by the Court in favor of dismissal, thus "resulting in the substantial confusion and inefficiency this prudential rule seeks to avoid." *In re Pursuit Cap. Mgmt.*, 2017 WL 2537234, at *10. In light of the overlap in the

9

issues presented by the Appeal and the Chapter 7 Petition, this Court lacks jurisdiction over this

Chapter 7 Case.[8]

## II.   ALTERNATIVELY, THIS COURT SHOULD DISMISS THIS CHAPTER 7 CASE PURSUANT TO SECTION 707(A)

18.   In the event the Court finds it has jurisdiction, it should dismiss the Chapter 7

Case under section 707(a) of the Bankruptcy Code, for largely the same reasons it dismissed the

Chapter 11 Case.  Section 707 provides for the dismissal of a chapter 7 case "for cause."  11

U.S.C. § 707(a).  While subsection (a) includes several examples of 'cause,' the list is not

exhaustive.  *See In re Krueger*, 812 F.3d 365, 370 (5th Cir. 2016) ("The statute lists three

grounds 'for cause' that all courts have understood as illustrative, not exclusive . . ."); *In re

Kempner*, 152 B.R. 37, 39 (D. Del. 1993) ("Courts interpreting § 707(a) have held that the three

grounds 'for cause' to dismiss a Chapter 7 petition expressly enumerated in § 707(a) . . . are not

intended as an exhaustive list."); *see also* 6 Collier on Bankruptcy ¶ 707.03[1] (16th ed. 2021)

("The examples [in section 707(a)] are merely illustrative, and the court may dismiss the case on

other grounds when cause is found to exist.").  Instead, the decision to dismiss under section 707

"is guided by equitable considerations and is committed to the sound discretion of the

bankruptcy court."  *In re Murray*, 900 F.3d 53, 58 (2d Cir. 2018); *see also In re Tamecki*, 229

F.3d 205, 207 (3d Cir. 2000) ("[T]he decision to dismiss a petition for lack of good faith rests

within the sound discretion of the bankruptcy court.").

---

8   While the divestiture rule prevents the Court's consideration of the Chapter 7 Petition and thus dismissal is warranted, this Court can, and should, enter an order barring any future bankruptcy filings by, on behalf of, or against the Debtor, until the later to occur of (1) resolution of the Appeal and (2) conclusion of the Chancery Court Action.  The Court retains jurisdiction to do so in order to "enforce or implement its order" and will not "disrupt the appellate process [because] its decision remains intact for the appellate court to review."  *In re Pursuit Cap. Mgmt.*, 2017 WL 2537234, at *6 (citations omitted).  Barring any further filings will avoid further frustration of the Court's intent in the Motion to Dismiss Ruling—to allow the Chancery Court Action to run its course—and is firmly within this Court's "equitable powers under 11 U.S.C. § 105 [which] 'surely enable it to control its own docket.'"  *In re Am. Cap. Equip.*, 688 F.3d at 154 (citation omitted).

19.     Section 707(a) "covers both voluntary and involuntary cases." *In re MacFarlane Webster Assocs.*, 121 B.R. at 696.  Much like dismissal under section 1112(b), courts have exercised discretion to dismiss under section 707(a) in instances where the case is in essence a two-party dispute capable of resolution in another forum; where the case would not serve the underlying purposes of the Bankruptcy Code, and where judicial economy and efficiency thus favor dismissal; and where the petitioner exhibits bad faith.  Because, as this Court already found, effectively all of these circumstances are present here, this case is a prime candidate for dismissal.

20.     *First*, this is effectively a two-party dispute that is capable of being resolved in the Chancery Court.  *See In re Bilzerian*, 258 B.R. 850, 858 (Bankr. M.D. Fla. 2001), *aff'd*, 276 B.R. 285 (M.D. Fla. 2002), *aff'd sub nom. Bilzerian v. SEC*, 82 F. App'x 213 (11th Cir. 2003) (dismissing chapter 7 case in favor of pending litigation in separate forum noting that court-appointed receiver would "[f]unctionally . . . be acting as a Chapter 7 trustee . . . under the control of a federal district court judge—the same judge that has vast familiarity with the background of this case . . ."); *In re Murray*, 900 F.3d at 61 (affirming bankruptcy court's dismissal of chapter 7 case, and its finding that the "petition was part of a long-running, two-party dispute").  As the UCC concluded after conducting its investigation in the Chapter 11 Case—a conclusion this Court afforded "great consideration and weight"—the Chapter 11 Case is "akin to a two-party dispute that should proceed outside of bankruptcy."  (Motion to Dismiss Ruling at 18:10-17.)  And as this Court explained in granting dismissal of the Chapter 11 Case without prejudice, the appropriate next steps involve the Chancery Court's final resolution of the matters before it, as well as resolution of any disputes between the parties with respect to the

11

Omnibus Agreement and the transfers of assets already made to SeeCubic.  (*See id.* at 19:25-20:2.)  Dismissal is warranted to allow that to occur.

21.     *Second*, and relatedly, this Chapter 7 Case will serve no valid bankruptcy purpose, and thus judicial economy militates in favor of dismissal.  *See In re Lots by Murphy, Inc.*, 430 B.R. 431, 436 (Bankr. S.D. Tex. 2010) (dismissing chapter 7 case where there were no assets to satisfy creditor claims and case would thus not serve the purposes underlying the Bankruptcy Code, noting that "[n]either the bankruptcy courts, nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions" (citation omitted)); *In re MacFarlane Webster Assocs.*, 121 B.R. at 695, 704 (dismissing involuntary chapter 7 commenced by junior creditor, noting that only estate assets "consist[ed] of claims to avoid a pre-petition foreclosure by the senior mortgagee," and because such an action would not clear the secured debt, "[d]ismissal would result in no prejudice to the general creditors if any").  The Court previously found that "by virtue of the Chancery Court's order the debtor entered these proceeding without any business operations, employees, cash, income, or ability to generate revenue" and "no material assets beyond those which are the subject of the omnibus agreement." (Motion to Dismiss Ruling at 11:25-12:5.)  And, as the Chancery Court aptly noted, the alternative to the Omnibus Agreement is foreclosure, in which case "Stream and its stockholders would have been left with nothing."  Chancery Opinion at *1.  The Court also found that the Chapter 11 Case would result in "significant administrative expenses" and the Debtor would still have to deal with the claims of its secured lenders "whose claim amounts will only grow as a result of the delay, rejection and attendant litigation."  (*See* Motion to Dismiss Ruling at 17:15-20.)

12

22.     Those issues are equally applicable and relevant here; any actions that might be taken by a chapter 7 trustee would similarly be "vigorously opposed, lengthy, costly and have less than certain endings." (*Id.* at 17:12-14.)  And because the Chancery Court Action is much further along—in fact, it is near completion—deference to that forum to resolve this two-party dispute will necessarily avoid "the likely avalanche of resulting administrative expenses." (*Id.* at 18:4.)  Indeed, only days ago SeeCubic filed in the Chancery Court its Summary Judgment Reply in support of its request for a declaratory judgment and permanent injunctive relief.

23.     *Finally*, the Petitioning Creditors, like the Debtor in the Chapter 11 Case, are not before this court in good faith.  *See In re Tamecki*, 229 F.3d at 207 ("Section 707(a) allows a bankruptcy court to dismiss a petition for cause if the petitioner fails to demonstrate his good faith in filing . . ."); *In re Krueger*, 812 F.3d at 370 ("[A] debtor's bad faith in the bankruptcy process can serve as the basis of a dismissal 'for cause.' . . . ").  In *Tamecki*, the Third Circuit explained that good faith in the context of section 707(a) dismissal should be assessed "on an ad hoc basis and [courts] must decide whether the petitioner has abused the provisions, purpose, or spirit of bankruptcy law." 229 F.3d at 207 (citation omitted).  "Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." *Id.*; *see also In re Crest By The Sea, LLC*, 522 B.R. 540, 547 (Bankr. D.N.J. 2014) (same).  "[I]n deciding a motion to dismiss based upon a debtor's lack of good faith, a bankruptcy court may consider all of the facts and circumstances surrounding the debtor's filing of the bankruptcy petition." *Perlin v. Hitachi Cap. Am. Corp.*, 497 F.3d 364, 374 (3d Cir. 2007); *see also In re Bilzerian*, 258 B.R. at 857 ("cause" under section 707 "requires an analysis of all of the facts and circumstances leading up to the filing of this case to include the debtor's motive in filing the case, the purposes which will be achieved in this case, and whether the debtor's motive and purposes are consistent

13

with the purpose of chapter 7 . . .").  "Bad faith may be found when the debtor has a frivolous, noneconomic motive for filing a bankruptcy petition, when there is a sinister or unworthy purpose, or when there is an abuse of the judicial process." *In re Kempner*, 152 B.R. at 39.  The Court has already established the Debtor's lack of good faith; this extends to the Petitioning Creditors.

24.     In its Motion to Dismiss Ruling, the Court clearly held that the Debtor "did not come to this court as the honest but unfortunate debtor to preserve and maximize value for its stakeholders," but instead "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the omnibus agreement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor for his own benefit." (*Id.* at 13:20-14:1, 15:14-19.)  The Chapter 7 Case accomplishes the same thing, and effectively skirts this Court's Dismissal Order, by yet again frustrating the Chancery Court's ability to resolve the dispute.

25.     The timing and circumstances of this filing suggest this was clearly the intent, and make it nearly impossible for the Petitioning Creditors to satisfy their burden of proving good faith.  Less than 24 hours after the Chapter 7 Petition was filed, Mr. Rajan sent a letter to the Chancery Court "advis[ing]" the court that "certain of the creditors" of Stream had commenced this Chapter 7 Case. (*See* Exhibit B.)  The very next day, Mr. Rajan sent yet another letter, this time to "bring to [the Chancery Court's] attention" certain "fraud" that was purportedly "perpetrated on both [Stream] and on the Court," claiming that "[t]he Omnibus Agreement on its face is a fraudulent conveyance and a clear violation of the absolute priority rule," and asking the court to rescind the injunction. (*See* Exhibit C.)[9]  The same day, one of the Petitioning Creditors

---

9    Certain exhibits to the letters attached hereto as Exhibits B and C have been omitted for brevity.

14

sent a mass-email to Stream's creditors indicating that by simply filling out an involuntary petition against the Debtor and sending it to counsel to the Petitioning Creditors "he may be able to get every ones [sic] money" purportedly because "stream tv is willing to pay all vendors." (*See* <u>Exhibit D</u>.) Finally, just yesterday Mr. Rajan contacted a Stream creditor to set up a Zoom meeting, purportedly to discuss the Chapter 7 Petition. (*See* <u>Exhibit E</u>.)

26. These actions appear to be nothing more than a continuation of the campaign to misuse the bankruptcy process to stave off final judgment in the Chancery Court and undermine the Omnibus Agreement. Further, the casual nature and timing of the solicitation to creditors is itself antithetical to the purpose and intent of the Bankruptcy Code, which this Court aptly described as requiring that debtors seeking protection "act in conformity with the code's underlying principles of equity and fairness," (Motion to Dismiss Ruling at 16:12-14), and suggests an intent to "abuse[] the provisions, purpose, [and] spirit of bankruptcy law." *In re Tamecki*, 229 F.3d at 207; *see also In re Crest By The Sea*, 522 B.R. at 548 (dismissing chapter 7 case, citing the "careless disregard with which [a member of the debtor] and the other Members approached the bankruptcy filing" and their "disregard for the bankruptcy process").

III. **IF THE COURT ALLOWS THIS CHAPTER 7 CASE TO PROCEED, RELIEF FROM THE STAY IS NECESSARY TO CONTINUE THE CHANCERY COURT ACTION**

27. While this case is a prime candidate for dismissal under section 707, if the Court determines that this Chapter 7 Case should proceed, relief from the stay is necessary to aid in the implementation of the Dismissal Order, by allowing the Chancery Court Action to proceed. As an action against the Debtor, continuation of the Chancery Court Action is subject to the automatic stay. *See* 11 U.S.C. § 362(a)(1). Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief

15

from the stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest . . ." 11 U.S.C. § 362(d)(1).

28. "Cause" is not defined by section 362(d)(1). *See In re The SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007). Courts in the Third Circuit have stated that "cause is a flexible concept" often involving a "fact intensive, case-by-case balancing test." *Id.* (citing *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997)). Courts have further noted that section 362(d)(1) is intended to be applicable to situations in which parties seek to go forward with proceedings in another tribunal. *Id.* Indeed, the legislative history states that "[i]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere." H.R. Rep. No. 95-595 at 341 (1977); *see also id.* at 343-44 (finding that cause may be established by a single factor such as "a desire to permit an action to proceed . . . in another forum").

29. In order to determine whether allowing litigation to proceed in its original forum is appropriate, courts in this District generally apply a three-prong balancing test. *In re The SCO Grp.*, 395 B.R. at 857. In particular, courts consider "(1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted." *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993) (citing *In re Rexene Prods Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)).

30. All three factors strongly support modifying the stay to allow the Chancery Court Action to proceed. There is no prejudice to the Debtor if the stay is modified. In the Motion to Dismiss Ruling, this Court already found that dismissal was warranted to allow the Chancery Court Action to run its course. (*See* Motion to Dismiss Ruling at 19:25-20:2 ("I would expect

16

that any future filing would occur after the completion of the Chancery Court litigation and the omnibus agreement's asset transfers.").)  SeeCubic, however, will face significant prejudice as the continuing overhang of these successive legal proceedings has a real and meaningful impact on SeeCubic's ability to operate its business and maintain necessary relationships and trust required from its vendors, customers, and other stakeholders.  Relief from the stay will simply carry out the intent and purpose of the Dismissal Order, by allowing the Chancery Court Action to proceed.  Finally, SeeCubic is very likely to prevail in the Chancery Court if the stay is modified.  Both this Court and the Chancery Court have acknowledged that a mandatory injunction is likely.  (*See id.* at 19:12-16 (explaining that the Chapter 11 Case was "designed to stop SeeCubic and the debtor's secured creditors from fully implementing the omnibus agreement, to unravel it and to avoid the Chancery Court's order and, v*ery likely, a mandatory injunction.*" (emphasis added)); Chancery Opinion at *24 ("Were it necessary to grant a mandatory injunction to enforce the Omnibus Agreement, then the record would be sufficiently clear to support it.").)  Accordingly, to the extent the Court determines that this Chapter 7 Case should proceed, the stay should be modified to allow the Chancery Court Action to continue.

## NOTICE

31.    Notice of the Motion will be given to: (a) the U.S. Trustee, (b) counsel to the Debtor in the Appeal, (c) counsel to the Petitioning Creditors, (d) the alleged Debtor, and (e) all parties that have requested notice in the Chapter 11 Case pursuant to Local Bankruptcy Rule 2002-1(b).  Under the specific facts and circumstances of this case, Movants submit that no other or further notice should be required.

## CONCLUSION

Movants respectfully request that this Court enter the Order, substantially in the form filed herewith, granting dismissal of this Chapter 7 Case and, in the alternative, granting relief from the automatic stay, and entering such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
       May 27, 2021

| | |
|---|---|
| ROBINSON & COLE<br><br>By: */s/ Davis Lee Wright*<br>Davis Lee Wright (No. 4324)<br>James F. Lathrop (No. 6492)<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801<br>Telephone: (302) 516-1700<br><br>-and-<br><br>QUARLES & BRADY LLP<br>Brittany S. Ogden (*pro hac vice* pending)<br>33 East Main Street Suite 900<br>Madison, Wisconsin 53703<br>Telephone: (608) 251-5000<br><br>Brandon M. Krajewski (*pro hac vice* pending)<br>411 East Wisconsin Avenue Suite 2400<br>Milwaukee, Wisconsin 53202<br>Telephone: (414) 277-5000<br><br>Alissa Brice Castañeda (*pro hac vice* pending)<br>Gabriel M. Hartsell (*pro hac vice* pending)<br>One Renaissance Square<br>Two North Central Avenue<br>Phoenix, Arizona 85004<br>Telephone: (602) 229-5200<br><br>*Counsel for SLS Holdings VI, LLC* | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br><br>*/s/ Joseph O. Larkin*<br>Joseph O. Larkin (I.D. No. 4883)<br>Carl T. Tullson (I.D. No. 6704)<br>Jason M. Liberi (I.D. No. 4425)<br>920 N. King Street, One Rodney Square<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-3000<br><br>- and -<br><br>Eben P. Colby (*pro hac vice* pending)<br>Marley Ann Brumme (*pro hac vice* pending)<br>500 Boylston Street, 23rd Floor<br>Boston, Massachusetts 02116<br>Telephone: (617) 573-4800<br><br>*Counsel for SeeCubic, Inc.* |

18

892711.02-WILSR01A - MSW

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                              |   |                           |
|------------------------------|---|---------------------------|
|                              | . | Chapter 11                |
| IN RE:                       | . |                           |
|                              | . | Case No. 21-10433 (KBO)   |
| STREAM TV NETWORKS, INC.,    | . |                           |
|                              | . |                           |
|                              | . | Courtroom No. 3           |
|                              | . | 824 N. Market Street      |
|                              | . | Wilmington, Delaware 19801|
|                              | . |                           |
|              Debtors.        | . | May 17, 2021              |
| . . . . . . . . . . . . . . . . . |  | 3:00 P.M.              |

TRANSCRIPT OF JUDGE'S RULING
BEFORE THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:           Martin J. Weis, Esquire
                           DILWORTH PAXSONLLP
                           704 N. King Street
                           P.O. Box 1031
                           Wilmington, DE 19899-1031

                           - and -

                           Lawrence G. McMichael, Esquire
                           Anne M. Aaronson, Esquire
                           Yonit A. Caplow, Esquire
                           1500 Market Street, Suite 3500E
                           Philadelphia, PA 19102


Audio Operator:            Madaline Dungey, ECRO

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email: gMathus@reliable-co.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

TELEPHONIC APPEARANCES (Cont'd):

For the U.S. Trustee:        Rosa Sierra, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, Delaware 19801

For SeeCubic, Inc.:          Joseph Larkin, Esquire
                             Jason Liberi, Esquire
                             SKADDEN, ARPS, SLTATE, MEAGHER
                               & FLOM LLP
                             One Rodney Square
                             920 N. King Street
                             Wilmington, Delaware 19801

                             - and -

                             Eben Colby, Esquire
                             500 Boylston Street
                             Boston, MA 02116

For Visual Technology        Jonathan Stemerman, Esquire
Innovations:                 Rafael Zahralddin, Esquire
                             ARMSTRONG TEASDALE LLP
                             300 Delaware Avenue, Suite 210
                             Wilmington, Delaware 19801

                             - and -

                             John Sten, Esquire
                             225 Franklin Street, 26th Floor
                             Boston, MA 02110

For the Committee:           Christopher Samis, Esquire
                             POTTER ANDERSON & CORROON LLP
                             HERCULES PLAZA
                             1313 North Market Street, 6th Floor
                             P.O. Box 951
                             Wilmington, Delaware 19801

MATTERS GOING FORWARD:

Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case [Filed: 3/12/2021; D.I.46]

United States Trustee's Motion for an Order Dismissing or Converting This Case to Chapter 7 [Filed: 3/24/2021; D.I. 84]

**Judge's Ruling: 4-20**

(Proceedings commence at 3:07 p.m.)

THE COURT: Good afternoon, parties. This is Judge Owens. We're gathered today for a continued hearing in the Stream TV Networks case.

I promised you that I would render my oral ruling on the motions to dismiss after the conclusion of the trial last week and I am prepared to do so. So if you have any issues hearing me please feel free to interrupt given that we're trying to get a complete and accurate record today. So let me just dive in.

So before the court are the motions of the United States Trustee, SeeCubic, Inc., which I will refer to as SeeCubic, and SLS Holdings VI, LLC to dismiss the Chapter 11 petition filed by Stream TV Networks, Inc. The motions are opposed by the debtor and Visual Technology Innovations, Inc., which I will refer to as VTI, but supported by the official committee of unsecured creditors.

The court conducted an evidentiary hearing and heard oral argument on the dismissal motions on May 10th and May 11th. Following the close of argument I took the matter under advisement and advised the parties that I intended to render an oral ruling as expeditiously as possible. I believe that this is warranted in lieu of a written opinion because I wished to avoid the delay associated with issuing such an opinion and because, among other things, certain

aspects of the Ultra-D business as well as other intended business plans of Stream, VTI, and other third parties are dependent on and in some instances, effectively, stayed until this court's ruling on the dismissal motions; however, in rendering this oral ruling I have attempted to be as thorough as possible, so excuse the length.

After considering the motions, oppositions thereto, and all related filings, evidence, and argument presented in connection with the dismissal request, as I mentioned, I am not ready to rule. And for the reasons that I will discuss in more detail I will grant the motions and dismiss the case; however, I am not prepared to do so with prejudice.

Let me start with some brief facts. This case was filed on February 24th, 2021. It was predated by Stream's May 2020 entry into the omnibus agreement with fifty-two of its stockholders as well as its secured creditors SLS and Hawk. SLS and Hawk, collectively, assert note claims aggregating almost $150 million secured by liens on substantially all of the debtor's assets.

Following an asserted default under the notes the parties entered into the omnibus agreement which provided that SLS and Hawk would not foreclose on their collateral and would accept, in satisfaction of their note claims, delivery of Stream's assets by way of SeeCubic; a new entity to be under the secured creditors control.

Case 23-10763-el21-10643-2084  Filed 04/08/26 05/27/21  Page 78 of 308 13:46:51  Desc
Appendix Part 2   Exs. 21-40   Page 78 of 308

6

The omnibus agreement granted the secured creditors, by way of Mr. Stastney, power of attorney to effectuate the asset transfers and allowed Stream's minority investors to swap their shares in Stream for shares in SeeCubic.  Upon the transfer of the assets to SeeCubic the secured notes would be extinguished.  Per the agreement Stream was to receive one million shares of SeeCubic's Class A common stock.

Mr. Rajan, Stream's sole director, CEO and controlling shareholder, is not entitled to participate in the omnibus agreement's equity swap, and did not and continues to not support Stream's entry into the omnibus agreement.  Mr. Rajan didn't approve the omnibus agreement on behalf of Stream.  That was handled by a resolution committee comprised of four outside independent directors with the full power and authority of Stream's board to resolve the claims of SLS and Hawk.

In September 2020 Stream, under the control of Mr. Rajan, commenced litigation in the Delaware Chancery Court seeking both a determination that the omnibus agreement was invalid and an injunction to prevent SeeCubic from taking any action to enforce it.  Stream argued that the directors who approved the agreement were never validly appointed; the agreement was invalid because it constituted a sale of all of Stream's assets which under Section 271 of the Delaware

Case 23-10763-amc   Doc 1-4   Filed 04/03/26   Page 79 of 308
Case 21-1048-XBO   Doc 504   Filed 05/27/21   Page 26 of 246:51   Desc
Appendix Part 2   Exs. 21-40   Page 79 of 308

7

General Corporation Law required stockholder approval; under its certification of incorporation the agreement required the separate approval of the holders of the majority of the Class B common stock; and finally, that members of the resolution committee breached their fiduciary duties by approving the agreement.  SeeCubic filed a competing request for an injunction.

On December 8th, 2020 the Delaware Chancery Court entered an order preliminary enjoining Stream, Mr. Rajan and others from, among other things, taking any action to interfere with the omnibus agreement including, but not limited to, disputing the validity of the agreement except as part of the Chancery Court litigation; interfering with the exercise of the granted power of attorney; asserting ownership rights to any of the assets subject to the omnibus agreement in the stock or comparable equity of Stream's subsidiary, TechnoVative, or those deemed the Dutch subsidiaries; and transferring, liquidating, converting, encumbering or, otherwise, disposing of any of the subject assets in a manner inconsistent with the omnibus agreement.

In its opinion accompanying the order the Chancery Court found that Mr. Rajan and his brother, who previously served as a director and officer of Stream, acted by unanimous written consent to expand the board of directors with four outside directors.  It found, at subsequent

meeting, the board validly created the resolution committee to negotiate and resolve outstanding claims. And on My 6th, 2020 the resolution committee approved the omnibus agreement and it became effective and binding on Stream. Stream failed on the remaining issues before the court.

Notably, while the Chancery Court grant only a preliminary injunction, the court concluded its lengthy and thorough opinion by holding that it need not enter a mandatory injunction because it was granting a prohibitive injunction preventing Stream from taking action to interfere with the rights of SLS, Hawk, SeeCubic and others under the omnibus agreement including the power of attorney.

Nonetheless, the court held that,

"Were it necessary to grant a mandatory injunction to enforce the omnibus agreement then the record would be sufficiently clear to support it."

The Chancery Court's order and its findings, which although preliminary, are not being challenged by the parties in this proceeding, and are firm, and compelling.

Following the entry of the Chancery Court's order the parties proceeded to brief whether a mandatory injunction should be granted to enforce the omnibus agreement. These cases were filed a few days from the completion of briefing on that issue and, therefore, prior to the court deciding whether a mandatory injunction should be entered.

Moreover, this case was commenced prior to the full effectuation of Stream's asset transfer to SeeCubic, the issuance of the SeeCubic shares to Stream, and the extinguishment of the secured lenders claims. And while the parties debate the extent of the transfers of the assets that were transferred to SeeCubic, which issue is not currently before the court, they do not dispute that the scope of Stream's assets, subject to the omnibus agreement, is broad encompassing substantially all of Stream's prepetition assets including the equity of its foreign subsidiaries.

Prepetition these assets aggregated to form Stream's business which was to develop technology and hopefully to commercialize its proprietary Ultra-D technology. The collective testimony from relevant witnesses is that this technology, developed from technology initially licensed to Stream from Philips, is the Rolls-Royce of "glasses-free 3D" display technology. This technology allows individuals to view 3D content without the need to wear glasses or goggles.

Shortly after the commencement of this proceeding SeeCubic, SLS and the U.S. Trustee moved to dismiss the case with prejudice for cause under Section 1112(b) because they assert that the case was filed in bad faith. They argue that it was filed not for a proper bankruptcy purpose, but rather to take advantage of the automatic stay, gain a tactical

advantage, and collaterally attack the Chancery Court order. Stream and VTI disagree, arguing that the case was filed in good faith to maximize Stream's assets for the benefit of its unsecured creditors who were left behind and not benefited by the omnibus agreement.

Pursuant to Section 1112(b) of the Bankruptcy Code the court may dismiss a Chapter 11 case for cause if it's in the best interest of the creditors and the estate. In the Third Circuit a Chapter 11 petition is subject to dismissal for cause under 1112(b) if not filed in good faith as only the honest, but unfortunate debtor is eligible to avail itself of the protections afforded by the bankruptcy code.

Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where the petition falls along the spectrum ranging from the clearly accepting to the patently abusive. Among the court's considerations for good faith are whether the petition serves a valid bankruptcy purpose such as preserving a going concern or maximizing the value of the debtor's estate and whether the petition was filed to obtain a tactical advantage.

As for the second question, timing is a key element. Generally the court will evaluate whether the timing of the filing of the Chapter 11 petition includes -- indicates, excuse me, that the primary, if not sole purpose

of the filing was a litigation tactic; however, the focus on a valid bankruptcy purpose and tactical advantage is not meant to limit the court's consideration of other factors.

Courts also look to the <u>Primestone</u> factors which were articulated by the Delaware District Court in the case of <u>Primestone Investment Partners</u>. And those factors are whether the case is a single asset case; whether there are a few unsecured creditors; whether there is an ongoing business or employees; whether the petition was filed on the eve of foreclosure; whether the matter is a two-party dispute which can be resolved in pending State Court action; whether there is any cash or income; whether there is pressure from non-moving creditors; whether there is a previous bankruptcy petition, the existence of an improper prepetition conduct; whether there is no possibility of reorganization; whether the debtor was formed immediately prepetition; whether the debtor filed solely to create the automatic stay; and finally the subject intent of the debtor.

The focus of the good faith inquiry is whether the petitioner sought to achieve objectives outside the legitimate scope of the bankruptcy laws when filing protection under Chapter 11, and no single factor is determinative.

I agree with the movants that many of the <u>Primestone</u> factors are present here. It's undisputed that by

virtue of the Chancery Court's order the debtor entered these proceeding without any business operations, employees, cash, income, or ability to generate revenue. Additionally, Stream has no material assets beyond those which are the subject of the omnibus agreement.

As already explained, substantially all of the debtor's assets necessary for a successful reorganization were agreed by the debtor prepetition to be transferred to SeeCubic pursuant to the omnibus agreement and, critically, are the subject of the Chancery Court's order enjoining the debtors and others outside of that litigation from asserting ownership rights in such assets or, otherwise, interfering with the consummation of the omnibus agreement.

The other assets Stream relies on to support a reorganization are based on two alternative an lesser quality "glasses-free 3D" viewing platforms upon which Stream did not develop, focus, or, otherwise, rely on prepetition, and the amount to two possible post-petition sales and distribution support agreements of unknown value that depend on contributions of engineers and other specialists that are not yet employees of Stream.

Parties have also pointed to Stream's intangible goodwill and NOL's, but such assets alone cannot serve as a basis for reorganization. These as well as the proffered alternative platform contracts serve as post rationalizations

for the filing. They were not mentioned in Mr. Rajan's initial first day declaration which focused on Stream's Ultra-D assets. They have been developed throughout the dismissal litigation.

While Stream points out that its currently insolvent and in financial distress given that there are approximately $20 million of unsecured claims asserted against it and it has no assets, operations, and current ability to satisfy such claims the court, after considering and weighing the evidence presented, does not believe that this financial distress was the motivating factor for the commencement of these proceedings, nor do I believe that the debtor entered these proceedings with the hope of preserving its business and maximizing its value for the benefit of its creditors and other stakeholders.

Rather, the weight of the evidence, including the timing of the filing days before the Chancery Court was to enter a mandatory injunction permanently enjoining the debtor from laying claim to substantially all of Stream's assets, indicates that Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the omnibus agreement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the

debtor for his own benefit.

Mr. Rajan's prepetition conduct as well as the timeline of circumstances leading to this filing serve as the starting points for this conclusion.

First, as detailed in the Chancery Court's order, Mr. Rajan and his brother took improper actions to neutralize the omnibus agreement after it was approved on behalf of Stream by the resolution committee. When it became clear that the Rajan's would challenge the omnibus agreement there were unsuccessful attempts to reach a resolution with them which followed by the brothers further attempting to nullify the agreement through corporate resolution and through machinations that included trying to change the management of the debtor's subsidiaries and attempting to remove prototype technology from a storage facility.

Approximately five months later Mr. Rajan, via Stream, challenged the omnibus agreement in the Chancery Court and sought an injunction barring SeeCubic from enforcing the omnibus agreement. Following the loss in Chancery Court and the entry of the injunction order Mr. Rajan established VTI of which he is the controlling shareholder, president, and until recently the sole director. Using VTI he began to fundraise using Stream's assets despite the injunction.

It is clear, through documentary evidence, that Mr.

Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value.

It's important to note that while all of this was happening Stream was distressed and some witness testimony indicated that creditors, apart from SLS and Hawk, may have been pursuing Stream for payment, but nevertheless it never sought bankruptcy protection. It was only when briefing was near complete in the Chancery Court that would have allowed the vice chancellor to enter a mandatory injunction that he previewed to the parties was likely that this proceeding was commenced.

This behavior and apparent attempts to avoid the effects of the omnibus agreement and Chancery Court order all for the benefit of Stream's insiders supports the conclusion that Stream did not come to this court as the honest but unfortunate debtor to preserve and maximize value for its stakeholders.

The debtor and VTI, however, have urged this court to look beyond the Chancery Court order and prepetition events leading thereto and highlight their plans and ability to put forth a reorganization that would lead to payment, in full, of its creditors including SLS and Hawk if Stream would be permitted to continue with its filing; however, the

repeated maneuverings of Mr. Rajan, the timing of the filing, and the initial goals of the proceeding in the face of the Chancery Court's order cannot be ignored or cured.

As the Eighth Circuit Court of Appeals aptly opined in the Cedar Shore Resort case,

"The taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal."

It also said,

"The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith."

Debtors seeking the protection of the code should act in conformity with the code's underlying principles of equity and fairness, and any debtor who files bankruptcy in bad faith should not be permitted to enjoy the protections of Chapter 11 even though the debtor might be capable of effectuating a reorganization.

This observation reigns even more poignant here given that, as readily admitted, the lynchpin of any restructuring centers around rejecting the omnibus agreement, stopping all Ultra-D asset transfers to the secured lenders, recapturing the assets that have been transferred and transferring them to VTI, an entity currently controlled and owned by Mr. Rajan.  These actions are plainly at odds and cannot be squared with the Chancery Court's order and its

Case 23-10763-21-108481-2394 Doc 5-04/03/26 05:27:21 Entered 04/08/26 08:46:51 Desc
Appendix Part 2 Exs. 21-40 Page 89 of 308

17

prohibition on the debtor claiming ownership to the assets.

Moreover, whether a benefit can even be achieved for unsecured creditors, if this case were permitted to proceed, is highly questionable given the enormous hurdles that must be overcome. These include, but are not limited to, a successful rejection of the omnibus agreement and unraveling of the effects of such rejection including a determination as to which assets were transferred to SeeCubic, complex actions to claw-back assets already transferred and perhaps even a motion to lift the stay so that the Chancery Court action can be completed; all of this will be vigorously opposed, lengthy, costly and have less then certain endings, and be value destructive to the Ultra-D business.

Even if Stream succeeds the estates will have incurred the estates will have incurred significant administrative expenses and Stream will still need to address the claims and rights of the secured creditors whose claim amounts will only grow as a result of the delay, rejection and attendant litigation.

While VTI may have one or more parties that are interested in or committed to providing it with investment it is unclear whether, when and in what amount that funding will materialize, and whether, when and how much Stream will actually receive. Currently VTI has committed only a small

amount to Stream in the form of a $1 million DIP.

In an acknowledgement of not only the risk attendant to Stream's urged approach for this proceeding, but the likely avalanche of resulting administrative expenses the committee performed its own investigation and analysis of the issues presented and to be presented in this case and ultimately came to the conclusion that the continuation of this case does not present the best option for the creditors and is unlike to achieve any benefit for them.

The committee determined that the case is more akin to a two-party dispute that should proceed outside of bankruptcy. I appreciate the work the committee has done to afform itself and reach its conclusions. I have given them great consideration and weight in reaching my own conclusions today especially given that according to Stream this proceeding was commenced for the benefit of the committee's constituency to whom the committee owes a fiduciary duty.

Faced with the circumstances of this proceeding the committee reached a settlement with SeeCubic that may achieve value for Stream's creditors. That settlement is not before me today; however the debtor and VTI have argued that the settlement supports that this case was filed in good faith as it achieved something that would, otherwise, not be available to creditors outside the bankruptcy; however, the court cannot agree.

The committee is represented by able counsel who used the circumstances presented to the advantage of the creditors. This does not alter the fact that the debtor did not come to this court in good faith, but rather to make one last ditch effort to take away the value and control given to the secured creditors prior to commencement of this case and to redistribute it back to the Rajan's.

Considering all the facts and circumstances presented I have determined that Stream has filed -- excuse me, Stream has failed to adequately fulfill its burden to show that the bankruptcy filing was filed in good faith and for a legitimate bankruptcy purpose. It was designed to stop SeeCubic and the debtor's secured creditors from fully implementing the omnibus agreement, to unravel it and to avoid the Chancery Court's order and, very likely, a mandatory injunction.

I will not permit the bankruptcy process to be used in such a fashion and, accordingly, I will dismiss the case; however, as I mentioned, the case will not be dismissed with prejudice. Stream has significant unsecured debt and no material assets free of the omnibus agreement. While I cannot predict how the future unfolds; to be clear, this case is being dismissed as a result of Stream's attempt to interfere with the Chancery Court's order and the omnibus agreement. So I would expect that any future filing would

Case 23-10768-11-10481-BBJ4 Doc 5-04/08/26 05:27:21 Entered 04/08/26 18:16:51 Desc
Appendix Part 2 Exs. 21-40 Page 92 of 308

20

occur after the completion of the Chancery Court litigation and the omnibus agreement's asset transfers.

So for these reasons I am prepared to dismiss the case and I will do so following the conclusion of today's hearing. I hope to get that order entered promptly within the hour. So unless there is anything further that we need to discuss today we will adjourn today's hearing.

(No verbal response)

THE COURT: Okay. I'm not hearing from anyone -- oh, I apologize. Mr. Larkin?

MR. LARKIN: That wasn't me, Your Honor. I don't have anything. We thank Your Honor for your time and attention to this matter.

MR. SAMIS: Your Honor, it was actually Mr. Samis. If I may be heard just briefly.

THE COURT: Okay. Happy to hear you.

MR. SAMIS: I only will chime-in with one point of clarification. The qualifier that you attached to your ruling at the end about your expectations that any future filing would happen after the litigation had concluded in the Chancery Court is that a directive that Your Honor is making as part of her order dismissing the case?

THE COURT: It's not a directive. I think the parties understand. I will not -- my order will not reflect those as conditions. I just merely proffered my opinion as

when I would expect a filing to be commenced in case a subsequent filing is filed in the jurisdiction outside this court and not before myself.

MR. SAMIS: Thank you, Your Honor.

MR. LARKIN: Your Honor, this is Joe Larkin. I did have one question actually.

In our proposed order we didn't include a Rule 6004(h) waiver and that was because we didn't think the dismissal order, if one was granted, was approving any use or sale of property of the estate. So it's our position, subject to reading the order, that it will be final and effective upon entry and we would like to return to the Chancery Court as soon as possible.

I just wanted to, I guess, ask Your Honor if you had a different view about that issue and whether we should provide some language.

THE COURT: I did not have a differing view. I was prepared to enter the form of order that was attached to your motion. It's slightly different given that there were multiple motions to dismiss filed and that I'm entering it without prejudice, but for the most part it will look, in sum and substance, similar to the order that you submitted.

MR. LARKIN: Thank you.

MR. MCMICHAEL: Your Honor, Larry McMichael. I'm actually not Amy Caplow [ph]. For some reason I am

Case 23-10768-11-08481284  Doc 5-1 04/08/26 05:27:21  Entered 04/08/26 18:46:51  Desc
Appendix Part 2   Exs. 21-40   Page 94 of 308

22

misidentified on your screen.

First of all, I agree with Mr. Larkin. We don't need a waiver, but we do and will apply for a stay pending appeal, and we will do that promptly. So I think the court would benefit from a written motion rather than oral. So I will prepare a written motion and submit it promptly.

THE COURT: I can tell you that --

UNIDENTIFIED SPEAKER: Your Honor, may I respond to that?

THE COURT: I don't think it's needed. I have given significant thought to this issue actually in anticipation that you were going to move for a stay pending appeal. And given that I found that this case was filed in bad faith entry of an order staying my order would, effectively, be my actions -- excuse me, would, in my mind be me acting as complicit in the bad faith filing. So I will not stay my order and I will deny -- excuse me, I will deny that request.

Normally I would entertain a brief stay to avoid inconveniencing the District Court because I anticipated parties would ask the District Court for a stay pending appeal, and so it's out of professional courtesy that I would grant a brief stay, but, again, on this record and my ruling I will not do so.

MR. MCMICHAEL: Thank you, Your Honor.

23

THE COURT: Thank you very much. That concludes today's hearing. Again, thank you call for entering my lengthy ruling, but I wanted to give the District Court and other parties a thorough and complete record. That was my attempt to do so.

With that I thank you all for excellent presentations in connection with the trial and for your time and attention to the matter. We will consider this hearing adjourned. Thank you all very much. Take care.

(Proceedings concluded at 3:32 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski          May 17, 2021
Mary Zajaczkowski, CET**D-531

# **Exhibit B**

EFiled: May 25 2021 01:06PM EDT
Transaction ID 66629721
Case No. 2020-0766-JTL

May 24, 2021

The Honorable J. Travis Laster
Vice Chancellor Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, Delaware 19801

RE: Stream TV Networks, Inc. v. Seecubic, Inc., C.A. No. 2020-0766-JTL (Del. Ch.)

Dear Vice Chancellor Laster:

I am sending you this notification as Chief Executive Officer of Stream TV Networks, Inc. ("**Stream TV**") and pro se participant in the above-captioned matter which is before the Court.

Please be advised that certain of the creditors of Stream TV Networks, Inc. have last night filed a petition in the Delaware United States Bankruptcy Court for involuntary Chapter 7 bankruptcy protection for Stream TV Networks, Inc. The case number is 21 – 10848 (KBO). A docket for the case is attached hereto.

Very truly yours,

_____/s/_____

Mathu Raja
Pro Se Third Party Defendant and CEO of Stream TV Networks, Inc.


CC:  Eben Colby, Esquire
     Skadden Arps

# **Exhibit C**

EFiled:  May 26 2021 01:44PM EDT
Transaction ID 66634109
Case No. 2020-0766-JTL

May 25, 2021


The Honorable J. Travis Laster
Vice Chancellor Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, Delaware 19801

RE: Stream TV Networks, Inc. v. Seecubic, Inc., C.A. No. 2020-0766-JTL (Del. Ch.)

Dear Vice Chancellor Laster:

As Chief Executive Officer of Stream TV Networks, Inc. ("**Stream TV**") and pro
se participant in the above-captioned matter which was before the Court but is
currently stayed, I wish to bring to your attention some information that has come to
light since the issuance of your preliminary injunction order on December 8, 2020.
Unfortunately, the fraud perpetrated in the Chancery Court was not recognized at
the time. Although the information may have been included in the several thousand
pages produced during the expedited Chancery Court action, the significance was
not recognized until our bankruptcy counsel "connected the dots" recently. I hope
that Your Honor will indulge me in reading this lengthy letter and afford some
consideration to what we believe are material facts.

1. Simultaneous with the execution of the May 6, 2020 settlement agreement
   between Stream TV and its secured creditors (the "**Omnibus Agreement**") in
   which the Resolution Committee of Stream TV committed all the assets of
   Stream TV to Newco/SeeCubic, Inc. ("**SeeCubic**"), some of those same parties
   executed a separate letter agreement (the "**Letter Agreement**"). That Letter
   Agreement, which was deliberately withheld from the majority shareholder,
   other members of the Board of Directors, other shareholders, and critical
   vendors, suggests that the actions by SeeCubic to take possession of the Stream
   TV assets were akin to a hostile acquisition rather than a private or friendly
   foreclosure. We believe that this insider abuse was a fraud perpetrated on both
   the Company and on the Court.

Rajan Letter 20210525                                                    Page 1

2. Even though the Letter Agreement was not signed by the Resolution Committee or anyone authorized to represent Stream TV, it:

a)

b)



and

c)

3.

4.

5. The failure to provide the executed Letter Agreement to Stream TV until well after the execution of the Omnibus Agreement denied Stream TV the opportunity to review and understand the full scope of the combined Omnibus Agreement and Letter Agreement and their impact on Stream TV.

Disclosure of just the Omnibus Agreement to Stream TV was the nontransparent presentation of an incomplete document to support the transfer of Stream TV's assets to another entity.

6.

Rajan Letter 20210525



## Officers and Directors

The executive team and directors are comprised of persons that have operational experience with consumer products and technology. Most importantly, they have the experience on protecting technology from competitors and partnering the technology with strong market participants for growth. Below are summaries of the backgrounds of the directors and key management personnel. The research and development team are listed at the end in a group.

The following individuals are the Company's key executive officers and directors:



7.

In your December 8 Opinion [D.I. 46-3, page 4 ¶ 2] Your Honor stated, "By any measure, Stream was insolvent and failing." Your evaluation of the company's financial situation was accurate, and Stream TV filed for Chapter 11 bankruptcy protection on February 24, 2021 to restructure the considerable debt left behind by the Omnibus Agreement. The timing of the filing was specifically related to Stream TV's ability to secure enough financing to enter bankruptcy; it was not done as a litigation tactic as claimed by SeeCubic.

With all due respect, resuming the temporary injunction ordered by the Court on December 8, 2020 under these circumstances perpetuates an injustice to Stream TV without a full hearing on the circumstances enumerated above. The transaction promulgated by the principals of SeeCubic, if endorsed by the Court, sets a horrible precedent of enforcing the takeover, in the form of an acquisition rather than a foreclosure, of Stream TV's assets without proper disclosure to and approval of Stream TV's shareholders.

Furthermore, the acquisition favored certain Stream TV shareholders over unsecured creditors owed approximately $20,000,000, leaving that debt behind.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ The Omnibus Agreement on its face is a fraudulent conveyance and a clear violation of the absolute priority rule.

Chancellor Strine set forth certain standards with respect to transactions considered to be "friendly foreclosures." The circumstances in the case currently before this Court fail to meet those standards, resulting in what is essentially a hostile acquisition that leaves $20,000,000 in unsecured debt behind and no way for Stream TV to satisfy those claims.

We humbly request that this Court rescind the temporary injunction order until such time that it can further study these allegations.

Very truly yours,

*Mathu Rajan*

Mathu G. Rajan
CEO, Stream TV Networks, Inc.

Encl.

# **Exhibit D**

## Walsh, Steve (WIL)

| | |
|---|---|
| **From:** | Mike DeMartino <mike@svcsearch.com> |
| **Sent:** | Thursday, May 27, 2021 3:24 PM |
| **To:** | Tullson, Carl T (WIL) |
| **Subject:** | [Ext] FW: Strream Tv Chapter 11 case |
| **Attachments:** | Official Form 205 (4).pdf; Docket for Creditor Chapter 7 Involuntary Filing 5.23.21 (1).pdf |

**From:** Jamuna Travels
**Sent:** Tuesday, May 25, 2021 12:11 PM
**To:** charleybooth@msn.com; rbright@bdo.com; accounts@adeptchips.com; Florian.Roth@adrian-roth.com; lisa@advancedimagingsociety.com; jessica.su@ailo.com.tw; contact@alvarte.com; susan.e.english1@aon.com; vinod@nichanilawfirm.com; rao@arasan.com; bdunbar@mgmresorts.com; fred.manriquez@avnet.com; Jeff@blueoceanpartnersltd.com; sadieg@bubbleagency.com; geoffrey.grivner@bipc.com; epuchta@cadence.com; Jim.Flannery@wolterskluwer.com; hello@cipherdevelopment.com; JRogers@wfjlawfirm.com; paddy@coralvision.co.uk; scott.cousins@cousins-law.com; pina@slollp.com; Mike DeMartino ; kyle.freeman@dezshira.com; info@digital-cp.com; diane.williams@dlapiper.com; asikich@dunnerlaw.com; jms@elliottgreenleaf.com; lauriew@ema-eda.com; colin@first-sentinel.com; pawel@frewinandclose.com; Joe.Fan@fticonsulting.com; kasia@fullfrontalgroup.com; cfunkhouser@gtmtax.com; kselan@hdmi.org; david@hj-packing.com; mkim@hudsonvaluation.com; mhershey@infocomm.org; innoventuresgroupllc@gmail.com; mikeg@izontv.com; jamunatravels@yahoo.com; kenwcar47@gmail.com; pawel.kisielewski@kleinwortbenson.com; young@ykplaw.com; kyunghoon.lee@leeko.com; ad@luijksadvies.com; Ilyssa.Blum@marcumllp.com; rajan2934@gmail.com; meghan_sercombe@mentor.com; JuergenAxelUrban@t-online.de; derick.nowker@motivit.com; aaronlamkin@icloud.com; rebecca_lee@pactroninc.com; sal_lu@pegatroncorp.com; jeff@porterdigitalsignage.com; karen.nice@cision.com; rlsystems@icloud.com; inquiries.bos@roberthalf.com; luis@salazar.law; hoonskk@skc-haas.com; mattjjlo@gmail.com; tha@stoit.nl; frankzhang_sz@163.com; joseph.karongo@synopsys.com; dayal@threedholograms.com; todd@tulsdairies.com; mediaAR@img.com; matt@tripleco.com; pdagostino@uslegalsupport.com; Paul_Kelly@uhaul.com; mmassimi@dhglobaltax.com; phil@darivoff.net; peter.d@vialicensing.com; pzeng@vialicensing.com; ww@walshchb.com; eric.szeto@weidafreight.com; jmayer@whartoncompanies.com; frank.chow@wiline.com
**Subject:** Strream Tv Chapter 11 case

Hello, I am from Jamuna Travels a vendor of Stream Tv net works and I have negotiated with stream Tv for 100 cents for dollar and Stream Tv is still under Bankruptcy. If you fill the attached form and sent to the lawyer in the form he may be able to get every ones money. stream tv is willing to pay all vendors.

Reji Abraham
Jamuna Travels, Inc.
Domestic & International Travel Services
6439 Market Street
Upper Darby, PA 19082
jamunatravels@yahoo.com
Phone: 610-352-7280
Fax: 610-352-9819

**Fill in this information to identify the case:**

United States Bankruptcy Court  for the:

_____ District of  DELAWARE _____
                                        (State)

Case number (*If known*): _____  Chapter __11__

❑ Check if this is an
    amended filing

Official Form 205

# Involuntary Petition Against a Non-Individual                    12/15

**Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).**

| Part 1: | Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed |
|---|---|

**1. Chapter of the Bankruptcy Code**

*Check one:*

❑ Chapter *7*

☑ Chapter 11

| Part 2: | Identify the Debtor |
|---|---|

**2. Debtor's name**

Stream TV Networks, Inc. _____

**3. Other names you know the debtor has used in the last 8 years**

Include any assumed names, trade names, or *doing business as* names.

_____
_____
_____

**4. Debtor's federal Employer Identification Number (EIN)**

❑ Unknown

_2_ _7_ – _1_ _2_ _2_ _4_ _0_ _9_ _2_
EIN

**5. Debtor's address**

**Principal place of business**

2009      Chestnut Street _____
Number    Street

3rd Floor _____

Philadelphia _____ PA   19103
City                        State  ZIP Code

Philadelphia_____
County

**Mailing address, if different**

_____
Number      Street

_____
P.O. Box

_____ _____ _____
City                      State  ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number      Street

_____

_____ _____ _____
City                      State  ZIP Code

Official Form 205                  Involuntary Petition Against a Non-Individual                  page 1

Debtor <u>Stream TV Networks, Inc.</u>                Case number *(if known)*_____
<br>Name

---

**6. Debtor's website** (URL)       <u>www.streamtvnetworks.com</u>

---

**7. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

❏ Partnership (excluding LLP)

❏ Other type of debtor. Specify: _____

---

**8. Type of debtor's business**

*Check one:*

❏ Health Care Business (as defined in 11 U.S.C. § 101(27A))

❏ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

❏ Railroad (as defined in 11 U.S.C. § 101(44))

❏ Stockbroker (as defined in 11 U.S.C. § 101(53A))

❏ Commodity Broker (as defined in 11 U.S.C. § 101(6))

❏ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the types of business listed.

❏ Unknown type of business.

---

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

☑ No

❏ Yes. Debtor _____ Relationship _____

District _____ Date filed _____ Case number, if known_____
<br>MM / DD / YYYY

Debtor _____ Relationship _____

District _____ Date filed _____ Case number, if known_____
<br>MM / DD / YYYY

---

**Part 3:        Report About the Case**

---

**10. Venue**

*Check one:*

☑ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.

❏ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

---

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked*:

☑ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

❏ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

---

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

☑ No

❏ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

---

Official Form 205                Involuntary Petition Against a Non-Individual                page 2

Debtor  <u>Stream TV Networks, Inc.</u>
Name

Case number (*if known*)_____

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| _____ | _____ | $ _____ |
| _____ | _____ | $ _____ |
| _____ | _____ | $ _____ |
| | Total of petitioners' claims | $ _____ |

**If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.**

**Part 4:  Request for Relief**

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

| **Petitioners or Petitioners' Representative** | **Attorneys** |
|---|---|

**Name and mailing address of petitioner**

_____
Name

_____
Number     Street

_____  _____  _____
City             State      ZIP Code

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number     Street

_____  _____  _____
City             State      ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____
             MM  / DD / YYYY

✗ _____
Signature of petitioner or representative, including representative's title

**Attorneys**

 John D. McLaughlin, Jr._____
Printed name

Ferry Joseph, P.A._____
Firm name, if any

824     North Market Street, Suite 1000_____
Number     Street

Wilmington_____  DE_____  19899_____
City                        State      ZIP Code

Contact phone  (302)575-1555   Email jmclaughlin@ferryjoseph.com

Bar number  _____

State  DE_____

✗ _____
Signature of attorney

Date signed  _____
             MM  / DD / YYYY

Official Form 205                    Involuntary Petition Against a Non-Individual                    page 3

Debtor   Stream TV Networks, Inc._____
Name

Case number (*if known*)_____

---

**Name and mailing address of petitioner**

_____
Name

_____
Number    Street

_____  _____  _____
City                                State         ZIP Code

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number    Street

_____  _____  _____
City                                State         ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____
                    MM / DD / YYYY

✖ _____
Signature of petitioner or representative, including representative's title

---

John D. McLaughlin, Jr._____
Printed name

Ferry Joseph, P.A._____
Firm name, if any

824    North Market Street, Suite 1000_____
Number    Street

Wilmington_____  DE_____  19899_____
City                            State            ZIP Code

Contact phone   (302)575-1555    Email jmclaughlin@ferryjoseph.com

Bar number   _____

State        _DE_____

✖ _____
Signature of attorney

Date signed   _____
                       MM / DD / YYYY

---

**Name and mailing address of petitioner**

_____
Name

_____
Number    Street

_____  _____  _____
City                                State         ZIP Code

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number    Street

_____  _____  _____
City                                State         ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____
                    MM / DD / YYYY

✖ _____
Signature of petitioner or representative, including representative's title

---

John D. McLaughlin, Jr._____
Printed name

Ferry Joseph, P.A._____
Firm name, if any

824    North Market Street, Suite 1000_____
Number    Street

Wilmington_____  DE_____  19899_____
City                            State            ZIP Code

Contact phone   (302)575-1555    Email jmclaughlin@ferryjoseph.com

Bar number   _____

State        DE_____

✖ _____
Signature of attorney

Date signed   _____
                       MM / DD / YYYY

---

# U.S. Bankruptcy Court
## District of Delaware (Delaware)
### Bankruptcy Petition #: 21-10848-KBO

*Date filed:* 05/23/2021

*Assigned to:* Karen B. Owens
Chapter 7
Involuntary

| | |
|---|---|
| ***Petitioning Creditor***<br>**Jamuna Travels, Inc.**<br>Reji Abraham<br>6439 Market Street<br>Upper Darby, PA 19082 | represented by **John Daniel McLaughlin, Jr.**<br>Ferry Joseph, P.A.<br>824 North Market Street<br>Suite 1000<br>Wilmington, DE 19801<br>302-575-1555<br>Fax : 302-575-1714<br>Email: jmclaughlin@ferryjoseph.com |
| ***Petitioning Creditor***<br>**Walsh CHB, Inc.**<br>189 Sunrise Highway<br>Suite 302<br>Rockville Centre, NY 11570 | represented by **John Daniel McLaughlin, Jr.**<br>(See above for address) |
| ***Petitioning Creditor***<br>**Rembrandt 3D Holding Ltd.**<br>Stephen Blumenthal<br>128 Bull Hill Road<br>Newfield, NY 14867 | represented by **John Daniel McLaughlin, Jr.**<br>(See above for address) |
| ***Alleged Debtor***<br>**Stream TV Networks, Inc.**<br>2009 Chestnut Street<br>3rd Floor<br>Philadelphia, PA 19103<br>PHILADELPHIA-PA<br>Tax ID / EIN: 27-1224092 | represented by **Stream TV Networks, Inc.**<br>PRO SE |
| ***U.S. Trustee***<br>**U.S. Trustee**<br>Office of the United States Trustee<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>(302)-573-6491 | represented by **Rosa Sierra**<br>Office of the United States Trustee<br>U. S. Department of Justice<br>844 King Street, Suite 2207<br>Lockbox #35<br>Wilmington, DE 19801<br>302-573-6491 x6492<br>Fax : 302-573-6497<br>Email: rosa.sierra@usdoj.gov |

| Filing Date | # | Docket Text |
|---|---|---|
| 05/23/2021 | 1 | Chapter 7 Involuntary Petition Fee Amount $338. Re: Stream |

| | | |
|---|---|---|
| (10 pgs; 5 docs) | | TV Networks, Inc. Filed by Petitioning Creditor(s): Jamuna Travels, Inc. (attorney John Daniel McLaughlin Jr.), Walsh CHB, Inc. (attorney John Daniel McLaughlin Jr.), Rembrandt 3D Holding Ltd. (attorney John Daniel McLaughlin Jr.). (Attachments: # 1 Rule 7007.1 Corporate Ownership Statement - Jamuna Travels, Inc. # 2 Rule 7007.1 Corporate Ownership Statement - Rembrandt 3D Holding Ltd. # 3 Rule 7007.1 Corporate Ownership Statement - Walsh CHB, Inc. # 4 Summons) (McLaughlin, John) (Entered: 05/23/2021) |
| 05/23/2021 | 2 | Receipt of filing fee for Involuntary Petition (Chapter 7)( 21-10848) [misc,invol7a] ( 338.00). Receipt Number A10343403, amount $ 338.00. (U.S. Treasury) (Entered: 05/23/2021) |
| 05/24/2021 | | Judge Karen B. Owens added to case (LB) (Entered: 05/24/2021) |
| 05/24/2021 | | Attorney Rosa Sierra and Rosa Sierra for U.S. Trustee added to case Filed by U.S. Trustee. (Sierra, Rosa) (Entered: 05/24/2021) |

# **Exhibit E**

**Walsh, Steve (WIL)**

| | |
|---|---|
| **From:** | Mike DeMartino <mike@svcsearch.com> |
| **Sent:** | Thursday, May 27, 2021 3:23 PM |
| **To:** | Tullson, Carl T (WIL) |
| **Subject:** | [Ext] FW: Stream TV Bankruptcy filing |

**From:** contact@streamacquisitiongroup.com
**Sent:** Wednesday, May 26, 2021 3:13 PM
**To:** Mike DeMartino
**Subject:** Stream TV Bankruptcy filing

Good evening,

I would like to have a call with you to discuss the recent Bankruptcy filing by the creditors.

Please let me know what time you are available tomorrow or Friday and I will send a zoom link.

Thank you,
Mathu Rajan

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Stream TV Networks, Inc., | Case No. 21-10848 (KBO) |
| Alleged Debtor. | **Related Docket Nos.** |

### ORDER DISMISSING DEBTOR'S INVOLUNTARY CHAPTER 7 CASE

This matter having come before the Court on the motion (the "Motion")[1] of

SeeCubic, Inc. and SLS Holdings VI, LLC for an order, pursuant to 11 U.S.C. §§ 105(a) and

707(a), dismissing the involuntary chapter 7 case of Stream TV Networks, Inc. (the "Debtor");

and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012; and entry of this Order dismissing this involuntary chapter 7

case being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this

proceeding and the Motion in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and due and proper notice of the Motion having been provided; and it appearing that no other or

further notice need be provided; and the relief requested in the Motion being in the best interests

of the Debtor's estate, its creditors and other parties in interest; and this Court having determined

that the legal and factual bases set forth in the Motion and at the hearing establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.   The Motion is GRANTED as set forth herein.

---

[1]   Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

887547.03A-WILSR01A - MSW

2. Pursuant to Bankruptcy Code sections 105(a) and 707(a), the involuntary chapter 7 case of Stream TV Networks, Inc. is hereby dismissed.

3. In accordance with the Dismissal Order entered on May 17, 2021 in the Debtor's Chapter 11 Case, all persons are hereby prohibited from commencing any further cases under any chapter of the Bankruptcy Code, whether on behalf of or against, the Debtor, pending the resolution of both the Chancery Court Action and the Appeal.

4. The Court retains jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

887547.03A-WILSR01A - MSW

## CERTIFICATE OF SERVICE

I, Joseph O. Larkin, certify that on May 27, 2021, I caused the foregoing

*Emergency Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing*

*Debtor's Involuntary Chapter 7 Case* to be served on the following parties by electronic mail

(where available) and first-class mail, and by electronic transmission using the Court's CM/ECF

system on all parties who have registered to receive notifications in these cases.

Stream TV Networks, Inc.
Attn: Mathu Rajan
    Raja Rajan
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
Email: Mattrajan1471@gmail.com
Email: 7raja.rajan7@gmail.com

John Daniel McLaughlin, Jr.
Ferry Joseph, P.A.
824 North Market Street
Suite 1000
Wilmington, DE 19801
Email: jmclaughlin@ferryjoseph.com

Martin J. Weis, Esq.
Dilworth Paxson LLP
704 N. King Street
P.O. Box 1031
Wilmington, DE 19899-1031
Email: mweis@dilworthlaw.com

Lawrence G. McMichael, Esq.
Anne M. Aaronson, Esq.
Dilworth Paxson LLP
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Email: lmcmichael@dilworthlaw.com
Email: aaaronson@dilworthlaw.com

Rosa Sierra
Office of the United States Trustee
U. S. Department of Justice
844 King Street, Suite 2207
Lockbox #35
Wilmington, DE 19801
Email: rosa.sierra@usdoj.gov

*/s/ Joseph O. Larkin*
Joseph O. Larkin

892879-WILSR01A - MSW

# App. Ex. 29

**From:** Christopher Michaels
**Sent:** Friday, May 28, 2021 10:30 PM EDT
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**BCC:** stephen3d@mac.com <stephen3d@mac.com>
**Subject:** Phone call

Rafael:

Is there a good time for a call tomorrow?  I want to touch base on strategy and next steps.

Our answer on the motion to dismiss in the bankruptcy case is due June 6th.  I am thinking that our best strategy would be to initiate an action against SeeCubic and potentially Shad personally prior to our answer. That puts some urgency on developing consensus on strategy and our agreement with VTI.


Chris


**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**TRUSTEE 33**

# App. Ex. 30

**TERM SHEET**

**FOR**

**AGREEMENT**

**BETWEEN**

**VISUAL TECHNOLOGY INNOVATIONS, INC.**

**AND**

**REMBRANDT 3D HOLDINGS LTD (Nevis Corporation)**

**AND**

**REMBRANDT 3D CORP. (Delaware Corporation)**

**AND**

**Stephen Blumenthal**

**June 5, 2021**

Visual Technology Innovations, Inc. ("VTI") is a Nevada corporation. Rembrandt 3D Holdings, Ltd ("Rembrandt-Nevis") is a Nevis corporation. Rembrandt 3D Corp. ("Rembrandt-Delaware") is a Delaware corporation. Rembrandt – Nevis and Rembrandt – Delaware are collectively the "Rembrandt Companies." Stephen Blumenthal ("Blumenthal") is an individual, US citizen, and owns 100% of the stock in Rembrandt 3D Holdings, Ltd and ~73% of the stock in Rembrandt 3D Corp., and does business as SVS 3D Consulting Services as a sole proprietorship. VTI, Rembrandt-Nevis, Rembrandt-Delaware, and Blumenthal are referred to herein as the "Parties", and each one of them is a "Party".

| | | |
|---|---|---|
| 1. | Confidentiality | The Parties agree that this term sheet will be protected by the Non-Disclosure Agreement executed between the Parties. The Parties agree further that the negotiation is subject to Rule 408 of the Federal Rules of Evidence and all discussions or negotiations are inadmissible in any proceeding. This term sheet and any related agreements are entered into in anticipation of litigation described herein and in furtherance of the parties common interest in defending its rights and claims and pursuing any related affirmative litigation. |
| 2. | Delaware Bankruptcy | Rembrandt-Nevis has filed an involuntary petition as a creditor of Stream TV Networks, Inc. ("Stream"). A motion to dismiss the bankruptcy petition has been filed and Rembrandt-Nevis has a choice regarding whether or not to respond.<br><br>Rembrandt-Nevis will file an opposition to the motion to dismiss and support a reorganization plan filed by Stream so long as Stream and VTI provide for the following: (a) full performance under the Settlement Agreement; (b) full performance under the VTI Payment Agreement, (c) VTI reasonable support for the litigation as provided below, (d) VTI support of a loan to Rembrandt-Delaware; (e) VTI support and completion of a Stockholder Subscription agreement including, but not limited to, payment of the purchase price of 5% of Rembrandt-Nevis shares; and (f) VTI supports all other terms and conditions of this document. |

{00843571.DOCX 1}



3. **IP Claims against SeeCubic**

The parties believe that SeeCubic, Inc. ("SeeCubic") officers were aware of the Rembrandt-Nevis IP rights, contracts with Stream and Rembrandt-Nevis patents, but have transferred possession of the confidential information of Rembrandt-Nevis and further breached and interfered with the contracts between Rembrandt-Nevis and Stream. The parties believe that Rembrandt-Nevis has an immediate case against SeeCubic's use of information acquired from Stream and that SeeCubic has sold TVs that infringe Rembrandt-Nevis patents and include Rembrandt-Nevis trade secrets and IP.

Rembrandt-Nevis will file an action against SeeCubic based on the IP claims above, funded by VTI in exchange for purchasing of 5% of Rembrandt Nevis stock from Stephen Blumenthal for $5,000,000. VTI will acquire a 50% decision making interest in the SeeCubic lawsuit and 50% share in the lawsuit settlement. (See Section 6.)

4. **Fraudulent Conveyance Claims against SeeCubic**

The parties believe that the Stream Officers and board were aware of the provisions in the agreements with SLS and Hawk that modified the number of shares in Stream such that a shareholder vote was required prior to signing the Omnibus Agreement and letter agreement. The parties believe that by not having the shareholder vote, and by not informing the Court of Rembrandt's legally filed claim, SeeCubic deprived Rembrandt of its ownership and debtor rights to recovery. Therefore, the parties believe that Rembrandt-Nevis has an immediate case against SeeCubic's transfer of assets from Stream.

Rembrandt-Nevis will evaluate with VTI the appropriate forum for fraudulent conveyance claims (in bankruptcy case as either an estate claim with the appropriate agreement with Stream TV as either a Debtor in possession under chapter 11 of the United States Bankruptcy Code or under chapter 7 as with the agreement of a chapter 7 trustee or an individual creditor claim in the appropriate state or Federal forum, in an IP case, or separate from both in the appropriate forum) and file with the intent of blocking transfer to SeeCubic. The parties acknowledge that the fraudulent conveyance action(s) against SeeCubic may also include SeeCubic's officers, directors and investors,

5. **Litigation Funding**

VTI will provide litigation funding to Rembrandt-Nevis that would cover all costs for the bankruptcy, collection from Stream, and the enforcement action against SeeCubic, including any counterclaims against Rembrandt-Nevis. This funding would include:

1) Armstrong Teasdale, as the project manager of the litigation through funding by VTI to provide litigation funding support and escrow agreement that provides for payments to Ferry Joseph, P.A. ("Ferry"), Brown & Michaels, PC ("Brown"), and SVS 3D Consulting Services ("SVS")and Armstrong Teasdale ("Armstrong") with a minimum back end retainer of $2,000,000 for all firms and a minimum of $350,000 back end retainer refreshed every month by VTI and allocated for Brown & Michaels, PC and SVS 3D Consulting Services, under the following schedule in 5.2, and for the avoidance of doubt, as noted in section 5.2 subject to an approved budget agreed to by Armstrong, VTI, Ferry, Brown, and SVS, with a 10% variance of the budget, and reporting to VTI prior to Court approved Debtor-in-Possession ("DIP") financing and then subsequently to a Court approved DIP financing, which will substantially conform to the Court approved DIP financing budget with an approved 10%

{00843571.DOCX 1}

variance on the DIP financing. As lead attorneys for the litigations contemplated herein, Armstrong Teasdale shall have 100% decision-making authority with regard to legal strategy, at the direction of VTI, notwithstanding reasonable consultation with other counsel below.

2) Payment of all bankruptcy expenses for Rembrandt-Nevis consulting fees and attorneys fees as follows:
   a. Bankruptcy counsel – Ferry with the rate of $____;
   b. Brown & Michaels, PC – largely Chris Michaels - $470/hour + reasonable budgeted expenses;
   c. SVS Consulting – Stephen Blumenthal - $500/hour + reasonable budgeted expenses; and
   d. If Stream pays Rembrandt-Nevis for costs of bankruptcy, VTI will be refunded payment for bankruptcy cost support.

3) Payment of all litigation expenses for Rembrandt-Nevis in enforcement against SeeCubic and any counterclaims against Rembrandt-Nevis in any related civil litigation outside of a bankruptcy proceeding including but not limited to any fraudulent conveyance action and related fraud or other civil actions and any IP enforcement action under the same terms for an agreed budget, budget variance, and rates as noted in section 5.2, as applicable and agreed to in a project management plan and budget.

4) Recovery from SeeCubic –
   a. VTI and Blumenthal must approve settlements with the primary goal to recover property and technology rights from SeeCubic and restrict SeeCubic's activities.
      i. If one party wants to settle and the other does not, the party not settling must pay the other their share of settlement offered to continue or negotiate in good faith, a compensation arrangement.
   b. Cash –
      i. Any litigation proceeds shall be used to repay VTI for litigation expenses.
      ii. After all litigation expenses are paid, Rembrandt-Nevis will pay Blumenthal 50% of net proceeds from the SeeCubic litigation.
      iii. After all litigation expenses are paid, Rembrandt-Nevis will pay VTI 50% of the net proceeds from the SeeCubic litigation.

   c. Return of Property and Technology Transfer from SeeCubic –Royalty free license to Rembrandt-Delaware included as part of prior Settlement between Rembrandt-Nevis and Stream.
   d. Armstrong Teasdale, or a mutually agreed upon third party to act as escrow agent for SeeCubic proceeds.

{00843571.DOCX 1}



<table>
<tbody>
<tr><td>6. Purchase of Shares in Rembrandt-Nevis</td><td>VTI, or VTI assigns (probably best to set up a foreign entity), shall purchase shares in Rembrandt-Nevis from Blumenthal pursuant to a confirmed bankruptcy plan with exit financing provided by VTI or a mutually agreed upon party by VTI and Rembrandt-Nevis or a settlement agreement approved by VTI and Rembrandt-Nevis in a chapter 7 as follows:</td></tr>
</tbody>
</table>

1) Valuation of Rembrandt-Nevis is $100,000,000 through 2026;

2) VTI, or its assigns, shall purchase $5,000,000 for 5% of the shares on the following schedule:

   a. On or before the effective date of a plan or agreement in a settlement in a chapter 7 ("Closing Date") – 1% of shares held by Blumenthal for $1,000,000;

   b. On or before 30 days from the ("Closing Date")– 1% of shares held by Blumenthal for $1,000,000;

   c. On or before 60 days from the ("Closing Date")– 1% of shares held by Blumenthal for $1,000,000;

   d. On or before 90 days from the ("Closing Date")– 1% of shares held by Blumenthal for $1,000,000; and

   e. On or before 120 days from the ("Closing Date") – 1% of shares held by Blumenthal for $1,000,000.

3) VTI, or its assigns, shall have the option to purchase 5% of the shares in each year 2022-2026, for $5,000,000 per year for a cap of $25 million and 25%.

4) A shareholders agreement delineating rights and management of corporation and shareholders.

5) VTI and Rembrandt-Nevis shall have the option to consummate an alternative agreement outside of bankruptcy on a similar schedule to the schedule delineated in this Section 6.2.

<table>
<tbody>
<tr><td>7. Purchase Order for Units</td><td>Rembrandt-Delaware submits purchase order(s) for units from Rembrandt-Nevis and Stream for which are intended to be either "Standard Units" or "Customized Units" as defined in the Settlement Agreement or as mutually agreed with the intent that the products made for Rembrandt-Delaware are based on the same or similar specifications to units made for other Stream customers (for US certification) to keep costs efficient.</td></tr>
<tr><td>8. Secured Lending to Rembrandt-Delaware</td><td>VTI/Stream will provide Rembrandt-Delaware with a revolving line of credit loan, for the purpose of finance purchases for all Stream products, covering their manufacturing cost, all 3rd party costs, including production, OEM manufacturing and assembly, customization to client specifications, shipping, through delivery to and payment by Rembrandt-Delaware customers.</td></tr>
</tbody>
</table>

{00843571.DOCX 1}



9. Secured Lending to Rembrandt-Delaware

VTI will lend Rembrandt-Delaware $3,000,000 as follows:

1) To be disbursed $500,000 per month for 6 months, beginning July 31, 2021

2) Interest Rate = LIBOR plus 5%;

3) Secured by TVs and product inventory of Rembrandt-Delaware; and

4) Repaid as Rembrandt-Delaware sells products – Rembrandt will pay 10% of product sales towards payment of principal and interest as each unit is sold.

5) In consideration for the loan described in this Section 9, Rembrandt-Delaware agrees to provide VTI with a first option to negotiate investment in, or license to, technology developed by the Rembrandt Companies, subject to good-faith negotiation between the parties.

10. List of Agreements

To complete the transactions contemplated under this term sheet the Parties intend to complete the following agreements:

1) A litigation funding agreement between VTI and Rembrandt-Nevis with the following agreements to support the litigation funding;
   a. SVS Consulting agreement with Rembrandt-Nevis for litigation support;
   b. Client agreement between Brown & Michaels, PC and Rembrandt-Nevis;
   c. Client agreement between Ferry and Rembrandt-Nevis;
   d. Client and Escrow agreement between Armstrong and Rembrandt-Nevis for legal services as agreed to by Armstrong and Rembrandt-Nevis, as appropriate and subject to conflicts review, and payments and disbursements to VTI, attorneys, and Rembrandt-Nevis; and
   e. Confirmatory royalty-free license of Rembrandt-Nevis IP to Rembrandt-Delaware (required by purchase authorization from Rembrandt-Delaware).

2) Purchase Agreement for shares in Rembrandt-Nevis:
   a. Shareholder agreement for Rembrandt-Nevis – payment of $5,840,000 proceeds from Stream litigation to be disbursed to attorneys and consultants from the Eng Law firm escrow or an alternative escrow agreed to between VTI and Rembrandt-Nevis pursuant to Section 6 of this term Sheet and any subsequent agreement between VTI and Rembrandt-Nevis.

3) A loan agreement from VTI to Rembrandt-Delaware:
   a. Promissory Note $10,000,000 @ 4% simple.
   b. Security agreement for loan in hardware purchased with loan proceeds.

4) A three-party Purchase Order/Agreement between Rembrandt-Delaware, Rembrandt-Nevis and Stream for 10,000 8K 3D TVs.

{00843571.DOCX 1}



5) Financing agreement for purchase order of 10,000 8K 3D TVs to cover costs through delivery to and payment by Rembrandt-Delaware customers.

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of VTI:**

Signature
Visual Technology Innovations, Inc.
By: Mathu Rajan
Date: June 5, 2021

**Signed for and on behalf of Rembrandt:**

Signature
Rembrandt 3D Holding Ltd
By: Stephen Blumenthal, President/CEO
Date: June 5, 2021

{00843571.DOCX 1}

# App. Ex. 31

**From:** Christopher Michaels
**Sent:** Thursday, June 10, 2021 1:01 PM EDT
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**CC:** stephen blumenthal <stephen3d@mac.com>
**Subject:** RE: VTI - Rembrandt Agreements

Sounds good.

My proposal is going to be to have Rembrandt 3D ask the chancery court order that Stream/SeeCubic remove all Rembrandt3D trade secrets and know how delineated in the term sheet signed by Shad.  We could also enter and then seek removal to Federal Court for diversity jurisdiction.

Secondly, I also think there is a cause of action both in the SDNY, Delaware, NJ, and PA against Shad directly for trade secret misappropriation.  He is under the protective order in the SDNY case, he took trade secrets for the benefit of a SeeCubic in Delaware, he was an officer for Stream in PA that had possession of those secrets.

Thirdly, I think we bring patent litigation against SeeCubic in a district court somewhere.

Lastly, we need Stream or SeeCubic to bring out product and sell it.  There are other options for Rembrandt outside of TVs from Stream and/or SeeCubic.  VTI may want to consider moving down a parallel path to Stream.  I still think it is everyone's interest to come together, but I think having a different business option puts us in a more powerful position.

Chris

---

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Thursday, June 10, 2021 12:48 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** RE: VTI - Rembrandt Agreements

Let's speak at 2:15,

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Thursday, June 10, 2021 12:40 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Subject:** Re: VTI - Rembrandt Agreements

I imagine you will want to talk to your client, but when you get a chance, give me a call to discuss next steps.

I have a 1:00pm phone conference but it will probably only take an hour or so.

Chris

Christopher A. Michaels
Brown & Michaels, PC
4th Floor M&T Bank Building
118 North Tioga Street
Ithaca, NY 14850
(607) 256-2000 (office)
(607) 256-3628 (fax)
www.bpmlegal.com

On Jun 10, 2021, at 9:56 AM, Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com> wrote:

Ok, no problem.

---

**From:** Jack McLaughlin <jmclaughlin@ferryjoseph.com>
**Sent:** Thursday, June 10, 2021 9:54 AM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Christopher Michaels <michaels@bpmlegal.com>
**Cc:** stephen3d@mac.com
**Subject:** RE: VTI - Rembrandt Agreements

Since I am not repping Rembrandt in those matters, it would be better for you  -on behalf of a party to the agreements,   VTI – to raise the objection.

_____
John D. McLaughlin, Jr.
Ferry Joseph, P.A.
824 North Market Street, Suite 1000
Wilmington, DE 19801
Tel.: 302-575-1555, ext. 107

**TRUSTEE 42**

Fax.: 302-575-1714
Mobile: 484-437-2676
jmclaughlin@ferryjoseph.com
www.ferryjoseph.com

---

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Thursday, June 10, 2021 9:47 AM
**To:** Christopher Michaels <michaels@bpmlegal.com>; Jack McLaughlin <jmclaughlin@ferryjoseph.com>
**Cc:** stephen3d@mac.com
**Subject:** RE: VTI - Rembrandt Agreements

Yes, all three are attorney work product and protected.

Jack I think you can make the objection on the basis that we are considering the chapter 7 route as we have that optionality.

Let me know if you think differently, but that is attorney client privileged and work product.

Rafael X. Zahralddin


**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Thursday, June 10, 2021 9:44 AM
**To:** Jack McLaughlin <jmclaughlin@ferryjoseph.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** stephen3d@mac.com
**Subject:** VTI - Rembrandt Agreements

**CAUTION:**   **EXTERNAL EMAIL**

Jack and Rafael:

I imagine that Eben will want to know about the relationship between VTI and Rembrandt.

We have three relevant agreements: 1) the joint defense agreement; 2) the payment agreement; and 3) the financing agreement.

I imagine we want to keep all three from disclosure under Work Product Doctrine. I assume this is an attorney objection. If asked about them I will pause to allow time for the objection and just follow instructions from the judge.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

<image001.jpg>

*Email:* *michaels@bpmlegal.com*
*Direct Dial: 607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

# App. Ex. 32

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| STREAM TV NETWORKS, INC., | ) | Case No. 21-10848 (KBO) |
| | ) | |
| Alleged Debtor. | ) | **Related to D.I. 5** |
| | ) | |
| _____ | ) | |

**ORDER GRANTING EMERGENCY MOTION OF SEECUBIC, INC.
AND SLS HOLDINGS VI, LLC FOR AN ORDER DISMISSING
<u>INVOLUNTARY CHAPTER 7 CASE</u>**

Upon consideration of the *Emergency Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Involuntary Chapter 7 Case* [D.I. 5] (the "<u>Motion to Dismiss</u>"), and all briefing, evidence, and argument in support of and in opposition to the Motion to Dismiss; it is

**HEREBY ORDERED, ADJUDGED AND DECREED** that, for the reasons set forth on the record by the Court on June 10, 2021:

1.     The above-captioned involuntary chapter 7 case of Stream TV Networks, Inc. ("<u>Stream</u>") is hereby dismissed.

2.     The dismissal shall be with prejudice and prohibit the commencement of future chapter 11 or chapter 7 cases of Stream until one year from the date of this Order.

3.     The Court retains jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

Dated:  June 10, 2021
Wilmington, Delaware

KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

**TRUSTEE 43a**

# App. Ex. 33

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                              |     |                          |
| ---------------------------- | --- | ------------------------ |
|                              | .   | Chapter 7                |
| IN RE:                       | .   |                          |
|                              | .   | Case No. 21-10848 (KBO)  |
| STREAM TV NETWORKS, INC.,    | .   |                          |
|                              | .   | Courtroom No. 1          |
|                              | .   | 824 North Market Street  |
|                              | .   | Wilmington, Deleware 19801 |
|            Debtor.           | .   |                          |
|                              | .   | June 10, 2021            |
| . . . . . . . . . . . . . . .| .   | 10:00 a.m.               |

TRANSCRIPT OF HEARING ON EMERGENCY MOTION OF SEECUBIC, INC. AND
SLS HOLDINGS VI, LLC, FOR AN ORDER DISMISSING INVOLUNTARY
CHAPTER 7 CASE VIA ZOOM TELECONFERENCE
BEFORE THE HONORABLE KAREN OWENS
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:            Chris Ward, Esq.
                           POLSINELLI
                           222 Delaware Avenue
                           Suite 1101
                           Wilmington, DE 19801

For the U.S. Trustee:      Rosa Sierra, Esq.
                           OFFICE OF THE U.S. TRUSTEE
                           U. S. Department of Justice
                           844 King Street, Suite 2207
                           Lockbox #35
                           Wilmington, DE 19801

(Telephonic Appearances continued on next page.)

Audio Operator:            Lisa Brown

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**TRUSTEE 43**

2

TELEPHONIC APPEARANCES (Cont'd):

For Petitioning Creditor:    John D. McLaughlin, Jr., Esq.
                             FERRY JOSEPH, P.A.
                             4 West Market Street
                             Georgetown, DE 19947

For Visual Technology        Rafael X. Zahralddin, Esq.
Innovations, Inc.:           ARMSTRONG TEASDALE, LLP
                             300 Delaware Avenue
                             Suite 210
                             Wilmington, DE 19801

For SeeCubic, Inc.:          Joseph Larkin, Esq.
                             SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                             One Rodney Square
                             920 North King Street
                             PO Box 636
                             Wilmington, DE 19899

For Rembrandt 3D             Christopher Michaels, Esq.
Holding Ltd.:                BROWN & MICHAELS, PC.
                             400 M & T Bank Building
                             118 North Tioga Street - The
                             Commons
                             Ithaca, NY 14850

Also Appearing:              Reji Abraham
                             JAMUNA TRAVELS, INC.

3

INDEX

MATTERS GOING FORWARD:

1. Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC
for an Order Dismissing Involuntary Chapter 7 Case, filed
5/27/21 [D.I. 5].

**RULING: Motion To Dismiss Granted with Prejudice ......... 63**

Responses Received:

A. Objection of the Petitioning Creditors to the Emergency
Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order
Dismissing Involuntary Chapter 7 Case, filed 6/6/21 [D.I. 22]

B. Joinder of Visual Technology Innovations, Inc. to the
Objection of the Petitioning Creditors to the Emergency Motion
of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order
Dismissing Involuntary Chapter 7 Case the Emergency Motion of
SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing
Involuntary Chapter 7 Case and Request to Adjourn the Emergency
Hearing, filed 6/8/21 [D.I. 26].

C. Joinder of the Alleged Debtor to the Objection of the
Petitioning Creditors and Objection to the Emergency Motion of
SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing
Involuntary Chapter 7 Case Emergency Motion of SeeCubic, Inc.
and SLS Holdings VI. LLC for an Order Dismissing Involuntary
Chapter 7 Case, filed 6/8/21 [D.I. 27].

D. Omnibus Reply of SeeCubic, Inc. and SLS Holdings VI. LLC in
Support of the Emergency Motion of SeeCubic, Inc. and SLS
Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7
Case, filed 6/9/21 [D.I. 29].

4

(Proceedings commence at 10:00 a.m.)

THE COURT:  Good morning, Counsel.  This is Judge Owens.  We're gathered today for a hearing on an emergency motion to dismiss the involuntary Chapter 7 petition filed by SeeCubic in the Stream involuntary bankruptcy case.

Mr. Larkin, this is your motion so I'll let you present first.

MR. LARKIN:  Good morning, Your Honor, and thank you again for agreeing to hear us on an emergency basis.

Your Honor, it was just three and a half weeks ago that we were in front of Your Honor on our motion to dismiss the Chapter 11 petition filed by Stream TV.  And as Your Honor knows and I won't spend a lot of time on it, Your Honor dismissed the Chapter 11 petition in that case principally because it was designed to stop SeeCubic and the debtor's secured creditors from fully implementing the omnibus agreement, to unravel it, and to avoid the Chancery Court's order and very likely a mandatory injunction.

Your Honor, it was clear at least to us about the appropriate path forward in light of that ruling.  We were to return to the Court of Chancery, complete that litigation and the asset transfers pursuant to the omnibus agreement.  And only then once that litigation was completed and the asset transfers were completed, I think Your Honor noted that, you know, at some point in the future, the unsecured creditors may

want to return to bankruptcy court. And so that's why it was dismissed without prejudice.

In our view, Your Honor, that's what should have happened if the objectors to our motion to dismiss the chapter 7 petition had respected Your Honor's decision and, frankly, the rule of law. But, instead, here we are three and half weeks later on another motion to dismiss. But nothing has really changed.

From a factual standpoint, and I'll talk about it a little bit, you know, the notice of appeal that was filed by Mr. Rajan and Stream on May 21 divested this Court of jurisdiction over that Chapter 11 case and all of the issues raised in that case, many of which are now being raised by the objectors here.

Importantly, I think consistent with Your Honor's ruling on the motion to dismiss the Chapter 11 case, we promptly filed out reply brief with Vice Chancellor Laster on May 22. And so the briefing on that motion for summary judgment is now complete. I guess unsurprisingly based on the tactics that have been implemented by Mr. Rajan and his cronies so far, the day after our reply brief was filed the Chapter 7 petition was filed here, once again trying to obtain the benefits of an automatic stay and get out from under the preliminary injunction order and the omnibus agreement.

Your Honor, with all due respect, we think it's sort

6

of time to put an end to this.  There are still -- you know, as Your Honor noted in her motion to dismiss ruling, there are enormous hurdles that are present for any recovery for the unsecureds, right, under any set of circumstances.  It would require the unraveling of the omnibus agreement.  It would require, I think, you know, an extensive litigation about a number of issues, right.  And that's one of the reasons why Your Honor dismissed.

And that ruling was completely ignored by the petitioning creditors.  And now it's become clear just based on the last 72 hours, some of the documents that the objectors have actually put in front of Your Honor, that this has all been part of the same plan by Mr. Rajan to continue to get out from under the preliminary injunction and to unravel the omnibus agreement.

Now as we state in our papers, Your Honor, we think there's really two principal bases for dismissing the Chapter 7 petition.  The first is divestiture.  Your Honor, the Chapter 7 petition has to be dismissed under the divestiture rule because, frankly, Your Honor, as much as I enjoy appearing in front of you, I don't think Your Honor has jurisdiction over the issues that are being raised here.

When Stream at Mathu Rajan's direction filed its notice of appeal on May 21, it divested this Court of jurisdiction over aspects of the case involved in the appeal.

7

It's not just whether there was a Chapter 7 petition that was being appealed. It's all of the issues. And most importantly, I think it's going to create the real risk of inconsistent judgments and rulings, and it will require the Court to reconsider your finding that dismissal rather than conversion to a Chapter 7 was in the best interest of the estate.

Now the objectors really haven't -- you know, collectively the objectors really haven't addressed the divestiture rule. They haven't addressed any of the case law that we cited on this point. They say that the divestiture rule does not apply because the issue of a Chapter 7 liquidation is not on appeal. But, again, that's wrong. The rule prohibits the lower courts considering issues that even if not expressly on appeal so impact the appeal as to effectively interfere or circumvent the appeal process.

Your Honor, I was -- you know, just before we started here, again, I was reviewing the statement of issues to be presented on appeal and designation of record on appeal and designation of record on appeal that was filed by Stream TV and Mr. Rajan last week. If you overlay the issues that are now on appeal with the papers that were submitted by the objectors, they're very duplicative.

I mean, for example, they're appealing Your Honor's finding that the debtor acted in bad faith where the debtor was in financial hardship, there was a reasonable possibility of

8

reorganization, and numerous legitimate bankruptcy purposes would be served by the proceedings.

They're appealing Your Honor's decision that the bankruptcy court -- did the bankruptcy court err in giving credence to the position of the Unsecured Creditors' Committee. Your Honor, the Unsecured Creditors' Committee filed the Chapter 7 petition, one of which -- one of those petitioners was on the committee, and yet they're taking the position that there's no risk of inconsistent judgments here. I think, frankly, permitting the Chapter 7 petition to proceed is going to set up a procedural morass, and it will create confusion and inefficiency in this case.

And just thinking practically about it, assume that the Chapter 7 case proceeds and the district court reverses, who's in charge then of the debtor? That is precisely the type of procedural morass that courts have guarded against in enforcing the divestiture rule.

The debtors -- you know, amazingly, Stream TV and VTI have now argued in support of the objection to the motion to dismiss that the Chapter 7 petition should be permitted to proceed so that next week they can convert the Chapter 7 petition into a whole new Chapter 11, a complete redo of everything we just did for the last three and a half months. Essentially, you know, a bridge to a new Chapter 11 is how they're treating the Chapter 7 petition.

Case 23-10763-djl-1-1084-2-0-B-4   Doc 374/08/26 06 Entered 04/08/26 03 66:51   Desc
Appendix Part 2   Exs. 21-40   Page 143 of 308

9

Your Honor, with all due respect, for purposes of, you know, really judicial economy and efficiency and, you know, to prevent the risk of inconsistent judgments and rulings, we think the divestiture rule applies here and the Chapter 7 petition should be dismissed for that reason alone.

But, you know, putting the divestiture rule aside, the case should be dismissed under Rule 707 for cause. The reasons are outlined in our brief, both in our opening brief and in our reply brief. And we've cited to at least one piece of evidence that's come to light, you know, in the last 48 hours showing what we think is, you know, pretty clear evidence of collusion here.

But before you even get there, you know, Your Honor, under Rule 707 and the case law, Your Honor, has, you know, the discretion to dismiss the Chapter 7 petition under Rule 707 for cause. And one of the reasons you can do that is for judicial economy, right. We think the next step here is to finish the litigation in the Chancery Court, resolve the issues that are in front of the Chancery Court, as well as the issues between the parties with respect to the omnibus agreement and the asset transfer.

The briefing is complete. Mr. Rajan has continued to pepper the Court of Chancery with filings. Since Your Honor's ruling, he's submitted I think three or four separate pleadings to Vice Chancellor Laster arguing that -- you know, arguing

against the preliminary injunction and arguing against summary judgment. He has a forum where he can make those arguments. But there's no reason to do it here.

And, frankly, the Chapter 7 petition serves no valid bankruptcy purpose. There's still no business operations and employees, cash, income, ability to generate revenue, and no material assets. The debtor is -- the debtor, I keep saying the debtor, you know, Stream is what it is. We're just three and a half weeks later.

And I think when you sort of, you know, peel all that away, it becomes very clear that the Chapter 7 petition, which was filed 72 hours after the briefing in Chancery was complete, is just part and parcel of Mr. Rajan's ongoing crusade to avoid the effects of the preliminary injunction.

When you look at the objectors' submissions, I mean they're literally copying and pasting each other's papers and yet claiming that they're not in collusion with each other and somehow not recognizing the inconsistency of a Chapter 7 petition which would take the debtor out of possession of the estate, teaming up with the debtor for a redo of the Chapter 11 case.

Again, Your Honor, I know that the briefing is fresh. We just completed it. I'm not going to redo or rehash everything that's in there, but we think for those basis, the motion to dismiss should be granted.

THE COURT: Okay. Thank you, Mr. Larkin. Why don't I hear from Mr. McLaughlin on behalf of the petitioning creditors. And, Mr. McLaughlin, you are on mute, and it appears coming from us from Ireland if my knowledge of travel is correct.

MR. McLAUGHLIN: That is the Grianan Of Aileach (phonetic) in Donegal, and it is a lot more attractive than -- I do these calls from my basement which is definitely not attractive. So we put up something a little bit more visually pleasing to my listeners.

Good morning, Your Honor. Let me clarify one thing for Mr. Larkin. I don't represent Mr. Rajan. Mr. Rajan is not a petitioning creditor. The creditors are and have separate complete interests from Mr. Rajan. I recognize that throughout the history of this case, and as I got involved in it every time I turned the page, there was another piece of litigation, that there's a lot of incest here. We've got -- and that includes the folks on the SeeCubic side, you know, through Mr. Stasney. There's a lot of interactions here.

However, the petitioning creditors are different. They have a different dog in the fight. Quite frankly, they just want to get paid. Your Honor, I read before -- when I was engaged here, I read your opinion, I read Vice Chancellor Laster's opinion. And I respect those opinions. However, that's -- my clients were not participants -- were not active

participants in either piece of litigation.

Mr. Abraham, Reji Abraham who is present in court today and prepared to testify was a member of the Creditors' Committee, but he was not -- he did not enter into any agreement on his own behalf and, in fact, will testify that he voted against the settlement agreement the Creditors' Committee made, so recognizing that a legitimate creditors' committee was appointed and took a position in a Chapter 11 case. That doesn't bind the other 152 general unsecured creditors that were disclosed on the schedule E/F that was filed.

SeeCubic has made a big deal that this is a two-party dispute and, respectfully, Your Honor, I would suggest that it's not. There are 152 plus or minus general unsecured creditors who are not -- who have a dog in the fight here of the creditors -- of the debts that were assumed pursuant to the omnibus agreements. And, again, presuming for the sake of argument the omnibus agreement is valid and enforceable.

None of these people's debts were assumed. They were all left in the dust on the wayside. Only very, very large creditors who also I think were equityholders had their debts assumed. And, again, that's -- pursuant to the omnibus agreement, that's not -- we're not here, you're not here, I don't think, to determine ultimately what that is or means or if it's enforceable.

That's up to the Vice Chancellor, and that's an issue

for the Chancery Court. If SeeCubic wants to go forward, then they could file an emergency motion to lift stay and go forward with litigation. That's fine. I think they misapprehend the purpose of a Chapter 7.

It's a lot more simple than they would suggest. There are some assets left in the estate, we believe. I have present in court today Mr. Michaels who represents -- who is an officer as well as an IP attorney for Rembrandt 3D as well as Mr. Blumenthal who is the owner of Rembrandt. Rembrandt is the holder of the -- or is the owner of the key intellectual property that makes this 3D technology work.

Their position is, and they're prepared to testify, that there is no lien on that, that pursuant to the omnibus agreement or pursuant to the pre-omnibus agreement security documents, that interest -- there was no security interest attached to that. It didn't pass over to SeeCubic. So basically, that relationship is still in the Stream estate. They will also testify why they believe the Stream estate or that Stream is better situated to move forward to develop the product. But, again, that's a much more complicated issue.

The bottom line is that here we do not -- you know, we're different people from Rajan -- or Mr. Rajan or both Mr. Rajans for that matter. With regard to the suggestion of collusion, which I quite frankly take a little bit of offense at, there are -- they're adjoined interests.

I mean, obviously, the big -- one of the undergirding issues here, Your Honor, is whether or not there's any value or what is the value of the Stream TV estate, I'll call it, use the bankruptcy term. The secured lenders, presumably, have a right to the value of their collateral, just like in any case. However, the suggestion has been made, and I think there's some error to it and it needs to be investigated that the value of the estate is far in excess of the amount of the secured claims.

The argument that's being made by the litigants in the Chancery Court, I believe, is that the omnibus agreement was in fact a subterfuge for the purpose of basically acquiring Stream TV rather than just foreclosing on the collateral. Whether that's true or not, again, that's up for Vice Chancellor Laster to, pardon me, to determine. But there's a very real concern here that there's a lot of value that could be residual after payment in full of the secured lenders that would flow to the general unsecured creditors, including my three petitioning creditors.

And alls we want in Chapter 7 is an opportunity for an independent trustee who doesn't have a dog in the fight, who's not a member of this incestuous relationship, to take a look at, you know, what's going on in the Chancery Court and to determine whether or not the debtor should continue to litigate that; secondly, to look at the issue of whether or not the

omnibus agreement even if it's valid and enforceable, was a breach of fiduciary responsibility because even under state law under the Gheewalla opinion, when a debtor is insolvent, the (indiscernible) fiduciary duty to the board of directors expands to the equity holders but expands out to include other stakeholders including the general unsecureds.

And it does look like this deal that was cut in fact disenfranchised, for whatever reason, $20 million plus or minus of general unsecured debt for the 152 plus or minus general unsecured creditors who really did get harmed by the deal. Whether it's a breach of fiduciary responsibility, again, that's a matter for later, but that's something that the trustee could and (indiscernible) --

THE COURT:  Mr. McLaughlin, I apologize.  I just want to let --

MR. McLAUGHLIN:  -- derivative suit if necessary. The other one --

THE COURT:  Mr. McLaughlin?

MR. McLAUGHLIN:  -- is on the same --

THE COURT:  Mr. McLaughlin, let me interrupt you because your connection is going in and out so I just want to let you know we're having trouble understanding you.  So if you could back up and --

MR. McLAUGHLIN:  Oh geez.

THE COURT:  -- yeah, and start over.  I'm sorry.  And

why don't you pick up the breach of fiduciary duty argument.

MR. McLAUGHLIN: Okay. Yeah, I'm sorry. I'm in my office here at 824, and sometimes I have a bad connection. Anyway, basically, two issues with regard to the enterprise valuation. One is whether or not there was a breach of fiduciary responsibility by the directors of Stream in entering into the omnibus agreement and the latter agreement which again is it's been suggested was really not fully briefed or discussed in the Chancery Court in a preliminary hearing -- preliminary injunction hearing.

But, again, under the Delaware state law and the Gheewalla decision, there are -- the duties of a board of directors expands out when the debtor is insolvent -- and I don't think there's any question this debtor was insolvent and is insolvent at this point -- to include other stakeholders including the general unsecured creditors and, specifically, my three petitioning creditors.

So that's something that needs to be looked at, whether it's looked at ideally by a trustee because, again, in a Chapter 7, the Trustee is acting for the benefit of all the general unsecured creditors. So a trustee would be an ideal person to look into that and make an independent decision. Maybe there's nothing there, but maybe there is. And, again, for $20 million worth of debt over 150-some people, it's worth looking into.

Secondly with regard --

THE COURT:  But, Mr. McLaughlin, let me interrupt you for one second because you understand that I now have pleadings in front of me indicating that there will not be a Chapter 7 trustee, that Stream wants to convert this case to an 11.

MR. McLAUGHLIN:  Your Honor, and that (indiscernible) Stream.  Again, I don't represent Stream, okay.  We brought a Chapter 7 petition.  If -- Stream has to answer the petition by June 17.  That would be the 21 days under the statute and the rule.  There's an option.  If they do not respond, then we would file a certificate of objection, ask the Court to enter the order in Chapter 7.

If they respond either then, or I guess theoretically, they could respond earlier, and consent to the order for relief, then an order for relief would be entered in Chapter 7.  But then, under Section 706(a), I believe it us, of the Code, a Chapter 7 debtor has a right to convert to Chapter 11.  Now they could do that, but again then if they do that, then we'd be back where you are now or where Mr. Larkin is now arguing they shouldn't be in Chapter 11.

But to be in Chapter 11 is a completely different thing than being in Chapter 7.  A Chapter 7 estate doesn't have operations.  It doesn't need them.  It can't have them.  Obviously, it doesn't have any money to speak of other than the possibility of getting funding to pursue litigation.  It

18

doesn't have any employees, but the employees would be laid off anyway.  The whole Chapter 7 is basically hospice care.  It is not -- you know, it's not rehabilitating the debtor.

If the debtor wishes, it could, you know, consent and then ask for a conversion under 706(a).  And then the Court would have to rule on that whether or not, you know, to immediately flip it back.  I mean I've seen cases -- I've represented debtors in the situation where, you know, the 707 -- or the Chapter 7 was entered by the Court over objection and then the debtor converted.  But, again, they run the risk then of having to defend yet another motion to dismiss.

One question I have with regard to the Chapter 7, Your Honor, is why does the secured lender care.  Secured lenders have the benefit of the collateral, okay.  Nothing in a Chapter 7 is going to defeat them as long as their collateral is properly secured.

If there are -- if there's something for the Chapter 7 trustee to look at in terms of other litigation or breaches or fraudulent transfers, that shouldn't bother the unsecured creditors.  They can make a 9013 oral motion for relief from stay -- in fact, I think they include it in the papers -- give them relief from stay for something, whether it's to foreclose on their collateral.  There is actually a foreclosure matter pending before Judge Mary Johnson in the Superior Court that I think was one of the earlier pieces of litigation that predated

19

the Chancery litigation.

But they could perhaps have relief from stay for that. Perhaps relief from stay to complete the litigation in Chancery Court. But that wouldn't defeat a trustee, you know, coming in and looking at these other issues. Again, the problem is I think they're trying to mush everything together. And this is like a Gordian Knot. And the bankruptcy court, the Bankruptcy Code, and the bankruptcy trustee would have the ability, you know, to cut that Gordian Knot and, you know, break down the individual pieces.

That's part of the -- I won't say confusion, but the complexity here is that there's so many different legal theories. You've got the secured creditor -- you start off with the secured creditor which is pretty simple. Then you have the litigation in Chancery Court that essentially concerns itself with corporate governance and, therefore, the enforceability of this omnibus agreement. The omnibus agreement, again, has -- it raises issues as to whether or not it is -- was fair under state law to the unsecured creditors and also whether or not if it was -- I can't provide it right now that it was subterfuge to do basically an acquisition that there was a fraudulent transfer of a great deal of value that's left in the estate.

So there's lot of stuff for a Chapter 7 trustee to do. Again, if the debtor wants to move to convert it, that's a

20

different issue.  But right now, my creditors have nothing to lose.  They think at least there's a hope that there may be something for that.  If a Chapter 7 trustee is appointed -- and, again, I can present testimony today that (indiscernible) --

THE COURT:  Mr. McLaughlin, we're losing you again.  I apologize, but I didn't hear you after you intended that you could put evidence on.

MR. McLAUGHLIN:  -- (indiscernible).  Let me try and stand up by the window and see if that helps.

THE COURT:  Okay.

MR. McLAUGHLIN:  This is why I say usually I do these from home because my connection at home is better.  Can you hear me now, Your Honor?

THE COURT:  I can.  Yes.

MR. McLAUGHLIN:  Can you hear me?

THE COURT:  Yes, we can hear you.

MR. McLAUGHLIN:  Do you have me?

THE COURT:  Yes.  Can you hear me?

MR. McLAUGHLIN:  I like the old days when we were actually sitting in a room all together.  (indiscernible).  Their secured creditor, they had the benefit of the collateral.  To the extent that they do not have the collateral, then, you know, they're just another creditor and they would be actually an unsecured creditor for the deficiency amount.

What I was saying before I faded out again there was if in fact SeeCubic does not have a lien or any sort of an interest, possessory interest, in the intellectual property, the non-exclusive license granted by Rembrandt 3D Holding who is one of the petitioning creditors, then maybe what they foreclosed on, what they seized, what they have come into possession of may not have a whole lot of value.  And maybe then it might be worthwhile to sit down with a Chapter 7 trustee and all the parties in interest and maybe have a discussion.

I am told, and I'm not a party to the appeal, but that the appeal in district court has been referred to Magistrate Judge Stein for mediation.  I mean that's another -- you know, mediation is another, you know, way of getting everybody to sit down and negotiate because, quite frankly, Your Honor, it sounds to me that without Rembrandt 3D's cooperation, ain't nobody going to be happy because they apparently have what Mr. Michaels would refer to as a blocking position.  So without their IP license, maybe nobody's going to make any money in this deal.

So at this point in time, dismissal is overkill.  If the secured lenders, SeeCubic, wishes relief from stay for limited purposes of foreclosing on the collateral, which is a normal type of thing in a chapter -- in any sort of a chapter whether or not it is -- relief is granted to go ahead and

finish up the litigation in Chancery Court, which is, quite frankly, okay with us. Again, if the trustee's appointed, the trustee can weigh in on behalf of the debtor.

The docket the last time I looked of the Chancery Court indicates that both counsel for Stream TV were allowed to withdraw so right now the debtor is unrepresented in that matter. And that's a source of concern as well because, again, quite frankly -- I mean SeeCubic is very ably represented in that matter, very zealously represented and the debtor is not. And if, in fact, some of these concerns I've reached the Court have merit, then it ought to be brought forward in the Chancery Court, argued to the Vice Chancellor and included in whatever subsequent record. He may elect to permit it to be made.

With regard to the divestiture argument, Your Honor, again, Chapter 7 is a completely different thing. It's different parties. It's a different type of relief. What is being -- what was appealed was a (indiscernible) order out of Chapter 11. If that order would be -- if the Court ultimately would reverse or remand, then under Rule 1015(a), you have the right to determine how the two bankruptcy cases would be dealt with and presumably consolidated.

Again, the debtor certainly doesn't seem to have any problem with being in Chapter 11. In fact, I guess they want to be in Chapter 11. I don't think my constituency would have any problem with this thing going back to 11 if all of the

23

representations made about funding and so on and so forth are carried forward because ultimately the creditors have been told that if the deal can be done that was proposed originally in Chapter 11, and I believe is now proposed in the (indiscernible) motion, they're going to pay 100 cents on the dollar, including the secured lenders.

And basically, if you distilled all that down, it would be essentially a foreclosure where there was a property of the debtor was redeemed, and everybody goes back in getting what they wanted.  And if in fact the secured lender can get 100 cents on the dollar plus their interest plus their fees, whatever they're owed, then they shouldn't care.  If in fact this is a subterfuge to try and take over the company, then, you know, that's not kosher and perhaps does warrant further litigation in the Chancery Court or litigation for fraudulent transfer in some court, whether it's your Court, the state court, wherever it would go.

There's really no downside to not permitting this thing to go forward in Chapter 7.  Again, we're not asking for the entry of the order today.  You know, the 17th is the deadline.  It would not be until the 18th that a C&O would be filed and a request that the order be entered.

So maybe the best bet is to (indiscernible) --

THE COURT:  Mr. McLaughlin, let me interrupt you and I apologize.

24

MR. McLAUGHLIN: -- if that IP --

THE COURT: Mr. McLaughlin --

MR. McLAUGHLIN: -- belongs to Rembrandt, it's not under a contract but it may not be available to SeeCubic.

THE COURT: Mr. McLaughlin, I have to interrupt you because you've been breaking up pretty consistently for the last few minutes. And I'm not in the interest of cutting parties off from their presentation, but I think it would be most efficient at this point if we perhaps take a five-minute break and see if you can get a better wireless connection because I'm really having --

MR. McLAUGHLIN: Okay.

THE COURT: -- difficulty hearing your presentation, okay.

MR. McLAUGHLIN: I apologize.

THE COURT: So let's take a five -- that's okay. That's okay. Let's take a five-minute break and we'll come back on at 10:35. If you're not able to correct the situation, then I'll just hear from other parties who wish to be heard in connection with this matter to give you the opportunity to correct that.

But with that, let's take a five-minute break.

MR. McLAUGHLIN: I apologize. Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 10:30 a.m./Reconvened at 10:40 a.m.)

25

THE COURT: Okay, Counsel, we're back on the record. I gave you a little bit of extra time. Mr. McLaughlin, are you with us? And you're on mute, sir.

MR. McLAUGHLIN: Okay, Your Honor, I am waiting -- I've hooked in through another computer with a hard line and I'm waiting to be connected by the Court. There I come. Okay.

THE COURT: Okay. I see you and I hear you, so you are in.

MR. McLAUGHLIN: Okay. Now --

THE COURT: And if we have any further issues, I think you could just dial in through telephone.

MR. McLAUGHLIN: Okay.

THE COURT: And I don't need to see you.

MR. McLAUGHLIN: Okay.

THE COURT: I can make an exception for that, okay?

Okay. And I apologize. I just want to make sure that we have a very clear record. Did I lose Mr. McLaughlin again? Yes, I did.

MR. ZAHRALDDIN: Your Honor, I think -- this is Mr. Zahralddin from Armstrong Teasdale. I was trying to help Mr. McLaughlin as well with -- as well your chambers. And he's switching to a hardwire, so I think he was taking himself off of one computer and putting him onto another. So he should come back on in a second.

MR. McLAUGHLIN: Can you see me now?

26

THE COURT: We can and we hear you, we see you, and it seems to be a little bit -- much more clearer.

MR. McLAUGHLIN: Okay.

THE COURT: So let me tell you where you left off at least from my perspective, Mr. McLaughlin.

MR. McLAUGHLIN: And I apologize for the technological thing there.

THE COURT: That's okay.

MR. McLAUGHLIN: Go ahead.

THE COURT: So I think you were talking about -- the last thing I think I digested was the fact that mediation could be used in district court to come up with a global resolution --

MR. McLAUGHLIN: Right.

THE COURT: -- to the issues before the Court.

MR. McLAUGHLIN: And my suggestion, Your Honor, is not -- that would be one way because that -- you know, as Mr. Larkin's pointed out, there's a matter pending on appeal. And I understand that it was referred to Magistrate Judge Stein. But that's one way.

The other way would be, you know, in my estimation, I guess I'm more comfortable with bankruptcy, if you have a Chapter 7 trustee, then the parties are going to say, well, tell you what, let's make a deal. We can -- you know, we have a way to pay everybody 100 cents on the dollars, plus of course

the trustee's commission, you know. And that is a grand slam home run in the world of bankruptcy. If that deal was not made, then the trustee can still look at the various assets that may remain.

I'm told but again cannot prove that there are actually some hard assets in China that have not passed over to the secured lender that may be available. Obviously, from my perspective, from my constituents, the litigation is very, very key because there is a perception that they have been done wrong in all these transactions.

And the bottom line, if none of it works, Your Honor, it's a no-asset Chapter 7. I'm sure in your career you've seen more than one no-asset Chapter 7s including corporate ones. I know I'm involved in one right now before Judge Dorsey, a medical center down state. It's not uncommon. But at least you got a trustee who again is not part of any sort of lengthy historical litigation, who's not related, who really doesn't care much one way or the other. Here she will get her $75 at worst. At best, they'll make a home run and everybody will get paid 100 cents on the dollar.

The bottom line is that there would be some forum to sit down and negotiate other than litigation. Litigating obviously is not working. And perhaps that would be most beneficial.

Again, the reason this is different from what

28

happened back on in May was that Rembrandt who is and was an unsecured creditor was not a participant in that. I don't even think they were advised of the motion to dismiss. But they hold a blocking position with regard to the use of their IP. Without them, I don't think anybody makes any money. So that's why I would suggest that to dismiss the case at this point would be premature.

The argument of judicial economy, while that works for a Chapter 11, which is long and complicated and expensive, in a Chapter 7, it's not. I mean, you know, hundreds of thousands of Chapter 7s go through personal, corporate all the time. There are fixed procedures that the U.S. Trustee has, that trustees have. It's just not that burdensome to the Court. And for you as the judge, if it's a no-asset case, presumably, you would never even touch it.

So we would ask that the Court deny the motion to dismiss. Again, if the Court wishes to grant relief from stay on specific issues, I think that -- you know, we could discuss that. But we would ask let the matter go forward. Let's see what the debtor decides to do on the 17th. Maybe in the interim the folks can have a meaningful dialogue and obviate all this mishegoss.

So that's I guess my opening argument, Your Honor. Again, if you wish to hear witnesses, I can put them on.

THE COURT: I mean I read the declarations, Mr.

McLaughlin. I think I know what the declarations say and (indiscernible) declarations are. Why don't we reserve the issue until the end to see if I need evidence here.

MR. McLAUGHLIN: I also have Mr. Abraham on the line here. Mr. Abraham is one of the petitioning creditors and was the creditor or was one of the members of the Official Unsecured Creditors' Committee. And I have him available to testify that, you know, why he wanted to become a petitioning creditor and how the disclosures made by the Creditors' Committee to the general unsecureds were perhaps less than fulsome before they cut their deal.

I don't know how terribly germane it is other than to show that the fact that the Creditors' Committee supported the dismissal of the 11 may have been not strongly supported by the great bulk of unsecured creditors. But again I don't want to waste the Court's time. If the Court does not wish to hear from Mr. Abraham, he would like to be excused because he operates his business in Upper Darby and there's nobody to operate the business but him.

THE COURT: This is your presentation. This is your case. I'm not going to tell you who to put on or not to put on. So I'm not going to make that determination.

MR. McLAUGHLIN: Okay.

THE COURT: If you think it's worthwhile to have him take the stand, then he can take the stand. But otherwise --

30

and I'll just say I don't think it's relevant to this proceeding about what happened in the 11. It's been dismissed and it's on appeal. So that's not relevant.

MR. McLAUGHLIN: In that case, Your Honor, I think I'll not put Mr. Abraham on the stand and ask that he be excused so he can go about running his business.

THE COURT: Okay. Well, that would be fine then.

MR. McLAUGHLIN: Reji?

MR. ABRAHAM: Thank you. Thank you so much, Your Honor.

THE COURT: Thank you very much. You are excused. Take care.

MR. ABRAHAM: Thank you.

THE COURT: Okay. Well, Mr. McLaughlin, thank you very much. I appreciate the presentation. Why don't I turn the podium over to Mr. Ward, counsel for Stream it seems.

MR. WARD: Yes, Your Honor. For the record, Chris Ward of Polsinelli on behalf of Stream Networks TV, Inc. Good to be in front of Your Honor. I am very much looking forward to our combined virtual in-person hearings that hopefully we'll be having soon in the Delaware Bankruptcy Court and getting back to a new normal.

I'm appearing before Your Honor for the first time in this case, and maybe fortunately I was not here as part of the original case. You know, it looks like a lot of the issues are

still unresolved but, unfortunately, we were just retained on Monday. We were contacted over the weekend by Mr. Rajan to represent Stream TV Network, so I do apologize as noted in our joinder for filing a late-filed reply.

It has been a whirlwind of a couple of days of getting up to speed and, frankly, Your Honor probably knows a little bit more about the background than I do at this point. But I think we have been as productive as we can over the last couple of days with our client, Your Honor.

We are here on what we think is a very different case than the voluntary case that was filed by my client and was dismissed by Your Honor. That filing was made by the debtor. It was a voluntary Chapter 11 petition by a want-to-be Chapter 11 debtor. We are here today on an involuntary petition filed by three unaffiliated creditors of the debtors who are here to protect their interest, Your Honor.

This is not anything done in concert with the company. This was done, as Mr. McLaughlin said, by his clients that are three individuals creditors of the debtor who each meet the statutory requirement to file an involuntary petition and have done so.

THE COURT: Let me just interrupt you, Mr. Ward. I want to be very careful here. You're not here to advocate on behalf of the petitioning creditors, so I want to hear your perspective from Stream and we'll go from there. But I don't

32

want another argument or a substitution argument by Stream about the good-faith nature of this case from the perspective of the petitioning creditors.

MR. WARD:  Absolutely, Your Honor.  And I think that's fair because as I was going to get into, this is not something that we have one with the petitioning creditors. Actually, Mr. McLaughlin and I have not spoken other than a conversation about who was filing the agenda in this case, Your Honor.  So, yes, I am --

THE COURT:  And I have no doubt that you did not, okay.  The questioning is whether there were behind-the-scenes discussions between Mr. Rajan and the petitioning creditors. And I don't need evidence of that right now, but I don't need to have -- I understand that you probably didn't talk to Mr. McLaughlin.

MR. WARD:  Understood, Your Honor, and I appreciate that.  And I think the crux of really what the movants have gotten at -- and I said movants, that SeeCubic has gotten at in its arguments and its reply was this was really the same plan that Stream Networks, Stream TV had in the first case.  And nothing's happened since the first case.

Frankly, Your Honor, our conversations leading up to today were we absolutely -- we being the debtor -- absolutely need a chief restructuring officer in there.  There's arguments about independence of the company.  This company clearly needs

a chief restructuring officer. Why haven't we done that? We haven't done it out of respect for your ruling, Your Honor. Have we discussed whether we should do that? Absolutely.

Is it done? There is an agreement in principle that Mr. Howard Brownstein will step in as the chief restructuring officer. We have decided -- we being the debtor has decided not to do that because Your Honor has this order dismissing our original case. How would this have progressed if not for the original case? There would have been an involuntary petition filed. As Mr. McLaughlin said, we have until June 17 to file -- or the debtor has until June 17 to file a response.

Your Honor, my client would have responded to this by filing a voluntary Chapter 11 petition on or before June 19. We would have filed all the related first-day pleadings, and we would have moved forward with a voluntary Chapter 11 case. Given Your Honor's ruling, the debtor determined that it was in its best interest not to run afoul of any prior ruling of the Court to come here today to support the petitioning creditors and their request to have this case -- have the involuntary petition granted.

And, yes, Your Honor, the debtor would prefer and the debtor wants to be, as this Court knows, wants to be a Chapter 11 debtor. We would either file a voluntary petition with the leave of the Court. We don't want to do that without this Court's blessing. The Court did not dismiss the case with

prejudice, so I do think that we had the right to file a voluntary petition. But trying to be mindful of Your Honor, we had not done that or, as Mr. McLaughlin noted, we can convert -- we have a right to convert the case from Chapter 7 to Chapter 11.

And why do we believe that we need to be in Chapter 11 is there was a plan in the first case, a lower case "P" plan in quotations. Here I think we are prepared to move forward with an upper case "P" plan as a term of art in the restructuring industry. We have spent time with our client on coming up with that plan that would pay all creditors in full. As Your Honor saw, we attached a term sheet to our joinder. Yes, the term sheet is with VTI, a company that Mr. Rajan is affiliated with.

Why is his name --

THE COURT: And let me ask you, I assume the term sheet is predicated on capturing, recapturing the assets that are in the process of being transferred to SeeCubic. Is that correct?

MR. WARD: The term sheet -- absolutely, Your Honor. The debtor believes that the asset should stay with the estate. There is no way around it, but --

THE COURT: That's not going to happen. I just want -- I'm really trying to control my temper here because I do have a temper. And I'm trying to control it, okay. But I want

Case 23-10763-djb-1-DO48-2080-4 Doc 374/Filed 06/11/21ed 04/08/25 0366:51 Desc
Appendix Part 2 Exs. 21-40 Page 169 of 308

35

to be abundantly clear to everybody that is on this line that regardless of what happens in these cases, okay, there will be a relief from stay to allow the omnibus agreement and the Chancery Court litigation to continue and I will allow the assets to continue to be transferred, okay.

So if we're proceeding under some (indiscernible), but that is not going to happen, okay. Everyone is abundantly mistaken. And that was more than I wanted to say, but I'm really having trouble here. So let me just -- I just felt like I needed to say that. And that's if these cases continue. So the idea that we're going to move forward on a plan that's predicated on recapturing the assets and doing exactly what was proposed in the Chapter 11 proceeding that was dismissed for bad faith is just simply not going to happen at this stage.

So I don't mean to usurp your presentation, Mr. Ward, and I know that you are a newcomer to these proceedings. But I don't feel like I can continue to sit here silently, as I should sit silently when I was hearing statements that seem to be contradictory to the TRO that was in place in the Chancery Court. So I just want to tell you I have many concerns, and I'm extremely troubled by what has been put forth in the supposed plan and in VTI's joinder.

So with that, let me do this. I need to take a five-minute break. I have to take a phone call real quick. So let's take a break for five minutes, and I apologize. I know

36

we're going -- we're ping-ponging back and forth with this proceeding, but I have to take a phone call.  And then, Mr. Ward, I'll allow you to continue with your presentation.

So at 11 o'clock we'll resume, okay.  I apologize.  Thank you very much.

MR. WARD:  Thank you, Your Honor.

(Recess at 10:53 a.m./Reconvened at 11:06 a.m.)

THE COURT:  Okay.  We're back on the record, and I apologize to all the parties.  My call ran over.  When Mr. Ward is back on and can join us, we will resume.

MR. WARD:  I had my video, Your Honor.

THE COURT:  Oh, there you are.

MR. WARD:  I'm here.

THE COURT:  Okay.  And, Mr. Ward, I do apologize.  I'm not -- I don't like to interrupt and stop in the middle of Counsel's presentation.  So I apologize for that.

So with that, why don't we continue.

MR. WARD:  Your Honor, it is not a problem at all.  You were able to take about 14 pages of notes and turn them into 3.  So I very much appreciate the Court's candor on where you stand.  And I think a lot of what we've heard and what's in the movant's paper and I think the Court probably agrees with is hollow promises is the comment they use.

And I think that we're here now to show that these aren't hollow promises, that we are prepared to move forward

37

with Mr. Brownstein as a CRO, that we had a commitment from VTI for lending. There is a business plan. I understand Your Honor's comments, and I'm not going to get into anything with respect to the omnibus agreement. But there's still the possibility that Stream Networks can survive even after the omnibus agreement, and that's given the assets that remain.

And why this case should be in bankruptcy and should be in Chapter 11 is it is not just about SeeCubic and the secured lenders here. There are other parties involved. There's the petitioning creditors. There's $25 million worth of unsecured debt out there. And most importantly, Your Honor, the representatives of Rembrandt who are on the phone today, and there are declarations of Christopher Michaels and Stephen Blumenthal that were filed with the Court.

The debtor and Rembrandt entered into a settlement agreement, Your Honor, and that settlement agreement called for several important things to happen. One of them was a payment to Rembrandt, which obviously has not occurred. But one of them was a license back to Stream to use the Rembrandt technology, and another important component was a provision where Rembrandt would buy TVs from Stream at a discounted price. So there is a potential line of revenue that's available to this debtor and a potential line of business working with Rembrandt, Your Honor, that this company potentially could move forward.

38

Given the Court's comments, we have to have a very frank conversation with VTI and Mr. Rajan about is this something that you still want to fund under these parameters that this judge has put before us. We understand that. But there is still an opportunity for this debtor to be in Chapter 11 and potentially reorganize given the issues with Rembrandt, Your Honor.

And I think those declarations were very clear that Rembrandt is unaffiliated and independent of the debtor. It is a separate entity. It struck a deal with Mr. Stasney when Mr. Stasney was with the debtor. He's now with SeeCubic or I guess he was always with the lender but he was the lender's representative on the board. So there was a transaction that was entered into between the debtor and Rembrandt, Your Honor.

There's a potential viable business stream there in that settlement agreement giving the licensing rights and this ongoing agreement that Rembrandt would buy TVs from the debtor. And there's the intellectual property issue that the debtor is the one that holds the licensing agreement with Rembrandt, Your Honor. It is not SeeCubic. And that cannot be transferred to SeeCubic under the omnibus agreement.

We actually fully appreciate Your Honor's comments. The automatic stay and something I was prepared to address was I think that's something that the debtor was prepared to live with coming back before this Court was the Chancery Court

litigation's going to go forward if Vice Chancellor Laster enters a final injunction. We understand that that's -- it is what it is, and that is an issue for a different court.

But there's an opportunity for more proceedings in the Chancery Court to happen, and Vice Chancellor Laster will come down however he comes down. But one of the assets that cannot be transferred under that omnibus agreement is the Rembrandt license, Your Honor. And we believe this is the appropriate court for that to be adjudicated in, and I believe Rembrandt would agree with this that that is an asset of this bankruptcy estate, that license, and it is a potential cause of action that this estate and/or Rembrandt may have against SeeCubic is the transfer of that intellectual property license.

So there is a valuable asset to this bankruptcy estate that needs to stay here and needs to be adjudicated in order for -- to determine who owns that license and whether SeeCubic can use it or whether it is an intellectual property right of Stream that Stream could use as part of a business plan going forward even assuming that the omnibus agreement goes forward and is finalized by Vice Chancellor Laster.

In addition to the Rembrandt issues, Your Honor, as Mr. McLaughlin noted, the estate does believe that there are potential breach of fiduciary duty claims that are out there. Mr. McLaughlin did a good job of summarizing the Delaware law, but I think it's abundantly clear since Gheewalla in the late

'90s all the way through Vice Chancellor Laster's opinion in (indiscernible) when a company is insolvent, the fiduciary duties shift from equity to all creditors.

We believe that entering in the omnibus agreement, whether it's valid or not, was a potential breach of those fiduciary duties, and that's something that should be investigated as part of this bankruptcy estate. And if there's claims, we can bring those claims against the Ds and Os with respect to that decision. If there's not claims, there's not claims.

And then, finally, Your Honor, there's potential issues related to the omnibus agreement on fraudulent transfer and other claims that we don't need to get into today. But we do believe that there are claims and causes of action in addition to the intellectual property rights with respect to the Rembrandt technology that are part of this estate, that are potentially valuable assets that need to be protected for creditors.

And we have three creditors here today that are asserting their interest, and the debtor is prepared to fulfill its duty, put in an independent chief restructuring officer, not Mr. Rajan to make the decisions going forward but that Mr. Brownstein be the independent party to make those decisions moving forward.

And I think all we're asking for is the right to file

41

a voluntary Chapter 11 petition, assuming that we have conversations with VTI, with SeeCubic, with any party that may be willing to finance the Chapter 11 case, Your Honor, and still -- assuming they're still willing to fund it and come back before this Court with a voluntary Chapter 11 petition in order to protect those potentially valuable rights, Your Honor. That is at the crux of it, taking apart all the other arguments that we were going to make about breathing spell and two-party dispute and everything, that's what we're here today asking for.

And we're trying to fix what the Court and what SeeCubic and others have found as wrongs that this debtor has done in the past by putting in an independent fiduciary and moving forward or not moving forward if there is an agreement on funding, Your Honor. Without funding, we understand there's not much that this debtor can do. We have, you know, basically a week I think to figure out if there's funding of someone who wants to take this on and push this Chapter 11 forward and attempt to protect these assets or at that point, potentially consent to a Chapter 7 as well, Your Honor.

You know, we're here on the motion to dismiss today. And as the Court's well aware, we've been involved for a few days, but I do think that this debtor is prepared to move forward on the grounds that I just set forth to protect these few assets and there may be others. My knowledge is a little

42

bit lacking outside of the kind of core subset of what is out there.

But I do believe that the Rembrandt technology, it could be the core to this bankruptcy. It could be a new potential business that is out there. There could be claims related to that. And I think those need to be protected because they do fall outside the omnibus agreement, and they're not within the purview of the Chancery Court. They're within the purview of the bankruptcy estate, and they're assets of this debtor.

So given the Court's comments, I had a much longer presentation and we touch on a lot of it in our joinder, but that is the crux of the debtor's argument. And I will apologize to the Court. I meant to support my earlier apology. There is a paragraph in our pleading that is identical to Mr. McLaughlin's pleading. I asked our associate who was drafting this, I said I like that section of the pleading, please put that as something similar in ours. And I did not do a sufficient job reviewing that to assure that we kind of changed it and made it our own.

So that was not anything that, you know, we concerted with Mr. McLaughlin on. I thought he did a good job on it, and we borrowed his language for our pleading.

THE COURT: Okay. Well, that's a good compliment to Mr. McLaughlin. So let me just ask you this. There's some

43

discussion about an independent fiduciary at Stream now, but there's no independent director, correct?

MR. WARD: I guess there's a dispute over whether there's independent -- my understanding, Your Honor, from the -- we have not been retained to do any of the Chancery Court stuff as of this point. I haven't really gotten too much involved with that. My understanding is there's a dispute on word composition, but I think Your Honor is correct.

But I think as this Court knows, if we file a motion to approve a chief restructuring officer, Ms. Sierra's going to weigh in heavily on who that CRO reports to and who he takes direction from in the Chapter 11. And I think our intent is to assure that the CRO is independent and acting as an independent fiduciary.

And, frankly, the reason that we believe a CRO is more apropos than a Chapter 7 trustee is there is a hope that this business can restart, and that can't happen in Chapter 7. If we go into Chapter 7, you know, it's end game, business is shut down. You know, we've seen trustees do limited operations, but that's very difficult. We do believe that there's a lifeline here to a future business, and that's why we believe we should be in Chapter 11 and try and restart that business with or without the omnibus agreement, Your Honor.

THE COURT: Okay. Well, thank you, Mr. Ward. I appreciate your perspective on this.

44

Okay.  Well, I think there's at least two other parties that probably wish to be heard.  So why don't I turn the podium over to Mr. Zahralddin on behalf of VTI.

MR. ZAHRALDDIN:  Good morning, Your Honor.  Rafael Zahralddin from Armstrong Teasdale on behalf of VTI.  Thank you, Your Honor, for your time this morning.

I think I'm going to try to make this as short as possible.  I will refer back.  Mr. Larkin said earlier that he believed nothing had changed from the first time around when we were before Your Honor.  I think that that is a little bit inaccurate in the sense, and as we've heard from other folks, that we have now a real serious issue in terms of what is important to our client which is intellectual property that's out there.

And I will clear the air and certainly happy to answer any questions you have, Your Honor, but we have been speaking with Rembrandt only because Rembrandt spoke to the debtor and the debtor said -- and this wasn't obviously Mr. Ward.  It was Mr. McMichael in the last case.  And Mr. McMichael responded back and told Mr. Michaels that he had to wait until after the motion to dismiss because they were really occupied with trying to deal with that issue.

Then, Mr. Michaels also told me that he had contacted and spoken to SeeCubic which is in his declaration, spoken to them and spoken directly to Mr. Stasney who he knew from the

45

prior settlement, and that they indicated that it wasn't their responsibility and that they weren't going to honor any sort of payment for the license. They were going to use the license despite the fact that it's not transferrable and non-exclusive.

And so then he came to us, and he asked us, you know, do you guys have an interest in this. And so we did some due diligence, looked at the licensing issues. I had our intellectual property department review it. And we came back and said that, yes, this would be something of interest to us under the hope that either there was a superior right to what SeeCubic holds or that there was an alternative pathway.

And also, part of the settlement with Mr. Michaels included an order and preferred pricing on a go-forward basis which was combined with the licensing. And he's much more sophisticated in this area than I am, but that that would present a viable project as well for the debtor as well as perhaps even independently just with -- between Rembrandt and VTI.

So I'm not here to try to argue against the omnibus agreement or the PI. I mean, obviously, we disagree with some of the things that happened in that case. But the face of the omnibus agreement itself says it is subject to creditor remedies, and I'm not even talking about the fraudulent conveyance in the bankruptcy. I'm talking simply about the remedies of Mr. Michaels and his license and the terms of, you

46

know, that he has those rights under U.S. patent laws.

So we're not here to argue that. I also understand that Judge Laster gave warnings to both parties. He said, you know, that his opinion was susceptible to insider abuse. And the one piece of information that he didn't have when he wrote his opinion was that there would be 25 now million dollars of unsecured debt. And he made a specific reference to the liabilities -- if Your Honor doesn't know, Schedule 1-B was released after the PI.

And that presents a situation where again on the face of the omnibus, it says it's subject to creditor remedies. Now you have $15 million worth of creditor remedies, part of which 4.8 million or so, it's roughly 25 -- 4.8 directly relates to the patent rights of Mr. Michaels. So we have been discussing that.

And again, we're looking at it from the point of view that VTI just wants to make 3D products and they want to acquire as much intellectual property as possible. That's why they're willing to fund this. They believe in this technology. We are funded. We have escrows that are being funded right now through the transfer of money from Burlington and its partners. And we would like to try and facilitate this.

I know you said that the prior Chapter 11 isn't significant, but I will just reiterate that, you know, Mr. McCarthy indicated and I think he called himself a white

47

knight, VTI would like to facilitate something that is beneficial for everyone. We are welcome -- we welcome any sort of option, whether it's a Chapter 7, whether it's a Chapter 11 where it's a combination with Mr. Larkin and his clients. We have offered to pay them in the past.

You know, we would continue to work on something else that would maybe involve a resolution of Mr. Michaels' issues since he believe he has a blocking patent as well as exclusive licenses and that there's also an issue with the Stream license. I think we're open to any of those things, and we would like -- and that's the reason that we asked for some time to use. And I'm glad Mr. Ward brought it up. We'd like to do our best to facilitate some sort of resolution.

But I wanted to make sure that you understood that our conversations only came up on the VTI side with Rembrandt after they were, you know, pretty much brushed aside by both the debtor and by SeeCubic, and that's something that Mr. Michaels has laid out in his affidavit and he's here to attest to, as well.

So I'm going to cut off my presentation with that, Your Honor, because I think that those were the salient issues. And, of course, we would also welcome -- if we have to go back and go in front of Judge Laster and fund something in front of Judge Laster, we would do that as well but, again, the parties we're talking about, they're not really involved in that

48

preliminary injunction hearing. Mr. Michaels doesn't get a resolution out of that; neither do any of these other folks.

And in order to make TV, in order to make flat panels and displays, we need to speak -- there's only a limited group of people that fit in this. If not, everyone would be making those 3D panels already. It's a complex supply chain. But I'm going to conclude with that, and I appreciate you letting me speak, Your Honor.

THE COURT: My pleasure, and nice to hear from you. I appreciate the perspectives.

MR. ZAHRALDDIN: Thank you, Your Honor.

THE COURT: Okay. All right. Is there anyone else that wishes to be heard in connection with this matter? Ms. Sierra, I see you're on the line, and I didn't see any papers that were filed on behalf of the U.S. Trustee. But if you wish to be heard, this may be the appropriate time.

MS. SIERRA: Good morning, Your Honor. Rose Sierra on behalf of the U.S. Trustee. Your Honor is correct. The U.S. Trustee did not file any papers in this matter as of this time. And just to talk about that a little bit, this case or this matter comes to this Court in the posture of an involuntary Chapter 7 case filed by petitioning creditors in which no order for relief has been entered yet.

For these reasons, the U.S. Trustee does see limitations to its involvement in this case for statutory

49

reasons. But, nonetheless, we have a few observations that if it would aid your Court, we would like to make on the record today.

THE COURT: That would be fine and appreciated.

MS. SIERRA: Okay. So, Your Honor, in the context of the Chapter 11 case filed by the now-alleged debtor in this case, based on the record before the Court at that time in which -- which was the result of weeks of discovery, depositions, and a two-day trial, without question, the UST believes that the Court's dismissal order of that case was proper.

Now in the context of this involuntary Chapter 7 case, given the circumstances and the facts that belied the Court's prior dismissal order, the parties pushing and requesting that this Court allow this Chapter 7 case to continue need to show something different in how they will prosecute this case that is, you know, not just the same record and the same factual circumstances and the same situations that belied the Chapter 11 case or, at the very least, they need to show that the record before -- the record in that case and the Court's dismissal order in that case is something that the parties here are not bound to.

Now as to these questions, Your Honor, whether there's, you know, the record in the Chapter 11 case and the Court's dismissal of the Chapter 11 case bears on this present

50

case, the UST has a few observations and concerns that we'd like to raise at this time.

First of all, the timing of this involuntary petition just weeks after the Court's dismissal of the 11 case raises some serious concerns as to whether the parties here are just attempting to relitigate and come to this Court again at the same posture that they came before the Chapter 11 case.

Exhibit D to the movant's motion to dismiss this involuntary case strongly suggests that there were some discussions between the debtor and one of the petitioning creditors prior to the filing of the petition. The UST has not investigated this nor do we -- are we saying as a matter of fact that those discussions happened. But it's strongly suggestive of that.

The papers filed by the parties opposing the dismissal of this case largely raise the same issues, the same facts, the same circumstances that were raised in the context of the dismissal and the litigation in the Chapter 11 case. Again, with respect to the alleged debtor in this case, they've been very open and forward about the fact that the attempt here is to let this Chapter 7 case go forward, and when the time is right to convert to a Chapter 11 case and again implement the same strategies that they were going to implement in the context of a Chapter 11 case.

And with respect to this Rembrandt issue that, quite

51

frankly, I'm trying to wrap my head around because I don't understand it and I don't -- I'm trying to make sense of how it's relevant to whether this Chapter 7 case should go forward. Exhibit C to the declaration filed I believe at some point yesterday by Mr. Michaels shows an agreement and a settlement agreement that was executed by the debtor, by Rembrandt, and by the debtor with Mr. Rajan's signature the day that the involuntary petition was filed.  Rembrandt, as you know, Your Honor, is one of the petitioning creditors in this case.

Your Honor, so those are our observations in this case which to sum it all up I think are strongly suggestive of the fact that this attempt and this filing of this involuntary Chapter 7 case is another attempt to circumvent this Court's dismissal order.  And with that, Your Honor, you know, those were the observations that we wanted to make to the extent that it would aid this Court and, quite frankly, the other parties in this case.

And, you know, there's been -- I've heard something about, you know, Mr. McLaughlin made some suggestions as to how he thinks this case would run as a Chapter 7 case and what are some of the purposes and goals here in the appointment of a Chapter -- an independent Chapter 7 trustee to look into certain issues.  I've also heard from Mr. Ward about the -- now that there's a CRO in the case and an agreement in principle.

Your Honor, at this juncture, I understand that we

52

are at a limited -- what I thought would be the limited issue of deciding whether a Chapter 7 case should go forward. But with all of the assertions that have been made about the purpose of this being another Chapter 11 case with a CRO really -- I think really negate or contradict or are inconsistent with the fact that there's now -- that the petitioning creditors want a Chapter 7 independent trustee to take a look at things.

So it's very hard, Your Honor, for the U.S. Trustee to kind of wrap its head around what's happening here. So for that reason, all we think we can do here to aid is make the observations that we've made, raise the concerns that we've raised and, Your Honor, if an order for relief is entered, we will fulfill our duty to appoint a Chapter 7 trustee. But at this point, I'm quite frankly at a loss for what exactly is going on. Thank you, Your Honor.

THE COURT: Thank you. And I do appreciate those observations of the U.S. Trustee.

Okay. Well, let me ask is there anyone else -- before I turn the podium back over to SeeCubic's counsel, why let me ask is there any other party that wishes to be heard in connection with the motion to dismiss?

MR. McLAUGHLIN: Your Honor, I'm going to want to put on Mr. Michaels as a witness, please, at --

THE COURT: I'm sorry.

MR. McLAUGHLIN: I'm going to call Christopher

53

Michaels as a witness at some point in time whenever the Court's ready to hear evidence.

THE COURT: Okay. Well, then, Mr. Larkin?

MR. LARKIN: Your Honor, I --

THE COURT: Did you wish to be heard in connection with that request?

MR. LARKIN: I do. I object to the calling of Mr. Michaels as a witness at this hearing. The affidavit that was submitted was submitted yesterday after the objections were due and I think after our reply brief was filed. I haven't had an opportunity to depose him or really digest the full extent of the affidavit or the declaration.

At the same time, Your Honor, I really think that this is turning into a sideshow about this motion. And I'm happy to address this in, you know, sort of my rebuttal remarks. But I just heard for the last hour argument from three different lawyers, none of whom addressed the principal legal issue here which is divestiture. There wasn't a single word uttered about it.

And the divestiture issue was created by the debtor when they filed the notice of appeal. The notice of appeal is still on file. They filed their statements of issues on appeal last week with Judge Andrews. As I said at the outset, the issues that are laid out in the statement of issues, if you overlaid them on top of the arguments that have been made by

54

the last hour by the objecting parties, they line up perfectly.

As Ms. Sierra said, it's hard to really make sense of everything that was said over the last hour because -- and this is precisely the procedural morass that the Third Circuit warned about. You know, this is from the Main Line Federal Savings and Loan case, it's 721 F.2d 904. The procedural morass in this case illustrates the problems created by assertions of concurrent jurisdiction. That is precisely where we are headed.

We're hearing about IP licensing and settlement agreements with Rembrandt. We're hearing about -- I heard about breach of fiduciary duties. Your Honor, I mean with all due respect to Mr. McLaughlin, I know he just came on the scene, but Vice Chancellor Laster found after, you know -- on a full body of evidence that no evidence suggests that the members of the resolution committee breached their fiduciary duties in connection with the execution of the omnibus agreement. That's at -- you know, it's page 24 of the Chancery Court decision.

We heard today about how we're going to litigate fraudulent transfer issues if the Chapter 7 petition is permitted to proceed or to convert into a Chapter 11 preference actions. These are all arguments that were made three and a half weeks ago unsuccessfully by the debtor and VTI.

And so, you know, if Mr. Michaels is going to

55

testify, I think we reserve all rights. Certainly, we'll cross-examine him. But I really don't think -- I think it's a sideshow, and I don't think we need to go there today.

THE COURT: Okay. Mr. McLaughlin, why don't i heard from you about the relevancy of the declaration.

MR. McLAUGHLIN: Well, again, Your Honor, we're here on a Chapter 7, a liquidation. The issue -- and Mr. Larkin has suggested we haven't addressed divestiture. And I don't know how else to say it. It's not the same issue that's pending -- there is no bankruptcy case pending anywhere. There's an appeal of a dismissal of the case. There's no bankruptcy estate. There's no automatic -- well, I guess there's an automatic stay based upon a Chapter 7.

But the Chapter 11 was over. So there's nothing that -- there's no bankruptcy -- you're not going to rule adverse anything. The district court would rule because the district court -- the issue before it is whether or not the case should have been dismissed. That's the issue. There may be subsidiary issues, you know, that were raised, but the issue is was the dismissal proper or not proper. If it was proper, then you affirm. If it wasn't proper, they reverse or remand or do whatever appellate courts do. That has nothing to do with liquidation of the assets.

I don't see any inconsistency in our position. Again, we just want somebody to look at this independently and

56

determine whether or not there are -- you know, there's appropriate litigation that can be brought or whether or not any of these vestigial (phonetic) assets that still exist in the estate not in derogation of the omnibus agreement or the security interest can be made -- can yield any value.

That was why I wanted to have Mr. Michaels testify is because he can tell you about the intellectual property and why he believes -- I believe he believes that there's still value left in the Stream estate.  Again, that would be value available to a Chapter 11 trustee if the case converts over.

Again, the debtor and VTI, they're talking about a possible conversion.  That's a possibility.  That's up to them.  That's up to you.  That's not the Chapter 7 issue.  The Chapter 7 issue is whether or not it's appropriate to let my creditors, my constituents have an independent party to take a look and see what is there.  If there's nothing there, then there's nothing there.  It's a no-asset case, thank you very much, the trustee gets his $75, and everybody leaves.

But that's not going to -- if the debtor elects to try and convert the case to a Chapter 11, then a lot of these issues may become more relevant.  Right now they're not.  This is a real simple matter.  It's a corporate case where there may or may not be assets, and we were looking for someone to take one last look and see.

Again, throughout this case, all of the players have

57

been interrelated in a lot of litigation. Let somebody who doesn't have an emotional dog in the fight take a look at things. It doesn't cost that much. There's very little burden on the system at all. And, again, the difference in a Chapter 7 you have a trustee, if -- you know, the debtor's talking about a CRO, if that becomes appropriate.

The bottom line is either way it's an independent third party who's not -- who hasn't been involved in this from day one. So, again, we would just like to show that there is some at least vestigial value in the estate that a trustee could look at. If the trustee determines it's not worth anything, then they abandon it under 554 and it's over. But it's really not that complicated, I don't think.

And, again, I understand that if the debtor decides it wants to try and convert to 11, then a lot of the arguments raised by the United States Trustee, by Mr. Larkin, they may have some more substance to be fought over. But in my petition -- and, again, this is a motion to dismiss the case. We would ask that the motion be denied and let's find out what happens on the 17th, if the debtor consents, you know, if the debtor moves under 706 to convert. And then, you know, we can see where we go.

But, again, I would like to put Mr. Michaels on just to testify as to the value that Rembrandt sees in Stream TV.

THE COURT: Okay. Well --

58

MR. LARKIN:  Your Honor, may I respond?

THE COURT:  You may, although I think that the way that I want to proceed -- I want to complete the arguments on -- I want to complete argument.  Then I'm going to take a break and I will let you know if I need further evidence, although I did read the declarations and I understand what the position is that you're putting forth with those declarations, which is that there is some assets possibly in this current Stream estate that could be valuable to creditors.

I understand that position, and positions were proffered of that nature in the Chapter 11.  So I certainly understand that position.  I'm not sure if I need actual testimony on that issue given that you filed the declarations and I read those.  I can determine what the relevancy of that is to the legal position before me.  But let's do this, let's conclude with argument and then, like I said, I'll take a break and I'll come back and let you know whether I need evidence.

So, Mr. Larkin, I believe you made some closing argument, at least on the jurisdictional piece.  But I yield the podium back to you for the last word since it's your motion.  And then I'll take a break.

MR. LARKIN:  Thank you, Your Honor.  I didn't mean to interrupt you.  I thought we were still on the witness issue.  And I won't rehash the divestiture point other than to say, again, I don't think any of the objecting parties have

59

addressed it squarely and, particularly, the debtor who has filed supporting papers; VTI who has filed supporting papers.

Mr. Rajan who, as Mr. Ward said, Mr. Rajan is still firmly in control of Stream TV. He retained Mr. Ward over the weekend. He's still the controlling stockholder of Stream TV. Our understanding is I think he's still the only director. There's been no governance changes. There's no CRO as of this date. Mr. Rajan's in charge and, frankly, his fingerprints are all over this. And no one has addressed the divestiture point that the debtor created by filing the notice of appeal.

With respect to the 707 issues that I went through at the outset, Your Honor, I think the last hour and a half of argument really just highlights again the procedural morass that we're going to be dealing with if the Chapter 7 petition is permitted to proceed even if, you know, the automatic stay is lifted and we're permitted to proceed in Chancery. I mean the longer that this plays out in multiple forums, I think the greater the risk is of inconsistent rulings. I think, frankly, will play directly into Mr. Rajan's playbook here to try and sort of fight a multi-front war to maintain control over Stream.

And I don't see the benefit of it, right. Again, as I said at the outset, you know, we understood Your Honor's ruling on May 17 to go back to the Chancery Court, complete that litigation, complete the asset transfers, and if there was

60

anything left after that, the unsecured creditors could come back to bankruptcy court. I still don't understand why that isn't an appropriate path to go down.

And my friends on the other side haven't addressed that. They haven't explained why they ignored Your Honor's ruling and four days after the order was entered came in and filed a Chapter 7 petition and then the debtor comes in and wants to bootstrap the Chapter 7 petition into a complete redo of the Chapter 11, right. There's been no explanation why that's a better path than the one Your Honor laid out on May 17.

So, again, you know, I laid out my arguments at the outset. I think we can all sort of see the writing on the wall here. If this is permitted to proceed in a Chapter 7 or if it's converted to a new Chapter 11, we're all going to be having the same arguments we had over the last three and a half months while an appeal is pending. While an appeal is pending. And, of course, we're going to, you know, want to litigate in the Court of Chancery.

So, again, Your Honor, we would ask that the motion be granted that the Chapter 7 petition be dismissed. We would ask that it be dismissed with prejudice at least until such time as the Chancery Court litigation is completed and the asset transfers have been complete. Thank you.

THE COURT: Mr. Larkin, what's the estimated time

61

frame you think that the omnibus -- or, excuse me, the Chancery

Court litigation -- how long is that going to take?

MR. LARKIN:  Your Honor, the briefing is complete.  I don't believe Vice Chancellor Laster has scheduled oral argument on the motion.  And so, you know, I can't give you a timeline other than, you know, I know the Vice Chancellor, at least back in December, had indicated that, you know, he would be, you know, I think ready to rule promptly on a motion if it was brought.  So -- but I don't think there's anything beyond that.

And I don't want to speak out of turn.  I can confer with one of my colleagues offline if we're going to have a break if anything's changed on that front, but I don't believe so, Your Honor.  I don't anticipate taking very long.

THE COURT:  Okay.  Thank you very much.

MR. LARKIN:  Thank you.

MR. MICHAELS:  Your Honor, may I interject on that point?  You asked about that that appearance.  To be clear, Rembrandt was not a party to that litigation to this point and has not been put on notice of any of the prior proceedings. But to the extent that -- and part of what we have argued is that SeeCubic is trying to walk away again with our IP rights. It's reasonable for them to expect that we are going to appear or file our own papers in that Chancery Court proceeding and then likely remove it to federal court because many of the

62

issues are exclusively federal court jurisdiction.

So the idea that that's going to be over quickly without having us heard is frankly unrealistic. We have an express interest in protecting our intellectual property. We have been in litigation on this point since 2017, and we thought we'd reached a settlement agreement with Mr. Stasney in April of 2019 far predating any omnibus agreement. I mean we are not new.

I understand that they failed to disclose that in this proceeding or any of the other proceedings. But by no stretch of the imagination are our claims new in this regard. And the idea that SeeCubic is going to somehow walk away with our intellectual property without us doing something about it is -- they have express -- our actions to date show otherwise.

And once it became clear that they were trying to take it away from Stream and that was actually going to happen, we have filed this involuntary petition. But, you know, we are -- if this is dismissed, they can expect us to be there in Chancery Court and in federal court otherwise.

THE COURT: Okay. Well, that's very helpful. I understand the issues. It sounds as if you have a pathway outside of this Court, but I understand why you're trying to proceed in this Court, as well. So I appreciate your perspective on timing.

Okay. Well, I'd like to take a break until 12:30 and

63

at that point, I'll come back and let you know whether we need to move on to some evidence in connection with the issues that are before me. So with that, let's adjourn today's hearing and I'll resume back on Zoom, same Zoom link, at 12:30. All right? Thank you all very much. I appreciate the arguments. Take care.

(Recess at 11:46 a.m./Reconvened at 12:35 p.m.)

THE COURT: We are back on the record shortly after 12:30 in the Stream involuntary Chapter 7 case. I want to thank you all for the opportunity for giving me the opportunity to collect my thoughts and determine whether I need evidence on the issues before me.

And I've concluded that I don't need Mr. Michaels' testimony because even considering and giving weight to the contents of his declaration as well as those of the declaration of Mr. Blumenthal, I would still come to the same conclusion which is that this proceeding must be dismissed.

Considering the totality of the facts and circumstances presented, including the arguments that were made by counsel today -- pardon me, I'm getting some feedback. As I was saying, considering the totality of the facts and circumstances presented, including the arguments that were made by counsel present today and the pleadings submitted and the documents attached thereto, it's clear to me that this proceeding was filed as another attempt by the parties to

64

circumvent my dismissal order, gain some sort of litigation leverage over the secured lenders and the disputes in the Chancery Court, and essentially get another bite of the apply to try and pursue the previously submitted plan and theories that are already considered and rejected in the prior Chapter 11 proceeding.

And this implicates and gives rise to issues of divestiture and judicial economy and also amounts to cause under Section 707. And I understand the petitioning creditors' positions that they are not a party to the proceedings in the Chancery Court and that they do not support the Unsecured Creditors' Committee's actions and conclusions in the Chapter 11 case. But the Creditors' Committee represented not only their interests but also the interests of all creditors in discharging its fiduciary duties and concluding -- and concluded that going down the path suggested by the petitioning creditors, Stream and VTI would not be beneficial to the creditor body. And I continue to agree.

Moreover, the relief and the remedies that the creditors hope that they or a Chapter 7 trustee can pursue in bankruptcy can be pursued outside of bankruptcy. And I thought I made myself clear when I dismissed the Chapter 11 case that I did not expect to see another case until the Chancery Court action was completed and the transfers to SeeCubic were accomplished. The arguments presented today do not change my

65

opinion.

So accordingly, I'm going to enter an order dismissing the case with prejudice so that no further bankruptcy filings for Steam can occur for 12 months. And I will enter that order shortly after the conclusion of today's proceedings.

With that, unless there's anything else we need to discuss, we can adjourn today's hearing.

MR. McLAUGHLIN: Nothing further --

THE COURT: Okay. I'm not hearing --

MR. LARKIN: Thank you, Your Honor.

THE COURT: Okay. Thank you all for your time and attention to the matter today, and we'll consider this hearing adjourned. Take care.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

(Proceedings concluded at 12:38 p.m.)

* * * * *

66

## CERTIFICATION

I, DIPTI PATEL, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

/s/ *Dipti Patel*                    Date:  June 11, 2021

DIPTI PATEL, CET

**RELIABLE**

# App. Ex. 34

**From:** Christopher Michaels
**Sent:** Saturday, June 26, 2021 4:48 PM EDT
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; John A. Sten <JSten@atllp.com>; David Going <DGOING@atllp.com>; Mathu Rajan <mathu.rajan@vti-global.com>; Joseph J. Gribbin <JGribbin@Atllp.com>; Allison McFarland <AMcFarland@atllp.com>; David M. Magee <DMagee@atllp.com>; Isaac D. Stevens <IStevens@atllp.com>; Maxwell B. Feit <MFeit@atllp.com>; Chelsea Bray <CBray@Atllp.com>; stephen3d@mac.com <stephen3d@mac.com>; Bud Robertson <bud.robertson@vti-global.com>; Suby Joseph <suby.joseph@vti-global.com>; dan.rink@vti-global.com <dan.rink@vti-global.com>; raja.rajan@vti-global.com <raja.rajan@vti-global.com>; Jack McLaughlin <jmclaughlin@ferryjoseph.com>; Chris Ward <CWard@Polsinelli.com>; Margaret I. Butler <MButler@atllp.com>
**CC:** stephen blumenthal <stephen3d@mac.com>
**Subject:** RE: VTI Meeting Agenda Attorney Client Protected by Joint Defense Agreement(s) [IWOV-IDOCS.FID4245647]

I think we need to consider the restraining order we are requesting:

1. Parties covered –
    a. Stream and its current and former affiliates, their employees, officers, directors, consultants, etc
    b. Or potentially limited to the anyone from the above group that has or had access to the trade secrets;
2. Trade Secrets – list from Schedule A in April 9, 2019 term sheet and May 23, 2021 settlement agreement
3. Relief/Order –
    a. No further copying, transfer, use of any information, documents, source code that includes and information related to Trade Secrets except by Stream itself;
    b. Take all current copies of source code that include Trade Secrets into a software escrow (e.g. Iron Mountain - www.ironmountain.com) except for copies held by Stream itself; and
    c. Identify all people/entities that had access to Trade Secrets.

The point is Stream has a license.  Any employee/entity that is employed by or owned by Stream has a right to have access to Trade Secrets, those outside of Stream's umbrella do not.  Anyone taking action to take Trade Secrets licensed to Stream and transfer them out of Stream is committing civil and criminal trade secret misappropriation and interfering with the Stream/Rembrandt contract and we are asking for the order to prevent the harm or more harm from occurring.

I don't know if we need to notice anyone outside of Stream, but certainly all those involved with SeeCubic would be reasonable.

I think Shad is a unique category as he was in the mediation, initialed the list of Trade Secrets, and is actively the one trying to transfer the Trade Secrets.

The others would not really have much standing to enter the action.  Why would SeeCubic have standing to enter? It does not claim in its bankruptcy or chancery court filings to have taken over a license from Rembrandt and unless it wants to admit that it has or is intending to steal the Trade Secrets it seems that it has no connection to Rembrandt's settlement agreement with Stream.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Saturday, June 26, 2021 3:15 PM
**To:** John A. Sten <JSten@atllp.com>; David Going <DGOING@atllp.com>; 'Mathu Rajan' <mathu.rajan@vti-global.com>; Christopher Michaels <michaels@bpmlegal.com>; Joseph J. Gribbin <JGribbin@Atllp.com>; Allison McFarland <AMcFarland@atllp.com>; David M. Magee <DMagee@atllp.com>; Isaac D. Stevens <IStevens@atllp.com>; Maxwell B. Feit <MFeit@atllp.com>; Chelsea Bray <CBray@Atllp.com>; stephen3d@mac.com; 'Bud Robertson' <bud.robertson@vti-global.com>; 'Suby Joseph' <suby.joseph@vti-global.com>; 'dan.rink@vti-global.com' <dan.rink@vti-global.com>; 'raja.rajan@vti-global.com' <raja.rajan@vti-global.com>; 'Jack McLaughlin' <jmclaughlin@ferryjoseph.com>; 'Chris Ward' <CWard@Polsinelli.com>; Margaret I. Butler <MButler@atllp.com>
**Subject:** RE: VTI Meeting Agenda Attorney Client Protected by Joint Defense Agreement(s) [IWOV-IDOCS.FID4245647]

A few corrections/additions

********** **PRIVATE AND CONFIDENTIAL**********

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended**

# TRUSTEE 45

recipient, Armstrong Teasdale LLP or its subsidiaries. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.

Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.

---

**From:** Rafael X. Zahralddin-Aravena
**Sent:** Saturday, June 26, 2021 3:06 PM
**To:** John A. Sten <JSten@atllp.com>; David Going <DGOING@atllp.com>; Mathu Rajan <mathu.rajan@vti-global.com>; Christopher Michaels <michaels@bpmlegal.com>; Joseph J. Gribbin <JGribbin@Atllp.com>; Allison McFarland <AMcFarland@atllp.com>; David M. Magee <DMagee@atllp.com>; Isaac D. Stevens <IStevens@atllp.com>; Maxwell B. Feit <MFeit@atllp.com>; Chelsea Bray <CBray@Atllp.com>; stephen3d@mac.com; Bud Robertson <bud.robertson@vti-global.com>; Suby Joseph <suby.joseph@vti-global.com>; dan.rink@vti-global.com; 'raja.rajan@vti-global.com' <raja.rajan@vti-global.com>; Jack McLaughlin <jmclaughlin@ferryjoseph.com>; Chris Ward <CWard@Polsinelli.com>; Margaret I. Butler <MButler@atllp.com>
**Subject:** VTI Meeting Agenda Attorney Client Protected by Joint Defense Agreement(s) [IWOV-IDOCS.FID4245647]

Have this set for 12:30 but we can make it a little later if people want.

Primary purpose of the meeting is to solidify calendar/ dates/ and schedule and clarify assignments for the following:

1. Southern District of New York
   a. John Sten, David Magee, Allison McFarland, Joseph Gribbin, Chelsea Bray
   b. Chris Michaels and Steve Rosenthal (Chi Eng current lawyer in SDNY)
   c. Apprise Chris Ward at some point
   d. Trade secret
   i. Federal
   ii. State
   e. Violation of NDA
   f. Violation of Protective Order
   g. Violation of settlement agreement
   i. September 2019
   ii. May 2021
2. Bankruptcy Appeal (Chapter 7)
   a. Max Feit, Isaac Stevens, Chelsea Bray
   b. Chris Michaels and Steve Rosenthal (will need to catch up their counsel as he is travelling or invite?  Jack McLaughlin)
   c. Chris Ward (or do another meeting if he can't make it)
3. Bankruptcy Appeal (Chapter 11)
   a. Jonathan Stemerman, Sten, Going, Rafael, Isaac, Max
4. Chancery Court
   a. Chris Ward
   i. Confidentiality/protective order removed or severely curtailed
   ii. MSJ
   iii. Response/reply to Skadden
   b. Receivership issue
   c. Counsel for Mathu and Raja
   d. Fiduciary duty violations by the Resolution Committee **against the creditors (derivative standing)**
   i. Isaac and Rafael research on priority scheme in Delaware
5. Fraudulent Conveyance
   a. David Going, Rafael Zahralddin, Isaac Stevens, and Max Feit
   b. Chris Michaels, Jack McLaughlin, Reji Abraham, possibly DLA
   i. Send a joint defense agreement to DLA
   c. Other creditors
5. Cross Border Litigation
   a. Netherlands
   i. IP
   ii. Fraudulent conveyance
   b. China
   i. Landlord Replevin
   ii. Deal with manufacturer of equipment (Japanese company) buy claims
   c. Guernsey

    i.  Norwich Pharmacal against Hawk for IP and trade secret issues

        d.  Securities violations in each foreign jurisdiction by Alastair and others

6.  Securities Issues compliance (brief overview)

        a.  Margaret Butler

        b.  Chris Michaels

        c.  Isaac Stevens

    i.  Litigation finance research



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

# App. Ex. 35

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Wednesday, July 14, 2021 12:15 AM EDT
**To:** Mathu Rajan <mathu.rajan@vti-global.com>; Christopher Michaels <michaels@bpmlegal.com>; stephen3d@mac.com <stephen3d@mac.com>
**CC:** Suzy Williams-Umstead <swilliams@atllp.com>; John A. Sten <JSten@atllp.com>
**Subject:** FW: P175379 VTI and Rembrandt 3D Conflict Waivers [IWOV-IDOCS.FID4338143]
**Attachment(s):** "P175379 VTI_Rembrandt 3D Conflict Waiver v.2.DOCX","P175379 Rembrandt 3D _ VTI Conflict Waiverv. 2.DOCX"

Here are the proposed conflict waivers for our collective review.

I will get you some other documents tonight.  Suzy is helping so please let's keep her copied.



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read ourGlobal Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

**TRUSTEE 48**

# Document Break



July 1, 2021

Stephen Blumenthal
Rembrandt 3D Holdings Ltd.
128 Bull Hill Road
Newfield, NY 14867

**Re:        Consent and Waiver of Potential Conflicts of Interest**

Dear Mr. Blumenthal:

Rembrandt 3D Holdings LTD (the "Company") has asked us to represent it with respect to potential litigation related to your intellectual property rights (the "New Matter") and has entered into a joint defense agreement with Virtual Technology Innovations Inc. ("VTI"), a current firm client.  VTI has authorized us to disclose to the Company that this firm represents VTI with respect to acquiring technology and assets from the Stream TV bankruptcy.  Insofar as I can presently determine, the factual and legal issues likely to arise in the work that the Company has asked us to do appear to be unrelated to the work we are presently doing or appear likely to do for VTI or which is subject to a joint defense agreement entered into by the Company and VTI.

Under *the* rules of professional conduct, which apply to all lawyers, my firm and I may not be adverse to a current client, even on an unrelated matter, without the informed consent of each affected client.  This means that I must explain to both the Company and VTI the material risks and reasonably available alternatives of consenting and that I cannot proceed to represent the Company in the New Matter unless VTI and the Company consent.

In deciding whether to consent, the Company should consider how our representation of VTI as described above could or might affect the Company.  The proposed New Matter and the existing matters in which we represent VTI are wholly unrelated and will be handled by different lawyers within the firm or are directly aligned with the interests of both the Company and Rembrandt and subject to the Joint Defense Agreement or for which Rembrandt has separate conflicts counsel.  For these reasons, we do not believe that there is any material risk that our commitment and dedication to the Company's interests will be adversely affected, and we believe that we will be able to provide competent and diligent representation to the Company in the New Matter.  In that regard, we also agree that any privileged, sensitive, proprietary, or other confidential information of a nonpublic nature acquired by us as a result of our representation concerning the proposed New Matter will not

ARMSTRONG TEASDALE LLP     300 DELAWARE AVE., SUITE 210, WILMINGTON, DE 19801  **T**   302.824.7089   **F**   314.621.5065   **ArmstrongTeasdale.com**

Stephen Blumenthal
July 1, 2021
Page 2

be transmitted to our lawyers who may be involved in the representation of VTI unless such matters are governed by the Joint Defense Agreement.

There are some inherent risks in an undertaking whereby this Firm jointly represents each of you with respect to the New Matter.  As a reminder, either of you could choose to be represented by separate counsel in this matter.  However, there are considerations of cost as well as strategic advantages for each of you in joint representation.  It is our understanding, based on our conversations, that you have agreed on all material issues concerning this matter.  This Firm will only act to advise you with respect to the New Matter and assist you in preparing documents concerning the New Matter.

In addition, you agree that, despite your current consensus on all material issues, it is possible that disagreements and other differences may arise between you in the future.  In that event, we will request that you together resolve any such differences between yourselves without our involvement or assistance.  If your differences cannot be resolved and those differences result in a conflict of interest that would materially limit our ability to provide competent and diligent representation to each of you with respect to the New Matter, then we may withdraw from the representation of both of you in order to resolve the conflict of interest, and you agree not to contest any effort by this Firm to withdraw from our representation of you with respect to the New Matter.  You both acknowledge and agree, however, that you will each remain responsible for your share of the Firm's fees and expenses incurred to and including the date on which any notice of withdrawal is received by the Firm.

One of the necessary consequences of joint representation of multiple clients by a single lawyer or law firm is the sharing of confidential information concerning the subject matter of the joint representation.  You acknowledge and agree that communication between the Firm and either of you relating to this matter will be treated as confidential and will not be disclosed to any outside party without your informed consent or as otherwise permitted by the applicable rules of professional conduct or other law. You also acknowledge and agree that whatever relevant or material communications or information that we receive from any one of you concerning this matter will be shared with the other as we consider appropriate.

The most likely alternative to consenting to our representation of the Company in the proposed New Matter is that the Company will need to seek and engage new lawyers for that matter.

This is an important decision, and we suggest that the Company consider consulting independent counsel to assist it in deciding whether to consent.  There is no requirement that it do so, and whether such counsel is consulted is the Company's decision.

Please review this matter carefully.  If the Company has any questions that it would like me to answer prior to reaching a decision on this issue, please let me know.  If the Company is willing to consent after appropriate review, please sign the enclosed copy of this letter in the space provided and return it to me.

ARMSTRONG TEASDALE LLP

Stephen Blumenthal
July 1, 2021
Page 3

Sincerely,

Rafael X. Zahralddin-Aravena, Esq.

RXZ:swu

cc:    Thomas Weaver

Rembrandt 3D Holdings Ltd. understands the risks described and consents to the terms of representation set forth above:

**_Rembrandt 3D Holdings Ltd._**

By: _____

Title: _____

Date: _____

ARMSTRONG TEASDALE LLP

Document Break



July 1, 2021


Via Email

Suby Joseph
VTI-Global
1105 William Penn Drive
Bensalem, PA 19020


**Re:     Consent and Waiver of Potential Conflicts of Interest**

Dear Mr. Joseph:

Visual Technology Innovations, Inc. (the "Company"), a current firm client, and Rembrandt 3D Holdings LTD ("Rembrandt") have asked us to represent  Rembrandt 3Dwith respect to potential litigation related to  intellectual property rights including patents, trademarks, know-how, and trade secrets,  in which VTI has a strategic interest, including but not limited to  an acquisition interest or for which VTI is providing litigation finance (the "New Matter"). The Company has entered into a joint defense agreement with Rembrandt (the "Joint Defense Agreement").  Rembrandt has authorized us to disclose to the Company that this firm will represent Rembrandt with respect to potential litigation involving enforcement of intellectual property rights.  Insofar as I can presently determine, the factual and legal issues likely to arise in the work that the Company has asked us to do for it or on behalf of Rembrandt and the work for both clients appears to be unrelated to the work we are presently doing or appear likely to do for Rembrandt.

Under the rules of professional conduct, which apply to all lawyers, my firm and I may not be adverse to a current client, even on an unrelated matter, without the informed consent of each affected client.  This means that I must explain to both the Company and Rembrandt the material risks and reasonably available alternatives of consenting and that I cannot proceed to represent the Company in the New Matter unless Rembrandt and the Company consent.

In deciding whether to consent, the Company should consider how our representation of Rembrandt as described above could or might affect the Company.  The proposed New Matter and the existing matters in which we represent the Company are wholly unrelated and will be handled by different lawyers within the firm or are directly aligned with the interests of both the Company and Rembrandt and subject to the Joint Defense Agreement or for which

Suby Joseph
July 1, 2021
Page 2

Rembrandt has separate conflicts counsel .  For these reasons, we do not believe that there is any material risk that our commitment and dedication to the Company's interests will be adversely affected, and we believe that we will be able to provide competent and diligent representation to the Company in the New Matter.  In that regard, we also agree that any privileged, sensitive, proprietary, or other confidential information of a nonpublic nature acquired by us as a result of our representation concerning the proposed New Matter will not be transmitted to our lawyers who may be involved in the representation of Rembrandt unless such matters are governed by the Joint Defense Agreement.

There are some inherent risks in an undertaking whereby this Firm jointly represents each of you with respect to the New Matter.  As a reminder, either of you could choose to be represented by separate counsel in this matter.  However, there are considerations of cost as well as strategic advantages for each of you in joint representation.  It is our understanding, based on our conversations, that you have agreed on all material issues concerning this matter.  This Firm will only act to advise you with respect to the New Matter and assist you in preparing documents concerning the New Matter.

In addition, you agree that, despite your current consensus on all material issues, it is possible that disagreements and other differences may arise between you in the future.  In that event, we will request that you together resolve any such differences between yourselves without our involvement or assistance.  If your differences cannot be resolved and those differences result in a conflict of interest that would materially limit our ability to provide competent and diligent representation to each of you with respect to the New Matter, then we may withdraw from the representation of both of you in order to resolve the conflict of interest, and you agree not to contest any effort by this Firm to withdraw from our representation of you with respect to the New Matter.  You both acknowledge and agree, however, that you will each remain responsible for your share of the Firm's fees and expenses incurred to and including the date on which any notice of withdrawal is received by the Firm.

One of the necessary consequences of joint representation of multiple clients by a single lawyer or law firm is the sharing of confidential information concerning the subject matter of the joint representation.  You acknowledge and agree that communication between the Firm and either of you relating to this matter will be treated as confidential and will not be disclosed to any outside party without your informed consent or as otherwise permitted by the applicable rules of professional conduct or other law. You also acknowledge and agree that whatever relevant or material communications or information that we receive from any one of you concerning this matter will be shared with the other as we consider appropriate.

The most likely alternative to consenting to our representation of Rembrandt in the proposed New Matter is that Rembrandt would need to seek and engage new lawyers for that matter.

This is an important decision, and we suggest that the Company consider consulting independent counsel to assist it in deciding whether to consent.  There is no requirement that it do so, and whether such counsel is consulted is the Company's decision.

ARMSTRONG TEASDALE LLP

Suby Joseph
July 1, 2021
Page 3

Please review this matter carefully.  If the Company has any questions that it would like me to answer prior to reaching a decision on this issue, please let me know.  If the Company is willing to consent after appropriate review, please sign the enclosed copy of this letter in the space provided and return it to me.

Sincerely,

Rafael X. Zahralddin-Aravena, Esq.

RXZ:swu


cc:     Thomas Weaver



Visual Technology Innovations, Inc. understands the risks described and consents to the terms of representation set forth above:

  Visual Technology Innovations, Inc.


  By:   _____

  Title:   _____

  Date:   _____

ARMSTRONG TEASDALE LLP

# App. Ex. 36

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Wednesday, July 14, 2021 12:28 AM EDT
**To:** Mathu Rajan <mathu.rajan@vti-global.com>; Christopher Michaels <michaels@bpmlegal.com>; stephen3d@mac.com <stephen3d@mac.com>
**CC:** Suzy Williams-Umstead <swilliams@atllp.com>; John A. Sten <JSten@atllp.com>
**Subject:** Weaver Redline to P175379 Rembrandt 3D Engagement Letter copy v. 3.DOCX
**Attachment(s):** "Weaver Redline to P175379 Rembrandt 3D Engagement Letter copy v. 3.DOCX","P175379 Third Party Payor Agreement (002).DOCX"

Just copies for discussion.

I wanted to get some of these – I think this is all the documents (prior email with the engagement letter), but will discuss with you all tomorrow.

Margaret Butler will be with us tomorrow as well and we can discuss the other documents.



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.


********** **PRIVATE AND CONFIDENTIAL**\*\*\*\*\*\*\*\*\*\*

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

**TRUSTEE 49**

# Document Break



**Rafael X. Zahralddin-Aravena, Esq.**
rzahralddin@atllp.com

June 25, 2021

Stephen Blumenthal                    Suby Joseph
Rembrandt 3D Corp.                    VTI Global
128 Bull Hill Road                    1105 William Penn Drive
Newfield, NY 14867                    Bensalem, PA 19020

**Re:        Litigation Protecting Creditor's Rights**

Dear Mr. Blumenthal and Mr. Joseph:

This letter confirms my firm's engagement to represent Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp. in the above-referenced action(s), and VTI-Global's agreement to pay all fees and expenses involved with our representation of Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp.  By separate writing Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp. have agreed to the terms of my firm's engagement to represent them in the above-referenced mattes, and their understanding that VTI Global will pay my firm's invoices related to services under such engagement. They have also confirmed, by separate correspondence, their understanding that in the event that VTI Global fails to pay all or any part of any invoice issued in connection with the subject representation, they will satisfy such invoice or amount owed.

> **Commented [Rafael X. Zahralddin-Aravena1]:** To be discussed.  Our retainer amount will need to be adjusted depending on the result of such discussions.

By signing below, VTI Global agrees to pay all invoices issued by my firm for legal fees and expenses related to the subject representation of Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp. The Firm is willing to accept such payment on the condition that both VTI Global and Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp. waive any conflict or claim against my firm related to the payment of Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp.'s legal fees and costs by VTI Global as a third-party payor.  By signing below, VTI Global waives any conflict or claim against Armstrong Teasdale related to these arrangements, and acknowledges that my firm does not represent them in any capacity in this matter, and that our only client in this matter will be Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp.  We know that you both have a good relationship with one another, however, in matters such as with intellectual property matters and creditor's rights matters, including but not limited to a fraudulent conveyance action, could arise where Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp.'s interests differ from VTI Global's.  In any such circumstances, we will be representing only Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp.'s interests, and by signing below VTI Global acknowledges that they understand that to be the case.

> **Commented [Rafael X. Zahralddin-Aravena2]:** This should also be discussed – these are working documents.

> **Commented [Rafael X. Zahralddin-Aravena3]:** To be discussed.

Stephen Blumenthal
June 25, 2021
Page 2

We will send Rembrandt 3D Holdings Ltd. and Rembrandt 3D Corp. a copy of our invoices, as well as a copy of the same for payment to VTI Global.

Let me assure you that we have not sent this letter because we anticipate any hostility between the two of you, but it is best, however, to make sure there is no misunderstanding about relationships between our firm and those with whom we have dealings in the such matters and under such arrangements.

Sincerely,

Rafael X. Zahralddin-Aravena, Esq.

RXZ:swu

**AGREED TO AND ACCEPTED:**

Rembrandt 3D Corp. and Rembrandt 3D Corp.

By: _____          Title: _____

Date:_____

**VTI Global, as third-party payor**

By: _____          Title: _____

Date: _____

ARMSTRONG TEASDALE LLP

Document Break

Rafael X. Zahralddin-Aravena, Esq.

rzahralddin@atllp.com

June 21, 2021

Via email:
Stephen Blumenthal
Rembrandt 3D Holdings Ltd.
Rembrandt 3D Corp.
128 Bull Hill Road
Newfield, NY 14867

**Re:      Enforcement of trade secret and intellectual property rights**

Dear Mr. Blumenthal:

Thank you for selecting this firm to represent Rembrandt 3D Holdings Ltd and Rembrandt 3D Corp. in connection with potential litigation related to your intellectual property rights.  This letter will confirm our understanding with you regarding our engagement and describe the basis on which our firm will provide legal services to you.

**Client.**  As we have discussed, our client in this matter will be Rembrandt 3D Holdings Ltd and Rembrandt 3D Corp.  (collectively the "Company").

**Scope of Engagement.**  We have been engaged to represent the Company solely in connection with enforcing trade secret and intellectual property rights.  We have agreed that our engagement is limited to performance of services related to this action.  Because we are not the Company's general counsel, our acceptance of this engagement does not involve an undertaking to represent the Company's interests in any other matter.  In particular, our present engagement does not include responsibility for review of the Company's insurance policies to determine the possibility of coverage for the claim asserted in this matter, for notification of the Company's insurance carriers about the matter, or for advice to the Company about the Company's disclosure obligations concerning the matter under the federal securities laws or any other applicable law.  We may agree with the Company to limit or expand the scope of our representation from time to time, provided that any such change is confirmed in writing.

**Fees.**  While we anticipate most of our work for the Company will be performed by me and John Sten, we may utilize other attorneys of our firm as appropriate.  We recognize that cost efficiency is very important to the Company, and we will make certain that our work to the Company is completed in a cost-effective manner.

Stephen Blumenthal
June 21, 2021
Page 2

The principal basis for computing our fees will be the amount of time spent on the matter by various lawyers and legal assistants multiplied by their individual hourly billing rates. Our billing rates currently range from $250 per hour for new associates to $925 per hour for senior partners. We anticipate most of our work for you will be performed by myself, John Sten, David Magee and Joseph Gribbin, although we may use other attorneys in our firm as appropriate.  My time is billed at $800 per hour and John Sten is billed at $825.  David Magee is billed at $550 and Joseph Gribbin is billed at $475.  Associate Max Feit is billed at $400 per hour and Law clerk Isaac Stevens is billed at $375 per hour.  Time devoted by legal assistants is charged at billing rates ranging from $125 to $350 per hour.  These billing rates are subject to change from time to time, typically, as of January 1 of each calendar year.

Other factors also may be taken into consideration in determining our fees, including the novelty and difficulty of the questions involved; the skill requisite to perform the services properly; the experience, reputation, and ability of those performing the services; the time limitations imposed by the Company or the circumstances; the amount involved; and the results obtained.

**Costs.**  We will include on our invoices separate charges for performing services such as photocopying, messenger and delivery service, computerized research, travel, fax charges, electronic delivery of court documents and search and filing fees.  Such expenses may also include deposition costs, process servers, court reporters, and witness fees.  The Company also agrees to pay the charges related to copying or digital reproduction of documents for retention in our files.  The Company authorizes us to retain any investigators, consultants, or experts necessary in our judgment to represent the Company's interests in the litigation.  Their fees and expenses generally will not be paid by us, but will be billed directly to you.  Additionally, for efficiency, we may use the services of an affiliate of our firm, Lawgical Choice, to perform technical support such as document scanning, bulk printing, electronic file processing, electronic closing books, CD and DVD copying, document coding, electronic bates numbering, trial support, conversion of electronic files, or production of electronic files and the Company agrees to pay the charges for such services.  You agree to indemnify Armstrong Teasdale for any claim made against us from an outside vendor for services rendered in connection with our representation of you.

**Third Party Payment.**  We understand that Visual Technology Innovations, Inc. (the "Payor") will be the party responsible for the payment of the fees and costs billed in connection with this representation and that you have agreed to such payment. You hereby consent to this arrangement and authorize us to provide all necessary documentation to the Payor, including a copy of this fee agreement as well as copies of the monthly billing invoices for legal services performed in connection with this matter.  However, please note that the payment of legal fees by any third party does NOT create an attorney-client relationship between the attorney and the third party.  We agree to, and shall, render completely independent legal advice to you without any consideration of, or regard for, the interests of any third party associated with this matter.  You also understand that the Payor may withdraw from this reimbursement/indemnification arrangement at any time that it deems necessary or appropriate. In that event, you shall become personally responsible for the payment of your legal fees.

**Retainer.**  Our representation of you will not commence until we receive from VTI good funds in the amount of $500,000 to serve as security for our final fees and expenses.  These funds will

ARMSTRONG TEASDALE LLP

Stephen Blumenthal
June 21, 2021
Page 3

remain in our client trust account for the duration of our representation, and any remaining balance will be returned to VTI upon termination of our representation. **We will provide a report weekly of fees and expenses incurred and the retainer is to be replenished within 2 business days of receipt of the report.** We reserve the right to use any part of said funds to satisfy a delinquent payment under our retainer agreement, and to discontinue our representation until the Company forwards funds to restore the full security retainer. Applicable court rules may require interest earned on client trust accounts to be paid to a charitable foundation.

**Estimates.** As we have discussed, the fees and costs relating to this litigation are not predictable. Accordingly, we have made no commitment to the Company concerning the maximum fees and costs that will be necessary to resolve or complete this matter. Any estimate of fees and costs that we may have discussed represents only an estimate of such fees and costs. It is also expressly understood that the Company's obligation to pay the firm's fees and costs is in no way contingent upon the ultimate outcome of the matter.

**Payment of Invoices.** Invoices normally will be rendered on a monthly basis. Payment is due promptly upon receipt of our invoice. If an invoice remains unpaid within sixty days of its date, we reserve the right to add a late charge of 1% per month on the unpaid balance, commencing from the date of the invoice and continuing until paid. If the delinquency continues and you do not arrange satisfactory payment terms for outstanding invoices and the payment of future fees and expenses, we may suspend performing services for you and pursue collection of your account. You also agree to pay all costs of collection of delinquent invoices, including attorneys' fees and expenses, regardless of whether those fees are attributable to Armstrong Teasdale attorneys or outside attorneys engaged for the purpose of collection.

**Trial Advance.** Once a trial or hearing date is set, we will require the Company to pay all amounts then owing to us and to deposit with us the fees we estimate will be incurred in preparing for and completing the trial or arbitration, as well as jury fees and arbitration fees likely to be assessed. If the Company fails to timely pay any additional deposit requested, we will have the right to withdraw from the representation and to cease performing further work. If permission of the court or arbitration panel is required, the Company agrees not to oppose any motion to withdraw.

**Client Responsibilities.** The Company agrees to pay our invoices for services and expenses as provided below. In addition, the Company agrees to be candid and cooperative with us and to keep us informed with complete and accurate factual information, documents and other communications relevant to the subject matter of our representation or otherwise reasonably requested by us. In particular, the Company agrees to make Company officers and employees available to attend trial, hearings, depositions and discovery conferences, and other proceedings, and to commit the appropriate personnel and sufficient resources to meet the Company's discovery obligations.

Because it is important that we be able to contact the Company at all times to consult with the Company regarding the Company's representation, the Company agrees to inform us, in writing, of any changes in the name, address, telephone number, contact person, e-mail address, state of incorporation, or other relevant changes regarding the Company or the Company's business.

ARMSTRONG TEASDALE LLP

Stephen Blumenthal
June 21, 2021
Page 4

Whenever we need the Company's instructions or authorization in order to proceed with legal work on the Company's behalf, we will contact the Company at the latest business address we have received from the Company.  If the Company affiliates with, acquires, are acquired by, or merge with another company, the Company agrees to provide us with sufficient notice to permit us to withdraw as the Company's lawyer if we determine that such affiliation, acquisition, or merger creates a conflict of interest between any of our clients and the other party to such affiliation, acquisition or merger, or if we determine that it is not in the best interests of the firm to represent the new entity.

**Advice about Possible Outcomes.**  Either at the commencement or during the course of our representation, we may express opinions or beliefs concerning the litigation or various courses of action and the results that might be anticipated.  Any such statement made by any lawyer of our firm is intended to be an expression of opinion only, based on information available to us at the time, and should not be construed by the Company as a promise or guarantee.

**Waiver of Conflicts.**  As you are aware, this firm is counsel to Visual Technology Innovations, Inc. ("VTI"), which may give rise to potential conflicts of interest.  Company has asked us to represent it with respect to enforcing trade secret and intellectual property rights under a joint defense agreement involving VTI.  At this time, the enforcement will not include assisting with any adversarial proceedings including but not limited to litigation or filing claims against VTI.  If the Company asks us to assert any claims against VTI, we could not represent the Company in those efforts without obtaining a conflict waiver from VTI.  Insofar as I can presently determine, the factual and legal issues likely to arise in the work that the Company has asked us to do appear to be unrelated to the work we are presently doing or appear likely to do for VTI.

Under the rules of professional conduct, which apply to all lawyers, my firm and I may not be adverse to a current client, even on an unrelated matter, without the informed consent of each affected client.  This means that I must explain to both the Company and VTI the material risks and reasonably available alternatives of consenting and that I cannot proceed to represent the Company unless Company consents.  Therefore, by signing this engagement letter, you consent to the scope of work described above.  If litigation is required, a formal waiver of consent will be required from both parties or in the alternative, the Company will need to seek and engage new lawyers for that matter

**Consent to Future Conflicts.**  Our firm is a relatively large law firm and represents many other companies and individuals.  Thus, during the time we are representing you, we may also represent other present or future clients who may be direct competitors of yours, or otherwise may have business interests that are contrary to your interests and such clients may seek to engage this firm in connection with an actual or potential transaction, or pending or potential litigation, or other dispute resolution proceeding in which such client's interests are or potentially may become adverse to your interests

Based on the foregoing, you agree that our representation of you in this matter will not disqualify our firm from opposing you in other matters, including litigation, that are unrelated to the subject matter of this representation.  We agree, however, not to use any proprietary or other confidential information of a nonpublic nature concerning you acquired by us as a result of our representation of you to your material disadvantage in connection with any litigation or other

ARMSTRONG TEASDALE LLP

Stephen Blumenthal
June 21, 2021
Page 5

matter in which we are opposed to you.  If necessary, we will erect an ethical screen between lawyers working on matters for you and those who would be adverse to you in a future matter.

**Termination of Engagement.**  The Company may at any time terminate our services and representation upon written notice to the firm. Such termination shall not, however, relieve the Company of the obligation to pay for all services already rendered, including work in progress and remaining incomplete at the time of termination, and to pay for all expenses incurred on behalf of the Company through the date of termination.

We reserve the right to withdraw from our representation as required or permitted by the applicable rules of professional conduct upon written notice to the Company.  In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect the Company's interests in the above litigation, and the Company agrees to take all steps necessary to free us of any obligation to perform further, including the execution of any documents necessary to perfect our withdrawal.  We will be entitled to be paid for all services rendered and costs or expenses incurred on behalf of the Company through the date of withdrawal.  If permission for withdrawal is required by a court or arbitration panel, we will promptly request such permission, and the Company agrees not to oppose our request.

**Disputes**.  We look forward to a mutually productive relationship with you.  If, however, you become dissatisfied for any reason with the fees charged or the services we have performed, we encourage you to bring that to our attention immediately.  In particular, we expect you to raise any disagreements about the amount of our fees or the services for which you have been billed within the first thirty days after a bill has been sent to you.  We believe that most disputes between attorney and client can be resolved by good faith discussions between the parties and we therefore encourage you to bring such disputes and concerns to our attention as promptly as possible.

**Conclusion of Representation; Retention and Disposition of Documents.**  Unless previously terminated, our representation of the Company in this matter will terminate upon our sending the Company our final invoice for services rendered in the matter.  At the Company's request, the Company's papers and property will be returned to the Company upon receipt of payment for outstanding fees and costs.  Our own files pertaining to the matter will be retained by the firm.  These firm files include, for example, firm administrative records, time and expense reports, personnel and staffing materials, and credit and accounting records; and internal lawyers work product such as drafts, notes, internal memoranda, and legal and factual research, including investigative reports, prepared by or for the internal use of lawyers.  All such documents retained by the firm will be transferred to the person responsible for administering our records retention program.  For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such documents or other materials retained by us within a reasonable time after the termination of the engagement, and the Company agrees that unless the Company has otherwise notified us in writing, we will have the right to dispose of files relating to the Company's matter without notice after the matter has been concluded for five years.

**Post-Engagement Matters.**  The Company is engaging the firm to provide legal services in connection with specific litigation.  After the litigation concludes, changes may occur in the

ARMSTRONG TEASDALE LLP

Stephen Blumenthal
June 21, 2021
Page 6

applicable laws or regulations that could have an impact upon the Company's future rights and liabilities.  Unless the Company engages us after completion of the litigation to provide additional advice on issues arising from the litigation, the firm has no continuing obligation to advise the Company with respect to future legal developments.

Please review this letter carefully.  If it meets with the Company's approval, sign the enclosed copy of the letter in the space provided below and return it to me **with retainer** so that we may begin work.  However, please note that your instructing us or continuing to instruct us on this matter will constitute your full acceptance of the terms set out above.  Please call me with any questions.

Sincerely,

Rafael X. Zahralddin-Aravena, Esq.

RXZ:swu

AGREED TO AND ACCEPTED:

Rembrandt 3D Holdings Ltd and Rembrandt 3D Corp.

By: _____

Title: _____

Date: _____

ARMSTRONG TEASDALE LLP

# App. Ex. 37

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Monday, January 03, 2022 2:42 PM EST
**To:** stephen3d@mac.com <stephen3d@mac.com>
**CC:** ntwallace@aol.com <ntwallace@aol.com>; Christopher Michaels <michaels@bpmlegal.com>
**Subject:** RE: Call [IWOV-IDOCS.FID4245647]

I am – but nothing stops those of you that are not lawyers from contacting Mathu directly and copying me.

I am also starting to feel better and catch up on things, but have sent notes to Mathu.

 Armstrong
Teasdale

Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

---

**From:** stephen blumenthal <stephen3d@mac.com>
**Sent:** Monday, January 3, 2022 12:14 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** Neil Wallace <ntwallace@aol.com>; Christopher A. Michaels <michaels@bpmlegal.com>
**Subject:** Re: Call

Hi Rafael, Sorry to hear that you got it.  Even mildly it is a nasty week.

 We assumed that your representation of VTI meant that all contacts had to go through you. Are you still the VTI lawyer?
Hope your feeling better,
Best,
Stephen

> On Jan 3, 2022, at 11:52 AM, Rafael X. Zahralddin-Aravena<RZahralddin@atllp.com> wrote:
>
> I am not an officer or director or even an employee of VTI.
>
> I can pass along the emails.
>
> Right now I am recovering from COVID.
>
> Rafael
>
> Rafael X. Zahralddin-Aravena
> Partner
> Armstrong Teasdale, LLP
> Cell 302.545.2888

********** **PRIVATE AND CONFIDENTIAL** **********

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

---

**From:** ntwallace@aol.com <ntwallace@aol.com>
**Sent:** Monday, January 3, 2022 11:48:58 AM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** stephen3d@mac.com <stephen3d@mac.com>;michaels@bpmlegal.com <michaels@bpmlegal.com>
**Subject:** Call

<span style="background-color:red;color:white;">**CAUTION:**</span> <span style="background-color:gray;color:white;">**EXTERNAL EMAIL**</span>

Rafael--I trust you had a great holiday and are now back in the saddle. It is of critical importance we have a call with Matthu and yourself to verify what the investment status is. Please set it up and let me know. Steve, Chris and I will make ourselves available.  Neil

# App. Ex. 38

Wyoming Secretary of State
Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only
**WY Secretary of State**
**FILED: Apr  4 2022 10:33AM**
**Original ID: 2022-001099045**

# Profit Corporation

# Articles of Incorporation

**I.     The name of the profit corporation is:**
Visual Semiconductor, Inc.

**II.    The name and physical address of the registered agent of the profit corporation is:**
Registered Agents Inc
30 N Gould St Ste R
Sheridan, WY 82801

**III.   The mailing address of the profit corporation is:**
30 N Gould St
Ste R
Sheridan, WY 82801

**IV.    The principal office address of the profit corporation is:**
30 N Gould St
Ste R
Sheridan, WY 82801

**V.     The number, par value, and class of shares the profit corporation will have the authority to issue are:**

| | | | |
|---|---|---|---|
| Number of Common Shares: | 1,200,000,000 | Common Par Value: | $0.0001 |
| Number of Preferred Shares: | 0 | Preferred Par Value: | $0.0000 |

**VI.    The name and address of each incorporator is as follows:**
Registered Agents Inc.
30 N Gould St Ste R, Sheridan, WY 82801

| | | | |
|---|---|---|---|
| **Signature:** | *Riley Park* | Date: | **04/04/2022** |
| Print Name: | **Riley Park** | | |
| Title: | **Authorized individual** | | |
| Email: | **reports@registeredagentsinc.com** | | |
| Daytime Phone #: | **(307) 200-2803** | | |

Page 1 of 4

**TRUSTEE 139**

**Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Business Corporation Act, (W.S. 17-16-101 through 17-16-1804) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Incorporation that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

☑ I affirm, under penalty of perjury, that I have received actual, express permission from each of the following incorporators to add them to this business filing: Registered Agents Inc.

☑ I consent on behalf of the business entity to accept electronic service of process at the email address provided with Article IV, Principal Office Address, under the circumstances specified in W.S. 17-28-104(e).

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

---

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

---

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**   ☐ An Individual      ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator, organizer, or partner. The following individual is signing on behalf of all Organizers, Incorporators, or Partners.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Incorporation.**

Signature:   *Riley Park*                                    Date:  **04/04/2022**

Print Name:   **Riley Park**

Title:   **Authorized individual**

Email:   **reports@registeredagentsinc.com**

Daytime Phone #:   **(307) 200-2803**

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

## Consent to Appointment by Registered Agent

**Registered Agents Inc**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **Visual Semiconductor, Inc.** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

| | | |
|---|---|---|
| **Signature:** | *Riley Park* | Date: **04/04/2022** |
| Print Name: | **Riley Park** | |
| Title: | **Authorized individual** | |
| Email: | **reports@registeredagentsinc.com** | |
| Daytime Phone #: | **(307) 200-2803** | |

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF INCORPORATION

**Visual Semiconductor, Inc.**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **4th** day of **April**, **2022** at **10:33 AM.**

Remainder intentionally left blank.



Filed Date: 04/04/2022

Secretary of State

Filed Online By:

Riley Park

on 04/04/2022

# App. Ex. 39

**Wyoming Secretary of State**
Herschler Building East, Suite 101
122 W 25th Street
Cheyenne, WY 82002-0020
Ph. 307.777.7311
Email: Business@wyo.gov

WY Secretary of State
FILED: 12/13/2022 02:15 PM
Original ID: 2022-001099045
Amendment ID: 2022-003953294

# Profit Corporation
# Articles of Amendment

**1. Corporation name:**
*(Name must match exactly to the Secretary of State's records.)*

Visual Semiconductor, Inc.

**2. Article number(s)**   III, IV, V and VI   **is amended as follows:**
   *\*See checklist below for article number information.*

There are too many changes to list on this form.
Please see attached "Third Amended and Restated Articles of Incorporation" dated August 15, 2022

**3.** If the amendment provides for an exchange, reclassification, or cancellation of issued shares, provisions for implementing the amendment if not contained in the amendment itself which may be made upon facts objectively ascertainable outside the articles of amendment.

**4. The amendment was adopted on**   11/30/2022
   *(Date – mm/dd/yyyy)*


RECEIVED
DEC 5 2022
WYOMING
SECRETARY OF STATE

P-Amendment – Revised June 2021

**TRUSTEE 140**

5. Approval of the amendment: *(Please check __only one__ appropriate field to indicate the party approving the amendment.)*

☐ **Shares were *not* issued** and the board of directors or incorporators have adopted the amendment.

## OR

☐ **Shares were issued** and the board of directors have adopted the amendment *without shareholder approval*, in compliance with W.S. 17-16-1005.

## OR

☑ **Shares were issued** and the board of directors have adopted the amendment *with shareholder approval*, in compliance with W.S. 17-16-1003.

Signature: _Mathu Rajan_    Date: 12/01/2022

*(May be executed by Chairman of Board, President or another of its officers.)*    *(mm/dd/yyyy)*

Print Name: Mathu Rajan    Contact Person: Bud Robertson

Title: President    Daytime Phone Number: 818-943-0616

Email: bud.robertson@visualsemi.com

*(An email address is required. Email(s) provided will receive important reminders, notices and filing evidence.)*

---

Checklist
☐ *Filing Fee: $60.00* Make check or money order payable to Wyoming Secretary of State.
☐ **Processing time is up to 15 business days** following the date of receipt in our office.
☐ *Refer to original articles of incorporation to determine the specific article number being amended or use the next number in sequence if you are adding an article. *Article number(s) is not the same as the filing ID number.*
☐ Please mail with payment to the address at the top of this form. **This form cannot be accepted via email.**
☐ Please review the form prior to submission. **The Secretary of State's Office is unable to process incomplete forms.**

---

P-Amendment – Revised June 2021

# VISUAL SEMICONDUCTOR, INC.

## THIRD AMENDED AND RESTATED
## ARTICLES OF INCORPORATION

### August 15, 2022

### I.

The name of the corporation is Visual Semiconductor, Inc. (the "*Company*").

### II.

The Company's registered office in the State of Wyoming is located at 30 N. Gould Street, Suite R, Sheridan, WY 82801. The registered agent in charge thereof is Registered Agents, Inc.

### III.

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the laws of the State of Wyoming.

### IV.

**A.**     The total number of shares of stock of all classes which the Company has the authority to issue is 2,500,000,000 shares of capital stock, par value $0.0001 per share, consisting of: 2,000,000,000 shares of Class A Common Stock ("*Class A Common Stock*"), 400,000,000 shares of Class B Voting Stock ("*Class B Voting Stock*"), 50,000,000 shares of Class C Non-Voting Stock ("*Class C Non-Voting Stock*"), and 50,000,000 shares of Class D Non-Voting Non-Dividend Stock ("*Class D Non-Voting Non-Dividend Stock*"). Classes A, C, and D stock may be certificated in digital or physical form as determined by the Company. Class B Voting Stock shall be uncertificated unless otherwise determined by the Company, with the record of holders thereof to be kept solely by the Company and/or its transfer agent.

**B.**     For every five (5) shares of Class A Common Stock issued by the Company, the Company shall issue for no consideration one (1) share of Class B Voting Stock to the Company Founder, Mathu Rajan ("*Founder*"), or Founder's assigns. The ratio of Class A Common Stock to Class B Voting Stock shall remain unchanged regardless of how many shares of Class A Common Stock are issued or authorized.

**C.**     Prior to the filing of these Third Amended and Restated Articles of Incorporation (these "*Third Restated Articles of Incorporation*"), all previously issued and outstanding shares of the Company's Common Stock had a par value $0.0001 per share (the "*Prior Common Stock*"). All designations, rights, preferences, privileges, and restrictions, if any, of the Prior Common Stock are hereby eliminated.

**D.**     Irrespective of any contrary provisions contained in Wyoming Law, the number of authorized shares of Class A Common Stock, Class B Voting Stock, Class C Non-Voting Stock, or Class D Non-Voting Non-Dividend Stock may be increased or decreased (but not below the number of shares of such stock then outstanding) by the affirmative vote of the holders of a majority of the stock of the Company entitled to vote (voting together as a single class on an as-converted basis).

E.      The rights, preferences, privileges, restrictions and other matters relating to the four classes of stock are as follows:

## 1.      DIVIDEND AND DISTRIBUTION RIGHTS.

a)  Holders of Class A Common Stock and Class C Non-Voting Stock may be entitled to dividends from time to time as determined by the Board of Directors. Such distributions, if any, shall be distributed ratably to all holders of the Class A Common Stock and Class C Non-Voting Stock combined as a single group.

b)  Whenever a dividend provided for in this Section 1 shall be payable in property other than cash, the value of such dividend shall be the fair market value of such distribution as determined in good faith by the Board.

c)  Class B Voting Stock is a special class of stock that entitles the holders thereof to the voting rights set forth in these Third Amended and Restated Articles of Incorporation but does not entitle the holders thereof to any economic rights in the Company, including the right to share in profits of the Company or the distribution of the Company's assets upon liquidation and dissolution. Accordingly, the holders of Class B Voting Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock, and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class B Voting Stock.

d)  Class D Non-Voting Non-Dividend Stock is a special class of stock that does not entitle the holders thereof to share in profits of the Company. Accordingly, the holders of Class D Non-Voting Non-Dividend Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock other than through a distribution related to the Company's liquidation or dissolution, and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class D Non-Voting Non-Dividend Stock. Class D Non-Voting Non-Dividend stockholders shall, however, be entitled to economic rights in the distribution of the Company's assets upon liquidation and dissolution. Class D Non-Voting Non-Dividend stockholders shall also have the right to sell their Class D shares, whether publicly traded or not.

## 2.      VOTING RIGHTS.

a) **Rights of Class A Common Stock.** Each holder of shares of Class A Common Stock shall be entitled to one (1) vote per share of Class A Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

b) **Rights of Class B Voting Stock.** Each holder of shares of Class B Voting Stock shall be entitled to ten (10) votes per share of Class B Voting Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

c) **Rights of Class C Non-Voting Stock and Class D Non-Voting Non-Dividend Stock.** No holder of shares of Class C Non-Voting Stock or Class D Non-Voting Non-Dividend Stock shall be entitled to any votes per share thereof but shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**d) General Rights of Voting Stock.** Except as otherwise expressly provided by these Third Amended and Restated Articles of Incorporation, such as the Class B voting requirement described in Sections 2(e) and 5(d) below, or as provided by law, the holders of shares of Class A Common Stock and Class B Voting Stock shall (a) at all times vote together as a single class on all matters (including the election of Directors) submitted to a vote or for the consent (if action by written consent of the stockholders is permitted at such time under these Third Amended and Restated Articles of Incorporation) of the stockholders of the Company, and (b) be entitled to vote upon such matters and in such manner as may be provided by applicable law. There shall be no cumulative voting.

**e) Separate Vote of Class B Voting Stock.** For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummate an Acquisition or Asset Transfer as defined in Section 4(b) below. For any issue requiring a separate vote by the holders of Class B Voting Stock as described herein, no vote by the holders of Class A Common Stock shall be required.

3.      **LIQUIDATION RIGHTS.**

**a) Class A Common Stock, Class C Non-Voting Stock, and Class D Non-Voting Non-Dividend Stock.** Upon any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary (a "*Liquidation Event*"), the assets of the Company legally available for distribution in such Liquidation Event (or the consideration received in such transaction), if any, shall be distributed ratably to the holders of Class A Common Stock, Class C Non-Voting Stock, and Class D Non-Voting Non-Dividend Stock combined as a single group.

**b) No Liquidation Right for Class B Voting Stock.** The holders of Class B Voting Stock shall not be entitled to share in any payment or distribution of Company assets, whether in cash or property, upon a Liquidation Event or Deemed Liquidation Event, and the Company shall not make any provision therefor.

4.      **ASSET TRANSFER OR ACQUISITION RIGHTS.**

**a)** An Acquisition or Asset Transfer (each as hereinafter defined) shall be deemed to be a liquidation of the Company (a "*Deemed Liquidation*"). The Company shall not have the power to effect any transaction constituting a Deemed Liquidation unless the definitive documents effecting such Deemed Liquidation provide that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with Section 3(a) above. The amount deemed paid or distributed to holders of capital stock of the Company upon any Deemed Liquidation shall be determined in accordance with Section 4(c) below.

**b)** For the purposes of this Article IV: (i) "*Acquisition*" shall mean (A) any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such

consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party and in which in excess of fifty percent (50%) of the Company's voting power is transferred; provided that an Acquisition shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; and (ii) "*Asset Transfer*" shall mean a private foreclosure, settlement, sale, lease or any disposition of all or substantially all of the assets or intellectual property of the Company under any circumstances or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company.

c)   In any Acquisition or Asset Transfer, if the consideration to be received is securities of a corporation or other property other than cash, its value will be deemed its fair market value as determined in good faith by the Board, on the date such determination is made; provided, however, that any publicly-traded securities to be distributed to stockholders will be valued as follows:

(i)   Securities not subject to investment letter or other similar restrictions on free marketability:

(A)   If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30)-day period ending three (3) calendar days prior to the closing; and

(B)   If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30)-day period ending three (3) calendar days prior to the closing.

(ii)   The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Sections 4(c)(i)(A) and (B) to reflect the approximate fair market value thereof, as determined in good faith by the Board.

(d)   Notwithstanding anything to the contrary in this Section 4, if the definitive transaction documents for an Acquisition or Asset Transfer provide for a different method of valuation, the method of valuation set forth in such documents shall control.

(e)   **Allocation of Escrow.**   In the event of a Deemed Liquidation, if any portion of the consideration payable to the stockholders of the Company is placed into escrow or is payable to the stockholders of the Company subject to contingencies, the definitive acquisition agreement relating thereto shall provide that (i) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the "*Initial Consideration*") shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above as if the Initial Consideration were the only consideration payable in connection with such Deemed

Liquidation and (ii) any additional consideration which becomes payable to the stockholders of the Company upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above after taking into account the previous payment of the Initial Consideration as part of the same transaction.

## 5.    RESTRICTIONS ON TRANSFER AND SALE.

(a) **Defined Terms.** As used in this Section 5, the following terms shall have the following meanings:

(i) "*Founder*" shall mean Mathu Rajan. Founder shall be entitled to receive Class B Voting Stock as specified in Section IV (B) above.

(ii) "*Class B Stockholder*" Other than the Founder, there are no registered holders of shares of Class B Voting Stock as of the date of filing these Third Amended and Restated Articles of Incorporation (the "*Effective Time*").

(iii) "*Permitted Entity*" shall mean, with respect to any individual Class B Stockholder, any trust, corporation, partnership, or limited liability company specified in Section 5(c)(i) established by or for such individual Class B Stockholder, so long as such entity meets the requirements of the exception set forth in Section 5(c)(ii) applicable to such entity.

(iv) "*Transfer*" of a share of Class B Voting Stock shall mean any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law; provided, however, that granting of a proxy to officers or directors of the Company at the request of the Board of Directors of the Company in connection with actions to be taken at an annual or special meeting of stockholders shall not be considered a Transfer.

(v) "*Voting Control*" with respect to a share of Class B Voting Stock shall mean the power (whether exclusive or shared) to vote or direct the voting of such share of Class B Voting Stock.

(b) **General Restrictions on Transfer.** There are no restrictions on transfer of Class A Common Stock, Class C Non-Voting Stock, or Class D Non-Voting Non-Dividend Stock. Shares of Class B Voting Stock may not be Transferred, except as provided in this Section 5, and any attempted Transfer in violation of these Third Amended and Restated Articles of Incorporation shall be null and void and not recognized for any purpose.

(c) **Permitted Transfers.** Notwithstanding the general restriction on Transfer specified in Section 5(b), shares of Class B Voting Stock may be Transferred as follows:

(i) by a Class B Stockholder who is a natural person to any of the following Permitted Entities, and from any of the following Permitted Entities back to such Class B Stockholder and /or any other Permitted Entity established by or for such Class B Stockholder:

(A) a trust for the benefit of such Class B Stockholder and for the benefit of no other person, provided such Transfer does not involve any payment of cash,

Visual Semiconductor, Inc – Third Amended and Restated Articles of Incorporation 20220815                    Page 5

securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

**(B)** a trust for the benefit of persons other than the Class B Stockholder so long as the Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such trust, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

**(C)** a corporation in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns shares with sufficient Voting Control in the corporation, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such corporation;

**(D)** a partnership in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns partnership interests with sufficient Voting Control in the partnership, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such partnership;

**(E)** a limited liability company in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns membership interests with sufficient Voting Control in the limited liability company, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such limited liability company.

**(ii)** by a Class B Stockholder that is a partnership, or a nominee for a partnership, which partnership beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a partner of such partnership pro rata in accordance with their ownership interests in the partnership, and any further Transfer(s) by any such partner that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

**(iii)** by a Class B Stockholder that is a limited liability company, or a nominee for a limited liability company, which limited liability company beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a member of such limited liability company pro rata in accordance with their ownership interests in the company, and any further Transfer(s) by any such member that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class

B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(iv) by a Class B Stockholder that is a corporation, or a nominee for a corporation, which corporation beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a shareholder of such corporation pro rata in accordance with their ownership interests in the corporation, and any further Transfer(s) by any such shareholder that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(v) by a Class B Stockholder to the Company or any other person or entity upon approval of the Company's Board of Directors.

(d) General Restrictions on Sale. Holders of Class A Common Stock issued prior to the Company's Initial Public Offering may not sell more than two and a half percent (2.5%) of such holdings during any financial quarter following the Company's Initial Public Offering without the consent of the Class B Voting stockholders, voting as a separate class.

(e) Compliance with Securities Laws. Notwithstanding any other provision of these Third Amended and Restated Articles of Incorporation, no Transfer of shares of Class B Voting Stock may be made in violation of the Securities Act of 1933, as amended, or any other federal or state securities laws.

## V.

A.    To the fullest extent permitted by law, a director of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director. If any law of the State of Wyoming is amended after approval by the stockholders of this Article V to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Company shall be eliminated or limited to the fullest extent permitted by such Wyoming law as so amended.

B.    To the fullest extent permitted by applicable law, the Company is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Company (and any other persons to which Wyoming law permits the Company to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Wyoming law.

C.    Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

D.    Unless the Company consents in writing to the selection of an alternative forum, the United States District Court for the District of Wyoming shall be the sole and exclusive forum

for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of Wyoming law, these Third Amended and Restated Articles of Incorporation or the Company's Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine.

## VI.

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further *provided* that:

A.      The management of the business and the conduct of the affairs of the Company shall be vested in its Board. The number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to terms and conditions set forth in these Third Amended and Restated Articles of Incorporation.

B.      The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

C.      The holders of Class B Voting Stock, voting as a separate class, shall have the right to appoint directors to the Board ("*Class B-Appointed Seats*"). At all times, Class B-Appointed Seats shall constitute a majority of the Board.

D.      Any and all directors of the Board appointed by holders of Class B Voting Stock shall have their terms determined solely by, and may be removed by, the Class B Voting Stockholders, voting as a separate class, irrespective of any contractual terms or Board resolutions.

E.      Any and all directors other than those appointed by the Class B Voting Stockholders must be approved by the affirmative vote of a majority of the outstanding voting shares then entitled to vote. Such

F.      Any director may be removed from the Board by the unanimous consent of all other directors for any reason, regardless of any contractual or other rights such director might have.

G.      Any all directors may be removed by a majority of the votes of the Class B Voting Stockholders, voting as a separate class, for any reason, irrespective of any contractual terms or Board resolutions.

H.      Compensation for all Board members shall be determined solely a majority of the votes of the Class B Voting Stockholders, voting as a separate class, irrespective of any contractual terms.

I.      Subject to any additional vote required by these Third Amended and Restated Articles of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board is expressly empowered to adopt, amend, or repeal the Bylaws of the Company.

J.      Engagement of the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer, and all other "C-Suite" executives must be

approved by the majority affirmative vote of the then-outstanding shares of Class B Voting Stock, voting as a separate class.

**K.**      Written Consent of the holders of a majority of the outstanding voting shares then entitled to vote may be accepted in lieu of a meeting of the stockholders, and any resolutions or actions resulting from a Written Consent of the Stockholders shall have the same force and effect as any resolutions or actions approved at a meeting of the stockholders.

**L.**      Meetings of stockholders may be held within or without the State of Wyoming, as the Bylaws of the Company may provide.  The books of the Company may be kept outside the State of Wyoming at such place or places as may be designated from time to time by the Board or in the Bylaws of the Company.

\* \* \* \* \*

# VISUAL SEMICONDUCTOR, INC.

## UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

August 15, 2022

THE UNDERSIGNED, being the only current duly-elected member of the Board of Directors (the "**Board of Directors**") of Visual Semiconductor, Inc., a Wyoming corporation (the "**Company**"), acting pursuant to the provisions of the Company's bylaws, hereby waive the calling or holding of a meeting of the Board of Directors, consent to the action set forth below, waive any right to dissent from such action, and direct that this Unanimous Written Consent of the Board of Directors (this "**Consent**") be filed in the minutes of the proceedings of the Board of Directors.

**WHEREAS**, the Company wishes to amend its Articles of Incorporation and Bylaws detailing matters of corporate organization and governance;

**NOW, THEREFORE, BE IT HEREBY RESOLVED**, that the Third Amended and Restated Articles of Incorporation, dated August 15, 2022, and attached hereto as Exhibit A, are hereby formally adopted.

**BE IT FURTHER RESOLVED**, that the Third Amended and Restated Articles of Incorporation, dated August 15, 2022, and attached hereto as Exhibit A, shall be filed with the Wyoming Secretary of State by the Company's officers or its agent as soon as practicable.

**BE IT FURTHER RESOLVED**, that the Bylaws, dated August 15, 2022, and attached hereto as Exhibit B, are hereby formally adopted.

Acknowledge and agreed:

_____

Mathu Rajan
Director

**EXHIBIT A**

Third Amended and Restated Articles of Incorporation
dated August 15, 2022

**VISUAL SEMICONDUCTOR, INC.**

**THIRD AMENDED AND RESTATED
ARTICLES OF INCORPORATION**

**August 15, 2022**

**I.**

The name of the corporation is Visual Semiconductor, Inc. (the "*Company*").

**II.**

The Company's registered office in the State of Wyoming is located at 30 N. Gould Street, Suite R, Sheridan, WY 82801. The registered agent in charge thereof is Registered Agents, Inc.

**III.**

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the laws of the State of Wyoming.

**IV.**

**A.**     The total number of shares of stock of all classes which the Company has the authority to issue is 2,500,000,000 shares of capital stock, par value $0.0001 per share, consisting of: 2,000,000,000 shares of Class A Common Stock ("*Class A Common Stock*"), 400,000,000 shares of Class B Voting Stock ("*Class B Voting Stock*"), 50,000,000 shares of Class C Non-Voting Stock ("*Class C Non-Voting Stock*"), and 50,000,000 shares of Class D Non-Voting Non-Dividend Stock ("*Class D Non-Voting Non-Dividend Stock*"). Classes A, C, and D stock may be certificated in digital or physical form as determined by the Company. Class B Voting Stock shall be uncertificated unless otherwise determined by the Company, with the record of holders thereof to be kept solely by the Company and/or its transfer agent.

**B.**     For every five (5) shares of Class A Common Stock issued by the Company, the Company shall issue for no consideration one (1) share of Class B Voting Stock to the Company Founder, Mathu Rajan ("*Founder*"), or Founder's assigns. The ratio of Class A Common Stock to Class B Voting Stock shall remain unchanged regardless of how many shares of Class A Common Stock are issued or authorized.

**C.**     Prior to the filing of these Third Amended and Restated Articles of Incorporation (these "*Third Restated Articles of Incorporation*"), all previously issued and outstanding shares of the Company's Common Stock had a par value $0.0001 per share (the "*Prior Common Stock*"). All designations, rights, preferences, privileges, and restrictions, if any, of the Prior Common Stock are hereby eliminated.

**D.**     Irrespective of any contrary provisions contained in Wyoming Law, the number of authorized shares of Class A Common Stock, Class B Voting Stock, Class C Non-Voting Stock, or Class D Non-Voting Non-Dividend Stock may be increased or decreased (but not below the number of shares of such stock then outstanding) by the affirmative vote of the holders of a majority of the stock of the Company entitled to vote (voting together as a single class on an as-converted basis).

majority of the stock of the Company entitled to vote (voting together as a single class on an as-converted basis).

E.     The rights, preferences, privileges, restrictions and other matters relating to the four classes of stock are as follows:

### 1.     DIVIDEND AND DISTRIBUTION RIGHTS.

**a)** Holders of Class A Common Stock and Class C Non-Voting Stock may be entitled to dividends from time to time as determined by the Board of Directors. Such distributions, if any, shall be distributed ratably to all holders of the Class A Common Stock and Class C Non-Voting Stock combined as a single group.

**b)** Whenever a dividend provided for in this Section 1 shall be payable in property other than cash, the value of such dividend shall be the fair market value of such distribution as determined in good faith by the Board.

**c)** Class B Voting Stock is a special class of stock that entitles the holders thereof to the voting rights set forth in these Third Amended and Restated Articles of Incorporation but does not entitle the holders thereof to any economic rights in the Company, including the right to share in profits of the Company or the distribution of the Company's assets upon liquidation and dissolution. Accordingly, the holders of Class B Voting Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock, and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class B Voting Stock.

**d)** Class D Non-Voting Non-Dividend Stock is a special class of stock that does not entitle the holders thereof to share in profits of the Company. Accordingly, the holders of Class D Non-Voting Non-Dividend Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock other than through a distribution related to the Company's liquidation or dissolution, and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class D Non-Voting Non-Dividend Stock. Class D Non-Voting Non-Dividend stockholders shall, however, be entitled to economic rights in the distribution of the Company's assets upon liquidation and dissolution. Class D Non-Voting Non-Dividend stockholders shall also have the right to sell their Class D shares, whether publicly traded or not.

### 2.     VOTING RIGHTS.

**a) Rights of Class A Common Stock.** Each holder of shares of Class A Common Stock shall be entitled to one (1) vote per share of Class A Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**b) Rights of Class B Voting Stock.** Each holder of shares of Class B Voting Stock shall be entitled to ten (10) votes per share of Class B Voting Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**c) Rights of Class C Non-Voting Stock and Class D Non-Voting Non-Dividend Stock.** No holder of shares of Class C Non-Voting Stock or Class D Non-Voting

Non-Dividend Stock shall be entitled to any votes per share thereof but shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**d) General Rights of Voting Stock.** Except as otherwise expressly provided by these Third Amended and Restated Articles of Incorporation, such as the Class B voting requirement described in Sections 2(e) and 5(d) below, or as provided by law, the holders of shares of Class A Common Stock and Class B Voting Stock shall (a) at all times vote together as a single class on all matters (including the election of Directors) submitted to a vote or for the consent (if action by written consent of the stockholders is permitted at such time under these Third Amended and Restated Articles of Incorporation) of the stockholders of the Company, and (b) be entitled to vote upon such matters and in such manner as may be provided by applicable law. There shall be no cumulative voting.

**e) Separate Vote of Class B Voting Stock.** For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummate an Acquisition or Asset Transfer as defined in Section 4(b) below. For any issue requiring a separate vote by the holders of Class B Voting Stock as described herein, no vote by the holders of Class A Common Stock shall be required.

## 3.    LIQUIDATION RIGHTS.

**a) Class A Common Stock, Class C Non-Voting Stock, and Class D Non-Voting Non-Dividend Stock.** Upon any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary (a "*Liquidation Event*"), the assets of the Company legally available for distribution in such Liquidation Event (or the consideration received in such transaction), if any, shall be distributed ratably to the holders of Class A Common Stock, Class C Non-Voting Stock, and Class D Non-Voting Non-Dividend Stock combined as a single group.

**b) No Liquidation Right for Class B Voting Stock.** The holders of Class B Voting Stock shall not be entitled to share in any payment or distribution of Company assets, whether in cash or property, upon a Liquidation Event or Deemed Liquidation Event, and the Company shall not make any provision therefor.

## 4.    ASSET TRANSFER OR ACQUISITION RIGHTS.

**a)** An Acquisition or Asset Transfer (each as hereinafter defined) shall be deemed to be a liquidation of the Company (a "*Deemed Liquidation*"). The Company shall not have the power to effect any transaction constituting a Deemed Liquidation unless the definitive documents effecting such Deemed Liquidation provide that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with Section 3(a) above. The amount deemed paid or distributed to holders of capital stock of the Company upon any Deemed Liquidation shall be determined in accordance with Section 4(c) below.

**b)** For the purposes of this Article IV: (i) *"Acquisition"* shall mean (A) any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party and in which in excess of fifty percent (50%) of the Company's voting power is transferred; provided that an Acquisition shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; and (ii) *"Asset Transfer"* shall mean a private foreclosure, settlement, sale, lease or any disposition of all or substantially all of the assets or intellectual property of the Company under any circumstances or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company.

**c)** In any Acquisition or Asset Transfer, if the consideration to be received is securities of a corporation or other property other than cash, its value will be deemed its fair market value as determined in good faith by the Board, on the date such determination is made; provided, however, that any publicly-traded securities to be distributed to stockholders will be valued as follows:

**(i)** Securities not subject to investment letter or other similar restrictions on free marketability:

**(A)** If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30)-day period ending three (3) calendar days prior to the closing; and

**(B)** If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30)-day period ending three (3) calendar days prior to the closing.

**(ii)** The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Sections 4(c)(i)(A) and (B) to reflect the approximate fair market value thereof, as determined in good faith by the Board.

**(d)** Notwithstanding anything to the contrary in this Section 4, if the definitive transaction documents for an Acquisition or Asset Transfer provide for a different method of valuation, the method of valuation set forth in such documents shall control.

**(e) Allocation of Escrow.** In the event of a Deemed Liquidation, if any portion of the consideration payable to the stockholders of the Company is placed into escrow or is payable to the stockholders of the Company subject to contingencies, the definitive acquisition

agreement relating thereto shall provide that (i) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the "*Initial Consideration*") shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation and (ii) any additional consideration which becomes payable to the stockholders of the Company upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above after taking into account the previous payment of the Initial Consideration as part of the same transaction.

## 5.   RESTRICTIONS ON TRANSFER AND SALE.

(a) **Defined Terms.** As used in this Section 5, the following terms shall have the following meanings:

(i) "*Founder*" shall mean Mathu Rajan. Founder shall be entitled to receive Class B Voting Stock as specified in Section IV (B) above.

(ii) "*Class B Stockholder*" Other than the Founder, there are no registered holders of shares of Class B Voting Stock as of the date of filing these Third Amended and Restated Articles of Incorporation (the "*Effective Time*").

(iii) "*Permitted Entity*" shall mean, with respect to any individual Class B Stockholder, any trust, corporation, partnership, or limited liability company specified in Section 5(c)(i) established by or for such individual Class B Stockholder, so long as such entity meets the requirements of the exception set forth in Section 5(c)(ii) applicable to such entity.

(iv) "*Transfer*" of a share of Class B Voting Stock shall mean any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law; provided, however, that granting of a proxy to officers or directors of the Company at the request of the Board of Directors of the Company in connection with actions to be taken at an annual or special meeting of stockholders shall not be considered a Transfer.

(v) "*Voting Control*" with respect to a share of Class B Voting Stock shall mean the power (whether exclusive or shared) to vote or direct the voting of such share of Class B Voting Stock.

(b) **General Restrictions on Transfer.** There are no restrictions on transfer of Class A Common Stock, Class C Non-Voting Stock, or Class D Non-Voting Non-Dividend Stock. Shares of Class B Voting Stock may not be Transferred, except as provided in this Section 5, and any attempted Transfer in violation of these Third Amended and Restated Articles of Incorporation shall be null and void and not recognized for any purpose.

(c) **Permitted Transfers.** Notwithstanding the general restriction on Transfer specified in Section 5(b), shares of Class B Voting Stock may be Transferred as follows:

**(i)** by a Class B Stockholder who is a natural person to any of the following Permitted Entities, and from any of the following Permitted Entities back to such Class B Stockholder and /or any other Permitted Entity established by or for such Class B Stockholder:

**(A)** a trust for the benefit of such Class B Stockholder and for the benefit of no other person, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

**(B)** a trust for the benefit of persons other than the Class B Stockholder so long as the Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such trust, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

**(C)** a corporation in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns shares with sufficient Voting Control in the corporation, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such corporation;

**(D)** a partnership in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns partnership interests with sufficient Voting Control in the partnership, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such partnership;

**(E)** a limited liability company in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns membership interests with sufficient Voting Control in the limited liability company, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such limited liability company.

**(ii)** by a Class B Stockholder that is a partnership, or a nominee for a partnership, which partnership beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a partner of such partnership pro rata in accordance with their ownership interests in the partnership, and any further Transfer(s) by any such partner that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

**(iii)** by a Class B Stockholder that is a limited liability company, or a nominee for a limited liability company, which limited liability company beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective

Time, to any person or entity that is a member of such limited liability company pro rata in accordance with their ownership interests in the company, and any further Transfer(s) by any such member that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(iv) by a Class B Stockholder that is a corporation, or a nominee for a corporation, which corporation beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a shareholder of such corporation pro rata in accordance with their ownership interests in the corporation, and any further Transfer(s) by any such shareholder that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(v) by a Class B Stockholder to the Company or any other person or entity upon approval of the Company's Board of Directors.

(d) **General Restrictions on Sale.** Holders of Class A Common Stock issued prior to the Company's Initial Public Offering may not sell more than two and a half percent (2.5%) of such holdings during any financial quarter following the Company's Initial Public Offering without the consent of the Class B Voting stockholders, voting as a separate class.

(e) **Compliance with Securities Laws.** Notwithstanding any other provision of these Third Amended and Restated Articles of Incorporation, no Transfer of shares of Class B Voting Stock may be made in violation of the Securities Act of 1933, as amended, or any other federal or state securities laws.

## V.

A.      To the fullest extent permitted by law, a director of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director. If any law of the State of Wyoming is amended after approval by the stockholders of this Article V to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Company shall be eliminated or limited to the fullest extent permitted by such Wyoming law as so amended.

B.      To the fullest extent permitted by applicable law, the Company is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Company (and any other persons to which Wyoming law permits the Company to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Wyoming law.

**C.**     Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

**D.**     Unless the Company consents in writing to the selection of an alternative forum, the United States District Court for the District of Wyoming shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of Wyoming law, these Third Amended and Restated Articles of Incorporation or the Company's Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine.

## VI.

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further *provided* that:

**A.**     The management of the business and the conduct of the affairs of the Company shall be vested in its Board. The number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to terms and conditions set forth in these Third Amended and Restated Articles of Incorporation.

**B.**     The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

**C.**     The holders of Class B Voting Stock, voting as a separate class, shall have the right to appoint directors to the Board ("***Class B-Appointed Seats***"). At all times, Class B-Appointed Seats shall constitute a majority of the Board.

**D.**     Any and all directors of the Board appointed by holders of Class B Voting Stock shall have their terms determined solely by, and may be removed by, the Class B Voting Stockholders, voting as a separate class, irrespective of any contractual terms or Board resolutions.

**E.**     Any and all directors other than those appointed by the Class B Voting Stockholders must be approved by the affirmative vote of a majority of the outstanding voting shares then entitled to vote. Such

**F.**     Any director may be removed from the Board by the unanimous consent of all other directors for any reason, regardless of any contractual or other rights such director might have.

**G.**     Any all directors may be removed by a majority of the votes of the Class B Voting Stockholders, voting as a separate class, for any reason, irrespective of any contractual terms or Board resolutions.

**H.**     Compensation for all Board members shall be determined solely a majority of the votes of the Class B Voting Stockholders, voting as a separate class, irrespective of any contractual terms.

**I.** Subject to any additional vote required by these Third Amended and Restated Articles of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board is expressly empowered to adopt, amend, or repeal the Bylaws of the Company.

**J.** Engagement of the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer, and all other "C-Suite" executives must be approved by the majority affirmative vote of the then-outstanding shares of Class B Voting Stock, voting as a separate class.

**K.** Written Consent of the holders of a majority of the outstanding voting shares then entitled to vote may be accepted in lieu of a meeting of the stockholders, and any resolutions or actions resulting from a Written Consent of the Stockholders shall have the same force and effect as any resolutions or actions approved at a meeting of the stockholders.

**L.** Meetings of stockholders may be held within or without the State of Wyoming, as the Bylaws of the Company may provide. The books of the Company may be kept outside the State of Wyoming at such place or places as may be designated from time to time by the Board or in the Bylaws of the Company.

\* \* \* \* \*

**EXHIBIT B**

Amended Bylaws
dated August 15, 2022

**VISUAL SEMICONDUCTOR, INC.**
**CORPORATE BYLAWS**
**August 15, 2022**

## ARTICLE 1

### Company Formation

1.01.**FORMATION.** Visual Semiconductor, Inc. ("Company") is formed pursuant to the laws of the State of Wyoming.

1.02. **PURPOSE.** The Company is formed to engage in any lawful business purpose.

1.03. **CORPORATE CHARTER COMPLIANCE.** The Board of Directors (the "Board") acknowledges and agrees that it has caused the Company's Articles of Incorporation to be filed with the relevant state authority and all filing fees have been paid and satisfied.

1.04. **ADOPTION OF BYLAWS.** These Bylaws are adopted on behalf of the Company.

1.05. **REGISTERED OFFICE & REGISTERED AGENT.** The registered office of the Company shall be as stated in the Articles of Incorporation, unless amended. The address of the registered office may be changed from time to time. The Company must maintain a statement of acceptance from the Company's current registered agent.

1.06. **OTHER OFFICES.** The Company may have other offices as may be selected by the Board of Directors from time to time.

1.07. **CORPORATE SEAL.** The Company may have a corporate seal which shall have the name of the Company inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors. The corporate seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced. The adoption and use of a corporate seal are not required.

1.08. **FISCAL YEAR.** The fiscal year of the Company shall be determined by the Board of Directors.

## ARTICLE 2

### Board of Directors

2.01. **POWERS. NUMBER AND QUALIFICATIONS.** The management of all the Company's affairs, property, and interests shall be managed by or under the direction of the Board of Directors, except as otherwise provided by law or in the Company's Articles of Incorporation. The Board shall consist of members who are elected by majority shareholder vote for a term of one (1) year and hold office until their successors are duly elected and qualified at the following annual shareholder meeting. Any director appointed at a time other than the annual shareholder meeting, as allowed by Articles 2.04 and 2.05 of these Bylaws, shall hold office only until the next annual shareholders meeting. The Board shall initially consist of one (1) director, assigned at the time of the Company's formation. Directors need not be shareholders or residents of the state in which the Company was formed.

**2.02. CHANGE OF NUMBER.** The number of directors may be increased or decreased at any time pursuant to the process outlined in Article 11 of these Bylaws. A decrease in number does not have the effect of shortening the term of any incumbent director. In the event the established number of directors is decreased, the directors shall hold their positions until the next shareholder meeting occurs and new directors are elected and qualified.

**2.03. CLASSES OF DIRECTORS.** Until such time as these Bylaws are accordingly amended, the Company does not have classes of directors, and does not elect to have staggered terms.

**2.04. ELECTION, TERM OF OFFICE, RESIGNATION & REMOVAL OF DIRECTORS.** Each director shall hold office until his or her term has ended or until his or her earlier resignation or removal. Any director may resign upon giving written notice to the Chairman of the Board, the President or the Secretary of the Company. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. Any or all of the directors may be removed, with or without cause, if such removal is approved by a majority of the outstanding voting shares then entitled to vote on the election of directors. Vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a special election by a majority of the outstanding voting shares then entitled to vote on the election of directors or at an annual shareholder meeting.

**2.05. VACANCIES.** All vacancies in the Board due to an increase in the number of directors or removal or resignation of a director may be filled only by the affirmative vote of a majority of the outstanding voting shares then entitled to vote on the election of directors, *provided* that any such director who fills a vacancy is qualified to be a director and shall hold the office only until a new director is elected and qualified by the shareholders at the next annual meeting of the shareholders or at a special meeting of the shareholders.

Any director who fills a vacancy on the Board shall not be considered unqualified or disqualified solely by virtue of being an interim director.

**2.06. REGULAR MEETINGS.** Regular meetings of the Board or any committee may be held at the Company's principal office or at any other place designated by the Board or its committee, including by means of remote communication. An annual meeting of the Board will be held immediately following the adjournment of the annual meeting of shareholders.

**2.07. SPECIAL MEETINGS.** Special meetings of the Board may be held at any place and at any time and may be called by the Chairman of the Board, the President, the sole director if there be only one, or by at least two directors if there be two or more directors.

**2.08. NOTICE OF MEETINGS.** The annual meeting of the Board shall be held without notice of the date, time, place, or purpose of the meeting, provided the meeting follows the adjournment of the annual shareholder meeting. All other regular and special meetings of the Board must be preceded by at least forty-eight (48) hours' advance notice of the date, time, place, and purpose of the meeting, unless these Bylaws require otherwise. Notice may be given personally, by facsimile, by mail, or in any other lawful manner, so long as the method for notice comports with Article 9 of these Bylaws. Oral notification is sufficient only if a written record of the notice is included in the Company's minute book.

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 2

Notice is effective at the earliest of:

a. Receipt;
b. Delivery to the proper address or telephone number of the director(s) as shown in the Company's records; or
c. Five days after its deposit in the United States mail, as evidenced by the postmark, if correctly addressed and mailed with first-class postage prepaid.

**2.09. WAIVER OF NOTICE.** A director waives the notice requirement if that director attends or participates in the meeting, unless a director attends for the express purpose of promptly objecting to the transaction of any business because the meeting was not lawfully called or convened. A director may waive notice by a signed writing, delivered to the Company for inclusion in the minutes before or after the meeting.

**2.10. PARTICIPATION IN MEETINGS BY CONFERENCE TELEPHONE PERMITTED.** Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board or of such committee, as the case may be, through the use of conference telephone, video teleconference, internet application, or similar communications equipment by means of which all members participating in such meeting can hear one another. Participation in a meeting pursuant to this Article 2.10 shall constitute presence in person at such meeting.

**2.11. QUORUM, VOTING.** At all meetings of the Board of Directors, a majority of the authorized number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board unless the Articles of Incorporation or these Bylaws shall require a vote of a greater number. An agenda describing any and all subject matters on which a vote shall be taken at any regular or special Board meeting shall be sent to all Board members, with specific reference that a vote on the matter is scheduled to occur. The written agenda, which may be sent via postal mail, email, or other electronic written means, shall be distributed not less than forty-eight (48) hours prior to the meeting to all Board members. Any subject matter not included on a meeting agenda sent with advance notice required by this Article 2.11 may be discussed at the Board meeting but may not be voted upon until presented at a subsequent Board meeting that meets the advance notice requirement.

**2.12. INTERESTED DIRECTORS.** No contract or transaction between the Company and one or more of its directors or between the Company and any other corporation, firm or association in which one or more of its directors are directors, or have a financial interest, shall be void or voidable solely for this reason, or solely because such director or directors are present at the meeting of the Board of Directors or committee thereof which authorizes, approves or ratifies the contract or transaction, or solely because his or her or their votes are counted for such purpose, if: (1) the material facts as to his/her/their relationship or interest and as to the contract or transaction are fully disclosed or are known to the Board or the committee, and the Board or committee authorizes, approves or ratifies the contract or transaction in good faith by the affirmative votes of a majority of the disinterested directors, even if the disinterested directors be less than a quorum; or (2) the material facts as to his/her/their relationship or interest in the contract or transaction is fully disclosed or is known to the shareholders and such contract or transaction is specifically approved by the shareholders in good faith by vote of the shareholders; or (3) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board, a committee thereof or the shareholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 3

**2.13. ORGANIZATION, MANNER OF ACTING.** Meetings of the Board of Directors shall be presided over by the Chairman of the Board, or in the absence of the Chairman of the Board by the Vice Chairman of the Board, if any, or in their absence by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary, the chairman of the meeting may appoint any person to act as secretary of the meeting.

The act of the majority of the Board present at a meeting at which a quorum is present when the vote is taken shall be the act of the Board unless the Articles of Incorporation require a greater percentage.

**2.14. REGISTERING DISSENT.** A director who is present at a meeting at which an action on a corporate matter is taken is presumed to have assented to such action, unless the director expressly dissents to the action. A valid dissent must be entered in the meeting's minutes, filed with the meeting's acting secretary before its adjournment, or forwarded by registered mail to the Company's Secretary within twenty-four (24) hours after the meeting's adjournment. These options for dissent do not apply to a director who voted in favor of the action or failed to express such dissent at the meeting.

**2.15. ACTION BY DIRECTORS WITHOUT A MEETING.** Any action which may be taken at a meeting of the Board, or its committee, may be taken without a meeting, *provided* all directors or committee members unanimously agree, and such unanimous consent is filed in writing with the minutes of the proceeding and sets forth the action taken by the Board.

**2.16. REMUNERATION.** The Board may adopt a resolution which results in directors being paid a reasonable compensation for their services rendered as directors of the Company. Directors may also be paid a fixed sum and expenses, if any, for attendance at each regular or special meeting of such Board. Nothing contained in these Bylaws precludes a director from receiving compensation for serving the Company in any other capacity, including any services rendered as an officer or employee. If the Board accordingly passes a resolution, then committee members may be allowed like compensation for attending committee meetings.

A resolution of the Board that grants compensation to a director may be challenged by a shareholder, provided the shareholder requests a special shareholder meeting specifically addressing the resolution related to director compensation. Any Board resolution that relates to director compensation can be overturned by a majority vote of shareholders.

**2.17. LOANS.** The Company may not make loans to the directors, unless first approved by the holders of two-thirds of the voting shares. The Company may not make loans secured by its own shares.

**2.18. ADVANCE EXPENSE.** The Company shall pay for or reimburse the reasonable expenses incurred by a director who is a party to a proceeding which arises from the business operations of the Company.

**2.19. DIRECTOR LIABILITY.** Each director is required, individually and collectively, to act in good faith, with reasonable and prudent care, and in the best interest of the Company. If a director acts in such a manner, then such director shall be immune from liability arising from official acts on behalf of the Company. Directors who fail to comply with this Article of these Bylaws shall be personally liable to the Company for any improper distributions and as may otherwise be described in these Bylaws.

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 4

## ARTICLE 3

### Committees

**3.01. COMMITTEES OF DIRECTORS.** The Board of Directors may not designate any committee without the express written approval of the majority of shareholder votes entitled to vote thereon. If so approved, the Board of Directors may designate one or more committees, each consisting of one or more directors. The Board shall have the power to dissolve any committee at any time, for any reason, without notice. The Board shall also have the power to nullify any actions taken by any committee, subject to applicable law.

Any committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board, except that no such committee shall have power or authority with respect to the following matters:

   a. Approving or adopting any action or matter expressly required by Wyoming Law to be submitted to the shareholders for approval;
   b. Approving or adopting any action or matter that transfers or commits to transfer more than one percent (1%) of the assets of the Company; or
   c. The amendment or repeal of the Bylaws, or the adoption of new Bylaws.
   d. The amendment or repeal of the Articles of Incorporation, or the adoption of new Articles of Incorporation.

**3.02. COMMITTEE RULES.** Unless the Board of Directors otherwise provides, each committee designated by the Board may adopt, amend and repeal rules for the conduct of its business. In the absence of a provision by the Board of Directors or a provision in the rules of such committee to the contrary, each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article 2 of these Bylaws.

**3.03. COMMITTEE MEETING MINUTES.** Every committee shall document its meetings in writing. Written meeting minutes shall be circulated by the committee to all members of the Board not more than twenty-four (24) hours following the adjournment of such meeting so that the Board of Directors may be sufficiently informed of the committee's actions.

## ARTICLE 4

### Shares

**4.01. AUTHORITY TO ISSUE.** The Company is authorized to issue any class of shares or securities convertible into shares of any class. Before any shares of the Company may be issued, the Board must pass a resolution which authorizes the issuance, sets the minimum consideration for the shares or security (or a formula to determine the minimum consideration), and fairly describes any non-monetary consideration. The authorized number of shares shall be as listed in the Company's Articles of Incorporation.

**4.02. RESTRICTIONS.** Shares may only be issued in accordance with the Company's Articles of Incorporation, and through the process described in these Bylaws. Any issuance of shares in excess of the amount described in the Articles of the Company must be authorized by the Board and approved by the affirmative vote of a majority of shareholders. Any restriction on the transferability of shares shall be fully furnished to the shareholder, upon shareholder request, and without any charge to the shareholder.

No shareholder has a preemptive right to subscribe to any subsequent or additional issuance of shares.

**4.03. FORMS OF SHARE CERTIFICATES.** All shares in the Company which require the issuance of a certificate shall be digitally issued upon an agreement between the Company and the holder.

If the Company is authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences, relative or other special rights, qualifications, restrictions and limitations of each class or series shall be set forth in full or summarized and furnished by the Company without charge to each shareholder who requests them.

If share certificates are issued, then each share certificate must contain on its face:
  a.  The name and state of formation of the Company;
  b.  The name of the shareholder (or person to whom the shares are issued);
  c.  The class of shares and the number of shares it represents;
  d.  The signature of the president, vice president, chief executive officer, chief operating officer, chief financial officer, chairman of the Board *or* vice-chairman of the Board; and
  e.  The counter signature of the Secretary, assistant secretary, treasurer, assistant treasurer, or any other officer.

For the sake of clarity, in the event that an individual serves multiple roles within the Company, that person *cannot* countersign any document which that person has already signed in their official or individual capacity.

If an officer who has signed or whose facsimile signature appears on any share certificate ceases to be an officer before the certificate is issued to the shareholder, it may be issued by the Company and is valid as if the person were an officer on the date of issuance. The certificate may be sealed with the Company's seal.

**4.04. MUTILATED, LOST, OR DESTROYED CERTIFICATES.** In the instance of any mutilation, loss, or destruction of any share certificate, another may be issued in its place on proof of such mutilation, loss or destruction. The Board may impose conditions on such issuance and may require the giving of a satisfactory bond or indemnity to the Company. The Board may establish other procedures as it deems necessary.

**4.05. FRACTIONAL SHARES OR SCRIP.** The Company may:
  a.  Issue fractions of a share which entitle the holder to exercise voting rights, to receive dividends, and to participate in any of the Company's assets in the event of liquidation;
  b.  Arrange for the disposition of fractional interests by those entitled thereto;
  c.  Pay the fair market value, in cash, of fractions of a share as of the time when those entitled to receive such shares are determined; or
  d.  Issue scrip in a form which entitles the holder to receive a certificate for the full share upon surrender of such scrip aggregating a full share.

**4.06. TRANSFER.** So long as there is no transferability restriction on the shares, as described in Article 4.02 of these Bylaws, the shares of the Company are freely transferable. Transfers of shares must be made upon the Company's share transfer books. Share transfer books shall be kept in the manner described in Article 8 of these Bylaws.

Before a new certificate is issued, the old certificate must be surrendered for cancellation. The Board may, by resolution, open a share register in any state of the United States, and may employ an agent or agents to keep such register, and to record transfers or shares therein.

**4.07. REGISTERED OWNER.** The Company shall recognize an individual as the registered owner of given shares, *provided* that individual is determined as the shareholder of record by the record date as set out in Articles 5.08 and 5.09 of these Bylaws. Shareholders may agree to confer the right to vote or represent their shares to third parties, including trustees, proxies, or fiduciaries. The Board may resolve to adopt a procedure by which a shareholder of the Company may certify in writing to the Company that all or a portion of the shares registered in the shareholder's name are held for the account of a specified person or persons.

The resolution must set forth:
   a. The classification of shareholders who may certify;
   b. The purpose or purposes for which the certification may be made;
   c. The form of certification and information to be contained therein;
   d. If the certification is with respect to a record date or closing of the share transfer books, the date within which the certification must be received by the Company; and
   e. Other provisions with respect to the procedure as are deemed necessary or desirable.

Upon receipt of a certification complying with this procedure, the Company must treat the persons specified in the certification as the holders of record for the number of shares specified in place of the shareholder making the certification.

**4.08. SHARES OWNED BY THE COMPANY.** Shares owned by the Company in another corporation may be voted by the officer, agent, or proxy chosen by the Board or, in the absence of such determination, by the President of the Company. The power to vote such shares is vested in the Board, however, the President is authorized to vote on the Company's behalf, only in the absence of a Board decision on how to vote. If the Board does render a decision related to the vote of shares, then the President is bound by the Board's decision.

The Company may vote or represent shares that it holds in itself, *provided* the Company holds such shares in a fiduciary capacity. If the Company holds shares in itself in such a fiduciary capacity, then such shares shall be counted in determining the total number of outstanding shares at a given time. If the Company holds shares in itself in a non-fiduciary capacity, then such shares shall be construed as authorized but unissued shares, and they may not be represented or voted at a meeting of the shareholders.

## ARTICLE 5
### Shareholders

**5.01. ANNUAL MEETING.** An annual meeting of shareholders shall be held for the election of directors on the first day of November each year, unless such date falls on a Saturday or Sunday, in which case the meeting shall be held on the next business day. The location shall be at a time and place either within or without the State of Wyoming fixed by resolution of the Board of Directors. Any other proper business may be transacted at the annual meeting. An annual meeting may be held in-person or via teleconference or other electronic means as may be agreed by the Board of Directors, provided such electronic means can accommodate the Board of Directors and all shareholders.

5.02 **SPECIAL MEETINGS.** Special meetings of the shareholders may be called at any time by the holders of shares entitled to cast not less than fifty percent (50%) of the votes at the meeting unless another percentage is required under Wyoming law, in which case the required percentage shall prevail, such meeting to be held on a date and at a time and place either within or without the State of Wyoming as may be stated in the notice of the meeting. A special meeting may be held in-person or via teleconference or other electronic means as may be agreed by the Board of Directors, provided such electronic means can accommodate the Board of Directors and all shareholders.

5.03. **NOTICE OF MEETINGS.** The Secretary shall cause notice to be given to each shareholder of record at least ten (10) days, but no more than sixty (60) days, before the shareholders' meeting. Notice shall be by writing, electronic transmission, or by personal delivery, and shall state the time, place, and purpose of the meeting (including instructions for how to remotely or electronically attend and participate). Notice is considered given to a shareholder when it is personally provided to the shareholder, left at the shareholder's residence or usual place of business, mailed to the shareholder's address of record, or by electronic transmission to the shareholder's address or number of record on file with the Company. A single notice may be delivered to multiple shareholders sharing the same address, unless the Company receives a request from a shareholder that more than a single notice be delivered.

Notice by electronic transmission shall be considered ineffective if the Company is unable to deliver two consecutive notices and the individual responsible for sending notices to shareholders is made aware of the delivery failures. A shareholder meeting, and any actions taken by shareholders, shall not be invalidated due to an inadvertent failure to deliver notice.

5.04. **WAIVER OF NOTICE.** A shareholder who is entitled to notice may waive the notice requirement if they provide a signed written waiver of the required notice, before or after the stated meeting time, or the shareholder is present at the meeting in person or by proxy.

5.05. **ADJOURNMENTS.** If any shareholder meeting is adjourned to a different date, time, or place, notice need not be given of the new date, time, and place if the new date, time, and place is announced at the meeting before adjournment. At the reconvened meeting, the Company may transact any business which might have been transacted at the original meeting prior to adjournment. But if the adjournment is for more than thirty (30) days or if a new record date for the adjourned meeting is, or must be fixed, then notice must be given pursuant to the requirements of Article 5.03, to those persons who are shareholders as of the new record date.

5.06. **ORGANIZATION.** Meetings of shareholders shall be presided over by the Chairman of the Board of Directors, if any, or in the absence of the Chairman of the Board by the Vice Chairman of the Board, if any, or in the absence of the Vice Chairman of the Board by the President, or in the absence of the foregoing persons by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as secretary of the meeting, or in their absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

5.07. **MEETING AGENDAS.** For all annual and special meetings, the Board of Directors shall distribute, or cause to be distributed, a written agenda of any and all subject matters on which a vote shall be taken at the meeting, with specific reference that a vote on the matter is scheduled to occur. The written agenda, which may be sent via postal mail, email, or other electronic written means, shall be distributed not less than seven (7) days prior to the meeting to all holders of shares

entitled to vote at such meeting. Any subject matter not included on a meeting agenda sent with advance notice required by this Article may be discussed at the meeting but may not be voted upon until presented at a subsequent meeting that meets the advance notice requirement.

**5.08. SHAREHOLDER LIST.** At least ten (10) days before each shareholder meeting, a complete record of the shareholders entitled to vote at the meeting must be made and maintained in the books and records of the Company. This list must be arranged by voting group (if any), in alphabetical order, and include number of shares held by and the address of each shareholder in a legible and reproducible format. This record must be kept on file at the Company's principal office for a period of ten (10) days prior to the meeting. The records must also be kept open for inspection at shareholder meetings.

**5.09. CLOSING OF TRANSFER BOOKS & FIXING RECORD DATE.** In order that the Company may determine the shareholders entitled to notice of any meeting, the Board of Directors may fix a record date, which shall not be more than sixty (60) nor less than ten (10) days prior to the date of such meeting, nor shall the record date precede the date upon which the resolution fixing the record date is adopted by the Board of Directors. In order that the Company may determine the shareholders entitled to consent to corporate action without a meeting, the Board of Directors may fix a record date, which shall not precede, or be more than ten (10) days after, the date upon which the resolution fixing the record date is adopted by the Board of Directors. In order that the Company may determine the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or of any other lawful action, the Board of Directors may fix a record date, which shall not be more than sixty (60) days prior to such action.

If no record date is fixed: (1) the record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day immediately preceding the day on which notice is given or, if notice is waived, at the close of business on the business day immediately preceding the day on which the meeting is held; (2) the record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, when no prior action by the Board has been taken, shall be the day on which the first written consent is given; if prior action by the Board is required, then the record date shall be the close of business on the date the Board of Directors adopts the resolution taking such prior action, and (3) the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

**5.10. SHAREHOLDER LIABILITY.** Shareholders shall not be personally liable for the debts and acts of the Company solely due to the fact that the shareholders own shares of the Company. Nevertheless, shareholders *are* personally liable to the Company or its creditors for any delinquencies in payments of the agreed upon price or consideration for the shares. In the event that a subscription price or consideration for shares has not been fully paid, the following people are not personally liable for the unpaid balance:
    a.  A transferee or assignee who acquires the shares or subscription in good faith and without knowledge or notice of the nonpayment;
    b.  A person who holds the shares as a fiduciary, although the estate in the hands of the fiduciary is liable for the nonpayment; and
    c.  A pledgee or other person who holds shares as security.

**5.11. VOTING RIGHTS.** Unless otherwise provided in the Articles of Incorporation, each shareholder entitled to vote at any meeting of shareholders shall be entitled to one vote for each share held by such shareholder which has voting power upon the matter in question. Directors shall

be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. In all other matters, unless otherwise provided by law or by the Articles of Incorporation or these Bylaws, the affirmative vote of the holders of a majority of the shares present in person or represented by proxy and entitled to vote on the subject matter at a meeting in which a quorum is present shall be the act of the shareholders. Where a separate vote by class or classes is required, the affirmative vote of the holders of a majority of the shares of such class or classes present in person or represented by proxy shall be the act of such class or classes, except as otherwise provided by law or by the Articles of Incorporation or these Bylaws.

5.12. **PROXIES.** Every person entitled to vote or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act by proxy with respect to such shares. Such proxy must be made in writing, with signature of the shareholder, and presented to the meeting prior to any vote. No proxy shall be valid after the expiration of three years from the date thereof unless otherwise provided in the proxy. Every proxy continues in full force and effect until revoked by the person executing it. Such revocation may be effected by a writing delivered to the Company stating that the proxy is revoked, or by a subsequent proxy executed by the person executing the prior proxy and presented to the meeting, or by attendance at any meeting and voting in person thereat by the person executing the proxy.

5.13. **QUORUM.** At each meeting of shareholders, except where otherwise provided by law or the Articles of Incorporation or these Bylaws, the holders of a majority of the outstanding shares of stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders. In the absence of a quorum, any meeting of shareholders may be adjourned from time to time by the vote of a majority of the shares represented either in person or by proxy until a quorum is present or represented. Shares of its own capital stock belonging to the Company or to another corporation where the majority of the voting power is held by the Company shall neither be entitled to vote nor counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Company to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

5.14. **CONSENT OF SHAREHOLDERS WITHOUT A MEETING.** Except as otherwise provided in the Articles of Incorporation, any action which may be taken at any annual or special meeting of the shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Company. Every written consent shall bear the date of signature of each shareholder who signs the consent, and no written consent shall be effective unless, within sixty (60) days of the earliest consent, written consents signed by a sufficient number of holders have been delivered to the Company.

Unless all shareholders entitled to vote consent in writing, prompt notice of any shareholder approval without a meeting shall be given to those shareholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting and the agenda describing the subject matter to be voted upon if the record date for such meeting had been the date that sufficient consents were delivered to the Company.

**5.15. COMPANY'S ACCEPTANCE OF VOTES.** The Company shall accept votes by the shareholders in the following manner:

a. If the name signed on a vote, consent, waiver, or proxy appointment corresponds to the name of a shareholder, the Company if acting in good faith is entitled to accept the vote, consent, waiver, or proxy appointment and give it effect as the act of the shareholders.

b. If the name signed on a vote, consent, waiver, or proxy appointment does not correspond to the name of its shareholder, the Company if acting in good faith is nevertheless entitled to accept the vote, consent, waiver, or proxy appointment and give it effect as the act of the shareholder if:

    i. the shareholder is an entity and the name signed purports to be that of an officer or agent of the entity;

    ii. the name signed purports to be that of an administrator, executor, guardian, or conservator representing the shareholder and, if the Company requests, evidence of fiduciary status acceptable to the Company has been presented with respect to the vote, consent, waiver, or proxy appointment;

    iii. the name signed purports to be that of a receiver or trustee in bankruptcy of the shareholder and, if the Company requests, evidence of this status acceptable to the Company has been presented with respect to the vote, consent, waiver, or proxy appointment;

    iv. the name signed purports to be that of a pledgee, beneficial owner, or attorney-in-fact of the shareholder and, if the Company requests, evidence acceptable to the Company of the signatory's authority to sign for the shareholder has been presented with respect to the vote, consent, waiver, or proxy appointment;

    v. two or more persons are the shareholder as co-tenants or fiduciaries and the name signed purports to be the name of at least one of the co-owners and the person signing appears to be acting on behalf of all the co-owners.

c. The Company is entitled to reject a vote, consent, waiver, or proxy appointment if the Secretary or other officer or agent authorized to tabulate votes, acting in good faith, has reasonable basis for doubt about the validity of the signature on it or about the signatory's authority to sign for the shareholder.

d. The Company and its officer or agent who accepts or rejects a vote, consent, waiver, or proxy appointment in good faith and in accordance with the standards of this Article are not liable in damages to the shareholder for the consequences of the acceptance or rejection.

e. Corporate action based on the acceptance or rejection of a vote, consent, waiver, or proxy appointment under this Article is valid unless a court of competent jurisdiction determines otherwise.

## ARTICLE 6

### Officers and Corporate Executives

**6.01. OFFICERS, ELECTION.** As soon as practicable after the annual meeting of shareholders in each year, the Board of Directors shall elect a President and a Secretary, and if it so determines, elect from among its members a Chairman of the Board and a Vice Chairman of the Board. The Board may also elect one or more Vice Presidents, one or more Assistant Secretaries, and such other officers as the Board may deem desirable or appropriate and may give any of them such further designations or alternate titles as it considers desirable. Any number of offices may be held by the same person.

**6.02. TERM OF OFFICE, RESIGNATION, REMOVAL, VACANCIES.** Except as otherwise provided in the resolution of the Board of Directors electing any officer, each officer shall hold office until his or her term has ended or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the Board or to the Chairman of the Board or to the Secretary of the Company. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. The Board may remove any officer with or without cause at any time. Any such removal shall be without prejudice to the contractual rights of such officer, if any, with the Company, but the election of an officer shall not of itself create contractual rights. Any vacancy occurring in any office of the Company by death, resignation, removal or otherwise may be filled by the Board at any regular or special meeting.

**6.03. PRESIDENT.** The President shall preside over all meetings of shareholders and directors, shall have general supervision of the Company's affairs, and perform all other duties as are incident to the office or are properly required by a resolution passed by the Board.

**6.04. VICE-PRESIDENT.** During the absence or disability of the President, the Executive Vice-President (if any) may exercise all functions of the President. Each Vice-President shall have such powers and fulfill such duties as may be assigned by a resolution of the Board. If there is no Vice-President, then the Treasurer shall perform such duties of the President.

**6.05. SECRETARY AND ASSISTANT SECRETARIES.** The Secretary must:
    a.  Issue notices for all meetings and actions of the Board or shareholders;
    b.  Accept all requests for special meetings of the Board or shareholders;
    c.  Accept all notices of proxy appointments and revocations;
    d.  Keep the minutes of all meetings;
    e.  Accept delivery of any dissent announced at any meeting of the Board or shareholders;
    f.  Acknowledge and execute any share certificates;
    g.  Have charge of the corporate seal and books; and
    h.  Make reports and perform duties as are incident to the office, or are properly required of him or her by the Board of Directors.

The Assistant Secretary or Assistant Secretaries (in the order designated by the Board) will perform all of the duties of the Secretary during the absence or disability of the Secretary, and at other times may perform such duties as are directed by the President or the Board.

**6.06. THE TREASURER.** The Treasurer shall:
    a.  Have custody of the Company's monies and securities and maintain regular books of account;
    b.  Disburse the Company's funds in payment of the just demands against the Company or as may be ordered by the Board, taking proper vouchers for such disbursements; and
    c.  Provide the Board with an account of all his or her transactions as Treasurer and of the financial conditions of the office properly required of him or her by the Board.

The Assistant Treasurer or Assistant Treasurers (in the order designated by the Board) must perform all of the duties of the Treasurer in the absence or disability of the Treasurer, and at other times may perform such other duties as are directed by the President or the Board.

6.07. **DELEGATION.** In the absence or inability to act of any officer and of any person authorized to act in their place, the Board may delegate the officer's powers or duties to any other officer, director, or other person, subject to Article 6.01 of these Bylaws. Vacancies in any office arising from any cause may be filled by the Board, subject to Article 6.01 of these Bylaws, at any regular or special board meeting.

6.08. **OTHER OFFICERS.** The Board may appoint other officers and agents as it deems necessary or expedient. The term, powers, and duties of such officers will be determined by the Board and described in the resolution authorizing the appointment.

6.09. **CORPORATE EXECUTIVES.** Engagement of the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer, and all other "C-Suite" executives must be approved by the majority affirmative vote of the then-outstanding shares of Class B Voting Stock, voting as a separate class.

6.10. **LOANS.** No loans may be made by the Company to any officer unless first approved by a two-thirds majority vote of all the outstanding the voting shares entitled to vote on the matter.

6.11. **BONDS.** The Board may resolve to require any officer to give bonds to the Company, with sufficient surety or sureties, conditioned upon the faithful performance of the duties of their offices and compliance with other conditions as required by the Board.

6.12. **SALARIES.** Officers' salaries will be fixed from time to time by the Board. Officers are not prevented from receiving a salary by reason of the fact that he or she is also a director of the Company.

## ARTICLE 7

### Capital & Finance

7.01. **DIVIDENDS.** Dividends may be declared by the Board and paid by the Company out of the net earnings of the Company unreserved and unrestricted earned surplus of the Company, or out of the unreserved and unrestricted net earnings of the current fiscal year, or in treasury shares of the Company, subject to the conditions and limitations imposed by the state of formation. The share transfer books may be closed by the Board pursuant to Articles 4.07 and 5.08 of these Bylaws. The Board, without closing the Company's books, may declare dividends payable only to holders of record at the close of business on any business day not more than ninety (90) days prior to the date on which the dividend is paid.

7.02. **RESERVES.** The Board may, in its absolute discretion, set aside out of the Company's earned net surplus, such sum or sums as it deems expedient for dividend, maintaining any corporate property, or any other purpose, before making any distribution of earned surplus.

7.03. **DEPOSITORIES.** The Company's monies must be deposited in the Company's name in a bank or trust company or trust companies designated by resolution of the Board. Corporate monies may be drawn out only by check or other order for payment signed by such persons and in such manner as may be determined by resolution of the Board.

## ARTICLE 8

### Books and Records

**8.01. MEETING MINUTES.** As required by these Bylaws, the Company must keep a complete and accurate accounting and minutes of the proceedings of its shareholders and Board.

**8.02. SHAREHOLDER LIST.** The Company must keep a list of its shareholders, including the names and addresses of all shareholders and the number and class of the shares held by each at its registered office or principal place of business, or at the office of its transfer agent or registrar.

**8.03. ACCOUNTING RECORDS.** The Company shall maintain appropriate accounting records.

**8.04. OTHER RECORDS.** The Company shall keep a copy of the following records at its principal office:

a. its Articles of Incorporation, as originally filed, and as currently in effect;
b. a copy of these Bylaws currently in effect;
c. the minutes of all shareholders' meetings, and records of all action taken by shareholders without a meeting, for the past three (3) years;
d. all written communications within the past three (3) years to shareholders as a group;
e. a list of the names and business addresses of its current officers and directors;
f. its most recent annual report delivered to the relevant state authority; and
g. all quarterly or annual financial statements (balance sheet and income statement) prepared for periods ending during the last three (3) years.

**8.05. LEGIBILITY OF RECORDS.** Any books, records, and minutes may be in written form or any other form capable of being converted into written form within a reasonable time.

**8.06. RIGHT TO INSPECT.** Any shareholder or shareholder representative has the right, upon written request delivered to the Company, to inspect and copy during usual business hours the following documents of the Company:

a. the Company's Articles of Incorporation;
b. these Bylaws;
c. minutes of the shareholder proceedings;
d. annual statements of affairs; and
e. any voting trust agreements.

The Company acknowledges and agrees that any obligation to produce corporate documents under this Article of these Bylaws shall attach to the Secretary as part of the duties described in Article 6.05 of these Bylaws.

**8.07. ENHANCED INSPECTION.** Any individual or group which comprises at least twenty percent (20%) of the outstanding shares, may submit to the Company a written request to inspect and copy the following documents during usual business hours:

a. The books of account and share ledger of the Company;
b. The statement of affairs for the Company; and
c. The list of shareholders.

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 14

## ARTICLE 9

### Notices

**9.01. MAILING OF NOTICE.** Except as may otherwise be required by law, any notice to any shareholder or director may be delivered personally or by mail. If mailed, the notice will be deemed to have been delivered on the close of business of the fifth business day following the day when deposited in the United States mail with postage prepaid and addressed to the recipient's last known address in the records of the Company.

**9.02. E-NOTICE PERMITTED.** Any communications required by these Bylaws, or by any other laws, may be made by digital or electronic transmission to the recipient's known electronic address or number as known to the Company at the time of notice.

**9.03. DUTY TO NOTIFY.** All shareholders, directors, officers, employees, and representatives of the Company are required to notify the Company of any changes to the individual's contact information. Pursuant to the obligations under this Article of these Bylaws, the individual must notify the Company that electronic transmissions of notice are impracticable, impossible, frustrated, or otherwise improper and ineffective.

## ARTICLE 10

### Special Corporate Acts

**10.01. EXECUTION OF WRITTEN INSTRUMENTS.** All contracts, deeds, documents, and instruments that acquire, transfer, exchange, sell, or dispose of any assets of the Company must be executed by the President to bind the Company. This Article does not apply to any checks, money orders, notes, or other financial instruments for direct payment of corporate funds which are subject to Article 10.02 of these Bylaws.

**10.02. SIGNING OF CHECKS OR NOTES.** All authorizations to distribute, pay, or immediately draw upon the financial resources of the Company must be signed by the Treasurer, including any expense reimbursement or compensation payments to directors, officers, employees, representatives, service providers, or contractors of the Company.

**10.03. SPECIAL SIGNING POWERS.** To duly bind the Company to an agreement or instrument in the event the President holds an interest which exists outside of the capacity of being President, then any agreement involving such interest must be signed by an officer pursuant to either Article 6.07 or 10.01 of these Bylaws.

**10.04. SHAREHOLDER APPROVAL.** Shareholder approval is required prior to any merger, consolidation, share-exchange, conversion, or dissolution, and any loans provided under Articles 2.17 or 6.09 of these Bylaws. In the event of any dissent by shareholders, the Company must comply with Article 10.05 of these Bylaws.

Until these Bylaws require otherwise, no shareholder approval is required to acquire, transfer, exchange, sell, or dispose of any assets of the Company in the ordinary course of business or after dissolving the Company.

**10.05. DISSENTER RIGHTS.** Shareholders are entitled to dissent from and obtain fair value payment for shares held in the event of, any corporate actions requiring shareholder approval under

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 15

Article 10.04 of these Bylaws. In the event a corporate action that will create dissenter rights under this Article of these Bylaws occurs, the Company shall deliver notice to all shareholders that a corporate action has occurred or will occur that entitles the shareholder to assert their dissenter rights under these Bylaws. These options for dissent do not apply to a shareholder who voted in favor of the action or failed to express such dissent at the meeting.

## ARTICLE 11

### Amendments

11.01. **BY SHAREHOLDERS.** These Bylaws may be altered, amended, or repealed by the affirmative vote of a majority of the voting shares issued and outstanding at any regular or special shareholder meeting.

11.02. **BY DIRECTORS.** The Board of Directors has the power to make, alter, amend, and repeal the Company's Bylaws. Any alteration, amendment, or repeal of the Bylaws by the Board may be subsequently changed or repealed by the holders of a majority of the shares entitled to vote at any shareholders meeting.

11.03. **EMERGENCY BYLAWS.** The Board of Directors may adopt emergency Bylaws, subject to a vote to repeal or modify by the shareholders, which operate during any emergency in the Company's conduct of business resulting from an attack on the United States or a nuclear or atomic disaster.

11.04. **COMPLIANCE WITH STATE LAW.** Any amendment to the Company's Articles of Incorporation or these Bylaws shall be consistent with laws of Wyoming.

## ARTICLE 12

### Indemnification

12.01 **INDEMNIFICATION.** The Company shall have the power to indemnify to the full extent permitted by law any person made or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person or such person's testator or instate is or was a director, officer or employee of the Company or serves or served at the request of the Company as a director, officer, employee or agent of another enterprise.

Expenses, including attorneys' fees, incurred by any such person in defending against such action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding by the Company upon receipt by it of an undertaking of such person to repay such expenses if it shall be ultimately determined that such person is not entitled to be indemnified by the Company.

For purposes of this Article 12.01, the term "Company" shall include any predecessor of the Company and any constituent corporation absorbed by the Company in consolidation or merger; the term "other enterprise" shall include any corporation, partnership, joint venture, trust or employee benefit plan; service "at the request of the Company" shall include services as a director, officer or employee of the Company which imposes duties on, or involves services by, such director, officer or employee with respect to an employee benefit plan, its participants or beneficiaries; any excise taxes assessed on a person with respect to an employee benefit plan shall be deemed to be indemnifiable expenses; and action by a person with respect to an employee

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 16

benefit plan which such person reasonably believes to be in the interest of the participants and beneficiaries of such plan shall be deemed to be action not opposed to the best interests of the Company.

These Bylaws are adopted by resolution of the Company's Board of Directors on this 15th day of August 2022.

\* \* \* \* \*

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 17

# VISUAL SEMICONDUCTOR, INC.

## WRITTEN CONSENT OF THE SHAREHOLDERS IN LIEU OF A MEETING

### November 30, 2022

THE UNDERSIGNED, representing the majority vote of the Shareholders (the "**Shareholders**") of Visual Semiconductor, Inc., a Wyoming corporation (the "**Company**"), acting pursuant to the provisions of the Company's bylaws, hereby waive the calling or holding of a meeting of the Shareholders, consent to the actions set forth below, waive any right to dissent from such actions, and direct that this Written Consent of the Shareholders in Lieu of a Meeting (this "**Consent**") be filed in the minutes of the meetings of the Shareholders.

**WHEREAS**, Mathu Rajan holds more than 68% of the shareholder voting rights in the Company and is thus the controlling shareholder of the Company;

**WHEREAS**, on August 15, 2022, the Board of Directors of the Company recommended adoption of Third Amended and Restated Articles of Incorporation via a formal Board Resolution;

**WHEREAS**, on August 15, 2022, the Board of Directors of the Company recommended adoption of Amended Bylaws via a formal Board Resolution; and

**WHEREAS**, the Shareholders wish to formally amend the Company's Articles of Incorporation and Bylaws detailing matters of corporate operation and governance;

**NOW, THEREFORE, BE IT HEREBY RESOLVED**, that the Third Amended and Restated Articles of Incorporation, dated August 15, 2022, and attached hereto as Exhibit A, are formally adopted by the Company;

**BE IT FURTHER RESOLVED**, that the Third Amended and Restated Articles of Incorporation, dated August 15, 2022, shall be filed with the Wyoming Secretary of State by the Company's officers or its agent as soon as practicable;

**BE IT FURTHER RESOLVED**, that the Bylaws, dated August 15, 2022, and attached hereto as Exhibit B, are hereby formally adopted; and

**BE IT FURTHER RESOLVED**, that the Amended Bylaws, dated August 15, 2022, shall be filed with the Wyoming Secretary of State by the Company's officers or its agent as soon as practicable.

Acknowledge and agreed:

Mathu Rajan
Majority Shareholder

## EXHIBIT A

Third Amended and Restated Articles of Incorporation
dated August 15, 2022

## VISUAL SEMICONDUCTOR, INC.

### THIRD AMENDED AND RESTATED
### ARTICLES OF INCORPORATION

### August 15, 2022

### I.

The name of the corporation is Visual Semiconductor, Inc. (the "*Company*").

### II.

The Company's registered office in the State of Wyoming is located at 30 N. Gould Street, Suite R, Sheridan, WY 82801. The registered agent in charge thereof is Registered Agents, Inc.

### III.

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the laws of the State of Wyoming.

### IV.

**A.**     The total number of shares of stock of all classes which the Company has the authority to issue is 2,500,000,000 shares of capital stock, par value $0.0001 per share, consisting of: 2,000,000,000 shares of Class A Common Stock ("*Class A Common Stock*"), 400,000,000 shares of Class B Voting Stock ("*Class B Voting Stock*"), 50,000,000 shares of Class C Non-Voting Stock ("*Class C Non-Voting Stock*"), and 50,000,000 shares of Class D Non-Voting Non-Dividend Stock ("*Class D Non-Voting Non-Dividend Stock*"). Classes A, C, and D stock may be certificated in digital or physical form as determined by the Company. Class B Voting Stock shall be uncertificated unless otherwise determined by the Company, with the record of holders thereof to be kept solely by the Company and/or its transfer agent.

**B.**     For every five (5) shares of Class A Common Stock issued by the Company, the Company shall issue for no consideration one (1) share of Class B Voting Stock to the Company Founder, Mathu Rajan ("*Founder*"), or Founder's assigns. The ratio of Class A Common Stock to Class B Voting Stock shall remain unchanged regardless of how many shares of Class A Common Stock are issued or authorized.

**C.**     Prior to the filing of these Third Amended and Restated Articles of Incorporation (these "*Third Restated Articles of Incorporation*"), all previously issued and outstanding shares of the Company's Common Stock had a par value $0.0001 per share (the "*Prior Common Stock*"). All designations, rights, preferences, privileges, and restrictions, if any, of the Prior Common Stock are hereby eliminated.

**D.**     Irrespective of any contrary provisions contained in Wyoming Law, the number of authorized shares of Class A Common Stock, Class B Voting Stock, Class C Non-Voting Stock, or Class D Non-Voting Non-Dividend Stock may be increased or decreased (but not below the number of shares of such stock then outstanding) by the affirmative vote of the holders of a majority of the stock of the Company entitled to vote (voting together as a single class on an as-converted basis).

majority of the stock of the Company entitled to vote (voting together as a single class on an as-converted basis).

E.      The rights, preferences, privileges, restrictions and other matters relating to the four classes of stock are as follows:

## 1.      DIVIDEND AND DISTRIBUTION RIGHTS.

**a)** Holders of Class A Common Stock and Class C Non-Voting Stock may be entitled to dividends from time to time as determined by the Board of Directors. Such distributions, if any, shall be distributed ratably to all holders of the Class A Common Stock and Class C Non-Voting Stock combined as a single group.

**b)** Whenever a dividend provided for in this Section 1 shall be payable in property other than cash, the value of such dividend shall be the fair market value of such distribution as determined in good faith by the Board.

**c)** Class B Voting Stock is a special class of stock that entitles the holders thereof to the voting rights set forth in these Third Amended and Restated Articles of Incorporation but does not entitle the holders thereof to any economic rights in the Company, including the right to share in profits of the Company or the distribution of the Company's assets upon liquidation and dissolution. Accordingly, the holders of Class B Voting Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock, and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class B Voting Stock.

**d)** Class D Non-Voting Non-Dividend Stock is a special class of stock that does not entitle the holders thereof to share in profits of the Company. Accordingly, the holders of Class D Non-Voting Non-Dividend Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock other than through a distribution related to the Company's liquidation or dissolution, and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class D Non-Voting Non-Dividend Stock. Class D Non-Voting Non-Dividend stockholders shall, however, be entitled to economic rights in the distribution of the Company's assets upon liquidation and dissolution. Class D Non-Voting Non-Dividend stockholders shall also have the right to sell their Class D shares, whether publicly traded or not.

## 2.      VOTING RIGHTS.

**a) Rights of Class A Common Stock.** Each holder of shares of Class A Common Stock shall be entitled to one (1) vote per share of Class A Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**b) Rights of Class B Voting Stock.** Each holder of shares of Class B Voting Stock shall be entitled to ten (10) votes per share of Class B Voting Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**c) Rights of Class C Non-Voting Stock and Class D Non-Voting Non-Dividend Stock.** No holder of shares of Class C Non-Voting Stock or Class D Non-Voting

Non-Dividend Stock shall be entitled to any votes per share thereof but shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.

**d) General Rights of Voting Stock.** Except as otherwise expressly provided by these Third Amended and Restated Articles of Incorporation, such as the Class B voting requirement described in Sections 2(e) and 5(d) below, or as provided by law, the holders of shares of Class A Common Stock and Class B Voting Stock shall (a) at all times vote together as a single class on all matters (including the election of Directors) submitted to a vote or for the consent (if action by written consent of the stockholders is permitted at such time under these Third Amended and Restated Articles of Incorporation) of the stockholders of the Company, and (b) be entitled to vote upon such matters and in such manner as may be provided by applicable law. There shall be no cumulative voting.

**e) Separate Vote of Class B Voting Stock.** For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummate an Acquisition or Asset Transfer as defined in Section 4(b) below. For any issue requiring a separate vote by the holders of Class B Voting Stock as described herein, no vote by the holders of Class A Common Stock shall be required.

## 3.   LIQUIDATION RIGHTS.

**a) Class A Common Stock, Class C Non-Voting Stock, and Class D Non-Voting Non-Dividend Stock.** Upon any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary (a "*Liquidation Event*"), the assets of the Company legally available for distribution in such Liquidation Event (or the consideration received in such transaction), if any, shall be distributed ratably to the holders of Class A Common Stock, Class C Non-Voting Stock, and Class D Non-Voting Non-Dividend Stock combined as a single group.

**b) No Liquidation Right for Class B Voting Stock.** The holders of Class B Voting Stock shall not be entitled to share in any payment or distribution of Company assets, whether in cash or property, upon a Liquidation Event or Deemed Liquidation Event, and the Company shall not make any provision therefor.

## 4.   ASSET TRANSFER OR ACQUISITION RIGHTS.

**a)** An Acquisition or Asset Transfer (each as hereinafter defined) shall be deemed to be a liquidation of the Company (a "*Deemed Liquidation*"). The Company shall not have the power to effect any transaction constituting a Deemed Liquidation unless the definitive documents effecting such Deemed Liquidation provide that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with Section 3(a) above. The amount deemed paid or distributed to holders of capital stock of the Company upon any Deemed Liquidation shall be determined in accordance with Section 4(c) below.

**b)** For the purposes of this Article IV: (i) "*Acquisition*" shall mean (A) any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party and in which in excess of fifty percent (50%) of the Company's voting power is transferred; provided that an Acquisition shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; and (ii) "*Asset Transfer*" shall mean a private foreclosure, settlement, sale, lease or any disposition of all or substantially all of the assets or intellectual property of the Company under any circumstances or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company.

**c)** In any Acquisition or Asset Transfer, if the consideration to be received is securities of a corporation or other property other than cash, its value will be deemed its fair market value as determined in good faith by the Board, on the date such determination is made; provided, however, that any publicly-traded securities to be distributed to stockholders will be valued as follows:

**(i)** Securities not subject to investment letter or other similar restrictions on free marketability:

**(A)** If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30)-day period ending three (3) calendar days prior to the closing; and

**(B)** If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30)-day period ending three (3) calendar days prior to the closing.

**(ii)** The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Sections 4(c)(i)(A) and (B) to reflect the approximate fair market value thereof, as determined in good faith by the Board.

**(d)** Notwithstanding anything to the contrary in this Section 4, if the definitive transaction documents for an Acquisition or Asset Transfer provide for a different method of valuation, the method of valuation set forth in such documents shall control.

**(e) Allocation of Escrow.** In the event of a Deemed Liquidation, if any portion of the consideration payable to the stockholders of the Company is placed into escrow or is payable to the stockholders of the Company subject to contingencies, the definitive acquisition

agreement relating thereto shall provide that (i) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the "*Initial Consideration*") shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation and (ii) any additional consideration which becomes payable to the stockholders of the Company upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above after taking into account the previous payment of the Initial Consideration as part of the same transaction.

## 5. RESTRICTIONS ON TRANSFER AND SALE.

**(a) Defined Terms.** As used in this Section 5, the following terms shall have the following meanings:

(i) "*Founder*" shall mean Mathu Rajan. Founder shall be entitled to receive Class B Voting Stock as specified in Section IV (B) above.

(ii) "*Class B Stockholder*" Other than the Founder, there are no registered holders of shares of Class B Voting Stock as of the date of filing these Third Amended and Restated Articles of Incorporation (the "*Effective Time*").

(iii) "*Permitted Entity*" shall mean, with respect to any individual Class B Stockholder, any trust, corporation, partnership, or limited liability company specified in Section 5(c)(i) established by or for such individual Class B Stockholder, so long as such entity meets the requirements of the exception set forth in Section 5(c)(ii) applicable to such entity.

(iv) "*Transfer*" of a share of Class B Voting Stock shall mean any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law; provided, however, that granting of a proxy to officers or directors of the Company at the request of the Board of Directors of the Company in connection with actions to be taken at an annual or special meeting of stockholders shall not be considered a Transfer.

(v) "*Voting Control*" with respect to a share of Class B Voting Stock shall mean the power (whether exclusive or shared) to vote or direct the voting of such share of Class B Voting Stock.

**(b) General Restrictions on Transfer.** There are no restrictions on transfer of Class A Common Stock, Class C Non-Voting Stock, or Class D Non-Voting Non-Dividend Stock. Shares of Class B Voting Stock may not be Transferred, except as provided in this Section 5, and any attempted Transfer in violation of these Third Amended and Restated Articles of Incorporation shall be null and void and not recognized for any purpose.

**(c) Permitted Transfers.** Notwithstanding the general restriction on Transfer specified in Section 5(b), shares of Class B Voting Stock may be Transferred as follows:

(i) by a Class B Stockholder who is a natural person to any of the following Permitted Entities, and from any of the following Permitted Entities back to such Class B Stockholder and /or any other Permitted Entity established by or for such Class B Stockholder:

(A) a trust for the benefit of such Class B Stockholder and for the benefit of no other person, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

(B) a trust for the benefit of persons other than the Class B Stockholder so long as the Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such trust, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

(C) a corporation in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns shares with sufficient Voting Control in the corporation, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such corporation;

(D) a partnership in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns partnership interests with sufficient Voting Control in the partnership, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such partnership;

(E) a limited liability company in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns membership interests with sufficient Voting Control in the limited liability company, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such limited liability company.

(ii) by a Class B Stockholder that is a partnership, or a nominee for a partnership, which partnership beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a partner of such partnership pro rata in accordance with their ownership interests in the partnership, and any further Transfer(s) by any such partner that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(iii) by a Class B Stockholder that is a limited liability company, or a nominee for a limited liability company, which limited liability company beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective

Time, to any person or entity that is a member of such limited liability company pro rata in accordance with their ownership interests in the company, and any further Transfer(s) by any such member that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

**(iv)** by a Class B Stockholder that is a corporation, or a nominee for a corporation, which corporation beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a shareholder of such corporation pro rata in accordance with their ownership interests in the corporation, and any further Transfer(s) by any such shareholder that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

**(v)** by a Class B Stockholder to the Company or any other person or entity upon approval of the Company's Board of Directors.

**(d) General Restrictions on Sale.** Holders of Class A Common Stock issued prior to the Company's Initial Public Offering may not sell more than two and a half percent (2.5%) of such holdings during any financial quarter following the Company's Initial Public Offering without the consent of the Class B Voting stockholders, voting as a separate class.

**(e) Compliance with Securities Laws.** Notwithstanding any other provision of these Third Amended and Restated Articles of Incorporation, no Transfer of shares of Class B Voting Stock may be made in violation of the Securities Act of 1933, as amended, or any other federal or state securities laws.

## V.

**A.** To the fullest extent permitted by law, a director of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director. If any law of the State of Wyoming is amended after approval by the stockholders of this Article V to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Company shall be eliminated or limited to the fullest extent permitted by such Wyoming law as so amended.

**B.** To the fullest extent permitted by applicable law, the Company is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Company (and any other persons to which Wyoming law permits the Company to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Wyoming law.

**C.**     Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

**D.**     Unless the Company consents in writing to the selection of an alternative forum, the United States District Court for the District of Wyoming shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of Wyoming law, these Third Amended and Restated Articles of Incorporation or the Company's Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine.

## VI.

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further *provided* that:

**A.**     The management of the business and the conduct of the affairs of the Company shall be vested in its Board. The number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to terms and conditions set forth in these Third Amended and Restated Articles of Incorporation.

**B.**     The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

**C.**     The holders of Class B Voting Stock, voting as a separate class, shall have the right to appoint directors to the Board (*"Class B-Appointed Seats"*). At all times, Class B-Appointed Seats shall constitute a majority of the Board.

**D.**     Any and all directors of the Board appointed by holders of Class B Voting Stock shall have their terms determined solely by, and may be removed by, the Class B Voting Stockholders, voting as a separate class, irrespective of any contractual terms or Board resolutions.

**E.**     Any and all directors other than those appointed by the Class B Voting Stockholders must be approved by the affirmative vote of a majority of the outstanding voting shares then entitled to vote. Such

**F.**     Any director may be removed from the Board by the unanimous consent of all other directors for any reason, regardless of any contractual or other rights such director might have.

**G.**     Any all directors may be removed by a majority of the votes of the Class B Voting Stockholders, voting as a separate class, for any reason, irrespective of any contractual terms or Board resolutions.

**H.**     Compensation for all Board members shall be determined solely a majority of the votes of the Class B Voting Stockholders, voting as a separate class, irrespective of any contractual terms.

**I.**      Subject to any additional vote required by these Third Amended and Restated Articles of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board is expressly empowered to adopt, amend, or repeal the Bylaws of the Company.

**J.**      Engagement of the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer, and all other "C-Suite" executives must be approved by the majority affirmative vote of the then-outstanding shares of Class B Voting Stock, voting as a separate class.

**K.**      Written Consent of the holders of a majority of the outstanding voting shares then entitled to vote may be accepted in lieu of a meeting of the stockholders, and any resolutions or actions resulting from a Written Consent of the Stockholders shall have the same force and effect as any resolutions or actions approved at a meeting of the stockholders.

**L.**      Meetings of stockholders may be held within or without the State of Wyoming, as the Bylaws of the Company may provide.  The books of the Company may be kept outside the State of Wyoming at such place or places as may be designated from time to time by the Board or in the Bylaws of the Company.

\* \* \* \* \*

**EXHIBIT B**

Amended Bylaws
dated August 15, 2022

**VISUAL SEMICONDUCTOR, INC.**
**CORPORATE BYLAWS**
**August 15, 2022**

## ARTICLE 1

### Company Formation

1.01.**FORMATION.** Visual Semiconductor, Inc. ("Company") is formed pursuant to the laws of the State of Wyoming.

1.02. **PURPOSE.** The Company is formed to engage in any lawful business purpose.

1.03. **CORPORATE CHARTER COMPLIANCE.** The Board of Directors (the "Board") acknowledges and agrees that it has caused the Company's Articles of Incorporation to be filed with the relevant state authority and all filing fees have been paid and satisfied.

1.04. **ADOPTION OF BYLAWS.** These Bylaws are adopted on behalf of the Company.

1.05. **REGISTERED OFFICE & REGISTERED AGENT.** The registered office of the Company shall be as stated in the Articles of Incorporation, unless amended. The address of the registered office may be changed from time to time. The Company must maintain a statement of acceptance from the Company's current registered agent.

1.06. **OTHER OFFICES.** The Company may have other offices as may be selected by the Board of Directors from time to time.

1.07. **CORPORATE SEAL.** The Company may have a corporate seal which shall have the name of the Company inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors. The corporate seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced. The adoption and use of a corporate seal are not required.

1.08. **FISCAL YEAR.** The fiscal year of the Company shall be determined by the Board of Directors.

## ARTICLE 2

### Board of Directors

2.01. **POWERS. NUMBER AND QUALIFICATIONS.** The management of all the Company's affairs, property, and interests shall be managed by or under the direction of the Board of Directors, except as otherwise provided by law or in the Company's Articles of Incorporation. The Board shall consist of members who are elected by majority shareholder vote for a term of one (1) year and hold office until their successors are duly elected and qualified at the following annual shareholder meeting. Any director appointed at a time other than the annual shareholder meeting, as allowed by Articles 2.04 and 2.05 of these Bylaws, shall hold office only until the next annual shareholders meeting. The Board shall initially consist of one (1) director, assigned at the time of the Company's formation. Directors need not be shareholders or residents of the state in which the Company was formed.

**2.02. CHANGE OF NUMBER.** The number of directors may be increased or decreased at any time pursuant to the process outlined in Article 11 of these Bylaws. A decrease in number does not have the effect of shortening the term of any incumbent director. In the event the established number of directors is decreased, the directors shall hold their positions until the next shareholder meeting occurs and new directors are elected and qualified.

**2.03. CLASSES OF DIRECTORS.** Until such time as these Bylaws are accordingly amended, the Company does not have classes of directors, and does not elect to have staggered terms.

**2.04. ELECTION, TERM OF OFFICE, RESIGNATION & REMOVAL OF DIRECTORS.** Each director shall hold office until his or her term has ended or until his or her earlier resignation or removal. Any director may resign upon giving written notice to the Chairman of the Board, the President or the Secretary of the Company. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. Any or all of the directors may be removed, with or without cause, if such removal is approved by a majority of the outstanding voting shares then entitled to vote on the election of directors. Vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a special election by a majority of the outstanding voting shares then entitled to vote on the election of directors or at an annual shareholder meeting.

**2.05. VACANCIES.** All vacancies in the Board due to an increase in the number of directors or removal or resignation of a director may be filled only by the affirmative vote of a majority of the outstanding voting shares then entitled to vote on the election of directors, *provided* that any such director who fills a vacancy is qualified to be a director and shall hold the office only until a new director is elected and qualified by the shareholders at the next annual meeting of the shareholders or at a special meeting of the shareholders.

Any director who fills a vacancy on the Board shall not be considered unqualified or disqualified solely by virtue of being an interim director.

**2.06. REGULAR MEETINGS.** Regular meetings of the Board or any committee may be held at the Company's principal office or at any other place designated by the Board or its committee, including by means of remote communication. An annual meeting of the Board will be held immediately following the adjournment of the annual meeting of shareholders.

**2.07. SPECIAL MEETINGS.** Special meetings of the Board may be held at any place and at any time and may be called by the Chairman of the Board, the President, the sole director if there be only one, or by at least two directors if there be two or more directors.

**2.08. NOTICE OF MEETINGS.** The annual meeting of the Board shall be held without notice of the date, time, place, or purpose of the meeting, provided the meeting follows the adjournment of the annual shareholder meeting. All other regular and special meetings of the Board must be preceded by at least forty-eight (48) hours' advance notice of the date, time, place, and purpose of the meeting, unless these Bylaws require otherwise. Notice may be given personally, by facsimile, by mail, or in any other lawful manner, so long as the method for notice comports with Article 9 of these Bylaws. Oral notification is sufficient only if a written record of the notice is included in the Company's minute book.

Notice is effective at the earliest of:

a. Receipt;

b. Delivery to the proper address or telephone number of the director(s) as shown in the Company's records; or

c. Five days after its deposit in the United States mail, as evidenced by the postmark, if correctly addressed and mailed with first-class postage prepaid.

**2.09. WAIVER OF NOTICE.** A director waives the notice requirement if that director attends or participates in the meeting, unless a director attends for the express purpose of promptly objecting to the transaction of any business because the meeting was not lawfully called or convened. A director may waive notice by a signed writing, delivered to the Company for inclusion in the minutes before or after the meeting.

**2.10. PARTICIPATION IN MEETINGS BY CONFERENCE TELEPHONE PERMITTED.** Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board or of such committee, as the case may be, through the use of conference telephone, video teleconference, internet application, or similar communications equipment by means of which all members participating in such meeting can hear one another. Participation in a meeting pursuant to this Article 2.10 shall constitute presence in person at such meeting.

**2.11. QUORUM, VOTING.** At all meetings of the Board of Directors, a majority of the authorized number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board unless the Articles of Incorporation or these Bylaws shall require a vote of a greater number. An agenda describing any and all subject matters on which a vote shall be taken at any regular or special Board meeting shall be sent to all Board members, with specific reference that a vote on the matter is scheduled to occur. The written agenda, which may be sent via postal mail, email, or other electronic written means, shall be distributed not less than forty-eight (48) hours prior to the meeting to all Board members. Any subject matter not included on a meeting agenda sent with advance notice required by this Article 2.11 may be discussed at the Board meeting but may not be voted upon until presented at a subsequent Board meeting that meets the advance notice requirement.

**2.12. INTERESTED DIRECTORS.** No contract or transaction between the Company and one or more of its directors or between the Company and any other corporation, firm or association in which one or more of its directors are directors, or have a financial interest, shall be void or voidable solely for this reason, or solely because such director or directors are present at the meeting of the Board of Directors or committee thereof which authorizes, approves or ratifies the contract or transaction, or solely because his or her or their votes are counted for such purpose, if: (1) the material facts as to his/her/their relationship or interest and as to the contract or transaction are fully disclosed or are known to the Board or the committee, and the Board or committee authorizes, approves or ratifies the contract or transaction in good faith by the affirmative votes of a majority of the disinterested directors, even if the disinterested directors be less than a quorum; or (2) the material facts as to his/her/their relationship or interest in the contract or transaction is fully disclosed or is known to the shareholders and such contract or transaction is specifically approved by the shareholders in good faith by vote of the shareholders; or (3) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board, a committee thereof or the shareholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 3

**2.13. ORGANIZATION, MANNER OF ACTING.** Meetings of the Board of Directors shall be presided over by the Chairman of the Board, or in the absence of the Chairman of the Board by the Vice Chairman of the Board, if any, or in their absence by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary, the chairman of the meeting may appoint any person to act as secretary of the meeting.

The act of the majority of the Board present at a meeting at which a quorum is present when the vote is taken shall be the act of the Board unless the Articles of Incorporation require a greater percentage.

**2.14. REGISTERING DISSENT.** A director who is present at a meeting at which an action on a corporate matter is taken is presumed to have assented to such action, unless the director expressly dissents to the action. A valid dissent must be entered in the meeting's minutes, filed with the meeting's acting secretary before its adjournment, or forwarded by registered mail to the Company's Secretary within twenty-four (24) hours after the meeting's adjournment. These options for dissent do not apply to a director who voted in favor of the action or failed to express such dissent at the meeting.

**2.15. ACTION BY DIRECTORS WITHOUT A MEETING.** Any action which may be taken at a meeting of the Board, or its committee, may be taken without a meeting, *provided* all directors or committee members unanimously agree, and such unanimous consent is filed in writing with the minutes of the proceeding and sets forth the action taken by the Board.

**2.16. REMUNERATION.** The Board may adopt a resolution which results in directors being paid a reasonable compensation for their services rendered as directors of the Company. Directors may also be paid a fixed sum and expenses, if any, for attendance at each regular or special meeting of such Board. Nothing contained in these Bylaws precludes a director from receiving compensation for serving the Company in any other capacity, including any services rendered as an officer or employee. If the Board accordingly passes a resolution, then committee members may be allowed like compensation for attending committee meetings.

A resolution of the Board that grants compensation to a director may be challenged by a shareholder, provided the shareholder requests a special shareholder meeting specifically addressing the resolution related to director compensation. Any Board resolution that relates to director compensation can be overturned by a majority vote of shareholders.

**2.17. LOANS.** The Company may not make loans to the directors, unless first approved by the holders of two-thirds of the voting shares. The Company may not make loans secured by its own shares.

**2.18. ADVANCE EXPENSE.** The Company shall pay for or reimburse the reasonable expenses incurred by a director who is a party to a proceeding which arises from the business operations of the Company.

**2.19. DIRECTOR LIABILITY.** Each director is required, individually and collectively, to act in good faith, with reasonable and prudent care, and in the best interest of the Company. If a director acts in such a manner, then such director shall be immune from liability arising from official acts on behalf of the Company. Directors who fail to comply with this Article of these Bylaws shall be personally liable to the Company for any improper distributions and as may otherwise be described in these Bylaws.

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 4

## ARTICLE 3

### Committees

**3.01. COMMITTEES OF DIRECTORS.** The Board of Directors may not designate any committee without the express written approval of the majority of shareholder votes entitled to vote thereon. If so approved, the Board of Directors may designate one or more committees, each consisting of one or more directors. The Board shall have the power to dissolve any committee at any time, for any reason, without notice. The Board shall also have the power to nullify any actions taken by any committee, subject to applicable law.

Any committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board, except that no such committee shall have power or authority with respect to the following matters:
   a. Approving or adopting any action or matter expressly required by Wyoming Law to be submitted to the shareholders for approval;
   b. Approving or adopting any action or matter that transfers or commits to transfer more than one percent (1%) of the assets of the Company; or
   c. The amendment or repeal of the Bylaws, or the adoption of new Bylaws.
   d. The amendment or repeal of the Articles of Incorporation, or the adoption of new Articles of Incorporation.

**3.02. COMMITTEE RULES.** Unless the Board of Directors otherwise provides, each committee designated by the Board may adopt, amend and repeal rules for the conduct of its business. In the absence of a provision by the Board of Directors or a provision in the rules of such committee to the contrary, each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article 2 of these Bylaws.

**3.03. COMMITTEE MEETING MINUTES.** Every committee shall document its meetings in writing. Written meeting minutes shall be circulated by the committee to all members of the Board not more than twenty-four (24) hours following the adjournment of such meeting so that the Board of Directors may be sufficiently informed of the committee's actions.

## ARTICLE 4

### Shares

**4.01. AUTHORITY TO ISSUE.** The Company is authorized to issue any class of shares or securities convertible into shares of any class. Before any shares of the Company may be issued, the Board must pass a resolution which authorizes the issuance, sets the minimum consideration for the shares or security (or a formula to determine the minimum consideration), and fairly describes any non-monetary consideration. The authorized number of shares shall be as listed in the Company's Articles of Incorporation.

**4.02. RESTRICTIONS.** Shares may only be issued in accordance with the Company's Articles of Incorporation, and through the process described in these Bylaws. Any issuance of shares in excess of the amount described in the Articles of the Company must be authorized by the Board and approved by the affirmative vote of a majority of shareholders. Any restriction on the transferability of shares shall be fully furnished to the shareholder, upon shareholder request, and without any charge to the shareholder.

No shareholder has a preemptive right to subscribe to any subsequent or additional issuance of shares.

**4.03. FORMS OF SHARE CERTIFICATES.** All shares in the Company which require the issuance of a certificate shall be digitally issued upon an agreement between the Company and the holder.

If the Company is authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences, relative or other special rights, qualifications, restrictions and limitations of each class or series shall be set forth in full or summarized and furnished by the Company without charge to each shareholder who requests them.

If share certificates are issued, then each share certificate must contain on its face:
a. The name and state of formation of the Company;
b. The name of the shareholder (or person to whom the shares are issued);
c. The class of shares and the number of shares it represents;
d. The signature of the president, vice president, chief executive officer, chief operating officer, chief financial officer, chairman of the Board *or* vice-chairman of the Board; and
e. The counter signature of the Secretary, assistant secretary, treasurer, assistant treasurer, or any other officer.

For the sake of clarity, in the event that an individual serves multiple roles within the Company, that person *cannot* countersign any document which that person has already signed in their official or individual capacity.

If an officer who has signed or whose facsimile signature appears on any share certificate ceases to be an officer before the certificate is issued to the shareholder, it may be issued by the Company and is valid as if the person were an officer on the date of issuance. The certificate may be sealed with the Company's seal.

**4.04. MUTILATED, LOST, OR DESTROYED CERTIFICATES.** In the instance of any mutilation, loss, or destruction of any share certificate, another may be issued in its place on proof of such mutilation, loss or destruction. The Board may impose conditions on such issuance and may require the giving of a satisfactory bond or indemnity to the Company. The Board may establish other procedures as it deems necessary.

**4.05. FRACTIONAL SHARES OR SCRIP.** The Company may:
a. Issue fractions of a share which entitle the holder to exercise voting rights, to receive dividends, and to participate in any of the Company's assets in the event of liquidation;
b. Arrange for the disposition of fractional interests by those entitled thereto;
c. Pay the fair market value, in cash, of fractions of a share as of the time when those entitled to receive such shares are determined; or
d. Issue scrip in a form which entitles the holder to receive a certificate for the full share upon surrender of such scrip aggregating a full share.

**4.06. TRANSFER.** So long as there is no transferability restriction on the shares, as described in Article 4.02 of these Bylaws, the shares of the Company are freely transferable. Transfers of shares must be made upon the Company's share transfer books. Share transfer books shall be kept in the manner described in Article 8 of these Bylaws.

Before a new certificate is issued, the old certificate must be surrendered for cancellation. The Board may, by resolution, open a share register in any state of the United States, and may employ an agent or agents to keep such register, and to record transfers or shares therein.

**4.07. REGISTERED OWNER.** The Company shall recognize an individual as the registered owner of given shares, *provided* that individual is determined as the shareholder of record by the record date as set out in Articles 5.08 and 5.09 of these Bylaws. Shareholders may agree to confer the right to vote or represent their shares to third parties, including trustees, proxies, or fiduciaries. The Board may resolve to adopt a procedure by which a shareholder of the Company may certify in writing to the Company that all or a portion of the shares registered in the shareholder's name are held for the account of a specified person or persons.

The resolution must set forth:
a. The classification of shareholders who may certify;
b. The purpose or purposes for which the certification may be made;
c. The form of certification and information to be contained therein;
d. If the certification is with respect to a record date or closing of the share transfer books, the date within which the certification must be received by the Company; and
e. Other provisions with respect to the procedure as are deemed necessary or desirable.

Upon receipt of a certification complying with this procedure, the Company must treat the persons specified in the certification as the holders of record for the number of shares specified in place of the shareholder making the certification.

**4.08. SHARES OWNED BY THE COMPANY.** Shares owned by the Company in another corporation may be voted by the officer, agent, or proxy chosen by the Board or, in the absence of such determination, by the President of the Company. The power to vote such shares is vested in the Board, however, the President is authorized to vote on the Company's behalf, only in the absence of a Board decision on how to vote. If the Board does render a decision related to the vote of shares, then the President is bound by the Board's decision.

The Company may vote or represent shares that it holds in itself, *provided* the Company holds such shares in a fiduciary capacity. If the Company holds shares in itself in such a fiduciary capacity, then such shares shall be counted in determining the total number of outstanding shares at a given time. If the Company holds shares in itself in a non-fiduciary capacity, then such shares shall be construed as authorized but unissued shares, and they may not be represented or voted at a meeting of the shareholders.

<u>**ARTICLE 5**</u>

**Shareholders**

**5.01. ANNUAL MEETING.** An annual meeting of shareholders shall be held for the election of directors on the first day of November each year, unless such date falls on a Saturday or Sunday, in which case the meeting shall be held on the next business day. The location shall be at a time and place either within or without the State of Wyoming fixed by resolution of the Board of Directors. Any other proper business may be transacted at the annual meeting. An annual meeting may be held in-person or via teleconference or other electronic means as may be agreed by the Board of Directors, provided such electronic means can accommodate the Board of Directors and all shareholders.

**5.02 SPECIAL MEETINGS.** Special meetings of the shareholders may be called at any time by the holders of shares entitled to cast not less than fifty percent (50%) of the votes at the meeting unless another percentage is required under Wyoming law, in which case the required percentage shall prevail, such meeting to be held on a date and at a time and place either within or without the State of Wyoming as may be stated in the notice of the meeting. A special meeting may be held in-person or via teleconference or other electronic means as may be agreed by the Board of Directors, provided such electronic means can accommodate the Board of Directors and all shareholders.

**5.03. NOTICE OF MEETINGS.** The Secretary shall cause notice to be given to each shareholder of record at least ten (10) days, but no more than sixty (60) days, before the shareholders' meeting. Notice shall be by writing, electronic transmission, or by personal delivery, and shall state the time, place, and purpose of the meeting (including instructions for how to remotely or electronically attend and participate). Notice is considered given to a shareholder when it is personally provided to the shareholder, left at the shareholder's residence or usual place of business, mailed to the shareholder's address of record, or by electronic transmission to the shareholder's address or number of record on file with the Company. A single notice may be delivered to multiple shareholders sharing the same address, unless the Company receives a request from a shareholder that more than a single notice be delivered.

Notice by electronic transmission shall be considered ineffective if the Company is unable to deliver two consecutive notices and the individual responsible for sending notices to shareholders is made aware of the delivery failures. A shareholder meeting, and any actions taken by shareholders, shall not be invalidated due to an inadvertent failure to deliver notice.

**5.04. WAIVER OF NOTICE.** A shareholder who is entitled to notice may waive the notice requirement if they provide a signed written waiver of the required notice, before or after the stated meeting time, or the shareholder is present at the meeting in person or by proxy.

**5.05. ADJOURNMENTS.** If any shareholder meeting is adjourned to a different date, time, or place, notice need not be given of the new date, time, and place if the new date, time, and place is announced at the meeting before adjournment. At the reconvened meeting, the Company may transact any business which might have been transacted at the original meeting prior to adjournment. But if the adjournment is for more than thirty (30) days or if a new record date for the adjourned meeting is, or must be fixed, then notice must be given pursuant to the requirements of Article 5.03, to those persons who are shareholders as of the new record date.

**5.06. ORGANIZATION.** Meetings of shareholders shall be presided over by the Chairman of the Board of Directors, if any, or in the absence of the Chairman of the Board by the Vice Chairman of the Board, if any, or in the absence of the Vice Chairman of the Board by the President, or in the absence of the foregoing persons by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as secretary of the meeting, or in their absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

**5.07. MEETING AGENDAS.** For all annual and special meetings, the Board of Directors shall distribute, or cause to be distributed, a written agenda of any and all subject matters on which a vote shall be taken at the meeting, with specific reference that a vote on the matter is scheduled to occur. The written agenda, which may be sent via postal mail, email, or other electronic written means, shall be distributed not less than seven (7) days prior to the meeting to all holders of shares

entitled to vote at such meeting. Any subject matter not included on a meeting agenda sent with advance notice required by this Article may be discussed at the meeting but may not be voted upon until presented at a subsequent meeting that meets the advance notice requirement.

**5.08. SHAREHOLDER LIST.** At least ten (10) days before each shareholder meeting, a complete record of the shareholders entitled to vote at the meeting must be made and maintained in the books and records of the Company. This list must be arranged by voting group (if any), in alphabetical order, and include number of shares held by and the address of each shareholder in a legible and reproducible format. This record must be kept on file at the Company's principal office for a period of ten (10) days prior to the meeting. The records must also be kept open for inspection at shareholder meetings.

**5.09. CLOSING OF TRANSFER BOOKS & FIXING RECORD DATE.** In order that the Company may determine the shareholders entitled to notice of any meeting, the Board of Directors may fix a record date, which shall not be more than sixty (60) nor less than ten (10) days prior to the date of such meeting, nor shall the record date precede the date upon which the resolution fixing the record date is adopted by the Board of Directors. In order that the Company may determine the shareholders entitled to consent to corporate action without a meeting, the Board of Directors may fix a record date, which shall not precede, or be more than ten (10) days after, the date upon which the resolution fixing the record date is adopted by the Board of Directors. In order that the Company may determine the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or of any other lawful action, the Board of Directors may fix a record date, which shall not be more than sixty (60) days prior to such action.

If no record date is fixed: (1) the record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day immediately preceding the day on which notice is given or, if notice is waived, at the close of business on the business day immediately preceding the day on which the meeting is held; (2) the record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, when no prior action by the Board has been taken, shall be the day on which the first written consent is given; if prior action by the Board is required, then the record date shall be the close of business on the date the Board of Directors adopts the resolution taking such prior action, and (3) the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

**5.10. SHAREHOLDER LIABILITY.** Shareholders shall not be personally liable for the debts and acts of the Company solely due to the fact that the shareholders own shares of the Company. Nevertheless, shareholders *are* personally liable to the Company or its creditors for any delinquencies in payments of the agreed upon price or consideration for the shares. In the event that a subscription price or consideration for shares has not been fully paid, the following people are not personally liable for the unpaid balance:
   a. A transferee or assignee who acquires the shares or subscription in good faith and without knowledge or notice of the nonpayment;
   b. A person who holds the shares as a fiduciary, although the estate in the hands of the fiduciary is liable for the nonpayment; and
   c. A pledgee or other person who holds shares as security.

**5.11. VOTING RIGHTS.** Unless otherwise provided in the Articles of Incorporation, each shareholder entitled to vote at any meeting of shareholders shall be entitled to one vote for each share held by such shareholder which has voting power upon the matter in question. Directors shall

be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. In all other matters, unless otherwise provided by law or by the Articles of Incorporation or these Bylaws, the affirmative vote of the holders of a majority of the shares present in person or represented by proxy and entitled to vote on the subject matter at a meeting in which a quorum is present shall be the act of the shareholders. Where a separate vote by class or classes is required, the affirmative vote of the holders of a majority of the shares of such class or classes present in person or represented by proxy shall be the act of such class or classes, except as otherwise provided by law or by the Articles of Incorporation or these Bylaws.

5.12. **PROXIES.** Every person entitled to vote or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act by proxy with respect to such shares. Such proxy must be made in writing, with signature of the shareholder, and presented to the meeting prior to any vote. No proxy shall be valid after the expiration of three years from the date thereof unless otherwise provided in the proxy. Every proxy continues in full force and effect until revoked by the person executing it. Such revocation may be effected by a writing delivered to the Company stating that the proxy is revoked, or by a subsequent proxy executed by the person executing the prior proxy and presented to the meeting, or by attendance at any meeting and voting in person thereat by the person executing the proxy.

5.13. **QUORUM.** At each meeting of shareholders, except where otherwise provided by law or the Articles of Incorporation or these Bylaws, the holders of a majority of the outstanding shares of stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders. In the absence of a quorum, any meeting of shareholders may be adjourned from time to time by the vote of a majority of the shares represented either in person or by proxy until a quorum is present or represented. Shares of its own capital stock belonging to the Company or to another corporation where the majority of the voting power is held by the Company shall neither be entitled to vote nor counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Company to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

5.14. **CONSENT OF SHAREHOLDERS WITHOUT A MEETING.** Except as otherwise provided in the Articles of Incorporation, any action which may be taken at any annual or special meeting of the shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Company. Every written consent shall bear the date of signature of each shareholder who signs the consent, and no written consent shall be effective unless, within sixty (60) days of the earliest consent, written consents signed by a sufficient number of holders have been delivered to the Company.

Unless all shareholders entitled to vote consent in writing, prompt notice of any shareholder approval without a meeting shall be given to those shareholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting and the agenda describing the subject matter to be voted upon if the record date for such meeting had been the date that sufficient consents were delivered to the Company.

**5.15. COMPANY'S ACCEPTANCE OF VOTES.** The Company shall accept votes by the shareholders in the following manner:

a. If the name signed on a vote, consent, waiver, or proxy appointment corresponds to the name of a shareholder, the Company if acting in good faith is entitled to accept the vote, consent, waiver, or proxy appointment and give it effect as the act of the shareholders.

b. If the name signed on a vote, consent, waiver, or proxy appointment does not correspond to the name of its shareholder, the Company if acting in good faith is nevertheless entitled to accept the vote, consent, waiver, or proxy appointment and give it effect as the act of the shareholder if:

   i. the shareholder is an entity and the name signed purports to be that of an officer or agent of the entity;

   ii. the name signed purports to be that of an administrator, executor, guardian, or conservator representing the shareholder and, if the Company requests, evidence of fiduciary status acceptable to the Company has been presented with respect to the vote, consent, waiver, or proxy appointment;

   iii. the name signed purports to be that of a receiver or trustee in bankruptcy of the shareholder and, if the Company requests, evidence of this status acceptable to the Company has been presented with respect to the vote, consent, waiver, or proxy appointment;

   iv. the name signed purports to be that of a pledgee, beneficial owner, or attorney-in-fact of the shareholder and, if the Company requests, evidence acceptable to the Company of the signatory's authority to sign for the shareholder has been presented with respect to the vote, consent, waiver, or proxy appointment;

   v. two or more persons are the shareholder as co-tenants or fiduciaries and the name signed purports to be the name of at least one of the co-owners and the person signing appears to be acting on behalf of all the co-owners.

c. The Company is entitled to reject a vote, consent, waiver, or proxy appointment if the Secretary or other officer or agent authorized to tabulate votes, acting in good faith, has reasonable basis for doubt about the validity of the signature on it or about the signatory's authority to sign for the shareholder.

d. The Company and its officer or agent who accepts or rejects a vote, consent, waiver, or proxy appointment in good faith and in accordance with the standards of this Article are not liable in damages to the shareholder for the consequences of the acceptance or rejection.

e. Corporate action based on the acceptance or rejection of a vote, consent, waiver, or proxy appointment under this Article is valid unless a court of competent jurisdiction determines otherwise.

## ARTICLE 6

### Officers and Corporate Executives

**6.01. OFFICERS, ELECTION.** As soon as practicable after the annual meeting of shareholders in each year, the Board of Directors shall elect a President and a Secretary, and if it so determines, elect from among its members a Chairman of the Board and a Vice Chairman of the Board. The Board may also elect one or more Vice Presidents, one or more Assistant Secretaries, and such other officers as the Board may deem desirable or appropriate and may give any of them such further designations or alternate titles as it considers desirable. Any number of offices may be held by the same person.

**6.02. TERM OF OFFICE, RESIGNATION, REMOVAL, VACANCIES.** Except as otherwise provided in the resolution of the Board of Directors electing any officer, each officer shall hold office until his or her term has ended or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the Board or to the Chairman of the Board or to the Secretary of the Company. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. The Board may remove any officer with or without cause at any time. Any such removal shall be without prejudice to the contractual rights of such officer, if any, with the Company, but the election of an officer shall not of itself create contractual rights. Any vacancy occurring in any office of the Company by death, resignation, removal or otherwise may be filled by the Board at any regular or special meeting.

**6.03. PRESIDENT.** The President shall preside over all meetings of shareholders and directors, shall have general supervision of the Company's affairs, and perform all other duties as are incident to the office or are properly required by a resolution passed by the Board.

**6.04. VICE-PRESIDENT.** During the absence or disability of the President, the Executive Vice-President (if any) may exercise all functions of the President. Each Vice-President shall have such powers and fulfill such duties as may be assigned by a resolution of the Board. If there is no Vice-President, then the Treasurer shall perform such duties of the President.

**6.05. SECRETARY AND ASSISTANT SECRETARIES.** The Secretary must:
a. Issue notices for all meetings and actions of the Board or shareholders;
b. Accept all requests for special meetings of the Board or shareholders;
c. Accept all notices of proxy appointments and revocations;
d. Keep the minutes of all meetings;
e. Accept delivery of any dissent announced at any meeting of the Board or shareholders;
f. Acknowledge and execute any share certificates;
g. Have charge of the corporate seal and books; and
h. Make reports and perform duties as are incident to the office, or are properly required of him or her by the Board of Directors.

The Assistant Secretary or Assistant Secretaries (in the order designated by the Board) will perform all of the duties of the Secretary during the absence or disability of the Secretary, and at other times may perform such duties as are directed by the President or the Board.

**6.06. THE TREASURER.** The Treasurer shall:
a. Have custody of the Company's monies and securities and maintain regular books of account;
b. Disburse the Company's funds in payment of the just demands against the Company or as may be ordered by the Board, taking proper vouchers for such disbursements; and
c. Provide the Board with an account of all his or her transactions as Treasurer and of the financial conditions of the office properly required of him or her by the Board.

The Assistant Treasurer or Assistant Treasurers (in the order designated by the Board) must perform all of the duties of the Treasurer in the absence or disability of the Treasurer, and at other times may perform such other duties as are directed by the President or the Board.

6.07. **DELEGATION.** In the absence or inability to act of any officer and of any person authorized to act in their place, the Board may delegate the officer's powers or duties to any other officer, director, or other person, subject to Article 6.01 of these Bylaws. Vacancies in any office arising from any cause may be filled by the Board, subject to Article 6.01 of these Bylaws, at any regular or special board meeting.

6.08. **OTHER OFFICERS.** The Board may appoint other officers and agents as it deems necessary or expedient. The term, powers, and duties of such officers will be determined by the Board and described in the resolution authorizing the appointment.

6.09. **CORPORATE EXECUTIVES.** Engagement of the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer, and all other "C-Suite" executives must be approved by the majority affirmative vote of the then-outstanding shares of Class B Voting Stock, voting as a separate class.

6.10. **LOANS.** No loans may be made by the Company to any officer unless first approved by a two-thirds majority vote of all the outstanding the voting shares entitled to vote on the matter.

6.11. **BONDS.** The Board may resolve to require any officer to give bonds to the Company, with sufficient surety or sureties, conditioned upon the faithful performance of the duties of their offices and compliance with other conditions as required by the Board.

6.12. **SALARIES.** Officers' salaries will be fixed from time to time by the Board. Officers are not prevented from receiving a salary by reason of the fact that he or she is also a director of the Company.

## ARTICLE 7

### Capital & Finance

7.01. **DIVIDENDS.** Dividends may be declared by the Board and paid by the Company out of the net earnings of the Company unreserved and unrestricted earned surplus of the Company, or out of the unreserved and unrestricted net earnings of the current fiscal year, or in treasury shares of the Company, subject to the conditions and limitations imposed by the state of formation. The share transfer books may be closed by the Board pursuant to Articles 4.07 and 5.08 of these Bylaws. The Board, without closing the Company's books, may declare dividends payable only to holders of record at the close of business on any business day not more than ninety (90) days prior to the date on which the dividend is paid.

7.02. **RESERVES.** The Board may, in its absolute discretion, set aside out of the Company's earned net surplus, such sum or sums as it deems expedient for dividend, maintaining any corporate property, or any other purpose, before making any distribution of earned surplus.

7.03. **DEPOSITORIES.** The Company's monies must be deposited in the Company's name in a bank or trust company or trust companies designated by resolution of the Board. Corporate monies may be drawn out only by check or other order for payment signed by such persons and in such manner as may be determined by resolution of the Board.

# ARTICLE 8

## Books and Records

**8.01. MEETING MINUTES.** As required by these Bylaws, the Company must keep a complete and accurate accounting and minutes of the proceedings of its shareholders and Board.

**8.02. SHAREHOLDER LIST.** The Company must keep a list of its shareholders, including the names and addresses of all shareholders and the number and class of the shares held by each at its registered office or principal place of business, or at the office of its transfer agent or registrar.

**8.03. ACCOUNTING RECORDS.** The Company shall maintain appropriate accounting records.

**8.04. OTHER RECORDS.** The Company shall keep a copy of the following records at its principal office:
   a. its Articles of Incorporation, as originally filed, and as currently in effect;
   b. a copy of these Bylaws currently in effect;
   c. the minutes of all shareholders' meetings, and records of all action taken by shareholders without a meeting, for the past three (3) years;
   d. all written communications within the past three (3) years to shareholders as a group;
   e. a list of the names and business addresses of its current officers and directors;
   f. its most recent annual report delivered to the relevant state authority; and
   g. all quarterly or annual financial statements (balance sheet and income statement) prepared for periods ending during the last three (3) years.

**8.05. LEGIBILITY OF RECORDS.** Any books, records, and minutes may be in written form or any other form capable of being converted into written form within a reasonable time.

**8.06. RIGHT TO INSPECT.** Any shareholder or shareholder representative has the right, upon written request delivered to the Company, to inspect and copy during usual business hours the following documents of the Company:
   a. the Company's Articles of Incorporation;
   b. these Bylaws;
   c. minutes of the shareholder proceedings;
   d. annual statements of affairs; and
   e. any voting trust agreements.

The Company acknowledges and agrees that any obligation to produce corporate documents under this Article of these Bylaws shall attach to the Secretary as part of the duties described in Article 6.05 of these Bylaws.

**8.07. ENHANCED INSPECTION.** Any individual or group which comprises at least twenty percent (20%) of the outstanding shares, may submit to the Company a written request to inspect and copy the following documents during usual business hours:
   a. The books of account and share ledger of the Company;
   b. The statement of affairs for the Company; and
   c. The list of shareholders.

## ARTICLE 9

### Notices

9.01. **MAILING OF NOTICE.** Except as may otherwise be required by law, any notice to any shareholder or director may be delivered personally or by mail. If mailed, the notice will be deemed to have been delivered on the close of business of the fifth business day following the day when deposited in the United States mail with postage prepaid and addressed to the recipient's last known address in the records of the Company.

9.02. **E-NOTICE PERMITTED.** Any communications required by these Bylaws, or by any other laws, may be made by digital or electronic transmission to the recipient's known electronic address or number as known to the Company at the time of notice.

9.03. **DUTY TO NOTIFY.** All shareholders, directors, officers, employees, and representatives of the Company are required to notify the Company of any changes to the individual's contact information. Pursuant to the obligations under this Article of these Bylaws, the individual must notify the Company that electronic transmissions of notice are impracticable, impossible, frustrated, or otherwise improper and ineffective.

## ARTICLE 10

### Special Corporate Acts

10.01. **EXECUTION OF WRITTEN INSTRUMENTS.** All contracts, deeds, documents, and instruments that acquire, transfer, exchange, sell, or dispose of any assets of the Company must be executed by the President to bind the Company. This Article does not apply to any checks, money orders, notes, or other financial instruments for direct payment of corporate funds which are subject to Article 10.02 of these Bylaws.

10.02. **SIGNING OF CHECKS OR NOTES.** All authorizations to distribute, pay, or immediately draw upon the financial resources of the Company must be signed by the Treasurer, including any expense reimbursement or compensation payments to directors, officers, employees, representatives, service providers, or contractors of the Company.

10.03. **SPECIAL SIGNING POWERS.** To duly bind the Company to an agreement or instrument in the event the President holds an interest which exists outside of the capacity of being President, then any agreement involving such interest must be signed by an officer pursuant to either Article 6.07 or 10.01 of these Bylaws.

10.04. **SHAREHOLDER APPROVAL.** Shareholder approval is required prior to any merger, consolidation, share-exchange, conversion, or dissolution, and any loans provided under Articles 2.17 or 6.09 of these Bylaws. In the event of any dissent by shareholders, the Company must comply with Article 10.05 of these Bylaws.

Until these Bylaws require otherwise, no shareholder approval is required to acquire, transfer, exchange, sell, or dispose of any assets of the Company in the ordinary course of business or after dissolving the Company.

10.05. **DISSENTER RIGHTS.** Shareholders are entitled to dissent from and obtain fair value payment for shares held in the event of, any corporate actions requiring shareholder approval under

Article 10.04 of these Bylaws. In the event a corporate action that will create dissenter rights under this Article of these Bylaws occurs, the Company shall deliver notice to all shareholders that a corporate action has occurred or will occur that entitles the shareholder to assert their dissenter rights under these Bylaws. These options for dissent do not apply to a shareholder who voted in favor of the action or failed to express such dissent at the meeting.

## ARTICLE 11

### Amendments

11.01. **BY SHAREHOLDERS.** These Bylaws may be altered, amended, or repealed by the affirmative vote of a majority of the voting shares issued and outstanding at any regular or special shareholder meeting.

11.02. **BY DIRECTORS.** The Board of Directors has the power to make, alter, amend, and repeal the Company's Bylaws. Any alteration, amendment, or repeal of the Bylaws by the Board may be subsequently changed or repealed by the holders of a majority of the shares entitled to vote at any shareholders meeting.

11.03. **EMERGENCY BYLAWS.** The Board of Directors may adopt emergency Bylaws, subject to a vote to repeal or modify by the shareholders, which operate during any emergency in the Company's conduct of business resulting from an attack on the United States or a nuclear or atomic disaster.

11.04. **COMPLIANCE WITH STATE LAW.** Any amendment to the Company's Articles of Incorporation or these Bylaws shall be consistent with laws of Wyoming.

## ARTICLE 12

### Indemnification

12.01 **INDEMNIFICATION.** The Company shall have the power to indemnify to the full extent permitted by law any person made or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person or such person's testator or instate is or was a director, officer or employee of the Company or serves or served at the request of the Company as a director, officer, employee or agent of another enterprise.

Expenses, including attorneys' fees, incurred by any such person in defending against such action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding by the Company upon receipt by it of an undertaking of such person to repay such expenses if it shall be ultimately determined that such person is not entitled to be indemnified by the Company.

For purposes of this Article 12.01, the term "Company" shall include any predecessor of the Company and any constituent corporation absorbed by the Company in consolidation or merger; the term "other enterprise" shall include any corporation, partnership, joint venture, trust or employee benefit plan; service "at the request of the Company" shall include services as a director, officer or employee of the Company which imposes duties on, or involves services by, such director, officer or employee with respect to an employee benefit plan, its participants or beneficiaries; any excise taxes assessed on a person with respect to an employee benefit plan shall be deemed to be indemnifiable expenses; and action by a person with respect to an employee

Visual Semiconductor, Inc. Bylaws – August 15, 2022 – Page 16

benefit plan which such person reasonably believes to be in the interest of the participants and beneficiaries of such plan shall be deemed to be action not opposed to the best interests of the Company.

These Bylaws are adopted by resolution of the Company's Board of Directors on this 15th day of August 2022.

* * * * *

# App. Ex. 40

**From:** Christopher Michaels
**Sent:** Sunday, July 31, 2022 11:39 AM EDT
**To:** Rafael.Zahralddin@lewisbrisbois.com <Rafael.Zahralddin@lewisbrisbois.com>
**BCC:** stephen3d@mac.com <stephen3d@mac.com>; Chi Eng <chi@englawfirm.com>; ntwallace@aol.com <ntwallace@aol.com>
**Subject:** FW: VTI-Rembrandt Term Sheet - Signed by VTI
**Attachment(s):** "Stream - Joint Defense Common Interest Agreement with VTI and Committee AT comments 4.17.21 (002) fully signed.DOCX.pdf","AB R3DH VTI Payment Agreement.pdf","R3DH VTI Signed agreement 060521.pdf","2021-05-23 Stream TV - Form of Warrant Rembrandt-Filled out for Rembrandt.docx","R3DH Stream Settlement Agreement.pdf","Standard Products.pdf"

Rafael:

This is just forwarding an email I sent you about a year ago, but it has the relevant final agreements.  I am sending other docs, but I will have to send them in batches due to size.

With regard to the settlement agreement ending the litigation, note that the warranty clause is express on the point that no party can sue another re trade secrets related to the litigation and seems to be a complete solution to Mathu's stated concerns about needing protection.  This was an issue contemplated and solved long before our collective call last week.  Also note that Mathu and Raja signed individually and are individually liable for all amounts therein, acknowledged assistance of counsel, and all parties agreed there are no other agreements or representations.

Rembrandt has 100% fulfilled its end of the agreement, only question left is when are the Rajans/Stream/VTI going to fulfill their end.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Tuesday, August 24, 2021 3:57 PM
**To:** 'Rafael X. Zahralddin-Aravena' <RZahralddin@atllp.com>
**Cc:** 'Mathu Rajan' <mathu.rajan@vti-global.com>; stephen3d@mac.com
**Subject:** RE: VTI-Rembrandt Term Sheet - Signed by VTI

Rafael:

You asked me to include the agreements (attached) and a short list of payments due (this is the same schedule sent back on 7/2/2021 except I included amounts due through the endo of August):

| Source | Text | Amount | Date Due |
|---|---|---|---|
| 6/5/2021 Term Sheet Agreement - Section 5 | Armstrong Teasdale, as the project manager of the litigation through funding by VTI to provide litigation funding support and escrow agreement that provides for payments to Ferry Joseph, P.A. ("Ferry"), Brown & Michaels, PC ("Brown"), and SVS 3D Consulting Services ("SVS")and Armstrong Teasdale ("Armstrong") with a minimum back end retainer of $2,000,000 for all firms and a minimum of $350,000 back end retainer refreshed every month by VTI and allocated for Brown & Michaels, PC and SVS 3D  Consulting Services | $    2,000,000 | 6/5/2021 |
| 6/5/2021 Term Sheet Agreement - Section 3 & Section 6.2(a) | Rembrandt-Nevis will file an action against SeeCubic based on the IP claims above, funded by VTI in exchange for purchasing of 5% of Rembrandt Nevis stock from Stephen Blumenthal for $5,000,000. … a. On or before the effective date of a plan or agreement in a settlement in a chapter 7 ("Closing Date") – 1% of shares held by Blumenthal for $1,000,000; | $    1,000,000 | 6/10/2021 |

**TRUSTEE 51**

| Source | Text | Amount | Date Due |
|---|---|---|---|
| 5/23/2021 Payment Agreement - Section 4 | VTI agree to make payments of $25,000/month ("Monthly Payment") starting 15 business days after signing this Agreement in consideration for Consulting Services performed by Rembrandt. | $ 25,000 | 6/12/2021 |
| 5/23/2021 Payment Agreement - Section 4 | VTI hereby guarantees payment of the $1,400,000 ("Initial Guarantee Payment") and will make such payment within thirty days of a final order of bankruptcy dismissal. | $ 1,400,000 | 7/10/2021 |
| 6/5/2021 Term Sheet Agreement - Section 3 & Section 6.2(b) | Rembrandt-Nevis will file an action against SeeCubic based on the IP claims above, funded by VTI in exchange for purchasing of 5% of Rembrandt Nevis stock from Stephen Blumenthal for $5,000,000. … b. On or before 30 days from the ("Closing Date")– 1% of shares held by Blumenthal for $1,000,000; | $ 1,000,000 | 7/10/2021 |
| 5/23/2021 Payment Agreement - Section 4 | VTI agree to make payments of $25,000/month ("Monthly Payment") starting 15 business days after signing this Agreement in consideration for Consulting Services performed by Rembrandt. | $ 25,000 | 7/12/2021 |
| 6/5/2021 Term Sheet Agreement - Section 9 | VTI will lend Rembrandt-Delaware $3,000,000 as follows:  1) To be disbursed $500,000 per month for 6 months, beginning July 31, 2021 | $ 500,000 | 7/31/2021 |
| 6/5/2021 Term Sheet Agreement - Section 3 & Section 6.2(c) | Rembrandt-Nevis will file an action against SeeCubic based on the IP claims above, funded by VTI in exchange for purchasing of 5% of Rembrandt Nevis stock from Stephen Blumenthal for $5,000,000. … c. On or before 60 days from the ("Closing Date")– 1% of shares held by Blumenthal for $1,000,000; | $ 1,000,000 | 8/9/2021 |
| 5/23/2021 Payment Agreement - Section 4 | VTI agree to make payments of $25,000/month ("Monthly Payment") starting 15 business days after signing this Agreement in consideration for Consulting Services performed by Rembrandt. | $ 25,000 | 8/12/2021 |
| 6/5/2021 Term Sheet Agreement - Section 9 | VTI will lend Rembrandt-Delaware $3,000,000 as follows:  1) To be disbursed $500,000 per month for 6 months, beginning July 31, 2021 | $ 500,000 | 8/31/2021 |

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:*  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels
**Sent:** Friday, July 2, 2021 3:02 PM
**To:** bud.robertson@vti-global.com; stephen3d@mac.com
**Cc:** 'Rafael X. Zahralddin-Aravena' <RZahralddin@atllp.com>; 'Mathu Rajan' <mathu.rajan@vti-global.com>
**Subject:** RE: VTI-Rembrandt Term Sheet - Signed by VTI

Bud asked for a list of amounts due prior to filing the SDNY and SeeCubic fraudulent conv. action.  I have provided a list and the section of the agreements with the payment amount and date due.

Talk to everyone at 4:00pm.

Chris

| Source | Text | Amount | Date Due |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 6/5/2021 Term Sheet Agreement - Section 5 | Armstrong Teasdale, as the project manager of the litigation through funding by VTI to provide litigation funding support and escrow agreement that provides for payments to Ferry Joseph, P.A. ("Ferry"), Brown & Michaels, PC ("Brown"), and SVS 3D Consulting Services ("SVS")and Armstrong Teasdale ("Armstrong") with a minimum back end retainer of $2,000,000 for all firms and a minimum of $350,000 back end retainer refreshed every month by VTI and allocated for Brown & Michaels, PC and SVS 3D  Consulting Services | $ 2,000,000 | 6/5/2021 |
| 6/5/2021 Term Sheet Agreement - Section 3 & Section 6.2(a) | Rembrandt-Nevis will file an action against SeeCubic based on the IP claims above, funded by VTI in exchange for purchasing of 5% of Rembrandt Nevis stock from Stephen Blumenthal for $5,000,000. … a. On or before the effective date of a plan or agreement in a settlement in a chapter 7 ("Closing Date") – 1% of shares held by Blumenthal for $1,000,000; | $ 1,000,000 | 6/10/2021 |
| 5/23/2021 Payment Agreement - Section 4 | VTI agree to make payments of $25,000/month ("Monthly Payment") starting 15 business days after signing this Agreement in consideration for Consulting Services performed by Rembrandt. | $ 25,000 | 6/12/2021 |
| 5/23/2021 Payment Agreement - Section 4 | VTI hereby guarantees payment of the $1,400,000 ("Initial Guarantee Payment") and will make such payment within thirty days of a final order of bankruptcy dismissal. | $ 1,400,000 | 7/10/2021 |
| 6/5/2021 Term Sheet Agreement - Section 3 & Section 6.2(b) | Rembrandt-Nevis will file an action against SeeCubic based on the IP claims above, funded by VTI in exchange for purchasing of 5% of Rembrandt Nevis stock from Stephen Blumenthal for $5,000,000. … b. On or before 30 days from the ("Closing Date")– 1% of shares held by Blumenthal for $1,000,000; | $ 1,000,000 | 7/10/2021 |
| 5/23/2021 Payment Agreement - Section 4 | VTI agree to make payments of $25,000/month ("Monthly Payment") starting 15 business days after signing this Agreement in consideration for Consulting Services performed by Rembrandt. | $ 25,000 | 7/12/2021 |

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** bud.robertson@vti-global.com <bud.robertson@vti-global.com>
**Sent:** Saturday, June 5, 2021 6:00 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>; stephen3d@mac.com
**Cc:** 'Rafael X. Zahralddin-Aravena' <RZahralddin@atllp.com>; 'Mathu Rajan' <mathu.rajan@vti-global.com>
**Subject:** VTI-Rembrandt Term Sheet - Signed by VTI

Hi Chris and Steve,

As discussed on the phone, attached is the term sheet (ver 10) signed by Mathu Rajan in pdf format. I have also attached the word doc (ver 9) with redline so you can easily see today's changes.

Please countersign and return to us/Armstrong. Thanks

Best regards,

Bud Robertson
Visual Technology Innovations, Inc.