# App. Ex. 41

| | |
|---|---|
| **From:** | Zahralddin, Rafael |
| **To:** | Christopher Michaels |
| **Subject:** | RE: [EXT] FW: VTI - Documents for SDNY Motion [IWOV-IDOCS.FID4245647] |
| **Date:** | Sunday, July 31, 2022 2:03:40 PM |
| **Attachments:** | image002.png |
| | Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png |

?

You mean the settlemnent in the bankruptcy? Or the original settlement with Shad.  I guess my question is why wasn't this heard in the time period in between, either by seeking stay relief, or moving forward against the Rajans individually. What prevents Shad from saying that this was an uneforceable contract?

Also, when was the magistrate recommendation sent to us, this seems material and I don't remember seeing it before the settlement so I am trying to figure out timing.

Rafael

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Sunday, July 31, 2022 1:39 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: [EXT] FW: VTI - Documents for SDNY Motion [IWOV-IDOCS.FID4245647]

I sent the recommendation from the magistrate.  We settled before the hearing on the Type II agreement was set.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

Text  Description automatically generated

*Email:* michaels@bpmlegal.com
*Direct Dial:* 607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 31, 2022 12:49 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Re: [EXT] FW: VTI - Documents for SDNY Motion [IWOV-IDOCS.FID4245647]

Can you send me an explanation on why the settlement with Shad was later rejected by the District Court?

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

**TRUSTEE 52**

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004  F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Jul 31, 2022, at 12:37 PM, Christopher Michaels <michaels@bpmlegal.com> wrote:

Rafael:

The joint exhibits include the Term Sheet signed by Shad (starting on Page 172 of the Joint Exhibits) and the amended complaint filed by Rembrandt Holding against the Rajans and Stream.  I think you will see that it lays out the case in a fairly high level of detail.  This was a patent infringement and contract breach case, not a trade secret case.  While the contractual breach case was related to confidential information it was primarily about the business information rather than technical.  The technical trade secrets were included in the patents and as a result were published to the world and no longer secret.

Note that the filing date of the patent application was all the way back in 2008, well before Steve ever met the Rajans.  By law, a patent application has to *"contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."* 35 USC Section 112(a)  Three patent examiners determined that Rembrandt met this burden in its patent applications.   These applications were shared in confidence (before being published) with the Eindhoven team and the Rajans.  Certainly this is more than enough documentation of Rembrandt's technical trade secrets and many pages of documents that were all on file with the patent office well before the interactions with the Rajans that led to the litigation.

While software and source code are almost never filed with the patent office.  I have include two screen shots of the software the 3D Fusion/Rembrandt developed back in that time frame and we still use it today.  We worked with a team a McGill University to create it.  Again it seems far from relevant to the issues at hand, but I provide the information just to be clear that Mathu carrying on about the need for software on Rembrandt's end are more than satisfied.  It seems strange to come up now, because we have been asking to have access to a StreamTV prototype that allows us to bypass Stream's software so we can use our own.  Clearly, we have our own technology.

We have THOUSANDS of pages of proof, independently verified in government offices, and shared among numerous parties that were in agreements with Rembrandt, and then went to work with Stream.  After years of litigation, no engineer, attorney, or executive at Stream ever identified a single element of our patent claims that they did not include in the Stream TVs.  In contrast, Rembrandt laid out the infringement element by element in the complaint.

Our opening in the mediation was a discussion of the newspaper article with a picture of Mathu standing over Steve's computer, showing Steve's software, and Steve's content claiming it as Stream's technology.  Steve eventually got his computer back and we showed the same computer, with the same software, running the same content to the magistrate.  We literally had photographic evidence of Stream's violation

and quotes from Mathu publicly recorded as evidence in the case.  I have been involved in a lot of IP disputes.  The sufficiency of the proof and photographic evidence is without precedent.  Stream's efforts to explain away the article led to varying stories that we disproved with email documentation that the Stream/Eindhoven team either destroyed or denied existed.  Take the NDAs for example, three declarations filed by Stream/Eindhoven team members denying they ever signed NDAs and us providing signed copies of the NDAs.  Every turn and explanation by Stream was met with more of the same contradictory, documented proof by Rembrandt.

I think you can get a sense of how we are reacting to Mathu's latest claims that we have insufficient proof.

1) Any discussion of proof was relevant prior to the settlement agreement and we have ended that litigation.

2) Rembrandt has massive amounts of proof of its technical developments and to our knowledge, Stream has precisely zero evidence that it got its technical information from any other source than the Rembrandt predecessor companies and people.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Isaac D. Stevens <IStevens@atllp.com>
**Sent:** Monday, June 28, 2021 5:01 PM
**To:** Allison McFarland <AMcFarland@atllp.com>; 'Christopher Michaels' <michaels@bpmlegal.com>
**Cc:** David M. Magee <DMagee@atllp.com>; Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; David Going <DGOING@atllp.com>; Maxwell B. Feit <MFeit@atllp.com>
**Subject:** RE: VTI - Documents for SDNY Motion [IWOV-IDOCS.FID4245647]

Allison,

Here are the two declarations filed in the involuntary bankruptcy case and the joint exhibits. I have also attached the Omnibus Agreement (Stream Exhibit 1), Letter Agreement (Stream Exhibit 3) and the Second Omnibus Agreement (VTI Exhibit 156).

Chris, can you please send the NDAs and Protective Order?

Armstrong Teasdale LLP
Isaac Stevens | Law Clerk
MAIN PHONE: 302.824.7089 | CELL: 267.257.7873

********** PRIVATE AND CONFIDENTIAL**********

This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be

**understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.**

**From:** Allison McFarland <AMcFarland@atllp.com>
**Sent:** Monday, June 28, 2021 4:28 PM
**To:** Isaac D. Stevens <IStevens@atllp.com>; 'Christopher Michaels' <michaels@bpmlegal.com>
**Cc:** David M. Magee <DMagee@atllp.com>
**Subject:** VTI - Documents for SDNY Motion

Hi Isaac and Chris,

Are you able to provide the documents that Rafael mentioned during the call. I believe this includes the two affidavits, and to the extent that the following are not included as exhibits:

- Settlement Agreement and Term Sheet
- Letter Agreement
- The third agreement mentioned (I believe someone referred to it as the "support agreement")
- NDAs
- Protective Order

If you think any other documents will be useful to the motion, please include those as well.

Thank you,
Allison

Armstrong Teasdale LLP
Allison McFarland
225 Franklin St. 26th Fl.
Boston, MA 02110

www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

# App. Ex. 42

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, August 26, 2022 6:21 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** FW: ALERT: Transaction 67945772
**Attachment(s):** "Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png","Hawk v. Stream TV.pdf"

Just an FYI

---

**From:** Jonathan M. Stemerman <JStemerman@atllp.com>
**Sent:** Friday, August 26, 2022 6:18 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] RE: ALERT: Transaction 67945772


FYI, here's the public version of the complaint.



Armstrong Teasdale LLP
**Jonathan M. Stemerman** | Partner
1007 North Market Street, Third Floor, Wilmington, DE 19801
MAIN PHONE: 302.416.9670
CELL: 610.505.7383
jstemerman@atllp.com
www.armstrongteasdale.com

---

**From:** Jonathan M. Stemerman <JStemerman@atllp.com>
**Sent:** Friday, August 19, 2022 12:01 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** Re: ALERT: Transaction 67945772

No.  Steve Caponi at K&L Gates.


Jonathan M. Stemerman
Armstrong Teasdale LLP
Cell: 610-505-7383

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, August 18, 2022 11:59:19 PM
**To:** Jonathan M. Stemerman <JStemerman@atllp.com>
**Subject:** Re: ALERT: Transaction 67945772

Skadden???

Thanks

Get Outlook for iOS




**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004  F: 302.985.6001  M: 302.545.2888**


500 Delaware Avenue, Suite 700, Wilmington, DE 19801  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

---

**From:** Jonathan M. Stemerman <JStemerman@atllp.com>
**Sent:** Thursday, August 18, 2022 11:42:10 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] Fwd: ALERT: Transaction 67945772


Raf- FYI.  Mathu, Stream and others were sued for breach of fiduciary duty, conversion and other causes of action by Hawk.  The

complaint was filed under seal, so I can't pull it.

Best,
Jon


Jonathan M. Stemerman
Armstrong Teasdale LLP
Cell: 610-505-7383
**\*\*\*\*\*\*\*\*\*\* PRIVATE AND CONFIDENTIAL\*\*\*\*\*\*\*\*\*\***

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 38-43 Lincoln's Inn Fields, London WC2A 3PE. Please review our International Legal Notices.**

---

**From:** FileAndServeXpress <AlertNotification@secure-mail.fileandservexpress.com>
**Sent:** Thursday, August 18, 2022 4:01:52 PM
**To:** Jonathan M. Stemerman <JStemerman@atllp.com>
**Subject:** ALERT: Transaction 67945772


CAUTION:      EXTERNAL EMAIL


To: Jonathan M Stemerman
Subject: Alert of Transaction 67945772


A new transaction with transaction ID 67945772 matches your alert criteria for:
    New Chancery Court Complaint


The details for this transaction are listed below.


Court:               DE Court of Chancery Civil Action
Case Name:               Hawk Investment Holdings Ltd. v. Mediatainment, Inc., et al.
Case Number:              2022-0733-
Transaction ID:         67945772
Authorized Date/Time:        8/18/2022 3:19:31 PM
Authorizer:         Steven L Caponi
Authorizer's Organization:     K & L Gates LLP-Wilmington
Sending Parties:
    Hawk Investment Holdings Ltd.
    Hawk Investment Holdings Ltd.
    Hawk Investment Holdings Ltd.
Document Title(s):
    [CONFIDENTIAL FILING] Verified Complaint for Breach of Fiduciary Duty (34 pages)
    [CONFIDENTIAL FILING] Exhibits 1-13 to Verified Complaint for Breach of Fiduciary Duty (87 pages)
    Declaration of Philip Richard Hunt and Rosco Maunder in accordance with the Delaware Uniform Unsworn Foreign
Declarations Act, 10 Del. C. Section 5356 to Verified Complaint for Breach of Fiduciary Duty (2 pages)
    Certification of Court of Chancery Rule 5.1 to Verified Complaint for Breach of Fiduciary Duty (1 page)
    Supplemental Information Sheet with Statement of Good Cause to Verified Complaint for Breach of Fiduciary Duty (3 pages)
    Letter to Register in Chancery from Steven L. Caponi providing summons instructions (2 pages)


Link to transaction details page where all documents can be viewed: https://secure.fileandservexpress.com/Login/Login.aspx?FI=67945772


Documents with direct links (The direct links will be available for your convenience for the next 7 days):


[CONFIDENTIAL FILING] Verified Complaint for Breach of Fiduciary Duty (Clerk review status: Accepted):
https://secure.fileandservexpress.com/Document/Download/648e89a1-9d46-4cac-b20e-c84a692387568


[CONFIDENTIAL FILING] Exhibits 1-13 to Verified Complaint for Breach of Fiduciary Duty (Clerk review status: Accepted):

https://secure.fileandservexpress.com/Document/Download/5727280e-7904-4cbb-9bcb-10ad5003f43f6

Declaration of Philip Richard Hunt and Rosco Maunder in accordance with the Delaware Uniform Unsworn Foreign Declarations Act, 10 Del. C. Section 5356 to Verified Complaint for Breach of Fiduciary Duty (Clerk review status: Accepted):
https://secure.fileandservexpress.com/Document/Download/61358693-8784-4269-a77f-4a43924bfc9a6

Certification of Court of Chancery Rule 5.1 to Verified Complaint for Breach of Fiduciary Duty (Clerk review status: Accepted):
https://secure.fileandservexpress.com/Document/Download/7b9cfa4d-724a-4bce-bcc9-a2ecdedad8c45

Supplemental Information Sheet with Statement of Good Cause to Verified Complaint for Breach of Fiduciary Duty (Clerk review status: Accepted):
https://secure.fileandservexpress.com/Document/Download/1d26e84f-e1bc-4022-b54e-0f62c6ef69712

Letter to Register in Chancery from Steven L. Caponi providing summons instructions (Clerk review status: Accepted):
https://secure.fileandservexpress.com/Document/Download/3184b662-9678-412e-b189-ad49057a3d9a6

Check for additional details online at https://secure.fileandservexpress.com/Login/Login.aspx?FA=67945772 (login is required).

Thank you for using File & ServeXpress.

Questions? For prompt, courteous assistance please contact File & ServeXpress Client Support by phone at 1-888-529-7587 (24/7).

# App. Ex. 43

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Monday, October 03, 2022 1:12 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Last week
**Attachment(s):** "Stream hawk 1534000-1534954-opinion on motion to modify final (1).pdf"

Another one coming.  Likely foreclosrues will start up again witjhing 10 days



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

# App. Ex. 44

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered)[1] |

# MEMORANDUM

## I.    INTRODUCTION

Before the Court for disposition are two motions by Hawk Investment Holdings Ltd. ("Hawk").  The first motion (the "Hawk Stay Relief Motion")[2] seeks relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "Delaware Chancery Court") seeking relief pursuant to §225 of Title 8 of the Delaware Code (the "Section 225 Action") against debtors Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and together with Stream, the "Debtors").  The second motion (the "Section 1112/1104 Motion") seeks an order, pursuant to §1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), converting the Debtors' chapter 11 bankruptcy cases to cases under chapter 7 of the Bankruptcy Code or dismissing them, or

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases.  Bankr. Docket No. 81.

[2] Bankr. Docket No. 16.

1

**TRUSTEE 87**

alternatively, appointing a trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the Bankruptcy Code.

For the reasons set forth herein, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed, as set forth below.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND[3]

The history of the Debtors, their relationship with their creditors, and, in particular from the Court's perspective, the events during these bankruptcy cases, are convoluted, and for the most part, riddled with strife. The docket in the Debtors' main case spans over 500 entries, telling a story of near-endless conflict.[4] The Court has spent an inordinate amount of time dealing with expedited motion practice, emergency hearings, and drawn-out contested matters. While the Court does not typically summarize the major activity in a case in order to explain a decision, here it believes a lengthy summary is necessary in order to paint the picture of the acrimony, relative lack of progress, and overlapping and simultaneous controversies these cases have endured over the nearly ten months they have been pending. Set forth below, therefore, is a summary of the major events not only that led to the Debtors' bankruptcy cases, but also that have transpired before this Court since the Debtors filed their bankruptcy petitions.

---

[3] The factual background recited herein is drawn from various pleadings filed on the docket as well as the testimony and evidence adduced at Trial (as defined *infra*). The Court notes, however, that to the extent such facts as set forth in the parties' various pleadings are disputed, such disputes are irrelevant to the Court's resolution of the pending motions, as the Court has drawn its conclusions from the record at Trial and the procedural history of these cases.

[4] This does not even account for the approximately 120 docket entries in the adversary action the Debtors filed in August 2023 against various parties, discussed *infra*. *See* Adv. Pro. No. 23-00057.

2

### A.   Pre-Petition Events

#### 1.   Formation of the Debtors

Stream was founded in 2009 by Mathu Rajan ("Mr. Rajan") and Raja Rajan (together

with Mr. Rajan, "the Rajans").  The company was founded to develop and commercialize a

proprietary technology for viewing three-dimensional content without the need for 3D glasses or

goggles ("Ultra-D").  Stream created Technovative, a wholly owned subsidiary, which in turn

directly or indirectly owns various subsidiaries, including SeeCubic B.V. ("SCBV"), an entity

formed under the laws of the Netherlands and which functions as the primary research and

development engine for the business.[5]  Together, these subsidiaries own and hold rights in

technology including Ultra-D.  Stream's Ultra-D technology was developed, in part, based on

certain intellectual property, including a portfolio of glasses-free 3D patents licensed from

Koninklijke Philips Electronics ("Philips").  Stream also has a technology license from

Rembrandt 3d Holding Ltd. ("Rembrandt"), which allows it to use the Rembrandt technology

incorporated into Stream's Ultra-D products (the "Rembrandt Licensing Agreement").

#### 2.   Funding from SLS and Hawk

From 2011 to 2020, Stream's senior secured creditor, SLS Holdings VI, LCC ("SLS"),

loaned Stream $6 million through a series of secured promissory notes (the "SLS Notes").  In

return, Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as

security for the SLS Notes. Stream and SLS executed a security agreement which authorized

SLS to take control of Stream's assets to satisfy the SLS Notes in the event Stream defaulted.

Between 2011 and 2014, Shadron Stastney ("Mr. Stastney"), the principal of SLS, served as an

outside director of Stream.  He rejoined the board as Vice Chairman in 2018 in a strategic role

---

[5] *See* Exhibit D-5.

3

until resigning in January 2020.

Between 2014 and 2020, Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million through a series of junior secured notes (the "Hawk Notes", and together with the SLS Notes, the "Notes"). Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted. On January 29, 2018, Stream entered into a conversion agreement with Hawk, whereby the parties agreed to terms pursuant to which Stream would be permitted to convert the outstanding portion of the Hawk Notes to Stream equity (the "Hawk Conversion Agreement"). Stream and SLS contemporaneously entered into a parallel agreement with respect to conversion of the SLS Notes to Stream equity (the "SLS Conversion Agreement" and together with the Hawk Conversion Agreement, the "Conversion Agreements").

### 3. Omnibus Agreement

In March 2020, Stream was notified it was in default under the SLS and Hawk Notes. In May 2020, Stream, Hawk, SLS, and 52 of its stockholders entered into an Omnibus Agreement whereby Stream would transfer all of its assets to a newly formed entity, SeeCubic Inc. ("SeeCubic"), and in exchange, SLS and Hawk would no longer pursue a foreclosure, and their claims under the Notes would be entirely extinguished. Mr. Stastney, who by then had left Stream, formed SeeCubic as a Delaware corporation to acquire Stream's assets pursuant to the Omnibus Agreement.

### 4. Litigation Over the Omnibus Agreement

In September 2020, Stream filed suit against SeeCubic in the Delaware Chancery Court to invalidate the Omnibus Agreement. Both Stream and SeeCubic moved for preliminary

4

injunctions whereby Stream sought to prevent SeeCubic from taking any actions to enforce the

Omnibus Agreement, and SeeCubic sought to compel Stream's compliance therewith.  In

December 2020, the Delaware Chancery Court issued an opinion finding that SeeCubic was

entitled to injunctive relief and barring Stream from failing to comply with the Omnibus

Agreement.  In September 2021, the Delaware Chancery Court granted SeeCubic's motion for

summary judgment (the "Summary Judgment Order"), declaring the Omnibus Agreement to be

valid and entering a permanent injunction preventing Stream from interfering with the

agreement.

In November 2021 Stream appealed the Delaware Chancery Court's ruling,[6] alleging that

the Delaware Chancery Court erred because Stream's unambiguous certificate of incorporation

required the approval of Stream's Class B stockholders for Stream's entry into the Omnibus

Agreement.  In June 2022, the Delaware Supreme Court vacated the Summary Judgment Order

on the grounds that the Omnibus Agreement was invalid without the approval of Stream's Class

B Stockholders.  The Delaware Supreme Court also found that (1) Hawk was a secured creditor

of Stream, (2) Stream had pledged all of its assets as security for the more than $50 million

Hawk lent to Stream, and (3) the Hawk Notes were executed in conjunction with security

agreements authorizing Hawk to take control of Stream's assets to satisfy the Hawk Notes if

Stream defaulted.

On remand, in September 2022, the Delaware Chancery Court ordered the parties to

unwind the Omnibus Agreement but confirmed that Hawk's and SLS's rights remained intact.

---

[6] On November 10, 2021, the Delaware Chancery Court issued an Order Entering Partial Final Judgment
Under Rule 54(b) (the "Partial Final Judgment Order"), effectively making the rulings in the Summary
Judgment Order final in order to permit appeal, finding that even though SeeCubic's conversion claim
remained unresolved, there was "no risk that after addressing [whether the Omnibus Agreement was
valid] on appeal, the Delaware Supreme Court might have to revisit the same issue in an appeal from a
final trial-level adjudication." *See* First Day Declaration, at Exhibit X.

In its opinion, the Court held that because the Omnibus Agreement did not validly transfer legal title of Stream's assets to SeeCubic and that SeeCubic would be required to transfer back to Stream the equity placed in the operating subsidiary, Technovative.

### 5.    Stream's Prior Bankruptcies

While the Omnibus Agreement litigation was playing out, on February 24, 2021, Stream filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On May 17, 2021, the Delaware Bankruptcy Court dismissed the case as a bad faith filing. After dismissal, on May 23, 2021, three of Stream's purported unsecured creditors, including Rembrandt, filed an involuntary Chapter 7 bankruptcy petition against Stream. On June 10, 2021, the Delaware Bankruptcy Court again dismissed the involuntary bankruptcy action as a bad faith filing, and imposed a twelve-month bar on Stream re-filing for bankruptcy.

### 6.    Mr. Rajan's Formation of VSI

Mr. Rajan formed Visual Semiconductor, Inc. ("VSI") in 2022, purportedly as a vehicle to raise new capital and support Stream. Upon formation, Mr. Rajan was the CEO of VSI. Mr. Rajan and members of his family are minority economic shareholders in VSI but have the majority of voting stock.

### 7.    The Proxy Notice, Marshaling Directive and Section 225 Action

On October 17, 2022, after ownership of the Technovative shares was transferred to Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to

6

satisfy the outstanding indebtedness (the "Marshaling Directive").  Stream refused to comply

with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured

debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no

longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the

Marshaling Directive.

On the same date, Hawk responded by filing the Section 225 Action to resolve whether

Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17,

2022.  On October 20, 2022, the Delaware Chancery Court entered an order providing that,

pending resolution of the Section 225 Action, Technovative was to operate according to the

status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day

basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action

on the issue of whether Stream defaulted under the Hawk Notes.  On November 29, 2022, the

Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court

Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the

underlying factual findings were undisturbed, such that Stream was collaterally estopped from

challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in

default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes,

including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not

been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new

money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023, but was

stayed by the filing of the Debtors' instant bankruptcy petitions.

7

B.      **Debtors' Pending Bankruptcy Cases**

1.      **The Filing of the Petitions**

The Debtors each filed voluntary bankruptcy petitions (each, a "Petition" and together, the "Petitions") under chapter 11 of the Bankruptcy Code on March 15, 2023.[7] Notwithstanding the dispute to be litigated over who is the rightful director of Technovative, Mr. Rajan signed both Stream's Petition and Technovative's Petition as Director.[8] The Corporate Resolutions attached to each of the Petitions identified Mr. Rajan as a Director, Secretary and Chief Executive Officer of Stream and Technovative, respectively, and he executed the Corporate Resolutions as Secretary of each entity.

Attached to Stream's Petition was Official Form 204, setting forth a list of its 20 largest non-insider unsecured creditors. Those creditors held purported claims totaling over $14 million.[9] Attached to Technovative's petition was its Official Form 204, which listed only Rembrandt, with a claim purported claim of $10,000,000.00.

2.      **Hawk's Stay Relief Motion**

Less than one week after the Petitions were filed, on March 20, 2023, Hawk filed the Hawk Stay Relief Motion. Hawk seeks relief from stay to proceed with the Section 225 Action against the Debtors in the Delaware Chancery Court. Hawk argues the Section 225 Action was

---

[7] Bankr. Docket No. 1; Bankr. Case No. 23-17064, Docket No. 1.

[8] On May 4, 2023, Stream filed an amended bankruptcy Petition, executed by Mr. Rajan as CEO and Director. Bankr. Docket No. 186. The amended Petition made two changes to the initial Petition. First, it responded in the affirmative to Question 12, asking whether the debtor owns or has possession of any real property or personal property that needs immediate attention, and by attachment references the Bonding Equipment (defined *infra*) located in China. Second, in response to Question 15 regarding its estimated assets, it reduced the range of value from $500,000,001-$1 billion to $100,000,001-$500,000,000.

[9] On April 12, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed a statement stating that an unsecured creditors' committee had not been appointed due to lack of response from unsecured creditors regarding serving on a committee. Bankr. Docket No. 100.

8

days away from trial when the Petitions were filed, and the Delaware Chancery Court is already

intimately familiar with the dispute between Hawk and the Debtors and the governing Delaware

law.  Hawk asserts that the Section 225 Action will resolve issues of state law that, while

fundamental to the Debtors' bankruptcy cases, are most efficiently and appropriately resolved by

the Delaware Chancery Court, including (i) who was the rightful director of Technovative pre-

petition, and therefore whether Technovative's bankruptcy filing was authorized (the

"Technovative Director Issue"), and (ii) whether Stream's secured debt to Hawk was converted

to equity pre-petition (the "Debt Conversion Issue").[10]

On April 5, 2023, the Debtors objected to the Hawk Stay Relief Motion (the "Debtors'

Stay Relief Objection").[11]  The Debtors argue that Hawk's purpose in prosecuting the Section

225 Action is to obtain a declaration that it can exercise rights as a purported secured creditor of

Technovative, enabling it to conduct a sale of Technovative's assets under Article 9 of the

Uniform Commercial Code (and "Article 9 Sale").  The Debtors argue that even if Hawk were to

obtain such a declaration, it would be prohibited by the automatic stay from exercising any such

rights absent further stay relief, and that such a sale would eviscerate the Debtors' primary

assets, consisting of intellectual property held by their subsidiaries.  Rembrandt filed a joinder to

the Debtors' Stay Relief Objection.[12]

On April 14, 2023, the Court held an initial hearing on the Hawk Stay Relief Motion and

---

[10] Hawk argues that rulings by the Delaware Chancery Court will "result in a complete resolution of issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes," which Hawk asserts are "all critical to the resolution of these Chapter 11 cases."  Hawk Stay Relief Motion, at 21.

[11] Bankr. Docket No. 78.

[12] Bankr. Docket No. 101.

9

determined that disputed facts would require an evidentiary trial.  That trial (the "Trial") was

initially scheduled to commence on May 22, but was then rescheduled to June 26.

### 3.      Debtors' Stay Violation Motion

On March 28, 2023, the Debtors filed an emergency motion seeking enforcement of the

automatic stay (the "Stay Violation Motion")[13] and imposition of related sanctions against

SeeCubic and SCBV, as well as certain entities and individuals purportedly acting on their behalf

(the "SeeCubic Parties").  In general, the Debtors asserted that SeeCubic and SCBV were

exercising possession and/or control over certain bonding equipment (the "Bonding Equipment")

of the Debtors located at a warehouse in China, which the Debtors asserted was essential to their

ability to receive client orders and commence production of their Ultra-D products.  The Stay

Violation Motion asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were

interfering with the Debtors' repossession and relocation of the Bonding Equipment, in violation

of the automatic stay and the Delaware Supreme Court's decision directing the unwinding of the

Omnibus Agreement.  The Stay Violation Motion also asserted that SeeCubic and SCBV, at the

direction of Mr. Stastney, were exercising possession and control over other Stream assets (the

"Other Stream Assets"), including Ultra-D demonstrator samples, engineering assets, laptops,

and intellectual property and software, in violation of the automatic stay.

On April 5, 2023, the Debtors filed an amended stay violation motion (the "Amended

Stay Violation Motion").[14]  In addition to their assertions regarding SeeCubic and SCBV's

interference with and control over the Bonding Equipment and Other Stream Assets, the Debtors

asserted that Mr. Stastney, SLS, SeeCubic, and Hawk had initiated proceedings in Amsterdam

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 76.

"to take certain measures preventing Debtors from managing its subsidiaries." The Debtors sought a directive from the Court that the SeeCubic Parties' possession and control over the Bonding Equipment and Other Stream Assets was to cease, and such estate property was to be turned over to the Debtors.[15]

On April 7, 2023, Debtors filed a supplement to the Amended Stay Violation Motion (the "Stay Violation Supplement"),[16] asserting that Mr. Stastney, SLS, SeeCubic, and Hawk had filed a joint legal action (the "Amsterdam Action"), apparently different from the summary proceeding described in the Amended Stay Violation Motion, seeking the removal of Mr. Rajan as a director and CEO of Stream's Dutch subsidiaries, in further violation of the automatic stay.

On April 12, 2023, SeeCubic objected to the Stay Violation Motion and the Amended Stay Violation Motion,[17] asserting that the Bonding Equipment and Other Stream Assets were not property of Debtors' estates, and even if they are, mere possession did not constitute violation of the automatic stay because it does not apply to the non-debtor Dutch subsidiaries. Hawk filed a joinder in support of SeeCubic's objection.[18]

The Court held an initial hearing on the Stay Violation Motion on April 14, 2023. With respect to the portions of that motion related to the Other Stream Assets and the Amsterdam Action, the Court reserved ruling pending additional information and evidence.[19] With respect to the Bonding Equipment, on July 13, 2023, the Court entered an order appointing my colleague,

---

[15] The Amended Stay Violation Motion did not seek specific relief with respect to the Amsterdam proceedings that were assumedly the reason for the amendment.

[16] Bankr. Docket No. 90.

[17] Bankr. Docket No. 105.

[18] Bankr. Docket No. 106.

[19] The Debtors followed with another emergency motion on April 18, 2023, seeking withdrawal of the Amsterdam Action in advance of a scheduled April 20 hearing in the Netherlands. Bankr. Docket No. 125. The Amsterdam court, however, thereafter postponed the scheduled hearing.

Judge Mayer, to mediate that dispute.[20]  To the Court's knowledge, this dispute remains in

mediation.

### 4.        Hawk's Section 1112/1104 Motion

On April 6, 2023, Hawk filed the Section 1112/1104 Motion.  As noted *supra* and

discussed in greater detail *infra,* the motion seeks either conversion or dismissal of the Debtors'

bankruptcy cases pursuant to §1112(b) of the Bankruptcy Code, or alternatively, the appointment

of a chapter 11 trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the

Bankruptcy Code.

With respect to conversion or dismissal, Hawk argues that there are three statutorily-

grounded bases for converting or dismissing the cases under §1112(b) of the Bankruptcy Code.

First, Hawk argues there has been substantial and continuing loss to the Debtors' bankruptcy

estates without likelihood of rehabilitation, as contemplated by §1112(b)(4)(A).  Second, Hawk

argues there has been gross mismanagement of the estates, as contemplated by §1112(b)(4)(B).

Third, Hawk argues the Debtors have engaged in the unauthorized use of cash collateral, as

contemplated by §1112(b)(4)(D).[21]  In addition to these statutory grounds for finding cause to

convert or dismiss, Hawk argues the Debtors lacked good faith in filing their bankruptcy cases,

providing an alternate grounds for dismissal under §1112(b).  Finally, Hawk argues that

Technovative's bankruptcy filing was unauthorized because Mr. Rajan was replaced as a director

of Technovative prior to its Petition being filed, and therefore could not have authorized the

filing on behalf of the entity.  After asserting that multiple grounds exist for conversion or

dismissal, Hawk argues in the Section 1112/1104 Motion that the Court should dismiss the

---

[20] Bankr. Docket No. 294.

[21] As discussed *infra,* Hawk did not address the unauthorized use of cash collateral in its post-trial brief,
and therefore the Court understands Hawk to no longer be asserting this basis for conversion or dismissal.

Debtors' cases with prejudice, rather than convert them, because it would alleviate any fears of the Debtors refiling, the Debtors are non-operational, and the both conversion and dismissal will likely conclude with the sale of the Debtors' equity in their subsidiaries.[22]

With respect to the appointment of a chapter 11 trustee, Hawk asserts that even if the Court is not inclined to convert or dismiss the Debtors' cases, cause exists to appoint a trustee based on the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of the Debtors' businesses. Hawk further argues that Mr. Rajan has engaged in self-dealing for the benefit of VSI that has led to irreconcilable acrimony between the Debtors' management and several stakeholders.

On May 8, 2023, the Debtors filed an opposition to the Section 1112/1104 Motion (the "Debtors' Section 1112/1104 Opposition").[23] Rembrandt also filed an opposition to the Section 1112/1104 Motion (the "Rembrandt Section 1112/1104 Opposition").[24]

As was the case with the Hawk Stay Relief Motion, the Section 1112/1104 Motion was scheduled to be heard at the Trial commencing on May 22, and subsequently rescheduled to June 26.

### 5.    Debtors' Expedited Motion to Approve Employee Obligations

On April 21, 2023, the Debtors filed an expedited motion (the "Employee Obligations

---

[22] As discussed *infra,* since filing the Section 1112/1104 Motion, Hawk's position has evolved, in that it now seeks conversion of the Debtors' cases rather than dismissal.

[23] Bankr. Docket 196. The Debtors filed an initial response to the Section 1112/1104 Motion on April 10, 2023, *see* Bankr. Docket No. 94, based on and contesting Hawk's request that the motion be heard on an expedited basis. The Court held an initial hearing on the motion on April 14, 2023, at which time it set a briefing schedule and a trial date. The Debtors' Section 1112/1104 Opposition was filed in accordance with that briefing schedule.

[24] Bankr. Docket No. 193.

13

Motion")[25] seeking authority to make certain payments the Debtors characterized as employee

obligations.

First, the Debtors sought authority to pay various obligations in connection with the

employees of SCBV, including payroll, taxes, paid leave, benefits payments, etc.[26] According to

the motion, there were 28 full-time, salaried employees of SCBV at the time of filing. The

Debtors claimed that there were no pre-petition amounts owing to these employees, but that post-

petition payroll was about $180,000 per month. The motion also sought to pay (a) six

independent contractors $193,000 for pre-petition services, as well ongoing post-petition fees of

$46,000 per month, (b) post-petition payroll taxes of $149,000 per month, (c) payroll processing

fees of $9,000 per month, and (d) pension contributions of $43,000 per month. The Debtors also

sought to pay approximately $20,000 in pre-petition reimbursable business expenses to SCBV

employees.

The Employee Obligations Motion, however, sought additional relief unrelated to current

employee and independent contractor obligations. It also sought authority to re-hire nine U.S.-

based Stream employees that purportedly left after the Delaware Chancery Court's Omnibus

Agreement decision in 2020, and who are now employed by VSI. In connection with re-hiring

them, the Debtors sought to pay those employees approximately $30,000 in pre-petition wages

owed (subject to the $15,150 cap on pre-petition wages under §507(a)(4)). The Debtors also

sought to pay certain independent service providers both pre-petition amounts owed, in the

amount of approximately $30,000 owed to one provider, and ongoing post-petition amounts of

approximately $10,000 per month. The Debtors further sought to pay the re-hired employees'

---

[25] Bankr. Docket No. 134.

[26] The motion required expedited treatment because the post-petition compensation Debtors sought to pay
SCBV employees was coming due just four days later, on April 25.

14

post-petition payroll taxes of approximately $10,000 to $12,000 per month, as well as the pre-petition payroll taxes owing as necessary, up to $178,000. The Debtors also sought to reinstate their paid leave program and benefit plans at a cost of approximately $23,000 per month, as well as pay approximately $267,000 in unreimbursed pre-petition business expenses.

In addition to the U.S.-based former Stream employees, the Debtors also sought to re-hire three Taiwan-based Stream employees who purportedly left after the Delaware Chancery Court's 2020 Omnibus Agreement decision as well, and who are also now employed by VSI. In connection with these former employees, the Debtors sought authority to pay post-petition payroll costs of $7,000 and medical plan costs of about $3,000, but did not believe there were any pre-petition amounts owed. The Debtors also sought authority to pay approximately $3,000 in unreimbursed pre-petition business expenses.

Finally, the Debtors stated that they had been using 15 independent contractors in China for various services through an entity called ST4M, Inc. The Debtors sought authority to establish a Beijing-based subsidiary to employ these 15 individuals as full-time employees. The gross payroll would be approximately $22,000 monthly, and the Debtors would also be required to pay approximately $29,000 quarterly for a state-sponsored health-plan.

As discussed *infra,* the Court held an emergency hearing on the Employee Obligations Motion on April 24, but limited its consideration to whether and what payments to current SCBV employees were needed on an expedited basis.

### 6. Debtors' Expedited Stock Sale Motion

On the same day that they filed the expedited Employee Obligations Motion, the Debtors filed an expedited motion for authority to sell up to $10 million in unissued shares of Stream's

15

Class A common stock to VSI to fund their post-petition operations (the "Stock Sale Motion").[27]

The Stock Sale Motion represented that VSI, formed by Mr. Rajan as a vehicle to raise new capital for Stream and to support Stream while fighting the transfer of Stream's assets pursuant to the Omnibus Agreement, had made pre-petition strategic investments in Stream, in addition to having engaged key Stream employees.  Per the Stock Sale Motion, VSI was prepared to fund the Debtors' post-petition product development and supply chain, but "as compensation for this support" Stream had entered into an exclusive distribution agreement (the "Distribution Agreement") whereby VSI would accept orders from and make delivery to third-party customers, issue a purchase order to Stream for 90% of the value of the third-party order, and retain the 10% difference as "margin for funding technical, business, and sales development." The Debtors represented that VSI would also assist with "productization of electronics," and asserted that the 10% fee was "industry standard for distribution agreements."

Together with the Debtor's expedited Employee Obligations Motion, the Court held an emergency hearing on the Stock Sale Motion on April 24, as discussed *infra*.

### 7.    Debtors' Emergency Financing Motion and Seecubic's Proposed Alternative Funding

As will be discussed in further detail *infra,* on April 25, 2023, the Debtors filed an emergency motion for the approval of debtor-in-possession financing from VSI as an alternative to the proposed sale of stock to VSI, in order to fund the SCBV payroll obligations coming due the following day.[28]  On the same day, SeeCubic filed an alternative funding motion that would have compelled SCBV, or alternatively the Debtors, to borrow under an existing line of credit from SeeCubic that had been put in place while the Receiver was managing Technovative and its

---

[27] Bankr. Docket No. 135.

[28] Bankr. Docket No. 156.

subsidiaries, including SCBV.[29]  Later that day, the Court held an eight-hour emergency hearing

on the alternative funding proposals that ended at approximately 11:00 p.m., after which it

determined that neither proposal would be approved.

### 8.      Debtors' Motion to Retain Thomas Park as Chief Financial Officer

On June 14, 2023, the Debtors filed a motion seeking authority to enter into an

employment agreement with Thomas Jung Ho Park ("Mr. Park") as Chief Financial Officer to

the Debtors (the "Park Retention Motion").[30]  The Debtors asserted in the Park Retention Motion

that, given their need to raise capital and the complexity of their businesses and structure of their

debt, it was necessary to have an experienced CFO to support the Debtors' financial operations

and successfully navigate the Debtors' businesses during their Chapter 11 cases and post-

emergence from bankruptcy.  Although the Debtors asserted that their entry into the employment

agreement with Mr. Park was within the ordinary course of their business, and therefore did not

require approval of the Court, after discussions with the United States Trustee the Debtors filed a

revised motion to employ Mr. Park on July 18, 2023.[31]

On July 25, 2023, Hawk filed an objection to the Park Retention Motion. In its objection,

Hawk argued that the Debtors neither provided a basis justifying the need for Mr. Park's

employment nor have the Debtors established that Mr. Park is not a disinterested person for the

purposes of §327 of the Bankruptcy Code. A hearing on the Park Retention Motion was

originally scheduled for August 16, 2023, but has been continued a number of times to allow for

Trial and other more pressing contested matters to go forward.

---

[29] Bankr. Docket No. 155.

[30] Bankr. Docket No. 234.

[31] Bankr. Docket No. 298.

17

### 9. Debtors' Motion to Continue Trial Due to Mr. Rajan's Hospitalization

On June 16, 2023, the Debtors filed an expedited motion to continue the Trial on the Hawk Stay Relief Motion and the Section 1112/1104 Motion, scheduled to commence on June 26.[32] The Debtors represented that Mr. Rajan was hospitalized after suffering a recent injury, and upon his medical provider's instruction, would be unable to participate in or attend Trial, whether remotely or in-person, nor would he be able to attend, remotely or in-person, his deposition. The Debtors therefore sought a continuation of the commencement of Trial for 45 days to allow Mr. Rajan to recuperate sufficiently to participate. Hawk objected to the continuation request, citing the prejudice a further delay would cause, and asserting that Mr. Rajan's absence would not affect the outcome to the extent the pending motions entailed strictly legal issues, as opposed to factual issues requiring testimony from Mr. Rajan. On June 21, 2023, the Court held an expedited hearing on the Debtors' continuance request, at which time it determined that Trial would proceed on June 26 to allow the parties to commence with the presentation of evidence, but that Trial would need to be continued to allow Mr. Rajan to recuperate sufficiently to be deposed and testify.

Trial then commenced from June 26 to June 29, and was subsequently continued on August 15 and 17, and again on September 22 and 25, to permit Mr. Rajan's recuperation and participation.

### 10. Debtors' Amendment to Stock Sale Motion

On June 23, 2023, the Debtors filed an amendment to their Stock Sale Motion (the "Stock Sale Motion Amendment").[33] The Debtors informed the Court that they had continued to

---

[32] Bankr. Docket No. 236.

[33] Bankr. Docket No. 258.

explore the sale of Class A common stock of Stream to third parties, one of which was a Chinese

company named Zhongsheng Group Holdings Ltd. ("Zhongsheng").  As a result, the Debtors had

entered into a non-binding term sheet with Zhongsheng on June 6, 2023 (the "Zhongsheng Term

Sheet"), pursuant to which Zhongsheng would invest $300 million in Stream through the

purchase of Stream Class A shares.

As discussed in further detail *infra*, a wave of motion practice followed the Stock Sale

Motion Amendment, and it later became one of the primary issues in the Trial.

### 11.    Debtors' Adversary Proceeding and TRO Motion

On August 12, 2023, with the resumption of Trial days away and in the midst of

contested hearings regarding discovery over the Zhongsheng Term Sheet, the Debtors filed an

adversary action ( the "Adversary Action") against a host of parties, including, among others,

Hawk, SLS, SeeCubic, and Mr. Stastney (collectively, the "Defendants).[34]  In their Complaint in

the Adversary Action, the Debtors allege that the Defendants have engaged in an effort to (a)

sabotage the Debtors' exercise of certain debt-to-equity conversion rights held against the

secured debtholders, (b) vitiate the Debtors' recapitalization, which would have rendered certain

Defendants' debt instruments obsolete; (c) restrict and/or interfere with the Debtors' ability to

raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets

and other business resources essential to its successful reorganization.

On September 1, 2023, the Debtors filed a motion in the United States District Court for

the Eastern District of Pennsylvania (the "District Court") to withdraw reference of the

Adversary Action from this Court.[35]  The Debtors followed that on September 28, 2023 with an

---

[34] Bankr. Docket No. 335; Adv. Pro. Docket No. 1.

[35] On November 16, 2023, the District Court denied the Debtors' request to withdraw the reference.  *See*
Case No. 23-mc-135, at Docket No. 18.

emergency motion in the District Court (the "TRO Motion") for a temporary restraining order, preliminary injunction, and permanent injunction. The District Court denied the motion on the grounds that it was not properly filed in the District Court absent withdrawal of the reference of the Adversary Action. Therefore on September 30, 2023, the Debtors refiled the TRO Motion in the Adversary Action before this Court.[36]

By the TRO Motion, the Debtors assert that Mr. Stastney testified in mid-September in the Amsterdam Action, during which he admitted that SeeCubic is in direct competition with Stream, and is currently working with twelve or thirteen customers using the Ultra-D technology developed by Stream. Stream alleges that this action by SeeCubic puts its technology licenses with Philips and Rembrandt at risk because they strictly prohibit sub-licensing. The Debtors further argue that SeeCubic's unauthorized use of the Philips and Rembrandt technology, as embedded in Stream's technology, violates the Philips and Rembrandt licenses and presents the potential of irreparable harm to Stream should Philips and Rembrandt decide to revoke their respective licenses.

The Court held a contested evidentiary hearing on the TRO Motion over the course of multiple days in October and November, after which the Court provided the parties certain dates in December that were available for the conclusion of the hearing, and directed that they confer regarding their mutual availability. The parties thereafter advised the Court that they had agreed to postpone continuation of the TRO hearing, as well as multiple other matters that were scheduled for hearing in December, until late January or early February to pursue settlement discussions. On December 14, the Court held a status hearing with the parties to discuss the impact of the proposed continuation on the status of the TRO hearing. The Court determined

---

[36] Adv. Pro. Docket No. 27.

20

that the entry of a limited temporary restraining order was warranted, based strictly on the

evidence presented at the TRO hearing to that point and in light of the lengthy delay that

continuation of the hearing would cause to the Court's final resolution of the matter.  The Court

directed Debtors' counsel to prepare an agreed form of order reflecting the Court's ruling at the

status hearing.  Indicative of the acrimony that has stalled progress in this case at nearly every

turn, the parties subsequently advised the Court that they were unable to reach agreement

regarding the terms of a proposed order.  The Court therefore prepared an Order consistent with

its ruling at the December 14 status hearing, which was entered on January 4, 2024.[37]

### 12. Trial on the Pending Motions

Commencing on June 26, the Court held Trial over eight days, concluding on September

25.  During the Trial, the Court heard testimony from Mr. Stastney, Mr. Park, Mr. Rajan, and

Christopher Michaels of Rembrandt.  Approximately 130 exhibits were admitted into evidence.[38]

### 13. The Parties' Positions After Trial

At the Court's direction, Hawk, the Debtors, and Rembrandt submitted post-trial briefs

(each a "Post-Trial Brief") setting forth their positions in light of the evidence presented at

Trial.[39]

#### a. The Section 1112/1104 Motion

---

[37] Adv. Pro. Docket No. 119.

[38] The transcripts of the Trial span nearly 2,000 pages, which is merely a fraction of the pages of transcripts that have accumulated from all of the contested hearings the Court has had to hold in these cases.

[39] Although Rembrandt submitted post-trial briefing in opposition to the two pending motions, the arguments therein relate largely to Rembrandt's history with the Debtors and its position with respect to the Rembrandt license.  Although the Rembrandt license is a central feature of these cases, it does not factor into the Court's analysis below regarding whether conversion, dismissal, or appointment of a trustee is warranted and whether cause exists to grant Hawk stay relief for resolution of the Technovative Director Issue and the Debt Conversion Issue.  The Court therefore will not summarize Rembrandt's arguments here.

21

Hawk argues that the Court should order conversion of the Debtors' cases to chapter 7 for any of three independent reasons.[40]

First, Hawk argues that the evidence established that conversion is warranted under §1112(b)(4)(A), based on the substantial or continuing losses to the Debtors' estates and no reasonable prospect at rehabilitation.[41]  According to Hawk, the record evidence established that the Debtors are incurring substantial losses during the pendency of these cases in the form of accruing administrative expenses and post-petition payment obligations to Rembrandt, without any offsetting revenue, and have no reasonable likelihood of rehabilitation because they have never had any operations, as all of the value lies in their non-debtor operating subsidiaries (and to the extent Mr. Rajan testified regarding the Debtors' operations, these are actually taking place at the VSI level).

Next, Hawk argues that the evidence established conversion is warranted under §1112(b)(4)(B), based on the Debtors' gross mismanagement of the estates.[42]  Hawk argues that the evidence at Trial established the Debtors' gross mismanagement in a number of ways: (a) Mr. Rajan's breach of his fiduciary duties and conflicts of interest; (b) the Debtors' lack of

---

[40] In its Post-Trial Brief, Bankr. Docket No. 431, Hawk does not address its argument in the Section 1112/1104 Motion that conversion or dismissal is warranted under §1112(b)(4)(D), based on the Debtors' unauthorized use of cash collateral. *See* Hawk Post-Trial Brief, at 42 (arguing that there are three bases under §1112(b) under which the Court can order conversion here: (i) substantial or continuing loss or diminution of the estate and absence of reasonable likelihood of rehabilitation under §1112(b)(4)(A); (b) gross mismanagement of the estate under §1112(b)(4)(B); and (c) lack of good faith in filing the Petitions).  In its Post-Trial Reply Brief, Bankr. Docket No. 436, Hawk acknowledges that it has not identified any cash collateral the Debtors used without permission, but attributes that to the Debtors' failure to adhere to their financial reporting and disclosure obligations. *Id.* at 14. While the Court is not clear that Hawk is even advancing this basis for conversion or dismissal given its omission from the Hawk Post-Trial Brief, Hawk's concession in its reply brief seems to end the inquiry, and the Court therefore does not address it further herein.

[41] Hawk Post-Trial Brief, at 44-47.

[42] *Id.* at 48-57.

22

candor to the Court and interested parties; (c) the Debtors' "blatant gamesmanship" in their requests for relief in this Court and the litigation that has ensued; and (d) likely fraud in the fabrication of a purported funding transaction.

Finally, Hawk argues that the evidence established conversion is warranted based on the Debtors' bad faith in commencing these cases.[43] Hawk argues that the timing of the Debtors' Petitions alone establishes *per se* bad faith because they were filed on the eve of trial in the Section 225 Action as a bad faith litigation tactic. Hawk further argues that under the totality of the circumstances test used in the Third Circuit, twelve of the fourteen factors used support a finding of bad faith.

Hawk argues that conversion of the Debtors' cases, rather than dismissal, is warranted so that the Court may continue to oversee them but curtail Mr. Rajan's influence in administering them.[44] Barring conversion, Hawk argues that dismissal is appropriate because the existence of cause has been established under §1112. If, however, the Court is not inclined to either convert or dismiss, Hawk argues the evidence establishes that appointment of a trustee is proper based on Mr. Rajan's pattern of fraud and dishonesty in managing the Debtors, his gross mismanagement not only of the estates, but also of the pre-petition Debtors, and the conflicts of interest between Mr. Rajan and his roles with and interests in the Debtors and VSI that have revealed themselves through the administration of these cases.[45] Hawk argues that the costs of appointing a trustee "are effectively nil" because Mr. Rajan's administration of the estates to date has been so

---

[43] *Id.* at 57-61.

[44] *Id.* at 62. The Court notes Hawk's request for conversion rather than dismissal represents a change from its preference for dismissal with prejudice as stated in the Section 1112/1104 Motion, but is consistent with the evolved position Hawk took in its pre-trial brief filed in May. *See* Bankr. Docket No. 195, at ¶¶23 to 42.

[45] *Id.* at 64-67.

harmful to creditors' prospects for recovery.

The Debtors argue that Hawk has failed to establish by a preponderance of the evidence that cause exists for conversion, dismissal, or the appointment of a trustee.[46]

First, the Debtors argue the evidence does not establish the absence of a reasonable likelihood of rehabilitation. The Debtors assert that their proposed plan of reorganization,[47] the post-petition purchase orders they have procured, and Mr. Rajan's testimony at Trial regarding expected revenues to be generated from new and existing Stream customers belie Hawk's narrative of a non-operating entity that has no ability to rehabilitate.[48] Moreover, the Debtors argue, the evidence does not establish substantial or continuing loss to the estates because operating expenses are being funded by VSI in exchange for Stream shares.[49]

The Debtors also argue that the evidence does not establish gross mismanagement of the estates supporting conversion or dismissal. The Debtors assert that their efforts to obtain financing from VSI to fund operations pursuant to the Debtor DIP Motion were the subject of "extreme resistance" that ultimately resulted in the Court declining to approve the financing, and that they have retained Mr. Park to provide independent oversight of the Debtors' post-petition finances and internal systems, thereby buffering management of the estates with "another layer of independence to the Debtors' management team."[50]

With respect to Hawk's argument that the Petitions were filed in bad faith, thereby providing another basis for conversion or dismissal, the Debtors argue that the cases were filed to

---

[46] Debtors Post-Trial Brief, Bankr. Docket No. 432, at 2-3.

[47] *See* Bankr. Docket No. 293.

[48] Debtors Post-Trial Brief, at 11-16.

[49] *Id*. at 17-19.

[50] *Id.* at 19-21.

provide breathing room and to develop a plan of reorganization, not as a litigation tactic solely for purposes of staying the Section 225 Action.[51]

Just as they argue there is no basis for conversion or dismissal, the Debtors argue there is no basis for the appointment of a trustee. The Debtors cite Mr. Rajan's experience as a businessman, his intimate familiarity with the Debtors' business and related technology, and the post-petition retention of Mr. Park as reasons for finding that the Debtors' estates are better administered by current management.[52]

### b.    The Hawk Stay Relief Motion

Hawk argues that cause exists to grant relief from stay to allow the Section 225 Action to proceed because its resolution "will determine: (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes – all critical to the resolution of these Chapter 11 cases."[53]  Relying on Mr. Stastney's Trial testimony regarding the late stage at which the Section 225 Action was when the Petitions were filed, the expenses that had been incurred getting to that point, and the extensive discovery that had been undertaken, Hawk argues that a quick resolution by the Delaware Chancery Court would be efficient and conserve judicial and estate resources.

The Debtors, in response, argue that relief from stay is not warranted. The Debtors first argue that Hawk has failed to articulate the exact relief and specific matters that it seeks to

---

[51] *Id.* at 22-26 (arguing that "virtually none" of the factors set forth in *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),* 272 B.R. 554, 557 (D.De. 2002) for analyzing whether a filing was in bad faith are present here).

[52] *Id.* at 27.

[53] Hawk Post-Trial Brief, at 62-63.

pursue in the Section 225 Action.[54]  Furthermore, they argue, the ultimate relief sought in that

action is to authorize Hawk to exercise rights under the Hawk Notes and the SLS Notes,

including pursuit of an Article 9 Sale of their purported collateral.[55]  Hawk cannot do so, the

Debtors argue, without resolution of the dispute regarding Stream's rights in connection with

ownership of 100% of Technovative shares, which are undisputedly estate property and therefore

subject to resolution by this Court rather than the Delaware Chancery Court.[56]  The Debtors

further argue that allowing the Section 225 Action to proceed would greatly prejudice the

Debtors by allowing Hawk to move forward with its plans to effectuate a sale of downstream

assets, thereby inflicting irreparable harm on the Debtors' ability to effectuate an orderly

reorganization process.  The Debtors also argue that they have strong defenses in the Section 225

Action, militating against relief.

## III.   DISCUSSION

### A.   Cause Exists and It Is In the Best Interest of Creditors and the Estates at This Stage to Appoint a Chapter 11 Trustee

#### 1.   Legal Standard for Dismissal or Conversion Under §1112(b)

Section 1112(b)(1) of the Bankruptcy Code sets forth the Court's power to convert or

dismiss a chapter 11 bankruptcy case:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b).  The movant bears the initial burden to demonstrate cause by a

---

[54] Debtors Post-Trial Brief, at 28.

[55] *Id.*

[56] *Id.* at 29.

preponderance of the evidence, and once shown, the burden shifts to the debtor to establish an exception under §1112(b)(2).[57]  *In re Dr. R.C. Samanta Roy Institute of Science Technology,* 465 Fed. Appx. 93, 96-97 (3d Cir. 2011) ("[O]nce cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors."); *In re Mann Realty Assocs.,* 2019 WL 4780937, at *6 (M.D. Pa. Sept. 30, 2019) ("After cause is established, the burden shifts to the opposing party to identify unusual circumstances that suggest conversion would not be in the best interests of the estate and its creditors, and that there is a reasonable likelihood that a reorganization plan will be confirmed in a reasonable time."); *In re Vascular Access Centers, L.P.,* 611 B.R. 742, 761 (Bankr. E.D. Pa. 2020) (citing cases).

The Bankruptcy Code sets forth a non-exclusive list of circumstances that constitute "cause" for conversion or dismissal.  11 U.S.C. §1112(b)(4).  As discussed *supra,* Hawk's Post-Trial Brief focuses on two of these circumstances: (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (B) gross mismanagement of the estate.

A motion filed under §1112(b) necessitates a two-step analysis: (1) to determine if cause exists to either dismiss the case or convert it to chapter 7, and (2) if so, which option is in the best interests of creditors and the estate (unless appointment of a trustee under §1104 is in the best interests).  *Camden Ordnance*, 245 B.R. at 798.  In considering whether to convert or

---

[57] Section 1112(b)(2) provides that the court may not convert or dismiss a case if the court finds and identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification for the act or omission; and that will be cured within a reasonable period of time fixed by the court.

27

dismiss, a bankruptcy court may consider a variety of factors, including:

(1)     whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

(2)     whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

(3)     whether the debtor would simply file a further case upon dismissal;

(4)     the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

(5)     in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

(6)     whether any remaining issues would be better resolved outside the bankruptcy forum;

(7)     whether the estate consists of a "single asset";

(8)     whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

(9)     whether a plan has been confirmed and whether any property remains in the estate to be administered;

(10)    whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

(11)    consideration of the effect of dismissal under §349 of the Bankruptcy Code.

*In re Ramreddy, Inc.,* 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 COLLIER ON BANKRUPTCY ¶1112.04[6]).

Although §1112(b)(4)'s enumerated circumstances constituting cause are wide-ranging, a court may consider other factors as they arise and may use its equitable powers to reach an appropriate result in individual cases. *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,* 245 B.R. 794, 798 (E.D. Pa. 2000) (quoting *Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D. Pa. 1991)).  For example, it is well-settled that a debtor's inability to achieve confirmation of a

plan, by itself, provides sufficient cause for dismissal or conversion of a chapter 11 case. *See, e.g., 1121 Pier Village LLC,* 635 B.R. at 137 n.14; *In re 3 Ram, Inc.,* 343 B.R. 113, 117 n.14 (Bankr. E.D. Pa. 2006).

Importantly, good faith is an implicit requirement in the filing of a chapter 11 bankruptcy case, and a case not filed in good faith is subject to dismissal under §1112(b). *See, e.g., In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999) (chapter 11 petitions are subject to dismissal unless filed in good faith); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661 (Bankr. E.D. Pa. 2009) (citing *SGL Carbon*). The debtor bears the burden of proving good faith. *Id.* (citing *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir. 2003)). In the business bankruptcy context, the preservation and rehabilitation of a going concern or the maximizing of the value of a debtor's estate for the benefit of creditors through an orderly liquidation are valid bankruptcy purposes supporting a finding of good faith. *Id.* (citing *In re Integrated Telecom Express, Inc.,* 384 F.3d 108 (3d Cir. 2004)); *In re Team Systems International LLC,* 640 B.R. 296, 311 (Bankr. D. Del. 2022) ("The ultimate touchstone is whether the case is being used to accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or to maximize the property available to satisfy creditor claims."). Whether a case should be dismissed for lack of good faith is committed to the discretion of the bankruptcy court, and the determination is a fact-intensive inquiry based on the totality of the circumstances. *Id.* at 662 (citing *Integrated Telecom*). The inquiry is facilitated, however, by factors courts use, the presence of which suggests a case was not filed in good faith:

(1)     the debtor has few or no unsecured creditors;

(2)     there has been a previous bankruptcy petition by the debtor or a related entity;

(3)     the prepetition conduct of the debtor has been improper;

(4)     the petition effectively allows the debtor to evade court orders;

(5)     there are few debts to non-moving creditors;

(6)     the petition was filed on the eve of foreclosure;

(7)     the foreclosed property is the sole or major asset of the debtor;

(8)     the debtor has no ongoing business or employees;

(9)     there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14)    the debtor filed solely to create the automatic stay.

*Id.* (citing *In re SB Properties, Inc.,* 185 B.R. 198, 204 (E.D. Pa. 1995)).

As discussed *supra,* the preservation and rehabilitation of a going concern is a valid bankruptcy purpose supporting a finding of good faith, and the determination of whether a case should be dismissed for lack of good faith is a fact-intensive inquiry based on the totality of circumstances.

> **2.      It Has Been Established by a Preponderance of the Evidence and the History of These Cases that Current Management's Actions and Inactions Constitute Gross Mismanagement of the Estates**

Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where there has been gross mismanagement of the estate.  11 U.S.C. §1112(b)(4)(B).  A debtor-in-possession owes a fiduciary duty to its creditors, and gross mismanagement is a breach of that duty.  *In re Ozcelebi,* 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022).  Section 1112(b)(4)(B) focuses on the conduct of the *estate's* affairs, not the pre-petition debtor's, and requires that the mismanagement

30

be gross in character, meaning that it is "'glaringly noticeable usually because of inexcusable badness or objectionableness.'" *In re 210 West Liberty Holdings, LLC,* 2009 WL 1522047, at *5 (Bankr. N.D. W.Va. May 29, 2009) (citing *Webster's Ninth New Collegiate Dictionary* 538 (1991)); see also *Ozcelebi,* 639 B.R. at 388 ("[W]hile 'gross mismanagement' is not defined by the Bankruptcy Code, Black's Law Dictionary defines 'gross' as 'beyond all reasonable measure; flagrant.' Given the plain language, a debtor's mismanagement must be beyond all reasonable measure.").

The above summary outlining the major activity in these cases, which have been pending for months, evidences the acrimony and overall lack of progress that has plagued these cases from their inception. Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtors' operations moving forward, these cases have stalled at virtually every turn. The Court has expressed its concern with the cases' lack of progress and direction on multiple occasions. Furthermore, the evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtors' cases to date, *i.e.,* the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management. There are many examples, large and small, that highlight (a) the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court, (b) the relatively directionless nature of these cases to date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date. The Court discusses the most glaring examples below.

### a.   All Indications Are That the Purported $300 Million Transaction with Zhongsheng Was Not Real

From the early days of these cases, the Court repeatedly raised concerns about how the Debtors were being funded. Although the Debtors attempted to answer that question in part with an ill-conceived emergency financing through the sale of stock to VSI, they later proposed a $300 million transaction for the sale of Stream Class A stock to Zhongsheng. That transaction was suspect from the start given its timing on the eve of Trial, lack of detail, and non-binding nature, but the dearth and opacity of information the Debtors provided about it at Trial when pressed, together with their abandonment of the proposed transaction, leads this Court to believe it never truly existed, and either embellished or fabricated to portray the Debtors' cases and operations as sufficiently progressing.

The Debtors filed the purported Zhongsheng Term Sheet on the evening of June 23, i.e., the Friday prior to the start of the Trial on the pending Hawk Motions.[58] That term sheet, which states that it is non-binding, provides that Zhongsheng will invest $300 million in exchange for Class A Common Stock in Stream, resulting in Zhongsheng holding a 35% equity stake in Stream.[59] Attached to the Term Sheet was a draft Subscription Agreement providing for Zhongsheng's purchase of the Stream shares, with an initial $15 million tranche to be sold by an unspecified date in July 2023, and the balance of the sale to occur by December 31, 2023. According to the Debtors, they intended to use the first $30 million received from the sale of

---

[58] The Term Sheet was filed as an attachment to a two-page pleading styled as an amendment to the Stock Sale Motion. Incredibly to the Court, the Debtors stated their position therein that they believed the relief sought by the Stock Sale Motion was broad enough to cover the sale of $300 million in Stream shares to Zhongsheng, but were filing the amendment out of an abundance of caution. The Court questions whether the post-petition sale of $300 million in equity in a debtor could ever be covered under an ordinary course of business concept, but it is enough to say that it certainly is not here.

[59] *See* Bankr. Docket No. 258-1.

Stream's Class A shares to fund their operations through confirmation. As such, the Zhongsheng transaction was to fund the Debtors through the issuance of Stream securities rather than the incurrence of debt.

The authenticity of this transaction, however, quickly began to grow murky, particularly in light of the amount of the purported investment and its importance to the Debtors' cases. Mr. Park testified at Trial less than a week later, on June 29, that he understood Zhongsheng to be a publicly traded entity on Hong Kong's Hang Seng Index, involved in the high-end auto dealership business but with a finance arm as well.[60] Mr. Park wanted to make clear, however, that he was not involved in any negotiations with Zhongsheng related to the Term Sheet, despite serving as CFO and being tasked with raising capital for the Debtors. Instead, the negotiations were handled by Mr. Rajan, and Mr. Park had not discussed the proposed deal with Mr. Rajan notwithstanding its enormous size and implications for the Debtors' finances.[61]

Following Mr. Park's testimony, Hawk sought more information about the Zhongsheng Term Sheet through discovery, and ultimately filed a motion to compel the Debtors to produce information sufficient to permit Hawk to depose a Zhongsheng representative about the purported transaction (the "Motion to Compel").[62] By the Motion to Compel, Hawk made clear that it sought the information in order to, among other things, "evaluate the veracity of the Term Sheet."[63] Although the Court denied the Motion to Compel, it entered an order (the "Discovery

---

[60] June 29, 2020 Hearing Transcript, 55:5 to 55:15.

[61] *Id.* at 55:21 to 56:9. The idea that Mr. Park, as CFO, would not even discuss the proposed deal with Mr. Rajan, let alone be involved in the negotiations, is indicative of its specious nature, or otherwise speaks to the marginal role Mr. Park plays with the Debtors despite Mr. Rajan being their only other employee.

[62] CR-242.

[63] *See* Motion to Compel, at ¶17.

Order")[64] directing the Debtors to produce contact information for the individuals at Zhongsheng who negotiated the Zhongsheng Term Sheet, as well as documents and communications with Zhongsheng or any affiliate of Zhongsheng "including but not limited to letters of intent, proposals, and diligence materials between the Debtors and Zhongsheng Group Holdings Ltd. or any affiliate thereof." After the Discovery Order was entered, Mr. Rajan submitted a Declaration in support of the legitimacy of the Zhongsheng Term Sheet (the "Zhongsheng Declaration").[65] It is unnecessary to fully summarize the Zhongsheng Declaration, but in it Mr. Rajan states, *inter alia,* that (a) the Zhongsheng Term Sheet was the product of negotiations with William Wang and Tea Lee, both of Zhongzhi Enterprise Group ("ZEG"), an affiliate of Zhongsheng, and (b) contrary to Mr. Park's testimony, the Zhongsheng entity that is party to the Zhongsheng Term Sheet is a privately held company of the People's Republic of China, and is not the Zhongsheng entity publicly traded on the Hong Kong stock exchange.[66]

What came next was a motion by Hawk to hold the Debtors in contempt for failing to produce the information and documents required by the Discovery Order (the "Contempt Motion").[67] Hawk alleged in the Contempt Motion that the Debtors only produced business cards in Mandarin for William Wang and Tea Lee, and that of the 4,300 pages of mostly unresponsive documents produced, only one document related to the Zhongsheng Term Sheet: a mobile phone or tablet screenshot of the Term Sheet's signature block, purportedly signed by Tea Lee on behalf of Zhongsheng, which was emailed from Jeff Shammah ("Mr. Shammah") of

---

[64] Bankr. Docket No. 322.

[65] CR-237.

[66] Although the Declaration is not entirely clear, the Court reads it to say that both the publicly-traded Zhongsheng and the privately-held Zhongsheng are affiliates of ZEG.

[67] Bankr. Docket No. 328.

Blue Ocean Partners Ltd.[68] to a Mark Savarese,[69] who then forwarded it to Mr. Rajan. Hawk

argued that the Debtors' failure to produce any communications or other documents related to

the Zhongsheng Term Sheet violated the Discovery Order and the Debtors' obligations under the

federal discovery rules. The Court heard the Contempt Motion at the start of the continued Trial

on August 15, but took the matter under advisement in order to proceed with evidence.[70]

Mr. Rajan testified in August at the continued Trial that the Zhongsheng Term Sheet

evolved from a November 2022 term sheet Zhongsheng had entered into with VSI, and that once

Stream filed for bankruptcy the parties simply agreed to revise the agreement to make Stream,

rather than VSI, the counterparty.[71] During his cross-examination in September, however, Mr.

Rajan was pressed on the legitimacy of the Zhongsheng Term Sheet. The Court found his

testimony regarding his dealings with Zhongsheng difficult to believe. For example:

- Although Mr. Rajan had stated on direct examination in August that he was
  meeting with William Wang in Boston that weekend to work on the Zhongsheng
  transaction,[72] by his cross-examination in September he testified that
  Zhongsheng's trip was delayed and would be occurring in October.[73] Mr. Rajan
  gave no explanation for why the trip was delayed, and admitted he did not ask
  anyone from Zhongsheng to testify in support of the transaction's authenticity. In

---

[68] Mr. Rajan testified that the Debtors retained Mr. Shammah, an investment banker, post-petition to negotiate the transaction with Zhongsheng, but acknowledged that no court approval for the retention was sought or granted. *See* September 25, 2023 Hearing Transcript, at 32:17 to 33:12.

[69] As will be discussed *infra,* Mr. Savarese evidently holds a role with VSI, but none with the Debtors of which the Court has been made aware.

[70] Bankr. Docket No. 354.

[71] See August 17, 2023 Hearing Transcript, at 88:4 to 95:20; 99:25 to 100:7.

[72] *Id.* at 101:9 to 101:22.

[73] September 25, 2023 Hearing Transcript, at 60:13 to 60:23.

light of the questions Hawk was raising and the enormous amount of capital to be

infused into Stream under the proposed transaction, the Court finds it incredible

that Mr. Rajan would not (a) dig deeper into why Zhongsheng would was not able

to negotiate the transaction in August 2023, whether in Boston or otherwise, and

(b) at least request that a representative of Zhongsheng or ZEG testify at Trial in

support of the transaction.[74]

- WeChat messages were the only documentation Mr. Rajan had supporting his

  claim that William Wang and Tea Lee, as purported employees of ZEG, were

  nonetheless authorized to negotiate a $300 million deal on behalf of

  Zhongsheng.[75]

- Mr. Rajan confirmed his testimony given on direct examination that

  Zhongsheng's preferred method of communication was WeChat, but when

  pressed as to why no WeChat messages were produced evidencing those

  communications, Mr. Rajan hedged, testifying that he "[didn't] know if it was

  WeChat or if it was photographs and those various programs."[76]

- When asked whether he had received any financial information from Zhongsheng,

  Mr. Rajan responded that he wasn't sure and would have to "go back and check,"

  but acknowledged that as of his deposition on August 14 he had not received any

  financial information from Zhongsheng, did not know its gross revenues, did not

---

[74] The Debtors gave no reason why a purported $300 million transaction could only be negotiated in-person in Boston and only at some uncertain date in the future, nor why it would be too much to ask a Zhongsheng or ZEG representative to travel to the United States to testify.

[75] Presumably these are the same WeChat messages attached to his Zhongsheng Declaration.

[76] September 25, 2023 Heating Transcript, at 74:21 to 75:17.

know how many auto dealerships it operated, or even what make of car it sold.[77]

- Mr. Rajan was pressed on his statements in the Zhongsheng Declaration that the privately-held Zhongsheng entity that signed the Term Sheet is distinct from the publicly-traded Zhongsheng entity. When asked for an explanation as to why the same address in Dalian, China was given by both the publicly-traded entity in its 2021 Annual Report[78] for its corporate headquarters and by the privately-held entity in the Zhongsheng Term Sheet for its principal place of business, Mr. Rajan provided a convoluted response that provided no explanation at all.[79]

- Notwithstanding the enormity of the proposed transaction, which would infuse $300 million of funding into Stream for a 35% stake in the company, Mr. Rajan disclaimed its importance to the Debtors, testifying in September that funding is now not needed to implement the Debtors' proposed plan because Stream was receiving financing from VSI instead.[80]

The Court finds the entire picture that Mr. Rajan painted of the Zhongsheng transaction to be not credible. The Court finds the almost complete lack of documentation and communications related to a purported $300 million transaction to be most damning and suggests

---

[77] *Id.* at 70:2 to 72:9.

[78] *See* CR-254 (page 2).

[79] September 25, 2023 Hearing Transcript, 146:14 to 147:8 ("The way it works in China is if you want to do business in China, you need a company in China where you do all your operations. And what Stream TV believes from its understanding, is some of the shares from the China company were put into a Hong Kong company, traded on the Hong Kong Exchange. The Hong Kong Exchange company is just a holding company, and Zhongsheng has shares and investments in the private company and no liquidity because they don't have no shares in the Hong Kong company. They wanted shares in Stream TV, because we have all these POs, on the hope that we could eventually get Zhongsheng some liquidity. They're two separate companies."). The Court finds this response to be non-responsive and, in the context of the question asked, largely nonsensical.

[80] September 25, 2023 Hearing Transcript, at 191:22 to 192:2.

that the transaction was not real.  In light of that lack of documentation, and Hawk putting the

Debtors on notice in the Motion to Compel (if not earlier) that it questioned the existence of an

actual deal with Zhongsheng, it was incumbent upon the Debtors to substantiate the transaction's

existence and legitimacy.  Moreover, if the Zhongsheng transaction was both legitimate and

intended, even as an alternate source of funding, the Court concludes that the Debtors would or

should have viewed it as being of the utmost importance to have someone other than Mr. Rajan,

whether an individual from Zhongsheng, Mr. Shammah, or someone else, testify in support of its

authenticity.  They did not, and the Court finds Mr. Rajan's testimony was not believable and

was instead suggestive that the transaction was never real to begin with.[81]

The Court views this as an enormous problem for the Debtors.  Particularly in a case

where funding for the Debtors has been a stated concern from the outset, the Court's trust in the

Debtors' management was severely undermined both by their failure to satisfactorily substantiate

the Zhongsheng transaction after submitting it to the Court, and their willingness to walk away

from it after its bona fides came into doubt.[82]

### b.      The Debtors' Self-Imposed April Funding Crisis Nearly Left SCBV's Payroll Unfunded

Early in these cases, the Debtors' management created a funding fiasco that greatly

---

[81] The Court notes, anecdotally, that despite the authenticity of the Zhongsheng transaction being the subject of motion practice, hearings, and a significant portion of Mr. Rajan's trial testimony, the Debtors' Post-Trial Brief does not address the transaction at all, let alone why the evidence supports a finding that it was legitimate.

[82] On this, the Court agrees with Hawk's point in its Reply Brief that the logic of the alternative funding from VSI under the Debtors' proposed plan is difficult to square if the Zhongsheng transaction was real: "In other words, instead of waiting a few weeks for an investor to allegedly provide a $300 million investment for only a 35% share of the company, Mr. Rajan has opted to pursue an investment from his other company, VSI of $25 million (*i.e.*, nearly 1/10th that amount) for a 90% share of the company (*i.e.,* nearly three times the equity share).  In other words, if the Zhongsheng Term Sheet is genuine, Mr. Rajan has robbed these Debtors and their estates of $736.4 million in order to ensure that his other company, VSI, obtains voting control over the Debtors."  Hawk Post-Trial Reply Brief, at §B.5.

diminished the Court's confidence in Mr. Rajan's ability to guide the Debtors successfully in

bankruptcy, and as importantly, in his ability to do so given his interest in and role with VSI.

Stream's Schedule A/B disclosed $2,362.50 in cash on hand as of the date its Petition

was filed.[83]  The Debtors did not file a financing motion at the time their Petitions were filed, nor

in the weeks thereafter.  The issue of how the Debtors were funding their cases was raised from

an early stage by Hawk, and by no later than April 14, the Court raised the issue with the Debtors

in light of the fact that April payroll was coming due for SCBV by the end of the month.[84]  At

that time, the Court was advised that the Debtors had the means to fund their estates at a rate of

at least $250,000 per month with cash from VSI, and that they would "have the appropriate

documentation on file when we know how much money we actually need to do it."[85]  The Court

advised the Debtors, given that §364(b) requires a motion and a hearing for debtor-in-possession

financing, that "somebody needs to do something" to obtain funding for April payroll.[86]

On April 21, *i.e.,* one week after the Court raised its concerns as to case funding, the

Debtors filed the expedited Stock Sale Motion.  The motion sought, among other things,

authority to engage in what the Debtors asserted was the ordinary course sale of unissued Stream

stock to VSI on an as-needed basis to fund their business operations.  In connection with that

request for authority, the Debtors also sought authority to enter into a stock purchase agreement

with VSI for the sale of up to $10 million in Stream stock.  According to the Debtors, they

routinely sold shares of stock pre-petition to fund operations, and therefore did not need

authority from the Court to do so post-petition, but did so "out of an abundance of caution to

---

[83] *See* Bankr. Docket No. 52.

[84] *See* April 14, 2023 Hearing Transcript, at 145:9 to 145:15; 163:2 to 163:6.

[85] *Id.* at 164:12 to 166:5.

[86] *Id.* at 173:5 to 173:10.

ensure their ability to continue selling and issuing new shares in Stream consistent with its pre-

bankruptcy practices in order to bring valuable and necessary funds into these chapter 11

cases."[87]

Given what it understood to be a funding crisis with respect to payroll obligations at the

SCBV level due on April 25, the Court heard the Stock Sale Motion on an emergency basis on

April 24.  It was clear to the Court from the outset, as the Court advised the Debtors on the

record at the hearing, that the circumstances creating a funding crisis with respect to the SCBV

payroll was a self-created emergency, was foreseeable at the time the Petitions were filed, and

should have been the subject of a first-day motion, rather than a motion filed days before payroll

was coming due and packaged with a request for expedited approval of matters entirely

irrelevant to funding SCBV and independent contracor payroll.[88]  Moreover, as the Court

expressed at the hearing, the Debtors were only advising the Court for the first time on an

emergency basis that they were proposing to sell shares to VSI to fund their post-petition

operations, which the Court was not going to approve on an expedited basis.[89]

At that point in the April 24 hearing, the Debtors pivoted on-the-fly, seeking approval for

emergency debtor-in-possession financing from VSI.[90]  It was unclear, however, whether VSI

even had sufficient funds to cover the payroll-related amounts.[91]  Meanwhile, SeeCubic advised

the Court that it was willing to fund the SCBV payroll under a pre-petition facility used to fund

---

[87] Stock Sale Motion, at ¶56.

[88] See April 24, 2023 Hearing Transcript, 6:19 to 6:25; 22:16 to 23:6.

[89] *Id.* at 38:23 to 39:3; 40:1 to 40:7.

[90] This was done only after the Debtors suggested the payroll be funded with money they were holding
from pre-petition subscription agreements, which upon the Court's inquiry, was revealed to be funds not
reported in the Debtors' filed Schedules. *Id.* at 43:5 to 44:5.

[91] *Id.* at 55:19 to 56:1; 57:11 to 57:16.

SCBV while the Receiver was in place.[92]  The Court concluded that it was not going to choose between the two alternatives without evidence, and expressed concern over whether the Debtors were even the entity that had an obligation to fund SCBV's payroll in the first place.[93]  The Court therefore required the Debtors to file a financing motion by the end of the day with the proposed terms, and allowed SeeCubic to file a proposed alternative financing, both of which would be considered at an emergency evidentiary hearing the following day.

The Debtors filed their financing motion the following morning (the "Debtor DIP Motion"),[94] and SeeCubic filed its motion for approval of alternative funding (the "Seecubic Alternative Funding Motion").[95]  The Debtor DIP Motion sought authority either for (a) the Debtors to borrow approximately €872,000 from VSI on an unsecured basis to fund SCBV payroll obligations or, alternatively, (b) VSI's issuance of one or more unsecured senior promissory notes to SCBV directly, with either option being in exchange for Stream's entry into the Distribution Agreement with VSI, whereby VSI would accept orders and make delivery of Stream's products to customers and retain a 10% margin.  The SeeCubic Alternative Funding Motion proposed to fund SCBV's payroll obligations with a loan directly to SCBV under the pre-existing unsecured facility with SeeCubic, or alternatively, with an unscured loan to the Debtors for the purpose of funding the SCBV payroll obligations.

The Court held a lengthy emergency evidentiary hearing on the alternative proposals later that day, at which Mr. Rajan testified on behalf of the Debtors and Mr. Stastney testified on behalf of SeeCubic.  Indicative of the Court's chief concern with the Debtors' proposal to obtain

---

[92] *Id.* at 66:18 to 67:13.

[93] *Id.* at 80:23 to 81:2.

[94] Bankr. Docket No. 156.

[95] Bankr. Docket No. 155.

financing from VSI, Mr. Rajan was also purporting to testify on behalf of VSI.[96]  Although the

Debtors ultimately withdrew Mr. Rajan as a representative of VSI when the Court questioned

how that could be, Mr. Rajan's dual role was indicative of the Court's trouble with the Debtors'

emergency financing proposal:  the evidence at the hearing made clear to the Court that the

proposal to have the Debtors incur $1 million in post-petition administrative debt to VSI was not

only unnecessary given the availability of approximately €700,000 in funding directly from

SeeCubic to non-debtor SCBV, but was also fatally flawed because Mr. Rajan was on both sides

of the proposed transaction.[97]  As such, the Court denied the Debtor DIP Motion.  With respect

to the SeeCubic Alternative Funding Motion, because SCBV was a non-debtor foreign company,

the Court held that it could not direct SCBV to borrow from SeeCubic, but also would not

approve an alternative debt financing from SeeCubic to the Debtors to fund payroll because the

incurrence of such debt by the estates was unnecessary given the availability of the existing

SeeCubic facility directly with SCBV.  The Court made clear to Mr. Rajan, however, that his

fiduciary duties to the Debtors, their estates, and SCBV were implicated by the funding crisis,

and recommended that he act consistent with them in approving SCBV's borrowing from

SeeCubic under the pre-existing facility.[98]

The funding crisis in April was entirely of Debtors' management's own making.  As the

Court observed on multiple occasions during the April 24 and 25 hearings, the Debtors knew

when they filed their petitions that SCBV payroll would need to be funded in April.  They did

not file a traditional financing motion at any point in the first month the cases were pending, and

---

[96] April 25, 2023 Hearing Transcript, at 52:14 to 54:9.

[97] *Id.* at 248:12 to 248:25.

[98] *Id.* at 253:15-17.

inexplicably waited until just days before the SCBV payroll was coming due to seek authority for what they asserted was the ordinary course sale of $10 million in Stream shares to an entity owned by Mr. Rajan, while also seeking other relief that was entirely unrelated to the funding crisis. When the Court made clear that no such transaction would be approved absent a full opportunity for all parties and the Court to vet it, the Debtors proposed an insider financing transaction with no notice to other parties in interest. This necessitated an eleventh hour, full-day hearing, only for the Court to conclude that there was no need for the financing at all. Particularly given the Debtors' acknowledgement in seeking such relief of the value SCBV holds and the calamitous effect its employees leaving would have, this funding crisis is further evidence that the Debtors' management, and specifically Mr. Rajan, cannot be entrusted with the management of the Debtors' estates.

> **c.  The Debtors Have Financed their Post-Petition Operations by the Transfer of Stream Shares to VSI Without Adequate Disclosure or Court Permission**

At the April 24 hearing on the Stock Sale Motion, given that the Debtors proposed to fund their cases through the sale of Stream shares to VSI, the Court expressly asked whether the Debtors had done so post-petition. The Court was advised that they had not, and were waiting for Court permission to do so.[99] In fact, counsel for the Debtors acknowledged that "[W]e're coming to you because we know that there are grave consequences to not getting permission from the court. So even when things are in the ordinary course people come to get permission, and that's what we did."[100] As discussed *supra,* the Court did not give that permission.

---

[99] See April 24, 2023 Hearing Transcript, at 28:10 to 28:15.

[100] *Id.* at 31:22 to 32:1.

43

Without approval of the Stock Sale Motion, and with no revenue and no financing, how the Debtors were funding their cases and operations remained opaque to the Court.  It became more clear, however, with Mr. Rajan's testimony at Trial.  Mr. Rajan testified that VSI had been paying all expenses of the Debtors since the inception of their bankruptcy cases, in exchange for shares in Stream.[101]  According to Mr. Rajan, Stream had been issuing shares to VSI every week or two since the Debtors' Petitions were filed.[102]  In connection therewith, the Debtors had pre-petition subscription agreements with VSI, but also had entered into new, post-petition agreements.[103]  Mr. Rajan was not sure how many Stream shares had been issued to VSI since the filings, but believed all were pursuant to pre-petition, rather than post-petition, subscription agreements.[104]  Mr. Rajan was aware there was a motion pending by which the Debtors were seeking approval of post-petition subscription agreements the Debtors had already entered into with VSI, but claimed to not be sure if the post-petition subscription agreements were related to VSI's proposed role as plan sponsor or were the agreements proposed pursuant to the pending motion.[105]

As of Mr. Rajan's testimony in August, neither VSI's funding of the Debtors' post-petition operations nor the post-petition issuance of shares to VSI, whether pursuant to pre- or post-petition subscription agreements, had been disclosed in the Stream's monthly operating reports or otherwise.[106]  Mr. Rajan claimed that the failure to make these disclosures was an

---

[101] August 17, 2023 Hearing Transcript, at 205:21 to 206:1.

[102] *Id.* at 212:25 to 213:3.

[103] *Id.* at 206:2 to 206:8.

[104] *Id.* at 206:12 to 207:1.

[105] *Id.* at 246:19 to 247:2.

[106] *See* Bankr. Docket Nos. 224, 253, 300 (April, May, and June 2023 Monthly Operating Reports); August 17, 2023 Hearing Transcript, at 219:9 to 219:24; 224:6 to 224:13.

oversight due to his hospitalization, and would be corrected promptly, but as of his testimony at Trial in late September, no such corrections had been made.[107]

The Court found Mr. Rajan's testimony regarding the Debtors' post-petition issuance of shares to VSI to be evasive, and as a result, untrustworthy.[108]   Mr. Rajan was pressed on whether VSI had been issued shares pursuant to post-petition subscription agreements,  and was shown his deposition testimony stating that Stream was issuing new shares to VSI every two weeks or so pursuant to post-petition subscription agreements.[109]  In response, Mr. Rajan asserted he was talking about pre-petition subscription agreements.[110]  This is not believable and is belied by his testimony.  Mr. Rajan admitted he attended the April hearing where representations were made to the Court that Stream shares were not being issued to VSI post-petition, but he nonetheless allowed Stream to do so.  Mr. Rajan cannot fall back on a supposed belief that all shares issued were pursuant to pre-petition subscription agreements, because even if that was authorized or did not require authorization, he could not say with certainty that this is, in fact, what had happened. Moreover, his failure to promptly amend the Debtors' monthly operating reports to reflect both VSI's post-petition funding of the Debtors' operations and the issuance of shares to VSI is unacceptable and was without any legitimate excuse.[111]  This casual approach to what was clearly a highlighted concern of the Court at the outset of the case is further evidence that Mr. Rajan has administered these estates with an eye towards what he personally wants to

---

[107] See September 25, 2023 Hearing Transcript, at 14:12 to 15:12.

[108] *See, e.g.,* August 17, 2023 Hearing Transcript, at 252:4 to 252:11; 253:23 to 254:4.

[109] *See* CR-231, at 140:10 to 141:13.

[110] August 17, 2023 Hearing Transcript, at 254:6 to 254:17.

[111] Given the Debtors' proposed retention of Mr. Park dating back to May 2023, Mr. Rajan's hospitalization in June and July cannot serve as a basis for failing to amend the Debtors' schedules by late September.

accomplish and disclose, rather than acting consistent with his obligations to the Court and the estates' creditors.

> **d.    The Debtors Have Proposed Certain Major Transactions in these Cases Benefitting VSI without Clear Benefit to the Debtors or the Estates**

The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra,* the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI.  It was therefore denied.  The unauthorized post-petition issuance of shares in Stream to VSI also raises serious questions about the administration of these cases for the benefit of VSI.  These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

> **i.    The Distribution Agreement**

A central feature of the Stock Sale Motion, and subsequently the Debtor DIP Motion, that created serious questions about how and for whose benefit these cases are being administered was the request for approval of the Distribution Agreement to be given to VSI, purportedly in exchange for its financial support in funding the Debtors' product development and supply chain. As stated in the Stock Sale Motion, under the agreement, VSI "will accept orders from and make delivery to third-party customers … VSI will then issue back-to-back purchase orders to Stream for 90% of the value of those third-party orders, retaining a 10% margin for funding technical, business, and sales development.  In essence, VSI will act as a distributor for Stream to these

customers."[112]  This was not the first time, however, that the Court was hearing about the

proposed Distribution Agreement.  In a declaration filed in support of the Debtors' Stay

Enforcement Motion, filed on April 13 (the "Stay Enforcement Declaration"),[113] Mr. Rajan

disclosed VSI's willingness to fund the Debtors' post-petition operations in exchange for the

Distribution Agreement.[114]  At a hearing on April 14 on the Stay Enforcement Motion, the Court

questioned why the Debtors need a distributor for their product.  However, the Distribution

Agreement was not the focus of that hearing, which, as discussed *supra,* was largely the urgent

need for the Debtors' to fund their cases.

In response to the Court's admonition at that hearing to the Debtors that funding needed

to be procured, the Debtors filed the Stock Sale Motion a week later, and it was there that they

sought (on an expedited basis) approval of the Distribution Agreement.  The agreement was then

the subject of Mr. Rajan's testimony at the hearing on the Debtor DIP Motion on April 25.  Mr.

Rajan was asked directly whether the Distribution Agreement was part of the compensation VSI

was to receive for providing post-petition funding to the Debtors.[115]  Mr. Rajan evaded,

responding that the Distribution Agreement "is an aspirational hope.  The Court has to – we

submitted it for approval to the Court."[116]  Only upon the Court's inquiry did Mr. Rajan affirm

that the Distribution Agreement was part of VSI's proposed compensation to fund the Debtors.

---

[112] See Stock Sale Motion at ¶¶25, 26 (internal paragraph numbering omitted).  The motion goes on to represent that "In addition to financial support, VSI will assist Debtors with productization of electronics, an area in which Stream needs support.  VSI will also assist Debtors with translating computer software and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with integration of those chips into end-user products."  *Id.* at ¶27.

[113] Bankr. Docket No. 114-1.

[114] Bankr. Docket No. 114-1, at ¶12.

[115] April 25, 2023 Hearing Transcript, at 93:11 to 93:13.

[116] *Id.* at 93:14 to 93:16.

Notwithstanding that the Debtors ultimately filed the motion seeking approval of the Distribution Agreement, the Court found the way it was done disconcerting. The agreement was disclosed in a declaration from Mr. Rajan in support of the Stay Enforcement Motion, wholly unrelated to the Debtors' funding proposal. Only when the Court questioned its necessity was the Stock Sale Motion filed, which sought the agreement's approval on an expedited basis. When that relief was denied, the Debtors pivoted to include it in the Debtor DIP Motion. At no point during Mr. Rajan's testimony in connection with that motion did the Debtors present a cogent business justification for VSI acting as a distributor of the Debtors' product for a 10% share of the sales. In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales. The Debtors argue that the Distribution Agreement is "beneficial to the Estates because VSI can provide support to the Debtors in terms of funding, customer contracts, technical know-how in the areas of electronic productization, translating computer software and hardware code, designing chips for use in end-user products, and integration of those chips into end-user products."[117] They cite to a portion of Mr. Rajan's Trial testimony that does not touch on any of those supposed benefits, but even if it did, the Court is troubled by (a) the Debtors' failure to explain why VSI's proposed financing was not subject to a note with market-rate interest, rather than a significant cut of the Debtors' product sales, and (b) the Debtors seeking approval of the agreement on an expedited basis and in a landscape where other emergencies the Debtors had created were the focus of the Court and other interested parties.

---

[117] Debtors' Post-Trial Brief, at ¶27.

### ii.    The Licensing Covenant

The Court also has concerns regarding the Debtors' post-petition Licensing Covenant with Rembrandt, entered into post-petition in August.[118]  Pursuant to the Licensing Covenant, Rembrandt agreed that it would not issue a license to the Rembrandt IP (a defined term) to Hawk, SeeCubic, Mr. Stastney, or a host of related entities and parties.  The Court understands the Debtors' desire for such an agreement, given those parties' adversarial relationship with the Debtors' and their competing interests.  Importantly, however, it also bars the licensing of the Rembrandt IP to any current or former subsidiary of Stream as well.[119]  In exchange, Stream and VSI[120] agreed to pay Rembrandt $3.6 million, payable in several installments.[121]  The Licensing Covenant addressed Stream and VSI's motivation to enter into it: "[T]he VSI Parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors and shareholders of Stream … [T]he VSI Parties would like to enter into a Licensing Covenant with Rembrandt to prevent certain lenders, creditors, and shareholders of Stream [from] attempting to commercialize the technology and products developed by Stream."[122]

---

[118] CR-222.

[119] Licensing Covenant, at §B.2.

[120] Reinforcing their lock-step alliance under the Licensing Covenant and the interrelationship between them, Stream and VSI are defined together under the agreement as the VSI Parties.

[121] *Id.* at §C.2.  Those installments were to commence on September 1, 2023.  At Trial, Mr. Rajan confirmed that Stream and VSI are jointly and severally liable for the payments under the Licensing Covenant.  Stream and VSI also agreed to an increase in the number of units Rembrandt can obtain.  *Id.* at §D.1 to D.3.

[122] *Id.* at fifth, sixth Whereas clauses.

The Court recognizes VSI's proposed role as plan sponsor, and as Mr. Rajan acknowledged during his testimony, if the Debtors' proposed plan is confirmed VSI will own 90% of Stream's equity.[123] The Court is nonetheless alarmed about the propriety and motivations of Stream entering into a post-petition transaction that is intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries. The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia,* Stream's subsidiaries. While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology by companies who do not own our technology, specifically SeeCubic of Delaware, to stop the use of our technology to compete against us,"[124] the Licensing Covenant goes beyond that, precluding the issuance of a license to any Stream subsidiary notwithstanding the possibility that there may be a business reason for doing so at some point in the future.[125] Rather than simply preventing SeeCubic from competing with the Debtors, the Licensing Covenant benefits a non-debtor insider third-party while requiring the Debtors to make significant post-petition payments to Rembrandt. Moreover, not only did Mr. Rajan confirm that Stream is jointly and severally liable for the payments under the Licensing Covenant,[126] but as Hawk notes, the obligation to make payments under the Licensing Covenant is not conditioned on confirmation of the proposed plan, and in fact the agreement contemplates its effectiveness even if a plan is not confirmed.[127]

---

[123] September 25, 2023 Hearing Transcript, at 51:10 to 51:12.

[124] *Id.* at 51:1 to 51:5.

[125] As Hawk argues, the Licensing Covenant limits the potential avenues to capitalize on the Debtors' assets by foreclosing the issuance of a license to a downstream subsidiary. Hawk Post-Trial Brief, at 50.

[126] *Id.* at 41:8 to 41:10.

[127] Licensing Covenant, at §C.5.

Each of these transactions have had the taint of benefit to VSI without clear benefit to the

Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only

add to the Court's conclusion that he has breached his fiduciary duties in proposing them without

being able to articulate how they are a reasonable exercise of his business judgment.

> **e.    There Has Been Little to Substantiate Mr. Rajan's Claims of Hundreds of Millions of Dollars in Nascent Purchase Orders Coming to Stream**

From the outset, Mr. Rajan has been touting the numerous deals and purchase orders the

Debtors are on the verge of obtaining. Like the Zhongsheng transaction, however, there has been

precious little evidence, other than Mr. Rajan's self-serving testimony, offered to verify the

existence of these deals, or even the negotiation of such deals. After listening to Mr. Rajan's

testimony, and having almost no other evidence against which to measure the veracity of his

claims, the Court was left with the firm impression that Mr. Rajan was engaging in hyperbole at

best, or fabrication at worst, in testifying regarding Stream being on the verge of obtaining

customer commitments worth hundreds of millions of dollars.

> **i.    The VSI Purchase Orders Were Not Substantiated by Anything Other than Mr. Rajan's Testimony**

On April 13, the Debtors filed Mr. Rajan's Stay Enforcement Declaration, in which he

represented that Stream had secured two post-petition purchase orders totaling $138,600,000 in

gross revenues, and attached the purchase orders as exhibits.[128] The securing of those purchase

orders was given as a primary reason the Debtors needed to repossess the Bonding Equipment as

soon as possible. Both orders are from VSI, the first dated March 20, 2023, in the amount of

$12,600,000 ("VSI Purchase Order #1"), and the second dated April 11, 2023, in the amount of

---

[128] Stay Violation Declaration, at ¶8. Mr. Rajan stated his opinion that revenues to be derived from these two purchase orders will allow the Debtors to successfully reorganize. *Id.* at ¶15.

$126,000,000 ("VSI Purchase Order #2" and together with the VSI Purchase Order #1, the "VSI Purchase Orders"). Joseph Corso ("Mr. Corso"), under limited power of attorney, executed the VSI Purchase Order #1 on behalf of VSI, and Mr. Savarese, under limited power of attorney, executed the VSI Purchase Order #2 on behalf of VSI.

During the Trial, Mr. Rajan testified that the VSI Purchase Order #1 is for Cystar International Limited ("Cystar") as the third-party customer.[129] A purchase order from Cystar to VSI was issued on the same date as VSI Purchase Order #1, which Mr. Rajan testified he negotiated on behalf of VSI.[130] Mr. Rajan testified that the VSI Purchase Order #2 is for Southern Telecom as the third-party customer.[131]

Mr. Rajan also testified at Trial about the role an entity he referred to as BOE had in the VSI Purchase Orders. According to Mr. Rajan, BOE is the "number 1 panel company in the world," and BOE introduced Stream to a number of BOE's customers, "and those customers have become customers of Stream TV."[132] Two of those customers, according to Mr. Rajan, are Cystar and Southern Telecom.[133] Mr. Rajan testified that under an August 2018 agreement between Stream and BOE's factory entity by the name of Hefei Xinsheng Optoelectronics Technology Co. Ltd. ("BOE"),[134] BOE agreed to introduce Stream to customers, vendors, and suppliers, as well as providing purchase order financing to Stream.[135] Mr. Rajan testified that the

---

[129] August 17, 2023 Hearing Transcript, 47:7 to 47:16; Exhibit D-18. As noted *supra*, Mr. Rajan also disclosed in his Stay Violation Declaration the Distribution Agreement with VSI. The VSI Purchase Orders were made in connection with this Distribution Agreement. *See* Stay Violation Declaration, at ¶12.

[130] August 17, 2023 Hearing Transcript, 53:6 to 53:11.

[131] *Id.* at 63:23 to 65:14; Exhibit D-19; Exhibit D-21.

[132] August 15, 2023 Hearing Transcript at 201:3 to 201:7.

[133] *Id.* at 201:9; 205:24 to 206:1.

[134] Exhibit D-3.

[135] August 15, 2023 Hearing Transcript, 205:8 to 206:2; September 25, 2023 Hearing Transcript, 154:8 to

2018 agreement is still in effect, and that Stream "has calls with BOE at least three to four times a week [and] meetings, at least once to twice a week, either in China or the United States."[136] According to Mr. Rajan, BOE "help[s] us with customers. They help us with vendors. They're helping us with supply chain finance. They're ramping up more introductions and they're also working on their own sales activities."[137]

The VSI Purchase Orders are, on their face, clearly for a considerable sum and require considerable production from Stream.[138] The Debtors have repeatedly stated that the importance of these purported deals to the Debtors' reorganization and success going forward is fundamental, but it is beyond dispute that the VSI Purchase Orders are not traditional contracts with the panoply of provisions governing performance of the parties' agreement. They also do not provide for any further commitment by Cystar and Southern Telecom. At Trial, however, Mr. Rajan testified that Cystar wants to increase its order from the 10,000 units under the VSI Purchase Order #1 to "about 75 to 100,000 once he gets the bonding machine, which is about $140 million in revenue if he goes up to 100,000."[139] Likewise, Mr. Rajan testified that Southern

---

155:15. Mr. Rajan pointed to Articles 4 and 5 of the BOE agreement as binding them to provide purchase order financing. August 17, 2023 Hearing Transcript, at 189:2 to 192:2.

[136] August 15, 2023 Hearing Transcript, at 208:25 to 209:6.

[137] *Id.* at 209:4 to 209:10.

[138] Mr. Rajan testified that, without the Bonding Equipment, it had made arrangements with an entity called Fuji-Prem to provide the bonding services needed to meet the production requirement under the VSI Purchase Orders and "for most of our customers." August 15, 2023 Hearing Transcript, at 193:6 to 193:19; August 17, 2023 Hearing Transcript, at 28:21 to 28:23.

[139] August 15, 2023 Hearing Transcript, 201:15 to 201:17. Consistent with the Court's concern regarding Mr. Rajan's tendency to be loose with the purported sales he expects, he later testified that Cystar's "plan, once they receive the bonding machine is to increase their order to 75 to 100,000 units, which is over 100 million in revenue." *See* September 25, 2023 Hearing Transcript, at 31:2 to 31:6. He also testified that the VSI Purchase Order #1 was for "14 million, but Stream TV believes it's going to be increased to about 75 million." *Id.,* at 156:1 to 156:3.

Telecom wants to increase its order from the 100,000 units under the VSI Purchase Order #2 to "about 300,000 TVs."[140]

SeeCubic signaled almost immediately that it questioned the legitimacy of the VSI Purchase Orders.[141]  Beyond Mr. Rajan's testimony, however, the Debtors did nothing to establish their bona fides.  It seemingly would have been both very easy and very urgent for the Debtors, given the consequences if Hawk is successful in obtaining dismissal, conversion, or appointment of a trustee, to provide witness testimony from Cystar, Southern Telecom, and/or BOE to substantiate, at the very least, the VSI Purchase Orders, if not the asserted interest of Cystar and Southern Telecom in greatly increasing purchases going forward.  This is particularly true with respect to Southern Telecom, as Mr. Rajan testified that it is a "big supporter" of Stream, and in addition to allegedly placing an order for 100,000 units, is interested in a merger or acquisition as well as cross-marketing activity.[142]  Despite that level of purported support and interest in Stream, however, the Debtors did not bring anyone from Southern Telecom to substantiate the VSI Purchase Order #2.  At a bare minimum, the Court would have expected the Debtors to put on the testimony of Mr. Corso and/or Mr. Savarese, each of whom purportedly bound VSI, to establish that the VSI Purchase Orders are legitimate.[143]  The Debtors instead

---

[140] *Id.* at 202:1 to 202:10; *see also id.* at 194:3 to 194:6 ("Southern Telecom has indicated that they are going to increase their order from 100,000 TVs, which is $140 million in revenues to about 300,000, which would push us to 400 million in revenue.").

[141] April 14, 2023 Hearing Transcript, 64:23 to 66:17.

[142] August 15, 2023 Hearing Transcript, 202:12 to 203:8.

[143] In their post-trial reply brief, *see* Bankr. Docket No. 437, the Debtors argue that it is disingenuous for Hawk to point out that VSI did not appear at Trial to provide supporting testimony.  *Id.* at 19.  It is true that the Debtors attempted, at the eleventh hour, to add Tom Sego, a purported independent board member of VSI, and Bud Robertson, a current VSI employee, to their witness list in advance of the resumption of the Trial on August 15.  *See* Bankr. Docket No. 334.  It is also true that Hawk requested that neither witness be permitted to testify given the late notice and extremely limited windows of time the Debtors were proposing to make Mr. Sego and Mr. Robertson available for depositions.  *See* Bankr. Docket No. 327.  After a hearing the Court barred both Mr. Sego and Mr. Robertson from testifying.

relied only Mr. Rajan, whose credibility with this Court has been greatly diminished. While the

Debtors may have had their reasons for doing so, that gap in substantiation left the Court with the

unanswered questions regarding the veracity of the VSI Purchase Orders and Mr. Rajan's claims

that Cystar and Southern Telecom intend to exponentially increase the amount of product

purchased from Stream. Unfortunately, in the context of so many other instances where the

Court has concerns regarding Mr. Rajan's truthfulness, this is just another example.

> **ii.      The Debtors Offered No Supporting Evidence for the Other Potential Customers and Deals Mr. Rajan Touted During Trial**

Mr. Rajan testified at Trial regarding a host of other deals and partnerships on which he

alleged the Debtors were working and/or were imminent:

- Mr. Rajan testified at Trial on August 15 that there are "eight or nine" other customers interested in the same unit that Cystar is ordering, including Google, and that a company from Thailand would be making an offer that morning.[144]

- Mr. Rajan alluded to other deals with "Hisense and some other brands, like Chunghwa Telecom, which will be ordering once we get the samples from [Fuji-Prem]."[145] Mr. Rajan subsequently testified that Chunghwa Telecom wants to purchase 60,000 units.[146]

---

Bankr. Docket No. 343. Even if the Court had permitted their testimony, however, neither VSI witness was proposed to testify regarding the legitimacy of the VSI Purchase Orders. *See* Bankr. Docket No. 327-1 (Exhibit A).

[144] *Id.* at 201:18 to 201:24.

[145] *Id.* at 203:5 to 203:8.

[146] *Id.* at 217:6 to 217:12.

- Mr. Rajan testified that the Debtors were in negotiations with Lenovo, Sony, and Samsung, and had just received a request for a price quotation from LG.[147]  Mr. Rajan subsequently testified that he was in negotiations with LG for the sale of 5,000,000 units.[148]

- Mr. Rajan also named other potential customers Skyworth, Highsense, Huawei, and Vizio.[149]  According to Mr. Rajan, Skyworth is "expected to order TVs in the two to three million unit range."[150]

- Mr. Rajan testified that Stream was in discussions with Bosch, with which it had a pre-petition deal for an automotive-based product that allegedly fell apart once SeeCubic took control of Stream's assets under the Omnibus Agreement.[151]  Mr. Rajan acknowledged, however, that Bosch is not a current customer of Stream.[152]

- Mr. Rajan testified that in addition to Bosch, Stream was in discussions with other potential customers for an automotive-based product, including Geely, Honda, Nissan, and Toyota.

- Mr. Rajan testified about certain other expressions of interest Stream has received for its product from Cystar, IQH3D, BBack Inc., and Sunny Hill Technology Ltd. ("Sunny Hill"), and the Debtor introduced into evidence letters from each of those

---

[147] *Id.* at 203:22 to 204:6.

[148] *Id.* at 219:8 to 219:10.

[149] *Id.* at 217:15 to 217:24.

[150] August 17, 2023 Hearing Transcript, at 30:7 to 30:13.

[151] August 15, 2023 Hearing Transcript, at 219:21 to 220:12.  The pre-petition agreement with Bosch was admitted as Exhibit D-4.

[152] August 17, 2023 Hearing Transcript, at 25:6 to 25:14.

companies purportedly expressing such interest.[153]  Three of four of these letters, however, were issued pre-petition, and the fourth, from Sunny Hill, was dated only days after the Debtors filed for bankruptcy.[154]

- Mr. Rajan testified that he understood, based on a February 2023 discussion with Google, that once Stream provides Google with a lens sample Google had ordered pre-petition but that was never provided, Google would be interested in resuming discussions on acquisition of various sizes of Stream's units, which Mr. Rajan stated are both "very high margin type" and "very easy to do, very easy to make, and it's a very easy project."[155]

- Mr. Rajan testified regarding his post-petition negotiations with "various large content companies and sports leagues" on cross-marketing deals, but asserted he was subject to a strict non-disclosure agreement and could not reveal the names of the sports leagues.[156]

- Mr. Rajan testified that he had "probably 100 customer meetings" since the Debtors' Petitions were filed, but provided no additional detail.[157]

After listening to Mr. Rajan's testimony regarding these purported customers and relationships, the Court found his testimony not credible.  Rather, it appeared to the Court that Mr. Rajan was "name-dropping" large players in the television and panel space, but had nothing to verify that Stream has had any post-petition discussions or negotiations with these parties, let

---

[153] *Id.* at 68:25 to 77:3

[154] Exhibits D-44 to D-47s D-44 to D-47.

[155] August 15, 2023 Hearing Transcript, 214:7 to 217:1.

[156] August 17, 2023 Hearing Transcript, at 120:1 to 120:22.

[157] *Id.* at 121:6 to 121:10.

alone is on the precipice of transactions with them. Rather, on cross-examination, despite having

referred to many of these parties as customers of Stream, Mr. Rajan acknowledged that Stream

was not "at a contract stage yet" with respect to any of the parties about which he testified.[158]

Moreover, although the Debtors have repeatedly stressed the need to regain the Bonding

Equipment so that they may begin meeting production requirements. Mr. Rajan testified that

alternative bonding arrangements had been made with Fuji-Prem to meet production needs, and

therefore that the yet-unresolved dispute over the Bonding Equipment would not seem to be an

impediment to at least some of these purported deals having come to fruition.[159] Particularly

where Mr. Rajan represented that the deals in the works would result in hundreds of millions, if

not billions, of dollars of revenue for the Debtors, the Court is confounded that the Debtors did

not produce *any* potential contract-counterparty to corroborate Mr. Rajan's claims. In that void,

the Court was left with only Mr. Rajan's assertions, which the Court found not credible.

> **f.** **The Net Effect of the Debtors' Conduct in These Cases, By and Through Mr. Rajan, Is That the Court Has No Faith in the Debtors' Ability to Effectively Manage These Bankruptcy Cases**

The Court's discussion of the general procedural history of these cases, specific events

that have transpired, and representations the Debtors, and specifically Mr. Rajan, have made, is

intended to illustrate the cloud of mistrust and mystery that has hung over these cases virtually

from the beginning. In arguing that Mr. Rajan has engaged in gross mismanagement of the

estates, Hawk points to much of the same conduct and actions by the Debtors during these cases

that the Court has cited above, including (a) the Debtors' proposed entry into the Distribution

---

[158] August 17, 2023 Hearing Transcript at 164:13 to 165:11.

[159] The Court notes that the Debtors did not provide any agreement or other documentary evidence of an agreement with Fuji-Prem.

Agreement with VSI, (b) the VSI Purchase Orders using VSI as an intermediary with customers for a 10% fee, (c) the transfer of Stream shares to VSI in exchange for funding the Debtors' post-petition operations without Court approval, (d) the entry into the Rembrandt License Covenant for the purpose of steering licensed intellectual property from Rembrandt to VSI, and (e) the failure to file accurate monthly operating reports, and the failure to timely correct them.[160]  Hawk asserts that Mr. Rajan has administered these cases for the benefit of VSI, rather than creditors, and that this blatant breach of fiduciary duty, together with failing to disclose proposed agreements and transactions until the eleventh hour, and in the case of the Zhongsheng Term Sheet, fabricating the transaction entirely, constitutes gross mismanagement of the Debtors' estates warranting conversion or dismissal.

The already-discussed transactions and requested relief that appear to be primarily for the benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of the Debtors' estates.  Another glaring example, however, is the Debtors' failure to revise knowingly false monthly operating reports, on which the Court and all interested parties rely in assessing the Debtors' post-petition performance and prospects, until December, months after the initial MORs were filed.  Furthermore, as discussed *infra*, the Revised MORs (as defined herein) appear to represent facts regarding payments VSI has made on behalf of Stream that contradicts Mr. Rajan's testimony at Trial, leaving the Court and interested parties unclear as to the Debtors' post-petition operations and finances.  A debtor-in-possession's fiduciary duties include the duty to keep the Court and creditors informed about the status and condition of its business.  *See In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007).  Monthly operating reports are "the lifeblood of Chapter 11, enabling creditors to keep tabs on the debtor's post-

---

[160] Hawk Post-Trial Brief, at 49-56.

petition operations." *In re Kholyakva,* 2008 WL 3887653, at *4 (Bankr. E.D. Pa. 2008).  They

are designed to allow the U.S. Trustee and creditors to monitor business operations during

chapter 11 and to avoid continued business operations that generate losses and administrative

insolvency.  *In re Domiano,* 442 B.R. 97, 106 (Bankr. M.D. Pa. 2010).  Importantly in the

context of these cases, the failure of a debtor to properly report income and expenses constitutes

evidence of gross mismanagement under §1112(b)(4)(B).  In *Domiano,* the court found the

debtor's monthly operating reports had been completed in cursory, if not casual fashion, omitted

significant information, and were completed "in such a summary fashion that creditors are left to

guess as to much of the Debtors' operations and financial results … The MORs have not been

completed in a fashion consistent with the Debtors' fiduciary duties."  *Id.*  The *Domiano* court

found that this was grounds for conversion due to the debtor's gross mismanagement of the

estate.

Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf

of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable.  The

Court does not attribute any credibility to Mr. Rajan's explanation that this lack of disclosure

was due to an oversight or attributable to his hospitalization.  There is no reason that Mr. Park, as

the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and

finances should not have ensured the disclosure of the funding arrangement with VSI in the

MORs.  The fact that it was not done, that it became clear only at Trial, and that the Debtors did

not file the Revised MORs until *December* is a breach of the Debtors' fiduciary duties to the

estates' creditors and its disclosure obligations to the Court.  The Court simply does not believe

Mr. Rajan that the lack of disclosure was an oversight.[161]

---

[161] On September 28, 2023, the U.S. Trustee submitted a proposed Rule 2004 consent order (the "Rule
2004 Order"), providing for, *inter alia*, authorization to examine the Debtors regarding post-petition

In sum, apart from this fundamental breach of the Debtors' disclosure obligations and the

Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has

been littered with questions about the role and involvement of VSI, the Debtors' ability to

operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the

Debtors from his role with VSI.  Alarmingly, the interrelationship between VSI, Stream, and Mr.

Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at

Trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his

inability or unwillingness to draw distinction between the entities and his roles with each.[162]  It

has consistently appeared that he cannot, and the Debtors' transactions and requested relief

outlined herein are indicative of his inherent conflict of interest.  The result has been delay,

confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if

the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date

in attaining it under Mr. Rajan's stewardship.

Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and

creditors rises to the level of gross mismanagement of the estates, even when viewed against the

high standard of glaring and inexcusable badness.  *See In re 210 West Liberty Holdings, LLC,*

---

payments made by or on behalf of the Debtors, the issuance of shares from Stream and/or Technovative to
VSI, and any post-petition agreement between the Debtors and VSI for VSI to fund the Debtors'
subsidiaries, including SCBV.  Bankr. Docket No. 428.  On October 3, 2023, the Court entered the Rule
2004 Order.  Bankr. Docket No. 433.  On December 29, 2023, the U.S. Trustee filed a motion to dismiss
the Debtors' bankruptcy cases (the "UST Dismissal Motion"), based on their failure to file timely and
complete monthly operating reports and other required reports, failure to provide accurate information in
the initial MORs or the Revised MORs, and failure to comply with the Rule 2004 Order's terms regarding
document production and appearing for examination.  *See* Bankr. Docket No. 534.  While the Debtors
have not yet had opportunity to respond to the UST Dismissal Motion, and the Court has not yet held a
hearing on it, its filing in and of itself is further evidence of the lack of cooperation and conflict that has
permeated these cases, and only reinforces the Court's conclusion that Mr. Rajan cannot serve as a
productive and responsible steward of the Debtors' bankruptcy estates.

[162] *See, e.g.,* August 17, 2023 Hearing Transcript, at 151:14 to 153:25.

2009 WL 1522047, at *5. The nearly ten months since the Debtors filed their Petitions have

been marred by delay, conflict, suspect proposals, lack of transparency, and lack of candor.

While the delay has been the result of numerous circumstances, the Court will not permit this to

continue under Mr. Rajan's watch. The only question for the Court is whether the Debtors' cases

should be dismissed, converted, or a trustee should be appointed to determine what value the

Debtors' operations hold, and what claims, if any, should be pursued, and how the cases move

expeditiously to reorganization or liquidation. As discussed *infra*, notwithstanding current

management's gross mismanagement of the Debtors' estates, the Court believes conversion or

dismissal is not in the best interests of creditors at this time.

> **3.** **It Has Not Been Established by a Preponderance of Evidence That There is Both Substantial or Continuing Loss to the Debtors' Estates and No Reasonable Likelihood of Rehabilitation**

Section 1112(b)(4)(A) of the Bankruptcy Code provides that cause for conversion or

dismissal exists where there is substantial or continuing loss to or diminution of the estate **and**

the absence of a reasonable likelihood of rehabilitation. It is written in the conjunctive, and

therefore both components must be shown. *See, e.g., In re 1121 Pier Village LLC,* 635 B.R. 127,

137 n.14 (Bankr. E.D. Pa. 2022); *In re Northeast Family Eyecare, P.C.,* 2002 WL 1836307, at *3

(Bankr. E.D. Pa. July 22, 2002) (stating that the subsection codifies a "two-prong test"); *In re

Route 202 Corp.,* 37 B.R. 367, 372 (Bankr. E.D. Pa. 1984).

In determining whether a loss to, or diminution of, the estate exists, a court must make a

full evaluation of the present condition of the estate, not merely look at the debtor's financial

statements. *In re Plasterer*, 2023 WL 6217801, at *6 (Bankr. E.D.N.Y. Sept. 25, 2023) (stating

that even where a debtor shows positive cash flow, continuing loss to or diminution of the estate

can also be established by an actual depreciation in the value of property of the estate).

Importantly, §1112(b)(4)(A) requires not only a consideration of whether a debtor is suffering continuing losses but whether the debtor's business prospects justify continuing the chapter 11 case. *In re EnCap Golf Holdings, LLC,* 2008 WL 4200324, at *9 (D.N.J. Sept. 4, 2008); *see also In re Andover Covered Bridge, LLC,* 553 B.R. 162, 175 (B.A.P. 1st 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business.").

Hawk argues that the Debtors have no operations, no expenses, and no sources of financing, and the Debtors' own filings prove the estates are suffering catastrophic losses during these cases based on over $7 million in administrative expenses incurred.[163] Hawk further argues that to the extent there are any operations, they are at the VSI level, and without operations the Debtors cannot establish a business plan based on future operations, and therefore are *per se* unable to rehabilitate.[164]

The Court agrees with Hawk that, based on the Debtors' originally-filed monthly operating reports (the "MORs") from March through June, it would appear that Stream has no expenses, employees, or financing. Stream's originally-filed April, May, and June MORs reflect little cash on hand, no full-time employees, no receipts, very little in disbursements, and no disbursements made by a third party for the benefit of the estate.[165] Mr. Rajan had his explanation for that at Trial. With respect to employees, Mr. Rajan testified in August that the Debtors had retained independent contractors through VSI to work on its projects.[166] Mr. Rajan

---

[163] Hawk Post-Trial Brief, at 45-46 (citing $750,000 in legal fees incurred, approximately $75,000 in salary for Mr. Park, and $6 million in post-petition obligations to Rembrandt under the Licensing Covenant and related subscription agreement).

[164] *Id.* at 46.

[165] Bankr. Docket Nos. 224, 253, 300; August 17, 2023 Hearing Transcript, at 196:20 to 200:3.

[166] August 17, 2023 Hearing Transcript, at 202:18 to 205:2. While the Court cannot verify that based only on Mr. Rajan's testimony, it is consistent with representations made in the Employee Obligation Motion.

alleged that the failure to make this clarification in the MORs was "an oversight" that would be
revised by the following week.[167] With respect to expenses and financing, Mr. Rajan testified, as
discussed *supra,* that VSI was paying all expenses of Stream since its bankruptcy was filed, in
exchange for Stream shares.[168] Mr. Rajan acknowledged, however, that none of the $1.5 to $2
million in expenses that VSI had allegedly paid on behalf of Stream were disclosed in the April,
May, or June MORs.[169] Mr. Rajan again claimed that this was an oversight that would be
corrected the following week.[170]

On December 8, 2023, the Debtors *finally* filed revised Stream MORs for March, April,
May, and June 2023 (the "Revised MORs").[171] Those Revised MORs still reflect no full-time
employees, as do subsequent MORs. Attached to the Revised MORs, however, are letters from a
Daniel Rink, Director of VSI, to Mr. Park, asserting the expenses VSI paid on behalf of Stream
during the months of March, April, May, and June. According to those letters,[172] and as
reflected in the Revised MORs, VSI paid expenses, and asserted it was entitled to Stream Class
A shares, in the following amounts: (a) $85,161.53 in expenses for March, in exchange for
56,774 Stream shares; (b) $331,134.30 in expenses for April, in exchange for 220,756 Stream

---

[167] No amended or corrected MORs had been filed as of late September, which Mr. Rajan attributed to
"going back and forth with the trustee." September 25, 2023 Hearing Transcript, 14:24 to 15:12.

[168] *Id.* at 205:21 to 206:4.

[169] *Id.* at 214:14 to 219:14.

[170] Mr. Rajan seemed to claim that the reason for this oversight was his three-month hospitalization, but
also acknowledged that he was not the only individual involved with the Debtors that was aware of the
expenses being paid by VSI. *Id.* at 219:22 to 219:24. The Court therefore attributes very little weight to
Mr. Rajan's explanation.

[171] Bankr. Docket Nos. 502, 503, 505, 512.

[172] Each of the letters is dated December 7, 2023, the day before the Revised MORs were filed and
months after the expenses were purportedly paid. No explanation is provided for why the letters were not
issued substantially contemporaneously with the end of each month, particularly where the subject of the
letters has been a hot-button issue in the case since Trial.

shares; (c) $200,910.46 in expenses for May, in exchange for 133,940 Stream shares; and (d) $243,871.98 in expense for June, in exchange for 162,581 Stream shares. This totals approximately $861,078 in expenses purportedly paid by VSI, which is the cumulative total Stream discloses in its Revised June MOR for disbursements made by a third party. Attached to each letter is a breakdown of the general categories of expenses purportedly paid.

The July MOR, filed after Mr. Rajan's August testimony, reflects approximately $750,000 in July third-party disbursements.[173] No letter from VSI is attached to the July MOR. Furthermore, the July MOR confusingly disclosed roughly the same figure for a cumulative total, seemingly in contradiction to Mr. Rajan's testimony in August that VSI had paid $1.5 to $2 million in expenses on behalf of Stream, and certainly in contradiction to the Revised MORs that represent over $861,000 in third-party disbursements for the three-and-a-half months prior to July. In September, Mr. Rajan testified that the cumulative total as of the end of July being the same as the figure for July alone could be harmonized because disbursements through the end of July had been approximately $750,000, whereas by the time he testified in mid-August the disbursements had apparently grown to $1.5 to $3 million.[174] This testimony is clearly contradicted by the Revised MORs, and is just another example of what the Court perceives as Mr. Rajan's propensity to come up with justifications or explanations on-the-fly when confronted with facts or information that seemed to contradict his prior statements. The August MOR discloses only $556 in third-party payments,[175] while the September MOR discloses approximately $104,000 in third-party payments.[176]

---

[173] Bankr. Docket No. 399.

[174] September 25, 2023 Hearing Transcript, at 31:3 to 32:16.

[175] Bankr. Docket No. 459.

[176] Bankr. Docket No. 460. Perhaps even more confusingly, the Debtors separately filed a supplement (the "MOR Supplement") to the August and September MORs, which among other things, attached

Hawk's point is well-taken that Stream's original MORs for April, May, and June, reflecting no employees, no post-petition receipts, and little cash on hand, are indicative of a non-operating entity.[177]  Moreover, the Court agrees with Hawk that the Debtors' estates have continued to incur significant administrative expenses, not the least of which are asserted counsel fees, while the MORs reflect no post-petition revenue.  However, notwithstanding that it is being done without having first obtained the Court's permission, the unrefuted testimony from Mr. Rajan is that the Debtors' post-petition operating expenses are being paid by VSI in exchange for Stream shares rather than debt.  Moreover, Mr. Rajan testified as to the nature of the $750,000 in disbursements VSI made on behalf of the estate in August: "That's money for payroll.  That's money for electronics to get ready for production.  Also, we had to get a backup [bonding] deal put in place so we can get the production started on the TVs.  So it's mainly operational expenses to get things started."[178]  Mr. Rajan also testified that the purported work is being done by independent contractors rather than Stream employees, and the letters from VSI attached to the Revised MORs purport to identify consultant payroll expenses totaling approximately $434,000. Hawk cites to no rule prohibiting a debtor from executing its business model with independent contractors, rather than full-time employees.

---

letters from VSI to Mr. Park stating that VSI had identified $2,000 and $219,000 in transfers from VSI to Stream in August and September, respectively, pursuant to a stock purchase agreement dated July 10, 2023, and as a result directed Stream to issue 1,333 and 146,000 shares of Stream Class A shares to VSI. Bankr. Docket No. 463.  The MOR Supplement also includes a statement that payments were made by VSI on Stream's behalf in August that were not included in the August MOR, that shares were issued to VSI in November in exchange for those payments, and that such payments will be reflected in the November MOR.  No explanation was given as to why they would not be reflected in an amended August MOR.

[177] In its Post-Trial Brief Hawk also argues that Stream is a non-operating entity based on the First Day Declaration and the Debtors' corporate organizational chart reflecting that Stream owns 99.9% of Technovative shares.  Hawk Post-Trial Brief at 2.  This fact alone does not establish that Stream is not an operating entity.

[178] September 25, 2023 Hearing Transcript, 162:22 to 163:2; *see also id.* at 173:18 to 174:3.

Therefore, with some indication of operational activity and financing by Stream, the Court cannot conclude that the Debtors are *per se* unable to rehabilitate. The Court is keenly aware of the fact that the Revised MORs, on which the Court places some reliance in arriving at this conclusion, were filed two-and-a-half months *after* the Trial concluded and appear to conflict with Mr. Rajan's testimony at Trial. Hawk has had no opportunity to probe the veracity of the representations made in the Revised MORs, which represents a considerable handicap in Hawk being able to meet its evidentiary burden. However, as discussed *infra*, the timing of the Revised MORs and their seeming contradiction to Mr. Rajan's testimony is simply more grounds for the Court's determination that Mr. Rajan cannot continue to administer these estates. While the Court found not credible Mr. Rajan's testimony regarding the Debtors' current and prospective deals, where the Court is required to evaluate both the present condition of the estates and the Debtors' business prospects going forward, it simply does not believe there has been sufficient and transparent information from the Debtors' management to determine at this stage that there is no reasonable likelihood of rehabilitation.

> **4.**      **It Has Not Been Established by a Preponderance of the Evidence that the Debtors' Petitions Were Filed in Bad Faith**

As a general matter, Hawk's argument is that the Debtors filed their bankruptcy cases on the eve of trial in the Section 225 Action with no other impetus for filing, but rather simply as a litigation tactic to stay what Hawk believes will be an adverse ruling from the Delaware Chancery Court. Hawk asserts that not only is this *per se* bad faith, but that under the Third Circuit's fourteen-factor analysis for bad faith filings, twelve of the factors support a finding of lack of good faith here.[179]

---

[179] Hawk Post-Trial Brief, at 59-60.

It is beyond dispute that the Debtors filed their Petitions with trial in the Section 225 Action imminent. Hawk goes too far, however, in arguing that Mr. Rajan "confirmed the 225 Action was the reason for filing," citing to his First Day Declaration[180] as evidence. That declaration explained, from Mr. Rajan's perspective, the history of the Omnibus Agreement, its invalidation by the Delaware Supreme Court, the failure of Hawk and SeeCubic to comply with the return of the Debtors' assets, and the events leading to the Section 225 Action. When Mr. Rajan states in his First Day Declaration that "[t]he irreparable harm" of this chain of events necessitated the Debtors' bankruptcy filings, he did not confirm that the Section 225 Action was the reason for filing.[181] He clearly was referencing a broader series of events, of which the Section 225 Action was only the most recent. As such, there is no grounds for a finding of *per se* bad faith based on the timing of the Debtors' Petitions alone.

The Court also disagrees that Hawk has established by a preponderance of the evidence that a majority of the factors used in the Third Circuit to analyze whether a filing was in bad faith are present here. Clearly the Debtors have previously filed for bankruptcy. The Delaware Bankruptcy Court's reasoning in dismissing those prior cases, however, is not a matter of record in these proceedings. Furthermore, while the current cases were filed on the eve of trial in the Section 225 Action and imposed a stay on that proceeding, the Court cannot conclude that the Debtors filed these cases solely to evade a Chancery Court order that would wrest control of Technovative from the Debtors. The Debtors have significant creditors other than Hawk, SeeCubic, and SLS,[182] and as Hawk and SeeCubic have noted a number of times during these

---

[180] *See* Bankr. Docket No. 48 (the "First Day Declaration").

[181] *Id.* at ¶¶90 to 94.

[182] Although the claims of Hawk, SeeCubic, and SLS, as well as Rembrandt's asserted claim of over $1.2 billion, dominate the claims register, other claims of sizeable amounts have also been filed. Moreover, as discussed above, Stream's Petition was accompanied by Official Form 204, representing that Stream's

68

cases, Stream had virtually no funds of its own at the time of its Petition with which to satisfy claims. Mr. Rajan testified regarding the Stream assets to be used in obtaining and fulfilling potential post-petition product orders,[183] as well as the Debtors' need to regain possession of the Bonding Equipment.[184] Together these reflect a need for the breathing spell afforded debtors and an intention to use bankruptcy for a purpose other than avoiding an adverse judgment in the Section 225 Action. Moreover, although Hawk argues that the Section 225 Action the Debtors seek to avoid will determine who can control Technovative and the operating subsidiaries, and therefore the majority of the value of the enterprise, Mr. Rajan asserts that the Debtors do not need SCBV to execute the Debtors' business plan because they have their own electronics and bonding arrangements.[185] Therefore, assuming that is accurate, an adverse ruling in the 225 Action would not necessarily torpedo the Debtors' ability to reorganize. Finally, as discussed herein, the Court is not prepared at this stage, based on the evidence before it and the history of these cases, to conclude that there is no possibility of reorganization. The lack of clarity the Debtors' management has created regarding the Debtors' operations, future prospects, and sources of funding leaves this Court unable to determine whether the Debtors have the assets and operations to successfully reorganize, but the Court will not foreclose that possibility at this stage.

Based on the evidence and in consideration of the factors used to determine whether a case has been filed in bad faith, the Court finds Hawk has not established by a preponderance of the evidence that the Debtors lacked good faith in filing their Petitions.

---

unsecured creditors held over $14 million is asserted claims.

[183] August 17, 2023 Hearing Transcript, at 128:6 to 129:23.

[184] *Id.* at 191:6 to 191:20.

[185] August 17, 2023 Hearing Transcript, 138:25 to 138:6.

**5.** **The Court Will Not Dismiss or Convert the Debtors' Chapter 11 Cases at this Stage Because a Chapter 11 Trustee is Needed to Administer the Debtors' Cases**

Having found that the Debtors' have grossly mismanaged the estates, cause exists to convert or dismiss the cases under §1112(b) of the Bankruptcy Code. As discussed *supra,* however, that provision requires conversion or dismissal unless the Court determines the appointment of a trustee is in the best interests of the estate under §1104(a). Section 1104(a) of the Bankruptcy Code governs the appointment of a trustee in chapter 11 cases, providing that the court **shall** order the appointment of a trustee:

(1) For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause … or

(2) If such appointment is in the interests of creditors, any equity security holders, and other interests of the estate….

11 U.S.C. §1104(a) (emphasis added). The appointment of a trustee is an extraordinary remedy, representing a rare exception to the rule that the debtor remains in possession throughout its reorganization because current management "is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests in the estate." *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 2004). As such, the party moving for appointment of a trustee under §1104(a) must overcome that presumption by clear and convincing evidence, and the determination is made on a case-by-case basis. *BELFOR USA Grp., Inc. v. Salem Consumer Square OH LLC (In re Salem Consumer Square OH LLC),* 629 B.R. 562, 575 (Bankr. W.D. Pa. 2021). Once the movant establishes cause for the appointment of a trustee, however, the burden shifts to the debtor to establish an exception under §1112(b)(2) of the Bankruptcy Code.[186]

---

[186] Under §1112(b)(2), the court may not convert or dismiss a case if the court finds and identifies unusual

That said, a chapter 11 debtor's invocation of the protections afforded under the

Bankruptcy Code comes with a trade-off: "in exchange for the authority to continue to manage

the affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the

estate, including the duty of care to safeguard assets, the duty of loyalty, and the duty of

impartiality." *In re Morningstar Marketplace, Ltd.,* 544 B.R. 297, 303 (Bankr. W.D. Pa. 2016)

(citing *Marvel Entertainment*).  And because the rights of a debtor to manage the reorganization

process are not absolute, they may be forfeited if these fiduciary duties are neglected.  *Id.* (citing

*In re Eurospark Industries, Inc.,* 424 B.R. 621 (Bankr. E.D.N.Y. 2010)).  The willingness of

courts to leave debtors in possession is premised upon an assurance that the officers and

managing employees can be depended upon to carry out the fiduciary responsibilities of a

trustee, and where a debtor-in-possession is unwilling or unable to do so, it is necessary to

appoint an independent trustee who will.  *See, e.g., In re Vascular Access Centers, L.P.,* 611 B.R.

742, 764 (Bankr. E.D. Pa. 2020) (citing *Fifth Third Bank v. Circulatory Ctrs. of Am., LLC (In re

Circulatory Ctrs. of Am., LLC*, 579 B.R. 752 (Bankr. W.D. Pa. 2017) and *Marvel

Entertainment*).

The list of situations in §1104(a)(1) is not an exclusive list of what constitutes cause to

appoint a trustee, and situations that have been found to support a finding of cause for the

appointment of a trustee include conflicts of interest, misuse of assets and funds, inadequate

recordkeeping and reporting, failure to file required documents, lack of adequate disclosure, lack

---

circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification for the act or omission; and that will be cured within a reasonable period of time fixed by the court.  The Debtors have not established any such unusual circumstances, although as discussed *infra,* the Court concludes that the appointment of a trustee, rather than conversion or dismissal, is proper at this stage.

of appropriate cost controls, transgressions related to taxes, failure to make required payments, lack of credibility and creditor confidence, and breaches of fiduciary duty. *Id.*; *see also Morningstar Marketplace,* 544 B.R. at 303; *Marvel Entertainment,* 140 F.3d at 471 (finding the district court did not err in appointing trustee where the debtor's management was unable to resolve conflicts with estate creditors). Appointment of a trustee is mandatory if cause is found under §1104(a)(1), but a bankruptcy court has wide discretion to determine what specific conduct establishes cause. *Morningstar Marketplace,* 544 B.R. at 303. By contrast, §1104(a)(2) envisions a flexible standard giving discretion to appoint a trustee when doing so would serve the estate's and parties' interests. *Vascular Access Centers,* 611 B.R. at 765 (*citing Marvel Entertainment*). Among the factors which may be considered in appointing a trustee under §1104(a)(2) are (a) the untrustworthiness of the debtor, (b) the debtor-in-possession's past and present performance and prospects for rehabilitation, (c) the confidence – or lack thereof – of the business community and of creditors in present management, and (d) the benefits derived from the appointment of a trustee balanced against the cost of the appointment. *Id.; see also Morningstar Marketplace,* at 304 (citing *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir. 1989)).

Without needing to address whether the Debtors mismanaged their affairs pre-petition, as Hawk asserts, clear and convincing evidence of the Debtors' gross mismanagement of their estates, through Mr. Rajan, has resulted in a situation where the Court has no faith in Mr. Rajan administering the Debtors' estates consistent with his fiduciary duties and obligations to this Court. Simply put, based on the history of these cases outlined above, the conflicted role of Mr. Rajan with both the Debtors and VSI, and the Court's assessment of Mr. Rajan's credibility throughout this case, the Court does not trust Mr. Rajan's interest in or ability to maintain the

integrity of these bankruptcy proceedings.  Months into the case, the Court lacks confidence that

it has been given transparent information regarding what the Debtors are actually doing, who is

doing it, at what stage those efforts are, and how that is being accomplished, and the evidence the

Court has that the Debtors are operating is Mr. Rajan's testimony and the Revised MORs and

July MOR, themselves in conflict, representing that VSI funded certain unspecified Stream

expenses in the first months of the case, none of which instills confidence in the Court.  While

the Court is not ready to wholly discount these meager signs of a path toward reorganization, it

has reached the point where it needs more clarity and more progress, far more quickly, and does

not believe this is possible with Mr. Rajan in charge of the estates.  Therefore the appointment of

a trustee pursuant to both §§1104(a)(1) and (a)(2) is warranted.  *See Vascular Access Centers,,*

611 B.R. at 769 (finding appointment of trustee was appropriate under both §§1104(a)(1) and

(a)(2) based on the Court's determination that the debtor's principal and manager lacked

credibility and trustworthiness and had engaged in self-serving conduct both before and during

the debtor's bankruptcy case).

The Court is not convinced conversion or dismissal is appropriate at this stage.  Because

of the dearth of information, transparency, and relief sought by the Debtors to date, the Court

remains unclear what assets and potential value the Debtors' operations hold.  The replacement

of Mr. Rajan at the helm of the Debtors' estates and the appointment of a trustee to evaluate the

Debtors' assets, potential deals, potential claims, etc. is needed.  It is clear there needs to be a

neutral, unconflicted party to deal with VSI at arms-length, including determining if there are

pre- or post-petition claims that lie against VSI.  A trustee is also needed to evaluate, resolve,

and/or litigate the claims of Hawk, SLS, SeeCubic, Rembrandt, and others.  If these cases have

any chance of succeeding, it will be because there is transparency to the Court and creditors and

an impartial third-party evaluating assets, claims, and the Debtors' reorganizational prospects. A

trustee will obviously come with a cost, but the Court believes the value of an unconflicted,

third-party neutral to assess the state of the Debtors' operations, potential transactions, and

claims, and efficiently determine whether and how the Debtors can achieve reorganization, more

than offsets these costs. *See Vascular Access Centers,* 611 B.R. at 769 (finding that the cost of

appointment of a chapter 11 trustee would be greatly outweighed by the benefits derived from

such appointment and would result in a more efficient reorganization while ensuring the integrity

of the process).

Although cause exists under §1112(b)(4)(B) to convert or dismiss the Debtors' cases, the

Court believes the appointment of a trustee to evaluate the Debtors' operations, prospects, and

ability to successfully reorganize, and to implement such reorganization if possible, is in the best

interests of creditors and the estate at this time. The Court will therefore exercise the

extraordinary remedy of appointing a chapter 11 trustee pursuant to §1104(a) of the Bankruptcy

Code.

**B.      Cause Exists to Grant Hawk Relief from Stay to Allow the Section 225
         Action to Resolve Certain Issues Critical to the Debtors' Bankruptcy Cases**

The Court may grant relief from the stay under §362(d)(1) for cause, including the lack of

adequate protection of an interest in property. 11 U.S.C. § 362(d)(1). Cause is an intentionally

broad and flexible concept which must be determined on a case-by-case basis. *In re Brown*, 311

B.R. 409, 412-413 (E.D. Pa. 2004) (citing *In re Marchant,* 256 B.R. 572, 576 (Bankr. W.D. Pa.

2000)). As such, the test to be applied is a totality of the circumstances test based upon the

particular facts of the case. *Buncher Co. v. Flaberg Solar US Corp. (In re Flaberg Solar US

Corp.)*, 499 B.R. 475, 482-83 (Bankr. W.D. Pa. 2013) (citing *O'Neal Steel, Inc. v. Chatkin (In re

Chatkin)*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012)). In applying the test, courts in this district

have employed a variety of factors to determine whether cause exists to permit a non-debtor

party to proceed with litigation in another forum:

> Given the broad discretion accorded to the bankruptcy court as described in *Brown,* it is therefore, not surprising that some courts have designed lists of "factors" to be considered in determining whether "cause" exists under §362(d)(1). For example, in *In re Granati,* the court identified four (4) factors to be considered:
>
> (1)     whether only issues of state law are involved;
>
> (2)     whether judicial economy will be promoted;
>
> (3)     whether the litigation will interfere with the bankruptcy case; and
>
> (4)     whether the estate can be protected by requiring that any judgment obtained be enforced only through the bankruptcy court.
>
> 271 B.R. 89, 93 (Bankr.E.D.Va. 2001) (citing *In re Robbins,* 964 F.2d 342 (4th Cir.1992)).
>
> Other courts have developed a checklist of twelve (12) factors to be considered:
>
> (1)     Whether the relief will result in a partial or complete resolution of the issues.
>
> (2)     The lack of any connection with or interference with the bankruptcy case.
>
> (3)     Whether the non-bankruptcy proceeding involves the debtor as a fiduciary.
>
> (4)     Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.
>
> (5)     Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.
>
> (6)     Whether the action primarily involves third parties.
>
> (7)     Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee or other interested parties.

(8)     Whether the judgment claim arising from the foreign action is
        subject to equitable subordination under Section 510(c).

(9)     Whether movant's success in the foreign proceeding would result
        in a judicial lien avoidable by the debtor under Section 522(f).

(10)    The interest of judicial economy and the expeditious and
        economical determination of litigation for the parties.

(11)    Whether the non-bankruptcy proceedings have progressed to the
        point where the parties are prepared for trial.

(12)    The impact of the stay on the parties and the "balance of hurt."

*See In re Sonnax Industries, Inc.,* 907 F.2d 1280 (2d Cir.1990); *In re
Curtis,* 40 B.R. 795, 800 (Bankr. D. Utah 1984) (citations omitted). *See
also In re Brown,* 311 B.R. at 413 (approving bankruptcy court's use of
factors set forth in *Sonnax* in ruling on § 362(d) motion).

The relevance and weight of the various overlapping factors outlined
above will depend upon the circumstances of the particular bankruptcy
case involved. Not all of the factors may be relevant in a particular case;
the factors that are relevant may not be entitled to equal weight. Thus, the
decision whether to grant relief from the automatic stay to an unsecured
creditor is not a mechanical or mathematical exercise.

*In re Chan*, 355 B.R. 494, 499–500 (Bankr. E.D. Pa. 2006).[187]

---

[187] The Debtors have cited to *In re Tribune Co.,* 418 B.R. 116, 126 (Bankr. D. Del. 2009) for the
following three-prong test for determining whether cause exists to lift the stay to continue litigation: (1)
whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of
the civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably
outweighs the hardship to the debtor, and (3) whether the creditor has a probability of prevailing on the
merits. The *Tribune* decision cited the test as being generally relied upon in that district. *Id.* A
"balancing of the harms" analysis has been recognized in this district as well. *See In re Cinelli,* 2014 WL
4106030, at *2 (E.D. Pa. Aug. 21, 2014) ("The first step to consider is whether there will be prejudice to
either the estate or the debtor if the stay is lifted on the one hand and hardship to the movant if the stay
continues on the other hand. Then, these two potential harms are weighed. The decision to lift the stay
depends on where the scale tips."); *In re Glunk,* 342 B.R. 717 (Bankr. E.D. Pa. 2006) (recognizing the
"balancing of the harms" analysis used by courts). The *Chan* decision recognized that underlying
guidepost, but employed the "different, more multi-faceted" approach for determining whether cause
exists that looks to multiple factors. 355 B.R. at 499. That approach has been cited by decisions rendered
since *Chan* was decided, *see, e.g., In re Schaffer,* 597 B.R. 777, 791, n.18 (Bankr. E.D. Pa. 2019), and it
is the approach this Court takes as well.

Hawk filed the Stay Relief Motion at the outset of the case, but the Court determined it needed an evidentiary record to resolve it. The path to obtaining that record has been tortured at times, but the circumstances that Hawk argued warranted stay relief early in the case have not changed – the Section 225 Action is ripe to be heard. It will resolve the Technovative Director Issue and the Debt Conversion Issue, two issues critical to these bankruptcy cases going forward but governed by Delaware law for which the Delaware Chancery Court, while not a specialized tribunal *per se,* certainly has unique and established expertise. If Hawk were successful with respect to both of those issues, it has acknowledged that it will still need to return to this Court for permission to proceed with an Article 9 Sale of its collateral under the Notes. As such, resolution of the Technovative Director Issue and the Debt Conversion Issue will not prejudice the interests of other estate creditors by allowing Hawk to foreclose on Technovative assets without this Court's authority. On the other hand, resolution of those will greatly advance resolution of the Debtors' bankruptcy cases by providing clarity regarding the status of the Technovative filing and whether, and to what extent, Hawk is a secured creditor of the Debtors.

As such, based on consideration of the factors used to determine whether causes exists to permit non-bankruptcy litigation to proceed, the Court finds Hawk has established, and the Debtors have not rebutted, that allowing the Section 225 Action to proceed to resolution with respect to the Technovative Director Issue and the Debt Conversion Issue will aid in administration of the Debtors' bankruptcy cases. Relief from stay will therefore be granted to permit the parties to proceed before the Delaware Chancery Court on those two issues.

## IV. CONCLUSION

For the reasons discussed above, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed solely with respect to the Technovative Director Issue and the Debt Conversion Issue.  The U.S. Trustee will be directed to immediately begin the process for appointing a chapter 11 trustee, and in the interim, Mr. Rajan is no longer authorized to take any action on behalf of the Debtors' estates.  To the extent the Debtors must take any urgent action, the Debtors shall identify any such actions needed to the U.S. Trustee, who may confer with Mr. Rajan in addressing such matters but who is not obligated to act in conformity with Mr. Rajan's instruction or desired outcome.

An Order consistent with this Memorandum shall be entered.

Dated:  January 5, 2024

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

# App. Ex. 45

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Joint Administration Requested) |

**APPLICATION PURSUANT TO 11 U.S.C. § 327(a) OF THE BANKRUPTCY CODE
FOR AUTHORITY TO EMPLOY LEWIS BRISBOIS BISGAARD & SMITH LLP
AS COUNSEL FOR THE DEBTORS**

The above-captioned debtors (the "Debtors") submit this application for entry of an order

authorizing and approving the employment and retention of Lewis Brisbois Bisgaard & Smith

LLP ("LBBS") as counsel for the Debtors and respectfully represents as follows:

**JURISDICTION**

1. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§157 and

1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A). Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates in support of the relief

requested herein are §§ 327, 329 and 330 of the Bankruptcy Code, Rules 2104(a), 2016, and 6003

of the Bankruptcy Rules.

**BACKGROUND**

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). Their corporate headquarters is located at 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103. The location of the Debtor's service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

1

92850955.1

**TRUSTEE 56**

2.     On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have been operating their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.     No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

**RELIEF REQUESTED**

**Scope of Services**

4.     Debtors desire to retain and employ LBBS as attorneys in these Chapter 11 Cases and, by this Application, request that the Court enter an order authorizing them to retain and employ LBBS, nunc pro tunc to March 15, 2023. Accordingly, the Debtors respectfully request the entry of an order, pursuant to Bankruptcy Code § 327(a), authorizing the employment and retention of LBBS as bankruptcy counsel to perform the legal services that will be necessary during these Chapter 11 Cases.

5.     Debtors believe that LBBS is qualified to practice in this Court and is qualified to advise Debtors on their relations with, and responsibilities to, the creditors and other interested parties, and the employment of LBBS would be in the best interests of the Estates. LBBS attorneys have represented debtors, creditors' committees, bank groups, officers and directors, and other parties-in-interest in numerous chapter 11 cases.

6.     Attorneys at LBBS have become familiar with the Debtors' business affairs and capital structure. Accordingly, LBBS has the necessary background to deal effectively with many of the legal issues that may arise in the context of these Chapter 11 Cases. Thus, in order to

2

92850955.1

maximize the value of the Debtors' estate and because of LBBS' recognized expertise in bankruptcy law, the Debtors desire that LBBS represent them in these Chapter 11 Cases.

7.      The Debtors' employment of LBBS is appropriate and necessary to enable the Debtors to execute faithfully their duties and to implement a successful reorganization.

8.      The professional services (the "Services") that LBBS will render are summarized as follows:

(a) To advise Debtors with respect to their powers and duties as debtors-in possession and the continued management of their affairs;

(b) To advise Debtors with respect to their responsibilities in complying with the U.S. Trustee's Operating Guidelines and Reporting Requirements and with the rules of the Court;

(c) To prepare motions, pleadings, orders, applications, adversary proceedings, and other legal documents necessary in the administration of the cases;

(d) To protect the interests of Debtors and the estates in all matters pending before the Court; and

(e) To represent Debtors in negotiations with their creditors in the preparation of a plan.

**Terms of Retention**

9.      The terms of employment agreed to between Debtor and LBBS, subject to Court approval, are that LBBS will charge for its legal services on an hourly basis in accordance with its ordinary and customary hourly rates in effect on the date services are rendered. These rates may change from time to time in accordance with LBBS' billing practices and procedures. LBBS will maintain detailed, contemporaneous time records of time and any action and necessary expense incurred in

3

92850955.1

connection with the rendering of legal services described above by category and nature of services rendered.

### **LBBS is Disinterested and Qualified to Serve as Debtors' Counsel**

10.     To the best of Debtors' knowledge LBBS does not have any connection with the creditors or other parties in interest or their respective attorneys that would render LBBS not disinterested. LBBS does not represent any interest adverse to the Debtors.

### **NO PRIOR REQUEST**

11.     No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, Debtors respectfully request entry of an order (i) authorizing the retention of Lewis Brisbois Bisgaard & Smith, LLP, on a general retainer, pursuant to 11 U.S.C. §§ 327 and 330, effective as of the Petition Date; and (ii) granting such other and further relief as the Court deems just and appropriate.

4

92850955.1

Stream TV Networks, Inc.

*/s/ Mathu Rajan*
Printed Name: <u>Mathu Rajan</u>
Title: <u>Director</u>

92850955.1

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>    Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

|  |  |
|---|---|
| In re:<br><br>Technovative Media, Inc.,<br><br>    Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Joint Administration Requested) |

**DECLARATION OF RAFAEL X. ZAHRALDDIN-ARAVENA IN SUPPORT OF
DEBTORS' APPLICATION TO EMPLOY LEWIS BRISBOIS BISGAARD & SMITH
<u>LLP AS COUNSEL FOR THE DEBTORS</u>**

I, Rafael X. Zahralddin-Aravena, hereby state and declare as follows:

I am a partner in the firm of Lewis Brisbois Bisgaard & Smith LLP ("LBBS"), a law firm

that maintains an office at 550 E. Swedesford Road, Suite 270 Wayne, PA 19087. I am duly

authorized to make this Declaration on behalf of LBBS, and I make this Declaration in support

of the Application to Employ Lewis Brisbois Bisgaard & Smith LLP as General Bankruptcy

Counsel (the "Application") to the above-captioned debtors ("Debtors"). The facts set forth in

this Declaration are personally known to me and, if called as a witness, I could and would testify

thereto. All capitalized terms used but not defined herein shall have the meanings given to them

in the Application.

    1.  Neither LBBS nor any attorney of LBBS represents any entity other than Debtors

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). Their corporate headquarters is located at 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103. The location of the Debtor's service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

1

92850955.1

in, or in connection with, Debtors' chapter 11 cases.

2.  LBBS is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code, in that, except as otherwise disclosed herein, LBBS and its attorneys:

    a.  are not creditors, equity holders, or insiders of Debtors;
    b.  are not and were not, within two years before the Petition Date, a director, officer, or employee of Debtors; and
    c.  do not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, Debtors, or for any other reason.

3.  To the best of my knowledge, information, and belief formed after reasonable inquiry, other than in connection with these cases and other than disclosed in this Declaration, neither I nor LBBS has any connection with Debtors, their creditors, the United States Trustee, the Bankruptcy Judge presiding in this case, or any other party with an actual or potential interest in these chapter 11 cases (or their respective attorneys or accountants).  *See* Exhibit A.

4.  To the best of my knowledge, information, and belief formed after reasonable inquiry, neither I nor LBBS holds or represents any interest adverse to Debtors' estates.

5.  Subject to the Court's approval of the Application, LBBS will earn and receive only those fees and other payments authorized by this Court.

6.  In consideration for services to be rendered to Debtors in these chapter 11 cases, LBBS, subject to the approval of the Court, will be compensated for such services rendered at its standard hourly rates and will be reimbursed for all reasonable and necessary out-of-pocket expenses.

7.  Pursuant to L.B.R. 2014-1, LBBS makes the following disclosures with respect to payments received from the Debtors within the 90 days preceding the order for relief:

<div align="center">2</div>

92850955.1

| Date Payment Received | Amount Received | Amount Applied To Services Rendered Before Receipt | Amount Applied to Services Rendered After Receipt | Amount Remaining on Petition Date |
|---|---|---|---|---|
| March 14, 2023 | $50,000.00 | $0 | $50,000.00 | $0 |
| Total | $50,000.00 | $0 | $50,000.00 | $0 |

8.      Before filing these cases, Visual Semiconductor, Inc. ("VSI"), an investor in the Debtor, paid a flat non-refundable fee payment on behalf of the Debtors in the amount of $50,000.00 in preparation for filing the Chapter 11 bankruptcies. VSI has been advancing payments for Stream TV Networks, Inc's expenses in exchange for equity in Stream TV Networks, Inc. The Firm used the $50,000.00 for prepetition services as follows: (i) advising the Debtors concerning their obligations under Chapter 11, (ii) researching and reviewing the extensive litigation preceding the Chapter 11 filings; (iii) preparing the bankruptcy petition and some related documents, including this retention application, and (iii) payment of the Court's $1,738 filing fee for each Debtor. There is no balance remaining.

9.      I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: April 3, 2023                         /s/ Rafael X. Zahralddin-Aravena
                                            Rafael X. Zahralddin-Aravena

92850955.1

## Exhibit A

1. Rafael X. Zahralddin, while working at a prior firm, Elliott Greenleaf P.C., represented Stream TV as a creditors rights and restructuring lawyer in a Chancery case in 2019 which sought an injunction to prevent self-help by certain creditors. He withdrew from the case with permission of the Court after three weeks and was replaced by substitution counsel. He also represented a special purpose vehicle which was to facilitate financing for Stream TV in a bankruptcy filed in Delaware while a lawyer at Armstrong Teasdale in 2020. These prior representations do not pose any material adverse interest.
2. The Firm is involved in several matters in which TD Bank is a creditor where Firm partner Amy L. Goldman serves as a chapter 7 Trustee and in multiple matters in which TD Bank is adverse to Firm clients.
3. The Firm also represents an unrelated U-Haul franchise, U-Haul Co. of Florida (Perrine), entities unrelated to the U-Haul franchise in New Jersey which was used for storage by the Debtors. The Firm is adverse to several U-Haul entities in unrelated insurance defense matters.
4. The Firm does not have any connection to Dell Financial Services, but is adverse to Dell Technologies in an unrelated matter.
5. The Firm does not have any connection to AON Risk Services, Inc. of New York. The Firm does represent Aon Risk Services, Inc. of Ohio in prior unrelated insurance defense matters. The firm also represents Aon Affinity Insurance Services in an unrelated matter. The Firm is also adverse to Aon Risk Services in an unrelated insurance matter.
6. The Firm represents Hartford Insurance Company in unrelated insurance defense matters which is a related entity to creditor Coverall North America, Inc.
7. Citi Cards, a Debtor creditor, is a creditor in unrelated matters in which Firm partner Amy L. Goldman serves as a chapter 7 Trustee.
8. The Firm has represented FTI Consulting in a prior unrelated matter which could be an affiliate of creditor FTI Consulting China Limited.
9. The Firm represents Robert Half International as a named insured for Client Gallagher Bassett in unrelated insurance defense matters. Robert Half International may be an affiliate of Robert Half Management Services, which is a creditor of Stream.

4

92850955.1

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>     Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>     Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Joint Administration Requested) |

## ORDER GRANTING DEBTORS' APPLICATION TO EMPLOY AND RETAIN NUNC PRO TUNC LEWIS BRISBOIS BISGAARD & SMITH LLP AS COUNSEL TO THE DEBTORS AND DEBTORS-IN-POSSESSION EFFECTIVE AS OF MARCH 15, 2023

**AND NOW**, upon consideration of the Debtors' Application to Employ LBBS as Debtors' Counsel (the "Application"), the Court having concluded that the employment of LBBS is necessary and is in the best interest of the Debtors, the Court being satisfied that LBBS represents no interest adverse to the estate with respect to matters as to which it is to be engaged, that LBBS is disinterested under Sections 101 and 327 of the United States Bankruptcy Code, and sufficient cause appearing therefor, it is **ORDERED** that

1. The Application is **GRANTED**.

2. The Debtors are hereby authorized to employ LBBS effective as of March 15, 2023, pursuant to the terms more fully set forth in the Application, and LBBS may receive such

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). Their corporate headquarters is located at 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103. The location of the Debtor's service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

1

92850955.1

compensation as is approved by this Court upon application after notice and opportunity for hearing.

Dated: _____ ___, 2023                    BY THE COURT:

_____

Magdeline D. Coleman
United States Bankruptcy Judge

2

92850955.1

# App. Ex. 46

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, April 07, 2023 7:18 AM EDT
**To:** mathu rajan <mathurajan@icloud.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**CC:** dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; Bud <bud@streamacquisitiongroup.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>
**Subject:** Re: [EXT] Re: STREAM; TECHNOVATIVE / Chap 11,

Dear Bennett,

I am getting on a flight and don't know whether I will have Wi-Fi

We have to remove all references to allowing Hawk any ability to file this motion.  We should simply ask for its cancellation as files in bad faith or it's  indefinite continuation for the same reason and because of the continuing stay violation.

The exclusivity issue is something we don't want to bring in at this time or with this motion.

The investor group funding VSI, the purchase order customers, and other vendors are all concerned about the chapter 7 conversion and we need this filed early today as a result and these changes should be make quickly please - just got off the phone with the client who is running out of daylight in Europe.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

> On Apr 7, 2023, at 6:18 AM, mathu rajan <mathurajan@icloud.com> wrote:
>
>
> Dear ALL:
> Why are we not just cancelling the hawk motion.
> Thanks,
> Mathu

then re-set the Hawk Motion for a date following the expiration of the Exclusivity Period in accordance with 11 U.S.C. § 1121(b), or as determined by this Court; and

>> On Apr 7, 2023, at 9:46 AM, mathu rajan <mathurajan@icloud.com> wrote:
>>
>> Hi :
>> I thought we were asking for criminal referral to District court not trustee. Can we do a zoom call this morning.
>> Thanks,
>> Mathu
>>
>> Sent from my iPhone

>>> On Apr 7, 2023, at 5:20 AM, dan@streamacquisitiongroup.com wrote:
>>>
>>> Perhaps I have missed something, but were not we thinking to infuse into the record the past scurrilous activities of Stastney et al?
>>>
>>> **From:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
>>> **Sent:** Thursday, April 6, 2023 10:02 PM
>>> **To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; mathu rajan <mathu@streamacquisitiongroup.com>;

**TRUSTEE 57**

bud@streamacquisitiongroup.com; dan@streamacquisitiongroup.com
**Cc:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; David, Daniel
<Daniel.David@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Pigg,
Jann <Jann.Pigg@lewisbrisbois.com>; Russell, Candace
<Candace.Russell@lewisbrisbois.com>
**Subject:** STREAM; TECHNOVATIVE / Chap 11,

Gentlemen:

Attached please find our draft of the Supplement.  Everyone has their own style and mine is to
objectively give the court the facts needed to assist the court in making a decision that will
benefit my client.  In sharp contrast is the motion filed by the Hawk group earlier this afternoon in
which a lot of unsupported and irrelevant opinion and history was presented.  I hope the judge
and her clerks lose interest by the second page of that motion (to dismiss, convert or appoint a
trustee).  I think the facts and the Netherlands pleadings may speak louder than our pounding
the table, so read this with that perspective.

Bennett

**Bennett G. Fisher**
**Partner**
Bennett.Fisher@lewisbrisbois.com

**T: 346.241.4095 F: 713.759.6830**

24 Greenway Plaza, Suite 1400, Houston, Texas 77046 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you
are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify
the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

# App. Ex. 47

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, April 13, 2023 3:28 PM EDT
**To:** Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**CC:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**BCC:** Chapter 11 _ 54493_2 _Email Official <{F11698191}.LEWIS_BRISBOIS@mail.cloudimanage.com>
**Subject:** RE: Stream TV Networks, Inc. 23-10763mdc Technovative Media, Inc. 23-10764mdc LBBS 327 Application
**Attachment(s):** "Stream Engagement Letter (rxza draft) (002) signed MR.pdf"

Dear Kevin,

Please find below responses to your questions.

1. You previously informed us that this case qualifies as subject to the Larger Case Fee Guidelines (see attached). The Application and/or Declaration does not include information and the disclosures as set forth in the Appendix B Guidelines, Section D, pgs.20-21. The information should be disclosed in verified statements by both the client and your firm. Further, the proposed order should include a statement setting forth essentially the following language: that LBBS will comply with the United States Trustee's requests for information and additional disclosures as set forth in Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases, effective as of November 1, 2013 (both in connection with the Application and the interim and final fee applications to be filed by LBBS).

After review of the Debtors' books and records and filed schedules, we have confirmed and agree with you that the Debtors do not qualify for Larger Chapter 11 Case treatment.

2. The Application and/or Declaration should list the attorneys, paralegals and support staff presently designated to represent the debtor and their current hourly rates. Also, the Declaration should include a list of potential parties in interest with connections to the debtor and firm.

Our rates as included in the attached engagement letter are as follows:

   Rafael Zahralddin $975 Partner
   Vincent Alexander $695 Partner
   Sean Shecter  $650 Partner
   Bennett Fisher $550 Partner
   Karen Poppel $450 Associate
   Aimee M. Czachorowski $450 Associate
   Daniel David $350 Associate
   Anh Nguyen $350 Associate
   Christina Freeman $275 Paralegal
   Candice Russell $275 Paralegal

We will supplement the firm affidavit, which was made and will be made by Rafael X. Zahralddin, on behalf of the firm, with a further review of the Firm's connections as part of our ongoing disclosure obligations and will run any party that files a notice of appearance through our system to confirm any connections.

3. The Declaration discloses in paragraph 7 that LBBS received $50,000 on March 14, 2023, the day before the petition and that LBBS applied the entire amount to services rendered after receipt. Please identify when LBBS began work for the debtors. Please provide time records identifying the prepetition services performed and time spent. Please also supply a copy of the engagement agreement. With respect to the retainer, please identify the kind of retainer and where the funds were deposited.

LBBS did not receive a retainer.  As indicated in the engagement letter, LBBS received a flat fee advance payment. Pursuant to the engagement letter, LBBS consulted with the client on the scope of work, and set the prepaid flat fee, inclusive of filing fees.  The fee was sent by wire to LBBS on March 13, 2023, and paid into LBBS's **operating account** on March 14, 2023, as an advance payment. Ultimately, LBBS wrote off approximately $4,000.00 in billable time due to the flat fee arrangement.

4. The Declaration discloses in paragraph 8 that Visual Semiconductor , Inc. ("VSI") paid a flat non-refundable fee payment on behalf of the debtors in preparation for filing the chapter 11 bankruptcies. Please identify to whom and when were the payments made. Please identify the owner of VSI and the nature of VSI's investment in the debtors. Please provide the document(s) evidencing the transaction.

VSI is another entity founded by Mathu Rajan which has its own assets and operations. We will follow up with the cap table of VSI. This cap table should not be disclosed to any other party due to the SLS and Hawk harassment of investors in the past – we can redact and send if you all are more comfortable. VSI is shareholder of Stream. It has been the source of operating funds for the Stream entities, on as needed basis, during the ongoing period when it cannot operate due to the alienation of and lack of repatriation of its assets.  VSI has purchased shares with the funds advanced.

5. Exhibit A, paragraph 1 attached to the Declaration discloses Rafael's connections with debtors. We request further detail regarding his relationship and connections with the debtors and their owners.
Please describe the Chancery court litigation in 2019, including the case number, and whether Rafael was the principal attorney in the case. Identify counsel who was substituted for Rafael as counsel. We note that Rafael's former firm Elliot Greenleaf is identified as an unsecured creditor of Stream holding an undisputed claim of $216.179.17. Please disclose whether Rafael holds a claim against the firm

**TRUSTEE 58**

or the debtor for performing services in the above-referenced litigation.

Please identify the 'special purpose vehicle' and describe any connections to the debtors and whether Rafael's representation of the entity poses a potential adverse interest. For example, was the entity paid or received consideration for the services it performed, or is it owed anything by the debtor or its principals in connection with the engagement.

Stream TV filed a preliminary injunction against SLS to prevent seizure of its assets represented by Buchannan Ingersoll. Bruce Castor, a former Elliott Greenleaf partner, was asked to represent Stream TV in Pennsylvania and Delaware. Having no Delaware office, he asked if the Delaware office of Elliott Greenleaf would assist. Jonathan Stemerman acted as Delaware Chancery Court counsel, Brian Grady, a Pennsylvania lawyer, was pro hac'd in to assist as with litigation, and Rafael Zahralddin was consulted to assess bankruptcy and creditor's rights issues. The firm was involved in the case for about three weeks. John M. Elliott decided by fiat that the case would be dropped so that the firm could pursue other matters and he engaged in actions in the case and in its withdrawal which lead to Mr. Zahralddin resigning from the firm a few months later. Rafael holds no claim against the company. All partners who were not related to John M. Elliott, the now deceased former chairman of the firm, had less than 100th of a percent of a share in Elliott Greenleaf, P.C., which was forfeited upon resignation from the firm pursuant to the firm's bylaws. He holds no interest in any fees owed to Elliott Greenleaf. The Debtors will be amending its scheduled unsecured claims and assessing treatment of claims.

VTI was the special purpose vehicle which was to finance and act as plan sponsor in Stream's first chapter 11 but was never able to finance the case as the matter was dismissed before DIP financing or a plan moved forward. As such VTI was not paid or received any consideration for any services it performed, if any, and it is not owed anything by the debtor or its principals. Mathu Rajan was a part owner of VTI which had a separate board and funding commitment.

6. Exhibit A, paragraph 9 attached to the Declaration describes LBBS' representation of two parties with connections to the debtors. We don't understand the representation. Please provide more detail.

LBBS represents Gallagher Basset, a large worldwide claims servicing company that works for insurance companies. An entity named Robert Half International is a named insured under an insurance policy or policies in which Gallagher Basset handles the claims processing and LBBS represents the insured as part of an unrelated insurance defense litigation. Robert Half Management Services, which offers fractional CFO and interim CFO services, does not appear on its most recently filed securities disclosures including its 10-k. We have been unable to confirm the connection between the two entities but cannot find one.

In any event, the representation of Gallagher Basset is in a totally unrelated matter. Gallagher Basset has no connection to the Debtors.

7. The 2016(b) Statements filed by LBBS in each case states that the firm was paid $50,000 by each debtor. Were payments made by each debtor? The statement appears to be inconsistent with the representation that VSI paid the fee LBBS. Please explain.

The 2016(b) statements will be revised, when the wire was received by LBBS it was overlooked that VSI directly sent the payment. Only one payment was made to LBBS on behalf of both Debtors for a total of $50,000. A notation was supposed to explain that detail which was inadvertently left off the final filing version.

8. Finally, the United States Trustee opposes nunc pro tunc relief to March 15, 2023. Please note that as to this issue, we would agree that the application could be granted effective as of the date of filing the application, i.e., April 3, 2023.

Please let us know when we can discuss LBBS's request for nunc pro tunc relief and any remaining issues. Thanks.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

**From:** Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**Sent:** Tuesday, April 11, 2023 3:28 PM

**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** [EXT] Stream TV Networks, Inc. 23-10763mdc Technovative Media, Inc. 23-10764mdc LBBS 327 Application

Hello Rafael and Bennett,

I haven't received a response to my email below. The Notice indicates a deadline of April 17 to file responses and a hearing scheduled for May 3.  We will need sufficient time to review the information we requested.    Please confirm before tomorrow April 12 that you consent to an extension to file a response to your employment application. If we can schedule a time to speak this week, please provide the documents beforehand.

With respect to our first request in the email below, the petitions for each case indicated the debtors qualified for the Larger Case Fee Guidelines. During our initial phone conversation, you confirmed that the Guidelines applied. However, during our initial debtor interview, Mr. Rajan told us that the assets in each case were worth over $900 million and the liabilities only $25 million. Those amounts would fall below the Guidelines' threshold.

We also note that the information in the filed schedules regarding the total value of the assets and /or the total liabilities in each case also do not reach the threshold amount, such that the Guidelines would not apply. Please confirm whether the cases qualify under the Larger Case Fee Guidelines.

Thanks


Kevin Callahan

Trial Attorney

Office of UST

215-597-2554

Cell  202-834-1626




**From:** Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**Sent:** Wednesday, April 5, 2023 11:11 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Cc:** Schanne, John (USTP) <John.Schanne@usdoj.gov>
**Subject:** Stream TV Networks, Inc. 23-10763mdc Technovative Media, Inc. 23-10764mdc LBBS 327 Application

Hello Rafael and Bennett,

We reviewed the attached Application to approve employment of Lewis Brisbois Bisgaard and Smith LLP ("LBBS") as counsel to the above-referenced debtors (the "debtor" or "StreamTV"), filed on April 3, 2023. We have questions and comments regarding the application, and we request that you do not file a certification of no objection until we discuss and hopefully resolve our concerns.


1. You previously informed us that this case qualifies as subject to the Larger Case Fee Guidelines (see attached). The Application and/or Declaration does not include information and the disclosures as set forth in the Appendix B Guidelines, Section D, pgs.20-21. The information should be disclosed in verified statements by both the client and your firm.  Further, the proposed order should include a statement setting forth essentially the following language: that LBBS will comply with the United States Trustee's requests for information and additional disclosures as set forth in  Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases, effective as of November 1, 2013 (both in connection with the Application and the interim and final fee applications to be filed by LBBS).


2. The Application and/or Declaration should list the attorneys, paralegals and support staff presently designated to

represent the debtor and their current hourly rates. Also, the Declaration should include a list of potential parties in interest with connections to the debtor and firm.

3. The Declaration discloses in paragraph 7 that LBBS received $50,000 on March 14, 2023, the day before the petition and that LBBS applied the entire amount to services rendered after receipt. Please identify when LBBS began work for the debtors. Please provide time records identifying the prepetition services performed and time spent. Please also supply a copy of the engagement agreement. With respect to the retainer, please identify the kind of retainer and where the funds were deposited.

4. The Declaration discloses in paragraph 8 that Visual Semiconductor , Inc. ("VSI") paid a flat non-refundable fee payment on behalf of the debtors in preparation for filing the chapter 11 bankruptcies. Please identify to whom and when were the payments made. Please identify the owner of VSI and the nature of VSI's investment in the debtors. Please provide the document(s) evidencing the transaction.

5. Exhibit A, paragraph 1 attached to the Declaration discloses Rafael's connections with debtors. We request further detail regarding his relationship and connections with the debtors and their owners.

Please describe the Chancery court litigation in 2019, including the case number, and whether Rafael was the principal attorney in the case. Identify counsel who was substituted for Rafael as counsel. We note that Rafael's former firm Elliot Greenleaf is identified as an unsecured creditor of Stream holding an undisputed claim of $216.179.17. Please disclose whether Rafael holds a claim against the firm or the debtor for performing services in the above-referenced litigation.

Please identify the 'special purpose vehicle' and describe any connections to the debtors and whether Rafael's representation of the entity poses a potential adverse interest. For example, was the entity paid or received consideration for the services it performed, or is it owed anything by the debtor or its principals in connection with the engagement.

6.Exhibit A, paragraph 9 attached to the Declaration describes LBBS' representation of two parties with connections to the debtors. We don't understand the representation. Please provide more detail.

7. The 2016(b) Statements filed by LBBS in each case states that the firm was paid $50,000 by each debtor. Were payments made by each debtor? The statement appears to be inconsistent with the representation that VSI paid the fee LBBS. Please explain.

8. Finally, the United States Trustee opposes *nunc pro tunc* relief to March 15, 2023. Please note that as to this issue, we would agree that the application could be granted effective as of the date of filing the application, i.e., April 3, 2023.

I will be out of the office and return on Tuesday April 11, but will be available mostly anytime next week.

Thank you for your anticipated cooperation..

Kevin Callahan

Trial Attorney

215-597-2554

Cell  202-834-1626

# Document Break



500 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
Rafael.Zahralddin@lewisbrisbois.com
Direct: 302.985.6004

March 7, 2023

CONFIDENTIAL COMMUNICATION

*Via Email Only*

mathu@streamacquisitiongroup.com

Re:     Engagement Letter/Fee Agreement

Dear Mathu:

The purpose of this correspondence is to, upon execution: 1) establish an attorney client relationship between Lewis Brisbois Bisgaard & Smith LLP ("LBBS" or the "Firm") and Stream TV Networks Inc. (hereinafter referred to as "You," "Your" or the "Client"); 2) define the scope of the Firm's representation of the Client; and 3) establish other material terms and conditions of the representation, including but not limited to the financial terms. This correspondence may be referred to as the "Engagement Letter" or the "Agreement."  *See* Schedule "A" for the limited scope of engagement parameters, and Schedule "B" for rates and costs.

Please read the Engagement Letter with care. By executing this Engagement Letter, You are entering into a contract that is binding on both the Firm and You, on the following terms and conditions.

1.     PARTIES TO ENGAGEMENT LETTER

The parties to the Agreement are LBBS and You.  No other person or entity shall be entitled to claim an attorney client relationship with the Firm with respect to the legal services to be provided pursuant to the Engagement Letter.

2.     INCEPTION OF ATTORNEY CLIENT RELATIONSHIP

No attorney client relationship will exist between LBBS and You until You have executed the Agreement, nor will LBBS be obligated to provide legal services, until You have returned a signed copy of this Agreement and paid the flat fee called for under Paragraph 8.

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • DELAWARE • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY • LOUISIANA
MARYLAND • MASSACHUSETTS • MINNESOTA • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK • NORTH CAROLINA • OHIO
OREGON • PENNSYLVANIA • RHODE ISLAND • TENNESSEE • TEXAS • UTAH • VIRGINIA • WASHINGTON • WASHINGTON D.C. • WEST VIRGINIA
4870-0864-7491.1

March 7, 2023
Page 2


3.     SCOPE OF REPRESENTATION: SCHEDULE A

LBBS will perform only those legal services set forth in the Scope of Representation attached as Schedule A.  The Client shall have no expectation that the Firm will provide legal services beyond those set forth in Schedule A, unless LBBS and the Client amend the Engagement Letter in writing or execute a separate agreement with respect to any such additional legal services.  The Client is generally required by law to retain documents, including electronically stored information ("ESI"), which may be relevant to the matter which is the subject of the representation.  Preservation of documents including ESI is the Client's responsibility, and it is important that the Client take all necessary and reasonable steps to preserve this information.  The Firm is available to discuss the scope of the Client's obligations and to provide advice or recommendations in this regard.  Nothing in this paragraph shall in any way limit the Client's obligation to pay for or the Firm's right to receive payment for any services provided by the Firm at the Client's request.

4.     DUTIES OF CLIENT

You agree to be truthful and to cooperate, to keep us informed of relevant developments, to abide by the Agreement, to pay our bills on time, and to keep us advised at all times of Your current address, telephone number and whereabouts.

5.     LEGAL FEES

We will charge You for the services provided pursuant to the Agreement based on the amount of time (including travel) we devote to the matter at the hourly rates for the particular professionals involved as are set forth in Schedule B.  We bill in minimum units of 6 minutes, or .1 hour, unless otherwise specified to adhere to applicable bankruptcy laws relevant to the retention of debtor's counsel..

We reserve the right to reasonable annual rate increases up to 10% per annum and will request for consent if any annual increase exceeds 10% subject to applicable bankruptcy laws relevant to the retention of debtor's counsel. .  We reserve the right to staff the handling of the matter with the partners, associates, paralegals and/or other personnel of our choice, at the rate we establish for each such timekeeper, although we will discuss the staffing of Your matter with You at any time, and will consider Your input in the staffing of the matter. Each of the undersigned individuals agree to be jointly and severally liable for all fees, costs and disbursements in connection with this representation.

6.     COSTS, EXPENSES AND OTHER CHARGES

A.  COSTS AND EXPENSES: SCHEDULE B

We will incur on Your behalf various costs and expenses in performing legal services under the Agreement.  You agree to pay for those costs and expenses, in addition to the hourly fees. Schedule B, attached, includes a non-exhaustive list of costs we may incur on Your behalf.

---

LEWIS BRISBOIS BISGAARD & SMITH LLP
www.lewisbrisbois.com

4870-0864-7491.1

March 7, 2023
Page 3

### B.   OUTSIDE CONSULTANTS/OTHER VENDORS

In addition to the costs of the type set forth in Schedule B, it may become necessary to hire persons or entities outside LBBS, including but not limited to consultants, experts, investigators, co-counsel, or other professionals.  We will select any consultants or investigators to be hired after notice to and approval from You, and You agree to honor the terms and conditions of any agreement that we enter into on Your behalf with any such outside person or entity.

### C.   REIMBURSEMENT OR DIRECT PAY

Unless we agree in writing, and in our sole discretion, to pay directly any of the external costs incurred such as those set forth in Schedule "B", and/or for outside consultants or other vendors, You agree to pay any such expense directly.  Our compensation arrangement with the third-party will provide that our Firm is not financially liable for the costs involved, and that You are solely responsible for payment.  When You are responsible to directly pay an outside consultant or vendor invoice we will work with You and the consultant or vendor to give effect to payment arrangements, including Your payment of estimated costs in advance or a deposit against these costs.  If You fail to make direct payments as required by this Letter Agreement, You agree to defend and indemnify our Firm with respect to any claim, demands or suit brought against our Firm as a result of Your failure to pay such invoice and that indemnity includes our attorney's fees and costs incurred in defending the claim against our Firm.  Payment directly by our Firm of any such expense on one or more occasions shall not be construed as a waiver of our right to require You in the future to pay any similar expense directly or in advance.  In addition, even if we pay these outside costs directly, we may require You to reimburse us immediately rather than waiting for the normal billing cycle to be completed.

### 7.   PERIODIC STATEMENTS AND BILLING TERMS

Our practice is to send periodic statements for services rendered and for costs incurred during the previous month or months on our client's behalf.  The detail in the periodic statement will inform You of both the nature and progress of work and of the fees and costs being incurred.

Our fee structure is based upon Your promise to pay all statements, as applicable, no later than 30 days after receipt.

We do our best to see that our clients are satisfied not only with our services, but also with the reasonableness of the fees and costs.  Therefore, while we urge You to raise any question about or objection to a fee statement, You must do so promptly.  Such inquiry shall be timely only if made, in writing, within thirty (30) days after the date of the invoice.  In the absence of a timely written inquiry, You will be deemed to have accepted the invoice and to have acknowledged that You are satisfied with it, in the absence of good cause for not having objected more timely.

In the event You fail to pay any invoice within thirty (30) days of the statement date, You agree to pay interest at the rate of ten percent (10%) per annum on the amount of such invoice, from the statement date until paid in full.  If we accept late payment of any invoice without interest, we shall not be deemed to have waived any claim in the future for interest on other invoices.  If

---

March 7, 2023
Page 4

You timely object in writing to a portion of a statement, You agree to pay the remainder of the statement which is not in dispute.  We agree to accept such partial payment without claiming You have waived Your right to contest the unpaid portion of the bill.

Failure to pay the undisputed amount of any invoice in full within 30 days shall constitute grounds for termination of this Engagement Letter and withdrawal of the Firm from representation, as more fully discussed in Paragraph 11 ahead.

8.      RETAINER AND ADVANCE FLAT FEE

This Engagement Letter shall not be effective until both You and LBBS have signed it and You have delivered to LBBS any advance payment fee described in Schedule "A" and "B" attached. You have agreed to advance a payment in the total amount of $50,000 as an advance payment flat fee as more fully described in Schedule "B."

We reserve the right to request a retainer and such retainer is not an estimate of the total charges which may be incurred.   We will apply any balance after we subtract the advance flat fee payment to a retainer in anticipation of your post chapter 11 filing needs. The retainer is: 1) a sum to be held as security for the Firm with respect to Your obligations to pay the fees and costs incurred by the Firm pursuant to the Engagement Letter; and 2) an advance payment to be applied to the Firm's final invoice in this matter. We will refund any unearned amounts of the retainer, if any, at the conclusion of our representation. We expect that You will live up to the terms and conditions of the Engagement Letter in full, in which case the full amount of the remaining retainer (if any) will be applied against the final invoice and any excess returned to You. However, as noted, should You become delinquent on the payment of any statement, we may in our discretion apply the retainer to the payment of that statement. In the event that the retainer is for any reason applied You shall immediately restore the retainer to its full amount upon our request. Failure to restore the retainer upon our request shall constitute grounds for termination of this Engagement Letter and withdrawal from representation, as more fully discussed in Paragraph 11 ahead.

We also reserve the right to require, and You agree to provide, increases to the retainer should the time and expense required to carry out the representation contemplated by this Engagement Letter increase beyond that reasonably anticipated at the beginning of the engagement.

For example, in the event that You were to request and we were to agree to undertake to represent You in connection with potential or actual litigation, such a matter could resolve in one of a variety of different ways, including dismissal, settlement, or trial. Trial preparation and the actual trial of a case are the most time consuming part of any litigation engagement. We would likely, therefore, require an increased retainer before we would begin trial preparation. We would determine the amount of the increase in the retainer prior to the trial, based upon an estimate of time and costs that may be involved for trial preparation and trial. In any event failure to provide the increased retainer upon our request shall constitute grounds for termination of this Engagement Letter and withdrawal of the Firm from the representation as more fully discussed in Paragraph 11 ahead.

4870-0864-7491.1

March 7, 2023
Page 5

9.    <u>ATTORNEY LIEN</u>

In consideration of the terms of this Agreement, as security for the payment of the fees, costs, and out-of-pocket expenses incurred on Your behalf pursuant to its terms, and without prejudice to any other rights, recourse, or remedies we may have, You hereby grant us a lien upon any sum or sums recovered by You, or on Your behalf (or which You are entitled to recover) in this or any other matter to which this or a similar agreement may pertain, and upon any sum or sums which may be on deposit with the Firm pursuant to this Agreement.  You expressly authorize us to resort to such lien to obtain partial or total satisfaction of any obligation or debt which You may have to us arising from this Agreement.

10.    <u>TERMINATION OF THE FIRM BY THE CLIENT</u>

You shall have the right to terminate this Engagement Letter and discharge the Firm at any time.  However, to be effective, termination or discharge of the Firm must be in writing.  In such event, You authorize the Firm to make and retain a duplicate of Your file.

The Client shall bear all reasonable costs of transferring the new matter to counsel chosen by the Client.

The attorney client relationship between the Firm and the Client shall end upon discharge of the Firm by the Client pursuant to this paragraph.  However, such discharge shall not relieve the Client of any obligation to pay fees and costs incurred prior to the discharge, as well as any fees and costs expended after the discharge to the extent reasonably required in the Firm's sole discretion to protect the Client's interests prior to court order substituting new counsel or permitting withdrawal of the Firm from the litigation.

11.    <u>WITHDRAWAL FROM REPRESENTATION BY THE FIRM</u>

The Firm shall be permitted to withdraw from representation whenever required or permitted to do so by law.  In addition, the Firm may withdraw as counsel at any time if withdrawal can be accomplished without material adverse effects on the interests of the Client, or if: 1) the Client persists in a course of action involving a lawyer's services that the lawyer reasonably believes to be criminal or fraudulent; 2) the Client has used the lawyer's services to perpetrate a crime or fraud; 3) the Client insists upon pursuing an objective that the lawyer considers repugnant or imprudent; 4) the Client fails substantially to fulfill an obligation to LBBS regarding the Firm's services (including, but not limited to, the Client's financial obligations under this Engagement Letter) after reasonable warning from the lawyer that the lawyer will withdraw unless the obligation is fulfilled; 5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the Client; or 6) where other good cause for withdrawal exists.

12.    <u>DOCUMENT STORAGE POLICY</u>

On termination of a matter, the Firm will maintain file documents for 10 years, or any alternate period as determined by the State of Delaware (or the state governing the location for

---

March 7, 2023
Page 6

where work will be conducted).  Upon termination of the matter, You have the right to take possession of the file.  If You choose to take possession of the file, the Firm may copy all or any part of the file.  If You choose not to take possession of the file, the Firm will retain the file pursuant to its document storage policy stated above.

13.     CONFLICTS

You should be aware that the Firm represents many other companies and individuals. It is possible that during the time that we are representing You, some of our present or future clients will have transactions or disputes with You. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for You even if the interests or legal positions of such clients in those other matters are directly adverse. We agree, however, that Your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of You, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to Your material disadvantage.

14.     CHOICE OF LAW/FORUM SELECTION

This Agreement is deemed to have been executed, and is intended to be performed in the State of Delaware, subject to its laws, regardless of whether services are actually rendered outside of the State of Delaware.  Any dispute arising from this agreement shall be governed by the laws of the State of Delaware.  The venue for the judicial resolution of such dispute shall be proper within the State of Delaware.

15.     NO PROMISES OR GUARANTEES

The Client understands that the Firm has made no representation or guarantee concerning the outcome of any legal proceedings that may be filed or defended on behalf of the Client.

16.     LEGAL MALPRACTICE INSURANCE

As of the date of this letter, Lewis Brisbois Bisgaard & Smith LLP has errors and omissions (legal malpractice) insurance applicable to the services to be rendered pursuant to this Agreement, subject to any applicable deductible or self-insured retention.

17.     MODIFICATION IN WRITING ONLY

No change to this Agreement shall be effective unless and until confirmed in writing and signed and acknowledged by the Firm and the Client making express reference to this Agreement. This Engagement Letter embodies the whole agreement of the parties.  There are no promises, terms, conditions or obligations other than those contained herein, and this contract shall supersede all previous communications, representations, or other agreements, either oral or written, between the Firm and the Client.

---

4870-0864-7491.1

March 7, 2023
Page 7

18.     COUNTERPARTS AND FACSIMILES EFFECTIVE

This Agreement may be signed in counterpart.  Facsimile or imaged signature pages executed by the Firm or the Client shall be effective as original signatures.

Thank you for choosing Lewis Brisbois Bisgaard & Smith LLP as Your counsel with respect to the matter set forth in Schedule A.

We look forward to working with You and thank you once again for the opportunity to serve You, upon execution of this Engagement Letter.

Sincerely,

*/s/ Rafael X. Zahralddin*

Rafael X. Zahralddin
LEWIS BRISBOIS BISGAARD & SMITH LLP

RXZA
Cc:     Vincent Alexander


Accepted and agreed to:

Stream TV Networks Inc.
By: _____
Name: Mathu Rajan
Title: CEO
Phone: 267-469-3858
E-mail: mathu@streamacquisitiongroup.com
Dated: March 8, 2023

4870-0864-7491.1

March 7, 2023

Page 8

SCHEDULE "A":

SCOPE OF REPRESENTATION

Representation of You, including any subsidiaries, with respect to restructuring and insolvency advice and the potential filing of a bankruptcy petition and all other matters related thereto, and such other matters as are assigned by the Client and accepted by the Firm, from time to time. I have further specified the bankruptcy services to be as follows:

(a) To advise Debtor with respect to its powers and duties as debtor-in possession and the continued management of its affairs;
(b) To advise Debtor with respect to its responsibilities in complying with the U.S. Trustee's Operating Guidelines and Reporting Requirements and with the rules of the Court;
(c) To prepare motions, pleadings, orders, applications, adversary proceedings, and other legal documents necessary in the administration of the case;
(d) To protect the interests of Debtor and the estate in all matters pending before the court;
(e) take all necessary actions in connection with any chapter 11 plan and related disclosure statement, and all related documents, and such further actions as may be required in connection with the administration of the Debtor's estate; and
(f) perform all other necessary legal services in connection with the prosecution of any chapter 11 case.

***

LEWIS BRISBOIS BISGAARD & SMITH LLP
www.lewisbrisbois.com

4870-0864-7491.1

March 7, 2023
Page 9

SCHEDULE "B":

RATE SCHEDULE AND COST/EXPENSE ITEMS SCHEDULE

A.      **Identification**

Client(s):      Stream TV Networks Inc.

Matter:      Chapter 11 Bankruptcy

B.      **Hourly rates for legal personnel are assigned from practice leader approved rate ranges applied by Billing Partner:**

$500+ for Partners;
$300+ for Associates;
$200+ for Paralegals and Assistants; and
$100+ for Law Clerks.

**Specific Example Applicable Rates to this Engagement:**

| | |
|---|---|
| Rafael Zahralddin | $975 |
| Sean M. Brennecke | $600 |
| Kevin Shaw | $450 |
| Aimee M. Czachorowski | $450 |
| Vincent Alexander | $695 |
| Bennett Fisher | $550 |
| Daniel David | $350 |
| Christina Freeman | $275 |
| Candice Russell | $275 |

*We may from time to time add other attorneys within the aforesaid rate ranges as needed, as determined by LBBS.

You have agreed to pay for our services with a $50,000 advance to be deposited into our operating account. We will calculate the amount due for this advance payment after our initial scope of work call and make a flat fee payment for our services and apply any balance to your retainer for post chapter 11 filing legal services.

Client agrees to provide to the Firm an advance against a flat fee.  This is analogous to an "advance payment retainer," as defined in Rule 1.15(c) of the Illinois Rules of Professional Conduct, Dowling v. Chicago Options Assoc., Inc., 875 N.E.2d 1012, 1018 (Ill. 2007), and In re Caesars Entm't Operating Co., Inc., No. 15-01145 (ABG) (Bankr. N.D. Ill. May 28, 2015) (and cases cited therein). In addition, Client agrees to provide one or more additional advance payment retainers upon request by the Firm,  so that the amount of any advance payment retainers remains

---

4870-0864-7491.1

March 7, 2023
Page 10

at or above the Firm's estimated fees and expenses. The Firm may apply the advance payment retainers to any outstanding fees as services are rendered and to expenses as they are incurred. Client understands and acknowledges that any advance payment retainers are earned by the Firm upon receipt, any advance payment retainers become the property of the Firm upon receipt, Client no longer has a property interest in any advance payment retainers upon the Firm's receipt, any advance payment retainers will be placed in the Firm's general account and will not be held in a client trust account, and Client will not earn any interest on any advance payment retainers; provided, however, that solely to the extent required under applicable law, at the conclusion of the Engagement, if the amount of any advance payment retainers held by the Firm is in excess of the amount of the Firm's outstanding and estimated fees, expenses, and costs, the Firm will pay to Client the amount by which any advance payment retainers exceed such fees, expenses, and costs. Client further understands and acknowledges that the use of advance payment retainers is an integral condition of the Engagement, and is necessary to ensure that: Client continues to have access to the Firm's services; the Firm is compensated for its representation of Client; the Firm is not a pre-petition creditor in the event of a restructuring case; and that in light of the foregoing, the provision of the advance payment retainers is in Client's best interests. The fact that Client has provided the Firm with an advance payment retainer does not affect Client's right to terminate the client-lawyer relationship.

Please be advised that there is another type of retainer known as a "security retainer," as defined in Dowling v. Chicago Options Assoc., 875 N.E.2d at 1018, and In re Caesars Entm't Operating Co., Inc., No. 15-01145 (ABG) (Bankr. N.D. Ill. May 28, 2015) (and cases cited therein). A security retainer remains the property of the client until the lawyer applies it to charges for services that are actually rendered and expenses that are incurred. Any unearned funds are then returned to the client. In other circumstances not present here, the Firm would consider a security retainer and Client's funds would be held in the Firm's segregated client trust account until applied to pay fees and expenses. Funds in a security retainer, however, can be subject to claims of Client's creditors and, if taken by creditors, may leave Client unable to pay for ongoing legal services, which may result in the Firm being unable to continue the Engagement. Moreover, a security retainer creates clawback risks for the Firm in the event of an insolvency proceeding. The choice of the type of retainer to be used is Client's choice alone, but for the Engagement and for the reasons set forth above, the Firm is unwilling to represent Client in the Engagement without using the advance payment retainer

Pennsylvania Bar Association Formal Opinion 95-100 provides that in the absence of a clear written statement or agreement to the contrary, client retainers must be deposited into a proper attorney trust account. This PBA opinion also distinguished between refundable and nonrefundable retainers and concluded that nonrefundable retainers are permissible if the arrangement is properly documented. The opinion made clear that any arrangement that includes a nonrefundable retainer must be confirmed by a clear and unambiguous written statement provided to the client, or by a written agreement between the attorney and client. Fees and costs paid in advance are considered trust funds in the absence of an agreement to the contrary and must be maintained in a trust account separate from the attorney's funds until they are earned or become payable and can be withdrawn with the client's consent. In In Re Anonymous, No. 98 DB

March 7, 2023
Page 11

92, 23 Pa. D.& C. 4th 452 (1994)(the Disciplinary Board set forth at length how it expects attorneys to deal with advances of fees and expenses).

California Rule of Professional Conduct Rule 1.15(a) provides that unearned flat fees must be deposited into a client trust account **unless**, as 1.15(b) provides:

> Notwithstanding paragraph (a), a flat fee paid in advance for legal services may be deposited in a lawyer's or law firm's operating account, provided:(1) the lawyer or law firm discloses to the client in writing (i) that the client has a right under paragraph (a) to require that the flat fee be deposited in an identified trust account until the fee is earned, and (ii) that the client is entitled to a refund of any amount of the fee that has not been earned in the event the representation is terminated or the services for which the fee has been paid are not completed; and (2) if the flat fee exceeds $1,000.00, the client's agreement to deposit the flat fee in the lawyer's operating account and the disclosures required by paragraph (b)(1) are set forth in a writing signed by the client.

In order to assure that the Firm is not disqualified as your counsel in a chapter 11, you have agreed to an advance payment and flat fee.  For the avoidance of doubt, the Firm and Client agree that the fee in this matter (1) is a flat, non-refundable fee which is earned upon receipt and covers the work described in Schedule "A" and "B," (2) will not be deposited into an attorney IOLTA or other Trust account to be billed against, and (3) will be deposited in the lawyer's operating account."

Please note that in appropriate circumstances, the Firm's charges may include a reasonable premium fee, which will be noted on any invoice in which it is included, in addition to the minimum fees calculated on the Firm's usual hourly rates.  A premium amount may be based upon the novelty or difficulty of the issues raised during the representation, the time limitations imposed by the Client or the results obtained.

Prior written notice must be given to Client for any work outside the scope covered by the flat fee with proposed applicable rates of the legal personnel to be engaged; and any such extra work must then be agreed to by Client in writing.

C.      **Standard charges**

We charge for our time in minimum units of .1 hours (6 minutes).

D.      **Costs and expenses incurred on Client's behalf may include but are not limited to:**

| | |
|---|---|
| Process server fees | At cost |
| Filing fees or other fees fixed by law or assessed by public agencies | At cost |
| Meals | At cost |

---

LEWIS BRISBOIS BISGAARD & SMITH LLP
www.lewisbrisbois.com

4870-0864-7491.1

March 7, 2023
Page 12

| | |
|---|---|
| Parking | At cost |
| Travel expenses including  e.g., lodging, air fare, taxis, public transportation, car rental, and meals | At cost |
| Facsimiles | $.25 per page |
| Deposition costs | At cost |
| Experts, consultants or investigators | At cost |
| Computer Research | At cost, plus facilities surcharge (approximately $5.00/minute) |
| Word processing support | $35.00 per hour |
| Mileage | At the Internal Revenue Service's business mileage reimbursement guidelines |
| Messenger and other delivery fees | At cost |
| Photocopying and other reproduction costs | In-house - $0.10 per page Outside service-At cost |
| After hours building services (when dictated by special client need) | At cost |
| Publication costs | At cost |
| Video costs | At cost |

Details of these costs and expenses will be reported to Client.

---

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

4870-0864-7491.1

# App. Ex. 48

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**LUNDY BELDECOS & MILBY, P.C.**
By:  Eric C. Milby, Esquire (#80769)
450 N. Narberth Avenue, Suite 200
Narberth, PA  19072
(610) 668-0773

**TIMONEY KNOX, LLP**
By: Eric B. Smith, Esquire (#81023)
400 Maryland Drive, P.O. Box 7544
Fort Washington, PA 19034
(215) 540-2653                                   *Attorneys for Defendants*

--------------------------------------------- :
**ELLIOTT GREENLEAF, P.C.**                  : **COURT OF COMMON PLEAS**
                                             : **OF MONTGOMERY COUNTY,**
                        **Plaintiff,**       : **PENNSYLVANIA**
        **v.**                               :
                                             :
**RAFAEL X. ZAHRALDDIN-ARAVENA,**            : **Civil Action No. 2021-01427**
**SHELLEY A. KINSELLA,**                     :
**ERIC M. SUTTY,**                           :
**JONATHAN M. STEMERMAN, AND**               :
**MARYANN MILLIS**                           :
                        **Defendants.**      :
---------------------------------------------:

## NOTICE TO PLEAD

You are hereby notified to file a response to the enclosed New Matter

and Counterclaim within twenty (20) days from service hereof or a judgment

may be entered against you.

**LUNDY BELDECOS & MILBY, P.C.**          **TIMONEY KNOX, LLP**

BY: _____          BY: _____
    **ERIC C. MILBY, ESQ.**                 **ERIC B. SMITH, ESQ.**
    *Attorney for Defendants*               *Attorney for Defendants*

1

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**LUNDY BELDECOS & MILBY, P.C.**
By:  Eric C. Milby, Esquire (#80769)
450 N. Narberth Avenue, Suite 200
Narberth, PA  19072
(610) 668-0773

**TIMONEY KNOX, LLP**
By: Eric B. Smith, Esquire (#81023)
400 Maryland Drive, P.O. Box 7544
Fort Washington, PA 19034
(215) 540-2653                                   *Attorneys for Defendants*

---

| | |
|---|---|
| **ELLIOTT GREENLEAF, P.C.** | : **COURT OF COMMON PLEAS** |
| | : **OF MONTGOMERY COUNTY,** |
| Plaintiff, | : **PENNSYLVANIA** |
| v. | : |
| | : |
| **RAFAEL X. ZAHRALDDIN-ARAVENA,** | : **Civil Action No. 2021-01427** |
| **SHELLEY A. KINSELLA,** | : |
| **ERIC M. SUTTY,** | : |
| **JONATHAN M. STEMERMAN, AND** | : |
| **MARYANN MILLIS** | : |
| Defendants. | : |

---

## DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT WITH NEW MATTER AND COUNTERCLAIM

Plaintiff's Complaint is long on conspiracies and sensational allegations but devoid of substance.  Defendants ethically departed Elliott Greenleaf, P.C. (the "Firm") to escape the disparate and hostile environment fostered by the controlling majority in the Blue Bell office despite the long history of the profitability of the Wilmington based practices.  Defendants violated no duties and breached no contracts in doing so and the Firm suffered no recoverable damages.  The Firm knows it does not have any meritorious claims, but this lawsuit is not about legitimate claims, rather, it is a pretext

2

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

for retaliation against the Defendants they forced out and a warning to anyone who considers leaving the Firm.

Plaintiff's Complaint repeatedly and routinely contravenes Pa. R.C.P. 1022 that requires each paragraph of a pleading to "contain as far as practicable only one material allegation." To the extent that any allegation in a paragraph of Plaintiff's complaint are alleged or deemed not to have been addressed, they are specifically denied.

### The Parties

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted in part and denied in part. It is admitted that Ms. Kinsella is an attorney licensed in the State of Delaware and that she was the Managing Partner of the Firm's Wilmington, Delaware office (the "Wilmington office"). It is denied that she was Managing Partner "at all times material hereto."

6.    Admitted.

7.    Admitted. By way of further answer, Mr. Sutty was not an officer or director.

8.    Admitted.

9.    Admitted. By way of further answer, Mr. Stemerman was not an

3

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

officer or director.

10.    Admitted.

11.    Admitted in part, denied in part. It is admitted that Ms. Millis was an employee of Plaintiff. It is denied that she was an employee until January 4th. To the contrary, she was advised to turn in her badge and key card on December 31, 2020, after she had declined an offer from Armstrong Teasdale, LLP ("AT"), and was never paid by Plaintiff for any of her time thereafter.  Understanding she was fired, Ms. Millis solicited and accepted an offer from AT on January 1. Upon information and belief, her start date was within a few days thereafter as she was specifically concerned about a lapse in health care coverage.  Additional services that she performed on Plaintiff's behalf were performed long after January 4 to assist Plaintiff with the transition of management of the Wilmington office and the collection of receivables.  She again was not paid for that time.  By way of further answer, Ms. Millis was not an officer, director, or shareholder.

12.    Denied as a conclusion of law to which no response is required. By way of further answer, it is denied that any defendants other than Zahralddin and Kinsella, strictly in their capacity as directors, owed a fiduciary duty to the Firm. By way of further answer, Plaintiff delegated the director's customary obligations, upon information and belief, to either a secretive committee or the Chairman of the Firm and failed to keep Zahralddin and Kinsella informed or permit them to participate in most Firm

4

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

decisions that would customarily be decided by a Board of Directors such as the decision to sue another partner who left the Firm.

## Jurisdiction and Venue

13.    This statement constitutes a conclusion of law to which no response is required. To the extent a response is required, it is denied.

14.    This statement constitutes a conclusion of law to which no response is required.  To the extent a response is required, it is denied.

15.    Admitted in part and denied in part. It is admitted that the Firm administration was located in Montgomery County. It is specifically denied that Plaintiff suffered any recoverable damages.

## Factual Background

16.    Admitted in part and denied in part.  It is admitted that the Firm has written policies concerning use of its computer and email systems and use of the internet.  Defendants lack sufficient knowledge and information to confirm or deny whether such policies "are distributed to all employees" or whether "all employees are required to execute a written acknowledgement of their review and receipt of those policies, and compliance with them" and same is therefore denied.

17.    Admitted.  By way of further answer, the policies that were signed by Defendants were superseded by newer policies after the Firm was the victim of a ransomware attack and thus the policies referred to were not the "firm policies" in place at any time relevant to Plaintiff's complaint.

5

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

18.    Denied. These allegations seek to characterize a written document that speaks for itself, and all such characterizations are therefore denied.

19.    Denied. These allegations seek to characterize a written document that speaks for itself, and all such characterizations are therefore denied.

20.    Denied. These allegations seek to characterize a written document that speaks for itself, and all such characterizations are therefore denied.

21.    Denied. These allegations seek to characterize a written document that speaks for itself, and all such characterizations are therefore denied.

22.    Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that any defendant misappropriated, deleted, or misused Firm data. All material Firm data was maintained on the Firm's "W" drive and none of that data was deleted. Rather it was left entirely intact until such time as Firm clients requested to follow Defendants to their new firm and directed that their files be transferred.

23.    Admitted.

24.    Admitted in part and denied in part. It is admitted that Mr. Zahralddin was the initial managing partner of the Wilmington office. It is

6

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

denied that Zahralddin was "removed" from that position or created a hostile work environment.  This character attack has no relevance to the Defendants' departure complained of herein as that occurred more than five (5) years after the change in managing shareholders.  It is further denied that Ms. Kinsella then requested to become managing shareholder. Rather the next managing shareholder of the Wilmington office was the Honorable Mark Kearney. Ms. Kinsella was the third managing shareholder.

25.    Admitted in part and denied in part. It is admitted that the majority of work performed in the Wilmington office was bankruptcy-related but denied that bankruptcy matters were the "primary" legal services. Denied that Defendants presence was necessary.  Nothing prevented the Firm from hiring other Delaware licensed attorneys at any time or retaining the Defendants to provide time for them to do so. By way of further answer, Defendants also litigated matters in many other courts and provided non-litigation services.  Upon information and belief, Plaintiffs are basing their allegation on the profitability of the Bankruptcy practice group as compared, per capita, to the entire Firm.  By way of further answer, Judge Kearney left the Firm more than five (5) years prior to the actions complained of in the Complaint and has no relevance to this action.  Since then, at least one other Delaware-licensed attorney was employed in the Wilmington office. That attorney offered her resignation and was, as per the majority shareholders' practice, abruptly terminated.

7

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

26.    Denied. Mr. Zahralddin did not decide to leave the Firm until he received an offer from AT on December 14, 2020.  Similarly, Ms. Kinsella did not decide to leave the Firm until after she received a written offer from AT, submitted the signed employment offer on December 17, 2020, and concluded negotiations regarding benefits on December 22, 2020, and Mr. Sutty did not decide to leave the Firm until he received a written offer from AT and considered the offer on December 14, 2020.

27.    Denied.  Mr. Zahralddin communicated with AT attorneys Richard Scheff and Richard Engel for the purpose of developing a business relationship with them and seeking to have AT engage the Firm as local counsel for AT in Delaware.  In fact, Mr. Zahralddin discussed his communications with AT and others with John M. Elliott on multiple occasions.  The Wilmington office had a significant Delaware counsel and co-counsel practice, the marketing for which necessitated discussions with firms that did not have a Delaware presence.

28.    Denied as stated.  The Wilmington office was instructed to routinely delete emails to free up storage space. Client and matter specific emails were retained on the "W" drive which served as the Firm client file for each matter and all emails were retained on a back-up tape system that remained with the Firm.  The emails included intellectual property entrusted to Mr. Zahralddin which was not the property of the Firm, personal financial information such as tax returns, personal Venmo records, pay stubs and W-

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2s, personal health provider information, life insurance information, communications with Mr. Zahralddin's personal financial planner, home insurance claim communications, e-mails from Leo Ventresca ("Ventresca") of Galway Computer Services, LLC, the Firm's IT vendor ("Galway"), regarding outages of e-mail, remote work, and other issues, a proposal to the City of Philadelphia done jointly with a woman-owned business that was awarded to the Firm but the Firm had declined, and communications from Jim McStravick of the Firm to assist in the collection of open accounts receivables.

29.    Denied. By way of further answer,  Mr. Zahralddin, Ms. Kinsella, and Mr. Sutty received a written offer to join AT on December 14, 2020 and Mr. Stemerman received an offer on the 18th. Mr. Zahralddin was advised shortly before the written offer that he would receive an offer of employment at AT and knew generally the terms of the forthcoming offer. For reasons more fully set forth in the New Matter below, the Attorney Defendants felt compelled to leave by the actions of the majority owners of the Firm and there is no legal or contractual restraint on their right to leave the Firm.

30.    Denied.  After reasonable investigation, Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the matter asserted. Same is therefore denied.  Mr. Zahralddin and Ms. Kinsella's marketing expenses were part of a preapproved marketing budget that promoted the Firm that, upon information and belief, predated

9

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

their departure by weeks or months, and those efforts resulted in revenue that overwhelmingly benefited the Firm as a whole.  Plaintiffs are actively concealing exculpatory evidence on the details of the marketing expenses.

31.    Denied. After reasonable investigation, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the matter asserted. Same is therefore denied.

32.    Denied.  Defendants took no client files until after the departure was announced and the election letters were sent out and returned by the respective client.  Defendants routinely used thumb-drives to take work to "work from home," a practice that accelerated during the pandemic and continued throughout their employment.  Upon information and belief, Plaintiff is characterizing the routine use of thumb-drives for legitimate purposes to make a case of nefarious copying and destruction of files that does not exist.  All copying of files to thumb-drives was for legitimate work on behalf of the Firm for which clients were billed and the Firm collected the revenues.  No firm files were destroyed or shredded for the purpose of either migration to AT or to obstruct the Firm's ability to retain clients.  AT has verified that no Firm files were transferred to its systems.  Firm files were electronic and preserved in the Firm's "W" drive.  Any and all shredding was of redundant documents unrelated to client files and done in the ordinary course and in light of the dangers of paper copies and related precautions taken in the COVID pandemic.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

33.    Denied.  The Law Clerk in question was using his University of Pennsylvania student Westlaw account to build the intern's personal form file.  The intern asked Mr. Zahralddin to review the files and indicated that he placed them on the Firm's "W" drive.  Mr. Zahralddin asked the intern to put the forms on the Google drive for ease of access to review them.  Some forms would have been kept on the google drive used by the Firm lawyers and staff, which included but was not limited to, the employees in the Wilmington office for ease of access and use on tablets and phones.  The firm's document management system was not integrated on tablets and phones but the firm's email system could be accessed and access was facilitated and approved by the Firm's IT personnel.  The Google drive was first approved for use by IT provider, Galway, and a Firm shareholder, Mark Kearney, because the Firm did not have the server capacity to store the materials used to populate the links in client alerts (opinions, motions, and orders, for example) for marketing.  Furthermore, the Firm refused to provide any other mechanism to the Wilmington office to share documents.  The poor quality of the Firm's IT system also often necessitated the use of a Google drive for marketing, book drafts (Mr. Zahralddin was a co-senior editor on a multi-chapter treatise published by the American Bar Association), opinion collections, and form files.  The Google drive was also used for housing publications and presentations which required collaboration with other clients and lawyers, though access was given on a folder-by-

11

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

folder basis.  The Google Drive in question was accessed by lawyers across the Firm's offices because it housed the public documents used in client alerts, which included promotion of various Firm lawyers outside of Delaware.  The password to the Google Drive was kept in an internal Firm document in the Firm document management system and all Firm personnel had access to the password document.  Though primarily utilized by the Wilmington office because of the steady client alerts and marketing done by that office, the Google Drive and the online marketing software used in conjunction with those materials was used by various parties across the Firm.  Fred Santarelli, Jim McStravick, John M. Elliott, and John P ("Jack") Elliott received the client alerts and other marketing on a regular basis and were included on a separate mailing list so that they saw all Firm marketing.  Many marketing campaigns also went to all shareholders and some associates.

34.    Denied. Client records were not kept in any cloud-based account unless requested by the client or housed by the client themselves.  Examples of client files kept on the Google drive include three largely pro bono projects whose boards requested copies of documents be kept in a Google drive as a central repository.  This was only used because, despite multiple requests for a cloud-based system to share and work on documents with clients, the Firm refused to invest in such commonly used technologies particularly where primarily necessary to benefit the satellite offices.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

35.    Denied. Mr. Zahralddin had not made the decision to leave the Firm or to join AT on November 10, 2020.  By way of further answer, USB thumb drives were regularly used during the pandemic and up until Defendants' departure to facilitate working from home and were used during periods where the system in Wilmington was inoperable or when the entire Firm suffered a shutdown.  Excel spreadsheets were often used to facilitate claims reconciliations in large bankruptcies and prepare defenses in bankruptcy litigations.  Excel spreadsheets were also used to track client accounts receivables and aid in collections.  Excel simply did not work reliably with the Firm's remote VPN.  The Firm's time entry system also did not work reliably through remote access on a consistent basis.  For these types of tasks, thumb drives were the only option for completing work, a practice which was exacerbated during the pandemic.  The Firm's antiquated technology necessitated constant "work arounds" with Firm IT vendors to accomplish basic tasks central to the legal work done by the lawyers and paralegals in the Firm's Delaware office.  All Firm thumb drives that were used for this purpose were left in the office upon the Defendant's departure at the paralegal stations near Mr. Sutty, Kinsella, and Zahralddin's offices and no such devices were retained.

36.    Denied. This allegation seeks to characterize a written document that speaks for itself. Same is therefore denied. By way of further answer, although Mr. Zahralddin began to entertain offers in advance of the

13

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

December decision to change firms as a result of the disparate and hostile treatment of the Wilmington office by the Firm, and the unfair treatment of a Firm client during a time-sensitive matter, no decision was made and there is nothing conceivably improper about these communications.  There is no contractual or legal restraint on Mr. Zahralddin's right to change firms.

37.    Denied. This allegation seeks to characterize a written document that speaks for itself. Same is therefore denied. By way of further answer, and for reasons more fully set forth in the New Matter below, Mr. Zahralddin felt compelled to leave by the actions of the majority owners of the Firm and there is no legal or contractual restraint on their right to leave the Firm.

38.    Denied as stated.  Upon information and belief, the "double deletion" was only emptying the "trash bin" of emails that had been deleted and did not result in a permanent deletion because tapes were used to back up all email as well as an Office 365 back up.  Mr. Zahralddin was not motivated to keep anything secret at the time as because he had already announced his departure, was cleaning up years of old personal or irrelevant emails, and was helping to organize and clean up the files and his desktop as requested by Jack Elliott to facilitate departure and any transition.  Upon information and belief, no deletion of relevant or important information occurred.  By way of further answer, Mr. Zahralddin did not simply provide 3 day's-notice.  The Firm had historically terminated employees with immediate effect when they gave longer notice of intention to depart the

14

Case 23-10763-djb   Doc 1208-5   Filed 04/08/26   Entered 04/08/26 13:16:51   Desc
Appendix Part 3   Exs. 41-60   Page 140 of 306

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

farm.  Employment at AT commenced on January 1, 2021.  However, AT offered an accommodation for Mr. Zahralddin, Ms. Kinsella, and Mr. Stemerman to stay as long as was necessary to accommodate the Firm and assist with an orderly transition of any clients that chose to follow Defendants to their new firm as well as assist with any clients who chose to remain with the Firm.  Mr. Zahralddin and Ms. Kinsella offered to stay as long as needed and were rejected out of hand by the Firm. Defendant's believe, coupled with the Firm's refusal to send joint letters to several clients which the Defendants had provided services, that the Firm feared more clients might leave if they provided them with the required election letters.  Mr. Stemerman offered to stay through January 15, 2021 but the Firm rejected that offer.

39.    Denied. Defendants were not "acting together" and did not "secretly arrange[]" for document shredding.  It is further denied that shredding was done without the firm's knowledge.  In fact, the Firm knows that this allegation is false, and they are actively concealing the exculpatory information that would confirm its falsity.  By way of further answer, the Firm has (or had) a master contract with a document shredding service that would come to the Wilmington office at regular intervals.  If the quantity of shredding was higher in December 2020, it is only because of office cleanouts of old materials that are not client files but, rather, accumulated seminar and CLE materials, articles, newspapers, journals, and the like.

15

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Defendants admit that the firm was obligated to pay the invoice, but they had a longstanding contract to do so.

40.   Denied. USB thumb drives were regularly used during the pandemic and during periods where the system in Wilmington was inoperable or when the entire firm suffered a shutdown.  Mr. Zahralddin, like all other Firm employees, was provided desktop computers which had ports for USBs and was given access to password-protected computers on a daily basis.  The Firm purchased USBs for use in the office.  Mr. Zahralddin accessed his computer in an authorized manner and with USBs purchased by the Firm or approved by Galway.  Galway downloaded and organized files or assisted staff in doing so from storage devices for Mr. Zahralddin on multiple occasions, including his form files that came from his prior firm which authorized his form files to be taken from that firm.  Such USBs and storage devices were left in the office before departure at the paralegal stations near Mr. Sutty, Ms. Kinsella, and Mr. Zahralddin's offices and no such devices were retained.  In fact, Mr. Zahralddin left personal property including books and external hard drives at the Firm that have not been returned.

41.   Admitted in part and denied in part.  It is admitted Mr. Zahralddin sent LinkedIn requests to AT attorneys. The allegation that there is something nefarious about Mr. Zahralddin connecting with AT employees on LinkedIn is demonstrative of how much Plaintiffs have strained to make a case where one doesn't exist. Until Mr. Zahralddin received an offer in mid-

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

December no one, including him, knew whether he was leaving the firm.  As explained above, the offer of employment from AT arose in part from Mr. Zahralddin's efforts to procure local counsel work for the Firm and networking with other firms who did not have an office in Delaware.  However, the Defendants' dissatisfaction with the Firm existed for a long time because of the disparate and abusive treatment of the Wilmington office by the majority shareholders in the Blue Bell office.

42.   Denied.  All deletions were in the ordinary course of business along with all other unnecessary emails.  The Firm has restrictions on the mailbox size of each lawyer's inbox, so email was regularly deleted to free up space at the direction of Galway. This allegation confirms, however, that the Firm was able to access all deleted emails, presumably through their tape backup system.

43.   Admitted in part and denied in part.  Defendants admit the Attorney Defendants were present at the December 2020 board and shareholder meetings.  The characterization of their participation is denied.  To the extent that financial, business, client, or prospective business matters were discussed at either meeting, they were only discussed in the most general of terms.  It is admitted that Defendants voted on matters but, upon information and belief, the only votes were for such routine matters as the election of directors by the shareholders and election of officers by the directors.  Whatever matters were voted on were wholly insignificant to this

17

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

lawsuit or they would have been specifically plead rather than in this conclusory fashion.

44.    Admitted.

45.    Admitted.  By way of further answer, Mr. Zahralddin had not made the decision to leave the firm by December 1, 2020, had no information about whether other attorneys had plans to leave the Wilmington office, and his statements at the meeting, albeit prospective, were true and based on market research supported by his browsing history produced in discovery by the Firm. Further, despite the fact that Ms. Kinsella was the managing partner of the Wilmington office, John M. Elliott instructed Mr. Zahralddin to address the Firm on behalf of the Wilmington office and to paint a rosy, positive, and in his words "glass half full," picture of potential business prospects for Delaware and the bankruptcy practice in order to help Firm morale, especially during the pandemic and with the departure of, or waning of engagements by, several important clients of the Blue Bell office. Zahralddin only gave truthful opinions about the prospects for Bankruptcy work having no plan to leave the firm at that time.

46.    Admitted in part and denied in part. The Attorney Defendants admit only that they did not disclose that they intended to leave the firm at the December 1, 2020 meeting because that decision had not been made by any of them. None of the Defendants had received an offer of employment at the time and, therefore, did not "actively mislead" or make any

18

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"misrepresentations." All Attorney Defendants deny that they "actively concealed" anything at the meetings in question. Furthermore, there is no obligation under Pennsylvania or Delaware law for an attorney to disclose an intent to depart employment and such an obligation is against public policy as a restraint of trade and would restrict freedom of movement of employees. In addition, such a requirement in the context of a legal practice also implicates the rights of clients to access the counsel of their choice, amongst various other ethical considerations.

47.    Denied. The Firm had a contract for monthly shredding services and after the pandemic began to wane and with the departure of one of three staff members and the return of staff to the office, the lawyers conducted a periodic cleaning and disposing of unnecessary files. This was a practice in all the Firm's offices. In the Blue Bell office, where the controlling shareholders are located, they made an event out of annual shredding event, invited the staff and attorneys to dress down for the day and ordered lunch for the whole office. They did not do this for the Wilmington office. As stated, the office files were paperless and electronic, but copies of documents taken to Court or left by co-counsel which were already in electronic form or available on the public dockets or claims and noticing agent websites were redundant and periodically cleaned up. In addition, the unnecessary and redundant files were a health hazard during COVID-19 and due to restrictions in place for staff and attorneys had accumulated over the

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

term of the pandemic.

48.    Denied. The Firm was aware of this practice and other workarounds to the inadequate technology provided to the Wilmington office.  Galway routinely told Mr. Zahralddin to use his home email or work on his home laptop using a cloud depository as neither a cloud-based system or firm file sharing platform was provided to the Wilmington office.  Jack Elliot, Jim McStravick, Ryan McStravick and Galway instructed, or were aware of instructions to, Mr. Zahralddin on multiple occasions to use his work email as a backup for outages or when remote access was unavailable or operating inadequately during the pandemic. Problems at the office with outages from XO and Verizon prompted multiple visits and a sit down to resolve the problems which necessitated home email use.  Home bandwidth was overloaded due to remote learning and other burdens on Mr. Zahralddin and Kinsella's home system during this time so any files or emails that were sent to home systems were sent to facilitate and complete work for which the Firm billed and received the revenue.

49.    Denied.  The Wilmington office was instructed to routinely delete emails to free up storage space. Client and matter specific emails were retained and filed on the "W" drive and all emails were retained on a back-up tape system that remained with the Firm. No permanent deletion occurred or could have occurred as there are tapes of which Mr. Zahralddin was aware as he was asked to and attended to them before leaving the

20

4895-3354-3463, v. 1

office and to which he, and various other firm personnel, had access. Furthermore, Jack Elliott asked Mr. Zahralddin during the meeting of December 30, 2020 to assist in making sure that electronic client files were complete. Mr. Zahralddin agreed to do so and worked all day on December 31, 2021 until late that night to clean up the files.  Mr. Zahralddin forwarded emails which included intellectual property entrusted to Mr. Zahralddin, which were not the property of the Firm, personal financial information such as tax returns, personal Venmo records, pay stubs and W-2s, personal health provider information, life insurance information, communications with Mr. Zahralddin's personal financial planner, home insurance claim communications, emails from Leo Ventresca of Galway regarding outages of email, remote work, and other issues, a proposal to the City of Philadelphia done jointly with a woman-owned business which was awarded to the Firm but the Firm had declined, and communications from Jim McStravick of the Firm to assist in the collection of open accounts receivables.  In addition, he understood there was a record in Office 365 as well as back up tapes in the Wilmington server room.

50.    Admitted in part and denied in part.  It is admitted that Mr. Sutty transferred publicly available pleadings to his gmail account especially in cases where he continued as counsel of record, and contact information for clients that was needed after his departure from the firm to send election letters as requested by the Firm.  This was done to maintain contact

21

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

information for clients in the event Mr. Sutty received and accepted an offer from AT and the Firm locked him out as they had done to other departing lawyers in the past.  It is denied that anything was deleted or stolen from the Firm. The Firm retained copies of all client and case information at least until such time as the clients made an election as what lawyers would retain their files.

51.   Admitted in part and denied in part.  It is admitted that Mr. Sutty transferred a limited number of documents in the event that he received and accepted an offer from AT and the Firm locked him out of files belonging to clients desiring to go with him to the new firm. It is denied that Mr. Sutty bypassed the Firm's computer systems.  Nothing was deleted or stolen from the Firm.

52.   Admitted in part and denied in part. It is admitted that Mr. Sutty would "bcc" his personal email account in the event Mr. Sutty received and accepted an offer from AT and the Firm locked him out of clients desiring to go with him to the new firm. Nothing was deleted or stolen from the Firm.

53.   Admitted.

54.   Admitted in part and denied in part. It is admitted that firm attorneys added an additional email to their PACER accounts to ensure uninterrupted service to the clients.  Specifically, at the beginning of December 2020, Ms. Millis added the attorneys' and her personal email addresses to their respective PACER accounts because the Firm was having

22

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

ongoing issues with their system and the Wilmington office was not receiving CM/ECF filing notifications promptly to the Firm email addresses.  By way of further answer, the attorneys did not remove their ElliottGreenleaf.com emails so the Firm was not deprived of any information or access that it previously had.  Other lawyers and paralegals were receiving notices and notices and other docket entries and filed documents are easily accessible to the general public and anyone with court credentials, which the firm had through multiple parties. The Court's system does not operate by firm, but by licensed attorney.  Court filings in active matters for electronic filings in the bankruptcy court are available to the public and to any party with a PACER account which multiple lawyers at the Firm have. Also, most bankruptcy matters are available on a separate noticing and claims agent website to which any person with an access to a search engine and the internet can access and sign up for direct real time delivery of filings.  It is denied that Defendants engaged in any tactics to obstruct the Firm's efforts to retain the clients. To the contrary, there was almost no overlap between the Wilmington office clients generated by the Delaware based lawyers and clients of the other Firm offices.  Defendants never had any concern that the Firm would retain many, if any, of the Wilmington office clients and, as such, they felt no need to disengage from the firm in any way but the most cautious and ethical way possible.

55.    Admitted in part and denied in part. It is admitted that many

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

email notifications were deleted as was the custom among many of the attorneys. It is often the attorneys' practice to delete notifications, especially from the bankruptcy court, after logging in, downloading, and saving the referenced filings, if necessary, because such notification emails do not contain any substantive information, only a one time use link to the document.  This practice continues to this day.  As for the double deletion allegation, it is assumed that Plaintiff is referencing the practice of clearing the email "trash bin."  This was done at the direction of Galway to free up storage space on the server.  It is specifically denied that this ongoing practice is designed to conceal misconduct or destroy evidence of it. Like most of Plaintiff's allegations, there is no logical connection between deleting notice emails and concealing wrongdoing.  If the clients had chosen to stay with the Firm, the Defendants still would have had to assist in transferring the file to Plaintiff.

57.    Admitted in part and denied in part.   Any materials forwarded to personal accounts were to facilitate continuing work for a client or to assist the Firm with collections.  By way of further answer, no information was taken from the firm.  Mr. Zahralddin had only copies of pleadings and notifications necessary to continue service to the clients. It is denied that he made any effort to conceal any wrongdoing.

57.    Denied.  It is admitted that some of the Defendants' personal items were moved to storage.  The assertion that "much" of the Firm's

24

4895-3354-3463, v. 1

contents was moved into storage is known by the Firm to be false.  It is denied that it was a "secret" in as much as the moving occurred during the day and in public view. Defendants took no steps of concealment.  However, by way of further denial, Defendants each are free at any time, for any reason, to move their own personal items to storage without input or permission from the Firm.

58.    Admitted in part and denied in part.  It is admitted that Defendants moved furniture and other personal items that were owned by the Defendants and not the firm on December 26, 2020 and that Defendants Zahralddin and Kinsella paid for the storage with a personal check.  It is denied that any items taken belonged to the Firm.  The Firm made accusations of theft and demanded an accounting despite knowing the allegations were untrue.  Ms. Kinsella purchased her own furniture.  Mr. Zahralddin had his own chair due to a back injury, a fact known to firm because it was purchased with a prescription and reimbursed through the Firm's medical plan.

59.    Admitted in part and denied in part. It is admitted that the check was sent to AT for reimbursement, that the email containing Mr. Zahralddin and Ms. Kinsella's personal information was deleted, and that the email trash bin was cleared.  It is denied that the Defendants were attempting to conceal their activity. In fact, the move and request for reimbursement occurred just prior to or concurrent with notification to the Firm of the

25

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Defendants' departure.

60. Admitted in part and denied in part. It is admitted that the Firm has never been provided an inventory of the personal belongings removed by Defendants. By way of further answer, the Firm never requested that Defendants provide an inventory, yet, Defendants offered to allow the Firm to view the storage locker and they declined the offer. It is denied that any items belonging to the Firm were removed on December 26, 2020 or any other date. All items removed from the Wilmington office on December 26, 2020 were the personal property of Zahralddin and/or Kinsella, and not the Firm's. Notably, despite requests to do so, the firm has failed to identify any property that was missing, because there is no such property and this allegation was inserted to malign the defendants' character and fabricate a cause of action where there is none. Incredibly, the Firm has no record of the items in the Wilmington office, much less records of any item that the Firm claims is missing. When asked in Depositions what was taken, Jack Elliott, who verified the Complaint, could not identify a single item. Further, Defendants offered to allow the Firm to inspect and inventory the storage unit and the Firm declined.

61. Denied. Before Mr. Zahralddin's assistant resigned due to the unfair and unnecessary in-person attendance policy mandated by the controlling majority during COVID, his assistant, who also worked on marketing efforts for the office, prepared an exit memo that identified open

26

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

items pending her departure, not Mr. Zahralddin's departure. The memo also included passwords for Mr. Zahralddin's accounts, including health care, retirement, and depository and credit cards because his assistant often arranged for payment and reservations on client and firm travel such as attendance at conferences and other trade meetings and passwords were changed to provide security. This information was not taken from the Firm because it existed on their back-up tape system. Leaving these personal items on the Firm's hard drive or email system where they could be more easily accessed during a breach especially because there had previously been a breach by a ransomware attack was an unnecessary security risk. However, the Firm still had access through back up tapes in the office server and online in Office 365.

62. Admitted in part and denied in part. It is admitted that the Attorney Defendants gave notice of their intent to leave the firm on December 28, 2020 with a tentative resignation effective on December 31, 2020. It is further admitted that December 28 is just after Christmas and shortly before New Years. It is denied that the resignations came as a complete surprise to the firm as they knew or should have known that the treatment of the Wilmington office was unsustainable and partners in the Wilmington office, especially Mr. Zahralddin, would leave as a result of the matters alleged in more detail in the New Matter below. It is further admitted that without Delaware-licensed attorneys employed by the Firm,

27

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the Firm would not be able to practice law in Delaware through its Wilmington office but it is denied that the firm would necessarily be rendered inoperable.  On the contrary, Mr. Stemerman, Ms. Kinsella and Mr. Zahralddin each offered to defer their resignations beyond December 31, 2020 and, in the case of Ms. Kinsella, indefinitely.  This allowed ample time for the Firm to hire new Delaware lawyers which the Firm subsequently did on short order. But the Plaintiff, through Jack Elliott, declined the offers and rendered the Wilmington office inoperable themselves.  The Firm did not request that Mr. Sutty stay on past December 31, 2020.

63.    Admitted in part and denied in part. It is only admitted that the Defendants declined to give longer notice because of the Firm's historical pattern of immediately locking out and immediately terminating attorneys who gave notice of resignation.  All other allegations are denied. Specifically, all Defendants actions were designed to effectuate an orderly withdrawal and protect the clients.  Defendants' withdrawal was not intended to prejudice or harm the Firm in any way.  As explained above, Defendants offered to defer their resignations but the Firm, through Jack Elliott, declined those offers.

64.    Denied. During the exit interview Jack Elliott asked Mr. Zahralddin and Ms. Kinsella to assist in cleaning up the files and making sure that any files would be ready for transition whether they stayed with the departing lawyers or with the Firm.  As noted previously, the Firm had a contract for monthly shredding and after the pandemic and with the

28

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

departure of one of three staff members and the return of staff to the office, the lawyers engaged in cleaning and disposing of unnecessary files. A practice that was done in all offices. As stated, the office files were paperless and electronic, but copies of documents taken to court or left by co-counsel which were already in electronic form or available on the public dockets or claims and noticing agent websites were redundant and cleaned up. In addition, the unnecessary and redundant files were a health hazard during COVID-19.

67. Admitted.

66. Admitted in part and denied in part. It is admitted that a USB device was inserted into Mr. Stemerman's firm-issued laptop to download certain materials but denies that he downloaded client files. On the contrary, the materials downloaded to the USB device were his children's homework and school projects. By way of further answer, the allegation that this downloading was "in an unauthorized manner" is a legal conclusion to which no response is required but, to the extent a response is required, it is denied.

67. Admitted in part and denied in part. It is admitted that the Firm demanded a meeting with the Attorney Defendants. It is denied that it did so "immediately." The Firm did not request a meeting until the next day, December 29, 2020. It is further admitted that Defendants readily agreed and participated in a meeting with Firm representatives and one additional

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

person on December 30, 2020.  It is further denied that Ms. Millis resigned on December 28, 2020.  She did not.  She believes she was terminated on December 31 upon being instructed to turn in her badge and key card.  The Attorney Defendants deny that they "allowed" Ms. Millis to work from home, as they had no authority to require her to be in or out of the office for work, especially during the COVID-19 pandemic.

68.    Denied.  Plaintiff's representatives did not express any surprise or concern about the removal of personal items by the Defendants. It is further denied that there were "significant" amounts of furniture, furnishing and records missing.  This claim was fabricated to prop up unsubstantiated attacks on the Defendants' character.  When asked in Depositions what was taken, Jack Elliott, who verified the complaint, could not identify a single item.

69.    Denied as a conclusion of law to which no response is required. Strict proof thereof is demanded.  By way of further answer, election letters went to almost every active client and those client's interests were protected.  Upon information and belief, the Firm did not send out election letters to several clients whose matters originated outside of the Wilmington office, but whose responsible Firm lawyers were resident in the Wilmington office, including Aetna, GT USA Wilmington LLC, and UFCW Local 1776 Keystone State.  Further, several of the Defendants offered to stay longer at the Firm to facilitate the transition and to assist the Firm in making sure

4895-3354-3463, v. 1

there was no issue with any client. Despite knowing this fact, Plaintiff verified a complaint with this gross misstatement of fact and law in a longshot claim to create a cause of action where none exists.

70. Denied. To the contrary, the Firm's disparate treatment of the Wilmington office, and John M. Elliott's actions in forcing Mr. Zahralddin to withdraw from several matters as explained in more detail in the New Matter, caused the Defendants, as the core of the highly profitable Wilmington office, to feel compelled to leave the firm. Consequently, the loss of the business to the Firm is not actionable and is a consequence of their own actions.

71. Denied. Mr. Zahralddin was a Firm client as he was appointed as the General Unsecured Claims Administrator in a bankruptcy case and hired the Firm to assist in reconciliation of bankruptcy claims. All other clients were informed of Defendants' departure for the first time by letter sent on the Firm's letterhead with the assistance of Defendants.

72. Denied as Stated. On the contrary, Ms. Kinsella, Mr. Zahralddin, and Mr. Stemerman all offered to stay as long as was necessary to reduce any impact on the Firm. By way of further answer, Plaintiffs have verified a complaint where they knew the facts to be different, yet they fabricated an allegation to attempt to assert a baseless claim. Now they have omitted critical information by stating that AT knew that the resignations were given on December 28, 2020 without informing the Court that not only did the

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Defendants offer to stay to assist, one of them for as long as it took assist in transition, but that AT approved of this concession.

73.   Denied.  No firm property was removed and all that was removed was personal and personal financial information.  Any other files were incidental to working for the Firm on behalf of its clients and under both the conditions of a pandemic as well as the antiquated and vulnerable information technology provided to the Defendants.

74.   Denied.  Mr. Zahralddin and Ms. Kinsella presented materials from Finger and Slanina, LLC a noted Delaware firm regarding ethics and professional responsibility, who Defendants had consulted to ensure they conducted a strictly ethical withdrawal, the parties agreed to send out joint letters, and the parties did send out joint letters.

75.   Admitted.  Jack Elliott asked for a sample letter and asked if AT could supply a letter form.  Mr. Zahralddin indicated he would ask Richard Scheff if AT's Philadelphia office had a sample.

76.   Admitted in part and denied in part. It is admitted that this was a sample that reflected the prevailing law and ethics opinions in both Delaware and Pennsylvania. It is denied, both affirmatively and as a conclusion of law, that Defendants did not adhere to an ethical departure. Furthermore, this is a further and compounded misrepresentation to the Court to omit the offer of three (3) of the Defendants to stay.  The Firm created the circumstances of which they complain.

32

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

77.    Admitted in part and denied in part.  It is admitted that certain letters were dated December 31, 2020.  The clients were not given a deadline as to when they had to elect a firm so the suggestion that the clients were placed under a short deadline is false.  Further Mr. Zahralddin, Ms. Kinsella and Mr. Stemerman offered to stay longer than 9 days after December 31, 2020, which would have afforded the Firm even more than the "ample advance notice" provided in the sample notification letter described in this paragraph.

78.    Admitted in part and denied in part. It is admitted that the Attorney Defendants were asked if they provided client lists and financial information to AT.  Plaintiff's characterization of Defendants' responses is denied.  Defendants stated that they provided cases where there was a public record of the Defendants serving as counsel or it was known to third-parties.  It is denied that Defendants provided "Firm" financial information to AT.  On the contrary, the Defendants provided personal information about their own billing and rates under a confidentiality agreement as is routinely done in all lateral hires.

79.    Denied. Defendants cannot speak to what Plaintiff believes.  The Attorney Defendants admit that, prior to December 30, 2020, they provided information to AT about clients for whom they were the originating and/or primary attorneys, their own billable hours and collections attributable to themselves as is routinely done in lateral hires.  Defendants deny the

33

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

characterization that this information was "extensive."  Even the Director Defendants had limited access to financial information at the Firm because such information was delegated to a secretive committee.

80.    Admitted in part and denied in part.  It is admitted that Mr. Zahralddin and Ms. Kinsella were asked by the Firm on December 30, 2020 whether Ms. Millis intended to join them at AT.  It is denied that they lied. Ms. Kinsella and Mr. Zahralddin did not know whether Ms. Millis intended to join AT and, indeed, as of December 30, 2020, Ms. Millis did not have an offer from AT. Ms. Millis received her first offer the morning of December 31st which she turned down. She received the second and final offer at around 9:30 p.m. on December 31st which she accepted.

81.    Denied. Ms. Millis was working from home.  She was not "secretly" accessing the computer system.

82.    Denied.  It is denied that the Defendants instructed Ms. Millis to delete emails from her Firm email account.  Any emails she deleted were not deleted to conceal anything, but were part of her regular email management, as the Firm had no policies with respect to same. Ms. Millis routinely deleted her emails at the end of every month. Galway was aware of this practice.  By way of further denial, the Firm routinely 'backs-up' the computer system, including emails, of the Wilmington office and no allegation is or could be made that the Defendants deleted any backups.

83.    Denied.  The Attorney Defendants, as of December 31, 2020,

34

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

were not aware of Ms. Millis' employment plans, and therefore, did not conceal or misrepresent anything.  By way of further answer, the Firm never asked Defendants Stemerman and Sutty about Ms. Millis' employment plans and, therefore, they could not have misrepresented her plans.  Ms. Millis did not "secretly access" Firm files or convert any such files for the benefit of the Attorney Defendants.

84.   Denied.  Firm representatives did not tell Defendants not to remove any personal, duplicative, redundant, or non-client information from the Firm's computer system, nor agreeing to so.  To the contrary, Jack Elliott instructed the Attorney Defendants to clean up and organize the office and client files. Had the Firm told Defendants not to remove such information from the Firm's computer systems, they would not have deleted anything, no matter how irrelevant or immaterial.  Ms. Millis was not present at the December 30, 2020 meeting in the Wilmington office and, therefore, could not have been "reminded" by firm representatives of anything at that meeting.  It is further denied that Defendants lied to Plaintiff. By way of further answer, nothing material, or that wasn't stored elsewhere, was deleted. By way of further denial, the Firm routinely 'backs-up' the computer system, including emails, of the Wilmington office.

85.   Denied as stated.  By way of further response, as indicated above, Defendants did not lie or continue to do something they were told not to do.  Further each Defendant states that, to the extent any firm

35

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

information may have been transferred on or after December 30, 2020,
none of it was material, nor in violation of any firm policies, and the Firm did
not suffer any damages as a result of such transmittal.

86.    Admitted in part and denied in part. It is admitted that Mr.
Zahralddin continued to clean up old emails and transfer his personal
information upon departing the firm. It is strictly denied that he deleted any
relevant or active "Firm emails" or attempted to conceal or destroy any
"evidence" as he was doing nothing wrong. By way of further denial, the
Firm routinely 'backs-up' the computer system, including emails, of the
Wilmington office.

87.    Denied. Plaintiff's characterization of how Mr. Zahralddin spent
his final day is denied.   Any deleted emails were part of cleaning up upon
his departure from the firm.  Emails forwarded to his personal account were
consistent with continuing to service clients until such time as the clients
made an election whether to stay with the Firm or follow the Defendants, or
to continue his duties as an appointed administrator in a bankruptcy case
where he was the Firm client, and no "evidence" was permanently deleted.

88.    Denied.  Defendants lack sufficient information to admit or deny
whether Plaintiff conducted a forensic investigation and demand strict proof
of same.  Defendants further deny that any use of cloud-based storage
accounts was unauthorized.  To the contrary Galway authorized the use of
cloud-based Google accounts because the Firm failed to provide other more

36

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

secure or robust cloud-based document storage systems which was especially problematic during the pandemic.  Furthermore, several clients added Defendant's emails to cloud-based repositories that they used to facilitate communication with the Defendants.

89.    Admitted in part and denied in part. It is admitted that Mr. Zahralddin used Dropbox and Google Drive on various occasions as was necessary to store and access document in the cloud. This was done for legitimate work purposes and not, as Plaintiff suggests, done in connection with the Defendants departure.  Further, a Firm client used Box and any access to a Box account was at the invitation of a client.  Finally, OneDrive is part of the Microsoft Office 365 software suite and documents opened on personal phones or tablets automatically open in the OneDrive application and access to the Firm servers was installed, serviced, or installation was facilitated by Galway or Ryan McStravick.  Upon information and belief, documents opened or edited on phones or tablets and downloaded from emails would have copies in OneDrive, Box, or iCloud.  Plaintiff here is simply trying to make a case out of routine client service that continued up until the day of Defendants' departure and for which Plaintiff billed and was paid.  It is denied that alleged "stolen" data or records resides in those accounts other than as copies opened incidental to editing or viewing documents in the ordinary course of the Defendant's work.  All such copies resided in various places on the Firm's systems.

37

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

90.    Admitted in part and denied in part. It is admitted that Mr. Sutty used Dropbox and Google Drive on various occasions as was necessary to store and access document in the cloud. This was done for legitimate work purposes and not, as Plaintiff suggests, in connection with the Defendants departure.  Further, a Firm client used Box and any access to a Box account was at the invitation of a client.   It is denied that Firm files or work product were transmitted to those accounts except where originals were retained on Firm system.

91.    Admitted in part and denied in part. It is admitted that Mr. Sutty accessed a Box account.  A Firm client used Box and any access to a Box account was at the invitation of a client.  It is denied that the use of the Box account was at all nefarious or improper.  Rather, it was not used in connection with the Defendants' departure from the Firm.

92.    Admitted in part and denied in part. It is admitted that Mr. Stemerman, on occasion accessed cloud-based accounts on his firm issued computers, including Google Drive and Box.  It is denied that such access was unauthorized.  By way of further answer, Mr. Stemerman only downloaded files from Box which, to the best of his recollection, were document files sent either by clients or by opposing counsel that were then stored elsewhere on the firm's computer system.  With respect to Google Drive, Mr. Stemerman would also download information from Google Drive. Upon information and belief, his children's school accounts also use Google

38

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Drive and, therefore his children may have uploaded schoolwork to their or their classes' Google Drives and Mr. Stemerman accessed those drives for personal reasons.  It is specifically denied that those cloud-based accounts were used for any nefarious or improper purpose in connection with the Defendants' departure from the Firm.

93.    Denied.  To the contrary, the Defendants were specifically authorized by Firm personnel to use Google Drive and other cloud-based accounts and, upon information and belief, nearly all other lawyers in the firm do so as well.

94.    Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that Ms. Kinsella had a duty to disclose her plans or the plans of other shareholders or directors to terminate their employment.  Ms. Kinsella was not treated as a director or managing shareholder and the Complaint omits her offer to stay as long as it took to service the Firm's needs.  Moreover, during her employment, the firm refused to recognize her as the managing shareholder of the Wilmington office and bypassed her to discuss office matters with Mr. Zahralddin. Despite multiple requests, the Firm never changed the website to list her as the managing shareholder of the Wilmington office. Further, it is denied that there was any conversion of the Firm's property and in fact when asked about this allegation in depositions, the Plaintiff's witnesses could not identify a single item or asset that was allegedly converted or

39

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

misappropriated.

95.    Admitted in part, denied in part. It is admitted that Ms. Kinsella is a highly experienced litigator in her field and for her experience level.  The balance of this paragraph is denied in as much as Defendants are unaware of what Plaintiff "knows." Further, this paragraph is denied as a conclusion of law to which no response is required, as to any misrepresentation made by any Defendant.  Further, Ms. Kinsella's qualifications speak for themselves.

96.    Admitted in part and denied in part. It is denied that Ms. Kinsella had never participated in a deposition before, rather this was early in the pandemic, and she sat in on a deposition that she requested Mr. Stemerman to take and because she had not taken a deposition by Zoom before. She chose not to double bill the client for her role observing the deposition.

97.    Denied. It is specifically denied that there were any affirmative misrepresentations, concealments, or unethical misconduct on the part of the Defendants. It is further denied that the firm was misled about Ms. Kinsella's experience. This mudslinging is irrelevant to the departure related claims in this case and are emblematic of desperate efforts to make a case where none exists.

98.    Denied as a conclusion of law to which no response is required. It is further denied that the Defendants acted in concert to breach any fiduciary duty, converted Firm property, or destroyed Firm property, or gave

40

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

inadequate notice of their departure.

99.    Denied as a conclusion of law to which no response is required. By way of further answer, on Saturday December 26, 2020, Ms. Millis learned that Mr. Zahralddin and Ms. Kinsella intended to notify the Firm on December 28, 2020 of their intention to leave and did not notify the Firm of that fact, however, she had no obligation to so inform the Firm.

100.    Denied. Ms. Kinsella routinely accessed the Firm remotely and only for work or at the direction of a supervisor.

101.    Denied.  Defendants did not remove "much of the contents of the Wilmington office" that day.  Defendants removed only personal items from the Wilmington office which is not "misconduct."  Ms. Millis was present in the Wilmington office part of that day, but it is denied that she assisted Defendants or that there was any misconduct.

102.    Admitted in part and denied in part. It is admitted that Ms. Kinsella was present in the Wilmington office on December 26, 2020 and that personal items were removed from the Wilmington office that day and admits she denied knowing whether Ms. Millis intended to go to work at AT. That statement was accurate as of December 30, 2020.

103.    Denied.  Defendants deny that they attempted to conceal that Defendants personal emails were added to CM/ECF notifications.  Defendants further state that, upon information and belief, several members of the Firm's Blue Bell office also received CM/ECF notifications on certain client

41

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

matters and received one or more CM/ECF notifications containing the Attorney Defendants' personal email address and, therefore, such actions were not concealed.

104.  Denied.  Defendants did not transfer client files until after the clients received and returned election letters that were sent by the Firm.

105.  Denied. After reasonable investigation, Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the matter asserted. Same is therefore denied. By way of further answer, if Ms. Millis downloaded docket entries it would have been at the request of an Attorney Defendant who was likely ensuring that client files could be ethically managed throughout a transition if, as expected, the client followed the Defendants. Liz Chalik, an insurance coverage counsel at another firm working as co-counsel for a Firm client, asked for hearing transcripts in the Hudson Palmer case, some of which were previously sent to her and for which the client had been previously billed but which were critical to a responsive brief.  Ms. Millis could not bill the client a second time for this task pursuant to the client's billing guidelines.

106.  Denied. After reasonable investigation, Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the matter asserted. Same is therefore denied. By way of further answer, if Ms. Millis downloaded pleadings, it would have been at the request of an Attorney Defendant who was likely ensuring that client files

42

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

could be ethically managed throughout a transition if, as expected, the client followed the Defendants Liz Chalik asked for hearing transcripts in the Hudson Palmer case, some of which were previously sent to her and billed for. Ms. Millis could not bill the client a second time for this task.

107.  Denied. December 29, 2020 was a Tuesday after the Attorney Defendants had announced their departure and, although she has no specific recollection of what she did on that day, she would have been assisting in cleaning, organizing, and preparing for the Attorney Defendants' transition all in the interest of continuing to service the client and not in the interest of one firm over the other. If fact, on that date, Ms. Millis did not have an offer from AT and thought she was staying with Plaintiff.

108.  Denied. Plaintiff seeks to characterize a written document that speaks for itself, and all such characterizations are denied.  By way of further answer, Ms. Millis did not have an offer from AT at the time.

109.  Denied. Plaintiff seeks to characterize a written document that speaks for itself, and all such characterizations are denied. By way of further answer, any information retained would have been only copies for the purpose of protecting the client through the transition and during the time that the clients were making a firm election. Answering Defendants were still counsel of record regardless of which firm they were affiliated with. They had an obligation to prosecute those active cases until the client was notified of the departure and made an election. By way of further answer, during the

43

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

weekend, Ms. Kinsella used her personal laptop computer to instruct Ms. Millis via email what they would be working on the next week, which commenced on Monday, December 28, 2020. Pursuant to Jack Elliott's instructions, before departing the Firm on December 31, 2020, Ms. Kinsella deleted any client-related information from her personal computer and made sure any files that had been at her home, if any, had been returned to the Wilmington office.  Ms. Kinsella admits that she cleared any unused email folders as repeatedly instructed by Galway and Jack Elliott's specific request that she and Mr. Zahralddin clean up the physical and electronic files prior to their departure. The cleanup included cleaning up Ms. Kinsella's unused, duplicate, non-relevant, and personal email folders.  It is denied that the cleanup constitutes anything nefarious as implied by the characterization of "double deleting" emails.

110.  Admitted in part and denied in part. It is admitted that Ms. Millis accepted an offer of employment on December 31, 2020.  It is denied that the employment was "effective" on that date.

111.  Denied. Ms. Millis did not "secretly" accept employment elsewhere. She had asked the Firm whether she had been fired when she was told to turn in her badge and key card and the Firm ignored her question leading her to believe she had been terminated.

112.  Admitted in part and denied in part. It is admitted that Ms. Millis scanned her personal information in furtherance of gaining employment after

44

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

being terminated by the Firm. It is denied that she was attempting to conceal or destroy evidence of this unremarkable activity.

113. Admitted in part and denied in part. It is admitted that the Defendants, occasionally assisted by Ms. Millis, changed their contact information in the Court websites in furtherance of transitioning to the new firm and "cleaning up" the Firm offices as instructed by Jack Elliott. All of this was done in furtherance of service to the clients and consistent with both Plaintiff and Defendants' ethical obligations to cooperate in such matters.

114. Admitted in part and denied in part. It is admitted that attorneys, including Delaware-licensed attorneys at the Firm, utilize File & Serve *Xpress* to electronically file submissions in certain Delaware state courts. It is denied that Ms. Millis accessed computers in an unauthorized and secretive manner, altered password settings, or hijacked the File & Serve account. The Wilmington office of the Firm still has that account. Defendants only moved the individual attorneys off of the Firm account and transitioned them to a new account set up by AT.

115. Denied. The Firm instructed Ms. Millis to turn in her badge and key card on December 31, 2020, and Ms. Millis was left to believe she had been terminated. And she had. It was only later that the Firm began to treat her as though she was still employed, for some unknown strategic reason, that she clarified that she had solicited and accepted another offer after

45

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

being terminated by the Firm.  It is further denied that Ms. Millis was secretly or improperly removing Firm property or deleting Firm information.

116.  Denied.  Mr. Zahralddin, Ms. Kinsella and Mr. Stemerman each offered to stay at the Firm beyond December 31, 2020 and each such attorney's offer was rejected by the Firm.  Upon information and belief, these claims are grossly exaggerated.  By way of further answer, Defendants assisted the Firm in collecting receivables even after their departure and, upon information and belief, many of the receivables were collected. In fact, Mr. Sutty, Ms. Kinsella, and Ms. Millis collected approximately $186,000 in fees for the Firm almost immediately after their departure and were not compensated for their time in doing so.

117.  Denied.  Mr. Zahralddin, Ms. Kinsella and Mr. Stemerman each offered to stay at the Firm beyond December 31, 2020 and each such attorney's offer was rejected by the Firm.  It is further denied that Defendants converted or destroyed Firm files or property.

118.  Denied.  Defendants cannot speak to the Firm's investigation but the allegations that any such investigation "suggests" impropriety as to the IOLTA account is strictly denied.  These allegations are falsely and carelessly made to defame Defendants.  Each of them strictly deny any allegations that they breached any fiduciary duties or ethical obligations.

119.  Denied. Those payments were related to the Court-ordered destruction of records related to the AgFeed case requested by the

46

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

bankruptcy trustee for whom the Firm worked and the payments were authorized by the client.  By way of further answer, the payment to Mr. Sutty was authorized by the client for bankruptcy-related Best Case software, typically an administrative expense of a law firm, after the Firm refused to pay for the software event though firms with bankruptcy practices typically have this software.  This is typical of the type of lack of support and resources afforded to the Wilmington office by the majority/controlling shareholders.  Accordingly, the client was forced to pay for the software, which was necessary for the filing of the client's bankruptcy case.

120.   Denied.  As set forth above, these were proper payments authorized by the respective client.  Upon information and belief, the Firm did not investigate these payments beyond looking at the check and included these file accusations to attack the Defendants' character and defame them under the color of litigation privilege.  Ms. Kinsella showed Jack Elliott on December 30, 2020, who verified the complaint, where the IOLTA records were kept, provided the keys, and explained the process, including the forms and supporting documents which were required for each transaction.  Had The Firm conducted an actual and honest investigation, including by contacting the clients at issue and making a cursory review of the file for the two (2) transactions at issue, it would have learned that the payments were authorized, and its accusations have no merit.

47

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Count I
## Breach of Fiduciary Duty against
## Zahralddin, Kinsella, Sutty and Stemerman

121. Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

122. Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that minority shareholders Sutty and Stemerman owed any fiduciary duties to the firm. Zahralddin and Kinsella owed only the fiduciary duties of a director to the extent that the directorships were real and not merely nominal. By way of further answer, each and every fiduciary duty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

123. Denied. It is strictly denied that any Defendant acted in bad faith, engaged in misconduct, or acted in any manner that any manner that constitutes wrongdoing or actionable behavior. Further, Plaintiff has not alleged that it suffered any damages because it has not suffered any recoverable damages.

124. Denied as a conclusion of law to which no response is required. By way of further answer, it is strictly denied that any Defendant acted in any manner that was egregious, intentional, wanton, or outrageous. Strict proof thereof is demanded.

Wherefore, it is respectfully requested that this Honorable Court enter judgment against Plaintiff and in favor of all Defendants together with

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

## Count II
## Aiding and Abetting Breach of Fiduciary Duty
## Against All Defendants

125.    Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

126.    Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that minority shareholders Sutty and Stemerman owed any fiduciary duties to the Firm. Zahralddin and Kinsella owed only the fiduciary duties of a director to the extent that the directorships were real and not merely nominal. By way of further answer, each and every fiduciary duty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

127.    Denied as a conclusion of law to which no response is required. Strict proof thereof is demanded.  By way of further answer, it is specifically denied that minority shareholders Sutty and Stemerman owed any fiduciary duties to the Firm. By way of further answer, each and every fiduciary duty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

128.    Denied as a conclusion of law to which no response is required. Strict proof thereof is demanded.  By way of further answer, it is specifically denied any Defendant breached a fiduciary duty, aided or abetted any

49

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

breach of a fiduciary duty, or that minority shareholders Sutty and Stemerman owed any fiduciary duties to the Firm.  It is further denied that any Defendant acted in bad faith, engaged in misconduct, or acted in any manner that was egregious, intentional, wanton, or outrageous or constitutes wrongdoing or actionable behavior. By way of further answer, each and every fiduciary duty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

129.  Denied as a conclusion of law to which no response is required. By way of further answer, it is strictly denied that Plaintiff suffered any recoverable damages.

Wherefore, it is respectfully requested that this Honorable Court enter judgment against Plaintiff and in favor of all Defendants together with attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

### Count III
### Breach of Duty of Loyalty against
### All Defendants

130.  Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

131.  Denied as a conclusion of law to which no response is required. By way of further answer, it is denied that Defendants, other than Defendants Zahralddin and Kinsella in their capacity as a director, owed any duty to the Firm of the type described in this allegation. Strict proof thereof

50

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

is demanded. By way of further answer, any alleged duty of loyalty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

132. Denied as a conclusion of law to which no response is required. By way of further answer, it is denied that Defendants, other than Defendants Zahralddin and Kinsella in their capacity as a director, owed any duty to the Firm of the type described in this allegation. Strict proof thereof is demanded. Further, it is strictly denied that any Defendant engaged in any misappropriation or destruction of Firm property or otherwise engaged in any actionable conduct. By way of further answer, any alleged duty of loyalty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

133. Admitted in part and denied in part. It is admitted that the Defendants were free to seek alternate employment. At all times following the forced withdrawal described in more detail below, the Firm had notice that the duty of loyalty, if any, terminated. It is denied that Defendants intended to or did cause any actionable harm to Plaintiff. Strict proof thereof is demanded. By way of further answer, any alleged duty of loyalty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility

134. Denied as a conclusion of law to which no response is required. By way of further answer, it is denied that any Defendant acted in bad faith,

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

engaged in misconduct, or acted in any manner that was egregious, intentional, wanton, or outrageous or otherwise constitutes wrongdoing or actionable behavior. By way of further answer, any alleged duty of loyalty owed by Defendants, if any, is subject to the applicable Rules of Professional Responsibility.

135.   Denied.  It is specifically denied that Plaintiff suffered any actionable harm.

Wherefore, it is respectfully requested that this Honorable Court enter judgment against Plaintiff and in favor of all Defendants together with attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

## Count IV
## Conversion against
## All Defendants

136.   Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

137.   Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that any Defendant misappropriated or otherwise denied the firm any right of property, and/or use or possession of Firm files, records, or other property. Strict proof thereof is demanded.

138.   Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that Defendants engaged

52

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

in any prohibited conduct or acted in any manner that was egregious, intentional, wanton, or outrageous or otherwise constitutes wrongdoing or actionable behavior.

139.  Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that Plaintiff suffered any actionable harm.

Wherefore, it is respectfully requested that this Honorable Court enter judgment against Plaintiff and in favor of all Defendants together with attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

### Count V
### Conspiracy against
### All Defendants

140.  Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

141.  Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that any Defendant committed breach of fiduciary duty, breach of a duty of loyalty, or conversion and it is specifically denied that Plaintiff suffered any actionable harm.

142.  Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that any Defendant committed breach of fiduciary duty, breach of a duty of loyalty, or

53

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

conversion and it is specifically denied that Plaintiff suffered any actionable harm. It is further denied that any action was taken with the intent to harm the Firm. Strict proof thereof is demanded.

143.  Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that Plaintiff suffered any actionable harm.

Wherefore, it is respectfully requested that this Honorable Court enter judgment against Plaintiff and in favor of all Defendants together with attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

## Count VI
## Accounting against
## All Defendants

144.  Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

145.  Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that minority shareholders Sutty and Stemerman or employee Ms. Millis owed any fiduciary duties to the Firm. Zahralddin and Kinsella owed only the fiduciary duties of a director to the extent that the directorships were real and not merely nominal.

146.  Denied as a conclusion of law to which no response is required. By way of further answer, it is specifically denied that any Defendant committed breach of fiduciary duty, or aided in the commission of any

54

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

breach of fiduciary duty, and it is specifically denied that Plaintiff suffered any actionable harm.

Wherefore, it is respectfully requested that this Honorable Court enter judgment against Plaintiff and in favor of all Defendants together with attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

## NEW MATTER

147.  Defendants incorporate their responses to the preceding and forgoing Paragraphs herein.

148.  All allegations of Defendants' new matter are averred as to all times material to this litigation.

### Nature of Employment at the Firm

149.  All Defendants were employees at will.

150.  Defendants had no contractual or legal restraint on their ability to resign their employment.

151.  No Defendant had an employment contract.

152.  No Defendant was, or could be, bound by a non-compete agreement or other restrictive covenant.

153.  Mr. Zahralddin owned a fraction of one percent of the shares of the Firm.

154.  Ms. Kinsella owned a fraction of one percent of the shares of the Firm.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

155. Mr. Sutty owned a fraction of one percent of the shares of the Firm.

156. Mr. Stemerman owned a fraction of one percent of the shares of the Firm.

157. Upon information and belief, John M. Elliott owned more than 90% of the shares of the Firm up until the date of his death.

158. Collectively, all defendants owned less than 1% of the shares of the Firm.

159. Yet, upon information and belief, the Delaware partners accounted for 10% to 15% of the Firm's revenue.

160. The Defendants were the largest or second largest practice in the Firm by revenue.

161. All authority over important firm management issues was delegated from the Board of Directors to the Chairman, a management committee, or other delegate.

162. The Firm has no written shareholders' agreement.

163. The Firm only has a set of written Bylaws.

**Life in the Wilmington office**

164. John M. Elliott and the other shareholders in the Blue Bell office, constituted a majority.

165. The majority continued to treat the Wilmington office disparately.

56

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

166.   At random intervals, John M. Elliott threatened to shut down the Wilmington office.

167.   John M. Elliott's support for the Wilmington office was superficial, despite monetary success, and waned dramatically in 2019 when bankruptcy work was slower.

168.   The Firm ignored, waived, consented, made directives, orders and gave implied and express permissions directly contrary to their own Policies as it related to those referred to in paragraph 16, 18, 19, 20, 21, and 22, including through the Firm's personnel and the Firm's outside vendors responsible for technology, computer and email systems and use of the internet, intranet, inter-office electronic communication, and storage and cloud storage ("Firm Technology").

169.   The Firm Technology was antiquated.

170.   At all times relevant hereto, Firm Technology was out of date, not uniform throughout its various office locations, disconnected from routine and seamless integration and use of cloud-based file exchange protocols, and mismanaged.

171.   For instance, at all times relevant hereto, email server capacity and the Firm's digital storage capacity at the Wilmington office was low.

172.   At all times relevant hereto, Firm attorneys and staff were regularly advised by Firm management, or through the Firm's technology vendors, to delete those items within the Firm's Outlook 'deleted' box

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

because of capacity concerns.

173.  It is common knowledge that deleting emails from the Outlook "Inbox" or "Sent Items" box does not in fact delete those emails, therefore, the common practice of further deletion from the "Deleted Items" box, i.e. a 'double delete,' was necessary to free up storage capacity.

174.  Indeed, all alleged 'double deletions' and alleged 'improper' use of the Firm's email system were not concealed, secret, or hidden, because, in fact, they occurred, if at all, on the Firm's system, utilizing Firm Technology over which, at all times, the Firm maintained possession, custody and control, as alleged, in part, in paragraph 28 of the Firm's Complaint.

175.  Further, at all times relevant hereto, the Firm's remote access terminal server, or similar technology, was out of date, slow, unreliable and antiquated, further necessitating use, at times, of home email systems.

176.  On several occasions, access to the system in the Wilmington office was out for consecutive days or weeks.

177.  Firm Technology Policies are ignored regularly by Firm attorneys, including the following:

   a. Regular use of home email for the business of the Firm while working remotely, on the go, or otherwise out of the office,

   b. Regular use by Firm attorneys of various cloud-based document storage accounts, such as, and without limitation, One Drive,

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Google Drive, Box, and Drop Box,

c. Regular use by Firm attorneys of various hardware, including, but not limited to, USB drives for transfer of materials from Firm computers to personal computer and devices, including for the purposes of working remotely, on the go, during business travel, or otherwise out of the office.

178. Further, the Firm had actual and constructive knowledge of the foregoing as undertaken regularly by Firm attorneys.

179. At all times relevant hereto, the Wilmington office maintained regular 'tape' or other back-ups of all electronic transactions on the Wilmington office's computer system.

180. Therefore, it is a materially false representation to the Court for the Firm to allege that any matter or item has been 'deleted' by any of the Defendants when, in fact, the Firm continues to have, maintain and possess the allegedly 'deleted' item.

181. Cloud-based accounts, if any, utilized, or alleged to be utilized by Defendants, were utilized only so that Defendants could engage in an ordinary, modern, 21st century digital law practice and transfer or exchange documents with clients, matter consultants, and/or the Court and not for any improper or unlawful purpose.

182. Utilization, if any, of these technology advantages by Defendants were done so in a manner so as to protect the Firm and client information,

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

while meeting the needs of the Court, clients and the demands of the professional and modern practice of law.

183.  The Wilmington office had inadequate information technology ("IT") systems in place.

184.  The Firm provided no back up system in the Wilmington office other than an analog tape system to retain a backup of server information.

185.  The tape system was inadequate get the lawyers back up and running in a timely manner after a shut-down.

186.  Upon information and belief, a more robust, modern, or digital backup system was installed in the Blue Bell office.

## Effect of the Covid Pandemic

187.  In or around March 2020, the Coronavirus disease 2019 (COVID-19) quickly spread throughout the world, causing a world-wide pandemic (hereinafter, the "Pandemic").

188.  The Pandemic effected the majority of the population of the United States, including how law firms and courts operated – closing governmental offices and courts and impacting many long-standing policies and procedures.

189.  On or around March 14, 2020, Delaware Supreme Court Chief Justice Collins J. Seitz, Jr. declared a Judicial Emergency, allowing all courts within the state flexibility in scheduling and suspending speedy trial guidelines.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

190.  On or around March 22, 2020, Chief Justice Seitz, ordered the closure of all state court facilities until at least April 15, 2020.

191.  On or around March 22, 2020, Delaware Governor John Carney issued a modified State of Emergency Order that closed all physical locations of non-essential businesses within the State of Delaware and the Governor highly recommended that all businesses, whether deemed essential or not, allow their employees to work remotely if possible.

192.  However, the majority members of the Firm insisted that the Delaware office employees work full-time in the Wilmington office once Pennsylvania eased its restrictions, despite the fact that the Governor of Delaware still recommended that all employees work remotely if possible and many restrictions remained in place, including continued school closures.

193.  Following the Judicial Emergency declaration, Delaware courts updated, extended, and modified, their Pandemic-related closures and policies throughout 2020 and 2021 with Chief Justice Seitz ultimately lifting the Judicial Emergency but not until July 13, 2021.

194.  Because of the Pandemic, attorneys of the Firm began operating in a manner which they never had before, including a) Firm attorneys consistently worked remotely, b) attended court appearances via video technologies, and c) conducted depositions virtually.

195.  Delivery of paper copies to the Courts in Delaware were

61

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

prohibited and have only recently moved to restricted status to be determined by each Judge based upon the COVID transmission dangers related to paper documents.

196. In order to work efficiently, while remaining away from the office and other Firm personnel, all attorneys regularly used:

a.    home email for the business of the Firm while working remotely, on the go, or otherwise out of the office;

b.    various cloud-based document storage accounts, such as, and without limitation, One Drive, Google Drive, Box, and Drop Box;

c.    various hardware, including, but not limited to, USB drives for transfer of materials from Firm computers to personal computer and devices, including for the purposes of working remotely, on the go, or otherwise out of the office.

197. These procedures, once never contemplated, became commonplace and the normal operating procedure for the majority of working professionals, such as Firm personnel, including the Defendants.

198. The Wilmington office's technological shortcomings proved especially challenging during the pandemic.

199. The lack of cloud-based technology exacerbated the difficulty of working from home.

200. Defendants had to use portable thumb drives and Google cloud accounts to make documents accessible out of the office.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

201.  This process was endorsed by the Firm's IT vendor, Galway.

202.  Upon information and belief, during the pandemic, the Blue Bell office was extensively renovated, including expensive communications and remote access to Courts.

203.  At the same time, the Wilmington office was denied cameras and Zoom accounts necessary to appear remotely in Court.

204.  Individual lawyers paid for their own cameras and used Ms. Kinsella's Zoom account.

205.  Mr. Zahralddin requested reimbursement from the majority shareholders for the Defendant's necessary technology expenses.

206.  Mr. Zahralddin's request for reimbursement was denied.

207.  Instead of upgrading the antiquated technology in Wilmington, the majority shareholders declared that the Wilmington based employees were required to work in-person in the office.

208.  The in-person policy created difficulties for employees whose children were at home attending school remotely.

209.  Mr. Zahralddin's former assistant has a special needs child.

210.  She had no childcare to watch her child during the school closures.

211.  She requested to continue working from home as a reasonable accommodation.

212.  The controlling majority shareholders refused to permit the

63

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

assistant such reasonable accommodation.

213.  Consequently, Zahralddin's assistant resigned and sought more accommodating employment after the Firm forced her to work in person.      .

### Shareholder and Directors meeting

214.  Prior to the December 1, 2020 Shareholder meeting, Mr. Zahralddin was asked by John M. Elliott, Chair of the Firm to present a positive outlook on the new business year.

215.  At John M. Elliott's insistence, Zahralddin reported that the Bankruptcy practice group was likely to have a very successful year as a result of the pandemic.

216.  Everything that Zahralddin stated at the meeting was opinion and projections based on market research.

217.  Ms. Kinsella did not make any representations at either meeting on December 1, 2020.

218.  Mr. Sutty did not make any representations at either meeting on December 1, 2020.

219.  Mr. Stemerman did not make any representations at either meeting on December 1, 2020.

220.  At the December 1, 2020 annual meeting of shareholders, no information was discussed that has any relevance to this lawsuit.

221.  At the December 1, 2020 annual meeting of shareholders, no votes were taken except, perhaps, to reappoint the Directors and approve

64

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the minutes of the prior year's meeting.

222. At the December 1, 2020 annual meeting of shareholders, no information was discussed that was not already known to the Defendants.

223. At the December 1, 2020 annual meeting of shareholders, no information was discussed that was conveyed to any attorneys at AT.

224. At the December 1, 2020 meeting of the directors, no information was discussed that has any relevance to this lawsuit.

225. At the December 1, 2020 meeting of the directors, no information was discussed that was not already known to the Defendant.

226. At the December 1, 2020 meeting of the directors, no information was discussed that was conveyed to any attorneys at AT.

227. At the December 1, 2020 meeting of directors, no information was discussed that was not already known to the Defendants.

228. At the December 1, 2020 meeting of directors, no votes were taken except, perhaps to reappoint the Officers and approve the minutes of the prior year's meeting.

229. None of the Defendants had received an offer of employment at the time of the Shareholders meeting.

230. After the inception of this litigation, the Firm created a set of minutes of the meeting.

231. The minutes are greatly exaggerated, inaccurate, contain far more detail than any prior set of minutes, and were created with the intent

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of propping up meritless claims in this litigation.

## Decision to Leave

232.  As a result of the Majority's behavior, Mr. Zahralddin felt compelled to leave employment at the Firm.

233.  From around April or May 2020, Mr. Zahralddin had been receiving frequent contacts from headhunters expressing serious interest from other firms.

234.  After the second forced client withdrawal, Mr. Zahralddin decided to entertain the contacts from headhunters and placement agencies looking for laterals.

235.  Zahralddin then sent a text to Rich Scheff of AT to the effect that he was definitively open to considering offers from other firms.

236.  Defendants, or many of them, were generally open to leaving the Firm for months if not years before December 2020 because of the disparate treatment by the controlling members of the Firm.

237.  As of December 1, 2020, no Defendant had made the formal decision to leave the Firm.

238.  Defendants Kinsella, Sutty, Stemerman, and Millis did not have an offer of employment from AT when Zahralddin learned that an offer to join AT would be forthcoming.

239.  Defendants Sutty, Kinsella and Stemerman and had not planned, let alone "secretly" to depart the Firm at that time.

66

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

240.  However, after learning that Zahralddin would be receiving an offer from AT, the other Attorney Defendants decided to pursue an offer as well.

### Effectuating the split

241.  Upon deciding to leave the firm, Mr. Zahralddin hired counsel with a specialty in professional ethics to provide advice on implementing an ethical departure.

242.  Defendants were well aware of the Firm's practice of immediately terminating the employment of any employees who gave notice to quit.

243.  Consequently, the Attorney Defendants decided to give three (3) days' notice but offer to stay if the Firm desired them to do so.

244.  There was never an agreement between any of the Defendants and the Firm to proceed in any particular manner, or upon any particular time frame, or to give any particular amount of notice, regarding Defendants' departure from the Firm.

245.  The Firm has no written policies to provide guidance to its lawyers about the procedures the firm anticipates following when a lawyer departs the Firm.

246.  The Firm cannot impose a notification period upon the departing Defendants, or any other of its lawyers, that would unreasonably delay the diligent representation of the client or unnecessarily interfere with a lawyer's

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

departure beyond the time necessary to address transition issues.

247. This is particularly applicable where the departing lawyer has agreed to cooperate post-departure in such matters.

248. The Defendants specifically offered to assist the Firm with client transition in connection with Defendants' departure.

249. The Firm rejected that offer of transition assistance.

250. The Defendants specifically offered to assist the Firm with collection.

251. Defendants helped the Firm with collection of receivables from the Notice Date until approximately June 2021.

252. Mr. Stemerman offered to stay on at the Firm through and including January 15, 2021.

253. Mr. Stemerman made this offer, for among other reasons, to allow for a smoother transition of clients.

254. The amount of time that Stemerman offered to stay on exceeded the notice period in the Firm's proposed election letter.

255. Ms. Kinsella offered to stay on at the Firm for as long as reasonably necessary, for among other reasons, to allow for a smoother transition of clients and for the Firm to hire a new attorney in Delaware.

256. Mr. Zahralddin offered to stay on at the Firm for as long as reasonably necessary, for, among other reasons, to allow for a smoother transition of clients.

4895-3354-3463, v. 1

257. Mr. Zahralddin's offer to stay on as necessary was conveyed orally at the December 30, 2020 meeting and evidenced by notes taken by the Firm.

258. Defendants Stemerman's and Kinsella's offers to stay on at the Firm were made in writing.

259. The Firm rejected Mr. Stemerman's offer to stay on at the Firm through January 15, 2021.

260. The Firm rejected Ms. Kinsella's offer to stay on at the Firm for as long as reasonably necessary.

261. The Firm rejected Mr. Zahralddin's offer to stay on at the Firm beyond December 31, 2020.

262. The Firm did not request that Mr. Sutty stay on at the Firm beyond December 31, 2020.

263. Defendants fulfilled their duty, pre- and post-departure, to cooperate with the Firm, to assist in the transition.

264. Defendants' assistance and cooperation included book-keeping and collections.

265. Defendants are entitled to adequate access to competently represent the firm's and departing clients during the period after the Firm knew that the Defendants intended to depart the Firm, and before the time that they have in fact departed.

266. Defendants are entitled to adequate access to all client

69

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

information and material to allow competent representation, even after Defendants' departure.

267. Defendants may retain all data, information, credentials, documents and files, of each and every type, that is part of the client files transitioning with the Defendants.

268. The Firm maintains a reputation—known to Defendants—generally of cutting off, excluding, locking-out and/or immediately terminating any attorney of the firm immediately (i.e., within a day or two) upon learning that said attorney intends to depart the Firm.

269. With the Firm's reputation as aforesaid in mind, Defendants ethically, reasonably, and properly balanced their obligations to clients, the Supreme Court of the State of Delaware, and the Firm, in the manner, method, and timing in which Defendants provided notice of their departure to the Firm.

270. Defendants prejudiced no client in the course of their departure.

271. Any other course by Defendants would have prejudiced clients given the Firm's reputation generally of cutting off, excluding, locking-out and/or immediately terminating any attorney of the firm immediately upon learning that said attorney intends to depart the Firm.

272. The notice period provided by a departing lawyer, here, Defendants, or demanded by the remaining firm, here, the Firm, cannot restrict a client's choice of counsel or the right of an attorney to change law

70

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

firms.

273. There is no requirement at law, or otherwise, that only a "jointly approved communication be sent to the client" in connection with the notice of departure and election provided by Defendants to firm clients, as alleged, for example, in paragraphs 69 to 77 of the Firm's Complaint.

274. Upon information and belief, the Firm did not send out election letters to several clients whose matters originated outside of the Wilmington office, including Aetna, GT USA Wilmington LLC, and UFCW Local 1776 Keystone State.

275. Mr. Zahralddin was lead counsel in pending bankruptcy matters for Aetna and UFCW Local 1776 Keystone State.

276. Mr. Stemerman was Delaware counsel in a pending Chancery matters for GT USA Wilmington LLC.

277. The Firm also used the Defendants' electronic signatures without authorization to send billing letters after the Defendants' departure.

278. The Firm is not harmed and has suffered no damage or loss as a result of any of the Defendants publicly maintaining and obtaining LinkedIn contacts, all of which appear and are searchable on the LinkedIn portal by anyone, including the Firm.

279. At an exit meeting with Mr. Zahralddin on December 30, 2020, Jack Elliott requested that Mr. Zahralddin assist in updating active client files.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

280. The stated reason for the request so that there would be no disruption in client service during his transition out of the Firm.

281. The Wilmington office was primarily an electronic paperless office.

282. Jack Elliott and Mr. Zahralddin agreed that joint letters would go out to each Firm client to determine where the file would go.

283. Mr. Zahralddin agreed to assist in ensuring the files were complete.

284. Mr. Zahralddin sent information to his personal account as he was cleaning up files at the request of Jack Elliott because John M. Elliott had instructed Firm personnel to eliminate the Defendants' access on New Year's Eve at or around 10 pm.

285. During the departure process Mr. Zahralddin did not send any Firm files to his home email and only sent personal items or items needed to finalize matters for the Firm such as billing information to assist in collection of receivables, an invoice from Fingers & Slanina, LLC for departure advice, information shared with the Firm at the exit meeting, names and addresses of the clients for joint letters, and other personal information of no relevance to the Firm.

286. Defendants did not take any information from the Firm that would in any way harm or injure the Firm.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### Alleged deletion of electronic files and theft of property

287.  A team from the Blue Bell office met with the Attorney Defendants on December 30, 2020 several days after the alleged removal of Firm files, furniture and other property.

288.  The team consisted of Jack Elliott, Jack McStravick, Brian Grady and an unidentified third-party who was introduced as a former FBI agent.

289.  The meeting occurred at the Wilmington office.

290.  The Blue Bell team spent the entire day at the Wilmington office.

291.  The Blue Bell team never noticed the absence of any files.

292.  The Blue Bell team never noticed the absence of any Firm furniture.

293.  The Blue Bell team never noticed the absence of any Firm property.

294.  The Blue Bell team never stated that anything was missing at any time during the meeting or thereafter until the filing of this lawsuit.

295.  The Defendants offered to allow the Firm to access the storage locker to inspect the items that were removed from the Wilmington office and placed into storage.

296.  The Firm declined the offer to inspect the storage locker.

297.  The reason the Firm declined to inspect the storage locker is because they knew no Firm property had been taken.

298.  The Wilmington employees were routinely instructed to delete

73

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

files and clear electronic trash bins to free up server space.

299. Human resources personnel Marybeth Shoemaker advised the Wilmington staff that the emails were not exposed to breaches when deleted in such a fashion.

300. Files were deleted to ensure sensitive financial information was protected.

301. Files were preserved, especially of the issues with information technology, so that Defendant could properly defend himself if there was any issue with a client file or matter.

### Alleged destruction of paper files

302. Defendants cleaned their offices before they left.

303. In doing so, the Defendants discarded three years of accumulated articles, journals, closed files, and other papers that no longer had any value to Plaintiff or Defendants.

304. The Firm was under contract with a shredding service that routinely picked up bins of discarded documents and shredded them for security reasons.

305. Much of the paper was discarded in shred bins.

306. All shredding and file destruction alleged to have occurred in the Firm's Complaint, if it occurred at all, occurred in the ordinary course of business, with routinely provided services, supplied, and paid for by the Firm with Firm selected vendors.

74

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

307. Further, all files destroyed or shredded, if any, were either also maintained electronically, immaterial and/or personal files.

308. Files destroyed or shredded by Defendants were destroyed or shredded in accordance with the Firms file retention policy.

309. As Managing Shareholder of the Wilmington office, Ms. Kinsella possessed the discretion and judgment to determine file space allocations and locations, digitization, and file destruction priorities, in the ordinary course of managing the Wilmington office.

310. Ms. Kinsella, and all Defendants, undertook file destruction and shredding reasonably.

311. The Firm has identified no file that Defendants allegedly shredded that should not have been shredded by Defendants.

312. The Firm has identified no file that Defendants allegedly shredded that caused any harm to the Firm.

313. The Firm has identified no file that Defendants allegedly shredded that caused any harm to any Firm client.

314. Defendants shredded only approximately 7 letter boxes worth of paper, according to paragraph 39 of the Firm's Complaint.

315. Defendants shredded only approximately 10 letter boxes worth of paper, according to paragraph 47 of the Firm's Complaint.

316. Defendant Attorneys spent an average of ten (10) years at the Firm's Wilmington office.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

317. Seven to ten boxes of immaterial paper is not surprising for four attorneys cleaning out their offices after spending an average of ten years in the same office.

318. The matters shredded, if anything, by Defendants included file folders, Redwelds, duplicates, drafts, outdated materials, non-material documents, such as cover-sheets, exhibit sheets, transmittal letters, items appearing on the public record and items already digitally backed up, among other routine and ordinary accumulated non-substantive material regularly found in attorney files.

319. As explained above, the shredding company was under contract with the Firm's Blue Bell office.

320. The shred bins were used on a daily basis.

321. Upon information and belief, the shredding generated by the office cleanup was not significantly out of proportion to the normal shredding.

322. Plaintiffs are actively withholding and refusing to produce the exculpatory shredding contract.

323. Plaintiffs are actively withholding and refusing to produce the exculpatory shredding company invoices.

324. Upon information and belief, the shredding invoices would confirm the invoice referenced in paragraph 47 of their complaint is not significantly out of proportion.

76

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Plaintiff is concealing exculpatory evidence

325. The Firm is actively concealing exculpatory evidence.

326. The Firm is concealing and refusing to produce forensic imaging reports, diagnoses, or informal opinions by Galway Computer Services, LLC and/or its employee Leo Ventresca.

327. Upon information and belief, the Firm is concealing and refusing to produce forensic imaging reports, diagnoses, or informal opinions by KL Discovery.

328. The Firm is concealing and refusing to produce copies of the tape backup system.

329. The Firm is concealing and refusing to produce the client election letters notifying the clients of Defendants' departure.

330. The Firm is concealing and refusing to produce communications between Defendants and clients after the departure seeking to collect fees on the Firm's behalf.

331. The Firm is concealing and refusing to produce the shredding company contract.

332. The Firm is concealing and refusing to produce the shredding company invoices.

333. The Firm is concealing and refusing to produce records confirming there was no wrongdoing in connection with the Firm's IOLTA account.

77

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

334. The Firm is concealing and refusing to produce communications with Mr. Sutty relating to the purchase of Best Case Software.

335. The Firm is concealing and refusing to produce attachments to emails that it was required by the Court to produce.

### Legal defenses

336. Plaintiff fails to state a claim upon which relief may be granted.

337. To the extent the Firm's Complaint and the causes of action alleged therein are predicated upon alleged breaches of the Delaware Rules of Professional Conduct ("DE Rules") or the Pennsylvania Rules of Professional Conduct ("PA Rules"), a violation of said rules, if any, does not form a basis for civil liability.

338. Minority shareholders do not owe a fiduciary duty to the Firm by virtue of their shareholder status.

339. Minority shareholders do not owe a fiduciary duty to the fellow shareholders by virtue of their shareholder status.

340. Ms. Millis is a non-shareholder employee.

341. Non-shareholder employees do not owe a fiduciary duty to the Firm.

342. There is no other fact that gives rise to a fiduciary duty by the shareholders or non-shareholder employees.

343. The Firm's claims, as they relate to the Defendants departing the Firm, client notice, and client representation election, as set forth in the

78

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Complaint are non-justiciable and solely a question of ethics under the DE Rules, or, if applicable, the PA Rules.

344.   The Firm's Complaint places the interests of the Firm and its shareholders above that of its clients, the clients that departed with Defendants, the DE Rules, and to the extent applicable, the PA Rules.

345.   The Firm's claims are barred by the doctrine of unclean hands.

346.   The Firm's claims are not cognizable at law and must be dismissed.

347.   The Firm has suffered no damages.

348.   The Firm's claims are against public policy and must be dismissed.

349.   The Firm's tort claims are barred by the gist of the action doctrine.

350.   This Honorable Court lacks personal jurisdiction over each of the Defendants as to some or all of the claims asserted by the Firm.

351.   The Firm failed to mitigate its damages, if any.

352.   The Firm exacerbated its damages, if any.

353.   The Firm's claims are in restraint of trade, seeking through this litigation to unlawfully restrain, encumber and prohibit Defendants in the practice of law, in violation of the laws and statutes of the United States of America, the Commonwealth of Pennsylvania, the State of Delaware and the DE Rules and PA Rules.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

354. The Firm does not have a legitimate basis to claim its information is confidential as it took few, if any, steps to protect such alleged information.

355. The Firm does not have a legitimate basis to claim its information was confidential to the extent such information was already in the public domain.

356. The Firm's claims are barred because it suffered no actionable or recoverable harm or damages from any of the conduct alleged in the Complaint.

357. The Firm's claims are barred because the Attorney Defendants did not breach any fiduciary duties owed to Plaintiff, to the extent any such duties were owed.

358. The Firm's claims for aiding and abetting are barred because, to the extent any Defendant breached their fiduciary duty to The Firm, the other Defendants had no knowledge of such breach.

359. The Firm's claims are barred by the doctrine of unclean hands.

360. The Firm's claims are barred by the equitable principles of waiver, release and/or acquiescence.

361. The Firm's claims are barred in whole or in part because the alleged actions of Defendants were not the proximate cause of harm, if any, to the Firm.

362. Any alleged damages that the Firm may have suffered, which are

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

specifically denied, are the result of the Firm's own actions and/or inactions.

363. If the Firm suffered any damages, which is specifically denied, the Firm failed to mitigate its damages.

364. To the extent the Firm seeks exemplary or punitive damages, Defendants specifically incorporate by reference herein all standards and/or limitations regarding the determination and enforceability of punitive damages that arise under the United States Constitution and the Pennsylvania Constitution. See, e g., BMW of N. Am. v. Gore, 517 U.S. 559 (1996); Cooper Inducs. Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001); State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408 (2003).

365. The Firm's claims are barred by the Voluntary Payment Doctrine.

366. All of the Firm's claims are barred in whole, or in party, by the doctrine of ripeness.

367. Under the circumstances, each of the Defendants acted reasonably and ethically to safeguard their clients' interests in connection with Defendants' departure from the Firm.

368. In connection with a client's election to transition with departing attorneys, here, the Defendants, the remaining firm, here, the Firm, has no property right in any part of the client's files, particularly after the client elects to depart the firm and to be represented by the departing attorneys, here, the Defendants.

369. Defendants' ethical obligations to their clients exceeds any duty

81

4895-3354-3463, v. 1

owed to the Firm.

370. The fiduciary duties and duties of loyalty alleged to be owed by the Defendants to the Firm as set forth in the Complaint are, if applicable at all, subordinate to the DE Rules, and to the extent applicable, the PA Rules.

371. To the contrary, in the context of an attorney departing a firm, such as the Defendants departing the Firm, the extent of fiduciary duties and duties of loyalty owed by the Defendants to the Firm is as set forth in the DE Rules, and to the extent applicable, the PA Rules, and no greater.

372. Further, in the context of the timing and manner of client notification and representation election as alleged in the Firm's Complaint, the extent of fiduciary duties and duties of loyalty owed by the Defendants to the Firm is as set forth in the DE Rules, and to the extent applicable, the PA Rules, and no greater.

373. Each of the Defendants acted reasonably and ethically in their departure from the Firm.

374. As a matter of law, there is no damage to the Firm because a client elects to be represented by another attorney, here, the Defendants.

375. As a matter of law, there is no civil liability by Defendants for the claimed improper client notification as alleged in the Firm's Complaint.

376. Plaintiff's claims are barred or limited by the doctrine of spoliation.

377. Plaintiff failed to maintain critical exculpatory evidence including

82

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

but not limited to the Wilmington office back up tapes.

378.  Both the Delaware and Pennsylvania Rules of Professional Conduct prohibit restraints on a client's election of counsel.  See De.R.P.C. 5.6 and Pa.R.P.C. 5.6.

379.  Further, both the Delaware and Pennsylvania Rules of Professional Conduct prohibit restraints on an attorney's right to practice. Id.

380.  This Honorable Court is unable to render a decision, order or judgment, or a jury enter a verdict, on some or all of the claims made in this matter by the Firm, in as much as doing so would merely be the rendering of an advisory opinion.

381.  This Honorable Court is unable to render a decision, order or judgment, or a jury enter a verdict, on some or all the claims made in this matter, and the Firm's claims are likewise barred in whole or in part, as a result of the Constitution of the United States of America, the Constitution of the State of Delaware and the Constitution of the Commonwealth of Pennsylvania, including all amendments to the foregoing.

382.  This Honorable Court lacks subject matter jurisdiction over some or all of the claims asserted in the Firm's Complaint.

383.  All claims for punitive damages as asserted in the Firm's Complaint are barred in as much as such claims violate and are within the exclusive, constitutional and ancient jurisdiction of the Delaware Supreme

83

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Court and Pennsylvania Supreme Court regarding the regulation, discipline and punishment of attorneys barred and practicing in each of their respective states.

384.   All claims alleging bad-faith, egregious, intentional, reckless, willful, wanton and outrageous conduct as asserted in the Firm's Complaint are barred in as much as such claims violate and are within the exclusive, constitutional and ancient jurisdiction of the Delaware Supreme Court and Pennsylvania Supreme Court regarding the regulation, discipline and punishment of attorneys barred and practicing in each of their respective states.

385.   Defendants reserve the right to assert any additional affirmative defenses in the form of a New Matter that may be disclosed through discovery and/or further investigation and proceeding in this case.

386.   To the extent to which Pa. R.C.P. 1030 and/or 1032 mandate that any and all affirmative defenses not set forth are waived, Defendants expressly assert any and all affirmative defenses contemplated or listed within Pa. R.C.P. 1030 and 1032 now and if the same become available through discovery and/or further investigation and proceeding in this case.

84

4895-3354-3463, v. 1

## COUNTERCLAIM

## Breach of Contract
## Defendants v. the Firm

387.  Defendants incorporate herein each and every of the foregoing paragraphs as though set forth at length.

388.  Counterclaim Defendant Elliott Greenleaf, P.C. (the "Firm") is a professional corporation incorporated under the laws of the Commonwealth of Pennsylvania.

389.  At all times relevant hereto, the Counterclaimants were shareholders or employees of the Firm.

390.  The Firm did not have a written shareholders' agreement at any relevant time hereto.

391.  The Firm has written Bylaws addressing some aspects of the management of the Firm.

392.  The Bylaws require the Firm to indemnify any director, officer, agent or employee of the Firm from any action or lawsuit even when brought by the Firm.

393.  The Firm has breached the agreement with the shareholder counterclaimants by disavowing and refusing to honor the indemnification obligations.

394.  Ms. Millis is a third-party beneficiary of the Bylaws as an employee entitled to indemnification.

395.  The Firm has breached the agreement with the employee

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

counterclaimants by disavowing and refusing to honor the indemnification obligations.

396. The Bylaws do not contain an integration clause and are not a full and complete expression of the parties' agreement.

397. By agreement of the shareholders, the Firm distributed the profits of the firm each year.

398. The distribution of profits were referred to by the Firm as discretionary bonuses.

399. However, the agreement of the shareholders was that bonuses consisted of a share of the distributions that were tied to the performance of the individual shareholders.

400. Although referred to as discretionary, the bonuses were in fact largely formulaic on the basis of individual performance.

401. Counterclaimants relied on the Firm's promises to provide bonuses based on performance and relied upon the history of providing bonuses based on performance.

402. Distributions, however, were to be tied to the performance of the firm, regardless of a shareholder's individual performance.

403. Such distributions were to be made *pro rata* based on the amount of the shareholder's ownership interest in the Firm.

404. Each Counterclaimant, on their own and together in the aggregate, were minority shareholders of the Firm.

4895-3354-3463, v. 1

Case# 2021-01427-88 Docketed at Montgomery County Prothonotary on 06/29/2022 11:00 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

405.  Despite their shareholder status, and despite, upon information and belief, the Firm being highly profitable in most, if not all, years in which they were shareholders of the Firm, many Counterclaimants did not receive a distribution from the firm based on their status of shareholders.

406.  More specifically, no Counterclaimant received a distribution in the year 2020.

407.  2019 was profitable year for the Counterclaimant's practices and, upon information and belief, the Firm as a whole.

408.  In fact, the Counterclaim Plaintiffs accounted for a higher profit, per capita, than most attorneys in the Firm.

409.  Upon information and belief, the majority shareholders of the firm secretly distributed the profits of the Firm disproportionately to favored shareholders without regard to the agreed performance metric for bonuses.

410.  Such payments were made either directly in the form of Dividends, or as Dividends disguised as bonus payments.

411.  Further upon information and belief, Firm profits were misappropriated through payments to undisclosed affiliated entities such as Galway Computer Services, LLC and perhaps others, where members of the majority owned an undisclosed interest.

412.  As shareholders of the Firm, if Dividend payments were made, even when characterized as bonuses, Counterclaimants were entitled to a pro rata share of the profits reasonably related to their individual

87

4895-3354-3463, v. 1

performance.

Wherefore, it is respectfully requested that this Honorable Court enter judgment, declaratory and monetary, against Plaintiff and in favor of all Defendants for indemnification and for actual damages including attorneys' fees, costs, interest and all other such legal and equitable relief as this Court deems just and proper.

**LUNDY, BELDECOS, & MILBY, P.C.**

**Date:** June 29, 2022      BY: _____

**ERIC C. MILBY, ESQ.**
*Attorney for Defendants*

**TIMONEY KNOX, LLP**

**Date:** June 29, 2022      BY: _____

**ERIC B. SMITH, ESQ.**
*Attorney for Defendants*

88

4895-3354-3463, v. 1

# App. Ex. 49

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

## SUPPLEMENTAL DECLARATION OF RAFAEL X. ZAHRALDDIN-ARAVENA IN SUPPORT OF DEBTORS' APPLICATION TO EMPLOY LEWIS BRISBOIS BISGAARD & SMITH LLP AS COUNSEL FOR THE DEBTORS

I, Rafael X. Zahralddin-Aravena, hereby declare, under penalty of perjury, as follows:

1.      I am a partner in the firm of Lewis Brisbois Bisgaard & Smith LLP ("LBBS"), a law firm that maintains an office at 550 E. Swedesford Road, Suite 270 Wayne, PA 19087.

2.      I am duly authorized to make this Supplemental Declaration on behalf of LBBS, and I make this Declaration in support of the Application to Employ Lewis Brisbois Bisgaard & Smith LLP as General Bankruptcy Counsel (the "Application") [D.I. 70] to the above-captioned debtors ("Debtors") and as a supplement to my initial declaration (the "Declaration") [D.I. 70-1]. The facts set forth in this Supplemental Declaration are personally known to me, unless otherwise stated, and, if called as a witness, I could and would testify thereto.  All capitalized terms used but not defined herein shall have the meanings given to them in the Application.

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

1

93837002.5

**TRUSTEE 60**

3.      LBBS has determined that the Debtors do not qualify for Larger Chapter 11 Case treatment. Therefore, LBBS does not believe that the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. §330 by Attorneys in Larger Chapter 11 Cases*, effective as of November 1, 2013, apply to LBBS's engagement in these bankruptcy cases.

4.      LBBS did not agree to any variations from, or alternatives to, its standard or customary billing arrangements for this engagement.

5.      LBBS professionals included in this engagement do not vary their rate based on the geographic location of the bankruptcy case.  To the contrary, when appropriate, our national bankruptcy practice utilizes experienced professionals across various jurisdictions with lower market rates to enhance value for the Debtors and their estates.

6.      On or about March 3, 2023, Mathu Rajan, Chief Executive Officer of Debtor Stream TV Networks, Inc. ("Stream"), contacted me regarding a potential bankruptcy filing for Stream and its subsidiaries, including Technovative. LBBS prepared and discussed an estimate based on the scope of work needed for a bankruptcy filing(s), conducted a conflict search and search for connections, and prepared an engagement letter dated March 7, 2023 (the "Engagement Letter"). *See* **Exhibit A**. Stream executed the Engagement Letter and agreed to a prepaid flat fee of $50,000.00, inclusive of the filing fee (the "Flat Fee Advance"). The scope of services in the Engagement Letter included representation of Stream and its subsidiaries, including Technovative, its wholly owned subsidiary. LBBS did not provide any services to the Debtors prior to March 14, 2023. Because LBBS agreed to the Flat Fee Advance, the fees incurred in connection with prepetition work for the bankruptcy filings were capped at $50,000.00. If billed on an hourly basis, LBBS's fees would have exceeded $50,000.00 in hourly time incurred by its attorneys and other

2

93837002.5

professionals and expenses incurred in connection with the bankruptcy filings. The Advance Flat Fee was utilized so that LBBS would be disinterested in these bankruptcy cases and appropriate disclosure was made in the Engagement Letter.

7.      The Debtors were obligated to pay the Flat Fee Advance, and LBBS expected the Flat Fee Advance to be paid by and delivered to LBBS by the Debtors. However, the Flat Fee Advance was ultimately wired to LBBS's operating account from a bank account of Visual Semiconductor, Inc. ("VSI"). VSI is a Wyoming corporation and an investor in Stream in which Mr. Rajan is the president. The Debtors advised LBBS that VSI purchased and received equity in Stream pursuant to subscription agreements that were executed prior to and unrelated to entry into the Engagement Agreement and, at the instruction of Stream, VSI transferred the Flat Fee Advance directly to LBBS's operating account instead of the funds first going to Stream and then Stream wiring the funds to LBBS. The Debtors advised LBBS that this was done for convenience and to expedite LBBS's receipt of the Flat Fee Advance. LBBS is unaware of any agreement between the Debtors and VSI specifically for the payment of the Flat Fee Advance. LBBS advised representatives of VSI that LBBS does not represent VSI, and that LBBS's duty of undivided loyalty is owed to the Debtors. On April 20, 2023, LBBS filed with the Court an *Amended Disclosure of Compensation of Attorney for Debtor* to more accurately reflect these disclosures. *See* D.I. 126.

8.      LBBS's hourly rates for the primary attorneys and paralegals involved in this engagement are as follows:[2]

| | | |
|---|---|---|
| Rafael Zahralddin | $975 | Partner |
| Vincent Alexander | $695 | Partner |

---

[2] LBBS anticipates that other attorneys and paralegals will work on these matters.

3

93837002.5

| Sean Shecter | $650 | Partner |
| Bennett Fisher | $550 | Partner |
| Karen Poppel | $550 | Associate |
| Aimee M. Czachorowski | $450 | Associate |
| Anh Nguyen | $350 | Associate |
| Christina Freeman | $275 | Paralegal |
| Candace Russell | $275 | Paralegal |

8.      Post-petition, the Debtors will pay LBBS on an hourly basis, subject to Court approval.  LBBS anticipates that the funds utilized to pay LBBS any court approved fees will be paid by the Debtors, either through receipt of court-approved debtor-in-possession funding, a sale of shares in Stream, revenue generated from Debtors' business operations, and/or a to be determined plan sponsor. LBBS has no agreement in place with any third party for the payment of its fees incurred in these bankruptcy cases.

9.      In accordance with ordinary practice, the billing rates for LBBS attorneys and paralegals are subject to annual review and increase by LBBS.

10.      In the Declaration, a potential connection was noted between LBBS and Robert Half Management Services, a creditor in these bankruptcy cases. Upon further review, LBBS has found no connection to Robert Half Management Services.

11.      In 2020, while I was a partner at Elliott Greenleaf, P.C. ("Elliott Greenleaf"), I served as counsel to Stream and Mathu and Raja Rajan as counterclaimants, in *Stream TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-0766 (the "Chancery Case"). Elliott Greenleaf entered its appearance on October 8, 2020, through a substitution of counsel for Buchanan Ingersoll. Jonathan Stemerman served as the primary lawyer in the Chancery Case and Brian

4

93837002.5

Grady served as the lead litigator. I provided bankruptcy and creditors' rights advice on the matter. Elliott Greenleaf filed a motion to withdraw on November 8, 2020, which was granted on November 10, 2020. Scott Cousins, P.C. and Salazar & Associates substituted for Elliott Greenleaf after the firm's withdrawal (I did not have any affiliation with either firm). Elliott Greenleaf's representation was limited to the Chancery Case. I hold no claim against the Debtors, either directly or in connection with Elliott Greenleaf's brief representation in the Chancery Case while I was a lawyer at Elliott Greenleaf. I did not receive any compensation from Stream, Mr. Rajan, or any related entity while I was employed at Elliott Greenleaf. Further, to the extent Elliott Greenleaf is a creditor of the Debtors, I am not entitled to any portion of any potential recovery on such claim, and I am unaware of any basis that Elliot Greenleaf would have a claim against me personally relating to any claim that Elliot Greenleaf may have in these bankruptcy cases.[3]

12.     While I was employed at Armstrong Teasdale, LLP ("Armstrong Teasdale"), Armstrong Teasdale represented Visual Technology Inc. ("VTI") in *In re Stream TV Networks, Inc.*, Case No. 20-10766(KBO) (Bankr. D. Del.), which was a chapter 11 bankruptcy filing by Stream. VTI is a Nevada corporation that was formed in January 2021. VTI is owned by numerous investors, including Mr. Rajan. Armstrong Teasdale was introduced to VTI through Lawrence G. McMichael, Stream's bankruptcy counsel in the case, and Mr. Rajan. VTI had a six member board at the time, including Mr. Rajan. For the representation of VTI, Armstrong Teasdale took instruction from Tim McCarthy, who was also a VTI board member and was to have a controlling interest in VTI through Burlington Resources Asia Limited. Armstrong Teasdale and its attorneys, including myself, filed notices of appearance in the bankruptcy case on behalf of VTI on March

---

[3] Treatment of claims will be reviewed and schedules and statements revised before the pending bar date.

93837002.5

17, 2021. VTI sought to provide debtor in possession financing in the bankruptcy case to Stream and ultimately serve as a plan sponsor. However, the bankruptcy case was dismissed on May 17, 2021, before any financing or chapter 11 plan was approved. To my knowledge, VTI received no payment or any consideration for services it performed, if any, and it is not owed anything from the Debtors and is not a creditor or interested party in these chapter 11 bankruptcy cases as a result of this matter or otherwise. VTI paid fees to Armstrong Teasdale for the representation, and no fees were paid to me for the representation. Armstrong Teasdale's representation of VTI in this matter ceased upon dismissal of the bankruptcy case.

13.     While I was employed at Armstrong Teasdale, Armstrong Teasdale also represented VTI in *In re Stream TV Networks, Inc.*, Case No. 20-10848(KBO) (Bankr. D. Del.), which was an involuntary bankruptcy filing against Stream. The case was filed on May 23, 2021. Armstrong Teasdale and its attorneys, including myself, filed notices of appearance in the bankruptcy case on behalf of VTI on June 8, 2021. VTI served a similar role in this bankruptcy case as in Case No. 20-10766(KBO). The bankruptcy was dismissed on June 10, 2021. To my knowledge, VTI received no payment or any consideration for services it performed, if any, and it is not owed anything from the Debtors and is not a creditor or interested party in these chapter 11 bankruptcy cases as a result of this matter or otherwise. VTI paid fees to Armstrong Teasdale for the representation, and no fees were paid to me for the representation. Armstrong Teasdale's representation of VTI in this matter ceased upon dismissal of the bankruptcy case. While I was employed at Armstrong Teasdale, Armstrong Teasdale's representation of VTI was limited to Case No. 20-10766(KBO) and Case No. 20-10848(KBO), and Armstrong Teasdale did not represent Mr. Rajan, individually, or any related entity during my employment at Armstrong Teasdale.

6

14.      Other than as disclosed in the Declaration and this Supplemental Declaration, I have never represented or received payment from Mr. Rajan or any related entity.

15.      LBBS has never represented VSI, VTI, or Mr. Rajan. LBBS has no other connection, if any, with VSI, VTI, or Mr. Rajan other than has been disclosed in the Declaration and this Supplemental Declaration. And, other than in connection with these chapter 11 cases, LBBS has never represented the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: April 28, 2023                       /s/ Rafael X. Zahralddin-Aravena
                                                           Rafael X. Zahralddin-Aravena

93837002.5



500 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
Rafael.Zahralddin@lewisbrisbois.com
Direct: 302.985.6004

March 7, 2023

CONFIDENTIAL COMMUNICATION

*Via Email Only*

mathu@streamacquisitiongroup.com

Re:     Engagement Letter/Fee Agreement

Dear Mathu:

The purpose of this correspondence is to, upon execution: 1) establish an attorney client relationship between Lewis Brisbois Bisgaard & Smith LLP ("LBBS" or the "Firm") and Stream TV Networks Inc. (hereinafter referred to as "You," "Your" or the "Client"); 2) define the scope of the Firm's representation of the Client; and 3) establish other material terms and conditions of the representation, including but not limited to the financial terms. This correspondence may be referred to as the "Engagement Letter" or the "Agreement."  *See* Schedule "A" for the limited scope of engagement parameters, and Schedule "B" for rates and costs.


        Please read the Engagement Letter with care. By executing this Engagement Letter, You are entering into a contract that is binding on both the Firm and You, on the following terms and conditions.

        1.     PARTIES TO ENGAGEMENT LETTER

        The parties to the Agreement are LBBS and You.  No other person or entity shall be entitled to claim an attorney client relationship with the Firm with respect to the legal services to be provided pursuant to the Engagement Letter.

        2.     INCEPTION OF ATTORNEY CLIENT RELATIONSHIP

        No attorney client relationship will exist between LBBS and You until You have executed the Agreement, nor will LBBS be obligated to provide legal services, until You have returned a signed copy of this Agreement and paid the flat fee called for under Paragraph 8.

---

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • DELAWARE • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY • LOUISIANA
MARYLAND • MASSACHUSETTS • MINNESOTA • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK • NORTH CAROLINA • OHIO
OREGON • PENNSYLVANIA • RHODE ISLAND • TENNESSEE • TEXAS • UTAH • VIRGINIA • WASHINGTON • WASHINGTON D.C. • WEST VIRGINIA
4870-0864-7491.1

March 7, 2023
Page 2

3.      SCOPE OF REPRESENTATION: SCHEDULE A

LBBS will perform only those legal services set forth in the Scope of Representation attached as Schedule A.  The Client shall have no expectation that the Firm will provide legal services beyond those set forth in Schedule A, unless LBBS and the Client amend the Engagement Letter in writing or execute a separate agreement with respect to any such additional legal services.  The Client is generally required by law to retain documents, including electronically stored information ("ESI"), which may be relevant to the matter which is the subject of the representation.  Preservation of documents including ESI is the Client's responsibility, and it is important that the Client take all necessary and reasonable steps to preserve this information.  The Firm is available to discuss the scope of the Client's obligations and to provide advice or recommendations in this regard.  Nothing in this paragraph shall in any way limit the Client's obligation to pay for or the Firm's right to receive payment for any services provided by the Firm at the Client's request.

4.      DUTIES OF CLIENT

You agree to be truthful and to cooperate, to keep us informed of relevant developments, to abide by the Agreement, to pay our bills on time, and to keep us advised at all times of Your current address, telephone number and whereabouts.

5.      LEGAL FEES

We will charge You for the services provided pursuant to the Agreement based on the amount of time (including travel) we devote to the matter at the hourly rates for the particular professionals involved as are set forth in Schedule B.  We bill in minimum units of 6 minutes, or .1 hour, unless otherwise specified to adhere to applicable bankruptcy laws relevant to the retention of debtor's counsel..

We reserve the right to reasonable annual rate increases up to 10% per annum and will request for consent if any annual increase exceeds 10% subject to applicable bankruptcy laws relevant to the retention of debtor's counsel. .  We reserve the right to staff the handling of the matter with the partners, associates, paralegals and/or other personnel of our choice, at the rate we establish for each such timekeeper, although we will discuss the staffing of Your matter with You at any time, and will consider Your input in the staffing of the matter. Each of the undersigned individuals agree to be jointly and severally liable for all fees, costs and disbursements in connection with this representation.

6.      COSTS, EXPENSES AND OTHER CHARGES

A.  COSTS AND EXPENSES: SCHEDULE B

We will incur on Your behalf various costs and expenses in performing legal services under the Agreement.  You agree to pay for those costs and expenses, in addition to the hourly fees. Schedule B, attached, includes a non-exhaustive list of costs we may incur on Your behalf.

March 7, 2023
Page 3

### B.  OUTSIDE CONSULTANTS/OTHER VENDORS

In addition to the costs of the type set forth in Schedule B, it may become necessary to hire persons or entities outside LBBS, including but not limited to consultants, experts, investigators, co-counsel, or other professionals.  We will select any consultants or investigators to be hired after notice to and approval from You, and You agree to honor the terms and conditions of any agreement that we enter into on Your behalf with any such outside person or entity.

### C.  REIMBURSEMENT OR DIRECT PAY

Unless we agree in writing, and in our sole discretion, to pay directly any of the external costs incurred such as those set forth in Schedule "B", and/or for outside consultants or other vendors, You agree to pay any such expense directly.  Our compensation arrangement with the third-party will provide that our Firm is not financially liable for the costs involved, and that You are solely responsible for payment.  When You are responsible to directly pay an outside consultant or vendor invoice we will work with You and the consultant or vendor to give effect to payment arrangements, including Your payment of estimated costs in advance or a deposit against these costs.  If You fail to make direct payments as required by this Letter Agreement, You agree to defend and indemnify our Firm with respect to any claim, demands or suit brought against our Firm as a result of Your failure to pay such invoice and that indemnity includes our attorney's fees and costs incurred in defending the claim against our Firm.  Payment directly by our Firm of any such expense on one or more occasions shall not be construed as a waiver of our right to require You in the future to pay any similar expense directly or in advance.  In addition, even if we pay these outside costs directly, we may require You to reimburse us immediately rather than waiting for the normal billing cycle to be completed.

### 7.  PERIODIC STATEMENTS AND BILLING TERMS

Our practice is to send periodic statements for services rendered and for costs incurred during the previous month or months on our client's behalf.  The detail in the periodic statement will inform You of both the nature and progress of work and of the fees and costs being incurred.

Our fee structure is based upon Your promise to pay all statements, as applicable, no later than 30 days after receipt.

We do our best to see that our clients are satisfied not only with our services, but also with the reasonableness of the fees and costs.  Therefore, while we urge You to raise any question about or objection to a fee statement, You must do so promptly.  Such inquiry shall be timely only if made, in writing, within thirty (30) days after the date of the invoice.  In the absence of a timely written inquiry, You will be deemed to have accepted the invoice and to have acknowledged that You are satisfied with it, in the absence of good cause for not having objected more timely.

In the event You fail to pay any invoice within thirty (30) days of the statement date, You agree to pay interest at the rate of ten percent (10%) per annum on the amount of such invoice, from the statement date until paid in full.  If we accept late payment of any invoice without interest, we shall not be deemed to have waived any claim in the future for interest on other invoices.  If

---

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

4870-0864-7491.1

March 7, 2023
Page 4

You timely object in writing to a portion of a statement, You agree to pay the remainder of the statement which is not in dispute.  We agree to accept such partial payment without claiming You have waived Your right to contest the unpaid portion of the bill.

Failure to pay the undisputed amount of any invoice in full within 30 days shall constitute grounds for termination of this Engagement Letter and withdrawal of the Firm from representation, as more fully discussed in Paragraph 11 ahead.

8.      RETAINER AND ADVANCE FLAT FEE

This Engagement Letter shall not be effective until both You and LBBS have signed it and You have delivered to LBBS any advance payment fee described in Schedule "A" and "B" attached. You have agreed to advance a payment in the total amount of $50,000 as an advance payment flat fee as more fully described in Schedule "B."

We reserve the right to request a retainer and such retainer is not an estimate of the total charges which may be incurred.   We will apply any balance after we subtract the advance flat fee payment to a retainer in anticipation of your post chapter 11 filing needs. The retainer is: 1) a sum to be held as security for the Firm with respect to Your obligations to pay the fees and costs incurred by the Firm pursuant to the Engagement Letter; and 2) an advance payment to be applied to the Firm's final invoice in this matter. We will refund any unearned amounts of the retainer, if any, at the conclusion of our representation. We expect that You will live up to the terms and conditions of the Engagement Letter in full, in which case the full amount of the remaining retainer (if any) will be applied against the final invoice and any excess returned to You. However, as noted, should You become delinquent on the payment of any statement, we may in our discretion apply the retainer to the payment of that statement. In the event that the retainer is for any reason applied You shall immediately restore the retainer to its full amount upon our request. Failure to restore the retainer upon our request shall constitute grounds for termination of this Engagement Letter and withdrawal from representation, as more fully discussed in Paragraph 11 ahead.

We also reserve the right to require, and You agree to provide, increases to the retainer should the time and expense required to carry out the representation contemplated by this Engagement Letter increase beyond that reasonably anticipated at the beginning of the engagement.

For example, in the event that You were to request and we were to agree to undertake to represent You in connection with potential or actual litigation, such a matter could resolve in one of a variety of different ways, including dismissal, settlement, or trial. Trial preparation and the actual trial of a case are the most time consuming part of any litigation engagement. We would likely, therefore, require an increased retainer before we would begin trial preparation. We would determine the amount of the increase in the retainer prior to the trial, based upon an estimate of time and costs that may be involved for trial preparation and trial. In any event failure to provide the increased retainer upon our request shall constitute grounds for termination of this Engagement Letter and withdrawal of the Firm from the representation as more fully discussed in Paragraph 11 ahead.

March 7, 2023
Page 5

9.      ATTORNEY LIEN

In consideration of the terms of this Agreement, as security for the payment of the fees, costs, and out-of-pocket expenses incurred on Your behalf pursuant to its terms, and without prejudice to any other rights, recourse, or remedies we may have, You hereby grant us a lien upon any sum or sums recovered by You, or on Your behalf (or which You are entitled to recover) in this or any other matter to which this or a similar agreement may pertain, and upon any sum or sums which may be on deposit with the Firm pursuant to this Agreement.  You expressly authorize us to resort to such lien to obtain partial or total satisfaction of any obligation or debt which You may have to us arising from this Agreement.

10.      TERMINATION OF THE FIRM BY THE CLIENT

You shall have the right to terminate this Engagement Letter and discharge the Firm at any time.  However, to be effective, termination or discharge of the Firm must be in writing.  In such event, You authorize the Firm to make and retain a duplicate of Your file.

The Client shall bear all reasonable costs of transferring the new matter to counsel chosen by the Client.

The attorney client relationship between the Firm and the Client shall end upon discharge of the Firm by the Client pursuant to this paragraph.  However, such discharge shall not relieve the Client of any obligation to pay fees and costs incurred prior to the discharge, as well as any fees and costs expended after the discharge to the extent reasonably required in the Firm's sole discretion to protect the Client's interests prior to court order substituting new counsel or permitting withdrawal of the Firm from the litigation.

11.      WITHDRAWAL FROM REPRESENTATION BY THE FIRM

The Firm shall be permitted to withdraw from representation whenever required or permitted to do so by law.  In addition, the Firm may withdraw as counsel at any time if withdrawal can be accomplished without material adverse effects on the interests of the Client, or if: 1) the Client persists in a course of action involving a lawyer's services that the lawyer reasonably believes to be criminal or fraudulent; 2) the Client has used the lawyer's services to perpetrate a crime or fraud; 3) the Client insists upon pursuing an objective that the lawyer considers repugnant or imprudent; 4) the Client fails substantially to fulfill an obligation to LBBS regarding the Firm's services (including, but not limited to, the Client's financial obligations under this Engagement Letter) after reasonable warning from the lawyer that the lawyer will withdraw unless the obligation is fulfilled; 5) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the Client; or 6) where other good cause for withdrawal exists.

12.      DOCUMENT STORAGE POLICY

On termination of a matter, the Firm will maintain file documents for 10 years, or any alternate period as determined by the State of Delaware (or the state governing the location for

---

where work will be conducted).  Upon termination of the matter, You have the right to take possession of the file.  If You choose to take possession of the file, the Firm may copy all or any part of the file.  If You choose not to take possession of the file, the Firm will retain the file pursuant to its document storage policy stated above.

13.    <u>CONFLICTS</u>

You should be aware that the Firm represents many other companies and individuals. It is possible that during the time that we are representing You, some of our present or future clients will have transactions or disputes with You. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for You even if the interests or legal positions of such clients in those other matters are directly adverse. We agree, however, that Your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of You, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to Your material disadvantage.

14.    <u>CHOICE OF LAW/FORUM SELECTION</u>

This Agreement is deemed to have been executed, and is intended to be performed in the State of Delaware, subject to its laws, regardless of whether services are actually rendered outside of the State of Delaware.  Any dispute arising from this agreement shall be governed by the laws of the State of Delaware.  The venue for the judicial resolution of such dispute shall be proper within the State of Delaware.

15.    <u>NO PROMISES OR GUARANTEES</u>

The Client understands that the Firm has made no representation or guarantee concerning the outcome of any legal proceedings that may be filed or defended on behalf of the Client.

16.    <u>LEGAL MALPRACTICE INSURANCE</u>

As of the date of this letter, Lewis Brisbois Bisgaard & Smith LLP has errors and omissions (legal malpractice) insurance applicable to the services to be rendered pursuant to this Agreement, subject to any applicable deductible or self-insured retention.

17.    <u>MODIFICATION IN WRITING ONLY</u>

No change to this Agreement shall be effective unless and until confirmed in writing and signed and acknowledged by the Firm and the Client making express reference to this Agreement. This Engagement Letter embodies the whole agreement of the parties.  There are no promises, terms, conditions or obligations other than those contained herein, and this contract shall supersede all previous communications, representations, or other agreements, either oral or written, between the Firm and the Client.

March 7, 2023
Page 7

18.    COUNTERPARTS AND FACSIMILES EFFECTIVE

This Agreement may be signed in counterpart. Facsimile or imaged signature pages executed by the Firm or the Client shall be effective as original signatures.

Thank you for choosing Lewis Brisbois Bisgaard & Smith LLP as Your counsel with respect to the matter set forth in Schedule A.

We look forward to working with You and thank you once again for the opportunity to serve You, upon execution of this Engagement Letter.

Sincerely,

/s/ Rafael X. Zahralddin

Rafael X. Zahralddin
LEWIS BRISBOIS BISGAARD & SMITH LLP

RXZA
Cc:    Vincent Alexander

Accepted and agreed to:

Stream TV Networks Inc.
By: _Mathu Rajan_____
Name: Mathu Rajan
Title: CEO
Phone: 267-469-3858
E-mail: mathu@streamacquisitiongroup.com
Dated: March 8, 2023

4870-0864-7491.1

March 7, 2023

Page 8

SCHEDULE "A":

SCOPE OF REPRESENTATION

Representation of You, including any subsidiaries, with respect to restructuring and insolvency advice and the potential filing of a bankruptcy petition and all other matters related thereto, and such other matters as are assigned by the Client and accepted by the Firm, from time to time. I have further specified the bankruptcy services to be as follows:

(a) To advise Debtor with respect to its powers and duties as debtor-in possession and the continued management of its affairs;

(b) To advise Debtor with respect to its responsibilities in complying with the U.S. Trustee's Operating Guidelines and Reporting Requirements and with the rules of the Court;

(c) To prepare motions, pleadings, orders, applications, adversary proceedings, and other legal documents necessary in the administration of the case;

(d) To protect the interests of Debtor and the estate in all matters pending before the court;

(e) take all necessary actions in connection with any chapter 11 plan and related disclosure statement, and all related documents, and such further actions as may be required in connection with the administration of the Debtor's estate; and

(f) perform all other necessary legal services in connection with the prosecution of any chapter 11 case.

***

March 7, 2023
Page 9

SCHEDULE "B":

RATE SCHEDULE AND COST/EXPENSE ITEMS SCHEDULE

A.      **Identification**

Client(s):        Stream TV Networks Inc.

Matter:           Chapter 11 Bankruptcy

B.      **Hourly rates for legal personnel are assigned from practice leader approved rate ranges applied by Billing Partner:**

$500+ for Partners;
$300+ for Associates;
$200+ for Paralegals and Assistants; and
$100+ for Law Clerks.

**Specific Example Applicable Rates to this Engagement:**

| | |
|---|---|
| Rafael Zahralddin | $975 |
| Sean M. Brennecke | $600 |
| Kevin Shaw | $450 |
| Aimee M. Czachorowski | $450 |
| Vincent Alexander | $695 |
| Bennett Fisher | $550 |
| Daniel David | $350 |
| Christina Freeman | $275 |
| Candice Russell | $275 |

*We may from time to time add other attorneys within the aforesaid rate ranges as needed, as determined by LBBS.

You have agreed to pay for our services with a $50,000 advance to be deposited into our operating account. We will calculate the amount due for this advance payment after our initial scope of work call and make a flat fee payment for our services and apply any balance to your retainer for post chapter 11 filing legal services.

Client agrees to provide to the Firm an advance against a flat fee.  This is analogous to an "advance payment retainer," as defined in Rule 1.15(c) of the Illinois Rules of Professional Conduct, Dowling v. Chicago Options Assoc., Inc., 875 N.E.2d 1012, 1018 (Ill. 2007), and In re Caesars Entm't Operating Co., Inc., No. 15-01145 (ABG) (Bankr. N.D. Ill. May 28, 2015) (and cases cited therein). In addition, Client agrees to provide one or more additional advance payment retainers upon request by the Firm,  so that the amount of any advance payment retainers remains

---

March 7, 2023
Page 10

at or above the Firm's estimated fees and expenses. The Firm may apply the advance payment retainers to any outstanding fees as services are rendered and to expenses as they are incurred. Client understands and acknowledges that any advance payment retainers are earned by the Firm upon receipt, any advance payment retainers become the property of the Firm upon receipt, Client no longer has a property interest in any advance payment retainers upon the Firm's receipt, any advance payment retainers will be placed in the Firm's general account and will not be held in a client trust account, and Client will not earn any interest on any advance payment retainers; provided, however, that solely to the extent required under applicable law, at the conclusion of the Engagement, if the amount of any advance payment retainers held by the Firm is in excess of the amount of the Firm's outstanding and estimated fees, expenses, and costs, the Firm will pay to Client the amount by which any advance payment retainers exceed such fees, expenses, and costs. Client further understands and acknowledges that the use of advance payment retainers is an integral condition of the Engagement, and is necessary to ensure that: Client continues to have access to the Firm's services; the Firm is compensated for its representation of Client; the Firm is not a pre-petition creditor in the event of a restructuring case; and that in light of the foregoing, the provision of the advance payment retainers is in Client's best interests. The fact that Client has provided the Firm with an advance payment retainer does not affect Client's right to terminate the client-lawyer relationship.

Please be advised that there is another type of retainer known as a "security retainer," as defined in Dowling v. Chicago Options Assoc., 875 N.E.2d at 1018, and In re Caesars Entm't Operating Co., Inc., No. 15-01145 (ABG) (Bankr. N.D. Ill. May 28, 2015) (and cases cited therein). A security retainer remains the property of the client until the lawyer applies it to charges for services that are actually rendered and expenses that are incurred. Any unearned funds are then returned to the client. In other circumstances not present here, the Firm would consider a security retainer and Client's funds would be held in the Firm's segregated client trust account until applied to pay fees and expenses. Funds in a security retainer, however, can be subject to claims of Client's creditors and, if taken by creditors, may leave Client unable to pay for ongoing legal services, which may result in the Firm being unable to continue the Engagement. Moreover, a security retainer creates clawback risks for the Firm in the event of an insolvency proceeding. The choice of the type of retainer to be used is Client's choice alone, but for the Engagement and for the reasons set forth above, the Firm is unwilling to represent Client in the Engagement without using the advance payment retainer

Pennsylvania Bar Association Formal Opinion 95-100 provides that in the absence of a clear written statement or agreement to the contrary, client retainers must be deposited into a proper attorney trust account. This PBA opinion also distinguished between refundable and nonrefundable retainers and concluded that nonrefundable retainers are permissible if the arrangement is properly documented. The opinion made clear that any arrangement that includes a nonrefundable retainer must be confirmed by a clear and unambiguous written statement provided to the client, or by a written agreement between the attorney and client.  Fees and costs paid in advance are considered trust funds in the absence of an agreement to the contrary and must be maintained in a trust account separate from the attorney's funds until they are earned or become payable and can be withdrawn with the client's consent.  In In Re Anonymous, No. 98 DB

March 7, 2023
Page 11

92, 23 Pa. D.& C. 4th 452 (1994)(the Disciplinary Board set forth at length how it expects attorneys to deal with advances of fees and expenses).

California Rule of Professional Conduct Rule 1.15(a) provides that unearned flat fees must be deposited into a client trust account *unless*, as 1.15(b) provides:

> Notwithstanding paragraph (a), a flat fee paid in advance for legal services may be deposited in a lawyer's or law firm's operating account, provided:(1) the lawyer or law firm discloses to the client in writing (i) that the client has a right under paragraph (a) to require that the flat fee be deposited in an identified trust account until the fee is earned, and (ii) that the client is entitled to a refund of any amount of the fee that has not been earned in the event the representation is terminated or the services for which the fee has been paid are not completed; and (2) if the flat fee exceeds $1,000.00, the client's agreement to deposit the flat fee in the lawyer's operating account and the disclosures required by paragraph (b)(1) are set forth in a writing signed by the client.

In order to assure that the Firm is not disqualified as your counsel in a chapter 11, you have agreed to an advance payment and flat fee. For the avoidance of doubt, the Firm and Client agree that the fee in this matter (1) is a flat, non-refundable fee which is earned upon receipt and covers the work described in Schedule "A" and "B," (2) will not be deposited into an attorney IOLTA or other Trust account to be billed against, and (3) will be deposited in the lawyer's operating account."

Please note that in appropriate circumstances, the Firm's charges may include a reasonable premium fee, which will be noted on any invoice in which it is included, in addition to the minimum fees calculated on the Firm's usual hourly rates. A premium amount may be based upon the novelty or difficulty of the issues raised during the representation, the time limitations imposed by the Client or the results obtained.

Prior written notice must be given to Client for any work outside the scope covered by the flat fee with proposed applicable rates of the legal personnel to be engaged; and any such extra work must then be agreed to by Client in writing.

C.      **Standard charges**

We charge for our time in minimum units of .1 hours (6 minutes).

D.      **Costs and expenses incurred on Client's behalf may include but are not limited to:**

| | |
|---|---|
| Process server fees | At cost |
| Filing fees or other fees fixed by law or assessed by public agencies | At cost |
| Meals | At cost |

---

March 7, 2023
Page 12

| | |
|---|---|
| Parking | At cost |
| Travel expenses including  e.g., lodging, air fare, taxis, public transportation, car rental, and meals | At cost |
| Facsimiles | $.25 per page |
| Deposition costs | At cost |
| Experts, consultants or investigators | At cost |
| Computer Research | At cost, plus facilities surcharge (approximately $5.00/minute) |
| Word processing support | $35.00 per hour |
| Mileage | At the Internal Revenue Service's business mileage reimbursement guidelines |
| Messenger and other delivery fees | At cost |
| Photocopying and other reproduction costs | In-house - $0.10 per page Outside service-At cost |
| After hours building services (when dictated by special client need) | At cost |
| Publication costs | At cost |
| Video costs | At cost |

Details of these costs and expenses will be reported to Client.

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

4870-0864-7491.1

# App. Ex. 50

**From:** Christopher Michaels
**Sent:** Thursday, July 01, 2021 4:51 PM EDT
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Chris Ward <CWard@Polsinelli.com>; Lindsey Suprum <LSuprum@Polsinelli.com>; jmclaughlin@ferryjoseph.com <jmclaughlin@ferryjoseph.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; raja@streamacquisitiongroup.com <raja@streamacquisitiongroup.com>; suby@streamacquisitiongroup.com <suby@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**CC:** Robert Penza <RPenza@Polsinelli.com>; Brenna Dolphin <BDolphin@Polsinelli.com>
**Subject:** RE: Stream TV Networks, Inc. - District Court Ruling on Motion for Stay [IWOV-IDOCS.FID4245647]

This is not my area of expertise, but it seems that any arguments by creditors are irrelevant based on the conclusion:

***Conclusion:***  *The Bankruptcy Court correctly concluded that Stream's pending appeal of the Chapter 11 Dismissal Order divested the Bankruptcy Court of jurisdiction to administer the Chapter 7 case. Stream has failed to show a likelihood of success on appeal on the other issues it has raised and has further failed to establish that it will suffer irreparable harm in absence of a stay. The remaining factors further weigh against granting Stream the relief sought.*

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Thursday, July 1, 2021 4:21 PM
**To:** Chris Ward <CWard@Polsinelli.com>; Lindsey Suprum <LSuprum@Polsinelli.com>; Christopher Michaels <michaels@bpmlegal.com>; jmclaughlin@ferryjoseph.com; dan@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; suby@streamacquisitiongroup.com; nicole@streamacquisitiongroup.com
**Cc:** Robert Penza <RPenza@Polsinelli.com>; Brenna Dolphin <BDolphin@Polsinelli.com>
**Subject:** RE: Stream TV Networks, Inc. - District Court Ruling on Motion for Stay [IWOV-IDOCS.FID4245647]

I don't see it in the other appeal as well, and it appears t be running on its own track.  I think we need to consider an alternative strategy for the creditors.

Rafael X. Zahralddin

---

**From:** Chris Ward <CWard@Polsinelli.com>
**Sent:** Thursday, July 1, 2021 4:16 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; Lindsey Suprum <LSuprum@Polsinelli.com>; michaels@bpmlegal.com; jmclaughlin@ferryjoseph.com; dan@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; amanda@streamacquisitiongroup.com; raja@streamacquisitiongroup.com; suby@streamacquisitiongroup.com; nicole@streamacquisitiongroup.com
**Cc:** Robert Penza <RPenza@Polsinelli.com>; Brenna Dolphin <BDolphin@Polsinelli.com>
**Subject:** Re: Stream TV Networks, Inc. - District Court Ruling on Motion for Stay [IWOV-IDOCS.FID4245647]

It was not filed in the company's appeal case.

**Christopher Ward**
*Chair, Bankruptcy & Restructuring*
*Managing Shareholder, Delaware*
*Vice-President – Development, ABI*
cward@polsinelli.com
**302.252.0922 (direct)**
**302.507.3910 (cell)**
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
polsinelli.com - @ChrisWard_DelBK



**TRUSTEE 47**

 Visit **_The Devil's Dictionary_** website
for an accurate and humorous description
of sophisticated bankruptcy jargon.

**From:** "Rafael X. Zahralddin-Aravena" <RZahralddin@atllp.com>
**Date:** Thursday, July 1, 2021 at 4:12 PM
**To:** Lindsey Suprum <LSuprum@Polsinelli.com>, "michaels@bpmlegal.com" <michaels@bpmlegal.com>,
"jmclaughlin@ferryjoseph.com" <jmclaughlin@ferryjoseph.com>, "dan@streamacquisitiongroup.com"
<dan@streamacquisitiongroup.com>, "mathu@streamacquisitiongroup.com" <mathu@streamacquisitiongroup.com>,
"amanda@streamacquisitiongroup.com" <amanda@streamacquisitiongroup.com>, "raja@streamacquisitiongroup.com"
<raja@streamacquisitiongroup.com>, "suby@streamacquisitiongroup.com" <suby@streamacquisitiongroup.com>,
"nicole@streamacquisitiongroup.com" <nicole@streamacquisitiongroup.com>
**Cc:** Chris Ward <CWard@Polsinelli.com>, Robert Penza <RPenza@Polsinelli.com>, Brenna Dolphin
<BDolphin@Polsinelli.com>
**Subject:** RE: Stream TV Networks, Inc. - District Court Ruling on Motion for Stay [IWOV-IDOCS.FID4245647]

**EXTERNAL EMAIL**  **rzahralddin@atllp.com**

Was the joinder by the petitioning creditors ever filed?


********** **PRIVATE AND CONFIDENTIAL**********

**This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended
recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying,
distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have
received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1
800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other
information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall
be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic
data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal
information.**

**Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of
Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited
company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors
Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R
1DJ. Please review our International Legal Notices.**

**From:** Lindsey Suprum <LSuprum@Polsinelli.com>
**Sent:** Thursday, July 1, 2021 3:54 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>; michaels@bpmlegal.com; jmclaughlin@ferryjoseph.com;
dan@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; amanda@streamacquisitiongroup.com;
raja@streamacquisitiongroup.com; suby@streamacquisitiongroup.com; nicole@streamacquisitiongroup.com
**Cc:** Chris Ward <CWard@Polsinelli.com>; Robert Penza <RPenza@Polsinelli.com>; Brenna Dolphin <BDolphin@Polsinelli.com>
**Subject:** Stream TV Networks, Inc. - District Court Ruling on Motion for Stay

**CAUTION:**    **EXTERNAL EMAIL**

Good Afternoon,

Attached find the District Court's ruling on the Emergency Motion for Stay Pending Appeal of Order Granting Emergency Motion for
an Order Dismissing Involuntary Chapter 7 Case.

Best,
Lindsey

**Lindsey M. Suprum**
_Senior Paralegal_

lsuprum@polsinelli.com
**302.252.0929**
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
polsinelli.com

Polsinelli PC, Polsinelli LLP in California

This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY - CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please reply to the sender and take the steps necessary to delete the message completely from your computer system.

# App. Ex. 51

**From:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Sent:** Monday, January 03, 2022 2:42 PM EST
**To:** stephen3d@mac.com <stephen3d@mac.com>
**CC:** ntwallace@aol.com <ntwallace@aol.com>; Christopher Michaels <michaels@bpmlegal.com>
**Subject:** RE: Call [IWOV-IDOCS.FID4245647]

I am – but nothing stops those of you that are not lawyers from contacting Mathu directly and copying me.

I am also starting to feel better and catch up on things, but have sent notes to Mathu.



Armstrong Teasdale LLP
**Rafael X. Zahralddin** | Partner
300 Delaware Avenue, Suite 210, Wilmington, DE 19801
MAIN PHONE: 302.824.7089
2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103
MAIN PHONE: 267.780.2000 | MAIN FAX: 215.405.9070
| CELL: 302.545.2888
RZahralddin@atllp.com
www.armstrongteasdale.com
Always exceed expectations through teamwork and excellent client service.

Please consider the environment before printing this email.

---

**From:** stephen blumenthal <stephen3d@mac.com>
**Sent:** Monday, January 3, 2022 12:14 PM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** Neil Wallace <ntwallace@aol.com>; Christopher A. Michaels <michaels@bpmlegal.com>
**Subject:** Re: Call

Hi Rafael, Sorry to hear that you got it.  Even mildly it is a nasty week.

 We assumed that your representation of VTI meant that all contacts had to go through you. Are you still the VTI lawyer?
Hope your feeling better,
Best,
Stephen

On Jan 3, 2022, at 11:52 AM, Rafael X. Zahralddin-Aravena<RZahralddin@atllp.com> wrote:

I am not an officer or director or even an employee of VTI.

I can pass along the emails.

Right now I am recovering from COVID.

Rafael

Rafael X. Zahralddin-Aravena
Partner
Armstrong Teasdale, LLP
Cell 302.545.2888

********** **PRIVATE AND CONFIDENTIAL** **********

This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.

Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is 200 Strand, London WC2R 1DJ. Please review our International Legal Notices.

**From:** ntwallace@aol.com <ntwallace@aol.com>
**Sent:** Monday, January 3, 2022 11:48:58 AM
**To:** Rafael X. Zahralddin-Aravena <RZahralddin@atllp.com>
**Cc:** stephen3d@mac.com <stephen3d@mac.com>;michaels@bpmlegal.com <michaels@bpmlegal.com>
**Subject:** Call

| CAUTION: | EXTERNAL EMAIL |
|---|---|

Rafael--I trust you had a great holiday and are now back in the saddle. It is of critical importance we have a call with Matthu and yourself to verify what the investment status is. Please set it up and let me know. Steve, Chris and I will make ourselves available.  Neil

# App. Ex. 52

# EXHIBIT "F"

TRUSTEE 59

**From:** Zahralddin, Rafael on behalf of Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Monday, April 24, 2023 4:15 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**BCC:** Chapter 11 _ 54493_2 _Email Official <{F11698191}.LEWIS_BRISBOIS@mail.cloudimanage.com>
**Subject:** RE: Plan for Rembrandt

First we have to revise the schedules to include you.  We will get that sorted out this week.  Copying Bennett to start that process.

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Monday, April 24, 2023 4:02 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] RE: Plan for Rembrandt

Our investors are primarily interested in product purchases and investment in long term production and distribution agreements with Rembrandt.  I doubt that they would be interested in DIP lending, but if they were, I am guessing their attorneys would expect secured lending options.

With SeeCubic offering unsecured debt, I can't see a way that any investment proposal for secured debt would get consideration at this stage.  I am not sure what SeeCubic and Hawk are demanding to honor their statements in their papers, but I read SeeCubic's papers and it seemed that they were offering funding on fairly favorable terms as unsecured debt.

While we are talking to a lot of money, we are not pitching to "dumb money." They are well represented and advised with a great deal of sophistication in their markets and ours.  I think you can appreciate the types of agreements and conditions their counsel will request prior to any investment. We are not going to be able to pull something together quickly, but it is a good longer term option at the right terms.

While I understand that you have an immediate cash flow issue to solve, we need clarification regarding Stream's plan for paying Rembrandt for its license.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Monday, April 24, 2023 3:35 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Re: Plan for Rembrandt

We have to update the schedules.

Right now we are trying to deal with the secured lenders.

Do your funding sources want to supply a DIP?

Might be better optics.

VSI isn't putting in $10 million - the purchase orders plus investors are the source of those funds.

Get Outlook for iOS

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Monday, April 24, 2023 3:31:58 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] Plan for Rembrandt

Rafael:

We have read Stream's latest motion papers and note that Stream was asking to have a number of employees and vendors paid to allow production to start but did not include any payment to Rembrandt. While I understand the list of vendors will not be paid, we expected to be included in the list of vendors that needed to be paid to restart production. Coupled with Stream's failure to list Rembrandt as either a creditor or as having an executory contract with Stream, we are having a hard time reconciling your filings with your statements that Rembrandt will both be paid and treated as an administrative claim.

If VSI has $10,000,000 to invest in Stream, there are funds to pay Rembrandt, but we see no plan to do so.

We are working with bankruptcy counsel, planning next steps, and talking to all parties. We need immediate clarification regarding Stream's plan for paying Rembrandt for its license.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:* 607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

# App. Ex. 53

**From:** bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Sent:** Thursday, April 27, 2023 3:47 PM EDT
**To:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**CC:** David, Daniel <Daniel.David@lewisbrisbois.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; Suby Joseph <suby@streamacquisitiongroup.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**Subject:** RE: [EXT] RE: STREAM / Bonding Equipment, need to initiate operations

+ Stream team

Interesting thoughts, Bennett. We'll discuss internally, but we're absolutely putting effort now to arrange alternative bonding options. Thanks.

---

**From:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Sent:** Thursday, April 27, 2023 12:38 PM
**To:** bud@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>
**Subject:** RE: [EXT] RE: STREAM / Bonding Equipment, need to initiate operations

Thanks, Bud.  My advice is that we not wait to see what the status of our equipment in China is, but that we start the process of a joint venture or lease as soon as possible.  That way, we can at least start accepting purchase orders and prove the commercial viability of the product.  I imagine that we need a sub-license agreement with that provider, as well as permission from the licensor.

One possibility to suggest: Raise money in VSI to fund purchase orders.  VSI can manufacture/assemble the 3D TVs (under a lease or JV with the owner(s) of the other machines) to fill purchase orders (from Stream to VSI, based on Stream's purchase orders from its customers) for sale to Stream (for a small, but commercially appropriate markup) and then to be resold to Stream's customers.  When Stream's bonding machine is operational, then Stream can then manufacture/assemble the units for sale to customers.

Advantages:
1.  we can prove the commercial viability of the business model;
2.  we can launch operations quicker;
3.  we are less dependent on a Chinese owned warehouse and transportations company as well as the technicians to assemble and repair the machine)
4.  VSI can raise money and its investors can receive a quicker return.
5.  VSI can be paid when Stream is paid (based on negotiated terms between VSI & Stream).

Disadvantages:
1.  Less profit (because VSI would be sharing the gross margin with its Joint Venture partner or its lessor and then there would be a markup from VSI to Stream).  If Hawk/SLS complains, then they should either lend the money or they should not have complained about our DIP motion.
2.  The transaction between VSI & Stream must appear to be arms-length, which means some consideration must be paid.
3.  Resolution of the relationship between VSI & Stream once Stream's bonding machine is operational and Stream no longer requires use of the other machine.  There could be a termination fee.  On the other hand, Stream's machine could be used for smaller screens and the JV/leased machine could be used strictly for the 65" units.

We are not in a position to try to hit a home run.  We need baserunners; whether we reach base on a single, double, walk or hit batsman.  If there are no operations, no revenues and no cash flow, we won't get a chance to present a plan.

Thoughts?

Or, call to discuss.

Bennett



**Bennett G. Fisher**
**Partner**
Bennett.Fisher@lewisbrisbois.com

**T: 346.241.4095 F: 713.759.6830**

24 Greenway Plaza, Suite 1400, Houston, Texas 77046 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Sent:** Thursday, April 27, 2023 2:03 PM
**To:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>
**Subject:** RE: [EXT] RE: STREAM / Bonding Equipment Insurance info to date

Hi Bennett,

There are other such bonding machines. I have already reached out to a (previous) competitor about this. I met with him on Zoom a couple weeks ago and he indicated that he might be interested in helping us because their focus is not on laptops and PC monitors, not big screens. But they have equipment capable of bonding the 65" for us.

Yesterday we traded text messages (he's on a 2 week holiday) and he said he will check with his team. He asked about volume and budget, so the dialogue is underway with at least one alternative bonding option. We could theoretically be in small production of the optical portion by May 22 with them, even if our own bonding equipment is still tied up.

There are at least one or two other options we are pursuing in parallel.

Best regards,

Bud Robertson

**From:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Sent:** Thursday, April 27, 2023 11:50 AM
**To:** bud@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>
**Subject:** RE: [EXT] RE: STREAM / Bonding Equipment Insurance info to date

Bud (and Raf & Vince):

Is this the only Bonding Machine in the world that can perform the type of function we need?  I thought I heard Mathu say that there is a similar machine in Japan.  In exploring the universe of possibilities, and managing the possibility that the machine in China cannot be re-assembled and fixed within a relevant time frame, we need to explore whether another machine can be borrowed, leased, purchased or a joint venture can be negotiated with the owner.

Thoughts?

Bennett



**Bennett G. Fisher**
**Partner**
Bennett.Fisher@lewisbrisbois.com

**T: 346.241.4095 F: 713.759.6830**

24 Greenway Plaza, Suite 1400, Houston, Texas 77046 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

# App. Ex. 54

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, July 04, 2023 4:15 PM EDT
**To:** mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**CC:** amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>; Lauter, Richard <Richard.Lauter@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; raja@streamacquisitiongroup.com <raja@streamacquisitiongroup.com>; Suby Joseph <suby@streamacquisitiongroup.com>; Bergman, Dale <Dale.Bergman@lewisbrisbois.com>; Lauter, Richard <Richard.Lauter@lewisbrisbois.com>
**Subject:** Disclosure Statement and assessment of Plan

Mathu,

Happy Fourth.  As you know we have to have documents complete this week for filing which will include a plan and disclosure statement.

We will need the key documents between the Debtor and VSI.  I assume at this point that will include a distribution agreement and subscription agreements.

Perhaps Dale and other can make suggestions what types of documents we should include, but do you have any term sheets or other documents that we can use to better understand the deal terms.  We need to see the most current cap tables from both Stream and VSI (Dale any other information).

As noted, we need far more detail, and I have heard back from Adam Swick at Akerman that he has cleared preliminary conflicts. Mathu you will need to make a deter

We will also need an agreement with Rembrandt, if you have the one prepared previously  - please send to me ASAP.

There has been some concern expressed that there is not enough information being provided as to the deal structure and that the documents are perhaps a bit too simple in light of both the amounts in question as well as the purposes for different funding.

There are also concerns regarding whether or not this is an "insider deal".

The cases I have seen so far which have an insider issue are ones in which the insider, say Mathu, wants to retain stock in the Debtor. That isn't the case here.  Mathu would keep his stock in VSI  - a totally different entity which is not a Debtor.

However, the case I cite below shows how the emphasis is more an issue of the Stream business getting resurrected than just the insider status.

I think disclosure gets us around the insider issue and Mathu has to reveal his ownership interest and management roles in VSI.

But now we have to show what the business will look like in order to get confirmed.

This excerpt from a case in Colorado which denied the request for an approval of a disclosure statement and confirmation of a plan where a company appeared to be a mere shell without any employees and assets is instructive.  You can see the parallels in how we could also be denied  - please pay particular attention to the bullet points.

At  [*3] the conclusion of the hearing, the Bankruptcy Court entered its order denying confirmation of the plan, finding that "the disclosure statement does not pass final muster, in which case the [bankruptcy] case may, for that reason, be unconfirmable. And, that's what we face here with this debtor." Transcript at 37. In support of his finding that the Disclosure Statement did not contain adequate information, and the plan could therefore not be approved, the Bankruptcy Judge gave the following reasons:

- There is inadequate information about the entities that are behind the restructuring of the debtor, a company admitted to be a public shell corporation;
- The Disclosure Statement does not provide sufficient information about the individuals who will control the reorganized entity, "their relation to the debtor prior to the reorganization, to each other, or just who they are;"
- The Disclosure Statement does not contain adequate information concerning potential material federal tax consequences of the reorganization;
- The Disclosure Statement has "far too little information on the reorganized debtor's future products and operations" given that the debtor presented only the testimony on these  [*4] subjects from Mr. Reiner, the company chairman, whose testimony the Bankruptcy Court found to be "incredible" or "marginally credible testimony";
- The Disclosure Statement fails to disclose the discriminatory treatment that resulted from the settlement with the IRS regarding the company's tax liabilities, such that its unsecured claim will be treated differently from other unsecured claims;
- Given elements of the proposed financing of the company going forward, including the fact that the company is obtaining a $100,000 loan for which the promoters of the Chapter 11 "come away with something like 80% of the debt-free public company, but little else by way of a viable business entity," it may not be possible to make adequate disclosure to allow past creditors and public investors to make an informed investment decision.

**TRUSTEE 64**

Transcript at 36-39.

Finally, the Bankruptcy Court expressed reservation as to whether the proposed plan was submitted in "good faith," as required under 11 U.S.C. §1129(a)(3), stating it had concerns as to whether the plan could "breathe life back into a public shell only to have the a new shell controlled by folks who have successfully used Title 11 to avoid the securities  [*5] law." *Id.* at 39. 11 U.S.C. §1129(d) provides that a court may not confirm a plan if the principal purpose of the plan is avoidance of application of Section 5 of the Securities Act of 1933, which requires registration of publicly issued securities.

Although the bankruptcy judge did not expressly reference this statute, it appears that he was concerned about this provision, because at the outset of the hearing, he stated that it appeared to him that the plan may be "using Chapter 11 to avoid the necessity of complying with the securities laws, because the exemptions that are provided for shares in Chapter 11." *Id.* at 6. Appellant acknowledges that the Bankruptcy Court raised the issue "in dictum, that the Plan may not be confirmable if the Plan seeks to avoid the securities laws." Appellant's Brief at 16.

Since the Bankruptcy Court found that the Disclosure Statement did not contain adequate information as required by 11 U.S.C. § 1125(a)(1), it concluded that approval of the plan could not be entered under 11 U.S.C. 1129(a). Transcript at 40. Appellant now asks me to reverse the Bankruptcy Court's order and enter an order approving the Disclosure Statement and confirming the plan (Appellant's  [*6] Brief at 17).

In re Sparta Surgical Corp., 2008 U.S. Dist. LEXIS 123025, *2-6, 2008 WL 878948

So a few points for our legal team.  I think we use the rights offering, which has an express safe harbor (in addition to the exemption under 11 USC 1145) to avoid the issue of any court saying that this proposed plan is a work around on either the securities laws or the tax information we should be providing.

What is clear is that we need to have details on who is going to be paying and restructuring Stream which only has two employee at this time (Mathu and Tom).  I have tried to begin that process by focusing on the operations, and new business partners and relationships related to operations, as well as the financing.

We are going to need to put front and center the people who will be governing VSI (board) and who will be managing (officers) as well as who will be governing and managing reorganized Stream when it emerges from bankruptcy.

As is clear from this excerpt and the holding in this case, we cannot rely just on Mathu's testimony or just Tom Parks.

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

# App. Ex. 55

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Thursday, July 06, 2023 4:26 PM EDT
**To:** adam.swick@akerman.com <adam.swick@akerman.com>; Christopher Michaels <michaels@bpmlegal.com>
**CC:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** STREAM TV, INC.; Confidentiality Agreement
**Attachment(s):** "Stream - Confidentiality Agreement(126431839.1).docx"

Adam and Chris,

Please find attached a confidentiality agreement for your review.  If there are no changes, please return executed copies.



**Daniel David**
**Attorney**
Daniel.David@lewisbrisbois.com

**T: 713.324.0107  F: 713.759.6830**

24 Greenway Plaza, Suite 1400, Houston, Texas 77046  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.



**Daniel David**
**Attorney**
**Daniel.David@lewisbrisbois.com**

**T: 713.324.0107 F: 713.759.6830**

24 Greenway Plaza, Suite 1400, Houston, Texas 77046 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**



This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

## CONFIDENTIALITY AGREEMENT

THIS CONFIDENTIALITY AGREEMENT (the "Agreement") is between Visual Semiconductor, Inc., whose address is 1105 William Penn Drive, Bensalem, Pennsylvania 19020, Rembrandt 3D Holding, Ltd, whose address is 128 Bull Hill Road, Newfield, New York 14867 ("Recipients") and Stream TV, Inc., whose address is 2009 Chestnut Street, Philadelphia, Pennsylvania 19103 (the "Company"), and to which both Recipients and Company agree that this Agreement governs the terms and conditions under which the Company agrees to disclose Confidential Information (defined below) to Recipients. Recipients and the Company may be referred to individually as a "Party" and together as the "Parties".

For and in consideration of the mutual promises and consideration provided herein, the receipt and sufficiency of is acknowledged, the Parties agree as follows:

1. **Confidential Information**. In connection with restructuring of equity and management of the Company (the "Transaction"), Recipients may be furnished with certain Confidential Information. Confidential Information means all, or any part of, any information concerning the Transaction, the Company, or any of the Company's affiliates, in whatever form embodied (*e.g.* oral, written, electronic), that is furnished to Recipients or their Representatives (as defined below), but excluding: (a) information that at the time of disclosure was, or becomes, part of the public domain (through a source other than Recipients); (b) information lawfully obtained from a third party that (to Recipients' knowledge) was not under, and did not impose, an obligation of confidentiality with respect to such information; (c) information that is independently developed by Recipients without violation of its obligation under this Agreement; and (d) information that was known by Recipients prior to disclosure by the Company.

2. **Treatment of Confidential Information**. Recipients shall (a) use Confidential Information only for the purpose of evaluating the Transaction; (b) limit dissemination of Confidential Information only to its partners, officers, employees, consultants, agents, representatives, advisors and its and their affiliates (collectively, "Representatives") who have a "need to know" such Confidential Information; (c) not disclose Confidential Information to any third party except as expressly permitted in writing by the Company; and (d) advise the Company promptly in writing of any unauthorized disclosure or use of Confidential Information of which Recipients become aware. Recipients shall not be deemed to have violated this Agreement if Recipients or any of their Representatives disclose Confidential Information in response to a request or requirement (by deposition, interrogatory, request for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) pursuant to law or regulation to disclose any of the confidential information, provided that Recipients shall have given the Company written notice of such request or requirement within 24 hours of receipt of such notice and not less than fourteen (14) days prior to disclosure so that the Company may, if time permits, seek a protective order or other appropriate remedy or waive compliance with the provisions of this Agreement. Notwithstanding anything to the contrary herein, Recipients

126431839.1                                                      1

may make disclosures of Confidential Information to regulatory authorities having jurisdiction to examine its books and records during a routine examination without any notice to or consent from the Company or any other Party. Recipients shall safeguard the confidentiality of the Confidential Information using the same standard it employs to safeguard its own confidential information of like kind, but in no event less than a commercially reasonable standard of care.

3. **Transaction; Discretion**. Unless and until a final, written definitive agreement regarding the Transaction has been executed and delivered, neither Party will be committed to conclude or further pursue the Transaction or any other type of business relationship by virtue of this Agreement.  Each Party reserves the right, in its sole discretion, for any reason or no reason, to reject any and all proposals made to it or its Representatives with regard to the Transaction and to terminate discussions and negotiations with the other Party at any time, provided that this Agreement shall thereafter continue in full force and effect as provided herein.  The conversations shall be protected by any "white knight" privilege that may be claimed by the Parties and their counsel regarding discussions of the Transaction. Notwithstanding the foregoing, or any other provision of this Agreement, the Confidentiality provisions of this Agreement survive termination of any such discussions/proposals if a Transaction is not consummated.

4. **Injunctive relief**. A breach of this Agreement may cause the Company immediate irreparable harm and therefore the Company is entitled to seek immediate injunctive relief in addition to any other right or remedy that the Company may have at law or in equity.

5. **Non-circumvention**.   Neither Recipients nor its Representatives shall, directly or indirectly contact, deal with, transact business with, or otherwise be involved with the Seller or any entity, corporation, company, investor, proprietorship, trust, bank, or other entity (other than the Company) involved with the Transaction without the prior written consent of the Company as specifically related to the Transaction and subject matter revealed herein.  In addition, the Recipients agrees that neither it nor its Representatives shall, directly or indirectly, disclose to the Seller, without the prior written consent of the Company, any financial projections, appraisal reports, valuation analysis, business strategy, and/or any other materials or Confidential Information in connection with the Transaction.

6. **Warranty**. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". THE COMPANY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS, PERFORMANCE, OR NON-INFRINGEMENT OF THE CONFIDENTIAL INFORMATION. THE COMPANY UNDERTAKES NO OBLIGATION TO PROVIDE THE RECIPIENTS WITH ACCESS TO ANY ADDITIONAL CONFIDENTIAL INFORMATION. THE COMPANY UNDERTAKES NO OBLIGATION TO PROVIDE THE RECIPIENTS WITH ACCESS TO ANY ADDITIONAL CONFIDENTIAL INFORMATION, OR TO UPDATE, OR TO CORRECT ANY INACCURACIES IN THE CONFIDENTIAL INFORMATION. THE RECIPIENTS AGREES THAT NEITHER THE COMPANY NOR ANY OF ITS REPRESENTATIVES SHALL HAVE ANY LIABILITY TO THE RECIPIENTS OR

126431839.1                                                2

ANY OF ITS REPRESENTATIVES RESULTING FROM THE USE OF THE CONFIDENTIAL INFORMATION BY THE RECIPIENTS OR ITS REPRESENTATIVES, EXCEPT AS MAY BE SET FORTH IN A SEPARATE DEFINITIVE AGREEMENT WITH RESPECT TO A TRANSACTION BETWEEN THE PARTIES.

7. **Miscellaneous**. This Agreement shall be governed by and construed in accordance with, the laws of the State of Pennsylvania without regard to its conflicts of law provisions, and any dispute shall be brought in the courts sitting in Philadelphia, Pennsylvania. If any provision of this Agreement is declared void or unenforceable, such provision shall be severed from this Agreement which shall otherwise remain in full force and effect, but only to the extent that the original intent of this Agreement would not be altered in any material respect. This Agreement may be amended only by writing executed by both Parties. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements. No delay or failure of either Party to exercise any right or remedy available to it pursuant to this Agreement shall operate as a waiver of such right or remedy.

8. **Term**. This Agreement, and each of the obligations herein stated, shall terminate one year following the date hereof.

EXECUTED this ___ day of _____, 2023.

REMBRANDT 3 HOLDING, LTD.

By:        _____

Name:        Chris Michaels

Title:

VISUAL SEMICONDUCTOR, INC.

By:        _____

Name:        Adam Swick

Title:

COMPANY:   STREAM TV, INC.

By:        _____

Name:        Mathu Rajan

Title:        CEO

126431839.1                                3

# App. Ex. 56

# EXHIBIT "A"

TRUSTEE 68

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 08, 2023 10:21 PM EDT
**To:** adam.swick@akerman.com <adam.swick@akerman.com>
**CC:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Christopher Michaels <michaels@bpmlegal.com>; Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>
**Subject:** FW: Zahralddin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB)
**Attachment(s):** "Revlon Inc._SDNY #22-10760_Backstop Commitment_Debt Commitment Ltr_Admin Exp_Rights Offering.pdf","Revlon Inc._SDNY #22-10760_Backstop Order.pdf","Revlon Inc._SDNY #22-10760_Revised Rights Offering Procedures and Subscription Form.pdf","Revlon Inc._SDNY #22-10760_Notice of Entry Into Exit Financing Comm Documents.pdf","PAEB Local Rules - effective 06-14-2021 (updated 04-12-2023).pdf","Revlon Inc._SDNY #22-10760_Notice of Hrg_Motion for Order Approv Discl Stmt_Solicitation_Voting Procedures_Form of Ballots.pdf"

Dear Adam,

Thanks for the call and or letting me know that the NDA and Joint Defense documents are coming (thanks Chris Michaels as well).

Here are the Revlon agreements which we will need to modify. This is really VSI's deal, so I am sending to you directly.

I will get the latest version of the Plan and Disclosure Statement – do you guys have a SharePoint account where we can all access the documents?

---

**From:** Freeman, Christina <Christina.Freeman@lewisbrisbois.com>
**Sent:** Thursday, July 6, 2023 12:05 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Subject:** RE: Zahralddin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB)

Good Afternoon,

I believe I've covered all the requests for me so far. Let me know what else is needed.

See pg 24 of the local rules regarding interim compensation.

**Christina Freeman**
**Paralegal**
Fort Lauderdale
954.628.5598 or x9545598

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, July 6, 2023 2:43 AM
**To:** Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>
**Subject:** Zahralddin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB)

Here is the link to the updated document with comments in Imanage.

## iManage LLC

**Zahralddin, Rafael** has shared a document with you.

**You must double-click the __attachment__ to "open" the document for editing.**

Use the link below to see a read-only "preview" of the document:

[STREAM TV rxza update to plan first draft.docx](140.5 KB)

***Please note: You __cannot__ edit the document from the preview window.***

LEGAL NOTICE: Th s e-ma s from Manage LLC, and may conta n conf dent a and/or ega y pr v eged nformat on. Th s e-ma s ntended so e y for the use of the nd v dua (s) to whom t s addressed.

If you have rece ved th s e-ma n error, p ease not fy the sender by rep y e-ma , de ete the e-ma from your computer and do not copy or d sc ose t to anyone e se. Any d sc osure, copy ng, d str but on, re ance or use of the contents or nformat on rece ved n error s str ct y proh b ted. Ne ther th s e-ma message nor ts attachment(s) may be construed as estab sh ng an attorney-c ent re at onsh p, const tut ng an e ectron c s gnature or prov d ng consent to contract e ectron ca y, un ess express y so stated by a Manage LLC attorney n the body of th s e-ma or an attachment.

Powered by iManage

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

# App. Ex. 57

# EXHIBIT "B"

TRUSTEE 71

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 2:41 PM EDT
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; adam.swick@akerman.com <adam.swick@akerman.com>
**CC:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>;
Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** RE: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

Dan – when is the ETA for the update to the complaint?

We are looking at it and need to know where you are – my last email from you said you would get this done this morning – now its afternoon.

Now, it's this evening?

I am sorry if you are going through some issues, but we need communication on exactly where you are so the rest of us can try and salvage this?

---

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 1:44 PM
**To:** adam.swick@akerman.com
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>;
john.thompson@akerman.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

All, I'm sorry. I had no intention to cause a delay or be last minute. After our conference call on Friday morning, I was under the impression that filing was to happen later than tomorrow. I apologize for any position I have put anyone in and take responsibility for having unexpected personal emergencies happen this weekend.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

---

**From:** adam.swick@akerman.com <adam.swick@akerman.com>
**Sent:** Sunday, July 30, 2023 12:39:53 PM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>;
john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

This is ridiculous. Client wants if filed tomorrow. We maybe can hold until Tuesday but Dan you have really put everyone in a bad position. John, Ralph and whoever else from LB can attend let's look at the draft and determine next steps. Let's have a call at 2:00 eastern.

Sent from my iPhone

On Jul 30, 2023, at 11:25 AM, David, Daniel <Daniel.David@lewisbrisbois.com> wrote:

<mark>[External to Akerman]</mark>

I had it offline from imanage to separate that working draft from the previous drafts that were saved and named differently.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

<Logo_e6253148-26a1-47a9-
b861-6ac0ff0bc3c4.png>

**Daniel David**
**Attorney**
Daniel.David@lewisbrisbois.com

**T: 713.324.0107 F: 713.759.6830**

24 Greenway Plaza, Suite 1400, Houston, Texas 77046 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<80pctcolor_2022mansfieldcertificationbadge_492244a7-2944-454d-8270-3a8a522bf068.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 11:23:57 AM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; adam.swick@akerman.com <adam.swick@akerman.com>
**Cc:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

You said you would send it this morning.

You didn't save this to IManage?

Get Outlook for iOS

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 12:22:14 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; adam.swick@akerman.com <adam.swick@akerman.com>
**Cc:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

I am not near my laptop right now. The update I can give you is I have included the Jane Doe, John Doe, investment bankers, and law firms references in the complaint. I need to finish plugging in the lender liability claim and applicable counts to that claim and connect facts which I will have this evening.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 11:00:09 AM
**To:** adam.swick@akerman.com <adam.swick@akerman.com>; David, Daniel <Daniel.David@lewisbrisbois.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

I sent the most up to date I could find.

Dan - you need to get us the most recent version now.

You are holding up another firm, our firm, and the client.

It is now noon on the East Coast and I need you to respond and clearly explain where we are.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

> On Jul 30, 2023, at 11:28 AM, adam.swick@akerman.com wrote:
>
>
> Please send the updated version.
>
> Sent from my iPhone
>
>
> On Jul 29, 2023, at 4:16 PM, Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> wrote:

**[External to Akerman]**

That was all I could find - please try and get your updates circulated.

Get Outlook for iOS

<Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png>

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<80pctcolor_2022mansfieldcertificationbadge_492244a7-2944-454d-8270-3a8a522bf068.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 5:15:30 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits) (126091682.2).DOCX

I had a version I was working in and was making a separate one. If it doesn't have lender liability but I'd dated yesterday it was one I started in but not the most up to date.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 4:14:03 PM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits) (126091682.2).DOCX

I will keep looking

Get Outlook for iOS

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 5:12:46 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits) (126091682.2).DOCX

I am not at a computer or at home right now. I can send tonight when I am back home.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 4:02:27 PM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>

**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complaint (DRAFT 7.26.2023) (akerman edits)
(126091682.2).DOCX

Ok - I am in a new client - but who has already sent us our retainer and signed an agreement with
an emergency next week- and I am looking through IManage for the complaint and can't find the
latest version.

I see a version locked out by Anh.

I don't see this version saved in our system- so family engagement or not - I need you to send
whatever you have done please right now.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

> On Jul 29, 2023, at 1:49 PM, Zahralddin, Rafael
> <Rafael.Zahralddin@lewisbrisbois.com> wrote:
>
>  The issue is that the client was waiting for it.  I understand family commitments but we
> need to communicate and coordinate with our client's and co-counsel's schedules as
> well.
>
> Can you please given me an update on the following:
>
> I was on site with another client yesterday and Adam said he was with a child at his
> doctors so I have no idea what the status is and which document is the most recent.
>
> Did you work with JT as instructed and recommended?  I think that was in order to deal
> with the structure/organization and your comment that you had some trouble combining
> the procedural and other fact sections?
>
> Did you get in the new counts? The lender liability, John and Jane Does, and the trade
> secret issues?
>
> Just need to understand where we are substantively.
>
> The client, Mathu, said that Akerman was waiting for us to circulate a document to
> them. I want copies on any emails so I have a blind spot on that issue.
>
> Can you just send the most recent version to Bud and Mathu to start reviewing and
> give them a definite time as to when the update will come to them?
>
> That might help.
>
> Bud has set our time to work on the document this weekend.
>
> Rafael X. Zahralddin
> 302.545.2888
> Sent from my iPhone

<Logo_e6253148-26a1-47a9-
b861-6ac0ff0bc3c4.png>

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<80pctcolor_2022mansfieldcertificationbadge_492244a7-2944-454d-8270-3a8a522bf068.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you
are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify
the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

> On Jul 29, 2023, at 1:32 PM, David, Daniel
> <Daniel.David@lewisbrisbois.com> wrote:
>
>
> I am finishing it up tomorrow morning and will send a revised version.  I

have a family obligation I am at today.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 12:25:26 PM
**To:** adam.swick@akerman.com <adam.swick@akerman.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>;
john.thompson@akerman.com <john.thompson@akerman.com>;
Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT
7.26.2023) (akerman edits)(126091682.2).DOCX

Is this supposed to be worked on by Daniel?

Is this supposed to go to client?

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

> On Jul 28, 2023, at 10:36 AM, adam.swick@akerman.com wrote:
>
> Current draft

**Adam Swick**

Special Counsel

Akerman LLP | 500 West 5th Street, Suite 1210 | Austin, TX
78701

D: 737-999-7103

adam.swick@akerman.com

Profile

Akerman Logo

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged
and confidential, and is intended only for the use of the individual or entity named above. If the
reader of this message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly prohibited. If you have
received this transmission in error, please immediately reply to the sender that you have
received this communication in error and then delete it. Thank you.

<7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023)
(akerman edits)(126091682.2).DOCX>

# App. Ex. 58

# EXHIBIT "C"

TRUSTEE 75

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, August 04, 2023 9:44 PM EDT
**CC:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Mathu <mathu@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; Curry, Josh <Josh.Curry@lewisbrisbois.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>; adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; luis.casasmeyer@akerman.com <luis.casasmeyer@akerman.com>; eduardo.espinosa@akerman.com <eduardo.espinosa@akerman.com>; bradley.henry@akerman.com <bradley.henry@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Subject:** Zahralddin, Rafael has shared a document with you : motion to withdraw the reference order brief and certificate of service.docx (49.6 KB)
**Attachment(s):** "motion to withdraw the reference order brief and certificate of service(127777894.1).docx.nrl","motion to withdraw the reference order brief and certificate of service(127777894.1).docx"

Bennett/Adam/JT,

This is just a template to hold onto in the event we need to file a motion to withdraw the reference.

It would help if you three could focus on the issue of the withdrawal of the reference and if that is appropriate under what we have so far.

The jury trial is another strategic issue – I think Adam's initial reaction was to do request it.

I also think we have to figure out of the District Court will move quickly on this injunction or whether she will move quickly. I have doubts that she will, and want to discuss as a group.

Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts  - we need to get that list and make sure we are asking for injunctive relief.

I think they want injunctive relief for  - the turnover, the trade secrets, and tortious interference.

---

## iManage LLC

**Zahralddin, Rafael** has shared a document with you.

**You must double-click the <u>attachment</u> to "open" the document for editing.**

Use the link below to see a read-only "preview" of the document:

[motion to withdraw the reference order brief and certificate of service.docx](49.6 KB)

***Please note:  You <u>cannot</u> edit the document from the preview window.***

LEGAL NOTICE: Th s e-ma  s from  Manage LLC, and may conta n conf dent a  and/or  ega y pr v  eged  nformat on. Th s e-ma  s  ntended so e y for the use of the  nd v dua (s) to whom  t s addressed.

If you have rece ved th s e-ma  n error, p ease not fy the sender by rep y e-ma , de ete the e-ma  from your computer and do not copy or d sc ose  t to anyone e se. Any  d sc osure, copy ng, d str but on, re ance or use of the contents or  nformat on rece ved  n error  s str ct y proh b ted. Ne ther th s e-ma  message nor  ts attachment(s) may be construed as estab sh ng an attorney-c  ent re at onsh p, const tut ng an e ectron c s gnature or prov d ng consent to contract e ectron ca y, un ess express y so stated by a  Manage LLC attorney  n the body of th s e-ma  or an attachment.

Powered by iManage

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

# App. Ex. 59

**From:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Sent:** Wednesday, June 21, 2023 3:23 PM EDT
**To:** mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; Suby Joseph <suby@streamacquisitiongroup.com>
**CC:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** Stream TV Networks, Inc. - Equity Funding

Any update on counsel for Zhongzhi Enterprise or Zhongsheng Group Holdings or if they will be providing a representative to testify in support of the Debtors? As we have stressed, this is critical. You have requested that we file a term sheet and subscription agreement (which Dale is reviewing), but LBBS still has not had any communications with the either of these entities that may be providing equity funding.

Please advise as to status.

Thanks.

Vince

**Vincent F. Alexander**
**Partner**
Fort Lauderdale
954.939.3371 or x9543371

**TRUSTEE 62**

# App. Ex. 60

**From:** Alexander, Vincent on behalf of Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Sent:** Friday, August 04, 2023 12:56 PM EDT
**To:** mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; Thomas park <thomas.park@streamacquisitiongroup.com>; bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; Suby Joseph <suby@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>
**CC:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; Shecter, Sean <Sean.Shecter@lewisbrisbois.com>; Poppel, Karen <Karen.Poppel@lewisbrisbois.com>
**BCC:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Chapter 11 _ 54493_2 _Email Official <{F11698191}.LEWIS_BRISBOIS@mail.cloudimanage.com>
**Subject:** FW: Stream - Rule 9011 Letter
**Attachment(s):** "Stream - Letter re Sanctions Motion.pdf","Stream - Sanctions Motion (with attachments).pdf"

I know we have previously discussed this sanctions letter that we received from Hawk's counsel regarding their belief that the Zhongsheng information is made up, but I am not sure if LBBS forwarded the letter. The motion has not yet been filed, and there is a 30-day safe harbor period before the motion could be filed. We need to provide Hawk with a written response to the letter within the 30-day safe harbor period. Our response needs to include information as to why Hawk is totally off base with their assertion. We must take this letter seriously and make sure that we have sufficient backup for the Zhongsheng Term Sheet. At the motion to compel hearing, Judge Coleman also indicated that she is interested in making sure that the Zhongsheng Term Sheet is truthful, so this issue will not be going away.

Vince

---

**From:** Edel, Jon N. <Jon.Edel@klgates.com>
**Sent:** Wednesday, July 26, 2023 4:29 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Rothman, Aaron S. <Aaron.Rothman@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Subject:** [EXT] Stream - Rule 9011 Letter

Gentlemen,

Attached, please find a "Safe Harbor Letter" pursuant to Rule 9011 for your consideration with a proposed Motion for Sanctions. Physical copies will be delivered in the coming days as well.

Thank you,
Jon

K&L Gates LLP

**Jon Edel**
Associate
K&L Gates LLP
300 South Tryon Street
Suite 1000
Charlotte, NC 28202
Phone: 704.331.7445
Fax: +1.704.353.3122
Jon.Edel@klgates.com
www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jon.Edel@klgates.com.

**TRUSTEE 73**

# Document Break

# K&L GATES

July 26, 2023

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

**VIA ELECTRONIC MAIL**

Vincent F. Alexander, Esq.
Lewis Brisbois Bisgaard & Smith
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301

Rafael X. Zahralddin
Lewis Brisbois Bisgaard & Smith
500 Delaware Avenue, Suite 700
Wilmington, DE 19801

RE:   *In re Stream TV Networks, Inc.*; Case No. 23-10763-MDC
      *In re Technovative Media, Inc.*; Case No. 23-10764-MDC

Dear Messer's Zahralddin and Alexander:

I write on behalf of the Secured Creditors to address a serious issue implicating Rule 9011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9011-1 of Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania.

As you are aware, on April 21, 2023 you filed on behalf of the Debtors the *Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 135] (the "Ordinary Course Motion"). Pursuant to the Ordinary Course Motion, the Debtors requested (in relevant part) authority to sell up to $10 million of stock of Debtor Stream to Visual Semiconductor, Inc. ("VSI") in the ordinary course of business in order to fund the Chapter 11 Cases. *See* Ordinary Course Motion, at ¶ 14.

On June 23, 2023, you signed and filed an *Amendment to Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 258] (the "Amendment"). In the Amendment, the Debtors reiterated their request for authority to sell Debtor Stream's equity in the ordinary course of their business, but amended the request so that the buyer was Zhongsheng Group Holdings Ltd. ("Zhongsheng") rather than VSI. The Amendment requested authority to sell up to $300 million of Stream's Class A common stock to Zhongsheng pursuant to a term sheet attached as Exhibit A to the Amendment (the "Term Sheet"). The Term Sheet, dated June 6, 2023, provided that it was "non-binding" and set forth "a summary of the proposed terms of the Transaction and is intended solely as a basis for further discussion…." See Term Sheet, introduction. The Term Sheet was

executed by Mathu Rajan on behalf of Stream and "Tea Lee," who purported to be a "Managing Director" of Zhongsheng.  Attached to the Term Sheet, the Debtors included an unexecuted Subscription Agreement providing the same details as were included in the Term Sheet.

Following disclosure of the Term Sheet, we have repeatedly asked the Debtors, formally and informally, to produce documents related to Zhongsheng, Tea Lee and the Tem Sheet.  To Date, the Debtors have refused to provide even a single corroborating document or communication.  After an independent investigation, we have determined that the Term Sheet is fraudulent and Tea Lee a fiction created by Mr. Rajan.  By this correspondence we hereby demand, pursuant to Rule 9011(b) of the Federal Rules of Bankruptcy Rules and Local Rules that you withdraw the Amendment and inform the Court of its fraudulent nature.

After receipt of the Amendment and Term Sheet, the undersigned working with lawyers in the Asian offices of K&L Gates LLP investigated the veracity of the Term Sheet and attempted to determine if Tea Lee had any affiliation with Zhongsheng.  Among other things, this investigation included a review of the Zhongsheng web site and its various public filings.  *See* Zhongsheng Group (zs-group.com.cn) and Financial Reports (zs-group.com.cn).  A review of this material quickly revealed that Zhongsheng's corporate structure does not include a position designated as "Managing Director" or any reference to a Tea Lee.

Further review of the Zhongsheng web site revealed that Wonderful Sky Financial Group ("Wonderful Sky") handles all investor relations inquiries.  See IR Contacts (zs-group.com.cn).  We initially engaged in direct communications with Wonderful Sky to determine if Tea Lee was affiliated with Zhongsheng.  On July 20, 2023, Natalie Chow responded by confirming, "[u]pon verification, Tea Lee is not our employee, officer or representative of Zhongsheng."  *See* Exhibit "A."  Upon learning Tea Lee did not exist, we forwarded the Term Sheet to Ms. Chow and inquired into the validity of the document.  Ms. Chow once again promptly responded by stating, "Zhongsheng has no record of the Term Sheet dated 6 June 2023."  *Id.*  Just as troubling, Ms. Chow noted that "we do not have any knowledge regarding the situation of Stream TV Networks." *Id.*

Under the circumstances, you were under an ethical obligation to independently verify the information provided by your client before filing the Amendment and Term Sheet.  This is particularly true where the Term Sheet on its face was too good to be true, the timing of its disclosure was questionable at best, and your client has a history of inventing claims of substantial business relationships that turn out to be untrue.  If this were not enough to prompt inquiry on your part, I would note that Mr. Park, who is seeking to be retained as Stream's CFO, testified that he had not heard of Zhongsheng or been informed of the Term Sheet at least as of June 21, 2023.  Mr. Park has worked for Stream since April of this year, after having been introduced to the Debtors by Mr. Zahralddin.  A reasonable inquiry would have quickly uncovered the fraudulent nature of the Amendment and Term Sheet.

July 26, 2023

We look forward to hearing from you and for your withdrawal of the Amendment and explanation repudiating the Term Sheet in its entirety.  Otherwise, we will file the attached sanctions motion with the Court in accordance with Bankruptcy Rule 9011.

Very truly yours,

*/s/ Steven L. Caponi*

Steven L. Caponi

Enclosure

3

July 26, 2023

# Document Break

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>STREAM TV NETWORKS, INC.,[1]<br><br>             Debtor. | Chapter 11<br><br>Case No. 23-10763 (MDC) |
| In re:<br><br>TECHNOVATIVE MEDIA, INC.,<br><br>             Debtor. | Chapter 11<br><br>Case No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**HAWK INVESTMENT HOLDINGS LIMITED'S**
**MOTION FOR SANCTIONS PURSUANT TO RULE 9011**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Hawk Investment Holdings Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), a secured creditor of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream, the "Debtors") in the above-captioned chapter 11 cases (together, the "Chapter 11 Cases"), by and through its undersigned counsel, respectfully moves this Court (the "Motion") for entry of an Order awarding sanctions against the Debtors, Mr. Mathu Rajan ("Mr. Rajan"), Mr. Rafael X. Zahralddin-Aravena ("Mr. Zahralddin-Aravena"), and/or Lewis Brisbois Bisgaard & Smith, LLP ("LBBS" and, together with the Debtors, Mr. Rajan, and Mr. Zahralddin-Aravena, the "Respondents") pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

Rule 9011 of Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania and represents as follows:

<u>**BACKGROUND**</u>

1.     On March 15, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

2.     On April 21, 2023, the Debtors filed the *Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 135] (the "Ordinary Course Motion").  Pursuant to the Ordinary Course Motion, the Debtors requested (in relevant part) authority to sell up to $10 million of stock of Debtor Stream to Visual Semiconductor, Inc. ("VSI") in the ordinary course of business in order to fund the Chapter 11 Cases.  *See* Ordinary Course Motion, at ¶ 14.  VSI is an insider of the Debtors, as it is owned and controlled by Mathu Rajan, who is the founder and CEO of the Debtors.

3.     The Court held a hearing on the Ordinary Course Motion on April 24, 2023, at which time the Court declined to grant the requested relief.  Doing so, the Court raised several questions with respect to the relief, including with respect to the insider nature of the proposed transaction with VSI, the procedural posture of the Ordinary Course Motion, and whether the sale of equity was part of the Debtors' "ordinary course of business."  Though the Court declined to grant the relief, it did not formally deny the Ordinary Course Motion, instead holding it in abeyance without setting a continued hearing date at that time.  *See* ECF No. 172.

4.      On May 22, 2023, the Court entered a notice [ECF No. 208] scheduling a continued evidentiary hearing on the Ordinary Course Motion for June 26–29, 2023 at 10:30 a.m. (ET) (the "June Hearings").  Also at the June Hearings, the Court was set to entertain several motions

Hawk had filed, including for relief from stay [ECF No.16] and to dismiss, convert, or appoint a trustee in the Chapter 11 Cases [ECF No. 83] (together, the "Pending Hawk Motions").

5.       On the last business day before the June Hearings—*i.e.*, June 23, 2023— the Debtors filed the *Amendment to Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 258] (the "Amendment"). In the Amendment, the Debtors reiterated their request for authority to sell Debtor Stream's equity in the ordinary course of their business, but amended the request so that the buyer was Zhongsheng Group Holdings Ltd. ("Zhongsheng")[2] rather than VSI. The Amendment requested authority to sell up to $300 million of Stream's Class A common stock to Zhongsheng pursuant to a term sheet attached as Exhibit A to the Amendment (the "Term Sheet").

6.       The Term Sheet, dated June 6, 2023, provided that it was "non-binding" and set forth "a summary of the proposed terms of the Transaction and is intended solely as a basis for further discussion...." *See* Term Sheet, introduction. The Term Sheet was executed by Mathu Rajan on behalf of Stream and "Tea Lee," who purported to be a "Managing Director" of Zhongsheng. Attached to the Term Sheet, the Debtors included an unexecuted Subscription Agreement setting forth the same details as were included in the Term Sheet.

7.       Prior to the June Hearings, the Debtors and Hawk exchanged preliminary witness lists, and on the Debtors' list, they included a representative of Zhongsheng, identified to testify "regarding its negotiations and agreements with the Debtors regarding stock purchase and/or debtor in possession financing." *See* Exhibit 1 to *Hawk Investment Holdings Limited's Motion to*

---

[2] According to its website, Zhongsheng is a "leading national automobile dealership" group in China, focusing on "luxury and mid-to-high end automobile brands ...." *See* https://en.zs-group.com.cn/c/en/introduction.jhtml. It also offers "after-sales businesses [related to] spare parts, automobile accessories, repair and maintenance service, detailing services and other automobile-related products and services." *Id.*

*Compel Discovery and Impose Sanctions for Failure to Comply* [ECF No. 295] (the "Motion to Compel"). This initial witness list was to allow the parties to identify deponents and conduct depositions prior to the June Hearings, but they were not final. Despite repeated requests, the Debtors never made such a representative available to Hawk, and they omitted the representative from Zhongsheng on their final witness and exhibit list that they filed on the docket on June 23, 2023. *See* ECF No. 264.

8. The Court held the June Hearings but declined to rule on any of the Pending Hawk Motions, continuing such matters and the Ordinary Course Motion (as amended by the Amendment) to August 15 and 17, 2023 (the "Continued Hearings"). The Court never reached the merits of the Amendment during the June Hearings, so it also continued the Amendment to be heard at the Continued Hearings. ECF No. 291. Based on subsequent communications with the Debtors, it does not appear the Debtors intend to produce a witness from Zhongsheng in support of the Amendment or Term Sheet going forward at the Continued Hearings.

9. Notwithstanding the Debtors' disinclination to call a representative of Zhongsheng, Hawk remains skeptical of the Term Sheet and, as such, has continued requesting information from the Debtors in order to conduct diligence. As such, Hawk has made multiple requests for contact information sufficient to conduct discovery with respect to Zhongsheng and has asked the Debtors, formally and informally, to produce documents related to Zhongsheng, Tea Lee, and the Term Sheet. The Debtors have refused to provide such information, prompting Hawk to file the Motion to Compel on July 14, 2023. The Motion to Compel provides additional detail with respect to Hawk's efforts in seeking the necessary information in order to propound discovery on Zhongsheng. To date, the Debtors still have failed to provide Hawk with even the basic information necessary to contact Zhongsheng.

10.      Faced with the Debtors' obstinacy, Hawk conducted its own diligence into the Term Sheet and representations made in the Amendment, including by contacting Zhongsheng through its investor relations manager, Wonderful Sky Financial Group ("Wonderful Sky").[3]  A true and correct copy of the communications with Wonderful Sky, as representative of Zhongsheng, is attached hereto as Exhibit A.

11.      Through this investigation, Hawk discovered that Zhongsheng does not have any record of any "employee, officer or representative" named "Tea Lee" who is listed as the signatory to the Term Sheet, as a Managing Director of Zhongsheng.  Similarly, Zhonsheng confirmed it has no record of the Term Sheet itself.  *See* Exhibit A.  Indeed, as confirmed through Zhongsheng's investor relations team, there is no record of Tea Lee in any publicly available disclosure or filing either, nor does "Managing Director" appear to be a formal position at Zhongsheng.  Moreover, Zhongsheng has no "knowledge regarding the situation of Stream TV Networks."  *Id.*  In other words, Zhongsheng is completely unaware of the existence of the Debtors, let alone the Term Sheet purportedly expressing its willingness to invest up to $300 million into the Debtors.  It appears Tea Lee is a fiction and the Term Sheet is fraudulent.

12.      Hawk believes that the Debtors presented the Amendment and the Term Sheet as an attempt to establish that the Chapter 11 Cases had progressed and were not administratively insolvent.  From the start, Hawk considered the Amendment and Term Sheet to be part of a broader pattern of bad faith and abusive—if not fraudulent—tactics the Debtors had employed during the course of these Chapter 11 Cases to frustrate Hawk's efforts to obtain relief.  Hawk believes that

---

[3] Wonderful Sky Financial Group is a Chinese public relations and communications firm operating in the Hong Kong market that provides public relations, investor relations, and other similar services. *See* http://www.wsfg.hk/professional-innovative?lang=en.  Zhongsheng has retained Wonderful Sky to maintain their investor relations communication channels, including the zs-group@wsfg.hk email address that Zhongsheng provides to its investors. *See* https://en.zs-group.com.cn/c/en/ircontacts.jhtml.

5

this conduct is directly attributable to Mr. Rajan; however, LBBS and Mr. Zahralddin-Aravena have an affirmative duty to investigate the representations made to this Court with respect to documents it signs on behalf of the Debtors and, in this case, has failed to do so.

13.    After Hawk's contact with Zhongsheng/Wonderful Sky, it is apparent that Hawk's concerns were justified and there is no evidence that the Term Sheet is legitimate.  With this information in hand, Hawk contacted the Respondents by letter dated July 25, 2023 and demanded they withdraw the Amendment and Term Sheet and repudiate the statements made therein, including by providing a statement of the diligence that they conducted prior to filing in the Amendment.  A copy of the July 25, 2023, letter is attached hereto as Exhibit B (the "Safe Harbor Notice").  The Respondents have ignored the Safe Harbor Notice and have left the Amendment on file without any clarification or explanation.

## ARGUMENT

### A.    The Respondents Have Violated Bankruptcy Rule 9011

14.    Under Bankruptcy Rule 9011, the signor of a pleading has an obligation to make a reasonable inquiry into the facts and law which support the pleading.  *See* Fed. R. Bankr. P. 9011(b); *In re Thomas*, 612 B.R. 46, 61 (Bankr. E.D. Pa. 2020) ("Rule 9011(b)(3) imposes a duty on attorneys to ensure, upon reasonable investigation, that the factual contentions they submit to the court have (or are likely to have) evidentiary support.").  Rule 9011(b), in relevant part, provides:

> (b)    *Representations to the Court.*  By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, --

6

(1)    it is not being presented for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)    the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)    ***the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery*** ....

Fed. R. Bankr. P. 9011(b) (emphasis added).

15.    The United States Court of Appeals for the Third Circuit has summarized the essence of Rule 9011[4] as follows:

> [T]he rule imposes an obligation on counsel and client analogous to the railroad crossing sign, "Stop, Look and Listen." It may be rephrased, "Stop, Think, Investigate and Research" before filing papers whether to initiate suit or to conduct the litigation. These obligations conform to those practices which responsible lawyers have always employed in vigorously representing their clients while recognizing the court's duty to serve the public efficiently.

*Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987).

16.    Rule 9011(b) places an affirmative duty on attorneys and litigants to investigate the facts and law before signing and submitting any petition, pleading, motion, or other paper. 10 *Collier on Bankruptcy* ¶ 9011.04[2][a] (16th ed. 2023). In other words, attorneys must "look before leaping." *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986). Hawk submits that the Respondents did not in fact "look" before they leapt in blindly relying on representations by Mr.

---

[4] Although the *Gaiardo* court referred to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"), courts within the Third Circuit consider the jurisprudence applicable to Rule 11 equally applicable to Bankruptcy Rule 9011. *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 96–97 (3d Cir. 2008) (noting, approvingly, that the district court found "no reason why Rule 9011 … sanctions should be treated differently than sanctions under Rule 11 and a court's inherent power").

Rajan, despite this affirmative obligation under Bankruptcy Rule 9011 and the presence of obvious hallmarks of fabrication.

17.    In determining whether Rule 9011 has been violated, courts apply the "reasonableness under the circumstances" standard. *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 534 (1991); *In re Antell*, 155 B.R. 921, 933 (Bankr. E.D. Pa. 1992) ("The touchstone for Rule [9011] sanctions is counsel's failure to make a reasonable inquiry into the facts being represented."). "To assess a Rule 9011 violation, the court need not use the benefit of hindsight but should instead inquire whether what the signor believed at the time the filing was submitted was 'reasonable under the circumstances.'" *See In re Vascular Access Cntrs., L.P.*, 646 B.R. 735, 754 (Bankr. E.D. Pa. 2022) (internal citations omitted).

18.    The objective reasonableness standard "is intended to discourage pleadings that are frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith." *Lieb*, 788 F.2d at 157. "Required of counsel is an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." *In re Jazz Photo Corp.*, 312 B.R. 524, 535 (Bankr. D.N.J. 2004) (internal citations omitted).    In other words, the "'pure heart, empty-head' or subjective good faith defense is inapplicable." *Vascular Access*, 646 B.R. at 754 (quoting *Lieb*, 788 F.3d at 157.).    To be reasonable, the signor must have objective knowledge or belief at the time of filing that the claims therein were well-grounded in fact. *See id.*

19.    Sanctions are imposed for pleadings not well grounded in fact and law after reasonable inquiry. *Bradgate Associates, Inc. v. Fellows, Read & Assoc., Inc.*, 999 F.2d 745, 752–53 (3d Cir. 1993).    An attorney may make a written allegation or factual contention (Rule 9011(b)(3)) **_only_** with the benefit of evidentiary support. *In re Melendez*, 235 B.R. 173, 194

8

(Bankr. D. Mass. 1999).  Where such support is not available—and the attorney specifically identifies the absence of such support—the attorney may make the contention only if it is "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." *In re Melendez*, 224 B.R. 252, 259, n.8 (D. Mass. 1988).  "Where 'the presenter knows there is no factual basis to support a claim,' the imposition of sanctions is justified—if not mandatory." *Vascular Access*, 646 B.R. at 754 (quoting 10 *Collier* ¶ 9011.04[8][a]).

20.    It is wholly unclear what—if any—investigation the Respondents have made to date with respect to the factual statements included in the Amendment and the Term Sheet; however, Hawk submits that even the most cursory of investigations would have uncovered that the Amendment and Term Sheet were complete fabrications.  Instead, it appears the Respondents relied solely upon the unchecked and unverified statements of Mr. Rajan, without any independent investigation, which is patently unreasonable given the context.

21.    Specifically, the situation at bar is not one in which any attorney should be allowed to bury their heads in the sand and argue that they relied on their client in good faith or that they expected to find factual support after reasonable inquest.  The context in which the Term Sheet and Amendment arose—including its nature, magnitude, and timing—is so intertwined with the hallmarks of fraud that any critical observer would have been suspicious of it from the start.  It simply is "too good to be true," and the Respondents should have understood as much.

22.    First, according to its website, Zhongsheng is an ***automobile dealership*** group in China that owns hundreds of car dealership locations.  It is not an institutional investor; it is not involved in the technology, audio-video, private equity, or start-up space; and it would have no reason to invest in companies such as the Debtors or in this technology whatsoever.  Second, even the most speculative of investors would be hesitant to put *any* money into a bankrupt entity as an

equity investment—let alone a $300 million investment when the Debtors had been unable to obtain traditional super-priority debtor-in-possession financing up to that point. Third, Mr. Rajan disclosed the existence of the Term Sheet on the eve of the June Hearings, up until which point not even the Debtors' proposed Chief Financial Officer was aware of its existence. In fact, only two days prior to the Debtors' filing the Amendment and Term Sheet, Mr. Thomas Park testified that there were no term sheets or "definitive financing at the moment" with the Debtors, and, instead, stated that the "term sheets with the Newco." *See* Park Deposition Transcript at 34:22–35:4, *In re Stream TV Networks, Inc.*, No.23-10763 (Bankr. E.D. Pa. June 21, 2023).

23.    In other words, the Term Sheet represented an immense capital infusion, on the best conceivable economic terms for any debtor in an active bankruptcy case (that would instantly be wiped out upon emergence from bankruptcy), from a company that is not traditionally involved in making such investments, with only one person having been involved in the negotiations—the owner and sole employee of the Debtors. This story is simply implausible, and merely asking a representative of Zhongsheng if it were true would have been sufficient to send the entire house of cards falling. As far as Hawk is aware, they did not.

24.    There is no basis for any reasonable attorney to have acted in the manner in which the Respondents have acted. Under Bankruptcy Rule 9011, the Respondents were required to conduct their own investigation, which should have included at least contacting the Debtors' alleged financing source or their counsel, but they did not. Furthermore, given the questionable nature, circumstances, and terms of the Term Sheet, they could not have reasonably relied upon the representations of Mr. Rajan. As such, the Respondents have violated Rule 9011(b)(3).

10

**B.     The Respondents Should be Sanctioned**

25.     Pursuant to Rule 9011(c)(2), the Court's determination of the type of sanction to be imposed is discretionary.  Bankruptcy Rule 9011(c)(2) states that sanctions "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." *See* Fed. R. Bankr. P. 9011(c)(2).  The sanctions may include an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.  *See Vascular Access*, 646 B.R. at 758–59 ("Such an order [directing payment of fees as part of a sanction] must be compensatory, not punitive, requiring the court to establish a causal link between the litigant's misbehavior and legal fees paid by the opposing party. Any award of attorneys' fees pursuant to the court's inherent authority may only include fees the complaining party would not have paid but for the misconduct.") (internal quotation marks and citations omitted).

26.     The Advisory Committee Note to Bankruptcy Rule 9011 suggests various factors for consideration by the Court in determining whether to award sanctions for violations of Rule 9011, including:

- whether the improper conduct was willful or negligent;

- whether the improper conduct was part of a pattern of activity or an isolated event;

- whether the improper conduct infected the entire pleading or only one particular count or defense;

- whether the person has engaged in similar conduct in other litigation;

- whether the improper conduct was intended to injure;

- the effect the improper conduct had on the litigation process in time or expense;

11

- whether the responsible person is trained in the law;

- the amount, given the financial resources of the responsible person, that is needed to deter that person from repetition in the same case; and

- the amount needed to deter similar activity by other litigants.

10 Collier, ¶ 9011.06[1].

27.     A weighing of these factors favors imposing meaningful sanctions against the Respondents, jointly and severally.  The Respondents' actions were *at least* grossly negligent in failing to investigate the allegations included in the Term Sheet at the most basic level.  Given the absolutely astounding terms and context detailed above, there is no excuse for why the Respondents did not conduct such investigation, and it is grossly negligent to rely on Mr. Rajan's representations—without independent verification—in this context.

28.     Moreover, there is a clearly established pattern of this type of questionable conduct throughout these Chapter 11 Cases.  Specifically, the Respondents have a history of making "bombshell" revelations on the eve of dispositive hearings—whether it be disclosing hundreds of millions of dollars in purchase orders filed ***one day prior*** to the initial hearing on the Pending Hawk Motions (compare ECF No. 114 with ECF No. 121) or the Term Sheet filed ***one business day prior*** to the June Hearings (compare ECF No. 258 with ECF No. 269).  The Respondents seem to consistently make materially impactful disclosures and representations in situations where Hawk and the other creditors are unable to completely assess the veracity of such statements. Furthermore, Mr. Rajan, in particular, has a history of fabricating documents to his own advantage, including backdating corporate documents (*see Stream TV Networks, Inc. v. SeeCubic, Inc.,* 250 A.3d 1016, 1026 (Del. Ch. 2020)) and producing *a substantially similar term sheet* for the

12

benefit of VSI during the 225 Action[5] on the eve of a dispositive hearing before Vice Chancellor Laster.  *See* Exhibit C.  If nothing else, Mr. Rajan's documented history of fabricating evidence should have placed the Respondents on notice that he may do so again, and such history makes their blind reliance on his representations even more egregious.

29.    Finally, the Respondents have undertaken these actions in a direct effort to frustrate Hawk and the other secured creditors' efforts to enforce their rights with respect to the secured debts—inflicting a direct injury on such creditors.  As Hawk has argued from the nascent stages of these Chapter 11 Cases, the Debtors commenced these cases in a bad faith effort to thwart the 225 Action from concluding with a detrimental result to the Debtors'—and Mr. Rajan's—interests. The Debtors' every action and omission during these Chapter 11 Cases has been designed to delay and defraud Hawk and the Debtors' other creditors and constituents by allowing the Debtors to hide behind the protections of the automatic stay while Hawk's interests wane as the technology risks becoming obsolete.  The Term Sheet is merely another chapter in the longer book of the Debtors' inappropriate actions—it provided just enough legitimacy to the idea that the Chapter 11 Cases may be progressing to delay the Pending Hawk Motions further.  In other words, the Respondents' intentionally dilatory and fraudulent actions have infected every aspect of these cases.  Such brazen disregard of the integrity of the bankruptcy system and this Court warrants substantial sanctions.

30.    Ultimately, there can be no rational explanation for the Respondents' failure to undertake even the most basic of investigations into such an outrageous factual contention. Moreover, the Respondents have been unable to explain their continued refusal to withdrawal and

---

[5] As used herein, the "225 Action" means the action captioned as *Hawk Investment Holdings Limited v. Stream TV Networks, Inc.*, C.A. No. 2022-0930-JTL (Del. Ch.).

repudiate the Amendment and Term Sheet, and they have produced no evidence sufficient to substantiate it. The Respondents' persistent efforts to frustrate Hawk's pursuit of information with respect to the Term Sheet and Zhongsheng only make sense if all parties involved were aware of the fraudulent nature of the pleadings—or those unaware buried their heads in the sand. Regardless, even if Mr. Rajan refused to disclose his contact at Zhongsheng to LBBS, such refusal should have prompted LBBS to conduct its own diligence into the matters. Such a situation is the precise type of action that Rule 9011 is enlisted to discourage.

31.     It is respectfully requested that, in the event the Court grants the Motion, Hawk be permitted to submit an affidavit setting forth its attorneys' fees and costs incurred in connection with (a) pursuing discovery with respect to Zhongsheng, including filing the Motion to Compel and pursuing Debtors' counsel with respect to the same, (b) preparation and prosecution of the Pending Hawk Motions (if the Court deems the Debtors' overall strategy part of this same scheme), and (c) the preparation of this Motion and defense of the Motion. Hawk respectfully submits that the Respondents will not be deterred unless they are required, jointly and severally, to fully reimburse Hawk for such fees and costs.

32.     Moreover, these actions and blatant fraud upon the Court further bolster Hawk's requested relief in the Pending Hawk Motions—specifically related to the request for dismissal, conversion, or appointment of a trustee. The Respondents simply cannot be trusted to continue shepherding these Chapter 11 Cases and should not be allowed to continue doing so in the future.

## CONCLUSION

33.     For the foregoing reasons, it is respectfully requested that the Court grant this Motion and accord such other and further relief as the Court considers just and proper.

14

**K&L GATES LLP**

Dated: August [__], 2023

*/s/ [DRAFT]*
Steven L. Caponi
Megan E. O'Connor
600 N. King St., Suite 901
Wilmington, DE 19801
P: 302-416-7080
steven.caponi@klgates.com
megan.oconnor@klgates.com

Margaret R. Westbrook
Aaron S. Rothman
Jonathan N. Edel
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
P: 704-331-7400
margaret.westbrook@klgates.com
aaron.rothman@klgates.com
jon.edel@klgates.com

Thomas A. Warns
599 Lexington Avenue
New York, NY 10022
P: 212-536-4009
tom.warns@klgates.com

*Counsel for Hawk Investment Holdings, Ltd.*

15

## CERTIFICATE OF SERVICE

I, Steven L. Caponi, certify that on August **[__]**, 2023, I caused a copy of the forgoing

*Hawk Investment Holdings Limited's Motion for Sanctions Pursuant to Rule 9011of the Federal*

*Rules of Bankruptcy Procedure* to be served on those persons receiving notice through CM/ECF.


*/s/ [DRAFT]*
Steven L. Caponi

# Exhibit A

| From: | 范露露 |
|---|---|
| To: | Chow, Natalie; zs-group@wsfg.hk |
| Cc: | Voon, Frank; Wang, Xiaotong; Chow, Natalie |
| Subject: | Re:RE: Zhongsheng Group Holdings Limited - Enquiries |
| Date: | Sunday, July 23, 2023 11:31:03 PM |

**External Sender:**

Dear Natalie,

Zhongsheng has no record of the Term Sheet dated 6 June 2023.

And we do not have any knowledge regarding the situation of Stream TV Networks.

Best regards,



Lulu Fan 范露露
**PR Manager** Wonderful Sky Financial Group
Asian Excellence Recognition Awards 2012 - 2014 Best Financial PR Firm
9/F, The Center, 99 Queen's Road Central, Central, Hong Kong | www.wsfg.hk
D: + 86 13058156527    |    E: lulufanll@wsfg.hk

------------------ Original ------------------

**From:** "Chow, Natalie"<Natalie.Chow@klgates.com>;
**Date:** Mon, Jul 24, 2023 11:19 AM
**To:** "范露露"<lulufanll@wsfg.hk>; "zs-group@wsfg.hk"<zs-group@wsfg.hk>;
**Cc:** "Voon, Frank"<Frank.Voon@klgates.com>; "Wang, Xiaotong"<Xiaotong.Wang@klgates.com>; "Chow, Natalie"
<Natalie.Chow@klgates.com>;
**Subject:** RE: Re:Zhongsheng Group Holdings Limited - Enquiries

Dear Ms. Fan,

Thank you very much for your confirmation.

May I also have your confirmation that Zhongsheng has no record of the Term Sheet dated 6 June 2023 (re-attached herein) and such Term Sheet is invalid?

Many thanks.

Kind regards,
Natalie



**Natalie Chow**
Trainee Solicitor
K&L Gates
44th Floor, Edinburgh Tower, The Landmark
15 Queen's Road Central, Hong Kong
Telephone: +852 2230 3505
Fax: +852 2511 9515
natalie.chow@klgates.com
www.klgates.com

**From:** 范露露 <lulufanll@wsfg.hk>
**Sent:** Thursday, July 20, 2023 11:44 AM
**To:** Chow, Natalie <Natalie.Chow@klgates.com>; zs-group@wsfg.hk
**Cc:** Voon, Frank <Frank.Voon@klgates.com>; Wang, Xiaotong <Xiaotong.Wang@klgates.com>;
Chow, Natalie <Natalie.Chow@klgates.com>
**Subject:** Re:Zhongsheng Group Holdings Limited - Enquiries


Dear Natalie,

Upon verification, Tea Lee is not our employee, officer or representative of Zhongsheng.

Please feel free to contact us, if you have further questions.


Best regards,



**Lulu Fan** 范露露
**PR Manager** Wonderful Sky Financial Group
Asian Excellence Recognition Awards 2012 - 2014 Best Financial PR Firm
9/F, The Center, 99 Queen's Road Central, Central, Hong Kong | www.wsfg.hk
D: + 86 13058156527    |    E: lulufanll@wsfg.hk



------------------ Original ------------------
**From:** "Chow, Natalie"<Natalie.Chow@klgates.com>;
**Date:** Tue, Jul 18, 2023 03:22 PM
**To:** "zs-group@wsfg.hk"<zs-group@wsfg.hk>;
**Cc:** "Voon, Frank"<Frank.Voon@klgates.com>; "Wang, Xiaotong"<Xiaotong.Wang@klgates.com>; "Chow, Natalie"
<Natalie.Chow@klgates.com>;
**Subject:** Zhongsheng Group Holdings Limited - Enquiries


To Whom It May Concern:

We attach the Term Sheet dated 6 June 2023 (from page 5) signed by Tea Lee (Managing Director) for and on behalf of Zhongsheng Group Holdings Limited (**Zhongsheng**).

We would like to confirm with you as to whether Tea Lee is an employee, officer or representative of Zhongsheng, in this regard.

If a call would help, please let us know.

Thank you.

Best regards,
Natalie



**Natalie Chow**
Trainee Solicitor
K&L Gates
44th Floor, Edinburgh Tower, The Landmark
15 Queen's Road Central, Hong Kong
Telephone: +852 2230 3505
Fax: +852 2511 9515
natalie.chow@klgates.com
www.klgates.com

This electronic message contains information from the law firm of K&L Gates. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Natalie.Chow@klgates.com.

This electronic message contains information from the law firm of K&L Gates. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Natalie.Chow@klgates.com.

# Exhibit B



July 26, 2023

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

**VIA ELECTRONIC MAIL**

Vincent F. Alexander, Esq.
Lewis Brisbois Bisgaard & Smith
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301

Rafael X. Zahralddin
Lewis Brisbois Bisgaard & Smith
500 Delaware Avenue, Suite 700
Wilmington, DE 19801

RE:   *In re Stream TV Networks, Inc.*; Case No. 23-10763-MDC
      *In re Technovative Media, Inc.*; Case No. 23-10764-MDC

Dear Messer's Zahralddin and Alexander:

I write on behalf of the Secured Creditors to address a serious issue implicating Rule 9011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9011 of Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Rules").

As you are aware, on April 21, 2023 you filed on behalf of the Debtors the *Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 135] (the "Ordinary Course Motion"). Pursuant to the Ordinary Course Motion, the Debtors requested (in relevant part) authority to sell up to $10 million of stock of Debtor Stream to Visual Semiconductor, Inc. ("VSI") in the ordinary course of business in order to fund the Chapter 11 Cases. *See* Ordinary Course Motion, at ¶ 14.

On June 23, 2023, you signed and filed an *Amendment to Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 258] (the "Amendment"). In the Amendment, the Debtors reiterated their request for authority to sell Debtor Stream's equity in the ordinary course of their business, but amended the request so that the buyer was Zhongsheng Group Holdings Ltd. ("Zhongsheng") rather than VSI. The Amendment requested authority to sell up to $300 million of Stream's Class A common stock to Zhongsheng pursuant to a term sheet attached as Exhibit A to the Amendment (the "Term Sheet"). The Term Sheet, dated June 6, 2023, provided that it was "non-binding" and set forth "a summary of the proposed terms of the Transaction and is intended solely as a basis for further discussion...." See Term Sheet, introduction. The Term Sheet was

executed by Mathu Rajan on behalf of Stream and "Tea Lee," who purported to be a "Managing Director" of Zhongsheng. Attached to the Term Sheet, the Debtors included an unexecuted Subscription Agreement providing the same details as were included in the Term Sheet.

Following disclosure of the Term Sheet, we have repeatedly asked the Debtors, formally and informally, to produce documents related to Zhongsheng, Tea Lee and the Tem Sheet. To Date, the Debtors have refused to provide even a single corroborating document or communication. After an independent investigation, we have determined that the Term Sheet is fraudulent and Tea Lee a fiction created by Mr. Rajan. By this correspondence we hereby demand, pursuant to Rule 9011(b) of the Federal Rules of Bankruptcy Rules and Local Rules that you withdraw the Amendment and inform the Court of its fraudulent nature.

After receipt of the Amendment and Term Sheet, the undersigned working with lawyers in the Asian offices of K&L Gates LLP investigated the veracity of the Term Sheet and attempted to determine if Tea Lee had any affiliation with Zhongsheng. Among other things, this investigation included a review of the Zhongsheng web site and its various public filings. *See* Zhongsheng Group (zs-group.com.cn) and Financial Reports (zs-group.com.cn). A review of this material quickly revealed that Zhongsheng's corporate structure does not include a position designated as "Managing Director" or any reference to a Tea Lee.

Further review of the Zhongsheng web site revealed that Wonderful Sky Financial Group ("Wonderful Sky") handles all investor relations inquiries. See IR Contacts (zs-group.com.cn). We initially engaged in direct communications with Wonderful Sky to determine if Tea Lee was affiliated with Zhongsheng. On July 20, 2023, Natalie Chow responded by confirming, "[u]pon verification, Tea Lee is not our employee, officer or representative of Zhongsheng." *See* Exhibit "A." Upon learning Tea Lee did not exist, we forwarded the Term Sheet to Ms. Chow and inquired into the validity of the document. Ms. Chow once again promptly responded by stating, "Zhongsheng has no record of the Term Sheet dated 6 June 2023." *Id.* Just as troubling, Ms. Chow noted that "we do not have any knowledge regarding the situation of Stream TV Networks." *Id.*

Under the circumstances, you were under an ethical obligation to independently verify the information provided by your client before filing the Amendment and Term Sheet. This is particularly true where the Term Sheet on its face was too good to be true, the timing of its disclosure was questionable at best, and your client has a history of inventing claims of substantial business relationships that turn out to be untrue. If this were not enough to prompt inquiry on your part, I would note that Mr. Park, who is seeking to be retained as Stream's CFO, testified that he had not heard of Zhongsheng or been informed of the Term Sheet at least as of June 21, 2023. Mr. Park has worked for Stream since April of this year, after having been introduced to the Debtors by Mr. Zahralddin. A reasonable inquiry would have quickly uncovered the fraudulent nature of the Amendment and Term Sheet.

2

July 26, 2023

We look forward to hearing from you and for your withdrawal of the Amendment and explanation repudiating the Term Sheet in its entirety.  Otherwise, we will file the attached sanctions motion with the Court in accordance with Bankruptcy Rule 9011.


Very truly yours,

*/s/ Steven L. Caponi*

Steven L. Caponi


Enclosure

July 26, 2023

# Exhibit C

VSI TS22009 (Common)

## TERM SHEET

### Proposed Private Placement Investment of Common Stock of Visual Semiconductor, Inc.

The following is a summary of the principal terms with respect to a proposed sale of Class A Common Stock of Visual Semiconductor, Inc., a Wyoming company. This is a non-binding Term Sheet setting for a summary of the proposed terms of the Transaction and is intended solely as a basis of further discussion and is not intended to be, and does not constitute, a legally binding obligation of any Party. A legally binding obligation will be established only pursuant to mutually acceptable definitive written agreements executed by the Parties. In the event of any inconsistency between this summary and such definitive written agreements, the definitive agreements will govern.

| | |
|---|---|
| **Issuer:** | Visual Semiconductor, Inc., a Wyoming corporation (the "**Company**"). |
| **Investor:** | Zhongsheng Group Holdings Ltd.("**Investor**") is an accredited investor and has a principal place of business at No. 20 Hequ Street, Shahekou District, Dalian, Liaoning 116000, PRC. Investor and the Company may together be referred to as the "**Parties**" and individually as "**Party.**" |
| **Amount:** | Investor will invest US dollars Three Hundred million (US $300,000,000) for the Issuer Stock on or before *Nov. 1st,* 2022 (the "**Investment Amount**") at Original Purchase Price in two (2) tranches as follows:<br>1) RMB 1.4 Billion (RMB 4,000,000,000), followed immediately thereafter by<br>2) USD 100 Million (USD $100,000,000). |
| **Board Seat:** | Upon a successful closing of the Investment Amount by the Investor, the Investor will be awarded one (1) board seat. |
| **Separate Production Investment:** | The Parties are discussing, in addition to the Investment Amount, a separate investment in the RMB equivalent amount of USD 10-20 Million (USD $10,000,000 – 20,000,000) for a factory/production facility. |
| **Placement Agents:** | Such placement agents as the Company may disclose to the Investor. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion. |
| **Securities:** | Class A Common Stock of the Company (the "**Stock**"). |
| **Valuation:** | The Investment amount will result in a 33% stock equity holding in the Class A Common Stock of the Company upon closing. (the "**Original Purchase Price**"). |
| **Capitalization:** | The Company's current capitalization consists of _____ shares of Class A Common Stock, _____ warrants exercisable into shares of Class A Common Stock and _____ authorized employee stock options. |
| **Use of Proceeds:** | The Company will use the proceeds, net of applicable placement agent fees, from the sale of the Stock, for any lawful general business purpose. |

HIGHLY CONFIDENTIAL

TP000928

TP000928

VS-TS22009 (Common)

| Drag Along Rights: | If the holders of a majority of the issued and outstanding capital stock of the Company (on an as-converted to Class A Common Stock basis) agree to, approve or otherwise participate in or are subject to any acquisition or asset transfer approved by the board of directors, then the holders of Stock shall consent to and raise no objections against such acquisition or asset transfer. If the acquisition or asset transfer is structured as a (i) merger or consolidation, the holders of Stock shall waive any dissenter rights, appraisal rights or similar rights in connection with such acquisition, (ii) sale of capital stock, the holders of Stock shall enter into an agreement approved by the majority holders governing the sale of all equity on the terms and conditions approved by the majority holders, or (iii) sale of all or substantially all of the assets of the company, the holders of Stock shall vote in favor thereof, if required. |
|---|---|
| Confidentiality: | Each Party agrees that, except with the prior written consent of the other Party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such Party has been or shall become privy by reason of this Term Sheet or the agreements contemplated herein, discussions or negotiations relating to this Term Sheet or the agreements contemplated herein, the performance of its obligations under the agreements contemplated herein or the ownership of the shares purchased under such agreements. |
| Expenses: | Each Party to this transaction shall bear its own expenses, including but not limited to legal fees. |
| Governing Law: | Any legal matter arising from the instant Term Sheet and the definitive documentation for such shall be governed by the laws of the Commonwealth of Pennsylvania USA and in the exclusive jurisdiction and venue of Philadelphia, Pennsylvania USA. |

Accepted and agreed to, this 17th day of September, 2022, by each of the Parties set forth below:

Company:   **Visual Semiconductor, Inc.**

Investor:   **Zhongsheng Group Holdings Ltd.**

By: _____

By: _____

Name:   Mathu Rajan

Name: _____

Title:   President

Title: _____

Date: _____

Date: _____

HIGHLY CONFIDENTIAL

TP000929

TP000929