# App. Ex. 61

**From:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Sent:** Friday, August 04, 2023 2:05 PM EDT
**To:** jeff blueoceanpartnersltd.com <jeff@blueoceanpartnersltd.com>
**CC:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: [EXT]
**Attachment(s):** "Zhongsheng Group Holdings Limited _ Shareholders Board Members Managers and Company Profile _ KYG9894K1085 _ MarketScreener.pdf"

Thanks Jeff. I am trying to follow the chats, but I am not sure I do. I still do not see the direct link between Zhongzhi and Zhongsheng. I pulled some market information for Zhongsheng, and I do not see Zhongzhi as one of the major shareholders (see attached and https://www.marketscreener.com/quote/stock/ZHONGSHENG-GROUP-HOLDINGS-6170716/company/).

Please help me connect the dots between Zhongzhi and Zhongsheng and as to how Tea Lee is a "Managing Director" of Zhongsheng with authority to sign the Term Sheet.

Thanks.

Vince


**Vincent F. Alexander**
**Partner**
Fort Lauderdale
954.939.3371 or x9543371

---

**From:** jeff blueoceanpartnersltd.com <jeff@blueoceanpartnersltd.com>
**Sent:** Friday, August 4, 2023 1:56 PM
**To:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** [EXT]

**TRUSTEE 74**

# Document Break

## Shareholders

| Name | Equities | % | Valuation |
|---|---|---|---|
| Yi Huang | 48.50 % | 1,161,075,874 | 4 437 M $ |
| JARDINE MATHESON HOLDINGS LIMITED | 21.13 % | 505,816,116 | 1 933 M $ |
| T. Rowe Price International Ltd. | 2.014 % | 48,200,500 | 184 M $ |
| Capital Research & Management Co. (World Investors) | 1.122 % | 26,866,750 | 103 M $ |
| APG Asset Management NV | 1.092 % | 26,140,951 | 100 M $ |
| The Vanguard Group, Inc. | 1.068 % | 25,560,442 | 98 M $ |
| FIL Investment Advisors (UK) Ltd. | 1.035 % | 24,773,340 | 95 M $ |
| FIL Investment Management (Hong Kong) Ltd. | 0.8879 % | 21,254,294 | 81 M $ |
| FIL Investment Management (Singapore) Ltd. | 0.8706 % | 20,840,910 | 80 M $ |
| The Caisse de dépôt et placement du Québec | 0.4903 % | 11,735,854 | 45 M $ |

# App. Ex. 62

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Wednesday, October 18, 2023 1:32 PM EDT
**To:** Suby Joseph <suby@streamacquisitiongroup.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>;
bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com
<dan@streamacquisitiongroup.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>
**CC:** Russell, Candace <Candace.Russell@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; Pigg,
Jann <Jann.Pigg@lewisbrisbois.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>
**Subject:** RE: THE COMEBACK TRAIL / MORs - August, September CONFIDENTIAL & PRIVILEGED

I sent around a zoom – I need all drafts and all back up for the MORs we have to amend and the new ones we have to file.

This SNAFU is going to get the CASE CONVERTED.

I CAN'T BE MORE SERIOUS ABOUT THIS ISSUE.


**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

---

**From:** Suby Joseph <suby@streamacquisitiongroup.com>
**Sent:** Tuesday, October 17, 2023 3:06 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>;
bud@streamacquisitiongroup.com; dan@streamacquisitiongroup.com; amanda@streamacquisitiongroup.com
**Cc:** Russell, Candace <Candace.Russell@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; Pigg, Jann
<Jann.Pigg@lewisbrisbois.com>; mathu@streamacquisitiongroup.com
**Subject:** [EXT] Re: THE COMEBACK TRAIL / MORs - August, September CONFIDENTIAL & PRIVILEGED


Hi Raf

Please see the Stream TV account statements for the MOR period last submitted

Need to talk to you. The MORs include all Stream related spend from Stream and non-Stream accounts (VSI). If you want to include
the $2,000 that was transferred to the Stream account, you will be double counting – since the monies being spent are already in the
table.

S


---

**From:** "Zahralddin, Rafael" <Rafael.Zahralddin@lewisbrisbois.com>
**Date:** Tuesday, October 17, 2023 at 2:44 PM
**To:** "Fisher, Bennett" <Bennett.Fisher@lewisbrisbois.com>, "bud@streamacquisitiongroup.com"
<bud@streamacquisitiongroup.com>, "dan@streamacquisitiongroup.com" <dan@streamacquisitiongroup.com>,
"amanda@streamacquisitiongroup.com" <amanda@streamacquisitiongroup.com>, 'Suby Joseph'
<suby@streamacquisitiongroup.com>
**Cc:** "Russell, Candace" <Candace.Russell@lewisbrisbois.com>, "David, Daniel" <Daniel.David@lewisbrisbois.com>, "Pigg,
Jann" <Jann.Pigg@lewisbrisbois.com>, "mathu@streamacquisitiongroup.com" <mathu@streamacquisitiongroup.com>
**Subject:** RE: THE COMEBACK TRAIL / MORs - August, September CONFIDENTIAL & PRIVILEGED

Client and Bennett,

We need to resolve this issue right now.  Not tomorrow. Not the next day.

Bud is not available – he is travelling to Africa.

Suby – I need all the bank statements sent to all on this list in the next hour or so I can review and sign off.

We also need subscription agreements to match the amounts, THIS IS PRIORITY.




**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**


# TRUSTEE 141

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**



This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

---

**From:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Sent:** Tuesday, October 17, 2023 1:49 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; bud@streamacquisitiongroup.com; dan@streamacquisitiongroup.com; amanda@streamacquisitiongroup.com
**Cc:** Russell, Candace <Candace.Russell@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>
**Subject:** THE COMEBACK TRAIL / MORs - August, September CONFIDENTIAL & PRIVILEGED

Gentlemen & Amanda:

Please recall that the August MORs have not been filed.  The last time I communicated about this, I reminded you that there was a $2,000 transfer from VSI to Stream in August, with no explanation other than "…Mathu said to transfer the money because there was a bill that had to be paid by Stream…."  Such a transfer cannot be a loan because advance permission from the court, after notice and a hearing, is required before the debtor can borrow any money.  I was then told that it was part of a previously executed subscription agreement, but I have not been provided with a copy of that agreement nor a memo detailing how this $2,000 was transferred pursuant to that agreement.  The last I inquired (last week), I was told that this was not a priority.  It needs to be pushed up to the top of the list.

The September MORs are due on Friday.  We currently have no information.  If Amanda is no longer available, then who is?  I know that Dan is capable of providing the information, as is Bud, but the shell game of who is working for which company is confusing to me and I'm sure (at some point) it's confusing to the creditors and the court.  The MORs are a pain in the ass, but it is the best means by which the US Trustee's office can keep tabs on cases.  Not filing them is a road to conversion.

Bennett

**Bennett G. Fisher**
**Partner**
Houston
346.241.4095 or x7134095

# App. Ex. 63

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, December 08, 2023 1:09 PM EST
**To:** mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; Russell, Candace <Candace.Russell@lewisbrisbois.com>; nicholas.greene15@gmail.com <nicholas.greene15@gmail.com>; Pigg, Jann <Jann.Pigg@lewisbrisbois.com>; Brown, Susan <Susan.Brown@lewisbrisbois.com>
**Subject:** FW: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX
**Attachment(s):** "Hawk - Witness and Exhibit List (Dec 11 Hearing)_USE_Active01_317226674_1.DOCX"

Dear Bennett – can we please get the amended MORs filed before we get creamed on Monday – if you review this list you will see that they are using the current MORs as evidence as to how STREAM IS NOT OUR CLIENT and really its VSI and as such we should *be disqualified from the case.*

They want us not to be paid and be disqualified.

Can we get the MORs filed so I can include them on the exhibit list that is due!!

Susan can help file.

Please.  Where are we?

---

**From:** Edel, Jon N. <Jon.Edel@klgates.com>
**Sent:** Friday, December 8, 2023 1:04 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; Brumme, Marley Ann <Marley.Brumme@skadden.com>; Winerman, Justin M <Justin.Winerman@skadden.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A. <Tom.Warns@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S. <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>; Cousins, Scott <Scott.Cousins@lewisbrisbois.com>
**Subject:** [EXT] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Rafael,

We have each of these exhibits also listed on our proposed Witness and Exhibit List which is attached, so we also stipulate to the admission of your exhibits.  As I mentioned, our exhibits are all either filed documents or transcripts of hearings or depositions, so we would request the same stipulated treatment.  Please let us know.

Our list also includes Exhibits for the Park Application as well.

I also mentioned that we may have a demonstrative that is a simple timeline that we would propose to use merely as a visual aid.  I will send that along when we have it completed.

Jon

K&L Gates LLP

**Jon Edel**
Associate
K&L Gates LLP
300 South Tryon Street
Suite 1000
Charlotte, NC 28202
Phone: 704.331.7445
Fax: +1.704.353.3122
Jon.Edel@klgates.com
www.klgates.com

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, December 8, 2023 12:08 PM
**To:** Edel, Jon N. <Jon.Edel@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>

**TRUSTEE 142**

**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; Brumme, Marley Ann <Marley.Brumme@skadden.com>; Winerman, Justin M <Justin.Winerman@skadden.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A. <Tom.Warns@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S. <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>; Cousins, Scott <Scott.Cousins@lewisbrisbois.com>
**Subject:** RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Dear John and Margaret,

I am filing this shortly, can you tell me if you will stipulate to the introduction of the exhibits?  I don't think these are controversial. Our CFO and Mr. Rajan will be available.

I am getting confirmation on a witness from VSI.

Thanks.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

# Mansfield Rule
## Certified 2022-2023 Powered by DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, December 7, 2023 11:51 AM
**To:** Brumme, Marley Ann <Marley.Brumme@skadden.com>; Winerman, Justin M <Justin.Winerman@skadden.com>
**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; 'Caponi, Steven L.' <Steven.Caponi@klgates.com>; 'Warns, Tom A.' <Tom.Warns@klgates.com>; 'Westbrook, Margaret' <Margaret.Westbrook@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; 'Rothman, Aaron S.' <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>
**Subject:** RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Thanks.

Let me discuss with my client and our witnesses.

In terms of Monday's hearing and our fee application defense, I will be filing something shortly, but relayed the other night that our CFO, Brian Gedeon, will be attending in person as a witness, Mathu Rajan will be available as a witness, and I am confirming a representative from VSI who will appear remotely.

We will be using our retention application and all supporting documents, the plan and disclosure statement and all supporting documents, and I am confirming which client documents from our books and records we will also use.

I am confirming if Mr. Park is available to attend, but he might have to attend via Zoom.  I am also filing a brief as requested by the Court shortly.

**From:** Brumme, Marley Ann <Marley.Brumme@skadden.com>
**Sent:** Wednesday, December 6, 2023 6:05 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Winerman, Justin M <Justin.Winerman@skadden.com>
**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; 'Caponi, Steven L.' <Steven.Caponi@klgates.com>; 'Warns, Tom A.' <Tom.Warns@klgates.com>; 'Westbrook, Margaret' <Margaret.Westbrook@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; 'Rothman, Aaron S.' <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>
**Subject:** [EXT] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Rafael,

Regarding your question on continuation of the TRO, we've aggregated availability of our rebuttal witnesses, and counsel for the various parties who have been involved the proceedings.  Given the number of people, pre-scheduled travel for business, the holidays, and court appearances elsewhere, we have not been able to squeeze it in before the holidays but can be available on January 5, which the Court indicated recently had freed up.

**Marley Ann Brumme**
**Skadden, Arps, Slate, Meagher & Flom LLP**
**T: +1.617.573.4861** | **F: +1.617.305.4861**
**marley.brumme@skadden.com**

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Wednesday, December 6, 2023 5:23 PM
**To:** Winerman, Justin M (CHI) <Justin.Winerman@skadden.com>
**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; 'Caponi, Steven L.' <Steven.Caponi@klgates.com>; 'Warns, Tom A.' <Tom.Warns@klgates.com>; 'Westbrook, Margaret' <Margaret.Westbrook@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; 'Rothman, Aaron S.' <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P (BOS) <Eben.Colby@skadden.com>; Mazza, Jr., James J (CHI) <James.Mazza@skadden.com>; Brumme, Marley Ann (BOS) <Marley.Brumme@skadden.com>; Ritchie, Rebecca L (CHI) <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E (CHI) <Marie.Sheehan@skadden.com>
**Subject:** [Ext] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Any updates on this order?

Also, the Court also asked again for dates for your witnesses for the continued TRO.

Also, looking to see if anyone is amenable to settle any other open issues related to the 2019, fee objection, Parks retention, and even stay enforcement issues.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
Certified 2022-2023 Powered by DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, December 5, 2023 10:10 PM
**To:** Winerman, Justin M <Justin.Winerman@skadden.com>
**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; 'Caponi, Steven L.' <Steven.Caponi@klgates.com>; 'Warns, Tom A.' <Tom.Warns@klgates.com>; 'Westbrook, Margaret' <Margaret.Westbrook@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; 'Rothman, Aaron S.' <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Brumme, Marley Ann <Marley.Brumme@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>
**Subject:** RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Very close, I only added a couple of things to balance the edits and hopefully its consistent with our discussion.

I am speaking to my client about this tomorrow.

Thanks,

Nice speaking to you and John as well.


**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

**From:** Winerman, Justin M <Justin.Winerman@skadden.com>
**Sent:** Tuesday, December 5, 2023 8:49 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** 'Terence M. Grugan' <GruganT@ballardspahr.com>; 'Caponi, Steven L.' <Steven.Caponi@klgates.com>; 'Warns, Tom A.' <Tom.Warns@klgates.com>; 'Westbrook, Margaret' <Margaret.Westbrook@klgates.com>; 'Callahan, Kevin P. (USTP)' <Kevin.P.Callahan@usdoj.gov>; 'Schanne, John (USTP)' <John.Schanne@usdoj.gov>; 'ademarco@devlinlawfirm.com' <ademarco@devlinlawfirm.com>; 'vesperm@ballardspahr.com' <vesperm@ballardspahr.com>; 'McKeeVassalloE@ballardspahr.com' <McKeeVassalloE@ballardspahr.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>; 'Davis L. Wright' <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; 'Rothman, Aaron S.' <Aaron.Rothman@klgates.com>; 'Ogden, Brittany S.' <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Brumme, Marley Ann <Marley.Brumme@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>
**Subject:** [EXT] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX



Rafael,

Good speaking with you tonight. Hope you were able to get your daughter Ok. The attached, which remains subject to internal and client review and comment from the other counsel on this email, should reflect the conversation and is hopefully final or close to it. Please confirm your client is signed off and we will do the same and then we can discuss process for informing the Court.

Thanks,

**Justin M. Winerman**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
155 North Wacker Drive | Chicago | Illinois | 60606-1720
T: +1.312.407.0924 | F: +1.312.827.9323
justin.winerman@skadden.com


**From:** Winerman, Justin M (CHI)
**Sent:** Tuesday, December 5, 2023 3:42 PM
**To:** 'Zahralddin, Rafael' <Rafael.Zahralddin@lewisbrisbois.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>
**Cc:** Terence M. Grugan <GruganT@ballardspahr.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A. <Tom.Warns@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>; ademarco@devlinlawfirm.com; vesperm@ballardspahr.com; McKeeVassalloE@ballardspahr.com; Davis L. Wright <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S.

<Aaron.Rothman@klgates.com>; Ogden, Brittany S. <Brittany.Ogden@quarles.com>; Colby, Eben P (BOS)
<Eben.Colby@skadden.com>; Mazza, Jr., James J (CHI) <James.Mazza@skadden.com>; Brumme, Marley Ann (BOS)
<Marley.Brumme@skadden.com>; Ritchie, Rebecca L (CHI) <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E (CHI)
<Marie.Sheehan@skadden.com>
**Subject:** RE: [Ext] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

5 p.m. eastern works for me. I can send a dial in assuming we have enough people. Unfortunately, if you are asking about rebuttal witnesses for TRO, that would be Eben and Marley, and I think they are tied up.

**Justin M. Winerman**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
**155 North Wacker Drive | Chicago | Illinois | 60606-1720**
**T: +1.312.407.0924** | **F: +1.312.827.9323**
**justin.winerman@skadden.com**

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, December 5, 2023 3:26 PM
**To:** Winerman, Justin M (CHI) <Justin.Winerman@skadden.com>; 'Edel, Jon N.' <Jon.Edel@klgates.com>
**Cc:** Terence M. Grugan <GruganT@ballardspahr.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A.
<Tom.Warns@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Callahan, Kevin P. (USTP)
<Kevin.P.Callahan@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>; ademarco@devlinlawfirm.com;
vesperm@ballardspahr.com; McKeeVassalloE@ballardspahr.com; Davis L. Wright <dwright@rc.com>; Kodosky, Keith
<Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin
<Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S.
<Aaron.Rothman@klgates.com>; Ogden, Brittany S. <Brittany.Ogden@quarles.com>; Colby, Eben P (BOS)
<Eben.Colby@skadden.com>; Mazza, Jr., James J (CHI) <James.Mazza@skadden.com>; Brumme, Marley Ann (BOS)
<Marley.Brumme@skadden.com>; Ritchie, Rebecca L (CHI) <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E (CHI)
<Marie.Sheehan@skadden.com>
**Subject:** [Ext] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

How about 5pm?

Also, Eileen just called me and needs to know about your side's rebuttal witness to have the continued hearing before she runs out of dates.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
Certified 2022-2023 DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Winerman, Justin M <Justin.Winerman@skadden.com>
**Sent:** Tuesday, December 5, 2023 3:46 PM
**To:** 'Edel, Jon N.' <Jon.Edel@klgates.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** Terence M. Grugan <GruganT@ballardspahr.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A.
<Tom.Warns@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Callahan, Kevin P. (USTP)
<Kevin.P.Callahan@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>; ademarco@devlinlawfirm.com;
vesperm@ballardspahr.com; McKeeVassalloE@ballardspahr.com; Davis L. Wright <dwright@rc.com>; Kodosky, Keith
<Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin
<Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S.
<Aaron.Rothman@klgates.com>; Ogden, Brittany S. <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>;
Mazza, Jr., James J <James.Mazza@skadden.com>; Brumme, Marley Ann <Marley.Brumme@skadden.com>; Ritchie, Rebecca L
<Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>
**Subject:** [EXT] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Thanks, Jon. Rafael, I got your voicemail. Does it makes sense for a small subset to get on a call (one person from each party who

wants to participate) so we can try to finalize this. I can be available the rest of the day or tomorrow morning before 11 a.m. eastern or between 2:30 and 5 eastern. Let me know who wants to be on and what time works, and I can send a dial in.

**Justin M. Winerman**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
155 North Wacker Drive | Chicago | Illinois | 60606-1720
T: +1.312.407.0924 | F: +1.312.827.9323
justin.winerman@skadden.com

---

**From:** Edel, Jon N. <Jon.Edel@klgates.com>
**Sent:** Tuesday, December 5, 2023 1:48 PM
**To:** Winerman, Justin M (CHI) <Justin.Winerman@skadden.com>; 'Zahralddin, Rafael' <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** Terence M. Grugan <GruganT@ballardspahr.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A. <Tom.Warns@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>; ademarco@devlinlawfirm.com; vesperm@ballardspahr.com; McKeeVassalloE@ballardspahr.com; Davis L. Wright <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S. <Aaron.Rothman@klgates.com>; Ogden, Brittany S. <Brittany.Ogden@quarles.com>; Colby, Eben P (BOS) <Eben.Colby@skadden.com>; Mazza, Jr., James J (CHI) <James.Mazza@skadden.com>; Brumme, Marley Ann (BOS) <Marley.Brumme@skadden.com>; Ritchie, Rebecca L (CHI) <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E (CHI) <Marie.Sheehan@skadden.com>
**Subject:** [Ext] RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Rafael,

This email responds to your email yesterday directed at Hawk but is added to this chain so everything progresses together.  We disagree with your position that the highlighted provision "gives a pass" or "exonerates" anything; it merely states that the order does not constitute a determination of any currently pending motions.  That said, in the interest of resolving any concern you may have, we propose to add the following bolded/underlined language to clarify that it is also not a determination as to the Debtors' stay enforcement motions (we have also made this change in the attached document):

"Nothing herein shall constitute a determination regarding any pending motions or proceedings (including motions for relief from **or seeking to enforce,** the automatic stay) or a grant of any injunction or injunctive relief requested or currently pending before the Court, nor…"

As you are aware, this type of request is properly made as a first or second day matter, so there are generally no outstanding motions requesting substantive relief as we have here.  Because of the timing of this request, Hawk believes it is prudent to clarify the order's potential impact on the other aspects of this case (*i.e.*, that it is not a ruling one way or the other on Hawk's motions for relief or dismissal/conversion or the Debtors' TRO or motions to enforce).

With these changes to SeeCubic's version, we think it should be ready to go.  We would also request that you provide us with a copy of any proposed notice to which you propose to attach this order after it's entered.

Thank you,
Jon

**Jon Edel**
Associate
K&L Gates LLP
300 South Tryon Street
Suite 1000
Charlotte, NC 28202
Phone: 704.331.7445
Fax: +1.704.353.3122
Jon.Edel@klgates.com
www.klgates.com

**From:** Winerman, Justin M <Justin.Winerman@skadden.com>
**Sent:** Monday, December 4, 2023 8:46 PM
**To:** 'Zahralddin, Rafael' <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** Terence M. Grugan <GruganT@ballardspahr.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Warns, Tom A. <Tom.Warns@klgates.com>; Edel, Jon N. <Jon.Edel@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>; ademarco@devlinlawfirm.com; vesperm@ballardspahr.com; McKeeVassalloE@ballardspahr.com; Davis L. Wright <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S.

<Aaron.Rothman@klgates.com>; Ogden, Brittany S. <Brittany.Ogden@quarles.com>; Colby, Eben P <Eben.Colby@skadden.com>; Mazza, Jr., James J <James.Mazza@skadden.com>; Brumme, Marley Ann <Marley.Brumme@skadden.com>; Ritchie, Rebecca L <Rebecca.Ritchie@skadden.com>; Sheehan, Marie E <Marie.Sheehan@skadden.com>

**Subject:** RE: CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

Rafael,

Please see SeeCubic's changes, which remain subject to internal and client review as well as comments from any of the other counsel on this email. I've also incorporated K&L's comments from the other day that they sent that were not yet incorporated into your draft. The stipulated order is a comfort order, which some judges do not like to even enter, and should not have --nor should it be intended to have-- any substantive effect or have any influence on the disputes the parties have. We are happy to discuss and could have a call tomorrow. I'm available starting at 1 p.m. eastern.

Thanks,

**Justin M. Winerman**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
155 North Wacker Drive | Chicago | Illinois | 60606-1720
**T: +1.312.407.0924** | **F: +1.312.827.9323**
**justin.winerman@skadden.com**

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, December 1, 2023 3:14 PM
**To:** Winerman, Justin M (CHI) <Justin.Winerman@skadden.com>
**Cc:** Terence M. Grugan <GruganT@ballardspahr.com>; Caponi, Steven L. <Steven.Caponi@klgates.com>; Thomas Warns <tom.warns@klgates.com>; Jon N. Edel <Jon.Edel@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>; ademarco@devlinlawfirm.com; vesperm@ballardspahr.com; McKeeVassalloE@ballardspahr.com; Davis L. Wright <dwright@rc.com>; Kodosky, Keith <Keith.Kodosky@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Shaw, Kevin <Kevin.Shaw@lewisbrisbois.com>; Campbell, Patrick <Patrick.Campbell@lewisbrisbois.com>; Rothman, Aaron S. <Aaron.Rothman@klgates.com>; Ogden, Brittany S. <Brittany.Ogden@quarles.com>; Colby, Eben P (BOS) <Eben.Colby@skadden.com>; Mazza, Jr., James J (CHI) <James.Mazza@skadden.com>; Brumme, Marley Ann (BOS) <Marley.Brumme@skadden.com>; Ritchie, Rebecca L (CHI) <Rebecca.Ritchie@skadden.com>
**Subject:** [Ext] CHISR02A-#1241135-v1D-Comments_to_Stay_Order (002).DOCX

**Settlement Discussions Protected under Federal Rule of Evidence 408 and State Law Equivalents**

Dear Justin,

I accepted many of your changes, and then edited to fill in some of the basics that we believe should be in the order.  Thank you for the redline in word – it just made it easier to review and edit your version.

My suggestion is that the parties take a look and perhaps we can get on a call this weekend (whoever wants to participate).

I expect to hear perhaps from Margaret as well at some point.  Hopefully the comments in the margin will facilitate the discussion.

The Debtors view this as mitigation and a reduction in further damages to the estate and any parties who have potentially violated the stay.   As the Judge noted, there are consequences to any stay violation, whether it was done under advice of counsel or color of law.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

Mansfield Rule
Certified 2022-2023

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

---------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jon.Edel@klgates.com.

------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jon.Edel@klgates.com.

# App. Ex. 64

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, May 07, 2024 9:33 AM EDT
**To:** Phil Darivoff (phil@darivoff.net) <phil@darivoff.net>
**CC:** Mathu Rajan <mathu.rajan@visualsemi.com>; bud.robertson@visualsemi.com <bud.robertson@visualsemi.com>;
Albert A. Ciardi III <Aciardi@ciardilaw.com>; ntwallace@aol.com <ntwallace@aol.com>; steve@rembrandt3d.com
<steve@rembrandt3d.com>; Christopher Michaels <michaels@bpmlegal.com>; ademarco@devlinlawfirm.com
<ademarco@devlinlawfirm.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>; Kelly Love <KLove@sgrvlaw.com>
**Subject:** Re: [EXT] Re: VSI-Stream Strategy Cal

Ok for me too.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

## Mansfield Rule
### Certified 2022-2023 DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you
are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify
the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On May 6, 2024, at 10:26 PM, Phil Darivoff (phil@darivoff.net) <phil@darivoff.net> wrote:

I'm in DC in back to back meetings. Hopefully Albert can attend and keep me in the loop

Philip M. Darivoff
Chairman
Vibrant Capital Partners, Inc.
350 Madison Avenue, 17th Floor
New York, NY 10017
Phil@Darivoff.net
(W) 646 747 8469
(M) 973 477 6707
(H) 973 379 4044

**From:** Mathu Rajan <mathu.rajan@visualsemi.com>
**Sent:** Monday, May 6, 2024 7:10:21 PM
**To:** bud.robertson@visualsemi.com <bud.robertson@visualsemi.com>
**Cc:** Albert A. Ciardi III <aciardi@ciardilaw.com>; Phil Darivoff (phil@darivoff.net) <phil@darivoff.net>; Zahralddin, Rafael
<Rafael.Zahralddin@lewisbrisbois.com>; ntwallace@aol.com <ntwallace@aol.com>; steve@rembrandt3d.com
<steve@rembrandt3d.com>; Christopher Michaels <michaels@bpmlegal.com>; ademarco@devlinlawfirm.com
<ademarco@devlinlawfirm.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>; Kelly Love <KLove@sgrvlaw.com>
**Subject:** Re: VSI-Stream Strategy Cal

Those times are fine for me.
Thanks,
Mathu
Sent from my iPhone

On May 6, 2024, at 7:06 PM, bud.robertson@visualsemi.com wrote:

Hello all,

**TRUSTEE 95**

We would like to have another strategy call Tuesday regarding important new developments.

Leslie is available before 10:30am or after 1:30pm. Please advise your availabilities for a call so I can lock in a time and send out a zoom invite. Thanks.

Best regards,

Bud Robertson
Visual Semiconductor, Inc.

# App. Ex. 65

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Wednesday, May 01, 2024 8:26 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**CC:** Kelly Love <KLove@sgrvlaw.com>; mathu rajan <mathu.rajan@visualsemi.com>; nicole.maneen@visualsemi.com <nicole.maneen@visualsemi.com>; ademarco@devlinlawfirm.com <ademarco@devlinlawfirm.com>; ntwallace@aol.com <ntwallace@aol.com>; steve@rembrandt3d.com <steve@rembrandt3d.com>
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants
**Attachment(s):** "Rembrandt 3D Holding Ltd - Objection to Proof of Claim - ver2.docx"

My edits are a little rough  - but these are just suggestions.



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
Certified 2022-2023  DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Wednesday, May 1, 2024 7:15 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Cc:** Kelly Love <KLove@sgrvlaw.com>; 'mathu rajan' <mathu.rajan@visualsemi.com>; nicole.maneen@visualsemi.com; ademarco@devlinlawfirm.com; ntwallace@aol.com; steve@rembrandt3d.com
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

Except from one of our drafts I the case – I don't think you focused on the Third Circuit estoppel opinion which itself relies on DE SUPREME COURT CONTROLLING PRECEDENT.

VC Laster actually ignored the Supreme Court decision cited in the 3 rd Circuit.

Notably, the Chancery Court used a different analysis to evaluate collateral estoppel than the Third Circuit did in its decision concluding the opposite about the same legal issue a month earlier. The Chancery Court pulled its test from the Superior Court of Delaware's decision in City of Newark v. Unemployment Ins. Appeal Bd., 802 A.2d 318, 324 (Del. Super. 2002), while the Third Circuit pulled its test from the Delaware Supreme Court's decision in M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d 513, 520 (Del. 1999).

The defendants do not address in the body of their motions two other collateral estoppel opinions issued under these operative facts that bracket the Collateral Estoppel Opinion. Both the Third Circuit Court of Appeals in *Mathu Rajan v. Crawford*, 2022 U.S. App. LEXIS 30505 (3d. Cir. Nov. 03, 2022) and the Court of Common Pleas of Philadelphia County, Pennsylvania in *Raja Rajan v. Crawford et al.*, No. 269 (Phil. Cnty Ct. Com. Pl. April 19, 2023) found that collateral estoppel based in the Chancery Court's Omnibus Litigation Injunction Decision is inapposite.

### 3D. CIRCUIT: A REVERSED JUDGMENT CANNOT SUPPORT PRECLUSION

The Third Circuit Court of Appeals concluded that collateral estoppel under Delaware State law (i.e. the rendering forum) would **not** bar litigation of the circumstances underlying the formation of the Omnibus Agreement (which would include the manufacture of defaults under the loan agreements of SLS Holdings VI and Hawk). *Mathu Rajan*, 2022 U.S. App. LEXIS at 7. The Third Circuit held that collateral estoppel could not be based in the Chancery Court's now-vacated, reversed and remanded Omnibus Litigation Injunction Decision. *Mathu Rajan*, 2022 U.S. App. LEXIS at 6 – 7.
The Third Circuit held that reversal of the Omnibus Litigation Injunction Decision deprived Appellees of a valid and final judgment to support collateral estoppel against Mathu Rajan's claims for tortious interference and civil conspiracy in his Eastern District of Pennsylvania lawsuit. *Mathu Rajan*, 2022 U.S. App. LEXIS at 6. The court vacated the underlying dismissal of Mathu Rajan's tortious interference and civil conspiracy claims and remanded the matter for further proceedings in the district court. *Id*. at 7. Applying Delaware law, the Third Circuit noted that "[a] bedrock principle of preclusion law has been that a reversed judgment cannot support preclusion; … an initial reliance on preclusion must be reversed once the underlying judgment is reversed." *Id*. at 6 (citations omitted).

### COURT OF COMMON PLEAS: A REVERSED JUDGMENT CANNOT SUPPORT PRECLUSION (REDUX)

The Court of Common Pleas of Philadelphia County, Pennsylvania in a decision that post-dates the Delaware Chancery Court's Collateral Estoppel Opinion by nearly five-months, on April 19, 2023 also concluded that collateral estoppel based in the Chancery Court's Omnibus Litigation Injunction Decision was inapposite. The court found that "[t]he Delaware Chancery Court's ruling was vacated in part and reversed in part by the Delaware Supreme Court [and] [f]or that reason, it cannot constitute a final judgment on the merits." The court went further and stated:

**TRUSTEE 90**

Defendants argue that the Vice Chancellor's findings of fact were not reversed by the Supreme Court, and in fact that the Supreme Court relied upon them in its ruling. This Court cannot agree. The injunction issued by the Chancery Court, which prohibited Plaintiff from attacking the validity of the Omnibus Agreement, was vacated. There is no final judgment that currently exists, even though the Supreme Court did not address those findings of fact.

*Id*. at 4.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

## Mansfield Rule
### Certified 2022-2023 DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Wednesday, May 1, 2024 4:31 PM
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Kelly Love <KLove@sgrvlaw.com>; 'mathu rajan' <mathu.rajan@visualsemi.com>;nicole.maneen@visualsemi.com; ademarco@devlinlawfirm.com; ntwallace@aol.com;steve@rembrandt3d.com
**Subject:** [EXT] RE: Stream TV- Rembrandt objection to Secured Status of Claimants


Leslie:

Attached is our draft.  Andrew's team is reviewing and will have additional changes.  I highlighted the Exhibit references, so we can easily find and renumber if we delete any based on my comments below.

I added specific language alleging that Shad et al were insiders and that the magic language from the case law re inequitable conduct that they harmed creditors and gained an unfair advantage.  I also made clear that they were not merely aggressively enforcing their existing agreements trying to differentiate from the Zohar string of cases.  Tilton v. MBIA Inc. (In re Zohar III, Corp.), 2022 WL 3278836 (D. Del. Aug. 11, 2022), appeal dismissed, No. 22-2695 (3d Cir. Nov. 10, 2022).

Chris

Planned exhibit list below

Rafael or Leslie - Exhibit List:
Exhibit 1 – Proposed Order – Rafael or Leslie - Do you have a draft proposed order?
Exhibit 2 – Amended Conversion Agreement - Rafael or Leslie - I have the Hawk Conversion agreement that was filed at ECF 48, Exhibit F, but I do not have the amended version can you forward a copy? Also, how would Rembrandt have a copy if it was not filed in the prior litigation record?  Should we consider leaving out a reference to the amended doc?
Exhibit 3 - Collateral Estoppel Opinion - Rafael or Leslie -" the Chancery Court denied Stream's motion to dismiss and granted Hawk's motion for partial summary judgment.  Exhibit 3 (*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al*, Case No. 2022-0930-JTL D.I.. 160). I am not sure we need this argument given Caponi's admission in court.  We could strike section.

Andrew  - Do we need to include copies of their POCs or can we just reference them?  I am not an attorney of record in the case, so it cost money for me to download, Andrew – can your office download the POCs if we need to attach them.
Exhibit 4 – Hawk POC – download from PACER  - Proof of Claim No. 6
Exhibit 5 – SLS POC – download from PACER  - Proof of Claim No. 9
Exhibit 6 – SeeCubic POC – download from PACER  - Proof of Claim No. 14

Attached –
Exhibit 7   Rembrandt 3D Corp proposal for funding plan

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

**BROWN & MICHAELS, PC**

118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Wednesday, May 1, 2024 9:32 AM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Kelly Love <KLove@sgrvlaw.com>; 'mathu rajan' <mathu.rajan@visualsemi.com>;nicole.maneen@visualsemi.com
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

We have been told that the trustee is planning to file his Motion to Approve his Settlement with Hawk *et. al.* today.  Any timeframe for your objection? Please let us know, thanks, Leslie

**Leslie Beth Baskin, Esquire**
**Spector Gadon Rosen Vinci P.C.**
**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com**  1635 Market Street, 7th Floor, Philadelphia, PA 19103

---

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

---

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Tuesday, April 30, 2024 5:16 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Kelly Love <KLove@sgrvlaw.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>; 'mathu rajan' <mathu.rajan@visualsemi.com>;nicole.maneen@visualsemi.com
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

Hi Chris. Please let us know where this stands and when you can file the objection.  The objection is critical to turning the trustee's viewpoint around in this matter.  Thanks ,Leslie

**Leslie Beth Baskin, Esquire**
**Spector Gadon Rosen Vinci P.C.**
Direct Phone: +1 215-241-8926
Fax: +1 215-531-9145

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Friday, April 26, 2024 3:13 PM
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

{EXTERNAL EMAIL} This message originated outside of your organization.
Leslie:

Thank you for reaching out.  I have already sent two emails: 1) one including the string of emails where I repeatedly asked/told him to get the username and password for the software development system; and 2) a second email letting him know we are preparing an objection to the proof of claim.

I am working diligently on the proof of claim objections. I found some good case law supporting our position in the 3rd circuit, but it is taking a long time as I am starting from a very low level of background knowledge. I am drafting the objection to allege all the salient and essential facts for the objection.

As a set of factual allegations, I am beefing up the following issues:

1. SeeCubic took control and then caused the debtor (Technovative) to violate IP licenses with both Rembrandt and Philips. Loss of these licenses is roughly $5.6 million cash owed to Rembrandt, and $4-5 million owed to Philips for a license from Rembrandt. Specifically, they created $10,000,000+ in liability for Technovative immediately upon attempting to license technology despite being prohibited by both licenses.
2. In addition, breach of contract is a specifically recited example supporting equitable subordination.
3. Lastly, Rembrandt proposed a number of times to fully cover the cost of a line dedicated to production for Rembrandt. Because of the terms of Philips license, this line had to owned/controlled by Stream even if 100% of the output was to go to Rembrandt. Point being, SeeCubic blocked a massive increase in the revenue and assets of Stream by refusing to engage Rembrandt on our proposal to fund a line. SLS and Hawk would have had a security interest in the production equipment Rembrandt paid for. This is not the action of a reasonable lender attempting to get paid. It is only explained as they wanted the technology and company rather than repayment.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email:michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Friday, April 26, 2024 2:05 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

Following up on our call of yesterday, I think that it would serve Rembrandt ( and VSI's) purposes for you to send a letter to the trustee and his counsel raising your concerns over his operations or failures to act or even answer your questions which he has an obligation to do especially since you represent the largest unsecured creditor. He needs to hear from other creditors, so he knows that he is being watched, and more importantly, so he knows that others are very concerned that he is not doing anything to protect the assets of this bankruptcy estate. Please let me know if you are planning to do this. Thanks, Leslie

**Leslie Beth Baskin, Esquire**
# Spector Gadon Rosen Vinci P.C.
**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com** 1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Thursday, April 25, 2024 3:13 PM
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>

**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

{EXTERNAL EMAIL} This message originated outside of your organization.
Leslie:

I have been working on it steadily, but it is fitting into a full docket and meetings.

Do you a minute for a quick call to get better insight into the timing of the trustee moving forward with SeeCubic?  I am open this afternoon/evening.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Thursday, April 25, 2024 9:27 AM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

We had our call with the trustee and it was not productive.  They are still very keen on the secured claim of SLS *et. al.* and their ability to credit bid.  Any update on Rembrandt's objection? Thanks, Leslie

### Leslie Beth Baskin, Esquire
# Spector Gadon Rosen Vinci P.C.
**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com** 1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Tuesday, April 23, 2024 3:30 PM
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: Stream TV- Rembrandt objection to Secured Status of Claimants

{EXTERNAL EMAIL} This message originated outside of your organization.
The draft Rafael is very helpful.  I am working feverishly on a draft and we would like to have it on file before your meeting with the trustee.  I have discussed it with Steve, but after I finished drafting, I need sign off from a number of reviewers at my end.

At this point, I need to keep drafting before I will have questions.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*

## BROWN & MICHAELS, PC

118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email:michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Tuesday, April 23, 2024 2:01 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** Stream TV- Rembrandt objection to Secured Status of Claimants

Hi Chris.  I have spoken with Raf regarding your client's filing of an objection to the secured status of SLS, etc., which of course will have an effect on their ability ( or lack thereof)  to credit bid.  I know that you have recently started  working on this pleading , but it is of the utmost importance to get it filed as soon as possible.  We are having a call with the trustee and his counsel tomorrow at 11am regarding a proposal which VSI wishes for the trustee to consider and which would be beneficial to the estate ( as opposed to any "credit bid" scenario he claims to have negotiated with SLS, etc. and which would form the basis of a resolution of this bankruptcy and other litigation.).

Raf and I could be available today from 4 pm and after if you wish to discuss your Opposition to the Secured Status ( not necessary- we just are here for you if you want to discuss).  Let me know if you would like to speak.  Again, I cannot emphasize enough the importance of the pleading to be filed ASAP.  Thanks, Leslie

**Leslie Beth Baskin, Esquire**
## Spector Gadon Rosen Vinci P.C.

**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com**  1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**REMBRANDT 3D HOLDING LTD.'S OBJECTION TO PROOFS OF CLAIM NO. 6
FILED BY HAWK INVESTMENT HOLDINGS LTD., "AS COLLATERAL AGENT,"
NO. 9 FILED BY SLS HOLDINGS VI, LLC, AND NO. 14 FILED BY SEECUBIC, INC.**

Rembrandt 3D Holding Ltd. ("Rembrandt") objects to Proofs of Claim No. 6 filed by

Hawk Investment Holdings Ltd. as "Collateral Agent," No. 9 filed by SLS Holdings VI, LLC,

and No. 14 filed by SeeCubic, Inc., by and through its counsel, and file this objection seeking

entry of the proposed order attached hereto as Exhibit 1 (the "Proposed Order"), disallowing the

claims.  In further support of this Objection, Rembrandt respectfully state as follows:

**Jurisdiction and Venue**

1.      The United States Bankruptcy Court for the Eastern District of Pennsylvania has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 502 of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 3007-1 of the United States

1

Bankruptcy Court of the Eastern District of Pennsylvania Local Bankruptcy Rules (the "Local Rules").

### Relief Requested

4. By this Objection, Rembrandt object to Proofs of Claim No. 6 filed by Hawk Investment Holdings Ltd. as "Collateral Agent," No. 9 filed by SLS Holdings VI, LLC, and No. 14 filed by SeeCubic, Inc., for the reasons described below, and seek entry of the Proposed Order, pursuant to section 502 of the Bankruptcy Code, Bankruptcy Rules 3007 and 9014, and Local Rule 3007-1, disallowing and expunging the claims as set forth below.

### Background

**A.     The Bankruptcy Filing**

5. On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Debtors filed in the Eastern District of Pennsylvania because that is the location of their principal place of business. D.I.. 48 at ¶ 2.

6. Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. As of the date of the filing of this Motion, no official committees have been appointed or designated. William A. Homony accepted his appointment as the chapter 11 trustee on January 15, 2024.

**B.     Overview of Debtors & Technology**

8. Debtors were founded in 2009 by Raja Rajan and Mathu Rajan as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences. Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

2

9.      Technovative Media, Inc. is a wholly owned subsidiary of Stream TV Networks, Inc.

10.     The technology that Debtors are currently seeking to manufacture and sell converts two dimensional devices into three dimensional without the need for viewing glasses.

11.     A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases and supporting this Motion, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

12.     In 2005, Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic display ("3DASD") solution known as the WOWvx Platform for converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors. The WOWvx Platform uses mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.

13.     Philips's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct.

14.     Rembrandt's predecessor, 3DFusion Corp (3DFusion) licensed the WOWvx Platform from Philips. From 2007 to 2009 working with Philips licensed tools, Stephen Blumenthal developed a novel methodology to correct the image quality issues or artifacts in the 3DASD content generated by the Philips's WOWvx Platform and protected the innovations through patents and maintaining certain elements as trade secrets.

3

15. In August 2009, 3DFusion started contracting and working with a team of engineers in Eindhoven, (the "Eindhoven Team") and registered a dutch B.V. with the Dutch Chamber of Commerce named, 3DFusionEU B.V. a wholly owned Dutch subsidiary of 3DFusion.

16. 3DFusionEU started working with The Eindhoven Team for the purpose of integrating 3DFusion's adjustability solution into the 2D+Depth 3DASD platform.

17. While 3DFusion had included some of the information and improvements in its patents, many other improvements were held as trade secrets and were disclosed and developed under non-disclosure agreements with the Eindhoven Team and 3DFusionEU.

18. This technology and 3DFusion's business plans were eventually disclosed to Mathu Rajan, Raja Rajan, and Stream under non-disclosure agreements.

19. Stephen Blumenthal and 3DFusion developed trades secrets and filed for its own patents far before either ever met any engineers from the Eindhoven Team, Stream or the Rajans.

20. 3DFusion has since dissolved and all of its rights to intellectual property and technology have been assigned to Rembrandt.

21. In June of 2010, Stephen Blumenthal met Mathu Rajan and Raja Rajan when they came to the 3DFusion Wall Street showroom offices for a demonstration of our 3D glasses free platform.

22. The Rajans immediately signed NDAs to be able to review details of 3DFusion's technology and business plans.

23. At the time of this original June 9, 2010 NDA between Stream and 3D Fusion, (now owned by Rembrandt), Stream had no technology of its own.

24. In June of 2010, all rights were held by 3D Fusion and therefore all improvements to that technology made after the June 9, 2010 NDA were owned by 3D Fusion. The NDA reads:

4

*"2.3.3 all inventions, improvements, copyrightable works and designs, relating to business plans, marketing plans, technology, machines, methods, compositions, or products of Disclosing Party directly resulting from or relating to the Confidential Information and the right to market, use, license and franchise the Confidential Information or the ideas, concepts, methods or practices embodied therein shall be the exclusive property of the Disclosing Party, and the Recipient has no right or title thereto."*

25.     The original Stream and 3DFusion term sheet was negotiated and signed on September 28, 2010 by the Rajans.  Walther Roelen, the head of 3DFusion's Eindhoven team, betrayed his fiduciary duty and orchestrated the transfer of key 3DFusion assets and the Eindhoven Team to Stream in January of 2011. This is the same Eindhoven Team that was working with Stream, then SeeCubic, Inc..

26.     The original technology developed by Stephen Blumenthal and 3DFusion was disclosed to Stream and is the basis for the improvements over the old Philips technology. Philips owned all the rights to the original 2D+Depth intellectual property and Rembrandt owns all the rights to its improvements to the technology.  The Philips technology and Rembrandt advancements are fully integrated into all the Stream technology and products.  Specifically, Rembrandt has identified with particularity how all the products sold by Stream have included Rembrandt technology and infringe Rembrandt patents.

27.     These events and agreements were the basis for the Rembrandt lawsuit filed against Stream, Mathu Rajan, and Raja Rajan. Rembrandt, Stream, Mathu Rajan, and Raja Rajan fully executed a settlement agreement on May 23, 2021 that included the same list of Rembrandt patents and trade secrets used in the settlement term sheet negotiated in a mediation before Magistrate Parker with Shadron Stastney representing Stream as its CFO. The April 12, 2019 term sheet was signed by all parties including Judge Parker at the close of the mediation conference and is materially identical to the current May 21, 2021 Settlement Agreement signed by the Rajans

5

28.     While Stream started with no technology of its own, it entered into a license with Philips and utilized Rembrandt's technology to develop its own glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable and immersive Glasses-Free 3D viewing experience.  Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content because it can convert 2D content to 3D content in real time.

29.     Rembrandt has closely evaluated the quality of the Stream products and even in the midst of its controversies with Stream purchased early versions of Stream's TVs and Stream provided additional units during the Rembrandt – Stream SDNY litigation.  The quality of the product has improved over time.  Rembrandt was impressed with Ultra-D and decided to structure a settlement in such a way that the primary value of the settlement was a supply of Ultra-D units.

30.     Prior to the Rembrandt – Stream SDNY litigation, Stream reported a recent valuation at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

31.     After Rembrandt initiated its litigation to enforce contracts including and NDA and term sheet the provided for Rembrandt to get 60-80% of Stream in exchanging for providing its technology, Stream's shares dropped to $1.50/share by the time Rembrandt negotiated its settlement term sheet on April 12, 2019 with Shadron Stastney acting as Stream's CFO at the time. The share price had dropped by 62.5% and Stream had lost $250,000,000 in valuation.

32.     At the request of Stream, in July 2019, Rembrandt's executive team met with Shadron Stastney, Mark Coleman (Stream board member) and litigation counsel to amend the

6

settlement terms to allow greater flexibility in timing of proving the units promised by Stream. The was agreeable to Rembrandt.

33.     At this point, Stream had all the necessary licenses it needed to relaunch its Ultra-D products with the additional volume that Rembrandt's purchase orders would provide.  Stream was poised to not only recapture the $250 million in lost valuation, but to become extremely valuable beyond its 2018 valuation.

34.     While SLS, Hawk, and SeeCubic allege that the entities are owed in excess of $178,000,000, the only thing better than receiving $178,000,000 in alleged principal and interest, is getting all the technology from a company that was recently valued at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

35.     Shadron Stastney left Stream and formed SeeCubic, Inc. and sought to take control of all of Stream's assets colluding with SLS, Hawk, and other shareholders and directors of Stream. SLS and Hawk did not pursue any rights under their actual agreements with Stream, but rather took inappropriate actions and compensated directors of Stream in an attempt to push through a new agreement (the "Omnibus Agreement") that was latter invalidated.  *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[1]

---

[1] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id.*. at p. 34.  The Delaware Supreme Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter.  *Id*. at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed

In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and predictability in our corporate laws. . . ." *Id*. at pp. 53-54.

36.     After using this invalidated agreement to take control of Stream assets, SeeCubic proceeded to destroy value of those assets by breaching both the Philips and Rembrandt license agreements, damaging production equipment, and promulgating a business plan based on infringing intellectual property and attempting to license out technology belonging to Philips and Rembrandt when both licenses specifically prohibited such sublicensing efforts thereby creating massive liabilities for infringement at Stream's subsidiary companies and specifically at Technovative.

37.     Upon learning of SeeCubic's malfeasance and reviewing its website and attempts to license out Rembrandt's technology through its control of Technovative and subsidiaries of Technovative, Rembrandt filed a Complaint For Injunctive Relief And Misappropriation Of Trade Secrets (the "Delaware Complaint") in the United States District Court For The District Of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SeeCubic"), and a true copy along with the exhibits was attached as Exhibit A to the Declaration re: of Christopher A. Michaels in Opposition of Hawk Emergency Motion for Relief from the Automatic Stay [ECF No. 69], which is incorporated herein by reference.

---

pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

8

38.    Shadron Stastney, the CEO of SeeCubic, Inc., was the individual that negotiated the term sheet with Rembrandt acting as Stream's CFO and agreed to the terms before Magistrate Parker agreeing to pay over $5 million in cash and to provide millions of units of TVs at cost. Clearly he had every reason to expect that Rembrandt would enforce its intellectual property against Technovative if he used his position to infringe Rembrandt's right thus incurring massive liabilities for Technovative both for expensive legal fees and damages.

**Debtors' Debt Structure**

39.    Since 2009, the Debtor has raised approximately $150 million from third party investors. D.I.. 48 at ¶ 25.  The investments have taken the forms of both debt and equity. *Id*. The Debtor's senior secured creditor is SLS Holdings VI, LLC ("SLS"). *Id.* Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of notes (the "SLS Insider Notes"). *Id.* The Debtor pledged substantially all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Insider Notes. *Id.* The Debtor executed a security agreement in connection with the SLS Insider Notes. *Id.*

40.    The Debtor's junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). D.I.. 48 at ¶ 26.  Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). *Id*. Subject to the security interest held by SLS, the Debtor pledged substantially all of its assets as security for the Hawk Notes. *Id*. The Debtor executed a security agreement in connection with the Hawk Notes. *Id*.

41.    In 2018, the Debtor entered into an agreement with Hawk which provided that the Hawk Notes would convert into equity if and when the Debtor raised additional equity capital (the "Hawk Conversion Agreement") (D.I., 48 at Exhibit F). D.I.. 48 at ¶ 28.  The Debtor and SLS

9

contemporaneously entered into a parallel agreement governing the SLS Insider Notes (the "SLS Conversion Agreement" (D.I., 48 at Exhibit G). *Id*. Per the Conversion Agreements, conversion of debt to equity is at the discretion of the Debtor. *Id*.

42.     On April 17, 2019, the Hawk Conversion Agreement was amended.  Exhibit 2.

### Formation of SeeCubic

43.     On September 18, 2013, Shadron L. Stastney ("Stastney"), principal of debtholder SLS, was ordered by the United States Securities and Exchange Commission ("SEC") to pay nearly $3 million in disgorgement, penalties, and interest for willfully violating Sections 206(2) and 206(3) of the Advisers Act2[2]. D.I.. 48 at ¶ 32.  The SEC determined that Stastney breached his fiduciary duty by failing to disclose a material conflict of interest and engaging in an undisclosed principal transaction with Vicis Capital, for whom he was the Chief Operating Officer and Head of Research. *Id*. In addition to the monetary penalty, Stastney was "(i) barred from association with any investment adviser, broker, dealer, municipal securities dealer, or transfer agent, and (ii) prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter." (*Id.* citing D.I., 48 at Exhibit H).

44.     SLS and Hawk formed SeeCubic, Inc. ("SeeCubic") as a Delaware corporation in 2020 to seize the Debtor's assets pursuant to the Omnibus Agreement described below. SeeCubic and Hawk were held in contempt by the Delaware Court of Chancery in October 2022 for their orchestrated efforts to seize control of the Debtor's subsidiary, TechnoVative USA. D.I.. 48 at ¶

---

[2] The SEC settlement is public record. In the Matter of Shadron L. Stastney, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sep. 18, 2013), published at https://www.sec.gov/litigation/admin/2013/ia-3671.pdf.

35. In Paragraph 3 of his October 3, 2022 Opinion, Vice Chancellor Laster wrote: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk." *Id.* (citing D.I., 48 at Exhibit K).

### Omnibus Agreement and Letter Agreement

45.     After issuing a Notice of Default to the Debtor, SLS filed a complaint on March 23, 2020, in the Superior Court of the State of Delaware in and for New Castle County ("Superior Court") against the Debtor and its subsidiaries TechnoVative USA, Technology Holdings, and Media Holdings. D.I.. 48 at ¶ 53.  The complaint sought money damages on the Debtor's alleged obligations due to SLS and replevin of collateral. *Id.*

46.     In a May 4, 2020 meeting of the Debtor's Board of Directors, Gola, Gollop, and Kabacinski proposed and passed a resolution to establish a debt-resolution committee with Gola and Gollop solely authorized to negotiate a settlement on the Debtor's behalf. D.I.. 48 at ¶ 57. Mathu Rajan and Raja Rajan, the two founding directors, abstained but were outvoted by the three new directors. *Id.* Hodgson was not present during the vote, which was planned by the other new directors to coincide with his absence so that they'd have a majority. *Id.*

47.     Two days later, on May 6, 2020, a lengthy debt resolution (the "Omnibus Agreement") was signed by Gola and Gollop, purporting to commit the Debtor to a resolution whereby all its assets would be transferred to SLS and Hawk. D.I.. 48 at ¶ 58 (citing D.I., 48 at Exhibit O). The Omnibus Agreement was a proposed settlement that benefitted the very investors responsible for creating the problem by failing to honor the Conversion Agreements. D.I.. 48 at ¶ 58.

11

48.     Executed simultaneously with the Omnibus Agreement was a secret side letter (the "Letter Agreement") in which the beneficiaries of the Omnibus Agreement detailed structure of their newco, SeeCubic (D.I., 48 at Exhibit P). D.I.. 48 at ¶ 59. The Letter Agreement was a critical component of the settlement, stating: "the parties hereto wish to agree among themselves to certain additional matters related to the Omnibus Agreement, and on which their execution of the Omnibus Agreement is conditioned..." *Id.* Also detailed in the Letter Agreement were equity distributions for SLS, Hawk, and certain of the Debtor's investors who had supported the hostile takeover. Despite the fact that no representative of the Debtor signed the Letter Agreement, it required the Debtor to issue 48 million shares of Debtor's common stock: 40 million shares to Hawk, 4 million shares to SLS, and 4 million shares to certain other investors. *Id*. The Debtor never issued such additional equity. *Id*.

49.     The Debtor immediately challenged the validity of the Omnibus Agreement, as it violated a key clause of the company's charter, which required approval of the Class B shareholders for any transaction that transferred all or substantially all of the company's assets (D.I.. 48 at ¶ 61 (citing D.I.. 48 at Exhibit R at IV(D)(2)(d)). Within days of the attempted hostile takeover, the Debtor formally removed new directors Gola, Gollop, and Kabacinski through a written resolution of the stockholders in lieu of a meeting.  D.I.. 48 at ¶ 61.

50.     Despite being removed from their directorships in May 2020, Gola and Gollop purported to represent the Debtor. D.I.. 48 at ¶ 62. On August 24, 2020, using the Debtor's letterhead, they signed a Delegation of Authority Letter which gave a third-party power of attorney to represent some of the Debtor's subsidiaries for the purpose of assuming the facility lease where the MPL was stored, taking possession MPL, and moving the equipment from the Debtor's reach *Id*. (citing D.I., 48 at Exhibit S).

12

51.     Despite being removed from his directorship in May 2020, Kabacinski used the Debtor's letterhead and, claiming to be the Debtor's Director and "acting executive," made demands and threats to the Debtor's executive vice president, who also served as CEO of SCBV. D.I.. 48 at ¶ 63. The letter and following email correspondence contained slanderous accusations and threatened legal consequences. *Id.* (citing D.I., 48 at Exhibit T).

52.     Using the Omnibus Agreement as a foundation, SLS and Hawk began seizing the Debtor's assets through their new business entity, SeeCubic, even though no court had yet ruled on the validity of the Omnibus Agreement. On the title page of its June 2, 2020 private placement memorandum, SeeCubic declared itself "Owner of the brand Ultra-D." D.I.. 48 at ¶ 64.

53.     This seizure of assets included the technology provided by Philips and Rembrandt even though both licenses prohibited assignment of the licenses and prohibited an sublicensing. By transferring technology to SeeCubic, Inc, Technovative and its subsidiaries infringed and misappropriated the intellectual property of both Philips and Rembrandt. The Philips license is held by a Technovative subsidiary, UltraD Ventures but has a change of control provision that terminates the license upon change of control. The Rembrandt license is directly with Stream and assignment is not authorized.  As such, SeeCubic caused breaches of both agreements and Technovative and its subsidiaries to be liable for various claims of copyright and patent infringement as well as trade secret misappropriation.

### Chancery Court Litigation – The Preliminary Injunction Order

54.     In September 2020, Stream filed a plenary action in the Delaware Chancery Court in which it sought a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. D.I.. 48 at ¶ 68 (citing *Stream TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-0766-JTL (the "Omnibus Agreement Litigation"). SeeCubic filed counterclaims

13

which sought a declaration that the Omnibus Agreement was valid and an injunction against anyone trying to interfere with it. *Id.*

55.    In December 2020, the Chancery Court issued an Order (the "PI Order") and accompanying Opinion (the "PI Opinion") in the Omnibus Agreement Litigation that rejected Stream's challenges to the Omnibus Agreement. D.I.. 48 at ¶ 69. The court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted).

## Delaware Bankruptcy Court

56.    Pursuant to the PI Order in the Delaware Court of Chancery, Stastney/SLS and Hawk/Morton seized most of the Debtor's assets and transferred them to their new entity, SeeCubic. D.I.. 48 at ¶ 71. They did not, however, accept any of the Debtor's liabilities. *Id.*

57.    Left with no assets, significant debt, and only a Delaware Supreme Court appeal to put its hopes in, the Debtor filed for chapter 11 protection in the District of Delaware and arranged initial debtor-in-possession financing for its planned reorganization. D.I.. 48 at ¶ 72.

58.    SeeCubic, SLS, Hawk, and Stastney filed motions to dismiss the bankruptcy, claiming that the Debtor had made a bad-faith filing in order to escape a state court ruling it disagreed with. The Debtor counterclaimed that the Omnibus Agreement was an executory contract since SeeCubic had failed to issue 1,000,000 shares of its common stock to the Debtor in exchange for the Debtor's assets, and that the Debtor had not yet transferred all of its assets, including the multi-million-dollar MPL bonding equipment. D.I.. 48 at ¶ 73.

14

59.     Despite the executory nature of the Omnibus Agreement, and despite the fact that the case in the Court of Chancery had only had a preliminary ruling, the Bankruptcy Court determined that the Omnibus Agreement was likely to be confirmed by the Chancery Court and thus dismissed the Debtor's petition for bankruptcy. D.I.. 48 at ¶ 74.

**Chancery Court Litigation – The Partial Summary Judgment**

60.     In September 2021, the Chancery Court granted SeeCubic's motion for summary judgment in the Omnibus Agreement Litigation ("Summary Judgment Order"). *See* D.I.. 48 at ¶ 79.  The resulting decision declared the Omnibus Agreement to be valid and entered a permanent injunction barring Stream from interfering with it. *Id.* On November 10, 2021, the Chancery Court entered a partial final judgment in favor of SeeCubic. D.I.. 48 at ¶ 80*; Omnibus Agreement Litigation, D.I.. 204 (the "First Partial Final Judgment").

**Delaware Supreme Court Appeal**

61.     Stream appealed the First Partial Final Judgment.  D.I.. 48 at ¶ 81.

62.     On June 15, 2022, in a unanimous 5-0 en banc opinion, the Delaware Supreme Court vacated the First Partial Final Judgment and held that the Omnibus Agreement could not have become effective without the approval of Stream's Class B stockholders. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022) (the "Supreme Court Decision").

63.     On July 1, 2022, the Delaware Supreme Court issued a mandate (the "Mandate") that the PI Order was "hereby VACATED, REVERSED and REMANDED. D.I.. 48 at ¶ 83 (citing D.I., 48 at Exhibit Z).

**Mandate to Chancery Court**

64.     The same day the Mandate was issued, the Debtor filed a Motion for Entry of Final Order and Judgment Consistent with the Mandate. D.I.. 48 at ¶ 84.

15

65. Despite the Delaware Supreme Court reversal, SeeCubic failed to return the Debtor's assets. D.I.. 48 at ¶ 85. On July 5, 2022, SeeCubic filed Supplemental Counterclaims in an attempt to block the assets from being returned to the Debtor. *Id*.

66. On July 31, 2022, SeeCubic informed the Debtor that it intended to take legal title to the Debtor's assets pursuant to Article 9 of the UCC, enforcing creditor rights held by SLS. D.I.. 48 at ¶ 86. Furthermore, SeeCubic intended to sell the Debtor's assets. *Id.*

67. On August 1, 2022, the Debtor requested a Temporary Restraining Order against SeeCubic to prevent the sale of its assets. D.I.. 48 at ¶ 87.

68. On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court opinion, the Chancery Court issued a TRO against SeeCubic. D.I.. 48 at ¶ 88. Vice Chancellor Laster specifically stated his expectations: "SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. SeeCubic must do so based on a status quo where Stream has title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous." *Id.* (citing D.I., 48 at Exhibit AA).

69. On August 10, 2022, the Delaware Chancery Court entered a partial final judgment which determined that the Omnibus Agreement was "without legal effect." D.I.. 48 at ¶ 89; Omnibus Agreement Litigation, D.I.. 477 ¶ 2 (the "Second Partial Final Judgment").

70. The Second Partial Final Judgment specifically determined that "the Omnibus Agreement did not validly transfer legal title to any [of the Legacy Stream Assets] from Stream to SeeCubic." Omnibus Agreement Litigation, D.I.. 477 ¶ 3. The Second Partial Final Judgment thus rescinded the transactions between SeeCubic and Stream. The court directed the parties to

16

cooperate to effectuate the Second Partial Final Judgment, including "by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

71.    No one appealed the Second Partial Final Judgment.

72.    The court then issued an order declaring Stream to be the sole owner of the Company's equity. *See* Omnibus Agreement Litigation, D.I.. 569 ¶¶ 1–2.

**Chancery Court - Section 225 Action**

73.    Thereafter, Hawk purported to exercise its rights under the Hawk Pledge Agreements by voting the shares of the Company to remove Mathu Rajan as sole director and replace him with Shad Stastney, the principal of SLS Holdings VI, LLC and formerly Stream's Chief Financial Officer and vice chair of the board of directors.

74.    On October 17, 2022, Hawk filed in Chancery Court, seeking an Order pursuant to 8 Del. C. § 225 ("Section 225") confirming that Hawk's purported removal of Mathu Rajan and appointment of Stastney constituted a validly elected board of directors of TechnoVative USA D.I.. 48 at ¶ 91 (citing D.I., 48 at Exhibit CC). With control of TechnoVative USA, Morton and Stastney would control Ultra-D. D.I.. 48 at ¶ 91.

75.    On October 20, 2022, the Chancery Court issued a Status Quo Order in which SeeCubic was allowed to retain possession of the Debtor's assets pending adjudication of the Section 225 action by Hawk. D.I.. 48 at ¶ 92. Further, the Court appointed Ian Liston of the firm Wilson, Sonsini, Goodrich & Rosati P.C. as receiver pendante lite (the "Receiver") to oversee the operations of TechnoVative USA. *Id.* (citing D.I., 48 at Exhibit DD).

76.    In response to Hawk's complaint, Stream filed a motion to dismiss pursuant to Del. Ch. Ct. R. 12(b)(6) and 17. *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al.*,

17

Case No. 2022-0930-JTL D.I.. 109.  In addition, Hawk filed a motion for partial summary judgment.  *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al*., Case No. 2022-0930-JTL D.I.. 104.  In its "Collateral Estoppel Opinion," the Chancery Court denied Stream's motion to dismiss and granted Hawk's motion for partial summary judgment.  Exhibit 3 (*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al*., Case No. 2022-0930-JTL D.I.. 160).

### The Claims Process

77.     On March 27, 2023, the Court issued a Notice, which established May 24, 2023 as the last date for all creditors other than governmental units holding a "claim" (as such term is defined in section 101(5) of the Bankruptcy Code against Stream TV Networks, Inc.).

78.     In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts thereof owed to their creditors.

79.     The Debtors' register of claims (the "Claims Register"), was prepared and maintained by the Debtors' claims agent BMS Group.

80.     On May 19, 2023, Hawk Investment Holdings Ltd., ("Hawk") as "Collateral Agent," filed Proof of Claim No. 6, a copy of which is attached hereto as Exhibit 4 ("Hawk POC").

81.     On May 23, 2023, SLS Holdings VI, LLC ("SLS") filed Proof of Claim No. 9, a copy of which is attached hereto as Exhibit 5 ("SLS POC")..

82.     On May 23, 2023, SeeCubic, Inc. ("SeeCubic") filed Proof of Claim No. 14, a copy of which is attached hereto as Exhibit 6 ("SeeCubic POC", collectively with the Hawk POC and SLS POC as "POCs").

### Objections

18

**Commented [Zahralddin, Rafael1]:** You don't need to attach this, BMC has these claims on their website which is the official claims register  - if you really want to you can  insert a cite to the register on the website.

83.     As a preliminary matter, the Debtors have filed an adversary proceeding, case number 23-00057, on August 18, 2023, which objects to the POCs ("Adversary").  The Objection, detailed in the Adversary, objects to the POCs because of the takeover scheme, which persists to this day, created by Alastair Crawford (and over 50 other shareholders), SLS, and Hawk.  The hallmark of this scheme is to take the valuable assets of the Debtors, obstruct their ability to make payment on their debts, obstruct the ability to raise the money needed to go to production and convert the secured debt to equity, and to avoid paying $20 million in unsecured claims and instead pay Mr. Crawford and other shareholders who participated in the scheme in violation of the absolute priority scheme.

84.     Rembrandt incorporates the arguments and facts in the Adversary by reference as if fully restated herein.

### Hawk's Secured Debt is Subject to Conversion

85.     In the Proof of Claim, Hawk fails to mention the existence of the Conversion Agreement and Amendment thereto.  In addition, none of the exhibits Hawk submitted to the Court contain the Conversion Agreement or Amendment thereto.

86.     A debt-to-conversion agreement was executed by Hawk on May 2, 2018 with an effective date of January 29, 2018. (D.I., 48 at Exhibit F).

87.     In April 2019, the Hawk Conversion Agreement was amended.  (Exhibit 2).

88.     During the June 26 trial, Judge Coleman asked if the Hawk debt was still convertible and Hawk's counsel agreed that debt if fully convertible:

*From June 26 trial transcript -*

*THE COURT: ... the only issue I was trying to figure out is did they ultimately have the right to convert?*

19

> *MR. ALEXANDER: Your Honor, I believe that the collateral estoppel order that they've referenced, has a provision in there that indicates that the Hawk debt is convertible.*
>
> *MR. CAPONI: The Hawk debt is convertible, Your Honor.*

89.    Hawk's debt is convertible and either has already been converted due to prior investment in Stream or is presently convertible by new investment into Stream.

90.    As Hawk's counsel has acknowledged, conversion of the Hawk debt is not collaterally estopped by the prior Delaware Chancery Court's rulings with respect to conversion of debt to equity because there was no final judgment on the merits.

91.    Collateral estoppel operates to preclude a later-filed claim where:

> 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the pleas is asserted was a party or in privity with a party to the prior adjudication, 4) the party against whom it asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Shaffer v. Smith*, 543 Pa. 526, 529, 673 A.2d 872, 874 (1996).

92.    While the Delaware Chancery Court made certain factual findings in the Injunction Decision, issued the Summary Judgment Order, and entered the First Partial Final Judgment based on the Summary Judgment Order, the Supreme Court Decision reversed the Chancery Court's legal determination that the Omnibus Agreement was valid.  Therefore, the Chancery Court's factual findings do not constitute a "final judgment on the merits."

93.    Two other collateral estoppel opinions issued under these operative facts bracket the Collateral Estoppel Opinion. Both the Third Circuit Court of Appeals in Mathu Rajan v. Crawford, 2022 U.S. App. LEXIS 30505 (3d. Cir. Nov. 03, 2022) and the Court of Common Pleas of Philadelphia County, Pennsylvania in Raja Rajan v. Crawford et al., No. 269 (Phil. Cnty

**Formatted:** Indent: Left: 1.27 cm, First Line: 1.27 cm

20

Ct. Com. Pl. April 19, 2023) found that collateral estoppel based in the Chancery Court's Omnibus Litigation Injunction Decision is inapposite.

93. 94.  In fact, the Court of Common Pleas of Philadelphia County recently stated that collateral estoppel does not apply to the Delaware Chancery Court's prior ruling because "[t]he Delaware Chancery Court's ruling was vacated in part and reversed in part by the Delaware Supreme Court.  For that reason, it cannot constitute a final judgment on the merits."

94. 95.  The Court of Common Pleas of Philadelphia County further stated that:

> *Defendants argue that the Vice Chancellor's findings of fact were not reversed by the Supreme Court, and in fact that the Supreme Court relied upon them in its ruling.  This Court cannot agree.  The injunction issued by the Chancery Court, which prohibited Plaintiff from attacking the validity of the Omnibus Agreement, was vacated.  There is no final judgment that currently exists, even though the Supreme Court did not address those findings of fact.*

95. 96.  Moreover, even if this Court agrees with the "Collateral Estoppel Opinion," Stream is not collaterally estopped from raising money and converting Hawk's secured debt to equity.  The Delaware Chancery Court did not find otherwise.  Hawk acknowledges that in the "Collateral Estoppel Opinion," the court found that "the doctrine of collateral estoppel prevents Stream from relitigating the following issues:

- Hawk holds secured debt in Stream;
- Stream defaulted on that debt;
- Hawk has valid creditor rights;
- Stream cannot convert that secured debt to equity without raising additional capital; and
- as of November 10, 2021, Stream had not converted the secured debt."

*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.*, C.A. No. 2022-0930-JTL (Del. Ch.), D.I.. 160 (Collateral Estoppel Op.) at 31.

97.      Notably, the Chancery Court used a different analysis to evaluate collateral estoppel than the Third Circuit did in its decision concluding the opposite about the same legal issue a month earlier. The Chancery Court pulled its test from the Superior Court of Delaware's

21

decision in City of Newark v. Unemployment Ins. Appeal Bd., 802 A.2d 318, 324 (Del. Super. 2002), while the Third Circuit pulled its test from the Delaware Supreme Court's decision in M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d. 513, 520 (Del. 1999).  It is obvious that the Delaware Supreme Court is the controlling precedent regarding state law and that the Third Circuit is controlling precedent, or if the decision is not precedential, it is highly persuasive and an indication of how the Third Circuit will rule again regarding the same facts and circumstances.

98.     The Third Circuit Court of Appeals concluded that collateral estoppel under Delaware State law (i.e. the rendering forum) would not bar litigation of the circumstances underlying the formation of the Omnibus Agreement (which would include the manufacture of defaults under the loan agreements of SLS Holdings VI and Hawk). Mathu Rajan, 2022 U.S. App. LEXIS at 7. The Third Circuit held that collateral estoppel could not be based in the Chancery Court's now-vacated, reversed and remanded Omnibus Litigation Injunction Decision. Mathu Rajan, 2022 U.S. App. LEXIS at 6 – 7.

99.     The Third Circuit held that reversal of the Omnibus Litigation Injunction Decision deprived Appellees of a valid and final judgment to support collateral estoppel against Mathu Rajan's claims for tortious interference and civil conspiracy in his Eastern District of Pennsylvania lawsuit. Mathu Rajan, 2022 U.S. App. LEXIS at 6. The court vacated the underlying dismissal of Mathu Rajan's tortious interference and civil conspiracy claims and remanded the matter for further proceedings in the district court. Id. at 7. Applying Delaware law, the Third Circuit noted that "[a] bedrock principle of preclusion law has been that a reversed judgment cannot support preclusion; … an initial reliance on preclusion must be reversed once the underlying judgment is reversed." Id. at 6 (citations omitted).

22

96.100.		Hawk is unable to cite anywhere in the opinion that bars Stream from

converting Hawk's secured debt to equity by raising additional capital or from converting

Hawk's secured debt after November 10, 2021.  No such support exists.  Rather the court plainly

stated that:

> *Collateral estoppel does not bar Stream from litigating about events that may have happened after November 10, 2021. Stream cannot dispute the court's now-final ruling that Stream must raise new equity financing before gaining the right to convert the Hawk Notes into equity,* **but Stream may seek to prove that it did so after the entry of the First Partial Final Judgment.**

*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.*, C.A. No. 2022-0930-JTL

(Del. Ch.), D.I.. 160 (Collateral Estoppel Op.) at 35-36 (emphasis added).

97.101.		In a prior opinion, the Chancery Court stated "those [creditor] rights,

again, as I understand it, are of a magnitude where, at least in theory, Stream could raise money

to satisfy that debt and then go on free of that claim." *In re Stream TV Networks, Inc*., Case No.

2020-0766-JTL (Del. Ch. Ct.), D.I.. 475 at Exhibit 1 (July 20, 2022 Hearing Tr.) at 28:15-23).

		The Chancery Court further stated "I'm not going to enter any orders that prevent

Stream from raising capital through stock issuances or debt issuances, or things of that sort,

because I do think Stream has the ability to try to raise money to payoff this debt." *In re Stream*

*TV Networks, Inc*., Case No. 2020-0766-JTL (Del. Ch. Ct.), D.I.. 475 at Exhibit 1 (July 20, 2022

Hearing Tr.) at 33:6-10).

98.

99.102.		Rembrandt 3D Corp has made an independent proposal to the Trustee

(attached as Exhibit 7) to fund a reorganization plan through new investment in Stream that

would include $39 million invested in a preferred share that would clearly convert the Hawk

23

Debt assuming their debt is not disallowed entirely or equitably subordinated due to their malfeasance in causing harm to the Debtors.  Because Stream will not be legally liable with respect to Hawk's secured debt, the debt secured by the Hawk Notes should be disallowed.

**Rent Regarding the Bonding Equipment**

~~100.~~103.        SeeCubic claims that it paid $917,171.00 in February 2022 for rent relating to storage of the Bonding Equipment.

~~101.~~104.        SeeCubic argues that "the Bonding Equipment is not property of the Debtors' estates. However, out of an abundance of caution, in the event that the Court determines the Bonding Equipment is property of the Debtors' estates, SeeCubic asserts a claim for the $917,171.00 it paid to avoid a sale of the Bonding Equipment."

~~102.~~105.        The Bonding Equipment is an asset of the Debtors.  There has been no evidence of any ownership by SeeCubic of the Bonding Equipment. SeeCubic took possession of the Bonding Equipment pursuant to the Omnibus Agreement, did not return it in defiance of the Delaware Supreme Court mandate, and then has stored it in ~~unconditioned~~ a warehouse space without climate controls thereby causing significant damage to this precision equipment.

~~103.~~106.        Stream and Visual Semiconductor, Inc. have testified in Court and discussed with Judge Mayer in mediation with Hawk and Seecubic that an arrangement has been reached with Cystar, one of the Customers who have a pending purchase order to house the bonding equipment rent free and have made arrangements for the engineers who manufactured the bonding equipment to ~~allow return of the bonding equipment to the manufacturer to be~~ repair and calibrate the bonding equipment ~~ed~~ and to allow initial production within ~~the manufacturer~~Cystar's facility.  However, SeeCubic has refused to allow such a transfer and has concealed the whereabouts and made several attempts to seize the equipment in violation of the

24

automatic stay in Stream's first chapter 11.  Until the Bonding Equipment is returned, and without damage, SeeCubic can recover nothing under 11 U.S.C. 502(d) and is also subject to setoff for the value of the damages as well as the lost productivity and related lost profits from refusing to return the Bonding Equipment.   If the equipment is lost or destroyed, SeeCubic's entire claim will be setoff as the value of the equipment as modified exceeds the full value of their claims against the estate.

### Claims Regarding Intellectual Property

104.107.         In its Proof of Claim, SeeCubic claims "[a]s part of its operation of the underlying business, SeeCubic devoted significant additional resources by funding the operations of the non-Debtor subsidiaries, investing in the business's technology, maintaining the requisite patents, and renewing software licenses, among other things."

105.108.        As of December 2022, the Debtor's subsidiary has been granted 128 patents.  These patents are held by Debtor's subsidiary Ultra-D Coöperatief U.A., a Uitsluiting van Aansprakelijkheid under the laws of the Netherlands.

106.109.        SeeCubic is unable to point to any agreement providing an interest in these patents in exchange for payment of maintenance fees because no such agreement exists.

107.110.         "It is well recognized that 'a corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary.'" *Williams v. McGreevey (Touch Am. Holdings, Inc.)*, 401 B.R. 107, 126 (Bankr. D. Del. 2009) (finding that parent's status as a holding company who owned all the shares of its subsidiaries did not create a right to the subsidiaries' assets) (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S.Ct. 1655, 1660, 155 L.Ed.2d 643 (2003)).

25

108.111.      Furthermore, there is a "the well-established rule that 'parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . [H]ence, the parent's  creditors have no claim to the subsidiary's assets, and vice versa.'" *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC*, 590 B.R. 211, 256-57 (Bankr. D. Del. 2018) (quoting *In re Regency Holdings (Cayman), Inc*., 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998)).  "It is only the exceptional case where a court will disregard the corporate form." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012).

109.112.      Therefore, because these patents are not the property of Debtors' estates and creditors have made no attempt at demonstrating an exceptional case, SLS, Hawk, and SeeCubic have no claim to the assets of Ultra-D Coöperatief U.A. and should not be allowed to seek a claim against this alleged collateral.

### SLS, Hawk, and SeeCubic Seek Double and/or Triple Recovery

110.113.      SLS, Hawk, and SeeCubic have submitted claims that appear to be duplicative.  Double and triple recovery should be disallowed.

111.114.      For example, both SLS and SeeCubic have asserted the same liability against Stream in the same amount and priority as that filed by Hawk as "Collateral Agent."

112.115.       According to the Collateral Estoppel Opinion,  "Hawk and SLS transferred their rights as creditors to SeeCubic, thereby consolidating those rights within a single entity." *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al*., Case No. 2022-0930-JTL D.I.. 160 at 8.  In addition, "[u]nder the Note Purchase Agreement, SeeCubic issued notes with a face value of $117,875,781.64 to various purchasers, including notes to Hawk with a face value of $56,293,255.13 and notes to SLS with a face value of $6,514,023. In

26

exchange, the noteholders received a first-priority security interest in all of SeeCubic's assets, including the Legacy Stream Assets." *Id.* at 7-8.  In addition to the Assignment Agreement and the Note Purchase Agreement, according to the Collateral Estoppel Opinion, SeeCubic entered into a Guarantee and Collateral Agreement with Hawk.  *Id.* at 8.

113.116.     With respect to the Guarantee and Collateral Agreement, the Chancery Court stated:

> Under that agreement, SeeCubic granted Hawk a security interest in all of its assets, including all of its contract rights. *Id.* §§ 3, 3.1(h), 4.1. If an event of default occurred under the Note Purchase Agreement, the Collateral Agreement empowered Hawk to act as the "Collateral Agent" to levy on SeeCubic's assets and enforce its contract rights, including the rights SeeCubic received under the Assignment Agreement. *See id.* art. 7. The issuance of a decision invalidating the Omnibus Agreement constituted an event of default under the Note Purchase Agreement.

*Id.*

114.117.     In its Collateral Estoppel Opinion, the Chancery Court also stated:

> The Collateral Agreement appointed Hawk as Collateral Agent with the authority following an event of default under the Note Purchase Agreement to assert any rights that the note purchasers possessed under the Note Purchase Agreement or in the Collateral Agreement. Those rights included a security interest in all of SeeCubic's assets, which encompassed to "all General Intangibles (including all contract rights)." Collateral Agreement § 3.1(h). The security interest thus extended to the enforcement rights that SeeCubic received under the Assignment Agreement, which in turn included SeeCubic's right to enforce the Hawk Pledge Agreements.

*Id.* at 22-23.

115.118.     Since Hawk is acting as "Collateral Agent," SLS and SeeCubic's respective claims should be barred to the extent they duplicate the claim filed by Hawk.

**Basis for Relief**

27

119. When asserting a proof of claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *In re Int'l Match Corp.*, 69 F. 2d 73, 76 (2d Cir. 1934) (finding that a proof of claim should at least allege facts from which legal liability can be seen to exist). Where the claimant alleges sufficient facts to support its claim, its claim is accorded *prima facie* validity. *In re Allegheny Int'l, Inc.*, 954 F.2d at 173.

120. A party wishing to dispute such a claim must produce evidence in sufficient force to negate the claim's *prima facie* validity. *Id*. In practice, the objecting party must produce evidence that would refute at least one of the allegations essential to the claim's legal sufficiency. *Id*. Once the objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence. Id. The burden of persuasion is always on the claimant. *Id.*

121. For the reasons discussed in the preceding section, the claims of SLS, Hawk, and SeeCubic do not meet the standards for *prima facie* validity and should be disallowed as requested.

122. It is undisputed that SLS, Hawk, and SeeCubic did not rely on their existing agreements to collect on any debt obligation owed to them, but rather sought to gain unfair advantage and severely harm the Debtor's by putting forth the invalid "Omnibus Agreement." This act was already determined to be unlawful by the Delaware Supreme Court.

123. The scheme to create the Omnibus Agreement was inequitable conduct that conferred an unfair advantage to the secured creditors far beyond what they would have been entitled to if they had merely relied on their existing debt agreements.

28

121.124.    The entire purpose of this scheme was to transfer the value of Stream and Technovative to SeeCubic in favor of SLS, Hawk, and the directors and shareholder of Stream that colluded with SeeCubic in this scheme.  This plan was at the direct expense of the unsecured creditors of Stream and Technovative, and specifically, harmed Rembrandt.

122.125.    It is undisputed that SLS, Hawk, and SeeCubic do not have a license from Philips or Rembrandt.

123.126.    By taking possession of technology and entities that had access to Philips and Rembrandt technology, SLS, Hawk, and SeeCubic caused a breach of the agreements with Philips and Rembrandt and caused infringement by Technovative of the intellectual property of both Philips and Rembrandt.

124.127.    It is undisputed that Shadron Stastney was the CFO of Stream and an insider with access to internal and proprietary information of Stream, including but not limited to, the status of the resolution of Rembrandt's claims with Stream.

125.128.    SLS, Hawk, and SeeCubic engaged in inequitable conduct that resulted in injury to creditors and conferred an unfair advantage on the claimant such that equitable subordination of the claim or its disallowance, whether based on its conduct or simple setoff, is consistent with the provisions of the Bankruptcy Code and the most appropriate remedy for the inequitable conduct. Particularly galling is the fact that these lenders engaged in an illegal takeover scheme and have asserted years of penalties and interest while they have robbed the Debtors' and their estates of their ability to operate.  They have disrupted progress towards commercialization at a crucial point where electronics had been perfected, ruined business relationships, scattered employees, and have persisted in their scheme to rob the assets, this time through a war of attrition that is simply an extension and reimagining of their takeover scheme.

29

Now, instead of allowing purchase orders to move forward and $150 million to come into the estate, which if their claims are allowed would result in their payment, they persist in sabotage, vexatious litigation, and infringement of trade secrets and other intellectual property.

**Reservation of Rights**

126.129.    Rembrandt hereby reserve the right to object in the future to any of the Proofs of Claim listed in this Objection or on the exhibits attached hereto on any ground, and to amend, modify or supplement this Objection, including, without limitation, to object to amended or newly-filed Claims. Separate notice and hearing will be scheduled for any such objection.

127.130.    Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that Rembrandt may have: (a) to bring avoidance actions under the applicable sections of the Bankruptcy Code against the holders of Claims subject to the Objection; or (b) to exercise their rights of setoff against the holders of such Claims relating to such avoidance actions.

**Notice**

37.  Rembrandt have provided notice of this Objection via first class mail to: (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) counsel for the agents for the Debtors' prepetition secured and unsecured lenders; (c) any persons who have filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (e) parties whose Claims have been objected to in this Objection. In light of the nature of the relief requested, Rembrandt respectfully submit that no further notice is necessary.

**Compliance With Local Rule 3007-1**

38. To the best of Rembrandt' knowledge and belief, this Objection and all exhibits to the Proposed Order comply with Local Rule 3007-1 and the Rule 3007(c) General Order. To the

30

extent that this Objection does not comply in all respects with the requirements of Local Rule

3007-1, the undersigned believes such deviations are not material and respectfully requests that

any such requirement be waived.

[date, sig block]

31

# App. Ex. 66

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, May 03, 2024 2:50 PM EDT
**To:** Heining, Aran <Aran.Heining@lewisbrisbois.com>; Christopher Michaels <michaels@bpmlegal.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Subject:** RE: Order disallowing claim

Thank you!



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

---

**From:** Heining, Aran <Aran.Heining@lewisbrisbois.com>
**Sent:** Thursday, May 2, 2024 10:05 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Christopher Michaels <michaels@bpmlegal.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Subject:** RE: Order disallowing claim

Are you looking for one for purposes of format? If so, this is really good – just note that it is not EDPA. Unsurprisingly, I couldn't find any examples out of EDPA. Let me know if this works, if not I can pull something else.

**Aran Heining**
Bankruptcy Paralegal
302-295-9442

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, May 2, 2024 9:48 AM
**To:** Heining, Aran <Aran.Heining@lewisbrisbois.com>; Christopher Michaels <michaels@bpmlegal.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Subject:** Order disallowing claim

Dear Aaron,

Somewhat of an urgent request related to Stream .Somewhat of an urgent request related to Stream . Please just put this in a temporary matter under Stream account receivable collection.

Can you forward to Chris Michaels a sample (PDF of a filed version is fine- If we can convert to Word even better) an order disallowing  claims.

If you can't find one this allowing claims or sustaining the objection, then any order related to allowing claims would be helpful. Please send to those copied on this email after you're done with breakfast.

Thank you Please excuse any typos dictating to Siri

Get Outlook for iOS

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

**TRUSTEE 91**

# App. Ex. 67

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, May 16, 2024 6:42 PM EDT
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>; Christopher Michaels <michaels@bpmlegal.com>;
ademarco@devlinlawfirm.com <ademarco@devlinlawfirm.com>
**Subject:** Re: Request for status conference--URGENT

Not opposed

Get [Outlook for iOS](#)



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
Certified 2022-2023 Powered by DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

---

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Thursday, May 16, 2024 6:34:55 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>; ademarco@devlinlawfirm.com <ademarco@devlinlawfirm.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] Request for status conference--URGENT

Please reply to the email I circulated to all earlier this afternoon when I asked if anyone opposed an expedited status conference. I need to reference the responses when I file it with the court. Raf- I think that you too can reply as you still represent Stream. Thanks

**Leslie Beth Baskin, Esquire**
## Spector Gadon Rosen Vinci P.C.
**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com** 1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

**TRUSTEE 100**

# App. Ex. 68

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, May 24, 2024 4:49 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>
**CC:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Subject:** TRO and related rules in EDPA
**Attachment(s):** "Stream's Motion for Expedited Hearing on the Motion for TRO(130073632.1).docx","Stream's Proposed Order for Expedited Hearing on TRO(130073634.1).docx","10 Collier on Bankruptcy P 7070.01.zip","USCS Bankruptcy R 9020.zip"

All –

Please just double check with your own counsel, but there were so many questions on this procedure I thought I would simply review and send back what I saw.  Looks like you have to file an expedited motion to enforce the TRO, for contempt rule 70 and Rule 9020, and for sanctions (take all the money they have raised by falsely claiming they have the technology).

I have attached our original TRO and order to give a headstart.  Below are various links and the rule language. I have attached Rule 70 (7070 bk rule) and 9020  - both are for contempt and it is suggested that a dual request under both rules be made for contempt.

Her chambers procedures:

https://www.paeb.uscourts.gov/sites/paeb/files/AMCPracProcs_013117.pdf

INJUNCTIONS 1. Hearings on Motions for Temporary Restraining Orders or Preliminary Injunctions Hearings on motions for temporary restraining orders or preliminary injunctions are viewed and scheduled**in the same manner as requests for expedited consideration in contested matters**. Requests for expedited discovery are treated in the same fashion and should be filed and served upon opposing parties.

https://www.paeb.uscourts.gov/sites/paeb/files/PAEB%20Local%20Rules%20-%20effective%2006-14-2021%20%28updated%2004-12-2023%29.pdf

Local Rule 5070-1 Calendars and Scheduling

(g) Expedited Consideration. (1) Consultation. A party who desires to obtain a hearing date earlier than the hearing date that would ordinarily be assigned under subdivision (a) of this rule or other expedited consideration, to the extent practicable, shall consult with all other interested parties to attempt to reach an agreement that an expedited hearing is appropriate and on the suggested hearing date or dates. (2) Content of Motion. A motion for expedited consideration shall:

(A) set forth with particularity the reasons expedited consideration is necessary and appropriate;
(B) identify who the movant consulted as required by subdivision (f)(1);
(C) describe the agreement, if any, that resulted from the consultation with other interested parties; and
(D) identify who was provided a copy of the motion for expedited consideration or otherwise given notice of the motion prior to its filing; and state when and how the movant gave notice of the motion.

(3) Combined Motion or Application. A motion or application may be combined with a request for expedited consideration of the motion or application. The title of such motion or application shall indicate that it includes a request for an expedited hearing date or other expedited consideration.
(4) Documents to Accompany Motion. The motion for expedited consideration shall be filed and served with: (A) a proposed order that grants expedited consideration by scheduling a hearing and provides for a method of prompt service of the order as well as the underlying motion or application, and (B) a copy of the underlying motion or application for which expedited consideration is requested, unless a combined motion under paragraph (g)(3) is filed.
(5) Disposition. A motion for expedited consideration is governed by L.B.R. 9014-2. If the Court grants an expedited hearing, the court may schedule the hearing for the date requested or some other date.

EDPA District Court Local Rules – no equivalent to Rule 65

https://www.paed.uscourts.gov/sites/paed/files/documents/locrules/civil/cvrules.pdf

Rule 65

https://www.federalrulesofcivilprocedure.org/frcp/title-viii-provisional-and-final-remedies/rule-65-injunctions-and-restraining-orders/

# Rule 65 – Injunctions and Restraining Orders

(a) **Preliminary Injunction**.

(1) *Notice.* The court may issue a preliminary injunction only on notice to the adverse party.

(2) *Consolidating the Hearing with the Trial on the Merits.*Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not

**TRUSTEE 102**

ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

(b) **Temporary Restraining Order**.

(1) *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

(2) *Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

(3) *Expediting the Preliminary-Injunction Hearing.* If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) *Motion to Dissolve.* On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

(c) **Security**. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

(d) **Contents and Scope of Every Injunction and Restraining Order**

(1) *Contents.* Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

(C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

(2) *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

(e) **Other Laws Not Modified**. These rules do not modify the following:

(1) any federal statute relating to temporary restraining orders or preliminary injunctions in actions affecting employer and employee;

(2) 28 U.S.C. §2361, which relates to preliminary injunctions in actions of interpleader or in the nature of interpleader; or

(3) 28 U.S.C. §2284, which relates to actions that must be heard and decided by a three-judge district court.

(f) **Copyright Impoundment**. This rule applies to copyright-impoundment proceedings.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 23, 2001, eff. Dec. 1, 2001; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
**Certified 2022-2023** Powered by DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

# App. Ex. 69

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, June 01, 2024 2:23 AM EDT
**To:** Andrew DeMarco <ademarco@devlinlawfirm.com>
**CC:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>; Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Re: [EXT] Re: 152032770109 Trustee objection and joinder to Hawk objection re: extending time
**Attachment(s):** "image001.png","image002.png"

I think you need a notice of service- just like a certificate of service for other filings.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
**Certified 2022-2023** Powered by DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On May 31, 2024, at 11:04 PM, Andrew DeMarco <ademarco@devlinlawfirm.com> wrote:

By my reading of the rule, nothing needs to be filed—just that written notice needs to be provided to each party, which we can achieve via service of the notice.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, May 31, 2024 9:51 PM
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Cc:** Andrew DeMarco <ademarco@devlinlawfirm.com>; Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Re: [EXT] Re: 152032770109 Trustee objection and joinder to Hawk objection re: extending time

I think you need to file a notice of service of the discovery and when it was served and that notice gets served by BMC when filed on the docket through ECF.

But you should check the rule.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

<image001.png>

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

**TRUSTEE 103**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<image002.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On May 31, 2024, at 8:38 PM, Leslie Beth Baskin <lbaskin@sgrvlaw.com> wrote:

Ok but you may want to check the rules

Get Outlook for iOS

**Leslie Beth Baskin, Esquire**
**Spector Gadon Rosen Vinci P.C.**
**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com** 1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

**From:** Andrew DeMarco <ademarco@devlinlawfirm.com>
**Sent:** Friday, May 31, 2024 7:51:34 PM
**To:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>; Christopher Michaels <michaels@bpmlegal.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: 152032770109 Trustee objection and joinder to Hawk objection re: extending time

{EXTERNAL EMAIL} This message originated outside of your organization.

I think our paralegal may have sent it to just the counsel for the witness.  I will find out and ensure all counsel are served.

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Friday, May 31, 2024 6:18 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>; Andrew DeMarco <ademarco@devlinlawfirm.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** RE: 152032770109 Trustee objection and joinder to Hawk objection re: extending time

Did you send the notices of depositions to all parties?   see FR 30, applicable in Bankruptcy under BR 7030. But I think that it  may mean that they can object at trial for use of the deposition testimony or by motion

**Leslie Beth Baskin, Esquire**

# Spector Gadon Rosen Vinci P.C.

**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com**   1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.

IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

**From:** Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**Sent:** Friday, May 31, 2024 6:02 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>;ademarco@devlinlawfirm.com
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** 152032770109 Trustee objection and joinder to Hawk objection re: extending time

Chris- Attached please find  what the trustee just filed-- note that Trustee's counsel argues that we can't complain that we need more time for, i.e.,  discovery when none has been propounded.  I think you need to address that with the trustee  and add that to the response you file on Tuesday when they don't show up for the depositions.

**Leslie Beth Baskin, Esquire**

**Spector Gadon Rosen Vinci P.C.**

**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com** 1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.

IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

# App. Ex. 70

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, June 04, 2024 1:15 AM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>; Leslie Beth Baskin <lbaskin@sgrvlaw.com>
**CC:** mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**Subject:** FW: [EXT] Email:Artesanias Hacienda Real S.A. de C.V. v. North Mill Cap...
**Attachment(s):** "Artesanias Hacienda Real S.A. de C.V. v. North Mill Cap.zip"

Doesn't this validate Rembrandt's standing?



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

**Mansfield Rule**
Certified 2022-2023 Powered by DIVERSITYLAB

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** LexisNexisDelivery@lexisnexis.com <LexisNexisDelivery@lexisnexis.com>
**Sent:** Tuesday, June 4, 2024 1:07 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] Email:Artesanias Hacienda Real S.A. de C.V. v. North Mill Cap...

Delivery

About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2024 LexisNexis.

* This is an automated email. Please do not reply to this email address.

**TRUSTEE 105**



**User Name:** Rafael Zahralddin

**Date and Time:** Tuesday, June 4, 2024 1:07:00AM EDT

**Job Number:** 225759743

## Document (1)

1. *Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.), 968 F.3d 273*

   **Client/Matter:** 333333.333333

   **Search Terms:** standing and bankruptcy

   **Search Type:** Terms and Connectors

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Court: Federal > 3rd Circuit,State Courts > Pennsylvania,State Courts > New Jersey,State Courts > Delaware |

LexisNexis | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2024 LexisNexis

Rafael Zahralddin

⚠ Caution

As of: June 4, 2024 5:07 AM Z

# *Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.)*

United States Court of Appeals for the Third Circuit

May 19, 2020, Argued; August 4, 2020, Filed

No. 19-2907

**Reporter**

968 F.3d 273 *; 2020 U.S. App. LEXIS 24487 **; 69 Bankr. Ct. Dec. 38; 2020 WL 4460000

IN RE: WILTON ARMETALE, INC., a/k/a Wapita, Inc., Debtor;ARTESANIAS HACIENDA REAL S.A. DE C.V., Appellant v. NORTH MILL CAPITAL, LLC; LEISAWITZ HELLER

**Prior History: [**1]** On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 5-18-cv-05553). District Judge: Honorable Edward G. Smith.

*Artesanias Hacienda Real S.A. de C.V. v. N. Mill Capital LLC, 607 B.R. 189, 2019 U.S. Dist. LEXIS 133321 (E.D. Pa., Aug. 8, 2019)*

# Core Terms

abandoned, statutory authority, plundering, cause of action, derivative, theory of recovery, bankruptcy court, warehouse, property of the estate, relinquish, remaining assets, standing to sue, settlements, transferred, insolvent, declares, managed

# Case Summary

**Overview**
HOLDINGS: [1]-When a bankruptcy trustee formally abandoned the estate's claims against certain entities, he returned the power to pursue those claims to the creditor, and thus, a creditor plaintiff had both constitutional standing and the statutory authority to sue certain entities, who allegedly plundered a now-bankrupt company that owed the creditor money; [2]-Chapter 7 trustees could abandon asset-plundering claims back to the creditors who had them before the bankruptcy; [3]-The creditors had constitutional standing to sue these entities for plundering the debtor's assets since they showed an injury traceable to the entities that would be redressed by a favorable ruling; [4]-When the trustee

formally abandoned the estate's claims against those entities, he returned the power to pursue those claims to the creditor.

**Outcome**
Decision vacated and case remanded.

# LexisNexis® Headnotes

Constitutional Law > ... > Case or Controversy > Standing > Particular Parties

## *HN1*[⬇] Standing, Particular Parties

When a company declares bankruptcy, that declaration does not erase a creditor's constitutional standing to sue.

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions

## *HN2*[⬇] Duties & Functions, Capacities & Roles

If the company declares bankruptcy, creditors may lose the statutory authority to pursue those claims. Under the Bankruptcy Code, a trustee manages the company's estate, including those creditors' asset-plundering claims. The Code thus shifts the statutory authority to pursue those claims from the creditors to the trustee, unless the trustee relinquishes it.

Rafael Zahralddin

968 F.3d 273, *273; 2020 U.S. App. LEXIS 24487, **1

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Liquidations

Constitutional Law > ... > Case or Controversy > Standing > Particular Parties

### *HN3*[⬇]  Duties & Functions, Liquidations

Bankruptcy Code standing is not constitutional standing, and thus is not jurisdictional, and Chapter 7 trustees can relinquish the statutory authority to pursue a claim back to a creditor.

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

### *HN4*[⬇]  Standards of Review, De Novo Standard of Review

Appellate courts review the bankruptcy court's dismissal de novo.

Civil Procedure > Preliminary Considerations > Justiciability > Standing

Constitutional Law > The Judiciary > Case or Controversy > Standing

### *HN5*[⬇]  Justiciability, Standing

The U.S. Supreme Court has clarified that a litigant's constitutional standing to bring a suit differs from its statutory authority to maintain one.

Business & Corporate Compliance > Bankruptcy > Estate Property > Contents of Estate
Bankruptcy Law > Estate Property > Contents of Estate

### *HN6*[⬇]  Estate Property, Contents of Estate

When a debtor declares bankruptcy, most of its property gets transferred to its estate. *11 U.S.C.S. § 541*. The estate encompasses all kinds of property, including causes of action. *11 U.S.C.S. § 541(a)(1)*. A cause of action becomes property of the estate if the claim

existed at the commencement of the bankruptcy filing and the debtor could have asserted the claim on his own behalf under state law.

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Immunities & Liabilities

### *HN7*[⬇]  Duties & Functions, Capacities & Roles

A court-appointed bankruptcy trustee manages the estate's property, including causes of action. The trustee is the representative of the estate with the capacity to sue and be sued on its behalf. *11 U.S.C.S. § 323(a)*, *(b)*. So once a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.

Business & Corporate Compliance > Bankruptcy > Estate Property > Contents of Estate
Bankruptcy Law > Estate Property > Contents of Estate

Constitutional Law > ... > Case or Controversy > Standing > Particular Parties

### *HN8*[⬇]  Estate Property, Contents of Estate

After a company files for bankruptcy, its creditors lack standing to assert claims that are property of the estate.

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

### *HN9*[⬇]  Duties & Functions, Capacities & Roles

Whether a given action is within the scope of the Bankruptcy Code is a question on the merits rather than one of justiciability. Thus, to avoid confusion, bankruptcy standing is recharacterized as the trustee's authority to act on behalf of the estate.

Business & Corporate

Compliance > Bankruptcy > Estate
Property > Contents of Estate
Bankruptcy Law > Estate Property > Contents of
Estate

Constitutional Law > ... > Case or
Controversy > Standing > Particular Parties

Civil
Procedure > ... > Justiciability > Standing > Persona
l Stake

### *HN10*[⬇]  Estate Property, Contents of Estate

A litigant's standing to pursue causes of action that
become the estate's property means its statutory
authority under the Bankruptcy Code, not its
constitutional standing to invoke the federal judicial
power.

Constitutional Law > ... > Case or
Controversy > Standing > Elements

### *HN11*[⬇]  Standing, Elements

In Lexmark, the U.S. Supreme Court reaffirmed that
constitutional standing has only three elements: (1) a
concrete and particularized injury in fact, (2) that is fairly
traceable to the defendant's conduct, and (3) that a
favorable judicial decision would likely redress. Once a
plaintiff satisfies those elements, the action presents a
case or controversy that is properly within federal courts'
U.S. Const. art.   III jurisdiction. Other standing
requirements, whether prudential or tied to a particular
statute, do not affect constitutional jurisdiction. Instead,
they go to the merits.

Bankruptcy Law > ... > Commencement of
Case > Involuntary Cases > Standing

Constitutional Law > ... > Case or
Controversy > Standing > Elements

Constitutional Law > ... > Case or
Controversy > Standing > Particular Parties

### *HN12*[⬇]  Involuntary Cases, Standing

The statutory requirements of bankruptcy standing
exceed the three elements of constitutional standing.

Civil
Procedure > ... > Justiciability > Standing > Injury in
Fact

Constitutional Law > ... > Case or
Controversy > Standing > Elements

### *HN13*[⬇]  Standing, Injury in Fact

Monetary harm is a classic form of injury-in-fact for
standing.

Constitutional Law > ... > Case or
Controversy > Standing > Particular Parties

### *HN14*[⬇]  Standing, Particular Parties

A creditor has constitutional standing when it asserts
that by taking and keeping the debtor's assets, the
defendants kept those assets from the creditor and
rendered the debtor insolvent, thereby contributing to
the creditor's economic harm.

Bankruptcy Law > ... > Examiners, Officers &
Trustees > Duties & Functions > Capacities & Roles

### *HN15*[⬇]  Duties & Functions, Capacities & Roles

Only the bankruptcy trustee has the power to prosecute
causes of action (1) that existed at the commencement
of the bankruptcy filing and (2) that the debtor could
have asserted on his own behalf.

Business & Corporate
Compliance > Bankruptcy > Claims
Bankruptcy Law > Claims

### *HN16*[⬇]  Bankruptcy Law, Claims

In bankruptcy, a claim arises when an individual is
exposed to conduct giving rise to an injury. *11 U.S.C.S.
§ 101(5)*.

Bankruptcy Law > ... > Examiners, Officers &
Trustees > Duties & Functions > Capacities & Roles

968 F.3d 273, *273; 2020 U.S. App. LEXIS 24487, **1

Bankruptcy Law > Claims > Types of Claims

**HN17**[⬇] **Duties & Functions, Capacities & Roles**

Individual creditors have the statutory authority to bring only personal claims. That is because a general claim inures to the benefit of all creditors by enlarging the estate, and so the trustee is the proper person to assert the claim. The distinction between general and personal claims promotes the orderly distribution of assets in bankruptcy by funneling all asset-recovery litigation through a single plaintiff: the trustee.

Bankruptcy Law > Claims > Types of Claims > Claim Classification

Bankruptcy Law > Claims > Types of Claims > Definitions

**HN18**[⬇] **Types of Claims, Claim Classification**

To distinguish general from personal claims in bankruptcy, courts focus not on the nature of the injury, but on the theory of liability. Claims alleging that third parties wrongfully depleted the debtor's assets are general or derivative because every creditor has a similar claim for the diversion of assets of the debtor's estate. The theory of recovery for those claims is not tied to the harm done to the creditor by the debtor. Rather, it is based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claims against the debtor.

Bankruptcy Law > Claims > Types of Claims > Claim Classification

**HN19**[⬇] **Types of Claims, Claim Classification**

Harm done mainly to the debtor can indirectly injure the creditors, making the claim a general one. If the theory of recovery would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors, then the claim is general, not personal. Only when a particular creditor suffers a direct, particularized injury that can be directly traced to the defendant's conduct is the claim personal to that creditor and not property of the bankruptcy estate.

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

**HN20**[⬇] **Duties & Functions, Capacities & Roles**

The trustee can relinquish his statutory authority to bring general or derivative claims to a creditor.

Bankruptcy Law > Claims > Types of Claims > Claim Classification

**HN21**[⬇] **Types of Claims, Claim Classification**

An abandoned bankruptcy claim, like abandoned property in general, flows to someone else. The abandoned property can flow back to any party with a possessory interest in it.

Bankruptcy Law > Claims > Types of Claims > Claim Classification

Bankruptcy Law > Estate Property > Abandonment of Property > Trustee Action

**HN22**[⬇] **Types of Claims, Claim Classification**

When the abandoned bankruptcy property is a cause of action, the right to assert it reverts back to the prior holder. Thus, if a trustee abandons a cause of action, the creditor's right to pursue it springs back to life. A Trustee could choose to abandon a claim, and allow creditors to pursue it independently).

Bankruptcy Law > Claims > Types of Claims > Claim Classification

Bankruptcy Law > Estate Property > Abandonment of Property > Trustee Action

**HN23**[⬇] **Types of Claims, Claim Classification**

If the trustee wants to abandon any property during the bankruptcy, he must do so overtly. When evidence of abandonment is clear, any abandoned causes of action revert to their prior owner.

**Counsel:** Barry L. Goldin [ARGUED], Allentown, PA, Counsel for Appellant.

Sam P. Israel [ARGUED], Timothy L. Foster, Sam P.

Israel P.C., New York, NY, Counsel for Appellee North Mill Capital LLC.

Jeffrey B. McCarron [ARGUED], Kathleen M. Carson, Swartz Campbell, Philadelphia, PA, Counsel for Appellee Leisawitz Heller.

**Judges:** Before: McKEE, BIBAS, and COWEN, Circuit Judges.

**Opinion by:** BIBAS

# Opinion

 **[*277]**  OPINION OF THE COURT

BIBAS, *Circuit Judge*.

**HN1**[⬆] When a company declares bankruptcy, that declaration does not erase a creditor's constitutional standing to sue. As a company nears insolvency, some may plunder the sinking ship. By depleting its remaining assets, they lower the odds that the company will repay its creditors. That risk of loss gives the creditors constitutional standing to sue the plunderers.

**HN2**[⬆] If the company declares bankruptcy, though, creditors may lose the statutory authority to pursue those claims. Under the Bankruptcy Code, a trustee manages the company's estate, including those creditors' asset-plundering claims. The Code thus shifts the statutory authority to pursue **[*278]**   **[**2]** those claims from the creditors to the trustee, unless the trustee relinquishes it.

At times, we have said that this transfer of statutory authority takes away a creditor's "standing." But as the Supreme Court recently held, that statutory question has nothing to do with constitutional standing. **HN3**[⬆] We now clarify that Bankruptcy Code "standing" is not constitutional standing (and thus is not jurisdictional) and that Chapter 7 trustees can relinquish the statutory authority to pursue a claim back to a creditor.

In this case, we hold that the creditor plaintiff has both constitutional standing and the statutory authority to sue two defendants who allegedly plundered a now-bankrupt company that owed the creditor money. When the trustee formally abandoned the estate's claims against those defendants, he returned the power to pursue those claims to the creditor. So we will vacate and remand the District Court's order to the contrary.

**I. BACKGROUND**

**A. The alleged asset-plundering scheme**

On appeal from the District Court's dismissal, we accept the complaint's allegations as true: Several years ago, Artesanias Hacienda Real S.A. de C.V. sold wares to Wilton Armetale, Inc. But Wilton never paid for **[**3]** them. So Artesanias sued Wilton and its then-owner, who had guaranteed the purchase. Artesanias obtained a judgment for around $ 900,000 and all the owner's shares in Wilton, which he transferred to an affiliate of Artesanias. Soon after, Artesanias recorded its judgment as a lien on a valuable warehouse that Wilton owned.

Once Artesanias took over Wilton, it got access to privileged documents held by Leisawitz Heller, a law firm that had represented Wilton and its previous owner. Those documents showed that Wilton was insolvent and that its previous owner and North Mill Capital, another creditor had plotted with Leisawitz Heller to plunder the company's remaining assets.

Among other things, the previous owner, Leisawitz Heller, and North Mill had engineered a sale of Wilton's non-realestate assets to an entity that North Mill chose, even though that entity paid hundreds of thousands of dollars less than what other bidders had offered. The previous owner and Leisawitz Heller had also let North Mill file inflated judgments against Wilton on its debts to North Mill, which gave North Mill a competing lien on the warehouse. In exchange, Wilton's owner received a 20% cut of the proceeds from **[**4]** the warehouse sale and Leisawitz Heller got tens of thousands of dollars in outstanding and future legal fees. After striking this deal, North Mill tried to foreclose on the warehouse.

When it discovered this scheme, Artesanias sued North Mill and Leisawitz Heller. It alleged that by "divert[ing]" Wilton's remaining assets, they had "hinder[ed] . . . Artesanias' ability to enforce and collect obligations [owed to it] from Wilton." App. 56. Artesanias sought damages, an order setting aside the purportedly fraudulent asset transfers, and an order stopping the warehouse foreclosure.

**B. Wilton declares bankruptcy**

Two months after Artesanias sued, the insolvent Wilton filed for Chapter 7 bankruptcy. The Bankruptcy Code's

automatic stay stopped the warehouse foreclosure. *See 11 U.S.C. § 362(a)*. The bankruptcy court soon appointed a trustee to liquidate Wilton's remaining assets.

To resolve Artesanias's and North Mill's competing claims to the warehouse, the trustee entered separate settlements with **[\*279]** each of them so that he could sell it. The trustee agreed to (1) split the sale proceeds between the two, (2) release the estate's claims against North Mill, and (3) not interfere with Artesanias's pending or potential **[\*\*5]** claims against North Mill and others.

At the hearing on the motions to approve the settlements, the trustee, Artesanias, North Mill, and the bankruptcy court all agreed that "nothing" in the settlements would "affect [Artesanias's] litigation" against North Mill. App. 235-36. Relying on those statements, the bankruptcy court entered both settlements and ordered the trustee to sell the warehouse. The trustee later did.

Afterwards, Wilton's bankruptcy estate had few assets left. Among them were legal claims that the trustee could bring against those who had allegedly plundered the company. If those claims succeeded, the estate could recover money to repay its remaining creditors, including Artesanias.

But to bring those claims would cost money. And any recovery was speculative. Rather than spend the estate's few remaining assets pursuing those claims, the bankruptcy court let the trustee abandon all but a select few of them. App. 468-74 (the Abandonment Order). Those few included negligence, professional-liability, and breach-of-contract claims against Leisawitz Heller. The other, abandoned claims were left for Wilton itself or Artesanias to pursue.

### C. Artesanias's claims are dismissed for [\*\*6] lack of standing

Meanwhile, Artesanias's claims against North Mill and Leisawitz Heller continued for a time in the District Court. But when the defendants moved to dismiss the amended complaint, the court declined to rule on their motions. Instead, it referred the whole action to the bankruptcy court handling Wilton's liquidation because Artesanias's claims were "related to" the bankruptcy. App. 265-66 (citing *28 U.S.C. § 157(a)*).

On referral, the bankruptcy court reasoned that

Artesanias "lack[ed] standing to sue." *Artesanias Hacienda Real S.A. de C.V. v. N. Mill Capital LLC (In re Wilton Armetale, Inc.), No. 16-16779, 2018 Bankr. LEXIS 3853, 2018 WL 6440600, at \*1 (Bankr. E.D. Pa. Dec. 6, 2018)*. Once the company had declared bankruptcy, Artesanias's claims became property of the estate to be managed by the trustee. So only the trustee, it explained, had standing to sue. It also rejected Artesanias's claim that the Abandonment Order gave it standing to bring those claims.

Artesanias challenged those conclusions before the District Court, which agreed with the bankruptcy court and "dismissed [the suit] for lack of standing." *Artesanias Hacienda Real S.A. de C.V. v. N. Mill Capital LLC (In re Wilton Armetale, Inc.), 607 B.R. 189, 211 (E.D. Pa. 2019)*. It found that Artesanias's claims were derivative of harm that the defendants had inflicted on Wilton. That meant that only the bankruptcy trustee had standing to pursue them. And it held that the trustee could not abandon to Artesanias the power to do so.

*HN4*[⬆] Artesanias **[\*\*7]** now appeals. We review the dismissal de novo. *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc., 898 F.3d 351, 356 (3d Cir. 2018)*.

### II. BANKRUPTCY "STANDING" IS NOT AN ELEMENT OF A CREDITOR'S CONSTITUTIONAL STANDING

At the outset, we must clean up some confusing legalese. North Mill and Leisawitz Heller ask us to dismiss this appeal for lack of jurisdiction because Artesanias **[\*280]** lacks "standing." They argue that under the Bankruptcy Code, Wilton's bankruptcy took away Artesanias's power to sue. In past decisions, we have called that statutory authority a creditor's "standing" to assert claims in bankruptcy. *HN5*[⬆] But since then, the Supreme Court has clarified that a litigant's constitutional standing to bring a suit differs from its statutory authority to maintain one. Because disputes over statutory authority do not affect our jurisdiction, and because Artesanias has constitutional standing to sue, we can hear this appeal.

### A. "Standing" has imprecisely referred to a bankruptcy litigant's statutory authority to sue

*HN6*[⬆] When a debtor declares bankruptcy, most of its property gets transferred to its estate. *11 U.S.C. § 541*. The estate encompasses "all kinds of property, including

968 F.3d 273, *280; 2020 U.S. App. LEXIS 24487, **7

. . . causes of action." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002)* (quoting *United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983))*; *see 11 U.S.C. § 541(a)(1)*. "A cause of action [becomes] property of the estate if the claim existed at **[**8]** the commencement of the [bankruptcy] filing and the debtor could have asserted the claim on his own behalf under state law." *Foodtown, 296 F.3d at 169 n.5*.

**HN7**[↑] A court-appointed bankruptcy trustee manages the estate's property, including those causes of action. The trustee "is the representative of the estate" with the "capacity to sue and be sued" on its behalf. *11 U.S.C. § 323(a)*, *(b)*. So once a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.

At times, we have called that statutory authority the trustee's exclusive "standing" to assert those claims. **HN8**[↑] We have held that "[a]fter a company files for bankruptcy, [its] creditors lack *standing* to assert claims that are property of the estate." *In re Emoral, Inc., 740 F.3d 875, 879 (3d Cir. 2014)* (emphasis added) (internal quotation marks omitted); *accord Foodtown, 296 F.3d at 169* (same). Our use of that terminology followed the Supreme Court's lead in *Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 416-17, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972)*. We were not alone. *See, e.g., Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.), 522 F.3d 575, 584 (5th Cir. 2008)*; *Logan v. JKV Real Estate Servs. (In re Bogdan), 414 F.3d 507, 511-12 (4th Cir. 2005)*.

That imprecise language is confusing, so some courts have tried to clear up the confusion. As Judge Easterbrook has noted, writing for the Seventh Circuit, bankruptcy "standing" is doctrinally "abnormal." *Grede v. Bank of N.Y. Mellon, 598 F.3d 899, 900 (7th Cir. 2010)*. He explained that the *Caplin* Court "used the language of 'standing' to refer, not to **[**9]** . . . [constitutional] standing, but to whether Congress had authorized a trustee to pursue a given kind of action." *Id.* (internal citation omitted). **HN9**[↑] And "[w]hether a given action is within the scope of the [Bankruptcy] Code is a question on the merits rather than one of justiciability." *Id.* Thus, "[t]o avoid confusion," the court recharacterized bankruptcy "standing" as the trustee's " 'authority' to act on behalf of the [estate]." *Id.* Our sister circuit's explanation is persuasive and we will adopt it.

## B. Bankruptcy "standing" is not constitutional standing

**HN10**[↑] Like the Seventh Circuit, we now clarify that a litigant's "standing" to pursue causes of action that become the estate's property means its *statutory* authority **[*281]** under the Bankruptcy Code, not its *constitutional* standing to invoke the federal judicial power. That articulation aligns our precedent with a recent Supreme Court decision that excised "prudential" or "statutory" additions to the " 'irreducible constitutional minimum of standing.' " *Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125-28, 134 S. Ct. 1377, 188 L. Ed. 2d 392 & n.4 (2014)* (quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992))*. Given this "intervening Supreme Court precedent," we may "reevaluate" our prior decisions to the contrary. *In re Krebs, 527 F.3d 82, 84 (3d Cir. 2008)*.

**HN11**[↑] In *Lexmark*, the Supreme Court reaffirmed that constitutional standing **[**10]** has only three elements: (1) "a concrete and particularized injury in fact," (2) that is "fairly traceable" to the defendant's conduct, and (3) that "a favorable judicial decision" would likely "redress[ ]." *572 U.S. at 125* (internal quotation marks omitted). Once a plaintiff satisfies those elements, the action "presents a case or controversy that is properly within federal courts' Article III jurisdiction." *Id.*

Other requirements, whether prudential or "tied to a particular statute," do not affect our constitutional jurisdiction. *Bank of Am. Corp. v. City of Miami, Fla., 137 S. Ct. 1296, 1302, 197 L. Ed. 2d 678 (2017)* (citing *Lexmark, 572 U.S. at 128 & n.4*). Instead, they go to the merits. *Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 320 & n.3 (3d Cir. 2015)*; *accord Grede, 598 F.3d at 900*.

**HN12**[↑] The statutory requirements of bankruptcy "standing" exceed the three elements of constitutional standing. Under *Lexmark*, they do not affect our constitutional jurisdiction, but only whether Artesanias has a claim on the merits.

## C. Artesanias retained constitutional standing throughout the bankruptcy

Artesanias has constitutional standing to bring its claims. It sued North Mill and Leisawitz Heller after

discovering their alleged scheme to plunder Wilton's remaining assets. It asserted that by depleting those assets, they had frustrated its ability to recover on its judgment against Wilton and so caused it economic **[\*\*11]** harm.

Those allegations give Artesanias constitutional standing. By allegedly plundering Wilton, they lowered Artesanias's odds of being repaid. *HN13*[⬆] That "[m]onetary harm is a classic form of injury-in-fact." *Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 293 (3d Cir. 2005)* (Alito, J.). The alleged misconduct is indirectly but fairly traceable to Artesanias's injury. *See Finkelman v. NFL, 877 F.3d 504, 510-12 (3d Cir. 2017)*. And the relief it seeks, including money damages, would likely redress that injury. *See id. at 512*.

Admittedly, Artesanias's injury flows from the alleged harm to Wilton's assets. *HN14*[⬆] But a creditor has constitutional standing when it asserts that by taking and keeping the debtor's assets, the defendants "kept th[o]se assets from [the creditor] and rendered [the debtor] insolvent, thereby contributing to [the creditor's] economic harm." *Enter. Fin. Grp., Inc. v. Podhorn, 930 F.3d 946, 950 (8th Cir. 2019)*.

A contrary rule would deprive all creditors of constitutional standing to bring fraudulent-transfer claims against corporate plunderers because those claims always flow from harm to a debtor corporation. *See 12 Pa. Cons. Stat. § 5108(b)(1)* (giving creditors remedies against a transferee of the debtor's assets); Unif. Fraudulent Transfer Act § 8(b)(1) (1984) (same). **[\*282]** So too with state-law claims that creditors can assert against an insolvent debtor's fiduciaries. *See, e.g., Official Comm. of Unsecured Creditors ex rel. Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged), 659 F.3d 282, 290 (3d Cir. 2011)*. We reject that approach.

## III. [\*\*12]  ARTESANIAS'S CLAIMS BECAME PROPERTY OF THE BANKRUPTCY ESTATE BECAUSE THEY RELY ON A DERIVATIVE THEORY OF RECOVERY

Now that we have confirmed our jurisdiction, we proceed to the merits. We start with whether Artesanias's claims against North Mill and Leisawitz Heller became property of the estate. If they did, then only the bankruptcy trustee has the statutory authority to bring them unless abandoned. We conclude that those claims rely on a theory of recovery derivative of harm that Wilton suffered directly. If Artesanias prevails, all of

Wilton's creditors would stand to benefit. So Artesanias's claims became property of the bankruptcy estate to be managed by the trustee.

### A. Only the trustee can pursue claims that rely on a derivative theory of recovery

Even though it has constitutional standing, Artesanias cannot pursue its claims if the Bankruptcy Code denies it the statutory authority to do so. As discussed, the Code makes some claims the exclusive province of the trustee, not a creditor like Artesanias. *HN15*[⬆] Only the trustee has the power to prosecute causes of action (1) that "existed at the commencement of the [bankruptcy] filing" and (2) that "the debtor could have asserted . . . on **[\*\*13]**  his own behalf." *Foodtown, 296 F.3d at 169 n.5*.

The first element is about timing. Artesanias's claims existed before Wilton's bankruptcy. Indeed, Artesanias brought those claims two months before the bankruptcy began. Even if it had not filed them, they still would have predated the bankruptcy because the alleged plundering preceded it. *HN16*[⬆] In bankruptcy, "a 'claim' arises when an individual is exposed . . . [to] conduct giving rise to an injury." *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.), 607 F.3d 114, 125 (3d Cir. 2010)* (en banc) (quoting *11 U.S.C. § 101(5)*).

*HN17*[⬆] The second element hinges on whether the claim is "general" to the estate or "personal" to a specific creditor. *Emoral, 740 F.3d at 879* (quoting *Foodtown, 296 F.3d at 170*); *accord* 5 *Collier on Bankruptcy* ¶ 541.07 & n.1 (16th ed. 2020) (citing *Emoral*). Individual creditors have the statutory authority to bring only personal claims. *Emoral, 740 F.3d at 879*. That is because a general claim "inures to the benefit of all creditors" by enlarging the estate, and so " 'the trustee is the proper person to assert the claim.' " *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 701 (2d Cir. 1989))*. The distinction between general and personal claims "promotes the orderly distribution of assets in bankruptcy" by funneling all asset-recovery litigation through a single plaintiff: the trustee. *Id.*

*HN18*[⬆] To distinguish general from personal claims, we focus not on the nature of the injury, but on **[\*\*14]**  the "theory of liability." *Emoral, 740 F.3d at 879*. Claims alleging that "third parties . . . wrongfully deplete[d] the debtor's assets" are general or derivative because "[e]very creditor has a similar claim for the diversion of

assets of the debtor's estate." *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.), 855 F.3d 84, 103 (2d Cir. 2017)*; *accord Emoral, 740 F.3d at 879-80*. The theory of recovery for those claims is "not tied to the harm done to the creditor by the debtor." *Tronox, [*283] 855 F.3d at 103*. Rather, it is "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor." *Id. at 104*.

HN19[⬆] So harm done mainly to the debtor can indirectly injure the creditors, making the claim a general one. If the theory of recovery "would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors," then the claim is general, not personal. *Emoral, 740 F.3d at 881*. Only when a particular creditor suffers a direct, particularized injury that can be "directly traced" to the defendant's conduct is the claim personal to that creditor and not property of the estate. *Tronox, 855 F.3d at 100* (quoting *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC), 740 F.3d 81, 89 (2d Cir. 2014))*; *see id. at 100-02* (collecting cases).

**B. Artesanias's claims rely on a derivative theory of recovery**

Artesanias's claims against North Mill and Leisawitz [**15] Heller became property of the estate. According to Artesanias, the defendants "hinder[ed]" its ability to collect debts owed to it by Wilton by "divert[ing] assets from [an] insolvent corporation." App. 56. As in *Emoral* and *Tronox*, Artesanias's claims are "aimed at recovering estate assets." *Tronox, 855 F.3d at 105* (citing *Emoral, 740 F.3d at 880-81*). Its theory of recovery thus derives from the plundering suffered by Wilton.

Artesanias's assertions that the plundering targeted and disproportionately affected it do not transform the harm into an injury unique to Artesanias. That its harm might be worse in degree than that suffered by other creditors does not change the fact that all the creditors' injuries from the plundering are the same in kind. Because Artesanias's claims depend on harm suffered directly by Wilton and only indirectly by Artesanias, its theory of recovery is not personal, but derivative of harm to the estate.

In reaching this conclusion, we decline to rely on the trustee's assertion that Artesanias's claims "belonged to . . . and continue to belong to Artesanias (not the Wilton estate)." App. 463. As the District Court rightly held, the trustee lacks authority to decide who has the statutory authority to bring those [**16] claims. *607 B.R. at 207-08*. We must answer that legal question ourselves. Plus, as the bankruptcy court noted, the trustee's assertion contradicts Wilton's asset schedules, which included causes of action much like Artesanias's. *2018 Bankr. LEXIS 3853, 2018 WL 6440600, at *3*. We will not outsource to the trustee our duty to determine what is part of the estate.

At bottom, Artesanias alleges that North Mill and Leisawitz Heller left Wilton "with insufficient assets to pay [its] creditors." *Tronox, 855 F.3d at 105*. Its claims rely on a general theory of recovery derivative of harm done to Wilton. The Bankruptcy Code thus gives the statutory authority to pursue those claims to the trustee.

**IV. The Trustee Abandoned His Statutory Authority Over Artesanias's Claims**

HN20[⬆] The trustee can, however, relinquish his statutory authority to bring general or derivative claims to a creditor. Because the Abandonment Order did just that, Artesanias regained the power to sue North Mill and Leisawitz Heller.

**A. Bankruptcy trustees can abandon to a creditor their authority to pursue the estate's claims**

As discussed, the Bankruptcy Code makes a creditor's derivative causes [*284] of action property of the estate. From there, the trustee decides how best to manage them for the benefit of all creditors. *Myers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996)*. One option is [**17] to prosecute those claims to judgment. *See, e.g., Shearer v. Titus (In re Titus), 916 F.3d 293, 298-99 (3d Cir. 2019)*. Another is to settle and extinguish them. *See, e.g., Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 347-48 (3d Cir. 1999)*.

But the trustee also has a third option: he can instead relinquish those claims. For instance, he might formally abandon them if the cost of pursuing them would be "burdensome" or outweigh the likely gain to the estate. *11 U.S.C. § 554(a)*.

HN21[⬆] An abandoned claim, like abandoned property in general, flows to someone else. The abandoned property can flow back "to any party with a possessory

interest in it." *Collier, supra,* ¶ 554.02[3]; *accord Dewsnup v. Timm (In re Dewsnup), 908 F.2d 588, 590 (10th Cir. 1990)* (per curiam) ("Following abandonment, whoever had the possessory right to the property at the filing of the bankruptcy again reacquires that right." (internal quotation marks omitted)), *aff'd, 502 U.S. 410, 112 S. Ct. 773, 116 L. Ed. 2d 903 (1992)*. If the bankruptcy has ended, abandonment sends the property back to the debtor. *See 11 U.S.C. § 554(c)*. Otherwise, the property reverts to "some other party," like "a secured creditor who has possession of the property when the trustee abandons the estate's interest." *Collier, supra,* ¶ 554.02[3].

**HN22**[⬆] ] When, as here, the abandoned property is a cause of action, the right to assert it "revert[s] back to the prior holder." *Id.* ¶ 548.02[5][a]. Thus, if a trustee abandons a cause of action, the "creditor's right to pursue" it "spring[s] **[\*\*18]** back to life." *Id.; accord St. Paul Fire & Marine Ins. Co., 884 F.2d at 698* (noting that "a trustee could choose to abandon a claim, and allow creditors to pursue it independently").

**HN23**[⬆] ] To be sure, if the trustee wants to abandon any property during the bankruptcy, he must do so "overt[ly]." *Collier, supra*, ¶ 548.02[5][a]; *see also O'Dowd v. Trueger (In re O'Dowd), 233 F.3d 197, 200 n.3 (3d Cir. 2000)* (noting that "[a]bandonment is an intentional act"). Thus, we and our sister circuits have declined to hold that a cause of action was abandoned when the evidence was "ambiguous." *Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 123-24 (2d Cir. 2008)* (per curiam); *see also O'Dowd, 233 F.3d at 200 n.3* (citing *Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657-58 (3d Cir. 1974))*. But when the evidence of abandonment is clear, any abandoned causes of action revert to their prior owner. *Collier, supra*, ¶ 548.02[5][a].

## B. The trustee abandoned the claims to Artesanias

By the Abandonment Order's express terms, the trustee abandoned to Artesanias his statutory authority to pursue certain claims against North Mill and Leisawitz Heller. The Order relinquished "without limitation" all the estate's "claims" (as broadly defined in *§ 101(5) of the Bankruptcy Code*), except for the negligence, professional-liability, and breach-of-contract claims that the trustee was pursuing against Leisawitz Heller, plus certain claims against Wilton's old owner and his wife. App. 470-71. The trustee thus relinquished all claims that the Order did not expressly **[\*\*19]** spare.

The abandoned claims included all of Artesanias's current claims against Leisawitz Heller (claims for breach of fiduciary duty, fraudulent transfer, unreasonable disposition of assets, and aiding and abetting and conspiring to commit those torts). **[\*285]** The abandoned claims also included Artesanias's claims against North Mill. These claims survived the trustee's separate settlements with Artesanias and North Mill, which extinguished all the estate's claims against North Mill while preserving Artesanias's separate claims against it.

We decline to read the Abandonment Order as relinquishing those claims only to Wilton. At some points, the Order says the claims are abandoned "to the Debtor"; at others, it says they go to both "the Debtor" and "Artesanias." App. 470-72. But read as a whole, the Order shows that "Artesanias or the Debtor" could "recover . . . on account of the Abandoned Claims." App. 471. It also provides that Artesanias's recoveries would "be deducted from" its claims against the estate. *Id.* The only way to make sense of those clauses is to read them as allowing some of the claims to go to Artesanias. Plus, that reading returns each claim to its pre-bankruptcy owner. Until **[\*\*20]** then, some claims were Wilton's, while others belonged to Artesanias as "the prior holder." *Collier, supra,* ¶ 548.02[5][a]; *see id.* ¶ 554.02[3].

The District Court declined to resolve that tension in the wording of the Abandonment Order. Instead, it read our decision in *Cybergenics* as preventing the trustee from transferring claims to Artesanias, no matter what the Order said. *607 B.R. at 209-10*. But *Cybergenics* does not hold that trustees cannot transfer causes of action. It leaves that question open because the asset transfer at issue did not reach the creditors' claims. *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 244-45 (3d Cir. 2000)*. And elsewhere, it reaffirms that "outside of the context of bankruptcy," claims challenging asset plundering, like Artesanias's, "belong[ ] to [a debtor's] creditors." *Id. at 242*. So *Cybergenics* supports, rather than undermines, our holding: Chapter 7 trustees can abandon asset-plundering claims back to the creditors who had them before the bankruptcy.

We thus hold, contrary to the District Court, that the Abandonment Order "spr[ang] back to life" and so restored Artesanias's power to pursue its claims against North Mill and Leisawitz Heller. *Collier, supra,* ¶ 548.02[5][a]. To be sure, Leisawitz Heller also argues

that Artesanias's amended complaint should be dismissed [**21] under *Federal Rule of Civil Procedure 12(b)(6)* and Pennsylvania law. We leave it to the District Court to decide whether Artesanias raised claims on which relief can be granted.

* * * *

Artesanias had constitutional standing to sue North Mill and Leisawitz Heller for plundering Wilton's assets. The bankruptcy merely deprived Artesanias of the statutory authority to bring those claims, transferring that power to the trustee. But by abandoning those claims, the trustee resurrected Artesanias's power to prosecute them. So we will vacate and remand for further proceedings.

**End of Document**

# App. Ex. 71

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARK L. BUNCE,

        *Plaintiff*,

        v.

VISUAL TECHNOLOGY
INNOVATIONS, INC.,

-and-

MATHU G. RAJAN,

        *Defendants*.

C.A. No. 2:23-cv-01740 KNS

### **DEFENDANTS' SUPPLEMENTAL MOTION TO STAY**

Defendants Visual Technology Innovations, Inc. ("VTI") and Mathu G. Rajan

("Mr. Rajan") (collectively, the "Defendants"), by and through their undersigned

counsel, hereby supplements[1] and renews their Motion to Stay—*see* ECF No. 189—

and moves this Honorable Court for an Order staying this action because Mr. Rajan

is preparing to undergo a bone marrow transplant secondary to leukemia which will

---

[1] Defendants' counsel has attempted to engage in a meet and confer with Plaintiff's counsel before filing this motion.  However, due to the holidays, no response was provided as to this motion. Defendants' current counsel, Matthew Weiser ("Mr. Weiser"), indicated that the Court requested the supplementary information in this document.

**TRUSTEE 115**

now, and thereafter, render him unable to participate in this matter. In support

thereof, Defendants state as follows:

## I.   BACKGROUND

1. On May 5, 2023, Plaintiff Mark L. Bunce ("Plaintiff") filed his

Complaint, *see* ECF No. 1 (the "Complaint"), in the above-referenced action against

Defendants.

2. On December 15, 2025, Defendants filed their Motion to Stay (the

"Motion"). *See* ECF No. 189. During a status conference addressing the Motion, the

Court directed Defendants to provide certain medical documentation of Mr. Rajan

supporting their position to stay this case. *See* ECF. No. 191. As advised by Mr.

Weiser, trial is tentatively scheduled for early January 2026.

3. Because of the recent and upcoming holidays, Mr. Rajan has had

difficulty obtaining his entire file. Notwithstanding, Defendants were able to obtain

the relevant documents (attached hereto as "**Exhibit A**"), but are still in the process

of obtaining the entire medical file. Upon information and belief, the Defendants have

also cooperated with the discovery efforts of the Plaintiffs, facilitating information

for Plaintiff's subpoena, but due to the shortened timelines in this matter, Mr. Rajan

went personally to the University of Pennsylvania medical records department

several times over the past week to get records. Mr. Rajan has reported that his file is

voluminous. As a result, the medical records department at the University of

Pennsylvania prioritized the selection of documents which included biopsies and the results of those biopsies. *See generally* Ex. A.

4. As of December 23, 2025, Defendants retained new trial counsel—Lewis Brisbois Bisgaard & Smith LLP ("LBBS"). The LBBS lawyers have previously spoken to Mr. Rajan's medical professionals and confirmed that his condition required a break from litigation responsibilities during the Stream TV bankruptcy proceedings, where Mr. Rajan often worked from his hospital bed much to the consternation of his medical staff.[2] Mr. Rajan's upcoming medical procedure requires the same break from litigation responsibilities in this action.

**(A). MR. RAJAN'S MEDICAL HISTORY, DIAGNOSIS, AND PROGNOSIS**

5. For the past several years, Mr. Rajan has been battling Acute Myeloid Leukemia ("AML")—which the medical field considers as one of the rarest and most aggressive types of cancer. *See generally* Ex. A; ECF No. 189. AML aggressively attacks and overwhelms blood and bone marrow by the rapid production of immature white blood cells—myeloblasts—which significantly impairs normal blood cell production leading to severe incapacitating symptoms and treatment. *See* ECF No.

---

[2] It is of grave concern that the aggressive tactics by opposing counsel in other unrelated litigation and bankruptcy matters not only resulted in a clear danger to his health and treatment but ultimately resulted in Mr. Rajan being dropped as a patient from his prior doctors at Stanford which is a result that cannot be repeated with his current treatment.

3

189-1 at 2–5.  With an overall 5-year survival rate around 32% for all ages,[3] in addition to its aggressive nature,  AML requires immediate intensive treatment such as bone marrow transplantation (a/k/a "Hematopoietic Stem Cell Transplant"). *See id.* at 5; National Cancer Institute, *Cancer Stat Facts: Leukemia — Acute Myeloid Leukemia (AML)* (available at https://seer.cancer.gov/statfacts/html/amyl.html).

6.      Mr. Rajan has been undergoing chemotherapy and other treatments at the University of Pennsylvania Hospital for quite some time, and, upon information and belief, his physicians have concluded that he requires a Hematopoietic Stem Cell Transplant, *see* ECF. No. 189-1 at 5, which is currently being planned for January 2026, on a date yet to be determined, and pre-transplant testing has already commenced.[4]

7.      However, time is of the essence for Mr. Rajan to undergo this life-saving surgery because it must be done while the cancer is in remission.  Mr. Rajan is now being treated by physicians at City of Hope National Medical Center in Duarte, California, where a highly-specialized team is supervising all aspects of his treatment. *See generally* Ex. A; ECF No. 189.

---

[3] The survival rate for AML decreases significantly as age increases.  *See* National Cancer Institute, *Cancer Stat Facts: Leukemia — Acute Myeloid Leukemia (AML)* (available at https://seer.cancer.gov/statfacts/html/amyl.html).

[4] Upon information and belief, Mr. Rajan's weakened bone density from the AML prevents further biopsies from being performed at this time.

8. Following his transplant and subsequent recovery period, it is expected that Mr. Rajan will be able to resume normal activities, including meaningful participation in the above-referenced action, no earlier than memorial day—May 25, 2026. Mr. Rajan's senior treating physician Dr. Monzr Al Malki, MD confirmed his medical condition, planned treatment, and estimated timing in his letter of December 9, 2025. *See* ECF No. 189-1 at 5.

9. Given the seriousness of Mr. Rajan's condition, any delay, stress, or interference with treatment places Mr. Rajan's health and life at significant risk. Mr. Rajan respectfully request that the Court grant an immediate stay and suspend proceedings until Mr. Rajan is medically cleared to participate.

## II.  ARGUMENT

10. "A stay is 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.' 'The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.'" *Da Silva v. Temple Univ. Hosp., Inc.*, 506 F. Supp. 3d 318, 322 (E.D. Pa. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433–34 (2009)) (internal citations omitted) (alterations in original); *see Molina v. Kauffman*, 2021 WL 12143104, at *1 (M.D. Pa. July 23, 2021) ("'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with the economy of time and effort for itself, for counsel, and for

5

litigants.'" (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)) (alterations in

original)).

11.     "'How this can best be done calls for the exercise of judgment, which

must weigh competing interests and maintain an even balance.'" *Crumble v. United*

*States*, 2024 WL 4173791, at *7 (M.D. Pa. Sept. 12, 2024) (quoting *Landis v. N. Am.*

*Co.*, 299 U.S. 248, 254–55 (1936)).

> Federal courts within the Third Circuit generally evaluate four factors
> in determining whether to grant a stay of proceedings: "(1) the length
> of the requested stay; (2) the hardship that the moving party would face
> in going forward with the litigation; (3) the injury that a stay would
> cause the non-moving party; (4) and whether a stay will simplify issues
> and promote judicial economy."

*Molina v. Kauffman*, 2021 WL 12143104, at *1 (M.D. Pa. July 23, 2021) (quoting

*Scicchitano v. Cnty. of Northumberland*, 2015 WL 7568357, at *2 (M.D. Pa. Nov.

25, 2015)).

12.     Here, the factors weigh heavily in favor of stay.

13.     First, the length of the stay is likely only a few months—i.e., until

memorial day. As stated above, it is expected that Mr. Rajan will be able to resume

normal activities following his transplant and subsequent recovery period, including

meaningful participation in the above-referenced action.

14.     Second, the hardship that the moving party (Mr. Rajan) would face in

going forward with the litigation is not only high, it's life and death.  Mr. Rajan has

been undergoing chemotherapy and other treatments at the University of

Pennsylvania Hospital for quite some time, and his physicians have concluded that he requires a Hematopoietic Stem Cell Transplant. Mr. Rajan's immune system has been compromised by numerous chemotherapy sessions and other pre-transplant procedures, and it will continue to remain that way until after his transplant recovery progresses to the satisfaction of his physicians. With Mr. Rajan's compromised immune system, he is unable to travel for anything other than critical medical appointments and the implant surgery in California. Given the seriousness of Mr. Rajan's condition, Defendants respectfully request that the Court grant an immediate stay and suspend proceedings until Mr. Rajan is medically cleared to participate—likely on or around memorial day 2026.

15.     Furthermore, Defendants have retained new counsel and, as such, Defendants would be further prejudiced in proceeding with trial because their counsel needs time to get caught up.[5]

16.     Third, there is little to no injury that a stay would cause Plaintiff as the non-moving party, and any potential injury to Plaintiff is significantly outweighed by Mr. Rajan's health risk if the stay is not granted.

17.     Fourth, while a stay will not simplify the issues, it will promote judicial economy by maximizing efficiency and minimizing waste of court resources.

---

[5] In addition, Defendants' prior counsel is currently on vacation, thereby making it difficult for the undersigned counsel to get caught up to speed before trial.

18.    At bottom, Mr. Rajan requires lifesaving treatment that cannot (and should not) be rescheduled to procced with litigation.  Mr. Rajan is literally in a fight for his life and requiring him to proceed in this action is unconscionable.

## III.    CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Honorable Court stay this action to afford Mr. Rajan the best chances of being successful in his fight against AML.

DATED: December 31, 2025            LEWIS BRISBOIS BISGAARD & SMITH LLP

                                    /s/ *Rafael X. Zahralddin-Aravena*
                                    Lee J. Janiczek (PA#68433)
                                    Patrick C. Campbell (PA #9647)
                                    Rafael X. Zahralddin-Aravena (PA #71510)
                                    Andrew A. Ralli (PA #329921)[6]
                                    575 E. Swedesford Road, Suite 102
                                    Wayne, PA 19087
                                    (215) 977-4100
                                    Lee.Janiczek@LewisBrisbois.com
                                    Patrick.Campbell@LewisBrisbois.com
                                    Rafael.Zahralddin@LewisBrisbois.com
                                    Andrew.Ralli@LewisBrisbois.com

                                    *Counsel for Defendants Visual Technology Innovations, Inc. and Mathu G. Rajan*

---

[6] Mr. Ralli's admission to this Court is forthcoming.

169176318.6                                8

# EXHIBIT A

# CONFIDENTIAL
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MARK L. BUNCE,<br><br>*Plaintiff*,<br><br>v.<br><br>VISUAL TECHNOLOGY<br>INNOVATIONS, INC.,<br><br>-and-<br><br>MATHU G. RAJAN,<br><br>*Defendants*. | C.A. No. 2:23-cv-01740 KNS |

## **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO STAY**

Upon consideration of Defendants' Motion to Stay, and the arguments made in support and in response thereto (if any);

IT IS HEREBY ORDERED, this _____ day of _____, 2025, that:

1.     The Motion is granted; and

2.     This action is stayed until June 1, 2026, at which time a status conference shall be scheduled by the Court.

_____
The Honorable Kai N. Scott

# App. Ex. 72

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARK L. BUNCE,                          :
          *Plaintiff,*               :
                                       :
      v.                       :   CIVIL ACTION
                                       :   NO. 23-1740
VISUAL TECHNOLOGY INNOVATIONS,          :
INC., and MATHU RAJAN,                  :
          *Defendants.*             :

## MEMORANDUM

This litigation has been a long one. What should have been a simple breach of contract and fraud case has spiraled into a years-long controversy involving discovery disputes, bankruptcies, and sanctions. This particular opinion goes to the heart of this case: the claims. For the reasons below, Plaintiff Mark L. Bunce and Defendants Visual Technology Innovations, Inc. ("VTI") and Mathu G. Rajan's motions for summary judgment are both granted in part and denied in part.

## I.  BACKGROUND

The Court need not recite this case's entire procedural history. For purposes of this opinion, both parties last year filed motions of summary judgment on Plaintiff's breach of contract, unjust enrichment, and fraudulent inducement claims. One day before this Court was to hold a hearing on the motions, both Defendants filed suggestions of bankruptcy. ECF No. 128. Consequently, the case was stayed against Defendants and the Court did not hear argument on the motions for summary judgment. ECF No. 142. Upon learning that the Defendants' bankruptcy proceedings had concluded, the Court entered an order lifting the stay. ECF No. 165. On August 27, 2025, a hearing was finally held for argument on the motions for summary judgment.

1

TRUSTEE 113

Despite the long history of this case, the facts underlying it are straightforward.  Plaintiff alleged that Defendants induced Plaintiff to loan $1,050,000 to Mr. Rajan's company, Visual Technology Innovations, Inc. ("VTI").  On February 17, 2021, Glen Davis, an undisputed agent of VTI, sent Plaintiff an Investor Presentation of VTI.  ECF No. 108-19 [hereinafter Investor Presentation]; ECF No. 108-4 ¶ 20; Hearing Transcript at 50-51.  The Investor Presentation conveyed that Plaintiff's contribution would be a precursor investment "to finance the purchase orders, fulfillment and shipping of current orders of 5,000 off Glasses Free 3-D 8" Tablets and 5 off 250" large exterior signage screens . . . plus the ever present expensive lawyers."  Investor Presentation at 46.  After which, an institutional investor was to invest $30 million to enable the acquisition of "a company in the sector." *Id.*  The company to be acquired was Stream TV Networks, Inc., of which Mr. Rajan was owner and CEO.  Stream TV had filed for Chapter 11 bankruptcy in both Delaware and Pennsylvania.  *In re Stream TV Networks, Inc.*, Case No. 21-10433, U.S. Bankr. Ct. for Dist. of Del.; *see In re Stream TV Networks, Inc.*, BR 23-10763 (MDC), 2024 WL 87639.  The ultimate goal was to take VTI public via a reverse merger with Stream TV. Investor Presentation at 34.

To loan the $1,050,000 amount, Plaintiff and VTI executed Convertible Notes on February 25, March 8, and May 4 of 2021.  ECF Nos. 108-5, 108-8, 108-11.  Respectively, Plaintiff wired $150,000 to VTI on February 25, 2021, $850,000 on March 8, 2021, and $50,000 on May 4, 2021. ECF No. 108-7.  Plaintiff loaned this money in consideration of his right to convert his loans into shares in VTI at a favorable set price if VTI went public.  The parties amended the March 8, 2021 Convertible Note on April 5, 2021, and amended the February 25, 2021 Convertible Note on November 23, 2021.  ECF Nos. 108-9, 108-12 [hereinafter Amendment to Note].  If both the merger and public offering did not occur, then the Amendment to Note's repayment schedule for

the $1,050,000 would kick in.  Amendment to Note at 2.  The Amendment to Note stated that if

VTI missed any of the payment dates, it would have a five-day cure period to get back on schedule

or else the whole of the remaining debt would be due immediately.  *Id*.  VTI did not go public by

the date of the first repayment deadline.  After the first repayment deadline came and went, Plaintiff

demanded that VTI repay the $1,050,000 amount.  ECF No. 108-13.  VTI never did.

Recently, Defendants obtained new counsel.  New counsel for Defendants have attempted

to usher in new evidence.  ECF No. 171.  For instance, counsel wants this Court to consider the

declaration of Charles M. Robertson almost a year after Defendants first filed their motion for

summary judgment.  Not only is Defendants' new evidence untimely, but it is also improper.  Mr.

Robertson was never disclosed in the Rule 26 initial disclosures.  Defendants cannot now introduce

testimony of witnesses, who were never initially disclosed, for the purpose of creating a dispute of

fact with their own previous discovery responses.  Thus, the Court will not entertain Defendants'

new submissions, and the facts as stated above are the applicable facts.

## II.   LEGAL STANDARDS

### A.  SUMMARY JUDGMENT

Summary judgment is warranted "if the movant shows there is no genuine dispute as to

any material fact and the movement is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  The nonmovant can defeat summary judgment by alleging "specific facts showing that

there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S.

574, 587 (1986).  A factual dispute is genuine if evidence in the record would permit a reasonable

jury to find for the nonmovant.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A fact

is material if it might affect the outcome.  *Id*.  The nonmovant must show more than a "mere

scintilla of evidence" to defeat summary judgment.  *Id*. at 252.  For each particular motion, this

Court views the facts in light most favorable to the nonmovant and draws reasonable inferences for the nonmovant. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022). Credibility determinations and weighing of the evidence are matters reserved to the jury. *Anderson*, 447 U.S. at 255.

## B.  FEDERAL RULE OF CIVIL PROCEDURE 37

Rule 37(b)(2)(A) permits a district court to impose sanctions on a party for failure to comply with a discovery order.  This Court may:

> (i) direct that designated facts shall be taken as established in favor of the prevailing party;
> (ii) prohibit the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matters in evidence;
> (iii) strike pleadings in whole or in part;
> (iv) stay further proceedings until the order is obeyed;
> (v) dismiss the action or proceeding in whole or in part;
> (vi) render a default judgment against the disobedient party; or
> (vii) treat the failure to obey the order as a contempt of court.

> FED. R. CIV. P. 37(b)(2)(A)(i)-(vii).

## III.   DISCUSSION

Both parties have moved for summary judgment on Plaintiff's breach of contract, unjust enrichment, and fraudulent inducement claims.  For breach of contract, Plaintiff's motion is granted, and Defendants' motion is denied.  For unjust enrichment, Plaintiff's motion is denied, and Defendants' motion is granted in part.  For fraudulent inducement, Plaintiff's motion is granted, and Defendants' motion is denied.

### A.  BREACH OF CONTRACT

A federal court sitting in diversity applies state substantive law and federal procedural law. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000).  This Court will uphold the Nevada choice of law provision in the Amendment to Note because VTI was organized under Nevada law. *Cottman Transmission Sys., Inc. v. Melody*, 869 F. Supp. 1180, 1184 (E.D. Pa. 1994).  Nevada and

4

Pennsylvania's elements for breach of contract do not materially differ. *Compare Contreras v. Am. Family Mut. Ins. Co.*, 135 F. Supp. 3d 1208, 1224 (D. Nev. 2015) *with Hanna v. Lincoln Fin. Grp.*, 498 F. Supp. 3d 669, 684 (E.D. Pa. 2020). Both parties concur that Nevada law applies. ECF No. 108-2 at 15 [hereinafter Pl.'s Mot. for Summ. J.]; ECF No. 107-1 at 8 [hereinafter Def.s' Mot. for Summ. J.].

To establish a breach of contract claim, a party must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. *Richardson v. Jones*, 1 Nev. 405, 408-09 (1865). There are numerous contracts at play here, but the relevant contract for this claim is the latest contract: the November 23, 2021 Amendment to Note, which amended the maturity date of the notes and provided a repayment schedule. *See* Amendment to Note. Contrary to VTI's argument that this amendment lacked consideration, the Amendment to Note permitted Plaintiff to convert 7,000,000 optional warrants for shares in VTI at a favorable rate, in consideration for VTI's right to repay its loans to Plaintiff in installments if needed. Therefore, the Court finds sufficient consideration and recognizes the November 23, 2021 Amendment to Note as a valid contract. *Cain v. Price*, 134 Nev. 193, 195 (2018) ("where a party's promise, offered as consideration, differs from that which it already promised, there is sufficient consideration to support the subsequent agreement.").

It is indisputable that VTI breached the Amendment to Note. Quite revealing, new counsel for VTI did not advance an argument at the August 27, 2025 hearing against Plaintiff's breach of contract claim. Hearing Transcript at 43-44. VTI never paid back the first installment of the loan by December 23, 2021 or within five days after. Plaintiff counsel noted at the August 27, 2025 hearing that VTI recently and unilaterally wired $30,000 to Plaintiff's overseas account. Hearing Transcript at 13. But such fact is only relevant for damages, not for breach. VTI's $30,000

payment in 2025 does not remedy the $1,050,000 principal amount it was to pay in 2021 per the terms of the Amendment to Note. Due to VTI's breach, Plaintiff has suffered $1,020,000 in compensatory damages, the principal amount that VTI has not repaid.

As required by Nevada law, Plaintiff shall also receive mandatory prejudgment interest. *See Schoepe v. Pac. Silver Corp.*, 111 Nev. 563, 567 (1995) (under N.R.S. 99.040 "interest is recoverable as a matter of right upon money due from contracts"); *see also Nippo Corp./Int'l Bridge Corp. v. AMEC Earth & Envtl., Inc.*, 2013 WL 1311094, at *64 (E.D. Pa. Apr. 1, 2013) (applying Nevada Law). As declared in the order accompanying this opinion, Plaintiff shall submit to the Court an accounting of a prejudgment interest award.

### B. RULE 37 SANCTIONS

Prior to ruling on the remaining two counts—unjust enrichment and fraudulent inducement—the Court will decide two issues that impact the claims' outcomes. The first issue is whether this Court will impose Rule 37(b)(2)(A) sanctions on Defendants for failure to obey a discovery order.

The list of available Rule 37(b)(2)(A) sanctions is not exhaustive, and imposing sanctions is "generally entrusted to the discretion of the district court."[1] *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 580 (3d Cir. 2018). However, "Rule 37(b)(2)(A) is not equivalent to carte blanche; it limits courts' discretion in two ways: First, any sanction must be just; second, the sanction must be specifically related to the particular claim which was at issue in the order to provide discovery." *Id.* (internal quotations omitted). "[U]nproduced discovery [must] be sufficiently material to the administration of due process to support a presumption that the failure to produce constituted an admission by the offending party that its asserted claim or defense lacked merit." *Id.* at 581; *see*

---

[1] In addition, a court must order the disobedient party to pay reasonable expenses, including attorneys' fees, caused by the failure to comply. FED. R. CIV. P. 37(b)(2)(C). This Court has already done so. ECF No. 155.

6

*also Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) (a court must "ensure that the sanction is tailored to address the harm identified.")

On August 13, 2024, this Court granted in part Plaintiff's motion to compel certain discovery and ordered Defendants to explain "how VTI used and spent the $1,050,000 that plaintiff provided to VTI, or, in the alternative, [explain] how VTI used and spent all of its money, identifying all dates, recipients, amounts and documentation as to each transfer or transaction involving any portion of such funds." ECF No. 87. On January 8, 2025, this Court sanctioned then-attorney for Defendants, Attorney Raja Rajan, for failing to comply with the discovery order. ECF No. 130. At that time, a stay was placed on the case given the Defendants' bankruptcies. Since that time, the stay has been lifted but Defendants have still not complied with the discovery order. The spreadsheet that Attorney Rajan shared with Plaintiff ostensibly contains all VTI's transactions, but it still does not provide the underlying documentation of the transactions as required by the order. New defense counsel do not contest that Defendants did not comply with the discovery order. Hearing Transcript at 38-39.

As punishment for Defendants continued non-compliance with the order, Plaintiff requested sanctions under Rule 37(b)(2)(A)(i); specifically, that Mr. Rajan be deemed to have (i) "personally controlled the money that Mr. Bunce loaned to VTI," (ii) "used that money for his own personal benefit and to the detriment of VTI," and (iii) "used that money for purposes that contradicted the presentations that Mr. Rajan and his agents made to Mr. Bunce to induce him to loan the money." Hearing Transcript at 8. Essentially, Plaintiff requested that VTI be deemed the alter ego of Mr. Rajan, that Mr. Rajan was unjustly enriched, and that he fraudulently induced Mr. Bunce. In the event this Court denies Plaintiff's motion for summary judgment on the unjust enrichment and fraudulent inducement claims, Plaintiff requested that this Court impose sanctions

7

under Rule 37(b)(2)(A)(ii) and bar Defendants "from putting up any evidence to rebut" Plaintiff's claims. Hearing Transcript at 57-58. Defense counsel requested a lesser sanction that a negative inference be submitted to the jury that VTI used Mr. Bunce's "funds for purposes other than the business purposes agreed to." Hearing Transcript at 45. Defendants argued that inferring that Mr. Rajan used Mr. Bunce's funds "for his personal purposes is one removed." *Id.* They reasoned that the non-disclosed discovery materials were records of VTI, not Mr. Rajan, and so the negative inference should be against VTI only. *Id.*

If the Court were to award Plaintiff's preferred sanctions under Rule 37(b)(2)(A)(i), that would equate to Plaintiff's preferred disposition of the claims. The Court is not willing to impose such severe sanctions without stronger evidence of Mr. Rajan's personal fault in violating the Court's discovery order. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Rather, the Court imposes the lesser sanction under Rule 37(b)(2)(A)(ii) on Defendants for their failure to comply with the discovery order. *Victaulic Co. v. HiTHERM*, LLC, No. CV 21-5077, 2024 WL 1364258, at *5 (E.D. Pa. Mar. 28, 2024) (finding the lesser sanction of Rule 37(b)(2)(A)(ii) to be more appropriate than Rule 37(b)(2)(A)(i), under the circumstances). Specifically, Defendants are prohibited from introducing evidence opposing Plaintiff's unjust enrichment and fraudulent inducement claims.

### C. ALTER EGO

The second threshold issue this Court must decide before ruling on the unjust enrichment and fraudulent inducement claims is whether VTI was an alter ego of Mr. Rajan.

There is no actual conflict between Pennsylvania and Nevada law on these claims. *Compare Mortimer v. McCool*, 667 Pa. 134, 148 (2021) *with LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904 (2000); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). Plaintiff

8

briefed his arguments under Nevada law, without any objections from Defendants, so this Court applies Nevada law. Pl.'s Mot. for Summ. J. at 21.

The elements of finding an alter ego are: "(1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice." *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904 (2000). The following factors may indicate an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities. *Id*. The elements of an alter ego must be established by a preponderance of the evidence. *Id*. "There is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 602 (1987). Here, the undisputed facts conclude that Mr. Rajan was indeed the alter ego of VTI.

### i. Mr. Rajan was VTI's Majority Shareholder and Sole Officer.

Mr. Rajan's control over VTI is demonstrated by his officer positions and ownership stake in VTI. Mr. Rajan was VTI's sole officer. He was its President, Treasurer, Secretary, as well as its majority shareholder. *Id*. ¶¶ 4-5; ECF No. 108-15; *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904-05 (2000) ("ownership of corporate shares is a strong factor favoring unity of ownership and interest"). Thus, Mr. Rajan's structural control over VTI weighs in favor of finding alter ego status. *LFC Mktg.*, 116 Nev. At 904-05 (a defendant, who considered himself to be "president and CEO" and the "primary owner" of a company, was the alter ego of the company).

### ii. VTI's Other Directors do not Shield Mr. Rajan from Alter Ego Status.

Although VTI had other directors besides Mr. Rajan, the timing of their appointment cancels out this fact as favorable for Mr. Rajan.  For background, Mr. Rajan was VTI's sole director as of January 6, 2021.  Three other directors—Tracy Rees, Glenn Hasen, and Cliff Morton—were all appointed on April 7, 2021.  Their end dates as directors are undocumented.  Two other directors—Timothy McCarthy and Sofia Kheddouci—served as directors from April 28, 2021, to October 28, 2021.  Defs. Interrog. Resp. ¶ 6.  The only actions these directors took were to appoint other directors and to approve a debtor-in-possession financing term sheet so VTI could loan money to Stream TV.  *Id.* ¶ 7; ECF No. 108-18; ECF No. 108-20.  But before any other directors were appointed to the VTI board, VTI loaned $300,000 of Plaintiff's funds, against their agreement,[2] to Stream TV on March 24, 2021.  At that time, Mr. Rajan was VTI's sole director.  Therefore, VTI's subsequent appointment of five directors does not rehabilitate a finding against alter ego status, especially when Mr. Rajan—who was VTI's sole director, officer, and majority shareholder at the time of Plaintiff's $300,000 loan—subsequently loaned these funds to Stream TV, a company Mr. Rajan founded and was CEO.

### iii. VTI had no Parent or Subsidiary Companies.

Although not sufficient on its own, VTI's lack of parent or subsidiary companies may indicate that VTI was being used as a mere instrumentality of Mr. Rajan.  Defs. Interrog. Resp. ¶¶ 1-2.  Where a more complex corporate structure may have provided checks and balances on any one person controlling VTI's finances and operations, a simple and unlayered structure may permit an easier pathway to personal control and breakdown of corporate formalities.  Thus, the lack of

---

[2]        *See* discussion *infra* Section III.E.

10

parent or subsidiary relationships may reinforce the inference that VTI was not operating as its own entity, but merely as an alter ego of Mr. Rajan.

### iv.  VTI had no Employees and Substantially Underdelivered on Sales.

Moreover, there were no employees of VTI,[3] and VTI never used accounting services. Defs. Interrog. Resp. ¶¶ 3, 12.  This suggests that VTI lacked the operational independence expected of a company that planned to sell 3-D tablets and screens in order to finance VTI's prospects to go public.  Those prospects are called into doubt as VTI only sold five tablets for $5,999.13. *Id.* ¶ 14.  The lack of internal personnel bolsters a finding that VTI was ill-equipped to manage its own affairs or maintain its stated goal to sell tablets and screens to finance its transition to a public entity.  VTI's low sales is evidence that VTI instead existed to further Mr. Rajan's personal interest to fund Stream TV's bankruptcy proceedings, an entity of which Mr. Rajan was the founder, shareholder, and CEO.

Plaintiff also claimed that commingling is a factor weighing in favor of finding VTI to be Mr. Rajan's alter ego.  However, VTI commingled Plaintiff's funds with other investor money. Pl.'s Mot. for Summ. J. at 22.  Commingling investor funds is not the same as commingling company funds with personal funds.  In any event, the Court finds that the above undisputed facts establish VTI as Mr. Rajan's alter ego. *Carson Meadows Inc. v. Pease*, 91 Nev. 187, 191 (1975). Honoring VTI's superficial separateness from Mr. Rajan would promote injustice by barring Plaintiff from proceeding with his unjust enrichment and fraudulent inducement claims for actions Mr. Rajan committed through VTI.

---

[3]  Defense counsel tried to argue otherwise on a technicality; specifically, that the interrogatory question was phrased in the present tense.  Hearing Transcript at 44.  Counsel argued that at the time that VTI answered the interrogatory, January 2024, Mr. Rajan was the only officer, but the relevant time would have been three years earlier at the time of the alleged misconduct. *Id.*  Once again, the Court is not convinced by Defense counsel's attempts to clean up past discovery.  The interrogatory states "Please identify all employees of Visual Technology Innovations, Inc. by name, position, date of hire, *end date of employment (if any)*, annual salary or hourly wage[,]" clearly indicating that the question did not have a temporal qualification.  Defs. Interrog. Resp. ¶ 3 (emphasis added).

### D.  UNJUST ENRICHMENT

To recover on an unjust enrichment claim, a plaintiff must demonstrate that a benefit was conferred on the defendant by the plaintiff, the defendant appreciated the benefit, and the defendant's acceptance and retention of the benefit occurred under such circumstances that it would be inequitable for the defendant to retain it without payment." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir.2010); *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 113 Nev. 747, 755 (1997).

Plaintiff's unjust enrichment claim is bifurcated.  Plaintiff argued (i) that VTI, as Mr. Rajan's alter ego, improperly loaned $300,000 of Plaintiff's funds to Stream TV for its bankruptcy proceedings for the purpose of keeping Mr. Rajan in control of Stream TV; and (ii) that Mr. Rajan used the remaining $720,000[4] of the $1,020,000 for his personal benefit.[5]  The Court addresses each argument in turn.

#### i.   The $300,000 Loan did not Unjustly Enrich Mr. Rajan.

On March 24, 2021, VTI loaned $300,000 of Plaintiff's funds to Stream TV in its bankruptcy proceedings.  ECF No. 108-16.  Defense counsel did not contest this fact at the August 27, 2025 hearing.  Hearing Transcript at 46.  Plaintiff argued that Mr. Rajan, using VTI as his alter ego, improperly used Plaintiff's loan to pay Stream TV's bankruptcy lawyers for the ultimate goal of Mr. Rajan maintaining control over Stream TV.  Pl.'s Mot. for Summ. J. at 22.

Defense counsel argued there was no personal benefit to Mr. Rajan.  Hearing Transcript at 50.  The VTI loan to Stream TV during its bankruptcy was allegedly an attempt to control Stream

---

[4]     As noted above, Plaintiff received $30,000 from Defendants, bringing the total amount due down to $1,020,000.

[5]     In Plaintiff's briefing, he phrased his unjust enrichment claim as an alternative to his breach-of-contract claim.  Pl.'s Mot. for Summ. J. at 20.  But at the August 27, 2025 hearing, counsel clarified that the unjust enrichment claim does not depend on the breach-of-contract claim.  Hearing Transcript at 33.

12

TV by obtaining Stream TV's stocks, not its assets. *Id*. at 48. However, that plan was denied by the bankruptcy court, and VTI never became the parent company of Stream TV via a stock purchase. *Id*. at 49. So, Defendants argued, there ultimately was no personal benefit to Mr. Rajan because he never regained control of Stream TV. *See In re Stream TV Networks, Inc.*, BR 23-10763, 2024 WL 87639, at * 36 (Bankr. E.D. Pa. Jan. 5, 2024); *see* Docs. 89-14 - 89-16.

The pertinent disagreement between both parties is whether an *attempt* to enrich is sufficient in an unjust enrichment claim. The Court finds that it is not. The Court has already found VTI to be Mr. Rajan's alter ego, so it is concluded that VTI's $300,000 loan of Plaintiff's funds to Stream TV was done on Mr. Rajan's behalf. But although Mr. Rajan attempted to enrich himself by maintaining control over Stream TV during its bankruptcy, he did not actually receive that benefit in the end. The gravamen of an unjust enrichment claim is the retention of an unearned, undeserved benefit. If the attempt to enrich did not result in a benefit, whether intended or not, then no benefit was actually retained.

For example, in *In re Wolf*, the plaintiff deposited a check into an the defendant's bank account, even though the check pertained to a transaction between the plaintiff and the defendant's corporation. 573 B.R. 179, 186 (E.D. Pa. 2017), *aff'd*, 739 F. App'x 165 (3d Cir. 2018). The plaintiff never received a car, as promised in the contract between the plaintiff and the defendant's corporation. *Id*. The plaintiff sued the individual defendant for unjust enrichment, but the court found that the individual defendant was not enriched because he used the plaintiff's payment to pay corporate debts. Therefore, the individual defendant was not himself enriched. *Id.* Similarly here, Mr. Rajan never received a personal benefit. He attempted to and failed, which is not sufficient for an unjust enrichment claim. Therefore, Plaintiff's motion for summary judgment

with respect to the unjust enrichment claim for the $300,000 loan to Stream TV is denied, and Defendants' motion is granted on this limited issue.

### ii. Defendants May Not Introduce Evidence Opposing Plaintiff's Unjust Enrichment Claim on the Remaining $720,000.

Because Defendants did not produce necessary information in discovery, the unjust enrichment claim on the remaining $720,000 loan proceeds to trial with the sanction that Defendants may not introduce evidence opposing this claim. Plaintiff sought discovery of VTI's use of his loan for the very purpose of establishing the evidence underlying his unjust enrichment claim. However, in defiance of this Court's order, Defendants still did not disclose this information, thereby depriving Plaintiff of the opportunity to establish his unjust enrichment claim with evidence on a motion for summary judgment. As noted above, *supra* Section III.B, Plaintiff requested sanctions under Rule 37(b)(2)(A)(i), but this Court opted instead to impose sanctions under Rule 37(b)(2)(A)(ii). Accordingly, both Plaintiff and Defendants' motions for summary judgment on the unjust enrichment claim—specifically regarding the remaining $720,000 of Plaintiff's loan for which there is no evidence of how it was used—are denied. However, this claim may proceed to trial, subject to the sanction imposed on Defendants: they are precluded from introducing evidence to oppose Plaintiff's unjust enrichment claim as it relates to the remaining $720,000.

### E.  FRAUDULENT INDUCEMENT

Last, Mr. Rajan is found to have fraudulently induced Plaintiff into making the loan. Fraud in the inducement alleges that one party misrepresented another party to induce a contractual agreement. *Ruggiero v. Nocenti*, 556 F. Supp. 3d 512, 527 (E.D. Pa. 2021). Plaintiff must establish, by clear and convincing evidence: "(1) a representation; (2) which is material to the

14

transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Id.* Nevada law does not materially differ. *See J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 290 (2004).

Here, VTI's Investor Presentation is sufficient to establish a fraudulent inducement claim. On February 17, 2021, Glen Davis—an agent of VTI and Mr. Rajan[6]—sent Plaintiff an Investor Presentation of VTI. Investor Presentation. At the time that this email was sent, Mr. Rajan was the only director and officer of VTI. Defs. Interrog. Resp. ¶ 6. Defendants do not dispute the Investor Presentation's authenticity. ECF No. 108-4 ¶ 4.

The Investor Presentation contained numerous, discrete misrepresentations. These misrepresentations are (i) VTI had a "Management team with High-Tech Experience," (iii) Tracey Rees was President of VTI, (iv) Bud Robertson was Executive VP of VTI, (v) Cliff Morton was VP, Engineering for VTI, (vi) VTI had a "Technical & Sales Team" consisting of four people, (vii) VTI had an "[e]xisting [r]elationship[ ]" and "strategic partnership with the world's biggest panel manufacturer," BOE, (viii) VTI had "[e]stablished R&D subsidiary with 20+ person engineering team and on-site 3D bonding capability and "[e]stablished subsidiaries in China for manufacturing & sales." Investor Presentation at 16-17, 19, 25; Defs. Interrog. Resp. ¶¶ 1-3, 10.

In addition to these discrete misrepresentations, Mr. Rajan also misrepresented the purpose of Plaintiff's loan. In Plaintiff's declaration, he declares that Mr. Davis contacted him to convey that VTI was raising money to purchase Stream TV's patents and assets. ECF No. 108-22 ¶ 13.

---

[6]      It is undisputed that Mr. Davis was an agent of VTI. ECF No. 108-4 ¶ 20; Hearing Transcript at 50-51. The Court has already determined VTI to be the alter ego of Mr. Rajan, *see supra* Section III.C. Consequently, conduct by Mr. Davis is imputed to VTI, and conduct by VTI is imputed to Mr. Rajan.

15

Even if we do not take Plaintiff's word as truth on the motions for summary judgment, the Investor Presentation itself stated that Plaintiff's contribution is a precursor investment "to finance the purchase orders, fulfillment and shipping of current orders of 5,000 off Glasses Free 3-D 8" Tablets and 5 off 250" large exterior signage screens . . . plus the ever present expensive lawyers." Investor Presentation at 46. After which, an institutional investor was to invest $30 million to enable the acquisition of "a company in the sector," namely, Stream TV. *Id.* As the Court sees it, the debate here revolves around the meaning of "plus the ever present expensive lawyers." The bullet point structure of the deal summary does not permit an interpretation that the phrase "plus the ever present expensive lawyers" included VTI making payments to Stream TV in its bankruptcy proceedings. A reasonable reading of the unambiguous language, which comports with Plaintiff's argument, was that his investment would be used to sell tablets and screens, which shall include lawyer costs to make those sales. Therefore, Mr. Rajan, who was the only VTI officer and director at the time of loaning Stream TV $300,000, was using VTI to funnel money into Stream TVs bankruptcy proceedings—in contradiction of VTI's representations to Plaintiff.

Thus, Mr. Rajan fraudulently induced Plaintiff through the Investor Presentation. The misrepresentations were material because the Investor Presentation falsely conveyed that VTI had experienced officers, experienced employees, and valuable market relationships. Moreover, it conveyed that Plaintiff's loan would be used to support the sale of product to trigger further investments to acquire Stream TV and go public. At the time the Investor Presentation was sent to Plaintiff, Mr. Rajan was the only director, only officer, and majority shareholder, and made such misrepresentations in the Investor Presentation with knowledge of their falsity with the intent of misleading Plaintiff to loan $1,050,000. Mr. Rajan then used Plaintiff's funds, in contradiction of

16

the stated purposes set out in the Investor Presentation, to loan $300,000 to Stream TV in its bankruptcy proceedings.

Plaintiff justifiably relied on this Investor Presentation because he had dealt with Mr. Davis concerning other investments.[7]  ECF No. 108-22 ¶ 12.  Plaintiff knew that Stream TV had $150 million in investments and developed valuable intellectual property.  *Id.* ¶ 14.  Defendants represented that Plaintiff's loan would enable VTI product sales to eventually purchase Stream TV's valuable assets through bankruptcy and take VTI public.  Investor Presentation at 46-47. Defendants even gave Plaintiff the option to convert his loan into shares in VTI if it became publicly traded.  As a result of Mr. Rajan's fraudulent inducement, Plaintiff loaned $1,050,000 he would not have otherwise loaned and was injured.  To determine damages for this claim, this Court will hold an evidentiary hearing.

## IV.   CONCLUSION

Based on the foregoing, Plaintiff's motion on the breach of contract and fraudulent inducement claims is granted.  Plaintiff's motion on the unjust enrichment is denied, and Defendants' motion on the unjust enrichment claim is granted in part.

---

[7]      Defendants claimed there can be no justifiable reliance because of a no-reliance contractual provision in the Convertible Note Agreement, stating:

> "Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification."

ECF No. 1-7 at 6; Hearing Transcript at 52.  This was a clause in the Convertible Loan Agreement, which this Court has already declared inapplicable to this case given that Mr. Bunce never opted to convert his loans into shares.  ECF No. 28 at 7-8.

BY THE COURT:

_____

**HON. KAI N. SCOTT**
**United States District Court Judge**

# App. Ex. 73

Message

| | |
|---|---|
| **From:** | Zahralddin, Rafael [Rafael.Zahralddin@lewisbrisbois.com] |
| on behalf of | Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> [Rafael.Zahralddin@lewisbrisbois.com] |
| **Sent:** | 10/24/2024 9:27:52 AM |
| **To:** | Callahan, Kevin P. (USTP) [Kevin.P.Callahan@usdoj.gov] |
| **CC:** | Schanne, John (USTP) [John.Schanne@usdoj.gov] |
| **Subject:** | Re: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks |

Thanks.


Rafael X. Zahralddin
302.545.2888
Sent from my iPhone


On Oct 24, 2024, at 9:16 AM, Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov> wrote:


> EXTERNAL

Hi Rafael,
 I'm in court. Should be out in 15-20 minutes.

Will call.
k


**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, October 24, 2024 8:19 AM
**To:** Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**Cc:** Schanne, John (USTP) <John.Schanne@usdoj.gov>
**Subject:** [EXTERNAL] Re: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

Kevin - let me know when you are around.

Would like to sort out the fee application and I have some authority to do so.

Thank you.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone


<image001.png>    **Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

LBBS0000369

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<image002.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Oct 3, 2024, at 11:11 AM, Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov> wrote:

EXTERNAL

# Thank you Rafael.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Thursday, October 3, 2024 11:09 AM
**To:** Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**Cc:** Schanne, John (USTP) <John.Schanne@usdoj.gov>
**Subject:** [EXTERNAL] RE: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

If I didn't respond in writing somewhere else, my apologies, my response is of course.  Thanks.

<image001.png>

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<image002.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**Sent:** Wednesday, September 4, 2024 1:12 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>

LBBS0000370

Cc: Schanne, John (USTP) <John.Schanne@usdoj.gov>
Subject: FW: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

EXTERNAL

Hello Rafael,

We are reviewing the Final Application for Compensation for your firm Lewis Brisbois Bisgaard & Smith LLP and ask that you consent to an extension of time to October 28 for the UST to respond to the Application, if appropriate.
Please let us know at your earliest convenience.

Thanks,

Kevin Callahan

From: Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
Sent: Thursday, August 29, 2024 11:40 AM
To: Gannone, James (USTP) <James.Gannone@usdoj.gov>; Lambe, James B. (USTP) <James.B.Lambe@usdoj.gov>
Cc: Baker, Frederic J. (USTP) <Frederic.J.Baker@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>
Subject: RE: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

Spoke to trustee's counsel Mike Vagnoni about LBBS' fee application. He will ask Rafael for extension of sixty days to respond. I told him that the UST will also request an extension.

Kevin

From: Callahan, Kevin P. (USTP)
Sent: Thursday, August 29, 2024 10:54 AM
To: Gannone, James (USTP) <James.Gannone@usdoj.gov>; Lambe, James B. (USTP) <James.B.Lambe@usdoj.gov>
Cc: Baker, Frederic J. (USTP) <Frederic.J.Baker@usdoj.gov>; Schanne, John (USTP) <John.Schanne@usdoj.gov>
Subject: FW: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

Jim and James,
Please review.

From: Baker, Frederic J. (USTP) <Frederic.J.Baker@usdoj.gov>
Sent: Thursday, August 29, 2024 9:06 AM
To: Schanne, John (USTP) <John.Schanne@usdoj.gov>; Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
Subject: FW: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

We should get Jim Lambe to look at all the fee applications and time records. I have some concern with the "Business" category and whether this involves legal services. I also would want James Gannone to look at the time devoted to the financial filings and whether these involve legal services and was the product produced worth the billing amounts.

LBBS0000371

*Frederic J. Baker*
Assistant United States Trustee
Robert N.C. Nix Federal Courthouse
900 Market Street, Suite 320
Philadelphia, PA 19107
215-597-5816(ph)
215-597-5795 (fax)

This message and any attachments are intended only for addressee and may contain information that is privileged, "Limited Official Use," or "Sensitive But Unclassified." If the reader of the message is not the intended recipient, then any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this e-mail message or by telephone at the number above, and delete the message and any attachments from your system. Thank you.

**From:** Schanne, John (USTP) <John.Schanne@usdoj.gov>
**Sent:** Wednesday, August 28, 2024 4:24 PM
**To:** Baker, Frederic J. (USTP) <Frederic.J.Baker@usdoj.gov>; Callahan, Kevin P. (USTP) <Kevin.P.Callahan@usdoj.gov>
**Subject:** FW: Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

Final fee application for LBBS was just docketed in Stream.

Approx. $2.9 MM in fees are requested. Plus expenses.

We'll need consider our response. I'm sure there will be objections from the purported secured creditors and the chapter 11 trustee (at least with respect to timing by Homony).

**From:** BKECF_LiveDB@paeb.uscourts.gov <BKECF_LiveDB@paeb.uscourts.gov>
**Sent:** Wednesday, August 28, 2024 4:11 PM
**To:** Courtmail@paeb.uscourts.gov
**Subject:** Ch-11 23-10763-amc Application for Compensation - Stream TV Networks

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.**

### U.S. Bankruptcy Court
### Eastern District of Pennsylvania

Notice of Electronic Filing

The following transaction was received from RAFAEL X. ZAHRALDDIN entered on 8/28/2024 at 4:10 PM EST and filed on 8/28/2024

| | |
|---|---|
| **Case Name:** | Stream TV Networks, Inc. and Technovative Media, Inc. |
| **Case Number:** | 23-10763-amc |
| **Document Number:** | 723 |

**Docket Text:**
Final Application for Compensation for Lewis Brisbois Bisgaard & Smith LLP, Debtor's Attorney, Period:

LBBS0000372

3/15/2023 to 1/15/2024, Fee: $2,928,159.00, Expenses: $49,799.10. Filed by RAFAEL X. ZAHRALDDIN Represented by Self(Counsel). (Attachments: # (1) Exhibit A) (ZAHRALDDIN, RAFAEL)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**Stream - Final Fee Application(142385380.1)(144647601.1).pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=8/28/2024] [FileNumber=32196727-0] [5531af74d2c45dd0d11613c37e9036aa1843c959bad0354069a25d29816b97c1b5 b9eac036bf079c73d81fbdafe3d2c1f8a7215555ab132bd11eb0af60bb1efa]]
**Document description:**Exhibit A
**Original filename:**C:\fakepath\Stream - Exhibit A to Final Application.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=8/28/2024] [FileNumber=32196727-1] [17ada6c4efd8bc9566a44496a04876b5aed30395e40c04200895c1a8f78196a0d8 da9feb612fd29d08500df1b86984495e62c88e37a42bfdd827ad7c42829873]]

### 23-10763-amc Notice will be electronically mailed to:

VINCENT F. ALEXANDER on behalf of Debtor Technovative Media, Inc.
valexander@shutts.com

LESLIE BETH BASKIN on behalf of Debtor In Possession Visual Semiconductor, Inc.
lbaskin@sgrvlaw.com, klove@sgrvlaw.com

ANDREW J. BELLI on behalf of William A Homony
abelli@kcr-law.com

ANDREW J. BELLI on behalf of Trustee WILLIAM A. HOMONY
abelli@kcr-law.com

KEVIN P. CALLAHAN on behalf of U.S. Trustee United States Trustee
kevin.p.callahan@usdoj.gov

STEVEN M. COREN on behalf of William A Homony
scoren@kcr-law.com, ccapra@kcr-law.com

STEVEN M. COREN on behalf of Trustee WILLIAM A. HOMONY
scoren@kcr-law.com, ccapra@kcr-law.com

Steven Caponi on behalf of Creditor Hawk Investment Holdings Ltd.
steven.caponi@klgates.com, alyssa.domorod@klgates.com;kay.laplante@klgates.com

Steven Caponi on behalf of Defendant HAWK INVESTMENT HOLDINGS LIMITED
steven.caponi@klgates.com, alyssa.domorod@klgates.com;kay.laplante@klgates.com

Steven Caponi on behalf of Defendant ARTHUR LEONARD ROBERT "BOB" MORTON
steven.caponi@klgates.com, alyssa.domorod@klgates.com;kay.laplante@klgates.com

ANDREW PETER DEMARCO on behalf of Rembrandt 3D Holding Ltd.
ademarco@devlinlawfirm.com, dlflitparas@devlinlawfirm.com

LBBS0000373

ANDREW PETER DEMARCO on behalf of Creditor Rembrandt 3D Holding Ltd.
ademarco@devlinlawfirm.com, dlflitparas@devlinlawfirm.com

Donald N. David on behalf of Creditor Visual Semiconductor, Inc.
donald.david@akerman.com

KATHERINE M. FIX on behalf of Interested Party SLS Holdings VI, LLC
kfix@rc.com

NICHOLAS E HAKUN on behalf of Interested Party Ian R. Liston in his capacity as the state court appointed
receiver pendente lite of the operations of Technovative Media, Inc.
nhakun@wsgr.com, nhakun@gmail.com

WILLIAM A. HOMONY
bhomony@mctllp.com, mtomlin@mctllp.com

JENNIFER R. HOOVER on behalf of Interested Party IMG Media Limited
jhoover@beneschlaw.com, docket2@beneschlaw.com;lmolinaro@beneschlaw.com

JENNIFER R. HOOVER on behalf of Interested Party Trans World International, LLC
jhoover@beneschlaw.com, docket2@beneschlaw.com;lmolinaro@beneschlaw.com

JEFFREY KURTZMAN on behalf of Creditor SSG Advisors, LLC
Kurtzman@kurtzmansteady.com

Joseph Oliver Larkin on behalf of Defendant SeeCubic, Inc.
joseph.larkin@skadden.com,
christopher.heaney@skadden.com;wendy.lamanna@skadden.com;andrea.bates@skadden.com;ecf-
7f0a8f590dc1@ecf.pacerpro.com

Joseph Oliver Larkin on behalf of Interested Party SeeCubic, Inc.
joseph.larkin@skadden.com,
christopher.heaney@skadden.com;wendy.lamanna@skadden.com;andrea.bates@skadden.com;ecf-
7f0a8f590dc1@ecf.pacerpro.com

JOHN HENRY SCHANNE on behalf of U.S. Trustee United States Trustee
John.Schanne@usdoj.gov

RANDALL ADAM SWICK on behalf of Creditor Visual Semiconductor, Inc.
adam.swick@akerman.com, teresa.barrera@akerman.com;valerie.braun@akerman.com

PAMELA ELCHERT THURMOND on behalf of Creditor CITY OF PHILADELPHIA
pamela.thurmond@phila.gov

United States Trustee
USTPRegion03.PH.ECF@usdoj.gov

MICHAEL D. VAGNONI on behalf of William A Homony
michael.vagnoni@obermayer.com,
Lucille.acello@obermayer.com;helen.belair@obermayer.com;coleen.schmidt@obermayer.com;kathleen.jordan
@obermayer.com

LBBS0000374

MICHAEL D. VAGNONI on behalf of Debtor Stream TV Networks, Inc.
michael.vagnoni@obermayer.com,
Lucille.acello@obermayer.com;helen.belair@obermayer.com;coleen.schmidt@obermayer.com;kathleen.jordan
@obermayer.com

MICHAEL D. VAGNONI on behalf of Debtor Technovative Media, Inc.
michael.vagnoni@obermayer.com,
Lucille.acello@obermayer.com;helen.belair@obermayer.com;coleen.schmidt@obermayer.com;kathleen.jordan
@obermayer.com

MICHAEL D. VAGNONI on behalf of Trustee WILLIAM A. HOMONY
michael.vagnoni@obermayer.com,
Lucille.acello@obermayer.com;helen.belair@obermayer.com;coleen.schmidt@obermayer.com;kathleen.jordan
@obermayer.com

MARGARET ANN VESPER on behalf of Creditor Shadron L. Stastney
vesperm@ballardspahr.com

MARGARET ANN VESPER on behalf of Defendant SHADRON L STASTNEY
vesperm@ballardspahr.com

MARGARET ANN VESPER on behalf of Interested Party Shadron L. Stastney
vesperm@ballardspahr.com

DAVIS LEE WRIGHT on behalf of Defendant SLS Holdings VI, LLC
dwright@rc.com

DAVIS LEE WRIGHT on behalf of Interested Party SLS Holdings VI, LLC
dwright@rc.com

RAFAEL X. ZAHRALDDIN on behalf of Debtor Stream TV Networks, Inc.
Rafael.Zahralddin@lewisbrisbois.com, rafael-zahralddin-4117@ecf.pacerpro.com;lewisbrisbois@ecfalerts.com

RAFAEL X. ZAHRALDDIN on behalf of Debtor Technovative Media, Inc.
Rafael.Zahralddin@lewisbrisbois.com, rafael-zahralddin-4117@ecf.pacerpro.com;lewisbrisbois@ecfalerts.com

RAFAEL X. ZAHRALDDIN on behalf of Plaintiff Stream TV Networks, Inc.
Rafael.Zahralddin@lewisbrisbois.com, rafael-zahralddin-4117@ecf.pacerpro.com;lewisbrisbois@ecfalerts.com

RAFAEL X. ZAHRALDDIN on behalf of Plaintiff Technovative Media, Inc.
Rafael.Zahralddin@lewisbrisbois.com, rafael-zahralddin-4117@ecf.pacerpro.com;lewisbrisbois@ecfalerts.com

**23-10763-amc Notice will not be electronically mailed to:**

BMC Group Inc.
600 First Ave
Seattle, WA 98104

SEAN M. BRENNECKE on behalf of Debtor Stream TV Networks, Inc.
Lewis Brisbois Bisgaard & Smith, LLP
500 Delaware Avenue, Suite 700
Wilmington, DE 19801

LBBS0000375

MARLEY ANN BRUMME on behalf of Defendant SeeCubic, Inc.
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street, 23rd Floor
Boston, MA 02116

MARLEY ANN BRUMME on behalf of Interested Party SeeCubic, Inc.
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street, 23rd Floor
Boston, MA 02116

EBEN P. COLBY on behalf of Defendant SeeCubic, Inc.
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street, 23rd Floor
Bosom, MA 02116

EBEN P. COLBY on behalf of Interested Party SeeCubic, Inc.
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street, 23rd Floor
Bosom, MA 02116

STEVEN M. COREN
Coren & Ress, P.C.
Two Commerce Square
2001 Market Street Suite 3900
Philadelphia, PA 19103

SCOTT D. COUSINS on behalf of Debtor Stream TV Networks, Inc.
1201 Orange Street
P.O. Box 491
Wilmington, DE 19899-0391

SCOTT D. COUSINS on behalf of Debtor Technovative Media, Inc.
1201 Orange Street
P.O. Box 491
Wilmington, DE 19899-0391

JONATHAN N. EDEL on behalf of Creditor Hawk Investment Holdings Ltd.
300 South Tryon St. ste 1000
Charlotte, NC 28202

JONATHAN N. EDEL on behalf of Creditor Hawk Investment Holdings Ltd.
K&L Gates LLP
300 South Tryon Street
Ste 1000
Charlotte, NC 28202

ERIN R. FAY on behalf of Interested Party Ian R. Liston in his capacity as the state court appointed receiver
pendente lite of the operations of Technovative Media, Inc.
Wilson Sonsini Goodrich & Rosati, P.C.
222 Delaware Avenue
Suite 800

LBBS0000376

Wilmington, DE 19801

BENNETT G. FISHER on behalf of Debtor Stream TV Networks, Inc.
Lewis Brisbois Bisgaard & Smith LLP
24 Greenway Plaza, Suite 1400
Houston, TX 77046

BENNETT G. FISHER on behalf of Debtor Technovative Media, Inc.
Lewis Brisbois Bisgaard & Smith LLP
24 Greenway Plaza
Ste 1400
Houston, TX 77046

CATHERINE C. LYONS on behalf of Interested Party Ian R. Liston in his capacity as the state court appointed receiver pendente lite of the operations of Technovative Media, Inc.
Wilson Sonsini Goodrich & Rosati, P.C.
222 Delaware Avenue
Suite 800
Wilmington, DE 19801

JUDGE PATRICIA M. MAYER
201 Penn Street, 4th Floor
The Gateway Building
Reading, PA 19601

JAMES J. MAZZA, JR. on behalf of Interested Party SeeCubic, Inc.
Skadden Arps Slate Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606-1720

Miller Coffey Tate
1628 John F Kenndy Blvd.
Suite 950
Philadelphia, Pa 19103

MEGAN E. O'CONNOR on behalf of Creditor Hawk Investment Holdings Ltd.
K&L Gates LLP
600 King Street
Suite 901
Wilmington, DE 19801

MEGAN E. O'CONNOR on behalf of Creditor Hawk Investment Holdings Ltd.
K&L Gates LLP
600 King Street
Suite 901
Wilmington, DE 19801

REBECCA L. RITCHIE on behalf of Interested Party SeeCubic, Inc.
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606-1720

LBBS0000377

AARON S. ROTHMAN on behalf of Creditor Hawk Investment Holdings Ltd.
K&L Gates LLP
300 South Tryon Street
Suite 1000
Charlotte, NC 28202

Aaron ROTHMAN on behalf of Creditor Hawk Investment Holdings Ltd.
300 South Tryon St. ste 1000
Charlotte, NC 28202

JOHN H. THOMPSON on behalf of Creditor Visual Semiconductor, Inc.
Akerman LLP
750 9th Street NW, Suite 750
Washington, DC 20001

THOMAS A. WARNS on behalf of Creditor Hawk Investment Holdings Ltd.
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022

MARGARET R. WESTBROOK on behalf of Creditor Hawk Investment Holdings Ltd.
K&L Gates LLP
300 South Tryon Street
Suite 1000
Charlotte, NC 28202

JUSTIN M. WINERMAN on behalf of Interested Party SeeCubic, Inc.
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606-1720

Margaret Westbrook on behalf of Creditor Hawk Investment Holdings Ltd.
300 South Tryon St. ste 1000
Charlotte, NC 28202

LBBS0000378

# App. Ex. 74

Message

---

**From:** Zahralddin, Rafael [Rafael.Zahralddin@lewisbrisbois.com]
**on behalf of** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> [Rafael.Zahralddin@lewisbrisbois.com]
**Sent:** 10/10/2025 5:52:58 PM
**To:** Bud Robertson [bud.robertson@visualsemi.com]
**Subject:** Fw: Ch- 24-00142-djb Stipulation - Rembrandt 3D Holdi

Get Outlook for iOS

---

**From:** BKECF_LiveDB@paeb.uscourts.gov <BKECF_LiveDB@paeb.uscourts.gov>
**Sent:** Friday, October 10, 2025 12:41:22 PM
**To:** Courtmail@paeb.uscourts.gov <Courtmail@paeb.uscourts.gov>
**Subject:** Ch- 24-00142-djb Stipulation - Rembrandt 3D Holdi

EXTERNAL

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.**

## U.S. Bankruptcy Court

## Eastern District of Pennsylvania

Notice of Electronic Filing

The following transaction was received from ANDREW PETER DEMARCO entered on 10/10/2025 at 12:41 PM EST and filed on 10/10/2025

**Case Name:**       Rembrandt 3D Holding Ltd. v. Homony et al
**Case Number:**     24-00142-djb
**Document Number:**   15

**Docket Text:**
Stipulation By Rembrandt 3D Holding Ltd. and Between Defendants Shadron L. Stastney, SeeCubic, Inc. and SeeCubic, B.V. *TO STAY ALL DEADLINES.* Filed by ANDREW PETER DEMARCO on behalf of Rembrandt 3D Holding Ltd.. (DEMARCO, ANDREW)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** 2025-10-10 Rembrandt No. 142 - Joint Stipulation to Stay Case.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=10/10/2025] [FileNumber=33018492
-0] [3b358f36c772da3d25f2e1ae0740a6058f5aeac215141dd57b12692bafe6f8efa
ef04cf634f1aae53be1bf755b05fd985f735016840b68f2684bd3903fcdf628]]

LBBS0000144

**24-00142-djb Notice will be electronically mailed to:**

STEVEN M. COREN on behalf of Defendant William A. Homony
scoren@kcr-law.com, ccapra@kcr-law.com

ANDREW PETER DEMARCO on behalf of Plaintiff Rembrandt 3D Holding Ltd.
ademarco@devlinlawfirm.com, dlflitparas@devlinlawfirm.com

RAFAEL X. ZAHRALDDIN on behalf of Defendant Stream TV Networks, Inc.
Rafael.Zahralddin@lewisbrisbois.com, rafael-zahralddin-4117@ecf.pacerpro.com;lewisbrisbois@ecfalerts.com

RAFAEL X. ZAHRALDDIN on behalf of Defendant Technovative Media, Inc.
Rafael.Zahralddin@lewisbrisbois.com, rafael-zahralddin-4117@ecf.pacerpro.com;lewisbrisbois@ecfalerts.com

**24-00142-djb Notice will not be electronically mailed to:**

Hawk Investment Holdings, Ltd.
,

Christopher A. Michaels on behalf of Plaintiff Rembrandt 3D Holding Ltd.
Brown and Michaels, P.C.
118 North Tioga Street
Ithaca, NY 14850

SeeCubic, B.V.
,

SeeCubic, Inc.
,

Shadron L. Stastney
,

LBBS0000145